# EXHIBIT C

TECH

# HOW UTAH'S TECH INDUSTRY TRIED TO DISRUPT CORONAVIRUS TESTING

By **Robert P. Baird**

June 13, 2020



*A pandemic, one doctor said, "is not the time for amateurs to learn."*  Illustration by Ben Wiseman

At a White House briefing, on April 23rd, Mike Pence offered what he described as "encouraging news" about COVID-19 testing. Commercial labs, he said, were processing a hundred thousand tests per day, and a number of states had developed "methods that they are employing to significantly increase testing." One of the specific efforts that Pence identified was Test Iowa, a public-private partnership that the Vice-President said would "triple testing capacity" in the state. In the course of introducing the initiative, Pence mentioned two of the companies behind the project: Nomi Health, a health-care startup, and Domo, a cloud-software firm. Josh James, the founder of Domo, was ecstatic. "You've got to be kidding me!!" he wrote on Twitter. "So stoked that all of my team's work and all their all-nighters are paying off."

Test Iowa was, in fact, the second statewide testing initiative launched by a group of Utah tech companies that included Nomi, Domo, and Qualtrics, an "experience management" firm. The project had originated, six weeks earlier, in their home state, as a philanthropic effort to respond to the covid-19 pandemic. Since then, it had transformed into a multistate commercial enterprise. The tech executives had procured thousands of covid-19 tests from a local company, arranged for the deployment of mobile testing sites, hired a small army of nurses to collect specimens, partnered with a laboratory near their companies' headquarters, and signed a two-month contract with the state of Utah to provide three thousand tests per day. Their contract also included the development of an online-assessment tool, an algorithm to determine who would get a test, and a data-tracking crisis command center.

Read *The New Yorker's* complete news coverage and analysis of the coronavirus pandemic.

Mark Newman, the thirty-seven-year-old founder of Nomi and one of the major drivers of the initiative, admitted openly that "none of us knew anything about lab testing" at the start of the effort. But Newman was nevertheless confident that a combination of creativity, willpower, and ingenuity had allowed him and a handful of other tech executives, in just a few weeks, to upend the established diagnostic-testing industry. It was, Newman said, "the exact same story of Clayton Christensen and disruptive innovation." Having "put together a low-cost alternative that the incumbent providers just laugh at," he and his colleagues were "going to take over testing capacity, and be the thing that's there to solve this problem." In addition to Utah and Iowa, which had purchased half a million tests, the group eventually signed agreements with state governments in Nebraska and Tennessee. Together, the four contracts were worth more than eighty million dollars.

Despite these apparent successes, significant questions about the program's performance began to appear in public shortly after Pence's press briefing. On April 24th, a columnist for *The Gazette*, in Cedar Rapids, noted that TestUtah had conducted fewer than thirteen thousand tests during the first three weeks of the month, about a quarter of what it had agreed to provide the state. A week later, the Salt Lake *Tribune* published an investigation into the quality of TestUtah's covid-19 tests. Citing internal e-mails from a testing task force that had been organized by the Utah Department of Health, the *Tribune* reported that the initiative's results showed a lower proportion of positive tests than at other labs in the state.

TestUtah, some members of the task force feared, might be missing a significant number of people who were sick with covid-19. "We have been watching TestUtah's positivity rate closely and have had multiple discussions with them about different practices that may be impacting their testing results," one state official wrote to his peers on the task force. Another member of the task force, Bert Lopansri, an infectious-disease doctor at a hospital chain called Intermountain Healthcare, was more direct. "This is a potential public health disaster that will be compounded by the fact that they are constantly promoting themselves publicly," Lopansri wrote. "What alarms me the most is that they are expanding collection and testing with these unknowns about how their test performs." A pandemic, he said, "is not the time for amateurs to learn."

The effort that would become TestUtah began in earnest on March 18th. On a Zoom-enabled virtual "town hall," Newman proposed a plan that included as many as a hundred thousand tests "bought up front for the good of the community." To achieve this, Newman said, Silicon Slopes, a nonprofit that promotes Utah's tech industry, was asking for five million dollars in donations "so that we can increase the volume of tests, access to care, and community support." The tests themselves would come from Co-Diagnostics, a small, publicly traded company based in Salt Lake City. Before the pandemic, Co-Diagnostics had sold

tests for use in agriculture and mosquito abatement in the United States and clinical diagnostic tests abroad; its 2019 annual report said that the company did not "anticipate offering our tests in the United States in the near future." But the dire shortage of COVID-19 tests in the U.S. had caused the F.D.A. to relax its policies for the distribution of new diagnostic tests, which meant that, for the first time, Co-Diagnostics would be able to sell tests for clinical use in the United States.

At the start of the pandemic, Utah had been, in many ways, better equipped than other states to deal with the testing crisis. Besides its public-health laboratory and a large lab operated by Intermountain Healthcare, it was home to ARUP, one of the country's largest reference laboratories. During a Zoom meeting, on March 26th, Angela Dunn, the Utah state epidemiologist, said that the state had more than twice the capacity necessary to test everyone with COVID-19 symptoms. Newman, however, disagreed. "I'll be completely blunt, and I guess I'm sharing more from the perspective of the business community," he said. "I think the posture of, 'We have tests and there's no demand for them' is complete B.S."

Senior members of Utah's state government felt similarly. "From very early on, the governor's office had come forward and said that, in order to effectively crush the curve, we needed to be testing up to seven thousand people a day," Robyn Atkinson-Dunn, who was, until recently, the director of Utah's public-health laboratory, told me. "Because it was felt that the laboratory community wasn't doing enough, the governor's office put out this call to say, 'Hey, whoever thinks they can solve this problem, come talk to us.' And that's when the Silicon Slopes guys came along."

Over the course of two weeks, the tech executives developed what was intended to be a comprehensive statewide testing infrastructure. At the program's official launch, on April 2nd, Utah's governor, Gary Herbert, called TestUtah "a first-of-its-kind public-private partnership." The lieutenant governor, Spencer Cox, whom Herbert had asked to chair the state's coronavirus task force, and who is a candidate to replace Herbert in this fall's gubernatorial election, called the program "a game changer." Two days later, the actor Ashton Kutcher retweeted a post about the program and added, "seems to me we should roll this out state by state." Newman, for his part, estimated that TestUtah would soon be able to process three to five thousand tests per day, and boasted that it was "going to be the hub of absolutely kicking butt across the country."

Within Utah, however, concerns about the initiative arose almost immediately. One question was why TestUtah's online assessment asked users whether they were allergic to hydroxychloroquine, a malaria and lupus drug that raised hopes, early on, of a possible treatment for COVID-19, and whose effects, in the absence of much evidence, President Trump had praised as "like a miracle." From the beginning, Newman had envisioned treatment as a central pillar of TestUtah's efforts, along with assessment and testing. In an e-mail he'd sent to his peers in Utah's tech industry, in March, which was first obtained by the Salt Lake *Tribune*, Newman said that he was negotiating access to twenty thousand "med packs," which included hydroxychloroquine, through a local pharmacy chain called Meds in Motion. By the time TestUtah launched, however, medical opinion had begun to turn against hydroxychloroquine; one prominent Utah physician warned state officials in late March that making the drug available without a prescription, as they had been discussing, "could be a grave mistake medically." On April 24th, the *Tribune* reported that Newman sat on the board of directors of Meds in Motion. The pharmacy chain's owner, anticipating a run on the drug, had purchased eighteen hundred pounds of hydroxychloroquine, some of which he sold to Utah at elevated prices before the state unwound the contract. In a statement, Nomi, Newman's startup, told me that "there was no conflict of interest."

A more persistent concern about TestUtah was its funding. At the launch, Clint Betts, the executive director of Silicon Slopes, had promised that "no tech company is going to make any money off of this. We're going to make sure of that." A few hours later, on a Zoom call with the governor, the lieutenant governor, and others, Ryan Smith, whose company, Qualtrics, had designed the

online assessment for TestUtah, said, "We're happy to help. We're doing it all for free." Smith, who wore a crisp white hoodie and a black Silicon Slopes ball cap, acknowledged that there would always be skeptics, but said that "they should know by now, we're all just trying to help because our families are here. There's nothing else to read into. There's no angle."

By the next day, however, the TestUtah tech execs were offering a different financial picture. On a Zoom call that afternoon, Betts asked Newman to "talk about what we mean by nobody's making a profit, or clarify or help clean up whatever I may have said." Newman told him, "Let's be clear. There are costs in facilitating all of this: tents, generators, heat, electricity, people, cones, security, public safety, tests, swabs, test kits, extraction kits, you name it." Newman did not quite promise not to take any profits. "There will be no profiteering," he said. "If we were going to try to make money, we would tune this up as fast as we can and go sell it to New York." As the *Tribune* would later report, the companies involved in TestUtah had already negotiated their agreements, worth more than five million dollars for two months of services, with the state.

Newman and others in the group had been holding Zoom town halls to track the progress of their initiative. The day after TestUtah launched, he said that more than thirty-five thousand people had completed the digital assessment, more than twenty-five hundred people had scheduled COVID-19 tests, and more than eight hundred had visited one of the two drive-through testing sites to be swabbed. "It took any state weeks and weeks to ramp up to this type of volume," Newman said. "We've done this in twenty-four hours."

On an earlier call, Newman had boasted of creating "an open-source system around the supply chain: the swabs, the transfer kits, the extractive reagent, the test kits, the labs, and the machines to run it." Behind the scenes, however, not everything was running as smoothly as he suggested. According to Atkinson-Dunn, at the state lab, the initiative ran headlong into the same shortages every other lab in the country was facing. "They needed swabs," she said. "They found a local distributor here in Utah who said he could get product out of China. But, after about a week or so, their shipments were not coming in from China. And so TestUtah came to us and said, 'Hey, we're out of stuff. We're going to be out of commission. Can you help us out?' " (Nomi confirmed that it "borrowed swabs while we waited on one of our orders during the start of the pandemic.".)

Early on, the executives running TestUtah had also been unaware that the R.N.A. extraction kits and reagents that were necessary to prepare specimens to be analyzed, which were in short supply across the country, were not included with the Co-Diagnostics tests. At one point, Newman acknowledged that they "totally didn't anticipate" the need to acquire those components. Unable to secure a reliable supply of extraction kits, TestUtah eventually purchased a relatively unknown extraction machine called an oKtopure. The instrument, one member of the group said, "would allow us to do up to eight thousand tests a day. We would be considered the highest-throughput private infectious-disease lab in the country." Josh Walker, the C.O.O. of Nomi, told me that this was a prime example of the initiative's "open source" approach. "Part of the value that we as a group brought to the table," he said, "is having deep health-care expertise but also this cross-pollinated team."

Atkinson-Dunn told me that she and other members of the testing task force were also concerned about the laboratory the group had chosen to process the tests, at Timpanogos Regional Hospital, in Orem, Utah. After the program launched, Atkinson-Dunn and another state official went for a visit. There was no placard on the door to the room where the R.N.A. extraction was being performed, and the floor was gridded with glue lines where tiles had been pulled up. "We went into a room that looked like a storage closet," she told me. "They had an old rickety desk that looked like it was from the nineteen-seventies with the oKtopure sitting on top of it."

A conference room nearby had been converted into auxiliary lab space, with polymerase chain-reaction machines and laminar-flow boxes lining the walls around a large conference table. Atkinson-Dunn said that she was struck not only by the carpet on the floor —"carpet in a lab is not recommended"—but also by the fact that the lab was using Glad Press'n Seal to close up its specimens. "I said to them, 'Have you done a test to make sure that whatever might be on that Press'n Seal is not interfering with your tests?' And they said, 'Well, how would COVID get on the Press'n Seal?' " (A spokesperson for MountainStar Healthcare, which operates Timpanogos, said that "while the COVID-19 lab space certainly does not look like that of our standard lab operations, it meets all requirements.")

On April 21st, the governor of Iowa, Kim Reynolds, launched Test Iowa. She had learned about TestUtah from Kutcher, an Iowa native. "This will make available five hundred and forty thousand COVID tests, to increase the state's testing capacity by up to three thousand additional tests per day," Reynolds said. The state's no-bid contracts paid the three companies a total of twenty-six million dollars for a year of tech services and six months of testing. Newman, appearing on video, told the governor that "what was successful for Utah was mobilizing the private sector and the supply chain behind it from non-obvious sources." Utah was the "test bed" for the new model, he said. "We're incredibly excited to bring this across the nation."

At the same time, the three companies were also signing no-bid agreements with the state of Nebraska. Like Iowa, Nebraska paid twenty-six million dollars for a year of assessment and tracking, and for five hundred and forty thousand Co-Diagnostics tests. In each of the three states, the companies' knack for branding, their carefully orchestrated social-media campaigns, and their close coördination with the governors' offices quickly helped them become the public face of COVID-19 testing. But the group was also dogged by persistent questions about the quality of their efforts.

In Iowa, according to internal e-mails obtained by *The New Yorker*, Michael Pentella, the director of the Iowa State Hygienic Laboratory, said that his lab was having trouble validating the Co-Diagnostics test, a procedure meant to insure that the tests are accurate. "This testing is very labor intensive," he wrote in an April 27th e-mail, "and therefore, there is more potential for error." The next day, Pentella said that he was "very concerned," in part because "the company is not supporting this as they should." In a separate e-mail that same day, a Tuesday, he warned, "If this test validation is not completed by Thursday, it could turn into a nightmare." An official with the governor's office, responding to Pentella's concerns, laid out a plan to divert the Test Iowa specimens to another lab for processing, and, eventually, "to Utah for testing." (According to Nomi, the plan was never enacted, and the samples remained at the Iowa State Hygienic Laboratory.)

In Utah, however, there were also problems. For weeks, several members of Utah's coronavirus-testing task force had been worried that TestUtah's tests might be returning negative results for people sick with COVID-19. "The biggest thing was, early on, they were getting levels of positivity that were significantly lower" than those found by other labs in the state, one participant told me. Of the eighteen thousand or so tests conducted by TestUtah during April, the *Tribune* reported, only about two per cent had come back positive, whereas ARUP, Intermountain, the public-health lab, and other labs in the state were averaging a positivity rate of at least five per cent. In Nebraska, the situation seemed to be even worse. The Omaha *World-Herald* reported that Test Nebraska's positivity rate was 3.4 per cent; meanwhile, other labs in the state were seeing positive results at a rate of nearly eighteen per cent.

Nomi Health, the labs in Utah, Iowa, and Nebraska, and Co-Diagnostics have repeatedly disputed any suggestion that there were problems with their tests. The e-mails from Pentella, Nomi told me in a statement, "reflect expected frustrations faced during this validation process, but the main thing Iowans should be focused on is whether or not the lab is functioning properly. It is." The

company noted that Pentella was eventually able to validate the Co-Diagnostics tests, though that validation did not happen until two weeks after Pentella's warnings. Co-Diagnostics, too, acknowledged that "there may have been frustrations expressed," but said that "it is our understanding that the Iowa lab is comfortable with the Co-Diagnostics test." Pentella declined multiple requests for an interview, but, through a spokesperson, said that the ability of his lab "to exponentially expand its testing capabilities, including validating the Test Iowa equipment, during a public health crisis speaks volumes about its leadership, its staff, and the support and cooperation of state leaders."

As for the positivity rates, the companies argue that the discrepancies were caused by differences in the populations being tested. "If you're only seeing the sickest patients that have the highest probability of being sick, of course your positive rates are going to be higher," Walker, of Nomi, told me. "The state of Utah has asked us to do a very different thing, which is to not only make testing available to those who are exhibiting all the symptoms and signs. They also gave us very clear direction to expand the testing access to people that are asymptomatic." The governor of Nebraska, Pete Ricketts, offered a similar explanation when pressed by a reporter for the Omaha *World-Herald*. "If you're testing non-symptomatic people, your chance of getting people who are testing positive is going to be lower, right?" Ricketts said.

Several laboratory directors told me that it was possible that population differences played a role in the positivity disparities, and perhaps a significant one. But, as the *Tribune* investigation noted, the divergence in the positivity rates remained apparent even after controlling for asymptomatic patients. "We could see all of the tests," Atkinson-Dunn told me. "We were separating out symptomatics and asymptomatics, and it was still a lower positivity rate." In addition to the specimens provided by the initiative, the lab at Timpanogos Regional Hospital was also processing tests for other hospitals operated by MountainStar in Utah. According to data obtained by *The New Yorker*, specimens collected by those hospitals during the first three weeks of May, after TestUtah adjusted its algorithm to include fewer asymptomatic patients, showed lower positive rates than tests that were handled by other labs. By May 9th, concerns about the quality of TestUtah's processes were serious enough that they caused the state to ask the group to send its specimens to ARUP.

"This has certainly got all of us scratching our heads a little bit," Brent Satterfield, the chief scientific officer of Co-Diagnostics, told me recently. Satterfield insisted that his company's test had consistently shown high levels of sensitivity, which measures how well a test picks up true positives, and specificity, which measures how well a test identifies true negatives. The validation at the Iowa State Hygienic Laboratory, he noted, found a ninety-five-per-cent sensitivity rate for the Co-Diagnostics tests, meaning that they correctly identified nineteen out of every twenty true positives.

Sensitivity and specificity are important measures of a test's accuracy, but they are not the only criteria by which to judge a diagnostic test. The limit of detection, or L.O.D., describes the concentration of a target pathogen that must be present for a test to consistently return a positive result. A test with a high L.O.D. may detect people who are acutely ill, when they are carrying a high viral load, but struggle to identify patients who are at the beginning or end of their illness, when the viral load is lower. Steven Hinrichs, the former director of the Nebraska Public Health Laboratory, told me that, for a disease like COVID-19, which appears to do much of its spreading while people are presymptomatic, it is important to have tests that can identify people in the early stages of infection, so that those people can be isolated and their contacts traced.

According to Co-Diagnostics' own reports, filed with the F.D.A., the company's test has an L.O.D. of 4,290 copies per milliliter. This is not out of the range of other tests the F.D.A. has authorized, but it is at the high end: the L.O.D. for one of the COVID-19

tests developed by the Centers for Disease Control and Prevention is one thousand copies per milliliter, and the L.O.D. for the test developed by Quest is a hundred and thirty-six copies per milliliter.

Satterfield dismissed concerns about the L.O.D. of the Co-Diagnostics test. "I like to compare it to cars," he said. "When going out and buying a car, the max speed that that car can hit is an important factor. If it can only do thirty miles an hour, it's probably not going to be a very useful car. But there's a certain point, once you hit seventy or eighty miles an hour, that it's doing everything that you're going to ever need it to do." Mark Oliver, an infectious-disease doctor in Utah, who has spoken with Satterfield about his company's test, rejects the analogy. "Their belief was, 'Well, it's going to pick up the same number of cases, because the viral load that individual patients have is always above a certain threshold.' I just don't believe that." Especially in asymptomatic or presymptomatic cases, Oliver said, "there are individuals who may have low viral loads."

Sensitivity, specificity, and L.O.D. are all analytic measures of a test's performance; they're determined with known samples in a carefully controlled laboratory environment. But a covid-19 diagnostic test is not a momentary procedure; it is a process. A patient must be swabbed, the swab must be transported to a lab, a sample must be extracted and isolated from the swab, and the sample must be run through many cycles of a polymerase chain reaction to determine if the coronavirus is present. Hinrichs said that the collection and extraction of a sample can have dramatic effects on a test's clinical sensitivity. The testing initiatives associated with TestUtah have had documented issues on both fronts.

In a statement, ARUP said that it was unable to test roughly ten per cent of the samples TestUtah had provided on May 9th, because of "insufficient volumes." I asked Satterfield, of Co-Diagnostics, if he knew what had caused that problem. "There was leaking or something from the tubes," he said, speaking of the collection tubes in which swabs are transported to the lab. "I talked with somebody from another part of the Nomi Health conglomerate, and they told me when people don't screw the lids on properly, they leak. They aren't getting screwed on properly at the time of collection." (According to Nomi, "The TestUtah specimens—like the sample collection in Iowa and Nebraska—had sufficient volume for testing by our lab partners consistent with the requirements of the [Co-Diagnostics] FDA-authorized test.")

Another factor contributing to the low positivity rates might be the extraction step, a part of the testing process that Hinrichs describes as "a big, big deal." The oKtopure extractor, which TestUtah had boasted could perform up to eight thousand extractions per day, was designed for agricultural, not clinical, use. According to the company that manufactures it, LGC Biosearch—which also produces some of the reagents for Co-Diagnostics' test—"the oKtopure instrument has been optimised to deliver extraction protocols across a wide variety of plant species and is suitable for extraction from leaves, seeds, flour or roots." In principle, there is no reason why an extractor built for use with plant D.N.A. could not work with viral R.N.A. samples in humans. But the oKtopure has not been through the rigorous pre-market review process that the F.D.A. uses to guarantee that instruments used on human specimens are safe and effective.

According to a so-called bridging study conducted by the Timpanogos Regional Hospital, which measures the limit of detection, the use of the oKtopure had a real effect on the performance of the Co-Diagnostics test. The study showed that the limit of detection for the test, when used with the oKtopure extractor, was nearly thirteen thousand copies per milliliter, three times the L.O.D. reported in the company's application with the F.D.A. Hinrichs told me that the higher limit of detection could very well be the reason that TestUtah's tests were coming back with a lower positivity rate than those of other labs. "If you don't get much R.N.A. out of a sample," he said, "you've dealt yourself a blow." Timpanogos maintains that the higher L.O.D. has no clinical

significance, but, when I asked Satterfield if he thought the extractor could account for some of the discrepancies, he allowed, "It could be a part of it."

It also appears that Timpanogos was not authorized to use the oKtopure for much of April. Though the F.D.A. has relaxed some of its requirements for COVID-19 tests, it nevertheless recommends certain procedures to guarantee test quality. To use a new component, such as an R.N.A. extractor, with a test, a lab must complete a bridging study, file for its own emergency authorization, or rely on an amendment to a manufacturer's authorization. When I asked Satterfield what Timpanogos had done, he initially told me that he didn't know. "We made it clear that the LGC device was not part" of Co-Diagnostics' authorization, he said. "What they did with their process, that I'm not familiar with." Michael Baumann, the chief medical officer at MountainStar, said that Timpanogos had "followed the F.D.A. process." After validating the instrument on April 9th, he said, the lab began using it pursuant to an amendment filed with the agency by Co-Diagnostics. But Timpanogos did not conduct its bridging study until May 1st, and Co-Diagnostics, the company eventually told me, did not file for an amended authorization that included the oKtopure until May 8th, nearly a month after TestUtah began using the instrument.

The F.D.A., which declined to comment, is clear that failing to follow its guidelines is not a crime. And, while the amended authorization has not yet been approved, Timpanogos says that the agency has not objected to the use of the oKtopure. Nevertheless, the failure to properly authorize the oKtopure was one of nineteen separate deficiencies identified by federal regulators at Timpanogos in May. According to a twenty-seven-page inspection report obtained by *The New Yorker*, the Timpanogos lab "failed to establish specificity, sensitivity, limits of detection, and reportable range for COVID-19 testing prior to performing patient testing on April 10, 2020."

The inspection report identified other problems as well: the lab did not properly track specimens as they moved through the testing process; it performed tests on leaking samples; it failed to properly maintain the oKtopure; and it stored samples at room temperature, despite a recommendation from Co-Diagnostics that they be stored at negative twenty degrees Celsius. The report noted that the lab took no corrective action after several test runs indicated "errors that could . . . yield invalid or incorrect test results." It also faulted the lab's director for being "unavailable to the laboratory from approximately March 27, 2020 until April 27, 2020"—which included nearly the whole first month of TestUtah's operations and the implementation of the oKtopure—and the lab's general supervisors for failing "to provide day-to-day supervision of testing personnel and reporting of test results." In a cover letter, the regulators warned that if Timpanogos did not remedy the problems, the lab could be liable for sanctions that include suspension of its certification or penalties of more than six thousand dollars a day.

Through a spokesperson, MountainStar said that the lab's director was "in the high-risk category for COVID-19 and has been following guidelines to isolate at home," and that "delegation for all validation and in-lab oversight throughout the COVID-19 testing process was given to an interim medical director." The spokesperson also said that "if there were any major concerns discovered during the [inspection], the lab would have been immediately shut down. This was not the case." Nomi, for its part, whose publicity materials say that the company is "responsible for supplying and delivering FDA-authorized tests," told me, "We trust our partners are delivering quality care in a compliant way," and claimed that those partners "have shown significant transparency around the validation of their processes and have worked closely with state and federal regulators to share data and results."

Case 2:20-cv-00368-JNP   Document 95-3   Filed 06/09/21   PageID.1048
of 12

D uring an early town hall for the TestUtah effort, Mark Newman put up a slide that counted "status quo," "tradition," and "turf wars" among the "barriers" the group had to overcome. Many of the people involved still share this view. "As far as I'm concerned, it's a witch hunt," Satterfield said. "What we've seen is that a lot of the opposition to the governors who are in office now"—by which he meant Herbert and Cox—"are the ones who have been most vocal about propagating" criticisms of TestUtah. (Cox's office did not respond to multiple interview requests.) Baumann, at MountainStar, told me that he suspected that ARUP and Intermountain Health were working together to squash an entrant in the market. "They're a little concerned that they've got a new competitor in the area," he said.

David Hillyard, the medical director of ARUP's Molecular Infectious Diseases Laboratory, and Bert Lopansri, of Intermountain, both objected to that characterization. They offered the testing task force, which met over Zoom three times a week, and frequent exchanges of test supplies among their labs, as examples of the sort of collaboration that had taken place throughout the pandemic. Another testing-task-force participant, who works at neither ARUP nor Intermountain, told me much the same thing. "These are scientists. They don't have it in for Co-Diagnostics or [MountainStar]," the person said. "They're just questioning things. They want good tests out there."

Through a spokesperson, Jeff Burton, the acting head of the Utah Department of Health, said that "ensuring the accuracy of test results from all testing locations is critical to our response. We will continue to explore any process improvements that will enhance the accuracy of COVID-19 testing in Utah." On May 31st, the state government extended the TestUtah contract for another forty-five days. Since then, Utah's COVID-19 case count has been increasing at a worrying rate. Before June 1st, the state had not seen a day with more than three hundred and fifty new cases. On June 5th, there were five hundred and forty-six new cases, with outbreaks at a long-term-care facilities and a meat-packing plant in Cache County.

Atkinson-Dunn told me that the increased demand for testing had created a backlog at the public-health lab. "Our capacity is a thousand samples a day, and we've been getting close to fifteen hundred samples," she said. During the week of June 1st, Atkinson-Dunn arranged for some of the samples coming into her lab to be tested by Intermountain. That Friday, however, the day after the Tribune first reported a summary of the investigation at Timpanogos, her superiors at the Department of Health suggested that she offload some of the samples to the TestUtah lab. She refused. "I will not take the responsibility for public-health actions being taken from a laboratory that has evidence that they are not properly validated," she told me. "I will not send samples to TestUtah until they can show that they have fixed their problems."

On Monday morning, Atkinson-Dunn was informed by her superiors that she was losing her position as the director of the Utah state laboratory and would be reassigned within the health department. Atkinson-Dunn's official e-mail account was shut down, and her work phone was reclaimed. "They reassigned me to a position I'm not even trained for," she told me. "They've assigned me to be an epidemiologist. I'm not an epidemiologist. It's just a way for them to get me out of the way."

On Wednesday, a spokesperson for the Utah Department of Health confirmed that Atkinson-Dunn "has been reassigned as a Multi-drug Resistant Organism Specialist in our Bureau of Epidemiology" and said "this position will benefit from somebody with a laboratory background." He also acknowledged that she had raised "serious allegations," and said, "we take those allegations seriously. The Utah Attorney General's Office will take the lead in reviewing her allegations." Nevertheless, the spokesperson confirmed that the state overruled Atkinson-Dunn and sent samples from the public-health lab to Timpanogos for processing.

6/1/2021
Case 2:20-cv-00368-JNP   Document 95-3   Filed 06/09/21   PageID.1049   Page 11 of 12
How Utah's Tech Industry Tried to Disrupt Coronavirus Testing | The New Yorker

In the past, health-department officials have defended TestUtah as a program that was developed quickly to meet a crucial need. I asked Atkinson-Dunn why, in the context of a pandemic driven by a shortage of national testing capacity, the regulatory issues at Timpanogos were so significant. "Play it out," she suggested. "I might be sick, but I want to go see my grandma, who's ninety-five. So I go to a TestUtah site, and I get tested. TestUtah tells me I'm negative. I go see grandma, and she gets sick from me because my result was wrong, because TestUtah ran an unvalidated test." She went on: "All of us within the laboratory community take it very seriously that the answers we are giving people when we diagnose them with a disease are valid, so that that person can make rational decisions about what they need to do."

*A previous version of this piece misidentified The Gazette.*

## A GUIDE TO THE CORONAVIRUS

- The <u>coronavirus vaccine</u> is on track to be the fastest ever developed.
- What the coronavirus has revealed about American medicine.
- Recommendations for maintaining social distancing as the U.S. reopens, from socializing and using public bathrooms to wearing masks.
- Why remote work is so hard—and how it can be fixed.
- Seattle leaders let scientists take the lead in responding to the coronavirus. New York leaders did not.
- The long crusade of Dr. Anthony Fauci, the infectious-disease expert pinned between Donald Trump and the American people.
- What to read, watch, cook, and listen to under quarantine.

*Robert Baird was a member of The New Yorker's editorial staff from 2012 to 2014.*

More:   **Coronavirus   Utah   Iowa   Startups   Coronavirus Treatment and Testing**

Cookies Settings

Case 2:20-cv-00368-JNP Document 95-3 Filed 06/09/21 PageID.1050 Page 12 of 12