FILED
2022 MAR 9
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GELT TRADING, LTD., <br><br> Plaintiff, <br><br> v. <br><br> CO-DIAGNOSTICS, INC., ET AL., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS** <br><br> Case No. 2:20-cv-00368-JNP-DBP <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead |

This case comes before the court on a motion to dismiss filed by defendants Co-Diagnostics, Inc., Dr. Brent Satterfield ("Satterfield"), and the directors and/or officers of Co-Diagnostics named in the second amended complaint. ECF No. 91. The court held oral argument on the motion on February 9, 2022. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court DENIES Defendants' motion to dismiss.

### FACTUL BACKGROUND

Co-Diagnostics, Inc. is a Utah corporation that specializes in DNA-related diagnostic testing technology. Satterfield formed the company on April 18, 2013. Satterfield has a PhD in biomedical engineering. The complaint names directors and/or officers of Co-Diagnostics—Dwight Egan (Co-Diagnostics' CEO), Reed Benson (Co-Diagnostics' CFO), James Nelson, Eugene Durenard (Co-Diagnostics' Board Member), Edward Murphy, and Richard Serbin

(Co-Diagnostics' Board Member). The company initially focused on developing and selling diagnostic tests for diseases like zika virus, tuberculosis, hepatitis B and C, malaria, dengue fever, and HIV.

But then the Covid-19 pandemic hit. Co-Diagnostics recognized a significant opportunity to use its technology to create a test for the new virus sweeping across the globe. Co-Diagnostics quickly produced "Logix Smart," a Covid-19 diagnostic test, using its existing technologies. On February 24, 2020, Co-Diagnostics became the first company to receive regulatory clearance to sell its Covid-19 test in the European Economic Area. Several months later, Co-Diagnostics received the first Emergency Use Authorization from the United States Food and Drug Administration for its Logix Smart test.

Co-Diagnostics' new test led to lucrative contracts at home and abroad. Co-Diagnostics sold millions of dollars of Covid-19 tests to fifty countries and more than twelve states in the United States. Co-Diagnostics also agreed to provide the majority of the Covid-19 tests for a $5 million contract between TestUtah and the state of Utah. Co-Diagnostics entered a similar agreement related to a $26 million contract in Iowa.

Co-Diagnostics' value as a company grew accordingly. Co-Diagnostics has been publicly listed on the NASDAQ since July 12, 2017. Prior to the pandemic, Co-Diagnostics regularly traded for under a dollar. At the beginning of 2020, Co-Diagnostics traded for just 91 cents. As Co-Diagnostics' test found success, the company reached an all-time high stock price of $29.72 per share.

But medical experts began raising concerns about Co-Diagnostics' tests. On April 30, 2020, the Salt Lake Tribune published an article questioning the accuracy of Co-Diagnostics' tests. Specifically, the TestUtah sites that used Co-Diagnostics' tests saw a 2% positivity rate, whereas

other sites across the state saw a positivity rate closer to 5%. One doctor called this discrepancy "a potential public health disaster." ECF No. 91-2. The Tribune quoted Satterfield as saying that the disparity was due to "population differences" and that Co-Diagnostics' tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe. *Id.* In spite of the negative publicity, Co-Diagnostics reiterated its confidence in its Covid-19 test in a press release issued on May 1, 2020. The press release stated that the company released "data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing." ECF No. 91-3, at 1. Satterfield added that "we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that." *Id.*

Satterfield's statements temporarily reassured investors. But Co-Diagnostics' shares began to decline rapidly as the negative information related to Co-Diagnostics' Covid-19 test continued to mount. On May 14, 2020, the stock went from a high of $29.52 to an intra-day low of $18.35, before closing at $22.13. The next day the stock opened at $15.80 per share. The stock now trades for around $8.00 to $9.00 per share.

Plaintiff Gelt Trading Ltd. ("Gelt Trading") is a Cayman Island limited company that trades in stocks. Gelt Trading contends that Defendants made false or misleading statements regarding the accuracy of their Covid-19 test, in order to artificially raise the company's stock price. Gelt Trading objects to two statements made by Satterfield and Co-Diagnostics regarding the company's test. First, Gelt Trading cites Satterfield's statement to a Salt Lake Tribune reporter that the company's "COVID-19 tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe." Second, Gelt Trading objects to the company's press release that stated that its test "[c]onsistently demonstrates 100% sensitivity and 100% specificity across independent evaluations" and that "[i]n countries where we have been evaluated against other tests, we have

3

consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that." As a result of the allegedly misleading statements and resulting inflated stock price, Gelt purchased shares of Co-Diagnostics and lost money when the stock prices fell. Specifically, Gelt purchased and sold stocks during the relevant period for a net loss of $117,845.87.

Prior to the rapid decline in stock price, Plaintiff contends, Defendants knew that the company's stock was inflated due to their misleading statements. Plaintiff argues that the company's officers rapidly exercised stock options and immediately sold their shares to profit from the inflated price of the stock due to the allegedly fraudulent statements. For instance, Board Members Serbin and Durenard sold nearly $1,000,000.00 of Co-Diagnostics' stock in late May, as the negative news mounted. CEO Egan and CFO Benson also sold $900,000.00 and $700,000.00 worth of Co-Diagnostics' stock, respectively. And several Defendants failed to make required disclosures within the requisite two days after selling their stocks. Gelt Trading alleges that Defendants delayed making the required disclosures to refrain from alerting the market to their doubts about their own company.

Gelt Trading brings two claims. First, it claims that Satterfield and Co-Diagnostics are liable as direct participants in the fraudulent statements. Second, it claims that the Individual Defendants are liable for the company's allegedly wrongful conduct because they were "controlling persons" within the meaning of securities law. In other words, the Individual Defendants, by reason of their positions as senior executive officers or directors, had the power and influence to cause the company to engage in the aforementioned unlawful conduct.

# LEGAL STANDARDS

## I. MOTION TO DISMISS AND PLEADING STANDARD

Dismissal of a claim under Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

In most civil actions, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 9(b) imposes a heightened pleading requirement for claims sounding in fraud: A plaintiff must "state with particularly the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of person's mind may be alleged generally." FED. R. CIV. P. 9(b). Securities fraud claims under the Securities Exchange Act must additionally satisfy the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading requirement "with regards to . . . whether the statements at issue were false or misleading, and whether the defendant acted with the requisite scienter." *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018) (citing 15 U.S.C. § 78u-4(b)(1))-(2)).

## II. SECURITIES LAW

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

"A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a claim for material misrepresentation or omission in violation of § 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (citation omitted). Defendants argue only that Plaintiff failed to adequately plead the first and second elements of a Section 10(b) claim. Accordingly, the court only evaluates the sufficiency of the second amended complaint with respect to the two contested elements.

## ANALYSIS

Defendants first contend that Plaintiff has failed to comply with the PSLRA by failing to identify the specific statements at issue and engaging in improper puzzle pleading. Defendants further contend that Plaintiff has failed to adequately plead both the element of a material misrepresentation and the element of scienter. The court disagrees. It begins by addressing the sufficiency of the pleadings generally, then addresses each disputed element in turn.

I.     SPECIFICITY OF ALLEGATIONS AND PUZZLE PLEADING

The court begins by addressing Defendants' contention that the second amended complaint improperly fails to specify each alleged misstatement and the reason why it is misleading. The PSLRA heightened the pleading standard for the first element under Rule 10b-5—whether the defendant made an untrue or misleading statement of material fact or omission. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). To satisfy the heightened pleading standard, the PSLRA provides that every complaint alleging a violation of § 10(b) must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiff complies with the PSLRA's pleading standard by identifying two specific allegedly misleading statements.

First, Plaintiff identifies statements made to a Salt Lake Tribune reporter. Satterfield stated that "Co-Diagnostics' tests were between 99.52% and 100% accurate in unspecified FDA and European studies."[1] ECF No. 86 ¶ 60. Plaintiff says that this statement was misleading because it "created the false impression that Co-Diagnostics' test was close to perfect." *Id.* ¶ 61. Plaintiff further explains that this statement "intended to mislead reasonable investors and create the impression that Co-Diagnostics' test was perfect." *Id.*

Second, Plaintiff identifies statements made in a Co-Diagnostics' press release. The press release title stated that "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent

---

[1] The parties quibble as to whether this statement is attributable to Satterfield. Defendants argue that paraphrasing an alleged misstatement is insufficient to allege a misrepresentation. But Satterfield's statement in the Salt Lake Tribune is not "generic paraphrasing." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 914 (S.D. Tex. 2001). Rather, it is a discrete statement, with specific statistics, purposefully given to a reporter. Accordingly, the court attributes the statement to Satterfield.

Evaluations." ECF No. 86 ¶ 62. The press release went on to say that "test performance data demonstrat[ed] 100% sensitivity and 100% specificity, the metrics used to determine accuracy in molecular diagnostics testing." *Id.* And Satterfield added that "[i]n countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that." *Id.* ¶ 63. Plaintiff claims that these statements were misleading because they "materially misstated the accuracy of the Company's Covid-19 tests and omitted material information that the Company's tests have problems with their accuracy and are significantly less than 100% accurate." *Id.* ¶ 64. Specifically, these statements led the investing public to "underst[and] Co-Diagnostics' statements to mean their tests were perfect," despite evidence otherwise, and the general consensus among scientists that no test is 100% accurate. *Id.* ¶¶ 64, 65, 69. In sum, because Plaintiff sets forth the alleged misstatements with specificity, Plaintiff has complied with the most basic requirements of the PSLRA. The court discusses in further detail below whether each statement adequately pleads material misrepresentation.

Finally, Defendants object to Plaintiff's second amended complaint as improper puzzle pleading. "Puzzle pleading occurs when a complaint is so voluminous and ineffectively organized as to 'place the burden on the reader' to 'solve the puzzle' of the plaintiff's claims" *Smith v. LifeVantage Corp.*, 429 F. Supp. 3d 1275, 1284 (D. Utah 2019) (citation omitted). Although the Tenth Circuit has expressed disapproval of puzzle pleading, *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339 n.8 (10th Cir. 2012), this district and the Tenth Circuit also recognize the "preference for deciding cases on the merits." *Rumbaugh v. USANA Health Scis., Inc.*, No. 2:17-cv-106, 2018 WL 5044240, at *5 (D. Utah Oct. 17, 2018); *accord Lee v. Max Int'l, LLC*,

638 F.3d 1318, 1321 (10th Cir. 2011) ("[O]ur legal system strongly prefers to decide cases on their merits.").

As an initial matter, the second amended complaint is not voluminous. At twenty-nine pages, including the certificate of service, it is relatively short for a securities complaint. And, as discussed above, Gelt Trading identified two specific, objectionable statements by Defendants. In the paragraphs immediately following each statement in the second amended complaint, Gelt Trading included allegations as to why each statement qualifies as misleading. Such straightforward, organized pleading does not constitute a burdensome "puzzle" for the court to solve.

## II.   MATERIAL MISREPRESENTATION

The court now turns to whether Gelt Trading has adequately stated the element of material misrepresentation. Gelt Trading first argues that Defendants' statements were actually false. The court rejects this argument. Defendants' press release appears carefully calibrated to assert that its Covid-19 tests performed with 100% accuracy in a subset of evaluations, not that the test was 100% accurate in all instances. In fact, the evidence provided by Defendants indicates that several small studies in foreign countries found the Logix Smart test 100% accurate. And Plaintiff makes no allegation that Satterfield's statement in the Salt Lake Tribune—that Co-Diagnostics' Covid-19 tests performed with 99.52% to 100% accuracy in tests in the United States and Europe—is false.

But Gelt Trading additionally argues that, even if technically true, the statements were intended to mislead the investing public. Co-Diagnostics responds that the company's statements about the test's accuracy were only about results from specific evaluations, and that it never claimed the tests were 100% accurate in all circumstances.

9

With regard to literal truth, the Second Circuit has stated that the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Statements of literal truth "can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Id.* (citation and alterations omitted); *see also Mitchell v. Tex. Gulf Sulphur Co.*, 446 F.2d 90, 97 (10th Cir. 1971) ("The misleading, misrepresented or untruthful character of the release may appear from . . . the half truths, omissions or absence of full candor concealed therein.").

### A.     Press Release

The court begins with Defendants' press release. Gelt Trading has alleged sufficient facts to demonstrate that the press release intended to put forth the impression that the Logix Smart test was 100% accurate, despite the fact that Defendants knew that to be untrue. Defendants stated that the Logix Smart test has "consistently and repeatedly achieved 100% clinical sensitivity and specificity," which are "the metrics used to define accuracy in molecular diagnostics testing." ECF No. 91-3, at 1-2. Using the words "consistently" and "repeatedly" implies that all of the studies conducted on Logix Smart tests have shown Defendants' product to be 100% accurate. Indeed, news coverage by financial sources at the time of Defendants' press release indicates that at least some sources understood Defendants' press release to mean that Co-Diagnostics' test was 100% accurate. For example, after the press release, Investor's Business Daily ran the following headline: "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate." ECF No. 86 ¶ 69.

10

But the impression that Co-Diagnostics' test was 100% accurate misled investors by omitting any indication that Defendants' test was less than perfect. Indeed, at the time of the press release, Defendants were aware, as indicated by Satterfield's statement to the Salt Lake Tribune, that other unspecified studies had placed the test's accuracy as low as 99.52%.[2] Gelt Trading alleges that, although they sound nearly identical, in the context of Covid-19 testing, the difference between 99.5% and 100% "can dramatically affect whether a test has any value to public health officials." ECF No. 86 ¶ 66. Co-Diagnostics was also aware that TestUtah sites using its Logix Smart test resulted in a 1% to 2% positivity rate, even in symptomatic patients, whereas other sites across the state received around a 5% positivity rate, suggesting that Co-Diagnostics' test were even less effective than Satterfield's quote in the Salt Lake Tribune indicated. Indeed, even the Australian study to which Defendants cite "explicitly stated that the test could in fact be between 96% to 98% effective, rather than 100%" due to the difficulty of detecting a low error rate with a small sample size. ECF No. 86 ¶ 85. And, finally, Gelt Trading alleges that Satterfield, a scientist with a PhD, should have known that no diagnostic test would be 100% accurate. *Id.* ¶¶ 61, 65. In

---

[2] At oral argument, counsel for Defendants argued that Defendants' press release would not have misled a reasonable investor because (1) a reasonable investor should know that no test is 100% accurate and (2) Satterfield's statement in the Tribune, which was available to the market at the time of the press release, confirms that Co-Diagnostics' test was not 100% accurate. These arguments essentially constitute a truth-on-the-market defense, i.e., that Plaintiff has "not alleged actionable statements, because the public already had available to it information regarding the issues with [Co-Diagnostics' test]." *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 664 (E.D. Va. 2021). But "because the investing public places a heavy emphasis on the pronouncements of corporate insiders" when a defendant attempts to use a truth-on-the-market defense, "insiders must demonstrate that the truth was transmitted to the public 'with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations.'" *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1123 (W.D. Mich. 1996) (quoting *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). Because that inquiry "is intensely fact-specific" it is "rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

11

sum, the implication that Co-Diagnostics' tests performed accurately 100% of the time is sufficient to allege a misleading statement.

The court further notes that the press release states that the 100% accurate performance data came from "evaluations . . . conducted in Mexico . . . India, and elsewhere in the US and abroad. ECF No. 91-3, at 1. The underlying validation reports, in fact, came from Mexico, Australia, and India. *See id.* at 7-24. Co-Diagnostics included only a single spreadsheet—with no analysis, context, or report—from a United States-based site (Minnesota) demonstrating twenty "concordant" tests. ECF No. 91-3, at 24. Indeed, there is some evidence to suggest that Co-Diagnostics avoided United States-based validation testing. *See* ECF No. 95-3, at 6 (stating that, on April 27, 2020, an Iowa official wrote that he was "very concerned" that Co-Diagnostics was "not supporting [validation testing] as they should"). Because investors might place more weight on a validation report prepared in the United States, this further misrepresentation served to create the impression that Co-Diagnostics' test's 100% accuracy was based on reliable data from the United States—when, in fact, Gelt Trading alleges that Co-Diagnostics knew otherwise.

Finally, the court is particularly troubled by Satterfield's statement in relation to the test's accuracy that "you can't do better than that." Rather than limiting himself to the specific context of the press release—that a few small studies found the test 100% accurate—Satterfield's editorializing statement suggests to potential investors that his company has created a Covid-19 test that has achieved perfection or is, at least, superior to any competitor (i.e., a competitor "can't do better than that").

At bottom, Gelt Trading's second amended complaint alleges that Co-Diagnostics' press release misleads because it fails to speak the full truth. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981) ("[I]t is also axiomatic that once a company undertakes partial

disclosure of . . . information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading."). While section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," disclosure of material information is required "when necessary to make statements made, in the light of the circumstances under which they were made, not misleading" *Matrixx Initiatives*, 563 U.S. at 44 (citation and alterations omitted). Stated in other words, "a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2nd Cir. 2016).

The court finds that Plaintiffs have sufficiently alleged a material misrepresentation by alleging facts demonstrating that Co-Diagnostics and Satterfield's statements attempted to paint a picture of a product for which everything was going right when, in fact, Defendants knew of evidence otherwise. If proven, such an attempt to "convey[] a false or misleading impression" would violate securities law. *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991); *see also SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1106-07 (9th Cir. 1977) (holding that a defendant's statements "were deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of a material fact was false." (citation omitted)).

### B.   *Statement to the Salt Lake Tribune*

On the other hand, the court finds that Satterfield's statement to the Salt Lake Tribune is not misleading. First, it does not carry the same implication that the Co-Diagnostic test is perfectly accurate. It openly admits that Co-Diagnostics' test performed at less than 100% accuracy in some studies. While Gelt Trading presses the argument that Satterfield's statement implies that the test is perfect because he failed to clarify that 99.52% accuracy is significantly different than 100% accuracy in diagnostic testing, the court does not find that Satterfield was required to elucidate that

13

distinction. Second, the statement to the Salt Lake Tribune does not suffer from the same editorializing that the press release contains. While the press release suggests you "can't do better" than the Logix Smart test, the statement in the Salt Lake Tribune simply offers basic statistics. Gelt Trading never alleges that the statistics offered by Satterfield were false or that Satterfield knew at the time that Co-Diagnostics' test was less effective than stated in the Salt Lake Tribune article.

In sum, the court finds that Gelt Trading adequately pleads the element of material misrepresentation as to the press release statement. The Salt Lake Tribune statement, in contrast, does not meet the element of material misrepresentation. However, because Gelt Trading adequately alleges at least one material misrepresentation, Defendants' motion to dismiss fails on its material misrepresentation arguments.

### III.   SCIENTER

The PSLRA also heightened the pleading standard for the second element of a 10b-5 claim regarding the defendant's requisite scienter. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095-96 (10th Cir. 2003). Under the PSLRA, the plaintiff must, "with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "In a securities fraud case, the appropriate level of scienter is 'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness." *Adams*, 340 F.3d at 1105 (citation omitted). "Recklessness in the context of securities fraud is . . . defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (citation omitted).

"A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). But "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* (citation omitted). To determine whether scienter is present, the court must "engage in a comparative evaluation," considering the plaintiff's inferences as well as "competing inferences rationally drawn from the facts alleged." *Id.* at 314. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (citation omitted).

In the Tenth Circuit, a plaintiff claiming securities fraud based on nondisclosure of a potentially material fact must allege the following to establish scienter:

> (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

*City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). In alleging scienter, "[a]llegations of motive and opportunity may be important," but they are "typically not sufficient in themselves to establish a 'strong inference' of scienter." *Id.* at 1262. Nevertheless, evidence of motive and opportunity "may be considered as part of the mix of information that can come together to create the 'strong inference' of scienter required by the PSLRA." *Id.* at 1263.

Defendants argue that Gelt Trading offers only generalized allegations that Defendants knew the statements to be untrue. Defendants contend that such generalized allegations do not meet PSLRA's exacting standard for pleading scienter. Gelt Trading responds by laying out five

15

categories of alleged facts that it argues combine to create a strong inference of scienter. First, Satterfield possessed actual information about concerns over Co-Diagnostics' tests at the time of the statements. Second, Satterfield's experience as a PhD scientist should have caused him to know that any claim that a diagnostic test is 100% accurate is patently false. Third, the misleading statements came on the heels of serious negative press. Fourth, Satterfield had motive and opportunity to mislead. And, fifth, Co-Diagnostics declined to engage in an experiment with other Utah labs to confirm the accuracy of its test. The court agrees with Gelt Trading and discusses the most compelling allegations below.

Most importantly, Gelt Trading has alleged copious facts demonstrating that Satterfield and Co-Diagnostics knew about the serious critiques of the Co-Diagnostics test when Co-Diagnostics issued its press release. On April 27, 2020, an internal email from an Iowa official indicated that his lab was having trouble validating the Co-Diagnostics test. ECF No. 95-3, at 6. And Defendants knew about this issue because the official said that "the company is not supporting [the validation testing] as they should." *Id.* A Utah infectious disease doctor similarly raised an alarm, saying that "[w]hat alarms me most is that [Co-Diagnostics and Satterfield] are expanding collection and testing with these unknowns about how their test performs." ECF No. 95-3, at 3; *see also id.*, at 8 (noting that "an infectious-disease doctor in Utah . . . has spoken with Satterfield about his company's test" to express concerns); ECF No. 95-1, at 2 (noting that, on April 30, 2020, "medical experts have been raising concerns about [the accuracy of Co-Diagnostics' test]").

And in April, Co-Diagnostics' tests at TestUtah were reporting a positivity rate of 1-2% whereas other labs in the state were averaging a positivity rate of at least 5%. "[S]everal members of Utah's coronavirus-testing task force had been worried" about this disparity in testing results— worries they presumably raised with Co-Diagnostics. ECF No. 95-3, at 6. And the Utah

16

Department of Health was investigating the disparity, including raising the issue with TestUtah, prior to the April 30, 2020 Salt Lake Tribune article. *See* ECF No. 95-1, at 5 ("'We have been watching TestUtah's positivity rate closely and have had multiple discussions with them about different practices that may be impacting their testing results,' [wrote] Nate Checketts, deputy director of the Utah Department of Heath."). It is reasonable to infer that TestUtah would have raised this disparity with Co-Diagnostics and Satterfield. Even if Satterfield and Co-Diagnostics were somehow unaware of these critiques, which the court finds highly unlikely, publication of the Salt Lake Tribune article put Defendants on notice of the critiques prior to their May 1, 2020 press release.

Viewing Defendants' statements in this context—inquiries by the media, an investigation by a public health agency, and doubts from medical experts—supports a finding of scienter. *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012) (noting that scienter is often present where "the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so"); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 422 (E.D. Pa. 2019) (finding that defendants' repeated statements, in the face of ongoing investigations by multiple law enforcement bodies, and questions from the press, were indicative of scienter.). Indeed, other courts have found scienter where a high-ranking officer "evince[es] certitude" as to a matter while the underlying substance is being publicly questioned. *See, e.g.*, *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

And the timing of the studies incorporated into the press release further support an inference of scienter. Each study was released by Co-Diagnostics (not by the third-party lab who conducted the test) and signed by a Co-Diagnostics' staff member on April 30, 2020—the same day that the Salt Lake Tribune released its article criticizing Co-Diagnostics. As Plaintiff argues,

17

this suggests that Co-Diagnostics issued the press release with the intent to counter the negative narrative surrounding its tests following the Salt Lake Tribune article.

Moreover, additional circumstantial evidence suggests that Defendants acted intentionally. While Satterfield himself did not sell his stocks, multiple board members sold significant amounts of stock just as news outlets began to question the accuracy of Co-Diagnostics' test.[3] This suggests that at least some individuals within the company knew that the statements were misleading that the artificially propped up stock could soon crash. If other corporate officials knew this fact, presumably Satterfield—the company's Chief Science Officer—would have known the same. Further, Gelt Trading alleged that Defendants avoided validity testing in the United States because they were concerned that testing would reveal their misleading statements. Defendants respond that TestUtah, not Co-Diagnostics, avoided validity testing. But even if Defendants are correct that TestUtah—not Co-Diagnostics—decided to forego the Utah validity experiment, the evidence suggests that in other instances, Co-Diagnostics did avoid United States-based testing. *See* ECF

---

[3] The court is not convinced by Plaintiff's motive and opportunity argument. While allegations of motive and opportunity are typically not sufficient in themselves to establish a strong inference of scienter, they may still be important to the totality evaluation by the court. *City of Phila.*, 264 F.3d at 1262. Generally, motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Id.* at 1261. "To succeed in establishing scienter with a 'motive and opportunity' pleading, plaintiffs had to allege 'that defendants benefitted in some concrete and personal way from the purported fraud.'" *Id.* (citation omitted); *see also Tellabs*, 551 U.S. at 325 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference."). Indeed, the Tenth Circuit provides as an example of motive and opportunity "when the defendants made material misrepresentations to maintain a high stock price and then sold their own shares at a profit." *City of Phila.*, 264 F.3d at 1261.

Gelt Trading does not allege that Satterfield himself sold his Co-Diagnostics stock. Indeed, there is no indication that Satterfield acted with a motive not shared by most companies. *See City of Phila.*, 264 F.3d at 1269 (rejecting "generalized motives shared by all companies and which are not specifically and uniquely related to [the defendant] in particular). Therefore, this allegation would not cut in favor of scienter as to Satterfield. But because Gelt Trading's other allegations sufficiently establish scienter, this court's conclusion on motive and opportunity is not dispositive.

No. 95-3, at 6 (stating that, on April 27, 2020, an Iowa official was "very concerned" that Co-Diagnostics was "not supporting [validation testing] as they should"). Defendants' alleged attempts to avoid testing that might reveal their statements as misleading grants further credence to Plaintiff's assertion of scienter.

And, finally, reckless statements can also corroborate a showing of scienter. A statement is reckless if it "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d at 1201 (citation omitted). Gelt Trading alleges that regardless of whether the medical community put Satterfield and Co-Diagnostics on notice that their tests were deficient, Satterfield—as a scientist with a PhD—should have known that any implication that the company's test was 100% accurate would mislead the public. Plaintiff has alleged sufficient facts to establish that any scientist with experience in the diagnostic testing arena would know that a claim that a test was perfect or 100% accurate "is so obvious[ly]" misleading that Satterfield must have been aware of its misleading nature. *See id.*

All of these allegations together give rise to an inference of scienter that is both cogent and compelling. *See Tellabs*, 551 U.S. at 324. Indeed, the inference that Defendants acted intentionally is at least as compelling, if not more compelling, than the inference that they simply intended to accurately convey—not overstate—the efficacy of their product.

* * *

As a final matter, Gelt Trading concedes that it does not attempt to assert a duty to correct claim. Gelt Trading's concession renders Defendants' arguments in section II.A.3—that the second amended complaint fails to plead facts sufficient to raise any duty to issue a corrective statement—and in section II.A.4—that the second amended complaint fails to plead facts sufficient to raise

any obligation to correct statements of third parties—moot. Accordingly, the court need not address these arguments.

## IV.     § 20(a) CLAIM

Defendants contend that Gelt Trading's § 20(a) claim must be dismissed because it is purely derivative of Gelt Trading's § 10(b) and Rule 10b-5 claim against Co-Diagnostics and Satterfield. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253 n.2 (2010) ("Liability under § 20(a) is obviously derivative of liability under some other provision of the Exchange Act."). Defendants argue that to the extent Gelt Trading has not stated a claim under Rule 10b-5, neither has it stated a claim under § 20(a). But the court finds that Gelt Trading does, indeed, state a claim against Co-Diagnostics and Satterfield. And Defendants offer no other argument for rejecting Gelt Trading's § 20(a) claim on its merits. Accordingly, Gelt Trading's § 20(a) claim survives Defendants' motion to dismiss.

## CONCLUSION

The court DENIES Defendants' motion to dismiss.

DATED March 9, 2022.

BY THE COURT

---
Jill N. Parrish
United States District Court Judge