# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, <br> Plaintiff, <br> v. <br> CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, <br> Defendants. | Case No. 2:20-cv-00368-CMR |

DECLARATION OF
DR. ADAM WERNER
October 17, 2022

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     PROFESSIONAL BACKGROUND AND EXPERIENCE ....................................1

III.    SUMMARY OF OPINIONS AND FINDINGS ....................................................3

IV.     BACKGROUND ...................................................................................................4

      A.      About Co-Diagnostics ................................................................................4

      B.      About Co-Diagnostics Common Stock .......................................................5

      C.      Summary of Plaintiff's Allegations ............................................................6

V.      EFFICIENCY OF THE MARKET FOR CO-DIAGNOSTICS STOCK ...........6

      A.      Market Efficiency in Finance Academia and Economic Theory .............................6

      B.      The Legal Foundation and Application of Market Efficiency ................................9

      C.      The *Cammer* Factors and Their Application in This Case ...................10

            1.      Cammer Factor 1: Average Weekly Trading Volume ..............................10

            2.      Cammer Factor 2: Analyst Coverage .........................................................11

            3.      Cammer Factor 3: Market Makers and Listing on the NASDAQ .............13

            4.      Cammer Factor 4: SEC Form S-3 Eligibility .............................................15

            5.      Cammer Factor 5: Price Reaction to New Information ............................16

      B.      The *Unger/Krogman* Factors Considered ................................................25

            1.      Market Capitalization .................................................................................25

            2.      Float ............................................................................................................26

            3.      Bid-Ask Spread ...........................................................................................27

VI.     COMMON DAMAGE METHODOLOGY ........................................................27

      A.      Section 10(b) Damages Methodology ........................................................28

VII.    CONCLUSION ....................................................................................................30

VIII.   LIMITING FACTORS AND OTHER ASSUMPTIONS ....................................31

I, Adam Werner, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief. If called to testify, I could and would testify competently to the following facts.

## I.    INTRODUCTION

1.    I was asked by the Loren Washburn of Armstrong Teasdale LLP, Michael Pineiro of Marcus Neiman Rashbaum & Pineiro LLP, and Michael Fasano of Fasano Law Firm PLLC, co-counsel for Lead Plaintiff, to determine whether the common stock of Co-Diagnostics, Inc., ("Co-Diagnostics" or the "Company") traded in an efficient market during the period from April 30, 2020 through May 15, 2020, inclusive (the "Class Period").

2.    In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology that can be calculated on a class-wide basis for all Class members in connection with their claims under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, "Section 10(b)").

3.    I understand that as an expert witness in this proceeding, my duty in providing my declaration is to the Court and that this duty overrides any obligation to the parties who have engaged me, from whom I have received instructions or compensation. I confirm that I have complied with this duty.

## II.    PROFESSIONAL BACKGROUND AND EXPERIENCE

4.    I am currently a Lecturer in economics at the Orfalea College of Business at California Polytechnic State University San Luis Obispo (Cal Poly) where I have taught managerial economics to graduate students, and international finance, macroeconomics and microeconomics to undergraduates. I am also an affiliated expert at Crowninshield Financial Research, Inc. ("Crowninshield"). Prior to accepting my lecturer position at Cal Poly and being

affiliated with Crowninshield, I spent 16 years working for consulting firms including Cornerstone Research, CRA International, and NERA. I have been retained by both plaintiffs and defendants to consult on matters pertaining to market efficiency, materiality and loss causation, damages, investment banking, financial valuation, security issuance, bankruptcy, and options backdating. My expert opinions have been accepted in Federal, State, and Bankruptcy courts within the United States as well as courts in Australia and Canada. I have lectured frequently to attorneys on the topic of damage estimation and settlements in securities class actions. I have also spoken on the estimation of capital rates in emerging economies at a conference organized by the University of Texas School of Law.

5.      I hold a Ph.D. in Finance (1999) from Northwestern University's Kellogg Graduate School of Management. While at Kellogg, I taught M.B.A. classes in corporate finance, and futures and options. I was also awarded a University Scholarship during my time at Kellogg. Prior to graduate school, I served as a Research Assistant at the Federal Reserve Bank of Cleveland. My full Vitae including prior testimony is attached as Exhibit-1 to this declaration.

6.      A list of documents I reviewed in forming my opinion in this matter is set forth in Exhibit-2 to this declaration.

7.      Crowninshield is currently being compensated at $750 per hour for my ongoing work on this matter. Additional Crowninshield consultants have assisted me with my work at rates ranging from $250 per hour to $500 per hour. This compensation is not contingent on the outcome of this matter.

III.    **SUMMARY OF OPINIONS AND FINDINGS**

**OPINION 1: Co-Diagnostics stock traded in an efficient market throughout
the Class Period.**

8.      My opinion is based on the following observations, analyses, and findings from the
Class Period:

a.  The average weekly trading volume of Co-Diagnostics stock as a percentage of shares outstanding was 205.15%, much higher than the 2% required to meet the strong-presumption-of-efficiency benchmark set forth by the court in *Cammer v. Bloom*;[1]

b.  At least three securities analysts covered Co-Diagnostics and there were at least 35 news stories, press releases, and SEC filings published about the Company;

c.  Co-Diagnostics stock traded on the NASDAQ and had numerous market makers, at least 64 firms made a market in Co-Diagnostics stock during at least one of April and May 2020;[2]

d.  A high number of institutional investors owned Co-Diagnostics stock, as indicated by public filings;

e.  Co-Diagnostics stock was eligible to file an S-3 registration statement with the SEC throughout the Class Period;

f.  Event study analysis indicates that a cause-and-effect relationship existed between the release of new Company-specific information and movements in the price of Co-Diagnostics stock (*i.e.,* the stock price exhibited statistically significant abnormal returns);

---

[1] *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[2] See, ¶34 below for more information.

3

g. The market capitalization of the Co-Diagnostics stock averaged $445.7 million over the Class Period, which was larger than the total market capitalization of at least 56% of all other publicly traded companies in the U.S.;

h. Co-Diagnostics' float averaged $400.0 million and was larger than the total market capitalization of at least 54% of all other publicly traded companies in the U.S.;

i. Co-Diagnostics stock had an average bid-ask spread[3] of 0.18% compared to the average bid-ask spread of 0.78% for all stocks in the CRSP database.

**OPINION 2: With expert assistance, the finder of fact in this matter will be able to compute damages using a common class-wide methodology that applies to the calculation of damages for each and every Class member.**

## IV. BACKGROUND

### A. About Co-Diagnostics

9. Co-Diagnostics develops and manufactures tools, reagents, and other equipment used "for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications."[4] The Company's products provide "very rapid, low-cost, sophisticated molecular testing for organisms and genetic diseases."[5]

10. In January 2020, Co-Diagnostics announced "the completion of the principle design work for a PCR screening test for new coronavirus, COVID-19, intended to address potential need for detection of the virus."[6] The following month, the Company announced that its

---

[3] A bid-ask spread is the price at which a market maker (intermediary) is willing to buy and sell a security. For example, if one is making a market in Company Y's security, one might be willing to buy (bid) security of Company Y at $10 per share and sell (ask) the same security at $10.15 per share. In this instance, the bid-ask spread would be $0.15, or approximately 1.5%.

[4] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 30, 2020, p. 4.

[5] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 30, 2020, p. 4.

[6] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 30, 2020, p. 5.

Logix Smart Covid-19 Test (the "Logix Test") had "obtained regulatory clearance to be sold as an in vitro diagnostic for the diagnosis of SARS-CoV-2 (COVID-19)" in certain markets.[7] On May 1, 2020, Co-Diagnostics announced "independent evaluations" of its Logix Test that purportedly demonstrated "100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing."[8]

11.    For fiscal years ("FY") 2019 and 2020, the Company reported total revenues of $0.2 million and $74.5 million, respectively.[9] For the same years, the Company reported net loss of $6.2 million and net income of $42.5 million respectively.[10]

**B.    About Co-Diagnostics Common Stock**

12.    Throughout the Class Period, Co-Diagnostics stock traded on the NASDAQ under the trading symbol CODX.[11] The price of Co-Diagnostics stock at the start of the Class Period was $11.34 per share.[12] Co-Diagnostics stock price peaked at $23.42 on May 13, 2020. By May 15, 2020, the last day of the Class Period, the price of Co-Diagnostics fell to $17.07 per share, a loss of 27.11% from its Class Period peak.

---

[7] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 30, 2020, p. 5.

[8] "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," Company press release, *PR Newswire*, May 1, 2020, 6:30 AM.

[9] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2020, filed on March 25, 2021, p.19.

[10] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2020, filed on March 25, 2021, p.19.

[11] Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 30, 2020, p.10; Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2020, filed on March 25, 2021, p.17.

[12] Share data obtained from the Center for Research in Security Prices ("CRSP").

**C.      Summary of Plaintiff's Allegations**

13.      Plaintiffs allege that, throughout the Class Period, Co-Diagnostics misled market participants about the efficacy of their products in combatting the Covid-19 pandemic. [13] Specifically, Plaintiffs allege that Co-Diagnostics "made continual, knowing, and willful misstatements about their main product," a diagnostic test kit marketed as "Logix Smart". [14] Plaintiffs state that while Co-Diagnostics touted that its Covid-19 tests "were 100% accurate", this was not true. [15] Plaintiffs allege that the truth about Co-Diagnostics and its Covid-19 test were revealed via a combination of market commentary and an FDA press release stating that no Covid-19 test is 100% accurate – a statement that undermined Co-Diagnostic's misrepresentations. [16]

**V.      EFFICIENCY OF THE MARKET FOR CO-DIAGNOSTICS STOCK**

**A.   Market Efficiency in Finance Academia and Economic Theory**

14.      The efficient market hypothesis is the foundation of modern finance theory. In essence, a security trades in an efficient market when all publicly available information is incorporated in the security price and any new information that impacts the economic outlook of the firm gets quickly reflected in its security price. In over 50 years' worth of academic articles, financial economists have used event study analysis to evaluate market efficiency by examining how new information affects securities prices. [17] Event studies are a set of analytical methods used to measure the response of security prices to typical corporate news events such as earnings

---

[13] Complaint, ¶5.

[14] Complaint, ¶5.

[15] Complaint, ¶7.

[16] Complaint, ¶14.

[17] *See*, *e.g.*, "The Event Study Methodology Since 1969," by John J. Binder, *Review of Quantitative Finance and Accounting*, vol. 11, 1998, pp. 111-137.

releases, merger announcements, guidance revisions, etc., after controlling for, among other things, market-wide factors. Campbell *et al.* [1997] provide a detailed description of the methodology and document its wide use in academic research.[18]

15.     Furthermore, event study analysis has formed the basis for assessing loss causation and artificial inflation in securities class actions.[19] Gold *et al.* [2017] write that financial economists generally accept and widely use the methodology in forensic applications.[20]

16.     While financial economists rely on event study analysis as direct evidence demonstrating security price response to new information, they accept other factors as tending to support the existence of an efficient market for a security. For example, financial economists have argued that trading volume is correlated with a market's efficiency such that the higher the trading volume, the more likely it is to be efficient.[21]

17.     Financial economists also believe that the number of analysts that follow a company is related to the market efficiency of the company's security. This is based on the theory that:

> [a]nalysts gather and independently generate information about companies and disseminate such information to their clients (e.g., in the form of earnings forecasts

---

[18] "Event-Study Analysis," by John Campbell et al., Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.

[19] *See*, *e.g.*, "Materiality and Magnitude: Event Studies in the Courtroom," by David I. Tabak and Frederick C. Dunbar, Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2001.

[20] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook*: *The Role of the Financial Expert*, 6th Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2017.

[21] *See*, *e.g.*, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 291.

and recommendations). Accordingly, it can be expected that the larger the number of analysts following a security, the more efficiently it is traded.[22]

18.    Put another way, the more analysts covering a security, the more likely it is that the market for that security will timely incorporate new information in that security's price.

19.    Similarly, financial economists have considered the market value of a firm and its relationship with market efficiency.[23] Larger companies tend to attract more analyst and news media coverage and gain the attention of a greater number of investors. All of these characteristics, which accompany a large market capitalization, promote, and therefore tend to support, market efficiency.

20.    A narrow bid-ask spread[24] of a particular security is also often associated with efficiency. In academia, a security's bid-ask spread is frequently used as a measure of liquidity[25] or cost of trading.[26] All things equal, a narrower bid-ask spread implies that there is a sufficient demand for and supply of an asset—the number of investors willing to buy or sell a security. Thus, the cost of executing a trade is low. A lower cost of trading implies that there are fewer impediments for investors to trade on new information.

---

[22] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 292.

[23] *See, e.g.*, "The Cross-Section of Expected Stock Returns," by Eugene F. Fama and Kenneth R. French, *The Journal of Finance*, vol. 47, no. 2, 1992, pp. 427-465 (discussing how the role of size explains returns).

[24] The bid-ask spread is the amount by which the ask price (the lowest price that a seller is willing to accept) for a share of a security exceeds the bid price (the highest price that a buyer is willing to pay).

[25] Liquidity refers to the degree to which investors can buy and sell a security in the market without affecting the price.

[26] *See, e.g., Trading & Exchanges: Market Microstructure for Practitioners*, by Larry Harris, Oxford University Press, 2003, pp. 420-441.

**B.      The Legal Foundation and Application of Market Efficiency**

21.      In *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989) ("*Cammer*"), the seminal decision on demonstrating market efficiency, the court's definition of efficiency was generally consistent with how financial economists and the academic community define efficiency.[27] The *Cammer* court then related efficiency to the reliance element of securities fraud claims and the applicability of the fraud-on-the-market doctrine, stating:

> [a]s relevant here, courts have permitted a rebuttable presumption of reliance in the case of securities traded in 'efficient markets' (*i.e.*, markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price).[28]

22.      Just one year earlier, the United States Supreme Court confirmed its understanding of the efficient market theory focusing on the same fundamental characteristic of market efficiency in the context of the availability of the fraud-on-the-market doctrine for establishing the reliance element of a securities fraud claim stating:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business …[29]

---

[27] *Cammer*, 711 F.Supp. at 1276, n. 17 (quoting *Securities Fraud and Commodities Fraud*, by Alan Bromberg & Lewis Lowenfels, §8.6 (Aug. 1988)) ("An efficient market is one which rapidly reflects new information in price.")); *id*. at 1280, n. 25 (quoting "Efficient Capital Markets: A Review of Theory and Empirical Work," by Eugene F. Fama, *The Journal of Finance*, vol. 25, no. 2, 1970) ("A market in which prices always 'fully reflect' available information is called 'efficient'").

[28] *Cammer*, 711 F.Supp. at 1273, n. 11.

[29] *Basic, Inc. v. Levinson*, 485 U.S. 224, 241 (1988); and *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 458 (2013) ("[t]he fraud-on-the market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company . . .").

23.    In advance of laying out a number of criteria that courts should examine in determining market efficiency, the *Cammer* court credited financial experts such as Bromberg and Lowenfels. The *Cammer* court explicitly acknowledged the importance of a listing on a developed exchange and the implications of such a listing for market efficiency:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[30]

### C.   The *Cammer* Factors and Their Application in This Case

24.    The *Cammer* court applied five factors to determine market efficiency.[31] Widely-accepted academic finance literature provides the economic basis for these factors as indicia of market efficiency. The five factors considered are (1) a security's/firm's average weekly trading volume; (2) analyst coverage; (3) number of market makers; (4) eligibility to file an SEC Form S-3; and (5) price reaction to new information.

#### 1.    Cammer Factor 1: Average Weekly Trading Volume

25.    The first *Cammer* factor examines whether a security's "average weekly trading volume … [would be] in excess of a certain number of shares."[32] More specifically, the court credited Bromberg who recognized that "turnover measured by average weekly trading of 2% or

---

[30] *Cammer,* 711 F. Supp. at 1292.

[31] *Cammer,* 711 F. Supp. at 1286-87.

[32] *Cammer,* 711 F. Supp. at 1286 ("the reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest …. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information").

more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[33]

26.    During the Class Period, Co-Diagnostics' weekly trading volume ranged between 22,045,509 and 113,626,619 shares.[34] As shown in Exhibit-3, the average weekly trading volume of Co-Diagnostics' stock during the Class Period as a percentage of its stock outstanding was 205.15%. This level of weekly average trading volume exceeds the *Cammer* benchmark of 2% necessary for a "strong presumption" of market efficiency and exceeds the benchmark of 1% necessary for a "substantial presumption" of market efficiency.[35] Thus, one can make a strong presumption of market efficiency for Co-Diagnostics stock during the Class Period.

### 2.    *Cammer Factor 2: Analyst Coverage*

27.    The *Cammer* Court found that "it would be persuasive [if] a significant number of securities analysts followed and reported on a company's stock."[36] If investment professionals were closely monitoring a firm's information and subsequently making buy/sell recommendations to their clients based on that information, "the market price of the stock would be bid up or down to reflect the [company's] financial information…as interpreted by the securities analysts."[37] This suggests that the more analysts who followed a security, the greater the likelihood that a security

---

[33] *Cammer,* 711 F. Supp. at 1293.

[34] Volume data obtained from CRSP.

[35] This corresponds to 56,325,373 shares traded per week during the Class Period on average.

[36] *Cammer,* 711 F.Supp. at 1286.

[37] *Cammer,* 711 F.Supp. at 1286.

traded in an efficient market. Barber *et al.* [1994] found that coverage by one or two analysts strengthened the presumption of efficiency for a publicly traded stock.[38]

28.     As the Class Period covered only 16 calendar days, there were no analyst reports published during the Class Period. However, at least two analyst firms following Co-Diagnostics issued recommendations and/or research reports shortly before and after the Class Period. These firms were H.C. Wainwright & Co, and Maxim Group.[39] Further, on May 12, 2020, *Reuters* reported that three analysts had submitted earnings estimates.[40] As such, at least three analysts followed Co-Diagnostics during the Class Period, with two analyst firms issuing recommendations and/or research reports both before and after the Class Period.

29.     The various avenues of news media coverage also facilitates the flow of material information to the marketplace, which promotes efficiency. Such avenues of information dissemination include company press releases.[41]

---

[38] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994.

[39] See, e.g., "FDA Issues Emergency Use Authorization to COVID-19 Test; Reiterate Buy," by Yi Chen, *H.C. Wainwright & Co.*, analyst report, April 6, 2020; "Additional Manufacturing Capacity Contracted; Reiterate Buy," by Yi Chen, *H.C. Wainwright & Co.*, analyst report, April 14, 2020; "CoPrimer-based COVID-19 Test Validated for Saliva Analysis; Reiterate Buy," by Yi Chen, *H.C. Wainwright & Co.*, analyst report, April 17, 2020; "1Q20 Results; 2Q20 Sales Eclipse Forecast; Reiterate Buy; Raising PT to $35," by Yi Chen, *H.C. Wainwright & Co.*, analyst report, May 18, 2020; "FDA Emergency Use Authorization Granted for Logix Smart COVID-19 Test - Maintain Hold on Valuation," by Jason McCarthy, *Maxim Group*, analyst report, April 6, 2020; and "COVID-19 Testing Has Been Transformative for Co-Diagnostics, Raising Revenue Forecast and Upgrading to Buy, with a $30 PT," by Jason McCarthy, *Maxim Group*, analyst report, May 20, 2020.

[40] See, "Co-Diagnostics Inc is expected to show an increase in its first quarter earnings to $-0.05 per share according to the mean Refinitiv estimate **from three analysts**" ("Co-Diagnostics Inc:A loss of 5 cents per share anticipated for first quarter," *Reuters*, May 12, 2020, 5:57 PM (emphasis added)).

[41] *See*, *e.g., Cammer*, 711 F. Supp at 1283, n. 30, citing that the company "issued numerous press releases concerning its business operations …."

30.     During the Class Period, over 35 news stories, press releases, and SEC filings featuring Co-Diagnostics appeared in financial publications and newswires, including *Dow Jones Institutional News, PR Newswire*, and *Reuters.*

31.     The number of analysts covering Co-Diagnostics supports a finding of market efficiency. In addition, the wide dissemination of information about Co-Diagnostics from company press releases and from well-regarded and widely-read sources in the news media such as *Dow Jones Institutional News, PR Newswire,* and *Reuters* also supports a finding of market efficiency.

### 3.     *Cammer Factor 3: Market Makers and Listing on the NASDAQ*

32.     The third factor considered by the *Cammer* court to indicate market efficiency is that a security had numerous market makers.[42] The *Cammer* court stated, "the existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[43]

33.     A security with a large number of market makers would indicate that many market participants are trading in that security, thereby increasing liquidity and decreasing trading costs. It follows that a large number of market makers indicates efficiency of the market for a particular security.

34.     Market making data from Bloomberg is available on a monthly basis. As the Class Period was only 16 days long, I obtained market making data for Co-Diagnostics stock for both April 2020 and May 2020. There were at least 72 market makers for Co-Diagnostics stock in April

---

[42] *See*, *e.g.,* "The Fraud-on-the-Market Theory and The Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 291.

[43] *Cammer*, 711 F. Supp. at 1286-1287.

2020, and at least 73 market makers in May 2020. There were at least 64 market makers who made a market in Co-Diagnostics stock in *both* April and May 2020, and at least 81 market makers who made a market in Co-Diagnostics stock in *at least one of* April 2020 or May 2020. *See* Exhibit-4 for a list of market makers during the Class Period. Again, citing Bromberg and Lowenfels, the *Cammer* court noted that "[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption."[44]

35.    Another indication of market efficiency is the presence of institutional investors – sophisticated and professional full-time investors – in the market, as economists presume them "to be better informed about the securities they hold and better able to interpret new information than individual investors."[45]

36.    There were no reporting dates for quarterly institutional holdings that occurred during the Class Period. However, on March 31, 2020, the quarterly reporting date preceding the Class Period, at least 44 unique institutional investors owned Co-Diagnostics stock. On June 30, 2020, the quarterly reporting date following the Class Period, at least 109 unique institutional investors owned Co-Diagnostics stock. Given the high number of institutions holding Co-Diagnostics directly preceding and succeeding the Class Period, as well as the increase in unique institutions holding Co-Diagnostics stock between these periods, a reasonable inference can be made that a high number of institutions held Co-Diagnostics stock during the Class Period. The

---

[44] *Cammer*, 711 F. Supp at 1293 (quoting Bromberg & Lowenfels, Securities Fraud and Commodities Fraud §8.6 (1988))

[45] "The Fraud-on-the-Market Theory and The Indicators of Common Stocks' Efficiency," by Brad M. Barber et al., *The Journal of Corporation Law*, 1994, p. 292. For discussion of the role of institutional investors in incorporating information into equity prices, *see*, *e.g.*, "The Influence of Analysts, Institutional Investors, and Insiders on the Incorporation of Market, Industry, and Firm-Specific Information into Stock Prices," by Joseph D. Piotroski and Darren T. Roulstone, *The Accounting Review*, vol. 79, no. 4, 2004, pp. 1119-1151.

presence of sophisticated professional investors is further support for finding that the market for Co-Diagnostics stock was efficient during the Class Period.

37.     The existence of market makers and a large number of unique institutional investors further supports that Co-Diagnostics stock traded in an efficient market.

### 4.     Cammer Factor 4: SEC Form S-3 Eligibility

38.     The fourth *Cammer* factor is a firm's ability to file a Form S-3 Registration Statement. For a company to be eligible to file a Form S-3, the Securities and Exchange Commission ("SEC") requires 12 months of filings and at least $75 million of float. A company with less than $75 million of float and 12 months of filings is eligible to file a Form S-3 registration so long as the company has "a class of common equity securities listed and registered on a national securities exchange, and the issuers do not sell more than the equivalent of one-third of their public float in primary offerings over any period of 12 calendar months."[46] Despite the fact that the SEC has loosened the $75 million float requirement, courts continue to focus on the $75 million float benchmark when analyzing this *Cammer* factor.[47]

39.     The *Cammer* court noted that S-3 registration eligibility is indicative of market efficiency because the filing requirement ensured that financial data are available to market participants, and the public float requirement indicated that many market participants would have examined the information.[48]

> Proposed Form S-3 recognizes the applicability of the efficient market theory to the registration statement framework with respect to those registrants which usually provide high quality corporate reports, including

---

[46] "Revisions to The Eligibility Requirements for Primary Securities Offerings on Forms S-3 And F-3," SEC Release No. 33-8878, December 19, 2007.

[47] *See, e.g., Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012).

[48] *Cammer*, 711 F. Supp. at 1284-85.

> Exchange Act reports, and whose corporate information is broadly disseminated, because such companies are widely followed by professional analysts and investors in the market place. Because of the foregoing observations made by the SEC, the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient.[49]

> The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document.[50]

> Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[51]

40.     Co-Diagnostics was eligible for S-3 registration for all Class Period trading days. During the Class Period, Co-Diagnostics float ranged in value from $279.2 million to $577.1 million, which was above the minimum requirement for S-3 registration. The Company also regularly filed financial reports with the SEC throughout the Class Period. Therefore, to the extent that S-3 registration eligibility indicates company characteristics associated with market efficiency, Co-Diagnostics clearly possessed those particular characteristics throughout the Class Period.

### 5.     *Cammer Factor 5: Price Reaction to New Information*

41.     The fifth factor cited in *Cammer* suggests "it would be helpful to . . . [have] empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[52] To demonstrate this cause-and-effect relationship, I conducted an event study investigating whether the market for Co-Diagnostics

---

[49] *Cammer*, 711 F. Supp. at 1284-85.

[50] *Cammer*, 711 F. Supp. at 1285.

[51] *Cammer*, 711 F. Supp. at 1287.

[52] *Cammer,* 711 F. Supp. at 1287.

common stock was efficient, specifically with respect to allegation-related information that was released to the market during the Class Period. A significant reaction would demonstrate market efficiency, not only generally, but also specifically with respect to the information at issue in this case. Furthermore, if the allegation-related information events do elicit statistically significant price reaction(s), this would be evidence that the price of Co-Diagnostics stock was impacted by the allegation-related information.

42. The event study is the paramount tool for testing market efficiency. Professor Fama states that:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.[53]

43. Since the seminal papers by Ball and Brown [1968] and Fama *et al*. [1969] first introduced event study analysis to a broader audience of accounting and finance researchers, event studies have "become ubiquitous in capital markets research."[54] Campbell *et al*. [1997] provide a detailed background and description of how event studies are used in econometric analysis.[55] Gold *et al*. [2017] write about how the methodology is generally accepted and widely used in forensic applications.[56]

---

[53] "Efficient Capital Markets: II," by Eugene F. Fama, *The Journal of Finance*, vol. 46, no. 5, 1991, p. 1607.

[54] "Event Studies: A Methodology Review," by Charles J. Corrado, *Accounting and Finance*, vol. 51, 2011, p. 207.

[55] "Event-Study Analysis," by John Campbell et al., Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.

[56] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2017.

44.     In its application, an event study can measure how much a firm's security price rises or falls in response to new information. An event study first calculates the difference between the actual return on an individual security and the return predicted by the market model. This difference is called an "abnormal return" (or residual return). It measures the impact of new, firm-specific information on a firm's security price. If the abnormal return over an event period is deemed to be statistically significant, it indicates that the security price movement was likely caused by firm-specific information and therefore cannot be attributed to market and/or industry factors, or to random volatility alone. Indeed, a cause-and-effect relationship between new material information and the reaction in the security price establishes market efficiency.

45.     Not every piece of new information will result in a statistically significant abnormal security return. To the extent that the new information may have been expected, or the valuation impact of the new information is appropriately modest, the appropriate abnormal price return should be statistically insignificant. As such, a finding of non-significance does not necessarily establish inefficiency as a modest non-significant security price reaction may be the appropriate and efficient security price reaction to a particular information event.[57]

46.     For example, if a company announces earnings that are in-line with analysts' and investors' expectations, even though the announcement contains important information, it may not change the total mix of information sufficiently enough to elicit a statistically significant security price reaction on that date. Appropriate candidate events for inclusion in a market efficiency event study, therefore, are events on which company-specific information was released that is new,

---

[57] "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," by Alon Brav and J. B. Heaton, *Washington University Law Review*, vol. 93, no. 2, 2015, p. 602.

unexpected, not confounded by major countervailing news, and is of such import as to reasonably be expected to elicit a security price reaction over the threshold for statistical significance.

(1)     **Selection of Co-Diagnostics Market Efficiency Events**

47.     In connection with this factor, the *Cammer* Court recognized the special importance of the information allegedly misrepresented that is the subject of the litigation:

> The central question under the fraud on the market theory is whether the stock price, at the time a plaintiff effected a trade, reflected the 'misinformation' alleged to have been disseminated.[58]

48.     By focusing an event study on information related to the allegations in the Complaint, I have ascertained that the market for Co-diagnostics stock was efficient, not only generally, but also with respect to the particular information at issue in this case. Consequently, the empirical behavior of Co-Diagnostics stock following the release of allegation-related information best determines whether the market for Co-Diagnostics stock was efficient for purposes of the fraud-on-the-market principle.

49.     An event study testing market efficiency does not require a comprehensive identification of all events during the Class Period, including all of those cited in the Complaint, on which new material allegation-related information was disclosed.[59] Further, because of the high threshold for statistical significance, it is also important to note that new information may be economically significant without being statistically significant.

---

[58] *Cammer*, 711 F.Supp. at 1282

[59] A comprehensive identification of all disclosures of information related to the alleged fraud is beyond the scope of this declaration and is properly addressed in an analysis of loss causation and damages.

50.    The following are amongst the event dates identified where important, relevant and material information was disclosed:

a.    **May 1, 2020:** On May 1, 2020, prior to the start of trading, Co-Diagnostics announced "independent evaluations" of its Logix Test that purportedly demonstrated "100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing."[60]

b.    **May 15, 2020:** On May 14, 2020, after the close of trading,[61] the United States Food and Drug Administration (the "FDA") issued a press release to inform the public about "possible accuracy concerns" where it specified that "no diagnostic test will be 100% accurate." Also after the close of trading on May 14, 2020, the Company announced Q1 2020 financial results and held a conference with investors. Despite the FDA's press release, Co-Diagnostics did not comment on the development during the conference call with investors.

(2)    **Market Model**

51.    A market model is used to determine how much of a company's security return on each event was driven by company-specific information as opposed to market and peer group factors. The market model involves running a regression to determine how Co-Diagnostics stock typically behaved in relation to the overall stock market and industry-specific factors. The regression model is then used to determine how much of each event day's observed security price return can be explained by the market and industry-specific factors (the "expected return" or

---

[60] "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," Company press release, *PR Newswire*, May 1, 2020, 6:30 AM.

[61] "FDA issues warning on accuracy of Abbott's rapid coronavirus test after study finds false negatives," by Salvador Rodriguez, CNBC.com, May 14, 2020, 8:36 PM.

"explained return"). That is, a market model measures the expected return of the company's security over an event period after controlling for the overall market and industry-specific factors.

52.    Next, the abnormal return (or residual return) is computed by subtracting the expected return from the observed security price return. The abnormal return is the return of the company's security after controlling for market effect and industry-specific factors.

53.    I ran a regression modeling the return of Co-Diagnostics stock as a function of 1) a constant term, 2) the returns of the overall stock market, and 3) an industry index return. The regression model is formulaically expressed as follows:

$$Rs_t = \alpha + \beta_1 Rm_t + \beta_2 Ri_t + \epsilon_t$$

Where:

$Rs_t$ = the return of the stock;

$Rm_t$ = the return of the market index;

$Ri_t$ = the daily return of the industry index.

54.    The regression model produces a "constant" term ("$\alpha$") also referred to as an "intercept" term, and one or more slope coefficient, or "beta" ("$\beta$"). The betas quantify the sensitivity of a security's return to the return on the market index ("$\beta_1$") and industry index ("$\beta_2$"). A security with a market index beta of 1.0 is expected to increase (decrease) by one percent for each one percent increase (decrease) in the market index. Similarly, a security with a market beta of 2.0 is expected to increase (decrease) by two percent for each one percent increase (decrease) in the market index.

55.   To control for movements in the overall stock market, I used the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index ("Market Index"), which is a generally accepted measure of the performance of the overall stock market. The Market Index incorporates payment of dividends by the constituent companies. Because Co-Diagnostics did not identify a comparable peer group in its SEC filings, to control for industry-related factors, I used the S&P 500 Health Care Equipment Sub Industry GICS Level 4 Index[62] as the peer group index ("Industry Index").

56.   Exhibit-5 presents the Co-Diagnostics return, Market Index return, and Industry Index return used in the regression model. Co-Diagnostics' stock prices and trading volume on the event study dates are shown in Exhibit-6.[63]

57.   Prior to running a regression, one must decide on an estimation period over which to measure the relationship between the security at issue and the corresponding market and industry indices. I ran the regression over the interval April 30, 2020 through April 29, 2021. In event study analysis, the choice of using a regression estimation period during the event window of interest is a widely used and generally accepted methodology.[64] The results of the regression are summarized in Exhibit-7.

---

[62] The S&P 500 Health Care Equipment Sub Industry GICS Level 4 Index is a widely-known index that tracks the performance of publicly-traded Health Care Equipment companies in the U.S. This index was selected because Co-Diagnostics makes Health Care Equipment, and its performance was likely affected by sector news for the Health Care Equipment Sub industry.

[63] In my regression analysis, I use log returns $R_1 = \ln(P_1/P_0)$ rather than normal returns $R_1 = ((P_1-P_0)/P_0)$ where $P_1 =$ ending stock price and $P_0 =$ beginning stock price, as security returns are considered to be log normally distributed.

[64] "Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window." ("Materiality and Magnitude: Event Studies in the Courtroom," by David I. Tabak and Frederick C. Dunbar, Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman L. Weil et al., John Wiley & Sons, Inc., 2001, p. 19.5.)

(3)     *t*-Test

58.     For each event, I conducted a statistical test called a *t*-test to determine whether Co-Diagnostics' abnormal return was statistically significant. If the absolute value of the "*t*-statistic," which is equal to the abnormal return on an event date divided by the standard deviation of all abnormal returns in the regression estimation, is greater than the critical *t*-statistic value of $\pm1.96$, then the security price return is deemed statistically significant. That is, there is less than a 5% chance that the abnormal return was caused by random volatility alone, which is generally accepted to be so unlikely that the random volatility explanation can be rejected. If an event date's abnormal return is deemed to be statistically significant, one can conclude that the security price return was caused by company-specific information, rather than random volatility.

59.     The results of the event study are presented below and in Exhibit-8.

b.     ***Event Study Results***

(1)     **May 1, 2020**

60.     On May 1, 2020, prior to the start of trading, Co-Diagnostics announced "independent evaluations" of its Logix Test that purportedly demonstrated "100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing."[65]

61.     On May 1, 2020, Co-Diagnostics' share price rose 17.21% (on a logarithmic basis), on volume of 16,701,876 shares traded. The Market Index return on that date was -2.84% and the Industry Index return was -2.20%. Based on the regression model, the expected portion of the return on Co-diagnostics stock was 1.17%. The difference between the actual return of 17.21% and the expected return of 1.17% is an abnormal return of 16.04%.

---

[65] "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," Company press release, *PR Newswire*, May 1, 2020, 6:30 AM.

62. According to the event study, the abnormal return of 16.04% is associated with a *t*-statistic value of 2.34, which indicates that the residual return is statistically significant at the 95% confidence level. The *t*-statistic value of 2.34 indicates that the abnormal return was too severe to have been a random fluctuation. Consequently, the abnormal stock return is deemed statistically significant and is indicative of market efficiency.

(2)      **May 15, 2020**

63. **May 15, 2020:** On May 14, 2020, after the close of trading,[66] the United States Food and Drug Administration (the "FDA") issued a press release to inform the public about "possible accuracy concerns" where it specified that "no diagnostic test will be 100% accurate."[67] Also after the close of trading on May 14, 2020, the Company announced Q1 2020 financial results and held a conference with investors.[68] Despite the FDA's press release, Co-Diagnostics did not comment on the development during the conference call with investors.[69]

64. On May 15, 2020, Co-Diagnostics' share price fell 25.96% (on a logarithmic basis), on volume of 21,052,293 shares traded. The Market Index return on that day was 0.52% and the Industry Index return was -0.15%. Based on the regression model, the expected portion of the return on Co-diagnostics stock was 0.18%. The difference between the actual return of -25.96% and the expected return of 0.18% is an abnormal return of -26.14%.

---

[66] "FDA issues warning on accuracy of Abbott's rapid coronavirus test after study finds false negatives," by Salvador Rodriguez, CNBC.com, May 14, 2020, 8:36 PM.

[67] "Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," press release, *U.S. Food & Drug Administration*, March 14, 2020, fda.gov, accessed at https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-informs-public-about-possible-accuracy-concerns-abbott-id-now-point.

[68] "Co-Diagnostics, Inc. Announces Q1 2020 Results and Provides Mid-Second Quarter Update," Company press release, *PR Newswire*, May 14, 2020, 4:01 PM.

[69] "Press Release: Co-Diagnostics, Inc. Releases Prepared Remarks for First Quarter 2020 Conference Call," *Dow Jones Newswire*, May 14, 2020, 4:01 PM.

65. According to the event study, the abnormal return of -26.14% is associated with a *t*-statistic value of -3.81, which indicates that the residual return is statistically significant at the 99% confidence level. The *t*-statistic value of -3.81 indicates that the abnormal return was too severe to have been a random fluctuation. Consequently, the abnormal stock return is deemed statistically significant and is indicative of market efficiency.

### c. *Cause and Effect Summary*

66. Based on the results of this test which examined how Co-Diagnostics stock reacted to new information, it is clear that based on this criterion, Co-Diagnostics stock traded in an efficient market.

### B. The *Unger/Krogman* Factors Considered

67. In addition to evaluating market efficiency using the *Cammer* factors, I also analyzed three factors considered by the Fifth Circuit Court of Appeals in *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005), and the district court in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) as indicative of market efficiency.

### 1. *Market Capitalization*

68. Economists have often considered the market value of a firm and its relationship with market efficiency when attempting to determine market efficiency. Larger companies tend to attract more analyst and news media coverage and gain the attention of greater numbers of investors, including very large institutional investors. All these characteristics, which accompany a large market capitalization, promote market efficiency.

69. The court in *Krogman* held that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because

there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[70] In addition, some investors such as pension funds are often restricted to owning securities whose market capitalization is sufficiently high.

70. During the Class Period, Co-Diagnostics' average market capitalization was $445.7 million (*See* Exhibit-6), putting Co-Diagnostics in the 5th decile of U.S. companies by size – Co-Diagnostics' market capitalization was larger than the market capitalization of at least 56% of all other publicly-traded companies in the United States.[71]

71. Consistent with the *Unger/Krogman* opinions, Co-Diagnostics' market capitalization throughout the Class Period is further evidence of market efficiency during the Class Period.

### 2. *Float*

72. Co-Diagnostics' stock float averaged $400.0 million during the Class Period. While float excludes shares held by insiders and affiliated corporate entities, Co-Diagnostics' stock float was still larger than the total market capitalization of at least 54% of all other publicly traded companies in the U.S. The size of Co-Diagnostics' float is indicative of market efficiency.[72]

73. Float can also be analyzed as a percentage of total shares outstanding as well as in absolute share and value terms. On average during the Class Period, there were 24.6 million stock in Co-Diagnostics' float and 27.4 million stock outstanding, resulting in an average float of 89.75% of stock outstanding.

---

[70] *Krogman*, 202 F.R.D. 467 at 478.

[71] Using averaged month-end data from CRSP for April 2020, I grouped public companies into deciles, so that the 1st decile contains the largest 10% of all public companies listed on the NYSE, American Stock Exchange, NASDAQ, and ARCA while the 10th decile contains the smallest 10%.

[72] Using averaged month-end data from CRSP for April 2020, I grouped public companies into deciles, so that the 1st decile contains the largest 10% of all public companies listed on the NYSE, American Stock Exchange, NASDAQ, and ARCA while the 10th decile contains the smallest 10%.

74.	The magnitude of Co-Diagnostics' float is indicative of the efficiency of the market for its stock during the Class Period.

### 3.	Bid-Ask Spread

75.	A narrow bid-ask spread of a particular security is also often associated with efficiency. A narrow bid-ask spread implies that there is a large number of investors willing to buy or sell a security, thus the cost of executing a trade is lower, all else equal.

76.	I obtained from CRSP the daily closing bid and ask quotes for Co-Diagnostics stock during the Class Period. I measured the percentage bid-ask spread as the difference between the bid and ask quotes, divided by the average of the bid and ask quotes.[73] Exhibit-6 presents Co-Diagnostics' bid-ask spread data.

77.	The average bid-ask spread for Co-diagnostics stock during the Class Period was 0.18% (*See* Exhibit-6). By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was 0.78%.[74]

78.	Co-Diagnostics' average bid-ask spread was narrower than the average level among all other CRSP stocks. The bid-ask spread measure favors a finding of market efficiency.

## VI.	COMMON DAMAGE METHODOLOGY

79.	Plaintiffs' counsel has asked me to opine on whether per share out-of-pocket damages could be measured for each Class member under Section 10(b) of the Exchange Act using a common methodology for all Class members.[75]

---

[73] "Price Reversals, Bid-Ask Spreads, and Market Efficiency," by Allen B. Atkins and Edward A. Dyl, *Journal of Financial and Quantitative Analysis*, vol. 25, no. 4, 1990.

[74] This calculation is based upon averaged month-end data from CRSP for April 2020.

[75]  It should be noted that I have not conducted a loss causation analysis at this time and reserve the right to address such issues at the appropriate stage. The loss causation analysis that will be necessary to actually calculate damages in the current case requires the full development of the record.

A.      **Section 10(b) Damages Methodology**

80.      The methodology a financial economist can employ to calculate individual and class-wide damages stemming from various alleged misrepresentations and omissions will accommodate alternative potential determinations of liability. Economic analysis can be used to estimate the relationship between specific statements or sets of statements and the subsequent effect on prices, in the case of affirmative statements, omissions, and/or corrective disclosures. As such, class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Plaintiffs can be calculated in a straightforward manner common to all Class members. Out-of-pocket damages can be measured as the difference between the amount of security price inflation at purchase and the amount of inflation in the security price at sale taking into account formulaic prescriptions in relevant case law and statutes, including, for example, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (15 U.S.C. § 78u-4(e)) and the holding in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

81.      Assuming a verdict for the Plaintiffs on the allegations of fraud, Section 10(b) per security damages can be measured as follows:

i.      First, valuation tools, which would include event study analysis such as that described herein, and potentially other empirical analyses if necessary, would be used to establish that the disclosure(s) correcting the alleged misrepresentations and omissions caused the price of Co-Diagnostics stock to fall. This analysis, after controlling for potentially confounding non-fraud-related information, would determine if the alleged misrepresentations and omissions had caused the security prices to be artificially inflated, and that the corrective disclosure(s) caused the inflation to dissipate, in turn causing investor losses. This analysis would be used to measure the effect of a disclosure(s) on Co-Diagnostics stock price and would apply on a class-wide basis.

28

ii. Second, an inflation ribbon would be constructed, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Co-Diagnostics stock on each day during the Class Period. An inflation ribbon is a time series of the difference between the actual security price observed in the marketplace, and the estimated price that the security would have traded at each day had there been full disclosure from the outset of the Class Period, or but-for price. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for the alleged fraud-related residual price declines as they occurred. The difference between the inflation prior to a corrective disclosure and the inflation after that corrective disclosure is equal to the amount of inflation that is dissipated due to the corrective disclosure. Should it be determined that a disclosure(s) is not corrective, the methodology described herein can accommodate such a change and adjust per security damages accordingly. This analysis is commonly referred to as the "backcasting" method and would also apply on a class-wide basis.

iii. Third, the measure of per security damages generally applied in 10b-5 cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss). That is, for each Class member, per security damages would be calculated as the difference between the inflation on Class Period date shares were purchased and the inflation on the date those same securities were subsequently sold (if during the Class Period) or held (if at the end of the Class Period). Pursuant to the PSLRA, for any securities sold during the 90-day period after the end of the Class Period, per security damages would be calculated as the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss), or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price from the final corrective disclosure date to the sale date. Also pursuant to the PSLRA, for any securities held 90 days or more beyond the final

29

corrective disclosure, damages would equal the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price over the 90 days following the final corrective disclosure. The calculation of each Class member's damages would be a mechanical arithmetical exercise, conducted the same way for all Class members, applying the results of the Class-wide analyses described above to each Class member's trading data.

82.    Consequently, each Class member's per security damages under Section 10(b) can be computed in the same way, common to all Class members, using readily available daily pricing information, in accordance with widely used and generally accepted methodologies and the PSLRA.

83.    I have not yet been asked to calculate damages for any of the claims alleged on behalf of the Class, and such calculations will likely depend, in part, on the completion of discovery. However, the methodology described above is generally accepted and widely used for calculating damages under Section 10(b) consistently on a class-wide basis in securities class actions. To the extent that there are specific issues complicating the quantification of artificial inflation and damages, such as potential confounding information, these issues relate to the merits of the damages model – not whether damages can be calculated on a class-wide basis pursuant to a common methodology for the Class.

## VII.    CONCLUSION

84.    Based on my analyses explained in detail above, I conclude that Co-Diagnostics stock traded in an efficient market with regard to publicly disclosed information during the Class Period.

85.     I also conclude that with expert assistance, the finder of fact in this matter will be able to compute damages using a common class-wide methodology that applies to the calculation of damages for each and every Class member.

## VIII.   LIMITING FACTORS AND OTHER ASSUMPTIONS

86.     My analyses and opinions are based on the information available as of the date of this declaration. Should any additional data or information become available subsequent to the submission of this declaration, I reserve the right to supplement or amend this declaration based on this new information.

Dated:     October 17, 2022

Adam Werner, PhD
Affiliated Expert,
Crowninshield Financial Research

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

## EDUCATION

1998        Northwestern University, Kellogg Graduate School of Management
            Ph.D. in Finance

1992        Oberlin College
            B.A. in Economics

## TEACHING EXPERIENCE

2014 – Present        Cal Poly San Luis Obispo
                      Orfalea College of Business
                      San Luis Obispo, CA
                      Lecturer in Economics

## BUSINESS EXPERIENCE

2015 – Present        Crowninshield Financial Research

2018 – 2021          Pismo Beach Planning Commission

2009 – 2015          Gnarus Advisors/Berkeley Economic Consulting

2008 – 2009          LitiNomics

2004 – 2008          CRA International

2000 – 2003          National Economic Research Associates, Inc.

1998 – 2000          Cornerstone Research

1992 – 1993          Federal Reserve Bank

## PAPERS AND PUBLICATIONS

"The Impact of Underwriter Reputation on Equity Offering: An Empirical Study." Thesis, 1999.

"The Long-Run Performance of Underwriters and its Impact on Seasoned Equity Offerings." 1999.

"Dynamic Measures of Underwriter Reputation: A Study of IPO's." 1999.

"CAFE Economics: A Note on the Limits and Effectiveness of Fuel Economy Regulation." With Stephen Sheppard, 1992.

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

"Trading Models Underestimate Securities Class Damages." with Narinder Walia, Law360, 2019.

"More 'Dark Pools" Deepen Litigation Issues." Law360, 2013.

"Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides." with Elaine Buckberg, Todd Foster and Ronald Miller, 2003.

"The Effects of the PSLRA and Subsequent Events on Securities Litigation." With Fred Dunbar and Todd Foster, prepared for the New York City Bar Association, 2003.

"The Energy Tax: Who Pays?" joint with Mark Schweitzer, in Federal Reserve Bank of Cleveland's Economic Commentary, 1993.

## PRESENTATIONS

"Cause or Effect: Are Settlement Statistics Driving Down Settlements?" Presentation to Robbins Geller Rudman & Dowd, LLP in San Diego, CA on October 10, 2013, Wolf Popper, LLP in New York, NY on September 18, 2013, Abraham, Fruchter & Twersky, LLP in New York, NY on September 17, 2013, Robbins Geller Rudman & Dowd, LLP in Melville, NY on September 11, 2013, Entwistle & Cappucci, LLP in New York, NY on September 10, 2013, and Faruqi & Faruqi, LLP in New York, NY on September 10, 2013.

"The Economics of Securities Litigation." Sidley & Austin in Los Angeles, CA on March 14, 2007.

"The Global Cost of Capital." Panel discussion on valuing assets in foreign countries at the University of Texas School of Law VALCON conference in Las Vegas on February 8, 2007.

"Economic Damages in Securities Fraud Matters." NERA Luncheon Seminars with Alan Cox given at the Fifth Avenue Suites Hotel in Portland, OR on November 19, 2002 and at the W Hotel in Seattle, WA on November 20, 2002.

"Shareholder Class Actions: Calculation of Damages." Presentation to Skadden, Arps, Slate, Meagher & Flom, LLP in San Francisco, CA on October 30, 2002, Marsh FINPRO in San Francisco, CA on September 18, 2002, Marsh Risk & Insurance Services in San Diego, CA on September 17, 2002 and Marsh FINPRO in Los Angeles, CA on September 13, 2002.

"Capital Formation: Class Action Litigation and Prevention." Speech and panel discussion focusing on securities class action litigation, which sometimes arise from

33

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

initial public offerings and/or market volatility in the aftermarket. Presented at the 2002 CALBIO Summit in San Diego, CA on April 23, 2002.

"Shareholder Class Actions after the NASDAQ Bubble." Speech given to the Securities Litigation Sub-Committee of the Colorado Bar Association at Holland & Hart, LLP in Denver, CO on April 17, 2002.

"Trends in Litigation: How Claims and Losses Are Valued." Speech at the American Bankers Association Insurance Risk Management Annual Conference in San Diego, CA on February 4, 2002.

"Recent Trends in Securities Litigation." "Basic Economic Analysis in Securities Class Action" and "Challenging the Efficient Market Assumption in Securities Class Action Matters." presented to Cooley Godward in San Diego, CA on November 28, 2001. "Recent Trends in Securities Litigation." presentation with Marcia Mayer given at Howard, Rice, Nemerovski, Canady, Falk & Rabkin in San Francisco, CA on November 27, 2001.

"Recent Trends in Securities Litigation." presentation given to Marsh USA in Denver, CO on November 8, 2001, and Thelen, Reid & Priest in Los Angeles, CA on November 6, 2001.

"Financial Economics in Litigation." speech presented to Simpson, Thacher & Bartlett in Palo Alto, CA on July 31, 2001, Baker & McKenzie in San Diego, CA on July 18, 2001, Brobeck, Phleger & Harrison in San Francisco, CA on June 25, 2001 and to Latham & Watkins in San Francisco, CA on June 26, 2001.

"Economic Analysis in Securities Fraud Cases." Speech with Alan Cox delivered to Morrison & Forester, San Francisco, CA on July 25, 2001.

"Recent Trends: Shareholder Class Actions Five Years After the PSLRA." speech presented to Shearman & Sterling in San Francisco, CA on May 23, 2001, O'Melveny & Myers in Los Angeles, CA on May 30, 2001 and Gray, Cary, Ware & Freidenrich in San Diego, CA on June 6, 2001.

## EXPERT REPORTS AND TESTIMONY

*6D Global Technologies, Inc. Securities Litigation*. Issued a declaration (2022) on loss causation and damages in a securities class action. (Southern District of New York).

*In Re: NIO, Inc. Securities Litigation*. Issued a declaration (2022) and provided deposition testimony (2022) on market efficiency in a securities class action. (Eastern District of New York).

34

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Securities and Exchange Commission v. Bradley C. Davis.* Issued a report (2021), a rebuttal report (2021), provided deposition testimony (2021), and provided trial testimony (2022) on materiality in a case brought by the SEC (U.S.D.C. Central District of California).

*In Re: Omega Healthcare Investors, Inc. Securities Litigation*. Issued a declaration (2022), provided deposition testimony (2022), and issued a rebuttal declaration (2022) on market efficiency in a securities class action. (Southern District of New York).

*Andrew Trampe v. CD Projekt S.A.* Issued a declaration (2022) on aggregate damages in a securities class action. (Central District of California).

*In re Global Brokerage, Inc. f/k/a/ FXCM Inc.* Issued a report (2020), a rebuttal report (2020), provided deposition testimony (2020) and testified (2020) on market efficiency in a securities class action. Issued a report (2021), a rebuttal report (2021) and provided deposition testimony (2021) on loss causation and damages (U.S.D.C. Southern District of New York).

*George Barney, et al. v. Nova Lifestyle, Inc., et al.* Issued a report on market efficiency in a securities class action (U.S.D.C. Central District of California, 2021).

*Peter Voulgaris, et al. v. Array Biopharma Inc., et al.* Issued a declaration on market efficient in a securities class action (District of Colorado, 2021).

*In re Innocoll Holdings Public Limited Company Securities Litigation.* Issued a report (2020), provided deposition testimony (2020) on market efficiency, and issued a rebuttal report (2020) in a securities class action (U.S.D.C. Eastern District of Pennsylvania).

*Michael Tietz, et al. v. Crytobloc Technologies Corp., et al.* Issued a report on price impact in a securities class action (Supreme Court of British Columbia, 2020).

*In re Horsehead Holding Corp. Securities Litigation.* Issues a report (2020) and provided deposition testimony (2020) on market efficiency in a securities class action (U.S.D.C. District of Delaware).

*Bing Li, et al. v. Aeterna Zentaris, Inc., et al.* Issued a declaration (2016), a report (2017), and provided deposition testimony (2017) on market efficiency in a securities class action. Issued a declaration (2019) a reply report (2019), and provided deposition testimony (2020) on loss causation and damages (U.S.D.C. District of New Jersey).

*In re Patriot National Inc. Securities Litigation.* Issued a declaration (2019) and a supplemental declaration (2019) on damages in a securities class action (U.S.D.C. Southern District of New York).

35

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*Hamza Ramzan, et al. v. GDS Holdings Limited, et al.* Issued a declaration on NASDAQ microstructure in a securities class action (U.S.D.C. Eastern District of Texas, Marshall Division, 2019).

*Ivan Nibur, et al. v. SandRidge Mississippian Trust I, et al.* Issued a declaration (2018), a reply declaration (2018), a supplemental reply declaration (2018), and provided deposition testimony (2018) on market efficiency in a securities class action. Issued a declaration (2019) a rebuttal declaration (2019), and provided deposition testimony (2019) on loss causation and damages (U.S.D.C. Western District of Oklahoma).

*In Re Insys Theraputics, Inc. Securities Litigation.* Issued a report on market efficiency in a securities class action (U.S.D.C. Southern District of New York, 2019).

*In Re Spectrum Pharmaceuticals, Inc. Securities Litigation.* Issued a declaration (2019) and provided deposition testimony (2019) on market efficiency in a securities class action (U.S.D.C. District of Nevada).

*Amanda Beezley et al. v. Fenix Parts, Inc., et al.* Issued a declaration on market efficiency in a securities class action (U.S.D.C. Northern District of Illinois, Eastern Division, 2019).

*Michael Desta, et al. v. Volkswagen Aktiengesellschaft, et al.* Issued a declaration regarding benefits to firms that have ADRs listed in a securities class action (U.S.D.C. Eastern District of New York, 2018).

*Michael Desta, et al. v. Wins Finance Holdings Inc., et al.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency in a securities class action (U.S.D.C. Central District of California).

*Andrew Meyer, et al. v. Concordia International Corp., et al.* Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on market efficiency in a securities class action. Issued a declaration (2018), a reply declaration (2018), and provided deposition testimony (2018) on loss causation and damages (U.S.D.C. Southern District of New York).

*In re: K12 Securities Litigation.* Issued a declaration (2018) and provided deposition testimony (2018) on market efficiency in a securities class action (U.S.D.C. Northern District of California).

*Robert Colman, et al. v. Theranos, Inc., et al.* Issued a declaration on damage methodology and price impact in a securities class action (U.S.D.C. Northern District of California, San Jose Division, 2018).

36

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*In re: CytRx Corporation Securities Litigation.* Issued a declaration (2017) and provided deposition testimony (2018) regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Lord Abbett Affiliated Fund, Inc., et al. v. American International Group, Inc.* Issued a report regarding market efficiency, loss causation, and damages in a securities case (U.S.D.C. Southern District of New York, 2017).

*Xiaolin Chi, et al. v. Qiao Xing Universal Resources, Inc., et al.* Issued a report on damages in a securities class action (District Court of the Virgin Islands, St. Croix Division, 2017).

*John Hosey v. Twitter, Inc., et al*. Issued a declaration (2017) and provided deposition testimony (2017) regarding rebuttal to Defendants' Motion for Summary Judgement in a securities class action (Superior Court of the State of California, County of San Mateo).

*Gwyn R. Hartman Revocable Living Trust v. Southern Michigan Bancorp, Inc. et al.* Issued a report on damages arising from alleged exclusions in a proxy solicitation (U.S.D.C. Western District of Michigan, 2017).

*Fred Kelsey, et al. v. Textura Corporation, et al.* Issued a declaration (2017) and provided deposition testimony (2017) on market efficiency in a securities class action (U.S.D.C. Northern District of Illinois).

*Dave Carlton, et al. v. Fred Cannon.* Issued a declaration on market efficiency in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2016).

*James Middlemiss v. Penn West Petroleum LTD., et al*. Issued a report on damages in a securities class action (Superior Court of Justice Ontario, Canada, 2016).

*David Loritz, et al. v. Exide Technologies, et al.* Issued a report on damages and loss causation in a securities class action (U.S.D.C. Central District of California, 2015)

*Manishkumar Khunt, et al. v. Alibaba Group Holding Limited, et al.* Issued a declaration on potential investor damages in a securities class action (U.S.D.C. Southern District of New York, 2015).

*Biotechnology Value Fund, L.P. et al. v. Celera Corporation et al.* Issued a report (2014), a reply report (2014), a supplemental report (2014), and provided deposition testimony (2014) on damages arising from a merger (U.S.D.C. Northern District of California).

37

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

*In re: Hi-Crush Partners L.P. Securities Litigation.* Issued a declaration (2014), a supplemental declaration (2014), and provided deposition testimony (2014) regarding market efficiency in a securities class action (U.S.D.C. Southern District of New York).

*Ian Mausner v. MarketByte LLC, et al.* Issued a declaration about investment advisor incentives and liquidity needs in a securities class action (U.S.D.C. Southern District of California, 2014).

*Artes Medical, Inc. v. Lemperle et al.* Provided deposition testimony on behalf of defendants about alleged damages caused by a proxy contest (Superior Court of the State of California, County of San Diego, Central District, 2013).

*In re: Ebix Inc. Securities Litigation.* Issued a declaration (2012) and provided deposition testimony (2013) regarding market efficiency in a securities class action (U.S.D.C. Northern District of Georgia, Atlanta Division).

*Erik Poole and William Rhody v. Alange Energy Corp., et al.* Issued a report (2012) and a reply report (2013) on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada).

*In re: Hecla Mining Securities Litigation.* Issued a declaration on investor losses in a securities class action (U.S.D.C. District of Idaho, 2012).

*Mark Henning, Roman Zaretski and Chrisitan Stillmark v. Orient Paper, Inc. et al.* Issued a declaration (2011), a supplemental declaration (2012) and provided deposition testimony (2012) regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Carlos Munoz et al. v. China Expert Technology, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a securities class action regarding market efficiency (U.S.D.C. Southern District of New York).

*Theodore Dean, et al. v. China Agritech, Inc., et al.* Issued a declaration (2012), a supplemental declaration (2012) and provided deposition testimony (2012) in a case regarding market efficiency in a securities class action (U.S.D.C. Central District of California).

*Robert Michael Shenk, Derivatively on Behalf of Sirius XM Radio Inc. v. Melvin Alan Karmazin, et al.* Issued an expert report (2011), a supplemental expert report (2012) and provided deposition testimony (2012) in a case involving damages in a shareholder derivative matter (U.S.D.C. Southern District of New York).

*Pathway Investments Pty Ltd and Doystoy Pty Ltd v. National Australia Bank Ltd.* Submitted a report on survey techniques, the efficient market hypothesis and liquidity in

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

a securities class action (Supreme Court of Victoria at Melbourne, Australia, Commercial and Equity Division, Commercial Court, 2012).

*Bruce Simmonds, Robert Grant and Gordon Moore v. Armtec Infrastructure Inc. et al.* Issued a report on market efficiency and damages in a securities class action (Superior Court of Justice Ontario, Canada, 2011).

*In re: BP plc. Securities Litigation.* Issued a declaration regarding damages and materiality in a securities class action (U.S.D.C. Southern District of Texas, Houston Division, 2010).

*In re: Tripath Technology Inc., Debtor.* Issued a report (2009) and provided deposition testimony (2010) regarding damages arising from Directors' and Officers' breach of fiduciary duty in bankruptcy court (U.S.D.C. Northern District of California, San Jose Division).

*David Ainslie and Muriel Marentette v. CV Technologies et al.* Issued a report estimating damages in a securities class action (Superior Court of Justice, Ontario, Canada, 2010).

*Harry Stackhouse, on Behalf of Himself and All Others Similarly Situated v. Toyota Motor Corporation, et al.* Issued a declaration regarding the relationship between Toyota's U.S. stock price and Japanese stock price in a securities class action (U.S.D.C. Central District of California, 2010).

*Phillip Elliot and William Kormos v. NovaGold Resources Inc., et al.* Issued a declaration in a securities class action regarding trading volume in the U.S. versus Canada. (Superior Court of Justice, Ontario, Canada, 2010).

*International Arbitration between a private equity firm and Chinese biotech company.* Issued a report (2008) and testified (2009) before an International Arbitration Committee regarding the value of a private equity investment.

*Arbitration between Albert Richards and Old Republic Title Insurance.* Deposed regarding estimated damages incurred by plaintiff as a result of a forced sale of Russian securities due to Old Republic's breach of contract (2008).

*Californians United for a Responsible Budget, et al., v. California State Public Works Board, et al.* Issued a report on the cost of issuing revenue bonds to fund California prison expansion (The Superior Court for the State of California, County of Sacramento, 2008).

*Arbitration between Daniel Lyons and Morgan Lyons, and Chinese Hospital Association and Sam English.* Deposed regarding plaintiffs' calculated damages arising from asbestos exposure for plaintiff (2003).

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

## ENGAGEMENTS

### Securities and Finance

In re: China Medicine Corporation Securities Litigation. Retained by class counsel to estimate damages and determine market efficiency in a securities class action.

In re: Citigroup Inc. Securities Litigation. Testified as to damages and inflation in a securities class action.

In re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Retained by class counsel as damages expert in a derivative securities class action.

Government of Guam Retirement Fund et al. v Countrywide Financial Corp, et al. Retained by class counsel to estimate damages in a securities class action.

Keith Cohn v. Sanford C. Bernstein & Co., LLC and Alliance Bernstein LP. Retained by client to testify on portfolio risk in a FINRA arbitration.

In re: Semgroup Energy Partners, L.P., Securities Litigation. Retained by Plaintiffs to estimate damages in a securities class action.

Asbestos Workers Philadelphia Pension Fund v. Merix Corporation, et al. Retained by Plaintiffs to evaluate fairness of merger between Merix and Viasystems.

Retained by Goldman Sachs to provide consulting on the IPO process, the valuation of securities at IPO and the possible impact of "tie-in" agreements on the pricing of IPOs for the purpose of analyzing class certification and damages.

Joseph Phelps Vineyards, Inc., et al., v Craig Williams, et al. Retained by Joseph Phelps Vineyards to estimate the value of the winery as part of arbitration.

UnitedHealth Group Option Backdating Investigation. Retained by a Special Litigation Committee formed by UnitedHealth Group's board of directors to estimate harm caused by company's decision to backdate options.

SEC v. Henry Nicholas, et al. Retained by founder of Broadcom to estimated harm caused by company's decision to backdate options.

40

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Enrico Bondi on behalf of Parmalat S.p.A. v. Bank of America et al. Hired by Bank of America to rebut damage arguments regarding Bank of America's role in Parmalat's eventual bankruptcy.

Capital Trading Co. v. Conor Medsystems. Retained to analyze a fairness opinion issued by Citigroup regarding the price offered by Johnson & Johnson to acquire Conor.

Enron Solvency. Retained by the surviving Enron Corporation to estimate the value of its assets for litigation purposes.

SEC v. Spear Leeds Kellogg (Goldman Sachs.) et al. Estimated damages associated with trading ahead allegations made by the SEC on behalf of Goldman market makers on the New York Stock Exchange, American Stock Exchange, Philadelphia Stock Exchange and the Chicago Board of Options Exchange.

General Fire and Casualty co. et al. v. Guy Carpenter and Co., Inc. Hired by defendant to rebut allegations that it had given incorrect advice to the plaintiff regarding reinsurance contracts.

R.D. Hubbard v. Pinnacle Entertainment, Inc. Analyzed the value of options granted and later rescinded on behalf of our client, the defendant.

Thomas Slemmer, et al. v. Cucamonga Valley Water District, et al. Estimated the value of restricted stock in a mutual water company.

Department of Labor v. Genuity (investigation). Assisted Genuity in an investigation by the Department of Labor as to whether or not Genuity stock was a safe investment for Genuity's pension fund. Investigation was dismissed.

Jason Stanley, et al. v. Safeskin Corporation, et al. Estimated damages and consulted on materiality for defendant in a securities class action.

Nanogen, Inc. v. Donald D. Montgomery and CombiMatrix Corporation. Estimated damages for defendant in cross complaint over a failed IPO resulting from plaintiff's claims of patent infringement in genomic industry.

Conseco, Inc. Securities Litigation. Retained by defendants to calculate damages in a securities class action matter.

Madison/OHI Liquidity Investors, LLC v. Omega Healthcare Investors. Estimated damages to Madison's investment funds as a result of the early termination of a debt facility.

41

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Barbara Rosen, et al. v. Macromedia, Inc., et al. Prepared rebuttal analyses in securities class action suit on behalf of Macromedia.

Karen Yarborough v. PeopleSoft, Inc. and Does 1-20. Calculated value of stock option package in wrongful termination suit on behalf of PeopleSoft.

Michael Carabetta v. Novadigm, Inc., et al. Did analysis of damages to a former company insider on behalf of Novadigm. Estimated value of lost options and salary.

Allen T. Gilliland Trust, et al. v. H&F MobileMedia Partners, LLC, et al. Engaged by auditors to analyze plaintiffs' decision to affirm a prior transaction.

California Federal Bank v. United States. Estimated damages caused by government in breach of contract case on behalf of Cal Fed.

LaSalle Talman v. United States. Estimated damages caused by government in breach of contract case on behalf of LaSalle Talman.

**Intellectual Property**

Transocean v. Maersk. Retained by Maersk to defend claims of patent infringement in case involving oil drilling technology.

Abbott Laboratories, et al. v. Sandoz, Inc. Retained on behalf of Abbott to estimate patent infringement damages as a result of Sandoz's decision to introduce a generic drug prior to the expiration of a patent.

LG Phillips LCD Co., LTD v. Tatung, Chunghwa Picture Tubes, et al. Provided rebuttal analysis for defendants in a patent infringement case dealing with LCD technology.

PostX Corporation v. Secure Data in Motion, Inc. d/b/a/ Sigaba Corporation. Calculated damages arising from tortuous interference and patent infringement in the secure document delivery market. Client was victorious on both complaint and cross-complaint.

Larkspur Data Resources, Inc. v. Trust Administrators, et al. Assisted plaintiff in calculating damages in trademark and copyright infringement case involving proprietary databases.

Dioptics Medical Products, Inc. v. The Cooper Companies, Inc.; CooperVision, Inc.; A. Thomas Bender; and Does 1-15. Retained by plaintiff to calculate damages in a copyright infringement case over naming of eyewear.

42

**Exhibit-1**
**Curriculum Vitae**
**Adam Werner, Ph.D.**

Intel Corporation v. Broadcom Corporation. Retained by Broadcom to estimate damages alleged by Intel based on charges of patent infringement.

Australia Vision Services Pty. Ltd. v. Dioptics Medical Products, Inc., Henry Lane, and individual, and Does 1-10. Estimated profits lost by Dioptics as a result of a competitor's allegations of patent infringement.

American Booksellers Association, Inc. v. Barnes & Noble, et al. Worked on analysis of publisher discounts and analysis of openings and closings of bookstores on behalf of Borders.

**Exhibit-2**

**Documents and Other Information Considered**

## CASE DOCUMENTS

- Second Amended Class Action Complaint (Proposed Class Action), filed April 7, 2021.

## NEWS ARTICLES AND PRESS RELEASES

- Factiva news articles (632) from January 1, 2020 to December 31, 2020, downloaded using the following search parameters: All Sources; All Subjects; Company: Co-Diagnostics, Inc.; All Subjects; All Industries; All Regions.
- "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," Company press release, *PR Newswire*, May 1, 2020, 6:30 AM.
- "Co-Diagnostics Inc:A loss of 5 cents per share anticipated for first quarter," *Reuters*, May 12, 2020, 5:57 PM.
- "Co-Diagnostics, Inc. Announces Q1 2020 Results and Provides Mid-Second Quarter Update," Company press release, *PR Newswire*, May 14, 2020, 4:01 PM.
- "*Co-Diagnostics Inc. (CODX) Paused due to volatility," Dow Jones Newswires, May 14, 2020, 1:25 PM.
- "*Co-Diagnostics Inc. (CODX) Resumed Trading*," Dow Jones Newswires, May 14, 2020, 1:30 PM.
- "*Co-Diagnostics Inc. (CODX) Paused due to volatility," Dow Jones Newswires, May 14, 2020, 1:48 PM.
- "*Co-Diagnostics Inc. (CODX) Resumed Trading*," Dow Jones Newswires, May 14, 2020, 1:58 PM.
- "Press Release: Co-Diagnostics, Inc. Releases Prepared Remarks for First Quarter 2020 Conference Call," Dow Jones Newswire, May 14, 2020, 4:01 PM.
- "TestUtah declines to join other Utah labs in accuracy check," by Erin Albert, The Salt Lake Tribune, May 14, 2020.

## ANALYST REPORTS

- H.C. Wainwright & Co., April 6, 2020.
- Maxim Group, April 6, 2020.
- H.C. Wainwright & Co., April 14, 2020.
- H.C. Wainwright & Co., April 17, 2020.

**Exhibit-2**

**Documents and Other Information Considered**

- H.C. Wainwright & Co., May 18, 2020.
- Maxim Group, May 20, 2020.


**SEC FILINGS**

- Co-Diagnostics, Inc., Form SC 13G/A, filed on January 3, 2020.
- Co-Diagnostics, Inc., Form 424B5, filed on January 27, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on January 27, 2020.
- Co-Diagnostics, Inc., Form SC 13G, filed on January 28, 2020.
- Co-Diagnostics, Inc., Form SC 13G/A, filed on February 10, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on February 11, 2020.
- Co-Diagnostics, Inc., Form 424B5, filed on February 12, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on February 19, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on February 27, 2020.
- Co-Diagnostics, Inc., Form 424B5, filed on February 28, 2020.
- Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 30, 2020.
- Co-Diagnostics, Inc., Form S-8, filed on April 15, 2020.
- Co-Diagnostics, Inc., Form 10-Q for the Fiscal Quarter Ended March 31, 2020, filed on May 14, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on May 15, 2020.
- Co-Diagnostics, Inc., Form 10-Q for the Fiscal Quarter Ended June 30, 2020, filed on August 13, 2020.
- Co-Diagnostics, Inc., Form S-3, filed on October 23, 2020.
- Co-Diagnostics, Inc., Form UPLOAD, filed on October 29, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on November 2, 2020.
- Co-Diagnostics, Inc., Form CORRESP, filed on November 2, 2020.
- Co-Diagnostics, Inc., Form DEFA14A, filed on November 3, 2020.
- Co-Diagnostics, Inc., Form DEF 14A, filed on November 3, 2020.
- Co-Diagnostics, Inc., Form 10-Q/A for the Fiscal Quarter Ended June 30, 2020, filed on November 3, 2020.
- Co-Diagnostics, Inc., Form EFFECT, filed on November 5, 2020.
- Co-Diagnostics, Inc., Form 10-Q for the Fiscal Quarter Ended September 30, 2020, filed on November 16, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on November 16, 2020.
- Co-Diagnostics, Inc., Form S-8 POS, filed on November 20, 2020.
- Co-Diagnostics, Inc., Form 8-K, filed on December 17, 2020.

**Exhibit-2**

**Documents and Other Information Considered**

- Co-Diagnostics, Inc., Form SC 13G/A, filed on January 4, 2021.
- Co-Diagnostics, Inc., Form 8-K, filed on January 6, 2021.
- Co-Diagnostics, Inc., Form SC 13G, filed on February 2, 2021.
- Co-Diagnostics, Inc., Form SC 13G, filed on February 10, 2021.
- Co-Diagnostics, Inc., Form 8-K, filed on February 22, 2021.
- Co-Diagnostics, Inc., Form 10-K for the Fiscal Year Ended December 31, 2020, filed on March 25, 2021.
- Co-Diagnostics, Inc., Form 8-K, filed on March 26, 2021.

## ACADEMIC AND PROFESSIONAL LITERATURE

- Anderson, David R., Dennis J. Sweeny, and Thomas A. Williams, "Statistical Inference About Means and Proportions with Two Populations," Chapter 10 of *Statistics for Business and Economics*, 2nd Edition, West Publishing, 1984.
- Atkins, Allen B., and Edward A. Dyl, "Price Reversals, Bid-Ask Spreads, and Market Efficiency," *Journal of Financial and Quantitative Analysis*, vol. 25, no. 4, 1990.
- Ball, Ray, "Anomalies in Relationships Between Securities' Yield and Yield-Surrogates," *Journal of Financial Economics*, vol. 6, 1978.
- Ball, Ray, and Philip Brown, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, 1968.
- Ball, Ray, and S. P. Kothari, "Security Returns around Earnings Announcements," *The Accounting Review*, vol. 66, no. 4, 1991.
- Barber, Brad M., Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law*, 1994.
- Beaver, William H., "The Information Content of Annual Earnings Announcements," *Journal of Accounting and Research*, 1968.
- Beaver, William H., *Financial Reporting: An Accounting Revolution*, 3rd Edition, Prentice Hall, 1998.
- Binder, John J., "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting*, vol. 11, 1998.
- Brav, Alon, and J.B. Heaton, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review*, vol. 93, no. 2, 2015.
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.

**Exhibit-2**

**Documents and Other Information Considered**

- Corrado, Charles J., "Event Studies: A Methodology Review," *Accounting and Finance*, vol. 51, 2011.
- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, vol. 46, no. 5, 1991.
- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, vol. 25, no. 2, 1970.
- Fama, Eugene F., and Kenneth R. French, "The Cross-Section of Expected Stock Returns," *Journal of Finance*, vol. 47, no. 2, 1992.
- Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak, "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," *St. John's Law Review*, vol. 78, no. 1, 2004.
- Gold, Kevin L., Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017.
- Harris, Larry, *Trading & Exchanges: Market Microstructure for Practitioners*, Oxford University Press, 2003.
- Hartzmark, Michael L. and H. Nejat Seyhun, "The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," *Virginia Law & Business Review,* vol. 6, No. 3, 2012.
- Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, 3rd Edition, Th National Academies Press, 2011.
- Mason, Robert D., Douglas A. Lind, and William G. Marchal, "Tests of Hypothesis," Chapter 9 of *Statistical Techniques in Business and Economics*, 10th Edition, Irwin/McGraw-Hill, 1999.
- Patell, James M. and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics*, vol. 13, 1984.
- Piotroski, Joseph D., and Barren T. Roulstone, "The Influence of Analysts, Institutional Investors, and Insiders on the Incorporation of Market, Industry, and Firm-Specific Information into Stock Prices," *The Accounting Review*, vol. 79, no. 4, 2004.
- Tabak, David I., "Use and Misuse of Event Studies to Examine Market Efficiency," NERA White Paper, April 30, 2010
- Tabak, David I., and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 of the *Litigation Services Handbook: The Role of the*

**Exhibit-2**

**Documents and Other Information Considered**

*Financial Expert*, 3rd Edition, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001.

- Watts, Ross L., "Systematic 'Abnormal' Returns after Quarterly Earnings Announcements" *Journal of Financial Economics*, vol. 6, 1978.

**DATA AND DATABASES**

- Bloomberg
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- Refinitiv Eikon

**LEGAL CASES**

- *Amgen, Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455 (2013).
- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- *Cammer v. Bloom,* 711 F. Supp. 1264 (D.N.J. 1989).
- *Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150 (S.D.N.Y. 2012)
- *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).
- *In re Alstom SA Securities Litigation*, 253 F.R.D. 266 (S.D.N.Y. 2008).
- *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008).
- *In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260 (D. Mass. 2006).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014).
- *Nguyen v. Radient Pharmaceuticals Corp. et al.*, 287 F.R.D. 563 (C.D. Cal. 2012).
- *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005).

**OTHER**

- Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(e)).
- "Revisions to the Eligibility Requirements for Primary Securities Offerings on Forms S-3 and F-3," SEC Release No. 33-8878, December 19, 2007.
- "Brief of Testifying Economists as *Amici Curiae* in Support of Respondent," *Halliburton Co. and David Lesar v., Erica P. John Fund, Inc., FKA Archdiocese of Milwaukee Supporting Fund, Inc.*, February 5, 2014.

**Exhibit-2**

**Documents and Other Information Considered**

- "Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," press release, *U.S. Food & Drug Administration*, 14 March 2020, fda.gov, accessed at https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-informs-public-about-possible-accuracy-concerns-abbott-id-now-point.
- https://twitter.com/HindenburgRes/status/1260987928064536583?ref_src=twsrc%5Etfw
- https://seekingalpha.com/news/3574617-co-diagnostics-reverses-rally-after-hindenburg-short-call
- Section 10(b) of the Securities Exchange Act of 1934.
- U.S. Securities & Exchange Commission Rule 10b-5.
- Other documents cited in my report.

**Exhibit-3**

**Average Weekly Volume**

| Week Ending | Shares Traded as a Percent of Outstanding Shares |
|---|---|
| 5/1/2020 | 80.31% |
| 5/8/2020 | 121.32% |
| 5/15/2020 | 413.83% |
| *Average weekly volume as percentage of outstanding shares:* | *205.15%* |

**Source:** CRSP.

**Exhibit-4**

**CODX Market Makers**

April 2020 through May 2020

| No. | Code | Market Maker | April Volume | May Volume | Total Volume |
|---|---|---|---|---|---|
| 1 | MSCO | MORGAN STANLEY & CO., INCORPOR | 8,380,593 | 8,321,728 | 16,702,321 |
| 2 | ETEJ | ELECTRONIC TRANSACTION CLEARING, INC. | 4,935,051 | 9,518,810 | 14,453,861 |
| 3 | NITE | VIRTU AMERICAS LLC | 9,479,665 | 4,540,785 | 14,020,450 |
| 4 | IBKR | INTERACTIVE BROKERS LLC | 4,544,938 | 4,769,120 | 9,314,058 |
| 5 | INCA | INSTINET CORPORATION | 4,771,638 | 3,257,047 | 8,028,685 |
| 6 | FBCO | CREDIT SUISSE FIRST BOSTON LLC | 3,068,791 | 2,019,316 | 5,088,107 |
| 7 | VALX | | 2,382,428 | 2,108,336 | 4,490,764 |
| 8 | UBSS | UBS SECURITIES LLC. | 1,818,934 | 2,294,259 | 4,113,193 |
| 9 | VALR | | 915,212 | 1,643,115 | 2,558,327 |
| 10 | LEHM | BARCLAYS CAPITAL INC. | 770,277 | 1,094,349 | 1,864,626 |
| 11 | NFSC | NATIONAL FINANCIAL SERVICES LL | 658,897 | 1,142,611 | 1,801,508 |
| 12 | CPEM | CLEARPOOL EXECUTION SERVICES, LLC | 630,191 | 1,080,056 | 1,710,247 |
| 13 | QLBR | | 731,407 | 781,338 | 1,512,745 |
| 14 | GTSZ | GTS SECURITIES LLC | 428,095 | 707,901 | 1,135,996 |
| 15 | DUST | | 315,212 | 718,845 | 1,034,057 |
| 16 | SBSH | CITIGROUP GLOBAL MARKETS INC. | 398,854 | 428,943 | 827,797 |
| 17 | LIME | LIME BROKERAGE LLC | 393,401 | 414,145 | 807,546 |
| 18 | ETRS | E*TRADE CLEARING LLC | 331,895 | 445,183 | 777,078 |
| 19 | GSCO | GOLDMAN SACHS | 207,000 | 330,382 | 537,382 |
| 20 | JNST | | 242,695 | 191,655 | 434,350 |
| 21 | GSCS | GOLDMAN, SACHS & CO. | 128,601 | 299,665 | 428,266 |
| 22 | ETDX | ELECTRONIC TRANSACTION CLEARING, INC. | 129,553 | 286,680 | 416,233 |
| 23 | LAMP | LAMPOST CAPITAL LLC | 238,951 | 149,916 | 388,867 |
| 24 | JMPT | JUMP TRADING, LLC | 184,315 | 196,973 | 381,288 |
| 25 | WSEA | WOLVERINE SECURITIES | 212,697 | 113,702 | 326,399 |
| 26 | SPDR | SPEEDROUTE LLC | 127,715 | 191,213 | 318,928 |
| 27 | CPEX | CLEARPOOL EXECUTION SERVICES | 100,694 | 158,025 | 258,719 |
| 28 | FOMA | AMERITRADE, INC. | 118,271 | 120,919 | 239,190 |
| 29 | GEBB | GLOBAL EXECUTION BROKERS, LP | 117,397 | 119,447 | 236,844 |
| 30 | ETCC | Electronic Transaction Clearing, Inc. | 182,434 | 28,341 | 210,775 |
| 31 | WCHV | Wells Fargo Securities, LLC | 37 | 206,478 | 206,515 |
| 32 | DBAB | DEUTSCHE BANK SECURITIES INC. | 198,413 | 4,212 | 202,625 |
| 33 | ETBE | Electronic Transaction Clearing, Inc. | 58,046 | 142,069 | 200,115 |
| 34 | TLSA | | - | 145,494 | 145,494 |
| 35 | HSBC | HSBC SECURITIES (USA) INC. | 75,590 | 69,237 | 144,827 |
| 36 | FRET | Fox River Execution Tehnology, LLC | 54,475 | 69,309 | 123,784 |
| 37 | LSCI | LEK SECURITIES CORPORATION | 41,813 | 81,081 | 122,894 |
| 38 | TRBT | TRADEBOT SYSTEMS, INC. | 96,890 | 19,685 | 116,575 |
| 39 | ITGI | ITG INC. | 115,851 | - | 115,851 |
| 40 | WBUL | | 69,504 | 34,062 | 103,566 |
| 41 | ETDR | ELECTRONIC TRANSACTION CLEARING, INC. | 12,224 | 86,368 | 98,592 |
| 42 | PUMA | Puma Capital, LLC | 58,426 | 35,008 | 93,434 |
| 43 | LMGP | LIME BROKERAGE LLC | 28,599 | 62,865 | 91,464 |
| 44 | INJX | INSTINET, LLC | 51,385 | 32,481 | 83,866 |
| 45 | CHAS | CHARLES SCHWAB AND CO. INC. | 39,992 | 31,642 | 71,634 |

**Exhibit-4**

**CODX Market Makers**

April 2020 through May 2020

| No. | Code | Market Maker | April Volume | May Volume | Total Volume |
|---|---|---|---|---|---|
| 46 | LTCO | LADENBURG, THALMANN & CO. INC. | 70,000 | - | 70,000 |
| 47 | GSLT | GOLDMAN SACHS & CO. LLC | 56,020 | 10,936 | 66,956 |
| 48 | NQRB | BRUT, LLC | 32,619 | 30,688 | 63,307 |
| 49 | TRLN | TRADELINK SECURITIES, LLC | 38,800 | - | 38,800 |
| 50 | WEXM | WOLVERINE EXECUTION SERVICES, LLC | 4,301 | 30,675 | 34,976 |
| 51 | NATL | NATIONAL SECURITIES CORP. | - | 32,200 | 32,200 |
| 52 | VIEW | VIEWTRADE SECURITIES, INC. | 5,948 | 23,815 | 29,763 |
| 53 | EGAW | BATS TRADING, INC. | 10,696 | 17,784 | 28,480 |
| 54 | STFL | STIFEL NICOLAUS | 8,297 | 17,731 | 26,028 |
| 55 | FOXB | | 23,470 | 2,538 | 26,008 |
| 56 | JEFF | JEFFERIES & COMPANY, INC. | 8,997 | 13,012 | 22,009 |
| 57 | CODA | | 4,316 | 13,021 | 17,337 |
| 58 | LAFC | R. F. Lafferty & Co., Inc. | 9,000 | 5,400 | 14,400 |
| 59 | INTL | INTL TRADING, INC. | - | 13,239 | 13,239 |
| 60 | ETBA | ELECTRONIC TRANSACTION CLEARING, INC. | 12,041 | 600 | 12,641 |
| 61 | DEGS | Dart Executions, LLC | 4,571 | 6,904 | 11,475 |
| 62 | PICT | PICTET OVERSEAS INC. | - | 11,100 | 11,100 |
| 63 | SAGL | SAGETRADER, LLC | 9,724 | 677 | 10,401 |
| 64 | ETFA | ELECTRONIC TRANSACTION CLEARING, INC. | 4,290 | 5,537 | 9,827 |
| 65 | DFIN | ELECTRONIC BROKERAGE SYSTEMS, LLC | 1,300 | 8,100 | 9,400 |
| 66 | RHCO | SUNTRUST CAPITAL MARKETS, INC. | 9,000 | - | 9,000 |
| 67 | VERT | THE VERTICAL GROUP, INC. | - | 9,000 | 9,000 |
| 68 | WEXX | WOLVERINE EXECUTION SERVICES, | 2,892 | 3,493 | 6,385 |
| 69 | MAXM | MAXIM GROUP, LLC | 5,600 | 500 | 6,100 |
| 70 | TDSI | TD SECURITIES (USA) INC. | - | 6,000 | 6,000 |
| 71 | TRCM | TRC MARKETS LLC | 4,262 | 1,145 | 5,407 |
| 72 | HAPX | HAP Trading, LLC | 900 | 700 | 1,600 |
| 73 | BMOC | BMO CAPITAL MARKETS | 1,400 | - | 1,400 |
| 74 | WABR | WALL STREET ACCESS | - | 1,000 | 1,000 |
| 75 | RGLD | REGAL DISCOUNT SECURITIES, INC | 100 | 600 | 700 |
| 76 | BAYT | BAYPOINT TRADING LLC | - | 400 | 400 |
| 77 | DAWA | DAIWA SECURITIES AMERICA INC. | - | 400 | 400 |
| 78 | BERN | SANFORD C. BERNSTEIN AND CO. I | 300 | - | 300 |
| 79 | CTLR | CUTLER GROUP, LP | 100 | - | 100 |
| 80 | CTDL | Citadel Derivatives Group Llc | 58 | 19 | 77 |
| 81 | CTDN | Citadel Securities LLC | 70 | - | 70 |

**Source:** Bloomberg

## Exhibit-5

## CODX, Market Index, and Peer Index Returns

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 4/30/2020 | -8.69% | -1.32% | -1.09% |
| 5/1/2020 | 17.21% | -2.84% | -2.20% |
| 5/4/2020 | 10.76% | 0.48% | -0.10% |
| 5/5/2020 | -7.98% | 0.87% | 2.88% |
| 5/6/2020 | 3.48% | -0.59% | -0.99% |
| 5/7/2020 | 2.75% | 1.32% | 1.99% |
| 5/8/2020 | 5.03% | 1.84% | -0.03% |
| 5/11/2020 | 9.53% | -0.04% | 1.22% |
| 5/12/2020 | -0.35% | -2.06% | -2.40% |
| 5/13/2020 | 32.10% | -1.92% | -1.63% |
| 5/14/2020 | -5.67% | 1.02% | 0.23% |
| 5/15/2020 | -25.96% | 0.52% | -0.15% |
| 5/18/2020 | 2.20% | 3.28% | 2.40% |
| 5/19/2020 | 7.72% | -0.98% | -1.60% |
| 5/20/2020 | -1.44% | 1.72% | 0.88% |
| 5/21/2020 | -3.06% | -0.67% | -1.60% |
| 5/22/2020 | 2.90% | 0.27% | 0.79% |
| 5/26/2020 | -2.84% | 1.41% | -0.49% |
| 5/27/2020 | -2.64% | 1.49% | 0.55% |
| 5/28/2020 | -0.51% | -0.35% | 1.85% |
| 5/29/2020 | 2.99% | 0.47% | 1.56% |
| 6/1/2020 | 0.00% | 0.66% | -0.72% |
| 6/2/2020 | -2.47% | 0.84% | 0.24% |
| 6/3/2020 | -3.65% | 1.48% | 0.03% |
| 6/4/2020 | 0.00% | -0.30% | -1.73% |
| 6/5/2020 | -5.77% | 2.47% | 3.02% |
| 6/8/2020 | 0.13% | 1.41% | 0.73% |
| 6/9/2020 | 0.93% | -0.96% | -2.05% |
| 6/10/2020 | -1.06% | -0.67% | 0.38% |
| 6/11/2020 | -4.22% | -6.00% | -5.93% |
| 6/12/2020 | 1.62% | 1.40% | 1.56% |
| 6/15/2020 | 11.23% | 1.06% | 1.44% |
| 6/16/2020 | -4.28% | 1.75% | 1.28% |
| 6/17/2020 | -1.08% | -0.41% | 0.49% |
| 6/18/2020 | -3.58% | 0.12% | -0.36% |
| 6/19/2020 | 7.90% | -0.46% | -0.07% |
| 6/22/2020 | -4.45% | 0.67% | -0.19% |

53

## Exhibit-5

## CODX, Market Index, and Peer Index Returns

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 6/23/2020 | 12.58% | 0.39% | 0.61% |
| 6/24/2020 | -2.60% | -2.61% | -4.05% |
| 6/25/2020 | 0.05% | 1.12% | 0.81% |
| 6/26/2020 | -0.83% | -2.31% | -0.65% |
| 6/29/2020 | -3.60% | 1.44% | 1.10% |
| 6/30/2020 | 10.39% | 1.46% | 2.19% |
| 7/1/2020 | 0.57% | 0.40% | 0.57% |
| 7/2/2020 | -2.97% | 0.50% | 0.81% |
| 7/6/2020 | -4.44% | 1.48% | 0.87% |
| 7/7/2020 | -0.72% | -1.03% | -1.11% |
| 7/8/2020 | 5.58% | 0.84% | 0.42% |
| 7/9/2020 | -5.19% | -0.57% | 0.12% |
| 7/10/2020 | 0.99% | 1.03% | -0.21% |
| 7/13/2020 | -4.04% | -1.13% | -0.47% |
| 7/14/2020 | 3.60% | 1.32% | 2.30% |
| 7/15/2020 | -2.52% | 1.17% | 2.43% |
| 7/16/2020 | 6.79% | -0.40% | -0.71% |
| 7/17/2020 | -2.41% | 0.36% | 2.87% |
| 7/20/2020 | 2.78% | 0.85% | 0.00% |
| 7/21/2020 | 15.68% | 0.23% | 0.40% |
| 7/22/2020 | -4.33% | 0.51% | 1.23% |
| 7/23/2020 | 4.78% | -1.10% | 0.10% |
| 7/24/2020 | -2.13% | -0.70% | -0.63% |
| 7/27/2020 | 1.37% | 0.90% | 0.82% |
| 7/28/2020 | -2.52% | -0.70% | -0.55% |
| 7/29/2020 | 2.34% | 1.33% | 2.38% |
| 7/30/2020 | 1.71% | -0.38% | -0.90% |
| 7/31/2020 | 6.63% | 0.45% | -0.03% |
| 8/3/2020 | 24.95% | 0.87% | 0.50% |
| 8/4/2020 | -8.18% | 0.45% | -0.95% |
| 8/5/2020 | -2.71% | 0.75% | 0.97% |
| 8/6/2020 | -5.47% | 0.46% | -1.51% |
| 8/7/2020 | -1.62% | 0.02% | 0.41% |
| 8/10/2020 | -6.09% | 0.26% | -0.78% |
| 8/11/2020 | -4.05% | -0.80% | -0.43% |
| 8/12/2020 | -17.23% | 1.29% | 1.67% |
| 8/13/2020 | 7.05% | -0.06% | 0.52% |

**Exhibit-5**

**CODX, Market Index, and Peer Index Returns**

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 8/14/2020 | -25.40% | -0.07% | -1.13% |
| 8/17/2020 | -3.53% | 0.50% | 0.89% |
| 8/18/2020 | -1.93% | 0.14% | 0.26% |
| 8/19/2020 | -5.98% | -0.44% | -0.65% |
| 8/20/2020 | -0.97% | 0.28% | -0.03% |
| 8/21/2020 | 3.21% | 0.16% | -0.12% |
| 8/24/2020 | -16.74% | 0.89% | -0.22% |
| 8/25/2020 | 3.67% | 0.34% | 1.21% |
| 8/26/2020 | 0.88% | 0.87% | 0.25% |
| 8/27/2020 | -14.14% | 0.17% | 2.11% |
| 8/28/2020 | 0.00% | 0.69% | 0.23% |
| 8/31/2020 | -4.66% | -0.16% | 0.12% |
| 9/1/2020 | -3.26% | 0.85% | -0.32% |
| 9/2/2020 | -7.58% | 1.20% | 2.03% |
| 9/3/2020 | -5.03% | -3.46% | -3.39% |
| 9/4/2020 | -12.10% | -0.81% | -1.31% |
| 9/8/2020 | 35.06% | -2.72% | -1.29% |
| 9/9/2020 | -13.52% | 1.96% | 2.41% |
| 9/10/2020 | 12.84% | -1.57% | -1.30% |
| 9/11/2020 | 16.54% | -0.02% | 0.04% |
| 9/14/2020 | -7.81% | 1.53% | 1.31% |
| 9/15/2020 | -1.51% | 0.54% | 0.21% |
| 9/16/2020 | 10.41% | -0.32% | -0.52% |
| 9/17/2020 | 3.20% | -0.79% | -0.25% |
| 9/18/2020 | 3.50% | -0.89% | -0.68% |
| 9/21/2020 | 2.33% | -1.26% | -1.18% |
| 9/22/2020 | -1.59% | 0.93% | -0.09% |
| 9/23/2020 | -10.44% | -2.43% | -1.45% |
| 9/24/2020 | 2.42% | 0.20% | -1.04% |
| 9/25/2020 | 3.98% | 1.56% | 2.16% |
| 9/28/2020 | -0.98% | 1.64% | 1.07% |
| 9/29/2020 | -1.99% | -0.40% | -0.05% |
| 9/30/2020 | -2.40% | 0.69% | 2.07% |
| 10/1/2020 | -4.67% | 0.78% | -0.45% |
| 10/2/2020 | 7.36% | -0.78% | -1.10% |
| 10/5/2020 | 6.05% | 1.81% | 1.96% |
| 10/6/2020 | -3.29% | -1.20% | -1.01% |

## Exhibit-5

## CODX, Market Index, and Peer Index Returns

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 10/7/2020 | 3.09% | 1.69% | 2.04% |
| 10/8/2020 | -2.67% | 0.85% | 0.44% |
| 10/9/2020 | 0.07% | 0.85% | 1.34% |
| 10/12/2020 | -1.40% | 1.34% | 1.09% |
| 10/13/2020 | 2.98% | -0.50% | -1.19% |
| 10/14/2020 | -2.70% | -0.60% | -0.03% |
| 10/15/2020 | -1.34% | -0.08% | -0.25% |
| 10/16/2020 | -0.50% | -0.07% | 1.18% |
| 10/19/2020 | -2.75% | -1.43% | -1.43% |
| 10/20/2020 | -2.38% | 0.38% | 0.18% |
| 10/21/2020 | -5.33% | -0.34% | -0.64% |
| 10/22/2020 | -3.96% | 0.61% | 1.66% |
| 10/23/2020 | 2.77% | 0.38% | -0.22% |
| 10/26/2020 | 11.94% | -1.83% | -0.81% |
| 10/27/2020 | 1.34% | -0.30% | -0.32% |
| 10/28/2020 | -4.57% | -3.34% | -3.44% |
| 10/29/2020 | 1.57% | 1.04% | -0.87% |
| 10/30/2020 | -2.94% | -1.32% | -0.72% |
| 11/2/2020 | -1.05% | 1.20% | 1.38% |
| 11/3/2020 | 5.50% | 1.86% | 1.55% |
| 11/4/2020 | 1.42% | 1.94% | 1.41% |
| 11/5/2020 | 1.95% | 2.09% | 1.27% |
| 11/6/2020 | -0.41% | 0.00% | 0.86% |
| 11/9/2020 | -22.85% | 1.06% | 1.61% |
| 11/10/2020 | 2.32% | -0.06% | -0.85% |
| 11/11/2020 | 12.31% | 0.80% | 0.04% |
| 11/12/2020 | 13.29% | -0.97% | -0.51% |
| 11/13/2020 | -1.39% | 1.32% | 1.43% |
| 11/16/2020 | -9.74% | 1.23% | 0.03% |
| 11/17/2020 | -13.36% | -0.15% | -0.82% |
| 11/18/2020 | -3.86% | -0.91% | -1.75% |
| 11/19/2020 | -5.11% | 0.58% | 0.58% |
| 11/20/2020 | 2.00% | -0.43% | -0.54% |
| 11/23/2020 | -5.56% | 0.79% | -0.84% |
| 11/24/2020 | 0.67% | 1.50% | 0.31% |
| 11/25/2020 | 13.94% | 0.02% | -0.83% |
| 11/27/2020 | -2.08% | 0.40% | 0.73% |

## Exhibit-5

## CODX, Market Index, and Peer Index Returns

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 11/30/2020 | -1.44% | -0.58% | 0.57% |
| 12/1/2020 | -5.80% | 0.96% | 0.10% |
| 12/2/2020 | -0.82% | 0.12% | 0.65% |
| 12/3/2020 | -1.19% | 0.23% | -0.34% |
| 12/4/2020 | 1.83% | 1.04% | 1.25% |
| 12/7/2020 | -3.50% | -0.02% | -0.83% |
| 12/8/2020 | -2.85% | 0.43% | -0.22% |
| 12/9/2020 | -2.05% | -0.96% | -0.21% |
| 12/10/2020 | 3.01% | 0.26% | 0.42% |
| 12/11/2020 | -2.62% | -0.23% | -0.41% |
| 12/14/2020 | 4.51% | -0.33% | -0.25% |
| 12/15/2020 | 3.32% | 1.30% | 1.46% |
| 12/16/2020 | -3.23% | 0.14% | 0.00% |
| 12/17/2020 | 1.77% | 0.79% | 1.24% |
| 12/18/2020 | 2.19% | -0.21% | 0.77% |
| 12/21/2020 | 3.10% | -0.29% | -1.05% |
| 12/22/2020 | -1.67% | 0.06% | 0.29% |
| 12/23/2020 | -3.07% | 0.14% | -0.46% |
| 12/24/2020 | -0.74% | 0.23% | 0.50% |
| 12/28/2020 | -7.67% | 0.38% | 0.30% |
| 12/29/2020 | -2.52% | -0.37% | 0.42% |
| 12/30/2020 | -0.61% | 0.33% | -0.05% |
| 12/31/2020 | -4.52% | 0.36% | 1.06% |
| 1/4/2021 | 6.96% | -1.32% | -0.97% |
| 1/5/2021 | 4.13% | 0.90% | 1.20% |
| 1/6/2021 | 1.43% | 0.80% | 0.73% |
| 1/7/2021 | 2.25% | 1.61% | 0.88% |
| 1/8/2021 | 2.20% | 0.47% | 0.93% |
| 1/11/2021 | -5.22% | -0.57% | -0.63% |
| 1/12/2021 | -1.44% | 0.42% | -1.45% |
| 1/13/2021 | -2.36% | 0.09% | 1.34% |
| 1/14/2021 | 0.89% | 0.00% | -1.38% |
| 1/15/2021 | 3.67% | -0.86% | -0.01% |
| 1/19/2021 | 11.42% | 0.85% | 0.34% |
| 1/20/2021 | 0.63% | 1.20% | 1.02% |
| 1/21/2021 | -0.25% | -0.09% | -0.41% |
| 1/22/2021 | -0.85% | -0.15% | -0.91% |

## Exhibit-5

## CODX, Market Index, and Peer Index Returns

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 1/25/2021 | 2.68% | 0.24% | 0.55% |
| 1/26/2021 | 3.26% | -0.29% | -0.38% |
| 1/27/2021 | 5.15% | -2.51% | -2.80% |
| 1/28/2021 | -3.88% | 0.92% | 2.47% |
| 1/29/2021 | 1.57% | -1.78% | -0.05% |
| 2/1/2021 | 10.42% | 1.71% | 0.42% |
| 2/2/2021 | -2.56% | 1.39% | 1.09% |
| 2/3/2021 | 5.19% | 0.14% | -0.89% |
| 2/4/2021 | 6.55% | 1.12% | 0.90% |
| 2/5/2021 | -1.09% | 0.61% | 1.01% |
| 2/8/2021 | 9.27% | 0.97% | 0.28% |
| 2/9/2021 | 12.52% | 0.10% | 0.07% |
| 2/10/2021 | -6.78% | -0.03% | 0.17% |
| 2/11/2021 | -10.26% | 0.19% | 1.07% |
| 2/12/2021 | 4.76% | 0.47% | 1.01% |
| 2/16/2021 | 6.60% | -0.11% | -0.74% |
| 2/17/2021 | -5.67% | -0.23% | -0.65% |
| 2/18/2021 | -7.44% | -0.66% | -0.84% |
| 2/19/2021 | 6.80% | 0.27% | -1.58% |
| 2/22/2021 | -7.43% | -0.97% | -0.27% |
| 2/23/2021 | -5.32% | -0.13% | 0.02% |
| 2/24/2021 | 10.62% | 1.12% | 0.66% |
| 2/25/2021 | -7.98% | -2.70% | -1.01% |
| 2/26/2021 | -11.26% | -0.39% | -0.89% |
| 3/1/2021 | 0.94% | 2.45% | 1.73% |
| 3/2/2021 | 0.00% | -0.91% | -0.35% |
| 3/3/2021 | 2.98% | -1.48% | -1.98% |
| 3/4/2021 | -8.07% | -1.68% | -2.35% |
| 3/5/2021 | -6.74% | 1.72% | 1.80% |
| 3/8/2021 | 0.40% | -0.59% | -1.80% |
| 3/9/2021 | 8.51% | 1.67% | 1.03% |
| 3/10/2021 | -7.94% | 0.68% | 0.06% |
| 3/11/2021 | 7.50% | 1.41% | 0.88% |
| 3/12/2021 | 3.73% | 0.15% | -0.29% |
| 3/15/2021 | -1.59% | 0.70% | 0.78% |
| 3/16/2021 | -1.91% | -0.43% | -0.44% |
| 3/17/2021 | 1.03% | 0.36% | -0.42% |

# Exhibit-5

## CODX, Market Index, and Peer Index Returns

April 30, 2020 through April 29, 2021

| Date | CODX Return | Market Index Return | Industry Index Return |
|---|---|---|---|
| 3/18/2021 | 0.66% | -1.81% | -0.86% |
| 3/19/2021 | 2.60% | 0.18% | 0.58% |
| 3/22/2021 | 3.36% | 0.48% | 0.95% |
| 3/23/2021 | -6.54% | -1.21% | -0.96% |
| 3/24/2021 | -9.31% | -0.91% | -0.21% |
| 3/25/2021 | -2.28% | 0.65% | 0.28% |
| 3/26/2021 | -22.27% | 1.52% | 2.27% |
| 3/29/2021 | -12.97% | -0.53% | 0.19% |
| 3/30/2021 | 0.23% | 0.00% | -0.63% |
| 3/31/2021 | 11.07% | 0.56% | 0.38% |
| 4/1/2021 | 0.21% | 1.27% | -0.06% |
| 4/5/2021 | -1.58% | 1.14% | 1.31% |
| 4/6/2021 | -1.50% | 0.03% | 0.20% |
| 4/7/2021 | -0.22% | -0.15% | -0.42% |
| 4/8/2021 | 0.54% | 0.59% | 0.53% |
| 4/9/2021 | -2.17% | 0.55% | 1.28% |
| 4/12/2021 | -3.47% | -0.07% | 0.10% |
| 4/13/2021 | 8.19% | 0.40% | 1.46% |
| 4/14/2021 | -1.48% | -0.29% | -0.54% |
| 4/15/2021 | -5.19% | 1.00% | 1.94% |
| 4/16/2021 | -0.62% | 0.26% | 0.44% |
| 4/19/2021 | -0.79% | -0.70% | -0.22% |
| 4/20/2021 | -7.18% | -0.91% | -0.39% |
| 4/21/2021 | 6.16% | 1.12% | 2.58% |
| 4/22/2021 | 2.16% | -0.73% | 0.40% |
| 4/23/2021 | 0.56% | 1.20% | 0.94% |
| 4/26/2021 | 2.32% | 0.44% | -0.55% |
| 4/27/2021 | -3.67% | -0.02% | -0.25% |
| 4/28/2021 | 2.57% | 0.01% | 0.39% |
| 4/29/2021 | -2.01% | 0.35% | -0.75% |

**Sources**: Bloomberg and CRSP.

**Note:** All returns are logarithmic returns.

**Exhibit-6**

**CODX Market Efficiency Statistics[1]**

April 30, 2020 through May 15, 2020

| Date | Closing Price | Log Return | Volume | Closing Bid | Closing Ask | Closing Bid/Ask Spread | Average Bid/Ask Spread % | Outstanding Shares | Market Capitalization |
|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d] | [e] | | | [f] | [g] |
| 4/30/2020 | $11.34 | -8.69% | 5,343,633 | $11.30 | $11.31 | $0.01 | 0.09% | 27,438,701 | $311,154,869 |
| 5/1/2020 | $13.47 | 17.21% | 16,701,876 | $13.46 | $13.47 | $0.01 | 0.07% | 27,438,701 | $369,599,302 |
| 5/4/2020 | $15.00 | 10.76% | 15,402,123 | $14.96 | $14.99 | $0.03 | 0.20% | 27,438,701 | $411,580,515 |
| 5/5/2020 | $13.85 | -7.98% | 4,955,598 | $13.82 | $13.85 | $0.03 | 0.22% | 27,438,701 | $380,026,009 |
| 5/6/2020 | $14.34 | 3.48% | 2,872,366 | $14.31 | $14.32 | $0.01 | 0.07% | 27,438,701 | $393,470,972 |
| 5/7/2020 | $14.74 | 2.75% | 3,523,736 | $14.71 | $14.74 | $0.03 | 0.20% | 27,438,701 | $404,446,453 |
| 5/8/2020 | $15.50 | 5.03% | 6,550,169 | $15.46 | $15.48 | $0.02 | 0.13% | 27,438,701 | $425,299,866 |
| 5/11/2020 | $17.05 | 9.53% | 10,307,458 | $17.02 | $17.04 | $0.02 | 0.12% | 27,438,701 | $467,829,852 |
| 5/12/2020 | $16.99 | -0.35% | 5,683,739 | $16.96 | $16.97 | $0.01 | 0.06% | 27,438,701 | $466,183,530 |
| 5/13/2020 | $23.42 | 32.10% | 24,236,378 | $23.38 | $23.39 | $0.01 | 0.04% | 27,457,133 | $643,046,055 |
| 5/14/2020 | $22.13 | -5.67% | 52,346,751 | $22.13 | $22.25 | $0.12 | 0.54% | 27,457,133 | $607,626,353 |
| 5/15/2020 | $17.07 | -25.96% | 21,052,293 | $17.00 | $17.07 | $0.07 | 0.41% | 27,457,133 | $468,693,260 |
| Average | $16.24 | 2.68% | 14,081,343 | $16.21 | $16.24 | $0.03 | 0.18% | 27,443,309 | $445.7 million |
| Median | $15.25 | 3.11% | 8,428,814 | $15.21 | $15.24 | $0.02 | 0.12% | 27,438,701 | $418.4 million |
| High | $23.42 | 32.10% | 52,346,751 | $23.38 | $23.39 | $0.12 | 0.54% | 27,457,133 | $643.0 million |
| Low | $11.34 | -25.96% | 2,872,366 | $11.30 | $11.31 | $0.01 | 0.04% | 27,438,701 | $311.2 million |

**Source:** CRSP.

**Exhibit-7**

**CODX Regression Results**

Estimation Period: April 30, 2020 through April 29, 2021

| Regression Statistics | |
|---|---|
| R Squared | 0.151 |
| Adjusted R Squared | 0.130 |
| Standard Error | 6.85% |
| Observations | 252 |

| | Coefficients | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | 0.27% | 0.44% | 0.61 |
| Market Index | -0.21 | 0.599 | -0.35 |
| Peer Index | -0.14 | 0.557 | -0.25 |
| 5/15/2020 | -26.14% | 6.87% | -3.80 |
| 8/14/2020 | -25.84% | 6.89% | -3.75 |
| 11/17/2020 | -13.78% | 6.88% | -2.00 |
| 3/26/2021 | -21.90% | 6.91% | -3.17 |

61

## Exhibit-8

## CODX Event Study Results

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | t-statistic[1] | |
|---|---|---|---|---|---|
| 4/30/2020 | -8.69% | 0.70% | -9.39% | -1.37 | |
| 5/1/2020 | 17.21% | 1.17% | 16.04% | 2.34 | * |
| 5/4/2020 | 10.76% | 0.18% | 10.58% | 1.54 | |
| 5/5/2020 | -7.98% | -0.32% | -7.65% | -1.12 | |
| 5/6/2020 | 3.48% | 0.53% | 2.95% | 0.43 | |
| 5/7/2020 | 2.75% | -0.29% | 3.04% | 0.44 | |
| 5/8/2020 | 5.03% | -0.11% | 5.14% | 0.75 | |
| 5/11/2020 | 9.53% | 0.10% | 9.43% | 1.38 | |
| 5/12/2020 | -0.35% | 1.04% | -1.39% | -0.20 | |
| 5/13/2020 | 32.10% | 0.90% | 31.20% | 4.55 | * |
| 5/14/2020 | -5.67% | 0.02% | -5.69% | -0.83 | |
| 5/15/2020 | -25.96% | 0.18% | -26.14% | -3.81 | * |
| 5/18/2020 | 2.20% | -0.76% | 2.96% | 0.43 | |
| 5/19/2020 | 7.72% | 0.70% | 7.02% | 1.02 | |
| 5/20/2020 | -1.44% | -0.22% | -1.22% | -0.18 | |
| 5/21/2020 | -3.06% | 0.63% | -3.69% | -0.54 | |
| 5/22/2020 | 2.90% | 0.10% | 2.80% | 0.41 | |
| 5/26/2020 | -2.84% | 0.04% | -2.88% | -0.42 | |
| 5/27/2020 | -2.64% | -0.12% | -2.52% | -0.37 | |
| 5/28/2020 | -0.51% | 0.08% | -0.59% | -0.09 | |
| 5/29/2020 | 2.99% | -0.05% | 3.04% | 0.44 | |
| 6/1/2020 | 0.00% | 0.23% | -0.23% | -0.03 | |
| 6/2/2020 | -2.47% | 0.06% | -2.53% | -0.37 | |
| 6/3/2020 | -3.65% | -0.05% | -3.61% | -0.53 | |
| 6/4/2020 | 0.00% | 0.58% | -0.58% | -0.08 | |
| 6/5/2020 | -5.77% | -0.68% | -5.10% | -0.74 | |
| 6/8/2020 | 0.13% | -0.13% | 0.26% | 0.04 | |
| 6/9/2020 | 0.93% | 0.76% | 0.18% | 0.03 | |
| 6/10/2020 | -1.06% | 0.35% | -1.41% | -0.21 | |
| 6/11/2020 | -4.22% | 2.36% | -6.58% | -0.96 | |
| 6/12/2020 | 1.62% | -0.25% | 1.87% | 0.27 | |
| 6/15/2020 | 11.23% | -0.16% | 11.39% | 1.66 | |
| 6/16/2020 | -4.28% | -0.28% | -4.00% | -0.58 | |
| 6/17/2020 | -1.08% | 0.28% | -1.37% | -0.20 | |
| 6/18/2020 | -3.58% | 0.29% | -3.87% | -0.56 | |
| 6/19/2020 | 7.90% | 0.37% | 7.53% | 1.10 | |
| 6/22/2020 | -4.45% | 0.15% | -4.60% | -0.67 | |
| 6/23/2020 | 12.58% | 0.10% | 12.48% | 1.82 | |

**Exhibit-8**

**CODX Event Study Results**

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | $t$-statistic[1] | |
|---|---|---|---|---|---|
| 6/24/2020 | -2.60% | 1.38% | -3.99% | -0.58 | |
| 6/25/2020 | 0.05% | -0.08% | 0.14% | 0.02 | |
| 6/26/2020 | -0.83% | 0.84% | -1.67% | -0.24 | |
| 6/29/2020 | -3.60% | -0.19% | -3.41% | -0.50 | |
| 6/30/2020 | 10.39% | -0.35% | 10.74% | 1.57 | |
| 7/1/2020 | 0.57% | 0.10% | 0.47% | 0.07 | |
| 7/2/2020 | -2.97% | 0.05% | -3.02% | -0.44 | |
| 7/6/2020 | -4.44% | -0.17% | -4.27% | -0.62 | |
| 7/7/2020 | -0.72% | 0.64% | -1.36% | -0.20 | |
| 7/8/2020 | 5.58% | 0.03% | 5.55% | 0.81 | |
| 7/9/2020 | -5.19% | 0.37% | -5.56% | -0.81 | |
| 7/10/2020 | 0.99% | 0.08% | 0.91% | 0.13 | |
| 7/13/2020 | -4.04% | 0.57% | -4.61% | -0.67 | |
| 7/14/2020 | 3.60% | -0.33% | 3.93% | 0.57 | |
| 7/15/2020 | -2.52% | -0.32% | -2.19% | -0.32 | |
| 7/16/2020 | 6.79% | 0.45% | 6.33% | 0.92 | |
| 7/17/2020 | -2.41% | -0.22% | -2.19% | -0.32 | |
| 7/20/2020 | 2.78% | 0.09% | 2.69% | 0.39 | |
| 7/21/2020 | 15.68% | 0.16% | 15.52% | 2.26 | * |
| 7/22/2020 | -4.33% | -0.01% | -4.31% | -0.63 | |
| 7/23/2020 | 4.78% | 0.48% | 4.30% | 0.63 | |
| 7/24/2020 | -2.13% | 0.50% | -2.63% | -0.38 | |
| 7/27/2020 | 1.37% | -0.04% | 1.40% | 0.20 | |
| 7/28/2020 | -2.52% | 0.49% | -3.01% | -0.44 | |
| 7/29/2020 | 2.34% | -0.35% | 2.69% | 0.39 | |
| 7/30/2020 | 1.71% | 0.47% | 1.23% | 0.18 | |
| 7/31/2020 | 6.63% | 0.18% | 6.46% | 0.94 | |
| 8/3/2020 | 24.95% | 0.01% | 24.93% | 3.64 | * |
| 8/4/2020 | -8.18% | 0.31% | -8.49% | -1.24 | |
| 8/5/2020 | -2.71% | -0.03% | -2.69% | -0.39 | |
| 8/6/2020 | -5.47% | 0.38% | -5.85% | -0.85 | |
| 8/7/2020 | -1.62% | 0.20% | -1.82% | -0.27 | |
| 8/10/2020 | -6.09% | 0.32% | -6.41% | -0.94 | |
| 8/11/2020 | -4.05% | 0.49% | -4.54% | -0.66 | |
| 8/12/2020 | -17.23% | -0.24% | -16.99% | -2.48 | * |
| 8/13/2020 | 7.05% | 0.21% | 6.85% | 1.00 | |
| 8/14/2020 | -25.40% | 0.44% | -25.84% | -3.77 | * |
| 8/17/2020 | -3.53% | 0.04% | -3.57% | -0.52 | |

63

**Exhibit-8**

**CODX Event Study Results**

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | $t$-statistic[1] | |
|---|---|---|---|---|---|
| 8/18/2020 | -1.93% | 0.20% | -2.13% | -0.31 | |
| 8/19/2020 | -5.98% | 0.45% | -6.43% | -0.94 | |
| 8/20/2020 | -0.97% | 0.21% | -1.18% | -0.17 | |
| 8/21/2020 | 3.21% | 0.25% | 2.96% | 0.43 | |
| 8/24/2020 | -16.74% | 0.11% | -16.85% | -2.46 | * |
| 8/25/2020 | 3.67% | 0.02% | 3.65% | 0.53 | |
| 8/26/2020 | 0.88% | 0.05% | 0.83% | 0.12 | |
| 8/27/2020 | -14.14% | -0.07% | -14.08% | -2.05 | * |
| 8/28/2020 | 0.00% | 0.09% | -0.09% | -0.01 | |
| 8/31/2020 | -4.66% | 0.28% | -4.94% | -0.72 | |
| 9/1/2020 | -3.26% | 0.13% | -3.40% | -0.50 | |
| 9/2/2020 | -7.58% | -0.27% | -7.31% | -1.07 | |
| 9/3/2020 | -5.03% | 1.47% | -6.50% | -0.95 | |
| 9/4/2020 | -12.10% | 0.62% | -12.72% | -1.86 | |
| 9/8/2020 | 35.06% | 1.02% | 34.04% | 4.97 | * |
| 9/9/2020 | -13.52% | -0.49% | -13.04% | -1.90 | |
| 9/10/2020 | 12.84% | 0.78% | 12.06% | 1.76 | |
| 9/11/2020 | 16.54% | 0.26% | 16.28% | 2.38 | * |
| 9/14/2020 | -7.81% | -0.24% | -7.57% | -1.11 | |
| 9/15/2020 | -1.51% | 0.12% | -1.63% | -0.24 | |
| 9/16/2020 | 10.41% | 0.41% | 10.00% | 1.46 | |
| 9/17/2020 | 3.20% | 0.47% | 2.73% | 0.40 | |
| 9/18/2020 | 3.50% | 0.55% | 2.95% | 0.43 | |
| 9/21/2020 | 2.33% | 0.70% | 1.64% | 0.24 | |
| 9/22/2020 | -1.59% | 0.08% | -1.68% | -0.25 | |
| 9/23/2020 | -10.44% | 0.98% | -11.42% | -1.67 | |
| 9/24/2020 | 2.42% | 0.37% | 2.05% | 0.30 | |
| 9/25/2020 | 3.98% | -0.36% | 4.35% | 0.63 | |
| 9/28/2020 | -0.98% | -0.23% | -0.75% | -0.11 | |
| 9/29/2020 | -1.99% | 0.36% | -2.35% | -0.34 | |
| 9/30/2020 | -2.40% | -0.17% | -2.23% | -0.33 | |
| 10/1/2020 | -4.67% | 0.17% | -4.84% | -0.71 | |
| 10/2/2020 | 7.36% | 0.58% | 6.77% | 0.99 | |
| 10/5/2020 | 6.05% | -0.39% | 6.44% | 0.94 | |
| 10/6/2020 | -3.29% | 0.66% | -3.95% | -0.58 | |
| 10/7/2020 | 3.09% | -0.38% | 3.46% | 0.51 | |
| 10/8/2020 | -2.67% | 0.03% | -2.70% | -0.39 | |
| 10/9/2020 | 0.07% | -0.10% | 0.17% | 0.02 | |

**Exhibit-8**

**CODX Event Study Results**

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | $t$-statistic[1] | |
|---|---|---|---|---|---|
| 10/12/2020 | -1.40% | -0.17% | -1.23% | -0.18 | |
| 10/13/2020 | 2.98% | 0.54% | 2.44% | 0.36 | |
| 10/14/2020 | -2.70% | 0.40% | -3.10% | -0.45 | |
| 10/15/2020 | -1.34% | 0.32% | -1.66% | -0.24 | |
| 10/16/2020 | -0.50% | 0.11% | -0.61% | -0.09 | |
| 10/19/2020 | -2.75% | 0.77% | -3.52% | -0.51 | |
| 10/20/2020 | -2.38% | 0.16% | -2.54% | -0.37 | |
| 10/21/2020 | -5.33% | 0.43% | -5.76% | -0.84 | |
| 10/22/2020 | -3.96% | -0.10% | -3.87% | -0.56 | |
| 10/23/2020 | 2.77% | 0.22% | 2.55% | 0.37 | |
| 10/26/2020 | 11.94% | 0.76% | 11.18% | 1.63 | |
| 10/27/2020 | 1.34% | 0.38% | 0.97% | 0.14 | |
| 10/28/2020 | -4.57% | 1.45% | -6.02% | -0.88 | |
| 10/29/2020 | 1.57% | 0.17% | 1.40% | 0.20 | |
| 10/30/2020 | -2.94% | 0.64% | -3.58% | -0.52 | |
| 11/2/2020 | -1.05% | -0.18% | -0.87% | -0.13 | |
| 11/3/2020 | 5.50% | -0.34% | 5.84% | 0.85 | |
| 11/4/2020 | 1.42% | -0.34% | 1.75% | 0.26 | |
| 11/5/2020 | 1.95% | -0.35% | 2.30% | 0.34 | |
| 11/6/2020 | -0.41% | 0.15% | -0.56% | -0.08 | |
| 11/9/2020 | -22.85% | -0.18% | -22.67% | -3.31 | * |
| 11/10/2020 | 2.32% | 0.40% | 1.92% | 0.28 | |
| 11/11/2020 | 12.31% | 0.09% | 12.21% | 1.78 | |
| 11/12/2020 | 13.29% | 0.54% | 12.75% | 1.86 | |
| 11/13/2020 | -1.39% | -0.21% | -1.18% | -0.17 | |
| 11/16/2020 | -9.74% | 0.01% | -9.74% | -1.42 | |
| 11/17/2020 | -13.36% | 0.41% | -13.78% | -2.01 | * |
| 11/18/2020 | -3.86% | 0.70% | -4.56% | -0.67 | |
| 11/19/2020 | -5.11% | 0.06% | -5.17% | -0.76 | |
| 11/20/2020 | 2.00% | 0.43% | 1.57% | 0.23 | |
| 11/23/2020 | -5.56% | 0.22% | -5.78% | -0.84 | |
| 11/24/2020 | 0.67% | -0.09% | 0.76% | 0.11 | |
| 11/25/2020 | 13.94% | 0.38% | 13.56% | 1.98 | * |
| 11/27/2020 | -2.08% | 0.08% | -2.16% | -0.32 | |
| 11/30/2020 | -1.44% | 0.31% | -1.75% | -0.25 | |
| 12/1/2020 | -5.80% | 0.05% | -5.85% | -0.85 | |
| 12/2/2020 | -0.82% | 0.15% | -0.97% | -0.14 | |
| 12/3/2020 | -1.19% | 0.27% | -1.46% | -0.21 | |

65

**Exhibit-8**

**CODX Event Study Results**

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | $t$-statistic[1] |
|---|---|---|---|---|
| 12/4/2020 | 1.83% | -0.13% | 1.96% | 0.29 |
| 12/7/2020 | -3.50% | 0.39% | -3.89% | -0.57 |
| 12/8/2020 | -2.85% | 0.21% | -3.06% | -0.45 |
| 12/9/2020 | -2.05% | 0.50% | -2.54% | -0.37 |
| 12/10/2020 | 3.01% | 0.15% | 2.86% | 0.42 |
| 12/11/2020 | -2.62% | 0.37% | -2.99% | -0.44 |
| 12/14/2020 | 4.51% | 0.37% | 4.14% | 0.60 |
| 12/15/2020 | 3.32% | -0.21% | 3.53% | 0.52 |
| 12/16/2020 | -3.23% | 0.24% | -3.47% | -0.51 |
| 12/17/2020 | 1.77% | -0.07% | 1.84% | 0.27 |
| 12/18/2020 | 2.19% | 0.20% | 1.99% | 0.29 |
| 12/21/2020 | 3.10% | 0.48% | 2.63% | 0.38 |
| 12/22/2020 | -1.67% | 0.21% | -1.89% | -0.28 |
| 12/23/2020 | -3.07% | 0.30% | -3.37% | -0.49 |
| 12/24/2020 | -0.74% | 0.15% | -0.88% | -0.13 |
| 12/28/2020 | -7.67% | 0.14% | -7.81% | -1.14 |
| 12/29/2020 | -2.52% | 0.28% | -2.81% | -0.41 |
| 12/30/2020 | -0.61% | 0.21% | -0.82% | -0.12 |
| 12/31/2020 | -4.52% | 0.04% | -4.56% | -0.67 |
| 1/4/2021 | 6.96% | 0.68% | 6.28% | 0.92 |
| 1/5/2021 | 4.13% | -0.09% | 4.22% | 0.62 |
| 1/6/2021 | 1.43% | -0.00% | 1.44% | 0.21 |
| 1/7/2021 | 2.25% | -0.20% | 2.45% | 0.36 |
| 1/8/2021 | 2.20% | 0.04% | 2.16% | 0.32 |
| 1/11/2021 | -5.22% | 0.47% | -5.69% | -0.83 |
| 1/12/2021 | -1.44% | 0.38% | -1.83% | -0.27 |
| 1/13/2021 | -2.36% | 0.06% | -2.41% | -0.35 |
| 1/14/2021 | 0.89% | 0.46% | 0.43% | 0.06 |
| 1/15/2021 | 3.67% | 0.45% | 3.22% | 0.47 |
| 1/19/2021 | 11.42% | 0.04% | 11.38% | 1.66 |
| 1/20/2021 | 0.63% | -0.13% | 0.76% | 0.11 |
| 1/21/2021 | -0.25% | 0.34% | -0.60% | -0.09 |
| 1/22/2021 | -0.85% | 0.43% | -1.27% | -0.19 |
| 1/25/2021 | 2.68% | 0.14% | 2.55% | 0.37 |
| 1/26/2021 | 3.26% | 0.38% | 2.88% | 0.42 |
| 1/27/2021 | 5.15% | 1.19% | 3.97% | 0.58 |
| 1/28/2021 | -3.88% | -0.28% | -3.60% | -0.53 |
| 1/29/2021 | 1.57% | 0.65% | 0.92% | 0.13 |

66

**Exhibit-8**

**CODX Event Study Results**

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | t-statistic[1] |
|---|---|---|---|---|
| 2/1/2021 | 10.42% | -0.15% | 10.57% | 1.54 |
| 2/2/2021 | -2.56% | -0.18% | -2.38% | -0.35 |
| 2/3/2021 | 5.19% | 0.36% | 4.83% | 0.70 |
| 2/4/2021 | 6.55% | -0.10% | 6.64% | 0.97 |
| 2/5/2021 | -1.09% | -0.00% | -1.09% | -0.16 |
| 2/8/2021 | 9.27% | 0.02% | 9.24% | 1.35 |
| 2/9/2021 | 12.52% | 0.24% | 12.28% | 1.79 |
| 2/10/2021 | -6.78% | 0.25% | -7.03% | -1.03 |
| 2/11/2021 | -10.26% | 0.08% | -10.33% | -1.51 |
| 2/12/2021 | 4.76% | 0.03% | 4.74% | 0.69 |
| 2/16/2021 | 6.60% | 0.39% | 6.21% | 0.91 |
| 2/17/2021 | -5.67% | 0.41% | -6.07% | -0.89 |
| 2/18/2021 | -7.44% | 0.52% | -7.97% | -1.16 |
| 2/19/2021 | 6.80% | 0.43% | 6.37% | 0.93 |
| 2/22/2021 | -7.43% | 0.51% | -7.94% | -1.16 |
| 2/23/2021 | -5.32% | 0.29% | -5.61% | -0.82 |
| 2/24/2021 | 10.62% | -0.06% | 10.68% | 1.56 |
| 2/25/2021 | -7.98% | 0.97% | -8.96% | -1.31 |
| 2/26/2021 | -11.26% | 0.47% | -11.73% | -1.71 |
| 3/1/2021 | 0.94% | -0.49% | 1.43% | 0.21 |
| 3/2/2021 | 0.00% | 0.50% | -0.50% | -0.07 |
| 3/3/2021 | 2.98% | 0.86% | 2.12% | 0.31 |
| 3/4/2021 | -8.07% | 0.95% | -9.03% | -1.32 |
| 3/5/2021 | -6.74% | -0.35% | -6.39% | -0.93 |
| 3/8/2021 | 0.40% | 0.64% | -0.24% | -0.03 |
| 3/9/2021 | 8.51% | -0.23% | 8.74% | 1.27 |
| 3/10/2021 | -7.94% | 0.12% | -8.06% | -1.18 |
| 3/11/2021 | 7.50% | -0.15% | 7.65% | 1.12 |
| 3/12/2021 | 3.73% | 0.28% | 3.45% | 0.50 |
| 3/15/2021 | -1.59% | 0.01% | -1.60% | -0.23 |
| 3/16/2021 | -1.91% | 0.42% | -2.33% | -0.34 |
| 3/17/2021 | 1.03% | 0.25% | 0.78% | 0.11 |
| 3/18/2021 | 0.66% | 0.77% | -0.11% | -0.02 |
| 3/19/2021 | 2.60% | 0.15% | 2.45% | 0.36 |
| 3/22/2021 | 3.36% | 0.03% | 3.33% | 0.49 |
| 3/23/2021 | -6.54% | 0.65% | -7.20% | -1.05 |
| 3/24/2021 | -9.31% | 0.49% | -9.80% | -1.43 |
| 3/25/2021 | -2.28% | 0.09% | -2.37% | -0.35 |

**Exhibit-8**

**CODX Event Study Results**

April 30, 2020 through April 29, 2021

| Date | CODX LN Return | CODX Explained Return | CODX Residual Return | t-statistic[1] | |
|------|---------------|----------------------|---------------------|---------------|---|
| 3/26/2021 | -22.27% | -0.37% | -21.90% | -3.20 | * |
| 3/29/2021 | -12.97% | 0.35% | -13.32% | -1.94 | |
| 3/30/2021 | 0.23% | 0.36% | -0.12% | -0.02 | |
| 3/31/2021 | 11.07% | 0.10% | 10.98% | 1.60 | |
| 4/1/2021 | 0.21% | 0.01% | 0.20% | 0.03 | |
| 4/5/2021 | -1.58% | -0.16% | -1.42% | -0.21 | |
| 4/6/2021 | -1.50% | 0.23% | -1.73% | -0.25 | |
| 4/7/2021 | -0.22% | 0.36% | -0.57% | -0.08 | |
| 4/8/2021 | 0.54% | 0.07% | 0.47% | 0.07 | |
| 4/9/2021 | -2.17% | -0.03% | -2.14% | -0.31 | |
| 4/12/2021 | -3.47% | 0.27% | -3.73% | -0.54 | |
| 4/13/2021 | 8.19% | -0.02% | 8.21% | 1.20 | |
| 4/14/2021 | -1.48% | 0.40% | -1.88% | -0.27 | |
| 4/15/2021 | -5.19% | -0.22% | -4.97% | -0.73 | |
| 4/16/2021 | -0.62% | 0.15% | -0.77% | -0.11 | |
| 4/19/2021 | -0.79% | 0.44% | -1.24% | -0.18 | |
| 4/20/2021 | -7.18% | 0.51% | -7.70% | -1.12 | |
| 4/21/2021 | 6.16% | -0.33% | 6.49% | 0.95 | |
| 4/22/2021 | 2.16% | 0.36% | 1.80% | 0.26 | |
| 4/23/2021 | 0.56% | -0.12% | 0.68% | 0.10 | |
| 4/26/2021 | 2.32% | 0.25% | 2.07% | 0.30 | |
| 4/27/2021 | -3.67% | 0.31% | -3.98% | -0.58 | |
| 4/28/2021 | 2.57% | 0.21% | 2.36% | 0.34 | |
| 4/29/2021 | -2.01% | 0.30% | -2.31% | -0.34 | |

**Note:**

[1] t-statistics marked with a "*" are significant at the 95% confidence level.

[2] All returns are logarithmic returns.