Ryan B. Hancey, Esq., rhancey@keslerrust.com, Utah State Bar Number 9101
Attorney for Defendants
Kesler & Rust
68 South Main Street, Suite 200
Salt Lake City, Utah 84101
(801) 532-800 (TEL.)

Christopher P. Milazzo, Esq., cmilazzo@cmfllp.com, Pro Hac Vice
Attorney for Defendants
Carmel, Milazzo & Feil LLP
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0458 (TEL.)

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **GELT TRADING, LTD., a Cayman Islands limited company,** | **Case NO. 2:20-cv-00368-JNP-DBP** |
| **Plaintiff,** | OPPOSITION TO MOTION TO CERTIFY |
| **v.** | CLASS |
| **CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON and BRENT SATTERFIELD,** | Judge Jill N. Parrish |
| **Defendants.** | |

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................................................................ iii

Introduction........................................................................................................................1

Statement of Pertinent Facts ..............................................................................................4

    The May 1, 2020 Co-Diagnostics Press Release ........................................................4

        Allegations Concerning the May 1, 2020 Co-Diagnostics Press
        Release .....................................................................................................................4

    Facts Omitted From the SAC Concerning the Purposeful
    Misinterpretation of the May 1, 2020 Co-Diagnostics Press Release .....................5

    The Alleged Corrective Disclosures ..........................................................................6

    Dr. Werner Concludes that the May 14 Trading Day Disclosures Had no
    Significant Effect on the Price of Co-Diagnostics' Stock ........................................8

    The May 14 Trading Day Disclosures Did Not Add Anything New and
    Value Relevant to the Publicly Available Information and/or Did Not
    Bear on Co-Diagnostics' COVID-19 Tests ..............................................................9

    Lead Plaintiff's Trades.............................................................................................11

Relevant Procedural History ............................................................................................12

Argument ..........................................................................................................................13

    POINT I
    STANDARDS ON A MOTION TO CERTIFY A CLASS...................................13

    POINT II
    LEAD PLAINTIFF FAILS TO ESTABLISH THE REQUIREMENTS
    FOR CLASS CERTIFICATION UNDER FEDRAL RULE 23(a)......................14

    A. Reports Plaintiff Has Failed to Establish
       Commonality and Typicality .............................................................................14

       1.  Commonality, Generally..............................................................................14

2. Typicality, Generally ...................................................................13

3. Dr. Werner's Event Study, in the Context of Common Injury ...................16

4. Dr. Werner's Event Study Concludes That Lead Plaintiff Cannot Establish For Itself the Loss Causation Allegedly Relied Upon by the Proposed Class ...................................................................17

5. The Various Categories of Class Members Do Not Share Common Injury ...................................................................19

B. Lead Plaintiff Cannot Establish it is an Adequate Representative of the Class ...................................................................23

CONCLUSION ...................................................................25

ii

## TABLE OF AUTHORITIES

**Cases**

*Adler v. All Hours Plumbing Drain Cleaning 24-7-365 LLC*,
2022 WL 15513196, *3 (D.Utah 2022). ...................................................................................... 13

*Berwecky v. Bear. Stearns & Co., Inc.*,
197 F.R.D. 65 (S.D.N.Y.2000) ..................................................................................................... 20

*Cunningham v. Vivint, Inc.*,
2022 WL 2291699, at *9 (D.Utah 2022) ............................................................................... 23, 24

*D.E. & J. Ltd. P'shp. V. Conaway*,
284 F.Supp.2d 719, 748-49 (E.D.Mich.2003), *aff'd*, 133 Fed.Appx. 994(6th Cir. 2005) ............. 18

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336, 342 (2005).......................................................................................................... 17, 19

*East Tex. Motor Freight System, Inc. v. Rodriguez*,
431 U.S. 395, 403 (1977)........................................................................................................... 13, 23

*Edgington v. R.G. Dickinson and Co.*,
139 F.R.D. 183, 189 (D.Kansas 1991)............................................................................................ 15

*General Telephone Co. of Northwest v. EEOC*,
446 U.S. 318, 330 (1980)................................................................................................................. 14

*General Telephone Co. of Southwest v. Falcon*,
457 U.S.147, 160 (1982)............................................................................................. 13, 14, 15, 23

*In re ORFA Sec. Litig.*,
654 F.Supp.1449, 1465 (D.N.J. 1987). .......................................................................................... 20

*In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*,
205 F.R.D. 572, 579 (D.Colorado 2001) ....................................................................................... 21

*In re Williams Securities Litigation*,
496 F.Supp.2d 1195, 122 (N.D.Oklahoma 2007). ........................................................ 17

*In re Williams Securities Litigation-WCG Subclass*,
558 F.3d 1130, 1140 (10th Cir. 2009). ............................................................. 18, 19, 20

*Manasfi v. Malone*,
2007 WL 891871, at *6 (D.Colo 2007). ....................................................................... 16

*Masri v. Wakefield*,
106 F.R.D. 322, 324-25 (D.Colo 1984). ....................................................................... 16

*Reed v. Bowen*,
849 F.2d 1307, 1309 (10th Cir. 1988);. ........................................................................ 14

*Schlesinger v. Reservists Comm. To Stop the War*,
418 U.S. 208, 216 (1974)................................................................................................ 24

*Shook v. Bd. Of Cnty. Comm'rs of El Paso*,
543 F.3d 597, 612 (10th Cir. 2008). ............................................................................. 13

*Spivak v. Petro-Lewis Corp.*,
120 F.R.D. 693, 697-98 (D.Colorado 1987) ........................................................... 15, 16

*Thompson v. Jiffy Lube Intern., Inc.*,
250 F.R.D. 607, (D.Kansas 2008) ................................................................................. 24

*Trevizo v. Adams*,
455 F.3d 1155, 1162 (10th Cir. 2006). .................................................................... 13, 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S.338, 349 (2011)........................................................................................ 14, 15, 23

*Wesley v. Snap Finance LLC*,
339 F.R.D. 277, 288 (D.Utah 2021). ....................................................................... 13, 14

**Statutes**

15 U.S.S. §78u-4(e)(1) ........................................................................................... 20, 21, 22

15 U.S.S. §78u-4(e)(2) ................................................................................................... 22

Fed. R. Civ. P. 23(a) ................................................................................................. 13, 14

Fed. R. Civ. P. 23(a)(2) ................................................................................................. 14

U.S.Const. art. III, s 2, cl. 1. ....................................................................................... 15

Defendants Co-Diagnostics, Inc. ("Co-Diagnostics"), Dwight Egan ("Egan"), James Nelson ("Nelson") Eugene Durenard ("Durenard"), Edward Murphy ("Murphy"), Richard Serbin ("Serbin"), Reed Benson ("Benson") and Brent Satterfield ("Satterfield") (collectively, the "Defendants")[1] respectfully submit this opposition to the motion of Lead Plaintiff Gelt Trading Ltd. ("Lead Plaintiff" or "Gelt") to certify the putative class.

**Introduction**

This motion seeks to certify a class which, by the allegations of this case, and upon the opinion of Lead Plaintiff's proposed expert, Dr. Andrew Werner ("Werner"), is illogical and suspiciously overbroad. The Second Amended Complaint (the "SAC") alleges that on May 1, 2020 Co-Diagnostics issued a misleading press release (the "Press Release") which allegedly artificially inflated the price of Co-Diagnostics' stock. It is alleged that on May 14, 2020 and May 15, 2020, third-parties made ostensible corrective disclosures causing price corrections, causing investors to lose money. Gelt submitted a declaration from Werner (the "Werner Dec."), which it argues speaks to the statistical significance of the changes in Co-Diagnostics' stock price in an attempt to attribute same to allegation related events, as opposed to random chance due to the stock's random volatility.

Werner contends that the change in stock price on May 1, 2020 was statistically significant, and therefore not due to random chance.[2] He also contends that the price change on May 15, 2020, the day following the alleged corrective disclosures, was also statistically significant.[3] Lead

---

[1] Egan, Nelson, Durenard Murphy, Serrbin, Benson and Satterfield are referred to collectively herein as the "Individual Defendants".

[2] Defendants contend that Werner's methodology is dubious, but understand that a contest between expert witnesses is not to be determined by a motion to certify the class. Defendants also contend that Werner ignored the fact that the information released in the ostensible corrective disclosures was already available to the public prior to the Press Release, and ignores the fact that the alleged corrective disclosures have no bearing on either the contents of the Press Release or any manner by which the Press Release can be even alleged to have been misleading,

[3] Defendants contend here too, that Werner's methodology is dubious.

1

Plaintiff contends that these show the price was artificially inflated as of May 1, 2020 and that the alleged corrective disclosures caused the price to decline, causing investors to lose money.

The trouble is that Lead Plaintiff is not amongst those who sold shares of Co-Diagnostics' stock on May 15, 2020 – it sold its shares on May 14, 2020. Notably, Werner's Declaration is entirely silent and offers no discussion as to the statistical significance of the price decline on May 14, 2020. This was purposeful – a chart attached to his Declaration as Exhibit 8 shows that the results of his own event study did not show statistical significance for the price decline on May 14, 2020 and therefore, as a scientific and statistical matter, that the decrease in stock price could not be attributed to any allegation specific events. In fact, his results are mathematically associated with a 41% chance that the return on that date was caused by random volatility alone, which is more than 8 times higher than the generally accepted 5% threshold below which statistical significance is determined, that Dr. Werner employs.

As discussed in the rebuttal report of Dr. Ran Wei, it is no surprise that the market did not react to the alleged corrective disclosures – matters contained therein were previously known by the public, and known even before the Press Release. Further, as Dr. Wei provides, no analyst or press reports attribute any change in Co-Diagnostics stock price thereto, let alone support Plaintiff's claims that the disclosures were purportedly corrective or value relevant.

As a result, Plaintiff cannot establish loss-causation for itself and therefore lacks standing to maintain this action – which precludes a finding of adequacy, a necessary element to certify the class. It also renders Lead Plaintiff's alleged losses atypical.

Next, the putative class is alleged to include those who purchased Co-Diagnostics stock between May 1, 2020[4] and May 15, 2020, inclusive. Lead Plaintiff proposed an inclusive date

---

[4] As amended, from April 30, 2020 in the Order resolving the motion to dismiss.

beyond the date on which it sold its shares in an effort to tie its claim, which is barred by its own expert declaration, in with those who sold their shares on a date on which Lead Plaintiff could, albeit through faulty methodology, at least purport to show statistical significance. Having achieved that purpose, Lead Plaintiff stopped there – that is, that it did not seek to tune the proposed class in a logical manner. In fact, within the proposed class there are six distinct subgroups which do not share a common injury. For example, Lead Plaintiff included those who purchased shares on May 15, 2020, however by this point the alleged corrective information was released a day prior and therefore members of this subgroup could not have been purchasing the stock at artificially inflated prices, defeating loss causation for that group of proposed class members.

In addition, the putative class includes all those who purchased shares between these May 1, 2020 and May 15, 2020, but does not exclude those who sold prior to the alleged corrective disclosures and therefore did not suffer allegation specific losses. The purpose of this seems to have been to draw a class to include the trading days of May 14 and 15, 2020, which account for nearly half of the trading volume for the proposed class period in an effort to baselessly pump up its damages claim. In addition, it seems to have been done in an attempt to avoid the consequences of the rise in price of Co-Diagnostics' price immediately following the purported corrective disclosures because Lead Plaintiff knows that all of the proposed class members who purchased shares from May 1, 2020 to May 12, 2020, inclusive, purchased below the 90-day mean, and whose ostensible damages will be entirely mitigated.

The proposed class also includes investors who purchased shares on (and after) May 13, 2020. This is a very interesting date for several reasons. According to Dr. Werner's explanation of the efficient market hypothesis, the alleged misrepresentation was already built into the price by this date. However, his event study found a t-statistic of 4.55 for this date, which is statistically

significant.  Once again, however, the body of his report is totally silent on this.  Neither Lead Plaintiff nor Dr. Werner offer any argument that this (supposedly) significant increase was due to allegation related events.  Therefore, it would be inappropriate to certify a class including totally unexplained and non-allegation related price increase.  As discussed below, based on the vast differences between the subgroups, the proposed class members do not share a common injury.

Therefore, as more fully discussed below, the motion to certify the class should be denied.

## Statement of Pertinent Facts

### The May 1, 2020 Co-Diagnostics Press Release

**Allegations Concerning the May 1, 2020 Co-Diagnostics Press Release**

On May 1, 2020, Co-Diagnostics issued a press release entitled *Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations*. (SAC ¶ 62.)  Plaintiff overstates the contents of the press release – which is the primary ostensible misrepresentation complained of – alleging that the "press release unequivocally stated that Co-Diagnostics Covid-19 tests were 100% accurate based upon data gathered from across the world."  (*Id*. ¶ 62.)  Rather, the Press Release announces that Co-Diagnostics released the results of evaluations performed by a number of institutions, and provides, in pertinent part:

> Co-Diagnostics, Inc. (Nasdaq:CODX) (the "Company") . . . today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to determine the accuracy in molecular diagnostic testing.
>
> The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field.  These evaluations were conducted in Mexico by the Mexican Department of Epidemiology (InDRE"), India, and elsewhere in the US and abroad.  Each study concluded 100% concordance for both specificity and sensitivity.

4

* * *

(Milazzo Decl. Exh. A.)  The Press Release issued on Co-Diagnostics' website contained a link with the results of each evaluation, each of which demonstrated 100% sensitivity and 100% specificity.  (Milazzo Decl. Exh. A.)  Further, the validation reports indicate a limit of detection ("LOD") of 8.42 copies/uL (42.1 copies per reaction).

The SAC also alleges that in the Press Release, Satterfield "did not mention that the tests might be less than 100% accurate – abandoning his recognition that the tests were between 99.52% and 100% accurate" and instead "insisted that the []tests were 100% accurate based upon experimental data".  (SAC ¶ 63.)  Again, this is an inaccurate characterization of what was actually stated in the Press Release.  Rather, Satterfield stated that "[i]n countries where [Co-Diagnostics has] been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that."  (Milazzo Decl. Exh. B.)  It is alleged that Defendants were aware that the Press Release misstated the accuracy of the Covid test and omitted information that the company's tests have accuracy problems. (SAC ¶64)  While the Press Release simply announced the test results, the SAC alleges that Co-Diagnostics could have released a "clarifying statement," without alleging what was might have been required clarification and without alleging that Defendants knew clarification was required. (SAC ¶88)

**Facts Omitted From the SAC Concerning the**
**Purposeful Misinterpretation of the May 1, 2020 Co-Diagnostics Press Release**

In order to make the allegation that the Press Release meant to announce that Co-Diagnostics' test is totally perfect, Lead Plaintiff omitted several key facts.

First, Lead Plaintiff omitted any reference to the limit of detection published in the validation reports.  A limit of detection is the lowest concentration of an analyte in a sample that can be consistently detected with a stated probability, typically 95%.  In other words, only a test

that has an infinitesimally low LOD at a probability of 100% could even approach "perfect" (as that term is meant to be used in the SAC.)  In addition, as discussed below, reports contending that among tests measuring limit of detection in parts per milliliter, Co-Diagnostics' tests ranked 17th out of 20 were available for nearly a month prior to the Press Release. (Wei Dec. ¶, Ex. .)  This is important because several of the ostensible corrective disclosures bear on the limit of detection of Co-Diagnostics' tests, though do not contradict the limit of detection set forth in the Press Release.[5]

Next, the product page for Co-Diagnostics' Covid-19 tests, on its own website, stated, both before, on the date of, and after the Press Release, that "Negative results do not preclude SARS-CoV02 infection…" (Milazzo Dec. ¶ 2, Ex. B.)  Thus at any pertinent time, Co-Diagnostics was explicitly informing the public that the test was *not* perfect and not 100% *accurate*, as Lead Plaintiff uses those terms.  These directly contradict Lead Plaintiff's mischaracterization of the contents of the Press Release.

**The Alleged Corrective Disclosures**

Gelt alleges that on May 14, 2020, third-parties "revealed" information characterized Gelt as "startling" which allegedly concerned Co-Diagnostics' COVID-19 tests. (SAC ¶74.)

It alleges that on May 14, 2020 [at 9:00 a.m.], The Salt Lake Tribune reported that TestUtah.com, which used Co-Diagnostics' tests, "declined to join other major Utah labs in a joint experiment to confirm one another's quality."[6] (the [purported] "Decline to Confirm Quality" disclosure.) (SAC ¶75.)  Lead Plaintiff does not allege that Co-Diagnostics declined to join the

---

[5] Defendants contend that the remaining allegedly corrective disclosures do not speak to the quality of Co-Diagnostics' Covid-19 test, but instead speak to the broad scope "accuracy" in field-testing in light of externalities such as the conditions of the testing facilities, specimen handling, etc.

[6]  Second Amended Complaint, ¶ 75. Also *see* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

joint experiment, but that TestUtah.com did. Subsequent reports would reveal substandard testing practices at TestUtah which put the testing initiative in "immediate jeopardy" of being shut down.

It alleges The Salt Lake Tribune revealed TestUtah's tests "have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury." (SAC ¶75.) It alleges this meant *Co-Diagnostics*' tests were likely to have a much higher false negative reporting rate.[7] (the [purported] "Higher Limit of Detection" disclosure) (SAC ¶75.)  Again, reports accused TestUtah of substandard testing practices and conditions; testing asymptomatic patients (contrary to CDC guidelines and to Co-Diagnostics' product instructions), and leaving samples out for hours, which would invalidate results.

Plaintiff alleges that The Tribune article also expressed concern relating to TestNebraska.com and TestIowa.com, which also used Co-Diagnostics tests.[8] (the [purported] Concern Related to TestNebraska" and "Concern Related to TestIowa" disclosures) (SAC ¶76.)

Plaintiff alleges that on May 14th [around noon ET], Iowa Governor Kim Reynolds issued a public statement saying, "I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives." (SAC ¶77.) Plaintiff alleges that those results did not comport with statements previously made by Co-Diagnostics on May 1, 2020.[9] (the [purported] "95% Accuracy Reported by Iowa Governor" disclosure.) (*Id.*)[10]

---

[7]    Second Amended Complaint, ¶ 75. Also *see* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

[8]    SAC, ¶ 76. Also *see* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

[9]    SAC, ¶ 77. Also *see* Iowa Governor Kim Reynolds Press Conference, May 14, 2020, 12:00 p.m. ET, available at https://governor.iowa.gov/newsroom, shortly after the start of the press conference the Governor announced the accuracy rate of the COVID-19 tests.

[10] Defendants contend this statement concerned testing machines used in Iowa and not the actual tests.

These are referred to herein as the "May 14 Trading Day Disclosures."

Finally, Plaintiff alleges that "[t]he same day [May 14, 2020 at 7:44pm ET], the United States FDA issued a press release about testing accuracy. Another much larger drug company (Abbott Laboratories) had created a diagnostic test for Covid-19 that was under increasing public scrutiny for apparent inaccuracy." The FDA announced to the public that "[t]he FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. **No diagnostic test will be 100% accurate** due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly." (emphasis added) (the "May 14 Post-Close Disclosure.) (SAC ¶83.)[11]

### Dr. Werner Concludes that the May 14 Trading Day Disclosures Had no Significant Effect on the Price of Co-Diagnostics' Stock

One would expect that if the May 14 Trading Day Disclosures really did "reveal" "startling information about Co-Diagnostics' allegedly 100% perfect test, an observable and statistically significant negative abnormal decrease in the stock price would have occurred on May 14, 2020. (Wei Dec. ¶22.) However, the body of Dr. Werner's report totally disregards Co-Diagnostics' stock price movement on May 14, 2020 – i.e., he completely ignores the May 14 Trading Day Disclosures upon which Plaintiff's claimed trading losses rely – and fails to discuss his own event study results for this date. In a chart annexed to his report as Exhibit 8, it is revealed that his own event study analysis finds that Co-Diagnostics' stock price decline on May 14, 2020 is not statistically significant. (Werner Dec., Ex. 8.) In fact, it is far from his significance threshold.

---

[11] Defendants contend that this press release did not concern Co-Diagnostics, spoke to accuracy in terms of specimen handling and user error, factors which cannot be attributed to the Press Release (it is not reasonable to assume Co-Diagnostics meant to announce its tests could withstand poor specimen handling and user error), and also makes no representation as to the performance characteristics of Co-Diagnostics' COVID-19 tests.

Based on his event study, the absolute value of the t-statistic for Co-Diagnostics' abnormal return on May 14, 2020 was only 0.83, which is well below his threshold of 1.96 required to show statistical significance. (*Id.*) Dr. Wei calculated that the absolute value of the t-statistic of 0.83 is associated with a 41% "chance that the abnormal return was caused by random volatility alone," which is more than 8 times higher than the generally accepted 5% threshold below which statistical significance is determined, which Dr. Werner employs. (Wei Dec. ¶26.) Therefore, his event study does not provide reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock on May 14, 2020 was impacted by the May 14 Trading Day Disclosures as opposed to random volatility. (Wei Dec. ¶27.)

**The May 14 Trading Day Disclosures**
**Did Not Add Anything New and Value Relevant to the Publicly Available**
**Information and Did Not Bear on Co-Diagnostics' COVID-19 Tests**

The SAC alleges "The Salt Lake Tribune *revealed* that TestUtah's tests [by Co-Diagnostics] 'have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury.'" (SAC ¶75.) The "Higher Limit of Detection" was *not* "revealed" by The Salt Lake Tribune on May 14, but was already published by BioCentury on April 3, 2020,[12] more than a month before May 14, 2020 (nearly a month before the Press Release containing the alleged misstatement at issue.) In the group of 22 COVID-19 diagnostic tests with limit of detection measured in "copies per mL," BioCentury had already reported that Co-Diagnostics' Logix Smart test has the 17th highest limit of detection. In fact, on April 30, 2020, the Salt Lake Tribune article cited in the SAC refers to this BioCentury publication

---

[12]  *See*, "Limits of detection for FDA-authorized COVID-19 diagnostics," *BioCentury*, April 1, 2020, updated April 3, 2020; "'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions," *The Salt Lake Tribune*, April 30, 2020.

9

– market participants were already aware of this – Gelt ignores the contents of a source that it cites in the SAC. (Wei Dec. ¶30.)

Therefore, not only is it no surprise that the market did not react to this "information," but again, issues pertaining to the LOD cannot form the basis of any claim of omission or misrepresentation.

Likewise, according to Plaintiff's own source, the alleged "Concern Related to TestNebraska" regarding the accuracy of Co-Diagnostics' tests was already released to the market by the *Lincoln Journal Star* on May 11, 2020 (a date on which Dr. Werner calculated a *positive*, albeit not statistically significant, return), which was quoted by *The Salt Lake Tribune* on May 14, 2020.[13] The *Lincoln Journal Star* article reported that Co-Diagnostics' tests for TestNebraska, as in TestUtah, show lower positive rates than those reported at other test sites in the state and the Co-Diagnostics' tests for TestNebraska have "a 95% accuracy rate:"[14]

Again, with respect to the alleged "Concern Related to TestIowa" regarding the accuracy of Co-Diagnostics' tests, same was already released to the market by *The Gazette* in Cedar Rapids on May 13, 2020 (another date on which Dr. Werner's event study showed a positive return), which was quoted by *The Salt Lake Tribune* on May 14, 2020.[15] *The Gazette* in Cedar Rapids

---

[13]     *See*, "Senators call on governor to end Test Nebraska contracts," *Lincoln Journal Star*, May 11, 2020; "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET ("The contracts in Utah and Iowa don't address the expected accuracy of the tests; however, Nebraska's contract calls for accurate results 'a majority of the time,' according to the Omaha World-Herald. Nebraska Gov. Pete Ricketts on Monday said the hospital lab that is processing TestNebraska's tests has confirmed an accuracy rate of 95 percent, the Lincoln Journal Star reported. But in Nebraska, as in Utah, the tech companies' testing sites have returned a far lower rate of positive results than the rest of the state's sites. Only about 3% of its Nebraska tests have been positive, compared with 18% statewide since the epidemic began, the Journal Star reported Monday.")

[14]     "Senators call on governor to end Test Nebraska contracts," *Lincoln Journal Star*, May 11, 2020 (emphasis added).

[15]     "Some Test Iowa results 'inconclusive,' Linn County officials say," *The Gazette*, May 13, 2020; "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET ("In one county, health officials said nearly ten percent of TestIowa's results were 'inconclusive,' The Gazette in Cedar Rapids reported.")

article reported, "almost 10 percent of the results from the Cedar Rapids location were found inconclusive."[16] (*See, also*, Wei Dec. ¶31.)

Likewise, while the Iowa Governor did announce that TestIowa's validation process reported 95% accuracy for determining positives, that same assessment by Nebraska was reported three days prior.[17]

It should be noted that Dr. Werner's report did not discuss any of these matters. For example, it does not address the fact that the alleged May 14, 2020 Trading Day Disclosures were previously known to the public and thus could not have affected the stock price, which calls its reliability into question.

Finally, Dr. Wei did not find any analyst or press reports that attribute any movement in Co-Diagnostics' stock price on May 14, 2020 to the May 14 Trading Day Disclosures, let alone support that they were "startling" or surprising, further contradicting the claim that they were new, value-relevant, or altered the total mix of publicly available information. (Wei Dec. ¶32.)

Therefore, with respect to all of the May 14, 2020 Trading Day Disclosures, the information was already in the public mix of information and on previous dates did not result in statistically significant abnormal negative returns. Therefore it is not surprising that Dr. Werner did not mention May 14, 2020 in the body of his report and that his event study did not find a statistically significant abnormal negative return on that date.

### Lead Plaintiff's Trades

Lead Plaintiff alleges to have purchased shares on May 13, 2020 and to have sold those shares on the same date for a profit. (SAC ¶32.) Lead Plaintiff also alleges to have purchased

---

[16]    "Some Test Iowa results 'inconclusive,' Linn County officials say," *The Gazette*, May 13, 2020,. Notably, Co-Diagnostics' stock closed at $23.42 on May 13, 2020 and opened higher at $26.72 on May 14, 2020. Source: Bloomberg.
[17] Senators call on governor to end Test Nebraska contracts, *Lincoln Journal Star*, May 11, 2020

shares on May 14, 2020 (though the trade was made on May 13, 2020 after hours and was completed on May 14, 2020) and sold those shares on May 14, 2020. As a result, based on Werner's findings, Lead Plaintiff's alleged losses did not occur on or after a date on which the decrease of the stock price of Co-Diagnostics is even argued to have been statistically significant. Therefore, it did not suffer an actionable loss, as there is no loss-causation, and Lead Plaintiff has no standing to maintain this lawsuit.

## Relevant Procedural History

Plaintiff commenced this proposed class action on June 15, 2020 by the filing of a complaint. On July 15, 2020, Plaintiff filed an Amended Complaint. (Dkt # 14.) On or about September 14, 2020, Defendants filed a motion to dismiss the Amended Complaint. (Dkt # 66). Gelt was subsequently appointed lead plaintiff, and it filed the SAC which is the subject of this motion. (Dkt # 86) In the SAC, Plaintiff asserts the following two causes of action: (1) Violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants. (SAC ¶¶ 106-110); and (2) Violation of Section 20(a) of the Exchange Act against the Individual Defendants (*id*. ¶¶ 111-112).

On, June 5, 2021, Defendants filed a motion to dismiss the SAC. That motion was denied by Order dated March 9, 2022. (Dkt.# 91.) However, the portion of the claim alleging a misstatement on April 30, 2020 was dismissed and therefore the putative class members only include those who purchased shares of Co-Diagnostics between May 1, 2020 and May 15, 2020, inclusive. (Dkt.# 101.)

**Argument**

**POINT I**

**STANDARDS ON A MOTION TO CERTIFY A CLASS**

In a class action, one or more plaintiffs files claims on behalf of a larger group "under circumstances where the named plaintiff possesses the same interest and suffers the same injury as the rest of the class." *Adler v. All Hours Plumbing Drain Cleaning 24-7-365 LLC*, 2022 WL 15513196, *3 (D.Utah 2022) (quotations omitted). "The decision whether to grant or deny class certification involves intensely practical considerations…and therefore belongs within the discretion of the trial court" and "[t]he court should certify a class only if, after **rigorous analysis**, it concludes that the prerequisites of Rule 23 have been satisfied." *Id.* (emphasis added.)  The analysis must be rigorous, as "actual, not presumed, conformance with Rule23(a) remains…indispensable." *General Telephone Co. of Southwest v. Falcon*, 457 U.S.147, 160 (1982).  The four requirements under Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of the representing party. Fed. R. Civ. P. 23(a).

While the merits of a case are not determined at the class certification stage, they may be considered "to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Wesley v. Snap Finance LLC*, 339 F.R.D. 277, 288 (D.Utah 2021); *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013). Given this, courts acknowledge that it is not practical to construct "an impermeable wall" to prevent the merits of the case from bleeding into the class certification decision. *Shook v. Bd. Of Cnty. Comm'rs of El Paso*, 543 F.3d 597, 612 (10th Cir. 2008)

"A party seeking class certification must show 'under a strict burden of proof' that all four requirements [of Rule 23(a)] are clearly met." *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir.

13

2006); *quoting*, *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988); *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988).  Whether a class should be certified involves intensely practical considerations which are factual or fact intensive and based on practicalities and prudential considerations. *Reed v. Bowen*, 849 F.2d at 1309.  "A live class with an existing direct interest in the outcome is an essential prerequisite." *Id.*

## POINT II

## LEAD PLAINTIFF FAILS TO ESTABLISH THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER FEDERAL RULE 23(a)

On a motion to certify a class, the movant must first establish that the class complies with the requirements of Federal Rule 23(a).  This rule requires a showing that:

(1) The class is so numerous that joinder of all members is impracticable;
(2) There are questions of law or fact common to the class;
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) The representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *Trevizo v. Adams*, 455 F.3d 1155, 1161-62 (10th Cir. 2006).

These four requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of Southwest v. Falcon*, 457 U.S.147, 156 (1982); *quoting General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 330 (1980).

### A. Lead Plaintiff Failed to Establish Commonality and Typicality

*1. Commonality, Generally*

Rule 23(a)(2) requires a plaintiff to show that there are questions of fact or law common to each class member. *Wesley v. Snap Finance LLC*, 339 F.R.D. 277, 291 (D.Utah 2021).  This can be "misread" to require only simplistic recitations of common circumstance, since "any competently crafted class complaint literally raises common questions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.338, 349 (2011).  "Commonality requires the plaintiff to demonstrate that the class

14

members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.338, 349; *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) which does not simply mean they have all suffered a violation of the same law. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.338, 349. Here, Lead Plaintiff only argues that all of the proposed class members suffered the same purported violation of law. However, Lead Plaintiff makes absolutely no argument, better yet showing, that they all suffered the same injury.

Further, commonality requires that a lead plaintiff be a part of the class and "possess the same interest and suffer the same injury" as the rest of the class members. *Id.*; *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982).

Here, as discussed below, there is no glue to hold together multiple distinct subdivisions of the proposed class. *See*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 352 (Without some glue holding together the different varieties of plaintiffs, it was impossible to say that the examination of all of the claims would produce a common answer to the crucial question at issue). Based on the sequence of alleged events, and based on the findings, or lack thereof of Dr. Werner, there are six distinct categories of proposed class members who did not suffer the same injury, and in most cases did not suffer any injury at all, causing the proposed class to fail the standard set forth in *Wal-Mart Stores, Inc. v. Duke*.

### 2. Typicality, Generally

To satisfy the typicality requirement, "the class representative must be a class member…and must have suffered the same injury as the other class members." *Edgington v. R.G. Dickinson and Co.*, 139 F.R.D. 183, 189 (D.Kansas 1991); U.S.Const. art. III, s 2, cl. 1. (As a matter of standing, uninjured plaintiff cannot bring suit on behalf of an injured class.); *Spivak v. Petro-Lewis Corp.*, 120 F.R.D. 693, 697-98 (D.Colorado 1987) (Without ruling on whether non-

tendering shareholders had standing, Court still ruled that existence of the issue of lack of standing rendered finding that the claims were not typical.); *Masri v. Wakefield*, 106 F.R.D. 322, 324-25 (D.Colo 1984); *Manasfi v. Malone*, 2007 WL 891871, at *6 (D.Colo 2007) (Typicality not met where Plaintiff lacked standing to maintain suit). Thus, Gelt is subject to a unique defense that will be at the center and major focus of this litigation, its claims are therefore not typical. In fact, this very Court, in this very case, denying lead plaintiff to Tadi, found this would be a unique defense, stating "The stock purchaser class members would be required to prove that corrective disclosures made on May 14, 2020 caused the stock price to decline," representing a unique defense likely to threaten to be the focus of the litigation, which rendered Tadi incapable of adequately representing the class *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2021 WL 913934, at *5 (2021.)

### 3. Dr. Werner's Event Study, in the Context of Common Injury

The following analysis must be viewed in light of the fact that Dr. Werner's own declaration and findings therein, upon which Lead Plaintiff solely relies to support its contention of loss-causation for the purposes of the instant motion, do not speak to affirmative statistical significance to any price drop on May 14, 2020. In fact, his findings contradict the allegation that the price drop on May 14, 2020 was statistically significant, and therefore cannot be said to have been due to anything more than random chance with any degree of scientific certainty.

Dr. Werner stated that a price return is deemed statistically significant if it is greater than a value of +/-1.96. (Werner Dec. ¶58.) Dr. Werner opined that his event study analysis showed that the price change on May 1, 2020 was statistically significant. That is, he contends that on this date, there was an abnormal return of 16.04%, which he contends is associated with a t-statistic

16

value for this date was +2.34.[18]  Because his analysis gives a t-statistic greater than +/-1.96, the results can at least be argued as statistically significant. (Werner Dec. ¶¶60-62; Ex. 8.)  Dr. Werner also opined that the price change on May 15, 2020 was statistically significant.  That is, he contends that on this date, there was an abnormal return of -26.14%, which he contends is associated with a t-statistic value of -3.81, and because his analysis gives a t-statistic of greater than +/-1.96, can at least be argued as statistically significant.[19] (Werner Dec. ¶¶63-65.)

However, for May 14, 2020, Dr. Werner ignores the results of his event study.  As shown in his chart under his Exhibit 8, he calculated a return of -5.69%, which he concedes is associated with a t-statistic value of -0.83.  Because this is less than +/-1.96, it is not deemed statistically significant.  In fact, as Dr. Wei states, she calculated that the value of the t-statistic of 0.83 to be associated with a 41% "chance that the abnormal return was caused by random volatility alone," which is **more than 8 times higher** than the generally accepted 5% threshold below which statistical significance is determined.

> 4. *Dr. Werner's Event Study Concludes That Lead Plaintiff Cannot Establish for Itself the Loss-Causation Allegedly Relied Upon by the Proposed Class*

"[A]n inflated purchase price will not itself constitute" loss-causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 122 (N.D.Oklahoma 2007).   In *Broudo*, the Supreme Court ruled that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Broudo*, 544 U.S. at 342

---

[18] Defendants do not agree with this assessment but understand that a competition of the experts is not within the purview of this motion.
[19] Defendants also do not agree with this assessment.

17

To show loss-causation, a party must show that a misrepresentation affected the integrity of the market price and *also* caused subsequent loss. *In re PolarityTE, Inc., Securities Litigation*, 2020 WL 6873798, at *6 (D.Utah 2020); *In re Williams Securities Litigation*, 496 F.Supp.2d, at 1264 ("[L]oss causation requires a false or misleading statement, which caused an artificial inflation of the stock, followed by a dissipation of that inflation *after* corrective disclosures were made.") (emphasis added).  That is, the link between an inflated purchase price is made by demonstrating a loss attributable to the alleged fraud through a significant price decline immediately *following* a corrective disclosure. *D.E. & J. Ltd. P'shp. V. Conaway*, 284 F.Supp.2d 719, 748-49 (E.D.Mich.2003), *aff'd*, 133 Fed.Appx. 994(6th Cir. 2005).  A plaintiff can only show loss causation if it can show that its losses were attributable to the corrective disclosure. *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("Any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation caused the resulting decline in price.")

Here, for Lead Plaintiff's claim, it alleges it purchased its shares during the alleged period of inflation following the Press Release.  However, it sold its shares on May 14, 2020.  On that date, by its own expert's analysis, there was no statistical significance to the price decline.  That means that the price decline cannot be attributed to any allegation-related events.  That Lead Plaintiff allegedly purchased shares at an artificially inflated price is not sufficient to show loss causation, in that there was not a significant price decline that can be attributed to the corrective information.  Being unable to establish that the decline in price causing its damages was caused by the revelation of allegedly corrective information.

As such, a number of the conclusions that are drawn from this fact that require the denial of this motion.  First, it means Plaintiff lacks standing to maintain this suit.  As discussed below a

18

representative cannot show it is an adequate class representative if it does not have standing and the certification will not be granted.  Second, it means that Lead Plaintiff does not share a common injury with, and that its purported injury is not typical of, the proposed class.  This bars a finding of commonality and typicality.  This finding also invites a review of the class as proposed with the level of rigor discussed above – are there other subgroups within the proposed class whose purported injuries are not common or typical of the proposed class (the proposed class being those who purchased their shares at allegedly artificially inflated prices and were damaged by a statistically significant drop in price due to the disclosure of corrective information).  The answer turns out to be yes.

### 5.  *The Various Categories of Class Members Do Not Share Common Injury*

Based on a first level review of the proposed class, there are at least six subgroups within the proposed class whose claims are not common to one another and are atypical.  It is a first level of review because a motion to confirm a class is not the forum for a competition of the experts.  However, it is expected that the findings of both sides' experts' merit reports raise substantially significant differences among the proposed class members, making certification of the class proposed by Plaintiff inappropriate.

The first category of class members, included within the proposed class, are those who purchased Co-Diagnostics stock after the Press Release and sold their shares on or before May 13, 2020.  Since such sales occurred before any alleged corrective disclosures were released which purportedly drove the price back down.  This subgroup definitionally did not suffer any allegation related injury since any decline in their selling price cannot have been due to any corrective disclosure.  Naturally, if "the purchaser sells the [inflated] shares quickly before the relevant truth beings to leak out, the misrepresentation will not have led to any loss." *Broudo*, 544 U.S. 336, 342;

*In re Williams Securities Litigation-WCG Subclass*, 558 F.3d at 1139 ("Until the fraud is revealed the purchasers actually benefit from the inflation and therefore have no legally compensable injury.) Accordingly, this subgroup has not suffered any loss which can be remedied in this action, better yet a loss common to the rest of the proposed class. Yet they are included in the proposed class.

The second category of class member, included within the proposed class, are those who purchased shares after the Press Release and sold their shares on May 14, 2020. As discussed above, with respect to Lead Plaintiff, Dr. Werner's event study concluded there was no statistical significance to the price change on May 14, 2020, and therefore they did not suffer any allegation related injury, yet are included in the proposed class.

The third category of class members are those who purchased their shares on or after May 14, 2020. This category of class members cannot have suffered any allegation related injury because they purchased their shares after the ostensibly corrective disclosures. Thus, based on Dr. Werner's explanation of the efficient market hypothesis, the market would have already corrected and they were no longer purchasing at an allegedly artificially increased price. Therefore, they did not suffer any allegation related injury, yet are included in the class. Their purported injury is uncommon and their factual circumstance is unique, requiring a finding against commonality. *Berwecky v. Bear. Stearns & Co., Inc.,* 197 F.R.D. 65 (S.D.N.Y.2000) (holding that a person who increases his holding after revelation of the fraud is subject to unique defenses.) In any event, the issuance of the alleged corrective information should close the class period, excluding purchases on May 14, and 15, 2020. *In re ORFA Sec. Litig.*, 654 F.Supp.1449, 1465 (D.N.J. 1987) (Duration of class period to be determined by the time when curative information is released, which terminates securities law violations. Publication of curative information makes it

20

unreasonable to rely on alleged misrepresentation and cuts off class period.); *In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 205 F.R.D. 572, 579 (D.Colorado 2001).[20]

The fourth category of class members are those who purchased their shares at a price below $19.34, and did not sell their shares until after the 90-day bounce back period or otherwise kept their shares. This price represents the mean stock price during the 90-day bounce back period. 15 U.S.S. §78u-4(e)(1) provides:

> in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

15 U.S.C. §78u-4(e)(1). Therefore, this category of class members did not suffer any recoverable injury.

A fifth subgroup within the proposed class consists of those who purchased their shares on May 13, 2020, as specifically distinguished from those who purchased their shares between May 1, 2020 and May 12, 2020. For the purposes of this motion, accepting Dr. Werner's findings (which we do not), this subgroup purchased shares at a, purportedly, statistically increased price above the alleged artificially inflated price. However, this increase is totally unexplained – no misrepresentation or omission is alleged aside from the Press Release, which by Dr. Werner's explanation of the efficient market hypothesis was already incorporated into the stock price well before this date. Even if it were found that the subsequent decrease in stock price was attributable

---

[20] Here, it should be noted that there is no question of fact as to whether the May 14, 20220 Trading Day Disclosures cured, to the extent a cure was necessary, the market. There is nothing contained in the Post-Closure Disclosure, which did not even pertain to Co-Diagnostics, which was not contained in the Trading Day Disclosures. All the Post-Closure Disclosure said was no test is perfect and the Trading Day disclosures already contended Co-Diagnostics' tests were not "perfect"

to the release of allegedly corrective information, the same inflation ribbon described by Dr. Werner cannot be used to calculate the alleged losses of this subgroup because that damages analysis assumes attribution of the inflated stock price to the Press Release, an entirely separate analysis would be required which would have to explain the purported rise in price on that date, together with an explanation regarding the fact that all of the May 14, 2020 Trading Day Disclosures had already been made public by this point.  To the extent they can be described as damages, any losses by this subgroup are of a different nature and require a totally separate analysis, including (if assuming Dr. Werner's event study is accepted as accurate, which we dispute) what other information was attributed with the inflation paid by this subgroup, which was not paid by those who purchase between May 1, 2020 and May 12, 2020.  Therefore, these damages are also not common to the class as proposed or the allegations.

Finally, the only even potentially viable category of class members are those who purchased their shares after the Press Release but before May 14, 2020, and sold their shares on or after May 15, 2020 (though Defendants will present evidence that neither the price change on May 1, 2020 nor May 15, 2020 exhibit statistical significance, and in any event, the damages will be limited as provided under 15 U.S.C. §78u-4(e)(1) and (2).)

Accordingly, the proposed class fails the commonality factor.  While Lead Plaintiff listed several purported common questions among the proposed class, the holding in *Wal-Mart Stores, Inc. v. Dukes* rejects this approach and explained that any competently crafted class will literally raise common questions. 564 U.S. at 349-50.  There, the Court laid out several questions that could have been said to be common for all the class members, but opined that reciting those questions would not be sufficient to obtain class certification and that the class members must have suffered the same injury. *Id*, at 349-50.

Lead Plaintiff attempt to rely on the same type of showing that the Supreme Court rejected in *Wal-Mart v. Duke*. Lead Plaintiff raises some common questions derived from its "craftfull" drafting of the proposed class, but did not discuss how their injuries were the same as the proposed Class as a whole. In fact, until the closing paragraph of that section of the Memorandum of Law, Lead Plaintiff did not even cite any law using, or itself used, the word loss. While it did suggest that there was a common question as to "whether the members of the Class have sustained damages and, if so, the extent of those damages," it did not describe how those damages are common, which in and of itself would be a failure to meet its burden to establish this branch of the motion. Instead, Lead Plaintiff cherry picked mostly benign District Court language to minimize its required showing, and did not cite any Supreme Court law, which routinely requires a showing that the class members have suffered the same injury. *e.g. Wal-Mart Stores, Inc.*, 564 U.S. at 350, *Falcon*, 457 U.S. at 148 ("[R]acial discrimination is by definition class discrimination. But the allegation that such discrimination has occurred neither determines whether a class action may be maintained.")

Accordingly, since Lead Plaintiff failed to demonstrate how all of the members of the class, as proposed, suffered the same injury, and since Lead Plaintiff did not actually suffer an injury that can be remedied by its very pleadings, commonality has not been met and the motion should be denied.

### B. Lead Plaintiff Cannot Establish it is an Adequate Representative of the Class

For similar reasons as set forth above, Lead Plaintiff cannot establish that it is an adequate representative, or even a member, of the proposed class.

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431

23

U.S. 395, 403 (1977) (Plaintiff could have suffered no allegation specific injury and "were, therefore simply not eligible to represent a class of persons who did allegedly suffer injury."); *quoting Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 216 (1974) (It is essential that a class representative "be a part of that class, that is, he must possess the same interest and suffer the same injury" of the class); *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (Class representative must possess the same interest and suffer the same injury as the class members.) *East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (Named plaintiff suffered no allegation related injury and were "not eligible to represent a class of persons who did allegedly suffer injury."); *see*, *also*, *Cunningham v. Vivint, Inc.*, 2022 WL 2291699, at *9 (D.Utah 2022) ("Simply put, standing to bring an individual claim is necessary, but not sufficient, to represent a class.")[21]

Plaintiff's own lack of standing presents a direct threat to the interests of the class.  Since it cannot maintain a case in which it suffered no recoverable damages, and because under its current theory it suffered no recoverable damages, the entire case for the class is put into jeopardy by Lead Plaintiffs representation. *See*, *Thompson v. Jiffy Lube Intern., Inc.*, 250 F.R.D. 607, (D.Kansas 2008) (A class representative is neither typical nor adequate if it is subject to a unique defense likely to be a major focus of the litigation.) For that reason alone, it is not an adequate representative of the class.

In addition, the adequacy inquiry seeks to uncover conflicts of interest between the named party and the class they seek to represent that may prevent them from advancing the interests of the class. *Cunningham v. Vivint*, 2022 WL 2291699, at *9.  Here, Lead Plaintiff's lack of standing

---

[21] These holdings also bar any finding of commonality or typicality.  The Supreme Court has noted that typicality and adequacy inquires tend to merge as both look to "whether the named plaintiff's claim and the class claims are so interrelated that these interests of the class members will be fairly and adequately protected in their absence." *Amchem*, 521 U.S. at 626 n.20.

24

presents a direct and unresolved conflict of interest with the class.  Because basing its claims on the current report of Dr. Werner would ultimately fail for itself, in order for Lead Plaintiff to hope for any recovery in this case, it will have to change course and develop and new theory or ask its expert to employ new methodology to establish a significant price decline on its sale date in order to establish loss-causation – and there is no basis to conclude that the Lead Plaintiff would continue the case on the current course knowing it could not recover damages based on Dr. Werner's current report.  There is no proof on this motion that any report on which Lead Plaintiff can rely for its own claims will support the claims of the class, and therefore it would be inappropriate to certify a class where it is unknown whether Lead Plaintiff can rely on a report to support both its own claims and those of the class.  The Court should first be satisfied that any methodology employed to support viable claims for Lead Plaintiff will also support viable claims for the rest of the class, which is not before the Court here.  This is the exact concern this Court had in denying Tadi lead plaintiff – its inability to prove loss-causation was a unique defense which would be at the center of the litigation.

Accordingly, the adequacy inquiry cannot be satisfied and the motion should be denied.

### Conclusion

For all the foregoing reasons, the Court should deny Plaintiff's motion for certification of the putative class.

Dated: New York, New York
　　　　November 21, 2022

<div style="margin-left:50%">

CARMEL, MILAZZO, & FEIL, LLP
　*/s/ Christopher P. Milazzo* _____
Christopher P. Milazzo, Esq.
*Admitted Pro Hac Vice*
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0457
CMilazzo@cmfllp.com

</div>

25

*Attorneys for Defendants*