IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GELT TRADING LTD., <br><br> Plaintiff, <br> v. <br><br> CO-DIAGNOSTICS, INC.; DWIGHT EGAN; JAMES NELSON; EUGENE DURENARD; EDWARD MURPHY; RICHARD SERBIN; REED BENSON; and BRENT SATTERFIELD, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER PARTIALLY GRANTING MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL** <br><br> Case No. 2:20-CV-00368-JNP-DBP <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead |

Pursuant to Federal Rule of Civil Procedure 23, lead plaintiff Gelt Trading Ltd. ("Gelt") moves for the court to order (i) the certification of a class of investors in Co-Diagnostics, Inc. ("Co-Diagnostics") defined as all those who purchased the securities of Co-Diagnostics between May 1, 2020 and May 15, 2020 inclusive, and who were damaged thereby, (ii) the appointment of Gelt as class representative, and (iii) the appointment of Armstrong Teasdale, LLP, Marcus Neiman Rashbaum & Pineiro LLP, and Fasano Law Firm, PLLC, as co-class counsel. ECF No. 114. Co-Diagnostics and several of the company's executives ("Defendants") oppose this motion by arguing that Gelt has failed to establish commonality, typicality, and adequacy, as required by Rule 23(a). Having reviewed the parties' memoranda, the court PARTIALLY GRANTS Gelt's motions.

## FACTUAL BACKGROUND

Co-Diagnostics is a Utah Corporation that develops and sells diagnostic tests for several diseases, including zika virus, tuberculosis, hepatitis B and C, malaria, dengue fever, and HIV.

When the COVID-19 pandemic began in early 2020, the corporation developed a test to detect the disease. On February 24, 2020, Co-Diagnostics announced that it was the first company to receive regulatory approval to sell its COVID-19 tests in the European Economic Area. Its stock price rose sharply on this news. On April 6, 2020, the U.S. Food and Drug Administration ("FDA") likewise granted Co-Diagnostics' COVID-19 test emergency use authorization.

Co-Diagnostics' new test led to lucrative contracts at home and abroad. It sold tests to fifty countries and more than twelve U.S. states. Co-Diagnostics also agreed to provide the majority of the COVID-19 tests for a $5 million contract between TestUtah and the state of Utah. It entered a similar agreement related to a $26 million contract in Iowa.

Co-Diagnostics' value grew accordingly. The company has been publicly listed on the NASDAQ since July 12, 2017. Prior to the pandemic, Co-Diagnostics stock regularly traded for under a dollar. As its COVID-19 test found success, the company's stock price reached an all-time high of $29.72 per share.

But medical experts began raising concerns about Co-Diagnostics' COVID-19 tests. On April 30, 2020, the Salt Lake Tribune published an article questioning the accuracy of its tests. Specifically, the Tribune reported that the TestUtah sites that used Co-Diagnostics' tests saw a 2% positivity rate, whereas other sites across the state saw a positivity rate closer to 5%. One doctor called this discrepancy "a potential public health disaster." ECF No. 91-2. In the article, the Tribune quoted Brent Satterfield, Co-Diagnostics' Chief Science Officer, as stating that studies had shown that the tests were between 99.52% and 100% accurate. On May 1, 2020, Co-Diagnostics issued a press release claiming that multiple independent evaluations had shown that its tests were 100% accurate.

On May 14, 2020, Co-Diagnostics stock reached its highest ever price. But that day journalists again began questioning the company's claims of 100% test accuracy. The Salt Lake Tribune reported that the state of Utah had declined to join other major Utah labs in a joint experiment to confirm one another's testing quality. The Tribune article also stated that Co-Diagnostics tests required a higher concentration of the COVID-19 virus than other tests to register a positive result. Soon thereafter, the Governor of Iowa issued a public statement explaining that the test was 95% accurate in determining positive results and 99.7% accurate in determining negative results. Later that day, the FDA issued a press release stating that no test would be 100% accurate. Co-Diagnostics' stock price declined as this news broke. On May 14, the stock's trading was stopped twice. Ultimately, Co-Diagnostics' stock value went from a high of $29.52, to an intra-day low of $18.35, before closing at $22.13. The next day, May 15, the stock opened at a price of $15.80 per share.

Gelt, a Cayman Island limited liability company purchased Co-Diagnostics shares on May 14 prior to the release of news pertaining to the COVID-19 test's inaccuracy. Gelt claims that, as a result of Defendants' allegedly misleading statements, it lost $117,845.87 when the stock price fell. On June 15, 2020, it filed a class action lawsuit against Co-Diagnostics and its officers and directors for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. ECF No. 1. Gelt alleged that the injured class of investors it represented included all individuals who purchased Co-Diagnostics stock between February 25, 2020 and May 15, 2020. But Gelt never served this initial complaint. On July 15, 2020, it filed an amended complaint. The amended complaint shortened the proposed class period to those who purchased Co-Diagnostics stock from April 30, 2020 to May 15, 2020. ECF No. 14. It served this amended complaint to the relevant parties.

On March 10, 2021, the court appointed Gelt lead plaintiff. ECF No. 84. Soon thereafter, Gelt filed a second amended complaint, which became the subject of a motion to dismiss filed by Defendants on May 5, 2021. ECF No. 86; ECF No. 91. The court partially denied Defendants' motion on March 9, 2022; however, it dismissed the portion of the claim alleging a misstatement on April 30, 2020. ECF No. 101 at 14. As a result of this ruling, the putative class could only include those who purchased shares of Co-Diagnostics between May 1, 2020, and May 15, 2020, inclusive. *Id*. Following the court's decision to allow this case to move forward, on October 17, 2022, Gelt filed the present motion for class certification. ECF No. 114.

## LEGAL STANDARD

To certify a class, a plaintiff must satisfy four requirements under Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy. A proposed class must also fit into one of the subdivisions of Fed. R. Civ. P. 23(b). Gelt seeks class certification under Rule 23(b)(3), which requires that questions of law or fact common to the class "predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Class certification is "committed to the discretion of the trial court." *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982). Plaintiffs bear the burden of establishing class certification by a preponderance of evidence. *See Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004). Courts "must accept the substantive allegations of the complaint as true . . . although [they] need not blindly rely on conclusory allegations . . . and may consider the legal and factual issues presented by plaintiff's complaints." *Id.* (cleaned up). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). This is because "the class determination generally involves

considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Gen. Tel. Co. Of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). Courts should be mindful that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).

## ANALYSIS

The court first turns to the question of whether Gelt satisfies Rule 23(a). It then examines the application of Rule 23(b)(3).

### I.      RULE 23(A)

Rule 23(a) permits

> [o]ne or more members of a class [to] sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class.

Fed. R. Civ. P. 23(a)(1)-(4). "[T]he party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quotation marks and citation omitted). Each factor is examined in turn.

### A.  NUMEROSITY

The court must determine whether the proposed classes are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "To satisfy this requirement, the plaintiffs need not show that joinder of all members is impossible, only that it is impracticable." *Ditty v. Check Rite, Ltd.*, 182 F.R.D. 639, 641 (D. Utah 1998). In securities fraud cases, if a stock is traded

nationally, it is generally presumed to meet the numerosity requirement. *McEwen v. Digitran Sys.*, *Inc.*, 160 F.R.D. 631, 636 (D. Utah 1994). Because Co-Diagnostics had 27.4 million shares listed on the NASDAQ exchange during the proposed class period, joinder of all putative class members in this action would be impracticable. ECF No. 114-1 at ¶ 73. Thus, the numerosity requirement is satisfied.

### B. COMMONALITY

Rule 23(a)(2) requires plaintiffs to establish that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, plaintiffs must show that class members can assert a "common contention . . . capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "A finding of commonality requires only a single question of law or fact common to the entire class." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010). "Factual differences between class members' claims do not defeat certification where common questions of law exist." *Id*. Commonality is a relatively "low hurdle" to jump. *Braver v. Northstar Alarm Services, LLC*, 329 F.R.D. 320, 328 (W.D. Okla. 2018).

"This case—as is typical of most securities fraud putative class actions—raises common questions of law and fact." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16CIV6728CMRWL, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (citing *Amgen*, 568 U.S. at 474-75). Without limitation, these questions include:

- Whether Defendants misrepresented or omitted material facts about Co-Diagnostics' COVID-19 diagnostic tests;

- Whether Defendants acted with the requisite level of scienter under Section 10(b);

- Whether Co-Diagnostics' executives were controlling persons under Section 20(a); and

- Whether Co-Diagnostics' share price was artificially inflated as a result of the Defendants' misrepresentations or omissions.

These questions are more than sufficient to satisfy the commonality requirement.

But Defendants argue Gelt cannot show commonality because "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and, here, class members have allegedly suffered unique injuries. *Wal-Mart* 564 U.S. at 349. Specifically, Defendants contend that there are six groups of class members that suffered either different flavors of injury or no injury at all due to the timing of their purchases and sales.[1] The divergence between each group's injury, according to Defendants, is too large to overcome the commonality requirement of *Wal-Mart* because "there is no glue to hold together [the] multiple distinct subdivisions of the proposed class." ECF No. 118 at 21.

Defendants, however, fundamentally misunderstand the *Wal-Mart* standard. Class members are not required to have suffered the same injury for a class to satisfy the commonality requirement of Rule 23(a). Rather, "[w]hat matters to class certification" is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-*

---

[1] The six groups identified by Defendants are as follow:

- Those who purchased shares after the May 1, 2020 press release and sold their shares on or before May 13;
- Those who purchased shares after the press release and sold their shares on May 14;
- Those who purchased their shares on or after May 14;
- Those who purchased their shares at a price below $19.34, and did not sell their shares until after the 90-day bounce back period or otherwise kept their shares;
- Those who purchased their shares on May 13, 2020; and
- Those who purchased their shares after the press release but before May 14, 2020, and sold their shares on or after May 15, 2020.

ECF No. 118 at 25-28.

*Mart*, 564 U.S. at 350 (citations omitted). "The common questions presented by this case—essentially, whether the [May 1 press release was] false or misleading in one or more respects—are clearly susceptible to common answers," regardless of which subclass one examines. *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 106 (S.D.N.Y. 2011).

Admittedly, the court will eventually have to distinguish between the various levels of injury to each class member.[2] *In re Signet Jewelers*, 2019 WL 3001084 at *20. But class certification is not the proper time for such slicing and dicing when a case involves common questions with common answers. *See, e.g., Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14–cv–20880–UU, 2016 WL 4006661, at *8 (S.D. Fla. Mar. 16, 2016) (finding that whether "Plaintiffs are unable to prove loss causation with respect to . . . . selling their shares before the . . . . disclosure" is a merits issue that is not proper at class certification); *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 196 (S.D.N.Y.1985) (finding that a plaintiff satisfied commonality because "individual questions with respect to damages will not defeat class certification or render a proposed representative inadequate unless that issue creates a conflict which goes to the heart of the lawsuit."). Thus, Gelt satisfies the commonality requirement.

## C. TYPICALITY

To certify a proposed class, the court must also find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]he typicality inquiry involves comparing the injury asserted in the claims raised by the named

---

[2] It is worth noting that one of the six subdivisions of the class is made up of "in-and-out traders," i.e., those who bought Co-Diagnostic shares during the class period but and sold them without holding over at least one of the" alleged corrective disclosure dates. *See, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 DRH AKT, 2015 WL 3915477, at *9 (E.D.N.Y. June 25, 2015). These individuals (and other individuals who the court later determines are uninjured) are excluded from the class by Plaintiffs proposed language limiting the class only to those "who were damaged thereby." ECF No. 114 at 4.

plaintiffs with those of the rest of the class. [Courts] do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Rodriguez v. Cascade Collections LLC*, 532 F. Supp. 3d 1099, 1120 (D. Utah 2021) (cleaned up).

Here, Gelt alleges that, like other class members, it purchased shares in Co-Diagnostics during the class period at prices that were inflated due to the material misstatements of Defendants and that it suffered damages as a result. Gelt also alleges that its rights, under Sections 10(b) and 20(a), were violated by Defendants, just like the other members of the class. In sum, the complaint indicates that Gelt and the class members' claims are based on the same conduct, assert the same violations of the federal securities laws, and deal with similar injury. This indicates that Gelt's claims are typical of the class. *See In Re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572, 578 (D. Colo. 2001); *see e.g., Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 552 (D. Colo. 1998) ("Plaintiffs' claims arise out of the same alleged course of conduct and are based on the same theories as those of the absent class members, namely that Defendants engaged in a course of conduct violative of federal . . . securities laws"). Indeed, the court has already indicated that Gelt's claims are typical by naming it the lead plaintiff over several other potential class representatives. *See* ECF No. 84 at 15. It did so only after a thorough examination into the suitability of each alternative lead plaintiff.

But Defendants contend that Gelt's claims are not typical. They argue that this is because "Gelt is subject to a unique defense that will be at the center and major focus [sic] of this litigation." ECF No. 118 at 22. The unique defense that allegedly destroys typicality is that Gelt will fail to establish loss causation at trial because of the timing of its stock sale on May 14. Defendants

maintain that Plaintiff has admitted that it cannot prove loss caution for its stock sale on May 14 because it submitted an expert report showing that there was not a statistically significant price drop that day, unlike on May 15 when other class members sold. According to Defendants, this atypical defense, specific to class members who sold on May 14, allegedly threatens to consume the whole trial.[3]

Putting aside the fact Gelt has offered a compelling explanation as to why its expert report determined that the drop in price on May 14 was not statistically significant and why this lack of statistical significance does not matter—trading was halted twice in order to slow the rapid depreciation of Co-Diagnostics' stock value—the Supreme Court has been crystal clear that "securities fraud plaintiffs should not be required to prove loss causation in order to . . . achieve class certification." *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*"); *see* ECF No. 125-1 at ¶ 18. This is because loss causation is purely an issue to be decided on the merits.[4] *Halliburton I*, 563 U.S. at 807. Moreover, courts regularly find that

---

[3] Defendant notes that this court previously held that unique defenses could threaten the focus of litigation and destroy typicality when it decided not to name Tejeswar Tadi ("Tadi") the lead plaintiff. However, the reason for the court's decision had nothing to do with "loss causation." Tadi was not the most appropriate Lead Plaintiff because he purchased call options as opposed to traditional shares of Co-Diagnostics stock. ECF No. 84 at 9. There is a split of authority as to whether options traders satisfy the Rule 23 typicality requirement. *See In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002) (holding that that options traders can satisfy the typicality requirement and serve as a lead plaintiff); *Micholle v. Ophthotech Corp.*, No. 17-CV-1758 (VSB), 2018 WL 1307285, at *9 (S.D.N.Y. Mar. 13, 2018) (holding that the claims of option purchasers are not typical of claims made by stock purchasers and rejecting option purchasers as lead plaintiffs). Such is not the case with parties whose loss causation is questioned. Loss causation is not a unique defense that would destroy typicality. *See Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 238-39 (E.D.N.Y. 2011) ("[C]ourts have 'routinely' appointed investors as lead plaintiff 'when they sell their shares of stock after a partial disclosure and are not holding any shares at the time of a later disclosure.'").

[4] Courts may have to evaluate "price impact" in order to establish predominance when analyzing the class for purposes of Rule 23(b)(3), but this is an entirely different question than that of "loss causation" and one that Defendants do not contest. *See Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 490 (E.D. Pa. 2022) ("[I]n *Halliburton I*, the Supreme

plaintiffs are typical even when the timing of their stock sales creates different damage calculations than those of other members of the class. *See e.g.*, *Wilson v. LSB Indus., Inc.*, 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *6 (S.D.N.Y. 2018) (finding that an "in-and-out" trader who did not hold shares throughout the entire class period did not render him "atypical or inadequate" because his claim relied "on the same alleged course of conduct and theory of liability" as other class members.); *Christian v. BT Grp., PLC*, No. 2:17-cv-00497-KM-JBC, 2017 WL 3705804, at *6-8 (D.N.J. Aug. 28, 2017) (finding that a movant that sold its shares after one of two "corrective disclosures" during a class period was not subject to unique defenses because it still suffered losses as a result of the alleged misrepresentations.); *Freudenberg v. E\*Trade Fin. Corp.*, No. 07 Civ. 8538, 2008 WL 2876373, at *7 (S.D.N.Y. July 16, 2008) ("Nor does the sale by KSG of their E\*Trade securities by August 20, 2007, prior to the end of the alleged class periods in the current complaints, render them inadequate or atypical under the PSLRA, absent a showing that such divestiture creates divergent interests."); *In re Catalina Mktg. Corp. Sec. Litig.*, 225 F.R.D. 684, 687 (M.D. Fla. 2003) ("The fact that the [named] Plaintiffs sold their . . . stock prior to the time the alleged fraud was fully disclosed does not indicate an absence of loss causation and does not pose an obstacle, in and of itself, to meeting the requirements in Fed. R. Civ. P. 23(a).").

Ultimately, the court need not dive into Defendants' substantive arguments regarding loss causation and the dueling expert reports in this case. A day will come for an examination of these issues if the parties do not reach a settlement, but today is not that day.

---

Court expressly ruled that plaintiffs do not need to prove loss causation at the class certification stage, and although *Halliburton II* required district courts to consider defendants' evidence of price impact at the class certification stage, it did not advance the stage at which loss causation should be considered.") (internal citations omitted).

### D. ADEQUACY

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (citation omitted). Additionally, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members," *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977), and "standing to bring an individual claim is necessary . . . to represent a class." *Cunningham v. Vivint, Inc.*, No. 2:19-cv-00568-DBB-CMR, 2022 WL 2291699, at *9 (D. Utah 2022).

Defendants argue that the adequacy requirement is not met because Plaintiff lacks standing due to its inability to show loss causation and because it is subject to a unique loss causation defense that could create a conflict with the interests of the class as a whole. The court rejects both arguments. First, the fact that Gelt's has not established loss causation at this stage of litigation does not mean that it does not have standing to sue. All that is required for standing is an allegation of injury, which was contained in Gelt's complaint. *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 776 (S.D.N.Y. 2012).

Second, Gelt does not have a conflict with the class that would undermine its adequacy as class representative.

> The substantial majority of courts that have addressed the propriety of class certification based on the timing of the class representative's sales or purchases have found . . . that the timing of the transactions does not necessarily create fundamentally divergent interests with the putative class. Rather, the supposed intra-class conflict based on the timing at which stock positions were divested or acquired is principally a damages issue, which is an inquiry premature at the class certification stage.

*Thorpe*, 2016 WL 4006661, at *9 (collecting cases). If there is any "conflict due to the timing of class members' purchases and sales of the shares at issue" it "is far outweighed by the common interest in establishing misrepresentations made by defendants." *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 392 (D. Mass. 2011) (quoting *In re Baan Co. Sec. Litig.*, No. 1:98CV2465 (ESH), 2002 WL 32307825, at *7 (D.D.C. July 19, 2002)).

Ultimately, there is no indication that Plaintiff has any conflict of interest with other class members or that Plaintiff will not prosecute the action vigorously on the class's behalf. This is why the court previously issued an order appointing Gelt as the lead plaintiff. ECF No. 84. The adequacy requirement is therefore satisfied.

## II.     RULE 23(b)(3)

In addition to satisfying Rule 23(a), a class must also meet the requirements of one of three categories of class actions under Rule 23(b). Plaintiff argues that its proposed class falls under Rule 23(b)(3). A court may certify a class under Rule 23(b)(3) if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The two key requirements derived from this statement of the Rule are commonly referred to as "predominance" and "superiority." *See e.g.*, *Edwards v. First American Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). That Plaintiff satisfies the requirements of Rule 23(b)(3) goes unchallenged. Nevertheless, the court must examine whether Plaintiff meets its burden of proof. *Shook*, 386 F.3d at 968.

### A.  PREDOMINANCE

The "predominance inquiry tests whether proposed [class is] sufficiently cohesive to warrant adjudication by representation" and "asks whether the common, aggregation-enabling,

issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *CGC Holding Co., Ltd. Liab. Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (citation omitted). "Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important; if, however, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate." *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009).

In assessing whether questions of law or fact predominate, a court first looks to the underlying elements of the cause of actions. *See Halliburton I*, 563 U.S. at 810. In securities fraud actions, "[p]laintiffs must prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and, (6) a causal connection between the material misrepresentation or omission and the loss, otherwise known as 'loss causation.'" *Thorpe*, 2016 WL 4006661, at *12. With the exception of reliance, all these elements are merits issues that courts generally consider common questions that must be decided at trial. *See Amgen*, 568 U.S. at 474-75; *see also Halliburton I*, 563 U.S. at 812; *In re Myriad Genetics*, No. 2:19-CV-00707-DBB, 2021 WL 5882259, at *7 (D. Utah Dec. 13, 2021). This means that the court's central inquiry in determining whether common issues predominate must be whether the element of reliance will require individualized proof at trial.

In this case, Gelt attempts to satisfy the element of reliance using the "fraud-on-the-market" theory. Under this theory, a plaintiff seeking certification may "satisfy the reliance element . . . by invoking a presumption that a public, material misrepresentation will distort the price of stock

traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). To invoke this presumption, a plaintiff must demonstrate that (1) the alleged misrepresentations were publicly known, (2) that the stock is traded in an efficient market, and (3) that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *See Halliburton I*, 563 U.S. at 811; *see also In re Myriad Genetics*, 2021 WL 5882259, at *7. The court examines whether Plaintiff can meet its burden to access the presumption of reliance.

First, Gelt can show that the alleged misrepresentations at issue in this case were publicly known. Defendants do not contest that Co-Diagnostics' May 1, 2020 press release, the key misrepresentation, was a public statement. Second, Plaintiff can also easily demonstrate that the relevant transaction, Gelt's purchase of shares on May 13 and 14, occurred between the time of the misrepresentation, May 1, and the time the truth was revealed, May 14.[5] Thus, the court's focus in reviewing the applicability of the fraud-on-the-market presumption must be whether Co-Diagnostics' shares were traded in an efficient market.

To assess market efficiency, courts in the District of Utah have historically relied upon the factors set out in *Cammer v. Bloom*. 711 F Supp. 1264, 1254 (D.N.J. 1989); *see In re Myriad Genetics*, 2021 WL 5882259, at *8; *see also In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 662 (D. Utah 2008). The *Cammer* factors include: (1) the average trade volume; (2) the number of securities analysts following the stock; (3) the number of market makers; (4) whether the company was entitled to file an S–3 Registration Statement; and (5) evidence of a

---

[5] The disclosure on May 14 occurred after Gelt's purchase of stock on that same day.

cause and effect relationship between unexpected news and stock-price changes. *Id*. None of these factors are dispositive. *Strougo v. Barclays PLC*, 312 F.R.D. 307, 321 (S.D.N.Y. 2016).

The court need not dive all that deeply into its *Cammer* analysis. This is because "[f]or stocks . . . that trade on a listed exchange such as NASDAQ, [the] reliance element of a 10b–5 cause of action is presumed." *Stevelman v. Alias Research*, No. 5:91–CV–682, 2000 WL 888385, at \*4 (D. Conn. June 22, 2000). Indeed, at least one court has noted that it was not able to identify "any authority . . . that has held that common shares traded on the NASDAQ are not traded in an efficient market." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013). The fact that Co-Diagnostics' stock was traded on the NASDAQ during the relevant period strongly indicates that it was traded in an efficient market.

Still, for the sake of thoroughness, the court briefly examines the *Cammer* factors. First, Co-Diagnostics' stock traded at a high volume. In *Cammer*, the court found that an average weekly trading volume of two percent or more of outstanding shares justified a strong presumption that an efficient market existed, 711 F. Supp. at 1286, and in *Nature's Sunshine* the court found that an average weekly trading volume of 2.7% of outstanding shares justified such a finding, 251 F.R.D. at 662. Here, the weekly trading volume of Co-Diagnostics' stock during the class period as a percentage of its stock outstanding was 205.15%. ECF No. 114-1 at ¶ 26. Thus, the first factor is satisfied.

Second, Co-Diagnostics' stock was closely followed by analysts who issued reports before, during, and after the class period. *See Nature's Sunshine*, 251 F.R.D. at 662. H.C. Wainright & Co., a full-service investment bank, issued analyst reports for Co-Diagnostics on April 6, 2020, April 14, 2020, April 17, 2020, and May 18, 2020. ECF No. 114-1 at ¶ 28 n.39. The investment bank Maxim Group issued analyst reports pertaining to Co-Diagnostics on April 6, 2020, and May

20, 2020. *Id*. Finally, Reuters reported that three analysts opined on Co-Diagnostics' expected first quarter earnings for 2020 in advance of the company's May 14, 2020, earnings call. *Id*. at ¶ 28 n.40. The second factor, therefore, is satisfied.

Third, several market makers traded Co-Diagnostics stock. A market maker is an entity "that announces itself ready to buy or sell a specified number of shares at specified prices." *Nature's Sunshine*, 251 F.R.D. at 663. The *Cammer* court held that the presence of more than ten market makers justifies a "substantial presumption" that the market for a security is efficient. 711 F.Supp. at 1293. Here, Plaintiff claims that at least seventy-two market makers invested in Co-Diagnostics during the relevant period. ECF No. 114-1 at ¶ 34. As a result, the third factor is satisfied.

Fourth, during the class period, Co-Diagnostics was eligible for S-3 registration. Companies are entitled to S-3 registration when they have filed Securities Exchange Act reports for 12 months and have an outstanding "float" of shares in excess of $75 million. *Brokop v. Farmland Partners Inc.*, 18-CV-02104-DME-NYW, 2021 WL 4916240, at *15 (D. Colo. July 23, 2021). Co-Diagnostics easily met this threshold because its float ranged from $279.2 million to $577.1 million and it regularly filed Security Exchange Act reports. ECF No. 114-1 at ¶ 40.

Fifth, there is ample evidence of a cause-and-effect relationship between unexpected news and stock-price changes. This *Cammer* factor "is often proven with an event study." *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 80 (S.D.N.Y. 2015). But when a court is presented with the "usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it." *Id*. at 86. Here, because Defendants present no evidence or argument that the market was inefficient, review of an event study is not necessary even though one was provided

by Gelt. The fifth factor, therefore, is satisfied. In sum, each of the *Cammer* factors favors Plaintiff. This means that trading of Co-Diagnostics' stock was almost certainly efficient. As a result, Plaintiff is entitled to the fraud-on-the-market presumption that it traded in reliance on Defendants' misrepresentations.

Before it holds that common issues predominate in Gelt's class action, however, the court must address one final issue. While the proposed class generally meets Rule 23(b)(3)'s predominance requirement, its temporal reach is slightly too broad. "In a securities class action based on material misrepresentations and omissions to the investing public, the class period should end when curative information is publicly announced or otherwise effectively disseminated to the market." *In re Ribozyme*, 205 F.R.D. at 579. "At that point, subsequent purchasers are charged with knowledge of the true state of business affairs, and thus common questions of law or fact arising from the misrepresentations or omissions do not predominate as to those subsequent purchasers, who are therefore excluded from the class." *Id.* (quoting *In re Kirschner Med. Corp. Secs. Litig.*, 139 F.R.D. 74, 82 (D. Md.1991)). Here, Gelt proposes that the class period should end on May 15, 2020, inclusive. This is despite the fact that the final disclosure of corrective information included in the second amended complaint occurred on May 14, 2020. This corrective information was the FDA's statement that no test would be 100% accurate. While courts have extended class periods beyond the release of the last piece of curative information, they only do so when "a substantial question of fact [remains] as to whether the release had cured the market or was itself misleading." *Friedlander v. Barnes*, 104 F.R.D. 417, 421 (S.D.N.Y.1984). Such is not the case here. Therefore, the court refines the class to exclude all purchases after the FDA's May 14, 2020 press release.

**B.  SUPERIORITY**

When deciding whether a class action is superior to other available methods of trying the case, courts examine "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). "In general, securities suits . . . easily satisfy the superiority requirement of Rule 23." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y.1999).

In this case, a class action is clearly the superior procedural path forward. First, the interest of individual class members weighs in favor of granting class certification. Securities fraud actions generally "involve geographically disbursed plaintiffs and involve such costs that if this litigation was not brought via class action, the costs of litigation would likely outweigh any benefit obtained." *In Re Ribozyme* 205 F.R.D. at 579. This case is no exception and individual class members would almost certainly benefit from an aggregation of their claims. Second, the extent and nature of prior litigation does not weigh in favor of any particular method of adjudication. Neither party has presented any evidence of past litigation asserting these claims on behalf of any individual class members. Third, it is desirable to concentrate the litigation of the class members' claims in this forum. To try each individual claim would be duplicative since the class's "claims are substantially similar, rely upon much of the same evidence, and will require many of the same witnesses." *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 513 (D. Kan. 2014). Fourth, there do not appear to be any unusual difficulties the court is likely to encounter in management of this class action. In brief, Gelt has adequately shown that a class action is the superior method for

resolving this dispute. The court, therefore, concludes that the class satisfies the requirements of Rule 23(b)(3).

### III.    APPOINTMENT OF CLASS COUNSEL

An order certifying a class must also appoint class counsel that will adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(1). In appointing class counsel, the court must consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Plaintiff moves to appoint Armstrong Teasdale, LLP, Marcus Neiman Rashbaum & Pineiro LLP, and Fasano Law Firm, PLLC, as co-class counsel. Defendants do not oppose this selection. After reviewing the record, the court is satisfied that Plaintiff's attorneys meet the criteria of Rule 23(g) and will adequately represent the interests of the class.

### CONCLUSION & ORDER

For the foregoing reasons, Gelt's motion is PARTIALLY GRANTED. The court ORDERS that:

(1)    Gelt Trading Ltd. is certified as class representative;

(2)    Class representatives' counsel, Armstrong Teasdale, LLP, Marcus Neiman Rashbaum & Pineiro LLP, and Fasano Law Firm, PLLC, are appointed co-class counsel; and

(3)    the proposed class of all those who purchased the securities of Co-Diagnostics between May 1, 2020 and May 14, 2020, inclusive, and who were damaged thereby, is certified.

DATED August 18, 2023

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge