Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: (212) 589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | **DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DR. JAMES WESTGARD AND MEMORANDUM IN SUPPORT THEREOF**<br><br>**(Oral Argument Requested)**<br><br><br>Case No. 2:20-cv-00368-JNP-DBP<br><br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

**INTRODUCTION AND RELIEF REQUESTED**

Plaintiff's purported scientific expert Dr. James Westgard ("Westgard") submitted two reports, the precise scope of which are not defined but appear to relate to the reliability of the validation results reported in Co-Diagnostic's press release issued on May 1, 2020 ("May 1 PR"), and whether the statements made in the May 1 PR were misleading. But Westgard's reports and testimony are foundationally flawed—in form and substance. As an initial matter, his written reports fail to meet the basic requirements of 28 U.S.C. § 1746 and Federal Rule of Civil Procedure 26(a)(2)(B) and should be excluded on that basis alone. Westgard also lacks the requisite qualifications to render a relevant and reliable expert opinion regarding the performance of qualitative PCR tests, the PCR diagnostic testing industry, PCR test performance evaluations, and COVID-19 PCR tests generally. By his own admission, Westgard has never developed, never validated, never implemented, and never even performed a PCR test. It is not surprising, then, that his opinions are based not on accepted standards, but on legal conclusions, unfounded speculation, and contradictory statements. Because Westgard's opinions would confuse rather than help the trier of fact in understanding the evidence in this case, Defendants hereby move to exclude Westgard's opinions in their entirety.

**BACKGROUND**

Plaintiff served Westgard's undated expert report on December 4, 2023 (Ex. 1,[1] "Report"), and Westgard's rebuttal report on January 19, 2024 (Ex. 2, "Rebuttal," and collectively, "Reports"). Defendants deposed Westgard on February 28, 2024. Westgard's testimony reflects a number of undisputed facts in this case:

---

[1] "Ex. _" refers to exhibits to the Greene Dec. in Support of this Motion, filed herewith.

- The May 1 PR reported the results of validations of Co-Diagnostic's ("Company") Logix Smart COVID-19 PCR diagnostic test ("Logix test") performed by four different laboratories, and attached the underlying validation data. (Ex. 1, at 19; Ex. 3, Deposition Transcript of James Westgard (Feb. 28, 2024), at 90:16-25; *see also* Ex. 3, at 143:8-144:14.)

- Validations performed after May 1, 2020, are not relevant to determine whether the Company fairly and accurately represented the performance of the Logix test in the May 1 PR. (Ex. 3, at 79:15-80:7, 148:23-149:2.)

- Articles evaluating validations of the Logix test published after May 1, 2020, are equally irrelevant.[2] (Ex. 3, at 101:16-102:4, 149:20-150:15, 161:22-162:1, 193:18-194:5.)

- No test, including a diagnostic test, performs perfectly every time. (Ex. 2, at 6; Ex. 3, at 170:4-5 ("I think the general public knows there can be errors.").)

- Early in the COVID-19 pandemic, and at the time of the May 1 PR, it was not typical for laboratories to publish their qualitative test validations in peer-reviewed publications. (Ex. 3, at 93:3-6, 94:2-9.) Nor is peer review necessary to assess the reliability of a qualitative test validation. (Ex. 3, at 100:9-18.)

- Laboratories do not typically report their validation results to the test's manufacturer. (Ex. 3, at 97:5-11, 98:7-22.) However, labs do often contact the manufacturer to troubleshoot issues that arise in performing the validation—such as contamination or other variables that could lead to unexpected or unfavorable validation results, but do not reflect on the test's overall efficacy. (Ex. 3, at 97:5-18.)

- Sensitivity and specificity are the best indicators of a PCR diagnostic test's performance and accuracy in clinical use. (Ex. 2, at 3; Ex. 3, at 53:3-8, 89:8-90:3.)

- PCR test manufacturers typically report a validation's sensitivity and specificity results when discussing a test's performance—not predictive values, or other various metrics. (Ex. 3, at 84:7-85:1, 172:15-21, 173:12-18, 175:7-14, 187:22-25.)

- Laboratories are not required to determine a test's limit of detection ("LoD") in validating a diagnostic test because the LoD "reveals itself" in the sensitivity results. (Ex. 1, at 21; Ex. 3, at 85:6-18.)

---

[2] Westgard spends a significant portion of his Reports discussing studies performed or published after the May 1 PR. Ex. 1, at 22-25; Ex. 2, at 14-19. But by Westgard's own admission, these publications and thus his related opinions are irrelevant to the claims at issue. *See* Ex. 3, at 193:1-17 (admitting his opinions regarding post-May 1 studies are a mere "passing interest"). Opinions based on irrelevant evidence do not assist the factfinder and should be excluded.

- While LoD is an important metric when a diagnostic test is being developed in the lab, sensitivity and specificity based on real-patient samples are better indicators of real-world performance and are the two most important performance metrics once the test moves beyond the development stage. (Ex. 1, at 21; Ex. 3, at 175:16-176:4.)

Notwithstanding these points of agreement, however, Westgard lacks the experience, qualifications, and expertise to opine on COVID PCR performance validations, the PCR diagnostic testing industry, how investors understood the May 1 PR, or any of the other topics on which he purports to opine, and his testimony and reports should be excluded as unreliable and irrelevant.

## ARGUMENT

Rule 702 of the Federal Rules of Evidence imposes a "gatekeeping obligation" on the court to determine the admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "A two-part test applies to determine admissibility." *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). "First, the district court must determine 'whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.'" *Id*. (citation omitted). "Second, the court 'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Id*. (citation omitted). "The proponent of the expert testimony bears the burden of showing that the testimony is admissible." *Id*. Westgard's Reports fail in both regards, and thus, the Court should exclude his opinions in their entirety.

## I.   WESTGARD'S REPORTS SHOULD BE EXCLUDED FOR FAILING TO COMPLY WITH 28 U.S.C. § 1746 AND RULE 26(A)(2)(B).

There is no dispute that Westgard failed to comply with the straightforward requirements under 28 U.S.C. § 1746 and Federal Rule of Civil Procedure Rule 26(a)(2)(B). Under 28 U.S.C. § 1746, unsworn statements, including expert reports, must be signed and indicate that they are

3

made under penalty of perjury. *See* 28 U.S.C. § 1746. Further, Rule 26(a)(2)(B) clearly requires that expert reports include: (i) a statement of all opinions the witness expressed, and the basis and reasons for them; (ii) the facts or data considered in forming those opinions; (iii) exhibits that will be used to support them; (iv) a list of publications authored in the previous ten years; (v) a list of cases in which the witness testified as an expert during the previous four years; and (vi) a statement of compensation paid for the testimony in the case.

First, Westgard failed to provide any declaration that the statements in his Reports were made under penalty of perjury, and thus his Reports are inadmissible on summary judgment. *See Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, No. 14–3157, 606 F. App'x 891, 895 (10th Cir. 2015) ("[U]nsworn expert reports are not competent evidence on summary judgment."); *Welch v. City of Albuquerque,* 2016 WL 8809479, at *3 (D.N.M. May 13, 2016) (striking unsworn expert reports); *Ho v. Michelin N. Am., Inc.*, 2011 WL 3241466, at *13 (D. Kan. July 29, 2011) ("[T]his court has repeatedly emphasized that . . . the proponent of expert testimony may not simply present the unsworn report of the proposed expert."), *aff'd*, 520 F. App'x 658 (10th Cir. 2013).

Second, Westgard disregarded multiple requirements under Rule 26(a)(2)(B). For example, the Reports do not disclose all facts and data that Westgard considered in forming his opinions. Ex. 3, at 11:3-10 ("I only referenced 14 documents, and I'm sure I reviewed more than that."). The Reports nowhere indicate his compensation for his work in this case. The Reports also lack a complete list of his publications. Ex. 3, at 17:10-13.

Rule 26(a)(2)(B)'s disclosure requirements are not a mere formality. They are essential to protect a party's right to properly cross-examine witnesses and prevent prejudice, particularly in cases that present "intricate and difficult issues." *See* Fed. R. Civ. P. 26 advisory committee's note

to 1970 amendment (explaining same). For these reasons, courts routinely exclude expert opinions that ignore the Rule 26(a)(2)(B) requirements. *See Pine Tel. Co. v. Alcatel-Lucent USA Inc.*, 617 F. App'x 846, 861 (10th Cir. 2015) (affirming exclusion of expert report that failed to comply with Rule 26(a)(2)(B) requirements); *Andersen v. Foremost Ins.*, 2022 WL 808051 (D. Utah Mar. 17, 2022) (excluding report that was unsigned and failed to clearly identify express opinions); *Healy-Petrik v. State Farm Fire & Cas. Co.*, 2022 WL 464220 (D. Utah Feb. 15, 2022) (same); *Chambers v. Fike*, 2014 WL 3565481, at *5-6 (D. Kan. July 18, 2014) (excluding multiple reports that failed to disclose the experts' publications); *Connelly v. H.O. Wolding, Inc.*, 2007 WL 2750595, at *2 (W.D. Mo. Sept. 18, 2007) (striking report that failed to disclose all information considered by the expert; all publications authored; and the expert's compensation). Westgard's Reports flagrantly violate § 1746 and Rule 26(a)(2)(B) and should be excluded on that basis alone.

## II.   WESTGARD SIMPLY IS NOT QUALIFIED TO RENDER AN EXPERT OPINION IN THIS CASE.

### A.   Westgard Is Not Qualified to Provide an Opinion on Whether Investors Understood the May 1 PR.

An expert opinion must fall "within the reasonable confines" of a witness's expertise. *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013). Throughout his Reports, Westgard opines that the May 1 PR would have been difficult to understand by the "intended audience." Ex. 1, at 25; Ex. 2, at 6-10, 12, 14. But Westgard concedes that he has **no** basis to opine on the "intended audience" of the May 1 PR or how that audience would have understood it—further admitting that he is not an investor in the Company, he has no experience as a financial analyst, he has never studied how investors interpret information in the market, and he has no expertise in how investors behave in the marketplace. Ex. 3, at 185:17-19, 185:25-186:17, 187:4-7. Moreover, only investors

5

(not experts—even those more familiar with investing practices) can testify as to whether they were misled. *See, e.g.*, *SEC v. Mapp*, 2017 WL 5466660, at \*3 (E.D. Tex. Nov. 14, 2017) ("Investors [not experts] may testify as to whether they were misled, and it is for the jury to determine whether Defendant's statements in fact were misleading."); *MTV Cap. Ltd. P'ship v. Quvis, Inc.*, 2008 WL 5516517, at \*2 (W.D. Okla. Nov. 12, 2008) (holding expert's securities regulation experience did not qualify him to offer opinion as to whether a reasonable investor would have considered financial statements important to his investing decisions). Further, as a matter of law, a "reasonable investor" in a diagnostic testing company must be assumed to have at least a basic understanding of the fundamentals of that industry. *Richfield v. PolarityTE, Inc.*, 2023 WL 3010208, at \*6 (D. Utah Apr. 19, 2023). An expert cannot opine on such "legal standards nor . . . apply[] the law to the facts." *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342-43 (10th Cir. 2017). Westgard's opinions on this topic are improper, outside his area of expertise, and irrelevant and should be excluded.

**B.**    **Westgard Is Not a PCR Expert and Is Not Qualified to Render Opinions Regarding the PCR Diagnostic Testing Industry, PCR Test Performance Evaluations, or COVID-19 PCR Tests Generally.**

The threshold question of whether a proposed expert is "qualified" is determined on the basis of how the expert's skill, experience, and knowledge relate to the facts at issue. *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013). Westgard purports to opine on the "performance of **qualitative laboratory tests**" and the "assessment of performance of **Logix Smart Covid-19 test**." Ex. 1, at 3, 17 (emphasis added). Here, the Logix test at issue is a qualitative, PCR diagnostic test for which clinical microbiology and virology laboratories have well-established practices. Ex. 3, at 28:21-29:12. Westgard, however, is an expert in clinical chemistry, not microbiology or

6

virology. This is a critically important distinction. While both clinical chemists and microbiologists might wear white coats and work in laboratories, they do not possess the same skillset, experience, or knowledge. Westgard recognizes that these are two very different, specialized fields of science—and only microbiology is relevant to evaluating PCR diagnostic tests, like the Logix test. Ex. 3, at 31:17-19, 35:12-22, 53:15-54:21, 64:14-23.

Westgard's experience is further confined to quantitative, not qualitative, tests. Clinical chemistry tests are subject to unique quality control programs because they are automated and provide quantitative (numerical) results used to monitor patients over time, whereas the Logix test involves manual processes and provides a qualitative ("yes/no") result. Ex. 3, at 29:18-19, 40:7-18. Indeed, the Westgard Rules—for which Westgard is known—apply to quantitative tests, not qualitative tests. Ex. 3, at 34:17-35:11, 38:17-40:6. Even though Westgard has written over 200 articles, none is about the validation of qualitative diagnostic tests for a molecular infectious disease, like COVID-19. Ex. 3, at 17:14-19.

Further, Westgard admits that he lacks the requisite experience to opine on COVID PCR diagnostic testing generally. He is not a microbiologist. Ex. 3, at 64:18-19. He has never worked in a microbiology lab. Ex. 3, at 40:24-41:4. He has never validated or implemented a PCR test. Ex. 3, at 42:2-8. He has never even performed a PCR test, let alone a PCR test used to diagnose COVID. Ex. 3, at 64:20-23.

"Though a proffered expert possesses knowledge as to a general field, the expert who lacks specific knowledge" is not helpful to the trier of fact. *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998). Thus, the Tenth Circuit is vigilant in disqualifying experts whose testimony strays beyond "the confines of [the expert's] subject area." *Ralston v. Smith & Nephew*

*Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (affirming disqualification of orthopedic surgeon retained to opine on orthopedic device, where her familiarity with "general orthopaedic and surgical principles and concepts" did not amount to particular experience with the device); *see also Rodgers v. Beechcraft Corp.*, 759 Fed. App'x. 646 (10th Cir. Dec. 13, 2018) (affirming disqualification of electromechanical engineer because "even if the [landing gear at issue] is not particularly advanced from an engineering standpoint," the engineer had never designed landing gear); *Conroy*, 707 F.3d at 1168 (affirming disqualification of doctor who worked in the general field for twenty-five years but had never researched or written about the specific subject area).

This Court should follow the long line of decisions that gatekeep against unqualified expert testimony and disqualify Westgard from providing any expert opinion in this matter.

## III. WESTGARD'S OPINIONS ARE GROUNDED IN INACCURATE INFORMATION AND NOT HELPFUL TO THE TRIER OF FACT.

The Reports contain numerous errors and misstatements that further render Westgard's opinions on qualitative PCR tests unreliable and not useful to a trier of fact. Westgard admitted at deposition that multiple statements he made and performance formulas he cited are wrong. Ex. 3, at 56:21-23, 59:3-8, 152:23-153:6, 183:25-184:4, 184:11-15. He further admitted that his analysis was "sloppy," and that his misstatements were repeated throughout his Reports. Ex. 3, at 78:20-21, 183:14-24. Accordingly, the Reports are confusing and should be excluded. *See ClearPlay, Inc. v. Dish Network, LLC*, 2023 WL 121278, at *11 (D. Utah Jan. 6, 2023) (excluding expert when underlying data was "concededly inaccurate").

## IV. WESTGARD'S OPINIONS REGARDING THE MAY 1 PR ARE NOT SUPPORTED BY RELIABLE METHODOLOGY AND, IN FACT, ARE CONTRADICTED BY INDUSTRY STANDARDS AND HIS OWN TESTIMONY.

Westgard should not be allowed to offer opinions that lack any reliable (or known) foundation, and which Westgard often conceded lack any basis at all. First, Westgard criticized the reliability of the validation results attached to the May 1 PR, while admitting that his opinion is based on nothing more than a cursory reading of those materials. Ex. 3, at 114:10-115:24. While it is not surprising that Westgard failed to review the underlying data given his lack of experience in performing validations for PCR diagnostic tests (Ex. 3, at 41:5-21, 42:2-8, 64:20-23 (admitting same)), expert opinions rendered without any review of the underlying data supporting such opinions are methodologically unsound and unreliable. *See Deem v. Baron*, 2020 WL 114138, at *14 (D. Utah Jan. 10, 2020) (excluding expert opinion when he did nothing to evaluate the information provided to him); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (expert opinions "connected to existing data only by the *ipse dixit* of the expert" are properly excluded); *Graystone Funding Co., LLC v. Network Funding, L.P.*, 598 F. Supp. 3d 1228, 1249 (D. Utah 2022) ("[E]xperts may not merely parrot or recite factual evidence[.]").

Second, Westgard opines that the validations disclosed in the May 1 PR are not reliable because they were not peer reviewed (Ex. 1, at 20), yet he agrees that it is not typical for labs validating a PCR diagnostic test to publish their results in a peer-reviewed publication (Ex. 3, at 93:20-23). And to the extent he creatively attempts to shift his opinion—claiming at deposition that by "peer review" he meant that the validation reports should have been reviewed by other qualified scientists—the undisputed evidence is that they were. *See* Ex. 4, Deposition Transcript of Dr. Brent Satterfield (May 16, 2023), at 262:9-12; *see also Harris v. Remington Arms Co.*, 997 F.3d 1107, 1113-14 (10th Cir. 2021) (affirming exclusion of expert opinion based on facts that contradict the undisputed evidence).

9

Third, Westgard opines that the validations reported in the May 1 PR are unreliable due to the limited number of samples tested and the type of samples used. Ex. 1, at 21; Ex. 2, at 5. But to support these statements, Westgard improperly points to the Clinical and Laboratory Standards Institute ("CLSI") guidelines, which Westgard admits are not customarily followed by laboratories validating COVID PCR tests and definitely were not followed during the COVID-19 pandemic when samples were scarce. Ex. 3, at 104:5-9, 182:4-183:13 (admitting the FDA did not require CLSI guidelines to be followed in validating COVID-19 PCR tests).

Fourth, Westgard opines that the performance claims in the May 1 PR should have used the lower limits of the Confidence Intervals. Ex. 1, at 25. But when asked for the basis of his opinion, Westgard admitted that he was being "facetious" and that his statement was "radical" and not supported by common practices. Ex. 3, at 176:5-14. Courts do not allow expert opinions like Westgard's that are contrary to generally accepted industry standards. *See*, *e.g.*, *United States v. Fredette*, 315 F.3d 1235, 1239-40 (10th Cir. 2003) (excluding expert opinion because it did not apply any industry standard nor "rest [ ] on a reliable foundation"); *Goebel v. Denver & Rio Grande W.R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) ("It is critical that the district court determine 'whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.'").

Because Westgard's opinions are not "scientifically sound" they should be excluded.

## CONCLUSION

Based on the foregoing, Defendants respectfully ask that the Court exclude Westgard's reports, testimony, and opinions in their entirety.

10

Dated: April 10, 2024                              **BAKER & HOSTETLER LLP**


By:    */s/ Douglas W. Greene*
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com


Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

11

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 10th day of April, 2024, a copy of the foregoing **DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DR. JAMES WESTGARD AND MEMORANDUM IN SUPPORT THEREOF** was filed with this Court's CM/ECF system, which will send notification to all counsel of record.

/s/ Douglas W. Greene
Douglas W. Greene