D. Loren Washburn (#10993)

WASHBURN LAW GROUP
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-9660
loren@washburnlawgroup.com

Michael A. Pineiro (*pro hac vice*)
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4268
mpineiro@mnrlawfirm.com

*Attorneys for Gelt Trading, Ltd. and the Class*

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>        Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>        Defendants. | **CLASS PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00368-JNP-DBP |

Class Plaintiff Gelt Trading, Ltd. ("Gelt" or "Class Plaintiff"), under Fed. R. Civ. P. 56, hereby moves this Court for partial summary judgment on Count 1 of Class Plaintiff's Second Amended Complaint, which asserts a claim against Defendant Co-Diagnostics, Inc. ("Co-Diagnostics," or the "Company") and Defendant Brent Satterfield for securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

## INTRODUCTION / RELIEF REQUESTED

This is a securities fraud class action brought by Class Plaintiff Gelt. The Court has certified a class of all those who purchased the securities of Defendant Co-Diagnostics between May 1, 2020 and May 14, 2020. In Count 1 of its Second Amended Complaint, Class Plaintiff brought a claim for securities fraud in violation of Section 10(b) and Rule 10b-5.  By this motion, the Class Plaintiff seeks partial summary judgment on the below elements of that securities fraud claim:

(1) That Co-Diagnostics and Satterfield (collectively, the "Defendants") made material misrepresentations in the May 1, 2020 press release issued by Co-Diagnostics regarding the accuracy of Co-Diagnostics' Covid-19 test ("the May 1 Press Release");

(2) That Defendants issued the misleading May 1 Press Release with an intent to deceive, manipulate, or defraud, or in a reckless state of mind;

(3) That the misrepresentation was made in connection with the purchase or sale of Co-Diagnostics' stock; and

(4) That the Class relied on that misrepresentation in purchasing securities in the Company during the class period.

The Class Plaintiff also moves for summary judgment on all of Defendants' affirmative

2

defenses, #1-41, because they are legally improper affirmative defenses.

## BACKGROUND

Before the Covid-19 pandemic, Co-Diagnostics was a struggling diagnostic testing company focused on selling tests for mosquito abatement. The Company was losing millions of dollars annually and its stock traded on the NASDAQ at around $1, constantly under threat of being de-listed by the exchange. The Covid-19 pandemic changed that. Seizing on the need for Covid-19 testing, the Company developed a Covid-19 PCR test called the Logix Smart test, which transformed the Company's financial prospects. However, on April 30, 2020, the Salt Lake Tribune reported that testing sites using the Company's tests were showing a lower percentage positive patients, likely stemming from the fact that the Logix test was less sensitive than other Covid-19 tests. That article, which had a headline describing the use of the Logix test as a "potential public health disaster," represented an existential threat to the Company and its management, which had watched Co-Diagnostics' stock price dramatically increase before the damaging article.

Faced with this problematic report, the Defendants scurried to immediately issue a press release that would assuage the investing markets. The next day, the Defendants issued the May 1 Press Release. This press release was fraudulent—it was an intentional effort to mislead investors about the accuracy of the test. The May 1 Press Release cited to cherry-picked validation studies on the Logix Smart test and falsely claimed that the test had demonstrated 100% sensitivity and specificity in all evaluations, creating the clear misimpression that the Logix test was 100% accurate. However, in reality, the record shows that prior to the press release, the Logix test had failed several validation studies in India, South Africa, and Greece, performing well below 100% accuracy. Indeed, the South Africa results were consistent with the Salt Lake Tribune article, because they showed that

the test was not sufficiently sensitive to pick up early or late stage patients. The Defendants intentionally and knowingly omitted those failed results from their May 1 Press Release and misrepresented the Logix test's performance. Knowing that the May 1 Press Release was misleading, the Company did not permit its head of compliance to review it before it was issued—despite formally agreeing with the FDA that it would do so. Based on this fraudulent press release, the investing markets bought up shares of the Company, which increased over 17% on May 1, 2020. In the end, investors in Co-Diagnostics lost tens of millions of dollars because they purchased artificially inflated shares.

This Court has already denied the Defendants' motion to dismiss this class action, finding that the Class Plaintiff properly alleged misrepresentations in the May 1 Press Release and that Dr. Satterfield's quotes in the press release were particularly "troubl[ing]." This Court also granted the Class Plaintiffs' motion to certify this class action. Now, with a full discovery record, the Class asks the Court to enter partial summary judgment on key aspects of the securities fraud claim. As the Court will see, there is no genuine issue of fact that the May 1 Press Release misled investors that the Logix test had 100% accuracy in all prior evaluations and that it was 100% accurate, when in fact the test had failed evaluations, and those failed evaluations led distributors or labs to refuse to use the test. Nor is there any dispute that the Defendants' misrepresentations were knowing, intentional, or reckless—the Defendants were aware of these failed evaluations and simply elected not to disclose them.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  Co-Diagnostics Finds Opportunity Amidst the COVID-19 Pandemic

1.      Before the Covid-19 pandemic, Co-Diagnostics, which specializes in DNA-based

4

diagnostic testing, sold molecular diagnostic tests for mosquito vectors such as the Zika Virus and Dengue Fever, as well as for tuberculosis and hepatitis. *See* **Ex. 1** (Satterfield Dep.) at 61:22-62:8.

2.      In 2019, the Company's gross revenues were less than $250,000 and it lost approximately $6 million. **Ex. 2** (D. Egan Dep.) at 98:9-13, 97:20-22. And the Company's stock, which is traded on the NASDAQ, was less than $1.00 and in jeopardy of being de-listed by the NASDAQ exchange. **Ex. 3** (A. Benson Dep.) at 37:11-18.

3.      In January 2020, when the Covid-19 pandemic started flaring up across the world, Co-Diagnostics began exploring the development of a Covid-19 PCR diagnostic test. **Ex. 2** (Egan Dep.) at 26:18-19. The next month, Co-Diagnostics developed a Covid-19 PCR test, called the Logix Smart test, that obtained regulatory approval—the "CE mark"—for sale in Europe. *Id*. at 22:9-11, 35:9-24, 33:13-15; **Ex. 4** (brochure regarding Logix Test available on Co-Diagnostics' website after CE mark was obtained); **Ex. 3** (A. Benson Dep.) at 94:21-95:4. In April 2020, the Company received emergency use authorization (EUA) from the U.S. Food and Drug Administration to sell the Logix Smart test in the United States. **Ex. 3** (A. Benson Dep.) at 97:6-8.

4.      After receiving these regulatory approvals, Co-Diagnostics entered into contracts for the provision of Covid-19 tests in the U.S. and abroad, including with Nomi Health—which became the Company's biggest customer and supplied the Logix Smart test for testing programs in Utah (called TestUtah), Iowa (called TestIowa), Nebraska (called TestNebraska), and Tennessee. **Ex. 2** (D. Egan) at 131:4-18, 132:5-133:15, 135:2-16, 136:6-7, 310:16-21.

5.      These developments sent Co-Diagnostics' share price soaring, from 91 cents at the beginning of 2020 to over $23 on May 13, 2020. *See* **Ex. 5** (Expert Report of Daniel Bettencourt) at p. 70.

**B.  The FDA Flags Misleading Statements by the Company About its Test**

6.      In February 2020, before Co-Diagnostics obtained EUA authorization for the Logix Smart test, the FDA contacted the Company about improper marketing representations regarding the test on its website and press releases. **Ex. 3** (A. Benson Dep.) at 71:11-15; **Ex. 6** (Hutchins Dep.) at 104:10-17. Cecilia Hutchins, then Co-Diagnostics' head of regulatory compliance, was in charge of handling the FDA's inquiry into the Company's improper representations. **Ex. 3** (A. Benson Dep.) at 71:20-24.

7.      During a telephone conference and in email correspondence, the FDA "identified a number of concerns with regards to the statements made [by the Company] with respect to" the Logix Smart test, in particular that the Company was making "performance claim[s]" regarding the test and representations implying that the test can be used for "screening/diagnosis"—all of which are "inconsistent with Research Use Only (RUO) products." **Ex. 6** (Hutchins Dep.) at 102:23-104:17; **Ex. 7** (Feb. 26, 2020 email); **Ex. 3** (A. Benson Dep.) at 72:8-74:1. The FDA cited multiple press releases and the website as containing these improper representations. **Ex. 7**.The FDA requested that the Company "take immediate corrective action to resolve these identified concerns and identify actions to avoid future issues." *Id.*

8.      In response to the FDA's request, Co-Diagnostics prepared a Corrective and Preventive Action (CAPA) Plan. **Ex. 3** (A. Benson Dep.) at 75:17-79:21. Under the plan, the Company agreed to have its regulatory department, headed by Ms. Hutchins, review all "press releases related to the Logix Smart line of products." *Id.* at 75:17-19, 79:9-21; **Ex. 8** (Feb. 14, 2020 email).

**C. It is Misleading to Claim that a PCR Test is 100% Accurate; The Company Receives Negative Performance Results Regarding Its Covid-19 Test**

9.      Co-Diagnostics submitted its Logix Smart test to several validation studies, in connection with the Company's efforts to sell the test to customers. A validation study attempts to identify the performance of a test; some validations involve a concordance study that compares the performance of a subject test against a "gold standard." **Ex. 1** (Satterfield Dep.) at 95:7-23, 267:23-268:7. Validation studies may evaluate several performance measures of a PCR test, including:

- the limit of detection (LOD) of a PCR test, which measures the threshold at which a PCR test is able to pick up a viral load (**Ex. 2** (Egan Dep.) at 41:2-7; **Ex. 1** (Satterfield Dep.) at 76:1-77:25);

- the sensitivity of a test, which measures the rate of false negatives (where Covid-19 positive individuals receive a negative test result) and which is interrelated with the limit of detection of a test (**Ex. 1** (Satterfield Dep.) at 70:10-13, 76:1-77:25); and

- the specificity of a test, which measures the rate of false positives (where the test mistakenly finds that a non-positive individual has Covid-19 (*Id.* at 86:2-10).

10.      As conceded by Dr. Satterfield, the Company's founder, a PCR test will never always be, or is truly ever, 100% sensitive and 100% specific. *Id.* at 86:11-16; 164:8-14. It would be misleading to state that a PCR test will be 100% accurate all of the time. *Id.* at 120:2-16.

*Failed Test in India*

11.      In April 2020, the Indian National Institute of Virology (NIV) ran a validation study on a test sold by CoSara, a Co-Diagnostic joint venture in India, in order to authorize the manufacturing and sale of the test in India. **Ex. 1** (Satterfield Dep.) at 104:13-23, 121:5-123:24; **Ex. 9** (First April 2, 2020 email); **Ex. 2** (D. Egan Dep.) at 120:19-121:25; **Ex. 23** (Garcia Dep.) at

111:13-116:18; **Ex. 10** (Second April 2, 2020 email). The name of the CoSara Covid-19 test is the Saragene test. The Logix Smart test and the Saragene test are "functionally identical." **Ex. 1** (Satterfield Dep.) at 104:13-23; **Ex. 2** (D. Egan Dep.) at 240:17-20.

12.     On April 2, 2020, Co-Diagnostics learned that the results of the NIV's validation study on the Saragene test was "not satisfactory" and that, as a result, it was unlikely the Saragene test would be authorized for manufacture and sale. **Ex. 1** (Satterfield Dep.) at 104:13-23, 121:5-123:24; **Ex. 9** (First April 2, 2020 email); **Ex. 23** (Garcia Dep.) at 111:13-116:18; **Ex. 10** (Second April 2, 2020 email). This initial validation study showed that the Saragene test had 88% specificity and 100% sensitivity—meaning that 12% of tests were showing false positives. **Ex. 11** (April 11, 2020 email). Dr. Rebecca Garcia, the former vice present of products development at Co-Diagnostics, opined that these problematic results did not result from alleged lab contamination. **Ex. 12** (Third April 2, 2020 email); **Ex. 22** (Apuli Dep.) at 61:24-62:2.

13.     Following the failed initial validation, Co-Diagnostics and CoSara submitted their Saragene test to a second validation comparing the Saragene test to the NIV's test. **Ex. 11** (April 11, 2020 email). *Id*. The results of this test were worse, showing just 65% specificity. *Id*. As a result, the NIV determined it would not recommend the Saragene test for regulatory approval.

*Failed Test in South Africa*

14.     On April 17, 2020, Co-Diagnostics received a report from one of their distributors, RX Medicals, who sought to sell the Logix Smart test in South Africa. **Ex. 13** (April 17, 2020 email); **Ex. 22** (Apuli Dep.) at 72:6-73:15; **Ex. 14** (April 18, 2020 email). The South Africa government laboratory performed a "verification" involving a "sensitivity analysis" and found that the Logix test missed 42% of positives—creating "concerns…that very early and later stages of

infection will be missed." *Id.*

15.     Cameron Gundry, Co-Diagnostic's director of commercialization, noted that the negative performance evaluation "[s]hould be looked at carefully and entered into QT9 as a customer complaint/comment." **Ex. 14** (April 18, 2020 email). QT9 is quality management software that Co-Diagnostics used to log any customer complaints, corrective actions, and preventive actions. **Ex. 22** (Apuli Dep.) at 79:24-80:21. Dr. Satterfield, who was the chief science officer at the company, testified he does not recall being notified of or investigating this failed result. **Ex. 1** (Satterfield Dep.) at 175:9-177:12.

*Failed Test in Greece*

16.     On April 24, 2020, Mr. Gundry sent an email to Dr. Satterfield, Ms. Hutchins, and others at Co-Diagnostics regarding a complaint from a distributor in Greece. **Ex. 15** (April 24, 2020 email). In the email, Mr. Gundry forwarded correspondence from a distributor called Biodynamics, which set out "problems" found with a validation test performed in "the biggest private diagnostic lab in Greece." *Id.* According to the email, the validation of the Logix test was "riddled with false positive results." *Id.* The Logix test found 8 positives while the results from three competitors' tests "were all identical to each other showing only one positive sample." *Id.* The distributor commented that this poor test result has "created huge problems for us and is putting our credibility in jeopardy." Based on this failed result, the Greek lab "decided to stop using [the Logix Smart test]." *Id.*

*Additional Customer Complaints*

17.     A spreadsheet generated by Co-Diagnostics QT9 software system shows that between March 1, 2020, and May 1, 2020, the Company had received other "complaints" regarding the Logix test, including from the Hungarian Ministry of Health and Gentech Biosciences. **Ex. 16**

(QT Spreadsheet). Further, there were seven customer complaints logged in July 2020 by Chad Apuli, Co-Diagnostic's laboratory director, which Mr. Apuli says might have occurred earlier and been logged at that later time. **Ex. 22** (Apuli Dep.) at 84:12-87:12.

18.    Between March and July 2020, Mr. Apuli received criticism from customers indicating that they would like the Logix test to have a lower limit of detection. *Id.* at 87:18-88:8.

**D. The April 30, 2020 Salt Lake Tribune Article Criticizing the Accuracy of the Logix Smart Test, Calling its Use in Utah a "Potential Public Health Disaster"**

19.    On April 30, 2020, the Salt Lake Tribune published a story entitled "'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions." ("April 30th SLT Article"). **Ex. 28** (April 30th SLT Article). The April 30th SLT Article reported that "[t]he accuracy of [the Logix tests used] by TestUtah.com has come into question, with state data showing that the rate of positive results among people tested at its site is less than half what it is for patients tested elsewhere in the state." *Id.* Specifically, "[a]bout 2% of symptomatic patients at TestUtah's sites have tested positive for coronavirus since April 1," which is "less than half of the 5% of patients testing positive at other Utah sites." *Id.* The article quotes an email from Dr. Bert Lopansri, a specialist in infectious diseases and microbiology, stating his concerns about "us[ing] a test from an unknown company [Co-Diagnostics] without much in vitro diagnostic experience." Dr. Lopansri noted that "[a] pandemic is not a time for amateurs to learn." *Id.*

20.    The April 30th SLT Article reported that "health officials and doctors have expressed concerns over…the sensitivity of the [Logix]test being used" at TestUtah. *Id.* In an email quoted in the article, Dr. Lopansri stated that the Co-Diagnostics test has a "higher limit of detection compared to tests offered by more established vendors." *Id.*

21.    Dr. Satterfield was quoted in the article defending the Company's tests. He stated

that the Company's tests "scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe, and that "there have been no complaints from nearly 50 other countries…where Co-Diagnostics has sole the majority of its tests." *Id.* Satterfield's latter statement was a lie because there were complaints about the test from, at a minimum, Greece, India, and South Africa and the QT9 database reflected other complaints about the test.

### E. Co-Diagnostics Issues a Misleading Press Release Regarding the Accuracy of its Logix Test and in Violation of Agreed Protocol with FDA

22. On April 30, 2020, after the April 30th SLT Article was published, Dr. Satterfield emailed Mr. Apuli, Dr. Garcia, and Ms. Hutchins, sending them a link to the article. **Ex. 23** (Garcia Dep.) at 166:19-170:14; **Ex. 17** (First April 30, 2020 email). Dr. Satterfield told them to "[n]otice what others are saying about us relative to our LOD [limit of detection] and how we perform worse than other tests." **Ex. 17** (First April 30, 2020 email). He stated that the Company needed to respond to the article immediately: "We need a response and/or multiple responses ASAP. We need multiple papers out, the faster the better." *Id.*

23. In response, Ms. Hutchins noted that the article's assertions about the sensitivity of the Logix Smart test and its ability to detect Covid-19 positive samples for asymptomatic patients were not inaccurate. She stated:

> Technically the [FDA Emergency Use Authorization] says that the [Logix Smart] test is intended for individuals suspected of COVID-19 by their healthcare provider. Our test is not intended for asymptomatic patients. Also, the sensitivity of 99.52% and specificity of 100% are for samples with a viral load equal or higher than the limit of detection. Therefore, a test with the same percentage of sensitivity but a lower limit of detection *is more sensitive than ours*.

*Id.* (emphasis added).

24. The same morning that the April 30th SLT Article came out, Andrew Benson, Co-

11

Diagnostics' head of investor relations, noted he was "putting together [the Company's] response all morning." **Ex. 3** (A. Benson Dep.) at 121:1-122:10; **Ex. 18** (Second April 30, 2020 email).

25.     Ms. Hutchins forwarded to Mr. Benson her April 30th email with Dr. Satterfield because she was concerned about Dr. Satterfield making public statements on the matter given his lack of knowledge. Ms. Hutchins wrote: "Honestly, I'm concerned about Brent [Satterfield] talking to the press about things he doesn't understand. I don't know about his academic curriculum but I doubt he had a single analytical chemistry class his whole life." **Ex. 17** (First April 30, 2020 email). Mr. Benson does not recall relaying Ms. Hutchins' concerns to the Company's management. **Ex. 3** (A. Benson Dep.) at 148:14-16.

26.     In the early evening of April 30th, Dwight Egan circulated a draft press release regarding the April 30th SLT Article to Dr. Satterfield. **Ex. 19** (First May 1, 2020 email). This was an early draft of the press release ultimately issued by the Company on May 1, 2020—the May 1 Press Release. Mr. Egan asked Dr. Satterfield to "look at the section on LOD and put it in the way you would like to see addressed." *Id.* Dr. Satterfield suggested that they ignore the April 30th SLT Article and "simply giv[e] an investor update that covers many of these same points." Dr. Satterfield suggested a new title for the article: "Co-Diagnostics Reports 100% Sensitivity for its Coronavirus Test in Competitive Field Studies from Countries Around the World." *Id.*

27.     That evening, Jennifer Webb, an outside public relations consultant for the Company, set out a plan to respond to the April 30th SLT Article and issue the May 1 Press Release. **Ex. 20** (Second May 1, 2020 email). In an email, she attached a version of the May 1 Press Release, noting that the "content and information….is relevant to a broad audience of stakeholders" and that she wanted to "place positive stories that will dilute the impact of the April 30th SLT Article." *Id.*

28. On May 1, 2020, Co-Diagnostics issued the May 1 Press Release. **Ex. 21** (May 1, 2020 Press Release). The release was entitled "Co-Diagnostics, Inc. Releases Covid-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations." In pertinent part, the release stated:

> Co-Diagnostics today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy.
>
> The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations were conducted in Mexico by the Mexican Department of Epidemiology, India, and elsewhere in the US and abroad. Each study concluded 100% concordance for both specificity and sensitivity.

*Id*. The release further quoted Dr. Satterfield:

> In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent Satterfield, PhD said, "…In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that.'"

*Id*.

29. The May 1 Press Release provided a link to the purported validation reports or data referenced in the press release. *Id.* The release omitted information about the failed validation studies from the Indian NIV, South Africa, and Greece evaluations of the Logix test as well as any mention of customer complaints logged in QT9. *Id*; *see also* **Ex. 1** (Satterfield Dep.) at 277:2-17. Dr. Satterfield did not know why that information was omitted. *Id.*

30. Notably, a prior draft version of the May 1 Press Release stated that Dr. Satterfield's above-referenced quote pertained to "some" of the evaluations performed on the Logix test. **Ex. 20** (Second May 1, 2020 email). But that word was removed in the final version by Mr. Benson. *Id.*

13

(containing a redline version of the press release with the word "some" stricken out); **Ex. 3** (A. Benson Dep.) at 161:4-163:1.

31.    Under its agreement with FDA, because the May 1 Press Release contained representations about the performance of the Logix test, Co-Diagnostics was required to have its regulatory department, headed by Ms. Hutchins, review and approve its content before it was issued. *Id.* (A. Benson Dep.) at 163:2-164:18. But Ms. Hutchins was not consulted about and did not review the May 1 Press Release before it was issued. **Ex. 6** (Hutchins Dep.) at 69:11-17, 178:9-18. Ms. Hutchins admits that she should have been consulted before this press release was issued. *Id.* at 191:4-10.

32.    The alleged validation reports or studies attached to the May 1 Press Release were internal Company documents prepared by Dr. Garcia on the day of the April 30th SLT Article and placed on Co-Diagnostics letterhead. **Ex. 21** (May 1, 2020 Press Release). When she prepared these reports, Dr. Garcia had "no idea" that they would shared with the public. **Ex. 23** (Garcia Dep.) at 187:21-188:11. Dr. Garcia testified that these purported validation reports should not have been shared or published because they were internal documents and not peer reviewed. *Id.* at 188:3-20.

33.    Dr. Garcia, who is a former Company employee, testified that Dr. Satterfield's quote in the May 1 Press Release, referencing the reports she prepared, was "very arrogant and egotistical [because] it's like dismissing error altogether." *Id.* at 206:8-207:1.

34.    On May 13, 2020, Ms. Hutchins informed Mr. Benson that a laboratory was "using the data published in the reports to the [May 1] press release," and she asked to remove the validation reports referenced in the release: "Can we take the reports [down] from the website now….? Because I know for sure that if the FDA sees those not reviewed data it'll be a problem." **Ex. 24**

(May 13, 2020 email). Mr. Benson responded that "[n]ormally I'd just delete that line that has the link in it full-stop, but isn't the headline [of the May 1 Press Release] damning enough?" *Id.*

**F. Co-Diagnostics Intended to Mislead the Investing Public that Its Test Was 100% Accurate**

35.     Andrew Benson, Co-Diagnostic's head of investor relations, acknowledged that the "general public[]….that [is] reading the [C]ompany's press releases is unsophisticated on the science" of Covid-19 tests." **Ex. 3** (A. Benson Dep.) at 104:13-105:9.

36.     On the day that the May 1 Press Release was issued, Co-Diagnostic's media relations consultant, Coltrin PR, informed Co-Diagnostic's management that it had connected with Allison Gatlin, a reporter at Investor's Business Daily, who "ha[d] seen the press release noting the 100% specificity and sensitivity of the Co-Diagnostics Covid-19 test and [was] interested in a comment from someone at the company…about the benefits of accuracy when testing for Covid-19. **Ex. 25** (Third May 1, 2020 email).

37.     At 11:23 a.m., Ms. Gatlin published an article for the Investor's Business Daily about the Company, entitled "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate." The first sentence of the article states: "Co-Diagnostics (CODX) said Friday its coronavirus test has proven 100% accurate in field testing — leading CODX stock to rocket." *Id.* The article also mentions Dr. Satterfield's attributed quote from the May 1 Press Release. *Id.*

38.     Mr. Egan admits that Ms. Gatlin's article states that Co-Diagnostics' test was 100% accurate. **Ex. 2** (D. Egan Dep.) at 268:2-9. Co-Diagnostics' management did not take any steps to correct this article's statement that the Logix Smart test was 100% accurate. *Id.* at 270:14-22.

39.     Other news articles similarly interpreted the May 1 Press Release. For example:

- "Co-Diagnostics says coronavirus test shows spotless sensitivity data in

independent evaluations," Proactive Investors, May 1, 2020. **Ex. 40.**

- "Co-Diagnostics Is a Smart Way to Play Coronavirus Testing: The company's tests are reportedly 100% accurate in at least three countries," Louis Navellier, Investorplace.com. **Ex. 41**.

40.     Co-Diagnostics' stock price rose 17.21% on May 1, 2020. D.E. 114-1 at ¶ 61.

**G.  Gelt Purchased Artificially Inflated Stock in the Company and Suffered Losses**

41.     On May 13, 2020, at 6:27 p.m., after the stock market had closed, the Class Plaintiff purchased 22,000 shares of the Company's stock at $26.65. **Ex. 29** (Gelt Trading History).

42.     On May 14, 2020, at 9:00 a.m. Mountain time, the Salt Lake Tribe published an article with the headline: "TestUtah declines to join other Utah labs in accuracy check." **Ex. 30** (May 14, 2020 SLT Article) The article discusses how TestUtah, which uses the Logix test, had "declined to join other major Utah labs in a joint experiment to confirm one another's quality." *Id*.

43.     That same day, at 1:25 p.m. eastern, trading in the Company's stock was halted by the NASDAQ until 1:30 p.m. eastern. Trading was halted again from 1:48 p.m. to 1:58 p.m. *See* **Ex. 5** (Bettencourt Report) at ¶¶ 51, 53. By the end of this second trading halt, the Company's stock had suffered a logarithmic decline of 37.18%. *See* D.E.125-1 at ¶ 21.

44.     On that day, at 2:07 p.m. eastern, the Class Plaintiff sold the Company's stock for $20.97 per share, resulting in a loss of $125,017.77. **Ex. 29** (Gelt Trading History).

45.     On May 14, 2020, after the close of trading, the FDA issued a press release warning that "No diagnostic test will be 100% accurate" for various reasons. **Ex. 31** (FDA Release).

46.     On May 14-15, 2020, the Company's shares dropped over 31%. **Ex. 5** (Bettencourt Report) at ¶ 113.

### H. The FDA Flags the May 1 Press Release as Misleading

47.     Around May 15, 2020, the FDA complained to the Company once again about improper marketing claims. Ms. Hutchins told her colleagues that "this last Monday I received a complaint from the FDA that one of our distributors had on their website the claim of 100% sensitivity and 100% specificity about the Logix Smart. Little they know that we had the same claim in our PR and I'm afraid it is just a matter of time until they found out from where it came from." **Ex. 32** (May 15, 2020 email).

### I. After the May 1 Press Release, Co-Diagnostics Works to Improve its Limit of Detection and Receives Additional Negative Performance Reviews

48.     On May 2, 2020, the day after the May 1 Press Release, Dr. Satterfield emailed Co-Diagnostics lab employees Chad Apuli and KC Bramwell that the Abbott Covid-19 test "absolutely has a better [limit of detection] than us" and that the Company's test "consistently [was] unable to detect" Covid-19 virus in samples that were "near [the Abbott test's] LOD." **Ex. 26** (May 2, 2020 email). Dr. Satterfield further suggested that the Company "may need a second product offering to compete with Abbott and other more sensitive players." *Id.*

49.     Two days later, on May 4, 2020, Co-Diagnostics' employees received an update and message from Company Management. **Ex. 27** (May 4, 2020 email). The update noted that the Company's development team—Dr. Satterfield, Mr. Apuli, and Mr. Bramwell—were "work[ing]…to improve the limit of detection" of the Logix Smart test. *Id.*

50.     On May 6, 2020, state medical officials in Tennessee expressed "significant concerns" about the efficacy of the Logix test. **Ex. 33** (May 6, 2020 email). Dr. Kara Levinson, a Lab Director for Tennessee Department of Health, wrote the following: "From the laboratory perspective, we have significant concerns about [using the Logix test which is] … 4-fold less

sensitive than the CDC EUA COVID-19 test. Using a less sensitive test has the potential to give false negative results, which has significant[] implications for individual patients that may be sick and for public health staff that perform contact tracing." Dr. Levinson told her colleagues that it was "not logical" for Tennessee to use a "less sensitive/inferior test." *Id.*

51.     Four months later, in September 2020, Andrew Benson emailed others at Co-Diagnostics and asked whether the Company should participate in an LOD comparison study administered by the FDA. **Ex. 34** (September 16, 2020 email). Benson suggested that the FDA study may give Co-Diagnostics "an opportunity to quell a lot of the rumblings about the tests LOD …" Mr. Apuli responded to Mr. Benson, told him that the Company had submitted data, and that the results on LOD from the FDA were not "that great to be honest." *Id.*

52.     A year later, in December 2021, researchers from Israel published a peer-reviewed paper in the journal Molecular Diagnosis & Therapy. **Ex. 35** (December 2021 Molecular Diagnosis Publication). The paper compared the performance of five Covid-19 tests. The study found that the Logix test had the highest number of false negative results (26/102) and that it was the "least sensitive" of all the tests. *Id.* at 236.

**J.  The SEC Fines Co-Diagnostic and C-Level Executives For Misleading Investors About the Logix Smart Test.**

53.     On July 5, 2023, the SEC fined Co-Diagnostics $250,000 based, in part, on press releases issued in early 2020 that misleadingly suggested that the test could be used by consumers to detect COVID-19 when in fact, at that time, the test could not be sold for clinical diagnostic purposes. **Ex. 36** (Co-Diagnostics Cease and Desist Order).

54.     The SEC also fined CEO Dwight Egan and Andrew Benson individually for their failure to exercise reasonable care in drafting and approving misleading press releases in early 2020

related to the Company's test. **Ex. 37** (Egan Cease-and-Desist Order at ¶ 1 ("These proceedings concern Egan's failure to exercise reasonable care in approving misleading press releases …"); **Ex. 38** (A. Benson Cease-and-Desist Order at ¶ 1 ("These proceedings concerns Benson's failure to exercise reasonable care in drafting misleading press releases …").

55.     Similarly, the SEC fined the Company's CFO, Reed Benson, for failing to "keep accurate books and records and [failing] to have disclosure controls and procedures designed to ensure the company disclosed related party transactions as required." **Ex. 39** (R. Benson Cease-and-Desist Order at ¶ 3).

## ARGUMENT

### I.      Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant meets this burden, it then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

### II.     The Court Should Enter Partial Summary Judgment on Elements of Count I

In Count 1, the Class Plaintiff brings a claim for securities fraud in violation of Section 10(b) and Rule 10b-5, based on the Defendants' misrepresentations in the May 1 Press Release. Specifically, the Class Plaintiff alleges that the May 1 Press Release was misleading because it falsely conveyed the impression that Co-Diagnostics' Logix test was 100% accurate and that all prior validation studies or evaluations of the Logix test had shown 100% accuracy—when in fact

the Defendants knew that the Logix test was not 100% accurate and that there were prior validation studies where the test performed poorly (and much lower than 100%).

To prevail on a claim for securities fraud under Section 10 and Rule 10b-5, the Class Plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *See* Order Denying Motion to Dismiss (D.E. 101) at 6 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)); *see also Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1153 (10th Cir. 2023). As shown below, the Class is entitled to partial summary judgment on four of these elements—(i) the Defendants made a material misrepresentation or omission, (ii) they had the requisite scienter in connection with the fraudulent misstatement, (iii) the misrepresentation was made in connection with the purchase or sale of Co-Diagnostics' stock, and (iv) the Class relied on that misrepresentation in purchasing stock in Co-Diagnostics during the Class Period.

### A.    There is No Genuine Issue of Material Fact That the Defendants' Statements in the May 1 Press Release Were Material and Fraudulent

There is no genuine issue of fact that the Defendants' statements in the May 1 Press Release contained material misrepresentations and omissions that misled investors.

To prevail on the first element of its Rule 10b-5 claim—a material misrepresentation or omission—the Class Plaintiff must show that the May 1 Press Release contained statements that were misleading as to a material fact. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). A defendant violates Rule 10b–5 by "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*

20

*v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting 17 C.F.R. § 240.10b–5(b)). As

stated by this Court, statements of "literal truth" can be misleading:

> [The] veracity of a statement or omission is measured not by its
> literal truth, but by its ability to accurately inform rather than
> mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund
> v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010).
> Statements of literal truth "can become, through their context and
> manner of presentation, devices which mislead investors."
> *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d
> Cir. 1990). "Even a statement which is literally true, if susceptible
> to quite another interpretation by the reasonable investor[,] may
> properly be considered a material misrepresentation." *Id.* (citation
> and alterations omitted); *see also Mitchell v. Tex. Gulf Sulphur Co.*,
> 446 F.2d 90, 97 (10th Cir. 1971) ("The misleading, misrepresented
> or untruthful character of the release may appear from . . . the half
> truths, omissions or absence of full candor concealed therein.").

*See* Order Denying MTD (D.E. 101) at 10. "The central issue … is not whether the particular

statements, taken separately, were literally true, but whether defendants' representations, taken

together and in context, would have mislead a reasonable investor." *Wherehouse*, 900 F.2d at 579.

Further, as stated in the Court's order denying the motion to dismiss:

> [I]t is…axiomatic that once a company undertakes partial
> disclosure of…information there is a duty to make the full
> disclosure of known facts necessary to avoid making such
> statements misleading." While section 10(b) and Rule 10b-5 'do not
> create an affirmative duty to disclose any and all material
> information,' disclosure of material information is required 'when
> necessary to make statements made, in the light of the circumstances
> under which they were made, not misleading.'" *Matrixx Initiatives*,
> 563 U.S. at 44 (citation and alterations omitted). Stated in other
> words, "a statement that contains only favorable matters and omits
> all reference to unfavorable matters is as much a false representation
> as if all the facts stated were untrue." *In re Vivendi, S.A. Sec. Litig.*,
> 838 F.3d 223, 240 (2nd Cir. 2016).

*See* Order (D.E. 101) at 12-13 (cleaned up). Indeed, "[t]he law is well settled that so called 'half

truths'—literally true statements that create a materially misleading impression—will support claims

21

for securities fraud." *SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 289 (E.D.N.Y. 2020); *Lusk v. Life Time Fitness, Inc.*, 213 F. Supp. 3d 1119, 1129 (D. Minn. 2016). "A statement can [ ] be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact." *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 349 (S.D.N.Y. 2020) (citation omitted).

A fact is also considered "material" if there is a "substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015); *See also SEC v. Cell>Point, LLC*, 2022 WL 2716549, at *5 (D. Colo. July 13, 2022) (material facts "affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities").

### The May 1 Press Release Contained Misleading Statements

There is no genuine issue of fact that the May 1 Press Release was misleading.

***Express Misrepresentation/Omission Regarding Prior Failed Validation Studies***: First, the release misrepresents, and conveys the misleading and false impression, that the Logix test had achieved 100% sensitivity and specificity in *all* prior validation studies. Specifically, the release quotes Dr. Satterfield as stating that, "In countries where we have been evaluated against other tests, we have *consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that.*" (emphasis added). However, that was not true. As shown above, as of the date of that press release, the Logix test had received poor or failed results in evaluations or validation studies in India, South Africa, and Greece. In India, the specificity was 88% and the Indian NIV rejected the test; in South Africa, the test scored at 58% sensitivity (it missed 42% of Covid-19 positive results), causing "concerns…that very early and later stages of infection will be missed; and

in Greece, the Logix test evaluation was "riddled with false positive results," leading to huge problems for the Company's distributor with Greece's largest private diagnostic lab.

Thus, the statements about "consistently and repeatedly achieving 100% clinical sensitivity and specificity…in countries where we have been evaluated against other tests" was false and misleading. It was a lie that expressly misrepresented and omitted crucial information regarding the Logix Smart test's performance in prior validation studies where it had poor validation results—significantly below 100% sensitivity and specificity. There is no dispute about this.

***Misleading Representation as to the 100% Accuracy of the Logix Test***: In conjunction and addition to the above express misrepresentations, the release contained other misleading statements falsely conveying that the Logix test had achieved 100% accuracy in all of its validation studies and was 100% accurate—even though the test had prior failed evaluations and no Covid-19 test can be 100% accurate. For example, the release was entitled "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: *Consistently Demonstrates 100% Sensitivity and 100% Specificity* Across Independent Evaluations." (emphasis added). And the release states: "Co-Diagnostics today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy." Even if one accepts the Defendants' contention that these statements pertain only to the specific validation studies cited to and linked in the press release, the statements are misleading and misinform investors because they falsely convey the impression that the Logix Test has been 100% accurate in *all* validation tests and they omit contradictory information from numerous failed validation studies. The release—and these specific statements—proffer half-truths that omit information directly undercutting the representation at issue: that the Logix test has been achieving 100% accuracy in evaluations. To be sure, Dr. Satterfield's statement that the Company

had "consistently and repeatedly achieved 100% clinical sensitivity and specificity" and that "you can't do better than that" exacerbates the misleading nature of the May 1 Press Release, reinforcing the false notion that the test had been immaculate in all evaluations and was 100% accurate. *Id.* Indeed, before having access to this evidence of prior failed evaluations from India, Greece, and South Africa, the Court found that Dr. Satterfield's statement that "you can't do better than that" was "particularly troubling" because it "suggests to potential investors that his company has created a Covid-19 test that has achieved perfection or is, at least, superior to any competitor…." *See* Order Denying MTD at 12. The statement is even worse in light of this record evidence.

Thus, there is no genuine issue of fact that the May 1 Press Release as a whole—and these particular statements—misled investors about the accuracy and performance of the Logix Smart test. In fact, reporting on the May 1 Press Release, the Investor's Business Daily published a story with the headline: "Coronavirus Test Maker Soars As its Diagnostic Proves 100% Accurate." And, even Co-Diagnostics' own distributors understood the May 1 Press Release to mean that the test could be marketed as having 100% sensitivity and specificity. **Ex. 32**.

### The Misrepresentations Were Material

The Defendants did not challenge the materiality of these statements at the threshold stage and they cannot do so now. That is because there is no genuine issue of fact that these misrepresentations were material given that they related to the performance of the Company's Covid-19 PCR test—their key, central product—at the outset of the Covid-19 pandemic.  The Company's misrepresentations that the Logix test—its primary product that caused an increase in annual sales from approximately $200,000 in 2019 to over $74 million in 2020—had achieved 100% accuracy in all prior validations and was 100% accurate undoubtedly "affect the desire of investors to buy, sell,

or hold the [C]ompany's securities." *Cell>Point*, 2022 WL 2716549, at *5. The caselaw is clear that representations about the performance of a company's primary product are material. *See, e.g., SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300, 325 (D.D.C. 2015) ("One cannot dispute that investors in a company built on the development and marketing of a single product would rely heavily on the description of that product when deciding whether and to what extent to invest"); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) ("[I]t would be a sad day when [a] court could determine that misstatements about whether a company's primary product worked did not alter the total mix of information available to the market") (citation omitted); *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 230 (S.D.N.Y. 1999) ("Reasonable investors might certainly consider data from the initial market tests of an important new product line to be significant in their evaluation of the firm's prospects.").

## B.  There is No Genuine Issue of Material Fact that Scienter is Satisfied

There is no genuine issue of fact that the second element—scienter—is satisfied because Co-Diagnostics and Satterfield knew that the test had performed poorly in certain evaluations, and they must have been aware that not disclosing those negative evaluations while disclosing other, more positive, foreign evaluations would mislead investors about the test's efficacy.

Under Tenth Circuit law, a plaintiff can prove scienter by establishing the following:

the defendant knew of the potentially material fact, and the defendant knew that failure to reveal the potentially material fact would likely mislead investors. The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

*City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001).

Though scienter is ordinarily a jury question, a plaintiff can succeed on a partial motion for

summary judgment as to scienter when a court concludes that a reasonable jury could "reach only one conclusion"—that defendants "knew their statements were false … or were reckless as to the truth or falsity of their statements." *In re Tesla Inc., Sec. Litig.*, 2022 WL 1497559, at \*17-\*19 (N.D. Cal. Apr. 1, 2022) (granting plaintiff partial summary judgment on scienter because Elon Musk was "aware of the facts" that made his statements misleading, and he could not "ignore the risk" that investors would be misled); *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010) (affirming grant of summary judgment to plaintiff on scienter even when defendant "subjectively believed that the press release was not misleading" because "no reasonable juror could credit that assertion."); *SEC v. Strategic Global Investments, Inc.*, 262 F. Supp. 3d 1007, 1025 (S.D. Cal. Apr. 17, 2017) (granting partial summary judgment to SEC on scienter because court found that "no reasonable juror could find that Defendants did not act with scienter").

A court should grant summary judgment for a plaintiff on scienter when a defendant issues a press release and "no reasonable juror could conclude that [the issuer] was not conscious of the risk that the press release would be misinterpreted." *Platforms Wireless*, 617 F.3d at 1094. In *Platforms Wireless*, a technology company that attempted to develop a new cellular communications technology called the Arc System, issued a press release suggesting that it had developed a functioning Arc System. *Id.* at 1094. Among other assertions, the press release claimed that the company was "unveiling" the new Arc System; that the Arc System was "resistant to inclement weather conditions"; and that the new ARC system had "particular performance characteristics." *Id.* at 1095. These statements were "deceptive" because they suggested the Arc System was operational; in reality the defendant had "only a design of the system, had no operational prototype, and did not have the money to build the prototype." *Id.* at 1094. The Ninth Circuit affirmed the district court's

26

granting of summary judgment in favor of the plaintiff on scienter even though the CEO of the company argued that he "subjectively believed that the press release was not misleading." *Id.* at 1095. The CEO claimed that he did not believe the release was misleading because it is common to issues press releases about "designs" of systems even when no prototype exists. *Id.* The Ninth Circuit rejected this argument, finding that the CEO's "self-serving" testimony of subjective intent need not be credited because the CEO knew that his company "had not produced a complete, field-tested ARC System, and that he authorized the materially misleading press release suggesting that [defendant] had in fact done so. Because no reasonable juror could conclude that [CEO] was not conscious of the risk that the press release would be misinterpreted" the Ninth Circuit concluded, as a matter of law, that the CEO was "deliberately reckless in issuing this press release." *Id.* at 1095-96.

Satterfield and Co-Diagnostics were similarly deliberately reckless in issuing the press release. Just as the *Platforms* Court found scienter established as a matter of law where the company knew that it had not produced a functional ARC system but issued a press release suggesting otherwise, this Court too should find scienter as a matter of law where Satterfield and the Company knew about failed and poor evaluations from South Africa, Greece, and India but authorized a press release suggesting that the Logix Test has been 100% accurate in *all* validations and evaluations.

Even before discovery commenced, this Court found that "the inference that Defendants acted intentionally is at least as compelling, if not more compelling, than the inference that they simply intended to accurately convey—not overstate—the efficacy of their product." *See* Order Denying MTD at 19. In denying Defendants' motion to dismiss, the Cout pointed to four categories of facts that, when combined, created a strong inference of scienter:

- The Company knew about serious critiques of the test before it issued the press

release and scienter is found where an executive evinces certitude of a matter while the "underlying substance is being publicly questioned" (*id.* at 16);

- The timing of the studies incorporated into the press release supported an inference of scienter because they were hastily put together one day before being released suggesting their "intent" was to counter the negative narrative" (*id.* at 17);

- Co-Diagnostics avoided joint validation testing in the US because it would likely "reveal their statements as misleading" which further supported an inference of scienter (*id.* at 19); and

- Dr. Satterfield's scientific background further supported a scienter finding because "any scientist with experience in the diagnostic testing arena" would know that a suggestion of 100% accuracy is "so obviously misleading" (*id.* at 19)

With the benefit of discovery, Plaintiff establishes an even stronger showing of scienter. Indeed, no reasonable juror could conclude that Co-Diagnostics and Satterfield were "not conscious of the risk that the press release would be misinterpreted." *Platforms Wireless*, 617 F.3d at 1095. Discovery has now revealed that before May 1, 2020, Defendants knew about poor evaluations and failed validations. **Ex. 12** (email sent to Dr. Satterfield about failed validation in India); **Ex. 15** (email sent to Dr. Satterfield about poor performance of test in Greece). Those poor evaluations were so obviously material that Defendants must have known that their non-disclosure and omission from the May 1 Press Release would likely mislead investors. Thus, as a matter of law, Plaintiff has established scienter.

### C. There is No Genuine Issue of Material Fact that the "In Connection" and Reliance Elements are Satisfied

There is no genuine issue of fact that the third element of the claim—the "in connection"

requirement—is satisfied. The Supreme Court has consistently embraced an expansive reading of § 10(b)'s "in connection with" requirement. *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006)). "[T]the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id*. (cites, quotes omitted). "Where the fraud alleged involves public dissemination in a document such as a press release…the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Id*. "That [is] because such documents are designed to reach investors and to influence their decisions to transact in a publicly-traded security, any misrepresentations contained within the documents are made "in connection with" the purchase or sale of that security." *Id*. (cites, quotes omitted).

Here, as a matter of law, the misrepresentations satisfy the "in connection" requirement because the May 1 Press Release was posted and disseminated on the Company's website (where it remains available)—at a time during which the Company's shares traded on the NASDAQ. *See, e.g. Strategic Glob. Invs., Inc*., 262 F. Supp. 3d at 1021 ("The Court concludes that there is no question of fact as to whether the 'in connection with' requirement is satisfied here. Defendants' material misstatements and omissions were made in press releases that were publicly disseminated and intended to influence potential investors."); *SEC v. DCI Telecomm., Inc*., 122 F.Supp.2d 495, 499–500 (S.D.N.Y.2000) (statements in press releases and website content satisfy the "in connection with" requirement); *SEC v. StratoComm Corp*., 2 F. Supp. 3d 240, 259 (N.D.N.Y. 2014), aff'd sub nom. *SEC v. StratoComm Corp*., 652 F. App'x 35 (2d Cir. 2016) (granting summary judgment where misrepresentations were made in press releases posted on the company's website: "a reasonable fact finder could only conclude that StratoComm made the false and misleading

statements in a manner reasonably calculated to influence investors, and the statements coincided with the offer and sale of the company's stock").

Turning to the reliance element, that too is satisfied. In this case, the Class Plaintiff alleges that the reliance element is satisfied based on a fraud-on-the-market theory. As stated by the Court:

> Under this theory, a plaintiff…may "satisfy the reliance element . . . by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). To invoke this presumption, a plaintiff must demonstrate that (1) the alleged misrepresentations were publicly known, (2) that the stock is traded in an efficient market, and (3) that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *See Halliburton I*, 563 U.S. at 811; *see also In re Myriad Genetics*, 2021 WL 5882259, at \*7. The court examines whether Plaintiff can meet its burden to access the presumption of reliance.

*See* Order Granting Motion for Class Certification (D.E. 154) at 14-15. Here, the Court has already ruled that "the Plaintiff is entitled to the fraud-on-the-market presumption that it traded in reliance on Defendants' misrepresentations." *Id*. at 18. Based on the record evidence, there is no genuine issue of material fact that all of the factors necessary to establish the fraud-on-the-market presumption are satisfied.

First, there is no dispute that the May 1 Press Release was publicly known. Second, there is no dispute that the Company's stock traded in an efficient market. Second, the Court already found that the Company's stock traded on an efficient market, because Co-Diagnostics' stock traded on the NASDAQ and because the *Cammer* factors are satisfied. *Id*. at 15-18. Third, there is no dispute that the Class Plaintiff purchased his shares on May 13 and 14, 2020, after the May 1 Press Release and before the final corrective disclosure from the FDA on May 14th. As a result, the Court should

grant summary judgment on this element of the securities fraud claim as well. *See, e.g. Hsingching Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at \*4–5 (C.D. Cal. Oct. 5, 2018) (entering partial summary judgment on these elements of fraud-on-market theory).

### B. Summary Judgment Must be Granted on the Defendants' Legally Insufficient Affirmative Defenses

The Defendants have asserted over forty separate affirmative defenses—all of which are boilerplate and legally insufficient as a matter of law. "A party may move for partial summary judgment as to an affirmative defense by identifying the defense on which summary judgment is sought. Such a motion for partial summary judgment may be used by the Court to dispose of affirmative defenses." *Boyko v. Parker*, 960 F. Supp. 2d 1270, 1271 (D. Utah 2013) (cleaned up).

All of the Defendants' forty-one affirmative defenses assert that the Class Plaintiff has not or cannot meet certain aspects of its prima facie burden of proof on its securities fraud claims. *See* Defendants' Answer and Affirmative Defenses (D.E. 105) at 17-22. These are not proper affirmative defenses. *See Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense."); *see also In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."). Thus, summary judgment on all of the Defendants' affirmative defenses is proper.

### CONCLUSION

The Defendants committed fraud in issuing the May 1 Press Release. Through the press release, Defendants intended to mislead investors about the Company's Logix test after a negative news story had criticized the test's accuracy. The record evidence is not in dispute that the press release was misleading, that the misrepresentations were made knowingly or recklessly, that the

misrepresentations were made in connection with the sale of the Company's stock, and that the Class relied on those misrepresentations. The Court should grant partial summary judgment on all those issues. Further, the Court should grant summary judgment on all of the Defendants' improper affirmative defenses.

DATED: April 10, 2024

**WASHBURN LAW GROUP**

 /s/ D. Loren Washburn
D. Loren Washburn (#10993)
loren@washburnlawgroup.com
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-9660
loren@washburnlawgroup.com

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**

Michael A. Pineiro
Florida Bar No. 041897
mpineiro@mnrlawfirm.com
Brandon S. Floch
bfloch@mnrlawfirm.com
Florida Bar No. 125218

2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131
Telephone: (305) 400-4260
Facsimile: (866) 780-8355

*Attorneys for Gelt Trading, Ltd. and the Class*

## CERTIFICATE OF SERVICE

I certify that on April 10, 2024 a copy of the foregoing was filed on the CM/ECF system and delivered to all parties of record.


/s/ D. Loren Washburn
D. Loren Washburn