**UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | Case No. 2:20-cv-00368-JNP-DBP<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead<br><br>**<u>Oral Argument Requested</u>** |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
<u>AND MEMORANDUM OF LAW IN SUPPORT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND RELIEF REQUESTED ........................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 5

    A.    Co-Diagnostics Develops the Logix Test and Receives Emergency Use Authorization ..................................................................................................... 5

    B.    Diagnostic PCR Test Development and Performance Measures ............... 6

    C.    Performance Data Available to Defendants Prior to May 1, 2020 ............. 8

    D.    Public Discussion of COVID Testing and the Fact that No Test Is Perfect ........................................................................................................................ 12

    E.    The May 1 Press Release ......................................................................... 16

    F.    The Stock Price did not react to the May 1 Press Release ...................... 18

    G.    Co-Diagnostics' Stock Price Went Up, Not Down, on May 11, 2020 Following an Announcement that Test Nebraska's Validation Had Shown 95% Sensitivity ........................................................................................... 19

    H.    Announcements and Stock Price Movement During the Trading Day on May 14, 2020 ........................................................................................... 19

    I.    Announcements After-Hours on May 14, 2020, and Trading on May 15, 2020 ......................................................................................................... 21

    J.    Lead Plaintiff Gelt's Trading History ..................................................... 21

    K.    Additional Facts Regarding Scienter and Control .................................. 22

ARGUMENT .............................................................................................................................. 22

    I.    MAY 1 PR WAS NOT FALSE OR MISLEADING, MUCH LESS MATERIALLY SO. ................................................................................... 23

    A.    No Reasonable Investor Could Have Been Misled by the Press Release into Thinking the Logix Test would perform "Perfectly" All the Time ... 23

    B.    The Performance Data Available to the Company Prior to May 1, 2020 Was Consistent with the Press Release and Did Not Show Accuracy Problems ................................................................................................. 28

    II.    PLAINTIFF CANNOT PROVE SCIENTER ......................................... 30

    III.    PLAINTIFF CANNOT PROVE RELIANCE. ........................................ 33

    IV.    PLAINTIFF CANNOT PROVE LOSS CAUSATION. ......................... 35

    V.    GELT LACKS STANDING TO SUE OR REPRESENT THE CLASS. .............. 39

    VI.    SECTION 20(a) CLAIM ALSO FAILS. ................................................ 40

CONCLUSION ........................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Wal-Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) ...................................................................................22

*In re Amarin Corp. PLC Sec. Litig.*,
   689 F.App'x 124 (3d Cir. 2017) .................................................................................24

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)....................................................................................................34

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).....................................................................................................22

*Basic v. Levinson*,
   485 U.S. 224 (1988)............................................................................................4, 27, 34, 35

*Chipman v. Aspenbio Pharma, Inc.*,
   2012 WL 4069353 (D. Colo. Sept. 17, 2012).........................................................28

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) .................................................................................40

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).....................................................................................................36

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*,
   431 U.S. 395 (1977)......................................................................................................40

*In re Gold Res. Corp. Sec. Litig.*,
   776 F.3d 1103 (10th Cir. 2015) .................................................................................33

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   594 U.S. 113 (2021).....................................................................................................34

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014).................................................................................................4, 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).....................................................................................................23

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .......................................................................................37

*Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)..........................................................................................2, 23, 24, 26

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)...........................................................................................37

*In re Omnicom, Inc. Sec. Litig.*,
  541 F.Supp.2d 546 (S.D.N.Y. 2008)...............................................................................39

*In re PolarityTE, Inc., Sec. Litig.*,
  2020 WL 6873798 (D. Utah Nov. 22, 2020) ..............................................................27, 37

*Rector v. City & Cnty. of Denver*,
  348 F.3d 935 (10th Cir. 2003) ........................................................................................40

*Richfield v. PolarityTE, Inc.*,
  2023 WL 3010208 (D. Utah Apr. 19, 2023).....................................................................24

*Shuster v. Symmetricom, Inc.*,
  35 F.App'x 705 (9th Cir. 2002) ......................................................................................33

*Smallen v. The W. Union Co.*,
  950 F.3d 1297 (10th Cir. 2020) ...........................................................................30, 32, 33

*Solid Q Holdings, LLC v. Arenal Energy Corp.*,
  2017 WL 782283 (D. Utah Feb. 28, 2017)......................................................................40

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)........................................................................................................23

*TDC Lending LLC v. Priv. Cap. Grp., Inc.*,
  340 F.Supp. 3d 1218 (D. Utah 2018)...............................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................30

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)............................................................................................24

*United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) ......................................................................................27

*In re Williams Sec. Litig.*,
558 F.3d 1130 (10th Cir. 2009) .......................................................................................4, 36, 39

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ...............................................................................................33

*In re Zagg Inc. Sec. Litig.*,
797 F.3d 1194 (10th Cir. 2015) .............................................................................................3

**Rules**

DUCivR-56 ...........................................................................................................................1

Fed. R. Civ. P. 56(a) ......................................................................................................1, 22

Pursuant to FRCP 56 and DUCivR-56, Defendants, Co-Diagnostics, Inc., Dwight Egan, James Nelson, Eugene Durenard, Edward Murphy, Richard Serbin, Reed Benson, and Dr. Brent Satterfield ("Defendants"), hereby move for summary judgment on all claims in this matter.

### INTRODUCTION AND RELIEF REQUESTED

No test is 100% accurate all of the time. This universal truth is widely acknowledged across industries but is especially important in the medical context where life and death decisions depend on diagnostic tests that, inevitably, produce some false results. This came into even sharper focus in the early months of the COVID-19 pandemic, when people across the world suddenly needed to understand diagnostic testing technology—and polymerase chain reaction ("PCR") tests in particular—in more detail to protect themselves and their families. The fact that no diagnostic test is perfect was widely discussed in early 2020 not only in scientific circles but in the general press: as numerous contemporaneous articles noted, PCR tests are highly accurate but imperfect tools.

So, too, was Co-Diagnostics' Logix Smart® test ("Logix test")—one of the first COVID tests to receive FDA Emergency Use Authorization ("EUA") in April 2020. The Logix test, like many of its PCR competitors, showed excellent accuracy both in the Company's own verifications and in comparative evaluations performed by independent labs using real-patient samples in the spring of 2020. And so, when an April 30, 2020 *Salt Lake Tribune* article ("April 30 SLT Article") falsely accused the Logix test of poor clinical performance, the Company defended its test, issuing a press release the next day ("May 1 PR") truthfully reporting that "in countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and 100% specificity" (the most important diagnostic testing performance metrics), and attaching the underlying data. The May 1 PR did not promise perfection; it merely reported that

1

the test had performed as well as it could on specific independent evaluations.

Nonetheless, when the stock dropped two weeks later, Plaintiff filed suit, alleging that the May 1 PR misled investors into believing that the Logix test was "perfect" (Dkt. #86 ("SAC") ¶ 64-65, 69), and that investors were harmed when the stock dropped after the "truth" (i.e., that the test was not perfect) was revealed through three alleged corrective disclosures: (1) a news article reporting that TestUtah, which used the Logix test, had declined to join some other Utah labs in a joint validation; (2) the Iowa Governor's announcement that Test Iowa (which also used the Logix test) had shown 95% sensitivity and 99.7% specificity in its validation; and (3) an after-hours FDA press release about the accuracy of competitor Abbott Labs' COVID test that stated "[n]o diagnostic test will be 100% accurate." *Id.* ¶¶ 74-77. This Court narrowed the class period and the claims on the motion to dismiss, but found the allegations sufficient to survive the pleading stage.

After extensive discovery, however, the undisputed, material facts demonstrate that Plaintiff cannot prove any of the required elements for its § 10(b) claim—material falsity, scienter, reliance, or loss causation. Each of these failures of proof is independently fatal to Plaintiff's § 10(b) claim, and without a primary violation, Plaintiff cannot prove a § 20(a) control-person claim:

***The May 1 PR was not misleading.*** Under *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), whether a statement is false or misleading "always depends on context" and requires courts to consider not only the statement being challenged and "all its surrounding text, including hedges, disclaimers, and apparently conflicting information" but also other statements made by the company and other publicly available information, including "the customs and practices of the relevant industry." *Id.* at 190-91. Plaintiff claims that the challenged statements in the May 1 PR were misleading because they

led investors to believe that the Logix test was "perfect" when in fact it was "significantly less than 100% accurate." SAC ¶¶ 64, 69. The undisputed, material facts disprove this: the statements in the May 1 PR were consistent with the performance data available to the Company at the time, and no reasonable investor could have read the May 1 PR in context as promising perfect accuracy every time. The fact that no test is 100% accurate was widely discussed in the months leading up to and following the May 1 PR; indeed, prior public statements, including by Defendants, indicated the Logix test, specifically, was highly accurate but imperfect. Viewed within this full factual context, no reasonable investor could have been misled, and no rational trier of fact could find for Plaintiff.

**Defendants did not act with scienter.** To prove scienter, Plaintiff must prove that Dr. Satterfield and Co-Diagnostics (the two § 10(b) defendants) made the statements in the May 1 PR intentionally to deceive investors, or with a recklessness "approximating actual intent." *In re Zagg Inc. Sec. Litig.*, 797 F.3d 1194, 1206 (10th Cir. 2015). Plaintiff cannot do so. Dr. Satterfield testified, and internal communications reflect, that he genuinely believed the May 1 PR fairly described the test's performance. No facts contradict this testimony, and it is supported by other Co-Diagnostics employees as well as the undisputed opinions of PCR expert Dr. Stephen Bustin. Nor did Dr. Satterfield have any motive to artificially inflate the stock price: he did not sell stock during the class period or personally benefit from the purported fraud in any way. On these undisputed material facts, Plaintiff cannot prove scienter.

**Plaintiff cannot prove reliance.** Plaintiff claims that Co-Diagnostics' stock traded in an efficient market and relies on the "fraud-on-the-market" presumption to establish class-wide reliance. SAC ¶ 100. But even where stock trades in an efficient market, defendants can rebut this presumption with "appropriate evidence" that the alleged misstatements did not in fact impact the

stock price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014) ("*Halliburton II*"). Here, Plaintiff claims that "[t]he market . . . understood [the challenged] statements to mean [Logix] tests were perfect—sending the Company's share price soaring" (SAC ¶ 69), but the undisputed material facts show there was no statistically significant movement in the stock price on May 1, 2020 following the Press Release. This "severs the link" between the challenged statements and the price paid by plaintiffs, thereby rebutting the presumption of reliance and making it necessary for Plaintiff and each class member to prove, individually, that they personally relied on the challenged statements when they traded in Co-Diagnostics' securities during the class period. *Basic v. Levinson*, 485 U.S. 224, 248 (1988). Because Plaintiff cannot do so, judgment should be entered against it. And because the undisputed material facts rebut the presumption of reliance, this action cannot be maintained as a class action and the class must be decertified.

***Plaintiff cannot prove loss causation.*** Plaintiff "bears the burden of showing that [its] losses were attributable to the revelation of the fraud and not the myriad other factors that affect[ed] [Co-Diagnostics'] stock price." *In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009). It cannot do so; the undisputed, material facts show that (i) none of the three allegedly "corrective" disclosures corrected any statement in the May 1 PR; and (ii) none caused a statistically significant stock-price decline. This failure of proof on each point requires entry of judgment against Plaintiff.

In addition, ***Lead Plaintiff Gelt cannot prove its own damages and therefore lacks standing to represent the class.*** Gelt's undisputed trading history establishes that it was not damaged by the purported fraud. It sold 10,000 shares on May 13, 2020, before the first allegedly corrective disclosure, when Plaintiff claims the stock price was still artificially inflated; it then purchased more shares after-hours on May 13, all of which it sold during the trading day on May

14. Because the parties agree there was no statistically significant price decline on May 14, there is no economic evidence that Plaintiff suffered any damages due to the purported fraud. As a result, Gelt's claims must be dismissed and it cannot adequately represent the class under Rule 23(a).

Because there is no genuine issue of material fact on any of these issues and Defendants are entitled to judgment as a matter of law, the Court should grant Defendant's motion and enter final judgment in Defendants' favor on all counts. In the alternative, should any part of the case move forward, the Court should dismiss Gelt's claims and decertify the class.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.      Co-Diagnostics Develops the Logix Test and Receives Emergency Use Authorization**.

1.      Co-Diagnostics is a Utah-based biotechnology company that develops, manufactures, and sells molecular tools for diagnostic testing, including PCR tests that use the Company's patented "Co-Primer" technology. Ex. 2[1] at 4-5. Prior to and throughout the class period (May 1, 2020 to May 14, 2020), Dwight "Ike" Egan was Co-Diagnostics' CEO and a member of its board of directors, Dr. Brent Satterfield was the Chief Science Officer, Reed Benson was the Chief Financial Officer, and James Nelson, Eugene Durenard, Edward Murphy, and Richard Serbin were outside members of its board. *Id.* at 43-45; Ex. 3 at 20-21.

2.      On January 23, 2020, the Company announced it had completed principal design work for a COVID PCR test—the Logix test. Ex. 2 at 5. On February 24, 2020, it announced that the Logix test had been cleared by the European Community to be sold as an in vitro diagnostic for COVID in markets that accept CE-marking as regulatory approval. *Id.* On April 6, 2020, the

---

[1] "Ex. _" refers to Exhibits to the Greene Dec. in the Appendix filed concurrently herewith. Unless otherwise indicated, internal quotation marks and citations are omitted and emphasis is added.

5

test received EUA from the FDA, allowing it to be sold to certified labs in the U.S. as well. *Id.*

**B.      Diagnostic PCR Test Development and Performance Measures**.

3.      Every new diagnostic PCR test is first developed and optimized in the manufacturer's lab using repeated, tightly controlled measurements to evaluate its performance in ideal conditions. Ex. 4 (Bustin Rep.) at 9. During this development phase, the limit of detection ("LoD," sometimes referred to as analytical sensitivity) and analytical specificity are the metrics most commonly used to assess and describe the test's performance. *Id.* The LoD represents the smallest amount of virus that a test can consistently detect under precise lab conditions. *Id.* at 9-10. Often, this is determined using patient samples, but in the early days of COVID few labs had access to enough patient samples and instead used "contrived" samples (negative samples seeded with positive controls). Ex. 5 (Bard Rep.) at 7; Ex. 6 (Bard Rbt.) at 5; Ex. 7 (Bard Tr.) 55:15-20. Analytical specificity measures how well a test discriminates between the target pathogen and other similar pathogens. Ex. 4 (Bustin Rep.) at 11-12. Because this too is determined under controlled lab conditions, new tests are expected to exhibit 100% analytical specificity. *Id.* at 11.

4.      Once the test is past the development stage, two different performance metrics are most important: (i) sensitivity (sometimes referred to as clinical or diagnostic sensitivity, or percentage positive agreement), defined as the proportion of patients with a disease who test positive; and (ii) specificity (sometimes referred to as clinical or diagnostic specificity, or percentage negative agreement), defined as the proportion of patients without the disease who test negative. Ex. 4 (Bustin Rep.) at 13; Ex. 8 (Bustin Rbt.) at 3-4; Ex. 10 (Bustin Tr.) 121:16-24; Ex 5 (Bard Rep.) at 5; Ex. 6 (Bard Rbt.) at 5-6; Ex. 9 (Westgard Tr.) 61:12-62:16, 81:21-83:3. Sensitivity and specificity can be measured by assessing how often the test correctly identifies

patient samples that are known to be positive or negative (difficult early in the pandemic), or by comparing the test's results against results generated by a "reference" test on the same sample set—these percentages of positive and negative "agreement" are then reported as the sensitivity and specificity. Ex. 4 (Bustin Rep.) at 20-21; Ex. 6 (Bustin Rbt.) at 1-2; Ex. 6 (Bard Rbt.) at 5-6; Ex. 11 (Westgard Rep.) at 17. High sensitivity indicates a test that produces fewer false negatives; high specificity indicates a test with fewer false positives. Ex. 4 (Bustin Rep.) at 13, 15. Sensitivity and specificity are often but not always reported along with a confidence interval ("CI"), which indicates the range within which it is 95% likely that the sensitivity or specificity lies—the fewer samples, the wider the CI and the less certain the result. *Id.* at 18-19.

5.      Sensitivity and specificity, based on real-patient samples, are the most important and useful metrics for assessing performance as a test moves into clinical use, and are better indicators of a test's real-world performance than LoD. *Id.* at 10, 12, 13; Ex. 8 (Bustin Rbt.) at 3; Ex 5 (Bard Rep.) at 1-2, 6, 9-10, 15; Ex. 10 (Bustin Tr.) 45:12-46:9, 124:16-24; Ex. 7 (Bard Tr). 33:21-34:12; Ex. 11 (Westgard Rep.) at 21; Ex. 9 (Westgard Tr.) 63:14-64:13, 84:23-85:5. If a test's LoD is causing problems in clinical practice, then the sensitivity using real-patient samples will be lower, reflecting this limitation; by the same token, if a test shows high sensitivity using real-patient samples, then this indicates the LoD is sufficient for clinical purposes. Ex. 4 (Bustin Rep.) at 13-14; Ex. 5 (Bard Rep.) at 9-10; Ex. 10 (Bustin Tr.) 123:22-124:3; Ex. 7 (Bard Tr.) 38:14-24; Ex. 12 (Satterfield Tr.) 296:22-25; Ex. 13 (D. Egan Tr.) 316:16-25. Defendants' expert, Dr. Jennifer Dien Bard, Director of the Clinical Microbiology and Virology Labs at Children's Hospital Los Angeles, opined that when evaluating new diagnostic tests her lab looks for sensitivity and specificity of 95% or greater and generally is not concerned with LoD. Ex. 5 at 9-

13. However, if a validation shows surprisingly low sensitivity or specificity (i.e., outside the manufacturer's CIs), it is standard practice to assume something went wrong in the lab and to work with the manufacturer to identify and fix any non-test causes. *Id.* 8, 10-11.

**C.      Performance Data Available to Defendants Prior to May 1, 2020**.

6.      Prior to May 1, 2020, Co-Diagnostics had data and information about the Logix test's performance from several sources. Ex. 4 (Bustin Rep.) at 25-26; Ex. 5 (Bard Rep.) at 14. First, it had performance data from its own development and verification of the Logix test. Exs. 14-16. The verification data included in the EUA submission in March and April 2020 were based on evaluations conducted in Co-Diagnostics' lab, and they showed 100% sensitivity, 100% specificity, and an LoD of 4,290 copies/mL. Ex. 14 at 34-35; Ex. 15; Ex. 16 at 17, 26-30. Despite that official LoD, however, the Company understood the Logix test's true LoD to be lower: internal verification data from February 2020 showed a lower LoD of 1,349 copies/mL (Ex. 17 at 7, 16), and internal communications and testimony reflect that Dr. Satterfield and others believed the Logix test's true LoD was in fact lower than the official LoD reported in the EUA and comparable to other COVID PCR tests at the time. Ex. 18 at 1; Ex. 19 at 2; Ex 12 (Satterfield Tr.) 152:6-153:12, 257:7-21; Ex 20 (A. Benson Tr.) 143:1-144:23; Ex 21 (Apuli Tr.) 43:1-21.

7.      Second, Co-Diagnostics had strong sales data indicating customers were happy with the Logix test's performance. Ex 13 (D. Egan Tr.) 90:4-91:7; Ex. 13 (Satterfield Tr.) 108:5-17, 134:10-135:11, 145:3-8, 193:13-15; Ex. 22 (S. Egan Tr.) 38:22-25. Usually, when an independent lab evaluates a new test for potential use, the lab does not share the results of its verification or validation with the manufacturer; in those instances, whether the lab ultimately chooses to purchase the test is typically the best indicator of how the test performed on that lab's

evaluation. Ex. 5 (Bard Rep.) 7-8; Ex. 9 (Westgard Tr.) 98:12-22. Ike Egan and Dr. Satterfield both testified that they viewed the Logix test's strong sales in April 2020 as confirming the excellent performance Co-Diagnostics had seen in its verifications. Ex. 13 (D. Egan Tr.) 90:4-91:7; Ex. 13 (Satterfield Tr.) 108:5-17; 134:10-135:11, 145:3-8, 193:13-15; Ex. 23.

8.      Third, the Company had access to evaluation results from several independent labs prior to May 1, 2020, all showing 100% sensitivity and specificity, detailed below. Ex. 4 at 25-35.

9.      PathWest, the pathology service of the Western Australia Ministry of Health, gave Co-Diagnostics the raw run files as well as the results from its validation of the Logix test, which showed 100% sensitivity (CI 96.48-100) and 100% specificity (CI 96.52-100) compared to their in-house reference test using 207 real-patient samples. *Id.* at 26-31; Ex. 8 (Bustin Rbt.) at 9; Ex. 24 at 8-17. PathWest ran the validation but the results were summarized by Co-Diagnostics in a report dated April 30, 2020, which was attached to the May 1 PR. Ex. 10 at 158:2-7, 159:3-14; Ex. 24 at 8-17. The report was signed by Dr. Rebecca Garcia as author and supervisor, as was allowed by her position and was not uncommon in practice. Ex. 25 (Garcia Tr.) 178:11-18; Ex. 7 (Bard Tr.) 110:11-19, 116:21-117:10; Ex. 10 (Bustin Tr.) 167:12-168:10; Ex. 8 (Bustin Rbt.) at 10.

10.     The NIP lab at the Indian Council of Medical Research ("ICMR") compared CoSara Diagnostics' Saragene test with a "Gold Standard ICMR-[National Institute of Virology ("NIV")]" reference test using 45 patient samples provided by the NIV, and reported the results to Co-Diagnostics on April 24, 2020. Ex. 26; Ex. 28 at 2-3. The Saragene test is identical to the Logix test but is instead manufactured in India by Cosara, Co-Diagnostics' joint venture, and rebranded "Saragene." Ex. 24 at 18; Ex. 27; Ex. 12 (Satterfield Tr.) 104:13-23. The report NIP sent to Co-Diagnostics on April 24, 2020 was signed by the NIP Director in Charge and stated the Saragene

test showed 100% sensitivity (CI 85.4-100) and 100% specificity (CI 78.1-100) in its evaluation. Again, as was common practice, Co-Diagnostics summarized the results in a report attached to the May 1 PR. Ex. 24 at 18-19. Based on the NIP evaluation, the Indian government cleared the Saragene test for sale to the Indian market. Ex. 27.

11.     On April 22, 2020, the Mexican government's Institute of Epidemiological Diagnosis and Reference ("InDRE")—similar to the U.S. CDC—published the results of its official evaluation of the Logix test and approved its sale in Mexico. Ex. 24 at 20; Ex. 29. Those results were summarized in a memo attached to the May 1 PR, and showed 100% analytical sensitivity and 100% analytical specificity, with an LoD of 10-14 copies/reaction, using a small set of real-patient samples. Ex. 24 at 20; Ex. 4 (Bustin Rep.) at 32.

12.     Co-Diagnostics also had access to data from an independent evaluation comparing the Logix test against the Minnesota DOH's reference test on April 10, 2020 using 20 real-patient samples. Ex. 18 at 2-5. These results, summarized in table form, were referenced in and attached to the May 1 PR (Ex. 24 at 24); they showed 100% agreement ("concordance") between the Logix test and reference test for both positive and negative samples, indicating 100% sensitivity and 100% specificity. Ex. 4 (Bustin Rep.) at 33; Ex. 7 (Bard Tr.) 117:17-118:8.

13.     Prior to May 1, 2020, Co-Diagnostics also had results from independent validations performed (i) at Timpanogos Regional Hospital in Utah on April 8-9, 2020, and (ii) by Gentech Biosciences SAS in Colombia, both of which showed 100% sensitivity and 100% specificity. Ex. 30; Ex. 10 at 193:2-23, 199:9-200:9, 201:13-22. An April 20, 2020 memo summarizing these results indicates Co-Diagnostics was not permitted to share them publicly at the time. Ex. 30 at 1.

14.     Separate from the evaluation results described above, Co-Diagnostics also received

10

communications from some independent labs, prior to May 1, 2020—in particular, the Indian NIV, a lab in Greece, and a lab in South Africa—regarding evaluation data from those labs that appeared to suggest lower performance characteristics for the Saragene/Logix test. Ex. 4 (Bustin Rep.) at 36-39. Initial NIV results in early April 2020 indicated sensitivity of 100% and specificity of 85% (and, in a second set of results from the same lab, 65%). Ex. 31 at 3-4. This was far below the performance range the Company had come to expect based on previous internal and external evaluations. Ex. 32; Ex. 34. Many other well-known COVID test manufacturers also seemingly performed poorly on the same NIV evaluation. Ex. 33. Dr. Satterfield and others believed that these results were caused by contamination and not the test itself. Ex. 12 (Satterfield Tr.) 124:9-130:21, 146:16-150:13, 301:9-304:5; Ex. 35, Ex. 36, Ex. 31 at 2-3; Ex. 13 (D. Egan Tr.) 119:10-19, 129:5-8, 195:11-13; Ex. 21 (Apuli Tr.) 51:15-25. Just a couple weeks later, the Saragene test was re-tested by a different ICMR lab (NIP) using samples provided by NIV and the same NIV reference test; as detailed *supra*, the Saragene test showed 100% sensitivity and 100% specificity on NIP's evaluation, leading the Indian government to clear the Saragene test for sale. Exs. 27, 28.

15.    Co-Diagnostics employees involved in communications related to the Greek and South African lab issues (including, regarding the Greek lab, Dr. Satterfield) similarly believed the unusual test performance observed by those labs was due to contamination or other non-test causes. Ex 37; Ex. 38; Ex. 39; Ex. 12 (Satterfield Tr.) 218:3-19, 221:3-9, 301:9-302:5; Ex. 21 (Apuli Tr.) 82:7-25; 83:14-23. Dr. Satterfield did not recall knowing about or being involved with communications with the South African lab, but testified that they would not have concerned him for the same reasons. Ex. 12 at 177:10-178:17, 304:1-23.

16.    After examining Co-Diagnostics' communications with the NIV, Greek, and South

11

African labs, Dr. Bustin testified that, based on his more than 30 years of PCR experience, he could conclusively state that each of those instances of seemingly lower test performance was the result of contamination of the lab and/or reagent and not due to lower performance by the Logix test. Ex 10 at 148:19-149:18, 172:8-174:23, 216:14-218:6, 218:8-219:18, 229:24-230:21, 234:24-235:6, 243:15-244:8, 245:12-246:12, 247:2-17, 253:15-254:17, 257:1-10, 265:25-267:10, 272:6-273:8, 280:7-281:7; Ex. 4 at 36-39. He opined that "anyone with PCR experience" would not have credited the NIV, Greek, or South African results and would have attributed them to contamination, and that in his opinion it would have been scientifically wrong, and would have given the wrong idea about the test's true performance characteristics, if the Company had reported them in the May 1 PR. Ex. 4 at 39; Ex. 10 at 263:8-11; 265:13-22; 266:5-7. He also opined that the statements in the May 1 PR were consistent with the Logix test performance data known to Co-Diagnostics at the time, and that the Logix test is "excellent and highly accurate" and "as good a diagnostic RT-qPCR test as can be designed." Ex. 4 at 52-53. *Plaintiff's purported scientific expert, Dr. Westgard, did not dispute Dr. Bustin's expert opinion on any of these points.*

**D.      Public Discussion of COVID Testing and the Fact that No Test Is Perfect**.

17.      While diagnostic testing companies were developing, verifying, and securing regulatory clearance for the first wave of COVID PCR tests in early 2020, public health officials and media outlets were trying to explain those tests, their performance metrics and limitations, and PCR technology generally to the public, as detailed below. Numerous public sources from February, March, and April 2020 explicitly discussed the inherent uncertainty in diagnostic testing and the fact that no COVID test could perform with perfect accuracy all of the time:

   a.   **Feb. 4, 2020, FDA press release**: "Negative results do not preclude [COVID] infection and should not be used as the sole basis for treatment . . . ." (Ex. 40)

b. **Feb. 14, 2020, CDC**, "The test we're using at CDC is very sensitive. . . . [but] if a person tests negative once, it's not clear that it's a true negative." (Ex. 41)

c. **Mar. 5, 2020, Johns Hopkins**: "<u>No diagnostic test ever provides complete certainty. Results exist within a margin of error</u> . . . . [T]he veracity of diagnosis is always an approximation . . . . Even when a test performs well in a laboratory, new uncertainties emerge as soon as the test enters the field." (Ex. 42)

d. **Mar. 26, 2020, *Washington Post***: "<u>The clamor for long-delayed coronavirus testing is teaching a basic lesson about how all medical tests work: No test is 100 percent accurate</u>. . . . Any medical test has two important qualities: sensitivity and specificity. . . . [COVID PCR tests] are typically very sensitive and specific under lab conditions, but in the real world, how the swab was done and the stage of illness the person was in can make a big difference. . . . 'A negative result does not rule out [COVID] . . . . The test is a screening tool. One has to think of it in terms of probabilities . . . .'" (Ex. 43)

e. **Apr. 1, 2020**, *NY Times*, "If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative": "[U]nder ideal conditions, [COVID] tests can detect small amounts of viral RNA. In the real world, though, the experience can be quite different, and the virus can be missed. . . . [I]f you test negative, 'you probably were not infected at the time your specimen was collected.' The key word there is 'probably.' . . . There are many reasons a test would be falsely negative . . . ." (Ex. 44)

f. **Apr. 1, 2020, ABC News**: "<u>[A]s with any medical test, the [COVID] test cannot be expected to be accurate 100% of the time</u>. . . . <u>The tests will 'never be perfect'</u> . . . . 'All tests have a chance of false negatives' . . . 'It's not that this test is faulty.'" (Ex. 45)

g. **Apr. 2, 2020, *Analytics***: "<u>Tests aren't perfect</u>—many of us are familiar with debates about the consequences of false positive cancer scares arising from mammograms and PSA tests, screening for breast cancer and prostate cancer. . . . Interpreting negative results, and sensitivity/specificity, are reaching mainstream media outlets. On April 1, the *New York Times* published the following article: 'If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative.'" (Ex. 46)

h. **Apr. 3, 2020, *LiveScience***: "<u>No diagnostic test is 100% accurate</u> . . . 'No test detects every case . . .'" (Ex. 47)

i. **Apr. 6, 2020, *Slate***: "<u>No test is perfect</u>. . . . There's always a degree of error involved in any testing . . . ." (Ex. 48)

j. **Apr. 12, 2020, *The Kansas City Star***: "COVID testing has a nearly 100 percent detection rate in the lab . . . [B]ut in real life, in people, it's only 70 percent. . . . Experts say the potential for error is tied to how and when specimens are collected for analysis,

13

not to mention the potential for contamination down the line." (Ex. 49)

k. **Apr. 16, 2020, *The Conversation***: "<u>No test is 100% accurate</u>. Although tests can perform well in ideal laboratory conditions, in real life lots of other factors affect accuracy . . . ." (Ex. 50)

18.     Dr. Satterfield, Denny Crockett, Dr. Bustin, and Dr. Dien Bard all testified that they considered the basic fact that no test can be 100% accurate to be widely known as of May 1, 2020:

a. Satterfield: "That is the most elementary understanding in diagnostics. . . . 'No test is always 100 percent sensitive, 100 percent specific.' It is so clearly understood that it just – it's just not something that you expect anyone else would ever misunderstand who has any understanding of what a diagnostic test is." (Ex. 12 at 298:23-299:17)

b. Crockett: "Q: [H]ave there ever been customers who have come back to Co-Diagnostics and said this test is less than 100 percent sensitive or specific? A. Never – they've never said this test is less than 100 percent because people in the industry will know that it's not going to be 100 percent[.]" (Ex. 51 at 60:1-12)

c. Bustin: "I gave numerous interviews on television and in radio stations [in spring 2020]. And what became clear [was] that as the pandemic was progressing in the early phases, people became more comfortable with testing. They understood . . . testing isn't 100 percent as certain. . . . [B]y mid-2020, people had become familiar with the terms and the limitations and expectations surrounding testing." (Ex. 10 at 113:5-114:4)

d. Dien Bard: "That's just common knowledge, that any of our validations that we generate that has 100 percent sensitivity and specificity, which is quite common, that doesn't mean the test is perfect, where it will always be 100 percent accurate, right." (Ex. 7 at 41:15-19; *see also* Ex. 5 (Bard Rep.) at 10, 14)

19.     Dr. Bustin, Dr. Dien Bard, Dr. Satterfield, and Ike Egan also testified that it was common for evaluations of a PCR test to show that it had performed with 100% sensitivity and 100% specificity, and that no one in the industry understood this to mean the test would perform with 100% accuracy in all circumstances. Ex. 10 at 102:10-18; Ex. 7 at 41:1-42:1; Ex. 12 at 73:6-19, 257:7-25, 298:23-299:17; Ex. 13 at 198:9-21, 218:10-23, 220:2-21. Indeed, Dr. Dien Bard's lab implemented five COVID tests during pandemic and all five showed 100% sensitivity and specificity in her lab's validations. Ex. 5 at 12-13. Dr. Westgard did not dispute any of these facts.

14

20.    Publicly available sources in February, March, and April 2020 also indicated that the Logix test, specifically, was not perfectly accurate all of the time:

a. **Feb. 24, 2020, H.C. Wainright** analyst report: "The test was designed with the company's CoPrimer technology that can significantly <u>reduce</u> the incidence of false positive results compared to other [PCR] tests." (Ex. 52)

b. **Feb. 26, 2020, Maxim Research** analyst report: "With a sensitivity and specificity of >99% and 100%, respectively for the [CODX] coronavirus test, the chance of false positives is substantially lower." (Ex. 53)

c. **Mar. 3, 2020, Maxim Research** analyst report: "With sensitivity and specificity of >99% and 100%, respectively, for the CODX coronavirus test, the chance of false positives is substantially lower." (Ex. 54)

d. **Mar. 9 and 13, 2020, H.C. Wainright** analyst reports: "[T]he test has 99.2% sensitivity and 100% specificity . . . ." (Exs. 55, 56)

e. **Mar. 18, 2020, H.C. Wainwright** analyst report: "We remind investors that [the Logix test] has 99.2% sensitivity and 100% specificity." (Ex. 57)

f. **Apr. 1, 2020, *BioCentury***, "Limits of detection for FDA-authorized Covid-19 diagnostics" (updated Apr. 3, 2020): Showing Logix test's official LoD (4,290 copies/mL) as higher than most other EUA tests listed. (Ex. 58)

g. **Apr. 3, 2020, Logix test "Fact Sheet for Patients,"** publicly available with Logix test's Information for Use ("IFU"): "There is a very small chance that this test can give a positive result that is wrong (a false positive result). . . . [A] negative test result for a sample collected while a person has symptoms usually means that COVID-19 did not cause your recent illness. . . . However, it is possible for this test to give a negative result that is incorrect (false negative) . . . ." (Ex. 59)

21.    On April 30, 2020, the *Salt Lake Tribune* published an article questioning the accuracy of the Logix test ("April 30 SLT Article"). Ex. 60. It reported that only 2% of patients at TestUtah testing sites tested positive in April 2020 versus 5% of patients at other Utah sites, and suggested this difference was due to the Logix test's "higher limit of detection," pointing to the April 1, 2020 *BioCentury* article (updated April 3) that had shown the Logix test's official LoD as higher than many other EUA tests. *Id.* at 1-10. The April 30 SLT Article reported that some

15

experts, including Dr. Satterfield, believed the difference in positivity rates was instead due to population differences (i.e., TestUtah testing fewer and/or less "symptomatic" patients than other sites), and it said that Dr. Satterfield "added that Co-Diagnostics' COVID tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe." *Id.* at 3, 6, 10.

22.    Dr. Satterfield testified that he was confident even after reading the April 30 SLT Article that the Logix test's LoD was not hindering its performance, in part based on the excellent sensitivity it demonstrated in independent studies. Ex. 12 at 202:19-203:5; 213:6-18, 318:2-321:13. Other Co-Diagnostics employees testified similarly. Ex. 21 (Apuli Tr.) 44:15-45:1, 88:20-89:9, 113:7-14; Ex. 13 (D. Egan Tr.) 234:10-16; Ex. 20 (A. Benson Tr.) 228:7-19. After the April 30 SLT Article was published, Dr. Satterfield compared the data from TestUtah sites with other Utah testing sites in a white paper showing that the disparity in positivity rates disappeared once TestUtah adopted the same screening criteria used by other testing sites. Ex. 61; Ex. 20 (A. Benson Tr.) 117:23-118:18] Dr. Bustin analyzed this white paper and its underlying data and concluded that it "convincingly demonstrates that the different positivity rates were due to population differences and that the Logix Smart Test was performing at least as well as other tests in Utah at the time." Ex. 4 at 23. Dr. Westgard did not dispute this conclusion. Dr. Bustin also opined that the April 30 SLT Article "incorrectly assume[d] that a test with a higher LoD will perform worse in clinical practice than a test with a lower LoD" when in fact the LoD was "practically peripheral" and "certainly was not the reason for the disparity [in positivity] the article noted." *Id.*

**E.    The May 1 Press Release**.

23.    The next day, prior to market open, Co-Diagnostics issued a press release titled "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates

16

100% Sensitivity and 100% Specificity Across Independent Evaluations," stating in part:

> [Co-Diagnostics] today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing. The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations include the India National Institute of Pathology, the Mexican Department of Epidemiology ("InDRE"), and others in the US and abroad. Each study concluded 100% concordance for both specificity and sensitivity.
>
> A summary of recent validation data and the data itself can be found here [hyperlink].
>
> In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent Satterfield, PhD said, "In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that."

The above-quoted text included a hyperlink to the data being released (i.e., the PathWest, NIP, InDRE, and Minnesota evaluation results described *supra* SOF ¶¶ 9-12). Ex. 24 at 1-2.

24.    The May 1 PR and attachments were reviewed by several Co-Diagnostics employees, including Dr. Satterfield, Ike Egan, Reed Benson, and Andrew Benson before it was issued. Ex. 12 (Satterfield Tr.) 262:4-12; 303:5-14; Ex. 13 (D. Egan Tr.) 228:18-23; Ex. 62 (R. Benson Tr.) 108:22-109:16; Ex. 20 (A. Benson Tr.) 166:6-13. Dr. Satterfield testified that he genuinely believed (and still believes) that the statements made in the May 1 PR accurately described the performance of the Logix test based on the information available at the time. Ex. 12 at 282:7-13; 297:24-298:11; 298:18-22; 304:1-23; 318:2-14. Other individuals who helped prepare, review, and issue it testified similarly. Ex. 13 (D. Egan Tr.) 217:17-218:9, 220:16-21, 261:14-24, 323:21-324:6; Ex. 20 (A. Benson Tr.) 185:17-186:14; Ex. 63 (Webb Tr.) 75:10-20; Ex. 62 (R. Benson Tr). 126:12-127:16, 163:22-164:16. Cecilia Hutchins testified that she did not review the May 1 PR before it was issued, but that she believes the statements in it were true

"based on the information that we had at that point." Ex. 64 at 178:9-182:4; *see also* Ex. 20 (A. Benson Tr.) 173:25-174:20 (testifying that if Ms. Hutchins was not consulted it was inadvertent).

**F.      The Stock Price Did Not React to the May 1 Press Release**.

25.      Plaintiff claims, and Defendants do not dispute, that the Company's stock traded in an efficient market at all relevant times. SAC ¶¶ 100, 103; Ex. 65, ¶ 9; Ex. 66, ¶ 5.

26.      Co-Diagnostics' stock price rose from $11.34 at the close of trading on April 30, 2020 to $13.47 at close of trading on May 1, 2020. Ex. 65 (Ferrell Rep.) ¶ 7.

27.      It is generally accepted that the statistical significance of stock price movement in excess of what an economic model would predict, all things being equal—an "abnormal return"—should be assessed using a 95% confidence level (i.e., a *t*-statistic with an absolute value of 1.96 or greater indicates statistical significance, because there is less than a 5% chance that the abnormal return was caused by random volatility). Ex. 68, ¶ 21; Ex. 66 (Bettencourt Tr.) 237:20-238:5.

28.      At class certification, Plaintiff's expert Dr. Werner opined that the abnormal return on May 1, 2020 was statistically significant (with a *t*-statistic of 2.34) based on an event study that ran from April 30, 2020 through April 29, 2021. Ex. 65 (Ferrell Rep.) ¶¶ 9-10, 17.

29.      However, Dr. Ferrell's subsequent analysis shows that Dr. Werner's model failed to correct for heteroscedasticity (i.e., the fact that the market was more volatile in the early part of his estimation period, when COVID was new, than in the later part), and that it was not robust to the use of reasonable alternative estimation periods, including shorter periods that Plaintiff's new proposed expert, Mr. Bettencourt, agreed are appropriate. *Id.* ¶¶ 12-13; Ex. 69 (Bettencourt Tr.) 242:13-17; 242:23-243:9. Dr. Ferrell opined that when properly corrected for heteroscedasticity, Werner's own model demonstrates that the abnormal return on May 1, 2020 was not statistically

18

significant. Ex. 65 ¶¶ 22-26. Dr. Ferrell also opined that the fact that Werner's finding of statistical significance for May 1 is not robust to several reasonable alternative estimation periods demonstrates that the finding unreliable and arbitrary. *Id.* ¶¶ 27-33. Thus, Dr. Ferrell concluded that there is no scientific or reliable basis to conclude that the abnormal return on May 1, 2020 was statistically significant. *Id.* ¶ 11.

30.     Bettencourt did not discuss the May 1 stock price movement in either of his reports, and he testified that whether the abnormal return on May 1 was statistically significant was "not germane to my opinion" and "doesn't bear on any of the conclusions in my report." Ex. 69 at 228:24-229:3; 231:13-17; 235:6-236:13. Bettencourt did not dispute Dr. Ferrell's assertion that Werner's model failed to correct for heteroscedasticity, and did not conduct any robustness analysis with respect to the abnormal return on May 1, 2020. *Id.* at 231:6-232:2; 235:6-15.

**G.     Co-Diagnostics' Stock Price Went Up, Not Down, on May 11, 2020 Following an Announcement that Test Nebraska's Validation Had Shown 95% Sensitivity**.

31.     Both Test Nebraska and Test Iowa announced in April 2020 that they were using the Logix test at their testing sites. Exs. 70–74. On May 11, 2020, the Nebraska Governor held a public COVID briefing at which he stated that Test Nebraska's validation showed the tests to be "95% accurate."[2] This was reported in the *Lincoln Journal Star* the same day. Ex. 75. Bettencourt testified that Co-Diagnostics' stock price increased on May 11, 2020. Ex. 69 at 183:4-184:3.

**H.     Announcements and Stock Price Movement During the Trading Day on May 14, 2020**.

32.     On May 14, 2020, at 9:00am ET, the *Salt Lake Tribune* published an article ("May

---

[2] Ex. 67 (Ferrell Rbt.) ¶ 31; Greene Decl. ¶ 75, Gov. Peter Rickets daily COVID-19 briefing (May 11, 2020), https://www.youtube.com/watch?v=Uaprp0oAcN4 (last visited Apr. 8, 2024).

14 SLT Article") reporting that TestUtah "declined to join other major Utah labs in a joint experiment to confirm one another's quality," but that it "agreed to a less-sophisticated 'compromise' experiment to compare results with the state lab." Ex. 94 at 6; Ex. 67 (Ferrell Rbt.) ¶ 9. The article also stated that TestUtah's tests "have a higher 'limit of detection' . . . than most other coronavirus tests approved for sale in the U.S.," citing and linking to the same *BioCentury* article referenced in the April 30 SLT Article. Ex. 94 at 3. Dr. Satterfield testified that in fact Co-Diagnostics told the individuals organizing the joint validation, at the time, that the Company "didn't care if the other parties of TestUtah were [willing to participate] or not, that we were willing to participate . . . that we knew that our test would perform well" but that the Company never received the samples necessary to participate in the joint validation. Ex. 12 at 340:2-11.

33.     Three hours later, at 12:00pm ET, Iowa Governor Kim Reynolds stated in a press conference: "I'm pleased to announce that the [Iowa] State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95% accuracy for determining positives and 99.7% accuracy for determining negatives."[3] Dr. Satterfield, Dr. Bustin, and Dr. Westgard all testified that these results showed excellent accuracy, from a scientific perspective, and that they viewed the Iowa results as consistent with the strong performance of the Logix test described in the May 1 PR. Ex. 12 at 308:13-309:3, 338:1-8; Ex. 8 at 12; Ex. 9 at 149:3-13.

34.     Dr. Ferrell noted that the stock price increased in the morning and early afternoon of May 14, 2020 following the first two allegedly corrective disclosures. Ex. 67 (Ferrell Rbt.) ¶¶ 32-33. Bettencourt did not dispute this. Dr. Ferrell and Bettencourt both opined that the abnormal

---

[3] Ex. 67 (Ferrell Rbt.) ¶ 10; Greene Decl. ¶ 77, Gov. Kim Reynolds, Press Conference (May 14, 2020), https://www.iowapbs.org/shows/governorpress/episode/3544/iowa-gov-kim-reynolds-press-conference-may-14-2020-1100-am.

20

return in Co-Diagnostics' stock price on May 14, 2020 was not statistically significant. Ex. 66 (Bettencourt Rep.) ¶ 111; Ex. 76 (Bettencourt Rbt.) Tbl. 2; Ex. 67 (Ferrell Rbt.) ¶¶ 30, 32-33, 63.

**I.**    **Announcements After-Hours on May 14, 2020, and Trading on May 15, 2020**.

35.    Shortly after the market closed on May 14, 2020, Co-Diagnostics announced its Q1 2020 financial results, reporting lower earnings but higher revenue relative to analyst's consensus forecasts. Ex. 77; Ex. 78 at 5; Ex. 67, ¶ 41. Co-Diagnostics had scheduled an earnings call for 4:30pm ET that day but cancelled it "[d]ue to overwhelming participation on the call" resulting in the conference call service being "unable to accommodate the traffic." *Id.* Instead, at 6:01pm ET, the Company issued a press release with its prepared remarks for the cancelled call. Ex. 79 at 1.

36.    At 7:44pm ET on May 14, the FDA issued a press release ("FDA Press Release") alerting the public to concerns about the accuracy of Abbott Lab's COVID test and stating "[n]o diagnostic test will be 100% accurate due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly." Ex. 80; Ex. 67, ¶ 11; Ex. 66, ¶ 60 n.79.

37.    On May 14, 2020, Co-Diagnostics' stock price closed at $22.13; the following morning it opened at $19.52, dropping to $17.07 by the close on May 15. Ex. 93.

38.    Several news articles attributed the Company's stock price decline after hours on May 14 and on May 15, 2020 to announcement of the Q1 2020 earnings results. Ex. 78 at 5; Ex. 81; Ex. 82 at 5; Ex. 67 (Ferrell Rbt.) ¶¶ 42-43. By contrast, no news article, analyst report, or other market commentary attributed the decline to the FDA Press Release, or in any way related that press release to Co-Diagnostics. Ex. 67 (Ferrell Rbt.) ¶ 40; Ex. 66 (Bettencourt Rep.) ¶¶ 56-61.

**J.**    **Lead Plaintiff Gelt's Trading History**.

21

39.     Gelt purchased and sold Co-Diagnostics' stock as follows:

On May 13, 2020, Gelt purchased 7,000 shares of CODX stock at a price of $21.20 [at 3:18 pm ET] and sold those shares that same day for $22.12 [at 3:50 pm ET], and also purchased 3,000 shares at a price of $23.42 [at 3:58 pm ET] and sold those shares that same day for $23.68 [at 4:51pm ET]. . . . for a net gain of $7,171.90.

On May 14, 2020, Gelt purchased 22,000 shares of CODX at a price of $26.65 [at 6:27 pm ET on May 13, 2020, after market closed] and sold those shares [on May 14, 2020] for $20.97 [at 2:07 pm ET], resulting in a loss of $125,017.77.

Ex. 67 (Ferrell Rbt.) ¶¶ 13, 61-63; SAC ¶¶ 32-33.

**K.     Additional Facts Regarding Scienter and Control**.

40.     Dr. Satterfield did not sell any stock during the class period. Ex. 92. None of the other defendants sold stock during the class period either. Exs. 88–91. Serbin and Durenard each acquired and sold shares between May 19 and 28, 2020, after the class period. Exs. 85, 86.

41.     There is no evidence that any outside director Defendant (Serbin, Nelson, Durenard, and Murphy) was involved in the day-to-day operations of the Company. Serbin testified he was not involved in preparing or reviewing the May 1 PR. Ex. 83 at 117:14-22.

## ARGUMENT

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant need only "point[] out to the court a lack of evidence for [Plaintiff] on an essential element of [its] claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The burden then shifts, and the plaintiff must "set forth specific [admissible] facts" from which a rational jury could find for it. *Id*. This requires more than "a scintilla of evidence"—plaintiff must offer "significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986). "Where the record taken as a whole could not lead a rational trier of fact to

22

find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To prevail under §10(b), Plaintiff must prove, among other things: (1) a materially false or misleading statement; (2) scienter; (3) reliance on the misstatement(s); and (4) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Plaintiff must also prove that it was actually damaged by the alleged fraud in order to have standing to sue or to represent the class. Here, there is no genuine issue of material fact and no rational trier of fact could find for Plaintiff on any of these claim elements.

## I.      MAY 1 PR WAS NOT FALSE OR MISLEADING, MUCH LESS MATERIALLY SO.

This Court has already held that the challenged statements in the May 1 PR—that the Logix test had "consistently and repeatedly achieved 100% clinical sensitivity and specificity" in independent evaluations and that "you can't do better than that"—were not false. Dkt. #101, at 9. Plaintiff's claims now rest on the theory that those literally true statements nonetheless were materially misleading in that they allegedly (i) led investors to believe the Logix tests were "perfect," and (ii) failed to disclose "that the Company's tests ha[d] problems with their accuracy and [were] significantly less than 100% accurate." SAC ¶¶ 64-65, 69. After extensive discovery, the undisputed material facts disprove both assertions: no reasonable investor could have read the statements in context as promising the test would perform perfectly in every situation, and the May 1 PR did not omit any known "problems" with the test's accuracy—which was and is excellent.

### A.      No Reasonable Investor Could Have Been Misled by the Press Release into Thinking the Logix Test would perform "Perfectly" All the Time.

Under *Omnicare*, a statement is only misleading if it would have misled a "reasonable

23

investor" reading it "fairly and in context." 575 U.S. at 186-89, 191, 194 (omission that renders statement misleading "in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame"). That context properly includes a broad swath of public materials: "all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information" as well as other public statements by the company, the "customs and practices of the relevant industry," and other publicly available information. *Id.* at 190-91. Thus, whether a statement was misleading is an objective inquiry focused on a "reasonable investor" who is assumed to be informed about that full context, including a basic understanding of the relevant industry, and who incorporates all public information into their decisionmaking. *See id.* at 186-87.

Here, a "reasonable investor" in a diagnostic testing company must be assumed to have at least a basic understanding of the fundamentals of that industry: how diagnostic test performance is assessed, generally what those performance measures mean, and the fact that even the best diagnostic test will sometimes produce false positives and false negatives. *See id.*; *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (assuming "reasonable investor" in pharmaceutical company would understand FDA approval process and be familiar with standard FDA dialogue and process); *In re Amarin Corp. PLC Sec. Litig.*, 689 F.App'x 124, 132 (3d Cir. 2017) (similar); *Richfield v. PolarityTE, Inc.*, 2023 WL 3010208, at *6 (D. Utah Apr. 19, 2023) (reasonable investor would not have been misled in light of "FDA guidance, [company's] SEC filings, and news reports [that] were all available to investors and provided context"). Dr. Bustin, Dr. Dien Bard, and Dr. Satterfield—all experts in the PCR diagnostic testing field—testified that everyone who knows anything about testing understands at least this: no test can be 100% accurate all the time. SOF ¶ 18; Ex. 4 (Bustin Rep.) at 19-20; Ex. 5 (Bard Rep.) at 2, 10, 14-15; Ex 10 (Bustin Tr.)

102:10-18; Ex 7 (Bard Tr.) 41:10-42:1. Dr. Dien Bard, Dr. Bustin, and Dr. Satterfield all testified that it is common for diagnostic test manufacturers to report results showing 100% sensitivity and 100% specificity for their tests and that no one in the industry would have understood such statements as suggesting that the Logix test was "perfect." SOF ¶ 19. None of this important industry context is disputed.

But even if it were, the undisputed facts also show that the May 1 PR was issued in the midst of a broad, deep, and energetic public discourse on the inherent limitations of COVID tests, which had already alerted the general public to this issue. SOF ¶ 17. News coverage from the time reflects that by May 1, 2020, PCR had become a household name and a topic of widespread debate: even people not previously familiar with this diagnostic technology (or its performance metrics) suddenly needed to understand these issues to protect themselves. *Id.*; Ex 10 (Bustin Tr.) 113:5-114:4. Numerous articles from various sources explained the most important performance metrics for COVID tests (sensitivity and specificity); the many ways in which non-test factors (e.g., collection, storage, transport, inexperience) can cause erroneous results; and the ever-present chance of false positives and negatives with any test. SOF ¶ 17. In short, a variety of public sources in February, March, and April 2020 told the market some version of: "No test is perfect."[4]

Not only was this widely discussed in general, but various public sources—including statements by Defendants—also acknowledged that the Logix test, specifically, was not perfect. Analyst reports in February and March 2020 described the Logix test as having a sensitivity of

---

[4] *E.g.*, SOF ¶¶ 17(c) (3/5/20 Johns Hopkins: "No diagnostic test ever provides complete certainty"); 17(d) (3/26/20 Washington Post: "No test is 100% accurate."); 17(f) ("4/1/20 ABC News: "[A]s with any medical test, the [COVID] test cannot be expected to be accurate 100% of the time"); 17(h) (4/3/20 LiveScience: "No diagnostic test is 100% accurate"); 17(i) (4/6/20 Slate: "No test is perfect"); 17(k) (4/16/20 The Conversation: "No test is 100% accurate").

"99.2%" or ">99%," indicating less than 100%. SOF ¶ 20. Similarly, the April 30 SLT Article—the day before the May 1 PR—described Dr. Satterfield himself as saying "that [Logix] tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe"; again, excellent but not perfect. SOF ¶ 21; Ex. 60 at 10. The April 30 SLT Article also cited and discussed the April 1 *BioCentury* article, which showed the Logix test's official LoD was higher than those of many competitors and incorrectly suggested that a higher LoD indicated a less "sensitive" test that might produce more false negatives. SOF ¶ 21; Ex. 58.

Indeed, Co-Diagnostics' own publicly available "Fact Sheet for Patients" explicitly warned that there is always a small chance the test will give a false positive or negative result. SOF ¶ 20(g); Ex. 59. And when the May 1 PR reported the independent evaluation results, it did not simply summarize them; it attached the performance data and evaluation reports themselves—essential context for understanding the statements in the Press Release. Of note, the PathWest and NIP reports each clearly stated confidence intervals for the performance measures they reported: PathWest showed "100% sensitivity (CI 96.48-100) and 100% specificity (CI 96.52-100)" while NIP showed "100% sensitivity (CI 85.4-100) and 100% specificity (CI 78.1-100)." SOF ¶¶ 9-10; Ex. 94 at 17-19. By definition, these CIs indicated that while the Logix test had correctly identified all positive and negative samples in those evaluations, it might reasonably be expected, in future, to perform with sensitivity as low as 96.48% or 85.5% and specificity as low as 96.52% or 78.1% (i.e., anywhere in the CIs), based on those respective evaluations.

All of these undisputed facts provide crucial context, under *Omnicare*, for assessing whether the May 1 PR would have misled a reasonable investor in context. The inescapable conclusion is that it would not. Amidst constant public discussion of how no COVID test is perfect

in general, and numerous public acknowledgements that the Logix test in particular was not perfect, no reasonable investor could have read the May 1 PR as promising that the Logix test (unlike every other diagnostic test) would perform perfectly all of the time. Accordingly, as a matter of law, Plaintiff cannot prove the statements in the May 1 PR were misleading in this regard.

For essentially the same reasons, Plaintiff also cannot prove materiality. Materiality "depends on the information that already exists in the market. Undisclosed information is material only if its disclosure would have 'significantly altered the total mix of information available' to a reasonable investor." *United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1237-38 (10th Cir. 2014). "A 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Id.*; *see also Basic*, 485 U.S. at 234 (reasonable investor not a "nitwit" with "child-like simplicity"). Thus, "[p]ublic documents are part of that total mix if an investor interested in a particular type of information about a company would know of the existence of the record and could readily access it." *United Food*, 774 F.3d at 1238.

Here, even if statements in the May 1 PR could be read (and they cannot) as misleadingly suggesting the Logix test would always perform "perfectly," Plaintiff still could not prove that this was *materially* misleading. It is undisputed that the May 1 PR was issued against the backdrop of an extensive public dialogue discussing the fact that no COVID test is perfect, as well as public statements from Dr. Satterfield, Co-Diagnostics, and financial analysts acknowledging this with respect to the Logix test specifically. Explicitly stating in the May 1 PR that the Logix test was not "perfect" would not have added anything to this "total mix of information," which was already widely known and readily available from public sources, as detailed above. *See In re PolarityTE,*

27

*Inc., Sec. Litig.*, 2020 WL 6873798, at \*12 (D. Utah Nov. 22, 2020) (dismissing; false statements were not material in context of numerous public sources indicating the opposite); *Chipman v. Aspenbio Pharma, Inc.*, 2012 WL 4069353, at \*5 (D. Colo. Sept. 17, 2012) (same). As a result, Plaintiff cannot prove the element of materiality in the first instance (nor can it rebut Defendants' "truth-on-the-market" affirmative defense, for the same reasons). In light of these undisputed material facts, the May 1 PR could not have materially misled a reasonable investor into believing the Logix test was "perfect" and would perform perfectly all of the time.

### B.    The Performance Data Available to the Company Prior to May 1, 2020 Was Consistent with the Press Release and Did Not Show Accuracy Problems.

Nor did the May 1 PR mislead investors by failing to disclose "problems with [the Logix test's] accuracy" or that it was "significantly less than 100% accurate." SAC ¶ 64. After extensive discovery, Plaintiff has no facts (and there are none) indicating that Defendants "cherrypicked" the results included in the May 1 PR.

This is not surprising: as Dr. Bustin opined (and Dr. Westgard did not dispute), the Logix test is "excellent and highly accurate" (Ex. 4 at 53), and both the sales data and the test performance data available to the Company as of May 1, 2020 reflected this strength. It is undisputed that the results from independent evaluations attached to the May 1 PR, as well as non-public evaluation results from Timpanogos and Gentech, all showed the Logix test performing with 100% sensitivity and 100% specificity. SOF ¶¶ 9-13; Ex. 4 at 25-36. And those excellent results were supported by strong sales from around the world, indicating that labs were consistently finding the Logix test to be sensitive and specific enough for them to want to purchase it. SOF ¶ 7; Ex. 5 at 7-8; Ex. 9 (Westgard Tr.) 98:12-22. As for the NIV, Greek, and South African lab issues, Dr. Satterfield and Dr. Bustin testified (again, undisputed), that the communications with those labs in April 2020

28

conclusively showed, to their expert eyes, that the performance issues observed in those labs were caused by contamination, were not credible indicators of the test's performance, and were not inconsistent with the statements in the May 1 PR. SOF ¶¶ 14-16.[5] Even if Dr. Westgard's opinions were to be admitted in this case (and they should not be), he did not opine or testify to the contrary.

Nor did the unfounded concerns raised in the April 30 SLT Article reflect an undisclosed problem with the Logix test's performance. Dr. Satterfield's undisputed white paper, and Dr. Bustin's uncontested testimony, establish that the lower positivity rate at TestUtah sites in April 2020 was because they were testing people with fewer and less severe symptoms (not, as the Article posited, because the Logix test had a higher LoD or lower sensitivity). SOF ¶¶ 21-22. Once TestUtah adopted the stricter "symptomatic" screening criteria used by other Utah sites, the disparity disappeared. *Id.* As for any post-May 1, 2020 validations or publications that show the Logix test performing with less than 100% sensitivity or specificity, they are irrelevant: whatever their merit, they did not exist when the May 1 PR was issued and could not render it misleading.[6]

Thus, the undisputed material facts show that, as of May 1, 2020, it was true and not misleading for the Press Release to report that the Logix test had "consistently and repeatedly" shown 100% sensitivity and 100% specificity on independent evaluations comparing it against other tests using real-patient samples. The May 1 PR truthfully described these results—clearly stating they were based on particular evaluations (as opposed to inherent properties of the test). Co-Diagnostics also attached the evaluation reports and data to the Press Release, so readers could

---

[5] Ex. 10 (Bustin Tr.) 229:24-230:21 ("Q: Can you conclusively testify that there was contamination in India and in Greece? A. Yes. . . . Q: Eliminating all other doubts? A. Yes. . . . [also re South Africa:] "I'm as certain as I can be that there's contamination . . . . 95 percent [certain]").

[6] Dr. Westgard agreed these are "not relevant" to the May 1 PR. Ex. 9 at 99:13-19, 193:1-194:8.

review the details for themselves. And the undisputed material facts establish that Co-Diagnostics was not aware of any credible, material performance data that contradicted those statements. On this record, no rational trier of fact could find that the May 1 PR was materially false or misleading, and summary judgment should be entered for Defendants.

## II.   PLAINTIFF CANNOT PROVE SCIENTER.

Summary judgment is also appropriate because no reasonable trier of fact could conclude that Dr. Satterfield or Co-Diagnostics acted with "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Scienter is a state of mind that embraces both intentional misconduct and recklessness, but "recklessness in this context is a particularly high standard, . . . closer to a state of mind approximating actual intent." *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020). With respect to a corporate defendant, courts "look to the state of mind of the individual corporate official or officials who ma[d]e or issue[d] the statement." *Id.* at 1313. Thus, Plaintiff must prove that Dr. Satterfield and/or Ike Egan or Reed Benson (the two officer Defendants involved in preparing the Press Release) made the statements therein intending to deceive investors. Plaintiff cannot do so, for multiple reasons.

First, the undisputed material facts uniformly demonstrate that Dr. Satterfield, Ike Egan, and Reed Benson acted in good faith and had no intention of misleading investors. SOF ¶ 24. Dr. Satterfield genuinely believed the May 1 PR accurately described the Logix test's performance, and with good reason: all of the independent evaluations available to the Company at the time showed the test to have performed with 100% sensitivity and 100% specificity; there were no credible evaluation results to the contrary. *Supra* 28-30; SOF ¶¶ 8-16, 24. At deposition, Dr. Satterfield described how he carefully surveyed and reviewed the available performance data

before helping to draft what he considered to be an accurate description in the May 1 PR. Ex. 12 at 303:10-14 ("I requested every piece of data we could get our hands on. I was severely disappointed that we could not make more data public. We looked at all of it that was available to us."); *id.* at 202:8-18 ("The only thing that we were able to state is what the data was giving us . . . . And in the handful of studies that we got back that we had permission to put into our press release, we had a hundred percent concordance, meaning . . . we were seeing a hundred percent sensitivity, a hundred percent specificity in those data sets."). Ike Egan and Reed Benson testified similarly, both as to the extensive review process and their belief that the final version was accurate. SOF ¶ 24; Ex. 13 at 217:17-218:9, 228:18-23; Ex. 62 at 108:22-109:16.[7]

While Dr. Satterfield and others were aware of certain communications with the NIV and Greek labs regarding issues those labs were experiencing, they testified that it was obvious at the time that those results were due to contamination and therefore not credible, concerning, or appropriate to include in the May 1 PR. SOF ¶¶ 14-16; Ex. 38 at 1 (email re Greek lab: "Strongly suspect contamination here."); Ex. 31 at 3 (similar re NIV);  Ex 13 (D. Egan Tr.) 119:10-19 (re NIV: "To us it was obvious on its face that it was a noncredible test."). And while Dr. Satterfield did not recall knowing about the South African issues at the time, he testified that they would not have concerned him for the same reasons. Ex. 12 at 304:1-23. Dr. Bustin similarly opined (and Westgard did not dispute) that "anyone with PCR experience" would not have credited the NIV,

---

[7] *See also* Ex. 13 (D. Egan Tr.) 220:16-21 ("Should I have lied to the FDA and said, 'Well, everything said 100 [%], 100 [%]; but we're going to put 93 and 87'? I mean, we put what the data said. The data speaks for itself."); Ex. 62 (R. Benson Tr.) 163:22-164:6 ("[May 1 PR] is specifically limited to . . . the results of some clinical evaluations of independent lab[s] that had achieved certain results. And all of those results and the data we [attached] to it, so it would be complete, and anybody could know exactly what tests we were talking about and [their] limits").

Greek, and South African results and would have attributed them to contamination—corroborating the views expressed by Dr. Satterfield and others. SOF ¶ 16.

More generally, Dr. Satterfield testified that it never occurred to him that anyone could possibly read the May 1 PR as promising the test would always perform perfectly, particularly in light of the widespread, public recognition that no test is 100% accurate all of the time (SOF ¶ 18):

> **A:** I didn't have any concerns whatsoever on that. It's my job to report the data. I was reporting it accurately. If I would have said anything else like we got 90 percent sensitivity or 90 percent specificity, that would have been false information.·. . . "You can't do better than that" is accurate in that you cannot get better than a 100 percent result in an evaluation. . . . You just can't.
> **Q:** . . . [D]id you have any concerns that the public would misconstrue this to – to say, "Co-Diagnostics is telling us their test is a hundred percent accurate"?
> **A:** No. . . . That [no test is perfect] is the most elementary understanding in diagnostics. . . . It is so clearly understood that it just – it's just not something that you expect anyone else would ever misunderstand who has any understanding of what a diagnostic test is.

Ex. 12 at 297:24-299:17. Ike Egan testified similarly, noting that the May 1 PR spoke about Logix test's performance in the "common parlance" of the industry and attached the underlying data.[8]

Against all this strong, undisputed evidence of good faith, Plaintiff has nothing—no facts evidencing intent to deceive, no motive to do so, and nothing suggesting that Dr. Satterfield, Ike Egan, or Reed Benson acted with a "recklessness . . . approximating actual intent." *Smallen*, 950 F.3d at 1312. None of the three sold any Co-Diagnostics stock during the class period or personally benefitted from the purported fraud in any way—this lack of motive cuts strongly against scienter. SOF ¶ 40. *See, e.g.*, *Smallen*, 950 F.3d at 1310-11 (lack of unusual sales by defendant "militate[s]

---

[8] Ex. 13 at 218:13-23 ("This is the way that every other COVID-19 manufacturer reported their results . . . [many] of them also cited 100 [%] sensitivity and 100 [%] specificity. . . . It was basically de rigueur in the industry."); *id.* 220:5-13 ("[Readers didn't] need to have a specialized knowledge. They [used] the common parlance of the industry in the press release; and we're showing, through the hyperlinks, the data that supports what we're talking about. So . . . they can look at the data, they can look at the actual field testing . . . and make their own determination.").

against" scienter); *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015) ("the absence of any allegation of a financial benefit [from stock sales] from the alleged fraud cuts" against scienter); *Shuster v. Symmetricom, Inc.*, 35 F.App'x 705, 707 (9th Cir. 2002) (affirming summary judgment for lack of scienter where defendants "did not sell any of their stock holdings" during class period). Nor did any other individual Defendant sell stock during the class period: the earliest of the "late May" (SAC ¶¶ 91, 95) stock sales by Defendants Serbin and Durenard did not take place until May 19, 2020, after the class period had ended and any artificial inflation in the stock price, by definition, had dissipated. SOF ¶ 40. This too cuts against scienter, both as to Dr. Satterfield and the corporate entity. *See Smallen*, 950 F.3d at 1311 (other defendants' lack of class-period sales "undermine[s] [Plaintiff's] theor[y] that negative information was withheld to obtain a higher sell price"); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (affirming summary judgment in part because lack of insider sales negates an "inference of scienter").

In short, the documents and testimony all show the same thing: the Defendants were employing industry-standard terminology to speak truthfully about the past performance of a product they genuinely believed was exceptionally good. They had no motive to (and did not) intentionally mislead investors about the Logix test's performance. It is an exceedingly rare case where a plaintiff can prove scienter absent compelling motive and/or a smoking gun. This is not that case: on this record, no reasonable jury could find that Dr. Satterfield or the corporate entity acted with scienter, and Defendants are entitled to summary judgment on this basis.

## III.    PLAINTIFF CANNOT PROVE RELIANCE.

Defendants are also entitled to summary judgment because the undisputed material facts

prove the May 1 PR did not impact Co-Diagnostics' stock price, thereby rebutting the fraud-on-the-market presumption of reliance on which Plaintiff's claims depend.

The fraud-on-the-market theory "recogniz[es] a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013). The "fundamental premise" of this presumption is that "investors rely on the market price of a company's security," which, in an efficient market, quickly incorporates all available information, including any false or misleading statements. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117-18 (2021). If the alleged misrepresentations did not actually impact the stock price, however, then "*Basic*'s fundamental premise completely collapses." *Id*. at 119. Thus, Defendants can rebut the fraud-on-the-market presumption with "appropriate evidence" that the alleged misstatement did not in fact impact the stock price. *Halliburton II*, 573 U.S. at 279-80. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade . . . [will] rebut the presumption of reliance." *Basic*, 485 U.S. at 248. And "without [this] presumption . . . a Rule 10b-5 suit cannot proceed as a class action [and] [e]ach plaintiff [must] prove reliance individually." *Halliburton II*, 573 U.S. at 281-82.

Here, the undisputed material facts prove that the May 1 PR did not impact Co-Diagnostics' stock price. Plaintiff alleges Co-Diagnostics' stock traded in an efficient market and that "[t]he market . . . understood [the May 1 PR] to mean [Logix] tests were perfect—sending the Company's share price soaring." SAC ¶ 69. But that is not, in fact, what happened: the undisputed evidence shows that the Company's stock price movement on May 1, 2020 was not statistically significant— i.e., it could not be distinguished from random chance. SOF ¶¶ 29-30. While Plaintiff's expert at

34

class certification, Dr. Werner, found the abnormal return on May 1 to be statistically significant, Dr. Ferrell's expert analysis showed that Werner's model was critically flawed in two different ways—it failed to account for heteroscedasticity, and it was not robust to reasonable alternative estimation periods—and opined that when corrected for these flaws, Werner's own model showed the abnormal return on May 1 was *not* statistically significant. SOF ¶ 29. Bettencourt's testimony (even if the Court were to allow it) does not create a genuine issue of material fact on any of these issues: he did not discuss the May 1 stock price movement at all in his reports; he did not dispute Dr. Ferrell's finding that Werner failed to correct for heteroscedasticity; he conceded that he did not conduct a robustness analysis regarding the abnormal return on May 1; and he testified that whether the abnormal return on May 1 was statistically significant was "not germane to my opinion" and "doesn't bear on any of the conclusions in my report." SOF ¶ 30.

Thus, there is no genuine issue of material fact—the abnormal return on May 1, 2020 was not statistically significant. This "severs the link" between the challenged statements and the price paid by Plaintiff and the class, thereby rebutting the presumption of reliance and making it necessary for each class member to prove, individually, that they personally relied on the May 1 PR when they traded in Co-Diagnostics' securities during the class period. *Basic*, 485 U.S. at 248. Because Lead Plaintiff Gelt cannot prove its individual reliance, judgment should be entered against it. And because the undisputed material facts rebut the presumption of reliance, this action cannot be maintained as a class action and the class must be decertified.

## IV.    PLAINTIFF CANNOT PROVE LOSS CAUSATION.

Nor can Plaintiff prove that its alleged losses were caused by the challenged statements. The securities laws are not meant "to provide investors with broad insurance against market losses,

but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Accordingly, "[P]laintiff bears the burden of showing that [its] losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *In re Williams*, 558 F.3d at 1137.

The central premise of this case is that the May 1 PR artificially inflated the stock price by misleading investors into believing that the Logix test would be 100% accurate in every circumstance, and that Plaintiff suffered losses when the purportedly hidden truth—that the test was not, in fact, perfect—was revealed two weeks later by three allegedly corrective third-party announcements. Plaintiff seeks to prove this through the (purportedly) expert reports and testimony of Mr. Bettencourt, whose methodology is scientifically unsupported and unreliable, as detailed in the accompanying *Daubert* motion to exclude. If the Court grants that motion, then it must grant this one as well since Plaintiff will have no remaining evidence on loss causation. But the Court need not exclude Bettencourt in order to find for Defendants on this element (or any other). Even with Bettencourt's testimony, Plaintiff cannot prove loss causation because the undisputed facts show: (i) the allegedly corrective disclosures did not "correct" any alleged misstatement, and (ii) the corrective disclosures did not cause a statistically significant drop in the stock price.

Plaintiff identifies three allegedly corrective disclosures on May 14: (1) the May 14 SLT Article (at 9:00am ET), which announced that TestUtah had declined to participate in a state-wide validation; (2) the Iowa Governor's announcement (at 12:00pm ET) that Test Iowa's validation had shown 95% sensitivity and 99.7% specificity; and (3) the after-hours FDA Press Release (at 7:44pm ET) raising concerns about the accuracy of Abbott Lab's COVID test, and reminding the public that "[n]o diagnostic test will be 100% accurate." SOF ¶¶ 32-33, 36; SAC ¶¶ 74-84.

36

But the undisputed facts show that none of these three news items actually corrected any statement in the May 1 PR. *TestUtah*'s decision not to participate in a state-wide validation had nothing to do with Co-Diagnostics, and it said nothing about the Logix test itself; indeed, Dr. Satterfield's undisputed testimony establishes that Co-Diagnostics wanted to participate in the joint validation and tried to do so. SOF ¶ 32. And while the May 14 SLT Article repeated the April 30 SLT Article's incorrect speculation that the Logix test's LoD might be negatively impacting its performance (again referencing the April 1 *BioCentury* article) (SOF ¶¶ 21, 32), this too did not reveal any truth previously hidden by the May 1 PR—both the test's LoD and this speculation were public knowledge prior to May 1 as well as May 14. Mere "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (affirming summary judgment for lack of loss causation); *see also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (same; "[T]he mere repackaging of already-public information . . . [is] insufficient to constitute a corrective disclosure"); *In re PolarityTE*, 2020 WL 6873798, at *12 (same).

Nor could the Test Iowa validation results correct the May 1 PR, for multiple reasons. Most importantly, the 100% sensitivity and 100% specificity results announced in the May 1 PR were explicitly in reference to specific, earlier independent evaluations. The Test Iowa results constituted new data from a new validation, not a correction of those previously announced data. Indeed, even the fact that the Logix test showed 95% sensitivity on an independent evaluation was not new at this point: on May 11, the Nebraska governor had announced that Test Nebraska (which also used the Logix test) had shown 95% sensitivity in its validation—the same result Test Iowa announced three days later. The parties agree that the stock price increased the day of the Nebraska

announcement (SOF ¶ 31), and Plaintiff has no explanation as to why the Test Iowa announcement on May 14 was allegedly corrective when the Nebraska announcement on May 11 was not. In any case, Dr. Satterfield, Dr. Bustin, and Dr. Westgard all testified that they viewed the Test Iowa validation results as consistent with and confirming, rather than correcting, the statements in the May 1 PR because they, like the independent evaluation results announced in the Press Release, demonstrated the Logix test's excellent performance. SOF ¶ 33.

As for the after-hours FDA Press Release, this had nothing to do with the Logix test, and, as detailed above, the fact that "no diagnostic test will be 100% accurate" had been the topic of extensive public discussion for months. SOF ¶ 17. Plaintiff cannot point to a single analyst or other report linking the FDA Press Release to Co-Diagnostics or its stock price decline on May 15.

Finally, even if Plaintiff could show that one or more of these announcements "corrected" the May 1 PR (and it cannot), no reasonable trier of fact could conclude that they caused the stock decline on which Plaintiff's claims rest. The parties agree that the abnormal return on May 14, 2020 was not statistically significant. SOF ¶ 34. This means that the first two alleged corrective disclosures—made early in the trading day on May 14—cannot have caused the alleged loss: in an efficient market (as the parties agree this was), those allegedly "startling" (SAC ¶ 74) disclosures were rapidly incorporated into the stock price, which did not decrease statistically significantly until the next day. In an efficient market, only the after-hours FDA Press Release could even theoretically have caused the price decline on May 15, but the FDA Press Release had nothing to do with Co-Diagnostics, did not correct any statement in the May 1 PR, and Plaintiff has not identified any news article, analyst report, or other market evidence attributing the May 15 stock price decline to the FDA Press Release. SOF ¶¶ 36, 38; Ex. 84 (Ferrell Tr.) 108:25-109:8. By

contrast, several news sources attributed the stock drop to the Q1 2020 financial results. SOF ¶ 38. No reasonable trier of fact could find that the alleged misstatements in the May 1 PR caused the alleged loss, and Defendants are entitled to summary judgment. *See In re Williams*, 558 F.3d at 1143 (affirming summary judgment; "there is simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss"); *In re Omnicom, Inc. Sec. Litig.*, 541 F.Supp.2d 546, 554 (S.D.N.Y. 2008) (similar).

## V.   GELT LACKS STANDING TO SUE OR REPRESENT THE CLASS.

For a § 10(b) claim, a plaintiff must prove that it "suffered damages as a result of [its] reliance [on the alleged misstatements]." *TDC Lending LLC v. Priv. Cap. Grp., Inc.*, 340 F.Supp. 3d 1218, 1225 (D. Utah 2018). Here, the undisputed facts show that Gelt did not, in fact, suffer any damages from the purported fraud. Gelt enjoyed a net gain from the 10,000 Co-Diagnostics shares that it purchased on May 13, 2020 and sold by the end of that same trading day, well before the first alleged corrective disclosure. SOF ¶ 39. As for the 22,000 shares Gelt purchased after-hours on May 13, 2020 (at 6:27pm ET), Gelt sold those in the middle of the trading day on May 14, 2020 (2:07pm ET), after the first two allegedly corrective disclosures. *Id.* Because the parties agree that the abnormal return on May 14 was not statistically significant, there is no economic evidence from which to conclude that any price decline that impacted Gelt's sales that day was attributable to the first or second alleged corrective disclosures. SOF ¶¶ 34, 39; Ex. 65 (Ferrell Rep.) ¶¶ 62-63. And even if the Court were to allow Bettencourt's testimony and credit his two-day event window (and it should not), that would not create a genuine issue of material fact because a statistically significant price drop on May 15, whatever its cause, cannot have caused a loss *for Gelt,* which sold the last of its Co-Diagnostics stock during the trading day on May 14. SOF ¶39.

39

Because the undisputed material facts show Gelt was not harmed by the alleged fraud, Gelt lacks standing to bring its claims and cannot adequately represent the interests of the class. *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (vacating certification; "class representative must . . . possess the same interest and suffer the same injury as the class"); *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 950 (10th Cir. 2003) (remanding for decertification where class representative lacked standing). Accordingly, Gelt's individual claims must be dismissed and the class must be decertified unless Lead Counsel can produce a lead-plaintiff candidate who was actually injured by the alleged fraud and can adequately represent the interests of the class.

## VI.     SECTION 20(a) CLAIM ALSO FAILS.

Because Plaintiff cannot prove its primary § 10(b) claim, the Court must enter judgment against it on the § 20(a) claim as well. *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1270 (10th Cir. 2001). Moreover, even if Plaintiff could prove its § 10(b) claim, Plaintiff cannot prove that outside director defendants Nelson, Durenard, Murphy, and Serbin exercised sufficient control over day-to-day operations to be liable under § 20(a). Simply demonstrating that "a person was a member of a corporation's board" is insufficient; Plaintiff must offer specific evidence that "the person individually exerted control or influence over the day-to-day operations of the company." *Solid Q Holdings, LLC v. Arenal Energy Corp.*, 2017 WL 782283, at *2 (D. Utah Feb. 28, 2017). Because Plaintiff cannot do so, it cannot prove its control-person claim against them. *Id.*

### CONCLUSION

For all of these reasons, the Court should grant the Defendants' motion for summary judgment and dismiss the case in its entirety with prejudice.

Dated:  April 10, 2024                    **BAKER & HOSTETLER LLP**


By:  ___*/s/ Douglas W. Greene*___
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 10th day of April, 2024, a copy of the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT was filed with this Court's CM/ECF system, which will send notification to all counsel of record.

/s/ Douglas W. Greene
Douglas W. Greene

42