# Exhibit 6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, <br><br><br> Plaintiff, <br><br> v. <br><br> CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, <br><br><br> Defendants. | Case No. 2:20-cv-00368-JNP-DBP <br><br> **DECLARATION OF DR. JENNIFER DIEN BARD IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead |

**DECLARATION OF DR. JENNIFER DIEN BARD IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Dr. Jennifer Dien Bard** declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Professor of Pathology (Clinical Scholar) at the Keck School of Medicine at the University of Southern California in Los Angeles, California. In addition, for the past 11 years, I have worked at Children's Hospital Los Angeles (CHLA) as the Director of the Clinical Microbiology and Virology Laboratories; as of July, 2023, I am also the Interim Division Chief of Laboratory Medicine at CHLA. As part of my role as clinical director, I oversee all development, verification/validation studies, and implementation of clinical assays in CHLA's Microbiology and Virology Laboratories. I submit this Declaration Of Dr. Jennifer Dien Bard In Support of

Defendants' Motion For Summary Judgment. I declare that I have personal knowledge of the facts set forth herein and I could and would testify competently thereto if called as a witness at trial.

2.    On or about January 18, 2024, I signed and issued the Rebuttal Expert Report of Dr. Jennifer Dien Bard (the "**Rebuttal Report**"). Attached hereto is a true and accurate copy of the Rebuttal Report. I drafted and issued the Rebuttal Report, which contains my expert opinions and sets forth the analyses that form the basis of my opinions with respect to the report prepared by James O. Westgard, served on Defendants on December 4, 2023.

3.    I have personal knowledge of the facts stated in this Declaration and the facts and opinions contained in the Rebuttal Report. If called as a witness at trial, I could and would competently testify to those facts and opinions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 9, 2024, at Los Angeles, California.

_____
Dr. Jennifer Dien Bard

2

4871-3602-1685.1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, <br><br><br> Plaintiff, <br><br> v. <br><br> CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, <br><br><br> Defendants. | Case No. 2:20-cv-00368-JNP-DBP <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead |

**REBUTTAL EXPERT REPORT**
**OF DR. JENNIFER DIEN BARD**

**January 18, 2024**

**<u>Scope of Assignment</u>**

I have been asked by Co-Diagnostics' counsel, Baker & Hostetler LLP, to evaluate the report prepared by James O. Westgard at the request of Plaintiff's counsel in this action, titled "Validation of Performance of Qualitative Tests" (the "Westgard Report"), and to offer my opinion with respect to certain statements in the Westgard Report.  As in my initial report in this matter, dated November 29, 2023, below I utilize my diverse experience in my current role as well as prior experience and my formal education and training to address certain assertions made in the Westgard Report with respect to verifying, validating, and implementing COVID-19 tests like the Logix Smart Test in the spring of 2020. The opinions stated below are solely my own and not of my employer.

**<u>Qualifications, Remuneration, and Materials Considered</u>**

My expert qualifications and remuneration are the same as described in my initial report, dated November 29, 2023, and exhibits thereto.

In forming the opinions expressed in this report, I considered the materials referenced herein, as well as the materials referenced in my initial expert report and the exhibits thereto.

**<u>Opinion</u>**

I.    **<u>Westgard's expertise is in quality control, not COVID-19 diagnostic testing.</u>**

Westgard is recognized as an expert in quality control (QC) and quality assurance (QA). He is known for the development of a multi-rule QC procedure—called, the Westgard rules—which is used to interpret QC data plotted on a Levy-Jennings chart.[1]  This procedure is commonly applied in the evaluation of biochemical tests in a clinical chemistry laboratory. The Westgard rules may also sometimes be applied in a clinical microbiology laboratory, but only in

---

[1] A Levy-Jennings chart is a graph that quality control data are plotted on to allow for users to visualize the quality control data and identify any erroneous data points.

limited circumstances. This is because the investigative focus, methods, and practices of a clinical chemistry lab and a clinical microbiology lab differ greatly. Clinical chemistry tests are often highly analytical and quantitative. Unlike a molecular result like SARS-CoV-2 PCR that is reported as "detected" or "not detected", chemistry tests are reported with a numerical value and depending on the reference range the value is interpreted as normal, elevated or low. An elevated or low value may be considered critical and require urgent clinical intervention (e.g., sodium and potassium levels). These tests are also monitored longitudinally in patients. Thus, it is imperative that chemistry laboratories have a robust QA/QC program that monitors numerical values to ensure continuous accuracy and precision. In the context of a microbiology lab, the Westgard rules are only applied to assess the acceptability of the QC and QA procedures for quantitative molecular tests, such as viral load measurements of Herpesviruses, HIV, and BK virus. They are not usually used to assess qualitative molecular tests, like the Logix Smart Test and other SARS-CoV-2 PCR tests, which typically are only used for quantitative measures as an intermediate step to produce qualitative results (i.e., a positive or negative result).

Instead, per CLIA regulations, the laboratory director or designee is responsible for establishing QC and QA rules used in the laboratory to determine whether both qualitative and quantitative patient test results are acceptable to report. Monthly monitoring of QC acceptability limits by calculating standard deviations (SD) and coefficient variations (CV) (part of the metrics needed to plot a Levy-Jenning chart and to apply optional Westgard rules) are only required for quantitative molecular assays, and are not usually done for qualitative assays like COVID PCR tests. There are no requirements for microbiology laboratories performing quantitative or qualitative molecular tests under CLIA or College of American Pathologist (CAP) regulations to apply Westgard rules, and most, including all of the labs I have worked in and run, do not.

Indeed, based on his background as described in the Westgard Report, Westgard seemingly has limited experience with infectious disease diagnostic tests and no direct experience with SARS-CoV-2 PCR tests. Despite his expertise in QC and QA (which, again, is not relevant to qualitative molecular tests, like RT-qPCR tests for COVID), he does not appear to have the necessary knowledge and experience to opine on matters related to the reliability of COVID-19 diagnostic test verifications, validations, or other evaluations.

Westgard's unfamiliarity with COVID tests is evident throughout his report. For example, Westgard opines that some of the primary difficulties labs faced in validating the performance of COVID-19 tests in the early months of the pandemic were "(a) how exactly should the precision and accuracy be determined experimentally, (b) how should the data be calculated, (c) what measures of performance should be employed, and (d) how claims should be expressed." (p.24). But the "difficulties" identified by Westgard illustrate his lack of experience in this space and how out of scope this topic is for Westgard. I was on the frontlines, running a clinical microbiology and virology laboratory during the early months of the COVID pandemic, and the most pressing and challenging issues we faced were limited access to reagents/kits and positive specimens to conduct evaluations – not the issues Westgard identifies. SARS-CoV-2 was a new virus, but the methods and practices for determining the accuracy and precision of RT-qPCR tests were already well established, and clinical microbiology labs like mine were experienced in calculating, analyzing, and reporting performance data for molecular diagnostic tests like the Logix Smart Test. And Westgard's opinion that many laboratory staff "had difficulties [understanding PPA and NPA] because they were primarily experienced with quantitative tests" (Westgard Report, p.24) exposes his lack of personal knowledge of or experience with the medical laboratory scientists working in the microbiology labs that were on

the front lines of the pandemic response. In fact, to the extent laboratories had difficulties running PCR tests like the Logix Smart Test early in the pandemic, it typically was because they lacked experience with high-complexity molecular testing.

II.    **Performance Measures Derived from Contrived Samples, Smaller Numbers of Samples, and Comparative Testing Are Still Reliable.**

Westgard's opinion regarding the number and types of samples needed to reliably evaluate the performance of a diagnostic test further illustrate his lack experience in the field of molecular (as opposed to chemical) diagnostic tests, especially during the early months of the COVID pandemic. As an initial matter, Westgard suggests that validations should conform to the guidelines set forth by the Clinical and Laboratory Standards Institute (CLSI), which call for "50 positive and 50 negative patient specimens to provide minimally reliable estimates of sensitivity and specificity." (Westgard Report, p.13). This approach may be feasible for validations of chemistry tests, which are often lower in cost and have more abundant specimens, but for molecular infectious disease tests, especially for new diseases, this approach is usually unrealistic. It is common for clinical microbiology and virology laboratories, including mine, to use fewer than 50 positive and 50 negative samples for verifications/validations of new diagnostic tests, and those evaluations still produce reliable sensitivity and specificity estimates—they simply have larger confidence intervals, due to the smaller sample size. Using a larger number of samples is more common and appropriate when validating a laboratory-developed test (i.e., a test that has not been cleared by the FDA for in vitro diagnostic use, or an FDA-cleared test that has been modified to deviate from the manufacturer's insert), but for assays that have been cleared by the FDA for diagnostic use—including Emergency Use Authorization ("EUA")—testing 10-20 positive and 10-20 negative samples is standard practice and sufficient. In the early months of the COVID-19 pandemic, with a supply-chain crisis and

4

limited positive samples available, the CLSI recommendation of 50 positive and 50 negative samples was impossible for most (if not all) laboratories. In fact, following the CLSI's recommendation for a single validation would likely have fully depleted an entire monthly allocation of COVID samples for many labs at the time. Companies and laboratories that opted to pursue FDA EUA for a COVID-19 diagnostic test were required to meet FDA requirements, not CLSI recommendations. For laboratories evaluating assays that had already received EUA, verification/validations studies were generally run according to CLIA or CAP guidelines (if applicable) and the number of samples included was determined by the laboratory director.

It is also unrealistic and inaccurate for Westgard to criticize the use of contrived samples in evaluating COVID PCR tests and question the reliability of the performance estimates generated from such samples.[2] (Westgard Report, p.25). In the early months of the pandemic, it was extremely difficult to obtain positive clinical samples, and many labs instead had to use contrived samples for their verification/validation studies. This practice was deemed acceptable by the FDA; likewise, CLIA and CAP consider contrived specimens obtained from external control material, cultured organisms, and even proficiency testing material seeded into clinical samples to be sufficient for validating the performance of a COVID-19 diagnostic test.

In addition, I disagree with Westgard's assertion that the terms positive percent agreement (PPA) and negative percent agreement (NPA) are "more common" ways to report estimates of sensitivity and specificity when performance is measured by comparing one test to

---

[2] Indeed, Westgard appears to contradict his own opinion on this point, as he opines later in his report that the data submitted for FDA EUA—generated from contrived samples—were the "most important" data available to Co-Diagnostics as of May 1, 2020 (Westgard Report, p.21).

another rather than to an established "gold standard." (Westgard Report, p.15).[3] The use of the terms sensitivity and specificity is just as common (if not more common) than the use of PPA and NPA when a comparative method is used. There are an abundance of peer reviewed publications using the terms sensitivity and specificity in lieu of PPA and NPA when comparing one SARS-CoV-2 PCR test against another. Indeed, for validations performed in my labs, we most frequently use the terms sensitivity and specificity even when they are the result of a comparative analysis. This is also a common practice (as it was during the early months of the COVID pandemic) for test manufacturers when communicating about their products. Regardless of the terminology, I agree with Westgard that the calculations of sensitivity and specificity are identical to calculations of PPA and NPA, respectively. However, the formulae in Westgard's Report (p.12) for PPA and NPA are incorrect, although the labels that he uses above the formulae are correct (should be PPA = 100% x TP/(TP+FN) and NPA = 100% x TN/(TN+FP)).

### III. Westgard's Attacks on the Reliability of the Independent Evaluations Attached to the May 1 Press Release Are Unwarranted.

Westgard's opinion that "it is difficult to assess the reliability of the data and the subsequent claims of performance" in the validation studies referenced in the May 1 Press Release because the validations were not peer reviewed is not supported by industry practices. Lab verification and validation studies for diagnostic tests are rarely published in peer-reviewed journals; there is no expectation that they would be, and the fact that a validation is not peer-reviewed says nothing about its reliability or lack thereof. It is not standard practice for laboratories to seek publication of validation studies, in part because drafting manuscripts and pursuing publication takes time, effort, and scholastic expertise that is not available in many labs

---

[3] I do, however, agree with Westgard's assertion that the limit of detection (LoD) "does not directly predict clinical usefulness" and that a test's clinical sensitivity and specificity (i.e., its ability to identify true positive and negative cases in patients) is more important than the LoD.

or institutions (particularly non-academic ones), and also because it is difficult for simple validations, without more, to generate sufficient interest at reputable journals to be accepted for publication. In any event, for most labs, it would have been practically impossible to pursue peer-review of a test validation during the early months of the COVID pandemic when laboratory scientists and staff were over extended and primarily focused on stopping the spread of the virus.

Westgard's suggestion that the validations referenced in and attached to the May 1 Press Release were not "independent" and thus are unreliable is equally without merit. (Westgard Report, p.20). It is a common practice for test manufacturers to offer assistance to laboratories that are evaluating their tests throughout the validation process, and this often includes providing validation report templates or assisting with the data analysis and summary. I am not aware of, nor does Westgard point to, any evidence indicating that the validations were anything other than independent. The mere fact that a test manufacturer or other third party summarized the data does not change the results of the validation or make them unreliable.[4]

Further, Westgard's criticism of the way in which the Australian Pathwest study handled discrepant results is also unwarranted (Westgard Report, p.22). The Australian study addressed initial discordant results by re-testing the specimen with both assays. This is the well-recognized best practice when a comparative method is used to validate a test: discrepant results are investigated with additional testing, and the fact of those discrepant results, and how they were ultimately handled, is disclosed. If repeat testing resolves the discrepancies, then the subsequent results are usually interpreted as agreement between the assays and this is reflected in the

---

[4] Nor does Co-Diagnostic's desire to make the data available for inclusion in the May 1 Press Release call into question the reliability of the validation report or the data set.

performance characteristics calculated. The way in which the Australian study addressed discrepant results through re-testing and disclosed its approach is the typical and expected practice for microbiology labs and accords with how my labs have handled discrepant results when performing diagnostic test verifications/validations.

While not a direct attack on the reliability of the validations at issue, Westgard suggests that the data submitted for FDA EUA were the "most important" data available to Co-Diagnostics as of May 1, 2020 (Westgard Report, p.21). I disagree. While Westgard is correct that the data submitted for FDA EUA are important, those data were generated by Co-Diagnostics itself from contrived samples (as Westgard himself points out on p.21). In contrast, the independent evaluations referenced in and attached to the May 1 Press Release were conducted by independent labs using real patient samples in the facilities that would be performing real-world testing; as such, the independent evaluations were at least as important as (if not more meaningful than) the EUA data for understanding the test's clinical performance characteristics. This is one of the reasons why CLIA and other regulatory agencies require labs to perform independent verifications/validations prior to implementing a diagnostic test for clinical use.

### IV.    It Would Have Been Misleading to Report the Lower Limit of a Confidence Interval as the Logix Smart Test's Sensitivity or Specificity.

Westgard opines that any alleged confusion over the performance of the Logix Smart Test could have been avoided or minimized if Co-Diagnostics had claimed the lower limit of the confidence interval, rather than the point estimates of 100% for sensitivity and specificity, when reporting the independent evaluation results in the May 1, 2020 Press Release, because this would have provided "claims that were more scientifically accurate as well as more realistic" (Westgard Report, p.25). I strongly disagree with this statement. In my opinion, it would have

8

been highly atypical and confusing for Co-Diagnostics to have done as Westgard suggests. I have never seen or heard of anyone in my field reporting the lower limit of a confidence interval as the test's "result." It is well understood and expected that a reported result falls *within* the confidence interval (which also is typically reported) and does not represent the top or bottom of that range. Accordingly, it would be highly misleading to report the bottom of the confidence interval range as the point result.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Los Angeles, California, on January 18, 2024.

_____
Dr. Jennifer Dien Bard

9