# Exhibit 7

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

CASE NO.:  2:20-CV-00368

GELT TRADING, LTD., a Cayman Islands limited company,

Plaintiff,

vs.

CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,

Defendants.

_____/

Friday, March 8, 2024

11:04 a.m. - 3:35 p.m.

South Pasadena, California

DEPOSITION OF DR. JENNIFER BARD

Taken via Zoom before Rinele Abramson, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

- - - - - - -

Page 2

APPEARANCES:

On behalf of the Plaintiff:
      Marcus Neiman & Rashbaum
      2 South Biscayne Boulevard, Suite 2530
      Miami, Florida 33131
      BY:  MICHAEL PINEIRO, ESQUIRE

On behalf of the Defendant:
      Baker & Hostetler, LLP
      45 Rockefeller Plaza
      New York, New York 10111
      BY:  GENEVIEVE YORK-ERWIN, ESQUIRE
         MARISSA PEIRSOL, ESQUIRE

      - - - - - - -

Page 3

I N D E X

WITNESS: DR. JENNIFER BARD                    PAGE:

      DIRECT EXAMINATION BY MR. PINEIRO:      5

            - - -
      E X H I B I T S
            - - -
EXHIBIT NO:                      PAGE:
Exhibit 1,   Expert Report        14
Exhibit 2,   Press Release        85
Exhibit 3,   E-mail              118
Exhibit 4,   E-mail              120
Exhibit 5,   E-mail              128
Exhibit 6,   E-mail              129

Page 4

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely.  This arrangement is pursuant to the Florida Supreme Court Administrative Order No. AOSC20-16.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Counsel, can you please indicate your agreement by stating your name and that you're in agreement with the statements made by the court reporter.  We can start with the noticing attorney.

MR. PINEIRO:  Yes.  Michael Pineiro of Marcus Neiman Rashbaum & Pineiro on behalf of the plaintiffs, and we consent.

MS. YORK-ERWIN:  Genevieve York-Erwin.  I'm here with colleague Marissa Peirsol from Baker & Hostetler for the defendants and also for the witness, and I consent.

Thereupon:

            DR. JENNIFER BARD

was called as a witness, and after being first remotely sworn, responded "I swear," and was examined and testified under oath as follows:

Page 5

DIRECT EXAMINATION

BY MR. PINEIRO:

Q.  Good morning, Doctor.  How are you?

A.  Good.  How are you?

Q.  Good.  Thank you.

Some brief ground rules.  Since we're doing this by Zoom, is there anybody in the room with you?

A.  No.

Q.  Do you have any notes or pieces of paper in front of you?

A.  No.

Q.  Where is it that you are sitting right now for this deposition?

A.  I'm in my son's room.

Q.  Okay.

And do you have your phone in front of you?

A.  I do, but I guess I can -- sorry.  I forgot about that.

Q.  That's okay.  I'll just ask, if it's okay with you -- you don't have to turn it off.  Just obviously please don't review it or communicate with counsel during the deposition.

A.  Yes.

Q.  So just briefly, I'll be asking you questions, as you know, Doctor.  And counsel, you know, Ms. York-Erwin, may object from time to time.  After she objects, you should

Veritext Legal Solutions

800-726-7007                                                  305-376-8800

Page 6

provide your response unless she gives you an instruction not to answer.

We need verbal responses, so nodding your head is not going to work. We have a court reporter taking this down, so everything has to be verbal.

I will do my best not to talk over you or begin my question before you've concluded your answer.

Similarly, sometimes you may know where I'm going with a question even before I finish it. Let me just finish the question so we have a clean record, and then you provide your answer.

And if you need a break, just let me know, and we're glad to take one.

A. Okay.

Q. When were you first contacted about serving as an expert in this case?

A. Oh, my goodness. I can't recall the date specifically. Sometime in 2023, mid -- early 2023, but I can't recall the date.

Q. And do you remember who contacted you?

A. It was Mark -- I'm going to butcher his last name. Pollack, I believe. I knew him previously from a different company that he worked at, so he reached out to me, asking.

Q. Who is Mark Pollack?

A. I don't know what his role or what his position was

Page 7

with regards to Co-Diagnostics, but that was the person that reached out. I only knew him from a previous company that he worked at.

Q. Got it.

Did he work at Co-Diagnostics; do you know that?

A. Not that I -- I'm not sure.

Q. And where did you know him from?

A. He used to work for a company called BioFire Diagnostics.

Q. What was the name of that? I'm sorry.

A. BioFire.

Q. What did BioFire diagnostic do?

A. They develop molecular infectious disease tests.

Q. Got it.

And do you have any idea what the connection is between Mr. Pollack and Co-Diagnostics?

A. I don't, no.

Q. How do you spell Mr. Pollack's last name, by the way?

A. I actually don't know. And I may not have his last name correctly. I'm horrible with names in particular -- last names in particular.

Q. You said Mr. Pollack may have reached out to you in mid 2023?

A. Sometime in 2023. I can't recall specifically, but

Page 8

it was just through an e-mail asking if -- I can't recall exactly what was asked, but whether I would be able to speak with the lawyers for a potential case. But that was it. It was very vague.

Q. Got it.

You don't recall whether it was an e-mail or a phone call?

A. It was an e-mail.

Q. It was an e-mail.

So he wanted to, I guess, connect you with the lawyers for Co-Diagnostics?

A. No. He wanted to connect me with Genevieve and Marissa.

Q. Got it. Or counsel for Co-Diagnostics; right?

A. I assume they are, yes.

Q. Sure.

So did you respond to that e-mail?

A. I did. I said that I would speak with them.

Q. Okay. And then what happened next in that regard? Did you speak with Ms. York-Erwin or Ms. Peirsol?

A. Yes. I believe we had a -- yes, it was a Zoom call.

Q. And do you remember when that was?

A. No, I don't.

Q. Who was on that Zoom call?

A. It was Genevieve and Marissa.

Page 9

Q. No one else?

A. No.

Q. And what is the description -- what was the objective of the proposed engagement of your services?

A. So really, the objective was just my opinions. And I have the report that I ended up writing about it, but just my opinions and my expertise on molecular diagnostics, particularly for clinical use.

That was the primary thing, and the additional opinions that was included in the report itself.

Q. Got it.

Did you provide them with a written engagement agreement or letter?

A. I did not provide them with one.

Q. Do you have an engagement agreement with the firm?

A. I have an engagement agreement, yes, I believe so, with the firm.

Q. And that was provided to you by the law firm?

A. It was -- it was sent to me by either Genevieve or Marissa.

Q. Do you know when they sent you that engagement?

A. No, I can't recall.

Q. How soon after the Zoom call, that initial Zoom call you discussed, were you sent the engagement?

A. I can't give you a specific day or date. But it was

3 (Pages 6 - 9)

Page 10

-- I would say it was within a few days or weeks, but, like, it wasn't months.

Q. Got it.

During the Zoom call, did you agree to the engagement?

A. I can't remember specifically whether it was communicated there or not, but I believe I did communicate my openness or willingness to do it.

Q. Sure.

In deciding to enter into this engagement or to commit to this engagement, did you first review any document or materials regarding the opinions that you'd be providing?

A. I can't recall specifically.

Q. And the engagement, does it provide for you to provide expert opinion testimony in this case?

A. Yes.

Q. Have you been engaged to provide any consulting expert services?

A. Consulting expert services? How so? As in reviewing documents or --

Q. Not testimony.

So besides the opinions that you've provided in this case, have you been engaged to assist with the litigation in any other capacity?

A. No, not that I'm aware of, no.

Page 11

Q. Prior to this engagement, did you have any affiliation with Co-Diagnostics?

A. No.

Q. Did you have any affiliation with any officer or director of Co-Diagnostics?

A. No.

Q. You prepared two expert reports in this case; correct?

A. Correct.

Q. An initial report on the day of November 29th, and a rebuttal on January 18th; right?

A. Correct.

Q. Have you prepared or made any modifications or supplements to those reports?

A. No.

Q. And do those reports contain all of your opinions and findings in this matter?

A. Yes, it should.

Q. Did you prepare the reports yourself?

A. Yes, I did.

Q. Did you type them out yourself?

A. Yes.

Q. Did anybody else assist you in writing the reports?

A. I reviewed it with Genevieve and Marissa and made edits. But all the edits and the opinions that are in there

Page 12

are of my own.

Q. Got it.

And your hourly rate for preparing the report was 600 an hour; is that correct?

A. Yes.

Q. And you're being paid 800 per hour for this deposition testimony and your trial testimony?

A. Yes.

Q. Have you sent any invoices for your services as an expert to the firm?

A. Yes.

Q. And to date, do you know how much you've invoiced them?

A. I don't know specifically. I think it's in the 30,000 range or so.

Q. And have you been paid?

A. Yes.

Q. What was your total income in 2023?

A. 2023?

Q. Yes.

A. From my primary job?

Q. Yeah, sure. For your primary job.

A. I don't know the exact number, but it's in the 400 or so range.

Q. Did you prepare for today's deposition?

Page 13

A. Yes.

Q. What did you do to prepare?

A. Just reviewed the same documents that I would have reviewed to form my opinions in the reports.

Q. So you reviewed the documents that you relied on for your report?

A. As well as my reports, correct.

Q. Do you have any meetings with Genevieve and Marissa?

A. I did, yes.

Q. How many meetings did you have?

A. I think a couple of.

Q. When did those take place?

A. I can't recall the first one, but the other one was just yesterday.

Q. Was that by Zoom?

A. Yes.

Q. For how long was that meeting?

A. I think three hours.

Q. And the meeting before yesterday's, do you remember when that was?

A. Not the specific day, but it was at least a week or so ago. Because it was before the previous deposition was changed -- the previous deposition date was changed.

Q. Did you review any deposition transcripts in preparing for this deposition?

4 (Pages 10 - 13)

Page 14

A. No.

Q. So I'm going to start introducing some exhibits. I've introduced through the Exhibit Share what's been marked as Exhibit 1.

(Exhibit 1, Expert Report, was marked for identification.)

BY MR. PINEIRO:

Q. What I will also do, Doctor, I'll be sharing it on my screen and directing you.

A. Okay.

Q. Obviously, feel free to scroll through it on your own through the Exhibit Share. Is this the initial report you prepared in this case?

A. Yes.

Q. So I want to turn and show you to Exhibit A. It's page 19. This is your, I guess, CV as of September 2023.

A. Yes. Correct.

Q. Is there a more updated or recent version of this?

A. There is, yes.

Q. What additions are -- in that more recent version, what are the additions to it or the changes, if any?

A. There are, I believe, at least a couple of additional publications. I was also just elected into the American Academy of Microbiology as a fellow. So that was

Page 15

added as well.

Q. Just going through your education, 1998, diploma, St. Joseph Composite High School. I guess that's high school. You attended high school in Canada and graduated in 1998?

A. Yes.

Q. And then it says 2003. Is this a bachelor's of science, medical laboratory science?

A. Correct.

Q. University of Alberta?

A. Uh-huh.

Q. What does a bachelor's of science in medical laboratory science entail or mean?

A. So it's a degree in laboratory sciences, which includes a clinical -- a year of clinical rotation in microbiology, chemistry, hematology, histology -- and I'm forgetting the last one. But basically it offers you a degree but also a license to practice as a medical laboratory scientist in the clinical lab. So I actually worked as a medical laboratory scientist in hematology and microbiology prior to moving to the U.S.

Q. Got it. In terms of, I guess, what you've just described, does that encompass education and training in PCR testing?

A. Not at that time, in 2003. I think molecular was

Page 16

still quite new back then. But in my PhD, yes, there were quite a few PCRs being run by me.

Q. So you have a PhD in 2008 in medical sciences from the same university?

A. Correct.

Q. What does a PhD in medical sciences entail?

A. So my PhD specifically -- so medical science is a general term for the Department of Pathology and Laboratory Medicine. So any diseases within that would work. I worked on -- in addition to working in the micrology lab during my PhD, I worked on a couple of different cancer research projects. And with that, there were a variety of different molecular diagnostic techniques that were incorporated, including PCR.

Q. Got it. It looks like you did your post-graduate fellowship at the University of California.

A. Correct. Yes.

Q. And it's a fellowship in medical and public health microbiology?

A. Correct.

Q. What is microbiology?

A. What is microbiology?

Q. What does that mean?

Page 17

A. I mean, it's the field of working and, you know, understanding microorganisms, which include bacteria, viruses, parasites, fungus. It's very broad, of course, because you can have a microbiologist that does not actually have experience in clinical work. So the medical and public health microbiology encompasses that portion. It's the medical microbiology -- the diagnostic microbiology basically.

Q. Got it. What is your primary occupation? Presently, what is your primary occupation?

A. So my primary occupation? I'm the director of the microbiology and virology lab at Children's Hospital Los Angeles. Currently, I also hold the interim division chief position for the division of laboratory medicine, which is where microbiology sits under. And then I'm also a professor at the University of Southern California.

Q. And that's where you are a professor in pathology, the school of medicine?

A. Right. Yes.

Q. Is that a tenure track position?

A. No, it's not. No one in our department are on the tenure track. This is not something that is routine for this

5 (Pages 14 - 17)

Page 18

department.

However, I do have the clinical scholar designation that you see there, which USC offers to the more highly academic and, I guess, experts in the field. And so the clinical scholar, they actually kind of deem as comparable to tenure.

Q. In terms of the time, the amount of hours in the week, what percentage of it would you say is dedicated to your work at the hospital versus your professorship?

A. I'm 100 percent at the hospital.

Q. Got it.

And then in terms of your in professorship, what do you do in connection with that?

A. So the professorship is really -- the only teaching, for example, that I do is actually for my fellows, or any residents or med students actually at the hospital.

I developed my own fellowship program when I joined CHLA in 2015. And so we have two fellows at any given time that are training under me.

So it's really more so that. I'm not actually giving formal lectures at the university. So it's all tied in with medical microbiology and the diagnostic lab there.

Q. Got it.

So then you have a licensure, 2019 to present. What does this mean, MTE? What is that?

Page 19

A. That's just the license number. But basically to practice in the state of California as a lab director, you need to have, at a minimum, a clinical laboratory scientist license. So that's what that is.

Q. Got it.

When you say CME courses developed, what does that mean?

A. It's basically medical education credits. So for all MDs, and even PhDs in this role, we need to prove that we have enough medical education credits when we submit for relicensure or accreditation. So that's what the course is, what the CME means.

The courses I developed are actual courses that, you know, I worked on, workshops I developed that offer these credits for MDs and PhDs.

Q. Got it.

When you say service, like department service, what does that mean?

A. It's basically just any additional, you know, time that you've spent contributing to the department in some way, whether it be administratively, clinically, research, teaching.

Q. Got it.

A. Yeah.

Q. Then you have consultantships and advisory boards.

Page 20

Do you see that?

A. Yes.

Q. What does that mean?

A. Basically I have been on advisory boards or expert panels or committees that have -- that are from the industry. Also diagnostic companies basically reaching out and asking me to consult with them or provide my specific opinions about any specific topic.

Q. Are these paid positions?

A. Some are. Majority are, I would say, yes.

Q. Okay.

So, for example, bioMérieux, what kind of company is that?

A. Correct. That's a diagnostic company, mainly microbiology. I believe they do other clinic diagnostics, too, but I know them for the microbiology piece.

Q. Got it.

And in terms of sitting on their advisory board, what do you do there?

A. That one in particular, I believe it was an eight-hour meeting with other panelists. And they presented just kind of just proposed plans for other diagnostic tests, and they just really wanted our opinion.

Q. Got it.

And how are you -- were you compensated in

Page 21

connection with that?

A. Yes.

Q. How were you paid or compensated?

A. Oh, I can't recall specifically.

Q. Money or shares?

A. Money. It's honorariums.

Q. In connection, I guess, with any of these engagements, consultantships, were you compensated in shares from the companies?

A. No. It's always just an honorarium.

Q. Got it.

Let me scroll down to depositions and testimony.

Do you see that?

A. Yes.

Q. Besides this case, how many other times have you been engaged to provide expert opinion testimony?

A. The two times that's listed there.

Q. Got it.

So then the first one is deposition testimony before Superior Court of the State of California, Olympus American Duodenoscope -- I can't even say that -- cases.

What were these cases? What do these cases pertain to?

A. So this was a case that was related to contaminated duodenoscopes with multidrug-resistant organisms. So, you

6 (Pages 18 - 21)

Page 22

know, microbiology related, they wanted my expert opinion on the organisms that were recovered from the scopes and recovered from the patients and whether there were any associations between them.

Q. Got it.

So this didn't have any -- did this testimony at all touch on accuracy of PCR testing?

A. It touched on the accuracy of molecular testing because it incorporated next-generation sequencing. But it wasn't specifically a PCR test that they were looking at.

Q. And you were serving as an expert for the plaintiff or the defendant in that suit?

A. For the defendant.

Q. And then there is deposition testimony before the Circuit Court of Mobile County, Alabama, Plaintiff versus University of South Alabama Health Services Foundation, USA Healthcare Management.

What was that case about?

A. So that case was about a specific patient, but basically a workup of the clinical specimens in the microbiology lab and just the process that was involved in working up that specimen, reporting out the result, and the susceptibility results there.

So they wanted my opinion whether there were any -- you know, whether the workup was basically reasonable.

Page 23

Q. Do you know what the dispute was about, though, in substance, the lawsuit?

A. I do. It was basically an unfortunate case where the patient received an antibiotic that likely was not required, and so the -- you know, the question on my end -- not my question, but where I was involved, was whether there was any potential delays in the workup of the clinical specimen that may have guided the physician to an alternate treatment.

Q. So was it a medical malpractice case?

A. I don't know specifically what it was designated as.

Q. Got it.

Did that testimony at all involve anything touching on the accuracy of PCR testing?

A. Not specifically for that one, no.

Q. Besides these two engagements, there are no other engagements where you've served as a testifying expert?

A. No.

Q. What about legal proceedings? Are there any other legal proceedings where you served as a consulting expert?

A. There was one additional proceeding where I served as a consulting expert, correct.

Q. When was that?

A. That was a fungal case where they were wanting my expertise on even just the -- the overall microbiology process

Page 24

of recovering fungus from the lab and the overall workup of that particular patient as it relates to infectious diseases.

Q. Do you remember the parties to that lawsuit?

A. No, not specifically.

Q. Do you remember where that lawsuit was taking place, like which jurisdiction?

A. It was in California.

Q. So on your CV, there's a question called "Grant support current."

What does this section describe or entail?

A. It's basically a list of all the grants that I am currently either the principal investigator or co-investigator for. So these are just studies that have been funded.

Q. Got it.

Do you have any formal education or training in securities?

A. In securities?

Q. Yes.

A. No.

Q. In investing markets?

A. No.

Q. In the responses of public markets, investing markets to public statements or press releases?

A. No.

Q. Prior to this lawsuit, have you ever evaluated, in

Page 25

any capacity, the press releases or public statements of companies regarding the accuracy of their PCR tests?

A. I've reviewed or read them if it is relevant to my practice, if that's what you mean.

Q. Have you ever been hired by anybody to review the accuracy of public statements or press releases pertaining to PCR testing?

A. No.

Q. Have you ever engaged in any formal analysis or evaluation of the accuracy of press releases related to PCR testing?

A. Can you repeat that again?

So formal -- being hired to review -- sorry.

Q. I can make it easier for you.

You've already covered the hiring piece. I'm asking just whether in your background, you've ever had occasion to study press releases pertaining to PCR testing in any capacity.

Forget hiring, because you answered that. But in general, where you sat down and reviewed the accuracy of press releases that pertain to PCR testing.

A. I wouldn't say, I guess, I reviewed it specifically for that, but I have reviewed and read press releases associated with accuracy of PCR results.

Q. Got it.

7 (Pages 22 - 25)

Page 26

And in what capacity have you -- what was the context of those press releases you reviewed, I guess?

A. If it pops up in my e-mails or if it pops up in, you know, various other avenues on the internet I've looked at. But I guess I would say I haven't necessarily paid that much attention to them.

Q. What have you been asked to opine on in this case?

A. I've been asked to opine on three specific areas. One is really just to provide my opinion as a microbiologist and director of the microbiology lab on how just lab testing and lab verifications and validations work; provide my opinion on what -- when you're doing a verification/validation, what would be specifically the more -- the most important factors that are required or what we really look for before implementing a test; and then lastly is basically my opinion on the statements that were made in the press release and whether that is typically in line with how other diagnostic companies would communicate their test.

Q. So the third part, the one about reviewing the press release, have you ever done anything like that in your career before this engagement?

A. Reviewing press releases?

Q. No. Again, like here you're actually providing opinions and findings regarding a press release.

Have you ever done that before?

Page 27

A. Well, I guess I would say I would provide opinions of press releases as it relates to just my day-to-day work, especially if there are, you know, individuals or colleagues within the institution, or administrators are kind of asking about specific tests, or even to my staff, right, if they're -- in that sense, not communicating to an attorney about it, no.

Q. Does the hospital that you work at issue press releases regarding PCR testing?

A. Not that I am aware of --

Q. Okay.

A. -- or can recall.

Q. So what press releases are you referring to now in that answer you just gave?

A. Any press -- if there was, for example, an assay that we were bringing on and there has been -- and there was a press release that was brought up or so, if there are questions about it, you know, typically I would be the person that they would ask, or if there are things that were to be communicated about it.

But not specifically our own press release about the test. We usually don't release -- we usually don't announce through press release a test that we are implementing.

Q. Why is that?

A. It's just not standard. We send an announcement

Page 28

within our hospital so the physicians and other healthcare workers are aware of a new test so that they know how to use it. But that's it.

Q. In the publications sections, have you offered any publications regarding COVID-19 PCR testing?

A. Yes.

Q. And do any of those publications pertain to validation or verification of PCR tests for COVID?

A. Not specifically a validation or verification of a PCR test that I can recall, but I know there's one in particular, for example, where we were pursuing alternate specimen types, such as saliva. Because of the shortages of swabs, we were looking at alternates. So we did look at the performance of testing saliva compared to a nasopharyngeal swab. So it wasn't specifically about the PCR test; it was the specimens.

Q. Turning to Exhibit B to your first report, materials considered, do you see that?

A. Yes.

Q. So is this a comprehensive list of every document or source you relied upon or referenced in rendering your opinions here?

A. These were the documents that I relied on to form my opinions, correct.

Q. Got it.

Page 29

Did counsel provide you with these documents?

A. Correct.

Q. Did they select the documents you were provided?

A. I'm not sure how they -- the process that was involved in providing me with the documents. I didn't ask for specifics, if that's what you mean.

Q. Got it.

At any point in time, did you request any documents yourself?

A. Not that I can recall.

Q. Sitting here, are there any documents that you would like to have seen with respect to your opinions -- sorry, strike that.

Sitting here today, are there any documents that you did not see but you would have liked to have seen with respect to the opinions you've rendered here?

A. Not that I can think of.

Q. Are you aware that the Co-Diagnostics hired an expert called Dr. Bustin?

A. Yes. I believe it's the legal team, I'm guessing, the same as me.

Q. Got it.

And did you review his report?

A. I did have a look at his report a while back.

Q. Is there a reason why it's not listed here?

8 (Pages 26 - 29)

Page 30

A.  Because it did not really contribute to me forming any of my opinions.

Q.  Why --

A.  I believe I also drafted this even before I saw his report.

Q.  Got it.

Why did you review it?

A.  Why did I review it?

Q.  Yes.

A.  It was shown to me.

Q.  Do you know why?

A.  Not specifically.  I assume that's kind of standard practice.

MS. PEIRSOL:  Objection; calls for privileged information.

BY MR. PINEIRO:

Q.  So you were provided that report after this report was prepared?

A.  Yes, I believe so.

Q.  Did you ever speak to Dr. Bustin?

A.  No.

Q.  Did you speak to anybody at Co-Diagnostics?

A.  No.

Q.  Do you know who Rebecca Garcia is?

A.  I've seen her name in some of the reports, but I

Page 31

don't know who she is.

Q.  Did you review her deposition testimony?

MS. YORK-ERWIN:  Objection; asked and answered.

THE WITNESS:  Sorry?

MS. YORK-ERWIN:  Objection; asked and answered, but you can answer.

BY MR. PINEIRO:

Q.  You can answer.

A.  Oh.  Not that I recall.

Q.  Besides conversations or meetings with counsel, did you have any conversations or meetings with any other third parties in connection with rendering your opinions in this case?

A.  No.

Q.  So going back to the top.  So summary of opinion, you write, "A summary of my professional opinions in this matter are as follows:  Prior to implementation of a test for in vitro diagnostic use, laboratories are required to conduct a full verification or validation of the test to ensure that its performance characteristics in the lab seeking to implement it are sufficient for the lab's use."

Do you see that?

A.  Yes.

Q.  What is the difference between verification and validation?

Page 32

A.  So there are -- I guess I'm prefacing it by saying there are different definitions for each.  There are individuals that may use them interchangeably.  But how I use, and how we use, at least in our institution and the field, is that a verification is performed on a test that has been authorized for use by the FDA, either by emergency authorization or full clearance for in vitro diagnostic use.

And so with that, the amount of work that you have to do within the lab space to verify that the test is appropriate is more limited than what you would have to do for a validation.

A validation is performed on -- conducted on any test that is either considered a lab-developed test or a modification of an FDA-cleared test, which would deem it basically lab-developed.

So with that, it requires a more extensive workup and different performance metrics that would have to be generated.

Q.  So you said for the validation, you do a validation where you have a lab-developed test or a -- I think you said a modified manufacturer's test; is that correct?

A.  Yes.  So a modified test that was previously cleared by the FDA for use, but if you are deviating from the manufacturer's package insert, for example, then you would do a validation.

Page 33

Q.  Got it.  What kind of deviations would -- I mean, are there -- any deviation from the package would require a validation?

A.  I would say I think it depends, but some common deviations would be different sample types.  For example, which we witness quite often, particularly during the pandemic, you know, that example I provided with saliva would be a deviation of the package insert where you would do a validation.

Q.  Got it.

So the verification is, I think you said, was more limited than a validation, and it pertains to tests that have been authorized for use?

A.  Yes, it's been authorized for use.  So you're verifying that it works.  So you're still going to test for accuracy and all that, but you really -- because there has been additional work that has been reviewed by the FDA, it is considered, of course, more, robust in that way.  But you do verification in the lab before you implement.

Q.  Got it.

And you say "For these purposes, the most important performance measures are the test's sensitivity and specificity."

Do you see that?

A.  Yes.

9 (Pages 30 - 33)

Page 34

Q.   Is this reference to analytical or clinical sensitivity?

A.   Well, I guess it's a reference, really, to, I would say, analytical, in the sense that you mean the percent sensitivity, not a reference to limited detection, if that's what you're referring to.  Because particularly for COVID tests, being qualitative, we're really are not looking at that analytical -- the LOD, or the limit of detection.

So it's analytical sensitivity in the sense that you're comparing it to a reference method to determine if it's just as sensitive or as accurate when picking up any positives.

Q.   Got it.

What is the difference between, if any, between clinical and analytical sensitivity and specificity?

A.   So analytical sensitivity is really something that's conducted in the lab and it can be on a variety of sample types, whether it be true patient clinical samples, contrived samples.  But you're really measuring how good one test is against another test or against known reference samples in picking up true positives.

The clinical or diagnostic sensitivity is where you are incorporating patient data or patient symptoms.  So looking at, you know, a subset of patients that have been -- that are truly positive, clinically, is that test able to pick

Page 35

up the disease in those patients.

Q.   Got it.

So in the clinical one, you're evaluating, for instance, whether a test is able to pick up disease in COVID-positive but asymptomatic patients?

A.   No.  So COVID is a little more complicated that way.  But it's basically if the test is able to pick up COVID, if you're using COVID as an example, patients that truly have COVID infection, or COVID, I should say, that's part of the term.

Q.   How do you test for clinical sensitivity?

A.   So this is not -- so usually clinical sensitivity is not something that is pursued as part of a validation.  Because in many labs, you really don't have -- you may not have access to the clinical data to incorporate that, right.

So we are really focusing on the analytical sensitivity, so that percent sensitivity when compared to another method or known samples.

The clinical sensitivity is really what comes up, perhaps, usually when the test is implemented and you may understand it more; or if just thinking about, for example, we have -- I can give you another example.  We have a -- there is a disease called pneumocystis pneumonia.  And it is -- the difficulty with that is you can almost have -- you can have a test that is very analytically sensitive where it picks up

Page 36

this fungus very well; however, clinically, it may not correlate.

So in that case, you may have high analytical sensitivity, but you actually have poor clinical specificity because you are picking up cases that are just colonized, for example, and it isn't associated with the disease.

So it really depends on the --

Q.   Okay.

A.   Yeah.

Q.   Go ahead.  I apologize.

A.   Sorry.  Yeah, so I think that's the thing.  It's a complicated process in general.  From the labs, we're really focusing on the analytical piece, which is the sensitivity, which I mentioned to you.  There's only so much you can do from the lab side with regards to the clinical.

Q.   What you are saying, though, there are circumstances where clinical sensitivity may deviate from analytical sensitivity?

A.   I don't know if I would say deviate, but there is a difference of -- there is a difference on analytical sensitivity and clinical sensitivity.  And you may have a test that is highly sensitive from the analytical standpoint, where they can pick up very low levels of a bacteria or a virus, but it may not correlate clinically to that patient actually having the disease.

Page 37

Q.   What would be the causes of that?

A.   One cause -- one common cause is there are -- so if you have, for example -- I guess I would say microorganisms that are very ubiquitous, and they are found in both normal individuals that are not infected, but also in infected individuals.

So, you know, the pneumocystis, as I mentioned, is one.  We have other viruses, like CMB, EBV, things like that, that you will pick up in normal individuals as well.

And so that's where the complications can come and where you have to really apply like the symptoms portion and why really only the right patient should be tested.  That's why you shouldn't be screening everybody for everything because you are just going to confuse yourself.

Q.   Got it.

So you can determine analytical sensitivity through validations, validation studies; is that correct?

MS. YORK-ERWIN:  Objection; misstates testimony.

THE WITNESS:  You can -- if you were pursuing a validation for a lab-developed test, one of the metrics is an analytical sensitivity, meaning that you would be comparing the sensitivity of the test that you are interested in against a reference method as well.

And part of that, you would also potentially pursue limit of detection if you are looking at a quantitative

10 (Pages 34 - 37)

Page 38

test as well.

BY MR. PINEIRO:

Q. What is a limit of detection?

A. It's basically a defined value that you identify. And it's a concentration of the virus or bacterial load that can be detected at least 95 percent of the time that you run.

That's not to say, for example, that the test would not pick up the pathogen below that limit of detection, but during your studies, as you do serial dilutions, it was not able to pick it up at least 95 percent of the time. So that's where you define the limit of detection.

Q. Does it have an impact on the performance of a PCR test?

A. I wouldn't -- I wouldn't necessarily say that. Because performance of a test, if it's able to pick up all the samples that you've included in the validation that are both positive and negative, you know, high and low levels, then that's an independent marker. That's something that you can generate, use to generate, you know, a percent, accuracy percent sensitivity.

A limit of detection is something that -- it's just another value, another piece of information. And, again, that is more important when you are doing a lab-developed test or quantitative tests.

Q. What do you mean by it's more important, the LOD --

Page 39

so you're saying the LOD is more important when you're doing lab-developed tests or quantitative tests; is that correct?

A. I'm saying it's more important because it's required from the regulatory standpoint.

Q. Got it.

It's required to determine that value?

A. Yes, as part of the validation.

Q. Now, the test, hypothetically, has a very poor LOD, would that potentially have an impact that would show up in the validation results?

MS. YORK-ERWIN: Objection; incomplete hypothetical.

THE WITNESS: Yes, that's a very generalized way of looking at it, really. And I mean, you can -- it could be both ways, right. You could have a test that has a very, very high limit of detection, but that isn't able to pick up some of the samples during the validations, but you can have a test that also has a high limit of detection but can pick up all the samples. So it's just a very general thing that you are asking.

BY MR. PINEIRO:

Q. Why is the LOD a required metric for a lab-developed test?

A. That is just what's required by CLIA and CAP. And CAP is the College of American Pathologists. And many labs, including ours, in the U.S., follow or are accredited by CAP.

Page 40

And so with that, you have very specific requirements from that regulatory agency, and it includes limit of detection.

Q. But do you know why they require that?

A. Well, I would say that it's because this is completely new tests, right. So you're developing from scratch. So you're really following what, in theory, the manufacturer would do when they're pursuing an FDA-cleared assay, which is incorporated in that the limit of detection.

MS. YORK-ERWIN: Mike, do you want to take a break sometime soon? It's been about an hour.

MR. PINEIRO: Yeah. If you want, let me just get through this right here and then we'll go.

MS. YORK-ERWIN: Sure.

BY MR. PINEIRO:

Q. And then, number two, you say, "The May 1, 2020 press release summarized sensitivity and specificity data from the past independent evaluations of the Logix test in a manner that is consistent with how diagnostic test manufacturers typically talk about test performance."

Do you see that?

A. Yes.

Q. What does independent evaluation mean?

A. Evaluations that were done in labs that's independent of the Co-Diagnostics.

Q. Got it.

Page 41

You said "Tests often show 100 percent sensitivity and specificity on independent lab verifications or validations. That doesn't mean the test is perfect or will perform perfectly in all circumstances. No one in the diagnostic testing industry would have understood the May 1st press release as promising 100 percent accuracy all of the time."

Do you see that?

A. Yes.

Q. Your opinion is based on, it appears, standards and understanding within the diagnostic testing industry?

A. My opinion is based on, you know, my own experience as part of the -- in the diagnostic world and of, I guess, you know, really just colleagues and stuff and training -- people that I've trained with. That's just common knowledge, that any of our validations that we generate that has 100 percent sensitivity and specificity, which is quite common, that doesn't mean the test is perfect, where it will always be 100 percent accurate, right.

Because there's so many different factors that can contribute to a test not picking up that positive sample, all the way from the pre-analytical stages of selections, you know, storage. There's so many factors that are involved that -- and it's -- that will contribute to how a test can be -- how a test can be performed, that is solely independent of the

11 (Pages 38 - 41)

Page 42

actual test kit itself.

MR. PINEIRO: Okay. Let's take a break, if you want. Five minutes is okay?

MS. YORK-ERWIN: Sure.

(Thereupon, a brief recess was taken.)

BY MR. PINEIRO:

Q. Dr. Bard, before we took a break, we were examining this second opinion, in particular this statement where you said "No one in the diagnostic testing industry would have understood the May 1st press release as promising 100 percent accuracy all of the time."

Do you see that?

A. Yes.

Q. So just to be clear, your opinion with respect to this solely pertains to the views -- how the press release would have been received by members of the diagnostic testing industry; correct?

A. That was my opinion in there, correct.

Q. And you have not -- you are not rendering any opinions on how the general public would have understood the May 1st press release; correct?

A. Well, I can't speak for the general public, per se; however, you know, throughout the pandemic and because of my role during the pandemic, I, you know, did communicate with a lot of general public people, just asking specific questions.

Page 43

And, you know, the general knowledge that I've -- I guess my opinion on that is that even the general population and the people that, at least I've spoken to, all became quite aware and knowledgeable in the overall COVID test and performance and all of that.

Like, I mean, I think, if anything, the pandemic has educated a lot of people on molecular testing. There was articles about it all the time. People were aware.

Q. Right. But you're not providing any opinions on that; are you?

A. I'm providing opinion for myself, you know, because I am involved in the diagnostic world.

But what I can just say, though, is that just speaking, and just my interactions with others that are not in the diagnostic world, there seems to have been at least general knowledge about the performance of COVID testing at that time.

Q. And what do you mean by the performance of COVID testing at that time?

A. The performance of COVID testing in general was just something that seemed to be just very -- I guess a very popular topic, if anything. You saw it all in -- even news articles, right. There was just more discussions about COVID testing than there ever was about any other test really.

So with that, the general population just became

Page 44

more aware and more knowledgeable of it.

Q. Aware of what?

A. About COVID testing in general and just the topics of accuracy and even sensitivity and stuff. It was talked about a lot.

Q. But your understanding or knowledge or your conversations with members of the general public regarding diagnostic testing are not part of the opinions that you are rendering in this case; correct?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: What I'm saying -- what I can say is that what I included in this report is what you see here, which is that no one in the diagnostic testing industry would understand that press release as promising 100 percent accuracy.

What I'm adding to that is as an individual that lived through the pandemic myself and interactions with others, that there appeared to have been awareness of the test and the -- just COVID test in general with regard to accuracy, sensitivity, et cetera.

BY MR. PINEIRO:

Q. And your testimony is that you believe the general public -- even though it's not part of your report, what you're saying is, setting aside your opinions in this case, you believe the general public would have understood the

Page 45

May 1st press release as not promising 100 percent accuracy all the time?

A. Yes.

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: Again, I said I cannot speak for the general public; however, with the individuals that I have interacted with throughout the pandemic and that have asked me questions, you know because of the work -- my line of work, there appeared to have been an understanding of COVID testing in general.

This was an area where people really sought to really read and understand about it because it impacted them directly.

BY MR. PINEIRO:

Q. Have you ever participated in any public polling or evaluation of public knowledge regarding COVID testing, the accuracy of COVID testing?

A. Public polling, not that I'm aware of. I don't usually seek them out.

Q. So opinion Roman I, do you see that on your screen?

A. Yes.

Q. So you say, "All laboratories that perform Co-Diagnostic testing on individuals must be certified through CLIA with the primary goal of ensuring quality laboratory testing and reporting of patient results, 1.

12 (Pages 42 - 45)

Page 46

This "1" in parentheses, what is that?

A.  It's a reference to a document that's at the bottom. It's basically the standard, so establishment of verification of performance specifications.

Q.  Got it.

So what's your experience in terms of, I guess, developing or administering a PCR test for COVID-19?

A.  Well, in my role as the director of the microbiology and virology lab here, I was responsible for identifying the specific tests, working with my team on any modifications if needed, ensuring that the verification or the validations were appropriate.  And I would have the final sign-off for the validation report before it gets implemented.

Q.  What's a validation report?

A.  It's a basically a report that summarizes all your -- the approach that you use for your verification or validation, which also would include the findings.  So a summary of the findings, any tables with any data that is relevant, and then your conclusions.

Q.  So who prepares a report at your lab?

A.  So it's a multi-person approach.  So usually it's the scientist that is also generating the data.  So putting together the -- doing the actual PCR runs, for example.  And then it is extensively reviewed by myself and possibly a fellow or somebody like that as well.

Page 47

But there are multiple iterations that go back and forth before it gets finalized.

Q.  Is that an industry standard or some type of other standard where in preparing a validation report, there are multiple people involved in supervising or involved in the process in general?

A.  I don't know -- I wouldn't -- I don't know if I would say it's a standard.  It really depends on who the first primary person is.  You could have the person that is the scientist that generates the data, but it's also the person that would approve it, you know, in some cases; or in our case, our institution, it's the scientist that will draft and generate the data with myself being the final reviewer and approver.

Q.  But the validation report is a report that is prepared by the lab that is generating the data; is that fair?

MS. YORK-ERWIN:  Objection; misstates testimony.

THE WITNESS:  So it depends.  That's a very general comment, and I think depending on the institution, the lab, it can be -- there are a wide variety or broad variety of ways where a report can be generated.

In my lab, and in most cases, it's our -- my staff and myself that will generate review and finalize.

However, there are labs that will typically work with even the manufacturer.  So, for example, our clinical

Page 48

chemistry lab does that quite often, where the manufacturer will help with a lot of the verification or validation that's conducted, and may help incorporate the data into an actual report for them.

So it just depends.  And there is not necessarily a right or wrong way.  It's just depending on each lab section and what they prefer.

BY MR. PINEIRO:

Q.  If the manufacturer is involved, is the validation still independent?

A.  Yes, because they are not actually -- it's independent in the sense that they are not actually running the samples, right.  They are helping with compiling the data into a report for you.

And it is still independent because it's all your samples and it's in your lab space and involves your staff as well.

Q.  Are there any particular instances that you recall where a manufacturer prepared the validation report themselves?

A.  Like I said, it does not happen with me.  I have been offered, but because we have the expertise and manpower to do it ourselves, and we also have very specific templates that we like to use, right, and approaches we have, I like to standardize things.  So one validation to another, I like to

Page 49

have it done in a very standardized way.

But as I mentioned, there are other labs, including, you know, our chemistry labs, where they have utilized help from the manufacturer and a technical support, basically, to generate and to summarize the data basically.

Q.  Just to be clear, you personally have never been involved in a validation report where the manufacturer prepared it; is that right?

MS. YORK-ERWIN:  Objection; asked and answered.

THE WITNESS:  As I mentioned, I have been offered and I have worked with them in helping -- for example, in helping them -- having them work with the instrument to pull the data for me, because it's easier for me to do.

But for the report itself, we prefer to do it ourselves.  But that doesn't mean that that's the right way only.  There are multiple different approaches and they're all fine.

BY MR. PINEIRO:

Q.  So I'm going to ask my question again.

So you have never personally been involved in the preparation of a validation report where it was prepared by the manufacturer; yes or no?

MS. YORK-ERWIN:  Asked and answered.

THE WITNESS:  As I said, I have been offered, but based off of how I like to do things in my lab, I have not

13 (Pages 46 - 49)

Page 50

utilized a manufacturer to help me with that.

BY MR. PINEIRO:

Q. And you indicated that there is another lab within your hospital that has worked with manufacturers on preparing validation reports?

A. Yes, the chemistry lab.

Q. And are you aware of any -- do you recall any particular instances, like the actual, you know, test at issue or the manufacturer, where that chemistry lab had the manufacturer prepare the validation report?

A. Yes. So they help generate the validation of the report. Not generate the data for it, but they help summarize the report.

Q. Do you recall the specific manufacturer?

A. No, I don't.

Q. So you don't remember the test or the manufacturer?

A. No, I don't. It's a chemistry test. I review it in my role as division chief, but I don't specifically remember the company name or the test.

Q. What do you mean by chemistry test?

A. Chemistry test? So it's a clinical chemistry lab, so it's usually a biochemical -- like glucose tests, for example. That's a chemistry test. Sodium, potassium. All those are chemistry tests.

Q. So turning to page 5 of your report, there is a

Page 51

section here on verification.

Do you see that?

A. Yes.

Q. It says "A verification has been performed on tests that have been cleared by the FDA for in vitro diagnostic use and that have not been modified. Verification studies are straightforward and only require establishment of a few performance characteristics: Accuracy, precision, reportable range reference intervals."

Do you see all that?

A. Yes.

Q. For accuracy, you say, "To confirm acceptable agreement between the test of interest and the comparator method, which is often referred to as the reference method."

Do you see that?

A. Yes.

Q. What do you mean by that?

A. Basically you are testing a subset of samples that are with a known result that was generated by either a reference method or generated because of, you know, no uncontrived samples. So you know what should be present in that sample. And you would run it against your tests that you are evaluating. And then from there, you're really looking at percent accuracy, but generating that data, you would also include the percent sensitivity or percent specificity as

Page 52

well, because it's all the same data that's being generated.

Q. Got it.

So the reference method can involve, I think you mentioned, contrived sample?

A. Correct.

Q. What's a contrived sample?

A. Basically they are using the same matrix that you would use -- for example, if it's COVID, you're using universal transport media basically. So you would use universal transport media and then seed it with a known virus or viral DRNA or something like that so that you know it should be present.

Q. And then you said there's another reference method besides contrived samples?

A. Did I?

Q. Is the only reference method the use of contrived samples?

A. No. A reference method is usually another method, so another PCR or another culture, like whatever is considered the reference method would be a comparator.

Q. So for example, a reference method regarding a PCR, is that where you're using what's called a, quote-unquote, gold standard?

A. It depends on what you define as a gold standard. But the alternate method you may consider a gold standard just

Page 53

for the purpose of the validation or verification itself.

Q. I'm just trying to understand. So the comparator method is referred to as a reference method. And that involves, number one, the use of contrived samples.

Are there any other ways to confirm acceptable agreement using a comparator method besides contrived samples?

A. No. I was saying that when you're including specimens to test on your test of interest, as well as the reference method, you can use patient samples, you can use contrived samples, right. But you have a reference method, which would be, in most cases for COVID, was another PCR test or another molecular test that was used as that comparator method for the test that you were wanting to pursue or evaluate itself.

Q. So you couldn't -- it was hard to do verifications with COVID-19 because you didn't have samples available?

A. Yes, especially early on. So for us, especially in the beginning, we did not have access to any positive patient samples. So we used contrived, seeded samples for our verification.

Q. And in terms of accuracy, is there a threshold below which you -- the test is not deemed acceptable?

A. It really depends, again, on multiple factors. But generally speaking, the majority of our tests have at least 95, if not 100 percent, accuracy when we are performing our

14 (Pages 50 - 53)

Page 54

validation or verification reports -- or verification studies.

Q. And what if there are results that are discordant with that, that don't match that, what do you do in that scenario?

A. We would troubleshoot and do further investigation to determine why. You know, it could be as simple as a sample mixup, where the scientist tested the wrong sample, right, so that's where you are getting the discordant, or a variety of reasons. But the only way you would know that is if you troubleshoot.

So we often would -- the first step would be just to repeat that very same sample using both the reference or the comparative method and the test method to determine if it is concordant the second time around.

Often, and, you know, we just completed a verification -- sorry, I should say a validation, for a different test recently. And we had that same issue where the test itself did not pick up the positive. So we investigated further. We repeated the sample on both the reference and the test method, and it was both negative. And it likely was the fact that the sample was stored for an extended period of time, probably through multiple freeze cycles. So with that, the integrity is decreased. And so it turned out to really be a negative at that point.

Q. What do you mean by the precision? You say, "To

Page 55

confirm minimal variance observed when compared within a run, between each run performed and across operators."

What does that mean?

A. Yeah. So you're wanting to confirm that the test is precise, regardless of when it's tested. So you would do multiple runs within the same day. You would do -- triplicate usually runs within -- samples within one run.

And then you would do multiple runs across so many days as well to determine that you can get the same result every single time.

And then you can incorporate different scientists or different operators in that mix, just to make sure there is no variability between one person versus another.

Q. Turning to validation, it says "A validation is performed on FDA-cleared tests that the lab has modified in some way from the manufacturer's IFU or for tests that have not been cleared by the FDA."

Do you see that?

A. Yes.

Q. You read the May 1st press release that was issued by Co-Diagnostics that you would opine on; correct?

A. Yes.

Q. You're aware that there were attachments to that that attached written validation reports?

A. Yes.

Page 56

Q. Did you review those reports?

A. Yes.

Q. The Co-Diagnostics tests, do you know why they were running validations on the Co-Diagnostics tests even though it was an FDA-cleared test?

A. I wouldn't -- I mean, well, I guess one -- just one thing to bring up is whether they're calling it a validation, but it really is a verification.

As I mentioned, people tend to use that terminology interchangeably sometimes; but, otherwise, I would just be speculating as to why they would pursue a specific method or not -- or a specific approach or not.

Q. When doing a validation, is the validation only as good as the reference test you're comparing it to?

A. In theory, it can be, right. That's why -- you know, it is important to incorporate a reference test that is a good test. And so, you know, usually with validations or verifications, like, that is one factor that we really do take into consideration. We want to make sure that whatever you're comparing it to is as good as you -- as good as you can get it to be at the time.

Q. Got it.

When doing a validation, should you be seeking, I guess, the most accurate test possible as the reference?

A. Do you mean as to the test you want to bring on or a

Page 57

reference test?

Q. As a reference.

A. No, because most people -- most labs in particular would be -- the reference test is going to be the test that you want to replace, really.

So, for example, if I am offering culture on a specific pathogen right now and I want to replace it with a PCR, my reference is going to be culture. Because I want to make sure that at least what I'm currently offering -- the new test will be better than what I'm offering.

I wouldn't go out to seek an alternate test just for that purpose because I also have invalidated that alternate test, right. So it's you're comparing two unvalidated tests at that point.

Q. You are saying in addition to accuracy, precision, reportable range and reference range, "A validation requires two additional characteristics to be established. Analytical sensitivity, to determine the ability of the test to detect low concentration of an analyte. The users must determine the lowest concentration of an analyte that can be consistently detected by a test at least 95 percent of the time. This is also classified as the limit of detection of a test."

Do you see that?

A. Yes.

Q. So in performing a validation, you're required to

15 (Pages 54 - 57)

Page 58

determine the LOD?

A. When performing a validation, yes, of a lab-developed test or a modified test, one of the requirements, even per CAP and CLIA, is that you pursue and identify what the LOD would be.

Q. And if the validation doesn't include a determination of the LOD, is it a valid validation?

A. Well, again, it depends the terminology they're using for a validation. Do they actually mean verification, but they're using the term "validation"? Was it an FDA-cleared test? Because if it was FDA-cleared test, then you don't need to do all that, right.

Q. Got it.

At least in terms of the definitions used by CLIA for a validation, you're required to determine the LOD of a test; is that right?

A. For a validation of a lab-developed test or a test that has been modified by the -- from an FDA-cleared test, yes.

Q. You say, "Because the more extensive work involved in completing a validation, many clinical laboratories opt to pursue implementation of unmodified FDA-cleared assays whenever possible, since this only requires a verification."

Do you see that?

A. Yes.

Page 59

Q. You say, "During this period" -- this is referring to the COVID-19 pandemic -- "many labs around the country, including ours, were first to modify the manufacturers' protocol for particular COVID-19 diagnostic tests in order to make substitutions for certain materials or devices."

Do you see that?

A. Yes.

Q. So what you're saying is that you, at least at your lab, during COVID, at times you had to make modifications to manufacturers' tests because some materials or devices pertinent to the test weren't available?

A. The major thing was really the specimen types, because I don't know if you recall, maybe not, but there were times where you couldn't get swabs. There was just no swabs available. People were printing 3-D swabs, which were horrible. So other options you had to do were saliva, you know, swab and saline instead universal transport media. Like, we had to get really creative just to offer a test.

Q. It says, "Optimally, clinical specimens that are known to be positive or negative for the infectious targets of interest are used in the verification or validation study to determine the performance characteristics of the new test."

Do you see that?

So clinical specimen, what does that mean?

A. Clinical specimen, in that reference, is basically

Page 60

patients -- preferably patient samples that are known to be positive or negative.

Q. What's the difference between a patient sample and a contrived sample?

A. So a contrived sample, it can still be a patient sample, because you can use leftover patient sample, but it was not positive for the test -- for the target you were interested in, so you would seed bacteria, virus, RNA, DNA into that to make it positive.

Q. Right. So you basically take -- for COVID, you take the virus and you would seed it and create this positive sample?

A. Correct, or the genetic material, yes.

Q. You say "We include a range of positive specimens to ensure the test can accurately test strong and weak positives."

And by that, you mean, I guess, contrived positive samples that have different amounts of, I guess, the virus?

A. It can be contrived or it can be actual patient samples that you know previously were a very, very strong positive or a weak positive. It could be both.

Q. When you say "Most instances, a lab's internal verification or validation results are not published or shared with any outside parties."

Do you see that?

Page 61

A. Yes.

Q. Are you aware of instances where a lab's internal verification or validation results are published and shared?

A. I mean, I would say in the peer-reviewed journals that are available, there are some verifications or validations that are published; however, they are typically difficult to publish for one thing, because they are not necessarily very novel work, right. It's just a verification or validation that's done.

Many institutions, especially non-academic places wouldn't necessarily pursue it because it's just not part of their job description or requirement, or interest even.

So a lot of the times, particularly now, it isn't very common to actually see a peer verification or validation being published. Usually it's a larger study. So you're expanding it extensively just to make it more relevant or applicable for publication.

Q. Got it.

MR. PINEIRO: I apologize. I drank too much water this morning. Can we take a quick bathroom break?

THE WITNESS: Sure.

(Thereupon, a brief recess was taken.)

BY MR. PINEIRO:

Q. So we were talking about a lab's internal verification or validation results are not published or shared

16 (Pages 58 - 61)

Page 62

with any outside parties.

Have any of the verifications that you've been involved with been published by or shared with outside parties?

A. I would say I've not shared them with outside parties like a manufacturer, if that's what you're referring to.

Part of my validation or verification studies have been pursued -- or have been published, but that's a subset of it. That, then, gets expanded extensively. You know, that's the paper, for example, that I mentioned. Part of that was the validation results, but we expanded it extensively to make it more appropriate for publication.

Q. Have you ever had one of your internal validations or verifications be disseminated by a manufacturer in a press release?

A. Not that I'm aware of, but we usually don't share our data. But again, that's my preference and what we like to abide by. That's not to say that labs out there are not sharing their data with the manufacturer. It really is preference. There's no specific, you know, I guess, guideline or so against or for it.

Q. Do you think it's strange that Co-Diagnostics attached to a press release its validation reports in the May 1st press release?

Page 63

MS. YORK-ERWIN: Objection; ambiguous.

THE WITNESS: I mean --

MR. PINEIRO: Trying to come up with a reason why my question was bad. Probably many of them.

MS. YORK-ERWIN: I'll go with ambiguous.

THE WITNESS: I guess I don't really have an opinion how manufacturers like to pursue things and whether they like to incorporate this or that or how they work with other labs and come to the agreement to publish -- or not publish, but post things as part of the press release or not. I really don't have an opinion on that.

BY MR. PINEIRO:

Q. In your experience, though, that appears to be extraordinary; right?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: No, I didn't say that was extraordinary. I said that that's usually -- that's something that I have not done for myself because we don't usually share our validation or verification data.

But again, there is no guidelines against or for it. So, you know, to each, their own. And if that's what they like to do, it is what it is.

BY MR. PINEIRO:

Q. Right. But in your experience, you've never seen that before; correct?

Page 64

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: Again, not that I would recall, because even though I do read or skim press releases randomly here and there, I'm not keeping a close eye out on what is in there or what was attached or, you know -- this could be a common thing, I wouldn't be able to tell you one way or the other.

BY MR. PINEIRO:

Q. Okay. So you say, going down to page 8, "If there were performance issues during the validation/verification, labs generally will work with the manufacturer to troubleshoot and determine potential issues that can be fixed."

Do you see that?

A. Yes.

Q. "If the problem is not resolved, the lab will likely forego implementing the test and orders will not be placed."

Do you see that?

A. Yes.

Q. Has that ever happened in your experience at your lab, where you couldn't resolve or troubleshoot an issue and you decided not to -- the lab -- your lab decided not to implement a certain test?

A. Yes. It actually just happened in the past month or so, unfortunately. And so, you know, we did work with the manufacturer. Usually the manufacturer wants to work with the

Page 65

lab because, you know, of course they are motivated for us to implement the test as well.

However, even with troubleshooting and modifications, the issues weren't resolved, and it wasn't necessarily in this case because of a sensitivity issue or a specificity issue. It was a lot of run failures.

So usually a PCR test, you include an internal control, and that will tell you or assure you that the PCR process actually worked. So even though a patient result is negative, you would have amplification of this control.

And so our issue with this particular test was that the internal control wasn't working, so there were failures, and more than we would like. So I think it was like 15-plus, 20 percent failure rate. And it's expensive tests, too. It's time-consuming. So we opted to not go ahead with it. And so we did not order their test.

Q. Got it.

Do you know whether there are any labs that perform validations or verifications of Co-Diagnostics' tests and elected not to implement the test?

A. I don't know of any.

Q. Do you know of any distributors who performed verifications or validations of Co-Diagnostics' tests and elected not to sell Co-Diagnostics' tests?

A. I don't know of any.

17 (Pages 62 - 65)

Page 66

Q.   Were you made aware by counsel or otherwise of any testing issues of the COVID -- for the Co-Diagnostics' COVID-19 test in South Africa?

A.   Not that I can recall.  I'm trying to think if it was in Westguard -- Dr. Westguard's report, but I can't recall at this point.

Q.   Your opinion, though, you can say here, your opinion doesn't involve any analysis of testing issues for the Co-Diagnostics' tests in South Africa; correct?

A.   Not that I can recall.

Q.   What about Greece?  Are you aware of any testing issues that occurred with the Co-Diagnostics' tests in Greece?

A.   Again, I'm trying to remember if it was in Westguard's report.  But other than that, I can't recall either.  I'm happy to look, if that's something you want me to look at, but not that I can recall.

Q.   No, that's okay.

So it's fair to say, again, that your opinions here didn't involve any analysis of any testing issues with the Co-Diagnostics tests in Greece; correct?

MS. YORK-ERWIN:  Objection; assumes facts not in evidence.

THE WITNESS:  I can't recall.

BY MR. PINEIRO:

Q.   I'm just saying your opinion, though.  In terms of

Page 67

your analysis and opinion here, it doesn't involve or encompass anything that happened with Greece with Co-Diagnostics' tests; correct?

MS. YORK-ERWIN:  Objection; vague.

THE WITNESS:  If you're referring to the report that was generated, whichever list of documents that was included in the report would have formed -- helped or aided in my forming opinions in that.

I don't believe -- I can't recall if there was anything related to Greece that was in those forms.

BY MR. PINEIRO:

Q.   So I'm going to the selection process for new diagnostic test.  "One of my primary roles as director of the clinical microbiology and virology laboratories is to investigate and assess novel diagnostic test that would be appropriate to implement for patient testing at CHLA."

Do you see that?

A.   Yes.

Q.   What's a novel diagnostic test?

A.   New.

Q.   And then you say, "I want to emphasize, this is often a lengthy and thoughtful process from test selection to evaluation."

Do you see that?

A.   Yes.

Page 68

Q.   How lengthy is this process typically?

A.   You know, it depends.

Q.   Sorry?

A.   It depends.  Depending also on manpower or how urgent it is, it can take up to a year or so.  You know, especially if we're just kind of looking at things here and there.

If it requires a new instrument, which would require an agreement, it can take quite a long time as well.  So there are other factors as well.

Q.   So would a manufacturer test for COVID-19 be a novel diagnostic test?

A.   It could be novel depending on the technology or their approach.

Q.   Got it.

And so the process for implementing COVID-19 tests at your lab, was that also lengthy and thoughtful, as you've described here?

A.   It wasn't lengthy because there was an urgency, so we moved quite quickly.  It was thoughtful in the sense that, of course, there was oversight and we wanted to ensure that whatever test we implemented was a good test.

But did I shop around as much as I normally would for other tests?  No, because there wasn't anything.

Q.   So given what was happening with COVID-19, is it

Page 69

fair to say that the process was more abbreviated or short-circuited?

A.   It was expedited.

Q.   So you say "When investigating potential commercial tests, I search the literature for published studies, speak with colleagues, et cetera.  Some of that may not have been available during COVID-19."

A.   The published studies definitely not, because it was very, very early.  And when I mean "published studies," we're looking for usually most -- like large clinical trials, multi-center studies with, you know, like -- or outcome studies, and especially things that have been around for a while that may help me determine whether this is going to be worthwhile, not necessarily just for the performance of the test, but whether there is going to be a positive impact on the patients if we offer the tests.  Those sort of things.

Q.   Generally speaking, is it fair to say that a published study will carry more weight with you than -- on a COVID PCR test than a written validation report?

MS. YORK-ERWIN:  Objection; incomplete hypothetical.

THE WITNESS:  No, I wouldn't agree with that.  Most validation studies aren't going to be published and, you know, I'm -- I am on an editorial board and editors for journals.  I know specifically we would never just accept a validation study for a publication.

18 (Pages 66 - 69)

Page 70

That doesn't mean it's not good, but it's just not novel enough from the approach to be published in a journal, which is more academic and more research-focused.

BY MR. PINEIRO:

Q. So this selection process that you're describing here, why is it in your report?

A. Why is it in the report?

Q. Yeah.

A. Because I wanted to communicate how typically outside of COVID, just what the routine process would be or how I would like to kind of -- how I would approach, even starting to consider a new test all the way to actually bringing it in.

And then, that kind of also conveys to you just, during COVID, how -- because of the urgency and the limitations of tests not being available, samples not being available, how we also approached COVID, you know, still following the metrics that are required of us, but in different ways as well with, you know, more contrived samples, for example, or less samples in the validation/verification.

Again, not saying it's not appropriate, but it's -- it was just what we had to do at that time.

Q. So you say, "With all this in mind, my colleagues and I review our verification/validation results to determine whether the tests under consideration demonstrate sufficiently

Page 71

high performance for use in our labs. While all required verification/validation criteria are important, for our purposes, the most important metrics for assessing test performance are how sensitive and specific it is, how well it differentiates between true positive and true negative samples."

Do you see that?

A. Yes.

Q. "As mentioned above, tests that are qualitative and FDA-cleared do not require labs to determine the LOD. Even when labs are required to determine LOD, as in the case of an LDT" -- what is LDT?

A. Lab-developed test.

Q. -- "the measure obtained is documented in the validation report and test characteristics, but the sensitivity and specificity of the test remain paramount in determining test performance."

Do you see that?

A. Yes.

Q. Is it normal on manufacturer test instructions or packaging that there are disclaimers that indicate that, you know, this test -- no test can be 100 percent sensitive or accurate?

MS. YORK-ERWIN: Objection; vague.

THE WITNESS: I mean, I can't recite specifically

Page 72

word to word what manufacturers' package insert would have, but typically there are usually a long list of limitations in general about the test that's listed there.

BY MR. PINEIRO:

Q. So you say, "If a lab is generating data outside of 95 percent CI, confidence interval, it would warrant further investigation; and if not resolved, a lab would not implement the test. Labs typically work with the manufacturer to try to identify and correct any non-test causes of reduced performance."

Do you see that?

MS. YORK-ERWIN: You are muted, Dr. Bard.

THE WITNESS: Sorry. My dog was barking for a minute. I was trying to not disturb you.

Yes, I see that.

BY MR. PINEIRO:

Q. "Due to the large number of factors and steps in molecular testing, there are many ways in which things can go wrong, and identifying the precise cause of lower-than-expected performance can take extensive investigation."

Do you see that?

A. Yes.

Q. If a lab is not able to troubleshoot or determine the reason for the lower-than-expected performance, can it

Page 73

rely on other third-party validations to, nonetheless, implement the test?

MS. YORK-ERWIN: Objection; incomplete hypothetical.

THE WITNESS: Are you asking if, let's say, a lab was not able to generate appropriate sufficient data, can we just drop that and then just reference a different lab --

BY MR. PINEIRO:

Q. Correct.

A. -- for their own?

Q. Well, no. So let's say it's your lab and you are having a test that's giving you lower-than-expected performance. You investigated, and you're not able to troubleshoot and determine why the test is performing lower than expected.

However, you are aware of -- and the manufacturer provides you with other third-party validations showing 100 percent sensitivity and specificity.

In that scenario, is your lab able to or will it implement the test?

MS. YORK-ERWIN: Objection; incomplete hypothetical and confusing.

THE WITNESS: I mean, I got -- if I'm understanding this correctly, if this was a lab that's completely outside of my institution in general, like an independent

19 (Pages 70 - 73)

Page 74

lab that has no relationship with me at all and no association, and they -- and I was not able to generate the good-enough data, but they are, can I use that lab?

Per CLIA and CAP, which we are under that, I would not be able to. That's basically saying you would reference just the IFU or something. You have to do your own verification or so.

However, there are many hospital systems where there are multiple hospitals or lab space with like, you know, a centralized section, for example. And you may be that primary centralized lab that can pursue the validations for your different sections and then have it implemented outwards and have training conducted that way.

BY MR. PINEIRO:

Q. So taking the hypothetical more specific to our case, so if your lab -- hypothetically you have a lab, you're doing COVID tests, you're presented with the Co-Diagnostics test, the tests, when you do your verification/validation, are showing lower-than-expected performance, and you can't -- despite troubleshooting, the performance doesn't improve. Co-Diagnostics then shows you the validation reports that are attached to their May 1st press release and they say, "Hey, these are from various labs or manufacturers."

In that scenario, your lab, under CLIA, can't just rely on those third-party validations to implement a test

Page 75

given that your own data didn't demonstrate appropriate performance.

Is that a fair depiction?

MS. YORK-ERWIN: Objection; incomplete hypothetical.

THE WITNESS: Again, if this was completely independent, and my lab is independent of any of those other labs and their data and not within the same system, then, you know, part of CAP and CLIA requirement is that we conduct our own verification or validation of it.

But there are many institutions that are not under that requirement. CLIA is a U.S. requirement. I'm not sure what the requirements are for other countries or places.

But, again, if there is an association between those labs, then they may approach it differently. And the assumption is that there would be training that would occur across those sections to ensure that they are up to speed and able to perform the test.

BY MR. PINEIRO:

Q. Got it.

Opinion three is "Procuring, validating and implementing PCR COVID-19 tests in the first few months of COVID-19."

Do you see that?

A. Yes.

Page 76

Q. You say, "As the COVID-19 pandemic was a significant public health emergency, there was great urgency for laboratories to test for SARS-CoV-2, and the verification/validation process and implementation experience was dramatically different."

Do you see that?

A. Yes.

Q. What did you mean by dramatically different?

A. It was dramatically different because, you know, as I mentioned up above with the process, that we usually kind of shop around for different tests and figure out which ones would work best for us. It was all just whatever was available at the time. That was one.

All hands were on deck. So we also completed the validation, the test build. Everything was just expedited as well because there was a huge urgency. You know, we -- a big thing about having a test available was being able to keep your hospital open and to accept patients.

So, yeah, it was just a huge urgency in general that allowed us to expedite things quickly.

Q. So you say, "The CDC 2019, called the 'CDC test,' was the first to be granted EUA by the FDA, and that was the first test that we implemented in our laboratory."

Do you see that?

A. Correct.

Page 77

Q. At present, do you know whether the CDC-2019 test was a very accurate test or not?

A. In our hands, we thought it worked well. I haven't looked into the literature about the test specifically, but we used it for a long time.

Q. I mean, do you know whether it ended up being less accurate than other manufacturer tests?

A. Not that I'm aware or have looked into.

Q. So you say, "Due to the difficulties in procuring positive clinical samples, our verification study consisted of contrived patient specimens derived from seeding SARS-CoV-2 material into universal transport media at various concentrations. We calculated the sensitivity, specificity and overall accuracy of the test using contrived patient samples that were seeded with virus. We found that the CDC test yielded sensitivity and specificity of 100 percent when tested against the positive and negative samples."

Do you see that?

A. Yes.

Q. So you say, "Our laboratory implemented a total of five SARS-CoV-2 tests on different platforms throughout the pandemic."

Do you see that?

A. Yes.

Q. Which were the five?

20 (Pages 74 - 77)

Page 78

A. The CDC, the SAFIA assay, one from BD Max, Thermal Fisher and BioFire. I think that's the fifth one.

Q. Which one was it?

A. BioFire.

Q. Do you know if your hospital was ever contacted regarding potential Co-Diagnostics' tests?

A. No. It would have gone through me, and I certainly was not.

Q. Of the five tests that you listed, looking back now, in retrospect, were any of them more or less effective?

A. No, we did the exact same -- pretty much the same evaluation for each one. After the CDC, we used -- after we implemented the CDC, we use the CDC as our reference method when verifying the rest of the assays.

Again, and we found the performance to be comparable, which is why we used it randomly, depending on what reagent was available basically.

Q. So you say "My laboratory did not evaluate or use the Logix test at any point, but based on my review of materials provided by Co-Diagnostics in connection with this litigation, the Logix test is a high-complexity RT-PCR test, and the protocol appears to be similar to the high-complexity PCR test that were utilized in my laboratory."

Do you see that?

A. Yes.

Page 79

Q. What is a high-complexity RT-PCR test?

A. So the CLIA designates tests based on the complexity. So you can have low, moderate or high complexity.

So a high-complexity test is one that's just more complicated. It requires multiple steps.

And in this case, high complexity, what I was referring to was the requirement for external extraction of the nucleic acid, and that a manual performance of the PCR -- setup of the PCR setup itself. And then, you know, of course -- and so usually those are classified as high complexity.

Q. You say, "We used a minimum of ten positive specimens. This resource limitation is not usually a factor when performing routine verifications for non-SARS-CoV-2 tests, and often a high number of specimens would be included in the verification study."

So it seems like the use of ten positives and ten negatives, that's a lower amount of specimens than you would normally use for a verification?

A. It's a lower amount than -- that we typically would use, but there is no actual required number. It's per CLIA and CAP. It's really dependent on what the lab director feels is appropriate.

I typically like to include more for our other tests; however, those same tests, another lab director might feel that less is enough. So it really is dependent.

Page 80

But for this purpose and for COVID, we felt that ten positive and ten negative was sufficient.

Q. What's the amount that you would normally use?

A. There is -- again, it's a more complicated question than it seems. It depends on the cost of the test, whether, you know, it's FDA-cleared. That really also does inform whether we would do more or less.

You know, we just validated, for example, this expensive panel that was, you know, a few hundred for each test. And so with that, we take into consideration that we usually will include less.

So we included ten negatives, for example, for that part. It was an FDA-cleared test, so that was justified as well.

So it just depends on those factors as well.

Q. Is there more risk when you use a lower amount of specimen?

MS. YORK-ERWIN: Objection; vague.

THE WITNESS: I would not say so because this is also -- these are also tests that have been assessed and determined to be appropriate by the FDA.

Yeah, I wouldn't agree with that.

BY MR. PINEIRO:

Q. You say, "My recollection is that all five of the SARS-CoV-2 assays we implemented showed 100 percent

Page 81

sensitivity and specificity compared to the reference method during our verification and validation of those tests as expected."

Do you see that?

A. Yes.

Q. So using a verification with ten positives and ten negatives, all five showed 100 percent sensitivity and specificity?

A. So using ten positive and ten negative, I can't tell you the exact number for each one, but there was 100 percent sensitivity and specificity for each one.

Q. You say, "The five assays that were implemented in our laboratory were a range of moderate- and high-complexity tests."

A. Uh-huh.

Q. "In contrast to the moderate-complexity tests that are often closed systems, high-complexity tests are open systems, meaning they require a separate extraction step using a separate instrument to obtain the total nucleic acid followed by PRC that is set up on a 96-well plate either manually or using automation."

So it seems you're saying that the open systems are more susceptible to contamination?

A. The open systems are highly complex. They require multiple steps, most of which are usually manual, at least for

21 (Pages 78 - 81)

Page 82

us, most are manual.  So yes, there are increased risks of contamination because there are multiple steps and it is more complicated, versus a closed system, which is the moderate-complexity test, you are literally piping into the cartridge, popping it into the machine and walking away.

Q.  And you say -- you describe some risks and you say, "These same risks caused major problems for many less sophisticated labs, without extensive high-complexity test experience, that sprung up around the United States to address the unmet demand for COVID-19 testing early in the pandemic.  Many of these pop-up labs may not have had qualified or experienced personnel with appropriate training and competency."

Do you see that?

A.  Yes.

Q.  Do you have any personal knowledge of pop-up labs, as you described them, that, you know, didn't have qualified or experienced personnel; and as a result, there was contamination?

A.  I don't have personal knowledge directly as in I experienced myself, but I heard of labs, you know, even through colleagues or so, like that, that have -- just have discussed this.

I mean, even in California, we had a number of pop-up labs that offered testing through LA County or, you

Page 83

know, other places, too.

And but me, personally, did I like actually have direct interaction or work with those labs, no.

Q.  So you don't have personal knowledge of this.

Is there any other -- what's the basis for this statement?

A.  I believe there also was news articles about this, even just in general, right.  But there were discussions of these new labs that -- fresh, new labs that have not ever existed before, right.

And just understanding the complexity of the test itself, I mean, we are -- we are a lab that has been performing PCRs and other molecular tests over a decade, and we encounter issues ourselves.

So it's -- I don't think that it's a poor assumption to think that this will be the case, particularly for labs that have no experience with molecular testing.

Q.  Okay.  In the appendix we reviewed earlier, you don't reference any articles discussing this; correct?

A.  No.

Q.  Did you rely on any published articles or journals regarding this?

A.  No.

MR. PINEIRO:  Can we go off for a second?

(Thereupon, a brief recess was taken.)

Page 84

BY MR. PINEIRO:

Q.  So Section 4 of your opinion here says, "The way the May 1st press release described the Logix test performance was consistent with how manufacturers typically describe diagnostic test performance."

Do you see that?

A.  Yes.

Q.  Now, you don't -- again, your laboratory is not a manufacturer; right?

A.  No.

Q.  Do you have a lot of experience reviewing test performance descriptions by manufacturers?

A.  I mean, I have a lot of experience communicating and speaking with manufacturers and getting communications from them.  And so this is -- it just seems -- it's a very, kind of typical, common approach for manufacturers to talk when speaking about their tests.

Q.  So you say, "The May 1st press release described COVID-19 test performance data demonstrating 100 percent sensitivity and 100 percent specificity, the metrics used to define accuracy in molecular diagnostic testing."

And you say, "In my view, this was simply a high-level summary of data reported to Co-Diagnostics from past independent evaluations of its test."

Do you see that?

Page 85

A.  Yes.

Q.  What's the basis for that view?

A.  Because there was a summary, and some of the independent studies that showed 100 percent sensitivity and specificity.  It's a summary of that.

(Exhibit 2, Press Release was marked for identification.)

BY MR. PINEIRO:

Q.  I'm showing you what's marked as Exhibit 2 to the deposition.  This is the May 1, 2022 press release from Co-Diagnostics.

Are you familiar with this?

A.  Yes.

Q.  So it says, "Co-Diagnostics releases COVID-19 test performance data:  Consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations."

Do you see that?

A.  Yes.

Q.  What do you interpret to mean as "Consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations"?

A.  I interpret that as -- in laboratories that evaluated the test, during their evaluation, they identified consistently 100 percent sensitivity and specificity.

22 (Pages 82 - 85)

Page 86

Q. Do you interpret that as saying that in every independent evaluation, the results were 100 percent sensitivity and 100 percent specificity?

A. I interpret that as in the independent evaluations that they are referencing for this press release, that it consistently demonstrated 100 percent sensitivity and 100 percent specificity.

Q. If they omitted -- hypothetically, if there were independent evaluations that didn't show 100 percent sensitivity and 100 percent specificity, and these existed before May 1st, do you think that this title would be misleading?

MS. YORK-ERWIN: Objection; assumes facts not in evidence and incomplete hypothetical.

THE WITNESS: I think that's -- it's a very broad question to try to answer without knowing more of the context. It's all assumptions at this point.

BY MR. PINEIRO:

Q. I get that, but you're an expert, so I'm allowed to ask you to make assumptions.

Hypothetically, let's say your lab did an independent evaluation of the Co-Diagnostics test, and it found that it performed poorly. After troubleshooting, you couldn't figure it out, you decided not to use the test.

You understand so far the hypothetical?

Page 87

A. Yes.

Q. Okay. In that scenario -- and this happens, let's say it happens in early April 2020. In that scenario, is this -- do you think that this press release, the title of the press release would be misleading?

MS. YORK-ERWIN: Same objections.

THE WITNESS: Again, it's -- I think there are -- it's a complicated question with multiple factors and it's difficult -- it would be difficult for me just to generalize it with a yes-or-no answer.

BY MR. PINEIRO:

Q. So you can't answer that question yes or no?

A. Not based on how you're asking it, no.

Q. Why?

A. Because there are -- there is -- I don't have the full picture. I don't know why there might have been an issue with that. Was it resolved? Was it investigated? Was there a reason that was identified that was independent of the test itself, right, being an issue?

There's all these factors that make it more complicated to be able to give a yes-or-no answer.

Q. My hypothetical, we are controlling for that, right. In my hypothetical, I'm telling you that your lab ran this to ground and you're certain that this test had subpar performance and you elected not to use the test.

Page 88

In that scenario, controlling for all these variables that I think you just referenced, would this title of the press release, would that be misleading or not?

MS. YORK-ERWIN: Same objections. Also calls for a legal conclusion.

THE WITNESS: It's the same thing. Even with troubleshooting and all of that, it may not necessarily allow you to say -- it doesn't allow me to say yes or no to this question. It's too broad.

BY MR. PINEIRO:

Q. So there is no way -- even controlling for the variables you said -- you said there were too many variables, right, for you to answer this question?

A. Well, because even controlling for the variables, it doesn't rule out that it was me or my lab that was the issue in this, right. So there's other factors like that. It's not a simple yes-or-no answer.

Q. Right. But the statement here says, "This test consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations."

That statement would not be accurate in my hypothetical --

MS. YORK-ERWIN: Objection; asked and answered.

MR. PINEIRO: Hold on. Now you just flat-out interrupted me in the middle of a question.

Page 89

MS. YORK-ERWIN: I apologize. I thought you were done.

MR. PINEIRO: No, no. I was taking my time.

BY MR. PINEIRO:

Q. So again, what this says is, "The test performance data consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations." That statement would not be accurate in the hypothetical I presented to you where, earlier, in April, your test, your lab conclusively found the test was not performing well; correct?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: Again, I can't answer yes or no to this because of the reasons I stated prior.

BY MR. PINEIRO:

Q. What if Co-Diagnostics, in my hypothetical, acknowledges, and they say, "No, it seems like your results are coming up right. The test isn't performing well in your lab, and we don't know why it is. And we don't see any issues with the way you did it." Let's add that to the mix.

In that scenario at least, can you agree that this statement would not be accurate under my hypothetical?

MS. YORK-ERWIN: Objection; incomplete hypothetical.

THE WITNESS: I still can't give a yes-or-no answer, even from that.

23 (Pages 86 - 89)

Page 90

BY MR. PINEIRO:

Q. So there is no scenario where you can give a yes-or-no to my hypothetical?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: No, not without a full picture, absolutely full picture with all the details. I'm not going to speculate.

BY MR. PINEIRO:

Q. Well, wait. You can either -- I know you don't want to speculate, and I'm going to keep asking this until I get something that makes sense to me in terms of an answer.

I'm asking you to speculate, right. That's part of what experts do. They make assumptions. So I'm asking -- and that's perfectly normal for an expert.

So as an expert here, you still -- you're telling me you can't answer this question as presented to you.

MS. YORK-ERWIN: Objection; asked and answered many times.

THE WITNESS: I'm not going to answer this question as it's presented to me.

BY MR. PINEIRO:

Q. Is that because the lawyers would be upset with you?

A. No.

Q. So then if you go to the actual press release, it says May 2020, May 1, 2020, "Co-Diagnostics, a molecular

Page 91

diagnostics company with a unique patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100 percent sensitivity and 100 percent specificity, the metrics used to define accuracy in molecular diagnostic testings."

Do you see that?

A. Yes.

Q. And it says, "The data being released comes from independent evaluations of the performance of the COVID-19 test in the field. These evaluations were conducted in Mexico by the Department of Epidemiology, India, and elsewhere in the U.S. and abroad. Each study concluded 100 percent concordance for both specificity and sensitivity."

Do you see that?

A. Yes.

Q. What does 100 percent concordance means?

A. It means 100 percent of the time they -- the test got the right answer. So it basically correlated with the reference method.

Q. So the summary of recent validation data and data itself can be found here, and it's attached -- the data is actually attached -- the validation reports are attached to the press release; correct?

A. I believe. At least in this form. I don't know if it was a link or so in the original.

Page 92

Q. Got it.

Have you ever seen anything like this?

A. Again, I usually will review and glance at press releases. I don't dig in further. It's not usually where I focus my time.

Q. But nonetheless, have you ever seen anything like this?

A. Not specifically, but I'm also not outright looking and paying attention.

Q. And then it says, "In remarking on the test's favorable limit of detection results in the evaluations, Brent Satterfield, PhD, said, 'In diagnostics, in the limit of detection, or LOD, is a single metric that helps inform the key metrics of sensitivity and specificity, but is not relevant as a standalone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity, and you can't do better than that.'"

Do you see that?

A. Yes.

Q. Now, it says here, "Remarking on the test's favorable limit of the detection results." Do you know if the validation report attached to this showed a favorable limit of

Page 93

detection results?

A. I'm looking at the forms right now.

I believe there was one study that actually did -- at least one study that did a limit of detection study, or maybe more. The Australian limit of detection. And I think there was another one.

I have nothing -- I guess there's nothing on here that would make me question that it isn't a good limit of detection. I personally really did not pay attention too much to the limit of detection itself, like the value for the test that we offer, as long as we were able to pick up the positives and negatives as part of our validation.

You know, again, with the tests being authorized for emergency use by the FDA, you know, limit of detection, at least in the lab and in the verification, wasn't required, so it wasn't something that I focused on.

Q. And so where he says, "We have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity, does that in any way remark on or implicate the limit of detection?

A. Not necessarily. It's implicating that compared to the reference method of the samples that were tested in these studies, they were able to accurately detect or not detect the virus 100 percent of the time.

Q. Right. And so when somebody says, "Hey, we've

24 (Pages 90 - 93)

Page 94

achieved 100 percent clinical sensitivity and specificity, they're not actually remarking on the limit of detection; right?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: I'm not sure I really understand what you are asking. But what I'm --

BY MR. PINEIRO:

Q. Well --

A. -- trying to convey is that for the sensitivity and specificity, you're comparing your results against the reference method results. And they are showing that they are able to pick up positives and negatives accurately 100 percent of the time.

A limit of detection is just a factor of the study that they would have conducted.

Q. Right.

A. And it's a value that's reported. But it doesn't necessarily -- isn't necessarily entirely connected, I guess, to the sensitivity, right, because whatever the value is, you can still pick up.

Q. Right.

So for instance -- another hypothetical. I know that Genevieve isn't fond of these, but let's say in this hypothetical I have Test X. And I say my test is achieving 100 percent clinical sensitivity and specificity in validation

Page 95

results, right.

Now, when I make that statement about Test X, am I remarking on the limit of detection of that test?

MS. YORK-ERWIN: Objection; incomplete hypothetical.

THE WITNESS: I'm not really sure I understand what you're asking.

BY MR. PINEIRO:

Q. That statement, does that remark upon the limit of detection of the test?

The answer is no; correct?

MS. YORK-ERWIN: Objection; vague.

THE WITNESS: The sensitivity -- if you're talking about the sensitivity specifically, a subset of how you could investigate sensitivity is looking at the limit of detection.

So it is tied together in some ways, right, but when they're remarking on the 100 percent sensitivity or specificity, I assume it's in reference to the samples they tested against the reference method.

BY MR. PINEIRO:

Q. Right.

So do you know who prepared this press release?

A. Not off the top of my head.

Q. So the press release says, "In remarking on the test's favorable limit of detection results in the

Page 96

evaluations."

Do you see that?

A. Yes.

Q. And then there is no reference to LOD results. But then Satterfield says, "We've consistently and repeatedly achieved 100 percent clinical sensitivity and specificity."

Do you see that?

A. Yes.

Q. So he's not actually remarking on the limit of detection in his statement; correct?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: I still don't really understand the question that's being asked.

BY MR. PINEIRO:

Q. Is he remarking -- this describes, "In remarking on the test's favorable limit of detection results," right? And then it gives the quote that it's referring to, "The remarks on the LOD."

He's not remarking on the LOD in that statement; correct?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: He is not remarking in the sense that there is no value that's based there. But the assumption is there is an association with the sensitivity and specificity -- the sensitivity in particular, right, where

Page 97

100 percent sensitivity that they are detecting, there is an association with the limit of detection in this case here.

BY MR. PINEIRO:

Q. So what you're saying is that when you make a reference to clinical sensitivity, there's an association between that and limit of detection?

A. No. That's a very general term.

You're asking me specifically in the sentence he's talking about. When I talk about sensitivity and specificity, I'm referencing the test, the reference test and the results that are generated by the test method and what we generate, like the data that's generated from that.

But you're asking me specifically about this sentence here. That's not a general thing.

Q. But it seems like, at least here, Satterfield, at least in this quote, he appears to be associating 100 percent clinical sensitivity with a favorable limit of detection; right?

MS. YORK-ERWIN: Objection; calls for speculation.

MR. PINEIRO: She's opining on the report.

THE WITNESS: I'm just reading the sentence right now. But I don't know if I can really answer that because again, I am -- and I know it is really just an assumption on my part. I am speculating.

25 (Pages 94 - 97)

Page 98

BY MR. PINEIRO:

Q. Wait a second.

Aren't you telling us -- you're providing your opinion how people in the lab-testing industry would view this press release; right?

A. Uh-huh.

Q. I'm asking you know --

A. How I would, yes.

Q. So I'm asking you: Do you believe that Satterfield -- in your capacity, right, as an expert here, do you believe that Satterfield is creating an association between 100 percent clinical sensitivity and a favorable limit of detection?

A. Not based on the quote specifically, right, because -- I mean, the quote specifically, he's talking about limit of detection as a single metric that helps inform the sensitivity and specificity.

Q. Got it. Okay.

Better question. Do you think the press release is creating that association?

MS. YORK-ERWIN: Objection --

THE WITNESS: That's --

MS. YORK-ERWIN: -- form.

THE WITNESS: I don't know if I really can answer that.

Page 99

BY MR. PINEIRO:

Q. What else are you doing here, then? You're an industry expert testifying on the way this would be received.

You can't testify about whether this is -- this language that's written here, you can't testify about how you view that in terms of what it means and what association it's creating?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: I just don't actually even understand what the relevance of this is.

BY MR. PINEIRO:

Q. What do you mean?

A. Well, I don't know -- I don't fully understand what you're asking, for one thing.

But are you referring to just the first part of this paragraph here?

Q. Correct. Right here. Yeah.

For some reason, it's not highlighting. "In remarking on the test's favorable limit of detection." That's the beginning of the sentence. And then what you have is a quote that purportedly remarks on the test's favorable LOD.

A. What is "favorable"?

Q. I'm asking you. You're the expert.

A. I think that's -- you know, you can -- yes, I can read this and say, Okay. This is a favorable LOD, where it

Page 100

will pick -- enough where the test will pick up the appropriate positives, right.

But there is no defined number or so that is considered appropriate, I guess, for an LOD itself.

Q. So is it ambiguous, then, you think, this part of the press release?

MS. YORK-ERWIN: Objection; assumes testimony.

THE WITNESS: That's not what I'm saying at all.

BY MR. PINEIRO:

Q. Do you think the statement, "In remarking on the test's favorable limit of the detection results in the evaluation," is that misplaced, then? Should it not be there?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: I don't see a problem with this paragraph that you're -- you have here.

BY MR. PINEIRO:

Q. Okay. So you don't have a problem -- so where does Satterfield remark on the favorable limit of detection of the test?

A. Based on what is listed here in this paragraph of this press release --

Q. Yes.

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: -- I don't see what the problem is or what the issue is.

Page 101

BY MR. PINEIRO:

Q. No, that's not my question, though.

My question is: Where do you see Satterfield in the quote in that paragraph comment on the favorable limit of detection?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: I don't -- again, I mean, he is -- his quote is there, so it's pretty straightforward. I don't -- can you -- I don't fully actually understand what you're asking again for this part.

BY MR. PINEIRO:

Q. In the quote --

A. Yes.

Q. -- based on -- in the quote, does he remark on the favorable limit of detection of the test?

MS. YORK-ERWIN: Objection; the document speaks for itself.

THE WITNESS: He remarks on the limit of detection in the first part of this sentence here as a metric of sensitivity and specificity.

BY MR. PINEIRO:

Q. Right. But does he remark on the favorable limit of detection?

MS. YORK-ERWIN: Objection; asked and answered. Document speaks for itself.

26 (Pages 98 - 101)

Page 102

THE WITNESS: Whatever he is remarking here is stated here. And it's clear to me.

BY MR. PINEIRO:

Q. You can't answer this question? I mean, you wrote a report -- the entire basis for your testimony is just this document. There's nothing else.

And I'm just asking you: In this quote, which is three lines, does he remark on the favorable limit of detection?

MS. YORK-ERWIN: Objection; harassing. You're harassing her.

MR. PINEIRO: I'm not harassing. I'm not getting an answer. And the court reporter can absolutely make --

MS. YORK-ERWIN: She's answered it multiple times already.

MR. PINEIRO: She has not.

THE WITNESS: He is remarking on the limit of detection as a part or a metric of sensitivity.

MS. YORK-ERWIN: That is the answer she has given a bunch of times.

BY MR. PINEIRO:

Q. Does he make any comment about a favorable limit of detection?

A. Again, he's remarking on it, the limit of detection, as part of the key metric of sensitivity. And then he reports

Page 103

on the sensitivity data.

Q. Right. So he is creating an association between limit of detection and sensitivity?

A. No, that's not what I'm saying.

Q. So what is he doing?

MS. YORK-ERWIN: Objection; speculation and asked and answered. The document speaks for itself. She's not Dr. Satterfield.

MR. PINEIRO: No. She's providing an opinion on a press release that he's quoted in.

MS. YORK-ERWIN: And she has done that.

MR. PINEIRO: This is the only thing I can ask her about.

MS. YORK-ERWIN: She has done that.

THE WITNESS: He's remarking on the --

MS. YORK-ERWIN: She answered this.

THE WITNESS: -- limit of detection as a part of the sensitivity, a key metric of the sensitivity, as stated here.

BY MR. PINEIRO:

Q. So it appears he is implying that there is a favorable LOD because it's a metric of sensitivity, and we're showing 100 percent clinical sensitivity in independent evaluations; is that fair?

MS. YORK-ERWIN: Objection; document speaks for

Page 104

itself, asked and answered.

THE WITNESS: You're asking me to answer on what somebody that is implying -- I mean, I'm hoping you asked him that question. But I can only speak to the fact of what he is saying here, that the limit of detection is a single metric that's part of the sensitivity.

MR. PINEIRO: All right. It's 2:00. Do you want to take a break?

MS. YORK-ERWIN: Sounds good.

MR. PINEIRO: Let's take a half-hour.

(Thereupon, a lunch break was taken from 1:58 p.m. to 2:34 p.m.)

BY MR. PINEIRO:

Q. Dr. Bard, during the lunch break we just took, did you speak with your counsel?

A. Yes, just very briefly.

Q. Okay. Without revealing the content of the communications, did you discuss the deposition?

A. We did not discuss anything of substance to the testimony. They were just checking to see how I was, if I wanted a lunch later.

Q. Sure. We should be done relatively soon.

So I'm sharing on my screen again what's been marked as Exhibit 2. We are going back to the May 1st press release.

So just continuing to go on looking at this, "The

Page 105

results underpin" -- it says, "The results underpin Co-Diagnostics' ongoing role as a major global supplier of COVID-19 tests, providing in vitro diagnostic kits to nearly 50 countries" -- strike that.

Going back to Dr. Satterfield's quote, he says, "In other countries where we have been evaluated against other tests."

Do you see that?

A. Yes.

Q. Is that a description of, I guess, a validation study?

MS. YORK-ERWIN: Objection; document speaks for itself.

THE WITNESS: It's a description of an evaluation, whether it's a validation or whatever. They're just saying that in other countries that evaluated the test, they achieved 100 percent sensitivity and specificity.

BY MR. PINEIRO:

Q. So I guess that would encompass any validation tests where the Co-Diagnostics test is compared to a reference test; correct?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: That's an assumption.

BY MR. PINEIRO:

Q. But would it encompass that?

27 (Pages 102 - 105)

Page 106

A.  I didn't make the statement.  I can't say that.

But how I interpret this is just how it's stated here, which is, in the countries that evaluated the test against another test, they achieved 100 percent sensitivity and specificity.

Q.  So then I'm going to the attachments to the press release.  This is page 7 of the PDF, Exhibit 2.

Have you seen this document before?

A.  Yes.

Q.  Are you familiar with the name Cecelia Hutchins?

A.  Only in some of the documents that were provided, but I don't know her.

Q.  Do you know what her role was at Co-Diagnostics?

A.  Something related to regulatory or other.  I don't know her specific title.

Q.  At your hospital, do you have to deal with compliance or regulatory issues?

A.  Do we have to deal with compliance and regulatory issues?

Q.  Yes.

A.  Yes, in general, as part of our quality control and quality assurance program.

Q.  In your role at the lab, do you interface at all or interact with members of the regulatory or compliance team?

A.  Superficially.  We also have our own quality program

Page 107

within our department that we would communicate with more regularly.

Q.  Do you know that before May 1, 2020, the FDA and Co-Diagnostics had agreed that Co-Diagnostics would have Ms. Hutchins review any public statements regarding the performance of the Co-Diagnostics' COVID test?

MS. YORK-ERWIN:  Objection; assumes facts not established.

THE WITNESS:  Not that I recall.  I don't -- not that I'm aware or can recall.

BY MR. PINEIRO:

Q.  Do you know whether she, Ms. Hutchins, was involved in reviewing or preparing this May 1st press release?

A.  Not specifically that I know of.

Q.  Has the compliance or regulatory team ever provided you with certain directions or instructions that you had to follow?

MS. YORK-ERWIN:  Objection; vague.

THE WITNESS:  Yes, that's very vague.  What do you mean by that?

BY MR. PINEIRO:

Q.  I mean, is there certain -- had your regulatory team member told you, "Hey, these are certain requirements that you have to, you know, carry out to be compliant with FDA regulations," for example?

Page 108

A.  Not with FDA because we are not inspected by FDA in my lab.  But there are requirements under CAP or CLIA that we have to follow.  But that's typically within our own department with our quality team.

Q.  Right.

In your experience, did you ever knowingly violate a CLIA requirement or regulation?

A.  I hope not.  Not to my knowledge.

Q.  So if this press release was in violation of -- was issued in violation of an agreement with the FDA, would that give you any concern?

MS. YORK-ERWIN:  Objection; assumes facts not established and incomplete hypothetical.

THE WITNESS:  I don't, I guess, know the full story of that.  So whether that is true or not, I can't really provide an opinion on.

BY MR. PINEIRO:

Q.  So this document says, "This document contains the following summaries of several studies performed on the Co-Diagnostics Logix Smart Test COVID-19 test and Cosara, Saragene Coronavirus 2019 Test, along with supportive data."

Do you see this?

A.  Yes.

Q.  Have you ever seen a test manufacturer put out a memorandum like this, summarizing validation results?

Page 109

A.  I'm sure I have.  I can't state specifically what, but I don't think that's that abnormal or out of the ordinary.

Q.  Do you have any specific instance of that that you can recall?

A.  Not that I can recall, no.

Q.  With respect to the press release that we went through earlier, have you reviewed any articles regarding how the investing markets reacted to that press release?

A.  No, not that I specifically sought out myself.  I don't think there was anything included in the files.

Q.  So if you go to the actual validation report, the first one is "validation report."  And you can see it's Co-Diagnostics letterhead.

Do you see that?

A.  Yes.

Q.  And it says, "To report the validation results of Logix Smart COVID-19 test for sensitivity, specificity and agreement with a laboratory-developed test performed at PathWest."

Do you see that?

A.  Yes.

Q.  Have you ever seen a manufacturer put on its own letterhead a validation report regarding data generated by a third-party lab?

A.  As I mentioned previously, I don't specifically use

28 (Pages 106 - 109)

Page 110

or have manufacturers help me with our report, and we have a very standardized template in our institutions that we like to follow.

With that being said, that doesn't mean that it's not done in other labs.

Q. And you see that the report is authored and supervised by the same person? And that's Rebecca Garcia.

Do you see that?

A. I'm assuming she's the person that typed out this report.

Q. Is that typical to have the author -- have the same author and supervisor?

A. It can be. I mean, a lot of the times I am a co-author on our reports because I'm editing it significantly, and I also would be the lab director that's signing it.

Q. What you're saying is, there are scenarios where you're the supervisor signing it, and you also are a co-author; correct?

A. Yes. Correct.

Q. Have you ever personally been the sole author and sole supervisor of a validation report?

A. I guess it depends on what you mean by a validation report. For this, it looks like this is just a summary that she -- whoever this person is -- put together and summarized for them.

Page 111

Depending on the requirements as well as the institution, usually there is more -- additional individuals that are included in the title. But I can say that I have been the sole author and the sole lab director that's signing it. But we would also have an additional medical director that's signing it as well, per our institutional requirements.

Q. What institutional requirements are you referring to?

A. My institutional requirements.

Q. Which are what?

A. Just that we have additional signatures on there as well.

Q. Why?

A. As part of a report. That's just standard for us.

Q. So it's standard to what, have a -- what is standard, you're saying? To have an author, supervisor and somebody else listed?

A. So it has an author, the lab director for that section, but also the CLIA license holder.

Q. Got it.

A. And that would be for labs in the U.S. that have that CLIA requirement.

Q. So for a validation report, have you ever been the sole person who signed and affirmed the report?

MS. YORK-ERWIN: Asked and answered.

Page 112

THE WITNESS: Again, under the CLIA requirement for U.S. labs, you cannot be the only person written on there unless -- unless you are the author, the lab director or supervisor and the CLIA holder, which, you know, some places may have that.

But if it's different people, then you need different signatures.

BY MR. PINEIRO:

Q. But in your personal experience, that has never happened for you; correct?

A. That's because I'm not the CLIA holder, correct.

Q. Who is typically, in your hospital, who is the -- what does it mean to be a CLIA holder?

A. It's basically -- you have to obtain a CLIA license to run a clinical lab, right, and offer testing. And so the CLIA license is granted to an individual, usually with an MD. And so they would be the person that holds that CLIA license.

Q. Got it.

A. And that's in California. However, in other states, it could be a PhD as well. It just depends on each state.

Q. So what you're saying is that if, in the scenario where the CLIA -- you're saying it's possible under CLIA regulations or requirements, it's possible that for a validation result that the author, supervisor and CLIA holder all be the same person?

Page 113

A. It can be, if that is the person that authored and the lab director of that section and also the CLIA holder, yes.

Q. What does a supervisor do when it comes to a validation report?

A. I mean, supervisor has -- every supervisor has its own specific job description depending on where you are. Our supervisor actually is not typically involved in validation, so it's just a general -- it's a title, right, that is self-brought, and very specific to each place and what their role is.

Q. Is there a standardized format for validation reports?

A. No. Every place does it very differently.

Q. Have you ever seen one similar to the one we're looking at here?

A. It looks pretty standard. I mean, it includes the key information. I don't -- it doesn't appear to be any different than any others, you know, minus templates and other things. But it includes everything it needs to, basically.

Q. Is that part of the opinion testimony you're providing? Like, did you review these specifically to see if, you know, these validation reports appear appropriate and an appropriate basis for the press release?

MS. YORK-ERWIN: Objection; compound question.

29 (Pages 110 - 113)

Page 114

THE WITNESS: I reviewed the validation report that's included in the attachments here. You know, just to see if it looks like a typical validation that most labs would do. And it does.

BY MR. PINEIRO:

Q. Do you know that Ms. Garcia, who signed these validation reports, testified in this case that Satterfield's comments in the press release were very arrogant and egotistical because it's like dismissing error altogether?

Are you aware of that?

MS. YORK-ERWIN: Objection; assumes facts.

THE WITNESS: I'm not aware of that. I don't believe I actually reviewed her deposition.

BY MR. PINEIRO:

Q. Did you ask whether she had been deposed?

A. No, I did not.

Q. Do you think it's pertinent to your opinion that the person who actually signed the validation reports thought the press release was arrogant and egotistical?

A. Not necessarily because I'm forming -- the opinions that I formed is based off of my knowledge and background of testing in general. And the other documents, I don't see how one person's opinion is -- it's one person's opinion. It's going to be different than my opinion.

It wouldn't have formed any -- it wouldn't have

Page 115

contributed to anything that I would have...

Q. Got it.

And then you have here this memo, InDRE Evaluation Co-Diagnostics, pertains to the Mexican government's CDC equivalent.

Do you see that?

A. Yes.

Q. There is no signature here for an author; correct?

A. Not where you're showing -- not on the page that you're showing. I don't know what else there is below.

I can scroll, myself, too.

Q. There is no -- you don't see -- there is no author that signed that; right?

A. Not from the pages that are here, but that doesn't necessarily mean that they do not have their own version or so that would be signed. This is also in Mexico. I don't know what the regulations are -- the requirements are in Mexico.

Q. This is on Co-Diagnostics letterhead; right?

A. Yes.

Q. Have you ever seen a validation report that's not signed by anyone?

A. This is the assumption that this is a validation report rather than a summary of a validation.

Q. Have you ever -- I mean, okay. Well, you tell me, what is this?

Page 116

A. This looks like a summary. Below -- you know, is this person inputting the results and data that was provided to them by the lab in Mexico and summarizing it?

You know, these are all assumptions. It could very well be that. The labs in Mexico might have their own report that they use.

Again, I don't know if there is a requirement for them to have it signed directly based on the rules there.

Q. Have you ever seen a validation report that's not signed?

A. In the U.S., if the lab is under CLIA requirements, a validation report requires signature.

But the question is: Is this a validation report or is it a validation summary? If it's a validation summary, then, no, it doesn't require it.

Q. Have you ever seen a validation report from a manufacturer?

A. No. Oh, you mean that the manufacturer has shared with me? I have not. Is that what you mean?

Q. Prepared by the manufacturer itself.

A. Oh. Like I said, I have seen cases, even just in the chemistry lab that I mentioned to you before, that the manufacturer has helped us put together reports for them.

Q. I mean, have you ever seen a validation summary before?

Page 117

A. We put together very short, condensed validation summaries occasionally ourselves.

Q. But you're summarizing your own validation report; right?

A. I summarize or me and my team, we summarize our own validation report. But the approach can be -- I'm sorry, validation summary. But the approach can be very similar, where it could be the manufacturer helping with that. It could be other people. There is a broad amount of ways to do this.

Q. And then it says "Multiple markers and COVID-19."

Do you see that?

A. Yes.

Q. This is not a validation report or validation summary; right?

A. I don't believe so. I think it's just information.

Q. What about this? What are we looking at here?

A. This looks like a summary of an evaluation or validation that was done.

Q. Just a chart, though; right?

A. Pretty straightforward. You see a bunch of negatives, a bunch of positives that are correlated. And the concordance is 100 percent.

Q. Has your lab ever prepared an unsigned chart like this, documenting a validation study?

30 (Pages 114 - 117)

Page 118

A.  You know, again, not knowing where this came from, this could have been a table that was transferred into this format, the table is pretty standard.  We would incorporate a table like this as part of our validation report.  And again, under CLIA, we require signatures for a validation report.

But if this is a summary that's done, or in a place that doesn't have the same regulations that we do, this could be sufficient.

Q.  I'm going to introduce what's marked as Exhibit 3.

(Exhibit 3, E-mail, was marked for identification.)

BY MR. PINEIRO:

Q.  Do you see an e-mail on your screen from Brent Satterfield to Dwight Egan, May 3, 2020?

A.  Yes.

Q.  Have you ever seen this e-mail before?

A.  I might have.  I couldn't recall if this was listed in the list of documents included in my report.  I can't recall specifically.  It doesn't look as familiar as some of the others.

Q.  So there is an e-mail here from Brent Satterfield, May 2, 2020.  It's the day after the press release; correct?

A.  Yes.

Q.  He says, "I ran into our first competitor that I believe absolutely has a better LOD than us, the Abbott m2000 test.  They claim a 0.1 copy/uL LOD.  We got samples from them

Page 119

in Nebraska that were near their LOD that we consistently weren't able to detect."

Do you see that?

A.  Uh-huh.

Q.  What does that mean?  "We got samples from them in Nebraska that were near their LOD that we consistently weren't able to detect."

MS. YORK-ERWIN:  Objection; calls for speculation.

THE WITNESS:  I mean, the sentence reads pretty clearly.  So they received samples from Nebraska that was, you know, samples positive close to the LOD that they -- I'm just reading here -- that we were consistently unable to detect.

It's a clear sentence.

BY MR. PINEIRO:

Q.  So that means this test is better than theirs?

MS. YORK-ERWIN:  Objection; misstates testimony.

THE WITNESS:  That's a very broad question.  Not necessarily.

BY MR. PINEIRO:

Q.  It means it's more sensitive; right?

MS. YORK-ERWIN:  Same objection.

THE WITNESS:  It means based on what he's saying, it has a lower, or better, LOD from what he's saying here.

Page 120

BY MR. PINEIRO:

Q.  Does that mean it's more sensitive, that test?

MS. YORK-ERWIN:  Objection; misstates testimony.

THE WITNESS:  No, that's not the same thing.  The LOD is separate than that.

BY MR. PINEIRO:

Q.  Aren't they associated?

A.  It's a metric as part of the sensitivity.  It's a value.  But if it still picks up all the exact same positives and not -- I'll focus on the positive.  If it still picks up the exact same positives as the other test, then that means the sensitivity is the same.

Q.  I'm showing you an e-mail that's marked as Exhibit 4.

(Exhibit 4, E-mail, was marked for identification.)

BY MR. PINEIRO:

Q.  It's an e-mail string, April 17, 2020.  The subject, "Re: Final feedback from government laboratory in South Africa."

Do you see that?

A.  Yes.

Q.  Have you seen this e-mail before?

A.  I don't believe so.

Q.  So there is an e-mail from Denny Crockett to Co-Diagnostics/Cecilia Hutchins.

Page 121

Do you see that?

A.  Yes.

Q.  Then below that, there is an e-mail from a gentleman, a company that appears to be called RX Medicals.

He says, "Dear Denny.  Please see final results from the government laboratory after running clinical samples with Logix Smart COVID-19.  Unfortunately, the final sensitivity was not acceptable to them."

Then it says, "Dear Tielman.  With regards to the verification of the Logix Smart ncov real-time PCR assay, this is the final update following additional PCR and sensitivity analysis.  As I informed you in our telephonic discussion, just looking at the pos/neg, the assay performed well for the specimens tested, but that I didn't do a sensitivity analysis.  Following our sensitivity analysis and looking at all data combined, the Logix assay missed positives that had a Cq of 33 and above on the reference assay.  In summary, 5 of 12 positives, 42 percent, were missed."

Do you see that?

A.  Yes.

Q.  "Therefore, concerns with the Logix assay is that very early and later stages of infection will be missed."

Do you see that?

A.  Yes.

Q.  This is not consistent with independent evaluation

31 (Pages 118 - 121)

Page 122

showing 100 percent sensitivity and specificity; correct?

MS. YORK-ERWIN: Objection.

THE WITNESS: At face value, when -- even in my lab, if you receive or identify these types of results, we're going to start with investigating and troubleshooting.

So, you know, my next question would really be whether that was done and what conclusions came from it to kind of explain this.

BY MR. PINEIRO:

Q. Right. But just the results, 5 of 12, 42 percent positives, that is inconsistent from what the May 1st press release says; right?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: Again, it's more complicated and would require troubleshooting to determine where this disconnect could have been, whether it be from the reference test, contamination, et cetera.

BY MR. PINEIRO:

Q. Right. So it says, "This is the final update following additional PCR and sensitivity analysis."

Do you see that?

A. I see that.

Q. So it seems like they did some follow-up; right?

A. That's speculation.

Q. If you were handed this document before you issued

Page 123

your report, would you still have issued your same opinion regarding the May 1st press release?

A. I mean, it's, again, speculating, but with the assumption that there are things that are happening in between or investigations that occurred, right, that may have identified reasons why these results were identified in this particular lab. And whatever that resolution was, it could be irrelevant to what was included in the press release.

Q. Okay. So if Ms. York-Erwin, who is in this deposition right now, if she had provided you with this, right, in connection with your engagement, what would you have done with this information?

MS. YORK-ERWIN: Objection; vague.

BY MR. PINEIRO:

Q. Would you have asked follow-up questions?

A. Would I have asked follow-up questions for this?

Q. Uh-huh.

A. If I was presented with this, yeah, I probably would have follow-up questions.

Q. What would those follow-up questions be?

A. Well, the details on the analysis and the testing that was done, right, and whether there were potential issues even from the lab's standpoint.

Q. And if Ms. York-Erwin couldn't answer those questions that you had about this, would you still feel

Page 124

comfortable issuing your opinion that the May 1st press release was accurate?

MS. YORK-ERWIN: Objection; misstates her testimony.

THE WITNESS: That's a big assumption right there. Because it's --

BY MR. PINEIRO:

Q. It's a simple one, right. So she can't answer your questions and you have this document in your hand.

Are you comfortable still providing your opinion in this case?

MS. YORK-ERWIN: Objection; outside the scope of the expert opinion.

BY MR. PINEIRO:

Q. You can answer.

A. It would be -- it's difficult for me to answer this question just with this -- yeah. I can't answer that.

Q. What information is missing in my hypothetical that you can't -- that's causing you not to be able to answer?

A. Well, all I have is a short paragraph there. There is no other detail.

Q. Right, but that's my point.

So in my hypothetical, I'm saying you're handed this document by Ms. York-Erwin. You've suggested you would have questions about it. And she doesn't have those answers.

So in that scenario, are you still comfortable

Page 125

issuing your opinion in this case?

A. Yes, because this paragraph here with no data really, except a couple of numbers or so, is completely different.

And without understanding it further and really being able to investigate it further, like, I don't see how it ties or relates to what was included in the press release.

Q. The press release indicates that across independent evaluations in all countries, that it's tested 100 percent sensitivity and 100 percent specificity; correct?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: You have to go back. I don't know verbatim what the press release says.

BY MR. PINEIRO:

Q. I put back on the screen Exhibit 2, and going back to Dr. Satterfield's quote. "In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity. And you can't do better than that."

Correct?

A. I see that.

Q. Based on the document I've shown you from South Africa, that's not correct; right?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: Yeah. Without additional information

32 (Pages 122 - 125)

Page 126

on that other piece, I'm not going to speculate on what is -- what should have been included here or not. It's completely separate.

BY MR. PINEIRO:

Q. Do you think you should have been provided that e-mail we were just going over?

A. I don't really have an opinion either way.

Q. No? You don't think it's relevant to -- do you think it's relevant to this press release?

MS. YORK-ERWIN: Calls for a legal conclusion.

THE WITNESS: It would be relevant if there were additional information that was also provided, and plus the investigation that, like, I'm assuming would have occurred for that.

BY MR. PINEIRO:

Q. So you are agreeing then --

A. No.

Q. -- that whatever -- hold on.

You're agreeing that whatever happened in South Africa, the e-mail and any investigation, et cetera, that is relevant to this press --

MS. YORK-ERWIN: Objection; misstates --

THE WITNESS: No, I did not say that.

I said that -- you asked if I should have been aware or have seen that e-mail. And I'm saying it would have

Page 127

been relevant if there was additional information that was also provided.

BY MR. PINEIRO:

Q. Right. Okay.

So if there was additional information regarding that e-mail, that would be relevant to this, then?

MS. YORK-ERWIN: Asked and answered.

THE WITNESS: No, that's not what I said.

BY MR. PINEIRO:

Q. Isn't that exactly what you just said?

A. No. I'm talking about what's relevant for me to see or not. That's what you were asking me.

Q. Well, I'm sorry.

I'm asking you whether the situation in South Africa, where there was validation testing -- I'm showing you an e-mail. I'm asking you whether that e-mail and any follow-up investigation regarding that validation testing, in your view as a lab director, is relevant to this press release.

MS. YORK-ERWIN: Objection; calls for a legal conclusion, asked and answered.

THE WITNESS: No, this is all speculation depending on what was -- what was concluded and whether there really is an association to make this relevant to this press release. And I can't say that.

Page 128

BY MR. PINEIRO:

Q. In your lab, if your lab put out a press release like this one on May 1st, and there's e-mails from April, the preceding month indicating that you're having validation problems in South Africa, you're telling me that a determination of what happened in South Africa would not be relevant to your lab in issuing this press release?

MS. YORK-ERWIN: Objection; incomplete hypothetical, calls for speculation. Also doesn't make very much sense.

MR. PINEIRO: It makes a lot of sense.

THE WITNESS: It's all speculation at this point that I can't answer.

BY MR. PINEIRO:

Q. I'm sorry?

A. I said it's all speculation at this point that I can't answer because I do not see every single picture that's, you know, that would allow me to answer those questions.

Q. I have introduced Exhibit 5 to Exhibit Share as an e-mail string on April 24, 2020.

(Exhibit 5, E-mail, was marked for identification.)

BY MR. PINEIRO:

Q. It says, "New results from lab - lot 179 problems again."

Have you reviewed this e-mail string before?

A. Let me just look at this. I believe I might have at

Page 129

one point.

Q. Are you sure?

A. I'm not 100 percent sure, but I believe I did.

Q. Did you discuss this e-mail with counsel?

MS. YORK-ERWIN: Objection; calls for privileged information.

THE WITNESS: Not that I can recall.

BY MR. PINEIRO:

Q. Do you think that non-scientists should be preparing public statements regarding lab results?

MS. YORK-ERWIN: Objection; vague.

THE WITNESS: I don't really have an opinion about that. I don't know what the -- what the kind of background requirements are for individuals who work in marketing or communications or so.

BY MR. PINEIRO:

Q. Sure.

So I've introduced an exhibit. It's Exhibit 6.

(Exhibit 6, E-mail, was marked for identification.)

BY MR. PINEIRO:

Q. This is an e-mail string on May 1st, the morning of the press release, 5:30 -- 5:20 in the morning.

Do you see that on your screen?

A. Yes.

Q. Have you ever seen this e-mail string to your

33 (Pages 126 - 129)

Page 130

knowledge?

A. Not that I can recall.

Q. And then it attaches a draft of the press release. Do you see it?

A. Yes.

Q. Do you see that there's redline changes here in this paragraph?

A. Yes.

Q. Do you see that somebody added the word "favorable"?

A. I see that.

Q. Do you think it was more accurate before or after that addition?

MS. YORK-ERWIN: Objection; calls for legal conclusion.

THE WITNESS: I don't see that it really changes or impacts the accuracy of it.

BY MR. PINEIRO:

Q. Okay.

And then before the final version, there was a version that said "In remarking on the test's favorable limit of detection results in some of the evaluations."

Do you see that?

A. Yes.

Q. Okay. In light of the e-mails I've shown you, for instance from South Africa, was this earlier version of the

Page 131

press release noting that on some of the evaluations, Co-Diagnostics had achieved 100 percent sensitivity and specificity, is this version more accurate?

MS. YORK-ERWIN: Objection; calls for legal conclusion.

THE WITNESS: Same thing. I don't have an opinion about that. I don't -- I don't see -- I don't really see a difference, really, in how it was written previously or how it was -- what it was that was released.

BY MR. PINEIRO:

Q. Well, in one of them, in the original version, it makes clear that in some evaluations, not all of them, it's obtained 100 percent and 100 percent; right?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: No, I don't agree with that.

BY MR. PINEIRO:

Q. You don't think that that's what this says here, in some of the evaluations?

A. No, because that sentence right there. And you are speculating to a sentence that's far below. That's all assumptions.

Q. So "In remarking on the test's limit of detection results on some of the evaluations," and then the quote says, "in the countries where we have been evaluated against other tests, we have consistently and repeatedly achieved

Page 132

100 percent clinical sensitivity and specificity."

Do you see that?

A. I see the part you're highlighting, correct.

Q. Yeah.

So wouldn't it have been more accurate to leave that in?

MS. YORK-ERWIN: Objection; asked and answered.

THE WITNESS: No, I don't see a difference.

BY MR. PINEIRO:

Q. Would you have done this? You would have kept -- in your role as lab director, issued this press release?

A. I don't do press releases in my role as a lab director, so I can't say.

Q. In your role as lab director, if you had to issue a validation report or a summary of validation reports, you would have been fine with removing the word "some" here?

MS. YORK-ERWIN: Objection; incomplete hypothetical.

THE WITNESS: That's completely out of the scope since that's not something I would typically do, write press releases.

BY MR. PINEIRO:

Q. Right.

So why are you opining on the interpretation or reception of this press release?

A. There is a difference --

Page 133

MS. YORK-ERWIN: Objection.

THE WITNESS: -- between the writing of one and the reading and interpretation of one as a person in the diagnostic field.

MR. PINEIRO: Okay. Can we take ten? And when I come back, I probably won't have much.

(Thereupon, a brief recess was taken.)

BY MR. PINEIRO:

Q. Dr. Bard, do you know why Co-Diagnostics issued the May 1st press release?

A. I don't.

Q. Do you know who the intended audience was?

A. No, I don't.

Q. Is there any indication in the press release itself that it was intended for the diagnostic testing industry?

A. Not that I can say one way or the other. It doesn't include or exclude, I guess.

Q. And does the intended target or audience of the press release impact your opinion of the language used therein?

A. Not necessarily, because I'm interpreting it just based on my background.

Q. If it's intended for investors, for example, then your opinion is not relevant; right?

MS. YORK-ERWIN: Objection; misstates testimony.

34 (Pages 130 - 133)

Page 134

THE WITNESS: Well, I mean, it's -- I don't really feel I understand that question.

BY MR. PINEIRO:

Q. Well, if the press release was actually the objective, it was intended for investors, then your opinion regarding how individuals in the diagnostic testing industry would have understood it isn't really pertinent; right?

MS. YORK-ERWIN: Objection; misstates testimony.

THE WITNESS: No, I think that's -- that's speculating. But also, you know, I have experience in the diagnostic world, but I am -- and I think I mentioned this before, I experience and lived through the pandemic and have communicated with many people that asked or have discussed pandemic-related topics, including tests and test sensitivity and such. So I wouldn't say that makes my opinions irrelevant.

MR. PINEIRO: Okay. Nothing further.

MS. YORK-ERWIN: Nothing from us. She will read.

THE COURT REPORTER: Mr. Pineiro, are you ordering?

MR. PINEIRO: Yes.

MS. YORK-ERWIN: We want a copy as well.

(Thereupon, the deposition was concluded at 3:35 p.m.)

Page 135

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF BROWARD

I, the undersigned authority, certify that DR. JENNIFER BARD remotely appeared before me on March 8, 2024 and was duly sworn.

WITNESS my hand and official seal on March 25, 2024.

*Rinele Abramson*

Rinele Abramson
My Commission #HH 224550
Expires June 4, 2026

Page 136

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF BROWARD

I, Rinele Abramson, Court Reporter, a Notary Public for the State of Florida at Large, hereby certify that I reported the deposition of DR. JENNIFER BARD; and that the foregoing pages constitute a true and correct transcription of my shorthand report of the deposition by said witness on this date.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action nor financially interested in the action.

WITNESS my hand and official seal in the State of Florida on March 25, 2024.

*Rinele Abramson*

Rinele Abramson, Court Reporter
Notary Public-State of Florida
My Commission #HH 224550
Expires June 4, 2026

Page 137

Genevieve York-Erwin, Esquire
Gyorkerwin@bakerlaw.com
March 25, 2024
RE: Gelt Trading v Co-Diagnostics, Inc., et al.
March 24, 2024
DR. JENNIFER BARD
JOB# 6475833

The above-referenced transcript is available for review.

DR. JENNIFER BARD should read the testimony to verify its accuracy. If there are any changes, DR. JENNIFER BARD should note those with the reason on the attached Errata Sheet. DR. JENNIFER BARD should, please, date and sign the Errata Sheet and e-mail to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be e-mailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)

35 (Pages 134 - 137)

Page 138

RE: Gelt Trading v Co-Diagnostics, Inc., et al.

Job No. FLA6475833

March 24, 2024

DR. JENNIFER BARD

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____  _____

DR. JENNIFER BARD            March 24, 2024

Veritext Legal Solutions

800-726-7007                                          305-376-8800

**[& - 6475833]**                                                     Page 139

**&**

**&**  2:4,8 4:14,17

**0**

**0.1**  118:25
**00368**  1:3

**1**

**1**  3:10 14:4,5
40:15 45:25
46:1 85:10
90:25 107:3
**1.310**  137:23
**100**  18:10 41:1,6
41:16,19 42:10
44:15 45:1
53:25 71:22
73:18 77:16
80:25 81:7,10
84:19,20 85:4
85:15,16,21,21
85:25 86:2,3,6,6
86:9,10 88:19
88:20 89:6,7
91:3,4,12,16,17
92:18 93:18,24
94:1,12,25
95:17 96:6 97:1
97:17 98:12
103:23 105:17
106:4 117:23
122:1 125:9,10
125:18 129:3
131:2,13,13
132:1

**10111**  2:9
**118**  3:11
**11:04**  1:15
**12**  121:17
122:10
**120**  3:11
**128**  3:12
**129**  3:12
**14**  3:10
**15**  65:13
**17**  120:17
**179**  128:22
**18th**  11:11
**19**  14:17 28:5
46:7 53:16 59:2
59:4 66:3 68:11
68:16,25 69:7
75:22,23 76:1
82:10 84:19
85:14 91:2,9
105:3 108:20
109:17 117:11
121:7
**19866**  135:16
136:20
**1998**  15:2,4
**1:58**  104:11
**1st**  41:5 42:10
42:21 45:1
55:20 62:25
74:22 84:3,18
86:11 104:24
107:13 122:11
123:2 124:1
128:3 129:21

133:10

**2**

**2**  2:4 3:10 76:3
77:11,21 79:13
80:25 85:6,9
104:24 106:7
118:21 125:15
**20**  65:14
**2003**  15:6,25
**2008**  16:4
**2015**  18:18
**2019**  18:24
76:21 77:1
108:21
**2020**  40:15 87:3
90:25,25 107:3
118:13,21
120:17 128:19
**2022**  85:10
**2023**  6:18,18
7:24,25 12:18
12:19 14:17
**2024**  1:14 135:8
135:10 136:17
137:2,4 138:3
138:24
**2026**  135:18
136:22
**224550**  135:17
136:21
**24**  128:19 137:4
138:3,24
**25**  135:10
136:17 137:2

**2530**  2:4
**29th**  11:10
**2:00**  104:7
**2:20**  1:3
**2:34**  104:12

**3**

**3**  3:11 59:15
118:9,10,13
**30**  137:14,22
**30,000**  12:15
**33**  121:16
**33131**  2:5
**3:35**  1:15
134:23

**4**

**4**  3:11 84:2
120:14,15
135:18 136:22
**400**  12:23
**42**  121:18
122:10
**45**  2:8

**5**

**5**  3:4,12 50:25
121:17 122:10
128:18,20
**50**  105:4
**5:20**  129:22
**5:30**  129:22

**6**

**6**  3:12 129:18,19
**600**  12:4
**6475833**  137:5

**[7 - agree]**                                                    Page 140

**7**

**7**  106:7

**8**

**8**  1:14 64:9
  135:8
**800**  12:6
**85**  3:10

**9**

**95**  38:6,10 53:25
  57:21 72:6
**96**  81:20

**a**

**a.m.**  1:15
**abbott**  118:24
**abbreviated**
  69:1
**abide**  62:19
**ability**  57:18
**able**  8:2 34:25
  35:4,7 38:10,15
  39:15 64:6
  72:24 73:5,13
  73:19 74:2,5
  75:18 76:17
  87:21 93:11,23
  94:12 119:2,7
  124:18 125:6
**abnormal**  109:2
**above**  1:23 71:9
  76:10 121:17
  137:6
**abramson**  1:21
  135:17 136:6,20

**abroad**  91:12
**absolutely**  90:6
  102:13 118:24
**academic**  18:4
  61:10 70:3
**academy**  14:25
**accept**  69:24
  76:18
**acceptable**
  51:12 53:5,22
  121:8
**access**  35:15
  53:18
**accreditation**
  19:11
**accredited**
  39:25
**accuracy**  22:7,8
  23:14 25:2,6,10
  25:20,24 33:16
  38:19 41:6
  42:11 44:4,15
  44:20 45:1,17
  51:8,12,24
  53:21,25 57:15
  77:14 84:21
  91:4 130:16
  137:8
**accurate**  34:11
  41:19 56:24
  71:23 77:2,7
  88:21 89:8,21
  124:2 130:11
  131:3 132:5

**accurately**
  60:15 93:23
  94:12
**achieved**  92:18
  93:18 94:1 96:6
  105:17 106:4
  125:18 131:2,25
**achieving**  94:24
**acid**  79:8 81:19
**acknowledge**
  4:2
**acknowledges**
  89:16
**action**  136:14
  136:15
**actual**  19:13
  42:1 46:23 48:4
  50:8 60:19
  79:20 90:24
  109:11
**actually**  7:20
  15:19 17:4 18:5
  18:15,16,20
  26:23 36:4,24
  48:11,12 58:9
  61:14 64:23
  65:9 70:12 83:2
  91:22 93:3 94:2
  96:9 99:9 101:9
  113:8 114:13,18
  134:4
**add**  89:19
**added**  15:1
  130:9

**adding**  44:16
**addition**  16:11
  57:15 130:12
**additional**  9:9
  14:24 19:19
  23:21 33:17
  57:17 111:2,5
  111:11 121:11
  122:20 125:25
  126:12 127:1,5
**additions**  14:21
  14:22
**address**  82:9
**administering**
  4:4 46:7
**administrative**
  4:6
**administratively**
  19:21
**administrators**
  27:4
**advisory**  19:25
  20:4,18
**affiliation**  11:2
  11:4
**affirmed**  111:24
**africa**  66:3,9
  120:19 125:23
  126:20 127:15
  128:5,6 130:25
**agency**  40:2
**ago**  13:22
**agree**  10:4
  69:21 80:22
  89:20 131:15

[agreed - asked]

**agreed** 107:4
**agreeing** 126:16
  126:19
**agreement** 4:9
  4:10 9:13,15,16
  51:13 53:6 63:9
  68:9 108:10
  109:18
**ahead** 36:10
  65:15
**aided** 67:8
**al** 137:3 138:1
**alabama** 22:15
  22:16
**alberta** 15:9
**allow** 88:8,8
  128:17
**allowed** 76:20
  86:19
**alternate** 23:8
  28:11 52:25
  57:11,12
**alternates** 28:13
**altogether**
  114:9
**ambiguous** 63:1
  63:5 100:5
**american** 14:25
  21:20 39:24
**amount** 18:7
  32:8 79:17,19
  80:3,16 117:9
**amounts** 60:18
**amplification**
  65:10

**analysis** 25:9
  66:8,19 67:1
  121:12,14,15
  122:20 123:21
**analyte** 57:19
  57:20
**analytical** 34:1
  34:4,8,9,15,16
  35:16 36:3,13
  36:17,20,22
  37:16,21 41:22
  57:17
**analytically**
  35:25
**angeles** 17:14
**announce** 27:22
**announcement**
  27:25
**answer** 6:2,7,11
  27:14 31:6,8
  86:16 87:10,12
  87:21 88:13,17
  89:12,23 90:11
  90:16,19 91:18
  95:10 97:23
  98:24 102:4,13
  102:19 104:2
  123:24 124:7,14
  124:15,16,18
  128:12,16,17
**answered** 25:19
  31:3,5 44:10
  49:9,23 88:23
  89:11 90:17
  96:11,21 99:8

  100:13,23 101:6
  101:24 102:14
  103:7,16 104:1
  111:25 122:13
  127:7,21 131:14
  132:7
**answers** 124:24
**antibiotic** 23:4
**anybody** 5:7
  11:23 25:5
  30:22
**aosc20-16** 4:6
**apologize** 36:10
  61:19 89:1
**appear** 113:18
  113:23
**appearances** 2:1
**appeared** 44:18
  45:9 135:7
**appears** 41:10
  63:13 78:22
  97:17 103:21
  121:4
**appendix** 83:18
**applicable**
  61:17
**apply** 37:11
**approach** 46:16
  46:21 56:12
  68:14 70:2,11
  75:15 84:16
  117:6,7
**approached**
  70:17

**approaches**
  48:24 49:16
**appropriate**
  32:10 46:12
  62:13 67:16
  70:21 73:5 75:1
  79:22 80:21
  82:12 100:2,4
  113:23,24
**approve** 47:11
**approver** 47:14
**april** 87:3 89:9
  120:17 128:3,19
**area** 45:11
**areas** 26:8
**arrangement**
  4:5,7
**arrogant** 114:8
  114:19
**articles** 43:8,23
  83:7,19,21
  109:7
**aside** 44:24
**asked** 8:2 26:7,8
  31:3,5 44:10
  45:8 49:9,23
  88:23 89:11
  90:17 96:11,13
  96:21 99:8
  100:13,23 101:6
  101:24 103:6
  104:1,3 111:25
  122:13 123:15
  123:16 126:24
  127:7,21 131:14

**[asked - based]**                                                Page 142

132:7 134:13
**asking**  5:23 6:23
  8:1 20:6 25:15
  27:4 39:19
  42:25 73:4
  87:13 90:10,12
  90:13 94:6 95:6
  97:9,14 98:7,9
  99:14,23 101:10
  102:7 104:2
  127:12,14,16
**assay**  27:15 40:8
  78:1 121:10,13
  121:16,17,21
**assays**  58:22
  78:14 80:25
  81:12
**assess**  67:15
**assessed**  80:20
**assessing**  71:3
**assist**  10:23
  11:23
**associated**
  25:24 36:6
  120:7
**associating**
  97:17
**association**  74:2
  75:14 96:24
  97:2,6 98:11,20
  99:6 103:2
  127:24
**associations**
  22:4

**assume**  8:15
  30:12 95:18
**assumes**  66:21
  86:13 100:7
  107:7 108:12
  114:11
**assuming**  110:9
  126:13
**assumption**
  75:16 83:15
  96:23 97:24
  105:23 115:22
  123:4 124:4
**assumptions**
  86:17,20 90:13
  116:4 131:21
**assurance**
  106:22
**assure**  65:8
**asymptomatic**
  35:5
**attached**  55:24
  62:24 64:5
  74:22 91:21,22
  91:22 92:25
  137:9
**attaches**  130:3
**attachments**
  55:23 106:6
  114:2
**attended**  15:4
**attention**  26:6
  92:9 93:9
**attorney**  4:12
  27:6 136:12,14

137:11
**attorneys**  4:1
**audience**  133:12
  133:18
**australian**  93:5
**author**  110:11
  110:12,14,18,20
  111:4,16,18
  112:3,24 115:8
  115:12
**authored**  110:6
  113:1
**authority**  135:6
**authorization**
  32:7
**authorized**  32:6
  33:13,14 93:13
**automation**
  81:21
**availability**
  92:16
**available**  53:16
  59:11,15 61:5
  69:7 70:16,17
  76:13,17 78:17
  137:6
**avenues**  26:4
**aware**  10:25
  27:10 28:2
  29:18 43:3,8
  44:1,2 45:18
  50:7 55:23 61:2
  62:17 66:1,11
  73:16 77:8
  107:10 114:10

114:12 126:24
**awareness**
  44:18

**b**

**b**  3:7 28:17
**bachelor's**  15:6
  15:11
**back**  16:1 29:24
  31:15 47:1 78:9
  104:24 105:5
  125:12,15,15
  133:6
**background**
  25:16 114:21
  129:14 133:22
**bacteria**  17:2
  36:23 60:8
**bacterial**  38:5
**bad**  63:4
**baker**  2:8 4:17
**bakerlaw.com**
  137:1
**bard**  1:19 3:2
  4:20 42:7 72:12
  104:14 133:9
  135:7 136:8
  137:4,7,8,10
  138:3,24
**barking**  72:13
**based**  41:10,12
  49:25 78:19
  79:2 87:13
  96:23 98:14
  100:20 101:14
  114:21 116:8

119:23 125:22 133:22

**basically** 15:17 17:8 19:1,8,19 20:4,6 22:20,25 23:3 24:11 26:15 32:15 35:7 38:4 46:3 46:15 49:4,5 51:18 52:7,9 59:25 60:10 74:5 78:17 91:18 112:14 113:20

**basis** 83:5 85:2 102:5 113:24

**bathroom** 61:20

**bd** 78:1

**beginning** 53:18 99:20

**behalf** 2:3,7 4:14

**believe** 6:22 8:21 9:16 10:7 14:23 20:15,20 29:20 30:4,19 44:22,25 67:9 83:7 91:24 93:3 98:9,11 114:13 117:16 118:24 120:23 128:25 129:3

**benson** 1:10

**best** 6:6 76:12

**better** 57:10 92:19 98:19 118:24 119:16 119:24 125:19

**big** 76:16 124:4

**biochemical** 50:22

**biofire** 7:8,11 7:12 78:2,4

**biomérieux** 20:12

**biscayne** 2:4

**board** 20:18 69:23

**boards** 19:25 20:4

**bottom** 46:2

**boulevard** 2:4

**break** 6:12 40:9 42:2,7 61:20 104:8,11,14

**brent** 1:10 92:11 118:12,20

**brief** 5:6 42:5 61:22 83:25 133:7

**briefly** 5:23 104:16

**bring** 56:7,25

**bringing** 27:16 70:13

**broad** 17:3 47:20 86:15 88:9 117:9 119:18

**brought** 27:17 113:10

**broward** 135:4 136:4

**build** 76:15

**bunch** 102:20 117:21,22

**bustin** 29:19 30:20

**butcher** 6:21

**c**

**calculated** 77:13

**california** 1:15 16:18 17:19 19:2 21:20 24:7 82:24 112:19

**call** 8:7,21,24 9:23,23 10:4

**called** 4:21 7:8 24:8 29:19 35:23 52:22 76:21 121:4

**calling** 56:7

**calls** 30:14 88:4 97:20 119:8 126:10 127:20 128:9 129:5 130:13 131:4

**canada** 15:4

**cancer** 16:13

**cap** 39:23,24,25 58:4 74:4 75:8 79:21 108:2

**capacity** 10:24 25:1,18 26:1 98:10

**career** 26:20

**carry** 69:18 107:24

**cartridge** 82:5

**case** 1:3 6:16 8:3 10:15,23 11:7 14:14 21:15,24 22:18 22:19 23:3,10 23:24 26:7 31:13 36:3 44:9 44:24 47:12 65:5 71:11 74:16 79:6 83:16 97:2 114:7 124:10 125:1

**cases** 21:21,22 21:22 36:5 47:11,22 53:11 116:21

**cause** 1:23 37:2 37:2 72:19

**caused** 82:7

**causes** 37:1 72:9

**causing** 124:18

**cayman** 1:4

**cdc** 76:21,21 77:1,15 78:1,12 78:13,13 115:4

**cecelia** 106:10

**cecilia** 120:25
**center** 69:11
**central** 1:1
**centralized** 74:10,11
**certain** 59:5 64:22 87:24 107:16,22,23
**certainly** 78:7
**certificate** 135:1 136:1
**certified** 45:23
**certify** 135:6 136:7,12
**cetera** 44:20 69:6 122:17 126:20
**change** 138:5,8 138:11,14,17
**changed** 13:23 13:23
**changes** 14:22 130:6,15 137:8
**characteristics** 31:20 51:8 57:17 59:22 71:15
**chart** 117:20,24
**checking** 104:20
**chemistry** 15:15 48:1 49:3 50:6,9 50:17,20,21,21 50:23,24 116:22
**chief** 17:15 50:18

**children's** 17:13
**chla** 18:18 67:16
**ci** 72:6
**circuit** 22:15
**circuited** 69:2
**circumstances** 36:16 41:4
**civil** 137:22,22
**claim** 118:25
**classified** 57:22 79:10
**clean** 6:10
**clear** 42:14 49:6 102:2 119:14 131:12
**clearance** 32:7
**cleared** 32:14 32:22 40:7 51:5 55:15,17 56:5 58:11,11,18,22 71:10 80:6,13
**clearly** 119:10
**clia** 39:23 45:24 58:4,14 74:4,24 75:8,11 79:2,20 108:2,7 111:19 111:22 112:1,4 112:11,13,14,16 112:17,22,22,24 113:2 116:11 118:5
**clinic** 20:15
**clinical** 9:8 15:14,14,19 17:5 18:2,5 19:3

22:20 23:7 34:1 34:15,18,22 35:3,11,12,15 35:19 36:4,15 36:17,21 47:25 50:21 58:21 59:19,24,25 67:14 69:10 77:10 92:18 93:18 94:1,25 96:6 97:6,18 98:12 103:23 112:15 121:6 125:18 132:1
**clinically** 19:21 34:25 36:1,24
**close** 64:4 119:11
**closed** 81:17 82:3
**cmb** 37:8
**cme** 19:6,12
**colleague** 4:17
**colleagues** 27:3 41:14 69:6 70:23 82:22
**college** 39:24
**colonized** 36:5
**combined** 121:16
**come** 37:10 63:3 63:9 133:6
**comes** 35:19 91:8 113:4

**comfortable** 124:1,9,25
**coming** 89:17
**comment** 47:19 101:4 102:22
**comments** 114:8
**commercial** 69:4
**commission** 135:17 136:21
**commit** 10:11
**committees** 20:5
**common** 33:4 37:2 41:15,17 61:14 64:6 84:16
**communicate** 5:21 10:7 26:18 42:24 70:9 107:1
**communicated** 10:7 27:20 134:13
**communicating** 27:6 84:13
**communicatio...** 84:14 104:18 129:15
**companies** 20:6 21:9 25:2 26:18
**company** 1:5 6:23 7:2,8 20:12 20:14 50:19 91:1 121:4

**[comparable - contribute]**

**comparable** 18:5 78:16

**comparative** 54:13

**comparator** 51:13 52:20 53:2,6,12

**compared** 28:14 35:17 55:1 81:1 93:21 105:20

**comparing** 34:10 37:22 56:14,20 57:13 94:10

**compensated** 20:25 21:3,8

**competency** 82:13

**competitor** 118:23

**compiling** 48:13

**completed** 54:15 76:14 137:14

**completely** 40:5 73:24 75:5 125:3 126:3 132:18

**completing** 58:21

**complex** 81:24

**complexity** 78:21,22 79:1,3 79:3,4,6,10 81:13,16,17

82:4,8 83:11

**compliance** 106:17,18,24 107:15

**compliant** 107:24

**complicated** 35:6 36:12 79:5 80:4 82:3 87:8 87:21 122:14

**complications** 37:10

**composite** 15:3

**compound** 113:25

**comprehensive** 28:20

**concentration** 38:5 57:19,20

**concentrations** 77:13

**concern** 108:11

**concerns** 121:21

**concluded** 6:7 91:12 127:23 134:22

**conclusion** 88:5 126:10 127:21 130:14 131:5

**conclusions** 46:19 122:7

**conclusively** 89:10

**concordance** 91:12,16 117:23

**concordant** 54:14

**condensed** 117:1

**conduct** 31:18 75:9

**conducted** 32:12 34:17 48:3 74:13 91:10 94:15

**confidence** 72:6

**confirm** 51:12 53:5 55:1,4

**confuse** 37:14

**confusing** 73:22

**connect** 8:10,12

**connected** 94:18 136:14

**connection** 7:15 18:13 21:1,7 31:12 78:20 123:11

**consent** 4:7,15 4:18

**consider** 52:25 70:12

**consideration** 56:19 70:25 80:10

**considered** 28:18 32:13 33:18 52:19 100:4 137:15

**consisted** 77:10

**consistent** 40:18 84:4 121:25

**consistently** 57:20 85:15,20 85:25 86:6 88:19 89:6 92:18 93:17 96:5 119:1,6,12 125:17 131:25

**constitute** 136:9

**consult** 20:7

**consultantships** 19:25 21:8

**consulting** 10:17,19 23:20 23:22

**consuming** 65:15

**contacted** 6:15 6:20 78:5

**contain** 11:16

**contains** 108:18

**contaminated** 21:24

**contamination** 81:23 82:2,19 122:17

**content** 104:17

**context** 26:2 86:17

**continuing** 104:25

**contrast** 81:16

**contribute** 30:1 41:21,24

**contributed** 115:1

**contributing** 19:20

**contrived** 34:18 52:4,6,14,16 53:4,6,10,19 60:4,5,17,19 70:19 77:11,14

**control** 65:8,10 65:12 106:21

**controlling** 87:22 88:1,11 88:14

**conversations** 31:10,11 44:7

**convey** 94:9

**conveys** 70:14

**copies** 137:12

**copy** 118:25 134:21

**coronavirus** 108:21

**corporation** 1:8

**correct** 11:8,9 11:12 12:4 13:7 14:18 15:8 16:6 16:19,22 20:14 23:22 28:24 29:2 32:21 37:17 39:2 42:17,18,21 44:9 52:5 55:21 60:13 63:25 66:9,20 67:3

72:9 73:9 76:25 83:19 89:10 91:23 95:10 96:10,20 99:17 105:21 110:18 110:19 112:10 112:11 115:8 118:21 122:1 125:10,20,23 132:3 136:9

**correctly** 7:21 73:24

**correlate** 36:2 36:24

**correlated** 91:18 117:22

**cosara** 108:20

**cost** 80:5

**counsel** 4:7,9 5:21,24 8:14 29:1 31:10 66:1 104:15 129:4 136:13,14

**countries** 75:12 92:17 105:4,6 105:16 106:3 125:9,16 131:24

**country** 59:2

**county** 22:15 82:25 135:4 136:4

**couple** 13:11 14:23 16:12 125:3

**course** 17:3 19:11 33:18 65:1 68:21 79:9

**courses** 19:6,13 19:13

**court** 1:1 4:1,2,5 4:11 6:4 21:20 22:15 102:13 134:19 136:6,20

**cov** 76:3 77:11 77:21 79:13 80:25

**covered** 25:15

**covid** 28:5,8 34:6 35:5,6,7,8 35:9,9 43:4,16 43:18,20,23 44:3,19 45:10 45:16,17 46:7 52:8 53:11,16 59:2,4,9 60:10 66:2,3 68:11,16 68:25 69:7,19 70:10,15,17 74:17 75:22,23 76:1 80:1 82:10 84:19 85:14 91:2,9 105:3 107:6 108:20 109:17 117:11 121:7

**cq** 121:16

**create** 60:11

**creating** 98:11 98:20 99:7

103:2

**creative** 59:18

**credits** 19:8,10 19:15

**criteria** 71:2

**crockett** 120:24

**culture** 52:19 57:6,8

**current** 24:9

**currently** 17:15 24:12 57:9

**cv** 1:3 14:17 24:8

**cycles** 54:22

## d

**d** 3:1 59:15

**data** 34:23 35:15 40:16 46:18,22 47:10 47:13,16 48:4 48:13 49:5,13 50:12 51:24 52:1 62:18,20 63:19 72:5 73:5 74:3 75:1,7 84:19,23 85:15 89:6 91:3,8,20 91:20,21 92:15 97:13 103:1 108:21 109:23 116:2 121:15 125:2

**date** 6:17,19 9:25 12:12 13:23 136:11

137:10

**day** 9:25 11:10 13:21 27:2,2 55:6 118:21

**days** 10:1 55:9 137:15

**deal** 106:16,18

**dear** 121:5,9

**decade** 83:13

**decided** 64:21 64:21 86:24

**deciding** 10:10

**deck** 76:14

**declare** 138:21

**decreased** 54:23

**dedicated** 18:8

**deem** 18:5 32:14

**deemed** 53:22

**defendant** 2:7 22:12,13

**defendants** 1:11 4:18

**define** 38:11 52:24 84:21 91:4

**defined** 38:4 100:3

**definitely** 69:8

**definitions** 32:2 58:14

**degree** 15:13,17

**delays** 23:7

**demand** 82:10

**demonstrate** 70:25 75:1

**demonstrated** 86:6

**demonstrates** 85:15,21 88:19 89:6

**demonstrating** 84:19 91:3

**denny** 120:24 121:5

**department** 16:9 17:24 18:1 19:17,20 91:11 107:1 108:4

**dependent** 79:21,25

**depending** 47:19 48:6 68:4 68:13 78:16 111:1 113:7 127:22

**depends** 33:4 36:7 47:8,18 48:5 52:24 53:23 58:8 68:2 68:4 80:5,15 110:22 112:20

**depiction** 75:3

**deposed** 114:15

**deposing** 137:11

**deposition** 1:19 1:23 4:2 5:13,21 12:7,25 13:22 13:23,24,25 21:19 22:14 31:2 85:10

104:18 114:13 123:10 134:22 136:8,10

**depositions** 21:12

**derived** 77:11

**describe** 24:10 82:6 84:4

**described** 15:23 68:18 82:17 84:3,18

**describes** 96:15

**describing** 70:5

**description** 9:3 61:12 105:10,14 113:7

**descriptions** 84:12

**designated** 23:11

**designates** 79:2

**designation** 18:2

**despite** 74:20

**detail** 124:20

**details** 90:6 123:21

**detect** 57:18 93:23,23 119:2 119:7,13

**detected** 38:6 57:21

**detecting** 97:1

**detection** 34:5,8 37:25 38:3,8,11

38:21 39:15,17 40:2,8 57:22 92:11,13,24 93:1,4,5,9,10,14 93:20 94:2,14 95:3,9,15,25 96:10,16 97:2,7 97:18 98:13,16 99:19 100:11,18 101:5,15,18,23 102:9,18,23,24 103:3,17 104:5 130:21 131:22

**determination** 58:7 128:6

**determine** 34:10 37:16 39:6 54:6 54:13 55:9 57:18,19 58:1 58:15 59:22 64:12 69:13 70:24 71:10,11 72:24 73:14 122:15

**determined** 80:21

**determining** 71:17

**develop** 7:13

**developed** 18:17 19:6,13,14 32:13,15,20 37:20 38:23 39:2,21 58:3,17 71:13 109:18

**developing** 40:5 46:7

**development** 91:2

**deviate** 36:17,19

**deviating** 32:23

**deviation** 33:2,8

**deviations** 33:1 33:5

**devices** 59:5,10

**diagnostic** 7:12 16:14 17:8 18:22 20:6,14 20:22 26:17 31:18 32:7 34:22 40:18 41:5,11,13 42:9 42:16 43:12,15 44:8,13 45:23 51:5 59:4 67:13 67:15,19 68:12 84:5,21 91:2,5 105:3 133:4,15 134:6,11

**diagnostics** 1:8 7:1,5,9,16 8:11 8:14 9:7 11:2,5 20:15 29:18 30:22 40:24 55:21 56:3,4 62:23 65:19,23 65:24 66:2,9,12 66:20 67:3 74:17,21 78:6 78:20 84:23

85:11,14 86:22 89:15 90:25 91:1 92:12 105:2,20 106:13 107:4,4,6 108:20 109:13 115:4,18 120:25 131:2 133:9 137:3 138:1

**difference** 31:24 34:14 36:20,20 60:3 131:8 132:8,25

**different** 6:22 16:12,14 32:2 32:17 33:5 41:20 49:16 54:17 55:11,12 60:18 70:19 73:6 74:12 76:5 76:8,9,11 77:21 112:6,7 113:19 114:24 125:4

**differentiates** 71:5

**differently** 75:15 113:14

**difficult** 61:7 87:9,9 124:15

**difficulties** 77:9

**difficulty** 35:24

**dig** 92:4

**dilutions** 38:9

**diploma** 15:2

**direct** 3:4 5:1 83:3

**directing** 14:9

**directions** 107:16

**directly** 45:13 82:20 116:8

**director** 11:5 17:12 19:2 26:10 46:8 67:13 79:21,24 110:15 111:4,5 111:18 112:3 113:2 127:18 132:11,13,14

**disclaimers** 71:21

**disconnect** 122:15

**discordant** 54:2 54:8

**discuss** 104:18 104:19 129:4

**discussed** 9:24 82:23 134:14

**discussing** 83:19

**discussion** 121:12

**discussions** 43:23 83:8

**disease** 7:13 35:1,4,23 36:6 36:25

**diseases** 16:10 24:2

**dismissing** 114:9

**dispute** 23:1

**disseminated** 62:15

**distributors** 65:22

**district** 1:1,1

**disturb** 72:14

**division** 1:1 17:15,16 50:18

**dna** 60:8

**doctor** 5:3,24 14:8

**document** 10:11 28:20 46:2 101:16,25 102:6 103:7,25 105:12 106:8 108:18,18 122:25 124:8,23 125:22 138:21

**documented** 71:14

**documenting** 117:25

**documents** 10:20 13:3,5 28:23 29:1,3,5,8 29:11,14 67:6 106:11 114:22 118:17

**dog** 72:13

**[doing - erwin]**                                                  Page 149

**doing**  5:6 26:12
  38:23 39:1
  46:23 56:13,23
  74:17 99:2
  103:5
**dr**  1:19 3:2 4:20
  29:19 30:20
  42:7 66:5 72:12
  103:8 104:14
  105:5 125:16
  133:9 135:7
  136:8 137:4,7,8
  137:9 138:3,24
**draft**  47:12
  130:3
**drafted**  30:4
**dramatically**
  76:5,8,9
**drank**  61:19
**drna**  52:11
**drop**  73:6
**due**  72:17 77:9
**duly**  135:8
**duodenoscope**
  21:21
**duodenoscopes**
  21:25
**durenard**  1:9
**dwight**  1:8
  118:13

**e**

**e**  3:1,7,11,11,12
  3:12 8:1,6,8,9
  8:17 26:3
  118:10,12,15,20

120:13,15,17,22
120:24 121:3
126:6,20,25
127:6,16,16
128:3,19,20,24
129:4,19,21,25
130:24 137:11
137:12,22,23
138:4,4,4
**earlier**  83:18
  89:9 109:7
  130:25
**early**  6:18 53:17
  69:9 82:10 87:3
  121:22
**ease**  92:16
**easier**  25:14
  49:13
**ebv**  37:8
**editing**  110:14
**editorial**  69:23
**editors**  69:23
**edits**  11:25,25
**educated**  43:7
**education**  15:2
  15:24 19:8,10
  24:15
**edward**  1:9
**effective**  78:10
**egan**  1:9 118:13
**egotistical**  114:9
  114:19
**eight**  20:21
**either**  9:19
  24:12 32:6,13

51:19 66:15
81:20 90:9
126:7
**elected**  14:24
  65:20,24 87:25
**emergency**  32:6
  76:2 93:14
**emphasize**
  67:21
**employee**
  136:13
**encompass**
  15:24 67:2
  105:19,25
**encompasses**
  17:7
**encounter**  83:14
**ended**  9:6 77:6
**engaged**  10:17
  10:23 21:16
  25:9
**engagement**  9:4
  9:12,15,16,21
  9:24 10:5,10,11
  10:14 11:1
  26:21 123:11
**engagements**
  21:8 23:16,17
**ensure**  31:19
  60:15 68:21
  75:17
**ensuring**  45:24
  46:11
**entail**  15:12
  16:7 24:10

**enter**  10:10
**entire**  102:5
**entirely**  94:18
**epidemiology**
  91:11
**equivalent**
  115:5
**errata**  137:9,10
  137:14
**error**  114:9
**erwin**  2:9 4:16
  4:16 5:24 8:20
  31:3,5 37:18
  39:11 40:9,13
  42:4 44:10 45:4
  47:17 49:9,23
  63:1,5,15 64:1
  66:21 67:4
  69:20 71:24
  72:12 73:3,21
  75:4 80:18
  86:13 87:6 88:4
  88:23 89:1,11
  89:22 90:4,17
  94:4 95:4,11
  96:11,21 97:20
  98:21,23 99:8
  100:7,13,23
  101:6,16,24
  102:10,14,19
  103:6,11,14,16
  103:25 104:9
  105:12,22 107:7
  107:18 108:12
  111:25 113:25

**[erwin - extraction]**

114:11 119:8,17 119:22 120:3 122:2,13 123:9 123:13,24 124:3 124:11,23 125:11,24 126:10,22 127:7 127:20 128:8 129:5,11 130:13 131:4,14 132:7 132:17 133:1,25 134:8,18,21 137:1

**especially** 27:3 53:17,17 61:10 68:6 69:12

**esquire** 2:5,9,10 137:1

**established** 57:17 107:8 108:13

**establishment** 46:3 51:7

**et** 44:20 69:6 122:17 126:20 137:3 138:1

**eua** 76:22

**eugene** 1:9

**evaluate** 53:14 78:18

**evaluated** 24:25 85:24 92:17 105:6,16 106:3 125:17 131:24

**evaluating** 35:3 51:23

**evaluation** 25:10 40:22 45:16 67:23 78:12 85:24 86:2,22 100:12 105:14 115:3 117:18 121:25

**evaluations** 40:17,23 84:24 85:17,22 86:4,9 88:20 89:7 91:9 91:10 92:11 96:1 103:24 125:9 130:21 131:1,12,18,23

**everybody** 37:13

**evidence** 66:22 86:14

**exact** 12:23 78:11 81:10 120:9,11

**exactly** 8:2 127:10

**examination** 3:4 5:1

**examined** 4:22

**examining** 42:7

**example** 18:15 20:12 27:15 28:11 32:24 33:5,7 35:8,21 35:22 36:6 37:3

38:7 46:23 47:25 49:11 50:23 52:8,21 57:6 62:11 70:20 74:10 80:8,12 107:25 133:23

**except** 125:3

**exclude** 133:17

**exhibit** 3:9,10 3:10,11,11,12 3:12 14:3,4,5,12 14:16 28:17 85:6,9 104:24 106:7 118:9,10 120:14,15 125:15 128:18 128:18,20 129:18,18,19

**exhibits** 14:2

**existed** 83:10 86:10

**expanded** 62:10 62:12

**expanding** 61:16

**expected** 72:20 72:25 73:12,15 74:19 81:3

**expedite** 76:20

**expedited** 69:3 76:15

**expensive** 65:14 80:9

**experience** 17:5 41:12 46:6 63:13,24 64:19 76:4 82:9 83:17 84:11,13 108:6 112:9 134:10,12

**experienced** 82:12,18,21

**expert** 3:10 6:16 10:15,18,19 11:7 12:10 14:5 20:4 21:16 22:1 22:11 23:17,20 23:22 29:19 86:19 90:14,15 98:10 99:3,23 124:12

**expertise** 9:7 23:25 48:22

**experts** 18:4 90:13

**expires** 135:18 136:22

**explain** 122:8

**extended** 54:21

**extensive** 32:16 58:20 72:20 82:8

**extensively** 46:24 61:16 62:10,12

**external** 79:7

**extraction** 79:7 81:18

**[extraordinary - found]**                                    Page 151

| | | | |
|---|---|---|---|
| **extraordinary** 63:14,17 | **fda** 32:6,14,23 33:17 40:7 51:5 | **financially** 136:15 | **follow** 39:25 107:17 108:3 |
| **eye** 64:4 | 55:15,17 56:5 | **findings** 11:17 | 110:3 122:23 |
| **f** | 58:11,11,18,22 | 26:24 46:17,18 | 123:15,16,19,20 |
| **face** 122:3 | 71:10 76:22 | **fine** 49:17 | 127:17 |
| **fact** 54:21 104:4 | 80:6,13,21 | 132:16 | **followed** 81:20 |
| **factor** 56:18 | 93:14 107:3,24 | **finish** 6:9,9 | **following** 40:6 |
| 79:12 94:14 | 108:1,1,10 | **firm** 9:15,17,18 | 70:18 108:19 |
| **factors** 26:13 | **federal** 137:16 | 12:10 | 121:11,15 |
| 41:20,23 53:23 | 137:22 | **first** 4:21 6:15 | 122:20 |
| 68:10 72:17 | **feedback** 120:18 | 10:11 13:13 | **follows** 4:23 |
| 80:15 87:8,20 | **feel** 14:11 79:25 | 21:19 28:17 | 31:17 |
| 88:16 | 123:25 134:2 | 47:8 54:11 59:3 | **fond** 94:23 |
| **facts** 66:21 | **feels** 79:21 | 75:22 76:22,23 | **forego** 64:16 |
| 86:13 107:7 | **fellow** 14:25 | 99:15 101:19 | **foregoing** 136:9 |
| 108:12 114:11 | 46:25 | 109:12 118:23 | 138:21 |
| 138:21 | **fellows** 18:15,18 | **fisher** 78:2 | **forget** 25:19 |
| **fails** 137:18 | **fellowship** | **five** 42:3 77:21 | **forgetting** 15:16 |
| **failure** 65:14 | 16:17,20 18:17 | 77:25 78:9 | **forgot** 5:17 |
| **failures** 65:6,12 | **felt** 80:1 | 80:24 81:7,12 | **form** 13:4 28:23 |
| **fair** 47:16 66:18 | **field** 17:1 18:4 | **fixed** 64:12 | 91:24 98:23 |
| 69:1,17 75:3 | 32:4 91:10 | **fl** 137:12 | **formal** 18:21 |
| 103:24 | 133:4 | **fla6475833** | 24:15 25:9,13 |
| **familiar** 85:12 | **fifth** 78:2 | 138:2 | **format** 113:12 |
| 106:10 118:18 | **figure** 76:11 | **flat** 88:24 | 118:3 |
| **far** 86:25 131:20 | 86:24 | **florida** 1:22 2:5 | **formed** 67:7 |
| **favorable** 92:11 | **filed** 1:23 | 4:5 135:3 136:3 | 114:21,25 |
| 92:24,25 95:25 | **files** 109:10 | 136:7,17,21 | **forming** 30:1 |
| 96:16 97:18 | **final** 46:12 | 137:16,22 | 67:8 114:20 |
| 98:12 99:19,21 | 47:13 120:18 | **focus** 92:5 | **forms** 67:10 |
| 99:22,25 100:11 | 121:5,7,11 | 120:10 | 93:2 |
| 100:18 101:4,15 | 122:19 130:19 | **focused** 70:3 | **forth** 47:2 |
| 101:22 102:8,22 | **finalize** 47:23 | 93:16 | **found** 37:4 |
| 103:22 130:9,20 | **finalized** 47:2 | **focusing** 35:16 | 77:15 78:15 |
| | | 36:13 | 86:23 89:10 |

91:21

**foundation** 22:16

**free** 14:11

**freeze** 54:22

**fresh** 83:9

**friday** 1:14

**front** 5:9,16

**full** 31:19 32:7 87:16 90:5,6 108:14

**fully** 99:13 101:9

**funded** 24:13

**fungal** 23:24

**fungus** 17:3 24:1 36:1

**further** 54:5,19 72:6 92:4 125:5 125:6 134:17 136:12

**g**

**garcia** 30:24 110:7 114:6

**gelt** 1:4 137:3 138:1

**general** 16:9 25:20 36:12 39:18 42:20,22 42:25 43:1,2,16 43:20,25 44:3,7 44:19,22,25 45:6,10 47:6,18 72:3 73:25 76:19 83:8 97:8

97:15 106:21 113:9 114:22

**generalize** 87:10

**generalized** 39:12

**generally** 53:24 64:11 69:17

**generate** 38:19 38:19 41:16 47:13,23 49:5 50:11,12 73:5 74:2 97:12

**generated** 32:18 47:21 51:19,20 52:1 67:6 97:12 97:13 109:23

**generates** 47:10

**generating** 46:22 47:16 51:24 72:5

**generation** 22:9

**genetic** 60:13

**genevieve** 2:9 4:16 8:12,25 9:19 11:24 13:8 94:23 137:1

**gentleman** 121:4

**getting** 54:8 84:14 102:12

**give** 9:25 35:22 87:21 89:23 90:2 108:11

**given** 18:18 68:25 75:1

102:19

**gives** 6:1 96:17

**giving** 18:21 73:12

**glad** 6:13

**glance** 92:3

**global** 105:2

**glucose** 50:22

**go** 36:10 40:12 47:1 57:11 63:5 65:15 72:18 83:24 90:24 104:25 109:11 125:12

**goal** 45:24

**going** 6:4,8,21 14:2 15:2 31:15 33:15 37:14 49:19 57:4,8 64:9 67:12 69:13,15,22 90:7,10,19 104:24 105:5 106:6 114:24 118:9 122:5 125:15 126:1,6

**gold** 52:23,24 52:25

**good** 5:3,4,5 34:19 56:14,17 56:20,20 68:22 70:1 74:3 93:8 104:9

**goodness** 6:17

**government** 120:18 121:6

**government's** 115:4

**graduate** 16:17

**graduated** 15:4

**grant** 24:8

**granted** 76:22 112:16

**grants** 24:11

**great** 76:2

**greece** 66:11,12 66:20 67:2,10

**ground** 5:6 87:24

**guess** 5:17 8:10 14:17 15:3,23 18:4 21:7 25:22 26:2,5 27:1 32:1 34:3 37:3 41:13 43:1,21 46:6 56:6,24 60:17 60:18 62:21 63:6 93:7 94:18 100:4 105:10,19 108:14 110:22 133:17

**guessing** 29:20

**guided** 23:8

**guideline** 62:21

**guidelines** 63:20

**gyorkerwin** 137:1

**[h - implemented]** Page 153

| h | | | |
|---|---|---|---|

**h**  3:7 138:4
**half**  104:10
**hand**  124:8
135:10 136:16
**handed**  122:25
124:22
**hands**  76:14
77:3
**happen**  48:21
**happened**  8:19
64:19,23 67:2
112:10 126:19
128:6
**happening**
68:25 123:4
**happens**  87:2,3
**happy**  66:15
**harassing**
102:10,11,12
**hard**  53:15
**head**  6:3 95:23
**health**  16:20
17:6 22:16 76:2
**healthcare**
22:17 28:1
**heard**  82:21
**help**  48:2,3 49:3
50:1,11,12
69:13 110:1
**helped**  67:7
116:23
**helping**  48:13
49:11,12 117:8

**helps**  92:13
98:16
**hematology**
15:15,20
**hey**  74:22 93:25
107:23
**hh**  135:17
136:21
**high**  15:3,3,4
36:3 38:17
39:15,17 71:1
78:21,22 79:1,3
79:4,6,10,14
81:13,17 82:8
84:23
**highlighting**
99:18 132:3
**highly**  18:3
36:22 81:24
**hired**  25:5,13
29:18
**hiring**  25:15,19
**histology**  15:15
**hold**  17:15
88:24 126:18
**holder**  111:19
112:4,11,13,24
113:2
**holds**  112:17
**honorarium**
21:10
**honorariums**
21:6
**hope**  108:8

**hoping**  104:3
**horrible**  7:21
59:16
**hospital**  17:13
18:9,10,16 27:8
28:1 50:4 74:8
76:18 78:5
106:16 112:12
**hospitals**  74:9
**hostetler**  2:8
4:17
**hour**  12:4,6
20:21 40:10
104:10
**hourly**  12:3
**hours**  13:18
18:7
**huge**  76:16,19
**huh**  15:10 81:15
98:6 119:4
123:17
**hundred**  80:9
**hutchins**  106:10
107:5,12 120:25
**hypothetical**
39:11 69:20
73:3,21 74:15
75:4 86:14,25
87:22,23 88:22
89:8,15,21,22
90:3 94:22,24
95:4 108:13
124:17,22 128:8
132:17

**hypothetically**
39:8 74:16 86:8
86:21

| i | | | |
|---|---|---|---|

**idea**  7:15
**identification**
14:6 85:7
118:10 120:15
128:20 129:19
**identified**  85:24
87:18 123:6,6
**identify**  38:4
58:5 72:9 122:4
**identifying**  46:9
72:19
**ifu**  55:16 74:6
**impact**  38:12
39:9 69:15
133:19
**impacted**  45:12
**impacts**  130:16
**implement**
31:21 33:19
64:22 65:2,20
67:16 72:7 73:2
73:20 74:25
**implementation**
31:17 58:22
76:4
**implemented**
35:20 46:13
68:22 74:12
76:23 77:20
78:13 80:25
81:12

**[implementing - interim]**

**implementing**
26:15 27:23
64:16 68:16
75:22

**implicate** 93:19

**implicating**
93:21

**implying** 103:21
104:3

**important** 26:13
33:21 38:23,25
39:1,3 56:16
71:2,3 92:16

**improve** 74:20

**include** 17:2
46:17 51:25
58:6 60:14 65:7
79:23 80:11
133:17

**included** 9:10
38:16 44:12
67:7 79:14
80:12 109:10
111:3 114:2
118:17 123:8
125:7 126:2

**includes** 15:14
40:2 113:17,20

**including** 16:15
39:25 49:2 53:7
59:3 134:14

**income** 12:18

**incomplete**
39:11 69:20
73:3,21 75:4

86:14 89:22
95:4 108:13
128:8 132:17

**inconsistent**
122:11

**incorporate**
35:15 48:3
55:11 56:16
63:8 118:3

**incorporated**
16:15 22:9 40:8

**incorporating**
34:23

**increased** 82:1

**independent**
38:18 40:17,22
40:24 41:2,25
48:10,12,15
73:25 75:6,6
84:24 85:4,16
85:22 86:2,4,9
86:22 87:18
88:20 89:7 91:9
103:23 121:25
125:8

**india** 91:11

**indicate** 4:9
71:21

**indicated** 50:3

**indicates** 125:8

**indicating** 128:4

**indication**
133:14

**individual**
44:16 112:16

**individuals** 27:3
32:3 37:5,6,9
45:6,23 111:2
129:14 134:6

**indre** 115:3

**industry** 20:5
41:5,11 42:9,17
44:13 47:3 98:4
99:3 133:15
134:6

**infected** 37:5,5

**infection** 35:9
121:22

**infectious** 7:13
24:2 59:20

**inform** 80:6
92:13 98:16

**information**
30:15 38:22
113:18 117:16
123:12 124:17
125:25 126:12
127:1,5 129:6

**informed**
121:12

**initial** 9:23
11:10 14:13

**inputting** 116:2

**insert** 32:24
33:8 72:1

**inspected** 108:1

**instance** 35:4
94:22 109:3
130:25

**instances** 48:18
50:8 60:22 61:2

**institution** 27:4
32:4 47:12,19
73:25 111:2

**institutional**
111:6,7,9

**institutions**
61:10 75:10
110:2

**instruction** 6:1

**instructions**
71:20 107:16

**instrument**
49:12 68:8
81:19

**integrity** 54:23

**intended** 133:12
133:15,18,23
134:5

**interact** 106:24

**interacted** 45:7

**interaction** 83:3

**interactions**
43:14 44:17

**interchangeably**
32:3 56:10

**interest** 51:13
53:8 59:21
61:12

**interested** 37:23
60:8 136:15

**interface** 106:23

**interim** 17:15

**[internal - know]**

**internal** 60:22 61:2,24 62:14 65:7,12
**internet** 26:4
**interpret** 85:20 85:23 86:1,4 106:2
**interpretation** 132:23 133:3
**interpreting** 133:21
**interrupted** 88:25
**interval** 72:6
**intervals** 51:9
**introduce** 118:9
**introduced** 14:3 128:18 129:18
**introducing** 14:2
**invalidated** 57:12
**investigate** 67:15 95:14 125:6
**investigated** 54:18 73:13 87:17
**investigating** 69:4 122:5
**investigation** 54:5 72:7,21 126:13,20 127:17

**investigations** 123:5
**investigator** 24:12,12
**investing** 24:20 24:22 109:8
**investors** 133:23 134:5
**invoiced** 12:12
**invoices** 12:9
**involve** 23:13 52:3 66:8,19 67:1
**involved** 22:21 23:6 29:5 41:23 43:12 47:5,5 48:9 49:7,20 58:20 62:3 107:12 113:8
**involves** 48:16 53:4
**irrelevant** 123:8 134:16
**islands** 1:5
**issue** 27:8 50:8 54:17 64:20 65:5,6,11 87:16 87:19 88:15 100:25 132:14
**issued** 55:20 108:10 122:25 123:1 132:11 133:9
**issues** 64:10,12 65:4 66:2,8,12

66:19 83:14 89:18 106:17,19 123:22
**issuing** 124:1 125:1 128:7
**iterations** 47:1

**j**

**james** 1:9
**january** 11:11
**jennifer** 1:19 3:2 4:20 135:7 136:8 137:4,7,8 137:10 138:3,24
**job** 12:21,22 61:12 113:7 137:5 138:2
**joined** 18:17
**joseph** 15:3
**journal** 70:3
**journals** 61:4 69:24 83:21
**june** 135:18 136:22
**jurisdiction** 24:6
**justified** 80:13

**k**

**keep** 76:17 90:10
**keeping** 64:4
**kept** 132:10
**key** 92:14 102:25 103:18 113:18

**kind** 18:5 20:12 20:22 27:4 30:12 33:1 68:6 70:11,14 76:10 84:15 122:8 129:13
**kit** 42:1
**kits** 105:3
**knew** 6:22 7:2
**know** 5:24,24 6:8,12,25 7:5,7 7:20 9:21 12:12 12:14,23 17:1 19:14,19 20:16 22:1,25 23:1,5 23:11 26:4 27:3 27:18 28:2,10 30:11,24 31:1 33:7 34:24 36:19 37:7 38:17,19 40:3 41:12,14,23 42:23,24 43:1 43:11 45:8 47:7 47:7,11 49:3 50:8 51:20,21 52:11 54:6,9,15 56:3,16,17 59:13,17 60:20 62:10,21 63:21 64:5,24 65:1,18 65:21,22,25 68:2,5 69:11,23 69:24 70:17,19 71:22 74:9 75:8

**[know - limit]** Page 156

76:9,16 77:1,6 78:5 79:9 80:6,8 80:9 82:17,21 83:1 87:16 89:18 90:9 91:24 92:24 93:13,14 94:22 95:22 97:23,24 98:7,24 99:13 99:24 106:12,13 106:15 107:3,12 107:14,24 108:14 112:4 113:19,23 114:2 114:6 115:10,16 116:1,4,7 118:1 119:11 122:6 125:12 128:17 129:13 133:9,12 134:10

**knowing** 86:16 118:1

**knowingly** 108:6

**knowledge** 41:15 43:1,16 44:6 45:16 82:16,20 83:4 108:8 114:21 130:1

**knowledgeable** 43:4 44:1

**known** 34:20 35:18 51:19 52:10 59:20

60:1

**l**

**la** 82:25

**lab** 15:19 16:12 17:13 18:22 19:2 22:21 24:1 26:10,10,11 31:20 32:9,13 32:15,20 33:19 34:17 36:15 37:20 38:23 39:2,21 41:2 46:9,20 47:16 47:20,22 48:1,6 48:16 49:25 50:3,6,9,21 55:15 58:3,17 59:9 64:15,20 64:21,21 65:1 68:17 71:13 72:5,7,24 73:4,7 73:11,19,24 74:1,3,9,11,16 74:16,24 75:6 79:21,24 83:12 86:21 87:23 88:15 89:9,18 93:15 98:4 106:23 108:2 109:24 110:15 111:4,18 112:3 112:15 113:2 116:3,11,22 117:24 122:3 123:7 127:18

128:2,2,7,22 129:10 132:11 132:12,14

**lab's** 31:21 60:22 61:2,24 123:23

**laboratories** 31:18 45:22 58:21 67:14 76:3 85:23

**laboratory** 15:7 15:12,13,18,19 16:9 17:16 19:3 45:24 76:23 77:20 78:18,23 81:13 84:8 109:18 120:18 121:6

**labs** 35:14 36:12 39:24 40:23 47:24 49:2,3 57:3 59:2 62:19 63:9 64:11 65:18 71:1,10 71:11 72:8 74:23 75:7,15 82:8,11,16,21 82:25 83:3,9,9 83:16 110:5 111:21 112:2 114:4 116:5

**language** 99:5 133:19

**large** 1:22 69:10 72:17 136:7

**larger** 61:15

**lastly** 26:15

**law** 9:18

**lawsuit** 23:2 24:3,5,25

**lawyers** 8:3,11 90:22

**ldt** 71:12,12

**leave** 132:5

**lectures** 18:21

**leftover** 60:6

**legal** 23:19,20 29:20 88:5 126:10 127:20 130:13 131:4 137:21

**lengthy** 67:22 68:1,17,19

**letter** 9:13

**letterhead** 109:13,23 115:18

**level** 84:23

**levels** 36:23 38:17

**license** 15:18 19:1,4 111:19 112:14,16,17

**licensure** 18:24

**light** 130:24

**liked** 29:15

**likely** 23:4 54:20 64:15

**limit** 34:8 37:25 38:3,8,11,21

**[limit - manufacturer]** Page 157

39:15,17 40:2,8 57:22 92:11,12 92:24,25 93:4,5 93:8,10,14,20 94:2,14 95:3,8 95:14,25 96:9 96:16 97:2,7,18 98:12,16 99:19 100:11,18 101:4 101:15,18,22 102:8,17,22,24 103:3,17 104:5 130:20 131:22

**limitation** 79:12

**limitations** 70:16 72:3

**limited** 1:5 32:10 33:12 34:5

**line** 26:17 45:9 138:5,8,11,14 138:17

**lines** 102:8

**link** 91:25

**list** 24:11 28:20 67:6 72:2 118:17

**listed** 21:17 29:25 72:3 78:9 100:20 111:17 118:16

**literally** 82:4

**literature** 69:5 77:4

**litigation** 10:23 78:21

**little** 35:6

**lived** 44:17 134:12

**llp** 2:8

**load** 38:5

**lod** 34:8 38:25 39:1,8,21 58:1,5 58:7,15 71:10 71:11 92:13 96:4,18,19 99:21,25 100:4 103:22 118:24 118:25 119:1,6 119:11,24 120:5

**logix** 40:17 78:19,21 84:3 108:20 109:17 121:7,10,16,21

**long** 13:17 68:9 72:2 77:5 93:11

**look** 26:14 28:13 29:24 66:15,16 118:18 128:25

**looked** 26:4 77:4,8

**looking** 22:10 28:13 34:7,24 37:25 39:13 51:23 68:6 69:10 78:9 92:8 93:2 95:14 104:25 113:16

117:17 121:13 121:15

**looks** 16:17 110:23 113:17 114:3 116:1 117:18

**los** 17:13

**lot** 42:25 43:7 44:5 48:2 61:13 65:6 84:11,13 110:13 128:10 128:22

**low** 36:23 38:17 57:19 79:3

**lower** 72:20,25 73:12,14 74:19 79:17,19 80:16 119:24

**lowest** 57:20

**lunch** 104:11,14 104:21

**m**

**m2000** 118:24

**machine** 82:5

**made** 4:11 11:13,24 26:16 66:1

**mail** 3:11,11,12 3:12 8:1,6,8,9 8:17 118:10,12 118:15,20 120:13,15,17,22 120:24 121:3 126:6,20,25 127:6,16,16

128:19,20,24 129:4,19,21,25 137:11

**mailed** 137:12

**mails** 26:3 128:3 130:24

**major** 59:12 82:7 105:2

**majority** 20:10 53:24

**make** 25:14 55:12 56:19 57:9 59:5,9 60:9 61:16 62:12 86:20 87:20 90:13 93:8 95:2 97:5 102:13,22 106:1 127:24 128:9

**makes** 90:11 128:10 131:12 134:15

**malpractice** 23:10

**management** 22:17

**manner** 4:8 40:17

**manpower** 48:22 68:4

**manual** 79:8 81:25 82:1

**manually** 81:21

**manufacturer** 40:7 47:25 48:2

**[manufacturer - michael]**                                                            Page 158

48:9,19 49:4,7
49:22 50:1,9,10
50:14,16 62:6
62:15,20 64:11
64:25,25 68:11
71:20 72:8
73:16 77:7 84:9
108:24 109:22
116:17,18,20,23
117:8
**manufacturer's**
32:21,24 55:16
**manufacturers**
40:18 50:4 59:3
59:10 63:7 72:1
74:23 84:4,12
84:14,16 110:1
**march** 1:14
135:8,10 136:17
137:2,4 138:3
138:24
**marcus** 2:4 4:13
**marissa** 2:10
4:17 8:13,25
9:20 11:24 13:8
**mark** 6:21,24
**marked** 14:4,5
85:6,9 104:23
118:9,10 120:13
120:15 128:20
129:19
**marker** 38:18
**markers** 117:11
**marketing**
129:15

**markets** 24:20
24:22,23 109:8
**match** 54:3
**material** 60:13
77:12
**materials** 10:12
28:17 59:5,10
78:20
**matrix** 52:7
**matter** 11:17
31:17
**max** 78:1
**md** 112:16
**mds** 19:9,15
**mean** 15:12
16:25 17:1
18:25 19:7,18
20:3 25:4 29:6
33:1 34:4 38:25
39:13 40:22
41:3,18 43:6,18
49:15 50:20
51:17 54:25
55:3 56:6,25
58:9 59:24
60:17 61:4 63:2
69:9 70:1 71:25
73:23 76:8 77:6
82:24 83:12
84:13 85:20
98:15 99:12
101:7 102:4
104:3 107:20,22
110:4,13,22
112:13 113:6,17

115:15,24
116:18,19,24
119:5,9 120:2
123:3 134:1
**meaning** 37:21
81:18
**means** 19:12
91:16,17 99:6
119:16,21,23
120:11
**measure** 71:14
**measures** 33:22
**measuring**
34:19
**med** 18:16
**media** 52:9,10
59:17 77:12
**medical** 15:7,11
15:18,19 16:4,7
16:8,20 17:6,7
18:22 19:8,10
23:10 111:5
**medicals** 121:4
**medicine** 16:10
17:16,21
**meeting** 13:17
13:19 20:21
**meetings** 13:8
13:10 31:10,11
**member** 107:23
**members** 42:16
44:7 106:24
**memo** 115:3
**memorandum**
108:25

**mentioned**
36:14 37:7 49:2
49:10 52:4 56:9
62:11 71:9
76:10 109:25
116:22 134:11
**method** 34:10
35:18 37:23
51:14,14,20
52:3,13,16,18
52:18,20,21,25
53:3,3,6,9,10,13
54:13,13,20
56:11 78:13
81:1 91:19
93:22 94:11
95:19 97:12
**metric** 39:21
92:13 98:16
101:19 102:18
102:25 103:18
103:22 104:6
120:8
**metrics** 32:17
37:20 70:18
71:3 84:20 91:4
92:14,15
**mexican** 115:4
**mexico** 91:10
115:16,17 116:3
116:5
**miami** 2:5
**michael** 2:5
4:13

**[microbiologist - notice]** Page 159

**microbiologist** 17:4 26:9
**microbiology** 14:25 15:15,20 16:21,23,24 17:6,7,8,13,17 18:22 20:15,16 22:1,21 23:25 26:10 46:8 67:14
**micrology** 16:12
**microorganisms** 17:2 37:3
**mid** 6:18 7:24
**middle** 88:25
**mike** 40:9
**mind** 70:23
**minimal** 55:1
**minimum** 19:3 79:11
**minus** 113:19
**minute** 72:14
**minutes** 42:3
**misleading** 86:12 87:5 88:3
**misplaced** 100:12
**missed** 121:16 121:18,22
**missing** 124:17
**misstates** 37:18 45:4 47:17 63:15 64:1 90:4 94:4 105:22 119:17 120:3

124:3 125:11,24 126:22 133:25 134:8
**mix** 55:12 89:19
**mixup** 54:7
**mobile** 22:15
**moderate** 79:3 81:13,16 82:4
**modification** 32:14
**modifications** 11:13 46:10 59:9 65:4
**modified** 32:21 32:22 51:6 55:15 58:3,18
**modify** 59:3
**molecular** 7:13 9:7 15:25 16:14 22:8 43:7 53:12 72:18 83:13,17 84:21 90:25 91:5
**money** 21:5,6
**month** 64:23 128:4
**months** 10:2 75:22
**morning** 5:3 61:20 129:21,22
**motivated** 65:1
**moved** 68:20
**moving** 15:20
**mte** 18:25

**multi** 46:21 69:11
**multidrug** 21:25
**multiple** 47:1,5 49:16 53:23 54:22 55:6,8 74:9 79:5 81:25 82:2 87:8 102:14 117:11
**murphy** 1:9
**muted** 72:12

**n**

**n** 3:1
**name** 4:10 6:21 7:10,18,21 30:25 50:19 106:10
**names** 7:21,22
**nasopharyngeal** 28:14
**ncov** 121:10
**near** 119:1,6
**nearly** 105:3
**nebraska** 119:1 119:6,10
**necessarily** 26:5 38:14 48:5 61:8 61:11 65:5 69:14 88:7 93:21 94:18,18 114:20 115:15 119:19 133:21
**need** 6:3,12 19:3 19:9 58:12 112:6

**needed** 46:11
**needs** 113:20
**neg** 121:13
**negative** 38:17 54:20,24 59:20 60:2 65:10 71:5 77:17 80:2 81:9
**negatives** 79:17 80:12 81:7 93:12 94:12 117:22
**neiman** 2:4 4:13
**nelson** 1:9
**never** 49:6,20 63:24 69:24 112:9
**new** 2:9,9 16:1 28:2 40:5 57:9 59:22 67:12,20 68:8 70:12 83:9 83:9 128:22
**news** 43:22 83:7
**nodding** 6:3
**non** 61:10 72:9 79:13 129:9
**normal** 37:4,9 71:20 90:14
**normally** 68:23 79:18 80:3
**notary** 1:21 136:6,21
**note** 137:9
**notes** 5:9
**notice** 1:23

**noticing** 4:12
**noting** 131:1
**novel** 61:8 67:15
 67:19 68:11,13
 70:2
**november** 11:10
**nucleic** 79:8
 81:19
**number** 12:23
 19:1 40:15 53:4
 72:17 79:14,20
 81:10 82:24
 100:3
**numbers** 125:3

**o**

**oath** 4:4,22
 135:1
**object** 5:25
**objection** 30:14
 31:3,5 37:18
 39:11 44:10
 45:4 47:17 49:9
 63:1,15 64:1
 66:21 67:4
 69:20 71:24
 73:3,21 75:4
 80:18 86:13
 88:23 89:11,22
 90:4,17 94:4
 95:4,11 96:11
 96:21 97:20
 98:21 99:8
 100:7,13,23
 101:6,16,24
 102:10 103:6,25

 105:12,22 107:7
 107:18 108:12
 113:25 114:11
 119:8,17,22
 120:3 122:2,13
 123:13 124:3,11
 125:11,24
 126:22 127:20
 128:8 129:5,11
 130:13 131:4,14
 132:7,17 133:1
 133:25 134:8
**objections** 4:8
 87:6 88:4
**objective** 9:4,5
 134:5
**objects** 5:25
**observed** 55:1
**obtain** 81:19
 112:14
**obtained** 71:14
 131:13
**obviously** 5:20
 14:11
**occasion** 25:16
**occasionally**
 117:2
**occupation**
 17:10,11,12
**occur** 75:17
**occurred** 66:12
 123:5 126:14
**offer** 19:14
 59:18 69:16
 93:11 112:15

**offered** 28:4
 48:22 49:10,24
 82:25
**offering** 57:6,9
 57:10
**offers** 15:17
 18:3
**officer** 11:4
**official** 135:10
 136:16
**oh** 6:17 21:4
 31:9 116:18,21
**okay** 5:15,19,19
 6:14 8:19 14:10
 20:11 27:11
 36:8 42:2,3 64:9
 66:17 83:18
 87:2 98:18
 99:25 100:17
 104:17 115:24
 123:9 127:4
 130:18,24 133:5
 134:17
**olympus** 21:20
**omitted** 86:8
**ones** 76:11
**ongoing** 105:2
**open** 76:18
 81:17,22,24
**openness** 10:8
**operators** 55:2
 55:12
**opine** 26:7,8
 55:21

**opining** 97:21
 132:23
**opinion** 10:15
 20:23 21:16
 22:1,24 26:9,11
 26:15 31:15
 41:10,12 42:8
 42:14,18 43:2
 43:11 45:20
 63:6,11 66:7,7
 66:25 67:1
 75:21 84:2 98:4
 103:9 108:16
 113:21 114:17
 114:23,23,24
 123:1 124:1,9
 124:12 125:1
 126:7 129:12
 131:6 133:19,24
 134:5
**opinions** 9:5,7
 9:10 10:12,22
 11:16,25 13:4
 20:7 26:24 27:1
 28:22,24 29:12
 29:16 30:2
 31:12,16 42:20
 43:9 44:8,24
 66:18 67:8
 114:20 134:16
**opt** 58:21
**opted** 65:15
**optimally** 59:19
**options** 59:16

**[order - peirsol]** Page 161

**order** 4:6 59:4 65:16

**ordering** 134:19 137:13

**orders** 64:16

**ordinary** 109:2

**organisms** 21:25 22:2

**original** 91:25 131:11

**outcome** 69:11

**outright** 92:8

**outside** 60:24 62:1,3,5 70:10 72:5 73:25 124:11

**outwards** 74:13

**overall** 23:25 24:1 43:4 77:14

**oversight** 68:21

**own** 12:1 14:12 18:17 27:21 41:12 63:21 73:10 74:7 75:1 75:9 106:25 108:3 109:22 113:7 115:15 116:5 117:3,5

**p**

**p.m.** 1:15 104:11,12 134:23

**package** 32:24 33:2,8 72:1

**packaging** 71:21

**page** 3:2,9 14:17 50:25 64:9 106:7 115:9 138:5,8,11,14 138:17

**pages** 115:14 136:9

**paid** 12:6,16 20:9 21:3 26:5

**pandemic** 33:7 42:23,24 43:6 44:17 45:7 59:2 76:1 77:22 82:10 134:12,14

**panel** 80:9

**panelists** 20:21

**panels** 20:5

**paper** 5:9 62:11

**paragraph** 99:16 100:15,20 101:4 124:19 125:2 130:7

**paramount** 71:16

**parasites** 17:3

**parentheses** 46:1

**part** 26:19 35:9 35:13 37:24 39:7 41:13 44:8 44:23 61:11 62:8,11 63:10 75:8 80:13

90:12 93:12 97:25 99:15 100:5 101:10,19 102:18,25 103:17 104:6 106:21 111:14 113:21 118:4 120:8 132:3

**participated** 45:15

**participating** 4:1

**particular** 7:21 7:22 20:20 24:2 28:11 42:8 48:18 50:8 57:3 59:4 65:11 96:25 123:7

**particularly** 9:8 33:6 34:6 61:13 83:16

**parties** 4:6 24:3 31:12 60:24 62:1,4,6 136:13 137:13

**party** 73:1,17 74:25 109:24

**pasadena** 1:15

**past** 40:17 64:23 84:24

**patented** 91:1

**pathogen** 38:8 57:7

**pathologists** 39:24

**pathology** 16:9 17:20

**pathwest** 109:19

**patient** 22:19 23:4 24:2 34:18 34:23,23 36:24 37:12 45:25 53:9,18 60:1,3,5 60:6,19 65:9 67:16 77:11,14

**patients** 22:3 34:24 35:1,5,8 60:1 69:16 76:18

**pay** 93:9

**paying** 92:9

**pcr** 15:24 16:15 22:7,10 23:14 25:2,7,10,17,21 25:24 27:9 28:5 28:8,10,15 38:12 46:7,23 52:19,21 53:11 57:8 65:7,8 69:19 75:22 78:21,23 79:1,8 79:9 121:10,11 122:20

**pcrs** 16:2 83:13

**pdf** 106:7

**peer** 61:4,14

**peirsol** 2:10 4:17 8:20 30:14

[penalties - pineiro]

penalties  138:21

people  41:14
42:25 43:3,7,8
45:11 47:5 56:9
57:3 59:15 98:4
112:6 117:9
134:13

percent  18:10
34:4 35:17 38:6
38:10,19,20
41:1,6,16,19
42:10 44:15
45:1 51:24,25
51:25 53:25
57:21 65:14
71:22 72:6
73:18 77:16
80:25 81:7,10
84:19,20 85:4
85:15,16,21,21
85:25 86:2,3,6,7
86:9,10 88:19
88:20 89:6,7
91:3,4,12,16,17
92:18 93:18,24
94:1,12,25
95:17 96:6 97:1
97:17 98:12
103:23 105:17
106:4 117:23
121:18 122:1,10
125:9,10,18
129:3 131:2,13
131:13 132:1

percentage  18:8

perfect  41:3,18

perfectly  41:4
90:14

perform  41:4
45:22 65:18
75:18

performance
28:14 31:20
32:17 33:22
38:12,15 40:19
43:4,16,18,20
46:4 51:8 59:22
64:10 69:14
71:1,4,17 72:10
72:20,25 73:13
74:19,20 75:2
78:15 79:8 84:3
84:5,12,19
85:15 87:25
89:5 91:3,9
107:6

performed  32:5
32:12 41:25
51:4 55:2,15
65:22 86:23
108:19 109:18
121:13

performing
53:25 57:25
58:2 73:14
79:13 83:13
89:10,17

period  54:21
59:1

perjury  138:21

person  7:1
27:18 46:21
47:9,9,10 55:13
110:7,9,24
111:24 112:2,17
112:25 113:1
114:18 116:2
133:3

person's  114:23
114:23

personal  82:16
82:20 83:4
112:9

personally  49:6
49:20 83:2 93:9
110:20

personnel  82:12
82:18

pertain  21:22
25:21 28:7

pertaining  25:6
25:17

pertains  33:12
42:15 115:4

pertinent  59:11
114:17 134:7

phd  16:2,4,7,8
16:12 92:12
112:20

phds  19:9,15

phone  5:16 8:6

physician  23:8

physicians  28:1

pick  34:25 35:4
35:7 36:23 37:9
38:8,10,15
39:15,18 54:18
93:11 94:12,20
100:1,1

picking  34:11
34:21 36:5
41:21

picks  35:25
120:9,10

picture  87:16
90:5,6 128:16

piece  20:16
25:15 36:13
38:22 126:1

pieces  5:9

pineiro  2:5 3:4
4:13,13,14 5:2
14:7 30:16 31:7
38:2 39:20
40:11,14 42:2,6
44:21 45:14
48:8 49:18 50:2
61:19,23 63:3
63:12,23 64:8
66:24 67:11
70:4 72:4,16
73:8 74:14
75:19 80:23
83:24 84:1 85:8
86:18 87:11
88:10,24 89:3,4
89:14 90:1,8,21
94:7 95:7,20

**[pineiro - press]**

96:14 97:4,21 98:1 99:1,11 100:9,16 101:1 101:11,21 102:3 102:12,16,21 103:9,12,20 104:7,10,13 105:18,24 107:11,21 108:17 112:8 114:5,14 118:11 119:15,20 120:1 120:6,16 122:9 122:18 123:14 124:6,13 125:14 126:4,15 127:3 127:9 128:1,10 128:13,21 129:8 129:16,20 130:17 131:10 131:16 132:9,21 133:5,8 134:3 134:17,19,20

**piping** 82:4

**place** 13:12 24:5 113:10,14 118:6

**placed** 64:16

**places** 61:10 75:13 83:1 112:5

**plaintiff** 1:6 2:3 22:11,15

**plaintiffs** 4:14

**plans** 20:22

**plate** 81:20

**platform** 91:1

**platforms** 77:21

**plaza** 2:8

**please** 4:9 5:20 121:5 137:10

**plus** 65:13 126:12

**pneumocystis** 35:23 37:7

**pneumonia** 35:23

**point** 29:8 54:24 57:14 66:6 78:19 86:17 92:15 124:21 128:11,15 129:1

**pollack** 6:22,24 7:16,23

**pollack's** 7:18

**polling** 45:15,18

**poor** 36:4 39:8 83:15

**poorly** 86:23

**pop** 82:11,16,25

**popping** 82:5

**pops** 26:3,3

**popular** 43:22

**population** 43:2 43:25

**portion** 17:7 37:11

**pos** 121:13

**position** 6:25 17:16,23

**positions** 20:9

**positive** 34:25 35:5 38:17 41:21 53:18 54:18 59:20 60:2,7,9,11,14 60:17,21,21 69:15 71:5 77:10,17 79:11 80:2 81:9 119:11 120:10

**positives** 34:12 34:21 60:16 79:16 81:6 93:12 94:12 100:2 117:22 120:9,11 121:16 121:18 122:11

**possible** 56:24 58:23 112:22,23

**possibly** 46:24

**post** 16:17 63:10

**potassium** 50:23

**potential** 8:3 23:7 64:12 69:4 78:6 123:22

**potentially** 37:24 39:9

**practice** 15:18 19:2 25:4 30:13

**prc** 81:20

**pre** 41:22

**preceding** 128:4

**precise** 55:5 72:19

**precision** 51:8 54:25 57:15

**prefacing** 32:1

**prefer** 48:7 49:14

**preferably** 60:1

**preference** 62:18,21

**preparation** 49:21

**prepare** 11:19 12:25 13:2 50:10

**prepared** 11:7 11:13 14:13 30:18 47:16 48:19 49:8,21 95:22 116:20 117:24

**prepares** 46:20

**preparing** 12:3 13:25 47:4 50:4 107:13 129:9

**present** 4:3 18:24 51:21 52:12 77:1

**presented** 20:21 74:17 89:9 90:16,20 123:18

**presently** 17:10

**press** 3:10 24:23 25:1,6,10,17,20 25:23 26:2,16

26:19,22,24
27:2,8,13,15,17
27:21,23 40:16
41:6 42:10,15
42:21 44:14
45:1 55:20
62:15,24,25
63:10 64:3
74:22 84:3,18
85:6,10 86:5
87:4,5 88:3
90:24 91:23
92:3 95:22,24
98:5,19 100:6
100:21 103:10
104:24 106:6
107:13 108:9
109:6,8 113:24
114:8,19 118:21
122:11 123:2,8
124:1 125:7,8
125:13 126:9,21
127:18,24 128:2
128:7 129:22
130:3 131:1
132:11,12,20,24
133:10,14,19
134:4
**pretty** 78:11
101:8 113:17
117:21 118:3
119:9
**previous** 7:2
13:22,23

**previously** 6:22
32:22 60:20
109:25 131:8
**primary** 9:9
12:21,22 17:10
17:11,12 45:24
47:9 67:13
74:11
**principal** 24:12
**printing** 59:15
**prior** 11:1 15:20
24:25 31:17
89:13
**privileged** 30:14
129:5
**probably** 54:22
63:4 123:18
133:6
**problem** 64:15
100:14,17,24
**problems** 82:7
128:5,22
**procedure**
137:22,22
**proceeding**
23:21
**proceedings** 4:4
23:19,20
**process** 22:21
23:25 29:4
36:12 47:6 65:9
67:12,22 68:1
68:16 69:1 70:5
70:10 76:4,10

**procuring** 75:21
77:9
**professional**
31:16
**professor** 17:18
17:20
**professorship**
18:9,12,14
**program** 18:17
106:22,25
**projects** 16:13
**promising** 41:6
42:10 44:14
45:1
**proposed** 9:4
20:22
**protocol** 59:4
78:22
**prove** 19:9
**provide** 6:1,10
9:12,14 10:14
10:15,17 20:7
21:16 26:9,11
27:1 29:1
108:16
**provided** 9:18
10:22 29:3
30:17 33:7
78:20 106:11
107:15 116:2
123:10 126:5,12
127:2
**provides** 73:17
**providing** 10:12
26:23 29:5 43:9

43:11 98:3
103:9 105:3
113:22 124:9
**public** 1:21
16:20 17:6
24:22,23 25:1,6
42:20,22,25
44:7,23,25 45:6
45:15,16,18
76:2 107:5
129:10 136:6,21
**publication**
61:17 62:13
69:25
**publications**
14:24 28:4,5,7
**publish** 61:7
63:9,10
**published** 60:23
61:3,6,15,25
62:3,9 69:5,8,9
69:18,22 70:2
83:21
**pull** 49:13
**purportedly**
99:21
**purpose** 53:1
57:12 80:1
**purposes** 33:21
71:3
**pursuant** 1:22
4:5
**pursue** 37:24
53:13 56:11
58:4,22 61:11

63:7 74:11

**pursued** 35:13 62:9

**pursuing** 28:11 37:19 40:7

**put** 108:24 109:22 110:24 116:23 117:1 125:15 128:2

**putting** 46:22

**q**

**qualified** 82:11 82:17

**qualitative** 34:7 71:9

**quality** 45:24 106:21,22,25 108:4

**quantitative** 37:25 38:24 39:2

**question** 6:7,9 6:10 23:5,6 24:8 49:19 63:4 80:4 86:16 87:8,12 88:9,13,25 90:16,19 93:8 96:13 98:19 101:2,3 102:4 104:4 113:25 116:13 119:18 122:6 124:16 134:2

**questions** 5:23 27:18 42:25

45:8 123:15,16 123:19,20,25 124:8,24 128:17

**quick** 61:20

**quickly** 68:20 76:20

**quite** 16:1,2 33:6 41:17 43:3 48:1 68:9,20

**quote** 52:22 96:17 97:17 98:14,15 99:21 101:4,8,12,14 102:7 105:5 125:16 131:23

**quoted** 103:10

**r**

**r** 138:4,4

**ran** 87:23 118:23

**randomly** 64:4 78:16

**range** 12:15,24 51:9 57:16,16 60:14 81:13

**rashbaum** 2:4 4:14

**rate** 12:3 65:14

**rather** 115:23

**reached** 6:23 7:2,23

**reaching** 20:6

**reacted** 109:8

**read** 25:3,23 45:12 55:20

64:3 99:25 134:18 137:7 138:21

**reading** 97:22 119:12 133:3

**reads** 119:9

**reagent** 78:17

**real** 121:10

**really** 9:5 18:14 18:20 20:23 26:9,14 30:1 33:16 34:3,7,16 34:19 35:14,16 35:19 36:7,12 37:11,12 39:13 40:6 41:14 43:24 45:11,12 47:8 51:23 53:23 54:23 56:8,18 57:5 59:12,18 62:20 63:6,11 79:21 79:25 80:6 93:9 94:5 95:5 96:12 97:23,24 98:24 108:15 122:6 125:3,5 126:7 127:23 129:12 130:15 131:7,8 134:1,7

**reason** 29:25 63:3 72:25 87:18 99:18 137:9 138:7,10 138:13,16,19

**reasonable** 22:25 137:15

**reasons** 54:9 89:13 123:6

**rebecca** 30:24 110:7

**rebuttal** 11:11

**recall** 6:17,19 7:25 8:1,6 9:22 10:13 13:13 21:4 27:12 28:10 29:10 31:9 48:18 50:7 50:14 59:13 64:2 66:4,5,10 66:14,16,23 67:9 107:9,10 109:4,5 118:16 118:18 129:7 130:2

**receipt** 137:15

**receive** 122:4

**received** 23:4 42:16 99:3 119:10

**recent** 14:19,21 91:20

**recently** 54:17

**reception** 132:24

**recess** 42:5 61:22 83:25 133:7

**recite** 71:25

**[recollection - removing]**

**recollection**
80:24
**record** 6:10
**recovered** 22:2
22:3
**recovering** 24:1
**redline** 130:6
**reduced** 72:9
**reed** 1:10
**reference** 34:1,3
34:5,10,20
37:23 46:2 51:9
51:14,20 52:3
52:13,16,18,20
52:21 53:3,9,10
54:12,19 56:14
56:16,24 57:1,2
57:4,8,16 59:25
73:6 74:6 78:13
81:1 83:19
91:19 93:22
94:11 95:18,19
96:4 97:6,11
105:20 121:17
122:16
**referenced**
28:21 88:2
137:6
**referencing**
86:5 97:11
**referred** 51:14
53:3
**referring** 27:13
34:6 59:1 62:6
67:5 79:7 96:17

99:15 111:7
**regard** 8:19
44:19 137:17
**regarding** 10:12
25:2 26:24 27:9
28:5 44:7 45:16
52:21 78:6
83:22 107:5
109:7,23 123:2
127:5,17 129:10
134:6
**regardless** 55:5
**regards** 7:1
36:15 121:9
**regularly** 107:2
**regulation**
108:7
**regulations**
107:25 112:23
115:17 118:7
**regulatory** 39:4
40:2 106:14,17
106:18,24
107:15,22
**related** 21:24
22:1 25:10
67:10 106:14
134:14
**relates** 24:2
27:2 125:7
**relationship**
74:1
**relative** 136:13
**relatively**
104:22

**release** 3:10
26:16,20,24
27:17,21,22,23
40:16 41:6
42:10,15,21
44:14 45:1
55:20 62:16,24
62:25 63:10
74:22 84:3,18
85:6,10 86:5
87:4,5 88:3
90:24 91:23
95:22,24 98:5
98:19 100:6,21
103:10 104:24
106:7 107:13
108:9 109:6,8
113:24 114:8,19
118:21 122:12
123:2,8 124:2
125:7,8,13
126:9 127:19,25
128:2,7 129:22
130:3 131:1
132:11,24
133:10,14,19
134:4
**released** 91:2,8
131:9
**releases** 24:23
25:1,6,10,17,21
25:23 26:2,22
27:2,9,13 64:3
85:14 92:4
132:12,20

**relevance** 99:10
**relevant** 25:3
46:19 61:16
92:15 126:8,9
126:11,21 127:1
127:6,11,18,24
128:7 133:24
**relicensure**
19:11
**relied** 13:5
28:21,23
**rely** 73:1 74:25
83:21
**remain** 71:16
**remark** 93:19
95:8 100:18
101:14,22 102:8
**remarking**
92:10,23 94:2
95:3,17,24 96:9
96:15,15,19,22
99:19 100:10
102:1,17,24
103:15 130:20
131:22
**remarks** 96:17
99:21 101:18
**remember** 6:20
8:22 10:6 13:19
24:3,5 50:16,18
66:13
**remotely** 4:4,21
135:7
**removing**
132:16

**[rendered - reviewed]**                                        Page 167

**rendered**  29:16
**rendering**  28:21
  31:12 42:19
  44:9
**repeat**  25:12
  54:12
**repeated**  54:19
**repeatedly**
  92:18 93:18
  96:5 125:18
  131:25
**replace**  57:5,7
**report**  3:10 9:6
  9:10 11:10 12:3
  13:6 14:5,13
  28:17 29:23,24
  30:5,17,17
  44:12,23 46:13
  46:14,15,20
  47:4,15,15,21
  48:4,14,19 49:7
  49:14,21 50:10
  50:12,13,25
  66:5,14 67:5,7
  69:19 70:6,7
  71:15 92:25
  97:21 102:5
  109:11,12,16,23
  110:1,6,10,21
  110:23 111:14
  111:23,24 113:5
  114:1 115:20,23
  116:5,9,12,13
  116:16 117:3,6
  117:14 118:4,5

  118:17 123:1
  132:15 136:10
**reportable**  51:8
  57:16
**reported**  84:23
  94:17 136:8
**reporter**  4:1,2
  4:11 6:4 102:13
  134:19 136:1,6
  136:20
**reporting**  4:3,8
  22:22 45:25
**reports**  11:7,14
  11:16,19,23
  13:4,7 30:25
  50:5 54:1 55:24
  56:1 62:24
  74:21 91:22
  102:25 110:14
  113:13,23 114:7
  114:18 116:23
  132:15
**request**  29:8
**require**  33:2
  40:3 51:7 68:8
  71:10 81:18,24
  116:15 118:5
  122:15
**required**  23:5
  26:14 31:18
  39:3,6,21,23
  57:25 58:15
  70:18 71:1,11
  79:20 93:15

**requirement**
  61:12 75:8,11
  75:11 79:7
  108:7 111:22
  112:1 116:7
**requirements**
  40:1 58:4 75:12
  107:23 108:2
  111:1,6,7,9
  112:23 115:17
  116:11 129:14
**requires**  32:16
  57:16 58:23
  68:8 79:5
  116:12
**research**  16:13
  19:21 70:3
**residents**  18:16
**resistant**  21:25
**resolution**  123:7
**resolve**  64:20
**resolved**  64:15
  65:4 72:7 87:17
**resource**  79:12
**respect**  29:12,15
  42:14 109:6
**respond**  8:17
**responded**  4:22
**response**  6:1
**responses**  6:3
  24:22
**responsible**
  46:9
**rest**  78:14

**result**  22:22
  51:19 55:9 65:9
  82:18 112:24
**results**  22:23
  25:24 39:10
  45:25 54:2
  60:23 61:3,25
  62:12 70:24
  86:2 89:16
  92:11,24 93:1
  94:10,11 95:1
  95:25 96:4,16
  97:11 100:11
  105:1,1 108:25
  109:16 116:2
  121:5 122:4,10
  123:6 128:22
  129:10 130:21
  131:23
**retrospect**  78:10
**returned**  137:14
**revealing**
  104:17
**review**  5:21
  10:11 13:24
  25:5,13 29:23
  30:7,8 31:2
  47:23 50:17
  56:1 70:24
  78:19 92:3
  107:5 113:22
  137:6
**reviewed**  11:24
  13:3,4,5 25:3,20
  25:22,23 26:2

**[reviewed - says]**                                                        Page 168

33:17 46:24
61:4 83:18
109:7 114:1,13
128:24
**reviewer** 47:13
**reviewing** 10:20
26:19,22 84:11
107:13
**richard** 1:10
**right** 5:12 8:14
11:11 17:22
27:5 35:15
37:12 39:14
40:5,12 41:19
43:9,23 48:6,13
48:24 49:8,15
53:10 54:7
56:15 57:7,13
58:12,16 60:10
61:8 63:14,24
83:8,10 84:9
87:19,22 88:13
88:16,18 89:17
90:12 91:18
93:2,25 94:3,16
94:19,21 95:1
95:16,21 96:16
96:25 97:19,22
98:5,10,14
99:17 100:2
101:22 103:2
104:7 108:5
112:15 113:9
115:13,18 117:4
117:15,20

119:21 122:10
122:12,19,23
123:5,10,11,22
124:4,7,21
125:23 127:4
131:13,19
132:22 133:24
134:7
**rinele** 1:21
135:17 136:6,20
**risk** 80:16
**risks** 82:1,6,7
**rna** 60:8
**robust** 33:18
**rockefeller** 2:8
**role** 6:25 19:9
42:24 46:8
50:18 105:2
106:13,23
113:11 132:11
132:12,14
**roles** 67:13
**roman** 45:20
**room** 5:7,14
**rotation** 15:14
**routine** 17:25
70:10 79:13
**rt** 78:21 79:1
**rule** 88:15
137:22,23
**rules** 5:6 116:8
137:16
**run** 16:3 38:6
51:22 55:1,2,7
65:6 112:15

**running** 48:12
56:4 121:6
**runs** 46:23 55:6
55:7,8
**rx** 121:4

**s**

**s** 3:7 138:4
**safia** 78:1
**saline** 59:17
**saliva** 28:12,14
33:7 59:16
**sample** 33:5
34:17 41:21
51:22 52:4,6
54:6,7,12,19,21
60:3,4,5,6,6,12
**samples** 34:18
34:19,20 35:18
38:16 39:16,18
48:13,16 51:18
51:21 52:14,17
53:4,6,9,10,16
53:19,19 55:7
60:1,18,20
70:16,19,20
71:6 77:10,15
77:17 93:22
95:18 118:25
119:5,10,11
121:6
**saragene** 108:21
**sars** 76:3 77:11
77:21 79:13
80:25

**sat** 25:20
**satterfield** 1:10
92:12 96:5
97:16 98:10,11
100:18 101:3
103:8 118:13,20
**satterfield's**
105:5 114:7
125:16
**saw** 30:4 43:22
**saying** 32:1
36:16 39:1,3
44:11,24 53:7
57:15 59:8
66:25 70:21
74:5 81:22 86:1
97:5 100:8
103:4 104:5
105:16 110:16
111:16 112:21
112:22 119:23
119:24 124:22
126:25
**says** 15:6 51:4
55:14 59:19
84:2 85:14
88:18 89:5
90:25 91:8
92:10,23 93:17
93:25 95:24
96:5 105:1,5
108:18 109:16
117:11 118:23
121:5,9 122:12
122:19 125:13

**[says - sensitivity]**

128:22 131:17 131:23

**scenario** 54:4 73:19 74:24 87:2,3 88:1 89:20 90:2 112:21 124:25

**scenarios** 110:16

**scholar** 18:2,5

**school** 15:3,3,4 17:21

**science** 15:7,7 15:11,12 16:8

**sciences** 15:13 16:4,7

**scientist** 15:18 15:20 19:3 46:22 47:10,12 54:7

**scientists** 55:11 129:9

**scope** 124:11 132:18

**scopes** 22:2

**scratch** 40:6

**screen** 14:9 45:20 104:23 118:12 125:15 129:23

**screening** 37:13

**scroll** 14:11 21:12 115:11

**se** 42:22

**seal** 135:10 136:16

**search** 69:5

**second** 42:8 54:14 83:24 98:2

**section** 24:10 48:7 51:1 74:10 84:2 111:19 113:2

**sections** 28:4 74:12 75:17

**securities** 24:16 24:17

**see** 18:3 20:1 21:13 28:18 29:15 31:22 33:24 40:20 41:8 42:12 44:12 45:20 51:2,10,15 55:18 57:23 58:24 59:6,23 60:25 61:14 64:13,17 67:17 67:24 71:7,18 72:11,15,22 75:24 76:6,24 77:18,23 78:24 81:4 82:14 84:6 84:25 85:18 89:18 91:6,14 92:21 96:2,7 100:14,24 101:3 104:20 105:8

108:22 109:12 109:14,20 110:6 110:8 113:22 114:3,22 115:6 115:12 117:12 117:21 118:12 119:3 120:20 121:1,5,19,23 122:21,22 125:6 125:21 127:11 128:16 129:23 130:4,6,9,10,15 130:22 131:7,7 132:2,3,8

**seed** 52:10 60:8 60:11

**seeded** 53:19 77:15

**seeding** 77:11

**seek** 45:19 57:11

**seeking** 31:20 56:23

**seemed** 43:21

**seems** 43:15 79:16 80:5 81:22 84:15 89:16 97:16 122:23

**seen** 29:12,15 30:25 63:24 92:2,6 106:8 108:24 109:22 113:15 115:20 116:9,16,21,24

118:15 120:22 126:25 129:25

**select** 29:3

**selection** 67:12 67:22 70:5

**selections** 41:22

**self** 113:10

**sell** 65:24

**send** 27:25

**sense** 27:6 34:4 34:9 48:12 68:20 90:11 96:22 128:9,10

**sensitive** 34:11 35:25 36:22 71:4,22 119:21 120:2

**sensitivity** 33:22 34:2,5,9,15,16 34:22 35:11,12 35:17,17,19 36:4,13,17,18 36:21,21 37:16 37:21,22 38:20 40:16 41:1,17 44:4,20 51:25 57:18 65:5 71:16 73:18 77:13,16 81:1,7 81:11 84:20 85:4,16,21,25 86:3,6,10 88:19 89:6 91:3,13 92:14,19 93:18 94:1,9,19,25

95:12,13,14,17 96:6,24,25 97:1 97:6,10,18 98:12,17 101:20 102:18,25 103:1 103:3,18,18,22 103:23 104:6 105:17 106:4 109:17 120:8,12 121:7,11,14,15 122:1,20 125:10 125:18 131:2 132:1 134:15

**sent** 9:19,21,24 12:9

**sentence** 97:9 97:15,22 99:20 101:19 119:9,14 131:19,20

**separate** 81:18 81:19 120:5 126:3

**september** 14:17

**sequencing** 22:9

**serbin** 1:10

**serial** 38:9

**served** 23:17,20 23:21

**service** 19:17,17

**services** 9:4 10:18,19 12:9 22:16

**serving** 6:15 22:11

**set** 81:20

**setting** 44:24

**setup** 79:9,9

**several** 108:19

**share** 14:3,12 62:17 63:19 128:18

**shared** 60:23 61:3,25 62:3,5 116:18

**shares** 21:5,8

**sharing** 14:8 62:20 104:23

**sheet** 137:9,10

**shop** 68:23 76:11

**short** 69:2 117:1 124:19

**shortages** 28:12

**shorthand** 136:10

**show** 14:16 39:9 41:1 86:9

**showed** 80:25 81:7 85:4 92:25

**showing** 73:17 74:19 85:9 94:11 103:23 115:9,10 120:13 122:1 127:15

**shown** 30:10 125:22 130:24

**shows** 74:21

**side** 36:15

**sign** 46:12 137:10

**signature** 115:8 116:12 135:16 136:20

**signatures** 111:11 112:7 118:5

**signed** 111:24 114:6,18 115:13 115:16,21 116:8 116:10 137:19

**significant** 76:1

**significantly** 110:14

**signing** 110:15 110:17 111:4,6

**similar** 78:22 113:15 117:7

**similarly** 6:8

**simple** 54:6 88:17 124:7

**simply** 84:22

**single** 55:10 92:13 98:16 104:6 128:16

**sits** 17:17

**sitting** 5:12 20:18 29:11,14

**situation** 127:14

**skim** 64:3

**smart** 108:20 109:17 121:7,10

**sodium** 50:23

**sole** 110:20,21 111:4,4,24

**solely** 41:25 42:15

**solutions** 137:21

**somebody** 46:25 93:25 104:3 111:17 130:9

**son's** 5:14

**soon** 9:23 40:10 104:22

**sophisticated** 82:8

**sorry** 5:17 7:10 25:13 29:12 31:4 36:11 54:16 68:3 72:13 117:6 127:13 128:14

**sort** 69:16

**sought** 45:11 109:9

**sounds** 104:9

**source** 28:21

**south** 1:15 2:4 22:16 66:3,9 120:18 125:22 126:19 127:14 128:5,6 130:25

**southern** 17:19

**space** 32:9 48:16 74:9

**speak** 8:2,18,20 30:20,22 42:22 45:5 69:5 104:4

104:15
**speaking** 43:14
53:24 69:17
84:14,17
**speaks** 101:16
101:25 103:7,25
105:12
**specific** 9:25
13:21 20:7,8
22:19 26:8 27:5
40:1 42:25
46:10 48:23
50:14 56:11,12
57:7 62:21 71:4
74:15 106:15
109:3 113:7,10
**specifically** 6:18
7:25 10:6,13
12:14 16:8 21:4
22:10 23:11,15
24:4 25:22
26:13 27:21
28:9,15 30:12
50:18 69:24
71:25 77:4 92:8
95:13 97:9,14
98:14,15 107:14
109:1,9,25
113:22 118:18
**specifications**
46:4
**specificity** 33:23
34:15 36:4
40:16 41:2,17
51:25 65:6

71:16 73:18
77:13,16 81:1,8
81:11 84:20
85:5,16,22,25
86:3,7,10 88:20
89:7 91:4,13
92:14,19 93:19
94:1,10,25
95:18 96:6,25
97:10 98:17
101:20 105:17
106:5 109:17
122:1 125:10,19
131:3 132:1
**specifics** 29:6
**specimen** 22:22
23:8 28:12
59:12,24,25
80:17
**specimens** 22:20
28:16 53:8
59:19 60:14
77:11 79:12,14
79:17 121:14
**speculate** 90:7
90:10,12 126:1
**speculating**
56:11 97:25
123:3 131:20
134:10
**speculation**
97:20 103:6
119:8 122:24
127:22 128:9,11
128:15

**speed** 75:18
**spell** 7:18
**spent** 19:20
**spoken** 43:3
**sprung** 82:9
**st** 15:3
**staff** 27:5 47:22
48:16
**stages** 41:22
121:22
**standalone**
92:15
**standard** 27:25
30:12 46:3 47:3
47:4,8 52:23,24
52:25 111:14,15
111:16 113:17
118:3
**standardize**
48:25
**standardized**
49:1 110:2
113:12
**standards** 41:10
**standpoint**
36:22 39:4
123:23
**start** 4:11 14:2
122:5
**starting** 70:12
**state** 1:22 19:2
21:20 109:1
112:20 135:3
136:3,7,16,21

**stated** 89:13
102:2 103:18
106:2 138:22
**statement** 42:8
83:6 88:18,21
89:8,21 95:2,8
96:10,19 100:10
106:1
**statements** 4:11
24:23 25:1,6
26:16 107:5
129:10
**states** 1:1 82:9
112:19
**stating** 4:10
**statute** 137:16
**step** 54:11 81:18
**steps** 72:17 79:5
81:25 82:2
**storage** 41:23
**stored** 54:21
**story** 108:14
**straightforward**
51:7 101:8
117:21
**strange** 62:23
**strike** 29:13
105:4
**string** 120:17
128:19,24
129:21,25
**strong** 60:15,20
**students** 18:16
**studies** 24:13
37:17 38:9 51:6

54:1 62:8 69:5,8 69:9,11,12,22 85:4 93:23 108:19

**study** 25:17 59:21 61:15 69:18,25 77:10 79:15 91:12 93:3,4,4 94:14 105:11 117:25

**stuff** 41:14 44:4

**subject** 120:17

**submit** 19:10

**subpar** 87:24

**subset** 34:24 51:18 62:9 95:13

**substance** 23:2 104:19

**substitutions** 59:5

**sufficient** 31:21 73:5 80:2 118:8

**sufficiently** 70:25

**suggested** 124:23 137:14

**suit** 22:12

**suite** 2:4

**summaries** 108:19 117:2

**summarize** 49:5 50:12 117:5,5

**summarized** 40:16 110:24

**summarizes** 46:15

**summarizing** 108:25 116:3 117:3

**summary** 31:15 31:16 46:18 84:23 85:3,5 91:20 110:23 115:23 116:1,14 116:14,24 117:7 117:15,18 118:6 121:17 132:15

**superficially** 106:25

**superior** 21:20

**supervised** 110:7

**supervising** 47:5

**supervisor** 110:12,17,21 111:16 112:4,24 113:4,6,6,8

**supplements** 11:14

**supplier** 105:2

**support** 24:9 49:4

**supportive** 108:21

**supreme** 4:5

**sure** 7:6 8:16 10:9 12:22 29:4 40:13 42:4

55:12 56:19 57:9 61:21 75:12 94:5 95:5 104:22 109:1 129:2,3,17

**susceptibility** 22:23

**susceptible** 81:23

**swab** 28:15 59:17

**swabs** 28:13 59:14,14,15

**swear** 4:22

**sworn** 4:21 135:8

**symptoms** 34:23 37:11

**system** 75:7 82:3

**systems** 74:8 81:17,18,22,24

**t**

**t** 3:7 138:4,4

**table** 118:2,3,4

**tables** 46:18

**take** 6:13 13:12 40:9 42:2 56:18 60:10,10 61:20 68:5,9 72:20 80:10 104:8,10 133:5

**taken** 1:21 42:5 61:22 83:25 104:11 133:7

**talk** 6:6 40:19 84:16 97:10

**talked** 44:4

**talking** 61:24 95:12 97:10 98:15 127:11

**target** 60:7 133:18

**targets** 59:20

**teaching** 18:14 19:22

**team** 29:20 46:10 106:24 107:15,22 108:4 117:5

**technical** 49:4

**techniques** 16:14

**technology** 68:13

**telephonic** 121:12

**tell** 64:6 65:8 81:9 115:24

**telling** 87:23 90:15 98:3 128:5

**template** 110:2

**templates** 48:23 113:19

**ten** 79:11,16,16 80:1,2,12 81:6,6 81:9,9 133:5

**tend** 56:9

**[tenure - tests]**                                            Page 173

| | | | |
|---|---|---|---|
| **tenure**  17:23,25 18:6 | 58:3,3,11,11,16 58:17,17,18 | 109:17,18 118:25 119:16 | 25:7,11,17,21 26:10 27:9 28:5 |
| **term**  16:9 35:10 58:10 97:8 | 59:11,18,22 60:7,15,15 | 120:2,11 122:16 134:15 | 28:14 41:5,11 42:9,16 43:7,16 |
| **terminology** 56:9 58:8 | 64:16,22 65:2,7 65:11,16,20 | **test's**  33:22 92:10,23 95:25 | 43:19,20,24 44:3,8,13 45:10 |
| **terms**  15:23 18:7,12 20:18 | 66:3 67:13,15 67:19,22 68:11 | 96:16 99:19,21 100:11 130:20 | 45:16,17,23,25 51:18 66:2,8,11 |
| 46:6 53:21 58:14 66:25 | 68:12,22,22 69:15,19 70:12 | 131:22 **tested**  37:12 | 66:19 67:16 72:18 82:10,25 |
| 90:11 99:6 **test**  22:10 26:15 | 71:3,13,15,16 71:17,20,22,22 | 54:7 55:5 77:17 93:22 95:19 | 83:17 84:21 98:4 112:15 |
| 26:18 27:22,23 28:2,10,15 | 72:3,8,9 73:2,12 73:14,20 74:18 | 121:14 125:9 **testified**  4:22 | 114:22 123:21 127:15,17 |
| 31:17,19 32:5,9 32:13,13,14,20 | 74:25 75:18 76:3,15,17,21 | 114:7 **testify**  99:4,5 | 133:15 134:6 **testings**  91:5 |
| 32:21,22 33:15 34:19,20,25 | 76:23 77:1,2,4 77:14,16 78:19 | **testifying**  23:17 99:3 | **tests**  7:13 20:22 25:2 27:5 28:8 |
| 35:4,7,11,20,25 36:21 37:20,22 | 78:21,21,23 79:1,4 80:5,10 | **testimony**  10:15 10:21 12:7,7 | 33:12 34:7 38:24 39:2,2 |
| 38:1,7,13,15,23 39:8,14,17,22 | 80:13 82:4,8 83:11 84:3,5,11 | 21:12,16,19 22:6,14 23:13 | 40:5 41:1 46:10 50:22,24 51:4 |
| 40:17,18,19 41:3,18,21,24 | 84:19,24 85:14 85:24 86:22,24 | 31:2 37:18 44:22 45:4 | 51:22 53:24 55:15,16 56:3,4 |
| 41:25 42:1 43:4 43:24 44:19,19 | 87:18,24,25 88:18 89:5,9,10 | 47:17 63:15 64:1 90:4 94:4 | 57:13 59:4,10 65:14,19,23,24 |
| 46:7 50:8,16,17 50:19,20,21,23 | 89:17 91:2,10 91:17 93:10 | 100:7 102:5 104:20 105:22 | 66:9,12,20 67:3 68:16,24 69:5 |
| 51:13 53:8,8,11 53:12,13,22 | 94:24,24 95:2,3 95:9 97:11,11 | 113:21 119:17 120:3 124:3 | 69:16 70:16,25 71:9 74:17,18 |
| 54:13,17,18,20 55:4 56:5,14,16 | 97:12 100:1,19 101:15 105:16 | 125:11,24 133:25 134:8 | 75:22 76:11 77:7,21 78:6,9 |
| 56:17,24,25 57:1,4,4,10,11 | 105:20,20 106:3 106:4 107:6 | 137:7,15 **testing**  15:24 | 79:2,14,24,24 80:20 81:2,14 |
| 57:13,18,21,22 | 108:20,20,21,24 | 22:7,8 23:14 | 81:16,17 83:13 |

84:17 91:2 92:17 93:13 105:3,7,19 125:17 131:25 134:14

**thank** 5:5

**theirs** 119:16

**theory** 40:6 56:15

**thermal** 78:1

**thing** 9:9 36:11 39:19 56:7 59:12 61:7 64:6 76:17 88:6 97:15 99:14 103:12 120:4 131:6

**things** 27:19 37:8 48:25 49:25 63:7,10 68:6 69:12,16 72:18 76:20 113:20 123:4

**think** 12:14 13:11,18 15:25 29:17 32:20 33:4,11 36:11 43:6 47:19 52:3 62:23 65:13 66:4 78:2 83:15 83:16 86:11,15 87:4,7 88:2 93:5 98:19 99:24 100:5,10 109:2 109:10 114:17

117:16 126:5,8 126:9 129:9 130:11 131:17 134:9,11

**thinking** 35:21

**third** 26:19 31:11 73:1,17 74:25 109:24

**thought** 77:3 89:1 114:18

**thoughtful** 67:22 68:17,20

**three** 13:18 26:8 75:21 102:8

**threshold** 53:21

**throughput** 92:16

**tied** 18:21 95:16

**tielman** 121:9

**ties** 125:7

**time** 5:25,25 15:25 18:7,18 19:19 29:8 38:6 38:10 41:7 42:11 43:8,17 43:19 45:2 54:14,22 55:10 56:21 57:21 65:15 68:9 70:22 76:13 77:5 89:3 91:17 92:5 93:24 94:13 121:10

**times** 21:15,17 59:9,14 61:13

90:18 102:14,20 110:13

**title** 86:11 87:4 88:2 106:15 111:3 113:9

**today** 29:14 91:2

**today's** 12:25

**together** 46:23 95:16 110:24 116:23 117:1

**told** 107:23

**took** 42:7 104:14

**top** 31:15 95:23

**topic** 20:8 43:22

**topics** 44:3 134:14

**total** 12:18 77:20 81:19

**touch** 22:7

**touched** 22:8

**touching** 23:13

**track** 17:23,25

**trading** 1:4 137:3 138:1

**trained** 41:15

**training** 15:24 18:19 24:15 41:14 74:13 75:16 82:12

**transcript** 137:6 137:18

**transcription** 136:9

**transcripts** 13:24 137:12

**transferred** 118:2

**transport** 52:9 52:10 59:17 77:12

**treatment** 23:9

**trial** 12:7

**trials** 69:10

**triplicate** 55:6

**troubleshoot** 54:5,10 64:11 64:20 72:24 73:14

**troubleshooting** 65:3 74:20 86:23 88:7 122:5,15

**true** 34:18,21 71:5,5 108:15 136:9 138:22

**truly** 34:25 35:8

**try** 72:8 86:16

**trying** 53:2 63:3 66:4,13 72:14 94:9

**turn** 5:20 14:16

**turned** 54:23

**turning** 28:17 50:25 55:14

**two** 11:7 18:18 21:17 23:16 40:15 57:13,17

**type** 11:21 47:3
**typed** 110:9
**types** 28:12 33:5
  34:18 59:12
  122:4
**typical** 84:16
  110:11 114:3
**typically** 26:17
  27:18 40:19
  47:24 61:6 68:1
  70:9 72:2,8
  79:19,23 84:4
  108:3 112:12
  113:8 132:19

**u**

**u.s.** 15:21 39:25
  75:11 91:12
  111:21 112:2
  116:11
**ubiquitous** 37:4
**uh** 15:10 81:15
  98:6 119:4
  123:17
**ul** 118:25
**unable** 119:12
**uncontrived**
  51:21
**under** 4:22
  17:17 18:19
  70:25 74:4,24
  75:10 89:21
  108:2 112:1,22
  116:11 118:5
  137:15 138:21

**underpin** 105:1
  105:1
**undersigned**
  135:6
**understand**
  35:21 44:14
  45:12 53:2
  86:25 94:5 95:5
  96:12 99:9,13
  101:9 134:2
**understanding**
  17:2 41:11 44:6
  45:9 73:23
  83:11 125:5
**understood**
  41:5 42:10,20
  44:25 134:7
**unfortunate**
  23:3
**unfortunately**
  64:24 121:7
**unique** 91:1
**united** 1:1 82:9
**universal** 52:9
  52:10 59:17
  77:12
**university** 15:9
  16:5,18 17:18
  18:21 22:16
**unmet** 82:10
**unmodified**
  58:22
**unquote** 52:22
**unsigned**
  117:24

**unvalidated**
  57:13
**update** 121:11
  122:19
**updated** 14:19
**upset** 90:22
**urgency** 68:19
  70:15 76:2,16
  76:19
**urgent** 68:5
**usa** 22:16
**usc** 18:3
**use** 9:8 28:2
  31:18,21 32:3,3
  32:4,6,7,23
  33:13,14 38:19
  46:16 48:24
  51:5 52:8,9,16
  53:4,9,9 56:9
  60:6 71:1 74:3
  78:13,18 79:16
  79:18,20 80:3
  80:16 86:24
  87:25 92:16
  93:14 109:25
  116:6
**used** 7:8 53:12
  53:19 58:14
  59:21 77:5
  78:12,16 79:11
  84:20 91:4
  133:19 137:18
**users** 57:19
**using** 35:8 52:7
  52:8,22 53:6

  54:12 58:9,10
  77:14 81:6,9,18
  81:21
**usually** 27:22,22
  35:12,20 45:19
  46:21 50:22
  52:18 55:7
  56:17 61:15
  62:17 63:17,19
  64:25 65:7
  69:10 72:2
  76:10 79:10,12
  80:11 81:25
  92:3,4 111:2
  112:16
**utah** 1:1,8
**utilized** 49:3
  50:1 78:23

**v**

**v** 137:3 138:1
**vague** 8:4 67:4
  71:24 80:18
  95:11 107:18,19
  123:13 129:11
**valid** 58:7
**validated** 80:8
**validating** 75:21
**validation** 26:12
  28:8,9 31:19,25
  32:11,12,19,19
  32:25 33:3,9,12
  35:13 37:17,20
  38:16 39:7,10
  46:13,14,17
  47:4,15 48:3,9

48:19,25 49:7
49:21 50:5,10
50:11 53:1 54:1
54:16 55:14,14
55:24 56:7,13
56:13,23 57:16
57:25 58:2,6,7,9
58:10,15,17,21
59:21 60:23
61:3,9,14,25
62:8,12,24
63:19 64:10
69:19,22,25
70:20,24 71:2
71:15 74:18,21
75:9 76:4,15
81:2 91:20,22
92:25 93:12
94:25 105:10,15
105:19 108:25
109:11,12,16,23
110:21,22
111:23 112:24
113:5,8,12,23
114:1,3,7,18
115:20,22,23
116:9,12,13,14
116:14,16,24
117:1,3,6,7,14
117:14,19,25
118:4,5 127:15
127:17 128:4
132:15,15
**validations**
26:11 37:17

39:16 41:3,16
46:11 56:4,17
61:6 62:14
65:19,23 73:1
73:17 74:11,25
**value** 38:4,22
39:6 93:10
94:17,19 96:23
120:9 122:3
**variability**
55:13
**variables** 88:2
88:12,12,14
**variance** 55:1
**variety** 16:13
34:17 47:20,21
54:8
**various** 26:4
74:23 77:12
**verbal** 6:3,5
**verbatim**
125:13
**verification**
26:12 28:8,9
31:19,24 32:5
33:11,19 46:3
46:11,16 48:2
51:1,4,6 53:1,20
54:1,1,16 56:8
58:9,23 59:21
60:23 61:3,8,14
61:25 62:8
63:19 64:10
70:20,24 71:2
74:7,18 75:9

76:4 77:10
79:15,18 81:2,6
93:15 121:10
**verifications**
26:11 41:2
53:15 56:18
61:5 62:2,15
65:19,23 79:13
**verify** 32:9
137:7
**verifying** 33:15
78:14
**veritext** 137:11
137:21
**veritext.com**
137:12
**version** 14:19
14:21 115:15
130:19,20,25
131:3,11
**versus** 18:9
22:15 55:13
82:3
**view** 84:22 85:2
98:4 99:6
127:18
**views** 42:15
**violate** 108:6
**violation** 108:9
108:10
**viral** 52:11
**virology** 17:13
46:9 67:14
**virus** 36:23 38:5
52:10 60:8,11

60:18 77:15
93:24
**viruses** 17:2
37:8
**vitro** 31:18 32:7
51:5 105:3
**vs** 1:7

## w

**wait** 90:9 98:2
**waive** 4:7
**walking** 82:5
**want** 14:16 40:9
40:11 42:3
56:19,25 57:5,7
57:8 66:15
67:21 90:9
104:7 134:21
**wanted** 8:10,12
20:23 22:1,24
68:21 70:9
104:21
**wanting** 23:24
53:13 55:4
**wants** 64:25
**warrant** 72:6
**water** 61:19
**way** 7:19 19:20
33:18 35:6
39:12 41:22
48:6 49:1,16
54:9 55:16 64:7
70:12 74:13
84:2 88:11
89:19 93:19
99:3 126:7

**[way - york]**                                                    Page 177

| | | | |
|---|---|---|---|
| 133:16 | 100:24 101:7,18 | **working** 16:11 | 132:4 |
| **ways** 39:14 | 102:1,17 103:15 | 17:1 22:22 | **year** 15:14 68:5 |
| 47:21 53:5 | 103:17 104:2 | 46:10 65:12 | **yesterday** 13:14 |
| 70:19 72:18 | 105:14,23 107:9 | **works** 33:15 | **yesterday's** |
| 95:16 117:9 | 107:19 108:14 | **workshops** | 13:19 |
| **we've** 93:25 | 112:1 114:1,12 | 19:14 | **yielded** 77:16 |
| 96:5 | 119:9,18,23 | **workup** 22:20 | **york** 2:9,9,9 |
| **weak** 60:15,21 | 120:4 122:3,14 | 22:25 23:7 24:1 | 4:16,16 5:24 |
| **week** 13:21 18:8 | 124:4 125:12,25 | 32:16 | 8:20 31:3,5 |
| **weeks** 10:1 | 126:11,23 127:8 | **world** 41:13 | 37:18 39:11 |
| **weight** 69:18 | 127:22 128:11 | 43:12,15 134:11 | 40:9,13 42:4 |
| **went** 109:6 | 129:7,12 130:15 | **worthwhile** | 44:10 45:4 |
| **westguard** 66:5 | 131:6,15 132:8 | 69:14 | 47:17 49:9,23 |
| **westguard's** | 132:18 133:2 | **write** 31:16 | 63:1,5,15 64:1 |
| 66:5,14 | 134:1,9 135:10 | 132:19 | 66:21 67:4 |
| **whichever** 67:6 | 136:10,16 | **writing** 9:6 | 69:20 71:24 |
| **wide** 47:20 | 137:18 | 11:23 133:2 | 72:12 73:3,21 |
| **willingness** 10:8 | **word** 72:1,1 | **written** 9:12 | 75:4 80:18 |
| **witness** 3:2 4:3 | 130:9 132:16 | 55:24 69:19 | 86:13 87:6 88:4 |
| 4:18,21 31:4 | **work** 6:4 7:5,8 | 99:5 112:2 | 88:23 89:1,11 |
| 33:6 37:19 | 16:10 17:5 18:9 | 131:8 | 89:22 90:4,17 |
| 39:12 44:11 | 26:11 27:2,8 | **wrong** 48:6 54:7 | 94:4 95:4,11 |
| 45:5 47:18 | 32:8 33:17 45:8 | 72:19 | 96:11,21 97:20 |
| 49:10,24 61:21 | 45:9 47:24 | **wrote** 102:4 | 98:21,23 99:8 |
| 63:2,6,16 64:2 | 49:12 58:20 | **x** | 100:7,13,23 |
| 66:23 67:5 | 61:8 63:8 64:11 | | 101:6,16,24 |
| 69:21 71:25 | 64:24,25 72:8 | **x** 3:1,7 94:24 | 102:10,14,19 |
| 72:13 73:4,23 | 76:12 83:3 | 95:2 | 103:6,11,14,16 |
| 75:5 80:19 | 129:14 | **y** | 103:25 104:9 |
| 86:15 87:7 88:6 | **worked** 6:23 7:3 | | 105:12,22 107:7 |
| 89:12,23 90:5 | 15:19 16:11,12 | **yeah** 12:22 | 107:18 108:12 |
| 90:19 94:5 95:5 | 19:14 49:11 | 19:24 36:9,11 | 111:25 113:25 |
| 95:12 96:12,22 | 50:4 65:9 77:3 | 40:11 55:4 70:8 | 114:11 119:8,17 |
| 97:22 98:22,24 | **workers** 28:2 | 76:19 80:22 | 119:22 120:3 |
| 99:9 100:8,14 | | 99:17 123:18 | 122:2,13 123:9 |
| | | 124:16 125:25 | |

**[york - zoom]**

Page 178

123:13,24 124:3
124:11,23
125:11,24
126:10,22 127:7
127:20 128:8
129:5,11 130:13
131:4,14 132:7
132:17 133:1,25
134:8,18,21
137:1

**z**

**zoom**   1:21 5:7
8:21,24 9:23,23
10:4 13:15

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

RE: Gelt Trading, Ltd. v. Co-Diagnostic, Inc. et al

Job No. FLA6475833

March 24, 2024

Dr. Jennifer Dien Bard

ERRATA SHEET

| Page | Line | Transcribed As | Change To | Reason |
|---|---|---|---|---|
| 18 | 17-18 | I developed my own fellowship program when I joined CHLA in 2015. | I developed my own fellowship program in 2015, after I joined CHLA. | clarification |
| 37 | 8 | CMB | CMV | mis-heard |
| 57 | 12 | invalidated | unvalidated | mis-heard |
| 59 | 17 | swab and saline instead universal transport media. | swab and saline instead of universal transport media. | mis-heard |
| 66 | 5 | Westguard – Dr. Westguard's | Westgard – Dr. Westgard's | spelling |
| 78 | 1 | The CDC, the SAFIA assay, | The CDC, the Cepheid assay, | mis-heard |
| 81 | 20 | PRC | PCR | spelling |
| 82 | 4 | you are literally piping into the | you are literally pipetting into the | mis-heard |

ACKNOWLEDGEMENT OF DEPONENT

I, Dr. Jennifer Dien Bard, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

DocuSigned by:

*Jennifer Dien Bard*
16D20298B4BB42E...

3/28/2024 | 1:37 PM PDT

Dr. Jennifer Dien Bard                                      Date

SUBSCRIBED AND SWORN TO BEFORE ME THIS

28th DAY OF MARCH, 2024.

DocuSigned by:

*Mary S. Lee*
2FAD7787555D439...

**MARY S. LEE**
Notary ID
11405696
My Commission Expires
11/4/2026

NOTARY PUBLIC

4855-2111-1730.2