# Exhibit 8

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br><br>Defendants. | Case No. 2:20-cv-00368-JNP-DBP<br><br>**DECLARATION OF DR. STEPHEN BUSTIN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

<u>**DECLARATION OF DR. STEPHEN BUSTIN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

**Dr. Stephen Bustin** declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Professor of Molecular Medicine at Anglia Ruskin University in Chelmsford, United Kingdom. I submit this Declaration In Support of Defendants' Motion For Summary Judgment. I declare that I have personal knowledge of the facts set forth herein and I could and would testify competently thereto if called as a witness at trial.

2.      On or about January 18, 2024, I signed and issued the Rebuttal Expert Report of Dr. Stephen Bustin (the "**Rebuttal Report**"). Attached hereto is a true and accurate copy of the Rebuttal Report. I drafted and issued the Rebuttal Report, which contains my expert opinions and

sets forth the analyses that form the basis of my opinions with respect to the report prepared by James O. Westgard, served on Defendants on December 4, 2023.

3.        I have personal knowledge of the facts stated in this Declaration and the facts and opinions contained in the Rebuttal Report. If called as a witness at trial, I could and would competently testify to those facts and opinions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 9, 2024, at Welwyn, England.

_____

Dr. Stephen Bustin

2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, | Case No. 2:20-cv-00368-JNP-DBP |
| Plaintiff, | Judge Jill N. Parrish |
| v. | Magistrate Judge Dustin B. Pead |
| CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, | |
| Defendants. | |

**REBUTTAL EXPERT REPORT**
**OF DR. STEPHEN BUSTIN**

**January 18, 2024**

**TABLE OF CONTENTS**

**Page(s)**

I.    SCOPE OF WORK..................................................................................................1

II.    THE WESTGARD REPORT ACKNOWLEDGES FUNDAMENTAL SCIENTIFIC PRINCIPLES; HOWEVER, IT LACKS A BASIC GRASP OF THE SPECIFICS OF RT-qPCR TECHNOLOGY, PARTICULARLY IN THE CONTEXT OF COVID-19 TESTING DURING THE PANDEMIC'S EARLY STAGES. ............................................................................................................1

III.   WESTGARD'S ASSESSMENT OF THE INDEPENDENT EVALUATIONS DISCUSSED IN AND ATTACHED TO CO-DIAGNOSTIC'S MAY 1 PRESS RELEASE MAKES MISLEADING AND INACCUARATE STATEMENTS.................6

IV.   INDEPENDENT EVALUATIONS AND PEER-REVIEWED PUBLICATIONS RELIED UPON BY WESTGARD CONFIRM THE LOGIX SMART TEST'S STRONG PERFORMANCE. .......................................................................................11

      A.    Iowa Hygienic Laboratory Results ...........................................................11

      B.    Evaluations at the University Hospitals of Geneva .................................14

      C.    The PathWest Australian Study ...............................................................14

      D.    The Israeli Study......................................................................................17

      E.    The Mexican Study...................................................................................17

V.    THE MAY 1 PRESS RELEASE'S DESCRIPTION OF THE LOGIX SMART TEST'S PERFORMANCE WAS CLEAR AND TRUTHFUL. ....................................21

## I.    SCOPE OF WORK

I have been asked by counsel for Defendant CO-DIAGNOSTICS, INC. ("Co-Diagnostics" or the "Company") to review the report prepared by James O. Westgard in this action, titled "Validation of Performance of Qualitative Tests" (the "Westgard Report"), and to opine on the statements and opinions expressed therein.

My expert qualifications and remuneration are the same as described in my initial report, dated December 1, 2023, and exhibits thereto. In forming the opinions expressed in this report, I considered the materials referenced herein, as well as the materials referenced in and appended to my initial expert report.

Based on the detailed analysis provided below my conclusion is that the Westgard Report is not supported by the facts in this case and fails to align with accepted norms and practices within the molecular diagnostics field. Westgard does not appear to be well acquainted with qPCR-based methods, which has resulted in an irrelevant discussion of metrics related to clinical chemistry as well as numerous inaccurate, conclusory statements and unwarranted assumptions.

## II.    THE WESTGARD REPORT ACKNOWLEDGES FUNDAMENTAL SCIENTIFIC PRINCIPLES; HOWEVER, IT LACKS A BASIC GRASP OF THE SPECIFICS OF RT-qPCR TECHNOLOGY, PARTICULARLY IN THE CONTEXT OF COVID-19 TESTING DURING THE PANDEMIC'S EARLY STAGES.

The Westgard Report provides some general information and theoretical background regarding the assessment of various types of diagnostic laboratory testing. As such, there are some basic and undisputed concepts referenced in the Westgard Report with which I agree, including: the importance of 95% confidence intervals (Westgard Report, p.12); that the most important performance characteristics of a RT-qPCR test are its sensitivity and specificity (Westgard Report, p.13); and that there were challenges in assessing the performance of RT-qPCR COVID tests in the early stages of the pandemic due to the limited availability of reference quality comparative

methods and of real (rather than contrived) patient samples (Westgard Report, p.17). Agreement/comparative studies—in which the accuracy of a new test is measured by its agreement with a comparator test—quickly emerged as the only realistic way laboratories could assess the performance of the many COVID-19 kits launched into the market in the early months of the pandemic. However, since there was no universal "gold standard" test, the suitability of any comparative assessment was critically dependent on the performance of the comparator test, and different comparator tests resulted in different agreement values, as is evident from the published literature. In this context, it was usual to refer to the resulting performance estimates as a test's sensitivity and specificity, even when what was being measured was percent positive and negative agreement (PPA and PNA). It is important to note that PPA and PNA only consider whether there is agreement between test kits, they do not consider whether tests accurately identify true positives (i.e., individuals infected by SARS-CoV-2) and true negatives (i.e., individuals not infected by SARS-CoV-2).

The Westgard Report is also correct to point out that positive and negative predictive values (PPV and NPV) are important metrics for characterising clinical or medical usefulness, but that "Predictive Values claims generally would not be made by manufacturers because they require knowledge of the prevalence of disease, which would vary for the particular country or region where the test would be applied". (Westgard Report, p.16). It made more sense to focus on sensitivity and specificity given the dynamic nature of the pandemic, with its early phase characterised by evolving information and changing epidemiological patterns. In addition, regulatory agencies require robust evidence and validation based on clinical studies for claims related to PPV and NPV, which were not available at the time. Hence, as discussed below, manufacturers primarily focused on reporting sensitivity and specificity values, because they are

2

not dependent on disease prevalence, were more readily determined and communicated to users, and provided more standardised measures of test performance.

I also agree that whilst the LoD is an important analytical performance characteristic, it does not directly predict clinical usefulness. (Westgard Report, p.21). Westgard correctly opines that a "lower LoD **should** provide better detection" of samples with low viral loads. (Westgard Report, p.21) (emphasis added), but the key word is "should"—there is no guarantee that a lower LoD will provide better detection in the real world. The LoD is established and determined under ideal laboratory conditions, where various factors are strictly controlled and standardised. These conditions will always differ considerably from real-world situations where numerous variables have an impact on the performance of a test beyond its LoD. Clinical usefulness ultimately depends not on LoD, but on the interplay of factors such as sample handling, environmental conditions, inherent variations in patient samples, and the presence of interfering substances, which collectively affect the reliability and applicability of diagnostic tests in everyday practice. In addition, arguably the most significant variable in LoD determination is the person conducting the test. Individual techniques, experience, and adherence to protocols among operators can lead to major differences in test outcomes. Hence, the clinical utility of a diagnostic test involves a broader evaluation beyond just the LoD, encompassing its overall performance under real-world conditions to ensure reliability and accuracy in practical use. Regardless, as Westgard opines, the LoD is reflected in the sensitivity and specificity performance metrics. (Westgard Report, p.17).

Westgard's assertion that "more commonly, the terms PPA, PNA, and POA are used when a comparative method is used" (Westgard Report, p.15) may be the case for clinical chemistry tests, but is certainly not the case for studies comparing RT-qPCR tests. Instead, an examination of the published literature shows that authors most often use the terms sensitivity, specificity and

3

accuracy when referring to the results of comparative evaluations that use another COVID-19 test as the reference point. This may not be the terminology Westgard is used to—as his expertise appears to be in the different field of clinical chemistry laboratory management—but it is the accepted nomenclature for laboratories performing RT-qPCR tests. The customary use and reporting of these terms in evaluating RT-qPCR tests for COVID-19 detection, despite potential limitations and the absence of a universally accepted gold standard, persists due to their established familiarity, interpretability, and historical precedence within the field of diagnostic testing. This historical legacy, predominantly centred on infectious disease diagnostics, has established sensitivity and specificity (including as measured in comparative assessments between different assays) as pivotal benchmarks for characterising a test's accuracy and reliability. Although the absence of a universally accepted gold standard for COVID-19 diagnosis posed challenges in precisely determining these values, their application allowed for comparative assessments between different assays. This standardised approach facilitated the comparison of test performances across studies and enabled researchers and clinicians to gauge the relative strengths and weaknesses of various RT-qPCR assays, despite the complexities arising from uncertain disease prevalence.

Westgard's reference to the Clinical and Laboratory Standards Institute (CLSI) guidance recommending a minimum of 50 positive and 50 negative patient specimens for estimating sensitivity and specificity further exemplifies his unfamiliarity with the standard and accepted processes for evaluating the performance of a RT-qPCR test for diagnosing COVID-19, especially in the early stages of the COVID-19 pandemic.[1] Whilst CLSI guidance serves as a valuable guideline to ensure a robust assessment of test performance when possible, the reliability of

---

[1] Indeed, later in the Westgard Report, Westgard acknowledges that "[i]t took till May 2020 for the FDA to require 30 real patient specimens that were positive and 75 patient specimens that were negative". (Westgard Report, p.22).

performance estimates is not solely dependent on meeting a specific sample size threshold. Studies with smaller sample sizes are not inherently less "reliable", they simply have wider confidence intervals. Thus, multiple studies with smaller sample sizes consistently demonstrating concordant sensitivity and specificity values across independent investigations are equally consequential because they signify a consistent pattern of test performance. Whilst larger cohorts are beneficial for precision, dismissing estimates from smaller sample sizes as "minimally reliable" fails to acknowledge the robustness accrued through consistent findings.

Moreover, as a practical matter, it was immensely difficult, and frequently impossible, in the early months of the COVID pandemic to acquire enough positive and negative patient samples to meet the CLSI recommendation. This constituted a significant limitation to conducting comprehensive evaluations according to the CLSI guidelines and it is important to acknowledge that in such circumstances any assessment utilising real-life patient samples, even if falling short of the recommended numbers, offered valuable insights into test performance. These evaluations were instrumental in providing foundational insights into the strengths and weaknesses of early COVID-19 diagnostic tests, aiding in their iterative improvement over time. Again, it is worth restating that each of the independent evaluations of the Logix Smart Test referenced in the May 1 Press Release used real patient samples and showed excellent performance.

In summary, although the theoretical concepts extensively covered in the Westgard Report are important within the realm of quality control for clinical chemical laboratories, their applicability is considerably limited when assessing the efficacy of RT-qPCR diagnostic tests, especially in the context of COVID-19 testing during the initial months of the pandemic. In theory, applying the standardised quality control measures employed in clinical chemistry to PCR diagnostics seems a logical step. However, operational differences between these fields render this

aspiration impractical in practice. Clinical chemistry laboratories predominantly carry out routine testing with highly automated systems, standardised assays, and long-standing, well-characterised procedures. These have undergone rigorous validation and quality control assessments using extensively defined, consistent metrics that emphasise precision, accuracy, and reproducibility. This meticulous approach ensures uniform and reliable analytical outcomes in everyday testing across diverse clinical chemistry laboratories and testing platforms.

In contrast, molecular diagnostics in general, and PCR-based testing specifically, relies heavily on often rapidly developed laboratory-developed tests characterised by diverse, complex, and non-standardised procedures that make tests less suitable for applying uniform quality control measures. The varied assay designs, diverse reagents, instrumentation, and multiple protocols for the same target have led to the development of distinct performance metrics to accommodate this variability. Here, the focus expands beyond the precision and accuracy of the testing process to include analytical and clinical indicators such as sensitivity and specificity. Consequently, quality control metrics in molecular diagnostics labs prioritise assessing an assay's robustness, its accurate prediction of disease presence or absence, and its ability to detect specific targets.

Ultimately, I am of the opinion that Westgard's emphasis on and extensive discussion of clinical chemistry lab theories detracts from and obscures the principal scientific question: does the May 1 Press Release fairly and accurately portray the performance of the Logix Smart Test based on the information available to Co-Diagnostics at that time?

III. **WESTGARD'S ASSESSMENT OF THE INDEPENDENT EVALUATIONS DISCUSSED IN AND ATTACHED TO CO-DIAGNOSTIC'S MAY 1 PRESS RELEASE MAKES MISLEADING AND INACCUARATE STATEMENTS.**

Westgard opines that "it is difficult to assess the reliability of the data and the subsequent claims of performance" for the independent evaluations referenced in and attached to the May 1 Press Release. This is based on a series of unsupported and conclusory assertions. For example,

6

Westgard questions the reliability of the validation studies at issue because they "were not peer reviewed to assure appropriate experimental procedures, data analysis, and performance claims". (Westgard Report, p.20). This criticism is inconsistent with well-established practices in the diagnostic testing industry: most independent validation and verification results are not reported in peer-reviewed publications (or even shared with the test manufacturer). Further, the absence of peer-reviewed publication for validation studies on diagnostic RT-qPCR tests does not inherently constitute a limitation or make it difficult to assess the reliability of the data and the ensuing performance claims.[2] And whilst peer-reviewed publications in theory offer a vetting process and enhance transparency, it is well known generally, and my colleagues and I have shown in a study analysing 1,700 peer-reviewed papers published in 2013,[3] that even in established journals, experiments utilising specialised qPCR-based techniques do not receive the level of scrutiny required, leading to the publication of studies with suboptimal methods, execution and incorrect conclusions. Conversely, independent studies often undergo meticulous scrutiny by expert panels, regulatory bodies, or peer review within the scientific community, albeit not in the traditional published format. Hence, the contribution of validations from independent laboratories serves as

---

[2] In any case, several publicly available peer-reviewed and/or published studies after May 1, 2020 (not mentioned by Westgard) confirm the reliability of the Logix Smart Test. For example: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8372477/, where the Logix Smart Test was used to confirm the results obtained with an in-house developed kit. Another study recorded 100% concordance with reported clinical values in a double-blind study (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9221879/). A pre-print showed 100% correlation with the TaqPath assay (https://www.medrxiv.org/content/10.1101/2021.02.12.21251229v1.full). An independent evaluation of the Logix Smart Test showed it to be 100% efficient, with a single copy target detected at a Cq of 35.5 (95% CI 35.34-35.75) (https://www.wellstandhealth.com/post/validation-of-co-diagnostics-logix-smarttm-covid-19-rt-pcr-diagnostic-test). Another undated independent study was "able to reliably and consistently" detect 2.73 copies/µL without a purification step (https://www.clentlifescience.co.uk/wp-content/uploads/2020/07/MicroLysis-RNA-sensitivity-testing-validation-information.pdf).
[3] *Bustin et al.*, The Need for Transparency and Good Practices in the qPCR Literature, *Nature Methods* (2013) 10:1063-67.

a crucial mechanism for corroborating and verifying manufacturer-generated data, enhancing the transparency and trustworthiness of the test performance claims.

Westgard also appears to question the reliability of the validations attached to the May 1 Press Release because they involved lower numbers of samples and because one used "contrived" samples as well as a patient sample. (Westgard Report, p.20). But neither of these factors rendered the validation results inherently "unreliable", and Westgard's criticism ignores both the significant practical limitations that affected validation processes for COVID-19 tests in the early months of the pandemic, as well as the accepted industry practices at that time. Whilst it is correct that specimen quantity, type, and quality impact any assessment of the clinical usefulness of RT-qPCR diagnostic tests, the availability of patient samples during the early stages of the COVID-19 pandemic posed an exceptional challenge. In this unprecedented circumstance, where the acquisition of clinically representative samples was constrained, adaptation became essential. This involved manufacturers generating and disseminating sensitivity and specificity data that were as transparent and informative as possible using alternative and accepted methods, such as spiked samples with purified standards or synthesised reference materials to simulate the presence of SARS-CoV-2. Whilst acknowledging the inherent limitations and differences between such contrived samples and actual patient specimens, these efforts aimed to provide the best possible insights into test performance under limiting conditions. It is worth noting, however, that the evaluations referenced in the May 1 Press Release used real patient samples (PathWest: samples from nasopharyngeal, nose and throat and dry swabs; NIP: upper, lower respiratory and serum samples; InDRE: unspecified "SARS-CoV-2 positive clinical sample"; USA-Minnesota: patient samples from unspecified source).

The Westgard Report acknowledges that the Australian validation was the most extensive, both in the characteristics that were considered and the number of specimens tested. Indeed, the Australian study met CLSI's recommendation regarding the preferred number of samples for analysis. But in criticising the other evaluations attached to the May 1 Press Release, Westgard ignores the fact that all of them recorded equivalent results, collectively reinforcing the positive assessment of the Logix Smart Test.

The Westgard Report also questions, without any basis or evidence suggesting otherwise, whether the validations included in the May 1 Press Release were independent reports. (Westgard Report, p.20). The evidence strongly suggests that they were:

- The Australian study was carried out by PathWest, the pathology service of the Western Australia Ministry of Health. PathWest carried out over 600,000 COVID-19 tests in 2020/21 and over 900,000 in 2021/22. Furthermore, Westgard's analysis on the Australian study is flawed as explained in detail below.

- The Indian National Institute of Pathology (NIP) is one of the premier research institutes of the Indian Council of Medical Research (ICMR), itself the highest scoring Indian medical institution (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3734727) and recognised as an Institute of Excellence by the Indian Ministry of Health. Westgard mistakenly states that this study was performed by CoSara, a joint venture with Co-Diagnostics.

- The Mexican InDRE serves as a full-service national public health laboratory and performs surveillance and diagnostic-reference testing as well as providing oversight and proficiency testing for the national network of laboratories. It is credited with developing the world's first PCR protocol to detect SARS-CoV-2

9

(https://www.science.org/content/article/mexico-s-coronavirus-czar-faces-criticism-covid-19-surges).

Ignoring these facts, the Westgard Report suggests that because the "author" is the same for both the Australian and NIP reports and the same person signed as the "supervisor" for both studies, the validations were not independent and thus (he implies) the results are not reliable. Specifically, Westgard opines: "Normally, it would be expected that the scientist who performed the experiments would sign as the 'investigator' and the report then be reviewed by a 'supervisor' who would typically be a 'regulatory affairs officer'". (Westgard Report, p.20). This statement, again, illustrates Westgard's lack of familiarity with industry-accepted practices for reporting diagnostic test validation results and providing (or in most cases *not* providing) them to test manufacturers. Here, it appears that the data were provided to Co-Diagnostics and a Co-Diagnostic employee then drafted the reports based on the same. In addition, the Australian qPCR run files name the operator of the instrument carrying out the validation studies. The same person carried out all the runs, and is different from the Co-Diagnostics employee who signed the validation report.

Westgard also appears to opine that the validation results were not reliable because the validation protocols "varied from country to country",[4] with some placing more emphasis on evaluating the test's LoD and others focused on determining the test's sensitivity and specificity. (Westgard Report, p.20-21). But any such variations in focus do not call into question the reliability of the results, they simply reflect slightly different approaches in analysing performance. These

---

[4] If Westgard is trying to say that the way in which the Logix Smart Test was run varied between countries and evaluations, that appears inaccurate. The information provided with three of the validation reports (Australia, India and Mexico) states that the protocol specified in the Logix Smart Test instructions for use was followed. The fourth one (USA-Minnesota) says nothing about the testing protocol used.

independent evaluations available to the Company as of May 1, 2020 showed excellent test performance and were consistent with the May 1 Press Release.

Finally, Westgard opines that the "data submitted for the EUA [presumably, as opposed to the data from the independent evaluations referenced in the May 1 Press Release] was the most important data available in May 2020". (Westgard Report, p.21). But the data reported in and annexed to the May 1 Press Release were equally, if not more important, as they demonstrated independent validation of the Logix Smart Test using real patient samples—an important fact that Westgard fails to understand or simply ignores. Indeed, given that the independent validations at issue were performed using actual patient samples, Westgard's opinion on this point seems to contradict his own opinion elsewhere in the Report that validations using real (rather than contrived) samples provide more reliable results and better reflect a test's real-world performance. (Westgard Report, p.21) (opining that the medical usefulness of the data submitted to the EUA "was of limited reliability" because it depended on spiked or contrived samples).

## IV.    INDEPENDENT EVALUATIONS AND PEER-REVIEWED PUBLICATIONS RELIED UPON BY WESTGARD CONFIRM THE LOGIX SMART TEST'S STRONG PERFORMANCE.

The Westgard Report also compares the validation results reported in the May 1 Press Release with results subsequently announced by the Iowa Hygienic Laboratory or published in peer-reviewed journals and suggests that these later evaluations demonstrate the Logix Smart Test's poor performance. (Westgard Report, p.22-24). But Westgard's analysis is flawed, as detailed below, and I view these later publications as consistent with the test's strong performance.

### A.    Iowa Hygienic Laboratory Results

First, Westgard purports to describe the "expected clinical performance" of the Logix Smart Test by taking as true the 95% sensitivity and 99.7% specificity found by the Iowa Hygienic Laboratory after the May 1 Press Release and extrapolating the PPV and NPV by assuming 2% or

11

5% disease prevalence. (Westgard Report, p.22). I take no issue with his maths on this point, but I disagree with the assumptions underlying it and the conclusions he suggests. In particular, I disagree with (i) his seeming assumption that the Iowa Hygienic Lab performance measures were more accurate (and fundamentally different) than those reported in previous evaluations; (ii) his assumption that 5% and 2% were accurate estimates of high and low prevalence at the time (seemingly based on the positivity rates reported in a May 30, 2020 *Salt Lake Tribune* article); and (iii) his insinuation that the extrapolated PPV and NPV are somehow inconsistent with the May 1 Press Release.

In my view, the Iowa Hygienic Lab's results were equally reliable as, and consistent with, the strong performance reported in the May 1 Press Release: whilst 95% sensitivity and 99.7% specificity are lower than the 100% and 100% shown in previous independent evaluations, they demonstrate excellent performance (indeed, the Iowa Hygiene Lab's results fall within the confidence intervals for the NIP evaluation attached to the Press Release). Achieving 95% sensitivity and 99.7% specificity in the Iowa evaluation further confirms the Logix Smart Test's status as a robust tool, proficient at accurately identifying true positives and negatives within the tested population. These metrics exemplify exceptional performance in real-world scenarios, which must consider numerous additional factors, including who is being tested, sampling, biological variability, and operator influences, and highlight the Logix Smart Test's reliability and efficiency in clinical practice. The Logix Smart Test's sensitivity rate of 95% in the Iowa study reflects an excellent level of performance for the test and is normally accepted as highly effective in clinical and diagnostic settings, irrespective of the prevalence rate. Ironically, its 99.7% specificity, which is outstanding for any diagnostic test, is particularly critical in settings characterised by lower prevalence rates, as it minimises misdiagnoses and false alarms. Westgard's

12

PPV and NPV estimates are simply the logical result of applying assumed disease prevalence to these strong performance metrics; there is nothing surprising about the resulting PPV and NPV estimates, or inconsistent with the performance described in the May 1 Press Release.

I also disagree with Westgard's assumption that 5% and 2% are accurate estimates of high and low COVID-19 prevalence generally in the spring of 2020, especially as the Report acknowledges that prevalence varies "for the particular country or region where the test would be applied". (Westgard Report, p.16). Estimating disease prevalence always requires careful consideration and is affected by population density, disease spread, and, crucially, local testing strategies. Estimating prevalence during the initial phases of the COVID-19 pandemic was even more challenging and uncertain, as disease variants caused significant fluctuation that varied enormously by date and location, hindering accurate estimations of true prevalence within specific regions, let alone across different states. Therefore, interpreting a 5% or 2% prevalence as high or low requires careful contextual assessments based on regional specifics and cannot properly be done by making broad and unwarranted assumptions that lump together Iowa and Utah. Extrapolating prevalence rates without empirical evidence disregards distinct epidemiological dynamics and characteristics inherent to various geographical areas, lacks scientific validity and likely leads to misleading conclusions.

In short, a proper evaluation of any diagnostic test's performance extends beyond simplistic assessments based on prevalence rates. Speculating that a test with 95% sensitivity and 99.7% specificity might be inadequate due to assumed prevalence rates of 2% and 5% oversimplifies the assessment and misleadingly criticises what those familiar with PCR diagnostic tests would widely consider to be excellent performance characteristics.

13

**B.      Evaluations at the University Hospitals of Geneva**

The Westgard Report then points to a series of peer-reviewed publications, beginning with a review by Polish scientists describing experimental results from independent evaluations carried out at the University Hospitals of Geneva. (Westgard Report, p.22).[5] Westgard erroneously asserts that the data from the online database "can no longer be accessed" (Westgard Report, p.22), when in fact the data are available at https://www.finddx.org/tools-and-resources/dxconnect/test-directories/covid-19-test-directory/, last visited January 18, 2024. On my review, however, the online table lists the Logix Smart Test but provides no information on its sensitivity or specificity. Likewise, contrary to Westgard's assertion, table 2 in the Polish review (reference 10 of the Westgard Report does not mention the Logix Smart Test.

**C.      The PathWest Australian Study**

Next, the Westgard Report addresses a peer-reviewed study published by PathWest Laboratory Medicine in Australia. (Westgard Report, p.23). This study appears to be based on the same validation data that were referenced in and attached to the May 1 Press Release.[6] Westgard's analysis of the Australian study includes a mistake and is based on incorrect assumptions that lead to wrong conclusions and fails to acknowledge the significance of these data in confirming the performance of the Logix Smart Test prior to May 1, 2020.

In short, Westgard suggests that the Australian validation showing that the Logix Smart Test performed with 100% sensitivity and 100% specificity is unreliable because four of the patient samples "initially provided discordant results" and were retested (with the concordant repeat test

---

[5] The Westgard Report mistakenly cites to reference 11 as the source for the summary of data. It appears that reference 10 is the correct citation.
[6] My analysis of the PathWest validation is set forth in my initial report, dated December 1, 2023. My opinion herein builds upon that analysis to correct the false and misleading opinions set forth in the Westgard Report.

results superseding the previous data) whereas Westgard opines that they instead should have used the original discordant data for those samples in calculating the performance results. (Westgard Report, p.23).

This is based on a misreading of the paper. Westgard states: "Of special interest, the authors [of the peer-reviewed Paton paper] discussed another **4** [my emphasis] specimens that initially provided discordant results, but upon further testing were found in agreement". (Westgard Report, p.23). But page 6 of the Australian study clearly states: "**Two** [emphasis added] samples returned a false negative result at 1 in 5 dilutions, however, the errors resolved with repeat testing from undiluted specimen" (Westgard Report, reference 12 at p.6). When those samples were retested, both recorded positive results with similar Cq values using both the PathWest and the Logix Smart kits (34.61 vs 35.00 and 32.94 vs 33.40, respectively), as shown in my reanalysis of the primary instrument run files (Fig.1, below). In contrast to the PathWest comparator assay, which recorded non-optimal amplification curves and low fluorescence values, the Logix Smart Test showed a normal amplification plot as well as 10x higher fluorescence levels, indicating better performance. The initial discordant result may have indeed been due to deterioration of the diluted sample. However, it could also have been a technical hitch, which is not uncommon with individual qPCR assays. An analysis of the Cq values recorded for the initial comparison shows that the Logix Smart Test was detecting Cq values as high as 39.51. Given that a five-fold dilution would have increased the Cqs for the two samples to around 37.38 and 35.81, respectively for the two samples, both explanations are plausible.

15



**Figure 1.** Amplification plots recorded from my re-analysis of the original run files (Kurabo + Logix Smart COVID-19 Error Discrepancy.micrun and Kurabo + PathWest LDT Purple Gold Error Discrepancy.micrun). **A.** Amplification curve recorded using the Australian kit. The first 10 cycles are ignored due to the large amount of background fluorescence noise at the beginning of the run. **B.** Amplification curve obtained using the Logix Smart kit. Due to the absence of any initial fluorescence noise, the first 10 cycles did not need to be excluded. The light blue line is the amplification plot obtained from the positive control. **C.** Analysis details and Cq values for the PathWest assay. **D.** Analysis details and Cq values for the Logix Smart assay. The threshold of the Logix Smart assay was adjusted to the same value as the PathWest assay in order to allow a direct comparison of Cq values.

In any case, the way the authors dealt with these discordant results is exemplary and follows the MIQE guidelines established for reporting qPCR results: they identified a possible problem (dilution), went back to the stock which they retested and then, crucially, reported this in their publication. This is precisely the way that any discrepant results ought to be handled—with retesting and clear disclosure as to how the lab addressed any discrepancies. Clearly, no results were excluded or changed, and the textbook way in which these samples were handled only further demonstrates the reliability of the study's results. Westgard's criticism of this textbook approach again reveals his unfamiliarity with best practices and standard procedure for RT-qPCR diagnostic test validation.

16

**D.      The Israeli Study**

The Westgard Report also points to an Israeli study published online in January 2022 as suggesting that the sensitivity of the Logix Smart Test was lower than described in the May 1 Press Release. (Westgard Report, p.24-25). The data from this Israeli study were not available as of May 1, 2020 and thus could not have been included in the May 1 Press Release. In any case, I addressed this study at length in my initial report (Bustin Initial Report, p.40-51), explaining the many ways in which it is poorly executed and its analysis critically flawed. The Westgard Report simply states the findings from that publication, without independently evaluating or understanding the critical flaws that make its conclusions meaningless.

**E.      The Mexican Study**

In a similar manner, the Westgard Report merely restates the results and conclusions from a Mexican study that was published more than two years after the May 1 Press Release. (Westgard Report, p.24). Again, Westgard does not seem to have read the study closely and thus fails to recognise the fundamental flaws, detailed below, that render his conclusions unreliable and the lower performance characteristics for the Logix Smart Test reported in the Mexican study unconvincing.

Most obviously, the authors did not follow the protocol specified in the product manuals for three of the assays evaluated. For example, the Viasure manual requires a sample volume of 5µL with a cutoff at 38 cycles (https://www.certest.es/wp-content/uploads/2020/03/IU-NCO212enes0420-rev.01.pdf). The study used 10µL and a cutoff at 40 cycles, as shown in Table 2 of the publication (Westgard Report, reference 14). Similarly, the Vircell manual requires a 5µL sample volume (https://www.abacusdx.com/media/DIRECT_SARS-CoV-2%20RealTime%20PCR%20Kit_2020.pdf), but the study used 10µL. And the LightMix manual

17

requires a sample volume of 5µL (https://elabdoc-prod.roche.com/eLD/api/downloads/f30be75d-e534-e711-669c-00215a9b3428?countryIsoCode=pi), but the study used 30µL. This immediately casts doubt on the reliability of the data and calls into question any conclusions arrived at based on the study's findings.

Several other aspects of the way the authors conducted and describe their evaluation also make it unreliable. The study states: "In addition to testing each of the six kits with numerous samples, we chose to compare them using nine specific samples, of which eight were positive and one negative. Of the positive samples selected, seven had low viral loads and one high viral load. An additional 27 samples were comparatively analysed using the Logix Smart and the RIDA kits" (Westgard Report, reference 14 at p.12). This raises several concerns.

First, the authors do not state what reference kit was used to categorise the samples as positive and negative.

Second, and more importantly, the data in the study's tables and figures clearly show that there were **not** 27 additional samples. Rather, the 27 samples tested using the Logix Smart Test included the eight positive samples initially validated. This is illustrated by sorting the Cq values provided in Table 3 from the study from low to high and aligning them with the values as set forth in Figure 2 from the study (Fig. 2, below).

18



**Figure 2. A.** Figure 2 from the Mexican study, with me writing in the Cq values for the positive samples listed in the publication's Table 3. Four of the samples were detected with the RIDA kit but not with the Logix Smart kit. I have marked these with a red "x" in the Logix Smart column. **B.** Sorting of the Cq values from Table 3 of the study, with samples in common with the paper's Figure 2 highlighted in blue. **C.** Table 3 from the published study.

19

Third, the pattern of the seven discordant positive and negative results is unexpected. Concordant positive Cq values are closely correlated (p<0.0001), with a correlation coefficient ±95% CI of 0.9862 (0.9530-0.9960) (Fig. 3, below). This correlation extends to five samples recording Cqs >37, with one sample recording Cqs of 38.87 with both tests. Yet, samples recording Cqs of 32.88, 34.80, 36.30, 37.13 and 38.09 (with the RIDA test) returned negative results with the Logix Smart Test, and samples recording Cqs of 34.70 and 37.18 (with the Logix Smart Test) were negative with the RIDA test. These discordant samples should have been re-run with both tests and compared to at least one of the other tests to ensure that these results were accurate before including them in the reported performance measures.



**Figure 3.** Close correlation between Cqs recorded by the RIDA and Logix Smart Tests. The graph shows the line of best fit ±95% confidence intervals.

20

The authors also claim to have recorded better results after optimising their protocols. However, it is clear from their data that the Cq values are no different pre- (Figure 3A on page 9 of the publication) and post- (Figure 3B on page 9 of the publication) "optimisation". Furthermore, following their optimisation the authors have omitted to show any of the amplification plots that had recorded high Cq values and/or low fluorescence levels, which account for half of the reactions they claimed to have optimised. Hence, there is no evidence that confirms their claim to have improved the performance of their tests.

In my opinion, these significant flaws make the Mexican study's results with respect to the Logix Smart Test unreliable.

## V.   THE MAY 1 PRESS RELEASE'S DESCRIPTION OF THE LOGIX SMART TEST'S PERFORMANCE WAS CLEAR AND TRUTHFUL.

In summary, Westgard opines that the May 1 Press Release was misleading because it expressed "the results of the performance … as simply as possible, e.g., 100% accuracy, even though … that claim did not correctly express the medical or clinical performance that was (or would be) experienced". (Westgard Report, p.24). As demonstrated here and in my initial report, Westgard's opinion is not supported by the evidence.

The data available to the Company prior to the May 1 Press Release were consistent with the statements in the May 1 Press Release and demonstrate without any doubt that the Logix Smart Test was highly sensitive and specific and fit-for purpose. It is patently incorrect for Westgard to opine that "those reported studies [associated with the May 1 Press Release] were poorly presented, lacked consistency in what characteristics and experiments were included as well as how the data was reported". (Westgard Report, p.25). To the contrary, the validation reports were clear, explained the comparative methodology, included statistical assessments of uncertainty (e.g., confidence intervals), and complemented and provided additional support for the statements made

21

in the May 1 Press Release. Anyone familiar with diagnostic testing would not have been confused by or have misunderstood the statements.

Westgard also selectively quotes the May 1 Press Release's headline to suggest that it claimed "the test was 100% accurate, 100% sensitive, 100% specific, and 100% concordant" (Westgard Report, p. 25). Instead, what the Press Release actually and correctly stated was that it "consistently demonstrate[d] 100% sensitivity and 100% specificity **across independent evaluations**". (May 1 Press Release) (emphasis added). In my opinion, this was not an oversimplification but a fair description of the performance data available to the Company at the time, particularly given that the evaluations themselves were attached to the Press Release.

As for Westgard's highly unusual and unsupported claim that "the confusion over the performance claims for the Logix Smart test might have been avoided, or at least minimized, by claiming the lower limits of the confidence intervals, rather than the point estimates of 100%" and that "[t]his . . . would have provided claims that were more scientifically accurate as well as more realistic" (Westgard Report, p.25), I am perplexed and fundamentally disagree. A robust evaluation of test performance requires an approach that considers various statistical measures and does not rely on one isolated aspect, especially one as limited in scope as the lower limit of a confidence interval. Advocating its use as a singular metric for describing test accuracy so conflicts with the comprehensive approach integral to laboratory quality control that it calls into question the reasoning guiding this recommendation. In blatantly ignoring the essence of uncertainty inherent in measurements, such a practice would be utterly unprecedented and contrary to the established reporting norms in the scientific literature. Doing as Westgard suggests would egregiously misrepresent a test's accuracy and lead to gross misinterpretations in evaluating its

22

performance. Consequently, this approach would be profoundly misleading, especially to any reader or listener unfamiliar with diagnostic tests or basic statistics.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Welwyn, England, UK, on January 18, 2024.

_____

Dr. Stephen Bustin

23