# Exhibit 12

GELT TRADING, LTD.

vs

CO-DIAGNOSTICS, INC.


BRENT SATTERFIELD, PH.D.

May 16, 2023



250 E 200 S. Suite 350
Salt Lake City, Utah 84111
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

Case 2:20-cv-00368-JNP    Document 169-13    Filed 04/10/24    PageID.2789    Page 3 of 126

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

*** TRANSCRIPT MARKED CONFIDENTIAL ***

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

* * *

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, | ) ) ) |
| Plaintiff, | ) Deposition of: ) BRENT SATTERFIELD, ) Ph.D. ) |
| v. | ) Case No. ) 2:20-cv-00368-CMR |
| CO-DIAGNOSTICS, INC., a Utah Corporation; DWIGHT EGAN; JAMES NELSON; EUGENE DURENARD; EDWARD MURPHY; RICHARD SERBIN; REED BENSON; BRENT SATTERFIELD, | ) ) Judge Jill Parrish ) ) ) ) ) |
| Defendants. | ) |

COPY

* * *

May 16, 2023 * 9:09 a.m. MST

Deposition taken at:
Armstrong Teasdale, LLP
222 South Main Street, Suite 1830
Salt Lake City, Utah 84101

* * *

Reporter:  Lindsay Payeur, RPR, CSR

**2**

A P P E A R A N C E S

FOR THE PLAINTIFF GELT TRADING, LTD., AND PROPOSED
CLASS:

Michael A. Pineiro
Brandon Floch - via conference call
MARCUS NEIMAN RASHBAUM & PINEIRO, LLP
Attorneys at Law
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
Tel:   305-400-4268
Email: mpineiro@mnrlawfirm.com

Michael C. Fasano - via conference call
FASANO LAW FIRM, PLLC
333 Southeast 2nd Avenue
Suite 2000
Miami, Florida 33131
Tel:   786-530-5239
Email: mfasano@fasanolaw.com

FOR THE DEFENDANTS:

Marissa A. Peirsol
BAKER & HOSTETLER, LLP
Attorney at Law
200 Civic Center Drive
Suite 1200
Columbus, Ohio 43215
Tel:   614-462-4732
Email: mpeirsol@bakerlaw.com

Joni Ostler
PARR BROWN GEE & LOVELESS
Attorney at Law
101 South 200 East
Seventh Floor
Salt Lake City, Utah 84111
Tel:   801-532-7840
Email: jostler@parrbrown.com

ALSO PRESENT:

Gavin Bohne - legal videographer

**3**

I N D E X

BRENT SATTERFIELD, Ph.D.                              PAGE
    Examination by Mr. Pineiro                          6

- o0o -

E X H I B I T S

NUMBER                                               PAGE
1   LinkedIn web page for Brent Satterfield        29
2   Research article entitled "Evaluation of
    Factors that Affect the Performance of
    COVID-19 Molecular Assays Including Presence
    of Symptoms, Number of Detected Genes and
    RNA Extraction Type                            108
3   Email dated March 14, 2020, re: Roche
    comment about their test for COVID-19          117
4   Email chain dated April 2, 2020
    Re: Performance Evaluation Results             120
5   Email chain dated April 7, 2020, and
    April 8, 2020, re: Attention: Investor
    Relations                                      131
6   Email dated April 10, 2020, re: Write Up       138
7   Email chain dated April 11, 2020,
    Re: NIV India Results and My Comments          146
8   Screen shot of text messages between
    Brent Satterfield and Barbara Blanke           158

**4**

E X H I B I T S (continued
NUMBER                                               PAGE
9   Email dated April 16, 2020, re: Salt Lake
    Tribune - questions and interview              168
10  Email chain dated April 17, 2020, re: Final
    Feedback from Government Laboratory in
    South Africa                                   175
11  Email chain dated April 14, 2020,
    April 15, 2020, April 16, 2020, and
    April 17, 2020, re: TestUtah                   181
12  Email dated April 20, 2020, re: BioTechniques
    COVID Article - bcs.ca revision                189
13  Email dated April 21, 2020, re: 200319
    COVID-19 Multiple Markers.pdf; Sample
    Exchange Between Access Genetics and the
    MN DOH.pdf                                     210
14  Email chain dated April 23, 2020, and
    April 24, 2020, re: Customer complaint:
    New Result from Lab Lot 179 Problems Again     214
15  Email dated April 17, 2020, re: Testing        229
16  Email dated April 29, 2020, re: See the
    Email - he's fact-checking Brent's
    attributed comment                             230
17  Email chain dated April 30, 2020,
    Re: SL Trib: 'This is a potential public
    health disaster': COVID-19 results from
    TestUtah.com are raising questions             240
18  Email chain dated April 30, 2020,
    Re: Paper                                      258
19  Email chain dated April 30, 2020, and
    May 1, 2020, re: Response                      273
20  Email chain dated April 30, 2020, and
    May 1, 2020, re: Tribune response plan and
    news release draft                             284

**5**

E X H I B I T S (continued
NUMBER                                               PAGE
21  News release article entitled
    "Co-Diagnostics, Inc. Releases COVID-19 Test
    Performance Data: Consistently Demonstrates
    100% Sensitivity and 100% Specificity Across
    Independent Evaluations                        291
22  Email chain dated May 2, 2020, and
    May 3, 2020, re: Digital PCR                   317
23  Email dated May 4, 2020, re: LOD response      326
24  Email dated May 4, 2020, re: Weekly Updated
    04May20 & Important Message From Management    330
25  Email chain dated May 14, 2020,
    Re: [External] Test results                    334
26  Email chain dated May 15, 2020,
    Re: BioCentury - Limited of detection for
    FDA-authorized COVID-19 diagnostics            341
27  Email chain dated May 20, 2020, re: FIND       342
28  Email chain dated March 12, 2020, and
    March 13, 2020, re: Results                    353
29  Email chain dated May 30, 2020,
    Re: Can we talk?                               362

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

6

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record at 9:09 a.m. Mountain time on May 16, 2023, from the offices of Armstrong Teasdale in Salt Lake City, Utah.  This is the video-recorded deposition of Brett [sic] Satterfield in the matter of Gelt Trading, Ltd., verse Co-Diagnostics, Inc.

My name is Gavin Bohne, legal videographer appearing on behalf of DepomaxMerit Litigation Services.  Our court reporter is Lindsay Payeur, also appearing on behalf of DepomaxMerit Litigation Services.

Will counsel please state their appearances for the record?  The witness will then be sworn.

MR. PINEIRO:  Sure.  Michael Pineiro on behalf of the plaintiff.  On the telephone is Brandon Floch as well and I believe Michael Fasano.

MS. PEIRSOL:  Marissa Peirsol with Baker Hostetler on behalf of defendants.

And for the record, it's Brent Satterfield, not Brett Satterfield.

MS. PINEIRO:  Sorry.  Okay.

MS. OSTLER:  And Joni Ostler from Parr

7

Brown on behalf of defendants.  We're also here on behalf of the witness.

MR. PINEIRO:  Was the notice incorrect?

MS. PEIRSOL:  Yes.

MR. PINEIRO:  Sorry.

Sorry, Brent.

BRENT SATTERFIELD, Ph.D., called as a witness, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PINEIRO:

Q.  Good morning, Mr. Satterfield.

MS. OSTLER:  Dr. Satterfield.

MR. PINEIRO:  Dr. Satterfield.  Sorry.

Q.  (By Mr. Pineiro)  Can you state your name for the record, please?

A.  Sure.  It's Brent Satterfield.

Q.  And where do you presently reside?

A.  In Herriman, Utah.

Q.  For how long have you resided there?

A.  Two years.

Q.  And what is your address?

A.  It's 13443 South Rowell Drive, Herriman,

8

Utah 84096.

Q.  I'm just going to go through a few ground rules.  So I'm going to be asking you questions.  When I'm done with my question, your counsel will lodge some objections sometimes.  Unless they instruct you to answer -- not to answer, you go ahead, then, and you provide your answer.  I'll do my best not to interrupt your answer.

Also, sometimes you may know where my question's going, but let me just get the question out for purposes of the court reporter and then provide your answer.  Also, no nodding, just because we need to take a, you know, transcript here.

If you need a bathroom break or anything else, just let me know.  Make sense?

A.  Okay.  Yes.

Q.  What did you do to prepare for today's deposition?

A.  I met with my attorneys for a couple of hours yesterday and on Thursday.

Q.  Okay.  And was that in person?

A.  On Thursday, it was a Zoom meeting, and then yesterday was in person.

Q.  Okay.  And did you review any documents?

A.  Yes.

9

Q.  Besides that, you did no other preparation for this deposition?

A.  No.

Q.  Did you speak to anybody at Co-Diagnostics about the deposition?

A.  No.

Q.  Have you ever -- besides this lawsuit, have you ever been sued before?

A.  Yes.

Q.  And what happened in that lawsuit?

A.  I have been part of a lawsuit where my shares were given as collateral to receive a loan. I never received the loan.  And I sued to try to get my shares restored to me.

Q.  Okay.  So you sued somebody in that lawsuit?

A.  Yes.

Q.  And do you know what court that lawsuit was brought in?

A.  In New York.

Q.  Okay.  Is that the law -- the lawsuit entitled Satterfield verse VStock?

A.  Yes.

Q.  Okay.  And did they countersue you in that case?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                    Brent Satterfield, Ph.D.

10

A. I don't think so.

Q. Okay. And did that case end up in arbitration?

A. Yes.

Q. Is that arbitration still ongoing?

A. The arbitration is concluded; however, not all the damages have been paid.

Q. Okay. So it's concluded. Has the arbitrator rendered a ruling?

A. Yes.

Q. Okay. And was it in your favor?

A. Yes.

Q. Okay. And what was his ruling?

A. His ruling --

Q. His or her. Sorry.

A. Yeah. Their ruling.

Q. Their. The tribunal?

A. The tribunal.

Q. Okay.

A. Their ruling was that Mr. Val Sklarov, who had taken the shares, was guilty of fraud and should pay back -- should give back the shares that he still had, plus pay any proceeds he received from trying to sell my shares, plus damages.

Q. Okay. And how many shares does he still

11

have?

A. He still has roughly 200,000.

Q. Okay. And -- and do you know what kind of proceeds he generated from the sale of shares?

A. He sold them back in 2018, about a million shares for about a million dollars.

Q. Okay. And can you describe the agreement you entered into with that gentleman?

A. It was a loan agreement. He was going to give me a loan for my shares as collateral.

Q. And how big was the loan?

A. The loan was for up to a couple of million dollars.

Q. Okay. Was it a line of credit? Or was it -- was it just a loan where you got the entire proceeds?

A. It was supposed to be a loan where I got the entire proceeds. It changed before the end, and I ended up getting $60,000 instead of the rest of the loan.

Q. Instead of the two million that you were supposed to get?

A. Correct.

Q. So you only got 60,000?

A. About 60,000.

12

Q. About 60,000. Sure.

A. Yes.

Q. And when -- when did you enter into this agreement?

A. It was in April of 2018.

Q. And why did you enter into that loan agreement?

A. I wanted to take out a line of credit to pay off my home. It was a nonrecourse loan, and so it would have left me with cash regardless of what happened at -- at the company.

Q. And by "nonrecourse," what do you mean?

A. That the investment bank has the recourse of keeping the collateral but nothing beyond the collateral.

Q. Understood. Understood.

And so what was the total amount of shares that you pledged towards that loan?

A. Roughly two million.

Q. Two million shares.

Did you have any -- besides those two million that you pledged, did you have any other outstanding shares at that point?

A. About 2,000 --

Q. Oh.

13

A. -- yeah, that I had purchased on the market.

Q. So you gave most of your shares in that deal?

A. Yes.

Q. And so you -- you said that what you wanted to do was take the cash from the loan to pay off your mortgage on your house?

A. Yes.

Q. How big was your mortgage?

A. It was just a couple hundred thousand.

Q. And so what went wrong with the agreement?

A. The lender didn't lend the money.

Q. Why not?

A. They never had any -- I can only speculate as to why not, but they -- what it appeared to be is they never had any intention of giving a loan. His modus operandus was to sell shares in a company with a thinly traded stock to manipulate the share price, push the share price down low enough that he could then call the note in default, and then never pay any of the loan and keep all the shares.

Q. And did you allege that he did that in this situation?

A. Yes.

14

Q.   And was there evidence he had done that previously?
A.   Yes.
Q.   What was the name of the gentleman that you sued?
A.   Val Sklarov.
Q.   And how did you meet him?
A.   I met him through an investment bank that the -- that Co-Diagnostics had been talking to for fundraising.
Q.   Which investment bank was that?
A.   I don't remember.
Q.   Did somebody from Co-Diagnostics assist in this, in connecting you?
A.   No.
Q.   Do you know whether the investment -- you don't recall the name of the investment bank?
A.   Not at the moment.
Q.   Okay.  Is the investment bank one that actually invested or provided financing to Co-Diagnostics?
A.   No.
Q.   So you said that the judge rendered a ruling.  Is there like a final judgment or order from the arbitration?

15

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.
Q.   (By Mr. Pineiro)  You can go ahead and answer.  She's just saying that the form of my question is bad, which is going to happen a lot, but you can go ahead and answer.
A.   Okay.  Sorry, could you repeat the question?
Q.   Yeah.  You had mentioned that the arbitrator has already ren-- has rendered a decision -- a final decision in the arbitration?
A.   Oh.  What I -- I don't understand legal terminology --
Q.   Sure.
A.   -- but I think of it as a final decision.
Q.   Got it.
And you had mentioned that the damages haven't been paid?
A.   No, they have not.
Q.   So the defendant still owes the obligation under the arbitral award?
A.   Yes.
Q.   Got it.
How much is outstanding of that award?
A.   The final amount hasn't been set.  His

16

delay in providing shares has -- has caused substantial loss in the value, and so the judge is still set to provide a final damages amount.  But, yeah, he -- he left the country.  She's threatened to issue a warrant for his arrest.
Q.   And the reason that -- the reason that the damage -- the reason that there's been losses due to his delays in tendering the shares is because of the lowering of the value of the shares over time?
A.   That's correct.
Q.   Okay.  And you mentioned that besides the two million shares that you had pledged, you had about 2,000 shares, right --
A.   That's correct.
Q.   -- that you had purchased on the open market?
A.   Yes.
Q.   Besides that lawsuit, have you been sued in any other proceedings?
A.   Me personally?  No.
Q.   Okay.  Companies that you've worked for have been sued?
A.   No.
Q.   Okay.  And besides that lawsuit that you initiated against somebody, have you sued anybody

17

else?
A.   No.
Q.   Okay.  Are you the -- presently the subject of any SEC investigation?
A.   Maybe.
Q.   Okay.  Have you met with lawyers from the SEC?
A.   Yes.
Q.   Okay.  Did you provide testimony under oath to the SEC?
A.   I don't know.
Q.   You don't know.  Okay.
A.   Testimony, yes.  Under oath, I don't know.
Q.   Okay.  Understood.
And do you recall when that was?
A.   About six months ago.  Last year sometime.
Q.   Okay.  So 2022 at some point?
A.   Yes.
Q.   Okay.  And did you have counsel present at that meeting?
A.   Yes.
Q.   Okay.  And who was that?
A.   I don't remember.
Q.   Have you been deposed before?
A.   I don't think so.

**18**

Q.   Okay.  This is the first time you did this?

A.   With recording -- yes.

Q.   Yeah.  Okay.  All right.
To your knowledge, are you the subject of any other -- besides the SEC, any other governmental investigation?

A.   No.

Q.   And with respect to the SEC, are you aware -- strike that.
With respect to your conversations with the SEC, do you recall what they asked you about?

A.   No.

Q.   Did it pertain at all to the May 1, 2020, press release by Co-Diagnostics?

A.   Yes.

Q.   Okay.  Did it pertain to any other press releases issued by Co-Diagnostics?

A.   I don't remember.

Q.   Okay.  But you do remember that one press release?

A.   Yes.

Q.   Okay.  Have you ever filed for bankruptcy?

A.   No.

Q.   Have you ever been the subject of a

**19**

foreclosure suit?

A.   A lawsuit?

Q.   Foreclose -- yeah.  Foreclosure.

A.   I've -- I've been through foreclosure.

Q.   Okay.  And when was that?

A.   2009, 2010.  Somewhere in there.

Q.   Okay.  And what happened there?

A.   I lost my job and couldn't pay the mortgage.

Q.   Okay.  And where -- where did you reside at that time?

A.   South Carolina.

Q.   Okay.  And was there -- do you know whether there was a final judgment of foreclosure in that proceeding?

A.   No.

Q.   Have you ever been arrested?

A.   Yes.

Q.   When was that?

A.   It's the summer after high school.  It was like 1995.

Q.   Okay.  And what were you arrested for?

A.   Breaking and entering.

Q.   Okay.  And what -- what jurisdiction was that in?

**20**

A.   Florida.

Q.   Florida?  What part of Florida?

A.   Tallahassee.

Q.   Okay.  And so were you prosecuted by -- were you prosecuted with respect to that arrest?

A.   What does that mean?  Sorry.

Q.   Were you charged?  Were you formally charged?

A.   Yes.

Q.   Okay.  And did you plea?

A.   Yes.  I plead no contest.

Q.   Okay.  Got it.
And did you serve any period of incarceration?

A.   Just under a year.

Q.   Okay.  And where was that?

A.   That was in Leon County.

Q.   Besides that, any other arrests?

A.   No.

Q.   And what were the charges -- what were the -- do you recall the specific charges in connection with that?

A.   No.

Q.   What was it -- what were you charged with, I guess, stealing?

**21**

A.   A -- there was a Revolutionary War-era muzzleloader, and I took that, and that was classified as a very expensive firearm, which turned it into a really bad felony.

Q.   Did you break into someone's home?

A.   Yes.

Q.   And did you do that with friends of yours, I guess?

A.   Yes.

Q.   Okay.  Whose house was it?

A.   It turned out to be the judge's secretary.

Q.   That's bad luck.

A.   That was really bad luck.

Q.   Okay.  Did you -- did you -- did you know her by any chance?

A.   No.

Q.   Yeah, that's a bad one.  Okay.
Are you presently on any medications that might impact your memory or your ability to testify today?

A.   No.

Q.   Are you presently employed?

A.   Yes.

Q.   And where are you presently employed?

A.   I'm an advisory board member at

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

22

Co-Diagnostics.

Q. Okay. And that's your -- that's your sole employment at the time?

A. That's my sole employment.

Q. Okay. And what are your responsibilities in that capacity?

A. We meet once every three to six months to discuss the science of the company.

Q. And do you -- are you getting paid a salary?

A. No.

Q. Are you receiving any type of compensation for that?

A. Yes. It's a -- I forget the technical term for it -- non -- non-W-2 --

Q. You're a contractor?

A. Yes, I'm a contractor.

Q. Okay. And what are -- what do they pay you as a contractor?

A. I get 75,000 a year.

Q. Okay. And are they providing you with any stock grants?

A. No.

Q. When did you start that position?

A. I started it about two years ago.

23

Q. Okay. And, you know, besides meeting every three to six months, do you have any other responsibilities?

A. No.

Q. When you're not -- strike that.

These meetings that occur every three to six months, who -- who -- who participates in these meetings?

A. So we have a scientific advisory board. It's run by Carl Wittwer. And there are a couple of other board members whose names I forget at the moment. We usually hear reports from various members of the company -- that would include Mr. Ike Egan, it would include Seth Egan -- and different reports from the lab.

Q. Got it.

And so how long do these meetings usually last?

A. A day.

Q. A day.

And so you -- you receive this information from the company's employees, and what does the board deliberate on, if anything?

A. So we help the company to evaluate priorities for product development to identify

24

opportunities within the scientific development.

Q. Before that, were you the chief science officer for Co-Diagnostics?

A. Yes.

Q. Okay. And whose decision was it for you to step down from that position?

A. It was mine.

Q. And why did you elect to do that?

A. I'm what you call a serial entrepreneur. At least I have been.

Q. Yeah.

A. So I enjoy the beginning phase, the startup phase of a company when there's fewer than ten employees. And Co-Diagnostics has been larger than ten employees for a while now.

Q. So you -- you wanted to -- effectively, you wanted to move on from the company?

A. Yes.

Q. Okay. Did the company approach you at all about your stepping down?

A. What do you mean?

Q. Well, did -- did somebody from the company ever approach you and suggest that maybe you step down?

MS. PEIRSOL: Objection. Asked and

25

answered.

Q. (By Mr. Pineiro) You can answer.

A. No.

Q. Okay. Who did you first inform at the company that you wanted to step down?

A. I in-- I don't remember who was first. It was either Seth Egan or Ike Egan.

Q. Okay. And were they receptive to the idea?

A. They didn't love it.

Q. Okay.

A. But they were -- they were okay with it if it was what I really wanted.

Q. So that was two years ago. Do you remember the month, approximately?

A. That I stepped down?

Q. Yeah.

A. It would have been around February of 2021.

Q. Okay. So at the present time, are you engaged in any other entrepreneurial pursuits?

A. No.

Q. Are you -- do you own any comp-- own or operate any -- any companies at present?

A. Define "own."

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**26**

Q.   Strike that.  Correct.  Good -- good -- good observation.  Sorry.

Do you -- do you own or operate any private companies?

A.   "Own" as in have any share --

Q.   Have an interest or have a beneficial interest, shares, partnership interest, et cetera.

A.   I gave a loan to a private company here in Utah.

Q.   Which company was that?

A.   TriSight.

Q.   How do you spell that?

A.   T-R-I-S-I-G-H-T.

Q.   And what do they do?

A.   They are looking at hydrocarbon revamping.

Q.   For a layman like me, what does that mean?

A.   They want to take coal and, instead of burn it, they want to turn it into useful products.  So they want to clean up the environment.

Q.   Okay.  And you extended them a loan?

A.   Yes.

Q.   In what amount?

A.   Two hundred and fifty thousand.

Q.   And when was that?

A.   That was a year ago.

**27**

Q.   Okay.  And what are the terms of that loan?

A.   The terms were that I was supposed to be paid back within a year.

Q.   And has that happened?

A.   No.

Q.   Okay.  Were there any conditions as part of the loan where you would obtain equity in the company?

A.   It's an option to convert.

Q.   Into equity?

A.   Into equity.

Q.   At what valuation?

A.   I don't remember.

Q.   Okay.  And have you been repaid any portion of the loan?

A.   No.

Q.   TriSight, are they based out of here in Utah?

A.   Yes.

Q.   Okay.  What's the -- is there -- what's the name of the manager or CEO?

A.   Brad Barham.

Q.   Are you taking any steps to collect on the loan that's outstanding?

**28**

A.   No.

Q.   Why not?

A.   I don't think it would be helpful to my situation right now.  I -- I've been a small-business owner.  I've had investors want to collect their notes and loans, and when you don't have the money, you don't have it.  Those kinds of entreaties just potentially force the company into bankruptcy, and then your note's worth nothing at that point.

Q.   And have you exer-- have you -- have you exercised the option to convert it into equity?

A.   No.

Q.   When did you -- strike that.

Do you have a college degree?

A.   Yes.

Q.   Where did you graduate from?

A.   I graduated from -- first from Tallahassee Community College, then from Arizona State, and again from Arizona State.

Q.   Okay.  So for your bachelor's, is that from Arizona State?

A.   Yes.

Q.   And what -- what was it in?

A.   Bioengineering.

**29**

Q.   Let me just introduce this.  This is going to be Exhibit 1.

(Exhibit 1 marked for identification.)

Q.   (By Mr. Pineiro)  So I'm showing you what's been marked as Exhibit 1.  We'll call this Satterfield 1, just so that way it's easier.  Is this your LinkedIn page?

A.   Yes.

Q.   I just figure it's easier to go through this.

So you graduated from Arizona State in 2005?

A.   With my bachelor's in 2005, yes.

Q.   Right.  In biomedical engineering?

A.   Yes.

Q.   Okay.  Did you have any type of specialty or subspecialty within that major?

A.   Not at that time.

Q.   Okay.  Later on, did you?

A.   Yes.

Q.   And was that when you obtained your Ph.D.?

A.   Yes.

Q.   Okay.  And what -- what was the specialty that you had within that Ph.D.?

A.   I took outside business classes,

May 16, 2023                        Confidential                    Brent Satterfield, Ph.D.

30

entrepreneurship courses; I took intellectual property law courses; and my scientific research focus was in the development of new types of DNA diagnostics.

Q.   What's a diagnostic?

A.   A diagnostic, generally speaking, is any device or method used to evaluate whether a -- an individual, in this instance, has a disease or not.

Q.   Got it.

And so your specialty was in DNA diagnostics, you said?

A.   Yes.

Q.   So then it seems like, you know, according to your LinkedIn page, you then -- it looks like this was during your Ph.D. -- you started working at Arcx-- I'm going to mispronounce this -- Arcxis Biotechnologies?

A.   Yes.

Q.   Okay.  And what did that company do?

A.   So that company spun out of Sandia National Laboratories, and it was -- started using inventions that I had developed at Sandia.  The focus was on front-end sample preparation.  So this is the extraction of DNA and RNA from complex samples, samples like air, like water.  We were

31

looking at homeland security applications initially.

And then the other focus of the company was in the DN -- DNA diagnostic itself, so the capacity to capture that DNA or RNA to detect it.  We were doing a combination of real-time PCR diagnostics and on-ship diagnostics.

Q.   And so you cofounded that company?  Were you the -- the CEO?

A.   I was a cofounder.

Q.   Cofounder.

A.   Yes.

Q.   Who was your -- who was your other -- who were your other cofounders?

A.   Jay West was initially the CEO, and then Kyle Hukari was I guess his second in command.

Q.   And what ultimately happened with that company?

A.   I left following receiving my Ph.D. to start my own company.  Arcxis was eventually acquired by Fluidigm.

Q.   Okay.  And what's Fluidigm?

A.   Fluidigm is a publicly traded company in California that deals in DNA diagnostics.

Q.   Got it.

And were your shares acquired as part of

32

that deal?

A.   I -- mine were not, no.

Q.   So then your next -- the next thing on your resume on your LinkedIn is acting chief science officer/director of engineering at Invoy Technologies?

THE COURT REPORTER:  I can't hear you.

MR. PINEIRO:  You can't hear me?  Sorry.

Q.   (By Mr. Pineiro)  I said the next thing on your resume on your LinkedIn is acting chief science officer/director of engineering at Invoy Technologies?  You --

A.   Yes.

Q.   -- see that?

What -- what's Invoy Technologies?

A.   Invoy Technologies developed sensors for breath acetone detection.

Q.   And did you found that company, or you joined an existing company?

A.   The company was founded by a friend of mine during my Ph.D. program.  I encouraged her to start the company, helped raise money for her to start the company, and then at the point in time listed here, from 2011 to 2012, she informed me that her technology -- that she found a fatal flaw with

33

it and she needed a new technology for breath acetone detection before the next board meeting.  So I went and invented that for her.

Q.   Sorry.  You said breath acetone?

A.   Breath acetone.

Q.   Can you describe that for me, what -- what that is?

A.   Sure.  So your body has fat cells, and every time a fat cell is metabolized, it releases byproducts, one of which is called acetone.  Acetone is volatile chemical compound that when you exhale, it comes out in your breath.  So you can directly measure your body's rate of fat metabolism through the breath.

Q.   Okay.  So you were there for a year.  And -- and why did you leave there?

A.   I had met Ike Egan about that point in time, and he was interested in an idea I had to start a company that would focus on diagnostics in the developing world.

Q.   When did you meet Mr. Egan?

A.   Probably around 2011 for the first time.

Q.   Okay.  Where did you meet him?

A.   A friend of mine made the introduction here in Utah.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                  Confidential                  Brent Satterfield, Ph.D.

**34**

Q.   And you said that he was interested in -- in forming a company with you?

A.   Not in forming a company with me, but I was pitching a company idea.  He was interested in find-- helping me find investors for it.

Q.   Got it.

What was the company you were pitching him on?

A.   I didn't have it put together yet.  It was still a business plan, an idea.

Q.   What was -- what was the idea?

A.   The idea is what then became DNA Logix. It was an idea to develop new types of diagnostics that would make testing affordable in the developing world.

Q.   And how -- how did -- how would this test make testing more affordable, like the specific -- the DNA Logix test?

A.   So prior to meeting Ike Egan, I had founded a company, Cooperate -- Cooperative Diagnostics, and the whole focus of that company was in -- it was in taking DNA diagnostics into the developing world.  At that time period, there were a lot of patents covering the real-time PCR technology, and the price of an HIV test in Africa,

**35**

for instance, was going for $150.  I had a friend at the California Department of Public Health who oversaw the HIV program, and he also did a lot of charity work in Africa.  So he asked me if -- with my background, if I could come up with new technologies that were robust enough to work in Africa and that could be sold for $2 a test, so dropping from a hundred and fifty down to $2 a test, which really he was asking me to do the impossible.

Q.   This was a -- what he was asking you to do was develop a cheaper real-time PCR technology?

A.   That's exactly what he was doing.

Q.   And how did you go about finding such a, you know, cheaper alternative to the existing PCR technology?

A.   So I reviewed the patents that were out there, I reviewed the different technologies, and with an engineering background -- so it's not just a science background.  The engineering focuses on not just how to combine molecules so they produce a new reaction, it focuses on -- one of the concepts is a design for manufacturing where you look at every single component in a reaction, you look at how necessary it is, you look at other components that are available, especially cheap, easy-to-source

**36**

components, and discover how to inter-- or combine those in ways to create a new product.

So a lot of the innovation comes down to the manufacturing, but a big piece at that time as well, there were multiple patents covering the whole industry.  And so if I could invent new technologies which did not infringe upon the frior -- prior art, then we could create very low-cost tests, coupled with the -- the intent, the intent to sell in the developing world.  We knew where we were going, we knew what kinds of components we could and couldn't use so we wouldn't get sucked into a trap like Cepheid.  For instance, Cepheid has these huge plastic consumables, and those plastic consumables, when they first started selling them, cost more than $50 each.  So there's no way with a cost of goods at $50 that you're ever going to be able to sell into a country at $2.  So that -- that's the big piece, is just focused -- heavy, heavy focus on the cost of goods.

Q.   Understood.

Sorry.  Just taking a step back, on the Arcxis, you -- you indicated that it was sold to a public company.  Do you know the amount -- you know, do you know the terms of the -- the acquisition?

**37**

A.   It was in a fire sale.  So it was -- it was not a favorable sale.

Q.   It was not a favorable sale?

A.   No.

Q.   Did it -- okay.  So basically it was a company that was in distress?

A.   Yes.

Q.   Financial distress?

A.   Yes.

Q.   Okay.  And so pennies on the dollar probably?

A.   Pennies on the dollar.

Q.   Okay.  Why -- do you know why that company I guess was in financial distress or failed?

A.   No.

Q.   Now, that's even though -- even though you were I guess the cofounder, is there any reason why you're not familiar with -- strike that.

Do you know when the -- when Arcxis was purchased?

A.   It would have been a couple years after I left.

Q.   Got it.  Okay.

Was it -- was it in financial distress when you were there?

Lindsay Payeur, RPR
DepomaxMerit Litigation Services

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

38

A. No. It was doing great while I was there.

Q. Okay. Was it profitable?

A. It was pre-profit. Like most biotech companies, there's a large lag time where you're developing the product and then commercializing.

Q. Got it.
How long is that lag time usually in a biotech company?

A. Many biotech companies go seven or more years before they break a profit.

Q. So then you mentioned Cooperative Diagnostics. According to your LinkedIn, it was founded in January 2008. That's the company you're talking about where you were looking into the DNA diagnostics?

A. Yes.

Q. Okay. And so was Mr. Egan involved in that company at all?

A. He wanted to help me find funding for it.

Q. Okay. Did he ultimately find funding for it?

A. No.

Q. Okay. And you were the CEO and founder of that company?

A. Yes.

39

Q. How many employees did it have?

A. Less than ten.

Q. Okay. And did you obtain outside financing for that company?

A. Yes.

Q. You had outside investors?

A. Outside investors.

Q. Okay. How much did you raise?

A. I don't remember the exact number, but ballpark of a half million.

Q. Okay. Now, ultimately -- strike that.
Ultimately did that company close?

A. Yes.

Q. And that was in 2013?

A. Yes.

Q. Okay. And why was that?

A. No funding.

Q. Ran out of money?

A. Ran out of money.

Q. Okay. So then the next thing on your resume is -- sorry, on the LinkedIn is: "CEO, Co-Diagnostics HBDC."
What is Co-Diagnostics HBDC?

A. So Co-Diagnostics HBDC, the "HBDC" stands for "high-burden developing country," and -- sorry,

40

could you repeat the question?

Q. Yeah. I just asked you what -- what company is that?

A. Yeah.

Q. What is it? Yeah.

A. It was a company focused on high-burden developing countries.

Q. Okay. Was that a -- was that company a joint venture between Co-Diagnostics and DNA Logix?

A. Yes.

Q. And what's DNA Logix?

A. DNA Logix --

Q. Logix. Sorry.

A. It's okay.
DNA Logix was a company where the only intent was to develop intellectual property and then license it out to other companies that had the capacity to distribute. It was me learning a lesson that I'm not very good at raising capital. But I'm very good at science, and so I just wanted to focus on the science, let somebody else deal with how to commercialize and how to raise capital.

Q. So you were the founder of DNA Logix?

A. Yes.

Q. Logix.

41

Did you own the company?

A. I owned the company.

Q. Okay. And all that company did was develop IP, which you -- the intent was to license it, you're --

A. Yes.

Q. -- saying, right?
And so Co-Diagnostics HBDC, you were the founder of that company?

A. Together with Ike Egan, yes.

Q. Together with Mr. Egan.
And that was in around 2013?

A. Yes.

Q. Okay. And so you had mentioned it was a joint venture between Co-Diagnostics and DNA Logix. Did Co-Diagnostics ex-- exist separate from Co-Diagnostics HBDC?

A. Yes.

Q. They were two separate companies?

A. (Witness nods head in the affirmative.)

Q. Okay. And were you a cofounder or owner of Co-Diagnostics?

A. Not initially.

Q. Who -- who was the founder of that company?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

42

A.   Ike Egan and Reed Benson.

Q.   Got it.

So Mr. Benson and Mr. Egan formed Co-Diagnostics.  It then enters into a JV with DNA Logix, and that company was Co-Diagnostics HBDC?

A.   Yes.

Q.   Okay.  And what was the -- what was the business purpose or objective of -- of Co-Diagnostics HBDC?

A.   So as a scientist, my only interest throughout most of my adult life has been to impact people in the developing world.  And so I wanted to create a structure that would ensure that the technology I created would have access to the developing world, and I -- I learned from my experiences at Cooperative Diagnostics that investors need a company that can commercialize a product, bring a large return to the investors, but I didn't want the philanthropic purpose of me developing the technology to be lost in -- in that pursuit of selling to the investors.  So I insisted to Mr. Egan that there be a -- this -- this joint venture which had the right to commercialize in the developing world.

Q.   So DNA Logix provided a license to

43

Co-Diagnostics HBDC?

A.   Yes.

Q.   Okay.  And what were the -- what were the terms and scope of that license?

A.   Roughly to commercialize in the developing world.

Q.   Got it.

It didn't provide a license, though, with respect to the developed world?

A.   Not to HBDC.

Q.   Got it.

So that would -- did Co-Diagnostics -- strike that.

Did DNA Logix provide a license to Co-Diagnostics with that --

A.   Yes.

Q.   -- with respect to those areas?  Okay.

So at this time, you're not an officer or employee of Co-Diagnostics, you're -- you're the CEO just of Co-Diagnostics HBDC.  Does that make sense, my question?

A.   And -- sorry.  One more time.

Q.   So there's two Co-Diagnostics.  There's Co-Diagnostics, and there's Co-Diagnostics HBDC.  At this point in time that we're talking about, 2013,

44

'14, you're not an employee of Co-Diagnostics; is that right?

A.   Right.

Q.   Okay.  You're -- you're the CEO of Co-Diagnostics HBDC?

A.   That's correct.

Q.   And were you being paid a salary?

A.   From -- from Co-Diagnostics HBDC?

Q.   Yeah.

A.   No.

Q.   Okay.  Were you being paid anything by Co-Diagnostics?

A.   No.

Q.   Okay.  Were you provided -- at this point, were you provided shares in -- sorry -- were you provided -- strike that.

What percentage -- what percentage was your ownership interest in Co-Diagnostics HBDC?

A.   I don't remember.

Q.   Okay.  Were you -- were you an owner of the company?

A.   I was.

Q.   Okay.  At that time, did you have any ownership interest or equity in Co-Diagnostics?

A.   Not until the fall of 2013.

45

Q.   Okay.  And what did they -- did Co-Diagnostics provide you with shares in the company?

A.   Yes.

Q.   Do you have any recollection of what percentage interest in the company you had?

A.   It was roughly a third.  They brought me in as a founder.

Q.   Of Co-Diagnostics?

A.   Of Co-Diagnostics.

Q.   Got it.

So then eventually, you know, according to the LinkedIn, it seems like Co-Diagnostics HBDC then just turns into Co-Diagnostics; is that right?

A.   It was dissolved, and then Co-Diagnostics took over that whole -- at least I think it was dissolved, just it never got used.

Q.   Got it.

And so that company ceased to exist, and then it was just Co-Diagnostics?

A.   Yes.

Q.   And you said that you had a -- you had a third -- you were a cofounder and you had a third equity interest in the company?

A.   Yes.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**46**

Q. Of Co-Diagnostics?

A. Of Co-Diagnostics.

Q. And do you recall when it is that that transition happened from Co-Diagnostics HBDC to then Co-Diagnostics?

A. It would have been around the beginning of 2015, around January.

Q. And do you recall why that decision -- the decision was made to dissolve HBDC and to transition to just Co-Diagnostics?

A. Roughly. I was tired of managing a company and trying to figure out how to develop the science and do the marketing, and Mr. Egan offered to relieve me of those duties. He also made a -- what was to me a very compelling sales pitch to incorporate, to roll DNA Logix up into Co-Diagnostics. And so I turned over the helm of those companies to Ike.

Q. So you turned over also DNA Logix?

A. Yes.

Q. Okay. And was there -- did you -- you sold it to, I guess, Mr. Egan? Or you sold it to Co-Diagnostics?

A. To Co-Diagnostics.

Q. Got it.

**47**

A. And "selling" is probably not the best word because I didn't receive cash.

Q. You just conveyed it over?

A. Conveyed it over, yes. I think -- I think I did get a small amount more of shares for doing it, but, yeah.

Q. Got it. So you sort of -- you folded Co-- HBDC; you, I guess, sold over DNA Logix; and then -- you're then the cofounder and you have a 33 percent or so equity interest in Co-Diagnostics?

A. Yes.

Q. Okay. And were -- were you provided a salary in connection with that transition?

A. Yes.

Q. How much was your salary?

A. I might be wrong about the salary.

Q. That's okay.

A. I -- it was -- I was receiving money either as a salary or a royalty. I know I was receiving a royalty, I just -- I don't know -- I don't remember whether I was receiving a salary on top of that. I don't -- I don't think so. I think it was just the royalty. And I was supposed to be receiving about 30,000 a month.

**48**

Q. Was it difficult for you to sell DNA Logix to Co-Diagnostics?

A. Yes.

Q. Why?

A. Because it felt like losing control of my baby.

Q. But you thought that was the right decision because you wanted to focus on the science, basically?

A. I wanted to focus on the science, yes.

Q. So in this transition, did you want to essentially segregate yourself from the responsibilities of having to raise money, things of that nature?

MS. PEIRSOL: Objection. Mischaracterizes his prior testimony.

Q. (By Mr. Pineiro) You can answer.

A. Okay. Could you repeat the question one more time, please?

Q. Yeah. In -- in this transition, you wanted to effectively, like -- you didn't want to have to deal with raising money and some of the other commercial aspects of -- of the business; is that fair?

A. I -- that would be part of it.

**49**

Q. What was the other part of it?

A. I've -- the company was already starting to grow past the ten-employee limit, and so I was already starting to think about how much longer I wanted to continue with Co-Diagnostics before moving into a -- a different project.

Q. Now, this was back in, you said, January of 2015, roughly?

A. Yes.

Q. Okay. Was Co-Diagnostics HBDC -- strike that. Did you raise money or financing for Co-Diagnostics HBDC?

A. No. It ended up just being a shell company.

Q. Got it. And so were you -- you were cofounder of this company, starting in, you know, roughly January 2015. Were you -- was your title chief science officer from that point on?

MS. PEIRSOL: Objection. Vague.

Q. (By Mr. Pineiro) You can answer.

A. Sorry. Can you repeat the question? I apologize.

Q. Yeah. I mean -- once you transitioned

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

50

fully into Co-Diagnostics, did -- did you have a formal title or role?

A.    Yes.  I -- I became the chief scientific officer.

Q.    Got it.

So you were in that position for roughly six years?

A.    Yes.

Q.    Okay.  And what were your responsibilities as chief science officer?

A.    It was to provide vision, scientific oversight, leadership in -- for the laboratory.

Q.    And what was the last part?  I'm sorry.

A.    Leadership for the laboratory.

Q.    Okay.  Besides -- before -- strike that.

Prior to being the chief science officer of Co-Diagnostics, did you have any experience in dealing with, you know, I guess, labs?

A.    Quite a bit.

Q.    Okay.

A.    I mean, I've worked in quite a few labs, started a number of companies, all of which have done -- dealt with DNA diagnostics and specifically real-time PCR testing.  I'd say I've -- I was one of the most qualified people I know in that field.

51

Q.    And in terms of -- did you -- did you supervise any scientists or personnel in that role?

A.    Yes.

Q.    How big was the team that you supervised?

A.    At that time, less than five.

Q.    At the time, less than five?

A.    2015.  Yeah, less than five.

Q.    And did you choose those personnel?

A.    The ones that were there in 2015, yes.

Q.    Okay.  Later on, did you not have say over who was hired?

A.    I didn't have as much say, no.

Q.    Okay.  Did that frustrate you?

A.    No.

Q.    Okay.  Did you think that the company did a good job of hiring scientific personnel?

A.    I thought it did a good job, yes.

Q.    Okay.  Were there any instances where you disagreed with the hiring decision?

A.    No.

Q.    When you said that in, then, 2021 you left that position to be on the advisory board, did this lawsuit have anything to do with that decision?

A.    To step down?

Q.    Yeah.

52

A.    It didn't help, but, no, it wasn't the decision.  I'd been wanting to step down for a few years, and Seth kept asking me -- both Seth and Ike kept asking me to stick around for a little bit longer, didn't feel the company was ready yet, and when COVID happened, they were -- they definitely wanted me to -- to be there to help with the scale-up.

Q.    When you say "it didn't help," what did you mean by that?

A.    The -- I -- I'm an idealist, I'm a philanthropist, I love humanity, and this lawsuit and some of the other individuals that I met during 2020 left a very awful taste in my mouth for the industry, for humanity, for life itself.  I just didn't know that there were people who could be so disgusting.

Q.    Who -- who are you referring to as disgusting?

A.    Those who would fail to see the sacrifice that we made, the hard work that we put in to help people at a time when this world was in need, and they have the audacity to call me and my company into this space and demand money out of us.  I am very, very upset with that.

53

Q.    So because of the lawsuit, it didn't help in terms of your wanting to move out of that position and, you know, move into some -- I guess a more inactive role?

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.

THE WITNESS:  Please give me a moment. I'm -- I'm emotionally worked up.

Q.    (By Mr. Pineiro)  That's all right.

MS. PEIRSOL:  Do you want to go ahead and take a break?

THE WITNESS:  Yes.  This would be -- is it okay if I take a break right now just to --

MR. PINEIRO:  Sure.

THE WITNESS:  -- breathe for a minute?

MR. PINEIRO:  Yeah.

THE VIDEOGRAPHER:  Going off the record. The time is 10:03.

(Recess taken.)

THE VIDEOGRAPHER:  Returning on the record.  The time is 10:13.

Q.    (By Mr. Pineiro)  So, Mr. Satt-- Dr. Satterfield, you had mentioned that this lawsuit gave you -- left you with an awful taste in your mouth, correct?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023    Confidential    Brent Satterfield, Ph.D.

**54**

A.   It was -- it was one of the smaller things from that year, but, yes, it did.

Q.   What were the other things from that year?

A.   I'd say that the one that probably bothered me the most was Bobby Baird from The New Yorker.

Q.   And what did he do?

A.   He -- I'm sure that -- that we'll end up talking about this later at length, but he had wanted to talk about the Salt Lake Tribune article.

Q.   Which one?

A.   I believe it's the April 30th.

Q.   Sure.

A.   And we had a -- a very nice conversation, he was a very friendly individual, and he showed me some data that I wasn't aware of at that time or just not -- not as aware of, and I told him I'd look into it.  So I went and I got all of the data that TestUtah had produced up to that point in time, and I compiled the data, answered his question and said, "Okay, I got the data for you.  I checked.  Here's what the data says."

And his response to me was, "I don't care about the data, I only care about my story."

Q.   He told you that?

**55**

A.   He told me that.  And it was one of the most, for me, viscerally disgusting acts that I have seen someone do.  I was hurt deeply by that action, and it -- it made me feel awful that we could live in a world where people can be so selfish.

Q.   What -- what data did he share with you?

A.   Oh, he didn't share with me data.  He was asking a more pointed question about the -- the population differences, and he was asking specifically about the symptomatic patients and saying that if they had excluded -- if -- if Intermountain Healthcare or whoever was looking at the data had excluded the asymptomatic data, then how could TestUtah still be getting a 2 percent rate relative to Intermountain Healthcare's 5 percent rate of positives.

And I told him I would look into it, that I -- I believed it was the -- due to the definition "symptomatic," but that now we didn't have to speculate, we had the data, we could go back and look at when TestUtah first applied their definition of "symptomatic" versus when TestUtah conformed to the CDC definition of "symptomatic," and we could see the before-and-after data, and we could prove conclusively whether the difference in the rate of

**56**

positives was due to the questionnaire or not.

And I found the data, I showed him the data, and he didn't care, according to what he told me.

Q.   And you prepared ultimately a white paper on this data?

A.   Yes, I did.

Q.   And was that -- did you disseminate that or publish that in any way?

A.   We published it on the company's website.

Q.   Got it.

Besides your white paper, were any other outside studies or analysis done of that data that confirmed your findings?

A.   Not that I'm aware of.

Q.   Okay.  Was your white-paper study peer-reviewed in any way?

A.   No.

Q.   I'm not a -- I'm not a scientist.  What does it mean to -- that something's peer-reviewed?

A.   "Peer review" means you have a panel of other scientists typically chosen by a third party, like a journal, who have an unbiased view, who disclose any conflicts of interest, and who evaluate the -- the logic going into the paper.  They -- I

**57**

mean, the data is what the data is, but they evaluate the logic and the conclusions that come out of that.

Q.   Could you have submitted your white paper for peer review?

A.   Possibly.

Q.   Did you look into it?

A.   No.

Q.   Why not?

A.   For a few reasons.  I mean, one, we were so busy turning the company from a company that had very few sales the year before into a company that was distributing tens of millions of tests in a year.  We were just swamped, working around the clock.  No one had any time off.  Pretty much lived at the company during that time period.  Yeah.

Q.   Wasn't this an important point?  You know, there were some allegations that the test was underreporting positives.  You didn't think this was important enough to get it peer-reviewed?

MS. PEIRSOL:  Objection.  Ambiguous.

THE WITNESS:  It was important enough for the company to consider what it wanted to do with that data.  I presented the data to Ike, I presented the data to Seth, I presented it to Timpanogos

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                        Confidential                        Brent Satterfield, Ph.D.

58

Regional Hospital, I presented it to Nomi Health and told them all that we had proof that the allegations were not true and then left the question to them of what to do with it.

Q.   (By Mr. Pineiro)  Got it.

So you had mentioned that Bobby Baird was the big part of the reason you left -- you transitioned to a new position, the lawsuit --

A.   No.

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I agree with her.  It's --

Q.   (By Mr. Pineiro)  Sorry.  It was part of the reason, right?

A.   It -- it -- I -- it was like a straw that --

Q.   Broke.

A.   -- broke the camel's back.

Q.   Got it.

A.   It was -- it was more of a confirmation of something I already knew.

Q.   Got it.

A.   I wanted to leave before COVID, it's just that was like, this is why I leave before there's ten employees.

59

Q.   You mentioned you met -- you mentioned you had also met -- and I'm sorry if I'm misquoting you -- some people that, you know, were unsavory or, like, despicable -- I forgot the word you used -- during that period of time.

MS. PEIRSOL:  Objection.  Misstates his testimony.

Q.   (By Mr. Pineiro)  Do you remember what word you used?

A.   I -- I felt disgusted by them.

Q.   Yeah.  And who were those -- besides -- who are those people?

A.   It's -- it's more of a collection of behavior than specific individuals, with the exception of Bobby Baird.  Bobby Baird, by far, takes the cake for me.

Q.   And the collection of behavior includes the lawsuit.  What other types of behavior are you describing here?

A.   So criticism by a competitor.  I mean, you've got the emails with Intermountain Healthcare where they called Timpanogos Regional Hospital an amateur and a small-town hospital when they're part of one of the largest chains in the nation.  It felt like a lot of petty behavior when we should have

60

been coming together as a nation, we should have been coming together as a community to find solutions to help people.  And that's both on the saving-lives side of it, but it's also on providing solutions that eases panic.

One of the biggest things I think that people were exposed to not only in the U.S. but worldwide was fear, that during those early months, March, April of the pandemic, especially as everything shuts down, is people were afraid.  They didn't know what was going to happen next, they didn't know how bad this thing was, they didn't know if we'd all be leaving this life in body bags.  And it -- it shocked me that the pettiness of human nature could come out, again, like with that criticism of the hospitals --

Q.   Sorry.

A.   That's all right.

-- with politics.  You know, Jon Huntsman in his interest in becoming the next governor, I mean, of course, he wants to become the next governor, but I felt that he wasn't always -- wasn't always acting in the interest of the public.

I have no problems to people questioning science.  That is what scientists do.  They should

61

question.  But I really did not like the behavior that was going on behind closed doors.

Q.   Any -- okay.  Strike that.

Isn't -- isn't concern over the accuracy of a COVID-19 test, though, I mean, isn't that valid in the scenario that you're describing where you're dealing with a global pandemic, people are afraid, testing is vital?  I mean, isn't the -- isn't questioning the accuracy of a test something that's a valid concern?

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.

THE WITNESS:  I believe that questioning is what a scientist should always do.

Q.   (By Mr. Pineiro)  All right.  So is there sometimes a conflict between your role as a scientist where your role is supposed to be questioning but also your role as an executive of a company that's public and that has an obligation to shareholders?

A.   I haven't found any conflict yet.

Q.   So before COVID-19, what was Co-Diagnostics selling?  PCR tests to customers?

A.   Yes.

Q.   What kind of PCR tests was it selling?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                 Confidential                 Brent Satterfield, Ph.D.

62

A.    The majority of our business was international prior to COVID, and we were doing a little bit of sales with the tuberculosis test, we had a hepatitis test that had just come out, we had -- there was a mosquito-vector test that had just come out for a variety of hemorrhagic-, fever-causing viruses, and that was probably doing the best out of all of them at that time.

Q.    And these tests, were they using the CoPrimer technology?

A.    Some of them, yes.

Q.    Okay.  Is CoPrimer something that you founded --

A.    Yes.

Q.    -- or created?

This was the idea that you founded back when you founded the Logix company?

A.    The DNA Logix.

Q.    DNA Logix.

A.    Yeah.  Almost all of our research at DNA Logix was around the CoPrimers.

Q.    Got it.

So some tests dealt with CoPrimers, but others did not?

A.    That's correct.

63

Q.    Okay.  And why -- why would there be a difference there?

A.    There were a few tests that DN -- DNA Logix developed prior to the CoPrimers, and those tests were grandfathered in.

Q.    Got it.  Okay.

Is the -- is the technology that's used for these PCR tests that you just described before COVID and the Logix Smart test, the COVID-19 test, is it the same type of technology?

A.    What do you mean?

Q.    You're using -- you're using CoPrimers for the Logix Smart test, correct?

A.    Yes.

Q.    Okay.  Is there any -- was there any transition -- so, you know, preCOVID, you were -- you had these type of -- these PCR tests.  Were you able to just easily translate this technology into COVID-19 testing?

A.    Yes.  All the -- all the work we'd done before prepared us perfectly for that, for -- for the COVID outbreak.

Q.    Were there any difficulties in transitioning your I guess PCR testing technology to COVID-19?

64

A.    No.  This was one of the smoothest and -- there are moments as a test developer where you -- you go to the drawing board and you create something, you evaluate it on a clinical specimen, and you go back to the drawing board, and this was one of the instances where we just hit it out of the park.  It was -- it was a home run in test development.  The performance from the beginning to the present has been, from my perspective as one-time insider and now as an almost outsider of the company, an outstanding performance for a test.

Q.    So before COVID, Co-Diagnostics went public in July of 2017; is that correct?

A.    Around then.

Q.    Okay.  Were you in favor of that?

A.    Yes.

Q.    Okay.  At the time, how many shares did you have?

A.    Once all the conversions were done in -- because -- they -- what do they call that where they condense the shares down?  The final number after the public was just over two million.

Q.    Got it.

And besides the -- you know, the -- the loan agreement you specified where you pledged some

65

of your shares, have you sold any of your shares in the company?

A.    Now I have.

Q.    Okay.  When -- when was that?

A.    Over the past year.

Q.    Why did you do that?

A.    To pay off lawyer debts.

Q.    Lawyers in this case?

A.    No.  In -- lawyers in the case of -- you didn't ask.

Q.    The prior case?

A.    With -- with Val Sklarov --

Q.    Correct.

A.    -- who took my shares.

Q.    Yeah.  The case --

A.    Yes.

Q.    -- you described that was in New York that ended up in arbitration.

A.    Yes.  That one.  That was an expensive case.

Q.    Were you tracking the stock -- once the company went public, were you tack -- tracking the stock price pretty closely?

A.    Define "pretty closely."

Q.    Every day.

Case 2:20-cv-00368-JNP    Document 169-13    Filed 04/10/24    PageID.2806    Page 20 of 126

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**66**

A. No.

Q. How often?

A. Like once a month, maybe once every couple months.

Q. While you were at the company, was it a big focus, tracking the market price of the shares?

A. Not for me.

Q. Did you notice that it was with other employees there?

A. No.

Q. So can you define or describe, like, what a CoPrimer is exactly?

A. Sure. In a way that you can understand it? Or a way that a scientist can --

Q. Maybe a blend of the two. I don't know. Do your best.

A. All right.

Q. I'll see if I can understand.

A. Sounds good. So -- and feel free to ask if you don't understand.

Q. Sure.

A. -- something I'm saying.

Q. Appreciate it.

A. So in a real-time PCR reaction, you are dealing with the amplification of DNA or RNA, which

**67**

are, in a sense, the fingerprint of an organ -- of an organism; it allows you to identify them specifically. So in this process of amplif-- amplifying RNA or DNA, you need at least one copy to be present. The theoretical limit of detection of PCR is one copy in a reaction.

Q. Right.

A. And with that one copy, we now have two pieces of DNA that are called primers because they prime the amplification reaction, they match up with the DNA template in a very specific way. And then a -- an enzyme, a pol-- it's called a polymerase -- sits down on the end of that primer and extends a perfect copy.

The problem in the PCR reaction that has plagued it for many, many years is that these primers, while in theory -- and there's lots of scientists out there that can quote you the theory, but I'm the guy who breaks theory down and shows why it doesn't work --

Q. Right.

A. -- and why what people think happens isn't really what happens in these reactions. But while -- in theory, they're only supposed to bind at the template, but in practice, they're sticking to

**68**

everything in that solution. They're sticking to the tube, they're sticking to junk that happened to be in the sample, they're sticking to each other. And when that happens and they stick to each other, the polymerase will amplify the primers themselves in something called a primer-dimer.

Q. Right.

A. And when those primers happen to include the probe, it can result in something called false positives.

Now, many, many scientists who have studied the theory of PCR deny the existence of primer-dimers, but then they don't understand why their tests are riddled with false positives, and sometimes when the primers get used up, it causes false negatives. And it is a huge problem in the industry. I've seen it in every lab that I have gone to work with on consulting projects or just to -- to help out. And it especially plagues labs in the developing world where they don't have proper training on how to run PCR --

Q. Right.

A. -- and the labor-- laboratory conditions are not ideal.

So one of the concepts that I came up with

**69**

early on was that we could create a molecule that could theoretically eliminate these primer-dimers. And to do that, we would take -- instead of the normal primer length, we could cut that primer down to about half, or maybe even less, of its normal length. So it was so small that it doesn't have enough attraction to the DNA template to actually stick to it on its own, normally. However, if you coupled that small priming segment with a much larger probe, a capture sequence, if you would, the capture sequence would bind down to the template and then hold the little tiny primer close enough that it could actually be strong enough to stay.

Q. Got it.

A. And then amplification could happen. However, in the case of the primer-dimer, there is no space for the capture sequence to bind down, so the little tiny primers can't propagate the sequence. So I -- in my seminal paper on this technology, I looked at how far could you push this technology before it breaks. If you push normal primers and you put in primer-dimers, you, like, intentionally put in a primer-dimer, all it takes is a tenfold excess to cause a false negative, meaning if you had -- if you were starting with one copy of

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                Confidential                Brent Satterfield, Ph.D.

---

**70**

DNA in a reaction, all it takes is ten copies before you cause it to have a false negative. It -- to put this in perspective, there's roughly 1.5 trillion primers in a PCR reaction. That's a lot.

Q.    Right.

A.    And out of those 1.5 trillion, if even ten of those happen to match up and create a primer-dimer, you're now at risk of having false negatives and potentially false positives.

Q.    A false negative is -- does that pertain to the sensitivity of the test?

A.    A false negative pertains to the sensitivity.

Q.    What -- how would you define the sensitivity of a test? Like, what is that -- when you measure a PCR test's sensitivity, what does that mean?

A.    Is -- is it okay if I finish the CoPrimer question?

Q.    I gotta be honest with you, it's severely over my head.

A.    All right.

Q.    You're much smarter than me. I mean, you can keep going, but, like, it's --

A.    Let me make a final point.

---

**71**

Q.    Sure. Go for it.

A.    So the final point is that these primers are two and a half million times more specific than normal primers. Two and a half million times. The average scientific invention that comes out makes a 10 percent or a 20 percent. That's only like 1.1 --

Q.    Right.

A.    -- or 1.2 times better. I'm talking about two and a half million times better. It eliminates the primer-dimer artifacts.

Q.    Right.

A.    It may be the most specific PCR technology this world's ever seen.

Q.    So you're saying the Logix Smart -- sorry, the primer-dimer is the most specific PCR technology in the world?

A.    The CoPrimer --

Q.    The CoPrimer.

A.    -- may be. It has reduced primer-dimers by two-and-a-half-million-fold. And I have investigated every other claim out there that people have come up with to eliminate or reduce primer-dimers, and none of them work. So what you run into are situations like in India where they cut the reaction short. They -- they have so many

---

**72**

primer-dimers, so many false positives, they can't run the reaction the way it's supposed to and they have to shut it down after 30 cycles because they're plagued with these things.

Q.    Got it.

A.    The --

Q.    So you're saying that, for example, the Logix Smart test is one of the -- is the -- the most specific test in the world?

MS. PEIRSOL:    Objection.

Q.    (By Mr. Pineiro) Of highest specificity?

A.    I'm not saying that.

MS. PEIRSOL:    Objection. Mischaracterizes the --

Q.    (By Mr. Pineiro) So what is it that you're saying just so I understand? You're saying the primer -- you're saying the -- you're saying the CoPrimer, that technology?

A.    That technology is one of the most, if not the most, specific real-time PCR technology --

Q.    Got it.

A.    -- in the world.

Q.    So we were talking about sensitivity. How would you describe sens-- you know, measuring sensitivity, you know, when you're dealing with a

---

**73**

PCR test like the Logix Smart test?

A.    So the word "sensitivity" is a word that has multiple meanings depending on who is using it and how they're using it.

Q.    Okay.

A.    And "sensitivity" at the beginning of the pandemic, to the FDA and the emergency-use authorization, had to do with how well your test could detect contrived samples, meaning a human sample that you have spiked a known quantity of viral RNA into, how well that your test could detect a known quantity of RNA that was above your stated limit of detection. And so everyone submitting to the FDA in the early pandemic was claiming at or near 100 percent sensitivity and 100 percent specificity, which no test does all the time. But for the data that the FDA wanted, almost all the tests were reporting 100 percent sensitivity and 100 percent specificity.

Q.    What's a contrived sample?

A.    A contrived sample is one that did not originate in nature.

Q.    A synthetic, basically?

A.    It's a synthetic.

Q.    Okay. And so with -- "sensitivity" with

---

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

74

respect to the FDA, at least initially during the emergency-use authorization, was, you know, comparing it to these contrived samples and seeing how your tests performed, basically, right?

A. And every group got to prepare their own contrived samples, set their limit of detection, and then test to see how well did we detect samples above our limit of detection.

Q. What's the -- so that's -- that's one way of defining or describing "sensitivity." What are the others?

A. So in a nonemergency-use authorization application, the FDA usually wants to see something that is called clinical sensitivity because clinical sensitivity actually has to do with the number of people who are correctly diagnosed.

Q. Okay. And is that based on -- how do you measure clinical sensitivity?

A. Clinical sensitivity requires comparison to a gold standard in order to achieve. The best studies use a gold standard that are universally acknowledged to be of high quality, coupled with a third-party tiebreaker test, so that way if the test that you are running that you're hoping to get through the FDA disagrees with the gold standard,

75

you have that third party to say who is right --

Q. Is this --

A. -- to break the tie.

Q. Is this a concordance test?

A. It's a concordance test.

Q. Got it.

Is there any other way of describing sens-- so you described EUA sensitivity, non-EUA sensitivity. What -- is there anything else?

MS. PEIRSOL: Objection. Misstates his testimony.

Q. (By Mr. Pineiro) You can answer.

A. There are a variety of different types of sensitivity. For me in the -- another one that people often use in -- is the term of "sensitivity" when talking about the limit of detection.

Q. What does that mean?

A. It has to do with the number of copies that you can detect in a sample. And out of those different definitions, the most useful clinically, which shouldn't be surprising, is clinical sensitivity because it's the only one of those definitions that actually tells you how many people are going to be correctly diagnosed.

76

Q. So what is the relationship between clinical sensitivity and limit of detection?

A. The relationship depends on the incidence in the population of people who are showing up to be diagnosed who have a viral load, meaning a number of copies of virus per sample, that is below what the limit of detection is. In a typical scenario where you have individuals showing up with symptoms -- now, at the beginning of the pandemic, no one knew what the COVID virus was going to do because it was new.

Q. Yeah.

A. But we had evidence from past coronaviruses that when people show up with a fever, when they show up feeling sick, that they have hundreds of thousands, even millions, of viruses present. So PCR, with the capacity to pick up even a single virus in the sample, is bound to be one of the most effective ways, maybe -- probably the most effective way, to detect the virus.

Q. Got it.

But -- so in terms of -- you said the incidence of -- you said the relationship between LOD and clinical sensitivity has to do with the incidence of viral load being beneath the limit of

77

detection, right?

A. That's correct.

Q. So if somebody is, for example, asymptomatic but they're COVID-positive, it's possible that they're going to be a false negative because their viral load is beneath the limit of detection?

MS. PEIRSOL: Objection. Mischaracterizes his testimony. Incomplete hypothetical.

THE WITNESS: Sorry. Could you repeat the question one more time?

Q. (By Mr. Pineiro) Yeah. So my -- my -- my -- you mentioned that there was a relationship between LOD and clinical sensitivity and it had to do with the incidence of viral load beneath the limit of detection, correct?

A. Yes.

Q. So what you're describing is a scenario where somebody is COVID-positive but the viral load isn't sufficiently high enough -- it -- it falls beneath the limit of detection of a test, and so that person --

A. Right.

Q. -- would be a false negative on a PCR --

A. Right.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**78**

Q. -- right?

A. So let me -- to -- if it's okay, I'd like to talk to that window period, that time between when a person has enough -- enough virus to be seen versus before it's -- it's high enough to be seen. There's something called a window period, and one of the jobs that I used to do was looking at blood screening in the developing world, and they're very concerned with this window-period question because when you give a blood donation, if somebody has HIV and you have a diagnostic with one limit of detection, then you pick it up in a certain time period after they've been infected, but there's always that possibility that somebody comes in prior to --

Am I boring you?

Q. No. No, no. I'm listening.

A. Okay.

Q. Sorry, I'm -- I'm just focusing on -- also on my notes, but I'm listening.

A. Okay.

Q. Please. Not at all. Go ahead.

A. It's -- it's a scientist thing. Sometimes we -- we talk too much.

Q. Listen, man, I wish I would have been a

**79**

scientist, not doing this. But go ahead.

A. Fair enough.

If you take a virus like HIV that's in the blood supply, in the developing world, they're running antibody tests, which can take one to two weeks to identify the presence of HIV. You run real-time PCR, it has a better limit of detection, and it can pick it up after three days.

Q. Right.

A. So you could save one to two weeks running a real-time PCR test. And the government of Guatemala wanted to know should we spend tens of millions of dollars to get this better limit of detection that's going to save weeks of time --

Q. Right.

A. -- and we could stop people from getting HIV in a blood donation. And running the math, the probability that someone just infected with HIV shows up in that week time period was actually one in ten million. One in ten million. So hypothetically, someone could show up in that week time period that's one in ten million, but in practice, there are less people in Guatemala than ten million, or at least there were at the time. And so my recommendation to them is do not spend

**80**

tenth -- tens of millions dollars on that.

Q. But going back to my question, so for example, with the Logix Smart test, again, there's a limit of detection on that test, and if somebody's asymptomatic and their viral load is beneath the limit of detection, in this hypothetical, that person would -- and they're positive, they're COVID-positive, that person would be showing up as a false negative, correct?

MS. PEIRSOL: Objection. Misstates the testimony.

THE WITNESS: You can create a hypothetical for anything.

Q. (By Mr. Pineiro) Can you answer the question?

A. If you have somebody who is in a very early asymptomatic period -- so within the first few hours of infection -- no test is going to pick that up. There's not a limit of detection on a PCR test that is sensitive enough to pick that up.

And the difference between PCR tests and the limit of detection -- because, I mean, people without a scientist background will look at those and say, "Well, this one says .5 copies per microliter, and this one says, you know, 4.9 copies

**81**

per microliter." And that looks like a huge difference. But it's kind of like saying this Ferrari goes 225 miles an hour and this one goes 240; with a speed limit of 70 or 80, who cares?

Q. You're saying in the real world, differences in the limit of detection aren't -- don't matter?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: What I'm saying is that in the real world, clinical sensitivity is a much more useful metric than limit of detection. The clinical sensitivity rolls in factors such as limit of detection --

Q. (By Mr. Pineiro) Right.

A. -- but it also includes factors of what's going on in the actual population, it includes the capacity of the people running the test to correctly run it and to interpret it correctly.

And so we have had instances where there are tests reporting a lower limit of detection than ours, but we have a better clinical sensitivity in the analysis run against them.

Q. Now, clinical sensitivity's a comparison, right? You're comparing your test's sensitivity

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                     Confidential                     Brent Satterfield, Ph.D.

82

versus another test's sensitivity, right?

A.   Yes.

Q.   What if -- at one point, was the CDC test considered a gold standard?

A.   At one point, the CDC test was the gold standard.

Q.   And did that turn out to be a very good test?

A.   My professional opinion, I did not like the CDC test.

Q.   Right.  So initially people were running concordance studies against the CDC test, but it ended up not being a great test?

MS. PEIRSOL:  Objection.

THE WITNESS:  It was an outstanding test because PCR tests are phenomenal, but within PCR tests, we were able to do a lot better job.

Q.   (By Mr. Pineiro)  Got it.

Why -- why did you -- earlier you said that you didn't think it was a great test, or something along those lines.  Why -- why is that?

MS. PEIRSOL:  Objection.  Mischaracterizes his testimony.

THE WITNESS:  So I did not state that it's not a great test, but I did not like it.

83

Q.   (By Mr. Pineiro)  You didn't like it.  Sorry.

A.   All right.  That being said, it's more a matter of preference.  The CDC test had multiple wells detecting multiple genes, it had problems with primer-dimers, and it had problems with false negatives in those wells.  And so labs who were using the CDC test at that time period were unable to determine whether they were seeing a false positive, a false negative.  It was very difficult to interpret, to work with.  And so as a matter of preference, both myself and many of the labs using our product expressed that they liked our test more because it was crisp.  Our test gives unequivocal yes/no answers, real easy.

Q.   Did the CDC test ended up -- end up having any issues with sensitivity, to your knowledge?

A.   It was -- it was on par with the other PCR test that came out, but it -- it was actually a good test --

Q.   Okay.

A.   -- it just wasn't easy to use, and they couldn't roll it out at the volumes that the nation needed to diagnose all the people with COVID.

Q.   If two tests have the same sensitivity --

84

clinical sensitivity but one has a lower limit of detection, is that -- is the one with the lower limit of detection a more sensitive test?

A.   No.

Q.   Why not?

A.   Because when you're talking about the different types of sensitivity -- like, with the -- the emergency-use authorization, the FDA is willing to call contrived sample testing sensitivity only in lieu of clinical sensitivity.  Once you know clinical sensitivity, the other parameters are -- they're not really even worth discussing at that point.

Q.   LOD's not worth discussing at that point?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  Once -- once the clinical sensitivity is known, that is the most important factor to the patient population.

Q.   (By Mr. Pineiro)  Got it.

But is it -- is limit of detection still a factor for the patient population?

A.   Not for the patients.

Q.   Why not?

A.   Because ultimately they want to know the

85

probability that the test is going to work according to what the test is recommended for.

Q.   And you're saying that limit of detection has no material bearing on that?

A.   It --

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  Limit of detection can still have use in off-label purposes.

Q.   (By Mr. Pineiro)  Such as?

A.   When you have a test that is defined to be used in one way, the clinical sensitivity only applies to the circumstances the test is used in.  If you use it for any purpose other than what the label says that you should use it for -- which labs have the right to do that, but then they have to run their own validation, their own evaluation and come up with a new clinical sensitivity factor.  Before, when they're -- when they're choosing a test, their marketing decision, the choice about which test to evaluate, may have something to do with the limit of detection.  However, once they have clinical sensitivity in their lab, under the new conditions, limit of detection is no longer something that they look at.  They're looking at the clinical

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

86

sensitivity because that is what actually affects the patient.

Q.   We've been talking about sensitivity. What is the specificity of a test?

A.   The specificity is the capacity of a test to correctly reject true negatives.

Q.   Effectively, specificity eliminates -- the higher the specificity, the lower the false positives you're going to get?

A.   That's correct.

Q.   And can a -- can a diagnostic test be a hundred percent sensitive and specific in all circumstances?

A.   A diagnostic test cannot be 100 percent sensitive and 100 percent -- percent specific in all circumstances.  It can be in a given data set.

Q.   Right.  And why is it that it can't be in all circumstances?

A.   Stat-- statistics.  You have nature that's happening, and nature includes not just the samples you're dealing with, but it includes the users who are running the test, it includes environmental conditions.  And statistically speaking, someone's going to make a mistake.  In the numbers that are reported and the data that's reported, sometimes a

87

lab will report something as a false positive that is not, in fact, a false positive, it just -- it happens.  Even in the best studies where you're using a universally accepted gold standard with a compared or a tiebreaker, there's going to be mischaracterizations.

And so stacastically speaking -- statistically speaking, you're going to have failures at some point in time.  It's kind of like saying your kid has made a hundred percent on all the tests they've taken this year, and knowing that doesn't give you the power to predict what's going to happen on the next test.

Q.   So you're saying the reason that you can't make -- the reason that diagnostic tests aren't a hundred percent specific and sensitive in all circumstances -- does it stem just mainly from human error, you're saying?

A.   No.

MS. PEIRSOL:  Objection.  Misstates his testimony.

Q.   (By Mr. Pineiro)  So there's -- there's -- besides -- there's other reasons besides human error, right?

A.   There are other reasons besides human

88

error.

Q.   And -- and it may be based on just the intrinsic performance of the test?

A.   Yes.

Q.   When did Co-Diagnostics begin -- do you remember when it began exploring and developing a COVID test?

A.   In January of 2020.

Q.   Okay.  And were -- who made that decision, if anyone?

A.   Mr. Ike Egan.

Q.   Did he consult with you in making that decision?

A.   No.

Q.   And so after he made that decision, did he announce that to you?  Did he talk to you about it?

A.   Yes.

Q.   Okay.  And did he seek your assistance in developing the test?

A.   Not the beginning phase.

Q.   Who did he -- who -- in terms of scientists at Co-Diagnostics, did he seek any of their assistance in developing the test?

A.   Yes.

Q.   Who did he speak to about it?

89

A.   I don't know who he would have talked to first, but Chad Apuli was the lab manager at that time and was very well -- I guess "experienced" is the right word for it -- to develop a test and would frequently do so without needing interaction from me to start that process.

Q.   Understood.

A.   Masen Christensen would have done the primer design.

Q.   And the primer design is done -- it's done first, you know, through, I guess, you know, software, right?  It's --

A.   Yes.

Q.   At what point -- at one -- at some point in time, did you become involved in the process of developing the test?

A.   Yes.

Q.   When was that?

A.   A few weeks into the process.

Q.   And -- and what was your role?

A.   It was to review data.

Q.   And what data were you reviewing?

A.   I was reviewing -- it was the data coming in right before the emergency-use authorization. There was still a little bit of tweaking with the

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                           Confidential                           Brent Satterfield, Ph.D.

90

primers going on. Outside of that, I -- I couldn't say more.

Q.   So you were still -- so the company was still tweaking the primers right before the EUA authorization?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: Given that the timeline on this is from January of 2020 to -- I don't remember when the exact submission date was, but end of February, beginning of March 2020, the entire process, not only for us but for all companies in the industry, was right before the EUA submission.

Q.   (By Mr. Pineiro) Got it.

Do you recall whether -- do you recall when the company received the CE mark for the test?

A.   No.

Q.   Do you recall whether -- would they have been still tweaking the primers after having received the CE mark authorization?

A.   No.

Q.   By the time they're submitting the test for regulatory approval to the EU or the EUA, you're done tweaking the primers?

A.   Generally speaking, yes.

91

Q.   Are there scenarios where you'd still be tweaking them after receiving regulatory approval?

A.   There is ongoing test improvement. There's always the thought about what's going to be the next product, what does the market need, and sometimes there -- that means evolution of the current test, sometimes it means a new test. And then even within regulatory approval, there's different levels and stages of regulatory approval. So what the CE mark requires is very different than what the FDA requires, and the FDA emergency-use authorization is very different from the full-on regulatory approval. So there is an ongoing process to dialogue with the regulatory bodies to understand what it is that they're looking for and to set up the tests that are necessary to get them that data.

Q.   Got it.

Did you feel that the process of developing the test was rushed at all?

A.   No.

Q.   If you could go back, would there -- things -- would there -- would there be things that you would have done differently in developing the test before it went to market?

A.   Not in the test development, no.

92

Q.   In what -- in what, then?

A.   In the selection of our distributors.

Q.   What -- what would you do differently with respect to that?

A.   I think it would have been helpful to select distributors who had more real-time PCR experience so that they could have done more of the troubleshooting.

You haven't asked this question yet, but I'm -- I'm guessing it's of interest. The -- at that time period, the whole world shut down. Businesses shut down, borders shut down, and the supply chain for the industry was completely disrupted, which meant that labs who had run PCR in the past could not get ahold of diagnostics. Most of the labs we talked to early pandemic were saying that they could not get diagnostic tests anywhere. They called Roche, they called Abbott, they called all the major labs, but no one had tests. The CDC certainly couldn't do it. And not only couldn't they -- they couldn't get the test, meaning the vile with the liquid in it, but they couldn't get the sample preparation that goes -- the front part of the test, they couldn't get the machines. So what I'm saying here is that the test is a very small

93

part of a large system that's run to get a result for a patient. We sell this little tiny piece of this whole big system. And out of that whole big system, there are a lot of standard components that, when they're available, are easy to use, everything flows nicely.

Q.   Right.

A.   But because those didn't exist, you have distributors popping up that are trying to solve problems in creative ways by taking off-label sample collection, off-label sample preparation, off-label PCR devices, off-label sample preparation equipment for handling the -- the fluids, there are labs that are popping up that haven't run PCR before. And so you have an environment where there are a lot of mistakes going to be made, mistakes that have nothing to do with the test that is performing very well, but mistakes that have to do with the system that has been set up. And those distributors that didn't have PCR experience were part of the problem --

Q.   Who --

A.   -- because they didn't know how to troubleshoot that, and so it created an unnecessary burden for us when we could have been pumping out

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                Confidential                Brent Satterfield, Ph.D.

94

more tests.  We were spending a lot of time handling media inquiries and troubleshooting labs to get them set up in that process.

Q.   Who made the decision on the selection of the distributors?

A.   I don't know.

Q.   Was it Mr. Egan?

MS. PEIRSOL:  Objection.  Asked and answered.  He just said he didn't know.

THE WITNESS:  Yeah, I -- I don't know.

Q.   (By Mr. Pineiro)  So in terms of the steps of developing this test, I've seen some terms thrown out there like "verification."  Is that a specific -- is that a term of art in terms of developing a test?

A.   It's a regulatory term, and I couldn't speak to it.

Q.   Okay.  And what about "validation"?  What does that term mean?

A.   "Validation" is also a regulatory term.

Q.   Okay.  And you've -- are you familiar with what "verification" means?

A.   Only that they're regulatory terms and it's not part of my role.

Q.   What about "validation"?  You're not aware

95

of what that word means?

A.   It's also a reg--

MS. PEIRSOL:  Objection.  Misstates his testimony.

Q.   (By Mr. Pineiro)  Sorry.

A.   It's also a regulatory term.

Q.   So what's a validation study?

A.   It depends on whether we're talking about it -- it's kind of like the legal terms that you use, and everyday people use them one way, but then there is a legal definition.  And likewise, with regulatory bodies, there is the everyday usage among scientists, and I can tell you about the everyday usage of a validation study.

Q.   Sure.

A.   But then there is the regulatory meaning, and what I'm unable to talk to you about is what the regulatory meaning is.

Q.   So what is the scientific use of that word?

A.   So in everyday language, it is a study in which a test is validated, meaning that it is -- its performance level is identified.

Q.   "Performance level" meaning what?

A.   It just depends on what the scientists are

96

interested in evaluating.

Q.   So with -- with respect to Logix Smart, what was -- what were you looking at when it came to performance level?

A.   The most important factor for me is the clinical sensitivity.  In lieu of the clinical sensitivity, the FDA wanted a contrived sensitivity.

Q.   Is it possible that a test performs well in terms of contrived sensitivity but then doesn't perform well -- or performs differently with respect to clinical sensitivity?

A.   Sure.

Q.   Can there be significant discrepancies between the two?

A.   Yes.

Q.   Why -- why would that happen?

A.   There's all kinds of reasons why that can happen, and this is one of the reasons why the FDA normally prefers clinical sensitivity as a metric over contrived sensitivity, is that the clinical sensitivity takes into account all of the field factors and the contrived sensitivity does not.

I could talk to you for several days about --

Q.   No, no.

97

A.   -- things that can go wrong, but --

Q.   No, that's okay, I gotta get home.

Clinical sensitivity, do you measure it based on the synthetic samples or human samples?

A.   Human samples.

Q.   So anytime you're measuring clinical sensitivity, it's based -- you're not using syn-- synthetic samples?

A.   I can't think of any at -- at present that --

Q.   Okay.

A.   -- would use synthetic.

Q.   So as you're developing the test, are you -- is -- is -- was COD -- strike that.

When CODX was developing the test -- and when I call it CODX, I'm referring to Co-Diagnostics, just for the record.

When CODX is developing the Logix Smart test, is it, you know, consistently running validation analysis on the test -- on the test performance to try to fine-tune it, basically?

A.   So, again, not using the regulatory meaning --

Q.   No, no.  Using the meaning that we've talked about.  Yeah.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023    Confidential    Brent Satterfield, Ph.D.

98

A.    The purpose of -- the purpose of running validation studies isn't to fine-tune it, it's to identify the performance. And the perf-- purpose of running larger validation studies -- once you have the initial one, now you want to confirm it in different conditions. Okay, well, it worked in our lab. Does it work in the lab down the street? Does it work in a different country? And then you start accumulating a mass of data, and the amount of data that you accumulate becomes really helpful because kind of like the analogy I gave earlier, if your child has made 100 percent on all the tests this year, well, how many tests was that? Was that like 20 tests? Because if it was only one test, it doesn't tell you much about how the next one's going to go. But if they made a hundred percent on 20 tests, your expectation that they're going to do well is really high. They might not make a hundred, but they're probably going to make an A.

And so it's the same kind of thing with diagnostics, that the more numbers that you run, the higher the -- the better the confidence interval you get, meaning it gets tighter and tighter and tighter, the range of the expected performance on the next evaluation.

99

Q.    Understood.

And, again, these -- these validations -- these validation analysis, they're being done -- are they being done internally? Are they being done with third-party data?

A.    Both.

Q.    Both. Okay.

When you do it internally, you do it against a gold standard as well?

A.    Yes.

Q.    Okay. And, like, how do you pick a gold standard for that kind of a study?

A.    Well, in the initial data that the FDA required, it didn't require a gold standard because you know there's virus in there because you put it in there.

Q.    Right.

A.    But as time goes on, the first gold standard we had was the only standard because there -- there were no tests on the market. There was only the CDC test.

Q.    Right.

A.    So that starts as the gold standard. But then as tests come out from companies that have a history of making high-quality tests and those tests

100

are -- they have a decent limit of detection, they have a decent sensitivity and specificity as reported on their emergency-use authorization, there is reason to believe that they're going to be a high-quality test. And then as those companies then emerge as leaders in the industry for the COVID outbreak, they become a focus for future gold standard. So -- so Roche would be a great one there. Abbott would be another good one. They're the types of tests that I would expect to see used as a gold standard.

Q.    Do you know whether CODX ever ran a concordance test -- strike that.

Do you know whether ever -- it ever ran a validation study or analysis against the Abbott test?

A.    I -- we never ran one, but -- I'm remembering one of our customers did. I want to say there's email in the record about it.

Q.    And do you know which customer that was?

A.    No.

Q.    And what were the results of that study? Do you know?

A.    The Abbott was -- had a really good limit of detection.

101

Q.    Well, but -- so the Abbott had a higher limit of detection?

A.    Had a lower limit --

Q.    Lower. Sorry.

A.    -- of detection. Yeah.

Q.    Right. But in the validation -- but in the -- you know, you had earlier testified that the limit of detection isn't pertinent to clinical sensitivity.

Or let me not mischaracterize your testimony. You testified some about how that impacts it, right?

A.    Yes.

Q.    So did the validation -- what was the CODX test's sensitivity and specificity as compared to the Abbott test?

A.    I don't believe that that customer -- I don't remember what they ran for the evaluation. What I'm remembering is that in that email I made a comment that it was the first test that we'd run into that might actually have a better limit of detection.

Q.    But for purposes of this validation analysis, it appears -- sorry, this validation study, it appears that the limit of detection did

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                          Brent Satterfield, Ph.D.

102

have an impact on the performance of the Co-Diagnostics test, right?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: I -- I wouldn't say that at all because the customer ended up choosing our test over Abbott.

Q. (By Mr. Pineiro) So did -- did the -- how did the -- how did the CODX test compare to the Abbott test?

A. I don't know.

Q. Was it as sensitive?

A. I don't know.

Q. Was it -- you don't know whether the CODX test was as sensitive as the Abbott test?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: I don't.

Q. (By Mr. Pineiro) But you're saying --

A. What I do know is that the customer chose our test over the Abbott test.

Q. Okay. So you know that, but then you mentioned that the customer also said that the limit of detection on the Abbott test was lower, correct?

A. Yes.

103

Q. Okay. Why was that relevant?

A. Because we knew that our limit of detection was better than what we reported to the FDA. And so a lot of the tests that people said had a better limit of detection than ours, when run side -- side by side in validation studies, our customers were telling us that we actually had the better limit of detection.

Q. But here, the Abbott test had a better limit of detection.

A. According to the customer --

Q. The customer.

A. -- yes.

Q. How would you even -- how would that even be ascertained in connection with a validation study where you're running a concordance analysis?

MS. PEIRSOL: Objection to the extent --

THE WITNESS: Those are two separate things.

Sorry. Should I let you finish?

MS. PEIRSOL: Yes. Please. But go ahead.

THE WITNESS: Those are two separate things.

Q. (By Mr. Pineiro) How so?

A. A validation study for limit of detection

104

determines the limit of detection. A validation study for the sensitivity -- clinical sensitivity determines the clinical sensitivity.

Q. So the val-- the validation study at issue here just evaluated limit of detection?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: I couldn't say because I don't remember how many pieces to this validation study there were. But what I am remembering is that that customer reported that the Abbott had a better limit of detection.

Q. (By Mr. Pineiro) Okay. What is the Saragene test, if I'm pronouncing that correctly?

A. You are. It is a product of our India joint venture company.

Q. Okay. That's with CoSara, I believe?

A. Yes.

Q. Okay. Is it similar to the Logix Smart test?

A. Yes, it is.

Q. Is it functionally identical?

A. Yes.

Q. Okay.

MS. PEIRSOL: Michael, we've been going

105

for about an hour.

MR. PINEIRO: Yeah.

MS. PEIRSOL: When you have a chance, can we just --

MR. PINEIRO: No, no. Let's take a break now.

MS. PEIRSOL: Okay.

MR. PINEIRO: That's fine.

THE VIDEOGRAPHER: Going off the record. The time is 11:13.

(Recess taken.)

THE VIDEOGRAPHER: Returning on the record. The time is 11:23.

Q. (By Mr. Pineiro) So we were talking about the Saragene test, correct?

A. Yes.

Q. Did you play any role in -- with respect to the development of that test?

A. No.

Q. So the Logix Smart test, did it initially just target one gene?

A. Yes.

Q. And that was the Rd -- RdRp gene?

A. I don't remember. Yeah, I don't remember.

Q. Now, eventually that -- did -- since that

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

106

initial test, did CODX then begin selling a test at some point that tested for two genes?

A.   Yes.

Q.   Do you know when that was?

A.   No.

Q.   Do you know why the decision was made to go -- to offer a two-gene test?

A.   I don't remember all the reasons, but one of the reasons was that our customers -- there was at least one market that we were selling into that you were not allowed to sell the test unless it had two genes.

Q.   Does having multiple genes being tested make a test potentially more sensitive?

A.   If it's -- forgive me for saying this. If it's a lousy test, it could make it more sensitive.

Q.   Why?

A.   Because they didn't do their design properly on the first gene.

Q.   So if you design things properly on the first gene, you don't -- you should be fine?

A.   It's a backup. It's a fail-safe.

Q.   All right. When you were developing the test, did you look at all -- like, what Abbott was doing, for example, and seeing how they were

107

developing their test, to the extent there was public information about it?

A.   We looked at all public information available.

Q.   Okay. And so Abbott -- Abbott's test, for example, do you know that -- whether it tests for one or two genes?

A.   No.

Q.   In the initial development of the test, was there any discussion about testing for two genes?

A.   I don't remember.

Q.   Do you recall which market it was that requested -- which market it was that required or desired a two-gene test?

A.   I'd have to speculate. So, no.

Q.   In the development of your test -- and I guess even after you received authorization, regulatory approval to sell it -- how did the Logix Smart test compare to your competitors?

MS. PEIRSOL: Go ahead.

THE WITNESS: One more time?

Q.   (By Mr. Pineiro) How did the Logix Smart test compare to your competitors?

A.   When we first launched? Or when?

108

Q.   Yeah. I mean, once you were -- once you were out in the market, you know, say, once you received regulatory approval.

MS. PEIRSOL: Objection. Ambiguous.

THE WITNESS: So compared to our competitors in the market, there still wasn't data on clinical sensitivity and clinical specificity. So there was a lot of speculation as to how all of these tests were going to perform as you moved out of contrived samples into clinical samples, but we started getting feedback from our distributors and from different government tenders where our test was run alongside Roche, it was run alongside some of the other top names, and our distributors would come back with feedback that said, "Hey, your test outperformed them, and the government is going to buy your test."

Q.   (By Mr. Pineiro) This is going to be Exhibit 2.

(Exhibit 2 marked for identification.)

THE WITNESS: Okay.

Q.   (By Mr. Pineiro) You can give that to the court reporter, the --

A.   Give it to -- oh.

Q.   Well, you don't have to --

109

A.   Oh.

Q.   No, sorry, the -- yeah. She's -- sorry.

A.   This one. She gets this one.

Q.   And you can just put that in a pile for her.

A.   Oh, she already got this one.

Q.   Yeah.

A.   Okay. Sounds good. I'm happy I got a sticker.

Q.   So I'm showing you what's been marked as Exhibit 2. Are you familiar with this test?

A.   Are you asking if I'm familiar with the paper?

Q.   Sorry. With this -- with this research paper.

A.   No.

Q.   No.

Have -- this is the first time that you've ever seen it?

A.   I saw something like this during the attorney review, but other than just "I've seen a paper like it," I couldn't say.

Q.   Okay. Have you ever reviewed this -- this -- this research article?

A.   No.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                Confidential                Brent Satterfield, Ph.D.

110

Q.   You can put that down.

A.   So you're done with this one, then?

Q.   Yep.

A.   Oh, okay.

Q.   You know what?  Can you just go back to that for one second?  I apologize.

A.   Sure.

Q.   So it seems -- at the top, it says that -- it seems like it was published in January of 2022.  Do you see that?

A.   Yes.

Q.   And were you aware that this -- that this study was being done?

A.   No.

Q.   Okay.  Has anybody communicated to you the results of this study?

A.   No.

Q.   All right.  If you just look at the "Materials and Methods" section, it -- on the first page, it says:  "Two hundred and four nasopharyngeal samples were collected" --

THE COURT REPORTER:  I can't hear you.

MR. PINEIRO:  Sorry.

THE COURT REPORTER:  You read quickly, and then you look away.

111

MR. PINEIRO:  Yeah.  No, I know.  Sorry.

Q.   (By Mr. Pineiro)  It says:  "Two hundred and four nasopharyngeal samples were collected from participants aged over 18 years" --

A.   I'm sorry.  Where are you?

Q.   "Materials and Methods," first page.

A.   And what section under "Materials and Methods"?

Q.   Just -- it should be just the very first page, I think.

MS. OSTLER:  In the abstract.

MR. PINEIRO:  In the abstract.

THE WITNESS:  Oh, in the abstract.

MR. PINEIRO:  Yeah, yeah.

THE WITNESS:  "Abstract:  Materials and Methods."  Got it.  Okay.  Got it.

Q.   (By Mr. Pineiro)  And it says:  "Two" -- you see that, "Materials and Methods"?

A.   Yes.

Q.   It says:  "Samples were tested by."  And then it lists a bunch of tests, and that includes the Logix -- towards the back, the Logix Smart test.  Do you see that?

A.   I see "Logix Smart" in there, yes.

Q.   And then it says:  "Results:  The Xpert

112

Xpress SARS-COVID-2 test and Logix Smart COVID-19 kit had the highest and the lowest sensitivity, respectively."  Do you see that?

A.   Yes.

Q.   You have no familiarity with this finding?

A.   None whatsoever.

MS. PEIRSOL:  Objection.  Asked and answered.

Q.   (By Mr. Pineiro)  Does this surprise you?

A.   Not terribly.

Q.   Why not?

A.   Because different groups, when they run validations, are trying to make different points, and so I haven't seen any of the methods yet, I haven't seen what types of samples they were using, I haven't seen what their objectives were, I haven't seen -- there is a lot that goes into a study, and depending on what point they're trying to make, they'll use different types of samples, so there's all kinds of results that can be potentially expected.

Q.   Okay.

A.   Compared to the Cepheid kit, it looks like we're in a reasonable range with where they're at.

113

So it's not hugely surprising, no.

Q.   Which is the Cepheid kit?  Where are you -- where are you seeing this here?

A.   They said -- let's see.  You read the results.  That the Xpert -- Xpert is Cepheid.  I'm sorry.  So that might not -- not have been clear to you.  So the Xpert test and the Logix Smart had the highest and the lowest sensitivity respectively.

Q.   Right.

A.   So then the Xpert would have been the 91.2 percent.

Q.   Right.

A.   So --

Q.   No, so -- so -- right.  So respectively.  So the lowest would have been -- that's -- that's -- that's the Logix Smart result, the 74.5?

A.   Right.

Q.   Right.  So, I'm sorry, what were you testifying, then?

A.   That compared to the Cepheid kit -- what it -- what it looks like, just from -- without having read the article, without having gotten to the samples, is that they have done a lot of looking at samples that are really hard to find.  And so when you get into that -- that narrow range right on

Lindsay Payeur, RPR
DepomaxMerit Litigation Services

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

114

the limit of detection, then they're -- they're pushing the boundaries of the expert to see how it can do and then checking to see how the other tests stack up in that boundary pushing.

Q.   Right.  And it says there: "Symptoms were a predictor of a positive result."

Do you see that?

A.   Uh-huh.

Q.   So what -- I mean, is what you're describing now what we talked about a bit earlier where you have potentially, you know, positive -- COVID-positive individuals who have a really low viral load which may test the actual limit of detection on some of these tests?

MS. PEIRSOL:  Objection.  Misstates his prior testimony.

THE WITNESS:  I would have to read the article to know what they're doing.

Q.   (By Mr. Pineiro)  Sure.  Okay.

A.   And I could do that.

Q.   No, it's okay.

A.   All right.

You have my book.

Q.   I do have your book.  I didn't read it all, though, just parts of it.

115

A.   Well, that's impressive.

Q.   When did you write that book, by the way?

A.   I wrote it -- I'd been writing it for years.  I published it January 14, 2021.

Q.   2021?  Was this while you were still chief science officer of the company?

A.   I think I had a month left or so before I stepped down.

Q.   Does this book have anything to do with your stepping down from the company?

A.   Not directly.

Q.   Indirectly?

A.   Indirectly as just a change of lifestyle preference.

Q.   You wanted a change of lifestyle preference?

A.   I wanted a change.

Q.   Based on parts of what you say in the book?  Or --

A.   My -- my biographical narrative, yeah.  It's just that I have changed as a person.

Q.   In the beginning of the pandemic or when -- and when Co-Diagnostics, you know, first went to market with this test, do you recall that the company was issuing a lot of press releases?

116

MS. PEIRSOL:  Objection.  Ambiguous.

THE WITNESS:  Can you rephrase the question?

Q.   (By Mr. Pineiro)  Do you recall that, you know, towards the beginning of the development of the test and eventually the sale of the test, that Co-Diagnostics was putting out a lot of press releases?

A.   I don't remember that.  It doesn't mean they didn't.

Q.   Okay.  Would they consult with you on any of the press releases they would issue?

A.   Usually if there was a quote from me, they would consult with me about the quote.

Q.   What if there was no quote but a press release had -- contained, you know, scientific information?  Would they consult with you?

MS. PEIRSOL:  Objection.  Incomplete hypothetical.  Calls for speculation.

THE WITNESS:  Sorry.  I'm -- would you repeat the question?

Q.   (By Mr. Pineiro)  So -- so was there any procedures put in place where, you know, they would consult with you on a press release before it was issued?

117

A.   Not at that point, no.

Q.   At what point did they put procedures in place?

A.   I don't know.  I --

Q.   At some -- at some point, did they?

A.   I don't know if they ever did.  They might have them now, they might not.  I don't know.

Q.   Are you aware of any -- strike that.

Did you ever request that they consult with you on any press releases that conveyed scientific information or information about the performance of the test?

A.   No.

Q.   This will be Exhibit 3.

THE WITNESS:  It'd make me happy if you put a smiley face on.

(Exhibit 3 marked for identification.)

Q.   (By Mr. Pineiro)  So I'm showing you what's been marked as Exhibit 3.  At the bottom, there is an email -- it looks like an email string involving you, Mr. Egan, and some other folks.

Do you see that?

A.   Yes.

Q.   And there is an email from Mr. Egan to you on the morning of March 14, 2020, saying: "Roche

**118**

noted that negative results with the Cobas test does not preclude infection and such results may be combined with clinical observations, patient history, and epidemiological information."

Do you see that?

A. Yes.

Q. And then you write: "It's a standard disclaimer. No test is a hundred percent accurate all the time."

Do you see that?

A. Yes.

Q. Do you know whether the Logix Smart test had that disclaimer?

A. No.

Q. And what did you mean by that, "No test is a hundred percent accurate all the time"?

A. What the statement says, that no test is a hundred percent accurate all the time. It can be for a data set but not every evaluation.

Q. So conveying that a test is a hundred percent accurate all the time would be false?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: So you're asking if conveying that a test is a hundred percent accurate

**119**

all the time, that that would be a false statement?

Q. (By Mr. Pineiro) Yeah.

A. It's not a statement that I would ever make about a test.

Q. Why not?

A. Because no test can be accurate all the time.

Q. So then it would be a false statement?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: Science works through proving by disproving. You can only ever disprove something is true. You can show evidence that something is true, but you can never show that it's absolutely true, you can only show that it's not true. And so you can't get a scientist like me to say that it's absolutely false, but you're always going on in this evaluation process. Every evaluation in the future has the probability of showing up something that shows that it's not a hundred percent accurate all the time.

Q. (By Mr. Pineiro) You're -- you're saying scientists like you wouldn't make this statement because you can't really support it, you can't --

MS. PEIRSOL: Objection. Misstates his

**120**

testimony.

Q. (By Mr. Pineiro) You can answer.

Can a scientist properly state that a PCR test is going to be a hundred percent accurate all the time?

MS. PEIRSOL: Objection. Ambiguous.

THE WITNESS: I would not be able to say that.

Q. (By Mr. Pineiro) Okay. Would that be misleading if somebody -- a scientist said that?

MS. PEIRSOL: Objection. Calls for a legal conclusion.

THE WITNESS: I would find it suspect.

Q. (By Mr. Pineiro) Why?

A. Because fundamentally no test is 100 percent accurate all the time.

MR. PINEIRO: This is 4?

THE COURT REPORTER: Yes.

MR. PINEIRO: Oh, sorry. I apologize.

(Exhibit 4 marked for identification.)

THE WITNESS: So we're done with Exhibit 3?

Q. (By Mr. Pineiro) Yes. Thank you.

THE WITNESS: Do you only type when the audio record doesn't convert right? Or -- oh,

**121**

sorry.

Q. (By Mr. Pineiro) We'll go off, and you can ask her all types of questions about that. I ask it all the time.

I'm showing you what's been marked as Exhibit 4 to your deposition. On the bottom of the first page, there's an email from Anurag Mehta at Synbiotics on April 2nd, and it's to a group of people.

Do you see that email?

A. I see the email. So you're talking about the one from me to Anurag or from Anurag to others?

Q. Well, beneath that -- beneath that, there's an email from Anurag to -- you know, it looks like Rebecca Garcia and some other people.

Do you see the email on the second page?

A. Yes.

Q. Okay. So he sends an email. It doesn't appear that you're copied on it. Do you know who Anurag Mehta is?

A. Only by name.

Q. Who is he?

A. Somebody associated with CoSara.

Q. Got it.

Is he an employee? Do you know? Or --

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                Confidential                Brent Satterfield, Ph.D.

122

A.   I don't know.

Q.   Are you familiar with the company called Synbiotics?

A.   No.

Q.   Okay.  So he writes:  "Dear all, today the results of a PE are published on ICMR site."

Do you know what a "PE" means?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  No.

Q.   (By Mr. Pineiro) Okay.  What about -- do you know what the ICMR is?

A.   Not what the acronym means.  Vaguely --

Q.   Well, what is it?  Yeah.

A.   Vaguely an Indian regulatory body.

Q.   Right.  For -- they -- they -- they would be the body that approves of the sale of a test in India?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I'm -- I'm not sure.

Q.   (By Mr. Pineiro) Okay.  It says: "Unfortunately our score is not that satisfactory.  Please refer our score for concordance among true negative and true positive, respectively.  The

123

requirement is a hundred percent for both parameters."

If you go a little further down, it says: "We have submitted these results to CDSCO."

Do you know what that is?

A.   No.

Q.   It says:  "For granting the permission from manufacturing, but I'm having doubts, which I am listing below.  CDSO [sic] will again raise the query that 'the results of PE are not meeting the ICMR requirements, and so the product needs improvements to meet the criteria.'"

Do you see that?

A.   I see it.

Q.   Do you recall a period of time where the Saragene test was not approved for sale in India?

A.   I remember a time before it was approved, yes.

Q.   Right.  And so do you -- do you recall that initially the Saragene test, at least as being described here, didn't -- it didn't pass, I guess, the criteria for sale in India?

A.   As of the moment of this email, it did not pass the criteria.

Q.   All right.  And do you know why that was?

124

A.   We still don't know the exact reason, but we have a lot of evidence that points to what it probably was.

Q.   Okay.  And then it says:  "After doing that, we can again submit the sample, version 2, to NIV for evaluation."

Do you know what "NIV" is?

A.   No.

Q.   And do you recall what the issues were with this initial, I guess, assessment of the Saragene test?

A.   The issues had to do with the Indian regulatory authority or the laboratory that was running the test.  We submitted to them, along with Roche and a number of other first-world companies, and they rejected all of us as having false positives, which is highly unlikely.  But on top of that, when we later submitted the exact same test, not even a version 2, just the same test, to a different lab in India who ran the same results, we got a hundred percent.  And the only reason as a scientist that I can come up with for why that happened is that the first lab had contamination of their lab.

Q.   Got it.

125

And so what happened here was I guess in their initial assessment -- did they -- did they run a validation study?  Is that what happened?

MS. PEIRSOL:  Objection.  Calls for speculation.

Q.   (By Mr. Pineiro) Do you know whether they ran a validation study?

A.   They would have run a study with our test against some of the samples that they had access to.

Q.   Okay.  So is that like the -- what kind of a validation study is that?

A.   I couldn't say.

Q.   Okay.  And they found that there was 88 -- 88 percent spec-- specificity?  Is that what it was?

A.   Let's see.

Q.   A 12 percent false positive rate?

A.   Can you show me the line where it's written?

Q.   Sorry.  Yeah, I'll just take you, then, to the first page.  And you -- you write -- do you see the email that you wrote at 10:37 a.m. on April 2nd?  And you say:  "Anurag, thank you for providing the results.  After consulting with Ike and Rebecca, we agree with you, if our sensitivity is higher than whatever 'gold standard' ICMR is using, then

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

126

resubmitting will not help.  For your consideration, I have attached a marketing write-up of our results compared to the CDC primer set, along with a comparison of gene alignments."

What do you mean by "gene alignments" here?

A.   So in primer selection, you are looking for a segment of a gene that is specific to COVID so it won't create false positives with other viruses, and it is conserved, meaning it doesn't mutate over time, so it doesn't create false negatives.  But when you look at each of the primers and the probes --

Q.   Right.

A.   -- and none of those genes have any cross alignment with any other species, you can state that in the virtual screening process, that you have a highly specific primer set.  And if you couple that with data that has been run across dozens of viruses and bacteria, the very ones that the ICMR claim to have run it against, and you don't see any false positives and you run hundreds and hundreds of samples in the field and find that there are no false positives in those, just crisp, clean results, then you get something called a confidence interval.

127

And that confidence interval tells you that there is no way that that data that they're reporting is accurate.  You don't have to know why yet, you just know it isn't consistent with what the statistics tell you is going to happen next.

Q.   Got it.

So while you -- strike that.

You have -- you have reasons to believe why this, I guess, validation study or whatever did not go correctly -- did not go well for the test, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.

THE WITNESS:  I had reasons to believe what the lab in India did to mess up their validation study.

Q.   (By Mr. Pineiro)  Okay.  Were you able to identify any contamination?

A.   Only through comparison, that they failed every test who had a sensitive limit of detection. So note that I'm -- I'm putting us in there with Roche and others of having a really good limit of detection relative to the PCR test that the ICMR was using.  They had a cycle threshold cutoff at cycle 30 because they were getting so much

128

contamination in their primer products.  But you remember, we have these CoPrimers, we don't get contamination --

Q.   Right.

A.   -- so we can run ours out to cycle 37, we can run it out to cycle 45, and we get beautiful results.  So we're able to pick up -- theoretically in PCR, every 3.3 cycles, the amount of template, the amount of DNA present increases by tenfold.  So in seven cycles, from cycle 30 to cycle 37 when they probably should have cut it off at, that's a hundredfold loss in sensitivity, a hundredfold loss in the limit of detection, meaning that trace levels of contaminant in their laboratory would not be picked up by their test.  But any test who had a decent limit of detection, ourselves, Roche, other first-world tests, would all see that, and, in fact, we all got rejected for having really abysmal specificity.

Q.   So it's possible that what happened here is that you correctly identified positives that weren't picked up by the gold standard being used by the NIV?

MS. PEIRSOL:  Objection.  Misstates his testimony.

129

THE WITNESS:  That we correctly identified contamination.

Q.   (By Mr. Pineiro)  Contamination.

A.   Because the ICMR also, to their credit, they went back and they tried to troubleshoot.  And so they pulled out samples from 2019 that should not have had COVID in them --

Q.   Right.

A.   -- and yet they're still finding positives.  The only explanation for that -- especially if run at this lab they show positive and run at this other lab down the street there's no positives, the only explanation that I know of for that is contamination.

Q.   And contamination means that in the -- I guess within the lab, some -- some sample of -- of the COVID virus accidentally gets into a sample that shouldn't have it?

A.   It's even easier than that.  PCR is notorious for messing up laboratories who don't have a lot of experience with PCR.  Contamination is the biggest problem because you start with a single copy of DNA and it amplifies up -- if you remember earlier in the conversation -- to 1.5 trillion copies.  1.5 trillion.  And if you open the lid on

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

---

**130**

that, it's -- it's like sneezing. You spray some of that into the room, and all it takes is for one of those 1.5 trillion copies to fall on a laboratory hood, to fall on a pipettor, to fall into an open tube somewhere, and now you have contamination all over your lab. And the only -- among PCR scientists, it's almost a joke to say the only way to get rid of it once you've got it is to burn the lab down and start over.

Q. And was it customary, I guess, for you to be dealing with these type of, you know, regulatory issues with the -- the test?

A. Not in general. We had experience with the Indian regulatory authority before. Same kind of problem. I've run into this problem routinely in the developing world where the -- the governments, they just don't have the same exposure to PCR testing that labs here in the U.S. do, and I have to say, even labs here in the U.S., it happens. It happens to everybody. Contamination just -- it's part of the PCR process.

Q. Got it.

Do you recall who it is that -- I guess within CODX that brought you in to assist with this issue?

**131**

A. No.

Q. You can put that aside. Thank you.

A. Okay.

MR. PINEIRO: Six?

THE COURT REPORTER: Five.

MR. PINEIRO: Five.

(Exhibit 5 marked for identification.)

Q. (By Mr. Pineiro) I'm showing you what's been marked as Exhibit 5. If you'd just go back to the second page -- well, if you want, just take a look at it. But this is an email string. If you go to the second page, it's the initial string -- the initial email in the string.

A. Yeah.

Q. The second page.

A. Would you mind giving me just a second to --

Q. Yeah. Of course.

A. -- get context? Thanks.

Okay. All right.

Q. So it seems like Mr. Benson has prepared a draft response to Nick German, I guess who -- this person who is an investor in Co-Diagnostics, correct?

A. I don't know if they're an investor,

**132**

but --

Q. Right. And so Mr. Benson, it appears, emailed you this draft response. Do you recall receiving this?

A. Not specifically.

Q. And so in your response to Mr. Benson's I guess draft email, you wrote: "It's generally okay. It would be nicer if we could link to the white paper or other countries where our product is used showing our confidence."

Do you see that --

A. Yes.

Q. -- up top?

Are you referring to an existing white paper that had already been prepared at that period of time?

A. I don't remember.

Q. At this period of time, do you recall -- strike that.

Do you know -- do you recall which countries you're referring to there where the product is being used?

A. No.

Q. And so you don't recall the genesis of this sort of request -- or this statement where you

**133**

said: "It would be nice if we could link to a white paper"?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: Yeah, I don't remember the white paper, and it's -- it's been long enough, I don't remember which countries. I just know that there were positive data. There -- that was the feeling that I had at the time, is that we had good results from other countries, we had been accepted as the test of choice in other countries who compared us against some of the top name brands, and it seemed like a simple enough matter to me to just share that information with them to say, "Hey, your data is inconsistent with our results."

Q. (By Mr. Pineiro) What -- in which countries at this point in time was the CODX test the test of choice?

MS. PEIRSOL: Objection. Asked and answered.

MR. PINEIRO: I haven't asked that question. That's the first time -- I'm -- the first time I asked that question.

MS. PEIRSOL: You can answer.

Q. (By Mr. Pineiro) You can answer.

---

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023          Confidential          Brent Satterfield, Ph.D.

134

A.   Okay.  It sounds similar to the last -- previous question for me, but, no, I don't remember.

Q.   **You don't remember?  Okay.**

A.   Yeah.

Q.   **But at this point, your recollection is that there was data coming in from other countries that demonstrated the test was performing well?**

A.   Yes.

Q.   **Okay.**

A.   And some of it wasn't just data, some of it's just the distributors coming in -- not the distributors, our salespeople coming to me and saying, "Hey, this distributor just called us and said that our test performed better than Roche, and we won the government tender."

So, you know, some of it isn't -- some of it is me saying, "Can you reach out to one of these government tenders, get some of this data, and pass that along?"

Q.   **So when you would -- when you would have these conversations or these interactions with the distributors and they would tell you, I guess, about, you know, the fact that the test had outperformed Roche, for example, were there scenarios where they would actually give CODX the**

135

**actual underlying data on whatever validations they ran?**

MS. PEIRSOL:  Objection.  Misstates his testimony.  Mischaracterizes the evidence.

THE WITNESS:  Okay.  The -- I wasn't the one talking to the distributors.  The salespeople were.  But the staff -- our staff, when they would come to me and talk to me about these conversations with the distributors, occasionally there was data, occasionally it's just a story.  All of it was received as good news.

Q.   (By Mr. Pineiro)  Got it.

**Was there some type of standardized procedure where when, you know, you're aware of a -- strike that.**

**Do customers or prospective customers, to your knowledge, typically run validation analyses on these PCR tests before they decide to purchase them?**

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  Internationally, that is something we've seen, is that the regulatory pol-- policies are different from one country to the next to the next, and so distributors will routinely -- or at least in our past experience have routinely

136

taken our tests and coordinated a study domestically to comply with their country's regulatory policies, and it just -- it depends on the level of regulatory scrutiny, what kind of study's put together.

Q.   (By Mr. Pineiro)  Domestically, you're saying that that's not typical?

A.   Domestically -- domestically, it's not typical for an FDA-approved test, but it is typical for an emergency-use-authorized test or any test that is used in an off-label way.

Q.   **Sorry.  So you're saying it is customary -- I don't want to misstate your testimony.  So it is customary to run validation analysis when you're dealing with an emergency-use-authorized test?**

A.   Many labs would choose to run their own, yeah, because there's just not complete data yet. So they would choose to run their own study.

Q.   **And they would select, like, which kind of gold standard they would compare to, for instance?**

A.   It depend -- they wouldn't all run validation studies against gold standards.  Some would; some would used contrived samples.  Early on in the pandemic, no one had clinical samples --

Q.   **Right.**

A.   -- to compare against a gold standard.  It

137

just -- it wasn't there.  There weren't gold standards, there weren't clinical samples, and so we're all dealing with this -- this great unknown.

Q.   **Who -- who would have been having the conversations with the customers or prospective customers where there were discussions about, you know, the validation tests that were being run to verify the performance of the test?**

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.

Q.   (By Mr. Pineiro)  **You don't know?**

A.   Huh-uh.

Q.   **Is it the science team, or is it the salespeople?**

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  I don't think there was a single person who was in charge of doing it.

Q.   (By Mr. Pineiro)  **Okay.  And to your knowledge, did the science team ever make requests of the sales personnel that they go out and try to get some of this validation data?**

A.   Like what validation data specifically?

Q.   **Yeah.  Just, you know, I guess -- you**

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

138

know, the data that's being -- the -- the validation data regarding any validation tests run by prospective customers or customers.

A.   I mean, I asked the sales team for it.

Q.   You did?

A.   Yeah.

Q.   And what -- who did you ask?

A.   I don't know all the people I asked, but I at least asked Cameron Gundry.

Q.   Got it.
Who's Cameron Gundry?

A.   He's one of the salespeople.  He generally works with Latin America or did at the time.  I don't know if he still does.

Q.   Okay.

MR. PINEIRO:  Six?

THE COURT REPORTER:  Yes.

(Exhibit 6 marked for identification.)

MS. PEIRSOL:  It's just after noon.  Do you want to break for lunch in about -- at 12:30?

MR. PINEIRO:  Yeah.  If we can find a logical breaking point about there, that's fine.

Q.   (By Mr. Pineiro)  I'm showing you what's been marked as Exhibit 6.  This is an email from you to Rebecca Garcia and Mayuranki Almaula.

139

Do you see that?

A.   Yes.

Q.   Do you know who Mayuranki Almaula is?

A.   I do.

Q.   Who is that?

A.   She works with sales and partnerships in the Indian entity.

Q.   Okay.  And so it seems like you provided Mayu with a draft statement to the Indian government, the ICMR?

A.   Yeah, give me a chance to review.

Q.   Sure.

A.   Okay.

Q.   Okay.  Do you recall sending this email to Mayuranki?

A.   Not specifically, no.

Q.   You can see that, you know, towards the bottom, there is a paragraph that starts with: "This means."  This is the first page.  It says: "This means that the Logix Smart COVID-19 test" --
Do you see that paragraph?

A.   Yes.

Q.   -- "can run many cycles with even less false positives and tests that cut off the PCR early where they use multiple markers.  Because the test

140

is done in a single well and because it runs the full length of the PCR, it has much better limit of detection than other tests that don't."
Do you see that?

A.   Yes.

Q.   What does the -- what does the phrase "limit of detection" mean in the context of this sentence?

A.   Okay.  So there is a table in this email that has the cycle cutoff at 37, 30, 24, and then it has the limit of detection.  For PCR that is working flawlessly, meaning that it exactly doubles the amount of DNA every cycle, then theoretically it can amplify one copy of DNA to a detectable level in 37 cycles.  And if you use the math of perfect amplification, which -- which most PCR tests come close, then at cycle 30 -- to detect a sample at cycle 30, you'd have to have at least a hundred copies present in the sample.  To detect it at cycle 24, you'd have to have at least 10,000 copies in the reaction.

Q.   Right.

A.   And so where you cut off the reaction profoundly -- not just a little bit -- profoundly impacts the limit of detection.  So if you have a

141

group like the ISM -- ISCMR who is claiming to have checked for contamination but isn't finding it, it doesn't mean it's not there if they're cutting their test off at cycle 30.  What it means is they're getting so much contamination that they shut their test down early to avoid seeing it.  They just blinded themselves.  They poked out their eyes.  But the Indian regulatory authority is one of the organizations which has more of an ego, for lack of a better word, than most, and so we had to be very tactical, very soft with our words and not blame them.  Even though I was a hundred percent convinced this is exactly what was happening, if we called them out for it, we might never be able to sell tests in India.

Q.   So then beneath that, you write:  "The Logix Smart COVID-19 test has received FDA EUA, and it is CE-IVD-marked with a stated sensitivity and specificity of a hundred percent."
Do you see that?

A.   Yes.

Q.   And there, you're referring to the sensitivity and specificity in con-- that was as tested in connection with those regulatory approvals, correct?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

142

A.   Yes.  Although I do believe I made a typo here.

Q.   Which is what?

A.   That -- and maybe "typo" isn't even the right word.  That I was confusing the IFU, which stated 100 percent sensitivity, 100 percent specificity, with what was submitted to the FDA, which stated 99.52 percent sensitivity and 100 percent specificity, and I didn't catch that in this email to Mayu, or I simply just generalized and made a blanket statement of a hundred percent because it's really close.

Q.   Right.  Then it says:  "Results from as-of-yet unpublished evaluations of our tests in places like Italy, Israel, Austria [sic], Ireland, the UK, et cetera, have led many government" -- "have led to many government tenders and private-sector contracts."

Do you see that?

A.   Yes.

Q.   So what unpublished evaluations are you referring to here?

A.   For most of those, I don't remember.  The Australia one is attached to the press release.

Q.   Did Italy -- were there ever any -- have

143

there ever been any evaluations published out of Italy?

A.   I don't know.

Q.   Okay.  Have there ever been any evaluations published out of Israel?

A.   I think you showed me one.

Q.   Okay.  Was --

A.   But I -- I don't believe that those were the results that we were hearing back at the time.

Q.   Yeah.  The -- were there any -- were there any unpublished evaluations from Ireland?  Strike that.  Let me ask another -- wrong question.

Have there ever been any published evaluations on the Logix Smart test from Ireland?

A.   I don't know.

Q.   Same for the UK?

A.   Same.

Q.   Okay.  So why -- why would you reference all these places if you really didn't have any rec-- idea whether there would be published evaluations?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  So at the time, our salespeople -- Denny Crockett would have been the one over most of these countries -- were coming to

144

me and telling me of these studies, in some cases, showing me data, and I assumed, incorrectly, that the stud-- these studies would be published.  And one of the things that I remember being very frustrated with with the May 1st press release is I expected more of this data to be made available, but we were told by our distributors that those results were confidential, that they'd been performed by that government, and I have no idea why they would want to keep them confidential, but that they were not -- they were not to be made public.

Q.   (By Mr. Pineiro)  So you -- you -- you misspoke here in this draft email regarding unpublished evaluations based on what you were told by your salespeople?

MS. PEIRSOL:  Objection.  Misstates his testimony.  Misstates the evidence.

THE WITNESS:  I did not misspeak.  The data was unpublished.

Q.   (By Mr. Pineiro)  Right.

A.   And I was not yet aware that they were not going to be published.

Q.   Right.  And the data you're referring to, again, is data -- this is -- this is based on conversations you're having with salespeople where

145

they're telling you that they're getting good feedback?

A.   It's a combination of the salespeople telling me that they're getting good feedback, but specifically that we won tenders in these countries in side-by-side comparisons or that the studies had been run, the results were good, and that we won those tenders, or that they had shown me data.

Q.   With respect to the data that was showed to you, is it just the Australian data that was showed to you?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I don't remember which of those had data attached to them.  The one I do know had data attached to it was the Australia.  And that is included in the May 1st press release.

Q.   (By Mr. Pineiro)  And these conversations that you had with I guess personnel at CODX regarding evaluations in these different countries, were you told by those salespersons that the validation studies were turning up a hundred percent sensitivity and a hundred percent specificity?

A.   For any that mentioned numbers, yes.

Q.   Okay.  And do you know which -- for which

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

146

they mentioned numbers?

A.   No.

MR. PINEIRO:  This is 7?

THE COURT REPORTER:  Yes.

(Exhibit 7 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you what's been marked as Exhibit 7.  Are you familiar with this document?

A.   Vaguely.

Q.   Okay.  So I'll just start off at the bottom.  Strike that.

Do you recall whether the NIV ran a second test on the Saragene test?

A.   I don't know if it was the NIV, but one of the labs in India did run a second test, yes.

Q.   Okay.  But you're not aware of whether the -- so we established that the NIV, you know, had initial results that didn't pass the test.  Were you aware of whether they did any follow-up testing?

A.   There was a second evaluation done, and I think they reported an even lower number than the time before.

Q.   And did you ever understand why that was?

A.   For the same reason as the first time, contamination.  The only -- this is another one of

147

those things that really strongly points to contamination that -- that any scientist who's worked in a PCR lab long enough to appreciate what contamination is, results don't change from one run to the next.  If we truly were getting an 88 percent specificity, which they claimed, then the second time they ran it, we should have seen an 88 percent specificity or something really close to that.  But for it to jump as much as it jumped on the exact same types of samples, it says that -- it really supports the contamination piece, that -- that it's not a constant, it's a -- not a predictable thing, which contamination is frequently not.

Q.   So you can see in Ms. Garcia's email, if you go to, like, number 3, it says:  "Our test gave 6 of 13 positive for COVID from this respiratory panel.  They decided to test more to confirm this was true."

A.   Okay.  Hold on a second.  Let me catch up with you.

Q.   Yeah.  No sweat.  It's the middle of the paragraph:  "Our test gave 6."

A.   Okay.  I see it.

Q.   "They decided to test more to confirm this was true.  They went back to preCOVID samples

148

stored in 80 celsius" -- "minus 80 celsius freezer from January and February of 2019.  They tested eight samples that had other unknown [sic] respiratory infection and not COVID.  All eight of their samples showed positive COVID with our tests between cycles 36 and 38 with clear amplification curves."

What does "clear amplification curves" mean?  Do you know?

A.   That means it's beautiful.  It's -- if -- if you get primer-dimers in a reaction that's causing false positives or if you're getting amplification of some other closely related virus but it's not amplifying it really well, then you get a really ugly curve that shows up that you almost can't call a curve.  But what she's saying here is these are beautiful, which to me says, this is COVID.  And, you know, how COVID got into samples from 2019, that's the only question we have to determine here.

The other thing it says, showing up at cycles 36 to 38, if you'll remember from the previous email, there was that table where the theoretical detection limit of one copy is at cycle 37.  So what we would assume here is that

149

we're looking at one to two copies in the reaction, and it's showing up at cycle 36 to 38.  The Indian regulatory body already admitted that they cut off their -- their test at cycle 30, so they would never see it.  So if they had contamination in their lab that's showing up at one to two copies per reaction, their test would never see it, and they'd be stuck trying to guess what's going on.

Q.   And so she says:  "None of these false positives" -- "none of the false positive samples were past cycle 39.  All" -- "all were confirmed with other real-time assays."

What does that mean, "all were confirmed with other real-time assays"?

A.   I'd have to see more of what's being said here about the other real-time assays.

Q.   What's a real-time assay?  Sorry.

A.   So talking about real-time PCR or -- or another method that is functionally equivalent to real-time PCR.

The other thing that she's saying here is she's adopting the language of the Indian lab of false positives, but from our perspective, or at least from mine, they weren't false positives.  That was never the question.  But she's adopting their

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

150

language, using that.

Q.   And then she says:  "She went on to tell me that contamination at the facility is conducted every Monday with swabs and run with real-time and other methods."

What does that mean?  Do you know?

A.   So they looked at -- to their credit, I actually think this is positive about the Indian lab.  They looked at our suggestion that maybe they had contamination and said that they could rule out contamination because they use their PCR test to look for contamination every Monday.  So they swab surfaces, meaning they're looking for it in the lab. The problem with that statement is that they're using a test with a really bad limit of detection because they're cutting the test off early.  They're basically killing the test and then saying they can't find contamination, and then they're failing us, and they're failing Roche, and they're failing all these other first-world companies because our test is sensitive -- sensitive enough to pick up the contamination that theirs can't.

Q.   So it appears -- so if you just go a little further, the next page on the email, Ms. Garcia says:  "Based on the above information,

151

we have agreed that she will tell the chief regulatory agency that we are working on the test instead of reporting the 65 percent failed test."

Do you see that?

A.   Yes.

Q.   So it seems like this -- this data actually was never submitted to NIV?  Do you know?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.

Q.   (By Mr. Pineiro)  Okay.  In connection -- you can put that aside.

A.   Okay.

Q.   In connection with the EUA application made by CODX and the EUA validation, is there a limit of detection that's disclosed or that's reported?

A.   I believe there is.

Q.   And -- and do you recall what that was for the CODX test?

A.   Not right offhand.

Q.   Was it a hundred percent?

A.   LODs aren't reported as a hundred percent.

Q.   Right.  So how are they reported?

Oh, sorry.  I know the -- they're --

152

the -- sorry -- the -- by the copies per million. Correct.

Do you recall what -- what it was for -- for CODX?

A.   No.

Q.   Okay.  Do you remember whether it was a favorable LOD or not?

A.   It was favorable to us, yeah.

Q.   What --

A.   The FDA asked us to go ahead and submit with what we had.

Q.   What do you mean with what you had?

A.   We were still validating and testing.  We wanted to have more validation studies done.  The FDA said what we had was sufficient.  We had customers that were ready to start using the test. So we submitted, even while knowing that we were continuing to refine -- not the test, but to zero in on the exact limit of detection and that we could go back to the FDA a month or two later and resubmit. We didn't know that the line would get so long that they would never get back to revising our application and showing that our limit of detection was a lot better than what we showed it was.

Q.   So the LOD -- in subsequent -- through

153

subsequent modifications to the test, the LOD improved from the time it was submitted to the FDA?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  No.

Q.   (By Mr. Pineiro)  No?

A.   The limit of detection was always better than what we reported it as, but in subsequent validation efforts internally and through our customers, we determined that our limit of detection was much better than what we reported and found a more accurate answer for that.

Q.   Understood.

So you reported a limit of detection that was actually higher than what it was?

A.   That's correct.

Q.   All right.  You're aware that at one point CODX landed a contract with Nomi to sell the Logix Smart test?

A.   Yes.

Q.   Were you at all involved in the negotiations or the sales efforts regarding Nomi?

A.   Not -- to sign up Nomi?

Q.   Yeah.

A.   To work with their -- to sign them up?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                        Confidential                        Brent Satterfield, Ph.D.

154

Q.   To sign them up.

A.   No.

Q.   Do you know who handled that?

A.   No.

Q.   Once -- once Nomi was signed up, were you then involved in dealing with that relationship?

A.   Yes.

Q.   And how -- how were you involved?

A.   I talked with -- I think it was Dave Elkington from Nomi and a couple of other people they'd bring in from time to time, and they'd have questions about the test, they'd have questions about their customers.  I interface with them on the science quite frequently.

Q.   Okay.  And who's Dave Elkington?

A.   Apart from he's involved with Nomi, I couldn't say.

Q.   Okay.  And are you aware that CODX's tests were being used by Nomi and TestUtah?

A.   Yes.

Q.   Okay.  And you're aware that Nomi was also using CODX's test in Iowa?

A.   Yes.

Q.   Nebraska?

A.   Yes.

155

Q.   Okay.

A.   And -- and when you asked Nomi, let me clarify --

Q.   Yeah.

A.   -- that they have a whole bunch of affiliate companies, and when I say Nomi, I am referring synonymously to Nomi, to Silicon Slopes, to Qualtrics, to -- I -- I don't know what other companies they have involved in there, but -- but that group of people.  So I don't know specifically if Nomi had a contract, but -- but that group, yes, I'm aware of, had contracts with Nebraska.

Q.   So Nomi may have -- Nomi had certain affiliates that may have been the actual contracting party with some of these state agencies?

A.   Yes.

Q.   Okay.  And what was TestUtah?

A.   I'd have a hard time defining it.

Q.   Do your best.

A.   Okay.  It was an initiative between Nomi Health and the government of Utah to increase accessibility of COVID tests to the general public.

Q.   Got it.

I mean, was this the most significant -- to your knowledge, was this the most significant

156

contract that CODX had ever had up to that point?

MS. PEIRSOL:  Objection.  Vague. Ambiguous.

Q.   (By Mr. Pineiro)  Largest contract?

A.   If not the largest up to that point in time, it would have -- it didn't start large, but it had the potential to be large.  I think that --

Q.   Right.

A.   -- that was more of it.  It started with actually a relatively small number of tests, but they were promising that there was going to be a huge number of tests run through TestUtah and related initiatives.

Q.   And in connection, I guess, with the sales effort to, you know, sign up with Nomi, do you know whether Nomi ran any validation studies on the test?

A.   No.

Q.   You don't know?

A.   I don't know.

Q.   Okay.  Who would know about that?  Do you know?

A.   Somebody at Nomi.

Q.   At Nomi?

Who -- who -- who would Nomi be interfacing with regarding running those kind of

157

studies, if they were to do so?

MS. PEIRSOL:  Objection.  Calls for spec--

Q.   (By Mr. Pineiro)  At -- at CODX.

A.   At -- okay.  So who would they talk to at Co-Diagnostics?

Q.   Yeah.

A.   It's a small number of people that they might have talked to.  They would have talked to somebody -- potentially somebody in the management like Ike Egan or Seth or somebody on the scientific staff like myself or Chad Apuli or maybe even on the regulatory like Cecilia Hutchins.

MS. OSTLER:  If you're going to do a new document, do you think we should break first?  Or how long do you --

MR. PINEIRO:  It's your guys' call.  It's 12:30.  I mean, I could probably go until one and break, but if you want to break now, that's fine.  I just -- maybe just get through this one document?

THE WITNESS:  I'm -- I'm good.

MS. OSTLER:  You're good?

THE WITNESS:  I'm good for a little.

MS. OSTLER:  Okay.  Well, let's go.

MR. PINEIRO:  I don't want to make you guys sit here hungry either.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

158

MS. PEIRSOL: No, no.

MS. OSTLER: No.

THE WITNESS: I'm not hungry yet. We're fine.

MR. PINEIRO: Okay. So we'll go another half hour then? You just let me know.

THE WITNESS: Sure.

MR. PINEIRO: Is this 8?

THE COURT REPORTER: Yes.

(Exhibit 8 marked for identification.)

Q. (By Mr. Pineiro) I'm showing you an email that's been marked as Exhibit 8.

A. Okay.

Q. This is a text message from Barbara Blanke. Who's Barbara Blanke?

A. She was the lab manager at Timpanogos Regional Hospital that was responsible for running our tests with Nomi's system.

Q. Okay. Did you have a lot of interaction with her?

A. I did for a brief period in time in around -- about April of 2020.

Q. Would it be fair to say that you're the person -- strike that.

Who -- who on behalf of CODX is

159

spearheading I guess the interfacing with Timpanogos -- sorry if I pronounce that incorrectly -- or Nomi on the science side in terms of the -- running the tests?

A. It usually would be me and also with Timpanogos Regional Hospital here.

Q. Did anybody assist you in this respect?

A. Yes.

Q. Who would that have been?

A. Madison Stark. Let's see. There were a couple of other people that assisted me from time to time. I don't remember if it was at Timpanogos Regional or other places. But Jana Kent. And there was another -- another guy who was kind of new to our company. He had come over from BioFire. I can't remember his name. But he would go and work with them from time to time too.

Q. Okay. So in this text message, she -- Ms. Blanke texts you and says: "Hi, Brent, I'm getting asked about the false positive" -- "the false pos/negative rate and sensitivity of this assay. Can you please help me with my talking points? Thanks."

Do you see that?

A. Yes.

160

Q. And this is dated April 2, 2020. Do you see that?

A. Uh-huh.

Q. Do you know what she's referring to?

A. She's asking for data that we either had on the test or that we'd submitted to the FDA. She's asking for false positive/negative rate.

Q. At this point in time, do you know -- April 2nd -- had the company -- had CODX already received EUA?

A. I don't remember.

Q. Okay. At this point in time, had Ms. Blanke previously indicated to you that the lab was running validation testing on -- on the CODX test?

A. We -- I don't know at this point in time, but from the moment I met Barb, we were talking about the fact that they had to run a validation study to do the kinds of volumes that they wanted to do.

Q. And did they run one?

A. Yes.

Q. And did -- of -- of the CODX test?

A. With the CODX test, with the Nomi system that Nomi put in place there.

161

Q. Okay. And what kind of a validation test was it?

A. I don't know.

Q. Okay. And do you know the results of that test?

A. It was enough of a -- I don't know what the exact result was, but I know it was enough for them to start selling tests.

Q. Was it -- do you know if it came up a hundred percent sensitivity and a hundred percent sensitivity [sic]?

A. No.

Q. Okay.

A. I don't know, that is.

Q. I'm sorry?

A. I don't know.

Q. All right. Did they ever report to you before or on April 2nd that they were getting some bad data on the test?

A. I don't know what the dates are because I just can't remember that time period. I know that there was troubleshooting to go through. It's the first time that Nomi Health had ever distributed a PCR product, and it was the first time that their engineers had ever tried to program an automated

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

162

liquid-handling device. And I remember that their engineer who -- for never having done this before, with all the pressure that was on him, did a phenomenal job. But I do remember that he accidentally forgot to program the device to pick up the liquid. And so initially it was not working because he had failed to program the device -- the liquid-handling device. Nothing to do with our test, but the liquid-handling device had not been programmed correctly.

Q.   I mean, do you know whether the reason why she asked you for talking points was because they were having some bad or negative data regarding the test?

MS. PEIRSOL: Objection. Vague.

THE WITNESS: I have no idea.

Q.   (By Mr. Pineiro) Okay. And then you write: "In our lab, we have seen no false positives or negatives. In an internal study with 90 positives and 90 negatives, we outperformed the CDC primer test set, having a hundred percent sensitivity and a hundred percent specificity. The CDC primer set did not detect all low-level positives."

So in what you're referencing there

163

regarding the CDC primer set, what did you mean when you say "the CDC primer set did not detect all the low-level positives"?

A.   That it did not have as good of a limit of detection in a side-by-side comparison with our test.

Q.   So there were inst-- so you're saying that when you compared the CODX test to the CDC test -- so you said here that you showed a hundred percent and a hundred percent when you compared it to the CDC primer set, right?

A.   Yes.

Q.   But then you were also able to see that -- you were also able to identify that your test is more -- had a -- had a lower LOD, you said?

A.   That's correct.

Q.   Right.

A.   In a side-by-side comparison.

Q.   Okay. So does that mean that there were some false -- there were some low-level positives that they didn't pick up but that you did?

A.   In contrived samples. We're still not talking about clinical here.

Q.   Right.

A.   This is all contrived samples. But, yes.

Q.   So you have a set of contrived samples

164

where you have some positive and some negative, right?

A.   (No audible response.)

Q.   And then the CDC primer set didn't pick up some of those low-level positives and -- and the CODX test did?

A.   That's correct.

Q.   And you say: "Obviously no test is a hundred" -- "is truly 100 percent specific and sensitive, but we're close enough not to have seen false positives or negatives in studies in our labs so far."

Do you see that?

A.   Yes.

Q.   Is there any reason why you didn't disclose to her, like, some of the issues you were having in India?

A.   I don't think we were having issues in India at this date. I mean, I could be wrong. But even if we were, they weren't issues in India. The issues were that their lab was having contamination.

Q.   But you weren't sure of that, right?

A.   Oh, I was sure.

Q.   You were sure?

A.   I was as certain as a scientist can be

165

without having permission from the lab to go over there and prove it to them.

Q.   Okay. But do you think that maybe you should disclose it and then also provide her with your explanation for why the India numbers came up the way they did?

A.   Could you --

MS. PEIRSOL: Objection. Asked and answered. He just told you he didn't think the India --

MR. PINEIRO: Hold on.

MS. PEIRSOL: -- issue was happening.

MR. PINEIRO: You -- you can -- you can object the way that you have been, but you can't then insert the lengthy sentence.

MS. PEIRSOL: He -- he just told you --

MR. PINEIRO: Just -- just say asked and answered.

MS. PEIRSOL: -- he doesn't know.

MR. PINEIRO: Just say asked and answered. That's what's appropriate.

MS. PEIRSOL: Asked and answered.

MR. PINEIRO: Perfect.

THE WITNESS: Okay. Without intervention from her, I did have that same question because I

Lindsay Payeur, RPR
DepomaxMerit Litigation Services

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023    Confidential    Brent Satterfield, Ph.D.

166

already did say I'm uncertain that the Indian correspondence took place prior to this.

Q. (By Mr. Pineiro) Okay.

A. Could you show me from -- the email from India? Actually, we have it here, don't we?

Q. It's okay. You don't have to look at it.

A. We -- we can prove it. I mean, because if it -- all right. So this one was --

Q. It was before.

A. -- on April 10th. It was which number? Okay. April 2nd. All right. 3:39 p.m. All right. Okay.

Q. So the initial email from -- that I showed you from India was on April 2nd. That's the date of the text message.

A. Yes. Mine was at -- sent out at 10:37 a.m. and this conversation with Barbara Blanke at 7:44 a.m. so I don't believe that I had --

Q. That information.

A. -- this information yet, one; and, two, even if I did, I would not feel it necessary to tell her about India's failure to check for contamination in their lab.

Q. Got it. So you didn't -- even -- even if you knew,

167

what you're saying is, because of your belief that those results were based on contamination, you didn't feel it was necessary to disclose it to her?

A. Correct.

Q. And then she writes: "Excellent points." And then I guess the next day she goes: "Hi. We had a patient who we sampled barely came up on the COVID marker. Cq, 4.15 [sic]. I will send a picture" --

THE COURT REPORTER: I cannot hear you.

MR. PINEIRO: Sorry. That's all right. You can just strike that question. No, actually, I'll -- I'll say it.

Q. (By Mr. Pineiro) So she says: "Hi. We had a patient who we sampled barely came up on the COVID marker. Cq equals 41.5. I will send a picture."

What does "Cq equal 41.5" mean?

A. So it's the cycle threshold. I forget exactly what the "q" stands for. I see it as "Ct" all the time, cycle threshold. And it's the cycle at which a marker shows up positive. At this point in time, Barb Blanke had no prior experience running PCR.

Q. Yeah.

168

A. So she's just trying to figure out how do you interpret data, what is the data supposed to look like, how do you know when it's positive, how do you know when it's negative. So these were very -- they're like kindergarten-type questions of how do you run a PCR test.

Q. Got it. She says: "I will send a picture. The IPC looks good."

What does "IPC" mean? Do you know?

A. The "IPC" stands for "internal positive control." And so that is the marker that looks for the DNA -- the human DNA to verify that the test is amplifying correctly, which also shows that -- it shows, one, that the sample is of high enough integrity to amplify, that -- that basically the DNA's still intact; and, two, that there's no inhibitors left over from the sample processing that would shut down the PCR.

Q. Got it.

MR. PINEIRO: Is this 9?

(Exhibit 9 marked for identification.)

Q. (By Mr. Pineiro) I'm showing you what's been marked as Exhibit 9. This is an email from Jennifer Webb sent on April 16, 2020, to a group of

169

people. Do you see that you're copied there? And it says: "All, Salt Lake reporter Nate Carlisle, who has emailed Seth a couple times with questions in the last few weeks, had more questions and reached out today. I spoke with him to get some clarification on his questions, and more is below for your reference."

It shows: "Brent, if I could put you on the phone with him to talk through the science behind the diagnostic platform and the accuracy of the test and then address the need for widespread testing, that would be great. His timeline is this afternoon or tomorrow morning before noon."

Do you see that?

A. Yes.

Q. And do you recall speaking with Mr. Carlisle?

A. Not specifically, but I know that I talked to the Salt Lake Tribune at least once.

Q. Okay. And was that over the phone?

A. I -- I don't remember, but I don't remember any face-to-face appointments either.

Q. Okay.

A. So probably.

Q. Do you recall who you spoke to?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                 Confidential                Brent Satterfield, Ph.D.

170

A.  No.

Q.  Do you recall whether anybody else from CODX was on that -- in that meeting or conversation?

A.  Generally the only person on phone calls with me with the reporters was Jennifer Webb.

Q.  Got it.

And who is Ms. Webb?

A.  She was running PR for -- for the company.

Q.  Got it.

And so in the -- do you remember in this conversation with somebody from the Salt Lake Tribune what was discussed?

A.  Not at this point, no.

Q.  What do you mean "not at this point"?

A.  I think the Salt Lake Tribune ran more than one article, and so early on, I don't -- I don't remember at all what they wanted to know.

Q.  Okay.  And so the questions are listed: "Questions:  Is Co-Diagnostics collecting data on the accuracy of its tests, and is there anything that can be shared?

"We have provided him with this language: In the clinical evaluation that was submitted for FDA review, Co-Diagnostic's test showed sensitivity of a hundred percent and specificity of a hundred

171

percent in detecting SARS-COVID-2, the virus which causes COVID-19, without demonstrating any cross-reactivity with other coronaviruses."

Do you see that?

A.  Yes.

Q.  And, again, that's a reference to the validation run on contrived samples for the FDA?

A.  That's correct.

Q.  So that's not a clinical -- but here, it says: "In the clinical evaluation that was submitted for FDA review."

So you had mentioned there's clinical sensitivity and then there's what you did with the FDA.  When she ref-- uses the term "clinical evaluation," is that an appropriate description of what was submitted to the FDA for review?

A.  No.  Other than just the general characterization of FDA data as clinical.  Jennifer Webb is not a scientist, and so none of us would expect her language to be precise scientifically.

Q.  Of course.

So it seems like she says:  "We have provided him with this language," right?  So it seems like she already provided Mr. -- or -- Mr. Carlisle with that language, correct?

172

A.  I couldn't say what she had done with it.

Q.  Okay.  Well, that's what the email says, though, right?

A.  It's what the email says.

Q.  Okay.  Do you recall being asked to evaluate that language before it was submitted to the Tribune?

A.  No.

Q.  Okay.  Do you recall whether after you read this you noted to Ms. Webb that she had misspoken with respect to referencing a clinical evaluation?

A.  I don't --

MS. PEIRSOL:  Objection.  Misstates -- mischaracterizes the evidence.

THE WITNESS:  I don't remember talking with Jennifer Webb about this at all.  I mean, I don't -- just don't remember whether I talked to her or not.

Q.  (By Mr. Pineiro)  Okay.

A.  Yeah.

Q.  Do you remember what the Salt Lake Tribune was looking into in connection with this inquiry, these conversations that were occurring?

A.  No.

173

Q.  Was it -- do you recall whether it was the testing discrepancy at TestUtah?

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.

THE WITNESS:  At the early phase of talking to the Salt Lake Tribune, I -- what I remember is talking about how all the different parties are working together to get test results out.  It was exciting.  It was fun talking to them.  It was fun talking to the other reporters.  And so it -- it was right about this time that the reporters -- there was a shift where we'd have one conversation and then they'd report something upside down from what we had just thought we'd talked about.

Q.  (By Mr. Pineiro)  You didn't think that they were being fair?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I was shocked at what they ended up saying based on our conversations.

Q.  (By Mr. Pineiro)  So you think they were taking your conversations and -- were they misconstruing them?

A.  It was more about the tone.  They were

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

### 174

very positive in tone talking to us and then very negative tone -- in tone in the article.

Q.   Why do you think that is?

MS. OSTLER:  Calls for speculation.

THE WITNESS:  Yeah, I -- I couldn't say. I don't know.

Q.   (By Mr. Pineiro)  Have you -- you never thought about that, why it is that you were having these conversations that were positive and then when they'd issue a story it was very negative?

A.   I've speculated with -- I've speculated with Ike.  We speculated why they might have wanted to do that.  But I -- I don't have any personal knowledge of why they would have done it.

Q.   You speculated that it was based on political motivations?

A.   I --

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I did not speculate that, but I did listen to Ike speculate on that.

Q.   (By Mr. Pineiro)  All right.  Do you agree with him?

A.   It's hard to say that -- with the brother of Jon Huntsman owning the Salt Lake Tribune, that

### 175

that -- that -- it was a completely arm's-length set of interviews and articles that came out.

Q.   Do you recall in your discussions with the Salt Lake Tribune reporters ever discussing some of the results in India?

A.   No.

MR. PINEIRO:  This is 10?  Okay.

(Exhibit 10 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you a document that's been marked as Exhibit 10.  Up top, there is an email from Denny Crockett on April 17th to a series of people.  Do you know who Denny Crockett is?

A.   Yes.

Q.   Who's that?

A.   Denny Crockett is one of our salespeople.

Q.   Okay.  So he was an employee at the company?

A.   I believe so.

Q.   Okay.  And are you familiar with the gentleman who was receiving the email, T. Nieuwoudt at RX Medicals?

A.   Not at all.

Q.   Okay. Mr. Crockett writes:  "I've sent this to our lab" -- the subject is:  "Final feedback

### 176

from government laboratory in South Africa."

Actually, I'm sorry, let me go -- let me go to the bottom email first.  This is the one from Mr. Nieuwoudt to I guess Mr. Crockett.

A.   Can you give me just a moment to -- I --

Q.   Sure.

A.   -- want to catch up with you.

Q.   I'll read -- you're not on this --

A.   Okay.

Q.   -- so I'll walk you through it.

A.   Okay.

Q.   It says:  "Dear Denny, please see final results from the government laboratory after running clinical samples with Logix Smart COVID-19. Unfortunately, the final sensitivity was not acceptable to them.  Could you please ask your scientific team for a response?"

And then he quotes an email to him that says:  "With regards to the verification of the Logix Smart ncov real-time PCR assay in" -- "this...final update following additional PCR and sensitivity analysis.  As I informed you in our telephone discussion, just looking at pos/negative, the assay performed well for the specimens tested, but that didn't do" -- "but that I didn't do a

### 177

sensitivity analysis.  Following our sensitivity analysis, looking at all the data combined, the Logix assay missed positives that had a Cq of 33 and above on the reference assay.  In summary, 5 of 12, 42 percent, positives were missed.  Therefore, concerns with the Logix assay is that very early and later stages of infection will be missed."

Do you see that?

A.   Yes.

Q.   Do you recall ever receiving information regarding these results from South Africa?

A.   No.

Q.   Now, as in -- now, Mr. Crockett up top says:  "I've sent this to our lab."

Do you see that?

A.   Yes.

Q.   Is it normal that he would send information like this to a lab and you wouldn't be made aware?

A.   Yeah.

Q.   So you're the chief science officer, and there's a negative result from South Africa, and you wouldn't be made aware of it?  Is that normal?

MS. PEIRSOL:  Objection.  Asked and answered.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**178**

THE WITNESS: So it is normal. I instructed the lab to take on all of the troubleshooting because, like -- like I had mentioned at the beginning of this interview, there were a lot of problems with companies setting up their systems, and the systems included a lot of components and a lot of -- you know, everything from the sample collection to the sample processing to the PCR machine being used to the liquid-handling device to the lab's protocols. There ends up being a lot of troubleshooting, and I didn't have time for all of it. So I told them only bring me the troubleshooting that our lab staff isn't able to just easily fix. And even here, Denny already has the right questions. He's -- he knows what to ask as a salesperson. And so to the extent that they could handle that without me, they did.

Q. (By Mr. Pineiro) And do you have any -- do you know whether this was ultimately resolved and the test was approved by this government laboratory in South Africa?

A. No.

Q. Okay. Is it possible that it wasn't approved?

MS. PEIRSOL: Objection. Asked and

**179**

answered.

THE WITNESS: I would have to speculate. I don't know.

Q. (By Mr. Pineiro) Okay. Who would know that?

A. Somebody with the sales log for the company.

Q. Okay. Would anybody in the lab, though, find out that the test ultimately was invalidated even after troubleshooting?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: To my knowledge, every lab that allowed us to troubleshoot, we were able to resolve to their satisfaction.

Q. (By Mr. Pineiro) Okay. But you don't have any specific knowledge about this one?

A. No.

Q. And so is there somebody in the lab who would be in charge of this troubleshooting?

A. I would check with whoever he CC'd here. So it looks like he emailed Chad Apuli and Cecilia Hutchins.

Q. Okay. Why would Ms. -- Ms. Hutchins is the head -- was the head of regulatory?

**180**

A. Yes.

Q. Is there a reason why she would be copied on an email like this?

A. I --

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't know.

Q. (By Mr. Pineiro) Was she involved in efforts to obtain regulatory approval in different countries?

A. From time to time.

Q. What would her role be in -- in that process?

A. I don't know.

Q. Okay. Was there a system in place where when you would get, I guess, you know, adverse data like this -- I'm going to call it adverse data -- where it would be filtered in a way where management, including you, would be notified of it?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: The -- there is a system required by the quality system that's required by the FDA to log and register complaints, and outside of knowing that that exists, I don't know what the

**181**

process is, and I don't know what the criteria are to bring complaints to the attention of management.

Q. (By Mr. Pineiro) So you're not sure whether this would be something that under that QC [sic] system would have to be reported?

A. I wouldn't know, no.

Q. Who would know that?

A. Cecilia Hutchins.

Q. Okay.

MR. PINEIRO: Eleven?

(Exhibit 11 marked for identification.)

THE WITNESS: How are we doing on time?

Q. (By Mr. Pineiro) We got five minutes. If you want, we can stop here. I have to go to the restroom.

A. I think five minutes is fine.

Q. Okay.

MR. PINEIRO: This is 11.

Q. (By Mr. Pineiro) I'm showing you what's been marked as Exhibit 11. On the top email, it's an email from you to Jennifer Webb on April 17th. Do you see that?

A. Hold on just a moment.

Q. That's fine.

A. I'm catching up with you.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023      Confidential      Brent Satterfield, Ph.D.

182

Sorry, what was your question?

Q.   On the top, there is an email from Jennifer -- sorry, from you to Jennifer Webb.
Do you see that?

A.   Yes.

Q.   It says:  "Jennifer, see email chain below.  This is why the Tribune wants the interview."

A.   Yes.

MS. OSTLER:  I think we have the wrong email.

MS. PEIRSOL:  Yeah.

MR. PINEIRO:  Oh.

MS. PEIRSOL:  I don't think this is right.

MS. OSTLER:  We have an email from Rebecca Garcia to Brent.

THE WITNESS:  Oh.  Yeah, that's -- I have his.

MS. PEIRSOL:  We'll keep -- we can keep this if you want and mark it later.

MS. OSTLER:  Do you have an email from Rebecca to Brent?

THE WITNESS:  No.

MS. PEIRSOL:  He has the correct document.

MS. OSTLER:  Oh, okay.  Are you going to

183

use this later?  Because we'll just hang onto it.

MR. PINEIRO:  Yeah.  I don't know which one you have, though.

MS. OSTLER:  Want me to --

MR. PINEIRO:  Yeah, just hold it there, and I'll figure it out.  For some reason -- you have the correct one?

MS. PEIRSOL:  Yes.

THE WITNESS:  I do.

MR. PINEIRO:  That's weird.

THE WITNESS:  It's because theirs didn't get a sticker.

MR. PINEIRO:  Yeah.  This is --
Let's go off.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:57.

(Recess taken.)

THE VIDEOGRAPHER:  Returning on the record.  The time is 2:10.

Q.   (By Mr. Pineiro) Okay.  Dr. Satterfield, during the -- during the lunch break, did you discuss your deposition with your counsel?

A.   No.
Oh, sorry.

MS. PEIRSOL:  Go ahead.  That's fine.

184

Q.   (By Mr. Pineiro) Yes or no?

A.   No.

Q.   Okay.  So this was 20.  Sorry.  No, that's not 20.  This was --

MS. OSTLER:  Eleven.

Q.   (By Mr. Pineiro) -- 11.  Right.  I got you the right document there.  Sorry.
So I'm showing you what's been marked as Exhibit 11.  And up top, there is an email from you to Ms. Webb on April 17th.
Do you see that?

A.   Yes.

Q.   It says:  "Jennifer, see email chain below.  This is why the Tribune wants the interview."
And then beneath that, it says:  "I received" -- it's an email from Ralph Costanzo to Michael Baumann.  Do you know who Mr. Costanzo is?

A.   Costanzo?  No.

Q.   Do you know who Mr. Baumann is?

A.   I remember the name, but that's it.

Q.   It says:  "I received the email below from Dr. Oliver.  He received perm"-- "permission from Mr. Lopans"-- "Lopansri to share it.  Dr. Lopansri is the ID medical director for all IHC and is

185

heading the ID/Lab subcommittee for the state of Utah.  As I told you yesterday, there is a distinct narrative circulating high up that our division is using a poor test compared to other options available to us and now we are -- we are going to even lose BioFire at St. Mark's."
Do you see that?

A.   Yes.

Q.   Do you know what -- do you know what "BioFire at St. Mark's" is a reference to?

A.   No.

Q.   "I hope you will share this info"-- "this with Heather Signorelli, as I am unsure that she truly understands the situation here."
Do you know who Heather Signorelli is?

A.   No.

Q.   "We cannot likely open up for business, especially for surgery, if our only option is Timpanogos if tho"-- "if this is going to be what it is" -- "what is communicated to our docs and the public at large."
So then if you go further down -- sorry.  The next page, there is an email from Bert Lopansri to Nate -- Nathan Checketts at the state of Utah and several other people.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

186

Do you see that?

A. Yes.

Q. Have you read this email before?

A. I have. I don't remember the details.

Q. Okay. I can just run you through it quickly.

A. Okay.

Q. It says: "Nate, I'm deeply alarmed with what I've heard about the TestUtah results if the numbers you reported are correct, and I appreciate you confirming the data."

Do -- do you know, by the way, who Nathan Checketts is?

A. No.

Q. Okay. "What alarms me the most is that they are expanding collection and testing with these unknowns about how their test performs."

And then a little further down, it says: "The major concerns that I have are the low percent positive and the high indeterminate rate."

Do you see that?

A. Okay. Sorry. I just was rereading one of the previous sentences.

Q. It's okay. It says: "The major concerns that I have are the low percent positive and the

187

high indeterminate rate."

Do you see that?

MS. PEIRSOL: And you can take your time --

THE WITNESS: I lost it.

MS. PEIRSOL: -- Brent, reading the document. Go ahead and -- if you need to read the entire document, you can. You can take your time.

THE WITNESS: Yeah, is that okay if I do that?

Q. (By Mr. Pineiro) Sure.

A. Okay. Okay.

Q. Have you read the document?

A. Yes.

Q. When he's talking about -- what does -- what does that "indeterminate rate" mean?

A. So an indeterminate rate means that the -- the test -- something in the test has -- sorry, I'm having this -- this post-lunch --

Q. That's okay.

A. -- fatigue.

All right. So an indeterminate is when the test is neither called positive nor negative; it's just you couldn't tell, something in the test or something in the testing setup. Usually it's a

188

failure in the sample preparation method that there is some extra chemicals present or the sample degraded or something prior to doing the test, and then the internal control tells you the result is not valid. You got to re-- need a new sample, or you have to repeat.

Q. Got it.

And so do you recall that this email from Dr. Lopansri was the -- part of the focus of the -- of the Salt Lake Tribune article on April 30th?

A. I don't know if this email was, but the difference in the rates of positives between Intermountain Healthcare and Timpanogos Regional Hospital were part of the Salt Lake Tribune article on the 30th.

Q. Got it.

And the data that he listed in the table below where he says: "I looked at the package inserts of the tests used in" -- "used in the state and the limit of detection data, which is summarized in the following table," do you know -- do you have any idea where he drew this data from?

A. Most likely the package inserts, but I -- I don't know specifically where.

Q. And the package inserts, what -- in terms

189

of the LOD, would it have the LOD that was submitted on the EUA?

A. Presumably.

Q. Okay. You can put that away.

A. Okay. That's -- you don't have any more questions on that one?

Q. No.

A. Okay.

MR. PINEIRO: This is 12?

(Exhibit 12 marked for identification.)

MS. OSTLER: Oh, it looks like this is the one that we had before.

MR. PINEIRO: Oh, okay. Well, you know --

MS. PEIRSOL: There you go. Figured it out.

MS. OSTLER: So we still have those.

MR. PINEIRO: Yeah. That's fine.

Q. (By Mr. Pineiro) So the first page of the exhibit, there is an email from Rebecca Garcia to you on April 20th.

Do you see that?

A. Yes.

Q. And the subject is: "Article with Chad's revisions."

And the attachment -- I guess the name of

May 16, 2023                                    Confidential                    Brent Satterfield, Ph.D.

190

the attachment is: "BioTechniques' COVID article."
Do you see that?

A. Yes.

Q. Do you recall what this article was?

A. The -- just from having glanced at it briefly, Rebecca was writing up a study on COVID. Outside of that, I don't remember what it was about.

Q. And then it says: "You will see in the notes, starting in the abstract, that he's suggesting changing the sensitivity and specificity."
Do you recall what that was about?

A. No.

Q. Okay. So if you go to the abstract, which is like two pages in, you can see that this is -- this document's red-lined, but in the abstract, there's a -- a section that says: "The performance characteristics show" -- and it appears that it was changed to "99.52 percent sensitivity and a hundred percent specificity."
Do you see that?

A. Yes.

Q. Do you know who made these edits to this document?

A. I do not, but Rebecca did say that it was

191

Chad who'd made those edits, and Chad Apuli, "CA" are his initials, so it -- it looks like he made comments on those sections.

Q. Okay. And are these comments -- do you remember editing this document at all?

A. No.

Q. There's -- there's some comments here on the side that says: "BS." You can see it -- it's numbered like BS5, BS6.

A. Okay.

Q. Is that -- is that you?

A. Probably.

Q. But you don't remember -- do you remember the purpose of preparing this document?

A. We wanted publications with our data, and Rebecca was willing to write up the data we already had internally. From the numbers reported here, the 99.52 percent sensitivity and the 100 percent specificity, it looks like she was just writing up the data we'd already published in the FDA EUA.

Q. If you'd just go, like, to the last page.

A. Uh-huh.

Q. So if you go to the discussion page, in the beginning, there is -- it says: "Early diagnosis of COVID-19" --

192

A. Okay.

Q. -- "remains dependent on detection by RT-PCR tests. The type of technology incorporated in the RT-PCR test determines the sensitivity and specificity of the assay. The use of cooperative technology like CoPrimer show promising levels of sensitivity and specificity for detection of COVID-19 and other" -- "other pathogens."
And then it previously said: "During the window period or early stages of infection."
Do you see that?

A. Yes.

Q. And then that was struck out.
Do you see that?

A. Yes.

Q. It seems like you commented: "We did not show this for COVID-19 with the data presented. Word differently if we say this at all."
Do you -- do you recall what you meant by that?

A. I don't remember what I had meant at the time. I can tell you what I think now.

Q. Yeah. What do you think now?

A. That the data that -- the data in the tables that we just kind of passed by really quickly

193

did not prove that we could detect the window-period infection or early stages of infection. There was no data in there to suggest how it would perform in that period of time.

Q. Following -- I guess this report was dated -- I guess this email is -- is April 20th. After April 20th, did you -- did Co-Diagnostics receive any data indicating promising levels of sensitivity and specificity during the window or early stages of infection?

A. I don't know that we ever did studies on that time period, no.

Q. And why -- why wouldn't you?

A. Because we were busy selling tests to countries that had validated our test.

Q. So does -- there's -- there's -- there was no utility to examining whether the test is picking up, you know, COVID positives during the window or early stages of infection?

A. I imagine that if -- if we had wanted to target blood screening, there would have been a lot of utility in doing that. But blood screening for COVID would have been a very limited market to us and a highly regulated market, so it made more sense for us and our investors to focus on the sales that

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

194

we could get without having to do any additional work.

Q.   All right.  And how would you -- so you -- at this point, you were satisfied with the performance of the test and you -- it wasn't -- the company didn't really consider there to be a need to examine whether the test was performing appropriately during those early stages?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  Can you repeat the question?  I'm sorry.

MR. PINEIRO:  Can you repeat that for him?

(The requested portion of the transcript was read back by the court reporter.)

MS. PEIRSOL:  Same objection.

THE WITNESS:  That is -- that is such a long question.  Can you break it down for me?  I've got a little bit of after-lunch brain fog.

Q.   (By Mr. Pineiro)  At this point, you were satisfied with the performance of the test?

A.   Yes.

Q.   Okay.  And you didn't see a need to examine how it was performing during the window period?

195

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I did see a need.  I would have loved to have examined that.  But we were too busy selling tests to customers that wanted them.

Q.   (By Mr. Pineiro)  Is there any relationship -- strike that.

Isn't it relevant to the customer that the test appropriately pick up COVID during the early stages of infection?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I can't say what the customers or the patients would ultimately want.  What I can say to the science of that is that people who show up based on our FDA EUA criteria of being symptomatic, that those people are not in the window period of infection.  They have, generally speaking, a large amount of virus.  By "large amount," I mean hundreds of thousands of copies present.  All we need is one.  And so, no, we didn't see a need.

Q.   (By Mr. Pineiro)  So people who are positive but asymptomatic might fall within this window period?

MS. PEIRSOL:  Objection.  Misstates his

196

testimony.

THE WITNESS:  Okay.  One more time, the question.  Sorry.

Q.   (By Mr. Pineiro)  Do people who are asymptomatic sometimes fall within this window period?

A.   People who are asymptomatic can fall within that window period, yes.

Q.   Okay.  Or people who eventually -- strike that.

Is the window period basically when somebody's in the beginning of just having gotten the infection?

A.   The -- the window period refers to the moment in time between when somebody gets an infection and when it can be detected by a test.  When somebody is first infected by COVID, there is no test that we know of today that can detect it.  It's --

Q.   So the -- the window period is when you -- when you get COVID and when it's detected?

A.   Between those two time points, between when you get it and between when there is enough present to be detectable.

Q.   But -- but the window period is going to

197

differ between tests, right?

A.   In theory, it differs between tests.  For the amount of difference in the limit -- limit of detection between different types of PCR tests, at least the ones that were submitted to the FDA, that window period should have been just a few hours in length.  And so the probability that somebody without symptoms chooses to be tested is so low that it has a negligible effect or a near negligible effect on clinical sensitivity.

Q.   Now, given what you had been hearing in TestUtah, didn't that raise any red flags regarding detection during this window period?

A.   What -- what we were hearing about TestUtah?  What specifically?

Q.   Oh, about -- about the -- the false negatives that were being received -- the -- the diminished percentage of positives compared to other communities.

A.   Thank you for rephrasing.

So never at any time were they called false negatives by us or I believe by even our critics.  They were asking what the difference in those rates of positives were.  And for us, there was never any question of what the difference in the

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                    Brent Satterfield, Ph.D.

### 198

rates was.

I was a little bit upset that a fellow scientist -- now, it's one thing for business people to -- to make comments that they have no knowledge about. But scientists, we kind of operate on a different principle. We tend to work with each other for the greater good of humanity, we tend to work across company lines, to the degree that our management allows us, because we -- we want to help people. And that being said, it really upset me that Bert Lopansri specifically would make a comment disparaging our test and Timpanogos Regional Hospital when everyone knew that TestUtah was using a questionnaire that was different from what the CDC recommended. TestUtah was openly criticized for using a different questionnaire than what the CDC recommended, and yet the first thought for him was that the test might be the problem. It -- it shocked me that the most obvious answer was not one that he was suggesting in his long email.

Q. Were there other tests at this time that were able to detect COVID-19 in the early stages of infection?

MS. PEIRSOL: Objection. Calls for speculation.

### 199

THE WITNESS: I -- I don't know. I'd have to speculate.

Q. (By Mr. Pineiro) You weren't evaluating the performance of your competitors?

A. We were aware of what our competitors had publicly published.

Q. Okay. And any of the public data that was published, did it indicate that any of the competing tests had the ability to detect COVID-19 in the early stages of infection?

A. To my knowledge, nobody was making those claims.

Q. Was it showing up in any of the data?

A. No.

MS. PEIRSOL: Objection. Vague.

Q. (By Mr. Pineiro) Did -- did you answer?

A. I apologize. Can you repeat the question one more time?

Q. You said nobody was making those claims. And my question is: Was that showing up in any of the data --

MS. PEIRSOL: Objection --

Q. (By Mr. Pineiro) -- that they were able to --

MS. PEIRSOL: Sorry.

### 200

Q. (By Mr. Pineiro) -- that they were able to detect COVID-19 in the early stages of infection?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: To my knowledge, no one was looking at -- was looking at that question. Although Bert Loprans-- Lopansri brings up the theory in his email of, hey, maybe -- no one was looking at limit of detection as it applied to clinical sensitivity yet.

Q. (By Mr. Pineiro) Say it again. Nobody was looking at limit of detection as it pertains to clinical sensitivity?

A. Right.

Now, he's asking a question: Could it affect it?

Q. And what's the answer?

A. The answer in theory is that anything can affect a test until you've ruled it out.

Now, for us, as the data shows in the white paper that I published with data from TestUtah, the answer for the -- the rates of positives -- the difference in rates of positives was 100 percent due to the questionnaire, that they were using a different definition of symptoms than

### 201

Intermountain Healthcare. And that different definition of symptoms, such as people saying that they were tired, was a really loose definition compared to the CDC's definition which says they have a fever, they've lost their sense of taste and smell, and at least at one point in their questionnaire that they'd come in contact with somebody who'd had COVID. So the number of positives you'd expect from the CDC questionnaire is much higher than that from Timpanogos Regional Hospital who's using TestUtah's definition.

And when TestUtah changed their definition, according to what the state recommended them do, they started seeing the same number of positives. So this entire email chain and everything about it and all the speculation is completely irrelevant because we discovered that there was no problem with the test, there was no problem with the way that Nomi Health set up their system, there was no problem with how Timpanogos was running the test. The only problem was that there were two different definitions of "symptomatic."

Q. Got it.

A. And I'd be -- love to give you that answer again.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

202

Q.   Yeah.  No, I'm sure.

So -- so in your view -- you said that, abstractly, limit of detection might be material.  But -- but with respect to CODX's test, the limit of detection wasn't impacting its performance?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  The only thing that we were able to state is what the data was giving us, and what we were seeing is that in the data we submitted to the FDA at that time, the contrived data was 99.52 percent sensitive, 100 percent specific.  And in the handful of studies that we got back that we had permission to put into our press release, we had a hundred percent concordance, meaning in the clinical sensitivity and clinical specificity, we were seeing a hundred percent sensitivity, a hundred percent specificity in those data sets.

Q.   (By Mr. Pineiro)  Okay.  But was the limit of detection impacting your -- the performance of your test?

A.   I don't know.

Q.   You don't know?

A.   Limit of detection, along with all kinds of factors, is going to impact the test.  That being

203

said, the clinical sensitivity that we were seeing in these studies of a hundred percent, it -- it clearly wasn't detracting from the clinical sensitivity or the specificity in those studies that we were getting back.

Q.   What about the South Africa email I showed you where it showed that you were getting low sensitivity rates there?

A.   I could not --

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I could not speak to the South Africa results.

Q.   (By Mr. Pineiro)  Is that because you cherry-picked your data?

MS. PEIRSOL:  Objection.  Argumentative.

Q.   (By Mr. Pineiro)  Is that what you -- isn't that what you guys did?

MS. PEIRSOL:  Objection.  Argumentative.

Q.   (By Mr. Pineiro)  You picked the tests that were -- that were great for you, you put them in a repor-- in a press release, and then you issued it, right?

MS. PEIRSOL:  Objection.  Misstates the evidence and argumentative.

204

THE WITNESS:  In science, when you exclude runs from labs like India that have contamination, that's not considered cherry-picking.  It's considered including data that has been run according to a certain standard.

Q.   (By Mr. Pineiro)  So you only -- you only ran data according to a certain standard?

MS. PEIRSOL:  Objection.  Misstates his testimony.

Q.   (By Mr. Pineiro)  You only provided data that was obtained based on certain standards?

A.   We provided data from studies in which fresh sample was used, there was a gold standard that has been universally accepted as being high quality, and there is a tiebreaker for that.  What we found is that when labs, countries, distributors, whomever, run studies that don't include those three elements, they're more likely to have problems with their data.  When somebody comes back to us with data that is outside of the confidence interval -- and if it was a little bit outside, that's one thing, but to come back with data that is like -- I forget what the South Africa one was, but it's way outside of the confidence interval, so far outside --

205

Q.   The South Africa one or the India one?

A.   The South Africa one.  Both.

Q.   Okay.  I thought that you don't remember getting that data.

A.   We just --

MS. PEIRSOL:  Objection.  Argumentative.  Misstates his testimony and the evidence.

THE WITNESS:  You just reviewed that email with me a few minutes -- or a couple hours ago.

Q.   (By Mr. Pineiro)  Right.  No, but at the time, you didn't -- at the time that you -- you never even saw that email, right?  You weren't copied on it?

A.   I don't know if I ever saw it or not, but I don't remember seeing it.

Q.   Do you know if anybody made a decision on the May 1st press release on whether to include that -- that data?

A.   I don't know.

Q.   Okay.  Should somebody have?

A.   If I were in charge of the decision, I would not have chosen to include it.

Q.   Why not?

A.   Because the data -- the data -- we have no knowledge of what that study was, what was done.

May 16, 2023                                   Confidential                         Brent Satterfield, Ph.D.

### 206

Even our salesperson who's not a scientist could pick apart the problems with the data that we were given.

Q.   Well, why didn't you inquire further?

MS. PEIRSOL:  Objection.  He just told you he doesn't remember that -- he didn't see the email at the time.

Q.   (By Mr. Pineiro)  Shouldn't they have inquired further?

MS. PEIRSOL:  Objection.  Argumentative.

Q.   (By Mr. Pineiro)  Shouldn't they have?

MS. PEIRSOL:  Calls for speculation.

Q.   (By Mr. Pineiro)  You're the chief scientist off-- you're the chief scientist of the company.  Shouldn't they have inquired further?

MS. PEIRSOL:  Objection.  Argumentative.  Calls for speculation.

Q.   (By Mr. Pineiro)  You can answer.

A.   I don't know if anyone inquired further.  However, in my conversations with the salespeople, they took every comment from a distributor or a potential distributor seriously, and they worked with every distributor who was willing to be worked with.  They did also prioritize.  If a distributor had little to no background in PCR and was not

### 207

willing to troubleshoot the process that the lab used who was running the study, then the distributor -- then our salespeople would spend their time talking to distributors who would do those things so that we could make sales because that ultimately is what our company does, makes sales because that helps people in the world and make sales because that creates revenues which benefit the company and our shareholders.

Q.   Okay.  When -- when that press release was put together -- strike that.

Has -- did every single prospective customer end up agreeing to buy CODX's test?

MS. OSTLER:  Calls for speculation.

MS. PEIRSOL:  Yeah.

THE WITNESS:  I -- I wouldn't know the answer to that.

Q.   (By Mr. Pineiro)  Okay.  Are you aware of any customers rejecting the purchase of the test?

A.   Not at the moment.

Q.   Not at the moment.  Okay.

And who would have that information?  The salespersons, probably?

A.   The sales -- I would assume the salespeople would have that.

### 208

Q.   And if the test -- if somebody elected not to purchase the test, would they report that to somebody?  Do you know?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I don't know what they would report or not report.

Q.   (By Mr. Pineiro)  Would they report it to the science department?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I can't see any reason why they would.

Q.   (By Mr. Pineiro)  Why?  What if the test is being rejected because it didn't -- didn't perform well?  Wouldn't the science department want to know about that?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I just have to say, I wouldn't -- wouldn't know.

Q.   (By Mr. Pineiro)  Aren't you the chief science officer?

MS. PEIRSOL:  Objection.  Argumentative.  Asked and answered.

### 209

Q.   (By Mr. Pineiro)  Wouldn't you want to know?  Wouldn't you want to know that -- if the test is being rejected because of poor validation results, wouldn't you want to know that?

A.   I think the way that you're asking the question doesn't reflect the situation at the time.  I personally was sick of startup distributors who'd never had experience with PCR and startup labs who'd never had experience with PCR trying to run our tests and getting results that weren't favorable because they'd never run a PCR test before.  We were spending way too much time with labs who didn't know what they were doing.

When -- when we spent time with labs who did, they either got the study results right the first time or they were willing to work with us quickly to get the job done, and we had a large amount of sales distribution as a result of those -- those contracts.  I felt that a lot of these contacts were wasting our time because they just didn't know what they were doing.

Q.   Okay.  So to the extent that a comp-- a distributor or a customer ended up rejecting the test or there was bad validation data, it probably was because they were inexperienced in knowing how

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                     Confidential                     Brent Satterfield, Ph.D.

210

to run the test?

MS. PEIRSOL:  Objection.  Misstates his testimony.  Calls for speculation.

MS. OSTLER:  Compound.

THE WITNESS:  I took every piece of information that the sales team brought to me with the utmost seriousness.  We worked with every customer that brought us information and feedback like they were the only customer we had.

That being said, I wasn't disappointed when some of them decided they didn't want to go through the process of troubleshooting not our test but their equipment, their process, their sample preparation, their lack of experience.

MR. PINEIRO:  This is 13?

THE COURT REPORTER:  Yes.

(Exhibit 13 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you what's been marked as Exhibit 13.  There is an email from you to Mr. McPherson on April 21st.  The subject matter is:  "COVID-19 LOD."

Do you see that?

A.   Yes.

Q.   Okay.

MS. OSTLER:  This document doesn't have a

211

Bates number.  Do you have a Bates-numbered one?

MR. PINEIRO:  Oh, I have one, yeah.  It's --

MS. OSTLER:  Would you mind reading it?

MR. PINEIRO:  -- 4861.

Q.   (By Mr. Pineiro)  It says:  "Matt" -- do you recall having a conversation --

So it says:  "Matt, as I mentioned on the phone."

Do you recall having a conversation with Mr. McPherson around this time?

A.   No.

Q.   Okay.  And who's Mr. McPherson?

A.   From the email, somebody at MountainStar Health, but I'm just reading that off of the line.

Q.   It says:  "Matt, as mentioned on the phone, our official LOD reported to the FDA in our EUA is 4.29 copies per uL with a sensitivity of 99.52 and specificity of a hundred percent."

Do you see that?

A.   Yes.

Q.   So it seems like Mr. McPherson was asking you about the limit of detection of the test?

MS. PEIRSOL:  Objection.  Calls for speculation.

212

THE WITNESS:  Yeah, I don't know what he's asking about.  We don't have the other part of the email here or the phone conversation or wherever this came from.

Q.   (By Mr. Pineiro)  Okay.  It seems like you mentioned -- you were saying:  "As mentioned on the phone."  So it seems like you mentioned on the phone -- you were talking about the LOD in the EUA, right?  That's what this email says, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.

THE WITNESS:  I have no idea what we were talking about on the phone.

Q.   (By Mr. Pineiro)  Okay.  You say:  "I've also attached some data, confidential, from the FDA EUA submission of one of our clients using our test alongside the Minnesota DOH that shows we have equivalent sensitivity to them."

Do you see that?

A.   Yes.

Q.   You're familiar with that data?

A.   From the Minnesota Department of Health?

Q.   Yeah.

A.   I remember seeing it at one point, but it's been a few years.

213

Q.   So then further down, you say:  "As to improving our reported LOD, here's what I have seen."

Do you see that part?

A.   Yes.

Q.   Was it a concern at this point in time what the reported LOD was?

A.   Not from a clinical sensitivity perspective.  But for Timpanogos Regional Hospital and TestUtah, they were taking fire from the media over the leaked information from Bert Lopansri, and everyone said -- or thought -- I shouldn't say "said" -- everyone thought that we -- it would make life a lot easier if we simply collected the rest of the data that showed that our limit of detection was better than what we stated it was and put out that data to the FDA and then no one would have anything to talk about anymore.

Q.   Got it.

So effectively it was almost like a PR issue, public relations issue?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  For a lot of these conversations, the main focus in updating the limit

Lindsay Payeur, RPR
DepomaxMerit Litigation Services

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

214

of detection was a PR issue.

MR. PINEIRO:  This is 14?

(Exhibit 14 marked for identification.)

Q.   (By Mr. Pineiro)  So in the top email, there is an email from Cameron Gundry to several people, and you see that you're copied on it?

A.   Yes.

Q.   And it's sent to Laura Benzonana.  Do you know who that is?

A.   No.

Q.   Okay.  Are you familiar with the company Biodynamics?

A.   No.

Q.   It says:  "Laura, we will call you via WhatsApp in a few minute" -- "a few min.  I will be with Chad.  It is very hard to believe this is systemic [sic]" -- sorry, and the subject matter is: "Customer complaint:  New results from lab, lot 179, problems again."

Do you see that?

A.   Sorry, I was --

Q.   Up top.

A.   Okay.  Back up top.

Q.   Well, I was just pointing out the subject matter of the -- of the email.

215

And it says:  "It's very hard to believe this is sys"-- "systematic contamination due to the late Cq's and still lack of very many NC."

What's a "late Cq"?  Do you know?

A.   It's -- sorry, I'm still processing the rest of it.

Q.   Okay.

A.   I'll come back to this question in just a second, if that's okay.

Q.   Yeah, do you need to read it?

A.   Yeah.  I just wanted to get a sense for our email chain here.

Q.   Have you reviewed the email now?

A.   Yes.

Q.   Okay.  So what is -- do you know what's meant -- what's a -- what's "late Cq"?

A.   "Late Cq" means that in the amplification -- now, I can't say what Cameron's referring to specifically, but in general, "late Cq" means that the signal comes up later in the amplification cycle.

Q.   Got it.

And it says:  "Still very many NC."

Any idea what that is?

A.   "NC" stands for "negative controls."  And

216

you would ask about negative controls whenever you're evaluating a potential contamination in a batch of reagents because it is by running negative controls that you prove contamination.  And it looks like Cameron was not convinced that they'd run very many negative controls.

Q.   It says:  "Our lot had no contamination detected, and we can directly confirm here with retained tubes."

What's a "retained tube"?

A.   So under FDA quality system guidance, generally a tube of the manufactured batch is maintained in a storage freezer so that later on if there are problems with a batch of -- of tests, the manufacturer -- in this case, us -- can go back to that tube of tests, test it, and evaluate whether there, in fact, was a problem with that batch and, if so, improve the process of manufacturing.

And so what Cameron is saying here is that the -- in the manufacturing record, there was no contamination, and there was still a batch of -- or a tube of tests from that batch that was in the freezer somewhere that they could go back to and test to verify whether or not the contamination happened in manufacturing on our site or whether

217

they contaminated on their site.

Q.   Right.

And he references:  "Systemic [sic] contamination."

What's the difference between that and just, like, the contamination we've been discussing here?

A.   I'm not certain what he meant by the adjective "systematic."

Q.   Okay.  And do you recall receiving this email from Mr. Gundry?

A.   No.

Q.   Do you recall this customer complaint from Biodynamics?

A.   No.

Q.   Okay.  If you go to the last page, you can see there's an email from Ms. Benzonana to Mr. Gundry that says:  "New results from lab."

It says:  "As promised, here are the results from a new run, including appropriate controls.  In this case, they saw three positive results.  Two of the three results were confirmed by Certest and Primer Design, but the third one showed up negative with the other two kits."

Do you see that?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

218

A.   Yes.

Q.   What does that mean?  Do you know?

A.   I can't say what she meant by this, but this whole email chain is discussing potential contamination of a manufactured batch.  Based off of the data that Cameron presented, it's most likely that the customer contaminated the test because if there is no contamination in the original manufactured batch, then it -- it shows that we didn't manufacture it incorrectly.  But even if there was contamination on our end, it still has absolutely nothing to do with sensitivity, specificity, and limit of detection, it is simply a bad batch.  It happens all the time in manufacturing processes.  You have a quality system to help you catch it, to work through and make sure it doesn't happen again, and you send out a new batch because it's so easy to fix.  Just like that, you ship a new batch.  Problem solved.

Q.   And so if you go to the -- the next page, there is an email from Ms. Benzonana to Cameron again. It's dated April 24, 2020.  Do you see that? Seven -- 7:17 a.m.?  It's probably the -- it's like the third page.  It's the third-to-last page. Towards the bottom right there.

219

MS. OSTLER:  Are you talking about 4909?

MR. PINEIRO:  Yeah.

MS. OSTLER:  It says 4909 on the bottom.

THE WITNESS:  I got it.

Q.   (By Mr. Pineiro) It says: "Hi, Cameron. Thank you for the swift response, but unfortunately the situation has gone from bad to worse.  After the run that you saw yesterday where all seemed well, the lab performed a test today that was riddled with false positive results.  The only logical explanation is that there is an issue with lot 179."

And a "lot" is what?  That's a -- that's a batch of -- of -- of samples?

A.   A "lot" -- yes.  I -- I don't have the exact definition because I'm not in the -- the regulatory, but it refers to something like a batch of samples.  I don't know if it's the whole batch or if it's like a subdivided batch.

Q.   And it says: "Specifically they tested a batch of samples with lot 179, and the results revealed eight positive samples.  They then used the Cepheid platform, Certest and Primer Design to confirm the results from the Logix Smart test. Logix Smart showed eight positive results, and only one was confirmed with the reagents.  The results

220

from Cepheid, Primer Design, and Certest were all identical to each other, showing only one positive sample."

So what does that mean, then?  What's being described there?  So Logix Smart showed one positive result, only one confirmed, and the other tests were accurately only picking up -- were -- and the other three tests that are mentioned only picked up one positive sample?

A.   So without seeing the data, I couldn't state for certain.  But, again, this whole email chain deals with contamination, and this woman is effectively asking for us to give them a reimbursement, a replacement batch of tests because the customer is always right.  Even if they contaminated it, it's easier for us to just send them a replacement batch and not ruin the relationship.

Q.   And it says:  "As you can understand, this has created huge problems for us" -- strike that.

If there was contamination, wouldn't it also have impacted the results from Cepheid, Primer Design, and Certest?

A.   Depends on what's contaminated.  So, for instance, if they contaminated the actual tube of

221

reagents itself, then none of the other ones would see that contamination.

Q.   And here, it's not clear whether that's the case?

A.   From the email chain, it's what she seems to believe is the problem.  And Cameron, as the salesperson, didn't question that there was contamination, the only thing that's being questioned is whether they did it or whether we did it.

Q.   It says: "As you can understand, this has created huge problems for us and is putting our credibility in jeopardy.  This lab is the biggest private diagnostic lab in Greece, a key opinion leader and the second-highest-grossing client for Biodynamics.  Currently of the 52 kits we have sold, 42 kits went to them, and the remainder of our stock was earmarked for them.  The lab has decided to stop using our kits, and we are fighting tooth and nail to convince them that this is an isolated event. But we need your help and assurance that this will not happen again."

Do you see that part?

A.   Yes.

Q.   Do you have any knowledge of whether this remedy was -- whether CODX got to the bottom of this

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

222

and figured out what happened with these -- with this lot?

A.   I do not have any present knowledge.  I'd have to talk to the salespeople.  But, again, with both Cameron and this woman agreeing that it's contamination, it's a real easy fix to just ship out a new batch of product.

Q.   But on the first email, if you go to the front -- the first page, Cameron is saying:  "It's very hard to believe this is systemic [sic] contamination."

So he -- is he -- he's not indicating he thinks it's contamination, right?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  So I can't state for certain what Cameron was referring to here.  What I -- what it appears that he is saying is that he doesn't believe that we contaminated the batch, he doesn't believe it came from our side.  And he's having a hard time telling this customer who is upset that they contaminated our test because he doesn't want to lose the relationship with that customer, doesn't want to lose the sales.  But at the same time, we didn't do it, as evidenced by the -- the batch

223

that's kept in the freezer.  I mean, that's why the FDA encourages you to keep these things, so you can monitor, you can see where in the whole chain of custody did it go wrong.  It wasn't on our watch.  That being said, Cameron's treading ultra carefully to preserve a customer to keep sales for our company and our shareholders.

Q.   (By Mr. Pineiro)  How do you know that?  How do you know he's treading carefully?

A.   I don't know that for certain.  However --

Q.   You're guessing?

A.   I'm speculating based on the information that's contained in this email.  As I stated at the beginning, I don't know for certain.

Q.   He says:  "It's very hard to believe this is systemic [sic] contamination due to late Cq's and still very" -- "still lack of very many NC."

Doesn't that have to do with contamination on their end?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  Do you want me to speculate or not?

Q.   (By Mr. Pineiro)  Well, you can speculate when -- when you want to, right?  But -- I mean,

224

you're the -- you're the chief scientist.  What did you interpret this to mean?  Or what do you interpret this to mean?

When he says:  "It's hard to believe this is systemic [sic] contamination due to late Cq's and still very many NC," do those two issues, late Cq, very many NC, do they have to do with contamination in the lab or in the batch as sent from CODX?

A.   It appears that's the question he's asking.

Q.   Well, he's not asking, he's saying it's hard to believe, right?

A.   You're right.

Q.   So he -- he appears to be indicating it's hard to believe there's -- there's contamination in the lab, and we didn't have any contamination with our lot, which we've confirmed.

That's what he's saying here?

MS. PEIRSOL:  Objection.  Misstates the evidence.  Calls for speculation.

Q.   (By Mr. Pineiro)  It appears that's what he's saying here, right?

MS. PEIRSOL:  Same objections.

THE WITNESS:  I've speculated all I feel comfortable speculating at this time.

225

Q.   (By Mr. Pineiro)  You need to answer the question, though, to the best you can, right?  So he's talking about contamination -- he's ruling out -- or he's saying it's hard to believe there's contamination at the lab, correct?  He appears to be saying that, right?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  What he does say is that the batch made at the lab "had no contamination" -- just quoting his email verbatim, "had no contamination detected."

Q.   (By Mr. Pineiro)  Yeah.  And then --

A.   And we can confirm with the batch that's still in the freezer.  So he's saying there's an easy fix for us to know whether contamination happened on our end, and it's unlikely because when it went out, there was no confirmation --

Q.   Right.

A.   -- but we can confirm it.

Q.   But then he's also saying it's hard to believe it's systemic -- it's contamination at the lab, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.  Calls for speculation.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                Confidential                Brent Satterfield, Ph.D.

226

Q.    (By Mr. Pineiro)  It seems that's what he's indicating to you.  I mean, he emailed you -- he emailed you this email, right?

MS. PEIRSOL:  Same objection.

THE WITNESS:  What I understand from this is that he's saying that it's hard to believe that we contaminated that sample or those tests.  The data doesn't indicate that.

Q.    (By Mr. Pineiro)  But I thought that you indicated that his reference to late Cq's and very many NC has to do with lab contamination, not -- not from the lot sent by CODX.

A.    You're talking about from the other side?  Or what do you mean?

Q.    Yeah.  Sure.  I mean, my understanding is our lot had no contamination, right, detected, right?  It says that.  So that's indicating that when you sent the batch, it was good, because there's retained tubes --

MS. PEIRSOL:  Objection.

Q.    (By Mr. Pineiro) -- right?

MS. PEIRSOL:  Calls for speculation.  Misstates the evidence.

THE WITNESS:  The words "our lot had no contamination," to a scientist, would mean that when

227

it left, there was no evidence of contamination --

Q.    (By Mr. Pineiro)  Right.

A.    -- on our end.

Q.    Right.  So then -- okay.  So it's clean when it leaves CODX, and then it gets to this new lab, right, over in Greece, right?  Where are the possible places that then the sample can be contaminated before -- what are the possible ways it could be contaminated before, then, you have these tests run?

A.    Anybody who touches it.

Q.    Okay.

A.    I mean, so that -- that could be -- now, presumably it's in a cold icebox taped up, so hopefully the shipping company wouldn't get in there, but they could.  So the first place where we might suspect introduction of contamination is with the distributor who pulls it out of the -- the cold box and then handles it to repackage it, reship it.

The second place where it might happen is at the lab itself, their customer site.  And since their customer's performing PCR, meaning every single tube that is positive, creating a trillion or more copies of template, to the extent that there is contamination or might be contamination present,

228

that would be the first place I would look.

Now, I have no way of knowing --

Q.    Right.

A.    -- where that would be introduced, but that would be the first place I would start.

Q.    And you don't have personal knowledge of how this was ultimately resolved one way or the other?

A.    No.

Q.    Do you recall doing any follow-up to this email?

A.    I don't recall this email at all.

Q.    Okay.  And when you issued the May 1st press release, was there -- were there any conversations about how to deal with this complaint from a customer?

MS. PEIRSOL:  Objection.  Calls for speculation.  Misstates the evidence.

THE WITNESS:  I don't know if there were any conversations about it.  I would not have talked about it.

Q.    (By Mr. Pineiro)  Okay.  Did you bring this up to anybody in connection with the preparation of that press release?

MS. OSTLER:  Objection.  Foundation.

229

THE WITNESS:  I don't remember this email to know whether -- that I -- you're asking if I brought it up to anybody in connection with the press release, and I'm just -- I don't remember the email at all.  So --

Q.    (By Mr. Pineiro)  All right.

A.    -- I couldn't say.

MR. PINEIRO:  This is 15?

(Exhibit 15 marked for identification.)

Q.    (By Mr. Pineiro)  So I'm showing you a document that's been marked as Exhibit 15.

A.    Sorry, I'm just flipping through really quick.

Q.    Yeah.  So there is an email on the front from Jennifer Webb.  It says, on the front: "See attached and below.  Can we get on a call to discuss?"

A.    I'm not quite ready yet.  Sorry.

Okay.

Q.    The email says -- it's from Ms. Webb to you, Mr. -- both Egans.  Do you see that?  And it says: "See attached and below.  Can we get on a call to discuss?"

And then there's what appears to be a blurb that says: "Jennifer, fair question.  Please

Lindsay Payeur, RPR
DepomaxMerit Litigation Services

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

230

see the attached spreadsheet and email from the state. We found a 2 percent positive rate for symptomatic patients only at TestUtah, while the state positive rate, excluding TestUtah, was" -- "was about 5 percent over that period."

Do you see that?

A. Yes.

Q. Okay. Do you recall having a conversation with Ms. Webb about this inquiry from the press?

A. Not specifically, no.

Q. Do you recall having -- do you recall any conference calls or in-person meetings to discuss a coordinated response to this press inquiry?

A. No.

MR. PINEIRO: Sixteen.

(Exhibit 16 marked for identification.)

Q. (By Mr. Pineiro) So this is an email from Jennifer Webb to you on that same date, April 29th. It says: "See the email" -- in the subject area, it says: "See the email. He's fact-checking Brent's attributed comment."

Do you see that?

A. I see that subject line.

Q. Okay. And you don't remember giving a specific comment to the reporter at the Salt Lake

231

Tribune?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: Not at this time, no.

Q. (By Mr. Pineiro) Okay. So it says: "Brent Satterfield, the founder and chief" -- this appears to be an excerpt from an article. Does that appear accurate?

A. Give me a second with it.

It's taking me longer. I'm just -- it's that after-lunch fatigue. I apologize.

Q. I mean, I'm going to walk you through it. Why don't you let me walk you through it --

A. Okay.

Q. -- so that way we --

A. I'll have to look at it anyway.

Q. That's fine.

A. Okay. I remember the part about the nose bleeds.

Q. Okay. So it says: "Brent Satterfield, the founder and chief science officer of Co-Diagnostics, said the only explanation for the discrepancy is that TestUtah is serving a different population than other testing centers. He noted TestUtah has provided diagnostics to anyone even if

232

they have mild or no symptoms."

Do you see that?

A. I see what it says.

Q. Do you remember, why was this email sent to you? Do you have any knowledge?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: No, I don't.

Q. (By Mr. Pineiro) Okay. I mean, was -- was -- did Ms. Webb ask you -- was she asking you to verify that these are the comments that you were making on the record?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I have no idea. This -- this late in the game three years later, I mean, it's just -- looks like she copied what looks like an article and sent it to Ike and myself and didn't explain why.

Q. (By Mr. Pineiro) When -- you did speak -- you do recall speaking to a Salt Lake reporter, correct?

A. Yes.

Q. And did -- did he tell you that your conversation was on the record?

233

A. I don't remember what he would have told me.

Q. Was -- did you ever indicate it was off the record?

A. No.

Q. Okay. And so it says here, in the fourth paragraph: "There have been no complaints from Euro"-- "European countries where Co-Diagnostics has sold the majority of its tests."

Do you see that?

A. Yes.

Q. But just, you know, a few moments ago, I showed you a customer complaint from Greece, didn't I?

A. (Witness nods head in the affirmative.)

Q. Okay.

A. Yes.

Q. So this isn't accurate, right?

MS. PEIRSOL: Objection. Misstates the evidence.

Q. (By Mr. Pineiro) Is this accurate based on the Greece complaint that I just showed you?

A. So right now, this is not a quote from me, this is the journalist writing up -- I mean, there's no quotes, I don't see, anyway. And so the

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

234

journalist is summarizing a conversation that presumably we had, and in that context, I would have given no complaints. With regard to the clinical sensitivity and clinical specificity, the journalist clearly did not include that context here.

Q.    You don't remember the conversation, though, right?

A.    I don't remember the conversation.

Q.    Right. And what he wrote down, what the journalist appears to have wrote down is that you indicated there have been no complaints from European countries --

MS. PEIRSOL:  Lack of foundation.

Q.    (By Mr. Pineiro) -- correct?

MS. PEIRSOL:  Objection. Lack of foundation. Misstates the evidence.

THE WITNESS:  I don't know what I told the journalist specifically that would have caused the journalist to write this. I only know the information that I had available to me at that time.

Q.    (By Mr. Pineiro) Got it.

Did you -- you received this on the 29th. The actual Salt Lake Tribune article was posted on -- published on the 30th, right?

A.    I don't know if this is from a previous

235

article or for content that was to be posted for the 30th.

Q.    Okay. Did you -- well, the email indicates that there is fact-checking going on, right? The subject line?

A.    That's what the email says.

Q.    Right. Okay. And so do you recall whether in response to this you contacted Jennifer Webb and told her that the statement "there have been no complaints from European countries" isn't exactly correct?

MS. PEIRSOL:  Objection. Asked and answered.

THE WITNESS:  I don't remember talking to Jennifer about this email. I don't remember the context of it, anything of that nature.

Q.    (By Mr. Pineiro) Did you -- do you remember talking to anyone else on this email list -- Mr. Egan, Mr. Coltrin, or anybody else at CODX -- about fixing the statement made that there have been no complaints from European countries?

A.    I don't remember anything with regard to this email.

Q.    Okay. Do you think you should have told Ms. Webb or the reporter that that statement might

236

have been inaccurate?

MS. OSTLER:  Lack of foundation. Calls for speculation.

THE WITNESS:  The problem with that statement is that I don't remember if I did have conversations with them, so I --

Q.    (By Mr. Pineiro) I'm -- sorry.

A.    Yeah.

Q.    I'm asking whether you should have -- why you think you should have, reviewing it now.

MS. OSTLER:  Same objections.

THE WITNESS:  So you're asking if you think I should have complained to Jennifer Webb?

Q.    (By Mr. Pineiro) I'm asking you whether, as a scientist, somebody who's worried about accuracy, would have seen the comments in this email that's apparently being attributed to you and whether, looking at this now, you think, Yeah, I should have probably told them that this statement isn't exactly accurate.

MS. PEIRSOL:  Objection. Same objections.

MS. OSTLER:  Also argumentative.

THE WITNESS:  I wouldn't have seen the problem with this statement. In context of sensitivity and specificity, the true measures of

237

performance, that would have been the context that I'd given the information in. To me, I wouldn't have seen any other way of interpreting it.

Q.    (By Mr. Pineiro) But you're -- again, you're -- aren't you speculating there, because it just -- it doesn't say that at all, right?

MS. PEIRSOL:  Objection.

Q.    (By Mr. Pineiro) It doesn't say that. It says:  "There have been no complaints from European countries."

Any person that reads plain English reads that and says, "No complaints from European countries."

MS. PEIRSOL:  Objection.

Q.    (By Mr. Pineiro) Right?

MS. PEIRSOL:  Calls for speculation. Argumentative. No foundation. Assumes facts not in evidence.

Should I go on?

MS. OSTLER:  Arguing with the witness.

MR. PINEIRO:  Please. No. And can we keep it to one lawyer objecting? I know -- this -- this is becoming a chorus.

MS. OSTLER:  No.

MR. PINEIRO:  Come on. Let's --

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

238

MS. OSTLER: No.

MR. PINEIRO: Let's keep it to one lawyer.

MS. OSTLER: No.

MR. PINEIRO: No? It's appropriate to have two lawyers objecting?

MS. OSTLER: Yeah.

MR. PINEIRO: It is? Really. Okay. It's atypical, but it's fine.

Q. (By Mr. Pineiro) Yeah. I mean, there's nothing in there qualifying it the way you have, right?

A. I'm a little bit confused because you asked me to speculate, I speculated, then you told me I shouldn't be speculating.

Q. No, I'm not telling you what to do.

A. Okay.

Q. I'm just saying -- in -- in some scenarios, you speculate; in others, you don't, right? So I'm just -- taking a look at this, the way that a layperson reads this, the qualification that you're speculating you would have made isn't actually in the text, right?

MS. PEIRSOL: Objection. Calls for speculation. Argumentative. Lack of foundation. Misstates the evidence.

239

THE WITNESS: Let me state simply that I have no idea, one, where this information came from; two, who made the comment there about no complaints; and, three, whether I had a conversation with anyone about that before or after.

Q. (By Mr. Pineiro) And then it says: "Satterfield said there have been no concerns expressed in those states either," I guess referencing Iowa and Nebraska.

Do you see that?

A. Yes.

Q. It says: "Though he noted little data has been collected there so far."

The data you're referring to here would have been what?

A. I don't remember exactly.

MS. OSTLER: May we take a bathroom break?

MR. PINEIRO: Sure.

THE VIDEOGRAPHER: Going off the record. The time is 3:20.

(Recess taken.)

THE VIDEOGRAPHER: Returning on the record. The time is 3:35.

Q. (By Mr. Pineiro) I'm introducing what is --

240

MR. PINEIRO: Nineteen?

THE COURT REPORTER: Seventeen.

MR. PINEIRO: Seventeen. Sorry.

(Exhibit 17 marked for identification.)

Q. (By Mr. Pineiro) So I'm showing you a -- what's been marked as Exhibit 17. This is an email from Keith Pinder to Andrew Benson. And then towards the middle, there's an email from Jennifer Webb which forwards an article from the Salt Lake Tribune on April 30, 2020.

Do you see that?

A. Yes.

Q. Okay. And have you ever read this article before?

A. Yes.

Q. Okay. Did you read it on the same day that it came out?

A. Most of it.

Q. After reading it, did you have any conversations with Ms. Webb regarding potential corrections to statements attributed to you?

A. I don't remember.

Q. Okay. Did you have any conversations with anybody at Co-Diagnostics on this same issue?

MS. PEIRSOL: Objection. Vague.

241

THE WITNESS: When you --

Q. (By Mr. Pineiro) Regarding -- regarding potential corrections to statements that were attributed to you in the article.

A. I don't remember.

Q. If you go to -- it's -- it's the page that's -- it's the page that's Bates-stamped -- ending in 64.

A. Okay.

Q. There is a section called "Critics question in Co-Diagnostics defense TestUtah tests."

Do you see that?

A. Yes.

Q. Okay. And then towards the bottom, there is a paragraph that starts: "But Satterfield maintained."

Do you see that?

A. Yes.

Q. Okay. And it says: "But Satterfield maintained in a real-world environment, people who have contracted COVID-19 have thousands or even hundreds of thousands of particles of the virus in their samples. That's plenty to trigger a positive in his company's test."

Do you see that?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023        Confidential        Brent Satterfield, Ph.D.

242

A.   Yes.

Q.   Okay.  Does this account for the early window of detection that we talked about earlier?

A.   This is referring to people who have contracted COVID-19 that have shown up with symptoms.

Q.   Right.  It says:  "People who have contracted COVID-19."  But it doesn't make any reference to symptoms in this statement, right?

A.   That's correct.

Q.   Should it have included that language regarding symptoms?

A.   You would have to ask the reporter.

Q.   Well, the statement's attributed to you.  If it had been correctly attributed, would it have included that statement, that -- that -- "symptomatic" within the context of that statement?

A.   If we want to write a dictionary statement, yeah, I would include that in there.

Q.   What do you mean if you want to write a dictionary statement?

A.   When we talk to people day to day, we don't talk like we're dictionaries, we talk with certain assumptions here.  In a real-world environment, the people that show up at a clinic are

243

sick, they have symptoms.  You don't typically go to a clinic unless you're sick.

Q.   What if you'd been exposed to somebody with COVID-19?

A.   Yeah, somebody like that might go.  Sure.

Q.   Right.  So then that kind of person wouldn't be accounted for in this statement, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.  Calls for speculation.

THE WITNESS:  I would have to speculate on that.

Q.   (By Mr. Pineiro)  And then you say -- it says:  "He added that Co-Diagnostics' COVID-19 test scored between 99.52 and a hundred percent in evaluations conducted by the FDA in Europe."

Do you see that?

A.   I see what it says.

Q.   And then two lines beneath that, it says:  "'And there have been no complaints from nearly 50 other countries where Co-Diagnostics has sold the majority of its tests,' Satterfield said."

A.   Uh-huh.

Q.   So here, he's directly attributing to you the statement that there have been no complaints from nearly 50 other countries, right?

244

A.   That's what it looks like.

Q.   Okay.  Did you have any reaction to this statement being inserted in this article?

A.   I don't remember what my reaction was at the time, other than I was in a state of shock where we had gone from what felt like to me a very friendly conversation to an article that was very negative.  I remember not reading all of this article because I -- I was upset.

Q.   So you didn't read the whole thing?

A.   I didn't read the whole thing.  Not at that time.

Q.   When did you read the whole thing?

A.   Yesterday.

Q.   The first time you read this article in its entirety was yesterday?

A.   I don't remember reading it in its entirety before that.

Q.   You're the chief science officer of a public company, and there's an article in the Salt Lake Tribune saying this is a potential health -- public health disaster about the tests that your company is producing, and you didn't read the whole article?

MS. PEIRSOL:  Objection.  Argumentative.

245

THE WITNESS:  So --

Q.   (By Mr. Pineiro)  Really?

A.   -- what's the question?

Q.   No, I mean, it's just bizarre, isn't it?

MS. PEIRSOL:  Objection.  Argumentative.  Misstates the evidence.

Q.   (By Mr. Pineiro)  What if there was data in here or statements in here that weren't correctly attributed to you?

MS. PEIRSOL:  Objection.  Argumentative.  Calls for speculation.  Misstates the evidence.

MR. PINEIRO:  Okay.

Q.   (By Mr. Pineiro)  Don't you think that's a little bit outrageous that you didn't read this whole thing?

MS. PEIRSOL:  Objection.  Argumentative.  Calls for speculation.  Misstates the evidence.

Q.   (By Mr. Pineiro)  Do you know where you stopped reading it?

A.   I don't.

MS. PEIRSOL:  Object-- same objections.

MR. PINEIRO:  Why?  Why?  He says that -- he says that he read some of this and then stopped.  I'm asking him where he stopped reading.  What's wrong with -- what's --

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                 Confidential                 Brent Satterfield, Ph.D.

246

MS. PEIRSOL: He's --

MR. PINEIRO: What's objectionable?

MS. PEIRSOL: He said on the -- that's not what his testimony was. Do you want to go back and read his testimony?

MR. PINEIRO: No.

Q. (By Mr. Pineiro) You stopped reading this at some point?

A. I did not --

MS. PEIRSOL: Objection. Misstates the evidence. Argumentative.

Q. (By Mr. Pineiro) Did you stop reading this at some point?

MS. PEIRSOL: Objection. Vague.

Q. (By Mr. Pineiro) At the time when this article came out, which you've indicated you read on April 30th, did you stop reading this at some point in time on that day?

A. I remember that I had no interest in reading the whole thing on that day. I don't know how much I read or where I stopped.

Q. Okay. And then after that date, on May 1st, did you pick it up again and read the whole thing?

MS. PEIRSOL: Objection. Argumentative.

247

THE WITNESS: I don't remember going back and rereading the whole thing.

Q. (By Mr. Pineiro) Okay. Didn't you participate in the preparation of a press release that responded to this article?

A. What I remember is advising the company to not respond to the article and to instead publish our data.

Q. How could you advise them to not respond to the article when you didn't read the whole thing?

MS. PEIRSOL: Objection. Misstates the evidence. Argumentative. Calls for speculation.

THE WITNESS: The little bit of the article that I did read was inflammatory enough, it didn't feel like it was helping. We had a conversation -- I had a very open, frank conversation with the reporter. What came out was very different than the tone of the conversation that we'd had, and it seemed that the conversations that we were having with this group of people were not helping. It wasn't helping them, it wasn't helping us, it wasn't helping TestUtah. What was needed wasn't more speculation. What was needed was actual data on the clinical sensitivity and clinical specificity because those were the only two metrics

248

that actually affect people.

Q. (By Mr. Pineiro) The clinical sensitivity and the clinical specificity?

A. That's correct.

Q. Got it.

When you were -- strike that.

Did you confer with Mr. Egan and others at CODX about responding to this article?

A. Yes.

Q. Okay. Did you inform them you hadn't read the whole thing?

A. I don't remember informing them of that.

Q. And you think you should have told them, "Hey, I didn't read the whole thing"?

MS. PEIRSOL: Objection. Argumentative. Assumes --

Q. (By Mr. Pineiro) Should you maybe asked -- told them that?

MS. PEIRSOL: Objection. Argumentative. Assumes facts not in evidence.

THE WITNESS: I told them what was needed was to report the data, was to show people what we were actually getting from evaluations in the field.

Q. (By Mr. Pineiro) But how would you know that releasing data is going to be helpful in

249

responding to this if you didn't read the whole thing?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: Having a theoretical conversation, such as the one we're having right now, is only relevant until the data is there. Once the data is there -- this is something I learned as a scientist really early on in my career -- the data speaks for itself. And so as a scientist, my job is to report the data, and that's what I told the CEO I believe we should do: Report the data.

Q. (By Mr. Pineiro) As a sci-- as a scientist, do you normally not read the entire article about your company --

MS. PEIRSOL: Objection. Calls for --

Q. (By Mr. Pineiro) -- when it pertains to the science, the actual product that you're putting out?

MS. PEIRSOL: Objection. Argumentative. Calls for speculation. Lack of foundation.

Q. (By Mr. Pineiro) In your role as a chief sign off-- science officer, didn't you have an obligation to read the whole thing?

A. I don't remember any specific obligations

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                              Confidential                    Brent Satterfield, Ph.D.

250

about reading the news, whether it regarded to -- our company or not. I don't remember obligations to track stock information or stock prices or the weather or anything else like that. The only thing my obligations entailed were to get the data and to report it to management who would decide how we used it.

Q.    So then why did you provide a comment to the reporter in connection with this article?

A.    Management had asked me to interact with Jennifer Webb in talking to the reporters.

Q.    Okay. So you're -- you're saying your only role is to provide the data to management --

MS. PEIRSOL: Objection. Misstates --

Q.    (By Mr. Pineiro) -- to address this kind of a thing?

MS. PEIRSOL: Objection. Misstates his testimony.

Q.    (By Mr. Pineiro) You can answer.

A.    And other roles as amended by management.

Q.    Is that an accurate statement, the one that we were just going over, "And there have been no complaints from nearly 50 other countries"? Is that accurate?

A.    With regard to the clinical sensitivity

251

and the clinical specificity run by laboratories who used fresh samples with a gold standard that's universally accepted and a third-party test to break the tie, there were no complaints.

Q.    That's not what I asked you. Is this statement accurate, "And there have been no complaints from nearly 50 other countries"?

MS. PEIRSOL: Objection. Argumentative. Ambiguous.

MS. OSTLER: Asked and answered.

Q.    (By Mr. Pineiro) Is that accurate?

MR. PINEIRO: He didn't answer my question.

MS. OSTLER: He did.

Q.    (By Mr. Pineiro) Is that an accurate statement?

MS. PEIRSOL: Same objections.

Q.    (By Mr. Pineiro) That statement. This is the statement I'm reading, not the one that you -- that you created. The statement that I'm reading, "And there have been no complaints from nearly 50 other countries" --

MS. PEIRSOL: Same --

Q.    (By Mr. Pineiro) -- is that accurate?

MS. PEIRSOL: Same objections.

252

MS. OSTLER: Okay. Stop for a second. You say your question. We say our objections.

MR. PINEIRO: Okay.

MS. OSTLER: But you just keep, like, saying more questions.

MR. PINEIRO: Sure. Okay. I'll stop.

MS. OSTLER: Just let him answer the question, please.

MR. PINEIRO: Okay.

MS. OSTLER: So can you -- Madam Reporter, I'm sorry, but can you please repeat back what the question is?

MR. PINEIRO: I can repeat it.

Q.    (By Mr. Pineiro) Not inserting the qualifications you've added, just reading the statement that's here in front of you, black and white, "And there have been no complaints from nearly 50 other countries," is that accurate?

MS. PEIRSOL: Objection. Vague. Misstates the evidence. Argumentative.

THE WITNESS: It is contextually accurate.

Q.    (By Mr. Pineiro) How so?

A.    "Contextually accurate" meaning that depending on the context that you're reading it in.

Q.    Okay.

253

A.    Are we saying that no one has contaminated a sample and then wanted us to replace a batch of product? Are we saying that? No. But are we saying that relevant to what this entire article is about, about the population difference between 5 percent and 2 percent rate of positive in the state of Utah, the only thing that matters here is the question that's being asked by this whole article, is why is Timpanogos Regional Hospital getting a 2 percent rate of positives when the state of Utah is getting a 5 percent rate of positives?

And in that context, answering that question to say that the countries who are running our tests, running it with evaluations where they are -- they're using a high-quality gold standard to evaluate fresh samples with a third-party comparator, in those countries we are getting outstanding results. Many of those countries choose our test over all of the other tests that Intermountain Healthcare cites as being better than ours. They choose our test because run side by side, it works better.

Q.    (By Mr. Pineiro) Okay. But --

A.    And so it answers the question of the whole article about 2 percent rate of positives

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

254

versus 5 percent of -- rate of positives which says that Bert Lopansri is full of it, that the only reason that we're seeing those differences in rate of positives is because of the difference in the questionnaire that was put out by TestUtah from the CDC questionnaire. And, in fact, in the white paper that I published with TestUtah data shortly after this article, it shows that when you send those same TestUtah samples to Intermountain Healthcare, ARUP, or as -- organizations who are critical of us, they were not capable of detecting as many positives in those samples as Timpanogos Regional Hospital. So what we're seeing here is that this entire article was based on a false premise.

Q.    But what I'm talking about is just your statement, right?

A.    I can't say why the reporter attributed that to me in that way.

Q.    Right. Okay. So he incorrectly attributed it to you?

MS. PEIRSOL: Objection. Misstates the evidence. Argumentative.

THE WITNESS: The reporter is attributing to me part of a conversation that I said that I do not now have access to to see exactly what I said,

255

nor do I have access to the reporter to know why they quoted it that way.

Q.    (By Mr. Pineiro) Sitting where you stand right now, did he incorrectly attribute this comment to you?

A.    Define "incorrectly attribute."

Q.    It doesn't include the context that you said makes this accurate.

MS. PEIRSOL: Objection. Misstates the --

Q.    (By Mr. Pineiro) Right?

MS. PEIRSOL: -- evidence. It does include the context.

MR. PINEIRO: That's not an appropriate objection. Come on, Marissa, just stick to the rules.

MS. PEIRSOL: Ask a good question.

MR. PINEIRO: Okay. I know, I know, I know. I'm the worst.

MS. PEIRSOL: Ask a good question.

MR. PINEIRO: It's unbelievable.

So you can object. Your remedy to a bad question --

MS. PEIRSOL: And you can ask a good question.

MR. PINEIRO: Your remedy to a bad

256

question is to object. It's not --

MS. PEIRSOL: And I'll do it.

MR. PINEIRO: It's -- yeah, you are. But it's not to then insert yourself. Come on. It's just --

MS. PEIRSOL: Let's just ask a good question --

MR. PINEIRO: Okay.

MS. PEIRSOL: -- so there's no need to object.

MR. PINEIRO: Got it.

THE WITNESS: So the context here is not just in this article, it's in the studies that have been published publicly on other websites, it is in the article itself, it's in our FDA submission. There is a whole lot of context in addition to what is being attributed here.

Q.    (By Mr. Pineiro) If you go to the -- the middle of the page, there is a reference to -- it says: "An analysis" -- same page -- "An analysis by the life sciences publication BioCentury showed that at least 16 of 22 comparable tests authorized by the FDA report a lower limit of detection or greater sensitivity than Co-Diagnostics' test."

Do you see that?

257

A.    I see what it says.

Q.    Okay. Are you familiar with the -- this BioCentury publication?

A.    Vaguely.

Q.    Okay. Did you ever review it?

A.    At one point in time, yes.

Q.    Okay. And did -- do you recall seeing that Co-Diagnostics' test had, you know, I guess unfavorable limit of detections compared to some of the other tests that were evaluated?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: I don't remember seeing anything about our limit of detection being unfavorable. I do remember seeing a list of limits of detection posted by different organizations who had submitted their PCR test to the FDA. I remember seeing where we ranked on that list. But as we've talked about earlier, with PCR being capable of theoretically detecting one copy per reaction, all of these tests are outstanding at detecting COVID.

Q.    (By Mr. Pineiro) Right.

A.    The vast majority of those were reporting 100 percent sensitivity, 100 percent specificity, as were we, to the FDA for their contrived samples.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                Confidential                Brent Satterfield, Ph.D.

258

And then as we later proved in our white paper, the actual problems with the 2 percent versus the 5 percent rates of positives in the state of Utah were not problems at all. It was simply amount -- amounting to different criteria for who is symptomatic being reported. And our test at Timpanogos Regional Hospital detected more positives in those same samples than most of the tests on this list that were used by Intermountain Healthcare to detect positives in those TestUtah samples. So we outperformed them in side-by-side analyses regardless of what any table published by some obscure third party mentioned.

Q. Okay. And did -- was -- did you -- do you recall when you reviewed that -- that analysis?

A. No.

MS. OSTLER: Dr. Satterfield, do you need to take a break?

THE WITNESS: I think I'm good for a few moments.

MS. OSTLER: Okay.

THE WITNESS: Thank you for the question.

MR. PINEIRO: Nineteen? Oh, 18.

(Exhibit 18 marked for identification.)

Q. (By Mr. Pineiro) So I'm showing you

259

what's been marked as Exhibit 18. Let's take you to the second page, the beginning of the string. So then at the bottom, there is an email from you to Chad Apuli, Ms. Garcia, and Ms. Hutchins.

Do you see that?

And it says: "Chad and Rebecca, please see the article that just came out about us."

And it appears you provided a link to the article I just showed you, right?

It says: "Notice what others are saying about us relative to our LOD and how we perform worse than other tests, including the CDC. If we had publications out already, none of this would be happening."

So at this point in time, were you attempting to get publications issued regarding the performance of the test?

A. We were -- it had become a higher priority, yes.

Q. Why was that?

A. We were spending a lot of time that we should have been spending selling tests and getting it out to the people who needed it and addressing media concerns that had no basis on data. So if we got the data out, I believed, as I later learned

260

from Bobby Baird, incorrectly, that the data would solve the problems.

Q. What publications -- do you recall which publications you were referencing here?

A. No.

Q. Do you recall any data that you had -- at this point in time that you had wanted to convert into some type of a report or publication?

A. Sure. We had side-by-side comparisons of our tests with the CDC. We had really good data from that. I wanted that to be published. And we also had data, both internally and from some of our customers, showing that our limit of detection was actually a lot better than what we'd reported. And just simply updating -- we'd all -- we were already learning that it was going to take a long time to get the FDA EUA updated just because that -- that line had gotten long. But if we could just get a peer-reviewed publication or even a white paper, just anything out there showing that our limit of detection was better than what we reported, then it might let us all get back to our jobs, get back to selling tests and getting them out to the people who needed them.

Q. And then it says: "I understand that Kyle

261

and Maddie did the bulk of the work."

What -- what are you referring to there?

A. So a lot of the data collected on our COVID test internally was run by both Kyle and Maddie, and neither one of them had time to write a paper because they were so busy manufacturing tests. Rebecca Garcia had time to write a paper; however, she wasn't the one who collected the data. So there -- there was an argument over who should be first author on the paper. I became frustrated with the argument because I didn't care, I just wanted the data out there.

Q. You mentioned that Kyle and Maddie, they're the ones that would collect the data internally?

A. Usually, yes.

Q. And is the data from third parties? Or is it data that you're generating on your own through your own tests?

A. Data that we generate on our own.

Q. Okay. Who was in charge of, like, processing data that you're obtaining from a third party regarding, you know, the validation analysis on your tests?

A. I don't think we had anybody officially

Lindsay Payeur, RPR
DepomaxMerit Litigation Services

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                        Confidential                        Brent Satterfield, Ph.D.

262

appointed to do that, but Rebecca Garcia would, from time to time, put the data into a more formal document.

Q.   Okay.  And when she did that, would somebody -- would another supervisor or someone else typically review the report and make sure it was correct?

A.   Not if it was going into a file in the company archives.  However, the data that was eventually included in the press release for May 1st, that was reviewed by multiple parties, including myself.

Q.   So then Ms. Hutchins -- oh, sorry.  The -- the -- the next email after that is from Mr. Apuli who says:  "We need to collect more data to show our LOD is better than what we claimed it is.  I'm good to talk whenever."

And then Ms. Hutchins writes, on the first page:  "Technically the EUA says the test is intended for individuals suspected of COVID-19 by their healthcare provider.  Our test is not intended for asymptomatic patients."

Do you see that?

A.   I see it.

Q.   So with respect to any company that

263

obtained EUA, the EUA was just for symptomatic patients; is that correct?

A.   Early in the pandemic, that's all any company was claiming.

Q.   Right.  Now, through observing the data, did -- did some companies have tests that were able to accurately decipher, you know, the positive -- positivity of an asymptomatic patient?

MS. PEIRSOL:  Objection.  Calls for speculation.  Vague.

THE WITNESS:  So I'm not aware of any company at that point in time that was making claims of being able to test for asymptomatic patients.  It's -- it's not a claim that the FDA would have treated nicely.  That being said, it was well within the rights of numerous CLIA-waived laboratories around the United States to take an emergency-use-authorized test and validate it for their own purposes with asymptomatic patients or however they chose to use it.

Q.   (By Mr. Pineiro)  And so after that, she says:  "Also, the sensitivity of 99.52 and specificity of 100 percent are for samples with a viral load equal or higher in the limit of detection.  Therefore, tests with the same

264

percentage of sensitivity but a lower limit of detection is more sensitive than ours."

Is that statement correct?

A.   Not necessarily.

Q.   Why -- why not?

A.   Because -- let me -- let me break those sentences up a little bit, if you would.  So the first part where she says that the reported claims -- "the sensitivity of 99.52 percent and the specificity of 100 percent are for samples with a viral load equal or higher than the limit of detection," that's -- that's correct, because that's what the FDA asked from us, is what is your sensitivity and specificity for samples at or above your limit of detection.

Now, the second part of that, "a test with a same percentage of sensitivity but a lower limit of detection is more sensitive than ours," that only applies in certain contexts.

Q.   Which ones?

A.   It would only apply for window-period infections.

Q.   What else?

A.   Outside of window-period infections, when you're dealing with a standard clinical

265

population -- it's speculation on her part that I don't necessarily agree with.  And with typical clinical populations, there's a lot more factors going into the sensitivity other than limit of detection.  Quite frequently, in the studies that we -- that were shown to us or reported to us from other countries that were comparing a gold standard that is universally accepted as being of high quality with a third-party comparator test, in those studies, we were able to see that, at times, we were more clinically sensitive than tests that were in a table that were reported to have a lower limit of detection than us.  So in those contexts, in actual clinical contexts, Cecilia would be wrong because the data said she was wrong.

Q.   So this statement is actually incorrect?

A.   It's incorrect in certain contexts.

Q.   In which context is it -- is it correct?

A.   It is correct in the context of window-period -- or potentially correct.  Not always correct, but potentially correct in the context of window-period infections.

Q.   You said -- you used the term -- and I apologize if I can't read my own handwriting -- "standard clinical population."  What does that

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

266

mean?

A.   There is always an exception to the rule. Somebody who's doing surgery, for instance, who needs a last-minute blood transfusion, and in that blood transfusion to this elderly patient, they need to know that the blood is 100 percent clean. And in that instance, you would use the test with the lowest limit of detection possible.

Q.   What -- what you're saying is the standard clinical population is symptomatic --

MS. PEIRSOL:  Objection.  Mis--

Q.   (By Mr. Pineiro) -- in the case of the test here?  Is that fair?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  That's not exactly what I'm saying.  The standard clinical population does include a majority of symptomatic patients and people who are not in the window-period infection. Even asymptomatic patients, it's a very small percentage who are going to fall in that window period at all, and of those, the number who would be picked up by another real-time PCR test is infinitesimally small.  We're talking a couple of hours of difference in the lifetime of the infection

267

to be able to hit that window period just right.

Q.   (By Mr. Pineiro) Have -- did CODX, while you were there or -- or, sorry, you're still there. You're on the advisory board.  Has CODX ever done any evaluation of what you're talking about now where -- you know, evaluating whether the limit of detection of the test has no impact except for with respect to those patients within the early window?

MS. PEIRSOL:  Objection.  Misstates his testimony and the evidence.

Q.   (By Mr. Pineiro) You can answer.

A.   I -- I don't know.

Q.   But you -- you've made that assertion a few times today, right?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I've made the assertion that when you have a data set that shows that you have a hundred percent clinical sensitivity and a hundred percent clinical specificity, that improving the limit of detection isn't going to make those results better.

Q.   (By Mr. Pineiro) Right.  But those are concordance tests, typically, right?  They're based on evaluating your test versus another one?

268

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  The only way to know how your test is performing in a clinical population is to have a comparator test that's called the gold standard.  And in a quality study, there will be at least one other test, which is used as a tiebreaker.

Q.   (By Mr. Pineiro) Is there any way to perform validation based on what's actually happening -- I'm going to -- I'm going to use the phrase "in the field," like, there's actual, you know, testing, you know, testing at sites and all that?  I mean, is there -- is there a way to do it -- is there another way to validate besides the way that you're indicating where you analyze what's happening on the ground floor, actually, in terms of testing?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  In order to calculate clinical sensitivity and clinical specificity, you have to have a way of knowing which samples have virus and which samples don't.  So in order to figure that out, since none of us can divine that information as of yet, there's always a diagnostic

269

method involved, unless you're dealing with contrived samples.  But then contrived samples aren't dealing with field results.

Q.   (By Mr. Pineiro) Do you recall having any conversation with Ms. Hutchins about her email that I just showed you?

A.   Not this one specifically, no.

Q.   Did you and Ms. Hutchins have a good relationship while she was at the company?

A.   We had a reasonable relationship.

Q.   Above, she forwards your email to Andrew Benson and Chad Apuli.  She says:  "Honestly, I'm concerned about Brent talking to the press about things he doesn't understand.  I don't know about his accurate" -- "academic curriculum, but I doubt he had a single analytical chemistry class in his whole life."

Do you see that?

A.   I see what she wrote.

Q.   Is that a fair criticism?

A.   I think it's fair for her to say that she has no idea about my academic curriculum and not having an idea about my academic curriculum to ask questions.

Q.   Did she ever express this concern to you?

May 16, 2023                                    Confidential                    Brent Satterfield, Ph.D.

270

A.   No.

Q.   You can put it aside.

A.   Okay.

I think, just as an aside, in that comment about her not knowing about my academic record, I'm not very vocal about my resume, but over my lifetime, I've invented multiple real-time PCR technologies. I -- we already talked about the CoPrimers that have a two-and-a-half-million-fold improvement in reducing nonspecific amplification products, but those aren't the only one that I built like that.

I also invented the RapidProbes that were 200 times faster than the molecular beacons, another probe type that's out there. This is, again, a huge, huge, huge improvement.

Before that, I built the tentacle probes, which were 10,000 times more specific --

Q.   I'm not doubting your credentials.

A.   What I'm saying is, what Cecilia didn't know is that I'm one of the most qualified people on real-time PCR in this whole world.

Q.   Is there a reason, though, that you haven't been hired by another company, then?

MS. PEIRSOL:  Objection.  Argumentative.

271

THE WITNESS:  There are plenty of headhunters who have asked for me to come with them, but why would I leave my baby?  Co-Diagnostics is mine.  Why would I go work for somebody else?

Q.   (By Mr. Pineiro)  Well, I mean, you're no longer an executive at the company, right?

A.   That is correct.

Q.   And you only meet with them once every three to six months, right?

A.   That is correct.

Q.   Have you had any offers to go work for other PCR-testing companies?

A.   I have.

Q.   Okay.  Which companies were those?

A.   There is one here in town that's a direct competitor to Co-Diagnostics earlier on.  I'm having a hard time remembering their name, but I had several meetings with them where they asked me to come in and be their chief scientific officer.  They offered to give me a nice position in the company -- it never got to the stage of deciding what "nice" meant, but implied that it would be worth my while.  I'm not looking for another job at this time.

Q.   You don't remember the name of that company?

272

A.   I could go back through my email records and find it if you want.

Q.   Okay.  Did they make you an offer?

A.   They told me they were going to make me an offer, yes.

Q.   Okay.  Did they make you an offer?

A.   In the end, I did not follow up with them.

Q.   Okay.  Have any other companies made you any other -- any other PCR-testing companies made you an offer?

A.   I've not responded to inquiries that I've received from headhunters.

Q.   Okay.

A.   And right now -- when I was in grad school, there was a team of scientists that I looked up to as the movers and shakers of PCR.  I mean, they were the guys who made the best technology when it came to real-time PCR devices and tests.  And that team of people now works for Co-Diagnostics.  My heros in this field now work for us.  They love the technology that I've built.

Q.   So Co-Diagnostics has the best PCR scientists in the world?

A.   We have the individuals who are among the best in the world.

273

Q.   Why is it -- why is the company not performing that well, then?

MS. PEIRSOL:  Objection.  Assumes facts not in evidence.  Misstates the record.  Ambiguous.

THE WITNESS:  By "not performing well," what do you mean?

Q.   (By Mr. Pineiro)  Its stock price is like at a dollar, right?

A.   I couldn't speculate as to why the stock price is where it's at.

Q.   Okay.

MR. PINEIRO:  So here we go.  Nineteen.

(Exhibit 19 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you what's been marked as Exhibit 19.  If you could just go to the last -- second-to-last page, and I'll walk you through it.

A.   Okay.  This is the Co-Diagnostics response to the --

Q.   Yeah.  So if you just go to the last page -- sorry, the second-to-last page, there is an email from -- on the bottom, from Mr. Egan to you on April 30th.  It's to you and Jennifer Webb.

Do you see that?

A.   I see it addressed to Jennifer Webb.  I

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                 Confidential                          Brent Satterfield, Ph.D.

274

don't see it addressed to me.

Q.   Just go -- go to the next page.

A.   Sorry.  Just my --

Q.   Flip it one page forward.  The other way.

A.   Okay.  Oh, the other direction.

Q.   Yeah.

A.   Okay.

Q.   To the bottom.

A.   Okay.

Q.   Yeah.  It says: "Brent, Jennifer is reworking this draft.  I need you to look at this section on LOD and put it in the way you would like to see it addressed.  Any other suggestions are also welcome."

Do you see that?

A.   I do, yeah.

Q.   Okay.  And so then on the next page, you can see a draft response that it appears Mr. Egan prepared, right?

A.   It's from Mr. Egan.  Whether he prepared it, I couldn't say.

Q.   Okay.  Did you -- do you recall -- do you know who prepared the first draft of what ultimately ended up being the May 1st press release?

A.   No.

275

Q.   Okay.  Do you recall reviewing this draft?

A.   No.

Q.   So if you just go to the second paragraph, it says: "The company's COVID-19 test has been the subject of numerous validation studies, including PathWest Laboratories in Australia; the Indian NIP, National Institute of Pathology; Mexico government's InDRE; and the Minnesota Department of Health."

Do you see that?

A.   Yes.

Q.   "All of these studies show a hundred percent concordance for both specificity and sensitivity, the benchmarks for accuracy."

Do you see that?

A.   Yes.

Q.   Okay.  Do you know who provided him with that list of -- of validation studies?

A.   No.

Q.   Okay.  Besides these validation studies listed here, were there any other validation studies that had been conducted and that CODX had knowledge of at this time?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I can't say what the company

276

at large had knowledge of.  I had knowledge about other studies that were performed, and I had put in requests to our sales team, Cameron Gundry and Denny Crockett, to ask for any of those government tenders that we'd won, data that they'd be willing to share with us to make public, or, from the data that had been shared with us, to get permission to add onto this list.  So this list was complete with all of the data that we were allowed to make public.

Q.   (By Mr. Pineiro)  When did you make that request of Mr. Gundry?

A.   I don't remember.

Q.   Did you also ask him for any validation studies that may have not been a hundred percent sensitivity and a hundred percent sensitivity -- specificity?

A.   I would have asked him for all of the data that we'd received in from the customers.

Q.   Okay.  So you didn't just ask him for validation studies showing a hundred percent specificity and sensitivity?

A.   No.

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  No.  Our duty is to report

277

the data the way it is.

Q.   (By Mr. Pineiro)  Okay.  There is no reference here to the issues in Greece, right?

A.   No.  The contamination of a batch in Greece doesn't contribute to or take away from Ike's statement that all these studies show 100 percent concordance for specificity and sensitivity.

Q.   And there --

A.   It just isn't relevant.

Q.   There was no reference to the sensitivity data out of South Africa too, right?

A.   I don't see any reference here to that data, no.

Q.   Why not?

A.   I can't speculate as to why Ike or Jennifer, whoever wrote this, would have omitted that information.

Q.   So then it says -- the next paragraph -- "The recent article cited differences in LOD, or level of detection, inferring the company's COVID-19 test was likely to detect low levels of infection when, in fact, the above-mentioned validation studies demonstrated excellent results in level of detection metrics."

I'll just skip a little further down.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

278

"While the company's own data intended to show the worst-case scenario for purposes of regulatory approval, the performance of the test in a clinical study shows that the company's test performance corresponds with required standards with 100 percent conformity. You can't get better than 100 percent."

Q. Do you see that?

A. I see what's written there.

Q. The phrase "You can't get better than 100 percent," was that Mr. Egan's idea or your idea?

A. I don't remember.

Q. Do you think it's appropriate to put a statement like that in a press release regarding the accuracy of a COVID-19 test?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I can't say what's appropriate or inappropriate to put in a press release of that nature.

Q. (By Mr. Pineiro) Why not?

A. It's not my role to decide what is appropriate. It's my role to report the data.

Q. But he was consulting with you. He asked you to look at this section on LOD and put it in a way you would like to see it addressed, right?

279

A. Sure.

Q. So he's asking you to actually review this and ensure that you're okay with it, right?

MS. OSTLER: Objection. Misstates the document.

THE WITNESS: He's asking me to report the data.

Q. (By Mr. Pineiro) Excuse me?

A. He's --

Q. Where does he say that?

A. It's my role as a chief scientific officer to report the data. He's asking me to put my contribution as the chief scientific officer into that -- that article.

Q. Where do you see that in his request?

A. I don't see those words specifically, but it's contextually in the fact that I was the chief scientific officer and he was the chief executive officer.

Q. Okay. And so in response to that, you write, on April 30th: "On the phone with Dave Elkington. Looks like the HIC [sic] and the guy who wrote the email are going to issue a formal apology and retraction of their statements. Also, the state of Utah is buying tests from us to run a

280

side-by-side comparison to end this controversy.

"As such, I wonder if it would be better to put out a general update on our results in the field rather than a point-by-point rebuttal. I believe we can make an even stronger rebuttal by ignoring their article and simply giving an investor update that covers many of these same points."

Q. Do you see that?

A. (Witness nods head in the affirmative.)

Q. Why did you reference "investor update" here?

A. I don't remember the exact reason why I would have used that language.

Q. Do you recall -- strike that.

At this point in time, was it -- was it important to -- strike that.

The contemplated press release, was it targeted to the investors?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't know all of the target audiences that the company intended to reach. I know that I was concerned about our customers -- or not existing customers so much as future customers making decisions about the product based

281

on incorrect information falsely portrayed in -- or -- or -- yeah, falsely portrayed in the Salt Lake Tribune article.

Q. (By Mr. Pineiro) But all that you reference here is "investor update," right?

A. Yeah. It's an informal email to the CEO. I wouldn't have to spell out in dictionary detail everything for him that we were thinking at that time.

Q. Okay. And then -- and then it seems like -- you write: "For example," comma.

And it seems like you provided, actually, a reworking of some of the language in the draft release; is that right?

A. I provided an example of something that they could put into a new release.

Q. Doesn't this go above and beyond just providing data?

A. It goes above and beyond in the sense that you're stating the data. I even put in an X in there of, "Hey, here's a number that we could post that is a factual number, it's a data point, but I don't know what that data point is. You tell me, sales team, what is the data? Because that's what we should report, is data."

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

282

Q.   You just reworded this, and you put an X so they could fill in whatever international government tenders have been awarded, right?

A.   Uh-huh.

MS. PEIRSOL:  Objection.  Mission states the evidence.

THE WITNESS:  I summarized the data from those five studies that we had seen 100 percent sensitivity and 100 percent specificity in those studies, and I parroted the language that was in the previous release:  "You can't do better than that," which is true.  One hundred percent is the top mark for any given study.

Q.   (By Mr. Pineiro)  And then if you go to the first page, it says -- you write:  "I love the reworking of that paragraph, Andrew, to take out the reference to the critic.  Much more natural sounding."

You also then say:  "Also, to be clear, it wasn't the DOH in Minnesota that did the study, it was that oral rinse group.  The DOH in Minnesota may not even know about that data.  It would be better to say the actual partner and reference the fact that the data was confirmed by samples submitted to the DOH."

283

Do you see that?

A.   Yes.

Q.   So the validation study in Minnesota wasn't done by Minnesota DOH, it was done by an oral rinse group?

A.   It was done by some other group.  I don't remember the relationship with them.

Q.   What's an oral -- do you know what you're referencing when you say "oral rinse group"?

A.   It was a company that had developed a different way of testing COVID.  Early on in the pandemic, it was really a radical thought that you could just do a mouth swish and get results for it, and by the end of the pandemic, it became the accepted way to collect samples because it's actually more sensitive.

MS. PEIRSOL:  Do you need a break?

THE WITNESS:  I might be good for just a couple more minutes.  I got one more can of Dr. Pepper.

Q.   (By Mr. Pineiro)  All right.  That's fine.

I'm showing you --

MR. PINEIRO:  What number is this?

THE COURT REPORTER:  Twenty.

MR. PINEIRO:  Twenty?

284

(Exhibit 20 marked for identification.)

Q.   (By Mr. Pineiro)  So I'm showing you what's been marked as Exhibit 20.

MS. OSTLER:  Do you have a Bates number?  We don't have one.  Can you please tell us the Bates if you have it?  You don't have it?

MR. PINEIRO:  I don't have it.  I'm sorry.

Q.   (By Mr. Pineiro)  I'll just take you to -- sort of to the back of the document.  As attached to this email string, there's a -- a -- it looks like a draft of the May 1st press release.  Just go towards the back.

A.   Sorry, I'm still on Exhibit 19.  I was just remembering the part where the state of Utah actually called me and apologized for how we were being treated in the media, for all the abuse we were receiving, because they were grateful that we were one of the key elements in containing the outbreak in Utah and --

Q.   Okay.

A.   -- wanted others to know about it.

Q.   Okay.  Just go back -- if you go towards the back of the document, there's an attachment to this string of emails.  And if you look at that attachment -- are you familiar with this draft of

285

the press release?

A.   I saw it yesterday.

Q.   First time?

A.   Probably not the first time, but I refreshed my memory.

Q.   Okay.  So if you look at the third paragraph -- fourth paragraph starting:  "In remarking," it says:  "In remarking on the test's" -- and somebody added "favorable limit of detection, LOD, results in some of the evaluations."

Somebody struck out the phrase "the" -- "some of the evaluations."

Do you see that?

A.   I do see that.

Q.   Do you think it was more accurate without that strikeout?

A.   No.

Q.   So by removing that, you think it's still an accurate statement?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  I do think it's an accurate statement.

Q.   (By Mr. Pineiro)  But there have been evaluations that I've shown you where the

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

286

sensitivity of the test was called into question, right?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: Are you referring to the 2 percent versus 5 percent positive rate in the state of Utah?

Q. (By Mr. Pineiro) No. The -- the Greece example.

A. The Greece example did not call into example [sic] the sensitivity, did it? Wasn't it qual-- calling into question where contamination occurred?

Q. No. You're referring to the explanation for the result, but the results that -- that were -- that we went through --

A. I see.

Q. -- regard -- pertain to the performance of the test, right?

MS. PEIRSOL: Objection. Misstates the evidence.

Q. (By Mr. Pineiro) So this -- it says here: "In some of the evaluations."

And so there were some evaluations that we've gone through, setting aside the reason for why

287

it happened, where the limit of detection results were not favorable --

MS. PEIRSOL: Objection. Mis--

Q. (By Mr. Pineiro) -- right?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: I disagree with your statement entirely.

Q. (By Mr. Pineiro) Okay. I didn't show you -- I haven't shown you documents from Greece, South Africa, India where there were evaluations that did not demonstrate a favorable limit of detection?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: The irony of the India data, since you mentioned that one, is that we were detecting their contamination because our limit of detection was too favorable. We were rejected from doing testing in India along with Roche and other first-world testing companies because our limit of detection was too favorable.

Q. (By Mr. Pineiro) So what about the other examples, the South Africa or the Greece examples?

A. I can't comment on the South Africa

288

example. I don't remember that email. The Greece example had nothing to do with limit of detection, it had to do with a contamination question.

Q. The Greece example, there were performance issues with the test, weren't there?

MS. PEIRSOL: Objection. Misstates the evidence.

Q. (By Mr. Pineiro) A distributor indicated that a client would no longer be using the test because of its performance on a batch, correct?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: A distributor said they were concerned about their relationship with a client due to what they believed was contamination.

Q. (By Mr. Pineiro) So then if you just skip forward a bit, there is an email string -- and I can't give you a Bates number, but about, you know, two or three pages in, there is an email on April 30th at 9:23 from Clint Betts. Have you found it?

A. I found it.

Q. Great.

Do you know who Clint Betts is?

A. Just the name.

289

Q. And then it says: "Quick rem"-- "recommendation: I think it" -- "I think it would be a good idea to include a quote from Co-Diagnostic's chief science officer, Dr. Brent Satterfield, in the release. Adds credibility and inoculates your company from being hit for 'just being a tech company that doesn't understand testing and science.'"

Do you see that?

A. I see what he wrote.

Q. And then I guess he realizes. "Disregard. I see that he's quoted very clearly."

Do you see that?

A. Okay.

Q. Yeah. So if you go back to -- sorry. If you go back to the draft, right where I -- I left you off, it says: "Dr. Brent Satterfield, Ph.D." -- sorry, "Brent Satterfield, Ph.D., said, 'In diagnostics, the limit of detection, or LOD, is a single metric that helps inform the key metrics of sensitivity and specificity.'"

Do you see that quote?

A. I see the quote.

Q. Okay. That language, was that language language that you provided or that somebody else

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

290

wrote that was then attributed to you?

A.   I don't remember.

MS. OSTLER:  Is it a good time for a bathroom break?

MR. PINEIRO:  Yeah.  Sure.

MS. OSTLER:  Thanks.

THE VIDEOGRAPHER:  Going off the record. The time is 4:33.

(Recess taken.)

THE VIDEOGRAPHER:  Returning on the record.  The time is 4:44.

Q.   (By Mr. Pineiro)  Mr. Satterfield, I showed you earlier an email -- or -- an email that you reviewed from Dr. Bert Lopan-- Lopansri, correct?

A.   Yes.

Q.   And that was the one that he -- where he expressed concerns about the -- TestUtah, the tests, correct?

A.   Yes.

Q.   Do you -- do you recall ever having a conversation with Dr. Lopansri about his concerns?

A.   I do.

Q.   And when did that happen?

A.   I don't remember the exact date.  It was

291

very shortly -- within like a day or so after the -- the Salt Lake Tribune article came out.

Q.   And do you remember the substance of the conversation?

A.   He apologized.  He said that he didn't mean for his scientific deliberations, just the brainstorming, in a sense, of a scientist to be put out in such a public way and to cause us potentially so much harm.

MR. PINEIRO:  Twenty-one?

THE COURT REPORTER:  Yes.

(Exhibit 21 marked for identification.)

THE WITNESS:  Are we still referencing this one?

MR. PINEIRO:  No, we're done with that. You guys have copies?

MS. OSTLER:  Yes.

MR. PINEIRO:  Okay.

Q.   (By Mr. Pineiro)  So I'm showing you what's been marked as Exhibit 21.  Are you familiar with this document?

A.   Yes.

Q.   So this is the May 1st press release, right, that we've been talking about?

A.   Yes, it is.

292

Q.   So just walking through it, it says: "Co-Diagnostics Releases COVID-19 Test Performance Data: Consistently Demonstrates a Hundred Percent Sensitivity and a Hundred Percent Specificity Across Independent Evaluations."

Do you see that?

A.   I see it.  Give me just a second.  I'm just checking the end to see what all you -- if you included all the attachments.

Q.   Yeah.

A.   Okay.  All right.

Q.   Do you know who decided on the -- the wording of the title of the press release?

A.   No.

Q.   And so it says:  "Co-Diagnostics, a molecular diagnostic company with a unique, patented platform, today releases COVID-19 test performance data demonstrating a hundred percent sensitivity and a hundred percent specificity, the metrics used to define accuracy in molecular diagnostic testing."

Do you see that?

A.   I see it, yes.

Q.   And it says:  "The data being released comes from independent evaluations of the performance of the company's COVID-19 test in the

293

fee" -- "in the field.  These evaluations were conducted in Mexico, India, and elsewhere in the U.S. and abroad.  Each study concluded a hundred percent concordance for both specificity and sensitivity."

Do you see that?

A.   Yes.

Q.   Okay.  And so, again, there -- this is -- this is what was actually put out to the public, and, again, there's no reference to some of the prior examples I showed you of South Africa, India, or Greece, right?

MS. PEIRSOL:  Objection.  Misstates the record.

THE WITNESS:  I'm sorry, can you repeat the question one more time?

Q.   (By Mr. Pineiro)  There's no -- there's no reference here to other instances or evaluations that we've gone through today from Greece, India, or South Africa where the evaluations didn't have a hundred percent concordance, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.

THE WITNESS:  I still find that question a little bit ironic because you're saying it doesn't

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                      Confidential                      Brent Satterfield, Ph.D.

294

include data from India but we just mentioned it does include data from India because we ran the study at -- in India at a department down the street who didn't have contamination, and there's 100 percent concordance. So, actually, the India data supports this statement. I mean, that -- that's why we put it there. It supports it.

Q. (By Mr. Pineiro) That's the -- that's the NIB data, though, right? N-I-B, as in boy?

A. It's the India data that we passed through their regulatory process with more than flying colors, with perfect flying colors.

Q. And then it says: "In remarking on the test's favorable limit of detection results in the" -- "in the evaluations, Brent Satterfield, Ph.D., said, 'In diagnostics, the limit of detection, or LOD, is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data'" -- "'data point. Other metrics that are important are availability, ease of use, throughput'" -- "'and throughput. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved a hundred percent clinical sensitivity and specificity, and

295

you can't do better than that.'"

Do you see that?

A. Yes.

Q. So just taking a step back, I mean, that quote appears to pertain to the test's favorable -- the limit of detection of the test?

MS. PEIRSOL: Objection. Misstates the document.

THE WITNESS: What statement is --

Q. (By Mr. Pineiro) It says: "In remarking" -- the quote that I just read that's attributed to you says it's -- it says: "In remarking on the test's favorable limit of detection results." And then it provides your quote.

Do you see that?

A. Yes.

Q. Okay. So do these -- do the validation results or data that was attached to this press release provide analysis of the limit of detection?

A. Some of it does.

Q. But -- but does all of it?

A. No.

Q. Okay. And what you -- and what those reports actually purported to I guess demonstrate was a hundred percent concordance on specificity and

296

sensitivity, right?

A. And -- you know, some -- the -- each report had a different piece of information. Some of it had 100 percent concordance as expressed through 100 percent sensitivity and specificity for that data set. Some of it was about the limit of detection. But even the 100 percent sensitivity in a clinical sample does comment on the limit of detection. It says that the limit of detection is adequate to detect 100 percent of the positives in that clinical sampling.

Q. But you've been saying today that limit of detection really isn't important and that it's all about clinical sensitivity, right?

MS. PEIRSOL: Objection. Misstates his testimony.

Q. (By Mr. Pineiro) Isn't that what you've been saying?

A. I think that's a misstatement of my testimony.

Q. Okay.

A. That -- it's not that limit of detection is not important, it's that clinical sensitivity is a metric that includes whatever impact limit of detection is having.

297

Q. But, again, these -- these validation reports, as you've said, they weren't being submitted to demonstrate the limit of detection of the test, right?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: Each of these data sets was reporting something different. Some of them were reporting on the 100 percent concordance of data, which means 100 percent sensitivity and 100 percent specificity. Some of them were reporting on the limit of detection, and even the ones with 100 percent sensitivity and 100 percent specificity were commenting on the limit of detection by saying that our limit of detection was sufficient to get a 100 percent result, which is the best result you can get in an evaluation.

Q. (By Mr. Pineiro) And then it says: "We have consistently and repeatedly achieved a hundred percent clinical sensitivity and specificity, and you can't do better than that."

Do you see that?

A. I see it.

Q. When that -- when that -- when you saw that statement or when you approved of that

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

298

statement being attributed to you, did you have any concerns that it would be misconstrued by the public that's reading it?

MS. PEIRSOL: Objection. Lack of foundation.

THE WITNESS: I didn't have any concerns whatsoever on that. It's my job to report the data. I was reporting it accurately. If I would have said anything else like we got 90 percent sensitivity or 90 percent specificity, that would have been false information. So I reported accurate information.

Q. (By Mr. Pineiro) Right. But, I mean, you're -- you're doing more than reporting accurate information. You're also -- you've included this phrase "You can't do better than that," right?

MS. PEIRSOL: Objection. Misstates the document. Misstates the evidence.

THE WITNESS: The phrase "You can't do better than that" is accurate in that you cannot get better than a 100 percent result in an evaluation.

Q. (By Mr. Pineiro) Right.

A. You just can't.

Q. Is there any concern, though, that the public would have -- did -- did you have any concerns that the public would misconstrue this

299

to -- to say, "Co-Diagnostics is telling us their test is a hundred percent accurate"?

A. No.

MS. PEIRSOL: Objection. Asked and answered.

Q. (By Mr. Pineiro) No?

A. No. That is the most elementary understanding in diagnostics. There is no one in -- I mean, you see throughout all of the emails that we were sending back and forth to each other, that myself, that Celia -- Cecilia, that we have numerous individuals who are coming out and stating, "No test is always 100 percent sensitive, 100 percent specific." It is so clearly understood that it just -- it's just not something that you expect anyone else would ever misunderstand who has any understanding of what a diagnostic test is.

Q. But you're -- you're referring to conversations within the company, right?

A. Yes.

Q. And then so the -- and you know this was going out and being read by investors, for example, right?

MS. PEIRSOL: Objection. Misstates his testimony.

300

THE WITNESS: I'm not sure who would be reading this.

Q. (By Mr. Pineiro) Okay. You sent an email calling it an "investor update." You knew investors were going to be reading this, right?

MS. PEIRSOL: Objection. Argumentative. Asked and answered.

THE WITNESS: I wasn't sure who was going to be reading this.

Q. (By Mr. Pineiro) Did you think that investors could possibly read this?

A. I wasn't sure who was going to be reading this. My job was to report the data, and I reported the data.

Q. You did more than that. You have a quote in here, and you have language that goes beyond just reporting data, right?

MS. PEIRSOL: Objection. Misstates the evidence --

MS. OSTLER: Argumentative.

MS. PEIRSOL: -- argumentative.

THE WITNESS: It's hard to report data without putting it in a sentence.

Q. (By Mr. Pineiro) Right. And so the phrase "You can't do better than that," that's a

301

pure -- that's a purely, like, clinical way of describing validation reports?

MS. PEIRSOL: Objection. Argumentative. Misstates his testimony.

THE WITNESS: The 100 percent clinical sensitivity, 100 percent clinical specificity is a clinical way of reporting things. "You can't do better than that" is an observation.

Q. (By Mr. Pineiro) Okay. And before including that sentence in here, "You can't do better than that," you hadn't actually run down and confirmed what problems were occurring in Greece and the bases for those problems, right?

MS. PEIRSOL: Objection. Misstates the evidence. Misstates his testimony.

THE WITNESS: I don't know how that problem was resolved. I don't know -- apart from -- from what was in the email that you showed me -- who it was reported to. What I do know is that it was contamination, and contamination has nothing to do with 100 percent clinical sensitivity and specificity.

Q. (By Mr. Pineiro) You reached a conclusion in your role as chief science officer that the complaint from Greece was based on contamination?

302

A.   Let me restate that.  The woman who was complaining to Cameron believed it was contamination.  Cameron believed it was contamination.  The only question that either one of them had was where the contamination occurred.

Q.   So did you -- are you aware of whether the company, whether Co-Diagnostics, ultimately was able to determine the cause for the problems there?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  I don't know how it was resolved.

Q.   (By Mr. Pineiro)  Okay.  So you had no resolution to that complaint where a customer stopped purchasing your test because of its performance, and yet you went out and you issued a press release that "you can't do better than that"?

MS. PEIRSOL:  Objection.  Misstates the evidence.  Argumentative.  Misstates his testimony.

THE WITNESS:  I didn't say that it was not resolved.  I didn't say that I knew about a pending complaint that was not resolved.  I said that I didn't know if it was resolved.

Q.   (By Mr. Pineiro)  At some point in time before this press release went out, did you sit with

303

somebody within the company and determine the universe of independent evaluations that had been performed of the company's test?

A.   I don't understand that question.

Q.   So before this press release is issued, did you sit down with somebody at the company and -- and figure out, "Okay, how many independent evaluations have been conducted of our test?"  Did you do that?

A.   We looked at -- I requested every piece of data we could get our hands on.  I was severely disappointed that we could not make more data public.  We looked at all of it that was available to us.

Q.   So I've shown you data, for example, from South Africa that wasn't favorable, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.

Q.   (By Mr. Pineiro)  Did somebody bring that up to you in these discussions you had regarding validation reports?

MS. PEIRSOL:  Objection.  Asked and answered.

MS. OSTLER:  Assumes facts not in evidence.

304

THE WITNESS:  The -- there is an assumption in that question that the data is not favorable based on the statements that that distributor made, which may or may not have been accurate.  I don't know whether I was aware of that information at the time.  Had I been aware of that information, it would not have bothered me any more than India reporting that we had 12 percent rate of false positives because it's outside of the confidence interval to such a degree as to alert us that something is going wrong in that process, that everything is not as it seems, and I would have been more than happy to have worked with that distributor, with that lab to resolve their problems just as we did in India.  And everywhere that performed a valid study, a study that used fresh samples, that used a gold standard, that is universally accepted to be of high quality, and that had a comparator test to break the tie, all of those came out beautiful.  And at this point in time, that was a hundred percent sensitivity and a hundred percent specificity, which did not change until Iowa.

Q.   (By Mr. Pineiro)  So is a -- is an independent -- is a distributor's statement

305

regarding the performance of the test, does that qualify as an independent evaluation?

A.   Repeat.

Q.   If a distributor provides you with feedback on the performance of the test, is that -- does that fall within the -- does that -- does that fall within the description of an independent evaluation?

MS. PEIRSOL:  Objection.  Calls for speculation.

MS. OSTLER:  Ambiguous.

MS. PEIRSOL:  Yeah.  Vague.

THE WITNESS:  It depends on what they tell us.

Q.   (By Mr. Pineiro)  What -- what do you mean?

A.   I can't evaluate the statement based on the information you gave me.

Q.   Okay.  If a distributor -- what -- what is an independent evaluation?  What did that mean in here, in this press release?

A.   So a third party has taken our test, they've run it against another test that would be universally seen as a high-quality test -- that is the biggest component -- used with fresh samples to

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                  Confidential                  Brent Satterfield, Ph.D.

306

make sure that -- because RNA degrades over time. You put it in the freezer, you pull it out.

So we've run into -- like in Iowa -- we haven't gotten to this one yet, but in Iowa, they were unaware that due to the supply chain issues, they weren't getting a typical RNA extraction kit, meaning a kit designed to extract RNA and preserve it over its lifetime. Instead, they were getting something else, a DNA extraction kit, which would not remove all of the RNases in the sample, the enzymes that degrade RNA. And so what was happening in Iowa is they were giving us samples to evaluate our test that had completely degraded the RNA. In other words, they're giving us samples with no more RNA in them, and it created a problem in that -- in their process because of the supply chain that had not been validated yet. It had nothing to do with our test. Our test was accurately reporting. The RNA got degraded.

So fresh samples is another component.

Q.    What else?

A.    Preferably the best data is going to have a third-party test to break the tie when the gold standard and our test disagree.

Q.    Oh, okay. So indepen-- that's what

307

"independent evaluation" means?

A.    It also included the government studies that had been done. India and Mexico both were government studies seen as authoritative, the only government studies that we had the data on that had been made public.

Q.    So, again, if a -- if a distributor is running a validation test on -- strike that.

Earlier I showed you an email from a distributor in Greece that indicated that there were some performance problems they've identified with the test. Is that an independent evaluation?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: The email that we read earlier, the distributor did not talk about evaluating the product, they talked about contamination in a batch.

Q.    (By Mr. Pineiro) But they only -- the contamination only came up because they were -- they ran the test against other tests and they were disparate results, correct?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: From the context in the

308

email, it looked like they were troubleshooting to see -- to see where this contamination was coming from, if it was a universal thing.

Q.    (By Mr. Pineiro) Okay. So setting aside contamination, just -- if a distributor comes to you and says the test isn't performing up to par, is that considered an independent evaluation?

A.    No.

Q.    Even if -- even if they come to that conclusion based on a validation study?

A.    Well, if there's a validation study attached to it, then we want to see the data, we want to see their testing methods. As in the case of Iowa, they found a 95 percent rate of sensitivity, and you'll see in my email correspondence with the company that I acknowledge this is the first study -- validation study that's been done in a quality fashion that has a number other than 100 percent.

Q.    Okay. And it was 95 percent, right?

A.    That's what I remember the email saying, yes.

Q.    Is there a significant difference between 95 percent sensitivity and a hundred?

A.    No. And it depends on who you're talking

309

to. To the vast majority of the people we were selling to, not at all. I saw the 95 percent result as another positive confirmation for our test.

Q.    Do you think that maybe just to avoid confusion maybe there could have been a disclaimer in here saying what we've talked about earlier, that no test can be a hundred percent accurate all the time?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I couldn't say what those reading the article would want to see or need to see. That being said, there were disclaimers in our other product literature.

Q.    (By Mr. Pineiro) Right. But there's nothing in here -- do you -- do you think in connection with your role as chief scientist that would have been the more accurate way to have issued a press release, with that kind of a disclaimer?

MS. PEIRSOL: Objection. Asked and answered. Argumentative. Ambiguous.

THE WITNESS: It's not my role to decide what the official company disclaimers ought to contain.

Q.    (By Mr. Pineiro) No, I get that. But you

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                    Brent Satterfield, Ph.D.

310

commented on the -- you had some drafting input on the press release, right?

A.   I had some drafting input on my quote and, it looked like, a couple of recommendations on other thoughts.

Q.   And the press release was provided for you to review, right?

A.   It was provided for me to -- to add comments to.

Q.   Okay.  Do you think it would have been helpful to add that type -- type of disclaimer?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  That wasn't my role.

Q.   (By Mr. Pineiro)  Okay.  But that would have ensured that there'd be no confusion, right?

MS. PEIRSOL:  Objection.  Calls for speculation.  Lack of foundation.  Asked and answered.  Ambiguous.  Argumentative.

THE WITNESS:  I can't say what would have caused more or less confusion.

Q.   (By Mr. Pineiro)  Even though you're a -- you're a -- even though you're chief science officer, you resp-- you -- you know, you understand how people may perceive statements made by the

311

company?

MS. PEIRSOL:  Objection.  Argumentative.  Asked and answered.  Calls for speculation.

MS. OSTLER:  Assumes facts not in evidence.

MS. PEIRSOL:  Lack of foundation.

THE WITNESS:  I would have assumed as a scientist when that -- I say in an article titled "Demonstrates 100 Percent Sensitivity and 100 Percent Specificity Across Independent Evaluations," in an article that attaches those evaluations and attaches all of the data from those evaluations so that anybody can look at it and decide where those comments came from, they wouldn't be total idiots.

I mean, we said it in the context of this was data.  This is data connected to what has been done in these studies.  Here are the studies.  Here is the data.  Look at it.  You figure it out.

Now, I would have never, never in my wildest dreams imagined that would have been confusing for anyone.

Q.   (By Mr. Pineiro)  So anybody that misconstrued this would be an idiot?

A.   No.

312

Sorry.

Q.   Isn't that what you said?

MS. PEIRSOL:  Objection.  Argumentative.  Misstates his testimony.

THE WITNESS:  I am feeling a great deal of emotion and passion.  I apologize for the use of the word "idiot."

Q.   (By Mr. Pineiro)  If you go to the -- to the attachment in the press release -- I think it's page 7 of 24 up top.  So do you know who prepared this -- these summaries?

A.   Not all of them.  For instance, number 4 was taken from a private communication I had talking about the quality controls we had in the Timpanogos Regional Hospital runs, and it wasn't written for -- it wasn't written for a press release, it was just written, communicating what I had seen there.

So these appear to be -- at least mine appears to be -- a cut and paste or some kind of a reformatting of different statements.  So I don't know the origin on all these.

Q.   Do you know who drafted this document we're staring at right now, the language here?

A.   No.

Q.   Okay.  To the bottom -- at the bottom, it

313

says:  "The Minnesota Department of Health comparison data against another assay showing a hundred percent concordance."

Do you see that?

A.   Yes.

Q.   But earlier, wasn't it -- wasn't it an oral rinse group in Minnesota that had actually performed the validation study?

A.   That's what I said in my email, yes.

Q.   Right.  So it wasn't the Minnesota Department of Health, right?

MS. PEIRSOL:  Objection.  Misstates the evidence.  Misstates the document.

THE WITNESS:  This doesn't say that the Minnesota Department of Health ran the study, it just said that the comparison of data -- it's the Minnesota Department of Health comparison data against another assay.  It's comparison data.  It doesn't say who ran it, it doesn't say why they ran it, just comparison data.

Q.   (By Mr. Pineiro)  The data was generated by the Minnesota Department of Health?

MS. PEIRSOL:  Objection.  Misstates his testimony.

Q.   (By Mr. Pineiro)  Who generated the data

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**314**

you're talking about here?

A.   So on this attachment 5, we see the Minnesota Department of Health -- the "MN," standard acronym for Minnesota; "DOH," standard acronym for Department of Health -- Minnesota Department of Health, and there's a series of numbers underneath there.  Those numbers are Ct values, cycle threshold values, that any -- anybody running PCR would be familiar with.  The negative results show the -- a series of samples that had -- that were not positive.  They're negative.

Just to the right of the Minnesota Department of Health, you see the COVID-fam channel, "COV" being a common acronym for COVID, and you can see the numbers side by side that compare and show that those numbers are -- if you were to plot them out, they form a -- each one is -- is a fairly consistent number above and below the cycle threshold of the Minnesota Department of Health data.  And it shows that there was equivalency in this test run by presumably the oral solution company and then the Minnesota Department of Health data, which was collected by the Minnesota Department of Health.

Q.   This -- this chart, who generated this

**315**

chart?

A.   I don't know.

Q.   Whose data is this?  Who -- that -- this table here, where was this data gathered from?

A.   I don't know at this point in time.

Q.   Was it gathered from the Minnesota Department of Health?

A.   The part attributed to the Minnesota Department of Health with their numbers would have been gathered from --

Q.   That's not what I'm asking.

A.   -- the Minnesota Department of Health.

Q.   The whole table, who generated the data -- who provided you with this data?

A.   I don't know who gave us the table, but that table includes numbers generated by the Minnesota Department of Health.

Q.   Okay.  So that -- that -- that statement that this was Minnesota Department of Health comparison data, that wasn't accurate, right?

MS. PEIRSOL:  Objection.  Misstates his testimony.  Argumentative.  Misstates the evidence and the document.

THE WITNESS:  That's an incorrect statement of the document, if I can find where we're

**316**

at again.

Rereading point number 5 on page 7 of 24, it's the Minnesota Department of Health comparison data.  So it's comparison data that includes Minnesota -- run information from the Minnesota Department of Health.  It is stated for what it is.  And it's also stating that it's showing 100 percent concordance, 100 percent sensitivity, and 100 percent specificity in that run with the official Department of Health in Minnesota.

Q.   (By Mr. Pineiro)  So all of this data that was supplied with this document I've shown you with this -- with the press release, all of it meets the criteria you discussed earlier for an independent evaluation, which was concordance, fresh samples, and a third-party validation as well?

MS. PEIRSOL:  Objection.  Misstates his testimony.  Misstates the document.

THE WITNESS:  I also mention the inclusion of government data, that the Indian National Institute of Pathology, as a government entity, part of their official registration process; the Mexican one as part of their official process.  The Minnesota Department of Health comparison data fits that criteria.

**317**

Q.   (By Mr. Pineiro)  Okay.  We can move on.

MR. PINEIRO:  Twenty-two.

(Exhibit 22 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you a document that's been marked as Exhibit 22.  At the bottom, there is an email from you to Chad Apuli and Kenneth C. Bramwell.  Who's Kenneth C. Bramwell?

A.   He was an individual who came over from BioFire, and he was capable of management.  We were still figuring out where he went in that space.  He had contributions in manufacturing and on study design from time to time.

Q.   Okay.  You say:  "Chad and KC, I ran into our first competitor that I believe absolutely has a better LOD than us, the Abbott m200" -- "2000 test.  They claim a 0.1 copy/uL LOD.  We got samples from them in Nebraska that were near their LOD that we consistently were unable to detect."

Do you see that?

A.   Yes.

Q.   Why did you run this analysis?

A.   We didn't run it.

Q.   Who ran it?

A.   Somebody in Nebraska.

Q.   And who told you about it from Nebraska?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                    Brent Satterfield, Ph.D.

318

A.    I don't remember.

Q.    Okay.  So a day after you put out a press release that says:  "You can't do better than that," you're learning that there's a test out there that is -- has absolutely a better LOD than you?

MS. PEIRSOL:  Objection.  Misstates the record.  Misstates the evidence.  Misstates his testimony.

THE WITNESS:  There in no way was any statement in the press release that said you can't do better in the limit of detection.  But you can't do better than 100 percent sensitivity and 100 percent specificity.  You can't do better than 100 percent concordance in an evaluation.

Q.    (By Mr. Pineiro)  Okay.  It says:  "Two thoughts:  Abbott uses digital PCR to quantify the controls."

And then second, it goes:  "We may need a sec"-- "a second product offering to compete with Abbott and other more sensitive players."

Do you see that?

A.    I see what's written.

Q.    What's -- what are the more sensitive players you're referring to?

A.    Here, the word "sensitive" is not

319

referring to clinical sensitivity.

Q.    What is it referring to?

A.    It is referring exclusively to limit of detection.

Q.    Then why didn't you use the word "limit of detection" there?

MS. PEIRSOL:  Objection.  Argumentative.

THE WITNESS:  So in informal emails amongst company personnel, when time is short, the -- we're not breaking out a legal dictionary or a regulatory dictionary to make sure that everything we said is exactly right when the other people in the company understand what it is that we're saying.

Q.    (By Mr. Pineiro)  So who are the more sensitive players you're referring to here?

A.    I don't know.

Q.    You don't know?

A.    No.

Q.    You don't recall?

A.    I don't remember.

Q.    So you said you got this information from Nebraska.  Were you getting other information regarding other tests indicating that they were more sensitive?

A.    No.  Or at least I don't remember.  What I

320

do remember is that Nebraska liked our test and chose to use them over the Abbott test.

Q.    It says:  "As the dust settles, LOD may become an increasingly important aspect of testing."

What did you mean by that?

A.    The emphasis by the competition at that time was pushing for more and more improvement in the limit of detection, like, lowering that limit of detection as far as they could go.  The irony is, is that within a year of that time, the government moved from offering free testing using highly sensitive PCR tests to using antigen tests which had, in some cases, limits of detection 100,000 times higher than what -- the PCR test we're doing.

So clearly at some point the government concluded that PCR tests were way too sensitive in terms of their limit of detection relative to what was required for public health and safety.

Q.    So you're saying that LOD didn't end up becoming an important aspect of testing?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I'm stating that to the state of Nebraska who ran a side-by-side with Abbott and with our test and found that Abbott had a lower

321

limit of detection, that they still chose our test over Abbott.

Q.    (By Mr. Pineiro)  Right.  But is this statement that you made here, did it end up being true or untrue?

A.    It ended up being completely untrue.

Q.    Okay.  It didn't -- LOD didn't become a more important aspect of --

A.    It went the other way entirely where it became a -- less important and then ultimately almost nonexistent because the antigen testing was found to be sufficient to detect the cases in the public.

Q.    Okay.  And then you write up top to Mr. Egan:  "Ike, you asked me to consider what it would take to get our LOD to where we were the top test in the upcoming Utah study.  It actually wouldn't take that much at all.  And the more I think about it, the more I like the idea."

Do you see that?

A.    Yes.

Q.    Did you end up engaging in efforts to try to improve the LOD of the test?

A.    We did some internal studies.  So a test itself, the PCR test, has the theoretical detection

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

322

limit of one copy per reaction. What changes the limit of detection of a PCR test that's performing near -- at or near the theoretical best is the up-front sample preparation. So all of these different laboratories out there, these CLIA-waived laboratories, are taking tests that have an EUA and then coupling them with their sample preparation of choice, almost like changing out Legos, parts of a Lego system. And when they would do that, they could change, they could dial up the limit of detection up or down independent of our test. All they had to do was just change out the front-end sample preparation. So what I was telling Ike is, do you want something that blows Abbott out of the water? Real easy. All we do is a take a sample preparation -- preparation technique that takes in more sample and then spits it out into a smaller volume. Done. So fast.

So in our internal deliberations, we talked about doing that and decided that that was a project for down the road. All we looked at internally was just reporting the correct limit of detection, meaning once we looked at how far down we could actually get that limit of detection with our current test making no changes whatsoever, we got

323

data back to show that we could get a lot better limit of detection than what we were reporting.

Q. And you say: "So we would also sell more tests because we would literally have the best test on the market. So more tests sold plus double the price/test equals a really big opportunity."
Do you see that?

A. Yes. I see what's written.

Q. Okay. So based on doing this, what you've described, you -- you think Co-Diagnostics could have justified doubling the price of the test?

MS. PEIRSOL: Objection. Misstates the document and the evidence.

THE WITNESS: I think that we could have justified doubling the price, tripling the price, quadrupling the price of the test without doing anything at all.

Q. (By Mr. Pineiro) Why?

A. Because we were the best-priced test on the market. We were $10 a test. Early in the pandemic, other companies were coming out with prices of a hundred and fifty bucks or more in some cases.

Q. So, sorry, just a little further -- back -- back to the bottom email, on number 2, you

324

say: "Of course, we could charge more for this product, maybe $20, still less than the competition but with the absolute best performance in every area."
Do you see that?

A. Sorry. Where is it?

Q. It's at the bottom of number 2. You say: "Of course, we would charge more for this product."
Do you see that?

A. I see it.

Q. "Maybe $20, still less than the competition but with the absolute best performance in every area."
Do you see that?

A. Yes.

Q. So you're indicating here that improving the limit of detection would increase the performance of the test?

MS. PEIRSOL: Objection. Misstates the document.

THE WITNESS: So I'm indicating here that in order -- one of the things I'm not saying here is that to make this change, I'm recommending it's going to increase our cost of goods. And so increasing the price of the test isn't -- it's not

325

about increasing the price of a test, it's just saying we could increase it without any problem, no one would ask any questions, and it's going to cover that cost of goods.

The second part of this, "the absolute best performance in every area," is that we're taking a media firestorm over a topic that has no bearing on clinical sensitivity and it's impacting -- or potentially impacting the perception of our future customers. And that's what I'm worried about, is how do we get this into the hands of the people that need it so that we can save lives so that we can do our job as a company.

And I would hate for people not to adopt our test, which is getting a hundred percent sensitivity and a hundred percent specificity in these evaluations that we're sharing. I would hate for that not to get adopted because of accusations that have shown up in the Salt Lake Tribune that have been taken out of context that are not accurate at all, because the entire difference between the 2 percent rate of positives and the 5 percent rate of positives is, in fact, the questionnaire that TestUtah's using. It has nothing to do with our test. And if you'd like, I can walk through that

May 16, 2023 — Confidential — Brent Satterfield, Ph.D.

326

data one more time.

Q. (By Mr. Pineiro) No, that's okay.

A. All right.

Q. So when you were talking about best performance here, you weren't actually talking about performance?

MS. PEIRSOL: Objection. Argumentative.

Q. (By Mr. Pineiro) What does the word "best performance" mean? Perform where? In the field? Clinically? Where?

A. "Performance" means all kinds of things. We already had performance in the field demonstrated at 100 percent sensitivity and 100 percent specificity in the evaluations that we had done. Now we're talking about performance relative to the limit of detection, which is a matter of getting rid of this debate that has nothing to do with clinical sensitivity and clinical specificity.

MR. PINEIRO: Twenty-three?

(Exhibit 23 marked for identification.)

Q. (By Mr. Pineiro) I'm showing you what's been marked as Exhibit 23. This is an email from you to Dwight Egan on May 4th. The subject is: "LOD response."

You write: "Ike, sample questions and

327

responses."

Question: "'How would you respond to statements that your LOD is not as good as other tests and that's why you are seeing lower positive rates?'

"I would keep it short and sweet and stay on message: 'Our test has gone through the FDA EUA process and clinical studies in other countries. We have detected a hundred percent of the positive patient samples. You can't do better than that.'"

Do you see that?

A. I see it.

Q. Why are you providing Mr. -- strike that.

You're providing Mr. Egan with advice on his public statements regarding the LOD?

A. I'm not certain if this is advice for public statements or elsewhere. However, Mr. Ike Egan is not a scientist, and so we're talking about the nuances of limit of detection versus clinical sensitivity.

Q. It says: "In clinical studies in other countries, we have detected a hundred percent of the pos"-- "positive patient samples."

Do you see that?

A. I see that.

328

Q. What's a clinical study?

A. A clinical study involves clinical samples.

Q. Is it, you know, similar to -- is the clinical sensitivity as -- as you were discussing earlier?

A. It provides information on clinical sensitivity and clinical specificity and is done in a quality fashion.

Q. It says: "For a far" -- "for a harder follow-up question like, 'But is it true that a lower limit of detection would be important for certain populations like asymptomatic patients?' I might respond, 'We're still waiting to see the data for what's important for asymptomatic patients. Our unique mathematical approach to design allows us to quickly adapt to evolving circumstances. As always, we're here to be part of the solution.'"

Do you see that?

A. I see it.

Q. It doesn't -- I mean, you indicated earlier that your job as the chief scientist is just to convey and provide data, but you're doing a lot more than that here, right?

MS. PEIRSOL: Objection. Misstates his

329

testimony. Misstate the document.

THE WITNESS: One of my roles as chief scientific officer was to talk with the CEO and educate him on scientific topics.

Q. (By Mr. Pineiro) Right. And, again, there's no -- did you provide Mr. Egan with any counsel here regarding the fact that there had been some performance issues in South Africa, India, Greece, et cetera?

MS. PEIRSOL: Objection. Misstates the evidence. Lack of foundation.

THE WITNESS: I would assume in my role as the chief scientific officer that it's not necessary for me to update the CEO on matters of the company at large, that he's aware of the comings and goings, the happenings, he's aware of the ongoing effort to get distributors and laboratories who've had no prior experience with real-time PCR or that have had limited experience or that are not familiar with how to adapt the many different components of the PCR system. The sample collection, the sample preparation, the devices, all of these components that were normally available in the supply chain were now gone, and they're being given other types of components that -- I would assume that he was

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

330

familiar with all of this effort in the company to do what was not our job. We're getting beyond selling our test into how to troubleshoot, you know, Nomi's engineering system, how to troubleshoot these systems put together in other countries to identify what they are messing up because it helps us sell tests to do that. But we've gone above and beyond our duty. We're working really hard. I'm assuming he's aware of that. But he's needing a technical explanation on limit of detection versus clinical sensitivity.

Q. (By Mr. Pineiro) Did you run these proposed responses by Celia Hutchins -- Cecilia Hutchins?

A. I don't remember doing so.

Q. Okay. Did you run them by legal counsel?

A. I don't remember doing that. That wouldn't be my role.

Q. Whose role would that be?

A. I'm uncertain.

MR. PINEIRO: Twenty-four?

(Exhibit 24 marked for identification.)

Q. (By Mr. Pineiro) I'm showing you what's been marked as Exhibit 24. This is an email from Marissa McEwan to several people to which I believe

331

you're up -- you're here. Yep, Brent Satterfield, you're copied. It says: "Good morning. Here are updates from today, including an important message from management."

And towards the bottom, the section on "Lab, COVID-19," and -- it says: "Development is being worked on by Brent, KC, and Chad to improve limit of detection."

Do you see that?

A. I see that.

Q. Do you know what this is referencing?

A. Not other than what it says.

Q. So do you -- was there -- was there, at this point in time, an effort put together to -- by the company, including -- that involved you to improve the limit of detection of the test?

A. As we've read in other emails, we were certainly talking about it.

Q. Okay.

A. I don't remember what was being done other than talking at this point in time.

Q. And -- and you're saying that ultimately no -- the company ultimately -- to your knowledge, the company did not undertake to improve the limit of detection?

332

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: It actually did, both undertake to report the correct limit of detection, which was much better than what we reported, and to work on further improving the limit of detection. I don't know whether that work was ever pursued to -- to the point that the FDA EUA was amended or that it was used in other countries or settings.

Q. (By Mr. Pineiro) Was that work ongoing at the time that you left the -- your role as chief science officer?

A. I don't know. I had faded out of my position as chief scientific officer before the official stepdown.

Q. What do you mean you faded out?

A. Meaning that my day-to-day contribution -- I -- I didn't officially live in Utah at the time of the outbreak, I had already undergone to step down as chief scientific officer. I was asked to stick around for a little bit longer to help with the company's scale-up to be able to provide millions of tests to customers. I did that. The company was able to run all of those. I was on standby for anything that the company needed at that point. So

333

I didn't follow all of the changes that went on in that -- the remainder of the year of 2020.

Q. The -- where did you -- you didn't reside in Utah during the -- strike that.

So when the COVID pandemic struck, you weren't residing in Utah?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: When the COVID pandemic struck, I was not residing in Utah.

Q. (By Mr. Pineiro) Did you move to Utah after that?

A. I did later move to Utah, yes.

Q. When was that?

A. I don't know if "move's" the right word. I was in an Airbnb in Utah. Probably around May of 2020.

Q. May of 2020?

And for -- would you staying there the entire -- were you in the Airbnb, you know, semi-permanently? Or would you, you know, fly back and forth?

A. I was back and forth for part of it. I was going through a divorce, so I was here.

Q. So you were here?

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

334

A.   I was here.

Q.   Okay.  Were you going in to the office?

A.   Yes.

Q.   Okay.  And then after the Airbnb, did you just permanently move to Utah after that May 2020 date?

A.   I ended up meeting someone out here and never left.

Q.   Okay.

MR. PINEIRO:  Can we take a bathroom break, if you guys don't mind?

MS. PEIRSOL:  Sure.

MS. OSTLER:  That would be great.

THE VIDEOGRAPHER:  Going off the record.  The time is 5:36.

(Recess taken.)

THE VIDEOGRAPHER:  Returning on the record.  The time is 5:45.

(Exhibit 25 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you what's being marked as Exhibit 25.

So the back -- all the way at the back, there is an email from you on May 14th to Michael Pentella over at -- it looks like University of Iowa?

335

A.   I don't know if that was his current position, but Michael Pentella, yes.

Q.   Yeah.  You -- and -- and who is he?

A.   He was associated with the TestIowa that -- the state's testing in Iowa.

Q.   Got it.

And he says:  "Mike" --

And you say:  "Mike, Dave Elkington tells me you've tabulated or nearly finished tabulating the results.  Just curious how it came out for our test, as well as for the CDC test."

Do you see that?

A.   Yes.

Q.   And then he writes:  "Hi, Brent.  We reached the 95 percent compared to the CDC-based assay."

Do you see that?

A.   Yes.

Q.   What -- what is he referencing there?  Do you know?

A.   They had an -- I don't know exactly what he's referencing here other than they got the 95 percent result.

Q.   When he says "compared to the CDC-based assay," what did -- you don't know what that means?

336

A.   They had a modified version of the CDC test that they were using in-house for their gold standard.

Q.   So it says -- he says:  "Our statement to the press is:  'SHL arrived at its accuracy ratings'" --

Do you know what "SHL" stands for?

A.   No.

Q.   -- "'arrived at its accuracy ratings after testing 871 samples and getting a hundred positives.  Testing was performed between Co-Diagnostics and the CDC-based procedure for comparison.  All machines worked fine.  However, Co-Diagnostics provided alternative equipment to the original thermocyclers that better matched up with the needs and experience of the lab.'

"The specificity was 99.7 percent."

Do you see that?

A.   Yes.

Q.   And so do you understand what he means by "testing was performed between Co-Diagnostics and the CDC-based procedure for comparison"?

A.   He was using the -- or they were using a modified CDC test, so meaning that they had amped it up to make it more sensitive.  They were using this

337

modified CDC test as a gold standard.

Q.   Got it.

So this was a concordance validation study?

A.   It was a concordance validation study.

Q.   And then if you just go -- and then it seems like you email Mr. Egan -- Seth Egan and Jennifer Webb, and you say:  "Jennifer, Mike from Iowa attached the statement they are releasing to the press.  He also shared the sensitivity and specificity they saw in comparison with the CD" -- "CDC test as resolved by Cepheid."

What is Cepheid?

A.   Oh.  They had a third-party test to break ties.  That was the Cepheid test.

Q.   And then if you go to the first page, Ms. Webb asks you for a sentence on what this looks like in a patient population.  And you wrote:  "It means we detected 95 out of a hundred people who were confirmed positive in the TestIowa population."

Do you see that?

A.   Yes.

Q.   So does that indicate 95 sensitivity -- 95 percent sensitivity?

A.   They were finding a 95 percent sensitivity.

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

338

Q.   Okay.  Is there -- is there a significant distinction between 95 and a hundred percent when it comes to false negatives in -- in testing for COVID?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  I have answered this before, and it does depend on who you talk to, but for us, this was -- this was a win.

Q.   (By Mr. Pineiro)  Now, it is -- it's not the same as the validation reports that you cited in the press release, right?

A.   No.

Q.   Okay.  And then it seems like you write up top:  "Well, that may change how we reference our sensitivity in the future, maybe even in response through Deseret News."

Do you see that?

A.   Yes.

Q.   Okay.  Do you know -- what did you mean by that?

A.   That people had asked us if we'd ever had any data that was not 100 percent sensitive and 100 percent specific in a clinical study, and this was the first data that used fresh samples with a gold standard of universally accepted high quality

339

and a third-party comparator to break the ties.  So the -- this was data that we would include from that time forward in -- in any references to what we had experienced in the field.

Q.   Did you know whether CODX issued a press release with -- setting out this sensitivity data?

A.   I don't know if they did.

Q.   Okay.  Did you make that request of the company?

A.   No.

Q.   At some point in time around this -- May of 2020, do you know whether CODX was approached about doing a joint validation study in Utah?

A.   I remember Bert Lopansri talking to me on the phone about a joint validation study and had mentioned that they had been told that we would not be interested.  I told them that was false, that we would absolutely present -- or participate in any study that they were doing.  We were told that we would be included in the study, told that samples would be sent to us, and then they weren't.

Q.   So Co-Diagnostics agreed to participate in the study, but they were ultimately excluded from it?

MS. PEIRSOL:  Objection.  Misstates his

340

testimony.

THE WITNESS:  I don't know why we didn't receive the samples, but we did not receive them.  We told the different groups at Intermountain Healthcare and elsewhere that we were willing and desirous, wanting to participate in the studies that were being done in Utah, that we didn't care if the other parties of TestUtah were favorable to those or not, that we were willing to participate, that we believed in the collaborative effort, that we knew that our test would perform well in those studies.

Q.   (By Mr. Pineiro)  Okay.  So you don't know why it is that ultimately the company did not participate in -- in a joint validation study?

A.   I --

MS. PEIRSOL:  Objection.  Misstates the record.  Lack of foundation.

Q.   (By Mr. Pineiro)  Do you know why?

A.   I can't --

MS. PEIRSOL:  Same objections.

THE WITNESS:  I can't state why the -- those running the study did not send us the samples like they told us they would do.  I also can't state why Robyn Dunn did not answer or return phone calls about running a study with us.

341

Q.   (By Mr. Pineiro)  Who is Robyn Dunn?

A.   She was running the state's health department, specifically over the COVID response.

And forgive me if I got her name mixed up with her sister Angela Dunn.  It's one of the Dunn girls.  Gosh.

Q.   Were you ever made aware of any of CODX's distributors misconstruing the May 1st press release in any way?

A.   I heard a story about someone claiming to be our distributor misrepresenting, but I don't remember any stories about actual distributors misrepresenting.

Q.   Do you recall any FDA inquiry to CODX about representations being made by the company's distributors who were marketing the test as a hundred percent accurate?

MS. PEIRSOL:  Objection.  Ambiguous.  Lacks foundation.

THE WITNESS:  Can you repeat the question?

Q.   (By Mr. Pineiro)  Let me show you a document.

A.   Okay.

MR. PINEIRO:  This is 26?

(Exhibit 26 marked for identification.)

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                 Confidential                 Brent Satterfield, Ph.D.

342

Q.   (By Mr. Pineiro)  This is an email from Ms. Hutchins to Ms. Webb, Mr. -- Mr. Benson, and you.  She says: "So this last Monday, I received a complaint from the FDA that one of our distributors had on their website the claim of a hundred percent sensitivity and specificity about the Logix Smart.  This is what the FDA sent me in the email."

And you see some language from the FDA.  Do you recall receiving this email?

A.   No.

Q.   Do you recall what your response was to receiving this email?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  No.

Q.   (By Mr. Pineiro)  No.

Do you recall having any conversations with Ms. Hutchins about CODX's distributors making claims about the test being a hundred percent sensitive and specific?

A.   No.

MR. PINEIRO:  That's 27?

(Exhibit 27 marked for identification.)

Q.   (By Mr. Pineiro)  This is Exhibit 27.  I'm showing you what's been marked as Exhibit 27.  There

343

is an email from you to Mr. Apuli on May 20th where you write: "Chad, see the link below.  Deselect the other companies and select Co-Diagnostics.  You can download the data in an Excel spreadsheet.  This was a study not run by FIND but submitted to FIND from South Africa."

What is FIND, F-I-N-D?

A.   FIND is -- I don't know the acronym or their -- their total scope of activities, but they're generally regarded as an international philanthropic organization that helps get diagnostics into the third world.

Q.   Got it.

And it says: "It looks like no info was available other than they claim to have used our test with the MagNA Pure."

What's MagNA Pure?

A.   MagNA Pure is a method of sample preparation that we had not, at least at that date, validated with our test.

Q.   And then it says: "To evaluate six positive samples, finding four of them positive, 66.67 percent sensitivity."

Do you see that?

A.   I see that.

344

Q.   Okay.

A.   And the next sentence that says they reported a limit of detection a lot better than what we reported to the FDA of .2 copies per microliter.

Q.   So was this -- do you know whether this was a valid evaluation of the test?

A.   I have no idea.

Q.   Did you look into it?

A.   We did.

Q.   And what did you find?

A.   I don't remember being able to find whoever ran the study.

Q.   You never -- so you were never able to ascertain how they conducted this study?

A.   No.

Q.   Okay.  Did you notify anybody at the company that perhaps you should issue an update about the company's sensitivity performance based on this information?

A.   Not that I remember.

Q.   Why not?

A.   Because like we've stated before, anytime that the clinical sensitivity was reported to be less than what the confidence interval was -- if it's a little bit less, that's expected.  That's

345

okay.  But if it's a lot less -- like 66 percent is way outside of the range of clinical sensitivities we've seen.  So either they were not measuring clinical sensitivity or they did something really wrong with their test.

And this appears to be missing the attachment with the data, but I remember that the data performed by other well-known international tests in this study also had low levels of sensitivity.  So we would work with a distributor who wanted to discover why the data was not performing the way that our test was labeled.  Any distributor that wanted to work with us, to my knowledge, we either never located this distributor or just didn't get any answer out of them.

Q.   Are you familiar with any validation analyses run by the FDA in like September of 2020?

A.   No.

Q.   So one of the things -- I -- I -- I did read your book.  So one of the things that I -- that I read in the book is about the concept of -- this is your second book, the one that was published in 2021.  What was the name of that book?

A.   Bringing Heaven Home.

Q.   And one of the concepts you discuss in

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

346

there is manifestation, correct?
A. Yes.
Q. What is that? Can you describe that to me, what that means?
A. "Manifestation" in popular literature is simply noticing a connection between what you feel within you and what shows up in the world around you.
Q. Does it mean that if you concentrate or meditate enough on something, that you can actually manifest it into reality?
A. I think there's quite a few people who believe that. I stop short at that to I just notice the connection between two events.
Q. So, for example, like, in your book, you reference that at one point you wanted to see what it would be like for your -- the company's -- CODX's stock price to increase, and then you -- you know, you meditated, and you manifested an increase of the stock price. The book talks about that, right? So you -- you believe that --
A. It talks about me wanting that -- to see that, meditating with that feeling, and then the stock price goes up.
Q. Right. But through manifestation, you're

347

actually causing that to occur?
A. I don't know if that's the case, but there is a synchronicity. I think the term is better referred to as "synchronicity" because it takes a little bit of the "I" out of the process. It's just something you observe.
Q. But does your -- when you say "manifest," that usually means that you're able to bring something about, correct?
MS. PEIRSOL: Objection. Misstates his testimony. Lack of foundation.
Q. (By Mr. Pineiro) Go ahead.
A. Do you want me to say something different than I've already said?
Q. Yeah. Just answer the question. I just want you to answer the question. So -- I mean, so what you're saying is that you're not actually -- so "manifesting" means you've -- you meditate on something, you feel something, and then maybe it happens?
MS. PEIRSOL: Objection. Misstates his testimony. Lack of foundation.
Q. (By Mr. Pineiro) What does it mean?
MS. PEIRSOL: Same objections.
THE WITNESS: In popular literature, there

348

are a number of people who do take that attitude that you can influence external events by changing internal conditions. I tend to take a more passive stance that you can observe external conditions that match internal changes but that it's not that you're causing them.
Q. (By Mr. Pineiro) So you're not -- okay. So what's the connection between what you feel, your meditation, and what occurs?
A. I think that is a matter of speculation.
Q. Well, what do you think?
A. I think that feeling positive about life and situations in general is always a good thing.
Q. No, but what do you -- is there any connection -- so do you believe that by being positive about something or desiring something and feeling positive emotions about it, that you could potentially play a part in manifesting its occurrence?
MS. PEIRSOL: Objection. Asked and answered.
THE WITNESS: I do believe that there is a connection between consciousness and quantum particles and how they behave.
Q. (By Mr. Pineiro) So --

349

A. Whether that has anything to do with the world around us I think remains to be seen.
Q. So, I mean, in your book, you write: "The manifestation is not the act of hijacking power from God, but rather remembering the power of God already within us and taking back conscious control of that creation rather than deferring it to our subconscious autopilot programs. It is to use prayer as it was originally to be used, with power and intention."
And then you say: "There really are no steps." But if you had to summarize, just feel the emotion of what it is you are creating.
So when you talk about "creating," it seems like you're indicating that the emotion can create the event you seek, right?
MS. PEIRSOL: Objection. Misstates the evidence.
THE WITNESS: When you plan out your day, your future, I think most people would assume that the emotion they have about making that plan influences whether it comes about.
I'm not sure where you're going with this.
Q. (By Mr. Pineiro) I'm -- I'm just trying to -- I mean, you -- for example, your book

350

references manifesting increase of the stock price.

A.   Okay.

Q.   You were the, you know, executive of a company, and I'm asking you what is meant through this concept of manifestation.

MS. PEIRSOL:  Asked and answered.

THE WITNESS:  It meant that I had a positive feeling about the company's future and then I observed that that happened.

Q.   (By Mr. Pineiro)  So you also write: "Most of us simply haven't realized that we can intentionally bring emotions into our heart or that when we do so, life has a way of mirroring back to us what we just put in our heart."

What do you mean by that?

A.   A mirror is a reflection, and I've just observed that when you put positive things in your heart, a lot of times positive things show up around you.

Q.   So there is an example of, like, one time that you were very -- you were dreading a fifteen-thousand-dollar bill, you went into meditation, and then after you finished meditating, it turns out you didn't actually have to pay the bill?  Was that an instance of manifestation?

351

A.   It's an instance of a really cool coincidence that you had a feeling inside you and something happened in the world around you.

Q.   So it's only a coincidence?

A.   I think that is, for me, another word for "manifestation," is that you observe these coincidences.

Q.   But a coincidence is not something that you create.  Do you have any -- any role in creating these events?

MS. PEIRSOL:  Asked and answered.

THE WITNESS:  I think that's something that could be debated.  There just -- there isn't scientific data on this subject.

Q.   (By Mr. Pineiro)  I get -- I get that, but what do you think?  I mean, you wrote a book on it, so I'm just asking about it.

A.   I wrote a book on the changes in my personality over time due to a series of experiences I had that were like near-death experiences, and one of the things I talk about is observing that the external world often reflects what we're going through inside of us.

I'm not sure what that has to do with what we're here for.

352

Q.   So you write:  "The types of experiences we can manifest are without limit."

So it seems like -- I mean, you're indicating here the types of -- what do you mean by that, "the types of experiences we can manifest are without limit"?  It means you can manifest anything?

MS. PEIRSOL:  Objection.  Misstates the evidence.  Assumes facts not in evidence.

THE WITNESS:  It means that I don't believe that anyone should be limited in their dreams and how they feel about life.

Q.   (By Mr. Pineiro)  Did this book cause any con-- did -- did what you said -- said in this book -- or did the book cause any concerns within Co-Diagnostics?

A.   No.

Q.   Did you discuss it with anybody within the company?

A.   I gave a copy to Ike Egan and to Seth Egan.

Q.   When did you do that?

A.   Sometime after I published it.

Q.   And after that, did you step down as chief science officer?

A.   I don't know if it was before or after.

353

They were happening at about the same place and time.

Q.   And -- and did anybody affiliated with the company express any concerns about some of the statements you made in your book?

MS. PEIRSOL:  Objection.  Calls for speculation.

MS. OSTLER:  Ambiguous.

Q.   (By Mr. Pineiro)  To you.

A.   No one expressed any concerns to me.

Q.   Are you -- are you -- besides your work as a -- on the advisory board -- strike that.

Are you presently working on writing or publishing any other books?

A.   Not yet.

MR. PINEIRO:  Why don't we take five and let me review my notes.

MS. PEIRSOL:  Sure.

THE VIDEOGRAPHER:  Going off the record.  The time is 6:10.

(Recess taken.)

THE VIDEOGRAPHER:  Returning on the record.  The time is 6:19.

(Exhibit 28 marked for identification.)

Q.   (By Mr. Pineiro)  I'm showing you what's

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

354

been marked as Exhibit 28.  At the bottom, there is an email from Mr. Apuli to you and some other -- you're copied on it, on March 12th.

Do you see that?

A.  Yes.

Q.  And it says:  "Hello, all...the results, and I'm not sure if you'd like me to email the individuals as well, but some of the results are somewhat inconclusive, and I'm not sure if we want to prevent people from coming in because of that.  I've included the run file for those who are interested in looking at the results."

Do you know what he's referencing here?

A.  I don't remember exactly.

Q.  Did -- did the -- did -- did CODX, I guess, have employees who thought they might have COVID and then test them?

A.  At one point in time, yes.

Q.  Okay.  And is this what -- is this what that is referring to?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  Yeah, I don't know if that's what this is referring to.

Q.  (By Mr. Pineiro)  Then it says:  "One of

355

the three NTCs came up positive for COVID."

Do you know what an "NTC" is?

A.  "Negative template control."

Q.  What's a -- what's a negative template control?

A.  Basically the same thing as a negative control.  There -- there is no virus added to that sample; it's expected to be negative.

Q.  "This was also true when we re-ran [redacted] and his family's samples, and we had some results where the first run and the second run don't match.  I've attached those results.  These discrepancies could be due to random variability, or there could be contaminations or issues with the test.  However, we haven't seen these issues during the validation, but may be because of the contrived samples that we've been use" -- "but that may be because of the contrived samples that we've been using may not represent the real-life scenario."

Do you see that?

A.  Yes.

Q.  So is -- is Mr. Apuli indicating that -- I guess that validation on contrived samples sometimes doesn't translate to, I guess, clinical validation?

MS. PEIRSOL:  Objection.  Calls for

356

speculation.

THE WITNESS:  I don't know what Mr. Apuli was conveying here.  What I can say is that a negative template control showing up as positive is immediately suspect as having contamination in the lab.

Q.  (By Mr. Pineiro)  Okay.  So do you know whose lab -- was this CODX's own lab?  Or what lab was this being run at?

A.  This would have been Co-Diagnostics' lab.

Q.  Okay.  And you say:  "Chad, thanks for the results.  Rebecca and I had a chance to look at these.  Only one of these has a positive level above the LOD cutoff.  Just in case, [redacted] will stay home tomorrow and get checked out by a doctor."

Does this refresh your recollection about what's being referenced in Mr. Apuli's email?

A.  Pieces of it.

Q.  Okay.  "The rest all look like the false amplification in the negative controls and did not exceed the LOD threshold."

What does that mean, that sentence?

A.  I don't remember exactly.

Q.  It says:  "We can repeat this procedure tomorrow with the CDC primer sets."

357

Do you see that?

A.  Yes.

Q.  Okay.  Do you know if that was done?

A.  I don't remember.

Q.  So does it seem like there are some issues here with the Logix Smart test being conducted on CODX's own employees?

MS. PEIRSOL:  Objection.  Misstates the evidence.

THE WITNESS:  Not at all.  It seems like there was some contamination in the lab that had to be dealt with -- it's -- like I said before, it happens to all labs at some point in time -- and that as a precaution, in case it was not contamination, in an abundance of caution, a person who had shown up who had a high fever was told to stay home.

Q.  (By Mr. Pineiro)  Okay.  Did you ever have any conversations with Kara Levinson in Tennessee?

A.  The name sounds familiar, but I don't remember communications with her directly.

Q.  Okay.  With respect to the pre-- the May 1st press release that we've been over, you know, I showed you the -- the data that was attached to that -- to the press release, correct?

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

358

A.   The data attached to the --

Q.   Yeah.

A.   -- press release?

Q.   The validation studies?

A.   Yes.

Q.   Did you let -- did Ms. Garcia -- did Rebecca Garcia know that -- did you tell her that you would be using those validation studies and attaching them to the press release?

A.   No.

Q.   And why -- why didn't you tell her that?

A.   Because I didn't know.

Q.   You didn't know either?

A.   I also didn't know that my paragraph that went into line number 4 of those five points, which had some of my words in there, was going to be used in that data set.

Q.   You didn't know that your -- your own words -- you didn't know that you were going to be quoted in the press release?

MS. PEIRSOL:  Objection.  Misstates his testimony.

Q.   (By Mr. Pineiro)  Oh, you're talking about the -- the summary page where they took your words and it appears they -- and you said they inserted

359

them into that summary?

A.   That's correct.  And in item number 4 specifically.

Q.   Right.  Okay.  So you didn't know that was going to happen?

A.   No.

Q.   And -- and you also didn't know that her -- you didn't know that her -- that these reports were going to be attached to the press release?

A.   I mean, to be fair, I don't know that anyone knew that because the idea of the press release came out within -- I mean, the Salt Lake Tribune article was published on the -- April 30th.  The press release is May 1st.  So there wasn't a lot of planning time here.  It -- the idea was formed, the paper was written, the "go" button was hit.  So there really wasn't a lot of back-and-forth communication with individual members of the company.

Q.   After the release was issued, did you -- did you -- did you -- you read the release, correct?

A.   Probably.  I don't remember, but probably.

Q.   Okay.  And do you remember seeing the validation reports attached to the release?

360

A.   I remember at least glancing at them.

Q.   Did you ever tell anybody at the company that they shouldn't have attached those?

A.   No.

Q.   Do you think it was appropriate to attach them?

A.   I couldn't comment on the data that Rebecca put into her report, other than to say it's company property and the company executive gets to decide how to use company property.  I mean, that's the whole point of putting the data into a company report, is to label it as company property.

Q.   Right.  And did Ms. Garcia ever express to you that she was -- that she didn't agree with disseminating those reports in the press release?

A.   Not that I remember.

Q.   And that validation -- those validation studies are not peer-reviewed, right?

A.   Those validation studies were not peer-reviewed at that time, and I'm not aware of them having been published in a peer-reviewed paper since.

Q.   Are you aware of any peer-reviewed studies that have evaluated the Logix Smart's sensitivity and specificity?

361

A.   Not other than the one that you briefly showed us this morning.

Q.   The Israeli study I showed you?

A.   Yes.

Q.   Okay.  Has -- do you know whether CODX has ever requested to have that done?

A.   You know, I have seen other papers with sensitivity and specificity in them, but I couldn't tell you right now who they were.  A quick literature search would turn them up.  I'm guessing if they had results that you liked, we would have talked about them today.

THE VIDEOGRAPHER:  That's seven minutes, Counsel.

MR. PINEIRO:  I have a couple more.

MS. OSTLER:  Wait.  Sorry.  Say it again?

MR. PINEIRO:  I have a little -- a few more questions.

MS. OSTLER:  Well, I think you need to ask Dr. Satterfield if he's willing.

MR. PINEIRO:  Okay.  Doc-- well, I'm going to ask his counsel and Dr. Satterfield.

MS. PEIRSOL:  I mean, how many -- how much longer are we talking here?

MR. PINEIRO:  I have one more document,

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                 Confidential                 Brent Satterfield, Ph.D.

362

and that's about it.

MS. OSTLER:  Dr. Satterfield?

THE WITNESS:  How -- roughly how many questions on the document?

MR. PINEIRO:  I don't know.  I'm just going -- it's just one more document.

MS. OSTLER:  You have the right to say no.

MR. PINEIRO:  The alternative is -- I'm only asking for a little bit of time, and I would have to then go to a magistrate judge, potentially.  I'm going to talk to your counsel and not you about this just so you -- so I'm not arguing with you on this and ask for five minutes that I'm requesting here.  I haven't moved to strike any of your answers.  I'm only -- I mean, this -- this shouldn't be a big deal.

MS. OSTLER:  It's totally up to you.

THE WITNESS:  Okay.

How are you feeling?

THE COURT REPORTER:  I'm okay.

THE WITNESS:  I'm okay with a couple extra questions.

Sorry I didn't ask you.

MR. PINEIRO:  This is what number?

THE COURT REPORTER:  Twenty-nine.

363

(Exhibit 29 marked for identification.)

MS. OSTLER:  Videographer, can you please give us a notification when five more minutes have passed?

THE VIDEOGRAPHER:  I'm sorry.  What?

MS. OSTLER:  Can you tell us when five more minutes have passed?

THE VIDEOGRAPHER:  Sure.

MS. OSTLER:  Thank you.

Q.   (By Mr. Pineiro)  So I'm showing you an email from Bobby Baird to you.  It says:  "Can we talk?"

It's dated February -- May 30, 2020.

Do you see that?

A.   Yes.

Q.   And Mr. Baird is the person that you referenced earlier as you had a difficult interaction with?

A.   Yes.

Q.   Okay.  Do you recall receiving this email?

A.   I don't recall the content, but I remember him reaching out for a follow-up interview.

Q.   And did you provide a follow-up interview?

A.   No.

Q.   Why not?

364

A.   Because I -- I've already expressed how I felt about Mr. Bobby Baird as being one of the most disgusting and dishonest people that I have encountered, and there is not a chance in this world that I would talk to him again and give me -- give him another chance to make me feel that way as an individual.

Q.   So in the third paragraph, he says:  "I've done enough reporting now, though, that I also feel confident that some of the parties to TestUtah are not playing straight with me."

Do you see that?

A.   Yes.

Q.   Do you know what he was referring to?

MS. PEIRSOL:  Calls for speculation.

THE WITNESS:  I can't say what he's referring to exactly.  I do know that he asked me to cough up dirt on different members of TestUtah and threatened to say negative things about us if I didn't comply.

Q.   (By Mr. Pineiro)  What members of TestUtah did he say that he wanted you to, you know, give him dirt on?

A.   I'd say Nomi Health, but that is kind of a umbrella of that whole group of organizations,

365

because I don't remember which ones specifically.

Q.   Got it.

And do you remember any follow-up conversation -- he's asking you, "Can we talk?"  Did you end up talking to him after this email was sent?  Do you know?

MS. PEIRSOL:  Asked and answered.

THE WITNESS:  No, I did not.

Q.   (By Mr. Pineiro)  One of the things your -- your book also references you had certain addictions.  Do you recall what that was in reference to?

A.   You'd have to show me where in the book.

Q.   I'm sorry?

A.   Which part in the book are you referring to?

Q.   Your book references addictions at one point.

A.   Okay.

MS. PEIRSOL:  Objection.

Q.   (By Mr. Pineiro)  Was that a reference to drug addictions?

MS. PEIRSOL:  Object-- objection.  Vague.  We're over time.  This isn't relevant.

MR. PINEIRO:  You guys gave me --

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

366

MS. OSTLER: No, we're going to cut it off.

MR. PINEIRO: Really?

MS. OSTLER: Yeah.

MS. PEIRSOL: Over this book? Like, come on.

MS. OSTLER: If you want to do this crap, you can go to the magistrate about it.

MR. PINEIRO: So this is -- so he's given super-long answers to these questions --

MS. PEIRSOL: Let's go off the record.

MS. OSTLER: That's okay.

MS. PEIRSOL: We're over time.

MR. PINEIRO: Let's go off.

THE VIDEOGRAPHER: Going off the record. The time is 6:32.

(Off the record.)

THE VIDEOGRAPHER: Returning on the record. The time is 6:33.

MR. PINEIRO: So for purposes of the record, I was cut off on the last series of questions. Counsel has objected to continuing the deposition after having provided me with five minutes because they've indicated this testimony isn't relevant. And so I obviously object to them

367

cutting off the deposition prematurely, and I guess we'll take it up.

MS. PEIRSOL: And for purposes of the record, I'd like the record to reflect that the rule allows counselor seven hours on the record, and we are past seven hours on the record.

MR. PINEIRO: Noted.

THE VIDEOGRAPHER: Do you guys need read and sign on the record?

MS. OSTLER: Yeah, we do need to read and sign. And for purposes of the protective order, we'd like to designate the entire transcript confidential provisionally.

MR. PINEIRO: Okay.

THE VIDEOGRAPHER: Going off the record. The time is 6:34.

(Deposition concluded at 6:33 p.m.)

(Read and sign requested.)

(Electronic copy of transcript requested by both counsel.)

368

C E R T I F I C A T E

STATE OF UTAH          )

COUNTY OF SALT LAKE  )

I HEREBY CERTIFY that I have read the foregoing testimony, and the same is a true and correct transcription of said testimony except as I have indicated said changes on enclosed errata sheet.



BRENT SATTERFIELD, Ph.D.



Subscribed and sworn to at this       day of                2023.

369

C E R T I F I C A T E

STATE OF UTAH          )

COUNTY OF SALT LAKE  )

THIS IS TO CERTIFY that the deposition of Brent Satterfield, Ph.D., was taken before me, Lindsay Payeur, a Registered Professional Reporter in and for the State of Utah.

That the said witness was by me, before examination, duly sworn to testify the truth, the whole truth, and nothing but the truth in said cause.

That the testimony was reported by me in Stenotype, and thereafter transcribed by computer under my supervision, and that a full, true, and correct transcription is set forth in the foregoing pages.

I further certify that I am not of kin or otherwise associated with any of the parties to said cause of action and that I am not interested in the event thereof.

WITNESS MY HAND this 24th day of May 2023.

Lindsay Payeur, RPR

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

### Exhibits

**Satterfield Exhibit 1**
29:2,3,5
**Satterfield Exhibit 2**
108:19,20 109:11
**Satterfield Exhibit 3**
117:14,17,19 120:22
**Satterfield Exhibit 4**
120:20 121:6
**Satterfield Exhibit 5**
131:7,9
**Satterfield Exhibit 6**
138:18,24
**Satterfield Exhibit 7**
146:5,7
**Satterfield Exhibit 8**
158:10,12
**Satterfield Exhibit 9**
168:22,24
**Satterfield Exhibit 10**
175:8,10
**Satterfield Exhibit 11**
181:11,20 184:9
**Satterfield Exhibit 12**
189:10
**Satterfield Exhibit 13**
210:17,19
**Satterfield Exhibit 14**
214:3
**Satterfield Exhibit 15**
229:9,11
**Satterfield Exhibit 16**
230:16
**Satterfield Exhibit 17**
240:4,6
**Satterfield Exhibit 18**
258:24 259:1
**Satterfield Exhibit 19**
273:13,15 284:13
**Satterfield Exhibit 20**
284:1,3
**Satterfield Exhibit 21**
291:12,20
**Satterfield Exhibit 22**
317:3,5
**Satterfield Exhibit 23**
326:20,22
**Satterfield Exhibit 24**
330:22,24
**Satterfield Exhibit 25**
334:19,21
**Satterfield Exhibit 26**
341:25
**Satterfield Exhibit 27**
342:23,24,25
**Satterfield Exhibit 28**
353:24 354:1
**Satterfield Exhibit 29**
363:1

---

### $

**$10** 323:20
**$150** 35:1
**$2** 35:7,8 36:18
**$20** 324:2,11
**$50** 36:16,17
**$60,000** 11:19

---

### 0

**0.1** 317:16

---

### 1

**1** 18:14 29:2,3,5,6
**1.1** 71:6
**1.2** 71:8
**1.5** 70:3,6 129:24,25 130:3
**10** 71:6 175:7,8,10
**10,000** 140:20 270:18
**100** 73:15,18,19 86:14,15
98:12 120:16 142:6,9
164:9 191:18 200:24
202:12 257:24 263:23
264:10 266:6 277:6 278:5,
6,10 282:8,9 294:5 296:4,
5,7,10 297:9,10,12,13,16
298:20 299:13 301:5,6,21
308:19 311:9,10 316:7,8,9
318:12,13,14 326:13
338:22,23
**100,000** 320:13
**10:03** 53:18
**10:13** 53:21
**10:37** 125:21 166:17
**10th** 166:10
**11** 181:11,18,20 184:6,9
**11:13** 105:10
**11:23** 105:13
**12** 125:16 177:4 189:9,10
304:8
**12:30** 138:20 157:17
**12:57** 183:16
**12th** 354:3
**13** 147:16 210:15,17,19
**13443** 7:25

**14** 44:1 115:4 117:25
214:2,3
**14th** 334:23
**15** 229:8,9,11
**16** 6:4 168:25 230:16
256:22
**17** 240:4,6
**179** 214:18 219:11,20
**17th** 175:11 181:21 184:10
**18** 111:4 258:23,24 259:1
**19** 273:13,15 284:13
**1995** 19:21
**1st** 144:5 145:17 205:17
228:13 246:23 262:11
274:24 284:11 291:23
341:8 357:23 359:15

---

### 2

**2** 55:14 108:19,20 109:11
124:5,19 160:1 230:2
253:6,10,25 258:2 286:6
323:25 324:7 325:22 344:4
**2,000** 12:24 16:13
**20** 71:6 98:14,16 184:3,4
284:1,3
**200** 270:14
**200,000** 11:2
**2000** 317:15
**2005** 29:12,13
**2008** 38:13
**2009** 19:6
**2010** 19:6
**2011** 32:24 33:22
**2012** 32:24
**2013** 39:14 41:12 43:25
44:25
**2015** 46:7 49:8,19 51:7,9
**2017** 64:13
**2018** 11:5 12:5
**2019** 129:6 148:2,19
**2020** 18:14 52:14 88:8
90:9,11 117:25 158:22
160:1 168:25 218:22
240:10 333:2,17,18 334:5
339:12 345:17 363:13
**2021** 25:19 51:21 115:4,5
345:23
**2022** 17:17 110:9
**2023** 6:4
**20th** 189:20 193:6,7 343:1
**21** 291:12,20

**21st** 210:20
**22** 256:22 317:3,5
**225** 81:3
**23** 326:20,22
**24** 140:10,20 218:22
312:10 316:2 330:22,24
**240** 81:4
**25** 334:19,21
**26** 341:24,25
**27** 342:22,23,24,25
**28** 353:24 354:1
**29** 363:1
**29th** 230:18 234:22
**2:10** 183:19
**2nd** 121:8 125:21 160:9
161:18 166:11,14

---

### 3

**3** 117:14,17,19 120:22
147:15
**3.3** 128:8
**30** 72:3 127:25 128:10
140:10,17,18 141:4 149:4
240:10 363:13
**30,000** 47:25
**30th** 54:12 188:10,15
234:24 235:2 246:17
273:23 279:21 288:20
359:14
**33** 47:10 177:3
**36** 148:6,22 149:2
**37** 128:5,10 140:10,14
148:25
**38** 148:6,22 149:2
**39** 149:11
**3:20** 239:20
**3:35** 239:23
**3:39** 166:11

---

### 4

**4** 120:17,20 121:6 312:12
358:15 359:2
**4.15** 167:8
**4.29** 211:18
**4.9** 80:25
**41.5** 167:16,18
**42** 177:5 221:16
**45** 128:6
**4861** 211:5
**4909** 219:1,3

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                               Confidential                               Brent Satterfield, Ph.D.

**4:33** 290:8
**4:44** 290:11
**4th** 326:23

---

**5**

**5** 55:15 80:24 131:7,9 177:4 230:5 253:6,11 254:1 258:3 286:6 314:2 316:2 325:22
**50** 243:19,25 250:23 251:7, 21 252:18
**52** 221:15
**5:36** 334:15
**5:45** 334:18

---

**6**

**6** 138:18,24 147:16,22
**60,000** 11:24,25 12:1
**64** 241:8
**65** 151:3
**66** 345:1
**66.67** 343:23
**6:10** 353:20
**6:19** 353:23
**6:32** 366:16
**6:33** 366:19 367:17
**6:34** 367:16

---

**7**

**7** 146:3,5,7 312:10 316:2
**70** 81:4
**74.5** 113:16
**75,000** 22:20
**7:17** 218:23
**7:44** 166:18

---

**8**

**8** 158:8,10,12
**80** 81:4 148:1
**84096** 8:1
**871** 336:10
**88** 125:13,14 147:5,7

---

**9**

**9** 168:21,22,24
**90** 162:19,20 298:9,10

**91.2** 113:11
**95** 308:14,20,24 309:2 335:15,23 337:19,23,24,25 338:2
**99.52** 142:8 190:19 191:18 202:12 211:18 243:14 263:22 264:9
**99.7** 336:17
**9:09** 6:4
**9:23** 288:20

---

**A**

**a.m.** 6:4 125:21 166:17,18 218:23
**Abbott** 92:18 100:9,15,24 101:1,16 102:7,10,15,21, 24 103:9 104:11 106:24 107:5 317:15 318:16,20 320:2,24,25 321:2 322:14
**Abbott's** 107:5
**ability** 21:19 199:9
**above-mentioned** 277:22
**abroad** 293:3
**absolute** 324:3,12 325:5
**absolutely** 119:15,17 218:12 317:14 318:5 339:18
**abstract** 111:11,12,13,15 190:9,14,16
**abstractly** 202:3
**abundance** 357:15
**abuse** 284:16
**abysmal** 128:18
**academic** 269:15,22,23 270:5
**acceptable** 176:16
**accepted** 87:4 133:10 204:14 251:3 265:8 283:15 304:18 338:25
**access** 42:14 125:9 254:25 255:1
**accessibility** 155:22
**accidentally** 129:17 162:5
**account** 96:21 242:2
**accounted** 243:7
**accumulate** 98:10
**accumulating** 98:9
**accuracy** 61:4,9 169:10 170:20 236:16 275:13 278:14 292:20 336:5,9
**accurate** 118:8,16,18,21, 25 119:6,21 120:4,16 127:3 153:12 231:8 233:18,21 236:20 250:21,

24 251:6,11,15,24 252:18, 21,23 255:8 269:15 285:15,19,22 298:11,13,19 299:2 304:5 309:7,18 315:20 325:20 341:17
**accurately** 220:7 263:7 298:8 306:18
**accusations** 325:18
**acetone** 32:17 33:2,4,5,10
**achieve** 74:20
**achieved** 294:24 297:19
**acknowledge** 308:16
**acknowledged** 74:22
**acquired** 31:20,25
**acquisition** 36:25
**acronym** 122:13 314:4,14 343:8
**act** 349:4
**acting** 32:4,10 60:23
**action** 55:3
**activities** 343:9
**acts** 55:2
**actual** 81:17 114:13 135:1 155:14 220:25 234:23 247:24 249:18 258:2 265:13 268:11 282:23 341:12
**adapt** 328:17 329:20
**add** 276:7 310:8,11
**added** 243:13 252:15 285:9 355:7
**addictions** 365:11,17,22
**addition** 256:16
**additional** 176:21 194:1
**address** 7:24 169:11 250:15
**addressed** 273:25 274:1, 13 278:25
**addressing** 259:23
**Adds** 289:5
**adequate** 296:10
**adjective** 217:9
**admitted** 149:3
**adopt** 325:14
**adopted** 325:18
**adopting** 149:22,25
**adult** 42:11
**adverse** 180:16,17
**advice** 327:14,16
**advise** 247:9
**advising** 247:6

**advisory** 21:25 23:9 51:22 267:4 353:12
**affect** 200:16,19 248:1
**affects** 86:1
**affiliate** 155:6
**affiliated** 353:3
**affiliates** 155:14
**affirmative** 41:20 233:15 280:9
**affordable** 34:14,17
**afraid** 60:10 61:7
**Africa** 34:25 35:4,7 176:1 177:11,22 178:21 203:6,13 204:23 205:1,2 277:11 287:11,24,25 293:11,20 303:16 329:8 343:6
**after-lunch** 194:19 231:11
**afternoon** 169:13
**aged** 111:4
**agencies** 155:15
**agency** 151:2
**agree** 58:12 125:24 174:22 265:2 360:14
**agreed** 151:1 339:22
**agreeing** 207:13 222:5
**agreement** 11:7,9 12:4,7 13:12 64:25
**ahead** 8:7 15:3,6 53:10 78:22 79:1 103:21 107:21 152:10 183:25 187:7 347:12
**ahold** 92:15
**air** 30:25
**Airbnb** 333:16,20 334:4
**alarmed** 186:8
**alarms** 186:15
**alert** 304:10
**alignment** 126:16
**alignments** 126:4,5
**all...the** 354:6
**allegations** 57:18 58:2
**allege** 13:23
**allowed** 106:11 179:14 276:9
**Almaula** 138:25 139:3
**alongside** 108:13 212:17
**alternative** 35:14 336:14 362:8
**amateur** 59:23
**Ambiguous** 57:21 108:4 116:1 120:6 156:3 251:9 273:4 305:11 309:21 310:19 341:18 353:8

Case 2:20-cv-00368-JNP    Document 169-13    Filed 04/10/24    PageID.2884    Page 98 of 126

May 16, 2023                                    GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
                                                      Confidential                    Brent Satterfield, Ph.D.

**amended** 250:20 332:8

**America** 138:13

**amount** 12:17 15:25 16:3 26:22 36:24 47:5 98:9 128:8,9 140:13 195:19 197:3 209:18 258:5

**amounting** 258:5

**amped** 336:24

**amplif--** 67:3

**amplification** 66:25 67:10 69:15 140:16 148:6,8,13 215:18,21 270:10 356:20

**amplifies** 129:23

**amplify** 68:5 140:14 168:16

**amplifying** 67:4 148:14 168:14

**analogy** 98:11

**analyses** 135:17 258:11 345:17

**analysis** 56:13 81:23 97:20 99:3 100:15 101:24 103:16 136:13 176:22 177:1,2 256:20 258:15 261:23 295:19 317:21

**analytical** 269:16

**analyze** 268:15

**Andrew** 240:7 269:11 282:16

**Angela** 341:5

**announce** 88:16

**answering** 253:12

**answers** 83:15 253:24 362:15 366:10

**antibody** 79:5

**antigen** 320:12 321:11

**Anurag** 121:7,12,14,20 125:22

**anymore** 213:18

**anytime** 97:6 344:22

**apologize** 49:24 110:6 120:19 199:17 231:11 265:24 312:6

**apologized** 284:15 291:5

**apology** 279:23

**apparently** 236:17

**appearances** 6:15

**appeared** 13:16

**appearing** 6:10,12

**appears** 101:24,25 132:2 150:23 190:18 222:18 224:9,14,21 225:5 229:24 231:7 234:10 259:8 274:18 295:5 312:19 345:6 358:25

**application** 74:13 151:14 152:23

**applications** 31:1

**applied** 55:21 200:9

**applies** 85:13 264:19

**apply** 264:21

**appointed** 262:1

**appointments** 169:22

**approach** 24:19,23 328:16

**approached** 339:12

**appropriately** 194:7 195:9

**approval** 90:23 91:2,8,9, 13 107:19 108:3 180:9 278:3

**approvals** 141:25

**approved** 123:16,17 178:20,24 297:25

**approves** 122:17

**approximately** 25:15

**April** 12:5 54:12 60:9 121:8 125:21 158:22 160:1,9 161:18 166:10,11,14 168:25 175:11 181:21 184:10 188:10 189:20 193:6,7 210:20 218:22 230:18 240:10 246:17 273:23 279:21 288:20 359:14

**Apuli** 89:2 157:11 179:22 191:1 259:4 262:14 269:12 317:6 343:1 354:2 355:22 356:2

**Apuli's** 356:17

**arbitral** 15:21

**arbitration** 10:3,5,6 14:25 15:11 65:18

**arbitrator** 10:9 15:10

**archives** 262:9

**Arcx--** 30:16

**Arcxis** 30:16 31:19 36:23 37:19

**area** 230:19 324:4,13 325:6

**areas** 43:17

**arguing** 237:20 362:12

**argument** 261:9,11

**argumentative** 203:16, 19,25 205:6 206:10,16 208:24 236:22 237:17 238:24 244:25 245:5,10,16 246:11,25 247:12 248:15, 19 249:20 251:8 252:20 254:22 270:25 300:6,20,21 301:3 302:19 309:21 310:19 311:2 312:3 315:22 319:7 326:7

**Arizona** 28:19,20,22 29:11

**arm's-length** 175:1

**Armstrong** 6:5

**arrest** 16:5 20:5

**arrested** 19:17,22

**arrests** 20:18

**arrived** 336:5,9

**art** 36:7 94:14

**article** 54:10 109:24 113:22 114:18 170:16 174:2 188:10,14 189:23 190:1,4 231:7 232:18 234:23 235:1 240:9,13 241:4 244:3,7,9,15,20,24 246:16 247:5,7,10,14 248:8 249:15 250:9 253:4, 9,25 254:8,13 256:13,15 259:7,9 277:19 279:14 280:6 281:3 291:2 309:12 311:8,11 359:14

**articles** 175:2

**artifacts** 71:10

**ARUP** 254:9

**as-of-yet** 142:14

**ascertain** 344:14

**ascertained** 103:15

**asks** 337:17

**aspect** 320:4,20 321:8

**aspects** 48:23

**assay** 149:17 159:22 176:20,24 177:3,4,6 192:5 313:2,18 335:16,25

**assays** 149:12,14,16

**assertion** 267:13,17

**assessment** 124:10 125:2

**assist** 14:13 130:24 159:7

**assistance** 88:18,23

**assisted** 159:11

**assume** 148:25 207:24 329:12,25 349:20

**assumed** 144:2 311:7

**Assumes** 237:17 248:16, 20 273:3 303:24 311:4 352:8

**assuming** 330:8

**assumption** 304:2

**assumptions** 242:24

**assurance** 221:20

**asymptomatic** 55:13 77:4 80:5,17 195:23 196:5,7 262:22 263:8,13,19 266:20 328:13,15

**attach** 360:5

**attached** 126:2 142:24 145:15,16 212:15 229:16, 22 230:1 284:9 295:18 308:12 337:9 355:12 357:24 358:1 359:9,25 360:3

**attaches** 311:11,12

**attaching** 358:9

**attachment** 189:25 190:1 284:23,25 312:9 314:2 345:7

**attachments** 292:9

**attempting** 259:16

**attention** 181:2

**attitude** 348:1

**attorney** 109:21

**attorneys** 8:19

**attraction** 69:7

**attribute** 255:4,6

**attributed** 230:21 236:17 240:21 241:4 242:14,15 245:9 254:17,20 256:17 290:1 295:12 298:1 315:8

**attributing** 243:23 254:23

**atypical** 238:8

**audacity** 52:23

**audible** 164:3

**audiences** 280:22

**audio** 120:25

**Australia** 142:24 145:16 275:6

**Australian** 145:10

**Austria** 142:15

**author** 261:10

**authoritative** 307:4

**authority** 124:13 130:14 141:8

**authorization** 73:8 74:2, 12 84:8 89:24 90:5,20 91:12 100:3 107:18

**authorized** 256:22 263:18

**automated** 161:25

**autopilot** 349:8

**availability** 294:21

**average** 71:5

**avoid** 141:6 309:4

**award** 15:21,24

**awarded** 282:3

**aware** 18:10 54:16,17 56:15 94:25 110:12 117:8 135:14 144:21 146:16,19 153:17 154:18,21 155:12 177:19,23 199:5 207:18 263:11 302:6 304:5,6

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                    Confidential                        Brent Satterfield, Ph.D.

329:15,16 330:9 341:7 360:20,23

**awful** 52:14 53:24 55:4

**B**

**baby** 48:6 271:3

**bachelor's** 28:21 29:13

**back** 10:22 11:5 27:4 36:22 49:7 55:20 58:18 62:16 64:5 80:2 91:21 108:15 110:5 111:22 129:5 131:9 143:9 147:25 152:20,22 194:15 202:13 203:5 204:19,22 214:23 215:8 216:15,23 246:4 247:1 252:11 260:22 272:1 284:9,12,22,23 289:15,16 295:4 299:10 323:1,25 333:21,23 334:22 349:6 350:13

**back-and-forth** 359:18

**background** 35:5,18,19 80:23 206:25

**backup** 106:22

**bacteria** 126:20

**bad** 15:5 21:4,12,13,17 60:12 150:15 161:19 162:13 209:24 218:14 219:7 255:21,25

**bags** 60:13

**Baird** 54:5 58:6 59:15 260:1 363:11,16 364:2

**Baker** 6:20

**ballpark** 39:10

**bank** 12:13 14:8,11,17,19

**bankruptcy** 18:23 28:9

**Barb** 160:17 167:23

**Barbara** 158:14,15 166:17

**barely** 167:7,15

**Barham** 27:23

**based** 27:18 74:17 88:2 97:4,7 115:18 144:14,24 150:25 167:2 173:21 174:15 195:16 204:11 218:5 223:12 233:21 254:14 267:24 268:9 280:25 301:25 304:3 305:17 308:10 323:9 344:18

**bases** 301:13

**basically** 37:5 48:9 73:23 74:4 97:21 150:17 168:16 196:11 355:6

**basis** 259:24

**batch** 216:3,12,14,17,21, 22 218:5,9,14,17,19

219:13,16,17,18,20 220:14,17 222:7,19,25 224:8 225:10,14 226:18 253:2 277:4 288:10 307:18

**Bates** 211:1 284:4,5 288:18

**Bates-numbered** 211:1

**Bates-stamped** 241:7

**bathroom** 8:14 239:17 290:4 334:10

**Baumann** 184:18,20

**beacons** 270:14

**bearing** 85:4 325:8

**beautiful** 128:6 148:10,17 304:20

**before-and-after** 55:24

**began** 88:6

**begin** 88:5 106:1

**beginning** 24:12 46:6 64:8 73:6 76:9 88:20 90:11 115:22 116:5 178:4 191:24 196:12 223:14 259:2

**behalf** 6:10,12,18,21 7:1,2 158:25

**behave** 348:24

**behavior** 59:14,17,18,25 61:1

**belief** 167:1

**believed** 55:18 259:25 288:15 302:2,3 340:10

**benchmarks** 275:13

**beneath** 76:25 77:6,15,21 80:5 121:13 141:16 184:16 243:18

**beneficial** 26:6

**benefit** 207:9

**Benson** 42:1,3 131:21 132:2 240:7 269:12 342:2

**Benson's** 132:6

**Benzonana** 214:8 217:17 218:21

**Bert** 185:23 198:11 200:7 213:11 254:2 290:14 339:14

**best-priced** 323:19

**Betts** 288:20,24

**big** 11:11 13:10 36:4,18 51:4 58:7 66:6 93:3 323:6 362:16

**biggest** 60:6 129:22 221:12 305:25

**bill** 350:22,25

**bind** 67:24 69:11,17

**Biocentury** 256:21 257:3

**Biodynamics** 214:12 217:14 221:15

**Bioengineering** 28:25

**Biofire** 159:15 185:6,10 317:9

**biographical** 115:20

**biomedical** 29:14

**biotech** 38:3,8,9

**Biotechniques'** 190:1

**Biotechnologies** 30:17

**bit** 50:19 52:4 62:3 89:25 114:10 140:24 194:19 198:2 204:21 238:12 245:14 247:13 264:7 288:17 293:25 332:21 344:25 347:5 362:9

**bizarre** 245:4

**black** 252:16

**blame** 141:11

**Blanke** 158:15 159:19 160:13 166:17 167:23

**blanket** 142:11

**bleeds** 231:19

**blend** 66:15

**blinded** 141:7

**blood** 78:7,10 79:4,17 193:21,22 266:4,5,6

**blows** 322:14

**blurb** 229:25

**board** 21:25 23:9,11,23 33:2 51:22 64:3,5 267:4 353:12

**Bobby** 54:5 58:6 59:15 260:1 363:11 364:2

**bodies** 91:14 95:12

**body** 33:8 60:13 122:15,17 149:3

**body's** 33:13

**Bohne** 6:9

**book** 114:23,24 115:2,9,19 345:20,21,22,23 346:15,20 349:3,25 351:16,18 352:12,14 353:5 365:10, 13,15,17 366:5

**books** 353:14

**borders** 92:12

**boring** 78:16

**bothered** 54:5 304:7

**bottom** 117:19 121:6 139:18 146:11 176:3 218:25 219:3 221:25 241:14 259:3 273:22 274:8 312:25 317:6 323:25 324:7 331:5 354:1

**bound** 76:18

**boundaries** 114:2

**boundary** 114:4

**box** 227:19

**boy** 294:9

**Brad** 27:23

**brain** 194:19

**brainstorming** 291:7

**Bramwell** 317:7

**Brandon** 6:19

**brands** 133:12

**break** 8:14 21:5 38:10 53:11,13 75:3 105:5 138:20 157:14,18 183:21 194:18 239:17 251:3 258:18 264:6 283:17 290:4 304:19 306:23 334:11 337:14 339:1

**breaking** 19:23 138:22 319:10

**breaks** 67:19 69:21

**breath** 32:17 33:1,4,5,12, 14

**breathe** 53:15

**Brent** 6:22 7:6,8,19 159:19 169:8 182:16,22 187:6 231:6,20 269:13 274:10 289:4,17,18 294:15 331:1, 7 335:14

**Brent's** 230:20

**Brett** 6:7,23

**briefly** 190:6 361:1

**bring** 42:18 154:11 178:12 181:2 228:22 303:19 347:8 350:12

**Bringing** 345:24

**brings** 200:7

**broke** 58:17,18

**brother** 174:24

**brought** 9:19 45:7 130:24 210:6,8 229:3

**Brown** 7:1

**BS** 191:8

**BS5** 191:9

**BS6** 191:9

**bucks** 323:22

**built** 270:11,17 272:21

**bulk** 261:1

**bunch** 111:21 155:5

**burden** 93:25

**burn** 26:18 130:8

**business** 29:25 34:10 42:8 48:23 62:1 185:17

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                     Confidential                          Brent Satterfield, Ph.D.

198:3
**Businesses** 92:12
**busy** 57:11 193:14 195:5 261:6
**button** 359:17
**buy** 108:17 207:13
**buying** 279:25
**byproducts** 33:10

**C**

**CA** 191:1
**cake** 59:16
**calculate** 268:20
**California** 31:23 35:2
**call** 13:21 24:9 29:5 52:23 64:20 84:9 97:16 148:16 157:16 180:17 214:14 229:16,23 286:10
**called** 7:9 33:10 59:22 67:9,12 68:6,9 74:14 78:6 92:18 122:2 126:25 134:13 141:13 187:23 197:21 241:10 268:5 284:15 286:1
**calling** 286:12 300:4
**calls** 116:19 120:11 122:8 125:4 135:19 137:9 151:8 157:2 170:4 174:4 179:11 180:5 195:11 198:24 203:10 206:12,17 207:14 208:4,10,18 210:3 211:24 222:14 223:20 224:20 225:7,25 226:22 228:17 230:12 232:6,13 236:2 237:16 238:23 243:9 245:11,17 247:12 249:16, 21 263:9 275:23 278:15 280:19 305:9 309:9 310:17 311:3 340:24 353:6 355:25 364:15
**camel's** 58:18
**Cameron** 138:9,11 214:5 216:5,19 218:6,21 219:5 221:6 222:5,9,17 276:3 302:2,3
**Cameron's** 215:18 223:5
**capable** 254:11 257:19 317:9
**capacity** 22:6 31:4 40:18 76:17 81:18 86:5
**capital** 40:19,22
**capture** 31:4 69:10,11,17
**care** 54:23,24 56:3 261:11 340:7
**career** 249:9
**carefully** 223:5,9

**cares** 81:4
**Carl** 23:10
**Carlisle** 169:3,17 171:25
**Carolina** 19:12
**case** 9:25 10:2 65:8,9,11, 15,20 69:16 216:15 217:21 221:4 266:12 308:13 347:2 356:14 357:14
**cases** 144:1 320:13 321:12 323:23
**cash** 12:10 13:7 47:2
**catch** 142:9 147:19 176:7 218:16
**catching** 181:25
**caused** 16:1 234:18 310:21
**causing** 148:12 347:1 348:6
**caution** 357:15
**CC'D** 179:21
**CD** 337:11
**CDC** 55:23 82:3,5,10,12 83:4,8,16 92:19 99:21 126:3 162:20,23 163:1,2,7, 10 164:4 198:14,16 201:9 254:6 259:12 260:10 335:11 336:1,24 337:1,12 356:25
**CDC's** 201:4
**CDC-BASED** 335:15,24 336:12,22
**CDSCO** 123:4
**CDSO** 123:9
**CE** 90:16,20 91:10
**CE-IVD-MARKED** 141:18
**ceased** 45:19
**Cecilia** 157:12 179:22 181:8 265:14 270:20 299:11 330:13
**Celia** 299:11 330:13
**cell** 33:9
**cells** 33:8
**celsius** 148:1
**centers** 231:24
**CEO** 27:22 31:8,14 38:23 39:21 43:19 44:4 249:11 281:6 329:3,14
**Cepheid** 36:13 112:24 113:2,5,20 219:22 220:1, 22 337:12,13,15
**Certest** 217:23 219:22 220:1,23
**cetera** 26:7 142:16 329:9
**Chad** 89:2 157:11 179:22 191:1 214:16 259:4,6

269:12 317:6,13 331:7 343:2 356:11
**Chad's** 189:23
**chain** 92:13 182:6 184:13 201:15 215:12 218:4 220:12 221:5 223:3 306:5, 16 329:23
**chains** 59:24
**chance** 21:15 105:3 139:11 356:12 364:4,6
**change** 115:13,15,17 147:4 304:22 322:10,12 324:23 338:14
**changed** 11:18 115:21 190:19 201:12
**changing** 190:10 322:8 348:2
**channel** 314:13
**characteristics** 190:18
**characterization** 171:18
**charge** 137:19 179:20 205:21 261:21 324:1,8
**charged** 20:7,8,24
**charges** 20:20,21
**charity** 35:4
**chart** 314:25 315:1
**cheap** 35:25
**cheaper** 35:11,14
**check** 166:22 179:21
**checked** 54:21 141:2 356:15
**Checketts** 185:24 186:13
**checking** 114:3 292:8
**chemical** 33:11
**chemicals** 188:2
**chemistry** 269:16
**cherry-picked** 203:15
**cherry-picking** 204:3
**chief** 24:2 32:4,10 49:19 50:3,10,16 115:5 151:1 177:21 206:13,14 208:22 224:1 231:6,21 244:19 249:22 271:19 279:11,13, 17,18 289:4 301:24 309:17 310:23 328:22 329:2,13 332:11,14,20 352:23
**child** 98:12
**choice** 85:20 133:11,18 322:8
**choose** 51:8 136:15,17 253:18,21
**chooses** 197:8
**choosing** 85:19 102:6

**chorus** 237:23
**chose** 102:20 263:20 320:2 321:1
**chosen** 56:22 205:22
**Christensen** 89:8
**circulating** 185:3
**circumstances** 85:13 86:13,16,18 87:17 328:17
**cited** 277:19 338:10
**cites** 253:20
**City** 6:6
**claim** 71:21 126:20 263:14 317:16 342:5 343:15
**claimed** 147:6 262:16
**claiming** 73:14 141:1 263:4 341:10
**claims** 199:12,19 263:12 264:9 342:19
**clarification** 169:6
**clarify** 155:3
**class** 269:16
**classes** 29:25
**classified** 21:3
**clean** 26:19 126:24 227:4 266:6
**clear** 113:6 148:6,8 221:3 282:19
**CLIA-WAIVED** 263:16 322:5
**client** 221:14 288:9,14
**clients** 212:16
**clinic** 242:25 243:2
**clinical** 64:4 74:14,18,19 75:22 76:2,24 77:14 81:11, 12,22,24 84:1,10,11,17 85:12,18,22,25 96:6,11,19, 20 97:3,6 101:8 104:2,3 108:7,10 118:3 136:23 137:2 163:22 170:23 171:9,10,12,14,18 172:11 176:14 197:10 200:10,13 202:16 203:1,3 213:8 234:3,4 247:24 248:2,3 250:25 251:1 264:25 265:3,14,25 266:10,17 267:19,20 268:4,21 278:3 294:25 296:8,11,14,23 297:20 301:1,5,6,7,21 319:1 325:8 326:17,18 327:8,19,21 328:1,2,5,7,8 330:10 338:23 344:23 345:2,4 355:24
**clinically** 75:21 265:11 326:10
**Clint** 288:20,24
**clock** 57:15

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                    Confidential                    Brent Satterfield, Ph.D.

**close** 39:12 69:12 140:17 142:12 147:8 164:10

**closed** 61:2

**closely** 65:23,24 148:13

**Co--** 47:8

**Co-diagnostic's** 170:24 289:4

**Co-diagnostics** 6:8 9:4 14:9,13,21 18:15,18 22:1 24:3,14 39:22,23,24 40:9 41:8,15,16,17,22 42:4,5,9 43:1,12,15,19,20,23,24 44:1,5,8,12,18,24 45:2,9, 10,13,14,15,20 46:1,2,4,5, 10,17,23,24 47:11 48:2 49:5,10,13 50:1,17 61:23 64:12 88:5,22 97:17 102:2 115:23 116:7 131:23 157:5 170:19 193:7 231:22 233:8 240:24 241:11 243:20 271:3,16 272:19,22 273:18 292:2,15 299:1 302:7 323:10 336:11,13,21 339:22 343:3 352:15

**Co-diagnostics'** 243:13 256:24 257:8 356:10

**coal** 26:17

**Cobas** 118:1

**COD** 97:14

**CODX** 97:15,16,18 100:12 101:14 102:9,14 106:1 130:24 133:17 134:25 145:19 151:15,20 152:4 153:18 156:1 157:3 158:25 160:9,14,23,24 163:7 164:6 170:3 221:25 224:8 226:12 227:5 235:20 248:8 267:2,4 275:21 339:5,12 341:14 354:15 361:5

**CODX's** 154:18,22 202:4 207:13 341:7 342:18 346:17 356:8 357:7

**cofounded** 31:7

**cofounder** 31:9,10 37:17 41:21 45:23 47:10 49:17

**cofounders** 31:13

**coincidence** 351:2,4,8

**coincidences** 351:7

**cold** 227:14,18

**collaborative** 340:10

**collateral** 9:12 11:10 12:14,15

**collect** 27:24 28:6 261:14 262:15 283:15

**collected** 110:21 111:3 213:14 239:13 261:3,8 314:23

**collecting** 170:19

**collection** 59:13,17 93:11 178:8 186:16 329:21

**college** 28:15,19

**colors** 294:12

**Coltrin** 235:19

**combination** 31:5 145:3

**combine** 35:20 36:1

**combined** 118:3 177:2

**comfortable** 224:25

**comings** 329:15

**comma** 281:11

**command** 31:15

**comment** 101:20 198:11 206:21 230:21,25 239:3 250:8 255:4 270:4 287:25 296:8 360:7

**commented** 192:16 310:1

**commenting** 297:14

**comments** 191:3,4,7 198:4 232:11 236:16 310:9 311:14

**commercial** 48:23

**commercialize** 40:22 42:17,23 43:5

**commercializing** 38:5

**common** 314:14

**communicated** 110:15 185:20

**communicating** 312:17

**communication** 312:13 359:19

**communications** 357:21

**communities** 197:19

**community** 28:19 60:2

**comp--** 25:23 209:22

**companies** 16:21 25:24 26:4 38:4,9 40:17 41:19 46:18 50:22 90:12 99:24 100:5 124:15 150:20 155:6,9 178:5 263:6 271:12,14 272:8,9 287:21 323:21 343:3

**company** 12:11 13:18 22:8 23:13,24 24:13,17,19, 22 25:5 26:8,10 27:9 28:8 30:19,20 31:2,7,17,19,22 32:18,19,20,22,23 33:19 34:2,3,4,7,20,21 36:24 37:6,13 38:8,13,18,24 39:4,12 40:3,6,8,15 41:1,2, 3,9,25 42:5,17 44:21 45:3, 6,19,24 46:12 49:2,15,18 51:15 52:5,23 57:11,12,16, 23 61:19 62:17 64:11 65:2, 22 66:5 90:3,16 104:16 115:6,10,25 122:2 159:15 160:9 170:8 175:18 179:7

194:5 198:8 206:15 207:6, 9 214:11 223:6 227:15 244:20,23 247:6 249:15 250:2 262:9,25 263:4,12 269:9 270:24 271:6,20,25 273:1 275:25 280:22 283:10 289:6,7 292:16 299:19 302:7 303:1,6 308:16 309:23 311:1 314:22 319:9,13 325:13 329:14 330:1 331:15,23,24 332:23,25 339:9 340:13 344:17 350:4 352:18 353:4 359:20 360:2,9,10,11,12

**company's** 23:22 56:10 241:24 275:4 277:20 278:1,4 292:25 303:3 332:22 341:15 344:18 346:17 350:8

**comparable** 256:22

**comparator** 253:17 265:9 268:5 304:19 339:1

**compare** 102:9 107:20,24 136:19,25 314:15

**compared** 87:5 101:15 108:5 112:24 113:20 126:3 133:12 163:7,9 185:4 197:18 201:4 257:9 335:15,24

**comparing** 74:3 81:25 265:7

**comparison** 74:19 81:24 126:4 127:19 163:5,17 280:1 313:2,16,17,18,20 315:20 316:3,4,24 336:12, 22 337:11

**comparisons** 145:6 260:9

**compelling** 46:15

**compensation** 22:12

**compete** 318:19

**competing** 199:8

**competition** 320:6 324:2, 12

**competitor** 59:20 271:16 317:14

**competitors** 107:20,24 108:6 199:4,5

**compiled** 54:20

**complained** 236:13

**complaining** 302:2

**complaint** 214:18 217:13 228:15 233:13,22 301:25 302:14,22 342:4

**complaints** 180:24 181:2 233:7 234:3,11 235:10,21 237:9,12 239:3 243:19,24 250:23 251:4,7,21 252:17

**complete** 136:16 276:8

**completely** 92:13 175:1 201:17 306:13 321:6

**complex** 30:24

**comply** 136:2 364:20

**component** 35:23 305:25 306:20

**components** 35:24 36:1, 11 93:4 178:7 329:20,22, 25

**compound** 33:11 210:4

**con--** 141:23 352:13

**concentrate** 346:9

**concept** 345:21 350:5

**concepts** 35:21 68:25 345:25

**concern** 61:4,10 213:6 269:25 298:23

**concerned** 78:9 269:13 280:23 288:14

**concerns** 177:6 186:19,24 239:7 259:24 290:18,22 298:2,6,25 352:14 353:4, 10

**concluded** 10:6,8 293:3 320:16 367:17

**conclusion** 120:12 301:23 308:10

**conclusions** 57:2

**conclusively** 55:25

**concordance** 75:4,5 82:12 100:13 103:16 122:24 202:15 267:24 275:12 277:7 293:4,21 294:5 295:25 296:4 297:9 313:3 316:8,15 318:14 337:3,5

**condense** 64:21

**conditions** 27:7 68:23 85:23 86:23 98:6 348:3,4

**conducted** 150:3 243:15 275:21 293:2 303:8 344:14 357:6

**confer** 248:7

**conference** 230:12

**confidence** 98:22 126:25 127:1 132:10 204:20,24 304:10 344:24

**confident** 364:10

**confidential** 144:8,10 212:15 367:13

**confirm** 98:5 147:18,24 216:8 219:23 225:14,20

**confirmation** 58:20 225:18 309:3

**confirmed** 56:14 149:11, 13 217:22 219:25 220:6

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                Confidential                          Brent Satterfield, Ph.D.

224:17 282:24 301:12 337:20

**confirming** 186:11

**conflict** 61:16,21

**conflicts** 56:24

**conformed** 55:22

**conformity** 278:6

**confused** 238:12

**confusing** 142:5 311:22

**confusion** 309:5 310:16, 21

**connected** 311:17

**connecting** 14:14

**connection** 20:22 47:14 103:15 141:24 151:11,14 156:14 172:23 228:23 229:3 250:9 309:17 346:6, 14 348:8,15,23

**conscious** 349:6

**consciousness** 348:23

**conserved** 126:10

**consideration** 126:1

**considered** 82:4 204:3,4 308:7

**consistent** 127:4 314:18

**consistently** 97:19 292:3 294:24 297:19 317:18

**constant** 147:12

**consult** 88:12 116:11,14, 17,24 117:9

**consulting** 68:18 125:23 278:23

**consumables** 36:14

**contact** 201:7

**contacted** 235:8

**contacts** 209:20

**contained** 116:16 223:13

**contaminant** 128:14

**contaminated** 217:1 218:7 220:16,24,25 222:19,22 226:7 227:8,9 253:1

**contamination** 124:23 127:18 128:1,3 129:2,3,14, 15,21 130:5,20 141:2,5 146:25 147:2,4,11,13 149:5 150:3,10,11,12,18, 22 164:21 166:22 167:2 204:2 215:2 216:2,4,7,21, 24 217:4,6 218:5,8,11 220:12,21 221:2,8 222:6, 11,13 223:16,18 224:5,7, 15,16 225:3,5,10,11,16,22 226:11,16,25 227:1,17,25 277:4 286:12 287:18 288:3,15 294:4 301:20,25

302:3,4,5 307:18,20 308:2, 5 356:5 357:11,15

**contaminations** 355:14

**contemplated** 280:17

**content** 235:1 363:21

**contest** 20:11

**context** 131:19 140:7 234:2,5 235:16 236:24 237:1 242:17 252:24 253:12 255:7,12 256:12,16 265:18,19,21 307:25 311:16 325:20

**contexts** 264:19 265:13, 14,17

**contextually** 252:21,23 279:17

**continue** 49:5

**continuing** 152:18 366:22

**contract** 153:18 155:11 156:1,4

**contracted** 241:21 242:5, 8

**contracting** 155:14

**contractor** 22:16,17,19

**contracts** 142:18 155:12 209:19

**contribute** 277:5

**contribution** 279:13 332:17

**contributions** 317:11

**contrived** 73:9,20,21 74:3, 6 84:9 96:7,9,20,22 108:10 136:22 163:21,24,25 171:7 202:11 257:25 269:2 355:16,18,23

**control** 48:5 168:12 188:4 349:6 355:3,5,7 356:4

**controls** 215:25 216:1,4,6 217:21 312:14 318:17 356:20

**controversy** 280:1

**conversation** 54:14 129:24 166:17 170:3,11 173:13 211:7,10 212:3 230:8 232:25 234:1,6,8 239:4 244:7 247:16,17,18 249:6 254:24 269:5 290:22 291:4 365:4

**conversations** 18:11 134:21 135:8 137:5 144:25 145:18 172:24 173:21,23 174:9 206:20 213:25 228:15,20 236:6 240:20,23 247:19 299:19 342:17 357:19

**conversions** 64:19

**convert** 27:10 28:12 120:25 260:7

**convey** 328:23

**conveyed** 47:3,4 117:10

**conveying** 118:20,25 356:3

**convince** 221:19

**convinced** 141:12 216:5

**cool** 351:1

**Cooperate** 34:20

**cooperative** 34:20 38:11 42:16 192:5

**coordinated** 136:1 230:13

**copied** 121:19 169:1 180:2 205:13 214:6 232:17 331:2 354:3

**copies** 70:1 75:19 76:6 80:24,25 129:25 130:3 140:19,20 149:1,6 152:1 195:20 211:18 227:24 291:16 344:4

**Coprimer** 62:10,12 66:12 70:18 71:17,18 72:18 192:6

**Coprimers** 62:21,23 63:4, 12 128:2 270:9

**copy** 67:4,6,8,14 69:25 129:22 140:14 148:24 257:20 322:1 352:19 367:19

**copy/ul** 317:16

**coronaviruses** 76:14 171:3

**correct** 11:23 16:10,14 26:1 44:6 53:25 62:25 63:13 64:13 65:13 77:2,16 80:9 86:10 102:24 105:15 131:24 141:25 152:2 153:16 163:15 164:7 167:4 171:8,25 182:24 183:7 186:10 225:5 232:22 234:14 235:11 242:10 248:4 262:7 263:2 264:3, 12 265:18,19,20,21 271:7, 10 288:10 290:15,19 307:22 322:22 332:4 346:1 347:9 357:25 359:2,22

**corrections** 240:21 241:3

**correctly** 74:16 75:25 81:18,19 86:6 104:14 127:10 128:21 129:1 162:10 168:14 242:15 245:8

**correspondence** 166:2 308:16

**corresponds** 278:5

**Cosara** 104:17 121:23

**cost** 36:15,16,19 324:24 325:4

**Costanzo** 184:17,18,19

**cough** 364:18

**counsel** 6:14 8:4 17:19 183:22 329:7 330:16 361:14,22 362:11 366:22 367:20

**counselor** 367:5

**countersue** 9:24

**countries** 40:7 132:9,21 133:7,10,11,17 134:6 143:25 145:5,20 180:10 193:15 204:16 233:8 234:12 235:10,21 237:10, 13 243:20,25 250:23 251:7,22 252:18 253:13, 17,18 265:7 294:22 327:8, 22 330:5 332:9

**country** 16:4 36:18 39:25 98:8 135:23

**country's** 136:2

**County** 20:17

**couple** 8:19 11:12 13:11 23:10 37:21 66:3 126:18 154:10 159:11 169:3 205:9 266:24 283:19 310:4 361:15 362:21

**coupled** 36:8 69:9 74:22

**coupling** 322:7

**courses** 30:1,2

**court** 6:11 8:11 9:18 32:7 108:23 110:22,24 120:18 131:5 138:17 146:4 158:9 167:10 194:15 210:16 240:2 283:24 291:11 362:20,25

**COV** 314:14

**cover** 325:3

**covering** 34:24 36:5

**covers** 280:7

**COVID** 52:6 58:23 62:2 63:9,22 64:12 76:10 83:24 88:7 100:6 126:8 129:7,17 147:16 148:4,5,18 155:22 167:8,16 190:1,6 193:18, 23 195:9 196:17,21 201:8 257:21 261:4 283:11 314:14 333:5,9 338:3 341:3 354:17 355:1

**COVID-19** 61:5,22 63:9, 19,25 112:1 139:20 141:17 171:2 176:14 191:25 192:8,17 198:22 199:9 200:2 210:21 241:21 242:5,8 243:4,13 262:20 275:4 277:20 278:14 292:2,17,25 331:6

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**COVID-FAM** 314:13

**COVID-POSITIVE** 77:4, 19 80:8 114:12

**Cq** 167:8,16,18 177:3 215:4,16,17,19 224:6

**Cq's** 215:3 223:16 224:5 226:10

**crap** 366:7

**create** 36:2,8 42:13 64:3 69:1 70:7 80:12 126:9,11 349:16 351:9

**created** 42:14 62:15 93:24 220:20 221:11 251:20 306:15

**creates** 207:8

**creating** 227:23 349:13,14 351:9

**creation** 349:7

**creative** 93:10

**credentials** 270:19

**credibility** 221:12 289:5

**credit** 11:14 12:8 129:4 150:7

**crisp** 83:14 126:24

**criteria** 123:22,24 181:1 195:16 258:5 316:14,25

**criteria.'** 123:12

**critic** 282:17

**critical** 254:10

**criticism** 59:20 60:16 269:20

**criticized** 198:15

**critics** 197:23 241:10

**Crockett** 143:24 175:11, 13,16,24 176:4 177:13 276:4

**cross** 126:15

**cross-reactivity** 171:3

**Ct** 167:20 314:7

**curious** 335:10

**current** 91:7 322:25 335:1

**curriculum** 269:15,22,23

**curve** 148:15,16

**curves** 148:7,8

**custody** 223:4

**customary** 130:10 136:11, 13

**customer** 100:20 101:17 102:6,20,23 103:11,12 104:11 195:8 207:13 209:23 210:8,9 214:18 217:13 218:7 220:15 222:21,23 223:6 227:21 228:16 233:13 302:14

**customer's** 227:22

**customers** 61:23 100:18 103:7 106:9 135:16 137:5, 6 138:3 152:16 153:10 154:13 195:5,14 207:19 260:13 276:18 280:23,24, 25 325:10 332:23

**cut** 69:4 71:24 128:11 139:24 140:23 149:3 312:19 366:1,21

**cutoff** 127:24 140:10 356:14

**cutting** 141:3 150:16 367:1

**cycle** 127:24,25 128:5,6,10 140:10,13,17,18,20 141:4 148:25 149:2,4,11 167:19, 21 215:21 314:7,18

**cycles** 72:3 128:8,10 139:23 140:15 148:6,22

---

**D**

**damage** 16:7

**damages** 10:7,24 15:17 16:3

**data** 54:16,18,20,21,22,24 55:6,7,13,20,24 56:2,3,6, 13 57:1,24,25 73:17 86:16, 25 89:21,22,23 91:16 98:9 99:5,13 108:6 118:19 126:19 127:2 133:8,15 134:6,10,18 135:1,9 136:16 137:23,24 138:1,2 144:2,6,19,23,24 145:8,9, 10,15,16 151:6 160:5 161:19 162:13 168:2 170:19 171:18 177:2 180:16,17 186:11 188:17, 20,22 191:15,16,20 192:17,24 193:3,8 199:7, 13,21 200:20,21 202:9,10, 11,18 203:15 204:4,7,10, 12,19,20,22 205:4,18,24 206:2 209:24 212:15,21 213:15,17 218:6 220:10 226:8 239:12,14 245:7 247:8,24 248:22,25 249:7, 8,9,11,12 250:5,13 254:7 259:24,25 260:1,6,10,12 261:3,8,12,14,17,18,20,22 262:2,9,15 263:5 265:15 267:18 276:5,6,9,17 277:1, 11,13 278:1,22 279:7,12 281:18,20,22,23,24,25 282:7,22,24 287:16 292:3, 18,23 294:1,2,6,9,10,20 295:18 296:6 297:7,9 298:7 300:13,14,17,22 303:11,12,15 304:2 306:22 307:5 308:12 311:12,17,19 313:2,16,17,18,20,21,25 314:20,23 315:3,4,13,14,

20 316:4,11,20,24 323:1 326:1 328:14,23 338:22,24 339:2,6 343:4 345:7,8,11 351:14 357:24 358:1,17 360:7,11

**data'** 294:20

**date** 90:10 164:19 166:14 230:18 246:22 290:25 334:6 343:19

**dated** 160:1 193:6 218:22 363:13

**dates** 161:20

**Dave** 154:9,15 279:21 335:8

**day** 23:19,20 65:25 167:6 240:16 242:22 246:18,20 291:1 318:2 349:19

**day-to-day** 332:17

**days** 79:8 96:23

**deal** 13:4 32:1 40:21 48:22 228:15 312:5 362:16

**dealing** 50:18 61:7 66:25 72:25 86:21 130:11 136:14 137:3 154:6 264:25 269:1, 3

**deals** 31:23 220:12

**dealt** 50:23 62:23 357:12

**Dear** 122:5 176:12

**debate** 326:17

**debated** 351:13

**debts** 65:7

**decent** 100:1,2 128:16

**decide** 135:18 250:6 278:21 309:22 311:14 360:10

**decided** 147:17,24 210:11 221:17 292:12 322:20

**deciding** 271:21

**decipher** 263:7

**decision** 15:11,15 24:5 46:8,9 48:8 51:19,23 52:2 85:20 88:9,13,15 94:4 106:6 205:16,21

**decisions** 280:25

**deeply** 55:3 186:8

**default** 13:21

**defendant** 15:20

**defendants** 6:21 7:1

**defense** 241:11

**deferring** 349:7

**define** 25:25 65:24 66:11 70:14 255:6 292:20

**defined** 85:11

**defining** 74:10 155:18

**definition** 55:18,21,23 95:11 200:25 201:2,3,4,11, 13 219:15

**definitions** 75:21,24 201:22

**degrade** 306:11

**degraded** 188:3 306:13,19

**degrades** 306:1

**degree** 28:15 198:8 304:10

**delay** 16:1

**delays** 16:8

**deliberate** 23:23

**deliberations** 291:6 322:19

**demand** 52:24

**demonstrate** 287:12 295:24 297:3

**demonstrated** 134:7 277:23 326:12

**Demonstrates** 292:3 311:9

**demonstrating** 171:2 292:18

**Denny** 143:24 175:11,12, 16 176:12 178:14 276:3

**deny** 68:12

**department** 35:2 208:9,16 212:22 275:8 294:3 313:1, 11,15,17,22 314:3,5,13,19, 22,24 315:7,9,12,17,19 316:3,6,10,24 341:3

**depend** 136:20 338:7

**dependent** 192:2

**depending** 73:3 112:19 252:24

**depends** 76:3 95:8,25 136:3 220:24 305:13 308:25

**Depomaxmerit** 6:10,12

**deposed** 17:24

**deposition** 6:6 8:18 9:2,5 121:6 183:22 366:23 367:1,17

**describe** 11:7 33:6 66:11 72:24 346:3

**describing** 59:19 61:6 74:10 75:8 77:18 114:10 301:2

**description** 171:15 305:7

**Deselect** 343:2

**Deseret** 338:16

**design** 35:22 89:9,10 106:18,20 217:23 219:22 220:1,23 317:12 328:16

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**designate** 367:12

**designed** 306:7

**desired** 107:15

**desiring** 348:16

**desirous** 340:6

**despicable** 59:4

**detail** 281:7

**details** 186:4

**detect** 31:4 73:9,11 74:7 75:20 76:20 140:17,19 162:23 163:2 193:1 196:18 198:22 199:9 200:2 258:10 277:21 296:10 317:18 321:12

**detectable** 140:14 196:24

**detected** 196:16,21 216:8 225:12 226:16 258:7 327:9,22 337:19

**detecting** 83:5 171:1 254:11 257:20,21 287:18

**detection** 32:17 33:2 67:5 73:13 74:6,8 75:17 76:2,7 77:1,7,16,21 78:12 79:7,14 80:4,6,19,22 81:6,12,14,21 84:2,3,21 85:3,8,22,24 100:1,25 101:2,5,8,22,25 102:24 103:3,5,8,10,25 104:1,5,12 114:1,14 127:20,23 128:13,16 140:3,7,11,25 148:24 150:15 151:16 152:19,23 153:7,10,14 163:5 188:20 192:2,7 197:4,13 200:9,12 202:3,5,20,24 211:23 213:15 214:1 218:13 242:3 256:23 257:14,16 260:13, 21 263:25 264:2,12,15,18 265:5,13 266:8 267:7,21 277:20,24 285:10 287:1, 13,19,22 288:2 289:19 294:14,17 295:6,13,19 296:7,9,13,22,25 297:3,12, 14,15 318:11 319:4,6 320:8,9,13,17 321:1,25 322:2,11,23,24 323:2 324:17 326:16 327:19 328:12 330:10 331:8,16,25 332:4,6 344:3

**detections** 257:9

**determine** 83:9 148:20 302:8 303:1

**determined** 153:10

**determines** 104:1,3 192:4

**detracting** 203:3

**develop** 34:13 35:11 40:16 41:4 46:12 89:4

**developed** 30:22 32:16 43:9 63:4 283:10

**developer** 64:2

**developing** 33:20 34:14, 23 36:10 38:5 39:25 40:7 42:12,15,20,24 43:5 68:20 78:8 79:4 88:6,19,23 89:16 91:19,23 94:12,15 97:13, 15,18 106:23 107:1 130:16

**development** 23:25 24:1 30:3 64:8 91:25 105:18 107:9,17 116:5 331:6

**device** 30:7 162:1,5,7,8,9 178:10

**devices** 93:12 272:18 329:22

**diagnose** 83:24

**diagnosed** 74:16 75:25 76:5

**diagnosis** 191:25

**diagnostic** 30:5,6 31:3 78:11 86:11,14 87:15 92:17 169:10 221:13 268:25 292:16,20 299:17

**diagnostics** 30:4,11 31:6, 23 33:19 34:13,21,22 38:12,15 42:16 50:23 92:15 98:21 231:25 289:19 294:16 299:8 343:12

**dial** 322:10

**dialogue** 91:14

**dictionaries** 242:23

**dictionary** 242:18,21 281:7 319:10,11

**differ** 197:1

**difference** 55:25 63:2 80:21 81:2 188:12 197:3, 23,25 200:23 217:5 253:5 254:4 266:25 308:23 325:21

**differences** 55:9 81:6 254:3 277:19

**differently** 91:23 92:3 96:10 192:18

**differs** 197:2

**difficult** 48:1 83:10 363:17

**difficulties** 63:23

**digital** 318:16

**diminished** 197:18

**direct** 271:15

**direction** 274:5

**directly** 33:12 115:11 216:8 243:23 357:21

**director** 184:25

**dirt** 364:18,23

**disagree** 287:7 306:24

**disagreed** 51:19

**disagrees** 74:25

**disappointed** 210:10 303:12

**disaster** 244:22

**disclaimer** 118:8,13 309:5,19 310:11

**disclaimers** 309:13,23

**disclose** 56:24 164:16 165:4 167:3

**disclosed** 151:16

**discover** 36:1 345:11

**discovered** 201:17

**discrepancies** 96:13 355:13

**discrepancy** 173:2 231:23

**discuss** 22:8 183:22 229:17,23 230:12 345:25 352:17

**discussed** 170:12 316:14

**discussing** 84:12,14 175:4 217:6 218:4 328:5

**discussion** 107:10 176:23 191:23

**discussions** 137:6 175:3 303:20

**disease** 30:8

**disgusted** 59:10

**disgusting** 52:17,19 55:2 364:3

**dishonest** 364:3

**disparaging** 198:12

**disparate** 307:22

**disprove** 119:12

**disproving** 119:12

**Disregard** 289:11

**disrupted** 92:14

**disseminate** 56:8

**disseminating** 360:15

**dissolve** 46:9

**dissolved** 45:15,17

**distinct** 185:2

**distinction** 338:2

**distress** 37:6,8,14,24

**distribute** 40:18

**distributed** 161:23

**distributing** 57:13

**distribution** 209:18

**distributor** 134:13 206:21, 22,23,24 207:3 209:23 227:18 288:8,13 304:4,14 305:4,19 307:7,10,16 308:5 341:11 345:10,13,14

**distributor's** 304:25

**distributors** 92:2,6 93:9, 19 94:5 108:11,14 134:11, 12,22 135:6,9,24 144:7 204:16 207:4 209:7 329:17 341:8,12,16 342:4,18

**divine** 268:24

**division** 185:3

**divorce** 333:24

**DN** 31:3 63:3

**DNA** 30:3,10,24 31:3,4,23 34:12,18,22 38:14 40:9,11, 12,15,23 41:15 42:4,25 43:14 46:16,19 47:9 48:1 50:23 62:18,19,20 63:3 66:25 67:4,9,11 69:7 70:1 128:9 129:23 140:13,14 168:13 306:9

**DNA's** 168:17

**Doc--** 361:21

**docs** 185:20

**doctor** 356:15

**document** 146:8 157:14, 19 175:10 182:24 184:7 187:7,8,13 190:24 191:5, 14 210:25 229:11 262:3 279:5 284:9,23 291:21 295:8 298:17 312:22 313:13 315:23,25 316:12, 18 317:5 323:13 324:20 329:1 341:22 361:25 362:4,6

**document's** 190:16

**documents** 8:24 287:10

**DOH** 212:17 282:20,21,25 283:4 314:4

**dollar** 37:10,12 273:8

**dollars** 11:6,13 79:13 80:1

**domestically** 136:1,5,7

**donation** 78:10 79:17

**doors** 61:2

**double** 323:5

**doubles** 140:12

**doubling** 323:11,15

**doubt** 269:15

**doubting** 270:19

**doubts** 123:8

**download** 343:4

**dozens** 126:19

**draft** 131:22 132:3,7 139:9 144:13 274:11,18,23 275:1 281:13 284:11,25 289:16

**drafted** 312:22

**drafting** 310:1,3

**drawing** 64:3,5

**dreading** 350:21

**dreams** 311:21 352:11

**drew** 188:22

**Drive** 7:25

**dropping** 35:8

**drug** 365:22

**due** 16:7 55:18 56:1 200:24 215:2 223:16 224:5 288:14 306:5 351:19 355:13

**duly** 7:9

**Dunn** 340:24 341:1,5

**dust** 320:3

**duties** 46:14

**duty** 276:25 330:8

**Dwight** 326:23

---

### E

**earlier** 82:19 98:11 101:7 114:10 129:24 242:3 257:19 271:16 290:13 307:9,16 309:6 313:6 316:14 328:6,22 363:17

**early** 60:8 69:1 73:14 80:17 92:16 136:22 139:24 141:6 150:16 170:16 173:5 177:6 191:24 192:10 193:2,10,19 194:8 195:9 198:22 199:10 200:2 242:2 249:9 263:3 267:8 283:11 323:20

**earmarked** 221:17

**ease** 294:21

**eases** 60:5

**easier** 29:6,9 129:19 213:14 220:16

**easily** 63:18 178:14

**easy** 83:15,22 93:5 218:18 222:6 225:16 322:15

**easy-to-source** 35:25

**editing** 191:5

**edits** 190:23 191:1

**educate** 329:4

**effect** 197:9,10

**effective** 76:19,20

**effectively** 24:16 48:21 86:7 213:20 220:13

**effort** 156:15 329:16 330:1 331:14 340:10

**efforts** 153:9,22 180:9 321:22

**Egan** 23:14 25:7 33:17,21 34:19 38:17 41:10,11 42:1,

3,22 46:13,22 88:11 94:7 117:21,24 157:10 235:19 248:7 273:22 274:18,20 321:15 326:23 327:14,18 329:6 337:7 352:19,20

**Egan's** 278:10

**Egans** 229:21

**ego** 141:9

**elderly** 266:5

**elect** 24:8

**elected** 208:1

**electronic** 367:19

**elementary** 299:7

**elements** 204:18 284:18

**Eleven** 181:10 184:5

**eliminate** 69:2 71:22

**eliminates** 71:9 86:7

**Elkington** 154:10,15 279:22 335:8

**email** 100:19 101:19 117:20,24 121:7,10,11,14, 16,18 123:23 125:21 131:11,13 132:7 138:24 139:14 140:9 142:10 144:13 147:14 148:23 150:24 158:11 166:4,13 168:24 172:2,4 175:11,21 176:3,18 180:3 181:20,21 182:2,6,11,15,21 184:9,13, 17,22 185:23 186:3 188:8, 11 189:19 193:6 198:20 200:8 201:15 203:6 205:8, 12 206:6 210:19 211:14 212:3,9 214:4,5,25 215:12, 13 217:11,17 218:4,21 220:11 221:5 222:8 223:13 225:11 226:3 228:11,12 229:1,5,14,20 230:1,17,19, 20 232:4 235:3,6,15,18,23 236:16 240:6,8 259:3 262:14 269:5,11 272:1 273:22 279:23 281:6 284:10 288:1,17,19 290:13 300:3 301:18 307:9,15 308:1,15,21 313:9 317:6 323:25 326:22 330:24 334:23 337:7 342:1,7,9,12 343:1 354:2,7 356:17 363:11,20 365:5

**emailed** 132:3 169:3 179:22 226:2,3

**emails** 59:21 284:24 299:9 319:8 331:17

**emerge** 100:6

**emergency-use** 73:7 74:2 84:8 89:24 91:11 100:3

**emergency-use-** 263:17

**emergency-use-authorized** 136:9,14

**emotion** 312:6 349:13,15, 21

**emotionally** 53:8

**emotions** 348:17 350:12

**emphasis** 320:6

**employed** 21:22,24

**employee** 43:19 44:1 121:25 175:17

**employees** 23:22 24:14, 15 39:1 58:25 66:9 354:16 357:7

**employment** 22:3,4

**encountered** 364:4

**encouraged** 32:21

**encourages** 223:2

**end** 10:2 11:18 54:8 67:13 83:16 90:10 207:13 218:11 223:19 225:17 227:3 272:7 280:1 283:14 292:8 320:19 321:4,22 365:5

**ended** 11:19 49:14 65:18 82:13 83:16 102:6 173:21 209:23 274:24 321:6 334:7

**ending** 241:8

**ends** 178:10

**engaged** 25:21

**engaging** 321:22

**engineer** 162:2

**engineering** 29:14 32:5, 11 35:18,19 330:4

**engineers** 161:25

**English** 237:11

**enjoy** 24:12

**ensure** 42:13 279:3

**ensured** 310:16

**entailed** 250:5

**enter** 12:3,6

**entered** 11:8

**entering** 19:23

**enters** 42:4

**entire** 11:15,18 90:11 187:8 201:15 249:14 253:4 254:13 325:21 333:20 367:12

**entirety** 244:16,18

**entitled** 9:22

**entity** 139:7 316:21

**entreaties** 28:8

**entrepreneur** 24:9

**entrepreneurial** 25:21

**entrepreneurship** 30:1

**environment** 26:19 93:15 241:20 242:25

**environmental** 86:22

**enzyme** 67:12

**enzymes** 306:11

**epidemiological** 118:4

**equal** 167:18 263:24 264:11

**equals** 167:16 323:6

**equipment** 93:12 210:13 336:14

**equity** 27:8,11,12 28:12 44:24 45:24 47:11

**equivalency** 314:20

**equivalent** 149:19 212:18

**error** 87:18,24 88:1

**essentially** 48:12

**established** 146:17

**EU** 90:23

**EUA** 75:8 90:4,13,23 141:17 151:14,15 160:10 189:2 191:20 195:16 211:18 212:8,16 260:17 262:19 263:1 322:6 327:7 332:8

**Euro"--** 233:8

**Europe** 243:15

**European** 233:8 234:12 235:10,21 237:9,12

**evaluate** 23:24 30:7 56:24 57:2 64:4 85:21 172:6 216:16 253:16 305:17 306:12 343:21

**evaluated** 104:5 257:10 294:23 360:24

**evaluating** 96:1 199:3 216:2 267:6,25 307:17

**evaluation** 85:17 98:25 101:18 118:19 119:18,19 124:6 146:20 170:23 171:10,15 172:12 267:5 297:17 298:20 305:2,8,20 307:1,12 308:7 316:15 318:14 344:6

**evaluations** 142:14,21 143:1,5,11,14,20 144:14 145:20 243:15 248:23 253:14 285:10,12,25 286:23,24 287:11 292:5,24 293:1,18,20 294:15 303:2, 8 311:11,12,13 325:17 326:14

**event** 221:19 349:16

**events** 346:14 348:2 351:10

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                          Brent Satterfield, Ph.D.

**eventually** 31:19 45:12 105:25 116:6 196:9 262:10

**everyday** 95:10,12,13,21

**evidence** 14:1 15:2 53:6 61:12 76:13 102:4 104:7 119:13 124:2 127:13 135:4 144:17 172:15 173:4 180:21 203:25 205:7 212:11 224:20 225:25 226:23 227:1 228:18 233:20 234:16 237:18 238:25 243:9 245:6,11,17 246:11 247:12 248:20 249:4 252:20 254:22 255:11 257:12 267:10 273:4 282:6 286:4,21 287:6,15 288:7,12 293:23 298:17 300:19 301:15 302:19 303:18,25 307:14, 24 311:5 313:13 315:22 318:7 323:13 329:11 349:18 352:8 357:9

**evidenced** 222:25

**evolution** 91:6

**evolving** 328:17

**ex--** 41:16

**exact** 39:9 90:10 124:1,18 147:9 152:19 161:7 219:15 280:12 290:25

**EXAMINATION** 7:12

**examine** 194:6,24

**examined** 7:10 195:4

**examining** 193:17

**examples** 287:24 293:11

**exceed** 356:21

**Excel** 343:4

**excellent** 167:5 277:23

**exception** 59:15 266:2

**excerpt** 231:7

**excess** 69:24

**exciting** 173:9

**exclude** 204:1

**excluded** 55:11,13 339:23

**excluding** 230:4

**exclusively** 319:3

**Excuse** 279:8

**executive** 61:18 271:6 279:18 350:3 360:9

**exer--** 28:11

**exercised** 28:12

**exhale** 33:11

**exhibit** 29:2,3,5 108:19,20 109:11 117:14,17,19 120:20,22 121:6 131:7,9 138:18,24 146:5,7 158:10, 12 168:22,24 175:8,10

181:11,20 184:9 189:10,19 210:17,19 214:3 229:9,11 230:16 240:4,6 258:24 259:1 273:13,15 284:1,3, 13 291:12,20 317:3,5 326:20,22 330:22,24 334:19,21 341:25 342:23, 24,25 353:24 354:1 363:1

**exist** 41:16 45:19 93:8

**existence** 68:12

**existing** 32:19 35:14 132:14 280:24

**exists** 180:25

**expanding** 186:16

**expect** 100:10 171:20 201:9 299:15

**expectation** 98:17

**expected** 98:24 112:22 144:6 344:25 355:8

**expensive** 21:3 65:19

**experience** 50:17 92:7 93:20 129:21 130:13 135:25 167:24 209:8,9 210:14 329:18,19 336:15

**experienced** 89:3 339:4

**experiences** 42:16 351:19,20 352:1,5

**expert** 114:2

**explain** 232:19

**explanation** 129:10,13 165:5 219:11 231:22 286:14 330:10

**exploring** 88:6

**exposed** 60:7 243:3

**exposure** 130:17

**express** 269:25 353:4 360:13

**expressed** 83:13 239:8 290:18 296:4 353:10 364:1

**extended** 26:20

**extends** 67:13

**extent** 103:17 107:1 178:16 209:22 227:24

**external** 348:2,4 351:22

**extra** 188:2 362:21

**extract** 306:7

**extraction** 30:24 306:6,9

**eyes** 141:7

___

**F**

___

**F-I-N-D** 343:7

**face** 117:16

**face-to-face** 169:22

**facility** 150:3

**fact** 87:2 128:17 134:23 160:18 216:17 254:6 277:22 279:17 282:23 325:23 329:7

**fact-checking** 230:20 235:4

**factor** 84:19,22 85:18 96:5

**factors** 81:13,16 96:22 202:25 265:3

**facts** 237:17 248:20 273:3 303:24 311:4 352:8

**factual** 281:22

**faded** 332:13,16

**fail** 52:20

**fail-safe** 106:22

**failed** 37:14 127:19 151:3 162:7

**failing** 150:18,19

**failure** 166:22 188:1

**failures** 87:9

**fair** 48:24 79:2 158:23 173:17 229:25 266:13 269:20,21 359:11

**fairly** 314:17

**fall** 44:25 130:3,4 195:23 196:5,7 266:21 305:6,7

**falls** 77:20

**false** 68:9,14,16 69:24 70:2,8,9,10,12 72:1 77:5, 24 80:9 83:6,9,10 86:8 87:1,2 118:21 119:1,8,17 124:16 125:16 126:9,11, 21,24 139:24 148:12 149:9,10,23,24 159:20,21 160:7 162:18 163:19 164:11 197:16,22 219:10 254:14 298:10 304:9 338:3 339:17 356:19

**falsely** 281:1,2

**familiar** 37:18 94:21 109:11,12 122:2 146:7 175:20 212:21 214:11 257:2 284:25 291:20 314:9 329:19 330:1 345:16 357:20

**familiarity** 112:6

**family's** 355:10

**Fasano** 6:19

**fashion** 308:18 328:9

**fast** 322:18

**faster** 270:14

**fat** 33:8,9,13

**fatal** 32:25

**fatigue** 187:21 231:11

**favor** 10:11 64:15

**favorable** 37:2,3 152:7,8 209:10 285:9 287:2,12,19, 22 294:14 295:5,13 303:16 304:3 340:8

**FDA** 73:7,14,17 74:1,13,25 84:8 91:11 96:7,18 99:13 103:4 141:17 142:7 152:10,15,20 153:2 160:6 170:24 171:7,11,14,16,18 180:24 191:20 195:16 197:5 202:11 211:17 212:15 213:17 216:11 223:2 243:15 256:15,23 257:17,25 260:17 263:14 264:13 327:7 332:8 341:14 342:4,7,8 344:4 345:17

**FDA-APPROVED** 136:8

**fear** 60:8

**February** 25:18 90:11 148:2 363:13

**fee** 293:1

**feedback** 108:11,15 145:2,4 175:25 210:8 305:5

**feel** 52:5 55:4 66:19 91:18 166:21 167:3 224:24 247:15 346:6 347:19 348:8 349:12 352:11 364:6,9

**feeling** 76:15 133:9 312:5 346:23 348:12,17 350:8 351:2 362:19

**fellow** 198:2

**felony** 21:4

**felt** 48:5 59:10,24 60:22 209:19 244:6 364:2

**Ferrari** 81:3

**fever** 76:14 201:5 357:16

**fever-causing** 62:7

**fewer** 24:13

**field** 50:25 96:21 126:23 248:23 268:11 269:3 272:20 280:4 293:1 326:9, 12 339:4

**fifteen-thousand-dollar** 350:22

**fifty** 26:23 35:8 323:22

**fighting** 221:18

**figure** 29:9 46:12 168:1 183:6 268:24 303:7 311:19

**figured** 189:14 222:1

**figuring** 317:10

**file** 262:8 354:11

**filed** 18:23

**fill** 282:2

**filtered** 180:18

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                     Confidential                     Brent Satterfield, Ph.D.

**final** 14:24 15:11,15,25 16:3 19:14 64:21 70:25 71:2 175:25 176:12,15

**financial** 37:8,14,24

**financing** 14:20 39:4 49:12

**find** 34:5 38:19,20 60:2 113:24 120:13 126:23 138:21 150:18 179:9 272:2 293:24 315:25 343:5,7,8 344:10,11

**find--** 34:5

**finding** 35:13 112:6 129:9 141:2 337:25 343:22

**findings** 56:14

**fine** 105:8 106:21 138:22 157:18 158:4 181:16,24 183:25 189:17 231:17 238:8 283:21 336:13

**fine-tune** 97:21 98:2

**fingerprint** 67:1

**finish** 70:18 103:20

**finished** 335:9 350:23

**fire** 37:1 213:10

**firearm** 21:3

**firestorm** 325:7

**first-world** 124:15 128:17 150:20 287:21

**fits** 316:24

**fix** 178:14 218:18 222:6 225:16

**fixing** 235:20

**flags** 197:12

**flaw** 32:25

**flawlessly** 140:12

**Flip** 274:4

**flipping** 229:12

**Floch** 6:19

**floor** 268:16

**Florida** 20:1,2

**flows** 93:6

**Fluidigm** 31:20,21,22

**fluids** 93:13

**fly** 333:21

**flying** 294:11,12

**focus** 30:3,23 31:2 33:19 34:21 36:19 40:20 48:8,10 66:6 100:7 188:9 193:25 213:25

**focused** 36:19 40:6

**focuses** 35:19,21

**focusing** 78:19

**fog** 194:19

**folded** 47:8

**folks** 117:21

**follow** 272:7 333:1

**follow-up** 146:19 228:10 328:11 363:22,23 365:3

**force** 28:8

**Foreclose** 19:3

**foreclosure** 19:1,3,4,14

**forget** 22:14 23:11 167:19 204:23

**forgive** 106:15 341:4

**forgot** 59:4 162:5

**form** 15:4 314:17

**formal** 50:2 262:2 279:23

**formally** 20:7

**formed** 42:3 359:16

**forming** 34:2,3

**forward** 274:4 288:17 339:3

**forwards** 240:9 269:11

**found** 32:18,25 56:2 61:21 125:13 153:11 204:16 230:2 288:20,22 308:14 320:25 321:12

**foundation** 228:25 234:13,16 236:2 237:17 238:24 249:21 298:5 310:18 311:6 329:11 340:17 341:19 347:11,22

**founded** 32:20 34:20 38:13 62:13,16,17

**founder** 38:23 40:23 41:9, 24 45:8 231:6,21

**fourth** 233:6 285:7

**frank** 247:16

**fraud** 10:21

**free** 66:19 320:11

**freezer** 148:1 216:13,23 223:1 225:15 306:2

**frequently** 89:5 147:13 154:14 265:5

**fresh** 204:13 251:2 253:16 304:16 305:25 306:20 316:15 338:24

**friend** 32:20 33:24 35:1

**friendly** 54:15 244:7

**friends** 21:7

**frior** 36:7

**front** 92:23 222:9 229:14, 15 252:16

**front-end** 30:23 322:12

**frustrate** 51:13

**frustrated** 144:5 261:10

**full** 140:2 254:2

**full-on** 91:12

**fully** 50:1

**fun** 173:9,10

**functionally** 104:22 149:19

**fundamentally** 120:15

**funding** 38:19,20 39:17

**fundraising** 14:10

**future** 100:7 119:19 280:24 325:10 338:15 349:20 350:8

---

### G

**game** 232:16

**Garcia** 121:15 138:25 150:25 182:16 189:19 259:4 261:7 262:1 358:6,7 360:13

**Garcia's** 147:14

**gathered** 315:4,6,10

**gave** 13:3 26:8 53:24 98:11 147:16,22 305:18 315:15 352:19 365:25

**Gavin** 6:9

**Gelt** 6:7

**gene** 105:21,23 106:19,21 126:4,5,8

**general** 130:13 155:22 171:17 215:19 280:3 348:13

**generalized** 142:10

**generally** 30:6 90:25 132:7 138:12 170:4 195:18 216:12 343:10

**generate** 261:20

**generated** 11:4 313:21,25 314:25 315:13,16

**generating** 261:18

**genes** 83:5 106:2,12,13 107:7,11 126:15

**genesis** 132:24

**gentleman** 11:8 14:4 175:21

**German** 131:22

**girls** 341:6

**give** 10:22 11:10 53:7 78:10 87:12 108:22,24 134:25 139:11 176:5 201:24 220:13 231:9 271:20 288:18 292:7 363:3 364:5,22

**giving** 13:17 131:16 202:9 230:24 280:6 306:12,14

**glanced** 190:5

**glancing** 360:1

**global** 61:7

**God** 349:5

**goings** 329:15

**gold** 74:20,21,25 82:4,5 87:4 99:9,11,14,18,23 100:7,11 125:25 128:22 136:19,21,25 137:1 204:13 251:2 253:15 265:7 268:5 304:17 306:23 336:2 337:1 338:25

**good** 7:14 26:1,2 40:19,20 51:16,17 66:19 82:7 83:19 100:9,24 109:8 127:22 133:9 135:11 145:1,4,7 157:20,21,22 163:4 168:9 198:7 226:18 255:16,19,23 256:6 258:19 260:10 262:16 269:8 283:18 289:3 290:3 327:3 331:2 348:13

**goods** 36:16,20 324:24 325:4

**Gosh** 341:6

**gotta** 70:20 97:2

**government** 79:11 108:12,16 134:15,18 139:10 142:16,17 144:9 155:21 176:1,13 178:20 276:4 282:3 307:2,4,5 316:20,21 320:10,15

**government's** 275:7

**governmental** 18:6

**governments** 130:16

**governor** 60:20,22

**grad** 272:14

**graduate** 28:17

**graduated** 28:18 29:11

**grandfathered** 63:5

**granting** 123:7

**grants** 22:22

**grateful** 284:17

**great** 38:1 82:13,20,25 100:8 137:3 169:12 203:21 288:23 312:5 334:13

**greater** 198:7 256:23

**Greece** 221:13 227:6 233:13,22 277:3,5 286:8, 10 287:10,24 288:1,4 293:12,19 301:12,25 307:10 329:9

**ground** 8:2 268:16

**group** 74:5 121:8 141:1 155:10,11 168:25 247:20 282:21 283:5,6,9 313:7

364:25

**groups** 112:13 340:4

**grow** 49:3

**Guatemala** 79:12,23

**guess** 20:25 21:8 31:15 37:14,17 46:22 47:9 50:18 53:3 63:24 89:3,11 107:18 123:21 124:10 125:1 127:9 129:16 130:10,23 131:22 132:7 134:22 137:25 145:19 149:8 156:14 159:1 167:6 176:4 180:16 189:25 193:5,6 239:8 257:8 289:11 295:24 354:16 355:23,24 367:1

**guessing** 92:10 223:11 361:10

**guidance** 216:11

**guilty** 10:21

**Gundry** 138:9,11 214:5 217:11,18 276:3,11

**guy** 67:19 159:14 279:22

**guys** 157:25 203:18 272:17 291:16 334:11 365:25 367:8

**guys'** 157:16

---

**H**

**half** 39:10 69:5 71:3,4,9 158:6

**handful** 202:13

**handle** 178:17

**handled** 154:3

**handles** 227:19

**handling** 93:13 94:1

**hands** 303:11 325:11

**handwriting** 265:24

**hang** 183:1

**happen** 15:5 60:11 68:8 69:15 70:7 87:13 96:16,18 127:5 218:17 221:21 227:20 290:24 359:5

**happened** 9:10 12:11 19:7 27:5 31:16 46:4 52:6 68:2 124:23 125:1,3 128:20 216:25 222:1 225:17 287:1 350:9 351:3

**happening** 86:20 141:13 165:12 259:14 268:10,16 306:11 353:1

**happenings** 329:16

**happy** 109:8 117:15 304:13

**hard** 52:21 113:24 155:18 174:24 214:16 215:1

222:10,21 223:15 224:4, 12,15 225:4,21 226:6 271:17 300:22 330:8

**harder** 328:10

**harm** 291:9

**hate** 325:14,17

**HBDC** 39:22,23,24 41:8,17 42:5,9 43:1,10,20,24 44:5, 8,18 45:13 46:4,9 47:8 49:10,13

**head** 41:20 70:21 179:25 233:15 280:9

**headhunters** 271:2 272:12

**heading** 185:1

**health** 35:2 58:1 155:21 161:23 201:19 211:15 212:22 244:21,22 275:8 313:1,11,15,17,22 314:3,5, 6,13,19,22,24 315:7,9,12, 17,19 316:3,6,10,24 320:18 341:2 364:24

**healthcare** 55:12 59:21 188:13 201:1 253:20 254:9 258:9 262:21 340:5

**Healthcare's** 55:15

**hear** 23:12 32:7,8 110:22 167:10

**heard** 186:9 341:10

**hearing** 143:9 197:11,14

**heart** 350:12,14,18

**Heather** 185:13,15

**Heaven** 345:24

**heavy** 36:19

**helm** 46:17

**helped** 32:22

**helpful** 28:3 92:5 98:10 248:25 310:11

**helping** 34:5 247:15,21,22

**helps** 207:7 289:20 294:17 330:6 343:11

**hemorrhagic-** 62:6

**hepatitis** 62:4

**heros** 272:20

**Herriman** 7:21,25

**hey** 108:15 133:14 134:13 200:8 248:14 281:21

**HIC** 279:22

**high** 19:20 74:22 77:20 78:5 98:18 168:15 185:3 186:20 187:1 204:14 265:8 304:18 338:25 357:16

**high-burden** 39:25 40:6

**high-quality** 99:25 100:5 253:15 305:24

**higher** 86:8 98:22 101:1 125:24 153:15 201:10 259:18 263:24 264:11 320:14

**highest** 72:11 112:2 113:8

**highly** 124:17 126:18 193:24 320:11

**hijacking** 349:4

**hired** 51:11 270:24

**hiring** 51:16,19

**history** 99:25 118:4

**hit** 64:6 267:1 289:6 359:17

**HIV** 34:25 35:3 78:10 79:3, 6,17,18

**hold** 69:12 147:19 165:11 181:23 183:5

**home** 12:9 21:5 64:7 97:2 345:24 356:15 357:17

**homeland** 31:1

**honest** 70:20

**Honestly** 269:12

**hood** 130:4

**hope** 185:12

**hoping** 74:24

**hospital** 58:1 59:22,23 158:17 159:6 188:14 198:13 201:11 213:9 253:9 254:12 258:7 312:15

**hospitals** 60:16

**Hostetler** 6:21

**hour** 81:3 105:1 158:6

**hours** 8:20 80:18 197:6 205:9 266:25 367:5,6

**house** 13:8 21:10

**huge** 36:13 68:16 81:1 156:12 220:20 221:11 270:16

**hugely** 113:1

**Huh-uh** 137:13

**Hukari** 31:15

**human** 60:14 73:9 87:17, 23,25 97:4,5 168:13

**humanity** 52:12,15 198:7

**hundred** 13:11 26:23 35:8 86:12 87:10,16 98:16,18 110:20 111:2 118:8,16,18, 20,25 119:21 120:4 123:1 124:21 140:18 141:12,19 142:11 145:22,23 151:22, 23 161:10 162:21,22 163:8,9 164:9 170:25 190:19 202:15,17 203:2 211:19 243:14 267:19 275:11 276:14,15,20 282:12 292:3,4,18,19 293:3,21 294:24 295:25

297:19 299:2 304:21 308:24 309:7 313:3 323:22 325:15,16 327:9,22 336:10 337:19 338:2 341:17 342:5,19

**hundredfold** 128:12

**hundreds** 76:16 126:22 195:20 241:22

**hungry** 157:25 158:3

**Huntsman** 60:19 174:25

**hurt** 55:3

**Hutchins** 157:12 179:23, 24 181:8 259:4 262:13,18 269:5,8 330:13,14 342:2, 18

**hydrocarbon** 26:15

**hypothetical** 77:9 80:6,13 116:19

**hypothetically** 79:21

---

**I**

**icebox** 227:14

**ICMR** 122:6,12 123:11 125:25 126:20 127:23 129:4 139:10

**ID** 184:25

**ID/LAB** 185:1

**idea** 25:9 33:18 34:4,10,11, 12,13 62:16 143:20 144:9 162:16 188:22 212:12 215:24 232:15 239:2 269:22,23 278:10 289:3 321:19 344:7 359:12,16

**ideal** 68:24

**idealist** 52:11

**identical** 104:22 220:2

**identification** 29:3 108:20 117:17 120:20 131:7 138:18 146:5 158:10 168:22 175:8 181:11 189:10 210:17 214:3 229:9 230:16 240:4 258:24 273:13 284:1 291:12 317:3 326:20 330:22 334:19 341:25 342:23 353:24 363:1

**identified** 95:23 128:21 129:1 307:11

**identify** 23:25 67:2 79:6 98:3 127:18 163:13 330:5

**idiot** 311:24 312:7

**idiots** 311:15

**IFU** 142:5

**ignoring** 280:6

**IHC** 184:25

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                       Confidential                        Brent Satterfield, Ph.D.

**Ike** 23:13 25:7 33:17 34:19 41:10 42:1 46:18 52:3 57:24 88:11 125:23 157:10 174:12,21 232:18 277:15 321:15 322:13 326:25 327:17 352:19

**Ike's** 277:5

**imagine** 193:20

**imagined** 311:21

**immediately** 356:5

**impact** 21:19 42:11 102:1 202:25 267:7 296:24

**impacted** 220:22

**impacting** 202:5,20 325:9

**impacts** 101:12 140:25

**implied** 271:22

**important** 57:17,20,22 84:18 96:5 280:16 294:21 296:13,23 320:4,20 321:8, 10 328:12,15 331:3

**impossible** 35:9

**impressive** 115:1

**improve** 216:18 321:23 331:7,16,24

**improved** 153:2

**improvement** 91:3 270:10,16 320:7

**improvements** 123:12

**improving** 213:2 267:20 324:16 332:6

**in--** 25:6

**in-house** 336:2

**in-person** 230:12

**inaccurate** 236:1

**inactive** 53:4

**inappropriate** 278:18

**incarceration** 20:14

**incidence** 76:3,23,25 77:15

**include** 23:13,14 68:8 204:17 205:17,22 234:5 242:19 255:7,12 266:18 289:3 294:1,2 339:2

**included** 145:17 178:6 242:11,16 262:10 292:9 298:14 307:2 339:20 354:11

**includes** 59:17 81:16,17 86:20,21,22 111:21 296:24 315:16 316:4

**including** 180:19 204:4 217:20 259:12 262:12 275:5 301:10 331:3,15

**inclusion** 316:19

**Incomplete** 77:9 116:18

**inconclusive** 354:9

**inconsistent** 133:15

**incorporate** 46:16

**incorporated** 192:3

**incorrect** 7:3 265:16,17 281:1 315:24

**incorrectly** 144:2 159:3 218:10 254:19 255:4,6 260:1

**increase** 155:21 324:17,24 325:2 346:18,19 350:1

**increases** 128:9

**increasing** 324:25 325:1

**increasingly** 320:4

**indepen--** 306:25

**independent** 292:5,24 303:2,7 304:25 305:2,7,20 307:1,12 308:7 311:10 316:14 322:11

**indeterminate** 186:20 187:1,16,17,22

**India** 71:24 104:15 122:18 123:16,22 124:20 127:15 141:15 146:15 164:17,19, 20 165:5,10 166:5,14 175:5 204:2 205:1 287:11, 16,20 293:2,11,19 294:1,2, 3,5,10 304:8,15 307:3 329:8

**India's** 166:22

**Indian** 122:15 124:12 130:14 139:7,9 141:8 149:2,22 150:8 166:1 275:6 316:20

**indicating** 193:8 222:12 224:14 226:2,17 268:15 319:23 324:16,21 349:15 352:4 355:22

**Indirectly** 115:12,13

**individual** 30:8 54:15 317:8 359:19 364:7

**individuals** 52:13 59:14 76:8 114:12 262:20 272:24 299:12 354:8

**Indre** 275:8

**industry** 36:6 52:15 68:17 90:13 92:13 100:6

**inexperienced** 209:25

**infected** 78:13 79:18 196:17

**infection** 80:18 118:2 148:4 177:7 192:10 193:2, 10,19 195:10,18 196:13,16 198:23 199:10 200:2 266:19,25 277:21

**infections** 264:22,24 265:22

**inferring** 277:20

**infinitesimally** 266:24

**inflammatory** 247:14

**influence** 348:2

**influences** 349:22

**info** 343:14

**info"--** 185:12

**inform** 25:4 248:10 289:20 294:18

**informal** 281:6 319:8

**information** 23:21 107:2,3 116:17 117:11 118:4 133:14 150:25 166:19,20 177:10,18 207:22 210:6,8 213:11 223:12 234:20 237:2 239:2 250:3 268:25 277:17 281:1 296:3 298:11,14 304:6,7 305:18 316:5 319:21,22 328:7 344:19

**informed** 32:24 176:22

**informing** 248:12

**infringe** 36:7

**inhibitors** 168:18

**initial** 98:5 99:13 106:1 107:9 124:10 125:2 131:12,13 146:18 166:13

**initially** 31:1,14 41:23 74:1 82:11 105:20 123:20 162:6

**initials** 191:2

**initiated** 16:25

**initiative** 155:20

**initiatives** 156:13

**innovation** 36:3

**inoculates** 289:6

**input** 310:1,3

**inquire** 206:4

**inquired** 206:9,15,19

**inquiries** 94:2 272:11

**inquiry** 172:23 230:9,13 341:14

**insert** 165:15 256:4

**inserted** 244:3 358:25

**inserting** 252:14

**inserts** 188:19,23,25

**inside** 351:2,23

**insider** 64:10

**insisted** 42:21

**inst--** 163:6

**instance** 30:8 35:1 36:13 136:19 220:25 266:3,7

312:12 350:25 351:1

**instances** 51:18 64:6 81:20 293:18

**Institute** 275:7 316:21

**instruct** 8:6

**instructed** 178:2

**intact** 168:17

**integrity** 168:16

**intellectual** 30:1 40:16

**intended** 262:20,21 278:1 280:22

**intent** 36:9 40:16 41:4

**intention** 13:17 349:10

**intentionally** 69:23 350:12

**inter--** 36:1

**interact** 250:10

**interaction** 89:5 158:19 363:18

**interactions** 134:21

**interest** 26:6,7 42:10 44:18,24 45:6,24 47:11 56:24 60:20,23 92:10 246:19

**interested** 33:18 34:1,4 96:1 339:17 354:12

**interface** 154:13

**interfacing** 156:25 159:1

**Intermountain** 55:12,15 59:21 188:13 201:1 253:20 254:9 258:9 340:4

**internal** 162:19 168:11 188:4 321:24 322:19 348:3,5

**internally** 99:4,8 153:9 191:17 260:12 261:4,15 322:22

**international** 62:2 282:2 343:10 345:8

**Internationally** 135:21

**interpret** 81:19 83:11 168:2 224:2,3

**interpreting** 237:3

**interrupt** 8:8

**interval** 98:22 126:25 127:1 204:20,24 304:10 344:24

**intervention** 165:24

**interview** 178:4 182:8 184:15 363:22,23

**interviews** 175:2

**intrinsic** 88:3

**introduce** 29:1

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

introduced 228:4

introducing 239:24

introduction 33:24 227:17

invalidated 179:9

invent 36:6

invented 33:3 270:7,13

invention 71:5

inventions 30:22

invested 14:20

investigated 71:21

investigation 17:4 18:7

investment 12:13 14:8,11, 16,17,19

investor 131:23,25 280:6, 10 281:5 300:4

investors 28:5 34:5 39:6,7 42:17,18,21 193:25 280:18 299:22 300:4,11

involved 38:17 89:15 153:21 154:6,8,16 155:9 180:8 269:1 331:15

involves 328:2

involving 117:21

Invoy 32:5,11,15,16

Iowa 154:22 239:9 304:23 306:3,4,12 308:14 334:25 335:5 337:9

IP 41:4

IPC 168:9,10,11

Ireland 142:15 143:11,14

ironic 293:25

irony 287:16 320:9

irrelevant 201:17

ISCMR 141:1

ISM 141:1

isolated 221:19

Israel 142:15 143:5

Israeli 361:3

issue 16:5 104:4 116:12 130:25 165:12 174:10 213:21 214:1 219:11 240:24 279:23 344:17

issued 18:18 116:25 203:22 228:13 259:16 302:16 303:5 309:18 339:5 359:21

issues 83:17 124:9,12 130:12 164:16,18,20,21 224:6 277:3 288:5 306:5 329:8 355:14,15 357:5

issuing 115:25

Italy 142:15,25 143:2

item 359:2

J

Jana 159:13

January 38:13 46:7 49:8, 19 88:8 90:9 110:9 115:4 148:2

Jay 31:14

Jennifer 168:25 170:5 171:18 172:17 181:21 182:3,6 184:13 229:15,25 230:18 235:8,15 236:13 240:8 250:11 273:23,25 274:10 277:16 337:8

jeopardy 221:12

job 19:8 51:16,17 82:17 162:4 209:17 249:10 271:23 298:7 300:13 325:13 328:22 330:2

jobs 78:7 260:22

joined 32:19

joint 40:9 41:15 42:22 104:16 339:13,15 340:14

joke 130:7

Jon 60:19 174:25

Joni 6:25

journal 56:23

journalist 233:24 234:1,4, 10,18,19

judge 14:23 16:2 362:10

judge's 21:11

judgment 14:24 19:14

July 64:13

jump 147:9

jumped 147:9

junk 68:2

jurisdiction 19:24

justified 323:11,15

JV 42:4

K

Kara 357:19

KC 317:13 331:7

keeping 12:14

Keith 240:7

Kenneth 317:7

Kent 159:13

key 221:13 284:18 289:20 294:18

kid 87:10

killing 150:17

kind 11:3 61:25 81:2 87:9 95:9 98:11,20 99:12 125:10 130:14 136:4,18 156:25 159:14 161:1 192:25 198:5 243:6 250:15 309:19 312:19 364:24

kindergarten-type 168:5

kinds 28:7 36:11 96:17 112:21 160:19 202:24 326:11

kit 112:2,24 113:2,20 306:6,7,9

kits 217:24 221:15,16,18

knew 36:10,11 58:21 76:9 103:2 166:25 198:13 300:4 302:21 340:10 359:12

knowing 87:11 152:17 180:25 209:25 228:2 268:22 270:5

knowledge 18:5 83:17 135:17 137:21 155:25 174:14 179:13,17 198:4 199:11 200:5 205:25 221:24 222:3 228:6 232:5 275:21 276:1 331:23 345:14

Kyle 31:15 260:25 261:4, 13

L

lab 23:15 68:17 85:23 87:1 89:2 98:7 124:20,23,24 127:15 129:11,12,16 130:6,9 147:3 149:5,22 150:9,13 158:16 160:13 162:18 164:21 165:1 166:23 175:25 177:14,18 178:2,13 179:8,13,19 207:1 214:18 217:18 219:9 221:12,13,17 224:8,16 225:5,10,23 226:11 227:6, 21 304:14 331:6 356:6,8, 10 357:11

lab's 178:10

lab.' 336:16

label 85:15 360:12

labeled 345:12

labor-- 68:23

laboratories 30:21 129:20 251:1 263:16 275:6 322:5, 6 329:17

laboratory 50:12,14 68:23 124:13 128:14 130:3 176:1,13 178:20

labs 50:18,21 68:19 83:7, 12 85:15 92:14,16,19 93:13 94:2 130:18,19

136:15 146:15 164:11 204:2,16 209:8,12,14 357:13

lack 141:9 210:14 215:3 223:17 234:13,15 236:2 238:24 249:21 298:4 310:18 311:6 329:11 340:17 347:11,22

Lacks 341:19

lag 38:4,7

Lake 6:5 54:10 169:2,19 170:11,15 172:22 173:6 174:25 175:4 188:10,14 230:25 232:21 234:23 240:9 244:21 281:2 291:2 325:19 359:13

landed 153:18

language 95:21 149:22 150:1 170:22 171:20,23,25 172:6 242:11 280:13 281:13 282:10 289:24,25 300:16 312:23 342:8

large 38:4 42:18 93:1 156:6,7 185:21 195:19 209:17 276:1 329:15

larger 24:14 69:10 98:4

largest 59:24 156:4,5

last-minute 266:4

late 215:3,4,16,17,19 223:16 224:5,6 226:10 232:16

Latin 138:13

launched 107:25

Laura 214:8,14

law 9:21 30:2

lawsuit 9:7,10,11,16,18,21 16:18,24 19:2 51:23 52:12 53:1,23 58:8 59:18

lawyer 65:7 237:22 238:2

lawyers 17:6 65:8,9 238:5

layman 26:16

layperson 238:20

leader 221:14

leaders 100:6

leadership 50:12,14

leaked 213:11

learned 42:15 249:8 259:25

learning 40:18 260:16 318:4

leave 33:16 58:23,24 271:3

leaves 227:5

leaving 60:13

led 142:16,17

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**left** 12:10 16:4 31:18 37:22 51:21 52:14 53:24 58:3,7 115:7 168:18 227:1 289:16 332:11 334:8

**legal** 6:9 15:12 95:9,11 120:12 319:10 330:16

**Lego** 322:9

**Legos** 322:8

**lend** 13:13

**lender** 13:13

**length** 54:9 69:4,6 140:2 197:7

**lengthy** 165:15

**Leon** 20:17

**lesson** 40:18

**level** 95:23,24 96:4 136:3 140:14 277:20,23 356:13

**levels** 91:9 128:13 192:6 193:8 277:21 345:9

**Levinson** 357:19

**license** 40:17 41:4 42:25 43:4,8,14

**lid** 129:25

**lieu** 84:10 96:6

**life** 42:11 52:15 60:13 213:14 256:21 269:17 348:12 350:13 352:11

**lifestyle** 115:13,15

**lifetime** 266:25 270:7 306:8

**likewise** 95:11

**limit** 49:3 67:5 73:13 74:6,8 75:17 76:2,7,25 77:6,16,21 78:11 79:7,13 80:4,6,19,22 81:4,6,12,13,21 84:1,3,21 85:3,8,21,24 100:1,24 101:2,3,8,21,25 102:23 103:2,5,8,10,25 104:1,5,12 114:1,13 127:20,22 128:13,16 140:2,7,11,25 148:24 150:15 151:16 152:19,23 153:7,10,14 163:4 188:20 197:3 200:9, 12 202:3,4,19,24 211:23 213:15,25 218:13 256:23 257:9,14 260:13,20 263:24 264:1,11,15,17 265:4,12 266:8 267:6,21 285:9 287:1,12,18,21 288:2 289:19 294:14,16 295:6, 13,19 296:6,8,9,12,22,24 297:3,12,14,15 318:11 319:3,5 320:8,17 321:1 322:1,2,10,22,24 323:2 324:17 326:16 327:19 328:12 330:10 331:8,16,24 332:4,6 344:3 352:2,6

**limited** 193:23 329:19 352:10

**limits** 257:15 320:13

**Lindsay** 6:11

**lines** 82:21 198:8 243:18

**link** 132:8 133:1 259:8 343:2

**Linkedin** 29:7 30:14 32:4, 10 38:12 39:21 45:13

**liquid** 92:22 162:6

**liquid-handling** 162:1,8,9 178:9

**list** 235:19 257:15,18 258:9 275:17 276:8

**listed** 32:24 170:18 188:17 275:20

**listen** 78:25 174:21

**listening** 78:17,20

**listing** 123:9

**lists** 111:21

**literally** 323:4

**literature** 309:14 346:5 347:25 361:10

**Litigation** 6:10,12

**live** 55:4 332:18

**lived** 57:15

**lives** 325:12

**load** 76:5,25 77:6,15,19 80:5 114:13 263:24 264:11

**loan** 9:12,13 11:9,10,11,12, 15,17,20 12:6,9,18 13:7, 17,22 26:8,20 27:2,8,16,25 64:25

**loans** 28:6

**located** 345:14

**LOD** 76:24 77:14 152:7,25 153:1 163:14 189:1 210:21 211:17 212:8 213:2,7 259:11 262:16 274:12 277:19 278:24 285:10 289:19 294:17 317:15,16, 17 318:5 320:3,19 321:7, 16,23 326:24 327:3,15 356:14,21

**LOD's** 84:14

**lodge** 8:5

**LODS** 151:23

**log** 179:6 180:24

**logic** 56:25 57:2

**logical** 138:22 219:10

**Logix** 34:12,18 40:9,11,12, 13,15,23,25 41:15 42:5,25 43:14 46:16,19 47:9 48:1 62:17,18,19,21 63:4,9,13 71:14 72:8 73:1 80:3 96:2 97:18 104:19 105:20 107:19,23 111:22,24 112:1

113:7,16 118:12 139:20 141:17 143:14 153:18 176:14,20 177:3,6 219:23, 24 220:5 342:6 357:6 360:24

**long** 7:22 23:17 38:7 133:6 147:3 152:21 157:15 194:18 198:20 260:16,18

**longer** 49:4 52:5 85:24 231:10 271:6 288:9 332:21 361:24

**looked** 69:20 107:3 150:7, 9 188:18 272:15 303:10,13 308:1 310:4 322:21,23

**loose** 201:3

**Lopan--** 290:14

**Lopans"--** 184:24

**Lopansri** 184:24 185:23 188:9 198:11 200:7 213:11 254:2 290:14,22 339:14

**Loprans--** 200:7

**lose** 185:6 222:23,24

**losing** 48:5

**loss** 16:2 128:12

**losses** 16:7

**lost** 19:8 42:20 187:5 201:5

**lot** 15:5 34:24 35:3 36:3 59:25 70:4 82:17 93:4,15 94:1 103:4 108:8 112:18 113:23 115:25 116:7 124:2 129:21 152:24 158:19 178:5,6,7,11 193:21 209:19 213:14,24 214:18 216:7 219:11,12,14,20 222:2 224:17 226:12,16,24 256:16 259:21 260:14 261:3 265:3 323:1 328:23 344:3 345:1 350:18 359:15,18

**lots** 67:17

**lousy** 106:16

**love** 25:10 52:12 201:24 272:20 282:15

**loved** 195:4

**low** 13:20 114:12 186:19, 25 197:8 203:7 277:21 345:9

**low-cost** 36:8

**low-level** 162:23 163:3,19 164:5

**lower** 81:21 84:1,2 86:8 101:3,4 102:24 146:21 163:14 256:23 264:1,17 265:12 320:25 327:4 328:12

**lowering** 16:9 320:8

**lowest** 112:2 113:8,15 266:8

**luck** 21:12,13

**lunch** 138:20 183:21

---

**M**

**m200** 317:15

**machine** 178:9

**machines** 92:24 336:12

**Madam** 252:10

**Maddie** 261:1,5,13

**made** 33:24 46:9,14 52:21 55:4 87:10 88:9,15 93:16 94:4 98:12,16 101:19 106:6 142:1,11 144:6,11 151:15 177:19,23 190:23 191:1,2 193:24 205:16 225:10 235:20 238:21 239:3 267:13,17 272:8,9, 17 304:4 307:6 310:25 321:4 341:7,15 353:5

**Madison** 159:10

**magistrate** 362:10 366:8

**Magna** 343:16,17,18

**main** 213:25

**maintained** 216:13 241:16,20

**major** 29:17 92:19 186:19, 24

**majority** 62:1 233:9 243:21 257:23 266:18 309:1

**make** 8:15 34:14,17 43:20 70:25 86:24 87:15 98:18, 19 106:14,16 112:14,19 117:15 119:4,23 137:21 157:24 198:4,11 207:5,8 213:13 218:16 242:8 262:6 267:21 272:3,4,6 276:6,9, 10 280:5 303:12 306:1 319:11 324:23 336:25 339:8 364:6

**makes** 71:5 207:6 255:8

**making** 88:12 99:25 199:11,19 232:12 263:12 280:25 322:25 342:18 349:21

**man** 78:25

**management** 157:9 180:19 181:2 198:9 250:6, 10,13,20 317:9 331:4

**manager** 27:22 89:2 158:16

**managing** 46:11

**manifest** 346:11 347:7 352:2,5,6

**manifestation** 346:1,5,25 349:4 350:5,25 351:6

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023    Confidential    Brent Satterfield, Ph.D.

manifested 346:19

manifesting 347:18 348:18 350:1

manipulate 13:19

manufacture 218:10

manufactured 216:12 218:5,9

manufacturer 216:15

manufacturing 35:22 36:4 123:8 216:18,20,25 218:14 261:6 317:11

March 60:9 90:11 117:25 354:3

Marissa 6:20 255:14 330:25

mark 90:16,20 91:10 182:20 282:12

Mark's 185:6,10

marked 29:3,5 108:20 109:10 117:17,19 120:20 121:5 131:7,9 138:18,24 146:5,7 158:10,12 168:22, 24 175:8,10 181:11,20 184:8 189:10 210:17,19 214:3 229:9,11 230:16 240:4,6 258:24 259:1 273:13,15 284:1,3 291:12, 20 317:3,5 326:20,22 330:22,24 334:19,21 341:25 342:23,25 353:24 354:1 363:1

marker 167:8,16,22 168:12

markers 139:25

market 13:2 16:16 66:6 91:5,24 99:20 106:10 107:13,14 108:2,6 115:24 193:23,24 323:5,20

marketing 46:13 85:20 126:2 341:16

Masen 89:8

mass 98:9

match 67:10 70:7 348:5 355:12

matched 336:15

material 85:4 202:3

Materials 110:19 111:6,7, 15,18

math 79:17 140:15

mathematical 328:16

Matt 211:6,8,16

matter 6:7 81:7 83:4,11 133:13 210:21 214:17,25 326:16 348:10

matters 253:7 329:14

Mayu 139:9 142:10

Mayuranki 138:25 139:3, 15

Mcewan 330:25

Mcpherson 210:20 211:11,13,22

meaning 69:24 73:9 76:5 92:21 95:16,18,22,24 97:23,24 98:23 126:10 128:13 140:12 150:13 202:15 227:22 252:23 306:7 322:23 332:17 336:24

meanings 73:3

means 56:21 91:6,7 94:22 95:1 122:7,13 129:15 139:19,20 141:4 148:10 187:17 215:17,20 297:10 307:1 326:11 335:25 336:20 337:19 346:4 347:8,18 352:6,9

meant 92:14 192:19,21 215:16 217:8 218:3 271:22 350:4,7

measure 33:13 70:16 74:18 97:3

measures 236:25

measuring 72:24 97:6 345:3

media 94:2 213:10 259:24 284:16 325:7

medical 184:25

Medicals 175:22

medications 21:18

meditate 346:10 347:18

meditated 346:19

meditating 346:23 350:23

meditation 348:9 350:23

meet 14:7 22:7 33:21,23 123:12 271:8

meeting 8:22 17:20 23:1 33:2 34:19 123:10 170:3 334:7

meetings 23:6,8,17 230:12 271:18

meets 316:13

Mehta 121:7,20

member 21:25

members 23:11,13 359:19 364:18,21

memory 21:19 285:5

mention 316:19

mentioned 15:9,17 16:11 38:11 41:14 53:23 58:6 59:1 77:13 102:23 145:24 146:1 171:12 178:4 211:8, 16 212:6,7 220:8 258:13 261:13 287:17 294:1

339:16

mess 127:15

message 158:14 159:18 166:15 327:7 331:3

messing 129:20 330:6

met 8:19 14:8 17:6 33:17 52:13 59:1,2 160:17

metabolism 33:13

metabolized 33:9

method 30:7 149:19 188:1 269:1 343:18

methods 110:19 111:6,8, 16,18 112:15 150:5 308:13

metric 81:12 96:19 289:20 294:17 296:24

metrics 247:25 277:24 289:20 292:19 294:18,20

Mexican 316:22

Mexico 275:7 293:2 307:3

Michael 6:17,19 104:25 184:18 334:23 335:2

microliter 80:25 81:1 344:4

middle 147:21 240:8 256:19

Mike 335:7,8 337:8

mild 232:1

miles 81:3

million 11:5,6,12,21 12:19, 20,22 16:12 39:10 64:22 71:3,4,9 79:20,22,24 152:1

millions 57:13 76:16 79:13 80:1 332:22

min 214:15

mind 131:16 211:4 334:11

mine 24:7 32:2,21 33:24 149:24 166:16 271:4 312:18

Minnesota 212:17,22 275:8 282:20,21 283:3,4 313:1,7,10,15,17,22 314:3, 4,5,12,19,22,23 315:6,8, 12,17,19 316:3,5,10,24

minus 148:1

minute 53:15 214:15

minutes 181:13,16 205:9 283:19 361:13 362:13 363:3,7 366:24

mirror 350:16

mirroring 350:13

Mis-- 266:11 287:3

mischaracterizations 87:6

mischaracterize 101:10

mischaracterizes 15:1 48:15 53:5 61:11 72:13 77:8 82:22 104:6 135:4 172:15 173:3

misconstrue 298:25

misconstrued 298:2 311:24

misconstruing 173:24 341:8

misleading 120:10

mispronounce 30:16

misquoting 59:2

misrepresenting 341:11, 13

missed 177:3,5,7

missing 345:6

Mission 282:5

misspeak 144:18

misspoke 144:13

misspoken 172:11

misstate 136:12 329:1

misstatement 296:19

Misstates 58:10 59:6 75:11 80:10 81:8 84:15 85:6 87:20 90:6 95:3 102:3 114:15 118:22 119:9,25 122:19 127:12 128:24 135:3 143:21 144:16,17 145:12 153:3 172:14 173:18 174:18 180:20 194:9 195:1,25 200:3 202:6 203:24 204:8 205:7 210:2 212:10 213:22 224:19 225:24 226:23 228:18 231:2 233:19 234:16 238:25 243:8 245:6,11,17 246:10 247:11 249:3 250:14,17 252:20 254:21 255:9 257:11 266:14 267:9,15 268:1,18 273:4 279:4 286:3,20 287:5,14 288:6,11 293:13, 22 295:7 296:15 297:5 298:16,17 299:24 300:18 301:4,14,15 302:18,19 303:17 307:13,23 312:4 313:12,13,23 315:21,22 316:17,18 318:6,7 320:21 323:12 324:19 328:25 329:10 332:1 333:7 339:25 340:16 347:10,21 349:17 352:7 357:8 358:21

mistake 86:24

mistakes 93:16,18

misunderstand 299:16

mixed 341:4

MN 314:3

modifications 153:1

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                          Brent Satterfield, Ph.D.

**modified** 336:1,24 337:1

**modus** 13:18

**molecular** 270:14 292:16, 20

**molecule** 69:1

**molecules** 35:20

**moment** 14:18 23:12 53:7 123:23 160:17 176:5 181:23 196:15 207:20,21

**moments** 64:2 233:12 258:20

**Monday** 150:4,12 342:3

**money** 13:13 28:7 32:22 39:18,19 47:19 48:13,22 49:12 52:24

**monitor** 223:3

**month** 25:15 47:25 66:3 115:7 152:20

**months** 17:16 22:7 23:2,7 60:8 66:4 271:9

**morning** 7:14 117:25 169:13 331:2 361:2

**mortgage** 13:8,10 19:9

**mosquito-vector** 62:5

**motivations** 174:16

**Mountain** 6:4

**Mountainstar** 211:14

**mouth** 52:14 53:25 283:13

**move** 24:17 53:2,3 317:1 333:11,13 334:5

**move's** 333:15

**moved** 108:9 320:11 362:14

**movers** 272:16

**moving** 49:5

**multiple** 36:5 73:3 83:4,5 106:13 139:25 262:11 270:7

**mutate** 126:10

**muzzleloader** 21:2

**N**

**N-I-B** 294:9

**nail** 221:18

**names** 23:11 108:14

**narrative** 115:20 185:3

**narrow** 113:25

**nasopharyngeal** 110:20 111:3

**Nate** 169:3 185:24 186:8

**Nathan** 185:24 186:12

**nation** 59:24 60:1 83:23

**National** 30:21 275:7 316:20

**natural** 282:17

**nature** 48:14 60:15 73:22 86:19,20 235:16 278:19

**NC** 215:3,23,25 223:17 224:6,7 226:11

**ncov** 176:20

**near-death** 351:20

**Nebraska** 154:24 155:12 239:9 317:17,24,25 319:22 320:1,24

**necessarily** 264:4 265:2

**needed** 33:1 83:24 247:23 248:21 259:23 260:24 332:25

**needing** 89:5 330:9

**negative** 69:24 70:2,10,12 77:5,24 80:9 83:10 118:1 122:25 162:13 164:1 168:4 174:2,10 177:22 187:23 215:25 216:1,3,6 217:24 244:8 314:9,11 355:3,4,6,8 356:4,20 364:19

**negatives** 68:16 70:9 83:7 86:6 126:11 162:19,20 164:11 197:17,22 338:3

**negligible** 197:9

**negotiations** 153:22

**news** 135:11 250:1 338:16

**NIB** 294:9

**nice** 54:14 133:1 271:20,21

**nicely** 93:6 263:15

**nicer** 132:8

**Nick** 131:22

**Nieuwoudt** 175:21 176:4

**Nineteen** 240:1 258:23 273:12

**NIP** 275:6

**NIV** 124:6,7 128:23 146:12, 14,17 151:7

**nodding** 8:12

**nods** 41:20 233:15 280:9

**Nomi** 58:1 153:18,22,23 154:5,10,16,19,21 155:2,6, 7,11,13,20 156:15,16,22, 23,24 159:3 160:24,25 161:23 201:19 364:24

**Nomi's** 158:18 330:4

**non-eua** 75:9

**non-w-2** 22:15

**nonemergency-use** 74:12

**nonexistent** 321:11

**nonrecourse** 12:9,12

**nonspecific** 270:10

**noon** 138:19 169:13

**normal** 69:4,5,21 71:4 177:17,23 178:1

**nose** 231:18

**note** 13:21 127:21

**note's** 28:9

**noted** 118:1 172:10 231:24 239:12 367:7

**notes** 28:6 78:20 190:9 353:17

**notice** 7:3 66:8 259:10 346:13

**noticing** 346:6

**notification** 363:3

**notified** 180:19

**notify** 344:16

**notorious** 129:20

**NTC** 355:2

**NTCS** 355:1

**nuances** 327:19

**number** 39:9 50:22 64:21 74:15 75:19 76:5 124:15 146:21 147:15 156:10,12 157:7 166:10 201:8,14 211:1 266:22 281:21,22 283:23 284:4 288:18 308:18 312:12 314:18 316:2 323:25 324:7 348:1 358:15 359:2 362:24

**numbered** 191:9

**numbers** 86:24 98:21 145:24 146:1 165:5 186:10 191:17 314:6,7,15,16 315:9,16

**numerous** 263:16 275:5 299:11

**O**

**oath** 17:10,13

**object** 165:14 255:21 256:1,10 366:25

**Object--** 245:21 365:23

**objected** 366:22

**objecting** 237:22 238:5

**objection** 15:1 24:25 48:15 49:21 53:5 57:21 58:10 59:6 61:11 72:10,13 75:11 77:8 80:10 81:8 82:14,22 84:15 85:6 87:20 90:6 94:8 95:3 102:3,16 103:17 104:6 108:4 112:8 114:15 116:1,18 118:22

119:9,25 120:6,11 122:8, 19 125:4 127:12 128:24 133:3,19 135:3,19 137:9, 16 143:21 144:16 145:12 151:8 153:3 156:2 157:2 162:15 165:8 172:14 173:3,18 174:18 177:24 178:25 179:11 180:5,20 194:9,16 195:1,11,25 198:24 199:15,22 200:3 202:6 203:10,16,19,24 204:8 205:6 206:5,10,16 208:4,10,18,24 210:2 211:24 212:10 213:22 222:14 223:20 224:19 225:7,24 226:4,20 228:17, 25 231:2 232:6,13 233:19 234:15 235:12 236:21 237:7,14 238:23 240:25 243:8 244:25 245:5,10,16 246:10,14,25 247:11 248:15,19 249:3,16,20 250:14,17 251:8 252:19 254:21 255:9,14 257:11 263:9 266:11,14 267:9,15 268:1,18 270:25 273:3 275:23 276:23 278:15 279:4 280:19 282:5 285:20 286:3,20 287:3,5,14 288:6, 11 293:13,22 295:7 296:15 297:5 298:4,16 299:4,24 300:6,18 301:3,14 302:9, 18 303:17,22 305:9 307:13,23 309:9,20 310:12,17 311:2 312:3 313:12,23 315:21 316:17 318:6 319:7 320:21 323:12 324:19 326:7 328:25 329:10 332:1 333:7 338:4 339:25 340:16 341:18 342:13 347:10,21 348:20 349:17 352:7 353:6 354:21 355:25 357:8 358:21 365:20,23

**objectionable** 246:2

**objections** 8:5 224:23 236:11,21 245:21 251:17, 25 252:2 340:20 347:24

**objective** 42:8

**objectives** 112:17

**obligation** 15:20 61:19 249:24

**obligations** 249:25 250:2, 5

**obscure** 258:13

**observation** 26:2 301:8

**observations** 118:3

**observe** 347:6 348:4 351:6

**observed** 350:9,17

**observing** 263:5 351:21

May 16, 2023                                                                                          Brent Satterfield, Ph.D.

**obtain** 27:8 39:3 180:9

**obtained** 29:21 204:11 263:1

**obtaining** 261:22

**obvious** 198:19

**occasionally** 135:9,10

**occur** 23:6 347:1

**occurred** 286:13 302:5

**occurrence** 348:19

**occurring** 172:24 301:12

**occurs** 348:9

**off--** 206:14 249:23

**off-label** 85:9 93:10,11,12 136:10

**offer** 106:7 272:3,5,6,10

**offered** 46:13 271:20

**offering** 318:19 320:11

**offers** 271:11

**offhand** 151:21

**office** 334:2

**officer** 24:3 43:18 49:20 50:4,10,16 115:6 177:21 208:23 231:21 244:19 249:23 271:19 279:11,13, 18,19 289:4 301:24 310:24 329:3,13 332:12,14,20 352:24

**officer/director** 32:5,11

**offices** 6:5

**official** 211:17 309:23 316:10,22,23 332:15

**officially** 261:25 332:18

**Oliver** 184:23

**omitted** 277:16

**on-ship** 31:6

**one's** 98:15

**one-time** 64:10

**ongoing** 10:5 91:3,13 329:16 332:10

**open** 16:15 129:25 130:4 185:17 247:16

**openly** 198:15

**operandus** 13:18

**operate** 25:24 26:3 198:5

**opinion** 82:9 221:13

**opportunities** 24:1

**opportunity** 323:6

**option** 27:10 28:12 185:18

**options** 185:4

**oral** 282:21 283:4,8,9 313:7 314:21

**order** 14:24 74:20 268:20, 23 324:22 367:11

**organ** 67:1

**organism** 67:2

**organization** 343:11

**organizations** 141:9 254:10 257:16 364:25

**origin** 312:21

**original** 218:8 336:14

**originally** 349:9

**originate** 73:22

**Ostler** 6:25 7:15 111:11 157:13,21,23 158:2 174:4 182:10,15,21,25 183:4 184:5 189:11,16 207:14 210:4,25 211:4 219:1,3 228:25 236:2,11,22 237:20,24 238:1,3,6 239:17 251:10,14 252:1,4, 7,10 258:17,21 279:4 284:4 290:3,6 291:17 300:20 303:24 305:11 311:4 334:13 353:8 361:16,19 362:2,7,17 363:2,6,9 366:1,4,7,12 367:10

**outbreak** 63:22 100:7 284:19 332:19

**outperformed** 108:16 134:24 162:20 258:11

**outrageous** 245:14

**outsider** 64:10

**outstanding** 12:23 15:24 27:25 64:11 82:15 253:18 257:21

**oversaw** 35:3

**oversight** 50:12

**owes** 15:20

**owned** 41:2

**owner** 28:5 41:21 44:20

**ownership** 44:18,24

**owning** 174:25

---

**P**

**p.m.** 166:11 367:17

**package** 188:18,23,25

**pages** 190:15 288:19

**paid** 10:7 15:18 22:9 27:4 44:7,11

**pandemic** 60:9 61:7 73:7, 14 76:9 92:16 115:22 136:23 263:3 283:12,14 323:21 333:5,9

**panel** 56:21 147:17

**panic** 60:5

**paper** 56:5,12,25 57:4 69:19 109:13,15,22 132:9, 15 133:2,6 200:21 254:6 258:2 260:19 261:6,7,10 359:17 360:21

**papers** 361:7

**par** 83:18 308:6

**paragraph** 139:18,21 147:22 233:7 241:15 275:3 277:18 282:16 285:7 358:14 364:8

**parameters** 84:11 123:2

**park** 64:7

**Parr** 6:25

**parroted** 282:10

**part** 9:11 20:2 27:7 31:25 48:25 49:1 50:13 58:7,13 59:23 92:23 93:1,20 94:24 130:21 188:9,14 212:2 213:4 221:22 231:18 254:24 264:8,16 265:1 284:14 315:8 316:21,23 325:5 328:18 333:23 348:18 365:15

**participants** 111:4

**participate** 247:4 339:18, 22 340:6,9,14

**participates** 23:7

**particles** 241:22 348:24

**parties** 173:8 261:17 262:11 340:8 364:10

**partner** 282:23

**partnership** 26:7

**partnerships** 139:6

**parts** 114:25 115:18 322:8

**party** 56:22 75:1 155:15 258:13 261:23 305:22

**pass** 123:21,24 134:18 146:18

**passed** 192:25 294:10 363:4,7

**passion** 312:6

**passive** 348:3

**past** 49:3 65:5 76:13 92:15 135:25 149:11 367:6

**paste** 312:19

**patented** 292:16

**patents** 34:24 35:16 36:5

**pathogens** 192:8

**Pathology** 275:7 316:21

**Pathwest** 275:6

**patient** 84:19,22 86:2 93:2 118:3 167:7,15 263:8 266:5 327:10,23 337:18

**patients** 55:10 84:23 195:14 230:3 262:22 263:2,13,19 266:18,20 267:8 328:15

**patients?'** 328:13

**pay** 10:22,23 12:9 13:7,21 19:8 22:18 65:7 350:24

**Payeur** 6:11

**PCR** 31:5 34:24 35:11,14 50:24 61:23,25 63:8,17,24 66:24 67:6,15 68:12,21 70:4,16 71:12,15 72:20 73:1 76:17 77:24 79:7,11 80:19,21 82:16 83:18 92:6, 14 93:12,14,20 120:3 127:23 128:8 129:19,21 130:6,17,21 135:18 139:24 140:2,11,16 147:3 149:18, 20 150:11 161:24 167:24 168:6,19 176:20,21 178:9 197:4 206:25 209:8,9,11 227:22 257:17,19 266:23 270:7,22 272:16,18,22 314:8 318:16 320:12,14,16 321:25 322:2 329:18,20

**PCR-TESTING** 271:12 272:9

**PE** 122:6,7 123:10

**peer** 56:21 57:5

**peer-reviewed** 56:17,20 57:20 260:19 360:18,20, 21,23

**Peirsol** 6:20 7:4 15:1 24:25 48:15 49:21 53:5,10 57:21 58:10 59:6 61:11 72:10,13 75:11 77:8 80:10 81:8 82:14,22 84:15 85:6 87:20 90:6 94:8 95:3 102:3,16 103:17,21 104:6, 25 105:3,7 107:21 108:4 112:8 114:15 116:1,18 118:22 119:9,25 120:6,11 122:8,19 125:4 127:12 128:24 133:3,19,24 135:3, 19 137:9,16 138:19 143:21 144:16 145:12 151:8 153:3 156:2 157:2 158:1 162:15 165:8,12,16,19,22 172:14 173:3,18 174:18 177:24 178:25 179:11 180:5,20 182:12,14,19,24 183:8,25 187:3,6 189:14 194:9,16 195:1,11,25 198:24 199:15,22,25 200:3 202:6 203:10,16,19,24 204:8 205:6 206:5,10,12,16 207:15 208:4,10,18,24 210:2 211:24 212:10 213:22 222:14 223:20 224:19,23 225:7,24 226:4, 20,22 228:17 231:2 232:6, 13 233:19 234:13,15 235:12 236:21 237:7,14,16

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                          Confidential                          Brent Satterfield, Ph.D.

238:23 240:25 243:8 244:25 245:5,10,16,21 246:1,3,10,14,25 247:11 248:15,19 249:3,16,20 250:14,17 251:8,17,23,25 252:19 254:21 255:9,11, 16,19,23 256:2,6,9 257:11 263:9 266:11,14 267:9,15 268:1,18 270:25 273:3 275:23 276:23 278:15 280:19 282:5 283:17 285:20 286:3,20 287:3,5, 14 288:6,11 293:13,22 295:7 296:15 297:5 298:4, 16 299:4,24 300:6,18,21 301:3,14 302:9,18 303:17, 22 305:9,12 307:13,23 309:9,20 310:12,17 311:2, 6 312:3 313:12,23 315:21 316:17 318:6 319:7 320:21 323:12 324:19 326:7 328:25 329:10 332:1 333:7 334:12 338:4 339:25 340:16,20 341:18 342:13 347:10,21,24 348:20 349:17 350:6 351:11 352:7 353:6,18 354:21 355:25 357:8 358:21 361:23 364:15 365:7,20,23 366:5, 11,13 367:3

**pending** 302:21

**pennies** 37:10,12

**Pentella** 334:24 335:2

**people** 42:12 50:25 52:16, 22 55:5 59:3,12 60:3,7,10, 24 61:7 67:22 71:21 74:16 75:16,24 76:4,14 79:16,23 80:22 81:18 82:11 83:24 95:10 103:4 121:9,15 138:8 154:10 155:10 157:7 159:11 169:1 175:12 185:25 195:15,17,22 196:4,7,9 198:3,10 201:2 207:7 214:6 241:20 242:4, 7,22,25 247:20 248:1,22 259:23 260:23 266:19 270:21 272:19 309:1 310:25 319:12 325:12,14 330:25 337:19 338:21 346:12 348:1 349:20 354:10 364:3

**Pepper** 283:20

**perceive** 310:25

**percent** 47:10 55:14,15 71:6 73:15,18,19 86:12,14, 15 87:10,16 98:12,16 113:11 118:8,16,18,21,25 119:21 120:4,16 123:1 124:21 125:14,16 141:12, 19 142:6,8,9,11 145:22,23 147:5,7 151:3,22,23 161:10 162:21,22 163:8,9 164:9 170:25 171:1 177:5 186:19,25 190:19,20

191:18 200:24 202:12,15, 17,18 203:2 211:19 230:2, 5 243:14 253:6,10,11,25 254:1 257:24 258:2,3 263:23 264:9,10 266:6 267:19,20 275:12 276:14, 15,20 277:6 278:5,6,10 282:8,9,12 286:6 292:3,4, 18,19 293:4,21 294:5,25 295:25 296:4,5,7,10 297:9, 10,13,16,20 298:9,10,20 299:2,13 301:5,6,21 304:8, 21,22 308:14,19,20,24 309:2,7 311:9,10 313:3 316:7,8,9 318:12,13,14 325:15,16,22 326:13 327:9,22 335:15,23 336:17 337:24,25 338:2,22,23 341:17 342:5,19 343:23 345:1

**percentage** 44:17 45:6 197:18 264:1,17 266:21

**perception** 325:9

**perf--** 98:3

**perfect** 67:14 140:15 165:23 294:12

**perfectly** 63:21

**perform** 96:10 108:9 193:3 208:16 259:11 268:9 326:9 340:11

**performance** 64:8,11 88:3 95:23,24 96:4 97:21 98:3, 24 102:1 117:12 137:8 190:17 194:4,21 199:4 202:5,20 237:1 259:17 278:3,4 286:18 288:4,10 292:2,17,25 302:16 305:1, 5 307:11 324:3,12,18 325:6 326:5,6,9,11,12,15 329:8 344:18

**performed** 74:4 134:14 144:8 176:24 219:9 276:2 303:3 304:16 313:8 336:11,21 345:8

**performing** 93:17 134:7 194:7,24 227:22 268:4 273:2,5 308:6 322:2 345:12

**performs** 96:8,10 186:17

**period** 20:13 34:23 57:16 59:5 78:3,6,13 79:19,22 80:17 83:8 92:11 123:15 132:15,18 158:21 161:21 192:10 193:4,12 194:25 195:18,24 196:6,8,11,14, 20,25 197:6,13 230:5 266:22 267:1

**perm"--** 184:23

**permanently** 334:5

**permission** 123:7 165:1 184:23 202:14 276:7

**person** 8:21,23 77:22 78:4 80:7,8 115:21 131:23 137:19 158:24 170:4 237:11 243:6 357:15 363:16

**personal** 174:13 228:6

**personality** 351:19

**personally** 16:20 209:7

**personnel** 51:2,8,16 137:22 145:19 319:9

**perspective** 64:9 70:3 149:23 213:9

**pertain** 18:14,17 70:10 286:18 295:5

**pertains** 70:12 200:12 249:17

**pertinent** 101:8

**pettiness** 60:14

**petty** 59:25

**Ph.d.** 7:8 29:21,24 30:15 31:18 32:21 289:17,18 294:16

**phase** 24:12,13 88:20 173:5

**phenomenal** 82:16 162:4

**philanthropic** 42:19 343:11

**philanthropist** 52:12

**phone** 169:9,20 170:4 211:9,17 212:3,7,8,13 279:21 339:15 340:24

**phrase** 140:6 268:11 278:9 285:11 298:15,18 300:25

**pick** 76:17 78:12 79:8 80:18,20 99:11 128:7 150:21 162:5 163:20 164:4 195:9 206:2 246:23

**picked** 128:15,22 203:20 220:8 266:23

**picking** 193:17 220:7

**picture** 167:9,17 168:8

**piece** 36:4,18 93:2 147:11 210:5 296:3 303:10

**pieces** 67:9 104:9 356:18

**pile** 109:4

**Pinder** 240:7

**Pineiro** 6:17,24 7:3,5,13, 16,17 15:3 25:2 29:4 32:8, 9 48:17 49:22 53:9,14,16, 22 58:5,13 59:8 61:15 72:11,15 75:13 77:12 80:14 81:15 82:18 83:1 84:20 85:10 87:22 90:14 94:11 95:5 102:8,19 103:24 104:13 105:2,5,8, 14 107:23 108:18,22 110:23 111:1,2,12,14,17

112:10 114:19 116:4,22 117:18 119:2,22 120:2,9, 14,17,19,23 121:2 122:11, 22 125:6 127:17 129:3 131:4,6,8 133:16,21,25 135:12 136:5 137:12,20 138:16,21,23 144:12,20 145:18 146:3,6 151:11 153:6 156:4 157:3,16,24 158:5,8,11 162:17 165:11, 13,17,20,23 166:3 167:11, 14 168:21,23 172:20 173:16,22 174:7,22 175:7, 9 178:18 179:4,16 180:8 181:3,10,13,18,19 182:13 183:2,5,10,13,20 184:1,6 187:11 189:9,13,17,18 194:13,20 195:6,22 196:4 199:3,16,23 200:1,11 202:19 203:14,17,20 204:6,10 205:10 206:8,11, 13,18 207:18 208:8,14,22 209:1 210:15,18 211:2,5,6 212:5,14 214:2,4 219:2,5 223:8,24 224:21 225:1,13 226:1,9,21 227:2 228:22 229:6,8,10 230:15,17 231:5 232:9,20 233:21 234:14,21 235:17 236:7,14 237:4,8,15,21,25 238:2,4, 7,9 239:6,18,24 240:1,3,5 241:2 243:12 245:2,7,12, 13,18,22 246:2,6,7,12,15 247:3 248:2,17,24 249:13, 17,22 250:15,19 251:11, 12,15,18,24 252:3,6,9,13, 14,22 253:23 255:3,10,13, 17,20,25 256:3,8,11,18 257:22 258:23,25 263:21 266:12 267:2,11,23 268:8 269:4 271:5 273:7,12,14 276:10 277:2 278:20 279:8 281:4 282:14 283:21,23,25 284:2,7,8 285:24 286:8,22 287:4,9,23 288:8,16 290:5, 12 291:10,15,18,19 293:17 294:8 295:10 296:17 297:18 298:12,21 299:6 300:3,10,24 301:9,23 302:13,24 303:19 304:24 305:15 307:19 308:4 309:15,25 310:15,22 311:23 312:8 313:21,25 316:11 317:1,2,4 318:15 319:14 321:3 323:18 326:2,8,19,21 329:5 330:12,21,23 332:10 333:11 334:10,20 338:9 340:12,18 341:1,21,24 342:1,16,22,24 347:12,23 348:7,25 349:24 350:10 351:15 352:12 353:9,16,25 354:25 356:7 357:18 358:23 361:15,17,21,25 362:5,8,24 363:10 364:21 365:9,21,25 366:3,9,14,20 367:7,14

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**pipettor** 130:4

**pitch** 46:15

**pitching** 34:4,7

**place** 116:23 117:3 160:25 166:2 180:15 227:16,20 228:1,5 353:1

**places** 142:15 143:19 159:13 227:7

**plagued** 67:16 72:4

**plagues** 68:19

**plain** 237:11

**plaintiff** 6:18

**plan** 34:10 349:19,21

**planning** 359:16

**plastic** 36:14

**platform** 169:10 219:22 292:17

**play** 105:17 348:18

**players** 318:20,24 319:15

**playing** 364:11

**plea** 20:10

**plead** 20:11

**pledged** 12:18,22 16:12 64:25

**plenty** 241:23 271:1

**plot** 314:16

**point** 12:23 17:17 28:10 32:23 33:17 43:25 44:14 49:20 54:19 57:17 70:25 71:2 82:3,5 84:13,14 87:9 89:14 106:2 112:19 117:1, 2,5 133:17 134:5 138:22 153:17 156:1,5 160:8,12, 16 167:23 170:13,14 194:4,20 201:6 212:24 213:6 246:8,13,17 257:6 259:15 260:7 263:12 280:15 281:22,23 294:20 302:24 304:20 315:5 316:2 320:15 331:14,21 332:8,25 339:11 346:16 354:18 357:13 360:11 365:18

**point-by-point** 280:4

**pointed** 55:8

**pointing** 214:24

**points** 112:14 124:2 147:1 159:23 162:12 167:5 196:22 280:7 358:15

**poked** 141:7

**pol--** 67:12 135:22

**policies** 135:23 136:2

**political** 174:16

**politics** 60:19

**polymerase** 67:12 68:5

**poor** 185:4 209:3

**popping** 93:9,14

**popular** 346:5 347:25

**population** 55:9 76:4 81:17 84:19,22 231:24 253:5 265:1,25 266:10,17 268:4 337:18,20

**populations** 265:3 328:13

**portion** 27:16 194:14

**portrayed** 281:1,2

**pos"--** 327:23

**pos/negative** 159:21 176:23

**position** 22:24 24:6 50:6 51:22 53:3 58:8 271:20 332:14 335:2

**positive** 80:7 83:10 87:1,2 114:6,11 122:25 125:16 129:11 133:8 147:16 148:5 149:10 150:8 159:20 164:1 167:22 168:3,11 174:1,9 186:20,25 187:23 195:23 217:21 219:10,21,24 220:2,6,9 227:23 230:2,4 241:23 253:6 263:7 286:6 309:3 314:11 327:4,9,23 337:20 343:22 348:12,16, 17 350:8,17,18 355:1 356:4,13

**positive/negative** 160:7

**positives** 55:16 56:1 57:19 68:10,14 70:9 72:1 86:9 124:17 126:9,22,24 128:21 129:10,13 139:24 148:12 149:10,23,24 162:18,20,24 163:3,19 164:5,11 177:3,5 188:12 193:18 197:18,24 200:23 201:9,15 253:10,11,25 254:1,4,11 258:3,7,10 296:10 304:9 325:22,23 336:10

**positivity** 263:8

**possibility** 78:14

**possibly** 57:6 300:11

**post** 281:21

**post-lunch** 187:19

**posted** 234:23 235:1 257:16

**potential** 156:7 206:22 216:2 218:4 240:20 241:3 244:21

**potentially** 28:8 70:9 106:14 112:21 114:11 157:9 265:20,21 291:8 325:9 348:18 362:10

**power** 87:12 349:4,5,9

**PR** 170:8 213:20 214:1

**practice** 67:25 79:23

**prayer** 349:9

**pre--** 357:22

**pre-profit** 38:3

**precaution** 357:14

**precise** 171:20

**preclude** 118:2

**precovid** 63:16 147:25

**predict** 87:12

**predictable** 147:12

**predictor** 114:6

**Preferably** 306:22

**preference** 83:4,12 115:14,16

**prefers** 96:19

**prematurely** 367:1

**premise** 254:14

**preparation** 9:1 30:23 92:23 93:11,12 188:1 210:14 228:24 247:4 322:4,7,13,16 329:22 343:19

**prepare** 8:17 74:5

**prepared** 56:5 63:21 131:21 132:15 274:19,20, 23 312:10

**preparing** 191:14

**presence** 79:6

**present** 17:19 25:20,24 64:9 67:5 76:17 97:9 128:9 140:19 188:2 195:20 196:24 222:3 227:25 339:18

**presented** 57:24,25 58:1 192:17 218:6

**presently** 7:20 17:3 21:18, 22,24 353:13

**preserve** 223:6 306:7

**press** 18:15,17,20 115:25 116:7,12,15,24 117:10 142:24 144:5 145:17 202:14 203:22 205:17 207:10 228:14,24 229:4 230:9,13 247:4 262:10 269:13 274:24 278:13,18 280:17 284:11 285:1 291:23 292:13 295:18 302:17,25 303:5 305:21 309:19 310:2,6 312:9,16 316:13 318:2,10 336:5 337:10 338:11 339:5 341:8 357:23,25 358:3,9,20 359:9,12,15 360:15

**pressure** 162:3

**pretty** 57:15 65:23,24

**prevent** 354:10

**previous** 134:2 148:23 186:23 234:25 282:11

**previously** 14:2 160:13 192:9

**price** 13:19,20 34:25 65:23 66:6 273:7,10 323:11,15, 16 324:25 325:1 346:18, 20,24 350:1

**price/test** 323:6

**prices** 250:3 323:22

**prime** 67:10

**primer** 67:13 69:4,12 72:17 89:9,10 126:3,7,18 128:1 162:21,23 163:1,2, 10 164:4 217:23 219:22 220:1,22 356:25

**primer-dimer** 68:6 69:16, 23 70:8 71:10,15

**primer-dimers** 68:13 69:2,22 71:19,23 72:1 83:6 148:11

**primers** 67:9,17 68:5,8,15 69:18,22 70:4 71:2,4 90:1, 4,19,24 126:12

**priming** 69:9

**principle** 198:6

**prior** 34:19 36:7 48:16 50:16 62:2 63:4 65:11 78:14 114:16 166:2 167:24 188:3 293:11 329:18

**priorities** 23:25

**prioritize** 206:24

**priority** 259:19

**private** 26:4,8 221:13 312:13

**private-sector** 142:18

**probability** 79:18 85:1 119:19 197:7

**probe** 68:9 69:10 270:15

**probes** 126:13 270:17

**problem** 67:15 68:16 93:21 129:22 130:15 150:14 198:18 201:18,19, 20,21 216:17 218:19 221:6 236:4,24 301:17 306:15 325:2

**problems** 60:24 83:5,6 93:10 178:5 204:18 206:2 214:19 216:14 220:20 221:11 258:2,4 260:2 301:12,13 302:8 304:14 307:11

**procedure** 135:14 336:12, 22 356:24

**procedures** 116:23 117:2

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**proceeding** 19:15

**proceedings** 16:19

**proceeds** 10:23 11:4,16, 18

**process** 67:3 89:6,15,19 90:12 91:13,18 94:3 119:18 126:17 130:21 180:13 181:1 207:1 210:12,13 216:18 294:11 304:11 306:16 316:22,23 327:8 347:5

**processes** 218:15

**processing** 168:18 178:8 215:5 261:22

**produce** 35:20

**produced** 54:19

**producing** 244:23

**product** 23:25 36:2 38:5 42:18 83:13 91:5 104:15 123:11 132:9,22 161:24 222:7 249:18 253:3 280:25 307:17 309:14 318:19 324:2,8

**products** 26:18 128:1 270:11

**professional** 82:9

**profit** 38:10

**profitable** 38:2

**profoundly** 140:24

**program** 32:21 35:3 161:25 162:5,7

**programmed** 162:10

**programs** 349:8

**project** 49:6 322:21

**projects** 68:18

**promised** 217:19

**promising** 156:11 192:6 193:8

**pronounce** 159:2

**pronouncing** 104:14

**proof** 58:2

**propagate** 69:18

**proper** 68:20

**properly** 106:19,20 120:3

**property** 30:2 40:16 360:9, 10,12

**proposed** 330:13

**prosecuted** 20:4,5

**prospective** 135:16 137:5 138:3 207:12

**protective** 367:11

**protocols** 178:10

**prove** 55:24 165:2 166:7 193:1 216:4

**proved** 258:1

**provide** 8:7,12 16:3 17:9 43:8,14 45:2 50:11 165:4 250:8,13 295:19 328:23 329:6 332:22 363:23

**provided** 14:20 42:25 44:14,15,16 47:13 139:8 170:22 171:23,24 204:10, 12 231:25 259:8 275:16 281:12,15 289:25 310:6,8 315:14 336:13 366:23

**provider** 262:21

**providing** 16:1 22:21 60:4 125:22 281:18 327:13,14

**proving** 119:12

**provisionally** 367:13

**public** 35:2 36:24 60:23 61:19 64:13,22 65:22 107:2,3 144:11 155:22 185:21 199:7 213:21 244:20,22 276:6,9 291:8 293:9 298:2,24,25 303:13 307:6 320:18 321:13 327:15,17

**publication** 256:21 257:3 260:8,19

**publications** 191:15 259:13,16 260:3,4

**publicly** 31:22 199:6 256:14

**publish** 56:9 247:7

**published** 56:10 110:9 115:4 122:6 143:1,5,13,20 144:3,22 191:20 199:6,8 200:21 234:24 254:7 256:14 258:12 260:11 345:22 352:22 359:14 360:21

**publishing** 353:14

**pull** 306:2

**pulled** 129:6

**pulls** 227:18

**pumping** 93:25

**purchase** 135:18 207:19 208:2

**purchased** 13:1 16:15 37:20

**purchasing** 302:15

**pure** 301:1 343:16,17,18

**purely** 301:1

**purported** 295:24

**purpose** 42:8,19 85:14 98:1,3 191:14

**purposes** 8:11 85:9 101:23 263:19 278:2 366:20 367:3,11

**pursued** 332:7

**pursuit** 42:21

**pursuits** 25:21

**push** 13:20 69:20,21

**pushing** 114:2,4 320:7

**put** 34:9 52:21 69:22,23 70:2 99:15 109:4 110:1 116:23 117:2,16 131:2 136:4 151:12 160:25 169:8 189:4 202:14 203:21 207:11 213:16 254:5 262:2 270:2 274:12 276:2 278:12,18,24 279:12 280:3 281:16,20 282:1 291:7 293:9 294:7 306:2 318:2 330:5 331:14 350:14,17 360:8

**putting** 116:7 127:21 221:11 249:18 300:23 360:11

## Q

**QC** 181:4

**quadrupling** 323:16

**qual--** 286:12

**qualification** 238:20

**qualifications** 252:15

**qualified** 50:25 270:21

**qualify** 305:2

**qualifying** 238:10

**quality** 74:22 180:23 204:15 216:11 218:15 265:9 268:6 304:18 308:18 312:14 328:9 338:25

**Qualtrics** 155:8

**quantify** 318:16

**quantity** 73:10,12

**quantum** 348:23

**query** 123:10

**question** 8:4,10 15:5,8 40:1 43:21 48:18 49:23 54:20 55:8 58:3 61:1 70:19 77:11 78:9 80:2,15 92:9 116:3,21 133:22,23 134:2 143:12 148:19 149:25 165:25 167:12 182:1 194:11,18 196:3 197:25 199:17,20 200:6,15 209:6 215:8 221:7 224:9 225:2 229:25 241:11 245:3 251:13 252:2,8,12 253:8, 13,24 255:16,19,22,24 256:1,7 258:22 286:1,12 288:3 293:16,24 302:4 303:4 304:2 327:2 328:11 341:20 347:15,16

**question's** 8:10

**questioned** 221:8

**questioning** 60:24 61:9, 13,18

**questionnaire** 56:1 198:14,16 200:24 201:7,9 254:5,6 325:23

**questions** 8:3 121:3 154:12 168:5 169:4,5,6 170:18,19 178:15 189:6 252:5 269:24 325:3 326:25 361:18 362:4,22 366:10,22

**quick** 229:13 289:1 361:9

**quickly** 110:24 186:6 192:25 209:17 328:17

**quote** 67:18 116:13,14,15 233:23 289:3,22,23 295:5, 11,14 300:15 310:3

**quoted** 255:2 289:12 358:20

**quotes** 176:18 233:25

**quoting** 225:11

## R

**radical** 283:12

**raise** 32:22 39:8 40:22 48:13 49:12 123:9 197:12

**raising** 40:19 48:22

**Ralph** 184:17

**ran** 39:18,19 100:12,14,17 101:18 124:20 125:7 135:2 146:12 147:7 156:16 170:15 204:7 294:2 307:21 313:15,19 317:13,23 320:24 344:12

**random** 355:13

**range** 98:24 112:25 113:25 345:2

**ranked** 257:18

**Rapidprobes** 270:13

**rate** 33:13 55:14,16,25 125:16 159:21 160:7 186:20 187:1,16,17 230:2, 4 253:6,10,11,25 254:1,3 286:6 304:8 308:14 325:22

**rates** 188:12 197:24 198:1 200:22,23 203:8 258:3

**rates?'** 327:5

**ratings** 336:9

**ratings'** 336:6

**Rdrp** 105:23

**re--** 188:5

**re-ran** 355:9

**reach** 134:17 280:22

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                                    Confidential                              Brent Satterfield, Ph.D.

**reached** 169:5 301:23 335:15

**reaching** 363:22

**reaction** 35:21,23 66:24 67:6,10,15 70:1,4 71:25 72:2 140:21,23 148:11 149:1,6 244:2,4 257:20 322:1

**reactions** 67:23

**read** 110:24 113:4,22 114:17,24 172:10 176:8 186:3 187:7,13 194:15 215:10 240:13,16 244:10, 11,13,15,23 245:14,23 246:5,16,21,23 247:10,14 248:10,14 249:1,14,24 265:24 295:11 299:22 300:11 307:15 331:17 345:20,21 359:22 367:8, 10,18

**reading** 187:6 211:4,15 240:19 244:8,17 245:19,24 246:7,12,17,20 250:1 251:19,20 252:15,24 298:3 300:2,5,9,12 309:12

**reads** 237:11 238:20

**ready** 52:5 152:16 229:18

**reagents** 216:3 219:25 221:1

**real** 81:5,11 83:15 222:6 322:15

**real-life** 355:19

**real-time** 31:5 34:24 35:11 50:24 66:24 72:20 79:7,11 92:6 149:12,14,16,17,18, 20 150:4 176:20 266:23 270:7,22 272:18 329:18

**real-world** 241:20 242:24

**reality** 346:11

**realized** 350:11

**realizes** 289:11

**reason** 16:6,7 37:17 58:7, 14 87:14,15 100:4 124:1, 21 146:24 162:11 164:15 180:2 183:6 208:12 254:3 270:23 280:12 286:25

**reasonable** 112:25 269:10

**reasons** 57:10 87:23,25 96:17,18 106:8,9 127:8,14

**Rebecca** 121:15 125:23 138:25 182:15,22 189:19 190:6,25 191:16 259:6 261:7 262:1 356:12 358:7 360:8

**rebuttal** 280:4,5

**rec--** 143:19

**recall** 14:17 17:15 18:12 20:21 46:3,8 90:15,18

107:13 115:24 116:4 123:15,19 124:9 130:23 132:3,18,20,24 139:14 146:12 151:19 152:3 169:16,25 170:2 172:5,9 173:1 175:3 177:10 188:8 190:4,12 192:19 211:7,10 217:10,13 228:10,12 230:8,11 232:21 235:7 257:7 258:15 260:3,6 269:4 274:22 275:1 280:14 290:21 319:19 341:14 342:9,11,17 363:20,21 365:11

**receive** 9:12 23:21 47:2 193:8 340:3

**received** 9:13 10:23 90:16, 20 107:18 108:3 135:11 141:17 160:10 184:17,22, 23 197:17 234:22 272:12 276:18 342:3

**receiving** 22:12 31:18 47:19,21,22,25 91:2 132:4 175:21 177:10 217:10 284:17 342:9,12 363:20

**recent** 277:19

**receptive** 25:8

**recess** 53:19 105:11 183:17 239:21 290:9 334:16 353:21

**recollection** 45:5 134:5 356:16

**recommendation** 79:25 289:2

**recommendations** 310:4

**recommended** 85:2 198:15,17 201:13

**recommending** 324:23

**record** 6:4,15,22 7:18 53:17,21 97:17 100:19 105:9,13 120:25 183:15,19 216:20 232:12,25 233:4 239:19,23 270:5 273:4 290:7,11 293:14 318:7 334:14,18 340:17 353:19, 23 366:11,15,17,19,21 367:4,5,6,9,15

**recording** 18:3

**records** 272:1

**recourse** 12:13

**red** 197:12

**red-lined** 190:16

**redacted** 355:10 356:14

**reduce** 71:22

**reduced** 71:19

**reducing** 270:10

**Reed** 42:1

**ref--** 171:14

**refer** 122:24

**reference** 143:18 169:7 171:6 177:4 185:10 226:10 242:9 256:19 277:3,10,12 280:10 281:5 282:17,23 293:10,18 338:14 346:16 365:12,21

**referenced** 356:17 363:17

**references** 217:3 339:3 350:1 365:10,17

**referencing** 162:25 172:11 239:9 260:4 283:9 291:13 331:11 335:19,22 354:13

**referred** 347:4

**referring** 52:18 97:16 132:14,21 141:22 142:22 144:23 155:7 160:4 215:19 222:17 239:14 242:4 261:2 286:5,14 299:18 318:24 319:1,2,3,15 354:20,24 364:14,17 365:15

**refers** 196:14 219:16

**refine** 152:18

**reflect** 209:6 367:4

**reflection** 350:16

**reflects** 351:22

**reformatting** 312:20

**refresh** 356:16

**refreshed** 285:5

**reg--** 95:2

**regard** 234:3 235:22 250:25 286:18

**regarded** 250:1 343:10

**Regional** 58:1 59:22 158:17 159:6,13 188:13 198:12 201:10 213:9 253:9 254:12 258:7 312:15

**register** 180:24

**registration** 316:22

**regulated** 193:24

**regulatory** 90:23 91:2,8,9, 13,14 94:16,20,23 95:6,12, 16,18 97:22 107:19 108:3 122:15 124:13 130:11,14 135:22 136:2,3 141:8,24 149:3 151:2 157:12 179:25 180:9 219:16 278:2 294:11 319:11

**reimbursement** 220:14

**reject** 86:6

**rejected** 124:16 128:18 208:15 209:3 287:19

**rejecting** 207:19 209:23

**related** 148:13 156:13

**relations** 213:21

**relationship** 76:1,3,23 77:13 154:6 195:7 220:18 222:23 269:9,10 283:7 288:14

**relative** 55:15 127:23 259:11 320:17 326:15

**release** 18:15,21 116:16, 24 142:24 144:5 145:17 202:14 203:22 205:17 207:10 228:14,24 229:4 247:4 262:10 274:24 278:13,19 280:17 281:14, 16 282:11 284:11 285:1 289:5 291:23 292:13 295:19 302:17,25 303:5 305:21 309:19 310:2,6 312:9,16 316:13 318:3,10 338:11 339:6 341:8 357:23,25 358:3,9,20 359:10,13,15,21,22,25 360:15

**released** 292:23

**releases** 18:18 33:9 115:25 116:8,12 117:10 292:2,17

**releasing** 248:25 337:9

**relevant** 103:1 195:8 249:7 253:4 277:9 294:19 365:24 366:25

**relieve** 46:14

**rem"--** 289:1

**remainder** 221:16 333:2

**remains** 192:2 349:2

**remarking** 285:8 294:13 295:11,13

**remedy** 221:25 255:21,25

**remember** 14:12 17:23 18:19,20 25:6,15 27:14 39:9 44:19 47:22 59:8 88:6 90:9 101:18 104:9 105:24 106:8 107:12 116:9 123:17 128:2 129:23 132:17 133:5,7 134:2,3 142:23 144:4 145:14 148:22 152:6 159:12,16 160:11 161:21 162:1,4 169:21,22 170:10, 17 172:16,18,22 173:7 184:21 186:4 190:7 191:5, 13 192:21 205:3,15 206:6 212:24 229:1,4 230:24 231:18 232:4 233:1 234:6, 8 235:14,15,18,22 236:5 239:16 240:22 241:5 244:4,8,17 246:19 247:1,6 248:12 249:25 250:2 257:13,15,17 271:24 276:12 278:11 280:12 283:7 288:1 290:2,25 291:3 308:21 318:1

Case 2:20-cv-00368-JNP    Document 169-13    Filed 04/10/24    PageID.2905    Page 119 of 126

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                         Confidential                    Brent Satterfield, Ph.D.

319:20,25 320:1 330:15,17 331:20 339:14 341:12 344:11,20 345:7 354:14 356:23 357:4,21 359:23,24 360:1,16 363:21 365:1,3

**remembering** 100:18 101:19 104:10 271:17 284:14 349:5

**remove** 306:10

**removing** 285:18

**ren--** 15:10

**rendered** 10:9 14:23 15:10

**repackage** 227:19

**repaid** 27:15

**repeat** 15:7 40:1 48:18 49:23 77:10 116:21 188:6 194:11,13 199:17 252:11, 13 293:15 305:3 341:20 356:24

**repeatedly** 294:24 297:19

**rephrase** 116:2

**rephrasing** 197:20

**replace** 253:2

**replacement** 220:14,17

**repor--** 203:22

**report** 87:1 161:17 173:13 193:5 208:2,7,8 248:22 249:11,12 250:6 256:23 260:8 262:6 276:25 278:22 279:6,12 281:25 296:3 298:7 300:13,22 332:4 360:8,12

**reported** 86:25 100:3 103:3 104:11 146:21 151:17,23,24 153:8,11,14 181:5 186:10 191:17 211:17 213:2,7 258:6 260:14,21 264:8 265:6,12 298:11 300:13 301:19 332:5 344:3,4,23

**reporter** 6:11 8:11 32:7 108:23 110:22,24 120:18 131:5 138:17 146:4 158:9 167:10 169:2 194:15 210:16 230:25 232:21 235:25 240:2 242:13 247:17 250:9 252:10 254:17,23 255:1 283:24 291:11 362:20,25

**reporters** 170:5 173:10,12 175:4 250:11

**reporting** 73:18 81:21 127:2 151:3 257:23 297:8, 9,11 298:8,13 300:17 301:7 304:8 306:18 322:22 323:2 364:9

**reports** 23:12,15 295:24 297:2 301:2 303:21 338:10 359:9,25 360:15

**represent** 355:19

**representations** 341:15

**request** 117:9 132:25 276:11 279:15 339:8

**requested** 107:14 194:14 303:10 361:6 367:18,19

**requesting** 362:13

**requests** 137:21 276:3

**require** 99:14

**required** 99:14 107:14 180:23 278:5 320:18

**requirement** 123:1

**requirements** 123:11

**requires** 74:19 91:10,11

**rereading** 186:22 247:2 316:2

**research** 30:2 62:20 109:14,24

**reship** 227:19

**reside** 7:20 19:10 333:3

**resided** 7:22

**residing** 333:6,10

**resolution** 302:14

**resolve** 179:15 304:14

**resolved** 178:19 228:7 301:17 302:12,21,22,23 337:12

**resp--** 310:24

**respect** 18:9,11 20:5 43:9, 17 74:1 92:4 96:2,10 105:17 145:9 159:7 172:11 202:4 262:25 267:8 357:22

**respiratory** 147:17 148:4

**respond** 247:7,9 327:2 328:14

**responded** 247:5 272:11

**responding** 248:8 249:1

**response** 54:23 131:22 132:3,6 164:3 176:17 219:6 230:13 235:8 273:18 274:18 279:20 326:24 338:15 341:3 342:11

**responses** 327:1 330:13

**responsibilities** 22:5 23:3 48:13 50:9

**responsible** 158:17

**rest** 11:19 213:14 215:6 356:19

**restate** 302:1

**restored** 9:14

**restroom** 181:15

**resubmit** 152:20

**resubmitting** 126:1

**result** 68:9 93:1 113:16 114:6 161:7 177:22 188:4 209:18 220:6 286:15 297:16 298:20 309:2 335:23

**results** 100:22 110:16 111:25 112:21 113:5 118:1,2 122:6 123:4,10 124:20 125:23 126:2,24 128:7 133:10,15 142:13 143:9 144:7 145:7 146:18 147:4 161:4 167:2 173:8 175:5 176:13 177:11 186:9 203:13 209:4,10,15 214:18 217:18,20,22 219:10,20, 23,24,25 220:22 253:18 267:21 269:3 277:23 280:3 283:13 285:10 286:15 287:1 294:14 295:14,18 307:22 314:9 335:10 354:6,8,12 355:11,12 356:12 361:11

**resume** 32:4,10 39:21 270:6

**retained** 216:9,10 226:19

**retraction** 279:24

**return** 42:18 340:24

**Returning** 53:20 105:12 183:18 239:22 290:10 334:17 353:22 366:18

**revamping** 26:15

**revealed** 219:21

**revenues** 207:8

**review** 8:24 56:21 57:5 89:21 109:21 139:11 170:24 171:11,16 257:5 262:6 279:2 310:7 353:17

**reviewed** 35:16,17 109:23 205:8 215:13 258:15 262:11 290:14

**reviewing** 89:22,23 236:10 275:1

**revising** 152:22

**revisions** 189:24

**Revolutionary** 21:1

**reworded** 282:1

**reworking** 274:11 281:13 282:16

**rid** 130:8 326:16

**riddled** 68:14 219:9

**rights** 263:16

**rinse** 282:21 283:5,9 313:7

**risk** 70:8

**RNA** 30:24 31:4 66:25 67:4 73:11,12 306:1,6,7,11,13, 15,19

**RNASES** 306:10

**road** 322:21

**robust** 35:6

**Robyn** 340:24 341:1

**Roche** 92:18 100:8 108:13 117:25 124:15 127:22 128:16 134:14,24 150:19 287:20

**role** 50:2 51:2 53:4 61:16, 17,18 89:20 94:24 105:17 180:12 249:22 250:13 278:21,22 279:11 301:24 309:17,22 310:14 329:12 330:18,19 332:11 351:9

**roles** 250:20 329:2

**roll** 46:16 83:23

**rolls** 81:13

**room** 130:2

**roughly** 11:2 12:19 43:5 45:7 46:11 49:8,18 50:6 70:3 362:3

**routinely** 130:15 135:24, 25

**Rowell** 7:25

**royalty** 47:20,21,24

**RT-PCR** 192:3,4

**ruin** 220:17

**rule** 150:10 266:2 367:4

**ruled** 200:19

**rules** 8:3 255:15

**ruling** 10:9,13,14,16,20 14:24 225:3

**run** 23:10 64:7 68:21 71:24 72:2 79:6 81:19,23 85:16 92:14 93:1,14 98:21 101:20 103:5 108:13 112:13 125:2,8 126:19,21, 22 128:5,6 129:11,12 130:15 135:17 136:13,15, 17,20 137:7 138:2 139:23 145:7 146:15 147:4 150:4 156:12 160:18,21 168:6 171:7 186:5 204:4,17 209:9,11 210:1 216:5 217:20 219:8 227:10 251:1 253:21 261:4 279:25 301:11 305:23 306:3 314:21 316:5,9 317:21,22 330:12,16 332:24 343:5 345:17 354:11 355:11 356:9

**running** 74:24 79:5,10,17 81:18 82:11 86:22 97:19 98:1,4 103:16 124:14 156:25 158:17 159:4 160:14 167:24 170:8 176:13 201:21 207:2 216:3 253:13,14 307:8 314:8 340:22,25 341:2

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

**runs** 140:1 204:2 312:15

**rushed** 91:19

**RX** 175:22

**S**

**sacrifice** 52:20

**safety** 320:18

**salary** 22:10 44:7 47:14, 16,17,20,22

**sale** 11:4 37:1,2,3 116:6 122:17 123:16,22

**sales** 46:15 57:12 62:3 137:22 138:4 139:6 153:22 156:14 179:6 193:25 207:5,7,8,24 209:18 210:6 222:24 223:6 276:3 281:24

**salespeople** 134:12 135:6 137:15 138:12 143:24 144:15,25 145:3 175:16 206:20 207:3,25 222:4

**salesperson** 178:16 206:1 221:7

**salespersons** 145:21 207:23

**Salt** 6:5 54:10 169:2,19 170:11,15 172:22 173:6 174:25 175:4 188:10,14 230:25 232:21 234:23 240:9 244:20 281:2 291:2 325:19 359:13

**sample** 30:23 68:3 73:10, 20,21 75:20 76:6,18 84:9 92:23 93:10,11,12 124:5 129:16,17 140:17,19 168:15,18 178:8 188:1,2,5 204:13 210:13 220:3,9 226:7 227:7 253:2 296:8 306:10 322:4,7,13,15,17 326:25 329:21 343:18 355:8

**sampled** 167:7,15

**samples** 30:25 73:9 74:3, 6,7 86:20 97:4,5,8 108:10 110:21 111:3,20 112:16,20 113:23,24 125:9 126:23 129:6 136:22,23 137:2 147:10,25 148:3,5,18 149:10 163:21,24,25 171:7 176:14 219:13,17,20,21 241:23 251:2 253:16 254:9,12 257:25 258:8,10 263:23 264:10,14 268:22, 23 269:2 282:24 283:15 304:17 305:25 306:12,14, 20 314:10 316:15 317:16 327:10,23 328:3 336:10 338:24 339:20 340:3,22 343:22 355:10,17,18,23

**sampling** 296:11

**Sandia** 30:20,22

**Saragene** 104:14 105:15 123:16,20 124:11 146:13

**SARS-COVID-2** 112:1 171:1

**satisfaction** 179:15

**satisfactory** 122:23

**satisfied** 194:4,21

**Satt--** 53:22

**Satterfield** 6:7,23 7:8,14, 15,16,19 9:22 29:6 53:23 183:20 231:6,20 239:7 241:15,19 243:21 258:17 289:5,17,18 290:12 294:15 331:1 361:20,22 362:2

**save** 79:10,14 325:12

**saving-lives** 60:4

**scale-up** 52:8 332:22

**scenario** 61:6 76:7 77:18 278:2 355:19

**scenarios** 91:1 134:25 238:18

**school** 19:20 272:15

**sci--** 249:13

**science** 22:8 24:2 32:4,10 35:19 40:20,21 46:13 48:8, 10 49:20 50:10,16 60:25 115:6 119:11 137:14,21 154:14 159:3 169:9 177:21 195:15 204:1 208:9,16,23 231:21 244:19 249:18,23 289:4 301:24 310:23 332:12 352:24

**science.'** 289:8

**sciences** 256:21

**scientific** 23:9 24:1 30:2 50:3,11 51:16 71:5 95:19 116:16 117:11 157:10 176:17 271:19 279:11,13, 18 291:6 329:3,4,13 332:14,20 351:14

**scientifically** 171:20

**scientist** 42:10 56:19 61:14,17 66:14 78:23 79:1 80:23 119:16 120:3,10 124:22 147:2 164:25 171:19 198:3 206:1,14 224:1 226:25 236:15 249:9,10,14 291:7 309:17 311:8 327:18 328:22

**scientists** 51:2 56:22 60:25 67:18 68:11 88:22 95:13,25 119:23 130:7 198:5 272:15,23

**scope** 43:4 343:9

**score** 122:23,24

**scored** 243:14

**screening** 78:8 126:17 193:21,22

**scrutiny** 136:4

**search** 361:10

**SEC** 17:4,7,10 18:6,9,12

**sec"--** 318:19

**second-highest-grossing** 221:14

**second-to-last** 273:16,21

**secretary** 21:11

**section** 110:19 111:7 190:17 241:10 274:12 278:24 331:5

**sections** 191:3

**security** 31:1

**seek** 88:18,22 349:16

**segment** 69:9 126:8

**segregate** 48:12

**select** 92:6 136:18 343:3

**selection** 92:2 94:4 126:7

**selfish** 55:5

**sell** 10:24 13:18 36:9,17 48:1 93:2 106:11 107:19 141:14 153:18 323:3 330:6

**selling** 36:15 42:21 47:1 61:23,25 106:1,10 161:8 193:14 195:5 259:22 260:23 309:2 330:3

**semi-permanently** 333:21

**seminal** 69:19

**send** 167:8,16 168:8 177:17 218:17 220:16 254:8 340:22

**sending** 139:14 299:10

**sends** 121:18

**sens--** 72:24 75:8

**sense** 8:15 43:20 67:1 193:24 201:5 215:11 281:19 291:7

**sensitive** 80:20 84:3 86:12,15 87:16 102:12,15 106:14,16 127:20 150:21 164:10 202:12 264:2,18 265:11 283:16 299:13 318:20,23,25 319:15,24 320:12,16 336:25 338:22 342:20

**sensitivities** 345:2

**sensitivity** 70:11,13,15,16 72:23,25 73:2,6,15,18,25 74:10,14,15,18,19 75:8,9, 15,16,23 76:2,24 77:14 81:11,13,22,25 82:1 83:17, 25 84:1,7,9,10,11,18 85:12,18,23 86:1,3 96:6,7, 9,11,19,20,21,22 97:3,7 100:2 101:9,15 104:2,3 108:7 112:2 113:8 125:24 128:12 141:18,23 142:6,8 145:23 159:21 161:10,11 162:22 170:24 171:13 176:15,22 177:1 190:10,19 191:18 192:4,7 193:9 197:10 200:10,13 202:16, 17 203:1,4,8 211:18 212:18 213:8 218:12 234:4 236:25 247:24 248:2 250:25 256:24 257:24 263:22 264:1,9,14,17 265:4 267:19 268:21 275:13 276:15,21 277:7,10 282:9 286:1,11 289:21 292:4,18 293:5 294:18,25 296:1,5,7,14,23 297:10,13, 20 298:9 301:6,21 304:21 308:15,24 311:9 316:8 318:12 319:1 325:8,16 326:13,18 327:20 328:5,8 330:11 337:10,23,24,25 338:15 339:6 342:6 343:23 344:18,23 345:4,10 360:24 361:8

**sensitivity's** 81:24

**sensors** 32:16

**sentence** 140:8 165:15 300:23 301:10 337:17 344:2 356:22

**sentences** 186:23 264:7

**separate** 41:16,19 103:18, 22

**September** 345:17

**sequence** 69:10,11,17,19

**serial** 24:9

**series** 175:12 314:6,10 351:19 366:21

**seriousness** 210:7

**serve** 20:13

**Services** 6:11,13

**serving** 231:23

**set** 15:25 16:3 74:6 86:16 91:15 93:19 94:3 118:19 126:3,18 162:21,23 163:1, 2,10,25 164:4 175:1 201:19 267:18 296:6 358:17

**Seth** 23:14 25:7 52:3 57:25 157:10 169:3 337:7 352:19

**sets** 202:18 297:7 356:25

**setting** 178:5 286:25 308:4 339:6

**settings** 332:9

**settles** 320:3

**setup** 187:25

**Seventeen** 240:2,3

**severely** 70:20 303:11

**shakers** 272:16

**share** 13:19,20 26:5 55:6,7 133:14 184:24 185:12 276:5

**shared** 170:21 276:7 337:10

**shareholders** 61:20 207:9 223:7

**shares** 9:12,14 10:21,22, 24,25 11:4,6,10 12:17,20, 23 13:3,18,22 16:1,8,9,12, 13 26:7 31:25 44:15 45:2 47:5 64:17,21 65:1,14 66:6

**sharing** 325:17

**shell** 49:14

**shift** 173:12

**ship** 218:18 222:6

**shipping** 227:15

**SHL** 336:5,7

**shock** 244:5

**shocked** 60:14 173:20 198:19

**short** 71:25 319:9 327:6 346:13

**shortly** 254:7 291:1

**show** 76:14,15 79:21 119:13,14,15 125:17 129:11 166:4 190:18 192:6,17 195:16 242:25 248:22 262:15 275:11 277:6 278:1 287:9 314:9, 15 323:1 341:21 350:18 365:13

**showed** 54:15 56:2 143:6 145:9,11 148:5 152:24 163:8 166:13 170:24 203:6,7 213:15 217:23 219:24 220:5 233:13,22 256:21 259:9 269:6 290:13 293:11 301:18 307:9 357:24 361:2,3

**showing** 29:4 76:4,8 80:8 109:10 117:18 119:20 121:5 131:8 132:10 138:23 144:2 146:6 148:21 149:2, 6 152:23 158:11 168:23 175:9 181:19 184:8 199:13,20 210:18 220:2 229:10 240:5 258:25 260:13,20 273:14 276:20 283:22 284:2 291:19 313:2 316:7 317:4 326:21 330:23 334:20 342:25 353:25 356:4 363:10

**shown** 145:8 242:5 265:6 285:25 287:10 303:15 316:12 325:19 357:16

**shows** 67:19 79:19 119:20 148:15 167:22 168:14,15 169:8 200:20 212:17 218:9 254:8 267:18 278:4 314:20 346:7

**shut** 72:3 92:11,12 141:5 168:19

**shuts** 60:10

**sic** 6:7 123:9 142:15 148:3 161:11 167:8 181:5 214:17 217:3 222:10 223:16 224:5 279:22 286:11

**sick** 76:15 209:7 243:1,2

**side** 60:4 103:6 159:3 191:8 222:20 226:13 253:21,22 314:15

**side-by-side** 145:6 163:5, 17 258:11 260:9 280:1 320:24

**sign** 153:23,25 154:1 156:15 249:23 367:9,11,18

**signal** 215:20

**signed** 154:5

**significant** 96:13 155:24, 25 308:23 338:1

**Signorelli** 185:13,15

**Silicon** 155:7

**similar** 104:19 134:1 328:4

**simple** 133:13

**simply** 142:10 213:14 218:13 239:1 258:4 260:15 280:6 346:6 350:11

**single** 35:23 76:18 129:22 137:19 140:1 207:12 227:23 269:16 289:20 294:17

**sister** 341:5

**sit** 157:25 302:25 303:6

**site** 122:6 216:25 217:1 227:21

**sites** 268:12

**sits** 67:13

**Sitting** 255:3

**situation** 13:24 28:4 185:14 209:6 219:7

**situations** 71:24 348:13

**Sixteen** 230:15

**skip** 277:25 288:16

**Sklarov** 10:20 14:6 65:12

**Slopes** 155:7

**small** 47:5 69:6,9 92:25 156:10 157:7 266:20,24

**small-business** 28:5

**small-town** 59:23

**smaller** 54:1 322:17

**Smart** 63:9,13 71:14 72:8 73:1 80:3 96:2 97:18 104:19 105:20 107:20,23 111:22,24 112:1 113:7,16 118:12 139:20 141:17 143:14 153:19 176:14,20 219:23,24 220:5 342:6 357:6

**Smart's** 360:24

**smarter** 70:23

**smell** 201:6

**smiley** 117:16

**smoothest** 64:1

**sneezing** 130:1

**soft** 141:11

**software** 89:12

**sold** 11:5 35:7 36:23 46:22 47:9 65:1 221:15 233:9 243:20 323:5

**sole** 22:2,4

**solution** 68:1 314:21

**solution.'** 328:18

**solutions** 60:3,5

**solve** 93:9 260:2

**solved** 218:19

**somebody's** 80:4 196:12

**someone's** 21:5 86:23

**something's** 56:20

**sort** 47:8 132:25 284:9

**sounding** 282:18

**sounds** 66:19 109:8 134:1 357:20

**South** 7:25 19:12 176:1 177:11,22 178:21 203:6,13 204:23 205:1,2 277:11 287:11,24,25 293:11,20 303:16 329:8 343:6

**space** 52:24 69:17 317:10

**speak** 9:4 88:25 94:17 203:12 232:20

**speaking** 30:6 86:23 87:7, 8 90:25 169:16 195:18 232:21

**speaks** 249:10

**spearheading** 159:1

**spec--** 125:14 157:2

**specialty** 29:16,23 30:10

**species** 126:16

**specific** 20:21 34:17 59:14 67:11 71:3,12,15 72:9,20 86:12,15 87:16 94:14 126:8,18 164:9 179:17 202:12 230:25 249:25 270:18 299:14 338:23

342:20

**specifically** 50:23 55:10 67:3 132:5 137:24 139:16 145:5 155:10 169:18 188:24 197:15 198:11 215:19 219:19 230:10 234:18 269:7 279:16 341:3 359:3 365:1

**specificity** 72:11 73:16,19 86:4,5,7,8 100:2 101:15 108:7 125:14 128:19 141:19,23 142:7,9 145:23 147:6,8 162:22 170:25 190:11,20 191:19 192:5,7 193:9 202:16,18 203:4 211:19 218:13 234:4 236:25 247:25 248:3 251:1 257:24 263:23 264:10,14 267:20 268:21 275:12 276:16,21 277:7 282:9 292:4,19 293:4 294:19,25 295:25 296:5 297:11,13,20 298:10 301:6,22 304:22 311:10 316:9 318:13 325:16 326:14,18 328:8 336:17 337:11 342:6 360:25 361:8

**specificity.'** 289:21

**specimen** 64:4

**specimens** 176:24

**speculate** 13:15 55:20 107:16 174:20,21 179:2 199:2 223:22,24 238:13,18 243:10 273:9 277:15

**speculated** 174:11,12,15 224:24 238:13

**speculating** 223:12 224:25 237:5 238:14,21

**speculation** 108:8 116:19 122:9 125:5 135:20 137:10 151:9 174:4 179:12 180:6 195:12 198:25 201:16 203:11 206:12,17 207:14 208:5,11,19 210:3 211:25 222:15 223:21 224:20 225:8,25 226:22 228:18 232:7,14 236:3 237:16 238:24 243:9 245:11,17 247:12,23 249:21 263:10 265:1 275:24 278:16 280:20 305:10 309:10 310:18 311:3 348:10 353:7 356:1 364:15

**speed** 81:4

**spell** 26:12 281:7

**spend** 79:12,25 207:3

**spending** 94:1 209:12 259:21,22

**spent** 209:14

**spiked** 73:10

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                         Confidential                         Brent Satterfield, Ph.D.

| | | | |
|---|---|---|---|
| **spits** 322:17 | 344:22 | 97:14 100:13 117:8 127:7 132:19 135:15 143:11 146:11 158:24 167:12 195:7 196:9 207:11 220:20 248:6 280:14,16 307:8 327:13 333:4 353:12 362:14 | 171:11,16 172:6 189:1 197:5 202:10 257:17 282:24 297:3 343:5 |
| **spoke** 169:5,25 | **statement** 118:17 119:1,3, 8,23 132:25 139:9 142:11 150:14 235:9,20,25 236:5, 19,24 242:9,16,17,19,21 243:7,24 244:3 250:21 251:6,16,18,19,20 252:16 254:16 264:3 265:16 277:6 278:13 285:19,23 287:8 294:6 295:9 297:25 298:1 304:25 305:17 315:18,25 318:10 321:4 336:4 337:9 | | **submitting** 73:13 90:22 |
| **spray** 130:1 | | | **subsequent** 152:25 153:1,8 |
| **spreadsheet** 230:1 343:4 | | | **subspecialty** 29:17 |
| **spun** 30:20 | | **strikeout** 285:16 | **substance** 291:3 |
| **St** 185:6,10 | | **string** 117:20 131:11,12,13 259:2 284:10,24 288:17 | **substantial** 16:2 |
| **stacastically** 87:7 | | | **sucked** 36:12 |
| **stack** 114:4 | | **strong** 69:13 | **sued** 9:8,13,15 14:5 16:18, 22,25 |
| **staff** 135:7 157:11 178:13 | **statement's** 242:14 | **stronger** 280:5 | **sufficient** 152:15 297:15 321:12 |
| **stage** 271:21 | **statements** 240:21 241:3 245:8 279:24 304:3 310:25 312:20 327:3,15,17 353:5 | **strongly** 147:1 | **sufficiently** 77:20 |
| **stages** 91:9 177:7 192:10 193:2,10,19 194:8 195:10 198:22 199:10 200:2 | | **struck** 192:13 285:11 333:5,10 | **suggest** 24:23 193:3 |
| | **states** 239:8 263:17 282:5 | **structure** 42:13 | **suggesting** 190:10 198:20 |
| **stance** 348:4 | **stating** 281:20 299:12 316:7 320:23 | **stuck** 149:7 | **suggestion** 150:9 |
| **stand** 255:3 | | **stud--** 144:3 | **suggestions** 274:13 |
| **stand-alone** 294:19 | **statistically** 86:23 87:8 | **studied** 68:12 | **suit** 19:1 |
| **standard** 74:20,21,25 82:4,6 87:4 93:4 99:9,12, 14,19,23 100:8,11 118:7 125:25 128:22 136:19,25 204:5,7,13 251:2 253:15 264:25 265:7,25 266:9,17 268:6 304:17 306:24 314:3,4 336:3 337:1 338:25 | **statistics** 86:19 127:4 | **studies** 56:13 74:21 82:12 87:3 98:2,4 103:6 136:21 144:1,3 145:6,22 152:14 156:16 157:1 164:11 193:11 202:13 203:2,4 204:12,17 256:13 265:5,10 275:5,11,17,19,20 276:2, 14,20 277:6,23 282:8,10 307:2,4,5 311:18 321:24 327:8,21 340:6,11 358:4,8 360:18,19,23 | **summaries** 312:11 |
| | **stay** 69:13 327:6 356:14 357:17 | | **summarize** 349:12 |
| | **staying** 333:19 | | **summarized** 188:20 282:7 |
| | **stealing** 20:25 | | **summarizing** 234:1 |
| | **stem** 87:17 | | **summary** 177:4 358:24 359:1 |
| | **step** 24:6,23 25:5 36:22 51:24 52:2 295:4 332:19 352:23 | **study** 56:16 95:7,14,21 99:12 100:15,22 101:25 103:15,25 104:2,4,10 110:13,16 112:18 125:3,7, 8,11 127:9,16 136:1,17 160:19 162:19 190:6 205:25 207:2 209:15 268:6 278:4 282:13,20 283:3 293:3 294:3 304:16 308:10,11,17 313:8,15 317:11 321:17 328:1,2 337:4,5 338:23 339:13,15, 19,20,23 340:14,22,25 343:5 344:12,14 345:9 361:3 | **summer** 19:20 |
| **standardized** 135:13 | | | **super-long** 366:10 |
| **standards** 136:21 137:2 204:11 278:5 | **stepdown** 332:15 | | **supervise** 51:2 |
| | **stepped** 25:16 115:8 | | **supervised** 51:4 |
| **standby** 332:24 | **stepping** 24:20 115:10 | | **supervisor** 262:5 |
| **stands** 39:24 167:20 168:11 215:25 336:7 | **steps** 27:24 94:11 349:12 | | **supplied** 316:12 |
| | **stick** 52:4 68:4 69:8 255:14 332:20 | | **supply** 79:4 92:13 306:5, 16 329:23 |
| **staring** 312:23 | **sticker** 109:9 183:12 | | **support** 119:24 |
| **Stark** 159:10 | **sticking** 67:25 68:1,2,3 | | **supports** 147:11 294:6,7 |
| **start** 22:24 31:19 32:22,23 33:19 89:6 98:8 129:22 130:9 146:10 152:16 156:6 161:8 228:5 | **stock** 13:19 22:22 65:21, 23 221:16 250:3 273:7,9 346:18,20,24 350:1 | **study's** 136:4 | **supposed** 11:17,22 27:3 47:24 61:17 67:24 72:2 168:2 |
| | | **subcommittee** 185:1 | |
| | **stop** 79:16 181:14 221:17 246:12,17 252:1,6 346:13 | **subconscious** 349:8 | **surfaces** 150:13 |
| **started** 22:25 30:15,21 36:15 50:22 108:11 156:9 201:14 | | **subdivided** 219:18 | **surgery** 185:18 266:3 |
| | **stopped** 245:19,23,24 246:7,21 302:15 | **subject** 17:4 18:5,25 175:25 189:23 210:20 214:17,24 230:19,23 235:5 275:5 326:23 351:14 | **surprise** 112:10 |
| **starting** 49:2,4,18 69:25 190:9 285:7 | **storage** 216:13 | | **surprising** 75:22 113:1 |
| **starts** 99:23 139:18 241:15 | **stored** 148:1 | | **suspect** 120:13 227:17 356:5 |
| | **stories** 341:12 | **submission** 90:10,13 212:16 256:15 | |
| **startup** 24:13 209:7,8 | **story** 54:24 135:10 174:10 341:10 | | **suspected** 262:20 |
| **Stat--** 86:19 | | **submit** 124:5 152:10 | **swab** 150:12 |
| **state** 6:14 7:17 28:19,20, 22 29:11 82:24 120:3 126:16 155:15 185:1,24 188:19 201:13 202:9 220:11 222:16 230:2,4 239:1 244:5 253:7,10 258:3 279:24 284:14 286:7 320:24 340:21,23 | **straight** 364:11 | **submitted** 57:4 123:4 124:14,18 142:7 151:7 152:17 153:2 160:6 170:23 | **swabs** 150:4 |
| | **straw** 58:15 | | **swamped** 57:14 |
| | **street** 98:7 129:12 294:3 | | |
| | **strike** 18:10 23:5 26:1 28:14 37:18 39:11 43:13 44:16 49:10 50:15 61:3 | | |
| **state's** 335:5 341:2 | | | |
| **stated** 73:12 141:18 142:6, 8 213:16 223:13 316:6 | | | |

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.
May 16, 2023                                   Confidential                          Brent Satterfield, Ph.D.

sweat 147:21

sweet 327:6

swift 219:6

swish 283:13

sworn 6:16 7:9

symptomatic 55:10,19, 22,23 195:17 201:22 230:3 242:17 258:6 263:1 266:10,18

symptoms 76:8 114:5 197:8 200:25 201:2 232:1 242:6,9,12 243:1

syn-- 97:7

Synbiotics 121:8 122:3

synchronicity 347:3,4

synonymously 155:7

synthetic 73:23,24 97:4,8, 12

sys"-- 215:2

system 93:1,3,4,18 158:18 160:24 180:15,22,23 181:5 201:20 216:11 218:15 322:9 329:21 330:4

systematic 215:2 217:9

systemic 214:17 217:3 222:10 223:16 224:5 225:22

systems 178:6 330:5

                T

T-R-I-S-I-G-H-T 26:13

table 140:9 148:23 188:17, 21 258:12 265:12 315:4, 13,15,16

tables 192:25

tabulated 335:9

tabulating 335:9

tack 65:22

tactical 141:11

takes 59:16 69:23 70:1 96:21 130:2 322:16 347:4

taking 27:24 34:22 36:22 93:10 173:23 213:10 231:10 238:19 295:4 322:6 325:7 349:6

talk 54:10 78:3,24 88:16 95:17 96:23 135:8 157:4 169:9 213:18 222:4 242:22,23 262:17 307:16 329:3 338:7 349:14 351:21 362:11 363:12 364:5 365:4

talked 89:1 92:16 97:25 114:10 154:9 157:8 169:18 172:18 173:14 228:20 242:3 257:19 270:8 307:17

309:6 322:20 361:12

talking 14:9 38:14 43:25 54:9 71:8 72:23 75:17 84:6 86:3 95:8 105:14 121:11 135:6 149:18 159:22 160:17 162:12 163:22 172:16 173:6,7,9,10 174:1 187:15 207:4 212:8,13 219:1 225:3 226:13 235:14,18 250:11 254:15 266:24 267:5 269:13 291:24 308:25 312:13 314:1 326:4,5,15 327:18 331:18,21 339:14 358:23 361:24 365:5

talks 346:20,22

Tallahassee 20:3 28:18

taped 227:14

target 105:21 193:21 280:22

targeted 280:18

taste 52:14 53:24 201:5

team 51:4 137:14,21 138:4 176:17 210:6 272:15,19 276:3 281:24

Teasdale 6:5

tech 289:7

technical 22:14 330:9

Technically 262:19

technique 322:16

technologies 32:6,12,15, 16 35:6,17 36:6 270:8

technology 32:25 33:1 34:25 35:11,15 42:14,20 62:10 63:7,10,18,24 69:20, 21 71:12,15 72:18,19,20 192:3,6 272:17,21

telephone 6:18 176:23

telling 103:7 144:1 145:1,4 222:21 238:15 299:1 322:13

tells 75:24 127:1 188:4 335:8

template 67:11,25 69:7,11 128:8 227:24 355:3,4 356:4

ten 24:14,15 39:2 58:25 70:1,6 79:20,22,24

ten-employee 49:3

tend 198:6,7 348:3

tender 134:15

tendering 16:8

tenders 108:12 134:18 142:17 145:5,8 276:4 282:3

tenfold 69:24 128:9

Tennessee 357:19

tens 57:13 79:12 80:1

tentacle 270:17

tenth 80:1

term 22:15 75:16 94:14,16, 19,20 95:6 171:14 265:23 347:3

terminology 15:13

terms 27:1,3 36:25 43:4 51:1 53:2 76:22 88:21 94:11,12,14,23 95:9 96:9 159:3 188:25 268:16 320:17

terribly 112:11

test 34:16,18,25 35:7,8 57:18 61:5,9 62:3,4,5 63:9, 13 64:2,7,11 70:11,15 72:8,9 73:1,8,11,16 74:7, 23 75:4,5 77:21 79:11 80:3,4,18,19 81:18 82:3,5, 8,10,12,13,15,20,25 83:4, 8,13,14,16,19,20 84:3 85:1,2,11,13,19,20 86:4,5, 11,14,22 87:13 88:3,7,19, 23 89:4,16 90:16,22 91:3, 7,19,24,25 92:21,24,25 93:17 94:12,15 95:22 96:8 97:13,15,19,20 98:14 99:21 100:5,13,16 101:16, 20 102:2,6,9,10,15,21,24 103:9 104:14,20 105:15, 18,20 106:1,7,11,14,16,24 107:1,5,9,15,17,20,24 108:12,15,17 109:11 111:22 112:1 113:7 114:13 115:24 116:6 117:12 118:1,8,12,15,17,20,25 119:4,6 120:4,15 122:17 123:16,20 124:11,14,18,19 125:8 127:10,20,23 128:15 130:12 133:11,17,18 134:7,14,23 136:8,9,14 137:8 139:20,25 141:4,6, 17 143:14 146:13,15,18 147:15,17,22,24 149:4,7 150:11,15,16,17,21 151:2, 3,20 152:16,18 153:1,19 154:12,22 156:16 160:6, 15,23,24 161:1,5,19 162:9, 14,21 163:5,7,13 164:6,8 168:6,13 169:11 170:24 173:8 178:20 179:9 185:4 186:17 187:18,23,24 188:3 192:4 193:15,17 194:5,7, 21 195:9 196:16,18 198:12,18 200:19 201:18, 21 202:4,21,25 207:13,19 208:1,2,14 209:2,11,24 210:1,12 211:23 212:16 216:16,24 218:7 219:9,23 222:22 241:24 243:13 251:3 253:19,21 256:24 257:8,17 258:6 259:17 261:4 262:19,21 263:13,18

264:16 265:9 266:7,13,23 267:7,25 268:4,5,7 275:4 277:21 278:3,4,14 286:1, 19 288:5,9 292:2,17,25 295:6 297:4 299:2,12,17 302:15 303:3,8 304:19 305:1,5,22,23,24 306:13, 18,23,24 307:8,12,21 308:6 309:3,7 314:21 317:15 318:4 320:1,2,14, 25 321:1,17,23,24,25 322:2,11,25 323:4,11,16, 19,20 324:18,25 325:1,15, 25 327:7 330:3 331:16 335:11 336:2,24 337:1,12, 14,15 340:11 341:16 342:19 343:16,20 344:6 345:5,12 354:17 355:15 357:6

test's 70:16 81:25 82:1 101:15 285:9 294:14 295:5,13

tested 106:2,13 111:20 141:24 148:2 176:24 197:8 219:19

testified 7:10 101:7,11

testify 21:19

testifying 113:19

testimony 17:9,13 48:16 58:11 59:7 75:12 77:9 80:11 81:9 82:23 84:16 85:7 87:21 90:7 95:4 101:11 114:16 118:23 119:10 120:1 122:20 128:25 135:4 136:12 143:22 144:17 145:13 153:4 173:19 174:19 194:10 195:2 196:1 200:4 202:7 204:9 205:7 210:3 213:23 231:3 246:4,5 250:18 266:15 267:10,16 268:2,19 296:16,20 297:6 299:25 301:4,15 302:19 312:4 313:24 315:22 316:18 318:8 320:22 329:1 332:2 333:8 340:1 347:11, 22 358:22 366:24

testing 34:14,17 50:24 61:8 63:19,24 84:9 107:10 130:18 146:19 152:13 160:14 169:12 173:2 186:16 187:25 231:24 268:12,17 283:11 287:20, 21 289:7 292:20 308:13 320:4,11,20 321:11 335:5 336:10,11,21 338:3

Testiowa 335:4 337:20

tests 36:8 57:13 61:23,25 62:9,23 63:3,5,8,17 68:14 73:18 74:4 79:5 80:21 81:21 82:16,17 83:25 87:11,15 91:16 92:17,19 94:1 98:12,13,14,17 99:20,

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                        Confidential                        Brent Satterfield, Ph.D.

24,25 100:10 103:4 107:6 108:9 111:21 114:3,14 128:17 135:18 136:1 137:7 138:2 139:24 140:3,16 141:15 142:14 148:5 154:18 155:22 156:10,12 158:18 159:4 161:8 170:20 188:19 192:3 193:14 195:5 197:1,2,4 198:21 199:9 203:20 209:10 216:14,16,22 220:7,8,14 226:7 227:10 233:9 241:11 244:22 253:14,19 256:22 257:10,21 258:8 259:12,22 260:10,23 261:6,19,24 263:6,25 265:11 267:24 272:18 279:25 290:18 294:23 307:21 319:23 320:12,16 322:6 323:4,5 327:4 330:7 332:23 345:9

**tests,'** 243:21

**Testutah** 54:19 55:14,21,22 154:19 155:17 156:12 173:2 186:9 197:12,15 198:13,15 200:22 201:12 213:10 230:3,4 231:23,25 241:11 247:22 254:5,7,9 258:10 290:18 340:8 364:10,18,21

**Testutah's** 201:11 325:24

**text** 158:14 159:18 166:15 238:22

**texts** 159:19

**that.'** 295:1 327:10

**theoretical** 67:5 148:24 249:5 321:25 322:3

**theoretically** 69:2 128:7 140:13 257:20

**theory** 67:17,18,19,24 68:12 197:2 200:8,18

**there'd** 310:16

**thermocyclers** 336:14

**thing** 32:3,9 39:20 60:12 78:23 98:20 147:12 148:21 149:21 198:3 202:8 204:22 221:8 244:10,11,13 245:15 246:20,24 247:2,10 248:11,14 249:2,24 250:4,16 253:7 308:3 348:13 355:6

**things** 48:13 54:1,3 60:6 72:4 91:22 97:1 103:19,23 106:20 144:4 147:1 207:5 223:2 269:14 301:7 324:22 326:11 345:19,20 350:17,18 351:21 364:19 365:9

**thinking** 281:8

**thinks** 222:13

**thinly** 13:19

**third-party** 74:23 99:5 251:3 253:16 265:9 306:23 316:16 337:14 339:1

**third-to-last** 218:24

**this...final** 176:21

**tho"--** 185:19

**thought** 48:7 51:17 91:4 173:14 174:8 198:17 205:3 213:12,13 226:9 283:12 354:16

**thoughts** 310:5 318:16

**thousand** 13:11 26:23

**thousands** 76:16 195:20 241:21,22

**threatened** 16:4 364:19

**threshold** 127:24 167:19,21 314:7,19 356:21

**throughput** 294:22

**throughput'** 294:22

**thrown** 94:12

**Thursday** 8:20,22

**tie** 75:3 251:4 304:19 306:23

**tiebreaker** 74:23 87:5 204:15 268:7

**ties** 337:15 339:1

**tighter** 98:23,24

**time** 6:4 16:9 18:1 19:11 22:3 25:20 29:18 32:23 33:9,18,22 34:23 36:4 38:4,7 43:18,22,25 44:23 48:19 51:5,6 52:22 53:18,21 54:16,19 57:15,16 59:5 62:8 64:17 73:16 77:11 78:3,12 79:14,19,22,24 83:8 87:9 89:3,15 90:22 92:11 94:1 99:18 105:10,13 107:22 109:18 118:9,16,18,21 119:1,7,21 120:5,16 121:4 123:15,17 126:11 132:16,18 133:9,17,22,23 138:13 143:9,23 146:22,24 147:7 153:2 154:11 155:18 156:6 158:21 159:11,12,17 160:8,12,16 161:21,23,24 167:21,23 173:11 178:11 180:11 181:12 183:16,19 187:4,8 192:22 193:4,12 196:2,15,22 197:21 198:21 199:18 202:11 205:11 206:7 207:4 209:6,12,14,16,20 211:11 213:6 218:14 222:21,24 224:25 231:4 234:20 239:20,23 244:5,12,15 246:15,18 257:6 259:15,21 260:7,16 261:5,7 262:2 263:12 271:17,23 275:22 280:15 281:9 285:3,4 290:3,8,11 293:16 302:24 304:6,20 306:1

309:8 315:5 317:12 319:9 320:7,10 326:1 331:14,21 332:11,18 334:15,18 339:3,11 350:20 351:19 353:2,20,23 354:18 357:13 359:16 360:20 362:9 365:24 366:13,16,19 367:16

**timeline** 90:8 169:12

**times** 71:3,4,8,9 169:3 265:10 267:14 270:14,18 320:14 350:18

**Timpanogos** 57:25 59:22 158:16 159:2,6,12 185:19 188:13 198:12 201:10,20 213:9 253:9 254:12 258:7 312:14

**tiny** 69:12,18 93:2

**tired** 46:11 201:3

**title** 49:19 50:2 292:13

**titled** 311:8

**today** 21:20 122:5 169:5 196:18 219:9 267:14 292:17 293:19 296:12 331:3 361:12

**today's** 8:17

**told** 54:17,25 55:1,17 56:3 58:2 144:7,14 145:21 165:9,16 178:12 185:2 206:5 233:1 234:17 235:9,24 236:19 238:13 248:13,18,21 249:11 272:4 317:25 339:16,17,19,20 340:4,23 357:16

**tomorrow** 169:13 356:15,25

**tone** 173:25 174:1,2 247:18

**tooth** 221:18

**top** 47:23 108:14 110:8 124:17 132:13 133:12 175:10 177:13 181:20 182:2 184:9 214:4,22,23 282:12 312:10 321:14,16 338:14

**topic** 325:7

**topics** 329:4

**total** 12:17 311:15 343:9

**totally** 362:17

**touches** 227:11

**town** 271:15

**trace** 128:13

**track** 250:3

**tracking** 65:21,22 66:6

**traded** 13:19 31:22

**Trading** 6:8

**training** 68:21

**transcript** 8:13 194:14 367:12,19

**transfusion** 266:4,5

**transition** 46:4,9 47:14 48:11,20 63:16

**transitioned** 49:25 58:8

**transitioning** 63:24

**translate** 63:18 355:24

**trap** 36:12

**treading** 223:5,9

**treated** 263:15 284:16

**tribunal** 10:17,18

**Tribune** 54:10 169:19 170:12,15 172:7,22 173:6 174:25 175:4 182:7 184:14 188:10,14 231:1 234:23 240:10 244:21 281:3 291:2 325:19 359:14

**trigger** 241:23

**trillion** 70:3,6 129:24,25 130:3 227:23

**tripling** 323:15

**Trisight** 26:11 27:18

**troubleshoot** 93:24 129:5 179:14 207:1 330:3,4

**troubleshooting** 92:8 94:2 161:22 178:3,11,13 179:10,20 210:12 308:1

**true** 58:3 86:6 119:13,14,15,16 122:24,25 147:18,25 236:25 282:12 321:5 328:11 355:9

**tube** 68:2 130:5 216:10,12,16,22 220:25 227:23

**tuberculosis** 62:3

**tubes** 216:9 226:19

**turn** 26:18 82:7 361:10

**turned** 21:3,11 46:17,19

**turning** 57:11 145:22

**turns** 45:14 350:24

**tweaking** 89:25 90:4,19,24 91:2

**Twenty** 283:24,25

**Twenty-four** 330:21

**Twenty-nine** 362:25

**Twenty-one** 291:10

**Twenty-three** 326:19

**Twenty-two** 317:2

**two-and-a-half-million-fold** 71:20 270:9

**two-gene** 106:7 107:15

**type** 22:12 29:16 63:10,17

GELT TRADING, LTD. vs CO-DIAGNOSTICS, INC.

May 16, 2023                    Confidential                    Brent Satterfield, Ph.D.

120:24 130:11 135:13 192:3 260:8 270:15 310:11

**types** 30:3 34:13 59:18 75:14 84:7 100:10 112:16, 20 121:3 147:10 197:4 329:24 352:1,4,5

**typical** 76:7 136:6,8 265:2 306:6

**typically** 56:22 135:17 243:1 262:6 267:24

**typo** 142:1,4

**U**

**U.S.** 60:7 130:18,19 293:3

**ugly** 148:15

**Uh-huh** 114:8 160:3 191:22 243:22 282:4

**UK** 142:16 143:16

**ul** 211:18

**ultimately** 31:16 38:20 39:11,12 56:5 84:25 178:19 179:9 195:14 207:6 228:7 274:23 302:7 321:10 331:22,23 339:23 340:13

**ultra** 223:5

**umbrella** 364:25

**unable** 83:8 95:17 317:18

**unaware** 306:5

**unbelievable** 255:20

**unbiased** 56:23

**uncertain** 166:1 330:20

**undergone** 332:19

**underlying** 135:1

**underneath** 314:6

**underreporting** 57:19

**understand** 15:12 66:13, 18,20 68:13 72:16 91:14 146:23 220:19 221:10 226:5 260:25 269:14 289:7 303:4 310:24 319:13 336:20

**understanding** 226:15 299:8,17

**understands** 185:14

**understood** 12:16 17:14 36:21 89:7 99:1 153:13 299:14

**undertake** 331:24 332:4

**unequivocal** 83:14

**unfavorable** 257:9,15

**unique** 292:16 328:16

**United** 263:17

**universal** 308:3

**universally** 74:21 87:4 204:14 251:3 265:8 304:18 305:24 338:25

**universe** 303:2

**University** 334:24

**unknown** 137:3 148:3

**unknowns** 186:17

**unnecessary** 93:24

**unpublished** 142:14,21 143:11 144:14,19

**unsavory** 59:3

**unsure** 185:13

**untrue** 321:5,6

**up-front** 322:4

**upcoming** 321:17

**update** 176:21 280:3,7,10 281:5 300:4 329:14 344:17

**updated** 260:17

**updates** 331:3

**updating** 213:25 260:15

**upset** 52:25 198:2,10 222:21 244:9

**upside** 173:13

**usage** 95:12,14

**users** 86:21

**Utah** 6:6 7:21 8:1 26:9 27:19 33:25 155:21 185:2, 24 253:7,11 258:4 279:25 284:14,19 286:7 321:17 332:18 333:4,6,10,11,13, 16 334:5 339:13 340:7

**utility** 193:17,22

**utmost** 210:7

**V**

**Vague** 49:21 156:2 162:15 199:15 240:25 246:14 252:19 263:10 305:12 365:23

**Vaguely** 122:13,15 146:9 257:4

**Val** 10:20 14:6 65:12

**val--** 104:4

**valid** 61:5,10 188:5 304:16 344:6

**validate** 263:18 268:14

**validated** 95:22 193:15 306:17 343:20

**validating** 152:13

**validation** 85:17 94:18,20, 25 95:7,14 97:20 98:2,4 99:3 100:15 101:6,14,23, 24 103:6,15,25 104:1,4,9

125:3,7,11 127:9,16 135:17 136:13,21 137:7, 23,24 138:1,2 145:22 151:15 152:14 153:9 156:16 160:14,18 161:1 171:7 209:3,24 261:23 268:9 275:5,17,19,20 276:13,20 277:22 283:3 295:17 297:1 301:2 303:21 307:8 308:10,11,17 313:8 316:16 337:3,5 338:10 339:13,15 340:14 345:16 355:16,23,24 358:4,8 359:25 360:17,19

**validations** 99:2 112:14 135:1

**valuation** 27:13

**values** 314:7,8

**variability** 355:13

**variety** 62:6 75:14

**vast** 257:23 309:1

**venture** 40:9 41:15 42:23 104:16

**verbatim** 225:11

**verification** 94:13,22 176:19

**verify** 137:8 168:13 216:24 232:11

**verse** 6:8 9:22

**version** 124:5,19 336:1

**versus** 55:22 78:5 82:1 254:1 258:2 267:25 286:6 327:19 330:10

**video-recorded** 6:6

**view** 56:23 202:2

**vile** 92:21

**viral** 73:11 76:5,25 77:6,15, 19 80:5 114:13 263:24 264:11

**virtual** 126:17

**virus** 76:6,10,18,20 78:4 79:3 99:15 129:17 148:13 171:1 195:19 241:22 268:23 355:7

**viruses** 62:7 76:16 126:9, 19

**viscerally** 55:2

**vision** 50:11

**vital** 61:8

**vocal** 270:6

**volatile** 33:11

**volume** 322:18

**volumes** 83:23 160:19

**VSTOCK** 9:22

**W**

**Wait** 361:16

**waiting** 328:14

**walk** 176:10 231:12,13 273:16 325:25

**walking** 292:1

**wanted** 12:8 13:7 24:16,17 25:5,13 38:19 40:20 42:12 48:8,10,21 49:5 52:7 54:10 57:23 58:23 73:17 79:12 96:7 115:15,17 152:14 160:19 170:17 174:12 191:15 193:20 195:5 215:11 253:2 260:7,11 261:11 284:21 345:11,13 346:16 364:22

**wanting** 52:2 53:2 340:6 346:22

**War-era** 21:1

**warrant** 16:5

**wasting** 209:20

**watch** 223:4

**water** 30:25 322:15

**ways** 36:2 76:19 93:10 227:8

**weather** 250:4

**Webb** 168:25 170:5,7 171:19 172:10,17 181:21 182:3 184:10 229:15,20 230:9,18 232:10 235:9,25 236:13 240:9,20 250:11 273:23,25 337:8,17 342:2

**website** 56:10 342:5

**websites** 256:14

**week** 79:19,21

**weeks** 79:6,10,14 89:19 169:4

**weird** 183:10

**well-known** 345:8

**wells** 83:5,7

**West** 31:14

**Whatsapp** 214:15

**whatsoever** 112:7 298:7 322:25

**white** 56:5,12 57:4 132:8, 14 133:1,6 200:21 252:17 254:6 258:1 260:19

**white-paper** 56:16

**who'd** 191:1 201:8 209:7,8

**who've** 329:17

**whomever** 204:17

**widespread** 169:11

**wildest** 311:21

**win** 338:8

**window** 78:3,6 192:10 193:9,18 194:24 195:17,24 196:5,8,11,14,20,25 197:6, 13 242:3 266:21 267:1,8

**window-period** 78:9 193:1 264:21,24 265:20,22 266:19

**Wittwer** 23:10

**woman** 220:12 222:5 302:1

**won** 134:15 145:5,7 276:5

**word** 47:2 59:4,9 73:2 89:4 95:1,20 141:10 142:5 192:18 312:7 318:25 319:5 326:8 333:15 351:5

**wording** 292:13

**words** 141:11 226:24 279:16 306:14 358:16,19, 24

**work** 35:4,6 52:21 63:20 67:20 68:18 71:23 83:11 85:1 98:7,8 153:25 159:16 194:2 198:6,8 209:16 218:16 261:1 271:4,11 272:20 332:6,7,10 345:10, 13 353:11

**worked** 16:21 50:21 53:8 98:6 147:3 206:22,23 210:7 304:13 331:7 336:13

**working** 30:15 57:14 140:11 151:2 162:6 173:8 330:8 353:13

**works** 119:11 138:13 139:6 253:22 272:19

**world** 33:20 34:15,23 36:10 42:12,15,24 43:6,9 52:22 55:5 68:20 71:16 72:9,22 78:8 79:4 81:5,11 92:11 130:16 207:7 270:22 272:23,25 343:12 346:7 349:2 351:3,22 364:4

**world's** 71:13

**worldwide** 60:8

**worried** 236:15 325:11

**worse** 219:7 259:12

**worst** 255:18

**worst-case** 278:2

**worth** 28:9 84:12,14 271:22

**write** 115:2 118:7 125:20 141:16 162:18 191:16 234:19 242:18,20 261:5,7 279:21 281:11 282:15 321:14 326:25 338:13 343:2 349:3 350:10 352:1

**write-up** 126:2

**writes** 122:5 167:5 175:24 262:18 335:14

**writing** 115:3 190:6 191:19 233:24 353:13

**written** 125:18 278:8 312:15,16,17 318:22 323:8 359:17

**wrong** 13:12 47:17 97:1 143:12 164:19 182:10 223:4 245:25 265:14,15 304:11 345:5

**wrote** 115:3 125:21 132:7 234:9,10 269:19 277:16 279:23 289:10 290:1 337:18 351:16,18

---

**X**

**Xpert** 111:25 113:5,7,10

**Xpress** 112:1

---

**Y**

**year** 17:16 20:15 22:20 26:25 27:4 33:15 54:2,3 57:12,14 65:5 87:11 98:13 320:10 333:2

**years** 7:23 22:25 25:14 37:21 38:10 50:7 52:3 67:16 111:4 115:4 212:25 232:16

**yes/no** 83:15

**yesterday** 8:20,23 185:2 219:8 244:14,16 285:2

**York** 9:20 65:17

**Yorker** 54:6

---

**Z**

**Zoom** 8:22