# Exhibit 13

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

- - -

GELT TRADING, LTD., a Cayman          )
Islands limited company,              )
                                      )
        Plaintiff,                    )
                                      )
        vs.                           )    Case No.
                                      )    220300053
CO-DIAGNOSTICS, INC., a Utah          )
corporation; DWIGHT EGAN; JAMES       )
NELSON; EUGENE DURENARD; EDWARD       )
MURPHY; RICHARD SERBIN; REED          )
BENSON; BRENT SATTERFIELD,            )
                                      )
        Defendants.                   )

**CERTIFIED COPY**

- - -

VIDEOTAPED DEPOSITION OF DWIGHT H. EGAN

Thursday, April 13, 2023

- - -

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

- - -

Thursday, April 13, 2023
9:10 a.m.
Armstrong Teasdale
210 South Main Street
Suite 2400
Salt Lake City, Utah  84111

REPORTED BY:  Gayle L. Anderson, RPR No. 11101156-7801

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Page 2

Deposition of DWIGHT H. EGAN, on April 13, 2023, at 9:10 a.m., before Gayle L. Anderson, Certified Court Reporter, in and for the State of Utah.

A P P E A R A N C E S

MICHAEL A. PINEIRO, Esq.
BRANDON S. FLOCH, Esq. (Attending by phone)
Marcus, Neiman, Rashbaum & Pineiro, LLP
2 South Biscayne Boulevard
Suite 2530
Miami, Florida  33131
(305) 400-4260
and
D. LOREN WASHBURN, Esq.
Armstrong Teasdale
201 South Main Street
Suite 2400
Salt Lake City, Utah  84111
(800) 243-5070
and
MICHAEL C. FASANO, Esq. (Attending by phone)
Fasano Law Firm, PLLC
2 South Biscayne Boulevard
Suite 2530
Miami, Florida  33131
(786) 530-5239
     On behalf of the Plaintiff.
JONI OSTLER, Esq.
Parr, Brown, Gee & Loveless
101 South 200 East
Suite 700
Salt Lake City, Utah  84111
(801) 532-7840
and

Page 3

A P P E A R A N C E S

ZACHARY R. TAYLOR, Esq.

Baker Hostetler

45 Rockefeller Plaza

New York, New York  10111

(212) 589-4645

     On behalf of the Defendants.

          - - -

ALSO PRESENT:

     Tyler Larsen, Videographer

          - - -

Page 4

I N D E X
          - - -

| WITNESS | PAGE |
|---|---|
| DWIGHT H. EGAN | |
| By: Mr. Pineiro | 08 |

          - - -

| EXHIBITS | MARKED |
|---|---|
| Egan Exhibit No. 1 (Document entitled Logix Smart SARS-CoV-2 Test Kit) | 35 |
| Egan Exhibit No. 2 (E-mail dated 7-31-20 with attachment) | 46 |
| Egan Exhibit No. 3 (E-mail dated 1-28-20) | 60 |
| Egan Exhibit No. 4 (E-mails, first one dated 1-29-20) | 62 |
| Egan Exhibit No. 5 (E-mail dated 2-2-20) | 66 |
| Egan Exhibit No. 6 (E-mails, first one dated 2-2-20) | 79 |
| Egan Exhibit No. 7 (E-mail dated 3-15-20 and Senator Romney letter) | 102 |
| Egan Exhibit No. 8 (E-mail dated 3-14-20) | 105 |
| Egan Exhibit No. 9 (E-mails, first one dated 4-3-20) | 108 |
| Egan Exhibit No. 10 (E-mails, first one dated 4-7-20) | 122 |
| Egan Exhibit No. 11 (E-mails, first one dated 4-17-20) | 141 |

Page 5

| EXHIBITS | MARKED |
|---|---|
| Egan Exhibit No. 12 (E-mails, first one dated 4-30-20) | 159 |
| Egan Exhibit No. 13 (E-mails, first one dated 4-30-20) | 187 |
| Egan Exhibit No. 14 (E-mails, first one dated 5-1-20) | 190 |
| Egan Exhibit No. 15 (E-mails, first one dated 5-1-20) | 210 |
| Egan Exhibit No. 16 (E-mail dated 4-30-20) | 216 |
| Egan Exhibit No. 17 (May 1, 2020 press release) | 216 |
| Egan Exhibit No. 18 (E-mail dated 5-4-20) | 248 |
| Egan Exhibit No. 19 (E-mails, first one dated 5-1-20) | 265 |
| Egan Exhibit No. 20 (E-mail dated 5-12-20) | 277 |
| Egan Exhibit No. 21 (E-mails, first one dated 5-11-20) | 278 |
| Egan Exhibit No. 22 (Document entitled TestUtah declines to join other Utah labs in accuracy check) | 283 |
| Egan Exhibit No. 23 (E-mails, first one dated 6-3-20) | 296 |
| Egan Exhibit No. 24 (E-mails, first one dated 5-29-20) | 305 |
| Egan Exhibit No. 25 (E-mail dated 5-20-20) | 312 |
| Egan Exhibit No. 26 (E-mails, first one dated 9-16-20) | 314 |

Page 6

EXHIBITS                                        MARKED
Egan Exhibit No. 27                             318
(Document entitled Evaluation of Factors
that Affect Performance of COVID-19
Molecular Assays Including Presence of
Symptoms, Number of Detected Genes and
RNA Extraction Type)

Egan Exhibit No. 28                             325
(Document entitled Co-Diagnostics, Inc.
Releases Prepared Remarks for First
Quarter 2020 Conference Call)

- - -

Page 7

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER:  We are going on the record.  My name is Tyler Larson.  The court reporter is Gayle Anderson.  We represent JD Legal Support. The time and date indicated on the video screen is April 13 at 9:10 a.m. in 2023.

This is in the matter of Gelt Trading versus Co-Diagnostics, et al., Case No. 2:20-cv-00368-CMR in the U.S. District Court for the District of Utah, Central Division.

Counsel will now state their appearances for the record, and then the witness will be sworn.

MR. PINEIRO:  Michael Pineiro and Loren Washburn on behalf of the plaintiff.

MS. OSTLER:  Jonie Ostler from Parr, Brown, Bee & Loveless on behalf of defendant and on behalf of the witness, Mr. Dwight Egan.

MR. TAYLOR:  Zachary Taylor from Baker Hostetler, LLP, on behalf of Mr. Egan and the defendants.

- - -

Page 8

DWIGHT H. EGAN, being by me first duly sworn, as hereinafter certified, deposes and says as follows:

EXAMINATION

BY MR. PINEIRO:

Q.      Good morning, Mr. Egan.  How are you?

A.      Fine.  Thank you.

Q.      Can you just state your name for the record, please?

A.      Dwight H. Egan.

Q.      Have you been deposed before?

A.      Yes.

Q.      So you're familiar with some of the ground rules.  I'm going to ask you questions.  Your counsel may object.  Unless she instructs you not to answer, after she objects you should provide your answer.

Let me just finish my question.  Sometimes you may know where I'm going; but let me get the question out for purposes of the transcript, and I will do my best to make sure you get your complete answer out before I ask my next question.

If you need to take a bathroom break or anything else, please let us know.  And, you know, we'll break for lunch and do our best to accommodate you in the deposition.

Page 9

Understood?

A.      Yes.

Q.      Also no nodding.  We need verbal answers for purposes of the transcript.

What did you do to prepare for today's depo?

A.      I met with my counsel.

Q.      And how many times did you meet with them?

A.      Once.

Q.      Was that in person --

A.      Yes.

Q.      -- or over --

You met with them in your counsel's office here?

A.      Yes.

Q.      And for how long did you meet?

A.      I'd say a few hours.

Q.      Okay.  And did you review documents? Without disclosing the content of the documents, did you review documents in the course of that preparation?

A.      Yes.

Q.      Besides that meeting, did you engage in any other preparation?

A.      No.

Q.      Have you spoken with anybody about today's

Page 10

deposition besides your counsel?

A.    No.

Q.    Besides this lawsuit, Mr. Egan, are you a defendant in any other civil lawsuit?

A.    I don't believe so.

Q.    Have you been sued in a related derivative action, do you know?

A.    I believe I have been sued in a derivative action in this case.

Q.    Okay.  Relating -- relating to what we'll call the May 1, 2020, press release?

A.    Right.

Q.    Besides that derivative action or those derivative actions, are you a defendant in any other lawsuits?

A.    I don't believe so.

Q.    Are you, to your knowledge, a target of any government -- government investigation at this point in time?

MS. OSTLER:  Objection.  Vague.

BY MR. PINEIRO:

Q.    You can answer.

A.    Can I have the question again?

Q.    Yeah.  Are you the target -- To your knowledge, are you a target of a -- a target or a

Page 11

subject of a government investigation at present?

MS. OSTLER:  Objection.  Vague, compound.

MR. PINEIRO:  You can answer.

MS. OSTLER:  You can still answer, yes.

A.    Yes.

Q.    Yes?

And which regulatory or government agency is that?

A.    The SEC.

Q.    And what is the SEC investigating?

MS. OSTLER:  I'll just caution the witness not to reveal any communications that you've had with counsel.  So to the extent that your only knowledge about what the SEC is investigating comes from your communications with your counsel, I instruct you not to answer.

A.    So that I won't -- I don't have an answer then.

Q.    The facts of the investigation aren't privileged.  So setting aside actual legal advice provided by your counsel, have you been provided any documents or -- Have you been the subject of any subpoenas by the SEC, for example?

A.    Yes.

Q.    Okay.  And what did that subpoena command

Page 12

you to do?

A.    I had a meeting with the SEC.

Q.    Did you provide testimony under oath in that meeting?

A.    I believe so.

Q.    When was that meeting?

A.    I think around a year ago.

Q.    Okay.  And which -- which counsel -- Did you have counsel in attendance at that meeting?

A.    Yes.

Q.    Who was that?

A.    Ross Carmel.

Q.    Is Co-Diagnostics the company also a subject of that same investigation?

MS. OSTLER:  Objection.  Vague.  And also if your only knowledge of that comes from your attorneys having a communication with you, I instruct you not to answer.  If you know apart from your attorneys' communications, you can answer.

A.    I don't know anything apart from my attorneys' communications.

Q.    Are you the CEO of Co-Diagnostics?

A.    Yes.

Q.    Are you aware of whether Co-Diagnostics is the subject of an SEC investigation?

Page 13

MS. OSTLER:  You can answer yes or no.  That wouldn't --

A.    I would say not necessarily, but generally speaking I would say yes.

Q.    Okay.  And what is -- Has the SEC provided you with the Wells Notice in connection with that investigation?

A.    Not that I'm aware.

Q.    Has the SEC, in writing or otherwise, informed you of potential charges they might be bringing?

A.    No.

Q.    Okay.  Have you entered -- have you or the company entered into any tolling agreements in connection with that investigation?

A.    No.

Q.    Is that investigation still ongoing to your knowledge?

MS. OSTLER:  I have to object.  To the extent that your only knowledge comes from communications with counsel, I have to instruct you not to answer.

MR. PINEIRO:  So the only issue with that, Jonie, is that there are some things that your counsel tells you that are not going to be privileged.  So,

Page 14

like, if your counsel -- You know, there are some facts that are just not privileged or work product or legal advice.  So if the investigation is still ongoing and your lawyers tell you that, I don't think that's privileged, frankly.  If that's something you have some knowledge about without conveying any legal advice, I think you can probably appropriately answer that question.

MS. OSTLER:  I understand your position.  Our position is that if he learned it through an attorney/client communication, that we're going to instruct him not to answer because it is covered under the context of attorney/client privileged communications.

So if you know outside of your communications with your attorneys, you can answer that.

A.      I only know what I know through the attorneys.

Q.      Okay.  So outside of what your lawyers tell you, you don't have any independent knowledge whether the SEC's investigation into Co-Diagnostics is still ongoing?

A.      Not outside of my information from my own counsel.

Page 15

Q.      Okay.  Has Co-Diagnostics made any presentations to the SEC in connection with that investigation?

MS. OSTLER:  I have to make the same objection that I caution you not to reveal any contents of attorney/client communications you've had.  If you know apart from that, you can answer.

A.      I don't know anything apart from that.

Q.      Okay.  In your capacity as CEO or otherwise, have you conveyed or communicated to the board that Co-Diagnostics is the subject of an SEC investigation?

A.      Yes.

Q.      You did that yourself, sir?

A.      It may have been done by our general counsel, but they were notified.

Q.      Okay.  And how were they notified?

A.      Just in the due course of our communications.

Q.      And has that been disclosed in any public statements?

A.      Any disclosure would be in our formal filings with the SEC.

Q.      Do you have any recollection of that being disclosed?

A.      Not in particular.

Page 16

Q.      Without revealing any attorney/client work product or privileged information, are you aware of the nature of the SEC's investigation?

MS. OSTLER:  Objection.  Vague.

And, again, just make sure not to disclose any communications with your counsel.

A.      Well, the only thing I'm aware of is what has been communicated to me through counsel.  So --

Q.      Are you aware that the investigation pertains to the May 1, 2020, press release?

MS. OSTLER:  Objection.  Assumes facts.

And same instruction, to be cautious about not revealing any communications with counsel.

A.      Yeah.  I have nothing to reveal there except things that would be communicated to me through counsel.

MR. PINEIRO:  So the position that you're taking is that I can't ask the CEO of a company about the potential charges because they're being conveyed by counsel?

MS. OSTLER:  First of all, that assumes facts.

MR. PINEIRO:  I get that.  I'm just talking to you.  So, like --

MS. OSTLER:  But, yeah.

Page 17

MR. PINEIRO:  I'm asking him.  He's told me there's an investigation.  I'm asking him what they're looking into; and you're saying that because it's being conveyed or filtered through you guys, through counsel, that I can't -- he can't answer these questions?

MS. OSTLER:  I'm just saying to the extent he would reveal a communication with counsel, yes, that he's being instructed not to answer.

BY MR. PINEIRO:

Q.      In the -- in the communication that was made from the company to its board, did that communication -- regarding the SEC investigation, did that communication disclose the nature of the SEC's inquiry?

MS. OSTLER:  Objection.  Vague.

BY MR. PINEIRO:

Q.      You can answer.

MS. OSTLER:  Also I should caution you if this was -- if there was a communication with the board where counsel for the company was discussing with the board legal advice for the SEC investigation, be careful not to reveal the contents of those communications.

A.      That would be the case.  It would have been

Page 18

done in conjunction with counsel.

Q.     So the position is that if Mr. Egan -- Was the Carmel firm involved in that disclosure?

A.     Yes.

Q.     Okay. Was it -- You don't recall whether it was in person, over the phone or in writing?

A.     That would have been -- that would have been over the phone.

Q.     Are you the subject of any Department of Justice investigation at present?

A.     No.

Q.     Is the company?

A.     No.

Q.     Are you or the company under an investigation by the FDA at the moment?

A.     No.

Q.     Are you the subject of any IRS investigations or proceedings right now?

A.     No.

Q.     Do you have any outstanding judgments entered against you?

A.     Yes, I do.

Q.     What were those judgments?

A.     A judgment entered with respect to a real estate transaction.

Page 19

Q.     Can you describe that?

A.     I was developing a piece of ground; and at a certain point, the debt became, you know, more than the value of the property. So that was -- I lost the property, and they pursued the judgment.

Q.     So you were -- There was a foreclosure suit regarding the property?

A.     Yes.

Q.     And you were sued in your individual capacity?

A.     Yeah. Well, they -- Yeah.

Q.     And when was that judgment entered?

A.     I'm thinking 2014.

Q.     And it's still unsatisfied?

A.     Right.

Q.     And where was that lawsuit?

A.     In Utah.

Q.     Besides that judgment, any other pending outstanding judgments?

A.     No.

Q.     Are you the subject of any tax liens?

A.     Yes.

Q.     Can you describe those?

A.     I have a tax lien with the State of Utah for -- I think the original lien was for about $14,000

Page 20

and all but $4,000 and change has been paid.

Q.     So there's -- there's still $4,000 outstanding on that lien?

A.     Yeah. That will be resolved, you know, in the next several weeks.

Q.     When was that lien entered?

A.     A few weeks ago.

Q.     And what kind of taxes were outstanding?

A.     It was just personal income.

Q.     Utah State income tax?

A.     Uh-huh.

Q.     Is there any reason why you weren't able to pay those income taxes?

A.     Well, it just -- it came up at the time of the -- that I filed the return; and they just hadn't estimated property, so --

Q.     You said they hadn't estimated --

A.     They hadn't estimated the taxes that would have been done.

Q.     But before I guess -- So you're saying that you misestimated your taxes; and as a result, you owed additional tax?

A.     Uh-huh.

Q.     So is there any reason why you couldn't have resolved that prior to the entry of a lien?

Page 21

A.     I wasn't notified of the lien until immediately before they requested payment. So --

Q.     You're saying the lien was entered very quickly after they requested the additional payment?

A.     Yes.

Q.     Have you notified the board of that pending lien?

A.     No.

Q.     Is there a reason why you haven't notified them?

A.     I don't know that I have an obligation to notify them.

Q.     How many shares of Co-Diagnostics stock do you own at present?

A.     I don't know the exact number. I own shares incident to an option and some restricted stock unit grants.

Q.     Do you have a ballpark figure? I won't hold you to it.

A.     A few hundred thousand shares.

Q.     Okay. So before the COVID-19 pandemic -- and we'll just stipulate that sort of started January, 2020 -- before that period of time, what kind of products was Co-Diagnostics selling?

A.     We were selling molecular diagnostic tests.

Page 22

Q.    What kind of molecular diagnostic tests? For what viruses or illnesses?

A.    We were selling tests for mosquito vector that would include things like Zika, Dengue, Chikungunya, that sort of thing.

Q.    And are these tests -- Are these diagnostic tests PCR tests?

A.    Yes.

Q.    Okay.  Is the technology for these tests similar to the Logix Smart test for COVID-19?

A.    It's similar in that it uses PCR.

Q.    Right.  Besides that is there any technological overlap between the tests?

MS. OSTLER:  Objection.  Vague.

BY MR. PINEIRO:

Q.    You can answer.

A.    The tests utilize PCR, and we -- we use our own proprietary oligonucleotides, which are called co-primers.

Q.    Got it.  And so when you sell -- Just so that I understand the business, pre-COVID when you're selling a test kit for, say, Zika, you're selling a physical test kit; is that right?

A.    Yes.

Q.    Okay. And that's just -- that's the kind of

Page 23

kit that I guess somebody could open up and they could swab themselves and take it.  How does it work? What's within the test kit?

A.    The characterization you gave is not correct.

Q.    Okay.  So then walk me through that.

A.    A test that's used in a mosquito abatement program involves a kit with several components.  And the customer utilizes the elements of the kit, which include a master mix and a -- combine that with the pathogen.  In this case, it would be ground-up mosquitoes.  And they -- they do a test to see whether or not the presence of something like West Nile virus or Chikungunya or something is present in the mosquito, utilizing our test as the -- sort of like a hunting dog.  It goes into the PCR reaction and identifies the actual presence of the -- of the molecule.

Q.    So where do they -- When you're testing mosquitoes for this, you're actually like -- How do you implement that test?  I mean, are you doing the test on a mosquito itself?  How does that work?

A.    We sell the kits to the people that do that themselves, so --

Q.    Right.

Page 24

A.    -- my understanding of it is that they set traps and capture mosquitoes out in the field.  Then they grind them up so that they can get them -- They try and isolate what they're trying to interrogate; and they put them into the PCR machine, which then does the PCR reaction, which is a thermal cycling exercise.

Q.    Understood.  So these are not -- So, again, pre-COVID, these are not tests that are taken by individuals who may suspect that they have Zika or tuberculosis.  You're testing mosquito populations through these tests, right?

A.    In that particular case, yes.

Q.    Before the pandemic, were there -- was Co-Diagnostics selling any PCR tests that were actually used on humans?

A.    CODX has done a number of different tests for humans, and I -- I don't know the exact dates that we would have been doing all these tests but they include tests either we had developed or that our joint venture in India had developed.  And there's a range of -- of tests that we -- that we manufactured with the intent to provide to the population of humans on the planet all around the world.

Q.    So before the pandemic, were you -- was --

Page 25

Co-Diagnostics, did it have regulatory approval to sell PCR tests that were to be taken by individuals?

MS. OSTLER:  Objection.  Vague and ambiguous.

A.    We did not have FDA clearance of an IVD at that time.

Q.    What's an IVD?

A.    It's an in vitro diagnostic.  It's the kind of diagnostic that you would use if you're going to test a human population.

Q.    Got it.

A.    And through that period, I mean, we were developing all kinds of tests, you know, lots of different pathogens, some here, some in India.  Some we received approval at the European Union level, a number through the CDSCO in India; but I can't tell you, just sitting here, what tests were available on what date.

Q.    Got it.

A.    I just don't recall that.

Q.    But you're saying that before the pandemic, you -- you -- you did have approval, regulatory approval, to sell what you've described as IVD tests?

MS. OSTLER:  Objection.  Vague.

A.    I just don't know the date that we had IVD

Page 26

tests, because we've gone through a number of different regulatory approvals in Europe and in India, so --

Q.    So you're saying it's possible that it might have been -- you might have gotten those approvals after COVID; and you don't remember the date, basically?

A.    Or before.  I just can't tell you, sitting here, when we had what approval.

Q.    Understood.

When did COVID begin to -- when did CODX --

MR. PINEIRO:  And -- and, Miss Court Reporter, so we'll use an abbreviation for the company Co-Diagnostics, which is C-O-D-X, CODX.

BY MR. PINEIRO:

Q.    When did CODX begin exploring, entering the COVID testing market?

A.    We began on the 20th of January, 2020 -- 2019.

Q.    And whose idea was that?

A.    I had heard of a -- a disease that was coming out of China.  And we were getting ready to make a presentation a week later to the Task Force for Global Health in Atlanta, who provides testing for things like neglected tropical diseases.  So they had

Page 27

put together a meeting where we were -- they were going to have us make a presentation about our patented proprietary CoPrimer technology and how it might relate to their constituents.

And so in preparation for that meeting, and thinking about what are we going to show them, I thought the best thing we could do is show them how we could make a test for this new pathogen that was coming out of China as we perceived it at the time.

Q.    You said January 20?

A.    Yes.

Q.    2020, right?  Not 2019.  It would have been 2020, not 2019.

A.    No.  It was 2019.  January 20, 2019.

Q.    So a year before the pandemic?

A.    Well, the pandemic was raging during 2020.

Q.    Okay.  I probably have my dates wrong then.  Okay.  I thought it was January, 2020.

Okay.  So then who's -- who is Brent Satterfield?

A.    Brent Satterfield was the person who invented the technology of co-primers and some others as well, but the CoPrimer technology is the technology that we used in this particular test for COVID.

Q.    And did you consult with him, I guess, when

Page 28

deciding that the company would be -- would explore a COVID test?

A.    Yes.  I mean, Brent was the chief scientific officer of the company at the time.

Q.    So who -- Besides Brent who else was involved in the conceiving of this test, this COVID-19 test?

A.    Well, on the 20th is when I gave the order to our staff here in Salt Lake City to engineer a test for the -- what was then called the coronavirus.  It hadn't yet been named COVID-19.

MR. WASHBURN:  Can I come back really quickly?  You and he exchanged over the year.  Are you saying it was January 20, 2019, that you instructed them to start a test for the coronavirus that, as far as I know, didn't originate in the world until October of 2019, or was it January of 2020?

MR. PINEIRO:  I just think the date, I think he's off on the year.  I mean, I think for purposes -- it's not that important.

MR. WASHBURN:  Okay.

MS. OSTLER:  Well, let's let the witness answer.

MR. PINEIRO:  Sure.

Page 29

BY MR. PINEIRO:

Q.    So it's your understanding that the pandemic began in January, 2019, or it was raging?  It was -- By then you were hearing rumblings of the pandemic in January, 2019?

A.    Let me just think for a second.

Q.    Let me come back to that.  It's not a memory test.  I will show you documents that will refresh your recollection.

A.    Well, assume that it's the end of 2020; and January, it's -- It would be January 20 of '20.

I'd have to look at a document --

Q.    That's okay.  I'll show you some documents.

A.    -- to be clear.

Q.    You said that you instructed your staff here in Salt Lake to begin engineering a test?

A.    Yes.

Q.    And which staff are you referring to?

A.    Our whole management staff.  It includes our lab personnel.

Q.    How many -- how many -- how many employees does Co-Diagnostics have?  At that point in time, how many employees did it have?

A.    At the end of 2019, I think we had 27, roughly.

Page 30

Q.   And how many of those were based out of Salt Lake?

A.   Most of them.

Q.   Most of them.
     On the science side in terms of the lab personnel, how many -- Out of the 27 people, how many are comprised of lab personnel?

A.   I don't know the exact number of what that would be.

Q.   So when -- when did you -- when did the company first realize that it was going to be able to successfully prepare or develop a COVID-19 test?

A.   Well, we had developed a very sophisticated piece of software, which we referred to as CODX design at the time, that enabled us to take a target piece of DNA, like a COVID virus, and design, utilizing this software, which could go through thousands or millions of iterations, if need be, to find the best combination of -- of component parts to make the test. It would interrogate things like the length of the primer and the probe and the tethered anchor and where on the target DNA of the organism that we wanted to identify its presence.

Q.   And that's because these -- the PCR test for COVID targets certain RNA strands in the virus to

Page 31

identify that it's present in the sample?

A.   Yes.  It involves a reverse transcriptase that turns, basically, the RNA into a DNA comparable.

Q.   So in developing this test, was there a big rush to try to get it to market?

     MS. OSTLER:  Objection.  Vague and ambiguous.

A.   Was there a big rush to get it to market?

Q.   Yes.

A.   We developed the test so that we could show the Task Force for Global Health what we could do with our technology.  Coronavirus had just begun to be even known about in terms of its coming out of China and infecting people.

Q.   Uh-huh.  But -- but from a company perspective, I have to assume that the company wanted to get its product out first in the market given the potential opportunity, right?

A.   Of course, we always want to get our products into the market; but we had no aspiration at that point, for example, that we would have a product for the United States, because, you know, FDA clearance was a time consuming and expensive process.

Q.   But once -- once you realized that this COVID-19 pandemic might be coming to Europe, to the

Page 32

United States, at that point in time, the company's goal was to sell the test in the U.S. and the European markets, correct?

A.   I'm sorry.  Give me the question.

Q.   The company's objective was to sell the test into the U.S. and European markets, correct?

A.   I think that would been aspirational at that point, yes.

Q.   When did it -- when did it -- when did it become more of an actual objective that you were training on?

A.   After we had finished our principal design work, which would have been shortly after I asked for the design work to be done, the coronavirus and the proliferation of it was gaining a lot of steam.  So through that period, we developed plans for potential commercialization, which would have required, because it would have been an IVD, that it be cleared by appropriate regulatory bodies.

Q.   When did you begin to develop plans for commercialization?

A.   Well, just through that period.

Q.   What period is that?

A.   From when we did the principal design work to when we actually had a test that we could put

Page 33

before a regulatory body with appropriate validations.

Q.   Did you -- did CODX view this as a very unique opportunity -- market opportunity for itself?

A.   We had no idea what kind of opportunity it was going to present.

Q.   You didn't view this, this global pandemic where there was going to be PCR testing, as a unique opportunity for the company given its technology?

A.   Like I say, it was aspirational; but we had -- we had no idea in the beginning whether this was going to have a pandemic status, whether it was going to be a passing fancy.  We had no idea of that.

Q.   And do you recall when you first got the CE mark from the European Union?

A.   It would have been in February.

Q.   You don't remember when particularly?

A.   I'm thinking it was about the 23rd, but I don't know exactly off the top of my head.

Q.   So you told me that by -- starting in January 20th, you, basically, conceived an idea of developing this test; and almost a month later, you already have the CE mark from the European Union.  Is that -- is that fair?

A.   Can we go off the record for just a second so that we can -- I want to get this date thing --

Page 34

Q.      That's okay.  You know what --

A.      You're asking me dates, about specific dates.

Q.      That's okay.  I'll show you a document.  We can -- we can move on.

A.      Can we do that now so that I can speak --

Q.      No.  I'll withdraw the question.

A.      All right.

Q.      I'll get to it.

        You developed this test fairly quickly.  Is that fair to say?

A.      We did.  That's what our technology has the capability of doing.

Q.      Had you ever developed -- Prior to COVID-19, had you ever developed a PCR test as quickly as this one?

A.      In our design software we design -- Anything we had designed would have been done rather quickly.

Q.      That doesn't answer my question.

A.      But I can't -- I don't know the answer to whether all the other tests that we had worked on or created, whether they were done in the same time frame.

Q.      You're not aware whether the other PCR tests that you had developed and were selling were developed

Page 35

as quickly as the COVID-19 test?

A.      You're talking we did a Zika test.  That would have been developed, I would say, in about the same time frame as -- as the COVID test.  So I mean, that was the -- One of our distinguishing features of our company was the ability to, you know, provide a design work for a test rather rapidly.  It's one of our distinguishing features as a company.

        MR. PINEIRO:  This is a copy for you.  This will be Exhibit 1.

                 - - -

        And, thereupon, Egan Exhibit No. 1 was marked for purposes of identification.

                 - - -

BY MR. PINEIRO:

Q.      Mr. Egan, we're showing you -- I'm showing you what's been marked as Exhibit 1 for the deposition.  If you want to just quickly scroll through it.

        Are you familiar with this document?

A.      A little bit.

Q.      Okay.  What are we looking at here?

A.      We're looking at a description of the Logix Smart SARS-CoV-2 test kit.

Q.      Okay.  And if you go to the second page of

Page 36

that, it describes the test.  Do you see that, where it says, "The Logix Smart SARS-CoV-2 test kit is an in vitro diagnostic."  Do you see that?

A.      Uh-huh.

Q.      And that's what you were describing earlier, the in vitro.  What does -- what does in vitro mean, just so that I understand?

A.      I'm not going to be able to give you a scientific definition of that.

Q.      To the best of your knowledge.  I know you're not a scientist.

A.      It's just a class of test that has to be done in order to test human beings.  It would probably apply to other types of, you know, living things, as well; but it's a specific designation of a test that's used to test human beings.

Q.      And can you describe what the CoPrimer technology is?  I know you've addressed it, sort of.

A.      Well, the CoPrimer technology is a technology that combines several components.  It combines a primer and a probe, and they're connected together with a -- what we call a linker.  It could be made out of different substances, but generally it's made out of polyethylene glycol.  So we refer to it sort of generically as a PEG linker.  It's a single

Page 37

molecule, and it is the molecule that we use in our tests as sort of the fundamental underpinning of our real-time PCR process.

Q.      And it says here that -- that it "uses the CoPrimer technology for the qualitative detection of two genes, gene RdRp and Gene E" -- do you see that? -- "from the RNA of SARS-CoV-2."

        Do you see that?

A.      I see it, yes.  I thought you were talking to her.  Sorry.

Q.      So this test in particular targets these two genes; and upon identifying those two genes, the CoPrimer technology will identify whether somebody is positive for COVID or not?

A.      Well, the purpose of the molecule is to, you know, be placed into a PCR reaction, which involves a thermal cycler that heats it up and cools it down.  The DNA target is denatured, and the probes and primers connect to the single strand of DNA in that case to identify the presence of, say, something like COVID-19.

Q.      Has CODX's test always targeted those two genes, RdRp and gene E?

A.      No.

Q.      So when did that change?

Page 38

A.    During -- At a certain point during the pandemic.  I'm not exactly sure where -- when.  There was a -- certain areas of the world that wanted to have two genes interrogated instead of one.

Our original test design, utilizing our technology, identified the RdRp gene as the primary target that would be of the most concern, least likely to have mutations, that sort of thing.  So originally it was a single target.  But we made a two gene target available for people in different parts of the world that wanted to use two genes instead of one.

Q.    So just to understand, at the beginning of the pandemic, when you -- when you obtained, you know, approval to sell your tests in the U.S. and Europe, the test that was being sold only targeted the RdRp gene?

A.    It's my understanding.

Q.    Okay.  When did you develop a test that targeted two separate genes?

A.    A little later on.  I don't know the exact date of that.

Q.    And at this moment in time, do you sell -- Are there two versions of your test at this moment in time where you target one gene versus two genes?

A.    Yes, there are.

Page 39

Q.    And are there customers who want one versus the other.

A.    Yes.  Some are happy with one gene.  The customers are looking for ease of use and what gives them the results they want.  So it's really up to the customer what they want.

Q.    So -- And so by -- Why is it -- Is the test more accurate if it's targeting two different genes?

MS. OSTLER: Objection. Ambiguous.

A.    You'd have to ask a scientist that question.  When you say something is more accurate, I mean, if you detect the virus with RdRp or you also detect it because it has RdRp and E, you know, they're both positive indicators.

Q.    If a tests -- if a test targets two genes, does that improve the specificity of the test?

A.    I don't -- I don't know the answer to that.

Q.    Okay.  Does targeting two genes improve the sensitivity of the test?

A.    I likewise would not be able to answer that.

Q.    Okay.  Is it a more rigorous -- Do you consider -- Do you consider it to be a more rigorous test when it targets two genes instead of one?

MS. OSTLER: Objection. Ambiguous.

A.    I don't necessarily consider that to be

Page 40

more -- Is it accurate you're looking for?

Q.    Rigorous, accurate, sure.

A.    Rigorous.  I don't -- I think you need to talk to one of our scientists with respect to getting definition about what you think is a more robust interrogation of the PCR process.

Q.    You're familiar with Abbott Labs COVID test?

A.    No.

Q.    No?  Do you know whether -- Strike that.

We were chatting a little bit about sensitivity, the sensitivity of a COVID-19 PCR test.  What is your understanding of what sensitivity means?

A.    I understand it to mean -- Again, I'm not a scientist.  I would understand it to mean the level of pathogen that would have to be in the sample for a test to detect it.

Q.    So the amount of -- the amount of the virus effectively in the sample?

A.    Yes.

Q.    So a test that is more sensitive is able to detect a positive result with a lower amount of viral load?

A.    I think that's correct.

Q.    Okay.  How -- how -- how familiar are you with the science behind the test?

Page 41

A.    Not particularly.  I mean, I'm not a scientist.

Q.    And what's your understanding of what the limit of detection of a test is?

A.    Well, just as I just said, how -- what's the limit at which the test is able to pick up the presence of the virus given the viral load.

Q.    But those two terms are used separately, right?  Sensitivity is different than limit of detection; is that correct?

A.    I can't answer that.

Q.    You don't know?

A.    (Witness shook head.)

Q.    It's your understanding that they're the same concept?

A.    Related, yeah.

Q.    Okay.  And do you know how they're related?

A.    Not particularly.

Q.    Do you know how they're distinct?

A.    No.

Q.    What is your understanding of what specificity means?

A.    Specificity, in my understanding, is the ability of the test to identify the presence of the target that you want to identify rather than being

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 42..45

Page 42

confused and identifying other pathogens that might also be in the sample. So, typically, when the test is being validated, it's being validated against a number of other pathogens that are -- that are also present in the sample; and if our test indicates that they're present, then that would be a lack of specificity, because it's detecting things other than the target that we're after.

Q. So with respect to sensitivity, it's a matter of false negatives. Is that fair? It's dealing with the prospect of a false negative because the test isn't sensitive enough to pick up what should be a positive result?

MS. OSTLER: Objection. Misstates prior testimony. Assumes facts.

BY MR. PINEIRO:

Q. I'm asking. Is that your understanding?

A. You're asking me scientific questions that I'm not going -- I'm not going to be able to give you an answer for because I don't --

Q. I understand, but you're -- You know more than me, so I'll tell you that.

A. I don't understand the question that you're asking.

Q. So the question is when it comes to

Page 43

sensitivity, you were just saying it pertains to the amount of virus required by the test to provide a positive -- to indicate a positive result, right? And so the issue is a more sensitive test will have less false negatives. Is that fair?

A. Again, I really want to point you to a scientist to answer a scientific question.

Q. Okay. So you don't know the answer to that?

A. I could guess. I don't want to guess.

Q. Okay. But you've authored press releases that mention and use the phrase -- Strike that.

You've authored documents or approved of documents issued on behalf of the company that discuss the sensitivity levels of the COVID test, right?

MS. OSTLER: Objection. Compound. Assumes facts. Ambiguous.

A. That would have been something that was verified by our scientific team.

Q. Well, I understand; but you're -- I'm asking you a very basic question about sensitivity, and you're indicating here today that you don't -- you're not -- you don't feel capable of answering a question about whether it pertains to the kind of false negatives that you would get?

MS. OSTLER: Objection. Argumentative.

Page 44

Ambiguous.

A. I'm telling you I can't give you a scientific answer. Our scientists do that. They do the validations and the verifications.

Q. Okay.

A. I don't go in the lab and conduct those experiments. So when I look at a table that comes from either an internal or external group of scientists that say this is the LoD or this is the sensitivity or specificity, that's what I have to rely on.

Q. But do you understand the implication of having a more or less sensitive test?

A. Generally.

Q. Okay. So what's the implication of having a less sensitive test?

A. The patient may be infected, but you wouldn't be able to pick it up.

Q. That's a false negative, right?

Do you understand what the phrase "false negative" means?

A. I'm -- Yeah, I believe I know what that means.

Q. Okay. So what you've described is a false negative, right? It's a test that demonstrates that

Page 45

you're negative when you're not.

A. Right.

Q. So for now on, I'll just use that -- Again, I'm not a scientist, so if that nomenclature is not perfect, I apologize. But now, for now on, I'll just -- I'll be using that phrase throughout, right, to describe a test where somebody who is positive for COVID is showing as negative.

A. Okay.

Q. Fair?

And with respect to the limit of detection -- I guess a related question -- is it fair to say that the higher the limit of detection, that means your test is less sensitive, right, because you need more viral load. Is that fair?

MS. OSTLER: Objection. Compound. Ambiguous.

A. Generally, I would agree with your assessment.

Q. Okay. So similarly if you have a -- a higher limit of detection, what that means is that that may impact having certain false negatives, right?

A. Right.

MR. PINEIRO: Just give me one second.

MS. OSTLER: I take it you're finished with

Page 46

1?

MR. PINEIRO:  Yes, I am.  You can -- you can store that away.

So this will be Exhibit 2.

- - -

And, thereupon Egan Exhibit No. 2 was marked for purposes of identification.

- - -

MR. PINEIRO:  Brandon Floch on behalf of the plaintiffs has also been attending by phone.

BY MR. PINEIRO:

Q.    I'm showing you a document that's been marked Egan 2.  The cover page is an E-mail from Jennifer Webb to you and some other folks.

Do you see that?

A.    Uh-huh.

Q.    Who is Jennifer Webb?

A.    Jennifer worked for a company called Coltrin & Associates, which is our public relations firm.

Q.    Okay.  Are they still your public relations firm?

A.    Jennifer Webb has a new firm, Coltrin Method, incident to the passing of her father several months ago.  So she -- she's still our public

Page 47

relations representative with a new firm.

Q.    Did you pay the Coltrin company through providing them with shares or warrants?

MS. OSTLER:  Objection.  Ambiguous.  I just want to make it clear when you're saying "you" --

BY MR. PINEIRO:

Q.    Sorry.  CODX.

A.    They were paid in a package that included both cash remuneration and some options.

Q.    Do you recall how many options you provided them?

A.    No.

Q.    So she writes, "Ike" -- And just to be clear, that's -- you go by the name Ike?

A.    Uh-huh.

Q.    "Ike, attached" -- So the date of this E-mail is July 31, 2020.

"Attached is the FAQ that has been discussed.  Brent and Andrew have reviewed the document and made their changes, which are included in this version."

Brent is a reference to Brent Satterfield?

A.    Yes.

Q.    And Andrew is Andrew Benson?

A.    Yes.

Page 48

Q.    So "I don't think we have your final sign-off on this version and wanted to make sure you are comfortable with it."

So if you go to the next page, it's a FAQ Co-Diagnostics.

Have you ever seen this document before?

A.    I believe so.  Haven't reviewed it in -- for a long time, but --

Q.    Do -- do you recall why this document was prepared?

A.    I think it was prepared to just provide a frequently asked question resource for inquiries from the media.

Q.    Was this document prepared in response to the lawsuit that we filed here?

A.    I don't know.

Q.    Okay.  And do you know whether this was ultimately published or disseminated by CODX?

MS. OSTLER:  Objection.  Vague.  Ambiguous.

A.    I don't know to what degree it was published or whether it appeared on the website or whether it was just used by Jennifer in her discussions with outside media.  I don't know.

Q.    Is that something that -- that Mr. Benson would know because he's in charge of --

Page 49

A.    He would maybe have a better idea about it.

Q.    Okay.  So if you go to the second page, there's a section that is called, "What is limit of detection?"  And it says, "The limit of detection or LoD is a measurement used as a baseline representing the lowest number of copies of the pathogen that need to be present in a sample for the diagnostic to detect a positive under the conditions of a particular evaluation."

Do you see that?

A.    Yes.

Q.    And it says, "Reporting on the topic has used Co-Diagnostics' LoD from the company's emergency use authorization submission incorrectly, falsely assigning it as evidence to support" --

A.    I don't know where you're reading.

Q.    Sorry, the second bullet, under Limit of Detection.  "Reporting on the topic as used" -- do you see that? -- "Co-Diagnostics'" --

MS. OSTLER:  I don't see that either.  I saw you pointing with your finger, but --

A.    The first bullet made sense to me.

Q.    Hold on.  Maybe we got crossed up.  Give me a second.

Okay.  Got it.  Yep.  I'm looking at the

Page 50

wrong document.  Sorry.

So the next bullet says, "The limit of detection is used to predict test sensitivity but does not supersede the measures of sensitivity and specificity -- the actual performance of the test."

Do you see that?

A.    Uh-huh.

Q.    Do you understand how limit of detection predicts test sensitivity?

A.    I don't -- I don't understand those to a degree that I can opine about it.

Q.    Got it.

And so then if you go to the next section, it says, "What do the terms of Sensitivity and Specificity reference?"

And it says, "Sensitivity refers to the percentage of positives correctly identified by the diagnostic test in a particular study when the samples are known positives and negatives."

Do you see that?

A.    Yes.

Q.    And then the third bullet says, "No test is 100 percent sensitive or specific in every environment."

Do you see that?

Page 51

A.    Uh-huh.

Q.    What does that mean?

A.    I think it speaks for itself.  When it talks about an indication of concordance between tests, it means that a test, when compared to some other standard, that when the results are -- are compared every time the standard says it's positive, the other test has to say positive; and conversely, if it says it's negative, it has to say that it's negative.

Q.    Well, what you're describing is a validation study, isn't it?

A.    I don't know whether that's a validation study.  I just know that that's a study that uses concordance as its measurement of whether it's 100 percent.

Q.    So a concordance study is when you take your test and you compare the positives and negatives versus the positive and negatives of some other test?

A.    Yes, or of a sample that is known to be positive or negative before they're subjected to your test.  So kind of like in a blinded study, where somebody sends, "Here's 30 samples.  You tell us whether they're positive or negative."  And that would be a --

Q.    So that's called a concordance study?

Page 52

A.    I think it would be involved in a concordance study.  Do we come up with the same answer that the other -- you know, a standard test would come up with.

Q.    What is -- Is that any different than field testing?  It's a phrase I've seen used throughout.

A.    I don't know.

Q.    So when you say no test is 100 percent specific -- sensitive or specific in every environment, what do you mean by every environment?

MS. OSTLER:  Objection.  Misstates his prior testimony.

MR. PINEIRO:  No, no.  I'm literally reading --

MS. OSTLER:  But you're saying "when you say."

MR. PINEIRO:  Sorry.  CODX.  I apologize.  I keep doing that.

BY MR. PINEIRO:

Q.    So what did CODX mean by that?

MS. OSTLER:  Objection.  Foundation.

A.    I think it means just what it says.  No test would be 100 percent sensitive or specific in every environment, but a scientist would have to tell you the types of environments in which that could be

Page 53

compromised.

Q.    All right.  So it's fair to say that if anyone says that their test is 100 -- is always 100 percent specific or sensitive, that's -- that can't be true?

MS. OSTLER:  Objection.  Ambiguous.  Assumes facts.

A.    Well, in every environment I would say that, yeah, that wouldn't be true.

Q.    Do you know what the -- what are the environmental factors that may impact sensitivity or specificity of a test?

A.    I don't know --

MS. OSTLER:  Objection.

A.    I don't know how to answer that.

Q.    You're not aware of the factors that can impact sensitivity or specificity?

A.    Well, a scientist would have to do that.  I don't work in the lab, and I'm not a scientist.

Q.    I understand.  I'm not asking you to provide any expert opinion here.  I'm saying as the CEO of this company, do you have an understanding of what environmental factors may impact sensitivity or specificity?

MS. OSTLER:  Objection.  Asked and answered.

Page 54

Argumentative.

A.    I could point to things that I could conjecture would impact it: How old the sample is; how, you know, it was transported from where the sample was taken to the lab -- that might impact whether or not it would be, you know, sensitive or specific -- whether it's become contaminated; whether the lab is clean; those sorts of things. But a scientist would have to tell you what other factors could be taken into account.

Q.    So if you go to -- I think it's the next page. There's a section called, "The FDA has said that no test is accurate all the time."
      Do you see that?

A.    Uh-huh.

Q.    Okay.

      THE VIDEOGRAPHER:  Mr. Egan, your arm.

      MS. OSTLER:  Oh, you have to be careful about not covering your mic. You can clip it higher, if you want.

      THE WITNESS:  I'll be careful.

      MS. OSTLER:  Okay.

BY MR. PINEIRO:

Q.    So then on the second bullet, it says, "A diagnostic may perform in one environment and show 100

Page 55

percent sensitivity and 100 percent specificity, which would mean it correctly identified every positive and negative result of the prepared samples, or else correctly identified every positive sample and every negative sample against the standard."
      Do you see that?

A.    Yes.

Q.    That's what you've described just a moment ago in terms of the concordance test?

A.    Uh-huh.

      MS. OSTLER:  Ike, I should just tell you --

      MR. PINEIRO:  Yes.

      MS. OSTLER:  Yeah.  It's hard for the court reporter.

      MR. PINEIRO:  Thank you.

      The last bullet point --

      Oh, sorry, I always do that.

BY MR. PINEIRO:

Q.    The last bullet of that section, "Likewise, Co-Diagnostics has never claimed that its COVID-19 diagnostic test will always be 100 percent sensitive or specific in every setting in every instance."
      Do you see that?

A.    Yes.

Q.    Okay.  That appears to be addressing the

Page 56

May 1, 2020, press release that's at issue in this lawsuit, right?

      MS. OSTLER:  Objection.  Argumentative. Assumes facts.  Calls for speculation.

A.    I don't know whether that was done in reaction to the lawsuit.

Q.    Okay.  It appears to address the allegations in this lawsuit, though, where we -- where it's alleged that the press release was misleading regarding the accuracy of the test?

      MS. OSTLER:  Objection.  Argumentative. Ambiguous.  Assumes facts.

A.    I don't know that it was done as a reaction. It may -- it may address an issue that's an issue in the lawsuit; but I mean, I think the answer here is -- is just, again, it speaks for itself.  That's the way it works.

Q.    So once you receive the appropriate regulatory clearances, how does Co-Diagnostics sell the test, market the test?  Who does it market it to?

      MS. OSTLER:  Objection.  Compound.

A.    Well, once we are -- once we're cleared to sell a test by an appropriate regulatory body, then those conditions are -- and those conditions are met, the company is then free to market it through

Page 57

solicitations, through E-mails, through calls.

Q.    But who are your customers?  Like are you selling to distributors?  Are you selling to labs? Like what does your customer base look like?

      MS. OSTLER:  Objection.  Compound.

A.    It can be both of those.  It can be to a distributor, who then sells to labs; or it could be directly to a lab.

Q.    And the distributors, do you provide them some type of license or geographical territory where they're authorized to -- to sell the tests?

A.    Generally speaking, in the United States, we do not provide people with territorial exclusivity. They could just use it in their lab.

      In the international market, it was more common for us to use a distributor because of our nonfamiliarity with the territory.

Q.    So you're saying in Europe you were working with some distributors, in the U.S. less so?

A.    Yes.

Q.    So in the United States, who were your main customers that you were supplying tests to?

A.    They would have been CLIA labs.

Q.    CLIA, C-L-I-A?

A.    Uh-huh.

Page 58

Q.    And what is a CLIA lab?

A.    It's a lab that's -- that's certified to perform high complexity tests.

Q.    Got it.  So at some point, CODX had a relationship with Nomi Health, for example?

A.    Yes.

Q.    And so is Nomi a CLIA lab?

A.    I'm sure they have a CLIA lab status, yes.

Q.    Besides CLIA labs in the -- in the United States, are there any different categories of customers that you would provide the test to?

A.    I don't believe so.  I think in the main it would -- it would have to be, you know -- We don't just sell tests to any -- any lab --

Q.    Right.

A.    -- you know.  So they would generally be a CLIA lab, which means they've been certified.

Q.    And I mean, you broadly described the kind of marketing efforts that you would use; but I mean, is there -- Who is in charge of marketing the test to these labs?

A.    We have -- we have several individuals in the company that are in charge of the marketing.  So they all have territories and customer relationships that they are responsible for.

Page 59

Q.    Is there -- is there somebody who is in charge of the sales team?

A.    Yes.

Q.    Who is that?

A.    Seth Egan.

Q.    Is that your son?

A.    Yes.

Q.    What's his official, I guess, title at the company?

A.    He's head of market -- head of sales.

Q.    And prior -- When did he become the head of sales of the company?

A.    Well, Seth was involved with the company from the get-go.  So many people in the company had multiple roles during its evolution, but he ultimately emerged as the person managing the sales team.

Q.    And do you recall in late January going -- appearing on television, CNBC, for example, and talking about CODX's test?

A.    Can you give me a date you're talking about?

Q.    January 28, for example, do you recall appearing on CNBC?

A.    Of what year?

Q.    2020.

A.    Do you see where I'm going with that?

Page 60

Q.    Oh, you're confused with the year.  Well, got it.  So okay.

A.    You're telling me we didn't have a pandemic in 2020.

Q.    No.  I'm saying it started in 2020.

A.    Well, I mean your colleague asserted that, which I think was very strange.

Q.    I'll show you a document.  Hold on.

MS. OSTLER:  Are you finished with No. 2.

MR. PINEIRO:  I am.  Thank you.

So this will be Egan 3.  This is PX5. Sorry.

- - -

And, thereupon, Egan Exhibit No. 3 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    So I'm showing you a document that's been marked as Egan 3.  This is an E-mail dated January 28, 2020, from Jennifer Webb to you, Seth Egan and some others.

Do you see that?

A.    Uh-huh.

Q.    And the subject is Top three -- "Top Three key points."

Page 61

"Ike," she writes, "Last point.  Say 'Co-Diagnostics' where you can rather than 'we' where possible so that everyone listening hears the company name.  Use long form Co-Diagnostics for the same reason.  Points you prioritized are below in short form for your reference."

Bullet number one:  "At Co-Diagnostics we have been able to produce a test at lightning speed."

Do you see that?

A.    Uh-huh.

Q.    So does that E-mail, given it's dated January 28, 2020, refresh your recollection that the, you know, pandemic and these -- your development efforts or Co-Diagnostics' development efforts began in January of 2020?

I can show you other documents.  It's not that important.  I'll show you other documents regarding the CE approval and, you know, other -- other approvals, and it will refresh your recollection.

There's a point that she writes, Sensitivity and specificity, she writes, "Able to eliminate false positives and false negatives."

Do you see that?

A.    I see that.

Page 62

Q.     Okay.  So you -- you recall discussing sensitivity, specificity and eliminating false positives and negatives in interviews with the media around this time?

A.     No, I don't.

Q.     Okay.  Who is Eugene Durenard?

A.     He's a member of our board.

MR. PINEIRO:  This is PX6 for you.

MS. OSTLER:  Thank you.  Can I just ask you, is this Egan 3 a document that was produced in the litigation?  It didn't have a Bates.

It's not that important.

MR. PINEIRO:  It might have been from prior counsel.

MS. OSTLER:  Okay.

MR. PINEIRO:  I mean, we don't have any E-mails besides what you guys have given us.

So this will be -- Is this Egan 3 or 4?

THE COURT REPORTER:  4.

MS. OSTLER:  You said PX6?

MR. PINEIRO:  Yeah.

MS. OSTLER:  Thank you.

                    - - -

And, thereupon, Egan Exhibit No. 4 was marked for purposes of identification.

Page 63

                    - - -

BY MR. PINEIRO:

Q.     So we're looking at Egan 4.  So just at the top, you see an E-mail from Mr. Durenard to you on January 29, 2020.

Do you see that?

A.     I do.

Q.     Below that there's an E-mail that you send at 1:09 on the same day to Mr. Durenard.

Do you see that?

A.     Uh-huh.

Q.     It says, "We expect the CoPrimers to be delivered in the next few days.  We will do our verification of their performance for a few days after that as this is highly prioritized in our workflow."

What -- what does verification mean?  Is there a distinction between verification and concordance?

A.     I don't know what -- the scientific differences between the two.  To me that just means our lab is verifying, you know, the -- that the test is working.

Q.     So when you used the term "verification," was that -- that was not like a scientific term of art?

Page 64

A.     That is correct.

Q.     And then you write towards the bottom, "Tomorrow I'm doing media events all day.  I'll update you when I get back Thursday."

Do you see that?

A.     Yes.

Q.     So were you doing a lot of media around this time?

A.     This was immediately after our meeting with the Task Force for Global Health, and I note that it's -- This is January of 2020, as I had represented to you before that the idea of making a COVID test was proffered in --

Q.     '19?

A.     In '19.  It's December of '19.

Q.     Right.  Oh, okay.  Got it.

So the idea of a COVID test, this -- this discussion we had earlier where you mentioned that you thought --

A.     Gave -- The order was on the 20th of December of '19.

Q.     Got it.  So it was the prior month, which makes sense --

A.     That is correct.

Q.     -- of -- of '19.  Got it.

Page 65

A.     Yes.  So to your question, was I doing media, this was a very fast and evolving situation with the coronavirus, so there were media requests from CNBC Asia, from Yahoo Finance, from Fox Business; and those were the three media events that were being referenced here.

Q.     Got it.

A.     In fact, it's just the two.  The CNBC Asia had been done two or three days earlier that week.

Q.     And from the company's perspective, why is it helpful to have you doing media appearances?

A.     Primarily because the media was asking us questions; and there was a lot of concern in the country and in the world about this new burgeoning pathogen, this coronavirus.  So we were -- we were involved in engineering a test, and so they wanted to know about it.

Q.     And does this also have the potential positive side effect for the company or impact for the company that it promotes and markets the company to the market; for example, to investors?

MS. OSTLER:  Objection.  Compound.

A.     Well, it would be our responsibility to inform the public about what's going on in the company.  It could take many forms, but doing a guest

Page 66

appearance on national cable networks is just part of that process.

MS. OSTLER:  Michael, you forgot to read the Bates number.

MR. PINEIRO:  Oh, sorry.  I'll give it to you right now.

MS. OSTLER:  Thank you.

MR. PINEIRO:  So for that document, it is -- The beginning Bates is -- ends in 3824.

MS. OSTLER:  Thanks.

MR. PINEIRO:  So this will be Egan 5.

MR. WASHBURN:  How are you doing?  We've been going an hour and a half.

THE WITNESS:  I'm doing great.  Thank you for asking.  I'm just fine.

MR. WASHBURN:  All right.

- - -

And, thereupon, Egan Exhibit No. 5 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.     I'm showing you what's been marked Egan 5, and the Bates on that is 21052.

This is an E-mail from Andrew Benson to you on February 2, 2020.

Page 67

Do you see that?

A.     Yes.

Q.     Okay.  And before that there's an E-mail from you at 11:47 to Mr. Benson that says, "Andrew, can you give me a sense for what your thought process is on the lab data?"

Do you see that?

A.     Uh-huh.

Q.     Do you know what you're referring to there?

A.     Let me look at this document.

Q.     Just let me know when you're ready, sir.

A.     Okay.  Go ahead.

Q.     So does -- Having read the E-mail more fully, do you recall what you were referencing there?

A.     I can see it in the E-mail.  I mean, it's a long time ago, so --

Q.     So it seems like the subject matter of your E-mail to Mr. Egan was "Press Releases, et cetera"?

A.     You mean to Mr. Benson?

Q.     I'm sorry.  To Mr. Benson, correct.

A.     Yeah.  We're talking about, it looks to me, like validation that's going on in the lab about our test.

Q.     And so it seems like you were asking Mr. Benson about the prospect of issuing a press

Page 68

release regarding the lab data?

MS. OSTLER:  Objection.  Foundation. Argumentative.

A.     That appears to be the discussion.

Q.     Okay.  And then Mr. Benson writes to you, "I think we should confirm with the science staff tomorrow.  I've never seen LoD" -- Does that stand for limit of detection?

A.     I believe so.

Q.     -- "published on synthetics before."

What does he mean by synthetics?

MS. OSTLER:  Objection.  Foundation.

A.     Well, at the time the -- our original COVID test was being developed; and this would be the same for pretty much everybody else making a test for COVID or coronavirus as it was called.  There were not actual samples available from laboratories or patients.  There wasn't just enough of it.  There were very few people that had contracted it.  And so any company that was involved in making a test had to do so using synthetic templates.  It's a very -- certainly extremely common at the time that -- when COVID came on the scene.

So Benson is saying to me this is done with synthetic templates, which is what -- That was an

Page 69

approved process from the FDA.  That's how these were being done.  And he was -- he was alerting me to the possibility that when the same test was done with actual real live viruses or real viruses, let's say, that maybe the results would be different.  There would have been no way of knowing at that point whether that was true or not.  So we were evaluating whether there was -- whether it was appropriate to talk about the results from synthetic template, even though that was an approved process and what everybody was having to use, because there was no availability of live viruses.

Q.     And then you say -- and then he says in the next paragraph, "We just announced the test has been verified."

Do you see that?  The next paragraph, first sentence.

A.     Yeah.  Yeah.

Q.     And, again, do you know what he's referring to when he says, "the test has been verified"?

A.     Well, I don't know what date we announced the test had been verified; but that means the laboratory had verified that the test was working, that it was in order.

Q.     And he writes, "Issuing a press release

Page 70

saying the same just feels like an excuse to issue a press release saying, 'Good news. Our tech is, in fact, as good as we thought it was.'"

Q. Do you see that?

A. Right.

Q. "I strongly recommend speaking with the science department all together before making a decision as to publicizing this data."

Q. Do you see that?

A. Yes.

Q. And did you -- Who normally put together the press releases? Strike that.

Who participated in preparing press releases that were issued by CODX?

A. At that time it would have involved -- And as to each individual press release, I can't tell you exactly who was involved on each of them; but it would involve Andrew Benson, because he was the head of investor relations, it would have involved me. So he would typically draft something that was being contemplated, and then we would have it looked at by counsel. We would also have it looked at by the scientific team.

We also had a consultant in New York by the name of Bill McCluskey, that, oftentimes, weighed in

Page 71

on press releases. It was -- it was a long process. It was carefully done. It involved usually hours and hours of back and forth and making sure that we thought things were represented properly and -- So it was not a cavalier process.

Q. So you said it would take hours and hours with respect to just one press release?

A. Yeah. So I mean, that's why Benson is saying we need to run this by the scientific team and see what they think about it.

Q. And what's the purpose of a press release?

A. Just to provide information.

Q. Is it to customers or to investors or both?

A. It could be whoever is reading the press. I mean, I think you have to put this in the context of an environment where, you know, our -- this pathogen is erupting in a very significant way. Everybody wants to know what's going on. Everybody. Investors, potential customers. It was a very frenetic pace of, you know, people wanting and needing information. So we were put in a position of having to provide accurate information as carefully and as timely as we could.

Q. And then at the bottom he says, "Also, look. We just released something 25 minutes before closing

Page 72

bell on Friday. We can let that breathe a bit before popping off another and still maintain our claim of working quickly."

Q. Do you see that?

A. Yeah.

Q. "Plus we may want to space them out so it's not all feast or famine. Four releases in a week and then nothing for five days just spooks shareholders and investors."

Q. Do you see that?

A. Uh-huh.

Q. So it seems like Mr. Benson is communicating to you that when it comes to these press releases, you're really looking to the reaction from shareholders and investors, correct?

MS. OSTLER: Objection. Calls for speculation. Compound. Vague.

A. I think Benson -- As I mentioned, this is a very fast moving target. You know, the world goes from a -- not even hearing about coronavirus to an environment where it's declared an international pandemic; and so news is working very quickly. And one of the -- one of the differentiating issues of our technology was our ability to produce a test with our CODX-designed software with significant interrogation

Page 73

in terms of the molecular process and the PCR process and have a valid product.

And that was the case here. And, of course, that caught the attention of lots of people, that this small company in Salt Lake City had technology that could produce a valid test quickly. It was one of the things that was, you know, part of our skill set; and it was new. Most companies would not have been able to produce something that quickly, at least historically.

Q. But what he says -- I mean, he, in particular, is talking about spooking shareholders and investors, correct?

A. Well, I think -- I mean, his note to me speaks for itself. He's saying this should arguably be done at a measured pace; and my main concern would have been that we're releasing information that is relevant and that it's material and that it's -- and that it's carefully considered.

Q. Right. But it appears that at least that what he's discussing here is a strategy in terms of press relations with shareholders and investors. That's his primary focus in this E-mail, correct?

MS. OSTLER: Objection. Calls for speculation. Argumentative. Ambiguous. Compound.

Page 74

A.    As a public company, the shareholders and investors are a primary constituent base to which we have to address.  I mean, that's why they're called shareholders.

Q.    Did you have a -- At this point in time, did you have a strategy with respect to -- Did CODX have a strategy with respect to issuing press releases on a frequent basis in order to, you know, frequently be informing shareholders regarding developments?

A.    No.  It was an evolving process.  There was certainly no strategy of saying we are going to do this many press releases.  It was strategy driven by facts and circumstances, and those facts and circumstances were changing rapidly.

Q.    And so do you -- are you aware of how many press releases you issued just in the first half of 2020, for example?

A.    No.

Q.    If I told you it was approximately 40 press releases, would that surprise you?

A.    No.

Q.    Is that an abnormally high amount of press releases?

A.    I think in the normal course that could be considered high, but not in the conditions under which

Page 75

we were operating, which was a global pandemic and a national health emergency.

Q.    Are you aware that Mr. Benson has a spreadsheet that tracks every press release that's issued by CODX.

      MS. OSTLER:  Objection.  It assumes facts.

      MR. PINEIRO:  I'm asking whether he's aware of it.

      MS. OSTLER:  Objection.  Calls for speculation.

A.    I don't know that I've ever seen that spreadsheet.

Q.    Okay.  Have you ever --

A.    It wouldn't surprise me that Benson keeps one, but --

Q.    And have you -- have you ever seen, whether it's his spreadsheet or someone else's, a spreadsheet of all the different press releases that have been issued, the dates of all the press releases?

      MS. OSTLER:  Objection.  Compound.

A.    I have seen what was -- is published on our website in terms of press releases.  I really don't count them.

Q.    You're not familiar with this document that I've described?

Page 76

A.    No.

      MS. OSTLER:  Objection.  Asked and answered.

Q.    And in that same spreadsheet, he's also tracking not only the press releases, but the -- he's tracking the stock price including -- based on, you know, following the issuance of the press release?

      MS. OSTLER:  Objection.  It assumes facts not in the record.

Q.    Are you aware --

      THE COURT REPORTER:  Wait a minute.  One at a time, please.

      MR. PINEIRO:  Sorry.  Go ahead.

      MS. OSTLER:  Well, now I don't know which question is pending because you started a new --

      MR. PINEIRO:  Let me just finish, and then you can get your --

      MS. OSTLER:  Okay.

BY MR. PINEIRO:

Q.    Are you aware of -- of that information in this spreadsheet?

A.    I don't --

      MS. OSTLER:  Objection.  Assumes facts not in evidence.  Argumentative.  Vague.  Ambiguous.

A.    I don't remember ever seeing such a document.

Page 77

Q.    Okay.  Is one of the reasons that you issue so many press releases is to help the stock price improve?

      MS. OSTLER:  Objection.  Misstates prior testimony.  Argumentative.  Ambiguous.

Q.    You can answer.

A.    I don't think anything we would have done in a press release would have particular impact upon the market in terms of the stock price.  I mean, we had no -- no ability to influence stock price with a press release.

Q.    So it's your position that investors don't rely on press releases in making decisions to buy and sell shares?

      MS. OSTLER:  Objection.  Calls for speculation.  Lacks foundation.  Ambiguous.

A.    They may use it for that, but that's not the reason we promulgate a press release.  We promulgate a press release to inform them.  They'll have to make a decision whether they use that to trade in the market.

Q.    What about if there's damaging information out in the marketplace?  Do you use press releases to remedy any concerns investors might have?

      MS. OSTLER:  Objection.  Incomplete hypothetical.  Assumes facts not in evidence.

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 78..81

Page 78

Ambiguous.

A.    To the extent there was something material that needed to be released that way, then I can see that we would want to do that.

Q.    So it's not just about informing them. It's also about mitigating any damage to the share price when there's negative information out there, correct?

MS. OSTLER: Objection. Misstates prior testimony. Incomplete hypothetical. Calls for speculation. Compound.

A.    We were not issuing press releases to, you know -- to respond to a barometer of stock pricing. The volatility in stock price at Co-Diagnostics was not something that was going to be mitigated by press releases.

Q.    It was a very volatile stock, right?

A.    It was.

Q.    It's still a volatile stock?

A.    Not so much.

Q.    What's it -- what's it trading at now?

A.    About a buck sixty.

Q.    And during the pandemic, what was the high on the -- on the shares?

A.    I think the highest trade was around $30.

MR. PINEIRO: This is Egan 6.

Page 79

- - -

And, thereupon, Egan Exhibit No. 6 was marked for purposes of identification.

- - -

MR. PINEIRO: Michael Fascano, plaintiff's co-counsel, is also, I guess, listening in on the phone.

BY MR. PINEIRO:

Q.    I'm showing you a document that's been marked Egan 6. Towards the bottom of the document, there's an E-mail from Madison Stark to Joseph Featherstone. You're copied on that.

Do you see that?

A.    Uh-huh.

Q.    Who is Madison Stark?

A.    She was one of our lab personnel.

Q.    And who's -- who's Joseph Featherstone?

A.    He's our head of business development.

Q.    And so if you just go through the E-mail, she says, "Hi, everyone. Apparently the images weren't visible in my original E-mail. I'm not sure why. I've never had that happen before."

And then if you flip to the next page.

A.    Let me -- let me catch up with you here.

Q.    Sorry. It's like -- I don't know -- there's

Page 80

a --

A.    Is it before or after the graphs?

Q.    Before the graphs she writes, "Also Ike asked about the LoD, which is 6.75 copies per 5uL reaction, which is 1.35 copies per uL. Please let me know if everyone needs more information about this."

Do you see that?

It's probably the second page. Yes, there you go, right at the top. Do you see that?

A.    Okay.

Q.    Okay. And then if you flip back to the first page -- sorry -- you write, "Madison, thank you for this info. As to the LoD issue, is that a good LoD? Is it exceptional? Is it normal? Is it barely passing?"

Do you see that?

A.    Yep.

Q.    Why were you so concentrated on the LoD?

MS. OSTLER: Objection. Assumes facts. Argumentative.

A.    I'm -- I -- I'm just asking how -- In my mind I'm asking how is the test performing. You know, you've done the -- you've done the validation of this test. It's February 2. What is the -- How is this test looking?

Page 81

Q.    Right, but I mean, you're specifically asking about limit of detection, correct?

A.    Right.

Q.    And why is that --

A.    I obviously don't know a lot about limit of detection because I'm asking her is it good, is it exceptional, is it normal, is it barely passing. I'm asking one of my lab technicians does this look okay.

Q.    I understand, but why is this the thing that you're focused on in your E-mail?

A.    It's one of the metrics that's provided to the FDA. So I don't know at the time exactly what made me focus on asking that question.

Q.    It's an important metric that's provided to the FDA?

A.    It's one of the metrics.

MS. OSTLER: Objection. Vague. Ambiguous.

A.    It's one of the metrics.

Q.    It's important enough that it's the one that you focus in on your E-mail to her, correct?

MS. OSTLER: Objection. Argumentative. Ambiguous. Asked and answered.

A.    I mean, I could have -- I don't know exactly why I was asking her about LoD on that particular case. I wouldn't have known how to interpret what she

Page 82

was saying very much. I would have to rely on her representation to me.

Q. So she says on top in response, "So one thing to keep in mind is that we don't have any real strains of the" COVID-19 -- sorry -- "the 2019 nCOV. We had to perform the LOD experiments on the synthetic template that we use as the positive control."

Do you see that?

A. Yes.

Q. "We do not normally do this."

Do you see that?

A. Yes.

Q. Okay. "We hope that the limit of detection on the synthetic template translates to real world patient samples, but this may not always be the case."

Do you see that?

A. Yes.

Q. To your knowledge, did CODX's test have any difficulties in transferring the -- in having the LoD results on the synthetics translate to the real world patient samples?

MS. OSTLER: Objection. Ambiguous.

A. As I said to you in previous testimony, there were not live samples available. So everybody had to use templates, which was also recognized by the

Page 83

FDA.

So with respect to how it translates, I was -- I was as anxious as everybody else was to understand how this was going to translate in the real world of patients.

Q. And how did it translate?

A. Very well with 100 percent sensitivity and specificity in concordance tests, so --

Q. Just looking at LoD --

A. I don't know exactly how it translated in terms of LoD.

Q. But that's what we're talking about here, right, the limit of detection?

A. Yeah. It's what she's talking about, but I don't know how -- how the LoD in the -- in subsequent validations held up to this. That I don't know.

Q. I mean, in your -- To your knowledge, does CODX -- In terms of just the marketplace of PCR tests, is the Logix Smart test one of the -- one of the more sensitive tests or one of the least, lesser sensitive tests?

MS. OSTLER: Objection. Vague.

A. I understand that more in the connection of how does it compare with, you know, concordant evaluation against a standard that's being used as

Page 84

the -- as a standard; and in multiple environments, it showed up with 100 percent concordance.

Q. But setting that aside, are you aware of about whether -- on the spectrum of competitor tests, whether the limit of detection on CODX's test is higher, on the higher end or the lower end?

A. I think it could be higher or lower. It's not -- To me it would come down to an issue of clinical relevance.

Q. But that's not my question.

A. I know it's not your question, but my point is that a lot of things can impact LoD.

Q. I understand. My question is whether you're aware of whether CODX's test on the spectrum of other tests is on the higher or lower end in terms of the LoD?

A. I don't know where it sits on the spectrum. I know it fits in the spectrum in a sufficient -- in a sufficient number that it was approved by the FDA for emergency use.

Q. So setting aside its approval for emergency use, you don't have any knowledge of how the test's limit of detection compares to other tests?

MS. OSTLER: Objection. Asked and answered. You're now just arguing with the witness.

Page 85

MR. PINEIRO: No. I'm asking.

BY MR. PINEIRO:

Q. Go ahead.

A. The question again was?

Q. Can you repeat it?

(Question read back.)

MS. OSTLER: And you have my objections, right?

THE COURT REPORTER: Yes.

A. My answer to that would be that I understood our test to be -- to be acceptable from an LoD standpoint. I don't know exactly how it compares to everybody else's LoD out there.

Q. What do you mean acceptable?

A. It was acceptable in that the FDA cleared it. That's not an easy hurdle.

Q. But is it -- I understand that it got cleared by the FDA, but what do you mean acceptable in terms of in comparison to other tests?

A. Well, to the extent the FDA wanted to adjudicate a clearance for emergency use and was using it, LoD as one of their benchmark metrics, it was sufficient to pass through their scrutiny.

Q. Right. So then all that matters is that the FDA approves the test?

Page 86

MS. OSTLER: Objection. Misstates the witness' prior testimony. Argumentative.

BY MR. PINEIRO:

Q.    So any test that's approved by the FDA is a fantastic test?

MS. OSTLER: Objection. Argumentative. Misstates prior testimony. Ambiguous.

A.    I can't opine on that.

Q.    So all that matters is regulatory approval, and then -- but setting that aside, differences between the tests in terms of performance are irrelevant?

MS. OSTLER: Objection. Asked and answered. Argumentative. Misstates the witness' prior testimony. Ambiguous.

A.    It's not what I'm saying.

Q.    So what are you saying?

A.    I'm saying our test had an LoD that was a good LoD, and it was also sufficient to pass scrutiny with the FDA.

Q.    And, again, this LoD was based on the version of your test that only targeted one gene, correct, the RdRp/E gene?

A.    At that point it would have been, yes.

Q.    Now your test -- Now you have a second test

Page 87

that targets Rd and Rp -- the RdRp and the E gene?

A.    Yes.

Q.    Does that version of the test have a higher limit of detection than the one gene version?

A.    I don't know.

Q.    Who would know that?

A.    One of our scientists would know.

Q.    Okay.

A.    I'm sure it's in a technical file.

Q.    What's the point of developing that -- that multi-gene test?

A.    I think I previously testified that there were certain places in the world -- I recall that as being primarily Europe -- that wanted to have a second gene in the test. But not everybody did that, but that was one -- a certain area of the world. We accommodated that.

Q.    Why did -- Do you know why the European labs or customers wanted that multi-gene test?

MS. OSTLER: Objection. Compound.

A.    No, no. I don't know that it was necessary or anything else, but we accommodated what they wanted.

Q.    So you -- we talked about the test, your CODX test was -- COVID-19 test was verified at one

Page 88

point in time as shown in some E-mails. After it was verified in the lab, what were the next steps in terms of -- were there any next steps in terms of quality control and ensuring that the test is accurate enough?

MS. OSTLER: Objection. Vague. Ambiguous. Compound.

A.    In this particular case, assuring that it's accurate enough was done by various places where we're trying to get into the market. It's a highly regulated business. You don't just walk down to Mexico and start selling tests to labs. You know, they require that it passes through their -- their version of the FDA, which is, I think, referred to as the InDRE.

So they do their own tests. They don't take our word for it. They don't look at our template and say, "Wow, this is great. We'll take it." They do their own verification.

Q.    But setting aside regulatory approvals, so after you have verified your test and before you began to market it for sale, did CODX perform any type of internal validation on the test by -- through concordance studies or otherwise?

MS. OSTLER: Objection. Ambiguous.

A.    I don't know exactly what our continuing

Page 89

process was. We have a whole regulatory and development process that we go through, which I can't give you specifics on; but it's not just that. And I take strong objection to the notion that aside from regulatory. It's all about regulatory. If you don't get regulatory approval, you're not in the market, period. And to get Australia and to get India or to get Mexico to say you can sell on our shores is not a trivial undertaking. And it's not something that we have any influence on whatsoever. You send the test, they run it on their comparatives, and they develop their own viewpoint as to your sensitivity and specificity on a concordant basis. So it is -- it is what it's all about, regulatory.

Q.    But -- Again, I understand that; and I don't mean to deemphasize that or downplay it, but I'm just trying to understand the process of after verification; validating; improving on; QCing the test, quality controlling the test and -- what was done at CODX in that respect?

MS. OSTLER: Objection.

BY MR. PINEIRO:

Q.    Do you have knowledge about that?

A.    I don't know --

MS. OSTLER: Hang on. Objection. Compound.

Page 90

Ambiguous. Vague.

A.    I can't tell you, sitting here, exactly what our ongoing processes are with respect to additional and continual verification. What I can tell you is that when you sell this product to a CLIA lab, of which there's been scores of them in the United States, and some of them some of the most prestigious labs in the country, they do their own verification of it before they use it in their lab. That's part of what they have to do to sell the test and so -- and to perform it in their lab.

So, again, it's not a trivial process. It's not like we sent a test out to a lab and they say, "Great. We're in."

Our test was, in fact, so good as a performer that certain labs, like Clinical Reference Lab or Access Genetics, used it as part of their filings with the FDA for additional FDA EUA clearances. They could buy tests from anybody they wanted, and they stated publicly in press release that -- that they -- their scientists looked at all kinds of different alternatives because at the heart of a good test is the methodology. And they, after serious consideration and weighing alternatives, chose our test as part of their emergency use authorization.

Page 91

That happened both at CRL and then at Access Genetics. So these -- these CLIA labs have a responsibility to make sure that what they're doing and what they're testing and the tests they're using pass muster.

So, you know, it's an ongoing validation, verification process that goes on continually.

Q.    At some point did CODX initially receive research only use authorization from the FDA?

A.    Did we receive --

Q.    Research only use authorization regarding its COVID test.

A.    I don't know.

Q.    Do you know what -- what's called RUO is?

A.    I know vaguely RUO is research use only, yes.

Q.    What does -- what does that mean?

A.    That means that a laboratory could use it for research. They may take it another step. They may decide to build it into another test and then go on to try and achieve a different type of authorization, but it's a commonly understood industry term in terms of research use only. A great deal of the tests that are performed in the United States every day are research use only tests.

Page 92

Q.    And these tests, are they done on the public, or they're just part of research within the lab?

A.    They're used in the lab, where a lab takes a research use only product and does their own validation and verification and makes whatever changes and things they want to do to it. And then they use it as what is called an LDT or an LCT, a lab created test or a lab directed test. And they oftentimes put that together by using one of the components, a research use only test from a supplier such as ourselves.

Q.    And did you provide -- did CODX provide its COVID test to any labs on a RUO basis?

A.    I don't know the exact answer to that. I mean, primarily, we sell tests under our emergency use authorization to CLIA labs, to qualified labs.

Q.    Got it.

Do you recall that in February, 2020, the FDA, the U.S. FDA, reached out to CODX regarding certain advertising issues with respect to its RUO status?

MS. OSTLER:  Objection.  Ambiguous.

A.    I have a very vague recollection of that. Whatever the FDA asked us to do we would have complied

Page 93

with.

Q.    Okay.

A.    It may have not even been an issue with us. It may have been somebody who bought tests from us who was making claims on their website.

Q.    Got it.  Is there -- Who is Cecilia Hutchins?

A.    She was the head of our regulatory department at the time.

Q.    Would she be the point of contact with the FDA on matters --

A.    Yes, uh-huh.

Q.    And would Miss Hutchins typically discuss with you any issues raised with the FDA?

A.    In general.

Q.    Would you typically involve legal counsel if the FDA was inquiring about certain advertising or other matters?

A.    May have.  I mean, it depends on what the -- We talk to the FDA on a frequent basis, you know, about submissions and what we plan to do and get their feedback on what we're planning to do. So it just depends on the facts and circumstances as to whether it would have been escalated to general counsel or to me.

Page 94

Q.        If -- if the FDA flags certain issues, who is responsible at the company for ensuring -- for remediating any of these advertising or other issues that the FDA would flag?  Is it Miss Hutchins?

A.        Well, they would be talking to Miss Hutchins at that point in time; and she would communicate that to Andrew Benson to remedy an issue if there was something on our website or any other sort of public communication.

Q.        Who prepares the content that goes on the website?

A.        Andrew Benson was generally in charge of that.

MS. OSTLER:  Are you at a point where it's a good time to take a bathroom break?

MR. PINEIRO:  Sure.  Let's do it.

THE VIDEOGRAPHER:  We are going off the record.  The time is 11:04 Gayle.

(Thereupon, a recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:18.

BY MR. PINEIRO:

Q.        Mr. Egan, we just got back from a break. Did you discuss your testimony during the break with your lawyer?

Page 95

A.        No.

Q.        Do you recall when CODX received the CE mark from Europe?

A.        It was in -- I believe it was about the 23rd of February in 2020.

Q.        Prior to receiving the CE mark had CODX validated its tests -- its tests on human samples?

A.        I don't know the answer to that.

Q.        Prior to receiving the CE mark, are you aware of whether CODX had received any negative or adverse results in validating its tests?

MS. OSTLER:  Objection.  Compound.

A.        Prior to the CE mark?

Q.        Yeah.

A.        Well, I mean, the CE -- the CE mark package is something that would have been submitted to the European Union, and it would have had all the tables and validation data in it.  So I'm not sure if there was anything before that that had any kind of negative results.

Q.        In connection with that regulatory approval, are you familiar -- Strike that.

What were -- Are you familiar with the requirements for obtaining that regulatory approval?

MS. OSTLER:  Objection.  Ambiguous.

Page 96

BY MR. PINEIRO:

Q.        The CE mark.

A.        Not the specifics of it, no.

Q.        So, you know, one of the things that we've been discussing is I know that you don't have a science background; but you're the CEO of a, you know, biotech company.  Is it challenging for you to be an executive of this company despite not having a science background?

A.        Not for the things that I do at the company. We have -- we have some of the best scientists in the world that work in our company, some of very high renown.  So, you know, I'm entitled to rely on their expert opinion.

Q.        What is it you do for the company that doesn't require a scientific background?

A.        What is it that I do?

Q.        Yeah.

A.        Well, I'm -- I'm, first of all, responsible for the strategic direction of the company, what our aspirations are, what we plan to do.  For instance, you know, do we want to take products around the world?  Do we want to service high burden developing companies, or do we want to restrict our efforts to the developing world?  Do we want to be involved in

Page 97

just tests for human beings, or do we want to extend it to agriculture?  Do we want to do tests for oncology, as well as bacterial and virulent infections?

There's a whole host of things that have to be adjudicated and worked on and -- to decide the direction of the company.  I'm also, of course, responsible to see that we have the resources to accomplish those strategic objectives.

Q.        Also working with the capital markets?

A.        Well, that's what I just said.  I'm responsible to work with the capital markets and -- to see that we can be in a position to raise money where we may need to in order to fulfill our obligations and objectives.

Q.        And that's because this was a startup company?

A.        Yes, it certainly was.  It had 27 employees at the end of 2019, roughly.

Q.        And in 2019 it was operating at a loss, correct?

A.        Yes.

Q.        A six million dollar loss approximately?

A.        Yes.

Q.        In 2020 was the company profitable?

Page 98

A.    Yes.

Q.    What were the net profits of the company? Do you remember?

A.    Well, we had had sales of about 74 million; and we have -- had a high profit margin.  Sitting here without K's and Q's and things in front of me, I don't know the exact number of our profit; but it would be a substantial profit.

Q.    What was the -- Do you know, just roughly, the increase in your -- in your gross revenues between '19 and '20, for example?

A.    Well, it would have gone from $250,000 roughly in '19 to 74 million in '20.

Q.    Just an extraordinary increase, right?

A.    Yes.  I think by most measures, yes.

Q.    And that's because -- And that's primarily driven by the sale of the Logix Smart test?

A.    Yes.

Q.    So before that the company wasn't even clearing a million in revenue?

A.    That's correct.  It was working on getting its patent issued and things that would make it so we would have credibility in the market.

Q.    And the share price was hovering around a dollar.  Is that fair?

Page 99

A.    Well, at a certain point in time, yeah.  It had been higher earlier than that.

Q.    So this -- the Logix Smart is by far the most important product that Co-Diagnostics has sold, obviously?

A.    To date.

Q.    To date.  It's the centerpiece of the business right now, correct?

A.    Well, to say right now, you know, it's an important part of the business for sure.

Q.    What comes -- what's second?

A.    We have a new platform that we've been developing, the CODX PCR home device.  So there's a lot of emphasis on that in the business.

Q.    What's that?

A.    That's a device that allows patients to be diagnosed at the point of care, like a dental office or the pediatrician's office or a school or a business and also potentially at their home, on their kitchen counter or their bathroom counter.

Q.    Similar to like the Binax test, for example, produced by Abbott?

A.    Well, in a related field, yeah.

Q.    Have you -- Is that for sale already?

A.    No.

Page 100

Q.    It's in development still?

A.    It's in clinical trials right now.

Q.    So you're indicating that -- you know, the functions of the company that you're responsible for; and part of what we talked about today have been press releases that, you know, deal with discussing sensitivity and other scientific issues, right?  So when -- when it comes to those press releases, do you just totally defer to the science team in terms of the language used to describe scientific terminology relating to the test?

MS. OSTLER:  Objection.  Ambiguous and argumentative.

A.    Well, I don't second guess my scientists; and I'm not a scientist.  So I rely on their operation.  These are -- these are people who have, you know, reputations at stake.  So they don't do careless work.

Q.    Right.  So when it comes to, again, representations regarding, you know, the effectiveness of the -- of the Logix test, for example, and the results of the -- that test, you fully defer to the scientists in terms of what's being released to the public?

MS. OSTLER:  Objection.  Ambiguous.  Vague.

Page 101

Compound.  Argumentative.

A.    I do rely on the scientists' opinion.  Those are -- those are not proffered cavalierly.  They're proffered as a most considered view with a lot of testing and a lot of verification and validation.

Q.    Do you remember when you applied -- when CODX applied for emergency use authorization with the FDA?  Was it in March?

A.    I don't know the exact date; but I mean, it was issued, you know, in early May.  So I believe it would have been, you know -- I would guess that it was probably about six weeks before that that we applied, somewhere like that.

Q.    Did you -- did the company attempt to solicit the assistance of Senator Mitt Romney in connection with that approval?

A.    Not that I'm aware.  Mitt Romney was -- I remember him being on one telephone conversation where people from -- I'm going to call it Silicon Slopes were on the phone, as well as the lieutenant governor, Spencer Cox, where they were looking to see what they could do to get ahead of this thing.

Q.    Do you remember when that call was?

A.    I don't know the specific date, but it was in that same time frame.

Page 102

Q.      Did you participate in the call?

A.      I did.  I did participate in the call.  I'm not sure I said anything, but I was on the call.

Q.      What is Silicon Slopes?

A.      It's an area in Utah County that is sort of the operational hub of a number of high tech firms, so they call it that as sort of a derivative of Silicon Valley in -- on the coast, and they call it Silicon Slopes.

Q.      So it's not like a formal entity or organization?

A.      Oh, I don't know.  I don't know whether they have an organization or not.

        MR. PINEIRO:  Joni, this is PX14.

                  - - -

        And, thereupon, Egan Exhibit No. 7 was marked for purposes of identification.

                  - - -

        MR. PINEIRO:  And this is Bate stamped 22699.

BY MR. PINEIRO:

Q.      I'm showing you an E-mail that's been marked Egan 7.  It's an E-mail from Andrew Benson to you and others on March 15, 2020.

        Do you see that?

Page 103

A.      Uh-huh.

Q.      And it's titled "Romney letter."

        And then it says, "I think this was more or less the tone we were striving for?  Gave him some background, let him know we're eager to do some good in the world, and we're already working hard to do so."

        It says, "I have no pride of ownership here.  If I'm off base, go ahead and make whatever changes you want."

        Do you see that?

A.      Uh-huh.  Yes.

Q.      And if you go to the next page, there appears to be a draft E-mail entitled -- or draft correspondence saying -- that says, "Dear Senator Romney."

        Do you see that?

A.      Uh-huh.

Q.      Do you know if this letter or some version of it was ever sent to Mr. Romney?

A.      I don't know.

Q.      Did you edit or revise this letter whatsoever?

A.      I don't think so.  Let me look at it for a second.

Page 104

Q.      Do you recall this letter?

A.      No, I don't recall this specific letter.

Q.      Okay.  You don't have any recollection of revising it or approving it be sent?

A.      No.

Q.      And in the letter, there's a -- Mr. Benson says, "Some of our" -- This is where the chart is or the table.  It says, "Some of our international and domestic shipments to customers on five continents include the following," and it lists a bunch of customers.  Then, you know, it includes customers in Italy and et cetera.

        Do you see that?

A.      Uh-huh.

Q.      Some of these include U.S. customers, like Genesis Reference Labs.

        Do you see that?

A.      Uh-huh.

Q.      So how is it possible that this is a customer that has Co-Diagnostics' tests when it still hasn't received UA approval?

        MS. OSTLER:  Objection.  Foundation.

BY MR. PINEIRO:

Q.      EUA approval.  Sorry.

A.      I don't know the answer for that.  They may

Page 105

have been sent out as samples; but it would have been clear that they couldn't, you know, buy them.  And he's referring to them as customers.  I'm not sure he's being clear enough in his -- in what he's saying here, but --

Q.      And so in that phone call that you were describing earlier with Mr. -- with Senator Romney, did you request his assistance in obtaining EUA approval?

A.      No.  No.

Q.      Did you have any --

A.      I had no -- I had no expectation at all that Romney would do anything for us.

Q.      Did you have any other conversations with him besides that?

A.      I did not.

        MR. PINEIRO:  This is PX13.

                  - - -

        And, thereupon, Egan Exhibit No. 8 was marked for purposes of identification.

                  - - -

BY MR. PINEIRO:

Q.      Mr. Egan, I'm showing you what's been marked as Egan Exhibit 8.  You can see it's an E-mail string between Brent Satterfield and you.

Page 106

Do you see that?

A.    Uh-huh.

Q.    There's some other people copied.  And the subject line is, "Roche comment about their test for COVID-19."

Do you see that?

A.    Let me read that.

Q.    Yep.

A.    Okay.

Q.    What is -- I don't know if I'm pronouncing it right.  Ro-shay?  Roche?

A.    We call it Roche or in Europe they call it Roche.

Q.    Roche.  What is Roche?

A.    They're a pharmaceutical company.

Q.    Okay.  And they were selling a COVID test in Europe, I suppose?

A.    Well, I don't know when they started selling COVID tests; but they sell lots of tests.

Q.    So you -- well, do you know --

A.    Cobas is not the name of a COVID test by the way.  That's a machine.

Q.    So it says here, "Roche noted that negative results with the Cobas test" --

What is the Cobas test?

Page 107

A.    Cobas test means it was a test done on their Cobas machinery, a big piece of machinery.

Q.    -- "does not preclude an infection and such results must be combined with clinical observations, patient history, and epidemiological information."

Do you see that?

A.    Yes.

Q.    Do you recall why you sent Mr. Satterfield this E-mail?

A.    I obviously noted that Roche had a disclaimer on their test that had to do with you can't just take the test results and use them exclusively as the predicate for saying whether somebody is positive or negative, that it had to be used in combination with other clinical observations, how the patient presents, the patient's history and what else is going on in the world in that community or referred to as the epidemiological information.

So I was just asking Brent, as the chief science officer of the company, to explain to me why they have this language on -- on their website with respect to their test.

Q.    So you weren't familiar with that kind of disclaimer?

A.    Right.

Page 108

Q.    And then Mr. Satterfield tells you, "It's a standard disclaimer.  No test is 100 percent accurate all the time."

Do you see that?

A.    Uh-huh.

Q.    Okay.  Did you have any conversations -- Strike that.

Did you have any follow-up E-mails or conversations regarding this issue?

A.    Not that I recall.  I mean, he's my chief scientific officer.  I talk with him here and there, but I don't remember any specific conversations.

Q.    So at this point, he's, in black and white, writing to you, "No test is 100 percent accurate all the time," right?

A.    Uh-huh.

Q.    And that means even the best possible test on the planet can never be 100 percent accurate all the time, right?

A.    Yeah.  I don't think people make that claim, nor did we.

- - -

And, thereupon, Egan Exhibit No. 9 was marked for purposes of identification.

- - -

Page 109

BY MR. PINEIRO:

Q.    So if you want, Mr. Egan, we'll just start with the -- with the end of the document string just for context.  There's an E-mail from Mr. Benson that's written on April 1, 2020.

A.    This is on the front page?

Q.    It's on the -- it's probably the second-to-last page.

Wait a second.  Sorry.  Let me make sure I'm working off the right document.

A.    I see a press release.

Q.    Yeah.  Yeah.  Hold on.  Yeah.  Sorry.

MS. OSTLER:  It looks the same.

MR. PINEIRO:  It is.  I have a different document here.  It's okay.

Yeah.  Okay.  You're right.

BY MR. PINEIRO:

Q.    So sorry.  It's on the -- on the page that ends in 887.  At the bottom there's an E-mail.  It's like the second -- It's like the -- towards the middle of the document.

A.    Okay.

Q.    It says it's an E-mail from Mr. Benson to you on April 1 that starts with, "Sorry, Ike."

A.    Yes.

Page 110

Q.   Do you see that?

A.   Okay.

Q.   So it says, "In anticipation of our (hopefully imminent) FDA approval, here's our first draft of a 'just the facts, ma'am,' announcement. We don't need to rehash everything we've said so many other times. Just want to get the word out that we're as respectable as all the bigger players."

Do you see that?

A.   Uh-huh.

Q.   Who are the bigger players that he's referring to, if you know?

MS. OSTLER: Objection. Foundation.

A.   That would be every player bigger than us in infectious disease, and that's a big list.

Q.   Who was -- who was your main competition in terms of the Logix Smart test?

A.   I don't know. I mean, I don't know how many tests Roche or ThermoFisher or Qiagen or Quidel or LabCorp or Quest -- I mean, there's a gigantic list of people who manufacture these sorts of things.

Q.   So you weren't -- you didn't -- As a CEO of the company, you hadn't identified a specific list of primary competitors to your test?

A.   It would be rather presumptuous for me to

Page 111

think I'm competitive with Roche or a long list of people that had a long history of providing in vitro diagnostic tests to the world.

Q.   Right.

A.   So, no, I didn't have a thing that says, "Here's our main target. We got to really knock these guys off with our product." It's not what our thinking pattern was.

Q.   But Mr. Benson is saying --

A.   It's more like how can we get a toe in.

Q.   Mr. Benson is saying, you know, a press release might demonstrate that we're as respectable as the bigger players, right?

MS. OSTLER: Objection. Misstates what the document says.

A.   He's saying that we want to show that our test and our technology can go toe-to-toe with the bigger players from a technological standpoint. I mean, if you look at the submissions for FDA EUA up through a certain period of time -- I don't know which date it would go to, but well into the pandemic -- fully about 89 different companies showed 100 percent sensitivity and specificity on the same basis that we did.

So it's common vernacular, commonly

Page 112

understood in the market what that means. It's published formally as a document accessible to anybody on the internet and was certainly used by people going into the internet and to the FDA site to see those who had had those types of clearances.

So getting an FDA EUA clearance was a monumental -- of monumental importance to the company and a very important seminal event in our history and in our relationship with the FDA and everything else. We, a small start-up, in a very short period of time created a very accurate and sensitive test that's been used all the way around the world in more than 50 different countries. So it's a -- that's a big deal. It was a big deal for us.

And you can ask why did we -- why did we think it was important? Well, it authorized us to go into the marketplace with our test that we thought was very good.

And I might add, you know, that single gene test has sold throughout the pandemic with great success. It didn't have to be altered at all. The same test that was released in its earliest iteration is the same test that you buy today.

Q.   And so if you go back -- If you go forward one page -- sorry -- there's an E-mail the same day

Page 113

from Jennifer Webb. And she writes, "We need something between the lead paragraph and the explanation of the current FDA regulations that gives context on the advantages of our test in a way that the media can understand it."

Do you see that?

A.   Yep.

Q.   And then she says, "Please pardon any mischaracterization below. Could we add in any of these points?"

And then she lists several bullet points; and the third bullet point is, "Co-Diagnostics tests have demonstrated 100 percent accuracy in the clinical evaluation required by the FDA emergency use authorization submission."

Do you see that?

A.   Uh-huh.

Q.   Do you know why she suggested that bullet point?

A.   Well, Jennifer is a public relations person. So she's writing to people in the company, giving her opinion and her perspective on things that we ought to try and emphasize in our communications. It doesn't mean we listen to them. Frequently, I don't pay any attention whatsoever to what she says to me. It just

Page 114

depends.

Q.    Up top Mr. Benson, Reed Benson, sends an E-mail at 3:42 p.m.

Do you see that?  It's the same page.

A.    Okay.

Q.    Who is Reed Benson by the way?

A.    He was the general counsel and chief financial officer of the company.

Q.    Okay.  And so at the time -- And he's still the general counsel, correct?

A.    He is still employed by the company in our legal department.  He is not general counsel.

Q.    Okay.  Who is the general counsel now?

A.    His name is Kevin Ontiveros.

Q.    How do you spell that?

A.    Kevin, K-E-V-I-N.  Onterveross, O-N-T-E-R, like, V-E-R-O-S.  T-I maybe.

Q.    Why is Mr. Benson no longer the general counsel?

A.    Benson, you know, was -- retired about -- I don't know -- 75.  He went on humanitarian service for his church.  And so, you know, it was just his stage of life, ready to go.

Q.    And so Mr. Benson writes, "I'm not really comfortable with 50,000," which I guess is a reference

Page 115

to bullet point two where Miss Webb suggests to put in that Co-Diagnostics has the capacity to produce 50,000 tests a day.

And he says, "I'm not really comfortable with 50,000 or with 100 percent."  It's on the same page.

"Need some qualifications before we can use those."

Do you see that?

A.    I'm still trying to find it.

MS. OSTLER:  It's right here.

A.    Oh, up at the very top.  Okay.

Q.    Do you see that?

A.    I do.

Q.    Okay.  And did you or Mr. Benson discuss why it wasn't appropriate to put in the bullet point regarding Co-Diagnostics' test have 100 percent accuracy in clinical evaluation?

MS. OSTLER:  Objection.  Misstates what the document says.

A.    I don't -- I don't know -- I'm quite certain I would have had conversations with Reed Benson about these issues -- these type of issues.  He's trying to guesstimate what our capacity to produce tests is, and he's questioning whether we use 100 percent.  But, you

Page 116

know, Reed may have not been thinking about 100 percent in the context in which it was being used in the press release, which was in the context of a concordant evaluation for which we provided hot links to the actual concordance results in the press release as hyperlinks.  So I'm not sure at that point at what point in the discussion this was, but --

Q.    But then if you go to the first page, there's an E-mail from Andrew Benson at 1:43 a.m. Mr. Benson writes, "Thanks for everyone's advice and input on this.  I incorporated as much as I dared.  My (long-winded) thoughts.  I'm extremely wary about overstating things, so following on to Reed's comment, I am also -- I also recommending shying away from discussing our ability to manufacture 2 million tests."

Do you see that?

A.    Yes.

Q.    And do -- and then if you go to the -- if you go to the back of the E-mail, the actual press release, it doesn't appear that Miss Webb's suggestion to include the line about 100 percent was accepted, right?

A.    Yeah.  In this particular press release, I can see that that was not mentioned.

Page 117

Q.    Do you recall when you received EUA approval?

MS. OSTLER:  Objection.  Ambiguous.

Q.    I'm sorry.  When CODX did.

MS. OSTLER:  Thanks, Mike.

A.    Thinking late April, early May of 2020.

Q.    Now, after CODX had received the CE mark and EUA approval, do you recall when you first started hearing some concerns about the performance of Co-Diagnostics' tests?

A.    I really don't know what you're talking about.  We didn't receive negative reports about the performance of our tests.

Q.    So you never received any negative reports?

A.    Are you talking about later on with -- with Iowa or those sorts of situations.

Q.    Well, I'm asking you when the first time you recall -- the first time -- Once you had regulatory approvals and you were selling the test, do you recall the first time that you -- that the company heard of concerns or complaints regarding the test?

A.    The first thing I remember is a very irresponsible remark made by Dr. Lopransri at IHC, who is a physician there, who made a -- a snarky remark that a global pandemic was not a time to turn things

Page 118

over to amateurs.  I don't know whether he was referring to Silicon Slopes people, who were very visible at the time on national television, here locally, or whether he had a direct or indirect reference to us.

We took -- we took strong umbrage at that and thought it was highly irresponsible and challenged on it, for which he gave us an apology for making the remark.

Q.   Got it.

A.   That's the first time I remember anybody making a disparaging remark about our tests.

Q.   Do you recall any issues with the regulatory approval of the test in India?

A.   I do.  India did a test with a -- one lab which did not show the kind of results we expected; but curiously, they did not show the same -- the kind of results that we would have expected for a number of other U.S.-based companies or European-based companies, whose reputation is unassailable.  So that naturally made us wonder why does every other company except for a company that's in the city where this testing was being done get -- get hammered by the lab.  It clearly said to us this is unreliable.  There's either a lot of infection or contamination in that

Page 119

lab, or there's some kind of other motive going on that we don't know and wouldn't have been able to decipher.

So we took it to be tested elsewhere; and as we expected, it showed the results we were getting everywhere else, 100 percent sensitivity and specificity on a concordant basis with a standard.

Q.   Did you ever figure out what the issues were with the Indian regulatory approval?

A.   No.  No, we didn't.  And it was -- To us it was obvious on its face that it was a noncredible test.  And I'm sure other major companies in the world that received the same kind of results, some of them worse than ours in those particular tests, were also stultified at what was being reported out of that lab.

And I would also say that the Indian regulatory people at CDSCO also apparently came to that conclusion because they gave us approval with the results.

Q.   So ultimately -- I'm sorry, what is the CDSCO?

A.   It is the regulatory body.  It is the equivalent of the FDA.  It's an acronym for a longer thing that I -- I don't know all the letters, but --

Q.   So ultimately, the CDSCO found that the --

Page 120

those lab validations were incorrect?

A.   Well, they approved our test based on the subsequent evaluation at another lab.

Q.   Okay.  And do you recall --

A.   By the way, we have 14 IVD tests approved at the CDSCO on a whole bunch of tests:  Human papillomavirus, Hepatitis B and C, malaria, tuberculosis, et cetera.  So the CDC didn't have any trouble -- the CDSCO didn't have any trouble with the valid nature of our tests.

Q.   Did the CDS -- did the CDSCO ever explain to you why they believed that the initial lab results were incorrect?

A.   No.  They apparently agreed with it because they gave us clearance; and it was supported with 100 percent readings from another lab that didn't have whatever, contamination or conflicts of interest, that were present in the others, in the other lab.

Q.   What is CoSara Diagnostics?

A.   CoSara is a joint venture of Co-Diagnostics with a company called Symbiotics in India, which is a subsidiary of Asis Pharma, which is an important pharmaceutical player in India.  So we have a 50/50 joint venture with CoSara.  And we have built a very beautiful laboratory there in Ranoli, which is

Page 121

somewhat close to Vadodara, which the English call Baroda, but it's really Vadodara.  And it's east of Ahmedabad, which is the sixth largest city of India.

And so we, from the beginning of the development of the company, believed that the high burden of developing companies of the world, of which there's about 145, but it includes the Brit companies, Brazil and Russia, India and China, that it would be an important place for us to establish a beachfront, a beachhead.  And so we developed this joint venture in 2017 with Asis Pharma.

Asis Pharma is a firm associated with the Sarabhai family, which is a -- sort of a legacy wealth.  And it's almost a national treasure, lots of statues of Vikram Sarabhai throughout the country.  He was basically head of the space and aeronautics initiatives of the Indian nation.  And his grandson, Mohal Sarabhai runs the company Asis Pharma and is the lead officer at CoSara, which is our joint venture.

So we built a plant.  It's a very formable plant, very modern.  And in that plant, we manufacture, as I mentioned, 14 different IVD's that are cleared through their regulatory body, which is also a very stringent body, akin to the FDA in the United States.

Page 122

Q.    Got it.

MR. PINEIRO:  This is PX17.

- - -

And, thereupon, Egan Exhibit No. 10 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    Mr. Egan, I'm showing you what's been marked Egan 10.  If you don't mind going to the second page to start.

So there's an E-mail at the bottom from a gentleman named Nick -- Nick German on April 7, 2020, to, I guess, an E-mail address of investors at Co-Diagnostics.

Do you see that?

A.    Uh-huh.

Q.    It says, "Good afternoon.  As a concerned investor of Co-Diagnostics, who initial investment has now plummeted over $80,000, I would certainly appreciate an answer on exactly what wrongfully happened with CoSara Diagnostics today."

Number one.  "Why did this kit fail under CoSara's guidance?"

Do you see that?

A.    Uh-huh.

Page 123

Q.    It appears that he's discussing, I guess, the initial rejection by the CDSCO?

A.    Perhaps.  I don't know.

Q.    So then if you flip to the next page, the front page, there's an E-mail from Rebecca Garcia on April 7 to you -- Sorry, to Andrew Benson; and he copies you and some others.

Do you see that?

A.    Uh-huh.

Q.    I apologize.  If you could just go back to the second page.

Up top Mr. Benson copies -- sends an E-mail to you.  He forwards the E-mail, sends it to you and some others, and says, "What is our official response to this?  Getting a lot of questions about it today."

Then you go to the first page, and Miss Garcia writes an E-mail.  She says, "Here's my rendition."

Do you see that?

A.    Uh-huh.

Q.    She says, "CoSara is following the guidelines established by the Indian government.  Any test that is manufactured in India must obtain CDSCO license to test, be evaluated by an approved ICMR institution, ICMR publishes release of the test based

Page 124

on their data, and finally CDSCO will approve the test for manufacturing."

Do you see that?

A.    Uh-huh.

Q.    And then she says, "They do not disclose what method they are using as a 'gold standard,' and they will not release any of their run files for secondary analysis."

Do you see that?

A.    Uh-huh.

Q.    "Mr. Sarabhai and CoSara team are working with government officials to have the test repeated at an approved institution."

Do you see that?

A.    Yes.

Q.    In the next paragraph she says, "We advocate changes be made to current testing guidelines that require 100 percent sensitivity and specificity passing criteria as these are not accurate indicators of test performance."

She says, "No test can be 100 percent sensitive and specific."

Do you see that?

A.    Uh-huh.

Q.    And so this is the second or the third time

Page 125

we've seen documents where scientists at Co-Diagnostics are making clear that no test is going to be 100 percent sensitive and specific, right?

A.    Right.

Q.    It's really well established in correspondence to you that any -- any -- conveying that sentiment is inaccurate, right?

MS. OSTLER:  Objection.  Argumentative. Ambiguous.  Lacks context.

BY MR. PINEIRO:

Q.    You can answer.  My question is, you've seen this repeatedly told or stated in correspondence that no test can be 100 percent sensitive and specific, correct?

MS. OSTLER:  Objection.  Assumes facts. Argumentative and ambiguous.

A.    We didn't say our test was 100 percent sensitive or specific.  We didn't make that claim.

Q.    No.  No.  But my question is, you've seen this now expressed to you by the scientists at the company multiple times in E-mails, right?

MS. OSTLER:  Objection.  Assumes facts. Argumentative.  Ambiguous.

BY MR. PINEIRO:

Q.    Is that correct, sir?

Page 126

MS. OSTLER:  Same objections.

A.      I've seen the reference to 100 percent sensitivity and specificity, yes; but that's a different -- 100 percent sensitivity and specificity in an absolute context is different than what we represented in the press release at issue.  We're talking about a concordant evaluation, not an absolute.

Q.      Right.  But you've heard this declaration.  No test -- Something like no test can be 100 percent sensitive --

A.      Yeah.  Don't have a problem with it.

Q.      -- or specific.

MS. OSTLER:  Whoa, whoa, whoa.  Hang on.  Same objections and add asked and answered.

BY MR. PINEIRO:

Q.      You've seen that stated by the company scientists multiple times now?

MS. OSTLER:  Same objections.  Asked and answered.

BY MR. PINEIRO:

Q.      Correct?

A.      I hadn't seen it -- a whole bunch of this discussion.  I mean, this is a specific discussion about a lab that we deemed to be contaminated or

Page 127

having some other agenda in India, which was replaced by a credible lab and then presented to the -- You know, this stuff is not done in a vacuum or in the shadows.  It's full out with validation data in front of a government entity with whom we have, you know, important interests.  And the stakes are high with us maintaining credibility with the CDSCO.  So they agreed to look at results from another lab, which didn't deem to have any of those problems.

And I would have to say a lot of other companies would have to have done the same thing because they all had questionable results from the lab in question.

Q.      Are you familiar with any other companies that -- whose tests were initially rejected by the CDSCO?

MS. OSTLER:  Objection.  Misstates prior testimony.  Assumes facts.

A.      I think I have seen a table that lists several different companies, a number of them, including some very large pharmaceutical names.

Q.      Did the -- When the CDSCO initially denied regulatory approval for CODX's test, were the investors informed of that?

MS. OSTLER:  Objection.  Assumes facts.

Page 128

A.      I don't think -- I don't think we were denied a clearance by the CDSCO.  It was part of a process of applying for clearance.

Q.      So let me -- so then I'll ask another question.  So did you inform investors that the CDSCO initially found that CODX's test didn't qualify?

MS. OSTLER:  Objection.  Assumes facts.  Misstates prior testimony.

A.      It wasn't the CDSCO that denied it.  It was looking at the data from this one lab before, you know, submission could be made to the CDSCO.  Those are the results that were questioned by the company, and the company went under, you know -- you know, in conjunction with the CDSCO, to have another credible lab run the tests so we could get a true reading on it.

And this is sort of nonsense because, you know, this test has been sold in hundreds and hundreds of labs around the world, all of which would have done their own tests to validate and verify its concordant 100 percent sensitivity and specificity.  The fact there's one lab in India -- I don't know if you've been to India, but it's quite a place to go to, you know.  It's a -- There's a lot of problems with contamination.  And there's probably 100,000 labs in

Page 129

India; and we wouldn't call 100 of them a real lab unless they have something like a NABL certification, which only involves about 1250 labs in that entire country.

So the company didn't have to skewer itself over results that we had every reason to believe were the result of a contaminated or otherwise compromised laboratory.

Q.      Do you view it as your obligation -- So we talked about press releases.  When there is -- when there are negative developments with respect to the company, do you -- when do you think it's appropriate to advise investors of that through press releases or otherwise?

MS. OSTLER:  Objection.  Incomplete hypothetical.  Calls for a legal conclusion.

A.      I think we have an obligation when we think we have something material to disclose.

Q.      And you would involve your legal counsel in those determinations?

A.      Sure.  I mean, it requires -- it would require an 8-K filing, as well.

Q.      So did -- Without revealing the content of any communication, did you discuss with your legal -- did you have a conversation?  Did you approach legal

Page 130

counsel regarding, you know, a press release as to the difficulties that were had with the Indian regulatory authorities?

MS. OSTLER: Objection. Misstates prior testimony. Assumes facts.

A.    I don't think -- I don't think we considered making a public statement until we had the facts.

Q.    What do you mean by that?

A.    Until we had another lab verify that they were having trouble over there, just like a lot of other large American pharmaceutical companies, as I mentioned. They were clearly a problematic lab.

Q.    What is -- We were talking about EUA earlier. What kind of sales activity or sales does that authorize?

MS. OSTLER: Objection.

BY MR. PINEIRO:

Q.    Are there any restrictions on -- on -- you know, under an EUA authorization?

MS. OSTLER: Objection. Compound. Calls for a legal conclusion.

A.    All I could respond to is that it allows us to sell these tests to labs, CLIA labs, that are qualified to perform high complexity tests, which I think is an important distinction, because these labs

Page 131

aren't -- it's incumbent upon them also to do the validation and verification what it is they are going to be using as a test for their constituents.

Q.    When did you first -- At some point in time did -- after you received EUA authorization, did CODX enter into some type of agreement with Nomi Health regarding the sale of tests or supplying tests?

A.    At a certain point, they became a large customer of ours, yes.

Q.    Okay. Were they the biggest customer you had at the time?

A.    Eventually they became the biggest customer.

Q.    Do you have a recollection of the amount of sales you were making to Nomi?

A.    No.

Q.    I mean --

A.    We were selling in 50 different countries, you know, millions of tests, so --

Q.    Are you -- Prior to entering into an agreement with Nomi Health, were you friendly with any of the executives of that company?

A.    I was not really -- I had a relationship with nobody at that company that I'm aware of. My son Seth had a high school friendship with one of their officers by the name of Mark Newman.

Page 132

Q.    And who was he?

A.    I think he was the president or CEO of Nomi.

Q.    Okay.

A.    They knew each other in high school.

Q.    And are you familiar with TestUtah?

A.    TestUtah was a major initiative of the State of Utah to battle COVID.

Q.    So it's a government program?

A.    Well, I think the government was involved in it at some level. I think the lieutenant governor was leading the charge on behalf of Governor Herbert and the State of Utah. So they were harnessing whatever they thought would help, you know. They used words like flatten this, flatten the curve and crush the curve. And, you know, this is what everybody was concerned about as people lay dying in rest homes and around the state.

Q.    Throughout these programs or initiatives was the State of Utah entering into contracts with Nomi and other --

A.    I can't -- I can't tell you that. They never entered into a contract with us at the State of Utah.

Q.    So your contracts were with Nomi, not with the State of Utah?

Page 133

A.    To the extent we even had a contract. I don't -- I can't tell you whether we have a contract with Nomi. We supply tests for them, and our test is just a component of a test. It's not -- it's not the whole shebang of what is involved in doing a test, you know. There's gathering the sample; there's in some cases using transport media to take it from an outside, you know, venue, like in a parking lot, to a lab somewhere else. So there's lots of different -- And then there's an extraction component and then other things.

We sold the part of the test that happens when they've done the things that make it ready to go into a PCR chamber. So I mean, let's make sure we don't conflate a test with what we sold.

Q.    What you're selling is once the sample has been collected, it's been transported to the lab, the component that you're selling is -- is effectively the -- when they -- when they, I guess, place the product into what's called the thermal cycler, I guess?

A.    Yes.

Q.    Now, did you also sell in some cases lab equipment?

A.    We sold a number of products that were made

Page 134

by a manufacturer, Biomolecular Systems in Australia, referred to as the Mic. It tests about 48 people at a time. You may be using four controls, so you may only test 46 or 47 at a time. We've sold, you know, a lot of those around the world and in the United States.

Q. Now, were at some point -- Strike that.

You mentioned you didn't have a contract with Nomi. How -- did you have an agreement with them regarding, you know, the price -- the price of a test that you were selling to them? Did you have a verbal or some type of other structure?

A. We certainly had agreements from time to time as to what they were going to be paying for every test that they ordered, yes.

Q. Got it. Okay. And you're aware that Nomi -- Nomi was using CODX's test in connection with TestUtah?

A. I suppose they were. You know, at one point they were using other labs as well, so I don't know all the things they do. I can represent to you that Nomi used a lot of our tests in whatever labs they were going to, including their own lab, you know, eventually.

Q. But you were aware that CODX's tests were being used for TestUtah, right?

Page 135

A. Yes.

Q. And were your tests also being used in connection with State programs in Iowa?

A. The component of our test.

Q. Correct. When I'm referring to tests --

A. Let's be clear.

Q. I understand. So when I refer to tests, I'm talking about what it is that you produce, not anything else, just that component of the test.

Your product was also being used for Test Iowa, correct?

A. I believe so. I don't have a lot of particulars about what states they were using and whether they were using our test; but I would presume that they were using our component in our tests, at least at a certain point.

Q. But I mean, aren't you -- Who else but you would know where your test is being used? You're the CEO of the company.

A. If we're sending tests to Nomi Health, they could distribute them, you know, to labs in states, in lots of different locations that we don't necessarily know or keep track of.

Q. They wouldn't tell you where they were using the test?

Page 136

A. Not necessarily.

Q. Okay. But you were aware that your tests were being used in connection with Test Iowa?

A. I certainly became aware of it a point in time.

Q. Okay. And also in Nebraska?

A. Uh-huh. Yes.

Q. Wisconsin?

A. Don't know about Wisconsin.

Q. Tennessee?

A. I'm not sure how much we hit ground in Tennessee.

Q. Are you familiar with the volume of your sales to Nomi in 2020?

A. No.

Q. Now, before you enter into an agreement or agreements with Nomi to supply them tests, were you aware of any issues or concerns with the test's limit of detection?

A. No. The LoD was fine.

Q. Had the scientists ever raised the issue to you, you know, prior to that -- prior to, you know, getting those sales?

A. No.

Q. Prior to selling the tests to Nomi, had CODX

Page 137

ever tested or validated its tests on human samples?

A. I don't know at what point that happened. You know, in order to do a test, you have to have a lab of a certain caliber. We don't -- we don't have a BSL-3 lab for example in our laboratory, so --

Q. What is a BSL-3 lab?

A. Oh, it's a certain designation. I can't even give you the scientific credentials of that. But, you know, you've heard with respect to the Wuhan lab. There is only one of those labs in China that had that sort of level. I think they may have been a BSL level 4. But it's a level. It's like DEFCON 1 through 5.

Q. But does CODX have -- CODX have its own lab or no?

A. Not a lab -- not a lab to do patient testing and not now.

Q. What kind of testing can you do at CODX's lab?

A. We can do our own verification, validation. You know, we have to have tests we do while we're preparing the tests for evaluation by the European Union or by the FDA.

Q. On synthetic --

A. Not necessarily. I mean, it could be on --

Page 138

Not everything is done on synthetic.  As you saw Madison Stark respond in earlier testimony, this was sort of a rare situation because it was the evolving pandemic; and there wasn't the availability of live or dead viruses.

So other things that's not the case.  There's lots of places.  If we wanted to do a test today on a more perfunctory sort of pathogen, we could get reference materials, is what we could call it.

Q.      Got it.

A.      And it would have -- it would be reference material that we would use with real samples of the biological target.  They may be dead, but they can be put into a PCR and detected.

Q.      Now, while you don't have a lab where you can run validation tests on human samples, you could outsource that, right?  You could enter into -- You can work with another lab that has that capability to --

A.      Well, we dealt with --

MS. OSTLER:  Objection.  I think it misstates his prior testimony.

Q.      Well, let me -- Okay.  So if you don't have a lab that -- Strike that.

My understanding is you're saying that you

Page 139

don't have a lab where you can perform validation tests on human samples.  It has to be some type of BCL -- BSL-3 lab?

A.      Let's be clear again.  Not every test that you would validate against would be on synthetic templates.

Q.      Right.

A.      They could be actual real viruses.  In the case of COVID, those were not available, not to us, not to anybody else, so -- But if we were doing a new test today and we wanted to test for some other pathogen, there's a very good chance if it's not a novel virus, like coronavirus was, that we could get reference material that actually contains the real virus or the bacteria.

Q.      So back then you couldn't, but now you could because of the --

A.      Back then we couldn't on coronavirus.

Q.      Because of the availability -- the lack of availability, right?

A.      Yeah.

Q.      Okay.  And, again, you're not -- you're not -- Are you aware of -- I mean, could it occur that there are issues with the test when translating it from, you know, synthetic verification, validation to

Page 140

human samples?

MS. OSTLER:  Objection.  Incomplete hypothetical.  Calls for speculation.

A.      It's a very good question.  I posed that question to Dr. Satterfield specifically and -- as to how are these synthetic results likely to correspond to human results.  And he said it's usually a very good indicator of what you're going to see in the real world.

Q.      Okay.

A.      You're talking -- you're talking about detection of nucleic acids, A's and T's and C's and G's, adenine, cytosine, guanine and thymine.  There's only four of them in the entire DNA double-helix.  And in the case of COVID, it's a single stranded -- It's an RNA; but it's mathematics, and it's detection of certain nucleic acids in a certain sequence, whether you're doing it on a template or whether you're doing it in real life environments.  I think it has more to do in real life environments with the nature of the sample or what we call the matrix.  Where did it come from?  How far did it travel?  What conditions?  Did it get too warm?  So on and so forth.

There's lots of elements of the test that are different than just what we're selling as a

Page 141

component.

Q.      Got it.

MR. PINEIRO:  This is Egan 11.

- - -

And, thereupon, Egan Exhibit No. 11 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.      Showing you what's been marked Egan 11.  This is Bates 35390.

If I could just take you to the third page, which starts with an E-mail from Bert Lopansri, a gentleman you referred to earlier.

Do you see that E-mail from him on April 14?

A.      At the top of the page here?

Q.      Yeah.  So who is Mr. Lopansri?

A.      I just know him as a doctor at IHC.

Q.      And was he involved -- Strike that.

Did Utah have a COVID-19 task force?

A.      I presume they did, and we're stars.

Q.      Are you aware that he was -- that he was on the task force?

A.      No.

Q.      Okay.  You mentioned that you know that he works at Intermountain -- Was it Intermountain --

Page 142

A.    Intermountain Health Care.

Q.    What is that?

A.    It's a large health care provider in the state of Utah.  Probably the largest.

Q.    Okay.  And so Mr. Lopansri writes to Nathan Checketts of the State of Utah -- Do you know who that is?

A.    Yes.

Q.    Okay.  He writes to a host of other people.  And he says, "Nate, I am deeply alarmed with what I heard about the TestUtah results if the numbers you reported are correct and appreciate you confirming the data.  What alarms me the most is they are expanding collection and testing with these unknowns about how their test performs.  If correct, I urge you to halt their testing until we understand why their results differ so much from what other labs are reporting as this is a potential public health disaster that will be compounded by the fact that they are constantly promoting themselves publicly while we are not."

Do you see that?

A.    Uh-huh.

Q.    Is he referring to -- I mean, do you know whether he's referring to in terms of promoting themselves publically to -- Who is he referring to, do

Page 143

you know?

MS. OSTLER:  It calls for speculation.

A.    The entity I think they're talking about primarily here is Nomi Health.

Q.    And then he says, "The major concerns that I have are:  The low percentage positive, the high indeterminate rate."

Do you see that?

A.    Yes.

Q.    It says, "I looked at the package inserts of the tests used in the state and the limit of detection data, which is summarized in the following table."

And do you see there's a table there where Co-Diagnostics is listed besides TestUtah?  It says Co-Diagnostics and then, parentheticals, TestUtah?

A.    Uh-huh.

Q.    And then it lists copies per microliters as 4.29.  Do you see that?

A.    Yeah.

Q.    And it says, "As you can see, the Co-Diagnostics test has a significantly higher LoD compared to the tests we use, which can be a big problem for low positives and could explain in part why their percent positive test is lower than what we and ARUP are reporting."

Page 144

Do you see that?

A.    Yeah.

Q.    And do you know, was Co-Diagnostics ever -- did it ever ascertain whether the information on LoD in this chart is correct or incorrect?

A.    I don't know whether we did or not.

Q.    Isn't that something that would have been really important to look into?

A.    As long as our LoD was clinically relevant, not necessarily, no.

Q.    So he's alleging that there are problems at TestUtah in terms of what appears to be a low percentage of positives, correct?

A.    Presumably.

Q.    And he's indicating it's -- it appears to be driven by the high limit of detection on Co-Diagnostics' tests, right?

MS. OSTLER:  Objection.  Calls for speculation.

BY MR. PINEIRO:

Q.    Isn't that what this E-mails says?

A.    I think -- I think --

Q.    Is that what this E-mail says or no?  I'm just --

A.    I think in terms of what --

Page 145

THE COURT REPORTER:  One at a time, please.

MS. OSTLER:  Objection.  Misstates what the document says.

A.    I think with respect to this table, I'm not taking issue with the table.  What I'm telling you is there's -- there are hundreds of companies that have this kind of published data, many of which -- and many of which are much larger companies than ours that have lower LoD than we have.

So it has to do with clinical relevance.  What is it that makes it so in the clinic, in the lab?  When you're actually testing somebody, what are the chances of coming up with a false positive or a false negative?  And as -- as you've seen a whole bunch of times in this -- in this interrogation, on a concordant level, regardless of what LoD is being cited, we came up with 100 percent sensitivity and specificity.

So there's a lot of companies that I'm aware of that have significantly less concordance -- or rather LoD levels than this demonstrates, which he has neglected to show.  He's showing what they're using at Intermountain Health Care.  There are other companies, as I mentioned to you earlier, scores of them, that have said in their filings to the FDA that they are

Page 146

100 percent sensitive and specific.

So, you know, it gets down to clinical relevance. On a concordant basis when X -- Test X says it's positive or negative, what did our test say? And 100 percent of the time, in study after study after study, it was concordant.

So I might add, in this whatever -- whatever he's using as his source for this table, I personally know that if you looked at it and looked at the CDC test, which was promulgated all over the country, it's, basically, right next to ours in terms of its -- its LoD.

So, you know, there's a lot, you know, that goes on with LoD that's being missed here.

Q.    So LoD is not clinically relevant?

A.    It's relevant, but it's not the only thing that's relevant, and there are a lot of things that can change LoD in a test that may not be, you know, indicative of how it's going to perform in the clinic in -- in terms of what's relevant in the clinic.

Q.    So it is a relevant factor --

A.    One of.

Q.    -- in the accuracy of a test?

A.    One of.

Q.    Okay. And so if your LoD is -- Strike that.

Page 147

So you actually -- CODX looked at these numbers, and they're accurate, what he said in here?

A.    I didn't -- No.

MS. OSTLER: Objection. Lacks foundation. Misstates prior testimony.

A.    I certainly did not review these numbers. I've never seen this letter before.

Q.    Okay. Are you familiar with whether upon receiving this --

You've never seen this letter?

A.    No.

Q.    You've never seen Mr. Lopansri's --

A.    I've never met Lopansri.

Q.    So you've never seen this letter before today?

A.    That's correct.

Q.    Okay. I'll just direct you to the front of the E-mail and the first page. And you see that you were forwarded the E-mail by Andrew Benson.

Do you see that? You don't recall receiving this?

A.    I'm not seeing Andrew's.

Q.    From -- I'm sorry. Actually, it was forwarded by -- beneath that Joseph Featherstone to Dwight Egan; and then you forwarded it to Andrew

Page 148

Benson up top.

A.    I probably would have seen the thing in my E-mail and just forwarded it to Andrew. Just because it came to my E-mail doesn't mean I read it.

Q.    So when your centerpiece test is being criticized by a member of the Utah task force and it's saying that your test is causing a potential public health disaster, you do not read that test, and you just forward it to your investor relations person?

MS. OSTLER: Objection. Argumentive. Assumes facts not to evidence. Misstates prior testimony. Ambiguous.

BY MR. PINEIRO:

Q.    Okay. I mean --

MS. OSTLER: Oh, wait. Let him answer.

MR. PINEIRO: The problem is the objections are -- Is there -- Can you object to form, and we'll say it's preserved?

MS. OSTLER: No. In the District of Utah, there's actually a rule that I cannot do that.

MR. PINEIRO: Okay. Even if we stipulate?

MS. OSTLER: I will not stipulate to that.

MR. PINEIRO: Okay. All right. That's fine.

MS. OSTLER:  That's the rule in the

Page 149

District of Utah.

MR. PINEIRO: Got it.

BY MR. PINEIRO:

Q.    You can answer.

A.    I'm curious in this letter from -- we've been talking about, the table incorporated inside of it, whether he's just talking about LoD or whether he's talking about other elements of the test.

Q.    But that wasn't my question. My question was whether you -- You claimed you received this important E-mail and then did not read it and just forwarded it; is that correct?

MS. OSTLER: Objection. Argumentative. Mischaracterizes the document. Misstates prior testimony.

A.    I don't recall specifically dealing with this letter. Obviously, I forwarded it; but I get a lot of E-mails, and I don't read every E-mail.

Q.    And this one wouldn't stand out?

MS. OSTLER: Objection. Argumentative. Mischaracterizes the document. Misstates prior testimony.

A.    It was being handled by the operatives in the lab and people like Joseph Featherstone, who were dealing with this on a client basis. It wouldn't

Page 150

necessarily have been something that I would have jumped in the middle of.

Q.      So this wasn't a big deal?

MS. OSTLER:  Objection.  Asked and answered. Mischaracterizes the document.  Misstates prior testimony.  Argumentative.

MR. WASHBURN:  Okay.  The rule says you don't get to coach your witness.

MS. OSTLER:  I'm not coaching.

MR. WASHBURN:  And he just asked a question that didn't reference any document at all, so it couldn't have mischaracterized the document.

MS. OSTLER:  No.  He is referencing the document.

MR. WASHBURN:  No, he didn't.  He just --

MS. OSTLER:  He is.  He's referencing this document.

MR. WASHBURN:  Read it back.  Read back the original question.  Sorry.

(Question read back.)

MS. OSTLER:  Yes.  He's referencing this E-mail.

MR. PINEIRO:  Yeah, but I'm not --

MR. WASHBURN:  How is he misstating the --

MR. PINEIRO:  What's wrong with -- what's

Page 151

wrong with the question?

MS. OSTLER:  I can state my objections for the record.

MR. WASHBURN:  You can; but if it has the effect of coaching it, and he didn't characterize the document at all --

MS. OSTLER:  I am saying the objections that I am allowed to say in the rule of the District of Utah.

MR. WASHBURN:  You're not allowed to state --

MS. OSTLER:  I am just stating my objections.

THE COURT REPORTER:  One at a time.

MR. WASHBURN:  -- valid objections that have the effect of coaching the witness under the rule in the state of Utah.

MS. OSTLER:  Loren, I'm not coaching the witness.

MR. WASHBURN:  It appears you are.

MS. OSTLER:  I don't think that it's productive to sit here and argue.  I'm going to state my objections for the record.

MR. PINEIRO:  That's okay.

MR. WASHBURN:  Confine them to what's

Page 152

relevant to the question.

MS. OSTLER:  I'm trying.  I am doing my best.

BY MR. PINEIRO:

Q.      Okay.  So this E-mail -- You said you get a lot of E-mails, correct?  This E-mail doesn't stand out from amongst all the E-mails you receive?

A.      It actually doesn't --

MS. OSTLER:  Whoa, whoa, whoa, whoa.

Objection.  Misstates prior testimony. Argumentative.  Asked and answered.

A.      So I'm looking at this E-mail.  I don't recall having reviewed it in the past.  I also notice, you know, a lot of things that would make it difficult to read this E-mail in context.  He cites Roche and Hologic in the table, doesn't give the information associated with it, just puts it as double question marks.

There are hundreds of companies that have published data, which Lopansri well knows.  Just because it isn't a test that's used by ARUP or a test used by Intermountain Health Care doesn't mean the standard necessarily has to be compared with.  They are also making a fuss out of the fact that tests that were done in Utah County had a lower percentage of

Page 153

positives than tests that were done in downtown Salt Lake.

Well, that was very early in the whole process.  There's been a white paper done on this by Dr. Satterfield in which he points out the reasons you would have had a lower percentage of positives in Utah County than you had in Utah.  And I think that's coincident with this, from a timing standpoint, what was going on in that argument.

So there's a lot of variables at play here, including, you know, what is the -- You know, he was upset that Utah was showing -- I don't know -- something like four and a half percent positivity and Utah County was showing two and a half percent.  I'm just guesstimating there.  It wasn't very long after that that West Valley was showing in excess of 20 percent.  Well, where was Lopansri on that one?

So it's an issue of making sure you understand the context in which an E-mail like this is sent.  It was irresponsible on the part of Lopansri. He has apologized to us personally and also sent a letter to that effect.

Q.      He sent you a letter that apologizes?

A.      Yes.  It was highly -- highly irresponsible of him and, frankly, caused our company a lot of

Page 154

damage.

Q.    Why?

A.    Because it was reverberated in the blogosphere all over the world as quoted by the Tribune, you know, in countless blogs since.

Q.    Did you sue him for defamation?

A.    I haven't.

Q.    Why not?

A.    I just haven't.  I'm going to leave it there.

Q.    And he sent the letter to Co-Diagnostics or to you personally, the letter you referred to that he sent, the apology letter?

A.    I believe to be Co-Diagnostics.  I don't know exactly who the addressee was.

Q.    Okay.  And then beneath that table he says, "As you can see, the Co-Diagnostics test has a significantly higher LoD compared to the tests which we use, which can be a big problem for low positives and could explain in part why their percent positive test is lower than what we and ARUP are reporting."

Do you see that?

A.    I do.

Q.    So he's saying it could be a part of the reason, not necessarily the whole reason, correct?

Page 155

MS. OSTLER:  Objection.  Calls for speculation.

A.    I don't know what he means.  Lopansri is the same guy that got on, you know, local television and heralded the use of antigen tests, which are like flipping a coin.  There's a guy who is getting righteous here about LoD's, who then advocates strongly for antigen tests.  So you'll have to ask Lopansri what he was talking about.

Q.    He's not a credible person?

A.    I'm not saying he's not a credible person. I'm saying you'll have to ask him what he means by it.

Q.    Do you consider him to be an authority on infectious disease issues?

A.    I think his credentials speak for themselves.  I think what he did in this case was very irresponsible, and I think he recognized that as well.

Q.    Why was it irresponsible?

A.    Because it made conclusions based on not having all the facts or examining all the reasons why they may have had a different positivity rate in Utah County than they had in Salt Lake, which ended up being a lot different than they had in West Valley and Salt Lake, and so on and so forth.  It was premature.

He also worked for a competitor of Nomi

Page 156

Health.  You know, Nomi Health and IHC are competitors.  So, you know, put that into the mix as to why he would be saying you really need to come and use our tests, not the competitors, not the people we wish would leave the scene.

Q.    Right.  So you think he had ulterior motives?

A.    I don't know if he had.  I don't know what his motive was.  I'm just laying that out there that that needs to be considered.  Nomi Health has a very, very distinguished record around the country wherever they've been engaged in the whole testing process of those particular places doing very well in terms of their fight against COVID.

Q.    Are they still one of your customers?

A.    Yes, they are.

Q.    Okay.  And you still supply tests to Nomi?

A.    We do.

Q.    Okay.  Do you know what your sales were to Nomi in 2022?

A.    No.

Q.    At some point did Nomi cease using CODX's test for TestUtah?

A.    Incident to this kind of material, they did stop using our tests in Utah.

Page 157

Q.    Okay.  Did they explain to you why they were doing that?

A.    No.  I presume they had pressure from, you know, Utah State.

Q.    So they stopped using your test because of pressure?

A.    I think so.

Q.    Okay.

A.    They certainly didn't use it because they didn't think the tests were any good.  There have been multiple validations and verifications of the veracity of our test so many times it's kind of insane to even be talking about it.  And they still use it and have used it to this day.  And this is what?  This is April of 2020.  It's now May -- It's now April of 2023, and they're still a major customer.

They can buy from whoever they please.  So do you think they're taking a risk with our tests with customers all over the world, wherever they are selling them, because there's a problem?  They can buy tests from anybody.

Q.    Do you know where they are selling your tests, where they're using your tests?

A.    No.

Q.    Are they still your biggest customer?

Page 158

A.    I think they are, which only speaks to the credibility our tests have with them.  Why would they want to put their reputation and labs at risk?

Q.    Do you give -- do you discount -- does CODX discount the price of its -- does it give different prices to different customers for the kits?

A.    Depending on size and volume and things, yeah.

Q.    So you would give Nomi and perhaps -- Strike that.

Do you know if you provide Nomi a discount given the amount of sales you make to them?

A.    My view would be that Nomi is given pricing that reflects their volume, and lots of other customers also receive discounts incident to their volume.

As a general rule, we have been a compassionate priced product compared to other things in the market.  You can look at these things that Lopansri cites from Quidel, Cepheid, Biofire.  I can just tell you, out of them, their tests are a lot more expensive than ours.

Q.    So at some point, was CODX contacted by reporters at the Salt Lake Tribune regarding Lopansri's E-mail?

Page 159

A.    I'm trying to figure out and think were we contacted by the Tribune.  I know we were referenced in the Tribune, and it seems to me we would have been contacted by the Tribune.  And that would have been handled primarily by our public relations firm and specifically our Jennifer Coltrin, C-O-L-T-R-I-N.

MR. PINEIRO:  This is PX25.

- - -

And, thereupon, Egan Exhibit No. 12 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    I'm showing you what's been marked Egan 12.

So on the front page, there's an E-mail in the middle from Jennifer Webb; and it appears to forward a Salt Lake Tribune article entitled, "This is a potential public health disaster."  And it's to you, Seth Egan, Andrew Benson.

Do you see that?

A.    Yes.

Q.    She writes, "Take a look."

So if you just start with the article, it says, the name of -- the title of the article is, "This is a potential public health disaster.  COVID-19 results from TestUtah are raising questions."

Page 160

And so the article says, "The accuracy" -- in the beginning, "The accuracy of coronavirus tests by TestUtah has come into question with state data showing that the rate of positive results among people tested at its sites is less than half of what it is for patients tested elsewhere in the state."

Do you see that?

A.    Yes.

Q.    And towards the next paragraph, the second line, it says, "While Utah's larger health care systems have relied on national names and diagnostics for their coronavirus tests, TestUtah has obtained its tests from a smaller Salt Lake City company and is processing them at a regional hospital in Orem."

Do you see that?

A.    Yes.

Q.    That's a reference to CODX?

A.    Uh-huh.

Q.    Okay.  And what's the regional hospital they were being processed?

A.    It doesn't say here, but I presume they're talking about Timpanogos Regional Hospital.

Q.    Okay.  And that -- Whose decision is it to process the tests there?  Was it -- was it Nomi's or CODX's?

Page 161

A.    It's not ours.  We're just selling a component of the test.

Q.    Got it.

A.    And Timpanogos Regional Hospital is a hospital that is part of Hospital Corporation of America.  It is the largest publicly-held hospital chain in the country.  So it's not like a no-name shack down in Utah County.

Q.    And then it says, "I worry about having tests" -- It quotes the E-mail I showed you earlier. "I worry about having tests routed to a small community hospital lab."

And you continue to the next page, and it's the Dr. Lopansri quote.

Do you see that?

A.    Yes.

Q.    So it says a couple paragraphs down -- Sorry.  I'll slow down -- "As of this week, TestUtah has had eight testing sites around the State and had conducted tests on more than 18,000 Utahns, more than half of whom did not have symptoms of coronavirus."

Do you see that?

A.    Uh-huh.

Q.    Okay.  Now, do you know whether at these eight testing sites all the tests that were being used

Page 162

were the CODX tests?

A.   I presume they were.  I don't know.

Q.   And so in the next paragraph, it says, "Mark Newman, whose health software company Nomi Health has a 5-million-dollar contract with the State to run the group's testing, said comparing TestUtah results to those other sites is not 'apples to apples.'"

Do you see that?

A.   Yes.

Q.   And then the next paragraph, "'We're talking about population differences,' agreed Brent Satterfield, founder and chief science officer of Co-Diagnostics" --

Do you see that?

A.   Yes.

Q.   -- "which produces the test kits used by TestUtah sites."

A.   Yes.

Q.   Do you recall conversations with Mr. Satterfield or others regarding having Mr. Satterfield provide statements regarding this article?

A.   Not specifically this article, but Brent did write a white paper to address this whole issue.

Q.   In connection with this actual article and

Page 163

speaking to the reporters who wrote this piece, do you recall conversations within CODX regarding having Mr. Satterfield be the one that submits the statement?

A.   Well, it was just naturally the case that he would submit the statement.  He was the chief scientific officer.

You note in the third paragraph -- the fourth that you cited here, it says these tests were given also to people that had -- that did not have symptoms of coronavirus, which would also contribute to them having a lower percentage show positive.

Q.   You said that Satterfield prepared a white paper on this very issue?

A.   On this particular issue, yeah, why it would have been different in Provo than it would in Salt Lake.

Q.   When did he -- Did he publish that?  Did he post it anywhere?

A.   Somewhere in this time frame, you know, when this stuff started to -- to emerge.

Q.   And do you know what he did in connection with preparing that white paper?

A.   I don't.

Q.   Okay.

A.   He's a scientist.  He does his work

Page 164

carefully.  He's been published in significant journals.

Q.   What is he doing now?

A.   I don't know.  He's on our scientific advisory board, so I'd see him from time to time; and he advises us, along with several other noteworthy scientists.

Q.   When did he resign -- when did he leave the company in terms of being the chief science officer?

A.   I don't know the exact date.  I think it would have been late in the year.

Q.   In the year?  Which year?

A.   Of 2020.

Q.   And do you recall why he left?

A.   Brent, I think, wanted to pursue some other interests, and he's been very helpful with us all the -- all the way along.  He's gone to labs out of state or wherever to help people get installed, and he's been very helpful.  Whenever we wanted him or needed him or there's been an issue like this that needed his -- him to opine on it, he's been very capable and willing to do so.

Q.   Did he resign or was he terminated?

A.   He was not terminated.

Q.   Did you force him --

Page 165

A.   No, no, no.  Clearly not.  We would have kept Brent as long as he wanted to stay and help us.  As I mentioned he's on our scientific advisory board now and receives compensation for doing so.

Q.   Sorry.  I should finish my question.

So the company did not force him to resign?

A.   No.  Absolutely not.

Q.   Did they suggest he should resign?

A.   Did they?  Who --

Q.   The company.

A.   I think we just came to a mutual determination that we were moving into a new environment with the company where we were going to really step up everything we're doing; and if he's -- you know, wants to go pursue other interests, that that might be a good thing for him to do.

Q.   Is that because he wasn't -- in your view he wasn't fully committed to the company?

A.   No.  Like I just told you, he did everything we asked him to do.  He's very, very good.

Q.   Right, but you said that, you know, the company was going to -- There was a mutual determination.  Who was involved in that determination?

A.   Oh, it just would have been senior level

Page 166

management, Reed Benson and myself.

Q.  So you're saying --

A.  Look, we'd grown from 250,000 to 74 million in a year.  So, yeah, don't criticize me for saying things were stepping up.  We had -- we had to --

Q.  I'm not criticizing you.  I'm just --

A.  Well, I'm just trying to point that out.

Q.  I know you stepped it up.  So my question is actually because the company grew so quickly and so large, was he not appropriately qualified as the chief science officer of a company that evolved that way?

A.  I think he was completely qualified for it.  He's the one who invented our core technology.

Q.  But then why did you say you came to a mutual determination that he should no longer --

A.  It was more of a lifestyle decision for Brent, frankly, what he wanted to do with his life.

Q.  You said it was mutual.  So from your end as the CEO of the company, what were the reasons why you thought that was a favorable move?

A.  I didn't resist him going off to pursue other interests, you know.  We had paid Brent a lot of money over time for the IP and other things and for his services as a chief science officer and before that as really the leader of the company in most

Page 167

respects.  So it just seemed like a natural transition.  I didn't resist it.

Q.  Is there a severance -- Did you have a severance agreement with him?

A.  We did have an agreement with him as to what he was -- how he was going to be remunerated going forward.  I don't know that it took the form of a written severance agreement.

Q.  Who is the chief science -- Who became the chief science officer after Mr. Satterfield left?

A.  He was replaced by Dr. Jessie Montgomery.  He was a Ph.D.

Q.  Were there any -- any HR issues regarding Satterfield prior to his leaving that position?

A.  No.

Q.  Did he leave that position after this lawsuit was filed?

A.  Yeah.  Yeah.

Q.  Okay.  Was part of the reason why there was a mutual decision for him to leave because of the lawsuit?

A.  No.

MS. OSTLER:  Objection.  Misstates prior testimony.

MR. PINEIRO:  What -- what part of the

Page 168

question misstates prior testimony?

MS. OSTLER:  I think that he's trying to say -- Do you really want me --

MR. PINEIRO:  Yeah.

MS. OSTLER:  -- to have a talking -- Okay.

I think what he's been trying to say is that they didn't mutually decide that they were going to kick him out.  They were just saying he wanted to leave, and they said okay.  That's okay.

MR. PINEIRO:  What part of my -- What part -- I'm using his words, mutual determination.  I'm not misstating his testimony.  I'm using the exact words.

So I just want to flesh out the objection, because, obviously, I'm asking a lot of bad questions; and I just want to -- I want to understand where some of them are running afoul of issues here.

So now I've lost my train of thought.  That's why I try not to go down these paths.  Anyways --

A.  I would just characterize it as -- as an amicable switch, you know.  He didn't stop having a relationship with the company.  He's still been available whenever we want him or need him to come and work or talk to reporters or to talk with people who

Page 169

are doing scientific articles.

Like I say, he is on our scientific advisory board, which includes Dr. Carl Whittwer, one of the most famous scientists in the whole state of Utah; a Dr. Norackusacara, who is a -- was the primary operator at ARUP, who's been cited in the letter from Lopansri.  It includes Dr. Karen Carroll from Johns Hopkins University.  It includes Dr. Anne Wyllie from the Yale School of Public Health.

It's an august body with very important people of which Brent is one of them.  They all receive remuneration from being on it, and they contribute to the knowledge base of the company and recommendations about what we should pursue in terms of tests that should be prioritized in our development process and so on.

Q.  Okay.  And was his -- Was it a mutual determination for him to leave?  Did it have anything to do with issues pertaining to the test's limit of detection?

A.  Not one iota.

Q.  Who approached -- Did Mr. Satterfield approach you first?

A.  I don't recall.

Q.  You don't remember?

Page 170

A.      I don't recall whether he came and said, you know, why don't we come to an accommodation.  We just -- it just naturally evolved over time.

Q.      Is that because he made comments to you prior to resigning that he didn't want to be the CSO anymore?

A.      No, no.

Q.      So how --

A.      I think it would have been more driven by the company just realizing where we were headed in a trajectory and that we -- we needed to have a chief scientific officer that was really fully engaged in everything we were trying to do and that it was going to be a lot of hard work going forward.  We were going to have to step up, you know, the game of, you know, how many tests we were producing and what they were and that sort of thing.

Q.      So in the same document, I think beneath Mr. Satterfield's quote, it says, "Two percent of the symptomatic patients at TestUtah's sites have tested positive for coronavirus since April 1 according to the State's data.  That's less than half of the 5 percent of patients testing positive at other sites."

Do you see that?

A.      Uh-huh.

Page 171

Q.      And so you were talking about Mr. Satterfield putting together a white paper explaining this discrepancy.

A.      Uh-huh.

Q.      And what was his conclusion?  Do you know?

A.      Mainly, it was a demographic issue.  It had to do with the fact that in Utah County they were testing a lot of children.  It had to do with the fact that Utah County was testing people who were asymptomatic, not just people that were symptomatic, which was not what they were doing up here.

So it was a -- it was a comparison that Lopansri made that I think that was out of school, and Satterfield took it on with the white paper.

Q.      Did anybody -- has anybody reviewed the white paper, any other scientists that you know of reviewed the white paper and confirmed the findings?

A.      We haven't had it reviewed in that context.  Lots of people have seen the white paper.

Q.      And you don't know whether that's been disseminated or published?

A.      I don't know to what degree --

MS. OSTLER:  Objection.  Ambiguous.

A.      I don't know what degree it's been disseminated.

Page 172

Q.      So on the next page --

MR. WASHBURN:  By the way, we've been going another hour and 45 since last break, hour and a half.  It's also getting toward lunch.  I think you've still got a chunk more.

BY MR. PINEIRO:

Q.      Yeah.  Why don't we -- I mean, why don't I finish -- I mean, is it okay finishing the document?  You got to go to the restroom?

A.      Yeah.  Go for another half hour or so if you want.  It's fine.

Q.      It's your call.  So if you want --

A.      No.  I'm good.  I'm good.  Go to 1:30, and then we can break.

Q.      Okay.

MS. OSTLER:  Madam Court Reporter, are you okay?

THE COURT REPORTER:  Let's stop after this.

MR. PINEIRO:  Okay.  Bathroom break after this.  Me too.

MR. WASHBURN:  Me too.

BY MR. PINEIRO:

Q.      Okay.  So if you turn to the next page, there's a section that starts with -- it says, "Critics question and CODX defends TestUtah tests."

Page 173

Do you see that?

A.      Where am I looking at here?

Q.      Are you looking at that?

A.      I think I'm on the right page.

MS. OSTLER:  No.  It's actually one more page.

BY MR. PINEIRO:

Q.      Sorry.  Are you there?

A.      Okay.  Go ahead.

Q.      And this says beneath that, "Shares in Co-Diagnostics tripled in late February when it received certification to sell its coronavirus test in Europe."

Do you see that?

Beneath that it says, "Now the company is supplying thousands of tests in Iowa and Nebraska, where State officials last week issued no-bid contracts worth more than 50 million to Nomi and the TestUtah team."

Do you see that?

A.      Yes.

Q.      A couple paragraphs down, it says, "An analysis by the life sciences publication BioCentury showed that at least 16 of 22 comparable tests authorized by the FDA report a lower limit of

Page 174

detection, or greater sensitivity, than Co-Diagnostics' test."

Q.   Do you see that?

A.   Uh-huh.

Q.   Have you ever seen -- have you ever reviewed that BioCentury analysis?

A.   I don't know that it's a BioCentury analysis.  It may have been published by whoever BioCentury is.

Q.   Sure.

A.   But you can -- you can -- That data has been available on the FDA's website for -- during all that period of time.

Q.   And have you ever --

A.   There are a lot of other very reputable companies on that list who have significantly less LoD than we do.

Q.   Right.  But have you ever reviewed that analysis?

A.   Yeah, I've looked at that.  Yeah.

Q.   Okay.  And what did it conclude?

A.   I conclude we were in the game just fine; and from a clinical standpoint, our test performed adequately.  As I think I previously mentioned, the CDC test was pretty much right next to ours.

Page 175

Q.   Right.

A.   That's the CDC.

Q.   And that -- and that report, did it focus on the limit of detection?

A.   It's on the list that you're talking about.  I'm talking about the same list, the one that BioCentury has published.

Q.   No.  I understand.  So that the BioCentury analysis -- Sorry.  This analysis that we're discussing here, was it focused on just limit of detection?

A.   I believe so; but I'd -- Off the top of my head, I don't know; but I think that's what it was on.

Q.   And then the next paragraph says, "Its limit of detection is also higher than that of the CDC's test, wrote Dr. Dan Diekema, Director of the Infectious Diseases Division at the University of Iowa's Department of Internal Medicine."

Q.   Do you see that statement?

A.   Uh-huh.

Q.   Now, you've indicated earlier that you were in the ballpark of the CDC's tests?

A.   I think so.

Q.   Okay.  Is what Mr. -- Dr. Diekema wrote here --

Page 176

A.   He doesn't tell you how -- when he says higher, how much higher.  He just says higher.

Q.   Okay.  Why are they talking so much about limit of detection if it's not that important according to you?

MS. OSTLER:  Objection.  Calls for speculation.  Misstates prior testimony.

A.   I don't know why they're talking about LoD.  I would -- I would urge you to look at the clinical relevance of LoD in the overall scheme of things with the test, because there's a whole bunch of other things that, you know, trigger a positive or negative test.  Especially in an environment with COVID-19, there's thousands and thousands of viral particles in a sample.  So you could have a wide variance, as there is throughout the industry in LoD; and all of them have clinical relevance and are able to be used in labs, CLIA labs, authorized by the FDA.

Q.   But -- And I'm sorry.  We've talked about this; but you indicated it's a relevant factor, correct, LoD?

A.   We're talking about clinical relevance.

Q.   It's clinically relevant, correct?

A.   Yeah, it is one of the things -- one of the aspects of clinical relevance.

Page 177

Q.   And it's clinically relevant as to sensitivity, correct?

A.   That I can't tell you exactly, but I think it's related to sensitivity.

Q.   So I mean, this entire case is about the sensitivity of a test and the limit of detection; and you're not aware, you don't have knowledge of the relationship been LoD and sensitivity?

MS. OSTLER:  Objection.  Argumentative.  Asked and answered.

A.   I've never had anybody describe to me what this whole case is about, so that's an interesting comment to me.  But I think what the case is -- I view the case is about what we said in the public press release, which was a concordance feature.  It didn't -- it didn't call out LoD.

Most of people who use our tests that are other CLIA labs respond to us with comments like, "You realize your LoD is actually a lot better than what you published with the FDA."

We go, "Fine," you know.

Q.   Why does it matter?

A.   It doesn't matter a lot.  It matters within the context of clinical relevance.

Q.   But I'm just surprised that as the CEO of

Page 178

this biotech company that you don't have an understanding of the interplay between LoD and sensitivity.  Isn't that bizarre?

MS. OSTLER:  Objection.  Argumentative.

A.       I think I have a general enough understanding of what it means to make the decisions I have to make, and then the scientists are the ones that have to make the decisions about what is put in and published as our scientific data; and the regulatory bodies need to evaluate that in context of what they're willing to clear.  It's not something that I can weigh in on.

Q.       So once you receive --

MR. PINEIRO:  Actually, you needed to take a -- Me too.  That's fine.  Why don't we take a break right there?

THE VIDEOGRAPHER:  We are going off the record.  The time is 1:02.

- - -

And, thereupon, the deposition was adjourned until 1:35 p.m. on Thursday, April 13, 2023.

- - -

Page 179

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:48.

BY MR. PINEIRO:

Q.       So, Mr. Egan, where we left off, we were chatting about the April 30 Salt Lake article, correct?

What was -- Do you recall what was your personal reaction to seeing that article?

A.       I was disturbed by it for several reasons. I thought it was factually incorrect.  I believed that even though I didn't know what motives were in operation at that point, it was not only a pandemic, but it was an election cycle going on.  And so Governor Herbert, who had assigned Spencer Cox, as the lieutenant governor, to kind of be the person who was in charge of the State's response, was running a vigorous campaign with -- in a primary election against John Huntsman, Jr., who had already been our governor twice and had subsequently served as the ambassador to China and to Russia and thought, I think, that being elected governor of Utah would be a lay-up for him.  And here they're in the primary, and it's -- it's a difficult sledding for Governor Huntsman.

Well, so to make matters worse, Governor

Page 180

Huntsman, Paul Huntsman, was the owner of the Salt Lake Tribune.

And so we had lots of reasons to question the motive of, you know, what was going on and why the Tribune seemed to be so assiduously bent on discrediting Co-Diagnostics and the current administration.

Q.       You think that the article was -- was really directed to Cox?

A.       We think -- we think there's a possibility. And like I said, I can't really speak to their motive; but it certainly was so strenuously argued that it looked to us like they had an agenda to discredit Cox, who was in charge of the State's response.  And, of course, one of the best ways they could try and discredit it was to try and discredit the Silicon Slopes consortium that were primarily backing Cox as a candidate.

Q.       And do you have -- I mean, are you speculating?  You're surmising this, or do you have evidence or other concrete data that would show that?

A.       I think on the main you'd have to accept it, I'm saying, as being our perception.  I didn't -- I didn't conduct a big study as to what we might be doing.

Page 181

I will tell you this, however.  We -- In the middle of all of that, the Tribune, one of their associated groups, came to us under the pretense that they were going to buy a large number of tests.  Yeah, you know, I think it was in the order of 15 million dollars or so.  It was either 15 million dollars or 15 million tests, but ostensibly for philanthropic, let's say, purposes.

And they approached us very formally about this whole project, and then they said, "The only thing we need to know is we need to do our own test of your test to make sure that they're good --

Q.       Yeah.

A.       -- before we make this commitment."

So we consented to that.  They hired an independent person to do the analysis.  She did the analysis over a certain period of time.  The test results were awesome.  She said these results were better than the company says their results would be.

As soon as the Tribune knew that, as soon as this organization, they just dropped it like a hot rock.

We surmised they don't want to know about how tests are doing so they can buy tests at all. They were just after doing their own test and their

Page 182

own analysis so they could try to discredit us; and when they found out they could not discredit us, they just dropped the whole thing like a hot potato.

Q. So this is a group affiliated with the SLT? And SLT is for the Salt Lake Tribune.

A. Yes. And I don't know exactly what the entire relationship was; but that's how we interpreted it, yeah.

Q. What was the name of the person or the company that approached you?

A. I don't recall what it was exactly.

Q. And what -- how did you come to believe or to understand that they were affiliated with the Tribune?

A. Because they would have indicated such.

Q. They -- they told you?

A. They would have told us, yes.

Q. Who was the person at CODX who mostly interacted with this group?

A. Joseph Featherstone.

Q. Featherstone. And so you're saying that you provided them with, I guess, samples of your tests?

A. Uh-huh.

Q. And they performed the validation study?

A. Uh-huh.

Page 183

Q. And where was that -- Do you know what lab they carried out that -- which lab they carried out that validation study?

A. I don't know all the places where it was done. They had access to our facility if they wanted to use it. But the scientist who conducted it was a very highly credentialed Ph.D. I'm trying to remember her name, but she's the one who did the study.

Q. Did you -- did they give you some type of written report or analysis?

A. Yes, yes, we saw the report.

Q. So they provided that to you?

A. Uh-huh.

Q. And then after they provided that to you, what happened? They just -- they dropped it?

A. Like I say, the Huntsman-related entity dropped it; and we interpreted it that as you were never interested in buying tests.

Q. And it's related to Huntsman how? Do you know?

A. I don't -- I don't know the particulars of who owned what. It was just represented to us that it was a philanthropic maneuver on -- that was affiliated with Huntsman.

Q. With Paul or the former -- the former

Page 184

governor?

A. Well, certainly Paul.

Q. Yeah.

A. I don't know about the former -- I don't know exactly the former governor.

Q. Okay.

A. And, again, I wouldn't hesitate to add these were our perceptions based on the facts as we saw them. We think they were disingenuous, in other words.

Q. So, you know, when you see this -- this article in the Tribune, is it perceived as a big deal at CODX?

A. Yes, it was.

Q. Okay. Why is that?

A. Because they put in the blogosphere a lot of very bad representations, starting with Lopansri. And, of course, you know, once that stuff hits the blogosphere, you can't call it back. It instantly goes all the way around the world, and it -- I think it damaged us significantly --

Q. How so?

A. -- the company.

Well, because it casted aspersions on our primary products, which were obviously lies and

Page 185

inappropriate. You don't go on to sell 30-, 35-or-some-odd-million tests around the world to labs who have to do their own analysis of your test; and you don't do that with a product that has serious faults. You just -- It's logically inconsistent to the max.

And so it damaged us by making suppositions; and you can guess, as well as I can, what the motives are. I think the motives for people like Intermountain Health Care might well have been motives of competition. They didn't like Hospital Corporation of America having -- you know, horning in on what they perceived to be their territory and where they wanted to dominate.

With respect to the political situation between Cox and Huntsman, that's another potential motive. I can't say that it's -- that it holds water or not; but these are the kind of things that, you know, you surmise. And you get the sense that publications like the Tribune have a narrative that they want to promote that no matter what facts are put in behind -- in front of them, including a test that they were involved with that showed that the tests were awesome, they completely ignore it, drop it.

So to us it said they were disingenuous.

Page 186

There were other motives at play.

And so you asked why we were concerned about it. Those are some of the reasons that would have --

Q. And so do you recall, you know, was there, you know, like an -- urgent meetings that were set up to sort of discuss the PR and other response to the article when it was published?

MS. OSTLER: Objection. Ambiguous.

A. Well, this is at a time when we're -- It's kind of during the time when we're in front of the FDA for our clearance. And so, yeah, we're highly focused on the fact that we have a submission in front of the FDA. That becomes a very important thing for us.

And so were there meetings? Yeah, meetings about, you know, what's going on. We're preparing for when and if we get clearance.

Q. So just -- do you recall -- I mean -- So the article came out April 30. Wasn't -- wasn't the EUA clearance before that?

A. I think the EUA clearances was -- Just off the top of my head, I think it's -- We'd have to look at a document.

MR. PINEIRO: Okay. So this is going to be PX24. This is Egan 13.

- - -

Page 187

And, thereupon, Egan Exhibit No. 13 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q. I'm showing you what's been marked Egan 13. If you go to the second page --

MR. TAYLOR: Do you have the Bates on that?

MR. PINEIRO: Yes. It's 35456.

MR. TAYLOR: Thanks.

BY MR. PINEIRO:

Q. So there's an E-mail at the bottom from Clint Betts at Silicon -- Silicon Slopes to Mark Newman, and you're copied. Well, Seth Egan is copied.

Do you see that?

A. Uh-huh.

Q. And then it looks like on top of that -- Sorry. Who is Clint Betts?

A. He's with Silicon Slopes. I'm not sure what his position is.

Q. Okay. And then above that you're -- Seth Egan writes, "Clint, yes, we are available to join. Please see the attached document. I would like to add the following participants from our end (copied on this E-mail.)"

And then you see it's listed -- you're

Page 188

copied, and so is Brent and Reed.

A. Uh-huh.

Q. And so then it seems like if you go to the first page, there's a Zoom call set for 1:30 on that same day. Do you see that? It's an invitation from Drew Ludlow at Silicon Slopes at 1:30 for a Zoom.

A. Okay.

Q. And then right above that, three or four hours later, Clint Betts sends an E-mail that you're copied on that says, "Any progress on the statement we discussed on our call this afternoon?"

Do you see that?

A. Uh-huh.

Q. And above that you say, "Clint, we've been drafting it since our call. Six minutes ago I got an update from Dave. If you would, please get updated from him about recent developments; and we can talk about strategy."

Do you see that?

A. Yes.

Q. So it's fair to say that Co-Diagnostics was working with Silicon Slopes and Nomi Health on a strategy to respond to the article?

MS. OSTLER: Objection. Ambiguous.

A. It's fair to say that a major customer of

Page 189

ours was calling us and wanting a response from the company. Is there anything we can do to respond to this -- this article, which as I've already indicated in my testimony we thought was scurrilous from the get-go.

And so we, you know, had -- had to respond to a major customer, who we thought was being misled by an inappropriate and an untrue and unfair article, which as you -- as I've indicated in previous testimony, I think was every bit as pointed, if not more so, at Silicon Slopes and Nomi Health as it was at Co-Diagnostics. I can't -- I can't tell you the rationale of where they were going.

Q. Yeah.

A. But they wanted to know if we could help them. And, you know, it's logical that they would say can you defend what we're having to deal with here?

Q. Can you recall just the substance of the discussion you had on that call?

A. Just what I just said, that what's the response to this?

Q. On that call were there any discussions regarding the cause for the lower positive rate that was set out -- that was alleged in the article?

A. I don't recall whether we discussed that or

Page 190

not.  I mean, it looks to me like Dr. Satterfield was included on this call, our counsel.  We would have -- You know, to the extent there was a difference in what Salt Lake and Provo were getting in their responses, we thought there were bona fide demographical reasons why that would be the case, including, as we talked before, the significantly younger population in Utah County and these significantly -- the significant variance caused by the fact that they were testing people who were asymptomatic, instead of just symptomatic like they were in Salt Lake.

There were lots of reasons why we felt that, you know, what was being alleged and what was being pushed around as to disparage Nomi and us, directly or indirectly, there were -- you know, there were good reasons why that was nonsense.

MR. PINEIRO:  Got it.  This is going to be PX26.

- - -

And, thereupon, Egan Exhibit No. 14 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    Showing you what's been marked Egan 14; is that right?

Page 191

If you could go back to the -- if you go to the second page, Mr. Egan.

MR. TAYLOR:  Bates number?

MR. PINEIRO:  Oh, yeah.  It's 5044.

MR. TAYLOR:  Thanks.

BY MR. PINEIRO:

Q.    So towards the bottom of the second page, there's an E-mail from you to Jennifer Webb.

Do you see that?

A.    Uh-huh.

Q.    And then it says "Response."  And then there's -- I guess some text titled, "Co-Diagnostics' response to Tribune article of 4/30/2020."

Do you see that?

A.    I'm looking for it.  Hold on.

Q.    At the bottom.

A.    Yes.

Q.    Do you recall -- I mean, this is -- appears to be an E-mail from you to Miss Webb where you provide what seems to be like a draft of Co-Diagnostics' written response to this article, correct?

A.    That's what it looks like to me.

Q.    Do you recall writing this on your own?

A.    I -- I don't think I wrote this on my own.

Page 192

Q.    Okay.  And do you recall participating in writing it?

A.    I would have -- I would have probably seen the draft.

Q.    Yeah.  And do you know who actually participated in writing this?

A.    My guess is that Andrew Benson would have been the primary author of it.

Q.    Do you know if in connection with this first draft whether Brent Satterfield or any other science personnel at the company were involved in the drafting?

A.    I would be -- I'm certain that Brent Satterfield was involved.

Q.    Okay.  So if we walk just through the draft, the first -- It says, "A recent article in the Salt Lake Tribune challenged the veracity of Co-Diagnostics' COVID-19 test results.  The company believes that the article contains numerous misleading" references --

MS. OSTLER:  Inferences.

Q.    -- "inferences."  Sorry.

"The test in question received regulatory clearance from the European Union on February 29 and was the first U.S. based company to achieve a CE

Page 193

mark."

Do you see that?

A.    Yes.

Q.    A little further down it says, "The article inferred that the company has little experience in molecular diagnostics, when, in fact, the company has a wide array of in vitro diagnostic tests approved by either the European Union or the CDSCO, the regulatory authority in India."

Do you see that?

A.    Yes.

Q.    Next paragraph says, "The company's COVID-19 test has been the subject of numerous validation studies, including PathWest Laboratories in Australia, the Indian National Institute of Pathology, Mexican government's InDRE and the Minnesota Department of Health."

Do you see that?

A.    Yes.

Q.    "All of these studies show 100 percent concordance for both specificity and sensitivity, the benchmarks for accuracy."

So just in this same paragraph where it says the company's tests have been the subject of numerous validation studies, and it lists some, as of this

Page 194

point in time -- this is April 30 -- do you know how many validation studies the test has been subject to?

A.    The ones I would have been aware of are the ones that are stated here: PathWest, in India, the Mexican government, and the Minnesota Department of Health.

Q.    Okay. Now, it seems the language appears to imply by saying including that there may be other ones. You don't know of any -- It says, "validation studies including." So did that mean -- does that mean that there was other ones that aren't referenced here, or this is the full set to your knowledge?

A.    I think to me that was what was available at the time. This is very early. There's no reason to think we would have a boatload of other regulatory clearances or studies.

Q.    When you wrote this -- Strike that.
      When this was being prepared, do you recall having any discussions about all of the available validation studies regarding the test?

A.    I don't have any specific recollection of are there others, for example. These -- I think these were actually quite recently completed. So it wasn't like we had these in a drawer waiting to defend our test.

Page 195

As I recall in the meeting that we had with the Silicon Slopes people, when they asked us if we had something that we could, you know, bring to bear as to the veracity of our test, these had just been completed. So we said, "Well, we have these studies available that have been done."

Q.    Are there -- To your knowledge, was there any validation studies that had been performed on the Logix Smart test that are not referenced in this paragraph?

A.    Not that I know of aside from what we've already discussed with respect to what we understood was a compromised test in India.

Q.    Who would have information about this? Who would have the most information about this? Is it Mr. Satterfield?

A.    Satterfield would know, the scientific team at the time, yeah.

Q.    Okay. And then where it says, "All of these studies show 100 percent concordance for both specificity and sensitivity, the benchmarks for accuracy," what is meant by 100 percent for both specificity and sensitivity?

      MS. OSTLER: Objection. Foundation.
      Go ahead, Ike.

Page 196

A.    That means that our test, when compared with a comparator that is deemed to be a -- sort of the standard, that our test reflected exactly the same score as these other tests in terms of specificity; in other words, saying that they have or they do not have COVID-19, and it's not compromised with other positives. You know, there's -- there's a lot of other tests that are done in connection with it that -- that are -- I don't know whether it's two dozen different pathogens, but it's a lot. And then, of course, the same kind of concordance and analysis with respect to sensitivity.

Q.    And so --

A.    In other words, did we say it was positive or negative?

Q.    It says, "The recent article" -- The next paragraph.
      "The recent article cited differences in LoD, or level of detection, inferring that the company's COVID-19 test was less likely to detect low levels of infection, when, in fact, the above-mentioned validation studies demonstrated excellent results in level of detection metrics."
      Do you see that?

A.    Yeah.

Page 197

Q.    "In support of the article's insinuation, the authors cited the company's own conservative data in the FDA's Instructions for Use. While the company's own data intended to show the worst case scenario for purposes of regulatory approval, the performance of the test in a clinical setting shows that the company's test performance corresponds with required standards with 100 percent conformity. You can't get better than 100 percent."
      Do you see that?

A.    Yes.

Q.    Whose decision was it to write that line, "You can't get better than 100 percent"?

A.    Well, that's Satterfield's quote, so --

Q.    Okay. So it's Mr. Satterfield?

A.    I would say, yes. I mean, he's -- he's the one that's quoted as saying that.

Q.    And then when it says, "that the company's test performance corresponds with required standards with 100 percent conformity," did you understand -- what did you understand that to mean?

A.    I understood it to mean that when the -- when the tests, which were being compared, said that it was COVID-19, so did ours without exception, and the same thing on the specificity metric, which are

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 198..201

Page 198

together commonly assumed to be the primary benchmarks for accuracy in molecular diagnostics.

Q.    Was there any discussion in preparing this draft statement about whether the public or readers of this statement might be -- might be under a misimpression that the tests are 100 percent accurate when they read these statements regarding 100 percent conformity or can't get better than 100 percent?

A.    No, because in the common parlance of the industry, the 100 percent, 100 percent is a comparative metric that's used by everybody.

So as I mentioned in previous testimony, if you look at the list of emergency use authorizations that are on the website of the Federal government, they mention scores of companies that cite 100 percent specificity and sensitivity concordance results.

It's commonly known, and it was published. Anybody could look at it. It's one of the reasons -- There's hooplas of people that have access to this data. And they use it, and they misconstrue it, and so on and so forth; but it is publicly available.

And we were only citing results that we were -- that we had cited for the Federal government, and we were citing conformity tests that were done by third-party people with whom we had nothing to do.

Page 199

I mean, just think for a second what it means to send a tube of reagents to Mexico, to somebody with whom you have no relationship or they have no interest in us or anything else. So they take it into their lab -- they're going to let this be unleashed to their entire population -- to test for COVID. And they test it and they test it rigorously to see whether, in fact, it gives them the concordance results they're looking for. Otherwise, they would not approve the test.

They -- they do that without us having any kind of input in that at all, and then they publish the results. And that's what we hot link to with respect to the press release and what we indicated, you know, in defense of our, you know, knowledge of how the test actually performed.

Q.    If you go to the next E-mail, right above it there's an E-mail from you that you've -- I guess you forwarded the response to Brent Satterfield and Jennifer Webb. And you say, "Brent, Jennifer is reworking this draft. I need you to look at the section on LoD and put it in the way you would like to see it addressed. Any other suggestions are also welcome."

Do you see that?

Page 200

A.    Uh-huh.

Q.    So it seems like this is the first time -- Strike that.

Based on your E-mail, doesn't it appear that this is the first time that Mr. Satterfield has seen this draft language?

MS. OSTLER:  Objection.  Calls for speculation.

A.    Well, the date of the draft language is arguably the 30th of April.

Q.    Right.  And so then that same day, after you sent it to Miss Webb, you forwarded it to Brent. And you say, I would like for you to look at the LoD section and "put it in the way you would like to see it addressed," so -- "Any other suggestions are also welcome."

So it appears this is the first time you speak to Mr. -- you contact Mr. Satterfield about providing feedback on this -- on this language, correct?

A.    I don't know that this --

MS. OSTLER:  Whoa.  Whoa.

Objection.  Calls for speculation.  Assumes facts.

A.    Look, he's my chief scientific officer.  I

Page 201

talk with him regularly.  So just how many conversations I had with him about LoD, I cannot say; but the fact that we were putting together a position paper that -- I would naturally want to go to my chief science officer and say, "I want you to peruse this and correct anything that needs to be addressed."

I'm not the scientist.  I'm looking for the scientist to give us the viewpoint from a person who was a molecular scientist, who invented CoPrimers, which have been featured in the Journal of Molecular Diagnostics as a technical advance demonstrating a two-and-a-half-million-fold reduction in nonspecific amplification errors.  He is sophisticated.

Q.    I understand that.  So --

A.    And I have a right to go to my chief science officer and say, "Look over this document and see if it says what you want it to say."

Q.    You're misunderstanding my question.  I -- I think that makes sense.  What I'm asking here is, it seems like this statement we read was put together initially without his input; and then you seek his input in this E-mail on April 30 at 5:53.  That's what I'm trying to understand.

MS. OSTLER:  I don't -- I don't understand what the question is.  You just made statements.

*JD Legal Support  |  (801) 937-9620*

Page 202

BY MR. PINEIRO:

Q.      I did.  So I mean, based on this E-mail, it appears that the first time that Mr. Satterfield -- Strike that.

It appears that this initial statement is prepared without his initial input, and then you're asking for his input for the first time in the E-mail at 5:53 p.m., correct?

MS. OSTLER:  Objection.  Calls for speculation.  Assumes facts not in evidence.

A.      Clearly, this document was collaborative.

MR. PINEIRO:  How does this call for speculation?

MS. OSTLER:  Because you're speculating whether or not --

MR. PINEIRO:  I'm asking him.

MS. OSTLER:  -- Brent ever saw this, but Brent is not here to testify.

MR. PINEIRO:  Hold on.  I'm asking a witness about his personal knowledge.  The problem with some of these objections is they're not, in my view, proper and they do coach.  And so like in this scenario, there's nothing about that question -- I'm literally asking him about his personal knowledge.  It appears --

Page 203

MS. OSTLER:  No.

MR. PINEIRO:  -- that this is --

And I'm asking if that's correct or not.  And he has the personal knowledge to say, "I don't know," or to say, "Yeah.  Actually, that -- that's the first time I sent him the draft."

MS. OSTLER:  Okay.  I disagree with what you just said because you're saying, "It seems from this blah, blah, blah, blah, blah; is that correct?"  You're not saying, "Do you know if Brent Satterfield ever saw this draft before?  Do you know if Brent Satterfield had input on this draft before?"

You're just saying, "Based on this, it seems like blah, blah, blah"; and then you're asking him to agree with your speculation.

MR. PINEIRO:  I'll ask a better question.

BY MR. PINEIRO:

Q.      So do you know whether Mr. Satterfield saw this draft language from the Tribune -- this draft language before you sent him this E-mail at 5:53 p.m.?

A.      I don't.

MS. OSTLER:  Mike, I'm really not trying to coach him; but I feel like the dialogues that we're having is coaching him more than just my --

MR. PINEIRO:  Sure.

Page 204

MS. OSTLER:  -- objection.

MR. PINEIRO:  I'm not worried about --

MS. OSTLER:  I normally would not have a dialogue like that in front of the witness.

MR. PINEIRO:  Don't sweat it.  It's a deposition.  It's no big deal.

BY MR. PINEIRO:

Q.      So if you go to the first page at the bottom, there's an E-mail from Brent Satterfield to -- to you and to Jennifer; and he appears to respond to your E-mail.  And he writes on the next page, "On the phone with Dave Elkington.  Looks like IHC and the guy who wrote the E-mail are going to issue a formal apology and a retraction of their statements."

Do you see that?

A.      Where are we?

Q.      On the top.  You're on the right page, on the next one.  The next page.  There you go.  Up top.

"On the phone with Dave Elkington."  Do you see that?

A.      Yes.  Okay.

Q.      And it says, "Also the State of Utah is buying tests from us to run a side-by-side comparison to end this controversy."

Do you see that?

Page 205

A.      Uh-huh.

Q.      Did that ever occur?  Did the State of Utah ever buy, purchase tests from CODX to run a side-by-side?

A.      I don't believe so.

Q.      Did they offer to do that?

A.      They may have offered to do it.

Q.      Did CODX --

A.      My recollection is that we were happy to have any kind of a test done by an independent third party who weren't necessarily going to count them and say potentially biased test from, you know, an interested party.

Q.      Interested party being who?

A.      Being Intermountain Health Care, being members of Intermountain Health Care who are on a task force for the State and so on.

Q.      Couldn't you -- couldn't -- couldn't the State of Utah run the side-by-side at a lab that you would consider to be uninterested or unbiased?

A.      I suppose.

Q.      Why didn't you offer that?

A.      I don't know exactly at this point what exactly we did offer them, but -- but --

Q.      So --

Page 206

A.        But our test have been evaluated by, you know, arguably hundreds of labs.  So it's not like we were worried about what results we were going to get. I've already told you about a test that was funded with $60,000 from this Tribune-related group that they just flat out ignored when it showed our test had good performance, because it did not fit their narrative is our judgment for why that happened.

Q.        And then the next sentence -- the next paragraph says, "As such, I wonder if it would be better to put out a general update on our results in the field rather than a point-by-point rebuttal.  I believe we can make an even stronger rebuttal by ignoring their article and simply giving an investor update that covers many of those same points."
          Do you see that?

A.        Yes.

Q.        So why -- why was -- Do you know why Mr. Satterfield was discussing providing an investor update in response to this -- Strike that.
          Was the purpose of this article that you circulated to provide an investor update?

A.        It was to provide an update to whoever wanted to read it in the press.

Q.        But primarily focused on investors according

Page 207

to Mr. Satterfield, no?

A.        Well, according to Satterfield.  He wasn't running the company.

Q.        Did you respond to him and tell them this isn't just for the investors, this is for everybody?

A.        No, but I wouldn't necessarily take on every point-by-point and every word.

Q.        So he was mistaken when he called it an investor update?

A.        Not necessarily.  I mean, it would include an investor update.  Remember what was going on at this time.  The coronavirus is starting to rage.  It is the -- it is the lead story on every news story. Every time the news comes on how many cases, how many hospitalizations, how many deaths.  People want to know what's going on; and they want to know what our company's response was to it, having, you know, been involved in making COVID-19 tests.
          So I don't think there's anything that's odd about us wanting to report to the public, whoever they may be, customer.  It isn't just investors.  You got -- you got customers that see this data.
          When that article went out from the IHC, it went to our customers.  I'd get calls from India about it.  I mean, when you put it into the blogosphere, it

Page 208

has far-reaching effects.
          And as I mentioned several times in this testimony, we were damaged significantly by irresponsible remarks that we then had to defend necessarily.  And we did it with bona fide data from bona fide third-party lab participants, including InDRE, Minnesota Department of Health, the pathology group in India, and PathWest in Australia.
          This was fully -- It should have fully been expected that the company had the right to defend the bona fides of its test.

Q.        Got it.

A.        And it has been continually -- continually done so for this -- for this several years that go past this date.

Q.        Understood.
          And then you see below that Mr. Satterfield writes, "For example," and then he appears to set out some draft text that starts with CODX in quotes. "Co-Diagnostics reports 100 percent sensitivity for its coronavirus test."
          Do you see that?

A.        Yes.

Q.        And there he also -- The next paragraph has a quote.  "We are proud to announce that we have won X

Page 209

international government tenders due to our test's superior performance when compared to U.S. and other tests.  We have repeatedly seen 100 percent sensitivity and specificity, and you can't do better than that."
          Do you see that?

A.        Yes.

Q.        So it seems like he actually, when he uses that statement, it's derived from the initial draft that you had sent to him, correct?

          MS. OSTLER:  Objection.  Calls for speculation.

A.        I have no idea whether that derives from that.  This is just how he wanted to characterize what had gone on.  He's the scientist who invented the technology.

Q.        But this statement is similar to the one in the prior version, right, which says, "You can't get better than 100 percent"?

A.        Uh-huh.  Are you asking whether the language that shows up in the press release is a derivative of this paragraph?

Q.        I'm saying that his -- that his proposed language here, where he says, "You can't do better than that," it appears to stem from the original draft

Page 210

that says, "You can't get better than 100 percent."

I'm asking whether, you know -- whether you know that his proposal here was a modification of, "You can't get better than 100 percent."

A.    No, I don't know whether it's a derivative or not.

MR. PINEIRO:  This is PX31.  This is Bates 1205.

- - -

And, thereupon, Egan Exhibit No. 15 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    So I'm showing you what's been marked as Egan 15, right?

So if you could just go to the third page of that document.

Thank you.  It's the third page.  If you want to, I can walk you through it.

A.    Go ahead.

Q.    At the bottom there's from -- I mean, the very, very bottom -- the start of an E-mail on April 30 at 9:06 p.m. from Jennifer Webb.

If you go over to the next page, it says, "Dave and Clint, the response plan for the Tribune

Page 211

article is as follows."

Do you see that?

A.    Okay.  Hold on.  I maybe went the wrong direction.

Q.    It should end -- it should be the next page.

There it is, I think.  Yes, that's it.

At the top you see, "Dave and Clint"?

A.    Uh-huh.

Q.    Yeah.  It says, "News release distribution. A version of the attached release is planned for national distribution.  The release addresses the faulty points in the Tribune article without engaging in a point/counterpoint.  The goal of that approach is to provide content and information that is relevant to a broad audience of stakeholders to avoid creating market crossover that could introduce the Tribune article to more markets both in the U.S. and internationally."

And then if you just go back a page.

The other way.  Sorry.

And so up above Clint Betts writes an E-mail that says, "Quick recommendation.  I think it'd be good to include a quote from Co-Diagnostics Chief Science Officer Brent Satterfield in the release. Adds credibility and inoculates your company from

Page 212

being hit for 'just being a tech company that doesn't understand testing and science.'"

Do you see that?

A.    Uh-huh.

Q.    And then I guess he says, "Ha, ha.  See that he's quoted very clearly."

On the next page, there's an E-mail from Andrew Benson --

A.    Coming forward?

Q.    Yeah.  Yeah.

-- to Jennifer Webb.  You're copied.  It's April 30 at 10:44 p.m.

So you're working late into the night on this -- on this day, the day of the Tribune article.

MS. OSTLER:  Objection.  Actually, I think these were produced in UTC, right?  I thought that that --

MR. PINEIRO:  10:44 p.m.

MS. OSTLER:  Well, my understanding was that the E-Discovery protocol required that the documents be processed in UTC.  I just wanted to note that for the record just in case.

MR. PINEIRO:  Okay.

MS. OSTLER:  Continue.  Sorry.  You go ahead.

Page 213

BY MR. PINEIRO:

Q.    Do you recall working late into the night on this press release?

A.    If there was something that was going to be released the next morning, I would typically be involved up until the time we decided it's good to go.

Q.    Then you see Mr. Benson writes, "I'm fine with the quote change, but even if it takes it in a bit of a different direction, but that's okay."

Then he writes, "To what degree do we want to explain the LoD here?  I prefer striking that phrase entirely over getting into the weeds about it."

Do you see that?

A.    Uh-huh.

Q.    And then if you go back to the front page, Mr. Benson writes another E-mail.  This is, I guess, the next morning.  He says, "To make things easier to parse, I just removed the line about the 13.5 copies. I liked it in there since it directly addresses some of the points that the article alluded to."

Do you see that?

A.    Yes.

Q.    And so then just taking you -- There's a press release -- a draft press release attached to the document, if you could just go to that.

Page 214

A.   So the last one or the --

Q.   It's the second to last -- No, it's not. You'll see it.

There it is.

So you're familiar with this document?

A.   This is a draft, you're saying?

Q.   Yeah.

A.   I'm --

Q.   So you can see that there's some -- some edits to the document on the fourth paragraph where it says -- the paragraph that starts, "In remarking on the test's."

Do you see that?

A.   Uh-huh.

Q.   So it says, "In remarking on the test's favorable limit of detection" -- somebody added the word "favorable" -- "results in some of the evaluations" -- And somebody crossed off the word "some" regarding the evaluations.

Do you see that?

A.   Uh-huh.

Q.   Do you know who did that?

A.   No.

Q.   Does that indicate that there are other evaluations that aren't being referenced in the press

Page 215

release?

A.   I don't think so.  I think these are the only studies we had.

Q.   So why would somebody have initially put the word "some" in there?

MS. OSTLER:  Objection.  Calls for speculation.

A.   Oh, I don't know.  They're just drafting -- they're just drafting language for a potential press release.  There's lots of words that they use that would have to be taken out or altered.  You have to evaluate whether we're saying strongly or boldly or -- You know, there's a lot of nuances.

Q.   It says above that, this draft release says, "A summary of recent validation data and the data itself can be found."  And it provides a hyperlink.

Do you see that?

A.   Uh-huh.  I do.

Q.   So this is -- is it -- Is it possible that this was just the more recent validation data, but that there's earlier validation data that wasn't -- that hasn't been shared or referenced here?

A.   No, I don't believe so.  As I recall, when we had our conversation with the Silicon Slopes people, we'd just barely got these other results.

Page 216

They were just -- That's what we had.

Q.   You can put that aside.

MR. PINEIRO:  If you can go to -- This is PX23.

- - -

And, thereupon, Egan Exhibit No. 16 was marked for purposes of identification.

- - -

MR. PINEIRO:  Can we go off for a second?

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:35.

(Discussion held off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:36.

MR. PINEIRO:  This is PX32.  Hopefully, you have that.

MS. OSTLER:  Yes.

- - -

And, thereupon, Egan Exhibit No. 17 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.   I'm showing you what's been marked as Exhibit 17.  So I'm showing you what's been marked Egan 17.  Are you familiar with this document,

Page 217

Mr. Egan?

A.   Yes.

Q.   Is this the May 1, 2020, press release?

A.   Yes.

Q.   Okay.  Who gave the final approval for the language in the press release?

A.   The final approval would have been -- would have been given by me.

Q.   Okay.  Do you -- do you know how many drafts -- Strike that.

Do you know how many revisions or drafts of this statement were prepared before the final version was issued?

A.   I don't know the number.  It was -- it was an exercise that required a great deal of due care, and so we spent a lot of time on it.

Q.   So then the title is "Co-Diagnostics, Inc., Releases COVID-19 test performance data:  Consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations."

Do you see that?

A.   Yes.

Q.   The use of the word "consistent," why was that used?  Why was that word used to describe the test results?

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Page 218

A.      Because all of these independent tests in the field had the same result.  So it was consistent.

Q.      Okay.

A.      It's very early.  It's not like you have time to gather -- you know, gather a dozen or 20 or a hundred.  This is very early in the whole pandemic environment.  There was only so much data to cull from.  And from the data we had to represent it, it was consistent to the point, 100 percent, 100 percent.

Q.      Was there ever any discussion that the title of the press release might mislead the public that the test was 100 percent accurate?

A.      No.  Because in the common parlance of the molecular diagnostic world, and anybody that follows that science, they know what it means to have a concordant test.  And this is the way that every other COVID-19 manufacturer reported their results to the FDA on the same basis.  And most -- And a very vast -- a very large group of them also cited 100 percent sensitivity and 100 percent specificity.  There was nothing actually fundamentally or intrinsically earthshaking about the 100 percent and 100 percent.  It was basically de rigueur in the industry.

Q.      But this is -- this is not only being provided to the FDA or a regulator, this is going out

Page 219

to the public, correct?

A.      Well, everything that goes to the FDA in the context of what I'm talking about in emergency use is also available and was, you know, significantly accessed by the public.  They know what we are talking about.  They could have compared with any other major manufacturer of tests or small manufacturer of tests.  It is the way the industry perceives it.

Q.      But this is -- But this is a press release that's also going to the investing public, correct?

A.      Who's also going to the FDA and checking the premises on that on what's going on with other tests and other -- other emergency use authorizations with respect to their -- what they call an IFU or instructions for use.

All of these -- all of these filings are readily available to the public, and they show this same kind of response.

Q.      But, again, who is the target audience of this release?

A.      It's anybody who wants to read the press.

Q.      Right.

A.      It's customers.  It's a wide group of constituents.  It's customers, it's people who are investors, it's analysts and anybody else who's

Page 220

reading the press.

Q.      So it's people who don't necessarily have a specialized knowledge in infectious diseases or in lab testing, correct?

A.      They don't need to have a specialized knowledge.  They had -- they were using the common parlance of the industry in the press release; and we're showing, through the hyperlinks, the data that supports what we're talking about.  So if they happen to be confused at all, they can look at the data, they can look at the actual field testing, they can look at the site for EUA authorizations at the FDA and make their own determination.

But it's common parlance.  It is the industry standard.  It's how you would --

What do you want me to do?  Should I have lied to the FDA and said, "Well, everything said 100 percent, 100 percent; but we're going to put 93 and 87"?

I mean, we put what the data said.  The data speaks for itself.

Q.      But this isn't -- Hold on.  But this isn't an FDA submission.

A.      An FDA submission is a public document.

Q.      That's not what I'm saying.  This isn't a

Page 221

FDA submission.  This is a press release, correct?  And the use of the word "consistently," that's your word, correct?

A.      And it was consistent.

Q.      Okay.  So the language in here is not being made in connection with a regulatory submission.  It's being made in connection with a press release to the general public, correct?

A.      Yes, but it is, by reference, you know, indicating what, you know, is the data that is also being presented before the FDA.

Q.      Okay.  So the validation reports that were attached or linked to in this press release were submitted to FDA?

A.      I don't know what exactly was submitted to the FDA, but what was submitted to the FDA in our filing would have included the 100 percent sensitivity and specificity readings.

Q.      Right.  And that was based on a validation study in connection with the EUA application, correct?

A.      That's correct.

Q.      Okay.  So this is separate from that.

A.      This is a different release.

Q.      Correct.  And so I mean, did you submit -- did you provide this release to the FDA?

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 222..225

Page 222

A.    I don't remember whether they provided it to the FDA.

Q.    So it says, "Co-Diagnostics today released COVID-19 performance -- COVID-19 test performance data demonstrating 100 percent sensitivity and specificity, the metrics used to define accuracy in molecular diagnostic testing."

Do you see that?

A.    Yes.

Q.    What does it mean when it says, "the metrics used to define accuracy"?

A.    That's just the common industry parlance. If you want to know how accurate the test is, the two measures which are generally put up by companies involved in this industry are specificity and sensitivity.

Q.    But isn't -- Sensitivity and specificity, aren't they relative?

A.    I don't know from a scientific standpoint whether they're relative or not. They are the metrics that are used by the industry.

Q.    Sensitivity is based on concordance, meaning the result that your tests produces are similar to the results of another test, correct?

MS. OSTLER: Objection. Argumentative.

Page 223

Misstates prior testimony.

A.    I'm unclear as to what you're asking.

Q.    Sensitivity is a metric that is premised on comparing your test to another test, correct?

A.    Uh-huh.

Q.    Okay. It's not an absolute measure, correct?

A.    Correct.

Q.    Whereas limit of detection is an absolute measure. It's based on the amount of virus required -- that's required to detect a positive result, correct?

A.    I think LoD is a little bit more complex than that depending on other variables. So, no, I couldn't opine that that's correct.

Q.    Okay. And so when you say that something is -- when you say a test is 100 percent sensitive, what that means is that when compared to some other barometer, it's having the same -- 100 percent of the same results, correct?

A.    It's not an abstract barometer. It is another, you know, test that is held to be highly accurate. Ergo, when they test ours against it as a comparative to see if we conform, it's meaningful.

Remember, this is done in a blinded

Page 224

environment. We send a test out to somebody like the InDRE or the PathWest in Australia. We don't have anything to do with that test. They take our test, put it in the lab; and they put also another test that is their standard, and they benchmark them against one another.

And every time the one says positive, we have to say positive. Every time that we say that it is specific to that particular virus, it has to match.

It's a very difficult thing to do. And so when you do it over and over again consistently at 100 percent, 100 percent, that's a meaningful metric. And that is what is accepted by the industry as being the measures of accuracy. Those are the two benchmarks for accuracy. You can read about it in journal after journal and article after article.

Q.    So with the language here, wouldn't a layperson, you know, assume that when you're talking about demonstrating 100 percent sensitivity and specificity, which are the metrics to define accuracy, wouldn't a layperson perceive that you're conveying that this test is 100 accurate?

MS. OSTLER: Calls for speculation.

BY MR. PINEIRO:

Q.    I mean, isn't that a natural implication of

Page 225

a layperson reading that sentence?

MS. OSTLER: Calls for speculation.

A.    I think a layperson would be able to rely on a company that's using the standard vernacular and lexicon of the business in representing what the metrics are in terms of sensitivity and specificity, just like dozens and dozens of other companies did in their filings with the SEC -- or with the FDA.

Q.    So -- And then it keeps going, "The data being released comes from independent evaluations of the performance of the company's COVID-19 test in the field."

Do you see that?

A.    I do.

Q.    What's meant by "in the field"?

A.    Well, they're outside of our lab. They're out somewhere else.

Q.    Yeah.

A.    That's what I take it to mean.

Q.    Okay, but what does that mean here, "in the field"?

MS. OSTLER: Asked and answered.

A.    We define what the field means. We tell them. It's Mexico, India, and so on and elsewhere.

Q.    In the field, doesn't that mean -- In the

Page 226

field, doesn't that convey that this is based on actual testing that's occurring with patients?

MS. OSTLER:  Objection.  Argumentative. Asked and answered.

A.    I don't think so.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:48.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:53.

BY MR. PINEIRO:

Q.    So we're back on Egan 17.  Before I keep reading, do you know whether this release was -- Strike that.

Did you provide a draft of this release to Cecilia Hutchins before it was issued?

A.    I don't -- I don't know whether that was submitted to her or not.  Andrew would have a better recollection of that.

Q.    Do you recall inquiring about whether -- Strike that.

Do you recall inquiring about whether this was submitted to Miss Hutchins?

A.    I don't recall whether I asked for that or not.

Page 227

Q.    Do you know whether this --

A.    I know we spent hours and hours and hours on it.  So it went through a lot of different hands.

Q.    Do you know whether -- Did you have legal counsel review this before it was issued?

A.    I don't have a specific recollection of it, but it very easily could have been submitted to legal counsel with Reed Benson.

Q.    Do you know whether outside counsel reviewed this before it was issued?

A.    I don't think -- I don't think outside counsel would have reviewed it.

Q.    And you said that sometimes you had your outside firm Carmel Milazzo review press releases, correct?

A.    They could have reviewed this.  I just don't have a specific recollection of it.

Q.    You said that a lot goes into these press releases, a lot of people review them; but you don't recall whether they reviewed this one?

A.    No.  That's one of the reasons I don't recall.  It goes -- It's a process that takes a lot of time, and a lot of people see it.  So I don't know whether they specifically saw this one or not.

It's very possible that Andrew passed it by

Page 228

them.  He had a specific protocol he had to follow.

Q.    I mean, we're showing E-mails previously from April 30th where everybody was working to sort of quickly put together this release.  Are press releases typically prepared under those type of circumstances, where there's a significant rush to get it out?

A.    No.  Sometimes a press release is, you know, put together the day before.  Andrew may have done a draft; but it's not ready to circulate until, you know -- But that would tend to be something like we're going to present at a show, at a convention, where it's a more perfunctory press release.

Q.    I mean, since this press release responds to, you know, the Tribune article, you don't recall thinking it would be important to ensure that outside counsel or your compliance personnel would review it to ensure that it's compliant?

A.    I think we did hours and hours of wordsmithing on this to use due care to make it compliant.  I just can't tell you sitting here exactly who saw it when.  It was an ongoing, long process, this particular press release.  There's nothing cavalier about it.

Q.    Then it says, "These evaluations were conducted in Mexico by the Mexican Department of

Page 229

Epidemiology, India and elsewhere in the U.S. and abroad.  Each study concluded 100 percent for both specificity and sensitivity."

Do you see that.

A.    Yes.

Q.    And then you -- you say a recent -- "A summary of recent validation data and the data itself can be found here."

And you provided a hyperlink to that data.

A.    Yes.

Q.    Next paragraph.  "In remarking on the test's favorable limit of detection results in the evaluations, Brent Satterfield, Ph.D., said, 'In diagnostics the limit of detection or LoD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point.  Other metrics that are important are availability, ease of use and throughput.  In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity, and you can't do better than that.'"

Do you see that?

A.    Yes.

Q.    So unpacking this a little bit, does the

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 230..233

Page 230

data -- does the data that's linked provide favorable results on the limit of detection?

A. Sitting here I don't know. I mean, I mainly think of them as showing the concordance in sensitivity and specificity.

Q. That's not what it says here. It says here that the data -- "In remarking on the test's favorable limit of detection results," right? So that specific phrase, "Favorable limit of detection results."

Do you know, sitting here, whether the data that was linked provides favorable results on limit of detection?

MS. OSTLER: Objection. Asked and answered. Mischaracterizes the document.

A. Yeah. I don't -- I don't personally have the scientific skill to answer that question.

Q. Hold on. This is a press release that's being issued by a public company, and you're the CEO. And the question I'm asking is whether the statement that's being made is consistent with the data that's attached to it?

A. Yeah. It's quoting Dr. Satterfield, who is my chief scientific officer. I can rely on his -- on his statement. I wouldn't be the one that could say, yeah, this LoD looks like it's great or otherwise; but

Page 231

my chief scientific officer can opine as to such matters, and he did.

Q. Well, the statement I'm reading, the use of "favorable limit of detection results" is not a quote from Dr. Satterfield. It's just a part of the release. So who decided to use that phrase?

A. I don't know specifically who decided to use that phrase.

Q. So we've been talking about sensitivity and specificity, but then suddenly you're inserting a phrase regarding a favorable limit of detection result?

MS. OSTLER: Objection. Ambiguous. I'm just going to --

Q. Does this match up?

A. I think it matches up in the context of Satterfield going on to explain the relevance of LoD with respect to its relationship in the overall performance of a test. He says it's a single metric that helps inform the key metrics, which would be sensitivity and specificity; but it is not relevant as a standalone data point. Then he cites other metrics that are important: Availability, ease of use and throughput.

Q. I mean, if somebody is reading this and they

Page 232

see that you have -- you're saying there's 100 percent sensitivity and 100 percent specificity, isn't the implication that the limit of detection of this test is phenomenal?

MS. OSTLER: Objection. Calls for speculation.

BY MR. PINEIRO:

Q. Isn't it?

A. I don't think there's an implication to that at all.

Q. So you're talking about these results, and then the press release says, "In remarking on the test's favorable limit of detection results" in the text. It's a direct implication of the words in your own release; isn't it? Isn't that right?

MS. OSTLER: Objection. Misstates the document.

BY MR. PINEIRO:

Q. So you bootstrapped off the concordance results to attempt to convey that you had favorable LoD results, right?

MS. OSTLER: Objection. Argumentative. Misstates the document.

A. I don't think we did that at all. If -- if the LoD results are in the hyperlink, then Brent is

Page 233

explaining how those relate to the overall performance of the test in a clinical setting. It says specifically "repeatedly achieved 100 percent clinical sensitivity and specificity."

Q. Is there --

A. It gets down to relevance. It gets down to, you know, what kind -- where does this play in the bona fide performance of the test. And Satterfield is clearly informing the public in this press release that that is one of the -- one of the metrics that informs the key metrics for sensitivity and specificity.

And then he goes on to say that it is not relevant as a standalone data point. Then he goes on to say that the metrics are important, that there other things, availability, ease of use and throughput. So, you know, you don't let the tail wag the dog here and say whatever is going on in LoD, you know, so goes the test. That's --

Q. But you could have -- I mean, if you're just looking at the validation data, right, on the concordance, you don't -- you don't need this phrase regarding limit of detection to convey the results of that data, right?

MS. OSTLER: Objection. Argumentative.

Page 234

A.      I don't know what you need or not.  I think we -- I think we explained the role of LoD in the process along with sensitivity and specificity.  We didn't ignore it.  We didn't -- it's not conspicuously absent from the release.  It's there in bold print.

Q.      **But you had to address it because that was the concern that was stated in the Salt Lake article, Tribune article, right?**

MS. OSTLER: Objection.  Argumentative.

A.      I can tell you from my perspective we were not preoccupied by LoD readings because we understood where LoD readings, you know -- where they exist on the plane of evaluation; and they are -- and they don't have relevance as a standalone.

So, you know, personally, I was not hyperfocused on LoD as a subject.  You can infer whatever you want from what they're saying in the Tribune article.  We thought that it was highly irresponsible from the get-go in what it was asserting --

Q.      **What --**

A.      -- a very selective use of data, including Lopansri's data where he only shows this is what we're using in our hospital; but don't pay attention to, you know, almost two dozen other types of tests that are

Page 235

out there.

Q.      **Did you ever contemplate doing a validation study between the Logix Smart test and the other tests that were listed in Lopansri's E-mail?**

A.      In Lopansri's E-mail?

Q.      **Yeah.**

A.      I don't -- I don't know whether we considered that or not.  What I can tell you is that our tests undergo constant evaluations of that type.  You can look at Clinical Reference Lab.  They're one of the biggest laboratories in the country.  They do hundreds of thousands of tests on a -- on a daily basis.

They incorporated our test into their test that they submitted to the FDA for EUA.  They plainly state in their own press release at the heart of the test, in terms of it being a good test, is the methodology.  We evaluated a whole bunch of different alternatives, and we chose the Co-Diagnostics product.  That's just in plain English.

They can buy any test they want.  Nobody wants a bad test at a less expensive price.  They have huge clients that use their services, and it's just preposterous to think that they would utilize our tests if they thought that any of the information that

Page 236

you're inferring was relevant.

Q.      **And so you said you're -- you're validating your test all the time?**

A.      They're getting evaluated by customers.  New customers come on; and as a part of their protocol as a CLIA lab, they -- they have to put it up and make sure it's performing to specs.

Q.      **And what do they do to validate?**

A.      I don't know all the things they do.  You'd have to ask a CLIA expert.

Q.      **Do they give you reports on their validation tests?**

A.      I don't know that they do give us a report, but they would certainly let us know if it doesn't pass muster.  And why would they buy our test if it didn't?

Q.      **Have you ever had a customer reject your test after testing it, trying to validate it?**

A.      I don't really have personal knowledge of people rejecting tests.  There were issues with the -- some of the Nomi Health clients, but those could have had a lot to do with some kinds of other things besides the component we provided.

Q.      **So at some point, Nomi Health's customers terminated.  You know, they indicated they did not**

Page 237

want to use CODX's tests anymore?

A.      I don't think -- I can't make that representation.  I don't know what they didn't want to use, whether it was Nomi or our tests as a fundamental underpinning of a test going on through Nomi.  Those are complex relationships.  We didn't have a relationship -- We did not have a contractual relationship with any of those parties.

Q.      **Besides -- Strike that.**

**Besides Nomi, do you have any knowledge of any other customers that, upon trying to validate your test, rejected it?**

A.      I don't have any knowledge of that.

Q.      **Okay.  Who would know about that?**

A.      I don't know.  We sold a lot, tens of millions of tests around the world.  So it would have to be somebody who knows more about the individual responses of tests.  I don't recall any of those.

Q.      **Who would be the person that would have knowledge of customers?**

A.      One of our scientific officers would -- would come into that.  If somebody came -- if a customer came and said, "We don't think your tests are operating properly," they would have gone to Satterfield; or subsequent to that, it would have gone

Page 238

to Jessie Montgomery. Subsequent to that, it would have gone to K.C. Bramwell; and today it would go to Dr. Mark Poritz, P-O-R-I-T-Z.

Q.   And would -- would they typically inform you of -- of something like that?

A.   Well, they may inform me. It depends on whether they thought it was a material event. But, you know, normally I think if there was a situation like that, they wouldn't just take it lying down. They would say, "What -- what's the problem here? Why -- why do tens of millions of tests look just fine, and you're having a problem with this in your lab? What are you doing in your lab? Is your lab contaminated? Do you have personnel that know what they're doing? Are you leaving ham sandwiches out on the, you know -- on the counter?"

Q.   So one thing that we had chatted about earlier was do you recall that E-mail between you and Dr. Satterfield discussing standard disclaimers regarding no test is 100 percent accurate?

A.   Uh-huh.

Q.   Was there any discussion of -- Strike that. You don't see any similar disclaimer in this press release, right?

A.   I don't think any is necessary. I think we

Page 239

were using standard industry vernacular and parlance clearly understood by anybody who is reading it what we mean; and from a clinical relevance standpoint, it's spot on.

Q.   And so in terms of -- Was there any discussion about including that kind of disclaimer?

A.   I don't think so because I think what we provided was the actual test results. Look at them for yourself. If you want to see whether -- whether they were 100 percent sensitive and specific, here's the data. You can look at it full on.

Q.   So if you go just a couple pages after the press release, which is -- I think if you look at the top of the page, it's going to be Page 7 of 24 up top. So this is a document that was prepared by Co-Diagnostics, right? It says, "This document contains the following summaries of several studies performed on the Co-Diagnostics Logix Smart COVID-19," test along with supportive data. Do you see that?

A.   Uh-huh.

Q.   So was this -- This language was prepared by Co-Diagnostics?

A.   It looks to me like it is.

Page 240

Q.   Right. And these summaries are also prepared by Co-Diagnostics, right?

A.   They appear to be.

MS. OSTLER:  Can I just note that the document also says, "and CoSara Saragene Coronavirus 2019"?

MR. PINEIRO:  Sure.

MS. OSTLER:  Sorry. Is it okay if I just put that on the record because I think it might be important --

MR. PINEIRO:  Okay.

MS. OSTLER:  -- that it says these are, "summaries of several studies performed on the Co-Diagnostics Logix Smart COVID-19 and Cosara Saragene Coronavirus (2019) test"?

BY MR. PINEIRO:

Q.   So is there a difference between the Logix Smart and the CoSara Saragene Coronavirus test?

A.   Not to my knowledge. I believe they're the same -- same molecule.

Q.   Do you remember reviewing this document that I'm showing you now, this page?

A.   I don't recall reviewing this. I'm not saying that I didn't, but it was several years ago.

Q.   So if you flip to the next page, there's a

Page 241

validation report. Do you see that?

A.   Uh-huh.

Q.   And who prepared this? This was also prepared by Co-Diagnostics?

A.   These validation reports would have been prepared by the companies doing the validation.

Q.   They're -- it's prepared on a Co-Diagnostics letterhead.

A.   Well --

Q.   Isn't it?

MS. OSTLER:  Can I just ask, the witness should look at the document. He didn't flip through the document before you started asking him questions about it.

MR. PINEIRO:  Okay.

A.   Okay. Go ahead.

Q.   So having reviewed the document, does it appear that these validation reports were prepared by Co-Diagnostics?

A.   Well, I can see that this is shown on our letterhead; but the -- the data would have come from the respective companies that actually did the validation report.

Q.   So it seems like Co-Diagnostics prepared these reports based on data -- Strike that.

Page 242

What you're saying is Co-Diagnostics prepared these reports, but that they were based on data from the independent third party; is that right?

A.      I don't know to what extent we prepared any of this, you know, in terms of actually preparing the report.  I can see that it's on our letterhead, but that's different than who did the actual report.  The reports came from India, from Mexico, and from the Minnesota Department of Health.

Q.      But they wouldn't be preparing reports on your letterhead, correct?

A.      I'm saying it could have been imported onto our letterhead for presentation to follow.

Q.      Do you know that to be the case?

A.      No.

Q.      Have you ever seen these reports?

A.      Just very on a sort of 10,000-foot basis.  I would not have studied them.

Q.      So what is -- what do you mean by a 10,000-foot basis?

A.      Well, I mean, I would have generally seen here are the reports.  Okay.  There's the negatives, there's the positives, and there's the concordance score.  And that's what I would have been interested in.

Page 243

Q.      Do you know -- do you know who -- do you know who helped in assembling or preparing these reports?

A.      No.

Q.      So if you go to this, it might help.  So if you go to Page 17 of 24.

A.      Uh-huh.

Q.      You see at the bottom that it says author?

A.      Yes.

Q.      Is that Rebecca Garcia?

A.      It looks to me like it is.

Q.      And it's April 30.  Do you see that?

A.      Uh-huh.  Uh-huh.

Q.      And then supervisor, Rebecca Garcia?

A.      Uh-huh.

Q.      So she was the supervisor of her own report?

A.      Yeah.  We only had so many employees at that point.

Q.      Is this normal?

A.      At that point in the company's history, that wouldn't have been necessarily abnormal.

Q.      Couldn't Satterfield have double-checked it, supervised it?

MS. OSTLER:  Objection.  Calls for speculation.

Page 244

A.      Could have.  I'm sure Satterfield saw these as well.

Q.      So it seems like she's authoring these on April 30.  So these reports are actually being prepared on the day that the Tribune article comes out, right?

A.      Okay.  Well, I don't know when the actual data was being prepared.  I can see that's when she's -- when she has signed it.

Q.      And then if you go to Page 18 of 24, it's the same, right?

A.      It appears to be.  I don't believe that casts aspersions on the validity of the report.  The report is coming from a lab in India.

Q.      This appears to be Mrs. Garcia's summary of the data; is that correct?

A.      That -- I don't know the answer to that.

Q.      So you issued a press release that's going out to the public that talks about 100 percent sensitivity and specificity; and it's based on these validations reports, but it doesn't seem like you're very familiar with them.  Isn't that -- isn't that odd?

MS. OSTLER:  Objection.  Argumentative.

A.      I'm familiar with the global results they

Page 245

infer in terms of sensitivity and specificity --

Q.      And it seems --

A.      -- which is what we published for the world on our website contemporaneously with making the press release.

I mentioned in previous testimony these were just -- had just become available.  It's very early in the pandemic.

Q.      And then just go all the way to the end.

A.      Okay.

Q.      It's not even a report.  It just looks like a table.  And do you know what MN DOH stands for?  Is that Minnesota Department of Health?

A.      That's what I think it is, yes.

Q.      Is this the U.S. -- So the press release references a U.S. validation report.  Is that this?

A.      I believe so.

Q.      Who are the people that would have knowledge about the specifics of the data within here and the preparation of the summary of the report?  We've seen Miss Garcia.  Who else would be familiar with it?

A.      Satterfield, Garcia, maybe -- maybe Andrew Benson to some extent.

Q.      So after the release was issued, do you recall what the reaction was by the investing public

Page 246

to this press release?

MS. OSTLER: Objection. Vague.

A.    I don't -- I don't recall the specifics of what happened in the -- in terms of investor response. Our stock was very volatile, had been volatile before this and continued to be volatile after.

Q.    Do you recall that the stock had a significant appreciation after this press release was issued the day after?

A.    I'm vaguely familiar with that phenomenon, yes.

Q.    Okay. Did you have any discussions about that with anybody at the company?

A.    No. It wasn't our job to try and work on the stock price.

Q.    Do you follow the stock -- do you follow the stock price on a daily basis?

A.    I think it's common on a daily basis for me to see what the stock is doing, see how many shares have traded, what our market cap is, that sort of thing. I look at it, sometimes I don't; but it's not a preoccupation.

Q.    You said that it -- it was a volatile stock, right?

A.    Yes.

Page 247

Q.    Why do you think that is?

A.    I think because it was a stock that was associated with a -- a pandemic. I can point you to countless other stocks that were also making COVID tests who had the same kind of volatility. It was a -- it was a thing that traders picked up on, both long and short traders, and made hoopla out of it. It was actually very, you know, from my perspective, disconcerting and somewhat of a nuisance to have the stock bouncing around like that.

Q.    Why?

A.    Well, because it just takes a lot of emotional energy when -- when the phone is ringing constantly with people wanting to know this or know that or analyst people wanting more and more information. And you can only, you know, do so much of releases that are material.

Q.    So the investors and the analysts were putting a lot of pressure for more information?

A.    All the time.

Q.    On an average day, you know, what percentage of your day is dedicated to dealing with this?

A.    Almost none of my day.

Q.    So who is handling --

A.    I don't read the blogs, and I don't answer

Page 248

those calls. Andrew Benson would -- is the head of investor relations.

Q.    Got it. This is PX28.

- - -

And, thereupon, Egan Exhibit No. 18 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    I'm showing you a document that's been marked Egan 18. This is Bates 5170.

There's an E-mail up top from Marissa McEwan to yourself and a lot of other employees of Co-Diagnostics. Do you see that E-mail?

A.    I do.

Q.    And it's May 4, 2020, a few days after the press release. Do you see that?

A.    Yes.

Q.    And she writes -- Who is Marissa McEwan?

A.    I don't really recall Marissa.

Q.    So you don't know who she is?

A.    Maybe she was in accounting, maybe she's in the lab; but I don't really recall Marissa McEwan.

Q.    So she writes, "Good morning. Here are the updates from today, including a important message from management. Under no circumstances are any

Page 249

Co-Diagnostics, Inc., employees allowed to comment on any stock message boards. If you have already commented on a message board, please let management know."

Do you see that?

A.    Yes.

Q.    Do you recall having discussions regarding employees chatting about the company on message boards?

A.    I recall us dealing with the issue of bloggers trying to penetrate the walls of the company. They would come to the company's facilities, take pictures through the glass of offices. They would try in any way they could to obtain information to do whatever they were going to do.

We had a conference call for our quarter results. They completely highjacked it. We weren't even able to hold the call. There was something like 11,000 people on the call swearing, profaning.

Q.    When was that?

A.    For the first quarter report.

Q.    Of 2020?

A.    2020.

Q.    Why do you think there was so much blogger interest in this thing?

Page 250

A.      Like there was in every other COVID company. They were going long, they were going short, doing both.

Q.      You think this was like a unique period in terms of --

A.      I think it was a very unique period.

Q.      Why is that?

A.      Because it was a national pandemic, an international pandemic.

Q.      Right.  But in terms of shareholder or, you know, just market interest in terms of the way that you're describing it, people, you know, trying to breach and taking pictures of the -- of the company's offices, why do you think that this was -- why do you think there was that level of interest in the company? Setting aside the pandemic, right, is this --

A.      How do I set aside the pandemic?  That was the reality on the floor.  And people wanted to know. They're doing whatever they are doing in the stock market.  I can't tell you what they were doing or why. I told you it was volatile.  And we're having, you know -- Our sales guys would go to lunch, and they'd come back, and there might be hundreds of inquiries of customer -- potential customers around the world.  I mean, it was a very frenetic pace.

Page 251

Q.      But you think that -- Your recollection is that the -- or your testimony is that investors in Co-Diagnostics were very attune to the stock, followed it zealously, basically.  That seems like that's what you're saying.

        MS. OSTLER: Objection.  Ambiguous. Argumentative.  Compound.

BY MR. PINEIRO:

Q.      There was a unique level of interest and monitoring of the company stock.  Is that fair?

A.      I think the operative part of your question is the company stock.

Q.      Yeah.

A.      I don't think they gave a hoot about the company in many respects.  They were just playing a market phenomenon, which we didn't create or control.

Q.      What was the market phenomenon that you are describing?

A.      That we were a COVID company in an international pandemic.

Q.      So you think there was -- Again, do you believe there was a lot of speculation on COVID companies during the pandemic?

A.      Certainly there was.

Q.      And so in terms of just were there any

Page 252

employees that -- Had it come to your knowledge or the company's awareness that there were employees of the company who were chatting on stock message boards?

A.      No.  I don't think we had people commenting. We just wanted to alert them that it was inappropriate for them to feed into those blogs.  You know, they may disseminate inside information.  They might say, oh, we're producing this many tests a day.  There's lots of reasons why we didn't want our employees, as a matter of practice, commenting on what's going on in the company.

Q.      But I mean, this message was labeled, you know, high importance up top.

A.      That's whoever Marissa is.  She can put her exclamation points and whatever she wants to say. They were obviously excited.  She's saying we reached 19 and a half million in April, and so far we've done a million eight in May.  She's enthused.

Q.      Got it.

A.      And so it comes through in her communication to the company.

Q.      And then she says, "Lab."

        And then below that she says, "Development is being worked on by Brent, K.C. and Chad to improve the limit of detection."

Page 253

        Do you see that?

A.      Uh-huh.

Q.      Who is K.C.?  Do you know?

A.      He's -- he was sort of a senior lab technician.

Q.      And Chad?

A.      Excuse me.  K.C. is K.C. Bramwell.

Q.      Bramwell?

A.      He's a Ph.D. scientist.  Chad was a senior lab technician.

Q.      Do you know what's Chad's last name?

A.      Apuli.  A-P-U-L-I, I think.

Q.      So when they're saying -- when it says here development is being worked on to improve the limit of detection, what is she referring to?

        MS. OSTLER:  Objection.  Calls for speculation.

A.      They were just working on looking at our tests, just looking for are there any ways we can potentially improve it.

        As a matter of fact, as I said to you before, customers that checked the limit of detection on our tests generally came back to us and said, "Your limit of detection is actually considerably better than you reported to the FDA."

Page 254

So they maybe would have wanted to do some additional testing to see if we can get the FDA data to conform more to what was -- what we were hearing from our customers.

Q.    Did you, as the CEO, request that Satterfield and others attempt to improve the limit of detection of the Logix Smart test?

A.    No.  But as a matter of just, you know, progress, it doesn't surprise me that they were looking to evaluate the test at every level to see if we can make it better.  As a practical matter, the single gene RdRp test has been the primary seller of tests in the company from the get-go.

Q.    So but what -- Do you know what about the limit of detection could have been improved?

A.    No, I don't.  I don't.  It may have simply been trying to conform it with what our customers were telling us they were finding.

Remember, you know, when this is done, this is early on with the FDA; and -- and the data that we provided to the FDA in our minds was very conservative, because we did not want to overstate anything in a public filing.  This was a new thing for us to go in front of the FDA.  So we weren't willing to go out and exaggerate any of the metrics, including

Page 255

LoD.

Q.    But this doesn't say anything about -- I mean, look.  This is a message, an important message, from management; and you're the CEO.  And it doesn't appear that you knew what Miss McEwan was writing when she says that this team of scientists was working on improving the limit of detection.  Is that normal?

MS. OSTLER:  Objection.  Argumentative. Ambiguous.

A.    Yeah, I'm unclear, looking at this, what is the message from management.  She's got a bullet that says management; and it looks to me like what we're opining about is Dr. Bramwell working on lyophilization or freeze drying of the product.

Q.    But the bottom line is you don't know, you're not familiar with what effort was being undertaken by Satterfield, K.C. or Chad to improve the LoD?

A.    I mean, that's just something that scientists would have done in the lab.  And like I say, it may have been just to conform to what customers were telling us.  "Your LoD is higher than you're saying it is."  That was a common remark from customers.

Q.    Are you speculating about that?  Do you know

Page 256

that to be a fact?

A.    No.  I know they -- I know that customers remarked that, "Your LoD is better than you're saying."

Q.    But that doesn't mean that -- What you're describing is having your LoD match up with the representations of the LoD, right, which is different than actually improving --

A.    No.  Matching up with what we're hearing from the field, not with our own representations.  We knew what our representations were, and they were sufficient for the FDA's purposes.

Q.    But you don't know -- You've indicated you're not familiar with this effort.  You don't know that when she said, "improve the level of detection," what they were working on was what you're specifying, what customers --

A.    I think that's fair, a fair assessment.

Q.    Okay.  Do you find it weird that you issue a press release three days before saying that the test is 100 percent sensitive and specific in these concordance tests and then behind the scenes your scientist team is working to improve the limit of detection, which was the root source of the Tribune article and the basis for the press release?  Is

Page 257

that -- isn't that a little misleading to the public?

MS. OSTLER:  Objection.  Argumentative. Calls for speculation.  Calls for a legal conclusion.

A.    I think you have to look at the speed with which things were moving in the COVID realm, and we were riding the vortex of that.  So the fact that our scientists would hear from the field, "Hey, your LoD is actually better than you're reporting," they would naturally want to go in and say let's look at the LoD again and see if we want to amend our filing with the FDA or something, you know, to show the improved LoD.

Q.    Your press release that you issued three days before doesn't inform the public that simultaneously you are working on trying to improve the LoD, does it?

A.    I think it was -- I don't think it was relevant from a clinical standpoint to make that disclosure.  And I'm not even sure when Brent and K.C. and Chad decided to start their whatever they were doing with it.

Q.    You're the CEO.  How could you not know?

A.    Because I don't work in the lab all day long.  There's, you know -- It's a pretty sizeable facility, and they -- they work mostly without interfacing with me.

Page 258

Q.      They don't update you on the major tasks that they're undertaking?

A.      They wouldn't have updated me on, "Hey, guess what we just found?" or "We're going in today to do LoD experiments."  I wouldn't have been tracking that.

Q.      Okay.  After this, you know -- Around this time is there any discussion between anybody at the company saying, you know, we issued this press release on the 1st.  At the same time, we're actually working to improve the limit of detection.  Maybe we should make some type of disclosure about that?

A.      No, because I don't think it was clinically relevant.  I mean, you saw in the press release what -- and in the description about LoD what Dr. Satterfield was saying about it, which is what management would have been relying on.  Satterfield is saying it's -- it's not a key metric.

Q.      Did you vet that -- This opinion that you've indicated that it's not relevant, did you vet that with legal counsel?

MS. OSTLER:  Objection.  Misstates the witness' prior testimony.

BY MR. PINEIRO:

Q.      Did you talk to lawyers about --

Page 259

A.      I don't know to what extent I talked to our general counsel about it.  I would have been much more interested in what our chief scientific officer was saying about it, which was manifested clearly in both the press release and in the supporting documentation.

Q.      Do you think investors should have known in connection with that press release you issued that at the same -- at the very same time you're working to improve the product -- the limit of detection on the product?

A.      No.  I don't think it was relevant, and I don't -- If they thought it was relevant, they were misinformed.

Q.      That's not material?

MS. OSTLER:  Objection.  Calls for a legal conclusion.

A.      No.  I mean, we talked about this over and over again, about Satterfield describing the role that LoD plays in the process.  Apparently, the FDA is in concordance with that.

Q.      It's important enough that you're trying to improve it.

A.      Well, I think we're always trying to improve our products.

Q.      But why?  If it's not -- if it's only

Page 260

somehow tangentally related to sensitivity, your sensitivity is consistently showing 100 percent, why are you trying to improve your LoD behind the scenes?

MS. OSTLER:  Objection.  Argumentative.  Misstates witness' prior testimony.  Ambiguous.  Assumes facts.

A.      First of all, it's not behind the scenes.  And, secondly, molecular diagnostic companies constantly work on their tests to improve one level of metric and another.  It would have been nothing odd or earthshattering about us evaluating it then or now.

Q.      I would agree with that; but three days after a press release where you're indicating your test has these 100 percent concordance results, it seems disingenuous to the investing public, doesn't it?

MS. OSTLER:  Objection.  Argumentative.  Asked and answered.

A.      Concordance results are different from the -- from the LoD.  As a standalone metric, it doesn't play.

Q.      So if you're telling -- if you're giving a picture to an investor through that May 1 press release about your concordance results, you're conveying a message to them, correct?

Page 261

A.      Uh-huh.

Q.      Don't you think in order to be fully accurate and comprehensive you should also be telling them we're working on improving the LoD too?

MS. OSTLER:  Objection.  Argumentative.  Calls for a legal conclusion.

BY MR. PINEIRO:

Q.      Isn't that the most comprehensive message you could provide them?

MS. OSTLER:  Same objection.

A.      I think it was unnecessary.  What we provided for them was what the key metrics were; and as a standalone measure, the LoD doesn't play.

Q.      Didn't you only provide them the numbers that you thought would -- would show that your test was doing well?

A.      We showed them the data that was honest, what the -- what the report showed.  Again, did you think I should lie about that?

Q.      No.  I --

A.      Do you think I should lie about it to the FDA?  When their test result say 100 percent sensitive and 100 percent specific, am I not -- is it not legitimately expected of me to convey that?

Q.      You're entitled, Mr. Egan, to convey the

Page 262

statements that you make regarding tests about validation.  What it appears you've done is you've omitted important information that wasn't favorable.

MS. OSTLER:  Objection.  That is not a question.  You're now just arguing.

BY MR. PINEIRO:

Q.      Isn't that right?  Isn't that what this shows?

MS. OSTLER:  Objection.  Argumentative. Asked and answered.  Asks for a legal conclusion. Badgering the witness.

A.      I don't think it shows that at all.

Q.      How would investors react you think --

MS. OSTLER:  Objection.  Calls for speculation.

MR. PINEIRO:  Let me finish my question.

BY MR. PINEIRO:

Q.      How would investors react if in that May 1 press release you also say, "By the way, we're working on improving our LoD"?  Would they view that favorably?

MS. OSTLER:  Objection.  Calls for speculation.

A.      I don't know.  I don't know.  It wasn't clinically relevant, so I don't think I had an

Page 263

obligation to deal with it at all.

Q.      It's obviously --

A.      We, in fact, did deal with it and devoted a paragraph to it.  So, you know, we tried to put in the appropriate context.

Q.      But isn't it clinically relevant if you're actually working on it behind the scenes?

A.      It doesn't mean that it's clinically relevant.

Q.      So your scientific team is devoting time and effort to something that's not clinically relevant?

MS. OSTLER:  Objection.  Misstates the witness' prior testimony.  Argumentative.  Ambiguous.

A.      I'm not sure what those three scientists were doing.  They may have -- Like I said, they may have just been getting feedback from the field and saying, "Everybody is saying we've underreported the LoD measures in our tests.  Let's run some more experiments, because maybe we need to revise that."

But it wasn't clinically relevant in any case.

Q.      Well, when you saw that E-mail and you saw they were working on -- somebody is working on improving the limit of detection, you didn't have a conversation with anybody where you asked, "Why are we

Page 264

working on this" --

A.      No.

Q.      -- "irrelevant clinical issue?"

MS. OSTLER:  Objection.  Assumes fact.

A.      They do lots of experiments in the lab that I don't know about.

Q.      Regarding clinically irrelevant matters?

MS. OSTLER:  Objection.  Misstates witness' prior testimony.  Argumentative.  Asked and answered.

A.      They test a lot of things.  I don't know all the things they test for.

Q.      I mean, they're not dissecting frogs, right? I mean, they're -- they're doing -- they're working or clinically relevant aspects of the test, aren't they?

MS. OSTLER:  Objection.  Argumentative.

A.      They're not always working on clinically relevant.  If they're working on LoD improvement, as we've already discussed, that is not a standalone key metric.

Q.      This is PX35.

MS. OSTLER:  You didn't give us the Bates.

MR. PINEIRO:  Sorry.  The Bates on the last one is 28- -- Sorry.  Hold on.

It's 5170.

- - -

Page 265

And, thereupon, Egan Exhibit No. 19 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.      So before we turn to this, the press release I showed you earlier that you issued on May 1 says -- Do you remember that phrase, "You can't do better than that"?

A.      Uh-huh.

Q.      So don't you think, again, when you juxtapose that with the fact that behind the scenes you are trying to improve the LoD, doesn't that make that phrase misleading?

MS. OSTLER:  Objection.  Argumentative. Misstates prior testimony.  Calls for a legal conclusion.  Ambiguous.

A.      I don't think it misleads anybody about anything that's clinically relevant.

Q.      Okay.  So the document that I'm showing you, if we could -- if you could just go to the second page.  There's an E-mail from Frank Garcia at Coltrin to you and Seth Egan on May 1.  Do you see that?

A.      Uh-huh.

Q.      And it says, "All, we have connected with Allison Gatlin, who is working on a story around the

Page 266

company's stock movement today. She has seen the press release noting the 100 percent specificity and sensitivity of Co-Diagnostics' COVID test and is interested in a comment from someone at the company (most likely Ike) about the benefits of accuracy when testing for COVID."

Q.  Do you see that?

A.  Uh-huh.

Q.  Do you recall what the stock movement of the company was on May 1?

A.  I do not.

Q.  Okay. And then if you go to the first page, do you recall giving a quote to Miss Gatlin?

A.  There are lots of interview opportunities that are set up through Coltrin & Associates. So she's probably -- If she's with Investor's Business Daily, it's likely that I spoke with her; but I don't have any specific recollection of that.

Q.  Okay. And you can see that in the E-mail on this first page, Mr. Garcia writes you the same day. He says, "All, Allison Gatlin has posted her article, which she intends to update throughout the day. Once we have a comment that we can share, it will be folded into the piece. (See below)."

Q.  Do you see that?

Page 267

And then the article is entitled "Coronavirus Test Maker Soars as its Diagnostic Proves 100 percent accurate."

Q.  Do you see that?

A.  Uh-huh.

Q.  Okay. And it says -- So is that true? Is the CODX test 100 percent accurate?

A.  It's 100 percent accurate in the context of conforming with other tests that are standards.

Q.  Got it. But I mean --

A.  I didn't write this press release.

Q.  No. I understand.

So is this statement, without the context you've added, is it an accurate statement?

MS. OSTLER: Objection. Asked and answered.

A.  I think in the context in which an investor would want to understand it being clinically relevant, I think it is accurate enough.

Q.  So you think that a -- you think the statement Co-Diagnostics' test is 100 percent accurate is an accurate statement?

MS. OSTLER: Objection. Asked and answered.

A.  In context it is, but I didn't write this press release. I'm not responsible for Allison's --

Q.  I know that. I'm not -- I'm not -- I'm not

Page 268

blaming you for writing this. I get that.

We've talked -- I've shown you multiple E-mails where we talked about no test can be 100 percent accurate, right? So here, based on the press release that's been issued, Investor's Business Daily issues an article saying that Co-Diagnostics' test proves 100 percent accurate.

Q.  Do you see that?

A.  I do.

Q.  So this statement, without any context, as you provided, is misleading, correct?

MS. OSTLER: Objection. Asked and answered. Calls for a legal conclusion.

A.  I don't believe so. I think Allison goes on to talk about where the field testing was done in India and Mexico and the U.S. and elsewhere; and in statistics, these two measures are key for determining accuracy.

Q.  So it says, "Co-Diagnostics said Friday its coronavirus test has proven 100 percent accurate in field testing, leading CODX stock to rocket."

Q.  Do you see that?

A.  Uh-huh.

Q.  So -- Again, so here it says 100 percent accurate in field testing. Doesn't this convey that

Page 269

the test is 100 percent accurate?

A.  It's not the full article.

Q.  I understand. Doesn't this statement say -- indicate that the test is 100 percent accurate?

MS. OSTLER: Objection. Asked and answered.

A.  I think it conveys that it's accurate for clinical purposes and for all material purposes.

Q.  Did anybody from CODX speak to Miss Gatlin on or off the record to explain to her that the way she's phrased this that she has misinterpreted your press release?

MS. OSTLER: Objection. Assumes facts. Calls for speculation.

A.  It sounds to me, by reading her article, that she's talked with somebody that's defining for her the key measures for determining accuracy in terms of specificity and sensitivity.

Q.  She only includes Dr. Satterfield's quote from the press release. Do you see any other quotes in here from anybody else?

A.  No, but that doesn't mean she didn't have an interview.

Q.  Did the Coltrin company participate in attempting or did it attempt to get this article placed in the Investor's Business Daily?

Case 2:20-cv-00368-JNP   Document 169-14   Filed 04/10/24   PageID.2982   Page 70
of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 270..273

Page 270

MS. OSTLER: Objection. Calls for speculation.

A.   They were our public relations firm. They most likely would have been involved --

Q.   And do they have --

A.   -- in setting it up.

Q.   So they were pushing this article on to the Investor's Business Daily?

A.   I don't believe so at all. I think Investor's Business Daily was inquiring of the company and wanting to do an article about it, and we wouldn't have known whether they wanted to do an article or not.

Q.   And, again, to your knowledge, nobody from the company, in speaking with Miss Gatlin, explained to her that saying that the test is proven 100 percent accurate could be misleading? Nobody -- nobody told her that, right?

MS. OSTLER: Objection. Calls for speculation.

A.   We didn't believe it was misleading, so why would we have said that?

Q.   So this article -- So you were happy this was being disseminated, this article?

A.   I didn't really have a big viewpoint on how

Page 271

this little article in Investor's Business Daily was disseminated.

Q.   Why? It's your PR firm that's working on getting this article placed.

MS. OSTLER: Objection. Assumes facts not in evidence.

A.   They work on lots of things.

Q.   Right. But they were working on this. Right now they're working on this and this specific article with this specific title and these specific statements, right?

MS. OSTLER: Objection. Misstates prior testimony. Assumes facts not in evidence.

A.   What are you wanting me to answer? Whether or not they put an article out? Obviously, they did.

Q.   Okay.

A.   How were they informed? Our press release? They probably had an interview, got as much information as they wanted. She wasn't going to go in and do a -- a gigantic discussion about specificity and sensitivity and LoD, for crying out loud. It's beyond the -- it's beyond what her readership wants to know. They want to know is it clinically relevant.

Q.   Right. So I mean, can't -- Nobody from your company, though, wants, even with her off the record,

Page 272

to explain that the phrasing used here could mislead the public? No one did that?

MS. OSTLER: Objection. Calls for speculation.

A.   Yeah. I don't know what follow-up that was done with her. I don't know whether Jennifer Coltrin got on the phone with her or not.

Q.   And the reason that that wasn't done is because you were glad that the press release was being interpreted this way by the investing public, right?

MS. OSTLER: Objection. Calls for speculation. Misstates prior testimony. Assumes facts not in evidence. Ambiguous and argumentative.

MR. PINEIRO: That's like 19 objections.

A.   We were neither -- we were neither glad nor sad. We wanted the public to know what was going on. This was her -- their publication, not mine.

Q.   But you're seeing it. You're seeing it. This is being -- You're participating in getting this story printed. Your -- your -- your PR company is working with her on the story.

MS. OSTLER: Objection. Misstates what the document says. Assumes facts not in evidence.

A.   It's still not our story, and I don't think -- In terms of materiality, I don't think

Page 273

there's anything wrong with the article. You know, I may have phrased some things differently, but it wasn't material.

Q.   What would you have phrased different?

MS. OSTLER: Objection. Calls for speculation.

A.   I would have to look at it.

MR. PINEIRO: What's speculative about that?

MS. OSTLER: He did not write this article. What would we have phrased differently?

MR. PINEIRO: That's not a valid -- that's not a valid objection. I asked him --

MS. OSTLER: Then he can read the entire article.

MR. PINEIRO: He said it. I'm asking him why. That is not an objection.

MS. OSTLER: Then let him read the entire article.

MR. PINEIRO: That's not -- Listen to me. That's coaching. Okay? He gave -- he gave an answer. I said why. You argued speculation. That's coaching. That can't happen. Okay? That's not a speculative --

MS. OSTLER: You are bullying me.

MR. PINEIRO: No, I'm not.

MS. OSTLER: Yes, you are.

Page 274

MR. PINEIRO:  What are you talking about?

MS. OSTLER:  I've been trying to just make very concise --

MR. PINEIRO:  My question is why.

MS. OSTLER:  -- objections this whole time.

MR. PINEIRO:  That is not true.

MS. OSTLER:  Yes, it is true.

MR. PINEIRO:  What is -- what is speculative about my question when I said why?  He gave an answer.  I asked why.

MS. OSTLER:  I don't think that's what your question was.  I don't -- I did not say calls for speculation when you say why.  I don't think that's what your question was.

MR. PINEIRO:  What was my question?  Do you recall?

MS. OSTLER:  Now I don't.  She can read it back.

MR. PINEIRO:  So he said, "I would have phrased it differently," right?  That's what he said.

THE WITNESS:  I can answer the question.

MR. PINEIRO:  Hold on.  That's what he said.  And I said --

MS. OSTLER:  Let's just have --

MR. PINEIRO:  -- why.

Page 275

MS. OSTLER:  -- the question read back.

MR. PINEIRO:  That's fine.  He can answer the question.  Go ahead.

MS. OSTLER:  I don't remember what the question is now.

A.     We could just put out a press release that had the way we would have phrased it.  So I think that was already covered.

Q.     That phrasing would have been better than this, you're saying?

A.     Well, not necessarily.  I think this is a -- this is somebody else's interpretation of, you know, what they think their readers are interested in; but it's not materially relevant in terms of the performance of the test in any case.

Q.     What do you mean?

A.     It still stands.  The test in terms of clinical materialism, materiality were 100 percent sensitive and specific in concordance tests.  That's what we said, and that's what she's saying here.

Q.     So the test is clinically -- So are you saying that the test is clinically 100 percent accurate?

A.     I'm saying in terms of the primary metrics used, which -- which she cites here in terms of the

Page 276

two measures that are key for determining accuracy, sensitivity and specificity, which are in her article.  I think she's got it pretty well covered in terms of what it means, you know.

They've had millions of tests done.  This is -- You're arguing about, you know, something that a lab somewhere, you know, that could come up and make an objection.  They don't do that because the tests are just fine.  They're easy to use, they're great to interpret, and they give excellent results.

And it's -- Very sophisticated laboratories in the United States and elsewhere use our tests exclusively for COVID.  They could use anything they want.  They have the money, they have the resources, they have the context.  They chose us.  There's nothing wrong with the sensitivity and specificity or the LoD of our test.

Q.     Do you know whether any of the Coltrin employees helped write any of the text of this article?

A.     I have no idea.

Q.     Who would know about that?  Mr. Garcia?

A.     I think -- I don't know that Frank would know, but Jennifer would probably know the most.

Q.     Okay.

Page 277

A.     Frank is -- was subordinate to Jennifer.

Q.     Did you -- In terms of these interactions with, you know, Investor's Business Daily on this article, did you speak to any anybody, any legal counsel or your compliance team regarding your comments to Miss Gatlin?

MS. OSTLER:  Objection.  Assumes fact not in evidence.

A.     I don't believe so.

MS. OSTLER:  You keep using the words "you" and "your" to mean Co-Diagnostics, but he's not a 30(b)(6) witness.

MR. PINEIRO:  I get it.  That's just -- Sorry about that.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:53.

(Recess taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:54.

MR. PINEIRO:  This is going to be PX30.

- - -

And, thereupon, Egan Exhibit 20 was marked for purposes of identification.

- - -

Page 278

BY MR. PINEIRO:

Q.      Are you aware that around mid May, 2020, the FDA opened an investigation or an inquiry regarding performance claims on the Logix Smart test?

A.      I don't -- I'm not, just sitting here, aware of what you're referring to.

Q.      You don't recall that?

A.      I mean, we talk with the FDA quite regularly, so I'm not sure what issue you're discussing.

MR. PINEIRO:  This is 29, PX29, I believe.

MS. OSTLER:  Oh, I just found 30.  It was stuck.

MR. PINEIRO:  It was misplaced?

MS. OSTLER:  It was stuck by the staple.

MR. PINEIRO:  That's okay.  We can move on anyways.  I'll go back to it.

(Discussion held off the record.)

- - -

And, thereupon, Egan Exhibit No. 21 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.      So if you go to the bottom of this E-mail, there's an E-mail from Brian Lowe to Cecilia Hutchins

Page 279

on May 11, 2020.  Do you see that?

A.      Uh-huh.

Q.      And it's to Cecilia Hutchins, head of clinical and regulatory affairs.

"Miss Hutchins, it has come to our attention that your Logix Smart Coronavirus 2019 test kit is being promoted by distributors in a manner not consistent with its authorization (EUA).  The allegation is that the test sales promotion includes for use with saliva specimens," and then No. 2, "that the test has perfect sensitivity and specificity."

Do you see that?

A.      Yes.

Q.      And then it says below that the, "FDA requires your firm to make immediate corrective actions."

And the fourth bullet point says, No IVD is 100 percent sensitive and specific, so please inform your distributors that performance of the test should be promoted as based on the validation study design and data and as in the EUA, the results of your validation and, importantly, how it was performed.

Do you see that?

A.      Uh-huh.

Q.      And then they say, "Failure to take adequate

Page 280

corrective actions may result in discontinuation of your firm's ability to distribute the product."

Does this refresh your recollection regarding an FDA inquiry into --

A.      Yeah, I do recollect that there was an inquiry with respect to the behavior of one of our distributors.

Q.      Which distributor was it?

A.      I don't know which distributor.

Q.      What was that distributor doing?

A.      It looks like they were making claims that were not consistent with what they were allowed to make based on our information on our EUA and our instructions for use, et cetera.

Q.      And do you know whether they were -- I mean, in terms of the representations about 100 percent specific and 100 percent sensitive test, do you know specifically what they were saying in marketing the test?

A.      No.  They were -- they were doing whatever they were doing as a distributor; and we, basically, had to go to them and say, "You can't do this, and you can't do that," which is what we did.

Q.      Was there any -- any discussion that the distributors were doing that based on, you know, a

Page 281

logical inference of the May 1 press release?

A.      No.

Q.      When this happens, you know, when you have something like this, the FDA coming to you, was there any thought to releasing a press release with a disclaimer indicating that in your May 1 press release you weren't communicating that the test was 100 percent accurate?

MS. OSTLER:  I'm sorry.  Can you read that question back again?  I didn't quite follow it.

(Question read back.)

MS. OSTLER:  Thank you.

MR. PINEIRO:  I'll withdraw the question.

BY MR. PINEIRO:

Q.      So after you get this FDA inquiry, were there any internal discussions within the company regarding that the press release was creating false impressions amongst distributors and the public?

A.      I don't believe so.  I think this was a distributor going off on their own making claims that they couldn't make.  And we -- we take a full compliance attitude with respect to the regulators, including the FDA; and we have a regular contact with them.

And so it's not -- it's not out of the

Page 282

ordinary for us to respond to an inquiry from the FDA about one thing or the other, an upcoming submission or -- And so as I said, we interpret compliance as being something that is a fundamental, important thing to our company; and that's how we approach it.

So we would have gone to this distributor and said, "This is what you've got to stop, and you've got to stop it now."

Q.    After this May 1 press release, were -- was CODX asked to participate in any joint validation studies by -- You had mentioned, I think, that the State of Utah had brought that up potentially.

A.    I don't know exactly which entity brought it up, whether it was the State of Utah; but we were willing to participate in any kind of a comparative study that people want to do. We weren't willing to do it, you know, in an environment which we believed may be prejudicial.

Q.    And you thought the State of Utah was biased in terms of --

A.    You mean that they had said they can't use our tests anymore? Yeah. We didn't think that was a fair venue to do, you know, a comparative test.

Q.    But if -- if your test had succeeded in the validation that the State of Utah had offered,

Page 283

wouldn't have that assisted with respect to TestUtah and your relations with them?

A.    I have no idea. The simple fact is it had already been validated and continues to be validated dozens and dozens and scores of times by other people who didn't have a potentially conflicting interest.

Q.    Who made -- who made the decision not to validate the test, not to engage in the State of Utah's request for a validation?

A.    I don't -- I don't know how -- who actually made that determination. Our scientific team would have made an assessment of it.

MR. PINEIRO: This will be 22.

- - -

And, thereupon, Egan Exhibit No. 22 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    Showing you an exhibit marked Egan 22, this is an article published in the Salt Lake Tribune on May 14 in the morning, at 9 a.m., 2020. The title is "TestUtah declines to join other Utah labs in accuracy check."

Do you see that?

A.    Uh-huh.

Page 284

Q.    And is this -- We've been discussing the fact that you declined to, you know, submit to the State of Utah's validation. Is this what this is referring to?

Strike that.

A.    Appears to be.

Q.    Have you -- have you read this article before?

A.    I'll have to look at it and see.

MS. OSTLER: While he's looking, I'm just going to grab some water.

MR. PINEIRO: Yep. That's good.

BY MR. PINEIRO:

Q.    At the top of the -- at the top of Page 2 of the article, it says, "The TestUtah companies agreed to a less sophisticated 'compromised' experiment to compare results with the State lab, said State epidemiologist Dr. Angela Dunn. 'This is a quick and dirty way to learn whether there's a difference.'"

Do you recall what compromise is being referred to here?

A.    No.

Q.    And was -- That compromised experiment, do you know whether it was carried out?

A.    I don't know. I don't know what they were

Page 285

going to do.

Q.    And it indicates --

A.    I remember vaguely, you know, a discussion about doing a study; but it never came to fruition.

Q.    And then if you go further down, it says, "In Nebraska, where the same Utah tech companies have contracts to run testing, the disparity between their results and the rest of the State's results is even bigger according to new data there."

Do you see that?

A.    Uh-huh.

Q.    Are you familiar with that?

A.    Not particularly. It doesn't -- Let's not conflate what we're producing with what somebody else is doing as a test and all the different increments and elements of a test from sample handling to transport media to extraction to the PCR thing. So don't -- don't throw me in a bucket with all the other processes, because that's not -- that's not relevant.

Q.    Right. So I'm just -- I'm just asking whether -- So was it -- was it brought to CODX's attention that in Nebraska they were having some issues with the disparity in the results?

A.    Certainly we would have heard about that.

Q.    Do you recall?

Page 286

A.      Vague -- Generally, yes.

Q.      And do you recall the company conducting any investigation into the disparity of those results?

A.      We would have looked at it.  We may have even sent Dr. Satterfield to that location to see -- make his own assessment, but I can't recall specifically whether he did it in this case.

Q.      Did he issue a white paper regarding the data disparities in Nebraska?

A.      Not that I know of.

Q.      So now it seems like in a second state there's also disparities in the results, right?  So we have Utah, and then we have Nebraska, right?

A.      Uh-huh.

Q.      So at this point in time, aren't you concerned that maybe there are issues with the test?

A.      We're not concerned, no, because we don't know all the different aspects that are being used, what equipment is being used, you know, how are they -- what are the other motives behind why they're complaining about it.  They have their contract with Nomi Health, not with us.  We're supplying a small increment of that test.

Q.      Didn't that merit an investigation by CODX, though?

Page 287

A.      Our tests were being continually investigated by all kinds of CLIA labs around the country without this problem.  So, you know, the fact that a whole testing system promulgated by Nomi Health would have had problems in Nebraska or Iowa, not necessarily our problem.  Where -- where we had to go in and try and help people understand that, we would have done so.

Q.      Then towards the bottom it says, "TestUtah was invited to join the proficiency challenge," in quotes, "but the group declined."

A.      Again, I'm not TestUtah.

Q.      No.  No.  I get that, but you're --

A.      No.  You don't seem to get it.

Q.      I do.

A.      We're not TestUtah, and there's a lot of factors going on here.  In fact, there's a lot of other tangential factors that may play into this, you know, same situation.  I think primarily the Salt Lake Tribune article is a hit piece against Nomi Health by the Salt Lake Tribune and other people that did not want Nomi Health or Hospital Corporation of American to succeed in their program, which had great results wherever it's been used.

Q.      Then towards the bottom it says, "So, Dunn

Page 288

said, the Utah Department of Health proposed this alternative quality check.  TestUtah last week sent 50 samples to the State lab, and the State lab sent 40 samples to TestUtah, which processes its test at Timpanogos Regional Hospital in Orem."

        So do you recall that quality check, conducting that quality check?

A.      I don't in specific, no.

Q.      Was CODX involved in that quality check?

A.      Most likely.  Most likely we were the underpinning molecule that would have been used in the PCR reaction.

        And there's a lot of other things.  I have to caution you about conflating the other elements of the test with what it is we actually provide and also with conflating us with other organizations, such as Nomi Health or TestUtah or other entities that may have been involved in this controversy because we are not they.

Q.      Do you recall the results of this quality check?

A.      Huh-uh, I don't offhand.  You'd have to ask yourself why would Nomi Health continue to use our tests for years all over the country in millions and millions of tests if they thought there was a problem

Page 289

with them.

Q.      What do you consider to be -- In terms of the accuracy of a test, is there a threshold that's acceptable or that's considered good?  95 percent accuracy?  Is there a general level?

A.      It's not a question I can address.  That's a scientific question with a scientific answer.

Q.      Do you recall CODX's -- Do you recall your reaction to this May 14 article?

A.      No, not specifically.

Q.      Do you recall how the company -- discussions within the company regarding responding to this article?

A.      We had discussion about what the Tribune was printing as I mentioned earlier.  I think it was, basically, a hit piece against several different organizations:  Silicon Slopes, Nomi Health.  I think there was the Tribune.  I don't know what their interest is.  I already described to you they did their own test with an affiliated thing.  And I know that those results were absolutely excellent, and then they buried them.  They are the ones that need to be asked questions what happened when you tested CODX's test.

Q.      Do you have those results handy?

Page 290

A.    Sure we do.

Q.    Why haven't you published them?

A.    I don't have a specific answer, taking all the variables into play, why we didn't publish them; but they were certainly available. For one thing, the test was done for that entity. They're the ones that had -- I don't even know that we had the right to publish them.

Q.    On May 14 do you recall that CODX stock was subject to multiple trading halts?

A.    No. I mean, I don't have a specific recollection on a day-to-day basis as to when somebody would have put a hold on the stock.

Q.    Okay. Generally speaking --

A.    That sounds to me -- that sounds to me like it's at the same time frame when we're trying to do our report for the quarter, because it's 45 -- roughly 45 days after the end of the first quarter, right? That's when we can't even hold our press -- we can't even hold our conference with our investors. It was purposely disrupted by people who wanted to embarrass the company, thousands of them swearing, playing loud music, making it so at the end of day, our only recourse was to publish -- file an 8-K with the prepared marks, which is what we did.

Page 291

Q.    Are you familiar with the short trader Hindenburg Research?

A.    Vaguely.

Q.    And do you know -- do you recall that on May 14 they issued public statements indicating that they were shorting CODX?

A.    Is this the article that they did? Is this what you're referring to or some other statement they made?

Q.    Yeah. Are you familiar that on May 14, 2020, Hindenburg indicated it would short CODX?

A.    I know they published an article to that effect.

Q.    And the article mentioned that the test is third tier and rated one of the worst. Do you recall that?

A.    That the test what?

Q.    Was third tier and rated one of the worst?

A.    I don't recall that, and that's utter nonsense. That's just short players trying to make a lot of money by driving a stock down. I don't think that has any credibility at all in terms of the actual bona fides of the test and its accuracy. What they -- what their motives were as short players, you know, one can -- one can try and surmise. I don't try and

Page 292

concentrate on their motives, but I know when I'm seeing something that doesn't smell right.

Q.    Were there certain results in -- in the West Valley of Salt Lake that you recall, you know, supporting CODX's position that the TestUtah discrepancies were based on population differences?

A.    I can remember that being discussed as to -- because, again, the comments that were made by Dr. Lopansri were very early on; and he was -- he was comparing, you know, widely disparate demographics, Provo compared to, you know, basically, downtown Salt Lake, very different population groups, lots of children down --

And you may know, being a student of this, that Utah ranks one of the lowest in the entire country, if not the lowest in the continental United States, in terms of deaths associated with COVID. Why? Well, because we are young probably is one of the main reasons. Two, we have a very good health system that most people have access to. And there's probably some other reasons.

But before, you know, they jump off on this discrepancy between the positivity rate in Utah County compared to Salt Lake without really giving any description about it, just casting aspersions on the

Page 293

test in association with that, which was a faulty conclusion, that's what -- why Satterfield did the white paper.

And not too long after that, it came into even greater relief when -- when these data came out of West Valley, which showed gigantic disparities between West Valley and Salt Lake and Provo. So, clearly, dynamic -- the dynamics were demographics, who's living where on top of each other, who has access to care, who has access to hygiene, so on and so forth.

Q.    At what point in time did the Deseret News and/or the Salt Lake Tribune -- Were you contemplating giving a demonstration of the test to the Deseret News or the Salt Lake Tribune?

A.    I'm not aware of that. That certainly could have been discussed.

Q.    You don't recall at one point actually agreeing to do it and then changing your mind on that?

A.    No, not specifically. But that could have been discussed and then not -- not gone through with.

Generally speaking, when -- You know, you don't pick fights with somebody who buys print -- printing ink by the 50-gallon barrel drum. And so when you make a decision about what you're going to do

Page 294

and what you're going to submit your company to, and you don't know what their motives are, and you can't understand why they hang onto a narrative which they will not let go of no matter what evidence is shown to countermand their evidence, you're reluctant to believe that they're going to act in good faith.

Q.   Do you believe the Tribune's -- I mean, look.  I don't want to put words in your mouth -- the Tribune's targeting you?  Is it Nomi Health, or is it CODX?

A.   Oh, I don't know.  As I've said before, you'd have to decide whether their primary target for their rancor was directed at Nomi or whether it was directed at us.  I think we'd have to claim that at least indirectly it's targeting us.  And as to their motives, I'm not going to speculate.

Q.   Are there any political -- Were there any potential political motivations regarding CODX and you?

A.   Not -- not with respect to CODX.  We have no political motivations.  We have no -- no candidate we prefer or party or anything else.  We're just making tests and trying to actually save some lives, which, incidentally, I think was compromised by the State of Utah doing what they did with respect to our tests,

Page 295

because then tests have to be -- had to be sent to California to Fulgent Genetics to do the test.  You tell me how many people could have been impaired or even died because their tests had to be flown to California and take the extra time that it took to adjudicate them when they could have just been done right here in facilities in Utah and had more immediate results.

There's a lot of things in retrospect that could be challenged from our perspective as to how deleterious those kinds of maneuvers potentially were to public health.  We're the little guy.

Q.   You think -- you think that because you're a little guy trying to break into a new field that people were targeting you?

A.   I most definitely believe that.  I don't think the people -- the major players in the State wanted us anywhere around.

Q.   Major players being who?

A.   The biggest health care providers.  That would be IHC, University of Utah, ARUP.

Q.   Could they have used your tests?

A.   Could they have?  Certainly they could have.  Probably would have saved a lot of money.  They were fully aware, you know -- capable of -- however they

Page 296

bill.  Nobody has ever done a study to say what did those primary health care providers in Utah charge the State for their tests.  I've never seen such a study.  I bet it would be very revealing.

MR. PINEIRO:  This is PX44.

- - -

And, thereupon, Egan Exhibit No. 23 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.   So I'm showing you what's been marked as Egan 23.  It's an E-mail up top from Andrew Benson on June 3, 2020, to Mr. Satterfield, Miss Stark, and you're copied.

Do you see that?

A.   Uh-huh.

Q.   And it forwards another E-mail entitled "Problems in Iowa."

And it says, "Brent and Madison:  The ongoing saga of our relationship with Iowa continues.  The brief version is:  A reporter from the New Yorker submitted an Open Records request a month ago to the State of Iowa and received what you see below.  Please take a look at what the reporter is asking us; and if you'd be so kind, answering the following."

Page 297

And then he lists several questions.  One question he asks, you know, in caps, "Critical:  Has the lab ever submitted a formal complaint to Co-Diagnostics either directly or through Nomi?"

I'm asking you do you -- are you aware of whether the Iowa labs that were using CODX's test ever submitted a formal complaint to it?

A.   Not that I'm aware of.

Q.   If you go to the next page, which is the E-mail that Mr. Benson forwarded to you, it's an E-mail from Bobby Baird to Jennifer Webb.  It says, "Dear Jennifer, as we've been trying to close the story, I've just this afternoon received the results of an open records request that I put in with Iowa about a month ago.  The E-mail suggests that ISH had significant problems validating the Co-Diagnostics assay."

What does assay mean?  I've seen that word a lot.  That's --

A.   I don't know what that means.  I would guess it means Iowa State Health or something like that.

Q.   No, no.  Assay, A-S-S-A-Y.

A.   An assay.  An assay is a test.  It's another -- it's a synonym for a test.

Q.   "I have E-mails from the head of the ISH lab

Page 298

saying things about the Co-Diagnostics test like:"

Now, I'll bring you down.

"This testing is very labor intensive; and, therefore, there is more potential for error."

Is the Co-Diagnostics test more labor intensive than other tests?

A.      I think this has got it completely backwards.  I've had specific discussions with Dr. Satterfield.  Let's -- let's not forget that the -- that the CDC promulgated an assay to 94 health departments around the country and then had to rescind it and call it back because they made errors.  They had a bad lab.

During that period, Dr. Satterfield tested our test compared to the CDC.  And he told me, "Ike, the CDC test is very difficult to do; and it's almost impossible to interpret."

And, boy, he was right.  And they had to call it back.

So I think the CDC, you know -- I'm not going to try and defend our test against CDC.  I think we beat them hands down.  And one of the main reasons people use our test is because it is so clean, so easy to use, and the results are so easy to interpret.

Q.      And he says -- Mr. Baird says, I also have

Page 299

E-mails from aides to the governor's office saying that because of these problems, they had to -- they had to reroute it -- had to reroute Test Iowa swabs to LabCorp and also to use ISH's existing instruments.

Do you see that?

A.      Uh-huh.

Q.      Do you ever recall hearing about that when it was occurring?

A.      I mean, I just remember this in a context of a flurry of what's going on in Iowa and what are they going to do.

Q.      And they say, "The lab director at ISH also suggested that he was 'very concerned' and that the validation problems they were having were so bad they constituted a 'nightmare' in the making."

Do you see that?

A.      Yes.

Q.      Is that -- I mean --

A.      So you're asking me to explain why a lab in Iowa had trouble, and I have no idea why they had trouble.  I can tell you it wasn't our tests.  Our tests are used in labs all over the world and all over the country, very prestigious labs; and this is not what they say.

Q.      Did you ever -- Did CODX ever look into

Page 300

that, into --

A.      I'm sure we did.  I'm sure -- And I don't know which trip Satterfield made; but he went to locations, as we felt it may be helpful to have him look at the lab and what they're doing and help them with their problems.

There's a lot -- a lot of motives at play when people are working at a State health lab.  They may have relationships with other big pharma companies, which pharmaceutical companies may be coming in and saying, "You really need to use this equipment.  You really need to go with our test.  You really need to do that."

And depending on who has the most influence and is the more persuasive, there are a lot of motivations that -- that show up in an E-mail like this that is not necessarily scientific or valid.

Q.      But it seems like whenever there's some type of a complaint or problem being reported about the test, it appears that you believe it's because of ulterior motives or vendetta or other agendas.  I mean, have you ever given an earnest look at some of these problems and conducted a close examination of all the instances where there appear to be problems like the ones reported in that E-mail?

Page 301

A.      First of all, all the instances is a very, very, very few instances; and they have to do with major contracts that Nomi Health had with big state health departments and a state like in Iowa or Nebraska.  And there's a lot of political pressure going on all over that sort of stuff in terms of who the governor is, what party they belong to.

So I'm not going to attempt to try and argue with you as to whether or not we don't take it seriously when a lab is complaining about a test.  We're just saying there's other things.  And I don't want to be conflated with the political problems, and I don't want to be conflated with the other elements of the test when we're talking about our test.

Clearly, our test is not the issue; and it would not have been the issue in these instances.  It may have been something else.  It may have been some other piece of equipment.  It may have been a political motivation or whatever.  But it wasn't our molecule; otherwise -- because, again, you're talking about very few instances that have to do with no big government contracts.  And I might add those are not contracts with us.

Q.      Got it.  Are you aware that the Iowa State Hygienic Lab eventually did conduct -- did finalize

Page 302

its validation of CODX's test and found a 95 percent accuracy rate for positive tests?

A.   I remember hearing that.

Q.   Is that -- is that considered a -- a good statistic for CODX?

A.   Again, it's a scientific question with a scientific answer.  Somebody like Satterfield could answer that for you.

Q.   Was there -- did you ever discuss or was there ever any concerns in the company that that validation didn't match up with the May 1 press release?

A.   No, not particularly with the May 1 press release; and it wasn't consistent with the information coming from dozens and dozens of labs in other places.

Q.   So you said there's dozens and dozens of labs.  So is it your testimony that there's dozens and dozens of labs that are -- have conducted validations, validation reports of your test and have found 100 percent sensitivity and specificity?

A.   I -- I -- I don't have copies of those reports, so I can't opine as to what individual CLIA labs determined, but what they did determine is they want to buy the test.

Q.   But that's separate and apart from whether

Page 303

the test is 100 percent specific and sensitive.

A.   It was -- it was clinically specific and accurate for testing human beings.

Q.   Right.  But, again, what we're talking about is the Iowa validation report showing a 95 percent positive as compared to the validation reports that you referenced in your May 1 press release, right?

A.   Yeah.  And I don't know all the reasons why they would have had a different number.  I don't know.  I don't know what they did in Iowa.

Q.   Did you investigate that at all?

A.   To a point we would have looked at it; and I know Satterfield went to, you know, places in the midwest.  I don't know if Iowa was one of them.

Q.   You issued a press release on May 1 about those validation reports.  Why didn't you issue a press release about Iowa's validation report?

A.   I don't know.  I mean, that was -- I think that was pretty well known in the country about what was going on in Iowa and Nebraska.  Moreover, we're not the ones with the contract.  You know, when you say they validated our test and showed this or that, there's a lot of elements to that test.  You keep conflating the part of the test that we provide with what may be provided by Nomi Health or may have been

Page 304

provided by the State themselves.

Q.   But wasn't that the case also with TestUtah?  Yet you still came out with the May 1 press release, right?

A.   What do you mean that it was the case?

Q.   You said that you didn't have the contract with Test Iowa.  There's a lot of other factors that could have led to it.

A.   Yeah.

Q.   Similarly, the same case with TestUtah; but yet in response to issues with TestUtah, you put out that May 1 press release, right?

A.   We put out the -- the test -- the press release on May 1 to support the veracity of our test performance.

Q.   Okay.  So what's the distinction between why you issued the press release on May 1 regarding Test Iowa stuff versus what's going on in Iowa?

MS. OSTLER:  I think you mixed that up.

Q.   No, I don't think -- I didn't mean to.

A.   Our press release on May 1 didn't have anything to do with Nomi Health in terms of as a party.  We were citing concordance tests with the InDRE, with the Institute of Pathology in India and -- and Minnesota Department of Health.  It didn't have

Page 305

anything to do with Nomi Health.  They may have been wanting us to support it, you know, in terms of their intention to use our test; but that's a different thing than whether we had some obligation to opine on what's going on in Iowa or Nebraska.  We don't have a first clue about how they're doing it, what equipment they're using, why they would have one result or another.  Those were not -- those were not the same kind of concordance tests that we were responding to in our May 1 press release.

MR. PINEIRO:  This is Egan 24.  This is PX34.  The Bates on this is 20490.

- - -

And, thereupon, Egan Exhibit No. 24 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.   Showing what's been marked as Egan 24.  At the bottom -- So if you go to the second page, there's an E-mail from Jennifer Webb to you and others on May 29.

Do you see that?

A.   Yes.

Q.   And it says, "Ike, it's clear now that the Washington Post has written and submitted her piece

Page 306

and had likely done so this morning when she initially reached out for comment. That being the case, please review the draft statement below and provide comment."

And it seems like there's a quote that's prepared here.

Do you recall what Washington Post article this is?

A.    I don't recall this specifically. The Washington Post has done a couple of different articles not just dealing with us, or that may have mentioned us in sort of a brief aside.

Q.    And then at the bottom of this proposed quote, it says, "While it's important to ask these questions in this pandemic state, only data can answer them; and the body of data evaluating Co-Diagnostics' test performance in a clinical setting continually shows sensitivity of at least 95 percent."

Do you see that?

A.    I do.

Q.    Okay. So that's different than the 100 percent representation in the May 1 press release, correct?

A.    Uh-huh. Yes, it is.

Q.    Okay. And do you know why that number changed?

Page 307

A.    I don't. I don't.

Q.    And then it seems like there's --

A.    Is this -- is this actually from the newspaper?

Q.    No.

A.    Or is this just her reaching out to me and others in the company with this suggested language?

Q.    So it appears that she's saying please review the statement draft below.

A.    Yes, the draft below. So I mean, she could have used any number there.

Q.    And then in the next draft above, it looks like the 95 percent number is removed. Somebody revised it 18 minutes later and removed the reference to 95 percent sensitivity. Do you know who did that?

A.    I don't know who did that; but I would say that if Jennifer put out a draft where she suggested that language, that that would have caught the eye of Benson and others that would say that's not a proper representation.

Q.    Why not?

A.    You call it a revision or that it was revised. I'm saying her initial E-mail was a draft to begin with.

Q.    Right.

Page 308

A.    So subject to review and -- a most considered review from the operatives of the company.

Q.    What would be an improper representation regarding the test showing sensitivity of at least 95 percent?

A.    I don't -- I don't know what would have been a problem with it, but scientists and others that were looking at it decided it was not appropriate.

Q.    And then on the first page, Mr. Benson sends an E-mail where he says, "I think that's helpful. They'll still fire back with a, 'Yeah, but,' just like the Trib; but we did our best."

Then he says, "Brent, is it fair to say that two tests with an identical LoD won't necessarily have the same sensitivity (underscoring the fact that LoD and sensitivity are not the same thing)? Like a test can detect very low copy count following a given extraction, but still miss positives."

Do you see that?

A.    Uh-huh.

Q.    And then towards the bottom he says, "But, Jen, maybe we could reach out to Justin Lessler, associate professor of epidemiology, (mentioned at the bottom of this article) to see if he has any comment on the degree to which LoD affects sensitivity."

Page 309

Do you see that?

A.    Yeah.

Q.    So it seems like it's an open question even within the company the extent to which LoD affects sensitivity. Is that fair?

MS. OSTLER: Objection. Lacks foundation. Calls for speculation.

A.    I think it's an indication that -- that Andrew Benson is looking at lots of different angles, you know, in terms of responses. He's not my expert. He's not my scientific officer. He's a smart kid, but he's not the scientific officer.

Q.    And then you say, "Great idea, Andrew."

Do you know whether ultimately they reached out to this professor?

A.    I don't know. I would note that --

No. I'm okay.

MR. PINEIRO: You want to take a break?

THE VIDEOGRAPHER: We are going off the record. The time is 4:38.

(Discussion held off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:47.

BY MR. PINEIRO:

Q.    So one thing that we've been discussing, you

Page 310

had mentioned, I believe, is that the -- the article from the Salt Lake -- the articles from the Salt Lake Tribune had had a significant impact on your business.

A.    I believe so, yes.

Q.    Were any of your contracts or customer relationships terminated as a result of what you perceived to be negative publicity?

A.    I don't know how many contracts or opportunities to sell that we lost as a result of that.  It certainly impacted, you know, what was going on in Utah; and we had to answer for Dr. Lopansri's irresponsible remarks over and over again.

Q.    Did Iowa also at some point stop using CODX's test?

A.    As far as I know.

Q.    And Tennessee as well?

A.    Yeah, if they ever used them; but, again, you refer to them as Co-Diagnostics' tests.  They were sold tests as provided by Nomi Health of which we were a component part.  So I don't want to step into their shoes.

Q.    It terms of the Utah -- the TestUtah, was it the State of Utah that -- that made the decision to terminate the relationship with Nomi and stop using CODX's tests?

Page 311

A.    I don't know where that emanated from.

Q.    Do you know that to be the case?

A.    I don't know if that's the case.  I don't know.  We didn't have the contract with the State of Utah.

Q.    Are you aware that the Tennessee -- the State of Tennessee paid almost six million dollars to get out of its contract with Nomi regarding tests?

A.    That's not my contract.

Q.    Right.  But it's in part because of issues with the testing, right?

A.    Again, I'm one -- I'm a molecule in that testing sequence.  So I'm not Nomi Health.  I'm not the ones who got their contracts bid or no bid or whatever.  I sold tests to Nomi and lots of other people.

Q.    Was it Nomi Health's fault that there was issues with testing in these states?

A.    I don't know.  I don't know whose fault it was.  It could have been the fault of the -- of people in the state.  I don't know.  All I know is that it flies in the face of mountains of evidence to the contrary.  And I think that states that made decisions to stop using tests, in fact, our tests, made a mistake.  Those tests have been proven over and over

Page 312

again to be excellent tests.

Q.    Have you -- did you ever learn that there were findings made by the State of Tennessee that CODX's test were four-fold less sensitive than the CDC test?

A.    No, I'm not aware of that.

MR. PINEIRO:  This is PX42.

- - -

And, thereupon, Egan Exhibit No. 25 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.    Showing you what's been marked as Egan 25, you are not copied to this; but it's an E-mail from Brent Satterfield to Chad Apuli and Cecilia Hutchins -- Cecilia Hutchins.

Do you see that?

A.    Yes.

Q.    It says, "Chad, see the link below. Deselect the other companies and select Co-Diagnostics.  You can download the data in an Excel spreadsheet.  This was a study not run by FIND, but submitted to FIND from South Africa.  Looks like no info was available other than they claim to have used our test with the Magnapure to evaluate six positive

Page 313

samples, finding four of them positive (66.67 sensitivity)."

Do you see that?

A.    Yes, I do.

Q.    Were you made aware of this?

A.    No.

Q.    Did CODX ever look into the results?

MS. OSTLER:  Objection.  Lacks foundation.

A.    Yeah.  I mean it sounds to me like Dr. Satterfield is trying to ask why he would -- why they would be generating those types of results when they're inconsistent with millions of tests all around the country, all around the world.  And you can't let that tail wag the dog of what's going on.  There could be enumerable reasons why they show the results they had.

I might also indicate that, you know, FIND has recently signed a contract with us.  So FIND is an ally of ours, not a --

Q.    What does FIND stand for?

A.    It's a -- it's an international NGO.

MR. PINEIRO:  Okay.  This is going to be PX51.

- - -

Page 314

And, thereupon, Egan Exhibit No. 26 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.   This is Bates stamped 14535.

I'm showing you an E-mail string involving Chad Apuli.  Is he the chief science officer?

A.   Chad?

Q.   Yeah.

A.   No, no.  He's a lab technician.

Q.   A lab tech.

So towards the bottom, there's an E-mail from Andrew Benson that says -- And you're copied on it on September 16.  It says, "Hey, all.  This was brought to my attention.  I'm wondering" --

The subject is FDA Comparison Study.

And it says, "I'm wondering whether we have been sent the materials as mentioned here, whether it's something we are participating in, and if we have received the materials but opted not to, why not?  It may give us an opportunity to quell a lot of rumblings about the test's LoD if we can point them to this table."

Mr. Apuli responds above, "We have received the materials and submitted the data this week."

Page 315

Are you familiar with this FDA comparison study?

A.   I'm familiar with, generally, we were looking at this.  I don't know what the ultimate results were.  I don't even know that we ever completed a study or submitted a finding, conclusionary finding, to the FDA.

Q.   Well, Mr. Apuli said, "We submitted the data this week."

Do you see that?

A.   Yes, I can see that.

Q.   And then Mr. Benson writes, "Nice.  Thanks.  Where did we end up with the LoD?"

And then above that Apuli says, "I believe we were at 14,000 NDU/ml, but we haven't gotten final approval.  It isn't that great to be honest."

Do you see that?

A.   Yes.

Q.   Was this reported to you, these results?

A.   Well, it looks to me like I received a copy of this E-mail.

Q.   Besides that --

A.   But that -- but that would -- that would not have set off a bunch of alarm bells.

Q.   Why not?

Page 316

A.   Because it's dealing with LoD, which is not a key independent factor.  It's part of a number of factors that are used.

And you really need to talk with a scientist like Dr. Satterfield to have -- to understand exactly how LoD plays, what its relevance is, what its materiality is in a clinical setting.

And this particular issue, with respect to materials being sent from the FDA and such to, you know, participate in some other study, I'm not sure exactly of how that all played out.

Q.   So if this isn't that important, why is the FDA measuring it?

MS. OSTLER:  Objection.  Misstates prior testimony.  Calls for speculation.

A.   They approved a whole bunch of tests that had significantly lower LoD's than we had and yet still deemed to be appropriate to be used in testing human beings, because from a clinical standpoint when you've got a nasopharyngeal swab or a nasal anterior swab or whatever, there are thousands, if not billions of copies of viruses that you're interrogating.  And LoD, you know -- LoD can be in a very wide range and still produce results that are 100 percent sensitive and 100 percent specific in a concordance study.

Page 317

Q.   Did you issue a press release after these FDA findings came out about these results?

A.   No.  I don't know that this -- This doesn't tell me that -- that we had anything to release.

Q.   Why not?

A.   Because it doesn't give me enough information to know what -- what the FDA did with whatever -- whatever was sent to them.

Q.   Are you aware of whether you received final confirmation of the FDA's results regarding CODX's limit of detection?

A.   No.

Q.   That didn't matter to you?

A.   It's not that it didn't matter to me.  I mean, the FDA may have decided they didn't want to evaluate it.  I don't know what the FDA was doing, but a scientist on our team would have a better idea --

Q.   Okay.

A.   -- about that.

Q.   Are you aware of a study conducted in Israel that -- in 2022 -- I'm sorry, in December, 2021, published in January, 2022, that measured the sensitivity of several COVID-19 tests including the Logix Smart test?

A.   I'm not aware of it offhand, no.

Page 318

MR. PINEIRO:  PX3.

- - -

And, thereupon, Egan Exhibit No. 27 was marked for purposes of identification.

- - -

BY MR. PINEIRO:

Q.  Showing what's been marked as Egan 27, have you ever seen this document before?

A.  I don't think so.

Q.  Okay.  Nobody has brought this document to your attention?

A.  Not that I'm aware of offhand.  It looks like a scientific paper.

Q.  It says -- If you look at the Materials and Methods section at the top, it says, "204 nasopharyngeal samples were collected from participants at the Baruch Pedeh Medical Center, between June and August, 2020.  Samples were tested by", and then you can see it includes Logix Smart Coronavirus 2019 test kit Co-Diagnostics.

And it says, Results:  Xpert Xpress SARS-CoV-2 test and Logix Smart COVID-19 kit had the highest and the lowest sensitivity respectively.  And it says that the Logix Smart had a 74.5 percent sensitivity.

Page 319

Do you see that?

A.  Uh-huh.

Q.  Were you ever made aware of this study?

A.  No.

Q.  Did you ever release a press release based on this study?

A.  No.

Q.  Why not?

A.  Well, I wasn't made aware of this; but I'm not sure we would have done anything with respect to a press announcement based on this paper.

Q.  If this is showing that the sensitivity of your test is significantly below 100 percent, don't you think that's something that the investing public should know about?

MS. OSTLER:  Objection.  Calls for speculation.

A.  It's -- Again, it's a scientific question with a scientific answer.  I don't know what was done in this test or what equipment or how it -- how it plays.

Q.  Were -- The validation reports that were attached to the May 1 press release, were those peer reviewed?

A.  No.  They were just independent studies.

Page 320

Q.  Okay.

A.  There would be no reason why we had to do a peer review especially within the time constraints under which we were operating.

Q.  Which time constraints?

A.  That -- Of how long it would take to get something peer reviewed.  I mean, it wasn't -- it wasn't -- it wasn't a necessary part of the protocol.

Q.  Well, the time constraints were based on the fact that you wanted to get a press release out the day after the Tribune article, right?

A.  We wanted -- we wanted to support the validity of our test.

Q.  Right.  Within a day, right?

A.  If we had the supporting data, and we did.

Q.  Okay.  But now I'm showing you a peer reviewed study that completely contradicts what you've told investors, and yet this wasn't significant enough to notify investors?

MS. OSTLER:  Objection.  Lacks foundation.  Calls for speculation.  Calls for a legal conclusion.

BY MR. PINEIRO:

Q.  Aren't you just cherry picking good information in that May 1 press release and putting it out there to solve a crisis and ignoring all the bad

Page 321

information --

MS. OSTLER:  Objection.

BY MR. PINEIRO:

Q.  -- before and after?  Isn't that you've been doing.

MS. OSTLER:  Objection.  Argumentative.

A.  No, absolutely not.  You're talking about a press release that's issued almost two years later than that period.  You're talking about a paper that came out more than two years later.

Q.  Do you think that investors now in 2022 --

A.  We don't know -- we don't know the bona fides of this study or who did it, where they did, how they were compared.

Q.  Have you evaluated it?

A.  I haven't evaluated.  I don't know whether our scientific team has looked at it, but --

Q.  Should they?

A.  This is going -- These evaluations at labs go on incessantly with our customers, so --

MS. OSTLER:  Object.

A.  -- I'm not going to turn on a dime because of a paper that comes out of South Africa that, you know, has their conclusions.

MS. OSTLER:  Objection as to the last

Page 322

question.  Lacks foundation.

BY MR. PINEIRO:

Q.      Should your science personnel evaluate that study?

        MS. OSTLER:  Objection.  Foundation.

        MR. PINEIRO:  Well, he's the CEO.

BY MR. PINEIRO:

Q.      In your capacity as CEO, do you think they should evaluate that study?

        MS. OSTLER:  Objection.  Lacks foundation.

        MR. PINEIRO:  What's the lack of foundation?

        MS. OSTLER:  He's never seen it before today.

        MR. PINEIRO:  I'm showing it to him right now.  My question to him is --

        MS. OSTLER:  He hasn't had a chance to look at what it is --

        MR. PINEIRO:  Okay.

        MS. OSTLER:  -- to give an answer to that.

A.      I don't know that our scientific team should spend a lot of time with this study, but I wouldn't -- I wouldn't resist that they study it.  I'm not sure it's worthy of a response.

Q.      With a test showing -- If you look at that report, it's based on tests from June of 2020 as

Page 323

indicated in the summary.  That's close to the period of time when there were issues with TestUtah, correct?

A.      In a relative sense.

Q.      And if a test -- if your test actually had a 74 percent sensitivity, then the amount of false negatives would be extraordinary, correct?

A.      We don't know why they have a 74 percent here.  We know what it is time after time with scores of labs on millions of tests, tens of millions of tests.  So whether they had a lab that was compromised, whether they didn't have the right equipment, whether they didn't have the right kind of dilution, there's lots of factors that would have gone into why they would have the results they have.

        And without knowing all of those different variables and nuances, there's no way that we would ever presume to think that that would be used against a mountain of evidence to the contrary that sensitivity and specificity was concordant to the 100 and 100 percent.

Q.      What's the mountain of evidence?

A.      The mountain of evidence is that we have CLIA labs all over the United States and equivalent CLIA labs all over the world, in over 50 countries, and that we pass muster with -- with being able to

Page 324

take those products into those markets with their regulatory authorities, like the InDRE or countless others all throughout South America and others.  There's a mountain of evidence that shows that these tests pass muster.  It would suggest there's something fishy in these results.

Q.      Passing muster, isn't that -- that's different than 100 percent sensitivity?

A.      No.  You're talking about human lives.  Not when you're talking about is Mexico willing to let this test go into their testing market.  They do rigorous analysis, very rigorous analysis, to determine whether they're going to let you in to sell your test in their country.  And whether these people were using tests in South Africa that had expired, that got too warm, you know, these are tests that were sent out on a cold chain.  So you don't -- you can't let them unfreeze, and so on and so forth.

        So I don't know the reason they had disparate results in South Africa; but it's not just as simple as saying, you know, they did this test and, ergo, you've got a problem.

Q.      We've talked a little bit about the May -- about the Q-1 2020 earnings call, the one that you said people were screaming into the --

Page 325

A.      Uh-huh.

Q.      Do you recall whether that earnings report, in your estimation as CEO, was a positive earnings report?

A.      I think it was an awesome earnings report.

Q.      Why?

A.      Because it showed a tremendous progress of the company and material amount of sales by any measure.

        MR. PINEIRO:  This is 28.

        - - -

        And, thereupon, Egan Exhibit No. 28 was marked for purposes of identification.

        - - -

BY MR. PINEIRO:

Q.      And so I'm showing you what's been marked as Egan 28.

        Are you familiar with this document?

A.      Yes.

Q.      Is this the -- You had mentioned an 8-K.

A.      This looks to me like what we -- when we were not able to deliver the remarks in the actual conference because of disruptive participants.

Q.      Yeah.

A.      We, in lieu of that, put out an 8-K with

Case 2:20-cv-00368-JNP    Document 169-14    Filed 04/10/24    PageID.2996    Page 84
of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Pages 326..329

Page 326

prepared remarks.

Q.      Uh-huh.  So do you have -- I mean, in your capacity as CEO, did you have any impression on how the market perceived your Q-1 earnings?

A.      I don't recall exactly how they perceived our earnings.

Q.      Okay.

A.      But our earnings were -- our performance as a company were really exceptional.  So whether -- whether it met their expectations or not, that's something I can answer for.

Q.      Now, on the -- on the -- on May 15 do you recall after earnings -- the earnings call, the price of CODX's shares dropped significantly?  Do you recall that at all?

A.      Vaguely.  I mean, I'm aware of this intense volatility that we experienced, yes.

Q.      And back then or now do you have any sense of why there was a large drop in the stock on May 15?

A.      I think it was primarily because you had short players who were doing what they do.  And they were publishing hit pieces, and they were trying to get lawsuits filed.  They were doing everything they could to drive the stock down.

Q.      And would one of those hit pieces have been

Page 327

the preceding day's May 14 Salt Lake Tribune article about CODX not doing the test validation with Utah?

A.      It could have been.  It could -- I don't know that it was dispositive, but --

Q.      So in your view, it's -- it's -- it's these news articles, which you've characterized as hit pieces, that are driving the stock down?

A.      I think they were used for that purpose a lot.

Q.      By whom?

A.      By whoever was, you know, deciding that based on them, they were going to short the stock and drive it down or sell it.

Q.      Do you ever read analysts' reports regarding CODX's stock?

A.      Sometimes.  I don't have a lot of analyst coverage.

Q.      And why do you do that?

A.      Why do I read them?

Q.      Uh-huh.

A.      Well, I like to see what they're thinking.

Q.      What is TNG, the company?  Are you familiar with them, TNG?

A.      Let me just think if I know who TNG is.
I -- I think it's a distributor maybe of

Page 328

ours or something like that, but --

Q.      At some point was Co-Diagnostics working with them to have them perform an independent evaluation of its test?

A.      Off the top of my head, I don't recall.  It could have been.
I'm thinking -- I'm wondering if TNG is -- I'd have to see some documentation.  I'm wondering if that's the test that was -- that was commissioned by the group associated with the Salt Lake Tribune.

Q.      In connection with discovery in this case, without revealing attorney/client privileged information, do you know whether your counsel took an image or obtained text messages in response to our request for production?

A.      Yes.

Q.      Have you deleted any text messages that pertain to this -- the allegations in this suit?

MS. OSTLER:  Objection.  Vague as to time.

A.      You're talking -- you're talking about do I know of things that should have been produced that are not?

Q.      No.  Just have you deleted any text messages --

A.      No, no.

Page 329

Q.      -- that are pertinent to this case?

A.      No.  I rarely, if ever, use a text message.

Q.      Are you aware that Dr. Garcia -- You're familiar with Dr. Garcia, who is no longer with the company?

A.      Yes.

Q.      Do you know that she deleted her files after she left the company?

A.      I did not.  I don't have any control over Dr. Garcia.

Q.      Who is Bryant Cragun?

A.      As far as I know, I mean I think he's mentioned in the Hindenburg hit piece.

Q.      But do you know who Mr. Cragun is?

A.      I think he was a former associate of Lynn Briggs long, long, long ago as far as I know.

Q.      And who is Lynn Briggs?

A.      Lynn is -- was the principal player in a company called Legends Capital who provided venture capital for Co-Diagnostics for a few years before we went public.

Q.      What was the amount?

A.      I think at the end of the day it was about five million all together, somewhere in that range.

Q.      Are you -- do you have any ownership

Page 330

interest in Legends?

A.      No.

Q.      Have you ever met Mr. Cragun personally?

A.      I did meet Mr. Cragun on one or two occasions, you know.  I'm thinking maybe 20 years ago, a long time ago.

Q.      Has Mrs. Briggs ever provided any services to CODX?

A.      Yeah.  Lynn was the venture capitalist who raised money for the company.

Q.      Besides -- besides in that role, has he ever taken a consulting role with the company?

A.      He works with another fellow by the name of Bill McCluskey.  They formed an entity called Rock Mills, Rock Mills.  And so they have both consulted for the company for a long time.  Lynn played a -- You know, he was funding the company up through the IPO process in July of 2017.

Q.      What kind of consulting do they provide?

A.      They provide, you know, activities of setting up meetings with funds that we could meet with in New York and explain the company to them.  That was their primary role.

        They also investigated opportunities for public relations or investor relations, I would just

Page 331

call it, with various firms that have programs that they thought we might benefit from.

Q.      How did you first come to become involved with CODX?  Are you a founder of the company?

A.      I -- I was approached by Brent Satterfield.  He was looking for his own investors.  For some reason I was on some list in Salt Lake.  When he came to Salt Lake, he met with me.

        So I didn't invest with him at that point.  I watched him continue to develop his concept.  He hadn't yet invented CoPrimers, for example.

        But he met with me in the middle of 2023 -- excuse me -- 2013 and said that he had a new invention that he thought was going to be very revolutionary and that if I wanted to get involved with it, I had to step up.

        And that whole process lead to me going to Venture Capital, which was Lynn Briggs.  And Reed Benson was his -- also involved with Legends.

        And, you know, the stipulation was that they would do the accounting and the legal, that they would be accounting for the company's activities from the get-go as though we were a public company with an outside firm so that in the event we wanted to take it public at some point, that we would be ready to do it

Page 332

and have the requisite history.

        So that's how I came to --

Q.      Where is Legends based out of?

A.      It was out of Salt Lake City.

Q.      At one point before the company IPO'd and it was private, did it have a large shareholder based out of Turks and Caicos?

A.      Well, it would have been in association with Legends Capital.

Q.      Is Legends -- does Legends have any affiliates that are based out of Turks and Caicos?

A.      I -- I -- I believe they have affiliates there, but I didn't deal with those -- whoever those people were.  I would have just dealt with Legends.  So if he had a network of investors in Europe or Turks and Caicos, you know, that wouldn't have been something that I was aware of.

Q.      Are you familiar with an attorney out of Turks and Caicos called Hugh O'Neill?

A.      I've heard his name.

Q.      Do you know who he is?

A.      Not really.  He's associated with Lynn Briggs and his operations in Turks and Caicos.  I don't even know if Lynn has operations in Turks and Caicos, but he did -- I did hear the name of Hugh

Page 333

O'Neill from time to time.

Q.      And so Mr. Benson is one of the principals of Legends?

A.      At the time he -- I don't know if I would call him a principal, but he was a stakeholder at some level.

Q.      Is he still a stakeholder?

A.      I don't believe so.

Q.      Are you familiar with Beaufort Capital Partners?

A.      Uh-huh.

Q.      Who are they?

A.      Beaufort is a company that at a certain point I think lent Co-Diagnostics $500,000 just for operating capital.

Q.      Did CODX repay the loan?

A.      They got repaid through subsequent financing and some things, yeah.

Q.      Are you aware of a company called Catalytic Capital?

A.      I don't know Catalytic.

Q.      Are you aware that Mr. Benson, before he was at CODX, had issues with Spanish regulators based on his involvement with a company called Carlton Burgle [phonetic] Financial Advisors?

Page 334

MS. OSTLER: Objection. Vague.

A.    I wasn't aware of that. I think that was raised in the Hindenburg hit piece.

Q.    You weren't aware of that before --

A.    No.

Q.    -- the hit piece?

Before the Hindenburg piece?

A.    Right.

Q.    After that, after you learned of that, is that why he's no longer general counsel to the company?

A.    No. He continued to serve as general counsel and chief financial officer for a long period after that.

Q.    Why did the firm decide to do an IPO?

A.    Well, you generally do an IPO for two reasons. One is to get access to the capital markets and, two, to provide an exit for stakeholders eventually.

So we definitely were in a business that was going to require additional capital. It's not -- it's not a small undertaking to go, you know, stake a claim in the molecular diagnostics world that's dominated by very big, important players. So we were going to need capital. And we felt we had a science and a

Page 335

technology that was revolutionary and that could really do some good. So that's why we went public.

MS. OSTLER: Have we been 7 hours yet?

THE VIDEOGRAPHER: You have five minutes left.

MS. OSTLER: Thank you.

MR. PINEIRO: Let's just go off for a second just that I -- I just have those two exhibits that were 23 and 30.

THE VIDEOGRAPHER: We're going off the record. The time is 5:22.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 5:23.

BY MR. PINEIRO:

Q.    I'm showing you what's been marked as Egan 30 -- I'm sorry, Egan 20. It's an E-mail from James Nelson to you on May 12, 2020.

Do you see that?

A.    I do.

Q.    It says, "Some ideas -- confidential."

Who is James Nelson?

A.    He's a member of our board.

Q.    Okay. You can see he says, "I have been giving some thought to what you want to communicate to

Page 336

the market. I don't mean for the following to be final or directive. It's more brainstorming."

And so it provides a lot of advice towards the bottom. One of the issues he points out is he says for No. 1: "Our test is the only test that is 100 percent accurate (support with data)."

Do you see that? It's towards the middle.

A.    Yeah, I got it.

Q.    Do you remember having a conversation with Mr. Nelson about this E-mail?

A.    No, I don't remember having a specific conversation. Jim is a very smart guy with Bain Capital for a couple of decades. So, you know, he's a guy that I call occasionally to strategize about what we're doing.

Q.    It appears this is, you know, less than two weeks after the May 1 press release, right?

A.    Yes.

Q.    It appears that he's under the impression that CODX's test is the only accurate test, correct?

MS. OSTLER: Objection. Foundation.

A.    He may have been under that impression.

Q.    Did you ever have a conversation where you explained to this board member that's not actually accurate?

Page 337

A.    Well, I'm sure eventually we did, yes.

Q.    You don't recall that?

A.    But I didn't take this laundry list and say -- call him up and say, "Hey, I need to talk with you about number, you know, whatever."

MR. TAYLOR: Can I have that Bates?

MR. PINEIRO: Yes. That's 3389.

Can we go off for one moment? Let me consult my notes.

THE VIDEOGRAPHER: We are going off the record. The time is 5:25.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 5:30.

BY MR. PINEIRO:

Q.    So one thing you had mentioned, Mr. Egan, is that you believed the company sales were impacted by some of the negative press, correct?

A.    I think there's a good chance that they were. I don't have empirical evidence to that.

Q.    How are the company sales now in 2023 compared to, you know, 2021? Significantly less because of --

A.    Yes.

Q.    Is that because, obviously, the demand for

Page 338

testing is significantly lower?

A.    Yes.

Q.    Do you attribute any of the decrease in the company's revenues to some of the bad publicity that occurred and we've gone over in May of '20 and afterwards?

A.    I don't fundamentally connect those two in terms of now compared to then.  I think the impact on -- from the press would have been much earlier in terms of opportunity the company had to sell its tests and, you know, where we had to overcome that kind -- you know, that kind of press.

Q.    Could without that -- I mean, could that have changed the trajectory of the company and where it is now versus where it could have been?

A.    I don't know.

MR. PINEIRO:  I don't have anything else.

MS. OSTLER:  We'd like to read and sign.  We need to provisionally designate the entire transcript confidential pursuant to the protective order, and we will later designate the specific portions that we would like protected under the confidentiality order.

MR. PINEIRO:  Thank you, Mr. Egan.

THE WITNESS:  My pleasure.  Thank you.

THE VIDEOGRAPHER:  We are going off the

Page 339

record.  The time is 5:31.

(Signature not waived.)

- - -

And, thereupon, the deposition was concluded at approximately 5:31 p.m.

- - -

Page 340

CERTIFICATE OF DEPONENT

PAGE      LINE      CHANGE

I, Dwight H. Egan, deponent herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected, and do hereby affix my signature to said deposition.

_____
Dwight H. Egan, Deponent

Page 341

REPORTER'S CERTIFICATE

State of Utah      )

County of Utah     )

I, Gayle L. Anderson, a Certified Shorthand Reporter, Registered Professional Reporter, hereby certify:

THAT the foregoing proceedings were taken before me at the time and place set forth under oath to tell the truth, the whole truth, and nothing but the truth; that the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such testimony adduced and oral proceedings had, and of the whole thereof.

I have subscribed my name on the 25th day of April, 2023.

*Gayle L. Anderson*

Gayle L. Anderson
Registered Professional
Reporter #11101156-7801

### Exhibits

**Exhibit 1**  4:7 35:10,12,17

**Exhibit 2**  4:9 46:4,6

**Exhibit 3**  4:11 60:14

**Exhibit 4**  4:12 62:24

**Exhibit 5**  4:14 66:18

**Exhibit 6**  4:15 79:2

**Exhibit 7**  4:17 102:16

**Exhibit 8**  4:19 105:19,24

**Exhibit 9**  4:20 108:23

**Exhibit 10**  4:22 122:4

**Exhibit 11**  4:23 141:5

**Exhibit 12**  5:2 159:9

**Exhibit 13**  5:3 187:1

**Exhibit 14**  5:5 190:20

**Exhibit 15**  5:6 210:10

**Exhibit 16**  5:8 216:6

**Exhibit 17**  5:9 216:19,24

**Exhibit 18**  5:11 248:5

**Exhibit 19**  5:12 265:1

**Exhibit 20**  5:14 277:22

**Exhibit 21**  5:15 278:20

**Exhibit 22**  5:17 283:15

**Exhibit 23**  5:19 296:7

**Exhibit 24**  5:21 305:14

**Exhibit 25**  5:22 312:9

**Exhibit 26**  5:24 314:1

**Exhibit 27**  6:2 318:3

**Exhibit 28**  6:5 325:12

### $

**$14,000**  19:25

**$250,000**  98:12

**$30**  78:24

**$4,000**  20:1,2

**$500,000**  333:14

**$60,000**  206:5

**$80,000**  122:19

### (

**(2019)**  240:15

### 1

**1**  10:11 16:10 35:10,12,17 46:1 56:1 109:5,24 137:12 170:21 217:3 260:23 262:18 265:6,22 266:10 281:1,6 282:9 302:11,13 303:7,15 304:3,12,14,17,21 305:10 306:21 319:23 320:24 336:5, 17

**1.35**  80:5

**10**  122:4,9

**10,000-foot**  242:17,20

**100**  50:23 51:14 52:8,23 53:3 54:25 55:1,21 83:7 84:2 108:2,14,18 111:22 113:13 115:5,17,25 116:1,22 119:6 120:15 124:18,21 125:3,13,17 126:2, 4,10 128:21 129:1 145:17 146:1,5 193:20 195:20,22 197:8,9,13,20 198:6,7,8,10,15 208:20 209:3,19 210:1,4 217:19 218:9,12,19,20,22 220:17,18 221:17 222:5 223:17,19 224:11,12,19,22 229:2,21 232:1,2 233:3 238:20 239:10 244:19 256:21 260:2,14 261:22,23 266:2 267:3,7,8, 20 268:3,7,20,24 269:1,4 270:16 275:18,22 279:18 280:16,17 281:7 302:19 303:1 306:20 316:24,25 319:13 323:19,20 324:8 336:6

**100,000**  128:25

**10:44**  212:12,18

**11**  141:3,5,9 279:1

**11,000**  249:19

**11:04**  94:18

**11:18**  94:21

**11:47**  67:4

**12**  159:9,13 335:18

**1205**  210:8

**1250**  129:3

**13**  7:7 178:22 186:24 187:1,5

**13.5**  213:18

**14**  120:5 121:22 141:14 190:20,24 283:21 289:9 290:9 291:5,10 327:1

**14,000**  315:15

**145**  121:7

**14535**  314:5

**15**  102:24 181:5,6 210:10,15 326:12, 19

**16**  173:24 216:6 314:14

**17**  216:19,24,25 226:12 243:6

**18**  244:10 248:5,10 307:14

**18,000**  161:20

**19**  64:14,15,21,25 98:11,13 252:17 265:1 272:14

**1:02**  178:18

**1:09**  63:9

**1:30**  172:13 188:4,6

**1:35**  178:22

**1:43**  116:9

**1:48**  179:2

**1st**  258:10

### 2

**2**  46:4,6,13 60:9 66:25 80:24 116:15 279:10 284:14

**20**  27:10,14 28:14 29:11 98:11,13 153:16 218:5 277:22 330:5 335:17 338:5

**2013**  331:13

**2014**  19:13

**2017**  121:11 330:18

**2019**  26:19 27:12,13,14 28:14,17 29:3,5,24 82:5 97:19,20 240:6 279:6 318:20

**2020**  10:11 16:10 21:23 26:18 27:12, 13,16,18 28:17 29:10 47:17 56:1 59:24 60:4,5,20 61:12,15 63:5 64:11 66:25 74:17 92:19 95:5 97:25 102:24 109:5 117:6 122:12 136:14 157:15 164:13 217:3 248:15 249:22,23 278:2 279:1 283:21 291:11 296:13 318:18

322:25 324:24 335:18

**2021** 317:21 337:22

**2022** 156:20 317:21,22 321:11

**2023** 7:7 157:15 178:22 331:12 337:21

**204** 318:15

**20490** 305:12

**20th** 26:18 28:8 33:20 64:20

**21** 278:20

**21052** 66:23

**22** 173:24 283:13,15,19

**22699** 102:20

**23** 296:7,12 335:9

**23rd** 33:17 95:4

**24** 239:14 243:6 244:10 305:11,14,18

**25** 71:25 312:9,13

**250,000** 166:3

**26** 314:1

**27** 29:24 30:6 97:18 318:3,7

**28** 59:21 60:19 61:12 325:10,12,17

**28-** 264:23

**29** 63:5 192:24 278:11 305:21

**2:20-cv-00368-cmr** 7:9

**2:35** 216:11

**2:36** 216:14

**2:48** 226:7

**2:53** 226:10

---
**3**
---

**3** 60:11,14,19 62:10,18 296:13

**30** 51:22 179:5 186:18 194:1 201:22 210:23 212:12 243:12 244:4 278:12 335:9,17

**30(b)(6)** 277:12

**30-** 185:1

**30th** 200:10 228:3

**31** 47:17

**3389** 337:7

**35-or-some-odd-million** 185:2

**35390** 141:10

**35456** 187:8

**3824** 66:9

**3:42** 114:3

**3:53** 277:16

**3:54** 277:19

---
**4**
---

**4** 62:18,19,24 63:3 137:12 248:15

**4.29** 143:18

**4/30/2020** 191:13

**40** 74:19 288:3

**45** 172:3 290:17,18

**46** 134:4

**47** 134:4

**48** 134:2

**4:38** 309:20

**4:47** 309:23

---
**5**
---

**5** 66:11,18,22 137:13 170:22

**5-million-dollar** 162:5

**50** 112:12 131:17 173:18 288:2 323:24

**50,000** 114:25 115:2,5

**50-gallon** 293:24

**50/50** 120:23

**5044** 191:4

**5170** 248:10 264:24

**5:22** 335:11

**5:23** 335:14

**5:25** 337:11

**5:30** 337:14

**5:53** 201:22 202:8 203:20

**5ul** 80:4

---
**6**
---

**6** 78:25 79:2,10

**6.75** 80:4

**66.67** 313:1

---
**7**
---

**7** 102:16,23 122:12 123:6 239:14 335:3

**74** 98:4,13 166:3 323:5,7

**74.5** 318:24

**75** 114:21

---
**8**
---

**8** 105:19,24

**8-K** 129:22 290:24 325:20,25

**87** 220:19

**887** 109:19

**89** 111:22

---
**9**
---

**9** 108:23 283:21

**93** 220:18

**94** 298:10

**95** 289:4 302:1 303:5 306:17 307:13, 15 308:4

**9:06** 210:23

**9:10** 7:7

---
**A**
---

**A's** 140:12

**A-P-U-L-I** 253:12

**A-S-S-A-Y** 297:22

**a.m.** 7:7 116:9 283:21

**abatement** 23:7

**Abbott** 40:7 99:22

**abbreviation** 26:13

Case 2:20-cv-00368-JNP    Document 169-14    Filed 04/10/24    PageID.3002    Page 90
of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Index: ability..ally

**ability** 35:6 41:24 72:24 77:10 116:15 280:2

**abnormal** 243:21

**abnormally** 74:22

**above-mentioned** 196:22

**abroad** 229:2

**absent** 234:5

**absolute** 126:5,8 223:6,9

**absolutely** 165:7 289:21 321:7

**abstract** 223:21

**accept** 180:22

**acceptable** 85:11,14,15,18 289:4

**accepted** 116:22 224:13

**access** 90:17 91:1 183:5 198:19 292:20 293:10 334:17

**accessed** 219:5

**accessible** 112:2

**accommodate** 8:24

**accommodated** 87:17,22

**accommodation** 170:2

**accomplish** 97:9

**account** 54:10

**accounting** 248:21 331:21,22

**accuracy** 56:10 113:13 115:18 146:23 160:1,2 193:22 195:22 198:2 222:6,11 224:14,15,20 266:5 268:18 269:16 276:1 283:22 289:3,5 291:23 302:2

**accurate** 39:8,11 40:1,2 54:13 71:22 88:4,8 108:2,14,18 112:11 124:19 147:2 198:6 218:12 222:13 223:23 224:22 238:20 261:3 267:3,7,8,14,18, 20,21 268:4,7,20,25 269:1,4,6 270:17 275:23 281:8 303:3 336:6,20,25

**achieve** 91:21 192:25

**achieved** 229:21 233:3

**acids** 140:12,17

**acronym** 119:23

**act** 294:6

**action** 10:7,9,13

**actions** 10:14 279:16 280:1

**activities** 330:20 331:22

**activity** 130:14

**actual** 11:20 23:17 32:10 50:5 68:17 69:4 116:5,20 139:8 162:25 220:11 226:2 239:8 242:7 244:7 291:22 325:22

**add** 112:19 113:9 126:15 146:7 184:7 187:22 301:22

**added** 214:16 267:14

**additional** 20:22 21:4 90:3,18 254:2 334:21

**address** 56:7,14 74:3 122:13 162:24 234:6 289:6

**addressed** 36:18 199:23 200:15 201:6

**addressee** 154:15

**addresses** 211:11 213:19

**addressing** 55:25

**Adds** 211:25

**adenine** 140:13

**adequate** 279:25

**adequately** 174:24

**adjourned** 178:21

**adjudicate** 85:21 295:6

**adjudicated** 97:6

**administration** 180:7

**advance** 201:11

**advantages** 113:4

**adverse** 95:11

**advertising** 92:21 93:17 94:3

**advice** 11:20 14:3,7 17:22 116:10 336:3

**advise** 129:13

**advises** 164:6

**Advisors** 333:25

**advisory** 164:5 165:3 169:2

**advocate** 124:16

**advocates** 155:7

**aeronautics** 121:16

**affairs** 279:4

**affects** 308:25 309:4

**affiliated** 182:4,13 183:23 289:20

**affiliates** 332:11,12

**afoul** 168:17

**Africa** 312:23 321:23 324:15,20

**afternoon** 122:17 188:11 297:13

**agency** 11:7

**agenda** 127:1 180:13

**agendas** 300:21

**agree** 45:18 203:15 260:12

**agreed** 120:14 127:8 162:11 284:15

**agreeing** 293:19

**agreement** 131:6,20 134:8 136:16 167:4,5,8

**agreements** 13:14 134:12 136:17

**agriculture** 97:2

**ahead** 67:12 76:12 85:3 101:22 103:9 173:9 195:25 210:20 212:25 241:16 275:3

**Ahmedabad** 121:3

**aides** 299:1

**akin** 121:24

**alarm** 315:24

**alarmed** 142:10

**alarms** 142:13

**alert** 252:5

**alerting** 69:2

**allegation** 279:9

**allegations** 56:7 328:18

**alleged** 56:9 189:24 190:13

**alleging** 144:11

**Allison** 265:25 266:21 268:14

**Allison's** 267:24

**allowed** 151:8,10 249:1 280:12

**alluded** 213:20

**ally** 313:19

**altered** 112:21 215:11

**alternative** 288:2

**alternatives** 90:22,24 235:19

**amateurs** 118:1

**ambassador** 179:20

**ambiguous** 25:4 31:7 39:9,24 43:16 44:1 45:17 47:4 48:19 53:6 56:12 73:25 76:23 77:5,16 78:1 81:17,22 82:22 86:7,15 88:5,24 90:1 92:23 95:25 100:12,25 117:3 125:9,16,23 148:12 171:23 186:8 188:24 231:13 251:6 255:9 260:5 263:13 265:16 272:13

**amend** 257:10

**America** 161:6 185:12 324:3

**American** 130:11 287:22

**amicable** 168:22

**amount** 40:17,21 43:2 74:22 131:13 158:12 223:10 323:5 325:8 329:22

**amplification** 201:13

**analysis** 124:8 173:23 174:6,8,19 175:9 181:16,17 182:1 183:10 185:3 196:11 324:12

**analyst** 247:15 327:16

**analysts** 219:25 247:18

**analysts'** 327:14

**anchor** 30:21

**and/or** 293:13

**Anderson** 7:5

**Andrew** 47:19,24 66:24 67:4 70:18 94:7,12 102:23 116:9 123:6 147:19,25 148:3 159:18 192:7 212:8 226:18 227:25 228:8 245:22 248:1 296:12 309:9,13 314:13

**Andrew's** 147:22

**Angela** 284:18

**angles** 309:9

**Anne** 169:8

**announce** 208:25

**announced** 69:14,21

**announcement** 110:5 319:11

**answering** 43:22 296:25

**answers** 9:3

**anterior** 316:20

**anticipation** 110:3

**antigen** 155:5,8

**anxious** 83:3

**anymore** 170:6 237:1 282:22

**apologize** 45:5 52:17 123:10

**apologized** 153:21

**apologizes** 153:23

**apology** 118:8 154:13 204:14

**apparently** 79:20 119:17 120:14 259:19

**appearance** 66:1

**appearances** 7:12 65:11

**appeared** 48:21

**appearing** 59:18,22

**appears** 55:25 56:7 68:4 73:20 103:14 123:1 144:12,15 151:20 159:15 191:18 194:7 200:17 202:3,5, 25 204:10 208:18 209:25 244:12,15 262:2 284:6 300:20 307:8 336:16,19

**apples** 162:7

**apples.'** 162:7

**application** 221:20

**applied** 101:6,7,12

**apply** 36:14

**applying** 128:3

**appreciation** 246:8

**approach** 129:25 169:23 211:13 282:5

**approached** 169:22 181:9 182:10 331:5

**appropriately** 14:7 166:10

**approval** 25:1,15,22,23 26:9 38:14 61:18 84:21 86:9 89:6 95:21,24 101:16 104:21,24 105:9 110:4 117:2,8 118:14 119:9,18 127:23 197:5 217:5,7 315:16

**approvals** 26:2,5 61:19 88:19 117:19

**approve** 124:1 199:10

**approved** 43:12 69:1,10 84:19 86:4 120:2,5 123:24 124:13 193:7 316:16

**approves** 85:25

**approving** 104:4

**approximately** 74:19 97:23

**April** 7:7 109:5,24 117:6 122:12 123:6 141:14 157:14,15 170:21 178:22 179:5 186:18 194:1 200:10 201:22 210:23 212:12 228:3 243:12 244:4 252:17

**Apuli** 253:12 312:15 314:7,24 315:8, 14

**area** 87:16 102:5

**areas** 38:3

**arguably** 73:15 200:10 206:2

**argue** 151:22 301:8

**argued** 180:12 273:21

**arguing** 84:25 262:5 276:6

**argument** 153:9

**argumentative** 43:25 54:1 56:3,11 68:3 73:25 76:23 77:5 80:20 81:21 86:2,6,14 100:13 101:1 125:8,16,23 149:13,20 150:6 152:11 177:9 178:4 222:25 226:3 232:22 233:25 234:9 244:24 251:7 255:8 257:2 260:4,17 261:5 262:9 263:13 264:9,15 265:14 272:13 321:6

**Argumentive** 148:10

**arm** 54:17

**array** 193:7

**art** 63:25

**article** 159:16,22,23 160:1 162:22,23, 25 179:5,8 180:8 184:12 186:7,18 188:23 189:3,8,24 191:13,21 192:16, 19 193:4 196:16,18 206:14,21 207:23 211:1,12,17 212:14 213:20 224:16 228:14 234:7,8,18 244:5 256:25 266:21 267:1 268:6 269:2,14,24 270:7,11,12,23,24 271:1,4,10,15 273:1,9,14,18 276:2,20 277:4 283:20 284:7,15 287:20 289:9,13 291:7,12,14 306:6 308:24 310:1 320:11 327:1

**article's** 197:1

**articles** 169:1 306:10 310:2 327:6

**ARUP**  143:25 152:21 154:21 169:6 295:21

**ascertain**  144:4

**Asia**  65:4,8

**Asis**  120:22 121:11,12,18

**asks**  262:10 297:2

**aspects**  176:25 264:14 286:18

**aspersions**  184:24 244:13 292:25

**aspiration**  31:20

**aspirational**  32:7 33:9

**aspirations**  96:21

**assay**  297:17,18,22,23 298:10

**assembling**  243:2

**asserted**  60:6

**asserting**  234:20

**assessment**  45:19 256:18 283:12 286:6

**assiduously**  180:5

**assigned**  179:14

**assigning**  49:15

**assistance**  101:15 105:8

**assisted**  283:1

**associate**  308:23 329:15

**Associates**  46:19 266:15

**association**  293:1 332:8

**assume**  29:10 31:16 224:18

**assumed**  198:1

**assumes**  16:11,21 42:15 43:15 53:6 56:4,12 75:6 76:7,22 77:25 80:19 125:15,22 127:18,25 128:7 130:5 148:11 200:23 202:10 260:6 264:4 269:12 271:5,13 272:12,23 277:7

**assuring**  88:7

**asymptomatic**  171:10 190:10

**Atlanta**  26:24

**attached**  47:16,18 187:22 211:10 213:24 221:13 230:21 319:23

**attempt**  101:14 232:20 254:6 269:24 301:8

**attempting**  269:24

**attendance**  12:9

**attending**  46:10

**attention**  73:4 113:25 234:24 279:5 285:22 314:15 318:11

**attitude**  281:22

**attorney**  332:18

**attorney/client**  14:11,13 15:6 16:1 328:12

**attorneys**  12:16 14:16,19

**attorneys'**  12:18,21

**attribute**  338:3

**attune**  251:3

**audience**  211:15 219:19

**august**  169:10 318:18

**Australia**  89:7 134:1 193:14 208:8 224:2

**author**  192:8 243:8

**authored**  43:10,12

**authoring**  244:3

**authorities**  130:3 324:2

**authority**  155:13 193:9

**authorization**  49:14 90:25 91:9,11, 22 92:17 101:7 113:15 130:19 131:5 279:8

**authorizations**  198:13 219:13 220:12

**authorize**  130:15

**authorized**  57:11 112:16 173:25 176:18

**authors**  197:2

**availability**  69:11 138:4 139:19,20 229:18 231:23 233:16

**average**  247:21

**avoid**  211:15

**aware**  12:24 13:8 16:2,7,9 34:24 53:16 74:15 75:3,7 76:9,19 84:3,14 95:10 101:17 131:23 134:15,24 136:2, 4,18 139:23 141:21 145:19 177:7 194:3 278:2,5 293:16 295:25 297:5,8 301:24 311:6 312:6 313:5 317:9,20,25 318:12 319:3,9 326:16 329:3 332:17

333:19,22 334:2,4

**awareness**  252:2

**awesome**  181:18 185:24 325:5

---

**B**

**back**  28:12 29:7 64:4 71:3 80:11 85:6 94:20,23 112:24 116:20 123:10 139:16,18 150:18,20 179:1 184:19 191:1 211:19 213:15 216:13 226:9,12 250:23 253:23 274:18 275:1 277:18 278:17 281:10,11 298:12,19 308:11 309:22 326:18 335:13 337:13

**background**  96:6,9,16 103:5

**backing**  180:17

**backwards**  298:8

**bacteria**  139:15

**bacterial**  97:3

**bad**  168:15 184:17 235:22 298:13 299:14 320:25 338:4

**Badgering**  262:11

**Bain**  336:12

**Baird**  297:11 298:25

**Baker**  7:19

**ballpark**  21:18 175:22

**barely**  80:14 81:7 215:25

**Baroda**  121:2

**barometer**  78:12 223:19,21

**barrel**  293:24

**Baruch**  318:17

**base**  57:4 74:2 103:9 169:13

**based**  30:1 76:5 86:21 120:2 123:25 155:19 184:8 192:25 200:4 202:2 203:13 221:19 222:22 223:10 226:1 241:25 242:2 244:20 268:4 279:20 280:13,25 292:6 319:5,11 320:9 322:25 327:12 332:3,6,11 333:23

**baseline**  49:5

**basic**  43:20

**basically**  26:7 31:3 33:20 121:16 146:11 218:23 251:4 280:21 289:16 292:11

Case 2:20-cv-00368-JNP    Document 169-14    Filed 04/10/24    PageID.3005    Page 93
of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Index: basis..Brit

**basis** 74:8 89:13 92:14 93:20 111:23 119:7 146:3 149:25 218:18 235:13 242:17,20 246:17,18 256:25 290:12

**Bate** 102:19

**Bates** 62:11 66:4,9,23 141:10 187:7 191:3 210:7 248:10 264:21,22 305:12 314:5 337:6

**bathroom** 8:22 94:15 99:20 172:19

**battle** 132:7

**BCL** 139:3

**beachfront** 121:9

**beachhead** 121:10

**bear** 195:3

**beat** 298:22

**Beaufort** 333:9,13

**beautiful** 120:25

**Bee** 7:17

**began** 26:18 29:3 61:14 88:20

**begin** 26:11,16 29:16 32:20 307:24

**beginning** 33:10 38:12 66:9 121:4 160:2

**begun** 31:12

**behalf** 7:15,17,20 43:13 46:9 132:11

**behavior** 280:6

**beings** 36:13,16 97:1 303:3 316:19

**believed** 120:12 121:5 179:10 282:17 337:17

**believes** 192:19

**bell** 72:1

**bells** 315:24

**belong** 301:7

**benchmark** 85:22 224:5

**benchmarks** 193:22 195:21 198:1 224:14

**beneath** 147:24 154:16 170:18 173:10,15

**benefit** 331:2

**benefits** 266:5

**Benson** 47:24 48:24 66:24 67:4,19, 20,25 68:5,24 70:18 71:8 72:12,18

75:3,14 94:7,12 102:23 104:6 109:4, 23 111:9,11 114:2,6,18,20,24 115:15, 22 116:9,10 123:6,12 147:19 148:1 159:18 166:1 192:7 212:8 213:7,16 227:8 245:23 248:1 296:12 297:10 307:19 308:9 309:9 314:13 315:12 331:19 333:2,22

**bent** 180:5

**Bert** 141:12

**bet** 296:4

**Betts** 187:12,17 188:9 211:21

**biased** 205:12 282:19

**bid** 311:14

**big** 31:4,8 107:2 110:15 112:13,14 143:22 150:3 154:19 180:24 184:12 204:6 270:25 300:9 301:3,21 334:24

**bigger** 110:8,11,14 111:13,18 285:9

**biggest** 131:10,12 157:25 235:11 295:20

**bill** 70:25 296:1 330:14

**billions** 316:21

**Binax** 99:21

**Biocentury** 173:23 174:6,7,9 175:7,8

**Biofire** 158:20

**biological** 138:13

**Biomolecular** 134:1

**biotech** 96:7 178:1

**bit** 35:21 40:10 72:1 189:10 213:9 223:13 229:25 324:23

**bizarre** 178:3

**black** 108:13

**blah** 203:9,14

**blaming** 268:1

**blinded** 51:21 223:25

**blogger** 249:24

**bloggers** 249:11

**blogosphere** 154:4 184:16,19 207:25

**blogs** 154:5 247:25 252:6

**board** 15:10 17:12,21,22 21:6 62:7 164:5 165:3 169:3 249:3 335:23

336:24

**boards** 249:2,9 252:3

**boatload** 194:15

**Bobby** 297:11

**bodies** 32:19 178:10

**body** 33:1 56:23 119:22 121:23,24 169:10 306:15

**bold** 234:5

**boldly** 215:12

**bona** 190:5 208:5,6,11 233:8 291:23 321:12

**bootstrapped** 232:19

**bottom** 64:2 71:24 79:10 109:19 122:11 187:11 191:7,16 204:9 210:21, 22 243:8 255:15 278:24 287:9,25 305:19 306:12 308:21,24 314:12 336:4

**bought** 93:4

**bouncing** 247:10

**boy** 298:18

**brainstorming** 336:2

**Bramwell** 238:2 253:7,8 255:13

**Brandon** 46:9

**Brazil** 121:8

**breach** 250:13

**break** 8:22,24 94:15,23,24 172:3,14, 19 178:15 295:14 309:18

**breathe** 72:1

**Brent** 27:19,21 28:3,5 47:19,22 105:25 107:19 162:11,23 164:15 165:2 166:17,22 169:11 188:1 192:10, 13 199:19,20 200:12 202:17,18 203:10,11 204:9 211:24 229:13 232:25 252:24 257:18 296:19 308:13 312:15 331:5

**Brian** 278:25

**Briggs** 329:16,17 330:7 331:18 332:23

**bring** 195:3 298:2

**bringing** 13:11

**Brit** 121:7

broad 211:15

broadly 58:18

brought 282:12,13 285:21 314:15 318:10

Brown 7:16

Bryant 329:11

BSL 137:12

BSL-3 137:5,6 139:3

buck 78:21

bucket 285:18

build 91:20

built 120:24 121:20

bullet 49:17,22 50:2,22 54:24 55:16, 19 61:7 113:11,12,18 115:1,16 255:11 279:17

bullying 273:23

bunch 104:10 120:6 126:23 145:14 176:11 235:18 315:24 316:16

burden 96:23 121:6

burgeoning 65:14

Burgle 333:24

buried 289:22

business 22:21 65:4 79:18 88:10 99:8,10,14,18 225:5 266:16 268:5 269:25 270:8,10 271:1 277:3 310:3 334:20

buy 77:13 90:19 105:2 112:23 157:17, 20 181:4,24 205:3 235:21 236:15 302:24

buying 183:18 204:23

buys 293:23

**C**

C's 140:12

C-L-I-A 57:24

C-O-D-X 26:14

C-O-L-T-R-I-N 159:6

cable 66:1

Caicos 332:7,11,16,19,23,25

caliber 137:4

California 295:2,5

call 10:11 36:22 101:19,23 102:1,2,3, 7,8 105:6 106:12 121:1 129:1 138:9 140:21 172:12 177:16 184:19 188:4, 11,15 189:19,22 190:2 202:12 219:14 249:16,18,19 298:12,19 307:22 324:24 326:13 331:1 333:5 336:14 337:4

called 22:18 28:10 46:18 49:3 51:25 54:12 68:16 74:3 91:14 92:8 120:21 133:20 207:8 329:19 330:14 332:19 333:19,24

calling 189:1

calls 56:4 57:1 72:16 73:24 75:9 77:15 78:9 129:16 130:20 140:3 143:2 144:18 155:1 176:6 200:7,23 202:9 207:24 209:11 215:6 224:23 225:2 232:5 243:24 248:1 253:16 257:3 259:15 261:6 262:14,22 265:15 268:13 269:13 270:1,19 272:3,11 273:5 274:12 309:7 316:15 319:16 320:21

campaign 179:17

candidate 180:18 294:21

cap 246:20

capability 34:13 138:18

capable 43:22 164:22 295:25

capacity 15:9 19:10 115:2,24 322:8 326:3

capital 97:10,12 329:19,20 331:18 332:9 333:9,15,20 334:17,21,25 336:13

capitalist 330:9

caps 297:2

capture 24:2

care 99:17 142:1,3 145:23 152:22 160:10 185:10 205:15,16 217:15 228:19 293:10 295:20 296:2

careful 17:23 54:18,21

carefully 71:2,22 73:19 164:1

careless 100:18

Carl 169:3

Carlton 333:24

Carmel 12:12 18:3 227:14

carried 183:2 284:24

Carroll 169:7

case 7:9 10:9 17:25 23:11 24:13 37:20 73:3 81:25 82:15 88:7 138:6 139:9 140:15 155:16 163:4 177:5,12, 13,14 190:6 197:4 212:22 242:14 263:21 275:15 286:7 304:2,5,10 306:2 311:2,3 328:11 329:1

cases 133:7,23 207:14

cash 47:9

casted 184:24

casting 292:25

casts 244:13

Catalytic 333:19,21

catch 79:24

categories 58:10

caught 73:4 307:18

caused 153:25 190:9

causing 148:7

caution 11:11 15:5 17:19 288:14

cautious 16:12

cavalier 71:5 228:23

cavalierly 101:3

CDC 120:8 146:9 174:25 175:2 298:10,15,16,20,21 312:4

CDC's 175:15,22

CDS 120:11

CDSCO 25:16 119:17,21,25 120:6,9, 11 123:2,23 124:1 127:7,16,22 128:2, 5,9,11,14 193:8

CE 33:13,22 61:18 95:2,6,9,13,15 96:2 117:7 192:25

cease 156:22

Cecilia 93:6 226:16 278:25 279:3 312:15,16

Center 318:17

centerpiece 99:7 148:5

Central 7:11

CEO 12:22 15:9 16:18 53:21 96:6 110:22 132:2 135:19 166:19 177:25 230:18 254:5 255:4 257:21 322:6,8

325:3 326:3

**Cepheid** 158:20

**certification** 129:2 173:12

**certified** 8:2 58:2,17

**cetera** 67:18 104:12 120:8 280:14

**Chad** 252:24 253:6,9 255:17 257:19 312:15,19 314:7,8

**Chad's** 253:11

**chain** 161:7 324:17

**challenge** 287:10

**challenged** 118:7 192:17 295:10

**challenging** 96:7

**chamber** 133:14

**chance** 139:12 322:16 337:19

**chances** 145:13

**change** 20:1 37:25 146:18 213:8

**changed** 306:25 338:14

**changing** 74:14 293:19

**characterization** 23:4

**characterize** 151:5 168:21 209:14

**characterized** 327:6

**charge** 48:25 58:20,23 59:2 94:12 132:11 179:16 180:14 296:2

**charges** 13:10 16:19

**chart** 104:7 144:5

**chatted** 238:17

**chatting** 40:10 179:5 249:8 252:3

**check** 283:23 288:2,6,7,9,21

**checked** 253:22

**Checketts** 142:6

**checking** 219:11

**cherry** 320:23

**chief** 28:3 107:19 108:10 114:7 162:12 163:5 164:9 166:10,24 167:9, 10 170:11 200:25 201:4,15 211:23 230:23 231:1 259:3 314:7 334:13

**Chikungunya** 22:5 23:14

**children** 171:8 292:13

**China** 26:22 27:9 31:13 121:8 137:10 179:20

**chose** 90:24 235:19 276:15

**chunk** 172:5

**church** 114:22

**circulate** 228:9

**circulated** 206:22

**circumstances** 74:13,14 93:23 228:5 248:25

**cite** 198:15

**cited** 145:17 163:8 169:6 196:18 197:2 198:23 218:19

**cites** 152:15 158:20 231:22 275:25

**citing** 198:22,24 304:23

**city** 28:9 73:5 118:22 121:3 160:13 332:4

**civil** 10:4

**claim** 72:2 108:20 125:18 294:14 312:24 334:22

**claimed** 55:20 149:10

**claims** 93:5 278:4 280:11 281:20

**class** 36:12

**clean** 54:8 298:23

**clear** 29:14 47:5,14 105:2,4 125:2 135:6 139:4 178:11 305:24

**clearance** 25:5 31:23 85:21 112:6 120:15 128:2,3 186:11,16,19 192:24

**clearances** 56:19 90:19 112:5 186:20 194:16

**cleared** 32:18 56:22 85:15,18 121:23

**clearing** 98:20

**CLIA** 57:23,24 58:1,7,8,9,17 90:5 91:2 92:17 130:23 176:18 177:18 236:6,10 287:2 302:22 323:23,24

**client** 149:25

**clients** 235:23 236:21

**clinic** 145:11 146:19,20

**clinical** 84:9 90:16 100:2 107:4,15 113:13 115:18 145:10 146:2 174:23 176:9,17,22,25 177:24 197:6 229:21 233:2,3 235:10 239:3 257:17 264:3 269:7 275:18 279:4 306:16 316:7,19

**clinically** 144:9 146:15 176:23 177:1 258:13 262:25 263:6,8,11,20 264:7, 14,16 265:18 267:17 271:23 275:21, 22 303:2

**Clint** 187:12,17,21 188:9,14 210:25 211:7,21

**clip** 54:19

**close** 121:1 297:12 300:23 323:1

**closing** 71:25

**clue** 305:6

**CNBC** 59:18,22 65:4,8

**co-counsel** 79:6

**Co-diagnostics** 7:9 12:13,22,24 14:22 15:1,11 21:13,24 24:15 25:1 26:14 29:22 48:5 55:20 56:19 61:2,4,7 78:13 99:4 113:12 115:2 120:20 122:14,18 125:2 143:14,15,21 144:3 154:11,14,17 162:13 173:11 180:6 188:21 189:12 208:20 211:23 217:17 222:3 235:19 239:16,19,24 240:2,14 241:4,7,19,24 242:1 248:13 249:1 251:3 268:19 277:11 297:4,16 298:1,5 312:21 318:20 328:2 329:20 333:14

**Co-diagnostics'** 49:13,19 61:14 104:20 115:17 117:10 144:17 174:2 191:12,21 192:18 266:3 267:20 268:6 306:15 310:18

**co-primers** 22:19 27:22

**coach** 150:8 202:22 203:23

**coaching** 150:9 151:5,16,18 203:24 273:20,21

**coast** 102:8

**Cobas** 106:21,24,25 107:1,2

**CODX** 24:17 26:11,14,16 30:14 33:2 47:7 48:18 52:17,20 58:4 70:14 74:6 75:5 83:18 87:25 88:21 89:20 91:8 92:13,20 95:2,6,10 99:13 101:7 117:4, 7 131:5 136:25 137:14 147:1 158:4,23 160:17 162:1 163:2 172:25 182:18 184:13 205:3,8 208:19 267:7 268:21 269:8 282:10 286:24 288:9 290:9 291:6,11 294:10,18,20 299:25 302:5 313:7 327:2 330:8 331:4 333:16,23

**CODX's** 37:22 59:19 82:18 84:5,14 127:23 128:6 134:16,24 137:18 156:22 160:25 237:1 285:21 289:8,23 292:5 297:6 302:1 310:14,25 312:4 317:10 326:14 327:15 336:20

Case 2:20-cv-00368-JNP    Document 169-14    Filed 04/10/24    PageID.3008    Page 96
of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Index: CODX-DESIGNED..concerns

**CODX-DESIGNED** 72:25

**coin** 155:6

**coincident** 153:8

**cold** 324:17

**collaborative** 202:11

**colleague** 60:6

**collected** 133:17 318:16

**collection** 142:14

**Coltrin** 46:19,23 47:2 159:6 265:21 266:15 269:23 272:6 276:18

**combination** 30:19 107:14

**combine** 23:10

**combined** 107:4

**combines** 36:20,21

**comfortable** 48:3 114:25 115:4

**command** 11:25

**comment** 106:4 116:13 177:13 249:1 266:4,23 306:2,3 308:24

**commented** 249:3

**commenting** 252:4,10

**comments** 170:4 177:18 277:6 292:8

**commercialization** 32:17,21

**commissioned** 328:9

**commitment** 181:14

**committed** 165:18

**common** 57:16 68:22 111:25 198:9 218:13 220:6,14 222:12 246:18 255:23

**commonly** 91:22 111:25 198:1,17

**communicate** 94:6 335:25

**communicated** 15:10 16:8,15

**communicating** 72:12 281:7

**communication** 12:17 14:11 17:8, 11,13,14,20 94:9 129:24 252:20

**communications** 11:12,15 12:19,21 13:21 14:14,16 15:6,18 16:6,13 17:24 113:23

**community** 107:17 161:12

**companies** 73:8 96:24 111:22 118:19,20 119:12 121:6,7 127:11,14,

20 130:11 145:6,8,19,23 152:19 174:16 198:15 222:14 225:7 241:6,22 251:23 260:8 284:15 285:6 300:10 312:20

**company** 12:13 13:14 16:18 17:12,21 18:12,14 26:13 28:1,4 30:11 31:15,16 33:8 35:6,8 43:13 46:18 47:2 53:22 56:25 58:23 59:9,12,13,14 61:3 65:19, 20,25 68:20 73:5 74:1 94:2 96:7,8,10, 12,15,20 97:7,17,25 98:2,19 100:4 101:14 106:15 107:20 110:23 112:7 113:21 114:8,11 117:20 118:21,22 120:21 121:5,18 125:21 126:17 128:12,13 129:5,12 131:21,23 135:19 153:25 160:13 162:4 164:9 165:6,10, 13,18,22 166:9,11,19,25 168:23 169:13 170:10 173:15 178:1 181:19 182:10 184:23 189:2 192:11,18,25 193:5,6 207:3 208:10 211:25 212:1 225:4 230:18 246:13 249:8,11 250:1, 15 251:10,12,15,19 252:3,11,21 254:13 258:9 266:4,10 269:23 270:10, 15 271:25 272:20 281:16 282:5 286:2 289:11,12 290:22 294:1 302:10 307:7 308:2 309:4 325:8 326:9 327:22 329:5,8,19 330:10,12,16,17,22 331:4, 23 332:5 333:13,19,24 334:11 337:17, 21 338:10,14

**company's** 32:1,5 49:13 65:10 193:12,24 196:20 197:2,4,7,18 207:17 225:11 243:20 249:12 250:13 252:2 266:1 331:22 338:4

**comparable** 31:3 173:24

**comparative** 198:11 223:24 282:15, 23

**comparatives** 89:11

**comparator** 196:2

**compare** 51:17 83:24 284:17

**compared** 51:5,6 143:22 152:23 154:18 158:18 196:1 197:23 209:2 219:6 223:18 292:11,24 298:15 303:6 321:14 337:22 338:8

**compares** 84:23 85:12

**comparing** 162:6 223:4 292:10

**comparison** 85:19 171:12 204:23 314:16 315:1

**compassionate** 158:18

**compensation** 165:4

**competition** 110:16 185:11

**competitive** 111:1

**competitor** 84:4 155:25

**competitors** 110:24 156:2,4

**complaining** 286:21 301:10

**complaint** 297:3,7 300:19

**complaints** 117:21

**complete** 8:20

**completed** 194:23 195:5 315:6

**completely** 166:12 185:24 249:17 298:7 320:17

**complex** 223:13 237:6

**complexity** 58:3 130:24

**compliance** 228:16 277:5 281:22 282:3

**compliant** 228:17,20

**complied** 92:25

**component** 30:19 133:4,10,18 135:4, 9,15 141:1 161:2 236:23 310:20

**components** 23:8 36:20 92:10

**compound** 11:2 43:15 45:16 56:21 57:5 65:22 72:17 73:25 75:20 78:10 87:20 88:6 89:25 95:12 101:1 130:20 251:7

**compounded** 142:19

**comprehensive** 261:3,8

**comprised** 30:7

**compromise** 284:20

**compromised** 53:1 129:7 195:13 196:6 284:16,23 294:24 323:11

**conceived** 33:20

**conceiving** 28:6

**concentrate** 292:1

**concentrated** 80:18

**concept** 41:15 331:10

**concern** 38:7 65:13 73:16 234:7

**concerned** 122:17 132:16 186:2 286:16,17 299:13

**concerns** 77:23 117:9,21 136:18 143:5 302:10

**concise** 274:3

**conclude** 174:21,22

**concluded** 229:2

**conclusion** 119:18 129:16 130:21 171:5 257:3 259:16 261:6 262:10 265:16 268:13 293:2 320:21

**conclusionary** 315:7

**conclusions** 155:19 321:24

**concordance** 51:4,14,16,25 52:2 55:9 63:18 83:8 84:2 88:23 116:5 145:20 177:15 193:21 195:20 196:11 198:16 199:8 222:22 230:4 232:19 233:22 242:23 256:22 259:20 260:14, 19,24 275:19 304:23 305:9 316:25

**concordant** 83:24 89:13 116:4 119:7 126:7 128:20 145:16 146:3,6 218:16 323:19

**concrete** 180:21

**conditions** 49:8 56:24 74:25 140:22

**conduct** 44:6 180:24 301:25

**conducted** 161:20 183:6 228:25 300:23 302:18 317:20

**conducting** 286:2 288:7

**conference** 249:16 290:20 325:23

**confidential** 335:21 338:20

**confidentiality** 338:22

**Confine** 151:25

**confirm** 68:6

**confirmation** 317:10

**confirmed** 171:17

**confirming** 142:12

**conflate** 133:15 285:14

**conflated** 301:12,13

**conflating** 288:14,16 303:24

**conflicting** 283:6

**conflicts** 120:17

**conform** 223:24 254:3,17 255:21

**conforming** 267:9

**conformity** 197:8,20 198:8,24

**confused** 42:1 60:1 220:10

**conjecture** 54:3

**conjunction** 18:1 128:14

**connect** 37:19 338:7

**connected** 36:21 265:24

**connection** 13:6,15 15:2 83:23 95:21 101:16 134:16 135:3 136:3 162:25 163:21 192:9 196:8 221:6,7,20 259:7 328:11

**consented** 181:15

**conservative** 197:2 254:22

**considerably** 253:24

**consideration** 90:24

**considered** 73:19 74:25 101:4 130:6 156:10 235:8 289:4 302:4 308:2

**consistent** 217:23 218:2,9 221:4 230:20 279:8 280:12 302:14

**consistently** 217:18 221:2 224:11 229:20 260:2

**consortium** 180:17

**conspicuously** 234:4

**constant** 235:9

**constantly** 142:19 247:14 260:9

**constituent** 74:2

**constituents** 27:4 131:3 219:24

**constituted** 299:15

**constraints** 320:3,5,9

**consult** 27:25 337:9

**consultant** 70:24

**consulted** 330:15

**consulting** 330:12,19

**consuming** 31:23

**contact** 93:10 200:18 281:23

**contacted** 158:23 159:2,4

**contaminated** 54:7 126:25 129:7 238:14

**contamination** 118:25 120:17 128:25

**contemplate** 235:2

**contemplated** 70:21

**contemplating** 293:13

**contemporaneously** 245:4

**content** 9:18 94:10 129:23 211:14

**contents** 15:6 17:23

**context** 14:13 71:15 109:4 113:4 116:2,3 125:9 126:5 152:15 153:19 171:18 177:24 178:10 219:3 231:16 263:5 267:8,13,16,23 268:10 276:15 299:9

**continental** 292:16

**continents** 104:9

**continual** 90:4

**continually** 91:7 208:13 287:1 306:16

**continue** 161:13 212:24 288:23 331:10

**continued** 246:6 334:12

**continues** 283:4 296:20

**continuing** 88:25

**contract** 132:22 133:1,2 134:7 162:5 286:21 303:21 304:6 311:4,8,9 313:18

**contracted** 68:19

**contracts** 132:19,24 173:18 285:7 301:3,22,23 310:5,8 311:14

**contractual** 237:7

**contradicts** 320:17

**contrary** 311:23 323:18

**contribute** 163:10 169:13

**control** 82:7 88:4 251:16 329:9

**controlling** 89:19

**controls** 134:3

**controversy** 204:24 288:18

**convention** 228:11

**conversation** 101:18 129:25 215:24 263:25 336:9,12,23

**conversations** 105:14 108:6,9,12 115:22 162:19 163:2 201:2

**conversely** 51:8

**convey** 226:1 232:20 233:23 261:24, 25 268:25

**conveyed** 15:10 16:19 17:4

**conveying** 14:6 125:6 224:21 260:25

**conveys** 269:6

**cools** 37:17

**copied** 79:12 106:3 187:13,23 188:1, 10 212:11 296:14 312:14 314:13

**copies** 49:6 80:4,5 123:7,12 143:17 213:18 302:21 316:22

**Coprimer** 27:3,23 36:17,19 37:5,13

**Coprimers** 63:12 201:9 331:11

**copy** 35:9 308:17 315:20

**core** 166:13

**coronavirus** 28:10,15 31:12 32:14 65:3,15 68:16 72:20 139:13,18 160:2, 12 161:21 163:10 170:21 173:12 207:12 208:21 240:5,15,18 267:2 268:20 279:6 318:20

**Corporation** 161:5 185:11 287:22

**correct** 23:5 32:3,6 40:23 41:10 64:1, 24 67:20 72:15 73:13,23 78:7 81:2,20 86:23 97:21 98:21 99:8 114:10 125:14,25 126:22 135:5,11 142:12,15 144:5,13 147:16 149:12 152:6 154:25 176:21,23 177:2 179:6 191:22 200:20 201:6 202:8 203:3,9 209:10 219:1,10 220:4 221:1,3,8,20,21,24 222:24 223:4,7,8,12,15,20 227:15 242:11 244:16 260:25 268:11 306:22 323:2,6 336:20 337:18

**corrective** 279:15 280:1

**correctly** 50:17 55:2,4

**correspond** 140:6

**correspondence** 103:15 125:6,12

**corresponds** 197:7,19

**Cosara** 120:19,20,24 121:19 122:21 123:21 124:11 240:5,14,18

**Cosara's** 122:23

**counsel** 7:12 8:14 9:6 10:1 11:13,15, 21 12:8,9 13:21,24 14:1,25 15:15 16:6,8,13,16,20 17:5,8,21 18:1 62:14 70:22 93:16,24 114:7,10,12,13,19 129:19 130:1 190:2 227:5,8,9,12 228:16 258:21 259:2 277:5 328:13 334:10,13

**counsel's** 9:12

**count** 75:23 205:11 308:17

**counter** 99:20 238:16

**countermand** 294:5

**countless** 154:5 247:4 324:2

**countries** 112:13 131:17 229:19 323:24

**country** 65:14 90:8 121:15 129:4 146:10 156:11 161:7 235:11 287:3 288:24 292:16 298:11 299:23 303:19 313:13 324:14

**County** 102:5 152:25 153:7,14 155:22 161:8 171:7,9 190:8 292:23

**couple** 161:17 173:22 239:12 306:9 336:13

**court** 7:4,10 26:12 55:13 62:19 76:10 85:9 145:1 151:14 172:16,18

**cover** 46:13

**coverage** 327:17

**covered** 14:12 275:8 276:3

**covering** 54:19

**covers** 206:15

**COVID** 26:6,11,17 27:24 28:2 30:16, 25 35:4 37:14 40:7 43:14 45:8 64:12, 17 68:13,15,23 91:12 92:14 106:16, 19,21 132:7 139:9 140:15 156:14 199:7 247:4 250:1 251:19,22 257:5 266:3,6 276:13 292:17

**COVID-19** 21:21 22:10 28:6,11 30:12 31:25 34:14 35:1 37:21 40:11 55:20 82:5 87:25 106:5 141:19 159:24 176:13 192:18 193:12 196:6,20 197:24 207:18 217:18 218:17 222:4 225:11 239:19 240:14 317:23 318:22

**Cox** 101:21 179:14 180:9,13,17 185:16

**Cragun** 329:11,14 330:3,4

**create** 251:16

**created** 34:22 92:8 112:11

**creating** 211:15 281:17

**credentialed** 183:7

**credentials** 137:8 155:15

**credibility** 98:23 127:7 158:2 211:25 291:22

**credible** 127:2 128:14 155:10,11

**crisis** 320:25

**criteria** 124:19

**Critical** 297:2

**criticize** 166:4

**criticized** 148:6

**criticizing** 166:6

**Critics** 172:25

**CRL** 91:1

**crossed** 49:23 214:18

**crossover** 211:16

**crush** 132:14

**crying** 271:21

**CSO** 170:5

**cull** 218:7

**curious** 149:5

**curiously** 118:17

**current** 113:3 124:17 180:6

**curve** 132:14,15

**customer** 23:9 39:6 57:4 58:24 104:20 131:9,10,12 157:16,25 188:25 189:7 207:21 236:17 237:23 250:24 310:5

**customers** 39:1,4 57:2,22 58:11 71:13,19 87:19 104:9,11,15 105:3 156:15 157:19 158:6,15 207:22,24 219:23,24 236:4,5,24 237:11,20 250:24 253:22 254:4,17 255:22,24 256:2,17 321:20

**cycle** 179:13

**cycler** 37:17 133:20

**cycling** 24:6

**cytosine** 140:13

**D**

**daily** 235:12 246:17,18 266:17 268:5 269:25 270:8,10 271:1 277:3

**damage** 78:6 154:1

**damaged** 184:21 185:7 208:3

**damaging** 77:21

**Dan** 175:16

**dared** 116:11

**data** 67:6 68:1 70:8 95:18 124:1 127:4 128:10 142:13 143:12 145:7 152:20 160:3 170:22 174:11 178:9 180:21 197:2,4 198:20 207:22 208:5 215:15, 20,21 217:18 218:7,8 220:8,10,20 221:10 222:4 225:9 229:7,9,17 230:1, 7,10,20 231:22 233:14,21,24 234:22, 23 239:11,20 241:21,25 242:3 244:8, 16 245:19 254:2,20 261:17 279:21 285:9 286:9 293:5 306:14,15 312:21 314:25 315:8 320:15 336:6

**date** 7:6 25:18,25 26:6 28:18 33:25 38:21 47:16 59:20 69:21 99:6,7 101:9, 24 111:21 164:10 200:9 208:15

**dated** 60:19 61:11

**dates** 24:18 27:17 34:2,3 75:19

**Dave** 188:16 204:12,19 210:25 211:7

**day** 63:9 64:3 91:25 112:25 115:3 157:14 188:5 200:11 212:14 228:8 244:5 246:9 247:21,22,23 252:8 257:22 266:20,22 290:23 320:11,14 329:23

**day's** 327:1

**day-to-day** 290:12

**days** 63:13,14 65:9 72:8 248:15 256:20 257:13 260:12 290:18

**de** 218:23

**dead** 138:5,13

**deal** 91:23 100:6 112:13,14 150:3 184:12 189:17 204:6 217:15 263:1,3 332:13

**dealing** 42:11 149:16,25 247:22 249:10 306:10 316:1

**dealt** 138:20 332:14

**Dear** 103:15 297:12

**deaths** 207:15 292:17

**debt** 19:3

**decades** 336:13

**December** 64:15,21 317:21

**decide** 91:20 97:6 168:7 294:12 334:15

**decided** 213:6 231:6,7 257:19 308:8

317:15

**deciding** 28:1 327:11

**decipher** 119:3

**decision** 70:8 77:20 160:23 166:16 167:20 197:12 283:7 293:25 310:23

**decisions** 77:13 178:6,8 311:23

**declaration** 126:9

**declared** 72:21

**declined** 284:2 287:11

**declines** 283:22

**decrease** 338:3

**dedicated** 247:22

**deem** 127:9

**deemed** 126:25 196:2 316:18

**deemphasize** 89:16

**deeply** 142:10

**defamation** 154:6

**DEFCON** 137:12

**defend** 189:17 194:24 208:4,10 298:21

**defendant** 7:17 10:4,14

**defendants** 7:21

**defends** 172:25

**defense** 199:15

**defer** 100:9,22

**define** 222:6,11 224:20 225:23

**defining** 269:15

**definition** 36:9 40:5

**degree** 48:20 50:11 171:22,24 213:10 308:25

**deleted** 328:17,23 329:7

**deleterious** 295:11

**deliver** 325:22

**delivered** 63:13

**demand** 337:25

**demographic** 171:6

**demographical** 190:5

**demographics** 292:10 293:8

**demonstrate** 111:12

**demonstrated** 113:13 196:22

**demonstrates** 44:25 145:21 217:19

**demonstrating** 201:11 222:5 224:19

**demonstration** 293:14

**denatured** 37:18

**Dengue** 22:4

**denied** 127:22 128:2,9

**dental** 99:17

**department** 18:9 70:7 93:9 114:12 175:18 193:16 194:5 208:7 228:25 242:9 245:13 288:1 304:25

**departments** 298:11 301:4

**depending** 158:7 223:14 300:14

**depends** 93:19,23 114:1 238:6

**depo** 9:5

**deposed** 8:11

**deposes** 8:3

**deposition** 8:25 10:1 35:18 178:21 204:6

**derivative** 10:6,8,13,14 102:7 209:21 210:5

**derived** 209:9

**derives** 209:13

**describe** 19:1,23 36:17 45:7 100:10 177:11 217:24

**describes** 36:1

**describing** 36:5 51:10 105:7 250:12 251:18 256:6 259:18

**description** 35:23 258:15 292:25

**Deselect** 312:20

**Deseret** 293:12,14

**design** 30:14,16 32:12,14,24 34:17 35:7 38:5 279:20

**designate** 338:19,21

**designation** 36:15 137:7

**designed** 34:18

**detect** 39:12 40:16,21 49:7 196:20 223:11 308:17

**detected** 138:14

**detecting** 42:7

**detection** 37:5 41:4,10 45:12,13,21 49:4,18 50:3,8 68:8 81:2,6 82:13 83:13 84:5,23 87:4 136:19 140:12,16 143:11 144:16 169:20 174:1 175:4,11, 15 176:4 177:6 196:19,23 214:16 223:9 229:12,14 230:2,8,9,12 231:4, 11 232:3,13 233:23 252:25 253:15,22, 24 254:7,15 255:7 256:15,24 258:11 259:9 263:24 317:11

**determination** 165:12,23,24 166:15 168:11 169:18 220:13 283:11

**determinations** 129:20

**determine** 302:23 324:13

**determined** 302:23

**determining** 268:17 269:16 276:1

**develop** 30:12 32:20 38:18 89:11 331:10

**developed** 24:20,21 30:13 31:10 32:16 34:10,14,15,25 35:3 68:14 121:10

**developing** 19:2 25:13 31:4 33:21 87:10 96:23,25 99:13 121:6

**development** 61:13,14 79:18 89:2 100:1 121:5 169:15 252:23 253:14

**developments** 74:9 129:11 188:17

**device** 99:13,16

**devoted** 263:3

**devoting** 263:10

**diagnosed** 99:17

**diagnostic** 21:25 22:1,6 25:8,9 36:3 49:7 50:18 54:25 55:21 111:3 193:7 218:14 222:7 260:8 267:2

**diagnostics** 120:19 122:21 160:11 193:6 198:2 201:11 229:14 334:23

**dialogue** 204:4

**dialogues** 203:23

**died** 295:4

**Diekema** 175:16,24

**differ** 142:17

**difference** 190:3 240:17

**difference.'** 284:19

**differences** 63:20 86:10 196:18 292:6

**differences,'** 162:11

**differentiating** 72:23

**differently** 273:2,10 274:20

**difficult** 152:14 179:23 224:10 298:16

**difficulties** 82:19 130:2

**dilution** 323:13

**dime** 321:22

**direct** 118:4 147:17 232:14

**directed** 92:9 180:9 294:13,14

**direction** 96:20 97:7 211:4 213:9

**directive** 336:2

**directly** 57:8 190:14 213:19 297:4

**director** 175:16 299:12

**dirty** 284:19

**disagree** 203:7

**disaster** 142:18 148:8 159:17,24

**disclaimer** 107:11,24 108:2 238:23 239:6 281:6

**disclaimers** 238:19

**disclose** 16:5 17:14 124:5 129:18

**disclosed** 15:19,24

**disclosing** 9:18

**disclosure** 15:21 18:3 257:18 258:12

**disconcerting** 247:9

**discontinuation** 280:1

**discount** 158:4,5,11

**discounts** 158:15

**discovery** 328:11

**discredit** 180:13,16 182:1,2

**discrediting** 180:6

**discrepancies** 292:6

**discrepancy** 171:3 292:23

**discuss** 43:13 93:13 94:24 115:15 129:24 186:6 302:9

**discussed** 47:19 188:11 189:25

195:12 264:18 292:7 293:17,21

**discussing** 17:21 62:1 73:21 96:5 100:6 116:15 123:1 175:10 206:19 238:19 278:10 284:1 309:25

**discussion** 64:18 68:4 116:7 126:24 189:19 198:3 216:12 218:10 238:22 239:6 258:8 271:20 278:18 280:24 285:3 289:14 309:21

**discussions** 48:22 189:22 194:19 246:12 249:7 281:16 289:11 298:8

**disease** 26:21 110:15 155:14

**diseases** 26:25 175:17 220:3

**disingenuous** 184:9 185:25 260:15

**disparage** 190:14

**disparaging** 118:12

**disparate** 292:10 324:20

**disparities** 286:9,12 293:6

**disparity** 285:7,23 286:3

**dispositive** 327:4

**disrupted** 290:21

**disruptive** 325:23

**dissecting** 264:12

**disseminate** 252:7

**disseminated** 48:18 171:21,25 270:24 271:2

**distinct** 41:19

**distinction** 63:17 130:25 304:16

**distinguished** 156:11

**distinguishing** 35:5,8

**distribute** 135:21 280:2

**distribution** 211:9,11

**distributor** 57:7,16 280:8,9,10,21 281:20 282:6 327:25

**distributors** 57:3,9,19 279:7,19 280:7,25 281:18

**District** 7:10 148:19 149:1 151:8

**disturbed** 179:9

**Division** 7:11 175:17

**DNA** 30:16,22 31:3 37:18,19 140:14

**doctor** 141:17

**document** 29:12 34:4 35:20 46:12 47:20 48:6,9,14 50:1 60:8,18 62:10 66:8 67:10 75:24 76:25 79:9,10 109:3, 10,15,21 111:15 112:2 115:20 145:3 149:14,21 150:5,11,12,14,17 151:6 170:18 172:8 186:22 187:22 201:16 202:11 210:17 213:25 214:5,10 216:25 220:24 230:14 232:17,23 239:15,17 240:5,21 241:12,13,17 248:9 265:19 272:23 318:8,10 325:18

**documentation** 259:5 328:8

**documents** 9:17,18,19 11:22 29:8,13 43:12,13 61:16,17 125:1 212:20

**dog** 23:16 233:18 313:14

**DOH** 245:12

**dollar** 97:23 98:25

**dollars** 181:6 311:7

**domestic** 104:9

**dominate** 185:14

**dominated** 334:23

**double** 152:17

**double-checked** 243:22

**double-helix** 140:14

**download** 312:21

**downplay** 89:16

**downtown** 153:1 292:11

**dozen** 196:10 218:5 234:25

**dozens** 225:7 283:5 302:15,16,17,18

**draft** 70:20 103:14 110:5 191:20 192:4,10,15 198:4 199:21 200:6,9 203:6,11,12,19 208:19 209:9,25 213:24 214:6 215:14 226:15 228:9 306:3 307:9,10,12,17,23

**drafting** 188:15 192:12 215:8,9

**drafts** 217:10,11

**drawer** 194:24

**Drew** 188:6

**drive** 326:24 327:13

**driven** 74:12 98:17 144:16 170:9

**driving** 291:21 327:7

**drop** 185:24 326:19

**dropped** 181:21 182:3 183:15,17 326:14

**drum** 293:24

**drying** 255:14

**due** 15:17 209:1 217:15 228:19

**duly** 8:2

**Dunn** 284:18 287:25

**Durenard** 62:6 63:4,9

**Dwight** 7:18 8:1,10 147:25

**dying** 132:16

**dynamic** 293:8

**dynamics** 293:8

---

**E**

---

**E-DISCOVERY** 212:20

**E-MAIL** 46:13 47:17 60:19 61:11 63:4,8 66:24 67:3,13,15,18 73:23 79:11,19,21 81:10,20 102:22,23 103:14 105:24 107:9 109:4,19,23 112:25 114:3 116:9,20 122:11,13 123:5,12,13,17 141:12,14 144:23 147:18,19 148:3,4 149:11,18 150:22 152:5,6,12,15 153:19 158:25 159:14 161:10 187:11,24 188:9 191:8,19 199:17,18 200:4 201:22 202:2,7 203:20 204:9,11,13 210:22 211:21 212:7 213:16 235:4,5 238:18 248:11, 13 263:22 265:21 266:19 278:24,25 296:12,17 297:10,11,15 300:16,25 305:20 307:23 308:10 312:14 314:6, 12 315:21 335:17 336:10

**E-MAILS** 57:1 62:17 88:1 108:8 125:21 144:21 149:18 152:6,7 228:2 268:3 297:25 299:1

**eager** 103:5

**earlier** 36:5 64:18 65:9 99:2 105:7 130:14 138:2 141:13 145:24 161:10 175:21 215:21 238:18 265:6 289:15 338:9

**earliest** 112:22

**early** 101:10 117:6 153:3 194:14 218:4,6 245:7 254:20 292:9

**earnest** 300:22

**earnings** 324:24 325:2,3,5 326:4,6,8, 13

**earthshaking** 218:22

**earthshattering** 260:11

**ease** 39:4 229:18 231:23 233:16

**easier** 213:17

**easily** 227:7

**east** 121:2

**easy** 85:16 276:9 298:23,24

**edit** 103:22

**edits** 214:10

**effect** 65:19 151:5,16 153:22 291:13

**effectively** 40:18 133:18

**effectiveness** 100:20

**effects** 208:1

**effort** 255:16 256:14 263:11

**efforts** 58:19 61:14 96:24

**Egan** 7:18,20 8:1,6,10 10:3 18:2 35:12,16 46:6,13 54:17 59:5 60:11,14, 19,20 62:10,18,24 63:3 66:11,18,22 67:18 78:25 79:2,10 94:23 102:16,23 105:19,23,24 108:23 109:2 122:4,8,9 141:3,5,9 147:25 159:9,13,18 179:4 186:24 187:1,5,13,21 190:20,24 191:2 210:10,15 216:6,19,25 217:1 226:12 248:5,10 261:25 265:1,22 277:22 278:20 283:15,19 296:7,12 305:11,14, 18 312:9,13 314:1 318:3,7 325:12,17 335:16,17 337:16 338:23

**elected** 179:21

**election** 179:13,17

**elements** 23:9 140:24 149:8 285:16 288:14 301:13 303:23

**eliminate** 61:22

**eliminating** 62:2

**Elkington** 204:12,19

**else's** 75:17 85:13 275:12

**emanated** 311:1

**embarrass** 290:21

**emerge** 163:20

**emerged** 59:16

**emergency** 49:13 75:2 84:20,21 85:21 90:25 92:16 101:7 113:14 198:13 219:3,13

**emotional** 247:13

**emphasis** 99:14

**emphasize** 113:23

**empirical** 337:20

**employed** 114:11

**employees** 29:21,23 97:18 243:17 248:12 249:1,8 252:1,2,9 276:19

**enabled** 30:15

**end** 29:10,24 84:6,15 97:19 109:3 166:18 187:23 204:24 211:5 245:9 290:18,23 315:13 329:23

**ended** 155:22

**ends** 66:9 109:19

**energy** 247:13

**engage** 9:22 283:8

**engaged** 156:12 170:12

**engaging** 211:12

**engineer** 28:9

**engineering** 29:16 65:16

**English** 121:1 235:20

**ensure** 228:15,17

**ensuring** 88:4 94:2

**enter** 131:6 136:16 138:17

**entered** 13:13,14 18:21,24 19:12 20:6 21:3 132:22

**entering** 26:16 131:19 132:19

**enthused** 252:18

**entire** 129:3 140:14 177:5 182:7 199:6 273:13,17 292:15 338:19

**entities** 288:17

**entitled** 96:13 103:14 159:16 261:25 267:1 296:17

**entity** 102:10 127:5 143:3 183:16 282:13 290:6 330:14

**entry** 20:25

**enumerable** 313:15

**environment** 50:24 52:10,24 53:8 54:25 71:16 72:21 165:13 176:13 218:7 224:1 282:17

**environmental** 53:11,23

**environments** 52:25 84:1 140:19,20

**epidemiological** 107:5,18

**epidemiologist** 284:18

**epidemiology** 229:1 308:23

**equipment** 133:24 286:19 300:12 301:18 305:6 319:20 323:12

**equivalent** 119:23 323:23

**ergo** 223:23 324:22

**error** 298:4

**errors** 201:13 298:12

**erupting** 71:17

**escalated** 93:24

**establish** 121:9

**established** 123:22 125:5

**estate** 18:25

**estimated** 20:16,17,18

**estimation** 325:3

**et al** 7:9

**EUA** 90:18 104:24 105:8 111:19 112:6 117:1,8 130:13,19 131:5 186:18,20 220:12 221:20 235:15 279:8,21 280:13

**Eugene** 62:6

**Europe** 26:2 31:25 38:14 57:18 87:14 95:3 106:12,17 173:13 332:15

**European** 25:15 32:2,6 33:14,22 87:18 95:17 137:22 192:24 193:8

**European-based** 118:19

**evaluate** 178:10 215:12 254:10 312:25 317:16 322:3,9

**evaluated** 123:24 206:1 229:19 235:18 236:4 321:15,16

**evaluating** 69:7 260:11 306:15

**evaluation** 49:9 83:25 113:14 115:18 116:4 120:3 126:7 137:22 234:13 328:4

**evaluations** 214:18,19,25 217:20 225:10 228:24 229:13 235:9 321:19

**event** 112:8 238:7 331:24

**events** 64:3 65:5

**eventually** 131:12 134:23 301:25 334:19 337:1

**everyone's** 116:10

**evidence** 49:15 76:23 77:25 148:11 180:21 202:10 271:6,13 272:13,23 277:8 294:4,5 311:22 323:18,21,22 324:4 337:20

**evolution** 59:15

**evolved** 166:11 170:3

**evolving** 65:2 74:10 138:3

**exact** 21:15 24:18 30:8 38:20 92:15 98:7 101:9 164:10 168:12

**exaggerate** 254:25

**examination** 8:4 300:23

**examining** 155:20

**Excel** 312:21

**excellent** 196:23 276:10 289:21 312:1

**exception** 197:24

**exceptional** 80:14 81:7 326:9

**excess** 153:16

**exchanged** 28:13

**excited** 252:16

**exclamation** 252:15

**exclusively** 107:12 276:13

**exclusivity** 57:13

**excuse** 70:1 253:7 331:13

**executive** 96:8

**executives** 131:21

**exercise** 24:7 217:15

**exhibit** 35:10,12,17 46:4,6 60:14 62:24 66:18 79:2 102:16 105:19,24 108:23 122:4 141:5 159:9 187:1 190:20 210:10 216:6,19,24 248:5 265:1 277:22 278:20 283:15,19 296:7 305:14 312:9 314:1 318:3 325:12

**exhibits** 335:8

**exist** 234:12

**existing** 299:4

**exit** 334:18

expanding 142:13

expect 63:12

expectation 105:12

expectations 326:10

expected 118:16,18 119:5 208:10 261:24

expensive 31:23 158:22 235:22

experience 193:5

experienced 326:17

experiment 284:16,23

experiments 44:7 82:6 258:5 263:19 264:5

expert 53:21 96:14 236:10 309:10

expired 324:15

explain 107:20 120:11 143:23 154:20 157:1 213:11 231:17 269:9 272:1 299:19 330:22

explained 234:2 270:15 336:24

explaining 171:3 233:1

explanation 113:3

explore 28:1

exploring 26:16

expressed 125:20

extend 97:1

extent 11:13 13:20 17:7 78:2 85:20 133:1 190:3 242:4 245:23 259:1 309:4

external 44:8

extra 295:5

extraction 133:10 285:17 308:18

extraordinary 98:14 323:6

extremely 68:22 116:12

eye 307:18

---

**F**

face 119:11 311:22

facilities 249:12 295:7

facility 183:5 257:24

fact 65:8 70:3 90:15 128:21 142:19 152:24 171:7,8 186:12 190:9 193:6

196:21 199:8 201:3 253:21 256:1 257:6 263:3 264:4 265:11 277:7 283:3 284:2 287:3,17 308:15 311:24 320:10

factor 146:21 176:20 316:2

factors 53:11,16,23 54:9 287:17,18 304:7 316:3 323:13

facts 11:19 14:2 16:11,22 42:15 43:16 53:7 56:4,12 74:13 75:6 76:7,22 77:25 80:19 93:23 110:5 125:15,22 127:18, 25 128:7 130:5,7 148:11 155:20 184:8 185:21 200:24 202:10 260:6 269:12 271:5,13 272:13,23

factually 179:10

fail 122:22

Failure 279:25

fair 33:23 34:11 42:10 43:5 45:10,12, 15 53:2 98:25 188:21,25 251:10 256:18 282:23 308:13 309:5

fairly 34:10

faith 294:6

false 42:10,11 43:5,23 44:19,20,24 45:22 61:22,23 62:2 145:13 281:17 323:5

falsely 49:14

familiar 8:13 35:20 40:7,24 75:24 95:22,23 107:23 127:14 132:5 136:13 147:8 214:5 216:25 244:22,25 245:21 246:10 255:16 256:14 285:12 291:1, 10 315:1,3 325:18 327:22 329:4 332:18 333:9

family 121:13

famine 72:7

famous 169:4

fancy 33:12

fantastic 86:5

FAQ 47:18 48:4

far-reaching 208:1

Fascano 79:5

fast 65:2 72:19

father 46:24

fault 311:17,19,20

faults 185:5

faulty 211:12 293:1

favorable 166:20 214:16,17 229:12 230:1,7,9,11 231:4,11 232:13,20 262:3

favorably 262:21

FDA 18:15 25:5 31:22 54:12 69:1 81:12,15 83:1 84:19 85:15,18,20,25 86:4,20 88:13 90:18 91:9 92:20,25 93:11,14,17,20 94:1,4 101:8 110:4 111:19 112:4,6,9 113:3,14 119:23 121:24 137:23 145:25 173:25 176:18 177:20 186:10,13 218:18,25 219:2,11 220:12,17,23,24 221:1,11,14,16,25 222:2 225:8 235:15 253:25 254:2,20, 21,24 257:11 259:19 261:22 278:3,8 279:14 280:4 281:4,15,23 282:1 314:16 315:1,7 316:9,13 317:2,7,15, 16

FDA's 174:12 197:3 256:12 317:10

feast 72:7

Featherstone 79:12,17 147:24 149:24 182:20,21

feature 177:15

featured 201:10

features 35:5,8

February 33:15 66:25 80:24 92:19 95:5 173:11 192:24

Federal 198:14,23

feed 252:6

feedback 93:22 200:19 263:16

feel 43:22 203:23

feels 70:1

fellow 330:13

felt 190:12 300:4 334:25

fide 190:5 208:5,6 233:8

fides 208:11 291:23 321:13

field 24:2 52:5 99:23 206:12 218:2 220:11 225:12,15,21,23,25 226:1 256:10 257:7 263:16 268:15,21,25 295:14

fight 156:14

fights 293:23

figure 21:18 119:8 159:1

**file**  87:9 290:24

**filed**  20:15 48:15 167:17 326:23

**files**  124:7 329:7

**filing**  129:22 221:17 254:23 257:10

**filings**  15:22 90:18 145:25 219:16 225:8

**filtered**  17:4

**final**  48:1 217:5,7,12 315:15 317:9 336:2

**finalize**  301:25

**finally**  124:1

**Finance**  65:4

**financial**  114:8 333:25 334:13

**financing**  333:17

**find**  30:18 115:10 256:19 312:22,23 313:17,18,20

**finding**  254:18 313:1 315:6,7

**findings**  171:17 312:3 317:2

**fine**  8:7 66:15 136:20 148:24 172:11 174:22 177:21 178:15 213:7 238:12 275:2 276:9

**finger**  49:21

**finish**  8:17 76:15 165:5 172:8 262:16

**finished**  32:12 45:25 60:9

**finishing**  172:8

**fire**  308:11

**firm**  18:3 46:20,22,23 47:1 121:12 159:5 227:14 270:3 271:3 279:15 331:24 334:15

**firm's**  280:2

**firms**  102:6 331:1

**fishy**  324:6

**fit**  206:7

**fits**  84:18

**flag**  94:4

**flags**  94:1

**flat**  206:6

**flatten**  132:14

**flesh**  168:14

**flies**  311:22

**flip**  79:23 80:11 123:4 240:25 241:12

**flipping**  155:6

**Floch**  46:9

**floor**  250:18

**flown**  295:4

**flurry**  299:10

**focus**  73:23 81:13,20 175:3

**focused**  81:10 175:10 186:11 206:25

**folded**  266:23

**folks**  46:14

**follow**  228:1 242:13 246:16 281:10

**follow-up**  108:8 272:5

**force**  26:23 31:11 64:10 141:19,22 148:6 164:25 165:6 205:17

**foreclosure**  19:6

**forget**  298:9

**forgot**  66:3

**form**  61:4,6 148:17 167:7

**formable**  121:20

**formal**  15:21 102:10 204:13 297:3,7

**formally**  112:2 181:9

**formed**  330:14

**forms**  65:25

**forward**  112:24 148:9 159:16 167:7 170:14 212:9

**forwarded**  147:19,24,25 148:3 149:12,17 199:19 200:12 297:10

**forwards**  123:13 296:17

**found**  119:25 128:6 182:2 215:16 229:8 258:4 278:12 302:1,19

**foundation**  52:21 68:2,12 77:16 104:22 110:13 147:4 195:24 309:6 313:8 320:20 322:1,5,10,11 336:21

**founder**  162:12 331:4

**four-fold**  312:4

**fourth**  163:8 214:10 279:17

**Fox**  65:4

**frame**  34:23 35:4 101:25 163:19

290:16

**Frank**  265:21 276:23 277:1

**frankly**  14:5 153:25 166:17

**free**  56:25

**freeze**  255:14

**frenetic**  71:19 250:25

**frequent**  74:8 93:20

**frequently**  48:12 74:8 113:24

**Friday**  72:1 268:19

**friendly**  131:20

**friendship**  131:24

**frogs**  264:12

**front**  98:6 109:6 123:5 127:4 147:17 159:14 185:22 186:10,12 204:4 213:15 254:24

**fruition**  285:4

**fulfill**  97:14

**Fulgent**  295:2

**full**  127:4 194:12 239:11 269:2 281:21

**fully**  67:14 100:22 111:22 165:18 170:12 208:9 261:2 295:25

**functions**  100:4

**fundamental**  37:2 237:4 282:4

**fundamentally**  218:21 338:7

**funded**  206:4

**funding**  330:17

**funds**  330:21

**fuss**  152:24

---

### G

**G's**  140:13

**gaining**  32:15

**game**  170:15 174:22

**Garcia**  123:5,17 243:10,14 245:21,22 265:21 266:20 276:22 329:3,4,10

**Garcia's**  244:15

**gather**  218:5

**gathering**  133:6

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Index: Gatlin..hearing

**Gatlin** 265:25 266:13,21 269:8 270:15 277:6

**gave** 23:4 28:8 64:20 103:4 118:8 119:18 120:15 217:5 251:14 273:20 274:9

**Gayle** 7:5 94:18

**Gelt** 7:8

**gene** 37:6,23 38:6,9,16,24 39:3 86:22,23 87:1,4,15 112:19 254:12

**general** 15:14 93:15,24 114:7,10,12,13,18 158:17 178:5 206:11 221:8 259:2 289:5 334:10,12

**generally** 13:3 36:23 44:14 45:18 57:12 58:16 94:12 222:14 242:21 253:23 286:1 290:14 293:22 315:3 334:16

**generating** 313:11

**generically** 36:25

**genes** 37:6,12,23 38:4,11,19,24 39:8,15,18,23

**Genesis** 104:16

**Genetics** 90:17 91:2 295:2

**gentleman** 122:12 141:13

**geographical** 57:10

**German** 122:12

**get-go** 59:14 189:5 234:19 254:13 331:23

**gigantic** 110:20 271:20 293:6

**give** 32:4 36:8 42:19 44:2 45:24 49:23 59:20 66:5 67:5 89:3 137:8 152:16 158:4,5,9 183:9 201:8 236:11,13 264:21 276:10 314:21 317:6 322:19

**giving** 113:21 206:14 260:22 266:13 292:24 293:14 335:25

**glad** 272:9,15

**glass** 249:13

**global** 26:24 31:11 33:6 64:10 75:1 117:25 244:25

**glycol** 36:24

**goal** 32:2 211:13

**gold** 124:6

**good** 8:6 70:2,3 80:13 81:6 86:19 90:15,23 94:15 103:5 112:18 122:17

139:12 140:4,8 157:10 165:16,20 172:13 181:12 190:15 206:6 211:23 213:6 235:17 248:23 284:12 289:4 292:19 294:6 302:4 320:23 335:2 337:19

**government** 10:18 11:1,7 123:22 124:12 127:5 132:8,9 194:5 198:14,23 209:1 301:22

**government's** 193:16

**governor** 101:20 132:10,11 179:14,15,19,21,23,25 184:1,5 301:7

**governor's** 299:1

**grab** 284:11

**grandson** 121:17

**grants** 21:17

**graphs** 80:2,3

**great** 66:14 88:17 90:14 91:23 112:20 217:15 230:25 276:9 287:23 309:13 315:16

**greater** 174:1 293:5

**grew** 166:9

**grind** 24:3

**gross** 98:10

**ground** 8:13 19:2 136:11

**ground-up** 23:11

**group** 44:8 182:4,19 206:5 208:8 218:19 219:23 287:11 328:10

**group's** 162:6

**groups** 181:3 292:12

**grown** 166:3

**guanine** 140:13

**guess** 20:20 23:1 27:25 43:9 45:12 59:8 79:6 100:14 101:11 114:25 122:13 123:1 133:19,21 182:22 185:8 191:12 192:7 199:18 212:5 213:16 258:4 297:20

**guesstimate** 115:24

**guesstimating** 153:15

**guest** 65:25

**guidance** 122:23

**guidelines** 123:22 124:17

**guy** 155:4,6 204:12 295:12,14 336:12,14

**guys** 17:4 62:17 111:7 250:22

---

**H**

**ha** 212:5

**half** 66:13 74:16 153:13,14 160:5 161:21 170:22 172:3,10 252:17

**halt** 142:15

**halts** 290:10

**ham** 238:15

**hammered** 118:23

**handled** 149:23 159:5

**handling** 247:24 285:16

**hands** 227:3 298:22

**handy** 289:25

**hang** 89:25 126:14 294:3

**happen** 79:22 220:9 273:22

**happened** 91:1 122:21 137:2 183:15 206:8 246:4 289:23

**happy** 39:3 205:9 270:23

**hard** 55:13 103:6 170:14

**harnessing** 132:12

**head** 33:18 41:13 59:10,11 70:18 79:18 93:8 121:16 175:13 186:21 248:1 279:3 297:25 328:5

**headed** 170:10

**health** 26:24 31:11 58:5 64:10 75:2 131:6,20 135:20 142:1,3,18 143:4 145:23 148:8 152:22 156:1,10 159:17,24 160:10 162:4 169:9 185:10 188:22 189:11 193:17 194:6 205:15,16 208:7 236:21 242:9 245:13 286:22 287:4,20,22 288:1,17,23 289:17 292:19 294:9 295:12,20 296:2 297:21 298:10 300:8 301:3,4 303:25 304:22,25 305:1 310:19 311:13

**Health's** 236:24 311:17

**hear** 257:7 332:25

**heard** 26:21 117:20 126:9 137:9 142:11 285:24 332:20

**hearing** 29:4 72:20 117:9 254:3 256:9

299:7 302:3

**hears** 61:3

**heart** 90:22 235:16

**heats** 37:17

**held** 83:16 216:12 223:22 278:18 309:21

**helped** 243:2 276:19

**helpful** 65:11 164:16,19 300:4 308:10

**helps** 229:15 231:20

**Hepatitis** 120:7

**heralded** 155:5

**Herbert** 132:11 179:14

**hereinafter** 8:2

**hesitate** 184:7

**Hey** 257:7 258:3 314:14 337:4

**high** 58:3 74:22,25 78:22 96:12,23 98:5 102:6 121:5 127:6 130:24 131:24 132:4 143:6 144:16 252:13

**higher** 45:13,21 54:19 84:6,7,15 87:3 99:2 143:21 154:18 175:15 176:2 255:22

**highest** 78:24 318:23

**highjacked** 249:17

**highly** 63:15 88:9 118:7 153:24 183:7 186:11 223:22 234:18

**Hindenburg** 291:2,11 329:13 334:3,7

**hired** 181:15

**historically** 73:10

**history** 107:5,16 111:2 112:8 243:20 332:1

**hit** 136:11 212:1 287:20 289:16 326:22,25 327:6 329:13 334:3,6

**hits** 184:18

**hold** 21:18 49:23 60:8 109:12 191:15 202:19 211:3 220:22 230:17 249:18 264:23 274:22 290:13,19,20

**holds** 185:17

**Hologic** 152:16

**home** 99:13,19

**homes** 132:16

**honest** 261:17 315:16

**hoopla** 247:7

**hooplas** 198:19

**hoot** 251:14

**hope** 82:13

**Hopkins** 169:8

**horning** 185:12

**hospital** 160:14,19,22 161:4,5,6,12 185:11 234:24 287:22 288:5

**hospitalizations** 207:15

**host** 97:5 142:9

**Hostetler** 7:20

**hot** 116:4 181:21 182:3 199:13

**hour** 66:13 172:3,10

**hours** 9:16 71:2,3,6 188:9 227:2 228:18 335:3

**hovering** 98:24

**HR** 167:13

**hub** 102:6

**huge** 235:23

**Hugh** 332:19,25

**Huh-uh** 288:22

**human** 25:10 36:13,16 95:7 97:1 120:6 137:1 138:16 139:2 140:1,7 303:3 316:19 324:9

**humanitarian** 114:21

**humans** 24:16,18,23

**hundred** 21:20 218:6

**hundreds** 128:18 145:6 152:19 206:2 235:12 250:23

**hunting** 23:16

**Huntsman** 179:18,24 180:1 183:19,24 185:16

**Huntsman-related** 183:16

**hurdle** 85:16

**Hutchins** 93:7,13 94:4,5 226:16,23 278:25 279:3,5 312:16

**hygiene** 293:10

**Hygienic** 301:25

**hyperfocused** 234:16

**hyperlink** 215:16 229:9 232:25

**hyperlinks** 116:6 220:8

**hypothetical** 77:25 78:9 129:16 140:3

---

**I**

---

**ICMR** 123:24,25

**idea** 26:20 33:4,10,12,20 49:1 64:12,17 209:13 276:21 283:3 299:20 309:13 317:17

**ideas** 335:21

**identical** 308:14

**identification** 35:13 46:7 60:15 62:25 66:19 79:3 102:17 105:20 108:24 122:5 141:6 159:10 187:2 190:21 210:11 216:7,20 248:6 265:2 277:23 278:21 283:16 296:8 305:15 312:10 314:2 318:4 325:13

**identified** 38:6 50:17 55:2,4 110:23

**identifies** 23:17

**identify** 30:23 31:1 37:13,20 41:24,25

**identifying** 37:12 42:1

**IFU** 219:14

**ignore** 185:24 234:4

**ignoring** 206:14 320:25

**IHC** 117:23 141:17 156:1 204:12 207:23 295:21

**Ike** 47:13,14,16 55:11 61:1 80:3 109:24 195:25 266:5 298:15 305:24

**illnesses** 22:2

**image** 328:14

**images** 79:20

**immediately** 21:2 64:9

**imminent** 110:4

**impact** 45:22 53:11,17,23 54:3,5 65:19 77:8 84:12 310:3 338:8

**impacted** 310:10 337:17

**impaired** 295:3

**implement** 23:21

**implication** 44:12,15 224:25 232:3,9, 14

**imply** 194:8

**importance** 112:7 252:13

**important** 28:20 61:17 62:12 81:14, 19 99:4,10 112:8,16 120:22 121:9 127:6 130:25 144:8 149:11 169:10 176:4 186:13 228:15 229:18 231:23 233:15 240:10 248:24 255:3 259:21 262:3 282:4 306:13 316:12 334:24

**importantly** 279:22

**imported** 242:12

**impossible** 298:17

**impression** 326:3 336:19,22

**impressions** 281:18

**improper** 308:3

**improve** 39:16,18 77:3 252:24 253:14,20 254:6 255:17 256:15,23 257:14 258:11 259:9,22,23 260:3,9 265:12

**improved** 254:15 257:11

**improvement** 264:17

**improving** 89:18 255:7 256:8 261:4 262:20 263:24

**inaccurate** 125:7

**inappropriate** 185:1 189:8 252:5

**incessantly** 321:20

**incident** 21:16 46:24 156:24 158:15

**incidentally** 294:24

**include** 22:4 23:10 24:20 104:10,15 116:22 207:10 211:23

**included** 47:8,20 190:2 221:17

**includes** 29:19 104:11 121:7 169:3,7, 8 269:18 279:9 318:19

**including** 76:5 127:21 134:22 153:11 185:22 190:6 193:14 194:8,10 208:6 234:22 239:6 248:24 254:25 281:23 317:23

**income** 20:9,10,13

**Incomplete** 77:24 78:9 129:15 140:2

**inconsistent** 185:5 313:12

**incorporated** 116:11 149:6 235:14

**incorrect** 120:1,13 144:5 179:10

**incorrectly** 49:14

**increase** 98:10,14

**increment** 286:23

**increments** 285:15

**incumbent** 131:1

**independent** 14:21 181:16 205:10 217:20 218:1 225:10 242:3 316:2 319:25 328:3

**indeterminate** 143:7

**India** 24:21 25:14,16 26:2 89:7 118:14,15 120:21,23 121:3,8 123:23 127:1 128:22,23 129:1 193:9 194:4 195:13 207:24 208:8 225:24 229:1 242:8 244:14 268:16 304:24

**Indian** 119:9,16 121:17 123:22 130:2 193:15

**indicating** 43:21 100:3 144:15 221:10 260:13 281:6 291:5

**indication** 51:4 309:8

**indicative** 146:19

**indicator** 140:8

**indicators** 39:14 124:19

**indirect** 118:4

**indirectly** 190:15 294:15

**individual** 19:9 70:16 237:17 302:22

**individuals** 24:10 25:2 58:22

**lndre** 88:14 193:16 208:7 224:2 304:24 324:2

**industry** 91:22 176:16 198:10 218:23 219:8 220:7,15 222:12,15,21 224:13 239:1

**infected** 44:17

**infecting** 31:14

**infection** 107:3 118:25 196:21

**infections** 97:4

**infectious** 110:15 155:14 175:17 220:3

**infer** 234:16 245:1

**inference** 281:1

**inferences** 192:21,22

**inferred** 193:5

**inferring** 196:19 236:1

**influence** 77:10 89:10 300:14

**info** 80:13 312:24

**inform** 65:24 77:19 128:5 229:15 231:20 238:4,6 257:13 279:18

**information** 14:24 16:2 71:12,20,22 73:17 76:19 77:21 78:7 80:6 107:5,18 144:4 152:16 195:14,15 211:14 235:25 247:16,19 249:14 252:7 262:3 271:19 280:13 302:14 317:7 320:24 321:1 328:13

**informed** 13:10 127:24 271:17

**informing** 74:9 78:5 233:9

**informs** 233:11

**initial** 120:12 122:18 123:2 202:5,6 209:9 307:23

**initially** 91:8 127:15,22 128:6 201:21 215:4 306:1

**initiative** 132:6

**initiatives** 121:17 132:18

**ink** 293:24

**inoculates** 211:25

**input** 116:11 199:12 201:21,22 202:6, 7 203:12

**inquiries** 48:12 250:23

**inquiring** 93:17 226:20,22 270:10

**inquiry** 17:15 278:3 280:4,6 281:15 282:1

**insane** 157:12

**inserting** 231:10

**inserts** 143:10

**inside** 149:6 252:7

**insinuation** 197:1

**installed** 164:18

**instance** 55:22 96:21

**instances** 300:24 301:1,2,16,21

**instantly** 184:19

**Institute** 193:15 304:24

**institution** 123:25 124:13

**instruct** 11:15 12:17 13:21 14:12

**instructed** 17:9 28:14 29:15

**instruction** 16:12

**instructions** 197:3 219:15 280:14

**instructs** 8:15

**instruments** 299:4

**intended** 197:4

**intends** 266:22

**intense** 326:16

**intensive** 298:3,6

**intent** 24:23

**intention** 305:3

**interacted** 182:19

**interactions** 277:2

**interest** 120:17 199:4 249:25 250:11, 15 251:9 283:6 289:19 330:1

**interested** 183:18 205:13,14 242:24 259:3 266:4 275:13

**interesting** 177:12

**interests** 127:6 164:16 165:15 166:22

**interfacing** 257:25

**Intermountain** 141:25 142:1 145:23 152:22 185:10 205:15,16

**internal** 44:8 88:22 175:18 281:16

**international** 57:15 72:21 104:8 209:1 250:9 251:20 313:21

**internationally** 211:18

**internet** 112:3,4

**interplay** 178:2

**interpret** 81:25 276:10 282:3 298:17, 24

**interpretation** 275:12

**interpreted** 182:7 183:17 272:10

**interrogate** 24:4 30:20

**interrogated** 38:4

**interrogating** 316:22

**interrogation** 40:6 72:25 145:15

**interview** 266:14 269:22 271:18

**interviews** 62:3

**intrinsically** 218:21

**introduce** 211:16

**invented** 27:22 166:13 201:9 209:15 331:11

**invention** 331:13

**invest** 331:9

**investigate** 303:11

**investigated** 287:2 330:24

**investigating** 11:10,14

**investigation** 10:18 11:1,19 12:14,25 13:7,15,17 14:3,22 15:3,11 16:3,9 17:2,13,22 18:10,15 278:3 286:3,24

**investigations** 18:18

**investing** 219:10 245:25 260:15 272:10 319:14

**investment** 122:18

**investor** 70:19 122:18 148:9 206:14, 19,22 207:9,11 246:4 248:2 260:23 267:16 330:25

**Investor's** 266:16 268:5 269:25 270:8,10 271:1 277:3

**investors** 65:21 71:13,18 72:9,15 73:13,22 74:2 77:12,23 122:13 127:24 128:5 129:13 206:25 207:5,21 219:25 247:18 251:2 259:6 262:13,18 290:20 320:18,19 321:11 331:6 332:15

**invitation** 188:5

**invited** 287:10

**involve** 70:18 93:16 129:19

**involved** 18:3 28:6 52:1 59:13 65:16 68:20 70:15,17,19 71:2 96:25 132:9 133:5 141:18 165:23 185:23 192:11, 14 207:18 213:6 222:15 270:4 288:9, 18 331:3,15,19

**involvement** 333:24

**involves** 23:8 31:2 37:16 129:3

**involving** 314:6

**iota** 169:21

**Iowa** 117:16 135:3,11 136:3 173:16 287:5 296:18,20,23 297:6,14,21 299:3,10,20 301:4,24 303:5,10,14,20 304:7,18 305:5 310:13

**Iowa's** 175:18 303:17

**IP** 166:23

**IPO** 330:17 334:15,16

**IPO'D** 332:5

**irrelevant** 86:12 264:3,7

**irresponsible** 117:23 118:7 153:20, 24 155:17,18 208:4 234:19 310:12

**IRS** 18:17

**ISH** 297:15,25 299:12

**ISH's** 299:4

**isolate** 24:4

**Israel** 317:20

**issuance** 76:6

**issue** 13:23 43:4 56:1,14 70:1 77:1 80:13 84:8 93:3 94:7 108:9 126:6 136:21 145:5 153:18 162:24 163:13, 14 164:20 171:6 204:13 249:10 256:19 264:3 278:9 286:8 301:15,16 303:16 316:8 317:1

**issued** 43:13 70:14 74:16 75:5,19 98:22 101:10 173:17 217:13 226:16 227:5,10 230:18 244:18 245:24 246:9 257:12 258:9 259:7 265:6 268:5 291:5 303:15 304:17 321:8

**issues** 72:23 92:21 93:14 94:1,3 100:7 115:23 118:13 119:8 136:18 139:24 155:14 167:13 168:17 169:19 236:20 268:6 285:23 286:16 304:11 311:10,18 323:2 333:23 336:4

**issuing** 67:25 69:25 74:7 78:11

**Italy** 104:12

**iteration** 112:22

**iterations** 30:18

**IVD** 25:5,7,23,25 32:18 120:5 279:17

**IVD's** 121:22

**J**

**James** 335:17,22

**January** 21:22 26:18 27:10,14,18 28:14,17 29:3,5,11 33:20 59:17,21 60:19 61:12,15 63:5 64:11 317:22

**JD** 7:5

**Jen**  308:22

**Jennifer**  46:14,17,18,23 48:22 60:20 113:1,20 159:6,15 191:8 199:20 204:10 210:23 212:11 272:6 276:24 277:1 297:11,12 305:20 307:17

**Jessie**  167:11 238:1

**Jim**  336:12

**job**  246:14

**John**  179:18

**Johns**  169:7

**join**  187:21 283:22 287:10

**joint**  24:21 120:20,24 121:10,19 282:10

**Joni**  102:14

**Jonie**  7:16 13:24

**Joseph**  79:11,17 147:24 149:24 182:20

**journal**  201:10 224:15,16

**journals**  164:2

**Jr**  179:18

**judgment**  18:24 19:5,12,18 206:8

**judgments**  18:20,23 19:19

**July**  47:17 330:18

**jump**  292:22

**jumped**  150:2

**June**  296:13 318:18 322:25

**Justice**  18:10

**Justin**  308:22

**juxtapose**  265:11

**K**

**K's**  98:6

**K-E-V-I-N**  114:16

**K.C.**  238:2 252:24 253:3,7 255:17 257:18

**Karen**  169:7

**Kevin**  114:14,16

**key**  60:25 229:15 231:20 233:11 258:18 261:12 264:18 268:17 269:16 276:1 316:2

**kick**  168:8

**kid**  309:11

**kind**  20:8 21:23 22:1,25 25:8 33:4 43:23 51:21 58:18 95:19 107:23 118:16,17 119:1,13 130:14 137:18 145:7 156:24 157:12 179:15 185:18 186:10 196:11 199:12 205:10 219:18 233:7 239:6 247:5 282:15 296:25 305:9 323:12 330:19 338:11,12

**kinds**  25:13 90:22 236:22 287:2 295:11

**kit**  22:22,23 23:1,3,8,9 35:24 36:2 122:22 279:6 318:20,22

**kitchen**  99:19

**kits**  23:23 158:6 162:16

**knew**  132:4 181:20 255:5 256:11

**knock**  111:6

**knowing**  69:6 323:15

**knowledge**  10:17,25 11:13 12:16 13:18,20 14:6,21 36:10 82:18 83:17 84:22 89:23 169:13 177:7 194:12 195:7 199:15 202:20,24 203:4 220:3,6 236:19 237:10,13,20 240:19 245:18 252:1 270:14

**L**

**lab**  29:20 30:5,7 44:6 53:19 54:5,8 57:8,14 58:1,2,7,8,14,17 63:21 67:6, 22 68:1 79:16 81:8 88:2 90:5,9,11,13, 17 92:3,4,8,9 118:15,23 119:1,15 120:1,3,12,16,18 126:25 127:2,8,12 128:10,15,22 129:1 130:9,12 133:9, 17,23 134:22 137:4,5,6,10,14,16,19 138:15,18,24 139:1,3 145:11 149:24 161:12 183:1,2 199:5 205:19 208:6 220:3 224:4 225:16 235:10 236:6 238:13 244:14 248:22 252:22 253:4, 10 255:20 257:22 264:5 276:7 284:17 288:3 297:3,25 298:13 299:12,19 300:5,8 301:10,25 314:10,11 323:10

**Labcorp**  110:20 299:4

**labeled**  252:12

**labor**  298:3,5

**laboratories**  68:17 193:14 235:11 276:11

**laboratory**  69:23 91:18 120:25 129:8 137:5

**labs**  40:7 57:3,7,23 58:9,21 87:18 88:11 90:8,16 91:2 92:14,17 104:16 128:19,25 129:3 130:23,25 134:19,21 135:21 137:10 142:17 158:3 164:17 176:18 177:18 185:2 206:2 283:22 287:2 297:6 299:22,23 302:15,17,18, 23 321:19 323:9,23,24

**lack**  42:6 139:19 322:11

**Lacks**  77:16 125:9 147:4 309:6 313:8 320:20 322:1,10

**Lake**  28:9 29:16 30:2 73:5 153:2 155:22,24 158:24 159:16 160:13 163:16 179:5 180:2 182:5 190:4,11 192:17 234:7 283:20 287:19,21 292:4, 12,24 293:7,13,15 310:2 327:1 328:10 331:7,8 332:4

**language**  100:10 107:21 194:7 200:6, 9,19 203:19,20 209:20,24 215:9 217:6 221:5 224:17 239:23 307:7,18

**large**  127:21 130:11 131:8 142:3 166:10 181:4 218:19 326:19 332:6

**larger**  145:8 160:10

**largest**  121:3 142:4 161:6

**Larson**  7:4

**late**  59:17 117:6 164:11 173:11 212:13 213:2

**laundry**  337:3

**lawsuit**  10:3,4 19:16 48:15 56:2,6,8, 15 167:17,21

**lawsuits**  10:15 326:23

**lawyer**  94:25

**lawyers**  14:4,20 258:25

**lay**  132:16

**lay-up**  179:22

**laying**  156:9

**layperson**  224:18,21 225:1,3

**LCT**  92:8

**LDT**  92:8

**lead**  113:2 121:19 207:13 331:17

**leader**  166:25

**leading**  132:11 268:21

**learn** 284:19 312:2

**learned** 14:10 334:9

**leave** 154:9 156:5 164:8 167:16,20 168:9 169:18

**leaving** 167:14 238:15

**led** 304:8

**left** 164:14 167:10 179:4 329:8 335:5

**legacy** 121:13

**legal** 7:5 11:20 14:3,6 17:22 93:16 114:12 129:16,19,24,25 130:21 227:4, 7 257:3 258:21 259:15 261:6 262:10 265:15 268:13 277:4 320:21 331:21

**Legends** 329:19 330:1 331:19 332:3, 9,10,14 333:3

**legitimately** 261:24

**length** 30:20

**lent** 333:14

**lesser** 83:20

**Lessler** 308:22

**letter** 103:2,19,22 104:1,2,6 147:7,10, 14 149:5,17 153:22,23 154:11,12,13 169:6

**letterhead** 241:8,21 242:6,11,13

**letters** 119:24

**level** 25:15 40:14 132:10 137:11,12 145:16 165:25 196:19,23 250:15 251:9 254:10 256:15 260:9 289:5 333:6

**levels** 43:14 145:21 196:21

**lexicon** 225:5

**license** 57:10 123:24

**lie** 261:19,21

**lied** 220:17

**lien** 19:24,25 20:3,6,25 21:1,3,7

**liens** 19:21

**lies** 184:25

**lieu** 325:25

**lieutenant** 101:20 132:10 179:15

**life** 114:23 140:19,20 166:17 173:23

**lifestyle** 166:16

**lightning** 61:8

**likewise** 39:20 55:19

**limit** 41:4,6,9 45:11,13,21 49:3,4,17 50:2,8 68:8 81:2,5 82:13 83:13 84:5, 23 87:4 136:18 143:11 144:16 169:19 173:25 175:4,10,14 176:4 177:6 214:16 223:9 229:12,14 230:2,8,9,11 231:4,11 232:3,13 233:23 252:25 253:14,22,24 254:6,15 255:7 256:23 258:11 259:9 263:24 317:11

**link** 199:13 312:19

**linked** 221:13 230:1,11

**linker** 36:22,25

**links** 116:4

**list** 110:15,20,23 111:1 174:16 175:5, 6 198:13 331:7 337:3

**listed** 143:14 187:25 235:4

**listen** 113:24 273:19

**listening** 61:3 79:6

**lists** 104:10 113:11 127:19 143:17 193:25 297:1

**literally** 52:13 202:23

**litigation** 62:11

**live** 69:4,12 82:24 138:4

**lives** 294:23 324:9

**living** 36:14 293:9

**LLP** 7:20

**load** 40:22 41:7 45:15

**loan** 333:16

**local** 155:4

**locally** 118:4

**location** 286:5

**locations** 135:22 300:4

**Lod** 44:9 49:5,13 68:7 80:4,13,14,18 81:24 82:6,19 83:9,11,15 84:12,16 85:11,13,22 86:18,19,21 136:20 143:21 144:4,9 145:9,16,21 146:12, 14,15,18,25 149:7 154:18 174:16 176:8,10,16,21 177:8,16,19 178:2 196:19 199:22 200:13 201:2 213:11 223:13 229:14 230:25 231:17 232:21, 25 233:18 234:2,11,12,16 255:1,18,22 256:3,6,7 257:7,9,11,15 258:5,15

259:19 260:3,20 261:4,13 262:20 263:18 264:17 265:12 271:21 276:17 308:14,15,25 309:4 314:22 315:13 316:1,6,23

**Lod's** 155:7 316:17

**logical** 189:16 281:1

**logically** 185:5

**Logix** 22:10 35:23 36:2 83:19 98:17 99:3 100:21 110:17 195:9 235:3 239:19 240:14,17 254:7 278:4 279:6 317:24 318:19,22,24

**long** 9:15 48:8 61:4 67:16 71:1 111:1, 2 144:9 153:15 165:2 228:21 247:7 250:2 257:23 293:4 320:6 329:16 330:6,16 334:13

**long-winded** 116:12

**longer** 114:18 119:23 166:15 329:4 334:10

**looked** 70:21,22 90:21 143:10 146:9 147:1 174:20 180:13 286:4 303:12 321:17

**Lopansri** 141:12,16 142:5 147:13 152:20 153:17,20 155:3,9 158:20 161:14 169:7 171:13 184:17 292:9

**Lopansri's** 147:12 158:25 234:23 235:4,5 310:11

**Lopransri** 117:23

**Loren** 7:14 151:18

**loss** 97:20,23

**lost** 19:4 168:18 310:9

**lot** 32:15 64:7 65:13 81:5 84:12 99:14 101:4,5 118:25 123:15 127:10 128:24 130:10 133:8 134:4,21 135:12 145:19 146:13,17 149:18 152:6,14 153:10,25 155:23 158:21 166:22 168:15 170:14 171:8 174:15 177:19,23 184:16 196:7, 10 215:13 217:16 227:3,18,19,22,23 236:22 237:15 247:12,19 248:12 251:22 264:10 287:16,17 288:13 291:21 295:9,24 297:19 300:7,15 301:5 303:23 304:7 314:21 322:21 327:9,16 336:3

**lots** 25:13 73:4 106:19 121:14 133:9 135:22 138:7 140:24 158:14 171:19 180:3 190:12 215:10 252:8 264:5 266:14 271:7 292:12 309:9 311:15 323:13

**loud** 271:21 290:22

**Loveless** 7:17

**low** 143:6,23 144:12 154:19 196:20 308:17

**Lowe** 278:25

**lower** 40:21 84:6,7,15 143:24 145:9 152:25 153:6 154:21 163:11 173:25 189:23 316:17 338:1

**lowest** 49:6 292:15,16 318:23

**Ludlow** 188:6

**lunch** 8:24 172:4 250:22

**lying** 238:9

**Lynn** 329:15,17,18 330:9,16 331:18 332:22,24

**lyophilization** 255:14

**M**

**machine** 24:5 106:22

**machinery** 107:2

**Madam** 172:16

**made** 15:1 17:11 36:23,24 38:9 47:20 49:22 81:13 117:23,24 118:21 124:17 128:11 133:25 155:19 170:4 171:13 201:25 221:6,7 230:20 247:7 283:7, 11,12 291:9 292:8 298:12 300:3 310:23 311:23,24 312:3 313:5 319:3,9

**Madison** 79:11,15 80:12 138:2 296:19

**Magnapure** 312:25

**main** 57:21 58:12 73:16 110:16 111:6 180:22 292:19 298:22

**maintain** 72:2

**maintaining** 127:7

**major** 119:12 132:6 143:5 157:16 188:25 189:7 219:6 258:1 295:17,19 301:3

**make** 8:20 15:4 16:5 26:23 27:2,8 30:19 47:5 48:2 77:19 91:3 98:22 103:9 108:20 109:9 125:18 133:13,14 152:14 158:12 178:6,7,8 179:25 181:12,14 206:13 213:17 220:12 228:19 236:6 237:2 254:11 257:17 258:12 262:1 265:12 274:2 276:7 279:15 280:13 281:21 286:6 291:20

293:25

**Maker** 267:2

**makes** 64:23 92:6 145:11 201:19

**making** 64:12 68:15,20 70:7 71:3 77:13 93:5 118:8,12 125:2 130:7 131:14 152:24 153:18 185:7 207:18 245:4 247:4 280:11 281:20 290:23 294:22 299:15

**malaria** 120:7

**management** 29:19 166:1 248:25 249:3 255:4,11,12 258:17

**managing** 59:16

**maneuver** 183:23

**maneuvers** 295:11

**manifested** 259:4

**manner** 279:7

**manufacture** 110:21 116:15 121:22

**manufactured** 24:22 123:23

**manufacturer** 134:1 218:17 219:7

**manufacturing** 124:2

**March** 101:8 102:24

**margin** 98:5

**Marissa** 248:11,18,19,22 252:14

**mark** 33:14,22 95:2,6,9,13,15 96:2 117:7 131:25 162:3 187:12 193:1 238:3

**marked** 35:13,17 46:6,13 60:15,19 62:25 66:19,22 79:3,10 102:17,22 105:20,23 108:24 122:5,8 141:6,9 159:10,13 187:2,5 190:21,24 210:11, 14 216:7,20,23,24 248:6,10 265:2 277:22 278:21 283:16,19 296:8,11 305:15,18 312:10,13 314:2 318:4,7 325:13,16 335:16

**market** 26:17 31:5,8,17,20 33:3 56:20,25 57:15 59:10 65:21 77:9,20 88:9,21 89:6 98:23 112:1 158:19 211:16 246:20 250:11,20 251:16,17 324:11 326:4 336:1

**marketing** 58:19,20,23 280:18

**marketplace** 77:22 83:18 112:17

**markets** 32:3,6 65:20 97:10,12 211:17 324:1 334:17

**marks** 152:18 290:25

**master** 23:10

**match** 224:9 231:15 256:6 302:11

**matches** 231:16

**Matching** 256:9

**material** 73:18 78:2 129:18 138:12 139:14 156:24 238:7 247:17 259:14 269:7 273:3 325:8

**materialism** 275:18

**materiality** 272:25 275:18 316:7

**materially** 275:14

**materials** 138:9 314:18,20,25 316:9 318:14

**mathematics** 140:16

**matrix** 140:21

**matter** 7:8 42:10 67:17 177:22,23 185:21 252:10 253:21 254:8,11 294:4 317:13,14

**matters** 85:24 86:9 93:11,18 177:23 179:25 231:2 264:7

**max** 185:6

**Mccluskey** 70:25 330:14

**Mcewan** 248:11,18,22 255:5

**meaning** 222:22

**meaningful** 223:24 224:12

**means** 40:12 41:22 44:21,23 45:14,21 51:5 52:22 58:17 63:20 69:22 91:18 107:1 108:17 112:1 155:3,12 178:6 196:1 199:2 218:15 223:18 225:23 276:4 297:20,21

**meant** 195:22 225:15

**measure** 223:6,10 261:13 325:9

**measured** 73:16 317:22

**measurement** 49:5 51:14

**measures** 50:4 98:15 222:14 224:14 263:18 268:17 269:16 276:1

**measuring** 316:13

**media** 48:13,23 62:3 64:3,7 65:2,3,5, 11,12 113:5 133:7 285:17

**Medical** 318:17

**Medicine** 175:18

**meet**  9:7,15 330:4,21

**meeting**  9:22 12:2,4,6,9 27:1,5 64:9 195:1

**meetings**  186:5,14 330:21

**member**  62:7 148:6 335:23 336:24

**members**  205:16

**memory**  29:7

**mention**  43:11 198:15

**mentioned**  64:18 72:18 116:25 121:22 130:12 134:7 141:24 145:24 165:3 174:24 198:12 208:2 245:6 282:11 289:15 291:14 306:11 308:23 310:1 314:18 325:20 329:13 337:16

**merit**  286:24

**message**  248:24 249:2,3,8 252:3,12 255:3,11 260:25 261:8 329:2

**messages**  328:14,17,24

**met**  9:6,12 56:24 147:13 326:10 330:3 331:8,12

**method**  46:24 124:6

**methodology**  90:23 235:18

**Methods**  318:15

**metric**  81:14 197:25 198:11 223:3 224:12 229:15 231:19 258:18 260:10, 20 264:19

**metrics**  81:11,16,18 85:22 196:23 222:6,10,20 224:20 225:6 229:15,17 231:20,22 233:10,11,15 254:25 261:12 275:24

**Mexican**  193:15 194:5 228:25

**Mexico**  88:11 89:8 199:2 225:24 228:25 242:8 268:16 324:10

**mic**  54:19 134:2

**Michael**  7:14 66:3 79:5

**microliters**  143:17

**mid**  278:2

**middle**  109:20 150:2 159:15 181:2 331:12 336:7

**midwest**  303:14

**Mike**  117:5 203:22

**Milazzo**  227:14

**million**  97:23 98:4,13,20 116:15 166:3 173:18 181:5,6,7 252:17,18 311:7 329:24

**millions**  30:17 131:18 237:16 238:11 276:5 288:24,25 313:12 323:9

**Mills**  330:15

**mind**  80:22 82:4 122:9 293:19

**minds**  254:21

**mine**  272:17

**Minnesota**  193:16 194:5 208:7 242:9 245:13 304:25

**minute**  76:10

**minutes**  71:25 188:15 307:14 335:4

**mischaracterization**  113:9

**mischaracterized**  150:12

**Mischaracterizes**  149:14,21 150:5 230:14

**misconstrue**  198:20

**misestimated**  20:21

**misimpression**  198:6

**misinformed**  259:13

**misinterpreted**  269:10

**mislead**  218:11 272:1

**misleading**  56:9 192:20 257:1 265:13 268:11 270:17,21

**misleads**  265:17

**misled**  189:7

**misplaced**  278:14

**missed**  146:14

**misstates**  42:14 52:11 77:4 78:8 86:1,7,14 111:14 115:19 127:17 128:8 130:4 138:22 145:2 147:5 148:11 149:14,21 150:5 152:10 167:23 168:1 176:7 223:1 232:16,23 258:22 260:5 263:12 264:8 265:15 271:12 272:12, 22 316:14

**misstating**  150:24 168:12

**mistake**  311:25

**mistaken**  207:8

**misunderstanding**  201:18

**mitigated**  78:14

**mitigating**  78:6

**Mitt**  101:15,17

**mix**  23:10 156:2

**mixed**  304:19

**MN**  245:12

**modern**  121:21

**modification**  210:3

**Mohal**  121:18

**molecular**  21:25 22:1 73:1 193:6 198:2 201:9,10 218:14 222:6 260:8 334:23

**molecule**  23:18 37:1,15 240:20 288:11 301:20 311:12

**moment**  18:15 38:22,23 55:8 337:8

**money**  97:13 166:23 276:14 291:21 295:24 330:10

**monitoring**  251:10

**Montgomery**  167:11 238:1

**month**  33:21 64:22 296:22 297:15

**months**  46:25

**monumental**  112:7

**morning**  8:6 213:5,17 248:23 283:21 306:1

**mosquito**  22:3 23:7,15,22 24:11

**mosquitoes**  23:12,20 24:2

**motivation**  301:19

**motivations**  294:18,21 300:16

**motive**  119:1 156:9 180:4,11 185:17

**motives**  156:7 179:11 185:8,9,10 186:1 286:20 291:24 292:1 294:2,16 300:7,21

**mountain**  323:18,21,22 324:4

**mountains**  311:22

**mouth**  294:8

**move**  34:5 166:20 278:16

**movement**  266:1,9

**moving**  72:19 165:12 257:5

**multi-gene**  87:11,19

**multiple**  59:15 84:1 125:21 126:18 157:11 268:2 290:10

**music** 290:23

**muster** 91:5 236:15 323:25 324:5,7

**mutations** 38:8

**mutual** 165:11,22 166:15,18 167:20 168:11 169:17

**mutually** 168:7

**N**

**NABL** 129:2

**named** 28:11 122:12

**names** 127:21 160:11

**narrative** 185:20 206:7 294:3

**nasal** 316:20

**nasopharyngeal** 316:20 318:16

**Nate** 142:10

**Nathan** 142:5

**nation** 121:17

**national** 66:1 75:2 118:3 121:14 160:11 193:15 211:11 250:8

**natural** 167:1 224:25

**naturally** 118:21 163:4 170:3 201:4 257:9

**nature** 16:3 17:14 120:10 140:20

**ncov** 82:5

**NDU/ML** 315:15

**Nebraska** 136:6 173:16 285:6,22 286:9,13 287:5 301:5 303:20 305:5

**necessarily** 13:3 39:25 135:22 136:1 137:25 144:10 150:1 152:23 154:25 205:11 207:6,10 208:5 220:2 243:21 275:11 287:6 300:17 308:14

**needed** 78:3 164:20,21 170:11 178:14

**needing** 71:20

**negative** 42:11 44:19,21,25 45:1,8 51:9,20,23 55:3,5 78:7 95:10,19 106:23 107:14 117:12,14 129:11 145:14 146:4 176:12 196:15 310:7 337:18

**negatives** 42:10 43:5,24 45:22 50:19 51:17,18 61:23 62:3 242:22 323:6

**neglected** 26:25 145:22

**Nelson** 335:18,22 336:10

**net** 98:2

**network** 332:15

**networks** 66:1

**Newman** 131:25 162:4 187:13

**news** 70:2 72:22 207:13,14 211:9 293:12,14 327:6

**newspaper** 307:4

**NGO** 313:21

**Nice** 315:12

**Nick** 122:12

**night** 212:13 213:2

**nightmare** 299:15

**Nile** 23:13

**no-bid** 173:17

**no-name** 161:7

**nodding** 9:3

**nomenclature** 45:4

**Nomi** 58:5,7 131:6,14,20 132:2,19,24 133:3 134:8,16,21 135:20 136:14,17, 25 143:4 155:25 156:1,10,17,20,22 158:9,11,13 162:4 173:18 188:22 189:11 190:14 236:21,24 237:4,5,10 286:22 287:4,20,22 288:17,23 289:17 294:9,13 297:4 301:3 303:25 304:22 305:1 310:19,24 311:8,13,15,17

**Nomi's** 160:24

**noncredible** 119:11

**nonfamiliarity** 57:17

**nonsense** 128:17 190:16 291:20

**nonspecific** 201:12

**Norackusacara** 169:5

**normal** 74:24 80:14 81:7 243:19 255:7

**note** 64:10 73:14 163:7 212:21 240:4 309:16

**noted** 106:23 107:10

**notes** 337:9

**noteworthy** 164:6

**notice** 13:6 152:13

**notified** 15:15,16 21:1,6,9

**notify** 21:12 320:19

**noting** 266:2

**notion** 89:4

**nuances** 215:13 323:16

**nucleic** 140:12,17

**nuisance** 247:9

**number** 21:15 24:17 25:16 26:1 30:8 42:4 49:6 61:7 66:4 84:19 98:7 102:6 118:18 122:22 127:20 133:25 181:4 191:3 217:14 303:9 306:24 307:11,13 316:2 337:5

**numbers** 142:11 147:2,6 261:14

**numerous** 192:19 193:13,24

**O**

**O'NEILL** 332:19 333:1

**O-N-T-E-R** 114:16

**oath** 12:3

**object** 8:15 13:19 148:17 321:21

**objection** 10:20 11:2 12:15 15:5 16:4,11 17:16 22:14 25:3,24 31:6 39:9,24 42:14 43:15,25 45:16 47:4 48:19 52:11,21 53:6,14,25 56:3,11,21 57:5 65:22 68:2,12 72:16 73:24 75:6, 9,20 76:2,7,22 77:4,15,24 78:8 80:19 81:17,21 82:22 83:22 84:24 86:1,6,13 87:20 88:5,24 89:4,21,25 92:23 95:12, 25 100:12,25 104:22 110:13 111:14 115:19 117:3 125:8,15,22 127:17,25 128:7 129:15 130:4,16,20 138:21 140:2 144:18 145:2 147:4 148:10 149:13,20 150:4 152:10 155:1 167:23 168:14 171:23 176:6 177:9 178:4 186:8 188:24 195:24 200:7,23 202:9 204:1 209:11 212:15 215:6 222:25 226:3 230:13 231:13 232:5,16,22 233:25 234:9 243:24 244:24 246:2 251:6 253:16 255:8 257:2 258:22 259:15 260:4,17 261:5,10 262:4,9,14, 22 263:12 264:4,8,15 265:14 267:15, 22 268:12 269:5,12 270:1,19 271:5,12 272:3,11,22 273:5,12,16 276:8 277:7 309:6 313:8 316:14 319:16 320:20 321:2,6,25 322:5,10 328:19 334:1 336:21

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

**objections** 85:7 126:1,15,19 148:16 151:2,7,13,15,23 202:21 272:14 274:5

**objective** 32:5,10

**objectives** 97:9,15

**objects** 8:16

**obligation** 21:11 129:9,17 263:1 305:4

**obligations** 97:14

**observations** 107:4,15

**obtain** 123:23 249:14

**obtained** 38:13 160:12 328:14

**obtaining** 95:24 105:8

**obvious** 119:11

**occasionally** 336:14

**occasions** 330:5

**occur** 139:23 205:2

**occurred** 338:5

**occurring** 226:2 299:8

**October** 28:16

**odd** 207:19 244:23 260:10

**offer** 205:6,22,24

**offered** 205:7 282:25

**offhand** 288:22 317:25 318:12

**office** 9:12 99:17,18 299:1

**officer** 28:4 107:20 108:11 114:8 121:19 162:12 163:6 164:9 166:11,24 167:10 170:12 200:25 201:5,16 211:24 230:23 231:1 259:3 309:11,12 314:7 334:13

**officers** 131:25 237:21

**offices** 249:13 250:14

**official** 59:8 123:14

**officials** 124:12 173:17

**oftentimes** 70:25 92:9

**oligonucleotides** 22:18

**omitted** 262:3

**oncology** 97:3

**ongoing** 13:17 14:4,23 90:3 91:6 228:21 296:20

**Onterveross** 114:16

**Ontiveros** 114:14

**open** 23:1 296:22 297:14 309:3

**opened** 278:3

**operating** 75:1 97:20 237:24 320:4 333:15

**operation** 100:16 179:12

**operational** 102:6

**operations** 332:23,24

**operative** 251:11

**operatives** 149:23 308:2

**operator** 169:6

**opine** 50:11 86:8 164:21 223:15 231:1 302:22 305:4

**opining** 255:13

**opinion** 53:21 96:14 101:2 113:22 258:19

**opportunities** 266:14 310:9 330:24

**opportunity** 31:18 33:3,4,8 314:21 338:10

**opted** 314:20

**option** 21:16

**options** 47:9,10

**order** 28:8 36:13 64:20 69:24 74:8 97:14 137:3 181:5 261:2 338:20,22

**ordered** 134:14

**ordinary** 282:1

**Orem** 160:14 288:5

**organism** 30:22

**organization** 102:11,13 181:21

**organizations** 288:16 289:17

**original** 19:25 38:5 68:13 79:21 150:19 209:25

**originally** 38:8

**originate** 28:16

**ostensibly** 181:7

**Ostler** 7:16 10:20 11:2,4,11 12:15 13:1,19 14:9 15:4 16:4,11,21,25 17:7, 16,19 22:14 25:3,24 28:22 31:6 39:9, 24 42:14 43:15,25 45:16,25 47:4

48:19 49:20 52:11,15,21 53:6,14,25 54:18,22 55:11,13 56:3,11,21 57:5 60:9 62:9,15,20,22 65:22 66:3,7,10 68:2,12 72:16 73:24 75:6,9,20 76:2,7, 13,17,22 77:4,15,24 78:8 80:19 81:17, 21 82:22 83:22 84:24 85:7 86:1,6,13 87:20 88:5,24 89:21,25 92:23 94:14 95:12,25 100:12,25 104:22 109:13 110:13 111:14 115:11,19 117:3,5 125:8,15,22 126:1,14,19 127:17,25 128:7 129:15 130:4,16,20 138:21 140:2 143:2 144:18 145:2 147:4 148:10,15,19,22,25 149:13,20 150:4, 9,13,16,21 151:2,7,12,18,21 152:2,9 155:1 167:23 168:2,5 171:23 172:16 173:5 176:6 177:9 178:4 186:8 188:24 192:21 195:24 200:7,22 201:24 202:9, 14,17 203:1,7,22 204:1,3 209:11 212:15,19,24 215:6 216:17 222:25 224:23 225:2,22 226:3 230:13 231:13 232:5,16,22 233:25 234:9 240:4,8,12 241:11 243:24 244:24 246:2 251:6 253:16 255:8 257:2 258:22 259:15 260:4,17 261:5,10 262:4,9,14,22 263:12 264:4,8,15,21 265:14 267:15, 22 268:12 269:5,12 270:1,19 271:5,12 272:3,11,22 273:5,9,13,17,23,25 274:2,5,7,11,17,24 275:1,4 277:7,10 278:12,15 281:9,12 284:10 304:19 309:6 313:8 316:14 319:16 320:20 321:2,6,21,25 322:5,10,12,16,19 328:19 334:1 335:3,6 336:21 338:18

**outsource** 138:17

**outstanding** 18:20 19:19 20:3,8

**overcome** 338:11

**overlap** 22:13

**overstate** 254:22

**overstating** 116:13

**owed** 20:21

**owned** 183:22

**owner** 180:1

**ownership** 103:8 329:25

---

**P**

---

**P-O-R-I-T-Z** 238:3

**p.m.** 114:3 178:22 202:8 203:20 210:23 212:12,18

**pace** 71:19 73:16 250:25

**package** 47:8 95:15 143:10

**pages** 239:12

**paid** 20:1 47:8 166:22 311:7

**pandemic** 21:21 24:14,25 25:21 27:15,16 29:2,4 31:25 33:6,11 38:2,13 60:3 61:13 72:22 75:1 78:22 111:21 112:20 117:25 138:4 179:12 218:6 245:8 247:3 250:8,9,16,17 251:20,23 306:14

**paper** 153:4 162:24 163:13,22 171:2, 14,16,17,19 201:4 286:8 293:3 318:13 319:11 321:9,23

**papillomavirus** 120:7

**paragraph** 69:14,16 113:2 124:16 160:9 162:3,10 163:7 175:14 193:12, 23 195:10 196:17 206:10 208:24 209:22 214:10,11 229:11 263:4

**paragraphs** 161:17 173:22

**pardon** 113:8

**parentheticals** 143:15

**parking** 133:8

**parlance** 198:9 218:13 220:7,14 222:12 239:1

**Parr** 7:16

**parse** 213:18

**part** 66:1 73:7 90:9,17,25 92:2 99:10 100:5 128:2 133:12 143:23 153:20 154:20,24 161:5 167:19,25 168:10,11 231:5 236:5 251:11 303:24 310:20 311:10 316:2 320:8

**participants** 187:23 208:6 318:17 325:23

**participate** 102:1,2 269:23 282:10,15 316:10

**participated** 70:13 192:6

**participating** 192:1 272:19 314:19

**particles** 176:14

**particulars** 135:13 183:21

**parties** 237:8

**Partners** 333:10

**parts** 30:19 38:10

**party** 205:11,13,14 242:3 294:22 301:7 304:23

**pass** 85:23 86:19 91:5 236:15 323:25 324:5

**passed** 227:25

**passes** 88:12

**passing** 33:12 46:24 80:15 81:7 124:19 324:7

**past** 152:13 208:15

**patent** 98:22

**patented** 27:3

**pathogen** 23:11 27:8 40:15 49:6 65:15 71:16 138:8 139:12

**pathogens** 25:14 42:1,4 196:10

**pathology** 193:15 208:7 304:24

**paths** 168:19

**Pathwest** 193:14 194:4 208:8 224:2

**patient** 44:17 82:15,21 107:5,15 137:16

**patient's** 107:16

**patients** 68:18 83:5 99:16 160:6 170:20,23 226:2

**pattern** 111:8

**Paul** 180:1 183:25 184:2

**pay** 20:13 47:2 113:24 234:24

**paying** 134:13

**payment** 21:2,4

**PCR** 22:7,11,17 23:16 24:5,6,15 25:2 30:24 33:7 34:15,24 37:3,16 40:6,11 73:1 83:18 99:13 133:14 138:14 285:17 288:12

**Pedeh** 318:17

**pediatrician's** 99:18

**peer** 319:23 320:3,7,16

**PEG** 36:25

**pending** 19:18 21:6 76:14

**penetrate** 249:11

**people** 23:23 30:6 31:14 38:10 57:13 59:14 68:19 71:20 73:4 100:16 101:19 106:3 108:20 110:21 111:2 112:3 113:21 118:2 119:17 132:16 134:2

142:9 149:24 156:4 160:4 163:9 164:18 168:25 169:11 171:9,10,19 177:17 185:9 190:10 195:2 198:19,25 207:15 215:25 219:24 220:2 227:19, 23 236:20 245:18 247:14,15 249:19 250:12,18 252:4 282:16 283:5 287:7, 21 290:21 292:20 295:3,15,17 298:23 300:8 311:16,20 324:14,25 332:14

**perceive** 224:21

**perceived** 27:9 184:12 185:13 310:7 326:4,5

**perceives** 219:8

**percent** 50:23 51:15 52:8,23 53:4 55:1,21 83:7 84:2 108:2,14,18 111:22 113:13 115:5,17,25 116:2,22 119:6 120:16 124:18,21 125:3,13,17 126:2, 4,10 128:21 143:24 145:17 146:1,5 153:13,14,17 154:20 170:19,23 193:20 195:20,22 197:8,9,13,20 198:6,7,8,10,15 208:20 209:3,19 210:1,4 217:19 218:9,12,19,20,22 220:18 221:17 222:5 223:17,19 224:12,19 229:2,21 232:1,2 233:3 238:20 239:10 244:19 256:21 260:2, 14 261:22,23 266:2 267:3,7,8,20 268:4,7,20,24 269:1,4 270:16 275:18, 22 279:18 280:16,17 281:8 289:4 302:1,20 303:1,5 306:17,21 307:13,15 308:5 316:24,25 318:24 319:13 323:5, 7,20 324:8 336:6

**percentage** 50:17 143:6 144:13 152:25 153:6 163:11 247:21

**perception** 180:23

**perceptions** 184:8

**perfect** 45:5 279:11

**perform** 54:25 58:3 82:6 88:21 90:11 130:24 139:1 146:19 328:3

**performance** 50:5 63:14 86:11 117:9,13 124:20 197:6,7,19 206:7 209:2 217:18 222:4 225:11 231:19 233:1,8 275:15 278:4 279:19 304:15 306:16 326:8

**performed** 91:24 174:23 182:24 195:8 199:16 239:18 240:13 279:22

**performer** 90:16

**performing** 80:22 236:7

**performs** 142:15

**perfunctory** 138:8 228:12

Case 2:20-cv-00368-JNP    Document 169-14    Filed 04/10/24    PageID.3028    Page
116 of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Index: period..position

**period** 21:23 25:12 32:16,22,23 89:7 111:20 112:10 174:13 181:17 250:4,6 298:14 321:9 323:1 334:13

**person** 9:9 18:6 27:21 59:16 113:20 148:9 155:10,11 179:15 181:16 182:9, 18 201:8 237:19

**personal** 20:9 179:8 202:20,24 203:4 236:19

**personally** 146:8 153:21 154:12 230:15 234:15 330:3

**personnel** 29:20 30:6,7 79:16 192:11 228:16 238:14 322:3

**perspective** 31:16 65:10 113:22 234:10 247:8 295:10

**persuasive** 300:15

**pertain** 328:18

**pertaining** 169:19

**pertains** 16:10 43:1,23

**pertinent** 329:1

**peruse** 201:5

**Ph.d.** 167:12 183:7 229:13 253:9

**pharma** 120:22 121:11,12,18 300:9

**pharmaceutical** 106:15 120:23 127:21 130:11 300:10

**phenomenal** 232:4

**phenomenon** 246:10 251:16,17

**philanthropic** 181:7 183:23

**phone** 18:6,8 46:10 79:7 101:20 105:6 204:12,19 247:13 272:7

**phonetic** 333:25

**phrase** 43:11 44:20 45:6 52:6 213:12 230:9 231:6,8,11 233:22 265:7,13

**phrased** 269:10 273:2,4,10 274:20 275:7

**phrasing** 272:1 275:9

**physical** 22:23

**physician** 117:24

**pick** 41:6 42:12 44:18 293:23

**picked** 247:6

**picking** 320:23

**picture** 260:23

**pictures** 249:13 250:13

**piece** 19:2 30:14,15 107:2 163:1 266:24 287:20 289:16 301:18 305:25 329:13 334:3,6,7

**pieces** 326:22,25 327:7

**Pineiro** 7:14 8:5 10:21 11:3 13:23 16:17,23 17:1,10,17 22:15 26:12,15 28:18,24 29:1 35:9,15 42:16 45:24 46:2,9,11 47:6 52:13,17,19 54:23 55:12,15,18 60:10,17 62:8,13,16,21 63:2 66:5,8,11,21 75:7 76:12,15,18 78:25 79:5,8 85:1,2 86:3 89:22 94:16, 22 96:1 102:14,19,21 104:23 105:17, 22 109:1,14,17 122:2,7 125:10,24 126:16,21 130:17 141:3,8 144:20 148:13,16,21,23 149:2,3 150:23,25 151:24 152:4 159:7,12 167:25 168:4, 10 172:6,19,22 173:7 178:14 179:3 186:23 187:4,8,10 190:17,23 191:4,6 202:1,12,16,19 203:2,16,17,25 204:2, 5,7 210:7,13 212:18,23 213:1 216:3,9, 15,22 224:24 226:11 232:7,18 240:7, 11,16 241:15 248:8 251:8 258:24 261:7 262:6,16,17 264:22 265:4 272:14 273:8,11,15,19,24 274:1,4,6,8, 15,19,22,25 275:2 277:13,20 278:1, 11,14,16,23 281:13,14 283:13,18 284:12,13 296:5,10 305:11,17 309:18, 24 312:7,12 313:22 314:4 318:1,6 320:22 321:3 322:2,6,7,11,14,18 325:10,15 335:7,15 337:7,15 338:17, 23

**place** 121:9 128:23 133:19

**places** 87:13 88:8 138:7 156:13 183:4 302:15 303:13

**plain** 235:20

**plainly** 235:15

**plaintiff** 7:15

**plaintiff's** 79:5

**plaintiffs** 46:10

**plan** 93:21 96:21 210:25

**plane** 234:13

**planet** 108:18

**planet all** 24:24

**planned** 211:10

**planning** 93:22

**plans** 32:16,20

**plant** 121:20,21

**platform** 99:12

**play** 153:10 186:1 233:7 260:21 261:13 287:18 290:4 300:7

**played** 316:11 330:16

**player** 110:14 120:23 329:18

**players** 110:8,11 111:13,18 291:20, 24 295:17,19 326:21 334:24

**playing** 251:15 290:22

**plays** 259:19 316:6 319:21

**pleasure** 338:24

**plummeted** 122:19

**point** 10:18 19:3 29:22 31:21 32:1,8 38:1 43:6 54:2 55:16 58:4 61:1,21 69:6 74:5 84:11 86:24 87:10 88:1 91:8 93:10 94:6,14 99:1,17 108:13 113:12, 19 115:1,16 116:6,7 131:4,8 134:6,18 135:16 136:4 137:2 156:22 158:23 166:7 179:12 194:1 205:23 218:9 229:17 231:22 233:14 236:24 243:18, 20 247:3 279:17 286:15 293:12,18 303:12 310:13 314:22 328:2 331:9,25 332:5 333:14

**point-by-point** 206:12 207:7

**point/counterpoint** 211:13

**pointed** 189:10

**pointing** 49:21

**points** 60:25 61:5 113:10,11 153:5 206:15 211:12 213:20 252:15 336:4

**political** 185:15 294:17,18,21 301:5, 12,19

**polyethylene** 36:24

**popping** 72:2

**population** 24:23 25:10 162:11 190:7 199:6 292:6,12

**populations** 24:11

**Poritz** 238:3

**portions** 338:21

**posed** 140:4

**position** 14:9,10 16:17 18:2 71:21 77:12 97:13 167:14,16 187:19 201:3 292:5

**positive** 37:14 39:14 40:21 42:13 43:3 45:7 49:8 51:7,8,18,20,23 55:2,4 65:19 82:7 107:13 143:6,24 145:13 146:4 154:20 160:4 163:11 170:21,23 176:12 189:23 196:14 223:11 224:7,8 302:2 303:6 312:25 313:1 325:3

**positives** 50:17,19 51:17 61:23 62:3 143:23 144:13 153:1,6 154:19 196:7 242:23 308:18

**positivity** 153:13 155:21 292:23

**possibility** 69:3 180:10

**post** 163:18 305:25 306:6,9

**posted** 266:21

**potato** 182:3

**potential** 13:10 16:19 31:18 32:16 65:18 71:19 142:18 148:7 159:17,24 185:16 215:9 250:24 294:18 298:4

**potentially** 99:19 205:12 253:20 282:12 283:6 295:11

**PR** 186:6 271:3 272:20

**practical** 254:11

**practice** 252:10

**pre-covid** 22:21 24:9

**preceding** 327:1

**preclude** 107:3

**predicate** 107:13

**predict** 50:3

**predicts** 50:9

**prefer** 213:11 294:22

**prejudicial** 282:18

**premature** 155:24

**premised** 223:3

**premises** 219:12

**preoccupation** 246:22

**preoccupied** 234:11

**preparation** 9:20,23 27:5 245:20

**prepare** 9:5 30:12

**prepared** 48:10,11,14 55:3 163:12 194:18 202:6 217:12 228:5 239:15,23 240:2 241:3,4,6,7,18,24 242:2,4 244:5,8 290:25 306:5 326:1

**prepares** 94:10

**preparing** 70:13 137:22 163:22 186:15 198:3 242:5,10 243:2

**preposterous** 235:24

**presence** 23:13,17 30:23 37:20 41:7, 24

**present** 11:1 18:10 21:14 23:14 31:1 33:5 42:5,6 49:7 120:18 228:11

**presentation** 26:23 27:2 242:13

**presentations** 15:2

**presented** 127:2 221:11

**presents** 107:16

**preserved** 148:18

**president** 132:2

**press** 10:11 16:10 43:10 56:1,9 67:18, 25 69:25 70:2,12,13,16 71:1,7,11,14 72:13 73:22 74:7,12,16,19,22 75:4,18, 19,22 76:4,6 77:2,8,10,13,18,19,22 78:11,14 90:20 100:5,8 109:11 111:11 116:3,5,20,24 126:6 129:10,13 130:1 177:14 199:14 206:24 209:21 213:3, 24 214:25 215:9 217:3,6 218:11 219:9,21 220:1,7 221:1,7,13 227:14, 18 228:4,7,12,13,22 230:17 232:12 233:9 235:16 238:24 239:13 244:18 245:4,15 246:1,8 248:16 256:20,25 257:12 258:9,14 259:5,7 260:13,23 262:19 265:5 266:2 267:11,24 268:4 269:11,19 271:17 272:9 275:6 281:1, 5,6,17 282:9 290:19 302:11,13 303:7, 15,17 304:3,12,13,17,21 305:10 306:21 317:1 319:5,11,23 320:10,24 321:8 336:17 337:18 338:9,12

**pressure** 157:3,6 247:19 301:5

**prestigious** 90:7 299:23

**presume** 135:14 141:20 157:3 160:21 162:2 323:17

**presumptuous** 110:25

**pretense** 181:3

**pretty** 68:15 174:25 257:23 276:3 303:19

**previous** 82:23 189:9 198:12 245:6

**previously** 87:12 174:24 228:2

**price** 76:5 77:2,9,10 78:6,13 98:24 134:9 158:5 235:22 246:15,17 326:13

**priced** 158:18

**prices** 158:6

**pricing** 78:12 158:13

**pride** 103:8

**primarily** 65:12 87:14 92:16 98:16 143:4 159:5 180:17 206:25 287:19 326:20

**primary** 38:6 73:23 74:2 110:24 169:5 179:17,22 184:25 192:8 198:1 254:12 275:24 294:12 296:2 330:23

**primer** 30:21 36:21

**primers** 37:19

**principal** 32:12,24 329:18 333:5

**principals** 333:2

**print** 234:5 293:23

**printed** 272:20

**printing** 289:15 293:24

**prior** 20:25 34:14 42:14 52:11 59:11 62:13 64:22 77:4 78:8 86:2,7,14 95:6, 9,13 127:17 128:8 130:4 131:19 136:22,25 138:22 147:5 148:11 149:14,21 150:5 152:10 167:14,23 168:1 170:5 176:7 209:18 223:1 258:23 260:5 263:13 264:9 265:15 271:12 272:12 316:14

**prioritized** 61:5 63:15 169:15

**private** 332:6

**privileged** 11:20 13:25 14:2,5,13 16:2 328:12

**probe** 30:21 36:21

**probes** 37:18

**problem** 126:12 143:23 148:16 154:19 157:20 202:20 238:10,12 287:3,6 288:25 300:19 308:7 324:22

**problematic** 130:12

**problems** 127:9 128:24 144:11 287:5 296:18 297:16 299:2,14 300:6,23,24 301:12

**proceedings** 18:18

**process** 31:23 37:3 40:6 66:2 67:5 69:1,10 71:1,5 73:1 74:10 89:1,2,17 90:12 91:7 128:3 153:4 156:12 160:24 169:16 227:22 228:21 234:3 259:19 330:18 331:17

**processed** 160:20 212:21

**processes** 90:3 285:19 288:4

**processing** 160:14

**produce** 61:8 72:24 73:6,9 115:2,24 135:8 316:24

**produced** 62:10 99:22 212:16 328:21

**produces** 162:16 222:23

**producing** 170:16 252:8 285:14

**product** 14:2 16:2 31:17,21 73:2 90:5 92:5 99:4 111:7 133:20 135:10 158:18 185:4 235:19 255:14 259:9,10 280:2

**production** 328:15

**productive** 151:22

**products** 21:24 31:20 96:22 133:25 184:25 259:24 324:1

**profaning** 249:19

**professor** 308:23 309:15

**proffered** 64:13 101:3,4

**proficiency** 287:10

**profit** 98:5,7,8

**profitable** 97:25

**profits** 98:2

**program** 23:8 132:8 287:23

**programs** 132:18 135:3 331:1

**progress** 188:10 254:9 325:7

**project** 181:10

**proliferation** 32:15

**promote** 185:21

**promoted** 279:7,20

**promotes** 65:20

**promoting** 142:20,24

**promotion** 279:9

**promulgate** 77:18

**promulgated** 146:10 287:4 298:10

**pronouncing** 106:10

**proper** 202:21 307:19

**properly** 71:4 237:24

**property** 19:4,5,7 20:16

**proposal** 210:3

**proposed** 209:23 288:1 306:12

**proprietary** 22:18 27:3

**prospect** 42:11 67:25

**protected** 338:22

**protective** 338:20

**protocol** 212:20 228:1 236:5 320:8

**proud** 208:25

**proven** 268:20 270:16 311:25

**proves** 267:2 268:7

**provide** 8:16 12:3 24:23 35:6 43:2 48:11 53:20 57:9,13 58:11 71:12,21 92:13 158:11 162:21 191:20 206:22, 23 211:14 221:25 226:15 230:1 261:9, 14 288:15 303:24 306:3 330:19,20 334:18

**provided** 11:21 13:5 47:10 81:11,14 116:4 182:22 183:12,14 218:25 222:1 229:9 236:23 239:8 254:21 261:12 268:11 303:25 304:1 310:19 329:19 330:7

**provider** 142:3

**providers** 295:20 296:2

**providing** 47:3 111:2 200:19 206:19

**provisionally** 338:19

**Provo** 163:15 190:4 292:11 293:7

**public** 15:19 46:19,21,25 65:24 74:1 92:2 94:8 100:24 113:20 130:7 142:18 148:7 159:5,17,24 169:9 177:14 198:4 207:20 218:11 219:1,5,10,17 220:24 221:8 230:18 233:9 244:19 245:25 254:23 257:1,13 260:15 270:3 272:2, 10,16 281:18 291:5 295:12 319:14 329:21 330:25 331:23,25 335:2

**publically** 142:25

**publication** 173:23 272:17

**publications** 185:20

**publicity** 310:7 338:4

**publicizing** 70:8

**publicly** 90:20 142:20 198:21

**publicly-held** 161:6

**publish** 163:17 199:12 290:4,8,24

**published** 48:18,20 68:10 75:21 112:2 145:7 152:20 164:1 171:21 174:8 175:7 177:20 178:9 186:7 198:17 245:3 283:20 290:2 291:12 317:22

**publishes** 123:25

**publishing** 326:22

**purchase** 205:3

**purpose** 37:15 71:11 206:21 327:8

**purposely** 290:21

**purposes** 8:19 9:4 28:19 35:13 46:7 60:15 62:25 66:19 79:3 102:17 105:20 108:24 122:5 141:6 159:10 181:8 187:2 190:21 197:5 210:11 216:7,20 248:6 256:12 265:2 269:7 277:23 278:21 283:16 296:8 305:15 312:10 314:2 318:4 325:13

**pursuant** 338:20

**pursue** 164:15 165:15 166:21 169:14

**pursued** 19:5

**pushed** 190:14

**pushing** 270:7

**put** 24:5 27:1 32:25 70:11 71:15,21 92:9 115:1,16 138:14 156:2 158:3 178:8 184:16 185:21 199:22 200:14 201:20 206:11 207:25 215:4 216:2 220:18,20 222:14 224:4 228:4,8 236:6 240:9 252:14 263:4 271:15 275:6 290:13 294:8 297:14 304:11,13 307:17 325:25

**puts** 152:17

**putting** 171:2 201:3 247:19 320:24

**PX13** 105:17

**PX14** 102:14

**PX17** 122:2

**PX23** 216:4

**PX24** 186:24

**PX25** 159:7

**PX26** 190:18

**PX28** 248:3

**PX29** 278:11

**PX3** 318:1

**PX30** 277:20

**PX31** 210:7

**PX32** 216:15

**PX34** 305:12

**PX35** 264:20

**PX42** 312:7

**PX44** 296:5

**PX5** 60:11

**PX51** 313:23

**PX6** 62:8,20

---

**Q**

---

**Q's** 98:6

**Q-1** 324:24 326:4

**QCING** 89:18

**Qiagen** 110:19

**qualifications** 115:7

**qualified** 92:17 130:24 166:10,12

**qualify** 128:6

**qualitative** 37:5

**quality** 88:3 89:19 288:2,6,7,9,20

**quarter** 249:16,21 290:17,18

**quell** 314:21

**Quest** 110:20

**question** 8:17,19,21 10:23 14:8 32:4
34:7,19 39:10 42:23,25 43:7,20,22
45:12 48:12 65:1 76:14 81:13 84:10,
11,13 85:4,6 125:11,19 127:13 128:5
140:4,5 149:9 150:10,19,20 151:1
152:1,17 160:3 165:5 166:8 168:1
172:25 180:3 192:23 201:18,25
202:23 203:16 230:16,19 251:11
262:5,16 274:4,9,12,14,15,21 275:1,3,
5 281:10,11,13 289:6,7 297:2 302:6
309:3 319:18 322:1,15

**questionable** 127:12

**questioned** 128:12

**questioning** 115:25

**questions** 8:14 17:6 42:18 65:13
123:15 159:25 168:15 241:13 289:23
297:1 306:14

**quick** 211:22 284:18

**quickly** 21:4 28:13 34:10,15,18 35:1,
18 72:3,22 73:6,9 166:9 228:4

**Quidel** 110:19 158:20

**quote** 161:14 170:19 197:14 208:25
211:23 213:8 231:4 266:13 269:18
306:4,13

**quoted** 154:4 197:17 212:6

**quotes** 161:10 208:19 269:19 287:11

**quoting** 230:22

---

**R**

---

**rage** 207:12

**raging** 27:16 29:3

**raise** 97:13

**raised** 93:14 136:21 330:10 334:3

**raising** 159:25

**rancor** 294:13

**range** 24:22 316:23 329:24

**ranks** 292:15

**Ranoli** 120:25

**rapidly** 35:7 74:14

**rare** 138:3

**rarely** 329:2

**rate** 143:7 155:21 160:4 189:23
292:23 302:2

**rated** 291:15,18

**rationale** 189:13

**Rdrp** 37:6,23 38:6,15 39:12,13 87:1
254:12

**Rdrp/e** 86:23

**reach** 308:22

**reached** 92:20 252:16 306:2 309:14

**reaching** 307:6

**react** 262:13,18

**reaction** 23:16 24:6 37:16 56:6,13
72:14 80:5 179:8 245:25 288:12 289:9

**read** 66:3 67:13 85:6 106:7 148:4,8
149:11,18 150:18,20 152:15 198:7
201:20 206:24 219:21 224:15 247:25

273:13,17 274:17 275:1 281:9,11
284:7 327:14,19 338:18

**readers** 198:4 275:13

**readership** 271:22

**readily** 219:17

**reading** 49:16 52:14 71:14 128:15
220:1 225:1 226:13 231:3,25 239:2
269:14

**readings** 120:16 221:18 234:11,12

**ready** 26:22 67:11 114:23 133:13
228:9 331:25

**reagents** 199:2

**real** 18:24 69:4 82:4,14,20 83:4 129:1
138:12 139:8,14 140:8,19,20

**real-time** 37:3

**reality** 250:18

**realize** 30:11 177:19

**realized** 31:24

**realizing** 170:10

**realm** 257:5

**reason** 20:12,24 21:9 61:5 77:18
129:6 154:25 167:19 194:14 272:8
320:2 324:19 331:6

**reasons** 77:1 153:5 155:20 166:19
179:9 180:3 186:3 190:5,12,16 198:18
227:21 252:9 292:19,21 298:22 303:8
313:15 334:17

**Rebecca** 123:5 243:10,14

**rebuttal** 206:12,13

**recall** 18:5 25:20 33:13 47:10 48:9
59:17,21 62:1 67:14 87:13 92:19 95:2
104:1,2 107:8 108:10 117:1,8,18,19
118:13 120:4 147:20 149:16 152:13
162:19 163:2 164:14 169:24 170:1
179:7 182:11 186:4,17 189:18,25
191:18,24 192:1 194:18 195:1 213:2
215:23 226:20,22,24 227:20,22
228:14 237:18 238:18 240:23 245:25
246:3,7 248:19,22 249:7,10 266:9,13
274:16 278:7 284:20 285:25 286:2,6
288:6,20 289:8,11 290:9 291:4,15,19
292:4 293:18 299:7 306:6,8 325:2
326:5,13,14 328:5 337:2

**receive** 56:18 91:8,10 117:12 152:7
158:15 169:12 178:13

**received** 25:15 95:2,10 104:21 117:1, 7,14 119:13 131:5 149:10 173:12 192:23 296:23 297:13 314:20,24 315:20 317:9

**receives** 165:4

**receiving** 95:6,9 147:9,20

**recent** 188:17 192:16 196:16,18 215:15,20 229:6,7

**recently** 194:23 313:18

**recess** 94:19 226:8 277:17 335:12 337:12

**recognized** 82:25 155:17

**recollect** 280:5

**recollection** 15:23 29:9 61:12,20 92:24 104:3 131:13 194:21 205:9 226:19 227:6,17 251:1 266:18 280:3 290:12

**recommend** 70:6

**recommendation** 211:22

**recommendations** 169:14

**recommending** 116:14

**record** 7:4,13 8:8 33:24 76:8 94:18,21 151:3,23 156:11 178:18 179:2 212:22 216:11,12,14 226:7,10 240:9 269:9 271:25 277:16,19 278:18 309:20,21, 23 335:11,14 337:11,14

**records** 296:22 297:14

**recourse** 290:24

**reduction** 201:12

**Reed** 114:2,6 115:22 116:1 166:1 188:1 227:8 331:18

**Reed's** 116:13

**refer** 36:24 135:7 310:18

**reference** 47:22 50:15 61:6 90:16 104:16 114:25 118:5 126:2 138:9,11 139:14 150:11 160:17 221:9 235:10 307:14

**referenced** 65:6 159:2 194:11 195:9 214:25 215:22 303:7

**references** 192:20 245:16

**referencing** 67:14 150:13,16,21

**referred** 30:14 88:13 107:17 134:2 141:13 154:12 284:21

**referring** 29:18 67:9 69:19 105:3 110:12 118:2 135:5 142:23,24,25 253:15 278:6 284:4 291:8

**refers** 50:16

**reflected** 196:3

**reflects** 158:14

**refresh** 29:8 61:12,19 280:3

**regional** 160:14,19,22 161:4 288:5

**regular** 281:23

**regularly** 201:1 278:9

**regulated** 88:10

**regulations** 113:3

**regulator** 218:25

**regulators** 281:22 333:23

**regulatory** 11:7 25:1,22 26:2 32:19 33:1 56:19,23 86:9 88:19 89:1,5,6,14 93:8 95:21,24 117:18 118:13 119:9, 17,22 121:23 127:23 130:2 178:10 192:23 193:8 194:15 197:5 221:6 279:4 324:2

**rehash** 110:6

**reject** 236:17

**rejected** 127:15 237:12

**rejecting** 236:20

**rejection** 123:2

**relate** 27:4 233:1

**related** 10:6 41:16,17 45:12 99:23 177:4 183:19 260:1

**relating** 10:10 100:11

**relations** 46:19,21 47:1 70:19 73:22 113:20 148:9 159:5 248:2 270:3 283:2 330:25

**relationship** 58:5 112:9 131:22 168:23 177:8 182:7 199:3 231:18 237:7,8 296:20 310:24

**relationships** 58:24 237:6 300:9 310:6

**relative** 222:18,20 323:3

**release** 10:11 16:10 56:1,9 68:1 69:25 70:2,16 71:7,11 75:4 76:6 77:8, 11,18,19 90:20 109:11 111:12 116:3, 5,21,24 123:25 124:7 126:6 130:1 177:15 199:14 209:21 211:9,10,11,24

213:3,24 215:1,10,14 217:3,6 218:11 219:9,20 220:7 221:1,7,13,23,25 226:13,15 228:4,7,12,13,22 230:17 231:6 232:12,15 233:9 234:5 235:16 238:24 239:13 244:18 245:5,15,24 246:1,8 248:16 256:20,25 257:12 258:9,14 259:5,7 260:13,24 262:19 265:5 266:2 267:11,24 268:5 269:11, 19 271:17 272:9 275:6 281:1,5,6,17 282:9 302:12,14 303:7,15,17 304:3, 12,14,17,21 305:10 306:21 317:1,4 319:5,23 320:10,24 321:8 336:17

**released** 71:25 78:3 100:23 112:22 213:5 222:3 225:10

**releases** 43:10 67:18 70:12,13 71:1 72:7,13 74:7,12,16,20,23 75:18,19,22 76:4 77:2,13,22 78:11,15 100:6,8 129:10,13 217:18 227:14,19 228:4 247:17

**releasing** 73:17 281:5

**relevance** 84:9 145:10 146:3 176:10, 17,22,25 177:24 231:17 233:6 234:14 239:3 316:6

**relevant** 73:18 144:9 146:15,16,17, 20,21 152:1 176:20,23 177:1 211:14 229:16 231:21 233:14 236:1 257:17 258:14,20 259:11,12 262:25 263:6,9, 11,20 264:14,17 265:18 267:17 271:23 275:14 285:19

**relied** 160:11

**relief** 293:5

**reluctant** 294:5

**rely** 44:10 77:13 82:1 96:13 100:15 101:2 225:3 230:23

**relying** 258:17

**remark** 117:23,24 118:9,12 255:23

**remarked** 256:3

**remarking** 214:11,15 229:11 230:7 232:12

**remarks** 208:4 310:12 325:22 326:1

**remediating** 94:3

**remedy** 77:23 94:7

**remember** 26:6 33:16 76:24 98:3 101:6,18,23 108:12 117:22 118:11 169:25 183:7 207:11 222:1 223:25 240:21 254:19 265:7 275:4 285:3 292:7 299:9 302:3 336:9,11

**removed** 213:18 307:13,14

**remunerated** 167:6

**remuneration** 47:9 169:12

**rendition** 123:18

**renown** 96:13

**repaid** 333:17

**repay** 333:16

**repeat** 85:5

**repeated** 124:12

**repeatedly** 125:12 209:3 229:21 233:3

**replaced** 127:1 167:11

**report** 173:25 175:3 183:10,11 207:20 236:13 241:1,23 242:6,7 243:16 244:13,14 245:11,16,20 249:21 261:18 290:17 303:5,17 322:25 325:2,4,5

**reported** 119:15 142:12 218:17 253:25 300:19,25 315:19

**reporter** 7:4 26:13 55:14 62:19 76:10 85:9 145:1 151:14 172:16,18 296:21,24

**reporters** 158:24 163:1 168:25

**reporting** 49:12,18 142:17 143:25 154:21 257:8

**reports** 117:12,14 208:20 221:12 236:11 241:5,18,25 242:2,8,10,16,22 243:3 244:4,21 302:19,22 303:6,16 319:22 327:14

**represent** 7:5 134:20 218:8

**representation** 82:2 237:3 306:21 307:20 308:3

**representations** 100:20 184:17 256:7,10,11 280:16

**representative** 47:1

**represented** 64:11 71:4 126:6 183:22

**representing** 49:5 225:5

**reputable** 174:15

**reputation** 118:20 158:3

**reputations** 100:17

**request** 105:8 254:5 283:9 296:22

297:14 328:15

**requested** 21:2,4

**requests** 65:3

**require** 88:12 96:16 124:18 129:22 334:21

**required** 32:17 43:2 113:14 197:8,19 212:20 217:15 223:11

**requirements** 95:24

**requires** 129:21 279:15

**requisite** 332:1

**reroute** 299:3

**rescind** 298:11

**research** 91:9,11,15,19,23,25 92:2,5,11 291:2

**resign** 164:8,23 165:6,8

**resigning** 170:5

**resist** 166:21 167:2 322:22

**resolved** 20:4,25

**resource** 48:12

**resources** 97:8 276:14

**respect** 18:24 40:4 42:9 45:11 71:7 74:6,7 83:2 89:20 90:3 92:21 107:22 129:11 137:9 145:4 185:15 195:12 196:12 199:14 219:14 231:18 280:6 281:22 283:1 294:20,25 316:8 319:10

**respectable** 110:8 111:12

**respective** 241:22

**respects** 167:1 251:15

**respond** 78:12 130:22 138:2 177:18 188:23 189:2,6 204:10 207:4 282:1

**responding** 289:12 305:9

**responds** 228:13 314:24

**response** 48:14 82:3 123:14 179:16 180:14 186:6 189:1,21 191:11,13,21 199:19 206:20 207:17 210:25 219:18 246:4 304:11 322:23 328:14

**responses** 190:4 237:18 309:10

**responsibility** 65:23 91:3

**responsible** 58:25 94:2 96:19 97:8,12 100:4 267:24

**rest** 132:16 285:8

**restrict** 96:24

**restricted** 21:16

**restrictions** 130:18

**restroom** 172:9

**result** 20:21 40:21 42:13 43:3 55:3 129:7 218:2 222:23 223:12 231:12 261:22 280:1 305:7 310:6,9

**results** 39:5 51:6 69:5,9 82:20 95:11, 20 100:22 106:24 107:4,12 116:5 118:16,18 119:5,13,19 120:12 127:8, 12 128:12 129:6 140:6,7 142:11,16 159:25 160:4 162:6 181:18,19 192:18 196:23 198:16,22 199:9,13 206:3,11 214:17 215:25 217:25 218:17 222:24 223:20 229:12 230:2,8,9,11 231:4 232:11,13,20,21,25 233:23 239:8 244:25 249:17 260:14,19,24 276:10 279:21 284:17 285:8,23 286:3,12 287:23 288:20 289:21,25 292:3 295:8 297:13 298:24 313:7,11,15 315:5,19 316:24 317:2,10 318:21 323:14 324:6, 20

**retired** 114:20

**retraction** 204:14

**retrospect** 295:9

**return** 20:15

**reveal** 11:12 15:5 16:14 17:8,23

**revealing** 16:1,13 129:23 296:4 328:12

**revenue** 98:20

**revenues** 98:10 338:4

**reverberated** 154:3

**reverse** 31:2

**review** 9:17,19 147:6 227:5,14,19 228:16 306:3 307:9 308:1,2 320:3

**reviewed** 47:19 48:7 152:13 171:15, 17,18 174:5,18 227:9,12,16,20 241:17 319:24 320:7,17

**reviewing** 240:21,23

**revise** 103:22 263:19

**revised** 307:14,23

**revising** 104:4

**revision** 307:22

**revisions** 217:11

**revolutionary** 331:14 335:1

**reworking** 199:21

**riding** 257:6

**righteous** 155:7

**rigorous** 39:21,22 40:2,3 324:12

**rigorously** 199:7

**rigueur** 218:23

**ringing** 247:13

**risk** 157:18 158:3

**RNA** 30:25 31:3 37:7 140:16

**Ro-shay** 106:11

**robust** 40:5

**Roche** 106:4,11,12,13,14,23 107:10 110:19 111:1 152:15

**rock** 181:22 330:14,15

**rocket** 268:21

**role** 234:2 259:18 330:11,12,23

**roles** 59:15

**Romney** 101:15,17 103:2,16,20 105:7,13

**root** 256:24

**Ross** 12:12

**roughly** 29:25 97:19 98:9,13 290:17

**routed** 161:11

**Rp** 87:1

**rule** 148:20,25 150:7 151:8,16 158:17

**rules** 8:14

**rumblings** 29:4 314:21

**run** 71:9 89:11 124:7 128:15 138:16 162:5 204:23 205:3,19 263:18 285:7 312:22

**running** 168:17 179:16 207:3

**runs** 121:18

**RUO** 91:14,15 92:14,21

**rush** 31:5,8 228:6

**Russia** 121:8 179:20

## S

**sad** 272:16

**saga** 296:20

**sale** 88:21 98:17 99:24 131:7

**sales** 59:2,10,12,16 98:4 130:14 131:14 136:14,23 156:19 158:12 250:22 279:9 325:8 337:17,21

**saliva** 279:10

**Salt** 28:9 29:16 30:1 73:5 153:1 155:22,24 158:24 159:16 160:13 163:15 179:5 180:1 182:5 190:4,11 192:16 234:7 283:20 287:19,21 292:4, 11,24 293:7,13,15 310:2 327:1 328:10 331:7 332:4

**sample** 31:1 40:15,18 42:2,5 49:7 51:19 54:3,5 55:4,5 133:6,16 140:21 176:15 285:16

**samples** 50:18 51:22 55:3 68:17 82:15,21,24 95:7 105:1 137:1 138:12, 16 139:2 140:1 182:22 288:3,4 313:1 318:16,18

**sandwiches** 238:15

**Sarabhai** 121:13,15,18 124:11

**Saragene** 240:5,15,18

**SARS-COV-2** 35:24 36:2 37:7 318:22

**Satterfield** 27:20,21 47:22 105:25 107:8 108:1 140:5 153:5 162:12,20,21 163:3,12 167:10,14 169:22 171:2,14 190:1 192:10,14 195:16,17 197:15 199:19 200:5,18 202:3 203:10,12,18 204:9 206:19 207:1,2 208:17 211:24 229:13 230:22 231:5,17 233:8 237:25 238:19 243:22 244:1 245:22 254:6 255:17 258:16,17 259:18 286:5 293:2 296:13 298:9,14 300:3 302:7 303:13 312:15 313:10 316:5 331:5

**Satterfield's** 170:19 197:14 269:18

**save** 294:23

**saved** 295:24

**scenario** 197:5 202:22

**scene** 68:23 156:5

**scenes** 256:22 260:3,7 263:7 265:11

**scheme** 176:10

**school** 99:18 131:24 132:4 169:9 171:13

**science** 30:5 40:25 68:6 70:7 96:6,8 100:9 107:20 162:12 164:9 166:11,24 167:9,10 192:10 201:5,15 211:24 218:15 314:7 322:3 334:25

**science.'** 212:2

**sciences** 173:23

**scientific** 28:3 36:9 42:18 43:7,18 44:3 63:19,24 70:23 71:9 96:16 100:7, 10 108:11 137:8 163:6 164:4 165:3 169:1,2 170:12 178:9 195:17 200:25 222:19 230:16,23 231:1 237:21 259:3 263:10 283:11 289:7 300:17 302:6,7 309:11,12 318:13 319:18,19 321:17 322:20

**scientist** 36:11 39:10 40:14 41:2 43:7 45:4 52:24 53:18,19 54:9 100:15 163:25 183:6 201:7,8,9 209:15 253:9 256:23 316:4 317:17

**scientists** 40:4 44:3,9 87:7 90:21 96:11 100:14,23 125:1,20 126:18 136:21 164:7 169:4 171:16 178:7 255:6,20 257:7 263:14 308:7

**scientists'** 101:2

**score** 196:4 242:24

**scores** 90:6 145:24 198:15 283:5 323:8

**screaming** 324:25

**screen** 7:6

**scroll** 35:18

**scrutiny** 85:23 86:19

**scurrilous** 189:4

**SEC** 11:9,10,14,23 12:2,25 13:5,9 15:2,11,22 17:13,22 225:8

**SEC's** 14:22 16:3 17:14

**second-to-last** 109:8

**secondary** 124:8

**section** 49:3 50:13 54:12 55:19 172:24 199:22 200:14 318:15

**seek** 201:21

**select** 312:20

**selective** 234:22

**sell** 22:20 23:23 25:2,23 32:2,5 38:14, 22 56:19,23 57:11 58:14 77:14 89:8 90:5,10 92:16 106:19 130:23 133:23 173:12 185:1 310:9 324:13 327:13 338:10

**seller** 254:12

**selling** 21:24,25 22:3,22 24:15 34:25 57:3 88:11 106:16,18 117:19 131:17 133:16,18 134:10 136:25 140:25 157:20,22 161:1

**sells** 57:7

**seminal** 112:8

**Senator** 101:15 103:15 105:7

**send** 63:8 89:10 199:2 224:1

**sending** 135:20

**sends** 51:22 114:2 123:12,13 188:9 308:9

**senior** 165:25 253:4,9

**sense** 49:22 64:23 67:5 185:19 201:19 323:3 326:18

**sensitive** 40:20 42:12 43:4 44:13,16 45:14 50:23 52:9,23 53:4 54:6 55:21 83:20 112:11 124:22 125:3,13,18 126:11 146:1 223:17 239:10 256:21 261:22 275:19 279:18 280:17 303:1 312:4 316:24

**sensitivity** 39:19 40:11,12 41:9 42:9 43:1,14,20 44:10 50:3,4,9,14,16 53:11,17,23 55:1 61:21 62:2 83:7 89:12 100:7 111:23 119:6 124:18 126:3,4 128:21 145:17 174:1 177:2,4, 6,8 178:3 193:21 195:21,23 196:12 198:16 208:20 209:4 217:19 218:20 221:17 222:5,16,17,22 223:3 224:19 225:6 229:3,16,21 230:5 231:9,21 232:2 233:4,11 234:3 244:20 245:1 260:1,2 266:3 269:17 271:21 276:2,16 279:11 302:20 306:17 307:15 308:4, 15,16,25 309:5 313:2 317:23 318:23, 25 319:12 323:5,19 324:8

**sentence** 69:17 206:9 225:1

**sentiment** 125:7

**separate** 38:19 221:22 302:25

**separately** 41:8

**September** 314:14

**sequence** 140:17 311:13

**serve** 334:12

**served** 179:19

**service** 96:23 114:21

**services** 166:24 235:23 330:7

**set** 24:1 73:7 186:5 188:4 189:24 194:12 208:18 250:17 266:15 315:24

**Seth** 59:5,13 60:20 131:24 159:18 187:13,20 265:22

**setting** 11:20 55:22 84:3,21 86:10 88:19 197:6 233:2 250:16 270:6 306:16 316:7 330:21

**severance** 167:3,4,8

**shack** 161:8

**shadows** 127:4

**share** 78:6 98:24 266:23

**shared** 215:22

**shareholder** 250:10 332:6

**shareholders** 72:8,15 73:12,22 74:1, 4,9

**shares** 21:13,15,20 47:3 77:14 78:23 173:10 246:19 326:14

**shebang** 133:5

**shipments** 104:9

**shoes** 310:21

**shook** 41:13

**shores** 89:8

**short** 61:5 112:10 247:7 250:2 291:1, 11,20,24 326:21 327:12

**shorting** 291:6

**shortly** 32:13

**show** 27:6,7 29:8,13 31:10 34:4 54:25 60:8 61:16,17 111:16 118:16,17 145:22 163:11 180:21 193:20 195:20 197:4 219:17 228:11 257:11 261:15 300:16 313:15

**showed** 84:2 111:22 119:5 161:10 173:24 185:23 206:6 261:17,18 265:6 293:6 303:22 325:7

**showing** 35:16 45:8 46:12 60:18 66:22 79:9 102:22 105:23 122:8 141:9 145:22 153:12,14,16 159:13 160:4 187:5 190:24 210:14 216:23,24 220:8 228:2 230:4 240:22 248:9 260:2

265:19 283:19 296:11 303:5 305:18 308:4 312:13 314:6 318:7 319:12 320:16 322:14,24 325:16 335:16

**shown** 88:1 241:20 268:2 294:4

**shows** 197:6 209:21 234:23 262:8,12 306:17 324:4

**shying** 116:14

**side** 30:5 65:19

**side-by-side** 204:23 205:4,19

**sign** 338:18

**sign-off** 48:2

**signed** 244:9 313:18

**significant** 71:17 72:25 164:1 190:8 228:6 246:8 297:16 310:3 320:18

**significantly** 143:21 145:20 154:18 174:16 184:21 190:7,8 208:3 219:4 316:17 319:13 326:14 337:22 338:1

**Silicon** 101:19 102:4,7,8 118:2 180:16 187:12,18 188:6,22 189:11 195:2 215:24 289:17

**similar** 22:10,11 99:21 209:17 222:23 238:23

**similarly** 45:20 304:10

**simple** 283:3 324:21

**simply** 206:14 254:16

**simultaneously** 257:14

**single** 36:25 37:19 38:9 112:19 140:15 229:14 231:19 254:12

**sir** 15:13 67:11 125:25

**sit** 151:22

**site** 112:4 220:12

**sites** 160:5 161:19,25 162:7,17 170:20,23

**sits** 84:17

**sitting** 25:17 26:8 90:2 98:5 228:20 230:3,10 278:5

**situation** 65:2 138:3 185:15 238:8 287:19

**situations** 117:16

**sixth** 121:3

**sixty** 78:21

Case 2:20-cv-00368-JNP   Document 169-14   Filed 04/10/24   PageID.3036   Page
124 of 131

GELT TRADING vs CO-DIAGNOSTICS
DWIGHT EGAN - 04/13/2023

Confidential
Index: size..state

**size**  158:7

**sizeable**  257:23

**skewer**  129:5

**skill**  73:7 230:16

**sledding**  179:23

**Slopes**  101:19 102:4,9 118:2 180:17 187:12,18 188:6,22 189:11 195:2 215:24 289:17

**slow**  161:18

**SLT**  182:4,5

**small**  73:5 112:10 161:11 219:7 286:22 334:22

**smaller**  160:13

**smart**  22:10 35:24 36:2 83:19 98:17 99:3 110:17 195:9 235:3 239:19 240:14,18 254:7 278:4 279:6 309:11 317:24 318:19,22,24 336:12

**smell**  292:2

**snarky**  117:24

**Soars**  267:2

**software**  30:14,17 34:17 72:25 162:4

**sold**  38:15 99:4 112:20 128:18 133:12,15,25 134:4 237:15 310:19 311:15

**solicit**  101:15

**solicitations**  57:1

**solve**  320:25

**son**  59:6 131:23

**sophisticated**  30:13 201:13 276:11 284:16

**sort**  21:22 22:5 23:15 36:18,25 37:2 38:8 94:8 102:5,7 121:13 128:17 137:11 138:3,8 170:17 186:6 196:2 228:3 242:17 246:20 253:4 301:6 306:11

**sorts**  54:8 110:21 117:16

**sounds**  269:14 290:15 313:9

**source**  146:8 256:24

**South**  312:23 321:23 324:3,15,20

**space**  72:6 121:16

**Spanish**  333:23

**speak**  34:6 155:15 180:11 200:18 269:8 277:4

**speaking**  13:4 57:12 70:6 163:1 270:15 290:14 293:22

**speaks**  51:3 56:16 73:15 158:1 220:21

**specialized**  220:3,5

**specific**  34:2 36:15 50:23 52:9,23 53:4 54:7 55:22 101:24 104:2 108:12 110:23 124:22 125:3,13,18 126:13,24 146:1 194:21 224:9 227:6,17 228:1 230:8 239:10 256:21 261:23 266:18 271:9,10 275:19 279:18 280:17 288:8 290:3,11 298:8 303:1,2 316:25 336:11 338:21

**specifically**  81:1 140:5 149:16 159:6 162:23 227:24 231:7 233:3 280:18 286:7 289:10 293:20 306:8

**specificity**  39:16 41:22,23 42:7 44:10 50:5,15 53:12,17,24 55:1 61:22 62:2 83:8 89:13 111:23 119:7 124:18 126:3,4 128:21 145:18 193:21 195:21, 23 196:4 197:25 198:16 209:4 217:20 218:20 221:18 222:5,15,17 224:20 225:6 229:3,16,22 230:5 231:10,21 232:2 233:4,12 234:3 244:20 245:1 266:2 269:17 271:20 276:2,16 279:11 302:20 323:19

**specifics**  89:3 96:3 245:19 246:3

**specimens**  279:10

**specs**  236:7

**spectrum**  84:4,14,17,18

**speculate**  294:16

**speculating**  180:20 202:14 255:25

**speculation**  56:4 72:17 73:25 75:10 77:16 78:10 140:3 143:2 144:19 155:2 176:7 200:8,23 202:10,13 203:15 209:12 215:7 224:23 225:2 232:6 243:25 251:22 253:17 257:3 262:15, 23 269:13 270:2,20 272:4,12 273:6,21 274:13 309:7 316:15 319:17 320:21

**speculative**  273:8,22 274:8

**speed**  61:8 257:4

**spell**  114:15

**Spencer**  101:21 179:14

**spend**  322:21

**spent**  217:16 227:2

**spoke**  266:17

**spoken**  9:25

**spooking**  73:12

**spooks**  72:8

**spot**  239:4

**spreadsheet**  75:4,12,17 76:3,20 312:22

**staff**  28:9 29:15,18,19 68:6

**stage**  114:22

**stake**  100:17 334:22

**stakeholder**  333:5,7

**stakeholders**  211:15 334:18

**stakes**  127:6

**stamped**  102:19 314:5

**stand**  68:7 149:19 152:6 313:20

**stand-alone**  229:17

**standalone**  231:22 233:14 234:14 260:20 261:13 264:18

**standard**  51:6,7 52:3 55:5 83:25 84:1 108:2 119:7 124:6 152:23 196:3 220:15 224:5 225:4 238:19 239:1

**standards**  197:8,19 267:9

**standpoint**  85:12 111:18 153:8 174:23 222:19 239:3 257:17 316:19

**stands**  245:12 275:17

**staple**  278:15

**Stark**  79:11,15 138:2 296:13

**stars**  141:20

**start**  28:15 88:11 109:2 122:10 159:22 210:22 257:19

**start-up**  112:10

**started**  21:22 60:5 76:14 106:18 117:8 163:20 241:13

**starting**  33:19 184:17 207:12

**starts**  109:24 141:12 172:24 208:19 214:11

**startup**  97:16

**state**  7:12 8:8 19:24 20:10 132:6,12, 17,19,22,25 135:3 142:4,6 143:11

151:2,11,17,22 157:4 160:3,6 161:19 162:5 164:18 169:4 173:17 204:22 205:2,17,19 235:16 282:12,14,19,25 283:8 284:3,17 286:11 288:3 294:24 295:17 296:3,23 297:21 300:8 301:3,4,24 304:1 306:14 310:23 311:4,7,21 312:3

**State's** 170:22 179:16 180:14 285:8

**stated** 90:20 125:12 126:17 194:4 234:7

**statement** 130:7 163:3,5 175:19 188:10 198:4,5 201:20 202:5 209:9,17 217:12 230:19,24 231:3 267:13,14,20,21 268:10 269:3 291:8 306:3 307:9

**statements** 15:20 162:21 198:7 201:25 204:14 262:1 271:11 291:5

**states** 31:22 32:1 57:12,21 58:10 90:7 91:24 121:25 134:5 135:13,21 276:12 292:17 311:18,23 323:23

**stating** 151:12

**statistic** 302:5

**statistics** 268:17

**statues** 121:15

**status** 33:11 58:8 92:22

**stay** 165:2

**steam** 32:15

**stem** 209:25

**step** 91:19 165:14 170:15 310:20 331:16

**stepped** 166:8

**stepping** 166:5

**steps** 88:2,3

**stipulate** 21:22 148:21,22

**stipulation** 331:20

**stock** 21:13,16 76:5 77:2,9,10 78:12,13,16,18 246:5,7,15,16,17,19,23 247:2,10 249:2 250:19 251:3,10,12 252:3 266:1,9 268:21 290:9,13 291:21 326:19,24 327:7,12,15

**stocks** 247:4

**stop** 156:25 168:22 172:18 282:7,8 310:13,24 311:24

**stopped** 157:5

**store** 46:3

**story** 207:13 265:25 272:20,21,24 297:13

**strains** 82:5

**strand** 37:19

**stranded** 140:15

**strands** 30:25

**strange** 60:7

**strategic** 96:20 97:9

**strategize** 336:14

**strategy** 73:21 74:6,7,11,12 188:18, 23

**strenuously** 180:12

**Strike** 40:9 43:11 70:12 95:22 108:7 134:6 138:24 141:18 146:25 158:9 194:17 200:3 202:4 206:20 217:10 226:14,21 237:9 238:22 241:25 284:5

**striking** 213:11

**string** 105:24 109:3 314:6

**stringent** 121:24

**striving** 103:4

**strong** 89:4 118:6

**stronger** 206:13

**strongly** 70:6 155:8 215:12

**structure** 134:11

**stuck** 278:13,15

**student** 292:14

**studied** 242:18

**studies** 88:23 193:14,20,25 194:2,10, 16,20 195:5,8,20 196:22 215:3 239:18 240:13 282:11 319:25

**study** 50:18 51:11,13,16,21,25 52:2 146:5,6 180:24 182:24 183:3,8 221:20 229:2 235:3 279:20 282:16 285:4 296:1,3 312:22 314:16 315:2,6 316:10,25 317:20 319:3,6 320:17 321:13 322:4,9,21,22

**stuff** 127:3 163:20 184:18 301:6 304:18

**stultified** 119:15

**subject** 11:1,22 12:13,25 15:11 18:9, 17 19:21 60:24 67:17 106:4 193:13,24 194:2 234:16 290:10 308:1 314:16

**subjected** 51:20

**submission** 49:14 113:15 128:11 186:12 220:23,24 221:1,6 282:2

**submissions** 93:21 111:19

**submit** 163:5 221:24 284:2 294:1

**submits** 163:3

**submitted** 95:16 221:14,15,16 226:18,23 227:7 235:15 296:22 297:3,7 305:25 312:23 314:25 315:6,8

**subordinate** 277:1

**subpoena** 11:25

**subpoenas** 11:23

**subsequent** 83:15 120:3 237:25 238:1 333:17

**subsequently** 179:19

**subsidiary** 120:22

**substance** 189:18

**substances** 36:23

**substantial** 98:8

**succeed** 287:23

**succeeded** 282:24

**success** 112:21

**successfully** 30:12

**suddenly** 231:10

**sue** 154:6

**sued** 10:6,8 19:9

**sufficient** 84:18,19 85:23 86:19 256:12

**suggest** 165:8 324:5

**suggested** 113:18 299:13 307:7,17

**suggestion** 116:21

**suggestions** 199:23 200:15

**suggests** 115:1 297:15

**suit** 19:6 328:18

**summaries** 239:18 240:1,13

**summarized** 143:12

**summary** 215:15 229:7 244:15 245:20 323:1

**superior** 209:2

**supersede** 50:4

**supervised** 243:23

**supervisor** 243:14,16

**supplier** 92:11

**supply** 133:3 136:17 156:17

**supplying** 57:22 131:7 173:16 286:22

**support** 7:5 49:15 197:1 304:14 305:2 320:12 336:6

**supported** 120:15

**supporting** 259:5 292:5 320:15

**supportive** 239:20

**supports** 220:9

**suppose** 106:17 134:18 205:21

**suppositions** 185:7

**surmise** 185:19 291:25

**surmised** 181:23

**surmising** 180:20

**surprise** 74:20 75:14 254:9

**surprised** 177:25

**suspect** 24:10

**swab** 23:2 316:20,21

**swabs** 299:3

**swearing** 249:19 290:22

**sweat** 204:5

**switch** 168:22

**sworn** 7:13 8:2

**Symbiotics** 120:21

**symptomatic** 170:20 171:10 190:11

**symptoms** 161:21 163:10

**synonym** 297:24

**synthetic** 68:21,25 69:9 82:6,14 137:24 138:1 139:5,25 140:6

**synthetics** 68:10,11 82:20

**system** 287:4 292:20

**systems** 134:1 160:11

---

**T**

---

**T-I** 114:17

**table** 44:7 104:8 127:19 143:12,13 145:4,5 146:8 149:6 152:16 154:16 245:12 314:23

**tables** 95:17

**tail** 233:17 313:14

**takes** 92:4 213:8 227:22 247:12

**taking** 16:18 145:5 157:18 213:23 250:13 290:3

**talk** 40:4 69:9 93:20 108:11 168:25 188:17 201:1 258:25 268:15 278:8 316:4 337:4

**talked** 87:24 100:5 129:10 176:19 190:6 259:1,17 268:2,3 269:15 324:23

**talking** 16:23 35:2 37:9 59:19,20 67:21 73:12 83:12,14 94:5 117:11,15 126:7 130:13 135:8 140:11 143:3 149:6,7,8 155:9 157:13 160:22 162:10 168:5 171:1 175:5,6 176:3,8,22 219:3, 5 220:9 224:18 231:9 232:11 274:1 301:14,20 303:4 321:7,9 324:9,10 328:20

**talks** 51:3 244:19

**tangentally** 260:1

**tangential** 287:18

**target** 10:17,24,25 30:15,22 37:18 38:7,9,24 41:25 42:8 72:19 111:6 138:13 219:19 294:12

**targeted** 37:22 38:15,19 86:22

**targeting** 39:8,18 294:9,15 295:15

**targets** 30:25 37:11 39:15,23 87:1

**task** 26:23 31:11 64:10 141:19,22 148:6 205:16

**tasks** 258:1

**tax** 19:21,24 20:10,22

**taxes** 20:8,13,18,21

**Taylor** 7:19 187:7,9 191:3,5 337:6

**team** 43:18 59:2,16 70:23 71:9 100:9 124:11 173:19 195:17 255:6 256:23 263:10 277:5 283:11 317:17 321:17 322:20

**tech** 70:2 102:6 212:1 285:6 314:11

**technical** 87:9 201:11

**technician** 253:5,10 314:10

**technicians** 81:8

**technological** 22:13 111:18

**technology** 22:9 27:3,22,23 31:12 33:8 34:12 36:18,19,20 37:5,13 38:6 72:24 73:5 111:17 166:13 209:16 335:1

**telephone** 101:18

**television** 59:18 118:3 155:4

**telling** 44:2 60:3 145:5 254:18 255:22 260:22 261:3

**tells** 13:25 108:1

**template** 69:9 82:7,14 88:16 140:18

**templates** 68:21,25 82:25 139:6

**tend** 228:10

**tenders** 209:1

**Tennessee** 136:10,12 310:16 311:6,7 312:3

**tens** 237:15 238:11 323:9

**term** 63:23,24 91:23

**terminate** 310:24

**terminated** 164:23,24 236:25 310:6

**terminology** 100:10

**terms** 30:5 31:13 41:8 50:14 55:9 73:1,21 75:22 77:9 83:11,18 84:15 85:19 86:11 88:2,3 91:23 100:9,23 110:17 142:24 144:12,25 146:11,20 156:13 164:9 169:14 196:4 225:6 235:17 239:5 242:5 245:1 246:4 250:5,10,11 251:25 269:16 272:25 275:14,17,24,25 276:3 277:2 280:16 282:20 289:2 291:22 292:17 301:6 304:22 305:2 309:10 310:22 338:8,10

**territorial** 57:13

**territories** 58:24

**territory** 57:10,17 185:13

**test** 22:10,22,23 23:3,7,12,15,21,22 25:10 27:8,24 28:2,6,7,9,15 29:8,16 30:12,19,24 31:4,10 32:2,5,25 33:21 34:10,15 35:1,2,4,7,24 36:1,2,12,13, 15,16 37:11,22 38:5,15,18,23 39:7,15,

16,19,23 40:7,11,16,20,25 41:4,6,24
42:2,5,12 43:2,4,14 44:13,16,25 45:7,
14 50:3,5,9,18,22 51:5,8,17,18,21
52:3,8,22 53:3,12 54:13 55:9,21
56:10,20,23 58:11,20 59:19 61:8
63:21 64:12,17 65:16 67:23 68:14,15,
20 69:3,14,20,22,23 72:24 73:6 80:22,
24,25 82:18 83:19 84:5,14 85:11,25
86:4,5,18,22,25 87:3,11,15,19,24,25
88:4,20,22 89:10,19 90:10,13,15,23,
25 91:12,20 92:9,11,14 98:17 99:21
100:11,21,22 106:4,16,21,24,25
107:1,11,12,22 108:2,14,17 110:17,24
111:17 112:11,17,20,22,23 113:4
115:17 117:19,21 118:14,15 119:12
120:2 123:23,24,25 124:1,12,20,21
125:2,13,17 126:10 127:23 128:6,18
131:3 133:3,4,5,12,15 134:4,9,14,16
135:4,9,10,14,18,25 136:3 137:3
138:7 139:4,11,24 140:24 142:15
143:21,24 146:3,4,10,18,23 148:5,7,8
149:8 152:21 154:17,21 156:23 157:5,
12 161:2 162:16 173:12 174:2,23,25
175:16 176:11,13 177:6 181:11,12,17,
25 185:3,22 192:18,23 193:13 194:2,
20,25 195:4,9,13 196:1,3,20 197:6,7,
19 199:6,7,10,16 205:10,12 206:1,4,6
208:11,21 217:18,25 218:12,16 222:4,
13,24 223:4,17,22,23 224:1,3,4,22
225:11 231:19 232:3 233:2,8,19
235:3,14,17,21,22 236:3,15,18 237:5,
12 238:20 239:8,19 240:15,18 254:7,
10,12 256:20 260:14 261:15,22
264:10,11,14 266:3 267:2,7,20 268:3,
6,20 269:1,4 270:16 275:15,17,21,22
276:17 278:4 279:6,9,11,19 280:17,19
281:7 282:23,24 283:8 285:15,16
286:16,23 288:4,15 289:3,20,24 290:6
291:14,17,23 293:1,14 295:2 297:6,
23,24 298:1,5,15,16,21,23 299:3
300:12,20 301:10,14,15 302:1,19,24
303:1,22,23,24 304:7,13,14,17 305:3
306:16 308:4,16 310:14 312:4,5,25
317:24 318:20,22 319:13,20 320:13
322:24 323:4 324:11,14,21 327:2
328:4,9 336:5,20

**test's** 84:22 136:18 169:19 209:1
214:12,15 229:11 230:7 232:13
314:22

**tested** 119:4 137:1 160:5,6 170:20
289:23 298:14 318:18

**testified** 87:12

**testify** 202:18

**testimony** 12:3 42:15 52:12 77:5
78:9 82:23 86:2,7,15 94:24 127:18
128:8 130:5 138:2,22 147:5 148:12
149:15,22 150:6 152:10 167:24 168:1,
12 176:7 189:4,10 198:12 208:3 223:1
245:6 251:2 258:23 260:5 263:13
264:9 265:15 271:13 272:12 302:17
316:15

**testing** 23:19 24:11 26:17,24 33:7
52:6 91:4 101:5 118:23 124:17
137:16,18 142:14,16 145:12 156:12
161:19,25 162:6 170:23 171:8,9 190:9
212:2 220:4,11 222:7 226:2 236:18
254:2 266:6 268:15,21,25 285:7 287:4
298:3 303:3 311:11,13,18 316:18
324:11 338:1

**tests** 21:25 22:1,3,6,7,9,13,17 24:9,
12,15,17,19,20,22 25:2,13,17,23 26:1
34:21,24 37:2 38:14 39:15 51:4 57:11,
22 58:3,14 83:8,18,20,21 84:4,15,23
85:19 86:11 88:11,15 90:19 91:4,24,
25 92:1,16 93:4 95:7,11 97:1,2 104:20
106:19 110:19 111:3 113:12 115:3,24
116:16 117:10,13 118:12 119:14
120:5,6,10 127:15 128:15,20 130:23,
24 131:7,18 133:3 134:2,21,24 135:2,
5,7,15,20 136:2,17,25 137:1,21,22
138:16 139:2 143:11,22 144:17
152:24 153:1 154:18 155:5,8 156:4,
17,25 157:10,18,21,23 158:2,21
160:2,12,13,24 161:10,11,20,25 162:1
163:8 169:15 170:16 172:25 173:16,
24 175:22 177:17 181:4,7,24 182:22
183:18 185:2,23 193:7,24 196:4,8
197:23 198:6,24 204:23 205:3 207:18
209:3 218:1 219:7,12 222:23 229:20
234:25 235:3,9,12,25 236:12,20
237:1,4,16,18,23 238:11 247:5 252:8
253:19,23 254:13 256:22 260:9 262:1
263:18 267:9 275:19 276:5,8,12
282:22 287:1 288:24,25 294:23,25
295:1,4,22 296:3 298:6 299:21,22
302:2 304:23 305:9 308:14 310:18,19,
25 311:8,15,24,25 312:1 313:12
316:16 317:23 322:25 323:9,10 324:5,
15,16 338:10

**Testutah** 132:5,6 134:17,25 142:11
143:14,15 144:12 156:23 159:25
160:3,12 161:18 162:6,17 172:25
173:19 283:1,22 284:15 287:9,12,16
288:2,4,17 292:5 304:2,10,11 310:22
323:2

**Testutah's** 170:20

**tethered** 30:21

**text** 191:12 208:19 232:14 276:19
328:14,17,23 329:2

**that.'** 229:22

**thermal** 24:6 37:17 133:20

**Thermofisher** 110:19

**thing** 16:7 22:5 27:7 33:25 38:8 81:9
82:4 101:22 111:5 117:22 119:24
127:11 146:16 148:2 165:16 170:17
181:11 182:3 186:13 197:25 224:10
238:17 246:21 247:6 249:25 254:23
282:2,4 285:17 289:20 290:5 305:4
308:16 309:25 337:16

**things** 13:24 16:15 22:4 26:25 30:20
36:14 42:7 54:2,8 71:4 73:7 84:12
92:7 96:4,10 97:5 98:6,22 110:21
113:22 116:13 117:25 133:11,13
134:20 138:6 146:17 152:14 158:7,18,
19 166:5,23 176:10,12,24 185:18
213:17 233:16 236:9,22 257:5 264:10,
11 271:7 273:2 288:13 295:9 298:1
301:11 328:21 333:18

**thinking** 19:13 27:6 33:17 111:8
116:1 117:6 228:15 327:21 328:7
330:5

**third-party** 198:25 208:6

**thought** 27:7,18 37:9 64:19 67:5 70:3
71:4 112:17 118:7 132:13 166:20
168:18 179:10,20 189:4,7 190:5
212:16 234:18 235:25 238:7 259:12
261:15 281:5 282:19 288:25 331:2,14
335:25

**thoughts** 116:12

**thousand** 21:20

**thousands** 30:17 173:16 176:14
235:12 290:22 316:21

**threshold** 289:3

**throughput** 229:19 231:24 233:17

**throw** 285:18

**Thursday** 64:4 178:22

**thymine** 140:13

**tier** 291:15,18

**time** 7:6 10:19 20:14 21:23 25:6 27:9
28:4 29:22 30:15 31:23 32:1 34:22
35:4 38:22,24 48:8 51:7 54:13 62:4
64:8 67:16 68:13,22 70:15 74:5 76:11

81:12 88:1 93:9 94:6,15,18,21 99:1 101:25 108:3,15,19 111:20 112:10 114:9 117:17,18,20,25 118:3,11 124:25 131:4,11 134:3,4,12,13 136:5 145:1 146:5 151:14 163:19 164:5 166:23 170:3 174:13 178:18 179:2 181:17 186:9,10 194:1,14 195:18 200:2,5,17 202:3,7 203:6 207:12,14 213:6 216:11,14 217:16 218:5 224:7,8 226:7,10 227:23 236:3 247:20 258:8, 10 259:8 263:10 274:5 277:16,19 286:15 290:16 293:12 295:5 309:20, 23 320:3,5,9 322:21 323:2,8 328:19 330:6,16 333:1,4 335:11,14 337:11,14

**timely** 71:22

**times** 9:7 110:7 125:21 126:18 145:15 157:12 208:2 283:5

**timing** 153:8

**Timpanogos** 160:22 161:4 288:5

**title** 59:8 159:23 217:17 218:10 271:10 283:21

**titled** 103:2 191:12

**TNG** 327:22,23,24 328:7

**today** 43:21 100:5 112:23 122:21 123:15 138:8 139:11 147:15 222:3 238:2 248:24 258:4 266:1 322:13

**today's** 9:5,25

**toe** 111:10

**toe-to-toe** 111:17

**told** 17:1 33:19 74:19 125:12 165:19 182:16,17 206:4 250:21 270:17 298:15 320:18

**tolling** 13:14

**tomorrow** 64:3 68:7

**tone** 103:4

**top** 33:18 60:24 63:4 80:9 82:3 114:2 115:12 123:12 141:15 148:1 175:12 186:21 187:16 204:17,18 211:7 239:14 248:11 252:13 284:14 293:9 296:12 318:15 328:5

**topic** 49:12,18

**totally** 100:9

**track** 135:23

**tracking** 76:4,5 258:5

**tracks** 75:4

**trade** 77:20 78:24

**traded** 246:20

**trader** 291:1

**traders** 247:6,7

**trading** 7:8 78:20 290:10

**train** 168:18

**training** 32:11

**trajectory** 170:11 338:14

**transaction** 18:25

**transcript** 8:19 9:4 338:19

**transcriptase** 31:2

**transferring** 82:19

**transition** 167:2

**translate** 82:20 83:4,6

**translated** 83:10

**translates** 82:14 83:2

**translating** 139:24

**transport** 133:7 285:17

**transported** 54:4 133:17

**traps** 24:2

**travel** 140:22

**treasure** 121:14

**tremendous** 325:7

**trials** 100:2

**Trib** 308:12

**Tribune** 154:5 158:24 159:2,3,4,16 180:2,5 181:2,20 182:5,14 184:12 185:20 191:13 192:17 203:19 210:25 211:12,16 212:14 228:14 234:8,18 244:5 256:24 283:20 287:20,21 289:14,18 293:13,15 310:3 320:11 327:1 328:10

**Tribune's** 294:7,9

**Tribune-related** 206:5

**trigger** 176:12

**trip** 300:3

**tripled** 173:11

**trivial** 89:9 90:12

**tropical** 26:25

**trouble** 120:9 130:10 299:20,21

**true** 53:5,9 69:7 128:15 267:6 274:6,7

**tube** 199:2

**tuberculosis** 24:11 120:8

**Turks** 332:7,11,15,19,23,24

**turn** 117:25 172:23 265:5 321:22

**turns** 31:3

**two-and-a-half-million-fold** 201:12

**Tyler** 7:4

**type** 57:10 88:21 91:21 115:23 131:6 134:11 139:2 183:9 228:5 235:9 258:12 300:18

**types** 36:14 52:25 112:5 234:25 313:11

**typically** 42:2 70:20 93:13,16 213:5 228:5 238:4

---

**U**

**U.S.** 7:10 32:2,6 38:14 57:19 92:20 104:15 192:25 209:2 211:17 229:1 245:15,16 268:16

**U.s.-based** 118:19

**UA** 104:21

**uh-huh** 20:11,23 31:15 36:4 46:16 47:15 50:7 51:1 54:15 55:10 57:25 60:23 61:10 63:11 67:8 72:11 79:14 93:12 103:1,12,18 104:14,18 106:2 108:5,16 110:10 113:17 122:16,25 123:9,20 124:4,10,24 136:7 142:22 143:16 160:18 161:23 170:25 171:4 174:4 175:20 182:23,25 183:13 187:15 188:2,13 191:10 200:1 205:1 209:20 211:8 212:4 213:14 214:14,21 215:18 223:5 238:21 239:22 241:2 243:7,13,15 253:2 261:1 265:9,23 266:8 267:5 268:23 279:2,24 283:25 285:11 286:14 296:16 299:6 306:23 308:20 319:2 325:1 326:2 327:20 333:11

**ul** 80:5

**ulterior** 156:6 300:21

**ultimate** 315:4

**ultimately** 48:18 59:15 119:20,25 309:14

**umbrage** 118:6

**unassailable** 118:20

**unbiased** 205:20

**unclear** 223:2 255:10

**undergo** 235:9

**underpinning** 37:2 237:5 288:11

**underreported** 263:17

**underscoring** 308:15

**understand** 14:9 22:21 36:7 38:12 40:13,14 42:21,23 43:19 44:12,20 50:8,10 53:20 81:9 83:4,23 84:13 85:17 89:15,17 113:5 135:7 142:16 153:19 168:16 175:8 182:13 197:20, 21 201:14,23,24 212:2 267:12,17 269:3 287:7 294:3 316:5

**understanding** 24:1 29:2 38:17 40:12 41:3,14,21,23 42:17 53:22 138:25 178:2,6 212:19

**understood** 9:1 24:8 26:10 85:10 91:22 112:1 195:12 197:22 208:16 234:11 239:2

**undertaken** 255:17

**undertaking** 89:9 258:2 334:22

**unfair** 189:8

**unfreeze** 324:18

**uninterested** 205:20

**Union** 25:15 33:14,22 95:17 137:23 192:24 193:8

**unique** 33:3,7 250:4,6 251:9

**unit** 21:16

**United** 31:22 32:1 57:12,21 58:9 90:6 91:24 121:25 134:5 276:12 292:16 323:23

**University** 169:8 175:17 295:21

**unknowns** 142:14

**unleashed** 199:6

**unnecessary** 261:11

**unpacking** 229:25

**unreliable** 118:24

**unsatisfied** 19:14

**untrue** 189:8

**upcoming** 282:2

**update** 64:3 188:16 206:11,15,20,22, 23 207:9,11 258:1 266:22

**updated** 188:16 258:3

**updates** 248:24

**upset** 153:12

**urge** 142:15 176:9

**urgent** 186:5

**Utah** 7:10 19:17,24 20:10 102:5 132:7,12,19,23,25 141:19 142:4,6 148:6,19 149:1 151:9,17 152:25 153:6,7,12,14 155:21 156:25 157:4 161:8 169:4 171:7,9 179:21 190:7 204:22 205:2,19 282:12,14,19,25 283:22 285:6 286:13 288:1 292:15,23 294:25 295:7,21 296:2 310:11,22,23 311:5 327:2

**Utah's** 160:10 283:9 284:3

**Utahns** 161:20

**UTC** 212:16,21

**utilize** 22:17 235:24

**utilizes** 23:9

**utilizing** 23:15 30:16 38:5

**utter** 291:19

---

**V**

---

**V-E-R-O-S** 114:17

**vacuum** 127:3

**Vadodara** 121:1,2

**vague** 10:20 11:2 12:15 16:4 17:16 22:14 25:3,24 31:6 48:19 72:17 76:23 81:17 83:22 88:5 90:1 92:24 100:25 246:2 286:1 328:19 334:1

**vaguely** 91:15 246:10 285:3 291:3 326:16

**valid** 73:2,6 120:10 151:15 273:11,12 300:17

**validate** 128:20 139:5 236:8,18 237:11 283:8

**validated** 42:3 95:7 137:1 283:4 303:22

**validating** 89:18 95:11 236:2 297:16

**validation** 51:10,12 67:22 80:23 88:22 91:6 92:6 95:18 101:5 127:4 131:2 137:20 138:16 139:1,25 182:24 183:3 193:13,25 194:2,9,20 195:8 196:22 215:15,20,21 221:12,19 229:7 233:21 235:2 236:11 241:1,5,6,18,23 245:16 262:2 279:20,22 282:10,25 283:9 284:3 299:14 302:1,11,19 303:5,6,16,17 319:22 327:2

**validations** 33:1 44:4 83:16 120:1 157:11 244:21 302:18

**validity** 244:13 320:13

**Valley** 102:8 153:16 155:23 292:4 293:6,7

**variables** 153:10 223:14 290:4 323:16

**variance** 176:15 190:9

**vast** 218:18

**vector** 22:3

**vendetta** 300:21

**venture** 24:21 120:20,24 121:10,19 329:19 330:9 331:18

**venue** 133:8 282:23

**veracity** 157:11 192:17 195:4 304:14

**verbal** 9:3 134:10

**verification** 63:14,16,17,23 88:18 89:18 90:4,8 91:7 92:6 101:5 131:2 137:20 139:25

**verifications** 44:4 157:11

**verified** 43:18 69:15,20,22,23 87:25 88:2,20

**verify** 128:20 130:9

**verifying** 63:21

**vernacular** 111:25 225:4 239:1

**version** 47:21 48:2 86:22 87:3,4 88:13 103:19 209:18 211:10 217:12 296:21

**versions** 38:23

**versus** 7:8 38:24 39:1 51:18 304:18 338:15

**vet** 258:19,20

**video** 7:6

**view** 33:2,6 101:4 129:9 158:13

165:17 177:13 202:21 262:20 327:5

**viewpoint** 89:12 201:8 270:25

**vigorous** 179:17

**Vikram** 121:15

**viral** 40:21 41:7 45:15 176:14

**virulent** 97:3

**virus** 23:13 30:16,25 39:12 40:17 41:7 43:2 139:13,15 223:10 224:9

**viruses** 22:2 69:4,12 138:5 139:8 316:22

**visible** 79:21 118:3

**vitro** 25:8 36:3,6 111:2 193:7

**volatile** 78:16,18 246:5,6,23 250:21

**volatility** 78:13 247:5 326:17

**volume** 136:13 158:7,14,16

**vortex** 257:6

**W**

**wag** 233:17 313:14

**wait** 76:10 109:9 148:15

**waiting** 194:24

**walk** 23:6 88:10 192:15 210:19

**walls** 249:11

**wanted** 30:22 31:16 38:3,11 48:2 65:16 85:20 87:14,19,23 90:20 138:7 139:11 164:15,19 165:2 166:17 168:8 183:5 185:13 189:15 206:24 209:14 212:21 250:18 252:5 254:1 270:12 271:19 272:16 290:21 295:18 320:10, 12 331:15,24

**wanting** 71:20 189:1 207:20 247:14, 15 270:11 271:14 305:2

**warm** 140:23 324:16

**warrants** 47:3

**wary** 116:12

**was.'** 70:3

**Washburn** 7:15 28:12,21 66:12,16 150:7,10,15,18,24 151:4,10,15,20,25 172:2,21

**Washington** 305:25 306:6,9

**watched** 331:10

**water** 185:17 284:11

**ways** 180:15 253:19

**wealth** 121:14

**Webb** 46:14,17,23 60:20 113:1 115:1 159:15 191:8,19 199:20 200:12 210:23 212:11 297:11 305:20

**Webb's** 116:21

**website** 48:21 75:22 93:5 94:8,11 107:21 174:12 198:14 245:4

**weeds** 213:12

**week** 26:23 65:9 72:7 161:18 173:17 288:2 314:25 315:9

**weeks** 20:5,7 101:12 336:17

**weigh** 178:12

**weighed** 70:25

**weighing** 90:24

**weird** 256:19

**Wells** 13:6

**West** 23:13 153:16 155:23 292:3 293:6,7

**whatsoever** 89:10 103:23 113:25

**white** 108:13 153:4 162:24 163:12,22 171:2,14,16,17,19 286:8 293:3

**Whittwer** 169:3

**whoa** 126:14 152:9 200:22

**wide** 176:15 193:7 219:23 316:23

**widely** 292:10

**Wisconsin** 136:8,9

**withdraw** 34:7 281:13

**witness'** 86:2,14 258:23 260:5 263:13 264:8

**won** 208:25

**wondering** 314:15,17 328:7,8

**word** 88:16 110:7 207:7 214:17,18 215:5 217:23,24 221:2,3 297:18

**words** 132:13 168:11,13 184:10 196:5,14 215:10 232:14 277:10 294:8

**wordsmithing** 228:19

**work** 14:2 16:1 23:2,22 32:13,14,24 35:7 53:19 96:12 97:12 100:18 138:18 163:25 168:25 170:14 246:14 257:22, 24 260:9 271:7

**worked** 34:21 46:18 97:6 155:25 252:24 253:14

**workflow** 63:15

**working** 57:18 63:22 69:23 72:3,22 97:10 98:21 103:6 109:10 124:11 188:22 212:13 213:2 228:3 253:18 255:6,13 256:16,23 257:14 258:10 259:8 261:4 262:19 263:7,23 264:1, 13,16,17 265:25 271:3,8,9 272:21 300:8 328:2

**works** 56:17 141:25 330:13

**world** 24:24 28:16 38:3,10 65:14 72:19 82:14,20 83:5 87:13,16 96:12, 23,25 103:6 107:17 111:3 112:12 119:12 121:6 128:19 134:5 140:9 154:4 157:19 184:20 185:2 218:14 237:16 245:3 250:24 299:22 313:13 323:24 334:23

**worried** 204:2 206:3

**worry** 161:9,11

**worse** 119:14 179:25

**worst** 197:4 291:15,18

**worth** 173:18

**worthy** 322:23

**Wow** 88:17

**write** 64:2 80:12 162:24 197:12 267:11,23 273:9 276:19

**writes** 47:13 61:1,21,22 68:5 69:25 80:3 113:1 114:24 116:10 123:17 142:5,9 159:21 187:21 204:11 208:18 211:21 213:7,10,16 248:18,23 266:20 315:12

**writing** 13:9 18:6 108:14 113:21 191:24 192:2,6 255:5 268:1

**written** 109:5 167:8 183:10 191:21 305:25

**wrong** 27:17 50:1 150:25 151:1 211:3 273:1 276:16

**wrongfully** 122:20

**wrote** 163:1 175:16,24 191:25 194:17 204:13

**Wuhan** 137:9

**Wyllie** 169:8

### X

**Xpert** 318:21

**Xpress** 318:21

### Y

**Yahoo** 65:4

**Yale** 169:9

**year** 12:7 27:15 28:13,19 59:23 60:1 164:11,12 166:4

**years** 208:14 240:24 288:24 321:8,10 329:20 330:5

**York** 70:24 330:22

**Yorker** 296:21

**young** 292:18

**younger** 190:7

### Z

**Zachary** 7:19

**zealously** 251:4

**Zika** 22:4,22 24:10 35:2

**Zoom** 188:4,6