# Exhibit 20

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION
CASE NO.: 2:20-cv-00368-CMR

GELT TRADING, LTD., a Cayman
Islands limited company,

                    Plaintiff,

v.

CO-DIAGNOSTICS, INC., a Utah
Corporation, DWIGHT EGAN, JAMES
NELSON, EUGENE DURENARD, EDWARD
MURPHY, RICHARD SERBIN, REED
BENSON, BRENT SATTERFIELD,

                    Defendants.
_____/

VIDEOTAPED REMOTE
DEPOSITION OF
ANDREW BENSON

April 18, 2023
9:00 a.m. to 4:53 p.m.

Reported By:
Maria C. Powers, Florida Stenographic Reporter
Signature Court Reporting, a Veritext Company
Job #5858446

Page 2

APPEARANCES:

On behalf of the Plaintiff:
MICHAEL A. PINEIRO, ESQ.
BRANDON S. FLOCH, ESQ.
MARCUS NEIMAN RASHBAUM & PINEIRO, LLP
   2 South Biscayne Boulevard
   Suite 2530
   Miami, Florida 33131
   E-mail: Mpineiro@mnrlawfirm.com
     Bfloch@mnrlawfirm.com

On behalf of the Defendants:
MARISSA A. PEIRSOL, ESQ.
RACHEL L. ELWOOD, ESQ.
BAKER & HOSTETLER LLP
   200 S. Civic Center Drive
   #1200
   Columbus, Ohio 43215
   E-mail:  Mpeirsol@bakerlaw.com
   E-mail:  Relwood@bakerlaw.com
ALSO PRESENT:  Michael Fasano, Esq.

Page 4

PLAINTIFF'S EXHIBITS (CONTINUED)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | E-mails | 208 |
| Exhibit 24 | E-mail | 216 |
| Exhibit 25 | E-mail, 5/4/20 | 225 |
| Exhibit 26 | Article | 229 |
| Exhibit 27 | E-mail, 5/14/20 | 233 |
| Exhibit 28 | E-mails | 236 |
| Exhibit 29 | E-mail, 5/6/20 | 246 |
| Exhibit 30 | E-mail, 5/20/20 | 247 |
| Exhibit 31 | E-mail, 9/16/20 | 249 |
| Exhibit 32 | E-mail, 9/17/20 | 253 |
| Exhibit 33 | Article | 256 |
| Exhibit 34 | E-mail, 9/2/20 | 257 |

Page 3

INDEX OF PROCEEDINGS

WITNESS        DIRECT

ANDREW BENSON

By Mr. Pineiro    6

- - -

PLAINTIFF'S EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mails | 43 |
| Exhibit 2 | Press Release, 1/23/20 | 49 |
| Exhibit 3 | E-mails | 51 |
| Exhibit 4 | FAQ Sheet | 61 |
| Exhibit 5 | E-mails | 69 |
| Exhibit 6 | E-mails | 72 |
| Exhibit 7 | Preventative & Corrective Action Plan | 75 |
| Exhibit 8 | E-mails | 85 |
| Exhibit 9 | (skipped) | |
| Exhibit 10 | E-mails | 88 |
| Exhibit 11 | E-mails | 93 |
| Exhibit 12 | E-mails | 99 |
| Exhibit 13 | E-mails | 102 |
| Exhibit 14 | E-mails | 114 |
| Exhibit 15 | E-mails | 119 |
| Exhibit 16 | E-mails w/attachment | 121 |
| Exhibit 17 | E-mails | 135 |
| Exhibit 18 | E-mails | 136 |
| Exhibit 19 | E-mails | 147 |
| Exhibit 20 | E-mails | 156 |
| Exhibit 21 | Press Release | 164 |
| Exhibit 22 | E-mail, 5/1/20 | 198 |

Page 5

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER:  Good morning.  We are on the record at 9:00 a.m. Mountain Time, on April 18, 2023. Please note that this deposition is being conducted virtually.  The quality of recording depends on quality of camera and Internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded of Andrew Benson, in the matter Gelt Trading Limited, a Cayman Islands limited company versus Co-Diagnostics, a Utah Corporation, et al., filed in the United States District Court, District of Utah Central Division, Case Number:  20-CV-00368-CMR.

This deposition is being conducted remotely using virtual technology.  My name is Jacqueline Tetenbaum from Veritext Legal Solutions, and I'm the videographer.  The court reporter is Maria Powers from the firm Veritext Legal Solutions.

I am not related to any party in this action nor

2 (Pages 2 - 5)

Page 6

am I financially interested in the outcome. If there any objections proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. PINEIRO: Yes. Michael Pineiro and Brandon Floch of Marcus, Neiman, Rashbaum and Pineiro, on behalf of the Plaintiffs.

MS. PEIRSOL: You have Marissa Peirsol and also joined by Rachel Elwood from Baker Hostetler on behalf of Defendants.

BY MR. PINEIRO:

Q. Good morning, can you please state your name for the record.

A. Andrew Benson.

Q. So I'll go through some quick ground rules. I'm going to be asking you a series of questions, as you know. Your counsel may object.

When she objects, after she's done with her objection, you can answer the question, unless she's instructing you not to answer for some reason.

I'll do my best to let your get your answers out before I ask my next question. Similarly, if you sort of know where I'm going with a question, let me just finish

Page 7

the question, for purposes of the transcript, and then provide your answer.

Also, just verbal answers. Nodding doesn't suffice since we have a court reporter here. And, if you need a bathroom break or just to take a break in general, please let me know. And, as the deposition progresses, we'll figure out lunch and all that; does that make sense?

A. Yes.

Q. Okay. Have you ever been arrested, sir?

A. No.

Q. Have you ever been criminally charged?

A. No.

Q. Have you ever been the defendant of a civil lawsuit?

A. No.

Q. Have you ever been a defendant in a regulatory or administrative proceeding?

A. I don't believe so.

Q. Why are you confused about that?

A. I answered questions with -- I gave testimony to the SEC, but I don't know if that qualifies as me being the defendant. I'm not sure what that legal terminology would be, so --

Q. When did you provide that testimony?

Page 8

A. 2021.

Q. Were you under oath?

A. Yes.

Q. Okay. And did you have counsel present?

A. I did.

Q. Do you remember the name of the SEC lawyer who questioned you?

A. I do not.

Q. And did it pertain Co-Diagnostics?

A. Yes.

Q. Did it pertain to the May 1, 2020 press release at issue in this proceeding?

A. I believe that was mentioned but that was not the focus.

Q. Okay. What was the focus?

A. I can't remember. It was several hours of testimony and that was one part of it, not -- there was a wide-ranging series of questions asked.

Q. Okay. Do you have any recollection of what some of the areas of questioning were?

A. Barely. It was two years ago. They'd asked a series of questions about various e-mails and press releases and things.

Q. Okay. Do you recall which -- besides the May 1, 2020 press releases, do you recall any other press

Page 9

releases that they asked you about?

A. I don't remember which ones specifically.

Q. Is that investigation -- to your knowledge, is that investigation still ongoing?

A. I understand that it is.

Q. And have you been listed -- have been you notified that you're a potential -- strike that.

Have you been notified that charges may be filed against you?

MS. PEIRSOL: Objection. Objection. To the extent that you can answer, Mr. Benson, without revealing any attorney-client privilege, you can answer; otherwise, I instruct you not to answer.

THE WITNESS: Yeah, anything that I would know would have been something I know from counsel.

BY MR. PINEIRO:

Q. Have you seen any correspondence from the SEC regarding what -- regarding potential charges against you?

A. I haven't.

Q. Have you spoken to any SEC lawyer about potential charges against you?

A. No.

Q. Besides you, do you know if anyone else, any other Co-Diagnostic employees or executives have been

3 (Pages 6 - 9)

Page 10

examined by the SEC in that investigation?

MS. PEIRSOL: Objection. To the extent you can answer that question, Mr. Benson, without revealing attorney-client privilege, you can answer; otherwise, I instruct you not to answer.

THE WITNESS: Again, yeah, I only know what -- we have a policy to not discuss it. So I only know what I've learned from counsel. I think that would be privileged.

BY MR. PINEIRO:

Q. What is that policy you just referred to?

A. Just to only speak about these things with counsel and not with other employees.

Q. Besides this SEC investigation we've been discussing, have you been the subject of any other government or regulatory proceeding?

A. No.

MS. PEIRSOL: Again, Mr. Benson, to the extent that you have to reveal any attorney-client privileged information, I instruct you not to answer; otherwise, you could go ahead and answer.

THE WITNESS: No, not that I'm aware of.

BY MR. PINEIRO:

Q. Do you have a college degree, sir?

A. I do.

Page 11

Q. Where did you graduate from?

A. I have a bachelor of arts from the University of Utah, and I have a master of philosophy from the University of Cambridge.

Q. What was your bachelor's of arts in?

A. Linguistics.

Q. You said you had a master's from the University of Cambridge in philosophy?

A. Master of philosophy.

Q. When did you get your BA -- when did you receive your BA?

A. 2004.

Q. And your master's?

A. 2005.

Q. Okay. Besides that, any, I guess, postgraduate certifications or licenses?

A. No, no further education beyond that.

Q. Okay. Do you have -- do you have any securities licenses?

A. Not currently.

Q. Did you have one?

A. I did.

Q. Which one did you have?

A. Series 7.

Q. When did you obtain the Series 7?

Page 12

A. 2006.

Q. Okay. And you obtained that in connection with employment in the securities industry?

A. Yes.

Q. And you've indicated you no longer have that; that is an inactive license?

A. That is correct.

Q. When did you let that lapse?

A. I believe it lapses on an annual basis if you don't renew and I only used it -- I only worked for a brokerage firm for a short period of time, and it was never renewed.

Q. Do you recall when that would have been?

A. I don't.

Q. Okay. Now, in terms of lapsing, did it lapse voluntarily or did it lapse involuntarily?

A. I chose to not renew it.

Q. Okay. Were you the subject of any FINRA proceedings?

A. No.

Q. Why did you choose not to renew it?

A. I was no longer working in the securities industry. I was not sponsored by a firm.

Q. Are you currently employed at Co-Diagnostics?

A. I am.

Page 13

Q. Just for ease of reference, I'll refer to it also as "CODX".

A. Okay.

Q. What's your current position at CODX?

A. Head of corporate communications.

MR. PINEIRO: And, Ms. Court Reporter, the abbreviation is CODX, when I refer to CODX. It will be C-O-D-X.

BY MR. PINEIRO:

Q. Did your title change, sir? When you first started at the company, what was your initial role?

A. My initial role at Co-Diagnostics was in an operational capacity.

Q. Did that role have a title or name?

A. Nominally, head of operations.

Q. And then eventually did you switch over to dealing with marketing and communications for the company?

A. I did.

Q. When was that?

A. I can't recall exactly, maybe 2016 or so.

Q. Before that, did you have any experience in handling investor relations or corporate communications?

A. I had previously worked in -- previously worked in venture capital, where I had dealings with high-net

4 (Pages 10 - 13)

Page 14

worth investors and communicating with them.

Q. Okay. Was your title previously "head of investor relations" at any point in time?

A. I believe so, yes.

Q. Do you know when the name of your title changed to head of corporate communications?

A. I can't recall exactly, 2019, 2020. I don't know exactly when.

Q. Do you know why that title changed?

A. Yes.

Q. Why is that?

A. I was involved in not just investor relations but also public relations as well, and so it was more of an overarching umbrella term to cover both roles.

Q. Got it. Can you describe your responsibilities in your current position.

A. Sure. As head of corporate communications, I work with management to help to oversee that the messaging that is conveyed to the public and done so in a way that it is accurate and comprehensive and aligns with management expectations for the communications.

Q. Got it. So within your role, it does include communication and outreach with investors within the company?

A. Yes.

Page 15

Q. So you indicated that you graduated in 2005 with your master's.

What did you do -- did you work somewhere after that?

A. I did, yes.

Q. Where was that?

A. I worked at KPMG in the Bay area in 2004, January to, I don't know, July or so 2006.

Q. What did you do at KPMG?

A. I worked for international executive services. I assisted the employees of client companies in the United States in tax preparation.

Q. Okay. And did you have any tax preparation background?

A. Sure didn't.

Q. Is there a reason why you were doing that then?

A. I wanted to move into -- I don't know, I was fortunate enough to get a job at KPMG and took the opportunity.

Q. Got it. And then you left in 2006 you said?

A. Correct.

Q. What did you do next?

A. That is when I studied for and received my Series 7, and, again, working for a boutique brokerage firm in Salt Lake City.

Page 16

Q. What's the name of that firm?

A. Cambria Capital.

Q. Can you spell that?

A. C-A-M-B-R-I-A Capital.

Q. Okay. What was your role at Cambria Capital?

A. Just sort of junior associate, I suppose. Registered agent. I can't recall exactly.

Q. And what's the business of this firm?

A. It's a boutique brokerage firm, investment banking firm.

Q. It's based out of Salt Lake?

A. Correct.

Q. So did you work with clients in processing trades?

A. On occasion, yes.

Q. What were the main type of things that you did in your role of junior associate?

A. That was primarily working with the clients that the more senior associates didn't have time to work with. So they had a little bit of work on their plates, so I would help to manage some of those clients.

Q. Did Cambria Capital engage in cold-call solicitation?

A. No.

Q. Where were most -- who comprised most of the

Page 17

clients? Was it institutional? Was it individuals?

A. I can't recall exactly. A mix of both.

Q. Is that firm still in existence?

A. I believe so.

Q. And how long were you there sir, at Cambria Capital?

A. Seven or eight months.

Q. Okay. And why did you leave so soon?

A. I had an opportunity to -- to move on to a different role.

Q. Where did you move on to?

A. I moved Barcelona, Spain to help to oversee the operations of a venture capital operation.

Q. What company is that?

A. Legends Capital.

Q. So you started there around 2007?

A. Yes.

Q. What is Legends Capital? Is it a venture capital firm?

A. It was. I don't believe it is still operating.

Q. Was your father affiliated with that firm?

A. At certain times, he was.

Q. At the time you went to go work there, was he affiliated?

A. I'm not sure.

5 (Pages 14 - 17)

Page 18

Q. Okay. When he had been affiliated, in what capacity was it? Is he an owner? Manager?

A. I don't know exactly what his participation in the LLC is. It's an LLC and I don't know if he's owner or manager. I don't really know exactly what his involvement is there.

Q. Do you know whether your father has an ownership interest in that company?

A. Again, I don't know whether he has an ownership in that LLC or not.

Q. Okay. Do you know who the owners of that company are?

A. I know at least one of them is, but, beyond that, I don't know.

Q. Who is that?

A. Pardon me?

Q. Who is the person that you know is an owner?

A. Len Briggs.

Q. How many employee are at Legends Capital?

A. I don't know. Like I said, I don't know if it's still operating.

Q. No, no, when you were there. I'm sorry. Strike my question.

For how many years or how much time were you at Legends Capital?

Page 19

A. I was working overseas in 2006 -- 2007 is when I started. I returned and repatriated in 2014, continued working for Legends another year or two. So I would say another 10 or 11 years.

The operations that I was working for in Spain were not directly owned by Legends Capital. But there any number of employees that worked there, I can't recall exactly how many, anywhere from 10 to 15. And the U.S. operation was, I don't know exactly, maybe five or six. I can't recall. It's been a while.

Q. You said you worked for organizations that may have been owned by Legends; so did your work Legends Capital, LLC or did you work for affiliates of it?

A. I considered Legends Capital to be my employer, although as far as my payroll was concerned, I was paid from a Spanish entity.

Q. Do you know the name of that company?

A. Oh, Portfolio Advisory Associates.

Q. Was that company wholly owned by Legends Capital?

A. I don't believe so, no.

Q. What was the relationship between that company and Legends Capital?

A. Like I said, Legends Capital was the -- was the entity that was involved in the decision making. The

Page 20

Spanish entity was one that was there primarily to facilitate, you know, having employees in Spain and paying payroll and operations. And it was directed by the directors -- by the director of Legends Capital.

Q. What was your -- what were your job responsibilities while you were working with Legends?

A. When I was in Barcelona, I was helping to manage the operations and facilitate communication between the back office and the front office, helping to -- working with the clients to ensure that communications with the high-net worth individuals that were involved in the private equity, make sure they were provided with accurate information and everybody was just running more or less smoothly.

Q. Got it. And what kind of business operations did Legends Capital have in Spain?

A. Like I said, Legends Capital had no initial operations in Spain. It was a Spanish entity. It was -- Legends Capital was providing private equity funding for pre-IPO companies through a network of high-net worth creditor investors.

Q. Was the goal of these investments that the companies would eventually IPO?

A. That was the expectation.

Q. Okay.

Page 21

A. An IPO or an acquisition.

Q. Is Mr. Briggs -- are you still friendly with Mr. Briggs?

A. I am.

Q. Okay. How often do you see him?

A. Very rarely.

Q. Is he an investor in CODX?

A. I don't know.

Q. Was Legends Capital an investor in CODX?

A. I believe so.

Q. Was it one of the larger initial investors?

A. Yes, Legends Capital was involved in providing some of the seed capital in early stages of CODX.

Q. Were you still with Legends Capital when it was providing seed capital to Co-Diagnostics?

A. Yes, I was.

Q. How big was -- in terms of its assets under management or in terms of assets, how big was Legends or --

A. I don't know. You'd have to speak to somebody in Legends.

Q. What about when you were there, do you have any knowledge?

A. Legends didn't have assets under management, per se. All of the venture capital, private equity that was

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

Page 22

provided was not managed by Legends Capital --

Q. Understood. To put it more accurately, do you know how much it was investing on an annual basis?

A. I don't.

Q. Were there -- to your knowledge, have there ever been allegations that Legends Capital operated as a boiler room?

A. That Legends Capital is operated as a boiler room? Not to my knowledge.

Q. Or that it is engaged in pump-and-dump schemes?

A. I cannot think of any specific allegations that would allege such a thing.

Q. Do you have any general knowledge of that?

A. There were some -- I can think of one article that was on -- from a noted stock short that -- that made claim something in that vein, sometime around 2020. But I don't remember exactly where it came from.

Q. Got it. Which was that stock short?

A. I can't remember exactly what it is. It was -- I can't remember the name of it. It was something that was funded by Mark Cuban, who had a history of having -- commissioning articles to be written about companies that he would then take a short position. He was on record that that that was the case. I'm not speaking out of turn there.

Page 23

Q. Got it. Are you familiar with a gentleman named Brian Kragen?

A. No.

Q. Do you know if Legends still operates?

A. I don't believe that it does but I don't know.

Q. You mentioned that Legends provided seed capital to CODX, correct?

A. Yes.

Q. Were you involved in Legends' decision to deploy capital to that company?

A. I was not.

Q. Who was involved in making that decision?

A. I don't know. Mr. Briggs is the only one I know for sure, but beyond that, I don't know.

Q. Was Reed Benson at CODX when the decision was made by Legends to provide CODX with seed capital?

A. No.

Q. He was still at Legends?

A. Correct, to the best of any knowledge. I don't know. I was Barcelona at the time, so --

Q. Have you ever heard a firm called "MB Financial Advisory AG"?

A. Yes, yes.

Q. Did you ever work for them?

A. I didn't work for them.

Page 24

Q. Okay. Did you have a relationship with that firm in any way?

A. Yes. But not me, personally. Yes, I had involvement with them.

Q. What was your involvement with them?

A. That was a Swiss entity that Legends Capital had used as -- it was being used to provide the framework for assisting in raising the venture capital for companies.

Q. How did it assist with raising venture capital?

A. I don't really know. It was -- it was the -- it was run by -- or it was a Swiss financial advisory firm. And I don't really know exactly what the corporate structure was that allowed them to do that, other than that was the umbrella that the capital was raised under.

Q. Have you ever heard of First Swiss Management AG?

A. Yes. Yes, I have.

Q. And what is that company?

A. I think it was the same thing. It was a previous Swiss entity that had been used.

Q. So also used by Legends Capital?

A. Sure, yes.

Q. And these Swiss entities, were they involved in, you know, soliciting -- strike that.

Were these Swiss entities involved in placing

Page 25

cold calls to potential investors?

A. I don't know.

Q. Do you know whether Legends Capital was involved in placing cold calls to investors in -- to prospective investors regarding shares in the company, in companies in which they had invested?

A. I don't believe that they were. If they were, I never saw it. I would not be aware of it.

Q. So how is it that you came to join Co-Diagnostics?

A. As mentioned, I was working with Legends Capital. I met the founder of Co-Diagnostics, Dr. Satterfield in 2015, I believe -- 2014. And he mentioned that he needed some help running operations. And he knew that I had previously been running operations in Barcelona and nominally had some ops experience, and asked if I would be interested in assisting to run some operations on a part-time basis.

Q. Got it. You met Satterfield you said in '14 or '15?

A. It was in 2014.

Q. That's when you were at Legends still?

A. I was, yes.

Q. Before that, had you been discussing working for CODX for Dwight Egan?

7 (Pages 22 - 25)

Page 26

A. No.

Q. What capacity did you meet with Mr. Satterfield?

A. He was giving a presentation and Legends Capital was in attendance.

Q. So, again, I think you said that you started working at CODX in 2016?

A. No. I'm sorry. I may have had that wrong. I would have started with them in 2014. Sorry.

Q. Got it. Do you know how long the company had been operating at the time that you joined them?

A. It was founded in 2013, so roughly a year, give or take.

Q. Okay. So you said initially you were the head of operations of the company?

A. Yes.

Q. What responsibilities did that entail?

A. Dr. Satterfield had wanted somebody to help run the day-to-day, so he could focus on the science. I, in turn, was involved in helping to just ensure that those day-to-day sundries that needed to be taken care of were being managed. That included everything from communicating with the India lead, to, you know, communicate everything that was happening on the U.S. side, assisting with logistics, assisting with the quality system as it was being implemented and just

Page 27

regular operations of an organization.

Q. Got it. At that time, was your father was your father working as the general counsel and CFO of the company?

A. I don't know if he was at the time. At some point, he was. I don't know when that began exactly. I believe it was after that but I'm not sure.

Q. You mentioned "India lead," what did you mean by that?

A. Co-Diagnostics had relationships with distributors and medical establishments in Indian to assist in the validation of Co-Diagnostics' technologies and tests.

Q. So it had a distributor in India assisting in the distribution -- validation and distribution?

A. Yeah, I mean, it was technically a distributor, although no tests were being sold or distributed at that time. They were helping Co-Diagnostics to -- to test its product, tuberculosis tests in India.

Q. What does it mean to validate a test?

A. It could mean various things. It depends on what you're asking specifically.

Q. Okay. What are possible meanings of that?

A. Validation? I'm not sure -- as you know, from my background, I'm not a laboratory technician or

Page 28

scientist. I could only go based on what our scientists provide to me.

But you could use validation in a more colloquial sense, just as you or I would use it, just, like, confirming that something works, and it was in that sense that I meant it.

The test would be manufactured and developed in the U.S. but then in order to test it on samples, we would send the test to India to have it -- to have it tested on tuberculosis samples.

Q. Is there a reason why that couldn't be done in the U.S.?

A. It's much easier to send an IVD than it is to send a live tuberculosis sample, which requires much more regulations and things. It's just easier to send the tests there than the samples here.

Q. So you had never -- before starting at Co-Diagnostics, you had never had any experience in the biotech field; is that right?

A. That's right.

Q. Was there any concern that you didn't have that background when you started that position?

A. No.

Q. Who made the decision to hire you, was it Mr. Egan or Mr. Satterfield?

Page 29

A. Doctor Satterfield.

Q. Was he the CEO?

A. He was not.

Q. Did he have the authority to hire you?

A. He did.

Q. Did Mr. Egan participate in that decision?

A. Not that I'm aware of.

Q. Was he the CEO at that time?

A. He was.

Q. Did you interview in connection with obtaining that position?

A. I did not.

Q. Do you recall when CODX had its initial public offering?

A. I do.

Q. Do you know when that was?

A. I do, yes.

Q. And --

A. Sorry. Pardon me.

Q. I apologize. I interrupted you.

A. That's okay.

Q. Did it happen July 2017?

A. It did.

Q. Before that, do you know how the company was financing its operations?

8 (Pages 26 - 29)

Page 30

A. Through Venture funding.

Q. That's through the venture funding from Legends Capital?

A. I believe so, yes.

Q. Do you know how much Legends Capital invested in CODX before the IPO?

A. I don't.

Q. Besides Legends -- Legends' investment, were there any other venture capital funds that invested in CODX before the IPO?

A. I believe there was some bridge financing at some point, but I don't recall exactly when or through what institution.

Q. Do you know the amount of the bridge financing?

A. No, I don't recall.

Q. Are you familiar with an attorney called Hugh O'Neill?

A. Yes, I am.

Q. Who is Mr. O'Neill?

A. He's an attorney that worked with Legends Capital in their legal affairs.

Q. Okay. Is he based out of the Turks and Caicos?

A. I believe so, as far as I know.

Q. Okay. And the entity that actually invested in -- that invested the funds in Legends Capital and

Page 31

CODX, was it based out of Turks and Caicos?

A. Sorry. Can you restate the question? I'm not sure exactly --

Q. Yeah, sure. You had indicated that Legends, you know, invested in Co-Diagnostics, and I wanted to know whether there was an affiliate of Legends based out of Turks and Caicos that was the entity that actually made any investing in CODX.

A. Right. So the venture funding was actually made into -- venture capital was paid into an entity -- a Turks and Caicos entity and then it was that entity that in turn -- it was that entity that in turn funded the operation into Co-Diagnostics, correct.

Q. What was the name of that -- what was the name of the Turks and Caicos entity?

A. I believe it was Co-Diagnostics Limited.

Q. So Co-Diagnostics Limited is the one that actually received venture funding, which was then used to finance the operations of CODX?

A. I understand that to be the case.

Q. Do you know who was the owner or manager of Co-Diagnostics, Ltd?

A. I think it was Hugh O'Neill but I don't know.

Q. Is he the owner or manager of Legends Capital?

A. I don't believe so.

Page 32

Q. One quick question. I apologize. I know we're in a video deposition.

Is there anybody present with you in the room?

A. There is not.

Q. Okay. Do you have any notes around you?

A. Nothing.

Q. Were you at all involved -- pre-IPO, were you at all involved in assisting the company in obtaining financing?

A. No, beyond all those operational roles, but that's it.

Q. Are you familiar Beaufort Capital Partners?

A. The name is familiar, although, I can't recall why.

Q. Does that name refresh your recollection about the entity that provided the bridge financing?

A. Possibly. I'm not sure.

Q. Are you familiar with a gentleman named Robert Marino?

A. Again, the name is familiar sometime around that era, but I don't -- I never met him.

Q. I apologize. You said that at one point you transitioned from head of operations, to head of, I guess, investor relations; was that in 2016?

A. Around then, yes.

Page 33

Q. Why did you make that transition?

A. Co-Diagnostics was -- I'm not really sure. It was sort of a realignment of what I was focussing on.

The organization -- the organizational structure had changed somewhat with, you know, bringing new people in. So there were multiple people kind of doing operations or different operational roles. So it just made more sense, as I recall, for my focus to just shift to more on the IR side, rather than having people step on each other's toes.

Q. Who was stepping on each other's toes?

A. No. I'm just using that term just to avoid having people duplicating, you know, doing -- doing the same job.

Q. Did somebody fill your prior role as head of operations?

A. No.

Q. Were you at all involved in the company's IPO?

A. Not very much, no.

Q. Okay. What role did you play, if any?

A. Right up to prepared diligence packets and occasionally to organize phone calls, but my involvement was pretty minimal in the IPO.

Q. Were you involved at all on the decision to IPO?

A. No.

9 (Pages 30 - 33)

Page 34

Q.  Is it customary for a company with no track record of sales to have an IPO?

MS. PEIRSOL:  Object to form.  Calls for speculation.

BY MR. PINEIRO:

Q.  You can answer.

A.  Yeah, I mean, I'm not familiar with every company that IPOs, so I'm not really sure exactly to what extent it was customary and to what extent it was usual.

Q.  Well, you worked for Legends Capital for seven years; during your time, did you observe or see that companies with no sales were undergoing initial public offerings?

MS. PEIRSOL:  Objection.  Argumentative.

THE WITNESS:  I didn't see that taking place at Legends Capital while I was there, nor with Co-Diagnostics.

BY MR. PINEIRO:

Q.  You're saying during your time -- during your time at Legends Capital, were you involved or aware of IPOs of companies in which Legends Capital was invested?

A.  I wasn't involved in any of those.

Q.  Okay.

A.  I was -- no involvement in any entity or IPO activity, yeah.

Page 35

Q.  Were you dealing -- when you were working with Legends in Spain, were you interfacing a lot with, I guess, with the investors?

A.  I had practically had no involvement with investors.  I would occasionally help draft communications to them, but I, myself, had no direct involvement or communication with them.

Q.  So what were your mainly doing then?

A.  Just what I said before, I was helping to run the operations there, the agents that were communicating with high-net worth investors, in making sure their communications were accurate and complete.  But I, myself, was not communicating with shareholders or --

Q.  Sorry.  What do you mean by "accurate and complete"?

A.  Just making sure -- I would work with -- to an extent, I would work with private equity companies themselves and have communications with them and make sure that the agents that were working with the shareholders, had up-to-date information that they could communicate to the investors.

Q.  Okay.  What was CODX's primary business before the COVID pandemic?

A.  Co-Diagnostics was developing and manufacturing in-vitro diagnostics and PCR tests for other IVD --

Page 36

non-IVD applications.

Q.  With respect to the in-vitro tests, were any of them for use with human patients?

A.  They were.

Q.  Which ones were those?

A.  Tuberculosis, Zika and the Zika/Dengue/Chikungunya multiplex.

Q.  Okay.

A.  Those tests all had CE, which allowed them to be used as in-vitro diagnostics.

Q.  And with those tests, the goal was to have human samples -- you know, human testing on that.  So human samples would be obtained and the PCR tests would be run to determine whether they had any of those three viruses?

A.  I mean, the purpose of in-vitro diagnostics by definition is to diagnose people with whatever the pathogen is.

Q.  There were also tests regarding mosquito abatement, for example?

A.  Correct.

Q.  What does -- what does that mean?

A.  Those were not in-vitro diagnostics, because we were not diagnosing or nobody was diagnosing mosquitos.  But mosquito abatement districts would purchase the tests and other laboratory equipment, and then would test

Page 37

mosquito pools for the presence target pathogens to help them better conduct their mosquito abatement services.

Q.  Before the pandemic, Co-Diagnostics, the company, was losing money, correct?

A.  It was running at a deficit, yes.

Q.  And it was in 2019, do you know, if it was approximately six million dollar deficit?

A.  I don't recall the number exactly.

Q.  Okay.  These deficits were being -- the company was being fully financed -- strike that.

Before the pandemic, do you recall that the company stock was hovering around one dollar per share?

A.  Yes.

Q.  Was the company contacted by NASDAQ regarding potential delisting?

A.  At a previous point.

Q.  Do you recall when was that?

A.  Summer of 2019.

Q.  Were you involved in responding to that communication -- actually, strike that.

A.  I can't recall exactly when.  For some reason, that date sticks in my head, but, as I think about it, I can't recall exactly when that communication took place.

Q.  Were involved in dealing with that?

A.  In dealing with that in what respect?

10 (Pages 34 - 37)

Page 38

Q. In responding NASDAQ's inquiry or to their letter?

A. No, I was not.

Q. Who was?

A. Company management, CEO, CFO.

Q. In terms of your -- how are you compensated by CODX?

A. Currently?

Q. Sure.

A. Salary and restricted stock units.

Q. What's your salary?

A. One hundred eighty thousand dollars annually.

Q. And what kind of stock options are you being given?

A. They're restricted stock units, not options. I can't remember exactly at this moment what my -- what that looks like. I can't remember how many that is.

Q. How many shares do you current own of CODX?

A. I'm also not sure.

Q. Do you have a ballpark?

A. No, I would not know that.

Q. For the company IPO, did you own any shares?

A. I did.

Q. Do you recall how many?

A. No, I don't recall exactly how many.

Page 39

Q. When did you first learn that CODX was attempting to develop a PCR test for COVID-19?

A. The decision to design a test for what would later become known as COVID-19, which was not at the time, was made in January 20, 2020.

Q. Who made that decision?

A. Dwight Egan.

Q. Were you involved in that decision?

A. I was not, unfortunately.

Q. Why do you say "unfortunately"?

A. I wish I was. It was impressive of him to start working on it. I wish I had any sort -- I wish I could claim any sort of credit for it, but it was all him.

Q. Did you have any role in the development of the test?

A. I did not.

Q. Do you know who was involved in developing the test?

A. Various scientists and test designers.

Q. Did Mr. Satterfield lead that endeavor?

A. I don't believe so, no.

Q. Do you know who did?

A. Who led the endeavor?

Q. Yeah.

A. It was group effort. I don't really know who

Page 40

would have been in charge of it.

Q. When you say several scientists, do you recall the names of the scientists that were involved?

A. Some of them. I'm not sure exactly who was involved in that specific test design process. So I can take a guess of who it was, but that wasn't part of my day-to-day to know who was involved in those laboratory operations.

Q. How were you informed that the company would be trying to develop this test?

A. It was in a management meeting.

Q. Do you participate in the management meetings?

A. I attended, yes.

Q. Who typically attends the management meetings?

A. Management meetings maybe is a bit of -- it's more of a -- it's a meeting of department heads, so describe it however you'd like. So the heads of various departments will attend that meeting.

Q. And in developing the test, did you have any roles or responsibilities or scientific --

A. I did not. I'm not a scientist.

Q. Was there any discussion about dealing with the PR of developing and then marketing this test?

A. At that time, no.

Q. Was there a stated goal about when the test

Page 41

would be verified?

A. Not a stated goal. But Dwight was meeting the following week with -- I can't recall exactly who -- the global task force for -- or task force for global health or something. I can't recall, but someplace in the Centers for Disease Control in Atlanta.

He said, we have this -- my recollection of meeting went along the lines of, "well, we have this really innovative and powerful test design platform. It would be great if we could demonstrate it to the CDC how quickly and how well we can design a test."

At that time -- this was before anybody had even heard of SARS-Co-V-2. I think at that time it was only referred to as the "novel coronavirus." And there was a lot of news on that, and this would be a good example to show -- to show the CDC how quickly and how powerful the platform works.

Q. Besides that meeting in Atlanta, did the company internally set a deadline or an objective in terms of being able to, you know, verify the test?

A. No, we just used our platform as well as we could.

Q. Okay. Do you recall if it was a rushed or expedited process?

A. I don't believe so, no.

11 (Pages 38 - 41)

Page 42

Q. Did CODX want to be the first test to market?

A. At that time, nobody who even knew what this was going to be. This was -- we heard about this weird flu thing coming out of China. We had no idea that it was going to be in the United States at the time we chose to begin designing the test.

Q. Besides you, are there any other employees -- strike that.

Do you have any employees of the company who you directly supervise?

A. One of them, yes.

Q. Who is that?

A. He is our logistics manager.

Q. What is his name?

A. Ron Sabo.

Q. S-A-B-O?

A. Correct.

Q. I'm going to start introducing exhibits. Bear with me here, as I use this platform.

MS. PEIRSOL: Michael, we've been going about an hour, does anybody want to take a break? Anybody need a break?

MR. PINEIRO: That's good. Do you want to take a five-minute break?

THE WITNESS: That's good, yes.

Page 43

THE VIDEOGRAPHER: Would counsel like to go off the record?

MR. PINEIRO: Yes.

THE VIDEOGRAPHER: This marks the end of media unit 1. The time is 10:08 a.m. We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: This marks the beginning unit number two. The time is 10:16 a.m. We are the on the record.

BY MR. PINEIRO:

Q. Mr. Benson, I've introduced a document labeled Exhibit 1. It should be on your Exhibit Share. I'm also going to share it on your screen.

Do you see that on your screen right now?

A. I do.

(Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. PINEIRO:

Q. Do you see me scrolling on that document?

A. I see you scrolling, yes.

Q. I'm showing you an e-mail from Jennifer Webb to you on January 22, 2020; do you see that?

A. I do.

Q. Who is Jennifer Webb?

Page 44

A. She was part of Coltrin & Associates, a PR firm.

Q. Is she still there?

A. Coltrin & Associates no longer exists as a firm. We still work with her under a different entity.

Q. Got it. She writes:

"Andrew, here are the three questions that I mentioned. This reporter, Sue Darcy with MedTech Insight is working on a deadline. Any chance we can get them back to her in that timeframe."

Then there's a series of questions. Question No. 1: "Is your firm Co-Diagnostics current working on a test or test kit, to diagnose coronavirus 2019-n-COV that has erupted in Wuhan Province of China. If so, how far along are you in the process."

Do you see that?

A. I do.

Q. So it appears that she's asking you these questions and then provides that information to this reporter, Ms. Darcy?

A. It appears so.

Q. And then you write an e-mail that same day on January 22nd; do you see that e-mail at 12:43 p.m.?

A. I do.

Q. You say:

"Hi, Jen, I'm looping Dr. Garcia into this so

Page 45

she can help verify the accuracy of what we're saying here. Ike, feel free to opine as well, vis-à-vis the messaging here."

Is Dr. Garcia, Kristen Garcia?

A. No.

Q. Who is -- what's her name or his name?

A. Rebecca Garcia.

Q. Rebecca Garcia. I'm sorry.

And she works at Co-Diagnostics, correct?

A. She did.

Q. When did she leave?

A. I can't recall exactly. I think the beginning of 2022.

Q. Do you know why she left?

A. To pursue a career in academia.

Q. And then "Ike," is that reference to Dwight Egan?

A. It is.

Q. That's his nickname?

A. Sure.

Q. It says:

"Also who being is being interviewed -- in quotes -- for this piece, and when will it run? We are already in danger of running afoul with NASDAQ for not informing of the content in that piece that

12 (Pages 42 - 45)

Page 46

printed to day Des News. It was news to me today that we were working on a test for coronavirus. Last I heard, we were just looking at it."

So, in there, you reference "we are in danger with running afoul with NASDAQ for not informing them."

What did you mean by that?

A. I was worried that NASDAQ would take issue with the fact that this information came out in a news article before we had issued a formal company press release about at about it. But, in the end, NASDAQ didn't have a problem with it.

Q. Is there -- is there -- is there some sort of NASDAQ rule or regulation that would apply -- strike that.

Is there some NASDAQ rule or regulation that would require the company to first notify the investing public through a press release?

A. I don't know specifically if there's a NASDAQ regulation about it. I'm just always trying to be really careful, making sure that anytime something comes out, you know, anytime we share something with the public that -- NASDAQ has a notification process, whereby, prior to submitting the press release, you give it to NASDAQ 15 minutes earlier, so they know that it's coming out. And

Page 47

so I just try to be really careful with our communications to make sure that NASDAQ has been informed of anything I knew.

So, yeah, I think that's all I was referring to there.

Q. And in complying with that requirement that press releases be shared with NASDAQ 15 minutes before, are you the person at the company that's in charge of that?

A. Primarily, yes.

Q. Who else -- who else deals with that?

A. On occasion, for SEC filings, I think that's managed by whatever the company is that does authorizations. I can't recall their name right now. But our CFO makes sure that notification is done for those.

Q. So then you also write -- up top, you wrote another e-mail at 8:15 p.m. You say:

"Rebecca also adds (and I'm paraphrasing, so don't quote her directly) that RNA can be quite variable, making it difficult for a test developed at early stages consistently pick up variations over time in all affected populations."

Do you see that?

A. I do.

Page 48

Q. So, at this time, I guess, it appears that you were concerned about being able to develop a test that's fully accurate?

MS. PEIRSOL: Objection. Misstates the evidence.

You can answer.

THE WITNESS: Like I said, I was just paraphrasing what I understood Dr. Garcia said about a test about which still relatively little was known.

BY MR. PINEIRO:

Q. Got it. So it seems as of this e-mail when you indicated, "It was news to me today that we were working on a test for coronavirus. Last I heard, we were just looking at it."

Do you know when, I guess, the decision was made to shift from looking at it to actually start working on it?

A. I just misunderstood the directional in that Monday meeting that I mentioned before, yeah.

Q. Okay.

A. The direction was given at that time. I just didn't understand that that that was the case until later.

Q. Okay. So I have introduced what's been marked as Exhibit 2. Do you see that on your screen here?

Page 49

(Plaintiff's Exhibit No. 2 was marked for identification.)

THE WITNESS: I do.

BY MR. PINEIRO:

Q. This is a press release of Co-Diagnostics on January 23, 2020. Do you -- are you familiar with this press release?

A. I have to read it over to refamiliarize myself with it but I recall it.

Q. Okay. It says:

"Co-Diagnostics, Inc., molecular diagnostics company with a unique, patented platform for the development of molecular diagnostic tests, announced today that it has completed principle design work for a PCR screening test for a new coronavirus. 2019-nCoV, intended to address potential need for detection of the virus."

Do you see that?

A. Yes.

Q. Whose decision was it to issue this press release?

A. All press releases are decided by management.

Q. And why -- why make this announcement?

A. It was not uncommon for us. In fact, it was our standard practice for us to announce when we had

13 (Pages 46 - 49)

Page 50

completed design work for various tests.

Q. I mean, at this point in time -- you know, previously we talked and you said that in January there wasn't a PR strategy that was developed for the test because you were still exploring the issue.

Here it appears that the company has already had designed the test. At this point, in time does the company --

MS. PEIRSOL: Objection. Mischaracterizes the witness's prior testimony.

MR. PINEIRO: Okay. Let me just finish the question. I understand your objection. Just let me get it out and then you could object.

BY MR. PINEIRO:

Q. So here, you know, at this point, it appears the company is engaging public relations with respect to the development of COVID-19 test, right?

A. Sure. Yes. We issued a press release. Sure.

Q. At this point in time -- by this point in time, had the company discussed the marketing or public relations plan regarding this test?

A. No.

Q. There was no discussion of how -- of how -- how to market or communicate developments with respect to this test to the public?

Page 51

A. No, not that I recall. Our PR firm was always working on various introductions to reporters about anything that we were working on, regardless of what it was.

This was just a new -- a new avenue of introduction. But for us at the time, this was another test that we designed. At the time, we thought it would be primarily for the developing world, is my recollection.

Q. I'm introducing a document marked as Exhibit 3.

Do you see this on your screen sir?

(Plaintiff's Exhibit No. 3 was marked for identification.)

THE WITNESS: I do.

BY MR. PINEIRO:

Q. Towards the bottom of this document, there is an e-mail from Jennifer Webb on January 24, 11:50.

Do you see that?

A. I do.

Q. It says:

"Great news. The article from the Financial Times did not I immediately show up in the our monitoring. It actually posted about 11 hours ago and mentions Co-Diagnostics, notably, within the context of being a potential solution to challenges

Page 52

with slow tests that require special laboratories. Tests.

Do you see that?

A. I do.

Q. So then she quotes towards the bottom and she highlights an excerpt of the article that mentions Co-Diagnostics. Do you see that?

A. Yes.

Q. Then you wrote the next day:

"That's great. Just something to keep in mind as a future talking point, we should make sure to avoid references in [sic] implications that our test faster. Not that our test faster, nor is that really one of your key competitive advantages.

I mean, maybe our test would have lower CT values than the CDC test. I don't know."

What is a CT value?

A. That's how many cycles, thermal cycles take place in a PCR reaction, how many heating and cooling cycles. And that's represented by the CT value.

THE VIDEOGRAPHER: This is the videographer, Mr. Benson, could you tilt your screen down, so that you're centered again, please.

THE WITNESS: Sorry about that.

BY MR. PINEIRO:

Page 53

Q. Then you say:

"The fact is, nobody would know right now since we don't know how fast the CDC test is anyway. And our test has only been designed, not verified or validated."

Do you see that?

A. I do.

Q. What did you mean by "verified" here?

A. We had completed the design work for a test for this -- for these genetic sequences, which were in the public domain. But until you have actually started purchasing reagents or purchasing the -- those -- those actual primers and testing them in an actual PCR reaction, which is what you do to verify that those test designs that you have -- the test that you created, that they actually function in the way that they're supposed to. You can't really know, you could only guess what the CT values would be.

And, so, at this time, on January 25th, I don't believe we had had those reagents in-house yet, although I could be mistaken. It sounds as though we didn't, because I'm saying it hasn't been verified, so --

Q. Then you say "validated" also; what does that mean? How is that distinct from "verification"?

A. I can't always remember. Verification and

14 (Pages 50 - 53)

Page 54

validation are two distinct -- two different terms of art in the PCR test design process.

Verification is what I described before, which is just confirming that those -- that test design, PCR reaction or those primers that you've developed, designed, that they do actually function. Whereas, validation is a more in-depth process confirming that on synthetic samples and using a specific format for doing that validation process.

Q. Got it. Are you familiar with -- are you familiar with the fact that the -- that CODX's Logix Smart Test targets certain genes from the RNA of COVID-19 virus?

A. Yes, that is the case.

Q. Now, initially, did the test only target one gene?

A. One of the tests only targets one gene, yes.

Q. Right. But the first test that was developed and received regulatory approval, was that a one-gene test?

A. It is.

Q. Okay. Do you when CODX developed a test that targeted two genes in the RNA?

A. Later that year. I can't recall exactly when it was.

Page 55

Q. Was it towards the end of 2020?

A. I can't recall.

Q. Do you know why it developed a second test that targets two genes?

A. My understanding was because certain regulatory bodies or ministries or departments of health in certain jurisdictions and for what seemed to be fair arbitrary reasons to determine that in order for a test to -- in order for a test to be cleared for use in their country, it had to target two genes, instead of just one.

Q. Do you know which countries or regulatory bodies those were?

A. The only one I recall really is Italy. I believe there may be more in Latin America, but I can't recall which.

Q. Do you know whether a test that targets two genes as opposed to one is more accurate?

A. I don't believe that's the case.

Q. So they're equally accurate?

MS. PEIRSOL: Object to the form. Misstates his testimony.

THE WITNESS: They can be equally accurate. It depends on the test.

BY MR. PINEIRO:

Q. Okay. Do you know why Italy or other regulatory

Page 56

bodies require a two-gene test?

A. No.

Q. Are you familiar with the term "sensitivity" when it comes to -- as a metric regarding a PCR test?

A. I am.

Q. What does that term mean?

A. It's the ability of a test to avoid false negative results.

Q. And why -- why does a false negative result potentially occur?

A. Various reasons.

Q. Okay.

A. Why would a test fail to identify the presence of a target genetic sequence? Could be for any number of reasons.

Q. Okay. And is the limit of detection one of the factors into the sensitivity of the test?

A. Not really, no.

Q. What is the limit of detection?

A. The limit of detection, as I understand it -- again, this is what I've gleaned from our scientists. I myself do not have science background -- the limit of detection is the number of copies or -- or partial copies that test would be able to identify within a certain target volume 95 percent of the time.

Page 57

Q. Is there any relationship between the limit of detection -- which I'll call "LoD" -- and sensitivity?

A. There can be but not necessarily.

Q. What do you mean by "there can be"?

A. I mean that test sensitivity can be affected by a number of factors: Primer design, location of genetic -- location of the genome. Also, just the prevalence of viral copies of the samples, it may be the case. If in fact it is the case for SARS-CoV-2, where there -- the virus proliferates so rapidly to such an extent that the sensitivity of the test, you know, the difference between a couple of hundred copies or a couple of thousand copies is negligible, because there's tens of thousands, millions of copies in a certain volume.

And so the sensitivity could be affected by more than just that limit of detection including primer design and target location.

Q. How many would have limit of detection -- you've indicated LoD is one possible factor that could impact sensitivity; how would LoD impact sensitivity?

A. In a scenario where a sample did not contain enough copies or it contained fewer copies than a given test limit of detection, then there's a possibility that the test might fail to -- might fail to identify the presence of those viral copies.

15 (Pages 54 - 57)

Page 58

Q. So it's possible that due to a very high LoD, a test maybe less sensitive?

A. It is possible.

Q. Was the LoD an important metric for the company in developing and marketing its test?

A. It was never important to any of our customers. They were always happy with our LoD.

Q. But was it important for the company?

A. In what respect?

Q. Was an important metric for the company to improve on?

A. The company understands that the sensitivity is a -- is an amalgamation of multiple factors, and in as much as the test's sensitivity was always high, the limit of detection was never an important factor, because it didn't appear to be affecting the test sensitivity in any way.

Q. Are you -- are you familiar with the competing PCR COVID tests?

MS. PEIRSOL: Object to form. Vague.

THE WITNESS: There's a lot of -- there's thousands and thousands of tests.

BY MR. PINEIRO:

Q. Got it. Do you have any knowledge about where on the Logix Smart Test lies in terms of its sensitivity?

Page 59

MS. PEIRSOL: Objection. Vague.

THE WITNESS: In terms of its sensitivity?

BY MR. PINEIRO:

Q. Yes.

A. It's fairly high. The sensitivity that was recorded in our filings -- or in our submissions to FDA and other subsequent third-party tests that have been performed, it's always performed very well.

Q. I mean, are you familiar with peer review studies that have evaluated the sensitivity of the Logix Smart Test?

A. I've read studies. I can't recall them off the top of my head.

Q. Okay. What does "specificity" means in terms of the metric for the Logix Smart Test?

A. Like how sensitivity is a metric that determines or that -- that -- that indicates the ability of a test to avoid false negative results, specificity is the ability of a test to avoid false positive results. False positive results are -- false positive results is when a test incorrectly identifies the presence of a target sequence that is not actually present in the testing --

Q. And what causes that to occur; do you know?

A. Any number of factors, test design. Primarily though, if a test has -- is targeting a genetic sequence

Page 60

that is common in multiple strains of -- or is a common genetic sequence that could be found in multiple microorganisms that would identify a test as positive, when, in fact, no actual specific target microorganism was present.

Q. So, based on your knowledge, what are the main factors that go into the accuracy of COVID-19 PCR test?

A. Accuracy is a term that's used -- it's more of a lay term than a scientific term, as I understand it. But it is a -- test accuracy is normally represented by its sensitivity and specificity.

Q. So you're saying it typically wouldn't make -- CODX wouldn't make representations about the accuracy of the test?

A. I didn't say that.

Q. So they wouldn't -- they wouldn't use accuracy as a metric, instead they would refer to specificity and sensitivity?

A. I can't say what the company would do every single time. Oftentimes, it's easier to communicate in a way that is more readily understood.

And if you're speaking about a test's accuracy and that's what's required to convey the information at hand, then the company may have used the word "accuracy." I can't say for sure what we've done every single time

Page 61

we've ever communicated about a test.

Q. Bear with me. I'm showing -- I've produced what's marked as Exhibit 4.

(Plaintiff's Exhibit No. 4 was marked for identification.)

BY MR. PINEIRO:

Q. Do you see that FAQ on your screen?

A. I do.

Q. Are you familiar with this document?

A. I recall it. I've not seen it for some time. I'm not super familiar with it right now.

Q. Did you assist in preparing this document?

A. I believe I assisted in providing edits to it, yes.

Q. Do you know who else assisted?

A. Jennifer Webb. Ed Coltrin had requested something like this to be used in her communications with -- with inbound press inquiries. And I believe Dr. Satterfield also assisted with the editing of it.

Q. Was this prepared in response to the lawsuit that we're dealing with here in this deposition?

A. I don't believe so.

Q. Besides Dr. Satterfield, did any other scientist at Co-Diagnostics assist in preparing this?

A. Possibly. I don't recall. It would have been

16 (Pages 58 - 61)

Page 62

almost three years ago.

Q. Do you know whether this was ultimately disseminated or distributed to people?

A. I don't know to what extent Ms. Webb used it.

Q. So scrolling down, it says -- this is a question:

"What is the limit detection?"

It says:

"The limit of detection or LoD is a measurement used as a baseline representing the lowest number of copies of the pathogen that need to be present in a sample for the diagnostic to detect a positive."

Do you see that?

A. I do.

Q. It says:

"Reporting on the topic has used Co-Diagnostics' LoD from the company's emergency use authorization submission incorrectly, falsely assigning it as evidence to support claims from competitors about the accuracy of Co-Diagnostics test."

Do you see that?

A. I do.

Q. Do you know what's being referred to here when it says the LoD from the emergency-use authorization submission is being used incorrectly?

Page 63

A. I -- I can't recall exactly what she meant there.

Q. I mean, are you familiar with that general --

A. I could guess. My guess -- you know, I don't really want to just -- you know, throw something out there. So I can't recall exactly what it was that she had -- why it was she wanted this bullet in there.

It does echo what I had said before, though, how the limit of detection is not equivalent to a test sensitivity and it seems like that's what she's referring to here.

Q. So if you go down to section -- another section here called -- there's a section here that says: "What do the terms sensitivity and specificity reference?"

Do you see that?

A. I do, yes.

Q. There third bullet point it says:

"In evaluations to gauge how a test will perform on patient samples e.g., sensitivity and specificity refer to the rates in which a diagnostic correctly identified all the known positives and negative samples from a set of prepared samples."

Do you see that?

A. Correct. I do.

Q. The next bullet point say:

Page 64

"In evaluation to compare performance against other COVID-19 diagnostics, sensitivity and specificity are the rates at which one diagnostic detected the same samples as positive and negative that were detected by another diagnostic."

Do you see that?

A. Yes, I do.

Q. It appears that when you're looking sensitivity and specificity, it pertains to a comparison with another test; is that correct?

A. Bullet --

MS. PEIRSOL: Objection. Assumes facts not in evidence.

You could answer, Mr. Benson.

THE WITNESS: Can you repeat the question, Michael?

BY MR. PINEIRO:

Q. Sure. So, I mean, just based on reading this fourth bullet, it appears that sensitivity and specificity are measured based on the performance of one of the Logix Smart Test, vis-à-vis another COVID-19 test?

A. It can be. Sorry.

MS. PEIRSOL: Objection. Assumes facts not in evidence.

You can answer, Mr. Benson.

Page 65

THE WITNESS: That can be the case. As sensitivity that's reported is the result of a specific test or a specific evaluation that took place.

And, as these bullets indicate, sometimes they are used against known positives and negative and sometimes they're used against a comparison assay.

BY MR. PINEIRO:

Q. Got it. So in the second bucket that you just described, it's more of a relative test, right, where you're comparing the Logix Smart Test to another test?

A. To a standard, yes.

Q. And, in the first one, it's just an absolute -- it's almost like an absolute validation, right, where you have known positives and negatives and you're seeing how the Logix Smart Test performs?

A. You mean this is in reference to any PCR test --

Q. Right --

A. Correct, that's how this type of validation would take place.

Q. Understood. Okay. It says here:

"The FDA has said no test is accurate all the time, so why do companies say their test is 100 sensitive and 100 percent specific then?

It says: Data are specific to the study being

17 (Pages 62 - 65)

Page 66

done and the conditions of that process."

The next bullet:

"A diagnostic may perform in one environment and show 100 percent sensitivity and 100 specificity, which would mean it correctly identified every positive and every negative result of the prepared samples, or else correctly identified every positive sample and every negative sample against the standard."

Do you see that?

A. I do.

"However, that same diagnostic in another evaluation, in a different lab with different samples performed by different technicians, may only identify 19 out of 20 positive samples, which would only show 95 percent sensitivity. As the FDA said, no test is accurate in every instance."

Do you see that?

A. I do.

Q. So it's fair to say that there's no test that's 100 percent accurate, right?

A. Correct.

Q. And inferring or implying that would be incorrect, right?

MS. PEIRSOL: Objection. Argumentative.

Page 67

THE WITNESS: If a company implied -- it is argumentative -- but if a company were to imply that its test was 100 percent accurate all the time, that would not be, if a company were to state that.

BY MR. PINEIRO:

Q. If a company was to state, "we have 100 percent accurate tests," would that be misleading?

A. Depends on how they stated it and the context.

Q. If they just put out there, "our test is 100 percent accurate," would that be misleading?

MS. PEIRSOL: Objection. Calls for the speculation.

He already testified that it depends on the context.

THE WITNESS: It does.

MR. PINEIRO: I understand. Look, I know that in Utah they have rules that allow you state the actual objection, but you don't need to go beyond just the phrase -- you know, the specific objection. Okay. I get it.

MS. PEIRSOL: Objection. Asked and answered.

BY MR. PINEIRO:

Q. Okay. It says:

"Likewise Co-Diagnostics has never claimed that its COVID-19 diagnostic will always be 100 percent

Page 68

sensitive or specific in every setting in every instance."

Do you see that?

A. I do.

Q. Are you familiar with the term "simulated limit of detection"?

A. Simulated limit of detection?

Q. Yeah.

A. I'm not really familiar with that right now, no.

Q. Are you -- are you aware of just the process to initially validate -- strike that.

In conducting its initial validations of the Logix Smart Test, did Co-Diagnostics use synthetic versions of the virus?

A. That was all that was available at the time, yes.

Q. And are you aware of whether there's ever any issues in translating the performance of the test from the synthetic material to actual human samples?

A. I don't really know what would go into that. I know that FDA approved to use synthetic samples in our limit of detection and validation studies.

Q. Okay. But subsequent to -- you know, setting aside the regulatory approval, have you been made aware of any problems in translating the results of the test

Page 69

from synthetics to human samples?

A. I'm not aware of anything like that.

(Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. PINEIRO:

Q. Showing you what I marked as Exhibit 5.

Do you see that on your screen, sir?

A. I do.

Q. Scrolling down. Are you familiar with Madison Stark?

A. Yes.

Q. Who is she?

A. She at the time was a laboratory scientist for Co-Diagnostics.

Q. Okay. And then she sent an e-mail to Joseph Featherstone, Chad Apuli and some others.

Do you see that? I'm looking on February 2, 2020 at 11:05?

A. I see that, yes.

Q. She says:

"Hi, everyone, the images weren't visible on my original e-mail. I'm not sure why. I've never had that happen before. I think I have fixed it now."

Then she says:

"Also, Ike asked the LoD, which is 6.75 copies

18 (Pages 66 - 69)

Page 70

per 5uL reaction, which is 1.35 copies per uL."
Do you see that?

A. I do.

Q. Do you know why Mr. Egan was asking about the LoD?

A. No.

Q. Are you familiar with the term, "research use only authorization"?

A. Yes.

Q. What does that mean?

A. If a test is research use only, that means it's just exactly as the name would imply, it has not been cleared for -- or it is not designated for use as an in-vitro diagnostic.

Q. When you receive -- strike that.
At some point, did CODX receive RUO authorization regarding the Logix Test?

A. RUO authorization isn't something that's granted by any regulatory body. A test is de facto research use only until it receives in-vitro diagnostic clearance or other clearance.

Q. So you don't actually need to submit any application or any approval for something to be RUO?

A. Correct.

Q. And are you able to sell tests to labs when

Page 71

they're RUO?

A. Yes, you are.

Q. Was -- did Co-Diagnostics do that before it received regulatory approval to sell its test?

A. It could sell products on a research-use-only basis prior to receiving regulatory approval, and Co-Diagnostics did so.
As long as those tests are sold and marked on the kit and the labelling indicates it's research use only, the manufacturer can do so.

Q. At some point in time in February of 2020, did you become aware that the FDA had contacted CODX about improper statements or marketing regarding its COVID test?

A. Yes.

Q. And what do you recall about that?

A. Just exactly what you said. We were contacted regarding some -- some concerns that FDA had about the way the test was described.

Q. Who is the person at -- at CODX that would be in charge of dealing with the FDA?

A. At the time, it was Cecilia Hutchins.

Q. What was her title?

A. I think head of regulatory.

Q. Anybody else, besides Ms. Hutchins?

Page 72

A. At that time, no. There may have been other individuals that would have been copied in, but she was the primary conduit for dealings with -- with regulatory bodies.

(Plaintiff's Exhibit No. 6 was marked for identification.)

BY MR. PINEIRO:

Q. And you could see that there's an e-mail here on you screen. Again, this is an exhibit that's been marked as Exhibit 6.
Do you see on your screen e-mails from Leroy Huang to Chad Apuli and others?

A. I do, yes.

Q. It says:
"Cecilia and Chad, Please find below the summary of today's teleconference. FDA acknowledges that Co-Diagnostics have requested the Pre-EUA template and are working with the premarket review team. But as indicated in the e-mail your firm has received from FDA with the EUA template: Please be reminded that in the U.S., a test for the detection of 2019-n-CoV or to diagnose, must not be distributed and/or used for clinical diagnosis."
Do you see that?

A. I do.

Page 73

Q. Then it a little further below it says:
"Specific concerns include: Website for the RUO Logix Smart Products states, and then it appears to list some concerns the FDA has. Do you see that?

A. I do.

Q. And, similarly, the FDA appears to have highlighted certain concerns they had with a press release, dated February 6, 2020.
Do you see that?

A. I do.

Q. And, similarly, with a news release from CODX, on February 10, 2020, do you see that?

A. Yes.

Q. And it seems like with respect to these statements, they have flagged that, you know -- for instance, in the second bullet, they highlight that on the February 6th statement it states:
"Co-Diagnostics believes that the test's unique design will provide enhanced accuracy when detecting the presence of the coronavirus, including improved specificity over tests designed on a different platform."
And then I guess the FDA has marked that as a "specificity/performance claim."
Do you see that?

19 (Pages 70 - 73)

Page 74

A.  I do.

Q.  Okay.  Then they request that:

"Your firm take immediate corrective action to resolve these identified concerns and identified actions to avoid future issues."

Do you see that?

A.  I do.

Q.  They ask you to provide -- "We ask you to provide a list of planned actions to address these concerns by Friday, February 14, 2020."

Do you see that?

A.  Yes.

Q.  In terms of these press releases that are being referenced here, do you know if Ms. Hutchins had reviewed them before they were issued?

A.  I don't recall.

Q.  With respect to just any press release that was issued, was Ms. Hutchins typically involved in reviewing them for compliance purposes?

A.  Occasionally, but not always, necessarily.

Q.  Did -- on what occasions would she review the press release?

A.  I can't recall specifically what would -- what the content or subject matter would be that would require us to incorporate her into the review process.

Page 75

Q.  Give me one moment.

A.  Sure.

MR. PINEIRO:  Give me a second to figure out a document issue here.  Can we go off for one minute, I'm having an issue with the document.  Can we just go off the record for a minute?  I apologize.

THE VIDEOGRAPHER:  This marks the end of media unit number two.  The time is eleven o'clock a.m.  We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  This marks the beginning of media unit number three.  The time is 11:07 a.m.  We are on the record.

(Plaintiff's Exhibit No. 7 was marked for identification.)

BY MR. PINEIRO:

Q.  Mr. Benson, I'm showing you a document marked as Exhibit 7.  Do you see that on your screen?

A.  I do.

Q.  This is an e-mail from Cecilia Hutchins to Chad Apuli and to you.  Do you see that?

A.  I do.

Q.  Who is Chad Apuli?

A.  Chad Apuli.

Q.  Sorry.

Page 76

A.  That's fine -- he is the -- I believe at the time he was our laboratory manager.

Q.  Okay.  And the subject is:  "Answer to the FDA with action plan."  It says:

"Chad and Andrew, here is enclosed is the answer to the FDA.  Let me know your thoughts."  And then let me -- okay.

Do see the document -- the attachment labeled "Corrective and Preventative Action Plan".

A.  I do.

Q.  It's addressed to Dr. Leroy Huang, Ph.D., recipient.  Do you see that?

A.  I do.

Q.  Did you participate in preparing the document?

A.  I don't recall participating in its preparation.

Q.  Did you review it?

A.  I think so.

Q.  Okay.  Did you give any input or edits to it?

A.  I don't recall.

Q.  Do you know if this was ultimately submitted to the FDA?

A.  I don't know what Cecilia would have done it.

Q.  Okay.  And so it appears that a table has been prepared and it says, you know, "Finding, Description."  And it appears to list the FDA's finding from that e-mail

Page 77

that I showed you.  Do you see that?

A.  Yes.

Q.  Next it says:  "Root Cause Analysis."

Do you see that?

A.  I do.

Q.  Then it says:

"Co-Diagnostics has a regularly department in charge of reviewing labeling.  However, the process for review and labeling was not well standardized."

Do you know what was meant by that?

A.  I don't know exactly what she meant by that.

Q.  Okay.  Now it says assigned person -- sorry -- "Corrective Action/Preventative Action."  And the corrective action is that:  "The web page for Logix Smart has been reviewed and updated and removing all claims or implied claims of performance."

Do you see that?

A.  I do.

Q.  It says:  "Assigned person and estimated completion date."  It lists you and Ms. Hutchins?

Do you see that?

A.  I do.

Q.  Do you recall implementing that corrective action?

A.  I do, yes.

20 (Pages 74 - 77)

Page 78

Q. So, when it says the labelling was -- the review of labelling was not well standardized, is -- are the descriptions of the Logix Smart Tests on the company's website considered labelling?

A. I believe so.

Q. Okay. And so was a form process put in place or a more standardized process put in place after this interaction with the FDA?

A. Yes. Anything that's posted on the website is reviewed by regulatory prior to -- prior to posting.

Q. Okay. And does that include press releases?

A. It does now.

Q. By "now" you mean at present?

A. Correct.

Q. Following the -- around this time, though, which was, you know, February of 2020, was that change made by then or --

A. I don't know -- I don't know what exactly was implemented. I can't recall.

Q. Was it implemented in 2020?

A. I believe so, yes.

Q. So similarly, in the Finding Description there's the listing of the issues with the -- the FDA's alleged issues with the news release on February 6, 2020 and also press release from February 10th. Do you see that?

Page 79

A. I do.

Q. Then in the Root Cause Analysis it says:

"Co-Diagnostics has a Regulatory department in charge of reviewing labelling. However, press releases were not included in the labelling review process."

Do you see that?

A. I do.

Q. And then the Preventive Action is:

"Inclusion of review of press releases related to the Logix Smart line of products, which comprehends the clinical line of in-vitro diagnostics developed, produced, and commercialized by Co-Diagnostics."

Do you see that?

A. I do.

Q. So it appears that the preventative action that's going to be taken is that, going forward, CODX would have its regulatory department review all press releases related to the Logix Test, correct?

A. Correct.

Q. Do you know whether CODX in fact followed that proposed preventative action?

A. I believe so.

Q. I mean, weren't you the person in charge of

Page 80

ensuring that this would be followed?

A. For the most part, yes, yeah.

Q. So, to your recollection, was this process standardized?

A. It certainly was something I did my best to do. If I missed something, it was unintentional. But it's certainly part of my standard practice now.

Q. So, you know, this case is about a May 1, 2020 press release that was issued regarding the Logix Text.

Do you know whether Ms. Hutchins reviewed that press release before it was issued?

A. I don't recall.

Q. You have no recollection of giving her a draft copy of that?

MS. PEIRSOL: Objection. You can answer.

THE WITNESS: Yeah, like I said, I don't recall specifically whether I gave her a draft copy of that one or not.

BY MR. PINEIRO:

Q. Okay. Was a draft copy after that press release provided to legal counsel before it was issued?

A. I believe so.

Q. Which legal counsel was that?

A. I can't remember the name of the firm at the time.

Page 81

Q. Who would have been the person that provided the draft release to legal counsel?

A. Myself or Dwight.

Q. Okay. Following, I guess, the February 2020 exchange with the FDA -- strike that.

Were -- in response to or in reaction to this exchange with the FDA in February of 2020, did the company implement any written or formal policies and procedures regarding the issuance of press releases?

A. Just what we've already stated here, that press releases would be reviewed by regulatory, prior to release.

Q. Okay. Besides the e-mail that I showed you that was prepared and appears to have been sent to the FDA, did the company prepare any written policies to that effect?

A. That was the written policy. Sorry. Go ahead.

MS. PEIRSOL: It's okay. Objection mischaracterizes the evidence.

THE WITNESS: The evidence that was provided, that was a quality -- it appears to me to be a quality document, which comprises the company's corrective and preventative action. And, if that is the case, then that becomes a part of the company's quality system.

21 (Pages 78 - 81)

Page 82

BY MR. PINEIRO:

Q. What do you mean by "quality document"?

A. I believe it's part of the company's quality management system.

Q. Okay. And how does -- how does a document like that become part of the quality management system?

A. Through an ISO 13485 process that implements changes to the quality system and incorporates them as part of the company's ongoing processes. It's a little circular.

Sorry about that, but I mean --

Q. You said ISO 45 process?

A. ISO 13485.

Q. What does that mean?

A. The company has ISO an 13485 as a quality system that has passed an ISO 13485 quality systems audit, which is the ISO standard for a manufacturer of in-vitro diagnostics. The company is ISO 13485 certified.

Q. So then with respect to this new policy that was described in that document, how would it be incorporated into the company's operations going forward?

A. All parties that are required to be aware of the new procedures are trained on them and are expected to follow them, following --

Q. Did that occur in this case?

Page 83

A. I believe so.

Q. Were you involved in that?

A. I -- I don't recall specifically what my involvement would have been.

Q. Did CODX issue a large number of press releases in the first half of 2020?

MS. PEIRSOL: Objection. Vague.

THE WITNESS: Can you describe what you mean by "a large number of press releases"?

BY MR. PINEIRO:

Q. Yeah. I mean, if I told you that it issued approximately 60 press releases in the first five months of 2020, would that surprise you?

A. Sixty? I'm not familiar with that number.

Q. Okay.

A. I'll take your word for it, if that's what you say.

Q. Was it issuing frequent press releases during the first half of 2020?

A. It was.

Q. And why was that?

A. To maintain communication with customers and its shareholders about our products and our progress.

Q. Okay. And did you have any discussions with Mr. Egan or anybody else at management regarding the

Page 84

frequency of the press releases?

A. I don't recall anything specific. It was -- it was a regular press release schedule, but I don't recall specifically what conversations I would have had about the frequency.

Q. What do you mean by "regular press release schedule"?

A. Like you said, we were -- we were really seeing press on a regular basis. I can't remember exactly what your phrase was earlier. I was trying to remember that.

Q. And who would determine what was newsworthy enough that it would be, I guess, communicated in a press release?

A. It was primarily a decision of the manager.

Q. Were you involved in those decisions?

A. Typically not.

Q. So who would make the decision?

A. It was management, it was Dwight or counsel.

Q. And then they would tell you?

A. Yes.

Q. And then you would be tasked with preparing and issuing the release?

A. With helping to prepare the release, yes, prior to --

Q. Sorry, I interrupted you.

Page 85

You mentioned that counsel was involved in decisions regarding the issuance of releases?

A. On occasion, sure.

Q. But they weren't involved in decisions regarding newsworthiness, correct?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: Yeah, I'm not -- I'm not sure whether that would be the case or not.

(Plaintiff's Exhibit No. 8 was marked for identification.)

BY MR. PINEIRO:

Q. I'm introducing a document that's been marked as Exhibit 8. Bear with me. Is Exhibit 8 or you screen, sir?

A. It is.

Q. At the bottom there is an e-mail -- excuse me -- from -- there's an e-mail from you, Andrew Benson on February 29, 2020 to Mr. Egan, Ms. Hutchins and some other folks. Do you see that?

A. Yeah. Yes, I do.

Q. Okay. Okay. So towards -- going back to the front of the document, in the middle there's an e-mail from Ms. Cecilia Hutchins on Sunday, March 1, 2020 at 2:19. She says:

22 (Pages 82 - 85)

Page 86

"Also, there are a couple of things or dozens that we have to decide before shipping anything. My suggestion is that we sell the Logix Smart 2019-nCov RUO. We will share only the information we have to for the labs to develop the LDT."

Do you know what "LDT" means?

A. It says, for "laboratory developed test."

Q. Okay.

"I don't want to share any proprietary information, but there is a minimum that they will need in order to develop the test. The customer won't know without testing what is the difference between the 2019-nCoV and the COVID-19."

And the she says: "We can discuss it later Sunday or Monday."

And your response to that is:

"No, we have to discuss it today because, obviously, we have to issue a press release first thing Monday morning, because God forbid we take a deep breath and thinks things through for a second before diving in."

A. Yes.

Q. Why did you write that?

A. I believe I was joking. I mean, it was a crazy time, everything was operating just at break-neck speed.

Page 87

And, you know, I think I was just commenting on that. I don't recall specifically writing this e-mail.

Q. Did you think that the company was too frequently issuing press releases?

A. It was more frequently than we had in the past, but I don't recall thinking that it was too many or too frequent.

Q. You appear to be inferring that the company wanted to issue a press release before even thinking things through; isn't that what you're saying here?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: I don't believe that's what I was saying, no.

BY MR. PINEIRO:

Q. Okay. When you said, "think things through," what did you mean by that?

A. I don't recall what I meant. Like I said, I think I was just, you know, commenting how quickly everything was going. Everybody was working late hours to provide -- you see Cecilia's e-mail was written at 2:13 in the morning. Everybody was working crazy hours to provide -- to keep on top of things and she was no different than me in that case.

Q. You say, "because, obviously, we have to issue a

Page 88

press release first thing Monday morning."

Q. Do you see that?

A. I do.

Q. Did somebody tell you had to issue a press release Monday morning?

A. I, again, do not recall writing this e-mail, what the context was when I wrote it.

Q. Were you upset that you, you know, were put on this schedule of very frequently issuing press releases?

MS. PEIRSOL: Objection. Misstates the evidence.

THE WITNESS: I don't recall feeling upset about that.

BY MR. PINEIRO:

Q. Give me a second. I'll show you this document.

(Plaintiff's Exhibit No. 10 was marked for identification.)

MR. PINEIRO: Ms. Court Reporter, I made a mistake. I accidentally introduced -- actually without sticker. It's still labeled as Exhibit 10. But I think that it's possible that Exhibit 9 and 10 are going to be the same one -- no, it's just Exhibit 10.

So what's been marked as Exhibit 10 does not have a sticker on it, just for purposes of the

Page 89

record.

So it's Bate Stamped 238279. It will be listed as Exhibit 10 but it has no sticker.

THE COURT REPORTER: It will be reflected in the record.

MR. PINEIRO: Thank you.

BY MR. PINEIRO:

Q. So I'm showing an e-mail from Harold Jahn on February 23rd to Chuck Berg and Dwight Egan.

Do you see that e-mail?

A. I do.

Q. Who is Harold Jahn?

A. I believe he was a customer of the company.

Q. Okay. It says:

"Good afternoon, Chuck. I would like you to got to Co-Diagnostics tomorrow morning and get a video done for Rapid DX Website."

Is Rapid DX of Co-Diagnostics?

A. I don't recall specifically who or exactly who Rapid DX was.

Q. It says: "It will be 1 minute 45 seconds long. Once completed, it posted to YouTube and linked on our website."

Was it normal to have customers request videos or other marketing materials from the company?

23 (Pages 86 - 89)

Page 90

A. I don't recall that happening very often.

Q. Okay. And then it appears this is forwarded to you and there's an e-mail from you to Chuck Berg. Who is Chuck Berg?

A. I don't recall exactly what his relationship with the company. He had some sort of friendly relationship with -- with Dwight. And I believe he made the introduction to Harold, so he was sort of the go-between, but I don't know exactly.

Q. Got it. Sorry. I mean, towards the bottom of the e-mail, Mr. Jahn, you know, provides a script for Chuck Berg. And in that script it talks about the advantages of the Co-Diagnostics test. In Number 2, it says: "Eliminate false negatives or false positives. Our tests are 100 percent accurate." Do you see that?

A. I do.

Q. You write: "Um, no. No. I didn't approve that. Negative. Thanks for running it by me. It's tough to know exactly where to begin with this but I guess if forced to pick somewhere it would be here." You say: "Its ability to detect low viral loads in the patient early on in the infection stage during the 27-day asymptomatic period."

Page 91

Then you said: "This claim has not been confirmed or validated and should not be made about our products." Do you see that?

A. Yes.

Q. By the way, do you know when this marketing -- this proposed marketing material was run by the regulatory department?

A. It was not. It was not Co-Diagnostics' marketing material.

Q. Okay. It was marketing material that was going to be prepared by, I guess, the Rapid Diagnostic company?

A. A company -- yes, a company who was going to be a distributor of ours.

Q. Got it. So they were asking -- they were asking -- do you know why they were asking Mr. Berg to get this video done?

A. No.

Q. Okay. Then Number 2: "Eliminate false negatives or false positives. Our tests are 100 percent accurate." You write: "No test is 100 accurate and nobody should ever make this claim." You write "nobody" in all caps. Why did you do that?

A. I don't know. Emphasis. I like to randomly

Page 92

emphasize words.

Q. Why were you emphatic at that point?

A. I believed it to be true.

Q. Okay. And why is it important to never make that claim?

A. I -- I don't believe in making false statements about company test products. You know, to state that a test is 100 percent accurate all the time or that it completely eliminates false negatives or false positives would be inaccurate.

Q. Right. The inference of that would be inaccurate, too, right?

MS. PEIRSOL: Objection. Argumentative. Misstates his testimony.

MR. PINEIRO: How have I misstated his testimony there?

MS. PEIRSOL: Repeat the question for me.

MR. PINEIRO: I said, the inference of that would -- now I forgot --

MS. PEIRSOL: Argumentative, Michael. Objection. Argumentative.

THE WITNESS: I think you mean the word, "implication," case not "inference," but that's up to you.

BY MR. PINEIRO:

Page 93

Q. Sure. The implication of that, inferring it --

MS. PEIRSOL: Objection. Argumentative.

BY MR. PINEIRO:

Q. You could answer.

A. I believe when I said nobody would ever make this claim, I'm referring to not just Co-Diagnostics but no test manufacturer ever would make that claim, I believe is what I meant by emphasizing that word or a distributor.

(Plaintiff's Exhibit No. 11 was marked for identification.)

BY MR. PINEIRO:

Q. I'm introducing what's been marked as Exhibit 11. Do you see that on the screen sir, 11?

A. Yes.

Q. At the bottom there's an e-mail from Mr. Egan from March 14, 2020 and he writes: "Roche noted that negative results with the Cobas Test does not preclude infection and such results must be combined with clinical evaluations -- "clinical observations, patient history and epidemiological information." Do you see that?

A. I do.

Q. And Mr. Satterfield comments: "It's a standard

24 (Pages 90 - 93)

Page 94

disclaimer. No test is 100 percent accurate all the time."

Do you see that?

A. I do.

Q. Do you know whether CODX had a standard disclaimer similar to that in its -- with respect to its Logix Test?

A. Standard disclaimer where?

Q. In the packaging or in the brochures regarding the Logix Test.

A. At the time that it received emergency-use authorization, which was following this time, then a disclaimer that -- I can't remember exactly what the wording is, but it's similar to what Roche had included here, was included in the labelling for the Logix Smart COVID-19 test.

Q. Okay. And that was from the get-go, in terms, of, like, initially upon relaying the product?

A. Upon releasing it with emergency-use authorization by FDA, yes.

Q. What is a CE marking?

A. CE marking is a marking that is used on goods that are commercially sold throughout the European community to markets, authorized by the European to be placed on goods to be sold for certain purposes.

Page 95

Q. And, Co-Diagnostics, did it obtain the CE marking in February of 2020?

A. It received a -- yes, a CE for its Logix Smart Test to be sold as an in-vitro diagnostic.

Q. Got it. Were you involved at all in the submission of that application for that authorization?

A. No.

Q. Are you familiar with what data was required to be submitted with that application?

A. I'm not familiar with the data that was required.

Q. Did -- once CODX was selling the COVID-19 test, did it implement any systems or procedures to obtain customer feedback regarding the test?

A. Customer feedback and post-market surveillance is a part of the ISO 13485 Quality System, under which Co-Diagnostics operates.

Q. Okay. And who is was in charge of -- strike that.

What is post-market surveillance?

A. I can't -- I know that it's term that's used, but it's -- I don't know exactly now how it functions.

I understand it to be just what it sounds like. After products are released in the market, then feedback is gathered somehow. I don't know exactly how it works.

Page 96

Q. And do you know who at the company was in charge of that in 2020?

A. No, I can't remember who -- that would be a more of a quality role, and I don't know exactly who was performing that at the time.

Q. Would it be somebody on the science side of the company?

A. It may have been. Again, I don't know who it was.

Q. Okay. What is emergency-use authorization; are you familiar with that term?

A. I am.

Q. What does that mean?

A. It was authorization by the Food & Drug Administration that allows a test or a -- or a -- or therapeutic to be used on -- I know this is a bit circular -- but on an emergency-use basis, that allows a test to qualify for use under -- under different qualifications than what would be required under a non-emergency situation.

Q. Now, were you at all involved in preparing that application to the FDA?

A. No.

Q. Are you familiar with the data that was submitted in connection with that application?

Page 97

A. I know there was data submitted, but I'm not really familiar with it.

Q. Who was responsible for putting together that application?

A. I believe that would have been Ms. Hutchins.

Q. Do you recall when the company received emergency use authorization?

A. I believe it was in the beginning of April 2020.

Q. Prior to that, did CODX or any employee of CODX make any outreach to Senator Mitt Romney regarding the EUA approval?

A. I don't know exactly what transpired. I believe there was some communication with his office, but I can't remember exactly when it was or who would have made that communication.

Q. Were you involved in those communications?

A. I had no communication with Senator Romney or anybody political.

Q. You didn't participate in any phone calls with his office?

A. No, not that I recall.

Q. Did you draft any letters that were sent to his office regarding EUA approval?

A. I might have completed some first drafts, but I don't specifically recall what I would have written.

25 (Pages 94 - 97)

Page 98

As corporate communications, you know, it wasn't uncommon for me to be asked to draft something.

Q. Did you -- did -- did Senator Romney assist at all with respect to the EUA approval?

A. I understand he did not.

Q. Okay. At some point in time, did CODX apply for regulatory approval to sell its tests in India?

A. I don't believe that's exactly how it worked. I think the company's joint venture in India applied for clearance with the CDSCO to sell the Co-Diagnostics test.

Q. What's the name of that company with which it has a joint venture?

A. What's the name of the joint venture of the joint venture, or what's the name of the company with whom Co-Diagnostics has --

Q. Sorry. What's the name of the joint venture?

A. CoSara, C-O-S-A-R-A, Diagnostics.

Q. Okay. And what's the name -- does CODX have an affiliate that's involved in that joint venture?

A. No, the joint venture is the affiliate.

Q. Got it. Okay.

So what you're saying is that CoSara had submitted a test for regulatory approval in India?

A. Yes.

Q. Okay. Is that test identical to the Logix Smart

Page 99

Test?

A. I understand that it is.

Q. Okay. Are you aware that at some point that the CDSCO rejected CoSara's application for approval to sell the COVID-19 test?

A. I was aware of something along those lines. That's not how I recall it being characterized.

Q. Okay. How was -- how was it more correctly characterized?

A. I recall that there was a study that was performed with a lot anomalous data, a lot of anomalous results.

We weren't given access to the data. We only saw the results. And it was confusing, because not only Co-Diagnostics, but many large-scale, well-known global manufactures of COVID diagnostics also received results that were contrary to what others reporting, as far as those tests performed.

(Plaintiff's Exhibit No. 12 was marked for identification.)

BY MR. PINEIRO:

Q. I've introduced an exhibit marked Exhibit 12. One second.

Do you see that on your screen, sir?

A. I do.

Page 100

Q. So there's an e-mail from Anurag Mehta, at Synbiotics on April 2, 2020.

Do you see that?

A. I do.

Q. What is Mr. Mehta?

A. I don't know his exact role. I believe he runs operations for Synbiotics.

Q. Okay. And it says:

"Subject: Performance Evaluation Result." Today the results of PE are published on ICMR site and unfortunately our score is not that satisfactory." Do you know what "PE" stands for?

A. I don't.

Q. Does ICMR stand for Indian Counsel for Medical Research?

A. I think so.

Q. And it says:

"Please refer our score for concordance amount true negative and true positive results, respectively."

What does word "concordance" mean?

A. My understanding is how, in this case, in this context, a test performs in comparison to a standard.

Q. It says:

"The requirement is 100 percent for both of the

Page 101

parameters. We have submitted these results to CDSCO for granting permission for manufacturing, but I'm having doubts, I am listing below."

Do you see that?

A. I do.

Q. Do you recall receiving this e-mail?

A. I don't recall specifically receiving it, but I do recall discussing after it arrived.

Q. And you recall that there was an issue with specificity -- strike that.

Do you recall that the ICMR found -- strike that.

Do you recall that the results of the -- of this test demonstrated a specificity of 88 percent?

A. I do recall those results, yes.

Q. Okay. And so in your position as the head of investor relations, were you concerned about that?

A. No.

Q. Why not?

A. Because when you receive something like that, it's such an outlier compared to everything else that you've seen, that your immediate reaction is, what was wrong with the study itself, not what was wrong with the test.

Q. Was there any discussion of disclosing this

26 (Pages 98 - 101)

Page 102

development to investors?

A. No, not that I recall.

Q. So I'm introducing what's been marked as Exhibit 13?

(Plaintiff's Exhibit No. 13 was marked for identification.)

BY MR. PINEIRO:

Q. One moment. So at the bottom there's an e-mail from Nick German: "Subject: Attention investor relations."

Who receives these investors at codiagnostics.com, e-mails to that e-mail address?

Do you see that?

A. I do.

Q. Anyone else?

A. I don't believe so.

Q. It says:

"Good afternoon. As a concerned investor of Co-Diagnostics, who initial investment has now plummeted over $80,000, I would certainly appreciate an answer on exactly what wrongfully happened with CoSara Diagnostics today."

Do you see that?

A. I do.

Q. It says:

Page 103

"I am disappointed in today's new and I would like someone to respond to these immediate questions."

And then you send an e-mail the next day at 11:29. Do you see that e-mail?

A. I do.

Q. It says:

"Okay. So, I'm thinking a response like the following: CoSara is following the guidelines established by the Indian government. The process works as follows."

And then it appears -- this appears to be like a draft response to this investor?

A. I believe so, yes.

Q. And then Mr. Satterfield responds:

"It's generally okay. It would be nicer if we could link to the white paper or other countries to show our confidence."

Do you see that?

A. Yes.

Q. Did you run this draft e-mail by Ms. Hutchins?

A. I don't recall.

Q. Who is Mayuranki Almaula?

A. She is -- I'm not sure of her title. She is our our main contact -- our main representative in India.

Page 104

Q. Got it. You respond:

"I want to avoid reference to the comparison with the CDC primers until we have it in at least a white paper format, so we could refer people to it, but the rest of it is really helpful. I need to keep in mind that our audience is unsophisticated."

What did you mean by that?

A. I think just what I followed up to say, which is "I don't think they know what "RNA dependent, RNA polymerase is." And I was just referencing that that line probably wasn't going to be helpful in communication in responding to that shareholder.

Q. Is it fair to say that the general public that's reading the company's press releases is unsophisticated on the science of these test?

A. As far as the science goes? Yes.

Q. Unsophisticated also regarding the metrics of accuracy of these tests?

A. If that -- can you explain what you mean?

Q. Yeah. I mean, you know, you reference that the audience is unsophisticated. That would include with respect to knowledge of the type of metrics that go into accuracy of a COVID test, right?

MS. PEIRSOL: Objection. Mischaracterizes his prior testimony.

Page 105

THE WITNESS: As far as unsophisticated here, all I'm referencing is just this one line that Dr. Almaula was talking about. It's a fairly scientific phrase, "RNA dependent, RNA polymerase," which isn't even anything that I understand.

But, certainly, there are terms of art or there are processes that the general public is not familiar with as it relates to what goes into determining test's performance.

BY MR. PINEIRO:

Q. With the word "audience" here, who are you referring to?

A. This -- I don't know exactly what I'm referring to exactly. Probably in reference to that shareholder that I was looking to respond to.

Q. Okay. Were you referring also to just the investing public?

A. I don't think so. I think I was referring just to that shareholder, and then any other similar inquiries that I received. I think that was the context of this e-mail.

Q. So any other inquiries from investors?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: As far as this goes.

BY MR. PINEIRO:

27 (Pages 102 - 105)

Page 106

Q.   So the answer is, yes?

A.   In this context, it is.

Q.   When preparing press releases regarding the Logix Smart Test, was this an issue that you considered, the relative lack of sophistication of the public regarding the specifics of PCR testing?

A.   I would certainly try to keep in mind who the audience was, whenever anything was being drafted.

Q.   So when -- but, more specifically, when the audience is the general public, was there a concerted effort to ensure they could understand the concepts that were being communicated in the releases or the communications?

MS. PEIRSOL: Objection.  Asked and answered.

THE WITNESS: Who do you mean as the "general public"?  We have a number of people that read our press releases, and a lot of them are a highly scientific audience.  And, a lot of times, we have to communicate to that audience as well.

It's hard to issue a press release that can be immediately and readily understood by absolutely every person.  And if the concern is that customers might have doubt about the performance of our tests -- and our customers are, by nature, scientific audience -- we have to be able to communicate with

Page 107

them as well.

So it could sometimes be a balancing line -- a balancing act to walk that line between communicating in a way that is sophisticated enough for that audience, but also accessible to those who may not have prior knowledge of how -- you know, the inner workings of a diagnostics manufacturer.

BY MR. PINEIRO:

Q.   When it came to the company's press releases -- strike that.

So are you saying that through the press releases, the company seeks to, in part, to communicate with its customers or prospective customers?

A.   It depends on the press release.

Q.   Okay.  So are there some press releases that are targeted to customers?

A.   There -- there may be, yes.

Q.   Okay.  And then there are some press releases that are targeted to investors?

A.   We don't typically target press releases to investors.  We like to inform the investing public what's going on, our shareholders, but also those that are not investors, not shareholders as well.  We anticipate that our press releases are not going to be read by our shareholders.  And so when we communicate, certainly

Page 108

there are times that, just through good corporate governance, we're trying to communicate with our shareholders.  But we always try to be aware of the fact that our press releases could be read by others as well.

I don't know if that really answers your question, but I might not have understood what I was being asked.

Q.   Did you closely follow the company's stock price?

A.   Yes.

Q.   Okay.  On a daily basis?

A.   At the time, yes.

Q.   Did you -- did you ever conduct any analysis of how the company's stocks reacted to its press releases?

A.   I don't recall performing such an analysis.

Q.   Do you know -- do you know whether your father, Reed Benson conducted that analysis?

A.   I think I saw somebody do one once, but I can't remember who that was.

Q.   Was it provided to you?

A.   If I saw it, it must have been provided to me.

Q.   Okay.  And who provided it to you?

A.   Once again, I can't recall who gave it to me.

Q.   Was there ever any discussions within the company regarding issuing press releases in order to have

Page 109

the stock go up in value?

A.   There was an understanding that press releases can at times have an effect on stock price, but press releases were never issued with the goal of affecting stock prices.

Q.   Okay.  And when you say there's an understanding, an understanding amongst whom?

A.   Just anybody who has worked in the industry is aware that stock -- that press releases can affect stock prices.

Q.   And -- but you never had any discussions with Mr. Egan about that?

A.   About what specifically?

Q.   About how press releases can positively impact the stock price.

A.   I regularly discussed -- I mean, it's just a matter of common knowledge that press releases can affect stock price.  I would have discussed it with any number of people.

Q.   Okay.  So this is something that would have come up with some frequency within the company?

MS. PERISOL: Objection.  Misstates his testimony.

THE WITNESS: Yeah, I didn't say with -- with -- with any degree of frequency, but something that

28 (Pages 106 - 109)

Page 110

would have come up, sure.

BY MR. PINEIRO:

Q. And was there a concerted effort to issue more press releases in order to increase the price of the stock?

A. No.

Q. Did -- did -- did CoSara's test ultimately get approved by the ICMR?

A. I did.

Q. Do you know what changes were made, if any, to obtain that approval?

A. I understand they redid that study using a different standard. And once they used a standard that was a known quantity, rather than whatever standard they were using before, that Co-Diagnostics, as well as some of these other global manufacturers of -- of -- of PCR test, all of those -- those -- those -- the performances of those tests fell more in line with the expectations based on previous evaluations.

Q. So CoSara did not improve or modify its test in order to obtain that approval?

A. No.

Q. So after CODX received EUA approval, are you aware that it entered into agreements with Nomi Health to sell the Logix Test?

Page 111

A. Yes, I believe so.

Q. Are you involved -- were you involved at all in those negotiations?

A. No.

Q. Are you typically involved with any negotiations with any potential customers?

A. No, not typically.

Q. What scenarios might you be?

A. I say "not typically: But maybe tangentially I've heard of them. I have very little, if any communication with -- with customers so, no.

Q. Are you notified by management when, I guess, the company enters into new customer relationships?

A. Not always, maybe sometimes, but I can't recall any specific examples.

Q. Okay. Are you aware whether Nomi was a large customer of CODX?

A. I believe it was.

Q. Is it still a large customer of CODX?

A. I'm not really sure.

Q. Who would be aware of that?

A. Those in sales and finance.

Q. Are you familiar TestUtah?

A. Yes.

Q. What was that?

Page 112

A. I understand it was an effort to increase the availability of COVID testing within the state of Utah and spearheaded by local tech entrepreneurs.

Q. Okay. Are you aware that Nomi received a contract from TestUtah to conduct COVID tests?

A. Yes, I believe that's the case.

Q. And that the tests that were being used in TestUtah were the Logix Smart Tests?

A. I understand they were -- I don't know if we were the sole test being used in TestUtah, but I know we were used for at least some of them.

Q. Are you familiar with Silicone Slopes?

A. Somewhat familiar, yes.

Q. What is it?

A. I think it was kind of a set up to sort of be a, you know, a Utah equivalent of Silicone Valley, where it just refers to the tech corridor, you know, along the mountains, slopes. Very clever.

Q. Are you aware that CODX's tests were also being used in TestIowa?

A. I believe so, yes.

Q. TestNebraska?

A. I believe so, yes.

Q. Wisconsin?

A. I didn't know TestWisconsin. I believe we

Page 113

shipped tests there. But I don't know what a --

Q. Got it. What about Tennessee?

A. I think that we shipped tests there as well. I don't know.

Q. Are you aware of the size of these contracts that -- are you aware of the size of the contract between -- strike that.

Are you aware of the volume of sales generated for CODX in connection with those contracts?

A. Not intimately, no.

Q. At this point in time, were these the largest contracts entered into by the company?

A. I don't think so, no. It may have been one of the largest domestic contracts, but I believe there may have been international contracts that were larger.

Q. Do you know which international contract was larger than those?

A. A customer in the Middle East.

Q. What was the name of that customer?

A. I can't recall. I should say, I don't -- I'm not familiar with the sizes of contracts. All I would be aware of was revenue that might have been generated in a particular corridor, if that was data that was provided to me by finance.

But I -- because I wasn't really intimately

29 (Pages 110 - 113)

Page 114

familiar with any of the contracts, all I know is that in certain corridors, there were, you know, customers that may have been responsible for our revenue.

(Plaintiff's Exhibit No. 14 was marked for identification.)

BY MR. PINEIRO:

Q. I'm introducing an exhibit marked as 14. I'm going to share my screen.

Up top there's an e-mail, a forward from Dwight Egan to you on April 17th. Do you see that?

A. I do.

Q. And then scrolling down to what was forwarded to you, there's an e-mail Bert Lopansri. Do you see that?

A. Yes, I do.

Q. Have you ever reviewed this e-mail?

A. Can you give me a moment.

Q. Sure.

A. Okay. I don't recall receiving this.

Q. You don't recall reviewing it?

A. Receiving or reviewing.

Q. Do you recall discussing this e-mail with people within the company?

A. I don't recall discussing the e-mail. It seems like I recall some of the content of the e-mail. The name of the individual who wrote it is familiar. But I

Page 115

recall his name in connection with concerns, but I don't recall specifically discussing the e-mail.

Q. Is it typical -- was it customary for you not to review an e-mail like this one, that, you know, discusses potential issues with the company's tests?

MS. PEIRSOL: Objection. Misstates his testimony. Argumentative.

THE WITNESS: I'm not involved in the science side of things. Somebody who had concerns about the performance of the company's test, as a matter of course, that's not something that would be sent to me. As noted here, it wasn't sent to me.

BY MR. PINEIRO:

Q. Right. I mean, nobody from the company was included in the e-mail. And then it was forwarded to Ralph Costanzo, and eventually ended up being sent by Mr. Egan to you. Do you see that?

A. Yeah. It went through several layers before it got to me. I mean, for the most part, information like this isn't anything that I associated with.

Q. So, Mr. Egan, who is the CEO of the company, sent you this and you didn't read it?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: I just said I don't recall reading

Page 116

it. I don't recall discussing it.

At the time, it was also the case that I would be receiving hundreds of e-mails a day. And I simply can't recall everything I would have received at the time.

BY MR. PINEIRO:

Q. So when Mr. Lopansri sent this e-mail, was there any discussion about the need to notify investors or the public about potential issues with the company's tests?

A. I don't recall a discussion like that, no.

Q. Does the company have an obligation to disclose negative information about its test to the investing public?

A. As I testified earlier, when you -- when a, you know, a body of scientists receives some information, some data that's anomalous, that's different from what would have been expected, the first question is, why we're seeing what we're seeing. And until we know why that is, then it would be irresponsible to report something to the public that turns out to be incorrect or anomalous.

So until we know why, those results are different, there wasn't anything to report. And that's why did exactly that. That's why we later on issued a white paper that showed that the differences in the

Page 117

positivity rate was not a result of test quality. It was a result of the -- of the -- I don't know exactly -- the classification by which people were approved for testing or not, that TestUtah was using.

TestUtah was using a different set of criteria for determining whether somebody qualified for a test, than the rest of the state of Utah.

And the data on that white paper showed that once those criteria came in line with what the rest of the state of Utah was doing, the positivity rate also matched.

So it would have been irresponsible to report that. It would have been untrue and misleading.

Q. Who prepared that white paper?

A. Doctor Satterfield.

Q. Did anybody assist him in preparing it?

A. I don't know.

Q. Was it peer reviewed?

A. It was not. It was a white paper. But the data speaks for itself, the data in there. It's just simple math at that point.

Q. And so based on that white paper -- strike that.

Besides the white paper, was there any other investigation by the company into Dr. Lopansri's allegations?

30 (Pages 114 - 117)

800-726-7007                                   305-376-8800

Page 118

A. What kind of investigation?

Q. To investigate the root cause of the issues he identified.

A. That is exactly what I just said we did. The root cause, was, "okay, well, this is odd, why are we seeing different results, let's get to the bottom of it."

You have to isolate and control for all of the variables, which is what happened. And you'll notice the positivity rate -- and this is evident in Dr. Satterfield's white paper -- the positivity rate jumps immediately upon changing that -- those classifications or those criteria for testing.

There wasn't anything else that happened. The test didn't change. The process didn't change. The only thing that changed was what was considered to be, you know, the criteria for testing. And once that came in line, the positivity rate did as well.

Q. Got it. Do you know whether Mr. Satterfield, in connection with that white paper, examined whether the LoD -- the LoD was any one of the factors involved in the lower positivity rate?

A. I don't know what was involved in him preparing that white paper.

Q. Okay. Was that white paper disseminated to the

Page 119

public?

A. It was posted on the company's website.

Q. Okay. Has the SEC -- did the SEC ask you any questions about that white paper?

A. I don't recall.

(Plaintiff's Exhibit No. 15 was marked for identification.)

BY MR. PINEIRO:

Q. I'm introducing marked Exhibit 15.

Do you see on your screen?

A. I do.

Q. It's an e-mail from Jennifer Webb on April 19th. It says:

"All, Nate Carlisle, the Tribune reporter who Brent diffused a couple of weeks ago is back again with this request today (below)."

Do you know what she's referring to when she said, "Brent diffused a couple of weeks ago is back"?

A. I'm not sure.

Q. "I have asked him to send me what he's looking at. We would almost always rather comment and clarify. Please give me a call when you can" ask.

Then it says:

"Update: We have spoken with reporter briefly and he is sending the "documents." I'll forward as soon

Page 120

I have them."

Q. Do you know what she referred to in terms of the documents in quotes?

A. No.

Q. At this point where you have reporter that's, you know, investigating issue regarding -- strike that.

The reporter that's referenced there, was that the reporter that ultimately -- one of the reporters that wrote the April 30th Salt Lake Tribune regarding TestUtah and CODX test?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't know. I think he might have been on the by line but I can't recall.

BY MR. PINEIRO:

Q. Upon receiving this inquiry from the Salt Lake Tribune reporter, were there internal discussions within the company regarding how to respond to this inquiry?

A. There may have been, but I can't recall what they were.

Q. Okay. Were you involved in those discussions?

A. Again, there may have been some. I can't recall specifically being involved with them or what the substance would have been.

There were a lot of meetings that took place every single day. I can't recall that specifically.

Page 121

(Plaintiff's Exhibit No. 16 was marked for identification.)

BY MR. PINEIRO:

Q. What I've introduced marked as Exhibit 16, there is an e-mail from Jennifer Webb on April 30th to Dwight Egan and some other folks. It appears to forward an article from the Salt Lake Tribune.

MS. PEIRSOL: We're not seeing the exhibit.

BY MR. PINEIRO:

Q. Sorry. Do you see it now?

A. I do.

Q. Ms. Webb forwards an article from the Salt Lake Tribune that says -- this is the title:

"This is a potential public health disaster. COVID-19 results from TestUtah.com are raising questions."

Do you see that?

A. I do.

Q. Then you write e-mail to Keith Pinder at Landon Capital. Do you know who that is?

A. Yes.

Q. Who is he?

A. Landon Capital was providing investor relations support for Co-Diagnostics at the time.

Q. What did that entail?

31 (Pages 118 - 121)

Page 122

A. He would assist in outreach to broker/dealers and to investment advisors and set up meetings for the company to introduce ourselves.

As a result, he would also have a lot of inbound inquiries from some of the people that he made those introductions.

So I would occasionally keep him in the loop -- I'd try to keep him in the loop about things like this when they're happening, so he wasn't caught off guard by them.

Q. Okay. So you made him aware since he's dealing with investors?

A. Yeah. He didn't deal directly with investors and shareholders. He would deal more the RIA's or the BE's that have the investors themselves.

Q. And so do you recall reading this article?

A. I recall reading it, vaguely. Well, I don't recall. I recall it reading it. Sure.

Q. And was this a very big deal at the company, this article?

MS. PEIRSOL: Objection. Vague. Ambiguous. What do you mean by "big deal"?

THE WITNESS: Yeah, that's what I was going to ask.

BY MR. PINEIRO:

Page 123

Q. You could answer.

A. Yeah, what do you mean by -- by "big deal."

Q. Well, I'm speaking to a person; was it a big deal at the company that you received this e-mail, that this article was published?

MS. PEIRSOL: Objection. Vague. Ambiguous.

THE WITNESS: It was definitely a surprise. We knew that something was being written. Until it broke, we had no idea that they were writing a negative -- or what could be largely viewed as a negative article about Co-Diagnostics. So it was definitely a surprise.

BY MR. PINEIRO:

Q. Prior to this, had the company -- in connection Logix Smart Test, had the company had any negative PR?

A. I don't recall whether we had at this point or not.

Q. This is the first -- would you consider the Salt Lake Tribune a sizable publication?

A. I mean, that's relative. It isn't on a national scale; it's relatively large for the local media.

Q. Was the company alarmed by this article?

A. I don't recall being alarmed, no.

Q. Okay. What was the company's reaction to this?

A. I would say disappointed, that they, you know,

Page 124

they seemed to misunderstand things; that they reported without, what we felt, was a firm understanding of all of the nuances that went into it, without doing, as we did, for example, an analysis to determine what resulted in a lower positivity rate. They had no interest in that.

Of course, their -- you know, in all of their communication with us about writing the article, there was no indication that it was remotely negative. And so they really sort of just waylaid us with this article.

They all want to be your friend and very friendly on the phone, when they have these ulterior motives.

Q. What was the ulterior motive?

A. To write a negative article.

Q. Do you think -- do you believe that the Salt Lake Tribune had some type of specific vendetta against CODX?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't think that the Tribune specifically as a whole had a vendetta against the company.

BY MR. PINEIRO:

Q. Okay. Did somebody else?

A. I can only speculate and it would -- it would be pure speculation, so --

Page 125

Q. Have you discussed with Mr. Egan -- strike that.

Are you aware that Mr. Egan believes that the Tribune had some type of vendetta against the company?

MS. PEIRSOL: Go ahead.

THE WITNESS: I don't believe that Mr. Egan believed that the Tribune had a vendetta against the company.

BY MR. PINEIRO:

Q. Did you ever discuss that with him?

A. Yes, we would discuss matters related to the Salt Lake Tribune.

Q. Did you ever discuss the specific -- did ever discuss the prospect that there may be a political motivation behind this article?

A. We discussed and believe -- I can't remember exactly what the individual's role is, but he essentially owns or runs the Tribune, who is the brother of a prominent Utah politician, who was, at the time, in an election cycle.

I have discussed with Dwight the possibility that there was some political machinations behind the scenes. But to say that something like that took place would be speculation.

Q. Was it Mr. Egan's impression that there was some type of political motivation?

32 (Pages 122 - 125)

Page 126

A. You'd have to refer to Mr. Egan's testimony about that.

Q. Well, I'm asking you about your conversations with him and what he relayed to you.

A. There was a lot of questions asked, you know, if things looked suspicious, looked fishy. And, you know -- my understanding is, he doesn't know any more than the rest of us; which is all he can do is speculate and ask the questions, to which no answers are forthcoming.

Q. So just looking at the article, it says:
"The accuracy of coronavirus tests by TestUtah.com has come into question, with state data showing that the rate of positive results among people tested at its sites is less than half what it is for patients tested elsewhere in the state."
Do you see that?

A. I do.

Q. Then it appears to quote from Dr. Lopansri's April 14th e-mail that I showed you, correct?

A. Yes.

Q. And then further down it says -- there's a quote from Mr. Satterfield that says:
"We're talking about population differences," agreed Brent Satterfield, founder and chief science officer at Co-Diagnostics, Inc., which produces the

Page 127

test kit used by Test Utah's sites."
Do you see that?

A. I do.

Q. Do you recall having -- did Mr. Satterfield have a conversation with a reporter?

A. He must have.

Q. Are there scenarios where quotes would be attributed to him but sent by you or the PR firm?

A. There could be, but I don't believe that was the case here. I believe he was actually interviewed by the reporter for this article.

Q. Okay. And so by this point, April 30th, it appears that Mr. Satterfield's already concluded that the discrepancies are based on population differences?

A. That's what he's saying here.

Q. When did he issue the white paper that you discussed?

A. I can't remember exactly.

Q. Was it after this article came out?

A. Yes.

Q. Do you know who was involved in -- strike that.
So I had asked you whether an investigation was conducted into, you know, the cause of the discrepancies and your answer was that, yes, and you referred to white paper. But it appears, like I've shown you here, that

Page 128

prior to that Mr. Satterfield had reached that conclusion.
Are you aware of what he did to reach that conclusion at this point in time?

A. Like I said, I'm not sure what went into Dr. Satterfield issuing the white paper. I do know a scientific theory begins with a hypothesis and then testing that hypothesis.
And the hypothesis that Dr. Satterfield was testing here was he knew the criteria that TestUtah was using were different than the TestUtah -- than the rest of the population or the rest of the testing criteria.
So his hypothesis was, we're talking about population differences. "Population" referring to the population of who qualifies to be tested or who doesn't, not geographical or demographical population differences.

Q. So, at this point, the statement that he's made to the press is a hypothesis?

MS. PEIRSOL: Objection. Mischaracterized what he just said.

THE WITNESS: You'd have to speak to Dr. Satterfield about how that would be characterized.

BY MR. PINEIRO:

Q. No, no. You -- you said he was hypothesizing.

Page 129

I'm using your words.

A. I'm telling you how the scientific -- how a scientific.

Q. No --

A. -- I stated multiple times, I don't know what was in Dr. Satterfield's head when he went through this, and I don't know what methodology he used.

Q. So you -- you're -- strike that.
Did you approve or were you involved in the approval of Dr. Satterfield's quotes submitted in connection with this article?

A. No. As I said, I believe he was interviewed. But I was not present for that interview.

Q. Prior to the interview, were you involved in any discussions with Dr. Satterfield regarding what he would tell the reporter?

A. I don't recall doing so, no.

Q. Do you recall whether Ms. Hutchins was involved in any discussions with Dr. Satterfield regarding what he would tell the reporter?

A. No.

Q. It says:
"But according to state data obtained by The Tribune, TestUtah reported that test results for symptomatic patients, and even for those patients,

33 (Pages 126 - 129)

Page 130

positive results are far below those reported at other test sites in the state."

Do you see that?

A. I do.

Q. Did Dr. Satterfield's white paper address that issue?

A. Yes, it controls symptomatic and asymptomatic, I believe, yes. I mean, symptomatic and asymptomatic is a definition of terms. Once you adjust the definition to be in line with what the rest of the state was, that's why those numbers started to match.

Q. Got it. One second here.

Are you familiar with a analysis run by Bio Century regarding the limit of detection of CODX's test?

A. Not really, no.

Q. So in the article, there's a reference to -- it says here: "Co-Diagnostics test has a higher limit of detection compared to tests offered by more established vendors, Lopansri wrote," referring to the test sensitivity."

Is that true or not?

A. I believe the test that he included in his e-mail that you presented to me earlier showed a couple of tests that had lower limits of detection.

Q. Right. And then below that it says:

Page 131

"An analysis by the life sciences publication BioCentury showed that at least 16 of 22 comparable tests authorized by the FDA reported a lower limit of detection."

Are you familiar -- have you seen that -- again, you've never seen this analysis?

A. I don't recall seeing it.

Q. Okay.

A. I will say if that you continue on that sentence, where you stopped, you could see how the Salt Lake Tribune also misunderstands limit of detection. It's now conflating a lower limit of detection and greater sensitivity. And like I've already said, those two things are not synonymous.

Q. It says:

"But Satterfied maintained that in a real-word environment, people who have contacted COVID-19 have thousands or even hundreds of thousands particles of the virus in their samples, and that's plenty to trigger a positive in his company's tests."

A. Correct.

Q. "He added that Co-Diagnostics COVID-19 tests scored between 99.52 percent and 100 percent in evaluations conducted by the FDA and in Europe."

Do you see that?

Page 132

A. I do.

Q. Do you know what evaluations he's referring to?

A. This must be a misunderstanding by the Salt Lake Tribune because the FDA does not do evaluations. So I don't know what they misunderstood, and I don't know what he said to them. Because I wasn't present for the interview.

Q. Do you know what he's referring to by "evaluations in Europe"?

A. No.

Q. Okay. And when you saw this -- so this is a mistake in the article?

A. I think it's a misunderstanding by the Salt Lake Tribune because I know that the FDA does not conduct evaluations.

Q. Okay. And did anybody CODX reach out to the reporters of the article and inform them they were mistaken regarding the quote?

A. I don't know specifically about this quote. I know there was outreach to Salt Lake Tribune to request clarification, but I don't know if it was specifically this quote.

Q. Did other news outlets pick up on this story?

A. Yes, I believe so.

Q. Was the company concerned about this story

Page 133

spreading?

A. I don't know that the company was concerned about the story spreading, but the company -- yeah, I don't know that we were concerned about the story spreading. But we did want to, you know, provide confidence to our customers that our tests are performed at a high level of quality.

Q. Was it concerned in any respect, with respect to the publication of this article?

MS. PEIRSOL: Objection.

BY MR. PINEIRO:

Q. Was it concerned at all about the publication of this article?

MS. PEIRSOL: Objection. Michael, he's not here to testify on behalf of the company.

Who are you referring to? Him?

BY MR. PINEIRO:

Q. Okay. Were you concerned?

A. Just like I said, there was concern that we wouldn't want customers to be misled by what we felt was a misleading and an inaccurate article, that the tests were not performing well, when that was not the case.

Q. Okay. Were you concerned about investors' reaction to this story?

A. I don't recall being concerned about investors'

34 (Pages 130 - 133)

Page 134

reactions. I think my concerns were in line with what I just testified.

Q. Okay. The concern was mainly with customers?

MS. PEIRSOL: Objection. That mischaracterizes his testimony.

BY MR. PINEIRO:

Q. You can answer.

A. Yeah. I mean, this happened three years ago. I can't recall what my mindset was for something that took place, you know, three years ago, most of which was a pandemic. Like, I simply can't recall exactly what I felt at any given day, about any particular stimulus.

Q. But this wasn't any -- I mean, this wasn't any random day. This was a day that a very negative news story came out about the company's test, and it could have had a significant impact on the company's -- on the company's operation.

So you don't recall how you felt when you saw this article published?

MS. PEIRSOL: Objection. Asked answered and argumentative.

THE WITNESS: It's easy to cherry pick this in hindsight. But at the time, when every single day was big, every single day was 14, 16-hours days -- I'm just trying to -- trying to -- at this point, you

Page 135

know, providing tests all around the world to people suffering from the pandemic. I mean, I had big-news events and bad-news events and good-news events, and this was one of them.

BY MR. PINEIRO:

Q. Just like any other day then?

A. I'm not saying it was like any other day, I --

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

BY MR. PINEIRO:

Q. So the article is published; do you recall what the company did next, in terms of, you know, preparing a PR response?

A. I don't recall what the exact steps were. I know there was conversations with management and PR and counsel as well, about what would be the best approach.

Q. Were there any phone calls between management and CODX and, you know, Nomi and the Silicone Slopes folks?

A. Possibly. But I wasn't a part of those. You'd have to speak to somebody in management. I was never involved in those phone calls.

MS. PEIRSOL: Do you want to take a break?

MR. PINEIRO: One exhibit and we'll take a break. Give me one second.

Page 136

(Plaintiff's Exhibit No. 17 was marked for identification.)

BY MR. PINEIRO:

Q. I'm sharing a document with you that's labeled Exhibit 17. There's an e-mail.

Do you know who Mark Newman is?

A. I think he's the director or owner, somebody high level. I can't remember exactly what his role is.

Q. Got it. It seems that he's on this phone call setup between Nomi and some Silicone Slopes folks and I think -- I believe you're copied on it.

A. I am, yes.

Q. Do you see that?

A. I do.

Q. Do you remember joining this phone call?

A. I don't recall joining it, no.

MR. PINEIRO: Okay. All right. We could go off the record.

THE VIDEOGRAPHER: This marks the end of media number 3. The time is 12:35 p.m. We are off the record.

(An off-the-record discussion was held.)

THE VIDEOGRAPHER: This is marks media unit number 4. The time the 12:47 p.m. We are on the record.

Page 137

(Plaintiff's Exhibit No. 18 was marked for identification.)

BY MR. PINEIRO:

Q. Mr. Benson, I'm showing you what's been marked as Exhibit 18.

Do you see that on your screen, sir?

A. I do.

Q. Starting at the bottom, there's an e-mail from Mr. Satterfield on April 30, 2020. Do you see that?

It says:

"Chad and Rebecca, please see the article that just came out about us. Notice what others are saying about us relative to our LoD and how we perform worse than other tests, including the CDC. If we had publications out already, none of this would be happening."

Do you know what publications he's referring to here?

A. I don't. I could only guess.

Q. "I understand that Kyle and Maddie did the bulk of the work. It is their prerogative to be the first authors, and I want to have that opportunity. That being said, Rebecca is very fast. If she writes it, then she has equal claim on that first author spot. She also needs continued education credits from the first author

35 (Pages 134 - 137)

Page 138

publication."

Q. Do you know who he's referring to when he's referring to Kyle and Maddie?

A. Two laboratory technicians, two scientists.

Q. Do you know what work he's referring to here when he says, "the bulk of the work"?

A. I don't.

Q. It says:

"Can the three of us talk and figure out a way to satisfy everyone's needs? Frankly, I don't care who gets to be first author. The company needed that paper published well before this article went out. We need a response and/or multiples responses ASAP. We need multiple papers out, the faster the better."

Do you see that?

A. I do.

Q. Did you ever discuss the Salt Lake -- the April 30th Salt Lake article with Dr. Satterfield?

A. I believe so. I can't recall specifically but it's possible.

Q. Did he express to you that he was concerned about it?

A. I can't recall the specifics of the conversation I would have had with him.

Q. Okay. It appears that he wanted to publish

Page 139

several papers that would validate the Logix Smart Test?

A. Your interpretation is as good as mine. I didn't write the e-mail.

Q. Did he ever communicate that to you?

A. As a scientist, Dr. Satterfield was always very interested in publications about our products, ever since I knew him.

Q. Right. But specifically in response to his article, did he ever mention to you that he wanted to get out a lot of papers that would support the Logix Smart Test?

A. Again, I can't recall that specifically in connection with this article. I know that was always an interest of his, a focus of his. I don't recall it specifically being more so, as it relates to April 30th article.

Q. Then Mr. Apuli writes: "We need to collect more data to show that our LoD is better than what we claimed it is. I'm good to talk whenever."

Do you see that?

A. Yes.

Q. Do you know why he --strike that.

Do you know what data he's referring to that might demonstrate that the LoD is better than what it claimed it is?

Page 140

A. No.

Q. And then Ms. Hutchins writes an e-mail. As you can, see she forwards it to you. In her e-mail, she writes:

"Technically, the EUA says that the test is intended for individuals suspected of COVID-19 by their health care provider. Our test is not intended for asymptomatic patients."

Do you see that?

A. I do.

Q. Is that -- was that the case for every other COVID-19 test that was out there that had EUA authorization?

A. Yes, as far as I understand. I haven't read every EUA. I believe that's the case.

Q. So -- so tests that were EUA authorized were intended for symptomatic patients?

A. That's primarily the case for most IVD's, yes.

Q. Right. It says:

"Also the sensitivity off 99.52 percent and specificity of 100 percent are for samples with a viral load equal or higher than the limit of detection. Therefore, a test with the same percentage of sensitivity but a lower limit detection of detection is more sensitive than ours."

Page 141

Do you see that?

A. I do.

Q. So Ms. Hutchins appears to be communicating, when you received this e-mail, that the limit of detection does have an impact on sensitivity, right?

A. I never claimed that it doesn't have an impact sensitivity. All I said is they're not synonymous, and there's a lot of factors that go into determining sensitivity.

Q. Got it. And these numbers 99.52 percent, specificity of 100 percent, those were numbers that were cited by Dr. Satterfield in the article by The Salt Lake Tribune, correct?

A. I believe so.

Q. And she appears to indicate that there's a qualifier for those numbers. It says: "Based on samples with a viral load above CODX's limit of detection," right?

A. I didn't write the e-mail. I mean, you'd have to ask her about that.

Q. You received it. I mean, was that your understanding?

A. I can't recall. I don't even specifically recall receiving this e-mail, let alone interpreting it. Even reading it now, I'm not sure exactly what she meant.

Veritext Legal Solutions

800-726-7007                                              305-376-8800

Page 142

Q. She said: "I would like to add that Chad, KC, are currently working with MRI Global for an independent evaluation that we will use in the paper."

Do you see that?

A. I do.

Q. Do you know what she's referring to regarding this independent evaluation?

A. No.

Q. Do you know what paper she's referring to when she says, "that we will use in the paper"?

A. No.

Q. "The Timpagnogos validation had been conducted by Jana accompanied by you, Brent, because I believe Timpagnogos understood that we were going to use the data for the amendment of the EUA, but Chad and I have never reviewed the protocol for testing to be sure that all conditions were being met for the results to be considered in the amendment of the EUA."

Do you see that?

A. Yes.

Q. Were you at all familiar with the fact they were going to amend the EUA submission?

A. Somewhat familiar with it, yes.

Q. What was the purpose of that?

Why were they going to amend the EUA?

Page 143

A. When the original EUA was submitted, it was performed exactly according to FDA requirements and specifications. However, the sample matrix that was used at the time by Co-Diagnostics -- because we understood COVID-19 to be a disease that resided primarily in the lungs, not unlike tuberculosis.

So the sample matrix that was used was sputum, similar to what would be done for tuberculosis. That means the extraction from sputum was performed to achieve our original LoD and sensitivity and specificity, was affected by that sample matrix.

Now, the samples that are primarily collected for COVID-19 are never sputum. It's always nasal swab or saliva.

And so -- and now that so much more was known, we were -- you know, more was being learned all the time, we said, okay, well, let's go back. We knew that our LoD would perform differently using a different sample matrix. We said, let's do exactly the same as the competitors have been doing. Let's use some nasal swabs matrices and -- and submit an amendment to the EUA showing a different LoD, using a different sample matrix.

Q. Was that ultimately done?

A. It was.

Q. And was the LoD adjusted then on the EUA?

Page 144

A. It was significantly lower. But FDA had higher priorities. They knew that the LoD didn't affect -- the sensitivity was the same regardless of what number was printed in that EUA. The sensitivity didn't change.

This is, again, another reason why LoD is not synonymous with sensitivity, because you have a different limit of detection from sputum using a certain kind of extraction than you would from a nasal swab using a different kind of extraction.

So it was submitted to the FDA for an amendment and FDA had bigger priorities. They were more concerned with ensuring other companies who were seeking EUAs were able to -- were able to achieve those.

And my understanding was they said, listen you already have a test on the market. This will take resources to review it. We're strained as it is. So they never prioritized the review of that amendment. Had they done so, it would have shown this lower LoD, and maybe this all could have been put to bed. But it wasn't done.

Q. Did they -- did they -- did they -- did they reject the application or did they not review it?

A. They just didn't review it.

Q. Did they send you a letter indicating that or --

A. Not to me. There was some communication. I

Page 145

understand there was some communication saying they weren't going to prioritize it, but I wouldn't have been involved in that.

Q. And the independent evaluation that she's referring to is the one -- with MRI Global is one that you were referring to, that was in connection with the amendment?

A. I don't know. I don't know.

Q. What about the Timpagnogos evaluation, was that the one you were referring to in connection with the amendment?

A. It sounds as though that's what she said, the Timpagnogos validation. I don't know. We were going to use that data for the amendment of the EUA. Again, I don't know what data was ultimately used for the EUA amendment.

Q. Then she said: "I would suggest that we urgently proceed with the validation protocol that Chad and I designed to be executed by Jana and Israa"; do you know who Jana is?

A. Yes. Jana.

Q. Jana. I'm sorry. Who is that?

A. She is a research scientist for Co-Diagnostics.

Q. And Israa?

A. Likewise.

37 (Pages 142 - 145)

Page 146

Q. Okay.

"So we could send the data for amendment of the EUA. My guess is Barbara Blanke's -- my guess is that it is Barbara Blanke's concern because she asked about the amendment last week."

Who is Barbara Blanke?

A. I don't know.

Q. She says: "This could be extremely damaging for Timpagnogos Hospital, TestUtah, and us."

Do you see that?

A. Yes.

Q. Do you know what she was referring to as being "extremely damaging"?

A. No.

Q. Then she wrote -- she forwards that e-mail to you and says:

"Honestly, I'm concerned about Brent talking to the press about things he doesn't understand. I don't know about his academic curriculum but I doubt he had a single analytical chemistry class in his whole life."

Do you see that?

A. I do.

Q. Did you have any conversation with Ms. Hutchins in response to this e-mail?

Page 147

A. Again, I don't even recall receiving it, let alone being concerned about Brent's academic curriculum.

Q. Did you have any concerns about him speaking to the press in connection with Salt Lake Tribune April 30th article?

A. Like I testified before, I wasn't even aware -- I don't recall even being aware that the interview had taken place in the first place.

I've always had confidence in Brent's ability to present himself and to present the science, so --

Q. Earlier I showed you a list of corrective actions that the company would take regarding representations about its tests; do you recall that?

A. I do.

Q. And you indicated those reformed policies and procedures were implemented into the company's quality processes?

A. Quality system, yes.

Q. Quality system. Does that include statements to the press regarding the effectiveness of the COVID test?

A. No. The quality system amendment, the corrective and preventative action that you were referring to before, it looked like it was just limited to press releases and websites, anything that could be considered labeling for the company's test.

Page 148

Q. Got it. So it wouldn't apply to public statements made to the press by company employees?

A. That was not the scope of the preventative action.

Q. Okay. And so based on her e-mail, it doesn't appear that Ms. Hutchins was consulted with in connection with -- before Mr. Satterfield provided his quotes to Salt Lake Tribune, correct?

A. Correct.

MS. PEIRSOL: Objection. Speculation.

THE WITNESS: It does appear so. I don't know, though.

BY MR. PINEIRO:

Q. Do you recall ever relaying to management Ms. Hutchins' concerns about Mr. Satterfield' statements?

A. I don't recall relating those to management.

(Plaintiff's Exhibit No. 19 was marked for identification.)

BY MR. PINEIRO:

Q. I'm introducing what's been marked as Exhibit 19.

Do you see this on your screen?

A. Yes.

Q. So towards the bottom, this is on April 30th, there's e-mail from Dwight Egan to Jennifer Webb; do you

Page 149

see that?

A. I do.

Q. The subject is: "Response," and it says: "Co-Diagnostics Response to Tribune Article of April 30, 2020." And then there's what appears to be a draft response. Do you see that?

A. I do.

Q. Do you know who authored this version of the draft response?

A. I don't.

Q. Do you recall whether you participated in drafting this draft response?

A. At this point, I don't remember whether I was involved.

Q. Would you normally take -- in preparing a press release, would you normally author the initial draft?

A. Sometimes, but not always.

Q. If it wasn't you, who else would author the initial draft?

A. Typically, Dwight, on occasion, Jen.

Q. Okay. How often -- ball parking it, what percentage of the time were you handling the initial draft of a press release?

A. Over 50 percent. Most of time, it would be me.

Q. Most of the time. You'll see that Mr. Egan

38 (Pages 146 - 149)

Page 150

sends the draft to Mr. Satterfield and Ms. Webb. And then you see eventually it's sent to you.

Do you see that?

A. Yes.

Q. Going through the draft, it says:

"A recent article in the Salt Lake Tribune challenged the veracity of Co-Diagnostics COVID-19 test results. The company believes that the article contained numerous misleading inferences." A little further down:

The article inferred that the company has little experience in molecular diagnostics, when in fact the company has a wide array of in-vitro diagnostic tests approved by either the European Union or the CDSCO."

Do you see that?

A. I do.

Q. It says:

"The company has been the subject of numerous validation studies, including Path West Laboratories in Australia, The Indian National Institute of Pathology, Mexican government's InDRE and the Minnesota Department of Health."

Do you see that?

A. I do.

Q. So it says that the COVID test had been the

Page 151

subject of numerous validation studies, including -- I mean, is this the full extent of the validation studies on CODX's COVID test?

A. It was not. However, my understanding is it was the full extent of studies for which we were then later provided data, and oftentimes we were told the results. But it was very rare -- not rare, but it was less common that then we were also presented with the data showing how those results were arrived.

Q. Are you aware of how many validation studies had been conducted that weren't referenced there?

A. No.

Q. Is it more than ten? Less than ten?

A. I don't know.

Q. But you are aware that there were other validation studies not included in that list?

A. Every single time the laboratory would buy our test, they would conduct a validation study. But it was all internal. Right.

They would conduct it. They would do the validation study and if see if the test worked as expected. And then once it passed that study, that's when they would place their order. They would always, you know, get a nominal order first and then do whatever their own internal validations requirements were to

Page 152

confirm the test's performance, and then they would proceed with purchase orders at that point.

Q. Would they provide you with -- you know, whenever these labs were doing these validations studies, you know, excluding the ones you've referred to here, would they typically provide you with some type of written work product regarding the results of the validation?

A. No.

Q. So setting aside the ones that are listed here, are you aware of whether any of the validation studies showed results that were less than 100 percent specificity and sensitivity?

A. That may have been the case but those would not have been ones for which we were provided actual -- the actual data backup for.

Q. So at this moment in time on April 30th, there were validation studies demonstrating that CODX's test did not have 100 percent specificity and sensitivity, right?

MS. PEIRSOL: Objection. Assumes facts not in evidence.

THE WITNESS: It's possible. I don't recall.

BY MR. PINEIRO:

Q. But you just testified that you do recollect

Page 153

that, right?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: I do recall studies were performed. I don't recall what the results of those studies were, and I certainly don't recall seeing any data to support the results of those studies.

In fact, I testified it was fairly uncommon for laboratories to provide us with the results of their validation studies.

BY MR. PINEIRO:

Q. Were you aware of -- at this in point time, were aware of any laboratories that, after conducting a validation study, declined to purchase the Logix Smart Test?

A. I don't think so. Nothing comes to mind.

Q. So, to your knowledge, every lab that conducted -- at this point in time, every lab that conducted validation studies went ahead and purchased the test?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: I just said, I don't what they did. I can't say that I know that everyone did. I just don't know one did --

39 (Pages 150 - 153)

Page 154

BY MR. PINEIRO:

Q. In connection with the press release that's ultimately issued on May 1st, was there any discussion about this universe of validation reports that's not listed in the release?

A. We were only able to report on the data that we had. We had been -- we were already planning on issuing releases about the Mexican result -- the results of the Mexican study, as well as the Indian study as well.

We had that data and those press releases were already in draft form. So we were already planning on presenting data saying -- which was not uncommon for us. If we were presented with results of a study performed with our test, it was not uncommon for us to then release a press release about that. If a paper was published using our test, we would issue a press release about that and link back to the paper.

So it wasn't uncommon for us to put out press releases where somebody performed a study using our technology on the COVID test.

Q. As of this date, April 30, 2020, had you already prepared press releases -- prior to this, had you prepared press releases regarding these validation studies?

A. They were in draft form.

Page 155

Q. They were?

A. We began drafting press releases about them, yes, prior to this point.

Q. Was there a specific time when you intended to release those?

A. I don't recall what the schedule was at the time. Certainly, we were drafting them, so there was an intention to release them but I don't know what the schedule was.

Q. Then it says:

"All these studies show 100 percent concordance for both specificity and sensitivity, the benchmarks for accuracy."

Do you see that?

A. I do, yes.

Q. Okay. What is meant by "100 percent concordance for both specificity and sensitivity"?

A. It means that -- it's just exactly what it says. It means it matched up with the -- with the -- with the standard that was being used in those tests. It showed 100 percent concordance. Every test that was positive according to the standard, it was positive according to our test. Every sample that was negative according to the standard, was negative according to the Co-Diagnostics test.

Page 156

Q. Okay. Then it says:

"The recent article cited differences in LoD or level of detection inferring that the company's COVID-19 test was less likely to detect low levels of infection, when, in fact, the above-mentioned validation studies demonstrated excellent results in level of detection metrics."

Do you see that?

A. I do.

Q. Did the valuations studies cited come to specific conclusions regarding LoD?

A. I don't believe so, no.

Q. Then why would it say that?

A. I don't know. I didn't draft this, so -- I don't believe this made into the final communication as well.

Q. It says: "While the company's own data intended to show the worst-case scenario for purposes of regulatory approval --

A. Right.

Q. -- "the performance of the test in a clinical setting shows that the company's test performance corresponds with the required standard with 100 percent conformity."

Do you see that?

Page 157

A. Yes.

Q. What does it mean that it "Corresponds with the required standard with 100 percent conformity"; do you know?

A. You have to speak to the author of this. It wasn't me.

Q. Then it says: "You can't get better than 100 percent." Do you see that?

A. I do.

Q. Do you know whose idea it was to draft that phrase or statement?

A. Again, I don't know. I know it wasn't me.

Q. If you want, we could do one more document and then we could break. Is that okay?

A. Yes, that's good.

Q. Showing you document marked as Exhibit 20.

(Plaintiff's Exhibit No. 20 was marked for identification.)

BY MR. PINEIRO:

Q. So you can see an e-mail from Jennifer Webb to Dave and Clint. I believe that eventually you are copied on -- yes. You see that you eventually received this on April 30, 2020?

A. Yes.

Q. So Ms. Webb says:

Page 158

"The response plan for the Tribune article is as follows," and then she lists a series of bullet points.

Q. Do you see that?

A. Yes.

Q. Okay. Then at 9:23, Clint Betts says: "Quick recommendation:

"I think it'd be good to include a quote from Co-Diagnostics Chief Science Officer Dr. Brent Satterfield in the release. Adds credibility and inoculates your company from being hit for just being a tech company that doesn't understand testing or science."

Do you see that?

A. I do.

Q. So, I mean, one thing we haven't discussed is who came up -- do you recall discussions within the company regarding preparing a specific press release to rebut the Salt Lake Tribune article?

A. I certainly recall, just like many of the discussions that went into the release that came out on May 1st.

Q. Who made the decision that a press release was appropriate?

A. I don't know if it was Dwight or counsel.

Q. Do you remember who communicated to you that a

Page 159

press release would be -- would be issued?

MS. PEIRSOL: Objection. To the extent it calls for attorney-client privileged information, Mr. Benson, I instruct you not to answer. But if you could answer otherwise, please go ahead.

THE WITNESS: I think it was Dwight.

BY MR. PINEIRO:

Q. Did Mr. Egan specify his desired timeframe?

Did he indicate that he wanted to get it out the next day on May 1st?

A. I recall a sense of urgency but not necessarily a specific timeframe.

Q. So it seems that -- you recall I showed a prior version that was at least sent by Mr. Egan that did not have any quotes from Dr. Satterfield, right?

A. Correct, yes.

Q. It seems like Clint Betts suggests that the company add Dr. Satterfield as having quotes in the press release, correct?

A. Yes.

Q. I mean, is that one of the issues that you dealt with in your capacity as an investor relations person? Was there a concern that the company would use a tech company that wasn't specialized in testing and science?

A. No, no.

Page 160

Q. So you write on April 30, 2020 at 10:44 p.m:

"I'm fine with the quote change, but even if it takes it in a bit of a different direction, but that's okay. To what degree do we want to explain the LoD here? I prefer striking that phrase entirely over getting into the weeds about it."

Do you recall why you wanted to remove the reference to the LoD?

A. I think it's just what I said there. I think it complicated the issue. It was a lot of educating people about something that ultimately didn't really have any bearing on the test performance anyway.

Q. You said: "Not really wild about a Friday release either but needs -- must here."

What did you mean by that?

A. I think that they indicated to me that they wanted the release to go out on Friday. And it wasn't standard policy for us to do so. So I recall not being wild about, but, you know, I'm team player.

Q. It says: "If we're going to do it, the sooner the better." What's -- what's the problem with a negative release -- I mean, with a Friday release, less attention?

A. Yeah, typically, you know, if you're putting out news and trying to communicate something, the idea is you

Page 161

want as many people to see it as possible. And typically people tend to not -- yeah, Friday releases tend to not get as much pick up.

Q. Got it. And then you write -- this is five in the morning on May 1st. It says:

"To make things easier to parse, I just removed the line above the 13.5 copies. I liked it in there since it directly addresses some of the points that the article alludes to, but we can always just show them the page about the Mexico study in that performance data doc, if it ever comes up again."

Do you see that?

A. Yes.

Q. Then if you just go down to the actual attachment, do you recall seeing this draft version of the press release?

A. Give me a moment to familiarize myself with it. I mean, I saw multiple drafts. I don't know this one specifically.

Okay.

Q. How many drafts of this were prepared and circulated, do you know?

A. I don't recall.

Q. Okay. So somebody went in there and red lined and it says: "In remarking on the test, they added the

41 (Pages 158 - 161)

Page 162

word favorable."  Are these red line edits yours?

A.  I don't know.  Possibly.

Q.  -- results in the sum of the evaluations."

Do you know who struck the phrase "sum of the evaluations"?

A.  Again, I don't recall if this was my edits or somebody else's.

Q.  And then -- and then -- and then as you mentioned in your e-mail, somebody removed the reference to 13.5 copies.

Do you see that?

A.  I do.

Q.  The fact that a draft of this initially referenced, you know, results in some of the valuations, that's consistent with your statement that there were other validation reports not referenced in this press release, right?

A.  I don't know that that's what that it was referring to exactly.  I don't know if I could say that with any degree of confidence, no.

Q.  You don't recall who removed that line, that word?

A.  I don't.  I don't.  I don't know if that was in the draft that was already presented to me, or if that's something I did and, if so, why it was done.  I don't

Page 163

know.

Q.  So, Ms. Hutchins, do you know whether she reviewed a draft of this release before it was issued?

A.  I don't know.

Q.  This release would fall under the modified protocol following your February interactions with the FDA, correct?

A.  I believe so.  I would have to review that corrective action again to make sure.

Q.  That corrective action pertained to any claims regarding the performance of the Logix Smart Test, right?

A.  I can't remember.  If that's what it said, then that's what it said.  I can't recall without looking.

Q.  Sorry.  You would agree that this press release discusses the performance of Logix Smart Test, right?

A.  It certainly discusses the results of -- for independent evaluations.

Q.  Right.  But the subject matter is the "performance of the test," correct?

A.  Sure.  I would.  I would, again, push back and say the subject matter is the performance in those four studies, but, sure.

Q.  Sure.  The performance of the test in certain studies that are linked in the article -- in the press release, correct?

Page 164

A.  Yes.

Q.  And so this is the kind of thing that should have been run through the regulatory department under the revised protocol, correct?

A.  Sure.

Q.  It doesn't appear that that happened, right?

A.  I don't know.  Like I said, I don't recall whether it was sent to her or not.

Q.  Who made the final call or the decision on the final version of the draft?

A.  Dwight signs off on all of the final drafts.

Q.  Is it customary to circulate press releases to the board before they're issued?

A.  It happened on occasion but it isn't standard practice.  They'll be notified about them, but it's not standard practice to circulate it to them for feedback.

Q.  Did that happen with this particular release?

A.  I don't recall.

Q.  How long does it typically take you to prepare and ultimately issue a release?

A.  Couple of hours to a couple of days.  It just kind of depends on the scenario and the situation, who is involved and -- and, you know, what kind of feedback is was.

Q.  Was the turnaround on this one from April 30th

Page 165

to May 1st relatively fast?

A.  No, it's not uncommon for a press release to go from draft to release in less than a day.

MR. PINEIRO:  We could stop there if that's okay.  We could go off right now, please.

THE VIDEOGRAPHER:  This marks the end of media number 4.  The time is 1:24 p.m.  We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  This marks beginning of media number 5.  The time is 2:06 p.m.  We are on the record.

BY MR. PINEIRO:

Q.  Mr. Benson, we're back from lunch.

Did you have any discussions with your counsel during the lunch break?

A.  I did not.

Q.  So I'm showing you on the screen what is marked as Exhibit 21.  Do you see that?

(Plaintiff's Exhibit No. 21 was marked for identification.)

THE WITNESS:  I do.

BY MR. PINEIRO:

Q.  Are you familiar with this document?

A.  Yes.

42 (Pages 162 - 165)

Page 166

Q. What are we looking at here?

A. It's a press release issued by Co-Diagnostics.

Q. Do you remember what time on first of May this was issued?

A. I don't recall exactly, no.

Q. Who is responsible for making the final version of this and posting it as a press release?

A. It's my responsibility to upload it to the wire service.

Q. Okay. And, again, I think you indicated that the final approval on the content or the language would have been given by Dwight Egan?

A. Correct.

Q. Do you recall whether there were any internal -- strike that.

I showed you some e-mails earlier with some revisions that were made to the documents.

Do you recall there being any debates or arguments regarding any of the language that was ultimately used in the press release?

A. I don't remember debates or arguments. I remember discussions, but I can't remember over what specifically.

Q. Were any of the discussions centered around the potentially misleading implication that the release was

Page 167

indicating -- strike that.

Did any of the discussions have do with the potentially misleading implication that the Logix Smart Test is 100 percent accurate?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: I don't recall any discussions of that nature.

BY MR. PINEIRO:

Q. Were there any discussions regarding whether any of the language in the press release may mislead investors?

A. Again, I don't recall any such discussions.

Q. Okay. Do you know whether outside counsel reviewed this press release before it was issued?

A. I seem to recall some level of involvement but I don't know for sure if the final version was reviewed or not.

MS. PEIRSOL: And if you're going to continue with this line of questioning, Michael, I just caution the witness, please don't disclose any information that is protected by the attorney-client privileged.

BY MR. PINEIRO:

Q. Just don't disclose the communication. I just

Page 168

want to know some basic non-privileged facts.

So who is typically the lawyer or the outside counsel that would be consulted regarding the language of a press release like this one?

A. I actually can't remember the name of the attorney we were working with at that time.

Q. Is it Carmel Mellazo (phonetic)?

A. It was at that firm, although I can't remember the name of the attorney.

Q. Was it Michael Lott?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: I don't believe so.

BY MR. PINEIRO:

Q. So looking at the title of the release, it says:

"Co-Diagnostics, Inc. Releases COVID Test Performance Data. Consistently Demonstrates 100 Percent Sensitivity and 100 Specificity Across Independent Evaluations."

Do you see that?

A. I do.

Q. Whose decision was it to use the word "consistently" in the title?

A. I don't recall.

Q. And by saying, "Across Independent Evaluations," does that mean across all of independent evaluation?

Page 169

A. I believe it is referring to the evaluations included herein.

Q. Okay. It doesn't include other independent evaluations that haven't been referenced herein, right?

A. In the first paragraph, it just talks about how Co-Diagnostics released COVID-19 test performance data, demonstrating 100 percent sensitivity and specificity. So it was -- it's referring to the test performance data that is being released here.

Q. Right. This says: "Across Independent Evaluations." Isn't the implication of that, that it's across all independent evaluations?

A. It sure isn't. I mean, the first part of the press release clearly says: "Releases test performance data." So if you want to ignore the first part of the press release, then you could just jump right to the last part, but I don't think that's really fair.

Q. Right. So it says:

"Co-Diagnostics, a molecular diagnostics company with a unique, patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100 percent sensitivity and 100 percent specificity, the metrics used to define accuracy in molecular diagnostics testing."

43 (Pages 166 - 169)

Page 170

Q. Do you see that?
A. Yes.
Q. So it doesn't -- it says, "Today released performance data." That's a general term, right? It's not specifying that it's based on certain validation studies and not others, correct?
MS. PEIRSOL: Objection. Argumentative.
BY MR. PINEIRO:
Q. You can answer.
A. I disagree with you. I think it's we released some data. We're not saying we released all data ever -- ever. We said, here's some data, we're releasing it.
Q. Then it says, "Demonstrating 100 percent sensitivity and specificity." Isn't the natural -- isn't a member -- a member of the public who reads that, isn't the implication that this test is 100 percent specific and sensitive?
MS. PEIRSOL: Objection. Argumentative.
BY MR. PINEIRO:
Q. You can answer.
A. You'd have to speak with every member of the public.
Q. That's how I read it.
A. What's more is -- I mean, there is a whole press release that follows that. A company can't included

Page 171

every single relevant piece of information in the first paragraph; otherwise, the first paragraph would be the entire release.
We expect that when somebody reads the first sentence, they will continue on to read more.
Q. Right. So it says:
"The data being released comes from independent evaluation of the performance of the company's COVID-19 test in the field. These evaluations were conducted in Mexico by the Mexican Department of Epidemiology, India, and elsewhere in the U.S. and abroad. Each study concluded 100 percent concordance for both specificity and sensitivity."
Do you see that?
A. I do.
Q. Is there any reference in this document to the fact that there were other validation studies outside of the ones that were linked in this press release?
A. No. This press release is purely releasing the data we had actually received, which shows 100 percent concordance for sensitivity and specificity.
It's not referencing other data that we did not receive.
Q. Okay. Did the company receive any data on any validation tests that didn't show 100 percent sensitivity

Page 172

and specificity?
MS. PEIRSOL: Objection. Asked and answered.
THE WITNESS: Yeah. This is all the data that I was aware of.
BY MR. PINEIRO:
Q. So you don't know the answer to that question?
MS. PEIRSOL: Objection. Mischaracterizes his testimony.
THE WITNESS: I only know what I was given.
BY MR. PINEIRO:
Q. So you were given these specific tests; is what that what you're saying?
A. I was provided the data on these evaluations.
Q. Okay. And did you ask when you were given this data, "hey, are there other validation tests that don't show 100 percent sensitivity and specificity"?
A. No.
Q. You didn't. Why not?
A. Why would I?
Q. Because wouldn't you be concerned about cherry picking data and putting it into a press release?
MS. PEIRSOL: Objection. Argumentative.
BY MR. PINEIRO:
Q. You can answer.
A. I'm concerned with publishing and disseminating

Page 173

the information that I have. The information I have is this. This is what we were given. I was told, "here's some studies" -- we were given some studies that showed -- a good example is the India study, that showed anomalous results, and we said, "whoa, what's going on there." And then once the study was performed and -- the test itself did not change one bit. The study did. When the study changed, then the results were in line with what we were expecting.
The results that I saw here, did not strike me as anomalous at all. These are exactly the kinds of results that I expected to see. There was nothing in here that made me think, whoa, are there more. These were the kinds of data that we expected to see, given the performance, characteristics that we knew about the test.
There wasn't any reason for me to question there might have been something else.
Q. So there was no reason for you to ask whether this was the totality of validation reports received by the company?
MS. PEIRSOL: Objection. Asked and answered.
THE WITNESS: Yeah, I feel like I've answered that already.
BY MR. PINEIRO:
Q. I mean, when you issue a press release, do you

44 (Pages 170 - 173)

Page 174

want to provide a comprehensive and accurate picture of information regarding the company's tests?

A. Yes.

Q. So why wouldn't you take it upon yourself to ask whether there's other conflicting data?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: Because I rely on management, who does get all of that data, and to let me know if there's something else. It's not my job to question whether management has data that they're keeping from me.

BY MR. PINEIRO:

Q. But you didn't even loop in regulatory to make sure this was in compliance, right?

MS. PEIRSOL: Objection. Mischaracterizes prior testimony. Assume facts not in evidence.

THE WITNESS: If I forgot to loop -- loop in regulatory, it wasn't out of malicious intent. It was because every once in a while people do make mistakes and might forget a step.

BY MR. PINEIRO:

Q. Right. And you don't recall any -- strike that.

You've indicated that management would have known whether the -- whether there was any data or independent evaluations that conflicted with the results

Page 175

of these studies, right?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I rely on management to inform me. I don't speak to every single employee at every level who might receive any amount of data. Anything that's relevant or important goes to department heads and makes its way to management. I'm not involved at every level there.

If management has something that's important for me to know, they let me know about it. But I can't be apprised of every single e-mail and every single correspondence and every single goings on of every single employee.

I rely on management to let me know what's important for me to be able to do my job.

BY MR. PINEIRO:

Q. Right. In this particular instance, you didn't ask questions about conflicting data, you relied on management making a decision on that?

MS. PEIRSOL: Objection. Asked and answered. Argumentative.

THE WITNESS: In this case, I relied on management.

I don't know how I can keep answering the same question over and over again. But, yes, I relied on

Page 176

management to let me know what my job was. That's how it works when you have a boss.

BY MR. PINEIRO:

Q. So, typically, when management provides you with a press -- you know, when they approve a final press release or indicate that they want to issue a press release, you're saying that you don't have any ability to provide feedback or scrutinize the information that's being disseminated?

MS. PEIRSOL: Objection. Mischaracterizes the witness's testimony. Mischaracterizes the evidence. Assumes facts not in evidence. It's argumentative.

THE WITNESS: Yeah, I definitely didn't say any of those things.

I'm certainly able to provide input. I'm not just, you know, taking dictation. I provide impact -- I provide input.

But, again, if management says, here's some data, this is what's relevant, this is what's important, I am involved in, you know, helping to craft messaging to -- you know, to see if it fits with management's expectations.

But, again, it is not my job to question whether I have been presented with an absolute totality of everything.

Page 177

I don't know how many times -- I don't know if you're just trying to get me to keep saying it until I say something inconsistent, but if we could move on and stop asking the same question, that would be helpful.

BY MR. PINEIRO:

Q. It's an important issue.

So it says here: "A summary of recent validation data and the data itself can be found here." Then it says:

"In remarking on the test's favorable limit of detection, LoD, results in the evaluations, Brent Satterfield, Ph.D. said, 'In diagnostics, the limit of detection or LoD, is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity and you can't do better than that."

Do you see that?

A. I do.

Q. Okay. So in the beginning of that paragraph, it

45 (Pages 174 - 177)

Page 178

says: "In remarking on the test's favorable limit of detection results in the evaluations."  Do you see that?

A.  I do.

Q.  Earlier you indicated that the validation results -- tests that were -- were attached and referenced in this release, don't actually have results regarding the LoD, correct?

MS. PEIRSOL:  Objection.  Mischaracterizes his testimony.

THE WITNESS:  I don't recall saying that.

BY MR. PINEIRO:

Q.  Okay.  So do the validation reports that are enclosed -- that are attached to this release, provide LoD results?

A.  It's been three years since I've reviewed them.  I can't recall if I've seen results in those validation reports.

Q.  And so what -- you indicated before that sensitivity doesn't necessarily correlate to LoD, yet, here, it appears the company is using sensitivity data to make a statement regarding a favorable limit of detection, right?

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.

THE WITNESS:  I don't remember that being the

Page 179

case, no.

BY MR. PINEIRO:

Q.  Okay.  So then why is LoD being referred to here?

A.  Because he's remarking on the LoD results and the evaluations.  He's just commenting on them.  He's not saying that it's equivalent to sensitivity.

Q.  What's being indicated here, according to the release, is that these tests show 100 percent sensitivity and specificity.  And then it jumps and it says -- talks about the test favorable limit of detection results.  It's clearly drawn a line between the two, wouldn't you say?

MS. PEIRSOL:  Objections.  Mischaracterize the evidence and assumes facts not in evidence.

THE WITNESS:  Once again, I would not say that.  Paragraph one is the intro.  Paragraph two talks about the data.  The third one, third paragraph presents the data.  And then in the fourth paragraph, Satterfield goes on to comment on the LoD.

BY MR. PINEIRO:

Q.  Right.  But it says that there's a favorable limit of detection; is that true?

A.  Sure.

Q.  So the Logix Test has a favorable limit of

Page 180

detection?

A.  It's referring to favorable limit of detection results in the valuations.

Q.  Okay.  And you reviewed the valuations and you confirmed that -- that those studies comment or show results regarding LoD?

MS. PEIRSOL:  Objection.  Mischaracterizes his prior testimony.

THE WITNESS:  I never said that.  But as a non-scientist, if somebody in the company who does have a Ph.D. reviews it and tells me what their observation is about the LoD, I don't really have the scientific credentials to question their -- their commentary.

BY MR. PINEIRO:

Q.  Did Mr. Satterfield review this press release?

A.  I believe so.

Q.  Okay.  Because there was somebody else who suggested that this quote -- that a quote be attributed to him, right?

MS. PEIRSOL:  Objection.  Assumes facts not in evidence.

THE WITNESS:  Just because somebody else suggested that the quote be attributed to him, doesn't mean that Dr. Satterfield did not review it.

Page 181

BY MR. PINEIRO:

Q.  No, I understand that.  But I showed you a document earlier where somebody said we should put a quote from him in there, right?

A.  Yes.

Q.  So you can't just rely on the fact that there's a quote in here to validate what's being said, correct?

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.

THE WITNESS:  But I can rely on the fact that individuals within the company who have more scientific knowledge than me would have reviewed that and signed off on it.

BY MR. PINEIRO:

Q.  Uh-huh.  And who are those people?

A.  Something in this case -- I don't know exactly who would -- who would have reviewed it.  But something in like this -- in a case like this, it would have been reviewed by somebody with a Ph.D. in the company.

Q.  But you don't recall who it was?

A.  We have several Ph.D's.  I don't know which one it was that would have reviewed this.  I believe it was Dr. Satterfield, but I don't know.

Q.  But didn't Cecilia Hutchins think he wasn't

46 (Pages 178 - 181)

Page 182

qualified to be putting out statements about the test?

MS. PEIRSOL: Objection. Argumentative. Calls for speculation.

THE WITNESS: That's Cecilia Hutchins' opinion. That doesn't mean that it's, you know, the truth or a facts, just opinions.

BY MR. PINEIRO:

Q. She's the head of regulatory, correct?

A. She was.

Q. She was telling you in an e-mail before this that she didn't think he was qualified to put out statements regarding the performance of the test, right?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: Whatever Cecelia's opinions were about Dr. Satterfield, Cecelia is not my boss. She was not the one that I take directions from, and I'm, you know, an employee.

If I -- what's more is, I've known Brent since 2014, and I never had any reason at all to question his scientific knowledge or credentials.

Everybody that I spoke to that was also a scientist that had interactions with him always spoke very highly about his acumen and his knowledge base in this area. One person's opinion did not negate

Page 183

all of the experience that I had.

BY MR. PINEIRO:

Q. But that was the person that you told the FDA you were going to be running these releases through, wasn't it?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: What -- I did tell the FDA we would be running the press releases through the regulatory department.

BY MR. PINEIRO:

Q. And then you disregarded with her statements about his qualifications to issue public statements about the accuracy of the test?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: No, that's certainly not what happened. What's more is, I testified that I don't even remember seeing that e-mail from Cecelia before. It certainly was not me actively disregarding her opinion in order to issue a presentation release.

BY MR. PINEIRO:

Q. Then, you know, there's a portion of the e-mail that says:

"We have consistently and repeatedly achieved

Page 184

100 percent clinical sensitivity and specificity and you can't do better than that?"

Do you see that?

A. I do.

Q. Isn't the implication of this comment that you can't do better than the Logix Smart Test, that's 100 percent accurate?

MS. PEIRSOL: Objection. Form. Vague. Calls for legal conclusions.

MR. PINEIRO: You can't object to every question just as like warning shot to him. I mean, it's -- it's obvious but, like, it can't be every single question. Not every question is improper but, I --

MS. PEIRSOL: I can object to every single question that --

MR. PINEIRO: You can, but it's obvious what's happening. I mean --

THE WITNESS: The fact is I --

MS. PEIRSOL: I object to the implication that there's something improper going on here.

MR. PINEIRO: You just objected to the question and didn't even know what the objection was.

MS. PEIRSOL: Excuse me. I don't think that that's correct.

MR. PINEIRO: You did. You said "form" and then

Page 185

you thought for ten --

MS. PEIRSOL: Do you want to take this up with the Court, Michael, because --

MR. PINEIRO: I do not. I do not.

MS. PEIRSOL: -- with the Court if it's okay if we follow the local --

MR. PINEIRO: I do not. I do not, but -- but --

MS. PEIRSOL: Let me know if you do. If you have a problem with my objections, I'm more than willing to call the Court.

MR. PINEIRO: I don't. I do have a problem with objecting when you don't even know what the objection is.

MS. PEIRSOL: Well, that did not occur.

MR. PINEIRO: Okay.

BY MR. PINEIRO:

Q. In countries -- so, "You can't do better than that."

Did anybody discuss whether that was a sensitive phrase to include in a press release?

MS. PEIRSOL: Objection.

THE WITNESS: I don't recall -- I don't recall discussions about that.

BY MR. PINEIRO:

Q. And when you read that, that line gives you no

47 (Pages 182 - 185)

Page 186

concern regarding the potential implication to the public?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: When I read the sentence, I read it the context with what he was talking about before, what was being mentioned before in this quote, and which was in the countries where we've been evaluated against other tests, we've repeatedly achieved 100 percent clinical sensitivity and specificity. And, it is objectively the case that you can't do better than 100 percent concordance, when you're being evaluated against other tests. You can't. That's the best you could do.

BY MR. PINEIRO:

Q. Right. Unless there's other conflicting data, right?

A. As far as these tests goes, he's talking about these evaluations against these other tests.

Q. No, no. I get that. But if there's other validation results that conflict with this data, then you can do better than that, can't you?

MS. PEIRSOL: Objection. Assumes facts not in evidence.

THE WITNESS: Yeah. I don't have access to that

Page 187

data. I mean, it's not data that was provided to me.

BY MR. PINEIRO:

Q. Is it your view that the test's limit of detection you can't do better than that?

A. That's not what he was talking about. You want to start at the first part of the paragraph and go to the end, you can do that. But there's many words in between there.

Q. Right. No, I get that, but my question is:

Does that phrase accurately apply to the test's limit of detection?

MS. PEIRSOL: Objection. Mischaracterizes -- assumes facts not in evidence and mischaracterizes the evidence.

THE WITNESS: You're drawing a lot of conclusions that I did not draw, that I did assume were the case when this was drafted.

None of the conclusions that you are drawing are any conclusions that I read or any conclusions that I drew when I read it.

So you could draw conclusions if you'd like, but I'm telling you, those are not conclusions that I drew when this was written. Doesn't matter how many times you ask me --

BY MR. PINEIRO:

Page 188

Q. And what about now?

A. No, I still don't believe that what you're saying is true. He's talking about the LoD, how does a single -- a single metric that -- a single metric that helps inform the key metrics sensitivity and specificity, amongst all the others.

And in these countries where we've been evaluated, we reached -- we've -- we've achieved 100 percent sensitivity and specificity -- I mean, when we've been evaluated in these other tests. I mean, to me, all of the words that go in there tell a story.

BY MR. PINEIRO:

Q. The second paragraph where it says:

"The data being released comes from independent evaluations of the performance of the company's COVID-19 test in the field."

What is meant "in the field," what is meant by that.

A. I'm not sure exactly why that was put in. I believe it was -- it was because it was being tested in -- in clinical samples, actual samples that were clinical --

Q. Is that a term of art?

A. Not that I'm aware of.

Q. Does testing in the field have to do actual

Page 189

testing on human samples in connection with, you know, regular COVID testing?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: Yeah, again, it's not really a term of art. Like, as far I understand that to mean, it's just referring to the actual clinical samples as opposed to, you know -- as opposed to contrived samples.

BY MR. PINEIRO:

Q. To be the clear, the validation results that are linked here don't pertain to results based on testing on actual human individuals that come in for COVID tests?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: I don't know the providence of those test -- those samples. There were actually human patients, that at one point were tested for COVID. They were tested according to wherever those tests were collected, and then the Co-Diagnostics test was tested against the standard that was used to test those patients.

BY MR. PINEIRO:

Q. It says: "A summary of the recent validation data can be found here." Did you provide the actual underlying data?

A. In the link. There was a link to the data, yes.

48 (Pages 186 - 189)

Page 190

Q.   Okay.  Are you familiar with this document, as part of the press release?

A.   It's been long time since I read it.  I can't recall it all.  I have a passing familiarity with it.

Q.   Do you know who prepared this?

A.   I can't remember who prepared it.

Q.   It says:

"This document contains the following summaries of several studies performed on the Co-Diagnostics Logix Smart COVID-19 Tes and CoSara Saragene Coronavirus 2019 Test along with supportive data."

Do you see that?

A.   Yes.

Q.   And it says:

"Results from PathWest Laboratories, Australia show 100 percent agreement with their in-house test, 100 percent clinical sensitivity and specificity, and 100 percent accuracy."

Do you see that?

A.   Yes.

Q.   What is meant by "100 percent accuracy" there, do you know?

A.   It think it's a restatement of what was said before.

Q.   So in issuing the press release and posting it,

Page 191

did you also review the language in this summary?

A.   It's -- it's possible.  I can't recall exactly what was my involvement was.

Q.   Okay.  How is 100 percent accuracy different than -- is it different than 100 percent clinical sensitivity and specificity?

A.   No.  I think it's just redundant.

Q.   Right.  Is it possible -- you've discussed that there is -- we've discussed throughout this deposition that you can't say a test is 100 percent accurate.

Was there ever any discussion within the company that this statement here might be a bit misleading to the general public?

MS. PEIRSOL:  Objection.  Mischaracterizes prior testimony.  Mischaracterizes the evidence.  Assumes facts not evidence.

THE WITNESS:  Not in context with the sentence that precedes it.  If you totally take it out of context, then anything can mean anything you want.

But in the content of what precedes it, it shows 100 agreement with their test, 100 percent clinical sensitivity and specificity, and 100 percent accuracy.

In the content of that sentence, it could only mean one thing.  If you could take it out of that

Page 192

sentence, it can mean whatever you want it to mean.

BY MR. PINEIRO:

Q.   Well, you've indicated it's redundant, so why include that?

A.   Because human beings are infallible -- or fallible, rather.

Q.   Right.

A.   Because you sometimes you can say something just for a little bit of redundancy.

Q.   All they would have had to have said was, "100 percent clinical sensitivity and specificity," and they wouldn't have need that second phrase, right, "100 percent accuracy"?

MS. PEIRSOL:  Objection.  Argumentative.

THE WITNESS:  The sentence would mean the same thing, with or without it.

BY MR. PINEIRO:

Q.   Right.  But you said it's redundant, it's not needed, right?

MS. PEIRSOL:  Objection.  Asked and answered.

THE WITNESS:  In my opinion, the sentence would mean the same thing with or without it.

BY MR. PINEIRO:

Q.   Okay.  So when somebody includes superfluous results in there, you think that they would interpret it

Page 193

as just a redundancy and the same way?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I can't speak to how anybody else would interpret something, only how I would.

BY MR. PINEIRO:

Q.   Okay.  But you were the head of investor relations, you weren't worried about putting the words "100 percent accuracy" in a release?

MS. PEIRSOL:  Objection, mischaracterizes the testimony.  Assumes facts not in evidence.

THE WITNESS:  Have you ever said anything and then later on went back and looked at it and said, "oh, I didn't mean that"?

BY MR. PINEIRO:

Q.   Yes, sir, but I'm not the head of investor relations for a public company.

A.   Yeah, but you are an attorney.  I mean, surely you said something in court and later you're like, "whoops."

I mean, it was a minor redundancy.  It doesn't change or over-emphasize anything in the sentence, according to my interpretation of it.

We've already talked about 100 percent clinical sensitivity and specificity.  How is 100 accuracy making that claim any more bold?  In my opinion, it doesn't.

49 (Pages 190 - 193)

Page 194

Q. Because -- haven't you indicated today that no test is 100 percent accurate?

MS. PEIRSOL: Objection. Mischaracterizes prior testimony. Assumes facts not in evidence.

THE WITNESS: I've testified today that no test is 100 percent accurate in every situation. Just like no test is 100 percent sensitive or specific in every situation. It depends on the specific study.

In this particular study, it was 100 percent accurate. It showed 100 percent agreement with the in-house test conducted PathWest, Australia, as evidenced by 100 percent clinical sensitivity and specificity. All of the statements are true.

BY MR. PINEIRO:

Q. Now, this was a type of validation -- we're talking about two validations, one against positive or negative results, and then another, we're looking at concordance with another test, right?

A. Yes.

Q. And all of these appear, at least this first one appears to be a concordant test, right?

A. I believe they all were.

Q. They all were. Okay. All right.

A. It's my recollection.

Q. So, in that scenario, where you're dealing with

Page 195

the concordance test, 100 percent sensitivity and specificity is only as good as the barometer that you're comparing it against, right?

A. It's as good as the -- it's concordance. It's as good as the -- as the -- as the standard against what is being tested.

Q. So, like, Number 5, it says:

"The Minnesota Department of Health comparison data against and another assay showing 100 percent concordance." Assay is another test, right?

A. Yes.

Q. So did you review these actual validation reports?

A. It's sort of beyond my scope of my expertise.

Q. I understand. But did you review them before you published the release?

A. I don't recall reviewing them.

Q. Okay. And is it normal for Co-Diagnostics itself to publish a validation report from somebody else's validation?

A. It can happen. It's not common or uncommon. It's just a thing that happens occasionally.

Q. So these validation reports, you could see that its author -- is that Rebecca Garcia?

A. It appears to be.

Page 196

Q. She's also the supervisor on that report; do you see that?

A. That's what it appears to be, yes.

Q. Is that normal that she would be both the author and the supervisor of the report?

A. I don't know how normal it would have been.

Q. And it appears she prepared it on April 30th; do you see that?

A. I do see that.

Q. So it appears that she prepared it on the day that you were preparing the press release?

A. In part, sure.

Q. Are you aware of whether it's normal to prepare validation reports from one day to the next?

A. From one day to next, what do you mean?

Q. Yeah. Over the course of just one day to prepare these reports?

A. A validation report can take any amount of time to prepare -- a day, several days. I don't know that there's a specific timeframe that's normal or abnormal.

Q. Do you know why Dr. Satterfield didn't -- strike that.

Did Dr. Satterfield review these actual validation reports?

A. I don't know.

Page 197

Q. Based on the fact that he's not listed as the supervisor, does that mean that he didn't review it?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: It doesn't mean that.

BY MR. PINEIRO:

Q. Okay. One second.

There's a reference in this Australia study. I don't know if you've seen this before.

It says: "The probability from .01 to .99 was calculated for copies/uL and 95 percent of detection was calculated at 8.42 copies/uL."

Do you see that?

A. I do.

Q. Okay. Again, besides Ms. Garcia, you're not aware of anybody else who verified these data points?

A. I don't know who would have been involved in it.

Q. Do you recall that I showed you an e-mail earlier from Dr. Lopansri in mid-April regarding the test you took?

A. I do.

Q. Did you review any letter that he sent subsequent to that e-mail on May 1st to CODX regarding his statements?

A. That Dr. Lopansri sent to --

Q. Yes?

50 (Pages 194 - 197)

Page 198

A. No, I'm not aware of any correspondence. I don't recall any.

Q. Once the press release was issued, what was, sort of -- what was the next step -- what were the next things that you did in terms of getting -- strike that.

Did you do anything after the press release was issued to, you know, publicize it, you know, have it obtain more exposure in the media?

A. I don't recall doing anything.

Q. Would you normally, you know, send to PR Newswire or some other source?

A. Well, I mean, it was a press release would appear on PR Newswire. It's the wire service.

Q. Do you recall the company receiving any incoming inquiries from media about the release?

A. Nothing comes to mind. I don't recall.

Q. Do you recall how the company's stock price responded the day after the press release?

A. I mean, I recall that it was just a crazy, volatile time. The stock price would regularly rise and fall 15 to 20 percent in a day or two. It was seemingly -- like, it was impossible to predict or guess how it was going to go one day to the next.

I can't recall what would have made it move or drop or fall or anything in -- it was wildly volatile and

Page 199

unpredictable. I don't recall from day-to-day what it was like.

Q. I'm showing you a document marked Exhibit 22.

(Plaintiff's Exhibit No. 22 was marked for identification.)

BY MR. PINEIRO:

Q. Below there's e-mail from Frank Garcia at Coltrin.

A. I don't see anything on your screen.

Q. Sorry. Do you see that now, sir?

A. Yes.

Q. There's e-mail there Frank Garcia to Mr. Egan. You're copied on May 1, 2020. It says: Allison Gatlin at Investor's Business Daily," do you see that?

A. Yes.

Q. It says:

"We have connected with Allison Gatlin who is working on the story around the company's stock movement today. She has seen the press release noting the 100 percent specificity and sensitivity of Co-Diagnostics' COVID-19 test and interested in a comment from someone at the company, most likely Ike, about the benefits of accuracy when testing for COVID-19.

We can draft something for you to review, unless

Page 200

you would prefer to craft something that we can share. She has a deadline of 2:00 p.m. today."

Do you see that?

A. I do.

Q. Who is Frank Garcia?

A. He worked for Coltrin & Associates.

Q. Does the company still exist, Coltrin?

A. It does not. Steve Coltrin passed away.

Q. Okay. Does the company still work for any PR company?

A. Yes. So Coltrin & Associates and all of its associates are no longer there, except Jennifer Webb started her own organization or her own entity afterwards, Coltrin PR -- Coltrin Method PR. So she's the only one we work with.

Q. Okay. So are you familiar with Allison Gatlin?

A. Not really.

Q. Before May 1, 2020, had you ever spoken to her?

A. I don't recall, possibly.

Q. Do you know whether Coltrin was attempting to -- strike that.

Do you know whether Coltrin approached Allison Gatlin about this article?

A. I don't know. The text below seems like she was already working on a story and reached out to Coltrin,

Page 201

but I don't know.

Q. So another e-mail same day, a little later. You're copies. It says:

"Allison Gatlin has posted her article, which she intends to update throughout the day. Once we have a comment that we can share it will be folded into the piece."

Do you see that?

A. I do.

Q. Were you involved at all in, I guess, in helping the company provide comment with respect to this article?

A. I don't see any comment that was provided. So I don't think so.

Q. Okay. So it says here -- strike that.

Do you know whether the company spoke off the record with Ms. Gatlin regarding this article?

A. I don't recall any conversations with her on or off the record.

Q. Or on background?

A. Yeah, or on background.

Q. It says: "Coronavirus test maker soars as a diagnostic test proves 100 percent accurate."

Do you see that?

A. I do.

Q. So the title indicates that -- appears to

51 (Pages 198 - 201)

Page 202

indicate that the test is 100 percent accurate, right?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: That appears to indicate -- that was one person's interpretation, what they chose to -- what they chose to glean from it.

BY MR. PINEIRO:

Q. But her interpretation is the test was 100 percent accurate, it seems?

A. You'd have the speak to her. I mean, I can only -- your guess is as good as mine.

Q. No, based on the title of the article, that's at least what the article is conveying, correct?

A. That's what the headline appears to be --

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: Again, you'd have to speak to Ms. Gatlin what she meant by that, but --

BY MR. PINEIRO:

Q. It says:

"Co-Diagnostics said Friday its coronavirus test has proven 10 percent accurate in field testing leading CODX stock to rocket."

Do you see that?

A. I do.

Page 203

Q. Now, is that accurate -- is that true that CODX's test has proven 100 percent accurate in field testing?

A. I mean, as far as what we communicated with the public, the field tests that we presented, that we provided, it was true. It was 100 percent accurate in those tests.

Q. Okay. Okay. This doesn't specify the actual evaluation. It just says it's "100 percent accurate in all field testing --

MS. PEIRSOL: Objection. Sorry. Didn't mean to step over you.

BY MR. PINEIRO:

Q. It appears to be stating 100 percent accurate in field testing, really without qualification, right?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: It may. I didn't have anything to do with drafting or disseminating this. This is solely Investor's Daily business statement.

BY MR. PINEIRO:

Q. And then it says:

"Evaluations from officials in India, Mexico, U.S. and elsewhere show Co-Diagnostics tests for COVID-19 have performed with 100 percent specificity

Page 204

and 100 percent sensitivity. In statistics, these two measures are key for determining accuracy."

Do you see that?

A. I do.

Q. And it appears that she's quoting from Dr. Satterfield's statement in the press release; do you see that?

A. I do.

Q. It appears that the shares of company went up 13.7 percent in early trading following the press release; do you see that?

A. I do.

Q. Do you know if anybody at the company called Ms. Gatlin after this article was first published to explain to her the nuances of the validation results and 100 percent accuracy testing?

A. I don't.

Q. Should you have?

A. In what sense?

Q. To ensure that she's not misinterpreting the press release issued on May 1.

A. It wasn't until later that I became aware of the fact that the press release -- for me, you know, when it was written -- you know how it is when you write something and it makes sense to you, and you've got three

Page 205

or four other people reviewing it, everybody signs off. It wasn't until later that I realized there were more interpretations than I could have predicted.

So should somebody have contacted this individual? I don't know. That's not really -- I mean I don't know how to answer that question.

But it was impossible for me to predict how many ways this could have been misinterpreted, without -- the absence of a crystal ball, I can't foresee every possible outcome.

Q. Well, when you get this e-mail that has this title, that did not signify to you that perhaps people were misinterpreting it?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: Again, when I see this, I'm still reading it in the context of what I understood the press release to say, not that this would be misinterpreted in the way that it was.

BY MR. PINEIRO:

Q. Was there any discussion within company after this article was posted about a potential misinterpretation by the public of the press release?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't recall such a discussion.

52 (Pages 202 - 205)

Page 206

BY MR. PINEIRO:

Q.  Did anybody share this article with Ms. Hutchins?

MS. PEIRSOL:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.

MR. PINEIRO:  Why does that call for speculation?

MS. PEIRSOL:  He doesn't know what everybody did.  He knows what he did.

BY MR. PINEIRO:

Q.  Did you share this with anybody?

A.  No, I don't recall sharing it with anybody specifically.

Q.  Do you have any knowledge of anybody sharing this with Ms. Hutchins?

A.  No.  Same answer as before, I don't know if it was ever shared with her.

Q.  You indicated that at some point you realized that people had misinterpreted the press release, right?

MS. PEIRSOL:  Objection.  Mischaracterizes his testimony.

THE WITNESS:  Can you repeat the question?

BY MR. PINEIRO:

Q.  You indicated earlier, a few moments ago, that at some point you realized that some people had

Page 207

misinterpreted the press release, right?

MS. PEIRSOL:  Objection.  Mischaracterizes his testimony.

THE WITNESS:  I think what I meant to say was that it is -- it was always my opinion, as far as misinterpretation of this press release goes, that it was always done intentionally; that it was used as leverage for people who were just trying to find a way to attack the company or to profit from it, and used an intentional misinterpretation of the words that were in there, in order -- in order to benefit or financially benefit from it.

That has always been my interpretation, that nobody reasonably would look at that and draw the types of inferences that are being alleged here. It's always been my feeling, my personal belief that anybody who does so is solely doing so because they're trying to gain something from it.

BY MR. PINEIRO:

Q.  And yet the stock went up, you know, almost 14 percent on that day, right?

A.  The stock would go up all the time and drop all the time.  It was a roller coaster.  We wouldn't put anything out and it would go up 20 percent.  We'd put something out and it'd go down 10 percent.  Who knows?

Page 208

Q.  Right.  Do you know whether Ms. Gatlin intentionally misinterpreted the results?

A.  I don't know.

Q.  Did she try to profit off of, you know, that press release?

MS. PEIRSOL:  Objection.  Assumes facts not in evidence.

THE WITNESS:  You're asking me what Ms. Gatlin was trying to do?

BY MR. PINEIRO:

Q.  You indicated that based on what you've seen, that most people that misinterpreted it had done so intentionally in order to profit from it.

I'm asking you whether a reporter who has put together this Investor's Business Daily piece is one of those people.

A.  When I read her article, I read it with the understanding that she understood what we were writing.

Q.  Okay.  But you don't know whether -- you don't know whether she's attempted to profit from this?

MS. PEIRSOL:  Objection.  Assumes facts not evidence.  Asked and answered.  Mischaracterizes his prior testimony.

THE WITNESS:  No, she has not conveyed to me what her intentions were.

Page 209

Again, I read this as her understanding of what we wrote.

BY MR. PINEIRO:

Q.  I'm showing PX 44 -- Exhibit 23.

(Plaintiff's Exhibit No. 23 was marked for identification.)

BY MR. PINEIRO:

Q.  Do you see that on your screen, sir?

A.  Yes, I do.

Q.  So on the first page Ms. Hutchins says:

"Hi, Andrew, A laboratory is using the data published in the reports attached to the press release response to the SLC Tribune article.

Can we take the reports from the website now that the answer has been given.  Because I know for sure that if the FDA sees those not reviewed data, it'll be a problem.  We should link the press release to the InDRE report."

Do you see that?

A.  I do.

Q.  Ms. Hutchins asked you if it was possible to remove the press release from the reports -- strike that.

She asked you if it was possible to remove the press release from the website, right?

A.  (Reading sotto voce.)

53 (Pages 206 - 209)

Page 210

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: Sounds like she's just asking to remove the data, not the press release.

You'll have to ask her what she meant by that.

BY MR. PINEIRO:

Q. Okay. Did you have any discussions with her about this request?

A. I don't recall seeing this. It looks like I responded to it up above, so if I could see that, that might refresh my memory.

Q. So this appears to confirm that she didn't review the press release before it went out, right?

MS. PEIRSOL: Objection. Assumes facts not in evidence.

THE WITNESS: It doesn't say anything of the sort there.

BY MR. PINEIRO:

Q. Okay.

A. I should say that FDA read all of the press releases and never had a problem with this one.

Q. She says: "Because I know for sure that if the FDA sees these not reviewed data, it's going to be a problem."

What does she mean by "not reviewed data"?

Page 211

A. I don't know. You'd have to ask her.

But I will say again, the FDA never had a problem with it, never issued any kind of comment, never an e-mail, never a request, and, as you could see, they've read all of our press releases.

Q. Did the SEC initiate an investigation based on the press releases?

MS. PEIRSOL: Objection. To the extent you can answer that question without divulging any attorney-client privilege, you can answer. Otherwise, I instruct you not to answer.

THE WITNESS: I don't know what prompted the SEC to do it.

BY MR. PINEIRO:

Q. But part of the probe in which you've provided testimony is -- pertains to that press release, right?

MS. PEIRSOL: Objection. To the extent you can answer without providing any attorney-client privileged communications or work product, you can answer. Otherwise, I instruct you not to answer, Mr. Benson.

THE WITNESS: Yeah, my sole understanding about the SEC's motivation has come from conversations with counsel.

BY MR. PINEIRO:

Page 212

Q. Right. But they asked you questions in the examination, correct?

A. Correct.

Q. And they asked you about the press release, right?

A. They did.

Q. Sorry. You don't recall whether you had a conversation with her.

We have an e-mail here from you, I guess, it looks like the same day. Do you recall whether you had a phone call with her about this issue?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: Okay. What's your question?

BY MR. PINEIRO:

Q. None right now. So you wrote:

"So we can't ever report the results of any evaluations ever, unless they are clinical validations."

Do you see that?

A. Yes.

Q. What did you mean by "clinical validations"?

A. I'm not sure what the context was about that.

Q. You don't know what your own words are?

A. That's correct, Michael. I can't remember what I was thinking when I was writing it. It was three years

Page 213

ago.

Q. By "clinical validation," did you perhaps mean peer review validation?

MS. PEIRSOL: Objection.

THE WITNESS: No, I don't think that's what I would have meant.

BY MR. PINEIRO:

Q. Okay.

"Two of them were official government evaluations, and we surely have the right to defend ourselves from false and spurious claims related to the performance of our test using the data that we have collected, no? Normally, I'd just delete that line that has the link in it full-stop, but isn't the headline damming enough?"

So why did you say "normally I'd delete that line that has the link in it full stop"?

A. Based on responding to Cecelia's request. But I don't want to say that -- you know, I, myself, was not thinking that that headline in the first paragraph was damming. I'm just saying, like, in the context of what you're asking here, isn't that bad enough. Wouldn't the FDA already have a problem with it, which they did not.

The FDA was always on our case about our press releases if we said anything that we weren't supposed to.

54 (Pages 210 - 213)

Page 214

And, again, we never received a single inquiry or comment about this release.

Q. Then you went on to say --

A. The reason I didn't want to remove that is because we're very particular in making sure we provide all the data to support all of our claims, and I didn't want to -- you know -- I didn't want to be accused of providing information or making claims without having data to support it.

Q. What you say actually is:

"My problem with removing that line" -- I guess that's the line -- that means the link, correct?

A. No.

Q. What did you mean by that?

A. Just -- I believe I was just referring to the one line in the press release that said -- that contained the link to the data. It was the third paragraph, the stand-alone sentence.

Q. Okay. "Or even just removing the release all together so that the SEC has requested more information to support those claims."

A. Right.

Q. Do you know what information they requested?

A. I don't recall.

Q. "Which isn't anything new, they do so with every

Page 215

release we publish these days."

So was the SEC, I guess, was frequently scrutinizing your releases?

MS. PEIRSOL: Objection.

To the extent that this question calls for attorney-client privileged information, Mr. Benson, I instruct you not to answer. Otherwise, you can answer the question.

THE WITNESS: Yeah, I believe all of the communication or correspondence that I would have had related to SEC would have all been through general or corporate counsel, which I believe is privileged.

BY MR. PINEIRO:

Q. "It's incredibly annoying. But I need to check with counsel" -- strike that.

So besides this May 1st press release, were there other press releases where you had to evaluate the content of the release based on an SEC inquiry?

MS. PEIRSOL: Objection.

To the extent it calls for attorney-client privileged information, I instruct you not to answer. Otherwise, you can answer, Mr. Benson.

THE WITNESS: The question kind of jumped around a little bit. Can you ask it one more time, please?

BY MR. PINEIRO:

Page 216

Q. Yeah. The question is whether besides this May 1st press release, if there were any other press releases that you recall having to go back and look at the release and revise or reevaluate it based on an SEC inquiry?

MS. PEIRSOL: And I object to the question based on that it calls for attorney-client privileged information or work product.

I instruct you not to answer, Mr. Benson.

THE WITNESS: Yeah, I never had to go and revise or reevaluate a press release based on any sort of involvement from the SEC.

BY MR. PINEIRO:

Q. Okay.

You said: "But I need to check with counsel first to see if it's okay to just disable the release all together with the SEC reviewing it."

So without revealing attorney-client information, did you -- did you check with counsel?

A. I don't recall.

Q. So here on May 13th -- strike that.

Besides this e-mail from Ms. Hutchins, did you become aware around this time of other customers or distributors of CODX using the press release to market the test?

A. I don't recall exactly. I'm not sure. Yeah, I

Page 217

can't remember.

(Plaintiff's Exhibit No. 24 was marked for identification.)

BY MR. PINEIRO:

Q. So I'm showing you what's been marked as Exhibit 24. It's an e-mail from someone called Phil Zobrist at --

A. Not seeing on the screen here.

Q. Sorry. See it now? It says -- the subject is:

"BioCentury - limits of detection for FD, COVID-19 diagnostics."

And, Mr. Benson, your father is copied, you're copied and some other ones.

Do you know who this person who sent this e-mail?

A. Phil Zobrist, looks like. I think he was -- he was a -- an investor or associate of Mr. Briggs. I don't know exactly what the relationship was.

Q. Without reviewing any attorney-client information, is the SEC -- did the SEC ask you any questions in its examination about a potential pump-and-dump scheme involving Co-Diagnostics shares?

A. I don't recall any such questions.

Q. Did they ask you questions -- without giving attorney-client privileged information -- did they ask

55 (Pages 214 - 217)

Page 218

you any questions regarding any boiler rooms that were soliciting investors in Co-Diagnostics shares?

A. Likewise, I don't remember any questions along those lines.

Q. Okay. Your response to this e-mail was:

"Have we formulated a response to this particular article yet, attacking our LoD? Is it basically LoD is just one measure of accuracy, etc., etc., etc."

Do you see that?

A. Yes.

Q. Do you recall reviewing this article that was linked here?

A. Vaguely. I haven't thought of it for three years until it had been brought up here in this deposition. I don't even really recall it. Just what -- what we've read here. There was some articles, some comparison about LoDs, but I don't remember any of the details.

Q. There's an e-mail here from Ms. Hutchins on May 15th to Ms. Webb to you and Dr. Satterfield. She says:

"So, this last Monday, I received a complaint from the FDA that one of our distributors had on their website the claim of 100 percent sensitivity and specificity about the Logix Smart. Little did

Page 219

they know that we had the same claim in our PR, and I'm afraid it is just a matter of time until they found out from where it came from. That is what the FDA sent me in the e-mail." And then she quotes the FDA.

"No IVD is 100 percent sensitive and 100 percent specific, so please inform your distributors that performance of the test should be promoted as based on the validation study design and data and as in the EUA, i.e., the results of your validation, and, importantly, how it was performed."

Do you see that?

A. I do.

Q. "You may report that in a specific study with a certain number of samples and condition, that you got something very close to 100 percent, but we cannot generalize that the test will always be 100 percent no matter what. That being said, it's going to be very hard to make the FDA agreeing on us to claim 100 percent.

We are working on improving the LoD, if the FDA agrees on including the data on this amendment, we may have something very soon."

Do you see that?

A. Yes.

Q. Did you ever discuss with her what she meant by:

Page 220

"It's going to be very hard to make the FDA agreeing on us to claim 100 percent"?

A. I don't know. Did I respond to this e-mail?

Q. There's no response.

A. Yeah, I don't know. I don't know. Again, all I know is the FDA certainly -- I mean, despite Cecelia's concern -- and that's fine she was doing her job -- FDA never had any problems with the press release.

I believe because FDA reviewed it and read the words that were included in there and realized what we were saying which was, "here's four reports with some data showing 100 percent concordance for sensitivity and specificity, concordance for sensitivity and specificity against the standards.

Q. Do you know that they actually did that? Do you know whether the FDA actually reviewed the release and concluded that there were no issues with it?

A. I know the FDA reviewed a lot of our other releases. I don't know when they stopped. But, I mean -- they even found this claim from one of our distributors on their website.

I mean, I know that they were regularly reviewing our press releases, and the fact that they found something even more obscure; you know, I would be surprised that they found that, but somehow not the

Page 221

release that was prominently released on the news wire and posted on our website.

Q. Then she says:

"Another thing is that, for example, BD'S BioGX with 40 copies/ml is run on their BD MAX System with a sample input of 750 uL, which is a closed system, where you add the sample at one end and get results on the other end."

Do you know what she's referring to here?

A. I don't know, BD Max machine, but I don't know anything about it, though.

Q. She said:

"While our test requires a separate manual or automated extraction, it gives the laboratories a lot of flexibility because we or they can validate it in as many thermocyclers as we would like to, and almost any laboratory in the would can use our test."

Also, our sample input is much smaller. It is 200 uL. The comparison is basically bananas to banana smoothy."

Do you know what she meant by that?

A. I'd have to probably read the article. No, I don't know what she meant by that.

Q. Okay. You don't remember having any follow-up about that comment, "bananas to banana smoothy," do you?

56 (Pages 218 - 221)

Page 222

A. I don't recall it.

Q. Okay. Then she said:

"Yes, the numbers in the article are accurate, but as I said, they are comparing bananas to banana smoothy."

Do you recall what Ms. Webb would have written to have prompted that response?

A. No --

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: No, I don't recall what she would have said.

BY MR. PINEIRO:

Q. Then, up top, Ms. Hutchins says:

"Yes, I just hope they miss it. I don't think it is worth trying to fix the PR now. Distributors aren't distorting but they are taking it out of context, like many articles I have seen, with so many of those articles talking about 100 percent sensitivity and specificity. I'm just waiting for the FDA to ask me. If they don't, I'll be grateful."

Do you see that?

A. I do.

Q. Do you recall discussing this e-mail with Ms. Hutchins?

A. No. Cecelia and I had a lot of conversations.

Page 223

I don't recall them all.

Q. Okay. In this one, she is concerned about the FDA contacting her about -- the -- the -- the May 1 press release. Do you recall escalating this to management?

A. No.

Q. Okay. Do you recall escalating this to legal counsel?

A. I don't.

Q. Okay. So you indicated that at some point it was obvious that some people were taking things out of context eventually when it came to the May 1st press release.

Is this around the time when you realized that, May 15th, when you received this --

MS. PEIRSOL: Objection. Mischaracterizes his prior testimony.

THE WITNESS: I -- I -- after reading this, I do recall there was time when there was, yeah, some distributor that had taken that -- I don't even recall which one or what country it was in -- that had taken that information out of context and was using it in promoting our test, which was brought to our attention by the FDA.

BY MR. PINEIRO:

Q. "Also, performance claims are tied to the

Page 224

intended use. If has a really low limit of detection, the FDA may allow the test to be used for screening asymptomatic patients."

Do you see that?

A. I do.

Q. So it appears she's indicating that a test with a favorable limit of detection can be used not only with symptomatic, but asymptomatic because they have lower viral loads; is that correct?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: She's saying that the FDA might allow a test to be used for that intended use.

BY MR. PINEIRO:

Q. Okay. Is the Logix Smart -- at this point in time, was the Logix Smart Test allowed to be used for screening asymptomatic patients?

A. The intended use is something that has to be published along with all the in-vitro diagnostics, saying, this is what the FDA has -- is authorized for it to be used for.

It's not against the law for a lab to use it for any other use.

So, in answer to your question, could it be used for anything else, we are only allowed to say, "hey, this

Page 225

is the intended use," but we don't police how it ultimately ends up being used by our end users.

Q. After -- after this May 1 press release, do you recall whether the company was asked to participate in any joint validation study in response to the Salt Lake Tribune article and all these issues?

A. I can't recall whether the company was asked to participate in a joint validation study.

Q. Okay. Would you have been involved in any decision to participate in a joint-validation study?

A. No.

Q. Do you have any recollection of CODX refusing to participate in a validation study by the state of Utah --

A. CODX refusing to participate? No.

MR. PINEIRO: Do we want to take five? It's been an hour.

THE WITNESS: How much do you think we need when we're back?

MR. PINEIRO: No, I'm moving. Ballpark, two hours maybe less.

THE VIDEOGRAPHER: Would counsel like to go off the record?

MR. PINEIRO: Yes.

THE VIDEOGRAPHER: This is end the media number 5. The time is 3:20 p.m. We are off the record.

57 (Pages 222 - 225)

800-726-7007                                                    305-376-8800

Page 226

(A recess was taken.)

THE VIDEOGRAPHER: This is beginning of media number 6. The time is 3:28 p.m. We are on the record.

BY MR. PINEIRO:

Q. I'm showing you what's been marked as Exhibit 25; do you see that on your screen, sir?

A. Yes.

(Plaintiff's Exhibit No. 25 was marked for identification.)

BY MR. PINEIRO:

Q. It's an e-mail from Marissa McEwan and it's to Dwight Egan, May 4, 2020 and you're Egan you're copied; do you see that?

A. Yes.

Q. Who is Marissa McEwan?

A. At the time, she was a, sort of an operations assistant, office manager role.

Q. She sends an e-mail and the subject is: "Weekly updates and important message from management." It says:

"Good morning. Here are the updates from today including an important message from management."

Was it customary for his McEwan to provide updates from management?

A. It was not totally unheard of. Occasionally,

Page 227

management would request that she would disseminate something.

Q. I apologize. It's hard to see but I'll hone in a little bit. In dark it says there: "Under no circumstances --

A. I see.

Q. "Under no circumstances are any Co-Diagnostics, Inc. employees are allowed to comment on any stock message boards. If you've already commented on our message board, please let management know."

To your knowledge, did any company employees ever post on stock message boards?

A. Not to my knowledge. I recall that being issued as a precautionary measure, but I don't recall that actually happening.

Q. Okay. Then she has bullet points, it says:

"Lab COVID-19. Manufacturing has been going exceedingly well. As of last Friday the first, we are caught up on orders. Development is being worked on by Brent, KC and Chad to approve the limit of detection."

Do you see that?

A. I do.

Q. Is Brent, Brent Satterfield you think?

A. I believe so.

Page 228

Q. Who are KC and Chad; do you know?

A. KC is Kenneth Casey Bradwell. He's currently the deputy CFO, and Chad is Chad Apuli.

Q. Do you know what development they were doing to improve the LoD?

A. No, I don't.

Q. After the May 1 press release, were you involved in any discussions with anyone in management regarding a project to improve the LoD?

A. No. As I mentioned before, it was the intention to submit a -- an amendment to the UA, where we were doing a more -- you know, a more similar LoD evaluation to what was done with -- with competing tests, to see what LoD showed up as.

But the test itself did not undergo any -- any additional development. The test that was designed in those additional three days has not undergone a single change, despite all of the variations and variance and mutations over the last three years.

Q. So would -- would these three, I guess -- I'm not going to call them "scientists," but people in the lab, you're saying what you believe they were doing was attempting to improve the LoD as listed on the EUA?

A. I believe that what this referring to is that performing some LoD studies, using different sample

Page 229

matrices. And, you know, I can't remember the outcome on this specifically or exactly which development was being worked on here. But I know there was a study underway at some point during this time.

Q. Do you know whether it's possible to improve the limit of the detection of a test that you developed and manufactured?

A. Yes, it is.

Q. Do you know how that's done?

A. A limit of detection is the result following a certain set of procedures. And if you change those procedures and change the inputs, you could change a lot of factors without changing that PCR test itself. That could remain static; whereas, a lot of other factors can be -- can, you know, can be changed and, you know, get a different result.

Q. Do you have any knowledge about whether the company was attempting to change any of the procedures or input in connection with the test in order to improve the LoD?

A. I don't know exactly what the company was doing to -- to change the LoD result.

Q. Showing you a document that's been marked as Exhibit 26. It's an article titled:

"TestUtah Declines to Join Other Utah Labs in

58 (Pages 226 - 229)

Page 230

Accuracy Check." Issued on May 14, 2020.

Do you recall reviewing this article?

A. Vaguely.

(Plaintiff's Exhibit No. 26 was marked for identification.)

BY MR. PINEIRO:

Q. It says:

"Amid questions about the accuracy of TestUtah.com's coronavirus test results, the statewide testing operation declined to join other major Utah labs in a joint experiment to confirm one another's quality."

Do you see that?

A. I do.

Q. And do you recall whether that was a decision that was made by Nomi or was it made by CODX?

A. It wasn't made by Co-Diagnostics. I don't know if it was Nomi or TestUtah. I don't know who made that decision. I don't recall it being the company Co-Diagnostics, no.

Q. And do you know whether the company provided any input to that decision?

A. I wasn't involved in it, so I couldn't say.

Q. It says:

"Instead, the TestUtah companies agreed to a

Page 231

less-sophisticated compromise experiment to compare results with the state lab, said epidemiologist Dr. Angela Dunn. It was a quick and dirty way to learn whether there is a difference."

Do you know whether that compromise experiment actually occurred?

A. I don't.

Q. It says: "The results of the more rudimentary accuracy check may not be made public."

Do you see that?

A. I do.

Q. Do you recall whether after this article was issued, there was any discussion within the company for its decision not to participate in the validation study?

A. Again, I wouldn't characterize it -- you said "within the company" about its decision to not participate. It was not Co-Diagnostics' decision to not participate. I don't know if it was Nomi.

We were a vendor. We were a supplier for Nomi Health. We were never a part of TestUtah itself. We were just one of the vendors that one of the companies was using. So it wasn't Co-Diagnostics' decision at all.

Q. Did you have any discussions with Mr. Egan about, you know, whether it made sense to submit the test, do a validation report with TestUtah, given the

Page 232

potential bias or ulterior motives of the state?

MS. PEIRSOL: Objection. Asked and answered.

THE WITNESS: I don't recall such a discussion with Mr. Egan. I wasn't aware of any of this until after the article would come out. I don't recall a subsequent discussion with him.

BY MR. PINEIRO:

Q. It says towards the bottom here:

"In Nebraska, as in Utah, the tech companies' testing sites have returned a far lower rate of positive results than the rest of the state's sites. Only about 3 percent of its Nebraska tests have been positive, compared with 18 percent statewide since the epidemic began."

Do you see that?

A. I do.

Q. Do you know whether these tests were CODX test that are being discussed here?

A. I don't know everything that Nebraska used.

Q. Do you know whether Nomi used CODX tests in connection with testing Nebraska?

A. They did. Co-Diagnostics tests were used in TestNebraska, but I don't know if they were the totality or the entirety of the tests used in Test Nebraska.

Q. Do you know whether Mr. Satterfield conducted

Page 233

any investigation or prepared any white paper to address these alleged disparities in the positive results in Nebraska?

MS. PEIRSOL: Objection. Mischaracterizes the evidence.

THE WITNESS: I remember some discussion about the Nebraska results. I can't remember what was done about them. I can't recall -- I mean, I recall being asked this question, and there was some data that was prepared that helped provide context to those numbers, but I can't remember what that was now. Again, my memory is only so good after several years.

BY MR. PINEIRO:

Q. It also says:

"However, Utah's numbers separate TestUtah's results by asymptomatic and symptomatic patients, and even when asymptomatic patients are filtered out, the rate of positive results is still less than half that of patients tested elsewhere in Utah."

Do you see that?

A. Yes.

Q. Do that appear to contradict Dr. Satterfield's white paper on the results in Utah?

A. No, it doesn't.

Q. Okay. Why not?

59 (Pages 230 - 233)

Page 234

A. Because filtering out symptomatic and asymptomatic wasn't the issue. It was how you characterized symptomatic.

So a symptomatic patient for TestUtah was not necessarily the same as a symptomatic patient for the rest of the state.

Once those definitions for asymptomatic and symptomatic became aligned, then those numbers matched. Then it was an apples-to-apple comparison.

Q. Are you aware of whether Nomi stopped using CODX tests in Nebraska?

A. Am I aware of whether they stopped using them?

Q. Uh-huh.

A. I mean, eventually. I don't believe the TestNebraska program is still going.

Q. Do you know when that occurred?

A. I don't. I remember Co-Diagnostics was still sending tests to Nebraska for some time, long after this article was written.

(Plaintiff's Exhibit No. 27 was marked for identification.)

BY MR. PINEIRO:

Q. Showing you Exhibit 27. It's an e-mail from Mr. Egan. You're copied to it. It provides a link. It appears to provide a link. The subject is "Salt Lake

Page 235

Tribune article needs attention."

Do you see that?

A. I do.

Q. It says:

"We are getting a request now form the Desert News based on this article. The assertion is that there has been an opportunity to validate the accuracy of the Co-Diagnostics test by the state and a refusal to participate. Can we get an update call on that. Need to check in on what has happened since we spoke about this last."

Do you see that.

A. I do.

Q. Do you recall having any conversation with Ms. Webb about this issue?

A. I spoke with to her every day, it seems like. I don't remember this specific one. I do -- I mean, the assertion -- I think she misread the article. Because the article itself never even asserts -- well, I take that back. Because she is saying that Co-Diagnostics -- I just misread her statement there. Yeah, I take that back.

Q. In your view, is there a significant difference between a 95-percent sensitivity and 100 percent?

A. I know 95-percent sensitivity in actual -- in a

Page 236

clinical laboratory setting where test samples are coming in and being tested on a daily basis, 95 percent was a fairly high mark, fairly high bar for a test to get. That was about what we were seeing from any of the leading test manufacturers, was a 95 percent.

It was 95 percent in those types of settings, which was a controlled evaluation, of course. Everybody knows that's different.

Q. Do you recall -- I showed you earlier the Salt Lake Tribune on May 14th about the validation issue on TestUtah.

Do you recall on May 14 that there were trading halts in Co-Diagnostics' stock?

A. No. Were there?

Q. I'm asking you if remember.

A. Yeah, I don't recall that.

Q. Yeah. Are you familiar with a short trader called Hindenberg Research?

A. I'm familiar with the name, yeah.

Q. Do you recall that on May 14th it made statements on Twitter that it was shorting CODX?

A. I don't recall the date, but I remember Hindenberg made comments some time in that time period.

Q. And do you recall that it stated that its test was third tier and rated one of the worst?

Page 237

A. I don't recall the substance of those. I'm not even on Twitter anymore. I don't recall the substance of exactly what Hindenberg was saying.

Q. Was there ever any discussion within the company about responding to Hindenberg's assertions?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't recall exactly what was discussed about whether we would respond or not to Hindenberg, but it wasn't the company's practice to respond to noted short sellers like that.

BY MR. PINEIRO:

Q. Did you ever become aware of -- strike that.

Were you aware that on May 14th the FDA issued a public notice indicating that no COVID test could be 100 percent accurate?

A. I don't recall that.

(Plaintiff's Exhibit No. 28 was marked for identification.)

BY MR. PINEIRO:

Q. Showing you a document that's been marked as Exhibit 28. Do you see that?

A. No.

Q. Do you see that now? Okay.

On the bottom there's an e-mail from Vimai Raj to the investors at Co-Diagnostics e-mail address. It

60 (Pages 234 - 237)

Page 238

says:

"Hello, I'm an investor in CODX. When I'm doing my research on your company, I noticed you viral detection limit is much higher, 4200 versus 125 for Abbott. How does thi affect the sensitivity of your testing. Thanks."

Q. Do you see that?

A. I do.

Q. Do you know who this person is?

A. No.

Q. And then you wrote to -- you forwarded to this to Brent Satterfield. You said:

"This is a really straightforward question. When I sat down to respond to it, I realized I still wasn't quite sure how do so. Is it fair to say something like this:

The limit of detection or analytical sensitivity is different from the clinical sensitivity or what is seen in the actual performance of the test. Ultimately, it is the clinical sensitivity that determines test performance, and the sensitivity of the Logix Smart COVID-19 test kit is regularly shown between 95 to 99 percent. This means that out of every 100 positive samples tested, it will correctly identify the presence of SARS-CoV-2, 95 to 99 times."

Page 239

Do you see that?

A. I do.

Q. Why is it that the numbers here regarding sensitivity, that you say are between 95 to 99 percent, are different than the validations that you referred to in the May 1, press release?

A. Because the May 1 press release was referring to four studies that were tested against a known standard, exactly as was described in there. That's different than a clinical laboratory down the street that has -- you know, that's not a controlled environment, that has employees that come in or -- maybe they've got COVID. They've got patient samples that might have been collected incorrectly. They've got different equipment. Sometimes they're running the equipment incorrectly. Sometimes they aren't. Sometimes the samples aren't transported as they're supposed to be. Sometimes they're left out too long. Sometimes they're not refrigerated, like they're supposed to.

There's any number of things that could go into influencing the actual results -- in -- in a clinical environment like that. And that's why it's regularly the case that when a company will apply for an EUA or a 510K or PMA, they'll present data to FDA that shows 100 percent sensitivity or 100 percent specificity or 99.98

Page 240

specificity or whatever.

FDA doesn't care about that. They know that those are the analytical sensitivity and specificity. And they know that the actual performance, once a test is actually being used in a clinical environment, by clinicians, by laboratory technicians, that there's going to be variation there. That's just how it goes.

Q. So there's going to be a differentiation between analytical sensitivity -- strike that.

Analytical sensitivity then is effectively what was being reported on the May 1 press release, you're saying?

A. No, that's not what I'm saying.

Q. Okay. Sorry.

A. So, analytical sensitivity, that's the limit of detection. That's something -- what's reported to the FDA in those controlled studies, you know, using contrived samples, whatever, in order to report the performance of the test, in a controlled environment, that's the analytical sensitivity.

That's different than what was being performed when our test was being compared against, you know, a known standard. And that's also different than what would be performed, you know. In your laboratory where your own COVID tests were processed.

Page 241

Q. So you're indicating here that -- so clinical sensitivity is what was being measured in the validation reports linked to in the May 1st press release?

A. No, not that either.

Q. Not that either.

A. Clinical sensitivity here is exactly what it says here, ultimately, it is the clinical sensitivity that determines test performance in terms of how it's being used out in wild; you know, how your sample might be tested. And that's different than a test -- an evaluation report or an evaluation study, where the test is being evaluated against a known standard for concordance.

We're talking about three different things here, not two. You're trying to put two of them together, but they're three different things.

Q. So why -- do you know why in the May 1st press release, which you put out the concordance studies, instead of the information you provided here regarding clinical sensitivity?

A. Because that is information that we are provided data on. We only provided data that we were given. We'll be given maybe a number, we'll be given a percentage, but we're not given the actual data. And we only wanted to report the actual data that we had, in

61 (Pages 238 - 241)

Page 242

case somebody asked, "how did you draw this conclusion," boom, here's the entirety of the data.

Q. So you're not provided data but you are provided -- you are provided with the actual sensitivity by the lab doing the valuation?

A. It was occasionally the case that a laboratory would let us know what that was, yes. We would get that as part of our post-market surveillance. But a post-market surveillance doesn't provide us all of the data we want to see.

I mean, there's patient information there. There's HIPAA requirements. They can't give us that data. They could tell what the numbers are looking like, but they can't give us, like, reports that have that kind of detail.

Q. Then Mr. Satterfield responds: "Probably a little late, but I think that's perfect."

Do you know what he meant by that?

A. I'm sending this e-mail on the ninth and he didn't respond to it until the 11th. So he's saying, probably a little late.

Q. So he's referring to his response being a little late?

A. You'd have to ask him. That's my interpretation.

Page 243

Q. Were you involved in preparing the press release for 2020 Q1 earnings?

A. Yes, I would have been involved in all press releases.

Q. Do you have any recollection that earnings report was favorable?

A. "Favorable" is a subjective term.

Q. What was your impression?

A. About the results or about the call itself?

Q. No, the results.

A. We were very pleased with the results. We were proud of what we had accomplished in the first quarter.

Q. Did you participate in the Q1 earnings call?

A. We tried to.

Q. And what happened?

A. As you may be aware because of the evidence that you've been provided, there's number of short sellers out there to Co-Diagnostics, that were doing everything they could to try to harm the company's image.

One of those included hijacking that Q1 earnings call. Which meant that instead of -- we thought there was going to be few hundred participants, turns out there was just a few thousand.

And the company that was in charge of executing that call did not provide the level of security it should

Page 244

have done. That call was hacked and, instead of five dozen participants all listening, while only a couple of us were muted at a time, there were, like, thousands of people all un-muted, all talking at once, which made it essentially impossible for us to execute the actual call.

We tried for a while and finally shut the platform down -- actually, we didn't even shut it down. It was still hijacked. We just had to let it go. We ended up issuing the results I believe as a -- as an NK.

Q. As somebody that followed the stock, you know, relatively regularly, as you indicated, why do you think -- you also indicated the stock was also very volatile.

Do you have any impressions while it was a volatile stock?

A. It was COVID, man, everything was weird back then.

Q. It didn't have to do with the fact that this was a company in the COVID space?

A. Absolutely. I believe so. But you'd have to speak all the individuals that were buying and trading to really figure it out. I could only guess.

Q. Do you recall when you first realized how volatile the stock was?

A. No.

Page 245

Q. Were there any discussions within the company about dealing with the volatile stock price with respect to issuing press releases?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: Can you just give me an example of what you are talking about?

BY MR. PINEIRO:

Q. Sure. Was there ever any discussion about, you know, how these press releases -- strike that.

Were there any discussion about how the company's press releases would impact the company's share price, in light of the volatility of the stock?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: Yeah, anything that I would have been involved in, I can't remember.

Like I testified to earlier, we're not unaware of the fact that a press release can have an effect on a stock price. But press releases were never issued with the intent of influencing the stock prices.

I mean, you know, as somebody who kept an eye on the stock price on a daily basis, I was obviously aware that sometimes it would go up, but I always found it to be very unpredictable.

A release could have no impact at all whatsoever

Veritext Legal Solutions
800-726-7007                                          305-376-8800

Page 246

or there would be no release and it could still go up 8, 10 percent.

BY MR. PINEIRO:

Q. Do you recall the company stock price the day after the Q1 earnings in 2020?

A. No.

Q. Do you recall -- strike that.

Did you at all evaluate or gauge the market's reaction to the earnings report?

A. I was way more concerned with the fallout from everybody that was trying to attend to call and couldn't. I mean, I was writing e-mails until three o'clock in the morning for the next couple of days, just on an one-on-one basis responding to people saying, like, what happened. And me trying to explain, Listen, I apologize. It wasn't our fault. It was the platform." It is what it is. You know, just helping respond to their -- respond to their inquiries.

Q. So there --

A. I was far more concerned about the shareholder outreach than I was what it did to the stock price.

Q. There were investors who couldn't log into the call?

A. Just the opposite. They could log into the call but none of them were muted, so you couldn't hear

Page 247

anything -- well, you could everything but not us.

Q. The fallout that you were dealing with, I guess was, what, people concerned about how the call went or --

A. Yeah, yeah.

Q. Can we get a time on the record?

THE VIDEOGRAPHER: May we go off the record to so I could check?

MR. PINEIRO: Yes.

THE VIDEOGRAPHER: This marks the end of media number 6. The time is 3:59 p.m. We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of media number 7. The time is 4:07 p.m. We are on the record.

(Plaintiff's Exhibit No. 29 was marked for identification.)

BY MR. PINEIRO:

Q. Showing you a document marked as Exhibit 29. You're not copied on this e-mail. It's an e-mail from Kara Levinson, who works for the state of Tennessee, to Lisa Piercy. It pertains to Nomi concerns.

A. It doesn't look familiar.

Q. Ms. Levinson says:

"In discussion with other states that have been

Page 248

involved with Nomi, it has been stated that the COVID-19 test used by Nomi appears to be a four-fold less sensitive than the CDC EUA COVID-19 test."

Has CODX ever obtained any information or data demonstrating that claim?

A. No, four-fold less sensitive than the CDC EUA test, no, not that I'm aware of.

(Plaintiff's Exhibit No. 30 was marked for identification.)

BY MR. PINEIRO:

Q. This is e-mail marked as Exhibit 30. It's an e-mail from Dr. Satterfield on May 20, 2020. You're copied on it -- you're bcc'd. It says:

"Chad, see the link below. Deselect the other companies and select Co-Diagnostics. You can download the data in an Excel spreadsheet. This was a study, not run by FIND, but submitted to FIND from South Africa. Looks like no info was available other than they claim to have used our test with Magnapure to evaluate six positive samples, find four of them positive, 66.67 percent sensitivity. They also reported an LoD of 0.2 copies/uL, far better than our current EUA."

Have you ever seen this data submitted by FIND -- published to FIND?

Page 249

A. Submitted to FIND, you mean?

Q. Yeah.

A. I don't recall receiving that.

Q. You don't recall receiving this e-mail?

A. No, I don't.

Q. So, when you have an e-mail like this, where, you know, it appears there's some data out there indicating there a sensitivity that's a lot lower than 100 percent, in your capacity as a director of investor relations and communications, do you have any responsibility to, I don't know, report this kind of information?

A. It sounds to me like what Dr. Satterfield is saying here is, you know, we should get an updated study done to determine -- because these numbers are far, far different than anything that we have seen.

So when we don't see any info available from it, and we know that they used the test with the Magnapure, which isn't something we're even really familiar with, there's -- you know, just having an end result is just a small part of the story.

We don't even have the data to present to people. You know, there's no info available for it. So, I mean --

Q. Did you ever -- do you know if the company --

63 (Pages 246 - 249)

Page 250

Mr. Satterfield asked, "just wondering if we can/should track this South African lab down."

Do you know whether the company ever did that?

A. I don't know. This -- oftentimes, when an e-mail, when I open it up and I'm copied on it and it's to somebody else, it's not even addressed to me, I may kind of like skim through it.

But this reads to me like directions given to the scientific staff to try figure to out why it is that we were seeing the data that we were seeing, not concern about data itself, but the results.

Q. Are you aware of any follow up on that study?

A. I don't know of any. Again, that would be more of a question for one of the scientists than for me.

(Plaintiff's Exhibit No. 31 was marked for identification.)

BY MR. PINEIRO:

Q. This is -- I'm introducing Exhibit 31.

This is an e-mail that you sent on September 16th of 2020 to Cecelia Hutchins and some other folks. It says: "FDA Comparison Study.

Hey all, this was brought to my attention. I wondering whether we have been sent the materials as mentioned here, whether it's something we are participating in, and if we have received the

Page 251

materials but opted not to. Why not? I may give us an opportunity to quell a lot of the rumblings about the tests LoD, if we could point them to this table."

Do you see that?

A. I do.

Q. And then Mr. Apuli writes: "We have received the materials and we submitted the data last week."

You write: "Nice. Thanks. Where do we end up with the LoD:

Mr. Apuli writes: "I believe we were at 14,000 NDU/ml, but we haven't gotten final approval. It isn't that great, to be honest."

Do you know what he meant by "final approval"?

A. Yes, this was set of reference material that was sent out to all companies that had an EUA, to do sort of like and apples-to-apple comparison for the LoD. Unfortunately, when it was given to the technician, the technician was not told what it was they were supposed to do with it.

So they did not run in accordance with what FDA had requested. It was supposed to be done with the reference material. I don't know what he was supposed to do with it. But whatever he did, it wasn't what was supposed to done.

So it took us -- it was submitted to FDA but

Page 252

because the way it was performed was not the way it was supposed to be performed, it was just left on the table like the results were something, like -- I can't remember -- "pending" or, you know, "analysis unclear," something. I can't remember what the status was.

So when he was referring to final approval, he was waiting for FDA to approve it. It took several -- several months and we finally got FDA to give us new reference material. They finally did. And then we performed the study in accordance with what they would have liked, and the LoD was far lower than what was given in our EUA.

We submitted that to FDA and said, "hey, put his on your table." FDA is, like, yeah, we don't really care about that anymore. We required somebody to look at it, review it, put on the table.

So we have that study report that I could dig up and provide that shows that LoD as an apples-to-apples comparison, with the other FDA EUA tests, but unfortunately, the FDA didn't prioritize it, didn't put it on the table.

Q. What did that study show?

A. I can't remember what the LoD was. It was -- I don't know, I can't remember. It was less than something like 25 percent of what the original LoD was -- I can't

Page 253

even remember. I can look it up and have counsel and provide it to you. I can just provide the whole validation report to you, show you what it says. I don't want to speculate.

It was far lower than our original EUA, and definitely far lower than the 14,000 copies.

Q. Okay. So you're saying that this number was made on faulty methodology?

MS. PEIRSOL: Objection. Mischaracterizes his testimony.

THE WITNESS: I would say that the methodology wasn't performed in accordance with what FDA had requested. I don't want to speak to whether it was faulty or not, but it wasn't in line with the request.

BY MR. PINEIRO:

Q. And was that the reason why the number -- strike that.

So you're saying that this number was not accurate because of that?

A. Correct. The number was accurate according to how the test -- how the methodology that was used, but it was not an apples-to-apples methodology with what everybody was doing. And once was that done, then it yielded far lower results, that I can't remember off the

64 (Pages 250 - 253)

Page 254

top of my head.

(Plaintiff's Exhibit No. 32 was marked for identification.)

BY MR. PINEIRO:

Q. Showing you what's been marked as Exhibit 32. Do you know who Kyle May is?

A. Yes, he's a laboratory technician.

Q. Okay. So in response to his e-mail about the FDA Reference Panel, you say:

"Hi, all, has this been submitted to the FDA? Did they accept the dilution explanation? So everyone knows the position we are in from a PR standpoint, while we all know there is no significant difference from a clinical perspective between 180 copies/mL and 14,000 copies m/L, when we're talking about an average over 300,000 copies/mL in an infected sample, the public does not.

And we're currently being unfairly raked over the coals for our LoD. It is absolutely vital that we have the most accurate, bullet-proof results for this study. All of the results are ending upon and a table, that is available for the public and we absolutely must put our best foot forward.

If the diluting the sample affects the results even slightly, then it calls into question the

Page 255

accuracy of what we're reporting."

Is that what you were referring to when you said apples-to-apples, diluting the samples?

A. Yeah. That was -- I can't remember what he had done. It was something about diluting the sample, yeah.

Q. Then you write:

"This just comes at a very bad time when there are at least two or more articles being written that will be published at any time, both of which try to discredit our test based on our LoD. If there's any chance at all that our LoD is better than this, then we have to know that."

What articles are you referring to?

A. They didn't end up actually being published.

Q. Who was investigating -- potential articles?

A. I can't remember the names of the journalists. One was ProPublica, one was something else. And after much, much in-depth explanation about LoDs and many conversations and they realized there was a big fat nothing there, they didn't end up writing the articles or at least not publishing them.

Q. Were you involved in those discussions?

A. Oftentimes with the journalists, yes.

Q. Who else was involved on behalf of CODX?

A. Jennifer Webb, KC Bradwell.

Page 256

Q. Did you provide those reporters with any data regarding the test performance?

A. Nothing that wasn't public.

Q. Did you exchange e-mails with those reporters?

A. Possibly. I can't remember. I think it might have been all through Jennifer Webb. I don't know if, I, myself, actually communicated with them.

Q. Give me one moment.

Do you see this exhibit on your computer, on your desktop, labeled Exhibit 33?

(Plaintiff's Exhibit No. 33 was marked for identification.)

THE WITNESS: Yes.

BY MR. PINEIRO:

Q. Have you ever seen this study before?

A. I would need a minute to go through it.

Q. Sure. I could scroll down. It should be up on your Exhibit Share. It's an Israeli study published in January, 2022. And it's evaluated the sensitivity of various tests, including the Logix Smart Test. I don't know if that refreshes your recollection.

A. There were a number of papers that used the Logix Smart Test.

Q. This one describes results. It says:

Xpert Xpress SARS-CoV-2 test and Logix Smart

Page 257

COVID-19 kit had the highest 91.2, and the lowest, 74.5 sensitivity, respectively.

Do you recall any study indicating that the Logix Smart Test had a 74.5 percent sensitivity?

A. Like I said, I do not recall this article.

Q. Okay. Do you recall anybody in the company referencing this Israeli study?

A. It is not familiar to me.

Q. Okay. Are you familiar with a company called "ENG"?

(Plaintiff's Exhibit No. 34 was marked for identification.)

THE WITNESS: I think so. I can't remember in what context.

BY MR. PINEIRO:

Q. Okay. I'm showing you what been marked as Exhibit 34. At the bottom here, on September 1, 2020, there's an e-mail from Josh Brammer to you.

Do you know who Josh Brammer is?

A. Yeah, I can't remember exactly -- maybe a potential distributor of ours or something like that.

They wanted to conduct a -- they wanted to do their own evaluation, test performance or something like that, before entering into an agreement.

Q. Did TNG ever become a distributor of CODX's

65 (Pages 254 - 257)

Page 258

test?

A. I don't think so.

Q. Okay. And it's your recollection that in connection with potentially becoming a distributor, they wanted to run some type of test on the Logix Smart Test?

A. Yeah, they had come to us because they in turn had been contacted -- to the best of my recollection, they had been contacted by somebody who represented the Huntsman Foundation.

The Huntsmans are a family of -- well, a well-known Utah family of philanthropists and businessmen and politicians as well. They contacted us saying the Huntsman group would like to purchase some insane amount of tests, but first they want to do -- I don't know why they went through this Josh Brammer guy first, but -- we didn't even know him before this.

They said, can you communicate with Co-Diagnostics and let them know first we'd like to buy a bunch of tests from them, but first we'd want to do a validation on them and make sure that the results are actually -- you know, the results are actually good.

And so that was my understanding on why we started working with TNG.

Q. Do you know if they performed a validation study?

Page 259

A. Yes.

Q. Do you know what kind of -- was it a concordance test?

A. No, I believe it was a test using known positives and negatives. I can't recall the details of it.

Q. And then Mr. Brammer writes to you and says:

"Andrew, here you go. Please let us know what you think. Joseph, our plan is to release the Arches finding next week in a separate release."

Do you know what he's referring to as "Arches findings"?

A. I mean, I read that as Arches.

Q. Okay. And you say:

"Hi, Josh, sorry we haven't gotten back to you on this. Thanks for giving us the chance to review and opine on it. It's taking a bit of time to get everything coordinated with our PR team and make the changes needed, so we can all stay on-message, but we'll get you something tomorrow and then give you a call to discuss."

Do you see that?

A. I do.

Q. Why was the PR team involved in -- strike that.

Do you know what the results were of the

Page 260

validation test?

A. I just remember that they were favorable and showed a much lower LoD than what we had -- we had published in our EUA, for example.

Q. Did you review -- did you receive any written reports or data regarding that test?

A. Yes.

Q. You did?

A. Yes.

Q. Do you recall any results regarding the test sensitivity?

A. I can't remember what those numbers were, but I know we issued a press release and disclosed them.

Q. Okay. So they did a validation report and the validation report was supposed to be done as the first step of potentially becoming a distributor, you said, right?

A. Well, they were going to be -- maybe "distributor" wasn't the right word. They were going to be a middleman to help facilitate this sale to the Huntsman Foundation.

The validation study itself was funded by the Utah Journalism Foundation. They provided the funding for it and to hire the scientist from back east to come out and do the validation study.

Page 261

Q. The Utah Journalism Foundation?

A. Uh-huh, the UJF.

Q. Who got them involved in this?

A. You know what, such a great question. Michael, I'm so glad you asked. I would love to talk about this.

No, this is the political stuff that I don't want get involved in because it's too many questions for me to know the answer to.

All I'll say is the Utah Journalism Foundation funds the Salt Lake Tribune. It's also one of the -- it's also funded by the Huntsman Foundation, so everything seemed legit.

Of course, once the article came out, the Salt Lake Tribune -- or once the press release came out, the Salt Lake Tribune wrote an article bashing it. And then we tried to get them include a line saying that it was funded by the Utah Journalism Foundation, and, furthermore, that it was performed in accordance with what the UJF had prescribed. They refused to include that line the press release.

Q. But do you know how it is that the UJF came to fund this test?

A. They worked with the Huntsmans. They received funding from the Huntsman Foundation.

If you could tell me, man, I would love to know

66 (Pages 258 - 261)

Page 262

it. If you could get to the bottom of this, man --

Q. So TNG was going to serve as the middleman between CODX and a Huntsman-affiliated company?

A. That's what I recall would be the case, yes. I wasn't involved with that side of it.

Q. So TNG requested to conduct a validation study of CODX's test?

A. Correct.

Q. And that study was financed by the UJF?

A. Correct. All we provided for it was the test. We didn't provide any -- no compensation. All we did was give them the test to use.

Q. Who was involved with the negotiations or discussions with TNG about this test?

A. I don't recall. I think it was Joseph Featherstone.

Q. Okay. Were any -- was Mr. Satterfield involved?

A. I don't think so. I don't recall, but, possibly. I wouldn't have been aware of it.

Q. And then it appears that you're coordinating things with your PR team, and that's, what, releasing the results of this validation?

A. I think so.

Q. And why did TNG -- why -- why were you publicizing these results in coordination with TNG?

Page 263

A. I can't recall. But, I mean, it was -- it was a validation that was performed on our test, and we had the actual data to support it. And you know, we kind of had a practice of disclosing, sharing valuations of the test when we have the data to support it so.

Q. Then you write:

"Hi, Josh, see attached. Thanks so much for taking the first run at this. Speaking from experience, editing is always far easier than the initial content generation."

So it seems like they prepared a press release which you edited; is that right?

A. I think so.

Q. And why were they going to issue a press release?

A. I don't know. You'd have to ask them. I can't recall what their reasoning behind that was.

Q. It says, "Speaking of your website, do you have one in process." I guess they didn't have a website at the time?

A. Yeah.

Q. It says:

"We most likely receive a lot of inbound inquiries, including likely from none -- one other than the SEC about your activities, track record, and

Page 264

objectives. Having a web presence makes those inquiries substantially easier to manage for all concerned. This is a great story you're telling, not least because it's one we've been wanting to magnify for some time."

So did you end up -- did they end up issuing a press release?

A. I can't remember if it was them or us. I know there was definitely a press release issued. I can't remember -- I think, yes, I believe so.

Q. Did the Huntsman-affiliated entity ever buy CODX's test?

A. They sure didn't.

Q. And you're saying that there was actually a negative Salt Lake Tribune article about this validation study, that was --

A. Yeah, it -- it attacked the methodology.

Because the results were way better than the Huntsmans' or UJF or somebody expected they were going to be. So since they couldn't attack the results, they attacked the methodology. But the test itself or the study was done, according to the methodology that UJF had requested.

And that doctor who performed it, the scientist that TNG had hired, she was prepared to go on the record

Page 265

with the Salt Lake Tribune on that point. Salt Lake Tribune didn't want to include that in their article.

Q. What was the name of the scientist who prepared this -- who conducted this study?

A. I've been wracking my brain trying to remember her name. I can't remember. It was referenced somewhere in the report.

She was not an employee of ours. I only knew her, you know, in this context. I can't remember. That's I think it's Marissa now, but that's just because Marissa is on the screen. It was an M name. It might have had an M in it.

Q. And she was paid by the UJF?

A. That's my understanding, yes. They funded the whole thing.

Q. Is it a theory of people within management that this was a front for the Huntsmans to run a test of the CODX Logix Smart Test and hopefully -- in their hopes find a negative, you know, bad validation results and then publicize that?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I don't really -- you'd have to ask Brent and all of them what their opinion is.

All I know is there's a lot of questions and things look suspicious, but I haven't drawn any

67 (Pages 262 - 265)

Page 266

conclusions myself.

BY MR. PINEIRO:

Q. Are you aware of whether -- is -- Dr. Satterfield is no longer with the company; is that correct?

A. That is correct.

Q. Okay. Do you know when he left the company?

A. I don't know exactly.

Q. Do you still maintain in touch with him?

A. Not very often.

Q. Do you know why he left the company?

A. I believe just to -- well, I don't know. You'd to speak to him. I'm not really sure why.

Q. Were you involved in any discussions regarding a decision for him to leave the company?

A. No.

Q. Do you know whether management wanted him to leave the company?

A. I don't know. I don't think so.

Q. Do you know what he's currently doing?

A. I don't know. I'm not even sure what state he's in.

Q. Did he sit on the board of the company or in any other boards of the company?

A. He is on the scientific board for the company,

Page 267

but none of our SAD's reside in the state. I don't have any communication with any of them -- - that's not true, some of our SADs do reside in the state, many don't.

Q. Rebecca Garcia is no longer with company?

A. That is correct.

Q. And, before she left, did you become aware that -- strike that.

Are you aware of whether some of her files from when she was with the company were deleted?

A. When she -- I understand that when she left, I guess, she was in another state, it was easier for her to just keep her laptop, rather than send it back. And, you know, I can't remember if it was hers to begin with or the company's.

But, in any case, I don't know whose decision it was to delete the files or reset it back to the factory. But I understand that that was the case, that after she left the company, she reset her computer back to the factory and just wiped it.

Q. Do you have any idea when that occurred?

A. When?

Q. Uh-huh.

A. No. Sometime in 2023.

Q. In connection with discovery in this case, and without revealing attorney-client privileged information,

Page 268

was your phone scanned for text message that are responsive to discovery in this case?

A. No.

Q. Does your phone -- do you -- do you use your text message function of your phone in connection with CODX's business?

A. On occasion.

Q. Did you do that during the first half of 2020?

A. I did.

Q. Are there text messages on your phone that pertain to the May 1, 2020 press release?

A. There are not. That was a phone or two ago. And when I get a new phone, the text messages don't -- I don't have an iPhone, so they don't go up in the Cloud or anything.

Q. You're saying those were on a prior phone that you no longer have?

A. That is correct. I traded it in to get a new one.

Q. Do you know if any efforts -- do you know whether any efforts were made to attempt to retrieve those text messages?

A. From the phone that I gave back to T-Mobile?

Q. Yeah, from the provider.

A. No, no. Because I don't know how Apple works.

Page 269

I heard there's something called an iCloud, but I don't have such a thing with my Samsung.

So when I get a new phone, it's fresh, new, clean slate of text message.

Q. When was it that Rebecca Garcia left the company?

A. I believe it was right at the end of 2022, is my recollection.

Q. Do you know what kind of files she had on that computer that pertained to CODX?

A. No.

Q. If you give me -- why don't we go off for ten. I'm going to review my notes, but I think I'm pretty much done.

THE VIDEOGRAPHER: This marks the end of media number seven. The time is 4:39 p.m. We are off the record.

(A recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of media number eight. The time is 4:47 p.m. We are on the record.

BY MR. PINEIRO:

Q. Mr. Benson, do you know when Cecelia Hutchins left the company?

A. I can't remember exactly.

68 (Pages 266 - 269)

Page 270

Q. Do you recall why she left the company?

A. No. No rhyme or reason. I think she was going back to school or something. I can't remember.

Q. So she resigned?

A. She did, yes.

Q. And who is the new head of regulatory?

A. Marisa Frost.

Q. Has Ms. Frost -- sorry -- when did she start at the company?

A. I'm not sure.

Q. Was it in the last year?

A. Yes.

Q. And when she came into -- when she came into the company, had she implemented any new policies and procedures regarding engagement of press releases?

A. She has not, no.

Q. The company stock is, you know, hovering between one and two dollars; are you aware of that?

A. Yes.

Q. Why do you think that is?

MS. PEIRSOL: Objection. Calls for speculation.

THE WITNESS: I've never been able to give any reason as to why a company stock performs the way it does, my company or anybody else's.

BY MR. PINEIRO:

Page 271

Q. And do you sell any of your shares -- have you ever sold any of your shares in CODX?

A. I have sold shares.

Q. And did you sell any shares in first half of 2020?

A. No.

Q. Did you sell any shares in the second half of 2020?

A. Yes.

Q. Okay. Do you remember when that was?

A. No.

Q. Do you know approximately how many shares you sold in 2020?

A. I can't remember that either.

Q. Do you remember approximately the total value of the share sales in 2020?

A. I was not prepared with that information today. I didn't do my homework in advance. I can't remember.

Q. But do you have any recollection, just a ballpark, of the amount that you sold in 2020? Million dollars? Half a million dollars?

A. I can't recall, 750 or something like that. I can't remember.

Q. Do you roughly remember the share price when you made those sales?

Page 272

A. No. It was -- no, I can't recall.

Q. Are you required to publicly disclose when you sell your shares?

A. No.

Q. Do you remember specifically when in 2020 -- strike that.

You've indicated you sold those shares in 2020; was that in one tranche or multiple tranches, those sales?

A. It was multiple trades.

Q. Okay. Did you disclose to management that you were selling your shares?

A. Not formally.

Q. Did you informally communicate that to management?

A. I don't recall. I may have mentioned it. But we didn't have a process or procedure in place; as long as we were not selling in a blackout period, which I wasn't doing.

Q. Do you remember why you sold?

A. Do I remember why I sold the shares?

Q. Uh-hum.

A. I believe it was for the same reason anybody sells shares.

Q. Everybody sells shares for different reasons.

Page 273

Why did you sell the shares?

A. Okay. Fair enough. I sold the shares for the -- for the proceeds.

Q. Okay. And did you think the company was unvalued or --

A. I did, yeah. I remember feeling like I'm really going to regret this, I should wait until it goes up. But -- but -- but I sold anyway, just to be prudent.

I've got a family. I've got kids. I want to make sure that if something happens to me, they're taken care of. So I had an opportunity to do that.

Q. One second.

You indicated that there were multiple tranches; do you recall the time frames?

A. No, I can't remember. I remember it was sometime after Q2 sometime in Q3 or Q4. I can't exactly when. I can't remember exactly what increments or the valuations at that time.

MR. PINEIRO: Okay. I have nothing further.

MS. PEIRSOL: We have no questions.

MR. PINEIRO: Awesome. Thank you for your time, Mr. Benson. I appreciate it.

MR. PINEIRO: Thank you.

THE VIDEOGRAPHER: Ms. Powers, do you need anything before going off the record?

69 (Pages 270 - 273)

Page 274

THE COURT REPORTER: No, I'm fine.

THE VIDEOGRAPHER: I'll just take video orders very quickly.

Mr. Pineiro, would you like your video order standard delivery or expedited?

MR. PINEIRO: No video for now.

THE VIDEOGRAPHER: Nobody else?

Ms. Peirsol, would you like to order the video?

MS. PEIRSOL: Not now.

THE VIDEOGRAPHER: Is Mr. Fasano here -- he signed off.

We are off the record at 4:53 p.m.

This concludes today's testimony given by Andrew Benson. The total number of media units used was eight and will be retained by Veritext Legal Solutions.

MR. PINEIRO: Okay. Thank you, everybody. Have a good rest of the day.

(Deposition concluded at 4:53 p.m.)

Page 275

C E R T I F I C A T E

- - -

THE STATE OF FLORIDA

I hereby certify that I have read the foregoing deposition by me given, and that the statements contained herein are true and correct to the best of my knowledge and belief, with the exception of any corrections or notations made on the errata sheet, if one was executed.

Dated this _____ day of _____, 2023.

_____

ANDREW BENSON

Job #5858446

Page 276

CERTIFICATE OF OATH

THE STATE OF FLORIDA

I, the undersigned authority, certify that ANDREW BENSON appeared remotely via Zoom and was duly sworn on the 18th day of April, 2023.

Signed this 11th day of May, 2023.

_____

MARIA C. POWERS
Florida Stenographic Reporter
Notary Public - State of Florida
My Commission No. HH350150
My Commission Expires:  January 17, 2027

Page 277

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA

I, MARIA C. POWERS, Florida Stenographic Reporter, certify that I was authorized to and did stenographically report the remote deposition via Zoom] of ANDREW BENSON, pages 4 through 273 to the best of my ability; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 11th day of May, 2023.

_____

MARIA C. POWERS
Florida Stenographic Reporter

70 (Pages 274 - 277)

Page 278

May 11th, 2023
Mr. Andrew Benson
C/o Marissa Peirsol, Esq.
200 S. Civic Center Drive #1200
Columbus, Ohio 43215

IN RE:  GELT TRADING VS. CO-DIAGNOSTICS, INC., ET AL

Please take notice that on the 18th of April 2023, you gave your deposition in the above cause.  At that time you did not waive your signature.

The above-addressed attorney has ordered a copy of this transcript and will make arrangements with you to read their copy.  Please execute the Errata Sheet, which can be found at the back of the transcript, and have it returned to us for distribution to all parties.

If you do not read and sign the deposition within a reasonable amount of time, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court.
If you wish to waive your signature now, please sign your name in the blank at the bottom of this letter and return it to the address listed below.
Very truly yours,

MARIA C. POWERS

Florida Stenographic Reporter
Signature Court Reporting, a Veritext Company
(561) 561-478-0401

I do hereby waive my signature.

_____
ANDREW BENSON

Page 279

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
IN RE:  GELT TRADING VS. CO-DIAGNOSTICS, INC., ET AL
WITNESS:  ANDREW BENSON
TAKEN:  4/18/23

Page    Line    Change    Reason For Change
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____
Date                ANDREW BENSON

71 (Pages 278 - 279)

[& - 19]

Page 280

**&**

**&** 2:3,9 3:15
44:1,3 96:14
200:6,11

**0**

**0.2** 248:22
**00368** 1:2 5:19
**01** 197:9

**1**

**1** 3:12 8:11,24
43:5,13,17
44:11 80:8
85:24 89:21
199:13 200:18
204:21 223:3
225:3 228:7
239:6,7 240:11
257:17 268:11
**1.35** 70:1
**1/23/20** 3:12
**10** 3:17 19:4,8
73:12 88:16,20
88:21,23,24
89:3 202:22
207:25 246:2
**100** 65:23,24
66:4,4,21 67:3,6
67:9,25 90:15
91:21,22 92:8
94:1 100:25
131:23 140:21
141:11 152:12
152:19 155:11
155:16,21

156:23 157:3,7
167:4 168:16,17
169:7,22,23
170:13,16
171:12,20,25
172:16 177:21
179:9 184:1,6
186:9,12 188:8
190:16,17,18,21
191:4,5,10,21
191:21,22
192:10,12 193:8
193:23,24 194:2
194:6,7,9,10,12
195:1,9 199:20
201:22 202:1,8
203:2,6,9,14,25
204:1,16 218:24
219:6,6,16,17
219:19 220:2,12
222:18 235:24
237:14 238:24
239:24,25 249:9
**102** 3:18
**10:08** 43:5
**10:16** 43:9
**10:44** 160:1
**10th** 78:25
**11** 3:17 19:4
51:23 93:10,14
93:14
**114** 3:19
**119** 3:19
**11:05** 69:18

**11:07** 75:12
**11:29** 103:5
**11:50** 51:17
**11th** 242:20
276:13 277:19
278:1
**12** 3:18 99:19,22
**1200** 2:10 278:2
**121** 3:20
**125** 238:4
**12:35** 136:20
**12:43** 44:22
**12:47** 136:24
**13** 3:18 102:4,5
**13.5** 161:7
162:10
**13.7** 204:10
**13485** 82:7,13
82:15,16,18
95:16
**135** 3:20
**136** 3:21
**13th** 216:20
**14** 3:19 25:19
74:10 93:17
114:4,7 134:24
207:20 230:1
236:12
**14,000** 251:10
253:6 254:15
**147** 3:21
**14th** 126:19
236:10,20
237:13

**15** 3:19 19:8
25:20 46:24
47:7 119:6,9
198:21
**156** 3:22
**15th** 218:21
223:14
**16** 3:20 121:1,4
131:2 134:24
**164** 3:22
**16th** 250:20
**17** 3:20 136:1,5
276:18
**17th** 114:10
**18** 1:13 3:21 5:5
137:1,5 232:13
**180** 254:14
**18th** 276:11
278:5
**19** 3:21 39:2,4
50:17 54:12
60:7 64:2,21
66:15 67:25
86:13 94:16
95:12 99:5
121:15 131:17
131:22 140:6,12
143:5,13 148:17
148:21 150:7
156:4 169:6,21
171:9 188:16
190:10 199:21
199:24 203:25
217:11 227:17
238:22 248:2,3

**[19 - 4]**                                                                 Page 281

| | | | |
|---|---|---|---|
| 257:1 | **2017** 29:22 | **21** 3:22 165:19 | **29** 4:6 85:19 |
| **198** 3:23 | **2019** 14:7 37:6 | 165:20 | 247:16,19 |
| **19th** 119:12 | 37:18 44:13 | **216** 4:4 | **2:00** 200:2 |
| **1:24** 165:7 | 49:16 72:22 | **22** 3:23 43:23 | **2:06** 165:11 |
| **1st** 154:3 158:21 | 86:3,13 190:11 | 131:2 199:3,4 | **2:13** 87:22 |
| 159:10 161:5 | **2020** 8:11,25 | **225** 4:4 | **2:19** 85:25 |
| 165:1 197:22 | 14:7 22:16 39:5 | **229** 4:5 | **2:20** 1:2 |
| 215:16 216:2 | 43:23 49:6 55:1 | **22nd** 44:22 | |
| 223:11 241:3,17 | 69:18 71:11 | **23** 4:3 49:6 | **3** |
| **2** | 73:8,12 74:10 | 209:4,5 | **3** 3:13 51:10,12 |
| **2** 2:4 3:12 41:13 | 78:16,20,24 | **233** 4:5 | 136:20 232:12 |
| 48:25 49:1 57:9 | 80:8 81:4,7 83:6 | **236** 4:6 | **30** 4:7 137:9 |
| 69:17 90:13 | 83:13,19 85:19 | **238279** 89:2 | 149:4 154:21 |
| 91:19 100:2 | 85:24 93:17 | **23rd** 89:9 | 157:23 160:1 |
| 238:25 256:25 | 95:2 96:2 97:8 | **24** 4:4 51:17 | 248:8,11 |
| **20** 3:22 5:19 | 100:2 137:9 | 217:2,6 | **300,000** 254:16 |
| 39:5 66:15 | 149:5 154:21 | **246** 4:6 | **30th** 120:9 |
| 157:16,17 | 157:23 160:1 | **247** 4:7 | 121:5 127:12 |
| 198:21 207:24 | 199:13 200:18 | **249** 4:7 | 138:18 139:15 |
| 248:12 | 226:13 230:1 | **25** 4:4 226:7,9 | 147:4 148:24 |
| **200** 2:10 221:19 | 243:2 246:5 | 252:25 | 152:17 164:25 |
| 278:2 | 248:12 250:20 | **253** 4:8 | 196:7 |
| **2004** 11:12 15:7 | 257:17 268:8,11 | **2530** 2:4 | **31** 4:7 250:15,18 |
| **2005** 11:14 15:1 | 271:5,8,13,16 | **256** 4:8 | **32** 4:8 254:2,5 |
| **2006** 12:1 15:8 | 271:20 272:5,7 | **257** 4:9 | **33** 4:8 256:10,11 |
| 15:20 19:1 | **2021** 8:1 | **25th** 53:19 | **33131** 2:5 |
| **2007** 17:16 19:1 | **2022** 45:13 | **26** 4:5 229:24 | **34** 4:9 257:11,17 |
| **2013** 26:11 | 256:19 269:7 | 230:4 | **3:20** 225:25 |
| **2014** 19:2 25:13 | **2023** 1:13 5:5 | **27** 4:5 90:25 | **3:28** 226:3 |
| 25:21 26:8 | 267:23 275:13 | 234:20,23 | **3:59** 247:10 |
| 182:20 | 276:11,13 | **273** 277:9 | **4** |
| **2015** 25:13 | 277:19 278:1,6 | **28** 4:6 237:17,21 | **4** 3:13 61:3,4 |
| **2016** 13:21 26:6 | **2027** 276:18 | **28138** 276:15 | 136:24 165:7 |
| 32:24 | **208** 4:3 | 277:21 | 226:13 277:9 |

**[4/18/23 - accuracy]**                                                    Page 282

**4/18/23**  279:3
**40**  221:5
**4200**  238:4
**43**  3:12
**43215**  2:11
  278:3
**44**  209:4
**45**  82:12 89:21
**49**  3:12
**4:07**  247:14
**4:39**  269:16
**4:47**  269:20
**4:53**  1:14
  274:12,19

**5**

**5**  3:14 69:3,6
  165:11 195:7
  225:25
**5/1/20**  3:23
**5/14/20**  4:5
**5/20/20**  4:7
**5/4/20**  4:4
**5/6/20**  4:6
**50**  149:24
**51**  3:13
**510k**  239:23
**561**  278:18
**561-478-0401**
  278:18
**5858446**  1:24
  275:18
**5ul**  70:1

**6**

**6**  3:5,14 72:5,10
  73:8 78:24
  226:3 247:10
**6.75**  69:25
**60**  83:12
**61**  3:13
**66.67**  248:21
**69**  3:14
**6th**  73:17

**7**

**7**  3:15 11:24,25
  15:24 75:14,18
  247:14
**72**  3:14
**74.5**  257:1,4
**75**  3:15
**750**  221:6
  271:22

**8**

**8**  3:16 85:10,14
  85:14 246:2
**8.42**  197:11
**80,000**  102:20
**85**  3:16
**88**  3:17 101:14
**8:15**  47:18

**9**

**9**  3:16 88:21
**9/16/20**  4:7
**9/17/20**  4:8
**9/2/20**  4:9
**91.2**  257:1

**93**  3:17
**95**  56:25 66:16
  197:10 235:24
  235:25 236:2,5
  236:6 238:23,25
  239:4
**99**  3:18 197:9
  238:23,25 239:4
**99.52**  131:23
  140:20 141:10
**99.98**  239:25
**9:00**  1:14 5:5
**9:23**  158:5

**a**

**a.m.**  1:14 5:5
  43:5,9 75:8,12
**abatement**
  36:19,24 37:2
**abbott**  238:5
**abbreviation**
  13:7
**ability**  56:7
  59:17,19 90:23
  147:9 176:7
  277:10
**able**  41:20 48:2
  56:24 70:25
  106:25 144:13
  144:13 154:6
  175:15 176:15
  270:22
**abnormal**
  196:20
**above**  141:17
  156:5 161:7

  210:10 278:6,7
**abroad**  171:12
**absence**  205:9
**absolute**  65:13
  65:14 176:24
**absolutely**
  106:21 244:20
  254:19,23
**academia**  45:15
**academic**
  146:19 147:2
**accept**  254:11
**access**  99:13
  186:25
**accessible**  107:5
**accidentally**
  88:19
**accompanied**
  142:13
**accomplished**
  243:12
**accordance**
  251:20 252:10
  253:12 261:18
**accuracy**  45:1
  60:7,8,10,13,16
  60:22,24 62:20
  73:19 104:18,23
  126:11 155:13
  169:24 183:14
  190:18,21 191:4
  191:23 192:13
  193:8,24 199:23
  204:2,16 218:8
  230:1,8 231:9

**[accuracy - al]** Page 283

235:8 255:1
**accurate** 14:20 20:13 35:12,14 48:3 55:17,19 55:22 65:22 66:17,21 67:3,7 67:10 90:15 91:21,22 92:8 94:1 167:4 174:1 184:7 191:10 194:2,6 194:10 201:22 202:1,9,22 203:1,2,6,9,14 222:3 237:15 253:20,21 254:20
**accurately** 22:2 187:10
**accused** 214:7
**achieve** 143:9 144:13
**achieved** 177:20 183:25 186:9 188:8
**acknowledges** 72:16
**acquisition** 21:1
**act** 107:3
**action** 3:15 5:25 74:3 76:4,9 77:13,13,14,24 79:9,17,23 81:23 147:22 148:4 163:9,10

277:16,17
**actions** 74:5,9 147:12
**actively** 183:20
**activities** 263:25
**activity** 34:25
**actual** 53:13,13 60:4 67:18 68:19 152:15,16 161:14 188:21 188:25 189:6,12 189:23 195:12 196:23 203:8 235:25 238:19 239:21 240:4 241:24,25 242:4 244:5 263:3
**actually** 30:24 31:7,9,18 37:20 48:16 51:23 53:11,16 54:6 59:22 70:22 88:19 127:10 168:5 171:20 178:6 189:15 214:10 220:15 220:16 227:15 231:6 240:5 244:7 255:14 256:7 258:21,21 264:14
**acumen** 182:24
**add** 142:1 159:18 221:7

**added** 131:22 161:25
**additional** 228:16,17
**address** 49:16 74:9 102:12 130:5 233:1 237:25 278:14
**addressed** 76:11 250:6 278:7
**addresses** 161:8
**adds** 47:19 158:9
**adjust** 130:9
**adjusted** 143:25
**administration** 96:15
**administrative** 7:18
**advance** 271:18
**advantages** 52:14 90:13
**advisors** 122:2
**advisory** 19:18 23:22 24:11
**affairs** 30:21
**affect** 109:9,17 144:2 238:5
**affected** 47:23 57:5,15 143:11
**affecting** 58:16 109:4
**affects** 254:24
**affiliate** 31:6 98:19,20

**affiliated** 17:21 17:24 18:1 262:3 264:11
**affiliates** 19:13
**affiliations** 6:5
**afoul** 45:24 46:5
**afraid** 219:2
**africa** 248:18
**african** 250:2
**afternoon** 89:15 102:18
**ag** 23:22 24:16
**agent** 16:7
**agents** 35:10,19
**ago** 8:21 51:23 62:1 119:15,18 134:8,10 206:24 213:1 268:12
**agree** 5:13 163:14
**agreed** 126:24 230:25
**agreeing** 219:19 220:1
**agreement** 190:16 191:21 194:10 257:24
**agreements** 110:24
**agrees** 219:21
**ahead** 10:21 81:17 125:4 153:19 159:5
**al** 5:17 278:4 279:2

**[alarmed - appears]**

**alarmed** 123:22 123:23
**aligned** 234:8
**aligns** 14:20
**allegations** 22:6 22:11 117:25
**allege** 22:12
**alleged** 78:23 207:15 233:2
**allison** 199:13 199:17 200:16 200:23 201:4
**allow** 67:17 224:2,13
**allowed** 24:13 36:9 224:16,25 227:8
**allows** 96:15,17
**alludes** 161:9
**almaula** 103:23 105:3
**amalgamation** 58:13
**ambiguous** 122:21 123:6
**amend** 142:22 142:25
**amendment** 142:15,18 143:21 144:10 144:17 145:7,11 145:14,16 146:2 146:5 147:21 219:21 228:11

**america** 55:14
**amid** 230:8
**amount** 30:14 100:18 175:5 196:18 258:13 271:20 278:11
**analysis** 77:3 79:2 108:13,15 108:17 124:4 130:13 131:1,6 252:4
**analytical** 146:20 238:17 240:3,9,10,15 240:20
**andrew** 1:12 3:4 5:15 6:16 44:6 76:5 85:18 209:11 259:8 274:14 275:16 276:10 277:9 278:1,22 279:3 279:24
**angela** 231:3
**announce** 49:25
**announced** 49:13
**announcement** 49:23
**annoying** 215:14
**annual** 12:9 22:3
**annually** 38:12

**anomalous** 99:11,11 116:16 116:21 173:5,11
**another's** 230:12
**answer** 6:21,22 7:2 9:11,13,13 10:3,4,5,20,21 34:6 48:6 64:14 64:25 76:3,5 80:15 93:4 102:21 106:1 123:1 127:24 134:7 159:4,5 170:9,20 172:6 172:24 205:6 206:16 209:15 211:9,10,11,18 211:20,20 215:7 215:8,21,22 216:8 224:24 261:8
**answered** 7:21 67:21 105:23 106:14 134:20 168:11 172:2 173:21,22 174:6 175:20 189:3,13 192:20 197:3 208:22 212:12 232:2
**answering** 175:24
**answers** 6:23 7:3 108:5 126:9

**anticipate** 107:23
**anurag** 100:1
**anybody** 32:3 41:12 42:21,21 71:25 83:25 97:18 109:8 117:16 132:16 185:19 193:3 197:15 204:13 206:2,11,12,14 207:17 257:6 270:24 272:23
**anymore** 237:2 252:15
**anytime** 46:21 46:22
**anyway** 53:3 160:12 273:8
**apologize** 29:20 32:1,22 75:6 227:3 246:15
**appear** 58:16 87:8 148:6,11 164:6 194:20 198:13 233:22
**appearance** 6:3
**appearances** 2:1 6:5
**appeared** 276:10
**appears** 44:17 44:20 48:1 50:6 50:15 64:8,19 73:3,6 76:23,25

79:17 81:14,21
90:2 103:12,12
121:6 126:18
127:13,25
138:25 141:3,15
149:5 178:20
194:21 195:25
196:3,7,10
201:25 202:4,14
203:14 204:5,9
210:12 224:6
234:25 248:2
249:7 262:20
**apple** 234:9
251:16 268:25
**apples** 234:9
251:16 252:18
252:18 253:23
253:23 255:3,3
**application**
70:23 95:6,9
96:22,25 97:4
99:4 144:22
**applications**
36:1
**applied** 98:9
**apply** 46:14
98:6 148:1
187:10 239:23
**appreciate**
102:20 273:22
**apprised** 175:11
**approach**
135:16

**approached**
200:22
**appropriate**
158:23
**approval** 54:19
68:24 70:23
71:4,6 97:11,23
98:4,7,23 99:4
110:11,21,23
129:10 156:19
166:11 251:11
251:13 252:6
**approve** 90:19
129:9 176:5
227:20 252:7
**approved** 68:21
110:8 117:3
150:14
**approximately**
37:7 83:12
271:12,15
**april** 1:13 5:5
97:8 100:2
114:10 119:12
120:9 121:5
126:19 127:12
137:9 138:17
139:15 147:4
148:24 149:4
152:17 154:21
157:23 160:1
164:25 196:7
197:18 276:11
278:5

**apuli** 69:16
72:12 75:21,23
75:24 139:17
228:3 251:6,10
**arbitrary** 55:7
**arches** 259:9,11
259:13
**area** 15:7
182:25
**areas** 8:20
**argumentative**
34:14 66:25
67:2 92:13,20
92:21 93:2
115:7 134:21
170:7,18 172:22
175:21 176:12
182:2 192:14
**arguments**
166:19,21
**arrangements**
278:8
**array** 150:13
**arrested** 7:10
**arrived** 101:8
151:9
**art** 54:1 105:6
188:23 189:5
**article** 4:5,8
22:14 46:9
51:21 52:6
121:7,12 122:16
122:20 123:5,11
123:22 124:7,9
124:14 125:14

126:10 127:11
127:19 129:11
130:16 132:12
132:17 133:9,13
133:21 134:19
135:11 137:11
138:12,18 139:9
139:13,16
141:12 147:5
149:4 150:6,8
150:11 156:2
158:1,18 161:9
163:24 200:23
201:4,11,16
202:12,13
204:14 205:22
206:2 208:17
209:13 218:7,12
221:22 222:3
225:6 229:24
230:2 231:12
232:5 234:19
235:1,6,18,19
257:5 261:13,15
264:15 265:2
**articles** 22:22
218:17 222:17
222:18 255:8,13
255:15,20
**arts** 11:2,5
**asap** 138:13
**aside** 68:24
152:10
**asked** 8:18,21
9:1 25:17 67:21

69:25 98:2 105:23 106:14 108:7 119:20 126:5 127:22 134:20 146:4 168:11 172:2 173:21 174:6 175:20 189:3,13 192:20 197:3 208:22 209:21 209:23 212:1,4 212:12 225:4,7 232:2 233:9 242:1 250:1 261:5

**asking** 6:18 27:22 44:17 70:4 91:15,16 91:16 126:3 177:4 208:8,14 210:3 213:22 236:15

**assay** 65:7 195:9 195:10

**assertion** 235:6 235:18

**assertions** 237:5

**asserts** 235:19

**assets** 21:17,18 21:24

**assigned** 77:12 77:19

**assigning** 62:18

**assist** 24:9 27:12 61:12,24 98:3

117:16 122:1

**assistant** 226:18

**assisted** 15:11 61:13,15,19

**assisting** 24:8 25:17 26:24,24 27:14 32:8

**associate** 16:6 16:17 217:17

**associated** 115:20

**associates** 16:19 19:18 44:1,3 200:6,11,12

**assume** 174:16 187:16

**assumes** 64:12 64:23 152:21 176:12 179:15 180:21 186:23 187:13 191:15 193:10 194:4 208:6,21 210:14

**asymptomatic** 90:25 130:7,8 140:8 224:3,8 224:17 233:16 233:17 234:2,7

**atlanta** 41:6,18

**attached** 178:5 178:13 209:12 263:7

**attachment** 3:20 76:8 161:15

**attack** 207:9 264:20

**attacked** 264:17 264:21

**attacking** 218:7

**attempt** 268:21

**attempted** 208:20

**attempting** 39:2 200:20 228:23 229:18

**attend** 40:18 246:11

**attendance** 26:4

**attended** 40:13

**attends** 40:14

**attention** 102:9 160:23 223:23 235:1 250:22

**attorney** 6:6 9:12 10:4,19 30:16,20 159:3 167:22 168:6,9 193:17 211:10 211:18 215:6,20 216:6,17 217:19 217:25 267:25 277:14,16 278:7 278:11

**attributed** 127:8 180:19,24

**audience** 104:6 104:21 105:11 106:8,10,18,19 106:25 107:5

**audio** 5:11

**audit** 82:16

**australia** 150:20 190:15 194:11 197:7

**author** 137:24 137:25 138:11 149:16,18 157:5 195:24 196:4

**authored** 149:8

**authority** 29:4 276:9

**authorization** 62:17,24 70:8 70:17,18 94:12 94:20 95:6 96:10,14 97:7 140:13

**authorizations** 47:14

**authorized** 94:24 131:3 140:16 224:20 277:7

**authors** 137:22

**automated** 221:14

**availability** 112:2 177:18

**available** 68:15 248:18 249:17 249:23 254:22

**avenue** 51:5

**average** 254:16

**[avoid - believe]** Page 287

**avoid** 33:12 52:12 56:7 59:18,19 74:5 104:2

**aware** 10:22 25:8 29:7 34:20 68:10,17,24 69:2 71:12 82:22 99:3,6 108:3 109:9 110:24 111:16 111:21 112:4,19 113:5,6,8,22 122:11 125:2 128:3 147:6,7 151:10,15 152:11 153:12 153:13 172:4 188:24 196:13 197:15 198:1 204:22 216:22 232:4 234:10,12 237:12,13 243:16 245:23 248:7 250:12 262:19 266:3 267:6,8 270:18

**awesome** 273:21

**b**

**b** 16:4 42:16

**ba** 11:10,11

**bachelor** 11:2

**bachelor's** 11:5

**back** 20:9 44:9 85:22 119:15,18

143:17 154:17 163:20 165:14 193:12 216:3 225:18 235:20 235:22 244:16 259:15 260:24 267:12,16,18 268:23 270:3 278:9

**background** 15:14 27:25 28:22 56:22 201:19,20

**backup** 152:16

**bad** 135:3 213:22 255:7 265:19

**baker** 2:9 6:11

**bakerlaw.com** 2:11,12

**balancing** 107:2 107:3

**ball** 149:21 205:9

**ballpark** 38:20 225:19 271:20

**banana** 221:20 221:25 222:4

**bananas** 221:19 221:25 222:4

**banking** 16:10

**bar** 236:3

**barbara** 146:3,4 146:6

**barcelona** 17:12 20:7 23:20 25:16

**barely** 8:21

**barometer** 195:2

**base** 182:24

**based** 16:11 28:1 30:22 31:1 31:6 60:6 64:18 64:20 110:19 117:22 127:14 141:16 148:5 170:5 189:11 197:1 202:12 208:11 211:6 213:18 215:18 216:4,5,10 219:8 235:6 255:10

**baseline** 62:10

**bashing** 261:15

**basic** 168:1

**basically** 218:8 221:19

**basis** 12:9 22:3 25:18 71:6 84:9 96:17 108:11 236:2 245:22 246:14

**bate** 89:2

**bathroom** 7:5

**bay** 15:7

**bcc'd** 248:13

**bd** 221:5,10

**bd's** 221:4

**be's** 122:15

**bear** 42:18 61:2 85:14

**bearing** 160:12

**beaufort** 32:12

**becoming** 258:4 260:16

**bed** 144:19

**began** 27:6 155:2 232:14

**beginning** 6:6 43:8 45:12 75:11 97:8 165:10 177:25 226:2 247:13 269:19

**begins** 128:7

**behalf** 2:2,8 6:9 6:12 133:15 255:24

**beings** 192:5

**belief** 207:16 275:10

**believe** 7:19 8:13 12:9 14:4 17:4,20 19:21 21:10 23:5 25:7 25:13 27:7 30:4 30:11,23 31:16 31:25 39:21 41:25 53:20 55:14,18 61:13 61:18,22 76:1

**[believe - brent]**                                                    Page 288

78:5,21 79:24
80:22 82:3 83:1
86:24 87:13
89:13 90:7 92:6
93:5,8 97:5,8,12
98:8 100:6
102:16 103:14
111:1,18 112:6
112:21,23,25
113:14 124:15
125:5,15 127:9
127:10 129:12
130:8,22 132:24
136:11 138:19
140:15 141:14
142:13 156:12
156:15 157:21
163:8 168:12
169:1 180:17
181:23 188:2,20
194:22 214:15
215:9,12 220:9
227:25 228:22
228:24 234:14
244:9,20 251:10
259:4 264:10
266:12 269:7
272:23
**believed**  92:3
  125:6
**believes**  73:18
  125:2 150:8
**benchmarks**
  155:12

**benefit**  207:11
  207:12
**benefits**  199:23
**benson**  1:8,12
  3:4 5:15 6:16
  9:11 10:3,18
  23:15 43:12
  52:22 64:14,25
  75:17 85:18
  108:17 137:4
  159:4 165:14
  211:21 215:6,22
  216:8 217:12
  269:23 273:22
  274:14 275:16
  276:10 277:9
  278:1,22 279:3
  279:24
**berg**  89:9 90:3,4
  90:12 91:16
**bert**  114:13
**best**  6:23 23:19
  80:5 135:16
  186:14 254:23
  258:7 275:9
  277:9
**better**  37:2
  138:14 139:18
  139:24 157:7
  160:21 177:22
  184:2,6 185:17
  186:11,22 187:4
  248:22 255:11
  264:18

**betts**  158:5
  159:17
**beyond**  11:17
  18:13 23:14
  32:10 67:18
  195:14
**bfloch**  2:6
**bias**  232:1
**big**  21:17,18
  122:19,22 123:2
  123:3 134:24
  135:2 255:19
**bigger**  144:11
**bio**  130:13
**biocentury**
  131:2 217:10
**biogx**  221:4
**biotech**  28:19
**biscayne**  2:4
**bit**  16:20 40:15
  96:16 160:3
  173:7 191:12
  192:9 215:24
  227:4 259:17
**blackout**  272:18
**blank**  278:13
**blanke**  146:6
**blanke's**  146:3,4
**board**  164:13
  227:10 266:23
  266:25
**boards**  227:9,12
  266:24
**bodies**  55:6,11
  56:1 72:4

**body**  70:19
  116:15
**boiler**  22:7,8
  218:1
**bold**  193:25
**boom**  242:2
**boss**  176:2
  182:16
**bottom**  51:16
  52:5 85:17
  90:10 93:16
  102:8 118:6
  137:8 148:24
  232:8 237:24
  257:17 262:1
  278:13
**boulevard**  2:4
**boutique**  15:24
  16:9
**bradwell**  228:2
  255:25
**brain**  265:5
**brammer**
  257:18,19
  258:15 259:7
**brandon**  2:3 6:8
**break**  7:5,5
  42:21,22,24
  86:25 135:23,25
  157:14 165:16
**breath**  86:20
**brent**  1:8
  119:15,18
  126:24 142:13
  146:17 158:8

**[brent - cayman]** Page 289

177:13 182:19 227:20,24,24 238:12 265:23

**brent's** 147:2,9

**brian** 23:2

**bridge** 30:11,14 32:16

**briefly** 119:24

**briggs** 18:18 21:2,3 23:13 217:17

**bringing** 33:5

**brochures** 94:9

**broke** 123:9

**broker** 122:1

**brokerage** 12:11 15:24 16:9

**brother** 125:17

**brought** 218:15 223:22 250:22

**bucket** 65:9

**bulk** 137:20 138:6

**bullet** 63:7,17 63:25 64:11,19 66:2 73:16 158:2 227:16 254:20

**bullets** 65:5

**bunch** 258:19

**business** 16:8 20:15 35:22 199:14 203:20 208:15 268:6

**businessmen** 258:11

**buy** 151:17 258:18 264:11

**buying** 244:21

**c**

**c** 1:23 5:1 13:8 16:4 98:17 275:1,1 276:16 277:6,22 278:2 278:16

**caicos** 30:22 31:1,7,11,15

**calculated** 197:10,11

**call** 16:22 57:2 119:22 136:9,15 164:9 185:10 206:6 212:11 228:21 235:9 243:9,13,21,25 244:1,5 246:11 246:23,24 247:3 259:21

**called** 23:21 30:16 63:13 204:13 217:6 236:18 257:9 269:1

**calls** 25:1,4 33:22 34:3 67:11 97:19 120:11 124:18 135:17,22 159:2 175:2 182:2

184:8 193:2 205:24 206:4 215:5,20 216:6 222:9 237:6 245:4,13 254:25 265:21 270:21

**cambria** 16:2,5 16:22 17:5

**cambridge** 11:4 11:8

**camera** 5:8

**capacity** 13:13 18:2 26:2 159:22 249:9

**capital** 13:25 16:2,4,5,22 17:6 17:13,15,18,19 18:19,25 19:6 19:13,14,20,23 19:24 20:4,16 20:17,19 21:9 21:12,13,14,15 21:25 22:1,6,8 23:6,10,16 24:6 24:8,9,14,21 25:3,12 26:3 30:3,5,9,21,25 31:10,24 32:12 34:10,16,20,21 121:20,23

**caps** 91:24

**care** 26:20 138:10 140:7 240:2 252:14 273:11

**career** 45:15

**careful** 46:21 47:1

**carlisle** 119:14

**carmel** 168:7

**case** 1:2 5:19 22:24 31:20 48:22 54:14 55:18 57:9,9 65:1 80:8 81:24 82:25 85:9 87:24 92:23 100:22 112:6 116:2 127:10 133:22 140:11 140:15,18 152:14 156:18 175:22 179:1 181:17,19 186:11 187:17 213:24 239:23 242:1,6 262:4 267:15,17,24 268:2

**casey** 228:2

**caught** 122:9 227:19

**cause** 77:3 79:2 118:2,5 127:23 278:6

**causes** 59:23

**caution** 167:21

**cayman** 1:3 5:16

cdc 41:10,16 52:16 53:3 104:3 137:14 248:3,6

cdsco 98:10 99:4 101:1 150:14

ce 36:9 94:21,22 95:1,3

cecelia 182:16 183:19 222:25 250:20 269:23

cecelia's 182:15 213:18 220:6

cecilia 71:22 72:15 75:20 76:22 85:24 181:25 182:4

cecilia's 87:21

center 2:10 278:2

centered 52:23 166:24

centers 41:6

central 1:1 5:18

century 130:14

ceo 29:2,8 38:5 115:21

certain 17:22 54:12 55:5,6 56:24 57:14 73:7 94:25 114:2 144:7 163:23 170:5 219:15 229:11

certainly 80:5,7 102:20 105:6 106:7 107:25 153:6 155:7 158:19 163:16 176:15 183:17 183:20 220:6

certificate 276:1 277:1

certifications 11:16

certified 82:18

certify 275:7 276:9 277:7,13

cfo 27:3 38:5 47:15 228:3

chad 69:16 72:12,15 75:21 75:23,24 76:5 137:11 142:1,15 145:18 227:20 228:1,3,3 248:14

challenged 150:7

challenges 51:25

chance 44:8 255:11 259:16

change 13:10 78:16 118:15,15 144:4 160:2 173:7 193:21 228:18 229:11 229:12,12,18,22

279:4,4

changed 14:5,9 33:5 118:16 173:8 229:15

changes 82:8 110:10 259:19 279:1

changing 118:12 229:13

characteristics 173:15

characterize 231:15

characterized 99:7,9 128:23 234:3

charge 40:1 47:8 71:21 77:8 79:4,25 95:18 96:1 243:24

charged 7:12

charges 9:8,18 9:22

check 215:14 216:14,18 230:1 231:9 235:10 247:7

chemistry 146:20

cherry 134:22 172:20

chief 126:24 158:8

chikungunya 36:7

china 42:4 44:14

choose 12:21

chose 12:17 42:5 202:5,6

chuck 89:9,15 90:3,4,12

circular 82:10 96:17

circulate 164:12 164:16

circulated 161:22

circumstances 227:5,7

cited 141:12 156:2,10

city 15:25

civic 2:10 278:2

civil 7:14

claim 22:16 39:13 73:24 91:1,23 92:5 93:6,7 137:24 193:25 218:24 219:1,19 220:2 220:20 248:5,19

claimed 67:24 139:18,25 141:6

claims 62:19 77:15,16 163:10 213:11 214:6,8 214:21 223:25

clarification 132:21

**clarify** 119:21
**class** 146:20
**classification** 117:3
**classifications** 118:13
**clean** 269:4
**clear** 189:10
**clearance** 70:20 70:21 98:10
**cleared** 55:9 70:13
**clearly** 169:14 179:12
**clerk** 278:12
**clever** 112:18
**client** 9:12 10:4 10:19 15:11 159:3 167:22 211:10,18 215:6 215:20 216:6,17 217:19,25 267:25
**clients** 16:13,18 16:21 17:1 20:10
**clinical** 72:23 79:12 93:20,21 156:21 177:21 184:1 186:10 188:21,22 189:6 190:17 191:5,21 192:11 193:23 194:12 212:17 212:21 213:2

236:1 238:18,20 239:10,21 240:5 241:1,6,7,20 254:14
**clinicians** 240:6
**clint** 157:21 158:5 159:17
**close** 219:16
**closed** 221:6
**closely** 108:8
**cloud** 268:14
**cmr** 1:2 5:19
**coals** 254:19
**coaster** 207:23
**cobas** 93:19
**codiagnostics....** 102:12
**codx** 13:2,4,7,7 21:7,9,13 23:7 23:15,16 25:25 26:6 29:13 30:6 30:10 31:1,8,19 38:7,18 39:1 42:1 54:22 60:13 70:16 71:12,20 73:11 79:18,22 83:5 94:5 95:12 97:9 97:9 98:6,18 110:23 111:17 111:19 113:9 120:10 124:17 132:16 135:18 197:22 202:23 216:23 225:12

225:14 230:16 232:17,20 234:10 236:21 238:2 248:4 255:24 262:3 265:18 269:10 271:2
**codx's** 35:22 54:11 112:19 130:14 141:17 151:3 152:18 203:2 257:25 262:7 264:12 268:6
**cold** 16:22 25:1 25:4
**collect** 139:17
**collected** 143:12 189:18 213:13 239:14
**college** 10:24
**colloquial** 28:4
**coltrin** 44:1,3 61:16 199:8 200:6,7,8,11,14 200:14,20,22,25
**columbus** 2:11 278:3
**combined** 93:20
**come** 109:20 110:1 126:12 156:10 189:12 211:23 232:5 239:12 258:6 260:24

**comes** 46:21 56:4 153:16 161:11 171:7 188:14 198:16 255:7
**coming** 42:4 46:25 236:1
**comment** 119:21 179:20 180:5 184:5 199:22 201:6,11 201:12 211:3 214:1 221:25 227:8
**commentary** 180:14
**commented** 227:9
**commenting** 87:1,19 179:6
**comments** 93:25 236:23
**commercialized** 79:13
**commercially** 94:23
**commission** 276:18,18
**commissioning** 22:22
**common** 60:1,1 109:17 151:7 195:21
**communicate** 26:23 35:21

**[communicate - compensation]**                    Page 292

50:24 60:20
106:19,25
107:12,25 108:2
139:4 160:25
258:17 272:14
**communicated**
61:1 84:12
106:12 158:25
203:4 256:7
**communicating**
14:1 26:22
35:10,13 107:3
141:3
**communication**
14:23 20:8 35:7
37:20,23 83:22
97:13,15,17
104:11 111:11
124:7 144:25
145:1 156:15
167:25 215:10
267:2
**communicatio...**
13:5,17,23 14:6
14:17,21 20:10
35:6,12,18 47:2
61:17 97:16
98:1 106:13
211:19 249:10
**community**
94:24
**companies**
15:11 20:20,23
22:22 24:8 25:5
34:12,21 35:17

65:23 144:12
230:25 231:21
232:9 248:15
251:15
**company**  1:4,24
5:16 13:11,18
14:24 17:14
18:8,12 19:17
19:19,22 23:10
24:18 25:5 26:9
26:14 27:4
29:24 32:8 34:1
34:8 37:4,9,12
37:14 38:5,22
40:9 41:18 42:9
46:10,17 47:8
47:13 49:12
50:6,8,16,20
58:4,8,10,12
60:19,24 67:1,2
67:4,6 81:8,15
82:15,18 87:3,8
89:13,25 90:6
91:12,13,13
92:7 96:1,7 97:6
98:11,14 107:12
108:25 109:21
111:13 113:12
114:22 115:14
115:21 116:11
117:24 120:17
122:3,19 123:4
123:14,15,22
124:21 125:3,7
132:25 133:2,3

133:15 135:12
138:11 147:12
148:2 150:8,11
150:13,18
158:10,11,17
159:18,23,24
169:19 170:25
171:24 173:20
178:20 180:10
181:12,20
191:11 193:16
198:14 199:22
200:7,9,10
201:11,15 204:9
204:13 205:21
207:9 225:4,7
227:11 229:18
229:21 230:19
230:21 231:13
231:16 237:4
238:3 239:23
243:24 244:19
245:1 246:4
249:25 250:3
257:6,9 262:3
266:4,7,11,15
266:18,23,24,25
267:4,9,18
269:6,24 270:1
270:9,14,17,23
270:24 273:4
278:18
**company's**
33:18 62:17
78:3 81:22,24

82:3,9,21 98:9
104:14 107:9
108:8,14 115:5
115:10 116:9
119:2 123:24
131:20 134:15
134:16,17
147:16,25 156:3
156:17,22 171:8
174:2 188:15
198:17 199:18
237:9 243:19
245:11,11
267:14
**comparable**
131:2
**compare**  64:1
231:1
**compared**
101:21 130:18
232:13 240:22
**comparing**
65:11 195:3
222:4
**comparison**
64:9 65:7
100:23 104:2
195:8 218:18
221:19 234:9
250:21 251:16
252:19
**compensated**
38:6
**compensation**
262:11

**[competing - consistently]** Page 293

**competing**
58:18 228:13
**competitive**
52:14
**competitors**
62:19 143:20
**complaint**
218:22
**complete** 35:12
35:15 277:11
**completed**
49:14 50:1 53:9
89:22 97:24
**completely** 92:9
**completion**
77:20
**compliance**
74:19 174:14
**complicated**
160:10
**complying** 47:6
**comprehends**
79:12
**comprehensive**
14:20 174:1
**comprised**
16:25
**comprises** 81:22
**compromise**
231:1,5
**computer** 256:9
267:18 269:10
**concepts** 106:11
**concern** 28:21
106:22 133:19

134:3 146:4
159:23 186:1
220:7 250:10
**concerned**
19:15 48:2
101:17 102:18
132:25 133:2,4
133:8,12,18,23
133:25 138:21
144:11 146:17
147:2 172:20,25
223:2 246:10,20
247:3 264:3
**concerns** 71:18
73:2,4,7 74:4,10
115:1,9 134:1
147:3 148:15
247:22
**concerted**
106:10 110:3
**concluded**
127:13 171:12
220:17 274:19
**concludes**
274:13
**conclusion**
128:2,4 242:1
**conclusions**
156:11 184:9
187:16,18,19,19
187:21,22 266:1
**concordance**
100:18,21
155:11,16,21
171:12,21

186:12 194:18
195:1,4,10
220:12,13
241:13,18 259:2
**concordant**
194:21
**condition**
219:15
**conditions** 66:1
142:17
**conduct** 37:2
108:13 112:5
132:14 151:18
151:20 257:22
262:6
**conducted** 5:6
5:20 108:17
127:23 131:24
142:12 151:11
153:18,19
171:10 194:11
232:25 265:4
**conducting**
68:12 153:13
**conduit** 72:3
**confidence**
103:18 133:6
147:9 162:20
**confirm** 152:1
210:12 230:11
**confirmed** 91:2
180:5
**confirming** 28:5
54:4,7

**conflating**
131:12
**conflict** 186:21
**conflicted**
174:25
**conflicting**
174:5 175:18
186:16
**conformity**
156:24 157:3
**confused** 7:20
**confusing** 99:14
**connected**
199:17 277:16
**connection** 5:8
12:2 29:10
96:25 113:9
115:1 118:20
123:14 129:11
139:13 145:6,10
147:4 148:6
154:2 189:1
229:19 232:21
258:4 267:24
268:5
**consider** 123:18
**considered**
19:14 78:4
106:4 118:16
142:18 147:25
**consistent**
162:15
**consistently**
47:22 168:16,22
177:20 183:25

**[consulted - correspondence]**

Page 294

consulted 148:6 168:3

contact 103:25

contacted 37:14 71:12,17 131:17 205:4 258:7,8 258:12

contacting 223:3

contain 57:21

contained 57:22 150:9 214:16 275:8

contains 190:8

content 45:25 74:24 114:24 166:11 191:20 191:24 215:18 263:10

context 51:25 67:8,14 88:7 100:23 105:20 106:2 186:6 191:17,19 205:17 212:22 213:21 222:17 223:11,21 233:10 257:14 265:9

continue 5:12 131:9 167:19 171:5

continued 4:1 19:2 137:25

contract 112:5 113:6,16

contracts 113:5 113:9,12,14,15 113:21 114:1

contradict 233:22

contrary 99:17

contrived 189:7 240:18

control 41:6 118:8

controlled 236:7 239:11 240:17,19

controls 130:7

conversation 127:5 138:23 146:24 212:8 235:14

conversations 84:4 126:3 135:15 201:17 211:23 222:25 255:19

convey 60:23

conveyed 14:19 208:24

conveying 202:13

cooling 52:19

coordinated 259:18

coordinating 262:20

coordination 262:25

copied 72:2 136:11 157:21 199:13 217:12 217:13 226:13 234:24 247:20 248:13 250:5

copies 56:23,23 57:8,12,13,14 57:22,22,25 62:11 69:25 70:1 161:7 162:10 197:10 197:11 201:3 221:5 248:22 253:6 254:15,15 254:16

copy 80:14,17 80:20 278:7,8

coronavirus 41:14 44:12 46:2 48:13 49:15 73:20 126:11 190:11 201:21 202:21 230:9

corporate 13:5 13:23 14:6,17 24:12 98:1 108:1 215:12

corporation 1:7 5:17

correct 12:7 15:21 16:12

23:7,19 31:13 36:20 37:4 42:17 45:9 63:24 64:10 65:19 66:22 70:24 78:14 79:20,21 85:5 126:19 131:21 141:13 148:8,9 159:16,19 163:7 163:19,25 164:4 166:13 170:6 178:7 181:8 182:8 184:24 202:13 212:2,3 212:24 214:12 224:9 253:21 262:8,10 266:5 266:6 267:5 268:18 275:9

corrections 275:10

corrective 3:15 74:3 76:9 77:13 77:14,23 81:23 147:11,22 163:9 163:10

correctly 63:20 66:5,7 99:8 238:24

correlate 178:19

correspondence 9:17 175:12 198:1 215:10

**[corresponds - data]**

**corresponds** 156:23 157:2

**corridor** 112:17 113:23

**corridors** 114:2

**cosara** 98:17,22 102:22 103:9 110:20 190:10

**cosara's** 99:4 110:7

**costanzo** 115:16

**counsel** 6:4,19 8:4 9:15 10:8,13 27:3 43:1 80:21 80:23 81:2 84:18 85:1 100:14 135:16 158:24 165:15 167:14 168:3 211:24 215:12 215:15 216:14 216:18 223:7 225:21 253:1 277:14,16

**countries** 55:11 103:17 177:19 185:17 186:8 188:7

**country** 55:9 223:20

**couple** 57:12,12 86:1 119:15,18 130:23 164:21 164:21 244:2 246:13

**course** 115:11 124:6 196:16 236:7 261:13

**court** 1:1,24 5:18,23 7:4 13:6 88:18 89:4 185:3,5,10 193:18 274:1 278:12,18

**cov** 44:13 57:9 72:22 238:25 256:25

**cover** 14:14

**covid** 35:23 39:2 39:4 50:17 54:12 58:19 60:7 64:2,21 67:25 71:13 86:13 94:16 95:12 99:5,16 104:23 112:2,5 121:15 131:17 131:22 140:6,12 143:5,13 147:20 150:7,25 151:3 154:20 156:4 168:15 169:6,21 171:9 188:16 189:2,12,17 190:10 199:21 199:24 203:25 217:11 227:17 237:14 238:22 239:12 240:25 244:16,19 248:2

248:3 257:1

**craft** 176:21 200:1

**crazy** 86:24 87:22 198:19

**created** 53:15

**credentials** 180:13 182:21

**credibility** 158:9

**credit** 39:13

**creditor** 20:21

**credits** 137:25

**criminally** 7:12

**criteria** 117:5,9 118:13,17 128:10,12

**crystal** 205:9

**ct** 52:15,17,20 53:18

**cuban** 22:21

**current** 13:4 14:16 38:18 44:11 248:23

**currently** 11:20 12:24 38:8 142:2 228:2 254:18 266:20

**curriculum** 146:19 147:2

**customary** 34:1 34:9 115:3 164:12 226:23

**customer** 86:11 89:13 95:14,15

111:13,17,19 113:18,19

**customers** 58:6 83:22 89:24 106:22,24 107:13,13,16 111:6,11 114:2 133:6,20 134:3 216:22

**cv** 1:2 5:19

**cycle** 125:19

**cycles** 52:18,18 52:20

**d**

**d** 5:1 13:8

**daily** 108:11 199:14 203:20 208:15 236:2 245:22

**damaging** 146:8 146:13

**damming** 213:15,21

**danger** 45:24 46:4

**darcy** 44:7,19

**dark** 227:4

**data** 65:25 95:8 95:10 96:24 97:1 99:11,13 113:23 116:16 117:8,19,20 126:12 129:23 139:18,23 142:14 145:14

**[data - department]**                                              Page 296

145:15 146:2
151:6,8 152:16
153:7 154:6,10
154:12 156:17
161:11 168:16
169:6,8,15,22
170:4,11,11,12
171:7,20,22,24
172:3,13,15,21
173:14 174:5,8
174:10,24 175:5
175:18 176:19
177:9,9,16
178:20 179:18
179:19 186:16
186:21 187:1,1
188:14 189:23
189:24,25
190:11 195:9
197:15 209:11
209:16 210:4,23
210:25 213:12
214:6,9,17
219:9,21 220:12
233:9 239:24
241:22,22,24,25
242:2,3,10,13
248:4,16,24
249:7,22 250:10
250:11 251:7
256:1 260:6
263:3,5
**date** 35:20
  37:22 77:20
  154:21 236:22

279:24
**dated** 73:8
  275:13 277:19
**dave** 157:21
**day** 26:18,18,20
  26:20 40:7,7
  44:21 46:1 52:9
  90:25 103:4
  116:3 120:25
  134:12,14,14,23
  134:24 135:6,7
  159:10 165:3
  196:10,14,15,16
  196:19 198:18
  198:21,23 199:1
  199:1 201:2,5
  207:21 212:10
  235:16 246:4
  274:18 275:13
  276:11,13
  277:19
**days** 134:24
  164:21 196:19
  215:1 228:17
  246:13
**de** 70:19
**deadline** 41:19
  44:8 200:2
**deal** 122:13,14
  122:19,22 123:2
  123:4
**dealers** 122:1
**dealing** 13:17
  35:1 37:24,25
  40:22 61:21

71:21 122:11
  194:25 245:2
  247:2
**dealings** 13:25
  72:3
**deals** 47:11
**dealt** 159:21
**debates** 166:18
  166:21
**decide** 86:2
**decided** 49:22
**decision** 19:25
  23:9,12,15
  28:24 29:6
  33:24 39:3,6,8
  48:15 49:20
  84:14,17 158:22
  164:9 168:21
  175:19 225:10
  230:15,19,22
  231:14,16,17,22
  266:15 267:15
**decisions** 84:15
  85:2,4
**declare** 279:22
**declined** 153:14
  230:10
**declines** 229:25
**deep** 86:20
**defend** 213:10
**defendant** 7:14
  7:17,23
**defendants** 1:9
  2:8 6:12

**deficit** 37:5,7
**deficits** 37:9
**define** 169:24
**definitely** 123:7
  123:12 176:13
  253:6 264:9
**definition** 36:16
  130:9,9
**definitions**
  234:7
**degree** 10:24
  109:25 160:4
  162:20
**delete** 213:13,16
  267:16
**deleted** 267:9
**delisting** 37:15
**delivery** 274:5
**demographical**
  128:16
**demonstrate**
  41:10 139:24
**demonstrated**
  101:14 156:6
**demonstrates**
  168:16
**demonstrating**
  152:18 169:7,22
  170:13 248:5
**dengue** 36:7
**department**
  40:16 77:7 79:3
  79:19 91:8
  150:22 164:3
  171:10 175:6

183:10 195:8

**departments** 40:18 55:6

**dependent** 104:9 105:4

**depends** 5:7 27:21 55:23 67:8,13 107:14 164:22 194:8

**deploy** 23:9

**deposition** 1:11 5:6,20 7:6 32:2 61:21 191:9 218:16 274:19 275:8 277:8 278:6,10

**depth** 54:7 255:18

**deputy** 228:3

**des** 46:1

**describe** 14:15 40:17 83:8

**described** 54:3 65:10 71:19 82:20 239:9

**describes** 256:24

**description** 3:11 4:2 76:24 78:22

**descriptions** 78:3

**deselect** 248:14

**desert** 235:5

**design** 39:3 40:5 41:9,11 49:14

50:1 53:9 54:2,4 57:6,16 59:24 73:19 219:9

**designated** 70:13

**designed** 50:7 51:7 53:4 54:6 73:21 145:19 228:16

**designers** 39:19

**designing** 42:6

**designs** 53:15

**desired** 159:8

**desktop** 256:10

**despite** 220:6 228:18

**detail** 242:15

**details** 218:19 259:5

**detect** 62:12 90:23 156:4

**detected** 64:4,5

**detecting** 73:19

**detection** 49:17 56:16,19,20,23 57:2,16,18,23 58:15 62:7,9 63:9 68:6,7,22 72:21 130:14,18 130:24 131:4,11 131:12 140:23 140:24,25 141:5 141:17 144:7 156:3,7 177:12 177:14 178:2,22

179:11,23 180:1 180:2 187:4,11 197:10 217:10 224:1,7 227:21 229:6,10 238:4 238:17 240:16

**determine** 36:14 55:8 84:11 124:4 249:15

**determines** 59:16 238:21 241:8

**determining** 105:8 117:6 141:8 204:2

**develop** 39:2 40:10 48:2 86:5 86:11

**developed** 28:7 47:21 50:4 54:5 54:18,22 55:3 79:13 86:7 229:6

**developing** 35:24 39:17 40:19,23 51:8 58:5

**development** 39:14 49:13 50:17 102:1 169:20 227:19 228:4,16 229:2

**developments** 50:24

**diagnose** 36:16 44:12 72:22

**diagnosing** 36:23,23

**diagnosis** 72:23

**diagnostic** 9:25 49:13 62:12 63:20 64:3,5 66:3,12 67:25 70:14,20 91:12 95:4 150:13 169:21 201:22

**diagnostics** 1:6 5:16 8:9 12:24 13:12 21:15 25:10,12 27:10 27:12,18 28:18 31:5,13,16,17 31:22 33:2 34:17 35:24,25 36:10,15,22 37:3 44:11 45:9 49:5,11,11 51:24 52:7 61:24 62:16,20 64:2 67:24 68:13 69:14 71:3,7 72:17 73:18 77:7 79:3 79:12,14 82:18 89:16,18 90:13 91:9 93:6 95:1 95:17 98:10,15 98:17 99:15,16 102:19,22 107:7

110:15 121:24 123:11 126:25 130:17 131:22 143:4 145:23 149:4 150:7,12 155:25 158:8 166:2 168:15 169:6,19,19,24 177:13 189:18 190:9 195:18 199:21 202:21 203:24 217:11 217:22 218:2 224:19 227:7 230:17,20 231:17,22 232:22 234:17 235:8,20 236:13 237:25 243:18 248:15 258:18 278:4 279:2

**dictation** 176:16

**difference** 57:12 86:12 231:4 235:23 254:14

**differences** 116:25 126:23 127:14 128:14 128:16 156:2

**different** 17:10 33:7 44:4 54:1 66:13,13,14 73:21 87:24 96:18 110:13 116:16,23 117:5

118:6 128:11 143:18,22,22 144:6,9 160:3 191:4,5 228:25 229:16 236:8 238:18 239:5,9 239:14 240:21 240:23 241:10 241:14,16 249:16 272:25

**differentiation** 240:8

**differently** 143:18

**difficult** 47:21

**diffused** 119:15 119:18

**dig** 252:17

**diligence** 33:21

**diluting** 254:24 255:3,5

**dilution** 254:11

**direct** 3:3 35:6

**directed** 20:3

**direction** 48:21 160:3

**directional** 48:18

**directions** 182:17 250:8

**directly** 19:6 42:10 47:20 122:13 161:8

**director** 20:4 136:7 249:9

**directors** 20:4

**dirty** 231:3

**disable** 216:15

**disagree** 170:10

**disappointed** 103:1 123:25

**disaster** 121:14

**disclaimer** 94:1 94:6,8,13

**disclose** 116:11 167:21,25 272:2 272:11

**disclosed** 260:13

**disclosing** 101:25 263:4

**discovery** 267:24 268:2

**discredit** 255:10

**discrepancies** 127:14,23

**discuss** 10:7 86:14,17 125:9 125:10,12,13 138:17 185:19 219:25 259:21

**discussed** 50:20 109:16,18 125:1 125:15,20 127:17 158:15 191:8,9 232:18 237:8

**discusses** 115:4 163:15,16

**discussing** 10:15 25:24 101:8 114:21,23 115:2 116:1 222:23

**discussion** 40:22 50:23 101:25 116:8,10 136:22 154:3 191:11 205:21 205:25 231:13 232:3,6 233:6 237:4 245:8,10 247:25

**discussions** 83:24 108:24 109:11 120:16 120:20 129:15 129:19 158:16 158:20 165:15 166:22,24 167:2 167:7,10,13 185:23 210:7 228:8 231:23 245:1 255:22 262:14 266:14

**disease** 41:6 143:5

**disparities** 233:2

**disregarded** 183:12

**disregarding** 183:20

**[disseminate - dwight]**                                              Page 299

**disseminate** 227:1

**disseminated** 62:3 118:25 176:9

**disseminating** 172:25 203:19

**distinct** 53:24 54:1

**distorting** 222:16

**distributed** 27:17 62:3 72:22

**distribution** 27:15,15 278:9

**distributor** 27:14,16 91:14 93:9 223:19 257:21,25 258:4 260:16,19

**distributors** 27:11 216:23 218:23 219:7 220:21 222:15

**district** 1:1,1 5:18,18

**districts** 36:24

**diving** 86:21

**division** 1:1 5:19

**divulging** 211:9

**doc** 161:11

**doctor** 29:1 117:15 264:24

**document** 43:12 43:20 51:10,16 61:9,12 75:4,5 75:17 76:8,14 81:22 82:2,5,20 85:13,23 88:15 136:4 157:13,16 165:24 171:16 181:3 190:1,8 199:3 229:23 237:20 247:19 279:22

**documents** 119:25 120:3 166:17

**doing** 15:16 33:6,13,13 35:8 54:8 117:10 124:3 129:17 143:20 152:4 198:9 207:17 220:7 228:4,12 228:22 229:21 238:2 242:5 243:18 253:24 266:20 272:19

**dollar** 37:7,12

**dollars** 38:12 270:18 271:21 271:21

**domain** 53:11

**domestic** 113:14

**doubt** 106:23 146:19

**doubts** 101:3

**download** 248:16

**dozen** 244:2

**dozens** 86:1

**dr** 25:13 26:17 44:25 45:4 48:8 61:19,23 76:11 105:3 117:24 118:11 126:18 128:6,9,22 129:6,10,15,19 130:5 138:18 139:5 141:12 158:8 159:15,18 180:25 181:24 182:16 196:21 196:23 197:18 197:24 204:6 218:21 231:2 233:22 248:12 249:13 266:4

**draft** 35:5 80:13 80:17,20 81:2 97:22 98:2 103:13,21 149:5 149:9,12,16,19 149:23 150:1,5 154:11,25 156:14 157:10 161:15 162:13 162:24 163:3 164:10 165:3 199:25

**drafted** 106:8 187:17

**drafting** 149:12 155:2,7 203:19

**drafts** 97:24 161:18,21 164:11

**draw** 187:16,21 207:14 242:1

**drawing** 187:15 187:18

**drawn** 179:12 265:25

**drew** 187:20,23

**drive** 2:10 278:2

**drop** 198:25 207:22

**drug** 96:14

**due** 58:1

**duly** 276:10

**dump** 22:10 217:22

**dunn** 231:3

**duplicating** 33:13

**durenard** 1:7

**dwight** 1:7 25:25 39:7 41:2 45:17 81:3 84:18 89:9 90:7 114:10 121:6 125:20 148:25 149:20 158:24 159:6 164:11 166:12 226:13

**[dx - employee]**                                                          Page 300

| | | | |
|---|---|---|---|
| **dx** 89:17,18,20 | 197:17,22 199:7 | **east** 113:18 | 159:8,14 166:12 |
| **e** | 199:12 201:2 | 260:24 | 199:12 226:13 |
| **e** 2:5,11,12 3:12 | 205:11 211:4 | **easy** 134:22 | 226:13 231:23 |
| 3:13,14,14,16 | 212:9 216:21 | **echo** 63:8 | 232:4 234:24 |
| 3:17,17,18,18 | 217:6,15 218:5 | **ed** 61:16 | **egan's** 125:24 |
| 3:19,19,20,20 | 218:20 219:4 | **edited** 263:12 | 126:1 |
| 3:21,21,22,23 | 220:3 222:23 | **editing** 61:19 | **eight** 17:7 |
| 4:3,4,4,5,6,6,7,7 | 226:12,19 | 263:9 | 269:20 274:15 |
| 4:8,9 5:1,1 8:22 | 234:23 237:24 | **edits** 61:13 | **eighty** 38:12 |
| 43:22 44:21,22 | 237:25 242:19 | 76:18 162:1,6 | **either** 150:14 |
| 47:18 48:11 | 246:12 247:20 | **educating** | 160:14 241:4,5 |
| 51:17 69:15,22 | 247:20 248:11 | 160:10 | 271:14 |
| 72:8,11,19 | 248:12 249:4,6 | **education** 11:17 | **election** 125:19 |
| 75:20 76:25 | 250:5,19 254:8 | 137:25 | **eleven** 75:8 |
| 81:13 85:17,18 | 256:4 257:18 | **edward** 1:7 | **eliminate** 90:14 |
| 85:23 87:2,21 | 275:1,1 | **effect** 81:16 | 91:20 |
| 88:6 89:8,10 | **e.g.** 63:19 | 109:3 245:17 | **eliminates** 92:9 |
| 90:3,11 93:16 | **earlier** 46:25 | **effectively** | **else's** 162:7 |
| 100:1 101:6 | 84:10 116:14 | 240:10 | 195:20 270:24 |
| 102:8,12,12 | 130:23 147:11 | **effectiveness** | **elwood** 2:9 6:11 |
| 103:4,5,21 | 166:16 178:4 | 147:20 | **emergency** |
| 105:21 114:9,13 | 181:3 197:18 | **effort** 39:25 | 62:17,24 94:11 |
| 114:15,21,23,24 | 206:24 236:9 | 106:11 110:3 | 94:19 96:10,17 |
| 115:2,4,15 | 245:16 | 112:1 | 96:20 97:7 |
| 116:3,7 119:12 | **early** 21:13 | **efforts** 268:20 | **emphasis** 91:25 |
| 121:5,19 123:4 | 47:22 90:24 | 268:21 | **emphasize** 92:1 |
| 126:19 130:23 | 204:10 | **egan** 1:7 25:25 | 193:21 |
| 136:5 137:8 | **earnings** 243:2 | 28:25 29:6 39:7 | **emphasizing** |
| 139:3 140:2,3 | 243:5,13,20 | 45:17 70:4 | 93:8 |
| 141:4,19,24 | 246:5,9 | 83:25 85:19 | **emphatic** 92:2 |
| 146:15,25 148:5 | **ease** 13:1 177:18 | 89:9 93:16 | **employed** 12:24 |
| 148:25 157:20 | **easier** 28:13,15 | 109:12 114:10 | **employee** 18:19 |
| 162:9 166:16 | 60:20 161:6 | 115:17,21 121:6 | 97:9 175:4,13 |
| 175:11 182:10 | 263:9 264:2 | 125:1,2,5 | 182:18 265:8 |
| 183:19,23 | 267:11 | 148:25 149:25 | 277:14,15 |

**[employees - eventually]**                                                    Page 301

employees 9:25 10:13 15:11 19:7 20:2 42:7,9 148:2 227:8,11 239:12

employer 19:14

employment 12:3

enclosed 76:5 178:13

endeavor 39:20 39:23

ended 115:16 244:9

ends 225:2

eng 257:10

engage 16:22

engaged 22:10

engagement 270:15

engaging 50:16

enhanced 73:19

ensure 20:10 26:19 106:11 204:20

ensuring 80:1 144:12

entail 26:16 121:25

enter 279:1

entered 110:24 113:12

entering 257:24

enters 111:13

entire 171:3

entirely 160:5

entirety 232:24 242:2

entities 24:23,25

entity 19:16,25 20:1,18 24:6,20 30:24 31:7,10 31:11,11,12,15 32:16 34:24 44:4 200:13 264:11

entrepreneurs 112:3

environment 66:3 131:17 239:11,22 240:5 240:19

epidemic 232:14

epidemiological 93:22

epidemiologist 231:2

epidemiology 171:11

equal 137:24 140:22

equally 55:19 55:22

equipment 36:25 239:14,15

equity 20:12,19 21:25 35:17

equivalent 63:9 112:16 179:7

era 32:21

errata 275:11 278:8 279:1

erupted 44:13

escalating 223:4 223:6

esq 2:2,3,8,9,13 278:2

essentially 125:16 244:5

established 103:10 130:18

establishments 27:11

estimated 77:19

et 5:17 278:4 279:2

eua 72:17,20 97:11,23 98:4 110:23 140:5,12 140:15,16 142:15,18,22,25 143:1,21,25 144:4 145:14,15 146:3 219:10 228:23 239:23 248:3,6,23 251:15 252:12 252:19 253:5 260:4

euas 144:12

eugene 1:7

europe 131:24 132:9

european 94:23 94:24 150:14

evaluate 215:17 246:8 248:20

evaluated 59:10 177:19 186:8,13 188:8,10 241:12 256:19

evaluation 64:1 65:3 66:13 100:9 142:3,7 145:4,9 168:25 171:8 203:9 228:12 236:7 241:11,11 257:23

evaluations 63:18 93:20 110:19 131:24 132:2,4,9,15 162:3,5 163:17 168:18,24 169:1 169:4,11,12 171:9 172:13 174:25 177:12 178:2 179:6 186:19 188:15 203:23 212:17 213:10

events 135:3,3,3

eventually 13:16 20:23 115:16 150:2 157:21,22 223:11 234:14

**[everybody - expected]**                                              Page 302

**everybody**
20:13 87:20,22
182:22 205:1
206:8 236:7
246:11 253:24
272:25 274:17
**everyone's**
138:10
**evidence**  48:5
62:19 64:13,24
81:19,20 87:12
88:11 152:22
167:6 174:16
176:11,12
178:24 179:15
179:15 180:22
181:10 182:14
183:7 186:24
187:13,14
191:15,16
193:10 194:4
202:3,16 203:17
208:7,22 210:2
210:15 224:11
233:5 243:16
**evidenced**
194:12
**evident**  118:10
**exact**  100:6
135:14
**exactly**  13:21
14:7,8 16:7 17:2
18:3,5 19:8,9
22:17,19 24:12
27:6 30:12 31:3

34:8 37:8,21,23
38:16,25 40:4
41:3 45:12
54:24 63:1,6
70:12 71:17
77:11 78:18
84:9 89:19 90:5
90:9,21 94:13
95:22,25 96:4
97:12,14 98:8
102:21 105:13
105:14 116:24
117:2 118:4
125:16 127:18
134:11 136:8
141:25 143:2,19
155:18 162:19
166:5 173:11
181:17 188:19
191:2 216:25
217:18 229:2,21
237:3,7 239:9
241:6 257:20
266:8 269:25
273:16,17
**examination**
212:2 217:21
**examined**  10:1
118:20
**example**  36:19
41:15 124:4
173:4 221:4
245:5 260:4
**examples**
111:15

**exceedingly**
227:18
**excel**  248:16
**excellent**  156:6
**except**  200:12
**exception**
275:10
**excerpt**  52:6
**exchange**  81:5,7
256:4
**excluding**  152:5
**excuse**  85:17
184:23
**execute**  244:5
278:8
**executed**  145:19
275:11
**executing**
243:24
**executive**  15:10
**executives**  9:25
**exhibit**  3:11,12
3:12,13,13,14
3:14,15,16,16
3:17,17,18,18
3:19,19,20,20
3:21,21,22,22
3:23 4:2,3,4,4,5
4:5,6,6,7,7,8,8,9
43:13,13,17
48:25 49:1
51:10,12 61:3,4
69:3,6 72:5,9,10
75:14,18 85:10
85:14,14 88:16

88:20,21,22,24
89:3 93:10,13
99:19,22,22
102:3,5 114:4,7
119:6,9 121:1,4
121:8 135:24
136:1,5 137:1,5
148:17,20
157:16,17
165:19,20 199:3
199:4 209:4,5
217:2,5 226:6,9
229:24 230:4
234:20,23
237:17,21
247:16,19 248:8
248:11 250:15
250:18 254:2,5
256:9,10,11,18
257:11,17
**exhibits**  3:9 4:1
42:18
**exist**  200:7
**existence**  17:3
**exists**  44:3
**expect**  171:4
**expectation**
20:24
**expectations**
14:21 110:18
176:22
**expected**  82:23
116:17 151:22
173:12,14
264:19

**[expecting - fd]** Page 303

**expecting** 173:9
**expedited** 41:24
  274:5
**experience**
  13:22 25:16
  28:18 150:12
  183:1 263:9
**experiment**
  230:11 231:1,5
**expertise** 195:14
**expires** 276:18
**explain** 104:19
  160:4 204:15
  246:15
**explanation**
  254:11 255:18
**exploring** 50:5
**exposure** 198:8
**express** 138:21
**extent** 9:11 10:2
  10:18 34:9,9
  35:17 57:11
  62:4 151:2,5
  159:2 211:8,17
  215:5,20
**extraction**
  143:9 144:8,9
  221:14
**extremely** 146:8
  146:13
**eye** 245:21

              **f**

**f** 275:1
**facilitate** 20:2,8
  260:20

**fact** 46:9 49:24
  53:2 54:11 57:9
  60:4 79:22
  108:3 142:21
  150:12 153:8
  156:5 162:13
  171:17 181:7,11
  184:18 197:1
  204:23 220:23
  244:18 245:17
**facto** 70:19
**factor** 57:19
  58:15
**factors** 56:17
  57:6 58:13
  59:24 60:7
  118:21 141:8
  229:13,14
**factory** 267:16
  267:19
**facts** 64:12,23
  152:21 168:1
  174:16 176:12
  179:15 180:21
  182:6 186:23
  187:13 191:16
  193:10 194:4
  208:6,21 210:14
  279:22
**fail** 56:13 57:24
  57:24
**fair** 55:7 66:20
  104:13 169:17
  238:15 273:2

**fairly** 59:5
  105:3 153:8
  236:3,3
**fall** 163:5
  198:21,25
**fallible** 192:6
**fallout** 246:10
  247:2
**false** 56:7,9
  59:18,19,19,20
  90:14,14 91:20
  91:20 92:6,9,9
  213:11
**falsely** 62:18
**familiar** 23:1
  30:16 32:12,13
  32:18,20 34:7
  49:6 54:10,11
  56:3 58:18 59:9
  61:9,11 63:3
  68:5,9 69:9 70:7
  83:14 95:8,10
  96:11,24 97:2
  105:7 111:23
  112:12,13
  113:21 114:1,25
  130:13 131:5
  142:21,23
  165:24 190:1
  200:16 236:17
  236:19 247:23
  249:19 257:8,9
**familiarity**
  190:4

**familiarize**
  161:17
**family** 258:10
  258:11 273:9
**faq** 3:13 61:7
**far** 19:15 30:23
  44:14 99:17
  104:16 105:1,24
  130:1 140:14
  186:18 189:5
  203:4 207:5
  232:10 246:20
  248:22 249:15
  249:15 252:11
  253:5,6,25
  263:9
**fasano** 2:13
  274:10
**fast** 53:3 137:23
  165:1
**faster** 52:13,13
  138:14
**fat** 255:19
**father** 17:21
  18:7 27:2,3
  108:16 217:12
**fault** 246:16
**faulty** 253:8,14
**favorable** 162:1
  177:11 178:1,21
  179:11,22,25
  180:2 224:7
  243:6,7 260:2
**fd** 217:10

**[fda - focus]** Page 304

**fda** 59:6 65:22 66:16 68:21 71:12,18,21 72:16,20 73:4,6 73:23 76:3,6,21 78:8 81:5,7,14 94:20 96:22 131:3,24 132:4 132:14 143:2 144:1,10,11 163:7 183:3,8 209:16 210:20 210:23 211:2 213:23,24 218:23 219:4,5 219:19,20 220:1 220:6,7,9,16,18 222:20 223:3,23 224:2,12,20 237:13 239:24 240:2,17 250:21 251:20,25 252:7 252:8,13,14,19 252:20 253:12 254:9,10

**fda's** 76:25 78:23

**featherstone** 69:16 262:16

**february** 69:17 71:11 73:8,12 73:17 74:10 78:16,24,25 81:4,7 85:19 89:9 95:2 163:6

**feedback** 95:14 95:15,24 164:16 164:23 176:8

**feel** 45:2 173:22

**feeling** 88:12 207:16 273:6

**fell** 110:18

**felt** 124:2 133:20 134:12 134:18

**fewer** 57:22

**field** 28:19 171:9 188:16,17 188:25 202:22 203:2,5,10,15

**figure** 7:7 75:3 138:9 244:22 250:9

**filed** 5:17 9:8 278:12

**files** 267:8,16 269:9

**filings** 47:12 59:6

**fill** 33:15

**filtered** 233:17

**filtering** 234:1

**final** 156:15 164:9,10,11 166:6,11 167:17 176:5 251:11,13 252:6

**finally** 244:6 252:8,9

**finance** 31:19 111:22 113:24

**financed** 37:10 262:9

**financial** 23:21 24:11 51:21

**financially** 6:1 207:12 277:17

**financing** 29:25 30:11,14 32:9 32:16

**find** 72:15 207:8 248:17,17,20,25 248:25 249:1 265:19

**finding** 76:24,25 78:22 259:10

**findings** 259:12

**fine** 76:1 160:2 220:7 274:1

**finish** 6:25 50:11

**finra** 12:18

**firm** 5:24 12:11 12:23 15:25 16:1,8,9,10 17:3 17:19,21 23:21 24:2,11 44:1,3 44:11 51:1 72:19 74:3 80:24 124:2 127:8 168:8

**first** 13:10 24:15 39:1 42:1 46:17 54:18 65:13

83:6,12,19 86:18 88:1 97:24 116:17 123:18 137:21 137:24,25 138:11 147:8 151:24 166:3 169:5,13,15 171:1,2,4 187:6 194:20 204:14 209:10 213:20 216:15 227:18 243:12 244:23 258:14,15,18,19 260:15 263:8 268:8 271:4

**fishy** 126:6

**fits** 176:21

**five** 19:9 42:24 83:12 161:4 225:15 244:1

**fix** 222:15

**fixed** 69:23

**flagged** 73:15

**flexibility** 221:15

**floch** 2:3 6:8

**florida** 1:23 2:5 275:5 276:4,17 276:17 277:3,6 277:23 278:17

**flu** 42:3

**focus** 8:14,15 26:18 33:8 139:14

**[focussing - gene]**

Page 305

**focussing** 33:3
**fold** 248:2,6
**folded** 201:6
**folks** 85:20
   121:6 135:19
   136:10 250:20
**follow** 82:24
   108:8 185:6
   221:24 250:12
**followed** 79:22
   80:1 104:8
   244:10
**following** 41:3
   78:15 81:4
   82:24 94:12
   103:9,9 163:6
   190:8 204:10
   229:10
**follows** 103:11
   158:2 170:25
**food** 96:14
**foot** 254:23
**forbid** 86:19
**force** 41:4,4
**forced** 90:22
**foregoing** 275:7
   279:22
**foresee** 205:9
**forget** 174:20
**forgot** 92:19
   174:17
**form** 34:3 55:20
   58:20 78:6
   154:11,25 184:8
   184:25 235:5

**formal** 46:10
   81:8
**formally** 272:13
**format** 54:8
   104:4
**formulated**
   218:6
**forthcoming**
   126:9
**fortunate** 15:18
**forward** 79:18
   82:21 114:9
   119:25 121:6
   254:23
**forwarded** 90:2
   114:12 115:15
   238:11 278:11
**forwards**
   121:12 140:3
   146:15
**found** 60:2
   101:11 177:9
   189:23 219:3
   220:20,24,25
   245:24 278:9
**foundation**
   258:9 260:21,23
   261:1,9,11,17
   261:24
**founded** 26:11
**founder** 25:12
   126:24
**four** 163:21
   205:1 220:11
   239:8 248:2,6

248:20
**fourth** 64:19
   179:19
**frames** 273:14
**framework** 24:7
**frank** 199:7,12
   200:5
**frankly** 138:10
**free** 45:2
**frequency** 84:1
   84:5 109:21,25
**frequent** 83:18
   87:7
**frequently** 87:4
   87:5 88:9 215:2
**fresh** 269:3
**friday** 74:10
   160:13,17,22
   161:2 202:21
   227:18
**friend** 124:10
**friendly** 21:2
   90:6 124:11
**front** 20:9 85:23
   265:17
**frost** 270:7,8
**full** 151:2,5
   213:14,17
**fully** 37:10 48:3
**function** 53:16
   54:6 268:5
**functions** 95:22
**fund** 261:22
**funded** 22:21
   31:12 260:22

261:11,17
   265:14
**funding** 20:19
   30:1,2 31:9,18
   260:23 261:24
**funds** 30:9,25
   261:10
**further** 11:17
   73:1 126:21
   150:10 273:19
   277:13
**furthermore**
   261:18
**future** 52:11
   74:5

**g**

**g** 5:1
**gain** 207:18
**garcia** 44:25
   45:4,4,7,8 48:8
   195:24 197:14
   199:7,12 200:5
   267:4 269:5
**gathered** 95:25
**gatlin** 199:13,17
   200:16,23 201:4
   201:16 202:18
   204:14 208:1,8
**gauge** 63:18
   246:8
**gelt** 1:3 5:15
   278:4 279:2
**gene** 54:16,17
   54:19 56:1

[general - greater]

Page 306

**general** 7:5 22:13 27:3 63:3 104:13 105:7 106:10,15 170:4 191:13 215:11
**generalize** 219:17
**generally** 103:16
**generated** 113:8 113:22
**generation** 263:10
**genes** 54:12,23 55:4,10,17
**genetic** 53:10 56:14 57:7 59:25 60:2
**genome** 57:7
**gentleman** 23:1 32:18
**geographical** 128:16
**german** 102:9
**getting** 160:6 198:5 235:5
**give** 26:11 46:24 75:1,3 76:18 88:15 114:16 119:22 135:25 161:17 242:12 242:14 245:5 251:1 252:8 256:8 259:20 262:12 269:12

270:22
**given** 38:14 48:21 57:22 99:13 134:12 166:12 172:9,11 172:14 173:2,3 173:14 209:15 231:25 241:22 241:23,23,24 250:8 251:17 252:11 274:13 275:8
**gives** 185:25 221:14
**giving** 26:3 80:13 217:24 259:16
**glad** 261:5
**glean** 202:6
**gleaned** 56:21
**global** 41:4,4 99:15 110:16 142:2 145:5
**go** 5:13 6:17 10:21 17:23 28:1 43:1 60:7 63:12 67:18 68:20 75:4,6 81:17 90:9 94:17 104:22 109:1 125:4 136:17 141:8 143:17 159:5 160:17 161:14 165:2,5 187:6

188:11 198:23 207:22,24,25 216:3,9 225:21 239:20 244:8 245:23 246:1 247:6 256:16 259:8 264:25 268:14 269:12
**goal** 20:22 36:11 40:25 41:2 109:4
**god** 86:19
**goes** 104:16 105:8,24 175:6 179:20 186:18 207:6 240:7 273:7
**going** 6:18,25 42:3,5,18,20 43:14 79:18,18 82:21 85:22 87:20 88:22 91:11,13 104:11 107:22,24 114:8 122:23 142:14 142:22,25 145:2 145:13 150:5 160:20 167:19 173:5 183:4 184:20 198:23 210:23 219:18 220:1 227:17 228:21 234:15 240:6,8 243:22 260:18,19 262:2

263:14 264:19 269:13 270:2 273:7,25
**goings** 175:12
**good** 5:4 6:14 41:15 42:23,25 89:15 102:18 108:1 135:3 139:2,19 157:15 158:7 173:4 195:2,4,5 202:11 226:21 233:12 258:21 274:18
**goods** 94:22,25
**gotten** 251:11 259:15
**governance** 108:2
**government** 10:16 103:10 213:9
**government's** 150:21
**graduate** 11:1
**graduated** 15:1
**granted** 70:18
**granting** 101:2
**grateful** 222:20
**great** 41:10 51:21 52:10 251:12 261:4 264:3
**greater** 131:13

ground 6:17
group 39:25
  258:13
guard 122:9
guess 11:15
  32:24 35:3 40:6
  48:1,15 53:17
  63:4,4 73:23
  81:4 84:12
  90:21 91:12
  111:12 137:19
  146:3,3 198:22
  201:10 202:11
  212:9 214:11
  215:2 228:20
  244:22 247:2
  263:19 267:11
guidelines 103:9
guy 258:15

**h**

hacked 244:1
half 83:6,19
  126:14 233:18
  268:8 271:4,7
  271:21
halts 236:13
hand 60:24
handling 13:23
  149:22
happen 29:22
  69:23 164:17
  195:21
happened
  102:21 118:9,14
  134:8 164:6,14

183:18 235:10
243:15 246:15
happening
  26:23 90:1
  122:9 137:16
  184:17 227:15
happens 195:22
  273:10
happy 58:7
hard 106:20
  219:18 220:1
  227:3
harm 243:19
harold 89:8,12
  90:8
head 13:5,15
  14:2,6,17 26:13
  32:23,23 33:15
  37:22 59:13
  71:24 101:16
  129:6 182:8
  193:6,15 254:1
  270:6
headline 202:14
  213:15,20
heads 40:16,17
  175:6
health 41:4 55:6
  110:24 121:14
  140:7 150:22
  195:8 231:20
hear 246:25
heard 5:10
  23:21 24:15
  41:13 42:3 46:3

48:13 111:10
269:1
heating 52:19
held 136:22
hello 238:2
help 14:18
  16:21 17:12
  25:14 26:17
  35:5 37:1 45:1
  260:20
helped 233:10
helpful 104:5,11
  177:5
helping 20:7,9
  26:19 27:18
  35:9 84:23
  176:20 201:10
  246:17
helps 177:15
  188:5
hey 172:15
  224:25 250:22
  252:13
hh350150
  276:18
hi 44:25 69:21
  209:11 254:10
  259:15 263:7
high 13:25
  20:11,20 35:11
  58:1,14 59:5
  133:7 136:8
  236:3,3
higher 130:17
  140:22 144:1

238:4
highest 257:1
highlight 73:16
highlighted
  73:7
highlights 52:6
highly 106:17
  182:24
hijacked 244:8
hijacking
  243:20
hindenberg
  236:18,23 237:3
  237:9
hindenberg's
  237:5
hindsight
  134:23
hipaa 242:12
hire 28:24 29:4
  260:24
hired 264:25
history 22:21
  93:21
hit 158:10
homework
  271:18
hone 227:3
honest 251:12
honestly 146:17
hope 222:14
hopefully
  265:18
hopes 265:18

**[hospital - impressive]** Page 308

**hospital** 146:9
**hostetler** 2:9
6:11
**hour** 42:21
225:16
**hours** 8:16
51:23 87:20,22
134:24 164:21
225:20
**house** 53:20
190:16 194:11
**hovering** 37:12
270:17
**huang** 72:12
76:11
**hugh** 30:17
31:23
**huh** 181:16
234:13 261:2
267:22
**hum** 272:22
**human** 36:3,11
36:12,12 68:19
69:1 189:1,12
189:16 192:5
**hundred** 38:12
57:12 243:22
**hundreds** 116:3
131:18
**huntsman** 258:9
258:13 260:21
261:11,24 262:3
264:11
**huntsmans**
258:10 261:23

264:19 265:17
**hutchins** 71:22
71:25 74:14,18
75:20 77:20
80:10 85:19,24
97:5 103:21
129:18 140:2
141:3 146:24
148:6,15 163:2
181:25 182:4
206:3,15 209:10
209:21 216:21
218:20 222:13
222:24 250:20
269:23
**hypothesis**
128:7,8,9,13,18
**hypothesizing**
128:25

**i**

**i.e.** 219:10
**icloud** 269:1
**icmr** 100:10,14
101:11 110:8
**idea** 42:4 123:9
157:10 160:25
267:20
**identical** 98:25
**identification**
43:18 49:2
51:13 61:5 69:4
72:6 75:15
85:11 88:17
93:11 99:20
102:6 114:5

119:7 121:2
136:2 137:2
148:18 157:18
165:21 199:5
209:6 217:3
226:10 230:5
234:21 237:18
247:17 248:9
250:16 254:3
256:12 257:12
**identified** 63:21
66:5,7 74:4,4
118:3
**identifies** 59:21
**identify** 56:13
56:24 57:24
60:3 66:14
238:25
**ignore** 169:15
**ike** 45:2,16
69:25 199:22
**image** 243:19
**images** 69:21
**immediate** 74:3
101:22 103:2
**immediately**
51:22 106:21
118:12
**impact** 57:19,20
109:14 134:16
141:5,6 176:17
245:11,25
**implement** 81:8
95:13

**implemented**
26:25 78:19,20
147:16 270:14
**implementing**
77:23
**implements**
82:7
**implication**
92:23 93:1
166:25 167:3
169:11 170:16
184:5,19 186:1
**implications**
52:12
**implied** 67:1
77:16
**imply** 67:2
70:12
**implying** 66:23
**important** 58:4
58:6,8,10,15
92:4 175:6,9,15
176:20 177:7,17
226:20,22
**importantly**
219:11
**impossible**
198:22 205:7
244:5
**impression**
125:24 243:8
**impressions**
244:14
**impressive**
39:11

**[improper - information]** Page 309

**improper** 71:13 184:13,20

**improve** 58:11 110:20 228:5,9 228:23 229:5,19

**improved** 73:20

**improving** 219:20

**inaccurate** 92:10,12 133:21

**inactive** 12:6

**inbound** 61:18 122:4 263:23

**include** 14:22 73:2 78:11 104:21 147:19 158:7 169:3 185:20 192:4 261:16,19 265:2

**included** 26:21 79:5 94:14,15 115:15 130:22 151:16 169:2 170:25 220:10 243:20

**includes** 192:24

**including** 6:4 57:16 73:20 137:14 150:19 151:1 219:21 226:22 256:20 263:24

**inclusion** 79:10

**incoming** 198:14

**inconsistent** 177:3

**incorporate** 74:25

**incorporated** 82:20

**incorporates** 82:8

**incorrect** 66:24 116:20

**incorrectly** 59:21 62:18,25 239:14,15

**increase** 110:4 112:1

**incredibly** 215:14

**increments** 273:17

**independent** 142:2,7 145:4 163:17 168:18 168:24,25 169:3 169:10,12 171:7 174:25 188:14

**index** 3:1

**india** 26:22 27:8 27:14,19 28:9 98:7,9,23 103:25 171:11 173:4 203:23

**indian** 27:11 100:14 103:10 150:20 154:9

**indicate** 65:5 141:15 159:9 176:6 202:1,4

**indicated** 12:5 15:1 31:4 48:12 57:19 72:19 147:15 160:16 166:10 174:23 178:4,18 179:8 192:3 194:1 206:18,24 208:11 223:9 244:11,12 272:7 273:13

**indicates** 59:17 71:9 201:25

**indicating** 144:24 167:1 224:6 237:14 241:1 249:8 257:3

**indication** 124:8

**individual** 114:25 205:5

**individual's** 125:16

**individuals** 17:1 20:11 72:2 140:6 181:12 189:12 244:21

**indre** 150:21 209:18

**industry** 12:3 12:23 109:8

**infallible** 192:5

**infected** 254:17

**infection** 90:24 93:19 156:5

**inference** 92:11 92:18,23

**inferences** 150:9 207:15

**inferred** 150:11

**inferring** 66:23 87:8 93:1 156:3

**influencing** 239:21 245:19

**info** 248:18 249:17,23

**inform** 107:21 132:17 175:3 177:15 188:5 219:7

**informally** 272:14

**information** 10:20 20:13 35:20 44:18 46:9 60:23 86:4 86:10 93:22 115:19 116:12 116:15 159:3 167:22 171:1 173:1,1 174:2 176:8 214:8,20 214:23 215:6,21 216:7,18 217:20 217:25 223:21 241:19,21

Page 310

242:11 248:4 249:12 267:25 271:17

**informed** 40:9 47:2

**informing** 45:25 46:5

**initial** 13:11,12 20:17 21:11 29:13 34:12 68:12 102:19 149:16,19,22 263:10

**initially** 26:13 54:15 68:11 94:18 162:13

**initiate** 211:6

**inner** 107:6

**innovative** 41:9

**inoculates** 158:10

**input** 76:18 176:15,17 221:6 221:18 229:19 230:22

**inputs** 229:12

**inquiries** 61:18 105:19,22 122:5 198:15 246:18 263:24 264:2

**inquiry** 38:1 120:15,17 214:1 215:18 216:4

**insane** 258:13

**insight** 44:8

**instance** 66:17 68:2 73:16 175:17

**institute** 150:20

**institution** 30:13

**institutional** 17:1

**instruct** 9:13 10:5,20 159:4 211:11,20 215:7 215:21 216:8

**instructing** 6:22

**intended** 49:16 140:6,7,17 155:4 156:17 224:1,13,18 225:1

**intends** 201:5

**intent** 174:18 245:19

**intention** 155:8 228:10

**intentional** 207:10

**intentionally** 207:7 208:2,13

**intentions** 208:25

**interaction** 78:8

**interactions** 163:6 182:23

**interest** 18:8 124:5 139:14

**interested** 6:1 25:17 139:6 199:21 277:17

**interfacing** 35:2

**internal** 120:16 151:19,25 166:14

**internally** 41:19

**international** 15:10 113:15,16

**internet** 5:8

**interpret** 192:25 193:4

**interpretation** 139:2 193:22 202:5,8 207:13 242:25

**interpretations** 205:3

**interpreting** 141:24

**interrupted** 29:20 84:25

**interview** 29:10 129:13,14 132:7 147:7

**interviewed** 45:22 127:10 129:12

**intimately** 113:10,25

**intro** 179:17

**introduce** 122:3

**introduced** 43:12 48:24

88:19 99:22 121:4

**introducing** 42:18 51:10 85:13 93:13 102:3 114:7 119:9 148:20 250:18

**introduction** 51:6 90:8

**introductions** 51:2 122:6

**invested** 25:6 30:5,9,24,25 31:5 34:21

**investigate** 118:2

**investigating** 120:6 255:15

**investigation** 9:3,4 10:1,14 117:24 118:1 127:22 211:6 233:1

**investing** 22:3 31:8 46:17 105:17 107:21 116:12

**investment** 16:9 30:8 102:19 122:2

**investments** 20:22

**investor** 13:23 14:3,12 21:7,9

**[investor - jennifer]**                                                   Page 311

32:24 101:17 102:9,18 103:13 121:23 159:22 193:6,15 217:17 238:2 249:9

**investor's** 199:14 203:20 208:15

**investors** 14:1 14:23 20:21 21:11 25:1,4,5 35:3,5,11,21 102:1,11 105:22 107:19,21,23 116:8 122:12,13 122:15 133:23 133:25 167:12 218:2 237:25 246:22

**involuntarily** 12:16

**involved** 14:12 19:25 20:11 21:12 23:9,12 24:23,25 25:3 26:19 32:7,8 33:18,24 34:20 34:22 37:19,24 39:8,17 40:3,5,7 74:18 83:2 84:15 85:1,4 95:5 96:21 97:16 98:19 111:2,2,5 115:8 118:21,23

120:20,22 127:21 129:9,14 129:18 135:22 145:3 149:14 164:23 175:7 176:20 197:16 201:10 225:9 228:7 230:23 243:1,3 245:15 248:1 255:22,24 259:24 261:3,7 262:5,13,17 266:14

**involvement** 18:6 24:4,5 33:22 34:24 35:4,7 83:4 167:16 191:3 216:11

**involving** 217:22

**iphone** 268:14

**ipo** 20:20,23 21:1 30:6,10 32:7 33:18,23 33:24 34:2,24 38:22

**ipos** 34:8,21

**ir** 33:9

**irresponsible** 116:19 117:12

**islands** 1:4 5:16

**iso** 82:7,12,13 82:15,16,17,18 95:16

**isolate** 118:8

**israa** 145:19,24

**israeli** 256:18 257:7

**issuance** 81:9 85:2

**issue** 8:12 46:8 49:20 50:5 75:4 75:5 83:5 86:18 87:9,25 88:4 101:9 106:4,20 110:3 120:6 127:16 130:6 154:16 160:10 164:20 173:25 176:6 177:7 183:13,21 212:11 234:2 235:15 236:10 263:14

**issued** 46:10 50:18 74:15,18 80:9,11,21 83:11 109:4 116:24 154:3 159:1 163:3 164:13 166:2,4 167:15 198:3,7 204:21 211:3 227:13 230:1 231:13 237:13 245:19 260:13 264:9

**issues** 68:18 74:5 78:23,24

115:5 116:9 118:2 159:21 220:17 225:6

**issuing** 83:18 84:22 87:4 88:9 108:25 128:6 154:7 190:25 244:9 245:3 264:6

**it'd** 158:7 207:25

**it'll** 209:17

**italy** 55:13,25

**ivd** 28:13 35:25 36:1 219:6

**ivd's** 140:18

**j**

**jacqueline** 5:22

**jahn** 89:8,12 90:11

**james** 1:7

**jana** 142:13 145:19,20,21,22

**january** 15:8 39:5 43:23 44:22 49:6 50:3 51:17 53:19 256:19 276:18

**jen** 44:25 149:20

**jennifer** 43:22 43:25 51:17 61:16 119:12 121:5 148:25 157:20 200:12

**[jennifer - know]** Page 312

| | k | know 6:19,25 | 87:1,19 88:8 |
|---|---|---|---|
| 255:25 256:6 | kara 247:21 | 7:6,22 9:14,15 | 90:9,11,20 91:6 |
| job 1:24 15:18 | kc 142:1 227:20 | 9:24 10:6,7 14:5 | 91:16,25 92:7 |
| 20:5 33:14 | 228:1,2 255:25 | 14:8,9 15:8,17 | 94:5 95:21,22 |
| 174:9 175:15 | keep 52:10 | 18:3,4,5,7,9,11 | 95:25 96:1,4,8 |
| 176:1,23 220:7 | 87:23 104:5 | 18:13,14,17,20 | 96:16 97:1,12 |
| 275:18 | 106:7 122:7,8 | 18:20 19:9,17 | 98:1 100:6,12 |
| join 25:9 229:25 | 175:24 177:2 | 20:2 21:8,20 | 104:9,20 105:13 |
| 230:10 | 267:12 | 22:3 23:4,5,13 | 107:6 108:5,16 |
| joined 6:11 | keeping 174:10 | 23:13,14,20 | 108:16 110:10 |
| 26:10 | keith 121:19 | 24:10,12,24 | 112:9,10,16,17 |
| joining 136:15 | kenneth 228:2 | 25:2,3 26:9,22 | 112:25 113:1,4 |
| 136:16 | kept 245:21 | 27:5,6,24 29:16 | 113:16 114:1,2 |
| joint 98:9,12,13 | key 52:14 | 29:24 30:5,14 | 115:4 116:15,18 |
| 98:14,16,19,20 | 177:15 188:5 | 30:23 31:5,5,21 | 116:22 117:2,17 |
| 225:5,8,10 | 204:2 | 31:23 32:1 33:5 | 118:17,19,23 |
| 230:11 | kids 273:9 | 33:13 36:12 | 119:17 120:2,6 |
| joking 86:24 | kind 20:15 33:6 | 37:6 38:21 | 120:12 121:20 |
| joseph 69:16 | 38:13 112:15 | 39:17,22,25 | 123:25 124:6 |
| 259:9 262:16 | 118:1 144:7,9 | 40:7 41:20 | 126:5,6,7 |
| josh 257:18,19 | 164:2,22,23 | 45:14 46:19,22 | 127:21,23 128:6 |
| 258:15 259:15 | 211:3 215:23 | 46:25 48:15 | 129:5,7 132:2,5 |
| 263:7 | 242:14 249:11 | 50:2,15 52:16 | 132:5,8,14,19 |
| journalism | 250:7 259:2 | 53:2,3,17 55:3 | 132:20,21 133:2 |
| 260:23 261:1,9 | 263:3 269:9 | 55:11,16,25 | 133:4,5 134:10 |
| 261:17 | kinds 173:11,14 | 57:11 59:23 | 135:1,12,15,18 |
| journalists | kit 44:12 71:9 | 61:15 62:2,4,23 | 136:6 137:17 |
| 255:16,23 | 127:1 238:22 | 63:4,5 67:16,19 | 138:2,5 139:13 |
| july 15:8 29:22 | 257:1 | 68:20,21,23 | 139:22,23 142:6 |
| jump 169:16 | knew 25:15 42:2 | 70:4 73:15 | 142:9 143:16 |
| jumped 215:23 | 47:3 123:8 | 74:14 76:6,20 | 145:8,8,13,15 |
| jumps 118:12 | 128:10 139:7 | 76:22,24 77:10 | 145:20 146:7,12 |
| 179:10 | 143:17 144:2 | 77:11 78:16,18 | 146:19 148:11 |
| junior 16:6,17 | 173:15 265:8 | 78:18 79:22 | 149:8 151:14,24 |
| jurisdictions | | 80:8,10 86:6,12 | 152:3,5 153:24 |
| 55:7 | | | |

**[know - lake]**

153:25 155:8
156:14 157:4,10
157:12,12
158:24 160:19
160:24 161:18
161:22 162:2,4
162:14,18,19,23
163:1,2,4 164:7
164:23 167:14
167:17 168:1
172:6,9 174:8
175:10,10,14,24
176:1,5,16,20
176:21 177:1,1
181:17,22,24
182:5,18 183:23
184:22 185:8,12
189:1,7,14
190:5,22 196:6
196:19,21,25
197:8,16 198:7
198:7,10 200:20
200:22,24 201:1
201:15 204:13
204:23,24 205:5
205:6 206:5,8
206:16 207:20
208:1,3,4,19,20
209:15 210:22
211:1,12 212:23
213:19 214:7,23
217:14,18 219:1
220:3,5,5,6,15
220:16,18,19,22
220:24 221:9,10

221:10,21,23
227:10 228:1,4
228:12 229:1,3
229:5,9,15,15
229:21 230:17
230:18,21 231:5
231:18,24
232:17,19,20,23
232:25 234:16
235:25 238:9
239:11 240:2,4
240:17,22,24
241:9,17 242:7
242:18 244:10
245:9,21 246:17
249:7,11,14,18
249:20,23,25
250:3,4,13
251:13,22 252:4
252:24 254:6,13
255:12 256:6,21
257:19 258:14
258:16,18,21,24
259:2,8,11,25
260:13 261:4,8
261:21,25 263:3
263:16 264:8
265:9,19,24
266:7,8,11,12
266:17,19,20,21
267:13,15
268:20,20,25
269:9,23 270:17
271:12

**knowledge**  9:3
21:23 22:5,9,13
23:19 58:24
60:6 104:22
107:6 109:17
153:17 181:13
182:21,24
206:14 227:11
227:13 229:17
275:9
**known**  39:4
48:9 63:21 65:6
65:15 99:15
110:14 143:15
174:24 182:19
239:8 240:23
241:12 258:11
259:4
**knows**  206:9
207:25 236:8
254:12
**kpmg**  15:7,9,18
**kragen**  23:2
**kristen**  45:4
**kyle**  137:20
138:3 254:6

| l |
| --- |

**l**  2:9 254:15
**lab**  66:13
153:17,18
224:22 227:17
228:22 231:2
242:5 250:2
**labeled**  43:12
76:8 88:20

136:4 256:10
**labeling**  77:8,9
147:25
**labelling**  71:9
78:1,2,4 79:4,5
94:15
**laboratories**
52:1 150:19
153:9,13 190:15
221:14
**laboratory**
27:25 36:25
40:7 69:13 76:2
86:7 138:4
151:17 209:11
221:17 236:1
239:10 240:6,24
242:6 254:7
**labs**  70:25 86:5
152:4 229:25
230:11
**lack**  106:5
**lake**  15:25 16:11
120:9,15 121:7
121:12 123:19
124:16 125:11
131:11 132:3,13
132:20 138:17
138:18 141:12
147:4 148:8
150:6 158:18
225:5 234:25
236:10 261:10
261:14,15
264:15 265:1,1

**[landon - link]**

**landon** 121:19 121:23

**language** 166:11,19 167:11 168:3 191:1

**lapse** 12:8,15,16

**lapses** 12:9

**lapsing** 12:15

**laptop** 267:12

**large** 83:5,9 99:15 111:16,19 123:21

**largely** 123:10

**larger** 21:11 113:15,17

**largest** 113:11 113:14

**late** 87:20 242:17,21,23

**latin** 55:14

**law** 224:22

**lawsuit** 7:15 61:20

**lawyer** 8:6 9:21 168:2

**lay** 60:9

**layers** 115:18

**ldt** 86:5,6

**lead** 26:22 27:8 39:20

**leading** 202:23 236:5

**learn** 39:1 231:3

**learned** 10:8 143:16

**leave** 17:8 45:11 266:15,18

**led** 39:23

**left** 15:20 45:14 239:18 252:2 266:7,11 267:6 267:10,18 269:5 269:24 270:1

**legal** 5:22,24 7:23 30:21 80:21,23 81:2 184:9 223:6 274:15

**legends** 17:15 17:18 18:19,25 19:3,6,12,12,14 19:19,23,24 20:4,6,16,17,19 21:9,12,14,18 21:21,24 22:1,6 22:8 23:4,6,9,16 23:18 24:6,21 25:3,11,22 26:3 30:2,5,8,8,20,25 31:4,6,24 34:10 34:16,20,21 35:2

**legit** 261:12

**len** 18:18

**leroy** 72:12 76:11

**letter** 38:2 144:24 197:21

278:13

**letters** 97:22

**level** 133:7 136:8 156:3,7 167:16 175:4,8 243:25

**levels** 156:4

**leverage** 207:8

**levinson** 247:21 247:24

**license** 12:6

**licenses** 11:16 11:19

**lies** 58:25

**life** 131:1 146:21

**light** 245:12

**liked** 161:7 252:11

**likely** 156:4 199:22 263:23 263:24

**likewise** 67:24 145:25 218:3

**limit** 56:16,19 56:20,22 57:1 57:16,18,23 58:14 62:7,9 63:9 68:5,7,22 130:14,17 131:3 131:11,12 140:22,24 141:4 141:17 144:7 177:11,14 178:1 178:21 179:11

179:23,25 180:2 187:3,11 224:1 224:7 227:20 229:6,10 238:4 238:17 240:15

**limited** 1:4 5:15 5:16 31:16,17 147:23

**limits** 130:24 217:10

**line** 79:11,12 104:11 105:2 107:2,3 110:18 117:9 118:18 120:13 130:10 134:1 161:7 162:1,21 167:20 173:8 179:12 185:25 213:14 213:17 214:11 214:12,16 253:14 261:16 261:20 279:4

**lined** 161:24

**lines** 41:8 99:6 218:4

**linguistics** 11:6

**link** 103:17 154:17 189:25 189:25 209:17 213:14,17 214:12,17 234:24,25 248:14

**[linked - lower]**

Page 315

**linked** 89:22 163:24 171:18 189:11 218:13 241:3

**lisa** 247:22

**list** 73:4 74:9 76:25 147:11 151:16

**listed** 9:6 89:2 152:10 154:5 197:1 228:23 278:14

**listen** 144:14 246:15

**listening** 244:2

**listing** 78:23 101:3

**lists** 77:20 158:2

**little** 16:20 48:9 73:1 82:9 111:10 150:9,11 192:9 201:2 215:24 218:25 227:4 242:17,21 242:22

**live** 28:14

**llc** 18:4,4,10 19:13

**llp** 2:3,9

**load** 140:22 141:17

**loads** 90:23 224:9

**local** 112:3 123:21 185:6

**location** 57:6,7 57:17

**lod** 57:2,19,20 58:1,4,7 62:9,17 62:24 69:25 70:5 118:21,21 137:13 139:18 139:24 143:10 143:17,22,25 144:2,5,18 156:2,11 160:5 160:8 177:12,14 178:7,14,19 179:3,5,20 180:6,12 188:3 218:7,8 219:20 228:5,9,12,14 228:23,25 229:20,22 248:22 251:3,9 251:16 252:11 252:18,23,25 254:19 255:10 255:11 260:3

**lods** 218:18 255:18

**log** 246:22,24

**logistics** 26:24 42:13

**logix** 54:11 58:25 59:10,15 64:21 65:11,16 68:13 70:17 73:3 77:14 78:3 79:11,20 80:9

86:3 94:7,10,15 95:3 98:25 106:4 110:25 112:8 123:15 139:1,10 153:14 163:11,15 167:3 179:25 184:6 190:10 218:25 224:15,16 238:22 256:20 256:23,25 257:4 258:5 265:18

**long** 17:5 26:9 71:8 89:21 164:19 190:3 234:18 239:18 272:17

**longer** 12:5,22 44:3 200:12 266:4 267:4 268:17

**look** 67:16 207:14 216:3 247:23 252:15 253:1 265:25

**looked** 126:6,6 147:23 193:12

**looking** 46:3 48:14,16 64:8 69:17 105:15 119:20 126:10 163:13 166:1 168:14 194:17 242:13

**looks** 38:17 210:9 212:10 217:16 248:18

**loop** 122:7,8 174:13,17,17

**looping** 44:25

**lopansri** 114:13 116:7 130:19 197:18,24

**lopansri's** 117:24 126:18

**losing** 37:4

**lot** 35:2 41:15 58:21 99:11,11 106:17,18 120:24 122:4 126:5 139:10 141:8 160:10 187:15 220:18 221:14 222:25 229:12,14 249:8 251:2 263:23 265:24

**lott** 168:10

**love** 261:5,25

**low** 90:23 156:4 224:1

**lower** 52:15 118:22 124:5 130:24 131:3,12 140:24 144:1,18 224:8 232:10 249:8 252:11 253:5,6,25 260:3

**[lowest - management]**

**lowest** 62:10 257:1
**lunch** 7:7 165:14,16
**lungs** 143:6

**m**

**m** 16:4 254:15 265:11,12
**machinations** 125:21
**machine** 221:10
**maddie** 137:20 138:3
**made** 22:15 23:16 28:24 31:7,9 33:8 39:5 39:6 48:15 68:24 78:16 88:18 90:7 91:2 97:14 110:10 122:5,11 128:17 148:2 156:15 158:22 164:9 166:17 173:13 198:24 230:16 230:16,17,18 231:9,24 236:20 236:23 244:4 253:8 268:21 271:25 275:11
**madison** 69:10
**magnapure** 248:19 249:18
**magnify** 264:4

**mail** 2:5,11,12 3:23 4:4,4,5,6,7 4:7,8,9 43:22 44:21,22 47:18 48:11 51:17 69:15,22 72:8 72:19 75:20 76:25 81:13 85:17,18,23 87:2,21 88:6 89:8,10 90:3,11 93:16 100:1 101:6 102:8,12 103:4,5,21 105:21 114:9,13 114:15,21,23,24 115:2,4,15 116:7 119:12 121:5,19 123:4 126:19 130:23 136:5 137:8 139:3 140:2,3 141:4,19,24 146:15,25 148:5 148:25 157:20 162:9 175:11 182:10 183:19 183:23 197:17 197:22 199:7,12 201:2 205:11 211:4 212:9 216:21 217:6,15 218:5,20 219:4 220:3 222:23 226:12,19

234:23 237:24 237:25 242:19 247:20,20 248:11,12 249:4 249:6 250:5,19 254:8 257:18
**mails** 3:12,13,14 3:14,16,17,17 3:18,18,19,19 3:20,20,21,21 3:22 4:3,6 8:22 72:11 102:12 116:3 166:16 246:12 256:4
**main** 16:16 60:6 103:25,25
**maintain** 83:22 266:9
**maintained** 131:16
**major** 230:11
**make** 7:7 20:12 33:1 35:18 47:2 49:23 52:11 60:12,13 84:17 91:23 92:4 93:5 93:7 97:10 161:6 163:9 174:13,19 178:21 219:19 220:1 258:20 259:18 273:10 278:8
**maker** 201:21

**makes** 47:15 175:7 204:25 264:1
**making** 19:25 23:12 35:11,16 46:21 47:21 92:6 166:6 175:19 193:24 214:5,8
**malicious** 174:18
**man** 244:16 261:25 262:1
**manage** 16:21 20:7 264:2
**managed** 22:1 26:21 47:13
**management** 14:18,21 21:18 21:24 24:15 38:5 40:11,12 40:14,15 49:22 82:4,6 83:25 84:18 111:12 135:15,17,21 148:14,16 174:7 174:10,23 175:3 175:7,9,14,19 175:23 176:1,4 176:18 223:4 226:20,22,24 227:1,10 228:8 265:16 266:17 272:11,15

**[management's - mean]** Page 317

management's 176:22

manager 18:2,5 31:21,24 42:13 76:2 84:14 226:18

manual 221:13

manufactured 28:7 229:7

manufacturer 71:10 82:17 93:7 107:7

manufacturers 110:16 236:5

manufactures 99:16

manufacturing 35:24 101:2 227:17

march 85:24 93:17

marcus 2:3 6:8

maria 1:23 5:24 276:16 277:6,22 278:16

marino 32:19

marisa 270:7

marissa 2:8 6:10 226:12,16 265:10,11 278:2

mark 22:21 136:6 236:3

marked 43:17 48:24 49:1 51:10,12 61:3,4

69:3,6 71:8 72:5 72:9 73:23 75:14,17 85:10 85:13 88:16,24 93:10,13 99:19 99:22 102:3,5 114:4,7 119:6,9 121:1,4 136:1 137:1,4 148:17 148:20 157:16 157:17 165:18 165:20 199:3,4 209:5 217:2,5 226:6,9 229:23 230:4 234:20 237:17,20 247:16,19 248:8 248:11 250:15 254:2,5 256:11 257:11,16

market 42:1 50:24 95:15,20 95:24 144:15 216:23 242:8,9

market's 246:8

marketing 13:17 40:23 50:20 58:5 71:13 89:25 91:6,7,10,11

markets 94:24

marking 94:21 94:22,22 95:2

marks 43:4,8 75:7,11 136:19

136:23 165:6,10 247:9,13 269:15 269:19

master 11:3,9

master's 11:7 11:13 15:2

match 130:11

matched 117:11 155:19 234:8

material 68:19 91:7,10,11 251:14,22 252:9

materials 89:25 250:23 251:1,7

math 117:21

matrices 143:21 229:1

matrix 143:3,7 143:11,19,22

matter 5:15 74:24 109:17 115:10 163:18 163:21 187:23 219:2,18

matters 125:10

max 221:5,10

mayuranki 103:23

mb 23:21

mcewan 226:12 226:16,23

mean 27:8,16,20 27:21 34:7 35:14 36:15,21 46:7 50:2 52:15

53:8,24 56:6 57:4,5 59:9 63:3 64:18 65:17 66:5 70:10 78:13 79:25 82:2,11,14 83:8 83:11 84:6 86:24 87:17 90:10 92:22 96:13 100:21 104:7,19,20 106:15 109:16 115:14,19 122:22 123:2,20 130:8 134:8,13 135:2 141:19,21 151:2 157:2 158:15 159:21 160:15,22 161:18 168:25 169:13 170:24 173:25 180:25 182:5 184:11,17 187:1 188:9,10 189:5 191:19,25 192:1,1,15,22 193:13,17,20 196:15 197:2,4 198:12,19 202:10 203:4,11 205:5 210:25 212:21 213:2 214:14 220:6,20 220:22 233:8 234:14 235:17

**[mean - mischaracterizes]**

242:11 245:21 246:12 249:1,24 259:13 263:1

**meanings** 27:23

**means** 59:14 70:11 86:6 143:9 155:18,19 214:12 238:23

**meant** 28:6 63:1 77:10,11 87:18 93:8 141:25 155:16 188:17 188:17 190:21 202:18 207:4 210:5 213:6 219:25 221:21 221:23 242:18 243:21 251:13

**measure** 218:8 227:14

**measured** 64:20 241:2

**measurement** 62:9

**measures** 204:2

**media** 5:14 43:4 75:7,12 123:21 136:19,23 165:6 165:10 198:8,15 225:24 226:2 247:9,14 269:15 269:20 274:14

**medical** 27:11 100:14

**medtech** 44:7

**meet** 26:2

**meeting** 40:11 40:16,18 41:2,8 41:18 48:19

**meetings** 40:12 40:14,15 120:24 122:2

**mehta** 100:1,5

**mellazo** 168:7

**member** 170:15 170:15,21

**memory** 210:11 233:12

**mention** 139:9

**mentioned** 8:13 23:6 25:11,14 27:8 44:7 48:19 85:1 156:5 162:9 186:7 228:10 250:24 272:16

**mentions** 51:24 52:6

**message** 226:20 226:22 227:9,10 227:12 259:19 268:1,5 269:4

**messages** 268:10,13,22

**messaging** 14:19 45:3 176:21

**met** 25:12,19 32:21 142:17

**method** 200:14

**methodology** 129:7 253:8,11 253:22,23 264:17,21,22

**metric** 56:4 58:4 58:10 59:15,16 60:17 177:14 188:4,4

**metrics** 104:17 104:22 156:7 169:23 177:15 177:17 188:5

**mexican** 150:21 154:8,9 171:10

**mexico** 161:10 171:10 203:23

**miami** 2:5

**michael** 2:2,13 6:7 42:20 64:16 92:20 133:14 167:20 168:10 185:3 212:24 261:4

**microorganism** 60:4

**microorganisms** 60:3

**mid** 197:18

**middle** 85:23 113:18

**middleman** 260:20 262:2

**million** 37:7 271:20,21

**millions** 57:14

**mind** 52:10 104:6 106:7 153:16 198:16

**mindset** 134:9

**mine** 139:2 202:11

**minimal** 33:23

**minimum** 86:10

**ministries** 55:6

**minnesota** 150:22 195:8

**minor** 193:20

**minute** 42:24 75:4,6 89:21 256:16

**minutes** 46:25 47:7

**mischaracterize** 179:14

**mischaracteri...** 128:19

**mischaracteri...** 50:9 81:19 85:6 87:11 104:24 134:4 135:8 153:2,21 167:5 172:7 174:15 176:10,11 178:8 178:23 180:7 181:9 182:13 183:6,15 186:3 187:12,13 191:14,15 193:9 194:3 202:2,15

203:16 205:14 206:20 207:2 208:22 210:1 223:15 224:10 233:4 253:9

**misinterpretat...** 205:23 207:6,10

**misinterpreted** 205:8,19 206:19 207:1 208:2,12

**misinterpreting** 204:20 205:13

**mislead** 167:11

**misleading** 67:7 67:10 117:13 133:21 150:9 166:25 167:3 191:12

**misled** 133:20

**misread** 235:18 235:21

**missed** 80:6

**misstated** 92:15

**misstates** 48:4 55:20 88:10 92:14 109:22 115:6,23

**mistake** 88:19 132:12

**mistaken** 53:21 132:18

**mistakes** 174:20

**misunderstand** 124:1

**misunderstan...** 132:3,13

**misunderstands** 131:11

**misunderstood** 48:18 132:5

**mitt** 97:10

**mix** 17:2

**ml** 221:5 251:11 254:15,16

**mnrlawfirm.c...** 2:5,6

**mobile** 268:23

**modified** 163:5

**modify** 110:20

**molecular** 49:11 49:13 150:12 169:19,24

**moment** 38:16 75:1 102:8 114:16 152:17 161:17 256:8

**moments** 206:24

**monday** 48:19 86:15,19 88:1,5 218:22

**money** 37:4

**monitoring** 51:23

**months** 17:7 83:12 252:8

**morning** 5:4 6:14 86:19 87:22 88:1,5

89:16 161:5 226:21 246:13

**mosquito** 36:18 36:24 37:1,2

**mosquitos** 36:23

**motivation** 125:14,25 211:23

**motive** 124:13

**motives** 124:12 232:1

**mountain** 5:5

**mountains** 112:18

**move** 15:17 17:9 17:11 177:3 198:24

**moved** 17:12

**movement** 199:19

**moving** 225:19

**mpeirsol** 2:11

**mpineiro** 2:5

**mri** 142:2 145:5

**multiple** 33:6 58:13 60:1,2 129:5 138:14 161:18 272:8,10 273:13

**multiples** 138:13

**multiplex** 36:7

**murphy** 1:8

**mutations** 228:19

**muted** 244:3,4 246:25

**n**

**n** 5:1 44:13 72:22

**name** 5:21 6:14 8:6 13:14 14:5 16:1 19:17 22:20 31:14,14 32:13,15,20 42:14 45:6,6 47:14 70:12 80:24 98:11,13 98:14,16,18 113:19 114:25 115:1 168:5,9 236:19 265:3,6 265:11 278:13

**named** 23:1 32:18

**names** 40:3 255:16

**nasal** 143:13,20 144:8

**nasdaq** 37:14 45:24 46:5,8,11 46:14,16,19,23 46:24 47:2,7

**nasdaq's** 38:1

**nate** 119:14

**national** 123:20 150:20

**natural** 170:14
**nature** 106:24
  167:8
**ncov** 49:16 86:3
  86:13
**ndu** 251:11
**nebraska** 232:9
  232:12,19,21,24
  233:3,7 234:11
  234:18
**necessarily** 57:3
  74:20 159:11
  178:19 234:5
**neck** 86:25
**need** 7:5 42:22
  49:16 62:11
  67:18 70:22
  86:11 104:5
  116:8 138:13,14
  139:17 192:12
  215:14 216:14
  225:17 235:10
  256:16 273:24
**needed** 25:14
  26:20 138:11
  192:19 259:19
**needs** 137:25
  138:10 160:14
  235:1
**negate** 182:25
**negative** 56:8,9
  59:18 63:21
  64:4 65:6 66:6,8
  90:19 93:18
  100:19 116:12

123:10,11,15
124:8,14 134:14
155:23,24
160:22 194:17
264:15 265:19
**negatives** 65:15
  90:14 91:20
  92:9 259:5
**negligible** 57:13
**negotiations**
  111:3,5 262:13
**neiman** 2:3 6:8
**nelson** 1:7
**net** 13:25 20:11
  20:20 35:11
**network** 20:20
**never** 12:12
  25:8 28:17,18
  32:21 58:6,15
  67:24 69:22
  92:4 109:4,11
  131:6 135:21
  141:6 142:15
  143:13 144:17
  180:9 182:20
  210:21 211:2,3
  211:3,4 214:1
  216:9 220:8
  231:20 235:19
  245:18 270:22
**new** 33:5 49:15
  51:5,5 82:19,23
  103:1 111:13
  214:25 252:8
  268:13,18 269:3

269:3 270:6,14
**newman** 136:6
**news** 41:15 46:1
  46:1,9 48:12
  51:21 73:11
  78:24 132:23
  134:14 135:2,3
  135:3 160:25
  221:1 235:6
**newswire**
  198:11,13
**newsworthiness**
  85:5
**newsworthy**
  84:11
**nice** 251:8
**nicer** 103:16
**nick** 102:9
**nickname** 45:19
**ninth** 242:19
**nk** 244:9
**nodding** 7:3
**nomi** 110:24
  111:16 112:4
  135:18 136:10
  230:16,18
  231:18,19
  232:20 234:10
  247:22 248:1,2
**nominal** 151:24
**nominally** 13:15
  25:16
**non** 36:1 96:20
  168:1 180:10

**normal** 89:24
  195:18 196:4,6
  196:13,20
**normally** 60:10
  149:15,16
  198:10 213:13
  213:16
**notably** 51:24
**notary** 276:17
**notations**
  275:11
**note** 5:6
**noted** 22:15
  93:18 115:12
  237:10
**notes** 32:5
  269:13 277:12
**notice** 118:9
  137:12 237:14
  278:5
**noticed** 238:3
**noticing** 6:6
**notification**
  46:23 47:15
**notified** 9:7,8
  111:12 164:15
**notify** 46:17
  116:8
**noting** 199:20
**novel** 41:14
**nuances** 124:3
  204:15
**number** 5:19
  19:7 37:8 43:9
  56:14,23 57:6

**[number - oftentimes]**

59:24 62:10 75:8,12 83:5,9 83:14 90:13 91:19 106:16 109:18 136:20 136:24 144:3 165:7,11 195:7 219:15 225:24 226:3 239:20 241:23 243:17 247:10,14 253:7 253:17,19,21 256:22 269:16 269:20 274:14

**numbers** 130:11 141:10,11,16 222:3 233:11,15 234:8 239:3 242:13 249:15 260:12

**numerous** 150:9 150:18 151:1

**o**

**o** 5:1 13:8 42:16 98:17 278:2

**o'clock** 75:8 246:12

**o'neill** 30:17,19 31:23

**oath** 8:2 276:1

**object** 6:19 34:3 50:13 55:20 58:20 184:10,14 184:19 216:5

**objected** 184:21

**objecting** 185:12

**objection** 6:21 9:10,10 10:2 34:14 48:4 50:9 50:12 59:1 64:12,23 66:25 67:11,18,19,21 80:15 81:18 83:7 85:6 87:11 88:10 92:13,21 93:2 104:24 105:23 106:14 109:22 115:6,23 120:11 122:21 123:6 124:18 128:19 133:10 133:14 134:4,20 135:8 148:10 152:21 153:2,21 159:2 167:5 168:11 170:7,18 172:2,7,22 173:21 174:6,15 175:2,20 176:10 178:8,23 180:7 180:21 181:9 182:2,13 183:6 183:15 184:8,22 185:12,21 186:3 186:23 187:12 189:3,13 191:14 192:14,20 193:2 193:9 194:3

197:3 202:2,15 203:11,16 205:14,24 206:4 206:20 207:2 208:6,21 210:1 210:14 211:8,17 212:12 213:4 215:4,19 222:9 223:15 224:10 232:2 233:4 237:6 245:4,13 253:9 265:21 270:21

**objections** 6:2 179:14 185:9

**objective** 41:19

**objectively** 186:11

**objectives** 264:1

**objects** 6:20

**obligation** 116:11

**obscure** 220:24

**observation** 180:12

**observations** 93:21

**observe** 34:11

**obtain** 11:25 95:1,13 110:11 110:21 198:8

**obtained** 12:2 36:13 129:23 248:4

**obtaining** 29:10 32:8

**obvious** 184:12 184:16 223:10

**obviously** 86:18 87:25 245:22

**occasion** 16:15 47:12 85:3 149:20 164:14 268:7

**occasionally** 33:22 35:5 74:20 122:7 195:22 226:25 242:6

**occasions** 74:21

**occur** 56:10 59:23 82:25 185:14

**occurred** 231:6 234:16 267:20

**odd** 118:5

**offered** 130:18

**offering** 29:14

**offerings** 34:13

**office** 20:9,9 97:13,20,23 226:18

**officer** 126:25 158:8

**official** 213:9

**officials** 203:23

**oftentimes** 60:20 151:6 250:4 255:23

**[oh - order]**                                          Page 322

| | | | |
|---|---|---|---|
| **oh** 19:18 193:13 | 108:22 109:6,20 | 258:3 259:14 | 19:5 20:3,8,15 |
| **ohio** 2:11 278:3 | 111:16 112:4 | 260:14 262:17 | 20:18 25:14,15 |
| **okay** 7:10 8:4 | 114:18 118:5,25 | 266:7 271:10 | 25:18 26:14 |
| 8:15,19,24 | 119:3 120:20 | 272:11 273:2,4 | 27:1 29:25 |
| 11:15,18 12:2 | 122:11 123:24 | 273:19 274:17 | 31:19 32:23 |
| 12:15,18 13:3 | 124:23 127:12 | **once** 89:22 | 33:7,16 35:10 |
| 14:2 15:13 16:5 | 131:8 132:11,16 | 95:12 108:18,23 | 40:8 82:21 |
| 17:8 18:1,11 | 133:18,23 134:3 | 110:13 117:9 | 100:7 226:17 |
| 20:25 21:5 24:1 | 136:17 138:25 | 118:17 130:9 | **opine** 45:2 |
| 26:13 27:23 | 143:17 146:1 | 151:22 173:6 | 259:17 |
| 29:21 30:22,24 | 148:5 149:21 | 174:19 179:16 | **opinion** 182:4 |
| 32:5 33:20 | 155:16 156:1 | 198:3 201:5 | 182:25 183:21 |
| 34:23 35:22 | 157:14 158:5 | 234:7 240:4 | 192:21 193:25 |
| 36:8 37:9 41:23 | 160:4 161:20,24 | 244:4 253:24 | 207:5 265:23 |
| 48:20,24 49:10 | 165:5 166:10 | 261:13,14 | **opinions** 182:6 |
| 50:11 54:22 | 167:14 169:3 | **ones** 9:2 36:5 | 182:15 |
| 55:25 56:12,16 | 171:24 172:14 | 152:5,10,15 | **opportunity** |
| 59:14 65:21 | 177:25 178:12 | 171:18 217:13 | 15:19 17:9 |
| 67:20,23 68:23 | 179:3 180:4,18 | **ongoing** 9:4 | 137:22 235:7 |
| 69:15 74:2 76:3 | 185:5,15 190:1 | 82:9 | 251:2 273:11 |
| 76:7,18,23 | 191:4 192:24 | **open** 250:5 | **opposed** 55:17 |
| 77:12 78:6,11 | 193:6 194:23 | **operated** 22:6,8 | 189:7,7 |
| 80:20 81:4,13 | 195:18 197:6,14 | **operates** 23:4 | **opposite** 246:24 |
| 81:18 82:5 | 200:9,16 201:14 | 95:17 | **ops** 25:16 |
| 83:15,24 85:22 | 203:8,8 208:19 | **operating** 17:20 | **opted** 251:1 |
| 85:22 86:8 | 210:7,19 212:13 | 18:21 26:10 | **options** 38:13 |
| 87:16 89:14 | 213:8 214:19 | 86:25 | 38:15 |
| 90:2 91:11,19 | 216:13,15 218:5 | **operation** 17:13 | **order** 28:8 55:8 |
| 92:4 94:17 | 221:24 222:2 | 19:9 31:13 | 55:9 86:11 |
| 95:18 96:10 | 223:2,6,9 | 134:17 230:10 | 108:25 110:4,21 |
| 98:6,18,21,25 | 224:15 225:9 | **operational** | 151:23,24 |
| 99:3,8 100:8 | 227:16 233:25 | 13:13 32:10 | 183:21 207:11 |
| 101:16 103:8,16 | 237:23 240:14 | 33:7 | 207:11 208:13 |
| 105:16 107:15 | 253:7 254:8 | **operations** | 229:19 240:18 |
| 107:18 108:11 | 257:6,9,16 | 13:15 17:13 | 274:4,8 |

**[ordered - pathology]** Page 323

| | | | |
|---|---|---|---|
| **ordered** 278:7 | **owned** 19:6,12 | 119:4 127:16,25 | **participate** 29:6 |
| **ordering** 278:11 | 19:19 | 128:6 130:5 | 40:12 76:14 |
| **orders** 152:2 | **owner** 18:2,4,17 | 138:12 142:3,9 | 97:19 225:4,8 |
| 227:19 274:2 | 31:21,24 136:7 | 142:10 154:15 | 225:10,13,14 |
| **organization** | **owners** 18:11 | 154:17 233:1,23 | 231:14,17,18 |
| 27:1 33:4 | **ownership** 18:7 | **papers** 138:14 | 235:9 243:13 |
| 200:13 | 18:9 | 139:1,10 256:22 | **participated** |
| **organizational** | **owns** 125:17 | **paragraph** | 149:11 |
| 33:4 | | 169:5 171:2,2 | **participating** |

**p**

**p** 5:1
**p.m** 160:1
**p.m.** 1:14 44:22
  47:18 136:20,24
  165:7,11 200:2
  225:25 226:3
  247:10,14
  269:16,20
  274:12,19

**organizations** 19:11
**organize** 33:22
**original** 69:22
  143:1,10 252:25
  253:5 278:11
**outcome** 6:1
  205:10 229:1
**outlets** 132:23
**outlier** 101:21
**outreach** 14:23
  97:10 122:1
  132:20 246:21
**outside** 167:14
  168:2 171:17
**overarching** 14:14
**overseas** 19:1
**oversee** 14:18
  17:12
**own** 38:18,22
  151:25 156:17
  200:13,13
  212:23 240:25
  257:23

**packaging** 94:9
**packets** 33:21
**page** 3:11 4:2
  77:14 161:10
  209:10 279:4
**pages** 277:9
**paid** 19:15
  31:10 265:13
**pandemic** 35:23
  37:3,11 134:11
  135:2
**panel** 254:9
**paper** 103:17
  104:4 116:25
  117:8,14,19,22
  117:23 118:11
  118:20,24,25

  177:25 179:17
  179:17,18,19
  187:6 188:13
  213:20 214:17
**parameters** 101:1
**paraphrasing** 47:19 48:8
**pardon** 18:16
  29:19
**parking** 149:21
**parse** 161:6
**part** 8:17 25:18
  40:6 44:1 80:2,7
  81:24 82:3,6,9
  95:16 107:12
  115:19 135:20
  169:13,15,17
  187:6 190:2
  196:12 211:15
  231:20 242:8
  249:21
**partial** 56:23
**participants** 5:9
  243:22 244:2

  76:15 250:25
**participation** 18:3
**particles** 131:18
**particular** 113:23 134:12
  164:17 175:17
  194:9 214:5
  218:7
**parties** 5:13
  82:22 277:14,15
  278:9
**partners** 32:12
**party** 5:25 59:7
**passed** 82:16
  151:22 200:8
**passing** 190:4
**past** 87:5
**patented** 49:12
  169:20
**path** 150:19
**pathogen** 36:17
  62:11
**pathogens** 37:1
**pathology** 150:21

**pathwest** 190:15 194:11

**patient** 63:19 90:24 93:21 234:4,5 239:13 242:11

**patients** 36:3 126:15 129:25 129:25 140:8,17 189:16,20 224:3 224:17 233:16 233:17,19

**paying** 20:3

**payroll** 19:15 20:3

**pcr** 35:25 36:13 39:2 49:15 52:19 53:13 54:2,4 56:4 58:19 60:7 65:17 106:6 110:16 229:13

**pe** 100:10,12

**peer** 59:9 117:18 213:3

**peirsol** 2:8 6:10 6:10 9:10 10:2 10:18 34:3,14 42:20 48:4 50:9 55:20 58:20 59:1 64:12,23 66:25 67:11,21 80:15 81:18 83:7 85:6 87:11 88:10 92:13,17

92:20 93:2 104:24 105:23 106:14 115:6,23 120:11 121:8 122:21 123:6 124:18 125:4 128:19 133:10 133:14 134:4,20 135:8,23 148:10 152:21 153:2,21 159:2 167:5,19 168:11 170:7,18 172:2,7,22 173:21 174:6,15 175:2,20 176:10 178:8,23 179:14 180:7,21 181:9 182:2,13 183:6 183:15 184:8,14 184:19,23 185:2 185:5,8,14,21 186:3,23 187:12 189:3,13 191:14 192:14,20 193:2 193:9 194:3 197:3 202:2,15 203:11,16 205:14,24 206:4 206:8,20 207:2 208:6,21 210:1 210:14 211:8,17 212:12 213:4 215:4,19 216:5 222:9 223:15 224:10 232:2

233:4 237:6 245:4,13 253:9 265:21 270:21 273:20 274:8,9 278:2

**penalties** 279:22

**pending** 252:4

**people** 33:5,6,9 33:13 36:16 62:3 104:4 106:16 109:19 114:21 117:3 122:5 126:14 131:17 135:1 160:10 161:1,2 174:19 181:16 205:1,12 206:19 206:25 207:8 208:12,16 223:10 228:21 244:4 246:14 247:3 249:23 265:16

**percent** 56:25 65:24 66:4,16 66:21 67:3,6,10 67:25 90:15 91:21 92:8 94:1 100:25 101:14 131:23,23 140:20,21 141:10,11 149:24 152:12 152:19 155:11 155:16,21

156:23 157:3,8 167:4 168:17 169:7,22,23 170:13,16 171:12,20,25 172:16 177:21 179:9 184:1,7 186:10,12 188:9 190:16,17,18,21 191:4,5,10,21 191:22 192:11 192:13 193:8,23 194:2,6,7,9,10 194:12 195:1,9 197:10 198:21 199:20 201:22 202:1,9,22 203:2,6,9,14,25 204:1,10,16 207:21,24,25 218:24 219:6,6 219:16,17,19 220:2,12 222:18 232:12,13 235:24,24,25 236:2,5,6 237:15 238:23 239:4,25,25 246:2 248:21 249:9 252:25 257:4

**percentage** 140:24 149:22 241:24

**[perfect - pineiro]** Page 325

**perfect** 242:17
**perform** 63:18
  66:3 137:14
  143:18
**performance**
  64:1,20 68:18
  73:24 77:16
  100:9 105:9
  106:23 115:10
  152:1 156:21,22
  160:12 161:11
  163:11,15,19,21
  163:23 168:16
  169:6,8,14,22
  170:4 171:8
  173:15 182:12
  188:15 213:12
  219:8 223:25
  238:19,21 240:4
  240:19 241:8
  256:2 257:23
**performances**
  110:17
**performed** 59:8
  59:8 66:14
  99:11,18 133:6
  143:2,9 153:5
  154:13,19 173:6
  190:9 203:25
  219:11 240:21
  240:24 252:1,2
  252:10 253:12
  258:24 261:18
  263:2 264:24

**performing**
  96:5 108:15
  133:22 228:25
**performs** 65:16
  100:23 270:23
**period** 12:11
  90:25 236:23
  272:18
**perisol** 109:22
**perjury** 279:22
**permission**
  101:2
**person** 18:17
  47:8 71:20
  77:12,19 79:25
  81:1 106:22
  123:3 159:22
  183:3 217:14
  238:9
**person's** 182:25
  202:5
**personal** 207:16
**personally** 24:3
**perspective**
  254:14
**pertain** 8:9,11
  189:11 268:11
**pertained**
  163:10 269:10
**pertains** 64:9
  211:16 247:22
**ph.d's.** 181:22
**ph.d.** 76:11
  177:13 180:11
  181:20

**phil** 217:6,16
**philanthropists**
  258:11
**philosophy** 11:3
  11:8,9
**phone** 33:22
  97:19 124:11
  135:17,22 136:9
  136:15 212:11
  268:1,4,5,10,12
  268:13,16,23
  269:3
**phonetic** 168:7
**phrase** 67:19
  84:10 105:4
  157:11 160:5
  162:4 185:20
  187:10 192:12
**pick** 47:22
  90:22 132:23
  134:22 161:3
**picking** 172:21
**picture** 174:1
**piece** 45:23,25
  171:1 201:7
  208:15
**piercy** 247:22
**pinder** 121:19
**pineiro** 2:2,3
  3:5 6:7,7,9,13
  9:16 10:10,23
  13:6,9 34:5,18
  42:23 43:3,11
  43:19 48:10
  49:4 50:11,14

  51:15 52:25
  55:24 58:23
  59:3 61:6 64:17
  65:8 67:5,16,22
  69:5 72:7 75:3
  75:16 80:19
  82:1 83:10
  85:12 87:15
  88:14,18 89:6,7
  92:15,18,25
  93:3,12 99:21
  102:7 105:10,25
  107:8 110:2
  114:6 115:13
  116:6 119:8
  120:14 121:3,9
  122:25 123:13
  124:22 125:8
  128:24 133:11
  133:17 134:6
  135:5,10,24
  136:3,17 137:3
  148:13,19
  152:24 153:11
  154:1 157:19
  159:7 165:4,13
  165:23 167:9,24
  168:13 170:8,19
  172:5,10,23
  173:24 174:12
  174:21 175:16
  176:3 177:6
  178:11 179:2,21
  180:15 181:1,15
  182:7 183:2,11

**[pineiro - positive]**

183:22 184:10
184:16,21,25
185:4,7,11,15
185:16,24
186:15 187:2,25
188:12 189:9,21
192:2,17,23
193:5,14 194:14
197:5 199:6
202:7,19 203:13
203:21 205:20
206:1,6,10,23
207:19 208:10
209:3,7 210:6
210:18 211:14
211:25 212:14
213:7 215:13,25
216:12 217:4
222:12 223:24
224:14 225:15
225:19,23 226:5
226:11 230:6
232:7 233:13
234:22 237:11
237:19 245:7
246:3 247:8,18
248:10 250:17
253:16 254:4
256:14 257:15
266:2 269:22
270:25 273:19
273:21,23 274:4
274:6,17
**place** 5:12 34:15
37:23 52:19

65:4,20 78:6,7
120:24 125:22
134:10 147:8,8
151:23 272:17
**placed** 94:25
**placing** 24:25
25:4
**plaintiff** 1:5 2:2
**plaintiff's** 3:9
4:1 43:17 49:1
51:12 61:4 69:3
72:5 75:14
85:10 88:16
93:10 99:19
102:5 114:4
119:6 121:1
136:1 137:1
148:17 157:17
165:20 199:4
209:5 217:2
226:9 230:4
234:20 237:17
247:16 248:8
250:15 254:2
256:11 257:11
**plaintiffs** 6:9
**plan** 3:15 50:21
76:4,9 158:1
259:9
**planned** 74:9
**planning** 154:7
154:11
**plates** 16:20
**platform** 41:9
41:17,21 42:19

49:12 73:22
169:20 244:7
246:16
**play** 33:20
**player** 160:19
**please** 5:6 6:2
6:14 7:6 52:23
72:15,20 100:18
119:22 137:11
159:5 165:5
167:21 215:24
219:7 227:10
259:8 278:5,8
278:13
**pleased** 243:11
**plenty** 131:19
**plummeted**
102:20
**pma** 239:24
**point** 14:3 27:6
30:12 32:22
37:16 50:2,7,15
50:19,19 52:11
63:17,25 70:16
71:11 92:2 98:6
99:3 113:11
117:21 120:5
123:16 127:12
128:4,17 134:25
149:13 152:2
153:12,18 155:3
177:17 189:16
206:18,25 223:9
224:15 229:4
251:3 265:1

**points** 158:2
161:8 197:15
227:16
**police** 225:1
**policies** 81:8,15
147:15 270:14
**policy** 10:7,11
81:17 82:19
160:18
**political** 97:18
125:13,21,25
261:6
**politician**
125:18
**politicians**
258:12
**polymerase**
104:10 105:4
**pools** 37:1
**population**
126:23 127:14
128:12,14,14,15
128:16
**populations**
47:23
**portfolio** 19:18
**portion** 183:23
**position** 13:4
14:16 22:23
28:22 29:11
101:16 254:12
**positive** 59:19
59:20,20 60:3
62:12 64:4 66:6
66:7,15 100:19

**[positive - press]** <span style="float:right">Page 327</span>

126:13 130:1 131:20 155:21 155:22 194:16 232:11,13 233:2 233:18 238:24 248:20,21

**positively** 109:14

**positives** 63:21 65:6,15 90:14 91:20 92:9 259:5

**positivity** 117:1 117:10 118:10 118:11,18,22 124:5

**possibility** 57:23 125:20

**possible** 27:23 57:19 58:1,3 88:21 138:20 152:23 161:1 191:2,8 205:9 209:21,23 229:5

**possibly** 32:17 61:25 135:20 162:2 200:19 256:5 262:19

**post** 95:15,20 227:12 242:8,9

**posted** 51:23 78:9 89:22 119:2 201:4 205:22 221:2

**postgraduate** 11:15

**posting** 78:10 166:7 190:25

**potential** 9:7,18 9:22 25:1 37:15 49:16 51:25 111:6 115:5 116:9 121:14 186:1 205:22 217:21 232:1 255:15 257:21

**potentially** 56:10 166:25 167:3 258:4 260:16

**powerful** 41:9 41:16

**powers** 1:23 5:24 273:24 276:16 277:6,22 278:16

**pr** 40:23 44:1 50:4 51:1 123:15 127:8 135:13,15 198:10,13 200:9 200:14,14 219:1 222:15 254:12 259:18,24 262:21

**practically** 35:4

**practice** 49:25 80:7 164:15,16 237:9 263:4

**pre** 20:20 32:7 72:17

**precautionary** 227:14

**precedes** 191:18 191:20

**preclude** 93:19

**predict** 198:22 205:7

**predicted** 205:3

**prefer** 160:5 200:1

**premarket** 72:18

**preparation** 15:12,13 76:15

**prepare** 81:15 84:23 164:19 196:13,17,19

**prepared** 33:21 61:20 63:22 66:6 76:24 81:14 91:12 117:14 154:22 154:23 161:21 190:5,6 196:7 196:10 233:1,10 263:11 264:25 265:4 271:17

**preparing** 61:12 61:24 76:14 84:21 96:21 106:3 117:16 118:23 135:12 149:15 158:17

196:11 243:1

**prerogative** 137:21

**prescribed** 261:19

**presence** 37:1 56:13 57:25 59:21 73:20 238:25 264:1

**present** 2:13 6:4 8:4 32:3 59:22 60:5 62:11 78:13 129:13 132:6 147:10,10 239:24 249:22

**presentation** 26:3 183:21

**presented** 130:23 151:8 154:13 162:24 176:24 203:5

**presenting** 154:12

**presents** 179:19

**press** 3:12,22 8:11,22,25,25 46:10,18,24 47:7 49:5,7,20 49:22 50:18 61:18 73:7 74:13,17,22 78:11,25 79:4 79:10,19 80:9 80:11,20 81:9 81:10 83:5,9,12

**[press - proceedings]**

83:18 84:1,3,6,9
84:12 86:18
87:4,9 88:1,4,9
104:14 106:3,17
106:20 107:9,11
107:14,15,18,20
107:24 108:4,14
108:25 109:2,3
109:9,14,17
110:4 128:18
146:18 147:4,20
147:24 148:2
149:15,23 154:2
154:10,15,16,18
154:22,23 155:2
158:17,22 159:1
159:18 161:16
162:16 163:14
163:24 164:12
165:2 166:2,7
166:20 167:11
167:15 168:4
169:14,16
170:24 171:18
171:19 172:21
173:25 176:5,5
176:6 180:16
183:9 185:20
190:2,25 196:11
198:3,6,12,18
199:19 204:6,10
204:21,23
205:18,23
206:19 207:1,6
208:5 209:12,17

209:22,24 210:4
210:13,20 211:5
211:7,16 212:4
213:24 214:16
215:16,17 216:2
216:2,10,23
220:8,23 223:3
223:11 225:3
228:7 239:6,7
240:11 241:3,17
243:1,3 245:3,9
245:11,17,18
260:13 261:14
261:20 263:11
263:14 264:7,9
268:11 270:15
**pretty** 33:23
269:13
**prevalence** 57:8
**preventative**
3:15 76:9 77:13
79:17,23 81:23
147:22 148:3
**preventive** 79:9
**previous** 24:20
37:16 110:19
**previously**
13:24,24 14:2
25:15 50:3
**price** 108:9
109:3,15,18
110:4 198:17,20
245:2,12,18,22
246:4,21 271:24

**prices** 109:5,10
245:20
**primarily** 16:18
20:1 47:10 51:8
59:24 84:14
140:18 143:5,12
**primary** 35:22
72:3
**primer** 57:6,16
**primers** 53:13
54:5 104:3
**principle** 49:14
**printed** 46:1
144:4
**prior** 33:15
46:23 50:10
71:6 78:10,10
81:11 84:23
97:9 104:25
107:6 123:14
128:1 129:14
154:22 155:3
159:13 174:15
180:8 191:14
194:3 208:23
223:16 268:16
**priorities** 144:2
144:11
**prioritize** 145:2
252:20
**prioritized**
144:17
**private** 20:12,19
21:25 35:17

**privilege** 9:12
10:4 211:10
**privileged** 10:9
10:20 159:3
167:23 168:1
211:19 215:6,12
215:21 216:6
217:25 267:25
**probability**
197:9
**probably**
104:11 105:14
221:22 242:16
242:21
**probe** 211:15
**problem** 46:12
160:21 185:9,11
209:17 210:21
210:24 211:3
213:23 214:11
**problems** 68:25
220:8
**procedure**
272:17
**procedures** 81:9
82:23 95:13
147:16 229:11
229:12,18
270:15
**proceed** 145:18
152:2
**proceeding** 6:2
7:18 8:12 10:16
**proceedings** 3:1
12:19

**[proceeds - published]**

**proceeds** 273:3

**process** 40:5 41:24 44:14 46:23 54:2,7,9 66:1 68:10 74:25 77:8 78:6 78:7 79:6 80:3 82:7,12 103:10 118:15 263:19 272:17

**processed** 240:25

**processes** 82:9 105:7 147:17

**processing** 16:13

**produced** 61:2 79:13

**produces** 126:25

**product** 27:19 94:18 152:7 211:19 216:7

**products** 71:5 73:3 79:11 83:23 91:3 92:7 95:24 139:6

**profit** 207:9 208:4,13,20

**program** 234:15

**progress** 83:23

**progresses** 7:6

**project** 228:9

**proliferates** 57:10

**prominent** 125:18

**prominently** 221:1

**promoted** 219:8

**promoting** 223:22

**prompted** 211:12 222:7

**proof** 254:20

**proposed** 79:23 91:7

**proprietary** 86:9

**propublica** 255:17

**prospect** 125:13

**prospective** 25:4 107:13

**protected** 167:22

**protocol** 142:16 145:18 163:6 164:4

**proud** 243:12

**proven** 202:22 203:2

**proves** 201:22

**provide** 7:2,25 23:16 24:7 28:2 73:19 74:8,9 87:21,23 133:5 152:3,6 153:9 174:1 176:8,15 176:16,17

178:13 189:23 201:11 214:5 226:23 233:10 234:25 242:9 243:25 252:18 253:2,2 256:1 262:11

**provided** 20:12 22:1 23:6 32:16 80:21 81:1,20 108:20,21,22 113:23 148:7 151:6 152:15 172:13 187:1 201:12 203:6 211:15 230:21 241:19,21,22 242:3,4,4 243:17 260:23 262:10

**providence** 189:14

**provider** 140:7 268:24

**provides** 44:18 90:11 176:4 234:24

**providing** 20:19 21:12,15 61:13 121:23 135:1 211:18 214:8

**province** 44:13

**prudent** 273:8

**public** 14:13,19 29:13 34:12

46:18,22 50:16 50:20,25 53:11 104:13 105:7,17 106:5,10,16 107:21 116:9,13 116:20 119:1 121:14 148:1 170:15,22 183:13 186:2 191:13 193:16 203:5 205:23 231:9 237:14 254:17,22 256:3 276:17

**publication** 123:19 131:1 133:9,12 138:1

**publications** 137:15,17 139:6

**publicize** 198:7 265:20

**publicizing** 262:25

**publicly** 272:2

**publish** 138:25 195:19 215:1

**published** 100:10 123:5 134:19 135:11 138:12 154:15 195:16 204:14 209:12 224:19 248:25 255:9,14 256:18 260:4

**publishing**
172:25 255:21
**pump** 22:10
217:22
**purchase** 36:24
152:2 153:14
258:13
**purchased**
153:19
**purchasing**
53:12,12
**pure** 124:25
**purely** 171:19
**purpose** 36:15
142:24
**purposes** 7:1
74:19 88:25
94:25 156:18
**pursue** 45:15
**push** 163:20
**put** 22:2 67:9
78:6,7 88:8
144:19 154:18
181:4 182:11
188:19 207:23
207:24 208:14
241:15,18
252:13,16,20
254:23
**putting** 97:3
160:24 172:21
182:1 193:7
**px** 209:4

**q**

**q1** 243:2,13,20
246:5
**q2** 273:16
**q3** 273:16
**q4** 273:16
**qualification**
203:15
**qualifications**
96:19 183:13
**qualified** 117:6
182:1,11
**qualifier** 141:16
**qualifies** 7:22
128:15
**qualify** 96:18
**quality** 5:7,8
26:25 81:21,22
81:25 82:2,3,6,8
82:15,16 95:16
96:4 117:1
133:7 147:16,18
147:19,21
230:12
**quantity** 110:14
**quarter** 243:12
**quell** 251:2
**question** 6:21
6:24,25 7:1 10:3
18:23 31:2 32:1
44:10 50:12
62:6 64:15
92:17 108:6
116:17 126:12
172:6 173:16

174:9 175:25
176:23 177:4
180:13 182:20
184:10,13,13,15
184:21 187:9
205:6 206:22
211:9 212:13
215:5,8,23
216:1,5 224:24
233:9 238:13
250:14 254:25
261:4
**questioned** 8:7
**questioning**
8:20 167:20
**questions** 6:18
7:21 8:18,22
44:6,10,18
103:3 119:4
121:16 126:5,9
175:18 212:1
217:21,23,24
218:1,3 230:8
261:7 265:24
273:20
**quick** 6:17 32:1
158:5 231:3
**quickly** 41:11
41:16 87:19
274:3
**quite** 47:20
238:15
**quote** 47:20
126:18,21
132:18,19,22

158:7 160:2
180:19,19,24
181:4,8 186:7
**quotes** 45:23
52:5 120:3
127:7 129:10
148:7 159:15,18
219:4
**quoting** 204:5

**r**

**r** 5:1 16:4 98:17
275:1
**rachel** 2:9 6:11
**raised** 24:14
**raising** 24:8,9
121:15
**raj** 237:24
**raked** 254:18
**ralph** 115:16
**random** 134:14
**randomly** 91:25
**ranging** 8:18
**rapid** 89:17,18
89:20 91:12
**rapidly** 57:10
**rare** 151:7,7
**rarely** 21:6
**rashbaum** 2:3
6:8
**rate** 117:1,10
118:10,11,18,22
124:5 126:13
232:10 233:18
**rated** 236:25

**[rates - recall]**

**rates** 63:20 64:3

**rather** 33:9
110:14 119:21
192:6 267:12

**reach** 128:3
132:16

**reached** 128:1
188:8 200:25

**reacted** 108:14

**reaction** 52:19
53:14 54:5 70:1
81:6 101:22
123:24 133:24
246:9

**reactions** 134:1

**read** 49:8 59:12
106:16 107:24
108:4 115:22
140:14 170:23
171:5 185:25
186:5,5 187:19
187:20 190:3
208:17,17 209:1
210:20 211:5
218:17 220:9
221:22 259:13
275:7 278:8,10
279:22

**readily** 60:21
106:21

**reading** 64:18
104:14 115:25
122:16,17,18
141:25 205:17
209:25 223:17

**reads** 170:15
171:4 250:8

**reagents** 53:12
53:20

**real** 131:16

**realignment**
33:3

**realized** 205:2
206:18,25
220:10 223:13
238:14 244:23
255:19

**really** 18:5
24:10,12 33:2
34:8 39:25 41:9
46:20 47:1
52:13 53:17
55:13 56:18
63:5 68:9,20
84:8 97:2 104:5
108:5 111:20
113:25 124:9
130:15 160:11
160:13 169:17
180:12 189:4
200:17 203:15
205:5 218:16
224:1 238:13
244:22 249:19
252:14 265:22
266:13 273:6

**reason** 6:22
15:16 28:11
37:21 144:5
173:16,18

182:20 214:4
253:17 270:2,23
272:23 279:4

**reasonable**
278:11

**reasonably**
207:14

**reasoning**
263:17

**reasons** 55:8
56:11,15 272:25

**rebecca** 45:7,8
47:19 137:11,23
195:24 267:4
269:5

**rebut** 158:18

**recall** 8:24,25
12:13 13:21
14:7 16:7 17:2
19:7,10 29:13
30:12,15 32:13
33:8 37:8,11,17
37:21,23 38:24
38:25 40:2 41:3
41:5,23 45:12
47:14 49:9 51:1
54:24 55:2,13
55:15 59:12
61:10,25 63:1,6
71:16 74:16,23
76:15,19 77:23
78:19 80:12,16
83:3 84:2,3 87:2
87:6,18 88:6,12
89:19 90:1,5

97:6,21,25 99:7
99:10 101:6,7,8
101:9,11,13,15
102:2 103:22
108:15,23
111:14 113:20
114:18,19,21,23
114:24 115:1,2
115:25 116:1,4
116:10 119:5
120:13,18,21,25
122:16,17,18,18
123:16,23 127:4
129:17,18 131:7
133:25 134:9,11
134:18 135:11
135:14 136:16
138:19,23
139:12,14
141:23,24 147:1
147:7,13 148:14
148:16 149:11
152:23 153:4,5
153:6 155:6
158:16,19
159:11,13 160:7
160:18 161:15
161:23 162:6,21
163:13 164:7,18
166:5,14,18
167:7,13,16
168:23 174:22
178:10,16
181:21 185:22
185:22 190:4

Page 332

191:2 195:17
197:17 198:2,9
198:14,16,17,19
198:24 199:1
200:19 201:17
205:25 206:12
210:9 212:7,10
214:24 216:3,19
216:25 217:23
218:12,16 222:1
222:6,10,23
223:1,4,6,18,20
225:4,7 227:13
227:14 230:2,15
230:19 231:12
232:3,5 233:8,8
235:14 236:9,12
236:16,20,22,24
237:1,2,7,16
244:23 246:4,7
249:3,4 257:3,5
257:6 259:5
260:10 262:4,15
262:18 263:1,17
270:1 271:22
272:1,16 273:14
**receive**  11:10
70:15,16 101:20
171:23,24 175:5
260:5 263:23
**received**  15:23
31:18 54:19
71:4 72:19
94:11 95:3 97:6
99:16 105:20

110:23 112:4
116:4 123:4
141:4,21 157:22
171:20 173:19
214:1 218:22
223:14 250:25
251:6 261:23
**receives**  70:20
102:11 116:15
**receiving**  71:6
101:6,7 114:18
114:20 116:3
120:15 141:24
147:1 198:14
249:3,4
**recent**  150:6
156:2 177:8
189:22
**recess**  43:7
75:10 165:9
226:1 247:12
269:18
**recipient**  76:12
**recollect**  152:25
**recollection**
8:19 32:15 41:7
51:9 80:3,13
194:24 225:12
243:5 256:21
258:3,7 269:8
271:19
**recommendati...**
158:6
**record**  5:5,13
6:6,15 22:23

34:2 43:2,6,10
75:6,9,13 89:1,5
136:18,21,22,25
165:8,12 201:16
201:18 225:22
225:25 226:4
247:5,6,11,15
263:25 264:25
269:17,21
273:25 274:12
277:11
**recorded**  5:11
5:14 59:6
**recording**  5:7
5:12
**red**  161:24
162:1
**redid**  110:12
**redundancy**
192:9 193:1,20
**redundant**
191:7 192:3,18
**reed**  1:8 23:15
108:17
**reevaluate**
216:4,10
**refamiliarize**
49:8
**refer**  13:1,7
60:17 63:20
100:18 104:4
126:1
**reference**  13:1
45:16 46:4
63:14 65:17

104:2,20 105:14
130:16 160:8
162:9 171:16
197:7 251:14,22
252:9 254:9
**referenced**
74:14 120:7
151:11 162:14
162:16 169:4
178:6 265:6
**references**
52:12
**referencing**
104:10 105:2
171:22 257:7
**referred**  10:11
41:14 62:23
120:2 127:24
152:5 179:3
239:5
**referring**  47:4
63:10 93:6
105:12,13,16,18
119:17 128:14
130:19 132:2,8
133:16 137:17
138:2,3,5
139:23 142:6,9
145:5,6,10
146:12 147:23
162:19 169:1,8
180:2 189:6
214:15 221:9
228:24 239:7
242:22 252:6

**[referring - release]**                                          Page 333

255:2,13 259:11
**refers** 112:17
**reflected** 89:4
**reformed** 147:15
**refresh** 32:15 210:11
**refreshes** 256:21
**refrigerated** 239:18
**refusal** 235:9
**refused** 261:19
**refusing** 225:12 225:14
**regarding** 9:18
  9:18 25:5 36:18
  37:14 50:21
  56:4 70:17
  71:13,18 80:9
  81:9 83:25 85:2
  85:4 94:9 95:14
  97:10,23 104:17
  106:3,6 108:25
  120:6,9,17
  129:15,19
  130:14 132:18
  142:6 147:12,20
  152:7 154:23
  156:11 158:17
  163:11 166:19
  167:10 168:3
  174:2 178:7,21
  180:6 182:12
  186:1 197:18,22

201:16 218:1
228:8 239:3
241:19 256:2
260:6,10 266:14
270:15
**regardless** 51:3 144:3
**registered** 16:7
**regret** 273:7
**regular** 27:1
  84:3,6,9 189:2
**regularly** 77:7
  109:16 198:20
  220:22 238:22
  239:22 244:11
**regulation** 46:14,16,20
**regulations** 28:15
**regulatory** 7:17
  10:16 54:19
  55:5,11,25
  68:24 70:19
  71:4,6,24 72:3
  78:10 79:3,19
  81:11 91:8 98:7
  98:23 156:19
  164:3 174:13,18
  182:8 183:10
  270:6
**reject** 144:22
**rejected** 99:4
**related** 5:25
  79:10,20 125:10
  213:11 215:11

**relates** 105:8 139:15
**relating** 148:16
**relations** 13:23
  14:3,12,13
  32:24 50:16,21
  101:17 102:10
  121:23 159:22
  193:7,16 249:10
**relationship** 19:22 24:1 57:1
  90:5,7 217:18
**relationships** 27:10 111:13
**relative** 65:10
  106:5 123:20
  137:13 277:13
  277:15
**relatively** 48:9
  123:21 165:1
  244:11
**relayed** 126:4
**relaying** 94:18 148:14
**release** 3:12,22
  8:11 46:10,18
  46:24 49:5,7,21
  50:18 73:8,11
  74:17,22 78:24
  78:25 80:9,11
  80:20 81:2,12
  84:3,6,13,22,23
  86:18 87:9 88:1
  88:5 106:20
  107:14 149:16

149:23 154:2,5
154:14,15,16
155:5,8 158:9
158:17,20,22
159:1,19 160:14
160:17,22,22
161:16 162:17
163:3,5,14,25
164:17,20 165:2
165:3 166:2,7
166:20,25
167:11,15 168:4
168:14 169:14
169:16 170:25
171:3,18,19
172:21 173:25
176:6,7 178:6
178:13 179:9
180:16 183:21
185:20 190:2,25
193:8 195:16
196:11 198:3,6
198:12,15,18
199:19 204:6,11
204:21,23
205:18,23
206:19 207:1,6
208:5 209:13,17
209:22,24 210:4
210:13 211:16
212:4 214:2,16
214:19 215:1,16
215:18 216:2,3
216:10,15,23
220:8,16 221:1

**[release - reports]**

223:4,12 225:3
228:7 239:6,7
240:11 241:3,18
243:1 245:17,25
246:1 259:9,10
260:13 261:14
261:20 263:11
263:15 264:7,9
268:11
**released** 95:24
169:6,9,21
170:3,10,11
171:7 188:14
221:1
**releases** 8:23,25
9:1 47:7 49:22
74:13 78:11
79:5,10,20 81:9
81:11 83:5,9,12
83:18 84:1 85:2
87:4 88:9
104:14 106:3,12
106:17 107:9,12
107:15,18,20,24
108:4,14,25
109:2,4,9,14,17
110:4 147:24
154:8,10,19,22
154:23 155:2
161:2 164:12
168:15 169:14
183:4,9 210:21
211:5,7 213:25
215:3,17 216:2
220:19,23 243:4

245:3,9,11,18
270:15
**releasing** 94:19
170:12 171:19
262:21
**relevant** 171:1
175:6 176:19
177:16
**relied** 175:18,22
175:25
**relwood** 2:12
**rely** 174:7 175:3
175:14 181:7,11
**remain** 229:14
**remarking**
161:25 177:11
178:1 179:5
**remember** 8:6
8:16 9:2 22:17
22:19,20 38:16
38:17 53:25
80:24 84:9,10
94:13 96:3
97:14 108:19
125:15 127:18
136:8,15 149:13
158:25 163:12
166:3,21,22,22
168:5,8 178:25
183:19 190:6
212:24 217:1
218:3,18 221:24
229:1 233:6,7
233:11 234:17
235:17 236:15

236:22 245:15
252:4,5,23,24
253:1,25 255:4
255:16 256:5
257:13,20 260:2
260:12 264:8,10
265:5,6,9
267:13 269:25
270:3 271:10,14
271:15,18,23,24
272:5,20,21
273:6,15,15,17
**reminded** 72:20
**remote** 1:11
277:8
**remotely** 5:20
6:4 124:8
276:10
**remove** 160:7
209:22,23 210:4
214:4
**removed** 161:6
162:9,21
**removing** 77:15
214:11,19
**renew** 12:10,17
12:21
**renewed** 12:12
**repatriated** 19:2
**repeat** 64:15
92:17 206:22
**repeatedly**
177:20 183:25
186:9

**report** 116:19
116:23 117:12
154:6 195:19
196:1,5,18
209:18 212:16
219:14 231:25
240:18 241:11
241:25 243:6
246:9 249:11
252:17 253:3
260:14,15 265:7
277:8
**reported** 1:23
65:2 124:1
129:24 130:1
131:3 240:11,16
248:22
**reporter** 1:23
5:23 7:4 13:6
44:7,19 88:18
89:4 119:14,24
120:5,7,8,16
127:5,11 129:16
129:20 208:14
274:1 276:17
277:1,7,23
278:17
**reporters** 51:2
120:8 132:17
256:1,4
**reporting** 1:24
62:16 99:17
255:1 278:18
**reports** 154:4
162:16 173:19

178:12,17
195:13,23
196:14,17,24
209:12,14,22
220:11 241:3
242:14 260:6
**representations**
60:13 147:13
**representative**
103:25
**represented**
52:20 60:10
258:8
**representing**
62:10
**request**  74:2
89:24 119:16
132:20 210:8
211:4 213:18
227:1 235:5
253:15
**requested**  61:16
72:17 214:20,23
251:21 253:13
262:6 264:23
277:10
**require**  46:17
52:1 56:1 74:24
**required**  60:23
82:22 95:8,11
96:19 156:23
157:3 252:15
272:2
**requirement**
47:6 100:25

**requirements**
143:2 151:25
242:12
**requires**  28:14
221:13
**research**  70:7
70:11,19 71:5,9
100:15 145:23
236:18 238:3
**reset**  267:16,18
**reside**  267:1,3
**resided**  143:5
**resigned**  270:4
**resolve**  74:4
**resources**
144:16
**respect**  36:2
37:25 50:16,24
58:9 73:14
74:17 82:19
94:6 98:4
104:22 133:8,8
201:11 245:2
**respectively**
100:20 257:2
**respond**  103:2
104:1 105:15
120:17 220:3
237:8,10 238:14
242:20 246:17
246:18
**responded**
198:18 210:10
**responding**
37:19 38:1

104:12 213:18
237:5 246:14
**responds**
103:15 242:16
**response**  61:20
81:6 86:16
103:8,13 135:13
138:13 139:8
146:25 149:3,4
149:6,9,12
158:1 209:13
218:5,6 220:4
222:7 225:5
242:22 254:8
**responses**
138:13
**responsibilities**
14:15 20:6
26:16 40:20
**responsibility**
166:8 249:11
**responsible**
97:3 114:3
166:6
**responsive**
268:2
**rest**  104:5 117:7
117:9 126:8
128:11,12
130:10 232:11
234:6 274:18
**restate**  31:2
**restatement**
190:23

**restricted**  38:10
38:15
**result**  56:9 65:2
66:6 100:9
117:1,2 122:4
154:8 229:10,16
229:22 249:20
**resulted**  124:4
**results**  56:8
59:18,19,20,20
68:25 93:18,20
99:12,14,16
100:10,19 101:1
101:13,15
116:22 118:6
121:15 126:13
129:24 130:1
142:17 150:8
151:6,9 152:7
152:12 153:5,7
153:9 154:8,13
156:6 162:3,14
163:16 173:5,8
173:10,12
174:25 177:12
178:2,5,6,14,16
179:5,11 180:3
180:6 186:21
189:10,11
190:15 192:25
194:17 204:15
208:2 212:16
219:10 221:7
230:9 231:2,8
232:11 233:2,7

Page 336

233:16,18,23 239:21 243:9,10 243:11 244:9 250:11 252:3 253:25 254:20 254:21,24 256:24 258:20 258:21 259:25 260:10 262:22 262:25 264:18 264:20 265:19

**retained** 274:15

**retrieve** 268:21

**return** 278:14

**returned** 19:2 232:10 278:9

**reveal** 10:19

**revealing** 9:12 10:3 216:17 267:25

**revenue** 113:22 114:3

**review** 59:9 72:18 74:21,25 76:16 77:9 78:1 79:5,10,19 115:4 144:16,17 144:22,23 163:8 180:16,25 191:1 195:12,15 196:23 197:2,21 199:25 210:13 213:3 252:16 259:16 260:5 269:13 277:10

**reviewed** 74:14 77:15 78:10 80:10 81:11 114:15 117:18 142:16 163:3 167:15,17 178:15 180:4 181:13,18,20,23 209:16 210:23 210:25 220:9,16 220:18

**reviewing** 74:18 77:8 79:4 114:19,20 195:17 205:1 216:16 217:19 218:12 220:23 230:2

**reviews** 180:11

**revise** 216:4,9

**revised** 164:4

**revisions** 166:17

**rhyme** 270:2

**ria's** 122:14

**richard** 1:8

**right** 28:19,20 31:9 33:21 43:15 47:14 50:17 53:2 54:18 61:11 65:10,14,18 66:21,24 68:9 92:11,12 104:23 115:14 130:25 136:17 139:8

140:19 141:5,18 151:19 152:20 153:1 156:20 159:15 162:17 163:11,15,18 164:6 165:5 169:4,10,16,18 170:4 171:6 174:14,22 175:1 175:17 178:22 179:22 180:20 181:5 182:12 186:16,17 187:9 191:8 192:7,12 192:18,19 194:18,21,23 195:3,10 202:1 203:15 206:19 207:1,21 208:1 209:24 210:13 211:16 212:1,5 212:15 213:10 214:22 260:17 260:19 263:12 269:7

**rise** 198:20

**rna** 47:20 54:12 54:23 104:9,9 105:4,4

**robert** 32:19

**roche** 93:18 94:14

**rocket** 202:23

**role** 13:11,12,14 14:22 16:5,17

17:10 33:15,20 39:14 96:4 100:6 125:16 136:8 226:18

**roles** 14:14 32:10 33:7 40:20

**roller** 207:23

**romney** 97:10 97:17 98:3

**ron** 42:15

**room** 22:7,9 32:3

**rooms** 218:1

**root** 77:3 79:2 118:2,5

**roughly** 26:11 271:24

**rudimentary** 231:8

**rule** 46:14,16

**rules** 6:17 67:17

**rumblings** 251:2

**run** 24:11 25:17 26:17 35:9 36:13 45:23 91:7 103:21 130:13 164:3 221:5 248:17 251:20 258:5 263:8 265:17

**running** 20:13 25:14,15 37:5 45:24 46:5

**[running - says]**

90:20 183:4,9
239:15
**runs** 100:6
125:17
**ruo** 70:16,18,23
71:1 73:2 86:4
**rushed** 41:23

**s**

**s** 2:3,10 5:1
42:16 98:17
278:2
**sabo** 42:15
**sad's** 267:1
**sads** 267:3
**salary** 38:10,11
**sale** 260:20
**sales** 34:2,12
111:22 113:8
271:16,25 272:9
**saliva** 143:14
**salt** 15:25 16:11
120:9,15 121:7
121:12 123:18
124:15 125:11
131:10 132:3,13
132:20 138:17
138:18 141:12
147:4 148:8
150:6 158:18
225:5 234:25
236:9 261:10,13
261:15 264:15
265:1,1
**sample** 28:14
57:21 62:12

66:8,8 143:3,7
143:11,18,22
155:23 221:6,7
221:18 228:25
241:9 254:17,24
255:5
**samples** 28:8,10
28:16 36:12,13
54:8 57:8 63:19
63:22,22 64:4
66:7,13,15
68:19,21 69:1
131:19 140:21
141:16 143:12
188:21,21 189:1
189:6,8,15
219:15 236:1
238:24 239:13
239:16 240:18
248:20 255:3
**samsung** 269:2
**saragene** 190:10
**sars** 41:13 57:9
238:25 256:25
**sat** 238:14
**satisfactory**
100:12
**satisfy** 138:10
**satterfied**
131:16
**satterfield** 1:8
25:13,19 26:2
26:17 28:25
29:1 39:20
61:19,23 93:25

103:15 117:15
118:19 126:22
126:24 127:4
128:1,6,9,22
129:15,19 137:9
138:18 139:5
141:12 148:7,15
150:1 158:9
159:15,18
177:13 179:20
180:16,25
181:24 182:16
196:21,23
218:21 227:24
232:25 238:12
242:16 248:12
249:13 250:1
262:17 266:4
**satterfield's**
118:11 127:13
129:6,10 130:5
204:6 233:22
**saw** 25:8 99:14
108:18,21
132:11 134:18
161:18 173:10
**saying** 34:19
45:1 53:22
60:12 87:10,14
98:22 107:11
127:15 135:7
137:13 145:1
154:12 168:24
170:11 172:12
176:7 177:2

178:10 179:7
188:3 213:21
220:11 224:12
224:20 228:22
235:20 237:3
240:12,13
242:20 246:14
249:14 253:7,19
258:12 261:16
264:14 268:16
**says** 45:21 49:10
51:20 62:5,8,15
62:24 63:13,17
65:21,25 67:23
69:20,24 72:14
73:1 76:4,24
77:3,6,12,19
78:1 79:2 85:25
86:7,14 89:14
89:21 90:14
100:8,17,24
102:17,25 103:7
119:13,23
121:13 126:10
126:21,22
129:22 130:17
130:25 131:15
137:10 138:6,8
140:5,19 141:16
142:10 146:8,16
149:3 150:5,17
150:25 155:10
155:18 156:1,17
157:7,25 158:5
160:20 161:5,25

**[says - see]**                                                                                          Page 338

168:14 169:10 169:14,18 170:3 170:13 171:6 176:18 177:8,10 178:1 179:10,22 183:24 188:13 189:22 190:7,14 195:7 197:9 199:13,16 201:3 201:14,21 202:20 203:9,22 209:10 210:22 217:9 218:21 221:3 222:13 226:20 227:4,16 230:7,24 231:8 232:8 233:14 235:4 238:1 241:7 247:24 248:13 250:21 253:3 256:24 259:7 263:18,22

**scale** 99:15 123:21

**scanned** 268:1

**scenario** 57:21 156:18 164:22 194:25

**scenarios** 111:8 127:7

**scenes** 125:22

**schedule** 84:3,7 88:9 155:6,9

**scheme** 217:22

**schemes** 22:10

**school** 270:3

**science** 26:18 56:22 96:6 104:15,16 115:8 126:24 147:10 158:8,12 159:24

**sciences** 131:1

**scientific** 40:20 60:9 105:4 106:18,24 128:7 129:2,3 180:13 181:13 182:21 250:9 266:25

**scientist** 28:1 40:21 61:23 69:13 139:5 145:23 180:10 182:23 260:24 264:24 265:3

**scientists** 28:1 39:19 40:2,3 56:21 116:15 138:4 228:21 250:14

**scope** 148:3 195:14

**score** 100:11,18

**scored** 131:23

**screen** 5:11 43:14,15 48:25 51:11 52:22 61:7 69:7 72:9 72:11 75:18 85:14 93:14

99:24 114:8 119:10 137:6 148:22 165:18 199:9 209:8 217:8 226:7 265:11

**screening** 49:15 224:2,17

**script** 90:11,12

**scroll** 256:17

**scrolling** 43:20 43:21 62:5 69:9 114:12

**scrutinize** 176:8

**scrutinizing** 215:3

**se** 21:25

**sec** 7:22 8:6 9:17,21 10:1,14 47:12 119:3,3 211:6,12 214:20 215:2,11,18 216:4,11,16 217:20,20 263:25

**sec's** 211:23

**second** 55:3 65:9 73:16 75:3 86:20 88:15 99:23 130:12 135:25 188:13 192:12 197:6 271:7 273:12

**seconds** 89:21

**section** 63:12,12 63:13

**securities** 11:18 12:3,22

**security** 243:25

**see** 21:5 34:11 34:15 43:15,20 43:21,23 44:15 44:22 47:24 48:25 49:18 51:11,18 52:3,7 53:6 61:7 62:13 62:21 63:15,23 64:6 66:10,18 68:3 69:7,17,19 70:2 72:8,11,24 73:4,9,12,25 74:6,11 75:18 75:21 76:8,12 77:1,4,17,21 78:25 79:7,15 85:20 87:21 88:2 89:10 90:16 91:4 93:14,23 94:3 99:24 100:3 101:4 102:13,23 103:5,19 114:10 114:13 115:17 119:10 121:10 121:17 126:16 127:2 130:3 131:10,25 136:13 137:6,9 137:11 138:15

**[see - sensitivity]**

139:20 140:3,9 141:1 142:4,19 146:10,22 148:22 149:1,6 149:25 150:2,3 150:15,23 151:21 155:14 156:8,25 157:8 157:20,22 158:3 158:13 161:1,12 162:11 165:19 168:19 170:1 171:14 173:12 173:14 176:21 177:23 178:2 184:3 190:12,19 195:23 196:2,8 196:9 197:12 199:9,10,14 200:3 201:8,12 201:23 202:24 204:3,7,11 205:16 209:8,19 210:10 211:4 212:19 216:15 217:9 218:10 219:12,23 222:21 224:4 226:7,14 227:3 227:6,22 228:13 230:13 231:10 232:15 233:20 235:2,12 237:21 237:23 238:7 239:1 242:10

248:14 249:17 251:4 256:9 259:22 263:7

**seed** 21:13,15 23:6,16

**seeing** 65:15 84:8 116:18,18 118:6 121:8 131:7 153:6 161:15 183:19 210:9 217:8 236:4 250:10,10

**seeking** 144:12

**seeks** 107:12

**seem** 167:16

**seemed** 55:7 124:1 261:12

**seemingly** 198:22

**seems** 48:11 63:10 73:14 114:23 136:9 159:13,17 200:24 202:9 235:16 263:11

**seen** 5:10 9:17 61:10 101:22 131:5,6 178:16 197:8 199:19 208:11 222:17 238:19 248:24 249:16 256:15

**sees** 209:16 210:23

**select** 248:15

**sell** 70:25 71:4,5 86:3 98:7,10 99:4 110:25 271:1,4,7 272:3 273:1

**sellers** 237:10 243:17

**selling** 95:12 272:12,18

**sells** 272:24,25

**senator** 97:10 97:17 98:3

**send** 28:9,13,14 28:15 103:4 119:20 144:24 146:2 198:10 267:12

**sending** 119:25 234:18 242:19

**sends** 150:1 226:19

**senior** 16:19

**sense** 7:8 28:4,6 33:8 159:11 204:19,25 231:24

**sensitive** 58:2 65:24 68:1 140:25 170:17 185:19 194:7 219:6 248:3,6

**sensitivity** 56:3 56:17 57:2,5,11 57:15,20,20

58:12,14,16,25 59:2,5,10,16 60:11,18 63:10 63:14,19 64:2,8 64:19 65:2 66:4 66:16 130:20 131:13 140:20 140:24 141:5,7 141:9 143:10 144:3,4,6 152:13,19 155:12,17 168:17 169:7,23 170:14 171:13 171:21,25 172:16 177:15 177:21 178:19 178:20 179:7,9 184:1 186:10 188:5,9 190:17 191:6,22 192:11 193:24 194:12 195:1 199:20 204:1 218:24 220:12,13 222:19 235:24 235:25 238:5,17 238:18,20,21 239:4,25 240:3 240:9,10,15,20 241:2,6,7,20 242:4 248:21 249:8 256:19 257:2,4 260:11

**[sent - signs]**

**sent** 69:15 81:14 97:22 115:11,12 115:16,22 116:7 127:8 150:2 159:14 164:8 197:21,24 217:14 219:4 250:19,23 251:15

**sentence** 131:10 171:5 186:5 191:17,24 192:1 192:15,21 193:21 214:18

**separate** 221:13 233:15 259:10

**september** 250:19 257:17

**sequence** 56:14 59:22,25 60:2

**sequences** 53:10

**serbin** 1:8

**series** 6:18 8:18 8:22 11:24,25 15:24 44:10 158:2

**serve** 262:2

**service** 166:9 198:13

**services** 15:10 37:2

**set** 41:19 63:22 112:15 117:5 122:2 229:11 251:14

**setting** 68:1,23 152:10 156:22 236:1

**settings** 236:6

**setup** 136:10

**seven** 17:7 34:10 269:16

**several** 8:16 40:2 115:18 139:1 181:22 190:9 196:19 233:12 252:7,8

**share** 37:12 43:13,14 46:22 86:4,9 114:8 200:2 201:6 206:2,11 245:11 256:18 271:16 271:24

**shared** 47:7 206:17

**shareholder** 104:12 105:14 105:19 246:20

**shareholders** 35:13,20 83:23 107:22,23,25 108:3 122:14

**shares** 25:5 38:18,22 204:9 217:22 218:2 271:1,2,3,4,7,12 272:3,7,12,21 272:24,25 273:1 273:2

**sharing** 136:4 206:12,14 263:4

**sheet** 3:13 275:11 278:8 279:1

**shift** 33:8 48:16

**shipped** 113:1,3

**shipping** 86:2

**short** 12:11 22:15,18,23 236:17 237:10 243:17

**shorting** 236:21

**shot** 184:11

**show** 41:16,16 51:22 66:4,15 88:15 103:18 139:18 155:11 156:18 161:9 171:25 172:16 179:9 180:5 190:16 203:24 252:22 253:3

**showed** 77:1 81:13 116:25 117:8 126:19 130:23 131:2 147:11 152:12 155:20 159:13 166:16 173:4,4 181:3 194:10 197:17 228:14 236:9 260:3

**showing** 43:22 61:2 69:6 75:17

89:8 126:13 137:4 143:22 151:8 157:16 165:18 195:9 199:3 209:4 217:5 220:12 226:6 229:23 234:23 237:20 247:19 254:5 257:16

**shown** 127:25 144:18 238:22

**shows** 156:22 171:20 191:20 239:24 252:18

**shut** 244:6,7

**sic** 52:12

**side** 26:24 33:9 96:6 115:9 262:5

**sign** 278:10,13

**signature** 1:24 276:15 277:21 278:6,13,18,20

**signed** 181:14 274:11 276:13

**significant** 134:16 235:23 254:13

**significantly** 144:1

**signify** 205:12

**signs** 164:11 205:1

**[silicone - sounds]**

**silicone** 112:12 112:16 135:18 136:10

**similar** 94:6,14 105:19 143:8 228:12

**similarly** 6:24 73:6,11 78:22

**simple** 117:20

**simply** 116:3 134:11

**simulated** 68:5 68:7

**single** 60:20,25 120:25 134:23 134:24 146:20 151:17 171:1 175:4,11,11,12 175:13 177:14 184:12,14 188:4 188:4,4 214:1 228:17

**sir** 7:10 10:24 13:10 17:5 51:11 69:7 85:15 93:14 99:24 137:6 193:15 199:10 209:8 226:7

**sit** 266:23

**site** 100:10

**sites** 126:14 127:1 130:2 232:10,11

**situation** 96:20 164:22 194:6,8

**six** 19:9 37:7 248:20

**sixty** 83:14

**sizable** 123:19

**size** 113:5,6

**sizes** 113:21

**skim** 250:7

**skipped** 3:16

**slate** 269:4

**slc** 209:13

**slightly** 254:25

**slopes** 112:12,18 135:18 136:10

**slow** 52:1

**small** 249:21

**smaller** 221:18

**smart** 54:12 58:25 59:11,15 64:21 65:11,16 68:13 73:3 77:14 78:3 79:11 86:3 94:15 95:3 98:25 106:4 112:8 123:15 139:1,10 153:14 163:11,15 167:3 184:6 190:10 218:25 224:15 224:16 238:22 256:20,23,25 257:4 258:5 265:18

**smoothly** 20:14

**smoothy** 221:20 221:25 222:5

**soars** 201:21

**sold** 27:17 71:8 94:23,25 95:4 271:2,3,13,20 272:7,20,21 273:2,8

**sole** 112:10 211:22

**solely** 203:20 207:17

**solicitation** 16:23

**soliciting** 24:24 218:2

**solution** 51:25

**solutions** 5:22 5:24 274:16

**somebody** 21:20 26:17 33:15 88:4 96:6 108:18 115:9 117:6 124:23 135:21 136:7 154:19 161:24 162:7,9 171:4 180:10,18,23 181:4,20 192:24 195:19 205:4 242:1 244:10 245:21 250:6 252:15 258:8 264:19

**someplace** 41:5

**somewhat** 33:5 112:13 142:23

**soon** 17:8 119:25 219:22

**sooner** 160:20

**sophisticated** 107:4 231:1

**sophistication** 106:5

**sorry** 18:22 26:7 26:8 29:19 31:2 35:14 45:8 52:24 64:22 75:25 77:12 81:17 82:11 84:25 90:10 98:16 121:10 145:22 163:14 199:10 203:11 212:7 217:9 240:14 259:15 270:8

**sort** 6:24 16:6 33:3 39:12,13 46:13 90:6,8 112:15 124:9 195:14 198:4 210:17 216:10 226:17 251:15

**sotto** 209:25

**sounds** 53:21 95:23 145:12 210:3 249:13

**[source - started]**                                                  Page 342

source  198:11
south  2:4
   248:18 250:2
space  244:19
spain  17:12 19:5
   20:2,16,18 35:2
spanish  19:16
   20:1,18
speak  10:12
   21:20 128:21
   135:21 157:5
   170:21 175:4
   193:3 202:10,17
   244:20 253:13
   266:13
speaking  22:24
   60:22 123:3
   147:3 263:8,18
speaks  117:20
spearheaded
   112:3
special  52:1
specialized
   159:24
specific  22:11
   40:5 54:8 60:4
   65:3,3,24,25
   67:19 68:1 73:2
   84:2 111:15
   124:16 125:12
   155:4 156:11
   158:17 159:12
   170:16 172:11
   194:7,8 196:20
   219:7,14 235:17

specifically  9:2
   27:22 46:19
   74:23 80:17
   83:3 84:4 87:2
   89:19 97:25
   101:7 106:9
   109:13 115:2
   120:22,25
   124:20 132:19
   132:21 138:19
   139:8,12,15
   141:23 161:19
   166:23 206:13
   229:2 272:5
specifications
   143:3
specificity  59:14
   59:18 60:11,17
   63:14,19 64:3,9
   64:20 66:4
   73:21,24 101:10
   101:14 140:21
   141:11 143:10
   152:13,19
   155:12,17
   168:17 169:7,23
   170:14 171:13
   171:21 172:1,16
   177:16,21
   179:10 184:1
   186:10 188:5,9
   190:17 191:6,22
   192:11 193:24
   194:13 195:2
   199:20 203:25

   218:25 220:13
   220:13 222:19
   239:25 240:1,3
specifics  106:6
   138:23
specify  159:8
   203:8
specifying  170:5
speculate
   124:24 126:8
   253:4
speculation
   34:4 67:12
   120:11 124:18
   124:25 125:23
   148:10 175:2
   182:3 193:2
   205:24 206:4,7
   222:9 237:6
   245:4,13 265:21
   270:21
speed  86:25
spell  16:3
spoke  182:22,23
   201:15 235:11
   235:16
spoken  9:21
   119:24 200:18
sponsored
   12:23
spot  137:24
spreading  133:1
   133:3,5
spreadsheet
   248:16

spurious  213:11
sputum  143:7,9
   143:13 144:7
staff  250:9
stage  90:24
stages  21:13
   47:22
stamped  89:2
stand  100:14
   177:16 214:18
standard  49:25
   65:12 66:9 80:7
   82:17 93:25
   94:5,8 100:23
   110:13,13,14
   155:20,22,24
   156:23 157:3
   160:18 164:14
   164:16 189:19
   195:5 239:8
   240:23 241:12
   274:5
standardized
   77:9 78:2,7 80:4
standards
   220:14
standpoint
   254:13
stands  100:12
stark  69:10
start  39:11
   42:18 48:16
   187:6 270:8
started  13:11
   17:16 19:2 26:5

**[started - study]** Page 343

26:8 28:22 53:11 130:11 200:13 258:23

**starting** 28:17 137:8

**state** 6:2,5,14 67:4,6,17 92:7 112:2 117:7,10 126:12,15 129:23 130:2,10 225:13 231:2 232:1 234:6 235:8 247:21 266:21 267:1,3 267:11 275:5 276:4,17 277:3

**state's** 232:11

**stated** 40:25 41:2 67:8 81:10 129:5 236:24 248:1 279:23

**statement** 73:17 128:17 157:11 162:15 178:21 191:12 203:20 204:6 235:21

**statements** 71:13 73:15 92:6 147:19 148:2,15 182:1 182:12 183:12 183:13 194:13 197:23 236:21 275:8

**states** 1:1 5:18 15:12 42:5 73:3 73:17 247:25

**statewide** 230:10 232:13

**static** 229:14

**stating** 203:14

**statistics** 204:1

**status** 252:5

**stay** 259:19

**stenographic** 1:23 276:17 277:6,12,23 278:17

**stenographica...** 277:8

**step** 33:9 174:20 198:4 203:12 260:16

**stepping** 33:11

**steps** 135:14

**steve** 200:8

**sticker** 88:20,25 89:3

**sticks** 37:22

**stimulus** 134:12

**stock** 22:15,18 37:12 38:10,13 38:15 108:8 109:1,3,5,9,9,15 109:18 110:5 198:17,20 199:18 202:23 207:20,22 227:8 227:12 236:13

244:10,12,15,24 245:2,12,18,19 245:22 246:4,21 270:17,23

**stocks** 108:14

**stop** 165:4 177:4 213:14,17

**stopped** 131:10 220:19 234:10 234:12

**story** 132:23,25 133:3,4,24 134:15 188:11 199:18 200:25 249:21 264:3

**straightforward** 238:13

**strained** 144:16

**strains** 60:1

**strategy** 50:4

**street** 239:10

**strike** 9:7 18:22 24:24 37:10,20 42:8 46:14 68:11 70:15 81:5 95:18 101:10,11 107:10 113:7 117:22 120:6 125:1 127:21 129:8 139:22 166:15 167:1 173:10 174:22 196:21 198:5 200:21 201:14

209:22 215:15 216:20 237:12 240:9 245:9 246:7 253:17 259:24 267:7 272:6

**striking** 160:5

**struck** 162:4

**structure** 24:13 33:4

**studied** 15:23

**studies** 59:10,12 68:22 150:19 151:1,2,5,10,16 152:4,11,18 153:4,6,7,10,19 154:24 155:11 156:6,10 163:22 163:24 170:6 171:17 173:3,3 175:1 180:5 190:9 228:25 239:8 240:17 241:18

**study** 65:25 99:10 101:23 110:12 151:18 151:21,22 153:14 154:9,9 154:13,19 161:10 171:12 173:4,6,7,8 194:8,9 197:7 219:9,14 225:5 225:8,10,13

**[study - synbiotics]**                                   Page 344

229:3 231:14
241:11 248:17
249:14 250:12
250:21 252:10
252:17,22
254:21 256:15
256:18 257:3,7
258:25 260:22
260:25 262:6,9
264:16,22 265:4
**stuff** 261:6
**subject** 10:15
12:18 74:24
76:3 100:9
102:9 149:3
150:18 151:1
163:18,21 217:9
226:19 234:25
**subjective** 243:7
**submission**
62:18,25 95:6
142:22
**submissions**
59:6
**submit** 70:22
143:21 228:11
231:24
**submitted** 76:20
95:9 96:25 97:1
98:23 101:1
129:10 143:1
144:10 248:17
248:24 249:1
251:7,25 252:13
254:10

**submitting**
46:24
**subsequent** 59:7
68:23 197:22
232:6
**substance**
120:23 237:1,2
**substantially**
264:2
**sue** 44:7
**suffering** 135:2
**suffice** 7:4
**suggest** 145:17
**suggested**
180:19,24
**suggestion** 86:3
**suggests** 159:17
**suite** 2:4
**sum** 162:3,4
**summaries**
190:8
**summary** 72:15
177:8 189:22
191:1
**summer** 37:18
**sunday** 85:24
86:15
**sundries** 26:20
**super** 61:11
**superfluous**
192:24
**supervise** 42:10
**supervisor**
196:1,5 197:2

**supplier** 231:19
**support** 62:19
121:24 139:10
153:7 214:6,9
214:21 263:3,5
**supportive**
190:11
**suppose** 16:6
**supposed** 53:16
213:25 239:17
239:19 251:18
251:21,22,24
252:2 260:15
**sure** 7:23 14:17
15:15 17:25
20:12 23:14
24:22 27:7,24
31:3,4 32:17
33:2 34:8 35:11
35:16,19 38:9
38:19 40:4
45:20 46:21
47:2,15 50:18
50:18 52:11
60:25 64:18
69:22 75:2 85:3
85:8 93:1
103:24 110:1
111:20 114:17
119:19 122:18
128:5 141:25
142:16 163:9,20
163:22,23 164:5
167:17 169:13
174:14 179:24

188:19 196:12
209:16 210:22
212:22 214:5
216:25 238:15
245:8 256:17
258:20 264:13
266:13,21
270:10 273:10
**surely** 193:17
213:10
**surprise** 83:13
123:7,12
**surprised**
220:25
**surveillance**
95:15,20 242:8
242:9
**suspected** 140:6
**suspicious**
126:6 265:25
**swab** 143:13
144:8
**swabs** 143:20
**swiss** 24:6,11,15
24:20,23,25
**switch** 13:16
**sworn** 276:11
**symptomatic**
129:25 130:7,8
140:17 224:8
233:16 234:1,3
234:4,5,8
**synbiotics** 100:2
100:7

**[synonymous - test]**                                                    Page 345

**synonymous** 131:14 141:7 144:6

**synthetic** 54:8 68:13,19,21

**synthetics** 69:1

**system** 26:25 81:25 82:4,6,8 82:15 95:16 147:18,19,21 221:5,6

**systems** 82:16 95:13

**t**

**t** 268:23 275:1,1

**table** 76:23 251:3 252:2,14 252:16,21 254:22

**take** 5:12 7:5 22:23 26:12 40:6 42:21,23 46:8 52:18 65:20 74:3 83:16 86:19 135:23,24 144:15 147:12 149:15 164:19 174:4 182:17 185:2 191:18,25 196:18 209:14 225:15 235:19 235:21 274:2 278:5

**taken** 26:20 43:7 75:10 79:18 147:8 165:9 223:19,21 226:1 247:12 269:18 273:10 279:3

**takes** 160:3

**talk** 138:9 139:19 261:5

**talked** 50:3 193:23

**talking** 52:11 105:3 126:23 128:13 146:17 186:6,18 187:5 188:3 194:16 222:18 241:14 244:4 245:6 254:15

**talks** 90:12 169:5 179:10,17

**tangentially** 111:9

**target** 37:1 54:15 55:10 56:14,25 57:17 59:21 60:4 107:20

**targeted** 54:23 107:16,19

**targeting** 59:25

**targets** 54:12,17 55:4,16

**task** 41:4,4

**tasked** 84:21

**tax** 15:12,13

**team** 72:18 160:19 259:18 259:24 262:21

**tech** 112:3,17 158:11 159:23 232:9

**technically** 27:16 140:5

**technician** 27:25 251:17,18 254:7

**technicians** 66:14 138:4 240:6

**technologies** 27:12

**technology** 5:21 154:20

**teleconference** 72:16

**tell** 84:19 88:4 129:16,20 183:8 188:11 242:13 261:25

**telling** 129:2 182:10 187:22 264:3

**tells** 180:11

**template** 72:17 72:20

**ten** 151:13,13 185:1 269:12

**tend** 161:2,2

**tennessee** 113:2 247:21

**tens** 57:13

**term** 14:14 33:12 56:3,6 60:8,9,9 68:5 70:7 95:21 96:11 170:4 188:23 189:5 243:7

**terminology** 7:23

**terms** 12:15 21:17,18 38:6 41:19 54:1 58:25 59:2,14 63:14 74:13 94:17 105:6 120:2 130:9 135:12 198:5 241:8

**tes** 190:10

**test** 27:18,20 28:7,8,9 36:25 39:2,3,15,18,19 40:5,10,19,23 40:25 41:9,11 41:20 42:1,6 44:12,12 46:2 47:21 48:2,9,13 49:15 50:4,7,17 50:21,25 51:7 52:12,13,15,16 53:3,4,9,14,15

**[test - testnebraska]**                                          Page 346

| | | | |
|---|---|---|---|
| 54:2,4,12,15,18 | 130:17,19,22 | 232:24 235:8 | **testify**  133:15 |
| 54:20,22 55:3,8 | 134:15 139:1,11 | 236:1,3,5,24 | **testimony**  7:21 |
| 55:9,16,23 56:1 | 140:5,7,12,23 | 237:14 238:19 | 7:25 8:17 50:10 |
| 56:4,7,13,17,24 | 144:15 147:20 | 238:21,22 240:4 | 55:21 85:7 |
| 57:5,11,23,24 | 147:25 150:8,25 | 240:19,22 241:8 | 92:14,15 104:25 |
| 58:2,5,16,25 | 151:3,18,21 | 241:10,11 248:2 | 109:23 115:7,24 |
| 59:11,15,17,19 | 152:18 153:15 | 248:3,7,19 | 126:1 134:5 |
| 59:21,24,25 | 153:20 154:14 | 249:18 253:22 | 135:9 153:3,22 |
| 60:3,7,10,14 | 154:16,20 | 255:10 256:2,20 | 172:8 174:16 |
| 61:1 62:20 63:9 | 155:21,23,25 | 256:23,25 257:4 | 176:11 178:9 |
| 63:18 64:10,21 | 156:4,21,22 | 257:23 258:1,5 | 180:8 183:16 |
| 64:21 65:3,10 | 160:12 161:25 | 258:5 259:3,4 | 186:4 191:15 |
| 65:11,11,16,17 | 163:11,15,19,23 | 260:1,6,10 | 193:10 194:4 |
| 65:22,23 66:16 | 167:4 168:15 | 261:22 262:7,10 | 205:15 206:21 |
| 66:20 67:3,9 | 169:6,8,14,21 | 262:12,14 263:2 | 207:3 208:23 |
| 68:13,18,25 | 170:16 171:9 | 263:4 264:12,21 | 211:16 223:16 |
| 70:11,17,19 | 173:7,15 179:11 | 265:17,18 | 253:10 274:13 |
| 71:4,14,19 | 179:25 182:1,12 | **test's**  58:14 | **testing**  36:12 |
| 72:21 79:20 | 183:14 184:6 | 60:22 73:18 | 53:13 59:22 |
| 86:7,11 90:13 | 188:16 189:15 | 105:9 152:1 | 86:12 106:6 |
| 91:22 92:7,8 | 189:19,20 | 177:11 178:1 | 112:2 117:3 |
| 93:7,19 94:1,7 | 190:11,16 | 187:3,10 | 118:13,17 128:8 |
| 94:10,16 95:4 | 191:10,21 194:2 | **tested**  28:10 | 128:10,12 |
| 95:12,14 96:15 | 194:5,7,11,18 | 126:14,15 | 142:16 158:11 |
| 96:18 98:10,23 | 194:21 195:1,10 | 128:15 188:20 | 159:24 169:25 |
| 98:25 99:1,5 | 197:18 199:21 | 189:16,17,19 | 188:25 189:1,2 |
| 100:23 101:14 | 201:21,22 202:1 | 195:6 233:19 | 189:11 199:23 |
| 101:24 104:15 | 202:8,21 203:2 | 236:2 238:24 | 202:22 203:3,10 |
| 104:23 106:4 | 213:12 216:24 | 239:8 241:10 | 203:15 204:16 |
| 110:7,17,20,25 | 219:8,17 221:13 | **testified**  67:13 | 230:10 232:10 |
| 112:10 115:10 | 221:17 223:22 | 116:14 134:2 | 232:21 238:6 |
| 116:12 117:1,6 | 224:2,6,13,16 | 147:6 152:25 | **testiowa**  112:20 |
| 118:15 120:10 | 228:15,16 229:6 | 153:8 183:18 | **testnebraska** |
| 123:15 127:1,1 | 229:13,19 230:9 | 194:5 245:16 | 112:22 232:23 |
| 129:24 130:2,14 | 231:25 232:17 | | 234:15 |

**[tests - thousand]**

**tests** 27:13,17 27:19 28:16 35:25 36:2,9,11 36:13,18,24 49:13 50:1 52:1 52:2 54:17 58:19,22 59:7 67:7 70:25 71:8 73:21 78:3 90:15 91:21 98:7 99:18 104:18 106:24 110:18 112:5,7 112:8,19 113:1 113:3 115:5 116:9 126:11 130:18,24 131:3 131:20,22 133:6 133:21 135:1 137:14 140:16 147:13 150:13 155:20 169:21 171:25 172:11 172:15 174:2 177:20 178:5 179:9 186:9,13 186:18,19 188:10 189:12 189:18 203:5,7 203:24 228:13 232:12,17,20,22 232:24 234:11 234:18 240:25 251:3 252:19 256:20 258:14

258:19

**testutah** 111:23 112:5,8,10 117:4,5 120:9 128:10,11 129:24 146:9 229:25 230:18 230:25 231:20 231:25 234:4 236:11

**testutah's** 233:15

**testutah.com** 121:15 126:12

**testutah.com's** 230:9

**testwisconsin** 112:25

**tetenbaum** 5:22

**text** 80:9 200:24 268:1,5,10,13 268:22 269:4

**thank** 89:6 273:21,23 274:17

**thanks** 90:20 238:6 251:8 259:16 263:7

**theory** 128:7 265:16

**therapeutic** 96:16

**thermal** 52:18

**thermocyclers** 221:16

**thi** 238:5

**thing** 22:12 24:19 42:4 86:19 88:1 118:16 158:15 164:2 191:25 192:16,22 195:22 221:4 265:15 269:2

**things** 8:23 10:12 16:16 27:21 28:15 86:1,20 87:10 87:16,23 115:9 122:8 124:1 126:6 131:14 146:18 161:6 176:14 198:5 223:10 239:20 241:14,16 262:21 265:25

**think** 10:8 22:11 22:14 24:19 26:5 31:23 37:22 41:13 45:12 47:4,12 69:23 71:24 76:17 87:1,3,16 87:19 88:21 92:22 98:9 100:16 104:8,9 105:18,18,20 108:18 112:15 113:3,13 120:12 124:15,19

132:13 134:1 136:7,11 153:16 158:7 159:6 160:9,9,16 166:10 169:17 170:10 173:13 181:25 182:11 184:23 190:23 191:7 192:25 201:13 207:4 213:5 217:16 222:14 225:17 227:24 235:18 242:17 244:12 256:5 257:13 258:2 259:9 262:15,18,23 263:13 264:10 265:10 266:19 269:13 270:2,20 273:4

**thinking** 87:6,9 103:8 212:25 213:20

**thinks** 86:20

**third** 59:7 63:17 179:18,18 214:17 236:25

**thought** 51:7 185:1 218:14 243:21

**thoughts** 76:6

**thousand** 38:12 57:13 243:23

**[thousands - tranches]**                                                      Page 348

**thousands**
  57:14 58:22,22
  131:18,18 244:3
**three**   36:14 44:6
  62:1 75:12
  134:8,10 138:9
  178:15 204:25
  212:25 218:14
  228:17,19,20
  241:14,16
  246:12
**throughput**
  177:18
**throw**   63:5
**tied**   223:25
**tier**   236:25
**tilt**   52:22
**time**   5:5 6:3
  12:11 14:3
  16:19 17:23
  18:24 23:20
  25:18 26:10
  27:2,5,18 29:8
  34:11,19,20
  39:5 40:24
  41:12,13 42:2,5
  43:5,9 47:23
  48:1,21 50:2,7
  50:19,19 51:6,7
  53:19 56:25
  60:20,25 61:10
  65:23 67:3
  68:15 69:13
  71:11,22 72:1
  75:8,12 76:2

  78:15 80:25
  86:25 92:8 94:2
  94:11,12 96:5
  98:6 108:12
  113:11 116:2,5
  121:24 125:18
  128:4 134:23
  136:20,24 143:4
  143:16 149:22
  149:24,25
  151:17 152:17
  153:12,18 155:4
  155:7 165:7,11
  166:3 168:6
  190:3 196:18
  198:20 207:22
  207:23 215:24
  216:22 219:2
  223:13,18
  224:16 225:25
  226:3,17 229:4
  234:18 236:23
  236:23 244:3
  247:5,10,14
  255:7,9 259:17
  263:20 264:5
  269:16,20
  273:14,18,21
  278:6,11
**timeframe**   44:9
  159:8,12 196:20
**times**   17:22
  51:22 106:18
  108:1 109:3
  129:5 177:1

  187:24 238:25
**timpagnogos**
  142:12,14 145:9
  145:13 146:9
**title**   13:10,14
  14:2,5,9 71:23
  103:24 121:13
  168:14,22
  201:25 202:12
  205:12
**titled**   229:24
**tng**   257:25
  258:23 262:2,6
  262:14,24,25
  264:25
**today**   46:1
  48:12 49:14
  86:17 100:10
  102:22 119:16
  169:21 170:3
  194:1,5 199:19
  200:2 226:21
  271:17
**today's**   72:16
  103:1 274:13
**toes**   33:10,11
**together**   97:3
  208:15 214:20
  216:16 241:15
**told**   83:11 151:6
  173:2 183:3
  251:18
**tomorrow**   89:16
  259:20

**took**   15:18
  37:23 65:3
  120:24 125:22
  134:9 197:19
  251:25 252:7
**top**   47:17 59:13
  87:23 114:9
  222:13 254:1
**topic**   62:16
**total**   271:15
  274:14
**totality**   173:19
  176:24 232:23
**totally**   191:18
  226:25
**touch**   266:9
**tough**   90:20
**towards**   51:16
  52:5 55:1 85:22
  90:10 148:24
  232:8
**track**   34:1 250:2
  263:25
**traded**   268:18
**trader**   236:17
**trades**   16:14
  272:10
**trading**   1:3 5:15
  204:10 236:12
  244:21 278:4
  279:2
**trained**   82:23
**tranche**   272:8
**tranches**   272:8
  273:13

**[transcript - understand]**

**transcript** 7:1 277:10,11 278:8 278:9 279:1
**transition** 33:1
**transitioned** 32:23
**translating** 68:18,25
**transpired** 97:12
**transported** 239:17
**tribune** 119:14 120:9,16 121:7 121:13 123:19 124:16,19 125:3 125:6,11,17 129:24 131:11 132:4,14,20 141:13 147:4 148:8 149:4 150:6 158:1,18 209:13 225:6 235:1 236:10 261:10,14,15 264:15 265:1,2
**tried** 243:14 244:6 261:16
**trigger** 131:20
**true** 92:3 100:19 100:19 130:21 179:23 188:3 194:13 203:1,6 267:2 275:9 277:11 279:23

**truly** 278:15
**truth** 182:5
**try** 47:1 106:7 108:3 122:8 208:4 243:19 250:9 255:9
**trying** 40:10 46:20 84:10 108:2 134:25,25 160:25 177:2 207:8,18 208:9 222:15 241:15 246:11,15 265:5
**tuberculosis** 27:19 28:10,14 36:6 143:6,8
**turks** 30:22 31:1 31:7,11,15
**turn** 22:24 26:19 31:12,12 258:6
**turnaround** 164:25
**turns** 116:20 243:22
**twitter** 236:21 237:2
**two** 8:21 19:3 43:9 54:1,1,23 55:4,10,16 56:1 75:8 131:14 138:4,4 179:12 179:17 194:16 198:21 204:2 213:9 225:19

241:15,15 255:8 268:12 270:18
**type** 16:16 65:19 104:22 124:16 125:3,25 152:6 194:15 258:5
**types** 207:15 236:6
**typical** 115:3
**typically** 40:14 60:12 74:18 84:16 107:20 111:5,7,9 149:20 152:6 160:24 161:1 164:19 168:2 176:4

**u**

**u.s.** 19:8 26:23 28:8,12 72:21 171:11 203:24
**ua** 228:11
**uh** 181:16 234:13 261:2 267:22 272:22
**ujf** 261:2,19,21 262:9 264:19,22 265:13
**ul** 70:1 197:10 197:11 221:6,19 248:22
**ulterior** 124:11 124:13 232:1

**ultimately** 62:2 76:20 110:7 120:8 143:23 145:15 154:3 160:11 164:20 166:20 225:2 238:20 241:7
**um** 90:19
**umbrella** 14:14 24:14
**un** 244:4
**unaware** 245:16
**unclear** 252:4
**uncommon** 49:24 98:1 153:8 154:12,14 154:18 165:2 195:21
**under** 8:2 21:17 21:24 24:14 44:4 95:16 96:18,18,19 163:5 164:3 227:4,7 279:22
**undergo** 228:15
**undergoing** 34:12
**undergone** 228:17
**underlying** 189:24
**undersigned** 276:9
**understand** 9:5 31:20 48:22

**[understand - validation]**

50:12 56:20 60:9 67:16 95:23 98:5 99:2 105:5 106:11 110:12 112:1,9 137:20 140:14 145:1 146:18 158:11 181:2 189:5 195:15 267:10,17

**understanding** 55:5 100:22 109:2,7,7 124:2 126:7 141:22 144:14 151:4 208:18 209:1 211:22 258:22 265:14

**understands** 58:12

**understood** 22:2 48:8 60:21 65:21 106:21 108:6 142:14 143:4 205:17 208:18

**underway** 229:3

**unfairly** 254:18

**unfortunately** 39:9,10 100:11 251:17 252:20

**unheard** 226:25

**unintentional** 80:6

**union** 150:14

**unique** 49:12 73:18 169:20

**unit** 5:14 43:5,8 75:8,12 136:23

**united** 1:1 5:17 15:12 42:5

**units** 38:10,15 274:14

**universe** 154:4

**university** 11:2 11:4,7

**unpredictable** 199:1 245:24

**unsophisticated** 104:6,14,17,21 105:1

**untrue** 117:13

**unvalued** 273:5

**update** 119:24 201:5 235:9

**updated** 77:15 249:14

**updates** 226:20 226:21,24

**upload** 166:8

**upset** 88:8,12

**urgency** 159:11

**urgently** 145:18

**use** 28:3,4 36:3 42:19 55:9 60:16 62:17,24 68:13,21 70:7 70:11,13,19 71:5,9 94:11,19

96:10,17,18 97:7 142:3,10 142:14 143:20 145:14 159:23 168:21 177:18 221:17 224:1,13 224:18,22,23 225:1 262:12 268:4

**used** 12:10 24:7 24:7,20,21 31:18 36:10 41:21 60:8,24 61:17 62:4,10 62:16,25 65:6,7 72:23 94:22 95:21 96:16 110:13 112:7,10 112:11,20 127:1 129:7 143:3,7 145:15 155:20 166:20 169:24 189:19 207:7,10 224:2,7,13,16 224:21,24 225:2 232:19,20,22,24 240:5 241:9 248:2,19 249:18 253:22 256:22 274:14

**users** 225:2

**using** 5:21 33:12 54:8 110:12,15 117:4,5 128:11 129:1 143:18,22

144:7,8 154:16 154:19 178:20 209:11 213:12 216:23 223:22 228:25 231:22 234:10,12 240:17 259:4

**usual** 34:9

**utah** 1:1,6 5:17 5:18 11:3 67:17 112:2,16 117:7 117:10 125:18 225:13 229:25 230:11 232:9 233:19,23 258:11 260:23 261:1,9,17

**utah's** 127:1 233:15

---

**v**

**v** 1:5 41:13

**vague** 58:20 59:1 83:7 122:21 123:6 184:8

**vaguely** 122:17 218:14 230:3

**validate** 27:20 68:11 139:1 181:8 221:15 235:7

**validated** 53:5 53:23 91:2

**validation** 27:12 27:15,24 28:3

**[validation - waiting]**

Page 351

54:1,7,9 65:14
65:19 68:22
142:12 145:13
145:18 150:19
151:1,2,10,16
151:18,21 152:8
152:11,18
153:10,14,19
154:4,23 156:6
162:16 170:5
171:17,25
172:15 173:19
177:9 178:4,12
178:16 186:21
189:10,22
194:15 195:12
195:19,20,23
196:14,18,24
204:15 213:2,3
219:9,10 225:5
225:8,10,13
231:14,25
236:10 241:2
253:3 258:20,24
260:1,14,15,22
260:25 262:6,22
263:2 264:15
265:19
**validations**
68:12 151:25
152:4 194:16
212:18,21 239:5
**valley** 112:16
**valuation** 242:5

**valuations**
156:10 162:14
180:3,4 263:4
273:18
**value** 52:17,20
109:1 271:15
**values** 52:16
53:18
**variable** 47:21
**variables** 118:9
**variance** 228:18
**variation** 240:7
**variations** 47:22
228:18
**various** 8:22
27:21 39:19
40:17 50:1 51:2
56:11 256:20
**vein** 22:16
**vendetta** 124:16
124:20 125:3,6
**vendor** 231:19
**vendors** 130:19
231:21
**venture** 13:25
17:13,18 21:25
24:8,9 30:1,2,9
31:9,10,18 98:9
98:12,13,14,16
98:19,20
**veracity** 150:7
**verbal** 7:3
**verification**
53:24,25 54:3

**verified** 41:1
53:4,8,22
197:15
**verify** 41:20
45:1 53:14
**veritext** 1:24
5:22,24 274:15
278:18
**version** 149:8
159:14 161:15
164:10 166:6
167:17
**versions** 68:14
**versus** 5:16
238:4
**video** 5:11,14
32:2 89:16
91:17 274:2,4,6
274:8
**videographer**
5:4,23 43:1,4,8
52:21,21 75:7
75:11 136:19,23
165:6,10 225:21
225:24 226:2
247:6,9,13
269:15,19
273:24 274:2,7
274:10
**videos** 89:24
**videotaped** 1:11
**view** 187:3
235:23
**viewed** 123:10

**vimai** 237:24
**viral** 57:8,25
90:23 140:22
141:17 224:9
238:3
**virtual** 5:21
**virtually** 5:7
**virus** 49:17
54:13 57:10
68:14 131:19
**viruses** 36:14
**vis** 45:2,2 64:21
64:21
**visible** 69:21
**vital** 254:19
**vitro** 35:25 36:2
36:10,15,22
70:14,20 79:12
82:17 95:4
150:13 224:19
**voce** 209:25
**volatile** 198:20
198:25 244:13
244:15,24 245:2
**volatility** 245:12
**volume** 56:25
57:14 113:8
**voluntarily**
12:16
**vs** 278:4 279:2

**w**

**w** 3:20
**wait** 273:7
**waiting** 222:19
252:7

waive 278:6,13 278:20

walk 107:3

want 42:1,21,23 63:5 86:9 104:2 124:10 133:5,20 135:23 137:22 157:13 160:4 161:1 168:1 169:15 174:1 176:6 185:2 187:5 191:19 192:1 213:19 214:4,7,7 225:15 242:10 253:4,13 258:14 258:19 261:7 265:2 273:9

wanted 15:17 26:17 31:5 63:7 87:9 138:25 139:9 159:9 160:7,17 241:25 257:22,22 258:5 266:17

wanting 264:4

warning 184:11

way 14:20 24:2 53:16 58:17 60:21 71:19 91:6 107:4 138:9 175:7 193:1 205:19 207:9 231:3 246:10 252:1,1

264:18 270:23

waylaid 124:9

ways 205:8

we've 10:14 42:20 60:25 61:1 81:10 186:8,9 188:7,8 188:8,9 191:9 193:23 218:17 264:4

web 77:14 264:1

webb 43:22,25 51:17 61:16 62:4 119:12 121:5,12 148:25 150:1 157:20,25 200:12 218:21 222:6 235:15 255:25 256:6

website 73:2 78:4,9 89:17,23 119:2 209:14,24 218:24 220:21 221:2 263:18,19

websites 147:24

weeds 160:6

week 41:3 146:5 251:7 259:10

weekly 226:19

weeks 119:15,18

weird 42:3 244:16

went 17:23 41:8 115:18 124:3 128:5 129:6

138:12 153:19 158:20 161:24 193:12 204:9 207:20 210:13 214:3 247:3 258:15

west 150:19

whatsoever 245:25

white 103:17 104:4 116:25 117:8,14,19,22 117:23 118:11 118:20,24,25 119:4 127:16,24 128:6 130:5 233:1,23

whoa 173:5,13

wholly 19:19

whoops 193:19

wide 8:18 150:13

wild 160:13,19 241:9

wildly 198:25

willing 185:10

wiped 267:19

wire 166:8 198:13 221:1

wisconsin 112:24

wish 39:11,12 39:12 278:13

witness 3:3 5:10 9:14 10:6,22

34:15 42:25 48:7 49:3 51:14 52:24 55:22 58:21 59:2 64:15 65:1 67:1 67:15 80:16 81:20 83:8 85:8 87:13 88:12 92:22 105:1,24 106:15 109:24 115:8,25 120:12 122:23 123:7 124:19 125:5 128:21 134:22 148:11 152:23 153:4,23 159:6 165:22 167:7,21 168:12 172:3,9 173:22 174:7,17 175:3,22 176:13 178:10,25 179:16 180:9,23 181:11 182:4,15 183:8,17 184:18 185:22 186:5,25 187:15 189:4,14 191:17 192:15 192:21 193:3,11 194:5 197:4 202:4,17 203:18 205:16,25 206:5 206:22 207:4 208:8,24 210:3 210:16 211:12 211:22 212:13

**[witness - yeah]**                                                        Page 353

213:5 215:9,23 216:9 222:10 223:17 224:12 225:17 232:3 233:6 237:7 245:5,14 253:11 256:13 257:13 265:22 270:22 279:3

**witness's** 50:10 176:11

**wondering** 250:1,23

**word** 60:24 83:16 92:22 93:8 100:21 105:11 131:16 162:1,22 168:21 260:19

**wording** 94:14

**words** 92:1 129:1 187:7 188:11 193:7 207:10 212:23 220:10

**work** 14:18 15:3 16:13,19,20 17:23 19:12,13 23:24,25 35:16 35:17 44:4 49:14 50:1 53:9 137:21 138:5,6 152:7 200:9,15 211:19 216:7

**worked** 12:10 13:24,24 15:7 15:10 19:7,11 30:20 34:10 98:8 109:8 151:21 200:6 227:19 229:3 261:23

**working** 12:22 15:24 16:18 19:1,3,5 20:6,9 25:11,24 26:6 27:3 35:1,19 39:12 44:8,11 46:2 48:12,16 51:2,3 72:18 87:20,22 142:2 168:6 199:18 200:25 219:20 258:23

**workings** 107:7

**works** 28:5 41:17 45:9 95:25 103:11 176:2 247:21 268:25

**world** 51:8 135:1

**worried** 46:8 193:7

**worse** 137:14

**worst** 156:18 236:25

**worth** 14:1 20:11,20 35:11

222:15

**wracking** 265:5

**write** 44:21 47:17 86:23 90:18 91:22,23 121:19 124:14 139:3 141:19 160:1 161:4 204:24 251:8 255:6 263:6 279:1

**writes** 44:5 93:17 137:23 139:17 140:2,4 251:6,10 259:7

**writing** 87:2 88:6 123:9 124:7 208:18 212:25 246:12 255:20

**written** 22:22 81:8,15,17 87:21 97:25 123:8 152:7 187:23 204:24 222:6 234:19 255:8 260:5

**wrong** 26:7 101:23,23

**wrongfully** 102:21

**wrote** 47:17 52:9 88:7 114:25 120:9 130:19 146:15

209:2 212:15 238:11 261:15

**wuhan** 44:13

**x**

**x** 13:8

**xpert** 256:25

**xpress** 256:25

**y**

**yeah** 9:14 10:6 27:16 31:4 34:7 34:25 39:24 47:4 48:19 68:8 80:2,16 83:11 85:8,21 104:20 109:24 115:18 122:13,23 123:2 133:3 134:8 160:24 161:2 172:3 173:22 176:13 186:25 189:4 193:17 196:16 201:20 211:22 215:9 216:1,9,25 220:5 223:18 235:21 236:16 236:17,19 245:14 247:4,4 249:2 252:14 255:4,5 257:20 258:6 263:21 264:17 268:24 273:6

**[year - à]** Page 354

**year**   19:3 26:11
  54:24 270:11
**years**   8:21 18:24
  19:4 34:11 62:1
  134:8,10 178:15
  212:25 218:15
  228:19 233:12
**yielded**   253:25
**youtube**   89:22

**z**

**zika**   36:6,7
**zobrist**   217:6,16
**zoom**   276:10
  277:8

**à**

**à**   45:2 64:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.