# Exhibit 22

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

CASE NO. 2:20-cv-00368-CMR

GELT TRADING, LTD., a Cayman Islands
limited company,

    Plaintiff,

vs.

CO-DIAGNOSTICS, INC., a Utah
corporation, DWIGHT EGAN, JAMES
NELSON, EUGENE DURENARD, EDWARD
MURPHY, RICHARD SERBIN, REED
BENSON, BRENT SATTERFIELD,

    Defendants.
_____/

                         Remote/Zoom
                         Friday, 11:04 AM-1:23 PM EST.
                         May 5, 2023

          VIDEOTAPED DEPOSITION OF SETH EGAN

      Taken on Behalf of the Plaintiff before
    Lisa Gerlach, FPR, Notary Public in and for
    the State of Florida at Large, pursuant to
    Notice of Taking Deposition in the above
    cause.

Page 2

Appearances:
Counsel for the Plaintiff:
MICHAEL C. FASANO, ESQUIRE
Fasano Law Firm, PLLC
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
786-530-5239
mfasano@fasanolawfirm.com

Counsel for the Defendants:

RACHEL L. ELWOOD, ESQUIRE
MARISSA A. PEIRSOL, ESQUIRE
BakerHostetler
200 Civic Center Drive
Suite 1200
Columbus, OH 43215
614-462-4722
relwood@bakerlaw.com
mpeirsol@bakerlaw.com

Also Present:
Alan Pokotilow, Videographer
Owen Badin, Fasano Law Firm

Page 3

INDEX
WITNESS          EXAMINATION               PAGE
Seth Egan
    Direct by Mr. Fasano            5
Certificate of Oath            77
Certificate of Reporter          78
Witness Review Letter             79
Errata Sheet                 80
          EXHIBITS

Exhibit 1    Email, CoDI_00024139 through
          00024143              47
Exhibit 2    Email, CoDI_00004944 through
          00004947         51

Exhibit 3    (Inadvertently skipped)

Exhibit 4    Email, CoDi_00005008 through
          00005010         54
Exhibit 5    Press Release, May 1, 2020      55
Exhibit 6    Email, CoDI_00024204 through
          00024205         61

Exhibit 7    Email from Brent Satterfield (Not
          provided to reporter.)     61

Page 4

THE VIDEOGRAPHER: Good morning. We're on the record. The time is now 9:04 a.m. Today is Friday, May 5th, of 2023. We're here today in Salt Lake City, Utah, for the video-recorded deposition of Seth Egan, in the matter of Gelt Trading, Ltd., a Cayman Islands Limited Company, vs. Co-Diagnostics Inc., a Utah corporation, et al, Case Number 2:20-cv-00368-CMR, to be heard before the United States District Court for the District of Utah, Central Division.

I'm Alan Pokotilow, forensic videographer, today here on behalf of Veritext Legal Solutions. Our court reporter today is Lisa Gerlach, also here today on behalf of Veritext Legal Solutions.

Will counsel, please, state their name and affiliation for the record? After which, our court reporter will swear the witness and we can proceed.

MR. FASANO: Michael Fasano, on behalf of the plaintiff, Gelt Trading.

MS. ELWOOD: Rachel Elwood, on behalf of the defendants. I'm with BakerHostetler. I'm joined by my colleague, Marissa Peirsol,

Page 5

P-E-I-R-S-O-L.
THEREUPON,
          SETH EGAN,
a witness herein, acknowledged after having been duly sworn, testified upon his oath as follows:
THE WITNESS: Yes.
          DIRECT EXAMINATION
BY MR. FASANO:
Q. All right, Mr. Egan. How are you? As I said just before, my name is Michael Fasano. I'm counsel for the plaintiff, Gelt Trading, in this matter. I'm going to be conducting your deposition this morning.
Just to get -- it's a Friday, so we'll try to go quickly and get you out of here, but, you know, it just will depend on how the testimony goes.
So can you state your full name for the record, please?
A. Seth Armstrong Egan.
Q. And your current address, home address, please?
A. 2978 East Willow Creek Drive, Sandy, Utah 84093.
Q. How old are you, sir?
A. 40.
Q. You look good.

Page 34

for marketing and selling the Co-Diagnostics COVID-19 test?

A. Generally, for business outside of the United States, previous to COVID-19, we would travel to visit and vet distributors around the world and sign them up to be distributors of our product. This was done before COVID and after COVID.

We used that distributor network to distribute tests generally around the world. And then, in the United States, we dealt with labs directly and we dealt with some distributors within the United States.

Q. Did the sales process change at all after the COVID-19 pandemic?

A. The general strategy did not change. We had been working on the distribution network for years. But we did open up the US market for human diagnostics with the FDA/EUA authorization.

Q. Did you have primary customers, like, customers for the COVID-19 test, who were more prominent than others?

A. More prominent? Give me more...

Q. I actually thought to myself that that was a confusing question. That you were selling more tests to than others by a significant margin.

Page 35

A. There were certainly big labs and small labs alike.

Q. Who were the big labs that you were selling to; do you remember?

A. Clinical Reference Laboratory.

Q. Okay.

A. Nomi Health, N-O-M-I. There were lots of laboratories. I mean, those come to mind, but those are not the only ones.

Q. What was the relationship between Co-Diagnostics and Nomi Health?

A. We were a test supplier.

Q. Okay. Do you know what Nomi Health does or did as its core business?

A. I don't. You need to ask Nomi.

Q. Well, do you know what Nomi was doing with the tests that Co-Diagnostics would supply to it?

A. I mean, we were supplying Nomi Health tests and they were testing individuals, I believe.

Q. Okay. Did you do any specific solicitation of customers for the COVID-19 test or did, mostly, the business sort of come to you once it was established that Co-Diagnostics had a test?

A. We did both. We had lots of customers coming to us and we also had general marketing activities

Page 36

about the company going on.

Q. Did you ever sell directly to states or countries?

A. Typically, out of the United States, we always dealt with distributors that then sold to government entities. In the United States, we typically used a distributor -- or there would a distributor relationship that sold to a state. I can recall maybe one instance when we sold directly to a state agency.

Q. What was that one time when you sold to a state agency?

A. It was in Florida -- to a state agency in Florida.

Q. Is that state agency still using the test?

A. No.

Q. Do you know why?

A. I don't.

Q. Were a majority of the customers of Co-Diagnostics COVID-19 tests distributors?

A. Sorry. Ask that again.

Q. Were a majority of Co-Diagnostics COVID-19 test customers distributors?

A. Were the customers distributors?

Q. Were your customers distributors, is what I'm

Page 37

asking.

A. In the United States, it was a mix. We had labs that we directly sold to and distributors that sold to laboratories.

Q. Okay. Did you sell to hospitals?

A. Some hospital organizations, yes.

Q. Do you remember who your largest customers were?

MS. ELWOOD: Objection; asked and answered.

Seth, you can go ahead and answer.

A. As I said earlier, Nomi Health, Clinical Reference Lab, and other large laboratories in the United States.

BY MR. FASANO:

Q. But, for example, there wasn't one customer -- what I'm asking -- for example, that was buying 80 percent of your tests? You didn't have --

A. No.

Q. -- sales like that?

A. No. Not 80 percent.

Q. Or any percentage above, let's say, 20 percent?

A. That's changed at different times throughout the pandemic. But Nomi Health was often more than

10 (Pages 34 - 37)

Page 38

20 percent.

Q. Okay. You mentioned earlier that some of your customers would come back with questions or concerns about validation studies they did.

Do you recall that?

A. I recall the question, yes.

Q. Now, I just want to understand a little bit more about how those issues were resolved by Co-Diagnostics.

What was the process, if there was a complaint received, that Co-Diagnostics would use to remedy that?

A. From my understanding and experience, customers could use a variety of different equipment to run tests. So, the first step would be to make sure we knew what type of equipment that they were running, and then we were able to generally make sure it wasn't a problem with our test.

Q. Okay. Do you recall any potential customers deciding to not work with Co-Diagnostics after they conducted their own validation study?

A. We would send out hundreds of samples -- not hundreds -- but we sent out lots of tests to laboratories. Generally, people really loved our product.

Page 39

Q. Okay. But do you recall any specific rejections of your company's product after a validation study was done by one of your customers?

A. Not specifically, no.

Q. Do you recall any of your customers coming back to you or the company -- well -- strike that.

Do you recall any customers coming back to Co-Diagnostics, after doing a validation study and complaining about the sensitivity or specificity of the test?

A. I do remember some issues where customers came that we were generally able to resolve.

Q. Okay. Do you recall -- now, can you describe those situations in more detail? Can you give me the first one you remember?

A. I don't recall -- I mean, there were -- I'm not sure if I could give you really specific examples of how they were resolved. I wasn't the laboratory technician responsible for it.

Q. But, again -- I may have asked this before, so I'm just asking you to clarify. If there was an issue with someone's validation report, that would be something that would be resolved by the science people, right, not necessarily the salespeople?

A. Correct.

Page 40

Q. Do you recall the time period in which there were complaints about the test?

A. I wouldn't really say complaints. I would say, questions about the process that needed to be dealt with. And that happens with customers whenever there is an issue, so there's not a specific time period that's tied to that. That is general with all of our products, that there's customer support need and issues that have to be talked over with customers.

Q. Do you recall any customer ever providing feedback that the test was producing false negatives?

A. I recall just there being some customer support issues that needed to be dealt with, not the specific issues that they were having.

Q. Okay. Was there a method for which the sales department would log any customer complaints or keep track of them?

A. Yes.

Q. And how was that done?

A. They were sent to quality and customer support to log and deal with.

Q. So do you know how quality and customer support would log that information?

A. I don't know.

Q. Do you know who at quality and customer

Page 41

support would be in charge of logging that information?

A. Quality, regulatory, and customer support, so probably the head of regulatory and the customer support individual. Those have changed over time.

Q. Okay. Are you familiar with an institution called the Indian Council For Medical Research?

A. I am -- I know what it is, so, yes, I'm vaguely familiar with it.

Q. What is that?

A. It's the Indian Council Medical Research, I believe. Something along those lines.

Q. Right, and it's sometimes called the ICMR?

A. Correct.

Q. Do you recall if Co-Diagnostics failed an evaluation study by the ICMR?

MS. ELWOOD: Objection; vague. What do you mean by "failed"?

BY MR. FASANO:

Q. Okay. You can answer the question, Mr. Egan.

A. I recall that there were issues with a validation that we were able to resolve later on with that issue.

Q. Do you recall what those issues were?

A. I don't recall exactly what the issues were,

11 (Pages 38 - 41)

Page 42

no.

Q. Do you recall if any investors asked the company, based on your personal knowledge, about the ICMR evaluation?

A. I don't handle investor complaints, no.

Q. Okay. Were you involved in the ICMR validation process?

A. I was not.

MR. FASANO: Can we take a two-minute break? Quite honestly, I need to get something to drink and we can come back on.

MS. ELWOOD: I was just going to suggest that. We've been going about an hour.

MR. FASANO: Let's take five and then we can come back, if that's okay with everybody.

THE VIDEOGRAPHER: The time is now 10:03 a.m. This is the end of media unit one. We are off the record.

(Brief recess.)

THE VIDEOGRAPHER: The time is now 10:15 a.m. We're back on the record. This is the beginning of media unit two. Please continue.

BY MR. FASANO:

Q. Mr. Egan, do you have any knowledge about the

Page 43

contract between Co-Diagnostics and Nomi Health?

A. The contract?

Q. Was there -- well, let me establish. Was there a signed agreement between Co-Diagnostics and Nomi Health?

A. Just as a supplier would have distributor agreements.

Q. Do you know what the nature of the agreement was with Nomi Health? Were they just a distributor who you had an agreement with?

A. Just -- we were just a supplier to them.

Q. Do you know what Silicon Slopes is?

A. Just kind of a general understanding of Silicon Slopes.

Q. What's your general understanding of Silicon Slopes?

A. A general understanding of Silicon Slopes, it's a group of tech companies in Utah that have formed the Silicon Slopes organization.

Q. Okay. Was the Nomi contract with Co-Diagnostics, Co-Diagnostics' largest distribution contract?

A. Ask the question one more time.

Q. Was the Nomi distribution agreement a contract with -- sorry -- strike that.

Page 44

Was the sales agreement between Co-Diagnostics and Nomi Health Co-Diagnostics's most significant financial contract?

MS. ELWOOD: Objection; vague. You can answer if you understand the question, Mr. Egan.

A. It was only a distribution. It wasn't a financial contract as you said.

BY MR. FASANO:

Q. Were they the largest distributor of Co-Diagnostics' tests?

A. In the United States, yes.

Q. About what percentage of Co-Diagnostic's sales were to Nomi, if you know?

A. It varied throughout the entire time, so it just depends on what was happening around the world. So there's no set number I can give it.

Q. Is there, like, a lower limit? Was it always above 50 percent, always above 20 percent, if you know?

A. It wasn't always above any -- again, it fluctuated. They were generally more than 20 percent, but I can't give you the specific percentage because I don't know it.

Q. Do you know what TestUtah is?

Page 45

A. I do know what TestUtah is generally.

Q. What is that?

A. It was a group with Nomi Health to provide testing to the state for residents in Utah.

Q. Okay. Did Co-Diagnostics supply tests to TestUtah?

A. We supplied tests to Nomi Health.

Q. Okay. Then do you know if Nomi Health supplied tests to TestUtah?

A. I don't know the contract between Nomi Health and TestUtah. We were just the supplier to Nomi Health.

Q. Okay. Did Co-Diagnostics provide tests for any similar state-run programs to TestUtah?

A. Ask that question again, please.

Q. Did you also provide tests to an initiative called TestIowa?

A. We would supply the tests to Nomi Health and they would supply them to the organizations they were working with.

Q. Would that be the same for TestNebraska?

A. Yes.

Q. Okay. Do you have any knowledge of tests from Co-Diagnostics being sold to the states of Wisconsin or Tennessee?

12 (Pages 42 - 45)

Page 74

privileged communications with counsel, and that's the basis for your knowledge, I instruct you not to answer. Otherwise, you can answer the question, Mr. Egan.

A. I'm not aware.

BY MR. FASANO:

Q. I just want to ask you some questions about discovery in this case.

Did you provide your email box to be searched by counsel to respond to discovery?

A. I believe so, yes.

Q. What about your telephone, did you give that to be searched to counsel?

A. I really only communicate through email on work-related --

Q. But did you provide your phone to counsel to search for relevant potential text messages or data?

A. I don't recall.

Q. Have you deleted any emails since the lawsuit began -- this lawsuit began -- relating to Co-Diagnostics' diagnostic tests?

A. No.

Q. Okay. You said that you do not use text messaging for work purposes; correct?

A. All of my customers, we would communicate

Page 75

through email. Occasionally, I would get a text message from a customer that says, "Call me when you have a minute so I can place an order," but we would use email to do the quote on the PO.

MR. FASANO: Guys, do you mind if we take ten here? I may be very close to being done with Mr. Egan. If we can just take ten minutes to review notes, restroom, and all that? Then I'll come back on and hopefully we'll have a few more questions, or maybe not.

MS. ELWOOD: That works for us. I assume that works for Mr. Egan A as well.

THE WITNESS: Great.

THE VIDEOGRAPHER: The time is now 11:09 a.m. We're going off the record.

THE VIDEOGRAPHER: The time is now 11:22 a.m. We're back on the record. Please continue.

MR. FASANO: Mr. Egan, I want to thank you for your time. I have reviewed my notes. I don't have any further questions for you. I'll pass the witness to Ms. Elwood, if she has any questions. If not, I guess we're done for the day.

Page 76

MS. ELWOOD: Defense counsel has no questions at this time. Thank you. Thanks to everybody.

THE REPORTER: Read or waive?

MS. ELWOOD: We'll read and sign.

THE VIDEOGRAPHER: The time is now 11:23 a.m. This concludes the video-recorded deposition of Mr. Egan. The total number of media units is two and will be retained by Veritext Legal Solutions. The time is 11:23 a.m. We are off the record.

(The reading and signing of the transcript were not waived, and these proceedings concluded at 11:23 a.m.)

Page 77

CERTIFICATE OF OATH
(VIDEOCONFERENCE PROCEEDINGS)

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Lisa Gerlach, Shorthand Reporter and Notary Public, State of Florida, certify that Seth Egan appeared before me via videoconference on the 5th of May 2023 and was duly sworn.

WITNESS my hand and official seal this 27th day of May 2023.

*Lisa Gerlach*
Lisa Gerlach, FPR
Commission #HH41912
Expires 9/13/2024

Witness produced Utah driver's license.

20 (Pages 74 - 77)

Page 78

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Lisa Gerlach, Court Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true and correct transcription of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 27th day of May, 2023.

*Lisa Gerlach*
Lisa Gerlach, FPR

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or discretion of the certifying reporter.

Page 79

Rachel L. Elwood, Esquire
relwood@bakerlaw.com

May 27, 2023

RE: Gelt Trading v. Co-Diagnostics, et al., Seth Egan,
May 5, 2023, Job #5879590

The above-referenced transcript is available for review.

The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions:
*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

Page 80

RE: Gelt Trading v. Co-Diagnostics, et al., Seth Egan, May 5, 2023, Job #5879590

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____
SETH EGAN                    MAY 27, 2023

21 (Pages 78 - 80)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.