# Exhibit 25

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

_____

GELT TRADING, LTD., a Cayman          ) Case No.
Islands limited company,              )
                                      ) 2:20-cv-
                                      ) 00368-CMR
                    Plaintiff,        )
                                      )
            vs.                       )
                                      )
                                      )
CO-DIAGNOSTICS, INC., a Utah          )
Corporation; DWIGHT EGAN, JAMES       )
NELSON, EUGENE DURENARD, EDWARD       )
MURPHY, RICHARD SERBIN, REED          )
BENSON, BRENT SATTERFIELD,            )
                                      )
                                      )
                    Defendants.       )
                                      )

_____

*********************CONFIDENTIAL*********************

 VIDEOTAPED DEPOSITION BY ZOOM OF REBECCA GARCIA, Ph.D.
                SIMPSONVILLE, SOUTH CAROLINA
                   FRIDAY, MAY 12, 2023

REPORTED BY:  Tammy M. Breed, CCR No. 7801

JOB NO:  FLA 5902786

CONFIDENTIAL

Page 2

VIDEOTAPED DEPOSITION BY ZOOM OF REBECCA GARCIA, Ph.D., taken at 234 SANDUSKY LANE, SIMPSONVILLE, SOUTH CAROLINA, on FRIDAY, MAY 12, 2023, at 7:00 A.M. EDT, before Tammy M. Breed, Certified Court Reporter, in and for the State of Utah.

APPEARANCES:

For Gelt Trading, Ltd. and Proposed Class:
Brandon S. Floch
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
(305) 400-4260
bfloch@mnrlawfirm.com

For the Defendants and Deponent:
Joni Ostler
PARR BROWN GEE & LOVELESS
101 South 200 East
Salt Lake City, Utah 84111
(801) 532-7840
jostler@parrbrown.com

Zachary R. Taylor
Baker Hostetler
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200
ztaylor@bakerlaw.com

Also Present:
Sofia Johnson, Videographer

Page 3

I N D E X
WITNESS: REBECCA GARCIA, Ph.D.
EXAMINATION                    PAGE
BY: Mr. Floch                    7

Page 4

E X H I B I T S
EXHIBIT                    PAGE
Exhibit 1  E-mail from Denny Crockett to Rebecca Garcia, Dated 12/17/21, Bates Nos. CoDI_00131545 to 131546    28
Exhibit 2  "Fluorescence" Graphic, 1 page    54
Exhibit 3  Original Research Article, Evaluation of Factors that Affect the Performance of COVID-19 Molecular Assays Including Presence of Symptoms, Number of Detected Genes and RNA Extraction Type, 10 pages    79
Exhibit 4  E-mail from Andrew Benson to Dwight Egan, Dated 1/22/2020, Bates Nos. CoDI_00023286 and 23287    90
Exhibit 5  E-mail from Chad Apuli to Rebecca Garcia, Dated 3/3/2020, and Other Related Documents, Bates Nos. CoDI_00077784 to 77878    97
Exhibit 6  E-mail from Rebecca Garcia to Tom Williams, Dated 3/23/2020, Bates No. CoDI_00004420    105
Exhibit 7  E-mail from Rebecca Garcia to Brent Satterfield, Dated 4/2/2020, Bates No. CoDI_00004509 to 4511    111
Exhibit 8  E-mail from Rebecca Garcia to Brent Satterfield, Dated 4/2/2020, Bates No. CoDI_00004512    120
Exhibit 9  E-mail from Cameron Gundry to Laura Benzonana, Dated 4/3/2020, Bates No. CoDI_00004529    127

Page 5

Exhibit 10  E-mail from Rebecca Garcia to Dwight Egan, Dated 4/11/2020, Bates Nos. CoDI_00023726 and 00023727    131
Exhibit 11  E-mail from Rebecca Garcia to Andrew Benson, Dated 4/28/2020, Bates Nos. CoDI_00024111 to 00024114    141
Exhibit 12  E-mail from Andrew Benson to Anurag Mehta, Dated 4/29/2020, Bates Nos. CoDI_00024121 and 24122    145
Exhibit 13  E-mail from Cameron Gundry to Chad Apuli, Dated 4/9/2020, Bates Nos. CoDI_00075061 to 75069    148
Exhibit 14  E-mail from Brent Satterfield to Chad Apuli, Dated 5/5/2020, Bates Nos. CoDI_00007794 and 7795    157
Exhibit 15  E-mail from Cecilia Hutchins to Kenneth KC Bramwell, Dated 8/14/2020, Bates Nos. CoDI_00085324 to 85328    159
Exhibit 16  E-mail from Cecilia Hutchins to Chad Apuli, Dated 4/30/2020, Bates Nos. CoDI_00001168 and 1169    166
Exhibit 17  E-mail from Brent Satterfield to Rebecca Garcia, Dated 4/30/2020, Bates Nos. CoDI_00001371 and 1372    173
Exhibit 18  E-mail from Rebecca Garcia to Andrew Benson, Dated 4/30/2020, and Validation Report, Bates Nos. CoDI_00024155 to 24165    176
Exhibit 19  E-mail from Rebecca Garcia to Dwight Egan, Dated 4/30/3030, Bates Nos. CoDI_00027453 to 27455    182

2 (Pages 2 - 5)

Veritext Legal Solutions
800-726-7007                    305-376-8800

CONFIDENTIAL

Page 174

Exhibit 17. And I'll scroll to the bottom so you can 12:59:49 read up, and just let me know when to scroll up. 12:59:53

A. (Witness complying.) Okay. 13:00:06

Q. Okay. So if we scroll down to the bottom in time 13:00:46 e-mail, it looks like Joseph Featherstone is forwarding 13:00:50 you some data from Australia, right? 13:00:54

A. Yes. 13:00:58

Q. And Dwight Egan received the e-mail from Joseph 13:00:59 Featherstone too? 13:01:05

A. Yes. 13:01:06

Q. And Dwight Egan's the CEO of Co-Diagnostics? 13:01:07

A. That's correct. 13:01:12

MS. OSTLER: Asked and answered. 13:01:13

Q. (BY MR. FLOCH) And who's Joseph Featherstone. 13:01:16

A. He's the -- he's over business development. I 13:01:18 don't know what his title is. 13:01:21

Q. Okay. So if we scroll up, it looks like after 13:01:23 you reviewed the data, then you prepared a summary of 13:01:30 the results of the data, right? 13:01:33

A. Yes. 13:01:35

Q. And did you put this summary in a validation 13:01:39 report? 13:01:45

A. Yes. 13:01:46

Q. Okay. And then you said, "Brent do you want to 13:01:46 sign this report," right? 13:01:51

Page 175

A. Yes. 13:01:52

Q. Why were you asking Brent if he wanted to sign 13:01:53 the report? 13:01:59

A. Because I wasn't the one who originally set up 13:02:00 the experiment so... 13:02:04

I felt that somebody in Salt Lake should have 13:02:10 been the one to sign the report. 13:02:14

Q. And when you say you weren't the one who set up 13:02:16 the -- the testing, are you talking about the Australian 13:02:19 testing? 13:02:22

A. Yeah. Somebody from Salt Lake should have 13:02:23 established some type of clinical evaluation agreement 13:02:26 with this PathWest Laboratories in Australia. And in 13:02:30 that agreement, they would have been the ones 13:02:35 responsible for seeing that the validation report was 13:02:38 completed and everything for the study. 13:02:41

Q. And then if you scroll up, you see 13:02:44 Dr. Satterfield reply to you, and he said, "Rebecca, 13:02:54 I'm good with the results and the summary. Have either 13:02:56 KC, Cecilia, or Chad sign it - they're technically over 13:03:00 development, including clinical results." 13:03:04

Do you see that? 13:03:07

A. I see that. 13:03:08

Q. Okay. So once you got this e-mail from 13:03:08 Dr. Satterfield, did you ask KC, Cecilia, or Chad to 13:03:10

Page 176

sign the Validation Report? 13:03:15

A. I don't remember. 13:03:17

Q. Okay. Let me show you the Validation Report. 13:03:18

MS. OSTLER: Oh, you're showing us your 13:03:27 thing. Did you mean to show us your thing? Your whole 13:03:29 screen right now? 13:03:33

MR. FLOCH: Thank you, Joni, no. 13:03:34

(Exhibit No. 18 marked.) 13:03:36

Q. (BY MR. FLOCH) Dr. Garcia, I'm showing you what 13:03:36 I've marked as Exhibit 18. And why don't you let me 13:04:14 know when you're done reading the top e-mail, and I'll 13:04:27 scroll through the report. 13:04:30

A. Okay. (Witness complying.) 13:04:31

Hang on. Can you go back up so I can see the 13:04:42 time stamp on that? 13:04:44

Q. (Complying.)

A. Okay. 13:04:45

MS. OSTLER: Dr. Garcia, just be aware that 13:04:45 those time stamps have been processed in a different 13:04:47 time zone, so that may be UTC. 13:04:51

THE WITNESS: (Witness complying.) Okay. 13:05:00

Okay, that's all data. 13:05:29

Q. (BY MR. FLOCH) So if we go all the way up, it 13:05:32 looks like this is an e-mail from to you Mr. Benson and 13:07:03 Mr. Egan around April 30th, 2020? 13:07:06

Page 177

A. Yes. 13:07:09

Q. And that's the same day that Dr. Satterfield was 13:07:10 writing to you about finishing a paper? 13:07:13

A. Yeah, same date, but a much later time. 13:07:17

Q. Okay. And do you see the "Subject" says "signed 13:07:21 copy"? 13:07:27

A. Yes. 13:07:28

Q. And then do you see the attachment says, 13:07:28 "Validation Report COVID-19 Australia"? 13:07:31

A. Yes. 13:07:34

Q. Why were you sending this Validation Report to 13:07:35 Mr. Benson and Mr. Egan? 13:07:39

A. I believe that Dwight had asked me to send him a 13:07:41 copy when I was done. 13:07:46

Q. Do you have an understanding of what he was going 13:07:47 to do with the Validation Report once you sent it to him 13:07:53 with your signature? 13:07:57

A. No, I had no idea what they were going to do with 13:07:58 it. 13:08:01

Q. Okay. Is it normal in the molecular diagnostic 13:08:01 industry to draft and finish a Validation Report in one 13:08:08 day? 13:08:15

A. It's possible. 13:08:15

MS. OSTLER: Objection, ambiguous. 13:08:16

Q. (BY MR. FLOCH) And let's scroll all the way down 13:08:28

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

before we go through the report.

Do you see that there's two signature lines on the report on page 10?

A. Yes.

Q. And the "Author," is that your signature --

A. That's mine.

Q. -- in the "Author" --

And then in the "Supervisor," is that your signature as well?

A. That's mine.

Q. Is it odd for the author also be the supervisor of a Validation Report?

MS. OSTLER: Objection, ambiguous, overbroad, foundation.

THE WITNESS: It's usually two separate people. But if there's nobody who as the supervisor is going to sign it, then my position will allow me to sign it.

Q. (BY MR. FLOCH) Before preparing this Validation Report, how many other validation reports had you prepared where you were both the author and the supervisor?

A. I don't know how many that was prepared like this.

Q. Okay. Let's go back to the top of the Validation

Page 179

Report.

So do you see that bullet 1 says, "Validation Report Scope"?

A. Yes.

Q. And do you see it says, "To report the validation results of the Logix Smart COVID-19 RT-PCR test for sensitivity, specificity, and agreement with laboratory developed test performed at PathWest Laboratory Medicine WA (Australia)"? Do you --

A. Yes.

Q. -- see that?

Okay. Can you explain to me what the results are in "Table 1"?

A. Yeah, so this is specificity testing where they're testing the kit with all types of bacteria viruses and maybe even inhibiting substances. I don't know what all's in that last. So they're identifying what they're testing the kit against, if the strain for that potential organism is known or whether it's not known, and then the result of the test.

Q. Okay. And then if we scroll to "Table 2," can you explain to me what Table 2 is showing?

A. Yeah, so this is sensitivity where they're taking a known sample concentration and they're serial diluting it into nine different points of concentration. And

Page 180

they're testing it in a replicates to identify the limit of detection. And they confirmed the limit of detection with 20 replicates.

Q. And is a 20-replicate limit of detection favorable, unfavorable?

MS. OSTLER: Objection, ambiguous, misstates prior testimony.

THE WITNESS: The FDA guidelines says there has to be 19 out of 20 replicates positive to de- -- confirm the limit of detention.

Q. (BY MR. FLOCH) So does this table reveal anything about whether or not the Logix Smart test has a good or bad limit of detection?

MS. OSTLER: Objection, vague.

THE WITNESS: You can't determine good or bad from the table, it simply confirms the limit of detection.

Q. (BY MR. FLOCH) Okay. So this table doesn't reveal anything about whether or not the limit of detection for the Logix Smart test is favorable or unfavorable?

MS. OSTLER: Objection, vague, asked and answered.

THE WITNESS: So the only thing you can derive from this table is the range of testing to the

Page 181

limit of detection, and you can estimate the probability past the limit of detection.

Q. (BY MR. FLOCH) Okay. What does "Table 3" show?

A. Table 3 summarizes what was in the previous table.

Q. Okay. And what about Table 4?

A. Table 4 is the comparison between the Logix kit and the laboratory-developed tests from Australia.

Q. After you sent this Validation Report to Mr. Egan and Mr. Benson, did you have any follow-up conversations about this specific Validation Report?

A. I don't remember if I had conversations after I sent the report.

Q. On April 30th, 2020, besides the Validation Report summarizing the Australian data, did you prepare any other validation reports describing other datasets?

A. I believe there was a few validation reports that I -- I wrote.

Q. Okay. Do you remember how many?

A. I don't remember the number exactly, maybe two or three.

Q. And if you recall, was all the data that you provided -- sorry.

Was all the data that was given to you to analyze, did all of it show 100% sensitivity and 100%

46 (Pages 178 - 181)

Veritext Legal Solutions

800-726-7007                                                      305-376-8800

CONFIDENTIAL

Page 182

specificity performance by the Logix Smart test?

MS. OSTLER:  Objection, vague as to time, foundation.

THE WITNESS:  I don't remember the specific numbers for each one.

Q.  (BY MR. FLOCH)  Okay.  Let's look at another exhibit.

(Exhibit No. 19 marked.)

Q.  (BY MR. FLOCH)  Dr. Garcia, I'm showing you what I've marked as Garcia Exhibit 19.  And let me know when you're ready for me to scroll down.

A.  Okay.  (Witness complying.)

Okay.

Okay.

Q.  You see there's a top e-mail from you to Mr. Egan and Mr. Benson on April 30th, 2020?

A.  Yes.

Q.  And the "Subject" line says, "India Signed Report"?

A.  Yes.

Q.  And the "Attachments" say, "Validation Report COVID-19 India.pdf"?

A.  Yes.

Q.  And did you prepare this Validation Report?

A.  Yes.

Page 183

Q.  And do you see under bullet 1, it says, "Validation Report Scope"?

A.  Yes.

Q.  Did you write the language under Validation Report Scope?

A.  I believe so.

Q.  And do you see it says, "To report the validation results of the Logix Smart COVID-19 RT-PCR Test manufactured by CoSara Diagnostics Pvt. Ltd. and re-branded Saragene Corona Virus (2019 NCV) RT-PCR Test."

Do you see that?

A.  Yes.

Q.  And do you see that you wrote, "This report shares the sensitivity, specificity, and agreement of the Logix Test with a laboratory developed test performed at the National Institute of Pathology, India."

Do you see that?

A.  Yes.

Q.  Can you help me understand -- we were talking earlier today about the fact that the Logix Smart test and the Saragene test are two separated products, right?

A.  Yes.

Q.  And you testified earlier that the National

Page 184

Institute of Pathology did an analysis of the performance of the Saragene test, right?

A.  That's right.

Q.  And the National Institute of Pathology did not do an analysis of the Logix Smart test, right?

A.  That's right.

Q.  But this first paragraph seems to imply that the National Institute of Pathology did an analysis of the Logix Smart test, right?

MS. OSTLER:  Objection, speculation.

THE WITNESS:  Well, I actually think it's a typo.

Q.  (BY MR. FLOCH)  Okay.  What -- what's the typo in here?

A.  In the last sentence referring to the Logix Test, as in there's another typo in Table 1 referring to the NIV.

Q.  Because it -- sorry, going back up.

So the typo in paragraph one, it should say, This report shares the sensitivity, specificity, and agreement of the Saragene test?

A.  That's right.

Q.  Okay.  And then in Table 1, instead of "NIV Gold Standard RT-PCR Test, it should say, NIP Gold Standard RT-PCR Test, right?

Page 185

A.  That's correct.

Q.  And that's because if the company had reported the NIP results, they would not be the results that are in the document we're looking at that's Garcia 19, right?

A.  Yeah, the results would have been different for NIV.

Q.  Okay.  And so it's your testimony that -- sorry, let me back up.

Why don't you take a read of the Validation Report again, and let me know if you see any other typos.

A.  (Witness complying.)

Yeah, there's one in 4.1.1.  The, ICMR-NIV gold standard, should have been NIP.

Q.  And do you see any other typos?

A.  Yeah, 1 -- 4.1.3, NIV again should be NIP.

Q.  Okay.  Sitting here today, is this the first time that you're noticing the typos in this validation report?

A.  Yes.

Q.  Did anyone ask you to insert the word Logix Test into the first paragraph under section 1?

A.  No, nobody asked me.

Q.  Okay.  Did anyone ask you in Table 1 to insert

47 (Pages 182 - 185)

CONFIDENTIAL

Page 218

status is in India.                     14:35:41

Q. (BY MR. FLOCH) Did you have any stock in CoSara?   14:35:42

A. Not that I know of.                 14:35:46

MR. FLOCH: Okay. Dr. Garcia, I have no    14:35:48
further questions. And I just want to thank you for    14:35:51
your time today. I know you're -- you don't work for    14:35:53
the company anymore and you're a busy professional, so I  14:35:57
really appreciate your time.                14:36:00

And I'll allow -- or I'll pass the witness   14:36:01
to Ms. Ostler.                       14:36:04

MS. OSTLER: So we need to take a break so I  14:36:05
can confer with Zach. Give us five minutes, and we'll   14:36:07
come right back.                     14:36:11

MR. FLOCH: Okay.                   14:36:12

Thank you -- and thank you again,       14:36:14
Dr. Garcia.                         14:36:15

THE VIDEOGRAPHER: We're going off the   14:36:16
record at 4:36 p.m.                    14:36:17

(A brief recess was taken.)             14:36:19

THE VIDEOGRAPHER: We're back on the record  14:42:23
at 4:42 p.m.                        14:42:25

MS. OSTLER: We have no questions.       14:42:27

We'd like to designate the entire transcript  14:42:29
provisionally confidential under the protective order.   14:42:34

And we would like to read and sign.      14:42:36

Page 219

THE REPORTER: Okay.                14:42:38

MS. OSTLER: Please send the read and sign   14:42:38
version to me.                       14:42:44

(Pause in the proceedings.)            14:42:45

THE VIDEOGRAPHER: Ready to go off the     14:42:45
record? Okay.                       14:42:54

We're off the record at 4:42 p.m. And this  14:42:55
concludes today's testimony given by Rebecca Garcia.   14:42:59
The total number of media used was five and will be    14:43:02
retained by Veritext.                   14:43:06

(Signature requested.)

(The proceedings concluded at 4:42 p.m. EDT)

Page 220

REPORTER'S CERTIFICATE

I, Tammy M. Breed, CSR No. 7801, Certified Reporter, certify:

That the foregoing proceedings were taken before me remotely at the time and place therein set forth, at which time the witness was put under oath remotely by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Utah that the foregoing is true and correct.

Dated this 31st day of May, 2023.

TAMMY M. BREED, C.C.R. No. 7801

Page 221

Rebecca Garcia, Ph.D. c/o Joni Ostler, Esq.
jostler@parrbrown.com

May 31st, 2023

RE: GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al
5/12/2023, Rebecca Garcia , Ph.D. (#5902786)
The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at transcripts-fl@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

CONFIDENTIAL

Page 222

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Rebecca Garcia , Ph.D. (#5902786)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Rebecca Garcia , Ph.D.                Date

Page 223

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Rebecca Garcia , Ph.D. (#5902786)

ACKNOWLEDGEMENT OF DEPONENT

I, Rebecca Garcia , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Rebecca Garcia , Ph.D.                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

Veritext Legal Solutions

800-726-7007                                                                    305-376-8800

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.