# Exhibit 51

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION


Gelt Trading, Ltd., a Caymen Islands

limited company,

    Plaintiff,

V.                       Case No. 2:20-cv-00368-CMR

Co-Diagnostics Inc., et al.,

    Defendants.


_____/


VIDEOTAPED

DEPOSITION OF:   DENNIS CROCKETT

DATE:            MARCH 13, 2023

TIME:            9:05 a.m. - 12:06 p.m.

TAKEN BY:        DEFENDANT

PLACE:           TELEPHONIC

REPORTED BY:     CHELSEA HLAVACH, NOTARY PUBLIC, STATE

                 OF FLORIDA

Page 2

APPEARANCES:

MICHAEL FASANO, ESQUIRE
OF: Fasano Law Firm, PLLC
2 S Biscayne Blvd Ste 2530
Miami, FL 33131-1806
Mfasano@fasanolawfirm.com
Attorney for the Plaintiff appeared via Zoom

NICK NIELSON, ESQUIRE
OF: Parr Brown Gee & Loveless
101 South 200 East, 700
Salt Lake City, UT 84111

Attorney for the Defendant appeared via Zoom

ZACHARY TAYLOR, ESQUIRE
OF: Baker & Hostetler, LLP
45 Rockefeller Plaza
New York, NY 10111
Ztaylor@bakerlaw.com

Attorney for the Defendant appeared via Zoom

BRANDON FLOCH, ESQUIRE
OF: Marcus Neiman Rashbaum & Pineiro LLP
2 S Biscayne Blvd Ste 2530
Miami, FL 33131-1806
Bfloch@mnrlawfirm.com

Attorney for the Defendant appeared via Zoom

MICHAEL PINEIRO, ESQUIRE
OF: Marcus Neiman Rashbaum & Pineiro LLP
2 S Biscayne Blvd Ste 2530
Miami, FL 33131-1806
Bfloch@mnrlawfirm.com

Attorney for the Defendant appeared via Zoom

ALSO PRESENT
PETER CURRAN, Videographer, appeared via Zoom
OWEN BADIN, Law Clerk

Page 3

INDEX
* * * * *

TESTIMONY OF DENNIS CROCKETT
Direct Examination by Mr. Fasano ........... 6
CERTIFICATE OF OATH ............................... 107
CERTIFICATE OF REPORTER .......................... 108
ERRATA SHEET...................................... 109
NOTIFICATION LETTER .............................. 110

EXHIBITS
* * * * * *
Exhibit No. 1 .................................... 61
   (E-mail - 3rd Party Validation)
Exhibit No. 2 .................................... 67
   (E-mail to Grant)
Exhibit No. 3 .................................... 72
   (E-mail to Reno about False Positive)
Exhibit No. 4 .................................... 88
   (Article - April 30th of 2020)
Exhibit No. 5 - not marked on the record.
   (E-mail - SA Results)
Exhibit No. 6 .................................... 98
   (E-mail 5/20/2020)
* * * * * *
STIPULATIONS
It is hereby stipulated and agreed by and between counsel present for the respective parties, and the deponent, that the reading and signing of the deposition are hereby reserved.

Page 4

PROCEEDINGS
* * * * *

THE VIDEOGRAPHER: All right. Good morning. We are going on the record at 9:05 a.m. on March 14th, 2023. Please note that this deposition is being conducted virtually. Quality of the recording depends on the quality of camera and Internet connection of the participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video recorded deposition of Dennis Crockett taken by counsel for the Plaintiff in the matter of Gelt Trading, Limited, a Caymen Islands Limited Company versus Co-Diagnostics Inc., a Utah Corporation, et al., filed in the United States District Court of Utah, Central Division, Case Number 2:20-CV-00368-CMR.

My name is Peter Curran representing Veritext Legal Solutions, and I am the videographer. The court reporter is Chelsea Hlavach from the firm Veritext.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please

Page 5

state them at the time of your appearance. Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. FASANO: My name is Michael Fasano from Fasano Law Firm, PLLC. Along with me is Owen Badin. We represent -- we are co-representatives of the -- of -- of Gelt Trading, which is the punitive class rep in this case.

MR. TAYLOR: Zach Taylor from Baker & Hostetler, LLP, on behalf of Defendants. And I'll let Nick introduce himself.

MR. NIELSON: Yeah. And Nick Nielson with Parr, Brown, Gee & Loveless, also on behalf of Defendants.

THE VIDEOGRAPHER: Thank you. Will the reporter please swear in the witness, and counsel may proceed.

THE COURT REPORTER: Can I have our witness raise your right hand, please?

Do you swear or affirm that the testimony you are about to give in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE COURT REPORTER: Thank you.

Counsel, you may proceed.

DENNIS CROCKETT,

2 (Pages 2 - 5)

Page 54

regarding the deletion of e-mails and texts.

MR. FASANO: Sure.

MR. TAYLOR: If you wouldn't mind clarifying that question one more time.

MR. FASANO: Sure.

BY MR. FASANO:

Q. So my -- my question to you was whether since the filing of the lawsuit in this action, if you deleted any e-mails or text messages on your devices that have been -- or -- or -- or any device or any storage -- anything in storage that -- that you've turned over?

A. Sure. Yeah. I apologize. I -- I thought you meant since I found out I was being deposed. And I, frankly, don't even know when this lawsuit was filed, but over the last couple years, I go through and I -- I delete, you know, e-mails and things all the time.

Q. Okay. So when --

A. And I -- I apologize for the misunderstanding there.

Q. No problem. So in the normal course of business --

A. Yes.

Q. -- you have deleted some e-mails and text messages over time?

A. Yes. Absolutely.

Page 55

Q. Okay. Okay. But not -- but since you learned that you were going to be a deponent in this action, you haven't done so?

A. That's right. Nothing -- nothing that falls under the -- out- -- outside of just normal business.

Q. Have you intentionally deleted anything that you did not wish -- that you did not wish to share with -- with -- with the Plaintiffs in this lawsuit?

A. No.

Q. Okay. Then let's move on.

A. Okay.

MR. TAYLOR: Thank you. I --

A. Oh, one other thing. Can I -- I wanted to clarify one other thing?

BY MR. FASANO:

Q. Of course.

A. I am -- I am a sales guy. I am not a scientist. So when you -- I -- I start spinning my wheels when I start trying to explain limit of detection and the reason for that. So -- so you can take my -- my layman's understanding, but just -- just keep it at that because I don't -- I don't claim to be a -- a -- a science guy.

Q. Okay. Well, look, here -- here -- here's what we'll do. I don't want you to guess and I don't want you to speculate. I -- you can certainly estimate things that

Page 56

you don't know the exact answer to, but if you're going to guess and you're going to speculate about something, it is okay to tell me that you don't know the answer. So if you don't feel comfortable answering a question because it's outside of the realm of -- of -- it's outside the realm of what you do for a living, you're here in your personal capacity as -- as Denny Crockett, not as the representative for Co-Diagnostics.

So please feel free to tell me that you don't know the answer, and if you don't know the answer, that's acceptable. Okay?

A. Great. Thank you.

Q. I told you, I'm not trying to trick you. I know I look -- I know I look like a trickster, but so -- so -- where did we leave off? -- so would you say that the Co-Dx test for COVID-19 was developed at a faster rate than some of the other tests that you've been a part of that have been rolled out by the company?

A. I wouldn't -- I wouldn't say faster. I would say that we put a lot of focus into developing that and making that as good as we can. So -- so in terms -- I can't -- I can't tell you it was faster, but we certainly put a bunch of focus there.

Q. Okay. Do you understand -- and I'm asking you this based on your personal understanding -- what the

Page 57

metrics of specificity and sensitivity are for a diagnostic test?

A. No.

Q. Okay. So when you go to sell the test to third -- or to distributors or to third parties, if they have questions about those specific things, what is it that you -- how do you resolve those questions?

A. So I refer them to the -- the published document from regulatory that shows what those are and -- and that's typically how we do things, is -- is send over the published document.

Q. Okay. At any point did you ever find out that -- that distributors were saying the test was 100 percent specific and 100 percent sensitive?

A. Yeah. There was -- there was a lot of confusion in general in terms of PCR tests, and we tried to clean -- we tried to clean that up every chance we got. But, yes, we -- we did hear that people would misrepresent because, you know, the -- the data sheet shows it's 100 percent sensitive, right, but that was 100 percent sensitive in that specific internal validation study. Great. But that doesn't mean it's always. And so there was times that we would -- we would do our best to -- if -- if we heard that someone misunderstood that because in the industry, that's pretty common knowledge, but if someone

15 (Pages 54 - 57)

Page 58

was -- were to under- -- misunderstand that, then we would do our best.

Q. Can you remember any -- any times when -- when there was a specific misunderstanding where a distributor believed the test was 100 percent sensitive and specific and you had to make a correction?

A. Nothing specific. I don't -- I can't remember like a specific instance, no.

Q. So you -- you had mentioned that people in the industry -- it's typically common knowledge that you wouldn't have a 100 percent specific and 100 percent sensitive test. Was that something that you had mentioned before?

A. Yeah. Because -- because when we -- when we show those results, we refer to the studies that are done, the data -- it's only the data that we have. We -- we -- we could never say that it is always this, but this is the data and there, here you go.

Q. So based on your understanding, again, it is -- it is -- this is not -- I'm not holding you to a PhD level scientist's, you know, understanding, but is it possible to have a 100 percent accurate COVID-19 PCR test?

A. That's a tough question because it depends on the val- -- it depends on how it's done. If you -- if -- possibly, but also maybe not. I -- I don't think there's

Page 59

-- there's something that will always be 100 percent. There's not -- there's not anything out there that will always be 100 percent, never.

Q. Okay.

A. And -- and I would think that most people would understand that. But in certain studies that are done that show 100 percent sensitivity, 100 percent specificity in that study, then those are the results and we are free to show those results, as every other company does in this industry.

Q. Do you think that -- okay. When you say every other company in this industry, who are the other companies that are -- that you know of that are making COVID-19 --

A. Oh, there's Thermo Fisher, Rosche, Isle Fire. Every one -- every -- every time there's a test -- a test that's being sold to the public, they'll have a specification chart that shows these are our internal studies. This is what we got. And -- and customers can see that, and say, okay, great. And then it's up to the -- it's up to the -- the customer to run that test in a lab following their own protocols and their own processes and -- and to see what they get.

Maybe they have a different machine. Maybe they have different -- so they -- it will not -- it will not be perfectly reproduced. It can't be.

Page 60

Q. Have you -- have there ever been customers who have come back to Co-Diagnostics and said this test is less than 100 percent sensitive or specific?

A. Never -- they've never said this test is less than 100 percent because people in the industry will know that it's not going to be 100 percent, but -- but they'll -- but we'll have customers that say, hey, I'm getting -- I'm getting a little bit less sensitive on here. What's going on? And -- and we troubleshoot with them and offer technical support to see the reasoning and sometimes those are bumps, sometimes it's a matter of machine. So every -- it's all -- it all varies.

Q. Okay. Now, but internal -- internally has Co-Diagnostics ever determined that its test was less than 100 percent sensitive or 100 percent specific?

A. Int- -- repeat that again?

Q. So in its internal testing, has Co-Diagnostics ever determined that its test is less than 100 percent sensitive or 100 percent specific?

A. I'd refer back to the -- the specification sheets, and whatever it says on there is what it is. I'm seeing if I can pull one up but --

MR. TAYLOR: Sorry. Denny -- Denny, we're not looking at any, like, documents here. This is all based on your --

Page 61

THE WITNESS: Okay.

BY MR. FASANO:

Q. Yeah. If I have a document -- I'm going to probably show you a few documents here today, not -- like after I ask you some -- some more general questions.

A. Sure.

Q. You can answer questions about that, but -- but please don't -- don't feel the need to -- to pull up any --

A. Pull something. Okay.

Q. To take anything to refresh your recollection.

A. Okay.

Q. That is -- that's -- that's -- I'm going to say something against my own interest -- that's my job, not your job. Okay?

A. Okay. Got it.

Q. Okay. So --

MR. FASANO: Actually, can you show Co-Diagnostics 06? This one. Okay.

BY MR. FASANO:

Q. I'm actually going to show you a document now.

A. Okay.

Q. Speaking of. I said later. Later is now now.

(Crockett Exhibit No. 1 was marked for identification.)

Okay. Mr. Crockett, what I'm showing you now we're going to -- we're going to just call for

16 (Pages 58 - 61)

Page 62

identification Crockett Exhibit 1.

A. Okay.

Q. I just -- I'm just going to focus on the top part of this e-mail, but you can read the -- let's -- let's scroll down and you can read the entire thing, if you'd like. Let us know when you want us to scroll down. Let us know when you want to look at it. If you want to take break and read it, you can. Whatever you want to do.

A. Okay. Okay. Yeah. So this gentleman was interested in selling diagnostics in the Philippines. I remember him. We never did any business with him, but I do remember him, and I do remember e-mailing him back and forth, sure. So --

MR. TAYLOR: Denny, sorry. You can wait for Mr. Fasano to ask his --

THE WITNESS: Oh, okay. I will.

MR. FASANO: Actually, I have -- I have a scheduling issue relating to a hearing tomorrow that there's a bunch of e-mails going back and forth.

Can we take two minutes off the record so that I can try and avoid flying to New York tonight, and then we'll get back on the record and we'll ask about this question.

MR. TAYLOR: Sure.

MR. FASANO: Thank you, guys. I appreciate that

Page 63

courtesy.

THE VIDEOGRAPHER: All right. The time is 10:35 a.m. We are going off the record.

(Break taken.)

THE VIDEOGRAPHER: The time is 10:41 a.m. We are back on the record.

BY MR. FASANO:

Q. Okay. So, Mr. Crockett, we're back on the record. We've -- we've marked this as -- we're going to call it Crockett Exhibit 1 for identification because there's a lot of witnesses in this case. Scroll -- let's -- you know, let us know when you're ready to talk about this e-mail and I'll ask you a couple of questions about it.

A. Sure. I'm ready.

Q. Okay. So I'm just going to focus on the top. It says from Denny Crockett, DCrockett -- D.Crockett@Co-Diagnostics.com to Bert Ginampos.

MR. FASANO: Can you make this a little bit bigger? Thanks. Sorry. My eyes aren't what they used to be -- never were.

BY MR. FASANO:

Q. Anyway -- no, it's fine -- and the subject RE: HTA DOH Philippines, and it says -- and it's from you saying this all seems good to me. Make sure to emphasize

Page 64

that our 100 percent concordance in both specificity and sensitivity were from third party validation studies, but we do not make the claim that there are tests that -- that -- that -- that are tests --

A. I should have said our, O-U-R.

Q. That's okay. That are tests are 100 percent accurate. We can simply share the information from other studies.

Now, do you recall the reason why you sent that disclaimer to Mr. Ginampos?

A. Yeah. We just -- we wanted to make sure that people that were repping the product or distributors, possible distributors, were not -- were not making claims that we -- we can't make.

Q. Okay. Now, did you send this in response to or because of an FDA inquiry that was made to the company?

A. I don't remember. I don't remember if it was -- if I sent this because of that. I certainly -- I can't tell you if that was the reason.

Q. Let's take a step back.

Do you recall that the FDA or were you ever made aware, I should say, that the FDA contacted Co-Diagnostics letting them know there was a concern that certain distributors were marketing -- were marketing the tests one hundred percent accurate?

Page 65

A. Yeah. I do remember that our regulatory head contacted the sales team and said we may have some people that are inaccurately showing -- or claiming -- making claims of our tests, and so we were -- we were asked to go and -- and discuss that with all of our representatives -- representatives or distributors.

Q. Okay. Do you remember which representatives or distributors were making those claims specifically?

A. No, I do not. I have a few -- can I speculate for a moment?

Q. If you want to. It's a deposition though.

A. Well, the -- the -- the FDA, when they contacted our -- our regulatory head, there could have been a few reasons. It could have been a competitor that wanted us out. It could have been a short saler that wanted us to -- take away our EUA. It could have been a lot of things. I con- -- all I know is that I contacted all of the people that I worked with, and no one was making those claims.

Q. Okay. Do you remember any internal discussions about that FDA inquiry that you had with anyone else at Co-Diagnostics?

A. Yeah. We -- we -- we -- we met together as a sales team and we wanted to put -- put an end to it -- to it, if it was true, immediately.

Q. Okay.

17 (Pages 62 - 65)

Page 106

about that for a second, but just let us know on the record whether you choose to read or waive.

THE WITNESS: I defer to Zach on this.

MR. TAYLOR: Read.

MR. FASANO: You're going to read?

MR. TAYLOR: I think we're going to read and submit an errata sheet, if necessary, yes.

MR. FASANO: Okay. Great. Then that's what we'll do.

THE VIDEOGRAPHER: The time is 12:05 p.m. We are off the record.

This concludes today's testimony given by Dennis Crockett. The total number of units used was three and will be retained by Veritext Legal Solutions.

(The deposition concluded at 12:06 p.m.)

Page 108

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, CHELSEA HLAVACH, Shorthand Reporter and Notary Public, State of Florida, HEREBY CERTIFY that I was authorized to and did stenographically report the deposition of DENNIS CROCKETT; that a review of the transcript was requested; and the foregoing transcript, pages 4 through 106, inclusive, is a true and accurate record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel to any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 16th day of March, 2023.

_____
Chelsea Hlavach, Notary Public,
State of Florida at Large

Page 107

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, CHELSEA HLAVACH, shorthand reporter and Notary Public, State of Florida, certify that DENNIS CROCKETT, appeared before me via Zoom and was duly sworn/affirmed Witness my hand and official seal this 14th day of March, 2023.

Witness my hand and official seal this 16th day of May, 2023.

_____
Chelsea Hlavach, Notary Public
State of Florida, My Commission:
GG352672, Expires: August 11, 2023

Page 109

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

RE:      GELT TRADING, LTD. VS. CO-DX
CASE NO:    2:20-cv-00368-CMR
DATE TAKEN:   MARCH 14, 2023

PAGE   LINE   CHANGE      REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

_____    _____
DATE    DENNIS CROCKETT

28 (Pages 106 - 109)

Page 110

May 16th, 2023
ZACHARY TAYLOR, ESQUIRE
OF: Baker & Hostetler, LLP
    45 Rockefeller Plaza
    New York, NY 10111

In Re:   March 14, 2023, depositsion of DENNIS CROCKETT
        GELT TRADING, LTD. VS. CO-DX
Dear Sir/Madam:
    This letter is to advise that the transcript for the above-referenced deposition has been completed and is available for review.  Please contact our office at (800)275-7991 to make arrangements for read and sign or sign below to waive review of this transcript.
    It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*; however, there is not Florida Statute to this regard.

    The original of this transcript had been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties for inclusion in the transcript.
        Sincerely,
        Chelsea Hlavach
        Veritext Legal Solutions
CC:  MICHAEL FASANO, ESQUIRE
Waiver:
I, _____, hereby waive the reading & signing of my deposition transcript.

_____  _____
Deponent Signature        Date
*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)

29 (Page 110)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.