# Exhibit 62

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

GELT TRADING, LTD., a        ) Case No.
Cayman Islands limited       ) 2:20-cv-00368-CMR
company,                     )
                             )
          Plaintiff,         )
                             )
v.                           )
                             )
CO-DIAGNOSTICS, INC., a      )
Utah Corporation; DWIGHT     )
EGAN; JAMES NELSON; EUGENE   )
DURENARD; EDWARD MURPHY;     )
RICHARD SERBIN; REED         )
BENSON; BRENT SATTERFIELD,   )
                             )
          Defendants.        )
_____)


VIDEO-CONFERENCED DEPOSITION OF REED BENSON

Through Advanced Reporting Solutions Via Zoom


Taken on March 21, 2023
9:01 a.m. to 3:09 p.m.


Reported by:  Carilee Dustin, CSR, RPR

Page 2

APPEARANCES

For the Plaintiff:

Brandon S. Floch
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Boulevard
Suite 2530
Miami, FL 33131
(305)400-4260
bfloch@mnrlawfirm.com

Michael C. Fasano
FASANO LAW FIRM, PLLC
2 South Biscayne Boulevard
Miami, FL 33131
mfasano@fasanolawfirm.com

For the Defendants:
Marissa Peirsol
Grace Elwood
BakerHostetler
11601 Wilshire Boulevard
Los Angeles, CA 90025
(214)477-0413
mpeirsol@bakerlaw.com
gelwood@bakerlaw.com

Also Present: Alyse Largin, Videographer
-ooOoo-

Page 4

INDEX TO EXHIBITS

| EXHIBITS | PAGE |
|---|---|
| Exhibit 1    Registration Statement for Broadcast International | 20 |
| Exhibit 2    ScamVictimsUnited.com document | 29 |
| Exhibit 3    Email from Reed Benson to Lynn Briggs, 4/25/20 | 43 |
| Exhibit 4    Email dated 2/18/20 | 81 |
| Exhibit 5    Email dated 2/24/20 | 83 |
| Exhibit 6    Co-Diagnostics Department Review Meeting | 92 |
| Exhibit 7    Emails dated 4/2/20 | 96 |
| Exhibit 8    Co-Diagnostics Code of Ethics for Senior Financial Officers | 104 |
| Exhibit 9    Email dated 7/20/20 | 115 |
| Exhibit 10   Email dated 4/3/20 | 124 |
| Exhibit 11   Email dated 4/17/20 | 132 |
| Exhibit 12   Email dated 4/30/20 | 146 |
| Exhibit 13   Email dated 5/1/20 | 149 |
| Exhibit 14   Email dated 5/1/20 | 158 |
| Exhibit 15   Email dated 5/11/20 | 172 |
| Exhibit 16   Email dated 6/23/21 | 178 |

Page 3

INDEX

| WITNESS | PAGE |
|---|---|
| REED BENSON | |
| Examination by Mr. Floch . . . . . . . | 6 |

-ooOoo-

WITNESS INSTRUCTED NOT TO ANSWER
Page 103, line 2
Page 169, line 11
Page 170, line 18
Page 172, line 14
Page 177, line 17

Page 5

March 21, 2023                    9:01 a.m.

PROCEEDINGS

THE VIDEOGRAPHER: We're going on the record. The time is 9:01 a.m. Today's date is March 21, 2023. This is media unit 1 in the recorded video deposition of Reed Benson and it's of Gelt Trading, LTD vs. Co-Diagnostics, Incorporated, et al., filed in the US District Court, District of Utah, Central Division. This deposition is being held over remote.

Will counsel please state who they are and who they represent.

MR. FLOCH: Good morning. Brandon Floch from the law firm Marcus Neiman Rashbaum on behalf of the plaintiff, Gelt Trading, and the punitive class.

MS. PEIRSOL: Marissa Peirsol with Baker Hostetler. I'm also joined by Grace Elwood. We represent the defendants.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

REED BENSON,
called as a witness herein, having been first duly sworn by the Certified Court Reporter to tell the truth, was examined and testified as follows:

2 (Pages 2 - 5)

Page 6

EXAMINATION
BY MR. FLOCH:

Q. Good morning, Mr. Benson. I mentioned before, my name is Brandon Floch with the law firm Marcus Neiman Rashbaum Pineiro, and I represent the plaintiff and the punitive class in this case.

Can you please state and spell your first name and last name for the record.

A. Reed Benson.

Q. And have you ever been deposed before, Mr. Benson?

A. Yes.

Q. About how many times have you been deposed?

A. I don't really remember. It's been years ago. Two or three times, I suppose.

Q. And were you deposed in civil cases?

A. Yes.

Q. Just generally, what types of cases were those civil cases?

A. One was a breach of contract matter, and one was a dispute between heirs in a -- it wasn't really a probate proceeding, but it was related to distribution of assets from an estate.

Q. So I take it you're generally familiar with depositions, but let me just go over some ground rules.

Page 7

First, because we have a court reporter here, you have to let me get out my question before you give your answer.

Do you understand that?

A. Yes.

Q. Second, your attorney may lodge an objection, but you can answer after she gives her objection.

Do you understand that?

A. Yes.

Q. Third, you understand you're under oath today, right?

A. Yes.

Q. Next, I'm going to be showing some documents on my screen. They're also on a program called Exhibit Share. You tell me where -- if you can't see them and I'll stop and take a break.

Does that make sense?

A. Yes.

Q. Okay. And finally, if you need a break at any time, to use the bathroom, food, you just let me know. And as long as we're not in the middle of a question, I'll make sure we take a break.

Does that make sense?

A. Yes.

Page 8

Q. Okay. Mr. Benson, what did you do to prepare for today's deposition?

A. I spoke with our counsel.

Q. Did you do -- did you speak to anyone else besides your counsel?

A. Not in preparation to the deposition, no.

Q. Okay. Did you review any documents to help you prepare for today's deposition?

A. Yes, my counsel showed me some documents and we talked about them.

Q. Okay. Just generally, can you describe for me what types of documents you looked at?

A. Mostly emails, press releases, and that kind of information. Things that were in the public, a newspaper article.

Q. When you say public newspaper article, what article are you referring to?

A. There was an article in the Salt Lake Tribune relative to this period of time.

Q. When you say "relative to this period of time," what time period are you referring to?

A. Early 2020.

Q. Okay. Do you have a college degree, Mr. Benson?

A. Yes.

Page 9

Q. From where?

A. The University of Utah.

Q. And what was your degree in?

A. I had a BS in accounting.

Q. Do you have any post college degrees?

A. Yes.

Q. What are they?

A. A JD from the University of Utah law school.

Q. Just generally, can you describe for me your work experience after law school?

A. I worked for a law firm in Salt Lake City, for some years. Then I worked for -- as a sole practitioner for ten years, I suppose. Then I worked for -- as general counsel for a company called Broadcast International. Again, for maybe eight or ten years, I can't remember.

And then I worked for another reorganized Broadcast International for some other years. I worked in private practice after that for -- that was probably from 20 -- 2005 or 2007 until -- until 2017, when I went to work for Co-Diagnostics as general counsel and chief financial officer, and worked for them until October of 2021, in that capacity.

Q. Okay. So let's break that down a little

3 (Pages 6 - 9)

Page 10

bit.

So after law school, you were practicing with a firm, you said, right?

A.   Yes.

Q.   What firm was that?

A.   Kesler, Gordon & Curtis, and then it merged with Senior & Senior.  And it was -- I guess it just was Senior & Senior for awhile.  And then I -- I left them and -- oh, actually, for about a year, I was an in-house counsel for a real estate development firm named -- something.  It had a name.  Mahan Hampshire Pruitt was the name of the real estate development firm.  And then I went out and practiced on my own after about a year with them.

Q.   When you were at Kesler and Senior & Senior, what type of law were you practicing?

A.   Mostly tax-related matters, income tax planning, estate planning, and some contracts and general business matters with them.

Q.   When you went out on your own, were you doing the same type of legal work?

A.   Primarily, yes.

Q.   Anything else besides tax planning and general business matters?

A.   Well, estate planning was a major part of

Page 11

it.

Q.   Okay.  You said that after your law firm experience, you worked for one of the structures of Broadcast International, right?

A.   Yes.

Q.   Around what year was that?

A.   Well, it seemed like I would have gone to work there probably about 19 -- I don't know.  These are approximate.  Probably about 1991 or something along those lines.  And then at about 1995, '96, Broadcast International merged with another company called Data Broadcasting Corporation, and I was -- still stayed as general counsel there, until it ended up getting bought by Pearson PLC in about the year 2000.

And at that point, some of the assets of Data Broadcasting Corporation, which were the assets of the original Broadcasting {sic} International, were spun off to some of the employees.  And I went to work with that subsidiary or whatever it was, as it was reincorporated and went public.

Q.   Okay.  So let's start with the first iteration of Broadcast International.

What -- what type of business did the company do?

Page 12

A.   It did satellite communications for large retailers.  Safeway stores was a client, and Broadcast International would install satellite dishes on the Safeway stores and deliver in-store music and in-store advertising to those stores.  And it would receive a license fee or a fee of some sort from the -- per retail store for the services that it provided.

Then it bought -- then it bought a subsidiary.  In fact, if you need to know the rest of the story, they bought a subsidiary that did -- called ChekRite that did check and check verification and collections for retailers.  And then it bought another company that did -- distributed stock and commodity quotes to private investors.

And so there were those three parts of the company that were then acquired by Data Broadcasting Corporation.

Q.   Was your role the same in the first iteration of Broadcast International and the new entity?

A.   Yes.  I was general counsel, when -- in 2000, when the assets were spun off, I had served as chief financial officer for awhile as well.

Q.   You said that there were three different pieces of the restructure of Broadcast International,

Page 13

right?

A.   No.  That was the original Broadcast International.

Q.   Got it.  Okay.  So let's go back to the original Broadcast International.  There's three separate pieces, right?

A.   Right.

Q.   Can you just break it down for me?  What was the first piece?

A.   The in-store communications and advertising that was done via satellite.

The second piece was a check collection and verification system that also dealt with those same kind of retailers.

And the third piece was a company that would deliver realtime stock and commodity quotes to individual subscribers.

Q.   So was there a unifying theme behind the three legs of the business or was Broadcast International essentially a holding company?

A.   A theme.  For the two, it was services that were provided to retailers, clearly.  The stock and commodity quote part was an opportunity that was presented to us and it seemed like a -- an interesting business, because it was -- the same delivery system

4 (Pages 10 - 13)

Page 14

was used. They were -- stock and commodity quotes were delivered by using -- I'm going back a long time -- sidebands on satellite video services.

There were -- there was a technology that allowed you to deliver data and audio on what was called the sidebands of the satellite feeds. And so with the satellite communications that we had, it was another service that could be provided down the same platform. So I suppose that was as close as you could get to a theme between the three.

Q. Is a sideband like a television or it's an audio --

A. It's an audio sideband, was where the stock and commodity quotes were delivered.

Q. Okay.

A. And we would use -- sometimes we would use the video for video conferencing, for example, but mostly we used those sidebands to deliver the services.

Q. So moving ahead in time to the second iteration of Broadcast International, what was the business of that company?

A. When we merged with Data Broadcasting Corporation, they had a company that delivered stock and commodity quotes through their technology that was a little different than the sidebands. But they wanted

Page 15

that subsidiary that -- that we had bought as -- and to incorporate it into their business. And what they did was they sold off the check and -- ChekRite portion of the business to somebody else, I don't remember who.

They incorporated the stock and commodity quote business into their business, and then they spun out the original part of Broadcast International, which was a satellite communications, which was the clients -- the main clients at that time were probably Safeway and Rite Aid. There was probably 12 -- 10 or 12 different retailers that had the satellite communications, the in-store advertising portion of the business. And that was what was spun out to the next iteration of Broadcast International.

Q. Did the stock and commodity portion have a name or a banner that it operated under?

A. Well -- and I can't remember the exact dates. It was a time when there was irrational exuberance in the market about dot coms. And so Data Broadcasting spun out a portion of their assets that became marketwatch.com, which I think now is now owned by Dow Jones.

They spun that out and took it public about 2000 or whenever the real dot com fury was. And that was probably the thing that you would recognize as a

Page 16

brand name or something that you might -- that you might recall. That was not the main part of their business, but it was the one that is -- has at least a brand name that you would recognize.

And then when the company merged or was bought by Pearson PLC, I don't know exactly what -- their service had a name, which I can't remember, and that was back when technology couldn't be got on your cell phone, because we didn't have cell phones. But there was a big brick-like thing with an antenna that would come up that you could get your stock and commodity quotes.

And I think it was delivered by a shortwave or -- I'm not sure what the technology was that delivered it to them, but that -- that was their product that they sold and advertised. And quite frankly, I don't remember the name of it, but it did have a brand name, but things -- technology has changed so much now that I'm -- the service is probably still there, but the delivery mechanism is I'm sure totally changed.

Q. Are any of the Co-Diagnostics employees -- were they employed by Broadcast International besides yourself?

A. Yes.

Page 17

Q. Who was that?

A. Dwight Egan was the president of Broadcast International, the first one. And I believe that's the only other employee, besides myself.

Q. How long have you known Mr. Egan?

A. I probably met him -- I don't know, 1985.

Q. Besides working with him at Broadcast International and Co-Diagnostics, do you have any other business dealings with him, or have you had any other business dealings with him?

A. He and his partner were clients of -- were estate planning and business clients of the law firm that I worked with, and that was how I got to know him initially.

Q. So let's go back to the second iteration of Broadcast International.

Did there come a time when your employment ended with the second iteration of Broadcast International?

A. I missed the question.

Q. Did there come a time when your employment ended with the second iteration of Broadcast International?

A. Yes.

Q. Can you just generally describe for me why

5 (Pages 14 - 17)

Page 18

it ended?

A. Well, I was working with -- with some other people in some other businesses. And when BI -- this goes back a long time, but when BI was -- they were public, they were a OTC stock, they were -- wanted to go onto an exchange. And they applied for a listing on the American Stock Exchange, as I recall.

And during that time, it turned out that there had been an enforcement action brought against a company in Europe, of which I was sitting on the board of directors. And it was deemed better if I was not an officer or director of Broadcast International, and so I stepped away from the board, stepped away as the CFO. I remained as a consulting attorney with them for some times after that, but I went back into private practice, basically.

Q. So you testified that it was deemed better that you left the company. Can you explain to me what you mean by that? Did you resign or were you terminated?

A. I don't really recall. I left. I do recall that, though I don't think I was terminated, no. I think I resigned, but I don't remember exactly.

Q. Okay. And can you tell me a little bit more about this enforcement action? What -- who was

Page 19

the enforcer and what were the allegations against you?

A. I don't really know. I was never served in any actions. I never saw any papers with any actions or anything else. The company was a company called Carlton Birtal. It raised money in Europe. It was located in Spain.

A friend of mine had asked me to serve on the board of directors. And I don't know exactly what the enforcement action entailed, because I was never -- never involved with it, never served with papers, never saw any -- any documentation from whatever the entity was in Spain that brought the action. Never consulted with an attorney about it, but I had been named in that -- in that action. And I even think there was a judgment or a fine or something that was -- that was levied against me.

Q. How do you know about a fine being levied against you?

A. Because the people that were involved in the company told me.

Q. Did you pay any money to satisfy a fine?

A. No.

Q. Why not?

A. Because I never received anything from the enforcement agency that asked me to.

Page 20

Q. Okay. I'm going to show you what I'm marking as Exhibit 1.

(Exhibit 1 marked.)

BY MR. FLOCH:

Q. And, Mr. Benson, let me know when you see it on your screen and then I'll ask you a few questions about it.

MR. FLOCH: Oh, can we go off the record for a second? Because it looks like I'm unable to share my screen. Ms. Dustin, could you --

(Discussion off the record.)

MR. FLOCH: Ms. Largin, could you give me host capabilities so I can share my screen?

THE VIDEOGRAPHER: That's working.

MR. FLOCH: There we go. We can go back on the record.

THE VIDEOGRAPHER: Back on.

BY MR. FLOCH:

Q. Okay, Mr. Benson, do you see a document on your screen marked Exhibit 1?

A. Yes.

Q. And just generally, from the first page, do you know what this document is?

A. It says it's a "Post-Effective Amendment No. 3 to Form S-1, Registration Statement Under the

Page 21

Securities Act of 1933."

Q. Okay. And do you see that the date at the top says May 6, 2009?

A. Yes.

Q. Okay. I'm going to scroll down. I'm only going to ask you questions about page 87 and 88, so I'll scroll down there.

Can you just take a second to read pages 87 and 88, beginning at the paragraph, Mr. Benson. Then let me know when you finish and I'll ask you a question.

A. Can you make it any bigger?

Q. Yes, sir.

A. Oh, much better.

(Witness reading.)

Okay, I've read it.

Q. What is the CNMV?

A. I don't know. I suppose it's the Comisi?n Nacional del Mercado de Valores, because that has C-M-C-N-M-V in the initials. I have no idea what it is.

Q. Do you see that in the middle of the bottom paragraph on page 87? It says, "On February 20, 2006, the CNMV imposed civil sanctions against Carlton Birtal, Mr. Benson and the other director in the amount

6 (Pages 18 - 21)

Page 22

of 300,506 Euros"?

A. Yes.

Q. When did you first hear about that civil sanction?

A. I would presume sometime after February 20, 2006. I didn't hear about it right away, I'm quite certain, but I -- it's been a long time ago and I don't remember.

Q. Do you see that on page 88, it says, "We became aware of the CNMV matter in September 2008"?

A. Yes.

Q. But if you look up above, on page 87, it looks like the CNMV issued a warning in 2004, right?

A. Yes.

Q. Did you know about the CNMV investigation into you and Carlton Birtal sometime in 2004?

A. No.

Q. Did you know about it in 2005?

A. No.

Q. Did you know about it in 2006?

A. It would have been sometime after 2006, yes. I don't really recall when I found -- found out about it.

Q. When you were serving -- sorry. Let me back up.

Page 23

Did you disclose to anyone at Broadcast International that you had a pending investigation by Spanish regulators?

A. No.

Q. So it's your testimony that they found out about it when they were doing some type of public offering?

MS. PEIRSOL: Objection. Misstates his testimony.

BY MR. FLOCH:

Q. Mr. Benson, let me ask another question. What is your understanding of when Broadcast International first learned about the Carlton Birtal investigation?

A. They learned about it from the American Stock Exchange. I had filed an application to be accepted to the Exchange. We had all filled out our histories, and because I was so totally unaware of this action, I did not list it on my -- on my -- whatever it was I filled out, the application form. And the Exchange brought it to our attention.

Q. Okay. Do you see, going on to page 88, it says, "Mr. Benson maintains, although he was named a director of Carlton Birtal, that he had no involvement in any business or affairs of Carlton Birtal and that

Page 24

he relied on a business colleague and attorney to manage all operations, compliance matters and other business affairs of Carlton Birtal"?

Do you see that?

A. Yes, I do.

Q. Is that an accurate statement?

A. I believe it is, yes.

Q. Okay. And then do you see the last sentence says, "Mr. Benson also maintains he tendered his resignation as a director of Carlton Birtal in December 2003, but that such resignation was never recorded or reflected in any filing with the CNMV or other Spanish authority"?

Do you see that?

A. Yes.

Q. Whom did you tender your resignation to as a director of Carlton Birtal?

A. It was the attorney for Carlton Birtal.

Q. And --

A. He was going to file it, I guess, but I guess he didn't.

Q. What was his name?

A. John Lewis.

Q. Do you have an understanding of why he never filed the resignation?

Page 25

A. No.

Q. After you found out about the investigation, did you communicate with Mr. Lewis?

A. Yes.

Q. And what were the substance of those communications?

A. "Why didn't you file it?" I suppose. I don't really recall the substance of any of our conversations that we had back then, but I'm sure we discussed that matter and where that left me.

Q. Is it concerning to you that you tried to resign as a director of a company and that that resignation was never recorded properly?

A. It certainly was a concern to me then, yes.

Q. After the Carlton Birtal investigation happened, do you now disclose that when you start new jobs?

A. No. I haven't done. It was 25 years ago.

Q. So is it your testimony that you don't believe that an investigation by a securities regulator is material information for your new or current employers?

MS. PEIRSOL: Objection. Misstates his testimony.

BY MR. FLOCH:

7 (Pages 22 - 25)

Page 26

Q. If you understand my question, Mr. Benson, you can answer it.

A. No, I don't think it's relevant.

Q. Why don't you think it's relevant?

A. Because it's something that happened 25 to 30 years ago.

Q. Mr. Benson, earlier I think we were talking about whether or not you resigned or were terminated, right?

A. Yes.

Q. And I think your testimony was you didn't remember, right?

A. Right.

Q. Do you see that the first sentence here says, "Mr. Benson's termination from the company on September 19, 2008, resulted from an incident involving the Comisi?n Nacional del Mercardo de Valores of Spain"?

A. Yes.

Q. So it looks like you were terminated from Broadcast International, right?

MS. PEIRSOL: Objection.

THE WITNESS: I don't think that that's what it says, no.

BY MR. FLOCH:

Page 27

Q. Okay. What do you understand that sentence to mean?

A. It could be a termination. It could be a voluntary termination in which I resign, or it could be a termination in which I was fired. The fact is, my services terminated, but it doesn't seem to indicate in that particular sentence exactly the nature of the termination.

Q. Okay. So let's go back to when you first became a director of Carlton Birtal.

What was your understanding of what that company did?

A. They raised money.

Q. And what year did you become director of that company?

A. I don't recall.

Q. Who did Carlton Birtal raise money for?

A. For companies that -- basically seed capital or angel funding for small venture capital companies' ideas.

Q. Okay. When you say "seed capital," what do you mean by that?

A. Companies that had an idea, but they needed money in order to commence operations or to pursue their -- their business plan.

Page 28

Q. How did you become involved with Carlton Birtal?

A. A friend of mine was involved in it.

Q. And that was John Lewis or someone else?

A. No. It was Lynn Briggs. John also was a friend of mine, but -- well, I don't know who asked me to be on the board of directors, whether it was Lynn or it was John. One of them.

Q. Do you have an understanding of why one of them asked you to be on the board of directors?

A. No.

Q. Who is Mr. Briggs?

A. He's a friend of mine who has raised money for venture capital uses for years.

Q. How long have you known Mr. Briggs?

A. Probably thirty or forty years. Thirty or forty years.

Q. How did Carlton Birtal locate potential investors?

A. I don't really know. My understanding is they had access to mailing lists, calling lists, and they would solicit those investors.

Q. Have you ever heard of complaints by Carlton Birtal customers that Carlton Birtal was a scam?

Page 29

A. No.

Q. Have you ever heard of the website Scam Victims United?

A. No.

Q. Okay. Mr. Benson, I'm going to show you what's been marked as Exhibit 2.

(Exhibit 2 marked.)

BY MR. FLOCH:

Q. And let me know when you get it on your screen and I'll direct you to a certain paragraph.

A. Okay.

Q. So, Mr. Benson, I'm going to scroll down to page 4 to 5. And why don't you read pages 4 to 5 and let me know when you're ready and I'll ask you a question.

A. Would you make it bigger, please?

Q. Yes, sir.

And, Mr. Benson, just let me know when you want me to scroll and I can do that for you as well.

A. Where am I starting to read?

Q. Where it says "hello."

A. Oh, okay.

And how much do I read?

Q. This page 4 down to page 5.

A. Oh, okay.

8 (Pages 26 - 29)

Page 30

(Witness reading.)

Turn it a little bit higher. Right there. Stop. Whoop. Go back a little bit. Okay.

(Witness reading.)

Turn it down more, please.

(Witness reading.) Okay.

(Witness reading.)

Turn it some more.

(Witness reading.) Okay.

Q. Okay. Mr. Benson, have you seen this before?

A. No.

Q. Does this appear to be a complaint by a customer of Carlton Birtal posted on the website Scam Victims United?

MS. PEIRSOL: Objection.

THE WITNESS: It is what it is. I don't know exactly anything about the website or anything. It seems to be in a -- a email thread or something like that.

BY MR. FLOCH:

Q. Okay. Do you see that, it looks like it was posted on June 11, 2012?

A. Yes.

Q. And there's a name associated with it,

Page 31

named Ryan Johnson?

A. Yes.

Q. Do you know Mr. Johnson?

A. No.

Q. Do you see that the first line of the entries, it says, "I was first approached by Carlton Birtal Advisory Service in 2002. (They changed the name a few times, including Carlton Birtal..), who in turn managed to sell me shares of Xvariant, Mayan Gold, and Broadcast International over the next four years."

Do you see that?

A. Yes.

Q. And then going forward a little bit, do you see that Mr. Johnson wrote, "By 2006 I became suspicious of the Carlton agent. I started doing internet inquiries and after many hours of searching I realized I was being scammed"?

Do you see that?

A. Yes.

Q. Do you know what Xvariant is?

A. Yes.

Q. What is Xvariant?

A. It was a small public company that had some technology that related to the real estate sales industry, connecting real estate agents with -- with

Page 32

ways to make the real estate -- I can't remember exactly -- the real estate sales more easier to follow, easier to find listings, and easier to present them to the buying public to make real estate sales easier for the agents that subscribe to the software.

Q. Were you an executive of Xvariant?

A. Yes, I was.

Q. What was your role in Xvariant?

A. To be honest, I don't really remember. I think I actually served as the president of Xvariant at -- I think I served as the president of Xvariant, but I don't really remember. It didn't -- it wasn't very long. The software didn't seem to do -- to be able to be sold nearly as well as those individuals that had developed it and were hoping that it would.

Q. Did you have an ownership interest in Xvariant?

A. I don't recall. I -- I don't remember exactly.

Q. Does Xvariant still exist?

A. It was sold to some other people, and I don't know whether it exists or not. I'm sure they must have changed the name, but I don't know.

Q. Sorry.

A. I don't know whether the entity does exist

Page 33

or not.

Q. Did you make money when Xvariant was sold?

A. No.

Q. Were you aware that the firm Carlton Birtal was selling shares of Xvariant?

A. I don't recall whether I was or not.

Q. Do you know what Mayan Gold is?

A. Yes.

Q. What is that?

A. It was a company that had a mine, a gold mine, in Honduras.

Q. And did you have a management role at Mayan Gold?

A. No. I don't believe I ever did have a management role. I was associated with Mayan Gold and in the -- any of its -- monitored the investment that went down there to the -- to develop the gold mine, but I think I did that as an outside consultant. I don't recall that I ever had a position in Mayan Gold in any way.

Q. Did you have an ownership interest in Mayan Gold?

A. No.

Q. So you believe your only association with Mayan Gold was as a consultant?

9 (Pages 30 - 33)

Page 34

A.   Yes.  It was sold sometime later to a company called Clavo Rico, which was the name of the gold mine.  And I was an officer of Clavo Rico, and -- for about four or five years, as we developed the gold mine and the leach pad and processed the gold and then oversaw the operations.

The gold dore bars were shipped from Honduras to a large smelter here in Salt Lake, and they were -- they were refined into pure gold and then sold on the spot market.  And I was involved in those operations there.

Q.   Okay.  Let's scroll down a little bit.  Do you see where Mr. Johnson wrote, "I have written off the money and I have no faith that I will ever see any return on this.  After I confronted the agent the Spanish authorities closed in on Carlton and seemingly managed to close them down.  One thing I must mention here, I don't know if I am allowed to but here goes. The common name that appeared in all the companies I was being enticed to buy was Reed L. Benson, and I see he received a fine from the Spanish authorities"?

Do you see that?

A.   Yes, I do.

Q.   Okay.  Now, if you scroll further down, do you see that Mr. Johnson then wrote, "The common thread

Page 35

what I understand how these guys operate is that they either own or have shares in the advisory company as well as the company they entice you to invest in, i.e. a double scam, they collect whatever fees when advising as well as the income from the failed company.  I followed the financials of some of the companies like Broadcast International, and they never made good profits if any at all.  They always seemed to have extraordinary expenditure resulting in losses."

Do you see that?

A.   I do.

Q.   Did you have an ownership interest or any shares in Carlton Birtal?

A.   No.

Q.   But you did have an ownership interest in some of the companies that Carlton Birtal was selling, right?

A.   I had an interest in Broadcast International, but it had nothing to do and did not come from anything having to do with Carlton Birtal.  I don't recall having an interest -- a stock interest in -- whatever that was, Xvariant.  I may have done, but I don't think so.

I don't think I ever had a stock interest in Mayan Gold.  I did get an interest in Clavo Rico,

Page 36

which was a successor to Mayan Gold, though that interest would have been less than a one percent interest or something.  I don't know exactly what percentage it was, but it would have been very, very small.

Q.   Do you see that Mr. Johnson then wrote, "All went quiet for a while, but they are back in business, with new names, and obviously new ways to trick you out of your money"?

Do you see that?

A.   I see that.

Q.   It appears that this individual is very upset by Carlton Birtal's solicitation option, right?

MS. PEIRSOL:  Objection.  Calls for speculation.  He can't testify as to how this person feels.

BY MR. FLOCH:

Q.   Mr. Benson, I think you testified earlier that you were director of Carlton Birtal, right?

A.   Yes.

Q.   And you tried to resign but that resignation was never recorded, right?

A.   Right.

Q.   And now we've just read what looks like a customer complaint of Carlton Birtal in 2012, right?

Page 37

MS. PEIRSOL:  Objection, compound.  The document speaks for itself.

BY MR. FLOCH:

Q.   Does it concern you that your name is associated with the entity Carlton Birtal?

A.   I'm sure it concerned me at the time.  I'm not sure that it concerns me today, no.

Q.   Why do you say you're sure it concerned you at the time?

A.   Well, because I don't like my name being associated with things that may or may not have legal ramifications to them.

Q.   Mr. Benson, we've been going for about an hour.  Would you like a five-minute break or so?

A.   No.  I'm fine.

Q.   Okay.  So I've stopped sharing my screen.

So let's go back to your work history.  We ended by talking about Broadcast International.  After Broadcast International, and before Co-Diagnostics, did you work anywhere else?

A.   After Broadcast International.  I was primarily just in private practice.  I don't think I was an employee and had a W-2 from -- from any other entity.

Q.   What's Legends Capital Group, LLC?

10 (Pages 34 - 37)

Page 38

A. It's the -- a company that was run by Lynn Briggs that would monitor the investments that were funded by his overseas operation.

Q. Okay. What was your involvement with Legends Capital Group, LLC?

A. I provide legal services and accounting services to Legends and to the companies that have been funded.

Q. I think you testified, and correct me if I'm wrong, about Legends Capital Group monitors Mr. Briggs's investments overseas, right?

A. Investments in the United States that were funded by overseas fundraising operations.

Q. Okay. So Legends Capital Group, LLC, is like an investment advisor or something?

A. No. No. I don't think that's correct. It was just an entity that would -- would make certain that the funds that were invested in companies were used for the purpose that they were intended. So we'd monitor where those expenditures went and how they were used.

Q. Have you ever heard the term "boiler room"?

THE COURT REPORTER: Would you repeat that, please.

BY MR. FLOCH:

Page 39

Q. Sorry. Mr. Benson, have you ever heard the term "boiler room"?

A. Sure.

Q. What does that mean to you?

A. People on the telephone selling investments.

Q. Okay. Have you ever heard of the term "pump and dump"?

A. Sure.

Q. And what does that term mean to you?

A. Invest in a company that touts its products and when the stock increases, sell your interest in the companies.

Q. Have you ever heard of anyone calling Carlton Birtal a "boiler room operation"?

A. No.

Q. Have you heard of the firm MB Financial Advisory, AG?

A. MB?

Q. Yes, sir.

A. Not that I recall.

Q. What about the firm First Swiss Financial Management, AG, have you heard of that one?

A. Yes.

Q. What is that firm?

Page 40

A. A firm that raised money overseas.

THE COURT REPORTER: Would you repeat the name of the company, just make sure I heard it right.

MR. FLOCH: Sorry, First Swiss Financial Management, AG.

BY MR. FLOCH:

Q. Mr. Benson, what was your involvement with First Swiss Financial Management, AG?

A. None.

Q. How do you know about it?

A. Lynn Briggs ran -- ran the firm, ran the operation.

Q. And I think you said that that firm promoted public shares to potential investors, right?

A. When you say "public shares," what do you mean? I don't --

Q. Sorry. Any shares. Just shares in companies.

A. They would sell investments to individual investors in Europe.

Q. But was First Swiss Financial Management based in the United States?

A. No -

Q. Was --

A. -- not that I know of.

Page 41

Q. Sorry.

Was Mr. Briggs based in the United States?

A. Yes. He lives in the United States.

Q. Have you ever heard anyone call First Swiss Financial Management, AG, a boiler room operation?

A. I don't recall.

Q. Okay. Who is Bryant Cragun?

A. I know Bryant from 40 or 50 years ago. I know he and Lynn Briggs worked together, or Lynn Briggs worked for Bryant, one or the other.

Q. Does Mr. Briggs have any association or involvement with Co-Diagnostics?

A. Yes.

Q. What's his involvement with Co-Diagnostics?

A. He is an investor and has been a consultant to Co-Diagnostics.

Q. What type of consulting does he provide to Co-Diagnostics?

A. Financial services, representation with brokers and investment bankers has been his primary involvement. At least after the company went public, that would have been his primary involvement.

Q. Does Bryant Cragun have an association or involvement with Co-Diagnostics?

A. No, not that I know of.

11 (Pages 38 - 41)

Page 42

Q. Okay. Mr. Benson, if we could take a short five-minute break just to use the restroom, and then we'll be back here at 12:10, which I guess is --

A. 10:10.

Q. -- 10:10 your time.

A. Sure.

Q. Thank you very much.

(Recess taken from 10:05 a.m. to 10:15 a.m.)

THE VIDEOGRAPHER: Back on the record. This is the beginning of video two. The time is 10:15.

BY MR. FLOCH:

Q. Mr. Benson, when we left before the break, we were talking about Mr. Briggs.

Do you remember that?

A. Yes.

Q. Have you ever heard Mr. Briggs's name associated with boiler rooms before?

A. I don't recall. I suppose I have, but I don't specifically recall any instance.

Q. Why do you say you suppose you have?

A. Because he sold private investments to individuals throughout Europe.

Q. And why would that -- why would his sale of private investments to individuals in Europe cause you

Page 43

to think that you've heard his name associated with boiler rooms?

A. I don't know.

Q. You just testified --

A. Isn't that what a boiler room is?

Q. I'm asking you what your understanding of what a boiler room is.

A. That's my understanding of what it -- of what it is. And so somebody might have mentioned that term to me in that context. He may have mentioned it to me in that context.

Q. Okay. Let me show you what's been marked as Exhibit 3.

(Exhibit 3 marked.)

BY MR. FLOCH:

Q. Do you see that, the top email, Mr. Benson, is from you to Mr. Briggs?

A. Yes.

Q. And it's from your gmail account, right?

A. Yes.

Q. Do you often conduct Co-Diagnostics business on your gmail account?

A. Yes.

Q. Do you also use a Co-Diagnostics email account to conduct Co-Diagnostics's business?

Page 44

A. The problem I have right now with my Co-Diagnostics account is I can receive emails on that Co-Diagnostics account, but if I just hit the button that says "reply," there's something wrong in the email server and it won't reply.

And so since I get all -- both my gmail and my Co-Diagnostics in the same -- off the same server, I don't know, they appear on my screen, either one, my Co-Diagnostics or my gmail. If I hit "reply," but then I change the "from" message, so if I'm just forwarding an email, I forward it. If I forward it from my -- from my gmail account, then it will go through. If I just hit "forward" and try to forward it from my -- or reply from my Co-Diagnostics account, some -- for some reason, it doesn't work.

It's been that way -- I need to get it fixed, but I haven't done. I've got to have somebody -- an IT guy fix it. But it's been easy to go ahead and just forward or reply from my gmail account, so I've never -- never bothered to investigate why it works that way or engage someone to get it fixed so I can reply from my Co-Diagnostics account.

Q. Okay. So do you see the subject line says, "Fw: Important questions from a journalist"?

A. Sure.

Page 45

Q. And if we scroll down, it looks like someone named Chris Carey emailed a Co-Diagnostics account and Jennifer Webb, right?

A. Yes.

Q. Who's Jennifer Webb?

A. She works with a company named Coltrin & Associates, which is a PR firm that Co-Diagnostics engages.

Q. Okay. And do you see the email from Mr. Carey says, "Hello, I am an editor of Sharesleuth.com, an investigative business reporting site backed by entrepreneur Mark Cuban"?

A. I see that.

Q. Then if you go down a little bit further, it says, "Below are some questions we would like you to address," do you see that?

A. Yes.

Q. Do you recall receiving the list of questions from Mr. Carey in April 2020?

A. No.

Q. Okay. I'm just going to point you to certain of his questions and we'll walk through this document, okay?

A. Okay. Could you make it bigger?

Q. Yes, sir.

12 (Pages 42 - 45)

Page 46

A.   Thank you.

Q.   So let's go to paragraph 2.  Do you see it says, "Mr. Benson has ties to two other Utah natives, Bryant Cragun and Lynn Briggs, who previously have been linked to offshore boiler rooms operating in Europe and Asia"?

Do you see that?

A.   Yes.

Q.   When the reporter says that Mr. Cragun and Mr. Briggs have been linked to offshore boiler rooms, do you know what he's talking about?

A.   Not necessarily.  I could -- in generalities, I suppose I do.

Q.   What do you mean, you know in generalities what he's talking about?

A.   Bryant Cragun and Lynn Briggs, as far as I know personally, raised money in Europe and in Asia.

Q.   Can you go down to paragraph 4.

A.   Yes.

Q.   Do you see it says, "We noted similarities in the capital structures of Co-Diagnostics, Broadcast International and Xvariant.  In the case of all three companies, the biggest initial shareholder was an entity incorporated in the Turks and Caicos Islands.  Although all had different names, they had the same

Page 47

address - P.O. Box 267," and then there's an address in Turks and Caicos, right?

A.   Yes.

Q.   Then it says, "That is the business address of an attorney named Hugh O'Neill."

A.   Yes.

Q.   Can you explain to me -- do you have an understanding of how Co-Diagnostics, Broadcast International and Xvariant, were all formed or incorporated originally?

A.   The funding entity would be formed in the Turks and Caicos Islands, and shares of that funding entity would be sold to European investors.  And the Turks and Caicos Island company would make a single investment in the venture capital company in the United States.

Q.   And who is Mr. O'Neill?

A.   An attorney in the Turks and Caicos Islands.

Q.   Did you have an involvement in setting up the Turks and Caicos structure for Co-Diagnostics, Broadcast International and Xvariant?

A.   No.

Q.   Did you have involvement in setting up the Turks and Caicos structure for any of those three

Page 48

companies?

A.   No.

Q.   Do you have an understanding of why Co-Diagnostics was set up using a Caribbean entity?

A.   Yes.

Q.   And what's your understanding about why a Caribbean entity was chosen to be the original structure for Co-Diagnostics?

A.   Chosen by whom?

Q.   Was it chosen by someone?

A.   It was chosen by Mr. O'Neill and Mr. Briggs, because that's where Mr. O'Neill had his offices.

Q.   So Co-Diagnostics eventually went public in the United States, right?

A.   Correct.

Q.   Why didn't the original entity for Co-Diagnostics get created in the United States?

MS. PEIRSOL:  Objection.

BY MR. FLOCH:

Q.   You can answer the question, Mr. Benson, if you understand.

A.   Because Mr. O'Neill was in the Turks and Caicos Islands, and he was the attorney that created the entities that made the investments into the U.S.

Page 49

Q.   Did you have any conversations with Mr. Briggs about why Co-Diagnostics chose the Turks and Caicos entity as its original --

THE COURT REPORTER:  Just a second.  Would you start over, please.  I didn't hear that.

MR. FLOCH:  Yes.  Sorry about that.

BY MR. FLOCH:

Q.   Did you have any discussions with Mr. Briggs about why Co-Diagnostics chose a Turks and Caicos entity for its original structure?

A.   Co-Diagnostics, the U.S. entity, did not choose any entity or location for any entity for its investors.

Co-Diagnostics, the U.S. company, was trying to raise capital for its operations and business plan.  It approached, or Mr. Egan, approached Mr. Briggs and said, "We have a great idea and a wonderful technology.  We need funding in order to develop and -- develop the technology and to pursue our business plan.  Would you be involved in some way and help us raise money in order to do that?"

And Mr. Briggs and Mr. O'Neill said, "Yes, that would be something that we would like to do." They selected the Turks and Caicos Islands as the area in which the investment entity was to be incorporated.

13 (Pages 46 - 49)

Page 50

Q.   Okay.  So you just testified that Mr. Egan had a conversation with Mr. Briggs and Mr. O'Neill who selected Turks and Caicos as a location for the entity, right?

A.   Correct.

Q.   What year are we talking about when this conversation is occurring, just roughly?

A.   2012, 2013.

Q.   And in 2012 or 2013, was Co-Diagnostics, as you understood it, a private company?

A.   Co-Diagnostics, as a private company, was formed in April of 2013.

Q.   Okay.  Before April 2013, were you involved with Mr. Egan on any projects that would eventually become the Co-Diagnostics that we know today?

A.   No.

Q.   Okay.  When did you first become involved with an entity that would become the Co-Diagnostics that we know today?

A.   2013.

Q.   Okay.  And can you just generally describe for me, what was your initial introduction to the entity that has now become Co-Diagnostics?

A.   I was involved in preparing, filing the articles of incorporation, forming the company in 2013.

Page 51

Q.   Now, you just told me a story about Mr. Egan having a conversation with Mr. Briggs and Mr. O'Neill about the Turks and Caicos that happens before 2013, right?

A.   I don't know exactly when the first conversations with regard to raising funds for Co-Diagnostics were held, whether it was late 2012 or early 2013.

Mr. Briggs and Mr. Egan had lived in the same neighborhood for some years ago and knew each other on an informal basis, knew each other as neighbors.  And that was the reason that Mr. Egan approached Lynn about raising funds for him.

Q.   Who approached you about becoming involved with Co-Diagnostics?

A.   I was involved -- I shared an office at that time with Legends Capital, and Lynn was in an adjacent office with me.  And I don't remember whether Mr. Egan came to me and Mr. Briggs at the same time or separately, or me first and then to Lynn, I don't recall, but it was -- I was in the same office complex as -- office building as Lynn.

Q.   And why did you decide to become involved with Co-Diagnostics?

A.   It seemed like a good idea.

Page 52

Q.   What seemed like a good idea to you?

A.   The technology that had been created and the business plan seemed like it had some potential, and it seemed like it would be -- could be a very successful -- successful venture.  And that's what I had the opportunity to do, is to help form the company and help run it through those initial years.

Q.   Okay.  So let me ask you a few questions, just based on what you said.

You said you helped form the company.  What entity did you help form?

A.   Co-Diagnostics.

Q.   The American entity?

A.   Correct.

Q.   Okay.  And what was the American entity's relationship to the Turks and Caicos entity in or around 2013?

A.   It had no relationship when it was first formed.  Subsequently, the Turks and Caicos entity became a shareholder of Co-Diagnostics.

Q.   Okay.  So let's just go back and recenter on 2013, 2012, around that time.

What were your job responsibilities in connection with the Co-Diagnostics American entity?

A.   I was still providing services to Legends

Page 53

Capital, and so I would provide those same monitoring financial and legal kinds of services to Co-Diagnostics.

Q.   When you say "financial services," were you helping locate IPO investors?

A.   No.  I was providing accounting services, trying to keep track of things, file the tax returns, make sure that the annual reports were filed.

Q.   Okay.  Let's scroll down a little bit, to paragraph 7.  Do you see it?

A.   Yes.

Q.   Have you heard of the firm Beaufort Capital Partners, LLC?

A.   Yes.

Q.   How do you know that firm?

A.   They made a loan to Co-Diagnostics.

Q.   What was your involvement with that loan?

A.   I don't understand the question.  I didn't have any involvement with the loan.  I had an involvement with Co-Diagnostics that received $500,000 from Beaufort Capital, and it was deposited in the account, and Co-Diagnostics used it for its operations.

Q.   What year did Beaufort Capital provide that $500,000 loan to Co-Diagnostics?

A.   I don't recall.  Perhaps 2015.  I'd have to

14 (Pages 50 - 53)

Page 54

go back and look.

Q.   Okay.  Do you see that paragraph 7 says, "We noted that Beaufort Capital Partners LLC -- which provided $500,000 in financing to Co-Diagnostics prior to the company's IPO -- and its principal, Robert P. Marino, were charged by the SEC in July 2017 in connection with their alleged role in a pump-and-dump scheme involving shares of another penny-stock company"?

Do you see that?

A.   Yes.

Q.   And then do you see there's a question that says, "How did Beaufort Capital come to invest in Co-Diagnostics?"

A.   Yes.

Q.   Can you answer that question?  Do you know how Beaufort Capital came to invest in Co-Diagnostics?

A.   Someone, and I don't recall who, referred Beaufort Capital to Co-Diagnostics and Beaufort made -- made the loan.

Q.   Prior to receiving this email, had you heard that Beaufort Capital's Partners, LLC, and Robert P. Marino had been charged by the SEC for their role in a pump-and-dump scheme?

A.   No.

Page 55

Q.   Does it concern you that one of Co-Diagnostics's premium IPO investors was charged with being involved in a pump-and-dump scheme?

A.   No.

MS. PEIRSOL:  Objection.

BY MR. FLOCH:

Q.   Let's go down to paragraph 8.  Do you see there's a reference to Catalytic Capital, LLC?

A.   Yes.

Q.   Have you heard of that firm before this email?

A.   Yes.

Q.   What is your understanding of what that firm is?

A.   I don't have an understanding of what the firm is.

Q.   How do you -- what's that firm's relationship to Co-Diagnostics?

A.   It was part of bridge financing that came to Co-Diagnostics.

Q.   What do you mean when you say "bridge financing"?

A.   There were four or five investors that entered into loan agreements to provide funding to Co-Diagnostics with the intent that Co-Diagnostics

Page 56

would go public.  And it was the bridge to get us from where we were until the public financing could -- and going public could be arranged.

Q.   Okay.  Do you see that that paragraph says -- sorry, do you see that paragraph 8 says, "We noted that one of the investors listed among the company's bridge lenders in 2016 was Catalytic Capital LLC.  Although Co-Diagnostics's SEC filings don't identify the manager of that LLC, our research found that one of the managers is Joe Geomichael, who was charged by the SEC in July 2017 with violating anti-touting rules"?

Do you see that?

A.   Yes.

Q.   Before receiving this email, had you heard of Joe Geomichael?

A.   Yes.

Q.   How have you heard of him?

A.   He was the person who was running Catalytic Capital.  And we would have had conversations with him regarding his loan from Catalytic Capital to Co-Diagnostics.

Q.   Before receiving this email, did you become aware of the charges against Joe Geomichael by the SEC?

A.   No.

Page 57

Q.   Okay.  Did it concern you when you learned that Joe Geomichael was charged by the SEC with violating anti-touting rules?

A.   This is the first time -- you have to understand, yes, did I receive this email?  Yes.  Did I read it?  No.  This is the first time I've known that Joe Geomichael was charged by the SEC in July 2017 with violating anti-touting rules.

Q.   Is it concerning to you, sitting here today, that at least two of your prepublic lenders were charged by the SEC with violating rules?

MS. PEIRSOL:  Objection.  Form.  We don't know that to be true.

BY MR. FLOCH:

Q.   Mr. Benson, I'm just asking if it concerns you, sitting here today, if the SEC had charged Joe Geomichael.

A.   We had --

MS. PEIRSOL:  Object to form.

THE WITNESS:  Prior to going public, we had, including those European investors, about 500 shareholders.  I didn't know anything about any of the shareholders, and the fact that Joe Geomichael may or may not have been charged by the SEC.  And I'm not sure I know what the word "charged" means in that context,

15 (Pages 54 - 57)

Page 58

what it meant to the -- by the -- to the person who was actually writing this email, nor what their intent was in writing this email, though I do -- I don't have any idea what they -- what they meant by it.

But no, it does not concern me, in answer to your question. Investors who invest come from a variety of backgrounds. They all have issues and problems, but it was not our responsibility to vet investors who were coming to make an investment in Co-Diagnostics. And so, no, it doesn't bother me particularly that Joe Geomichael had issues with the SEC or anybody else.

BY MR. FLOCH:

Q.    Prior to receiving money from an investor, did Co-Diagnostics do any due diligence on its investors in the pre-IPO era?

MS. PEIRSOL:  Objection.  Form.

THE WITNESS:  They all make representations to the effect that they were accredited investors.  And we did not do any independent due diligence to see whether or not those representations of being accredited investors were accurate.

BY MR. FLOCH:

Q.    What do you mean when you say "accredited investor"?

Page 59

A.    An accredited investor, my understanding is there are certain criteria set forth by the SEC that tells whether an investor is a sophisticated investor or not and has the knowledge to make investments that involve -- well, I guess they involve risk or they may not involve risk, but they are an investor that can make those kinds of investments and they can assess for themselves the appropriateness of the investment.

Q.    Okay.  So I want to take us back now to the pre-IPO period of Co-Diagnostics.

When you first get involved, was Dr. Satterfield there?

A.    Yes.

Q.    And what was his role in the pre-IPO period?

A.    He was the inventor of the technology.

Q.    Okay.  What technology are you referring to?

A.    Co-Diagnostics has a unique technology that is used in polymerase chain reaction testing, based on the primers and probes and how they interact with each other in a PCR reaction.  And that is the technology that I was referring to.

Q.    Do you have any background in diagnostic testing or chemistry?

Page 60

A.    No.

Q.    So your role at the company was primarily financial and legal, right?

A.    Correct.

Q.    Okay.  Around 2012 or 2013, but besides you, Mr. Egan and Dr. Satterfield, who else worked at Co-Diagnostics?

A.    The lab manager was Chad Apuli.  I think Chad was there then.  Joe Featherstone was a business development, sales.  He was there then.  There were -- I'm sure there must have been another one or two scientists.  Rebecca Garcia was there right in the beginning.  Dr. Mayu was there in India right from the beginning.

So those would have been the ones that were there right from the -- right from the start.  There were probably some others.  I don't recall everybody.

Q.    What was Mr. Dwight Egan's role in the pre-IPO period?

A.    He was president of the company.

Q.    And what was your role in the pre-IPO period -- your job title, I mean?

A.    I served as sort of like CFO and served as legal counsel.

Q.    In the pre-IPO period, was your son working

Page 61

at Co-Diagnostics?

A.    Yes, but I don't recall exactly when he came on.  It wasn't right at the very beginning, but it was -- it was in the pre-IPO period.

Q.    And that's your son Andrew Benson?

A.    Yes.

Q.    What's his work background, just generally?

A.    He graduated with a master's degree in linguistics, or something to do with Slavic languages, of which I'm a little fuzzy on.  He worked for -- oh, one of the big accounting firms, which my mind is blanking out, in California, after he got his master's degree.  And then he took a job in Spain in Mr. Briggs's organization as the office manager.

He got his Series 7 securities license and then took a job in Spain for some years.  And when he came back to the United States, he worked -- he went to work for Co-Diagnostics.  I don't know exactly what the years are.

Q.    You said he worked for Mr. Briggs's organization in Spain.  What organization are you referring to?

A.    You'll have to ask him.  I don't know the name of it.  It was in Barcelona.  I don't know exactly who -- who he actually worked for there.

16 (Pages 58 - 61)

Page 62

Q. It wasn't Carlton Birtal?

A. No, I don't believe so, no.

Q. And it wasn't Legends Capital?

A. No. Not there.

Q. Okay. Was Seth Egan working at the company in the pre-IPO period?

A. I'm sure, yes. I'm sure Seth worked right from the beginning. I should have mentioned that.

Q. Okay. So let's move forward from 2013 to, let's say, generally 2015, 2016. What did Co-Diagnostics -- sorry. Let me back up.

In 2015 and 2016, was Co-Diagnostics making a profit?

A. No.

Q. Was it operating at a loss?

A. Yes.

Q. If you remember, generally, what was the annual loss for 2015 or 2016, just generally?

A. I don't remember. Probably a million -- a million to $2 million, something like that.

Q. And in 2015 and 2016, did Co-Diagnostics have any diagnostic tests that it was selling to customers?

A. I don't believe so in 2015 or 2016.

Q. Okay. When did Co-Diagnostics first

Page 63

develop a diagnostic test that it sold to customers?

Sorry. Let me strike that.

When did Co-Diagnostics first sell a diagnostic test that it created to customers?

A. It may have had some minimal sales in -- in 2015 or 2016. The initial testing tests were some -- there were some Zika tests that they developed, some -- some other tests that would have been -- I don't know. I don't recall exactly when the first one would have been sold.

Tuberculosis was one of the first ones. Whether they were sold in India or sold down in the Caribbean, I don't remember exactly when the first ones were sold. They would have been very -- very small in 2015 and 2016.

Q. So at least as of 2015 and 2016, Co-Diagnostics didn't have any American-based customers for its diagnostic tests?

A. No, I would not think so.

Q. Okay.

A. It wasn't -- it wasn't until they started selling testing for mosquitoes to mosquito abatement districts, would have been the first U.S. based revenues, I would think, and that -- I don't know when that was. Probably 2018. I don't recall exactly.

Page 64

Q. Okay. When did Co-Diagnostics go public?

A. July -- June or July of 2017.

Q. And why -- what is your understanding of why Co-Diagnostics went public at that time?

A. Required capital funding to continue their research and development of the products.

Q. Okay. Let's just pause for a second, and we're now at Co-Diagnostics going public, but before we go forward and talk about the company, let me just come back and ask you about your role in the public Co-Diagnostics period.

Did your role change -- sorry, let me back up.

Did your responsibilities change once the company went public?

A. Well, sure, because we were public, and that required different responsibilities than when we were private. But it was still primarily financial related and legal related. I was actually on the board of directors of Co-Diagnostics pre-IPO, but stepped off the board at the time of the IPO so that we could have an independent board.

Q. So it seems like you still have or still had, when the company went public, both a financial aspect and a legal aspect to your job, right?

Page 65

A. Yes. Yes.

Q. When you provide legal advice to other employees inside Co-Diagnostics -- sorry, let me say that again.

A. Say that again.

Q. Do you provide legal advice to employees inside Co-Diagnostics?

A. No. Not as a general rule, I wouldn't think. Somebody may ask me a question sometimes, but I don't -- I don't provide advice to those people.

Q. If you were providing legal advice about the company, would you clearly mark your written work product "attorney-client privilege" or something like that?

A. I probably did not.

Q. Okay. As a general matter, is it easier -- sorry.

Is it easy for you to determine whether you're giving business advice or legal advice, or do they sometimes blend?

A. I would think they blend.

Q. Okay. Just generally topic area-wise, what types of legal advice were you providing for the company?

A. I would provide draft contracts, provide

17 (Pages 62 - 65)

Page 66

input on contracts or business structure, provide some tax advice that maybe would be in that same realm, business structure.

We had companies that we had formed that would have been subsidiaries of Co-Diagnostics. I would have -- that would have been part of the legal advice.

We had some contracts that we drafted when we acquired technology from Dr. Satterfield. I think that would have been in the context of legal advice.

There were some patent issues that I didn't deal with directly, though I did deal with patent counsel and would have had discussions with them, with regard to what those patents were and how they related.

The same with trade names, trademarks, basically dealing with outside counsel in those matters.

We had some legal issues that were in the nature of some things that could have been to lawsuits -- that could have expanded to lawsuits, and I dealt with those matters, either myself or with outside legal counsel.

So those were the kinds of things that I suppose would have been in my role as -- as legal counsel.

Page 67

Q.   But it wasn't your practice to clearly mark a piece of work product "attorney-client privilege" if you were providing legal advice rather than business advice?

MS. PEIRSOL:  Objection.  Form.

THE WITNESS:  I don't know in what context I would have been writing -- it's not like I wrote letters to Mr. Egan and said something or other.  I would have called him on the phone or I would have talked with him in person and in that context.  I don't -- maybe there were times when I would have written things that could have been marked attorney-client privilege, but it was not my practice to do so.

BY MR. FLOCH:

Q.   Did you ever provide comments on draft press releases?

A.   I'm sure I did, yes.

Q.   Would you consider that business advice or legal advice?

A.   It could have been either one.  If there was a press release that had financial matters in it, I probably would have responded from that financial perspective.  If it was a matter of whether or not I thought a disclosure was fair or accurate, that

Page 68

probably would have been more as a legal review.

Q.   So let's go back now to talk about Co-Diagnostics, right after it becomes public.

2018, was Co-Diagnostics making a profit?

A.   No.

Q.   Was it losing money?

A.   Sure.

Q.   About how much per year?

A.   I don't recall.

Q.   Over 20 million?

A.   Oh, goodness, no.

Q.   Five million, maybe?

A.   In the two -- it seemed like our cash burn back then was in the neighborhood of 200 to 250,000, so the losses would have been in that neighborhood of 2 -- well, maybe 3, 3 million.  I don't know.  I could go look, but I don't have a recollection of exactly what it was, but 2 to 3 million, I would think.  Maybe 4 million.

Q.   What about 2019, was the company operating at a profit?

A.   2019?  No.

Q.   It was operating at a loss?

A.   Yes.

Q.   And just generally, about how much was the

Page 69

loss?

A.   I would presume it was approximately the same thing as it had been in 2018.  I don't know any reason that it would have gone up from then.

Q.   Ballpark, 2018 and 2019, what is Co-Diagnostics's share price during that time, during those years?

A.   We went public at $6 and then it dropped down over the course of the next two or three years. And it was up and down, but it dropped down as low -- I think as low as it got was like 88¢ or something.

Q.   When it got below a dollar, did Co-Diagnostics receive any inquiries from any regulators?

MS. PEIRSOL:  Objection.  Just a minute. Objection.  To the point that if you're asking for any information that's privileged, I instruct Mr. Benson not to answer the question.

If you can answer without revealing any privileged information, Mr. Benson, you can go ahead.

THE WITNESS:  I believe it was public that NASDAQ had contacted us about delisting if our stock price wasn't above a buck.

BY MR. FLOCH:

Q.   Did NASDAQ -- who at the company spoke with

18 (Pages 66 - 69)

Page 70

NASDAQ about possible delisting?

A. I don't know that anybody did. I may have -- I don't think -- hmm. I don't recall.

Q. Okay. So at least as of 2018, 2019, the company's operating at a loss, right?

A. Yes.

Q. And the share price has dipped below a dollar, at some points, right?

A. At some points, it was.

Q. Did you still consider the company a startup at that point?

A. It was prerevenue. I don't know what you mean by "startup."

Q. At the end of 2019, did Co-Diagnostics have any diagnostic tests that it hoped would produce a reliable stream of revenue?

A. Yes. There were a number of tests that we had hoped would provide a reliable chain of revenue.

Q. And those were tests related to Zika and tuberculosis that you mentioned before?

A. Tuberculosis, yes. Malaria, we thought had a good market for us as well. We had started to make some real inroads in -- we had tests for West Nile virus and Eastern and Western Equine Encephalitis and a couple of others that we were really starting to get

Page 71

some good traction with, with different mosquito abatement districts. And we thought that had -- actually had the potential to bring us to a break-even point as we were going forward through 2019. That was something that was -- was looking very promising for us.

Q. Who is Keith Pinder?

THE COURT REPORTER: Say that again?

BY MR. FLOCH:

Q. Sorry. Who is Keith Pinder, P-I-N-D-E-R?

A. He was a stock PR firm. I can't remember the name of his company that he ran, that he would make calls to investors and set up investor relations meetings for us.

Q. Is his firm called Land and Capital?

A. Yes.

Q. When you say "stock PR firm," what do you mean by that?

A. I mean he would call people and -- brokers primarily I think is who he talked to, and told them of the Co-Diagnostics story, of what our technology was and how we had potential to be a successful company, and encourage them to buy our stock.

Q. Did he call investors all over the world?

A. I don't have any idea who he called.

Page 72

Q. Did Co-Diagnostics pay him to find these investors?

A. Yes.

Q. Okay. So let's move forward in time to late 2019, early 2020, okay?

A. Yes.

Q. When did you first hear about the Coronavirus?

A. We were in a -- we have a management meeting every Monday morning. We were in that -- in a meeting, the first week or two weeks of January of 2020. And Mr. Egan suggested that there was a virus that was being talked about, that was coming out of China. And that we ought to see if we could get the DNA codes for that virus and develop a test for it, that it might be something that would be worthwhile for us. So it would have been in the first week or two weeks of 2020.

Q. Who at Co-Diagnostics had responsibility for developing a diagnostic test to detect Coronavirus?

A. There were a number of people that would be involved in that process. We had developed some software that would go through all -- bear in mind, you're asking someone who has absolutely no background in this, so my comments are qualified by the fact that

Page 73

I don't know what I'm talking about.

We had developed some software that would -- would analyze all the various possibilities of how to design a test and to which genes on the virus DNA strand we should examine and target to develop our test. And that was one -- one fellow that would do that.

And he would go through those kinds of calculations and put it into the -- into the computer. And it would spit out the -- what we thought were the optimum genes to target for the test. And then the people that were in the lab would take that design work, and we would have to have a company create primers and probes designed to utilize the design work that had been designed by the computer software guys.

Then they would send us the primers and probes and the master mix that would then be used by the lab technicians to test the formulation that had been designed and see if the response was positive and that we had a test that -- in the lab with the -- with the synthetic viruses and things that would test with, if there was --

Q. Mr. Benson, I'm sorry to cut you off, but I'm going to go off the record just because I noticed that your counsel dropped off the video and I don't

19 (Pages 70 - 73)

Page 74

want --

A. Oh.

Q. -- the record to continue while she's not here.

MR. FLOCH: So why don't we take a -- let's take a five- to ten-minute break. How long do you need, Mr. Benson? Let's go off the record.

THE VIDEOGRAPHER: Off the record at 11:09.

(Recess taken from 11:09 a.m. to 11:20 a.m.)

THE VIDEOGRAPHER: This is the beginning of video number three. We're back on the record. The time is 11:20.

BY MR. FLOCH:

Q. Mr. Benson, before the break, we were discussing the development of a diagnostic test for Coronavirus by Co-Diagnostics, right?

A. Yes.

Q. And you were describing for me the development process, right?

A. Yes.

Q. Which individuals at Co-Diagnostics were responsible for the development of the Co-Diagnostics Coronavirus diagnostic test?

A. I apologize. I can't remember his name.

Page 75

His last name is Christensen, that did the design work with the computer and came up with the gene that should be targeted and the structure of the primers and probes and how they should be created. Then after they were manufactured, then Chad Apuli was the lab manager and he would have probably been in charge of the running all of the lab tests on the --

Q. Did Dr. Satterfield have a role in developing the test?

A. I don't believe he had anything to do with the development of the Coronavirus test.

Q. And when I say "test" today, you'll understand me to mean the Logix Smart Coronavirus Co-Diagnostics diagnostic test, right?

A. Yes.

Q. Okay. Did Dr. Garcia have any role in developing the Co-Diagnostics Coronavirus test?

A. She may have done.

Q. Just generally, what is Dr. Garcia's role or what was her role at Co-Diagnostics?

A. She was a scientist who understood the technology, had been there right from the beginning. At the end, she was primarily involved with interface with our Indian joint venture.

Q. When did Dr. Garcia leave Co-Diagnostics?

Page 76

A. I don't recall.

Q. Do you have an understanding of why she left Co-Diagnostics?

A. No.

Q. Was she terminated?

A. No.

Q. Does Dr. Satterfield still work for Co-Diagnostics?

A. He's on the scientific advisory board.

Q. But he no longer holds the chief science officer title?

A. No.

Q. Do you have an understanding of why he no longer works in a capacity as a chief science officer?

A. Yes.

Q. What's your understanding?

A. He didn't want to work 8:00 to 5:00 every day and to manage people and processes.

Q. When did he step down from the chief science officer role?

A. I don't remember exactly when he gave up that title. It could have been like at the end of 2019. I'm not real sure.

Q. Okay. So let's go back to the development of the Coronavirus test. How long did it take

Page 77

Co-Diagnostics to develop a Coronavirus diagnostic test?

A. It took about a week to do the design work, the computer work, and that kind of process. And then it took time to order all of the component parts being manufactured, and that probably took a week or -- I don't know how long. And then it took some time in the lab to develop, to do the testing that they do on the -- on the tests as they develop them. Maybe it took a month total.

Q. Okay. So it seems like you were saying there's sort of three phases of development, right?

A. The design work, and then the lab work. I'm not sure -- if you put ordering the materials as one of the phases, then yes, I suppose there are three.

Q. That's what I was counting.

So when you say "the lab work," what do you mean by that?

A. People in the lab take the component parts that had been ordered and put them together and have them run through the thermocyclers and test those component parts against what you would expect. And you'll need to talk to a lab manager for anything in addition to that.

Q. Is it your understanding, when you say "lab

20 (Pages 74 - 77)

Page 78

work," that the Co-Diagnostics's lab technicians are checking if the test is accurate?

A. Sure.

Q. Okay. So that checking accuracy is part of this lab testing phase, in your mind?

A. I think the word accuracy is a misnomer. They are testing various results of how the test `behaves under certain circumstances. And I don't know whether that -- and I'm not sure I'm comfortable with the word "accuracy," but it's whether the test works as it was designed to work, is what they're testing for.

Q. Okay. When you say that they're testing whether it works as it was designed to work, under certain circumstances, what circumstances are you referring to?

A. The circumstances where you take a sample and stick it in a thermocycler. And then after the process cycles 20 or 30 times, or however many times it signs, and the little graphs print out, those little graphs look like what they're supposed to look like.

Q. When Co-Diagnostics develops its test, other than the Coronavirus tests, like the Zika test or the tuberculosis test, how long did development take for those tests?

A. I think they took a lot longer because we

Page 79

didn't have all of the design processes computerized. We had started that process of computerizing that design process. After we got funded from our IPO, we had hired a software engineer -- everything else had been done manually up to that point, and that sped up the design work immeasurably.

It had originally all been done on Excel spreadsheets. And the calculation time and the input time took a great deal of -- a great deal of processing power and time. So I don't know that you can compare those two. It took longer for sure. But that was mainly because we were trying to design the process as well as design the tests.

Q. Were you involved in obtaining regulatory approval for Co-Diagnostics Coronavirus test?

A. No.

Q. Do you know what a CE marking is?

A. Yes.

Q. What's a CE marking?

A. It is a mark granted by a regulatory body in Europe that says that your -- your diagnostic test has met whatever the requirements are and received its CE mark, so that it can be sold in company -- in countries that accept the CE mark as regulatory approval.

Page 80

Q. Were you involved at all in corresponding with the FDA in order to get regulatory approval to -- for Co-Diagnostics to sell its Coronavirus test?

A. No.

Q. Do you know what the term RUO means?

A. "Research use only."

Q. And can you just generally describe for me what that term means to you?

A. It means the product can be used for research but not for sale.

Q. So if you're -- if Co-Diagnostics is allowed to sell something RUO, it can only sell to research labs, for example, right?

A. The CLIA labs, yes.

Q. What does CLIA mean?

THE COURT REPORTER: I'm sorry?

THE WITNESS: C-L-I-A. They are certain sophisticated labs that have received a designation. It's not by the FDA, it's by some other regulatory body that can approve a lab for preparing and selling tests. But you have to be a -- meet certain requirements in order to be designated a CLIA lab.

BY MR. FLOCH:

Q. Okay. You mentioned before that part of the analysis before selling the test is this lab

Page 81

process to make sure that the test is working the way it's designed to work, right?

A. Yes.

Q. Does that process require a company like Co-Diagnostics to have an actual live sample of the virus it's trying to detect?

A. No.

Q. Okay. Let me show you a document that we are marking as, I believe, Exhibit 5. If you give me a second. Apologies, Mr. Benson. This will be Exhibit 4.

(Exhibit 4 marked.)

BY MR. FLOCH:

Q. And I just want you to look at the top email, Mr. Benson, and let me know when you're done reading it and I'll have a few questions for you.

A. (Witness reading.)
What was I supposed to read? Excuse me.

Q. Just the top email here.

A. Okay.

Q. That starts with "Jeff" and ends with "well."

A. Okay.
(Witness reading.)
Okay.

21 (Pages 78 - 81)

Page 82

Q. Okay. Mr. Benson, does this appear to be an email that you sent on February 18, 2020, to some individuals at Co-Diagnostics, as well as Mr. Briggs and Mr. Soong?

A. Yes.

Q. Who is Mr. Soong?

A. He's an acquaintance in -- who lives in Hong Kong.

Q. Okay. And do you see you wrote to him and said, "Jeff, Our test is completed and ready to go, but the difficulty has been in gaining access to actual virus samples so we can prove out with clinical data the efficacy of the test"?

Do you see that?

A. Yes.

Q. What do you mean by that?

A. It seems like we were trying to find actual virus samples.

Q. And I think you testified before we looked at the document that you don't need actual virus samples to do this efficacy test, right?

A. You can -- you buy synthetic virus, and everyone assumes this is -- that the synthetic virus reacts exactly the same way as an actual virus, but you always try to get -- and so you prove everything out

Page 83

with synthetics, which we did. And I don't know exactly if or when we actually got actual virus samples.

Q. Is it preferable to do the efficacy test with an actual viral sample as opposed to a synthetic sample?

A. You'll have to ask someone else that question.

Q. Is it preferable to analyze the efficacy of a test by looking at how it performs in the field as opposed to how it performs in the lab?

A. I think either one of those works, but you'd have to ask somebody else. In the field, outside of the lab, there are factors that you can't control, like you can control it in the lab, which is the sample preparation and other outside contaminants and things. So it's important that you do both.

Q. Okay. So it's important to look -- in analyzing the efficacy of a diagnostic test, it's important to look at both the lab results as well as field results, right?

A. I would think so.

Q. Okay. Let me show you what we're going to mark now as Exhibit 5.

(Exhibit 5 marked.)

Page 84

BY MR. FLOCH:

Q. Mr. Benson, can you just take a look at this email and I'll ask you a question. And please let me know when you're finished reviewing it.

MS. PEIRSOL: We don't see -- Brandon, we don't see the email. Thank you.

BY MR. FLOCH:

Q. Mr. Benson, do you see Exhibit 5 on your screen now?

A. Yes.

Q. Okay. Please review it and let me know when you're done reviewing and I'll ask you a question.

A. (Witness reading.)

Okay.

Q. Okay. So does this appear to be an email from Ms. -- from Dr. Hutchins to you and others at Co-Diagnostics from February 24, 2020?

A. It does.

Q. Do you recall receiving this email?

A. I don't.

Q. Do you see at the bottom of the first paragraph, Ms. Hutchins wrote to you and others, "My worry at this point, after receiving the CE Marking for the Logix Smart COVID-19 is within two issues"?

A. Yes.

Page 85

Q. And the CE Marking is referring to that European regulatory marking we were talking about earlier, right?

A. Yes.

Q. And do you see her first bullet says, "Adequately recording the feedback from customers to ensure the performance we observed during verification will be reproduced in the field"?

Do you see that?

A. Yes.

Q. What do you understand her to be saying her first concern is with the test?

A. The performance in the lab should be coincident with performance in the field, and we should be able to record any feedback from customers in that regard.

Q. Around February or March of 2020, do you recall speaking with any customers about the test performance in the field?

A. No.

Q. Do you recall speaking -- sorry. Let me back up.

In February or March of 2020, do you recall speaking with anyone else at Co-Diagnostics about the test performance in the field?

22 (Pages 82 - 85)

Page 86

A.   Not specifically, no.

Q.   Generally, what do you recall?

A.   I don't recall anything either generally or specifically.  I would say we undoubtedly had conversations about how the test was received in the field and whether people liked our test, whether they wanted to reorder the tests, but I don't recall any specific instance of having those kinds of conversations.

Q.   So placing us again in February or March 2020, who were Co-Diagnostics's largest customers who were buying the Coronavirus test?

A.   I don't recall.  We would have -- I'd have to go back and look at the list of -- the list of sales.  They would have been -- we had -- we're building a distributor network all over the world.  One of the earliest, largest customers we had was from our distributor in Italy.  That was like a million dollar order, which was big for us right then.  I don't know exactly when all of those customers came online.  I do remember that one being the first largest one, but --

Q.   What do you mean when you say "distributor network"?

A.   All of the products that we sold outside the United States were sold through distributors that

Page 87

were local in the countries in which they lived, in which the products were sold.

Q.   So Co-Diagnostics sold to a distributor who then sold to an end user?

A.   Correct.

Q.   Okay.  Have you heard of the term -- have you heard of the entity Silicon Slopes?

A.   Sure.

Q.   What is that entity?

A.   I don't know that it is an entity.  It's referred to just generally here in Salt Lake as the area down in Utah County that has a lot of tech businesses in it.

Q.   Have you heard the name Clint Betts?

A.   Repeat the name again.

Q.   Clint, C-L-I-N-T, Betts, B-E-T-T-S.

A.   No.

Q.   What about Drew Ludlow?

A.   No.

Q.   Okay.  What is Test Utah?

A.   It was an initiative, a government initiative, to get Coronavirus tests to the public in Utah.

Q.   What was Co-Diagnostics's involvement with Test Utah?

Page 88

A.   We sold tests to Nomi Health that was involved with Test Utah.  I don't know that we had any involvement directly with Test Utah.  In fact, I'm not even sure I know whether it was an entity or not.

Q.   What does Nomi Health mean?  What is Nomi Health?

A.   My understanding is that Nomi Health is an entity that had a contract with Test Utah to provide testing services to residents of Utah.

Q.   Did Co-Diagnostics have a subcontractor contract or any type of contract with Nomi Health?

A.   I don't believe we ever had a contract.  We just sold on purchase orders to them.

Q.   Who is Mark Newman?

A.   I don't know.

Q.   What about Dave Elkington?

A.   I've seen his name before.  I think he has something to do with test -- with Nomi Health.

Q.   But you don't know him personally?

A.   No.

Q.   Have you ever had any conversations with him?

A.   I don't believe so.  There may have been conversations with a lot of people on a telephone conference with a lot of people, and he may have been

Page 89

on a call that I was on, but I've had no direct contact with him at all.

Q.   What is Test Nebraska?

A.   I think the same thing as Test Utah.

Q.   So Co-Diagnostics would sell to Nomi, who would sell to the State of Nebraska, is that your understanding of what Test Nebraska is?

A.   Yes, except in that particular instance -- well, I -- now I can't remember.  It was through Nomi Health that we made those sales.

I was going to say, I thought that we sold directly to Nebraska, their health department, and they sent us the fund -- the funds from -- but I retract that.

I believe it was all -- all of our revenue that we received from Test Nebraska would have come through Nomi Health.

Q.   Okay.  Besides Utah, Nebraska, were there any other state entities that Co-Diagnostics was sending their tests to?

A.   Any other state entities?

Q.   Yeah, a department of health for the state.

A.   Yes.

Q.   Which states do you remember there?

A.   We sent some to Idaho, I remember.  We sent

23 (Pages 86 - 89)

Page 90

some to Florida. We sent -- we sent some to a lot of different state entities, as I recall. Sometimes --

Q. What --

A. Pardon me?

Q. What about Tennessee?

A. No. They did -- Nomi Health was -- Iowa was, of course, a big one as well. That was a Nomi Health customer as well. They tried to get Tennessee the same as they had done with Iowa and Nebraska, but they weren't successful in securing that customer.

Q. Sorry. Can you repeat the last thing? I missed the last sentence you said.

A. You'll have to forgive me because I can't remember the last thing I said either. I said, I believe, they had sold tests to Test Iowa as well. And they attempted to get the similar contract with Tennessee, but were not successful in getting that contract.

Q. So it's your understanding that Nomi was unsuccessful in getting a contract with Tennessee?

A. That would be my understanding, yes.

Q. Okay. Did Co-Diagnostics have any involvement in the contracts that were awarded to Nomi through Test Utah?

A. How do you mean, involvement?

Page 91

Q. Was Co-Diagnostics part of the process where the contracts were bid on?

A. No. Now, I don't know what Nomi Health bid or how they bid it or whether they bid what they bid, including the Logix Smart Test or not. But as far as I know, no one at Co-Diagnostics had any input into the preparation of or submission of those bids.

Q. Do you know whether or not, for example, that Test Utah, Nomi contract, was a bid contract or a no bid contract?

A. Only what I read in the papers.

Q. Okay. And what did you -- what was your understanding from reading in the papers?

A. That it was a no bid contract.

Q. Do you have any understanding of how Nomi obtained a no bid contract with the State of Utah?

A. No.

Q. Okay. So let's move forward, March 2020. I asked you before if you remembered any conversations with how the Coronavirus test was performing in the field, right?

A. Right.

Q. In fact, I think you said you didn't remember anything specifically.

A. No.

Page 92

Q. Do you remember any customers complaining about the performance of the Co-Diagnostics Coronavirus test in March 2020?

A. No.

Q. Do you remember any officials with states complaining about the performance of the Coronavirus test in March 2020?

A. None ever complained to us, to Co-Diagnostics or to me, that I was aware of, no.

Q. Okay. The same question, but for April 2020, do you remember any state entities complaining about the performance of the Co-Diagnostics Coronavirus test?

A. I don't.

Q. Okay. Let me show you another exhibit. This will be Exhibit 6, Mr. Benson, and when it comes up, just let me know.

(Exhibit 6 marked.)

BY MR. FLOCH:

Q. Do you see Exhibit 6 on your screen?

A. Yes.

Q. And why don't you just take a look at it.

A. Could you increase it in size?

Q. Yes, sir.

A. Thank you.

Page 93

Okay.

Q. What is this document?

A. It looks like it is a -- an agenda for our department review meetings.

Q. What's a department review meeting?

A. A meeting where all the department heads would get together and review what was happening.

Q. And how often did Co-Diagnostics host department review meetings?

A. Weekly.

Q. Okay. Do you see that the date of this says March 23, 2020?

A. Yes.

Q. And if we scroll down to "Quality Section."

A. Yes.

Q. Do you see there's a bullet that says "Customer Complaints"?

A. Yes.

Q. Do you have any understanding of what that bullet is referring to?

A. No.

Q. Were you at this meeting?

A. Probably. I don't know. I certainly don't have a recollection of that meeting, no.

Q. Are you listed as one of the attendees at

24 (Pages 90 - 93)

Page 94

the March 23, 2020, meeting?

A. I am.

Q. Okay. But you don't recall any conversations about customer complaints right around March 2020?

A. No.

Q. Okay. Let me show you another exhibit.

Actually, before I do that, have you heard of the term ICMR?

A. ICMR? No, I don't believe so.

Q. Have you heard of the Indian Council for Medical Research?

A. No.

Q. During March or April 2020, do you remember discussing with anyone at Co-Diagnostics the results of an evaluation done by the Indian Council of Medical Research on CODX's diagnostic test?

A. I remember having conversations. I don't remember the -- what the entity was. Yes, I remember having conversations with an entity that failed our test.

Q. Okay. What do you remember about those conversations?

A. The conversation was that the testing had to be totally inaccurate and totally flawed.

Page 95

Q. Do you remember anything else -- well, let me back up.

Who did you have conversations with at Co-Diagnostics about the ICR test?

A. I don't recall in specifics, only in generalities, that our scientists, people in the sales department, I'm sure Mr. Egan, and we all had those conversations about the fact that this test was -- was flawed in some regard. Whether it was samples or preparation or execution, we didn't know, but we knew it was incorrect.

MS. PEIRSOL: And, Mr. Benson, I just caution you again, to the extent any of those conversations contain privileged information, to refrain from testifying about the substance of the conversation.

BY MR. FLOCH:

Q. Mr. Benson, I wasn't asking you about attorney-client privileged communications, but I'll --

A. I will tell you, I had no input in into those conversations. I was only present for them.

Q. Okay. So you have no independent basis to question the validity of the ICMR results?

A. Not personally, no.

Q. You just heard from others at

Page 96

Co-Diagnostics that this Indian performance test must be faulty; right?

A. The people who had responsibilities for our technology are people that I relied upon.

Q. Okay. Let me show you what I'm marking as Exhibit 7.

(Exhibit 7 marked.)

BY MR. FLOCH:

Q. Give me one second, Mr. Benson.

Do you see a document on your screen?

A. Yes.

Q. Why don't you read the document and let me know when you're done and I'll ask you a question.

A. Could you make it a little bigger? Thank you.

(Witness reading.)

You have to raise it up. Yeah.

(Witness reading.)

Okay.

Q. Mr. Benson, let's go to the top. Do you see this is an email from Brent Satterfield to you and others at Co-Diagnostics?

A. Yes.

Q. It's -- there's also someone named Mohal Sarabhai on the "to" line.

Page 97

Do you see that?

A. Mohal Sarabhai, yes.

Q. Who is that individual?

A. He is the -- our joint venture partner of the -- he runs Asence Pharmaceutical in India, which is our joint -- was our joint venture -- probably still is our joint venture partner for the Indian operations.

Q. Okay. Do you see the subject line of this email is "Performance Evaluation Results"?

A. Yes.

Q. And can you generally describe for me what this email says?

A. It says that the testing entity, whatever it was in India, was using the CDC primers, or we didn't know what they were using or how they came to their results, but Brent's assessment was that it was impossible for our test, which had received -- had been tested hundreds and hundreds of times in many different situations to ever come up with -- I think he said on the bottom of there, 12 percent false positives.

And he doesn't understand what they did to end up with that kind of results, but that he questions that it would be -- that to go back to them and resubmit to them would be requiring them to admit that they had either contaminated the results or used some

25 (Pages 94 - 97)

Page 98

other primer sets that made the test results come out to what they said they were.

Q. So the ICMR found that the Co-Diagnostics Coronavirus had a 12 percent false positive rate, right?

A. That's what the email says.

Q. And Dr. Satterfield, to your understanding, disagreed with that, right?

A. Absolutely.

Q. And he wrote in his email, "While no test is ever 100% specific, I find the results by ICMR inconsistent with what we know about the {sic} test. There is no way that a test with 100% specificity across hundreds of samples had a 12% false positive rate."

Right?

A. That's what it says.

Q. Okay. What did you understand him to be saying when he said, "While no test is ever 100% specific..."?

A. I don't know.

Q. Well, can a diagnostic test ever be a hundred percent accurate?

A. You're saying something different. I think what he's saying, when he says there's no way that a

Page 99

test with 100 percent specificity across hundreds of samples, a test could have 100 percent specificity across hundreds of samples. It may not have 100 percent specificity over an infinite number of samples.

And I think when he says, "While no test is ever 100% specific," I think he is saying it could never be 100 percent specific over an infinite number of samples. But it could have 100 percent specificity across hundreds of samples, or thousands of samples.

Q. What is specificity?

A. You'll have to ask someone else.

Q. Okay. Do you know what sensitivity means?

A. Only what it generically means, and that is that a test is sensitive enough to pick up a low number of molecules that carry the targeted virus.

Q. As a nonscientist, is it your understanding that a test could never be a hundred percent sensitive and a hundred percent specific all the time?

A. It would -- my understanding as a known scientist is that a test could be 100 percent specific and 100 percent sensitive over a defined test -- over a defined number of tests, yes.

Q. But it would be misleading to say that a test is always a hundred percent specific or a hundred

Page 100

percent sensitive, right?

MS. PEIRSOL: Objection.

BY MR. FLOCH:

Q. To your understanding?

MS. PEIRSOL: Objection. Form.

BY MR. FLOCH:

Q. Let me -- Mr. Benson, I'll rephrase the question.

As a nonscientist, is it your understanding that a test cannot be a hundred percent sensitive and a hundred percent specific all of the time?

MS. PEIRSOL: Objection. Form.

THE WITNESS: My understanding is, as a nonscientist, that I looked on the FDA website for all of the companies that received UEA authorization for their Coronavirus tests. And on that list of companies, and I don't have any idea how many there were, hundreds, there were 60 to 70, at least, of those -- of those companies that had registered and received the UEA that showed that they had 100 percent specificity and 100 percent sensitivity.

Now, why they listed those at 100 and 100, all those 60 or 70 companies, I don't know. I also don't know whether or not, with that designation of 100 percent specificity and 100 percent sensitivity,

Page 101

whether that means that they are 100 percent specific and 100 percent sensitive 100 percent of the time.

BY MR. FLOCH:

Q. So I'm going to move your answer -- I'm going to move to strike your answer as nonresponsive. I just want you to listen to my question. I appreciate you're -- you're giving me some background, but I'm just saying, as a nonscientist, is it your understanding that a test cannot be a hundred percent specific and a hundred percent sensitive a hundred percent of the time?

MS. PEIRSOL: Objection. Form.

THE WITNESS: I don't know the answer to that. I suppose it could. I don't know whether it is or it isn't. But as a nonscientist, I only know how those designations are shown to the public.

BY MR. FLOCH:

Q. And how do you know that?

A. Well, I've looked on the FDA website.

Q. Okay. When did you look on the FDA website?

A. When we were having all of these discussions about the press release that we're going to talk about later.

Q. Are you referring to a May 1, 2020, press

26 (Pages 98 - 101)

Page 102

release?

A.  I don't know what the date is, but I'm sure that that's the one that we're referring to, yes.

Q.  Okay.  And before that press release is issued, it's your testimony that you personally looked at the FDA's website, right?

A.  Not --

MS. PEIRSOL:  Just objection.  Mischaracterizing his testimony.

BY MR. FLOCH:

Q.  Sorry.  Mr. Benson, I'm asking -- because I don't quite understand.  Who looked -- who are you testifying about when you say, "We looked at the FDA website"?

A.  Well, I did specifically, but other people in Co-Diagnostics did as well.

Q.  How do you know that?

A.  And it was not before the press release was issued, it was after the press release was issued.

Q.  Okay.  When?

A.  I don't recall an exact time.  It would have been in the month or two after that, the press release was issued.  Maybe three months after.  I don't recall exactly when.

Q.  Did you have a discussion with others at

Page 103

Co-Diagnostics about the FDA website?

MS. PEIRSOL:  Objection.  To the extent you had those conversations in your legal role, Mr. Benson, I instruct you not to answer.

THE WITNESS:  Okay.

BY MR. FLOCH:

Q.  Are you not answering the question on your advice of counsel?

A.  Yes.  Correct.

Q.  So let's go back to the exhibit.  At least as of April 2, 2020, at around 3:30, individuals within Co-Diagnostics were discussing a performance evaluation that showed that the CODX test had a 12 percent false positive, right?

A.  Yes.

Q.  Okay.  So I want to shift gears a little bit and talk about press releases and the company.

Do you write press releases for the company?

A.  No.

Q.  As a general matter, who writes the press releases for Co-Diagnostics?

A.  Andrew Benson would probably write the first draft of the press releases.

Q.  And that's your son --

Page 104

A.  Yes.

Q.  -- Andrew Benson?  Okay.

And what's his title with the company?

A.  Head of investor relations.

Q.  Before Co-Diagnostics issues press releases, do you have an opportunity to comment on them?

A.  Generally.

Q.  And do you exercise that ability to comment on them often?

A.  Generally, yes.  This is not including now.  We were talking about that time period in 2020.

Q.  Back in 2020, March, April, May.

A.  Yes.

Q.  Okay.  Does CODX have a code of ethics that executives must follow?

A.  Yes.

Q.  Are you familiar with that code of ethics?

A.  Generally.

Q.  Okay.  Let me show you what we're marking as Exhibit 8.

(Exhibit 8 marked.)

BY MR. FLOCH:

Q.  And before we get there, Mr. Benson, how often would you say Co-Diagnostics releases a press

Page 105

release in the year 2020, for example?

A.  I would think that we issued a press release maybe 25 -- 25 or 30, maybe, in that year.

Q.  Compared to your work with other public companies, is that on the more frequent side or the less frequent side?

A.  Oh, I think this would be more frequent.

Q.  Okay.  Are there any reasons why, in 2020, Co-Diagnostics was more frequently releasing press releases?

A.  Yes.  We were in the middle of a 100-year pandemic and everybody was concerned about what was happening in the company, in the business, and in the world.  And there was a lot happening.  And so we would issue a lot of press releases.  We wanted people to know we had products that were for sale and that -- and that we could supply them.  In the middle of a pandemic, you need to do more.  And that's why I think more was done.

Q.  When you say "you need to do more," you're saying you need to do more press releases?

A.  Yes.  You need to have more outreach, not only to your investors, but to your potential customers as well.

Q.  So the press releases were geared at both

27 (Pages 102 - 105)

Page 106

informing investors and locating potential customers?

MS. PEIRSOL: Objection. Form.

THE WITNESS: Sorry. Yes. I would think that's true.

BY MR. FLOCH:

Q. Okay. So let me show you what has been marked as Exhibit 8.

Is this the code of ethics we were just discussing?

A. It may be, yes. It looks like it.

Q. I'm only going to ask you about Section III. Why don't you take a look at it and let me know when you're done.

A. (Witness reading.)

Okay.

Q. Do you see that bullet III says, "Compliance with Applicable Laws, Rules and Regulations"?

A. Yeah. I was looking at the wrong place. Yes, I see that, that you've highlighted.

Q. Do you see that it says, "Senior Financial Officers will establish and maintain mechanisms to:," and then it lists four bullets?

A. Yes.

Q. In 2020, were you a senior financial

Page 107

officer of the company?

A. Yes.

Q. And then do you see bullet 4 says, "Ensure that disclosure in documents filed with the Securities and Exchange Commission and in other public communications is full, fair, accurate, timely, and understandable"?

A. Yes.

Q. Okay. So do you have an understanding of what "full" means in the context of this code of ethics?

A. Yes.

MS. PEIRSOL: Objection. Form.

BY MR. FLOCH:

Q. What do you understand "full" to mean in terms of this bullet point?

A. Complete.

Q. Okay. What would make a press release incomplete?

MS. PEIRSOL: Objection. Form.

THE WITNESS: What would make a press release incomplete? I -- I'm not sure that I -- I guess if you only had half the press release, that would be incomplete.

BY MR. FLOCH:

Page 108

Q. Well, I asked you before, what does full mean in the context of this code of ethics, and you said full means complete. So I'm asking you, let's say you release a communication publicly. What makes it complete rather than incomplete?

MS. PEIRSOL: Objection. Form.

THE WITNESS: I would say maybe leaving out something that is necessary to understand the press release in the context that it was intended.

BY MR. FLOCH:

Q. Okay. So leaving out something necessary in the context of what the press release was about would make it incomplete?

A. Something necessary, yes, sure.

Q. Okay. Do you see that this code of ethics also discusses that senior financial officers will establish and maintain mechanisms to --

A. Yes.

Q. Excuse me, disclosure of filings as full and fair and accurate and timely and understandable?

A. Yes.

Q. Did Co-Diagnostics, in 2020, have any mechanisms to ensure that public communications were full, fair, accurate, timely and understandable?

A. Yes.

Page 109

Q. Okay. What were those mechanisms?

A. All of our public communications were reviewed by everybody in senior management. And from the technical side, scientists would have an opportunity to review and opine on matters that were explained in the public. In addition, all of our press releases were sent to our securities council for their review of the documents before they were released. All of our documents filed with the Securities and Exchange Commissions were reviewed by our securities counsel, to ensure compliance with SEC rules and regulations.

And all of those matters would have been discussed by everyone involved. So I believe those were the mechanisms that were established to ensure both fair, accurate, timely and understandable disclosures.

Q. So it seems like your testimony is that everyone within senior management had an opportunity, if they wanted to, to comment on any type of public disclosure?

MS. PEIRSOL: Objection. Misstates his testimony.

THE WITNESS: We would regularly review all the press releases and all the public disclosures, all of our -- anything else that went out to the public,

28 (Pages 106 - 109)

Page 110

and I don't know whether -- when you said everybody, but --

BY MR. FLOCH:

Q. Sorry. Members --

A. Members of senior management would review those things, yes.

Q. And who are the members of senior management in the first half of 2020?

A. Well, myself, Mr. Egan, then the -- Mr. Satterfield could have reviewed it. The lab managers could have -- would have reviewed things.

Cecelia Hutchins would have reviewed things that related to her area of -- of responsibility. So those are the ones that I would -- can think of right offhand, that may have had input into releasing information to the public.

Q. Did board members generally have input before press releases were issued to the public?

A. I would not think so. Sometimes they would, depending on what the press release was. But I don't -- I don't know as a matter of fact whether all the press releases were sent to all the members of the board and -- we certainly did not send them to the board with the intent that the board would necessarily have input into -- into writing the press release,

Page 111

because they wouldn't have really had knowledge, that detailed of knowledge, of the business.

We may have sent them to them as a matter of courtesy, so they knew press releases when they were coming out. I don't -- I don't recall whether they were circulated as a general rule, however.

Q. If a board member wanted to make an edit or change wording of a press release, would senior management generally be receptive to that input?

A. I would think so, yes.

Q. Okay. Does Co-Diagnostics monitor the impact that press releases have on Co-Diagnostics's share price?

A. How do you mean, monitor?

Q. As a general matter, does Co-Diagnostics do an analysis of the share price connected to the date that the press release was released for every press release?

A. I would think not. I certainly did not, and I don't think anybody else did.

If you're asking, did we put out a press release and did the next day somebody look and see if the stock price -- whether the stock went up or down, I'm sure we all did that, but not as a matter of discipline or analysis of whether or not the stock

Page 112

price reacted to press releases.

Q. Why are you saying that you're sure individuals within Co-Diagnostics would look at the share price a day after the press release?

A. Because everybody in the company has stock and they are -- they look at it probably every day, whether it goes up or down or whether we put out a press release or not. The employees are concerned about it and vested in it, so sure, they would look at it.

Q. But you've never done an analysis of the share price as compared to the dates press releases were made?

MS. PEIRSOL: Objection. Form.

THE WITNESS: I have, it seems, gone back to look at trading volumes, trading price and press releases, and looked at that, though I don't know that looking at it rises to the level of an analysis, but it seems like I've done -- looked at that.

BY MR. FLOCH:

Q. Why do you say it seems like you've looked at that?

A. Because I don't really remember. I know we've had conversations about it and I know I've gone back and looked at certain times.

Page 113

Q. When you say "we've had conversations," who is the "we" that you're referring to?

A. I'm sure it would have been with Mr. Egan, and maybe others in our -- in our department have meetings, though we didn't talk about the stock hardly ever in those department head meetings. So it would have been just with -- probably with Mr. Egan.

Q. And why do you think you probably had a conversation with Mr. Egan about -- I think you said trade volume, trade price and press releases?

A. Because part of our responsibility is to manage that part of the business as well as the sales of tests part of the business.

MS. PEIRSOL: Brandon, when you're done with this line of questioning, could we take a quick break.

MR. FLOCH: Why don't we take a break right now. I'm sorry about that. I was looking at the time and realized I hadn't given a break. Let's go off the record.

THE VIDEOGRAPHER: Off the record at 12:28.

(Recess taken from 12:28 p.m. to 1:02 p.m.)

THE VIDEOGRAPHER: Beginning of media four. Back on the record. The time is 1:02.

BY MR. FLOCH:

29 (Pages 110 - 113)

Page 114

Q.   Mr. Benson, you testified earlier today that you have a law degree, correct?

A.   Yes.

Q.   Are you licensed currently to practice in any state?

A.   My license is currently inactive in the State of Utah.

Q.   Okay.  And you don't have any licenses in other states?

A.   No.

Q.   When did you go inactive?

A.   Like the middle of October of 2021.

Q.   Was there any reason you decided to go inactive?

A.   I went for a year to Augusta, Georgia, to serve a service mission for our church and was not -- didn't seem like I needed it.  And I haven't decided yet whether I'm just too old and I want to reactivate my license or whether I'm not going to.

Q.   And to be a general counsel in a Utah company, you don't need to be licensed to practice law in Utah, right?

A.   Oh, I would think you should, but I don't know for sure.

Q.   Okay.  One question I didn't ask you at the

Page 115

beginning, just a background question.  Have you ever been arrested?

A.   No.

Q.   Okay.  Let's go back to what we were talking about before the break.

We were talking about trading volumes, trading price and press releases, right?

A.   Yes.

Q.   I'm going to show you what I am going to mark as Exhibit 9.

(Exhibit 9 marked.)

BY MR. FLOCH:

Q.   Okay.  Do you see Exhibit 9 on your screen?

A.   Yes.

Q.   And do you see that it is an email from your gmail to Mr. Briggs --

A.   Yes.

Q.   Sorry -- and to Mr. McCluskey?

A.   Yes.

Q.   And it's dated July 20, 2020?

A.   Yes.

Q.   And there's a subject line that says, "Trading history and press releases"?

A.   Yes.

Q.   And it looks like there's an attachment to

Page 116

it.

A.   Yes.

Q.   Okay.  Do you see that you wrote to Mr. Briggs and Mr. McCluskey, "Here is our trading history.  I've got to update it when I get a chance and put in the negative 'short' releases just to get a complete picture"?

A.   Yes.

Q.   Who's Mr. McCluskey?

A.   He's a consultant with the company.

Q.   And what type of consulting did he provide Co-Diagnostics?

A.   He would represent us in New York with investment bankers and potential investors.

Q.   Mr. Benson, I'm just going to scroll quickly through the attachment here.  It was produced to us in Excel form, so it's been printed to PDF, but can you just take a look at it and then I'm going to ask you a question.

A.   Okay.

Q.   Do you recall preparing this document?

A.   Yes, I do.

Q.   Why did you prepare this document?

Well, let me back up.

What is this document?

Page 117

A.   It looks like it is dates and has a column for the high value of our stock, low, close, adjusted, and volume.  It looks like it's from 12/31/2019 to whenever it ends, 6/18/2020.

Q.   And next to the volume column, is there another column there?

A.   A comment column, I suppose you'd say.

Q.   And what are the comments inside that column?

A.   They would be maybe the title of our press releases.

Q.   Okay.  So can you explain to me why you're preparing a document with stock prices and volume and dates of press releases for Mr. Briggs and Mr. McCluskey?

A.   I wanted to know whether or not there was a correlation between press releases and how the stock traded.

Q.   Did you have -- sorry.

Do you recall having discussions with Mr. Briggs and Mr. McCluskey about this document?

A.   I'm sure I must have done, but I do not recall, no.

Q.   Do you recall coming to a conclusion about whether or not Co-Diagnostics's press releases affected

30 (Pages 114 - 117)

Page 118

Co-Diagnostics's stock price?

A. It appeared to at some times but not at others, so no, there was no conclusion necessarily that I could draw from it. I'm not sure that there was a correlation, a direct correlation, between the press releases and the volume of the stock.

Q. And what type of analysis were you performing? Was it just an eyeball analysis?

A. Yes.

Q. Okay. And it looks like, if we look at 12/31/19, that the stock closed at about .889 or round up to 90? a share, right?

A. Yes.

Q. And then if you go forward about April, May, it looks like the stock is around 10 to $15 a share, right?

A. Yes.

Q. Okay. And then it looks like if we go from May 1st to around May 14, the stock shoots up to a high of about $29 a share?

A. Okay. Yeah, I see that.

Q. Okay. Now --

A. It didn't close there, of course. You noticed that.

Q. Right. It closed --

Page 119

A. The stock just closed right in the -- wherever that line was that you had -- yeah, it closed at the 22, the same as the day before.

Q. Okay. What was the purpose of providing this document specifically to Mr. Briggs and Mr. McCluskey?

A. They were our consultants on Wall Street. They wanted to know what the trading history was, I suppose, and so I sent it to them so that they could speak with investment bankers and other investors and get a feel for how the stock traded. I don't recall any specifics about that, only generalities.

Q. Did you ever have any discussions with Mr. Briggs or Mr. McCluskey about Co-Diagnostics's ability to affect the stock price by either a positive or a negative press release?

A. I don't recall any specific conversations in that regard, no.

Q. Do you recall any conversations with them at all about this trading history and press release analysis?

A. No, I don't recall having those conversations with them. I undoubtedly did have a conversation. I sent them an email and I would think they would have looked at it or asked me questions or I

Page 120

would have said something about it, but I don't have any recollection of any specific conversations, no.

Q. What did you mean when you said, "I've got to update it when I get a chance and put in the negative 'short' releases just to get a complete picture"?

A. It was our opinion that there were certain investors in the investing public who had a vested interest in decreasing the price of our stock, and there would be press releases from a number of different places that would point out anything negative about the company in an attempt to decrease the price of the stock. And we believed that they were put out for the purpose of driving down the price of the stock because stock had been sold short by those investors. And I wanted to see if there was a correlation between those negative short releases and the trading prices and volumes of our stock.

Q. When you say "negative short releases," you're talking about public statements made by companies or individuals other than Co-Diagnostics?

A. Specifically, when you say other individuals, there were three or four companies that -- and I can't remember the names of them -- that would put out negative information about the company. Any

Page 121

time anything was said by anybody that was not in a positive view, they would put out those press releases. There was only like, I don't know, three or four.

Q. And you don't remember any of the names of the individuals or entities you're referring to?

A. No, I don't.

Q. When you say "negative information," what do you mean by "negative"?

A. Information that -- this is kind of a bad definition of negative. Something that was not positive. So if they would put out something that says, "Co-Diagnostics has a bad test," that would be negative information. "Co-Diagnostics can't -- can't get approval from the FDA," that would be negative information. That's what I mean about negative information.

Q. Okay. But you're not saying in this email to Mr. Briggs and Mr. McCluskey that the negative information is false, right, you're just saying negative?

A. I would believe that we all assumed that the negative information was of a generally false nature or was cast in the most negative light that it could be.

Now, I didn't put anything about that in

31 (Pages 118 - 121)

Page 122

the email that is on the screen.

Q. Is it your opinion that for lack of a better term, these short sellers could affect Co-Diagnostics's stock price with certain negative releases?

A. Absolutely. Also, the trading volumes had to be by people who had sold the stock short.

Q. Sorry. Can you explain that? What do you mean by, "The trading volumes had to be by the people who sold the stock short"?

And let's go down to the document. Can you give me an example of what you mean by that last statement?

A. Well, it would have been better if you go back into 2019, because this -- this doesn't have anything to do with those negative releases on there, but there were times when our stock would trade very high volumes. And back in 2019, I think it was in January of 2019, we'd put out a press release that one on our major investors had decided to convert his loan to preferred shares of stock.

Our stock price went up and we were able to fund a portion of our S3 that we had filed to investors, who obviously knew what the stock was, because they didn't particularly do any due diligence

Page 123

on the company. But they were willing to invest 5 or $6 million in the company stock that came out at that S3.

Well, our assumption always was the reason they didn't do their due diligence was because they had already sold the stock short when the stock price went up and they covered their short positions with investments through the S3. And that's why we assumed the same thing was happening when those negative press releases were put out by groups that we were informed were run by or invested in by people who shorted stocks of public companies.

Q. So I just want to go back to one thing you said. You said that in response to my question, do you think the short sellers were affecting the stock price with the releases, you said "absolutely," right?

A. Yes.

Q. But when I asked you, do I think Co-Diagnostics could affect the stock price with its press releases, you said, "Maybe yes, maybe no."

A. Yes. Sometimes there's a -- there was activity in the stock after we put out a press release and sometimes not so much, so it just depended. After I had done this little study, I'm not sure I ever knew whether there was a direct correlation.

Page 124

Q. Okay. But you never did like an econometric analysis or anything like that?

A. I don't know what that is, so no, I didn't.

Q. Okay. Let's go back now. We were talking about press releases generally before the lunch break, right?

A. Yes.

Q. And we talked about how the fact that sometimes you made comments on those press releases, right?

A. Yes.

Q. Okay. Let me show you what we're going to mark as Exhibit 10.

(Exhibit 10 marked.)

BY MR. FLOCH:

Q. And, Mr. Benson, I'm only going to be asking you about the page with the number 569 on the bottom. So I'm going to zoom in and let you read it and then let me know when you're finished.

A. (Witness reading.)

Q. Mr. Benson, please let me know when you're finished and I'll ask a question.

A. (Witness reading.) Okay.

Q. Okay. Do you see that this is an email between you and Jennifer Webb around April 2, 2020, in

Page 125

the afternoon?

A. Yes.

Q. And generally, what are you discussing?

A. Her suggestions for information to put in a press release, it seems.

Q. Okay. Now, do you see that she wrote to you and said, "We need something between the lead paragraph and the explanation of the current FDA regulations that gives context on the advantages of our test in a way that the media can understand it"?

Do you see that?

A. Yes.

Q. And then she lists a bunch of points, right?

A. Yes.

Q. And the second bullet point says, "Co-Diagnostics has the capacity to produce 50,000 tests per day from its Salt Lake manufacturing facility."

Do you see that?

A. Yes.

Q. And then do you see there's another bullet that says, "Co-Diagnostics tests have demonstrated 100% accuracy in the clinical evaluation required by the FDA emergency use authorization submission"?

32 (Pages 122 - 125)

Page 126

Do you see that?

A.   Yes.

Q.   Then do you see you respond to her and say, "I'm not really comfortable with 50,000 or 100% need some qualifications before we can use those"?

Do you see that?

A.   Yes.

Q.   What did you mean when you said you're not really comfortable with 50,000?

A.   I needed to know that the lab could produce 50,000 tests.

Q.   Okay.  And when you said, "I'm not really comfortable with 100%," what did you mean by that?

A.   Her use of the word "accuracy," our clinical tests had demonstrated 100 percent sensitivity and 100 percent specificity but not 100 percent accuracy.

Q.   Okay.  So what are the qualifications that were needed for you to give her the thumbs up on using the 100 percent number?

A.   It needed to be set what it was, which was a hundred percent -- a hundred percent specificity and a hundred percent sensitivity.  And it could be in the clinical evaluations that we submitted to the FDA, it could be in other clinical evaluations, however we

Page 127

wanted to do it, but it needed to be stated correctly.

Q.   And why did that 100 percent number of all the bullet points listed cause you to respond to her and say, "Please don't use that number," basically?

MS. PEIRSOL:  Objection.  Misstates the witness's testimony.

BY MR. FLOCH:

Q.   Let me rephrase the question, Mr. Benson.

What about the 100 percent number caused you to respond to her?

A.   The 100 percent was not what caused me to respond.  It was the term "100 percent accuracy" that caused me to respond, because in our submissions to the FDA, we asserted 100 percent sensitivity and 100 percent specificity to get the UEA submission authorized by the FDA.

Q.   And is it your understanding that customers, when determining which diagnostic test to buy, are interested in the sensitivity in the test and the specificity of the test?

A.   Yes.

Q.   And to your understanding, why is that an important metric for a customer who's purchasing a diagnostic test?

A.   If you're talking about customers in the

Page 128

United States, they are only sophisticated labs and they understand what that means much better than I do.  And so I'm sure that's a metric that they use, because that's what is reported by the FDA on their list of UEA approvals.  So it must be something that those labs look at and understand and desire.

Q.   Mr. Benson, I'm just going to go back to one exhibit and show you something quickly and then return to this one.

A.   Okay.

Q.   Do you see Exhibit 7 on your screen?

A.   Yes.

Q.   And is this an email that we looked at earlier from April 2nd in the afternoon?

A.   Yes, seems to be.

Q.   And is this the email where Dr. Satterfield emailed Co-Diagnostics discussing the ICMR test that found a 12 percent false positive rate in Co-Diagnostics's tests?

A.   Yes.

Q.   And it looks like this is April 2nd in the afternoon, right?

A.   Yes.

Q.   And if we go back to Exhibit 10, it looks like you're sending the email from 3:42 p.m. in

Page 129

Exhibit 10, right around the same time you received the email from Dr. Satterfield about the ICMR report, right?

A.   Okay.

Q.   Were you concerned about using the 100 percent number on individuals within Co-Diagnostics that had knowledge that some performance evaluations were showing sensitivity and specificity at less than a hundred percent?

MS. PEIRSOL:  Objection.  Form.

THE WITNESS:  No.

BY MR. FLOCH:

Q.   Why do you say "no"?

A.   Because I was assured by our scientists that the test in India was bogus for some reason.

Q.   So when you say, we need some qualifications before a hundred percent, are you telling Ms. Hutchins that she can't issue a press release that says the Co-Diagnostics test is a hundred percent accurate?

A.   If you're talking about Ms. Webb, she would never issue a press release anyway.  She was only giving some suggestions of things that we might could put into the press release, or into press releases, that would give additional understanding to a

33 (Pages 126 - 129)

Page 130

broader -- a broader public, but Jennifer Webb never prepared any of our press releases. She would review them, look at them and give her opinion of what ought to be in there.

And now I go back to your sentence. The only thing I was concerned about with the hundred percent was the word "accuracy." And we would never have put accuracy in a press release, but Jennifer might not have understood specificity and sensitivity. And so she was just talking generically, but that's what I was concerned about.

Q. Would Co-Diagnostics ever put in a press release that its test is a hundred percent specific and a hundred percent sensitive?

MS. PEIRSOL: Objection. Form.

THE WITNESS: Would we have ever? I don't know whether we -- whether we did or not, and I don't know whether we would have.

BY MR. FLOCH:

Q. Okay. Let me ask you a different question. Have you heard of the hospital Intermountain Health?

A. Sure.

Q. Have you heard of that hospital in connection with Co-Diagnostics's Coronavirus test?

Page 131

A. Yes.

Q. Have you heard the name Dr. Lopansri?

A. Yes.

Q. Okay.

THE COURT REPORTER: I missed that name, I'm sorry.

MR. FLOCH: L-O-P-A-N-S-R-I.

THE WITNESS: Oh, I'm not sure that's the one I was thinking about, but I may or may not have heard of it. The way you spelled it, it doesn't sound like who I was thinking of. So I'm --

BY MR. FLOCH:

Q. Who were you thinking of, Mr. Benson?

A. I thought it was Lopransi or something else. Maybe I'm just mistaken on the name.

Q. My spelling could be wrong too, but we'll -- let me show you a document and we'll put it to rest.

A. And I would only be familiar with that name from reading in the papers, actually.

Q. What do you mean, you'd only be familiar with it from reading --

A. I've never had any contact with this doctor. I don't know him. I've never heard him talk. I've never -- I don't know who he is or what his

Page 132

background is or anything else in that regard.

Q. What do you recall hearing about him?

A. The person I was thinking about was quoted in a newspaper article.

Q. Okay. I am showing you what has been marked as Exhibit 11.

(Exhibit 11 marked.)

BY MR. FLOCH:

Q. And I just want you to read the very top of the "to" line, and then we'll scroll down after that.

A. (Witness reading.)

Q. Do you see that this is an email from Mr. Dwight Egan to you?

A. Yes. And would you make it a little bit bigger?

Q. Sorry.

On April 17, 2020?

A. Yes.

Q. And the subject line is, "Fw: Test Utah"?

A. Yes.

Q. And it looks like Mr. Egan has forwarded you a few chains of emails, right?

A. Yes.

Q. And if we scroll all the way down, you see there's an email from Bert Lopansri, right?

Page 133

A. Oh, okay. Sure.

Q. And do you see his signature line shows that he's the associate medical director, Intermountain Infectious Diseases Program?

A. Yes.

Q. Is this the individual you were thinking about before?

A. I think so, but I -- it just seemed like it was a different -- a different spelling or different name.

Q. Why don't you take a look this email and then I'm going to ask you a question.

A. (Witness reading.)

Okay.

Q. I'll just scroll down a little bit for you to see the rest of it.

A. (Witness reading.)

Okay.

Q. Okay. Do you recall receiving this email?

A. No.

Q. But it appears you did receive it, right?

A. Yes.

Q. Do you recall discussing this email with Dwight Egan?

A. I'm sure we must have done, but no, I don't

34 (Pages 130 - 133)

Page 134

recall.

Q. Okay. Do you see that this email is from Bert Lopansri to others, but not anyone at Co-Diagnostics, right?

A. No.

Q. And do you see he writes, "Nate, I am deeply alarmed with what I heard about the Test Utah results if the numbers you reported are correct and appreciate you confirming the data"?

Right?

A. Yes.

Q. Then he says, "What alarms me the most is that they are expanding collection and testing with these unknowns about how their test performs."

Right?

A. Okay.

Q. Then he says, "If correct, I urge you to halt their testing until we understand why their results differ so much from what other labs are reporting as this is a potential public health disaster that will be compounded by the fact that they are constantly promoting themselves publicly while we are not."

Do you see that?

A. Yes.

Page 135

Q. And then if you scroll down, you see Dr. Lopansri writes, "As you can see, the Co-Diagnostics test has a significantly higher LOD compared to the tests we use which can be a big problem for low positives."

Do you see that?

A. Yes.

Q. Okay. Do you understand what LOD means here?

A. "Level of detection."

Q. Okay. And then do you see at the bottom, Dr. Lopansri writes, "Either way, I worry about having tests routed to a small community hospital lab inexperienced with highly complex molecular testing that uses a test from an unknown company without much in vitro diagnostic experience that has a higher limit of detection compared to tests offered by more established vendors."

Do you see that?

A. I do.

Q. Then he wrote, "A pandemic is not the time for amateurs to learn."

A. I see that, too.

Q. Having looked through this email, do you recall having any discussions about Dr. Lopansri's

Page 136

concerns with anyone inside Co-Diagnostics?

A. Not specifically concerning that email, no, I wouldn't -- I don't have any recollection of that.

Q. Do you have any recollection of discussing concerns by Intermountain Health generally about the performance of Co-Diagnostics's Coronavirus test in or around April 2020?

A. Sure. We had discussions about Intermountain Health and why they did not approve of the lab that was run by United Healthcare.

Q. Okay. Can you explain to me, what do you mean by Intermountain Health didn't approve a lab?

A. Well, you just saw what they were -- put in the email. They said it was a small, inexperienced lab. Well, it's run by good -- it's one of the United Healthcare hospitals, which was a major competitor of Intermountain Healthcare. And we have those discussions about the interplay of their competition and how that could have influenced their opinions.

Q. Did you have any discussions about Intermountain Health's criticism of the performance of Co-Diagnostics's Coronavirus test?

MS. PEIRSOL: Objection. To the extent you're going -- that this question calls for privileged information, I instruct the witness not to answer.

Page 137

So, Mr. Benson, if you can answer without providing any privileged conversations, you can do so.

THE WITNESS: I did -- I remember having conversations with our technical team, staff, and Dr. Satterfield about the fact that our tests were -- would live up to exactly what we purported them to be, that they were a PCR test, properly administered, were a test that anyone could use with confidence, and that's -- that would have been the nature of the conversations that we would have had around this time. Whether it was specifically about that email or not, I don't know.

BY MR. FLOCH:

Q. So it seems like, at least in April 2020, there was a bit of a pattern, right, in that Co-Diagnostics received a bad performance evaluation and then Dr. Satterfield would say to you, there's nothing to worry about, right?

MS. PEIRSOL: Objection. Form.

THE WITNESS: I don't know that I would characterize it like that.

BY MR. FLOCH:

Q. Well --

A. I -- Dr. Satterfield was someone that we'd rely on, because he understands the technology, he

35 (Pages 134 - 137)

Page 138

understands testing. He also knows that it depends on who is doing the testing, how it is administered. And we had had enough independent evaluations of our test by sophisticated labs all over the world that if one lab was having a problem with it, we were convinced it was not the fault of our test.

So I don't -- well, so that's why I would accept that -- the statements that Dr. Satterfield would have been making to us.

Q. So the ITMR we saw earlier found that when it did a performance evaluation on the Co-Diagnostics's test, found a 12 percent false positive, right?

A. Yes.

Q. And it's your understanding that Dr. Satterfield said, "It's a problem with their protocol, it's not a problem with our test," right?

A. Absolutely.

Q. And then we just looked at an email where Dr. Lopansri, at Intermountain Health, said, "Something appears to be wrong with the Co-Diagnostics's Coronavirus test," right?

A. Yes, he does.

Q. And --

A. He says that.

Q. And your testimony is that Dr. Satterfield

Page 139

again had some type of conversation with you where he said, "There's not a problem with our test, there's a problem with the way that Intermountain Health is running our test," right?

A. Intermountain Health did not run the test.

Q. Sorry. The labs that were working with Intermountain Health, the way they were running the test was the --

A. The labs that were working in competition with Intermountain Health, yes.

Q. Okay.

A. But that's not -- I don't think that's a proper characterization either, because there were some other issues with regard to the testing subjects and the base, as I recall as well. So --

Q. What do you mean when you say there's --

A. I don't recall exactly --

THE COURT REPORTER: I didn't hear that question at all.

MR. FLOCH: Sorry.

BY MR. FLOCH:

Q. I said, what did you mean when you said there was a problem with the testing subjects?

A. As I recall, one group was testing people with symptoms. Others were testing people that were

Page 140

asymptomatic. And so you were not testing the same groups that were -- that were comparable. They were -- they had different characteristics of the testing group. That's what I was referring to. That's what I remember those times of conversations as well.

Q. Besides the ICMR performance evaluation and Dr. Lopansri's email, do you recall any other criticisms of Co-Diagnostics's Coronavirus test in or around April or May 2020?

A. Not offhand, no.

Q. What about any criticisms of the Co-Diagnostics's Coronavirus test from health officials in the state of Tennessee?

A. I didn't have anything -- I don't recall anything about the state officials of Tennessee, so no.

Q. Okay. So earlier you testified about a Salt Lake Tribune article, right?

A. Yes.

Q. Did the Salt Lake Tribune article quote or reference the email we just looked at with Dr. Lopansri?

A. I don't know whether it quoted the email or not, but he was quoted in the article.

Q. Just generally, what do you remember about that article?

Page 141

A. The same type of information that was in the -- that we just discussed in the email.

Q. Did you discuss that April 30, 2020, article with anyone else at Co-Diagnostics?

A. I'm sure I had discussions with -- with Mr. Egan about that and probably with -- I can't remember whether I did with Brent, but I probably did with Brent as well.

Q. What were the substance of your conversations with Mr. Egan about the April 30th, 2020, article?

MS. PEIRSOL: Objection.

To the extent this question calls for privileged information, Mr. Benson, I instruct you not to answer. You can go ahead and answer if you can answer without divulging privileged information.

THE WITNESS: Okay. We would have discussed the motives that both the Tribune and the IHC would have had for their characterization of the testing that was being done by Nomi Health and by the United Healthcare's hospitals.

BY MR. FLOCH:

Q. Okay. When you say you would have discussed the motives of the Tribune and Intermountain Health, what do you mean when you say "motives"?

Veritext Legal Solutions
800-726-7007　　　　　　　　　　　　　　　　305-376-8800

Page 142

A.   It was our belief that the Tribune article was motivated -- was politically motivated because the brother of the editor of the Tribune was Huntsman, who had just lost the gubernatorial nomination to Governor Cox. And Governor Cox was primarily responsible for Test Utah, and anything they could do to color Test Utah as problematic was the motivations behind the articles that came from the Tribune.

IHC's motivations were that they were -- they were testing and wanted to have a monopoly of the testing in Utah, and did not want their competition from United Healthcare to cut into their competition. And so they would -- or cut into their market share. So they would do whatever they could to raise problems, issues or other matters to -- to further their own ends. That would have been the nature of the majority of our conversations.

Q.   So is it your belief that Dr. Lopansri, in making criticisms of the Co-Diagnostics test, was not operating in good faith?

MS. PEIRSOL:  Objection to form.

THE WITNESS:  I don't know whether he was operating in good faith or not, but we believe that he was probably ill informed.

BY MR. FLOCH:

Page 143

Q.   And what is your basis for believing that Dr. Lopansri was ill informed?

A.   Every time someone had asked to come and test our test, look at it, it had passed with flying colors. There were multiple independent labs that had examined the -- our test, both before and after this point in time. All of them liked the test.

Nebraska had used the test. Their people are really bright. They're Ph.Ds. They're doctors. They do all of their own research. They validated the test and wanted to use it.

Why all of those smart people who had examined the test and found that the test performed as we had represented it to test gave us confidence that it was a good test and it performed exactly the way it was supposed to perform, with the characteristics that a high quality PCR test should have.

Q.   So I think you just testified that it passed all evaluations except for the Test Utah criticism with flying colors, right?

MS. PEIRSOL:  Objection. Form.

THE WITNESS:  And I think we're talking about two different things.

The criticism of Dr. Lopansri didn't have to do with -- with the quality of or the performance of

Page 144

the test, as much as it had to do with the reporting coming back from Test Utah of the number of people that they had tested and their rates of positive incidence of COVID. And so I'm not sure that we're talking about exactly the same thing.

BY MR. FLOCH:

Q.   So after the April 30, 2020, article comes out, did Co-Diagnostics's employees discuss with each other a potential response to the article?

MS. PEIRSOL:  Objection.

Again, if it calls for privileged information, Mr. Benson, I instruct you not to answer. If you can answer without disclosing privileged information, go ahead.

THE WITNESS:  Part of those discussions clearly would have been of a legal nature. Part of those discussions would have been, I suppose, of a public relations nature.

BY MR. FLOCH:

Q.   Okay. So without -- I'm not trying to ask you about any attorney-client privileged communications, but when you say part of those communications would have been legal, who is the lawyer in those legal conversations?

A.   Well, me and probably our outside counsel

Page 145

would have had discussions about it.

Q.   And who was the outside counsel you're referring to?

A.   The law firm of Carmel, Milazzo & Dichiara in New York. They've advised us on -- mostly on securities matters and things, but they would certainly have been involved in those discussions as well, about what the appropriate legal response to that might have been, whether it was advice -- advice -- advisable to have such a legal response and what the nature of it might be.

Q.   So shifting to the second sphere that you were talking about, like a PR response, did Co-Diagnostics ever develop or execute a public relations response to the April 30, 2020, article?

MS. PEIRSOL:  Again, to the extent that the question calls for privileged information, Mr. Benson, I instruct you not to answer. To the extent you can without disclosing privileged information, go ahead.

THE WITNESS:  I don't recall that we had any public response to that particular press release -- or that particular newspaper article, other than to continue doing exactly what we -- had been done in the past.

BY MR. FLOCH:

37 (Pages 142 - 145)

Page 146

Q.   What do you mean when you say "continuing to do what we did in the past"?

A.   If we had newsworthy information to release via press releases, we would continue to do so.

Q.   Okay.  Did you discuss the April 30, 2020, article with any employees or individuals associated with Test Utah?

A.   I did not, no.

Q.   Okay.  Let me show you what we're going to mark as Exhibit 12.

(Exhibit 12 marked.)

BY MR. FLOCH:

Q.   And, Mr. Benson, I'm going to ask you to read this whole email, starting from the top and going down, and I'll zoom in and just let me know when to scroll.

A.   Okay.

(Witness reading.)

Scroll.

(Witness reading.)

Scroll.

(Witness reading.)

Scroll.

(Witness reading.)

Scroll.

Page 147

Q.   Okay.  So if we go to the top, this looks like an email from Clint Betts with a Silicon Slopes email address, right?

A.   Yes.

Q.   It's dated April 23, 2020?

A.   Yes.

Q.   And looks to be in the evening, like 11:24 p.m.?

A.   Yes.

Q.   And you're on this email, right?

A.   Yes.

Q.   Do you recall this email at all?

A.   No.

Q.   Do you see Mr. Betts wrote, "Any progress on the statement we discussed on our call this afternoon?"

Do you see that?

A.   Yes.

Q.   You can see there's a zoom link, and do you recall being on a zoom with anyone from Silicon Slopes?

A.   No.

Q.   Do you recall having any discussions with Mark Newman at Nomi Health on April 30, 2020?

A.   No.

Q.   And if we scroll all the way down, the

Page 148

bottom email is an email from Mark at Nomi Health, right?

A.   Yes.

Q.   And he says, "Seth, please connect Clint with your PR so we can gameplan {sic} on response. Thanks.  Mark."

Do you see that?

A.   Yes.

Q.   So you have no recollection of having any conversations with anyone at Nomi about a response to the April 30th article?

A.   No.

Q.   And you have no recollection of any conversations with anyone at Silicon Slopes in regard to a response to the April 30, 2020, Salt Lake Tribune article?

A.   No.

Q.   When Mr. Betts wrote to Mr. Ludlow and others at Co-Diagnostics, including you, "Any progress on the statement we discussed on our call this afternoon," do you know what statement he's referring to?

A.   No.

Q.   Okay.  Did you work on a press release on the evening of April 30, 2020?

Page 149

A.   I don't know.

Q.   Okay.  I'm going to show you a document. This will be Exhibit 13.

(Exhibit 13 marked.)

BY MR. FLOCH:

Q.   Okay.  Let's focus on the top.  Do you see that -- the top is a May 1, 2020, email at 1:22 a.m.?

A.   Yes.

Q.   Do you see it's from Andrew Benson to Jennifer Webb and you're in the CC line?

A.   Yes.

Q.   Do you recall receiving this email?

A.   No.

Q.   Let's scroll down a bit.

Do you see that on the bottom of the chain, there appears to be --

A.   My screen is blank right now.  It went completely dark.

MR. FLOCH:  Let's see.  Why don't we go off the record for a second so we can fix it.

THE VIDEOGRAPHER:  Off the record, 1:58.

(Recess taken from 1:58 p.m. to 2:05 p.m.)

THE VIDEOGRAPHER:  This is the beginning of video five.  We're back on the record.  The time is 2:05.

38 (Pages 146 - 149)

Page 150

BY MR. FLOCH:

Q. So, Mr. Benson, before the break, we were looking at Exhibit 13, and I'm going to pull it up on the screen again.

Do you see it?

A. Yes.

Q. And before the break, we were looking at the top email, which shows that you were on this email chain.

A. Yes.

Q. And if you scroll down, there's an email from Dwight Egan to Jennifer Webb, April 30th at 4:44 p.m., right?

A. Yes.

Q. And do you see that Dwight wrote to Ms. Webb and said, "Subject: Response," and the title of his email appears to be "Co-Diagnostics Response to Tribune article of 4/30/2020"?

A. Yes.

Q. Did you work on a potential response to the Tribune article of April 30, 2020?

A. I don't recall.

Q. Okay. Do you see that Dwight drafted a potential response to the Tribune article?

A. Yes, I see that.

Page 151

Q. Okay. And do you see that in the one, two -- third paragraph, he wrote, "The recent article cited differences in LOD or level of detection inferring that the company's COVID-19 test was less likely to detect low levels of infection, when in fact, the above-mentioned validation studies demonstrated excellent results in level of detection metrics."

Then he goes on to write, "In support of the article's insinuation the authors cited the company's own conservative data and FDA Instructions For Use."

Do you see that?

A. I do.

Q. And then he writes, "While the company's own data intended to show the worse case scenario for purposes of regulatory approval, the performance of the test in a clinical setting shows that the company's test performance corresponds with required standards with 100% conformity. You can't get better than 100%."

Do you see that?

A. I do.

Q. Did you make any comments to this draft prepared by Dwight Egan?

A. I don't recall.

Q. Okay. If we scroll up a little bit, do you

Page 152

see there's an email from Dr. Satterfield now to Dwight Egan and Jennifer Webb at around 5:30 p.m. on April 30, 2020?

A. Yes.

Q. And do you see in the middle of the paragraph he writes -- or, sorry, let me go back.

In the middle of Mr. -- Dr. Satterfield's email, do you see he writes, "Co-Diagnostics Reports 100% Sensitivity for its Coronavirus Test in Competitive Field Studies from Countries Around the World"?

Do you see that?

A. Yes.

Q. And then he writes, "Co-Diagnostics announced in an update on use of its Coronavirus test in countries around the world that it has completed several clinical evaluations."

And then he writes, "We are proud to announce that we have won X international government tenders due to our test's superior performance when compared to US and other tests. We have repeatedly seen 100% sensitivity and 100% specificity, and you can't do better than that."

Do you see that?

A. I do.

Page 153

Q. Does it look like to you that he was editing Mr. Egan's potential response?

MS. PEIRSOL: Objection. Form.

THE WITNESS: I don't know.

BY MR. FLOCH:

Q. Okay. And then do you see at the bottom of his email he writes, "I just worry that by getting into the mud with a direct response to their article that we will be making the problem potentially worse by bringing more attention to it"?

Do you see that?

A. I see that.

Q. Do you have any understanding of what the problem was that Dr. Satterfield was referring to?

A. No.

Q. Okay. Now, if you scroll up, do you see that Jennifer Webb, about 45 minutes later, writes an email? Do you see that?

A. Yes.

Q. Then she writes, "Pardon, please review this version."

Do you see that?

A. Yes.

Q. And then if you scroll up, there's an email from Andrew Benson to you and others at about 1:30 a.m.

39 (Pages 150 - 153)

Page 154

on May 1, 2020, right?

A.   Yes.

Q.   Okay.  And do you see Andrew writes and he says, "I rearranged the paragraphs to get Brent's comments about LOD up higher, and even though it's not unimportant, move CoDi's other business activities lower"?

Do you see that?

A.   Yes.

Q.   And then do you see Andrew Benson wrote, "After discussion with Reed and Ike, we also removed the reference to a previous critic, and as a result had to rework the lead in to the LOD" -- excuse me, "the LOD topic"?

Do you see that?

A.   Yes.

Q.   Okay.  So do you have any understanding of what discussion with Reed and Ike Mr. Benson is referring to?

A.   No, not specifically.

Q.   Does it -- do you believe you're the Reed that's mentioned in this email?

A.   I do.

Q.   Do you -- excuse me.  Excuse me, Mr. Benson.

Page 155

MS. PEIRSOL:  Bless you.

MR. FLOCH:  Thank you.  I hope I'm not getting sick.

THE WITNESS:  We've got a test for you.

BY MR. FLOCH:

Q.   Do you have any recollection of a discussion about removing a reference to a critic?

A.   No.

Q.   Do you see that there's some attachments to the email?

A.   Yes.

Q.   And it looks like one attachment is "CLEAN"?

A.   Yes.

Q.   And one says "edits" on it?

A.   Yes.

Q.   I'm going to scroll down to one of the attachments.  Does this appear -- sorry.  Let me ask you, we're on Bates 5049.

A.   Yes.

Q.   What does this appear to be to you?

A.   It is -- it appears to be a draft press release with redlined comments on it.

Q.   Okay.  Do you recall seeing any of these redlined edits?

Page 156

A.   No, I don't recall it.  I may have -- I very well may have done that, however.

Q.   And up above in the top of the chain we saw that Mr. Benson was referencing some discussion about removing a reference to a critic after talking with you, right?

A.   Whether it was me or with Ike that we were talking about it, I don't know.  I don't remember the critic matter.  Maybe Ike would remember it, and maybe he made the comments about removing reference to the critic, but -- and I may have done, but I don't recall that.

Q.   Okay.  And do you see that there's --

THE COURT REPORTER:  Just a second.  Will you repeat that, please.

BY MR. FLOCH:

Q.   And do you see that there's writing stricken out on the page ending 5050 in the middle?

A.   Yes.  And can you make it larger?  Because I can't read any of that stuff.  Thank you.

Q.   And can you read the paragraph out loud that says "a recent critic"?

A.   "A recent critic of the initiative, pointed to Co-Diagnostics limit of detection rate, drawing an inference that the test is less sensitive than others

Page 157

on the market.  The misattribution of cause and effect was given context by Co-Diagnostics' chief science officer, Brent Satterfield, Ph.D.

"In diagnostics" -- or quote, "In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point.  Other metrics that are important are availability, ease of use and throughput.  In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that."

Q.   Do you -- reading this now, do you recall having any discussions about removing the first piece that you read that references a recent critic?

A.   No.

MS. PEIRSOL:  Objection.

Again, to the extent any of this line of questioning calls for privileged information, Mr. Benson, I just caution you not to disclose anything that was said with your legal hat on.

THE WITNESS:  Okay.

No, I don't recall having a conversation about deleting that particular part of the press

40 (Pages 154 - 157)

Page 158

release.

BY MR. FLOCH:

Q.   Did Co-Diagnostics issue a press release on April 30th or May 1st, 2020?

A.   I don't recall specific dates.  We released press releases during that period of time, yes, and I know one of them is the subject of this litigation, but I don't recall what or exactly when it was released.

Q.   I'm going to show you what I'm marking as Exhibit 14, Mr. Benson.  And I'll just ask you to take a look at it on the screen.

(Exhibit 14 marked.)

BY MR. FLOCH:

Q.   Do you see that this is an email from Andrew Benson to you and others at Co-Diagnostics on May 1st at 8:00 a.m.?

A.   Yes.

Q.   And do you see that the email says, "Dear Management and Members of the Board, Attached see a copy of the release scheduled for 6:30 a.m. Eastern on Friday, concerning the consistently exemplary evaluations of our COVID-19 test"?

Do you see that?

A.   Yes.

Q.   And then if you scroll down, do you see

Page 159

there's a press release?

A.   Yes.

Q.   Does this press release appear to be the one that we looked at that had redline edits in Exhibit 13?

A.   Yeah, it could be.

Q.   Now, I think you testified earlier that you didn't recall Co-Diagnostics giving a specific response to the Salt Lake Tribune article, but that you would just do what you did normally in the past and issue press releases if there were noteworthy information, right?

A.   Yes.

MS. PEIRSOL:  Objection.  Form.

BY MR. FLOCH:

Q.   So is it your testimony that this press release was not in response to the April 30, 2020, Salt Lake Tribune article?

MS. PEIRSOL:  Objection.  Form.

THE WITNESS:  It releases information that is related to that article in the Tribune, but I don't know that you would say that it is in response to that Tribune article.  We had received noteworthy communications from the people in India as well as the people in Mexico, and other studies, that demonstrated

Page 160

that we had a test that met standard -- standards for sensitivity and specificity; that we wanted to make sure that our customers around the world knew that our test had been evaluated by independent test laboratories and these were their results.

I suppose you could characterize it as a response to that article, but it was clearly a response and clearly a release of information that demonstrated the quality of our test.  And that was important for distributors and customers to know about.

BY MR. FLOCH:

Q.   And why did Co-Diagnostics decide to release the information about the evaluations mentioned in the press release, specifically on May 1st, 2020?

A.   I don't know why it was specifically May 1st.  I don't know when we received all of the results from those various labs, but --

Q.   Okay.  So let's look at the press release.

Do you see the top title says, "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data:  Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations"?

Do you see that?

A.   Yes.

Page 161

Q.   And then do you see -- if you go down a bit, in the middle of the page, there's a quote from Dr. Satterfield.

Do you see that?

A.   Could you make it a little bit larger, please?

Oh, yes.  Okay.  I see Brent's quote, yes.

Q.   And do you see it says, "In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that"?

Do you see that?

A.   Yes.

Q.   Now, is there any mention in this press release of the ICMR evaluation that found that COVID -- sorry, let me back up.

Is there any mention in this press release of the ICMR evaluation that found a 12 percent false positive rate for Co-Diagnostics's tests?

A.   No.

Q.   And is there any mention in this press release about criticisms from Test Utah or Intermountain Health?

A.   No.

41 (Pages 158 - 161)

Page 162

Q.   Does this press release mention Dr. Lopansri?

A.   No.

Q.   Does this press release mention any complaints that customers may have had about the performance of Co-Diagnostics's COVID-19 test?

A.   No.

MS. PEIRSOL:  Objection to form.

BY MR. FLOCH:

Q.   Okay.  Do you recall earlier we looked at a Code of Ethics?

A.   Yes.

Q.   And you and I discussed that senior management has a duty and an obligation to release full press releases?

MS. PEIRSOL: Objection.  Form.

BY MR. FLOCH:

Q.   To release full and accurate public communications?

MS. PEIRSOL: Objection.  Form.

THE WITNESS:  Yes.

BY MR. FLOCH:

Q.   And do you remember your testimony earlier was that a full communication is one that is complete in context?

Page 163

MS. PEIRSOL: Objection.  Form.

THE WITNESS:  Yes.

BY MR. FLOCH:

Q.   Now, doesn't it seem like this press release is incomplete because it doesn't say anything about any criticism of the COVID-19 Coronavirus test at all?

MS. PEIRSOL:  Objection.

THE WITNESS:  No.

MS. PEIRSOL:  Form.

BY MR. FLOCH:

Q.   Why do you say "no"?

A.   Because it's not a -- it's not a press release that is purporting to describe everything that has happened to the company and its tests.  It doesn't describe anything about this submission to the FDA and the approval of the EUA or an approval of CE marks and the -- all of the tests that have been sold throughout the world, and how many countries that we've been selling tests to and the people to whom we've been selling tests.

There is a whole lot of our business that is not dealt with in this press release, because this press release is specifically limited to those things that it said in the headlines, which was the results of

Page 164

some clinical evaluations of independent laboratories that had achieved certain results.  And all of those results and the data we -- we attach to it, so it would be complete, and anybody could know exactly what tests we were talking about and exactly what the limits of those tests were, but how many -- how many samples were involved in each of the tests, and under what conditions those tests were made by those independent laboratories.

It doesn't purport to be an entire history of everything that has happened with Co-Diagnostics from the time we developed our test until the time -- until this point in time.  It just is what it is, which is fairly clear and concise and complete, which is the reporting of those test performances that were made by those individual laboratories.

Q.   Mr. Benson, are you aware that the court overseeing this litigation said this about the press release, and I quote, "The Court is particularly troubled by Satterfield's statement in relation to the test's accuracy that you can't do better than that.  Rather than limiting himself to the specific context of the press release, that a few small studies found the test a hundred percent accurate, Satterfield's editorializing statement suggests to potential

Page 165

investors that his company has created a COVID-19 test that has achieved perfection or is at least superior to any competitor; that is, a competitor can't do better than that."

Are you aware of that statement by the court?

A.   No, I'm not.

Q.   Okay.  After Co-Diagnostics released this press release on May 1st, was Co-Diagnostics asked to participate in any joint validation studies?

A.   I believe it was, yes.

Q.   And who asked Co-Diagnostics to participate in the joint validation study?

A.   I don't recall.

Q.   Do you recall whether or not Co-Diagnostics agreed to participate in a joint validation study?

A.   I believe we did not agree to participate in it.

Q.   Do you have an understanding of why Co-Diagnostics declined to participate in a joint validation study?

A.   My understanding from our science people is that the way that the tests were going to be structured would not give a fair evaluation.

Q.   Besides these conversations with your

42 (Pages 162 - 165)

Page 166

science people, did you have any conversations with anyone else at Co-Diagnostics about declining to participate in a joint validation study?

MS. PEIRSOL: Objection.

To the extent this question calls for privileged information, Mr. Benson, I instruct you not to answer.

THE WITNESS: I would have been told and been in parts of conversations with other members of management when I received the information that I just explained to you about -- from our technical people. I don't know that I had other conversations with members of management outside of that context before or after those -- those conversations that I had with the people in the technical group.

BY MR. FLOCH:

Q. After May 2020, are you aware of any investigations initiated by any regulatory bodies against Co-Diagnostics?

MS. PEIRSOL: Objection.

To the extent you know of any investigation, based on conversations with counsel, I instruct you not to answer.

MR. FLOCH: And I'll just put on the record, the fact of an investigation does not

Page 167

constitute legal advice.

BY MR. FLOCH:

Q. So I'd ask you the question, are you aware of any investigations, doesn't ask you to reveal attorney-client privileged communication.

MS. PEIRSOL: So the extent you can answer without revealing attorney-client privileged information, you can. Beyond your awareness of the investigation, I caution you you need to be careful about privileged information.

THE WITNESS: Your statement, or your question, dealt with a timeframe. Are you -- would you repeat that again?

BY MR. FLOCH:

Q. After May 2020 to the present, are you aware of any investigations into Co-Diagnostics by any regulatory body?

MS. PEIRSOL: Again, I caution you, Mr. Benson, just not to disclose any privileged information.

THE WITNESS: I believe the answer to that question is yes, but I'm still not sure about the date issue.

BY MR. FLOCH:

Q. Okay. Let me ask another question.

Page 168

Are you aware of an investigation by the Securities and Exchange Commission sometime in 2020?

A. Yes.

Q. What about 2021?

A. Continuing. Same investigation.

Q. Okay. And do you -- is it your understanding that that investigation is still open?

MS. PEIRSOL: Objection.

To the extent that you can answer that question, Mr. Benson, without revealing privileged information, you can.

THE WITNESS: Hmm. Could we -- could I confer with my counsel for a moment before I answer that, then?

BY MR. FLOCH:

Q. Yes.

MR. FLOCH: So why don't we take a two to -- let's take a five-minute break because I think we've been going for a while and we can come back.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Off the record at 2:31.

(Recess taken from 2:31 p.m. to 2:37 p.m.)

BY MR. FLOCH:

Q. Mr. Benson, I think --

THE VIDEOGRAPHER: Back on the record. The

Page 169

time is 2:37.

MR. FLOCH: Sorry.

BY MR. FLOCH:

Q. When we went off the record, I believe my question to you was, is the SEC investigation still open? And you needed a second to confer with your counsel, right?

A. Yes.

Q. I'm going to ask you the question again.

Is the SEC investigation still open?

MS. PEIRSOL: And we're going to object to that question based on privilege and instruct the witness not to answer.

BY MR. FLOCH:

Q. Mr. Benson, are you following the advice of your counsel on that?

A. Yes.

Q. Okay.

Besides an SEC investigation, are you aware of an investigation by FINRA in 2020?

MS. PEIRSOL: Objection. Form.

BY MR. FLOCH:

Q. Sorry, let me ask a different question.

In 2020, are you aware of an investigation by FINRA into any Co-Diagnostics's employees?

43 (Pages 166 - 169)

Page 170

MS. PEIRSOL: Objection to form. If you understand the question, you can answer it, but --

THE WITNESS: Well, the problem is, we received -- have received inquiries from regulatory bodies. I don't know that any of them rise to the level of investigation. We may have received something from FINRA, a request for information or an inquiry of some sort, to which we would have responded.

BY MR. FLOCH:

Q. When you say -- sorry. Go ahead. You're not finished.

A. It may have been NASDAQ and not FINRA. I'm -- I'm not sure I remember. And maybe we received an inquiry from both of them. I don't recall specifically.

Q. When you say you received an inquiry, do you remember what the substance of the inquiry was?

MS. PEIRSOL: Objection. We're going to object to this ground -- to this question on the ground of privilege and instruct the witness not to answer.

BY MR. FLOCH:

Q. Are you following your attorney's advice on that?

A. Yes.

Q. Okay. Has Co-Diagnostics received any

Page 171

inquiries from the Department of Justice?

A. No.

MS. PEIRSOL: To the -- go ahead.

BY MR. FLOCH:

Q. Okay. Has Co-Diagnostics, since 2020 to the present, received any inquiries from the Food and Drug Administration?

A. In the process of registration, we have received regular correspondence from the FDA. I don't recall that we have received what I would term an inquiry, and certainly not what I would term an investigation from the FDA.

Q. Let me just go back to the SEC. Has -- have you testified, formally or informally, before any attorneys at the Securities and Exchange Commission?

A. I have been interviewed by someone from the Securities and Exchange Commission.

Q. Besides you, who else at Co-Diagnostics has been interviewed by the Securities and Exchange Commission?

MS. PEIRSOL: Objection. Privileged. We're going to instruct the client, the witness, rather, not to answer.

MR. FLOCH: Ms. Peirsol, I disagree that the identity of someone who speaks to the SEC is

Page 172

privileged information.

MS. PEIRSOL: And I disagree to the extent that he has that information. Based on privileged conversations with his counsel, he cannot answer that question.

MR. FLOCH: The identity of an individual who spoke to the SEC is not a legal communication.

BY MR. FLOCH:

Q. So, Mr. Benson, I'm going to ask you the question again.

Who at Co-Diagnostics spoke to the Securities and Exchange Commission, either informally or formally?

MS. PEIRSOL: And I'm going to object on privilege and instruct the witness not to answer.

BY MR. FLOCH:

Q. And, Mr. Benson, are you going to follow the advice of your counsel?

A. Yes.

Q. Okay. Let me show you a document. This will be Exhibit 15, Mr. Benson.

(Exhibit 15 marked.)

BY MR. FLOCH:

Q. Do you see what's been marked as Exhibit 15 on your screen?

Page 173

A. Yes.

Q. I'm sorry. If you could just look at the top email. Do you see it's from Cecelia Hutchins on May 11, 2020?

A. Yes.

Q. And do you see that it's to you and others at Co-Diagnostics?

A. Yes.

Q. And do you see Dr. Hutchins wrote to you and others and said, "Hi all, Dr. Lowe contacted me to complain about advertisement practices by US distributors"?

Do you see that?

A. Yes.

Q. And then if you go down a bit, do you see that Dr. Hutchins wrote, "And we have to provide them better directions on how claim sensitivity and specificity"?

Do you see that?

A. Yes.

Q. Do you recall having any conversations with anyone at Co-Diagnostics about the email that we're looking at right now?

A. No.

Q. Do you know who Dr. Lowe is?

44 (Pages 170 - 173)

Page 174

A.   No.

Q.   If you scroll down a little bit, do you see that there's an email that got forwarded to you from May 11, 2020 --

A.   Yes.

Q.   -- at 2:49?  And do you see it's Brian.Lowe@fda.hhs.gov?

A.   Yes.

Q.   And it's to Cecelia Hutchins?

A.   Yes.

Q.   And do you see the email says, "Ms. Hutchins, It has come to our attention that your Logix Smart Coronavirus 2019 (COVID-19) Test Kit is being," and I'm sorry, I cut off the words, but I'll change the exhibit after, "distributors in a manner not consistent with its authorization"?

A.   Yes.

Q.   Do you see that?

Then it says, "The allegation is that the test," and again, I'm sorry, I cut it off with my stamp, but if you look at No. 2, it says, "that the test has perfect sensitivity and specificity"?

Do you see that?

A.   Yes.

Q.   Then if you go down, there's a bullet that

Page 175

says, "No IVD is 100% Sensitive and 100% Specific, so please confirm {sic} your distributors" -- sorry, "so please inform your distributors that performance of the test should be promoted as based on the validation study design and data and as in the EUA, that is, the results of your validation and, importantly, how it was performed."

Do you see that?

A.   Yes.

Q.   Does this appear to you to be an email in which the FDA is complaining about the advertising practices of Co-Diagnostics's distributors?

A.   I'm not sure I agree with your use of the word "complaining."  It is certainly an email from the FDA informing us that some of our distributors are going outside the EUA in their advertising, and they request us to make sure that they don't do that.

Q.   And it appears that one of the ways that distributors are alleged to have been going outside of the EUA is that some of them may have been claiming that your test had perfect sensitivity and specificity, right?

MS. PEIRSOL:  Objection.  Form.

THE WITNESS:  It may have done.  I don't know.

Page 176

BY MR. FLOCH:

Q.   Do you have an understanding of why Co-Diagnostics's distributors would be claiming that Co-Diagnostics's Coronavirus test had perfect sensitivity and specificity?

MS. PEIRSOL:  Objection.  Form.

THE WITNESS:  No, not specifically, other than distributors are salespeople and that's how they would sell tests.

BY MR. FLOCH:

Q.   Did you have any conversations with Cecelia Hutchins about this FDA inquiry?

A.   No.

MS. PEIRSOL:  Objection.

To the extent that that question calls for privileged information, Mr. Benson, I'll instruct you not to answer.

THE WITNESS:  No.

BY MR. FLOCH:

Q.   Did you have any conversations with anyone else besides Ms. Hutchins and Co-Diagnostics about this FDA inquiry?

MS. PEIRSOL:  Same objection.

THE WITNESS:  I don't recall having any discussions with regard to this email or the matter

Page 177

specified by the FDA.

BY MR. FLOCH:

Q.   Just going back to that CC, Mr. Benson, do you recall, ballpark, when you had your formal or informal interview with them?

A.   The best of my recollection would have been April or May of 2021.

Q.   Okay.  And just generally, do you remember the substance of that interview?

MS. PEIRSOL:  Objection.  That question calls for privileged information.

Mr. Benson, we instruct you not to answer.

MR. FLOCH:  I just -- I'm not sure how questions from authorities constitutes privileged information between a lawyer, Mr. Benson's lawyer, and Mr. Benson.

MS. PEIRSOL:  Let me say this:  We're going to instruct the witness not to answer.  There's confidentiality concerns based on the SEC investigation and parameters around that that we have in place with the SEC.

MR. FLOCH:  Understood.

BY MR. FLOCH:

Q.   So, Mr. Benson, on the advice of counsel, you're not going to answer that question, right?

Veritext Legal Solutions
800-726-7007                                                                                    305-376-8800

Page 178

A.   Correct.

Q.   Thank you.

MR. FLOCH:  And thank you for your explanation, Ms. Peirsol.

BY MR. FLOCH:

Q.   Let's just take this exhibit down.

Let's move to June 2020.  At some point, did Co-Diagnostics stop becoming the supplier to the Utah government?

A.   I don't know that we were ever the supplier to the Utah government.  We were a supplier of tests to Nomi Health, who had a contract to do testing for Test Utah.  And there was --

Q.   I'm sorry.

A.   And there was a time when we ceased providing tests that were used specifically to Test Utah, though we continued to provide tests to Nomi Health for tests that were still provided in Utah.  I don't know if that --

Q.   Mr. Benson, let me show you an exhibit.  This will be Exhibit 16.

(Exhibit 16 marked.)

BY MR. FLOCH:

Q.   Okay.  Do you see that there is an email on your screen from June 23, 2021?

Page 179

A.   Yes.

Q.   Do you see it's from Ms. Webb to you and others at Co-Diagnostics and Coltrin?

A.   Yes.

Q.   And do you see the subject says, "Fwd: Bleeding Heartland:  Company that provided Test Iowa tests faced SEC investigation"?

A.   Yes.

Q.   And then if you scroll down, do you see that there is an article that Ms. Webb forwarded to you?

A.   Yes.

Q.   Okay.  I'm going to just ask you about two paragraphs on the page that begins -- that ends with 312.

Do you see that there's a paragraph that says, "While negotiating new Test Utah contracts last August, public health officials 'forced TestUtah to stop working with the two testing partners it had chosen - Salt Lake City company Co-Diagnostics, Inc., which had supplied its testing kits, and Orem's Timpanogos Regional Hospital, which had processed them"?

Do you see that?

A.   Yes.

Page 180

Q.   And I apologize for any butchering of any of those words that I just said.

So it appears that as of August 2020, Test Utah could no longer buy tests from Co-Diagnostics, right?

A.   Yes.

Q.   And that was at the request of public health officials?

A.   That's what it says.

Q.   Do you have any understanding of what public health -- why public health officials decided to force Test Utah to stop working with Co-Diagnostics?

A.   No.

Q.   Okay.  And then do you see that there's a second paragraph that says, "Health officials in Tennessee pushed back hard against that state's $26.5 million no-bid contract with Nomi Health"?

Do you see that?

A.   I do.

Q.   Then if you go a little bit further in the paragraph, it says, "A deputy director of the Tennessee Public Health Laboratory warned that 'Using a less sensitive test has the potential to give false-negative results,' and said 'Nomi laboratory equipment is not novel or groundbreaking technology.'"

Page 181

Do you see that?

A.   Yes.

Q.   Do you recall any discussions with anyone inside Co-Diagnostics about concerns raised by the state of Tennessee regarding the performance of Co-Diagnostics's Coronavirus test?

A.   No.  I knew that we had -- or that Nomi had tried to get the contract with Tennessee, the same as they had with Nebraska and Iowa, and that they didn't -- they didn't get it.  And so we didn't end up providing tests to Tennessee.

Q.   Well, it appears that Nomi did get a contract but that the state of Tennessee got out of the contract, right?

A.   May have done.  That didn't affect us or I didn't -- I didn't know whether they did or they didn't.

Q.   Okay.  Are you currently subject to a litigation hold in this case?

A.   I don't know what that means.

Q.   Okay.  Have you provided access to your email files to counsel in this case -- for this case, excuse me?

A.   I'm sure we did.

Q.   Have you deleted any emails related to

46 (Pages 178 - 181)

Page 182

CODX's Coronavirus test since this case began?

A.  I'm sure I have not.

Q.  And have you deleted any text messages since this lawsuit began related to Co-Diagnostics's diagnostic test?

A.  I wouldn't think so.  I don't recall ever having done that, no.

Q.  Are you aware of any employees at Co-Diagnostics deleting emails related to Co-Diagnostics's COVID-19 test since this case began?

A.  No.

Q.  Okay.  I want to shift forward in time.

Are you aware that there is another securities lawsuit against Co-Diagnostics based on an allegedly misleading press release besides this case?

A.  I am aware of maybe six or seven different case -- maybe six or seven, eight different cases that have been filed, some sounding as securities class action violations and some sounding in -- as derivative actions.  And I don't know, to be honest, which ones were all consolidated under Gelt and which ones weren't.  So when you say "another action," I'm not sure I know exactly what you're referring to.

Q.  I'm referring to an action that was filed in the Southern District of New York.  Are you aware of

Page 183

a case that was filed against Co-Diagnostics in the Southern District of New York?

A.  No, I don't -- I don't know which ones were filed and I don't know what the jurisdictions were in which those cases were all filed.  I'd have to go pull them all out and look at them or something.

Q.  Mr. Benson, just a few more questions about your responsibilities at Co-Diagnostics.

You said that you stepped down or stepped back from the CFO role a few years ago, right?

A.  Yes.

Q.  When was that?

A.  I think Brian came on in February or March of 2091 -- 2021.

Q.  And is Brian a reference to Brian Brown?

A.  Yes.

Q.  He's the new CFO at Co-Diagnostics?

A.  Yes.

Q.  What's your role at Co-Diagnostics currently?

A.  I'm currently an employee with absolutely no responsibilities.

Q.  So you're not the general counsel anymore?

A.  Oh, no, no, I am not.

Q.  Okay.

Page 184

A.  And I haven't been since like October or September of 2021.

Q.  Okay.  What is your job title after October 2021 at Co-Diagnostics?

A.  I don't believe I have a job title.  Ike wanted me to stay employed so that I would be responsive to these matters of litigation.  And because I have been around since the beginning, I have maybe a better history of all of the things that have happened from the time we started to -- through the IPO and through to where we are today, where we were, actually, until the end of 2021.  I have been way less active after that point.

THE COURT REPORTER:  I need to get the answer.  There was still a little bit missing with the freezing.

THE WITNESS:  I am not nearly as involved since 20 -- since September, October of 2020 as I was before.  So I have some understanding of the things that happened since that time, but a much greater understanding of things that had happened prior to then.

Q.  Is Ms. Hutchins still at the company?

A.  I don't believe so, no.

Q.  Do you have an understanding of why she

Page 185

left?

A.  No.

Q.  And I believe -- I don't know if we talked about Dr. Garcia.  Is she still at the company?

A.  I don't believe so, no.

Q.  And do you have an understanding of why she left?

A.  No.

Q.  Okay.

MR. FLOCH:  If you give me two minutes, let me just make sure I don't have any further questions.

THE WITNESS:  Okay.

MR. FLOCH:  Is that okay?

THE WITNESS:  Yes.

MR. FLOCH:  Let's go off the record for just -- until 5:05 -- 3:05.

(Recess taken from 3:02 p.m. to 3:07 p.m.)

THE VIDEOGRAPHER:  Back on the record, 3:07.

MR. FLOCH:  Mr. Benson, the plaintiff has no further questions, and we thank you for your time today.

THE WITNESS:  Thank you.

MS. PEIRSOL:  Thank you, Brandon.

MR. FLOCH:  Thank you.

47 (Pages 182 - 185)

Page 186

We can go off the record, I guess, unless, Marissa, you have any questions.

MS. PEIRSOL:  I have no questions, thank you.

THE COURT REPORTER:  Can I make sure I get your orders on the record before we conclude today?

MR. FLOCH:  We just want an electronic copy, and we don't need a video at this time.

THE VIDEOGRAPHER:  No video?

MR. FOSANO:  You don't want a video?

MR. FLOCH:  Not at this time.  Maybe later. Maybe later.

MR. FOSANO:  I dressed up and everything.

THE COURT REPORTER:  And, Marissa, electronic for you?

MS. PEIRSOL:  Yeah, we'll want an electronic.  I don't know what they've ordered in the past depositions, do you?  Have you been doing those?

THE COURT REPORTER:  I haven't, but I can check.

MS. PEIRSOL:  Okay.  Yeah, I'm sure we'll want to be consistent, but I want the electronic.

THE VIDEOGRAPHER:  Do you want the video?

MS. PEIRSOL:  I don't think that we will, but like I said, I want to be consistent with the

Page 187

others, with what they've been ordering.

THE COURT REPORTER:  Okay.  I'll check it out.

And for the exhibits, would you make sure you send those and we'll get those attached?

MR. FLOCH:  Yes.

THE VIDEOGRAPHER:  We're off the record. The time is 3:08.

(Concluded at 3:08 p.m.)

Page 188

REPORTER'S CERTIFICATE

STATE OF UTAH      )
                  ) ss.
COUNTY OF SALT LAKE )

I, CARILEE DUSTIN, a Certified Court Reporter and Registered Professional Reporter, hereby certify:

THAT the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was placed under oath to tell the truth, the whole truth, and nothing but the truth; the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such deposition adduced and oral proceedings had, and of the whole thereof.

I further certify I am not a relative or employee of any attorney of the parties, nor do I have a financial interest in the action.

I have subscribed my name on this 4th day of April, 2023.

_____
CARILEE DUSTIN, CSR, RPR

Page 189

Marissa Peirsol
mpeirsol@bakerlaw.com
            April 4th, 2023
RE: GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al
    3/21/2023, Reed Benson (#5810267)
The above-referenced transcript is available for review.
Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney.
Copies should be sent to all counsel, and to Veritext at (transcripts-fl@veritext.com).

Return completed errata within 30 days from receipt of testimony.
If the witness fails to do so within the time allotted, the transcript may be used as if signed.

        Yours,
        Veritext Legal Solutions

Veritext Legal Solutions
800-726-7007                                          305-376-8800

Page 190

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Reed Benson (#5810267)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Reed Benson                    Date

---

Page 191

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Reed Benson (#5810267)

ACKNOWLEDGEMENT OF DEPONENT

I, Reed Benson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Reed Benson                    Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

49 (Pages 190 - 191)

**[& - 2019]**                                                                 Page 192

| **&** |
| --- |

**&** 2:4 10:6,7,8
10:15 45:6
145:4

| **0** |
| --- |

**00368** 1:4

| **1** |
| --- |

**1** 4:3 5:5 20:2,3
20:20,25 101:25
149:7 154:1
**10** 4:14 15:10
118:15 124:13
124:14 128:24
129:1
**100** 98:11,13,19
99:1,2,4,7,8,9
99:21,22 100:20
100:21,22,22,25
100:25 101:1,2
101:2 105:11
125:24 126:4,13
126:15,16,16,20
127:2,9,11,12
127:14,14 129:6
151:19,19 152:9
152:22,22
157:11 160:22
160:22 161:10
175:1,1
**103** 3:9
**104** 4:11
**10:05** 42:8
**10:10** 42:4,5

**11** 3:10 4:15
30:23 132:6,7
173:4 174:4
**115** 4:13
**11601** 2:13
**11:09** 74:8,9
**11:24** 147:8
**12** 4:16 15:10,11
97:20 98:4,14
103:13 128:18
138:12 146:10
146:11 161:19
**12/31/19** 118:11
**12/31/2019**
117:3
**124** 4:14
**12:10** 42:3
**12:28** 113:21,22
**13** 4:17 149:3,4
150:3 159:5
**132** 4:15
**14** 3:12 4:18
118:19 158:10
158:12
**146** 4:16
**149** 4:17
**15** 4:19 118:15
172:21,22,24
**158** 4:18
**16** 4:20 178:21
178:22
**169** 3:10
**17** 3:13 132:17
**170** 3:11

**172** 3:12 4:19
**177** 3:13
**178** 4:20
**18** 3:11 82:2
**19** 11:8 26:16
84:24 151:4
158:22 160:20
162:6 163:6
165:1 174:13
182:10
**1933** 21:1
**1985** 17:6
**1991** 11:9
**1995** 11:10
**1:02** 113:22,24
**1:22** 149:7
**1:30** 153:25
**1:58** 149:21,22
**1st** 118:19 158:4
158:16 160:14
160:16 165:9

| **2** |
| --- |

**2** 2:4,8 3:9 4:4
29:6,7 37:23
46:2 62:20
68:15,18 103:11
124:25 174:21
**2/18/20** 4:7
**2/24/20** 4:8
**20** 4:3 9:21
21:23 22:5
68:10 78:18
115:20 184:18
191:15

**200** 68:14
**2000** 11:15
12:22 15:24
**2002** 31:7
**2003** 24:11
**2004** 22:13,16
**2005** 9:21 22:18
**2006** 21:23 22:6
22:20,21 31:14
**2007** 9:21
**2008** 22:10
26:16
**2009** 21:3
**2012** 30:23
36:25 50:8,9
51:7 52:22 60:5
**2013** 50:8,9,12
50:13,20,25
51:4,8 52:17,22
60:5 62:9
**2015** 53:25
62:10,12,18,21
62:24 63:6,15
63:16
**2016** 56:7 62:10
62:12,18,21,24
63:6,15,16
**2017** 9:21 54:6
56:11 57:7 64:2
**2018** 63:25 68:4
69:3,5 70:4
**2019** 68:20,22
69:5 70:4,14
71:4 72:5 76:23
122:15,18,19

**[2019 - 7]**                                                                                                   Page 193

174:13
**2020** 8:22 45:19
72:5,12,18 82:2
84:17 85:17,23
86:11 91:18
92:3,7,11 93:12
94:1,5,14
101:25 103:11
104:12,13 105:1
105:8 106:25
108:22 110:8
115:20 124:25
132:17 136:7
137:14 140:9
141:3,10 144:7
145:15 146:5
147:5,23 148:15
148:25 149:7
150:21 152:3
154:1 158:4
159:17 160:14
166:17 167:15
168:2 169:20,24
171:5 173:4
174:4 178:7
180:3 184:18
**2021** 9:24
114:12 168:4
177:7 178:25
183:14 184:2,4
184:12
**2023** 1:17 5:1,5
188:20 189:3
**2091** 183:14

**21** 1:17 5:1,5
**214** 2:14
**22** 119:3
**23** 93:12 94:1
147:5 178:25
**24** 84:17
**25** 25:18 26:5
105:3,3
**250,000** 68:14
**2530** 2:5
**26.5** 180:17
**267** 47:1
**28921** 188:23
**29** 4:4 118:20
**2:05** 149:22,25
**2:20** 1:4
**2:31** 168:21,22
**2:37** 168:22
169:1
**2:49** 174:6
**2nd** 128:14,21

**3**

**3** 4:5 20:25
43:13,14 68:16
68:16,18
**3/21/2023** 189:5
**30** 26:6 78:18
105:3 141:3
144:7 145:15
146:5 147:23
148:15,25
150:21 152:2
159:17 189:17
**300,506** 22:1

**305** 2:6
**30th** 141:10
148:11 150:12
158:4
**312** 179:15
**33131** 2:5,9
**3:02** 185:17
**3:05** 185:16
**3:07** 185:17,19
**3:08** 187:8,9
**3:09** 1:18
**3:30** 103:11
**3:42** 128:25

**4**

**4** 4:7 29:13,13
29:24 46:18
68:18 81:11,12
107:3
**4/17/20** 4:15
**4/2/20** 4:10
**4/25/20** 4:6
**4/3/20** 4:14
**4/30/20** 4:16
**4/30/2020**
150:18
**40** 41:8
**400-4260** 2:6
**43** 4:5
**45** 153:17
**477-0413** 2:14
**4:44** 150:13
**4th** 188:19
189:3

**5**

**5** 4:8 29:13,13
29:24 81:9
83:24,25 84:8
123:1
**5/1/20** 4:17,18
**5/11/20** 4:19
**50** 41:8
**50,000** 125:17
126:4,9,11
**500** 57:21
**500,000** 53:20
53:24 54:4
**5049** 155:19
**5050** 156:18
**569** 124:17
**5810267** 189:5
190:2 191:2
**5:00** 76:17
**5:05** 185:16
**5:30** 152:2

**6**

**6** 3:4 4:9 21:3
69:8 92:16,18
92:20 123:2
**6/18/2020** 117:4
**6/23/21** 4:20
**60** 100:18,23
**6:30** 158:20

**7**

**7** 4:10 53:10
54:2 61:15 96:6
96:7 128:11

**[7/20/20 - advisory]**

Page 194

**7/20/20** 4:13
**70** 100:18,23

**8**

**8** 4:11 55:7 56:5
104:21,22 106:7
**81** 4:7
**83** 4:8
**87** 21:6,8,23
22:12
**88** 21:6,9 22:9
23:22 69:11
**889** 118:11
**8:00** 76:17
158:16

**9**

**9** 4:13 115:10,11
115:13
**90** 118:12
**90025** 2:14
**92** 4:9
**96** 4:10 11:10
**9:01** 1:18 5:1,4

**a**

**a.m.** 1:18 5:1,4
42:8,9 74:9,10
149:7 153:25
158:16,20
**abatement**
63:22 71:2
**ability** 104:9
119:15
**able** 32:14 85:15
122:22

**above** 22:12
69:23 151:5
156:3 189:6
191:7
**absolutely**
72:24 98:9
122:6 123:16
138:17 183:21
**accept** 79:24
138:8
**accepted** 23:17
**access** 28:21
82:11 181:21
**account** 43:19
43:22,25 44:2,3
44:12,14,19,22
45:3 53:22
**accounting** 9:4
38:6 53:6 61:11
**accredited**
58:19,22,24
59:1
**accuracy** 78:4,6
78:10 125:24
126:14,17
127:12 130:7,8
164:21 189:9
**accurate** 24:6
58:22 67:25
78:2 98:23
107:6 108:20,24
109:15 129:20
162:18 164:24
188:13

**achieved** 157:11
161:10 164:2
165:2
**acknowledge...**
191:3
**acknowledgm...**
189:12
**acquaintance**
82:7
**acquired** 12:16
66:9
**act** 21:1
**action** 18:9,25
19:9,12,14
23:19 182:19,22
182:24 188:18
**actions** 19:3,3
182:20
**active** 184:12
**activities** 154:6
**activity** 123:22
**actual** 81:5
82:11,17,20,24
83:2,5
**actually** 10:9
32:10 58:2
61:25 64:19
71:3 83:2 94:8
131:20 184:11
**addition** 77:24
109:6
**additional**
129:25
**additions** 191:6

**address** 45:16
47:1,1,4 147:3
**adduced** 188:14
**adequately** 85:6
**adjacent** 51:18
**adjusted** 117:2
**administered**
137:7 138:2
**administration**
171:7
**admit** 97:24
**advanced** 1:14
**advantages**
125:9
**advertised**
16:16
**advertisement**
173:11
**advertising** 12:5
13:10 15:12
175:11,16
**advice** 65:2,6,10
65:11,19,19,23
66:2,7,10 67:3,4
67:19,20 103:8
145:9,9 167:1
169:15 170:22
172:18 177:24
**advisable** 145:9
**advised** 145:5
**advising** 35:4
**advisor** 38:15
**advisory** 31:7
35:2 39:18 76:9

**[affairs - approximate]** Page 195

**affairs** 23:25 24:3
**affect** 119:15 122:3 123:19 181:15
**affected** 117:25
**affecting** 123:15
**afternoon** 125:1 128:14,22 147:16 148:21
**ag** 39:18,23 40:5 40:8 41:5
**agency** 19:25
**agenda** 93:3
**agent** 31:15 34:15
**agents** 31:25 32:5
**ago** 6:15 22:7 25:18 26:6 41:8 51:10 183:10
**agree** 165:17 175:13
**agreed** 165:16
**agreements** 55:24
**ahead** 14:19 44:19 69:20 141:15 144:14 145:19 170:10 171:3
**aid** 15:10
**aided** 188:12
**al** 5:7 189:4 190:1 191:1

**alarmed** 134:7
**alarms** 134:12
**allegation** 174:19
**allegations** 19:1
**alleged** 54:7 175:19
**allegedly** 182:15
**allotted** 189:20
**allowed** 14:5 34:18 80:12
**alyse** 2:17
**amateurs** 135:22
**amendment** 20:24
**american** 18:7 23:15 52:13,15 52:24 63:17
**amount** 21:25
**analysis** 80:25 111:16,25 112:11,18 118:7 118:8 119:21 124:2
**analyze** 73:3 83:9
**analyzing** 83:19
**andrew** 61:5 103:23 104:2 149:9 153:25 154:3,10 158:15
**angel** 27:19
**angeles** 2:14

**announce** 152:19
**announced** 152:15
**annual** 53:8 62:18
**answer** 3:8 7:3 7:7 26:2 48:21 54:16 58:5 69:18,19 101:4 101:5,13 103:4 136:25 137:1 141:15,15,16 144:12,13 145:18 166:7,23 167:6,21 168:9 168:13 169:13 170:2,20 171:23 172:4,15 176:17 177:12,18,25 184:15
**answering** 103:7
**antenna** 16:10
**anti** 56:12 57:3 57:8
**anybody** 58:12 70:2 111:20 121:1 164:4
**anymore** 183:23
**anyway** 129:22
**apologies** 81:10
**apologize** 74:25 180:1

**appear** 30:13 44:8 82:1 84:15 155:18,21 159:3 175:10
**appeared** 34:19 118:2
**appears** 36:12 133:21 138:20 149:16 150:17 155:22 175:18 180:3 181:12
**appended** 191:7
**applicable** 106:17 189:8
**application** 23:16,20
**applied** 18:6
**appreciate** 101:6 134:9
**approached** 31:6 49:16,16 51:13,14
**appropriate** 145:8
**appropriateness** 59:8
**approval** 79:15 79:25 80:2 121:14 151:16 163:17,17
**approvals** 128:5
**approve** 80:20 136:9,12
**approximate** 11:9

**[approximately - back]**

**approximately** 69:2

**april** 45:19 50:12,13 92:11 94:14 103:11 104:13 118:14 124:25 128:14 128:21 132:17 136:7 137:14 140:9 141:3,10 144:7 145:15 146:5 147:5,23 148:11,15,25 150:12,21 152:2 158:4 159:17 177:7 188:20 189:3

**apuli** 60:8 75:5

**area** 49:24 65:22 87:12 110:13

**arranged** 56:3

**arrested** 115:2

**article** 8:15,16 8:17,18 132:4 140:17,19,23,25 141:4,11 142:1 144:7,9 145:15 145:22 146:6 148:11,16 150:18,21,24 151:2 153:8 159:9,18,21,23 160:7 179:10

**article's** 151:9

**articles** 50:25 142:8

**asence** 97:5

**asia** 46:6,17

**asked** 19:7,25 28:6,10 91:19 108:1 119:25 123:18 143:3 165:9,12

**asking** 43:6 57:15 69:16 72:24 95:18 102:11 108:3 111:21 124:17

**aspect** 64:25,25

**asserted** 127:14

**assess** 59:7

**assessment** 97:16

**assets** 6:23 11:16,17 12:22 15:20

**associate** 133:3

**associated** 30:25 33:15 37:5,11 42:18 43:1 146:6

**associates** 45:7

**association** 33:24 41:11,23

**assumed** 121:21 123:8

**assumes** 82:23

**assumption** 123:4

**assured** 129:14

**asymptomatic** 140:1

**attach** 164:3

**attached** 158:19 187:5 189:11

**attachment** 115:25 116:16 155:12

**attachments** 155:9,18

**attempt** 120:12

**attempted** 90:16

**attendees** 93:25

**attention** 23:21 153:10 174:12

**attorney** 7:6 18:14 19:13 24:1,18 47:5,18 48:24 65:13 67:2,13 95:19 144:21 167:5,7 188:17 189:13

**attorney's** 170:22

**attorneys** 171:15

**audio** 14:5,12 14:13

**august** 179:18 180:3

**augusta** 114:15

**authorities** 34:16,21 177:14

**authority** 24:13

**authorization** 100:15 125:25 174:16

**authorized** 127:16

**authors** 151:9

**availability** 157:9

**available** 189:6

**awarded** 90:23

**aware** 22:10 33:4 56:24 92:9 164:17 165:5 166:17 167:3,16 168:1 169:19,24 182:8,13,16,25

**awareness** 167:8

**awhile** 10:8 12:23

**b**

**b** 87:16

**back** 13:4 14:2 16:8 17:15 18:4 18:15 20:15,17 22:25 25:9 27:9 30:3 36:7 37:17 42:3,10 52:21 54:1 59:9 61:17 62:11 64:10,12 68:2,14 74:12 76:24 85:22

**[back - betts]**                                                    Page 197

86:14 95:2
97:23 103:10
104:13 112:15
112:25 113:24
115:4 116:24
122:15,18
123:13 124:4
128:7,24 130:5
144:2 149:24
152:6 161:17
168:19,25
171:13 177:3
180:16 183:10
185:18
**backed** 45:12
**background**
59:24 61:7
72:24 101:7
115:1 132:1
**backgrounds**
58:7
**bad** 121:9,12
137:16
**baker** 5:16
**bakerhostetler**
2:13
**bakerlaw.com**
2:15,15 189:2
**ballpark** 69:5
177:4
**bankers** 41:20
116:14 119:10
**banner** 15:16
**barcelona** 61:24

**bars** 34:7
**base** 139:15
**based** 40:22
41:2 52:9 59:20
63:17,23 166:22
169:12 172:3
175:4 177:19
182:14
**basically** 18:16
27:18 66:16
127:4
**basis** 51:11
95:22 143:1
**bates** 155:19
**bathroom** 7:21
**bear** 72:23
**beaufort** 53:12
53:21,23 54:3
54:13,17,19,19
54:22
**becoming** 51:14
178:8
**began** 182:1,4
182:10
**beginning** 21:9
42:11 60:13,14
61:3 62:8 74:11
75:22 113:23
115:1 149:23
184:8
**begins** 179:14
**behalf** 5:14
**behaves** 78:8
**belief** 142:1,18

**believe** 17:3
24:7 25:20
33:14,24 62:2
62:24 69:21
75:10 81:9
88:12,23 89:15
90:15 94:10
109:13 121:21
142:23 154:21
165:11,17
167:21 169:4
184:5,24 185:3
185:5
**believed** 120:13
**believing** 143:1
**benson** 1:10,13
3:3 4:5 5:6,22
6:3,9,11 8:1,24
20:5,19 21:9,25
23:11,23 24:9
26:1,7 29:5,12
29:18 30:10
34:20 36:18
37:13 39:1 40:7
42:1,13 43:16
46:3 48:21
57:15 61:5
69:17,20 73:23
74:7,15 81:10
81:15 82:1 84:2
84:8 92:16
95:12,18 96:9
96:20 100:7
102:11 103:3,23
104:2,24 114:1

116:15 124:16
124:21 127:8
128:7 131:13
137:1 141:14
144:12 145:17
146:13 149:9
150:2 153:25
154:10,18,25
156:4 157:21
158:10,15
164:17 166:6
167:19 168:10
168:24 169:15
172:9,17,21
176:16 177:3,12
177:16,24
178:20 183:7
185:20 189:5
190:2,24 191:2
191:4,12
**benson's** 26:15
177:15
**bert** 132:25
134:3
**best** 177:6
**better** 18:11,17
21:14 122:3,14
128:2 151:19
152:23 157:12
161:11 164:21
165:3 173:17
184:9
**betts** 87:14,16
147:2,14 148:18

**[beyond - building]** Page 198

**beyond** 167:8
**bfloch** 2:6
**bi** 18:3,4
**bid** 91:2,3,4,4,4
  91:9,10,14,16
  180:17
**bids** 91:7
**big** 16:10 61:11
  86:19 90:7
  135:4
**bigger** 21:12
  29:16 45:24
  96:14 132:15
**biggest** 46:23
**birtal** 19:5
  21:25 22:16
  23:14,24,25
  24:3,10,17,18
  25:15 27:10,17
  28:2,18,24,24
  30:14 31:7,8
  33:4 35:13,16
  35:20 36:19,25
  37:5 39:15 62:1
**birtal's** 36:13
**biscayne** 2:4,8
**bit** 10:1 18:24
  30:2,3 31:13
  34:12 45:14
  53:9 103:17
  132:14 133:15
  137:15 149:14
  151:25 161:2,5
  173:15 174:2
  180:20 184:15

**blank** 149:17
**blanking** 61:12
**bleeding** 179:6
**blend** 65:20,21
**bless** 155:1
**board** 18:10,13
  19:8 28:7,10
  64:19,21,22
  76:9 110:17,23
  110:24,24 111:7
  158:19
**bodies** 166:18
  170:5
**body** 79:20
  80:19 167:17
**bogus** 129:15
**boiler** 38:22
  39:2,15 41:5
  42:18 43:2,5,7
  46:5,10
**bother** 58:10
**bothered** 44:20
**bottom** 21:22
  84:21 97:20
  124:18 135:11
  148:1 149:15
  153:6
**bought** 11:14
  12:8,8,10,12
  15:1 16:6
**boulevard** 2:4,8
  2:13
**box** 47:1
**brand** 16:1,4,18

**brandon** 2:3
  5:13 6:4 84:5
  113:14 185:24
**breach** 6:20
**break** 7:17,20
  7:23 9:25 13:8
  37:14 42:2,13
  71:3 74:6,15
  113:16,17,19
  115:5 124:5
  150:2,7 168:18
**brent** 1:10
  96:21 141:7,8
  157:3
**brent's** 97:16
  154:4 161:7
**brian** 183:13,15
  183:15
**brian.lowe**
  174:7
**brick** 16:10
**bridge** 55:19,21
  56:1,7
**briggs** 4:6 28:5
  28:12,15 38:2
  40:11 41:2,9,9
  41:11 42:14
  43:17 46:4,10
  46:16 48:12
  49:2,9,17,22
  50:2 51:2,9,19
  82:3 115:16
  116:4 117:14,21
  119:5,14 121:18

**briggs's** 38:11
  42:17 61:14,20
**bright** 143:9
**bring** 71:3
**bringing** 153:10
**broadcast** 4:3
  9:16,19 11:4,11
  11:23 12:2,19
  12:25 13:2,5,19
  14:20 15:7,14
  16:23 17:2,7,16
  17:18,22 18:12
  23:1,13 26:21
  31:10 35:7,18
  37:18,19,21
  46:21 47:8,22
**broadcasting**
  11:12,17,18
  12:16 14:22
  15:20
**broader** 130:1,1
**brokers** 41:20
  71:19
**brother** 142:3
**brought** 18:9
  19:12 23:21
**brown** 183:15
**bryant** 41:7,8
  41:10,23 46:4
  46:16
**bs** 9:4
**buck** 69:23
**building** 51:22
  86:16

**[bullet - certainly]**

**bullet** 85:5 93:16,20 106:16 107:3,16 125:16 125:22 127:3 174:25
**bullets** 106:23
**bunch** 125:13
**burn** 68:13
**business** 10:19 10:24 11:24 13:19,25 14:21 15:2,4,6,6,13 16:3 17:9,10,12 23:25 24:1,3 27:25 36:8 43:22,25 45:11 47:4 49:15,20 52:3 60:9 65:19 66:1,3 67:3,19 105:13 111:2 113:12,13 154:6 163:22
**businesses** 18:3 87:13
**butchering** 180:1
**button** 44:3
**buy** 34:20 71:23 82:22 127:19 180:4
**buying** 32:4 86:12

**c**

**c** 2:1,7 5:2 21:20 21:20 80:17 87:16
**ca** 2:14
**caicos** 46:24 47:2,12,14,18 47:21,25 48:24 49:3,10,24 50:3 51:3 52:16,19
**calculation** 79:8
**calculations** 73:9
**california** 61:12
**call** 41:4 71:19 71:24 89:1 147:15 148:20
**called** 5:23 7:16 9:15 11:12 12:10 14:6 19:4 34:2 67:9 71:15 71:25
**calling** 28:21 39:14
**calls** 36:14 71:13 136:24 141:13 144:11 145:17 157:20 166:5 176:15 177:11
**capabilities** 20:13
**capacity** 9:24 76:14 125:17

**capital** 27:19,19 27:21 28:14 37:25 38:5,10 38:14 46:21 47:15 49:15 51:17 53:1,12 53:21,23 54:3 54:13,17,19 55:8 56:7,20,21 62:3 64:5 71:15
**capital's** 54:22
**careful** 167:9
**carey** 45:2,10,19
**caribbean** 48:4 48:7 63:13
**carilee** 1:25 188:4,25
**carlton** 19:5 21:24 22:16 23:13,24,25 24:3,10,17,18 25:15 27:10,17 28:1,18,24,24 30:14 31:6,8,15 33:4 34:16 35:13,16,20 36:13,19,25 37:5 39:15 62:1
**carmel** 145:4
**carry** 99:16
**case** 1:4 6:6 46:22 151:15 181:19,22,22 182:1,10,15,17 183:1

**cases** 6:16,18,19 182:18 183:5
**cash** 68:13
**cast** 121:23
**catalytic** 55:8 56:7,19,21
**cause** 42:25 127:3 157:1
**caused** 127:9,11 127:13
**caution** 95:13 157:21 167:9,18
**cayman** 1:4
**cc** 149:10 177:3
**cdc** 97:14
**ce** 79:17,19,23 79:24 84:23 85:1 163:17
**ceased** 178:15
**cecelia** 110:12 173:3 174:9 176:11
**cell** 16:9,9
**central** 1:2 5:9
**certain** 22:7 29:10 38:17 45:22 59:2 78:8 78:14 80:17,21 112:25 120:7 122:4 164:2
**certainly** 25:14 93:23 110:23 111:19 145:6 171:11 175:14

**[certificate - comisi]**                                        Page 200

certificate  188:1
certified  5:24
  188:4
certify  188:5,16
cfo  18:13 60:23
  183:10,17
chad  60:8,9
  75:5
chain  59:20
  70:18 149:15
  150:9 156:3
chains  132:22
chance  116:5
  120:4
change  44:10
  64:12,14 111:8
  174:15 190:4,7
  190:10,13,16,19
changed  16:18
  16:21 31:7
  32:23
changes  189:10
  191:6
characteristics
  140:3 143:16
characterization
  139:13 141:19
characterize
  137:21 160:6
charge  75:6
charged  54:6,23
  55:2 56:11 57:2
  57:7,11,16,24
  57:25

charges  56:24
check  12:11,11
  13:12 15:3
  186:20 187:2
checking  78:2,4
chekrite  12:11
  15:3
chemistry  59:25
chief  9:23 12:23
  76:10,14,19
  157:2
china  72:14
choose  49:12
chose  49:2,9
chosen  48:7,9
  48:10,11 179:20
chris  45:2
christensen  75:1
church  114:16
circulated  111:6
circumstances
  78:8,14,14,16
cited  151:2,9
city  9:12 179:20
civil  6:16,19
  21:24 22:3
claim  173:17
claiming  175:20
  176:3
class  5:15 6:6
  182:19
clavo  34:2,3
  35:25
clean  155:13

clear  164:14
clearly  13:22
  65:12 67:1
  144:16 160:7,8
clia  80:14,15,22
client  12:2
  65:13 67:2,13
  95:19 144:21
  167:5,7 171:22
clients  15:9,9
  17:11,12
clinical  82:12
  125:24 126:15
  126:24,25
  151:17 152:17
  157:11 161:10
  164:1
clint  87:14,16
  147:2 148:4
close  14:9 34:17
  117:2 118:23
closed  34:16
  118:11,25 119:1
  119:2
cmr  1:4
cnmv  21:17,24
  22:10,13,15
  24:12
code  4:11
  104:15,18 106:8
  107:10 108:2,15
  162:11
codes  72:15
codi's  154:6

codx  103:13
  104:15
codx's  94:17
  182:1
coincident
  85:14
colleague  24:1
collect  35:4
collection  13:12
  134:13
collections
  12:12
college  8:23 9:5
color  142:6
colors  143:5,20
coltrin  45:6
  179:3
column  117:1,5
  117:6,7,9
com  15:24
come  16:11
  17:17,21 35:20
  54:13 58:6 64:9
  89:16 97:19
  98:1 143:3
  168:19 174:12
comes  92:16
  144:7
comfortable
  78:9 126:4,9,13
coming  58:9
  72:13 111:5
  117:24 144:2
comisi  21:18
  26:17

commence 27:24

comment 104:6 104:9 109:19 117:7

comments 67:16 72:25 117:8 124:9 151:22 154:5 155:23 156:10

commission 107:5 168:2 171:15,17,20 172:12

commissions 109:10

commodity 12:13 13:16,23 14:1,14,24 15:5 15:15 16:12

common 34:19 34:25

communicate 25:3

communication 108:4 162:24 167:5 172:7

communicatio... 12:1 13:10 14:7 15:8,12 25:6 95:19 107:6 108:23 109:2 144:22,23 159:24 162:19

community 135:13

companies 27:18,20,23 34:19 35:6,16 38:7,18 39:13 40:18 46:23 48:1 66:4 100:15,17,19,23 105:5 120:21,23 123:12

company 1:5 9:15 11:11,25 12:13,16 13:15 13:20 14:21,23 16:5 18:10,18 19:4,4,20 25:12 26:15 27:12,15 31:23 33:10 34:2 35:2,3,5 38:1 39:11 40:3 41:21 45:6 47:14,15 49:14 50:10,11,25 52:6,10 54:9 60:2,20 62:5 64:9,15,24 65:12,24 68:20 69:25 70:10 71:12,22 73:13 79:23 81:4 103:17,19 104:3 105:13 107:1 112:5 114:21 116:10 120:12

120:25 123:1,2 135:15 163:15 165:1 179:6,20 184:23 185:4

company's 54:5 56:7 70:5 151:4 151:10,14,17

comparable 140:2

compare 79:10

compared 105:4 112:12 135:4,17 152:21

competition 136:18 139:9 142:11,12

competitive 152:10

competitor 136:16 165:3,3

complain 173:11

complained 92:8

complaining 92:1,6,12 175:11,14

complaint 30:13 36:25

complaints 28:23 93:17 94:4 162:5

complete 107:17 108:3,5 116:7 120:5 162:24

164:4,14 191:8

completed 82:10 152:16 189:17

completely 149:18

complex 51:21 135:14

compliance 24:2 106:17 109:11

component 77:5 77:19,22

compound 37:1

compounded 134:21

computer 73:9 73:15 75:2 77:4 188:12

computerized 79:1

computerizing 79:2

coms 15:19

concern 25:14 37:4 55:1 57:1 58:5 85:12

concerned 37:6 37:8 105:12 112:8 129:5 130:6,11

concerning 25:11 57:9 136:2 158:21

concerns 37:7 57:15 136:1,5

177:19 181:4
concise 164:14
conclude 186:6
concluded
187:9
conclusion
117:24 118:3
conditions
164:8
conduct 43:21
43:25
confer 168:13
169:6
conference
88:25
conferenced
1:13
conferencing
14:17
confidence
137:8 143:14
confidentiality
177:19
confirm 175:2
confirming
134:9
conformity
151:19
confronted
34:15
connect 148:4
connected
111:16
connecting
31:25

connection
52:24 54:7
130:25
conservative
151:10
consider 67:19
70:10
consistent
174:16 186:22
186:25
consistently
157:11 158:21
160:21 161:10
consolidated
182:21
constantly
134:22
constitute 167:1
constitutes
177:14 188:13
consultant
33:18,25 41:15
116:10
consultants
119:7
consulted 19:12
consulting
18:14 41:17
116:11
contact 89:1
131:23
contacted 69:22
173:10
contain 95:14

contaminants
83:16
contaminated
97:25
context 43:10
43:11 57:25
66:10 67:6,10
107:10 108:2,9
108:12 125:9
157:2 162:25
164:22 166:13
continue 64:5
74:3 145:23
146:4
continued
178:17
continuing
146:1 168:5
contract 6:20
88:8,11,11,12
90:16,18,20
91:9,9,10,14,16
178:12 180:17
181:8,13,14
contracts 10:18
65:25 66:1,8
90:23 91:2
179:17
control 83:14,15
conversation
50:2,7 51:2
94:24 95:16
113:9 119:24
139:1 157:24

conversations
25:9 49:1 51:6
56:20 86:5,9
88:21,24 91:19
94:4,18,20,23
95:3,8,14,21
103:3 112:24
113:1 119:17,19
119:23 120:2
137:2,4,10
140:5 141:10
142:17 144:24
148:10,14
165:25 166:1,9
166:12,14,22
172:4 173:21
176:11,20
convert 122:20
convinced 138:5
copies 189:14
copy 158:20
186:8
coronavirus
72:8,20 74:17
74:24 75:11,13
75:17 76:25
77:1 78:22
79:15 80:3
86:12 87:22
91:20 92:2,6,13
98:4 100:16
130:25 136:6,22
138:21 140:8,12
152:9,15 163:6
174:13 176:4

**[coronavirus - dealt]**                                                    Page 203

181:6 182:1
**corporation** 1:8
  11:12,17 12:17
  14:23
**correct** 38:9,16
  48:16 50:5
  52:14 60:4 87:5
  103:9 114:2
  134:8,17 178:1
  191:8
**corrections**
  191:6
**correctly** 127:1
**correlation**
  117:17 118:5,5
  120:16 123:25
**correspondence**
  171:9
**corresponding**
  80:1
**corresponds**
  151:18
**council** 94:11,16
  109:7
**counsel** 5:11 8:3
  8:5,9 9:15,22
  10:10 11:13
  12:21 60:24
  66:13,16,22,25
  73:25 103:8
  109:10 114:20
  144:25 145:2
  166:22 168:13
  169:7,16 172:4
  172:18 177:24

181:22 183:23
  189:14
**counting** 77:16
**countries** 79:24
  87:1 152:10,16
  157:9 161:8
  163:19
**county** 87:12
  188:3
**couple** 70:25
**course** 69:9 90:7
  118:23
**court** 1:1 5:8,19
  5:24 7:1 38:23
  40:2 49:4 71:8
  80:16 131:5
  139:18 156:14
  164:17,19 165:6
  184:14 186:5,14
  186:19 187:2
  188:4
**courtesy** 111:4
**covered** 123:7
**covid** 84:24
  144:4 151:4
  158:22 160:20
  161:16 162:6
  163:6 165:1
  174:13 182:10
**cox** 142:5,5
**cragun** 41:7,23
  46:4,9,16
**create** 73:13
**created** 48:18
  48:24 52:2 63:4

75:4 165:1
**criteria** 59:2
**critic** 154:12
  155:7 156:5,9
  156:11,22,23
  157:16
**criticism** 136:21
  143:20,24 163:6
**criticisms** 140:8
  140:11 142:19
  161:23
**csr** 1:25 188:25
**cuban** 45:12
**current** 25:21
  125:8
**currently** 114:4
  114:6 181:18
  183:20,21
**curtis** 10:6
**customer** 30:14
  36:25 90:8,10
  93:17 94:4
  127:23
**customers** 28:24
  62:23 63:1,4,17
  85:6,15,18
  86:11,17,20
  92:1 105:23
  106:1 127:18,25
  160:3,10 162:5
**cut** 73:23
  142:12,13
  174:14,20
**cv** 1:4

**cycles** 78:18

**d**

**d** 3:1 5:2 71:10
**dark** 149:18
**data** 11:12,17
  12:16 14:5,22
  15:19 82:12
  134:9 151:10,15
  157:8 160:21
  164:3 175:5
**date** 5:4 21:2
  93:11 102:2
  111:16 167:22
  190:24 191:12
**dated** 4:7,8,10
  4:13,14,15,16
  4:17,18,19,20
  115:20 147:5
**dates** 15:18
  112:12 117:1,14
  158:5
**dave** 88:16
**day** 76:18
  111:22 112:4,6
  119:3 125:18
  188:19 191:15
**days** 189:17
**de** 21:19 26:17
**deal** 66:12,12
  79:9,9
**dealing** 66:16
**dealings** 17:9,10
**dealt** 13:13
  66:21 163:23
  167:12

**[dear - diagnostics]** Page 204

**dear** 158:18
**december** 24:11
**decide** 51:23
  160:12
**decided** 114:13
  114:17 122:20
  180:11
**declare** 191:4
**declined** 165:20
**declining** 166:2
**decrease** 120:12
**decreasing**
  120:9
**deemed** 18:11
  18:17 191:6
**deeply** 134:7
**defendants** 1:11
  2:11 5:18
**defined** 99:22
  99:23
**definition**
  121:10
**degree** 8:23 9:3
  61:8,13 114:2
**degrees** 9:5
**del** 21:19 26:17
**deleted** 181:25
  182:3
**deleting** 157:25
  182:9
**delisting** 69:22
  70:1
**deliver** 12:4
  13:16 14:5,18

**delivered** 14:2
  14:14,23 16:13
  16:15
**delivery** 13:25
  16:20
**demonstrated**
  125:23 126:15
  151:6 159:25
  160:8
**demonstrates**
  160:21
**department** 4:9
  89:12,22 93:4,5
  93:6,9 95:7
  113:4,6 171:1
**depended**
  123:23
**depending**
  110:20
**depends** 138:1
**deponent**
  189:13 191:3
**deposed** 6:10,13
  6:16
**deposing** 189:13
**deposited** 53:21
**deposition** 1:13
  5:6,9 8:2,6,8
  188:14
**depositions** 6:25
  186:18
**deputy** 180:21
**derivative**
  182:20

**describe** 8:11
  9:10 17:25
  50:21 80:7
  97:11 163:14,16
**describing**
  74:19
**design** 73:4,12
  73:14 75:1 77:3
  77:13 79:1,3,6
  79:12,13 175:5
**designated**
  80:22
**designation**
  80:18 100:24
**designations**
  101:16
**designed** 73:14
  73:15,19 78:11
  78:13 81:2
**desire** 128:6
**detailed** 111:2
**detect** 72:20
  81:6 151:4
**detection**
  135:10,17 151:3
  151:7 156:24
  157:5
**determine** 65:18
**determining**
  127:18
**develop** 33:17
  49:19,19 63:1
  72:15 73:5 77:1
  77:8,9 145:14

**developed** 32:15
  34:4 63:7 72:22
  73:2 164:12
**developing**
  72:20 75:9,17
**development**
  10:10,12 60:10
  64:6 74:16,20
  74:23 75:11
  76:24 77:12
  78:23
**develops** 78:21
**diagnostic**
  59:24 62:22
  63:1,4,18 70:15
  72:20 74:16,24
  75:14 77:1
  79:21 83:19
  94:17 98:22
  127:18,24
  135:16 182:5
**diagnostics** 1:8
  4:9,11 5:7 9:22
  16:22 17:8
  37:19 41:12,14
  41:16,18,24
  43:21,24 44:2,3
  44:7,9,14,22
  45:2,7 46:21
  47:8,21 48:4,8
  48:14,18 49:2,9
  49:11,14 50:9
  50:11,15,18,23
  51:7,15,24
  52:12,20,24

**[diagnostics - discussions]**

53:3,16,20,22
53:24 54:4,14
54:17,19 55:18
55:20,25,25
56:22 58:10,15
59:10,19 60:7
61:1,18 62:11
62:12,21,25
63:3,17 64:1,4,8
64:11,20 65:3,7
66:5 68:3,4
69:13 70:14
71:21 72:1,19
74:17,22,23
75:14,17,20,25
76:3,8 77:1
78:21 79:15
80:3,11 81:5
82:3 84:17
85:24 87:3
88:10 89:5,19
90:22 91:1,6
92:2,9,12 93:8
94:15 95:4 96:1
96:22 98:3
102:16 103:1,12
103:22 104:5,25
105:9 108:22
111:11,15 112:3
116:12 120:21
121:12,13
123:19 125:17
125:23 128:17
129:6,19 130:12
134:4 135:3

136:1 137:16
141:4 142:19
145:14 148:19
150:17 152:8,14
156:24 157:2,4
157:5 158:3,15
159:8 160:12,20
164:11 165:8,9
165:12,15,20
166:2,19 167:16
170:25 171:5,18
172:11 173:7,22
176:21 178:8
179:3,20 180:4
180:12 181:4
182:9,14 183:1
183:8,17,19
184:4 189:4
190:1 191:1
**diagnostics's**
43:25 55:2 56:8
69:6 78:1 86:11
87:24 111:12
117:25 118:1
119:14 122:4
128:19 130:25
136:6,22 138:11
138:20 140:8,12
144:8 161:20
162:6 169:25
175:12 176:3,4
181:6 182:4,10
**dichiara** 145:4
**differ** 134:19

**differences**
151:3
**different** 12:24
14:25 15:11
46:25 64:17
71:1 90:2 97:18
98:24 120:11
130:20 133:9,9
133:9 140:3
143:23 169:23
182:17,17
**difficulty** 82:11
**diligence** 58:15
58:20 122:25
123:5
**dipped** 70:7
**direct** 29:10
89:1 118:5
123:25 153:8
**directions**
173:17
**directly** 66:12
88:3 89:12
**director** 18:12
21:25 23:24
24:10,17 25:12
27:10,14 36:19
133:3 180:21
**directors** 18:11
19:8 28:7,10
64:20
**disagree** 171:24
172:2
**disagreed** 98:8

**disaster** 134:20
**discipline**
111:25
**disclose** 23:1
25:16 157:21
167:19
**disclosing**
144:13 145:19
**disclosure** 67:25
107:4 108:19
109:20
**disclosures**
109:16,24
**discuss** 141:3
144:8 146:5
**discussed** 25:10
109:13 141:2,18
141:24 147:15
148:20 162:13
**discusses**
108:16
**discussing**
74:16 94:15
103:12 106:9
125:3 128:17
133:23 136:4
**discussion**
20:11 102:25
154:11,18 155:7
156:4
**discussions** 49:8
66:13 101:23
117:20 119:13
135:25 136:8,18
136:20 141:5

144:15,17 145:1 145:7 147:22 157:15 176:25 181:3

**diseases** 133:4

**dishes** 12:3

**dispute** 6:21

**distributed** 12:13

**distribution** 6:23

**distributor** 86:16,18,22 87:3

**distributors** 86:25 160:10 173:12 174:15 175:2,3,12,15 175:19 176:3,8

**district** 1:1,2 5:8,8 182:25 183:2

**districts** 63:23 71:2

**division** 1:2 5:9

**divulging** 141:16

**dna** 72:15 73:5

**doctor** 131:24

**doctors** 143:9

**document** 4:4 20:19,23 37:2 45:23 81:8 82:20 93:2 96:10,12 116:21

116:23,25 117:13,21 119:5 122:11 131:17 149:2 172:20

**documentation** 19:11

**documents** 7:15 8:7,9,12 107:4 109:8,9

**doing** 10:21 23:6 31:15 138:2 145:23 186:18

**dollar** 69:12 70:8 86:18

**dore** 34:7

**dot** 15:19,24

**double** 35:4

**dow** 15:22

**dr** 59:12 60:6,13 66:9 75:8,16,19 75:25 76:7 84:16 98:7 128:16 129:2 131:2 135:2,12 135:25 137:5,17 137:24 138:8,15 138:19,25 140:7 140:21 142:18 143:2,24 152:1 152:7 153:14 161:3 162:2 173:9,10,16,25 185:4

**draft** 65:25 67:16 103:24 151:22 155:22

**drafted** 66:8 150:23

**draw** 118:4

**drawing** 156:24

**dressed** 186:13

**drew** 87:18

**driving** 120:14

**dropped** 69:8 69:10 73:25

**drug** 171:7

**due** 58:15,20 122:25 123:5 152:20

**duly** 5:23

**dump** 39:8 54:7 54:24 55:3

**durenard** 1:9

**dustin** 1:25 20:10 188:4,25

**duty** 162:14

**dwight** 1:8 17:2 60:18 132:13 133:24 150:12 150:15,23 151:23 152:1

**e**

**e** 2:1,1 3:1 5:2,2 71:10 87:16 190:3,3,3

**earlier** 26:7 36:18 85:3 114:1 128:14

138:10 140:16 159:7 162:10,23

**earliest** 86:17

**early** 8:22 51:8 72:5

**ease** 157:9

**easier** 32:2,3,3,4 65:16

**eastern** 70:24 158:20

**easy** 44:18 65:18

**econometric** 124:2

**edit** 111:7

**editing** 153:2

**editor** 45:10 142:3

**editorializing** 164:25

**edits** 155:15,25 159:4

**edward** 1:9

**effect** 58:19 157:1

**effective** 20:24

**efficacy** 82:13 82:21 83:4,9,19

**egan** 1:9 17:2,5 49:16 50:1,14 51:2,9,12,19 60:6 62:5 67:8 72:12 95:7 110:9 113:3,7,9 132:13,21

133:24 141:6,10 150:12 151:23 152:2

**egan's** 60:18 153:2

**eight** 9:16 182:17

**either** 35:2 44:8 66:21 67:21 83:12 86:3 90:14 97:25 119:15 135:12 139:13 172:12

**electronic** 186:7 186:15,17,22

**elkington** 88:16

**elwood** 2:12 5:17

**email** 4:5,7,8,13 4:14,15,16,17 4:18,19,20 30:19 43:16,24 44:4,11 45:9 54:21 55:11 56:15,23 57:5 58:2,3 81:15,19 82:2 84:3,6,15 84:19 96:21 97:9,12 98:6,10 115:15 119:24 121:17 122:1 124:24 128:13 128:16,25 129:2 132:12,25 133:11,19,23

134:2 135:24 136:2,14 137:11 138:18 140:7,20 140:22 141:2 146:14 147:2,3 147:10,12 148:1 148:1 149:7,12 150:8,8,11,17 152:1,8 153:7 153:18,24 154:22 155:10 158:14,18 173:3 173:22 174:3,11 175:10,14 176:25 178:24 181:22

**emailed** 45:2 128:17

**emails** 4:10 8:13 44:2 132:22 181:25 182:9

**emergency** 125:25

**employed** 16:23 184:6

**employee** 17:4 37:23 183:21 188:17

**employees** 11:19 16:22 65:3,6 112:8 144:8 146:6 169:25 182:8

**employers** 25:22

**employment** 17:17,21

**encephalitis** 70:24

**encourage** 71:23

**ended** 11:13 17:18,22 18:1 37:18

**ends** 81:21 117:4 142:16 179:14

**enforcement** 18:9,25 19:9,25

**enforcer** 19:1

**engage** 44:21

**engages** 45:8

**engineer** 79:4

**ensure** 85:7 107:3 108:23 109:11,14

**entailed** 19:9

**entered** 55:24

**entice** 35:3

**enticed** 34:20

**entire** 164:10

**entities** 48:25 89:19,21 90:2 92:11 121:5

**entity** 12:20 19:11 32:25 37:5,24 38:17 46:24 47:11,13 48:4,7,17 49:3 49:10,11,12,12

49:25 50:3,18 50:23 52:11,13 52:16,19,24 87:7,9,10 88:4,8 94:19,20 97:13

**entity's** 52:15

**entrepreneur** 45:12

**entries** 31:6

**equine** 70:24

**equipment** 180:24

**era** 58:16

**errata** 189:11 189:13,17

**essentially** 13:20

**establish** 106:22 108:17

**established** 109:14 135:18

**estate** 6:23 10:10,12,18,25 17:12 31:24,25 32:1,2,4

**et** 5:7 189:4 190:1 191:1

**ethics** 4:11 104:15,18 106:8 107:11 108:2,15 162:11

**eua** 163:17 175:5,16,20

**eugene** 1:9

**europe** 18:10 19:5 40:20 42:23,25 46:5 46:17 79:21
**european** 47:13 57:21 85:2
**euros** 22:1
**evaluated** 157:10 160:4 161:9
**evaluation** 94:16 97:9 103:12 125:24 137:16 138:11 140:6 161:16,19 165:24
**evaluations** 126:24,25 129:7 138:3 143:19 152:17 158:22 160:13,23 164:1
**evening** 147:7 148:25
**eventually** 48:14 50:14
**everybody** 60:17 105:12 109:3 110:1 112:5
**exact** 15:17 102:21
**exactly** 16:6 18:23 19:8 27:7 30:18 32:2,19 36:3 51:5 61:2

61:18,24 63:9 63:13,25 68:17 76:21 82:24 83:2 86:20 102:24 137:6 139:17 143:15 144:5 145:23 158:8 164:4,5 182:23
**examination** 3:4 6:1
**examine** 73:5
**examined** 5:25 143:6,13
**example** 14:17 80:13 91:8 105:1 122:12
**excel** 79:7 116:17
**excellent** 151:6
**except** 89:8 143:19
**exchange** 18:6,7 23:16,17,21 107:5 109:9 168:2 171:15,17 171:19 172:12
**excuse** 81:18 108:19 154:13 154:24,24 181:23
**execute** 145:14
**execution** 95:10
**executive** 32:6

**executives** 104:16
**exemplary** 158:21
**exercise** 104:9
**exhibit** 4:3,4,5,7 4:8,9,10,11,13 4:14,15,16,17 4:18,19,20 7:16 20:2,3,20 29:6,7 43:13,14 81:9 81:11,12 83:24 83:25 84:8 92:15,16,18,20 94:7 96:6,7 103:10 104:21 104:22 106:7 115:10,11,13 124:13,14 128:8 128:11,24 129:1 132:6,7 146:10 146:11 149:3,4 150:3 158:10,12 159:5 172:21,22 172:24 174:15 178:6,20,21,22
**exhibits** 4:1,2 187:4
**exist** 32:20,25
**exists** 32:22
**expanded** 66:20
**expanding** 134:13
**expect** 77:22

**expenditure** 35:9
**expenditures** 38:20
**experience** 9:11 11:3 135:16
**explain** 18:18 47:7 117:12 122:8 136:11
**explained** 109:6 166:11
**explanation** 125:8 178:4
**extent** 95:13 103:2 136:23 141:13 145:16 145:18 157:19 166:5,21 167:6 168:9 172:2 176:15
**extraordinary** 35:9
**exuberance** 15:19
**eyeball** 118:8

**f**

**faced** 179:7
**facility** 125:19
**fact** 12:9 27:5 57:23 72:25 88:3 91:23 95:8 110:21 124:8 134:21 137:5 151:5 166:25

**[factors - floch]**                                                                 Page 209

| | | | |
|---|---|---|---|
| **factors**  83:14 | **fda's**  102:6 | **filled**  23:17,20 | **firms**  61:11 |
| **failed**  35:5 | **fda.hhs.gov** | **finally**  7:20 | **first**  5:23 6:7 |
| 94:20 | 174:7 | **financial**  4:12 | 7:1 11:22 12:18 |
| **fails**  189:19 | **featherstone** | 9:23 12:23 | 13:9 17:3 20:22 |
| **fair**  67:25 107:6 | 60:9 | 39:17,22 40:4,8 | 22:3 23:13 |
| 108:20,24 | **february**  21:23 | 40:21 41:5,19 | 26:14 27:9 31:5 |
| 109:15 165:24 | 22:5 82:2 84:17 | 53:2,4 60:3 | 31:6 39:22 40:4 |
| **fairly**  164:14 | 85:17,23 86:10 | 64:18,24 67:22 | 40:8,21 41:4 |
| **faith**  34:14 | 183:13 | 67:23 106:21,25 | 50:17 51:5,20 |
| 142:20,23 | **fee**  12:6,6 | 108:16 188:18 | 52:18 57:4,6 |
| **false**  97:20 98:4 | **feedback**  85:6 | **financials**  35:6 | 59:11 62:25 |
| 98:14 103:13 | 85:15 | **financing**  54:4 | 63:3,9,11,13,23 |
| 121:19,22 | **feeds**  14:6 | 55:19,22 56:2 | 72:7,11,17 |
| 128:18 138:12 | **feel**  119:11 | **find**  32:3 72:1 | 84:21 85:5,12 |
| 161:19 180:23 | **feels**  36:16 | 82:17 98:11 | 86:21 103:24 |
| **familiar**  6:24 | **fees**  35:4 | **fine**  19:15,17,21 | 110:8 157:15 |
| 104:18 131:19 | **fellow**  73:6 | 34:21 37:15 | **five**  34:4 37:14 |
| 131:21 | **field**  83:10,13 | **finish**  21:10 | 42:2 55:23 |
| **far**  46:16 91:5 | 83:21 85:8,14 | **finished**  84:4 | 68:12 74:6 |
| **fasano**  2:7,8 | 85:19,25 86:6 | 124:19,22 | 149:24 168:18 |
| **fasanolawfirm...** | 91:21 152:10 | 170:11 | **fix**  44:18 149:20 |
| 2:9 | **file**  24:20 25:7 | **finra**  169:20,25 | **fixed**  44:17,21 |
| **fault**  138:6 | 53:7 | 170:7,12 | **fl**  2:5,9 189:15 |
| **faulty**  96:2 | **filed**  5:8 23:16 | **fired**  27:5 | **flawed**  94:25 |
| **fda**  80:2,19 | 24:25 53:8 | **firm**  2:8 5:14 | 95:9 |
| 100:14 101:19 | 107:4 109:9 | 6:4 9:12 10:3,5 | **floch**  2:3 3:4 |
| 101:20 102:13 | 122:23 182:18 | 10:10,13 11:2 | 5:13,13 6:2,4 |
| 103:1 121:14 | 182:24 183:1,4 | 17:12 33:4 | 20:4,8,12,15,18 |
| 125:8,25 126:24 | 183:5 | 39:17,22,25 | 23:10 25:25 |
| 127:14,16 128:4 | **files**  181:22 | 40:1,11,13 45:7 | 26:25 29:8 |
| 151:10 163:16 | **filing**  24:12 | 53:12,15 55:10 | 30:21 36:17 |
| 171:9,12 175:11 | 50:24 | 55:14,16 71:11 | 37:3 38:25 40:4 |
| 175:15 176:12 | **filings**  56:8 | 71:15,17 145:4 | 40:6 42:12 |
| 176:22 177:1 | 108:19 | **firm's**  55:17 | 43:15 48:20 |
| | | | 49:6,7 55:6 |

**[floch - gaining]**                                                    Page 210

57:14 58:13,23 67:15 69:24 71:9 74:5,14 80:23 81:13 84:1,7 92:19 95:17 96:8 100:3,6 101:3 101:17 102:10 103:6 104:23 106:5 107:14,25 108:10 110:3 112:20 113:17 113:25 115:12 124:15 127:7 129:12 130:19 131:7,12 132:8 137:13,22 139:20,21 141:22 142:25 144:6,19 145:25 146:12 149:5,19 150:1 153:5 155:2,5 156:16 158:2,13 159:15 160:11 162:9,17 162:22 163:3,11 166:16,24 167:2 167:14,24 168:15,17,23 169:2,3,14,22 170:9,21 171:4 171:24 172:6,8 172:16,23 176:1 176:10,19 177:2 177:13,22,23

178:3,5,23 185:10,13,15,20 185:25 186:7,11 187:6

**florida** 90:1
**flying** 143:4,20
**focus** 149:6
**follow** 32:2 104:16 172:17
**followed** 35:6
**following** 169:15 170:22
**follows** 5:25
**food** 7:21 171:6
**force** 180:12
**forced** 179:18
**foregoing** 188:6 188:12 191:5
**forgive** 90:13
**form** 20:25 23:20 52:6,10 52:11 57:12,19 58:17 67:5 100:5,12 101:12 106:2 107:13,20 108:6 112:14 116:17 129:10 130:15 137:19 142:21 143:21 153:3 159:14,19 162:8,16,20 163:1,10 169:21 170:1 175:23 176:6

**formal** 177:4
**formally** 171:14 172:13
**formed** 47:9,11 50:12 52:19 66:4
**forming** 50:25
**formulation** 73:18
**forth** 59:2 188:7
**forty** 28:16,17
**forward** 31:13 44:11,11,13,13 44:19 62:9 64:9 71:4 72:4 91:18 118:14 182:12
**forwarded** 132:21 174:3 179:10
**forwarding** 44:10
**fosano** 186:10 186:13
**found** 22:22,22 23:5 25:2 56:9 98:3 128:18 138:10,12 143:13 161:16 161:19 164:23
**four** 31:10 34:4 55:23 106:23 113:23 120:23 121:3
**frankly** 16:17

**freezing** 184:16
**frequent** 105:5 105:6,7
**frequently** 105:9
**friday** 158:21
**friend** 19:7 28:3 28:6,13
**full** 107:6,10,15 108:1,3,19,24 162:14,18,24 188:13
**fund** 89:13 122:23
**funded** 38:3,8 38:13 79:3
**funding** 27:19 47:11,12 49:18 55:24 64:5
**fundraising** 38:13
**funds** 38:18 51:6,13 89:13
**further** 34:24 45:14 142:15 180:20 185:11 185:21 188:16
**fury** 15:24
**fuzzy** 61:10
**fw** 44:24 132:19
**fwd** 179:5

**g**

**g** 5:2
**gaining** 82:11

**[gameplan - groundbreaking]** Page 211

**gameplan** 148:5
**garcia** 60:12
  75:16,25 185:4
**garcia's** 75:19
**geared** 105:25
**gears** 103:16
**gelt** 1:4 5:6,15
  182:21 189:4
  190:1 191:1
**gelwood** 2:15
**gene** 75:2
**general** 9:15,22
  10:19,24 11:13
  12:21 65:8,16
  103:21 111:6,15
  114:20 183:23
**generalities**
  46:13,14 95:6
  119:12
**generally** 6:18
  6:24 8:11 9:10
  17:25 20:22
  50:21 61:7
  62:10,17,18
  65:22 68:25
  75:19 80:7 86:2
  86:3 87:11
  97:11 104:8,11
  104:19 110:17
  111:9 121:22
  124:5 125:3
  136:5 140:24
  177:8
**generically**
  99:14 130:10

**genes** 73:4,11
**geomichael**
  56:10,16,24
  57:2,7,17,23
  58:11
**georgia** 114:15
**getting** 11:14
  90:17,20 153:7
  155:3
**give** 7:3 20:12
  81:9 96:9
  122:12 126:19
  129:25 130:3
  165:24 180:23
  185:10
**given** 113:19
  157:2 191:9
**gives** 7:7 125:9
**giving** 65:19
  101:7 129:23
  159:8
**gmail** 43:19,22
  44:6,9,12,19
  115:16
**go** 6:25 13:4
  17:15 18:6 20:8
  20:15,15 27:9
  30:3 37:17
  44:12,18 45:14
  46:2,18 52:21
  54:1 55:7 56:1
  64:1,9 68:2,16
  69:20 72:23
  73:8,24 74:7
  76:24 82:10

86:14 96:20
97:23 103:10
113:19 114:11
114:13 115:4
118:14,18
122:11,14
123:13 124:4
128:7,24 130:5
141:15 144:14
145:19 147:1
149:19 152:6
161:1 170:10
171:3,13 173:15
174:25 180:20
183:5 185:15
186:1
**goes** 18:4 34:18
  112:7 151:8
**going** 5:3 7:14
  14:2 20:1 21:5,6
  23:22 24:20
  29:5,12 31:13
  37:13 45:21
  56:3 57:20 64:8
  71:4 73:24
  83:23 89:11
  101:4,5,23
  106:11 114:19
  115:9,9 116:15
  116:18 124:12
  124:16,18 128:7
  133:12 136:24
  146:9,13,14
  149:2 150:3
  155:17 158:9

165:23 168:19
169:9,11 170:18
171:22 172:9,14
172:17 175:16
175:19 177:3,17
177:25 179:13
**gold** 31:9 33:7
  33:10,13,15,17
  33:19,22,25
  34:3,4,5,7,9
  35:25 36:1
**good** 5:13 6:3
  35:7 51:25 52:1
  70:22 71:1
  136:15 142:20
  142:23 143:15
**goodness** 68:11
**gordon** 10:6
**government**
  87:21 152:19
  178:9,11
**governor** 142:4
  142:5
**grace** 2:12 5:17
**graduated** 61:8
**granted** 79:20
**graphs** 78:19,20
**great** 49:17 79:9
  79:9
**greater** 184:20
**ground** 6:25
  170:19,19
**groundbreaking**
  180:25

**[group - hutchins]** Page 212

**group** 37:25 38:5,10,14 139:24 140:4 166:15
**groups** 123:10 140:2
**gubernatorial** 142:4
**guess** 10:7 24:20 24:21 42:3 59:5 107:23 186:1
**guy** 44:18
**guys** 35:1 73:15

**h**

**h** 190:3
**half** 107:23 110:8
**halt** 134:18
**hampshire** 10:11
**happened** 25:16 26:5 163:15 164:11 184:9,20 184:21
**happening** 93:7 105:13,14 123:9
**happens** 51:3
**hard** 180:16
**hat** 157:22
**head** 104:4 113:6
**headlines** 163:25
**heads** 93:6

**health** 88:1,5,6 88:7,11,18 89:10,12,17,22 90:6,8 91:3 130:22 134:20 136:5,9,12 138:19 139:3,5 139:7,10 140:12 141:20,25 147:23 148:1 161:24 178:12 178:18 179:18 180:8,11,11,15 180:17,22
**health's** 136:21
**healthcare** 136:10,16,17 142:12
**healthcare's** 141:21
**hear** 22:3,6 49:5 72:7 139:18
**heard** 28:23 29:2 38:22 39:1 39:7,14,17,23 40:3 41:4 42:17 43:1 53:12 54:22 55:10 56:15,18 87:6,7 87:14 94:8,11 95:25 130:21,24 131:2,10,24 134:7
**hearing** 132:2

**heartland** 179:6
**heirs** 6:21
**held** 5:9 51:7
**hello** 29:21 45:10
**help** 8:7 49:21 52:6,7,11
**helped** 52:10
**helping** 53:5
**helps** 157:6
**hereto** 191:7
**hi** 173:10
**high** 117:2 118:19 122:18 143:17
**higher** 30:2 135:3,16 154:5
**highlighted** 106:20
**highly** 135:14
**hired** 79:4
**histories** 23:18
**history** 37:17 115:23 116:5 119:8,20 164:10 184:9
**hit** 44:3,9,13
**hmm** 70:3 168:12
**hold** 181:19
**holding** 13:20
**holds** 76:10
**honduras** 33:11 34:8

**honest** 32:9 182:20
**hong** 82:8
**hope** 155:2
**hoped** 70:15,18
**hoping** 32:15
**hospital** 130:21 130:24 135:13 179:22
**hospitals** 136:16 141:21
**host** 20:13 93:8
**hostetler** 5:17
**hour** 37:14
**hours** 31:16
**house** 10:10
**hugh** 47:5
**hundred** 98:23 99:18,19,25,25 100:10,11 101:9 101:10,10 126:22,22,23 129:9,17,19 130:6,13,14 164:24
**hundreds** 97:18 97:18 98:14 99:1,3,10 100:18
**huntsman** 142:3
**hutchins** 84:16 84:22 110:12 129:18 173:3,9 173:16 174:9,12 176:12,21

184:23

**i**

**i.e.** 35:3
**icmr** 94:9,10 95:23 98:3,11 128:17 129:2 140:6 161:16,19
**icr** 95:4
**idaho** 89:25
**idea** 21:20 27:23 49:17 51:25 52:1 58:4 71:25 100:17
**ideas** 27:20
**identify** 56:9
**identity** 171:25 172:6
**ihc** 141:18
**ihc's** 142:9
**iii** 106:12,16
**ike** 154:11,18 156:7,9 184:5
**immeasurably** 79:6
**impact** 111:12
**important** 44:24 83:17,18,20 127:23 157:8 160:9
**importantly** 175:6
**imposed** 21:24
**impossible** 97:17

**inaccurate** 94:25
**inactive** 114:6 114:11,14
**incidence** 144:3
**incident** 26:16
**including** 31:8 57:21 91:5 104:11 148:19
**income** 10:17 35:5
**incomplete** 107:19,22,24 108:5,13 163:5
**inconsistent** 98:12
**incorporate** 15:2
**incorporated** 5:7 15:5 46:24 47:10 49:25
**incorporation** 50:25
**incorrect** 95:11
**increase** 92:23
**increases** 39:12
**independent** 58:20 64:22 95:22 138:3 143:5 160:4,23 164:1,8
**index** 4:1
**india** 60:13 63:12 97:5,14 129:15 159:24

**indian** 75:24 94:11,16 96:1 97:7
**indicate** 27:6
**individual** 13:17 36:12 40:19 97:3 133:6 164:16 172:6
**individuals** 32:14 42:23,25 74:22 82:3 103:11 112:3 120:21,23 121:5 129:6 146:6
**industry** 31:25
**inexperienced** 135:14 136:14
**infection** 151:5
**infectious** 133:4
**inference** 156:25
**inferring** 151:3
**infinite** 99:4,8
**influenced** 136:19
**inform** 157:6 175:3
**informal** 51:11 177:5
**informally** 171:14 172:12
**information** 8:14 25:21 69:17,20 95:14

110:16 120:25 121:7,9,13,15 121:16,19,22 125:4 136:25 141:1,14,16 144:12,14 145:17,19 146:3 157:20 159:11 159:20 160:8,13 166:6,10 167:8 167:10,20 168:11 170:7 172:1,3 176:16 177:11,15
**informed** 123:10 142:24 143:2
**informing** 106:1 175:15
**initial** 46:23 50:22 52:7 63:6
**initially** 17:14
**initials** 21:20
**initiated** 166:18
**initiative** 87:21 87:22 156:23
**input** 66:1 79:8 91:6 95:20 110:15,17,25 111:9
**inquiries** 31:16 69:13 170:4 171:1,6
**inquiry** 170:7 170:14,16,17

**[inquiry - ipo]** Page 214

171:11 176:12 176:22

**inroads** 70:23

**inside** 65:3,7 117:8 136:1 181:4

**insinuation** 151:9

**install** 12:3

**instance** 42:20 86:8 89:8

**instruct** 69:17 103:4 136:25 141:14 144:12 145:18 166:6,23 169:12 170:20 171:22 172:15 176:16 177:12 177:18

**instructed** 3:8

**instructions** 151:10

**intended** 38:19 108:9 151:15

**intent** 55:25 58:2 110:24

**interact** 59:21

**interest** 32:16 33:21 35:12,15 35:18,21,21,24 35:25 36:2,3 39:12 120:9 188:18

**interested** 127:19

**interesting** 13:24

**interface** 75:23

**intermountain** 130:22 133:3 136:5,9,12,17 136:21 138:19 139:3,5,7,10 141:24 161:24

**international** 4:3 9:16,19 11:4 11:11,18,23 12:3,19,25 13:3 13:5,20 14:20 15:7,14 16:23 17:3,8,16,19,23 18:12 23:2,13 26:21 31:10 35:7,19 37:18 37:19,21 46:22 47:9,22 152:19

**internet** 31:16

**interplay** 136:18

**interview** 177:5 177:9

**interviewed** 171:16,19

**introduction** 50:22

**inventor** 59:16

**invest** 35:3 39:11 54:13,17 58:6 123:1

**invested** 38:18 123:11

**investigate** 44:20

**investigation** 22:15 23:2,14 25:3,15,20 166:22,25 167:9 168:1,5,7 169:5 169:10,19,20,24 170:6 171:12 177:19 179:7

**investigations** 166:18 167:4,16

**investigative** 45:11

**investing** 120:8

**investment** 33:16 38:15 41:20 47:15 49:25 58:9 59:8 116:14 119:10

**investments** 38:2,11,12 39:6 40:19 42:22,25 48:25 59:4,7 123:8

**investor** 41:15 58:14,25 59:1,3 59:3,6 71:13 104:4

**investors** 12:14 28:19,22 40:14 40:20 47:13 49:13 53:5 55:2

55:23 56:6 57:21 58:6,9,16 58:19,22 71:13 71:24 72:2 105:23 106:1 116:14 119:10 120:8,15 122:20 122:24 165:1

**involve** 59:5,5,6

**involved** 19:10 19:19 28:1,3 34:10 49:20 50:13,17,24 51:14,16,23 55:3 59:11 72:22 75:23 79:14 80:1 88:2 109:13 145:7 164:7 184:17

**involvement** 23:24 38:4 40:7 41:12,14,21,22 41:24 47:20,24 53:17,19,20 87:24 88:3 90:23,25

**involving** 26:16 54:8

**iowa** 90:6,9,15 179:6 181:9

**ipo** 53:5 54:5 55:2 58:16 59:10,14 60:19 60:21,25 61:4 62:6 64:20,21

**[ipo - kong]** Page 215

79:3 184:10
**irrational** 15:18
**island** 47:14
**islands** 1:4
46:24 47:12,19
48:24 49:24
**issue** 105:15
129:18,22 158:3
159:10 167:23
**issued** 22:13
102:5,19,19,23
105:2 110:18
**issues** 58:7,11
66:11,18 84:24
104:5 139:14
142:15
**italy** 86:18
**iteration** 11:23
12:19 14:20
15:14 17:15,18
17:22
**itmr** 138:10
**ivd** 175:1

**j**

**james** 1:9
**january** 72:11
122:19
**jd** 9:8
**jeff** 81:21 82:10
**jennifer** 45:3,5
124:25 130:1,8
149:10 150:12
152:2 153:17
**job** 52:23 60:22
61:13,16 64:25

184:3,5
**jobs** 25:17
**joe** 56:10,16,24
57:2,7,16,23
58:11 60:9
**john** 24:23 28:4
28:5,8
**johnson** 31:1,3
31:14 34:13,25
36:6
**joined** 5:17
**joint** 75:24 97:4
97:6,6,7 165:10
165:13,16,20
166:3
**jones** 15:22
**journalist** 44:24
**judgment** 19:15
**july** 54:6 56:11
57:7 64:2,2
115:20
**june** 30:23 64:2
178:7,25
**jurisdictions**
183:4
**justice** 171:1

**k**

**keep** 53:7
**keith** 71:7,10
**kesler** 10:6,15
**key** 157:6
**kind** 8:14 13:14
77:4 97:22
121:9

**kinds** 53:2 59:7
66:23 73:8 86:8
**kit** 174:13
**kits** 179:21
**knew** 51:10,11
95:10 111:4
122:24 123:24
160:3 181:7
**know** 7:22 11:8
12:9 16:6 17:6
17:13 19:2,8,17
20:5,23 21:10
21:18 22:15,18
22:20 28:6,20
29:9,14,18
30:18 31:3,20
32:22,23,25
33:7 34:18 36:3
40:10,25 41:8,9
41:25 43:3 44:8
46:11,14,17
50:15,19 51:5
53:15 54:16
57:13,22,25
61:18,23,24
63:8,24 67:6
68:16 69:3 70:2
70:12 73:1 77:7
78:8 79:10,17
80:5 81:15 83:1
84:4,11 86:19
87:10 88:2,4,15
88:19 91:3,6,8
92:17 93:23
95:10 96:13

97:15 98:12,21
99:13 100:23,24
101:13,14,15,18
102:2,17 105:16
106:12 110:1,21
112:17,23,24
114:24 117:16
119:8 121:3
124:3,19,21
126:10 130:17
130:18 131:24
131:25 137:12
137:20 140:22
142:22 146:15
148:21 149:1
153:4 156:8
158:7 159:22
160:10,15,16
164:4 166:12,21
170:5 173:25
175:25 178:10
178:19 181:16
181:20 182:20
182:23 183:3,4
185:3 186:17
**knowledge** 59:4
111:1,2 129:7
**known** 17:5
28:15 57:6
99:20
**knows** 138:1
**kong** 82:8

**[l - little]** Page 216

**l**

**l** 34:20 80:17 87:16 131:7
**lab** 60:8 73:12 73:18,20 75:5,7 77:8,13,17,19 77:23,25 78:1,5 80:20,22,25 83:11,14,15,20 85:13 110:10 126:10 135:13 136:10,12,15 138:5
**laboratories** 160:5 164:1,9 164:16
**laboratory** 180:22,24
**labs** 80:13,14,18 128:1,5 134:19 138:4 139:6,9 143:5 160:17
**lack** 122:2
**lake** 8:18 9:12 34:8 87:11 125:18 140:17 140:19 148:15 159:9,18 179:20 188:3
**land** 71:15
**languages** 61:9
**large** 12:1 34:8
**larger** 156:19 161:5

**largest** 86:11,17 86:21
**largin** 2:17 20:12
**late** 51:7 72:5
**law** 2:8 5:14 6:4 9:8,11,12 10:2 10:16 11:2 17:12 114:2,21 145:4
**laws** 106:17
**lawsuit** 182:4 182:14
**lawsuits** 66:20 66:20
**lawyer** 144:23 177:15,15
**leach** 34:5
**lead** 125:7 154:13
**learn** 135:22
**learned** 23:13 23:15 57:1
**leave** 75:25
**leaving** 108:7,11
**left** 10:8 18:18 18:21 25:10 42:13 76:3 185:1,7
**legal** 10:21 37:11 38:6 53:2 60:3,24 64:19 64:25 65:2,6,11 65:19,23 66:6 66:10,18,22,24

67:3,20 68:1 103:3 144:16,23 144:24 145:8,10 157:22 167:1 172:7 189:23
**legends** 37:25 38:5,7,10,14 51:17 52:25 62:3
**legs** 13:19
**lenders** 56:7 57:10
**letters** 67:8
**level** 112:18 135:10 151:3,7 170:6
**levels** 151:5
**levied** 19:16,17
**lewis** 24:23 25:3 28:4
**license** 12:6 61:15 114:6,19
**licensed** 114:4 114:21
**licenses** 114:8
**light** 121:23
**liked** 86:6 143:7
**likely** 151:4
**limit** 135:16 156:24 157:5
**limited** 1:4 163:24
**limiting** 164:22
**limits** 164:5

**line** 3:9,10,11,12 3:13 31:5 44:23 96:25 97:8 113:15 115:22 119:2 132:10,19 133:2 149:10 157:19 190:4,7 190:10,13,16,19
**lines** 11:10
**linguistics** 61:9
**link** 147:19
**linked** 46:5,10
**list** 23:19 45:18 86:14,14 100:16 128:4
**listed** 56:6 93:25 100:22 127:3
**listen** 101:6
**listing** 18:6
**listings** 32:3
**lists** 28:21,21 106:23 125:13
**litigation** 158:7 164:18 181:19 184:7
**little** 9:25 14:25 18:24 30:2,3 31:13 34:12 45:14 53:9 61:10 78:19,19 96:14 103:16 123:24 132:14 133:15 151:25 161:5 174:2 180:20 184:15

**[live - malaria]**

**live** 81:5 137:6
**lived** 51:9 87:1
**lives** 41:3 82:7
**llc** 37:25 38:5,14
53:13 54:3,22
55:8 56:8,9
**llp** 2:4
**loan** 53:16,17
53:19,24 54:20
55:24 56:21
122:20
**local** 87:1
**locate** 28:18
53:5
**located** 19:6
**locating** 106:1
**location** 49:12
50:3
**lod** 135:3,8
151:3 154:5,13
154:14 157:5
**lodge** 7:6
**logix** 75:13
84:24 91:5
174:13
**long** 7:22 14:2
17:5 18:4 22:7
28:15 32:13
74:6 76:25 77:7
78:23
**longer** 76:10,14
78:25 79:11
180:4
**look** 22:12 54:1
68:17 78:20,20

81:14 83:18,20
84:2 86:14
92:22 101:20
106:12 111:22
112:3,6,9,16
116:18 118:10
128:6 130:3
133:11 143:4
153:1 158:11
160:18 173:2
174:21 183:6
**looked** 8:12
82:19 100:14
101:19 102:5,12
102:13 112:17
112:19,21,25
119:25 128:13
135:24 138:18
140:20 159:4
162:10
**looking** 71:5
83:10 106:19
112:18 113:18
150:3,7 173:23
**looks** 20:9 22:13
26:20 30:22
36:24 45:1 93:3
106:10 115:25
117:1,3 118:10
118:15,18
128:21,24
132:21 147:1,7
155:12
**lopansri** 131:2
132:25 134:3

135:2,12 138:19
140:21 142:18
143:2,24 162:2
**lopansri's**
135:25 140:7
**lopransi** 131:14
**los** 2:14
**losing** 68:6
**loss** 62:15,18
68:23 69:1 70:5
**losses** 35:9
68:15
**lost** 142:4
**lot** 78:25 87:12
88:24,25 90:1
105:14,15
163:22
**loud** 156:21
**low** 69:10,11
99:15 117:2
135:5 151:5
**lowe** 173:10,25
**lower** 154:7
**ludlow** 87:18
148:18
**lunch** 124:5
**lynn** 4:5 28:5,7
38:1 40:11 41:9
41:9 46:4,16
51:13,17,20,22

| m |
| --- |

**m** 21:20,20
**made** 35:7
48:25 53:16
54:19,20 89:10

98:1 112:13
120:20 124:9
156:10 164:8,15
191:5
**mahan** 10:11
**mailing** 28:21
**main** 15:9 16:2
**maintain**
106:22 108:17
**maintains** 23:23
24:9
**major** 10:25
122:20 136:16
**majority** 142:16
**make** 7:18,23,24
21:12 29:16
32:1,4 33:2
38:17 40:3
45:24 47:14
53:8 58:9,18
59:4,7 70:22
71:12 81:1
96:14 107:18,21
108:13 111:7
132:14 151:22
156:19 160:2
161:5 175:17
185:11 186:5
187:4
**makes** 108:4
**making** 62:12
68:4 138:9
142:19 153:9
**malaria** 70:21

**manage** 24:2 76:18 113:12

**managed** 31:9 34:17

**management** 33:12,15 39:23 40:5,8,21 41:5 72:9 109:3,18 110:5,8 111:9 158:19 162:14 166:10,13

**manager** 56:9 60:8 61:14 75:5 77:23

**managers** 56:10 110:11

**manner** 174:15

**manually** 79:5

**manufactured** 75:5 77:6

**manufacturing** 125:18

**march** 1:17 5:1 5:5 85:17,23 86:11 91:18 92:3,7 93:12 94:1,5,14 104:13 183:13

**marcus** 2:4 5:14 6:5

**marino** 54:6,23

**marissa** 2:12 5:16 186:2,14 189:1

**mark** 45:12 65:12 67:1 79:20,23,24 83:24 88:14 115:10 124:13 146:10 147:23 148:1,6

**marked** 20:3,20 29:6,7 43:12,14 67:12 81:12 83:25 92:18 96:7 104:22 106:7 115:11 124:14 132:6,7 146:11 149:4 158:12 172:22 172:24 178:22

**market** 15:19 34:10 70:22 142:13 157:1

**marketwatch....** 15:21

**marking** 20:2 79:17,19 81:9 84:23 85:1,2 96:5 104:20 158:9

**marks** 163:17

**master** 73:17

**master's** 61:8 61:12

**material** 25:21

**materials** 77:14

**matter** 6:20 22:10 25:10

65:16 67:24 103:21 110:21 111:3,15,24 156:9 176:25

**matters** 10:17 10:19,24 24:2 66:17,21 67:22 109:5,12 142:15 145:6 184:7

**mayan** 31:9 33:7,12,15,19 33:21,25 35:25 36:1

**mayu** 60:13

**mb** 39:17,19

**mccluskey** 115:18 116:4,9 117:15,21 119:6 119:14 121:18

**mean** 18:19 27:2,22 39:4,10 40:16 46:14 55:21 58:24 60:22 70:13 71:18,19 75:13 77:18 80:15 82:16 86:22 88:5 90:25 107:15 108:2 111:14 120:3 121:8,15 122:9 122:12 126:8,13 131:21 136:12 139:16,22 141:25 146:1

**means** 57:25 80:5,8,9 99:13 99:14 101:1 107:10 108:3 128:2 135:8 181:20

**meant** 58:1,4

**mechanism** 16:20

**mechanisms** 106:22 108:17 108:23 109:1,14

**media** 5:5 113:23 125:10

**medical** 94:12 94:16 133:3

**meet** 80:21

**meeting** 4:9 72:10,11 93:5,6 93:22,24 94:1

**meetings** 71:14 93:4,9 113:5,6

**member** 111:7

**members** 110:4 110:5,7,17,22 158:19 166:9,12

**mention** 34:17 161:15,18,22 162:1,4

**mentioned** 6:3 43:9,10 62:8 70:20 80:24 151:6 154:22 160:13

[mercado - nature]                                                              Page 219

**mercado**  21:19
**mercardo**  26:17
**merged**  10:6
  11:11 14:22
  16:5
**message**  44:10
**messages**  182:3
**met**  17:6 79:22
  160:1
**metric**  127:23
  128:3 157:6
**metrics**  151:7
  157:6,8
**mexico**  159:25
**mfasano**  2:9
**miami**  2:5,9
**michael**  2:7
**middle**  7:22
  21:22 105:11,17
  114:12 152:5,7
  156:18 161:2
**milazzo**  145:4
**million**  62:19,20
  62:20 68:10,12
  68:16,18,19
  86:18 123:2
  180:17
**mind**  61:11
  72:23 78:5
**mine**  19:7 28:3
  28:6,13 33:10
  33:11,17 34:3,5
**minimal**  63:5
**minute**  37:14
  42:2 69:15 74:6

168:18
**minutes**  153:17
  185:10
**misattribution**
  157:1
**mischaracteri...**
  102:9
**misleading**
  99:24 182:15
**misnomer**  78:6
**missed**  17:20
  90:12 131:5
**missing**  184:15
**mission**  114:16
**misstates**  23:8
  25:23 109:21
  127:5
**mistaken**
  131:15
**mix**  73:17
**mnrlawfirm.c...**
  2:6
**mohal**  96:24
  97:2
**molecular**
  135:14
**molecules**  99:16
**moment**  168:13
**monday**  72:10
**money**  19:5,21
  27:13,17,24
  28:13 33:2
  34:14 36:9 40:1
  46:17 49:21
  58:14 68:6

**monitor**  38:2,20
  111:11,14
**monitored**
  33:16
**monitoring**  53:1
**monitors**  38:10
**monopoly**
  142:10
**month**  77:10
  102:22
**months**  102:23
**morning**  5:13
  6:3 72:10
**mosquito**  63:22
  71:1
**mosquitoes**
  63:22
**motivated**  142:2
  142:2
**motivations**
  142:7,9
**motives**  141:18
  141:24,25
**move**  62:9 72:4
  91:18 101:4,5
  154:6 178:7
**moving**  14:19
**mpeirsol**  2:15
  189:2
**mud**  153:8
**multiple**  143:5
**murphy**  1:9
**music**  12:4

**n**

**n**  2:1 3:1 5:2
  21:18,20 26:17
  71:10 87:16
  131:7
**nacional**  21:19
  26:17
**name**  6:4,8,8
  10:11,12 15:16
  16:1,4,7,17,18
  24:22 30:25
  31:8 32:23 34:2
  34:19 37:4,10
  40:3 42:17 43:1
  61:24 71:12
  74:25 75:1
  87:14,15 88:17
  131:2,5,15,19
  133:10 188:19
**named**  10:11
  19:13 23:23
  31:1 45:2,6 47:5
  96:24
**names**  36:8
  46:25 66:15
  120:24 121:4
**nasdaq**  69:22,25
  70:1 170:12
**nate**  134:6
**natives**  46:3
**nature**  27:7
  66:19 121:23
  137:9 142:16
  144:16,18
  145:10

**[nearly - obtained]**                                          Page 220

**nearly** 32:14 184:17
**nebraska** 89:3,6 89:7,12,16,18 90:9 143:8 181:9
**necessarily** 46:12 110:24 118:3
**necessary** 108:8 108:11,14 191:6
**need** 7:20 12:9 44:16 49:18 74:7 77:23 82:20 105:18,20 105:21,22 114:21 125:7 126:4 129:16 167:9 184:14 186:8
**needed** 27:23 114:17 126:10 126:19,21 127:1 169:6
**negative** 116:6 119:16 120:5,11 120:17,19,25 121:7,8,10,13 121:14,15,18,20 121:22,23 122:4 122:16 123:9 180:23
**negotiating** 179:17

**neighborhood** 51:10 68:14,15
**neighbors** 51:12
**neiman** 2:4 5:14 6:5
**nelson** 1:9
**network** 86:16 86:23
**never** 19:2,3,9 19:10,10,10,12 19:24 24:11,25 25:13 35:7 36:22 44:20,20 99:8,18 112:11 124:1 129:22 130:1,7 131:23 131:24,25
**new** 12:19 25:16 25:21 36:8,8 116:13 145:5 179:17 182:25 183:2,17
**newman** 88:14 147:23
**newspaper** 8:15 8:16 132:4 145:22
**newsworthy** 146:3
**nile** 70:23
**nomi** 88:1,5,5,7 88:11,18 89:5,9 89:17 90:6,7,19 90:23 91:3,9,15 141:20 147:23

148:1,10 178:12 178:17 180:17 180:24 181:7,12
**nomination** 142:4
**nonresponsive** 101:5
**nonscientist** 99:17 100:9,14 101:8,15
**normally** 159:10
**notary** 191:13 191:19
**note** 189:10
**noted** 46:20 54:3 56:6 191:7
**notes** 188:11
**noteworthy** 159:11,23
**noticed** 73:24 118:24
**novel** 180:25
**number** 70:17 72:21 74:12 99:4,8,15,23 120:10 124:17 126:20 127:2,4 127:9 129:6 144:2
**numbers** 134:8

**o**

**o** 5:2 131:7
**o'neill** 47:5,17 48:11,12,23

49:22 50:2 51:3
**oath** 7:11 188:8
**object** 57:19 169:11 170:19 172:14
**objection** 7:7,8 23:8 25:23 26:22 30:16 36:14 37:1 48:19 55:5 57:12 58:17 67:5 69:15,16 100:2,5,12 101:12 102:8 103:2 106:2 107:13,20 108:6 109:21 112:14 127:5 129:10 130:15 136:23 137:19 141:12 142:21 143:21 144:10 153:3 157:18 159:14 159:19 162:8,16 162:20 163:1,8 166:4,20 168:8 169:21 170:1,18 171:21 175:23 176:6,14,23 177:10
**obligation** 162:14
**observed** 85:7
**obtained** 91:16

**[obtaining - option]** Page 221

**obtaining** 79:14
**obviously** 36:8
   122:24
**occurring** 50:7
**october** 9:24
   114:12 184:1,4
   184:18
**offered** 135:17
**offering** 23:7
**offhand** 110:15
   140:10
**office** 51:16,18
   51:21,22 61:14
**officer** 9:23
   12:23 18:12
   34:3 76:11,14
   76:20 107:1
   157:3
**officers** 4:12
   106:22 108:16
**offices** 48:13
**officials** 92:5
   140:12,15
   179:18 180:8,11
   180:15
**offshore** 46:5,10
**oh** 10:9 20:8
   21:14 29:22,25
   61:10 68:11
   74:2 105:7
   114:23 131:8
   133:1 161:7
   183:24
**okay** 7:20 8:1,7
   8:11,23 9:25

11:2,22 13:4
14:15 18:24
20:1,19 21:2,5
21:16 23:22
24:8 27:1,9,21
29:5,11,22,25
30:3,6,9,10,22
34:12,24 37:16
38:4,14 39:7
41:7 42:1 43:12
44:23 45:9,21
45:23,24 50:1
50:13,17,21
52:8,15,21 53:9
54:2 56:4 57:1
59:9,17 60:5
62:5,9,25 63:20
64:1,7 65:16,22
70:4 72:4,5
75:16 76:24
77:11 78:4,12
80:24 81:8,20
81:23,25 82:1,9
83:18,23 84:11
84:14,15 87:6
87:20 89:18
90:22 91:12,18
92:10,15 93:1
93:11 94:3,7,22
95:22 96:5,19
97:8 98:18
99:13 101:20
102:4,20 103:5
103:16 104:2,15
104:20 105:8

106:6,15 107:9
107:18 108:11
108:15 109:1
111:11 114:8,25
115:4,13 116:3
116:20 117:12
118:10,18,21,22
119:4 121:17
124:1,4,12,23
124:24 125:6
126:12,18
128:10 129:4
130:20 131:4
132:5 133:1,14
133:18,19 134:2
134:16 135:8,11
136:11 139:11
140:16 141:17
141:23 144:20
146:5,9,17
147:1 148:24
149:2,6 150:23
151:1,25 153:6
153:16 154:3,17
155:24 156:13
157:23 160:18
161:7 162:10
165:8 167:25
168:6,20 169:18
170:25 171:5
172:20 177:8
178:24 179:13
180:14 181:18
181:21 182:12
183:25 184:3

185:9,12,13
186:21 187:2
**old** 114:18
**once** 64:14
**ones** 60:15
   63:11,13 110:14
   182:21,22 183:3
**online** 86:20
**ooooo** 1:3 2:18
   3:6
**open** 168:7
   169:6,10
**operate** 35:1
**operated** 15:16
**operating** 46:5
   62:15 68:20,23
   70:5 142:20,23
**operation** 38:3
   39:15 40:12
   41:5
**operations** 24:2
   27:24 34:6,11
   38:13 49:15
   53:22 97:7
**opine** 109:5
**opinion** 120:7
   122:2 130:3
**opinions** 136:19
**opportunity**
   13:23 52:6
   104:6 109:5,18
**opposed** 83:5,11
**optimum** 73:11
**option** 36:13

**[oral - peirsol]**                                              Page 222

**oral**  188:14
**order**  27:24
  49:18,21 77:5
  80:2,22 86:19
**ordered**  77:20
  186:17
**ordering**  77:14
  187:1
**orders**  88:13
  186:6
**orem's**  179:21
**organization**
  61:14,21,21
**original**  11:18
  13:2,5 15:7 48:7
  48:17 49:3,10
**originally**  47:10
  79:7
**otc**  18:5
**ought**  72:14
  130:3
**outreach**  105:22
**outside**  33:18
  66:16,21 83:13
  83:16 86:24
  144:25 145:2
  166:13 175:16
  175:19
**oversaw**  34:6
**overseas**  38:3
  38:11,13 40:1
**overseeing**
  164:18
**own**  10:13,20
  35:2 142:15

143:10 151:10
151:15
**owned**  15:21
**ownership**
  32:16 33:21
  35:12,15

**p**

**p**  2:1,1 5:2 54:5
  54:23 71:10
  131:7
**p.m.**  1:18
  113:22,22
  128:25 147:8
  149:22,22
  150:13 152:2
  168:22,22
  185:17,17 187:9
**p.o.**  47:1
**pad**  34:5
**page**  3:2,9,10,11
  3:12,13 4:2
  20:22 21:6,23
  22:9,12 23:22
  29:13,24,24
  124:17 156:18
  161:2 179:14
  190:4,7,10,13
  190:16,19
**pages**  21:8
  29:13
**pandemic**
  105:12,18
  135:21
**papers**  19:3,10
  91:11,13 131:20

**paragraph**  21:9
  21:23 29:10
  46:2,18 53:10
  54:2 55:7 56:4,5
  84:22 125:8
  151:2 152:6
  156:21 179:16
  180:15,21
**paragraphs**
  154:4 179:14
**parameters**
  177:20
**pardon**  90:4
  153:20
**part**  10:25
  13:23 15:7 16:2
  55:19 66:6 78:4
  80:24 91:1
  113:11,12,13
  144:15,16,22
  157:25
**participate**
  165:10,12,16,17
  165:20 166:3
**particular**  27:7
  89:8 145:21,22
  157:25
**particularly**
  58:11 122:25
  164:19
**parties**  188:17
**partner**  17:11
  97:4,7
**partners**  53:13
  54:3,22 179:19

**parts**  12:15 77:5
  77:19,22 166:9
**passed**  143:4,19
**past**  145:24
  146:2 159:10
  186:18
**patent**  66:11,12
**patents**  66:14
**pattern**  137:15
**pause**  64:7
**pay**  19:21 72:1
**pcr**  59:22 137:7
  143:17
**pdf**  116:17
**pearson**  11:14
  16:6
**peirsol**  2:12
  5:16,16 23:8
  25:23 26:22
  30:16 36:14
  37:1 48:19 55:5
  57:12,19 58:17
  67:5 69:15 84:5
  95:12 100:2,5
  100:12 101:12
  102:8 103:2
  106:2 107:13,20
  108:6 109:21
  112:14 113:14
  127:5 129:10
  130:15 136:23
  137:19 141:12
  142:21 143:21
  144:10 145:16
  153:3 155:1

**[peirsol - portion]**

157:18 159:14 159:19 162:8,16 162:20 163:1,8 163:10 166:4,20 167:6,18 168:8 169:11,21 170:1 170:18 171:3,21 171:24 172:2,14 175:23 176:6,14 176:23 177:10 177:17 178:4 185:24 186:3,16 186:21,24 189:1

**pending** 23:2

**penny** 54:8

**people** 18:3 19:19 32:21 39:5 65:10 71:19 72:21 73:12 76:18 77:19 86:6 88:24,25 95:6 96:3,4 102:15 105:15 122:7,9 123:11 139:24 139:25 143:8,12 144:2 159:24,25 163:20 165:22 166:1,11,14

**percent** 36:2 97:20 98:4,23 99:1,2,4,8,9,18 99:19,21,22,25 100:1,10,11,20 100:21,25,25

101:1,2,2,9,10 101:11 103:13 126:15,16,16,20 126:22,22,23 127:2,9,11,12 127:14,15 128:18 129:6,9 129:17,20 130:7 130:13,14 138:12 161:19 164:24

**percentage** 36:4

**perfect** 174:22 175:21 176:4

**perfection** 165:2

**perform** 143:16

**performance** 85:7,13,14,19 85:25 92:2,6,12 96:1 97:9 103:12 129:7 136:6,21 137:16 138:11 140:6 143:25 151:16 151:18 152:20 160:21 162:6 175:3 181:5

**performances** 164:15

**performed** 143:13,15 175:7

**performing** 91:20 118:8

**performs** 83:10 83:11 134:14

**period** 8:19,20 8:21 59:10,15 60:19,22,25 61:4 62:6 64:11 104:12 158:6

**person** 36:15 56:19 58:1 67:10 132:3

**personally** 46:17 88:19 95:24 102:5

**perspective** 67:24

**ph.d.** 157:3

**ph.ds.** 143:9

**pharmaceutical** 97:5

**phase** 78:5

**phases** 77:12,15

**phone** 16:9 67:9

**phones** 16:9

**pick** 99:15

**picture** 116:7 120:6

**piece** 13:9,12,15 67:2 157:15

**pieces** 12:25 13:6

**pinder** 71:7,10

**pineiro** 2:4 6:5

**place** 106:19 177:20 188:7

**placed** 188:8

**places** 120:11

**placing** 86:10

**plaintiff** 1:6 2:2 5:15 6:6 185:20

**plan** 27:25 49:16,20 52:3

**planning** 10:18 10:18,23,25 17:12

**platform** 14:9

**plc** 11:14 16:6

**please** 5:11,20 6:7 29:16 30:5 38:24 49:5 84:3 84:11 124:21 127:4 148:4 153:20 156:15 161:6 175:2,3

**pllc** 2:8

**point** 11:16 45:21 69:16 70:11 71:4 79:5 84:23 107:16 120:11 125:16 143:7 157:8 164:13 178:7 184:13

**pointed** 156:23

**points** 70:8,9 125:13 127:3

**politically** 142:2

**polymerase** 59:20

**portion** 15:3,12 15:15,20 122:23

**[position - privileged]**

**position** 33:19
**positions** 123:7
**positive** 73:19
  98:4,14 103:14
  119:15 121:2,11
  128:18 138:12
  144:3 161:20
**positives** 97:20
  135:5
**possibilities**
  73:3
**possible** 70:1
**post** 9:5 20:24
**posted** 30:14,23
**potential** 28:18
  40:14 52:3 71:3
  71:22 105:23
  106:1 116:14
  134:20 144:9
  150:20,24 153:2
  164:25 180:23
**potentially**
  153:9
**power** 79:10
**pr** 45:7 71:11,17
  145:13 148:5
**practice** 9:20
  18:16 37:22
  67:1,13 114:4
  114:21
**practiced** 10:13
**practices** 173:11
  175:12
**practicing** 10:2
  10:16

**practitioner**
  9:14
**pre** 58:16 59:10
  59:14 60:19,21
  60:25 61:4 62:6
  64:20
**preferable** 83:4
  83:9
**preferred**
  122:21
**premium** 55:2
**preparation** 8:6
  83:16 91:7
  95:10
**prepare** 8:2,8
  116:23
**prepared** 130:2
  151:23
**preparing** 50:24
  80:20 116:21
  117:13
**prepublic** 57:10
**prerevenue**
  70:12
**present** 2:17
  32:3 95:21
  167:15 171:6
**presented** 13:24
**president** 17:2
  32:10,11 60:20
**press** 8:13 67:17
  67:22 101:23,25
  102:4,18,19,22
  103:17,18,21,24
  104:5,25 105:2

105:9,15,21,25
107:18,21,23
108:8,12 109:6
109:24 110:18
110:20,22,25
111:4,8,12,17
111:17,21 112:1
112:4,8,12,16
113:10 115:7,23
117:10,14,17,25
118:5 119:16,20
120:10 121:2
122:19 123:9,20
123:22 124:5,9
125:5 129:18,22
129:24,24 130:2
130:8,12 145:21
146:4 148:24
155:22 157:25
158:3,6 159:1,3
159:11,16
160:14,18
161:15,18,22
162:1,4,15
163:4,13,23,24
164:18,23 165:9
182:15
**presume** 22:5
  69:2
**previous** 154:12
**previously** 46:4
**price** 69:6,23
  70:7 111:13,16
  111:23 112:1,4
  112:12,16

113:10 115:7
118:1 119:15
120:9,12,14
122:4,22 123:6
123:15,19
**prices** 117:13
  120:17
**primarily** 10:22
  37:22 60:2
  64:18 71:20
  75:23 142:5
**primary** 41:20
  41:22
**primer** 98:1
**primers** 59:21
  73:14,16 75:3
  97:14
**principal** 54:5
**print** 78:19
**printed** 116:17
**prior** 54:4,21
  57:20 58:14
  184:21
**private** 9:20
  12:14 18:15
  37:22 42:22,25
  50:10,11 64:18
**privilege** 65:13
  67:2,13 169:12
  170:20 172:15
**privileged** 69:17
  69:20 95:14,19
  136:24 137:2
  141:14,16
  144:11,13,21

**[privileged - put]**

Page 225

145:17,19
157:20 166:6
167:5,7,10,19
168:10 171:21
172:1,3 176:16
177:11,14
**probably** 9:20
11:8,9 15:9,10
15:25 16:19
17:6 28:16
60:17 62:19
63:25 65:15
67:23 68:1 75:6
77:6 93:23 97:6
103:23 112:6
113:7,8 141:6,7
142:24 144:25
**probate** 6:22
**probes** 59:21
73:14,17 75:3
**problem** 44:1
135:4 138:5,15
138:16 139:2,3
139:23 153:9,14
170:3
**problematic**
142:7
**problems** 58:8
142:14
**proceeding** 6:22
**proceedings**
188:6,10,14
**process** 72:22
74:20 77:4
78:18 79:2,3,12

81:1,4 91:1
171:8
**processed** 34:5
179:22
**processes** 76:18
79:1
**processing** 79:9
**produce** 70:15
125:17 126:10
**produced**
116:16
**product** 16:16
65:13 67:2 80:9
**products** 39:11
64:6 86:24 87:2
105:16
**professional**
188:5
**profit** 62:13
68:4,21
**profits** 35:8
**program** 7:15
133:4
**progress** 147:14
148:19
**projects** 50:14
**promising** 71:5
**promoted** 40:14
175:4
**promoting**
134:22
**proper** 139:13
**properly** 25:13
137:7

**protocol** 138:16
**proud** 152:18
**prove** 82:12,25
**provide** 38:6
41:17 53:1,23
55:24 65:2,6,10
65:25,25 66:1
67:16 70:18
88:8 116:11
173:16 178:17
**provided** 12:7
13:22 14:8 54:4
178:18 179:6
181:21
**providing** 52:25
53:6 65:11,23
67:3 119:4
137:2 178:16
181:11
**pruitt** 10:12
**public** 8:14,16
11:21 15:23
18:5 23:6 31:23
32:4 40:14,15
41:21 48:14
56:1,2,3 57:20
64:1,4,8,10,15
64:16,24 68:3
69:8,21 87:22
101:16 105:4
107:5 108:23
109:2,6,19,24
109:25 110:16
110:18 120:8,20
123:12 130:1

134:20 144:18
145:14,21
162:18 179:18
180:7,11,11,22
191:19
**publicly** 108:4
134:22
**pull** 150:3 183:5
**pump** 39:8 54:7
54:24 55:3
**punitive** 5:15
6:6
**purchase** 88:13
**purchasing**
127:23
**pure** 34:9
**purport** 164:10
**purported**
137:6
**purporting**
163:14
**purpose** 38:19
119:4 120:14
**purposes**
151:16
**pursue** 27:24
49:19
**pushed** 180:16
**put** 73:9 77:14
77:20 111:21
112:7 116:6
120:4,13,25
121:2,11,25
122:19 123:10
123:22 125:4

**[put - recall]** Page 226

129:24 130:8,12
131:17 136:13
166:24

**q**

**qualifications**
126:5,18 129:17
**qualified** 72:25
**quality** 93:14
143:17,25 160:9
**question** 7:2,23
17:20 21:11
23:11 26:1
29:15 48:21
53:18 54:12,16
58:6 65:9 69:18
83:8 84:3,12
92:10 95:23
96:13 100:8
101:6 103:7
114:25 115:1
116:19 123:14
124:22 127:8
130:20 133:12
136:24 139:19
141:13 145:17
166:5 167:3,12
167:22,25
168:10 169:5,9
169:12,23 170:2
170:19 172:5,10
176:15 177:10
177:25
**questioning**
113:15 157:20

**questions** 20:6
21:6 44:24
45:15,19,22
52:8 81:16
97:22 119:25
177:14 183:7
185:11,21 186:2
186:3
**quick** 113:15
**quickly** 116:16
128:8
**quiet** 36:7
**quite** 16:16 22:6
102:12
**quote** 13:23
15:6 140:19
157:4 161:2,7
164:19
**quoted** 132:3
140:22,23
**quotes** 12:14
13:16 14:1,14
14:24 16:12

**r**

**r** 2:1 5:2 71:10
131:7 190:3,3
**raise** 27:17
49:15,21 96:17
142:14
**raised** 19:5
27:13 28:13
40:1 46:17
181:4
**raising** 51:6,13

**ramifications**
37:12
**ran** 40:11,11,11
71:12
**rashbaum** 2:4
5:14 6:5
**rate** 98:4,15
128:18 156:24
161:20
**rates** 144:3
**rather** 67:3
108:5 164:22
171:23
**reacted** 112:1
**reaction** 59:20
59:22
**reactivate**
114:18
**reacts** 82:24
**read** 21:8,16
29:13,20,23
36:24 57:6
81:18 91:11
96:12 124:18
132:9 146:14
156:20,21
157:16 189:9
191:5
**reading** 21:15
30:1,4,6,7,9
81:16,17,24
84:13 91:13
96:16,18 106:14
124:20,23
131:20,22

132:11 133:13
133:17 146:18
146:20,22,24
157:14
**ready** 29:14
82:10
**real** 10:10,12
15:24 31:24,25
32:1,2,4 70:23
76:23
**realized** 31:17
113:19
**really** 6:14,22
18:21 19:2
22:22 25:8
28:20 32:9,12
70:25 111:1
112:23 126:4,9
126:12 143:9
**realm** 66:2
**realtime** 13:16
**rearranged**
154:4
**reason** 44:15
51:12 69:4
114:13 123:4
129:15 189:11
190:6,9,12,15
190:18,21
**reasons** 105:8
**rebecca** 60:12
**recall** 16:2 18:7
18:21,22 22:22
25:8 27:16
32:18 33:6,19

**[recall - reincorporated]**

35:21 39:21 41:6 42:19,20 45:18 51:21 53:25 54:18 60:17 61:2 63:9 63:25 68:9 70:3 76:1 84:19 85:18,21,23 86:2,3,7,13 90:2 94:3 95:5 102:21,24 111:5 116:21 117:20 117:23,24 119:11,17,19,22 132:2 133:19,23 134:1 135:25 139:15,17,24 140:7,14 145:20 147:12,20,22 149:12 150:22 151:24 155:24 156:1,11 157:14 157:24 158:5,8 159:8 162:10 165:14,15 170:14 171:10 173:21 176:24 177:4 181:3 182:6

**receipt** 189:18

**receive** 12:5 44:2 57:5 69:13 133:21

**received** 19:24 34:21 53:20

79:22 80:18 86:5 89:16 97:17 100:15,20 129:1 137:16 159:23 160:16 166:10 170:4,4 170:6,13,16,25 171:6,9,10

**receiving** 45:18 54:21 56:15,23 58:14 84:19,23 133:19 149:12

**recent** 151:2 156:22,23 157:16

**recenter** 52:21

**receptive** 111:9

**recess** 42:8 74:9 113:22 149:22 168:22 185:17

**recognize** 15:25 16:4

**recollection** 68:17 93:24 120:2 136:3,4 148:9,13 155:6 177:6

**record** 5:4 6:8 20:8,11,16 42:10 73:24 74:3,7,8,12 85:15 113:20,21 113:24 149:20 149:21,24 166:25 168:21

168:25 169:4 185:15,18 186:1 186:6 187:7 188:14

**recorded** 5:5 24:12 25:13 36:22

**recording** 85:6

**redline** 159:4

**redlined** 155:23 155:25

**reed** 1:10,13 3:3 4:5 5:6,22 6:9 34:20 154:11,18 154:21 189:5 190:2,24 191:2 191:4,12

**reference** 55:8 140:20 154:12 155:7 156:5,10 183:15

**referenced** 189:6

**references** 157:16

**referencing** 156:4

**referred** 54:18 87:11

**referring** 8:17 8:21 59:17,23 61:22 78:15 85:1 93:20 101:25 102:3 113:2 121:5

140:4 145:3 148:21 153:14 154:19 182:23 182:24

**refined** 34:9

**reflected** 24:12

**refrain** 95:15

**regard** 51:6 66:14 85:16 95:9 119:18 132:1 139:14 148:14 176:25

**regarding** 56:21 181:5

**regional** 179:22

**registered** 100:19 188:5

**registration** 4:3 20:25 171:8

**regular** 171:9

**regularly** 109:23

**regulations** 106:18 109:11 125:9

**regulator** 25:20

**regulators** 23:3 69:14

**regulatory** 79:14,20,24 80:2,19 85:2 151:16 166:18 167:17 170:4

**reincorporated** 11:21

**related**  6:22
  10:17 31:24
  64:19,19 66:14
  70:19 110:13
  159:21 181:25
  182:4,9
**relation**   164:20
**relations**   71:13
  104:4 144:18
  145:15
**relationship**
  52:16,18 55:18
**relative**   8:19,20
  188:16
**release**   67:22
  101:23 102:1,4
  102:18,19,23
  105:1,3 107:18
  107:22,23 108:4
  108:9,12 110:20
  110:25 111:8,17
  111:18,22 112:4
  112:8 119:16,20
  122:19 123:22
  125:5 129:19,22
  129:24 130:8,13
  145:21 146:3
  148:24 155:23
  158:1,3,20
  159:1,3,17
  160:8,13,14,18
  161:16,18,23
  162:1,4,14,18
  163:5,14,23,24
  164:19,23 165:9

  182:15
**released**   109:8
  111:17 158:5,8
  165:8
**releases**   8:13
  67:17 103:17,18
  103:22,24 104:6
  104:25 105:10
  105:15,21,25
  109:7,24 110:18
  110:22 111:4,12
  112:1,12,17
  113:10 115:7,23
  116:6 117:11,14
  117:17,25 118:6
  120:5,10,17,19
  121:2 122:5,16
  123:10,16,20
  124:5,9 129:24
  130:2 146:4
  158:6 159:11,20
  160:20 162:15
**releasing**   105:9
  110:15
**relevant**   26:3,4
  157:7
**reliable**   70:16
  70:18
**relied**   24:1 96:4
**rely**   137:25
**remained**   18:14
**remember**   6:14
  9:17 15:4,17
  16:7,17 18:23
  22:8 26:12 32:1

  32:9,12,18
  42:15 51:18
  62:17,19 63:13
  71:11 74:25
  76:21 86:21
  89:9,24,25
  90:14 91:24
  92:1,5,11 94:14
  94:18,19,19,22
  95:1 112:23
  120:24 121:4
  137:3 140:5,24
  141:7 156:8,9
  162:23 170:13
  170:17 177:8
**remembered**
  91:19
**remote**   5:10
**removed**   154:11
**removing**   155:7
  156:5,10 157:15
**reorder**   86:7
**reorganized**
  9:18
**repeat**   38:23
  40:2 87:15
  90:11 156:15
  167:13
**repeatedly**
  152:21 157:11
  161:10
**rephrase**   100:7
  127:8
**reply**   44:4,5,9
  44:14,19,22

**report**   129:2
**reported**   1:25
  128:4 134:8
**reporter**   5:19
  5:24 7:1 38:23
  40:2 46:9 49:4
  71:8 80:16
  131:5 139:18
  156:14 184:14
  186:5,14,19
  187:2 188:4,5
**reporter's**   188:1
**reporting**   1:14
  45:11 134:20
  144:1 164:15
**reports**   53:8
  152:8
**represent**   5:12
  5:18 6:5 116:13
**representation**
  41:19
**representations**
  58:18,21
**represented**
  143:14
**reproduced**
  85:8
**request**   170:7
  175:17 180:7
**require**   81:4
**required**   64:5
  64:17 125:24
  151:18 191:13
**requirements**
  79:22 80:21

**[requiring - rooms]**

**requiring** 97:24
**research** 56:9
64:6 80:6,10,13
94:12,17 143:10
**residents** 88:9
**resign** 18:19
25:12 27:4
36:21
**resignation**
24:10,11,16,25
25:13 36:22
**resigned** 18:23
26:8
**respond** 126:3
127:3,10,12,13
**responded**
67:23 170:8
**response** 73:19
123:14 144:9
145:8,10,13,15
145:21 148:5,10
148:15 150:16
150:17,20,24
153:2,8 159:8
159:17,22 160:7
160:7
**responsibilities**
52:23 64:14,17
96:3 183:8,22
**responsibility**
58:8 72:19
110:13 113:11
**responsible**
74:23 142:5

**responsive**
184:7
**rest** 12:9 131:18
133:16
**restroom** 42:2
**restructure**
12:25
**resubmit** 97:24
**result** 154:12
**resulted** 26:16
**resulting** 35:9
**results** 78:7
83:20,21 94:15
95:23 97:9,16
97:22,25 98:1
98:11 134:8,19
151:7 160:5,17
163:25 164:2,3
175:6 180:24
**retail** 12:7
**retailers** 12:2,12
13:14,22 15:11
**retract** 89:13
**return** 34:15
128:9 189:13,17
**returns** 53:7
**reveal** 167:4
**revealing** 69:19
167:7 168:10
**revenue** 70:16
70:18 89:15
**revenues** 63:24
**review** 4:9 8:7
68:1 84:11 93:4
93:5,7,9 109:5,8

109:23 110:5
130:2 153:20
189:7
**reviewed** 109:3
109:10 110:10
110:11,12
**reviewing** 84:4
84:12
**rework** 154:13
**richard** 1:10
**rico** 34:2,3
35:25
**right** 7:12 10:3
11:4 13:1,6,7
22:6,13 26:9,12
26:13,21 30:2
35:17 36:13,19
36:22,23,25
38:11 40:3,14
43:19 44:1 45:3
47:2 48:15 50:4
51:4 60:3,12,13
60:16,16 61:3
62:7 64:25 68:3
70:5,8 74:17,20
75:14,22 77:12
80:13 81:2
82:21 83:21
85:3 86:19
91:21,22 94:4
96:2 98:5,8,16
100:1 102:6
103:14 110:14
113:17 114:22
115:7 118:12,16

118:25 119:1
121:19 123:16
124:6,10 125:14
128:22 129:1,3
132:22,25
133:21 134:4,10
134:15 137:15
137:18 138:12
138:16,21 139:4
140:17 143:20
147:3,10 148:2
149:17 150:13
154:1 156:6
159:12 169:7
173:23 175:22
177:25 180:5
181:14 183:10
**rise** 170:5
**rises** 112:18
**risk** 59:5,6
**rite** 15:10
**robert** 54:5,22
**role** 12:18 32:8
33:12,15 54:7
54:23 59:14
60:2,18,21
64:10,12 66:24
75:8,16,19,20
76:20 103:3
183:10,19
**room** 38:22 39:2
39:15 41:5 43:5
43:7
**rooms** 42:18
43:2 46:5,10

**[roughly - scroll]** Page 230

**roughly** 50:7
**round** 118:11
**routed** 135:13
**rpr** 1:25 188:25
**rule** 65:8 111:6
**rules** 6:25 56:12
  57:3,8,11
  106:17 109:11
**run** 38:1 52:7
  77:21 123:11
  136:10,15 139:5
**running** 56:19
  75:6 139:4,7
**runs** 97:5
**ruo** 80:5,12
**ryan** 31:1

**s**

**s** 2:1,3 5:2 20:25
  87:16 131:7
  190:3
**s3** 122:23 123:3
  123:8
**safeway** 12:2,4
  15:10
**sale** 42:24 80:10
  105:16
**sales** 31:24 32:2
  32:4 60:10 63:5
  86:15 89:10
  95:6 113:12
**salespeople**
  176:8
**salt** 8:18 9:12
  34:8 87:11
  125:18 140:17

140:19 148:15
159:9,18 179:20
188:3
**sample** 78:16
  81:5 83:5,6,15
**samples** 82:12
  82:18,21 83:3
  95:9 98:14 99:2
  99:3,5,9,10,10
  164:6
**sanction** 22:4
**sanctions** 21:24
**sarabhai** 96:25
  97:2
**satellite** 12:1,3
  13:11 14:3,6,7
  15:8,11
**satisfy** 19:21
**satterfield** 1:10
  59:12 60:6 66:9
  75:8 76:7 96:21
  98:7 110:10
  128:16 129:2
  137:5,17,24
  138:8,15,25
  152:1 153:14
  157:3 161:3
**satterfield's**
  152:7 164:20,24
**saw** 19:3,11
  136:13 138:10
  156:3
**saying** 77:11
  85:11 98:19,24
  98:25 99:7

101:8 105:21
112:2 121:17,19
**says** 20:24 21:3
  21:23 22:9
  23:23 24:9
  26:15,24 29:21
  31:6 44:4,23
  45:10,15 46:3,9
  46:20 47:4 54:2
  54:13 56:5,5
  79:21 85:5
  93:12,16 97:12
  97:13 98:6,17
  98:25 99:6
  106:16,21 107:3
  115:22 121:12
  125:16,23
  129:19 134:12
  134:17 138:24
  148:4 154:4
  155:15 156:22
  158:18 160:19
  161:8 174:11,19
  174:21 175:1
  179:5,17 180:9
  180:15,21
**scam** 28:25 29:2
  30:14 35:4
**scammed** 31:17
**scamvictimsu...**
  4:4
**scenario** 151:15
**scheduled**
  158:20

**scheme** 54:8,24
  55:3
**school** 9:9,11
  10:2
**science** 76:10,14
  76:20 157:2
  165:22 166:1
**scientific** 76:9
**scientist** 75:21
  99:21
**scientists** 60:12
  95:6 109:4
  129:14
**screen** 7:15 20:6
  20:10,13,20
  29:10 37:16
  44:8 84:9 92:20
  96:10 115:13
  122:1 128:11
  149:17 150:4
  158:11 172:25
  178:25
**scroll** 21:5,7
  29:12,19 34:12
  34:24 45:1 53:9
  93:14 116:15
  132:10,24
  133:15 135:1
  146:16,19,21,23
  146:25 147:25
  149:14 150:11
  151:25 153:16
  153:24 155:17
  158:25 174:2
  179:9

**searching** 31:16
**sec** 54:6,23 56:8
  56:11,24 57:2,7
  57:11,16,24
  58:12 59:2
  109:11 169:5,10
  169:19 171:13
  171:25 172:7
  177:19,21 179:7
**second** 7:6
  13:12 14:19
  17:15,18,22
  20:9 21:8 49:4
  64:7 81:10 96:9
  125:16 145:12
  149:20 156:14
  169:6 180:15
**section** 93:14
  106:11
**securing** 90:10
**securities** 21:1
  25:20 61:15
  107:4 109:7,9
  109:10 145:6
  168:2 171:15,17
  171:19 172:12
  182:14,18
**see** 7:17 20:5,19
  21:2,22 22:9
  23:22 24:4,8,14
  26:14 30:22
  31:5,11,14,18
  34:13,14,20,22
  34:25 35:10
  36:6,10,11

43:16 44:23
45:9,13,16 46:2
46:7,20 53:10
54:2,10,12 55:7
56:4,5,13 58:20
72:14 73:19
82:9,14 84:5,6,8
84:21 85:5,9
92:20 93:11,16
96:10,21 97:1,8
106:16,20,21
107:3 108:15
111:22 115:13
115:15 116:3
118:21 120:16
124:24 125:6,11
125:20,22 126:1
126:3,6 128:11
132:12,24 133:2
133:16 134:2,6
134:24 135:1,2
135:6,11,19,23
147:14,17,19
148:7 149:6,9
149:15,19 150:5
150:15,23,25
151:1,12,20
152:1,5,8,12,24
153:6,11,12,16
153:18,22 154:3
154:8,10,15
155:9 156:13,17
158:14,18,19,23
158:25 160:19
160:24 161:1,4

161:7,8,13
172:24 173:3,6
173:9,13,15,19
174:2,6,11,18
174:23 175:8
178:24 179:2,5
179:9,16,24
180:14,18 181:1
**seed** 27:18,21
**seeing** 155:24
**seem** 27:6 32:13
  114:17 163:4
**seemed** 11:7
  13:24 35:8
  51:25 52:1,3,4
  68:13 133:8
**seemingly** 34:16
**seems** 30:19
  64:23 77:11
  82:17 109:17
  112:15,19,21
  125:5 128:15
  137:14
**seen** 30:10
  88:17 152:22
**selected** 49:24
  50:3
**sell** 31:9 39:12
  40:19 63:3 80:3
  80:12,12 89:5,6
  176:9
**sellers** 122:3
  123:15
**selling** 33:5
  35:16 39:5

62:22 63:22
80:20,25 163:20
163:21
**send** 73:16
  110:23 187:5
**sending** 89:20
  128:25
**senior** 4:12 10:7
  10:7,8,8,15,16
  106:21,25
  108:16 109:3,18
  110:5,7 111:8
  162:13
**sense** 7:18,24
**sensitive** 99:15
  99:18,22 100:1
  100:10 101:2,10
  130:14 156:25
  175:1 180:23
**sensitivity** 99:13
  100:21,25
  126:15,23
  127:14,19 129:8
  130:9 152:9,22
  157:6,12 160:2
  160:22 161:11
  173:17 174:22
  175:21 176:5
**sent** 82:2 89:13
  89:25,25 90:1,1
  109:7 110:22
  111:3 119:9,24
  189:14
**sentence** 24:9
  26:14 27:1,7

**[sentence - sold]**                                                    Page 232

90:12 130:5
**separate** 13:6
**separately**
  51:20
**september**
  22:10 26:16
  184:2,18
**serbin** 1:10
**series** 61:15
**serve** 19:7
  114:16
**served** 12:22
  19:2,10 32:10
  32:11 60:23,23
**server** 44:5,7
**service** 14:8
  16:7,19 31:7
  114:16
**services** 12:7
  13:21 14:3,18
  27:6 38:6,7
  41:19 52:25
  53:2,4,6 88:9
**serving** 22:24
**set** 48:4 59:2
  71:13 126:21
  188:7
**seth** 62:5,7
  148:4
**sets** 98:1
**setting** 47:20,24
  151:17
**seven** 182:16,17
**several** 152:17

**share** 7:16
  20:10,13 69:6
  70:7 111:13,16
  112:4,12 118:12
  118:16,20
  142:13
**shared** 51:16
**shareholder**
  46:23 52:20
**shareholders**
  57:22,23
**shares** 31:9 33:5
  35:2,13 40:14
  40:15,17,17
  47:12 54:8
  122:21
**sharesleuth.com**
  45:11
**sharing** 37:16
**sheet** 189:11
**shift** 103:16
  182:12
**shifting** 145:12
**shipped** 34:7
**shoots** 118:19
**short** 42:1 116:6
  120:5,15,17,19
  122:3,7,10
  123:6,7,15
**shorted** 123:11
**shorthand**
  188:10
**shortwave**
  16:13

**show** 20:1 29:5
  43:12 81:8
  83:23 92:15
  94:7 96:5
  104:20 106:6
  115:9 124:12
  128:8 131:17
  146:9 149:2
  151:15 158:9
  172:20 178:20
**showed** 8:9
  100:20 103:13
**showing** 7:14
  129:8 132:5
**shown** 101:16
**shows** 133:2
  150:8 151:17
**sic** 11:18 98:12
  148:5 175:2
**sick** 155:3
**side** 105:5,6
  109:4
**sideband** 14:11
  14:13
**sidebands** 14:3
  14:6,18,25
**sign** 189:12
**signature** 133:2
  188:23
**signed** 189:20
**significantly**
  135:3
**signs** 78:19
**silicon** 87:7
  147:2,20 148:14

**similar** 90:16
**similarities**
  46:20
**single** 47:14
  157:5
**sir** 21:13 29:17
  39:20 45:25
  92:24
**site** 45:12
**sitting** 18:10
  57:9,16
**situations** 97:19
**six** 182:16,17
**size** 92:23
**slavic** 61:9
**slopes** 87:7
  147:2,20 148:14
**small** 27:19
  31:23 36:5
  63:14 135:13
  136:14 164:23
**smart** 75:13
  84:24 91:5
  143:12 174:13
**smelter** 34:8
**software** 32:5
  32:13 72:23
  73:2,15 79:4
**sold** 15:3 16:16
  32:14,21 33:2
  34:1,9 42:22
  47:13 63:1,10
  63:12,12,14
  79:23 86:24,25
  87:2,3,4 88:1,13

**[sold - states]**                                                          Page 233

89:11 90:15
120:15 122:7,10
123:6 163:18
**sole** 9:13
**solicit** 28:22
**solicitation**
36:13
**solutions** 1:14
189:23
**somebody** 15:4
43:9 44:18 65:9
83:13 111:22
**son** 60:25 61:5
103:25
**soong** 82:4,6
**sophisticated**
59:3 80:18
128:1 138:4
**sorry** 22:24
32:24 39:1 40:4
40:17 41:1 49:6
56:5 62:11 63:2
64:12 65:3,17
71:10 73:23
80:16 85:21
90:11 102:11
106:3 110:4
113:18 115:18
117:19 122:8
131:6 132:16
139:6,20 152:6
155:18 161:17
169:2,23 170:10
173:2 174:14,20
175:2 178:14

**sort** 12:6 60:23
77:12 170:8
**sound** 131:10
**sounding**
182:18,19
**south** 2:4,8
**southern** 182:25
183:2
**spain** 19:6,12
26:18 61:13,16
61:21
**spanish** 23:3
24:13 34:16,21
**speak** 8:4
119:10
**speaking** 85:18
85:21,24
**speaks** 37:2
171:25
**specific** 86:8
98:11,20 99:7,8
99:19,21,25
100:11 101:1,10
119:17 120:2
130:13 158:5
159:8 164:22
175:1
**specifically**
42:20 86:1,4
91:24 102:15
119:5 120:22
136:2 137:11
154:20 160:14
160:15 163:24
170:15 176:7

178:16
**specificity** 98:13
99:1,2,4,9,11
100:21,25
126:16,22
127:15,20 129:8
130:9 152:22
157:7,12 160:2
160:22 161:11
173:18 174:22
175:21 176:5
**specifics** 95:5
119:12
**specified** 177:1
**speculation**
36:15
**sped** 79:5
**spell** 6:7
**spelled** 131:10
**spelling** 131:16
133:9
**sphere** 145:12
**spit** 73:10
**spoke** 8:3 69:25
172:7,11
**spot** 34:10
**spreadsheets**
79:8
**spun** 11:19
12:22 15:6,13
15:20,23
**ss** 188:2
**staff** 137:4
**stamp** 174:21

**stand** 157:7
**standard** 160:1
**standards**
151:18 160:1
**start** 11:22
25:16 49:5
60:16
**started** 31:15
63:21 70:22
79:2 184:10
**starting** 29:20
70:25 146:14
**starts** 81:21
**startup** 70:11
70:13
**state** 5:11 6:7
89:6,19,21,22
90:2 91:16
92:11 114:5,7
140:13,15 181:5
181:13 188:2
**state's** 180:16
**stated** 127:1
**statement** 4:3
20:25 24:6
122:13 147:15
148:20,21
164:20,25 165:5
167:11
**statements**
120:20 138:8
**states** 1:1 38:12
40:22 41:2,3
47:16 48:15,18
61:17 86:25

**[states - sure]** Page 234

89:24 92:5
114:9 128:1
**stay** 184:6
**stayed** 11:13
**step** 76:19
**stepped** 18:13
18:13 64:20
183:9,9
**stick** 78:17
**stock** 12:13
13:16,22 14:1
14:13,23 15:5
15:15 16:11
18:5,7 23:16
35:21,24 39:12
54:8 69:22
71:11,17,23
111:23,23,25
112:5 113:5
117:2,13,17
118:1,6,11,15
118:19 119:1,11
119:15 120:9,13
120:14,15,18
122:4,7,10,17
122:21,22,24
123:2,6,6,15,19
123:22
**stocks** 123:11
**stop** 7:17 30:3
178:8 179:19
180:12
**stopped** 37:16
**store** 12:4,4,7
13:10 15:12

**stores** 12:2,4,5
**story** 12:10 51:1
71:21
**strand** 73:5
**stream** 70:16
**street** 119:7
**stricken** 156:18
**strike** 63:2
101:5
**structure** 47:21
47:25 48:8
49:10 66:1,3
75:3
**structured**
165:23
**structures** 11:3
46:21
**studies** 151:6
152:10 159:25
164:23 165:10
**study** 123:24
165:13,16,21
166:3 175:5
**stuff** 156:20
**subcontractor**
88:10
**subject** 44:23
97:8 115:22
132:19 150:16
158:7 179:5
181:18
**subjects** 139:14
139:23
**submission** 91:7
125:25 127:15

163:16
**submissions**
127:13
**submitted**
126:24
**subscribe** 32:5
**subscribed**
188:19 191:14
**subscribers**
13:17
**subsequently**
52:19
**subsidiaries**
66:5
**subsidiary**
11:20 12:9,10
15:1
**substance** 25:5
25:8 95:15
141:9 170:17
177:9
**successful** 52:5
52:5 71:22
90:10,17
**successor** 36:1
**suggested** 72:12
**suggestions**
125:4 129:23
**suggests** 164:25
**suite** 2:5
**superior** 152:20
165:2
**supplied** 179:21
**supplier** 178:8
178:10,11

**supply** 105:17
**support** 151:8
**suppose** 6:15
9:14 14:9 21:18
25:7 42:19,21
46:13 66:24
77:15 101:14
117:7 119:9
144:17 160:6
**supposed** 78:20
81:18 143:16
**sure** 7:23 16:14
16:20 25:9
32:22 37:6,7,8
39:3,9 40:3 42:6
44:25 53:8
57:24 60:11
62:7,7 64:16
67:18 68:7
76:23 77:14
78:3,9 79:11
81:1 87:8 88:4
95:7 102:2
107:22 108:14
111:24 112:2,9
113:3 114:24
117:22 118:4
123:24 128:3
130:23 131:8
133:1,25 136:8
141:5 144:4
160:3 167:22
170:13 175:13
175:17 177:13
181:24 182:2,23

185:11 186:5,21 187:4

**suspicious** 31:15

**swear** 5:20

**swiss** 39:22 40:4 40:8,21 41:4

**sworn** 5:24 191:14

**symptoms** 139:25

**synthetic** 73:21 82:22,23 83:5

**synthetics** 83:1

**system** 13:13,25

**t**

**t** 87:16,16,16 190:3,3

**take** 6:24 7:17 7:23 21:8 42:1 59:9 73:12 74:5 74:6 76:25 77:19 78:16,23 84:2 92:22 106:12 113:15 113:17 116:18 133:11 158:10 168:17,18 178:6

**taken** 1:17 42:8 74:9 113:22 149:22 168:22 185:17 188:6,10

**talk** 64:9 68:2 77:23 101:24 103:17 113:5

131:24

**talked** 8:10 67:10 71:20 72:13 124:8 185:3

**talking** 26:7 37:18 42:14 46:11,15 50:6 73:1 85:2 104:12 115:5,6 120:20 124:4 127:25 129:21 130:10 143:22 144:4 145:13 156:5,8 164:5

**target** 73:5,11

**targeted** 75:3 99:16

**tax** 10:17,17,23 53:7 66:2

**team** 137:4

**tech** 87:12

**technical** 109:4 137:4 166:11,15

**technicians** 73:18 78:1

**technology** 14:4 14:24 16:8,14 16:18 31:24 49:18,19 52:2 59:16,17,19,22 66:9 71:21 75:22 96:4 137:25 180:25

**telephone** 39:5 88:24

**television** 14:11

**tell** 5:24 7:16 18:24 95:20 188:8

**telling** 129:18

**tells** 59:3

**ten** 9:14,16 74:6

**tender** 24:16

**tendered** 24:9

**tenders** 152:20

**tennessee** 90:5,8 90:17,20 140:13 140:15 180:16 180:21 181:5,8 181:11,13

**term** 38:22 39:2 39:7,10 43:10 80:5,8 87:6 94:9 122:3 127:12 171:10,11

**terminated** 18:20,22 26:8 26:20 27:6 76:5

**termination** 26:15 27:3,4,5,8

**terms** 107:16

**test** 63:1,4 72:15 72:20 73:4,6,11 73:18,20,21 74:16,24 75:9 75:11,12,14,17 76:25 77:2,21 78:2,7,10,21,22

78:23 79:15,21 80:3,25 81:1 82:10,13,21 83:4,10,19 85:12,18,25 86:5,6,12 87:20 87:25 88:2,3,8 88:18 89:3,4,7 89:16 90:15,24 91:5,9,20 92:3,7 92:13 94:17,21 95:4,8 96:1 97:17 98:1,10 98:12,13,19,22 99:1,2,6,15,18 99:21,22,25 100:10 101:9 103:13 121:12 125:10 127:18 127:19,20,24 128:17 129:15 129:19 130:13 130:25 132:19 134:7,14 135:3 135:15 136:6,22 137:7,8 138:3,6 138:12,16,21 139:2,4,5,8 140:8,12 142:6 142:6,19 143:4 143:4,6,7,8,11 143:13,13,14,15 143:17,19 144:1 144:2 146:7 151:4,17,18

152:9,15 155:4 156:25 158:22 160:1,4,4,9,20 161:23 162:6 163:6 164:12,15 164:24 165:1 174:13,20,22 175:4,21 176:4 178:12,16 179:6 179:17 180:3,12 180:23 181:6 182:1,5,10

**test's**  152:20 164:21

**tested**  97:18 144:3

**testified**  5:25 18:17 36:18 38:9 43:4 50:1 82:19 114:1 140:16 143:18 159:7 171:14

**testify**  36:15

**testifying**  95:15 102:13

**testimony**  23:5 23:9 25:19,24 26:11 102:5,9 109:17,22 127:6 138:25 159:16 162:23 189:9,18 191:8

**testing**  59:20,25 63:6,22 77:8 78:5,7,11,12

88:9 94:24 97:13 134:13,18 135:14 138:1,2 139:14,23,24,25 140:1,3 141:20 142:10,11 178:12 179:19 179:21

**tests**  62:22 63:6 63:7,8,18 70:15 70:17,19,23 75:7 77:9 78:22 78:24 79:13 80:20 86:7 87:22 88:1 89:20 90:15 99:23 100:16 113:13 125:18 125:23 126:11 126:15 128:19 135:4,13,17 137:5 152:21 157:10 161:9,20 163:15,18,20,21 164:4,6,7,8 165:23 176:9 178:11,16,17,18 179:7 180:4 181:11

**testutah**  179:18

**text**  182:3

**thank**  42:7 46:1 84:6 92:25 96:14 155:2 156:20 178:2,3

185:21,23,24,25 186:3

**thanks**  148:6

**theme**  13:18,21 14:10

**thereof**  188:15

**thermocycler** 78:17

**thermocyclers** 77:21

**thing**  15:25 16:10 34:17 69:3 89:4 90:11 90:14 123:9,13 130:6 144:5

**things**  8:14 16:18 37:11 53:7 66:19,23 67:12 73:21 83:16 110:6,11 110:12 129:23 143:23 145:6 163:24 184:9,19 184:21

**think**  15:21 16:13 18:22,23 19:14 26:3,4,7 26:11,23 32:10 32:11 33:18 35:23,24 36:18 37:22 38:9,16 40:13 43:1 60:8 63:19,24 65:9 65:21 66:9 68:18 69:11

70:3 71:20 78:6 78:25 82:19 83:12,22 88:17 89:4 91:23 97:19 98:24 99:6,7 105:2,7 105:18 106:3 110:14,19 111:10,19,20 113:8,9 114:23 119:24 122:18 123:15,18 133:8 139:12 143:18 143:22 159:7 168:18,24 182:6 183:13 186:24

**thinking**  131:9 131:11,13 132:3 133:6

**third**  7:11 13:15 151:2

**thirty**  28:16,16

**thought**  67:25 70:21 71:2 73:10 89:11 131:14

**thousands** 99:10

**thread**  30:19 34:25

**three**  6:15 12:15 12:24 13:5,19 14:10 46:22 47:25 69:9 74:12 77:12,15

**[three - two]**　　　　　　　　　　　　　　　　　　　　　　Page 237

102:23 120:23 121:3

**throughput** 157:9

**thumbs** 126:19

**ties** 46:3

**time** 5:4 7:21 8:19,21,21 14:2 14:19 15:9,18 17:17,21 18:4,8 22:7 37:6,9 42:5 42:11 51:17,19 52:22 57:4,6 64:4,21 69:6 72:4 74:13 77:5 77:7 79:8,9,10 99:19 100:11 101:2,11 102:21 104:12 113:18 113:24 121:1 129:1 135:21 137:10 143:3,7 149:24 158:6 164:12,12,13 169:1 178:15 182:12 184:10 184:20 185:21 186:8,11 187:8 188:7,8 189:19

**timeframe** 167:12 189:8

**timely** 107:6 108:20,24 109:15

**times** 6:13,15 18:15 31:8 67:11 78:18,18 97:18 112:25 118:2 122:17 140:5

**timpanogos** 179:22

**title** 60:22 76:11 76:22 104:3 117:10 150:16 160:19 184:3,5

**today** 7:12 37:7 50:15,19 57:10 57:16 75:12 114:1 184:11 185:22 186:6

**today's** 5:4 8:2 8:8

**together** 41:9 77:20 93:7

**told** 19:20 51:1 71:20 166:8

**took** 15:23 61:13,16 77:3,5 77:6,7,10 78:25 79:9,11

**top** 21:3 43:16 81:14,19 96:20 132:9 146:14 147:1 149:6,7 150:8 156:3 160:19 173:3

**topic** 65:22 154:14

**total** 77:10

**totally** 16:20 23:18 94:25,25

**touting** 56:12 57:3,8

**touts** 39:11

**track** 53:7

**traction** 71:1

**trade** 66:15 113:10,10 122:17

**traded** 117:18 119:11

**trademarks** 66:15

**trading** 1:4 5:7 5:15 112:16,16 115:6,7,23 116:4 119:8,20 120:17 122:6,9 189:4 190:1 191:1

**transcribed** 188:11

**transcript** 188:13 189:6,20 191:5,8

**transcription** 188:12

**transcripts** 189:15

**tribune** 8:19 140:17,19 141:18,24 142:1 142:3,8 148:15

150:18,21,24 159:9,18,21,23

**trick** 36:9

**tried** 25:11 36:21 90:8 181:8

**troubled** 164:20

**true** 57:13 106:4 188:13 191:8

**truth** 5:25 188:9 188:9,9

**try** 44:13 82:25

**trying** 49:15 53:7 79:12 81:6 82:17 144:20

**tuberculosis** 63:11 70:20,21 78:23

**turks** 46:24 47:2 47:12,14,18,21 47:25 48:23 49:2,9,24 50:3 51:3 52:16,19

**turn** 30:2,5,8 31:9

**turned** 18:8

**two** 6:15 13:21 42:11 46:3 57:10 60:11 68:13 69:9 72:11,17 79:11 84:24 102:22 143:23 151:1 168:17 179:13 179:19 185:10

**[type - verification]** Page 238

**type** 10:16,21 11:24 23:6 41:17 88:11 109:19 116:11 118:7 139:1 141:1
**types** 6:18 8:12 65:23

**u**

**u.s.** 48:25 49:11 49:14 63:23
**uea** 100:15,20 127:15 128:4
**unable** 20:9
**unaware** 23:18
**under** 7:11 15:16 20:25 78:8,13 164:7 182:21 188:8
**understand** 7:4 7:9,11 26:1 27:1 35:1 48:22 53:18 57:5 75:13 85:11 97:21 98:18 102:12 107:15 108:8 125:10 128:2,6 134:18 135:8 170:2
**understandable** 107:7 108:20,24 109:15
**understanding** 23:12 24:24 27:11 28:9,20

43:6,8 47:8 48:3 48:6 55:13,15 59:1 64:3 76:2 76:13,16 77:25 88:7 89:7 90:19 90:21 91:13,15 93:19 98:7 99:17,20 100:4 100:9,13 101:9 107:9 127:17,22 129:25 138:14 153:13 154:17 165:19,22 168:7 176:2 180:10 184:19,21,25 185:6
**understands** 137:25 138:1
**understood** 50:10 75:21 130:9 177:22
**undoubtedly** 86:4 119:23
**unifying** 13:18
**unimportant** 154:6
**unique** 59:19
**unit** 5:5
**united** 1:1 29:3 30:15 38:12 40:22 41:2,3 47:15 48:15,18 61:17 86:25 128:1 136:10,15 141:21 142:12

**university** 9:2,8
**unknown** 135:15
**unknowns** 134:14
**unsuccessful** 90:20
**update** 116:5 120:4 152:15
**upset** 36:13
**urge** 134:17
**use** 7:21 14:16 14:16 42:2 43:24 80:6 125:25 126:5,14 127:4 128:3 135:4 137:8 143:11 151:11 152:15 157:9 175:13
**used** 14:1,18 38:19,21 53:22 59:20 73:17 80:9 97:25 143:8 178:16 189:20
**user** 87:4
**uses** 28:14 135:15
**using** 14:2 48:4 97:14,15 126:19 129:5 180:22
**utah** 1:2,8 5:8 9:2,8 46:3 87:12 87:20,23,25

88:2,3,8,9 89:4 89:18 90:24 91:9,16 114:7 114:20,22 132:19 134:7 142:6,7,11 143:19 144:2 146:7 161:23 178:9,11,13,17 178:18 179:17 180:4,12 188:2
**utilize** 73:14

**v**

**v** 1:7 21:20 189:4 190:1 191:1
**validated** 143:10
**validation** 151:6 165:10,13,16,21 166:3 175:4,6
**validity** 95:23
**valores** 21:19 26:17
**value** 117:2
**variety** 58:7
**various** 73:3 78:7 160:17
**vendors** 135:18
**venture** 27:19 28:14 47:15 52:5 75:24 97:4 97:6,7
**verification** 12:11 13:13

85:7
**verify** 189:9
**veritext** 189:14
189:23
**veritext.com**
189:15
**version** 153:21
**vested** 112:9
120:8
**vet** 58:8
**victims** 29:3
30:15
**video** 1:13 5:6
14:3,17,17
42:11 73:25
74:12 149:24
186:8,9,10,23
**videographer**
2:17 5:3,19
20:14,17 42:10
74:8,11 113:21
113:23 149:21
149:23 168:21
168:25 185:18
186:9,23 187:7
**view** 121:2
**violating** 56:11
57:3,8,11
**violations**
182:19
**viral** 83:5
**virus** 70:24
72:12,15 73:4
81:6 82:12,18
82:20,22,23,24

83:2 99:16
**viruses** 73:21
**vitro** 135:16
**volume** 113:10
117:3,5,13
118:6
**volumes** 112:16
115:6 120:18
122:6,9,18
**voluntary** 27:4
**vs** 5:7

**w**

**w** 37:23
**walk** 45:22
**wall** 119:7
**want** 29:19 59:9
74:1 76:17
81:14 101:6
103:16 114:18
123:13 132:9
142:11 182:12
186:7,10,16,22
186:22,23,25
**wanted** 14:25
18:5 86:7
105:15 109:19
111:7 117:16
119:8 120:16
127:1 142:10
143:11 160:2
184:6
**warned** 180:22
**warning** 22:13
**way** 33:20 44:16
44:21 49:20

81:1 82:24
98:13,25 125:10
131:10 132:24
135:12 139:3,7
143:15 147:25
165:23 184:12
**ways** 32:1 36:8
175:18
**we've** 36:24
37:13 112:24
113:1 155:4
163:19,20
168:19
**webb** 45:3,5
124:25 129:21
130:1 149:10
150:12,16 152:2
153:17 179:2,10
**website** 29:2
30:14,18 100:14
101:19,21 102:6
102:14 103:1
**week** 72:11,17
77:3,6
**weekly** 93:10
**weeks** 72:11,18
**went** 9:22 10:13
10:20 11:19,21
18:15 33:17
36:7 38:20
41:21 48:14
61:17 64:4,15
64:24 69:8
109:25 111:23
114:15 122:22

123:6 149:17
169:4
**west** 70:23
**western** 70:24
**whoop** 30:3
**willing** 123:1
**wilshire** 2:13
**wise** 65:22
**witness** 3:2,8
5:20,23 21:15
26:23 30:1,4,6,7
30:9,17 57:20
58:18 67:6
69:21 80:17
81:17,24 84:13
96:16,18 100:13
101:13 103:5
106:3,14 107:21
108:7 109:23
112:15 124:20
124:23 129:11
130:16 131:8
132:11 133:13
133:17 136:25
137:3,20 141:17
142:22 143:22
144:15 145:20
146:18,20,22,24
153:4 155:4
157:23 159:20
162:21 163:2,9
166:8 167:11,21
168:12,20
169:13 170:3,20
171:22 172:15

**[witness - zoom]**

175:24 176:7,18 176:24 177:18 184:17 185:12 185:14,23 188:8 189:8,10,12,19

**witness's** 127:6

**won** 152:19

**wonderful** 49:18

**word** 57:25 78:6 78:10 126:14 130:7 175:14

**wording** 111:8

**words** 174:14 180:2

**work** 9:11,22 10:21 11:8,19 37:17,20 44:15 61:7,18 65:12 67:2 73:13,14 75:1 76:7,17 77:3,4,13,13,17 78:1,11,13 79:6 81:2 105:4 148:24 150:20

**worked** 9:12,13 9:14,18,19,23 11:3 17:13 41:9 41:10 60:6 61:10,17,20,25 62:7

**working** 17:7 18:2 20:14 60:25 62:5 81:1 139:6,9 179:19

180:12

**works** 44:21 45:6 76:14 78:10,13 83:12

**world** 71:24 86:16 105:14 138:4 152:11,16 160:3 163:19

**worry** 84:23 135:12 137:18 153:7

**worse** 151:15 153:9

**worthwhile** 72:16

**write** 103:18,23 151:8

**writes** 103:21 134:6 135:2,12 151:14 152:6,8 152:14,18 153:7 153:17,20 154:3

**writing** 58:2,3 67:7 110:25 156:17

**written** 34:13 65:12 67:12

**wrong** 38:10 44:4 106:19 131:16 138:20

**wrote** 31:14 34:13,25 36:6 67:7 82:9 84:22 98:10 116:3 125:6 135:21

147:14 148:18 150:15 151:2 154:10 173:9,16

**x**

**x** 3:1 152:19

**xvariant** 31:9 31:20,22 32:6,8 32:10,11,17,20 33:2,5 35:22 46:22 47:9,22

**y**

**yeah** 89:22 96:17 106:19 118:21 119:2 159:6 186:16,21

**year** 10:9,14 11:6,14 27:14 50:6 53:23 68:8 105:1,3,11 114:15

**years** 6:14 9:13 9:14,17,19 25:18 26:6 28:14,16,17 31:10 34:4 41:8 51:10 52:7 61:16,19 69:7,9 183:10

**york** 116:13 145:5 182:25 183:2

**z**

**zika** 63:7 70:19 78:22

**zoom** 1:14 124:18 146:15 147:19,20

Utah Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30


(E) Submission to Witness; Changes; Signing.

Within 28 days after being notified by the officer

that the transcript or recording is available, a

witness may sign a statement of changes to the form

or substance of the transcript or recording and the

reasons for the changes. The officer shall append

any changes timely made by the witness.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.