# Exhibit 63

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

GELT TRADING, LTD., a Cayman     :
Islands limited company,

                                 :

                Plaintiff,

                                 :

v.                                          Case No.
                                 :  2:20-cv-00368-JNP-DBP

CO-DIAGNOSTICS, INC., a Utah
Corporation, DWIGHT EGAN,        :
JAMES NELSON, EUGENE
DURENARD, EDWARD MURPHY,         :
RICHARD SERBIN, REED BENSON,
BRENT SATTERFIELD,               :

                Defendants.      :

_____



VIDEO-CONFERENCED
DEPOSITION OF JENNIFER WEBB
TAKEN THROUGH
ADVANCED REPORTING SOLUTIONS, a Veritext company



Taken on Friday, September 1, 2023
9:20 a.m. to 1:01 p.m.



Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC

Page 2

APPEARANCES

For the Plaintiff:

    Michael C. Fasano
    KOBRE & KIM LLP
    201 South Biscayne Boulevard
    Suite 1900
    Miami, Florida 33131
    Michael.fasano@kobrekim.com
    (305) 967-6104

For JENNIFER WEBB:

    Marissa A. Peirsol
    BakerHostetler
    200 Civic Center Drive
    Columbus, OH 43215
    Mpeirsol@bakerlaw.com
    (614) 228-1541

-ooOoo-

Page 3

I N D E X

EXAMINATIONS                           PAGE
Examination By Mr. Fasano............................. 4

E X H I B I T S
EXHIBIT NO.         DESCRIPTION           PAGE
Exhibit 1   Email correspondence ...................91
    [CoDI_00023415]

Exhibit 2   Email correspondence ...................97
    [CoDI_00018884-00018888]
Exhibit 3   Email correspondence .................104
    [CoDI_00004788]

Exhibit 4   Email correspondence .................107
    [CoDI_00004944]
Exhibit 5   Email correspondence .................112
    [CoDI_00004943]

Exhibit 6   Email correspondence .................115
    [CoDI_00005025-00005026]
Exhibit 7   Email correspondence .................119
    [CoDI_00005106]

Exhibit 8   Email correspondence .................122
    [CoDI_00005044-00005046]
Exhibit 9   Email correspondence .................125
    [CoDI_00024204-00024205]

Exhibit 10   Email correspondence .................130
    [CoDI_00005828-00005829]
Exhibit 11   Email correspondence .................131
    [CoDI_00005830-00005831]

Exhibit 12   Email correspondence .................132
    [CoDI_00004054-00004055]
Exhibit 13   Email correspondence .................139
    [CoDI_00027470-00027471]

Page 4

September 1, 2023                    9:20 a.m.

P R O C E E D I N G S

-o0o-

Thereupon --

    JENNIFER WEBB,
was called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. FASANO:

Q.   Okay.  Ms. Webb, my name is Michael Fasano. We introduced ourselves offline.  I'm an attorney for Gelt Trading and this is a lawsuit, Gelt Trading versus Co-Diagnostics.  It's a securities class action lawsuit.  And I am going to ask you some questions today about -- that may be relevant to this lawsuit. And --

    MS. PEIRSOL:  Michael, if I could interrupt you quickly.  Could I just also announce myself for the record?

    MR. FASANO:  Sorry, yeah.  Go ahead.

    MS. PEIRSOL:  Yeah.  Marissa Peirsol with Baker Hostetler, representing Defendants and Ms. Webb for purposes of this deposition.

    MR. FASANO:  Okay.  My apologies.  I forgot

Page 5

to --

    MS. PEIRSOL:  No.

BY MR. FASANO:

Q.   So Ms. Webb, just for the -- for the record, can you state and spell your name?

A.   Jennifer Webb, J-e-n-n-i-f-e-r W-e-b-b.

Q.   Okay.  Have you ever been deposed before, Ms. Webb?

A.   I have not.

Q.   Okay.  So I am going to just go over some ground rules for deposition so that we both understand what we're going to do today, and then we will get started.

So just so you know, this is a proceeding that is under oath.  You just were sworn in.  So you understand that you took an oath to tell the truth as you would in a court proceeding?

A.   I do.

Q.   Okay.  Now, there's a court reporter here -- and some of this may seem obvious, and if it does, I'm just, you know, just going to go through it.

There's a court reporter, Ms. Johnson, here that is taking down everything that you and I say.

Do you understand that?

A.   Yes.

2 (Pages 2 - 5)

Page 70

Is that a yes?

A. Yes.

Q. Yes. In this situation, did you recommend to respond with a press release or did you make a specific -- did you specifically discuss how to respond with the company?

A. A press release is always a good option if there is a level of correction that needs to be communicated.

Q. Well, let's -- let's talk about that then a little bit more, in general. From your -- your experience, you know, when do -- when do companies typically want to issue press releases in response to other news that may be out there in the market?

A. When do companies -- okay. When do companies typically? So again, usually, a press release would be related to a milestone. A company might issue a statement in response to something. Usually, those are statements directly to the reporter or if there is broad misunderstanding from, you know, a level of media, then there might be a -- a statement issued as a press release. A press release is just a form of distribution.

Q. Okay. Do you know if a press release was -- was issued by Co-Diagnostics in response to the

Page 71

April 30th article?

A. There was a press release issued. I don't know if the company would characterize it as a response to the April 30th, but yes, there was a press release issued.

Q. Okay. There was a -- now, I'll just represent, so we can move this along, there is -- and I may show it to you, I may not because --

A. Okay.

Q. -- it was drafted. The May 1st, 2020 press release, which is kind of the -- the -- you know, the mack daddy document in this entire case.

A. Okay.

Q. I'm sorry I said on the record, "mack daddy," but it's what came to my mind.

You know, the -- do you -- were you -- were you discussing issuing that press release prior to the April 30th news coming out? Was it -- was that an independent project that was moving forward or was that -- or was that press release -- did the press release start to be crafted after the April 30th article, do you know?

A. I don't know the answer to that.

Q. Okay. Fair enough. Now, on the May 1st press release -- again, these are just questions that

Page 72

don't require you to probably look at the press release.

Did you have -- did you have any role in preparing the text of the press release?

A. Mm-hmm, yeah, I would have looked at drafts -- I don't think that press release started as a press release. I think I would -- I would have to go back and look, but I don't think it started as a press release.

Q. Do you know what -- do you have an idea of what it may have started as?

A. I think it was just a group of -- I think it may have started more as a statement, as a -- I think there was a letter. It might have been in a letter form.

Q. Okay.

A. And then it was reformatted into a press release.

Q. Do you know --

A. If that's relevant to you.

Q. Sure. Do you know why Co-Diagnostics would have been preparing a letter about the issue that ultimately went into the press release?

A. If I remember correctly, that probably was as part of the discussion around what education and

Page 73

context could be provided to the Tribune.

Q. Do you know when the decision was made to turn that -- to turn that work product into a press release?

MS. PEIRSOL: Objection. Assumes facts not in evidence.

She says she doesn't know if there was a letter.

BY MR. FASANO:

Q. Oh, well then, if you -- I think you testified previously, you're not sure when the -- the information that was to go in the press release was -- was being developed; right?

A. Mm-hmm, right.

Q. Okay. So we'll -- we'll leave it. We'll leave that question then.

Was there anyone at Co-Diagnostics who you recall, who, in response to the April 30th Tribune article, wanted to issue a press release? Was there someone specific who said, "We need to release a press release on this"?

A. I don't think there was anybody specific. But there was -- you know, that was definitely one of the modes of communication that was discussed, yeah.

Q. Do you remember who was involved in those

19 (Pages 70 - 73)

Page 74

discussions? This may be a broken record, it may be the same people, but...

A. Andrew -- yeah, the same people. Mm-hmm.

Q. Okay. Now, do you recall the -- what the press release, the May 1st press release, actually said, from the top of your head, if I don't show it to you?

A. Mm-hmm, yes. I recall that it included results from four validations that the company had received.

Q. Okay. And -- and did you have any impressions at the time of -- of -- of the press release? I mean, did you think it was good, bad, indifferent?

A. I don't recall what my thoughts were at the time. But I think the -- you know, again, just broadly as a communications professional, communicating when there's been something that's been mischaracterized, misunderstood, a communication is usually a good idea. There are exceptions to every rule, but that is usually a good idea.

Q. Do you recall what was being misunderstood or -- if anything, that this May 1st, 2020 press release was specifically responding to?

A. Yeah. If I remember right, Dr. Lopansri, I

Page 75

think was his name, Dr. Lopansri was commenting on a difference in the rate of positivity in two different testing operations.

MS. PEIRSOL: Michael, do you mind if we just take another five-minute break?

MR. FASANO: Yeah, absolutely.

MS. PEIRSOL: Okay, great.

(Recess was taken.)

BY MR. FASANO:

Q. So Ms. Webb, was there anything -- on the May 1st, 2020 press release, was there anything that you thought about that press release was either -- was -- was misleading?

A. Was there anything I thought was misleading? No.

Q. Yes. Do you think --

A. No.

Q. -- there was anything inaccurate in that press release?

A. I don't.

Q. Okay. Do you recall anyone objecting to the final language in the press release, either at Co-Diagnostics or at Coltrin & Associates?

A. I don't recall.

Q. Okay. Were there -- were there drafts of

Page 76

the press release?

A. Yes.

Q. Okay. Do you know how many times -- how many drafts there were?

A. Several.

Q. Okay. Would you personally be in possession of -- of those drafts or would it have been Coltrin that would have them?

A. Coltrin.

Q. Okay.

A. I mean, my Coltrin email would have had them, but -- but I don't have access to that.

Q. Okay. That's -- that's -- just to clarify, so you don't have access to Coltrin emails any longer?

A. I do not.

Q. Okay. That's fine.

Do you remember who was involved -- specifically involved in preparing the May 1st, 2020 press release? Again, just people you interacted with who you know were involved. I'm not asking you on behalf of the company.

A. I interacted with Andrew Benson and Dwight Egan. Possibly Dr. Satterfield, but I don't recall.

Q. Okay. Do you remember, when you were crafting this press release, what specific discussions

Page 77

you had about it with Mr. Benson?

A. So I didn't write this release. I would have been editing it or formatting it. I don't recall the specifics of the discussion, other than as it related to those four validation studies.

Q. Okay. And what discussions do you recall about the four validation studies?

A. So this is why I mentioned that I think this -- this may have been something that was in the works prior to that week because they had been -- as I understand it, a molecular diagnostics company would not typically get feedback like a validation study. There isn't -- I don't know if these are the words that the industry uses, but there isn't a mechanism, per se, for those validation results to be reported back to the company in the same way that Target doesn't know if you like the rubber ducky that you bought there or not; right?

And so -- so there -- there were -- as I remember it, there were four validation studies that the company had permission to talk about, and -- and so that was the primary content of the discussion.

Q. Do you know of any additional validation studies that the company did not have permission to talk about?

20 (Pages 74 - 77)

Page 78

A.   I don't know of any.

Q.   Okay.  So is there a reason why those four validation studies were -- were chosen to be put into the press release, do you know?

A.   I believe because --

MS. PEIRSOL: Objection.  Objection.  Objection.  Misstates her testimony.

BY MR. FASANO:

Q.   Okay.  Ms. Webb, if you could answer my question, I would appreciate it.

A.   So I think, as I said, those were the validations that the company had and had permission to share.

Q.   Okay.  Now, previously, you had mentioned the validation study is more about the -- the lab than it is about the actual test.

Is that your understanding?

A.   Mm-hmm.

Q.   So why was Co-Diagnostics informing the public about how labs had done with validation studies if they are about the lab?

MS. PEIRSOL: Objection.  Calls for speculation.

You can answer, if you know.

THE WITNESS:  Yeah, I don't think I can

Page 79

answer that specifically.

BY MR. FASANO:

Q.   Okay.  So do you know what Co-Diagnostics' motivation was for publishing those four validation tests in the press release?

A.   Would I know what their motivation was?

Q.   What were they trying to -- what were you trying to convey to the market, from your perspective, with those four validation studies?

A.   That was the feedback that the company had from the validation studies that were provided.  So I think probably there would be -- I don't know how to characterize that.  I'm sorry.

Q.   Okay.  Because I'm just trying to understand if the -- if -- what the -- what the purpose of adding that data to the press release was.  Was it, you know -- and again, I will give you some color.  Was that in response to a specific question from a reporter?  Was that a response to a specific article?

How did that assist Co-Diagnostics?

A.   So it's not my understanding that that press release stood on its own.  And I think, again, in the interest of communicating a milestone, it -- it's -- like I said, there's not -- there's not a mechanism for a diagnostic manufacturer to get that

Page 80

kind of information back.  And they had permission to share it.  And so -- you know, again, I'm not the company and I can't comment on -- I mean, I couldn't represent what they were thinking.  And probably each individual person is thinking something differently than the others, but they -- they are just communicating a milestone.

Q.   Okay.  And what -- what is the milestone that they -- that they were communicating?

A.   In that case, it was the results of four validation studies.

Q.   Okay.  And what I'm trying to understand is: If the validation studies are a reflection of -- of the lab's performance, why were they -- why were they concerned with the lab's ability to get certain results?  Why were --

A.   I see what you're asking.

Q.   Yeah, I need you to put it together.

MS. PEIRSOL: Objection.  Calls for speculation.  Let's just please slow down, let me get my objection on the record.

MR. FASANO:  You got it.  Noted.

BY MR. FASANO:

Q.   Go ahead, Ms. Webb.

A.   Yeah.  This would be intense speculation.

Page 81

So I don't think I want to answer this because it would -- I really don't --

MS. PEIRSOL: Yeah.

THE WITNESS:  I really can't represent what they were thinking or what the value of the market, from their perspective, would be.  It just wouldn't be appropriate for me to --

BY MR. FASANO:

Q.   Did anyone in the company share with you, you know, Ms. Webb or Jennifer, you know, something along the lines of what -- you know, "Here is what we are trying to achieve with this press release"?

A.   So being that the test that Co-Diagnostics manufactures are for high complexity labs.  So it would make sense to me that they would be communicating based on who their -- you know, what their -- what their market is.

Q.   Okay.  But again, my question, to take it out of speculation and into, you know, just hard data, is: Do you recall a conversation with anyone inside of Co-Diagnostics about why Co-Diagnostics chose to put that data into that press release?

A.   I don't recall the specifics of -- of why that -- I'm sure there was conversation like that.  I'm sure -- but I don't recall the specifics of what it

21 (Pages 78 - 81)

Page 142

concerns --

A.   It would have been a long list of concerns, yeah.

Q.   Can you give me the list of concerns?  Can you give me the -- the concerns that come to mind?

A.   All under that umbrella.  The -- the -- the company should be the one speaking about matters related to the company.  This was issued on a wire service, via a wire service.  Which means it had broad availability, those sorts of things.

Q.   Okay.  Was there anything in the article -- in the press release by Landon Capital, specifically about the content of it, that gave you concern in any way?

A.   I, personally, don't like the way that it is -- even the first sentence, the way that it's characterized, that anything is characterized.  So this is not an approach that -- that I would personally recommend or -- or encourage.

Q.   Okay.  Did -- so did Co-Diagnostics -- well, this -- this press release relates to an NPR article.

Do you recall an NPR article coming out relating to Co-Diagnostics' test in 2020?

A.   I don't recall a specific article, no.  I'm

Page 143

sure there was one, but I don't recall what the content of that article was.

Q.   Okay, sure.  All right.  So with that, I am going to -- well, I will pass the witness and give Ms. Peirsol to -- to -- is that how you pronounce your last name?  Or is -- I'm sorry.

MS. PEIRSOL:  It is.  Yes, thank you.

MR. FASANO:  So -- so in any case, if Ms. Peirsol has any questions, I'll -- I'll turn over the witness, but if not, Ms. Webb, I want to thank you very much for your time and I appreciate it and you're free to enjoy the rest of your day.

MR. FASANO:  No questions from us.  And I echo those statements.  Thank you, Ms. Webb.

COURT REPORTER:  Did you want electronic?

MR. FASANO:  Yeah, that's fine.

COURT REPORTER:  And did you want an electronic also, Ms. Peirsol?

MS. PEIRSOL:  Yes.  And we want to read and sign.

(Concluded at 1:01 p.m.)

-o0o-

Page 144

REPORTER'S CERTIFICATE

STATE OF UTAH      )
                              )
COUNTY OF SALT LAKE )

I, ABIGAIL D.W. JOHNSON, a Certified Shorthand Reporter and Registered Professional Reporter, hereby certify:

THAT the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was placed under oath to tell the truth, the whole truth, and nothing but the truth; that the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such testimony adduced and oral proceedings had, and of the whole thereof.

I FURTHER CERTIFY that I am not a relative or employee of any attorney of the parties, nor do I have a financial interest in the action.

(X) Review and signature was requested.
( ) Review and signature was waived.
( ) Review and signature was not requested.

I have subscribed my name on this 15th day of Sept

ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

Page 145

Marissa A Peirsol

mpeirsol@bakerlaw.com

September 15th, 2023

RE: Gelt Trading, Ltd. v. Co-Diagnostic, Inc. Et Al

9/1/2023, Jennifer Webb (#6086645)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney.  Copies should be sent to all counsel, and to Veritext at (transcripts-fl@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

37 (Pages 142 - 145)

Page 146

Gelt Trading, Ltd. v. Co-Diagnostic, Inc. Et Al

Jennifer Webb (#6086645)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Jennifer Webb              Date

Page 147

Gelt Trading, Ltd. v. Co-Diagnostic, Inc. Et Al

Jennifer Webb (#6086645)

ACKNOWLEDGEMENT OF DEPONENT

I, Jennifer Webb, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Jennifer Webb              Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

38 (Pages 146 - 147)

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.