# Exhibit 64

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION


CASE NO. 2:20-cv-00368-CMR


GELT TRADING, LTD., a Cayman
Islands limited company,
        Plaintiff,
 VS.

CO-DIAGNOSTICS, INC., a Utah
Corporation, DWIGHT EGAN, JAMES
NELSON, EUGENE DURENARD, EDWARD
MURPHY, RICHARD SERBIN, REED
BENSON, BRENT SATTERFIELD,

        Defendants.
 _____/


                            Remote via Zoom
                            April 10, 2023
                            11:03 a.m. - 6:55 p.m.



        VIDEOTAPED DEPOSITION OF CECILIA HUTCHINS
            Taken before Lilly Villaverde, RPR and Notary
   Public in and for the State of Florida at Large,
   pursuant to Notice of Taking Deposition filed in the
   above-mentioned cause.

Page 2

APPEARANCES:

MICHAEL C. FASANO, ESQUIRE
mfasano@fasanolawfirm.com
Fasano Law Firm, PLLC
2 S. Biscayne Boulevard
Suite 2530
Miami, FL 33131
and
MICHAEL A. PINEIRO, ESQUIRE
mpinero@mnrlawfirm.com
BRANDON S. FLOCH, ESQUIRE
bfloch@mnrlawfirm.com
Marcus Neiman Rashbaum & Pineiro, LLP
2 S. Biscayne Boulevard
Suite 2530
Miami, FL 33131
on behalf of the Plaintiff

JONI OSTLER, ESQUIRE
jostler@parrbrown.com
Parr Brown
101 South 200 East
Suite 700
Salt Lake City, UT 84111
and
ZACHARY R. TAYLOR, ESQUIRE
ztaylor@bakerlaw.com
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111
on behalf of the Defendants

ALSO PRESENT:
OWEN BADIN
FRED VEITCH, VIDEOGRAPHER

Page 3

I N D E X
E X A M I N A T I O N S

| WITNESS | PAGE |
|---|---|
| CECILIA HUTCHINS | |
| DIRECT EXAMINATION BY MR. FASANO | 7 |
| CROSS-EXAMINATION BY MS. OSTLER | 197 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail Chain - Bates CoDi 80712-80716 | 87 |
| Exhibit 2 | E-mail Chain - Bates CoDi 73713-73715 | 90 |
| Exhibit 3 | E-mail - Bates CoDi 79338 | 94 |
| Exhibit 4 | E-mail Chain - Bates CoDi 79448-79451 | 99 |
| Exhibit 5 | E-mail Chain - Bates CoDi 89645-89652 | 102 |
| Exhibit 6 | E-mail Chain - Bates CoDi 79770-79772 | 109 |
| Exhibit 7 | E-mail Chain - Bates CoDi 4513-4514 | 113 |
| Exhibit 8 | E-mail Chain - Bates CoDi 7437-7438 | 122 |
| Exhibit 9 | E-mail Chain - Bates CoDi 75250-75252 | 128 |
| Exhibit 10 | E-mail Chain - Bates CoDi 1168-1169 | 134 |
| Exhibit 11 | E-mail Chain - Bates CoDi 102876-102878 | 139 |
| Exhibit 12 | E-mail Chain - Bates CoDi 86671-86673 | 144 |
| Exhibit 13 | E-mail Chain - Bates CoDi 102883-102885 | 150 |
| Exhibit 14 | E-mail Chain - Bates CoDi 5515-5517 | 155 |

Page 4

I N D E X
E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | E-mail Chain - Bates CoDi 1353-1356 | 159 |
| Exhibit 16 | Article - Evaluation of Factors that Affect the Performance of COVID-19 Molecular Assays Including Presence of Symptoms, Number of Detected Genes and RNA Extraction Type | 166 |
| Exhibit 17 | E-mail Chain - Bates CoDi 201703-201704 | 168 |
| Exhibit 18 | Press Release - Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations | 175 |

Page 5

THE VIDEOGRAPHER:  We are on the video record. Today is April 10, 2023, the time is 11:03 a.m.

Please note that this deposition is being conducted virtually.  The quality of the recording depends on the quality of internet connection and the camera of all participants.  What is heard from the witness and seen on screen is what will be recorded. And the audio and video recording will continue to take place, unless all parties agree to go off the record.

This is Media 1 of the video-recorded deposition of Cecilia Hutchins in the matter of Gelt Trading Limited versus Co-Diagnostics, Incorporated, et al., filed in the United States District Court, District of Utah, Central Division, case number 2:20-cv-0038.

My name is Fred Veitch, videographer for Veritext.  And the court reporter is Lilly Villaverde with Veritext.

At this time will counsel please state their appearances for the record.

MR. FASANO:  Michael Fasano, I represent the plaintiff Gelt Trading and the punitive class.

MR. PINEIRO:  Hi, Michael Pineiro is on as well, counsel for the plaintiffs.

2 (Pages 2 - 5)

Page 174

right, this one. So let's go off the record and we'll go get the right version.

MS. OSTLER: I have it. Would you like me to e-mail it to you?

MR. FASANO: Sure. E-mail it to myself and Obadin, O-B-A-D-I-N, at Fasanolawfirm.com.

THE VIDEOGRAPHER: We'll go off the record?

MR. FLOCH: Michael, I have it. I will give it to, Owen.

MR. FASANO: Oh, you do?

MR. FLOCH: Yeah.

MR. FASANO: Oh, then Joni, don't worry. Brandon, the other counsel for us, can do it.

MS. OSTLER: Awesome.

THE VIDEOGRAPHER: We staying on, Mr. Fasano?

MR. FASANO: No, just stay off the record for now.

THE VIDEOGRAPHER: Stay off. I didn't go off yet. Off 6:04 p.m.

(Off the record.)

THE VIDEOGRAPHER: Back on the video record. It's 6:07 p.m.

BY MR. FASANO:

Q. All right. Ms. Hutchins, I have now what is the version of the press release that is the file --

Page 175

they call it a file-stamped version. You will see across the top that was filed in this lawsuit and I believe it's the accurate version that has the links. So please scroll down and let me know when you're ready to read from it.

A. Okay. If you can scroll down.

MS. OSTLER: Are you guys going to mark this as an exhibit?

MR. FASANO: Yeah, we were. It was -- the tag was going over some information, but.

MR. BADIN: I'll upload it after we finish using this.

MR. FASANO: Okay. Perfect. Thank you.

MS. OSTLER: It will be Exhibit 19?

MR. FASANO: Yeah, that's right. I think that's right, yeah, lucky number 19.

(Cecilia Hutchins' Exhibit 18 was marked for identification.)

THE WITNESS: Can you scroll down? Yeah, I think the other is just like -- if you scroll down -- can you go -- I know -- go back. If you go back one more -- I don't think there's any links in here, is it, or it's just the attachments? If you want to scroll down. Is there an attachment here?

Page 176

BY MR. FASANO:

Q. Yes.

A. Yes, attachment.

Q. This is the attachment of each of the validation reports. So you have not the links, you actually have the documents attached to the exhibit itself.

MS. OSTLER: I think you guys accidentally scrolled one page too far.

THE WITNESS: No, this is good.

BY MR. FASANO:

Q. Okay.

A. Yeah, if you scroll down.
One more. One more. One more.
You want to scroll down, two more.
Yeah, you can move from the table.
You can move. One more.
Can you scroll.
Okay. Scroll down.
If you can scroll down.
You can scroll down one more time.
Is there another page? I think maybe the one -- oh, okay. If you scroll down one more time.

MR. BADIN: There's the last page.

THE WITNESS: Last page. Okay. You have any

Page 177

questions?

BY MR. FASANO:

Q. Yes, sorry. Let me get back into position.
I wasn't sure how long it was going to take to read that one.
Okay. So let's start with the title, "Co-Diagnostics, Inc., releases COVID-19 test performance data," colon, "consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations"; do you see that?

A. Yes.

Q. Now, how many independent evaluations were actually done that relate to the --

A. So if you scroll to the -- the other -- if you go to the first page of the attachment -- no, go back.
So the thing is that I was not the one receiving the those independent evaluations. So it was basically like the sales team taking the product to the places and to reference labs and to do the evaluations before we could even start registration or any discussion.
So, basically -- and many times, the only one that can apply for an evaluation is the company in the country, not really the manufacturer entity in -- in the U.S. So those were evaluations were the ones that the

45 (Pages 174 - 177)

Page 178

company received some independent evaluations. So by the time that the press release was made, those were the ones that were available.

We had many, and I'm not going to be able to remember when we received what, and a lot of time it's they were not a formal report, but those were the ones that were available by the time of the press release, I would say.

Q. Well, the -- so let me take a step back. You had no hand in drafting this -- this press release; is that fair to say?

A. No.

Q. Okay. Did you review it before it was sent out?

A. No.

Q. Okay. Did anyone ask you to review it before it was sent out?

A. No.

Q. Okay. Let's go back up to the top. Isn't it potentially misleading to say that the Co-Diagnostics test consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations?

MS. OSTLER: Objection, ambiguous, calls for a legal conclusion.

Page 179

THE WITNESS: I don't think so. That is just a matter of fact. It is just reporting a data point, as far as I understand.

BY MR. FASANO:

Q. But it doesn't say consistently demonstrates across X number of tests 100 percent sensitivity and 100 percent specificity, it says consistently; isn't that correct?

A. About -- because this press release is talking about those specific independent evaluations.

Q. Wait. But when you say --

A. So --

Q. -- it's consistent, isn't consistency where you can replicate it multiple times?

MS. OSTLER: Objection, incomplete hypothetical, calls for speculation.

THE WITNESS: No, because it's talking about those specific studies that is reported in this press release. That's my understanding.

BY MR. FASANO:

Q. Okay. So let's go down more into the body. It says, "Salt Lake City, Utah," dash --

MR. FASANO: No, go up on the first page, Owen.

BY MR. FASANO:

Q. It says, Salt Lake City, Utah - May 1, 2020 -

Page 180

Co-Diagnostics, Inc., NASDAQ CODX, the company, a molecular diagnostics company with a unique patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100 percent sensitivity and 100 percent specificity, the metrics used to define accuracy in molecular diagnostic testing; do you see that?

A. Yes.

Q. It says that it released test performance data, but it doesn't say it released test performance data in just a few number of tests, does it?

MS. OSTLER: Objection, misrepresents the full document.

THE WITNESS: Yes, you are taking one paragraph of a whole document.

BY MR. FASANO:

Q. Okay.

A. So I don't know. A person that is reading a document, that's just the first paragraph.

Q. Okay. But in the first paragraph, it could have been more accurate if you would have said, demonstrates 100 percent sensitivity and 100 percent specificity in blank number of tests, that would make it more accurate, wouldn't it?

MS. OSTLER: Objection, ambiguous, calls for

Page 181

legal conclusion, lack of foundation.

THE WITNESS: It could be -- that could be your opinion, but not necessarily everybody's opinion.

BY MR. FASANO:

Q. Okay. Let's go down to the second page.

MR. FASANO: We need to go up one more. Sorry, Owen, I think it's my fault. I can't read my own document, because I'm -- okay.

Okay. We need to go back up to the first page.

BY MR. FASANO:

Q. So in the last paragraph of the first page, it says, "In remarking on the test's favorable limit of detection results in the evaluations, Brent Satterfield, Ph.D., said, 'In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and" --

MR. FASANO: Go to the next page.

BY MR. FASANO:

Q. -- "specificity, but is not relevant as a standalone data point. Other metrics that are important are availability, ease of use and throughout. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity and you can't do better than that."

46 (Pages 178 - 181)

Page 182

Is that a true statement, Ms. Hutchins?

A. I would say based on the information that we had at that point, I don't remember having anything that could go against that.

Q. Well, wasn't your EUA authorization 99.52 percent specific?

A. You are talking about something else.

Q. What's different from the validation study that was done for the EUA authorization versus other validation studies?

A. He's talking about like the clinical sensitivity that was done with -- against other methods across those independent studies. He was not talking about like the performance we have in the -- in the EUA. He was talking about the clinical sensitivity that it was done across those independent studies. I don't think he was talking about the sensitivity and specificity -- the sensitivity and specificity we got with the EUA. He was talking about field information, feedback from the customers, that's my understanding.

Q. Is it your position that in the field -- well, didn't we look at some field data that showed that there were -- that there was less than 100 percent sensitivity and specificity?

A. I don't remember from where. Like you are

Page 183

talking about the study from -- from India that was performed with another test that was manufacture -- excuse me.

THE WITNESS: Could you please go downstairs.

So he was talking about -- you were talking about another -- like the study was made in India with another product, even though like -- the thing is that that study -- there's not anything on that result that could say that I could compare that result with my product.

BY MR. FASANO:

Q. So when it says, "Consistently and repeatedly achieved 100 percent clinical sensitivity," doesn't that go against what the FDA recommended -- not recommended, required of Co-Diagnostics, which was to not say things like that?

A. If it would, the FDA would have asked me to retrieve this PR or redact it or review it or make any changes, which has not -- has not happened, as far as I can remember.

Q. Your position is that if the FDA took umbrage or took issue with this press release, it would have informed you?

A. Yes.

Q. But since it didn't, it has implicitly approved

Page 184

this press release?

A. I would say that they came to the same conclusion that I made, that we were talking about reporting results that came from the field, just that.

Q. Now, were you talking about all the reports that ever came from the field or were you talking about just the reports --

A. No, no.

Q. Well, what about the phrase "and you can't do better than that," doesn't that imply perfection, "you can't do better than that"?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: I don't know.

BY MR. FASANO:

Q. Well, if -- I'm asking you just as a person now, not as a pharmacist, not as a scientist, just as a person when someone says, Hey, you can't do better than this, doesn't that imply perfection or the top ability for something to work?

MS. OSTLER: Objection, incomplete hypothetical, ambiguous.

THE WITNESS: It may -- it tells me that the person that makes a product is telling me that the product is good. But I can only make sure that the product is good after I do my evaluation.

Page 185

BY MR. FASANO:

Q. So you can't do better than that, in your opinion, is a statement that the product is a good product?

A. Yeah --

MS. OSTLER: Objection, it's out of context.

BY MR. FASANO:

Q. Okay. You can answer.

A. For me, it means that Brent is saying that the product has a good quality.

Q. Okay. But he didn't say that the test was high quality. He said you can't do better than the results that they were -- than these results; is that fair to say?

MS. OSTLER: Objection, misstates what the press release says. You're taking that snippet of a phrase out of the context of the full sentence.

MR. FASANO: That's okay.

THE WITNESS: Yeah. No, I don't agree with you. It means -- for me, it means that he is happy with the results that came from the field.

BY MR. FASANO:

Q. So before you said it meant that it was a good test, now you say it means that it was -- he was happy with the results that came from the field, which one do

47 (Pages 182 - 185)

Page 198

So when I'm saying legally authorized to make to market or to make claims is according to the regulation for emergency use authorization for the FDA.

Q.  Thank you.  No further questions.

MR. FASANO:  All right.  Well -- or do you want to waive your right to your deposition, meaning you can get a copy of your deposition, read it and then, you know, there's a thing called an errata sheet where you can change certain things, based on your counsel -- you know, you can discuss that with your counsel or you can waive that right.  If you want to discuss that with your counsel or your counsel wants to answer for you, please go ahead and do it now.

MS. OSTLER:  We would like to review and sign please.

MR. FASANO:  Okay.  Perfect.  Then that's that.

THE VIDEOGRAPHER:  Okay.  We will go off the video record 6:54 p.m.

(The deposition was concluded at approximately 6:55 p.m.  Signature and formalities were not waived.)

Page 199

CERTIFICATE

STATE OF FLORIDA       :

COUNTY  OF  MIAMI-DADE :

I, the undersigned authority, certify that CECILIA HUTCHINS personally appeared before me on April 10, 2023, and was duly sworn.

WITNESS my hand and official seal this 26th day of April, 2023.

Lilly Villaverde

Registered Professional Reporter

My Commission HH016865

Expires July 23, 2024

Page 200

CERTIFICATE

STATE OF FLORIDA       :

COUNTY  OF  MIAMI-DADE  :

I, Lilly Villaverde, RPR, a Notary Public in and for the State of Florida at Large, hereby certify that I reported the deposition of CECILIA HUTCHINS; and that the foregoing pages constitute a true and correct transcription of my shorthand report of the deposition by said witness on this date.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action nor financially interested in the action.

WITNESS my hand and official seal in the State of Florida, this 26th day of April, 2023.

Lilly Villaverde

Lilly Villaverde

Registered Professional Reporter

My Commission HH016865

Expires July 23, 2024

Page 201

VERITEXT LEGAL
One Biscayne Tower, Suite 2250
2 South Biscayne Boulevard
Miami, Florida 33131
305-376-8800

April 26th, 2023

CECILIA HUTCHINS
c/o JONI OSTLER, ESQUIRE
101 South 200 East Suite 700
Salt Lake City, UT 84111

RE:        GELT TRADING, LTD., a Cayman Islands limited company v CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD

DEPO OF:        CECILIA HUTCHINS
TAKEN:        April 10, 2023

Dear JONI OSTLER, ESQUIRE,

With reference to the deposition of CECILIA HUTCHINS taken on April 10, 2023 in connection with the above-captioned case, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please have your client read the transcript and complete the errata page.  Upon completion, please send the signed errata to our office at Two South Biscayne Blvd., Ste. 2250, Miami, FL, 33131, or email it to litsup-fla@veritext.com.

If this is not taken care of, however, within the next 30 days, we shall conclude that the reading and signing of the deposition has been waived and the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court without further notice.

Sincerely,

Production Department
Veritext Florida

51 (Pages 198 - 201)

Page 202

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

Page-line        Should read        Reason for change

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Witness signature                    Date

Veritext Legal Solutions

800-726-7007                                                                    305-376-8800

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.