# Exhibit 67

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br><br>Defendants. | Case No. 2:20-cv-00368-JNP-DBP<br><br>**DECLARATION OF PROFESSOR ALLEN FERRELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

<u>**DECLARATION OF PROFESSOR ALLEN FERRELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

**Professor Allen Ferrell** declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an economist and the Greenfield Professor of Securities Law at Harvard Law School in Cambridge, Massachusetts. I submit the Declaration Of Professor Allen Ferrell In Support Of Defendants' Motion For Summary Judgment. I declare that I have personal knowledge of the facts set forth herein and I could and would testify competently thereto if called as a witness at trial.

2.      On or about January 19, 2024, I signed and issued the Rebuttal Report of Professor Allen Ferrell (the "**Rebuttal Report**"). Attached hereto is a true and accurate copy of the Rebuttal Report. I drafted and issued the Rebuttal Report, which contains my expert opinions and sets forth

the analyses that form the basis of my opinions with respect to the report prepared by Daniel S. Bettencourt served on Defendants on or about December 4, 2023.

3.    I have personal knowledge of the facts stated in this Declaration and the facts and opinions contained in the Rebuttal Report. If called as a witness at trial, I could and would competently testify to those facts and opinions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 9, 2024, at Cambridge, Massachusetts.

_____
Professor Allen Ferrell

2

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| GELT TRADING, LTD., a Cayman Islands limited company, | ) ) | Case No. 2:20-cv-00368-CMR |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**REBUTTAL REPORT OF PROFESSOR ALLEN FERRELL**

**January 19, 2024**

## I.      Introduction

1.      I previously issued a report in this matter on December 4, 2023 (the "Ferrell Report") in which I opined that there is no scientific or reliable basis to conclude that the abnormal return on May 1, 2020 is statistically significant.[1]

2.      Also on December 4, 2023, Plaintiff submitted the Report of Daniel S. Bettencourt (the "Bettencourt Report") in which he was asked to (i) opine on whether investors who purchased Co-Diagnostics' common stock "suffered losses as a result of the alleged misrepresentations and omissions described in the Second Amended Class Action Complaint" and (ii) "compute damages, if any, suffered by Class members from their investments in the common stock of Co-Diagnostics made during the period from 1 May 2020 through 14 May 2020, inclusive."[2] I have been asked by counsel for the Defendants to, among other things, review and respond to Mr. Bettencourt's conclusions.

3.      My testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.      I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,500, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

5.      Below I first summarize: (i) Plaintiff's allegations; (ii) Mr. Bettencourt's opinions;

---

[1]     Ferrell Report ¶ 11. The Ferrell Report includes my qualifications and defines certain capitalized terms.
[2]     Bettencourt Report ¶¶ 1 and 2.

and (iii) my assignment and conclusions. I then present the bases for my conclusions in the subsequent sections.

## II.   Summary of Plaintiff's Allegations, Mr. Bettencourt's Opinions, and My Assignment and Conclusions

### A.   Summary of Plaintiff's Allegations

6.      Lead Plaintiff Gelt Trading, Ltd. ("Gelt") brings this action on behalf of a class of purchasers of Co-Diagnostics' common stock during the Class Period.[3] Plaintiff alleges that Defendants "made unequivocal statements to the market that [Co-Diagnostics'] Covid-19 tests were 100% accurate…. As was later revealed, however, this was not true…."[4]

7.      Plaintiff claims that the sole alleged misstatement occurred prior to the market open on May 1, 2020 when Co-Diagnostics issued the May 1 Press Release stating:

> Co-Diagnostics, Inc. (Nasdaq: CODX), a molecular diagnostics company with a unique, patented platform for the development of molecular diagnostic tests, today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing. The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations include the India National Institute of Pathology, the Mexican Department of Epidemiology ("InDRE"), and others in the US and abroad. Each study concluded 100% concordance for both specificity and sensitivity. … In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent Satterfield, PhD said, "In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that."[5]

8.      Plaintiff alleges that the May 1 Press Release "materially misstated the accuracy of

---

[3]     Complaint at cover page. Mr. Bettencourt recognizes that the Class Period that Plaintiff pled in the Complaint has been limited to the period from May 1, 2020 through May 14, 2020. Bettencourt Report ¶ 2 n.1.

[4]     Complaint ¶ 7 (emphasis removed).

[5]     "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," *PR Newswire*, May 1, 2020 at 6:30 am ET.

the Company's Covid-19 tests and omitted material information that the Company's tests have problems with their accuracy and are significantly less than 100% accurate" (the "Alleged Misstatement").[6] Plaintiff claims that the Alleged Misstatement was corrected when "third parties revealed *startling* information about Co-Diagnostics' allegedly 100% accurate test" in three separate disclosures on May 14, 2020 (collectively, the "Alleged Corrective Disclosures").[7]

9.      Plaintiff claims that the first alleged corrective disclosure occurred on May 14, 2020 at 9:00 a.m. ET when *The Salt Lake Tribune* published an article ("May 14 SLT Article") stating that TestUtah, which used tests developed by Co-Diagnostics, "declined to join other major Utah labs in a joint experiment to confirm one another's quality."[8] The article further states that TestUtah's tests "have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury."[9] The article also discussed potential concerns with Covid-19 testing in TestNebraska and TestIowa sites, which also used the Company's Covid-19 diagnostics tests.[10]

10.      Plaintiff claims that the second alleged corrective disclosure occurred on the same day at 12 pm ET, when Iowa Governor Kim Reynolds stated in a press conference ("May 14 Iowa Governor Press Conference") that "I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for

---

[6]   Complaint ¶ 64.
[7]   Complaint ¶¶ 74-77, 83 (emphasis added).
[8]   Complaint ¶ 75; "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020 at 9 am ET, updated at 10:19 am ET, available at https://www.sltrib.com/news/2020/05/14/testutah-declines-join/.
[9]   Complaint ¶ 75; May 14 SLT Article. The *BioCentury* article to which the May 14 SLT Article refers was published on April 1, 2020 (*see infra* ¶ 28).
[10]  Complaint ¶ 76; May 14 SLT Article.

3

determining positives and 99.7 percent accuracy for determining negatives."[11] I refer to this disclosure along with the May 14 SLT Article as the "May 14 Pre-Close Disclosures."

11.     Plaintiff claims that the third alleged corrective disclosure occurred after the market closed on May 14, 2020 when the FDA issued a press release ("FDA Disclosure") "alerting the public to early data that suggest potential inaccurate results from using the Abbott ID NOW point-of-care test to diagnose COVID-19" and stating, among other things, that "[n]o diagnostic test will be 100% accurate due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly."[12]

12.     Plaintiff claims that "Co-Diagnostics stock price fell precipitously as the prior artificial inflation came out of Co-Diagnostics' stock price" as a result of the Alleged Corrective Disclosures, and that because of their purchases of the stock during the Class Period, it and other members of the Class "suffered economic loss, *i.e.*, damages, under the federal securities laws."[13]

13.     The Complaint states that "Gelt purchased and sold Co-Diagnostics' (NASDAQ: CODX) stock as follows:"

> On May 13, 2020, Gelt purchased 7,000 shares of CODX stock at a price of $21.20 [at 3:18 pm ET] and sold those shares that same day for $22.12 [at 3:50 pm ET], and also purchased 3,000 shares at a price of $23.42 [at 3:58 pm ET] and sold those shares that same day for $23.68 [at 4:51pm ET]. These trades resulted in a net gain of $7,171.90.

> On May 14, 2020, Gelt purchased 22,000 shares of CODX at a price of $26.65 [at 6:27 pm ET on May 13, 2020, after market closed] and sold those shares [on May 14, 2020] for $20.97 [at 2:07 pm ET], resulting in a loss of $125,017.77.

---

11   Complaint ¶ 77; Iowa Governor Kim Reynolds Press Conference, May 14, 2020 at 12 pm ET available at https://www.iowapbs.org/shows/governorpress?page=2.
12   Complaint ¶ 83; "Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," *PR Newswire*, May 14, 2020 at 7:44 pm ET.
13   Complaint ¶ 98.

Gelt's alleged net losses equal $117,845.87 during the class period.[14]

14.     Finally, Plaintiff alleges that the Individual Defendants sold the Company's stock to "directly benefit[] from the fraudulent overstatement of the Company's technological capabilities."[15]

### B.   Mr. Bettencourt's Opinions

15.     Mr. Bettencourt assumes that Plaintiff will be able to prove its factual allegations and that the market in which Co-Diagnostics' stock traded was efficient throughout the Class Period.[16] Mr. Bettencourt also claims that:

> Defendants' misstatements, omissions, and conduct, intended to mislead investors and create the false impression that Co-Diagnostics' Covid-19 tests were *perfectly accurate*, misled investors about the true condition of the Company's technology and business prospects and caused the Co-Diagnostics stock price to be artificially inflated. The corrective disclosures informed the market that, contrary to what the market had been led to believe, the accuracy of the Company's Covid-19 test was not 100%, and the Company's condition and prospects were worse than what they had been led to believe.[17]

> Given that Co-Diagnostics stock traded in an efficient market, it follows that misrepresentations and omissions about the accuracy of the Company's Covid-19 test caused the price of Co-Diagnostics stock to be artificially inflated.[18]

16.     With respect to loss causation, Mr. Bettencourt concludes:

> The alleged misrepresentations, omissions, and deceptive conduct caused the price of Co-Diagnostics stock to be artificially inflated over the course of the Class Period. When disclosures ultimately informed investors and the public that they had been misled by the alleged misrepresentations and omissions, the artificial inflation dissipated, the stock price declined, and investors sustained losses.[19]

He further opines:

> The conclusion that the alleged misrepresentations and omissions caused investors to suffer losses is based on fundamental principles of finance, on

---

14     Complaint ¶¶ 32-33 and GELT0000001-20 at 1.
15     Complaint ¶ 90.
16     Bettencourt Report ¶ 5.
17     Bettencourt Report ¶ 17 (emphasis added).
18     Bettencourt Report ¶ 18.
19     Bettencourt Report ¶ 16.

analysis of Company statements, news articles, and on event study analysis. Event study analysis, which considers potentially confounding information, *proves* that the alleged misrepresentations and omissions caused the price of Co-Diagnostics stock to be artificially inflated prior to the corrective disclosures, as the event study demonstrates that the corrective disclosures caused Co-Diagnostics' stock price to decline. Thus, the misrepresentations and omissions caused investor losses.[20]

17.    With respect to damages, Mr. Bettencourt opines that it is appropriate to "examine[] 14 May 2020 and 15 May 2020 together, as a two-day event window."[21] Consequently, despite the fact that his event study finds that the abnormal return on May 14, 2020 is not statistically significant, he opines that the two-day abnormal return is statistically significant.[22] Mr. Bettencourt then uses the abnormal return estimated over these two days to measure total artificial inflation that purportedly was removed from Co-Diagnostics' stock price by purportedly corrective information.[23] He concludes that "on account of Defendants' misrepresentations and omissions, the Company's stock price was inflated by up to $6.42 per share during the Class Period."[24] Mr. Bettencourt also "determined that the artificial inflation was embedded in the stock price on the first day of the Class Period … [and] that artificial inflation increased on 13 May 2020, when *Bloomberg* reported that the FDA was reviewing the New York University study that had raised doubts about the accuracy of Abbot's [*sic*] ID NOW Covid-19 test."[25] He uses Co-Diagnostics' abnormal return on May 13, 2020 to measure artificial inflation entering Co-Diagnostics' stock on May 13, 2020 as $6.28.[26] Mr. Bettencourt measures artificial inflation entering Co-Diagnostics' stock on May 1, 2020 as $0.13, the difference between the share price declines he estimates occurred when the Alleged Corrective

---

[20]    Bettencourt Report ¶ 20 (emphasis added).
[21]    Bettencourt Report ¶ 92.
[22]    Bettencourt Report ¶¶ 111 & 114.
[23]    Bettencourt Report ¶¶ 124-126.
[24]    Bettencourt Report ¶ 23. Of the $6.42 decline, $5.10 occurred on May 15, 2020. *Id.* ¶ 112.
[25]    Bettencourt Report ¶ 134.
[26]    Bettencourt Report ¶ 136.

Disclosures were made less the $6.28 per share of artificial inflation that purportedly entered the stock price on May 13, 2020.[27]

### C. Assignment and Summary of Opinions

18.     I have been retained by counsel for the Defendants to (i) review and analyze the Bettencourt Report's analyses and conclusions; (ii) review and analyze Lead Plaintiff's trading records; and (iii) review and analyze Defendants' trading records.

19.     Based on my professional experience, review of the materials in **Appendix B**, and analyses, I have formed the following opinions:

   a. Mr. Bettencourt ignores that market participants understood that investing in Co-Diagnostics' stock was particularly risky.

   b. Mr. Bettencourt's analyses of loss causation and alleged artificial inflation are fundamentally flawed and unreliable.

   c. Mr. Bettencourt ignores that the economic evidence demonstrates that Plaintiff was not harmed by the alleged fraud under its own claims.

   d. Mr. Bettencourt ignores that the individual Defendants' behavior is inconsistent with his opinion that the Alleged Misstatement caused Co-Diagnostics' stock price to be artificially inflated.

## III.    Mr. Bettencourt Ignores that Market Participants Understood that Investing in Co-Diagnostics' Stock Was Particularly Risky

20.     A security's price movements depend on the company's non-diversifiable risk. Riskier securities have greater expected returns but are also more likely to decline in value. In addition, the market value of riskier securities is generally more sensitive to changes in economic conditions.

21.     The claims of common stockholders are the most junior claims in corporations. Creditors and bondholders are examples of more senior claimants. Because all other claims are paid

---

[27]    Bettencourt Report ¶ 137.

first, common stockholders are the residual claimants. Therefore, the value of common stock is generally more sensitive to changes in the value of an issuer. This makes investing in common stock risky.

22.    The risk of common stock generally can be illustrated by comparing the variability of returns from investing in common stock with the variability of returns from investing in less risky assets.  The chart below compares the volatility of an investment in the S&P 500 Index (a diversified portfolio of stocks) with the volatility of an investment in United States Treasury Bills from 1927 to 2019.  The chart shows that the annual returns to investing in the S&P 500 Index are substantially more volatile than U.S. Treasury Bills because of the effect of market factors on the value of firms in the index.



**Chart 1**
**Annual Returns for the S&P 500 and 30 Days U.S. Treasury Bills**
**1927 - 2019**

Source: Morningstar Direct.

8

23.    Likewise, an investment in an individual common stock is generally riskier than an investment in a diversified portfolio, such as the S&P 500 Index, because the businesses of individual firms are less diversified than the market as a whole.  This means that the returns to investing in individual stocks often will be affected by industry- and firm-specific factors that can be diversified away in a large portfolio. Co-Diagnostics' relative riskiness can be illustrated by comparing the daily returns to investing in the Company's shares with the daily returns to investing in the market. As shown in the chart below, the volatility of the Company's stock price was substantially greater than the volatility of the S&P 500 Index prior to the beginning of the Class Period. From January 2, 2020 to April 30, 2020, the standard deviation (i.e., a standard measure of volatility) of S&P 500 was 3.37 percent and the standard deviation of the Company's stock was 24.89 percent, more than seven times higher than the standard deviation of the market index.



**Chart 2**
**Daily Returns for Co-Diagnostics, Inc. and the S&P 500**
**January 2, 2020 to June 30, 2020**

Note: The black vertical lines denote May 1, 2020 and May 15, 2020.
Source: Bloomberg L.P.

24.    As of the beginning of the Class Period, Co-Diagnostics was a company with small revenues and large losses—its revenues for 2019 were less than a quarter of a million and its losses for 2019 were $6.2 million.[28] The Company announced the completion of the development of a Covid-19 test in January of 2020 and announced that it obtained approval to market its test in international markets in February 2020 and in the U.S. in April 2020.[29] With the onset of the Covid-19 pandemic, Co-Diagnostics went from a company with virtually no revenues and large losses to a

---

[28]    2019 Form 10-K at F-3.
[29]    2019 Form 10-K at 5; "Co-Diagnostics, Inc Receives FDA Emergency Use Authorization for COVID-19 Test," *PR Newswire*, April 6, 2020 at 6:30 am ET.

company forecasted to realize millions of dollars in revenues and profits. Co-Diagnostics' median

consensus revenue forecast for the fiscal year 2020 increased from $2.39 million on January 1, 2020

to $19.96 million on April 30, 2020, a more than eightfold increase, and Co-Diagnostics' median

consensus Earning Per Share forecast for the fiscal year 2020 increased from -$0.175 on January 1,

2020 to $0.295 on April 30, 2020, i.e., a change in expectations from losing money to making a

profit almost twice as large as the previously expected loss.[30] This large increase in analysts'

expectations regarding its future revenues and profits demonstrates the significant growth market

participants anticipated before the Class Period began, but also highlights the potential risks that the

Company faced as a high-growth company with an unproven product.

25.    Mr. Bettencourt ignores that these risks (and others) were disclosed in Co-

Diagnostics' SEC filings. For example:

a.    The Company's Form S-1 dated April 28, 2017 states:

We have a limited commercial history upon which to base our prospects, have not
generated revenues or profits and do not expect to generate profits for the
foreseeable future. … Our near-term success is dependent upon our ability to
commence sales of our tests. … If we cannot successfully develop, obtain
regulatory approvals for and commercialize new diagnostic tests, our financial
results will be harmed and our ability to compete will be harmed. … We are subject
to many laws and governmental regulations and any adverse regulatory action may
materially adversely affect our financial condition and business operations. … If
our diagnostic tests do not perform as expected or the reliability of the technology
on which our diagnostic tests are based is questioned, we could experience delayed
or reduced market acceptance of our diagnostic tests, increased costs and damage
to our reputation.[31]

b.    The Company's 2019 Form 10-K states:

The molecular diagnostics industry is extremely competitive. There are many firms
that provide some or all of the products we provide and provide many diagnostic
tests that we have yet to develop. Many of these competitors are larger than us and
have significantly greater financial resources. Because we are not established, many

---

[30]    S&P Capital IQ.
[31]    Co-Diagnostics, Inc., Form S-1, filed on April 28, 2017 at 15-18.

11

of our competitors have a competitive advantage in the diagnostic testing industry because they also have other lines of business in the pharmaceutical industry from which they derive revenues and for which they are well known and respected in the medical profession. We will need to overcome the disadvantage of being a start up with no history of success and no respect of the medical and testing professionals. … Many of these competitors already have an established customer base with industry standard technology, which we must overcome to be successful.[32]

26.    Mr. Bettencourt also ignores that these risks were recognized by the analysts that covered the Company's stock. In particular, a Maxim analyst report dated April 6, 2020 characterized Co-Diagnostics' "Risk Profile" as "Speculative," which it defined as:

Fundamental Criteria: This is a risk rating assigned to early-stage companies with minimal to no revenues, lack of earnings, balance sheet concerns, and/or a short operating history. Accordingly, fundamental risk is expected to be significantly above the industry. Price Volatility: Because of the inherent fundamental criteria of the companies falling within this risk category, the price volatility is expected to be significant with the possibility that the investment could eventually be worthless. Speculative stocks may not be suitable for a significant class of individual investors.[33]

27.    Mr. Bettencourt also ignores that articles discussed the uncertainties surrounding the accuracy of Covid-19 diagnostics tests in general as early as March 2020, which further highlights that market participants were aware of the risks to investing in Co-Diagnostics' stock prior to and during the Class Period. For example:

a.    An article by Johns Hopkins Bloomberg School of Public Health dated March 5, 2020 states:

No diagnostic test ever provides complete certainty. Results exist within a margin of error, expressed as the percentage of true positive cases that are detected (sensitivity), the percentage of true negative results that are detected (specificity), and the lowest detectable concentration at which 95% of all true positive cases are detected (limit of detection). The notion of a "confirmed test" is a myth; the veracity of diagnosis is always an approximation, reflecting the

---

[32]    Co-Diagnostics, Inc. Form 10-K for the fiscal year ended December 31, 2019, filed on March 30, 2020 ("2019 Form 10-K") at 13-14.

[33]    "FDA Emergency Use Authorization Granted for Logix Smart COVID-19 Test – Maintain Hold on Valuation," Maxim Group, April 6, 2020 at 1 and 5 (emphasis removed).

degree of uncertainty public health authorities, clinicians and, in the case of an emergency, lawmakers, are willing to accept.[34]

b.  An article in *The Washington Post* dated March 26, 2020 states:

The clamor for long-delayed coronavirus testing is teaching a basic lesson about how all medical tests work: No test is 100 percent accurate.[35]

c.  An article in *The Wall Street Journal* dated April 2, 2020 states:

The sensitivity of the currently available coronavirus tests seems to be lower than other similar tests, said Mike Lozano, a Tampa, Fla.,-based executive at Envision Healthcare Corp., a medical group that contracts to provide care at hospitals. Dr. Lozano said he estimates that the sensitivity of the tests is in the neighborhood of 70%, meaning nearly one in three positive patients walks away with a reassuring negative result.[36]

d.  An article in *The Kansas City Star* dated April 12, 2020 states:

Dr. Anthony Fauci, the national infectious disease expert, says we simply can't know how many Americans have COVID-19 until more of us are tested. But the scarcity of test kits may not be the only reason for the undercount. The testing itself, doctors and researchers are finding, may have troubling flaws. By some estimates, 30 percent of people with the virus aren't flagged by the testing method most commonly used today. So even when the time comes that we do have more test kits, there's a fear that these "false negative" test results will provide a corresponding false level of security, making it more likely that the disease will continue to spread. … Also weighing into the discussion was Dr. David Bluemke, editor of the influential medical journal "Radiology," which has received more than 500 research publications on the disease. One study has gotten a lot of attention. Researchers at the largest hospital in Wuhan, China, monitored more than 1,000 COVID-19 cases during a single month this year. They found that nearly 30 percent who initially tested negative for COVID-19 were later found, through other diagnostic methods, to have contracted the disease. … "COVID testing has a nearly 100 percent detection rate in the lab," [Dr. Bluemke] said in his latest podcast. "But in real life, in people, it's only 70 percent. Why?"[37]

e.  A *Los Angeles Times* article dated May 7, 2020  states:

---

[34]  "The Unknown Unknowns: Diagnosing the New Coronavirus," Johns Hopkins Bloomberg School of Public Health, March 5, 2020.

[35]  "A 'negative' coronavirus test result doesn't always mean you aren't infected," *The Washington Post*, March 26, 2020.

[36]  "Questions About Accuracy of Coronavirus Tests Sow Worry," *The Wall Street Journal*, April 2, 2020.

[37]  "If test says you have coronavirus, believe it. If it's negative, don't be so sure," *The Kansas City Star*, April 12, 2020.

The concept of risk determination requires us to face the reality of uncertainty. Tests are rarely 100% accurate. Existing tests for COVID-19 appear to be falsely negative in many who have the disease.[38]

f.  A *Today* article dated May 11, 2020 states:

As Singapore ramps up its testing, [founder and chief executive of JN Medsys, a life science company in Singapore,] Dr Ng said that labs have already put in place strict processes to ensure the accuracy of results. However, while the RT-PCR test is the most accurate test for Covid-19 for now, a 100 per cent accuracy rate will be impossible. Dr Ng said that it is already a good sign that only 35 false positives were detected out of all the tests done to date.[39]

28.  Mr. Bettencourt ignores that market participants also discussed the uncertainties surrounding the accuracy of Co-Diagnostics' Covid-19 diagnostics tests in particular both prior to and during the Class Period, which also highlights that market participants were aware of the risks to investing in the Company's stock prior to and during the Class Period. For example:

a.  An H.C.Wainwright analyst report dated March 18, 2020 states:

We remind investors that [Co-Diagnostics'] Logix Smart COVID-19 test has 99.2% sensitivity and 100% specificity.[40]

b.  A study published by *BioCentury* dated April 1, 2020 states that Co-Diagnostics' Covid-19 diagnostics tests had a higher limit of detection than most other tests examined.[41]

c.  An article in *The Salt Lake Tribune* dated April 30, 2020, which cites the *BioCentury* article, states:

---

[38]  "Commentary: Evaluating risk and medical treatment in the time of coronavirus," *Los Angeles Times*, May 7, 2020 at 2:28 pm ET. According to Mr. Bettencourt's event study, the abnormal return on May 7, 2020 is 2.94 percent and is not statistically significant with a *t*-statistic of 0.43. Bettencourt Report Exhibit-6.

[39]  "Explainer: False positives in Covid-19 tests and the risk of errors as Singapore moves towards mass testing," *Today*, May 11, 2020 at 1:24 pm ET. According to Mr. Bettencourt's event study, the abnormal return on May 11, 2020 is 9.51 percent and is not statistically significant with a *t*-statistic of 1.40. Bettencourt Report Exhibit-6.

[40]  "U.S. Coronavirus Test Shipments Slated to Expand; Reiterate Buy," H.C.Wainwright&Co, March 18, 2020. I note that Plaintiff claims that an accuracy rate of 99% "was not the same, and not remotely as valuable, as a 100% accurate test … because the widespread administration of a Covid-19 test that is even minimally inaccurate can have highly adverse public health consequences." Complaint ¶ 86.

[41]  "Limits of detection for FDA-authorized Covid-19 diagnostics," *BioCentury*, April 1, 2020. Limit of detection is the lowest detectable number of virus copies in a sample at which a test will return a positive result 95 percent of the time. Food and Drug Administration, Guidance for Industry and FDA Staff, Establishing the Performance Characteristics of In Vitro Diagnostic Devices for the Detection or Detection and Differentiation of Influenza Viruses - Guidance for Industry and FDA Staff, July 2011 at 15.

The accuracy of coronavirus tests by TestUtah.com[, which uses test kits provided by Co-Diagnostics,] has come into question, with state data showing that the rate of positive results among people tested at its sites is less than half what it is for patients tested elsewhere in the state.[42]

d.  A *Lincoln Journal Star* article dated April 30, 2020 states:

An email from an infectious disease specialist in Utah has drawn scrutiny to the accuracy of coronavirus tests provided by [Co-Diagnostics,] a private company contracted to roll out the same test kits in Nebraska.[43]

e.  An article in *Lincoln Journal Star* dated May 5, 2020 states:

An infectious disease specialist in Utah **has challenged the accuracy** of coronavirus tests provided by [Co-Diagnostics,] the same private company contracted for the same test kits in Nebraska. The tests provided by Nomi Health were reported to possibly require a higher limit of detection to return a positive result, meaning some people who may have contracted COVID-19 would show up as negative. **Utah doctors question accuracy of coronavirus tests provided by Test Nebraska partners.**[44]

f.  A *Lincoln Journal Star* article dated May 11, 2020 states:

[Nebraska's Governor Pete] Ricketts on Monday said the [Co-Diagnostics] tests have been validated at the Test Nebraska lab set up at CHI St. Elizabeth in Lincoln and have a 95% accuracy rate.[45]

g.  The May 14 SLT Article states:

[Co-Diagnostics' tests] have a higher "limit of detection" — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests

---

[42]  "'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions," *The Salt Lake Tribune*, April 30, 2020 at 8:00 am ET, updated at 8:27 pm ET. Although Mr. Bettencourt discusses this article in ¶¶ 36-37 of his report, he ignores that, contrary to his claim that the Alleged Misstatement caused the market to believe that Co-Diagnostics' tests were 100% accurate, the article describes Dr. Satterfield, founder and chief science officer of Co-Diagnostics and a Defendant in this litigation, as saying that "Co-Diagnostics' COVID-19 tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe."

[43]  "Utah doctors question accuracy of coronavirus tests provided by Test Nebraska partners," *Lincoln Journal Star*, April 30, 2020 at 5:21 pm ET. According to Mr. Bettencourt's event study, the abnormal return on the next trading day, May 1, 2020, is 16.44 percent and is statistically significant with a *t*-statistic of 2.35. Bettencourt Report Exhibit-6.

[44]  "Test Nebraska underway with CHI Health St. Elizabeth lab," *Lincoln Journal Star*, May 5, 2020 at 6:53 pm ET (emphasis in original). According to Mr. Bettencourt's event study, the abnormal return on the next trading day, May 6, 2020, is 3.03 percent and is not statistically significant with a *t*-statistic of 0.45. Bettencourt Report Exhibit-6.

[45]  "Senators call on governor to end Test Nebraska contracts," *Lincoln Journal Star*, May 11, 2020, 5:45 pm ET. According to Mr. Bettencourt's event study, the abnormal return on the next trading day, May 12, 2020, is -1.12 percent and is not statistically significant with a *t*-statistic of -0.16. Bettencourt Report Exhibit-6.

15

approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury.

h.  The May 14 Iowa Governor Press Conference states:

I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives.

## IV.  Mr. Bettencourt's Analyses of Loss Causation and Alleged Artificial Inflation Are Fundamentally Flawed and Unreliable

### A.  The May 14 Pre-Close Disclosures

29.  Plaintiff alleges that the Alleged Misstatement was partially corrected when third parties made certain disclosures during market hours on May 14, 2020 through (i) the publication of the May 14 SLT Article and (ii) the May 14 Iowa Governor Press Conference.[46] Mr. Bettencourt concludes that these two alleged corrective disclosures caused Co-Diagnostics investors to suffer losses.[47] Mr. Bettencourt's conclusion is fundamentally flawed and unreliable for several reasons.

30.  First, Mr. Bettencourt's own event study analysis found that the abnormal return on May 14, 2020 is not statistically significant (i.e., abnormal return is -5.81 percent with a $t$-statistic of -0.86, far from the threshold of -1.96).[48] Hence, according to his own analysis, there is no reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock on May 14, 2020 was impacted by the May 14, 2020 Trading Day Disclosures, and thus there is no reliable and scientific

---

[46]  Complaint ¶¶ 75-77.

[47]  Bettencourt Report ¶ 116.

[48]  Bettencourt Report Exhibit-6. Mr. Bettencourt employs an event study "to determine whether the alleged misrepresentations and omissions caused investors to suffer losses by testing whether the subject security price fell as a result of corrective disclosures." *Id.* ¶ 65. He describes the event study as a technique that "investigates whether a security price reacted to the release of new information" and states that "[a] statistically significant security price reaction in response to the release of new information indicates that the new information caused the change in price." *Id.* ¶ 80. Mr. Bettencourt denotes statistical significance using the 95% confidence level (*see id.* Note to Exhibit-6), which means an abnormal return that is associated with a "$t$-statistic" (i.e., a standardized measure of statistical significance) of greater than the critical value of +/- 1.96 is considered statistically significant. In other words, if a $t$-statistic associated with allegation-related information is between -1.96 and 1.96, event study analysis finds that the security price movement is explainable by market and/or industry factors or due to random volatility alone, and thus there is an insufficient scientific basis to conclude that the allegation-related information impacted the company's stock price.

16

evidence to conclude that these alleged corrective disclosures caused Co-Diagnostics' investors to suffer losses, or to infer that the Alleged Misstatement caused or maintained artificial inflation in the stock price on May 1, 2020.[49]

31.    Second, Mr. Bettencourt ignores that, contrary to his claim that the Alleged Misstatement caused the market to believe that Co-Diagnostics' tests were "perfectly accurate" with an accuracy of "100%,"[50] market participants were aware that Covid-19 diagnostics tests in general and Co-Diagnostics' Covid-19 diagnostics tests in particular were not 100 percent accurate prior to the May 14 Pre-Close Disclosures.[51] He specifically notes but disregards the fact that Nebraska's governor stated on May 11, 2020 that the Test Nebraska lab's validation showed Co-Diagnostics' tests "have a 95% accuracy rate," which is the same accuracy rate Mr. Bettencourt claims was corrective information when stated by Iowa's governor on May 14, 2020.[52] If the Company's stock traded in an efficient market as Mr. Bettencourt assumes,[53] then its price should not have reacted to the repetition of information that was previously disclosed.[54] In other words, the May 14 Pre-Close

---

[49]    Co-Diagnostics' trading was halted for 15 minutes on May 14, 2020: (i) from 1:25 pm ET to 1:30 pm ET and (ii) from 1:48 pm ET to 1:58 pm ET. Bloomberg L.P. The Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Memorandum Decision and Order Partially Granting Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, Case No. 2:20-CV-00368-JNP-DBP, filed on August 18, 2023 states at 10: "Putting aside the fact Gelt has offered a compelling explanation as to why its expert report determined that the drop in price on May 14 was not statistically significant and why this lack of statistical significance does not matter—trading was halted twice in order to slow the rapid depreciation of Co-Diagnostics' stock value—the Supreme Court has been crystal clear that 'securities fraud plaintiffs should not be required to prove loss causation in order to . . . achieve class certification.'" However, Co-Diagnostics' trading volume of 17,865,176 shares from the end of the second trading halt at 1:58 pm ET on May 14, 2020 to the close of the market on that day was almost three times more than the average daily trading volume of 6,622,946 shares in May 2020 (excluding May 1, May 14, and May 15, 2020). Bloomberg L.P.; Tick API. Accordingly, the amount of trading volume from the end of the trading halts to the close on May 14, 2020 is inconsistent with a claim that the trading halts on May 14, 2020 impeded Co-Diagnostics' stock price from fully incorporating the information in the May 14 Pre-Close Disclosures within the trading day on May 14, 2020.

[50]    *See supra* ¶ 15.

[51]    *See supra* ¶¶ 27-28.

[52]    Bettencourt Report ¶¶ 41-42, 85.

[53]    Bettencourt Report ¶ 5.

[54]    As Plaintiff's expert Dr. Werner, who opined on the efficiency of the market for Co-Diagnostics' stock during the Class Period, states: "In essence, a security trades in an efficient market when all publicly available information is

Disclosures could not have caused a stock price decline because they did not provide information that was inconsistent with previously disclosed information that, in an efficient market, was already reflected in the stock price.

32.     Third, rather than causing an immediate decline in Co-Diagnostics' stock price as one would expect in an efficient market if information was "startling" as Plaintiff claims,[55] news articles noted that the price *increased* in the morning and early afternoon of May 14, 2020 following the May 14 Pre-Close Disclosures. For example:

a.   An *RTT News* article published on May 14, 2020 at 9:58 am ET states: "Shares of Co-Diagnostics, Inc. (CODX), a molecular diagnostics company, are climbing more than 15 percent or $3.58 in Thursday's morning trade at $27.00, after earlier rising to a new 52-week high of $28.81 despite no stock-specific news."[56]

b.   A *Benzinga* article published on May 14, 2020 at 12:55 pm ET states: "Co-Diagnostics, Inc. (NASDAQ: CODX) rose 13.3% to $26.52 after surging 38% on Wednesday."[57]

c.   A *TheFlyOnTheWall.com* article published on May 14, 2020 states: "In afternoon trading, shares of Co-Diagnostics are up $2.17, or 9.25%, to $25.59."[58]

33.     Hence, the economic evidence is inconsistent with Mr. Bettencourt's opinion that the May 14 Pre-Close Disclosures removed artificial inflation purportedly created or maintained by the Alleged Misstatement from Co-Diagnostics' stock price and caused Class members to suffer losses.

> B.   Mr. Bettencourt's Claim of Additional Purportedly Corrective Information During the Trading Day on May 14, 2020

34.     Contrary to the disclosures identified by Plaintiff that it claims corrected the Alleged

---

incorporated in the security price and any new information that impacts the economic outlook of the firm gets quickly reflected in its security price. … To the extent that the new information may have been expected, or the valuation impact of the new information is appropriately modest, the appropriate abnormal price return should be statistically insignificant." Werner Declaration ¶¶ 14 and 45.

[55]   Complaint ¶ 74.

[56]   "Stock Alert: Co-Diagnostics Hits New 52-week High," *RTT News*, May 14, 2020 at 9:58 am ET, available at https://www.rttnews.com/3096050/stock-alert-co-diagnostics-hits-new-52-week-high.aspx.

[57]   "44 Stocks Moving In Thursday's Mid-Day Session," *Benzinga*, May 14, 2020 at 12:55 pm ET.

[58]   "13:40 EDT Nebraska senators want to void $27M in COVID testing contracts, KUTV reports," *TheFlyOnTheWall.com*, May 14, 2020 at 1:40 pm ET.

Misstatement, Mr. Bettencourt unilaterally asserts that a series of tweets made on May 14, 2020 at 1:38 pm ET by a short seller, Hindenburg Research ("Hindenburg"),[59] also provided corrective information.[60] Hindenburg first tweeted: "We are short $CODX due to its CFO's checkered history, involvement with companies halted by the SEC, its astronomical valuation, a growing list of higher quality COVID tests & its propensity to issue frequent fluffy press releases."[61] Mr. Bettencourt claims that subsequent tweets "assert[ed] that Co-Diagnostics' Covid-19 testing quality was deemed 'one of the worst' and labeled the Company as a 'third-tier option of questionable quality' compared to its rivals."[62]

35.     Mr. Bettencourt's claim is flawed for several reasons. Aside from the fact that Plaintiff does not allege that the tweets contained any corrective information, the first tweet on its face explains that Hindenburg is short Co-Diagnostics' stock due to factors that are *not* alleged to be misstated in the Complaint.[63] If anything, this tweet implies that the Alleged Misstatement is one of "frequent" and "fluffy" press releases.

36.     Regarding the subsequent tweets that Mr. Bettencourt cites, it is clear that they merely represent the short seller's opinion based on publicly available information. First, Hindenburg's claim that Co-Diagnostics' test quality is rated "one of the worst" is based on the same *BioCentury* article published on April 1, 2020 that I discuss *supra* ¶ 28.[64] Second, Hindenburg

---

[59]   Hindenburg Research Twitter feed, May 14, 2020 at 1:38 pm ET available at https://twitter.com/HindenburgRes/status/1260987928064536583?lang=en.

[60]   Bettencourt Report ¶¶ 83, 86.

[61]   Hindenburg Research Twitter feed, May 14, 2020 at 1:38 pm ET available at https://twitter.com/HindenburgRes/status/1260987928064536583?lang=en; Bettencourt Report ¶ 52.

[62]   Bettencourt Report ¶¶ 52, 86.

[63]   I note that even if Mr. Bettencourt were to establish that the Hindenburg tweets contained corrective information and caused a decline in Co-Diagnostics' stock price, which he has not, he fails to parse out the portion that he claims is related to the Alleged Misstatement, if any, from the portion related to other information.

[64]   *Compare supra* ¶ 28.a. *with* Hindenburg Research Twitter feed, May 14, 2020 at 1:38 pm ET available at https://twitter.com/HindenburgRes/status/1260987928064536583?lang=en. I note that the *BioCentury* article was cited in the article published by *The Salt Lake Tribune* on April 30, 2020 that Mr. Bettencourt discusses

19

states: "We believe $CODX provides a third-tier option of questionable quality amidst a sea of growing competition. The FDA lists ~100 tests that have received Emergency Use Authorizations: https://fda.gov/medical-devices/emergency-situations-medical-devices/emergency-use-authorizations."[65] Consequently, Mr. Bettencourt fails to explain how opinions by Hindenburg – which I understand the Defendants did not share – that are based on publicly available information "corrects" the Alleged Misstatement and represents information that the Defendants allegedly could and should have disclosed on May 1, 2020. He further, and again, fails to explain why the repetition of information that was previously disclosed had an impact on the stock's price in the efficient market in which he assumes Co-Diagnostics' stock traded.

37.    Hence, the economic evidence is inconsistent with Mr. Bettencourt's opinion that the Hindenburg tweets removed artificial inflation purportedly created or maintained by the Alleged Misstatement from Co-Diagnostics' stock price and caused Class members to suffer losses.

### C.    The FDA Disclosure

38.    Plaintiff also alleges that the Alleged Misstatement was partially corrected through the FDA Disclosure.[66] Mr. Bettencourt concludes that this alleged corrective disclosure caused Co-Diagnostics' investors to suffer losses.[67] His conclusion is fundamentally flawed and unreliable because it is pure speculation and inconsistent with economic evidence he disregards.

39.    First, prior to the FDA Disclosure, market participants understood that Covid-19 diagnostics tests in general and Co-Diagnostics' Covid-19 diagnostics tests in particular were not

---

(Bettencourt Report ¶¶ 36-37) as well as in the May 14 SLT Article published at 9:00 am ET, many hours before the Hindenburg tweets.

[65]    Hindenburg Research Twitter feed, May 14, 2020 at 1:38 pm ET available at https://twitter.com/HindenburgRes/status/1260987928064536583?lang=en.

[66]    Complaint ¶ 83.

[67]    Bettencourt Report ¶ 116.

100 percent accurate.[68] If the Company's stock traded in an efficient market as Mr. Bettencourt assumes, then its stock could not have reacted to the repetition of information that was previously disclosed.

40.    Second, despite the fact that his opinions are in part based on his analysis of "news articles" and "commentary by market participants,"[69] Mr. Bettencourt does not cite *any* news article, analyst report, or other market commentary that relates the FDA Disclosure to the accuracy of Co-Diagnostics' Covid-19 test or attributes it as the cause of the stock price decline on May 15, 2020 to support his conjecture. Instead, he documents that even in the week after the FDA Disclosure, market participants did not recognize the FDA Disclosure (or any other purported corrective information) as having changed their expectations of the Company's prospects.[70]

41.    Third, Mr. Bettencourt acknowledges that Co-Diagnostics reported its Q1 2020 financial results after market hours on May 14, 2020,[71] but ignores the negative impact of this announcement on Co-Diagnostics' stock price on May 15, 2020.[72] In particular, shortly after the market closed on May 14, 2020, Co-Diagnostics announced its Q1 2020 financial results.[73] The Company reported lower earnings but higher revenues relative to analysts' consensus forecasts.[74]

---

[68]    *See supra* ¶¶ 27-28.

[69]    Bettencourt Report ¶¶ 20, 62.

[70]    Bettencourt Report ¶ 61 (citing a May 20, 2020 Maxim Group analyst report titled "COVID-19 Testing Has Been Transformative for Co-Diagnostics, Raising Revenue Forecast and Upgrading to Buy, with a $30 PT.").

[71]    Bettencourt Report ¶ 56.

[72]    Bettencourt Report ¶ 116 stating "Based on i) the nature of the information disclosed throughout the day on 14 May 2020, which corrected the prior alleged misrepresentations and omissions, ii) financial valuation principles and market commentary, iii) **the absence of any economically material negative confounding news**, and iv) the statistical significance of the share price decline on 14-15 May 2020 which was precipitated by the 14 May 2020 corrective disclosures, which sum to $6.42 per share, I conclude that the alleged misrepresentations and omissions caused these investor losses" (emphasis added).

[73]    "Co-Diagnostics, Inc. Announces Q1 2020 Results and Provides Mid-Second Quarter Update," *PR Newswire*, May 14, 2020 at 4:01 pm ET.

[74]    *See*, e.g., "Stock Market Shows Bullish Rebound After Sharp Sell-Off; AMD, Facebook Set Up To Move Higher," *Investor's Business Daily*, May 14, 2020 at 5:27 pm ET (stating "Co-Diagnostics reported mixed quarterly results. The company's loss widened to 5 cents per share, missing estimates for a loss of 4 cents. Sales topped analyst estimates. The stock tumbled more than 20% to 17.68 in the after-hours session.").

Co-Diagnostics cancelled its earnings call scheduled for 4:30 pm ET on the same day "[d]ue to overwhelming participation on the call" resulting in the conference call service being "unable to accommodate the traffic."[75] Instead, the Company issued a press release with its prepared remarks for the Q1 2020 conference call at 6:01 pm ET on the same day.[76]

42.     In contrast to the FDA Disclosure, news articles attributed the Company's stock price decline after market hours on May 14, 2020 and on May 15, 2020 to the announcement of the Q1 2020 financial results. For example:

a.  An *Investor's Business Daily* article dated May 14, 2020 states:

Earnings To Watch: Applied Materials, Co-Diagnostics Meanwhile, earnings season continues to be a driving force behind big stock moves. After the stock market close, chip giant Applied Materials and coronavirus test maker Co-Diagnostics reported their quarterly earnings results. … Co-Diagnostics reported mixed quarterly results. The company's loss widened to 5 cents per share, missing estimates for a loss of 4 cents. Sales topped analyst estimates. The stock tumbled more than 20% to 17.68 in the after-hours session.[77]

b.  An *Impact Financial News* article dated May 15, 2020 states:

Co-Diagnostics, Inc. CODX shares fell 13.5% to $19.15 in pre-market trading after reporting Q1 results.[78]

c.  A *Benzinga.com* article dated May 15, 2020 states:

Co-Diagnostics, Inc. (NASDAQ: CODX) shares fell 19.8% to $17.76 after reporting Q1 results.[79]

43.     Hence, the economic evidence is inconsistent with Mr. Bettencourt's opinion that the FDA Disclosure removed artificial inflation purportedly created or maintained by the Alleged

---

[75]  "Co-Diagnostics, Inc. Announces Q1 2020 Results and Provides Mid-Second Quarter Update," *PR Newswire*, May 14, 2020 at 4:01 pm ET; "Press Release: Co-Diagnostics, Inc. Releases Prepared Remarks for First Quarter 2020 Conference Call," *Dow Jones Institutional News*, May 14, 2020 at 6:01 pm ET.

[76]  "Press Release: Co-Diagnostics, Inc. Releases Prepared Remarks for First Quarter 2020 Conference Call," *Dow Jones Institutional News*, May 14, 2020 at 6:01 pm ET.

[77]  "Stock Market Shows Bullish Rebound After Sharp Sell-Off; AMD, Facebook Set Up To Move Higher," *Investor's Business Daily*, May 14, 2020 at 4:26 pm ET.

[78]  "Co-Diagnostics, Inc. falls 13.5% in premarket," *Impact Financial News*, May 15, 2020.

[79]  "50 Stocks Moving In Friday's Mid-Day Session," *Benzinga.com*, May 15, 2020 at 12:31 pm ET.

Misstatement from Co-Diagnostics' stock price and caused Class members to suffer losses.[80]

### D.   Mr. Bettencourt's Use of a Two-Day Event Window

44.   Mr. Bettencourt claims that a two-day event window is appropriate given "the sequence of the disclosures, that the disclosures were a 'less regular' form of information releases from various third-party sources, that the disclosures were at odds with what the market had been led to believe, and that the disclosures were met with countervailing denials by Co-Diagnostics."[81] In support of his claim, he cites finance literature and "empirical studies."[82] Mr. Bettencourt's claim is nonsensical and unsupported for several reasons.

45.   First, Mr. Bettencourt fails to identify *any* "countervailing denials" during the trading day on May 14, 2020, let alone any other information that would have prevented the stock price from falling if the market had determined that the information in the May 14 Pre-Close Disclosures, which Plaintiff characterizes as "startling," was new and value-relevant.[83]

46.   Second, because Mr. Bettencourt ignores information about Co-Diagnostics' tests that was already publicly disclosed, he fails to establish that the allegedly corrective information was inconsistent with the market's understanding of the tests' accuracy. In the efficient market in which he assumes Co-Diagnostics' stock traded, all of the publicly available information regarding the Company's tests described above already would have been reflected in the stock's price.

47.   Third, Mr. Bettencourt mischaracterizes the finance literature he cites to support his

---

[80]   As explained *supra* ¶ 17, Mr. Bettencourt opines that the amount of alleged artificial inflation entering Co-Diagnostics' stock price on May 1, 2020 due to the Alleged Misstatement was $0.13. I note that if the finder of fact determines that even as little as $0.13 of the $5.10 decline in the stock price on May 15, 2020 – or 2.5 percent – is not attributable to the Alleged Corrective Disclosures, then under Mr. Bettencourt's own analysis, the price increase on May 1, 2020 attributable to the Alleged Misstatement is zero, i.e., in that event, all of the purported inflation would have entered the stock price on May 13, 2020 under his analysis.

[81]   Bettencourt Report ¶ 92.

[82]   Bettencourt Report ¶¶ 89-91.

[83]   Complaint ¶ 74.

use of a two-day event window. Specifically:

a. <u>Patell and Wolfson (1984)</u>: Mr. Bettencourt cites this article for the proposition that "'less regular' information releases could impact stock prices over a period longer than one day."[84] However, he ignores that this statement is not based on the empirical findings of the paper but rather is part of caveats the authors provide, and that the authors do not present a reliable way to determine which "less regular" information requires more time, let alone why the market would take longer to begin to react to information Plaintiff describes as "startling."[85] In contrast, the authors conclude that "our empirical results are consistent with the notion that the stock market impounds publicly available information 'very quickly.'"[86]

b. <u>Tabak and Dunbar (2001)</u>: Mr. Bettencourt cites this paper for its assertion that "many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement," but it does not explain under what circumstances a particular window should be used.[87] Moreover, his citation omits the explanation that the event window is often cut short when there is "another news announcement, or confounding event, within the event window… so that it does not include the effects of the confounding event"[88] which, as discussed *supra* ¶¶ 41-43, is exactly what happened in this matter when Co-Diagnostics released its financial results after the market closed on May 14, 2020.

c. <u>McKinlay (1997)</u>: Mr. Bettencourt cites this article because it states that "[i]n practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement."[89] Yet again, he omits relevant information, i.e., the very next sentence which explains that "[t]his captures the price effects of announcements which occur after the stock market closes on the announcement day."[90] The May 14 Pre-Close Disclosures were issued hours before the

---

[84] Bettencourt Report ¶ 89.

[85] Patell, J., and M. Wolfson, 1984, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (2), 223-252 ("Patell and Wolfson (1984)") at 250.

[86] Patell and Wolfson (1984) at 250. Dr. Werner also explained that in an efficient market, "any new information that impacts the economic outlook of the firm gets quickly reflected in its security price." Werner Declaration ¶ 14.

[87] Bettencourt Report ¶ 91; Tabak, D., and F. Dunbar, 2001, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2001 ("Tabak and Dunbar (2001)").

[88] Tabak and Dunbar (2001) at 19.4 stating "Occasionally, there is another news announcement, or confounding event, within the event window. When this occurs, the event window is often cut short so that it does not include the effects of the confounding event."

[89] Bettencourt Report ¶ 91; MacKinlay, A.C., 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35(1), 13-39 ("MacKinlay (1997)").

[90] MacKinlay (1997) at 14-15 stating "The initial task of conducting an event study is to define the event of interest and identify the period over which the security prices of the firms involved in this event will be examined—the event window. For example, if one is looking at the information content of an earnings with daily data, the event will be the earnings announcement and the event window will include the one day of the announcement. It is customary to define the event window to be larger than the specific period of interest. This permits examination of periods surrounding the event. In practice, the period of interest is often expanded to multiple days, including at

market closed, the last at 12 pm ET; even with the trading halts, the market traded after this disclosure for almost four hours before closing.[91] Given that the empirical evidence in an article Mr. Bettencourt cites finds that the stock market impounds publicly available information "very quickly," there is no reason to believe that Co-Diagnostics' stock price did not fully reflect the allegedly corrective information on May 14, 2020.

d. <u>Ferrell and Saha (2007)</u>: Mr. Bettencourt cites a paper I co-authored which states that "[i]f the stock price reaction in the days, weeks and months following a corrective disclosure are due to the market inferring additional information about the misrepresentation's implications for a firm's valuation, then these stock price movements occurring after the corrective disclosure date identified by the plaintiffs should analytically be deemed to be additional corrective disclosures."[92] I do not understand why he believes my article supports his opinions because clearly I did not mean that an efficient market could take days, weeks, and months to reflect new information. Rather, I explain that over time, *additional* related information may inform the market, particularly regarding the recovery of the stock price because "[i]n a number of circumstances, the stock price of the firm recovers, at least partially, in the immediate post-corrective disclosure period" which "is analytically distinct from the 'cap' on damages contained in section 21D of the Securities Exchange Act of 1934" described in Bettencourt Report ¶¶ 119-120.[93]

e. <u>Cornell and Morgan (1990)</u>: Mr. Bettencourt cites this article that discusses "a fraud which is revealed slowly over time," which has been used as the basis for a so-called "leakage model" over a lengthy period, ignoring that the allegations he assumes are true do not conform to that fact pattern.[94] Rather, he assumes that the allegedly corrective information was "startling," implying that the information should have had an immediate effect.[95]

48.    Fourth, Mr. Bettencourt's own event study analysis finds that the abnormal return on the first of the two-day event window (i.e., on May 14, 2020) is not statistically significant and only the abnormal return on the second of the two-day event window (i.e., on May 15, 2020) is

---

least the day of the announcement and the day after the announcement. In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement. **This captures the price effects of announcements which occur after the stock market closes on the announcement day.**" (with the bolded part being excluded from Bettencourt Report ¶ 91).

[91] The market traded for 225 minutes between noon and 4 pm ET. This calculation excludes the two trading halts totaling 15 minutes on May 14, 2020. Bloomberg L.P.

[92] Bettencourt Report ¶ 91; Ferrell, A., and A. Saha, 2007, "The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of Dura Pharmaceuticals v. Broudo," *Business Lawyer* 63(1), 163-186 ("Ferrell and Saha (2007)").

[93] Ferrell and Saha (2007) at 175.

[94] Bettencourt Report ¶ 91; Cornell, B., and R.G., Morgan, 1990, "Using Finance Theory to Measure Damages in Fraud on The Market Cases," *UCLA Law Review* 49(2), 591-615, 883-924.

[95] Complaint ¶ 74.

statistically significant.[96] None of the literature he cites demonstrates that it is appropriate to use a two-day window when the first day is not statistically significant as he does. Rather, finance literature suggests that cumulating returns over multiple days in an event study when the first-day abnormal return is not statistically significant is inappropriate.[97] For example:

a.  Rinaudo and Saha (2014) examine intraday intervals using an event study analysis and state: "Needless to say, if the initial CAR [Cumulative Abnormal Return] (denoted by CAR0) is found to be statistically insignificant, then the information contained in the event at issue would not be deemed material."[98]

b.  Cowan et al. (2020) state: "The investigator first chooses an event window. This window should include the time during which the public revelation of the misstatement or misrepresentation is released and incorporated in prices and perhaps one or two (trading) days on either side. However, care must be taken in the selection of the event window; the more efficient the market, the faster the information would be expected to be absorbed into the price. Guidance is provided for this from the District Court's decision following Halliburton II… As the Northern District of Texas observed on remand after the Supreme Court decided Halliburton II: '[I]n this case, the use of a two-day window is inappropriate to measure price impact in an efficient market. An efficient market is said to digest or impound news into the stock price in a matter of minutes; therefore, an alleged corrective disclosure released to the market at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged correct disclosure.'"[99]

49.    The inappropriateness of Mr. Bettencourt's use of a two-day event window is further illustrated by the fact that if he were to combine the May 15, 2020 abnormal return with *any* of the other daily abnormal returns in May 2020 that occurred after the end of the Class Period, he would find the two-day cumulative abnormal return to be statistically significant. In particular, cumulating the May 15, 2020 negative abnormal return with the largest *positive* abnormal return during this

---

[96]  Bettencourt Report Exhibit-6.
[97]  Mr. Bettencourt's event study shows a statistically nonsignificant abnormal return for May 14, 2020 and a statistically significant return for May 15, 2020. Bettencourt Report Exhibit-6.
[98]  Rinaudo A. and A. Saha, 2014, "An intraday event study methodology for determining loss causation," *The Journal of Financial Perspectives* 2(2), 161-173 at 167.
[99]  Cowan, A.M., P.J. Seguin, and S.T. Malone, 2020, "Event Studies in Securities Litigation," Chapter 47 of *The Comprehensive Guide to Economic Damages*, 6th Edition, edited by Fannon, N.J. and J.M. Dunitz, Business Valuation Resources at 1028.

period of 7.1% on May 19, 2020 – which is 22% greater in magnitude than the -5.8% abnormal return on May 14, 2020 but in the opposite direction – also results in a finding that the two-day cumulative abnormal return is statistically significant.[100] Consequently, Mr. Bettencourt's finding of a statistically significant two-day abnormal return is driven by the abnormal return on May 15, 2020, not by the information disclosed during the trading day on May 14, 2020.

50.     For all of the reasons above, Mr. Bettencourt's claim that his event study analysis of the purported corrective information "proves that the alleged misrepresentations and omissions caused the price of Co-Diagnostics stock to be artificially inflated prior to the corrective disclosures" is incorrect.

E. <u>Mr. Bettencourt's Event Study Analysis of the Abnormal Return in Co-Diagnostics' Stock Price on May 1, 2020</u>

i. *Mr. Bettencourt's Correction for Heteroscedasticity Is Incorrect*

51.     As part of his event study analysis, Mr. Bettencourt finds that the abnormal returns in his event study model exhibit a statistical property known as "heteroscedasticity," which must be corrected before drawing any conclusion from the model's results.[101] Heteroscedasticity occurs when the variation in the abnormal returns is not constant, for example when it changes in magnitude over the course of the time period at issue.[102] Mr. Bettencourt corrects for the presence of heteroscedasticity in his event study model by applying the Newey-West estimation procedure.[103]

---

[100]   Bettencourt Backup Materials, Exhibit.xls tab "Results." Per this spreadsheet, the *t*-statistics on May 15, 2020 and May 19, 2020 are -3.86 and 1.05, respectively. The cumulative *t*-statistic for two abnormal returns is calculated by dividing the sum of the *t*-statistics by the square root of 2, hence $(-3.86 + 1.05) / \sqrt{2} = -1.99$, which is above the -1.96 threshold for statistical significance.

[101]   Bettencourt Report ¶¶ 104-105; *see also* Ferrell Report ¶ 12.

[102]   Bettencourt Report ¶ 104.

[103]   Bettencourt Report ¶ 105. When appropriately applied, the Newey-West estimation procedure corrects for autocorrelation and heteroskedasticity in the regression residuals. Newey, W.K, and K.D. West, 1987, "A simple, positive semi-definite, heteroskedasticity and autocorrelation consistent covariance matrix," *Econometrica* 55(3), 703-708.

Mr. Bettencourt's correction for heteroscedasticity is incorrect leading to flawed and unreliable event study results.

52.    As explained above, the presence of heteroscedasticity means that the variance of the error in Mr. Bettencourt's regression is not constant. Evaluating the statistical significance of an out-of-sample abnormal return in the presence of heteroscedasticity is therefore impossible without placing some structure on the variance of the error. The methodology used by Mr. Bettencourt to purportedly correct for heteroscedasticity, Newey-West, does not place any structure on the variance of the error. Mr. Bettencourt attempts to skirt this issue by assuming that the variance of the error is constant when he calculates the standard error of the forecast for the event date, but this assumption is in direct contradiction to his finding that there is heteroscedasticity, thereby invalidating his approach.[104, 105]

53.    I appropriately correct for heteroscedasticity in Mr. Bettencourt's event study analysis by employing a commonly used and widely accepted methodology called GLS regression using the VIX index to estimate the weights of the errors.[106] Unlike Mr. Bettencourt's Newey-West correction, this approach specifies the structure for the variance of the error, allowing me to

---

[104]    Specifically, Mr. Bettencourt uses the sum of squares of the residuals from his Newey-West regression (which is constant) to estimate the variance of the error.

[105]    An alternative to forecasting (what Mr. Bettencourt does, albeit incorrectly) is to include a dummy for the event date in a regression and conduct inference via a *t*-test on the event date dummy. As recognized by the academic literature, the Newey-West method cannot be used to conduct inference in this manner. *See* Elsas, R., and D.S., Schoch, 2023, "Robust inference in single firm/single event analyses," *Journal of Corporate Finance* 80(102391), 1-26 at 7 and n.18.

[106]    My conclusion in the Ferrell Report was based on the event study of Plaintiff's prior expert, Dr. Werner. Mr. Bettencourt's event study model is slightly different. Dr. Werner's event study estimation period was from April 30, 2020 to April 29, 2021 while Mr. Bettencourt's estimation period was from May 1, 2020 to April 30, 2021. Werner Declaration ¶ 57; Bettencourt Report Exhibit-4. Moreover, Dr. Werner only included indicator or "dummy" variables for the earnings announcement dates that fall within the estimation period while Mr. Bettencourt also included dummy variables for the Alleged Misstatement date and the additional alleged corrective disclosure date (i.e., May 14, 2020) that falls within the estimation period in his regression model, which I also did in my correction of Dr. Werner's model. Werner Declaration Exhibit-7; Bettencourt Report ¶ 103; Ferrell Report ¶ 25 n.33. Hence, to correct Mr. Bettencourt's model, I applied my correction of Dr. Werner's model to the slightly different estimation period in Mr. Bettencourt's model.

28

determine the statistical significance of the abnormal return on the event date in a way that accounts for heteroscedasticity.[107, 108] Using this approach, I find that the abnormal return on May 1, 2020 of 16.97 percent is not statistically significant, with a *t*-statistic of 1.81.

54.    Accordingly, correcting Mr. Bettencourt's model to appropriately account for heteroscedasticity demonstrates that there is no scientific or reliable basis to conclude that the abnormal return in Co-Diagnostics' stock price on May 1, 2020 is statistically significant.[109]

> ii.    *Mr. Bettencourt's Conclusion Regarding the Statistical Significance of the Abnormal Return on May 1, 2020 Is Incorrect Because It Is Driven by his Arbitrary and Inappropriate Choice of Estimation Period*

55.    Mr. Bettencourt's event study also is fundamentally flawed and unreliable because – like Dr. Werner's event study – it is not robust to the use of alternative estimation periods.

56.    As I explained in the Ferrell Report, the choice of estimation period by itself can

---

[107]  This approach is appropriate both when forecasting out of sample and when including a dummy variable for the event date.

[108]  VIX data per Chicago Board Options Exchange, Historical Data for Cboe VIX® Index and Other Volatility Indices, VIX Index data for 2004 to present (Updated Daily), available at https://www.cboe.com/tradable_products/vix/vix_historical_data/. *See also* Ferrell Report ¶ 25.

[109]  Mr. Bettencourt claims that the level of artificial inflation in Co-Diagnostics' stock price of $0.13 per share on May 1, 2020 is "conservatively estimated" because "[c]oncluding that some of that artificial inflation entered the stock price on a date following the start of the Class Period, rather than on the first day of the Class Period, produces a more conservative (lower) measure of damages as the average level of artificial inflation during the Class Period would be lower," as he does by opining that alleged inflation increased on May 13, 2020. Bettencourt Report ¶¶ 23, 136, 136 n.134. This claim is at best disingenuous because Class members who purchased prior to May 13, 2020 incurred virtually no recoverable damages regardless of the amount of alleged inflation he opines entered Co-Diagnostics' stock price on May 1, 2020. To see why, first note that, as Mr. Bettencourt recognizes, the Private Securities Litigation Reform Act of 1995 ("PSLRA") limits damages to "'the difference between the purchase or sale price paid or received' and 'the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which' the security is sold." *Id.* ¶¶ 119-120. The closing prices on every day during the Class Period prior to May 13, 2020 are lower than this average – *compare*, e.g., *id.* Exhibit-3 (showing daily closing prices, the highest of which prior to May 13 is $17.05 on May 11, 2020) and ¶ 121 (reporting that "[t]he mean per share trading price of Co-Diagnostics stock during the 90 days beginning on 15 May 2020 is $19.34"). Accordingly, the PSLRA limitation will eliminate alleged damages on most if not all shares purchased prior to May 13, 2020 and retained through the end of the Class Period. Second, as explained *infra* ¶ 63, Plaintiff's own experts' analyses demonstrate that there is no reliable and scientific basis that Class members (like Plaintiff) who sold on May 14, 2020 suffered any economic loss attributable to the Alleged Misstatement. Therefore, Mr. Bettencourt's "conservative[]" estimate does not "produce a more conservative (lower) measure of damages" as he claims.

29

drive a finding of statistical significance, hence it is important to choose an estimation period during which the volatility of the abnormal returns is similar to the volatility of the abnormal returns at the time of the event being examined.[110] I also explained that the results of a statistical model are scientific and reliable only if small changes to the model do not change the results, i.e., the results must be robust to alternative specifications of the model. A chapter on "regression" analysis (the statistical technique underlying event studies) in a book cited by Mr. Bettencourt states: "Regression provides an accurate and reliable method to measure the relation between two or more variables, if implemented properly. … One should proceed by estimating a reasonable model and then testing it to check the robustness. Also, the expert should consider other variations of the model before settling on one to present."[111]

57.     Mr. Bettencourt chose to run his analysis "using the estimation period that runs one year forward from the first day of the Class Period" and states that "[t]esting events using a regression estimation that surrounds the events is consistent with widely used and generally accepted practice in event study analysis."[112] As explained below, Mr. Bettencourt's choice of estimation period drives his conclusion of statistical significance for the abnormal return on May 1, 2020.

---

[110]  Ferrell Report ¶ 28.

[111]  King, A.C., M.P. Rao, and C.D. Tregillis, 2017, "Econometric Analysis," Chapter 9 of the *Litigation Services Handbook: The Role of the Financial Expert* edited by R.L. Weil, D.G. Lentz, and E.A. Evans, 6th Edition, John Wiley & Sons, Inc. at 9.13, which is cited in Bettencourt Report ¶¶ 20 n.4, 79 n.104, 117 n.126, and 129 n.129. *See also* Rubinfeld, D.L., 2011, "Interpreting Multiple Regression Results," Chapter 3 of the *Reference Manual on Scientific Evidence*, 3rd Edition, National Research Council at 322 ("The issue of robustness – whether regression results are sensitive to slight modifications in assumptions (e.g., that the data are measured accurately) – is of vital importance. If the assumptions of the regression model are valid, standard statistical tests can be applied. However, when the assumptions of the model are violated, standard tests can overstate or understate the significance of the results. The violation of an assumption does not necessarily invalidate a regression analysis, however. In some instances in which the assumptions of multiple regression analysis fail, there are other statistical methods that are appropriate. Consequently, experts should be encouraged to provide additional information that relates to the issue of whether regression assumptions are valid, and if they are not valid, the extent to which the regression results are robust.").

[112]  Bettencourt Report ¶¶ 101-102.

30

58.     Mr. Bettencourt fails to explain why he chose a one-year estimation period that begins with the approximately two-week Class Period and ends eleven-and-a-half months later. To test whether Mr. Bettencourt's choice of estimation period impacts his conclusion, I shortened it to 120 trading days beginning on the same day (i.e., May 1, 2020) but ending on October 20, 2020.[113] Eliminating the half of his estimation period that is furthest from May 1, 2020 finds that the relationship between movements in the Company's stock price and those of the market and industry indexes changed such that the abnormal return on May 1, 2020 declined from his estimate of 16.44 percent to 13.79 percent, and the standard deviation of the abnormal returns increased from 6.76 percent to 7.71 percent. Consequently, the $t$-statistic declined from 2.35 to 1.70, which is below his critical value of 1.96 – in other words, the May 1, 2020 price increase is not statistically significant and cannot be distinguished from random price movement. This demonstrates that Mr. Bettencourt's finding of statistical significance on May 1, 2020 is not robust to a simple and appropriate change to his analysis.

59.     Moreover, in support of his estimation period, Mr. Bettencourt cites a book chapter that states: "Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window."[114] Accordingly, I also tested the robustness of Mr. Bettencourt's event study results on May 1, 2020 (i.e., the event window) by placing the estimation period before and surrounding this date using both 252 (approximately one

---

[113]  An academic source Mr. Bettencourt cites, which Dr. Werner describes as "provid[ing] a detailed description of the [event study] methodology and document[s] its wide use in academic research," supports this shorter estimation period, explaining that "the market-model parameters could be estimated over the 120 days prior to the event," approximately six calendar months of trading days. Campbell, J.Y., A.W. Lo, and A.C. MacKinlay, 1997, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press at 152, cited in Bettencourt Report ¶ 104 n.121 and Werner Declaration ¶¶ 14, 43.

[114]  Bettencourt Report ¶ 102.

year) and 120 trading days.[115] As shown in the table below, adopting Mr. Bettencourt's event study

analysis but simply changing the estimation period finds that *none* of the alternatives results in a

statistically significant abnormal return on May 1, 2020.

**Table 1**
**Co-Diagnostics, Inc.**
**May 1, 2020 Event Study Results Using Alternative Estimation Periods**

| | Estimation Period | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | After | | Before | | Surrounding | |
| | 252 Days | 120 Days | 252 Days | 120 Days | 252 Days | 120 Days |
| | 5/1/20-4/30/21 (1) | 5/1/20-10/20/20 (2) | 5/3/19-5/1/20 (3) | 11/8/19-5/1/20 (4) | 10/30/19-10/28/20 (5) | 2/5/20-7/27/20 (6) |
| Abnormal Return | 16.45% | 13.97% | 14.49% | 13.07% | 13.89% | 13.83% |
| *t*-statistic | 2.35 | 1.70 | 1.17 | 0.76 | 1.07 | 0.90 |
| Statistically Significant? | Yes* | **NO** | **NO** | **NO** | **NO** | **NO** |

\* As discussed *supra* ¶ 53, the abnormal return on May 1, 2020 for this estimation period is not statistically significant when the appropriate correction for the presence of heteroscedasticity in Mr. Bettencourt's event study analysis is applied.

Notes & Sources: Abnormal returns and *t*-statistics using the event study methodology in the Bettencourt Report and alternative estimation periods. I followed Mr. Bettencourt's event study methodology solely for the purposes of this exercise. Column (1) shows my replication of Mr. Bettencourt's event study analysis. Statistical significance is measured at the 5 percent level using a two-tailed *t*-statistic. Data from CRSP and Bloomberg L.P.

60.    Consequently, Mr. Bettencourt's event study results are not robust to alternative

estimation periods (even ones indicated by the literature he cites), a critical test to determine

whether an event study produces scientific and reliable results, and his finding of a statistically

significant stock price movement on May 1, 2020 based on his unsupported and arbitrary estimation

---

[115]  The Breusch-Pagan test rejects the null hypothesis of homoscedasticity in four out of the six estimation periods in the table below but does not reject the null hypothesis of homoscedasticity for the estimation periods in columns 4 and 6 (i.e., 11/8/19-5/1/20 and 2/5/20-7/27/20). As shown in columns 4 and 6 of the table presented in ¶ 32 of the Ferrell Report, the residual return on May 1, 2020 is still not statistically significant when using these estimation periods but not employing Mr. Bettencourt's flawed correction for heteroscedasticity.

period must be rejected. Both standard statistical analysis and economic intuition (as well as common sense) support this result. Accordingly, I find that there is no scientific or reliable basis to conclude that the abnormal return on May 1, 2020 is statistically significant.

## V.    Mr. Bettencourt Ignores that the Economic Evidence Demonstrates that Plaintiff Was Not Harmed by the Alleged Fraud Under Its Own Claims

61.    The table below summarizes the timeline of the Alleged Misstatement and Alleged Corrective Disclosures and Gelt's trades.

**Table 2**
**Analysis of Gelt's Trades**

| Description | Date | Time |
|---|---|---|
| May 1 Press Release | May 1, 2020 | 6:30 am ET |
| Gelt May 13 Purchases & Sales of 10,000 Shares | May 13, 2020 | 3:18 pm ET (Purchase of 7,000 shares)<br>3:50 pm ET (Sale of 7,000 shares)<br>3:58 pm ET (Purchase of 3,000 shares)<br>4:51 pm ET (Sale of 3,000 shares) |
| Gelt May 13 Purchase of 22,000 Shares | May 13, 2020 | 6:27 pm ET |
| May 14 SLT Article | May 14, 2020 | 9 am ET, updated 10:19 am ET |
| May 14 Iowa Governor Press Conference | May 14, 2020 | 12:00 pm ET |
| Gelt May 14 Sale of 22,000 Shares | May 14, 2020 | 2:07 pm ET |
| FDA Disclosure | May 14, 2020 | 7:44 pm ET |

Sources: Complaint ¶¶ 32, 62-64, 74-78, 83 and GELT0000001-20 at 1.

62.    As shown, the Gelt May 13 Purchases & Sales occurred before any of the Alleged Corrective Disclosures; therefore, these trades were not impacted by such purported disclosures. Further, Plaintiff exited its entire position from the Gelt May 13 Purchase of 22,000 Shares during the day on May 14, 2020. Consequently, the only corrective information alleged by Plaintiff that

33

could have impacted its trading is in the May 14 Pre-Close Disclosures.

63.    As discussed above, Mr. Bettencourt finds the abnormal return on May 14, 2020 is not statistically significant, as did Dr. Werner.[116] Hence, Plaintiff's own experts' analyses find that there is no reliable and scientific evidence to conclude that the May 14 Pre-Close Disclosures caused Co-Diagnostics' stock price to decline over the trading day on May 14, 2020. Consequently, because Gelt sold its entire position in the Company's stock during the trading day on May 14, 2020, there is no reliable and scientific evidence to conclude that the price at which Gelt sold was negatively impacted by the Alleged Corrective Disclosures, and thus there is no reliable and scientific evidence to conclude that Gelt suffered any economic loss attributable to the Alleged Misstatement.[117]

## VI.    Mr. Bettencourt Ignores that the Individual Defendants' Behavior Is Inconsistent with his Opinion that the Alleged Misstatement Caused Co-Diagnostics' Stock Price to Be Artificially Inflated

64.    Plaintiff alleges that "[e]ach of the Individual Defendants directly benefited from the fraudulent overstatement of the Company's technological capabilities in the form of at least the false inflation of their own stock and stock options" and describes sales by Messrs. Serbin, Durenard, Egan, and Benson.[118] As noted *supra* ¶ 16, Mr. Bettencourt opines that his event study analysis "proves that the alleged misrepresentations and omissions caused the price of Co-Diagnostics stock to be artificially inflated prior to the corrective disclosures."

65.    If the Individual Defendants caused Co-Diagnostics' stock price to be artificially inflated as Mr. Bettencourt claims, they would have had a powerful economic incentive to sell their

---

[116]    *See supra* ¶ 30; Werner Declaration Exhibit-8 (showing a *t*-statistic on May 14, 2020 of -0.83).
[117]    Although Plaintiff did sell after the Hindenburg tweets that Mr. Bettencourt unilaterally claims contain corrective information, he fails to establish that the tweets contained new information that the Defendants could have disclosed on May 1, 2020 or present any reliable and scientific evidence that the supposedly corrective information caused Plaintiff's losses for the reasons explained *supra* ¶¶ 35-37.
[118]    Complaint ¶¶ 90, 91, 95, 97.

shares to benefit from the purported inflation. However, as documented by Plaintiff itself, all sales by the Individual Defendants occurred after the end of the Class Period, i.e., *after* Mr. Bettencourt opines the purported inflation in the Company's stock price had fully dissipated.[119] Consequently, the Individual Defendants did not benefit from the purported inflation in Co-Diagnostics' stock price that they allegedly created as Plaintiff claims, which is economic evidence Mr. Bettencourt ignores that is inconsistent with his opinion that the Alleged Misstatement caused the Company's stock price to be artificially inflated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: January 19, 2024

_____
Allen Ferrell

---

[119] Complaint ¶¶ 91 ("Richard Serbin sold nearly $1 million worth of Co-Diagnostics' stock in late May"), 95 ("Eugene Durenard sold nearly $1 million of Co-Diagnostics' stock in late May 2020"), 97 ("CEO Dwight Egan and CFO Reed Benson recently sold $900,000 and $700,000 worth of Company stock respectively" (I understand that the Complaint was filed in April 2021)). I verified that, according to FactSet, none of the Individual Defendants sold Co-Diagnostics' stock during the Class Period.

1

## Appendix A

January, 2024

## Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

### COURSES TAUGHT

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

### REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

### CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

### Papers

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, Working Paper (2021)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

4

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

 "Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

**TESTIMONY LAST FOUR YEARS**

*Homyk v. ChemoCentryx*, Case No. 4:21-CV-03343-JST, Expert report and deposition on January 6, 2024

*In re Ripple Labs Litigation*, Case No. 4:18-CV-06753-PJH, Expert report and deposition on October 16, 2023

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074-JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019 and trial testimony June 7, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert report and deposition on August 26, 2021

*Pearlstein et al. v. Blackberry Limited*, Case No. 1:13-cv-7060-CM, Expert report and deposition on November 3, 2020

*In re Grupo Televisa Securities Litigation*, Case No. 1:18-cv-01979-LLS, Expert report and deposition on February 21, 2020

**Appendix B**
**Materials Relied Upon**

**Legal Documents**
1.  Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Second Amended Complaint, In the United States District Court, District of Utah, Central Division, Case No. 2:20-cv-00368-CMR, filed on April 7, 2021.
2.  Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Memorandum Decision and Order Partially Granting Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, Case No. 2:20-CV-00368-JNP-DBP, filed on August 18, 2023.

**Bates Stamped Documents**
3.  GELT0000001-20.

**Expert Reports**
4.  Declaration of Dr. Adam Werner, October 17, 2022.
5.  Report of Daniel S. Bettencourt, December 4, 2023.
6.  Report of Professor Allen Ferrell, December 4, 2023.

**Securities and Exchange Commission Filings**
7.  Co-Diagnostics, Inc., Form S-1, filed on April 28, 2017.
8.  Co-Diagnostics, Inc., Form 10-K for the fiscal year ended December 31, 2019, filed on March 30, 2020.

**Academic Articles and Books**
9.  Campbell, J.Y., A.W., Lo, and A.C., MacKinlay, 1997, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press.
10. Cornell, B., and R.G., Morgan, 1990, "Using Finance Theory to Measure Damages in Fraud on The Market Cases," *UCLA Law Review* 49(2), 591-615.
11. Cowan, A.M., P.J., Seguin, and S.T., Malone, 2020, "Event Studies in Securities Litigation," Chapter 47 of *The Comprehensive Guide to Economic Damages*, 6th Edition, edited by Fannon, N.J., and J.M., Dunitz, Business Valuation Resources.
12. Elsas, R.. and D.S., Schoch, 2023,  "Robust inference in single firm/single event analyses," *Journal of Corporate Finance* 80(102391), 1-26.
13. Ferrell, A., and A., Saha, 2007, "The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of Dura Pharmaceuticals v. Broudo," *Business Lawyer* 63(1), 163-186.
14. King, A.C., M.P., Rao, and C.D., Tregillis, 2017, "Econometric Analysis," Chapter 9 of the *Litigation Services Handbook: The Role of the Financial Expert* edited by Weil, R.L., D.G., Lentz, and E.A., Evans, 6th Edition, John Wiley & Sons, Inc.
15. MacKinlay, A.C., 1997, "Event Studies in Economics and Finance," *Journal of Economic*

*Literature* 35(1), 13-39.

16. Newey, W.K, and K.D., West, 1987, "A simple, positive semi-definite, heteroskedasticity and autocorrelation consistent covariance matrix," *Econometrica* 55(3), 703-708.

17. Patell, J., and M., Wolfson, 1984, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13(2), 223-252.

18. Rinaudo, A., and A., Saha, 2014, "An intraday event study methodology for determining loss causation," *The Journal of Financial Perspectives* 2(2), 161-173.

19. Rubinfeld, D.L., 2011, "Interpreting Multiple Regression Results," Chapter 3 of the *Reference Manual on Scientific Evidence*, 3rd Edition, National Research Council.

20. Tabak, D., and F., Dunbar, 2001, "Materiality and Magnitude: Event Studies in the Courtroom," Chapter 19 of the *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2001.

**Analyst Reports**

21. "U.S. Coronavirus Test Shipments Slated to Expand; Reiterate Buy," H.C.Wainwright&Co, March 18, 2020.

22. "FDA Emergency Use Authorization Granted for Logix Smart COVID-19 Test - Maintain Hold on Valuation," Maxim Group, April 6, 2020.

23. "COVID-19 Testing Has Been Transformative for Co-Diagnostics, Raising Revenue Forecast and Upgrading to Buy, with a $30 PT," Maxim Group, May 20, 2020.

**News Articles, Press Releases, and Press Conferences**

24. "The Unknown Unknowns: Diagnosing the New Coronavirus," Johns Hopkins Bloomberg School of Public Health, March 5, 2020.

25. "A 'negative' coronavirus test result doesn't always mean you aren't infected," *The Washington Post*, March 26, 2020.

26. "Limits of detection for FDA-authorized Covid-19 diagnostics," *BioCentury*, April 1, 2020.

27. "Questions About Accuracy of Coronavirus Tests Sow Worry," *The Wall Street Journal*, April 2, 2020 at 10:00 am ET.

28. "Co-Diagnostics, Inc Receives FDA Emergency Use Authorization for COVID-19 Test," *PR Newswire*, April 6, 2020.

29. "If test says you have coronavirus, believe it. If it's negative, don't be so sure," *The Kansas City Star*, April 12, 2020.

30. "'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions," *The Salt Lake Tribune*, April 30, 2020 at 8:00 am ET, updated at 8:27 pm ET.

31. "Utah doctors question accuracy of coronavirus tests provided by Test Nebraska partners," *Lincoln Journal Star*, April 30, 2020 at 5:21 pm ET.

32. "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," *PR Newswire*, May 1, 2020 at 6:30 am ET.

33. "Test Nebraska underway with CHI Health St. Elizabeth lab," *Lincoln Journal Star*, May 5, 2020 at 6:53 pm ET.

34. "Commentary: Evaluating risk and medical treatment in the time of coronavirus," *Los Angeles Times*, May 7, 2020 at 2:28 pm ET.

35. "Explainer: False positives in Covid-19 tests and the risk of errors as Singapore moves towards mass testing," *Today*, May 11, 2020 at 1:24 pm ET.

36. "Senators call on governor to end Test Nebraska contracts," *Lincoln Journal Star*, May 11, 2020, 5:45 pm ET.

37. "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020 at 9 am ET, updated at 10:19 am ET, available at https://www.sltrib.com/news/2020/05/14/testutah-declines-join/.

38. "Stock Alert: Co-Diagnostics Hits New 52-week High," *RTT News*, May 14, 2020 at 9:58 am ET, available at https://www.rttnews.com/3096050/stock-alert-co-diagnostics-hits-new-52-week-high.aspx.

39. Iowa Governor Kim Reynolds Press Conference, May 14, 2020 at 12 pm ET available at https://www.iowapbs.org/shows/governorpress?page=2.

40. "44 Stocks Moving In Thursday's Mid-Day Session," *Benzinga*, May 14, 2020 at 12:55 pm ET.

41. "13:40 EDT Nebraska senators want to void $27M in COVID testing contracts, KUTV reports," *TheFlyOnTheWall.com*, May 14, 2020 at 1:40 pm ET.

42. "Co-Diagnostics, Inc. Announces Q1 2020 Results and Provides Mid-Second Quarter Update," *PR Newswire*, May 14, 2020 at 4:01 pm ET.

43. "Stock Market Shows Bullish Rebound After Sharp Sell-Off; AMD, Facebook Set Up To Move Higher," *Investor's Business Daily*, May 14, 2020 at 5:27 pm ET.

44. "Stock Market Shows Bullish Rebound After Sharp Sell-Off; AMD, Facebook Set Up To Move Higher," *Investor's Business Daily*, May 14, 2020 at 5:27 pm ET.

45. "Press Release: Co-Diagnostics, Inc. Releases Prepared Remarks for First Quarter 2020 Conference Call," *Dow Jones Institutional News*, May 14, 2020 at 6:01 pm ET.

46. "Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," *PR Newswire*, May 14, 2020 at 7:44 pm ET.

47. "Co-Diagnostics, Inc falls 13.5% in premarket," *Impact Financial News*, May 15, 2020.

48. "50 Stocks Moving In Friday's Mid-Day Session," *Benzinga.com*, May 15, 2020 at 12:31 pm ET.

**Rules and Regulations**

49. Food and Drug Administration, Guidance for Industry and FDA Staff, Establishing the Performance Characteristics of In Vitro Diagnostic Devices for the Detection or Detection and Differentiation of Influenza Viruses - Guidance for Industry and FDA Staff, July 2011.

**Websites**

50. Hindenburg Research Twitter feed, May 14, 2020 at 1:38 pm ET available at https://twitter.com/HindenburgRes/status/1260987928064536583?lang=en.

**Data Sources**

1. Bloomberg L.P.
2. Center for Research in Security Prices, LLC ("CRSP")
3. Chicago Board Options Exchange, Historical Data for Cboe VIX® Index and Other Volatility

3

Indices, VIX Index data for 2004 to present (Updated Daily), available at https://www.cboe.com/tradable_products/vix/vix_historical_data/
4. FactSet
5. Morningstar Direct
6. S&P Capital IQ
7. Tick API

All other materials cited in the report.