# Exhibit 68

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| GELT TRADING, LTD., a Cayman Islands limited company, | ) ) | Case No. 2:20-cv-00368-CMR |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**REBUTTAL REPORT OF DR. RAN WEI**

**November 21, 2022**

## I. Qualifications

1. I am a Senior Vice President at Compass Lexecon, a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues. I received a Ph.D. in applied economics with a concentration in finance and a Master of Arts in statistics from the Wharton School of University of Pennsylvania. My Ph.D. research included analyzing the relationship between stock price movements and firm disclosures, commonly referred to as "event study" analysis.

2. Over the past sixteen years, I have consulted in a variety of securities matters involving market efficiency, price impact, loss causation, and damages, all of which typically incorporated event study analysis. I have also consulted on various economic issues related to corporate governance, executive compensation, trading manipulation, and bankruptcy. My work spans numerous industries, including financial services, private equity and hedge funds, mortgage banking, insurance, automotive, chemicals, entertainment, pharmaceuticals, real estate, and technology. A copy of my curriculum vitae is attached hereto as **Appendix A**.

3. I have been assisted by staff of Compass Lexecon. Compass Lexecon is being compensated for the time spent by its staff at their customary hourly rates. My hourly rate is $925. Our compensation is not contingent or based upon the content of my opinion or the outcome of this matter.

## II. Background and Summary of Allegations

4. Co-Diagnostics, Inc. ("Co-Diagnostics") develops "molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications."[1] In January 2020, Co-Diagnostics announced "the completion of the principal design work for a PCR [Polymerase

---

[1] Co-Diagnostics, Inc. Form 10-K for the fiscal year ended December 31, 2020, ("2020 10-K") at 4.

1

Chain Reaction] screening test for the new coronavirus, COVID-19."[2] Beginning in February 2020, Co-Diagnostics sold its COVID-19 tests to international customers.[3] On April 6, 2020, Co-Diagnostics announced that it had received an Emergency Use Authorization from the U.S. Food and Drug Administration ("FDA") allowing it to sell its Logix Smart COVID-19 test in the United States.[4]

5. Lead Plaintiff Gelt Trading, Ltd. ("Plaintiff" or "Gelt") alleges in its Second Amended Complaint (the "SAC") that "Co-Diagnostics, through its Chief Science Officer, and directed by other officers and directors made unequivocal statements to the market that its Covid-19 tests were 100% accurate;" "[a]s was later revealed, however, this was not true: Co-Diagnostics' Covid-19 tests are materially less than 100% accurate…."[5]

6. Specifically, on May 1, 2020 at 6:30 am ET, Co-Diagnostics "issued a press release titled: 'Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations.'"[6] The Plaintiff alleges that the press release "unequivocally stated that Co-Diagnostics Covid-19 tests were 100% accurate based on data gathered from across the world"[7] and that the market "accepted Co-Diagnostics false claims of 100% accuracy, and understood Co-Diagnostics' statements to mean their tests were perfect…."[8]

7. The Plaintiff further claims that on May 14, 2020, "third parties revealed **startling** information about Co-Diagnostics' allegedly 100% accurate test,"[9] alleging as follows:

---

[2] 2020 10-K at 4-5.
[3] 2020 10-K at 5.
[4] 2020 10-K at 5.
[5] SAC, filed on April 7, 2021, ¶ 7.
[6] SAC, ¶ 62. *See also*, "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," *PR Newswire*, May 1, 2020, 6:30 am ET.
[7] SAC, ¶ 62. *See also*, "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," *PR Newswire*, May 1, 2020, 6:30 am ET.
[8] SAC, ¶ 69.
[9] SAC, ¶ 74 (emphasis added).

2

**the purported "Decline to Confirm Quality" Disclosure**

[On May 14, 2020, at 9 am ET], The Salt Lake Tribune reported that TestUtah.com, which used tests developed by Co-Diagnostics, "declined to join other major Utah labs in a joint experiment to confirm one another's quality."[10]

**the purported "Higher Limit of Detection" Disclosure**

Moreover, The Salt Lake Tribune revealed that TestUtah's tests [by Co-Diagnostics] "have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., according to an analysis by the life sciences publication BioCentury." This meant that Co-Diagnostics tests were likely to have a much higher false negative reporting rate, meaning that potentially thousands of infected people were inaccurately told that they did not have the disease.[11]

**the purported "Concern Related to TestNebraska and TestIowa" Disclosure**

The Tribune article also expressed concern relating to TestNebraska.com and TestIowa.com, testing services that also used Co-Diagnostics tests.[12]

**the purported "95% Accuracy Reported by Iowa Governor" Disclosure**

Also on May 14th [around noon ET], Iowa Governor Kim Reynolds issued a public statement saying, "I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives." These results did not comport with statements previously made by Co-Diagnostics on May 1, 2020.[13]

---

[10] SAC, ¶ 75. *See also* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

[11] SAC, ¶ 75. *See also* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

[12] SAC, ¶ 76. *See also* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

[13] SAC, ¶ 77. *See also* Iowa Governor Kim Reynolds Press Conference, May 14, 2020, 12:00 pm ET, available at https://www.iowapbs.org/shows/governorpress/episode/3544/iowa-gov-kim-reynolds-press-conference-may-14-2020-1100. Shortly after the start of the press conference, the Governor announced the accuracy rate of the COVID-19 tests.

3

I refer to these alleged corrective disclosures as the "May 14 Trading Day Disclosures." The Plaintiff claims that on May 14, 2020, due to the "startling" information in the May 14 Trading Day Disclosures that "cast[] serious doubt as to Co-Diagnostics' bold claims of 100% accuracy, the stock price began to fall, closing the day at $22.13."[14]

8.     The SAC continues to allege that:[15]

**the purported "U.S. FDA Press Release" Disclosure**

The same day [May 14, 2020 at 7:44 pm ET], the United States FDA issued a press release about testing accuracy. Another much larger drug company (Abbott Laboratories) had created a diagnostic test for Covid-19 that was under increasing public scrutiny for apparent inaccuracy. The FDA announced to the public that "[t]he FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. *No diagnostic test will be 100% accurate* due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and identify the cause of suspected false results so any significant issues can be addressed quickly." (emphasis added).

I refer to this alleged corrective disclosure as the "May 14 Post-Close Disclosure." The Plaintiff claims that the Co-Diagnostics stock price "further fell to just over $15 per share when markets opened on May 15, 2020."[16]

9.     The Plaintiff, Gelt, brings this securities class action "on behalf of a class consisting of all those who purchased the securities of Co-Diagnostics between April 30, 2020 and May 15, 2020, (the 'Class Period') inclusive, and who were damaged thereby (the 'Class')."[17] During the Class

---

[14]    SAC, ¶¶ 74 and 79 (emphasis added).

[15]    SAC, ¶ 83. *See also* "Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," *PR Newswire*, May 14, 2020, 7:44 pm ET (emphasis added).

[16]    SAC, ¶ 84.

[17]    SAC, at 1 and ¶ 31. *See also* SAC, ¶ 31 ("Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest."). I understand that the Court finds the alleged misrepresentation on April 30, 2020 was not misleading, hence by definition the market price for Co-Diagnostics' stock was not impacted by a recognized alleged misstatement until May 1,

Period, Co-Diagnostics' common stock (ticker: CODX) traded on the NASDAQ.[18]

10.     The Plaintiff claims that "[t]he economic loss, i.e., damages, suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Co-Diagnostics' stock price and the subsequent **significant** decline in the value of Co-Diagnostics' stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed."[19]

11.     The SAC alleges that "Gelt purchased and sold Co-Diagnostics' (NASDAQ: CODX) stock as follows:"[20]

### The "Gelt May 13 Trades"

On May 13, 2020, Gelt purchased 7,000 shares of CODX stock at a price of $21.20 [at 3:18 pm ET] and sold those shares that same day for $22.12 [at 3:50 pm ET], and also purchased 3,000 shares at a price of $23.42 [at 3:58 pm ET] and sold those shares that same day for $23.68 [at 4:51pm ET]. These trades resulted in a net gain of $7,171.90.

### The "Gelt May 14 Trades"

On May 14, 2020, Gelt purchased 22,000 shares of CODX at a price of $26.65 [at 6:27 pm ET on May 13, 2020, after market closed] and sold those shares [on May 14, 2020] for $20.97 [at 2:07 pm ET], resulting in a loss of $125,017.77.

Gelt's alleged net losses equal $117,845.87 during the class period.

---

2020. *See* Memorandum Decision and Order Denying Defendants Motion to Dismiss dated March 9, 2022, at 13-14.

[18]     2020 10-K at 17.

[19]     SAC, ¶ 99 (emphasis added).

[20]     SAC, ¶¶ 32-33 and GELT0000001-20 at 1.

12.     I summarize the timeline of events discussed above:

| Description | | Calendar Date | Time |
| --- | --- | --- | --- |
| Alleged Misleading Statement | | May 1, 2020 | 6:30 am ET |
| Gelt May 13 Trades | Purchase | May 13, 2020 | 3:18 pm ET |
| | Sale | | 3:50 pm ET |
| | Purchase | | 3:58 pm ET |
| | Sale | | 4:51 pm ET |
| Gelt May 14 Trades | Purchase | May 13, 2020 | 6:27 pm ET |
| May 14 Trading Day Disclosures | By *The Salt Lake Tribune* | May 14, 2020 | 9 am ET, updated 10:19 am ET |
| | By Iowa Governor | | Around noon ET |
| Gelt May 14 Trades | Sale | May 14, 2020 | 2:07 pm ET |
| May 14 Post-Close Disclosure | By U.S. FDA | May 14, 2020 | 7:44 pm ET |

13.     Accordingly, the Gelt May 13 Trades were both purchased and sold before any of Plaintiff's alleged corrective disclosures; therefore, these trades were not impacted by such purported disclosures. Further, the Plaintiff exited its entire position from the Gelt May 14 Trades after the May 14 Trading Day Disclosures but before the May 14 Post-Close Disclosure, consequently, the only allegedly corrective information that could have impacted Plaintiff's trading is the May 14 Trading Day Disclosures.

14.     In support of its motion for class certification,[21] Plaintiff retained Dr. Adam Werner who opines, among other things, that "Co-Diagnostics stock traded in an efficient market throughout the Class Period."[22] In support of his opinions, Dr. Werner prepared an event study.[23] Solely for the purposes of my analysis and this report, I assume that Co-Diagnostics common stock traded in an efficient market during the purported Class Period and accept the results of Dr. Werner's event study

---

[21]     Lead Plaintiff's Motion for Class Certification, filed on October 17, 2022.
[22]     The Declaration of Dr. Adam Werner, October 17, 2022 at 3, (the "Werner Declaration").
[23]     Werner Declaration, ¶¶ 51-66.

6

model.[24]

## III.    Assignment and Summary of Opinions

15.    I have been asked by counsel for the Defendants,[25] Carmel, Milazzo & Feil LLP, to analyze the price impact of the May 14 Trading Day Disclosures, i.e., the alleged corrective disclosures released before Gelt sold its remaining shares in Co-Diagnostics' stock on May 14, 2020. A list of materials I have considered in preparing this report is attached as **Appendix B**.

16.    Based on my analysis to date, as well as my skills, professional experience, education, and training, I find that the economic evidence, in particular Dr. Werner's event study, contradicts Plaintiff's claim that the May 14 Trading Day Disclosures represented "startling" information and that they "significant[ly]" impacted Co-Diagnostic's stock price on May 14, 2020 for the following reasons:

> a.    Dr. Werner's own event study analysis finds that Co-Diagnostics' stock price decline on May 14, 2020 was **not** "significant" as a matter of statistics and thus does not provide reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock on May 14, 2020 was impacted by the May 14 Trading Day Disclosures; tellingly, Dr. Werner fails to even mention these alleged corrective disclosures in his report.
>
> b.    The lack of statistical significance in Dr. Werner's event study is not surprising

---

[24]    Dr. Werner noted that "pursuant to the PSLRA, for any securities held 90 days or more beyond the final corrective disclosure, damages would equal the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the security price (the investment loss), where the terminal security price is deemed to be the average price over the 90 days following the final corrective disclosure." *See* Werner Declaration, ¶ 81. I refer to the average price over the 90 days following the final corrective disclosure as the "90-day average price." Counsel asked me to calculate the 90-day average price, and it is $19.34.

[25]    The Defendants include Co-Diagnostics and directors and/or officers of Co-Diagnostics Dwight Egan, James Nelson, Eugene Durenard, Edward Murphy, Richard Serbin, Reed Benson, and Brent Satterfield. *See* SAC, ¶¶ 24-26.

because the alleged corrective information in the May 14 Trading Day Disclosures did not demonstrably alter the total mix of publicly available information on May 14, 2020; in particular, I did not find a single analyst or press report that attributed any movement in Co-Diagnostics' stock price to the May 14 Trading Day Disclosures, let alone supported Plaintiff's claim that these disclosures were "startling," or even surprising.

Moreover, because the Plaintiff, Gelt, sold its entire position in Co-Diagnostics' stock during the trading day on May 14, 2020, there is no reliable and scientific evidence to conclude that the price at which Gelt sold was negatively impacted by an alleged corrective disclosure.

**IV.     The Economic Evidence, in Particular Dr. Werner's Event Study, Contradicts Plaintiff's Claim That the May 14 Trading Day Disclosures Represented "Startling" Information and That They "Significant[ly]" Impacted Co-Diagnostic's Stock Price on May 14, 2020**

17.     As discussed above, Plaintiff alleges that the May 14 Trading Day Disclosures (i.e. *The Salt Lake Tribune* article and Iowa Governor Kim Reynolds's public statement) partially corrected the alleged misstatements.[26] However, the economic evidence does not establish that this information impacted Co-Diagnostics' stock price.[27]

> **A. Dr. Werner's event study analysis does not provide reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock on May 14, 2020 was impacted by the May 14 Trading Day Disclosures.**

18.     Among other analyses included in the Werner Declaration, Dr. Werner "conducted an event study investigating whether the market for Co-Diagnostics common stock was efficient,

---

[26]     *See* above ¶ 7.

[27]     Plaintiff claims that the market reacted to the alleged corrective information contained in the May 14 Trading Day Disclosures before the market closed on May 14, 2020 and reacted to the May 14 Post-Close Disclosure after the market closed on May 14, 2020, and therefore, after Gelt sold its remaining shares of Co-Diagnostics' stock. *See* above ¶¶ 7, 8 and 11. Under Plaintiff's claim and Dr. Werner's opinion that the market for Co-Diagnostics' stock was efficient, there is no reason to believe that the May 14 Trading Day Disclosures had any price impact on Co-Diagnostics' stock price after the market closed on May 14, 2020.

8

specifically with respect to allegation-related information that was released to the market during the Class Period."[28] Dr. Werner describes event study analysis as "generally accept[ed] and widely use[d]" by financial economists in forensic applications and states that it "has formed the basis for assessing loss causation and artificial inflation in securities class actions"[29] and that "an event study can measure how much a firm's security price rises or falls in response to new information."[30]

19.     Dr. Werner explains that a security price change net of market and/or industry factors, commonly referred to as an "abnormal" or "residual" return, "measures the impact of new, firm specific information on a firm's security price. If the abnormal return over an event period is deemed to be statistically significant, it indicates that the security price movement was likely caused by firm-specific information and therefore cannot be attributed to market and/or industry factors, or to random volatility alone."[31] In other words, if the abnormal return is not statistically significant, then there is too high a chance that the security price movement can be explained by the market and/or industry factors considered in the event study model or by random volatility alone, and so there is no reliable and scientific evidence to attribute the movement to any firm-specific information.[32]

---

28    Werner Declaration, ¶ 41.
29    Werner Declaration, ¶ 15.
30    Werner Declaration, ¶ 44.
31    Werner Declaration, ¶ 44.
32    A typical event study analysis tests the null hypothesis that the abnormal return or residual return on an event date (e.g. May 14, 2020) is zero against the alternative hypothesis that the abnormal return or residual return is different from zero. If an event date's abnormal return is deemed to be statistically significant, the scientific evidence concludes that the security price return was caused by company-specific information, rather than random volatility. *See* e.g. J.Y. Campbell, A.W. Lo, & A. Craig MacKinlay, *The Econometrics of Financial Markets*, (Princeton University Press, 1997) at 150, 162 and 167; A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997) 13-39 at 21 and 24; G.W. Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *Journal of Law and Economics* (1981) 121 - 158 at 150.

In other words, the event study analysis tests the null hypothesis that the event at issue (e.g. the May 14 Trading Day Disclosures) had no impact on the relevant company's stock price against the alternative hypothesis that the event is associated with a change in the company's stock price. If the null hypothesis cannot be rejected at conventional levels of significance, then the abnormal return is not considered to be statistically significant, i.e., it is not considered to be significantly different from zero. Under these circumstances, one cannot reject the null hypothesis that the firm-specific information released on the event date had no effect on the company's stock

20. Dr. Werner further explains: "if the allegation-related information events do elicit statistically significant price reaction(s), this would be **evidence** that the price of Co-Diagnostics stock was impacted by the allegation-related information."[33] Accordingly, if the allegation-related information events do *not* elicit statistically significant price reactions, then there is no reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock was impacted by the allegation-related information.

21. Dr. Werner uses the "generally accepted" 5% level of statistical significance which is associated with a t-statistic with an absolute value of 1.96 or greater.[34] As Dr. Werner explains: a t-statistic with an absolute value of 1.96 or greater means that "there is less than a 5% chance that the abnormal return was caused by random volatility alone, which is generally accepted to be so unlikely that the random volatility explanation can be rejected."[35] In other words, per Dr. Werner's own explanation, "the random volatility explanation" cannot be rejected if the likelihood is above 5%.

22. In an efficient market such as the one in which Dr. Werner opines Co-Diagnostics' stock traded, Dr. Werner explains that "all publicly available information is incorporated in the security price and any new information that impacts the economic outlook of the firm gets quickly reflected in its security price."[36] Therefore, only disclosures of new information that significantly alter the total mix of publicly available information rapidly impact the price of a stock, while previously known or expected information already would have been incorporated into the price of the stock and

---

price. Consequently, there is no reliable and scientific evidence to conclude that the event at issue had an impact on the relevant company's stock price.

[33] Werner Declaration, ¶ 41 (emphasis added).

[34] Werner Declaration, ¶ 58. Also *see* D.L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd ed., (Federal Judicial Center and National Research Council 2011) at 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%.")

[35] Werner Declaration, ¶ 58.

[36] Werner Declaration, ¶ 14. Also *see* C. Jones, *Investments: Analysis and Management* (John Wiley & Sons, Inc. 2013) at 320.

unexceptional information would not have any impact.[37] As Dr. Werner also explains, "[t]o the extent that the new information may have been expected, or the valuation impact of the new information is appropriately modest, the appropriate abnormal price return should be statistically insignificant."[38] Consequently, if the May 14 Trading Day Disclosures "revealed startling information about Co-Diagnostics' allegedly 100% accurate test" that resulted in a "significant decline in the value of Co-Diagnostics' stock" as Plaintiff claims,[39] one would expect to observe a negative and statistically significant abnormal return on May 14, 2020.

23.     Using his event study, Dr. Werner "examined how Co-Diagnostics stock reacted to new information" on May 1 and May 15, 2020 following the alleged misleading statements on May 1, 2020 and the U.S. FDA's press release after the market closed on May 14, 2020, respectively.[40] Dr. Werner opined that the abnormal stock returns on both May 1 and May 15, 2020 were "too severe to have been random fluctuation[s]" and are "deemed statistically significant" at the 5% level of statistical significance.[41]

24.     However, despite stating that he "conducted an event study investigating whether the market for Co-Diagnostics common stock was efficient, specifically with respect to allegation-related information that was released to the market during the Class Period,"[42] Dr. Werner disregards Co-Diagnostics' stock price reaction on May 14, 2020 – i.e., he completely ignores the May 14 Trading Day Disclosures upon which Plaintiff's claimed trading losses rely – and fails to discuss the results

---

[37]     E. Elton, M. Gruber, S. Brown, and W. Goetzmann, *Modern Portfolio Theory and Investment Analysis*, (John Wiley & Sons, Inc. 2003) at 414; C. Jones, *Investments: Analysis and Management* (John Wiley & Sons, Inc. 2003) at 320.
[38]     Werner Declaration, ¶ 45.
[39]     SAC, ¶¶ 74 and 99.
[40]     Werner Declaration, ¶¶ 50 and 66.
[41]     Werner Declaration, ¶¶ 62 and 65.
[42]     *See* above ¶ 18; Werner Declaration, ¶ 41.

11

of his own event study for this date.[43]

25.     Dr. Werner's disregard for the May 14 Trading Day Disclosures is not unexpected because his own event study analysis undermines Plaintiff's claim because it finds that Co-Diagnostics' stock price decline on May 14, 2020 is not statistically significant. In fact, it is far from his significance threshold.

26.     Based on Dr. Werner's event study, the absolute value of the t-statistic for Co-Diagnostics' abnormal return on May 14, 2020 was only 0.83, which is well below his threshold of 1.96.[44] I calculate that the absolute value of the t-statistic of 0.83 is associated with a 41% "chance that the abnormal return was caused by random volatility alone," which is **more than 8 times higher** than the generally accepted 5% threshold below which statistical significance is determined.[45] As discussed above ¶19, if the abnormal return is not statistically significant, then there is no reliable and scientific evidence to attribute the movement on May 14, 2020 to any Co-Diagnostics-specific information because there is too high a chance that the Co-Diagnostics' price movement can be explained by the market and/or industry factors considered in Dr. Werner's event study model or by random volatility alone.

27.     Because Dr. Werner's event study does not provide reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock on May 14, 2020 was impacted by the May 14 Trading Day Disclosures as opposed to random volatility, his own analysis is inconsistent with Plaintiff's claim that Co-Diagnostics' stock price on May 14, 2020 was impacted by the May 14 Trading Day Disclosures.

---

[43]     Werner Declaration, ¶¶ 50 & 60-65.
[44]     Werner Declaration, Exhibit 8.
[45]     A "p-value" measures the probability of observing an abnormal return associated with the t-statistic. *See* D.A. Lind, W.G. Marchal, S.A. Wathen., *Statistical Techniques in Business & Economics*, 15th ed. (McGraw Hill Irwin 2012) at 346. The p-value for a t-statistic of 0.83 is 41%.

**B. The lack of statistical significance in Dr. Werner's event study is not surprising because the alleged corrective information in the May 14 Trading Day Disclosures did not demonstrably alter the total mix of publicly available information on May 14, 2020**

28.     The Plaintiff fails to explain why market participants would have found disclosures such as the alleged Decline to Confirm Quality and Concern Related to TestNebraska and TestIowa Disclosures, to be value relevant or purportedly corrective. In fact, as shown below, the economic evidence demonstrates that the allegedly corrective information disclosed in the May 14 Trading Day Disclosures was (1) previously known, therefore, in the efficient market in which Dr. Werner opines Co-Diagnostics stock traded, was already incorporated into its stock price, and/or (2) not viewed by market participants as "startling," or even surprising.

29.     First, contrary to Plaintiff's claim that the May 14 Trading Day Disclosures were "startling," I find that disclosures such as the alleged Higher Limit of Detection and results regarding the accuracy of Co-Diagnostics' tests from state testing were already known to the market based on, among other things, sources cited by the Plaintiff.

30.     The SAC alleges that "The Salt Lake Tribune [on May 14, 2020] **revealed** that TestUtah's tests [by Co-Diagnostics] 'have a higher 'limit of detection' — that is, they require more of the virus to trigger a positive result — than most other coronavirus tests approved for sale in the U.S., **according to an analysis by the life sciences publication BioCentury**.'"[46] However, the alleged Higher Limit of Detection Disclosure was *not* "revealed" by *The Salt Lake Tribune* on May 14 because it had already been publicly disclosed by *BioCentury* on April 3, 2020,[47] approximately one month before the Class Period begins. Furthermore, the Plaintiff ignores that an article it cited in

---

[46]     SAC, ¶ 75 (emphasis added).
[47]     "Limits of detection for FDA-authorized COVID-19 diagnostics," *BioCentury*, April 1, 2020, updated April 3, 2020.

13

the SAC published in *The Salt Lake Tribune* on April 30, 2020[48] – i.e., the same source, two weeks

earlier than the alleged corrective disclosures and one day before the alleged misstatement was made

– also publicly disclosed the analysis by BioCentury:[49]

> An analysis by the life sciences publication BioCentury showed that at least 16 of 22 comparable tests authorized by the FDA report a lower limit of detection, or greater sensitivity, than Co-Diagnostics' tests.

31.     Plaintiff also claims that the purported 95% Accuracy Reported by Iowa Governor

Disclosure on May 14, 2020 "did not comport with [purported] statements previously made by Co-

Diagnostics on May 1, 2020."[50] However, the Governor of Nebraska reported three days earlier on

Monday May 11, 2020 that the Co-Diagnostics' tests for TestNebraska have "a 95% accuracy rate:"[51]

> A group of state lawmakers urged Gov. Pete Ricketts on Monday to terminate agreements with three Utah companies the state has contracted with as part of its initiative to ramp up coronavirus testing….

---

48      SAC, ¶ 59.

49      "'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions," *The Salt Lake Tribune*, April 30, 2020. As noted by Plaintiff, on April 30, 2020, *The Salt Lake Tribune* "reported that Co-Diagnostics tests being used by TestUtah.com resulted in only a 1% to 2% positive test rate even in symptomatic patients, suggesting that Co-Diagnostics tests were only accurately reporting half of the Covid-19 infections…." See SAC, ¶ 68. The Plaintiff claims that the alleged higher limit of detection reported by *BioCentury* was consistent with "concerns about TestUtah's lower rate of positive test results." *See* SAC, ¶ 75.

50      SAC, ¶ 77.

51      "Senators call on governor to end Test Nebraska contracts," *Lincoln Journal Star*, May 11, 2020, 5:45 pm ET (emphasis added).

In fact, *The Salt Lake Tribune* article on May 14, 2020 itself reported the same information about TestNebraska: "Nebraska Gov. Pete Ricketts on Monday [May 11, 2020] said the hospital lab that is processing TestNebraska's tests has confirmed an accuracy rate of 95 percent, the Lincoln Journal Star reported." *See* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET.

The same *Salt Lake Tribune* article on May 14, 2020 also reported TestIowa's accuracy which was previously reported by *The Gazette* in Cedar Rapids: "In one county, health officials said nearly ten percent of TestIowa's results were 'inconclusive,' The Gazette in Cedar Rapids reported." *See* "TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET; *See also* "Some Test Iowa results 'inconclusive,' Linn County officials say," *The Gazette*, May 13, 2020, 4:28 pm ET, updated 11:11 pm ET ("Only 334 people were tested for the coronavirus disease over the first four days of a new drive-through site in Cedar Rapids, according to health officials, and a 'fairly large amount' of those results were deemed inconclusive, Linn County Supervisor Stacey Walker said Wednesday….Walker said almost 10 percent of the results from the Cedar Rapids location were found inconclusive."). I note that Co-Diagnostics' stock closed at $23.42 on May 13, 2020 and opened *higher* not lower on May 14, 2020, at $26.72. Source: Bloomberg.

14

> The 3% positive rate is well below the 18% average positive rate for all other tests conducted in Nebraska since testing began in early March….
>
> Test Utah, the model for the Test Nebraska program that has been operating since April 1, separated results for symptomatic patients from those without symptoms, the Salt Lake Tribune reported last month, but positive rates for both groups were below those reported at other test sites....
>
> Ricketts on Monday said the tests have been validated at the Test Nebraska lab set up at CHI St. Elizabeth in Lincoln and **have a 95% accuracy rate**.

Therefore, the market was aware prior to May 14, 2020 that the results of state testing "did not comport with [purported] statements previously made by Co-Diagnostics on May 1, 2020."[52]

32. Second, I did not find a single analyst or press report that attributed any movement in Co-Diagnostics' stock price to the May 14 Trading Day Disclosures, let alone supported Plaintiff's claim that these disclosures were "startling," or even surprising.[53] Rather, the lack of such commentary contradicts Plaintiff's claim that the information in the May 14 Trading Day Disclosures

---

[52] SAC, ¶ 77. Since the *Lincoln Journal Star* article was published after the market closed on May 11, 2020, the market reaction date is May 12, 2020. I note that Dr. Werner's event study analysis finds that Co-Diagnostics' stock price movement on May 12, 2020 is not statistically significant with a t-statistic of only -0.20. *See* Werner Declaration, Exhibit 8.

[53] My news search includes 114 articles with "Co Diagnostics" or "CoDiagnostics" in the entire article from Factiva from May 13 to May 20, 2020 and 36 articles from Bloomberg for Co-Diagnostics, Inc. from May 13 to May 20, 2020. This includes all sources in the Factiva database including all major newspapers, newswires, and other major publications and all articles from Bloomberg. For analyst reports, I searched FactSet, Eikon, and Capital IQ for Co-Diagnostics analyst reports during the one-week window from May 14, 2020 to May 20, 2020, and my search resulted in 2 analyst reports.

The only article I found that mentions a price decline during the trading day on May 14, 2020 was a Bloomberg article which stated that "Co-Diagnostics **briefly** fell as much as 22%, its biggest drop since March 10, after Hindenburg Research tweeted that it's short the company. Hindenburg's concerns include the 'astronomical' valuation of the stock; CODX has gained about 2,400% since start of the year." "Co-Diagnostics Slides After Short Call From Hindenburg Research," *Bloomberg*, May 14, 2020 2:26 pm ET (emphasis added). Plaintiff does not claim Hindenburg Research is the source of an alleged corrective disclosure, and while the tweets regard many issues concerning Co-Diagnostics, the discussion of test quality is limited to the information in the BioCentury report which had been previously reported as discussed above, Hindenburg Research Tweet, May 14, 2020, 1:38 pm ET (Together with the following tweet, "$CODX's test quality has been consistently rated one of the worst, despite its own press releases touting 100% specificity and sensitivity:" Hindenburg provided a link to the same BioCentury article from April 1, 2020, updated on April 3, 2020).

was new, value-relevant, or otherwise altered the total mix of publicly available information.

33.     Finally, Co-Diagnostics' stock did not trade as one would expect if the May 14 Trading Day Disclosures were value relevant. As noted above, Dr. Werner acknowledges that "a security trades in an efficient market when all publicly available information is incorporated in the security price and any new information that impacts the economic outlook of the firm gets **quickly** reflected in its security price."[54] The academic literature has studied how quickly new information is reflected in the stock price in an efficient market. Numerous academic studies indicate that an efficient market's reaction to new events is immediate.[55] An hour after each of the May 14 Trading Day Disclosures, Co-Diagnostics' stock price had not declined due to the "startling" news but instead traded at *higher* prices. Intraday stock prices show that: 1) the last price before *The Salt Lake Tribune* article was

---

[54]     *See* above ¶ 22 (emphasis added); Werner Declaration, ¶ 14.

[55]     *See* e.g. J. Patell & M. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," 13 *Journal of Financial Economics* (1984), 223-252 at 249 ("All three sets of experiments hint at some activity in the hour or two preceding the Broad Tape news release, but by far the largest portion of the price response occurs in the first five to fifteen minutes after the disclosure");

L.H. Ederington, and J.H. Lee, "The Short-Run Dynamics of the Price Adjustment to New Information," 30 *Journal of Financial and Quantitative Analysis* (1995) 117-134 at 130 ("The price adjustment picture that emerges from this evidence may be summarized as follows. The market price begins adjusting almost immediately following a news release—generally within the first 10 seconds");

S.P. Kothari, "Capital Markets Research in Accounting," 31 *Journal of Accounting and Economics*, (2001) 105-231 at 125 ("In contrast, in an efficient capital market, prices adjust immediately to reflect changing expectations about a firm's earnings generating ability such that at any point in time an investor can only expect a normal rate of return on an investment in any stock");

J.A. Busse & T.C. Green, "Market Efficiency in Real Time," 65 *Journal of Financial Economics* (2002) 415-37, at 416 ("We study the response of stock prices and trading when a stock is featured on the Morning Call or Midday Call segment on the cable television financial news provider CNBC…. We find that stocks discussed positively experience a statistically and economically significant price impact beginning seconds after the stock is first mentioned and lasting approximately one minute. The response to negative reports is more gradual, lasting 15 minutes, perhaps due to the higher costs of short selling. Overall, the price response pattern is similar to the pattern of abnormal performance in work on traditional analyst recommendations, such as Womack (1996), only measured in minutes instead of days or months");

D.Y. Chung & K. Hrazdil, "Speed of Convergence to Market Efficiency: The Role of ECNs" 19 *Journal of Empirical Finance* (2012) 702-720 at 702 ("Overall, we confirm [previous research's] result that price adjustments to new information occur on average within 5–15 min for large NYSE stocks. We further show that it takes about 20 min longer for smaller firms to incorporate information into prices").

released at 9 am ET was $26.27, and the last price an hour later before 10:00 am ET was $27.52; 2) the last price before Iowa Governor Kim Reynolds's public statement announcing the accuracy rate of the COVID-19 tests at noon ET was $27.77, and the last price an hour later before 1:00 pm ET was $28.16.[56]

## V. Conclusion

34. All of the economic evidence cited above, in particular Dr. Werner's event study, contradicts Plaintiff's claim that the May 14 Trading Day Disclosures represented "startling" information that resulted in a "significant decline in the value of Co-Diagnostics' stock" on May 14, 2020. Therefore, there is no reliable and scientific evidence to conclude that the Company's stock price was impacted by the May 14 Trading Day Disclosures. Consequently, because Gelt sold its entire position of 22,000 Co-Diagnostics shares during the trading day on this date, there is no reliable and scientific evidence to conclude that the price at which Gelt sold was negatively impacted by an alleged corrective disclosure.

Dated: November 21, 2022                      _____

                                                Ran Wei

---

[56]       Source: TICK.

# Appendix A

**RAN WEI, Ph.D.**  November 2022
**Senior Vice President**

**Compass Lexecon**
332 S. Michigan Ave.
Chicago, IL 60604
(312) 322-0252 (direct)
rwei@compasslexecon.com

## FIELDS OF SPECIALIZATION

Accounting Litigation
Bankruptcy & Financial Distress Litigation
Class Certification
Corporate Governance
Damages
ERISA Litigation
Mergers & Acquisition Litigation
Securities, Derivatives, and Structured Financial Products

## EDUCATION

Ph.D., The Wharton School of University of Pennsylvania, 2006
    Applied Economics with a concentration in Finance

M.A., The Wharton School of University of Pennsylvania, 2004
    Statistics

B.A., Ohio Wesleyan University, 2001
    Economics, Mathematics, and Computer Science *(summa cum laude and Phi Beta Kappa)*

## PROFESSIONAL EXPERIENCE

Compass Lexecon, 2020 – Present
        Senior Vice President

Analysis Group, Inc., 2013 – 2020
        Vice President (2016 – 2020), Manager (2013 – 2015)

Navigant Economics (formerly Chicago Partners, LLC), 2006 – 2013
        Director (2008 – 2013), Associate Director (2006 – 2008)

**SELECT CONSULTING EXPERIENCE**

*General Securities Fraud Matters*

In matters related to Rule 10b-5, Section 11, and Section 12 securities damages claims, conducted numerous event studies assessing the impact of public disclosures on the price of stocks and corporate bonds, and supported extensive expert analyses including:
- The impact of allegedly misleading and corrective disclosures on security prices;
- The impact of alleged accounting fraud on security prices;
- The effects of alleged insider trading and market manipulation on security prices;
- The effects of block trades on security prices; and
- Quantification of affected trading volume in class actions.

In a matter related to the initial public offering (IPO) of a large Asian e-commerce company, supported an e-commerce expert in a securities class action suit alleging false and misleading statements in filings; evaluated the expected economic impact of at-issue statements on this firm's IPO.

In a matter related to regulatory risk disclosures, supported an accounting expert in a securities fraud lawsuit alleging misleading disclosures by a large energy corporation about risks certain regulations posed to its business; evaluated the impact on impairment costs.

In a matter related to a retail bankruptcy, supported a retail industry expert in assessing the reasonableness of financial projections used in a proposed restructuring plan.

In a matter related to executive compensation in the technology industry, supported a compensation expert in evaluating the trading behavior of the CEO and other executives of a major technology firm; analyzed patterns of executive stock sales and compensation across the tech sector.

In a matter related to trading manipulation in precious metals instruments, led and managed teams to analyze high-frequency intraday data and model the price impact of spoofing strategies and other market price manipulation.

*Private Equity and Investment Banking Matters*

In a matter related to management fees, supported a private equity expert in assessing the reasonableness of fees charged to investors, proper distribution of investment returns, and strategic actions undertaken by the firm's general partners.

In a matter related to investment due diligence, supported a private equity expert in evaluating and assessing the due diligence process for different stages of a private equity investment (e.g., acquisition, monitoring, and liquidation).

In a matter related to new venture investments, supported a private equity expert in examining the customs and practices with respect to launching new ventures.

In a matter related to fiduciary duty, supported a private equity expert in estimating potential disgorgements stemming from alleged breaches of fiduciary duties and misappropriated confidential information.

In a matter related to the post-acquisition integration process, supported a private equity expert in evaluating the economic incentives of an earn-out provision in a purchase agreement, and the reasonableness of the integration process, after an established company acquired a start-up company.

In a matter related to the liquidation of a hedge fund, supported a private equity expert in assessing a hedge fund manager's practices in liquidating and distributing over $1 billion in assets to investors.

In a matter related to fundraising, supported a private equity expert in assessing the reasonableness of a fundraising executive's compensation and examining the custom and practice in fundraising.

*Mutual Fund and ERISA Matters*

In several mutual fund excessive fee actions, supported expert analyses of the reasonableness of mutual fund advisory companies' cost accounting system, and the appropriateness of the accounting treatment of subadvisory fees for the purposes of computing the advisors' profitability from serving as an advisor to the funds.

In a matter related to an investment monitoring process, supported an industry expert to evaluate and assess reasonableness of the investment monitoring process in an ERISA class action litigation.

In a matter related to a settlement with a regulator, conducted a settlement prediction analysis and assisted a large mutual fund family in distributing settlement awards to shareholders.

*Other Matters*

In a matter related to investment suitability, supported a fixed-income expert in evaluating investment suitability to achieve an accountholder's stated objectives by assessing municipal bond trading strategies, the appropriateness of account leverage, and the reasonability of fees charged to the accountholder.

In a matter related to executive compensation in the entertainment industry, supported two experts in corporate governance practices as well as an expert who opined on damages in a litigation matter alleging that a corporation had violated the terms of a former executive's stock agreement after her employment was terminated.

In matters related to pre-release American Depositary Receipts (ADRs), conducted analyses to assist counsel in settlement negotiations in an investigation into a broker/dealer's handling of pre-release ADRs.

In matters related to fraudulent conveyance, conducted valuations of relevant companies.

In a matter related to the solar industry, conducted a valuation of the long-term supply contracts for a manufacturing company.

In matters related to the securities lending industry, supported an industry expert in examining the customs and practices with respect to participating in and managing securities lending programs, and the market for structured finance securities.

In a matter related to tax accounting in the energy industry, supported an accounting expert in evaluating the economic substance of an intercompany transfer of funds and whether it should be considered debt financing or equity financing.

**PUBLICATIONS**

"Examining The Evidence On VIX Manipulation," with Edi Grgeta et al., *Law360*, May 15, 2019

"3 Aspects Of Value Preservation For Restructuring Cos.," with Gaurav Jetley and Edi Grgeta, *Law360*, January 29, 2019

"The Market Value Impact of Operational Risk Events for U.S. Banks and Insurers," with J. David Cummins, and Christopher M. Lewis, *Journal of Banking and Finance*, 2006 30: 2605-2634

"Quantification of Operational Losses Using Firm-Specific Information and External Database," *Journal of Operational Risk*, 2006 1(4): 3-34

"An Empirical Analysis of the Economic Impact of Federal Terrorism Reinsurance," with Jeffrey R. Brown, J. David Cummins, and Christopher M. Lewis, *Journal of Monetary Economics*, 2004 51: 861-898

"Financial Sector Integration and Information Spillovers: Effects of Operational Risk Events on US Banks and Insurers," with J. David Cummins and Xiaoying Xie, (working paper)

# Appendix B

Case 2:20-cv-03668-NRDB Document 169-17 Filed 12/10/24 Page 134049 Page 24 of 27
of 28

**Materials Considered**

**Court Documents**

Second Amended Class Action Complaint (Proposed Class Action), April 7, 2021

Memorandum Decision and Order Denying Defendants' Motion to Dismiss, March 9, 2022

Lead Plaintiff's Motion for Class Certification, October 17, 2022

**Expert Report**

Declaration of Dr. Adam Werner, October 17, 2022

**Securities and Exchange Commission Filing**

Co-Diagnostics, Inc. Form 10-K for the fiscal year ended December 31, 2020

**News Articles and Other Publicly Available News**

"Limits of detection for FDA-authorized COVID-19 diagnostics," *BioCentury*, April 1, 2020, updated April 3, 2020

"'This is a potential public health disaster:' COVID-19 results from TestUtah.com are raising questions," *The Salt Lake Tribune*, April 30, 2020

"Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," *PR Newswire*, May 1, 2020, 6:30 am ET

"Senators call on governor to end Test Nebraska contracts," *Lincoln Journal Star*, May 11, 2020, 5:45 pm ET

"Some Test Iowa results 'inconclusive,' Linn County officials say," *The Gazette*, May 13, 2020, 4:28 pm ET, updated 11:11 pm ET

"TestUtah declines to join other Utah labs in accuracy check," *The Salt Lake Tribune*, May 14, 2020, 9:00 am ET, updated 10:19 am ET

Iowa Governor Kim Reynolds Press Conference, May 14, 2020, 12:00 pm ET, available at https://www.iowapbs.org/shows/governorpress/episode/3544/iowa-gov-kim-reynolds-press-conference-may-14-2020-1100-am

Hindenburg Research Tweets, May 14, 2020; 1:38 pm ET

"Co-Diagnostics Slides After Short Call From Hindenburg Research," *Bloomberg*, May 14, 2020 2:26 pm ET

"Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," *PR Newswire*, May 14, 2020, 7:44 pm ET

## Academic Publications

J.A. Busse & T.C. Green, "Market Efficiency in Real Time," 65 *Journal of Financial Economics* (2002) 415-437

J.Y. Campbell, A.W. Lo, & A.C. MacKinlay, *The Econometrics of Financial Markets* (Princeton University Press 1997)

D.Y. Chung & K. Hrazdil, "Speed of Convergence to Market Efficiency: The Role of ECNs" 19 *Journal of Empirical Finance* (2012) 702-720

L.H. Ederington, & J.H. Lee, 30 "The Short-Run Dynamics of the Price Adjustment to New Information," 30 *Journal of Financial and Quantitative Analysis* (1995) 117-134

E. Elton, M. Gruber, S. Brown, & W. Goetzmann, *Modern Portfolio Theory and Investment Analysis* (John Wiley & Sons, Inc. 2003)

C. Jones, *Investments: Analysis and Management* (John Wiley & Sons, Inc. 2013)

S.P. Kothari, "Capital Markets Research in Accounting," 31 *Journal of Accounting and Economics* (2001) 105-231

D.A. Lind, W.G. Marchal, & S.A. Wathen, *Statistical Techniques in Business & Economics*, 15th ed. (McGraw-Hill/Irwin 2012)

A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997) 13-39

J. Patell & M. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," 13 *Journal of Financial Economics* (1984) 223-252

D.L. Rubinfeld, "Reference Guide on Multiple Regression," *Reference Manual on Scientific Evidence*, 3rd ed., (Federal Judicial Center and National Research Council 2011)

G.W. Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *Journal of Law and Economics* (1981) 121-158

## Bates-stamped Document

GELT0000001-20

## Data Sources

Bloomberg, L.P.

TICK Data

Bloomberg news search for Co-Diagnostics, Inc. from May 13, 2020 to May 20, 2020.

Factiva news search for "CoDiagnostics" or "Co Diagnostics" in the entire article from May 13 to May 20, 2020.

FactSet, Eikon, and Capital IQ searches for Co-Diagnostics analyst reports from May 13, 2020 to May 20, 2020.

***All other documents cited in this report***