# Exhibit 69

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION
Case No. 2:20-cv-00368-JNP-DBP
---------------------------------------x
GELT TRADING, LTD., a Cayman Islands
limited company,

                        Plaintiff,

                -against-

CO-DIAGNOSTICS, INC., a Utah
Corporation, DWIGHT EGAN, JAMES
NELSON, EUGENE DURENARD, EDWARD
MURPHY, RICHARD SERBIN, REED BENSON,
BRENT SATTERFIELD,

                        Defendants.
---------------------------------------x
                     February 14, 2024
                     10:06 a.m.



        Remote Videotaped Deposition of
DANIEL BETTENCOURT, an Expert Witness in
the above-entitled action, located in
Massachusetts, taken before Dawn Matera,
a Notary Public of the State of New York
and Connecticut.

                *     *     *

Page 2

APPEARANCES:

MARCUS NEIMAN RASHBAUM & PINEIRO LLP
Attorney for Plaintiff
    One Biscayne Tower
    2 South Biscayne Boulevard
    Suite 2530
    Miami, Florida 33131000
By:  MICHAEL PINEIRO, ESQ.
    mpineiro@mnrlawfirm.com
    BRANDON FLOCH, ESQ.
    bfloch@mnrlawfirm.com

BAKERHOSTETLER
Attorney for Defendants
    45 Rockefeller Plaza
    New York, New York 10111

By:  ZACHARY R. TAYLOR, ESQ.
    ztaylor@bakerlaw.com
    GENEVIEVE YORK-ERWIN ESQ.
    gyorkerwin@bakerlaw.com

Also Present:
    TYLER QUADE
    MICHAEL A. KEABLE, Compass Lexecon
    JEFF MENTON, Videographer
            ~oOo~

Page 3

THE VIDEOGRAPHER:  Good morning, we are going on the record at approximately 10:06 a.m. on February the 14th, 2024.  Please note this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connections of participants.  What is seen from witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is video media disk one of the video-recorded deposition of Daniel S. Bettencourt taken by counsel for the Defendant in the matter of Gelt Trading Limited versus Co-Diagnostics, Inc.  This case is filed in the United States District Court, District of Utah.  Case number 2:20-CV-00368.  This deposition is being conducted remotely using virtual technology.

My name is Jeff Menton.  I'm the

Page 4

certified legal videographer.  The court reporter is Dawn Matera.  And we are both from Veritext New York.

All counsel consent to this remote video arrangement and waive any objections to this manner of reporting.

If there are any objections to the court reporter swearing in the witness remotely, please state your notice now.

Not hearing any objections, all counsel have been noted on the stenographic record.  The court reporter may proceed to swear in the witness.

DANIEL BETTENCOURT, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. TAYLOR:

Q.   So good morning, Mr. Bettencourt.  Going to go through just some introductory stuff just to get certain information on the record and

Page 5

then some deposition basics.  That's the first way we are going to start out.

If you don't mind giving your full name and current address for the record?

A.   Sure.  Full name Daniel Stephen, that's with a P-H, Bettencourt.  And my full address is 45 Long Meadow Road in Wellesley, Massachusetts.  02482 is the zip.

Q.   So because we are doing this remotely can you please tell me where you are physically located today?

A.   Sure.  I'm at 56 Harvard Street in Brookline, Massachusetts.

Q.   Are you represented by counsel today in connection with this deposition?

A.   Personally, no.

Q.   Okay.  Is counsel present in the room with you?

A.   No.

Q.   Is anybody else in the room with you at the moment?

A.   No.

Q.   Okay.  Have you ever been

2 (Pages 2 - 5)

Page 6

deposed before?

A.   Yes.

Q.   Okay.  In connection with your expert work?

A.   Yes.

Q.   Do you mind telling us which cases you were deposed in before?

A.   Sure.  So let's see, one of them was 2017 or 2018.  It was, the company's name was Emergent Biopharmaceuticals, I think is the name of the company, and I was deposed in that in connection with a class action 10b-5 securities matter.

And then last summer, so the summer of 2023, I was deposed in a shareholder dispute matter for a private company valuation.

Q.   So as you sit here right now, those are the only two instances that you were deposed in your capacity as an expert?

A.   Correct.

Q.   Okay.  So just to go over some deposition basics before we start.  So as

Page 7

you know, your deposition is being transcribed.  And just to make sure that the transcript is accurate, I would just ask that you not begin answering a question until I finish.  So I'll ask the question fully and give a little pause and then you can answer the question fully and I will wait for your response, just so everything is clean on the transcript.  That's the first thing.

The other thing, just to make sure it's a clean transcript, it's important that your answers to my questions be oral, yes, no, or whatever else instead of uh-huh or nodding your head or anything else or a gestures. Just so everything that you respond to is actually transcribed on the record.

Second, just to clarify more about your deposition being under oath. If you do not understand a question that I ask you, please ask me to clarify or rephrase and that's fine and I will do so.  If I do ask a question and you do answer it, I'm just going to assume that

Page 8

you understood my question.

As far as objections go, from time to time you may hear your lawyer, Mr. Pineiro, put an objection on the record to a question that I'm asking. For depositions, after the objection is noted, you can proceed to answer my question unless your attorney directs you not to answer the question.  And if that's the case, me and Mr. Pineiro might get into a conversation about how to deal with that, but otherwise if he objects, you can proceed to answer unless you're directed otherwise.

As far as breaks, I will try to take a break every hour, hour-and-a-half, just depending on how things are going and how we're feeling, just so this is not painful on everybody.  But otherwise, the one rule for breaks is as long as there is an outstanding question, if I ask a question and you haven't responded or you're in the middle of the response, I just ask that we only take a break once a question is completely responded to and

Page 9

then we can talk about taking a break, so there is not some hanging question in the air.

And then the last thing in this matter is just I have to ask, is there anything preventing you from testifying truthfully today?

A.   No.

Q.   Are you under the influence of any medications?

A.   No.

Q.   Anything else that would inhibit your ability to answer today, like alcohol or anything else?

A.   No.

Q.   All right.  So I already asked about anyone in the room.  Electronics. Aside from the computer you're using to do the Zoom call right now, are there any other electronic devices that are on or near you or in your arm's reach at the moment?

A.   Aside from like the ancillary electronics, like the microphone and speakers and lights, there is a phone on

3 (Pages 6 - 9)

Page 10

my desk, no.

Q. So in terms of the cell phone, I mean first if you don't mind just putting that either on silent or just shutting it off during the deposition, just so make sure that it's just you and me here doing our thing. Besides that, is there anything else that you're using during this deposition, note pad, notes, documents?

A. So I brought a copy of my report and the rebuttal report that I wrote in this matter.

Q. Okay.

A. Those are the only two documents that I have.

Q. Okay. So you'll notice, because I have been doing it for the last five minutes, you may notice that I'm looking away from the camera from time to time; that can be because I'm either looking at my notes, I'm only controlling the exhibits in this, so I might be sort of gazing somewhere else to do that. Just be aware of that while this is

Page 11

happening.

So those are the basics. Do you have any other questions with regard to just how the deposition is going to be handled before I begin?

A. No. I should say like my monitor is one of those wide-screen monitors, so if my eyes are looking from left to right at some documents, I guess, just so that you're familiar with what I might be looking at on either side of the screen.

Q. Okay. And are you intending to communicate with anybody during this deposition, either through e-mail or through text messages?

A. No, not with regards to the deposition. I have a son who was recently diagnosed with Type 1 diabetes, so I think during breaks I might communicate with my wife to make sure that everything is okay. But outside of that, no, I have no intention of communicating with anybody.

Q. I would just ask that while

Page 12

we're on the record and while we're doing this deposition, that only the people here in this virtual room be the only people that we are communicating with. I, for example, have my phone completely off right now and my e-mail closed.

Have you seen the deposition notice that we served upon your counsel?

A. I'm not sure that I have seen the formal notice. I know counsel informed me, obviously, of the deposition. But I'm not sure that I put eyes on the formal notice.

Q. Okay. So before we begin, let me just put the notice on. I'll mark this as Exhibit 1.

(Bettencourt Exhibit 1, Notice of Deposition, was so marked for identification, as of this date.)

MR. TAYLOR: Does everyone see the exhibit that I'm sharing currently that has the notice?

(Off the record.)

BY MR. TAYLOR:

Q. For now I can share my screen

Page 13

and you can see it. Mr. Bettencourt, do you now see the notice that I just put on the screen right now?

A. Yes.

Q. So this is the Notice of Deposition. Let me scroll down. You can take a read of that, you can see it's dated February 2024. Just let me know when you completed reading the notice.

(Witness reviews document.)

A. I read it.

Q. So what did you do to prepare for the deposition today?

A. In preparation for the deposition today, I reread my two reports. I reread the amended complaint. The motion to dismiss in this matter. Dr. -- I might butcher the pronunciation, but We or Wei, her report. I read Dr. Werner's report on market efficiency. His rebuttal report to Dr. We. Then I read the judge's class cert ruling. My two reports. And then the two reports issued by Dr. Ferrell in this matter.

In addition, I probably looked

4 (Pages 10 - 13)

Page 14

at some additional documents that were cited in those reports, like certain of the academic literature. I might have printed out and, you know, just refreshed my memory of. I also met with cocounsel for about to hours in total, once yesterday and once on Friday. Thursday. Thursday of last week I believe it was. So that's about what I did.

Q. Okay. So I guess in total how much time would you say you spent preparing for this deposition?

A. I would say I probably spent the better part of four days, four-and-a-half days. So eight hours a day. Probably somewhere between 30 and 40 hours.

Q. Did you review the plaintiff's second amended complaint in this action?

A. Sorry, yeah, when I said amended complaint, I meant the complaint that was cited in my report.

Q. Please describe the claims at issue in this case as you understand them?

Page 15

MR. PINEIRO: Form. Calls for a legal conclusion.

Q. You can answer.

A. As I understand them, plaintiffs are bringing claims under Section 11 of the Securities Act -- of the Exchange Act, rather. Sorry, let me start again.

Plaintiffs are bringing claims under Section 10b-5 of the Exchange Act alleging that there was material misrepresentations and omissions made by defendants in this matter.

Q. Okay. Are you aware of the May 1, 2020 press release in this case?

A. Yes.

Q. And what is your understanding of the significance of that press release?

A. Significance as it relates to this case or significance -- what do you mean exactly by "significance"?

Q. What its role is in this case. You discussed the claims at issue, I'm just trying to get at how does the May 1,

Page 16

2020 press release sort of factor into the claims at issue in this case?

MR. PINEIRO: Form. Calls for a legal conclusion.

MR. TAYLOR: You can continue.

A. Sure, in my initial report I have an excerpt from the complaint where they allege that the press release on May 1st misled investors about the accuracy of the Logix Smart Covid-19 test by saying that the test had consistently and repeatedly outperformed its competitors. And Mr. Satterfield's comments that you can't do better than that.

Q. Just to go back to the preparation, you mentioned that you spoke with counsel in preparation for your deposition today. So how many times did you meet with counsel to prepare for today's deposition?

A. Twice. I think I said it was twice. We had two virtual meetings in preparation.

Q. And how long was each meeting?

A. I would say on average they

Page 17

were probably about an hour. So a total of two hours with prep with counsel.

Q. Besides for you and counsel, was anyone else present?

A. Yes. Tyler Quade from my office. One of my associates was also there.

Q. When you said you were having meetings with counsel, with whom were you meeting, which counsel?

A. Well, I met with Michael and Brandon.

Q. Okay. Other than counsel, have you discussed today's deposition with anybody else?

A. I discussed it with most of the firm that we, for scheduling purposes, have had it on the calendar and wanted to make sure that it has been blocked off.

In preparing for it I spoke with Miguel Villanueva, who is our quantitative analyst here at Crowninshield, to just revisit some of the quantitative methods that we applied and that Dr. Ferrell applied and the

5 (Pages 14 - 17)

Page 18

methods that Dr. Ferrell says that we incorrectly applied, and determined that he was -- that he failed to understand what exactly we did in our approach to the quantitative methods that we implemented in the current matter.

Q. Okay. Just to be clear, when you said you spoke to people at the firm, the firm means Crowninshield?

A. Yes.

THE VIDEOGRAPHER: Going off the video record at 10:26 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record at 10:34 a.m., please proceed.

BY MR. TAYLOR:

Q. Okay. So I just want to back up just one second just to ensure something on the record. You know, we are doing this as a remote deposition, but I guess we can sort of place ourselves as if we were in the room together. I just want to make sure that whatever is, whatever materials I'm

Page 19

showing you are the only materials that I'm showing you right now.

Can you confirm that right now you're not looking at any other documents or anything else on your screen besides the video of this deposition?

A. Correct. The only two windows I have open are the Marked Exhibits one and an Edge browser and then this Zoom window.

Q. Okay. All right. Last question about the preparation. Did you provide any documents to your counsel or Mr. -- plaintiff's counsel in this case in preparation for this deposition?

A. No, not that I'm aware of.

Q. Did plaintiff's counsel provide you with any documents in preparation for this deposition?

A. Yes, there was one document they provided us. It was from a Saha article that Dr. Ferrell cited that is like a defunct journal it looks like, so we couldn't find it anywhere on the web so we had to ask counsel for that

Page 20

document.

Q. Understood. Okay. All right. Now we're just moving on to your background. So first let's talk about your education. Did you graduate from college?

A. Yes.

Q. Where did you go for undergraduate studies?

A. I studied undergraduate, at the time it was Bentley College, but I believe now it's Bentley University.

Q. And when did you graduate from Bentley University?

A. 2005.

Q. And what was your major?

A. Corporate finance and accounting.

Q. As part of your undergraduate studies, did you take any courses relevant to measuring statistical significant of stock price movements?

A. Yes.

Q. Which courses?

A. It's been almost 20 years since

Page 21

I graduated. So there is a number of, you know, basic statistic courses that come up.

And then as part of the major you have to take, I believe like stats, like level one stats, level two stats, and then you have to take, you know, as part of a corporate finance and accounting major, you have to take a number of finance courses where you're also doing statistical and econometric analyses, you know, to study stock prices and how stock prices react to information.

Q. During your undergraduate degree, did you learn how to conduct an event study?

A. From memory, I believe so. It's just, you know, it's not one of those things that I necessarily, you know, committed to memory per se.

Q. Okay. And do you have a graduate degree?

A. Yes.

Q. From where?

6 (Pages 18 - 21)

Page 22

A.    Babson College.

Q.    And what is the graduate degree in?

A.    It's got a concentration in finance.  So a master of business administration with a concentration of finance.

Q.    Was your MBA also with a concentration in entrepreneurship?

A.    I don't believe it was.  I know Babson has a reputation for being an entrepreneurial school, but I don't believe I had an entrepreneurial focus.

MR. TAYLOR:  Okay.  So I'm going to introduce a document as Bettencourt Exhibit 2.  I will put that in the marked exhibits folder now.

(Bettencourt Exhibit 2, Expert report of Daniel Bettencourt dated December 4th, 2023, was so marked for identification, as of this date.)

Q.    Do you recognize this document?

A.    Yes.

Q.    What is this document?

A.    It looks like the report that I

Page 23

filed -- this appears to be the report that I filed in this matter on December 4th.

Q.    Okay.  I'm going to scroll down to Exhibit 2 of your December 4th, 2023 report.  This is Exhibit 2, it's entitled "Curriculum vitae, Daniel S. Bettencourt, MBA."

Do you recognize this?

A.    Yes.

Q.    Is this your current curriculum vitae?

A.    No.  There is another expert report that's been filed since this one.  And then as you are probably about to point out, it looks like there is probably a typo in there where it says corporate finance and entrepreneurship in the concentration for Babson College.

Q.    So actually before we get to the education.  What was the other matter in which you filed an expert report that's listed here on the CV?

A.    It was another shareholder dispute in a private company in

Page 24

Massachusetts.

Q.    This was not a litigation in a court?

A.    No.  It was in the District Court of Massachusetts.  It was in connection with a court case.

Q.    Okay.  Do you happen to know the name of the case and the citation?

A.    As I sit here, I don't know the citation is.  To be honest with you, I'm not even -- I'm not sure if it's a public matter or not.  I could try to get some more color on that.  I don't know if it's something that I can disclose or not since it is a private company.

Q.    We'll revisit that.  So just going back to your education.  So if you look at the top right there, under Education it says, 2009, Babson College, F.W. Olin Graduate School of Business, MBA in corporate finance and entrepreneurship.

Do you see that?

A.    Yes.

Q.    So what was the -- can you

Page 25

please describe the entrepreneurship specialization?

A.    Like I said before, I think it's a typo because, to the best of my knowledge, my MBA has a concentration in finance.

Q.    And as part of your MBA, did you take courses in statistics?

A.    Yes.

Q.    Econometrics?

A.    Yes.

Q.    Did you take any courses in how to conduct an event study?

A.    Yes.

Q.    What were those?  Please describe what you learned in your MBA in connection with how to conduct an event study.

A.    Sure.  Again, I took a number of statistical courses where we went through conducting an event study, regression analysis.  I spent a year as a portfolio manager in the Babson College Fund managing a portion of the endowment where we frequently would conduct event

7 (Pages 22 - 25)

Page 26

studies to look at the information impact of, or the impact of information on particular securities.

So there is a number of examples or courses and examples where I have done event study analysis.

Q. Was that the focus of your corporate finance specialization?

A. Was what the focus?

Q. How to conduct an event study.

A. As I explained before, I think there is a typo in there where the concentration is just in finance. So I would disagree with the premise that it was a focus of the corporate finance degree.

But it is a focus in that it was a consideration or some analyses that you would probably run on a, you know, two or three times a week in connection with analyzing stocks and coming up with recommendations for stocks for the portfolio.

Q. Okay. Just to clarify --

MR. TAYLOR: If we can go off

Page 27

the record for one second.

THE VIDEOGRAPHER: Going off the video record at 10:44 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record at 10:47 a.m., please proceed.

BY MR. TAYLOR:

Q. Mr. Bettencourt, can you please describe your work experience since you graduated high school?

A. So since I graduated high school, in the summers I used to work at my family's landscape construction company in the summers. Well, I guess also worked part time at a gym, if I'm being honest.

After I completed my undergraduate degree I went back to help run the family business. After a few years of that and a couple of other projects coming to completion I returned to graduate school. I got out with an MBA from Babson in 2009.

So since then I have been

Page 28

working as an economic consultant at Crowninshield Financial Research, so for the past 14 years, almost 15 years.

Q. If you go back to Exhibit 2, which is your December 4th, 2023 report, so it should be, out of 86 pages, if you scroll down, it should be page 66 out of 86, just let me know when you're back at your CV, which is Exhibit 2 to your December 4th report.

A. It's taking a second to load on my end. Sorry, I just got the spinning wheel here. I'm waiting for it to download. I can see Exhibit 1, but when I scroll over to Exhibit 2, it doesn't show up yet.

Q. Did you try refreshing?

A. I see it in the list of documents, just when I go to open it.

MR. TAYLOR: Let's go off the record.

THE VIDEOGRAPHER: Off the record at 10:51 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are back

Page 29

on the video record at 10:54 a.m., please proceed.

BY MR. TAYLOR:

Q. I'm going to share my screen and show you a portion of Exhibit 2, which is your CV, one moment.

So on your CV here, attached as Exhibit 2 to your December 4th report, under Business Experience, does this accurately represent your entire professional experience post-high school?

A. Yeah. I mean it represents, it accurately represents jobs that I have had where I collected or received like a W-2 pay, if you will.

Q. Were there any other jobs that you took that did not have a W-2?

A. Well, there is other things that I do, you know, in terms of investments, et cetera, that wouldn't be reflected here. But in terms of like actual W-2 jobs, that's reflected.

Q. So what is Bettencourt Irrigation and Landscaping?

A. It's a business founded by my

8 (Pages 26 - 29)

Page 30

father that does landscape construction and irrigation on Martha's Vineyard.

Q. And what was your title at Bettencourt Irrigation and Landscaping?

A. Vice president.

Q. And that was true throughout 2005 to 2008?

A. Yes.

Q. What were your responsibilities at Bettencourt Irrigation and Landscaping?

A. So my responsibilities were, you know, it's a relatively small business, so the day to day could involve, you know, any number of things from business development, you know, marketing, website design, dealing with the banks, dealing with contractors, dealing with any number of things, suppliers, customers, handling the business's finances. Basically you're running a small business.

Q. And in your time at Bettencourt Irrigation and Landscaping, were you a full-time employee throughout 2005 to

Page 31

2008?

A. I believe that I was, yes.

Q. So you were a full-time employee at Bettencourt Irrigation and Landscaping while you were studying your undergraduate degree; is that correct?

A. So I would have, I guess with more precision, I could have put May 2005 through May 2008.

Q. Okay. So in your CV, if you look above that under Business Experience, it says 2009 to present, Crowninshield Financial Research, vice president. Do you see that?

A. I do.

Q. So what is Crowninshield?

A. Crowninshield is an economic consulting firm.

Q. And you joined Crowninshield as a vice president in 2009; is that correct?

A. No. When I initially joined I was, I had the title of analyst.

Q. Which years were you an analyst at Crowninshield?

Page 32

A. Offhand it was probably 2009 to 2011. I don't know exactly when I became an associate. Yeah, about two years, 18 months to two years, give or take.

Q. And what were your responsibilities as an analyst at Crowninshield?

A. So at the time it was, you know, getting a lot of data, doing a lot of analyses, running a bunch of event study analyses. Putting together exhibits. Checking the econometrics. Helping prepare reports for submission. Estimating damages for clients.

Q. As an analyst you would estimate damages for clients on your own or in conjunction with other people?

A. In conjunction with other people. I was still at the time learning the models.

Q. Okay. And after you were an analyst, somewhere around 2011, what was your title after that?

A. I believe then it was associate.

Page 33

Q. Okay. And which years were you an associate at Crowninshield?

A. Again, that was probably like another 18 months or two years. So from 2011 to 2013.

Q. And how did your responsibilities change when you became an associate as opposed to when you were an analyst?

A. Sure. At that point, you know, there was obviously more familiarity with the models and the understanding, so I would need less guidance, if you will, on a daily basis. And then I would help train the new analysts who came in.

So it was basically everything that I did as an associate and then help in training the new analysts that came in as well.

Q. So as an analyst, did you have to answer to people or were there levels of people above you who were managing your work?

A. Yes. To the best of my recollection, yes.

9 (Pages 30 - 33)

Page 34

Q.   Okay.  What were the levels -- like when you were an analyst, who was managing above you?  Who was managing your work?

A.   So there was -- we're going back a while now.

Q.   In terms of titles.

A.   Oh.  There was an associate and then there was an expert, like a testifying expert, and there was also, like a quantitative analyst that would have been managing my work.

Q.   What does a quantitative analyst do at Crowninshield?

A.   Sure.  So the quantitative -- now, currently what they do or back then?  I guess when?

Q.   Let's start with now.  What does a quantitative analyst do at Crowninshield currently?

A.   Sure.  So the quantitative analyst at Crowninshield is usually or has been in my experience somebody that has a Ph.D. in econometrics or finance and spends, you know, most of their

Page 35

professional life doing research and staying up to date with the state of the art in terms of quantitative methods.

And then also ensuring that all of the econometric analysis and financial analysis, generally, that comes out of Crowninshield is within their purview, and it's their responsibility to usually check the work and to make sure that all of the work is, like I said, it meets our professional standards here and that it is, you know, accurate and correct.

Q.   So is it fair to say that the quantitative analyst at Crowninshield is responsible for ensuring the accuracy of an event study analysis?

A.   I think the quantitative analyst will just, as you know, as I understand sort of most of the these shops, these shops, by that I mean economic consulting firms, the way that we work is that the work is constantly getting checked.  So everybody is really responsible for ensuring that the analysis is correct and the quantitative

Page 36

analyst is one of those individuals.

Q.   Would you say that the quantitative analyst has the final signoff on the accuracy of any given event study?

A.   No.  I believe the final signoff on the accuracy would lie with the expert.

Q.   So going back to around 2013, you were an associate.  What was the title you held after being an associate?

A.   I believe it was senior associate.

Q.   Okay.  And how did your responsibilities change once you became the senior associate as compared to when you were an associate?

A.   Sure.  So again, all of the work that I did as an analyst and as an associate, I was still doing.  But then there became more opportunities to get in front of clients, you know, during meetings, on telephone calls.  And, you know, to manage some of the, not only the analysts now, but also the associates.

Page 37

Q.   How long were you a senior associate, from what year to what year?

A.   Senior associate might have been 2013 to 2016, the beginning of 2017, roughly speaking.

Q.   Okay.  And what was your title after being a senior associate at Crowninshield?

A.   My current title, which is vice president.

Q.   What are your responsibilities as a vice president at Crowninshield?

A.   So, again, I mean it's basically everything all the way up from, you know, doing some of the analysis.  Managing, you know, analysts and associates and senior associates and, you know, doing research internally with our experts, affiliated experts and quantitative analysts.  Discussing, you know, certain topics that are in the -- in the news as it relates to securities litigation and financial economics.

Then there is sort of an element where obviously I've done more

10 (Pages 34 - 37)

Page 38

testimony as of late. So I guess that's part of the responsibilities. And then also to personnel, you know, to make sure that the personnel in the office is, you know, being managed correctly.

Q. As a vice president is it your responsibility to conduct event studies for expert reports?

A. As a vice president, at the direction of the expert, whoever the testifying expert is, will, if asked, conduct an event study. I frequently do, yes.

Q. When did you become -- when did you start becoming a testifying expert?

A. So there is a number of cases where I have consulted. You know, I have been like the consultant on a number of matters doing damages that sort of preceded, and I continue to do a lot of that work, but those cases probably preceded the testimony.

I think my first testimony report and deposition was the Emergent BioSolutions matter at the bottom of page

Page 39

63 there.

Q. That was in 2017, correct?

A. Yeah. Like I said before that there was a number of cases where I would consult with attorneys on damages or other settlement issues, just provide consulting report throughout the litigation.

Q. Is there a title above vice president at Crowninshield?

A. I don't think currently, no. I mean, president, between president and vice president, there is no title currently.

Q. So during your time at Crowninshield -- well, yeah. At Crowninshield, how long have you been working on securities litigation cases?

A. 14 or 15 years.

Q. And are Section 10b cases your primary focus as an expert?

A. For me personally?

Q. Yeah.

A. No, I would say it's a mixture of 10b cases, Section 11 cases and then

Page 40

these private business disputes.

Q. So between 10b cases, Section 11 cases and these private disputes, do you say they are equally divided? You focus on them, you know, equally or is one sort of your primary focus as an expert.

A. As an expert my primary focus or I guess the area of expertise, you know, that I've, yeah, my primary focus would be Section 11 and 10b-5 cases, but through my education and training, the same underlying financial principles and valuation principles that are taught in, at college and are used in securities litigation can also be applied to value these, value any asset included private companies.

Q. Which would you say you focus on more, Section 11 cases or Section 10b cases?

A. I mean generally speaking, I would say 10b cases are more prevalent in terms of the day-to-day work than a Section 11 case. But there's obviously

Page 41

other types of securities litigation that I'm involved in as well.

Q. Let me ask it a little bit differently. Have you worked on more Section 11 cases than Section 10b cases?

A. Again, I don't know the exact number, but the percentages might be close. It would probably be more towards the 10b cases than the Section 11 cases, but I just don't know offhand exactly what the proportions would be.

Q. So I'm going to scroll down and now we are on page 64 of your report. This is still part of Exhibit 2 to your December 4th report, your CV. The page starts with Selected Experience. And then under it says, "Project lead in the following securities cases."

Do you see that?

A. Yes.

Q. What does project lead mean?

A. Project lead is just a term that we use internally here to be the person that is responsible to the expert and to the clients and making sure that

11 (Pages 38 - 41)

Page 42

the analysis that was had communicated from the expert is getting done. And that the client's, you know, deadlines or deliverables are being met.

So you're managing both internally and externally both downwards and upwards within the organization.

Q. When you are an analyst -- sorry, let me rephrase that.

Were you a project lead while you were an analyst at Crowninshield?

A. I believe towards the end I was. But again, it's so long ago and so many different projects ago that it's hard to know for sure as I sit here now. But I believe towards the end of that two year, 18-month span, that I was sort of stepping into that role.

Q. Were you a project lead while you were an associate at Crowninshield?

A. Yes.

Q. Were you a project lead when you were a senior associate at Crowninshield?

A. Yes.

Page 43

Q. And were you a project lead while you were a vice president at Crowninshield?

A. Yes.

Q. Is it fair to say that as a project lead it was your responsibility to assist in preparing expert reports?

A. In preparing expert reports, what do you mean, the actual writing or drafting of the reports?

Q. You can tell me. Well, let's say as a project lead, was it your job to assist an expert?

MR. PINEIRO: Form. Calls for a legal conclusion.

Q. You can continue.

A. Yeah, I guess you were assisting the expert in that the expert was dictating the analysis to be done and how they wanted it, you know, what they wanted -- which analysis they wanted to conduct. So I guess in that sense, we were assisting or I was assisting.

Q. And in these cases listed under Project Lead, is it correct that you were

Page 44

not the testifying expert on any of these cases?

A. That's correct.

Q. Okay. And for all of these, all of the cases listed under Project Lead, the expert reports that were, that were conducted were not under your name; is that correct?

A. To the extent that there was an expert report filed, that would be correct.

Q. Okay. Which experts have you assisted at Crowninshield in your capacity as project lead?

A. Primarily Professor Finestein.

Q. And besides Professor Finestein, who else?

A. Over the years, there have been a number of different affiliated experts. Dr. John Minahan is one. Dr. Micah Officer is one. Do you want me to list them, is that what we are going for?

Q. Yes.

A. Micah Officer. Dr. Andrew Kleit. Professor Dawn Chance. Who else.

Page 45

I'm sure I'm missing -- Adam Warner is one, Dr. Adam Warner. Michael Hartzmark. Dr. Larry Wise is another one that I supported. Dr. Tom Porter. And then Dr. Mark Potter and Dr. Michael Goldstein.

There might be others. There probably are. But those are the ones that come to mind.

Q. Did you assist Dr. Warner in this case?

A. No.

Q. Have you communicated with Dr. Warner about this case?

A. No.

Q. So looking at these cases listed under Project Lead in the following securities cases, I'm going to represent to you that you list 37 cases in which you were the project lead. Does that sound correct?

A. The math of you counting these cases? Yes, they are represented here, yes.

Q. Were all of these cases listed

12 (Pages 42 - 45)

Page 46

under Project Lead Section 10b cases?

A.    No.

Q.    How many would you say were Section 10b cases as opposed to other types of cases?

A.    Offhand it's hard to say.  I know the first two cases were both 10b -- Section 11, those were both Section 11. Blackstone was a Section 11 case. Countrywide was Section 11.  Grupon was both Section 11.  10b-5.  HCA Holdings was a Section 11 and 12 case.  IndyMAC was a -- again, this is all from memory. So obviously memory is imperfect. IndyMAC I believe was a Section 11 case. Orbital ATK was a Section 10b and Section 14 large agg case.  Petrobas was Section 11 and Section 10b and also there was a Brazilian component to those damages analysis, like a Brazilian securities litigation.

Q.    Okay.

A.    Prudential might have had both, if I remember correctly again.  SunEdison I believe was I believe both, Section 11

Page 47

and 10b-5.  Valant was also Section 10b, Section 11 and then 20A is the insider trading one I believe and Bank Rate might have had Section 10b and Section 11.

Q.    So going over these 37 cases listed under Project Lead, at least based on my counting, only 21 of them dealt with loss causation per your descriptions; is that correct?

A.    Yes, in terms of supporting the expert.  There might have been some consulting that I did with the client and the, like the AIG case, for example, when it came to settlement in terms of damages and potential loss causation issues there.  As listed here, I think your count is correct.

Q.    And you have been working for 14 years at Crowninshield; is that right?

A.    Yes.

Q.    So factoring in 21 expert reports as project lead dealing with loss causation over 14 years, on average, that's about 1.5 projects dealing with loss causation per year; is that right?

Page 48

MR. PINEIRO:  Form.

A.    Well, this is just a selected experience, not meant to be comprehensive in any way.  So I guess, you know, assuming that your math is correct on what's presented here on selected experience, then that would be correct, that based on the selected experience that the subset of the total experience, that it is 1.5 a year.  But there has likely many more.

Q.    So this list of cases under Project Lead, this is not a comprehensive list of the securities litigation cases that you worked on as project lead?

MR. PINEIRO:  Form. Mischaracterizes testimony.

Q.    You can answer.

A.    Sure.  Can you read the question back again?

(The record was read as follows:

"Question:  So this list of cases under Project Lead, this is not a comprehensive list of the securities litigation cases that you worked on as

Page 49

project lead?")

A.    So this is a selected list of cases where I was project lead.  It's not a comprehensive list.

Q.    So just to be clear, this list under Project Lead, this is not a comprehensive list of the securities litigation cases you worked on as project lead; is that correct?

A.    That's correct.

Q.    There are other security litigation cases that you worked on as project lead that are not listed here?

A.    Yes, there is likely several or many others.

Q.    And why were those cases omitted?

A.    Some of them might have been ongoing or unresolved at the time that this list was made.

In addition, I thought having 37 cases, you know, of these large class action disputes was sufficient to list under selected experience.

Q.    When was this list made?

13 (Pages 46 - 49)

Page 50

A.   I think originally it was probably put together in 2017, somewhere around there, 2017, 2016 and then it has been appended to at different intervals since then.

Q.   Just for the record, these cases that are listed under Project Lead, none of them contain the citations to the cases; is that correct?

A.   Citations as in the filing numbers?

Q.   Correct?

A.   That's correct.

MR. PINEIRO:  Zach, is there a good time for a five-minute restroom break?

MR. TAYLOR:  Yes, I think I have one more question and then we can do a break; is that all right?

MR. PINEIRO:  Yeah.

Q.   All of these cases -- let me start over.

For all of the cases listed under Project Lead, were you engaged, you, meaning you as in Crowninshield,

Page 51

engaged on behalf of plaintiffs for all of these cases?

A.   Looking at it, I would say it's most of them that are listed here, that would be the case, at least on 64, yes.

Q.   Okay.  So let's go down -- so on 64, let me just ask one more time, for all of the cases listed on page 64 of your December 4th report, all of that work was done on behalf of plaintiffs; is that correct?

A.   That's correct.

Q.   Now I'm scrolling down to page 65.  Were all of the cases listed on page 65, were you engaged by plaintiffs in those cases?

A.   I believe so, yes.

Q.   Now I'm scrolling to page 66, the same question, were all of the cases on page 66, were you engaged on behalf of plaintiffs?

A.   I believe that is correct as well, yeah.  It looks like they are all on behalf of plaintiffs.

Q.   Have you ever been engaged by

Page 52

defendants in a securities litigation case?

A.   Personally or has Crowninshield ever been?

Q.   Well, let's start with you personally.

A.   So in the context of security litigation, the answer is no.  Like the most recent valuation matter that I discussed earlier that is not listed, that's on behalf of defendants.

Q.   Just to close this loop, all of your experience serving as an expert or a project lead has been on behalf of plaintiffs in securities litigation cases; is that correct?

A.   No.

Q.   What cases were you not engaged on behalf of plaintiffs in securities litigation?

A.   From memory, I don't know offhand.  But I know there's probably like five cases, up to five cases where I worked or supported experts that were hired on behalf of defendants.

Page 53

Q.   Do you recall the names of those cases?

A.   Again, not as I sit here now.  But there definitely are a few.  If they come to me, I will be happy to share them with you.

Q.   Are any of the cases that you were retained by defendants listed in your CV?

A.   We just went through this list, they were not listed here.  And I guess in that private shareholder dispute, I was hired by defendants in that matter.

Q.   Okay.

MR. TAYLOR:  Mike, I think we can take a five-minute break now.

MR. PINEIRO:  Thanks.

THE VIDEOGRAPHER:  This will be the end of video media disk number one.  The time is 11:29 a.m. and we are going off the video record.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the video record.  This is video media disk number 2.  The time is

14 (Pages 50 - 53)

Page 54

11:39 a.m. Please proceed.

BY MR. TAYLOR:

Q. So we are still looking at your CV. So now we are on page 63, which is the first page of your CV, we are looking at the section entitled "Expert Reports and Testimony."

A. Okay.

Q. So in this section you list six matters under Expert Reports and Testimony; is that correct?

A. Yes.

Q. Were each of these reports in your name? Let me strike that.

In each of these six matters, did you prepare an expert report?

A. No.

Q. So I guess can you just explain to me what this section is, Expert Reports and Testimony?

A. Yes, so for the Private Hauling Company, I never submitted the report. I did prepare slides for mediation and took part in the mediation. But there was no report filed.

Page 55

Q. So in terms of expert testimony, are there any cases in which you gave expert testimony that are not listed here on page 63?

A. And you're defining testimony as deposition testimony?

Q. Well, we can ask about that, deposition testimony. Have you ever done any other expert deposition testimony other than what is listed here on page 63?

A. No.

Q. Have you ever done any testimony at trial, other than what is listed here?

A. No.

Q. Let's just go through these one by one.

So the first case is Michelle DeLuca versus Instadose Pharma Corp and Terry Wilshire.

A. Yup.

Q. The CV does not state which jurisdiction this case was in, correct?

A. No.

Page 56

Q. Which jurisdiction was this case filed in?

A. I don't know offhand.

Q. Was this case filed in the Eastern District of Virginia?

A. To be honest, I don't know one way or the other as I sit here now.

Q. Was this case, the DeLuca case, was this a Section 10b case?

A. Yes, there was a default judgment entered, if I remember correctly, because the defendant was not showing up or not responding.

Again, I'm not a lawyer, but I was just asked to provide a declaration to explain how two-trader model is executed in a 10b case and to present the findings from that analysis for executing that model.

Q. So for the DeLuca case, you prepared a declaration; is that correct?

A. Yes.

Q. You did not prepare an expert report for the DeLuca case; is that correct?

Page 57

A. No, in the DeLuca case, I prepared a, like I just said, a declaration that described the two-trader model and how the parameters of the model and what the estimates for aggregate damages were based on the model.

Q. In your understanding, a declaration is different than an expert report; is that right?

A. Again, I'm not a lawyer, so I don't know the specific, but, yes, a declaration does have a different meaning than a report.

Q. Okay. So you did not file an expert report in the DeLuca case; is that correct?

A. That's correct. I believe I just said that I filed a declaration.

Q. So isn't it true -- let me rephrase that. You did not opine on market efficiency in the DeLuca case; is that right?

A. That's correct.

Q. You did not opine on loss causation in the DeLuca case; is that

Page 58

right?

A.    Again, without the benefit of the report it's hard to know, but I don't think so just given the description here. I can't remember if I was asked to assume it or, I just don't remember the specifics as I sit here now.

I wouldn't be surprised if the answer to that question is no.

Q.    You did not conduct an event study for the DeLuca case; is that correct?

A.    I don't know -- the declaration did not contain an event study. There may have been an event study conducted.

Q.    But you personally did not conduct an event study for the DeLuca case; is that right?

A.    Like I said, the declaration doesn't have an event study in it, but there may have been an event study at some point in connection with that engagement.

Q.    Did you calculate the amount of per-share damages for the DeLuca case?

Page 59

A.    Yes, per-share damages were an input to the aggregate damages model.

Q.    Okay. Moving on. The next case you have listed here is Hoffman versus Thras.io Inc. This was a case that was listed as being in the U.S. District Court for the District of Massachusetts; do you see that?

A.    Yes.

Q.    And you else describe this case -- you describe your role in this case as "Issued a report (2022) provided deposition testimony (2022) on the valuation of a private company's stock and options and the Plaintiff's damages"; is that right?

A.    That's correct.

Q.    The Hoffman case was not a Section 10b case, isn't that correct?

A.    That is correct.

Q.    And you did not conduct any event study in connection with the Hoffman case?

A.    I don't know if I conducted an event study per se, but we may have done

Page 60

a regression analysis in that case, which is obviously part of an event study, but I'm not, offhand, it's hard to remember exactly the exact methodologies that were used in that case.

Q.    Did your report in the Hoffman case contain an event study?

A.    Again, as I sit here now, I'm not sure one way or the other. Probably unlikely, but again I'm just not sure.

Q.    Moving to the next one, this is titled "Private Hauling Company Shareholder Dispute."

A.    Yup.

Q.    It's listed as having been in Massachusetts; is that correct?

A.    That's correct.

Q.    There is no case citation for this matter; is that right?

A.    That's correct.

Q.    Why?

A.    I'm trying to remember if it was -- again, I just don't remember the details offhand. If there was a complaint filed or if they were trying to

Page 61

settle this dispute outside of the -- outside of filing a complaint in Massachusetts. I just don't remember. There very well might be a case number. Honestly I just don't know offhand.

Q.    So as you sit here today, when you worked on this Private Hauling matter you're not entirely sure if there was a complaint filed; is that correct?

A.    I know that there were certain allegations as to ownership of a particular company, who owned it, what they were entitled to and how and whether other sort of subsidiaries or related companies were or were not considered in that valuation. But I just don't remember.

Q.    So for this Private Hauling Shareholder Dispute, there was no expert report that you prepared that was filed in any court; is that correct?

A.    Yes, I said that earlier.

Q.    And this was not a Section 10b case; is that right?

A.    That is correct.

16 (Pages 58 - 61)

Page 62

Q.   And no event study was conducted in connection with the shareholder dispute; is that right?

A.   That's correct.

Q.   Okay.  Let's go to the next case.  It's in Alpha Capital Anstalt versus IntelliPharmaCeutics International Inc., 19-CV-09270.  And this case was in the Southern District of New York; is that right?

A.   That's correct.

Q.   So the Alpha case, this was not a Section 10b case; is that right?

A.   No, I believe that was a Section 11 case.

MR. TAYLOR:  Okay.  I'm putting in what I believe is now Bettencourt Exhibit 3.

(Bettencourt Exhibit 3, July 9th, 2021 opinion and order, was so marked for identification, as of this date.)

Q.   Let me know when you have access to it.

A.   I got it.

Page 63

Q.   Okay.  So this document, Exhibit 3, is a July 9th, 2021 opinion and order; do you see that?

A.   Yes.

Q.   And that's in the same Alpha case that's listed in your CV; is that right?

A.   Yes.

Q.   Please scroll down to page 15.  Let me know when you're on page 15.

A.   I'm there.

Q.   The beginning of the first paragraph it says, "Even if Section 1746 did not bar consideration of Bettencourt's report, it would be inadmissible under the principles set out by the Supreme Court in Daubert versus Merrell Dow Pharmaceuticals and even if admissible it would be insufficient to create a dispute of material fact."

Do you see that?

A.   Yes.

Q.   And Bettencourt, that's referring to you, right?

A.   Yes.

Page 64

Q.   So in this case, in the Alpha case, your expert report was found inadmissible; is that right?

A.   It was found inadmissible because it wasn't -- it wasn't declared.

Again, I'm not an attorney, but the report was -- on the above page it explains that I was -- that the report is inadmissible because it wasn't declared, I guess or wasn't asked to declare from the client.

Q.   If you go to the paragraph in the bottom of page 15, the Court states, "Bettencourt's report is both inadmissible and incapable of creating a dispute of material fact regarding the defendant's negative loss causation defense because it is based on conjecture."

Do you see that?

A.   I do.

Q.   What's your reaction to the Court's statement here?

MR. PINEIRO:  Form.

Q.   You can continue.

Page 65

A.   Sure.  I think that there is certain elements that maybe the Court didn't understand about my testimony here and perhaps I could have done a better job of explaining it.

But if I remember correctly, I simply pointed out that defendant's experts had performed an event study on a security that didn't trade and they proxied the event study on a penny stock, again, if I can remember correctly, and I just said that in order to determine that no information caused a stock price reaction, you first had to determine that any information would be expected to cause a stock price reaction and therefore, establish that the market for the particular security was an efficient one.

And I believe later on the judge says that I appear to conflate Section 11 with Section 10b-5.  But all I was making the point was, that according to the statistics literature, which I thought was well documented in that

17 (Pages 62 - 65)

Page 66

report, that just saying that something doesn't have an effect doesn't prove that it had no effect.

Q.   Just going back to the Court's comment here, so in your opinion is it proper to prepare an expert report based on conjecture?

MR. PINEIRO:  Form. Mischaracterizes testimony and calls for a legal conclusion.

Q.   You can answer.

A.   Sure.  I think that's the Court's opinion and I disagree with the Court's opinion.  I think that report has a lot of analytical support in it for the conclusions that were reached.

Q.   Okay.  The next sentence after that one towards the bottom of page 15 says, "Bettencourt did not conduct an event study or other analysis of his own. Instead, his report merely argues that Dr. Surana's conclusions are unsupported by the statistical analysis described in her report."

Do you see that?

Page 67

A.   Yes.

Q.   Dr. Surana was the defendant's expert in the Alpha case; is that right?

A.   Yes.

Q.   Why didn't you conduct your own event study in the Alpha case?

A.   Because I wasn't asked to conduct my event study.  I was -- again, I didn't go to law school, but my understanding of Section 11 is that it's the defendant's burden to establish that something other than the allegation-related information caused the price to decline between the IPO and the date of suit.  And so it wasn't necessary for me to run an event study on a security that didn't trade.

In fact, it's impossible in that matter to have done so since the security was initially priced and then never traded.  And Dr. Surana in that matter ran an event study on the common stock, which I noted, and she -- well, let me think.

Dr. Surana in that case said

Page 68

that she was unable to identify any statistically significant movements that had allegation-related information released on those dates.  And therefore she argued -- again, this is all from memory -- but she argued that there was no -- that she had established negative causation.  And I wrote a report that pointed out that just failing to identify statistically significant movement -- and there were citations in that report to the statistics in the literature -- does not prove the null hypothesis to be true. Obviously the judge disagrees.

Q.   So if you go down now to the beginning of page 17.  It reads, "Finally, Bettencourt's expert report does not create a dispute of material fact because it relies upon unrealistic and incorrect assumptions about the relevant legal standards governing Alpha's claims and the negative loss causation defense."

Do you see that?

A.   Yes.

Page 69

Q.   What is your reaction to the Court's statement here?

MR. PINEIRO:  Form.  Calls for a legal conclusion.  Speculation.

Q.   You can continue.

A.   Again, those words have a legal meaning and I think the next sentence explains it, that I was pointing out that she would have to establish that the company's stock traded in an efficient market, meaning that the company's stock would reflect or, I'm sorry, in this case it was a warrant, that the security traded in an efficient market.  And that Dr. Surana hadn't done so.  And that she needed to do that in order to establish that any information whatsoever would be expected to be impounded into the stock price.  And because she hadn't done that, I explained that -- and by "done that," I mean she hadn't established that the security traded in an efficient market or traded at all for that matter -- that there was no way to say what information was impacting the stock price or if any

Page 70

information would be expected to impact the stock price.

Q.   I guess my question is a little bit different.  What I wanted to understand is your reaction to the Court saying that "Bettencourt's expert report both relies upon unrealistic and incorrect assumptions."

A.   About the relevant legal standards.

MR. PINEIRO:  Objection to form.  Asked and answered.

A.   Again, I don't know exactly what they mean about relevant legal standards.

I can explain that from an economic standpoint, in order to say that certain -- that certain information did not cause a stock price reaction, it's reasonable that you would have to establish that any information would cause a stock price reaction.  And in addition to that, I also pointed out that failing to reject the null hypothesis does not mean that the null hypothesis is

Page 71

true.

Q.   All right.  So then if we just go to page 14.  Let me know when you're there.

A.   Yup.

Q.   So the last sentence in the middle paragraph the Court states, "For several reasons, Alpha's arguments premised on Bettencourt's report are unpersuasive."

Do you see that?

A.   Yes.

Q.   And then the next sentence states, the Court states, "To begin with, Bettencourt's report does not present admissible evidence because it is unsworn."

Do you see that?

A.   Yes.

Q.   Isn't it true that your report in this case is unsworn?

A.   I'm not sure.  I believe the rebuttal report was sworn.  I can't remember if the initial report was sworn.

Q.   Let's go back to Exhibit 2.

Page 72

Let me know when you're in Exhibit 2, this is your December 4th, 2023 report.

A.   I'm there.

Q.   You prepared this report, right?

A.   Yes.

Q.   You can take a minute, please identify where you swear under penalty of perjury to the statements in this report?

(Witness reviews document.)

A.   I don't believe that language appears in this report.

Q.   Okay.  Have you ever prepared an expert report in your name where you did swear to the report?

A.   I believe the rebuttal report in this matter includes that language.

And again, the distinction between a report and a declaration, I believe in the matter we talked about earlier, I believe the damages contains the language under penalty of perjury.  But again, just offhand, I can't recall.

Q.   Is there a reason you didn't swear to your December 4th report?

Page 73

A.   In my experience, in over 15 years, sometimes the attorneys ask for the report to have that language in it and sometimes they don't ask to have it in there.  So it's usually done at the direction of counsel and if it's not in there, then I wasn't asked to put that language in there.

Q.   Okay.  So moving on from the Alpha case, have any other Courts criticized your testimony?

MR. PINEIRO:  Form, vague.

Q.   You can answer.

A.   Not that I'm aware of.

Q.   Has any Court ever limited the admissibility of your expert report in any way?

A.   Aside from the Alpha case that we just discussed, I don't believe so.

Q.   Has any other Court, besides the Alpha case, limited the admissibility of your expert testimony?

A.   Again, same answer, no.

Q.   All right.  Moving to the next case in your CV, this is the In Re

19 (Pages 70 - 73)

Page 74

Restoration Robotics Securities Litigation case in the Northern District of California?
A. Yes.
Q. So this was not a Section 10b case; isn't that right?
A. That's correct.
Q. What kind of case was it?
A. This was a Section 11 matter.
Q. There was no event study in your expert report in this case; isn't that right?
A. I don't think that's correct. I believe there was.
Q. So you understand that there was an event study in the Restoration Robotics case?
A. I'm sorry, I didn't hear you.
Q. It's your understanding that you did conduct an event study for your report in the robotics case?
A. Again, as I sit here now, I'm just unsure. It could have gone -- it's hard to tell exactly from that description whether or not there was an

Page 75

event study in there. I would think that there was.
But again, given the scope and the timing or the sequence of the timing of that report in that litigation, it's been my experience that sometimes the initial report on materiality and common damages may not include an event study.
Q. Your report in the Restoration Robotics case did not contain any loss causation analysis; is that right?
A. Again, I'm not a lawyer, but loss causation to me is a term of art in a 10b-5 litigation. Since that's Section 11, when we are talking about economic materiality, you know, that the information matters that people relied on, and then if it was untrue, to the extent that that overlaps with the analysis that one would do in connection with loss causation damages, then, yes. But does it contain a heading that says Loss Causation? Probably not.
Q. Moving on to the next case. Sponn versus Emergent BioSolutions, Inc.

Page 76

This was in the District Court for the District of Maryland; is that right?
A. Correct.
Q. The Sponn case was a Section 10b case, correct?
A. Yes.
Q. And your expert report in the Sponn case was submitted in connection with plaintiff's motion for class certification; is that right?
A. Again, sitting here today, I don't know specifically but I assume that it was.
Q. Your expert report in the Sponn case was not filed in connection with any motion for summary judgment; is that right?
A. Again, to the best of my knowledge, it was not.
Q. Okay. So just looking back at this list of six cases listed under Expert Reports and Testimony, so excluding this case, you've only submitted four expert reports in your name in your entire career; is that

Page 77

correct?
A. Again, more than four, but are we not counting the declaration as being, is one that does not qualify as a report?
Q. Let's exclude declaration. For purposes of this question, not to include declarations, you have only submitted four expert reports, at least that are listed here; is that correct? Let me rephrase.
You have submitted four expert reports and a declaration under your name in your career; is that right?
A. No.
Q. What other expert reports have you filed in your name that are not listed here?
A. The one that we mentioned that's not here.
Q. Okay.
A. And you have the declaration, that makes two. The Thras.io matter makes three. Alpha Capital makes four. Restoration Robotics makes five. Sponn makes six and seven.

20 (Pages 74 - 77)

Page 78

Q.    In your opinion, a declaration is the same thing as an expert report?

A.    So in your earlier question you asked me whether if we include declarations that I have submitted a certain number and I said no.  And then I explained including the declaration, included the declaration in that calculation.

Q.    Excluding the declaration, aside from this case, you have only submitted one expert report in a Section 10b case; is that right?

A.    No.

Q.    Which other expert report in your name in a 10b case have you filed besides for this one and the Emergent Bio case?

A.    Well, there's two expert reports in the Emergent Bio case.  That's why I disagree.

Q.    Understood.  Besides from the Sponn case and this case, what other cases have you filed an expert report in a -- sorry, let me rephrase that.

Page 79

In what other Section 10b cases, besides this case and the Sponn case, have you filed an expert report in your name?

A.    None.  Those are the only two.

Q.    And just to be clear, in these six cases listed under Expert Reports and Testimony, were all of these expert reports prepared on behalf of plaintiffs?

A.    Yes, in these six, all of those -- the Private Hauling Company, I think was not a report.  But that was, I was hired by defendants.  And then in the other case that is not mentioned I was also hired by defendants.

And by "not mentioned," I mean that the report was issued or filed subsequent to the filing of the report.

Q.    All right.  If you scroll down, this should be the last page of your CV, this is page 66.

A.    Yes.

Q.    Under Publication?

A.    Yes.

Q.    Under Publication you only list

Page 80

one publication; is that correct?

A.    Correct.  That's the only publication that I have coauthored.  There has been a number of other publications where I've helped and contributed to it, but not as a coauthor.

Q.    Have you ever authored any academic articles?

A.    Again, I have assisted in some academic articles, but not in an author capacity.

Q.    And why have you not authored any academic articles?

A.    Generally, I would say that my primary focus has been on supporting expert work and helping assist experts at Crowninshield and the experts at Crowninshield.  So that is why I haven't written or spent much time developing papers and publications for academic, academic articles.

Q.    Why haven't you authored any articles in the last six years?

A.    Like I said, I've been, you know, very focused and working on helping

Page 81

the other experts and affiliated experts at Crowninshield here on a day-to-day basis.

There has been a number of articles that -- maybe not a number.  But there have been several articles that I've contributed to, but not so much so that I would get credit for being an author.

Q.    Have you ever authored any books?

A.    No.  Again, I have helped and assisted in reviewing certain chapters of books, but I have not authored any books per se.

Q.    Have you ever coauthored any books?

A.    It would be the same answer.

Q.    Have you ever participated in any speaking engagements in connection with your role at Crowninshield?

A.    Yeah.  At Crowninshield, there has been a number of, I don't know, speaking engagements, I don't know how we're defining it, but I presented some

21 (Pages 78 - 81)

Page 82

research results to classes at Babson and other schools in the area, and in addition discussed research that at the time wasn't published or even hasn't been published in the academic literature at places like Fidelity. But I haven't presented a paper at an academic conference.

Q. In connection with your role at Crowninshield, have you ever made any media appearances?

A. How do you define media, like television.

Q. Sure, let's go with television. In connection with your role at Crowninshield, have you ever made any television appearances?

A. No.

Q. In connection with your role at Crowninshield, have you ever made any online appearances?

A. I don't believe so. Like an online video appearance, I would say no.

Q. In your role at Crowninshield, were you ever responsible for deciding

Page 83

whether or not to take a case?

MR. PINEIRO: Form. Vague.

A. When you say take a case, exactly what do we mean?

Q. Has it ever been a part of your responsibility at Crowninshield to obtain client business?

MR. PINEIRO: Form, vague.

A. I guess it's hard to understand, what do you mean by "obtain"? Like go out and do business development?

Q. I will ask you generally. How do clients come to Crowninshield?

A. Relationships and reputation.

Q. Okay. In your career at Crowninshield, have you ever refused to take a case?

MR. PINEIRO: Form, vague.

A. Personally as an expert or in connection with helping another expert like weigh the pros and cons of taking a case?

Q. Let's ask first as an expert. As an expert at Crowninshield, have you ever refused to take a case?

Page 84

A. Yes. Would we be able to help the client in that, if they asked me if I would be willing to opine on a certain issue or certain issues on market efficiency. And I didn't believe that there was, I wasn't comfortable that there was enough evidence there to support my opinion.

Q. And was this -- was this potential client, was this a defendant or a plaintiff?

A. Again, it's happened several times. I note that it probably has the same distribution as the work that we talked about before, where most of the clients are, in general, representing the plaintiff side.

But I want to say that there was one or two times where we were asked to -- where I was asked to specifically consider issuing an opinion on behalf of defendants.

Q. Was there ever any case in your career at Crowninshield where you found no statistically significant price

Page 85

decline following an alleged corrective disclosure?

MR. PINEIRO: Form. Asked and answered.

A. Are we talking about my total experience or in my experience in offering testimony?

Q. So let's say as a testifying expert, or in your capacity as an expert, has there ever been a case where you found no statistically significant price decline following an alleged corrective disclosure?

A. Again, speaking from memory, I believe that there was. I just don't know for sure.

It's not that uncommon that for whatever reason a particular corrective disclosure might not be over the threshold for statistical significance.

Q. But as you sit here today, you can't remember an instance where you reached that conclusion in your expert report?

MR. PINEIRO: Asked and

22 (Pages 82 - 85)

Page 86

answered.

A.   Again, I would just go back to having not looked at any of those expert reports that we discussed earlier in a number of years, I just wouldn't know for sure.  But it wouldn't surprise me like if there was a partial corrective disclosure in one of those matters that was not statistically significant.

If you told me that was the finding, I wouldn't be surprised.  It's not that uncommon.

Q.   In your capacity -- let's just ask generally.  In your career at Crowninshield, was there ever a case in which you determined that the alleged misstatement did not cause artificial inflation?

A.   Certainly there is a number of reports that I come across where misstatements can maintain artificial inflation and not just cause artificial inflation.  So the answer would be yes.

Q.   Has there ever been a case in your career where you did not find that

Page 87

artificial inflation was either created or maintained by an alleged misstatement?

MR. PINEIRO:  Form.  Asked and answered.

A.   Again, I would probably say yes, and this is entirely from memory, but there is a number of alleged misstatements that get tossed and are no longer actionable, and usually those are thrown out or dismissed because there is no impact or those statements are deemed to be immaterial as a matter of law.

Q.   Just to close out this line of questioning, have you ever worked on a case where you found that there was no artificial inflation, period, in a Section 10b case?

MR. PINEIRO:  Form.  Asked and answered.

A.   Again, I have worked on several cases where that might have been the case and we would have analyzed the case in advance and explained to the client that we were going to be unable to issue an opinion to support loss causation or

Page 88

establish that the stock price was artificially inflated, and so we would explain that and decline the matter.

Q.   Okay.  Besides for this case, is there any other case where you found a lack of statistical significance on the first day after an alleged corrective disclosure, but a statistically significant loss over a two-day window?

A.   Yeah, in my professional experience, that is not something that is unusual.

Q.   Can you list any other case that you worked on where there was no statistically significant price movement on the day of an alleged corrective disclosure, but there was one over a two-day window?

A.   Again, from memory in cases where I helped other experts on their opinion, and again this is, like I said, my memory is imperfect, but I think Grupo Televisa was one of those matters.  This company called Pharmacia was another one.

Like I said, it's not unusual

Page 89

that it might, you know, that no individual day might be statistically significant if you look at it on a standalone basis and you have to detect whether the movement collectively is statistically significant.

So it's, again, it's not unusual that, you know, one or two days might not be statistically significant, but they are collectively.  Chilean Mining might be another company, another case.  Like I said, there is likely a significant number of them.

Q.   The Chilean Mining case, for example, how do you explain why the stock price did not decline significantly on the first day, but did on the second day?

A.   Well, if I said that was exactly what happened in Chilean Mining, then I misspoke.  I know in the Chilean Mining case the event study covered a number of days, perhaps five even in the series of events and perhaps the last one was significant.  But none of the first three or four dates were significant.

23 (Pages 86 - 89)

Page 90

Q.   I guess the same question for the Pharmacia case, how do you explain why there was no significant decline, statistically significant decline on the first day, but yes on the second day?

A.   Again, in the Pharmacia case, I don't want to agree that it was insignificant on the first day and significant on the second.  It might have been insignificant on the first and second and significant on the third, or insignificant across all three of them and significant if you looked at the dates collectively.

But in that case, it was -- it's all predicated on the news and the type of information that was released to the market.  Again, if I can remember correctly.

Q.   So as you sit here today, do you recall any case where there was no statistically significant decline on the first day, but there was on the second day?

A.   Southern Company was one of

Page 91

them that there was two-day reactions there, if I remember that.  And there is probably several others that are not coming to memory.  But in terms of there being specifically nonsignificant reaction on the first day and a significant reaction on the second day, that's definitely one.

MR. TAYLOR:  One second, the lunch is just coming into the conference room.  Can we go off the record for one second.

THE VIDEOGRAPHER:  Going off the record at 12:32 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the video record at 12:44 p.m., please proceed.

MR. TAYLOR:  I think we were just discussing that we may as well take lunch now between 12:45 and come back at 1:15.  Does that work for everybody?

MR. PINEIRO:  That's fine.

THE VIDEOGRAPHER:  So this will

Page 92

be the end of video media disk number two.  The time is 12:45 p.m. and we are going off the video record.

(Off the record.)

(Lunch recess:  12:45 p.m.)

Afternoon Session

1:19 p.m.

THE VIDEOGRAPHER:  We are on the video record.  This is video media disk number three.  The time is p.m., please proceed.

D A N I E L  B E T T E N C O U R T, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued) BY MR. TAYLOR:

Q.   Okay.  So just before we broke for lunch, we were talking about the topic of sort of multiday stock declines and then finding where there is a statistically significant drop on one day but not the other day, that's sort of where we left off.  So I'm going to pick up from there.

So in our prior conversation I

Page 93

believe you named four cases.  I kind of want to just go through a couple of those cases.

So the first case I believe you mentioned was Grupo Televisa; is that correct?

A.   Yeah, again, from memory that is one that I thought had that issue.  Not issue, but methodology in it.

Q.   So what was the basis for combining multiday declines after the alleged corrective disclosures in the Grupo Televisa case?

MR. PINEIRO:  Form.  Asked and answered.

A.   I mean, it's hard to tell.  I just don't remember exactly.  I don't know if I agree with the idea that it would have been like after a corrective disclosure.  Like the corrective disclosure itself or the form of the corrective disclosure may have dictated, like it did here, the use of a multiday window.

Q.   When you say alleged corrective

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 94

disclosure --

MR. TAYLOR: Actually, Court Reporter, can you read that back to me, please.

(The record was read as follows: "Answer: I mean, it's hard to tell. I just don't remember exactly. I don't know if I agree with the idea that it would have been like after a corrective disclosure. Like the corrective disclosure itself or the form of the corrective disclosure may have dictated, like it did here, the use of a multiday window.")

Q. When you say a corrective disclosure may dictate the use of a multiday window, what do you mean?

A. As I explain in my report, I think you have to consider all available evidence when you're trying to examine whether certain information had price impacts or cause losses.

And when you look at how the information in the current matter, the sequence of the information arrived in

Page 95

the market and given the total mix of information prior to the start of the corrective disclosure, that in such an instance that would require one to use a multiday window to measure the price impact of that information.

Q. So did the corrective disclosures dictate the use of a multiday window in the Grupo Televisa case?

A. Again, it's from memory and I didn't really study Grupo Televisa coming into today, so it's really hard for me to know one way or the other.

Q. How about the Pharmacia case, the same question?

A. It's likely that in those cases there was some element that made it be sort of like a protracted or a series of news events that fully informed investors and fully updated the total mix of information such that a two-day window was warranted.

Q. Do you recall the circumstances in the Pharmacia case that gave rise to the use of a multiday window?

Page 96

A. Like very high level, had something to do with the FDA and some advisory panels.

Q. Okay. And what about the circumstances that led to the use of a multiday window in the Chilean Mining case, can you please describe what those were?

A. Again, I didn't study that coming in, so I know that there was some sort of board dispute in that case, I think. That there is a series of events related to a board meeting or something that dictated the use of the multiday window there.

Q. And for the Southern Company case that you mentioned, that were the circumstances that warranted using a multiday window in that case?

A. Again, I just can't recall offhand without looking at the report or revisiting the report to answer that question.

Q. Okay. We will probably revisit this. Have you ever seen any instances

Page 97

where circumstances dictate a two-day window but the price reacted fully within one day?

A. In this, I guess, hypothetical how would you determine that the price reacted fully within the first day?

Q. I guess if on the first day the full statistically significant impact happened but there was a series of disclosures as you said might fully inform the market over a period of days, have you ever seen an instance where the full price decline happens on the first day, even though there is more information that comes out that would warrant a use of a two-day window?

MR. PINEIRO: Form. Asked and answered.

A. Again, it's hard without knowing the specifics. I mean, you know, what are the facts in this hypothetical that would warrant such that the stock price would react, I guess significantly on the first day and then what happens on the second day? Is it insignificant? Is

25 (Pages 94 - 97)

Page 98

it close to significant?  Is it significant in the opposite direction or insignificant or close to significant in the opposite direction?

It's just hard to know all of like the underlying assumptions and necessarily understand how, whether the facts and circumstances of this hypothetical are applicable and whether a two-day window would be applicable.

Q.   So I will rephrase.

Have you ever seen an instance where circumstances warranted use of a two-day window but the price decline on the first day was significant and the second day was not?

MR. PINEIRO:  Form.  Asked and answered.

A.   Yeah, I mean I think there are times where the price decline on the first day might be significant and the price decline on the second day might be under the threshold for significance.  But there could be, you know, facts and circumstances that dictate that a two-day

Page 99

window is appropriate there.

Q.   So I guess as a general matter, what are the criteria that determine when circumstances dictate use of a two-day window?

A.   I think in the literature it's pretty clear that you have to -- that every case is unique and you have to, as a financial analyst, look at the information that's disseminated, form a hypothesis about how that information may have impacted the stock price, given the total mix of information both prior to and throughout a corrective disclosure to determine whether you should expand a window from one day to two days, to five days or however many days are required based on the information at issue in your, this hypothetical.

Q.   Is a statistically significant price decline on the second day what dictates use of a two-day window?

A.   I guess in what circumstance are we referring to?

Q.   Is it enough on its own, the

Page 100

fact that the statistically significant decline happens on the second day, is that enough on its own to warrant use of a two-day window?

A.   No.  It could have been completely unrelated information that caused that significant decline on the second day, in which case a two-day window or multiday window would be inappropriate.

Q.   And based on the facts and circumstances as you understand them in this case, did you expect that you would find that the first day would not have a significant decline, but there would be on a second day?

A.   Ex ante, you don't know whether you're going to expect to see it or observe a statistically significant decline on the first day or the second day.  You just know that the news dictates the need to test the event on a multiday window.

And in this case, consistent with the literature that's cited in my

Page 101

report, the two-day window is appropriate given the total mix of information that was available to investors prior to the disclosure throughout the day on the 14th.  And so because of that, it's appropriate to measure the stock price impact from the 14th and the 15th.

Q.   So what news in this case dictated having to use a two-day window?

A.   Sure.  Can I reference my report, because I think I said it best there?

Q.   You already have your report.  Just based on your understanding of the case, is there any particular news event that warranted use of this two-day window, just based on your recollection?

A.   Sure.  I think when you're considering what's appropriate you have to go back in time to 2020, in this pandemic, and given how much uncertainty there is about Covid, you know, leading up to throughout the class period and after the class period, there is a bunch of information being put to the market

26 (Pages 98 - 101)

Page 102

from a bunch of different companies, whether they are vaccine makers or diagnostic test manufacturers. And so when we look at that, we look at the sequence of events that happened.

Considering those circumstances, looking at the sequence of the events that happened over the course of the class period, with the misrepresentations on the first day of the class period, where Mr. Satterfield said that, you know, the Company's tests have consistently and repeatedly outperformed the competition and they have 100 percent sensitivity and specificity, and you can't do better than that, which I should note that Judge Parish said that that was particularly troubling language coming from a Ph.D. scientist.

And then we fast forward to May 13th. May 13th comes, Abbott releases information that indicates that their tests are less than perfect and not accurate, and we have news commentary

Page 103

attributing a large highly statistically significant increase in the price of Co-Diagnostic stock on May 13th to this news, essentially tying it back to the original misrepresentation that the company's tests were perfectly accurate.

Starting on the morning of the 14th, the news, the sequence of bad news starts to emerge where we learn prior to the start of trading, right, that the company's unwilling to cooperate or partake in testing, the standard testing that all the other Utah labs are doing. And that's in the Salt Lake Tribune. It's not the Wall Street Journal. It's the Salt Lake Tribune. And then we go forward to 12 o'clock. We have the Governor of Iowa, on PBS Iowa, so we are not talking about CNBC here, holds a press conference to discuss the results of the Test Iowa, the accuracy of the Test Iowa results. So we get some more information about Co-Diagnostics' tests.

And then we have Hindenberg Research that comes out and they discuss

Page 104

more information. They tie the company's representation and fluffy press releases with an intent to mislead and saying that the Company's tests are not perfectly accurate.

There is a number of news articles in response to those news reports that say, "Look, the company had previously told people that it was 100 percent."

Now, we know in advance that the company is announcing earnings after the close of trading on the 14th. So some investors reasonably might wait for the company to be the arbiter and to weigh in on whether or not these rumors are true or false. And after the close, they don't get anything except for a reiteration of the statement that the company's tests are 100 percent accurate or -- I'm sorry, they have 100 percent specificity and sensitivity. And we don't learn the true facts until after the company's announcement when the FDA comes out as the ultimate arbiter and

Page 105

says, "Look, no test is going to be 100 percent accurate."

And so because of all of those facts, the total mix of information from the start of the class period to and through the disclosures and after the close on the 14th, all of those factors go into considering whether it's appropriate to examine the news of the corrective disclosure on the two-day window, using the two-day window.

Q. So going back to, you had mentioned during your response just now the article in the Salt Lake Tribune on May 14th, about Test Utah; do you recall that?

A. Yes.

Q. You said something to the effect of, that it was, the article was in the Salt Lake Tribune and not the Wall Street Journal; do you recall that?

A. Yes.

Q. What do you mean by that?

A. Well, it's factual. It wasn't in the Wall Street Journal. It was in

27 (Pages 102 - 105)

Page 106

the Salt Lake Tribune. The readership of the Wall Street Journal is very different from the readership of the Wall Street Journal [sic]. So where the information is released matters.

I think as the Supreme Court in Halliburton pointed out that, you know, depending on where or how the information is released, it's going to matter to how quickly and rapidly that information can get assimilated into stock price.

Q. So on its own would you be of the opinion that the May 14th Salt Lake Tribune article and its statements would be enough to warrant the use of a two-day window?

A. I would say it's very hard to analyze this incomplete hypothetical and I think, as I explained in my report, based on everything that we know and the total mix of information and how this information was disseminated to market participants, it must be analyzed on a two-day window, using a two-day window.

Q. Do you have any support for

Page 107

your assertion that investors waited until the conference call to decide to trade on the corrective information?

MR. PINEIRO: Form. Misstates testimony.

A. I said that it's reasonable that certain investors might wait for the company to weigh in on whether or not these media reports have any validity and potentially undermine the perfectly accurate representations about the Co-Diagnostics tests. That's perfectly reasonable.

The source -- it's well documented that the source of information matters and the company being, you know, and the fact that something, that a representation could come from the company as to whether or not these rumors are true or false would go a long way for investors.

And again, I think even Judge Parish pointed out that, you know, in her motion to dismiss, that the company wasn't willing to succumb to or didn't

Page 108

have, I should say, didn't have testing done in the states. And she said that, you know, investors reasonably would put more emphasis on testing done in the United States. So that's an example of how the source of information matters.

Q. So what kind of investors would wait until the conference call to determine whether to trade on the allegedly corrective information?

MR. PINEIRO: Form. Calls for speculation.

A. Like I said, it's reasonable to believe that some investors may have. Who exactly, I don't know. But it is reasonable given that investors knew going into, you know, the day on May 14th, that the company was going, it had already planned to announce earnings and hold a conference call with investors after the close of trading that day.

Q. Let me ask this based on some prior responses. Is it your testimony that any time a corrective disclosure is made in a local news outlet, that it

Page 109

won't impound, that the stock price won't impound the information efficiently?

MR. PINEIRO: Form. Misstates testimony.

A. Again, I think it's, as I explained in my report, and tried to recount to you here by memory, that the Salt Lake City Tribune does not have the same readership as the Wall Street Journal. It doesn't have the same number of followers. So would it be reasonable to expect that news that gets disseminated to millions of financial or market participants in the mainstream financial media could potentially be incorporated more quickly than news disseminated by a smaller, more localized newspaper. I think the answer to that question is yes.

Q. Okay. I think we might move on. We may revisit this topic later.

Let's go to your report. That's still Exhibit 2. And let's go to page 1. Let me know when you're there?

A. I'm there.

28 (Pages 106 - 109)

Page 110

Q.   Do you mind just reviewing paragraphs 1, 2 and 5 on pages 1 to 2.

A.   I'm sorry, I missed that, you want me to review them?

Q.   Is it fair to say that plaintiff's counsel retained you to opine on loss causation and damages in this case?

A.   They asked me to investigate whether investors suffered losses as a result of the alleged misrepresentations and omissions.

Q.   Okay.

A.   And asked me to compute damages, if any, suffered by the class members from their investments in the common stock of Co-Diagnostics made during the period.

Q.   So besides for the two items that you just mentioned, were you retained to opine on anything else for purposes of this report?

A.   I think that these two paragraphs correctly lay out what I was asked to do.

Page 111

Part of it, an analysis of loss causation requires an analysis of the economic materiality of the statements at issue in the case.  So as part of the loss causation analysis, I did that as well.  But again, that's sort of part of what I did in connection with analyzing loss causation in the current matter.

Q.   Okay.  Were you retained to opine on market efficiency on purposes of your report?

A.   No.  I think I say I was asked to assume the market was efficient.  My understanding based on the documents that I read is that it has been even, again, Judge Parish said that the market is efficient, concluded it based on Dr. Werner's testimony.

Q.   Let's go to paragraph 17.  Paragraph 17 is the second paragraph in your conclusions section.  That's on page 5.  In paragraph 17 of your report you state, "Defendants' misstatements, omissions and conduct intended to mislead investors and create the false impression

Page 112

that Co-Diagnostics Covid-19 tests were perfectly accurate, misled investors about the true condition of the company's technology and business prospects and caused the Co-Diagnostics stock price to be artificially inflated."

Do you see that?

MR. PINEIRO:  What page are we on, Zach?

MR. TAYLOR:  Page 5, paragraph 17.

Q.   So my question is, Mr. Bettencourt, were you retained by plaintiff's counsel to opine on defendants' intent in this case?

A.   No, but intent is part of their alleged misrepresentations.  Plaintiff alleged that defendants' misrepresentations and omissions had the intent of misleading investors.

Q.   So is it your assumption that defendants intended to mislead investors, for purposes of your report; is that correct?

A.   Well, I'm assuming that

Page 113

plaintiff's allegations are true.  And that part of the alleged misrepresentation and omission, the misrepresentations and omissions had the intent of misleading, that is an allegation.

Q.   Just to be clear, you did not independently conclude anything with regard to defendants' intent in this case; is that correct?

A.   No, I was asked to assume that the allegations were true.

Q.   If you go back to page 2, paragraph 5.  This is what I think you were talking about.  In paragraph 5 you state, "I assumed Plaintiff will be able to prove their factual allegations"; is that right?

A.   Correct.

Q.   Without referencing the report, which factual allegations do you assume plaintiff will be able to prove in this case?

A.   Without going any further in my report?

29 (Pages 110 - 113)

Page 114

Q. Yeah.

A. That defendants made misrepresentations and omissions that artificially inflated the stock price and caused investors to suffer losses.

Q. So are those the only factual allegations that you're assuming are true for purposes of your report?

A. Well, I think elsewhere in the report I explain what the exact factual allegations are in the plaintiff's allegation section that I understand that they intend to prove to be true.

Q. Is your report meant to be evidence to prove plaintiff's factual allegations?

MR. PINEIRO: Form. Calls for a legal conclusion.

Q. You can answer.

A. My understanding is that I'm not being put forward as a fact witness.

Q. Okay. Have you reviewed any evidence plaintiff may use to prove its factual allegations in this case?

A. Can you be more specific on

Page 115

what that might be?

Q. I mean generally, has plaintiff or plaintiff's counsel presented you with any evidence whatsoever that you believe supports its factual allegations?

MR. PINEIRO: Form. Calls for a legal conclusion. Vague.

A. So you want me to opine on whether I think they presented me evidence to --

Q. Whether they showed you any evidence that they intend, that they may use to support their factual allegations?

A. I mean, the documents reviewed and relied upon present the evidence that they presented me. But I don't think any of the information was ever provided with the disclaimer that this is going to be used or you should know that this is going to be used to prove our factual allegations. I was not aware of any of that.

Q. Okay. If you go to page 55 of your report. This is Exhibit 1, Documents and Other Information

Page 116

Considered.

A. I'm there.

Q. In the second section there is a section titled "Deposition Transcripts."

A. Yup.

Q. And below that there are three deposition transcripts that are listed; is that correct?

A. Yes.

Q. Why did you review these documents for purposes of your report? Let me ask that actually a little bit different. Why did you review the deposition transcript of Reed Benson in connection with your report?

A. I believe that I asked plaintiff's counsel for information that was relevant to the opinions that I was going to be offering in this report on loss causation and damages and asked whether any of the depositions from, you know, Mr. Benson or Mr. Egan or the other Mr. Benson would be relevant, had relevant information to support my

Page 117

opinions.

Q. Was anything in the deposition transcript of Reed Benson relevant to the opinions in your report?

A. I believe so. I think Mr. Benson is -- there is an excerpt from his deposition transcript above, which we can scroll to and I can show you how it was relevant to my opinion. Should I do that now?

Q. Sure. If you can locate where that transcript was cited.

A. I don't know if you control F in these documents. I saw Andrew Benson's deposition cited. I don't know if Reed Benson was on there. So it might have been considered but not cited in the report.

Q. Do you typically review deposition transcripts in connection with preparing expert reports?

A. Yes, all the time. It depends on sometimes if another expert has a deposition, you know, Dr. Ferrell had an opportunity to respond to my most recent

30 (Pages 114 - 117)

Page 118

report, he would cite to my deposition transcript.

Q. Why is it -- well, why do you consider fact witness depositions in connection with preparing expert reports?

MR. PINEIRO: Form. Calls for speculation.

A. Well, as you can see, where I cited Mr. Egan's testimony, what was relevant there is that he characterized the company's earnings announcement after the close of trading on the 14th as being -- let me just get the language right here, Mr. Egan, who was the CEO at the time, said that the company's Q1 2020 results was "an awesome earnings report."

That's important to consider when you're evaluating the total mix of information, whether anything in the earnings release could have been interpreted to be confounding negative information. This shows, as Mr. Egan testified, that the earnings announcement was awesome, which belies one of Dr. Ferrell's points that the earnings

Page 119

announcement was negative.

And if you go earlier, the other Benson noted that the company wasn't the sole, he didn't know whether the company was the sole provider of test kits to Test Nebraska.

Q. So sitting here today in connection with the witness deposition transcripts that are not quoted in your report, you can't say what was relevant in those witness deposition transcripts? Let me rephrase that.

I believe you had said that the only deposition transcript you reviewed that was not quoted was that of Reed Benson, correct?

A. That's correct.

Q. So sitting here today, you can't say what was relevant about that deposition transcript?

MR. PINEIRO: Form. Calls for a legal conclusion. Asked and answered.

A. Just to go back to the previous answer. I might have jumped the gun. So it was in the documents considered list.

Page 120

I'm not sure, I think we reviewed it here and perhaps somebody, I directed somebody on my team to review it or I reviewed it. I just don't know. But it is a document that we received from counsel. And so we felt compelled to list it in the documents considered list.

Q. For purposes of this report, do you believe that the market believed that Co-Diagnostics' Covid tests were 100 percent accurate all the time as a result of the May 1, 2021 press release?

A. I didn't -- I could see how analysts and investors reacted to the May 2021 press release and they interpret it as the company's Co-Diagnostics test were in fact 100 percent accurate following that May 21 press release.

In fact, even up to the day prior to the corrective disclosures, it was clear that the market was under the misimpression that the company's Covid tests were in fact 100 percent accurate.

Q. Going back to paragraph 17 of your report, on page 5. There in the

Page 121

second sentence you state, "The corrective disclosures informed the market that contrary to what the market had been led to believe, the accuracy of the Company's Covid-19 test was not 100 percent."

So based on this, I'm just trying to clarify for purposes of this report, did you assume that the market believed Co-Diagnostics' Covid test was 100 percent accurate because of the May 1 press release?

A. Can we go down to the timeline and review some of the news and market commentary after the May 1st announcement on May 13th? I want to make sure we get the language precisely right.

Yeah, I mean, the allegation is that they misled people to believe that their tests were perfectly accurate. And whether that's 100 percent or better than all of the other competitors, you know, people did understand, you know, according to the reports anyways, that these tests were in fact perfectly

31 (Pages 118 - 121)

Page 122

accurate or 100 percent accurate, depending on the source.

Q.   Okay.  So this paragraph 17, I mean this is one of your conclusions in your conclusion section.  And the way at least -- I mean you can correct me if I'm wrong -- the way I'm reading this sentence is that you're asserting or concluding that the market was led to believe that the accuracy of the company's Covid-19 test was 100 percent; is that fair to say?

A.   I would say no.  I think we say that the accuracy was less than 100 percent is what they learned.

Q.   That's what they learned.  What I'm asking is what were they led to believe, according to you?

A.   In the first sentence of 17 says that the false impression that Co-Diagnostics' Covid-19 tests were perfectly accurate.

Q.   So for purposes of your report, you do not conclude that the market was led to believe that the company's

Page 123

Covid-19 test was 100 percent accurate?

A.   Sorry, I want to hear that question again.  Can I hear the question again?

Q.   Sure.  For purposes of your report, you are not saying that the market was led to believe that the company's Covid-19 test was 100 percent accurate, that is not a conclusion of yours?

MR. PINEIRO:  Form.  Asked and answered.  Vague.

Q.   I can restate the question.

A.   Yeah, I would just direct you back to 17.  I think paragraph 17 speaks for itself when it says what the alleged misrepresentations had the effect of doing to investors.  It gave them the false impression that they were perfectly accurate and superior to the competition, when in fact they were not perfectly accurate.

Q.   What gave the market the impression that the tests were 100 percent accurate?

Page 124

A.   I think if we go down to the timeline of events, we can see some of the, how the market interpreted the company's statements in the May 1 press release.

Q.   Okay.

A.   When Satterfield said that the company's tests have consistently and repeatedly, so historically, and as Judge Parish pointed out, relative to the competition, consistently and repeatedly achieved 100 percent specificity and sensitivity, and you can't do better than that.

Q.   I will try to rephrase this one more time.  Did you assume for your report that the May 1 press release led the market to believe that the company's Covid-19 test was 100 percent accurate?

MR. PINEIRO:  Form.  Asked and answered.

A.   Again, I don't believe that I said those words anywhere in the report.

And as I just said, now that we have the misrepresentation, that I assume

Page 125

that plaintiffs will be able to establish is that the company told investors, a Ph.D., a scientific Ph.D. told investors that the company's tests consistently and repeatedly outperforms or consistently and repeatedly established 100 percent or achieved 100 percent sensitivity and accuracy and that you can't do better than that.  That's what I'm assuming was the misleading statement and that plaintiffs would be able to establish was untrue.

Q.   Are you assuming that or concluding it?

MR. PINEIRO:  Form.  Asked and answered.

A.   Concluding what?

Q.   Concluding it?  Is that an assumption or a conclusion of yours?

A.   What exactly?

Q.   What you just described, you just described the impression that was given by the May 1 press release?

A.   I would disagree that I used the term "impression."  I think

Page 126

plaintiffs identified this as a misleading statement.

I can restate the statement again or we can go down to review the press release if you'd like. But I think the record and my report reflect exactly with precision what the allegations are and what I'm assuming that plaintiffs will be able to prove.

Q. Is it your understanding that one of plaintiff's allegations is that the May 1 press release was false or misleading?

MR. PINEIRO: Form. Asked and answered.

A. I'm sorry, can you run that back again?

Q. Yeah, is it your understanding that one of plaintiff's allegations in this case is that the May 1 press release was false or misleading? Is that an allegation in this case?

A. I believe I explained this in my report down below. I'm happy to go read it. But I believe that the

Page 127

allegation is that the May 1 press release gave people the misimpression or the false impression that the tests were perfectly accurate.

Q. Is it also your assumption that the market believed the May 1 press release regarding the tests' accuracy?

MR. PINEIRO: Form. Asked and answered.

A. Again, I think it's best, the report speaks for itself, I think there are a number of news media and financial media commentary down below that indicate exactly how the market interpreted the statement.

Q. So just generally, I understand that the report speaks for itself, but the report is the report. And now this is the deposition, so I'm just asking you as the person who prepared the report, was one of your assumptions that the market believed the May 1 press release, press release's claims about the accuracy of the Covid-19 test?

MR. PINEIRO: Form. Asked and

Page 128

answered.

A. Again, can we just go down and read what the market commentary was in realtime.

Q. You don't know whether you assumed whether the market believed the May 1 press release?

MR. PINEIRO: Asked and answered.

A. Again, I think the report explains this more concisely than I could here.

I did not -- I assume that the statements that were made were false. I have evidence in my report to show the market were misled by those statements. So the report provides evidence that the market was misled by the alleged, by the information provided to it in the press release.

Q. Are you aware of the May 14th, 2020 FDA press release in this case?

A. I know I reviewed it in preparing my report. I don't have it committed to memory, though.

Page 129

Q. All right. Let's go to paragraph 60 of your report. That would be on page 23.

A. I see it.

Q. There it says, "Later that day the FDA issued a press release 'alerting the public' that Abbott's ID NOW test 'may return false negative results'"; do you see that?

A. That's what it says.

MR. TAYLOR: I'm going to introduce this as what should be Exhibit 4.

(Bettencourt Exhibit 4, May 14th FDA press release, was so marked for identification, as of this date.)

Q. Let me know when you have it.

THE WITNESS: You think we can take a break in the next 5 or 10 minutes, if possible?

MR. TAYLOR: I think we can do a five-minute break in about five minutes.

THE WITNESS: Roger that.

MR. TAYLOR: Is that okay?

33 (Pages 126 - 129)

Page 130

THE WITNESS:  Yes.  All right. I have this open.

MR. TAYLOR:  You know what?  If you need the five minutes, let's just take the five minutes now, if that's okay?

THE WITNESS:  Yeah, either way works for me.

MR. TAYLOR:  All right.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  This will be the end of video media disk number three.  The time is 2:14 p.m. and we are going off the video record.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the video record.  This is video media disk number four.  The time is 2:24 p.m., please proceed.

BY MR. TAYLOR:

Q.   We talked a little bit before about certain investors waiting until the May 14th conference call to start trading on the allegedly corrective information; is that correct?  Do you recall that?

Page 131

A.   Yeah, I think I said it's reasonable that some investors may have waited for the company to ultimately weigh in.

Q.   And part of that conclusion you believe supports your position that a two-day window was appropriate here?

A.   Well, I think the appropriateness of the two-day window is determined by the analysis of all the factors that I described before the break; not any one particular factor.

Q.   So this assumption that investors would trade on the allegedly corrective information the following day, is that one factor that you believe supports the use of a two-day window?

A.   Can you say that question again?

Q.   Sure.  Is the assumption that investors would trade on the allegedly corrective information after the conference call, is that assumption, is that one factor that supports your conclusion that a two-day window is

Page 132

appropriate?

A.   I think the fact that the investors understood that the company has or was going to hold a conference call and issue earnings after the close is one of many considerations that supports the applicability of the two-day window in the instant case.

Q.   Okay.  If you go back to Exhibit 2, this is your report.  If you go to page 67.

A.   67?

Q.   Yes.  So I think this is Exhibit 3 to your December 4th report?

A.   Yes.

Q.   If you look at the trading volume on May 14th, it shows 52,346,751; is that correct?

A.   Hold on, I'm sorry.  I was at paragraph 67.

Q.   Yeah, page 67.

A.   Sorry, I'm on there now.

Q.   So you look at the trading volume on May 14th, 2020?

A.   Yes.

Page 133

Q.   Look at the trading volume on May 15th, 2020?

A.   Yes.

Q.   Isn't it true that the volume of trading on May 14th is more than double the trading on May 15th?

A.   Yeah.  The reported trading volume here on May 13th is, I'm sorry, May 14th is more than double that on the 15th, that's what this shows.

Q.   So doesn't the fact that the trading volume on May 14th being more than double that on the 15th, doesn't that indicate that investors were not waiting for the conference call to trade on the allegedly corrective information?

MR. PINEIRO:  Form.  Calls for speculation.

A.   I didn't never said investors were going to wait.  I said it's reasonable that some investors may wait to hear what the company had to say about the information that was being released to the market.  I didn't say everybody would wait or a majority of them would

34 (Pages 130 - 133)

Page 134

wait. I said it's reasonable that certain investors may wait.

Q. Looking at the report here, looking at the trading volume on the 14th and 15th. Looking at the difference between the trading volumes, does this indicate that investors were waiting to trade on the allegedly corrective information until after the conference call?

A. It indicates that certain investors did in fact trade on the 14th following some of the corrective, a series of corrective events that had arrived. But it doesn't prove that all investors traded on the 14th.

Q. Do you have any evidence that any investors waited to trade, waited -- sorry, I'm going to rephrase.

Do you have any evidence that any investors waited until the conference call to trade on the allegedly corrective information on the 14th?

A. Again, I think it's reasonable that certain investors, given the source

Page 135

of information that was expected to arrive after their close of trading, would wait to hear what the company has said.

I know from experience in past cases where certain investors will wait for the company or will try to work the trade such that they don't realize bad prices upon selling it. And there is a system in place for some of these mutual funds to dispose of shares. And so it's reasonable that certain investors, given the source of the information and the total mix of information, and the sequence of information that arrived on the 13th, 14th during trading and after trading, or throughout the day on the 14th, would have reasonably been waiting to hear what the company had to say.

Q. So I understand that you're saying that you're concluding that it's reasonable that investors might wait?

A. Some investors, yeah.

Q. That some investors might wait until the conference call, but do you

Page 136

have any evidence at all that shows that any investors in fact did wait until the conference call in order to trade on the allegedly corrective information?

MR. PINEIRO: Form. Asked and answered.

A. Again, I would just go back to what I had previously said. I don't have trade confirms from any investors except for one in the instant matter. And I don't have internal memorandums written at hedge funds or mutual funds.

All I'm saying is that given the total mix of information around these dates on the 13th, 14th, or throughout the day on the 14th, that it's reasonable that some investors, not all, it's reasonable that some investors would have waited to listen to, to hear what the company had to say about these allegations.

Q. And at least based on the trading volume, it's reasonable to understand that far more investors did not wait until the conference call in

Page 137

order to trade on the allegedly corrective information; isn't that right?

MR. PINEIRO: Form. Asked and answered.

A. There is no indication from the trading volume that there was more investors that traded shares on the 14th than traded shares on the 15th.

There might have been a couple of larger investors perhaps that traded on the 14th and not the 15th. There is just no indication to know whether there was, in fact, a greater number of investors that traded on the 14th. The data indicate that it's reasonable that there was. But to know for sure without trade confirmations and account numbers, it's very hard to know.

Q. That certain investors may have waited until after the conference call to trade on the allegedly corrective information, why is that relevant to your opinion?

A. Well, it's part of the total mix of information that was in the market

35 (Pages 134 - 137)

Page 138

on the morning of the 14th.

Everybody understood that the company was going to announce earnings. That the company itself is probably the best source of information about the company. All that is well documented in the literature. We have a series of news events or a sequence of news events that comes out that slowly chips away at this notion that the company's tests are perfect. And there is a lot of uncertainty in the market in general at this time.

So given all of those factors, how we learn this information, what we knew coming into the 14th, my point is that it's reasonable that some investors would have waited and because of that, that would have stalled or slowed the assimilation of the information into the stock price.

Q.   All right. So let's go back to -- I guess one final question on this topic. What is the difference between the investors on the 14th and the 15th?

Page 139

MR. PINEIRO: Form. Vague.

A.   Yeah, what do you mean exactly "What is the difference"? Somebody who purchased on the 15th? Is that the question?

Q.   So I think we are still on page 67 of your report.

A.   Okay.

Q.   So why is it that the investors who traded on the 15th moved the stock price to such an extent but the investors on the 14th did not?

A.   If I understand your question, you're asking why the stock price fell more on the 15th than on the 14th; is that correct?

Q.   Yes.

A.   And again, I would just go back to my earlier answer to say given everything that we know around this time period, all of the uncertainty, the news about Abbott on the 13th, the large stock price increase. The sources and the manner -- the formats and the sources in which these disclosures occurred

Page 140

throughout the day on the 13th.

Knowing that there is an earnings announcement after the close of trading and the FDA announcement, all of those things we consider holistically inform the traders that traded on the 15th, and that drove down the stock price.

Q.   So the circumstances you've described, the holistic view that you keep describing, what literature says that those circumstances warrant the use of a two-day window?

A.   What literature says that the two-day window is applicable here?

Q.   Correct.

A.   Well, I cite it in my report. We can go and look at that.

Q.   Sure.

A.   Up in the event study section I know -- so it starts on page 36, the discussion about the learning of the event window. It could be even more informative if we were going to start on the page before about the identification

Page 141

of the corrective disclosure itself, which I guess is the first step of the event study.

Q.   Let's just focus on -- so the question was this: Which literature supports that these circumstances in this case warrant the use of a two-day window?

A.   Well, I should note that generally the exact detail of what happened to Co-Diagnostics on the 13th, 14th and 15th, you know, is going to be unique to this particular case. You're not going to find a study of these information releases and this sequence of events in the finance literature. You're going to have a bunch of papers that support the use of multi-day windows for events that are similar or have similar characteristics.

Q.   Does any of the literature cited here provide any criteria to use when determining whether to use a one or two-day window?

A.   Yeah. It might even be informative to pull up the articles.

36 (Pages 138 - 141)

Page 142

But starting in '88, we talk about the empirical and theoretical considerations that we considered to determine whether we should use or I should use a longer than one-day event window. And explain why the information and the news events that occurred on May 14th in particular, would warrant the use of a multi-day window.

So in '89 we have a quote from Patell and Wolfson that talks about, it says less regular information releases. You go down to the footnote, and it says "It's possible that the adjustment intervals will be significantly longer for a smaller firm or for other less regular announcements made by our sample firms."

I mean Co-Diagnostics is both -- you know, Co-Diagnostics isn't ExxonMobil. So it is relative to Exxon, smaller. And this is by definition, I mean very obviously, a less regular announcement. We have, as I explained before, the Salt Lake City Tribune, PBS

Page 143

in Iowa, and a tweet from short-seller. And then some additional commentary after the close, and a press release from the company and the FDA.

So it's perfectly consistent with what Patell and Wolfson say constitutes less regular information from a relatively smaller firm.

And I even point out how Dr. Ferrell's literature, literature that he's written in the past support the use of examining stock price and returns over multiple days.

And I cite to another paper on page 38, Cornell and Morgan have more support for why the facts and circumstances of the instant matter align with those identified by these authors as warranting a multi-day window.

And as the quote right above 92 says, "The length of the window depends on the facts of each specific case." And as I explained, the facts of this case warrant the use of a multi-day window.

Q. Okay. I am ready to move on

Page 144

from this topic. Okay. Let's go to Exhibit 4.

A. Yes.

Q. Do you recognize this document.

A. Oh, sorry, I went to Exhibit 4 of the report. My fault.

Yeah, this is the FDA announcement after the close of trading on the 14th.

Q. Yes. Did you review this document in connection with preparing either of your reports in this case?

A. Yes.

Q. Do you understand the May 14th FDA press release as being one of the alleged corrective disclosures in this case?

A. Yes.

Q. Okay. So if you go to the fourth paragraph. You will see the last sentence states, "No diagnostic test will be 100 percent accurate due to performance characteristics, specimen handling, or user error, which is why it is important to study patterns and

Page 145

identify the cause of suspected false results so any significant issues can be addressed quickly."

Do you see that?

A. Yes.

Q. To your knowledge, the FDA's statement here that no diagnostic test will be 100 percent accurate, is that the first time the market learned that no diagnostic test will be 100 percent accurate?

A. Well, I think as it relates to Co-Diagnostics, we can observe that on the 13th of May when Abbott came out with the information that I believe this, and I don't know for sure, but I would suspect this press release was issued in response to, investors in the market attributed a large stock price increase in Co-Diagnostics' stock to the fact that Abbott's test was not 100 percent accurate and that Co-Diagnostics did have perfectly accurate tests.

Now, they obviously learned some information about the accuracy of

37 (Pages 142 - 145)

Page 146

the test in the morning of the 14th. So this wouldn't necessarily constitute the first time that the market is shown information contrary to what was understood at the close of trading on May 13th.

Q. Yeah, I apologize, that was not at all in response to my question.

My question was: Is this statement by the FDA on May 14th that no diagnostic test will be 100 percent accurate, was that the first time that the market learned of that fact, that no diagnostic test will be 100 percent accurate? I am not asking anything having to do with Co-Diagnostics.

MR. PINEIRO: Form. Asked and answered. Vague.

Q. What about this statement "No diagnostic test will be 100 percent accurate" is corrective?

MR. PINEIRO: Form. Calls for a legal conclusion.

A. Well, it's at odds with what the market was led to believe as we can,

Page 147

again, observe it on the 13th, when the stock price goes up significantly, that people were under the misimpression that Co-Diagnostics tests were, in fact, 100 percent accurate.

Q. Is it your understanding that no diagnostic test will be 100 percent accurate was new information on May 14th?

MR. PINEIRO: Form. Asked and answered.

A. Again, I would just go back to, as it relates to Co-Diagnostics, which is what I was asked to consider here, we can observe a large stock price increase on May 13th. And the market commentary, not me, the market commentary draws similarities between the Abbott test stopped having 100 percent accuracy and Co-Diagnostics having 100 percent accuracy. So we can observe that cause and effect relationship right immediately prior to the disclosures.

Q. With regards to your discussion about the May 13th news with the Abbott test, wouldn't it be enough for the

Page 148

market just to believe that the Co-Diagnostics' test was better than Abbott's for the stock price to go up?

A. You mean the hypothetical. It's hard to consider with all of the information that we have and what we can observe here that actually happened. So I mean based on that sort of incomplete hypothetical, it could, but that's not actually what happened in the instant matter.

Q. I guess my question is, did the market have to believe Co-Diagnostics' tests were 100 percent accurate for the stock price to increase on May 13th or was it just enough that it was better than Abbott's?

MR. PINEIRO: Form. Calls for speculation.

A. You know, we would obviously be guessing as to what the market would have done relative to Abbott. But we do know what the market was told on May 1st, that this -- not only was their test better than Abbott's, but their test was better

Page 149

than everybody consistently and regularly and you can't do better than that. So that's the, that's the facts as I understand them and as the market understood them at the time, based on contemporaneous market commentary.

Q. Did the market understand before the May 14th FDA press release that, in general, no diagnostic test would be 100 percent accurate?

MR. PINEIRO: Form. Asked and answered.

A. So again, I would just go back to -- I think you say May 14th, did you mean the 13th?

Q. I am talking about the FDA press release that says "No diagnostic test is 100 percent accurate." So the question is --

A. We can observe what actually, how the market interpreted the statements that are at issue here. And what Co-Diagnostics' statements, how the market interpreted those statements. We have a number of analyst, of financial

38 (Pages 146 - 149)

Page 150

media commentary that attribute the stock price increase on two separate days to the statements about having a perfectly accurate test or a test that's better, that is shown to be better relative to the competition repeatedly and consistently.

Q.   So I am not asking about Co-Diagnostics' tests.  I am asking about all diagnostic tests.

Before the May 14th FDA press release, did the market understand that no diagnostic test could be 100 percent accurate?

MR. PINEIRO:  Form.  Asked and answered.

MR. TAYLOR:  Definitely not answered.

MR. PINEIRO:  Move to strike.

A.   I would just, again, point -- I didn't go and examine what the market had believed throughout the history of time with respect to diagnostic tests generally.

My focus here was on the

Page 151

statements made by Co-Diagnostics on May 1st.  The news that came out on the 13th.  And then the sequence of news events that started on the morning of the 14th.  That informs my decision, or my opinion in this matter.  Whether people understood diagnostic tests in general to be not 100 percent is not something that I or that was relevant to my opinion here, because we can observe what was relevant to the investors and what the investors understood in realtime throughout the class period.

Q.   If the market knew that no diagnostic test could be 100 percent accurate on April 30th, 2020, would the FDA disclosure on May 14th, 2020 still be corrective?

MR. PINEIRO:  Form.  Calls for a legal conclusion.

A.   So you're asking me to assume that there was no misrepresentation on the 1st?

Q.   No, I am saying that if this FDA disclosure, that no diagnostic test

Page 152

is 100 percent accurate was said the day before the May 1 press release, and then it was said again on May 14th, would it still be corrective on May 14th, even though it had already been said the day before the press release?

A.   I haven't done the analysis under that hypothetical.  All I can say is what we know to be the case here about what the company said on May 1st.  And as Judge Parrish pointed out, that Satterfield's comments were particularly troubling when he said you can't do better than that.  And the company is an important source that investors rely on for accurate information.  So I don't -- I haven't considered the hypothetical of what would have happened if the FDA announcement was made twice.

Q.   Doesn't corrective information have to be new information?

MR. PINEIRO:  Form.  Calls for a legal conclusion.

A.   Again, I didn't go to law school, so I don't know exactly what

Page 153

constitutes corrective information.  I do know from the position of a financial analyst, how investors interpreted this information made on the 1st.  How it impacted the stock price on the 13th.  And then how it was subsequently impacted the stock price on the 14th and 15th, collectively.

Q.   How did investors interpret the FDA's statement that no diagnostic test is 100 percent accurate on May 14th?

MR. PINEIRO:  Form.  Asked and answered.

A.   Again, as I explained in my report there were a series of disclosures that occurred on the day of the 14th.  The company was silent on these issues in their press release and their conference calls.  And the FDA was the ultimate arbiter of the facts.  We can observe that this information was material information that impacted investors' decisions on multiple days during the class period.

When you take the information,

Veritext Legal Solutions

212-267-6868        www.veritext.com        516-608-2400

Page 154

the total mix of information and the sequence of information, that it's clear that the investors are reacting to the company's tests being less than perfect on the 14th and the 15th of May.

Q.   Before the May 1, 2020 press release, did the market know that no diagnostic test could be 100 percent accurate?

MR. PINEIRO:  Form.  Asked and answered.

A.   Whether they understood that or not isn't germane to my opinion because of what the company said on May 1st.  And the company is a, in most circumstances, a reliable source of information about the company and its technology and its prospects.

Q.   So you testified earlier that you did not look into what the market knew about diagnostic tests generally in regards to accuracy; is that fair to say?

A.   My opinions in this case were based on what, how the market interpreted the statements made by the company on May

Page 155

1st, and we can observe that on more than one day during the class period.  And that's what I considered for purposes of the opinions issued in my report.

Q.   So on May 14th the FDA statement that no diagnostic test is 100 percent accurate, do you understand that to include Co-Diagnostics' Covid test?

A.   So we know from the stock price reaction on May 13th, that a lot of people are comparing these tests and the accuracy of these tests to one another. And so we can observe that, what the market said, what the market commentary on the 13th essentially said.  You have one test that's perfectly accurate and one test that is not.  So that's bad for Abbott and good for Co-Diagnostics.  So right there we have the market commentary linking the fortunes of Co-Diagnostics and Abbott together.

So while the FDA announcement did not mention Co-Diagnostics specifically, we can observe that just, you know, two days prior investors

Page 156

understood that the implications of the announcement from Abbott and how that would impact Co-Diagnostics' business.

Q.   In the May 14th FDA press release, where they say no diagnostic test is 100 percent accurate, aren't they saying that as a general matter?

A.   As I said before, what they are doing is they are providing investors, and particularly in this case investors in Co-Diagnostics, that regardless of what's been said in the past about 100 percent accuracy or perfectly accurate, that no test is able to obtain that level of accuracy.

Q.   So what is the basis of your opinion that the FDA's proclamation that no diagnostic tests would be material to investors?

A.   To investors in Co-Diagnostics; is that the question?

Q.   Sure.

A.   Well, again, I go back to this, to the news that came out throughout the course of the class period that on May

Page 157

1st, we have the company's statement. Consistently and reliably have demonstrated 100 percent accuracy and you can't do better than that, from a Ph.D. scientist.

Fast forward, when Abbott's results come out that their test is not 100 percent accurate, their stock price declines, and Co-Diagnostics' stock price increases.

So there is literally almost a near immediate reversal following the announcements on the 13th when we start to realize, you know what, perhaps what Co-Diagnostics was saying about their test being 100 percent accurate is untrue.  And that's why we looked at the series of information that came out over the 14th and after the close on the 14th.

Q.   You don't cite a single market commentator that mentions the May 14th FDA press release in connection with Co-Diagnostics; isn't that correct?

A.   I would have to take a look at the report, and from memory I'm not sure.

40 (Pages 154 - 157)

Page 158

(Witness reviews document.)

Q. All right. I will move on from that question.

Did you consider any evidence that contradicted the assertion that the market believed Co-Diagnostics' Covid-19 test was 100 percent accurate after the May 1 press release?

A. Sure. I consider everything about Co-Diagnostics between the start of the class period and the end of the class period, all of the information that was released to the market. And as I said before, we can observe that from the stock price increase on the 13th, that investors still believed immediately prior to the corrective disclosures that Co-Diagnostics' tests were perfectly accurate.

Q. Do you consider any material before the class period that might contradict the position that the market believed Co-Diagnostics' tests were 100 percent accurate?

A. Can you read that back one time

Page 159

for me?

Q. Sure. Did you consider any materials before the class period that would contradict the position that the market believed Co-Diagnostics' Covid-19 tests were 100 percent accurate?

A. Sure. I know that in the, you know, that there was a press release that they, prior to the company's statement, that indicated that maybe the company's tests were not 100 percent accurate or perfectly accurate. There may have been others, you know, that are cited in my report, but from memory, that's what I recall.

MR. TAYLOR: Okay. I am putting in what is now Exhibit 5.

(Bettencourt Exhibit 5, March 5, 2020 Johns Hopkins Bloomberg School of Health article, was so marked for identification, as of this date.)

Q. Let me know when you have it.

A. I got it.

Q. Do you recognize this document?

A. Yes, I believe it was cited in

Page 160

my report.

Q. So this is a March 5th, 2020 Johns Hopkins Bloomberg School of Health article. Do you see that?

The article is titled "The Unknown Unknowns: Diagnosing the New Coronavirus."

Do you see that?

A. Yes.

Q. If you go to the second page, the second full paragraph, it states "No diagnostic test ever provides complete certainty."

Do you see that?

A. Yes.

Q. Isn't that, essentially, communicating the same thing that the FDA stated on May 14th in its press release?

A. The words are different. The FDA said no test would be 100 percent accurate.

Q. Right.

A. And we know from what the company said on the first day that their tests give the people the misimpression

Page 161

that their test was, in fact, perfectly accurate.

Q. So I am talking about the article right now. I am not talking about Co-Diagnostics' press release.

This is a March 5th, 2020 article that states that no diagnostic test ever provides complete certainty; isn't that correct?

A. That's what it says.

Q. Does that reflect that the public understood that no diagnostic test could ever provide complete certainty?

MR. PINEIRO: Form. Calls for speculation.

Q. You can answer.

A. Can I hear the question one more time, I am sorry?

Q. Sure.

A. Doesn't this reflect that at least as early as March 5th, 2020, that the public understood that no diagnostic test ever provides complete certainty?

MR. PINEIRO: Form. Speculation.

41 (Pages 158 - 161)

Page 162

A.   I mean, it's hard to know exactly how the market for Co-Diagnostics' investors interpreted this information.  I mean, the words on a page, I mean they say that.  But again, I know you're not going to want to hear this, but at the start of the class period we have the company saying that could be interpreted very differently than this.

Q.   So is it your position that the market before May 1 may have understood that no diagnostic test could be 100 percent accurate, but because of the May 1 press release by Co-Diagnostics, they have started to believe that Co-Diagnostics' test could be 100 percent accurate?

MR. PINEIRO:  Form.  Compound. Calls for speculation.

A.   I analyzed how the market interpreted the May 1 press release, both on May 1st and on May 13th.

MR. TAYLOR:  Let's go to Exhibit 6.

Page 163

(Bettencourt Exhibit 6, Washington Post article, was so marked for identification, as of this date.)

Q.   It's a Washington Post article. Do you have it?

A.   Yes.

Q.   So this is a March 26th, 2020 article in the Washington Post titled "A 'Negative' Coronavirus Test Result Doesn't Always Mean You Aren't Infected."

Do you see that?

A.   Yes.

Q.   If you go, it should be five lines down, basically, the start of the fourth paragraph it states, "The clamor for long-delayed Corona virus testing is teaching a basic lesson about how all medical tests work.  No test is 100 percent accurate."

Do you see that?

A.   Yes.

Q.   Isn't it safe to assume that the market understood, at least as of March 26th, 2020 that no diagnostic test is 100 percent accurate?

Page 164

MR. PINEIRO:  Form.  Asked and answered.  Calls for speculation.

A.   I mean, again, it might mean that the market understood that, but that is why the company's statements on the 1st of May are so important in the case because they said that they had a test that was superior to all the other tests on the market.

Q.   So this article -- do you agree that this article describes the fact that no test is 100 percent accurate?  It describes that as a basic lesson about how medical tests work.

MR. PINEIRO:  Form.  Vague. Calls for speculation.

A.   Listen, I agree those are the words on the page but that's what makes the statements in the press release that much more egregious.

Q.   Is it your testimony that the May 1 press release somehow dispelled the market of the notion that no test is 100 percent accurate?

MR. PINEIRO:  Form.  Misstates

Page 165

testimony.

A.   The May 1st press release, as we said throughout the day today, misled the market about the accuracy of the company's Covid-19 tests.

We can observe how the market interpreted the company's statements, the impact that those statements had on the company's -- the impact that those statements had on the company's stock price.

Q.   Did the market stop believing that no test is 100 percent accurate after the May 1st press release?

MR. PINEIRO:  Form.  Calls for speculation.

A.   Again, what we can observe from the May 1st press release is how the market interpreted the press release to mean that the company's Co-Diagnostics's test was perfectly accurate and it consistently and repeatedly demonstrated 100 percent sensitivity and specificity.

Q.   So this statement "No test is 100 percent accurate" is being said here

42 (Pages 162 - 165)

Page 166

in the Washington Post on March 26th, 2020.

Why was the same statement, essentially, the same statement included in the May 14th FDA press release somehow corrective?

MR. PINEIRO: Form. Asked and answered.

A. Again, we have the company's statements. At this time, I believe, I might be wrong, but I think in my report I have the information. The company wasn't even selling, they weren't even FDA approved yet, right, for their Covid-19 test. So the company got approval for their Covid-19 test. They issued the May 1st press release, which said that their test consistently outperformed others, the other tests on the market or the other tests, the competitors' tests, I should say.

Q. Okay. If you go down, I guess the second page of the pdf in the same article. It will be four paragraphs up.

A. Up from the bottom?

Page 167

Q. Up from the bottom, sorry.

A. Okay.

Q. It says, "'A negative result does not rule out Covid-19 and should not be used as the sole basis for treatment or patient management decisions' according to the fact sheet for healthcare providers."

Do you see that?

A. Yes.

Q. Then the quote continues "'When diagnostic testing is negative, the possibility of a false negative result should be considered in the context of a patient's recent exposures and the presence of clinical signs and symptoms consistent with Covid-19.'"

Are you familiar with the healthcare sheet for providers?

A. No.

Q. Are you aware that Co-Diagnostics had a fact sheet for healthcare providers?

A. That they provided a fact sheet to healthcare providers?

Page 168

Q. There was a Co-Diagnostics fact sheet for healthcare providers; are you aware of the fact?

A. That is not what's being referred to here or is that what's being referred to here?

Q. Just as a general matter. Are you aware -- I am asking separate from this article.

Are you aware that Co-Diagnostics had a fact sheet for healthcare providers?

A. Not specifically, no. But generally, I think, that with any tests or any vaccines or medications, right, there is usually a description on how to use them.

MR. TAYLOR: Okay. All right. I am going to bring up another exhibit, Exhibit 7.

(Bettencourt Exhibit 7, Emergency Use Authorization for Co-Diagnostics Logix Smart coronavirus disease test, was so marked for identification, as of this date.)

Page 169

Q. Let me know when you have it up.

A. This is the April 3rd?

Q. Yes, correct.

Do you recognize this document?

A. I can't remember if I reviewed this or not. It looks like the request for emergency use authorization.

Q. I will represent to you that this is the Emergency Use Authorization for Co-Diagnostics Logix Smart Coronavirus Disease test.

A. Okay.

Q. Are you aware or -- are you aware that this EUA -- so anytime, for the court reporter EUA is going to stand for Emergency Use Authorization -- are you aware that this EUA was publicly available as of April 3rd, 2020?

A. I wasn't aware of it, but it wouldn't be surprising that it was. Usually that information is made available right away.

Q. If you go down to page 3 of the letter. Go up three paragraphs from the

43 (Pages 166 - 169)

Page 170

bottom and it says, "Your product is authorized to be accompanied by the following product specific information pertaining to the emergency use, which is required to be made available to healthcare providers and patients, fact sheet for healthcare providers: Logix Smart Coronavirus Disease 2019 and fact sheet for patients."

Do you see that?

A.   Yes.

MR. TAYLOR:  Exhibit 8.

(Bettencourt Exhibit 8, Fact Sheet For Healthcare Providers dated April 3rd, 2020, was so marked for identification, as of this date.)

Q.   Are you on Exhibit 8?  This should be the Fact Sheet For Healthcare Providers, dated April 3rd, 2020.

A.   All right.  I see it.

Q.   If you go to the beginning of the second page.  Well, first of all, I'll represent to you that along with the EUA letter that we just looked at, this fact sheet for healthcare providers for

Page 171

Co-Diagnostics Logix Smart Covid-19 test was also publicly available on April 3rd, 2020.  Do you have any reason to dispute that?

A.   No.

Q.   So at the top of page 2 it states, "The Logix Smart Covid-19 test has been designed to minimize the likelihood of false positive test results.  However, in the event of false positive results, risks to patients could include the following," and then it has a list of issues.

Do you see that?

A.   On page 2?

Q.   Yes, the first paragraph on page 2.

A.   Okay.  Yeah, I see it.

Q.   Okay.  Doesn't this paragraph show that even, that -- sorry, let me restate that.

Doesn't this paragraph show that there might be a potential likelihood of a false positive result even using the Logix Smart Covid-19 test?

Page 172

A.   It says that "They were designed to minimize the likelihood of positive test results."

Q.   And then in the next sentence however, "In the event of a fall positive result," right?

A.   Yes.

Q.   So the fact sheet for Co-Diagnostics' healthcare providers on April 3rd, 2020 is communicating that there might be a chance of a false positive result; is that fair to say?

A.   Yeah.  I mean I would also say to look back on this period and say that there was perfect clarity around Covid and how it manifested itself and how it spread amongst people, it suffers from a little bit of hindsight bias.

So I think there is a bunch of uncertainty in the market following the onset of the pandemic.  And that makes what the company says to the public all that much more important at the start of the class period.

Q.   So looking at the

Page 173

Co-Diagnostics' Fact Sheet for Healthcare Providers, isn't this an example of the company saying that its test is not 100 percent accurate as of April 3rd, 2020?

A.   Again, speaking strictly about what this says, it indicates that there is a risk that it's not 100 percent, but it doesn't provide us with whether it's, in fact, zero or next to zero or some other number.  We just don't know.

Q.   Let's go down two more paragraphs.  It states, "A negative test result for this test means that SARS-CoV-2 RNA was not present in the specimen above the limit of detection.  However, a negative result does not rule out Covid-19 and should not be used as the sole basis for treatment or patient management decisions.  A negative result does not exclude the possibility of Covid-19."

By saying that the test -- that a negative test result using the Logix Smart test does not exclude the possibility of Covid-19, isn't the

44 (Pages 170 - 173)

Page 174

company communicating that its test is not 100 percent accurate all of the time?

A.  I think there is a couple of different ways to interpret this.  One being that depending on where you are and how long ago your exposure was to the virus, that you could have it and still test negative.  And that the timing of the test matters.

So I don't know it necessarily speaks to the accuracy of the test overall, or just the timing at which the test was taken.  It doesn't indicate one way or another.

(Bettencourt Exhibit 9, Fact sheet for patients, was so marked for identification, as of this date.)

MR. TAYLOR:  Now I am doing Exhibit 9.

Can you tell me how much time we have been on the record so far?

THE VIDEOGRAPHER:  This volume was an hour and four minutes.  And you had just about three hours before this.  So you are about at four hours.

Page 175

MR. TAYLOR:  So I will move a little quickly here.  Let's go to Exhibit 9, this is the fact sheet for patients.

Q.  I am going to represent to you that this fact sheet for patients, which was referenced in the EUA letter was also publicly available as of April 3rd, 2020; do you have any reason to dispute that?

MR. PINEIRO:  Form.  Calls for speculation.

A.  Again, I don't have any reason to dispute that it was available.

Q.  Okay.  If you look to, on page 2, if you go three paragraphs down, with the word that says "However."

A.  Yes.

Q.  So here the company says, "However, it is possible for this test to give a negative result that is incorrect in some people with Covid-19."

Do you see that?

A.  Yes.

Q.  It says "This means that you could possibly still have Covid-19 even

Page 176

though the test is negative"; isn't that correct?

A.  That's correct.

Q.  In this fact sheet for patients isn't Co-Diagnostics indicating that its test is not 100 percent accurate in all circumstances?

A.  Again, I think we have to go back to what was said at the beginning of the class period.  Clearly, they are saying that their test has consistently and repeatedly outperformed all other tests at 100 percent specificity and -- yeah, with 100 percent -- has basically performed nearly perfect on all prior tests, and is better than the competitors that are available.

And so that this says that some people might have false negative is at odds with what the company's press release reasonably led people to believe at the start of the class period.

MR. TAYLOR:  I will show one more exhibit quickly before we take a break.  This will be Exhibit 10.

Page 177

(Bettencourt Exhibit 10, HC Wainwright report, was so marked for identification, as of this date.)

Q.  It's an HC Wainwright report.  Just let me know when you have it.  This is an HC Wainwright report dated March 18th, 2020; do you see that?

A.  Yes.

Q.  This is about a month-and-a-half, about a month-and-a-half before the May 1 press release; is that correct?

A.  Correct.

Q.  If you go to the top of page 2, the first non-bolded sentence in the report says, "We remind investors that the Logix Smart Covid-19 test has 99.2 percent sensitivity and 100 percent specificity."

Do you see that?

A.  Yup.

Q.  99.2 percent is less than 100 percent, correct?

A.  Yes.

Q.  So isn't it safe to say that

45 (Pages 174 - 177)

Page 178

market analysts knew that the Logix Smart test was not 100 percent accurate all the time, at least as early as of March 18th, 2020?

A.   I would disagree.  I think the company's press release says that based on recent studies that the company's test was almost perfectly accurate or near perfectly accurate in sensitivity and specificity.

Q.   Exhibit 11, let me know when you have it.

(Bettencourt Exhibit 11, April 30, 2020 Salt Lake Tribune Article, was so marked for identification, as of this date.)

A.   Got it.

Q.   Do you recognize this document.

A.   It's the article cited in my report that occurred on the day prior to the corrective disclosure -- sorry, I misspoke.  Prior to the original alleged misrepresentation.

Q.   If you go down to what is page 6 out of 7 on the pdf, the first words on

Page 179

the page are "Based upon concerns."

The second paragraph says that "Satterfield maintained that in a real world environment, people who have contracted Covid-19 have thousands or even hundreds of thousands of particles of virus in their sample and that's plenty to trigger a positive in his company's tests."

Do you know who Satterfield is here?

A.   Yes, my understanding is that he is the person who developed Co-Diagnostics' Covid-19 test and is their chief technology officer.

Q.   Okay.  And then it says, "He added that Co-Diagnostics Covid-19 tests scored between 99.52 percent and 100 percent in evaluations conducted by the FDA and in Europe."

Do you see that?

A.   Yes.

Q.   99.52 percent is less than 100 percent, right?

A.   That's correct.

Page 180

Q.   And is it your testimony that on May 1, after the publication of the May 1 press release, that the market ignored all of the prior disclosures about Co-Diagnostics' test being less than 100 percent accurate?

MR. PINEIRO:  Form.  Misstates testimony.

A.   No, that's not what I said at all.  I mean as I explained earlier, we talked at length about what Satterfield said.  He said that the company's test had consistently and repeatedly had 100 percent specificity on all prior tests, or consistently outperformed the competition -- I have to go back to my report to get the words right -- and that you can't do better than that.

And those are the representations that the market understood following the May 1 press release.  I mean, we can observe that.  I have it well documented in my report about how the market interpreted his statements on the 1st.

Page 181

MR. TAYLOR:  I think we can take the break now.

THE VIDEOGRAPHER:  This will be the end of media disk number 4.  The time is 3:37 p.m. and we are going off the video record.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the video record.  This is video media disk number 5.  The time is p.m.  Please proceed.

BY MR. TAYLOR:

Q.   Going back to your report, so that's Exhibit 2.  Let's go to page 15.

MR. PINEIRO:  We are on Exhibit 2, right now, Zach?

MR. TAYLOR:  Yes, it's in the report on page 15.

Q.   So it's page 15, paragraph 41.  Is everyone there?

A.   Yes.

Q.   Okay.  So this section, this series of paragraphs here, paragraph 41 and 42 discusses comments from the Nebraska governor regarding Covid-19

46 (Pages 178 - 181)

Page 182

testing; is that correct?

A.   These particular comments relate to Covid-19.  But I think the press conference was related to youth sports.

Q.   So in paragraph 41 you quote the governor, Governor Ricketts, that's the Governor of Nebraska, saying "The question was 'What about the accuracy of these tests?'  Again, we validated our test lab to, you know, again, cooperating with the public health lab to be able to do that and you know the tests are going to be 95 percent accurate."

Do you see that?

A.   Yes.

Q.   And then in paragraph 42 you site to a Lincoln Journal Star article; is that correct?

A.   Yes.

Q.   And there you quote the article as saying "Ricketts on Monday said that the tests have been validated.  That the Test Nebraska lab set up in CHI and St. Elizabeth in Lincoln and have a 95

Page 183

percent accuracy rate."

Is that correct?

A.   That's correct.

Q.   Is it your understanding that Test Nebraska used Co-Diagnostics' Covid tests?

A.   My understanding is that Co-Diagnostics' Covid tests were one of the tests used by Test Nebraska.

Based on what my understanding is, I think it's uncertain as to whether Co-Diagnostics tests were the only tests used by Test Nebraska.

Q.   If you go to -- all of these comments from the Nebraska governor were from May 11th, correct?

A.   Correct.

Q.   If you go to page 67 of your report.

A.   Okay.

Q.   Does page 67 of your report reflect is 9.53 percent increase in Co-Diagnostics' stock price on May 11th?

A.   Yes, it does.

Q.   And that's the same day that

Page 184

the governor of Nebraska made his comments about 95 percent accuracy that we just discussed; is that correct?

A.   That is also correct.  But I think as Professor Ferrell would say, that that's probably statistically indistinguishable from zero.  There is no scientific evidence that concludes that's a significant price reaction.

Q.   But there was a stock price increase on that day, correct?

A.   There is an observed stock price increase.  We don't know in the market what happened.

Q.   All right.  So also in your report you discuss a May 13th, 2020 Bloomberg article; is that correct?

A.   Sounds right.  I can go there and check.

Yes, in paragraph 44 there is a citation to a Bloomberg article.

MR. TAYLOR:  I am just going to introduce a new exhibit in the marked exhibits.  This is going to be Exhibit 12.

Page 185

(Bettencourt Exhibit 12, Bloomberg Article, was so marked for identification, as of this date.)

Q.   Let me know when you have it.

A.   I have it.

Q.   Is this the article you cite in your report, the May 13 Bloomberg article?

A.   I think so, without having the report side by side.

Q.   Have you read this article?

A.   This is the one that's cited in my report?

Q.   Correct.

A.   Then yes.

Q.   This article discusses the NYU study, related to the Abbott ID NOW Covid test; isn't that correct?

A.   That's correct.

Q.   So in the middle of page 2 you will see a paragraph that starts "The second analysis."  Do you see that?

A.   Yup.

Q.   So this paragraph discusses a study by the, published by the Annals of

47 (Pages 182 - 185)

Page 186

Internal Medicine authored by Johns Hopkins researchers; do you see that?

A. Yes.

Q. Okay. So this Johns Hopkins study "Analyzed seven previously published studies evaluating 1330 patient samples and focused on a group of widely used Covid-19 diagnostic tests known as a 'polymerase chain reaction' test."

Do you see that?

A. Yes, I see that.

Q. Are you aware that polymerase chain reaction tests are also referred to as PCR tests?

A. I am.

Q. Are you aware that the Co-Diagnostics' Covid-19 test is a PCR test?

A. Yes.

Q. Based on the article, do you understand that this study by Johns Hopkins did not concern the Abbott test; am I correct?

A. Let me go back to the article here.

Page 187

(Witness reviews document.)

A. Correct. It doesn't look like the second analysis. It's referring specifically to Abbott.

Q. Right. Okay. The next sentence says, regarding the Johns Hopkins analysis about Covid PCR tests, "It suggested that false negatives are especially likely before the onset of symptoms, such as when a patient is tested soon after exposure to the virus. When patients were tested immediately after infection, typically before symptoms occur, the false-negative rate was 100 percent."

Do you see that?

A. I do.

Q. So isn't it fair to say that the Johns Hopkins study is suggesting that Covid PCR tests are not 100 percent accurate, at least at certain points during an infection?

A. Again, I think we have to go back to how the market interpreted the mix of information that was released on

Page 188

May 13th.

We can observe that Abbott came out with negative news that market commentators said what was bad for Abbot was good for Co-Diagnostics because Co-Diagnostics had a perfectly accurate test.

Q. Right. But my question was about the Johns Hopkins study.

The Bloomberg description of the Johns Hopkins study, doesn't it suggest that PCR tests generally are not 100 percent accurate at least at certain points during the infection?

A. It suggests that, yes, but market participants and investors and in connection with this case they focused specifically on how the Abbott news impacted Co-Diagnostic's prospects.

Q. So I think you can kind of see in the exhibit the second analysis looks like it has a hyperlink; do you see that?

A. Yes.

Q. So did you review the Johns Hopkins study described here in the

Page 189

Bloomberg article?

A. As I sit here now, I can't recall if I did or did not.

(Zoom disconnect.)

(Off the record.)

THE VIDEOGRAPHER: Back on the video record at 4:06 p.m., please proceed.

MR. TAYLOR: Okay. So I just introduced Exhibit 13.

(This Exhibit 13 was retracted.)

Q. You should see in the top right corner it says "Annals of Internal Medicine."

A. Yes.

Q. I will represent to you that this is the Johns Hopkins test referenced in the May 13th Bloomberg article that we, that we just reviewed as Exhibit 11.

So now that I bring the document up, did you review this document in connection with the preparation of either of your reports?

A. I don't believe it's cited in my documents reviewed and relied upon.

48 (Pages 186 - 189)

Page 190

So I believe the answer to that question is no.

Q. If you go down to the section, so if you look at the bottom right-hand corner, it has the page numbers.

A. Yes.

Q. 265?

A. Okay.

Q. If you look at the third, well, the second paragraph at the bottom from the left it starts with "Tests for SARS-CoV-2."

A. Yes.

Q. This sentence says, "Tests for SARS-Cov-2 based on RTPCR added limited diagnostic value in the days immediately after exposure."

Do you see that?

A. I do.

Q. What do you understand that sentence to mean?

MR. PINEIRO: Form. Calls for speculation. Lacks foundation.

A. This is the article that is referenced in Bloomberg?

Page 191

Q. The study.

A. Even though the study is dated August 18th of 2020?

Q. Yeah. I did notice that.

A. This is --

Q. Actually, you know what, just because of the issue of the confusion of the link, let's just strike this. Let's go back to Exhibit 12.

THE CONCIERGE: Do you want 13 completely deleted?

MR. TAYLOR: Yeah.

THE CONCIERGE: Okay.

Q. So if you go back to the Bloomberg article and you go to, it should be on the last page, the page starts "Scientists have developed."

It says, "Scientists have developed a variety of tests to detect the novel coronavirus and some have not been vetted with the usual rigger by federal health regulators. It is also still unclear at what point in the incubation period of the virus, any test is most likely to produce an accurate

Page 192

result. Enough information about the virus is simply not yet known."

Do you understand that or did you see that?

A. I do see that, yeah.

Q. Isn't it fair to say that this portion of the May 13th Bloomberg article is stating that there are concerns about accuracy of Covid tests at least as of May 13th, 2020?

MR. PINEIRO: Calls for speculation. Lacks foundation.

A. As I explained in my report, I think we can observe that investors did not interpret this information to be applicable to Co-Diagnostics at this time. They specifically cite this article as a reason for a 35 percent stock price increase on May 13th.

MR. TAYLOR: All right. And now I will put in what is now the new Exhibit 13.

(Bettencourt Exhibit 13, May 14, 2020 Salt Lake City Tribune article, was so marked for identification, as

Page 193

of this date.)

Q. Please let me know when you see it.

A. The Salt Lake City Tribune article?

Q. Correct. Do you recognize this article?

A. Yes.

Q. So this is a May 14th, 2020 article in the Salt Lake Tribune, titled "Test Utah declines to Join Other Utah Labs in Accuracy Check; is that correct?

A. That's correct.

Q. And you list this as one of the alleged corrective disclosures in this case; is that correct?

A. That the information in here that the company was unwilling to participate in an accuracy check with the other labs, is a partially revealed corrective information to the market. That's what I wrote.

Q. Is it your understanding that this May 14th, 2020 Salt Lake Tribune article is an alleged corrective

49 (Pages 190 - 193)

Page 194

disclosure in this case?

A. My understanding is, again, the information in here is an alleged partially corrective disclosure, is how I would say it.

Q. Is there anything in this article that talks about the accuracy of the Co-Diagnostics Covid-19 test?

A. I would need to review it again.

(Witness reviews document.)

Q. I can actually direct you to a section. If you go to page 3 out of 9 of the pdf.

A. Okay.

Q. The first words in the top left should say "And with its partners."

A. Yes.

Q. If you look at the last paragraph "Co-Diagnostics' founder and chief science officer Brent Satterfield has said that the tests scored between 99.52 percent and 100 percent in evaluations conducted by the FDA and in Europe."

Page 195

Do you see that?

A. Yes.

Q. This is on May 14th, 2020, correct?

A. This is on May 14th, yeah. It's obviously referring back to some of his prior representations, though, in the earlier Salt Lake City Tribune article, where it says, I think exactly that, prior to the start of the class period.

Q. Right. So doesn't this article establish that the market still understood the Co-Diagnostics Logix Smart test to be less than 100 percent accurate, as was previously disclosed?

A. No. Again, we can observe that on May 1st, there is a statistically significant stock price increase. And we can go back to the timeline in my report, that explains in detail what was said in the press release just so we get this on the record at this late hour.

Q. I will actually ask you that. Where in your report do you say that there is a statistically significant

Page 196

price increase on May 1st?

A. It's in my Exhibit 5. But again, whether it's statistically significant at a 95 percent confidence level as indicated in my Exhibit 5 or 93 percent confidence level which Dr. Ferrell finds, there is still, when you consider all of the evidence available, it's undeniable that the stock price increase on May 1st was highly unusual and caused by the company's, the alleged misrepresentations in the company's press release.

If you go to paragraph 40 of my report we can see how the market interpreted Satterfield's statements in the press release and linked those statements to the stock price increase.

This comes the day after the company's -- that same statement in the Salt Lake City Tribune article on April 30th. And I understand that based on the judge's opinion in this matter, and plaintiff's allegation, that based on what the company said in the Salt Lake --

Page 197

or what the Salt Lake City Tribune article reported on, the day prior to the start of the class period, the company had rushed to get this press release out. And we can observe that the press release has a great impact on Co-Diagnostics' stock price.

Q. Going back, earlier we looked at an April 30th, 2020 Salt Lake Tribune article where Brent Satterfield stated that the Co-Diagnostics' Covid test scored between 99.52 and 100 percent, correct; do you recall that?

A. Yes, that's correct, yes.

Q. And we're seeing that same exact information, 99.52 percent repeated again on May 14th in this article, correct?

A. That's correct.

Q. So that information was not removed from the market's knowledge after the May 1 press release; isn't that right?

A. It wasn't removed from the total mix of information, but it was

50 (Pages 194 - 197)

Page 198

arguably refuted by Mr. Satterfield's comments in the May 1st press release when he said -- again, we'll just go back and get the words, but, you know, that Co-Diagnostics' Covid tests demonstrated 100 percent sensitivity and 100 percent specificity, the metrics used to define accuracy in molecular diagnostic testing.

And then he expounded on that, he went even further and said that in the countries where we have been evaluated against other testing, comparing them directly to the competitors, and this is relevant to the Abbott article that appears on May 14th, "We consistently and repeatedly achieved 100 percent clinical sensitivity, and you can't do better than that."

And we can observe that the market is interpreting those comments positively, noting that the, that those comments caused the company's stock price to rocket in response.

Q.   Going back to Exhibit 2, so this is your December 4th report, so it's

Page 199

page 18, paragraph 47 through 49.

So above page 47, you have a header that says "14 May, 2020 Reports Emerge Regarding the Accuracy of Co-Diagnostics' Covid-19 Test. Co-Diagnostics Announces Q1 2020 Results and Provides Mid-Second Quarter Update."

So in connection with the May 14th, 2020 Salt Lake Tribune article, what was the information that was emerging about the accuracy of Co-Diagnostics' Covid-19 test in that article?

A.   Sure.  As we discussed before, you can't consider any piece of information in isolation.  You have to consider all the information holistically.

Q.   Right.  But I am only asking about this one specifically.  What piece of this article fit into your holistic view of the alleged corrective disclosures?

A.   Again, so the day before the market is informed that Abbott's test is

Page 200

less than 100 percent.  They say that, well, Co-Diagnostics, their test is 100 percent.  So the stock price goes up.

On the morning of the 14th, there is a news report that comes out and says, hey, is Co-Diagnostics essentially willing to stand behind their test results and validate them with the other tests and testing sites in Utah?  And they declined.  They opted for a less sophisticated compromised experiment.

Q.   Where in the May 14th Salt Lake Tribune article does it say that Co-Diagnostics declined to join the accuracy check?

A.   The title of the article is Test Utah "Declines to Join Other Utah Labs and Accuracy Check."

Q.   What is Test Utah?

A.   What is Test Utah?

Q.   Yeah.

A.   Well, I think it's in the first part of my report, I'll go back and make sure we get it correct.

All right.  So paragraph 33 of

Page 201

my report, talking about Gary Herbert announced an expansion of the state's Covid-19 testing capacity in partnership with the Silicon Slopes Service Commission.

Upon completion of an assessment test he has done on TestUtah.com, an individual will be informed if he or she, if she or he needed to be tested for Covid-19 and will be directed to visit the testing center. Co-Diagnostics partnered with Silicon Slopes to aid in the expansion of Utah's Covid-19 testing.  Among the other partners were ATL Technology, Domo, Nomi Health, Qualtrics, RPH Engineering and local hospitals.  So that's what Test Utah is.

Q.   So is it your understanding that Test Utah is Co-Diagnostics?

A.   Not necessarily.

MR. PINEIRO:  Form.  Asked and answered.  Misstates testimony.  Go ahead.

A.   Right.  So I just explained

51 (Pages 198 - 201)

Page 202

exactly what Test Utah was. The Test Utah, when they declined it, to take part in this accuracy check with the other labs -- hold on, I am just reading my report here.

Q. I can simplify the question. Is Test Utah Co-Diagnostics?

MR. PINEIRO: Form. Asked and answered.

A. Again, as I explained above, I can't describe Test Utah any different than I had previously, and I do it in my report.

Q. Okay. So there is nothing in this May 14th, 2020 Salt Lake Tribune article that says that Co-Diagnostics declined to join any other Utah labs in the accuracy check; isn't that correct?

A. Again, all the press release does is mention Test Utah. And as we showed above, Co-Diagnostics is a big part of Test Utah.

Q. If you go to paragraph 50 --

A. Yes.

Q. -- now you're saying, "At 12

Page 203

p.m. Iowa Governor Kim Reynolds held a press conference," and it goes on to state in that paragraph "Governor Reynolds announced that the Test Iowa tests had 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives."

Do you see that?

A. I do.

Q. Did Governor Reynolds say anything about Co-Diagnostics during this press conference?

A. I remember it was a video, a YouTube video. I think I have a definition somewhere of Test Iowa, too. Right.

So in paragraph 35 we have an announcement by Iowa Governor Kim Reynolds saying that she's expanding the Covid-19 testing capacity using the same program launch in Utah. And that they had signed contracts with Nomi Health, whose partners include Co-Diagnostics, Qualtrics and Domo.

So I am not aware of whether

Page 204

the press conference, I can't remember offhand if the press conference in PBS Iowa mentioned Co-Diagnostics by name.

Q. Well, at least in your report you don't cite any comments by Governor Reynolds about Co-Diagnostics by name, correct?

A. That's correct. Paragraph 50 has no mention of Co-Diagnostics by name in her press release.

Q. So on what basis do you conclude that the market understood Governor Reynolds' comments as referring to Co-Diagnostics?

A. Again, I think we have to consider the totality of the information and the sequence in which this information is being learned, right? So we are getting a more rapid release of information that undercuts some of what the market understood to be true, based on the company's misrepresentations prior to May 14th.

So we have the Utah article. Building upon that Utah article, we have

Page 205

another announcement from the Iowa governor. Following the Iowa governor, we have the stock price being halted due to volatility.

Once it starts trading again, we get a Hindenburg press release, a series of tweets that is also critical of the accuracy of Covid diagnostic tests and highlights the company's propensity to issue floppy press releases.

Q. I am sorry, just because --

MR. PINEIRO: No, no, no, hold on a second. Let him finish his response.

MR. TAYLOR: I understand. But I also can't let him like read his entire report in response to every question that I ask.

MR. PINEIRO: Hold on, he's not doing that and he's finishing his response. Let him finish his response, and you can ask your question. If you want to withdraw the question, that's another matter.

MR. TAYLOR: Okay. I withdraw

52 (Pages 202 - 205)

Page 206

the question.

Q. So going back to paragraph 50 about the Iowa governor's comments that Iowa tests had 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives?

A. Yes.

Q. If you scroll up to paragraph 41 on page 15 and this was the governor of Nebraska, his statement that the "The tests are going to be 95 percent accurate."

Do you see that?

A. Yes.

Q. Why is the May 14th comment from the Iowa governor corrective, but the May 11th comment from the Nebraska governor not?

A. Again, I mentioned this before, that it's about the sequence of the information and how it came out. It's not that the May 11th comment is not important. It's what we observed on May 13th, 14th -- well, I should say on May 13th and then throughout the day on May

Page 207

14th.

And it's this sequence, this drum beat of negative news that causes every sequential press release or news article to be further revelatory of the information that was allegedly withheld at the start of the class period.

Q. Is it your testimony that the May 11th statements by the Nebraska governor were corrective of the May 1st press release?

MR. PINEIRO: Form. Misstates testimony.

A. No, I never said that that was corrective of -- there is no indication that that was corrective of the May 1st press release.

Q. But it is your understanding that the comments from the Iowa governor talking about 95 percent accuracy, were corrective of the May 1st press release?

A. My testimony is -- and again I think it's in my report, where I said it best -- that the sequence of the news as it emerged on May 14th is collectively

Page 208

corrective when you analyze everything holistically of the May 1st press release. And only when considered holistically can it be corrective of the May 1st press release.

Q. And in your holistic view, does your holistic view of the correction of the May 1st press release include the May 11th comments from the Nebraska governor?

A. I considered all publicly-available information throughout the class period. There is no indication that the market understood those, the Nebraska governor's statement, to be informative regarding Co-Diagnostics' Covid-19 test, the accuracy of the Co-Diagnostics' Covid-19 test.

Q. Did you see any market commentary that attributed the comments from the Iowa governor to Co-Diagnostics?

A. Let me go to my report here again.

(Witness reviews document.)

MR. TAYLOR: I will withdraw that question as well.

Page 209

Q. Going back to the May 11th comment from the Nebraska governor about the 95 percent accuracy, in an efficient market shouldn't the market price for Co-Diagnostics stock have quickly incorporated that information?

A. What information? We know that there are a bunch of factors -- well, there is a bunch of information in that May -- hold on, let me get there.

When you say quickly incorporate, what does that mean? How quickly are you suggesting it should have been incorporated?

Q. Well, in an efficient market, I mean, I am not the one with the expert opinion here. I guess in an efficient market, wouldn't -- in an efficient market wouldn't the Nebraska governor's comments about 95 percent accuracy have been incorporated into Co-Diagnostics' stock price?

A. It's possible that it could have, but there is no, as we explained earlier in the report, there is no

53 (Pages 206 - 209)

Page 210

indication that Co-Diagnostics, that he's referring to Co-Diagnostics' tests, specifically.

Q. Okay. And is there anything in the --

A. It was a YouTube special conference about Little League in Nebraska.

Q. Right. And is there anything in the Ohio governor's comments that talk about Co-Diagnostics, specifically?

A. Again, this is why I am saying when you look at May 14th, you have to consider the information that came out on the 13th, on the 14th, prior to the start of trading, in the Iowa news, the Hindenburg news -- I am sorry, the news that came out in the Salt Lake City Tribune prior to the start of trading. The Iowa news. The trading halts. The Hindenburg news. The next trading halt. The company's announcement after the close where they were silent on the accuracy of their test and then the FDA announcement.

Page 211

Those holistically provided the market with the understanding that the prior representations about 100 percent accuracy were untrue.

Q. So just to be clear, specifically, about the Iowa governor's comments, specifically, about her comments at 12 p.m. in paragraph 50, you can't identify anything specific regarding Co-Diagnostics in those comments; is that correct?

A. Again, what I am saying is you have to analyze things, especially this disclosure, holistically, with the sequence of information that came out -- I was very clear about that in my report -- and the importance of doing the analysis that way.

Q. So if the Iowa governor's comments about 95 percent accuracy should become part of your holistic analysis, why, why aren't the comments from the Nebraska governor included in that?

A. They were considered. I mean that's why it's in my report.

Page 212

Q. So is it your testimony that the beginning of the negative news about Co-Diagnostics tests started on May 11th?

MR. PINEIRO: Form. Misstates testimony.

A. No. I explain very clearly in my report when the negative news -- and I explain very clearly in my report the impact of the company's statement -- or I am sorry, the impact that Abbott's news on May 13th had on the company's stock price. And following that, how the sequence of information corrected, when considered holistically, corrected the market's misunderstanding following the company's May 1st press release.

Q. Going to paragraph 52, this describes a Hindenburg Research tweet at 1:38 p.m.; is that correct?

A. Yes, that describes a series of tweets.

Q. Is the Hindenburg tweet mentioned anywhere in plaintiff's complaint?

A. I'm not sure. You would have

Page 213

to show me the complaint. We could check. Whether it's mentioned in their complaint or not is not -- my analysis isn't bound by what they have in their complaint.

As I explained above, I was asked to assess loss causation and damages, based on the misrepresentations in the May 1st press release.

Down below, I explained how I identified each component of the corrective information that was released to the market on May 13th -- I am sorry, on May 14th, and how it corrected the market's previous misunderstanding or how it corrected the misrepresentations and omissions and the market's misunderstanding that stem from those.

Q. Are you aware that the Hindenburg tweet is not alleged to be an alleged corrective disclosure in plaintiff's complaint?

MR. PINEIRO: Form. Asked and answered.

A. Again, I would repeat the same

54 (Pages 210 - 213)

Page 214

answer I just gave, which is whether it's identified as a corrective disclosure, per se, from a legal standpoint, this information from an economic standpoint was clearly corrective and of exactly what the company had said on the first day of the class period.

Q.   So I get that, but you're answering a question that I am not asking. I am asking you if you are aware of the fact that Hindenburg is not mentioned in plaintiff's complaint? It's a very simple question. Are you aware of that fact?

MR. PINEIRO:  Asked and answered.

A.   Again, I would just repeat the answer that I just gave. Whether it is or it isn't doesn't matter to me. I analyzed loss causation and measure damages based on, from a financial analytic perspective, not a, what was in the complaint. I wasn't bound by what was in the complaint.

Q.   Did plaintiff's counsel direct

Page 215

you to include the Hindenburg tweet in your expert report?

A.   No.

Q.   Have you, in other cases, have you ever included a corrective disclosure in a report where it wasn't mentioned anywhere in the party's pleadings?

A.   In my 15 years experience, yes.

Q.   Can you name one case where you include a corrective disclosure in a report where it wasn't mentioned anywhere in the party's pleadings?

A.   I don't know how much of this would be confidential or not. That's what I am hesitating on or how many of these reports are actually public.

Q.   Can you name one publicly-available case where you provided an expert report that included corrective disclosures that were not mentioned anywhere in the party's pleadings?

A.   As I sit here now, I couldn't provide you with an example of a publicly-available report on loss

Page 216

causation and damages that identify a corrective disclosure that was not in the pleadings.

Q.   And in any of the expert reports listed in your CV that were done under your name, those six forms that we saw, did any of those include a corrective disclosure that was not mentioned in the party's pleadings?

A.   Again, I just don't remember offhand right now whether that's true, right or wrong. I just can't recall.

Q.   Okay. So looking at the actual Hindenburg tweet here it says "We are short Co-Diagnostics due to its CFO's checkered history involvement with companies halted by the SEC, its astronomical valuation, a growing list of higher quality Covid tests and its propensity to issue frequent fluffy press releases."

Do you see that?

A.   Yes.

Q.   Is there any mention of Co-Diagnostics' Covid test -- sorry, is

Page 217

there any mention of the sensitivity of Co-Diagnostics's Covid test?

A.   In that particular tweet there?

Q.   Right.

A.   I mean, they said that there was a questionable quality. I think that goes right at sensitivity and accuracy of the test.

Q.   Where does it say in the tweet something about questionable quality?

A.   Well, it's one of the tweets. If you look at footnote 64, in the middle of paragraph 52, "The testing quality was deemed 'one of the worst' and labeled the company as a 'third-tier option of questionable quality compared to its rivals.'"

Q.   We will get to that one. But at least in this tweet right here, do you see anything about the sensitivity of Co-Diagnostics' Covid tests?

A.   Again, you're limiting the tweet to -- I said there was a series of tweets. I excerpt one of them that was a summary. But I cited to many others in

55 (Pages 214 - 217)

Page 218

that series of tweets that talk about, that address specifically the quality and the company's propensity to issue frequent press releases.

Q. All right. So I will try this one more time. In the tweet that is mentioned in the black square below paragraph 52, the one that I read out loud that starts with "We are short" and ends with "Press releases," does the word "sensitivity" mentioned anywhere?

A. Again, the word "sensitivity" does not appear there.

Q. Okay. Does the word --

A. It's talking about the quality of the Covid tests --

Q. Does the word --

A. -- and there are a lot of tests out there.

Q. Is the word "specificity" mentioned in this tweet that I had referred to?

A. No. But again, specificity and sensitivity are all going to the accuracy and accuracy equates to quality. So I

Page 219

mean they aren't talking about the accuracy and, therefore, the specificity and sensitivity of the test.

Q. Is it your understanding that the use of the word "quality" in this tweet is equivalent to the word "accuracy"?

A. I think if we reviewed all of the, the series of tweets holistically, it would become pretty apparent that when they say quality, they are talking about accuracy.

Q. Now, are the reasons listed in the Hindenburg tweet for why it's shorting the company, were those reasons all based on publicly-available information?

A. I don't know specifically if the CFO's checkered history or if there is an involvement was -- if the company being halted by the SEC was publicly known or if that was research that was done by Hindenburg. I am unsure. But these tweets are related right back to the, the statements made on May 1st, when

Page 220

they say that you can't do better than that in the commentary provided by Satterfield.

Q. Okay. Do you consider the tweet's mention of the CFO's checkered history and the other reasons listed not related to the test's quality, as being corrective information?

A. The company's astronomical valuation is observable. I mean the astronomical valuation increased following the news on May 13th, no doubt. Like that's undisputed. The other things about the CFO's checkered history and the company being halted by the SEC and their propensity to issue fluffy press releases, all directly relate back to plaintiff's allegations and the initial misrepresentation on May 1st; so yes.

Q. How is the CFO's checkered history corrective of the May 1 press release?

A. Well, in the financial principle section, if we go down in the report we talk about reputation and the

Page 221

company talks about the importance of its reputation.

Q. Was there anything about, was there anything in the May 1 press release that the company stated about its reputation?

A. Say that again.

MR. TAYLOR: Strike that.

Q. What information in the May 1 press release was corrected by mention of the CFO's checkered history?

A. Again, it just causes investors to question the accuracy, any reasonable investor to question the accuracy of the company's statements. And, you know, it's an attack on their reputation and whether investors are going to believe verbatim exactly what the company is telling them.

Q. Okay. If you go to paragraph 54, you cite a Seeking Alpha article. Towards the end it says "Hindenburg writes that the test quality has been 'rated one of the worst' despite the company's claims of 100 percent

56 (Pages 218 - 221)

Page 222

sensitivity and specificity. It is a third-tier option among competitors, the note continues."

Q. Do you see that?

A. Yeah. And I will say to one of your earlier questions, I mean when they argued whether the company's test was of high quality, here you have Seeking Alpha interpreting that information as being directly back to the claims of 100 percent sensitivity and specificity. So that ties it back to the original misstatements.

MR. TAYLOR: So I just introduced what is now Exhibit 14.

(Bettencourt Exhibit 14, Series of tweets issued by Hindenburg, was so marked for identification, as of this date.)

Q. Let me know when you have it.

A. This is the Hindenburg?

Q. Yeah.

A. Okay.

Q. So if you notice just at the top "We are short Co-Diagnostics," this

Page 223

is the portion that had the black frame around it in paragraph 52 of your report.

Do you recognize this document?

A. Yeah, maybe in a separate form, but my understanding is this is the series of tweets that were mentioned by the, by, I guess, the series of tweets issued by Hindenburg.

Q. Yeah. So if you go to, if you look in the bottom right corner you see the pages, something out of 8. If you go to page 5 out of 8.

And if you go three paragraphs up above the big rectangle, it should say "CODX's test quality has been consistently rated one of the worst, despite its own press releases touting 100 percent specificity and sensitivity."

Do you see that?

A. Yes.

Q. And do you see that it has a semicolon after it or colon, sorry?

A. Yup.

Q. And then under that colon is a link to an article titled "Limits of

Page 224

Detection For FDA-Authorized Covid-19 Diagnostics."

Q. Do you see that?

A. Yes.

Q. And there is a link to that article below it to a Biocentury.Com article.

Do you see that?

A. Yup.

Q. Did you review the Biocentury article in connection with the preparation of your report?

A. I believe I did, yes. I think that was also mentioned by the Salt Lake Tribune on April 30th.

MR. TAYLOR: I am marking this as Exhibit 15.

(Bettencourt Exhibit 15, Biocentury article, was so marked for identification, as of this date.)

Q. Let me know when you have it.

A. I got it.

Q. So this is the Biocentury article referred to in the Hindenburg tweet, titled "Limits of Detection for

Page 225

FDA-Authorized Covid-19 Diagnostics."

Do you see that?

A. Yes. It's a Biocentury article.

Q. And what date is this article?

A. It is, it was originally published on April 1st and updated on April 30th of 2020 -- I am sorry, April 3rd.

Q. Okay. So now going back to Exhibit 14, the Hindenburg note, back on page 5 out of 8.

So isn't it true that Hindenburg is citing to an April 1 Biocentury article in support of its position that Co-Diagnostics' test quality has been consistently rated one of the worst?

A. Let me review the rest of the Hindenburg tweets, just to make sure.

Q. Yes. It says, "Co-Diagnostics' test quality has been consistently rated one of the worst, despite its own press releases touting 100 percent sensitivity and specificity."

57 (Pages 222 - 225)

Page 226

And is it fair to say that Hindenburg cites the April 1 Biocentury article as support for that position; isn't that correct?

A. Yeah, but I would go back to the top and if we start and read, again, we can talk all day about why the sequence matters.

If you start with the first tweet and work your way down to that page 5 of 8, I think it provides an important new context for the consideration of the company's test quality.

Q. Well, my question is a little different. My question is: Isn't Hindenburg here basing its opinion that Co-Diagnostics has consistently been rated one of the worst? Isn't Hindenburg basing its opinion on an April 1 article, at least in part?

A. I think it's obviously cited within the Hindenburg series of tweets, but they have a whole bunch of other analysis that was done in addition to just that one piece as the reason for

Page 227

them issuing those comments and shorting the stock.

Q. But this information in the Biocentury article predates the May 1 press release; doesn't it?

A. The Biocentury article is dated, yeah, before May 14th. It's also prior to the company's representations that their tests were at 100 percent specificity and 100 percent sensitivity, and also Satterfield's editorializing that you can't do better than that.

Q. Okay. But as a practical matter, this section of the tweet, just this section of the tweet about having been consistently rated one of the worst, isn't this just based on prior publicly-available information; namely, the Biocentury article?

A. This one, in isolation -- and again it's not the right way to look at it -- but in isolation, this is mentioning the Biocentury is focusing this statement here on the Biocentury article that was issued or published

Page 228

prior to the start of the class period, yes.

MR. TAYLOR: If we can just take another five-minute break and if you don't mind letting us know how much time we are on the record?

THE VIDEOGRAPHER: This will be the end of video media disk number 5. The time is 4:59 p.m. and we are going off the video record.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record. This is video media disk number 6. The time is p.m. Please proceed.

BY MR. TAYLOR:

Q. Let's go back to Exhibit 2, which is your December 4th report.

A. Okay.

Q. Is Exhibit 5 to your December 4th report the basis for your opinion that the stock price movement on May 1st was statistically significant?

A. Well, I guess whether May 1st is statistically significant or not is

Page 229

not germane to the analysis of loss causation that I performed in my original report. But it wouldn't be Exhibit 5. It would be Exhibit 6.

Q. Exhibit 6.

A. That indicates that the, that the return is above the 95 percent confidence level.

Q. Okay. All right. So moving on, have you reviewed Dr. Ferrell's first report in this case?

A. That was the one that was submitted in December, at the same time as mine, correct?

Q. Yes.

A. Yes, I have reviewed it.

MR. TAYLOR: Okay. This is going to be Exhibit 16.

(Bettencourt Exhibit 16, Dr. Ferrell's first report, was so marked for identification, as of this date.)

Q. So as a general matter, you are aware that Dr. Ferrell's first report, that in Dr. Ferrell's first report, he

58 (Pages 226 - 229)

Page 230

posited that the May 1 stock price was not statistically significant; is that correct?

A.   Yes, I believe that's a summary of what he found.  And that there was no scientific bases to conclude that there was a statistically significant stock price reaction on May 1st.

Q.   And you're aware that in Dr. Ferrell's report, he tested the statistical significance of the May 1 stock price movement using six different estimation periods; is that correct?

A.   Yeah, that's page 17 of the report, I guess.  And I think I explained in my rebuttal report why every single one of those is flawed.  Each of the estimation periods is inappropriate, based on the changing of the company due to the Covid-19 pandemic, which he, himself, recognizes.  It's a little confusing why he suggests that those are more appropriate estimation periods.

MR. TAYLOR:  So I am introducing your rebuttal report as Exhibit 17.

Page 231

(Bettencourt Exhibit 17, Daniel Bettencourt's rebuttal report, was so marked for identification, as of this date.)

A.   Okay.

Q.   So nowhere in either of your reports in this case did you perform any alternative robustness analysis to determine whether the May 1 stock price movement was statistically significant; is that correct?

A.   That's correct.  The statistical significance, whether May 1st is statistically significant at 95 percent, the 95 percent confidence level or the 93 percent confidence level is not germane to my opinion.  We can observe that the stock price movement that day is highly unusual and that investors attributed the increase, that large observed increase to the news that day.

But I did not conduct an analysis -- I guess a robustness, as you put it -- to determine whether May 1st was statistically significant at the 95

Page 232

percent confidence level under a variety of different estimation periods.

Q.   Understood.  So I believe you just mentioned something, a 95 percent confidence level, but you also mentioned a 93 percent confidence level.  What is the significance of a 93 percent confidence level?

A.   I guess the question is why did I mention 93?

Q.   Yeah.

A.   Sure.  So Dr. Ferrell criticizes, in his original report criticizes Dr. Werner's finding of statistically significance on May 1st.

However, when Dr. Ferrell runs his GLS methodology in the same estimation period that Dr. Warner has, he has a test statistic of -- let me make sure I got it correct, I think I've I pointed it out here.  Where is Dr. Ferrell's report.  It's all right.  Bear with me.

Q.   So Dr. Ferrell's report should be Exhibit -- right now it's Exhibit 16.

Page 233

A.   So he has in his paragraph 31, he has a test statistic of 1.79, which he points out is below the threshold of 1.96, to indicate that it's significant of the 95 percent level.

But the 1.79 test statistic, if you do the calculation, is associated with the 93 percent confidence level, not the 95 percent confidence level.  But it's still close to the 95 percent confidence level.  That's what I am referring to.

Q.   Okay.  So isn't it true for your analysis of the May 1 stock price, stock movement, that you used a one-year estimation period; is that correct?

A.   When you say my analysis, what are you referring to exactly?

Q.   Of the statistical significance of the May 1 stock price movement.

A.   So in my Exhibit 6, where I have that star next to it?

Q.   Yeah.

A.   Yeah, that's correct.

Q.   Why was it a one-year

59 (Pages 230 - 233)

Page 234

estimation period appropriate in that case and not a six-month period beginning on May 1st, 2020?

A.   I mean, again, I believe I point out, if you go to my reply report, that if you test the qualitative conclusions presented in the original Bettencourt report, utilizing any reasonable estimation period, whether it's one year, six months, one year from the start of the pandemic, six months from the start of the pandemic, six months from the start of when the company's drug is approved or one year forward from when the company's drug got approved.

Whether you use my model or Dr. Ferrell's model, they both confirm the results of the, the qualitative results presented in the Bettencourt report, specifically with respect to 5/14, 5/13, 5/17 and the two-day window.

I did consider it for purposes of analyzing the robustness of the qualitative conclusions presented in the

Page 235

Bettencourt report.

Q.   But nowhere in either of your reports did you test a six-month estimation period for the May 1st price impact; isn't that correct?

A.   I don't believe the May 1st price impact is, the statistical significance of the price impact on May 1st is germane to my opinion and my estimation of the amount of artificial inflation in the stock price throughout the class period.  So I don't know why I would perform a series of robustness analyses on something that doesn't bear on any of the conclusions in my report.

Q.   Okay.  So because, because per your words, the statistical significance of the May 1 price, stock price movement, was not germane to the report, you did not conduct any alternative estimation periods to verify the statistical significance of that stock price movement; is that correct?

A.   Well, I did test alternative estimation periods, but I did not present

Page 236

the results for May 1st for those alternative estimation periods because the estimate of artificial inflation that was in Co-Diagnostics' stock, was measured based on the corrective disclosures at the end of the class period, the May 13th stock price increase.  And so it wasn't -- the May 1st stock price increase was not, did not directly impact the quantification of artificial inflation or the construction of the what the inflation would have been.

Q.   Okay.  So just to be clear, you are not opining that the challenged statement caused a statistically significant price impact on May 1st; is that correct?

A.   My opinion is that the statements on May 1st are economically important, and alter the total mix of information available to the market.

According to my event study, again, the one that was presented in the original Bettencourt report, the stock

Page 237

price return was statistically significant at greater than the 95 percent confidence level.

Dr. Ferrell says if we use a different approach that significant level drops down to 93 percent -- the confidence level drops down to 93 percent.  And so you couple with the fact that I found it to be 95 percent significant based on one test.  He found it to be 93 percent significant based on his test.  And that we have all of these news articles citing the stock price increase or attributing the stock price increase to the company's statements and how they were interpreted by market participants, that confirms the economic materiality of the information that was released on May 1st.

Q.   Isn't the 95 percent confidence level the most widely-used confidence level for statistical significance?

A.   I know it's one of the most used.  There are some others that are used.  You know, the 99 percent is one,

60 (Pages 234 - 237)

Page 238

as well as the 90 percent confidence level, it's you know depending on which academic journal. But I think generally 95 is the most frequently cited. So I suppose I agree there.

Q. So in your reports you used an estimation period from starting on May 1, 2020 through April 30th, 2021; is that correct?

A. Let me just confirm. It sounds right.

Q. If you go to Exhibit 17, page 5, paragraph 16.

A. Yes, okay, sorry.

Q. So it's correct that your estimation period that you used was May 1st, 2020 through April 30th, 2021?

A. Yes.

Q. Why did you choose that estimation period?

A. Well, I think, running a regression on 252 days is very common in both expert work and in the literature. Dr. Warner ran it one-year forward. Defendants' previous expert, Dr. Weed,

Page 239

adopted his estimation period. And since there was no dispute prior to Dr. Ferrell over what the appropriate estimation period was, I thought one-year forward from the start was consistent with generally-accepted practice. And again, it wasn't disputed until Dr. Ferrell's report.

Q. Is it your opinion that May 1, 2020 through April 30th, 2021, is the most appropriate estimation period in this case?

A. It's the estimation period that I deem to be most appropriate for purposes of analyzing the stock price returns at issue in this matter.

I also show, as I explained earlier, that if you choose any reasonable estimation period, not the ones that Dr. Ferrell made up and chose on a completely ad hoc and unsupported basis, but the results, the quantitative results of my analysis -- the qualitative results of my analysis are unchanged.

Q. If you go back to your original

Page 240

report, Exhibit 2, page 40, paragraph 102. Just let me know when you got that.

A. I am there.

Q. So you have a quote here which is cited in footnote 119 that says "Three general choices for the placement of an estimation window are before the event window, surrounding the event window and after the event window."

Do you see that?

A. Yes.

Q. Are any of these three choices inappropriate?

A. Well, it really depends. I think, you know, Dr. Ferrell correctly points out when you're measuring what the normal stock price movement is, you should consider, you know, what is normal for the stock. And Dr. Ferrell would have one believe that, including a period when Co-Diagnostics is booking annual revenues of $250,000 and testing for, you know, mosquitos in mosquito abatement districts, that somehow that is the same company that was producing

Page 241

Co-Diagnostics' tests. And that the relationship between that company in a period of time prior to a pandemic, to a company that makes diagnostic tests for tests for a virus that is at the heart of the pandemic, that somehow the stock price reaction in that earlier period would represent what's normal for the period, the class period, and how the stock would normally perform in relation to market and peers during the class period.

And I think that that is just absolutely crazy. I mean, I point out in my report how different the company was during each one of the windows that Dr. Ferrell proposes.

So you know in paragraph 102 I propose some reasonable alternatives to surrounding the different estimation windows that can surround the class period. We're limited here because the pandemic is relatively young at the start of the class period. So if you're trying to estimate what's the normal

Page 242

relationship between this company and the market and its peers well prior to the start of the class period, it's indisputably a different company.

Q.   Have you, in your capacity as a testifying expert, ever used an estimated -- sorry.

Have you as a testifying expert ever used an estimation period that was six months or shorter?

A.   I'm not sure that I used one shorter than six months.  Perhaps, I used one at six months.  I mean, six months, I agree with Dr. Ferrell that it's in the literature as an appropriate alternative if you're going to analyze the robustness of your results.  I just don't think you should start six months prior to May 1st, because back at the end of 2019, there is no pandemic.  And like I said earlier, this company's selling mosquito abatement tests.

Q.   What about a six-month estimation window starting on May 1st; is that appropriate?

Page 243

A.   Yeah, I think I put that in my rebuttal report as a potential alternative and showed that the qualitative results of my event study and my loss causation damages analysis are robust to that selection of, or that choice, I should say, of estimation period, whether you use Dr. Ferrell's GLS model or my Newey-West model.

Q.   Did the nature of the Covid-19 pandemic change significantly from May 1st, 2020 through April 30th, 2021?

A.   Arguably, yes, it did change; I think it changed every day.  I mean just go back to 2020 and find out all the stuff that we were learning every day about the pandemic and how it changed.  And that's why I was saying, Professor Ferrell pointing out that we should use periods prior to the pandemic even existing or this company having a test on the market is just unfounded and it's really at odds with common sense.  He proposed them and I proposed what I think are some reasonable alternatives.

Page 244

MR. TAYLOR:  I know we are on the clock, I think we are getting to the finishing stages.

I am just going to look at my notes to see what's left and then we will do that in the next and probably last chapter.  Just if we can have a couple of minutes off the record.

MR. PINEIRO:  Sure.

THE VIDEOGRAPHER:  Going off the video record at 5:34 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the video record at 5:43 p.m., please proceed.

BY MR. TAYLOR:

Q.   Okay.  So Mr. Bettencourt, what is heteroscedasticity?

A.   Heteroscedasticity, I think I explain it well in my report, the heteroscedasticity, these are the volatility of the residuals is not constant over time.

Q.   Are you familiar with a generalized least squares?

Page 245

A.   Yes, that's the methodology that Professor Ferrell proposes to use to correct for it.

Q.   What is, what are generalized least squares?

A.   What do you mean, specifically?

Q.   Can you please describe the concept?

A.   Sure.  So generalized least squares is an econometric model.  In the case of Dr. Ferrell, he uses it to, he uses the VIX to provide a structure to the volatility, the changing volatility in the data.

Q.   Have you ever used generalized least squares with your expert work?

A.   I know I've analyzed generalized least squares models in my expert work.  But I'm not sure that, I can't think of a time where I used it as like an affirmative approach to correct it for heteroscedasticity.

Q.   Why not?

A.   Well, there is a number of different models that you can use that

62 (Pages 242 - 245)

Page 246

are generally accepted to correct for potential heteroscedasticity.

Q. But you do not dispute that generalized least squares is a proper method to correct for heteroscedasticity; is that correct?

A. That's correct. I say that in my report, in my rebuttal report, that it's generally accepted and widely used.

Q. And in your reports you state that you use the Newey-West regression estimation procedure; is that correct?

A. Yes.

Q. And what is the Newey-West regression estimation procedure?

A. So the Newey-West regression estimation procedure is a different type of regression where it, essentially, the way that we used it in this case is we used the Newey-West procedure to estimate or to construct the variance covariance matrix of the coefficients; right? And then from there what we did was we took that data and added the observed data for each particular day during the class

Page 247

period for the market and Peter to come up with a forecasted, an updated forecasted variance on a daily basis. And then we added that forecasted variance for the coefficients to the observed variance for the -- from the regression output. And that's what we used. We squared that to get the Newey-West, the Newey-West standard errors that are presented in Exhibit 5 of my report.

Q. Why did you choose to use the Newey-West procedure and not the generalized least squares procedure in this case?

A. Well, we have had a lot of conversations internally at the firm over the years about what the best approach is or the most flexible approach to controlling for potential heteroscedasticity.

And after a lot of discussion, you know, with Miguel Villanueva, who is our quantitative analyst here, and considering a lot of different models, we

Page 248

have determined that the Newey-West has the most flexibility in terms of correcting for heteroscedasticity and error correlation.

Q. What do you mean that it has the most flexibility to correct for heteroscedasticity?

A. Sure. Well, it doesn't assume a structure. So what we did here is we used the forecasted variance of the coefficients as the structure for the changing volatility on a daily basis.

What Dr. Ferrell does, in his GLS he assumes that the structure in the volatility or the change in the volatility over time is, he assumes that the VIX is the structure that can explain that change in volatility.

MR. TAYLOR: I am going to introduce a new exhibit.

(Bettencourt Exhibit 18, Dr. Ferrell's rebuttal report, was so marked for identification, as of this date.)

Q. This should be Bettencourt

Page 249

Exhibit 18. Does everybody have it up?

A. Is that his rebuttal report?

Q. Yeah.

A. Yeah.

Q. Did you review Professor Ferrell's rebuttal report in this action?

A. Yes, he got a lot of things wrong. It doesn't seem like he was the one who wrote this report, to be honest.

Q. Can you go to paragraph 52? If you go to the middle of the paragraph, paragraph 52, "The methodology used by Mr. Bettencourt to purportedly correct for heteroscedasticity, Newey-West, does not place any structure on the variance of the error."

Do you agree with that?

A. The Newey-West generally doesn't. But we did do it. I mean his next sentence is just patently false where he says that we assume that the variance of the error was constant throughout the period.

I mean you can observe in Exhibit 5 of the original Bettencourt

63 (Pages 246 - 249)

Page 250

report that the estimated volatility is changing on a daily basis. So he's just wrong here.

Q. Let's go to paragraph 49. If you can just read paragraph 49 just from start to finish and let me know when you're done and then I will ask you a question about it.

A. Okay.

Q. Have you performed any analysis to dispute Professor Ferrell's finding that when combining the May 15th, 2020 stock price decline with any other daily abnormal return in May of 2020, the two-day return is statistically significant?

A. I think you got your question wrong there. It's not with any other day in May. It's any other day after May 15th. So you're talking about half a month. I think it's, I mean I don't know exactly what the intent is here, but to say that in a two-week period, if you take the largest positive significant, the largest positive return that it

Page 251

doesn't change the significance of the two-day window doesn't mean anything.

Like the decision to use a two-day window in this case, we can go back to it, but it wasn't predicated on the fact that you needed, that, oh, May 15th, any day you paired with. It wasn't collected because May 15th was a large day. It was selected on the basis of the news and the sequence of the news and how the news was learned by the market, the true information about the accuracy of the test.

For him to say that, you know, of the 10 or so trading days that exist at the end of May, that he can't find a positive stock price movement combined with a negative one to make it not significant doesn't mean anything. And I don't know how in any way it shows that my analysis is inappropriate.

Q. So let's go back to Exhibit 18, which is Professor Ferrell's rebuttal report --

A. Okay.

Page 252

Q. -- and let's go down to paragraph 61.

A. This is about Gelt Trading.

Q. Correct. So just in terms of the chart, do you have any reason to contest the accuracy of the chart presented here reflecting Plaintiff Gelt's purchases and sales of Co-Diagnostics stock?

A. No, I wasn't asked to examine the plaintiff's trading records.

Q. So as you can see, in the second row, Gelt May 13th purchases and sales of 10,000 shares; do you see that?

A. Uh-huh.

Q. Do you see in the right column under a time, it shows purchases, a purchase of 7000 shares at 3:18 p.m. followed by a sale of 7000 shares and then another purchase of 3000 and then another sale of 3000; is that correct?

A. Yeah, that's what it says.

Q. So all of those purchases and sales, those 10,000 shares were all sold before any of the alleged corrective

Page 253

disclosures; isn't that right?

A. Yes.

Q. So isn't it true that just as a matter of economics, the, that Plaintiff Gelt could not have suffered any damages in relation with these 10,000 shares on May 13th?

A. Well, if you match them as they are matched here, that would be the case. But if the plaintiff held the other shares coming into the class period and they were matched on a FIFO basis, then, you know, there might be -- well, I guess -- I am sorry, sorry. This is all before any corrective disclosure, so you're right.

Q. So I am correct that in regard to these 10,000 shares that were all sold before May 14th, that plaintiff could not have suffered any damages in regard to those shares?

A. Right that was before any inflation dissipation had occurred.

Q. Similarly with regard to those 10,000 shares, plaintiff could not have

64 (Pages 250 - 253)

Page 254

suffered any loss causation -- let me rephrase that. Loss causation cannot be established for those 10,000 shares?

A.    I want to say yes, I think that's correct. Any shares that were sold prior to a corrective disclosure, would have suffered no loss on account of the misrepresentations and omissions.

MR. TAYLOR: I am getting to my last series here. Can someone just let me know how long we have been on the record?

THE VIDEOGRAPHER: When we started it was at five hours and 13 minutes and you used 38 minutes. So it's five hours and 51 minutes.

Q.    All right. So I think we are still in the rebuttal report, Exhibit 18. Let's go to paragraph 47.

A.    Yes.

Q.    The sentence in paragraph 47 starts, "Third. Mr. Bettencourt mischaracterizes the finance literature he cites to support his two-day event window." And then the report presents

Page 255

certain examples. Do you see that?

A.    Yes.

Q.    Okay. So on page 24, subparagraph A, there is a source "Patell and Wolfson, 1984."

A.    Yup.

Q.    All right. If you mind just reading that and then tell me when you're done and I will ask a question about it.

A.    Okay.

Q.    What is your response to Professor Ferrell's comments here in paragraph, in paragraph 52 -- 47, subsection A?

A.    I think he's being misleading in how I presented the findings or the reason for using Patell and Wolfson.

As I clearly explained in paragraphs 88 and 89 of my original report, why this was considered less regular information. Now, I understand that he seems to be quibbling over what is less, how to define less regular.

And as I explained earlier in the day, less regular would start with

Page 256

there being a news article in the Salt Lake City Tribune. Again, it's not, as I said earlier, it's not the Wall Street Journal.

Then there is a PBS broadcast in the middle of the day, PBS Iowa, that is not exactly CNBC, right? There is a series of tweets and trading halts and a company announcement followed by an FDA announcement. And the only thing that was actually scheduled out of all of those was the company's earnings announcement.

And in paragraph, paragraph or footnote 113 of my original report, I have an excerpt from Patell and Wolfson, it says "It's possible that the adjustment intervals would be significantly longer for smaller firms."

As I pointed out earlier in the day, this is not ExxonMobil or Apple. This company had $250,000 of revenue in 2019 before the Covid-19 pandemic. And this adjustment period would be longer for less regular announcements. So I

Page 257

think definitionally, for all the reasons I just stated, this would constitute a less regular announcement.

Q.    Okay. If you go to, now on page 24, subsection B, Tabak and Dunbar 2001. Do you mind just reading that over and letting me know when you're done?

A.    Yes, I am done.

Q.    What's your reaction to Professor Ferrell's critique here?

A.    It would be helpful to see the rest of the paper, but I believe that's the excerpt that I have. And I was just trying to establish that multi-day windows can be used to measure the effective information and that's common practice in the literature.

Dr. Ferrell here is saying that there is, you know, that I omitted the explanation that an event window should be cut short if there is a piece of confounding information in that window. And where Dr. Ferrell errs in that critique is he believes that the company's earnings announcement is that

65 (Pages 254 - 257)

Page 258

piece of confounding negative information.

Now, his opinion is just at odds with the facts and the company's own statement that the earnings announcement was, what exactly did the CEO say, he said it was an awesome earnings announcement. So there is no confounding information that would warrant, no confounding negative information that would warrant cutting short, as he says, the window here.

Q. Now page 24, subsection C, the McKinlay (1997), we can do the same thing. Just give it a read and let me know when you're done.

A. Okay. I see it.

Q. What's your reaction to Professor Ferrell's critique here?

A. Let me see exactly how I used in context the McKinlay article to make sure that I provide an accurate response.

Q. Well, I mean let me just actually ask you if you can try to answer this without referencing your report --

Page 259

A. Sure.

Q. -- to the best of your capability?

A. In the McKinlay article they are laying out the framework by which you can test stock price reactions over multiple days. And in that article they are conducting event studies, not just on a singular stock, but on a number of stocks. So when you're doing that across thousands of earnings events, you know, the timing of the earnings announcement event might be imprecise. In which case they are saying that you should look at multiple day windows.

And again, I used the McKinlay article as support for the fact that two-day windows are tested, and the methodology to use them is outlined in the literature.

Q. What is your response to Professor Ferrell's comment here about the May 14th preclose disclosures having been issued at least four hours before the closing of trading and that in an

Page 260

efficient market, you know, that news should have been impounded into the stock price, you know, by the end of the day on May 14th? What is your response to that?

A. Sure. I think I laid this out earlier, why you're looking at two-day windows.

You know, looking at the stock price reaction both during the trading on the 14th and the close of trading on the 13th to the close of trading on the 15th. It's important to consider the total mix of information that's in the marketplace prior to the start of the class period, prior to the disclosures on May 14th.

And then when you examine the sequence of events that occurred on May 14th, the Salt Lake City article that we've already discussed. The Iowa PBS news press conference, the trading halt. Hindenburg. The other trading halt.

All the while investors knew that the company was going to announce earnings and hold a conference call after the close of trading.

Page 261

For all of those reasons, that's why what Ferrell is saying here is inappropriate or irrelevant to the analysis that I've conducted in my loss causation report.

Q. If you look at precise timing, McKinlay does not support the use of a two-day window; is that correct?

A. McKinlay was testing earnings announcement dates. He wasn't testing the exact information that we're testing in the current matter.

As I said before, these tests, some of them support the use of the two-day window in securities litigation, specifically. Others support the use of two-day windows generally as a widely accepted and generally used methodology for measuring stock price reactions.

McKinlay, as I said before, is analyzing stock price reactions for a number of companies and probably thousands of observations, without the benefit of the article it would be hard to say.

66 (Pages 258 - 261)

Page 262

Q. Okay. Next one now on page 25, subparagraph D, it says "Ferrell and Saha (2007)." Give it a read and let me know when you're done.

(Witness reviews document.)

A. All right. I am finished.

Q. So what is your reaction to the critique in this paragraph?

A. I mean it seems like he's trying to walk back what he said in his paper. I mean I have the exposition and the excerpt from his paper. Those aren't my words, those are his. He says that you can analyze stock price reactions in the days, weeks and months following a corrective disclosure where the market is inferring additional information about the misrepresentations, implications for a firm's valuation.

Now, I also understand as he points out that under some scenarios the implication may be positive. And I think in his paper he points to an example of a restatement where the company announces a restatement, but they don't tell you the

Page 263

size. And then when the size of it comes out, is published, I should say or released to the public, that, I think he's arguing that, essentially, you should consider that as an offset to damages. But that paper does contain more language around how, again, the market was inferring additional information about the misrepresentations of the firm's value, and that's why you would extend the window.

Q. Okay. And then the last one, subparagraph E, "Cornell and Morgan (1990)." Just give that a read and let me know when you're done.

(Witness reviews document.)

A. Yeah, I read it.

Q. Okay. What's your response to this critique?

A. I am trying to remember what he says in paragraph 47. He says I mischaracterized the literature. I think that that is a misleading statement that he makes. There is no mischaracterization.

Page 264

He's criticizing me here because the plaintiffs in their complaint used the term "startling." But that's not my word, that's theirs. I explain precisely in my report why I used the two-day window. Cornell and Morgan, in that article, as he points out, talks about information being, about a fraud being revealed over time. They talk about the sequence of events and how it's appropriate to test the stock price reaction from a sequence of events over time.

So the fact that he says I mischaracterized that article because I am supposed to assume that the corrective disclosure was startling, because plaintiffs use that in their complaint is just, just honestly misleading.

Q. Okay. Going back to that statement, did you assume for purposes of your report, that the news, the pre-close disclosures on May 14th were startling to the market?

A. No. I mean how plaintiffs

Page 265

characterize the corrective disclosure in their complaint has no implication on my analysis, whether they say it's startling, surprising, it has no bearing on an analysis of loss causation and damages.

Q. In your opinion, do you believe that the pre-close May 14th alleged corrective disclosures were startling to the market?

MR. PINEIRO: Form. Vague.

Q. You can answer.

A. Sure. Startling is their word. I would say that, that when you look at the sequence of events, there was a lot of information being introduced to the market that was at odds with what the market had previously understood to be true. I wouldn't necessarily try to put that in a, define it by one particular word and say startling.

Q. Is the description of the May 14th pre-close disclosures as startling, consistent with your opinion?

A. You're asking if the

67 (Pages 262 - 265)

Page 266

plaintiff's use of the term "startling" in their complaint is consistent with my opinion, if the information should be startling?

Q.   If the understanding that the pre-close disclosures, if that understanding that those disclosures were startling, is that consistent with how you describe the events unfolding in your report?

MR. PINEIRO:  Form.

A.   I am just not exactly sure how they are using the word "startling." Offhand, I can look at the complaint and analyze how it's been presented.

Q.   It's now Exhibit 19.  It should be in there.

(Bettencourt Exhibit 19, Complaint, was so marked for identification, as of this date.)

A.   All right, I have it open.

Q.   If you go to page 16 in the bottom right-hand corner, if you go to paragraph 74.  It says "In late morning and early afternoon of May 14th, 2020,

Page 267

third parties revealed startling information about Co-Diagnostics, allegedly 100 percent accurate test."

Do you see that?

A.   Yeah.

Q.   And in paragraph 75, the complaint describes the May 14th Salt Like Tribune article regarding Test Utah; is that correct?

A.   Yes.

Q.   And then in paragraph 77, the complaint describes the May 14th comments from the Iowa governor; is that correct?

A.   Yes.

Q.   So now that we've looked at it, in your opinion, was this, was the news from the Salt Lake Tribune, was that startling to the market?

MR. PINEIRO:  Form.  Asked and answered.

A.   Again, I mean their use of startling is, they are the ones that use startling, not me.  I explained I thought several times today and in my report, exactly how I viewed the information that

Page 268

came out on May 14th.

Q.   Are market participants' description of the events a relevant part of your -- let me rephrase that.

Are market participants' description of the events relevant to you in forming your opinions?

A.   Can you give me an example of what you mean exactly?

Q.   Let's say analysts.  Is an analyst description of events relevant to you in coming up with your opinion?

A.   It may be.  It's definitely something, you know, to be considered, but again, it has to be considered in the context of all information, all publicly-available information.

Q.   Okay.  How about other public commentary about events concerning a company's stock price?

MR. PINEIRO:  Form, vague.

Q.   Is that relevant to you in forming your opinion?

MR. PINEIRO:  Same objection.

A.   Is public commentary important?

Page 269

Q.   Describing the reasons behind a company's stock price drop, would that be relevant in forming your opinion?

A.   So if a, let me just get this right.  If a news media commentator comes out and says in realtime, hey, the stock price is reacting on, today, because of this piece of news; is that relevant?

Q.   Yes, would that be relevant to your...

A.   I believe, yes.  I mean I considered some of that in response to the initial misrepresentation on May 1st, as well as the misrepresentations on -- sorry, then the implication of those statements on May 13th with the Abbott news.  And I believe there was some news media commentary considered throughout the course of trading on May 14th.

Q.   And if there was news, let's say that, for example, news commentary that was describing the events, the pre-closing May 14th disclosures as startling, would that be relevant to your analysis here?

68 (Pages 266 - 269)

Page 270

MR. PINEIRO: Form. Calls for speculation.

A. I would have to consider it in context. I just don't know like how it, how that would appear. I think context is important. That's what we talked about throughout the day today.

Q. Plaintiff Gelt was a shareholder of Co-Diagnostics stock; is that your understanding?

A. Yes, based on the table you showed me earlier he was.

Q. Is it not relevant that Plaintiff Gelt as an investor described its reaction to the pre-closing May 14th disclosures as startling; is that not relevant?

MR. PINEIRO: Form. Asked and answered.

A. When you say described its reaction; what's "it"?

Q. The complaint, Plaintiff Gelt is an entity.

MR. PINEIRO: Form. Asked and answered. Calls for a legal

Page 271

conclusion.

A. I am sorry, I still don't understand the question, can you read it back?

Q. Is it not relevant that the plaintiff in this case as a shareholder of Co-Diagnostics' stock described the events on May 14th as pre-closing as startling; is that not relevant?

MR. PINEIRO: Same objection.

A. Where did he make those comments?

Q. In the complaint, we just went over it.

A. Oh, that was the plaintiff saying that it was startling?

Q. Yeah.

A. Sorry, the lead plaintiff, he actually said those words?

Q. That's what's written in the complaint.

A. I mean that Gelt privately held an opinion that it was startling? That's why, you know, market prices, you know, reflect everybody in the market's

Page 272

opinion. Some people might have said, used other more colorful language to describe it and other people might have used more benign language. What one person's view of the, how they would describe it is really up to them. And if they trade on that information, that view would get incorporated into the stock price.

Q. This is definitely the last time out, I promise, now I am really just seeing if there is really like one or two odds and ends, and then we will wrap this up.

MR. PINEIRO: Okay.

THE VIDEOGRAPHER: Going off the video record at 6:24 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record at 6:28 p.m., please proceed.

Q. So Exhibit 2, back to your report, the December 4th report, page 38, paragraph 92. Let me know when you're there.

Page 273

A. I am there.

Q. Is it your opinion that the company's "countervailing denials" prevented the stock price from declining on May 14th?

MR. PINEIRO: Form.

A. I think the company's countervailing denials was part of the total mix of information on May 14th.

Q. But are you of the opinion that the countervailing denials prevented the stock price from declining on May 14th?

A. I guess how are you defining May 14th would be the important -- when you say from declining on May 14th, what do you mean?

Q. Is it your opinion that the company's denials prevented the stock price from declining on May 14th before the close of trading?

A. The company's denials came out after the close of trading. The countervailing denials that I identify here are in the press release and the earnings announcement that came out after

69 (Pages 270 - 273)

Page 274

the close of trading.

Q. So the countervailing denials that you referred to here in paragraph 92 are referring to the post-closing disclosures on May 14th; is that correct?

A. Correct.

Q. So then why are these allegedly "countervailing denials" relevant to your opinion?

A. Because as I said before, we have to consider the announcements and the sequence of events holistically.

When you move from May 3rd and the announcement by, that Allergan's tests are less than 100 percent. You observe that Abbott's stock is going down. And the market commentators are attributing the increase in the price of Co-Diagnostics to the fact that Co-Diagnostics' tests are perfectly accurate.

Then the following day, again, the sequence of news is important. And one of the sequence of news when you're looking at the two-day window is the

Page 275

countervailing denials made by, or the lack of clarity provided by the company during their press release and their prepared statements for the conference call.

Q. Understood. So I am asking, why are the countervailing denials relevant to that holistic view?

A. Because the market is still not aware of -- the company -- well, let me go to their actual statement here.

So again, in paragraph 56, we have the news here the company is touting that its Covid-19 test showed 100 percent specificity and 100 percent sensitivity in several independent evaluations. You have market commentators picking up on that statement and those assurances made by management. So it's part of the total mix of information that's in the market on the 14th.

Again, in their prepared statements on the conference call, they make a very similar statement about the accuracy of their test and that, again,

Page 276

is picked up and echoed in the financial news media. So this is part of the holistic analysis when you're looking at the total, the stock price impact of these corrective disclosures over the two days.

Q. If these allegedly countervailing denials had not occurred, would your opinion change in any way?

A. I mean it's hard to consider that one piece of information in isolation. We know what had happened, and that's how I formed the opinions in this case, is based on what actually happened. Taking out one piece of information, I just haven't, I didn't come prepared to talk about removing that one hypothetical disclosure or I should say a hypothetical where that one particular reassuring statement or those two reassuring statements and the news articles reiterating the reassuring statements never happened.

MR. TAYLOR: That's all I have.

MR. PINEIRO: I have no

Page 277

questions.

THE VIDEOGRAPHER: Any orders for the court reporter before we go off the record?

MR. TAYLOR: We ordered the rough transcript and I believe we put in an order for an expedited, but I'm not sure, we can follow-up after that.

MR. PINEIRO: We'll just take a regular order of the transcript. regular time.

THE VIDEOGRAPHER: Video at this time?

MR. PINEIRO: Not for me.

THE VIDEOGRAPHER: Ready to go off the record, this concludes today's testimony given by Daniel S. Bettencourt. The total number of media disks was six and will be retained by Veritext New York. The time is 6:35 p.m., and we are going off the video record.

(Time noted: 6:35 p.m.)

Page 278

ACKNOWLEDGMENT OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_____
DANIEL BETTENCOURT

SUBSCRIBED AND SWORN before and to me this _____ day of _____, 2024.

_____
NOTARY PUBLIC

My Commission Expires:

---

Page 279

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of February, 2024.

_Dawn Matera_
DAWN MATERA

---

Page 280

I N D E X

Witness                          Page
DANIEL BETTENCOURT                 6

E X H I B I T S

Bettencourt                      Page
Exhibit 1 Notice of Deposition        12
Exhibit 2 Expert report of Daniel     22
    Bettencourt dated
    December 4th, 2023
Exhibit 3 July 9th, 2021 opinion and  62
    order

Exhibit 4 May 14th FDA press release  129

Exhibit 5 March 5, 2020 Johns         159
    Hopkins Bloomberg School
    of Health article

Exhibit 6 Washington Post article     163

Exhibit 7 Emergency Use               168
    Authorization for
    Co-Diagnostics Logix Smart
    coronavirus disease test
Exhibit 8 Fact Sheet For Healthcare   170
    Providers dated April 3rd,
    2020
Exhibit 9 Fact sheet for patients     174
Exhibit 10 HC Wainwright report       177
Exhibit 11 April 30, 2020 Salt Lake   178
    Tribune Article

Exhibit 12 Bloomberg Article          185

Exhibit 13 May 14, 2020 Salt Lake     192

---

Page 281

    City Tribune article
Exhibit 14 Series of tweets issued by  222
    Hindenburg

Exhibit 15 Biocentury article          224
Exhibit 16 Dr. Ferrell's first report  229
Exhibit 17 Daniel Bettencourt's        231
    rebuttal report

Exhibit 18 Dr. Ferrell's rebuttal      248
    report
Exhibit 19 Complaint                   266

~oOo~

---

71 (Pages 278 - 281)

Page 282

ERRATA SHEET
VERITEXT

CASE NAME: Gelt Trading v Co-Diagnostics
DATE OF DEPOSITION: February 14, 2024
WITNESS'S NAME: DANIEL BETTENCOURT

PAGE/LINE(s)/   CHANGE        REASON
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____

_____
        Signature of Deponent

Subscribed and Sworn To
Before Me This_____Day
of_____, 2024.

_____
    Notary Public
My Commission Expires_____

72 (Page 282)

**[& - 13th]**

Page 1

**&**

**&**  2:2

**0**

**00368**  1:2 3:22
**02482**  5:9
**09270**  62:8

**1**

**1**  11:19 12:16
12:17 15:15,25
28:14 109:24
110:2,2 115:24
120:12 121:11
124:4,17
125:23 126:12
126:20 127:1,6
127:22 128:7
152:2 154:6
158:8 162:12
162:15,22
164:22 177:11
180:2,3,21
197:22 220:21
221:4,9 225:14
226:2,19 227:4
230:1,11 231:9
233:14,20
235:18 238:7
239:9 280:7
**1.5**  47:24 48:10
**1.79**  233:2,6
**1.96**  233:4
**10**  129:19
176:25 177:1
251:15 280:21

**10,000**  252:14
252:24 253:6
253:18,25
254:3
**100**  102:15
104:9,20,21
105:1 120:10
120:17,23
121:5,11,21
122:1,11,14
123:1,8,24
124:12,19
125:6,7 144:22
145:8,10,21
146:11,14,20
147:4,7,18,19
148:14 149:10
149:18 150:13
151:7,15 152:1
153:11 154:8
155:6 156:6,12
157:3,8,16
158:7,23 159:6
159:11 160:20
162:13,17
163:18,25
164:12,23
165:13,23,25
173:3,7 174:2
176:6,13,14
177:18,22
178:2 179:18
179:23 180:6
180:13 187:15
187:20 188:13

194:23 195:14
197:12 198:6,6
198:16 200:1,2
211:3 221:25
222:10 223:18
225:24 227:9
227:10 267:3
274:15 275:14
275:15
**10111**  2:10
**102**  240:2
241:18
**10:06**  1:11 3:3
**10:26**  18:12
**10:34**  18:15
**10:44**  27:3
**10:47**  27:6
**10:51**  28:23
**10:54**  29:1
**10b**  6:13 15:10
39:20,25 40:2
40:11,20,23
41:5,9 46:1,4,7
46:11,16,18
47:1,1,4 56:9
56:17 59:19
61:23 62:13
65:22 74:5
75:14 76:5
78:13,16 79:1
87:17
**11**  15:6 39:25
40:3,11,20,25
41:5,9 46:8,8,9
46:10,11,12,15

46:18,25 47:2
47:4 62:15
65:22 67:10
74:9 75:15
178:11,13
189:19 280:22
**113**  256:15
**119**  240:5
**11:29**  53:20
**11:39**  54:1
**11th**  183:16,23
206:17,22
207:9 208:9
209:1 212:3
**12**  46:12
103:17 184:25
185:1 191:9
202:25 211:8
280:7,23
**129**  280:11
**12:32**  91:14
**12:44**  91:17
**12:45**  91:21
92:2,5
**13**  185:7
189:10,11
191:10 192:22
192:23 254:14
280:25
**1330**  186:6
**13th**  102:22,22
103:3 121:16
133:8 135:16
136:15 139:22
140:1 141:10

**[13th - 1997]**                                                                     Page 2

145:14 146:6
147:1,15,24
148:15 149:15
151:2 153:5
155:10,15
157:13 158:15
162:23 184:16
188:1 189:18
192:7,10,19
206:24,25
210:15 212:11
213:13 220:12
236:7 252:13
253:7 260:11
269:16
**14** 1:11 28:3
39:19 46:17
47:19,23 71:3
192:23 199:3
222:15,16
225:11 280:25
281:2 282:3
**14th** 3:4 101:5
101:7 103:8
104:13 105:7
105:15 106:13
108:18 118:12
128:21 129:14
130:23 132:17
132:24 133:5,9
133:12 134:4
134:12,16,23
135:16,18
136:15,16
137:7,11,14

138:1,16,25
139:12,15
141:11 142:8
144:9,14 146:1
146:10 147:8
149:8,14
150:11 151:4
151:17 152:3,4
153:7,11,16
154:5 155:5
156:4 157:19
157:19,21
160:18 166:5
193:9,24 195:3
195:5 197:17
198:15 199:9
200:4,12
202:15 204:23
206:15,24
207:1,25
210:13,15
213:14 227:7
253:19 259:23
260:4,10,15,18
264:23 265:8
265:23 266:25
267:7,12 268:1
269:19,23
270:15 271:8
273:5,9,12,14
273:15,19
274:5 275:21
280:11
**15** 28:3 39:19
63:9,10 64:13

66:18 73:1
181:14,18,19
206:9 215:8
224:17,18
281:3
**159** 280:12
**15th** 101:7
133:2,6,10,13
134:5 137:8,11
138:25 139:4
139:10,15
140:7 141:11
153:7 154:5
250:12,20
251:7,8 260:11
**16** 229:18,19
232:25 238:13
266:22 281:4
**163** 280:14
**168** 280:15
**17** 68:16
111:19,20,22
112:11 120:24
122:3,19
123:15,15
230:14,25
231:1 238:12
281:5
**170** 280:18
**174** 280:20
**1746** 63:13
**177** 280:21
**178** 280:22
**18** 32:3 33:4
42:17 199:1

248:21 249:1
251:22 254:18
281:6
**185** 280:23
**18th** 177:7
178:3 191:3
279:17
**19** 16:10 62:8
112:1 121:5
122:11,21
123:1,8 124:19
127:24 158:6
159:5 165:5
166:15,16
167:4,17 171:1
171:7,25
173:17,21,25
175:21,25
177:17 179:5
179:14,17
181:25 182:3
186:8,17 194:8
199:5,12 201:3
201:10,14
203:20 208:16
208:17 224:1
225:1 230:20
243:10 256:23
266:16,18
275:14 281:8
**192** 280:25
**1984** 255:5
**1990** 263:14
**1997** 258:14

**[1:15 - 31]**                                                                 Page 3

**1:15** 91:22
**1:19** 92:7
**1:38** 212:19
**1st** 16:9 121:15
  148:23 151:2
  151:23 152:10
  153:4 154:14
  155:1 157:1
  162:23 164:6
  165:2,14,18
  166:17 180:25
  195:17 196:1
  196:10 198:2
  207:10,16,21
  208:2,5,8
  212:16 213:9
  219:25 220:19
  225:7 228:22
  228:24 230:8
  231:13,24
  232:15 234:3
  235:4,6,9
  236:1,9,17,20
  237:19 238:17
  242:18,24
  243:12 269:13

**2**

**2** 2:4 22:16,18
  23:5,6 28:4,9
  28:15 29:5,8
  29:15,17,22
  41:14 53:25
  71:25 72:1
  109:23 110:2,2
  113:13 132:10

171:6,15,17
173:14 175:15
177:14 181:14
181:16 185:20
190:12,15
198:24 228:17
240:1 272:22
280:8
**20** 20:25
**2001** 257:6
**2005** 20:15
  30:7,25 31:8
**2007** 262:3
**2008** 30:7 31:1
  31:9
**2009** 24:19
  27:24 31:12,20
  32:1
**2011** 32:2,22
  33:5
**2013** 33:5 36:9
  37:4
**2016** 37:4 50:3
**2017** 6:9 37:4
  39:2 50:2,3
**2018** 6:9
**2019** 170:8
  242:19 256:23
**2020** 15:15
  16:1 101:20
  118:15 128:22
  132:24 133:2
  151:16,17
  154:6 159:19
  160:2 161:6,21

163:7,24 166:2
169:19 170:15
170:19 171:3
172:10 173:4
175:8 177:7
178:4,14
184:16 191:3
192:10,24
193:9,24 195:3
197:9 199:3,6
199:9 202:15
225:8 234:3
238:8,17
239:10 243:12
243:15 250:12
250:14 266:25
280:12,19,22
280:25
**2021** 62:20
  63:2 120:12,15
  238:8,17
  239:10 243:12
  280:10
**2022** 59:12,13
**2023** 6:16
  22:20 23:5
  28:5 72:2
  280:9
**2024** 1:11 3:4
  13:8 278:14
  279:18 282:3
  282:21
**20a** 47:2
**21** 47:7,21
  120:18

**22** 280:8
**222** 281:2
**224** 281:3
**229** 281:4
**23** 129:3
**231** 281:5
**24** 255:3 257:5
  258:13
**248** 281:6
**25** 262:1
**250,000** 240:22
  256:22
**252** 238:22
**2530** 2:4
**265** 190:7
**266** 281:8
**26th** 163:7,24
  166:1
**2:14** 130:13
**2:20** 1:2 3:22
**2:24** 130:19

**3**

**3** 62:18,19 63:2
  132:14 169:24
  194:13 280:10
**30** 14:16
  178:14 280:22
**3000** 252:20,21
**30th** 151:16
  196:22 197:9
  224:15 225:8
  238:8,17
  239:10 243:12
**31** 233:1

**[33 - 95]**                                                                Page 4

**33** 200:25
**33131000** 2:5
**35** 192:18
 203:17
**36** 140:21
**37** 45:19 47:5
 49:22
**38** 143:15
 254:15 272:23
**3:18** 252:18
**3:37** 181:5
**3rd** 169:3,19
 170:15,19
 171:2 172:10
 173:4 175:8
 225:9 274:13
 280:18

**4**

**4** 129:13,14
 144:2,5 181:4
 280:11
**40** 14:17
 196:14 240:1
**41** 181:19,23
 182:6 206:9
**42** 181:24
 182:17
**44** 184:20
**45** 2:10 5:8
**47** 199:1,2
 254:19,21
 255:13 263:21
**49** 199:1 250:4
 250:5

**4:06** 189:7
**4:59** 228:9
**4th** 22:20 23:3
 23:5 28:5,10
 29:8 41:15
 51:9 72:2,25
 132:14 198:25
 228:18,21
 272:23 280:9

**5**

**5** 6:13 15:10
 40:11 46:11
 47:1 65:22
 75:14 110:2
 111:22 112:10
 113:14,15
 120:25 129:19
 159:17,18,18
 181:10 196:2,5
 223:12 225:12
 226:11 228:8
 228:20 229:3
 238:13 247:10
 249:25 280:12
 280:12
**5/13** 234:22
**5/14** 234:22
**5/17** 234:22
**50** 202:23
 204:8 206:2
 211:8
**51** 254:16
**52** 212:17
 217:13 218:8
 223:2 249:10

249:12 255:13
**52,346,751**
 132:17
**54** 221:21
**55** 115:23
**56** 5:14 275:12
**5777** 279:21
**5:34** 244:11
**5:43** 244:14
**5th** 160:2 161:6
 161:21

**6**

**6** 162:25 163:1
 178:25 228:14
 229:4,5 233:21
 280:3,14
**60** 129:2
**61** 252:2
**62** 280:10
**63** 39:1 54:4
 55:4,11
**64** 41:13 51:5,7
 51:8 217:12
**65** 51:14,15
**66** 28:7 51:18
 51:20 79:21
**67** 132:11,12,20
 132:21 139:7
 183:18,21
**6:24** 272:17
**6:28** 272:20
**6:35** 277:21,23

**7**

**7** 168:20,21
 178:25 280:15
**7000** 252:18,19
**74** 266:24
**75** 267:6
**77** 267:11

**8**

**8** 170:12,13,17
 223:11,12
 225:12 226:11
 280:18
**86** 28:6,8
**88** 142:1
 255:19
**89** 142:10
 255:19

**9**

**9** 174:15,19
 175:3 194:13
 280:20
**9.53** 183:22
**90** 238:1
**92** 143:20
 272:24 274:3
**93** 196:5
 231:16 232:6,7
 232:10 233:8
 237:6,7,11
**95** 182:14,25
 184:2 196:4
 203:5 206:4,11
 207:20 209:3
 209:20 211:20

229:7 231:14
231:15,25
232:4 233:5,9
233:10 237:2,9
237:20 238:4
**99** 237:25
**99.2** 177:17,22
**99.52** 179:18,23
194:23 197:12
197:16
**99.7** 203:6
206:5
**9th** 62:20 63:2
280:10

**a**

**a.m.** 1:11 3:3
18:12,15 27:3
27:6 28:23
29:1 53:20
54:1
**abatement**
240:23 242:21
**abbot** 188:4
**abbott** 102:22
139:22 145:14
147:17,24
148:22 155:18
155:21 156:2
185:17 186:22
187:4 188:2,18
198:14 269:16
**abbott's** 129:7
145:21 148:3
148:17,25
157:6 199:25

212:10 274:16
**ability** 9:13
**able** 84:1
113:16,22
125:1,11 126:9
156:14 182:12
**abnormal**
250:14
**above** 1:16
31:11 33:22
34:3 39:9 64:7
117:7 143:20
173:15 199:2
202:10,21
213:6 223:14
229:7
**absolutely**
241:14
**academic** 14:3
80:8,10,13,20
80:21 82:5,7
238:3
**accepted** 239:6
246:1,9 261:18
**access** 62:24
**accompanied**
170:2
**account** 137:17
254:7
**accounting**
20:18 21:9
**accuracy** 16:9
35:15 36:4,7
103:21 121:4
122:10,14

125:8 127:7,23
145:25 147:18
147:20 154:22
155:12 156:13
156:15 157:3
165:4 174:11
182:9 183:1
184:2 192:9
193:12,19
194:7 198:8
199:4,11
200:15,18
202:3,18 203:5
203:7 205:8
206:4,6 207:20
208:16 209:3
209:20 210:24
211:4,20 217:7
218:24,25
219:2,7,12
221:13,14
251:12 252:6
275:25
**accurate** 7:3
35:12 102:25
103:6 104:5,20
105:2 107:11
112:2 120:11
120:17,23
121:11,20
122:1,1,22
123:1,9,20,22
123:25 124:19
127:4 144:22
145:8,11,22,23

146:12,15,21
147:5,8 148:14
149:10,18
150:4,14
151:16 152:1
152:16 153:11
154:9 155:7,16
156:6,13 157:8
157:16 158:7
158:19,24
159:6,11,12
160:21 161:2
162:14,18
163:19,25
164:12,24
165:13,21,25
173:4 174:2
176:6 178:2,8
178:9 180:6
182:14 187:21
188:6,13
191:25 195:15
206:12 258:22
267:3 274:21
278:7
**accurately**
29:10,13
**achieved**
124:12 125:7
198:16
**acknowledg...**
278:1
**act** 15:6,7,10
**action** 1:16
6:13 14:19

**[action - analysis]**

49:23 249:6 279:13

**actionable** 87:9

**actual** 29:22 43:9 216:13 275:11

**actually** 7:18 23:20 94:2 116:13 148:7 148:10 149:20 191:6 194:12 195:23 215:16 256:11 258:24 271:19 276:14

**ad** 239:21

**adam** 45:1,2

**added** 179:17 190:15 246:24 247:4

**addition** 13:25 49:21 70:23 82:3 226:24

**additional** 14:1 143:2 262:17 263:8

**address** 5:4,8 218:2

**addressed** 145:3

**adjustment** 142:14 256:18 256:24

**administration** 22:6

**admissibility** 73:16,21

**admissible** 63:19 71:16

**adopted** 239:1

**advance** 87:23 104:11

**advisory** 96:3

**affiliated** 37:19 44:19 81:1

**affirmative** 245:21

**afternoon** 92:6 266:25

**agg** 46:17

**aggregate** 57:5 59:2

**ago** 42:13,14 174:6

**agree** 3:13 90:7 93:18 94:8 164:10,17 238:5 242:14 249:17

**ahead** 201:24

**aid** 201:13

**aig** 47:13

**air** 9:3

**alcohol** 9:14

**alerting** 129:6

**align** 143:17

**allegation** 67:12 68:3 113:6 114:12 121:18 126:22

127:1 196:24

**allegations** 61:11 113:1,12 113:17,21 114:7,11,16,24 115:5,13,21 126:7,11,19 136:21 220:18

**allege** 16:8

**alleged** 85:1,12 86:16 87:2,7 88:7,16 93:12 93:25 110:11 112:17,18 113:2 123:16 128:18 144:16 178:22 193:15 193:25 194:3 196:12 199:22 213:20,21 252:25 265:8

**allegedly** 108:10 130:24 131:14,21 133:16 134:8 134:22 136:4 137:1,21 207:6 267:3 274:7 276:7

**alleging** 15:11

**allergan's** 274:14

**alpha** 62:6,12 63:5 64:1 67:3 67:6 73:10,18

73:21 77:23 221:21 222:8

**alpha's** 68:22 71:8

**alter** 236:21

**alternative** 231:8 235:20 235:24 236:2 242:15 243:3

**alternatives** 241:19 243:25

**amended** 13:16 14:19,21

**amount** 58:24 235:10

**analyses** 21:12 26:18 32:10,11 235:14

**analysis** 25:22 26:6 35:5,6,16 35:25 37:15 42:1 43:19,21 46:20 56:18 60:1 66:20,23 75:11,20 111:1 111:2,5 131:10 152:7 185:22 187:3,7 188:21 211:18,21 213:3 226:24 229:1 231:8,23 233:14,17 239:23,24 243:5 250:10 251:21 261:4

**[analysis - approval]**                                    Page 7

265:3,5 269:25 276:3

**analyst** 17:22 31:23,24 32:6 32:15,22 33:9 33:20 34:2,11 34:14,19,22 35:14,18 36:1 36:3,19 42:8 42:11 99:9 149:25 153:3 247:24 268:11

**analysts** 33:15 33:18 36:25 37:16,20 120:14 178:1 268:10

**analytic** 214:22

**analytical** 66:15

**analyze** 106:18 208:1 211:13 242:16 262:14 266:15

**analyzed** 87:22 106:23 162:21 186:5 214:20 245:17

**analyzing** 26:21 111:7 234:24 239:15 261:21

**ancillary** 9:23

**andrew** 44:24 117:14

**annals** 185:25 189:13

**announce** 108:19 138:3 260:23

**announced** 201:2 203:4

**announcement** 104:24 118:11 118:23 119:1 121:15 140:3,4 142:24 144:8 152:19 155:22 156:2 203:18 205:1 210:22 210:25 256:9 256:10,13 257:3,25 258:5 258:8 259:12 261:10 273:25 274:14

**announcements** 142:17 157:13 256:25 274:11

**announces** 199:6 262:24

**announcing** 104:12

**annual** 240:21

**anstalt** 62:6

**answer** 7:7,25 8:7,9,13 9:13 15:3 33:21 48:18 52:8 58:9 66:11

73:13,23 81:18 86:23 94:6 96:22 109:18 114:19 119:24 139:19 161:16 190:1 214:1,18 258:24 265:12

**answered** 70:12 85:4 86:1 87:4,19 93:15 97:18 98:18 119:22 123:12 124:21 125:16 126:15 127:9 128:1,9 136:6 137:4 146:18 147:10 149:12 150:16 150:18 153:13 154:11 164:2 166:8 201:23 202:9 213:24 214:16 267:20 270:19,25

**answering** 7:4 214:9

**answers** 7:13

**ante** 100:17

**anybody** 5:22 11:14,24 17:15

**anytime** 169:15

**anyways** 121:24

**apologize** 146:7

**apparent** 219:10

**appear** 65:21 218:13 270:5

**appearance** 82:23

**appearances** 82:11,17,21

**appears** 23:1 72:12 198:15

**appended** 50:4

**apple** 256:21

**applicability** 132:7

**applicable** 98:9 98:10 140:15 192:16

**applied** 17:24 17:25 18:2 40:16

**approach** 18:4 237:5 245:21 247:18,19

**appropriate** 99:1 101:1,6 101:19 105:9 131:7 132:1 230:23 234:1 239:3,11,14 242:15,25 264:11

**appropriaten...** 131:9

**approval** 166:16

**[approved - associate]**                                            Page 8

| | | | |
|---|---|---|---|
| **approved** 166:14 234:14 234:16 | **art** 35:3 75:13 | 264:7,15 267:8 | 154:10 164:1 |
| **approximately** 3:3 | **article** 19:22 105:14,19 | 280:13,14,22 | 166:7 201:22 |
| | 106:14 159:20 | 280:23 281:1,3 | 202:8 213:7,23 |
| **april** 151:16 | 160:4,5 161:4 | **articles** 80:8,10 | 214:15 252:10 |
| 169:3,19 | 161:7 163:2,4 | 80:13,21,23 | 267:19 270:18 |
| 170:15,19 | 163:8 164:10 | 81:5,6 104:7 | 270:24 |
| 171:2 172:10 | 164:11 166:24 | 141:25 237:13 | **asking** 8:5 |
| 173:4 175:8 | 168:9 178:14 | 276:22 | 122:17 127:19 |
| 178:13 196:21 | 178:19 182:18 | **artificial** 86:17 | 139:14 146:15 |
| 197:9 224:15 | 182:21 184:17 | 86:21,22 87:1 | 150:8,9 151:21 |
| 225:7,8,8,14 | 184:21 185:2,6 | 87:16 235:10 | 168:8 199:19 |
| 226:2,19 238:8 | 185:8,11,16 | 236:3,11 | 214:10,10 |
| 238:17 239:10 | 186:20,24 | **artificially** 88:2 | 265:25 275:6 |
| 243:12 280:18 | 189:1,18 | 112:6 114:4 | **asserting** 122:8 |
| 280:22 | 190:24 191:15 | **aside** 9:18,23 | **assertion** 107:1 |
| **arbiter** 104:15 | 192:7,18,24 | 73:18 78:11 | 158:5 |
| 104:25 153:20 | 193:5,7,10,25 | **asked** 9:16 | **assess** 213:7 |
| **area** 40:9 82:2 | 194:7 195:8,11 | 38:11 56:15 | **assessment** 201:7 |
| **arguably** 198:1 | 196:21 197:2 | 58:5 64:10 | **asset** 40:17 |
| 243:13 | 197:10,17 | 67:7 70:12 | **assimilated** 106:11 |
| **argued** 68:5,6 | 198:14 199:9 | 73:7 78:4 84:2 | **assimilation** 138:20 |
| 222:7 | 199:13,21 | 84:19,20 85:3 | **assist** 43:7,13 |
| **argues** 66:21 | 200:13,16 | 85:25 87:3,18 | 45:10 80:16 |
| **arguing** 263:4 | 202:16 204:24 | 93:14 97:17 | **assisted** 44:13 |
| **arguments** 71:8 | 204:25 207:5 | 98:17 110:9,14 | 80:9 81:13 |
| | 221:21 223:25 | 110:25 111:12 | **assisting** 43:18 |
| **arm's** 9:21 | 224:6,7,11,19 | 113:11 116:17 | 43:23,23 |
| **arrangement** 4:5 | 224:24 225:4,5 | 116:21 119:22 | **associate** 32:3 |
| | 225:15 226:3 | 123:11 124:20 | 32:25 33:2,8 |
| **arrive** 135:2 | 226:19 227:4,6 | 125:15 126:14 | 33:17 34:8 |
| **arrived** 94:25 | 227:19,25 | 127:8,25 128:8 | 36:10,11,13,16 |
| 134:15 135:15 | 256:1 258:21 | 136:5 137:3 | 36:17,20 37:2 |
| | 259:4,7,17 | 146:17 147:9 | |
| | 260:18 261:24 | 147:13 149:11 | |
| | | 150:15 153:12 | |

**[associate - bakerhostetler]**                                    Page 9

37:3,7 42:20
42:23
**associated**
233:7
**associates** 17:6
36:25 37:17,17
**assume** 7:25
58:5 76:12
111:13 113:11
113:21 121:9
124:16,25
128:13 151:21
163:22 248:8
249:21 264:16
264:21
**assumed**
113:16 128:6
**assumes** 248:14
248:16
**assuming** 48:5
112:25 114:7
125:9,13 126:8
**assumption**
112:21 125:19
127:5 131:13
131:20,23
**assumptions**
68:20 70:8
98:6 127:21
**assurances**
275:18
**astronomical**
216:18 220:9
220:11

**atk** 46:16
**atl** 201:15
**attached** 29:7
**attack** 221:16
**attorney** 2:3,9
8:8 64:6
**attorneys** 39:5
73:2
**attribute** 150:1
**attributed**
145:19 208:19
231:20
**attributing**
103:1 237:14
274:18
**audio** 3:11
**august** 191:3
**author** 80:10
81:9
**authored** 80:7
80:12,22 81:10
81:14 186:1
**authorization**
168:22 169:8
169:10,17
280:16
**authorized**
170:2 224:1
225:1
**authors** 143:18
**available** 94:19
101:3 169:19
169:23 170:5
171:2 175:8,13
176:17 196:9

208:11 215:18
215:25 219:16
227:18 236:22
268:17
**average** 16:25
47:23
**aware** 10:25
15:14 19:16
73:14 115:21
128:21 167:21
168:3,8,10
169:14,15,18
169:20 186:12
186:16 203:25
213:19 214:10
214:13 229:24
230:9 275:10
**awesome**
118:16,24
258:7

**b**

**b** 4:17 92:12
257:5 280:5
**babson** 22:1,11
23:19 24:19
25:23 27:24
82:1
**back** 16:15
18:14,18 24:17
27:5,19 28:4,8
28:25 34:6,16
36:9 48:20
53:23 66:4
71:25 76:20
86:2 91:16,22

94:3 101:20
103:4 105:12
113:13 119:23
120:24 123:15
126:17 130:16
132:9 136:7
138:22 139:18
147:11 149:13
156:23 158:25
172:14 176:9
180:16 181:8
181:13 186:24
187:24 189:6
191:9,14 195:6
195:19 197:8
198:3,24
200:23 206:2
209:1 219:24
220:17 222:10
222:12 225:10
225:11 226:5
228:12,17
239:25 242:19
243:15 244:13
251:5,22
262:10 264:20
271:4 272:19
272:22
**background**
20:4
**bad** 103:8
135:8 155:17
188:4
**bakerhostetler**
2:9

**[bakerlaw.com - bettencourt's]** Page 10

**bakerlaw.com** 2:12,13
**bank** 47:3
**banks** 30:18
**bar** 63:14
**based** 47:6 48:8 57:6 64:18 66:6 99:18 100:11 101:14 101:17 106:20 108:22 111:14 111:17 121:7 136:22 148:8 149:5 154:24 178:6 179:1 183:10 186:20 190:15 196:22 196:24 204:21 213:8 214:21 219:16 227:17 230:19 236:5 237:10,11 270:11 276:14
**bases** 230:6
**basic** 21:2 163:17 164:13
**basically** 30:21 33:16 37:14 163:14 176:14
**basics** 5:1 6:25 11:2
**basing** 226:16 226:19
**basis** 33:14 81:3 89:4

93:10 156:16 167:5 173:18 204:11 228:21 239:22 247:3 248:12 250:2 251:9 253:12
**bear** 232:22 235:14
**bearing** 265:4
**beat** 207:3
**becoming** 38:15
**beginning** 37:4 63:12 68:16 170:21 176:9 212:2 234:2
**behalf** 51:1,10 51:20,24 52:11 52:14,19,25 79:9 84:21
**belies** 118:24
**believe** 14:8 20:12 21:5,18 22:10,13 31:2 32:24 36:6,12 42:12,16 46:15 46:25,25 47:3 51:17,22 57:17 62:14,17 65:20 71:22 72:11,16 72:20,21 73:19 74:14 82:22 84:5 85:15 93:1,4 108:14 115:4 116:17

117:5 119:13 120:9 121:4,19 122:10,18,25 123:7 124:18 124:22 126:23 126:25 131:6 131:16 145:15 146:25 148:1 148:13 159:25 162:16 166:10 176:21 189:24 190:1 221:17 224:13 230:4 232:3 234:4 235:6 240:20 257:12 265:7 269:11,17 277:6
**believed** 120:9 121:10 127:6 127:22 128:6 150:22 158:6 158:16,23 159:5
**believes** 257:24
**believing** 165:12
**benefit** 58:2 261:24
**benign** 272:4
**benson** 1:8 116:15,23,24 117:3,6,16 119:3,16

**benson's** 117:15
**bentley** 20:11 20:12,14
**best** 25:4 33:24 76:18 101:11 127:10 138:5 207:24 247:18 259:2
**bettencourt** 1:15 3:16 4:23 5:7 12:17 13:1 22:15,18,19 23:8 27:9 29:23 30:4,10 30:23 31:4 62:17,19 63:23 66:19 112:13 129:14 159:18 163:1 168:21 170:13 174:15 177:1 178:13 185:1 192:23 222:16 224:18 229:19 231:1 234:8,20 235:1 236:25 244:17 248:21,25 249:13,25 254:22 266:18 277:18 278:9 280:3,6,8 282:3
**bettencourt's** 63:15 64:14

**[bettencourt's - capacity]**                                    Page 11

68:17 70:6 71:9,15 231:2 281:5

**better** 14:14 16:14 65:4 102:16 121:21 124:13 125:8 148:2,16,24,25 149:2 150:4,5 152:14 157:4 176:16 180:18 198:17 220:1 227:12

**bfloch** 2:7

**bias** 172:18

**big** 202:21 223:14

**bio** 78:17,20

**biocentury** 224:10,19,23 225:3,15 226:2 227:4,6,19,23 227:24 281:3

**biocentury.co...** 224:6

**biopharmace...** 6:11

**biosolutions** 38:25 75:25

**biscayne** 2:3,4

**bit** 41:3 70:4 116:13 130:21 172:18

**black** 218:7 223:1

**blackstone** 46:9

**blocked** 17:19

**blood** 279:13

**bloomberg** 159:19 160:3 184:17,21 185:2,7 188:10 189:1,18 190:25 191:15 192:7 280:13 280:23

**board** 96:11,13

**bolded** 177:15

**booking** 240:21

**books** 81:11,14 81:14,17

**bottom** 38:25 64:13 66:18 166:25 167:1 170:1 190:4,10 223:10 266:23

**boulevard** 2:4

**bound** 213:4 214:23

**brandon** 2:7 17:12

**brazilian** 46:19 46:20

**break** 8:16,24 9:1 50:16,19 53:16 129:19 129:22 131:12 176:25 181:2 228:4

**breaks** 8:15,20 11:20

**brent** 1:8 194:21 197:10

**bring** 168:19 189:20

**bringing** 15:5,9

**broadcast** 256:5

**broke** 92:17

**brookline** 5:15

**brought** 10:11

**browser** 19:9

**building** 204:25

**bunch** 32:10 101:24 102:1 141:16 172:19 209:8,9 226:23

**burden** 67:11

**business** 22:5 24:20 27:20 29:9,25 30:14 30:16,22 31:11 40:1 83:7,11 112:4 156:3

**business's** 30:21

**butcher** 13:18

**c**

**c** 2:1 4:17 92:12 258:13

**calculate** 58:24

**calculation** 78:9 233:7

**calendar** 17:18

**california** 74:3

**call** 9:19 107:2 108:8,20 130:23 131:23 132:4 133:15 134:10,22 135:25 136:3 136:25 137:20 260:24 275:5 275:23

**called** 88:24

**calls** 15:1 16:3 36:23 43:14 66:9 69:3 108:11 114:17 115:6 118:6 119:21 133:17 146:22 148:18 151:19 152:22 153:19 161:14 162:20 164:2 164:16 165:15 175:10 190:22 192:11 270:1 270:25

**camera** 3:7 10:20

**capability** 259:3

**capacity** 6:21 44:14 80:11 85:9 86:13 201:3 203:20 242:5

**[capital - chain]**                                                    Page 12

**capital** 62:6
  77:23
**career** 76:25
  77:13 83:15
  84:24 86:14,25
**case** 1:2 3:19
  3:21 8:10
  14:24 15:15,21
  15:23 16:2
  19:14 24:6,8
  40:25 45:11,14
  46:9,12,15,17
  47:13 51:5
  52:2 55:19,24
  56:2,4,8,8,9,17
  56:20,24 57:1
  57:15,21,25
  58:11,18,25
  59:4,5,11,12,18
  59:19,23 60:1
  60:5,7,18 61:4
  61:24 62:6,8
  62:12,13,15
  63:6 64:1,2
  67:3,6,25
  69:12 71:21
  73:10,18,21,25
  74:2,6,8,11,17
  74:21 75:10,24
  76:4,5,8,15,23
  78:11,13,16,18
  78:20,23,23
  79:2,3,14 83:1
  83:3,17,22,25
  84:23 85:10

86:15,24 87:15
87:17,21,22
88:4,5,13
89:12,14,21
90:2,6,15,21
93:4,13 95:9
95:14,24 96:7
96:11,17,19
99:8 100:8,13
100:24 101:8
101:15 110:8
111:4 112:15
113:10,23
114:24 126:20
126:22 128:22
132:8 141:7,12
143:22,23
144:12,17
152:9 154:23
156:10 164:6
188:17 193:16
194:1 215:9,18
229:11 231:7
234:2 239:12
245:11 246:19
247:15 251:4
253:9 259:13
271:6 276:14
282:2
**cases** 6:7 38:16
  38:21 39:4,18
  39:20,25,25
  40:2,3,11,20,21
  40:23 41:5,5,9
  41:9,18 43:24

44:2,5 45:16
45:18,19,23,25
46:1,4,5,7 47:5
48:12,14,23,25
49:3,8,12,16,22
50:7,9,21,23
51:2,8,14,16,19
52:16,18,23,23
53:2,7 55:2
76:21 78:24
79:2,7 87:21
88:19 93:1,3
95:16 135:6
215:4
**causation** 47:8
  47:15,23,25
  57:25 64:17
  68:8,23 75:11
  75:13,21,23
  87:25 110:7
  111:2,5,8
  116:21 213:7
  214:20 216:1
  229:2 243:5
  254:1,2 261:5
  265:5
**cause** 65:16
  70:19,22 86:17
  86:22 94:22
  145:1 147:20
**caused** 65:13
  67:13 100:7
  112:5 114:5
  196:11 198:22
  236:16

**causes** 207:3
  221:12
**cayman** 1:3
**cell** 10:2
**center** 201:11
**central** 1:1
**ceo** 118:14
  258:6
**cert** 13:22
**certain** 4:25
  14:2 37:21
  61:10 65:2
  70:18,18 78:6
  81:13 84:3,4
  94:21 107:7
  130:22 134:2
  134:11,25
  135:6,12
  137:19 187:21
  188:13 255:1
**certainly** 86:19
**certainty**
  160:13 161:8
  161:13,23
**certification**
  76:10 279:1
**certified** 4:1
**certify** 279:5,11
**cetera** 29:20
**cfo's** 216:15
  219:19 220:5
  220:14,20
  221:11
**chain** 186:9,13

**[challenged - close]**                                                          Page 13

challenged 236:15

chance 44:25 172:11

change 33:7 36:15 243:11 243:13 248:15 248:18 251:1 276:9 282:4

changed 243:14,17

changes 278:5

changing 230:19 245:13 248:12 250:2

chapter 244:7

chapters 81:13

characteristics 141:19 144:23

characterize 265:1

characterized 118:10

chart 252:5,6

check 35:9 184:19 193:12 193:19 200:15 200:18 202:3 202:18 213:2

checked 35:23

checkered 216:16 219:19 220:5,14,20 221:11

checking 32:12

chi 182:24

chief 179:15 194:21

chilean 89:10 89:14,19,20 96:6

chips 138:9

choice 243:7

choices 240:6 240:12

choose 238:19 239:18 247:12

chose 239:20

circumstance 99:23

circumstances 95:23 96:5,18 97:1 98:8,13 98:25 99:4 100:12 102:7 140:9,12 141:6 143:17 154:15 176:7

citation 24:8,10 60:18 184:21

citations 50:8 50:10 68:11

cite 118:1 140:17 143:14 157:20 185:6 192:17 204:5 221:21

cited 14:2,22 19:22 100:25

117:12,15,17 118:9 141:21 159:13,25 178:19 185:12 189:24 217:25 226:21 238:4 240:5

cites 226:2 254:24

citing 225:14 237:13

city 109:8 142:25 192:24 193:4 195:8 196:21 197:1 210:18 256:2 260:18 281:1

claims 14:23 15:5,9,24 16:2 68:22 127:23 221:25 222:10

clamor 163:15

clarify 7:19,22 26:24 121:8

clarity 172:15 275:2

class 6:13 13:22 49:22 76:9 101:23,24 102:9,11 105:5 110:15 151:13 153:24 155:2 156:25 158:11 158:11,21 159:3 162:7

172:24 176:10 176:22 195:10 197:3 207:7 208:12 214:7 228:1 235:12 236:6 241:9,11 241:21,24 242:3 246:25 253:11 260:14

classes 82:1

clean 7:9,12

clear 18:7 49:5 79:6 99:7 113:7 120:21 154:2 211:5,16 236:14

clearly 176:10 212:6,8 214:5 255:18

client 47:12 64:11 83:7 84:2,10 87:23

client's 42:3

clients 32:14,16 36:22 41:25 83:13 84:16

clinical 167:16 198:16

clock 244:2

close 41:8 52:12 87:13 98:1,3 104:13 104:17 105:7 108:21 118:12 132:5 135:2

**[close - company]** Page 14

140:3 143:3
144:8 146:5
157:19 210:23
233:10 260:10
260:11,25
264:22 265:8
265:23 266:6
273:20,22
274:1
**closed** 12:6
**closing** 259:25
269:23 270:15
271:8 274:4
**cnbc** 103:19
256:7
**coauthor** 80:6
**coauthored**
80:3 81:16
**cocounsel** 14:5
**codx's** 223:15
**coefficients**
246:22 247:5
248:11
**collected** 29:14
251:8
**collectively**
89:5,10 90:14
153:8 207:25
**college** 20:6,11
22:1 23:19
24:19 25:23
40:15
**colon** 223:22
223:24

**color** 24:13
**colorful** 272:2
**column** 252:16
**combined**
251:17
**combining**
93:11 250:12
**come** 21:3 45:9
53:5 83:13
86:20 91:21
107:18 157:7
247:1 276:17
**comes** 35:6
97:15 102:22
103:25 104:25
138:9 196:19
200:5 263:1
269:5
**comfortable**
84:6
**coming** 26:21
27:22 91:4,10
95:11 96:10
102:19 138:16
253:11 268:12
**comment** 66:5
206:15,17,22
209:2 259:22
**commentary**
102:25 121:15
127:13 128:3
143:2 147:15
147:16 149:6
150:1 155:14
155:19 208:19

220:2 268:19
268:25 269:18
269:21
**commentator**
157:21 269:5
**commentators**
188:4 274:17
275:17
**comments**
16:13 152:12
181:24 182:2
183:15 184:2
198:2,20,22
204:5,13 206:3
207:19 208:9
208:19 209:20
210:10 211:7,8
211:11,20,22
227:1 255:12
267:12 271:12
**commission**
201:5 278:18
282:24
**committed**
21:21 128:25
**common** 67:22
75:7 110:17
238:22 243:23
257:16
**communicate**
11:14,21
**communicated**
42:1 45:13
**communicating**
11:24 12:4

160:17 172:10
174:1
**companies**
40:18 61:15
102:1 216:17
261:22
**company** 1:3
6:12,18 23:25
24:15 27:15
54:22 60:12
61:12 79:11
88:24 89:11
90:25 96:16
104:8,12,15
107:8,16,19,24
108:18 119:3,5
125:2 131:3
132:3 133:22
135:3,7,19
136:20 138:3,4
138:6 143:4
152:10,14
153:17 154:14
154:15,17,25
160:24 162:8
166:12,15
172:22 173:3
174:1 175:18
193:18 196:25
197:3 214:6
217:15 219:15
219:20 220:15
221:1,5,18
230:19 240:25
241:2,4,15

242:1,4 243:21
256:9,22
260:23 262:24
275:2,10,13
**company's**
6:10 59:14
69:10,11
102:12 103:6
103:11 104:1,4
104:20,24
112:3 118:11
118:15 120:16
120:22 121:5
122:11,25
123:8 124:4,8
124:18 125:4
138:10 154:4
157:1 159:9,10
164:5 165:5,7
165:9,10,20
166:9 176:20
178:6,7 179:9
180:12 196:11
196:13,20
198:22 204:22
205:9 210:22
212:9,11,16
218:3 220:9
221:15,25
222:7 226:13
227:8 234:14
234:15 237:15
242:21 256:12
257:25 258:4
268:20 269:2

273:3,7,18,21
**compared**
36:16 217:16
**comparing**
155:11 198:12
**compass**  2:17
**compelled**
120:6
**competition**
102:14 123:20
124:11 150:6
180:16
**competitors**
16:12 121:22
166:21 176:16
198:13 222:2
**complaint**
13:16 14:19,21
14:21 16:7
60:25 61:2,9
212:24 213:1,3
213:5,22
214:12,23,24
264:2,18 265:2
266:2,14,19
267:7,12
270:22 271:13
271:21 281:8
**complete**
160:12 161:8
161:13,23
**completed**  13:9
27:18
**completely**
8:25 12:5

100:6 191:11
239:21
**completion**
27:22 201:6
**component**
46:19 213:11
**compound**
162:19
**comprehensive**
48:3,13,24
49:4,7
**compromised**
200:11
**compute**
110:14
**computer**  9:18
**concentration**
22:4,6,9 23:19
25:5 26:13
**concept**  245:8
**concern**  186:22
**concerning**
268:19
**concerns**  179:1
192:8
**concierge**
191:10,13
**concisely**
128:11
**conclude**  113:8
122:24 204:12
230:6
**concluded**
111:17

**concludes**
184:8 277:16
**concluding**
122:9 125:14
125:17,18
135:21
**conclusion**  15:2
16:4 43:15
66:10 69:4
85:23 114:18
115:7 119:22
122:5 123:9
125:19 131:5
131:25 146:23
151:20 152:23
271:1
**conclusions**
66:16,22
111:21 122:4
234:7,25
235:15
**condition**  112:3
**conduct**  21:16
25:13,17,25
26:10 38:7,12
43:22 58:10,17
59:21 66:19
67:5,8 74:20
111:24 231:22
235:20
**conducted**  3:5
3:23 44:7
58:15 59:24
62:2 179:19
194:24 261:4

**[conducting - context]**                                                    Page 16

**conducting**
  25:21 259:8
**conference**
  82:8 91:11
  103:20 107:2
  108:8,20
  130:23 131:23
  132:4 133:15
  134:9,21
  135:25 136:3
  136:25 137:20
  153:18 182:4
  203:2,12 204:1
  204:2 210:7
  260:20,24
  275:4,23
**confidence**
  196:4,6 229:8
  231:15,16
  232:1,5,6,8
  233:8,9,11
  237:3,7,20,21
  238:1
**confidential**
  215:14
**confirm** 19:3
  234:18 238:10
**confirmations**
  137:17
**confirms** 136:9
  237:17
**conflate** 65:21
**confounding**
  118:21 257:22
  258:1,8,10

**confusing**
  230:22
**confusion**
  191:7
**conjecture**
  64:19 66:7
**conjunction**
  32:17,18
**connecticut**
  1:19
**connection**
  5:17 6:3,13
  24:6 25:17
  26:20 58:22
  59:22 62:2
  75:20 76:8,15
  81:20 82:9,15
  82:19 83:20
  111:7 116:16
  117:20 118:5
  119:8 144:11
  157:22 188:17
  189:22 199:8
  224:11
**connections** 3:8
**cons** 83:21
**consent** 4:4
**consider** 84:21
  94:19 118:4,17
  140:5 147:13
  148:5 158:4,9
  158:20 159:2
  196:8 199:15
  199:17 204:16
  210:14 220:4

  234:23 240:18
  260:12 263:5
  270:3 274:11
  276:10
**consideration**
  26:18 63:14
  226:12
**considerations**
  132:6 142:3
**considered**
  61:15 116:1
  117:17 119:25
  120:7 142:3
  152:17 155:3
  167:14 208:3
  208:10 211:24
  212:14 255:20
  268:14,15
  269:12,18
**considering**
  101:19 102:6
  105:8 247:25
**consistent**
  100:24 143:5
  167:17 239:5
  265:24 266:2,8
**consistently**
  16:11 102:13
  124:8,11 125:4
  125:5 149:1
  150:7 157:2
  165:22 166:18
  176:11 180:13
  180:15 198:15
  223:16 225:17

  225:22 226:17
  227:16
**constant**
  244:23 249:22
**constantly**
  35:22
**constitute**
  146:2 257:2
**constitutes**
  143:7 153:1
**construct**
  246:21
**construction**
  27:14 30:1
  236:11
**consult** 39:5
**consultant** 28:1
  38:18
**consulted**
  38:17
**consulting**
  31:18 35:21
  39:7 47:12
**contain** 50:8
  58:14 60:7
  75:10,22 263:6
**contains** 72:21
**contemporan...**
  149:6
**contest** 252:6
**context** 52:7
  167:14 226:12
  258:21 268:16
  270:4,5

**[continue - corrective]**                                              Page 17

| | | | |
|---|---|---|---|
| **continue** 3:12 16:5 38:20 43:16 64:25 69:5 | **cornell** 143:15 263:13 264:6 | 74:13 76:3,5 77:1,9 80:1,2 93:6 112:24 | 261:8 267:9,13 274:5,6 |

**continue** 3:12
16:5 38:20
43:16 64:25
69:5
**continued**
92:16
**continues**
167:11 222:3
**contracted**
179:5
**contractors**
30:18
**contracts**
203:22
**contradict**
158:22 159:4
**contradicted**
158:5
**contrary** 121:3
146:4
**contributed**
80:6 81:7
**control** 117:13
**controlling**
10:22 247:20
**conversation**
8:11 92:25
**conversations**
247:17
**cooperate**
103:11
**cooperating**
182:11
**copy** 10:11

**cornell** 143:15
263:13 264:6
**corner** 189:13
190:5 223:10
266:23
**corona** 163:16
**coronavirus**
160:7 163:9
168:23 169:12
191:20 280:17
**coronoavirus**
170:8
**corp** 55:20
**corporate**
20:17 21:8
23:18 24:21
26:8,15
**corporation**
1:7
**correct** 6:23
19:7 31:6,21
35:12,25 39:2
43:25 44:3,8
44:11 45:21
47:9,17 48:5,7
49:9,10 50:9
50:12,13 51:11
51:12,22 52:16
54:11 55:24
56:21,25 57:16
57:17,23 58:12
59:17,19,20
60:16,17,20
61:9,21,25
62:4,11 74:7

74:13 76:3,5
77:1,9 80:1,2
93:6 112:24
113:10,19
116:9 119:16
119:17 122:6
130:25 132:18
139:16 140:16
157:23 161:9
169:4 176:2,3
177:12,13,23
179:25 182:1
182:19 183:2,3
183:16,17
184:3,4,11,17
185:14,18,19
186:23 187:2
193:6,12,13,16
195:4 197:13
197:14,18,19
200:24 202:18
204:7,8 211:11
212:19 226:4
229:14 230:3
230:13 231:11
231:12 232:20
233:16,24
235:5,23
236:18 238:9
238:15 245:3
245:21 246:1,5
246:6,7,12
248:6 249:13
252:4,21
253:17 254:5

261:8 267:9,13
274:5,6
**corrected**
212:13,14
213:14,16
221:10
**correcting**
248:3
**correction**
208:7
**corrections**
278:5
**corrective** 85:1
85:12,18 86:7
88:7,16 93:12
93:19,20,22,25
94:10,11,12,15
95:3,7 99:14
105:10 107:3
108:10,24
120:20 121:2
130:24 131:15
131:22 133:16
134:8,13,14,22
136:4 137:2,21
141:1 144:16
146:21 151:18
152:4,20 153:1
158:17 166:6
178:21 193:15
193:21,25
194:4 199:22
206:16 207:10
207:15,16,21
208:1,4 213:12

**[corrective - customers]** Page 18

213:21 214:2,5
215:5,10,20
216:2,8 220:8
220:21 236:5
252:25 253:15
254:6 262:16
264:16 265:1,9
276:5
**correctly** 38:5
46:24 56:12
65:6,11 90:19
110:24 240:15
**correlation**
248:4
**counsel** 3:16
4:4,13 5:16,19
12:8,10 16:17
16:19 17:2,3,9
17:10,13 19:13
19:14,17,25
73:6 110:6
112:14 115:3
116:18 120:5
214:25
**count** 47:17
**countervailing**
273:3,8,11,23
274:2,8 275:1
275:7 276:8
**counting** 45:22
47:7 77:3
**countries**
198:11
**countrywide**
46:10

**couple** 27:21
93:2 137:9
174:3 237:8
244:8
**course** 102:8
156:25 269:19
**courses** 20:20
20:24 21:2,10
25:8,12,20
26:5
**court** 1:1 3:21
4:2,9,14 24:3,5
24:6 59:7
61:21 63:17
64:13 65:2
70:5 71:7,14
73:15,20 76:1
94:2 106:6
169:16 277:3
**court's** 64:23
66:4,13,14
69:2
**courts** 73:10
**cov** 173:14
190:12,15
**covariance**
246:21
**covered** 89:21
**covid** 16:10
101:22 112:1
120:10,22
121:5,10
122:11,21
123:1,8 124:19
127:24 155:8

158:6 159:5
165:5 166:15
166:16 167:4
167:17 171:1,7
171:25 172:15
173:17,21,25
175:21,25
177:17 179:5
179:14,17
181:25 182:3
183:5,8 185:17
186:8,17 187:7
187:20 192:9
194:8 197:11
198:5 199:5,12
201:3,10,14
203:20 205:8
208:16,17
216:19,25
217:2,21
218:16 224:1
225:1 230:20
243:10 256:23
275:14
**crazy** 241:14
**create** 63:20
68:18 111:25
**created** 87:1
**creating** 64:15
**credit** 81:8
**criteria** 99:3
141:21
**critical** 205:7
**criticized** 73:11

**criticizes**
232:13,14
**criticizing**
264:1
**critique** 257:10
257:24 258:19
262:8 263:19
**crowninshield**
17:23 18:9
28:2 31:13,16
31:17,19,25
32:7 33:2
34:14,20,22
35:7,14 37:8
37:12 39:10,16
39:17 42:11,20
42:24 43:3
44:13 47:19
50:25 52:3
80:17,18 81:2
81:21,22 82:10
82:16,20,24
83:6,13,16,24
84:24 86:15
**current** 5:4
18:6 23:11
37:9 94:24
111:8 261:12
**currently** 12:21
34:16,20 39:11
39:14
**curriculum**
23:7,11
**customers**
30:20

**[cut - decisions]**                                                                    Page 19

**cut**  257:21
**cutting**  258:11
**cv**  1:2 3:22
 23:23 28:9
 29:6,7 31:10
 41:15 53:9
 54:4,5 55:23
 62:8 63:6
 73:25 79:20
 216:5

**d**

**d**  4:17 92:12
 262:2 280:1
**daily**  33:14
 247:3 248:12
 250:2,13
**damages**  32:14
 32:16 38:19
 39:5 46:19
 47:14 57:6
 58:25 59:1,2
 59:15 72:21
 75:8,21 110:7
 110:15 116:21
 213:8 214:21
 216:1 243:5
 253:5,20 263:6
 265:6
**daniel**  1:15
 3:16 5:6 22:19
 23:7 231:1
 277:17 278:9
 280:3,8 281:5
 282:3

**data**  32:9
 137:15 245:14
 246:24,24
**date**  12:19
 22:21 35:2
 62:22 67:14
 129:16 159:21
 163:3 168:25
 170:16 174:17
 177:3 178:16
 185:3 193:1
 222:19 224:20
 225:5 229:22
 231:4 248:24
 266:20 282:3
**dated**  13:8
 22:19 170:14
 170:19 177:6
 191:2 227:7
 280:8,18
**dates**  68:4
 89:25 90:14
 136:15 261:10
**daubert**  63:17
**dawn**  1:17 4:2
 44:25 279:3,22
**day**  14:16
 30:14,14 40:24
 40:24 81:2,2
 88:7,9,16,18
 89:2,17,17
 90:5,5,8,23,24
 91:1,6,7 92:21
 92:22 95:21
 97:1,3,6,7,14

 97:16,24,25
 98:10,14,15,16
 98:21,22,25
 99:4,16,21,22
 100:2,4,8,8,14
 100:16,20,21
 101:1,4,9,16
 102:10 105:10
 105:11 106:15
 106:24,24
 108:17,21
 120:19 129:5
 131:7,9,15,17
 131:25 132:7
 135:17 136:16
 140:1,13,15
 141:7,17,23
 142:5,9 143:19
 143:24 152:1,5
 153:16 155:2
 160:24 165:3
 178:20 183:25
 184:11 196:19
 197:2 199:24
 206:25 214:7
 226:7 231:18
 231:21 234:22
 243:14,16
 246:25 250:15
 250:18,19
 251:2,4,7,9
 254:24 255:25
 256:6,21
 257:14 259:15
 259:18 260:3,6

 261:8,15,17
 264:6 270:7
 274:22,25
 278:13 279:17
 282:21
**days**  14:14,15
 89:8,22 97:11
 99:16,17,17
 143:13 150:2
 153:23 155:25
 190:16 238:22
 251:15 259:7
 262:15 276:6
**dbp**  1:2
**deadlines**  42:3
**deal**  8:11
**dealing**  30:17
 30:18,19 47:22
 47:24
**dealt**  47:7
**december**
 22:20 23:2,5
 28:5,10 29:8
 41:15 51:9
 72:2,25 132:14
 198:25 228:18
 228:20 229:13
 272:23 280:9
**decide**  107:2
**deciding**  82:25
**decision**  151:5
 251:3
**decisions**
 153:23 167:6
 173:19

**[declaration - detail]** Page 20

**declaration**
56:15,21 57:3
57:8,12,18
58:13,19 72:19
77:3,5,12,21
78:1,7,8,10
**declarations**
77:7 78:5
**declare** 64:10
**declared** 64:5,9
**decline** 67:14
85:1,12 88:3
89:16 90:3,4
90:22 97:13
98:14,20,22
99:21 100:2,7
100:15,20
250:13
**declined**
200:10,14
202:2,17
**declines** 92:19
93:11 157:9
193:11 200:17
**declining** 273:4
273:12,15,19
**deem** 239:14
**deemed** 87:11
217:14
**default** 56:10
**defendant** 3:17
56:12 84:10
**defendant's**
64:17 65:7
67:2,11

**defendants** 1:9
2:9 15:13 52:1
52:11,25 53:8
53:13 79:13,15
84:22 111:23
112:15,18,22
113:9 114:2
238:25
**defense** 64:18
68:23
**define** 82:12
198:7 255:23
265:20
**defining** 55:5
81:25 273:13
**definitely** 53:4
91:8 150:17
268:13 272:10
**definition**
142:22 203:15
**definitionally**
257:1
**defunct** 19:23
**degree** 21:16
21:23 22:2
26:16 27:19
31:6
**delayed** 163:16
**deleted** 191:11
**deliverables**
42:4
**deluca** 55:20
56:8,20,24
57:1,15,21,25
58:11,17,25

**demonstrated**
157:3 165:22
198:5
**denials** 273:3,8
273:11,18,21
273:23 274:2,8
275:1,7 276:8
**depending** 8:17
106:8 122:2
174:5 238:2
**depends** 3:7
117:22 143:21
240:14
**deponent** 278:1
282:19
**deposed** 6:1,7
6:12,16,21
**deposition** 1:14
3:5,15,22 5:1
5:17 6:25 7:1
7:20 10:5,9
11:4,15,18
12:2,7,12,18
13:6,13,15
14:12 16:18,20
17:14 18:21
19:6,15,19
38:24 55:6,8,9
59:13 116:4,8
116:15 117:2,7
117:15,20,24
118:1 119:8,11
119:14,20
127:19 278:4
280:7 282:3

**depositions** 8:6
116:22 118:4
**describe** 14:23
25:1,16 27:10
59:10,11 96:7
202:11 245:7
266:9 272:3,6
**described** 57:3
66:23 125:21
125:22 131:11
140:10 188:25
270:14,20
271:7
**describes**
164:11,13
212:18,20
267:7,12
**describing**
140:11 269:1
269:22
**description**
58:4 74:25
168:16 188:10
265:22 268:3,6
268:11
**descriptions**
47:9
**design** 30:17
**designed** 171:8
172:2
**desk** 10:1
**despite** 221:24
223:17 225:23
**detail** 141:9
195:20

**[details - disagrees]** Page 21

**details** 60:24
**detect** 89:4
  191:19
**detection**
  173:15 224:1
  224:25
**determine**
  65:12,14 97:5
  99:3,15 108:9
  142:4 231:9,24
**determined**
  18:2 86:16
  131:10 248:1
**determining**
  141:22 203:6,7
  206:5,6
**developed**
  179:13 191:17
  191:19
**developing**
  80:19
**development**
  30:16 83:11
**devices** 9:20
**diabetes** 11:19
**diagnosed**
  11:19
**diagnosing**
  160:6
**diagnostic**
  102:3 103:3
  144:21 145:7
  145:10 146:11
  146:14,20
  147:7 149:9,17

150:10,13,23
151:7,15,25
153:10 154:8
154:21 155:6
156:5,18
160:12 161:7
161:12,22
162:13 163:24
167:12 186:8
190:16 198:8
205:8 241:4
**diagnostic's**
  188:19
**diagnostics** 1:6
  3:19 103:23
  107:12 110:17
  112:1,5 120:10
  120:16 121:10
  122:21 141:10
  142:19,20
  145:13,20,22
  146:16 147:4
  147:12,19
  148:2,13
  149:23 150:9
  151:1 155:8,18
  155:20,23
  156:3,11,20
  157:9,15,23
  158:6,10,18,23
  159:5 161:5
  162:3,15,17
  167:22 168:1
  168:11,23
  169:11 171:1

172:9 173:1
176:5 179:14
179:17 180:5
183:5,8,12,23
186:17 188:5,6
192:16 194:8
194:20 195:13
197:6,11 198:5
199:5,6,12
200:2,6,14
201:12,20
202:7,16,21
203:11,23
204:3,6,9,14
208:15,17,20
209:5,21 210:1
210:2,11
211:10 212:3
216:15,25
217:21 222:25
224:2 225:1,16
225:21 226:17
236:4 240:21
241:1 252:9
267:2 270:9
271:7 274:19
274:20 280:16
282:2
**diagnostics's**
  165:20 217:2
**dictate** 94:16
  95:8 97:1
  98:25 99:4
**dictated** 93:22
  94:13 96:14

101:9
**dictates** 99:22
  100:22
**dictating** 43:19
**difference**
  134:5 138:24
  139:3
**different** 42:14
  44:19 50:4
  57:8,12 70:4
  102:1 106:2
  116:14 160:19
  174:4 202:11
  226:15 230:12
  232:2 237:5
  241:15,20
  242:4 245:25
  246:17 247:25
**differently** 41:4
  162:9
**direct** 123:14
  194:12 214:25
**directed** 8:14
  120:2 201:11
**direction** 38:10
  73:6 98:2,4
**directly** 198:13
  220:17 222:10
  236:10
**directs** 8:8
**disagree** 26:14
  66:13 78:21
  125:24 178:5
**disagrees** 68:14

**[disclaimer - downwards]**                                                                    Page 22

disclaimer
 115:18
disclose  24:14
disclosed
 195:15
disclosure  85:2
 85:13,19 86:8
 88:8,17 93:20
 93:21,22 94:1
 94:10,11,12,16
 95:3 99:14
 101:4 105:10
 108:24 141:1
 151:17,25
 178:21 194:1,4
 211:14 213:21
 214:2 215:5,10
 216:2,8 253:15
 254:6 262:16
 264:17 265:1
 276:18
disclosures
 93:12 95:8
 97:10 105:6
 120:20 121:2
 139:25 144:16
 147:22 153:15
 158:17 180:4
 193:15 199:23
 215:20 236:6
 253:1 259:23
 260:15 264:23
 265:9,23 266:6
 266:7 269:23
 270:16 274:5

 276:5
disconnect
 189:4
discuss  103:20
 103:25 184:16
discussed  15:24
 17:14,16 52:10
 73:19 82:3
 86:4 184:3
 199:14 260:19
discusses
 181:24 185:16
 185:24
discussing
 37:20 91:20
discussion
 140:22 147:23
 247:22
disease  168:24
 169:12 170:8
 280:17
disk  3:14 53:19
 53:25 92:1,10
 130:12,18
 181:4,10 228:8
 228:14
disks  277:19
dismiss  13:17
 107:24
dismissed
 87:10
dispelled
 164:22
dispose  135:11

dispute  6:17
 23:25 53:12
 60:13 61:1,19
 62:3 63:20
 64:16 68:18
 96:11 171:3
 175:9,13 239:2
 246:3 250:11
disputed  239:7
disputes  40:1,3
 49:23
disseminated
 99:10 106:22
 109:13,17
dissipation
 253:23
distinction
 72:18
distribution
 84:14
district  1:1,1
 3:20,21 24:4
 56:5 59:7,7
 62:9 74:2 76:1
 76:2
districts  240:24
divided  40:4
division  1:1
document
 13:10 19:20
 20:1 22:15,22
 22:24 63:1
 72:10 120:4
 144:4,11 158:1
 159:24 169:5

 178:18 187:1
 189:21,21
 194:11 208:23
 223:3 262:5
 263:16
documented
 65:25 107:15
 138:6 180:23
documents
 10:10,16 11:9
 14:1 19:4,13
 19:18 28:19
 111:14 115:14
 115:25 116:12
 117:14 119:25
 120:7 189:25
doing  5:11 10:7
 10:18 12:1
 18:21 21:11
 32:9 35:1
 36:20 37:15,18
 38:19 103:13
 123:18 156:9
 174:18 205:20
 211:17 259:10
domo  201:15
 203:24
double  133:6,9
 133:13
doubt  220:12
dow  63:18
download
 28:14
downwards
 42:6

**[dr - emergent]**                                                        Page 23

**dr** 13:18,20,21 13:24 17:25 18:1 19:22 44:20,20,24 45:2,3,4,5,5,10 45:14 66:22 67:2,21,25 69:15 111:18 117:24 118:25 143:10 196:7 229:10,20,24 229:25 230:10 232:12,14,16 232:18,21,24 234:18 237:4 238:24,25 239:2,7,20 240:15,19 241:17 242:14 243:8 245:11 248:13,22 257:18,23 281:4,6

**drafting** 43:10

**draws** 147:16

**drop** 92:21 269:2

**drops** 237:6,7

**drove** 140:7

**drug** 234:14,15

**drum** 207:3

**due** 144:22 205:3 216:15 230:19

**duly** 4:18 92:13 279:7

**dunbar** 257:5

**durenard** 1:7

**dwight** 1:7

**e**

**e** 2:1,1 4:17,17 4:17 11:15 12:6 92:12,12 92:12 263:13 280:1,5

**earlier** 52:10 61:22 72:21 78:3 86:4 119:2 139:19 154:19 180:10 195:8 197:8 209:25 222:6 239:18 241:7 242:20 255:24 256:3,20 260:6 270:12

**early** 161:21 178:3 266:25

**earnings** 104:12 108:19 118:11,16,20 118:23,25 132:5 138:3 140:3 256:12 257:25 258:5,7 259:11,12 260:24 261:9 273:25

**eastern** 56:5

**echoed** 276:1

**econometric** 21:11 35:5 245:10

**econometrics** 25:10 32:12 34:24

**economic** 28:1 31:17 35:21 70:17 75:15 111:3 214:4 237:17

**economically** 236:20

**economics** 37:23 253:4

**edge** 19:9

**editorializing** 227:11

**education** 20:5 23:21 24:17,19 40:12

**edward** 1:7

**effect** 66:2,3 105:19 123:17 147:21

**effective** 257:16

**efficiency** 13:20 57:21 84:5 111:10

**efficient** 65:18 69:10,14,22 111:13,17

209:3,15,17,18 260:1

**efficiently** 109:2

**egan** 1:7 116:23 118:14 118:22

**egan's** 118:9

**egregious** 164:20

**eight** 14:15

**either** 10:4,21 11:11,15 87:1 130:7 144:12 189:23 231:6 235:2

**electronic** 9:20

**electronics** 9:17,24

**element** 37:25 95:17

**elements** 65:2

**elizabeth** 182:25

**emerge** 103:9 199:4

**emerged** 207:25

**emergency** 168:22 169:8 169:10,17 170:4 280:15

**emergent** 6:10 38:24 75:25 78:17,20

**[emerging - evidence]**                                      Page 24

**emerging**
  199:11
**emphasis**  108:4
**empirical**  142:2
**employee**  30:25
  31:4
**endowment**
  25:24
**ends**  218:10
  272:13
**engaged**  50:24
  51:1,15,20,25
  52:18
**engagement**
  58:23
**engagements**
  81:20,24
**engineering**
  201:16
**ensure**  18:19
**ensuring**  35:4
  35:15,24
**entered**  56:11
**entire**  29:10
  76:25 205:17
**entirely**  61:8
  87:6
**entitled**  1:16
  23:6 54:6
  61:13
**entity**  270:23
**entrepreneurial**
  22:12,13
**entrepreneurs...**
  22:9 23:18

24:22 25:1
**environment**
  179:4
**equally**  40:4,5
**equates**  218:25
**equivalent**
  219:6
**errata**  278:6
  282:1
**error**  144:24
  248:4 249:16
  249:22
**errors**  247:10
**errs**  257:23
**erwin**  2:12
**especially**
  187:9 211:13
**esq**  2:6,7,11,12
**essentially**
  103:4 155:15
  160:16 166:4
  200:6 246:18
  263:4
**establish**  65:17
  67:11 69:9,16
  70:21 88:1
  125:1,11
  195:12 257:14
**established**
  68:7 69:21
  125:6 254:3
**estimate**  32:16
  236:3 241:25
  246:20

**estimated**
  242:6 250:1
**estimates**  57:5
**estimating**
  32:14
**estimation**
  230:13,18,23
  232:2,18
  233:16 234:1,9
  235:4,10,20,25
  236:2 238:7,16
  238:20 239:1,3
  239:11,13,19
  240:7 241:20
  242:9,24 243:7
  246:12,15,17
**et**  29:20
**eua**  169:15,16
  169:18 170:24
  175:7
**eugene**  1:7
**europe**  179:20
  194:25
**evaluated**
  198:11
**evaluating**
  118:18 186:6
**evaluations**
  179:19 194:24
  275:16
**event**  21:17
  25:13,17,21,25
  26:6,10 32:10
  35:16 36:5
  38:7,12 58:10

58:14,15,17,20
  58:21 59:22,25
  60:2,7 62:1
  65:8,10 66:20
  67:6,8,16,22
  74:10,16,20
  75:1,8 89:21
  100:22 101:15
  140:20,23
  141:3 142:5
  171:10 172:5
  236:23 240:7,8
  240:9 243:4
  254:24 257:20
  259:8,13
**events**  89:23
  95:19 96:12
  102:5,8 124:2
  134:14 138:8,8
  141:15,18
  142:7 151:3
  259:11 260:17
  264:10,12
  265:15 266:9
  268:3,6,11,19
  269:22 271:8
  274:12
**everybody**  8:19
  35:23 91:23
  133:24 138:2
  149:1 249:1
  271:25
**evidence**  71:16
  84:7 94:20
  114:15,23

**[evidence - expert]** Page 25

115:4,10,12,15
128:15,17
134:17,20
136:1 158:4
184:8 196:8
**ex** 100:17
**exact** 41:6 60:4
114:10 141:9
197:16 261:11
**exactly** 15:22
18:4 32:2
41:10 60:4
70:13 74:24
83:4 89:19
93:17 94:7
108:15 125:20
126:6 127:14
139:2 152:25
162:2 195:9
202:1 214:5
221:18 233:18
250:22 256:7
258:6,20
266:12 267:25
268:9
**examination**
4:21 92:16
**examine** 94:20
105:9 150:21
252:10 260:16
**examined** 4:19
92:14
**examining**
143:12

**example** 12:5
47:13 89:15
108:5 173:2
215:24 262:23
268:8 269:21
**examples** 26:5
26:5 255:1
**except** 104:18
136:9 278:4
**excerpt** 16:7
117:6 217:24
256:16 257:13
262:12
**exchange** 15:7
15:10
**exclude** 77:5
173:20,24
**excluding**
76:23 78:10
**executed** 56:17
**executing**
56:18
**exhibit** 12:16
12:17,21 22:16
22:18 23:5,6
28:4,9,14,15
29:5,8 41:14
62:18,19 63:2
71:25 72:1
109:23 115:24
129:13,14
132:10,14
144:2,5 159:17
159:18 162:24
163:1 168:20

168:20,21
170:12,13,17
174:15,19
175:3 176:24
176:25 177:1
178:11,13
181:14,15
184:23,24
185:1 188:21
189:10,11,19
191:9 192:22
192:23 196:2,5
198:24 222:15
222:16 224:17
224:18 225:11
228:17,20
229:3,4,5,18,19
230:25 231:1
232:25,25
233:21 238:12
240:1 247:10
248:20,21
249:1,25
251:22 254:18
266:16,18
272:22 280:7,8
280:10,11,12
280:14,15,18
280:20,21,22
280:23,25
281:2,3,4,5,6,8
**exhibits** 10:23
19:8 22:17
32:12 184:24

**exist** 251:15
**existing** 243:21
**expand** 99:15
**expanding**
203:19
**expansion**
201:2,13
**expect** 100:13
100:18 109:12
**expected** 65:15
69:18 70:1
135:1
**expedited**
277:7
**experience**
27:10 29:9,11
31:12 34:23
41:16 48:3,7,8
48:9 49:24
52:13 73:1
75:6 85:6,6
88:11 135:5
215:8
**experiment**
200:11
**expert** 1:15 6:4
6:22 22:18
23:13,22 34:9
34:10 36:8
38:8,10,11,15
39:21 40:7,8
41:24 42:2
43:7,8,13,18,18
44:1,6,10
47:11,21 52:13

**[expert - far]**

Page 26

54:6,10,16,19 55:1,3,9 56:23 57:8,15 61:19 64:2 66:6 67:3 68:17 70:6 72:14 73:16,22 74:11 76:7,14 76:22,24 77:8 77:11,15 78:2 78:12,15,19,24 79:3,7,8 80:16 83:19,20,23,24 85:9,9,23 86:3 117:21,23 118:5 209:16 215:2,19 216:4 238:23,25 242:6,8 245:16 245:19 280:8

**expertise** 40:9

**experts** 37:19 37:19 44:12,19 52:24 65:8 80:16,17 81:1 81:1 88:20

**expires** 278:18 282:24

**explain** 54:18 56:16 70:16 88:3 89:15 90:2 94:18 114:10 142:6 212:6,8 244:20 248:17 264:4

**explained** 26:11 69:20 78:7 87:23 106:19 109:6 126:23 142:24 143:23 153:14 180:10 192:13 201:25 202:10 209:24 213:6 213:10 230:15 239:17 255:18 255:24 267:23

**explaining** 65:5

**explains** 64:8 69:8 128:11 195:20

**explanation** 257:20

**exposition** 262:11

**exposure** 174:6 187:11 190:17

**exposures** 167:15

**expounded** 198:9

**extend** 263:11

**extent** 44:9 75:19 139:11

**externally** 42:6

**exxon** 142:21

**exxonmobil** 142:21 256:21

**eyes** 11:8 12:13

**f**

**f** 117:13

**f.w.** 24:20

**fact** 63:20 64:16 67:18 68:19 100:1 107:17 114:21 118:4 120:17 120:19,23 121:25 123:21 132:2 133:11 134:12 136:2 137:13 145:20 146:13 147:4 161:1 164:11 167:7,22,24 168:1,3,11 170:6,8,13,18 170:25 172:8 173:1,9 174:15 175:3,6 176:4 214:11,14 237:8 251:6 259:17 264:14 274:19 280:18 280:20

**factor** 16:1 131:12,16,24

**factoring** 47:21

**factors** 105:7 131:11 138:14 209:8

**facts** 97:21 98:8,24 100:11 104:23 105:4

143:16,22,23 149:3 153:20 258:4

**factual** 105:24 113:17,21 114:6,10,15,24 115:5,13,20

**failed** 18:3

**failing** 68:9 70:24

**fair** 35:13 43:5 110:5 122:12 154:22 172:12 187:18 192:6 226:1

**fall** 172:5

**false** 104:17 107:20 111:25 122:20 123:19 126:12,21 127:3 128:14 129:8 145:1 167:13 171:9 171:10,24 172:11 176:19 187:8,14 249:20

**familiar** 11:10 167:18 244:24

**familiarity** 33:11

**family** 27:20

**family's** 27:14

**far** 8:2,15 136:24 174:21

**[fast - five]**                                                    Page 27

**fast**  102:21
  157:6
**father**  30:1
**fault**  144:6
**fda**  96:2 104:24
  128:22 129:6
  129:15 140:4
  143:4 144:7,15
  146:10 149:8
  149:16 150:11
  151:17,25
  152:18 153:19
  155:5,22 156:4
  157:22 160:17
  160:20 166:5
  166:14 179:20
  194:24 210:24
  224:1 225:1
  256:9 280:11
**fda's**  145:6
  153:10 156:17
**february**  1:11
  3:3 13:8
  279:18 282:3
**federal**  191:22
**feeling**  8:18
**fell**  139:14
**felt**  120:6
**ferrell**  13:24
  17:25 18:1
  19:22 117:24
  184:5 196:7
  232:12,16
  237:4 239:2,20
  240:15,19

241:17 242:14
  243:19 245:2
  245:11 248:13
  257:18,23
  261:2 262:2
**ferrell's**  118:25
  143:10 229:10
  229:20,24,25
  230:10 232:22
  232:24 234:18
  239:7 243:8
  248:22 249:6
  250:11 251:23
  255:12 257:10
  258:19 259:22
  281:4,6
**fidelity**  82:6
**fifo**  253:12
**file**  57:14
**filed**  3:20 23:1
  23:2,14,22
  44:10 54:25
  56:2,4 57:18
  60:25 61:9,20
  76:15 77:16
  78:16,24 79:3
  79:17
**filing**  50:10
  61:2 79:18
**final**  36:3,6
  138:23
**finally**  68:17
**finance**  20:17
  21:8,10 22:5,7
  23:18 24:21

25:6 26:8,13
  26:15 34:24
  141:15 254:23
**finances**  30:21
**financial**  28:2
  31:13 35:5
  37:23 40:13
  99:9 109:13,15
  127:12 149:25
  153:2 214:21
  220:23 276:1
**find**  19:24
  86:25 100:14
  141:13 243:15
  251:16
**finding**  86:11
  92:20 232:14
  250:11
**findings**  56:18
  255:16
**finds**  196:7
**fine**  7:23 91:24
**finestein**  44:15
  44:17
**finish**  7:5
  205:13,21
  250:6
**finished**  262:6
**finishing**
  205:20 244:3
**firm**  17:17 18:8
  18:9 31:18
  142:16 143:8
  247:17

**firm's**  262:19
  263:10
**firms**  35:21
  142:18 256:19
**first**  4:18 5:2
  7:10 10:3 20:4
  38:23 46:7
  54:5 55:19
  63:12 65:14
  83:23 88:7
  89:17,24 90:5
  90:8,10,23
  91:6 93:4 97:6
  97:7,13,24
  98:15,21
  100:14,20
  102:10 122:19
  141:2 145:9
  146:3,12
  160:24 170:22
  171:16 177:15
  178:25 194:16
  200:22 214:6
  226:9 229:10
  229:20,24,25
  281:4
**fit**  199:21
**five**  10:19
  50:15 52:23,23
  53:16 77:24
  89:22 99:16
  129:22,22
  130:4,5 163:13
  228:4 254:14
  254:16

**[flawed - gelt]** Page 28

**flawed** 230:17
**flexibility** 248:2,6
**flexible** 247:19
**floch** 2:7
**floppy** 205:10
**florida** 2:5
**fluffy** 104:2 216:20 220:16
**focus** 22:13 26:7,9,15,17 39:21 40:5,6,8 40:10,19 80:15 141:4 150:25
**focused** 80:25 186:7 188:17
**focusing** 227:23
**folder** 22:17
**follow** 277:8
**followed** 252:19 256:9
**followers** 109:11
**following** 41:18 45:18 85:1,12 120:17 131:15 134:13 157:12 170:3 171:12 172:20 180:21 205:2 212:12 212:15 220:12 262:15 274:22
**follows** 4:20 48:21 92:15

94:5
**footnote** 142:13 217:12 240:5 256:15
**forecasted** 247:2,3,4 248:10
**foregoing** 278:3
**form** 15:1 16:3 43:14 48:1,16 64:24 66:8 69:3 70:11 73:12 83:2,8 83:18 85:3 87:3,18 93:14 93:21 94:12 97:17 98:17 99:10 107:4 108:11 109:3 114:17 115:6 118:6 119:21 123:11 124:20 125:15 126:14 127:8,25 133:17 136:5 137:3 139:1 146:17,22 147:9 148:18 149:11 150:15 151:19 152:22 153:12 154:10 161:14,24 162:19 164:1 164:15,25

165:15 166:7 175:10 180:7 190:22 201:22 202:8 207:12 212:4 213:23 223:4 265:11 266:11 267:19 268:21 270:1 270:18,24 273:6
**formal** 12:10 12:13
**formats** 139:24
**formed** 276:13
**forming** 268:7 268:23 269:3
**forms** 216:6
**forth** 279:7
**fortunes** 155:20
**forward** 102:21 103:17 114:21 157:6 234:15 238:24 239:4
**found** 64:2,4 84:24 85:11 87:15 88:5 230:5 237:9,10
**foundation** 190:23 192:12
**founded** 29:25
**founder** 194:20
**four** 14:14,15 76:24 77:2,8 77:11,23 89:25

93:1 130:18 166:24 174:23 174:25 259:24
**fourth** 144:20 163:15
**frame** 223:1
**framework** 259:5
**fraud** 264:8
**frequent** 216:20 218:4
**frequently** 25:25 38:12 238:4
**friday** 14:7
**front** 36:22
**full** 5:4,6,8 30:25 31:3 97:8,13 160:11
**fully** 7:6,8 95:19,20 97:2 97:6,10
**fund** 25:24
**funds** 135:11 136:12,12
**further** 92:14 113:24 198:10 207:5 279:11

**g**

**gary** 201:1
**gazing** 10:24
**gelt** 1:3 3:18 252:3,13 253:5 270:8,14,22 271:22 282:2

**[gelt's - good]**                                    Page 29

**gelt's** 252:8
**general** 84:16
  99:2 138:12
  149:9 151:7
  156:7 168:7
  229:23 240:6
**generalized**
  244:25 245:4,9
  245:15,18
  246:4 247:14
**generally** 35:6
  40:22 80:14
  83:12 86:14
  115:2 127:16
  141:9 150:24
  154:21 168:14
  188:12 238:3
  239:6 246:1,9
  249:18 261:17
  261:18
**genevieve** 2:12
**germane**
  154:13 229:1
  231:17 235:9
  235:19
**gestures** 7:16
**getting** 32:9
  35:23 42:2
  204:19 244:2
  254:9
**give** 7:6 32:4
  160:25 175:20
  258:15 262:3
  263:14 268:8

**given** 36:4 58:4
  75:3 95:1
  99:12 101:2,21
  108:16 125:23
  134:25 135:12
  136:13 138:14
  139:19 277:17
  279:9
**giving** 5:3
**gls** 232:17
  243:8 248:14
**go** 3:13 4:23
  6:24 8:2 16:15
  20:8 26:25
  28:4,19,20
  51:6 55:17
  62:5 64:12
  67:9 68:15
  71:3,25 82:14
  83:11 86:2
  91:11 93:2
  101:20 103:16
  105:8 107:20
  109:22,23
  111:19 113:13
  115:23 119:2
  119:23 121:13
  124:1 126:4,24
  128:2 129:1
  132:9,11 136:7
  138:22 139:18
  140:18 142:13
  144:1,19
  147:11 148:3
  149:13 150:21

  152:24 156:23
  160:10 162:24
  163:13 166:22
  169:24,25
  170:21 173:11
  175:2,15 176:8
  177:14 178:24
  180:16 181:14
  183:14,18
  184:18 186:24
  187:23 190:3
  191:9,14,15
  194:13 195:19
  196:14 198:3
  200:23 201:23
  202:23 208:21
  220:24 221:20
  223:9,11,13
  226:5 228:17
  234:5 238:12
  239:25 243:15
  249:10,11
  250:4 251:4,22
  252:1 254:19
  257:4 266:22
  266:23 275:11
  277:3,15
**goes** 147:2
  200:3 203:2
  217:7
**going** 3:2 4:23
  5:2 7:25 8:17
  11:4 18:11
  22:14 23:4
  24:17 27:2

  29:4 34:5 36:9
  41:12 44:22
  45:18 47:5
  53:21 66:4
  87:24 91:13
  92:3,23 100:18
  105:1,12 106:9
  108:17,18
  113:24 115:18
  115:20 116:20
  120:24 129:11
  130:14 132:4
  133:20 134:19
  138:3 140:24
  141:11,13,16
  162:6 168:19
  169:16 175:5
  181:5,13
  182:13 184:22
  184:24 197:8
  198:24 206:2
  206:11 209:1
  212:17 218:24
  221:17 225:10
  228:9 229:18
  242:16 244:4
  244:10 248:19
  260:23 264:20
  272:16 274:16
  277:21
**goldstein** 45:6
**good** 3:1 4:22
  50:15 155:18
  188:5

**[governing - helping]** Page 30

**governing**
68:21
**governor**
103:18 181:25
182:7,7,8
183:15 184:1
203:1,3,10,18
204:5,13 205:2
205:2 206:9,16
206:18 207:10
207:19 208:9
208:20 209:2
211:23 267:13
**governor's**
206:3 208:14
209:19 210:10
211:6,19
**graduate** 20:5
20:13 21:23
22:2 24:20
27:23
**graduated** 21:1
27:11,12
**great** 197:6
**greater** 137:13
237:2
**group** 186:7
**growing** 216:18
**grupo** 88:22
93:5,13 95:9
95:11
**grupon** 46:10
**guess** 11:9
14:10 18:22
27:15 31:7

34:17 38:1
40:9 43:17,22
48:4 53:11
54:18 64:10
70:3 83:9 90:1
97:4,7,23 99:2
99:23 138:23
141:2 148:12
166:22 209:17
223:7 228:24
230:15 231:23
232:9 253:14
273:13
**guessing**
148:21
**guidance** 33:13
**gun** 119:24
**gym** 27:16
**gyorkerwin**
2:13

**h**

**h** 5:7 280:5
**half** 8:16 14:15
177:10,11
250:20
**halliburton**
106:7
**halt** 210:21
260:20,21
**halted** 205:3
216:17 219:21
220:15
**halts** 210:20
256:8

**hand** 190:4
266:23 279:17
**handled** 11:5
**handling** 30:20
144:24
**hanging** 9:2
**happen** 24:7
**happened**
84:12 89:19
97:9 102:5,8
141:10 148:7
148:10 152:18
184:14 276:12
276:15,23
**happening** 11:1
**happens** 97:13
97:24 100:2
**happy** 53:5
126:24
**hard** 42:15
46:6 58:3 60:3
74:24 83:9
93:16 94:6
95:12 97:19
98:5 106:17
137:18 148:5
162:1 261:24
276:10
**hartzmark**
45:2
**harvard** 5:14
**hauling** 54:21
60:12 61:7,18
79:11

**hc** 177:1,4,6
280:21
**hca** 46:11
**head** 7:16
**header** 199:3
**heading** 75:22
**health** 159:20
160:3 182:12
191:22 201:16
203:22 280:13
**healthcare**
167:8,19,23,25
168:2,12 170:6
170:7,14,18,25
172:9 173:1
280:18
**hear** 8:3 74:18
123:2,3 133:22
135:3,19
136:19 161:17
162:6
**heard** 3:9
**hearing** 4:12
**heart** 241:5
**hedge** 136:12
**held** 36:11
203:1 253:10
271:22
**help** 27:19
33:14,17 84:1
**helped** 80:5
81:12 88:20
**helpful** 257:11
**helping** 32:13
80:16,25 83:20

**[herbert - impacting]**

**herbert** 201:1
**hereunto** 279:17
**hesitating** 215:15
**heteroscedast...** 244:18,19,21 245:22 246:2,5 247:21 248:3,7 249:14
**hey** 200:6 269:6
**high** 27:11,12 29:11 96:1 222:8
**higher** 216:19
**highlights** 205:9
**highly** 103:1 196:10 231:19
**hindenberg** 103:24
**hindenburg** 205:6 210:17 210:21 212:18 212:22 213:20 214:11 215:1 216:14 219:14 219:23 221:22 222:17,21 223:8 224:24 225:11,14,20 226:2,16,18,22 260:21 281:2

**hindsight** 172:18
**hired** 52:25 53:13 79:13,15
**historically** 124:9
**history** 150:22 216:16 219:19 220:6,14,21 221:11
**hoc** 239:21
**hoffman** 59:4 59:18,23 60:6
**hold** 108:20 132:4,19 202:4 205:12,19 209:10 260:24
**holdings** 46:11
**holds** 103:19
**holistic** 140:10 199:21 208:6,7 211:21 275:8 276:3
**holistically** 140:5 199:18 208:2,4 211:1 211:14 212:14 219:9 274:12
**honest** 24:10 27:17 56:6 249:9
**honestly** 61:5 264:19
**hopkins** 159:19 160:3 186:2,4

186:22 187:7 187:19 188:9 188:11,25 189:17 280:13
**hospitals** 201:17
**hour** 8:16,16 17:1 174:23 195:22
**hours** 14:6,15 14:17 17:2 174:24,25 254:14,16 259:24
**huh** 7:15 252:15
**hundreds** 179:6
**hyperlink** 188:22
**hypothesis** 68:13 70:24,25 99:11
**hypothetical** 97:4,21 98:9 99:19 106:18 148:4,9 152:8 152:17 276:18 276:19

**i**

**idea** 93:18 94:8
**identification** 12:19 22:21 62:21 129:16 140:25 159:21

163:3 168:25 170:16 174:17 177:3 178:15 185:3 192:25 222:18 224:20 229:21 231:3 248:23 266:20
**identified** 126:1 143:18 213:11 214:2
**identify** 68:1,9 72:8 145:1 211:9 216:1 273:23
**ignored** 180:4
**immaterial** 87:12
**immediate** 157:12
**immediately** 147:21 158:16 187:12 190:16
**impact** 26:1,2 70:1 87:11 95:6 97:8 101:7 156:3 165:8,9 197:6 212:9,10 235:5 235:7,8 236:10 236:17 276:4
**impacted** 99:12 153:5,6,22 188:19
**impacting** 69:25

**[impacts - information]** Page 32

**impacts** 94:22
**imperfect**
46:14 88:22
**implemented**
18:6
**implication**
262:22 265:2
269:15
**implications**
156:1 262:18
**importance**
211:17 221:1
**important** 7:13
118:17 144:25
152:15 164:6
172:23 206:23
226:11 236:21
260:12 268:25
270:6 273:14
274:23
**impossible**
67:18
**impound** 109:1
109:2
**impounded**
69:18 260:2
**imprecise**
259:13
**impression**
111:25 122:20
123:19,24
125:22,25
127:3
**inadmissible**
63:16 64:3,4,9

64:15
**inappropriate**
100:10 230:18
240:13 251:21
261:3
**incapable**
64:15
**include** 75:8
77:6 78:4
155:8 171:12
203:23 208:8
215:1,10 216:7
**included** 40:17
78:8 166:4
211:23 215:5
215:19
**includes** 72:17
**including** 78:7
240:20
**incomplete**
106:18 148:8
**incorporate**
209:12
**incorporated**
109:16 209:6
209:14,21
272:8
**incorrect** 68:20
70:8 175:20
**incorrectly**
18:2
**increase** 103:2
139:23 145:19
147:14 148:15
150:2 158:15

183:22 184:11
184:13 192:19
195:18 196:1
196:10,18
231:20,21
236:8,9 237:14
237:15 274:18
**increased**
220:11
**increases**
157:10
**incubation**
191:24
**independent**
275:16
**independently**
113:8
**indicate** 127:13
133:14 134:7
137:15 174:13
233:4
**indicated**
159:10 196:5
**indicates**
102:23 134:11
173:6 229:6
**indicating**
176:5
**indication**
137:5,12
207:15 208:12
210:1
**indisputably**
242:4

**indistinguish...**
184:7
**individual** 89:2
201:8
**individuals**
36:1
**indymac** 46:12
46:15
**infected** 163:10
**infection**
187:13,22
188:14
**inferring**
262:17 263:8
**inflated** 88:2
112:6 114:4
**inflation** 86:18
86:22,23 87:1
87:16 235:11
236:3,11,12
253:23
**influence** 9:9
**inform** 97:11
140:6
**information**
4:25 21:14
26:1,2 65:13
65:15 67:13
68:3 69:17,24
70:1,18,21
75:17 90:17
94:21,24,25
95:2,6,21
97:15 99:10,11
99:13,18 100:6

**[information - investor]** Page 33

101:2,25
102:23 103:23
104:1 105:4
106:4,8,10,21
106:22 107:3
107:15 108:6
108:10 109:2
115:17,25
116:18,25
118:19,22
128:19 130:24
131:15,22
133:16,23
134:9,23 135:1
135:13,14,15
136:4,14 137:2
137:22,25
138:5,15,20
141:14 142:6
142:12 143:7
145:15,25
146:4 147:8
148:6 152:16
152:20,21
153:1,4,21,22
153:25 154:1,2
154:16 157:18
158:12 162:4
166:12 169:22
170:3 187:25
192:1,15
193:17,21
194:3 197:16
197:20,25
199:10,16,17

204:16,18,20
206:21 207:6
208:11 209:6,7
209:9 210:14
211:15 212:13
213:12 214:4
219:17 220:8
221:9 222:9
227:3,18
236:22 237:18
251:12 255:21
257:16,22
258:2,9,10
260:13 261:11
262:17 263:9
264:8 265:16
266:3 267:2,25
268:16,17
272:7 273:9
275:20 276:11
276:16
**informative**
140:24 141:25
208:15
**informed** 12:11
95:19 121:2
199:25 201:9
**informs** 151:5
**inhibit** 9:13
**initial** 16:6
71:24 75:7
220:18 269:13
**initially** 31:22
67:20

**input** 59:2
**insider** 47:2
**insignificant**
90:8,10,12
97:25 98:3
**instadose** 55:20
**instance** 85:22
95:4 97:12
98:12
**instances** 6:20
96:25
**instant** 132:8
136:10 143:17
148:10
**insufficient**
63:19
**intellipharma...**
62:7
**intend** 114:13
115:12
**intended**
111:24 112:22
**intending**
11:13
**intent** 104:3
112:15,16,20
113:5,9 250:22
**intention** 11:23
**interested**
279:14
**internal** 136:11
186:1 189:13
**internally**
37:18 41:23
42:6 247:17

**international**
62:7
**internet** 3:8
**interpret**
120:15 153:9
174:4 192:15
**interpreted**
118:21 124:3
127:14 149:21
149:24 153:3
154:24 162:3,9
162:22 165:7
165:19 180:24
187:24 196:16
237:16
**interpreting**
198:20 222:9
**intervals** 50:4
142:15 256:18
**introduce**
22:15 129:12
184:23 248:20
**introduced**
189:10 222:15
265:16
**introducing**
230:24
**introductory**
4:24
**investigate**
110:9
**investments**
29:20 110:16
**investor** 221:14
270:14

**[investors - know]**

**investors** 16:9
95:19 101:3
104:14 107:1,7
107:21 108:3,7
108:14,16,20
110:10 111:25
112:2,20,22
114:5 120:14
123:18 125:2,3
130:22 131:2
131:14,21
132:3 133:14
133:19,21
134:2,7,12,16
134:18,21,25
135:6,12,22,23
135:24 136:2,9
136:17,18,24
137:7,10,14,19
138:17,25
139:9,11
145:18 151:11
151:11 152:15
153:3,9,22
154:3 155:25
156:9,10,19,20
158:16 162:3
177:16 188:16
192:14 221:12
221:17 231:19
260:22
**involve** 30:15
**involved** 41:2
**involvement**
216:16 219:20

**iowa** 103:18,18
103:21,22
143:1 203:1,4
203:15,18
204:3 205:1,2
206:3,4,16
207:19 208:20
210:16,20
211:6,19 256:6
260:19 267:13
**ipo** 67:14
**irrelevant**
261:3
**irrigation**
29:24 30:2,4
30:10,24 31:4
**islands** 1:3
**isolation**
199:16 227:20
227:22 276:12
**issue** 14:24
15:24 16:2
84:4 87:24
93:8,9 99:18
111:4 132:5
149:22 191:7
205:10 216:20
218:3 220:16
239:16
**issued** 13:24
59:12 79:17
129:6 145:17
155:4 166:17
222:17 223:8
227:25 259:24

281:2
**issues** 39:6
47:15 84:4
145:2 153:17
171:13
**issuing** 84:21
227:1
**items** 110:19

**j**

**james** 1:7
**jeff** 2:18 3:25
**jnp** 1:2
**job** 43:12 65:5
**jobs** 29:13,16
29:22
**john** 44:20
**johns** 159:19
160:3 186:1,4
186:21 187:6
187:19 188:9
188:11,24
189:17 280:12
**join** 193:11
200:14,17
202:17
**joined** 31:19,22
**journal** 19:23
103:15 105:21
105:25 106:2,4
109:10 182:18
238:3 256:4
**judge** 65:21
68:14 102:17
107:22 111:16
124:9 152:11

**judge's** 13:22
196:23
**judgment**
56:11 76:16
**july** 62:19 63:2
280:10
**jumped** 119:24
**jurisdiction**
55:24 56:1

**k**

**keable** 2:17
**keep** 140:11
**kim** 203:1,18
**kind** 74:8 93:1
108:7 188:20
**kits** 119:6
**kleit** 44:25
**knew** 108:16
138:16 151:14
154:21 178:1
260:22
**know** 7:1 12:10
13:8 14:4
18:20 21:2,7
21:12,19,21
22:10 24:7,9
24:13 26:19
28:8 29:19
30:13,15,16
32:2,9 33:10
34:25 35:12,18
36:22,24 37:15
37:16,18,21
38:3,5,17 40:5
40:10 41:6,10

**[know - league]** Page 35

42:3,15 43:20 46:7 48:4 49:22 52:21,22 56:3,6 57:11 58:3,13 59:24 61:5,10 62:23 63:10 70:13 71:3 72:1 75:16 76:12 80:25 81:23,24 85:16 86:5 89:1,8,20 93:18 94:8 95:13 96:10 97:20 98:5,24 100:17,21 101:22 102:12 104:11 106:7 106:20 107:16 107:23 108:3 108:15,17 109:24 115:19 116:23 117:13 117:15,24 119:4 120:4 121:22,23 128:5,23 129:17 130:3 135:5 137:12 137:16,18 139:20 140:21 141:11 142:20 145:16 148:20 148:22 152:9 152:25 153:2

154:7 155:9,25 157:14 159:7,8 159:13,22 160:23 162:1,6 169:1 173:10 174:10 177:5 178:11 179:10 182:11,13 184:13 185:4 191:6 193:2 198:4 209:7 215:13 219:18 221:15 222:20 224:21 228:5 235:12 237:23 237:25 238:2 240:2,15,18,23 241:18 244:1 245:17 247:23 250:6,21 251:14,20 253:13 254:11 257:7,19 258:16 259:11 260:1,3,8 262:3 263:15 268:14 270:4 271:24,24 272:24 276:12
**knowing** 97:20 140:2
**knowledge** 25:5 76:19 145:6 197:21

**known** 186:8 192:2 219:22

**l**

**l** 4:17 92:12
**lab** 182:11,12 182:24
**labeled** 217:14
**labs** 103:13 193:12,20 200:18 202:4 202:17
**lack** 88:6 275:2
**lacks** 190:23 192:12
**laid** 260:5
**lake** 103:14,16 105:14,20 106:1,13 109:8 142:25 178:14 192:24 193:4 193:10,24 195:8 196:21 196:25 197:1,9 199:9 200:12 202:15 210:18 224:14 256:2 260:18 267:17 280:22,25
**landscape** 27:14 30:1
**landscaping** 29:24 30:4,11 30:24 31:5
**language** 72:11 72:17,22 73:3

73:8 102:19 118:13 121:17 263:7 272:2,4
**large** 46:17 49:22 103:1 139:22 145:19 147:14 231:20 251:8
**larger** 137:10
**largest** 250:24 250:25
**larry** 45:3
**late** 38:1 195:22 266:24
**launch** 203:21
**law** 67:9 87:12 152:24
**lawyer** 8:3 56:14 57:10 75:12
**lay** 110:24
**laying** 259:5
**lead** 41:17,21 41:22 42:10,19 42:22 43:1,6 43:12,25 44:6 44:14 45:17,20 46:1 47:6,22 48:13,15,23 49:1,3,6,9,13 50:7,24 52:14 271:18
**leading** 101:22
**league** 210:7

**[learn - longer]**                                                    Page 36

**learn** 21:16 103:9 104:23 138:15
**learned** 25:16 122:15,16 145:9,24 146:13 204:18 251:11
**learning** 32:19 140:22 243:16
**led** 96:5 121:4 122:9,17,25 123:7 124:17 146:25 176:21
**left** 11:9 92:23 190:11 194:16 244:5
**legal** 4:1 15:2 16:4 43:15 66:10 68:21 69:4,6 70:9,14 114:18 115:7 119:22 146:23 151:20 152:23 214:3 270:25
**length** 143:21 180:11
**lesson** 163:17 164:13
**letter** 169:25 170:24 175:7
**letting** 228:5 257:7
**level** 21:6,6 96:1 156:14

196:5,6 229:8 231:15,16 232:1,5,6,8 233:5,8,9,11 237:3,5,7,21,22 238:2
**levels** 33:21 34:1
**lexecon** 2:17
**lie** 36:7
**life** 35:1
**lights** 9:25
**likelihood** 171:9,24 172:2
**likely** 48:11 49:14 89:12 95:16 187:9 191:25
**limit** 173:15
**limited** 1:3 3:18 73:15,21 190:15 241:22
**limiting** 217:22
**limits** 223:25 224:25
**lincoln** 182:18 182:25
**line** 87:13 282:4
**lines** 163:14
**link** 191:8 223:25 224:5
**linked** 196:17
**linking** 155:20

**list** 28:18 44:21 45:19 48:12,14 48:22,24 49:2 49:4,5,7,20,23 49:25 53:10 54:9 76:21 79:25 88:13 119:25 120:6,7 171:13 193:14 216:18
**listed** 23:23 43:24 44:5 45:17,25 47:6 47:16 49:13 50:7,23 51:4,8 51:14 52:10 53:8,11 55:4 55:10,15 59:4 59:6 60:15 63:6 76:21 77:9,17 79:7 116:8 216:5 219:13 220:6
**listen** 136:19 164:17
**literally** 157:11
**literature** 14:3 65:24 68:12 82:5 99:6 100:25 138:7 140:11,14 141:5,15,20 143:10,10 238:23 242:15 254:23 257:17

259:20 263:22
**litigation** 24:2 37:23 39:8,18 40:16 41:1 46:21 48:14,25 49:8,12 52:1,8 52:15,20 74:2 75:5,14 261:15
**little** 7:6 41:3 70:3 116:13 130:21 172:18 175:2 210:7 226:14 230:21
**llp** 2:2
**load** 28:11
**local** 108:25 201:17
**localized** 109:17
**locate** 117:11
**located** 1:16 5:13
**logix** 16:10 168:23 169:11 170:7 171:1,7 171:25 173:23 177:17 178:1 195:13 280:16
**long** 5:8 8:20 16:24 37:1 39:17 42:13 107:20 163:16 174:6 254:11
**longer** 87:9 142:5,15

**[longer - market]**                                      Page 37

256:19,24
**look** 24:18 26:1
31:11 89:3
94:23 99:9
102:4,4 104:8
105:1 132:16
132:23 133:1
140:18 154:20
157:24 172:14
175:14 187:2
190:4,9 194:19
210:13 217:12
223:10 227:21
244:4 259:14
261:6 265:14
266:14
**looked** 13:25
86:3 90:13
157:17 170:24
197:8 267:15
**looking** 10:20
10:22 11:8,11
19:4 45:16
51:3 54:3,5
76:20 96:21
102:7 134:3,4
134:5 172:25
216:13 260:6,8
274:25 276:3
**looks** 19:23
22:25 23:16
51:23 169:7
188:21
**loop** 52:12

**loss** 47:8,15,22
47:25 57:24
64:17 68:22
75:10,13,21,23
87:25 88:9
110:7 111:1,5
111:8 116:21
213:7 214:20
215:25 229:1
243:5 254:1,2
254:7 261:4
265:5
**losses** 94:22
110:10 114:5
**lot** 32:9,9 38:20
66:15 138:11
155:10 218:18
247:16,22,25
249:7 265:15
**loud** 218:9
**lunch** 91:10,21
92:5,18

**m**

**made** 15:12
49:20,25 82:10
82:16,20 95:17
108:25 110:17
114:2 128:14
142:17 151:1
152:19 153:4
154:25 169:22
170:5 184:1
219:25 239:20
275:1,18 278:8

**mail** 11:15 12:6
**mainstream**
109:14
**maintain** 86:21
**maintained**
87:2 179:3
**major** 20:16
21:4,9
**majority**
133:25
**make** 7:2,11
10:6 11:21
17:19 18:24
35:9 38:3
121:16 200:23
225:20 232:19
251:18 258:21
271:11 275:24
**makers** 102:2
**makes** 77:22,23
77:23,24,25
164:18 172:21
241:4 263:24
**making** 41:25
65:23
**manage** 36:24
**managed** 38:5
**management**
167:6 173:19
275:19
**manager** 25:23
**managing**
25:24 33:22
34:3,3,12
37:16 42:5

**manifested**
172:16
**manner** 4:6
139:24
**manufacturers**
102:3
**march** 159:18
160:2 161:6,21
163:7,24 166:1
177:6 178:3
280:12
**marcus** 2:2
**mark** 12:15
45:5
**marked** 12:18
19:8 22:17,20
62:21 129:15
159:20 163:2
168:24 170:15
174:16 177:2
178:15 184:23
185:2 192:25
222:18 224:19
229:21 231:3
248:23 266:19
**market** 13:20
57:21 65:17
69:11,14,22
84:4 90:18
95:1 97:11
101:25 106:22
109:14 111:10
111:13,16
120:9,21 121:3
121:3,9,14

**[market - mean]**  Page 38

122:9,24 123:7 123:23 124:3 124:18 127:6 127:14,22 128:3,6,16,18 133:24 137:25 138:12 145:9 145:18 146:3 146:13,25 147:15,16 148:1,13,21,23 149:4,6,7,21,24 150:12,21 151:14 154:7 154:20,24 155:14,14,19 157:20 158:6 158:13,22 159:5 162:2,12 162:21 163:23 164:4,9,23 165:4,6,12,19 166:20 172:20 178:1 180:3,20 180:24 184:14 187:24 188:3 188:16 193:21 195:12 196:15 198:20 199:25 204:12,21 208:13,18 209:4,4,15,18 209:19 211:2 213:13 236:22 237:16 241:11

242:2 243:22 247:1 251:11 260:1 262:16 263:8 264:24 265:10,17,18 267:18 268:2,5 271:24 274:17 275:9,17,20

**market's** 197:21 212:15 213:15,17 271:25

**marketing** 30:17

**marketplace** 260:13

**marking** 224:16

**marriage** 279:13

**martha's** 30:2

**maryland** 76:2

**massachusetts** 1:17 5:9,15 24:1,5 59:8 60:16 61:3

**master** 22:5

**match** 253:8

**matched** 253:9 253:12

**matera** 1:17 4:2 279:3,22

**material** 15:11 63:20 64:16 68:18 153:21

156:18 158:20

**materiality** 75:7,16 111:3 237:18

**materials** 18:25 19:1 159:3

**math** 45:22 48:5

**matrix** 246:22

**matter** 3:17 6:14,17 9:5 10:13 13:17,24 15:13 18:6 23:2,21 24:12 38:25 52:9 53:13 60:19 61:7 67:19,22 69:23 72:17,20 74:9 77:22 87:12 88:3 94:24 99:2 106:9 111:8 136:10 143:17 148:11 151:6 156:7 168:7 196:23 205:24 214:19 227:14 229:23 239:16 253:4 261:12 279:15

**matters** 38:19 54:10,15 75:17 86:8 88:23 106:5 107:16 108:6 174:9

226:8

**mba** 22:8 23:8 24:21 25:5,7 25:16 27:24

**mckinlay** 258:14,21 259:4,16 261:7 261:9,20

**meadow** 5:8

**mean** 10:3 15:22 29:12 35:20 37:13 39:12 40:22 41:21 43:9 69:21 70:14,25 79:16 83:4,10 93:16 94:6,17 97:20 98:19 105:23 115:2 115:14 121:18 122:4,6 139:2 142:19,23 148:4,8 149:15 162:1,4,5 163:10 164:3,3 165:20 172:13 180:10,22 190:21 209:12 209:16 211:24 217:5 219:1 220:10 222:6 234:4 241:14 242:13 243:14 245:6 248:5 249:19,24

**[mean - misimpression]**

250:21 251:2
251:19 258:23
262:9,11
264:25 267:21
268:9 269:11
271:22 273:16
276:10
**meaning** 50:25
57:12 69:7,11
**means** 18:9
173:13 175:24
**meant** 14:21
48:3 114:14
**measure** 95:5
101:6 214:20
257:15
**measured**
236:5
**measuring**
20:21 240:16
261:19
**media** 3:14
53:19,25 82:11
82:12 92:1,9
107:9 109:15
127:12,13
130:12,18
150:1 181:4,10
228:8,14 269:5
269:18 276:2
277:19
**mediation**
54:23,24
**medical** 163:18
164:14

**medications**
9:10 168:15
**medicine** 186:1
189:14
**meet** 16:19
**meeting** 16:24
17:10 96:13
**meetings** 16:22
17:9 36:23
**meets** 35:10
**members**
110:16
**memorandums**
136:11
**memory** 14:5
21:18,21 46:13
46:14 52:21
68:6 85:14
87:6 88:19,22
91:4 93:7
95:10 109:7
128:25 157:25
159:14
**mention** 155:23
202:20 204:9
216:24 217:1
220:5 221:10
232:10
**mentioned**
16:16 77:18
79:14,16 93:5
96:17 105:13
110:20 204:3
206:19 212:23
213:2 214:12

215:6,11,21
216:9 218:7,11
218:21 223:6
224:14 232:4,5
**mentioning**
227:23
**mentions**
157:21
**menton** 2:18
3:25
**merely** 66:21
**merrell** 63:18
**messages** 11:16
**met** 14:5 17:11
42:4
**method** 246:5
**methodologies**
60:4
**methodology**
93:9 232:17
245:1 249:12
259:19 261:18
**methods** 17:24
18:1,5 35:3
**metrics** 198:7
**miami** 2:5
**micah** 44:20,24
**michael** 2:6,17
17:11 45:2,5
**michelle** 55:19
**microphone**
9:24
**mid** 199:7
**middle** 8:23
71:7 185:20

217:12 249:11
256:6
**miguel** 17:21
247:23
**mike** 53:15
**millions** 109:13
**minahan** 44:20
**mind** 5:3 6:6
10:3 45:9
110:1 228:5
255:7 257:6
**mine** 229:14
**minimize** 171:8
172:2
**mining** 89:11
89:14,19,21
96:6
**minute** 50:15
53:16 72:7
129:22 228:4
**minutes** 10:19
129:20,23
130:4,5 174:23
244:8 254:15
254:15,16
**mischaracteri...**
263:25
**mischaracteri...**
263:22 264:15
**mischaracteri...**
48:17 66:9
254:23
**misimpression**
120:22 127:2
147:3 160:25

**[mislead - nature]**

**mislead** 104:3 111:24 112:22

**misleading** 112:20 113:5 125:10 126:2 126:13,21 255:15 263:23 264:19

**misled** 16:9 112:2 121:19 128:16,18 165:3

**misrepresent...** 103:5 113:3 124:25 151:22 178:23 220:19 269:13

**misrepresent...** 15:12 102:10 110:11 112:17 112:19 113:4 114:3 123:17 196:12 204:22 213:8,16 254:8 262:18 263:9 269:14

**missed** 110:3

**missing** 45:1

**misspoke** 89:20 178:22

**misstatement** 86:17 87:2

**misstatements** 86:21 87:8 111:23 222:13

**misstates** 107:4 109:3 164:25 180:7 201:23 207:12 212:4

**misunderstan...** 212:15 213:15 213:18

**mix** 95:1,20 99:13 101:2 105:4 106:21 118:18 135:14 136:14 137:25 154:1 187:25 197:25 236:21 260:12 273:9 275:20

**mixture** 39:24

**mnrlawfirm.c...** 2:6,7

**model** 56:16,19 57:4,4,6 59:2 234:17,18 243:9,9 245:10

**models** 32:20 33:12 245:18 245:25 247:25

**molecular** 198:8

**moment** 5:23 9:22 29:6

**monday** 182:22

**monitor** 11:7

**monitors** 11:8

**month** 42:17 177:10,11

234:2 235:3 242:23 250:21

**months** 32:4 33:4 234:10,11 234:13 242:10 242:12,13,13 242:18 262:15

**morgan** 143:15 263:13 264:6

**morning** 3:1 4:22 103:7 138:1 146:1 151:4 200:4 266:24

**mosquito** 240:23 242:21

**mosquitos** 240:23

**motion** 13:17 76:9,16 107:24

**move** 109:20 143:25 150:19 158:2 175:1 274:13

**moved** 139:10

**movement** 68:10 88:15 89:5 228:22 230:12 231:10 231:18 233:15 233:20 235:18 235:23 240:17 251:17

**movements** 20:22 68:2

**moving** 20:3 59:3 60:11 73:9,24 75:24 229:9

**mpineiro** 2:6

**multi** 141:17 142:9 143:19 143:24 257:14

**multiday** 92:19 93:11,23 94:14 94:17 95:5,8 95:25 96:6,14 96:19 100:9,23

**multiple** 143:13 153:23 259:7,15

**murphy** 1:8

**mutual** 135:10 136:12

**n**

**n** 2:1 4:17,17 92:12,12 280:1

**name** 3:25 5:4 5:6 6:10,11 24:8 44:7 54:14 72:14 76:25 77:12,16 78:16 79:4 204:3,6,9 215:9,17 216:6 282:2,3

**named** 93:1

**names** 53:1

**nature** 243:10

**[near - number]** Page 41

near 9:21
157:12 178:8
nearly 176:15
nebraska 119:6
181:25 182:8
182:24 183:5,9
183:13,15
184:1 206:10
206:17 207:9
208:9,14 209:2
209:19 210:8
211:23
necessarily
21:20 98:7
146:2 174:10
201:21 265:19
necessary
67:15
need 33:13
100:22 130:4
194:9
needed 69:16
201:10 251:6
negative 64:17
68:7,22 118:21
119:1 129:8
163:9 167:3,12
167:13 173:12
173:16,19,23
174:8 175:20
176:1,19
187:14 188:3
207:3 212:2,7
251:18 258:1
258:10

negatives 187:8
203:7 206:6
neiman 2:2
nelson 1:7
never 54:22
67:21 133:19
207:14 276:23
new 1:18 2:10
2:10 4:3 33:15
33:18 62:9
147:8 152:21
160:6 184:23
192:21 226:12
248:20 277:20
279:4
newey 243:9
246:11,14,16
246:20 247:9,9
247:13 248:1
249:14,18
news 37:22
90:16 95:19
100:21 101:8
101:15 102:25
103:4,8,8
104:6,7 105:9
108:25 109:12
109:16 121:14
127:12 138:7,8
139:21 142:7
147:24 151:2,3
156:24 188:3
188:18 200:5
207:3,4,24
210:16,17,17

210:20,21
212:2,7,10
220:12 231:21
237:13 251:10
251:10,11
256:1 260:1,20
264:22 267:16
269:5,8,17,17
269:20,21
274:23,24
275:13 276:2
276:21
newspaper
109:18
nodding 7:15
nomi 201:15
203:22
non 177:15
nonsignificant
91:5
normal 240:17
240:18 241:8
241:25
normally
241:10
northern 74:2
notary 1:18
4:19 278:16
279:3 282:23
note 3:4 10:9
84:13 102:17
141:8 222:3
225:11
noted 4:13 8:7
67:23 119:3

277:23 278:5
notes 10:9,22
244:5
notice 4:11
10:17,19 12:8
12:10,13,15,17
12:22 13:2,5,9
191:4 222:24
280:7
noting 198:21
notion 138:10
164:23
novel 191:20
null 68:13
70:24,25
number 3:21
21:1,10 25:19
26:4 30:15,19
38:16,18 39:4
41:7 44:19
53:19,25 61:4
78:6 80:4 81:4
81:5,23 86:5
86:19 87:7
89:13,22 92:1
92:10 104:6
109:10 127:12
130:12,18
137:13 149:25
173:10 181:4
181:10 228:8
228:14 245:24
259:9 261:22
277:18

**[numbers - ooo]**                                                    Page 42

| | | | |
|---|---|---|---|
| **numbers** 50:11 137:17 190:5 | **obviously** 12:11 33:11 37:25 40:25 46:14 60:2 68:14 142:23 145:24 148:20 195:6 226:21 | 10:17 11:13,22 12:14 14:10 15:14 17:13 18:7,18 19:11 20:2 21:22 22:14 23:4 24:7 26:24 31:10 32:21 | 205:25 210:4 216:13 218:14 220:4 221:20 222:23 225:10 227:13 228:19 229:9,17 231:5 233:13 235:16 236:14 238:14 |
| **nyu** 185:16 | **occur** 187:14 | 33:1 34:1 | 244:17 250:9 |
| **o** | **occurred** 139:25 142:7 153:16 178:20 253:23 260:17 276:8 | 36:14 37:6 44:4,12 46:22 51:6 53:14 54:8 57:14 59:3 62:5,16 | 251:25 255:3 255:10 257:4 258:17 262:1 263:12,18 264:20 268:18 272:15 |
| **o** 4:17 92:12 | | 63:1 66:17 | **olin** 24:20 |
| **o'clock** 103:17 | **odds** 146:24 176:20 243:23 258:4 265:17 272:13 | 72:13 73:9 76:20 77:20 83:15 88:4 92:17 96:4,24 | **omission** 113:3 |
| **oath** 7:20 | | | **omissions** 15:12 110:12 111:24 112:19 113:4 114:3 213:17 254:8 |
| **objection** 8:4,6 70:11 268:24 271:10 | **offering** 85:7 116:20 | 109:20 110:13 111:9 114:22 115:23 122:3 124:6 129:25 130:6 132:9 139:8 143:25 144:1,19 | |
| **objections** 4:6 4:8,12 8:2 | **offhand** 32:1 41:10 46:6 52:22 56:3 60:3,24 61:5 72:23 96:21 204:2 216:11 266:14 | | **omitted** 49:17 257:19 |
| **objects** 8:12 | | | **once** 8:24 14:6 14:7 36:15 205:5 |
| **observable** 220:10 | | | |
| **observations** 261:23 | | 159:16 166:22 167:2 168:18 169:13 171:18 171:19 175:14 179:16 181:22 183:20 186:4 187:5 189:9 190:8 191:13 194:15 202:14 | **ones** 45:8 239:20 267:22 |
| **observe** 100:19 145:13 147:1 147:14,20 148:7 149:20 151:10 153:20 155:1,13,24 158:14 165:6 165:17 180:22 188:2 192:14 195:16 197:5 198:19 231:17 249:24 274:16 | **office** 17:6 38:4 | | **ongoing** 49:19 |
| | **officer** 44:21,24 179:15 194:21 | | **online** 82:21,23 |
| | **offset** 263:5 | | **onset** 172:21 187:9 |
| | **oh** 34:8 144:5 251:6 271:15 | | |
| | **ohio** 210:10 | | **ooo** 2:19 281:9 |
| **observed** 184:12 206:23 231:21 246:24 247:6 | **okay** 5:19,25 6:3,24 10:14 | | |
| **obtain** 83:6,10 156:14 | | | |

**[open - pandemic]**                                                  Page 43

**open**  19:8 28:19 130:2 266:21
**opine**  57:20,24 84:3 110:6,21 111:10 112:14 115:8
**opining**  236:15
**opinion**  62:20 63:2 66:5,13 66:14 78:1 84:8,21 87:25 88:21 106:13 117:9 137:23 151:5,9 154:13 156:17 196:23 209:17 226:16 226:19 228:21 231:17 235:9 236:19 239:9 258:3 265:7,24 266:3 267:16 268:12,23 269:3 271:23 272:1 273:2,10 273:17 274:9 276:9 280:10
**opinions** 116:19 117:1,4 154:23 155:4 268:7 276:13
**opportunities** 36:21
**opportunity** 117:25
**opposed**  33:8 46:4
**opposite**  98:2,4
**opted**  200:10
**option**  217:15 222:2
**options**  59:15
**oral**  7:14
**orbital**  46:16
**order**  62:20 63:3 65:12 69:16 70:17 136:3 137:1 277:7,10 280:10
**ordered**  277:5
**orders**  277:2
**organization** 42:7
**original**  103:5 178:22 222:12 229:2 232:13 234:7 236:25 239:25 249:25 255:19 256:15
**originally**  50:1 225:6
**outcome** 279:14
**outlet**  108:25
**outlined**  259:19
**outperformed** 16:12 102:14 166:19 176:12 180:15
**outperforms** 125:5
**output**  247:7
**outside**  11:22 61:1,2
**outstanding** 8:21
**overall**  174:12
**overlaps**  75:19
**own**  32:16 66:20 67:5 99:25 100:3 106:12 223:17 225:23 258:4
**owned**  61:12
**ownership** 61:11

**p**

**p**  2:1,1 5:7
**p.m.**  91:14,17 92:2,5,7,11 130:13,19 181:5,11 189:7 203:1 211:8 212:19 228:9 228:15 244:11 244:14 252:18 272:17,20 277:21,23
**pad**  10:9
**page**  28:7 38:25 41:13,15 51:8,13,14,18 51:20 54:4,5 55:4,10 63:9 63:10 64:7,13 66:18 68:16 71:3 79:20,21 109:24 111:21 112:8,10 113:13 115:23 120:25 129:3 132:11,21 139:6 140:21 140:25 143:15 160:10 162:5 164:18 166:23 169:24 170:22 171:6,15,17 175:14 177:14 178:24 179:1 181:14,18,19 183:18,21 185:20 190:5 191:16,16 194:13 199:1,2 206:9 223:12 225:12 226:10 230:14 238:12 240:1 255:3 257:5 258:13 262:1 266:22 272:23 280:2,6 282:4
**pages**  28:6 110:2 223:11
**painful**  8:19
**paired**  251:7
**pandemic** 101:21 172:21

**[pandemic - people]** Page 44

230:20 234:11
234:12 241:3,6
241:23 242:20
243:11,17,20
256:23
**panels** 96:3
**paper** 82:7
143:14 257:12
262:11,12,23
263:6
**papers** 80:20
141:16
**paragraph**
63:13 64:12
71:7 111:19,20
111:20,22
112:10 113:14
113:15 120:24
122:3 123:15
129:2 132:20
144:20 160:11
163:15 171:16
171:19,22
179:2 181:19
181:23 182:6
182:17 184:20
185:21,24
190:10 194:20
196:14 199:1
200:25 202:23
203:3,17 204:8
206:2,8 211:8
212:17 217:13
218:8 221:20
223:2 233:1

238:13 240:1
241:18 249:10
249:11,12
250:4,5 252:2
254:19,21
255:13,13
256:14,14
262:8 263:21
266:24 267:6
267:11 272:24
274:3 275:12
**paragraphs**
110:2,24
166:24 169:25
173:12 175:15
181:23 223:13
255:19
**parameters**
57:4
**parish** 102:18
107:23 111:16
124:10
**parrish** 152:11
**part** 14:14
20:19 21:4,8
25:7 27:16
38:2 41:14
54:24 60:2
83:5 111:1,4,6
112:16 113:2
131:5 137:24
200:23 202:2
202:22 211:21
226:20 268:3
273:8 275:19

276:2
**partake** 103:12
**partial** 86:7
**partially**
193:20 194:4
**participants**
3:8 106:23
109:14 188:16
237:17 268:2,5
**participate**
193:19
**participated**
81:19
**particles** 179:6
**particular** 26:3
61:12 65:18
85:18 101:15
131:12 141:12
142:8 182:2
217:3 246:25
265:20 276:20
**particularly**
102:18 152:12
156:10
**parties** 3:13
267:1 279:12
**partnered**
201:12
**partners**
194:17 201:15
203:23
**partnership**
201:3
**party's** 215:7
215:12,21

216:9
**past** 28:3 135:5
143:11 156:12
**patell** 142:11
143:6 255:4,17
256:16
**patently** 249:20
**patient** 167:6
173:18 186:6
187:10
**patient's**
167:15
**patients** 170:6
170:9 171:11
174:16 175:4,6
176:4 187:12
280:20
**patterns**
144:25
**pause** 7:6
**pay** 29:15
**pbs** 103:18
142:25 204:2
256:5,6 260:19
**pcr** 186:14,17
187:7,20
188:12
**pdf** 166:23
178:25 194:14
**peers** 241:11
242:2
**penalty** 72:8,22
**penny** 65:10
**people** 12:2,4
18:8 32:17,19

**[people - pharmaceuticals]**                                    Page 45

33:21,22 75:17
104:9 121:19
121:23 127:2
147:3 151:6
155:11 160:25
172:17 175:21
176:19,21
179:4 272:1,3

**percent** 102:15
104:10,20,21
105:2 120:11
120:17,23
121:6,11,21
122:1,11,15
123:1,8,25
124:12,19
125:6,7 144:22
145:8,10,21
146:11,14,20
147:5,7,18,19
148:14 149:10
149:18 150:13
151:8,15 152:1
153:11 154:8
155:7 156:6,13
157:3,8,16
158:7,24 159:6
159:11 160:20
162:14,17
163:19,25
164:12,24
165:13,23,25
173:4,7 174:2
176:6,13,14
177:18,18,22

177:23 178:2
179:18,19,23
179:24 180:6
180:14 182:14
183:1,22 184:2
187:15,20
188:13 192:18
194:23,23
195:14 196:4,6
197:12,16
198:6,6,16
200:1,3 203:5
203:6 206:4,5
206:11 207:20
209:3,20 211:3
211:20 221:25
222:11 223:18
225:24 227:9
227:10 229:7
231:15,15,16
232:1,4,6,7
233:5,8,9,10
237:3,6,8,9,11
237:20,25
238:1 267:3
274:15 275:14
275:15

**percentages**
41:7

**perfect** 102:24
138:11 154:4
172:15 176:15

**perfectly** 103:6
104:4 107:10
107:12 112:2

121:20,25
122:22 123:19
123:21 127:4
143:5 145:23
150:3 155:16
156:13 158:18
159:12 161:1
165:21 178:8,9
188:6 274:20

**perform** 231:7
235:13 241:10

**performance**
144:23

**performed** 65:8
176:15 229:2
250:10

**period** 87:16
97:11 101:23
101:24 102:9
102:11 105:5
110:18 139:21
151:13 153:24
155:2 156:25
158:11,12,21
159:3 162:8
172:14,24
176:10,22
191:24 195:10
197:3 207:7
208:12 214:7
228:1 232:18
233:16 234:1,2
234:9 235:4,12
236:7 238:7,16
238:20 239:1,4

239:11,13,19
240:20 241:3,7
241:9,9,12,22
241:24 242:3,9
243:8 247:1
249:23 250:23
253:11 256:24
260:14

**periods** 230:13
230:18,23
232:2 235:21
235:25 236:2
243:20

**perjury** 72:9,22

**person** 41:24
127:20 179:13

**person's** 272:5

**personally** 5:18
39:22 52:3,6
58:16 83:19

**personnel** 38:3
38:4

**perspective**
214:22

**pertaining**
170:4

**peter** 247:1

**petrobas** 46:17

**ph.d.** 34:24
102:19 125:3,3
157:4

**pharma** 55:20

**pharmaceutic...**
63:18

**[pharmacia - position]** Page 46

**pharmacia**
  88:24 90:2,6
  95:14,24
**phone** 9:25
  10:2 12:5
**physically** 5:13
**pick** 92:23
**picked** 276:1
**picking** 275:17
**piece** 199:15,20
  226:25 257:21
  258:1 269:8
  276:11,15
**pineiro** 2:2,6
  8:4,10 15:1
  16:3 43:14
  48:1,16 50:14
  50:20 53:17
  64:24 66:8
  69:3 70:11
  73:12 83:2,8
  83:18 85:3,25
  87:3,18 91:24
  93:14 97:17
  98:17 107:4
  108:11 109:3
  112:8 114:17
  115:6 118:6
  119:21 123:11
  124:20 125:15
  126:14 127:8
  127:25 128:8
  133:17 136:5
  137:3 139:1
  146:17,22

147:9 148:18
149:11 150:15
150:19 151:19
152:22 153:12
154:10 161:14
161:24 162:19
164:1,15,25
165:15 166:7
175:10 180:7
181:15 190:22
192:11 201:22
202:8 205:12
205:19 207:12
212:4 213:23
214:15 244:9
265:11 266:11
267:19 268:21
268:24 270:1
270:18,24
271:10 272:15
273:6 276:25
277:9,14
**place** 3:12
  18:22 135:10
  249:15
**placement**
  240:6
**places** 82:6
**plaintiff** 1:4 2:3
  84:11,17
  112:17 113:16
  113:22 114:23
  115:2 252:7
  253:4,10,19,25
  270:8,14,22

271:6,15,18
**plaintiff's**
  14:18 19:14,17
  59:15 76:9
  110:6 112:14
  113:1 114:11
  114:15 115:3
  116:18 126:11
  126:19 196:24
  212:23 213:22
  214:12,25
  220:18 252:11
  266:1
**plaintiffs** 15:5
  15:9 51:1,10
  51:15,21,24
  52:15,19 79:9
  125:1,11 126:1
  126:8 264:2,18
  264:25
**planned** 108:19
**plaza** 2:10
**pleadings**
  215:7,12,22
  216:3,9
**please** 3:4 4:10
  5:12 7:22
  14:23 18:16
  25:1,15 27:7,9
  29:2 54:1 63:9
  72:7 91:18
  92:11 94:4
  96:7 130:19
  181:11 189:7
  193:2 228:15

244:15 245:7
272:21
**plenty** 179:8
**point** 23:16
  33:10 58:22
  65:23 138:16
  143:9 150:20
  191:23 234:5
  241:14
**pointed** 65:7
  68:9 70:23
  106:7 107:23
  124:10 152:11
  232:21 256:20
**pointing** 69:8
  243:19
**points** 118:25
  187:21 188:14
  233:3 240:16
  262:21,23
  264:7
**polymerase**
  186:9,12
**porter** 45:4
**portfolio** 25:23
  26:23
**portion** 25:24
  29:5 192:7
  223:1
**posited** 230:1
**position** 131:6
  153:2 158:22
  159:4 162:11
  225:16 226:3

**[positive - previous]**

**positive** 171:9
171:11,24
172:3,5,12
179:8 250:24
250:25 251:17
262:22
**positively**
198:21
**positives** 203:6
206:5
**possibility**
167:13 173:20
173:25
**possible** 129:20
142:14 175:19
209:23 256:17
**possibly** 175:25
**post** 29:11
163:2,4,8
166:1 274:4
280:14
**potential** 47:15
84:10 171:23
243:2 246:2
247:20
**potentially**
107:10 109:15
**potter** 45:5
**practical**
227:13
**practice** 239:6
257:17
**pre** 264:22
265:8,23 266:6
269:23 270:15

271:8
**preceded** 38:20
38:22
**precise** 261:6
**precisely**
121:17 264:5
**precision** 31:8
126:7
**preclose** 259:23
**predates** 227:4
**predicated**
90:16 251:5
**premise** 26:14
**premised** 71:9
**prep** 17:2
**preparation**
13:14 16:16,17
16:23 19:12,15
19:18 189:22
224:12
**prepare** 13:12
16:19 32:13
54:16,23 56:23
66:6
**prepared** 56:21
57:2 61:20
72:4,13 79:9
127:20 275:4
275:22 276:17
**preparing**
14:12 17:20
43:7,8 117:21
118:5 128:24
144:11

**presence**
167:16
**present** 2:15
5:19 17:4
31:12 56:17
71:15 115:15
173:14 235:25
**presented** 48:6
81:25 82:7
115:3,9,16
234:7,20,25
236:24 247:10
252:7 255:16
266:15
**presents**
254:25
**president** 30:5
31:14,20 37:10
37:12 38:6,9
39:10,12,12,13
43:2
**press** 15:15,18
16:1,8 103:20
104:2 120:12
120:15,18
121:12 124:4
124:17 125:23
126:5,12,20
127:1,6,22,23
128:7,19,22
129:6,15 143:3
144:15 145:17
149:8,17
150:11 152:2,6
153:18 154:6

156:4 157:22
158:8 159:8
160:18 161:5
162:15,22
164:19,22
165:2,14,18,19
166:5,17
176:20 177:11
178:6 180:3,21
182:4 195:21
196:13,17
197:4,5,22
198:2 202:19
203:2,12 204:1
204:2,10 205:6
205:10 207:4
207:11,17,21
208:2,5,8
212:16 213:9
216:20 218:4
218:10 220:16
220:21 221:4
221:10 223:17
225:23 227:5
260:20 273:24
275:3 280:11
**pretty** 99:7
219:10
**prevalent**
40:23
**prevented**
273:4,11,18
**preventing** 9:6
**previous**
119:23 213:15

**[previous - project]**                                    Page 48

238:25
**previously**
92:13 104:9
136:8 186:5
195:15 202:12
265:18
**price** 20:22
65:13,16 67:13
69:19,25 70:2
70:19,22 84:25
85:11 88:1,15
89:16 94:21
95:5 97:2,5,13
97:23 98:14,20
98:22 99:12,21
101:6 103:2
106:11 109:1
112:5 114:4
138:21 139:11
139:14,23
140:8 143:12
145:19 147:2
147:14 148:3
148:15 150:2
153:5,7 155:9
157:8,9 158:15
165:11 183:23
184:9,10,13
192:19 195:18
196:1,10,18
197:7 198:22
200:3 205:3
209:4,22
212:12 228:22
230:1,8,12

231:9,18
233:14,20
235:4,7,8,11,18
235:18,22
236:7,9,17
237:1,13,14
239:15 240:17
241:7 250:13
251:17 259:6
260:3,9 261:19
261:21 262:14
264:11 268:20
269:2,7 272:9
273:4,12,19
274:18 276:4
**priced** 67:20
**prices** 21:12,13
135:9 271:24
**primarily**
44:15
**primary** 39:21
40:6,8,10
80:15
**principle**
220:24
**principles**
40:13,14 63:16
**printed** 14:4
**prior** 92:25
95:2 99:13
101:3 103:9
108:23 120:20
147:22 155:25
158:17 159:9
176:15 178:20

178:22 180:4
180:14 195:7
195:10 197:2
204:22 210:15
210:19 211:3
227:8,17 228:1
239:2 241:3
242:2,18
243:20 254:6
260:14,15
**private** 6:17
23:25 24:15
40:1,3,17
53:12 54:21
59:14 60:12
61:7,18 79:11
**privately**
271:22
**probably** 13:25
14:13,16 17:1
23:15,17 26:19
32:1 33:3
38:21 41:8
45:8 50:2
52:22 60:9
75:23 84:13
87:5 91:3
96:24 138:4
184:6 244:6
261:22
**procedure**
246:12,15,17
246:20 247:13
247:14

**proceed** 4:15
8:7,13 18:16
27:7 29:2 54:1
91:18 92:11
130:19 181:11
189:8 228:15
244:15 272:21
**proclamation**
156:17
**produce** 191:25
**producing**
240:25
**product** 170:1
170:3
**professional**
29:11 35:1,11
88:10
**professor** 44:15
44:16,25 184:5
243:18 245:2
249:5 250:11
251:23 255:12
257:10 258:19
259:22
**program**
203:21
**project** 41:17
41:21,22 42:10
42:19,22 43:1
43:6,12,25
44:5,14 45:17
45:20 46:1
47:6,22 48:13
48:15,23 49:1
49:3,6,8,13

**[project - question]**

50:7,24 52:14
**projects**  27:22
  42:14 47:24
**promise**  272:11
**pronunciation**
  13:18
**propensity**
  205:9 216:20
  218:3 220:16
**proper**  66:6
  246:4
**proportions**
  41:11
**propose**  241:19
**proposed**
  243:24,24
**proposes**
  241:17 245:2
**pros**  83:21
**prospects**
  112:4 154:18
  188:19
**protracted**
  95:18
**prove**  66:2
  68:13 113:17
  113:22 114:13
  114:15,23
  115:20 126:9
  134:15
**provide**  19:13
  19:17 39:6
  56:15 141:21
  161:13 173:8
  215:24 245:12

258:22
**provided**  19:21
  59:12 115:17
  128:19 167:24
  211:1 215:19
  220:2 275:2
**provider**  119:5
**providers**
  167:8,19,23,25
  168:2,12 170:6
  170:7,14,19,25
  172:9 173:2
  280:18
**provides**
  128:17 160:12
  161:8,23 199:7
  226:11
**providing**
  156:9
**proxied**  65:10
**prudential**
  46:23
**public**  1:18
  4:19 24:11
  129:7 161:12
  161:22 172:22
  182:12 215:16
  263:3 268:18
  268:25 278:16
  279:3 282:23
**publication**
  79:23,25 80:1
  80:3 180:2
**publications**
  80:5,20

**publicly**  169:18
  171:2 175:8
  208:11 215:18
  215:25 219:16
  219:21 227:18
  268:17
**published**  82:4
  82:5 185:25
  186:6 225:7
  227:25 263:2
**pull**  141:25
**purchase**
  252:18,20
**purchased**
  139:4
**purchases**
  252:8,13,17,23
**purportedly**
  249:13
**purposes**  17:17
  77:6 110:22
  111:10 112:23
  114:8 116:12
  120:8 121:8
  122:23 123:5
  155:3 234:23
  239:15 264:21
**purview**  35:7
**put**  8:4 12:12
  12:15 13:2
  22:16 31:8
  50:2 73:7
  101:25 108:3
  114:21 192:21
  231:24 243:1

265:19 277:6
**putting**  10:4
  32:11 62:16
  159:16

**q**

**q1**  118:15
  199:6
**quade**  2:16
  17:5
**qualify**  77:4
**qualitative**
  234:6,19,25
  239:23 243:4
**quality**  3:6,7
  216:19 217:6
  217:10,13,16
  218:2,15,25
  219:5,11 220:7
  221:23 222:8
  223:15 225:17
  225:22 226:13
**qualtrics**
  201:16 203:24
**quantification**
  236:10
**quantitative**
  17:22,24 18:5
  34:11,13,15,19
  34:21 35:3,14
  35:17,25 36:3
  37:20 239:22
  247:24
**quarter**  199:7
**question**  7:5,6
  7:7,21,24 8:1,5

**[question - rebuttal]**

Page 50

8:8,9,21,22,25 9:2 19:12 48:20,22 50:18 51:19 58:9 70:3 77:6 78:3 90:1 95:15 96:23 109:19 112:12 123:3,3 123:13 131:18 138:23 139:5 139:13 141:5 146:8,9 148:12 149:19 156:21 158:3 161:17 182:9 188:8 190:1 202:6 205:18,23,24 206:1 208:25 214:9,13 221:13,14 226:14,15 232:9 250:8,17 255:9 271:3

**questionable** 217:6,10,16

**questioning** 87:14

**questions** 7:14 11:3 222:6 277:1

**quibbling** 255:22

**quickly** 106:10 109:16 145:3 175:2 176:24

209:5,11,13

**quote** 142:10 143:20 167:11 182:6,21 240:4

**quoted** 119:9 119:15

**r**

**r** 2:1,11 4:17 92:12

**ran** 67:22 238:24

**rapid** 204:19

**rapidly** 106:10

**rashbaum** 2:2

**rate** 47:3 183:1 187:14

**rated** 221:24 223:16 225:17 225:22 226:18 227:16

**rather** 15:7

**reach** 9:21

**reached** 66:16 85:23

**react** 21:13 97:23

**reacted** 97:2,6 120:14

**reacting** 154:3 269:7

**reaction** 64:22 65:14,16 69:1 70:5,19,22 91:6,7 155:10 184:9 186:9,13

230:8 241:7 257:9 258:18 260:9 262:7 264:12 270:15 270:21

**reactions** 91:1 259:6 261:19 261:21 262:14

**read** 13:7,11,19 13:22 48:19,21 94:3,5 111:15 126:25 128:3 158:25 185:11 205:16 218:8 226:6 250:5 258:15 262:3 263:14,17 271:3 278:3

**readership** 106:1,3 109:9

**reading** 13:9 122:7 202:4 255:8 257:6

**reads** 68:16

**ready** 143:25 277:15

**real** 179:3

**realize** 135:8 157:14

**really** 35:23 95:11,12 240:14 243:23 272:6,11,12

**realtime** 128:4 151:12 269:6

**reason** 72:24 85:18 171:3 175:9,12 192:18 226:25 252:5 255:17 282:4

**reasonable** 70:20 107:6,13 108:13,16 109:11 131:2 133:21 134:1 134:24 135:12 135:22 136:16 136:18,23 137:15 138:17 221:13 234:9 239:19 241:19 243:25

**reasonably** 104:14 108:3 135:18 176:21

**reasons** 71:8 219:13,15 220:6 257:1 261:1 269:1

**reassuring** 276:20,21,22

**rebuttal** 10:12 13:21 71:23 72:16 230:16 230:25 231:2 243:2 246:8 248:22 249:2,6 251:23 254:18 281:5,6

**[recall - relative]** Page 51

**recall** 53:1 72:23 90:21 95:23 96:20 105:15,21 130:25 159:15 189:3 197:13 216:12
**received** 29:14 120:5
**recent** 52:9 117:25 167:15 178:7
**recently** 11:19
**recess** 92:5
**recognize** 22:22 23:9 144:4 159:24 169:5 178:18 193:6 223:3
**recognizes** 230:21
**recollection** 33:25 101:17
**recommendat...** 26:22
**record** 3:2,13 4:14,25 5:5 7:18 8:5 12:1 12:23 18:12,13 18:15,20 27:1 27:3,4,6 28:21 28:23,24 29:1 48:21 50:6 53:21,22,24 91:12,14,15,17

92:3,4,9 94:5 126:6 130:14 130:15,17 174:21 181:6,7 181:9 189:5,7 195:22 228:6 228:10,11,13 244:8,11,12,14 254:12 272:17 272:18,20 277:4,16,22 278:7 279:9
**recorded** 3:10 3:15
**recording** 3:6 3:11
**records** 252:11
**recount** 109:7
**rectangle** 223:14
**reed** 1:8 116:15 117:3,16 119:15
**reference** 101:10
**referenced** 175:7 189:17 190:25
**referencing** 113:20 258:25
**referred** 168:5 168:6 186:13 218:22 224:24 274:3

**referring** 63:24 99:24 187:3 195:6 204:13 210:2 233:12 233:18 274:4
**reflect** 69:12 126:6 161:11 161:20 183:22 271:25
**reflected** 29:21 29:22
**reflecting** 252:7
**refreshed** 14:4
**refreshing** 28:17
**refused** 83:16 83:25
**refuted** 198:1
**regard** 11:3 113:9 253:17 253:20,24
**regarding** 64:16 127:7 181:25 187:6 199:4 208:15 211:10 267:8
**regardless** 156:11
**regards** 11:17 147:23 154:22
**regression** 25:22 60:1 238:22 246:11 246:15,16,18

247:7
**regular** 142:12 142:17,23 143:7 255:21 255:23,25 256:25 257:3 277:10,11
**regularly** 149:1
**regulators** 191:22
**reiterating** 276:22
**reiteration** 104:19
**reject** 70:24
**relate** 182:3 220:17
**related** 61:14 67:13 68:3 96:13 182:4 185:17 219:24 220:7 279:12
**relates** 15:20 37:22 145:12 147:12
**relation** 241:10 253:6
**relationship** 147:21 241:2 242:1
**relationships** 83:14
**relative** 124:10 142:21 148:22 150:5

**[relatively - report]**                                                    Page 52

**relatively** 30:13
  143:8 241:23
**release** 15:15
  15:19 16:1,8
  118:20 120:12
  120:15,18
  121:12 124:5
  124:17 125:23
  126:5,12,20
  127:2,7,22
  128:7,20,22
  129:6,15 143:3
  144:15 145:17
  149:8,17
  150:12 152:2,6
  153:18 154:7
  156:5 157:22
  158:8 159:8
  160:18 161:5
  162:15,22
  164:19,22
  165:2,14,18,19
  166:5,17
  176:21 177:12
  178:6 180:3,22
  195:21 196:13
  196:17 197:4,5
  197:22 198:2
  202:19 204:10
  204:19 205:6
  207:4,11,17,21
  208:3,5,8
  212:16 213:9
  220:22 221:4
  221:10 227:5
  273:24 275:3
  280:11
**release's**
  127:23
**released** 68:4
  90:17 106:5,9
  133:23 158:13
  187:25 213:12
  237:19 263:3
**releases** 102:22
  104:2 141:14
  142:12 205:10
  216:21 218:4
  218:10 220:17
  223:17 225:24
**relevant** 20:21
  68:21 70:9,14
  116:19,24,25
  117:3,9 118:10
  119:10,19
  137:22 151:9
  151:10 198:14
  268:3,6,11,22
  269:3,8,9,24
  270:13,17
  271:5,9 274:8
  275:8
**reliable** 154:16
**reliably** 157:2
**relied** 75:17
  115:15 189:25
**relies** 68:19
  70:7
**rely** 152:15
**remember**
  46:24 56:11
  58:5,6 60:3,22
  60:23 61:3,17
  65:6,11 71:24
  85:22 90:18
  91:2 93:17
  94:7 169:6
  203:13 204:1
  216:10 263:20
**remind** 177:16
**remote** 1:14 4:5
  18:21
**remotely** 3:23
  4:10 5:12
**removed**
  197:21,24
**removing**
  276:17
**repeat** 213:25
  214:17
**repeated**
  197:16
**repeatedly**
  16:12 102:13
  124:9,11 125:5
  125:6 150:6
  165:22 176:12
  180:13 198:16
**rephrase** 7:23
  42:9 57:20
  77:10 78:25
  98:11 119:12
  124:15 134:19
  254:2 268:4
**reply** 234:5
**report** 10:12,12
  13:19,20,21
  14:22 16:6
  22:19,25 23:1
  23:6,14,22
  28:5,10 29:8
  38:24 39:7
  41:13,15 44:10
  51:9 54:16,22
  54:25 56:24
  57:9,13,15
  58:3 59:12
  60:6 61:20
  63:15 64:2,7,8
  64:14 66:1,6
  66:14,21,24
  68:8,11,17
  70:6 71:9,15
  71:20,23,24
  72:2,4,9,12,14
  72:15,16,19,25
  73:3,16 74:11
  74:21 75:5,7,9
  76:7,14 77:4
  78:2,12,15,24
  79:3,12,17,18
  85:24 94:18
  96:21,22 101:1
  101:11,13
  106:19 109:6
  109:22 110:22
  111:11,22
  112:23 113:20
  113:25 114:8

114:10,14
115:24 116:12
116:16,20
117:4,18 118:1
118:16 119:10
120:8,25 121:9
122:23 123:6
124:17,23
126:6,24
127:11,17,18
127:18,20
128:10,15,17
128:24 129:2
132:10,14
134:3 139:7
140:17 144:6
153:15 155:4
157:25 159:14
160:1 166:11
177:2,4,6,16
178:20 180:17
180:23 181:13
181:18 183:19
183:21 184:16
185:7,10,13
192:13 195:19
195:24 196:15
198:25 200:5
200:23 201:1
202:5,13 204:4
205:17 207:23
208:21 209:25
211:17,25
212:7,8 215:2
215:6,11,19,25

220:25 223:2
224:12 228:18
228:21 229:3
229:11,20,24
229:25 230:10
230:15,16,25
231:2 232:13
232:22,24
234:5,8,21
235:1,15,19
236:25 239:8
240:1 241:15
243:2 244:20
246:8,8 247:11
248:22 249:2,6
249:9 250:1
251:24 254:18
254:25 255:20
256:15 258:25
261:5 264:5,22
266:10 267:24
272:23,23
280:8,21 281:4
281:5,7
**reported** 133:7
197:2
**reporter** 4:2,9
4:15 94:3
169:16 277:3
**reporting** 4:7
**reports** 13:16
13:23,23 14:2
32:13 38:8
43:7,8,10 44:6
47:22 54:6,10

54:13,20 76:22
76:24 77:8,12
77:15 78:20
79:7,9 86:4,20
104:8 107:9
117:21 118:5
121:24 144:12
189:23 199:3
215:16 216:5
231:7 235:3
238:6 246:10
**represent**
29:10 45:19
169:9 170:23
175:5 189:16
241:8
**representation**
104:2 107:18
**representations**
107:11 180:20
195:7 211:3
227:8
**represented**
5:16 45:23
**representing**
84:16
**represents**
29:12,13
**reputation**
22:11 83:14
220:25 221:2,6
221:16
**request** 169:7
**require** 95:4

**required** 99:17
170:5
**requires** 111:2
**reread** 13:15
13:16
**research** 28:2
31:13 35:1
37:18 82:1,3
103:25 212:18
219:22
**researchers**
186:2
**residuals**
244:22
**respect** 150:23
234:21
**respond** 7:17
117:25
**responded** 8:22
8:25
**responding**
56:13
**response** 7:8
8:23 104:7
105:13 145:18
146:8 198:23
205:14,17,21
205:22 255:11
258:22 259:21
260:4 263:18
269:12
**responses**
108:23
**responsibilities**
30:9,12 32:6

Page 54

33:7 36:15
37:11 38:2
**responsibility**
35:8 38:7 43:6
83:6
**responsible**
35:15,24 41:24
82:25
**rest** 225:19
257:12
**restate** 123:13
126:3 171:21
**restatement**
262:24,25
**restoration**
74:1,16 75:9
77:24
**restroom** 50:15
**result** 110:11
120:11 163:9
167:3,13
171:24 172:6
172:12 173:13
173:16,19,23
175:20 192:1
**results** 82:1
103:20,22
118:16 129:8
145:2 157:7
171:10,11
172:3 199:6
200:8 234:19
234:20 236:1
239:22,23,24
242:17 243:4

**retained** 53:8
110:6,21 111:9
112:13 277:20
**retracted**
189:11
**return** 129:8
229:7 237:1
250:14,15,25
**returned** 27:22
**returns** 143:12
239:16
**revealed**
193:20 264:9
267:1
**revelatory**
207:5
**revenue** 256:22
**revenues**
240:22
**reversal** 157:12
**review** 14:18
110:4 116:11
116:14 117:19
120:3 121:14
126:4 144:10
188:24 189:21
194:9 224:10
225:19 249:5
**reviewed**
114:22 115:14
119:14 120:1,3
128:23 169:6
189:19,25
219:8 229:10
229:16

**reviewing**
81:13 110:1
**reviews** 13:10
72:10 158:1
187:1 194:11
208:23 262:5
263:16
**revisit** 17:23
24:16 96:24
109:21
**revisiting** 96:22
**reynolds** 203:1
203:4,10,19
204:6,13
**richard** 1:8
**ricketts** 182:7
182:22
**rigger** 191:21
**right** 6:19 9:16
9:19 11:9 12:6
13:3 19:2,3,11
20:2 24:18
47:19,25 50:19
57:9,22 58:1
58:18 59:16
60:19 61:24
62:3,10,13
63:7,24 64:3
67:3 71:2 72:5
73:24 74:6,12
75:11 76:2,10
76:17 77:13
78:13 79:19
103:10 113:18
118:14 121:17

129:1 130:1,9
137:2 138:22
143:20 147:21
155:19 158:2
160:22 161:4
166:14 168:15
168:18 169:23
170:20 172:6
179:24 180:17
181:16 184:15
184:18 187:5
188:8 189:12
190:4 192:20
195:11 197:23
199:19 200:25
201:25 203:16
204:18 210:9
216:11,12
217:4,7,19
218:5 219:24
223:10 227:21
229:9 232:22
232:25 238:11
246:22 252:16
253:1,16,22
254:17 255:7
256:7 262:6
266:21,23
269:5
**rise** 95:24
**risk** 173:7
**risks** 171:11
**rivals** 217:17
**rna** 173:14

**[road - scientists]**                                                    Page 55

**road** 5:9

**robotics** 74:1
74:17,21 75:10
77:24

**robust** 243:6

**robustness**
231:8,23
234:24 235:13
242:16

**rockefeller**
2:10

**rocket** 198:23

**roger** 129:24

**role** 15:23
42:18 59:11
81:21 82:9,15
82:19,24

**room** 5:20,22
9:17 12:3
18:23 91:11

**rough** 277:6

**roughly** 37:5

**row** 252:13

**rph** 201:16

**rtpcr** 190:15

**rule** 8:20 167:4
173:16

**ruling** 13:22

**rumors** 104:16
107:19

**run** 26:19
27:20 67:16
126:16

**running** 30:22
32:10 238:21

**runs** 232:16

**rushed** 197:4

**s**

**s** 2:1 3:16 23:7
277:17 280:5
282:4

**safe** 163:22
177:25

**saha** 19:21
262:2

**sale** 252:19,21

**sales** 252:8,14
252:24

**salt** 103:14,16
105:14,20
106:1,13 109:8
142:25 178:14
192:24 193:4
193:10,24
195:8 196:21
196:25 197:1,9
199:9 200:12
202:15 210:18
224:14 256:1
260:18 267:7
267:17 280:22
280:25

**sample** 142:17
179:7

**samples** 186:7

**sars** 173:14
190:12,15

**satterfield** 1:8
102:11 124:7
179:3,10

180:11 194:21
197:10 220:3

**satterfield's**
16:13 152:12
196:16 198:1
227:11

**saw** 117:14
216:7

**saying** 16:11
66:1 70:6
104:3 123:6
135:21 136:13
151:24 156:7
157:15 162:8
173:3,22
176:11 182:8
182:22 202:25
203:19 210:12
211:12 243:18
257:18 259:14
261:2 271:16

**says** 18:1 23:17
24:19 31:12
41:17 63:13
65:21 66:19
75:22 105:1
122:20 123:16
129:5,10
140:11,14
142:12,13
143:21 149:17
161:10 167:3
170:1 172:1,22
173:6 175:16
175:18,24

176:18 177:16
178:6 179:2,16
187:6 189:13
190:14 191:18
195:9 199:3
200:6 202:16
216:14 221:22
225:21 237:4
240:5 249:21
252:22 256:17
258:11 262:2
262:13 263:21
263:21 264:14
266:24 269:6

**scenarios**
262:21

**scheduled**
256:11

**scheduling**
17:17

**school** 22:12
24:20 27:11,13
27:23 29:11
67:9 152:25
159:19 160:3
280:13

**schools** 82:2

**science** 194:21

**scientific** 125:3
184:8 230:6

**scientist** 102:20
157:5

**scientists**
191:17,18

**[scope - sentence]** Page 56

| | | | |
|---|---|---|---|
| **scope** 75:3 | 41:5,5,9 46:1,4 | 66:25 68:24 | **seem** 249:8 |
| **scored** 179:18 | 46:8,8,9,10,11 | 71:11,18 | **seems** 255:22 |
| 194:22 197:12 | 46:12,15,16,16 | 100:18 112:7 | 262:9 |
| **screen** 3:10 | 46:17,18,25 | 118:8 120:13 | **seen** 3:9 12:7,9 |
| 11:7,12 12:25 | 47:1,2,4,4 54:6 | 124:2 129:4,9 | 96:25 97:12 |
| 13:3 19:5 29:4 | 54:9,19 56:9 | 144:20 145:4 | 98:12 |
| **scroll** 13:6 23:4 | 59:19 61:23 | 160:4,8,14 | **selected** 41:16 |
| 28:7,15 41:12 | 62:13,15 63:13 | 163:11,20 | 48:2,6,8 49:2 |
| 63:9 79:19 | 65:22,22 67:10 | 167:9 170:10 | 49:24 251:9 |
| 117:8 206:8 | 74:5,9 75:14 | 170:20 171:14 | **selection** 243:6 |
| **scrolling** 51:13 | 76:4 78:12 | 171:18 175:22 | **seller** 143:1 |
| 51:18 | 79:1 87:17 | 177:7,20 | **selling** 135:9 |
| **se** 21:21 59:25 | 111:21 114:12 | 179:21 182:15 | 166:13 242:21 |
| 81:15 214:3 | 116:3,4 122:5 | 185:21,22 | **semicolon** |
| **sec** 216:17 | 140:20 181:22 | 186:2,10,11 | 223:22 |
| 219:21 220:15 | 190:3 194:13 | 187:16 188:20 | **senior** 36:12,16 |
| **second** 7:19 | 220:24 227:14 | 188:22 189:12 | 37:1,3,7,17 |
| 14:19 18:19 | 227:15 | 190:18 192:4,5 | 42:23 |
| 27:1 28:11 | **securities** 6:14 | 193:2 195:1 | **sense** 43:22 |
| 89:17 90:5,9 | 15:6 26:3 | 196:15 203:8 | 243:23 |
| 90:11,23 91:7 | 37:22 39:18 | 206:13 208:18 | **sensitivity** |
| 91:9,12 97:25 | 40:15 41:1,18 | 216:22 217:20 | 102:15 104:22 |
| 98:16,22 99:21 | 45:18 46:20 | 222:4 223:10 | 124:13 125:7 |
| 100:2,8,16,20 | 48:14,24 49:7 | 223:19,21 | 165:23 177:18 |
| 111:20 116:3 | 52:1,15,19 | 224:3,8 225:2 | 178:9 198:6,17 |
| 121:1 160:10 | 74:1 261:15 | 240:10 244:5 | 217:1,7,20 |
| 160:11 166:23 | **security** 49:11 | 252:12,14,16 | 218:11,12,24 |
| 170:22 179:2 | 52:7 65:9,18 | 255:1 257:11 | 219:3 222:1,11 |
| 185:22 187:3 | 67:16,20 69:13 | 258:17,20 | 223:18 225:24 |
| 188:21 190:10 | 69:22 | 267:4 | 227:10 275:15 |
| 199:7 205:13 | **see** 6:8 12:20 | **seeing** 197:15 | **sentence** 66:17 |
| 252:13 | 13:1,2,7 24:23 | 272:12 | 69:7 71:6,13 |
| **section** 15:6,10 | 28:14,18 31:14 | **seeking** 221:21 | 121:1 122:8,19 |
| 39:20,25 40:2 | 41:19 59:8 | 222:8 | 144:21 172:4 |
| 40:11,20,20,25 | 63:3,21 64:20 | | 177:15 187:6 |

**[sentence - signoff]**                                              Page 57

190:14,21
249:20 254:21
**separate** 150:2
168:8 223:4
**sequence** 75:4
94:25 102:5,7
103:8 135:15
138:8 141:14
151:3 154:2
204:17 206:20
207:2,24
211:15 212:13
226:8 251:10
260:17 264:10
264:12 265:15
274:12,23,24
**sequential**
207:4
**serbin** 1:8
**series** 89:23
95:18 96:12
97:9 134:14
138:7 153:15
157:18 181:23
205:7 212:20
217:23 218:1
219:9 222:16
223:6,7 226:22
235:13 254:10
256:8 281:2
**served** 12:8
**service** 201:4
**serving** 52:13
**session** 92:6

**set** 63:16
182:24 279:7
279:17
**settle** 61:1
**settlement** 39:6
47:14
**seven** 77:25
186:5
**several** 49:14
71:8 81:6
84:12 87:20
91:3 267:24
275:16
**share** 12:25
29:4 53:5
58:25 59:1
**shareholder**
6:17 23:24
53:12 60:13
61:19 62:3
270:9 271:6
**shares** 135:11
137:7,8 252:14
252:18,19,24
253:6,11,18,21
253:25 254:3,5
**sharing** 12:21
**sheet** 167:7,19
167:22,24
168:2,11 170:7
170:9,14,18,25
172:8 173:1
174:16 175:3,6
176:4 278:6
280:18,20

282:1
**shops** 35:20,20
**short** 143:1
216:15 218:9
222:25 257:21
258:11
**shorter** 242:10
242:12
**shorting**
219:15 227:1
**show** 28:16
29:5 117:8
128:15 171:20
171:22 176:23
213:1 239:17
**showed** 115:11
202:21 243:3
270:12 275:14
**showing** 19:1,2
56:13
**shown** 146:3
150:5
**shows** 118:22
132:17 133:10
136:1 251:20
252:17
**shutting** 10:5
**sic** 106:4
**side** 11:11
84:17 185:10
185:10
**signature**
279:21 282:19
**signed** 203:22

**significance**
15:18,20,21,22
85:20 88:6
98:23 230:11
231:13 232:7
232:15 233:19
235:8,17,22
237:22 251:1
**significant**
20:22 68:2,10
84:25 85:11
86:9 88:9,15
89:3,6,9,13,24
89:25 90:3,4,9
90:11,13,22
91:7 92:21
97:8 98:1,2,3
98:15,21 99:20
100:1,7,15,19
103:2 145:2
184:9 195:18
195:25 196:4
228:23,25
230:2,7 231:10
231:14,25
233:4 236:17
237:2,5,10,11
250:16,24
251:19
**significantly**
89:16 97:23
142:15 147:2
243:11 256:19
**signoff** 36:4,7

**[signs - specimen]**                                                    Page 58

**signs** 167:16
**silent** 10:4
153:17 210:23
**silicon** 201:4,12
**similar** 141:18
141:18 275:24
**similarities**
147:17
**similarly**
253:24
**simple** 214:13
**simplify** 202:6
**simply** 65:7
192:2
**single** 157:20
230:16
**singular** 259:9
**sit** 6:19 24:9
42:15 53:3
56:7 58:7 60:8
61:6 74:22
85:21 90:20
189:2 215:23
**site** 182:18
**sites** 200:9
**sitting** 76:11
119:7,18
**six** 54:9,15
76:21 77:25
79:7,10 80:23
216:6 230:12
234:2,10,11,12
235:3 242:10
242:12,13,13
242:18,23

277:19
**size** 263:1,1
**slides** 54:23
**slopes** 201:4,13
**slowed** 138:19
**slowly** 138:9
**small** 30:13,22
**smaller** 109:17
142:16,22
143:8 256:19
**smart** 16:10
168:23 169:11
170:8 171:1,7
171:25 173:24
177:17 178:1
195:13 280:16
**sold** 252:24
253:18 254:6
**sole** 119:4,5
167:5 173:18
**somebody**
34:23 120:2,2
139:3
**son** 11:18
**soon** 187:11
**sophisticated**
200:11
**sorry** 14:20
15:7 28:12
42:9 69:12
74:18 78:25
104:21 110:3
123:2 126:16
132:19,22
133:8 134:19

144:5 161:18
167:1 171:20
178:21 205:11
210:17 212:10
213:13 216:25
223:22 225:8
238:14 242:7
253:14,14
269:15 271:2
271:18
**sort** 10:23 16:1
18:22 35:19
37:24 38:19
40:6 42:17
61:14 92:19,22
95:18 96:11
111:6 148:8
**sound** 45:21
**sounds** 184:18
238:10
**source** 107:14
107:15 108:6
122:2 134:25
135:13 138:5
152:15 154:16
255:4
**sources** 139:23
139:24
**south** 2:4
**southern** 62:9
90:25 96:16
**span** 42:17
**speakers** 9:25
**speaking** 37:5
40:22 81:20,24

85:14 173:5
**speaks** 123:15
127:11,17
174:11
**special** 210:6
**specialization**
25:2 26:8
**specific** 57:11
114:25 143:22
170:3 211:9
**specifically**
76:12 84:20
91:5 155:24
168:13 187:4
188:18 192:17
199:20 210:3
210:11 211:6,7
218:2 219:18
234:21 245:6
261:16
**specificity**
102:16 104:22
124:12 165:23
176:13 177:19
178:10 180:14
198:7 218:20
218:23 219:2
222:1,11
223:18 225:25
227:10 275:15
**specifics** 58:7
97:20
**specimen**
144:23 173:15

**[speculation - statistically]**                                    Page 59

**speculation**
  69:4 108:12
  118:7 133:18
  148:19 161:15
  161:25 162:20
  164:2,16
  165:16 175:11
  190:23 192:12
  270:2
**spends**  34:25
**spent**  14:11,13
  25:22 80:19
**spinning**  28:12
**spoke**  16:16
  17:20 18:8
**sponn**  75:25
  76:4,8,14
  77:24 78:23
  79:2
**sports**  182:5
**spread**  172:17
**square**  218:7
**squared**  247:8
**squares**  244:25
  245:5,10,16,18
  246:4 247:14
**st**  182:24
**stages**  244:3
**stalled**  138:19
**stand**  169:16
  200:7
**standalone**
  89:4
**standard**
  103:12 247:9

**standards**
  35:11 68:21
  70:10,15
**standpoint**
  70:17 214:3,4
**star**  182:18
  233:22
**start**  5:2 6:25
  15:8 34:18
  38:15 50:22
  52:5 95:2
  103:10 105:5
  130:23 140:24
  157:13 158:10
  162:7 163:14
  172:23 176:22
  195:10 197:3
  207:7 210:15
  210:19 226:6,9
  228:1 234:11
  234:12,13
  239:5 241:23
  242:3,18 250:6
  255:25 260:14
**started**  151:4
  162:16 212:3
  254:14
**starting**  103:7
  142:1 238:7
  242:24
**startling**  264:3
  264:17,23
  265:4,9,13,21
  265:23 266:1,4
  266:8,13 267:1

  267:18,22,23
  269:24 270:16
  271:9,16,23
**starts**  41:16
  103:9 140:21
  185:21 190:11
  191:17 205:5
  218:9 254:22
**state**  1:18 4:10
  35:2 55:23
  111:23 113:16
  121:1 203:3
  246:10 279:4
**state's**  201:2
**stated**  160:18
  197:10 221:5
  257:2
**statement**
  64:23 69:2
  104:19 125:10
  126:2,3 127:15
  145:7 146:10
  146:19 153:10
  155:6 157:1
  159:9 165:24
  166:3,4 196:20
  206:10 208:14
  212:9 227:24
  236:16 258:5
  263:23 264:21
  275:11,18,24
  276:20
**statements**
  72:9 87:11
  106:14 111:3

  124:4 128:14
  128:16 149:21
  149:23,24
  150:3 151:1
  154:25 164:5
  164:19 165:7,8
  165:10 166:10
  180:25 196:16
  196:18 207:9
  219:25 221:15
  236:20 237:15
  269:16 275:4
  275:23 276:21
  276:23 278:8
**states**  1:1 3:20
  64:13 71:7,14
  71:14 108:2,5
  144:21 160:11
  161:7 163:15
  171:7 173:12
**stating**  192:8
**statistic**  21:2
  232:19 233:2,6
**statistical**
  20:21 21:11
  25:20 66:23
  85:20 88:6
  230:11 231:13
  233:19 235:7
  235:17,21
  237:22
**statistically**
  68:2,10 84:25
  85:11 86:9
  88:8,15 89:2,6

**[statistically - suffered]**

89:9 90:4,22 92:21 97:8 99:20 100:1,19 103:1 184:6 195:17,25 196:3 228:23 228:25 230:2,7 231:10,14,25 232:15 236:16 237:1 250:15

**statistics** 25:8 65:24 68:12

**stats** 21:5,6,6

**staying** 35:2

**stem** 213:18

**stenographic** 4:14

**step** 141:2

**stephen** 5:7

**stepping** 42:18

**stock** 20:22 21:12,13 59:14 65:10,13,16 67:23 69:10,11 69:18,25 70:2 70:19,22 88:1 89:15 92:19 97:22 99:12 101:6 103:3 106:11 109:1 110:17 112:5 114:4 138:21 139:10,14,22 140:7 143:12 145:19,20

147:2,14 148:3 148:15 150:1 153:5,7 155:9 157:8,9 158:15 165:10 183:23 184:10,12 192:19 195:18 196:9,18 197:7 198:22 200:3 205:3 209:5,22 212:11 227:2 228:22 230:1,7 230:12 231:9 231:18 233:14 233:15,20 235:11,18,22 236:4,7,9,25 237:13,14 239:15 240:17 240:19 241:6 241:10 250:13 251:17 252:9 259:6,9 260:2 260:8 261:19 261:21 262:14 264:11 268:20 269:2,6 270:9 271:7 272:8 273:4,12,18 274:16 276:4

**stocks** 26:21,22 259:10

**stop** 165:12

**stopped** 147:18

**street** 5:14 103:15 105:21 105:25 106:2,3 109:9 256:3

**strictly** 173:5

**strike** 54:14 150:19 191:8 221:8

**structure** 245:12 248:9 248:11,14,17 249:15

**studied** 20:10

**studies** 20:9,20 26:1 38:7 178:7 186:6 259:8

**study** 21:12,17 25:13,18,21 26:6,10 32:11 35:16 36:5 38:12 58:11,14 58:15,17,20,21 59:22,25 60:2 60:7 62:1 65:8 65:10 66:20 67:6,8,16,22 74:10,16,20 75:1,8 89:21 95:11 96:9 140:20 141:3 141:13 144:25 185:17,25 186:5,21 187:19 188:9

188:11,25 191:1,2 236:23 243:4

**studying** 31:5

**stuff** 4:24 243:16

**submission** 32:13

**submitted** 54:22 76:8,24 77:7,11 78:5 78:12 229:13

**subparagraph** 255:4 262:2 263:13

**subscribe** 278:6

**subscribed** 278:12 282:20

**subsection** 255:14 257:5 258:13

**subsequent** 79:18

**subsequently** 153:6

**subset** 48:9

**subsidiaries** 61:14

**succumb** 107:25

**suffer** 114:5

**suffered** 110:10 110:15 253:5 253:20 254:1,7

**[suffers - taught]**

Page 61

**suffers** 172:17
**sufficient** 49:23
**suggest** 188:12
**suggested**
  187:8
**suggesting**
  187:19 209:13
**suggests** 188:15
  230:22
**suit** 67:15
**suite** 2:4
**summary** 76:16
  217:25 230:4
**summer** 6:15
  6:16
**summers** 27:13
  27:15
**sunedison**
  46:24
**superior**
  123:20 164:8
**suppliers** 30:20
**support** 66:15
  84:8 87:25
  106:25 115:13
  116:25 141:17
  143:11,16
  225:15 226:3
  254:24 259:17
  261:7,14,16
**supported** 45:4
  52:24
**supporting**
  47:10 80:15

**supports** 115:5
  131:6,17,24
  132:6 141:6
**suppose** 238:5
**supposed**
  264:16
**supreme** 63:17
  106:6
**surana** 67:2,21
  67:25 69:15
**surana's** 66:22
**sure** 5:6,14 6:8
  7:2,12 10:6
  11:21 12:9,12
  16:6 17:19
  18:24 24:11
  25:19 33:10
  34:15,21 35:9
  36:18 38:3
  41:25 42:15
  45:1 48:19
  60:9,10 61:8
  65:1 66:12
  71:22 82:14
  85:16 86:6
  101:10,18
  117:11 120:1
  121:16 123:5
  131:20 137:16
  140:19 145:16
  156:22 157:25
  158:9 159:2,7
  161:19 199:14
  200:24 212:25
  225:20 232:12

  232:20 242:11
  244:9 245:9,19
  248:8 258:22
  259:1 260:5
  265:13 266:12
  277:8
**surprise** 86:6
**surprised** 58:8
  86:11
**surprising**
  169:21 265:4
**surround**
  241:21
**surrounding**
  240:8 241:20
**suspect** 145:17
**suspected**
  145:1
**swear** 4:15
  72:8,15,25
**swearing** 4:9
**sworn** 4:19
  71:23,24 92:13
  278:12 279:7
  282:20
**symptoms**
  167:16 187:10
  187:14
**system** 135:10

**t**

**t** 4:17,17,17
  92:12,12,12
  280:5
**tabak** 257:5

**table** 270:11
**take** 3:12 8:16
  8:24 13:7
  20:20 21:5,7,9
  25:8,12 32:4
  53:16 72:7
  83:1,3,17,25
  91:21 129:19
  130:5 153:25
  157:24 176:24
  181:1 202:2
  228:3 250:24
  277:9
**taken** 1:17 3:16
  174:13
**talk** 9:1 20:4
  142:1 210:10
  218:1 220:25
  226:7 264:9
  276:17
**talked** 72:20
  84:15 130:21
  180:11 270:6
**talking** 75:15
  85:5 92:18
  103:19 113:15
  149:16 161:3,4
  201:1 207:20
  218:15 219:1
  219:11 250:20
**talks** 142:11
  194:7 221:1
  264:7
**taught** 40:14

**[taylor - testimony]**                                    Page 62

**taylor**  2:11
4:21 12:20,24
16:5 18:17
22:14 26:25
27:8 28:20
29:3 50:17
53:15 54:2
62:16 91:9,19
92:16 94:2
112:10 129:11
129:21,25
130:3,9,20
150:17 159:16
162:24 168:18
170:12 174:18
175:1 176:23
181:1,12,17
184:22 189:9
191:12 192:20
205:15,25
208:24 221:8
222:14 224:16
228:3,16
229:17 230:24
244:1,16
248:19 254:9
276:24 277:5
**teaching**
163:17
**team**  120:3
**technology**
3:24 112:4
154:17 179:15
201:15

**telephone**
36:23
**televisa**  88:23
93:5,13 95:9
95:11
**television**  82:13
82:14,17
**tell**  5:12 43:11
74:24 93:16
94:7 174:20
255:8 262:25
**telling**  6:6
221:19
**term**  41:22
75:13 125:25
264:3 266:1
**terms**  10:2
29:19,21 34:7
35:3 40:24
47:10,14 55:1
91:4 248:2
252:4
**terry**  55:21
**test**  16:10,11
100:22 102:3
103:21,22
105:1,15 119:5
119:6 120:16
121:5,10
122:11 123:1,8
124:19 127:24
129:7 144:21
145:7,10,21
146:1,11,14,20
147:7,17,25

148:2,24,25
149:9,18 150:4
150:4,13
151:15,25
153:10 154:8
155:6,8,16,17
156:6,14 157:7
157:16 158:7
160:12,20
161:1,8,12,23
162:13,17
163:9,18,24
164:7,12,23
165:13,21,24
166:15,16,18
168:24 169:12
171:1,7,9,25
172:3 173:3,12
173:13,22,23
173:24 174:1,8
174:9,11,13
175:19 176:1,6
176:11 177:17
178:2,7 179:14
180:5,12
182:11,24
183:5,9,13
185:18 186:9
186:17,18,22
188:7 189:17
191:24 193:11
194:8 195:14
197:11 199:5
199:12,25
200:2,7,17,19

200:20 201:7
201:17,20
202:1,1,7,11,20
202:22 203:4
203:15 208:16
208:17 210:24
216:25 217:2,8
219:3 221:23
222:7 223:15
225:16,22
226:13 232:19
233:2,6 234:6
235:3,24
237:10,12
243:21 251:13
259:6 264:11
267:3,8 275:14
275:25 280:17
**test's**  220:7
**tested**  187:11
187:12 201:10
230:10 259:18
**testified**  4:20
92:14 118:23
154:19
**testifying**  9:6
34:10 38:11,15
44:1 85:8
242:6,8
**testimony**  38:1
38:22,23 48:17
54:7,11,20
55:2,3,5,6,8,9
55:14 59:13
65:3 66:9

**[testimony - thras.io]**                                              Page 63

73:11,22 76:22
79:8 85:7
107:5 108:23
109:4 111:18
118:9 164:21
165:1 180:1,8
201:23 207:8
207:13,22
212:1,5 277:17
279:6,9
**testing**   103:12
103:12 108:1,4
163:16 167:12
182:1 198:8,12
200:9 201:3,11
201:14 203:20
217:13 240:22
261:9,10,11
**tests**   102:12,24
103:6,23 104:4
104:20 107:12
112:1 120:10
120:23 121:20
121:25 122:21
123:24 124:8
125:4 127:3,7
138:10 145:23
147:4 148:14
150:9,10,23
151:7 154:4,21
155:11,12
156:18 158:18
158:23 159:6
159:11 160:25
163:18 164:8

164:14 165:5
166:19,20,21
168:14 176:13
176:16 179:9
179:17 180:14
182:10,13,23
183:6,8,9,12,12
186:8,13,14
187:7,20
188:12 190:11
190:14 191:19
192:9 194:22
198:5 200:9
203:5 205:8
206:4,11 210:2
212:3 216:19
217:21 218:16
218:18 227:9
241:1,4,5
242:22 261:13
274:15,20
**testutah.com**
201:8
**text**   11:16
**thank**   130:10
**thanks**   53:17
**theirs**   264:4
**theoretical**
142:2
**thing**   7:10,11
9:4 10:7 78:2
160:17 256:10
258:15
**things**   8:17
21:20 29:18

30:15,19 140:5
211:13 220:13
249:7
**think**   6:11
11:20 16:21
25:3 26:11
35:17 38:23
39:11 47:16
50:1,17 53:15
58:4 65:1
66:12,14 67:24
69:7 74:13
75:1 79:12
88:22 91:19
94:19 96:12
98:19 99:6
101:11,18
106:6,19
107:22 109:5
109:18,20
110:23 111:12
113:14 114:9
115:9,16 117:5
120:1 122:13
123:15 124:1
125:25 126:5
127:10,11
128:10 129:18
129:21 131:1,8
132:2,13
134:24 139:6
145:12 149:14
166:11 168:14
172:19 174:3
176:8 178:5

181:1 182:3
183:11 184:5
185:9 187:23
188:20 192:14
195:9 200:22
203:14 204:15
207:23 217:6
219:8 224:13
226:11,21
230:15 232:20
238:3,21
240:15 241:13
242:17 243:1
243:14,24
244:2,19
245:20 250:17
250:21 254:4
254:17 255:15
257:1 260:5
262:22 263:3
263:22 270:5
273:7
**third**   90:11
190:9 217:15
222:2 254:22
267:1
**thought**   49:21
65:25 93:8
239:4 267:23
**thousands**
179:5,6 259:11
261:23
**thras.io**   59:5
77:22

**[three - trading]** Page 64

**three** 26:20
77:23 89:25
90:12 92:10
116:7 130:13
169:25 174:24
175:15 223:13
240:5,12
**threshold**
85:20 98:23
233:3
**thrown** 87:10
**thursday** 14:7
14:8
**tie** 104:1
**tier** 217:15
222:2
**ties** 222:12
**time** 8:3,3
10:20,21 14:11
20:11 27:16
30:23,25 31:3
32:8,19 39:15
49:19 50:15
51:7 53:20,25
80:19 82:4
92:2,10 101:20
108:24 117:22
118:15 120:11
124:16 130:13
130:18 138:13
139:20 145:9
146:3,12 149:5
150:22 158:25
161:18 166:10
174:2,20 178:3

181:5,10
192:17 218:6
228:6,9,14
229:13 241:3
244:23 245:20
248:16 252:17
264:9,13
272:11 277:11
277:13,21,23
**timeline** 121:13
124:2 195:19
**times** 16:18
26:20 84:13,19
98:20 267:24
**timing** 75:4,4
174:8,12
259:12 261:6
**title** 30:3 31:23
32:23 36:11
37:6,9 39:9,13
200:16
**titled** 60:12
116:4 160:5
163:8 193:10
223:25 224:25
**titles** 34:7
**today** 5:13,17
9:7,13 13:13
13:15 16:18
61:6 76:11
85:21 90:20
95:12 119:7,18
165:3 267:24
269:7 270:7

**today's** 16:20
17:14 277:16
**together** 18:24
32:11 50:2
155:21
**told** 86:10
104:9 125:2,3
148:23
**tom** 45:4
**took** 25:19
29:17 54:23
246:23
**top** 24:18 171:6
177:14 189:12
194:16 222:25
226:6
**topic** 92:19
109:21 138:24
144:1
**topics** 37:21
**tossed** 87:8
**total** 14:6,10
17:1 48:9 85:5
95:1,20 99:13
101:2 105:4
106:21 118:18
135:14 136:14
137:24 154:1
197:25 236:21
260:12 273:9
275:19 276:4
277:18
**totality** 204:16
**touting** 223:17
225:24 275:13

**towards** 41:8
42:12,16 66:18
221:22
**tower** 2:3
**trade** 65:9
67:17 107:3
108:9 131:14
131:21 133:15
134:8,12,18,22
135:8 136:3,9
137:1,17,21
272:7
**traded** 67:21
69:10,14,22,23
134:16 137:7,8
137:10,14
139:10 140:6
**trader** 56:16
57:3
**traders** 140:6
**trading** 1:3
3:18 47:3
103:10 104:13
108:21 118:12
130:23 132:16
132:23 133:1,5
133:6,7,12
134:4,6 135:2
135:16,17
136:23 137:6
140:4 144:8
146:5 205:5
210:16,19,20
210:21 251:15
252:3,11 256:8

**[trading - uncommon]**  Page 65

259:25 260:9
260:10,11,20
260:21,25
269:19 273:20
273:22 274:1
282:2
**train** 33:15
**training** 33:18
40:12
**transcribed** 7:2
7:18
**transcript** 7:3
7:10,12 116:15
117:3,7,12
118:2 119:14
119:20 277:6
277:10 278:4,7
279:8
**transcripts**
116:5,8 117:20
119:9,11
**treatment**
167:5 173:18
**trial** 55:14
**tribune** 103:14
103:16 105:14
105:20 106:1
106:14 109:8
142:25 178:14
192:24 193:4
193:10,24
195:8 196:21
197:1,9 199:9
200:13 202:15
210:19 224:15

256:2 267:8,17
280:22 281:1
**tried** 109:6
**trigger** 179:8
**troubling**
102:19 152:13
**true** 30:6 57:19
68:13 71:1,20
104:17,23
107:20 112:3
113:1,12 114:7
114:13 133:4
204:21 216:11
225:13 233:13
251:12 253:3
265:19 279:9
**truthfully** 9:7
**try** 8:15 24:12
28:17 124:15
135:7 218:5
258:24 265:19
**trying** 15:25
60:22,25 94:20
121:8 241:24
257:14 262:10
263:20
**tweet** 143:1
212:18,22
213:20 215:1
216:14 217:3,9
217:19,23
218:6,21 219:6
219:14 224:25
226:10 227:14
227:15

**tweet's** 220:5
**tweets** 205:7
212:21 217:11
217:24 218:1
219:9,24
222:17 223:6,7
225:20 226:22
256:8 281:2
**twice** 16:21,22
152:19
**two** 6:20 10:15
13:15,23,23
16:22 17:2
19:7 21:6
26:20 32:3,4
33:4 42:16
46:7 56:16
57:3 77:22
78:19 79:5
84:19 88:9,18
89:8 91:1 92:2
95:21 97:1,16
98:10,14,25
99:4,16,22
100:4,8 101:1
101:9,16
105:10,11
106:15,24,24
110:19,23
131:7,9,17,25
132:7 140:13
140:15 141:7
141:23 150:2
155:25 173:11
234:22 250:15

250:23 251:2,4
254:24 259:18
260:6 261:8,15
261:17 264:6
272:12 274:25
276:5,21
**tying** 103:4
**tyler** 2:16 17:5
**type** 11:19
90:17 246:17
**types** 41:1 46:5
**typically**
117:19 187:13
**typo** 23:17 25:4
26:12

**u**

**u** 4:17 92:12
**u.s.** 59:6
**uh** 7:15 252:15
**ultimate**
104:25 153:19
**ultimately**
131:3
**unable** 68:1
87:24
**uncertain**
183:11
**uncertainty**
101:21 138:12
139:21 172:20
**unchanged**
239:24
**unclear** 191:23
**uncommon**
85:17 86:12

**[undeniable - used]**                                        Page 66

**undeniable**
  196:9
**under**  7:20 9:9
  15:5,10 24:18
  29:9 31:11
  41:17 43:24
  44:5,7 45:17
  46:1 47:6
  48:12,23 49:6
  49:24 50:7,24
  54:10 63:16
  72:8,22 76:21
  77:12 79:7,23
  79:25 98:23
  120:21 147:3
  152:8 216:6
  223:24 232:1
  252:17 262:21
**undercuts**
  204:20
**undergraduate**
  20:9,10,19
  21:15 27:19
  31:6
**underlying**
  40:13 98:6
**undermine**
  107:10
**understand**
  7:21 14:24
  15:4 18:3
  35:19 65:3
  70:5 74:15
  83:10 98:7
  100:12 114:12

  121:23 127:16
  135:20 136:24
  139:13 144:14
  149:4,7 150:12
  155:7 186:21
  190:20 192:3
  196:22 205:15
  255:21 262:20
  271:3
**understanding**
  15:17 33:12
  57:7 67:10
  74:19 101:14
  111:14 114:20
  126:10,18
  147:6 179:12
  183:4,7,10
  193:23 194:2
  201:19 207:18
  211:2 219:4
  223:5 266:5,7
  270:10
**understood**  8:1
  20:2 78:22
  132:3 138:2
  146:5 149:5
  151:6,12
  154:12 156:1
  161:12,22
  162:12 163:23
  164:4 180:21
  195:13 204:12
  204:21 208:13
  232:3 265:18
  275:6

**undisputed**
  220:13
**unfolding**
  266:9
**unfounded**
  243:22
**unique**  99:8
  141:12
**united**  1:1 3:20
  108:5
**university**
  20:12,14
**unknown**  160:6
**unknowns**
  160:6
**unpersuasive**
  71:10
**unrealistic**
  68:19 70:7
**unrelated**
  100:6
**unresolved**
  49:19
**unsupported**
  66:22 239:21
**unsure**  74:23
  219:23
**unsworn**  71:17
  71:21
**untrue**  75:18
  125:12 157:17
  211:4
**unusual**  88:12
  88:25 89:8
  196:11 231:19

**unwilling**
  103:11 193:18
**update**  199:7
**updated**  95:20
  225:7 247:2
**upwards**  42:7
**use**  41:23 93:23
  94:14,16 95:4
  95:8,25 96:5
  96:14 97:16
  98:13 99:4,22
  100:3 101:9,16
  106:15 114:23
  115:13 131:17
  140:12 141:7
  141:17,21,22
  142:4,5,8
  143:11,24
  168:17,22
  169:8,10,17
  170:4 219:5
  234:17 237:4
  243:8,19 245:2
  245:25 246:11
  247:12 251:3
  259:19 261:7
  261:14,16
  264:18 266:1
  267:21,22
  280:15
**used**  27:13
  40:15 60:5
  115:19,20
  125:24 167:5
  173:17 183:5,9

**[used - volume]**                                                                Page 67

183:13 186:8
198:7 233:15
237:21,24,25
238:6,16 242:6
242:9,11,12
245:15,20
246:9,19,20
247:8 248:10
249:12 254:15
257:15 258:20
259:16 261:18
264:3,5 272:2
272:4
**user** 144:24
**uses** 245:11,12
**using** 3:23 9:18
10:8 96:18
105:11 106:24
171:25 173:23
203:20 230:12
255:17 266:13
**usual** 191:21
**usually** 34:22
35:8 73:5 87:9
168:16 169:22
**utah** 1:1,6 3:21
103:13 105:15
193:11,11
200:9,17,17,19
200:20 201:18
201:20 202:1,2
202:7,11,17,20
202:22 203:21
204:24,25
267:8

**utah's** 201:13
**utilizing** 234:8

**v**

**v** 282:2
**vaccine** 102:2
**vaccines**
168:15
**vague** 73:12
83:2,8,18
115:7 123:12
139:1 146:18
164:15 265:11
268:21
**valant** 47:1
**validate** 200:8
**validated**
182:10,23
**validity** 107:9
**valuation** 6:18
40:14 52:9
59:14 61:16
216:18 220:10
220:11 262:19
**value** 40:16,17
190:16 263:10
**variance**
246:21 247:3,5
247:6 248:10
249:15,22
**variety** 191:19
232:1
**verbatim**
221:18
**verify** 235:21

**veritext** 4:3
277:20 282:1
**versus** 3:18
55:20 59:5
62:7 63:17
75:25
**vetted** 191:21
**vice** 30:5 31:13
31:20 37:9,12
38:6,9 39:9,13
43:2
**video** 3:11,14
3:15 4:5 18:12
18:15 19:6
27:3,6 29:1
53:19,21,24,24
82:23 91:17
92:1,3,9,9
130:12,14,17
130:17 181:6,9
181:9 189:7
203:13,14
228:8,10,13,13
244:11,14
272:17,20
277:12,22
**videographer**
2:18 3:1 4:1
18:11,14 27:2
27:5 28:22,25
53:18,23 91:13
91:16,25 92:8
130:11,16
174:22 181:3,8
189:6 228:7,12

244:10,13
254:13 272:16
272:19 277:2
277:12,15
**videotaped**
1:14
**view** 140:10
199:22 208:6,7
272:5,7 275:8
**viewed** 267:25
**villanueva**
17:21 247:23
**vineyard** 30:2
**virginia** 56:5
**virtual** 3:23
12:3 16:22
**virtually** 3:6
**virus** 163:16
174:7 179:7
187:11 191:24
192:2 241:5
**visit** 201:11
**vitae** 23:7,12
**vix** 245:12
248:17
**volatility** 205:4
244:22 245:13
245:13 248:12
248:15,16,18
250:1
**volume** 132:17
132:24 133:1,4
133:8,12 134:4
136:23 137:6
174:22

**[volumes - witness]**

**volumes** 134:6

**w**

**w** 29:15,17,22
**wainwright**
  177:2,4,6
  280:21
**wait** 7:8 104:14
  107:7 108:8
  133:20,21,25
  134:1,2 135:3
  135:6,22,24
  136:2,25
**waited** 107:1
  131:3 134:18
  134:18,21
  136:19 137:20
  138:18
**waiting** 28:13
  130:22 133:15
  134:7 135:18
**waive** 4:5
**walk** 262:10
**wall** 103:15
  105:20,25
  106:2,3 109:9
  256:3
**want** 18:18,24
  44:21 84:18
  90:7 93:2
  110:4 115:8
  121:16 123:2
  162:6 191:10
  205:23 254:4
**wanted** 17:18
  43:20,21,21

70:4
**warner** 45:1,2
  45:10,14
  232:18 238:24
**warrant** 69:13
  97:16,22 100:3
  106:15 140:12
  141:7 142:8
  143:24 258:9
  258:11
**warranted**
  95:22 96:18
  98:13 101:16
**warranting**
  143:19
**washington**
  163:2,4,8
  166:1 280:14
**way** 5:2 35:21
  37:14 48:4
  56:7 60:9
  69:24 73:17
  95:13 107:20
  122:5,7 130:7
  174:14 211:18
  226:10 227:21
  246:19 251:20
  276:9 279:14
**ways** 174:4
**we've** 260:19
  267:15
**web** 19:24
**website** 30:17
**weed** 238:25

**week** 14:8
  26:20 250:23
**weeks** 262:15
**wei** 13:19
**weigh** 83:21
  104:16 107:8
  131:4
**wellesley** 5:9
**went** 25:20
  27:19 53:10
  144:5 198:10
  271:13
**werner's** 13:20
  111:18 232:14
**west** 243:9
  246:11,14,16
  246:20 247:9,9
  247:13 248:1
  249:14,18
**whatsoever**
  69:17 115:4
**wheel** 28:13
**whereof** 279:16
**wide** 11:7
**widely** 186:7
  237:21 246:9
  261:17
**wife** 11:21
**willing** 84:3
  107:25 200:7
**wilshire** 55:21
**window** 19:10
  88:9,18 93:24
  94:14,17 95:5
  95:9,21,25

96:6,15,19
  97:2,16 98:10
  98:14 99:1,5
  99:16,22 100:4
  100:9,9,23
  101:1,9,17
  105:11,11
  106:16,24,24
  131:7,9,17,25
  132:7 140:13
  140:15,23
  141:7,23 142:6
  142:9 143:19
  143:21,24
  234:22 240:7,8
  240:8,9 242:24
  251:2,4 254:25
  257:20,22
  258:12 261:8
  261:15 263:11
  264:6 274:25
**windows** 19:7
  141:17 241:16
  241:21 257:15
  259:15,18
  260:7 261:17
**wise** 45:3
**withdraw**
  205:23,25
  208:24
**withheld** 207:6
**witness** 1:15
  3:9 4:10,16,18
  13:10 72:10
  114:21 118:4

**[witness - ztaylor]**                    Page 69

119:8,11
129:18,24
130:1,7,10
158:1 187:1
194:11 208:23
262:5 263:16
279:6,10,16
280:2
**witness's** 282:3
**wolfson** 142:11
143:6 255:5,17
256:16
**word** 175:16
218:10,12,14
218:17,20
219:5,6 264:4
265:13,21
266:13
**words** 69:6
124:23 160:19
162:4 164:18
178:25 180:17
194:16 198:4
235:17 262:13
271:19
**work** 6:4 27:10
27:13 33:23
34:4,12 35:9
35:10,22,22
36:19 38:21
40:24 51:10
80:16 84:14
91:22 135:7
163:18 164:14
226:10 238:23

245:16,19
**worked** 27:16
41:4 48:15,25
49:8,12 52:24
61:7 87:14,20
88:14
**working** 28:1
39:18 47:18
80:25
**works** 130:8
**world** 179:4
**worst** 217:14
221:24 223:16
225:18,23
226:18 227:16
**wrap** 272:13
**writes** 221:23
**writing** 43:9
**written** 80:19
136:11 143:11
271:20
**wrong** 122:7
166:11 216:12
249:8 250:3,18
**wrote** 10:13
68:8 193:22
249:9

|     x     |
|-----------|

**x** 1:2,10 280:1
280:5

|     y     |
|-----------|

**yeah** 14:20
29:12 32:3
39:3,16,23

40:10 43:17
50:20 51:23
81:22 88:10
93:7 98:19
114:1 121:18
123:14 126:18
130:7 131:1
132:21 133:7
135:23 139:2
141:24 144:7
146:7 171:18
172:13 176:14
191:4,12 192:5
195:5 200:21
222:5,22 223:4
223:9 226:5
227:7 230:14
232:11 233:23
233:24 243:1
249:3,4 252:22
263:17 267:5
271:17
**year** 25:22 37:2
37:2 42:17
47:25 48:10
233:15,25
234:10,10,14
238:24 239:4
**years** 20:25
27:21 28:3,3
31:24 32:3,4
33:1,4 39:19
44:18 47:19,23
73:2 80:23
86:5 215:8

247:18
**yesterday** 14:7
**york** 1:18 2:10
2:10,12 4:3
62:9 277:20
279:4
**young** 241:23
**youth** 182:4
**youtube** 203:14
210:6
**yup** 55:22
60:14 71:5
116:6 177:21
185:23 223:23
224:9 255:6

|     z     |
|-----------|

**zach** 50:14
112:9 181:16
**zachary** 2:11
**zero** 173:9,9
184:7
**zip** 5:10
**zoom** 9:19 19:9
189:4
**ztaylor** 2:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.