# Exhibit 83

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

GELT TRADING, LTD., a         :
Cayman Islands limited
company,                      :

            Plaintiff,        : Case No.
                                2:20:cv-00368-CMR
v.                            :

CO-DIAGNOSTICS, INC., a       :
Utah Corporation, DWIGHT
EGAN, JAMES NELSON,           :
EUGENE DURENARD, EDWARD
MURPHY, RICHARD SERBIN,
REED BENSON, BRENT
SATTERFIELD,

            Defendants.

_____


VIDEO CONFERENCED VIDEOTAPED DEPOSITION OF
                RICHARD SERBIN
                TAKEN THROUGH
ADVANCED REPORTING SOLUTIONS, a Veritext company
                  Via Zoom


        Taken on Friday, March 10, 2023
            9:02 a.m. to 12:54 p.m.




   Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC

Page 2

A P P E A R A N C E S

For the Plaintiff:

Brandon Floch
Michael Pineiro
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Blvd., Suite 2530
Miami, Florida 33131
bfloch@mnrlawfirm.com
mpineiro@mnrlawfirm.com
(786) 530-5239

For the Defendants:

Joni L. Ostler
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East
Suite 700
Salt Lake City, Utah 84111
jostler@parrbrown.com
(801) 532-7840

Genevieve G. York-Erwin
BAKERHOSTETLER
999 Third Avenue, Suite 3900
Seattle, WA 98104
gyorkerwin@bakerlaw.com
(206) 332.7079

Also Present:        Owen Badin
-ooOoo-

Page 3

I N D E X

EXAMINATIONS                     PAGE
Examination By Mr. Floch............................  5
Examination By Ms. Ostler...........................  143
Examination By Ms. York-Erwin.......................  144


          E X H I B I T S
EXHIBIT NO.         DESCRIPTION            PAGE
Exhibit 1   Email Correspondence, Subject: ..... 16
            FW: NPR inquiry re Co-Diagnostics
            [CoDI_00030625-00030636]
Exhibit 2   United States Securities and ........ 35
            Exchange Commission Form 10-K

Exhibit 3   4/1/2019 Haynie & Company ........... 44
            letter to Co-Diagnostics, Inc.
            [CoDI_00011149]

Exhibit 4   Email Correspondence, Subject: ...... 68
            Re: Coronavirus test
            [CoDI_0001118-00011189]

Exhibit 5   FAQ: Co-Diagnostics ................. 88
            [CoDI_00104699-00104702]
Exhibit 6   Email Correspondence, Subject: ...... 95
            Fwd: TestUtah
            [CoDI_00004822-00004825]
Exhibit 7   "Exhibit A" Article.................. 102
Exhibit 8   Email Correspondence, ............... 106
            Subject: Nomi concerns

Exhibit 9   Email Correspondence, Subject: ...... 115
            Fw: Upcoming Press Notification
            May 1, 2020

Exhibit 10   United States Securities and........ 129
             Exchange Commission, Form 4

Page 4

March 10, 2023                    9:02 p.m.
          P R O C E E D I N G S
               -o0o-
     VIDEOGRAPHER:  We are going on the record. The time is 9:02 a.m.  Today's date is March 10th, 2023.  This is Media Unit 1 in the recorded video deposition of Richard Serbin taken by the counsel for the plaintiff in the matter of Gelt Trading, Ltd., versus Co-Diagnostics, et al, filed in the U.S. District Court, District of Utah, Central Division.
     This deposition is being held over Zoom. All counsel state who they are and who they represent for the record, please.
     MR. FLOCH:  Good morning, Brandon Floch from the law firm Marcus Neiman Rashbaum & Pineiro LLP here on behalf of the named class rep, Gelt Trading and the punitive class.  And with me are attorneys Michael Pineiro, with my firm, and Owen Badin with Fasano Law Firm.
     MS. OSTLER:  Joni Ostler from the law firm of Parr Brown Gee & Loveless appearing on behalf of defendants and on behalf of the witness Richard Serbin.
     MS. YORK-ERWIN:  Genevieve York-Erwin from Baker & Hostetler also appearing on behalf of defendants and Richard Serbin.

Page 5

Thereupon --
          RICHARD SERBIN,
   was called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:
          EXAMINATION
BY MR. FLOCH:
     Q.   Good morning, Mr. Serbin.  Can you please state and spell your name for the record?
     A.   Good morning.  Richard Serbin, R-i-c-h-a-r-d S-e-r-b-i-n.
     Q.   Mr. Serbin, have you ever been deposed before?
     A.   Yes, I have.
     Q.   About how many times?
     A.   Perhaps five or six times.
     Q.   And did those depositions occur in civil cases?
     A.   They were -- yes, they were all in civil -- yes, they were all in civil cases --
     Q.   And --
     A.   -- to the best of my recollection.  I cannot recall any other one, yes.
     Q.   Were those cases in which you were a plaintiff?

2 (Pages 2 - 5)

Page 6

A. Some of them. Well, I -- one -- I am just trying to think. One that I was a plaintiff. The other ones that I was testifying. One as the defendant and the others testifying on behalf of a client.

Q. Okay. So the one where you were a plaintiff, can you just generally describe that lawsuit for me?

A. Yes, it is Serbin versus Disney World. I was the president of the New Jersey Bar Association attending a Florida convention many, many years ago. This is in excess of 40 years ago --

Q. Okay.

A. -- just so we have a time frame.

I was accused of passing a counterfeit bill at Disney. I was taken in and questioned. At the end of the day, they found out that they had given me the money that was counterfeit, and I sued them for defamation and for mental distress. My children were there. My wife was there. The New Jersey Bar Association was there.

Q. Okay. And then you mentioned that you were involved in maybe one or two lawsuits where you were the defendant.

Can you just generally describe those for me?

Page 7

A. I was brought into a lawsuit many years ago with a company called Viropro, which was a company that I was a board member. And the case was dismissed and I never paid anything. I never had any judgment against me. Nothing happened at the end, a complete dismissal.

Q. Was it a securities fraud lawsuit?

A. No. It was a lawsuit about the misuse use of funds by the president of the company. And I was brought in because I was on the board of directors. And they never alleged that I misused funds or did anything wrong.

Q. So Mr. Serbin, it seems like you are generally familiar with the rules of a deposition, but let's just go over them so we are both clear.

First, because we have a court reporter today and we are on Zoom, it's important for me to get out my question and -- before you answer.

Do you understand that?

A. Yes, sir.

Q. Second, your attorneys may lodge an objection. After the objection is made, you can answer unless they tell you not to.

Do you understand that?

A. Yes, sir.

Q. And third, you understand you are under

Page 8

oath today; right?

A. Yes.

Q. And finally, I am going to be sharing some exhibits on the screen. If you can't see them or you need me to go slower, just let me know.

Does that make sense?

A. Yes.

Q. And finally, if you need a break at any time, just ask me. And as long as we are not in the middle of a question, I will allow to you take a break.

Does that make sense?

A. Yes, sir.

Q. Mr. Serbin, what did you do to prepare for today's deposition?

A. I reviewed some documents. I went back to my emails. I spoke to Counsel.

Q. So you said you reviewed some documents.

Without telling me any conversations -- I don't want to know about your conversations with attorneys, but generally, can you tell me the types of documents you looked at?

A. Press releases, user manuals for the technology.

Q. Besides press releases and user manuals for technology, did you look at any other types of

Page 9

documents?

A. Generally, not. There may have been others, but that's my recollection of what I looked at.

Q. And when you say, "User manuals for technology," can you provide me some more detail?

A. It was the user manual that accompanied the COVID test provided by Co-Diagnostics at that time.

Q. That's a user manual for the use of the COVID-19 diagnostic test that Co-Diagnostics sold; right?

A. Yes, sir.

Q. Okay. Besides your attorneys, did you speak with anyone else about this deposition today?

A. My wife. Other than that, I don't believe anyone else.

Q. And I think you said you also looked at your emails in preparing --

A. Yes, sir.

Q. -- for your deposition?

Can you generally describe for me your review of your emails to prepare for your deposition?

A. The emails that I looked at, or that I found, basically related to copies of the press release which I had sent to business associates of mine describing the results or describing the press release

3 (Pages 6 - 9)

Page 10

issued by Co-Diagnostics.

Q.   And when you say, "The press release issued by Co-Diagnostics," are you referring to a press release from around May 2020?

A.   Yes, sir.

Q.   Okay.  Besides the press releases, the emails and the user manual, did you look at anything else to prepare for today's deposition?

A.   Not -- not for -- not for today.  In the interim between when the lawsuit was filed and today, I may have looked at other things on the internet, but I am not sure of anything else beyond that.

Q.   When you say you may have "looked at things on the internet," what are you referring to?

A.   Well, just to see the -- the most current website for Co-Diagnostics.  Also, I had looked at the fact that your -- the counsel had filed lawsuits or had looked to find a class that would participate in a lawsuit, to see what was being asked for.

Q.   Mr. Serbin, I just want to shift gears a little bit and talk about your background.

A.   Sure.

Q.   Can you -- do you have a college degree?

A.   Yes, sir.

Q.   From where?

Page 11

A.   I have many college degrees.  My undergraduate degree is from Rutgers University.  I have a bachelor of science degree and a bachelor of pharmacy degree.  I have a law degree and then I have an advanced law degree.

Q.   Okay.  Where is the law degree from?

A.   Seton Hall Law School in New Jersey, the advanced law degree is the New York University Graduate School of Law.

Q.   And is the advanced law degree in a specific topic?

A.   Yes, sir.  Trade regulation.

Q.   Sorry, I missed that.  What --

A.   I have a masters in trade regulation.

Q.   Okay.  After law school, can you just generally describe for me your work experience?

A.   Yes, sir.  I started as -- after law school?  Okay.

I was -- went to law school with the undergraduate part at night.  So I worked full-time at the pharmaceutical industry Schering Corporation and then became Schering-Plough Corporation.  I then was recruited by Revlon Corporation as the chief FDA counsel for Revlon.  I worked there for a number of years.

Page 12

I then was recruited by Johnson & Johnson as the chief FDA counsel for Johnson & Johnson.  I worked for Johnson & Johnson and my position then changed, during my pendency there, into running businesses for Johnson & Johnson.  I sat on the board of 16 of the J&J operating companies.  I ran a number of business opportunities.  As well as when I left J&J, I ran corporate development for J&J.

After that, I had never practiced law after that period of time.  I've had many jobs but not practicing law.

Q.   So just generally, what -- what have your jobs been after you practiced law?

A.   Always healthcare related.  I built a number of medical advertising companies, which we sold all of them.  I built a contract clinical research organization, which we took public and sold to Covance, one of the leaders in that area.  I'm a specialist in -- I was, at that point, in clinical studies.

We worked in stem cells for years.  We worked in anti-aging medicine.  I have been a consultant for a number of government agencies over the years in the United States and abroad.

I run a seminar every year in Sweden for the last 15 years in healthcare called the

Page 13

Swedish-American Life Science Summit.  For the last 15 years, we have Nobel laureates and major people from Scandinavian and Nordic countries attend that.

Everything that I do is healthcare.  At this point, we license products from the National Institute of Health and develop them for the National Institute of Health.  Everything, again, is healthcare oriented.

Q.   Mr. Serbin, I am going to ask you to slow down a bit just for purposes of our court reporter.  You know they are typing everything you say.  So I want to make sure that they can catch everything.

Of the jobs that you have had in the healthcare industry, how many of them were you in charge of overseeing the launch or sale of diagnostic tests?

A.   None of them were -- none of them was I in charge of launching diagnostic tests.

Q.   Did any of the companies that you worked for sell diagnostic tests?

A.   Yes.  Johnson & Johnson and Schering sold diagnostic tests, so did Revlon in the pharmaceutical division when I worked for Revlon.

Q.   Okay.  Moving forward to today, are you currently employed in any management role?

4 (Pages 10 - 13)

Page 14

A.   I am involved in a number of companies, yes.

Q.   Can you just generally list your different roles with those different companies today?

A.   I am the founder of a number of the companies, which are related to contract clinical research --

(Clarification by the reporter.)

THE WITNESS:  I'm sorry.  Let me slow down and get closer.

I am involved with contract clinical research organizations, which are companies that do research for third parties, number one.  Number two, we are involved in developing cancer drugs as well as other drugs for therapeutic entities.  We are involved in the sale of consumer products and cosmetic products.  I am an advisor to a number of public and private companies.

I do sit on the board of a number of companies.  I am the founder and the chief executive officer and board member of a number of pharmaceutically-related companies.

Q.   How many public boards do you currently serve on, besides Co-Diagnostics?

A.   I serve on a company -- Inocon [phonetic],

Page 15

which is a public company.  I have just accepted another position on a company called IR Med [phonetic], which is a public company.  So that would be three current public companies.  I have sat on the board of other public companies in the past.

(Clarification by the reporter.)

THE WITNESS:  Sure -- the boards of other public companies in the past.

BY MR. FLOCH:

Q.   Okay.  Mr. Serbin, have you ever pled guilty to any crimes?

A.   At one point, yes, I did.  That was reversed and expunged.

Q.   Okay.  And what -- what was that crime?

A.   It dealt with falsifying documents for an insurance company.

Q.   Okay.  What -- what documents did you plead guilty to falsifying?

A.   It was one document with regard to my medical condition at the time.  Later, that was reversed, completely expunged from the record.  I do have a copy of the -- of the ruling from the judge exactly to that extent.

Q.   So, Mr. Serbin, I am going to show you what I am going to mark as Exhibit 1.

Page 16

(Exhibit No. 1 was marked for identification.)

BY MR. FLOCH:

Q.   And I'm going to share it on the screen.  Let me know when you see it.  And then I will ask you some questions about it.  Okay?

A.   Yes, sir.

Q.   Okay.  Mr. Serbin, do you see on my screen what is marked as Exhibit 1?

A.   Yes, I do.  I don't see -- yeah, now I see the top of it, yes.

Q.   And do you see it's an email from Jennifer Webb to Andrew Benson and Dwight Egan and there are two attachments?

A.   Yes.

Q.   And then if we scroll down, do you see that there is an attachment from -- dated June 28, 2006?

A.   Yes, sir.

Q.   And does it say "State of New Jersey Department of Law and Public Safety, Division of Consumer Affairs, State Board of Pharmacy"?

A.   Yes, it does.

Q.   And it looks like it is entitled "Provisional Order of Discipline"?

A.   Yes, sir.

Page 17

Q.   Can you just generally describe for me what this document is?

A.   This is a continuation of this original lawsuit against me, which was later dismissed.  But if you look at the time -- and the time of this dismissal, this was very close to the period of time.  And this had been scheduled and could not be canceled.  Again, at the end of the day, this was provided to them.  This was the order that they issued.  And on advice of counsel, I did not protest, but the -- based upon his representation that the overruling issue was the reversal and the dismissal and the expungement of the suit based upon which this hearing was related to.

Q.   Okay.  I want to direct your attention to paragraph 2, Mr. Serbin.

A.   Yes.

Q.   Do you see that it says, "Specifically, Respondent consented to the entry of the order finding that he did knowingly provide false and misleading statements to Reassure America Life Insurance Company by failing to disclose his work with Health Star Communications."

A.   That is --

Q.   Do you see that?

A.   That is -- that is the basis of what the

5 (Pages 14 - 17)

Page 18

original plea was based on, yes.

Q. So you agreed that you had provided false and misleading statements to a health insurance company; right?

A. What I agreed, based upon the advice of counsel, was to answer the question that I had done that based upon this litigation, which was subsequently reversed, overturned and expunged, yes.

Q. Did -- did you agree to give up your pharmacy license after pleading guilty to falsifying documents?

A. Did I? Yes.

Q. And since 2006, have you held a pharmacy license in any state?

A. No, I have not. However, I have not practiced pharmacy since 1969.

Q. Okay. And then if we scroll down, there's a second attachment to this email.

Do you see it on your screen?

A. Yes, sir.

Q. And do you see it says "Decision"?

A. Yes.

Q. And is it from the Supreme Court of New Jersey?

A. Yes.

Page 19

Q. Just generally, do you know what this document is?

A. I don't recall it now.

Q. Okay. Did the Supreme Court of New Jersey discipline you in your capacity as an attorney after you pled guilty for falsifying documents?

A. If my recollection is correct, they suspended me from practice of law for six months.

Q. Okay. And that suspension was based on the guilty plea that we've been talking about, about falsifying documents to a health insurance company?

A. That is the only reason that I know that that would have happened, yes.

Q. Got it. Okay. I just want to take you through this decision.

Do you see on the -- on the bottom of the page with 627 on it, leading to the next page it says, "Respondent stipulated"?

A. I do not see it, no.

Q. Sorry.

A. I see -- the only paragraph starts at the bottom says, "Respondent stipulated about retiring from the practice of law."

Q. Do you see on the bottom where it says 627, it says, "Respondent stipulated"?

Page 20

A. "Respondent stipulated," yes.

Q. Do you see where it says, "Respondent stipulated that he violated RPC 8.4(b) (commission of a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as a lawyer) and RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), based on his receipt of disability insurance benefits while gainfully employed"?

Do you see that?

A. Yes, sir.

Q. And you're the respondent that is referenced in this decision?

A. I believe that is me, yes.

Q. And do you know what conduct involving dishonesty, fraud, deceit or misrepresentation this decision is referring to?

A. It is referring to the decision that this order reverses and expunges and -- I just thought I would read the wording to you, so you have it in the context of the situation it says, "The plea of guilty" -- let me start.

[Reading] The charge embodied in the above accusation to which falsifying records fourth degree to be the same is hereby dismissed and the plea of guilty

Page 21

to the fourth degree falsifying records offense entered by the defendant before this court August 22, 2005. And the same is hereby vacated deemed null and void.

Q. Do --

A. So they are referring to something that had been reversed, expunged and my plea had been reversed.

Q. Did you pay a monetary penalty after pleading guilty to falsifying --

A. Yes, I did. Yes, I did.

Q. How much, Mr. Serbin?

A. I don't recall the exact amount, but I think it was over $100,000 based upon a premium -- not premiums, based upon payments that were made to me during the period that they claimed that I should not have been receiving the payments.

Q. I believe you testified earlier you remembered there being a penalty of about a six-month suspension from the Supreme Court of New Jersey; right?

A. That is my recollection.

Q. After that suspension, did you practice law in the state of New Jersey?

A. No, I had not practiced law for years before that either.

Q. And after that suspension, did you practice law in any state?

6 (Pages 18 - 21)

Page 22

A. No, I did not.

Q. So you haven't practiced pharmacy or law for many, many years; right?

A. That's correct.

Q. Okay. Now, you mentioned earlier that currently you are serving on three public boards; right?

A. I -- currently three, yes. And I am about to go on the third.

Q. And before that, you served on -- on many public boards; right?

A. I have served on several public boards.

Q. Before serving on each of those public boards, did you disclose your guilty plea of falsifying --

A. Yes.

Q. -- documents to an insurance company?

A. Yes, I did. But also more than that. Because this comes out in public or Google or wherever you found it or in the court records. And after it was reversed, of course, they never published that it was reversed.

So for many years, I had a GoDaddy ad that came up along with anyone that searched me to show exactly this document that had it down released --

Page 23

reversed and my plea had been withdrawn and nullified. And that's because I paid for it to be posted, not because the courts posted it.

Q. So you paid for a GoDaddy ad to link to a separate document to explain the document we just went through; right?

A. Exactly.

Q. And why did you do that?

A. Because the same question that you're asking me would come up by anybody searching, any time I go on the board, I would either tell them or they would search and ask me before I came in to explain that. It was just easier to put up on the board so that any time anybody looked for it, it would find this document.

Q. So I want to move now to talk about the company Co-Diagnostics.

When did you first hear about the company Co-Diagnostics?

A. I believe sometime in 2006, 2007.

Q. Okay. And what do you remember hearing about it when you first heard about the company?

A. It was introduced to me as an interesting diagnostic company with a unique technology -- that the person that introduced me to it thought that it was

Page 24

something that I could be of interest to them and should be of interest to me since I am very interested in diagnostics.

In my life in this business, I have seen things go from drug, being a very important drug screen, therapeutically very important diagnostics and devices that have become very important in the last 10 to 15 years. And I wanted to become more involved in that where I hadn't been as involved prior to that.

Q. Okay. Who -- who introduced you to Co-Diagnostics?

A. William McClusky [phonetic].

Q. And how do you know Mr. McClusky?

A. I have known Bill for many, many years as a result of both socially and he was the president of a company called Tourist Capital, which I have sought raising funds from in the past prior to my introduction to Co-Diagnostics.

Q. So going back to 2006, 2007, what relationship, if any, did you have with Co-Diagnostics when you first heard about it?

A. Prior to the introduction by Bill McClusky, none.

Q. And then after he introduced you to the company, what role did you have with Co-Diagnostics?

Page 25

A. After a period of time of learning a bit about the company and meeting the people, I was asked if I was interested in being an advisor to the company. I said yes. And I was retained as an advisor.

Q. Okay. What -- what year were you retained as an advisor?

A. I believe it was either in the end of 2006, but certainly during 2007.

Q. Okay. So you have had a relationship with Co-Diagnostics for 15-or-so years?

A. No, for six years.

Q. So when you say "2007," do you mean "2017"?

A. I am sorry. You are absolutely right. And I said '07. And that is erroneous. It's my fault stating it.

Q. So every time you said "2006" you meant "2016." And every time you said "2007," you meant "2017"?

A. I am sorry, you are quite correct.

Q. All right. So you have had a relationship with Co-Diagnostics for six or seven years?

A. Yes, sir.

Q. And during the time that you have had a relationship with Co-Diagnostics, have they been a public company the entire time?

7 (Pages 22 - 25)

Page 26

A.   No.  When I first joined, they were not a public company.

Q.   Okay.  Now, let's walk back a little bit.

What do you understand -- prior to coronavirus, what do you understand Co-Diagnostics to be in the business of?

A.   Of developing unique diagnostic tests for infectious diseases.

Q.   And before coronavirus, what diseases did Co-Diagnostics have diagnostic tests for?

A.   One of them that was of great interest to me was Zika.  I do a fair amount of work in Brazil.  And Zika was a very major problem in Brazil.  And so that was of great interest to me as well as the other tropical diseases that they had been working on.

They had another area in tuberculosis, which was an area that was of great interest as well as general infectious diseases such as your typical streps and other kinds of diseases.

I come from an industry where monoclonal antibodies and other products were being used for different diagnostic tests, such as pregnancy tests, not necessarily infectious diseases.  And it seemed to me the next step would be having a panel of diagnostic tests which would be more accurate and available

Page 27

generally.  And that's where my interest was, and they were working in these areas.

(Clarification by the reporter.)

THE WITNESS:  I do apologize.  I do have a speech impediment.  I had two strokes, and so unfortunately some of my speech is a little garbled.  So please don't hesitate if you don't understand what I said to ask me to repeat.

BY MR. FLOCH:

Q.   So Mr. Serbin, I think you just mentioned that you had a background in monoclonal antibody tests but you were interested in Co-Diagnostics because they had something called the panel of tests?

A.   They were working -- they were working on a panel of tests, yes.

Q.   And can you just help me understand, what do you mean when you say "panel of tests"?

A.   It would be a series of tests that looked in different indications.  For example, if a patient came in complaining of a sore throat, it may or may not be streptococcus.  So giving the wrong antibiotic for streptococcus if it was another offending organism could lead to the use the -- just to the fact that these antibiotics would be less useful with a real indication.

Page 28

So it was important to me to see someone develop tests which are accurately identifying the offending organism causing the underlying conditions.  And the panel of tests are something that would be used to identify an individual offending organism.  It might be very specific for an organism as opposed to multiple organisms.

Q.   When -- who at Co-Diagnostics brought you on as an advisor?

A.   I believe the original agreement was signed either by Reed Benson or Dwight Egan.

Q.   And what did you understand your responsibilities to be as an advisor to Co-Diagnostics?

A.   It changed over the period of time that I had been involved with them, but originally, I assume it was to help open some doors with the pharmaceutical industry, which is often why I am brought on by companies.  I had lived my whole career in the pharmaceutical industry.  I am fairly well known.  And I am able to open doors often for small companies to other groups that might be strategic partners or distributing agents for them.

Q.   Okay.  When you say, "open doors," what do you mean by that?

A.   Make an introduction.  It's often very

Page 29

difficult to get into pharmaceutical companies or other companies in the healthcare area because they are constantly being bombarded by people asking for meetings.  Everyone has the newest, best invention.

And so it's often useful for companies to find someone like me that comes out of the inside that can say they have looked at the opportunity, they opined upon it and bring it to the people that they know within the organization, using their credentials and credibility, and hopefully to say to something here that I think or that they think is of value to the organization.

Q.   Prior to being introduced to Co-Diagnostics, did you have any relationship with Reed Benson?

A.   None whatsoever.

Q.   And prior to being introduced to Co-Diagnostics, did you have any relationship to Dwight or Ike Egan?

A.   None whatsoever.

Q.   So in the beginning, your -- sorry, let me back up.

When you first meet people at Co-Diagnostics, you are an advisor; right?

A.   Yes, sir.

8 (Pages 26 - 29)

Page 30

Q.   At what point do you become a member of the board of directors?

A.   Prior to the public offering, but how much prior to that, I don't recall.

Q.   And who asked you to become a member of the board of directors?

A.   My assumption, it was Dwight Egan.  I don't know who else would have asked me.  But I don't -- I cannot tell you for certain it was Dwight.

Q.   And since 2017, have you served as a board of director at Co-Diagnostics?

A.   Yes, sir.

Q.   And what committees, if any, have you served on as a board of director at Co-Diagnostics?

A.   I served as the chairman of the compensation committee, on the governance committee and on the audit committee.

Q.   Okay.  What is the responsibility of the compensation committee?

A.   It's to review the compensation packages of the executives, bonuses, other cash or equity distributions to the employees, and to help guide and set policies with regard to general compensation and recruitment packages for the industry for the people coming to the company.

Page 31

Q.   And what are the responsibilities of the audit committee?

A.   To review documentation from the outside auditors, accountants and the internal documentation, taking a look at, within the guidelines, the financial workings of the company and other issues that come up relating to the financial aspects, whether it's raising money, going public, taking on debt, whatever it may be as part of the overall looking at the general business transactions of the company that affect the balance sheet and affect the dollars in and out of the company.

Q.   And what are the responsibilities of the governance committee?

A.   It's to look at how the -- the SEC and other regulatory agencies have guidelines with regard to how other public companies should be run, as well as we mesh that with how private and other companies should be run, looking at what kind of programs should be implemented, what needs to be implemented, what needs to be changed.  And on a constant basis looking at the operation of the company to try to keep in touch with, ahead of the curve as to how to run a public company for the benefit of the public as well as for the shareholders in general.

Q.   So just generally, for me, how -- how many

Page 32

hours per week do you spend working on your board duties for Co-Diagnostics?

A.   It varies from time to time and from different times of the year.  Obviously, right now, we are very involved in taking a look at the financials in preparation for SEC filings that are required.  Other times, there are issues that come up.

When issues are raised or when things need to be dealt with, there may be a new hire that's being considered, looking at the package for that person, whether it's options or cash or other kinds of opportunities or there is a new law that suggests that you should have better representation on the board.  You should have females or minorities or others with regard to that.  So it really depends on the time of the year.

I do spend a fair amount of time on this, as all the board members.  It's an active board.

Q.   And I think you said the board is pretty active in reviewing SEC filings?

A.   Let's see, yesterday was an example, there's an SEC filing that was going in.  And the board was on the phone with the auditors and the accountants and the attorneys going over the preparation of the filing.  Yes, sir.

Page 33

Q.   Is the board active in reviewing other public releases or statements that Co-Diagnostics makes?

MS. OSTLER:  Objection.  Vague and compound.

BY MR. FLOCH:

Q.   Mr. Serbin, you can answer after the objection is lodged.

A.   Okay, thank you.  I personally do not review prior -- I get to see them shortly before they are released.  I do not participate in drafting them or necessarily being part of the -- generally producing them.  Other board members may or may not.  I don't know the answer to that.

Q.   If you had comments on a press release or edits, do you think management would consider your edits?

A.   I think my comments are considered valid.  So I would hope so.

Q.   Okay.  So I want to go back to your earlier testimony.

You said when you first got connected with Co-Diagnostics it was a small company; right?

A.   Yes, sir.

Q.   Do you know how many employees they had

9 (Pages 30 - 33)

Page 34

when you first connected with them?

A. I don't recall how many they had specifically. I don't -- no, I don't recall.

Q. Do you know whether they had any major customers when you first connected with them?

A. I don't believe they had a major customer that would be considered a huge customer or a large customer.

(Clarification by the reporter.)

THE WITNESS: The answer was I do not believe they had a large customer, a single large customer.

(Clarification by the reporter.)

BY MR. FLOCH:

Q. Do you know if they sold any diagnostic tests in the United States when you first connected with them in around 2016?

A. I believe they had some customers for the tests, yes.

Q. In the United States?

A. They certainly had it outside of the United States. I do believe that they were working with some other groups. If you define "customers" as somebody that they are working with using their technology, the answer is, I believe, yes. If you are asking me: Do I

Page 35

know if they got paid for that, I don't know the answer to that.

Q. When you first connected with them, around 2016, do you know if they were operating at a loss?

A. I do not know the answer to that.

Q. Okay. I am going to show you, Mr. Serbin, what we are going to mark as Exhibit 2.

(Exhibit No. 2 was marked for identification.)

BY MR. FLOCH:

Q. And when it comes up on your screen, just let me know.

Mr. Serbin, do you see what has been marked as Exhibit 2 up on your screen?

A. Yes, I do.

Q. And can you just generally describe for me what this document is?

A. It's a Form 10-K filed to the Security and Exchange Commission and -- by Co-Diagnostics, Incorporated.

Q. And it appears to be for the fiscal year ended December 31st, 2019; right?

A. Yes, sir.

Q. Okay. I am going to scroll down.

Mr. Serbin, as a member of the board of

Page 36

directors, do you sign all of the filings that Co-Diagnostics makes with the Securities and Exchange Commission?

A. To the best of my knowledge, the ones that I am required to, yes, that the directors are required to. Yes, I do believe so.

Q. And do you see your signature on this 10-K?

A. I see the electronic signature.

Q. I am going to scroll up to -- do you see a section entitled "Competition" on your screen?

A. Yes, sir.

Q. And do you see that in the middle of the paragraph of that section it says, "We will need to overcome the disadvantage of being a startup with no history of success and no respect of the medical and testing professionals"; right?

A. Yes, sir.

Q. So at least as of December 31st, 2019, the company appeared to consider itself a startup; right?

A. I think that is a typical kind of risk factor that one would put in this, based upon where the company was at that point.

Q. What do you mean when you say, "this is a typical type of risk factor"?

A. I think you are asking me a question, sir,

Page 37

that, if you look through SEC filings, and, obviously, you have, there are hundreds of risk factors that companies put in there to try to correctly characterize the position and the risks of the marketplace, and this was an early-stage company. And clearly they were not a hot [inaudible]. They were not avid pharmaceuticals. And they were competing in a marketplace dominated by such people as that.

And I think that was a fair statement, yes, as to what the reality is there. And many risk factors try to characterize things such as this. And I think that was a fair characterization at that point, yes, sir.

Q. As of late 2019, do you know whether or not Co-Diagnostics was in danger of being delisted from NASDAQ?

A. I know, at some point in the history of Co-Diagnostics, it was in that position. I do not recall if it was in 2019.

Q. Why was it in danger of being delisted from NASDAQ?

A. My recollection was because of the stock price or the -- the amount of cash that it had or the value the company had.

Q. Okay. Let's -- let's break down those two.

10 (Pages 34 - 37)

Page 38

Why would the stock price put Co-Diagnostics in danger of being delisted?

A. From my understanding -- and I am not an SEC attorney. From my understanding is that there's a minimum stock price that was required at that point to maintain a listing on that exchange.

Q. Do you know what the minimum was?

A. I do not recall. And I do not know what it is now, so no.

Q. And then I think you mentioned you thought there may have been another risk factor that caused Co-Diagnostics to potentially be delisted and you said maybe cash on hand or something?

A. It might have been. Again, I don't know if -- I know that they were raising funds at that point. And I don't recall if that was because just a good business practice, which, of course, it is under any circumstance or one of the requirements of NASDAQ. But those were two things that were, I think, at the same time.

Q. Why would the amount of cash on hand cause a company like Co-Diagnostics to be in danger of being delisted from NASDAQ?

A. I am not sure. As I said, I may have misstated or misunderstood the combination of the two.

Page 39

They may have been separate issues. But, obviously, in any business you run out of cash, you run out of business as a result of that. Most small companies such as Co-Diagnostics are in constant search of cash.

Q. Okay. If we go up, do you still see on your screen, Exhibit 2, which is the 10-K filing?

A. Yes, sir.

Q. Do you see that there is a paragraph entitled "Major Customers"?

A. Yes, sir.

Q. And do you see where it says, "We had no major customers in 2019, but one customer in the first quarter of 2020 comprised approximately 20% of our sales to date and payment was received in advance of shipment of the tests."

A. Yes, I see that.

Q. Do you know who the one customer was that this 10-K filing is referring to?

A. I do not recall who that customer was, no, sir.

Q. Okay. And at least for 2019, Co-Diagnostics didn't have any major customers; right?

A. That's what we said at that point, yes, sir.

Q. Okay. Now if we go to the -- do you see

Page 40

there is a section called the "United States"?

A. Yes.

Q. Do you see in the second paragraph there is a statement that says, "We do not anticipate offering our tests in the United States in the near future"?

A. Yes, sir.

Q. Okay. So it seems like, as of December 31st, 2019, Co-Diagnostics did not have any customers in the United States; right?

A. Well, I think it could be incorporated as that. I am not sure if that is or is not accurate based on how you interpret it, you know, as a definition of customers as opposed to somebody paying or somebody using the tests in trials.

Q. And then do you see on your screen there is a section entitled, "Revenues"?

A. Yes, sir.

Q. And do you see that that paragraph says, "Sales of products in the twelve months ended December 31, 2019 were $214,974, which consisted of sales of testing equipment of" -- $128,000 -- 124 -- "$128,124, sales from the license of our technology in the agriculture industry of $50,000 and $36,850 which represented the initial sales of our diagnostic tests."

Do you see that?

Page 41

A. Yes, sir.

Q. So it seemed like for the year ended 2019, Co-Diagnostics had only about $36,000 in sales of its diagnostic tests; right?

MS. OSTLER: Objection. Misstates the document.

THE WITNESS: I think you could draw that conclusion from seeing -- reading that.

BY MR. FLOCH:

Q. Okay. And then if you look at the last sentence, it appears to say that testing revenue or revenue from selling diagnostic tests was only about $700; right?

A. Yes, sir.

Q. Okay. And then if you go down, do you see there's a section that says "Net Loss"?

A. Yes.

Q. And it -- that paragraph says, "We had net loss of $6,271,723 for the year ended December 31, 2018 compared to a net loss of $6,195,557 for the year ended December 31, 2019"?

A. Yes.

Q. So it seems like up until December 31st, 2019, for the entire time that you had been at Co-Diagnostics, it was not making money; right?

11 (Pages 38 - 41)

Page 42

A. Yes.

Q. Okay. And were you participating as an advisor and as a board director in 2016, 2017, 2018 and 2019?

A. I was -- at different times, I had different functions, yes. Part of the time I was an advisor, part of the time I was a board member, but my advisory as an advisor designee had ceased. I did not have those two positions at the same time.

Q. Do you remember when your advisor role ceased?

A. No, I am sorry, I do not.

Q. And did your responsibilities to Co-Diagnostics change when you moved from an advisor to a board director?

A. I took on a fiduciary responsibility, which was different than as an advisor, sure.

Q. And how were those responsibilities different, to your understanding?

A. Well, one, I was asked different questions. And number two, just by the nature of being on the board, I had other responsibilities that were mandated as a board member of a public company.

Q. And one of those responsibilities was overseeing the financial audits of the company?

Page 43

A. I am not sure that I was on the -- at that point, I don't know when I became a part of the audit committee. I don't recall the date of that.

Q. Which auditors have audited the financials of Co-Diagnostics?

A. There have been a number of them over there. I have the names in the books, but I could not give you the names offhand or the time periods, but they are all documented. There have been more than one during that period.

Q. Generally, what is the role of an auditor when it's looking at a company?

A. Well, obviously -- not obviously. The company has its own internal financial group that prepares documents and keeps records and the auditors go in to take a look to see if these statements are correct, appropriate and meet qualification or create issues that need to be resolved in my opinion.

Q. Have you heard of the term "internal control"?

A. Yes, sir.

Q. And what does that term mean to you, Mr. Serbin?

A. It means to me, the requirements and regulations that have been established to -- and the

Page 44

rubrics by which the -- the financial -- or at least the internal operations to which that refers are monitored and checked to make sure they are in compliance with.

Q. In your role on the audit committee, have any Co-Diagnostics auditors raised any concerns with the internal controls of the company in their audit reports?

A. I believe a couple of years ago, there might have been one question that was raised. I believe that it had been resolved positively with the responses that the company provided to the auditor.

Q. And just generally, what were the concerns that the auditor raised?

A. I don't recall, but I know it -- to the best of my recollection, it was resolved without any other controversy or question by the response provided by the people internally to the auditors.

Q. Mr. Serbin, I am going to show you what I am marking as Exhibit 3.

(Exhibit No. 3 was marked for identification.)

BY MR. FLOCH:

Q. And just let me know when it comes up on your screen.

Page 45

A. Sure.

Q. Mr. Serbin, do you see an exhibit on your screen?

A. I see an exhibit from Haynie & Company dated April 1st, 2019.

Q. And can you just generally describe for me what this exhibit is?

A. I have no idea. I need to read it, if I may.

Q. Okay. Just take a second to look at it, and then let me know when you are finished.

A. Sure. I am sorry, I read slowly. As I said, I have had two strokes. And my reading --

Q. Mr. Serbin, there's no need to -- you take all the time you need and just let us know when you are ready. Don't worry.

A. Thank you. Thank you. I have read the document.

Q. Can you just describe generally what this letter is?

A. It is a letter from Steven Avis, who is a partner in Haynie, providing information to the audit committee indicating the results of their analysis of the internal controls and raising issues that they have requested either action or response to for

12 (Pages 42 - 45)

Page 46

clarification.

Q. And were you on the audit committee in April of 2019?

A. I believe I was, yes.

Q. And if we read in the first paragraph, it says, "We noted certain matters involving internal control in its operation that we consider to be significant deficiencies or material weaknesses under standards of the public company accounting and oversight board."

Do you see that?

A. Yes, sir.

Q. And then the document goes on to list some of those significant deficiencies; right?

A. Yes.

Q. And some of them have to do with Co-Diagnostics' accounting?

A. With the Indian operation, yes.

(Clarification by the reporter.)

THE WITNESS: Yes, certainly. The reference is to the operation that Co-Diagnostics has a joint venture for in India, in the country of India, CoSara.

BY MR. FLOCH:

Q. What is CoSara?

Page 47

A. CoSara is a joint venture between Co-Diagnostics and an Indian conglomerate group that is charged with looking at building a market for the Co-Diagnostics products in India and other areas in that region.

Q. And this document also notes some deficiencies with providing cash advances to members of management?

A. I see that, yes.

Q. Do you recall discussing among the audit committee any of these deficiencies?

A. I remember this -- I am looking at this and I do remember a CoSara conversation, yes. I am not sure that I recall the other issues. I do not recall specifically the cash advances to Dwight Egan or failure to report quarter three adjusting journal entries for CoSara. I do not recall those conversations specifically.

MR. FLOCH: Mr. Serbin, we have been going about an hour. Would you like to take a five-minute break?

THE WITNESS: I'm fine. Thank you.

MR. FLOCH: Okay.

THE WITNESS: I prefer to continue.

//

Page 48

BY MR. FLOCH:

Q. So let me shift gears a little bit and ask what you did to produce documents, if any, in this case.

Did you provide any emails to counsel to produce your emails in this case?

A. I don't believe so, no.

Q. You didn't provide --

A. I mean, I am sorry, maybe I misunderstood the question. Please --

Q. Why don't you let me reask the question.

A. Thank you.

Q. Did you give access to your -- any email accounts to your lawyers --

A. Yes.

[Overlapping speakers. Inaudible.]

BY MR. FLOCH:

Q. -- search for --

[Overlapping speakers. Inaudible.]

THE WITNESS: I'm sorry --

BY MR. FLOCH:

Q. -- which is --

A. -- the answer is yes to that.

COURT REPORTER: You guys are talking over each other way too much. I am not sure what anybody

Page 49

just said.

THE WITNESS: Okay. I'm sorry about that.

BY MR. FLOCH:

Q. I will ask the question again just so the record is clear.

Did you provide access to your email account to your -- to your attorneys?

A. Yes, I did.

Q. And to your understanding, did they produce any of your relevant emails to Plaintiffs in this case?

A. I do not know.

Q. What email address do you use to conduct your board work for Co-Diagnostics?

A. I only use one email address for all of my information. That is richardserbin@yahoo.com.

Q. Do you ever communicate with other board members via text message?

A. I don't like text messages, so I probably don't, but it's not impossible that I have. I prefer to use email.

Q. Okay. I just want to shift briefly and now ask about some of the members of management of Co-Diagnostics.

Who at Co-Diagnostics, in management, do you interact with?

13 (Pages 46 - 49)

Page 50

A. It depends on what issue. I mean, in general, with Dwight Egan. I also interact with the chief financial officer on occasion. And in the past -- oh, and Reed Benson was there as the internal legal counsel as well as secretary and involved in the financial aspects of the company. I interacted with Reed to a much lesser degree, though, also with Joseph Featherstone on some issues when I thought there might be an opportunity for him to speak to somebody for a potential sale.

Q. Okay. Mr. Dwight Egan is the CEO?

A. Yes, sir.

Q. And Mr. Reed Benson was the CFO?

A. Yes, sir.

Q. And who is the current CFO of Co-Diagnostics?

A. Brian is right now.

Q. What is Brian's last name?

A. I am having a -- a senior moment right now.

(Clarification by the reporter.)

THE WITNESS: I'm sorry. The answer is: I apologize. I just am having a blockage right now on that.

BY MR. FLOCH:

Q. And what was Mr. Featherstone's role at the

Page 51

company?

A. When I worked with Joseph Featherstone, it was primarily sales.

Q. Do you know what Mr. Featherstone's title was?

A. I don't know the exact title, no.

Q. Who is Eugene Durenard?

A. Eugene Durenard is -- first of all, he is a friend of mine that I recommended to join the board of directors of the company and a business partner of mine in other transactions outside of Co-Diagnostics.

He is a PhD mathematician from Harvard. He ran a fund in Bermuda, and he has run other funds in Latin America.

Q. When did you bring Mr. Durenard on to the board?

A. I am not positive. I assume it was 2019, 2020, somewhere in that area. I recommended him to the board.

Q. And does Mr. Durenard serve on any committees?

A. Yes. He is the -- he serves on the compensation committee. He serves on the governance committee, but he is the chairman of the audit committee.

Page 52

Q. And just generally, what is your relationship with him outside of the board work at Co-Diagnostics?

A. Well, first of all, he is my friend, to be clear. Second of all, he is a business associate that I have other business relationships with.

Q. Okay.

Who is James Nelson?

A. James Nelson is a gentleman that was brought on to the board by Mr. Egan. He is a seasoned healthcare and businessman, somebody that I think takes a lot of interest and works very hard for the company.

Q. And who is Ted Murphy?

A. Ted Murphy is a gentleman from Canada who came on the board at the request of one of the investors that put money into the company.

Q. And now, just moving to -- to some folks in management, who is Brent Satterfield?

A. Brent Satterfield was one of the founders of the company, and he is the scientific person behind the technology.

Q. Is Mr. Satterfield still with Co-Diagnostics?

A. Dr. Satterfield has a function with regard to the board of advisors, the scientific advisors. He

Page 53

does not have a day-to-day operation within the company that I am aware of.

Q. When did he leave the company for the day-to-day work?

A. I -- I am -- a couple of years ago, at least. Exactly when? I am not certain.

Q. Do you have an understanding of why he left the day-to-day role of the company?

A. No. I have a speculation, but not a -- not a real understanding, no.

Q. What's your speculation?

A. He wanted to play bass guitar.

Q. You mentioned the name Reed Benson before; right?

A. Yes, sir.

Q. And you said that Mr. Benson had two roles at the company?

A. At least that I am aware.

Q. One was CFO; right?

A. Yes, sir.

Q. And he is no longer CFO; right?

A. He is not.

Q. When did he leave his CFO role?

A. I -- about two years ago.

Q. Do you have an understanding as to why he

14 (Pages 50 - 53)

Page 54

left that role?

A.   Mr. Benson is my agent.  He is smarter than I am.

Q.   And the second role Mr. Benson had was in internal legal?

A.   Yes, sir.

Q.   Does he still -- does he still operate as an internal legal advisor?

A.   He still has a role within -- inside the company.  The exact nature of that role, I don't know what it currently is.

Q.   Are you aware whether or not Mr. Benson has pled guilty to any securities violations?

A.   I am unaware of that -- of any.

Q.   Have you ever heard of the firm Carlton Bitral [phonetic]?

A.   No, sir.

Q.   Do you know whether or not Mr. Benson had any issues with securities regulators in Spain?

A.   I am unaware of any.

Q.   Let me just go back to Mr. Satterfield.  You said he wanted to play bass guitar.  Was he asked to leave --

A.   Not --

Q.   -- the company?

Page 55

A.   Not to the best of my knowledge, no.  I am being a little sarcastic.  I am a bass guitar player also.

Q.   Okay.

A.   So please forgive me.

Q.   Did this lawsuit have anything to do with Dr. Satterfield's change in role?

A.   I can't -- not to the best of my knowledge.

Q.   Have you ever discussed Dr. Satterfield's change in role with any other members of the board?

A.   Possibly.

Q.   And what do you recall about those discussions?

A.   I don't remember specific discussions, but it's not improbable that there were some discussions.

Q.   Who is Seth Egan?

A.   Seth Egan is Dwight Egan's son.

Q.   Okay.  And does he have any role at Co-Diagnostics?

A.   Yes, he has an important role.  He heads up the sales effort.

Q.   Do you have any interactions with him?

A.   I have had --

Q.   Sorry, let me finish the question, Mr. Serbin.

Page 56

A.   I am sorry.

Q.   In your capacity as a board member, do you have interactions with Seth Egan?

A.   Not routinely.

Q.   Outside of your role as a board member, do you have interactions with Seth Egan?

A.   Not at all.

Q.   Okay.  What about Andrew Benson, who is he?

A.   He is involved in public relations.  He is the son of Reed Benson.

Q.   Does he have a science background?

A.   I do not believe so.

Q.   Do you know where he worked before Co-Diagnostics?

A.   I believe he worked with his father in some other organization.  That may or may not be accurate.  That's my recollection.

Q.   And in your capacity as a board member, do you have any interactions with Andrew Benson?

A.   Minimal.

Q.   What are the nature of those interactions?

A.   Well, he will send press releases to me and other board members, directors.  I have been in New York at meetings that he has attended where Mr. Egan had been a presenter.  And I have been at luncheons

Page 57

with him.  Beyond that, nothing.

Q.   Who is Rebecca Garcia?

A.   She was with the company.  I know the name, but I had never had any interactions with her.

Q.   Is she still with the company?

A.   I do not believe so.

Q.   Do you have an understanding of why she is no longer with the company?

A.   I do not.

Q.   What about Dennis Crockett [phonetic]?  Do you know him?

A.   A name that I know.  A person that I don't believe I ever spoke to.

Q.   What about Cecilia Hutchins [phonetic]?

A.   Again, a name that I am aware of.  A person that I never interacted with.

Q.   Do you know whether or not she is still with Co-Diagnostics?

A.   I do not know that.

Q.   Do you recognize the name David Elkington [phonetic]?

A.   I do not.

Q.   What about Jennifer Webb [phonetic]?

A.   Jennifer Webb is a name that I've seen before, yes.

15 (Pages 54 - 57)

Page 58

Q. And who is Ms. Webb?

A. I believe Ms. Webb worked with Andrew Benson in some capacity.

Q. In -- in what capacity?

A. I think that she was part of the responsibility for handling PR information or requests from the outside. It's my recollection. I may be wrong, but that's what I think.

Q. Mr. Serbin, I think now would be a good time for a break. Let's go off the record quickly.

VIDEOGRAPHER: Off the record. 10:14.

(Recess was taken.)

VIDEOGRAPHER: This is Media 2, we are back on the record. The time is 10:31.

BY MR. FLOCH:

Q. Mr. Serbin, when did you first hear that Co-Diagnostics was developing a COVID-19 diagnostic test?

A. I am not sure if it was the end of 2019 or the beginning of 2020. I am sorry, try that again. I am sorry, I am terrible with the dates. So I apologize.

No, I think that actually is right. I'm sorry, yeah. Just before they had actually determined that Co-Diagnostic -- rather that COVID-19 was an

Page 59

issue, I know that they had been working with the COVID-19 virus before it was -- it had become such a prominent issue in the public. So I guess it was shortly before it was acknowledged to be a pandemic.

Q. Okay. And when you say, "they," who are you referring to?

A. I -- "they," being the people at Co-Diagnostics as a group working on a project.

May I just correct something that I said before? I went back into my -- I am sorry. You had asked me before about the chief financial officer, it's Brian Brown.

Q. Okay.

A. Sorry. I've been on the phone. That was just a correction. Sorry.

Q. Thank you for that.

So going back to the end of 2019, early 2020, who at Co-Diagnostics developed the COVID-19 diagnostic test?

A. My belief is that Brent Satterfield was the lead. Obviously, he had a team that worked with him, but I believe he was the lead.

Q. And if I refer to the COVID -- sorry, if I refer to the Co-Diagnostics COVID-19 diagnostic test today as the "test," will you understand what I mean?

Page 60

A. Yes.

Q. And does Co-Diagnostics sometimes refer to that test as the Logix Smart test?

A. Yes, sir.

Q. So if I say the "test" or "Logix Smart test," you will understand I am referring to the Co-Diagnostics COVID-19 diagnostic test; right?

A. Yes, sir.

Q. Okay. So you said, Mr. Satterfield, you think, developed the test with others; right?

A. I think he was the lead, yes --

Q. And just --

A. -- as working with others, yes.

Q. Can you explain to me what goes into developing a diagnostic test at a company like Co-Diagnostics?

A. I can give you general information, but not specifics. I mean, the answer is Dr. Satterfield had a new approach to looking at how you do diagnostic testing. And it incorporated typical testing procedures as well as artificial intelligence and identifying very specific areas on the -- on the offending agent that were unique to that particular agent, and then developing a test that looked for those specific markers rather than general markers.

Page 61

So the first thing was to identify, on that organism, what are those specific markers. And then have the technology to be able to find them in a reproducible, reliable way.

Q. You said that Mr. Satterfield had a "new approach" you called it; right?

A. Dr. Satterfield has a patented, which would indicate it's a new approach, to be able to diagnose different kinds of disease entities.

Q. Can you just generally describe for me what -- what is that new approach?

A. It looks for markers. Each organism has some unique RNA, unique genetic material. And if you can identify that specific genetic material, you know for sure that it's that organism, as opposed to a general test that looks for other markers that may be there, like, proteins. But Dr. Satterfield's test is very targeted, looking for very specific portions of the molecule or portion of the organism that emit these very specific entities. And once you find them, you know that it is that organism, offending organism.

Q. Was Dr. Satterfield's new approach different than the approaches that Roche, for example, took to developing a COVID-19 diagnostic testing?

(Clarification by the reporter.)

16 (Pages 58 - 61)

Page 62

MR. FLOCH: Roche, R-o-c-h-e.

THE WITNESS: I do not know how Roche approached their testing.

BY MR. FLOCH:

Q. And Mr. Serbin, you are not -- you're a scientist who understands the nuts and bolts of diagnostic testing; right?

A. Yes, sir. That is correct.

Q. Okay. But you understand it at a high, general level; right?

A. I have a general understanding, yes.

Q. And I think you testified previously that you believed Dr. Satterfield's new approach could produce reliable indicators if a patient had COVID-19; right?

A. Yes, sir. I believe if you look for the right end points and then you find them, it increases the reliability of what you are doing as opposed to looking for general information.

Q. Between the time that Co-Diagnostics started looking to develop a COVID-19 diagnostic test and when they created it, do you know how much time elapsed?

A. I do not.

Q. Was it a fairly quick process?

Page 63

A. I believe it was surprisingly quick, yes.

Q. When you say "surprisingly quick," why are you using the word, "surprising"?

A. Because often it takes a long time to find the diagnostic or answers for medical questions that pop up; ergo, we have been surprised, again, with the vaccines.

So perhaps, you know, it wasn't as surprising as I thought it was, but based upon my history, I thought it was a good short time, and a fortunate situation based upon what happened with this pandemic.

Q. Generally, in your history, how long does it take to develop a reliable diagnostic test?

A. I don't have a lot of experience in developing diagnostic tests, specifically, but it depends upon the organism, I assume. So I can't give you a time -- a legitimate time frame.

Q. But it seems like your testimony earlier was that this was among the fastest you had ever seen a test designed; right?

A. I was surprised that they had a reliable rapid test that I thought answered the questions in that period of time, yes.

Q. Were you involved at all in obtaining

Page 64

regulatory authority for Co-Diagnostics to sell the COVID-19 diagnostic test?

A. No, I was not.

Q. Did you have any responsibility for finding buyers for the COVID-19 test?

A. I was never asked to have responsibility. Did I bring people that I thought would be buyers with the test to the company or the company to buyers that I knew? Yes.

Q. Did Co-Diagnostics pay you to find customers for the COVID-19 diagnostic test?

A. I never asked for nor did I ever receive any compensation for introducing potential buyers or buyers.

Q. So just generally, can you help me understand does -- does Co-Diagnostics sell its test directly to labs?

A. It does in some instances, yes.

Q. Does it also use distributors to sell its tests?

A. Yes, sir.

Q. So once Co-Diagnostics developed the test, was it able to sell that test in the United States right away?

A. No.

Page 65

Q. Okay. Can you generally walk me through the process that has to happen before Co-Diagnostics was allowed to sell to U.S.-based customers?

A. Well, they were -- first of all, they were allowed to sell to CLIA laboratories, which was not considered as we view -- as a normal commercial test but it had to a registered CLIA laboratory, which is a government registration with that specific technology.

The company then filed for something that is very unusual in the U.S. regulatory landscape of an emergency use authorization. And they were able to obtain one. There were very few that was issued. But the U.S. government issued that. Once that was issued, they were allowed to sell commercially.

Q. Okay. You testified that it is unusual to get an emergency use authorization; right?

A. That is not a normal procedure for going to market, yes, sir.

Q. Why is it not a normal procedure for going to market?

A. The FDA has a very clear procedure with regard to approving products that they put on the market. However, just to make it clear, Co-Diagnostics was not the only company that applied for it. And not the first one to receive it. Roche and Abbott and

17 (Pages 62 - 65)

Page 66

others that applied for it also, and had received emergency use authorization. The data submitted to the FDA and thoroughly reviewed, in my opinion, by the FDA gave the FDA the basis for this extraordinary ability to approve the emergency use authorization for Co-Diagnostics' technology.

Q. Have you heard of the term "RUO"?

A. I am not sure that I have, no.

Q. Okay. So let me just make sure I understand the process.

So once Co-Diagnostics creates the test, they are allowed to sell to CLIA labs, right, immediately?

A. CLIA labs are an exemption they are allowed to sell to, yes.

Q. And what does "CLIA" stand for?

A. I can't tell you what the letters -- Clinical Laboratory-something Association, but it's a unique group of laboratory -- clinical -- of laboratory companies.

Q. But before the FDA puts their stamp of approval on a test, a company cannot sell the test to anyone else besides the CLIA labs; right?

A. There are certain exemptions, but the answer is -- in general, the answer is: They are not

Page 67

supposed to, yes.

Q. And then once a company gets emergency use authorization, then it can sell the test to more users than just the CLIA labs?

A. Under the terms and conditions of the emergency use authorization, it specifies the sales conditions.

Q. Did you have any role in helping Co-Diagnostics obtain emergency use authorization for the test?

A. I did not, sir, no.

Q. Do you know who at Co-Diagnostics had a role obtaining emergency use authorization?

A. They -- I don't recall which outside vendor they used. But I believe they used an outside vendor to help them with that.

Q. What kind of outside vendor would be --

A. It would either be a clinical research laboratory or an FDA regulatory consultant that deals in moving products through the FDA administrative channels.

Q. So after obtaining emergency use authorization, are there any regulatory hurdles that a company has to meet before it can sell a product more broadly like the Co-Diagnostics --

Page 68

A. Not unless the FDA has put those conditions upon them. And then there are other things one can do after that or not do after that, that some do, and some don't.

Q. So to your understanding, once the emergency use authorization was received by Co-Diagnostics, it could sell tests -- its test to anyone in the United States?

A. Subject to the approval letter.

Q. Okay. Let me show you, Mr. Serbin, what we are marking as Exhibit 4.

(Exhibit No. 4 was marked for identification.)

BY MR. FLOCH:

Q. Mr. Serbin, do you see Exhibit 4 on the screen?

A. Yes, I do, sir. I see an exhibit that says message from Eugene Durenard sent 3/11/2020 to me.

Q. Why don't you take a second to look at it and then let me know when you are done and I will ask you some questions. Okay?

A. Yes, sir.

MS. OSTLER: I want to note for the record that this document does not have its attachment included.

Page 69

THE WITNESS: I have read the letter, thank you. I have read the email, thank you.

BY MR. FLOCH:

Q. Okay. So this is an email from Mr. Durenard to you --

A. Dr. Durenard, yes.

Q. I apologize. Dr. Derenard to you, around March 11, 2020; right?

A. Yes, sir.

Q. And what are you discussing in this email?

A. He is giving me information. If I recall correctly, because the only reason that I seemed to think that I am referring to the correct situation, he refers to the Rockefellers.

We were approached by Stephen Rockefeller, one of the branches of the Rockefeller family, with regard to an interest in Co-Diagnostics. I know them, I have worked with them before. One of my business associates represents their interests. We were invited to make a presentation.

At that presentation, I think they showed several other diagnostic agents that they were considering. And then I had circulated -- I assumed to Eugene and to others to look at. And these were his comments back with regard to that. And his thoughts

18 (Pages 66 - 69)

Page 70

have had a position in the conversation, what I believe he said.

Q. So you were potentially going to present the Rockefellers with the Co-Diagnostics test but maybe other tests to buy; right?

A. I was not, no. I was only going to show them the Co-Diagnostics test, but I had been told that they were looking at other tests prior to the Co-Diagnostics test. And so I was just preparing to answer questions that they might have with regard to the other tests for how this differentiated between them.

Q. Did you have any financial incentive for the Co-Diagnostics test to be sold rather than other tests?

A. Did I? No. I mean, obviously, no, I can't -- the answer is -- do I have -- did I have -- did I have stock options in the company? Yes. So the stock became more valuable, that was my incentive. Beyond that, the answer is no.

Q. So the company wasn't going to compensate you with a bonus if you found potential buyers?

A. I hadn't asked for one. I wouldn't accept one.

Q. Why wouldn't you accept one?

Page 71

(Clarification by the reporter.)

THE WITNESS: I did not ask for one nor would I accept one.

BY MR. FLOCH:

Q. And my question was: Why wouldn't you accept one?

A. Because in the business that I do, I bring opportunities together with people. And if it looks like I am being driven by a financial means, it undermines my credibility.

Q. Do you see in the last paragraph of this email, Dr. Derenard wrote to you and said, "We just need to help Ike and team to do a few of those sales to the commercial labs and R&D community, which, as you know, I have already started. All we need now is for him to recognize those efforts and compensate us."

Do you see that?

A. Yes, I do.

Q. Did you ever reply to Dr. Durenard and say, "Hey, what are you talking about? I don't want any compensation for finding buyers"?

A. I don't know if ever I did. I had worked with Eugene, Dr. Durenard, for a number of years. I continue to work with him.

In all of the deals we have done, I'd never

Page 72

take compensation for anyone that I have introduced him to. So it is my pattern and practice, what he asks for, and what he wants is between him and the company, not me.

Q. Let's move forward a little bit.

Around March 2020, April 2020, who are the major buyers of Co-Diagnostics' COVID-19 test?

A. It is a very confusing question. It is a very important question.

There were so many political things going on at that time with how orders were being placed, who was buying. We worked -- I personally had a lot of contact with states and other people that should have been interested in this. The company got some orders from people, didn't get orders from other people.

There was a lot of people scurrying for position and pulling in political favors with regard to things which I completely believed were inappropriate. I am not a big supporter of the antigen tests and they were being promoted as the answer to this opportunity.

I knew enough to know that the antigen test you might as well flip a coin, and that was not the answer, as an epidemiologist, to figure out how to solve this problem or do something that was meaningful.

So I was distressed at the confusion that

Page 73

was going on during this, which is not surprising with something that we had not faced before.

Q. Let's break down a little bit what you said.

So first, you referenced something called an antigen test, which I take is different than the test that Co-Diagnostics was selling; right?

A. That looks for proteins, as opposed to RNA. It is far less specific. Yes, sir.

Q. Is it correct to call the Co-Diagnostics test a "PCR" test?

A. Yes, sir.

Q. And an antigen test is something different?

A. Yes, sir.

Q. Okay. And so you said that a lot of political things and political favors were going on.

Can you elaborate by what you mean by "political favors"?

A. I live in New York City. And the sales of a lot of these tests were given to people that were political supporters of the governor or the mayor or other people that were buying these tests, which I think in the cold light of looking at the value of those tests, were not up to what they should have been or could have been. That's my personal opinion.

19 (Pages 70 - 73)

Page 74

Q.   So let's go back to what my question was originally.

Who -- who were the major customers for Co-Diagnostics' COVID-19 tests in March, April, 2020?

A.   I believe laboratories. I believe that there were sales efforts made towards states which were large buyers, like the state of Florida or some government agencies which would be large buyers.

Q.   Okay. And I think you testified earlier that you had some personal involvement in talking to state buyers; right?

A.   I -- I spoke to friends of mine that were involved with state buyers, yes, sir.

Q.   Okay. Can you explain to me which states you talked to about buying Co-Diagnostics' COVID-19 tests?

A.   The three main states were New Jersey, Pennsylvania and New York -- New York.

Q.   Okay. Who did you speak with in New Jersey?

A.   I -- in New Jersey, Jerry Brager.

Q.   And what was the -- sorry, can you spell that?

A.   Surely. B-r-a-g-e-r.

Q.   And who was Mr. Brager?

Page 75

A.   Jerry Brager is also a former partner of mine who sits on the board of a number of hospital chains and has been a consultant in the healthcare area in the state of New Jersey over the years.

Q.   And what were the substances of the conversations with Mr. Brager in March or April of 2020 regarding Co-Diagnostics?

A.   I told him I was on the board of directors of the company. I told him I believed in the technology, and I thought in my opinion, it was superior to others. And I provided him with some background information. And I asked him if he could be helpful, it would be very much appreciated. I thought it would do New Jersey a service, and I thought it was a good thing for him to take a look and bring to his people.

Q.   Did the state of New Jersey end up purchasing any tests from Co-Diagnostics?

A.   Unfortunately, not to the best of my knowledge. Certainly, not through Jerry Brager.

Q.   Do you know why that decision was made by the state of New Jersey?

A.   I really do not know the answer, no.

Q.   Okay. Besides Mr. Brager, did you speak with anyone else representing the state of New Jersey

Page 76

about the --

A.   I personally did not.

Q.   When you say you "personally did not," did Co-Diagnostics speak with anyone else in New Jersey?

A.   Not because of Jerry Brager. If it was to someone else, I am unaware of it.

Q.   So you also mentioned Pennsylvania.

A.   Yes, sir.

Q.   Who at -- who, on behalf of the state of Pennsylvania, did you speak to about Co-Diagnostics?

A.   Wayne Morrison.

Q.   And who is Mr. Morrison?

A.   Mr. Morrison is a resident of Pennsylvania involved in politics in Pennsylvania and someone that I've worked with on other projects. He, in fact, is my introduction to the Rockefeller family, and I had worked with him trying to present the opportunity to the Rockefeller family.

Q.   And what was the substance of your conversations with Mr. Morrison about Co-Diagnostics, just generally?

A.   Just, basically, the same thing, that I was on the board of directors of the company. I believed this was advanced technology. I thought that it would be very valuable to bring to Pennsylvania. It

Page 77

certainly would be helpful to the people. And I thought that it would be very good for him to bring this opportunity.

Q.   Did Pennsylvania end up purchasing tests from Co-Diagnostics?

A.   Not through Mr. Morrison. I do not know if they purchased tests, but not through Mr. Morrison.

Q.   Okay. And the last state I think you mentioned was New York; right?

A.   Yes, sir.

Q.   Who in New York did you -- sorry, let me back up.

Who from the state of New York did you speak to about Co-Diagnostics?

A.   A young woman named Love Malone, M-a-l-o-n-e.

Q.   And who was Ms. Malone?

A.   Ms. Malone is a young lady who was involved in healthcare legislation, had worked for some of the Congressmen in New York City and was the only person that I really knew in New York that I thought could be of help in bringing this opportunity to the state of New York, that I knew.

Q.   Did the state of New York purchase any tests from Co-Diagnostics?

20 (Pages 74 - 77)

Page 78

A. I believe they did, but not through Ms. Malone.

Q. Okay. And I think you testified earlier you -- you have no understanding of why New Jersey and Pennsylvania decided not to purchase from Co-Diagnostics?

A. That is correct.

Q. So I think you testified before that some of the major customers were laboratories and states; right?

A. Yes, sir.

Q. But it seems like the states that you spoke to did not end up purchasing tests from Co-Diagnostics.

A. Yes, sir.

Q. So which states purchased tests from Co-Diagnostics?

A. Well, I know Florida was one of the major states.

Q. What about Utah?

A. I know that there were some sales in Utah. I don't know if they were major sales.

Q. What about Nebraska?

A. I believe Nebraska was a purchase.

Q. Any other ones you can think of?

A. I -- I really was not involved in the

Page 79

specific sales effort other than to try to make some introductions. So the answer is: I don't know which states specifically.

Q. Have you heard of the entity "Silicon Slopes"?

A. It -- it sounds familiar. Silicon-something referring to being in Utah. I think that's what it is, if that's what I am thinking of.

Q. It -- what is your understanding of what that entity is?

A. It was like a parallel to Silicon Valley in California, if, in fact, that is the correct company -- the correct group. I think that's what it was, but I am not positive.

Q. Did Co-Diagnostics have any affiliation with that group?

A. I think they had interaction with them.

Q. Do you know anyone at Silicon Slopes?

A. I personally do not.

Q. Have you heard of the company "Nomi Health"?

A. Yes.

Q. What is that company?

A. It is a company in a similar field of Co-Diagnostics.

Page 80

Q. And what's Co-Diagnostics' relationship to Nomi Health?

A. I know that they have had conversations. I don't know the extent of the conversations. I'm not aware if anything has matured out of those conversations as well.

(Clarification by the reporter.)

THE WITNESS: -- anything that has resulted out of those conversations.

BY MR. FLOCH:

Q. Have you heard of the organization "TestUtah"?

A. Yes.

Q. What is that?

A. I can't define it. I mean, I have seen it referred to in an article and other places. But I do not know anything about the actual workings or the definition or their franchise.

Q. What are you -- what did you see in articles about TestUtah?

A. My recollection is that they had done some testing on the Co-Diagnostics product.

Q. What do you mean when you say, "testing on the Co-Diagnostics product"?

A. What -- what I, at least read or recall

Page 81

reading, was that they had samples of the product and they had tested it on coronavirus to see if it was -- if it was accurate, in their opinion.

Q. And do you remember what you read in terms of whether or not they thought it was accurate?

A. I don't recall the final conclusion that they reached.

Q. Are you aware of any news articles that called into question the accuracy of Co-Diagnostics' COVID-19 test?

A. I do believe that there were articles -- at least an article out of a paper in Utah that raised some questions as to the percentage of accuracy, not accuracy per se, but the percentage of accuracy, if I recall correctly.

Q. When did you become aware of that article that you're referring to?

A. I am not sure exactly when, but probably around the -- around the time that it was issued.

Q. That article that you're referring to, how was it brought to your attention?

A. In all probability, either through Andrew Benson or through Ike Egan.

Q. Why do you say it was probably Andrew or Ike?

21 (Pages 78 - 81)

Page 82

A. Because those -- I would certainly not have read an article out of Utah. And my assumption was that it came out of Utah and -- about the company that it typically would have been my source of information coming from them.

Q. Do you remember any conversations about that article with any other board members?

A. I am certain that we had conversations with -- that referred to it. As to the specific conversations, I do not recall with whom or exactly the nature of it, but I am certain we must have had conversations.

Q. Why are you certain you must have had conversations about this news article?

A. Because it called into question something that I think was -- was rather surprising. If I recall the article correctly, they were questioning the fact of 100 percent accuracy as opposed to 95-plus percent accuracy and a statement that Dr. Satterfield had made with regard to, I believe, 100 percent accuracy of the testing. If that's the article that you are referring to. That's the one that I think I recall.

Q. Did that article raise concern among the board members of Co-Diagnostics?

MS. OSTLER: Objection. Foundation. Calls

Page 83

for speculation.

THE WITNESS: Did it -- "concern" I don't think is the right word. I think the -- it led to conversations with regard to that. I -- I will share with you my feeling with regard to that. If you do nothing more than read the manual with regard to how to use this product -- and remember, this was early on in using the product, and people had to be educated -- mishandling the product by the lab testing, would guarantee that you would get an altered result.

My belief is if the results were altered in any way, and were not 100 percent, which the company believed and had every reason to believe was correct when used correctly, to be at 95-plus percent handled by people that are just learning how to handle this project without any proof that they handled it correctly was not of any concern to me. If it was 40 percent, 30 percent, maybe I would be concerned. But 95 percent to 100 percent, I don't think that's a concern. That's -- that's my opinion, personally, my personal opinion.

Q. So let's back up a little.

You said that you don't think the board members were concerned about the article but it definitely led to conversations; right?

Page 84

MS. OSTLER: Objection. Misstates testimony.

THE WITNESS: I did not state that they weren't concerned. I said we had a conversation about it.

BY MR. FLOCH:

Q. Okay. Do you remember anything about the conversation you had with board members about the article that you are referring to?

THE WITNESS: I don't remember. But it would not surprise me if I said exactly what I just told you.

I owned a contract clinical research organization. We did lots of testing for the pharmaceutical industry. We handled --

(Clarification by the reporter.)

THE WITNESS: I'm sorry. I owned a contract clinical research organization. Mishandling of testing happens all the time, especially when a product is new. I -- I would not be surprised if the tests -- the results that they were reporting resulted in not using the test as indicated in the instruction manuals. And I am sure I shared that -- my experience with the board.

//

Page 85

BY MR. FLOCH:

Q. The -- the article that we've been discussing, do you recall any conversations with management about that article?

A. Independently, I don't. They may have been in the conversations when the board was -- when I, at least, opined it was my opinion or the board had a conversation about it to whatever degree it might have been. I don't remember specifically having independent conversations with management.

Q. Besides management and other board members, do you remember discussing that article with anyone else?

A. I probably did, with people that I had distributed information to. They may -- they may have asked me -- it would not be illogical that they asked me the same question. And my answer would have been consistent because that's what I believed then and I still believe now.

Q. What do you mean when you say you think that they asked you the same question?

What question are you referring to?

A. They would ask me about -- there is a discrepancy. And I would provide that information with regard to exactly what I told you about the difference

22 (Pages 82 - 85)

Page 86

between 95 percent and 100 percent. And the fact that in a new laboratory technology or technique, people using it often do not follow the instructions correctly.

If you read the test -- the -- the brochure, it tells you that ethanol can destroy the test validation. Many, many people in laboratories use ethanol to clean the equipment. It would not be surprising if the testing equipment was not appropriately cleaned, and that would change the results in and of itself. There is no validation from the people that ran the test that they followed the protocol. I have never read one bit of information that suggests that they absolutely followed the protocol.

Q. Is it your testimony that the Co-Diagnostics' COVID-19 test is accurate between 95 percent and 100 percent of the time?

A. To the best of my belief and knowledge, yes.

Q. Okay. So if the company told the public that the test was accurate 100 percent or nearly 100 percent of the time, would that be wrong?

A. It wouldn't be wrong. But if you read the article, it says Dr. Satterfield indicated that the

Page 87

results of independent testing by government agencies consistently showed 100 percent accuracy. And he was opining on that. And that is, to the best of my knowledge, completely accurate.

Q. Okay. Let's -- let's shift gears just a little bit and talk more about the -- the metrics of accuracy of a test. Okay?

A. Yes, sir.

Q. So do you know what "sensitivity" means?

A. I have an idea of what the definition means.

Q. And what does it mean?

A. To me, it means how accurate it is under different conditions.

Q. Okay. And what about the term "specificity"?

A. Specificity, to me, means that it is looking for something very specific that differentiates it from other potential answers.

Q. Okay. What about "limit of detection"? What does that mean?

A. I am not sure what that means, no. I am not sure what you mean by that.

Q. Okay. Okay. And I think we have established earlier you're -- you're in the healthcare

Page 88

industry, but you are not -- you are not a scientist?

A. That is correct. I am a pharmacist. I am scientifically trained. I do not hold myself out to be a scientist.

Q. And you are not a chemist?

A. That is correct.

Q. And you don't have any training that would allow you to opine on whether or not a diagnostic test is reliable or unreliable; right?

A. But I can read information. The answer is you're correct. But I read the information in support of it. That, I can do.

Q. Okay. I'm going to pull up a document, Mr. Serbin, if you give me one second. This will be Exhibit 5.

(Exhibit No. 5 was marked for identification.)

BY MR. FLOCH:

Q. And just let me know when it shows up on your screen.

Do you see Exhibit 5, Mr. Serbin?

A. Yes. FAQ, questions, Co-Diagnostics. "Who is Co-Diagnostics" is the first heading.

Q. Have you seen this document before?

A. Probably, but I don't recall when.

Page 89

Certainly not recently.

Q. Okay. I want to take -- does this appear to be a document prepared by Co-Diagnostics?

A. I have no reason to believe it is or isn't. I don't know.

Q. Okay. I want to take us down to page -- the second page that ends in 700.

Do you see that page?

A. Yes, sir.

Q. Do you see that there are questions and answers underneath the questions?

A. Yes, sir.

Q. And do you see that one of the questions in the middle says, "What do the terms Sensitivity and Specificity reference"?

A. Yes.

Q. And do you see that the first bullet says, "Sensitivity refers to the rate at which a test successfully avoids false negative results"?

A. I can see that.

Q. Do you see that?

A. Yes, I do.

Q. Okay. That definition appears to be a little bit different than the definition you gave me earlier; right?

23 (Pages 86 - 89)

Page 90

A. That may well be. As I indicated, I gave you what my definition is.

Q. Got it. And then you see the second bullet says, "Specificity refers to the rate at which a test successfully avoids false positive results"?

A. Yes, sir.

Q. And that definition of specificity appears to be a little bit different than the definition you gave me earlier; right?

A. Only by wording. I don't believe by inference. I mean, to me, that says the same thing. By being accurate and having very unique things that you are looking for, it avoids false positive results. Yes, the words are different, but I don't think the inference is.

Q. Okay. What is a false positive?

A. A false positive, to me, would mean that you are indicated to have a condition which you don't have, based upon the results of the test. The test indicated that you had something which later turns out to be erroneous.

Q. And -- and what is a false negative?

A. A false negative would be the same situation in reverse. It says that you are healthy and you don't have this condition, when, in fact, you did

Page 91

have the condition.

Q. Okay. And then do you see under the question, "What is the limit of detection," there's an answer that says, "The Limit of Detection or LoD is a measurement used as a baseline representing the lowest number of copies of the pathogen that need to be present in a sample for the diagnostic to detect a positive under the conditions of a particular evaluation."

Do you see that?

A. Yes, sir.

Q. And I think earlier you testified you hadn't heard of limit of detection or didn't recall what it was?

A. Yes, sir.

Q. Do you agree with this definition here?

A. I think it's a workable definition.

Q. Okay.

A. I am not sure -- I am not sure that it's completely accurate, but it sounds reasonable.

Q. And if we scroll down to the bottom, do you see that there is a section that says, "TestUtah, TestIowa and TestNebraska"?

A. Yes, sir.

Q. And there is a question that says, "What is

Page 92

Co-Diagnostics' role in these three initiatives?"

A. Yes, sir.

Q. And do you see the answer says, "Co-Diagnostics is a supplier to Nomi Health for molecular diagnostic assays"?

A. Yes, sir.

Q. And I asked you a little bit earlier about what Co-Diagnostics' relationship was with Nomi health, and I think that you didn't quite remember; is that correct?

A. I think I said they were looking at different relationships together --

Q. Did --

A. -- but I didn't recall what the relationships were.

Q. Did this refresh your memory that Nomi was basically a distributor of Co-Diagnostics' tests?

A. It -- it sounds familiar. I cannot tell you for sure. It would not surprise me if that was correct, though.

Q. Okay. So let's go back to March, April, 2020.

You testified earlier you remember reading an article that someone had been raising concerns about the reliability of Co-Diagnostics' tests; right?

Page 93

A. Yes, sir.

Q. Besides that article, do you recall any other concerns raised by anyone about the reliability of Co-Diagnostics' tests?

A. I cannot specifically recall anything specific, no. No.

Q. Generally, do you remember any -- anyone raising concerns about the reliability of Co-Diagnostics' COVID-19 tests?

A. Not to my recollection.

Q. So have you heard of the Indian Council of Medical Research?

A. No.

Q. Okay. Have you heard of any studies coming out of India that called in to question the reliability of Co-Diagnostics' COVID-19 test?

A. I do not recall -- what I do recall was some government tests that indicated the same high degree of accuracy that had been reported by Dr. Satterfield. I do not recall any other Indian documentation that was contrary to that.

Q. Have you heard the name Dr. Bert Lopansri?

A. It sounds familiar, yes.

Q. What's -- what do you understand Dr. Lopansri's relationship to be with Co-Diagnostics?

24 (Pages 90 - 93)

Page 94

A.   I do not recall, what, if any, the relationship is.

Q.   What basis did you have for saying you thought it sounded familiar?

A.   Well, certain names sound familiar, certain names don't.  You asked me a question and I answered it.  It sounds familiar.

Q.   You don't know where you know the name from?

A.   Honestly, no, I do not.

Q.   Okay.  Have you heard of Intermountain Health?

A.   Yes.

Q.   Okay.  What is your understanding of what Intermountain Health is?

A.   I am not sure I can define exactly what it is.  But I do know people that have worked there at Intermountain Health that are physicians that have been involved and so I assume it is to bring medical services to the communities.

Q.   Are you aware of any concerns raised by employees of Intermountain Health about the reliability of Co-Diagnostics' COVID-19 tests?

A.   No, not that I know of.

Q.   Okay.  I am going to show you Exhibit 6,

Page 95

Mr. Serbin.

(Exhibit No. 6 was marked for identification.)

BY MR. FLOCH:

Q.   And just let me know when it pops up on your screen.

A.   Sure.  It is now on my screen.  Joseph Featherstone --

Q.   Sir, why don't -- why don't you take a second to look at it quickly and let me know when you're finished and then I can scroll for you.

You know what I'll do, I will start at the bottom and then I can go up for you.  So you tell me when to move up just so you can read it.

A.   Okay.  So I am going to read begin forwarded message from -- okay.  Let's -- okay.

(Discuss off the record.)

THE WITNESS:  Some gentleman walked into my office.  I had to give him a document.  Thank you.

BY MR. FLOCH:

Q.   Mr. Serbin, just let me know when you want me to scroll up.

A.   Thank you.  I am finishing the last paragraph on this.  And I will let you know in a moment.  Thank you.  I am at the bottom of the page.

Page 96

Thank you.  We can continue to go down after the next.

Okay, attached is the signature.  Okay.  I finished that part of the correspondence.  Okay.  Okay.  Thank you.

Q.   Okay.  Mr. Serbin, does this appear to be an email from April 17th, 2020, that Mr. Featherstone -- excuse me -- sent to Mr. Satterfield?

A.   To -- Yes.  That's how it's captioned, yes.

Q.   And it looks like it's a forward from an email from individuals inside Intermountain Health?

A.   That's what it shows on the documentation, yes.

Q.   Have you ever heard about this email before?

A.   No.  I have not, not that I recall, for sure.

Q.   Have you ever seen this email?

A.   Not that I recall, no.

Q.   Generally, what does this email say?

A.   Well, it indicates, as I read it, that there were concerns about the accuracy of the testing and raising questions, which I would assume Mr. Featherstone and the group and Dr. Satterfield responded to, but I cannot say that they did or not.

Page 97

Q.   And if we just scroll down, what you are referring to is the email from Dr. Bert Lopransri to others at different email addresses; right?

A.   Dated April 14, 2020.  Yes, sir.

Q.   Right.  And it appears that they are talking about the Co-Diagnostics test; right?

A.   Yes, sir.

Q.   And it looks like Dr. Lopansri is the chief of Intermountain Division of Infectious Diseases and Epidemiology; right?

A.   Yes, sir.

Q.   And it looks like he basically -- he wrote, "What alarms me the most is that they are expanding collection and testing with these unknowns about how their test performs."

Do you see that?

A.   That's what he wrote, yes.

Q.   And do you see he also wrote, "If correct, I urge you to halt their testing until we understand why their results differ so much from what other labs are reporting, as this is a potential public health disaster that will be compounded by the fact that they are constantly promoting themselves publicly while we are not."

Do you see that?

25 (Pages 94 - 97)

Page 98

A.   I do.  And it starts, "If correct".

Q.   And do you see on the bottom --

A.   By the way, which indicates in my mind -- you are asking me to tell you what I say it indicates in my mind, a question -- he is raising a question.  And without definitive answers, he is asking, "if correct, I am concerned", which is a fair question.

Q.   And do you see he wrote about the Co-Diagnostics test, "As you can see, the Co-Diagnostics test has a significantly higher LoD compared to the test we use, which can be a big problem for low positives and could explain, in part, why their percent positive test is lower than what we and ARUP are reporting."

Do you see that?

A.   I do see that.

Q.   And do you see in the last paragraph Dr. Lopansri wrote, "Either way, I worry about having tests routed to a small community hospital lab inexperienced in highly complex molecular testing that uses a test from an unknown company without much in vitro diagnostic experience that has a higher limit of detection compared to tests offered by more established vendors."

Do you see that?

Page 99

A.   I do see it.  However, sir, the answer to that is very simple.  The proof in the pudding is that a Co-Diagnostics test is widely accepted.  Look at the date of when this was written and when these tests were brought into this community.  And the question I would ask -- and I indicated before I don't know this company and I don't know it -- is did they continue to still use the test after this letter?

Q.   Well, let me ask you that question:  Did the state of Utah continue to use the Co-Diagnostics COVID-19 test after this email was sent?

A.   I don't know.

MS. OSTLER:  Objection.  Lacks foundation.

THE WITNESS:  I'm --

MS. OSTLER:  I am sorry, go ahead, Mr. Serbin.

THE WITNESS:  I am sorry.  The answer is that certainly is information that can be obtained.  I don't have that information.

BY MR. FLOCH:

Q.   So you are not aware that two months after this email was sent that the state of Utah cancelled their contract with Nomi Health and stopped buying Co-Diagnostics' tests; right?

MS. OSTLER:  Objection.  Lacks foundation.

Page 100

Assumes facts not in evidence.

Go ahead Mr. Serbin.

THE WITNESS:  I am unaware of that.

BY MR. FLOCH:

Q.   Let's go back, Mr. Serbin.  Because I think you said you weren't aware of this email; right?

A.   That's correct.

Q.   And you weren't aware of this complaint; right?

A.   I do not recall it.

Q.   Okay.  So in April 2020, Co-Diagnostics was a company that was losing about $6 million a year; right?

A.   Yes, sir.

Q.   So the COVID-19 diagnostic test for Co-Diagnostics was a significant revenue generator; right?

A.   Yes.

Q.   And it appears that in this email, management at Co-Diagnostics is learning about a problem with the COVID-19 diagnostic test; right?

MS. OSTLER:  Objection.  Lacks foundation.  Calls for speculation.

THE WITNESS:  I believe it is raising an issue.  Again, I go -- "if it is correct", is -- in his

Page 101

letter, he is not saying his results are correct.  He is raising an issue that he is asking for an answer to respond to why or -- to explain this.

Again, I point out this was very early in COVID, very early in testing, very early in people having experience in using any of the tests that were for COVID.

BY MR. FLOCH:

Q.   Did Mr. Featherstone or Mr. Satterfield alert the board that there were concerns about the Co-Diagnostics test?

MS. OSTLER:  Objection.  Vague.

THE WITNESS:  I am not aware of it, with regard to them specifically.

BY MR. FLOCH:

Q.   Did anyone in management come to the board and say, "Hey, there are questions about the reliability of the Co-Diagnostics test"?

A.   I know for sure we had a conversation, at some point, as I indicated before, that someone indicated about the article in the Utah paper, which raises issues there.  Beyond that, I am not sure.

Q.   Okay.  Let me show you a new exhibit.

MS. OSTLER:  Are you aware that you are still sharing your screen?  I just want to make sure

26 (Pages 98 - 101)

Page 102

you knew.

MR. FLOCH: I am not. Thank you, Joni. It won't make a difference. But I will share it once it is up. I appreciate that.

MS. OSTLER: No problem.

MR. FLOCH: Mr. Serbin, I am going to show you what has been marked as Exhibit 7. And just let me know when you see it on your screen.

(Exhibit No. 7 was marked for identification.)

THE WITNESS: Yes, sir. Exhibit A has now come on my screen marked Exhibit 7.

BY MR. FLOCH:

Q. Do you recognize this document, Mr. Serbin?

A. I do believe that I have seen this at some point, yes, sir.

Q. Is this the article that you have been referring to throughout today?

A. I am not sure. I am trying to look at these -- April 30th, 2020. Salt Lake Tribune -- the article I am referring to was probably out of the Salt Lake Tribune. This is probably the article, yes, sir.

Q. And do you see that the headline of the article says, "This is a potential public health disaster: COVID-19 results from TestUtah.com are

Page 103

raising questions"?

A. Yes, sir.

Q. And do you see that the first paragraph says, "The accuracy of coronavirus tests by TestUtah.com has come into question, with state data showing that the rate of positive results among people tested at its sites is less than half what it is for the patients tested elsewhere in the state"; right?

A. Yes, but I -- at this point, I don't recall what the rest of the article says. They could have been testing other tests for the coronavirus also, besides COVID -- beside Co-Diagnostics' test.

I don't recall what the rest of the article said. But I am just reading that part of the article.

Q. Do you see that there is a line on page 3 where Mr. Satterfield said, "'We're talking about population differences,' agreed Brent Satterfield, founder and chief science officer of Co-Diagnostics Inc., which produces the test kit used by TestUtah's sites"?

A. I do see that, yes.

Q. So this article appears to say that the tests used by TestUtah are Co-Diagnostics tests; right?

A. I don't know that. He could be referring to tests in general.

Page 104

Q. Okay. I want to take you to page 8.

Do you see that there is a sentence that says, "Now the company is supplying thousands of tests in Iowa and Nebraska, where state officials last week issued no-bid contracts worth more than $50 million to Nomi and the TestUtah team."

Do you see that, sir?

A. Yes, sir.

Q. Were you involved in the no-bid contracts that were awarded to purchase Co-Diagnostics' tests at all?

A. No, sir.

Q. Okay. And do you see lower down it says, "But the Co-Diagnostics test has a 'higher limit of detection compared to tests offered by more established vendors,' Lopransri wrote, referring to the test's sensitivity. A higher limit of detection means more virus is required in a sample to trigger a positive result."

Do you see that?

A. Yes, sir. But again, it goes to the letter that we were discussing before that he raised the question. And I don't know if that is answered here, or that's just a quote from the original letter. So, again, it's out of context.

Page 105

Q. Does a higher limit of detection increase the risk that a test will have more potential false negatives?

MS. OSTLER: Objection. Lacks foundation.

THE WITNESS: I think the answer is with any test, there is a baseline in which you don't get detection, whether it's a pregnancy test, whether it's test for strep, or whether it is a Co-Diagnostics test. So I think that there are probably are limits to something.

You know, if you give a pregnancy test to a person who is pregnant, you are not going to get a positive result. So it depends on -- at what point you give the test for all testing, in my opinion. Others are more -- some are more sensitive than others.

MS. OSTLER: Brandon, when you reach a point, could you just let me know when it would be a good to have a five-minute bathroom break?

MR. FLOCH: We can take a break right now, Joni.

MS. OSTLER: Okay. Great.

MR. FLOCH: Let's go off the record. Let's say ten minutes and come back at -- let's say 1:50 your time.

VIDEOGRAPHER: Off the record at 1:37.

27 (Pages 102 - 105)

Page 106

(Recess was taken.)

VIDEOGRAPHER:  This Media 3.  We are back on the record.  The time is 11:49.

BY MR. FLOCH:

Q.   Mr. Serbin, before the break, we were talking about an April 30th, 2020, article from the Salt Lake Tribune; right?

A.   Yes, sir.

Q.   And that article appeared to question the accuracy of Co-Diagnostics' COVID-19 test; right?

A.   Yes, sir.

Q.   Besides that article, do you remember any other questions around April 2020, about the reliability of Co-Diagnostics' COVID-19 test?

A.   No, I do not.

Q.   Do you know whether or not Tennessee in or around -- around April 2020, was purchasing Co-Diagnostics tests?

A.   I do not know.

Q.   I'm going to show you Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MR. FLOCH:

Q.   Mr. Serbin, why don't you take a second to look at it and let me know when you are done, and I am

Page 107

just going to ask you a question.

A.   This is dated Wednesday, May 6th from Kara Levinson.  Yes, I will read that.

MS. OSTLER:  Brandon, does the exhibit just have one page?

MR. FLOCH:  It just has one page.  And Joni, it was obtained by a public website, which is why it doesn't have a Bates stamp.

MS. OSTLER:  Okay.

THE WITNESS:  Could we advance the page a bit?  I am at the bottom now.  I see.  Thank you. Thank you.  I finished reading Exhibit 8.

BY MR. FLOCH:

Q.   And I think you testified earlier, Mr. Serbin, that you -- you were not aware that Co-Diagnostics was selling tests to Tennessee, were you?

A.   I was not aware, that is correct.

Q.   Does this refresh your memory that Co-Diagnostics was selling tests to the state of Tennessee?

A.   Since I don't recall having knowledge initially, it doesn't refresh my memory.

Q.   Okay.  Are you aware that the state of Tennessee -- sorry, let me back up.

Page 108

Do you see that in the first bullet point it says, "Decreased COVID-19 test sensitivity using the Nomi test platform"?

A.   Yes, I see that.

Q.   And do you see the first sentence that says, "In discussion with other states that have been involved with Nomi, it has been stated that the COVID-19 test used by Nomi appears to be 4-fold less sensitive than the CDC EUA COVID-19 test."

Do you see that?

A.   Yes, I do.

Q.   And I think we discussed earlier that Nomi was the supplier of Co-Diagnostics' COVID-19 test?  Do you recall --

MS. OSTLER:  Objection.  Objection. Misstates prior testimony.

THE WITNESS:  I'm not sure that is what we said.  I just do not recall specifically what the answer was to that question.  I am sorry.  And it seems that they are questioning Nomi, yeah.

BY MR. FLOCH:

Q.   Okay.  And it seems like the individual who wrote this is associated with the Tennessee public health laboratory?

MS. OSTLER:  Objection.  Lacks foundation.

Page 109

THE WITNESS:  I don't --

MS. OSTLER:  Go ahead.

THE WITNESS:  I do not know where that person is from.

BY MR. FLOCH:

Q.   Okay.  But you, as a board member, did not hear from anyone at Co-Diagnostics about concerns raised by individuals in Tennessee about the reliability of the Co-Diagnostics COVID-19 test?

A.   Not that I recall.

Q.   Do you think questions about the accuracy of the test from state officials should have been brought to the board's attention?

MS. OSTLER:  Objection.  Calls for speculation.

THE WITNESS:  I think answers should have been provided.  Do I think this had to be presented to the board?  Not necessarily.

BY MR. FLOCH:

Q.   After the April 30th, 2020 article that you remember reading, what actions, if any, did the board of Co-Diagnostics take?

A.   As I indicated before, I am sure that we had a conversation.  My recollection is that -- I am trying to give you an exact -- my recollection is that

Veritext Legal Solutions

800-726-7007                                                                 305-376-8800

Page 110

the board had asked -- I am trying to get the right words.

If a response was going to be made and my understanding was that this was going to be dealt with in the normal course of business as questions come back about products that are launched. And if there was a problem, then we would know about it.

Q. Okay. When you say that the decision was made by the board to address questions about the reliability of the test in the normal course, what do you mean?

A. Well, questions come up about products all the time. I will give you a very specific example.

I worked at Ortho Female Health. And Ortho was sued by a woman who got pregnant using a vaginal contraceptive.

The fact is she forgot to take the tinfoil off of the suppository when she used it. So obviously, when they went to look at the issue, it turns out that the product was not used correctly.

So one of the questions, especially, as I indicated before with new products is, were the products used correctly. I -- I assumed that there was no problem or that this was resolved because I don't recall hearing anything about it after that.

Page 111

Q. So let me back up to my original question. After the April 30th, 2020 article, what actions, if any, did the board of directors take?

A. I think that they did nothing other than wait for a response that if there was a problem with these questions that we would be told that the results were either inconsistent or the results were not correct or that the -- there was a problem there. We were never told there was a problem, that I am aware of. Therefore, I believe there was not a problem or the questions that were raised were resolved.

Q. Okay. Let me back up. You -- I am having problems understanding exactly what you're saying.

You're saying the board was waiting for a response from whom?

A. Whomever indicated initially about the article. If there was a problem, that we would be told there was a problem. My assumption, in the normal course of business, people would look at this, respond to it, and if there was another problem or other issues, that we would be advised with regard to that. I was not advised.

Again, I have been in situations where people allege that something is wrong. The company, under its normal procedures, looks at it and resolves

Page 112

it. I am not aware of what happened with any of these groups after they alleged the problem, whether there continued to be purchases for the product, whether this product went away, or whether they had another complaint after the original complaint. To the best of my knowledge, there were no additional complaints or no additional problems.

Q. So is it your testimony that no one from management came to the board and said, "Let's do something" in response to the April 30th, 2020 article?

A. No, quite the opposite. I am sure that they took a look and seriously took a look at the issues raised and responded to them. And I am sure, in my opinion, that they resolved them, otherwise they would have resurfaced again. And I am certainly not aware that any of these complaints resurfaced again.

Q. Mr. Serbin, you are here testifying about the facts that you know. You just said you are sure in your opinion that they would have responded. I am asking you: Did they respond --

A. I don't know.

Q. -- did the board of directors --

A. I don't know.

Q. Okay. You don't know?

You testified earlier that the board of

Page 113

directors -- sorry, you testified earlier about a press release that you had reviewed in preparation for today; right?

A. I indicated that I was aware of the press release.

Q. What do you remember about that press release?

A. I think -- I don't have it in front of me. So I am responding -- there are a lot of things that we've dealt with.

I think that in the press release Dr. Satterfield indicated that the results that had come back from regulatory agencies had indicated 100 percent accuracy.

Q. Okay. In your experience in the healthcare field, can a diagnostic test ever be 100 percent accurate all the time?

A. Yes --

Q. You can --

A. -- if used correctly.

Q. Yes.

A. That's my experience. You asked me. Yes.

Q. Okay. Are you aware that the FDA has issued statements saying that no diagnostic test can be accurate 100 percent of the time?

29 (Pages 110 - 113)

Page 114

A.   I am aware that --

MS. OSTLER: Objection. Sorry. Objection. Lacks foundation. Assumes facts not in evidence.

Go ahead.

THE WITNESS: I am aware that the FDA makes statements every day that they retract the following day.

BY MR. FLOCH:

Q.   Okay. So it's your testimony that a diagnostic test can be 100 percent accurate all the time if used correctly? That's your testimony?

A.   Certain diagnostic tests, not every diagnostic test. Yes, I believe the answer is: Are there diagnostic tests that are 100 percent accurate if used correctly? Yes.

Q.   Was the Co-Diagnostics' COVID-19 test one of the tests that, if used accurately, could show 100 percent accuracy every time?

A.   I have no reason to believe that it wasn't.

Q.   Okay.

(Clarification by the reporter.)

THE WITNESS: I have no reason to believe that it wasn't one of those tests.

BY MR. FLOCH:

Q.   How many press releases did Co-Diagnostics

Page 115

release between January 2020 and January 2021, just ballpark?

A.   I have no idea.

Q.   Would it surprise you to learn that Co-Diagnostics released 52 press releases from January 2020 to January 2021?

A.   Would it surprise me? No.

Q.   Okay. Let me show you what we are going to mark as Exhibit 9.

(Exhibit No. 9 was marked for identification.)

BY MR. FLOCH:

Q.   Mr. Serbin, I will scroll down for you. Just let me know when to scroll so you can take a look at everything.

A.   Thank you.

MS. OSTLER: I want to note for the record this does not include the entirety of the press release. There was linked information and Defendants object to this press release being used without its full context.

MR. FLOCH: And Joni, just for the record, I will note that this is the way the document was produced to us with the parent and the attachment. But I -- you're objection is on the record.

Page 116

THE WITNESS: Thank you. I've read the letter.

BY MR. FLOCH:

Q.   Okay. And now I am scrolling down to a press release.

Why don't you take a second to look at it, Mr. Serbin and then --

A.   Thank you.

Q.   -- let me know.

A.   I am down to the paragraph, "In addition." Thank you. Thank you. I have read that.

Q.   Okay. So let's go to the top, Mr. Serbin.

A.   Yes.

Q.   Do you see that this is an email from you to Love Malone around 10:30 May 1st?

A.   Yes, sir.

Q.   And do you see that you are forwarding an email that says, "Upcoming Press Notification" May 1st, 2020?

A.   That is correct.

Q.   And if you go down, it looks like Andrew Benson forwarded you an email; right?

A.   Yes, sir.

Q.   And it is from 4:02 a.m. on May 1st?

A.   Yes, sir.

Page 117

Q.   And Mr. Benson said, "Dear Management and Members of the Board, Attached see a copy of the release scheduled for 6:30 AM ET on Friday, concerning the consistently exemplary evaluations of our COVID-19 test."

Do you see that?

A.   Yes, sir.

Q.   And then it looks like there is an attachment of a press release; right?

A.   Yes.

Q.   And you forwarded that press release to Love Malone; right?

A.   I did.

Q.   Okay. Did you have any role in preparing this press release?

A.   None whatsoever.

Q.   Did you read the press release before it went out?

A.   No, I did not. Assuming that it went out at 6:30 a.m., I did not read it. I don't know if it went out at 6:30 a.m. But if it did, I did not read it at 6:30 a.m.

Q.   Now this press release is dated one day after the April 30th Salt Lake Tribune article; right?

A.   Yes, sir.

30 (Pages 114 - 117)

Page 118

Q.   Why did the company issue this press release?

MS. OSTLER:  Objection.  Lacks foundation. Calls for speculation.

THE WITNESS:  I don't know the answer.

BY MR. FLOCH:

Q.   Why did you forward this press release to Love Malone?

A.   I don't think that I had seen the Salt Lake City article, first of all.  Second of all, I believed that the content was accurate.

Q.   Okay, but let's get back to my question. Why send it to Love Malone specifically?

A.   I don't believe I only sent it to Love Malone.  I believe I probably sent it to Wayne Morrison and probably to Jerry Brager also, who was trying to provide information that was useful for them in their communication with the different state agencies which we discussed before.

Q.   Do you remember sending it to Jerry Brager and Wayne Morrison or are you guessing?

A.   I am guessing, but it wouldn't surprise me.

Q.   Okay.  Let's go down to the press release. Do you see that at the top it says, "Co-Diagnostics, Inc. releases COVID-19 Test

Page 119

Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations"?

A.   Yes, sir.

Q.   And then if you go down to the middle, do you see that there is a quote from Mr. -- sorry, Dr. Satterfield --

A.   Yes.

Q.   -- right in the middle, the beginning of the paragraph, "in remarking"?

A.   Yes, sir.  Let me read it.  Let me just go back and read it, please.

Yes, sir, I have read it.

Q.   And do you see Dr. Satterfield gave a quote that said, "In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that."

Do you see that?

A.   Yes, sir.

Q.   Does this press release suggest to you that Co-Diagnostics had created a test that was superior to all of its competitors?

A.   No.  It indicated to me that Co-Diagnostics had a test that third parties had tested.  And it was

Page 120

100 percent of clinically sensitive and specific, not better than other competitors necessarily, but it is hard to beat 100 percent in anything.

Q.   Does this press release suggest to you that Co-Diagnostics was selling a nearly perfect test?

A.   It suggests to me that they were reporting on what others had reported to them and providing information which was useful.

Q.   Now this press release was issued on May 1st; right?

A.   Yes, sir.

Q.   And that was a day after the Salt Lake Tribune article?

A.   Yes, sir.

Q.   And the Salt Lake Tribune article that you and I have been discussing today raised questions about the reliability of Co-Diagnostics' COVID-19 test?

A.   Between 95-plus and 100 percent, yes, sir.

Q.   But this press release does not mention anything about questions about the reliability that were raised in the April 30th article; right?

A.   You are correct, sir.

Q.   Okay.  So it omits any reference to the email that we looked at about Dr. Lopansri?

A.   Yes.

Page 121

Q.   And it omits any reference to any other states raising concerns about the reliability of Co-Diagnostics' COVID-19 test?

A.   Yes.

Q.   If you know, what is your understanding of why the company did not indicate that there were questions being raised about its Co-Diagnostics -- about its COVID-19 test?

MS. OSTLER:  Objection.  Assumes facts not in evidence.

THE WITNESS:  I used to own a public relations company and a medical advertising company. And sometimes this information is already in the hands of the press, especially in the time frame that we are talking about.  They may not -- even if they knew about it -- first of all, the public relations agency may not have known about that other article.  And even if they did, they may not have been able to pull it back before it was released.  But the answer is: I don't know.

BY MR. FLOCH:

Q.   Was Co-Diagnostics trying to change the narrative about whether or not its test was reliable?

MS. OSTLER:  Objection.  Lacks foundation. Calls for speculation.

THE WITNESS:  I don't believe so.

31 (Pages 118 - 121)

Page 122

BY MR. FLOCH:

Q. What's your basis for saying you don't believe so?

A. I am very proud of this company and the people that I work with there. I think they try to do the right thing as often as you possibly can. And I don't believe they would intentionally do something that would be misleading or inappropriate.

Q. Did you personally have any concerns after reading the April 30th, 2020, article that the Co-Diagnostics test was not as reliable as you originally thought?

A. No. I have seen data and discussed data before with regard to the reliability of what other people say or make allegations.

For example, in the other article you showed me, they said, "If true." I mean, you can raise issues, but as far as I know, it has never been substantiated that it's erroneous what they claimed or that -- what they indicated that the tests of the independent governmental agencies show the efficacy at the level that they claimed it was. Those are accurate facts to the best of my knowledge.

Q. And which government agencies are you referring to?

Page 123

A. It is right in the article. It indicates it in the first paragraph, Mexico and India.

Q. Okay. And do you -- did you analyze those validation studies at all?

A. No. I am a regular -- I am an FDA regulatory attorney. And I believe that if the government makes those allegations, it's based upon sound information. So I put a lot of credence into that.

Q. Did you discuss this press release with anyone else besides Love Malone?

A. I am sure I did.

Q. Do you recall the substance of your conversations about this press release with others?

A. As I said, I'm sure. And I don't have a specific recollection that I sent it, just as my nature to do it, to Jerry Brager and to Wayne Morrison. And there may have been other people that I sent it to for information. So if I sent it, it's because I believed it was true.

The only way that I deal with the people that I deal with, like Love and Jerry and others, is because if I send them something, it's because I believe the information is accurate. So I believed the information was accurate and still do.

Page 124

Q. Are you aware of an FDA investigation into whether or not the claims made in the May 1st press release are misleading?

MS. OSTLER: Objection. Assumes facts not in evidence.

THE WITNESS: I am aware that there was communication with the FDA and there were some modifications made to the labeling, yes.

BY MR. FLOCH:

Q. Okay. What do you know, if anything, about the FDA investigation?

A. I stayed out of it. I am an FDA attorney. I believe that it was turned over to FDA counsel to handle that. It is something that I don't want to second-guess FDA counsel.

Q. Besides hearing about it, did you have any involvement in an investigation by the FDA into the May 1st press release?

MS. OSTLER: Objection.

THE WITNESS: I did not.

MS. OSTLER: Assumes facts not in evidence. Sorry.

THE WITNESS: Sorry. I did not.

BY MR. FLOCH:

Q. And just let me back up.

Page 125

What is your understanding of what -- sorry, when did this FDA investigation that you are remembering occur?

A. I don't know the date. I don't recall the date.

Q. Do you remember what the focus of that FDA investigation was?

A. No, but I believe it was trivial because it was resolved very rapidly to my recollection.

Q. When you say it was resolved to your recollection, what do you remember about a resolution?

A. The product remained on the market with whatever changes they had agreed to with the FDA in the wording.

Q. Sorry. You are talking about "wording."

What wording are you talking about?

A. I believe my recollection is that they objected to some wording or characterization which was altered. And they were allowed to remain on the market with that alteration, is my recollection.

Q. So the FDA asked the company to make some alterations to some wording?

A. That is my recollection, yes.

Q. Wording on package labels or what -- what -- where is the wording that you're talking about?

32 (Pages 122 - 125)

Page 126

A.   I am not sure if it was on the labeling or publicly or any other place.

Q.   Okay.  When you say, "alterations", what do you mean?

A.   What it mean -- what I mean is that the FDA raised an issue with something that they objected to. The company responded to it and then agreed with the FDA to take whatever action they ultimately agreed to. And the FDA had allowed the product to stay on the market.

If they did not agree with the changes, they would not have let the company continue to market their product.

Q.   Besides the FDA, are you aware of any other investigations by regulatory bodies into Co-Diagnostics in or around 2020?

A.   I -- with regard to that specific date, I am not aware of any with that specific date.

Q.   Okay.  Without couching a date, in the last five years, has Co-Diagnostics been investigated by any other regulatory body besides the FDA?

MS. OSTLER:  Objection.  Vague.

THE WITNESS:  Yes.

BY MR. FLOCH:

Q.   Okay.  Was there an SEC investigation into

Page 127

Co-Diagnostics that you were involved?

A.   I am, as a member of the board, involved in it, yes.

Q.   Okay.  What is the focus of the SEC investigation?

MS. OSTLER:  Objection.  I am going to instruct the witness not to answer because to the extent that anything he knows is only learned through communications that are privileged communications with his counsel.

Richard, if you know the answer outside of privileged communications with counsel, you can answer.

THE WITNESS:  The only communications I have is privileged communications with counsel.

BY MR. FLOCH:

Q.   Okay.  Is there an ongoing SEC investigation into Co-Diagnostics?

A.   Yes.

Q.   Okay.  Have you provided testimony in that SEC investigation?

A.   No.

Q.   Have you produced documents in that SEC investigation?

A.   I have produced documents.  I don't know how -- to counsel, I don't know how they were used.

Page 128

Q.   What is the focus of that SEC investigation?

MS. OSTLER:  The same instruction as previously.  Asked and answered.

And I, again, instruct the witness not to answer to the extent that his knowledge is only through attorney-client privileged communications.

Richard, you can --

THE WITNESS:  That is my only knowledge.

MS. OSTLER:  Say again?

THE WITNESS:  That is my only knowledge. Through privileged communications.

BY MR. FLOCH:

Q.   After the May 1st, 2020 press release came out, do you recall any other states or entities raising concerns about the reliability of the Co-Diagnostics COVID-19 test?

A.   I do not recall any others.

Q.   Have you heard of the firm Hindenburg Research?

A.   Yes.

Q.   What's that firm?

A.   I don't really know very much about it, but I have heard the name used.

Q.   Were you aware that, around May 14th, that

Page 129

firm tweeted about Co-Diagnostics?

A.   No.  I do not tweet.  And I don't know anything about tweeting.

Q.   Okay.  Around the time of the press release, did you sell shares of Co-Diagnostics?

MS. OSTLER:  Objection.  Vague.

THE WITNESS:  I have sold shares in Co-Diagnostics.  The exact time frame is a public record.  I don't recall the specific dates.

BY MR. FLOCH:

Q.   Okay.  Let me show you another exhibit.

(Exhibit No. 10 was marked for identification.)

BY MR. FLOCH:

Q.   And before I show you that exhibit, Mr. Serbin, let me go back to one question.

In the past year, have you discussed the May 1st, 2020 press release with any other members of the board?

A.   I don't think I have discussed the specific May 1st press release, no.

Q.   In the past year, have you discussed the May 1st, 2020 press release with any members of management of Co-Diagnostics?

A.   Not that I recall.

33 (Pages 126 - 129)

Page 130

Q. In the past year, have you discussed the May 1st, 2020, press release with anyone, not your lawyers. I don't want to know about your lawyers --

A. Right.

Q. -- just anyone -- anyone else?

A. Beyond the lawyers, I don't believe so.

Q. Okay. Let me show you what we are marking Exhibit 10. And just take a look at it and let me know when you are ready.

A. Sure. Yes. Yes, I see it.

Q. Okay. What -- what is this?

A. This is the Form 4 filed with the Securities and Exchange Commission dealing with the sale of securities.

Q. And does it show your name in the top left corner?

A. Yes, it does.

Q. And does it show that you sold 50,000 shares of common stock in late May 2020?

A. Yes, it does.

Q. And this is -- it shows that you sold shares of Co-Diagnostics about three or four weeks after the May 1st press release; right?

A. Yes.

Q. And it looks like you sold the shares for

Page 131

about $900,000; right?

A. That seems -- I believe that's correct, yes.

Q. And I think you testified earlier that -- I am sorry, let me back up.

And it also looks like, that after you sold the 50,000 shares, you held no securities in Co-Diagnostics; right?

A. That is incorrect. I am sorry, I held options. I had additional options.

Q. But -- but you held no other shares?

A. I don't believe I had actual securities other than options.

Q. Because Column 5 shows that after the sales, you had zero shares; right?

A. That may -- that probably is correct, yeah.

Q. Okay. Why did you sell all of your shares in late May 2020?

A. To be able to get cash to be able to move out of New York City. I live in New York City. COVID was creating major problems there. I wanted to move my family out and buy a house. And it was to get cash so that I could buy a house. The prices of homes were skyrocketing. And I knew if I didn't have the cash offer, I wouldn't be able to buy a house.

Page 132

Q. Are you aware that investors see major stock sales by company insiders as a potential warning sign for a company?

MS. OSTLER: Objection. Assumes facts not in evidence.

THE WITNESS: I -- I don't know the answer. I can't imagine that shareholders don't understand that people inside sell their shares. And nor did I sell it at the high. If I am -- I am not as stupid as I may appear. If I was going to sell it for a bad purpose, I would have sold it at $28 or $29, not where I sold it.

BY MR. FLOCH:

Q. Did you sell all of your shares in the company because you thought once the full facts about the accuracy of the test came out that Co-Diagnostics' common stock would be worthless?

A. Absolutely not, or I would have exercised all of my options.

Q. Are you aware that under federal law, Form 4 is supposed to be filed two business days after the transactions take place?

A. Absolutely. And I was under the impression and understanding that the counsel were going to file it for me, yes.

Q. And it looks like you signed this form on

Page 133

June 5th, 2020; right?

A. I -- I don't recall the date that I signed it. Whatever the date is is probably when I did sign it, yes.

Q. Do you see that signature line with your name?

A. I see that it is an electronic signature and I see a date. But can I tell you for sure that I signed it on that date? I cannot attest to that.

Q. It looks like this Form 4 was issued about 10 to 15 days late; right?

A. Based upon when the sale was and if it was beyond the two days, yes.

Q. Why was this form filed so late?

A. As I indicated, it was supposed to be filed by counsel who did not file it. I mean, I realize that I was supposed to do it. But I was under the clear understanding that counsel was going to file. I believe they did exactly the same mistake for Eugene Durenard who sold stock at the same period.

Q. And when you say "counsel," are you referring to your individual counsel?

A. No. The corporate counsel.

Q. So the corporate counsel for Co-Diagnostics filed your Form 4 late?

34 (Pages 130 - 133)

Page 134

A.   That was my understanding.  Well, they filed it -- I did not personally file it.  It was filed by -- at the behest of Co-Diagnostics' counsel, yes.

Q.   Is it reasonable for an investor to look at your Form 4 and think that you have no confidence in the company?

MS. OSTLER:  Objection.  Calls for speculation.  Lacks foundation.

THE WITNESS:  I have no idea.

BY MR. FLOCH:

Q.   Well, you were selling all of your shares in the company a few weeks after concerns had been raised about the only revenue-generating product for Co-Diagnostics; right?

A.   I sold it far off the high point of the stock, number one.  And I didn't sell all the stock I could have.  I could have exercised my other options.  I sold what I needed to buy a house.

Q.   You say you sold "far off the high," but four or five months prior to this May 2020 date, wasn't Co-Diagnostics selling for under $1?

A.   That is true.  So were other -- other diagnostic companies that were in the same position.

There was a great opportunity and a great thing that it happened that they had come with a

Page 135

wonderful product that allowed me -- I had held these shares for a long time.  And the issue of selling it was not a lack of confidence -- was to be able to be in a cash position to make an offer on a property to move to.

Q.   But at least as of May 2020, you knew that, at a minimum, individuals -- individual medical professionals within the state of Utah were questioning the accuracy of the Co-Diagnostics' test; right?

MS. OSTLER:  Objection.  Argumentative.  Misstates prior testimony.

THE WITNESS:  I absolutely indicated what I believed of the value of those articles.

MR. FLOCH:  Okay.  Is now okay time for, like, a five-minute break, Mr. Serbin?

THE WITNESS:  I am fine.

MR. FLOCH:  Why don't we take a five-minute break and maybe I can consolidate some questions.

THE WITNESS:  Of course.  I am available.  Absolutely.

MR. FLOCH:  Let's go off the record.

VIDEOGRAPHER:  Off the record at 12:32.

(Recess was taken.)

VIDEOGRAPHER:  Back on the record.  12:42.

//

Page 136

BY MR. FLOCH:

Q.   Mr. Serbin, earlier I was asking you about a May 1st, 2020 press release.

Do you remember that?

A.   Yes, sir.

Q.   And I think you testified that you forwarded it to Love Malone and others because it had useful information in it; right?

A.   I forwarded it because it was other information that came out about the company that I thought would be useful for them in what I had hoped they would be able to get others to buy the company's product, yes.

Q.   What do you mean when you say "it would be useful for them"?  What would be useful about the press release?

A.   Well, the fact that information that other agencies, international governments had looked at it and opined upon it and just a general discussion about -- from Dr. Satterfield, who I think is a very credible guy, with regard to the technology and the opportunity.

Q.   What's your basis for saying Mr. Satterfield -- sorry, Dr. Satterfield was a "credible guy"?

Page 137

A.   Well, I have read his patents.  I have read papers that he has written.  I live in the scientific community.  I deal with Nobel laureates.  I run meetings in Sweden, which are the top scientific meetings that are there.  I am a consultant to regulatory agencies.  I deal with science people all the time.  I ran the medical technology at Stanford Medical School.  I deal with really smart, competent people.

I believe that Satterfield did something that was meaningful, important and I -- I acquiesced to say and I trusted his judgment.  As a result of that, I wanted to distribute that information to the people I thought it might be meaningful to.

Q.   Because whether or not a diagnostic test is accurate is important information for the purchaser of the test; right?

A.   I think it is important, of course.

Q.   And it could potentially be important information for investors too; right?

A.   I think it is important information, yes, sir.

Q.   Because investors -- sorry, because customers care if the test they are buying works or not; right?

35 (Pages 134 - 137)

Page 138

A. I care about the patients very much also, as well as the investors. And I want to make sure that they have something that is meaningful and gives them the right answer.

And I will tell you that I think it's a sin that the government allowed the other tests on the market because you might as well flip a coin. And if you don't use a PCR test, in my opinion, it's malpractice.

Q. Does Dr. Satterfield continue to do any work for Co-Diagnostics?

A. He is on the -- one of the scientific advisory boards, yes, sir.

Q. What is a scientific advisory board for Co-Diagnostics?

A. It is a group of experts in an area that opine and help give guidance for the scientific development or other issues that they are asked to do for the company or any company. I mean, most -- most companies that are in healthcare have scientific advisory boards, as does Co-Diagnostics.

Q. You mentioned earlier that you are on the compensation committee; right?

A. Yes, sir.

Q. Since May 2020, do you know how much

Page 139

Dr. Satterfield has made in compensation from Co-Diagnostics?

A. As far as salary?

Q. Salary and any other benefits.

A. I am sure I have the information in our notes. I don't know offhand, but I am certain we have the information in our documents.

Q. In your capacity as a board member, have you had any interactions with the company TNG?

A. That does not ring a bell at all, no.

Q. In your capacity as a board member, have you worked with an individual named Josh Brammer?

A. No, I have not.

Q. Who is Landon Capital?

A. I am not sure if that is one of the organizations that Bill McClusky is a part of. I don't know the answer. I know that he has a company that has a name similar to that, but I don't know if that is the one. If Landon Capital has McClusky in it, that's the one that I am thinking of then.

Q. Is Bill McClusky an investor in Co-Diagnostics?

A. I am not sure I understand what that means. Does it mean, does he owns stock or did he put dollars into it?

Page 140

Q. Did Mr. McClusky put dollars into Co-Diagnostics?

A. To the best of my knowledge he did, yes.

Q. Okay. Who is Rashan Palie [phonetic]?

A. I have no idea.

Q. Okay. Are you aware that Co-Diagnostics has been sued in another securities fraud suit in the Southern District of New York?

A. I am aware that there was another suit pending, yes.

Q. What is your understanding of that lawsuit?

A. I have not been involved directly in any issues regarding that.

Q. Are you sued individually in that lawsuit?

A. I believe that I am also named, yes.

Q. But you don't know anything about the allegations of that lawsuit?

A. I assume it is similar ones being handled by counsel, yeah.

Q. Today, is Co-Diagnostics operating at a loss still?

A. On a quarter-to-quarter basis, this quarter was probably a loss. Beyond that, I don't think so, yeah.

Q. Let's talk about on an annual basis.

Page 141

Did Co-Diagnostics report a loss for 2022?

A. I don't -- I don't remember the exact numbers. There might have been a slight loss, but I am not sure. I am not sure. The -- the last quarter was difficult for everybody in this industry where people cut back on -- on diagnostic-type testing for COVID. So it may have been.

I did see the numbers. I just am not specifically sure. It was -- it was marginal. I don't know. It will be out in a week, too. It will be out, the numbers.

Q. Do you receive a salary for your work on the board of Co-Diagnostics?

A. I do receive, as all the board members. I receive exactly the same compensation as the other board members do.

Q. And what is your salary?

A. $25,000 a quarter.

Q. Besides your salary, do you receive any other financial compensation from Co-Diagnostics?

A. At their discretion, I am eligible for the pool of what they have -- they have replaced options, which I've received in the past, with RSUs, which other employees and board members are also entitled to. And that is discretionary.

36 (Pages 138 - 141)

Page 142

Q.   What is an RSU?

A.   It is a -- it's a -- instead of a stock option, it's actually the grant of a share of stock at the value on the day that it is granted as opposed to an option which gives you the alternative of acquiring it in the future.  It is a taxable event on the date that it is issued.

Q.   So just ballpark from May 2020 until today --

A.   Yes.

Q.   -- how much monetary compensation have you received from Co-Diagnostics?

A.   This year -- well, the last one, it's a loss.  It was issued at around $9 a share and then stock is at $3 a share.

After the tax consequence of having to pay taxes on it the second that it's issued is now a loss of 70 percent from the value of the stock.  So the answer is:  I am underwater with that.

So the answer is negative situation.

Q.   So I am not asking about the RSUs or the options.  I am asking:  From May 2020 until now, ballpark, how much did you make in salary, RSUs, stock sales from Co-Diagnostics, ballpark?

A.   So the -- the stock -- the salary itself

Page 143

has been just $100,000, but it wasn't that over the whole period.  It's at the high, now, period.  With the stock sale and others, probably around a million dollars for the overall period.

Q.   Okay.

MR. FLOCH:  I have no further questions at this time, Mr. Serbin, and I thank you for your time today.

THE WITNESS:  Thank you, sir.

MS. OSTLER:  Great.  I actually do have a question.  If you can please display -- actually, I can display it.

EXAMINATION

BY MS. OSTLER:

Q.   Okay.  Mr. Serbin, are you able to see on your screen what was previously marked as Exhibit 8?

A.   Yes, I can see it.  "Craig Harris," yes.

Q.   Do you know who Kara Levinson is?

A.   I do not know specifically.  It does not -- no, I am sorry, I don't.

Q.   Do you know who Lisa Piercey is?

A.   No, I do not.

Q.   Do you know who Richard Steece is?

A.   I do not.

Q.   Do you know who Craig Harris is?

Page 144

A.   I do not.

Q.   Do any of those names look familiar as someone that worked at Co-Diagnostics?

A.   Not to the best of my recollection.

Q.   Have you ever seen this document before today?

A.   I don't believe I ever saw this, no.

Q.   Do you know whether anyone at Co-Diagnostics ever saw this document in 2020?

A.   I have no knowledge as to who or if anyone saw it, no.

MS. OSTLER:  No further questions.

MS. YORK-ERWIN:  I have one question, if that's all right.

EXAMINATION

BY MS. YORK-ERWIN:

Q.   Is there any particular --

MR. FLOCH:  Are you guys representing different parties?  I'm just --

MS. YORK-ERWIN:  No, I am sorry.  I -- Joni and I are working together representing Mr. Serbin.

MR. FLOCH:  I think that I am going to object on the basis that it should be one questioning attorney per side.  I just think it will -- it will save time in the long run here.  So I am going to

Page 145

object.

MR. PINEIRO:  But it's okay.  You can go ahead and ask your question.

BY MS. YORK-ERWIN:

Q.   Is there any particular medical reason why you might have trouble recalling information?

A.   Yes.  I have had two strokes, one very serious stroke -- all strokes are serious.  One very serious stroke when I was 49 years old where I was incapacitated for five years.  I lost significant speech and mobility on my left side.  I still have mobility issues on my left side.  Right now, you can hear me beginning to slur.  When I get tired, I lose the ability to manage my vocal cords and my tongue.

And then about ten years ago I had a second stroke.  I, unfortunately, have had two strokes which I've fought to come back from.

On the first stroke, I had a golf ball-sized blood clot in my brain that my neurologist told me to go to the hospital and get my attorney there because I was going to die.

And so I was very lucky to have -- able to recover from that.  It took a lot of years and a lot of work to regain speech and mobility.  But it has affected my memory and speech, yes.

37 (Pages 142 - 145)

Page 146

Q.   Thank you.

MR. FLOCH:  I have no redirect.  And Mr. Serbin, thanks again for your time.

THE WITNESS:  Thank you, Counselors.

COURT REPORTER:  Can you tell me about the read and sign?

MS. OSTLER:  We would like -- the witness requests the opportunity to read and sign.

VIDEOGRAPHER:  Off the record.

COURT REPORTER:  Do you want a copy, Ms. Ostler?

MS. OSTLER:  Yes.

COURT REPORTER:  Okay.  The read and sign, Ms. Ostler, do you want me to send it to you or to him?

MS. OSTLER:  Send it to me and I will forward it to him.

COURT REPORTER:  Mr. Floch, do you want electronic?

MR. FLOCH:  Yes, electronic would be great.

MS. OSTLER:  Abby, are you able to give us a rough?

COURT REPORTER:  Yes, I will do that for you.

(Concluded at 12:54 P.M.)

-o0o-

Page 147

REPORTER'S CERTIFICATE

STATE OF UTAH      )
                  )
COUNTY OF SALT LAKE )

I, ABIGAIL D.W. JOHNSON, a Certified Shorthand Reporter and Registered Professional Reporter, hereby certify:

THAT the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was placed under oath to tell the truth, the whole truth, and nothing but the truth; that the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such testimony adduced and oral proceedings had, and of the whole thereof.

I FURTHER CERTIFY that I am not a relative or employee of any attorney of the parties, nor do I have a financial interest in the action.

I have subscribed my name on this 21st day of March, 2023.

*Abigail D.W. Johnson*

_____
ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

Page 148

Case: GELT TRADING, LTD. vs. CO-DIAGNOSTICS, INC., et al
Case No. 2:20:cv-00368-CMR
Reported by: Abigail D.W. Johnson, RPR, CRR, CRC
Date Taken: March 10, 2023 Due Back: 30 Days
Send to: transcripts-fl@veritext.com

WITNESS CERTIFICATE
I, RICHARD SERBIN, HEREBY DECLARE:

That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof: That with these corrections, I have noted this transcript truly and accurately reflects my testimony.

PAGE-LINE     CHANGE-CORRECTION          REASON
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____  _____  _____
_____      No corrections were made.

I, RICHARD SERBIN, deponent herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be true and correct.

_____
    RICHARD SERBIN, Deponent
SUBSCRIBED and SWORN to at _____
_____, this _____day of _____ , 20   .

_____
    Notary Public

38 (Pages 146 - 148)

**[& - 25,000]**    Page 149

**&**

**&**  2:5,11 3:12 4:15,21,24 12:1 12:2,3,5 13:21 45:4

**0**

**00004822-00...** 3:19
**00011149**  3:13
**0001118-000...** 3:15
**00030625-00...** 3:10
**00104699-00...** 3:17
**00368**  1:7 148:1
**07**  25:14

**1**

**1**  3:9,23 4:6 15:25 16:1,9 134:21
**10**  1:20 3:11,24 4:1 24:7 35:18 36:7 39:6,18 129:12 130:8 133:11 148:2
**100**  82:18,20 83:12,19 86:1 86:18,22,23 87:2 113:14,16 113:25 114:10 114:14,18 119:1 119:2,17 120:1 120:3,18

**100,000**  21:12 143:1
**101**  2:11
**102**  3:20
**106**  3:21
**10:14**  58:11
**10:30**  116:15
**10:31**  58:14
**10th**  4:5
**11**  69:8
**115**  3:22
**11:49**  106:3
**124**  40:21
**128,000**  40:21
**128,124**  40:22
**129**  3:24
**12:32**  135:22
**12:42**  135:24
**12:54**  1:21 146:24
**14**  97:4
**143**  3:4
**144**  3:5
**14th**  128:25
**15**  12:25 13:1 24:8 25:10 133:11
**16**  3:9 12:6
**17th**  96:6
**19**  9:9 58:17,25 59:2,18,24 60:7 61:24 62:14,21 64:2,5,11 72:7 74:4,15 81:10 86:17 93:9,16

94:23 99:11 100:15,21 102:25 106:10 106:14 108:2,8 108:9,13 109:9 114:16 117:4 118:25 120:17 121:3,8 128:17
**1969**  18:16
**1:37**  105:25
**1:50**  105:23
**1st**  45:5 116:15 116:18,24 120:10 124:2,18 128:14 129:18 129:21,23 130:2 130:23 136:3

**2**

**2**  2:5 3:11 17:15 35:7,8,14 39:6 58:13
**20**  39:13 148:19
**200**  2:11
**2005**  21:2
**2006**  16:17 18:13 23:20 24:19 25:7,16
**2007**  23:20 24:19 25:8,12 25:17
**2016**  25:17 34:17 35:4 42:3
**2017**  25:12,18 30:10 42:3

**2018**  41:19 42:3
**2019**  35:22 36:18 37:14,19 39:12,21 40:8 40:20 41:2,21 41:24 42:4 45:5 46:3 51:17 58:19 59:17
**2020**  3:23 10:4 39:13 51:18 58:20 59:18 69:8 72:6,6 74:4 75:6 92:22 96:6 97:4 100:11 102:20 106:6,13 106:17 109:20 111:2 112:10 115:1,6 116:19 122:10 126:16 128:14 129:18 129:23 130:2,19 131:18 133:1 134:20 135:6 136:3 138:25 142:8,22 144:9
**2021**  115:1,6
**2022**  141:1
**2023**  1:20 4:1,6 147:22 148:2
**206**  2:17
**214,974**  40:20
**21st**  147:22
**22**  21:2
**25,000**  141:18

**[2530 - accurate]**                                                     Page 150

**2530** 2:5
**28** 16:17 132:11
**28932** 147:23
**29** 132:11
**2:20** 1:7 148:1

**3**

**3** 3:12 44:20,21
  103:15 106:2
  142:15
**3/11/2020** 68:18
**30** 83:18 148:2
**30th** 102:20
  106:6 109:20
  111:2 112:10
  117:24 120:21
  122:10
**31** 40:20 41:19
  41:21
**31st** 35:22 36:18
  40:8 41:23
**33131** 2:6
**332.7079** 2:17
**35** 3:11
**36,000** 41:3
**36,850** 40:23
**3900** 2:16

**4**

**4** 3:14,25 68:11
  68:12,15 108:8
  130:12 132:20
  133:10,25 134:5
**4/1/2019** 3:12
**40** 6:11 83:18

**44** 3:12
**49** 145:9
**4:02** 116:24

**5**

**5** 3:3,16 88:15
  88:16,21 131:14
**50** 104:5
**50,000** 40:23
  130:18 131:7
**52** 115:5
**530-5239** 2:7
**532-7840** 2:13
**5th** 133:1

**6**

**6** 3:18 94:25
  95:2 100:12
**6,195,557** 41:20
**6,271,723** 41:19
**627** 19:17,24
**68** 3:14
**6:30** 117:3,20
  117:21,22
**6th** 107:2

**7**

**7** 3:20 102:7,9
  102:12
**70** 142:18
**700** 2:12 41:13
  89:7
**786** 2:7

**8**

**8** 3:21 104:1
  106:20,21
  107:12 143:16

**8.4** 20:3,6
**801** 2:13
**84111** 2:12
**88** 3:16

**9**

**9** 3:22 115:9,10
  142:14
**900,000** 131:1
**95** 3:18 82:18
  83:14,19 86:1
  86:18 120:18
**98104** 2:16
**999** 2:16
**9:02** 1:21 4:1,5

**a**

**a.m.** 1:21 4:5
  116:24 117:20
  117:21,22
**abbott** 65:25
**abby** 146:20
**abigail** 1:25
  147:5,24 148:2
**ability** 66:4
  145:14
**able** 28:20 61:3
  61:8 64:23
  65:11 121:18
  131:19,19,25
  135:3 136:12
  143:15 145:22
  146:20
**above** 20:23
**abroad** 12:23

**absolutely**
  25:13 86:14
  132:17,22
  135:12,20
**accept** 70:23,25
  71:3,6
**accepted** 15:1
  99:3
**access** 48:13
  49:6
**accompanied**
  9:6
**account** 49:7
**accountants**
  31:4 32:23
**accounting** 46:9
  46:17
**accounts** 48:14
**accuracy** 81:9
  81:13,14,14
  82:18,19,20
  87:2,7 93:19
  96:22 103:4
  106:10 109:11
  113:14 114:18
  132:15 135:9
**accurate** 26:25
  40:11 56:16
  81:3,5 86:17,22
  87:4,13 90:12
  91:20 113:17,25
  114:10,14
  118:11 122:22
  123:24,25
  137:16 147:15

**[accurately - answer]**

accurately 28:2 114:17 148:7

accusation 20:24

accused 6:14

achieved 119:17

acknowledged 59:4

acquiesced 137:11

acquiring 142:5

act 20:4

action 45:25 126:8 147:20

actions 109:21 111:2

active 32:18,20 33:1

actual 80:17 131:12

actually 58:23 58:24 142:3 143:10,11

ad 22:23 23:4

addition 116:10

additional 112:6,7 131:10

address 49:12 49:14 110:9

addresses 97:3

adduced 147:16

adjusting 47:16

administrative 67:20

advance 39:14 107:10

advanced 1:17 11:5,8,10 76:24

advances 47:7 47:15

adversely 20:4

advertising 12:15 121:12

advice 17:9 18:5

advised 111:21 111:22

advisor 14:17 25:3,4,6 28:9,13 29:24 42:3,7,8 42:10,14,17 54:8

advisors 52:25 52:25

advisory 42:8 138:13,14,21

affairs 16:21

affect 31:10,11

affected 145:25

affiliation 79:15

agencies 12:22 31:15 74:8 87:1 113:13 118:18 122:21,24 136:18 137:6

agency 121:16

agent 54:2 60:23,24

agents 28:22 69:22

aging 12:21

ago 6:10,11 7:1 44:9 53:5,24 145:15

agree 18:9 91:16 126:11

agreed 18:2,5 103:17 125:13 126:7,8

agreement 28:10

agriculture 40:23

ahead 31:22 99:15 100:2 109:2 114:4 145:3

aided 147:14

al 4:9 148:1

alarms 97:13

alert 101:10

allegations 122:15 123:7 140:17

allege 111:24

alleged 7:10 112:2

allow 8:10 88:8

allowed 65:3,5 65:14 66:12,14 125:19 126:9 135:1 138:6

alteration 125:20

alterations 125:22 126:3

altered 83:10,11 125:19

alternative 142:5

america 17:20 51:14

american 13:1

amount 21:11 26:12 32:17 37:23 38:21

analysis 45:23

analyze 123:3

andrew 16:13 56:8,19 58:2 81:22,24 116:21

annual 140:25

answer 7:17,21 18:6 33:7,14 34:10,25 35:1,5 48:23 50:21 60:18 66:25,25 70:10,17,20 72:20,23 75:23 79:2 85:17 88:10 91:4 92:3 99:1,17 101:2 105:5 108:19 114:13 118:5 121:19 127:7,11 127:12 128:6 132:6 138:4 139:17 142:19 142:20

**answered**  63:23 94:6 104:23 128:4

**answers**  63:5 87:19 89:11 98:6 109:16

**anti**  12:21

**antibiotic**  27:21

**antibiotics** 27:24

**antibodies** 26:21

**antibody**  27:11

**anticipate**  40:4

**antigen**  72:19 72:21 73:6,13

**anybody**  23:10 23:14 48:25

**apologize**  27:4 50:22 58:22 69:7

**appear**  89:2 96:5 132:10

**appeared**  36:19 106:9

**appearing**  4:21 4:24

**appears**  35:21 41:11 89:23 90:7 97:5 100:19 103:22 108:8

**applied**  65:24 66:1

**appreciate** 102:4

**appreciated** 75:13

**approach**  60:19 61:6,8,11,22 62:13

**approached** 62:3 69:15

**approaches** 61:23

**appropriate** 43:17

**appropriately** 86:10

**approval**  66:22 68:9

**approve**  66:5

**approving** 65:22

**approximately** 39:13

**april**  45:5 46:3 72:6 74:4 75:6 92:21 96:6 97:4 100:11 102:20 106:6,13,17 109:20 111:2 112:10 117:24 120:21 122:10

**area**  12:18 26:16,17 29:2 51:18 75:3 138:16

**areas**  27:2 47:4 60:22

**argumentative** 135:10

**article**  3:20 80:16 81:12,16 81:20 82:2,7,14 82:17,21,23 83:24 84:9 85:2 85:4,12 86:25 92:24 93:2 101:21 102:17 102:21,22,24 103:10,13,14,22 106:6,9,12 109:20 111:2,17 112:10 117:24 118:10 120:13 120:15,21 121:17 122:10 122:16 123:1

**articles**  80:20 81:8,11 135:13

**artificial**  60:21

**arup**  98:13

**asked**  10:19 25:2 30:5,8 42:20 54:22 59:11 64:6,12 70:23 75:12 85:16,16,21 92:7 94:6 110:1 113:22 125:21 128:4 138:18

**asking**  23:10 29:3 34:25 36:25 98:4,6 101:2 112:20 136:2 142:21,22

**asks**  72:2

**aspects**  31:7 50:6

**assays**  92:5

**associate**  52:5

**associated** 108:23

**associates**  9:24 69:19

**association**  6:9 6:20 66:18

**assume**  28:15 51:17 63:17 94:19 96:23 140:18

**assumed**  69:23 110:23

**assumes**  100:1 114:3 121:9 124:4,21 132:4

**assuming** 117:19

**assumption** 30:7 82:2 111:18

**attached**  96:2 117:2

**attachment** 16:17 18:18 68:24 115:24

117:9
**attachments** 16:14
**attend** 13:3
**attended** 56:24
**attending** 6:10
**attention** 17:14 81:21 109:13
**attest** 133:9
**attorney** 19:5 38:4 123:6 124:12 128:7 144:24 145:20 147:19
**attorney's** 20:4
**attorneys** 4:17 7:20 8:20 9:12 32:24 49:7
**audit** 30:17 31:2 43:2 44:5,7 45:22 46:2 47:10 51:24
**audited** 43:4
**auditor** 43:11 44:12,14
**auditors** 31:4 32:23 43:4,15 44:6,18
**audits** 42:25
**august** 21:2
**authority** 64:1
**authorization** 65:11,16 66:2,5 67:3,6,9,13,23 68:6

**available** 26:25 135:19
**avenue** 2:16
**avid** 37:6
**avis** 45:21
**avoids** 89:19 90:5,13
**awarded** 104:10
**aware** 53:2,18 54:12 57:15 80:5 81:8,16 94:21 99:21 100:6,8 101:13 101:24 107:15 107:18,24 111:9 112:1,16 113:4 113:23 114:1,5 124:1,6 126:14 126:18 128:25 132:1,19 140:6 140:9

**b**

**b** 3:7 5:11 20:3 74:24
**bachelor** 11:3,3
**back** 8:15 24:19 26:3 29:22 33:20 54:21 58:13 59:10,17 69:25 74:1 77:12 83:22 92:21 100:5 105:23 106:2 107:25 110:5 111:1,12 113:13

118:12 119:12 121:18 124:25 129:16 131:5 135:24 141:6 145:17 148:2
**background** 10:21 27:11 56:11 75:12
**bad** 132:10
**badin** 2:19 4:18
**baker** 4:24
**bakerhostetler** 2:15
**bakerlaw.com** 2:17
**balance** 31:10
**ball** 145:19
**ballpark** 115:2 142:8,23,24
**bar** 6:9,19
**based** 17:10,13 18:1,5,7 19:9 20:7 21:12,13 36:21 40:12 63:9,11 65:3 90:19 123:7 133:12
**baseline** 91:5 105:6
**basically** 9:23 76:22 92:17 97:12
**basis** 17:25 31:20 66:4 94:3 122:2 136:23

140:22,25 144:23
**bass** 53:12 54:22 55:2
**bates** 107:8
**bathroom** 105:18
**beat** 120:3
**beginning** 29:21 58:20 119:9 145:13
**behalf** 4:16,21 4:22,24 6:4 76:9
**behest** 134:3
**belief** 59:20 83:11 86:19
**believe** 9:14 20:14 21:16 23:20 25:7 28:10 34:6,11 34:18,22,25 36:6 44:9,11 46:4 48:7 56:12 56:15 57:6,13 58:2 59:22 62:16 63:1 67:15 70:1 74:5 74:5 78:1,23 81:11 82:20 83:13 85:19 89:4 90:10 100:24 102:15 111:10 114:13 114:19,22 118:14,15

[believe - business]                                               Page 154

121:25 122:3,7
123:6,24 124:13
125:8,17 130:6
131:2,12 133:19
137:10 140:15
144:7
**believed** 62:13
72:18 75:9
76:23 83:13
85:18 118:10
123:19,24
135:13
**bell** 139:10
**benefit** 31:23
**benefits** 20:8
139:4
**benson** 1:11
16:13 28:11
29:15 50:4,13
53:13,16 54:2,4
54:12,18 56:8
56:10,19 58:3
81:23 116:22
117:1
**bermuda** 51:13
**bert** 93:22 97:2
**best** 5:22 29:4
36:4 44:16 55:1
55:8 75:19
86:19 87:3
112:5 122:23
140:3 144:4
**better** 32:13
119:18 120:2

**beyond** 10:12
57:1 70:20
101:22 130:6
133:13 140:23
**bfloch** 2:6
**bid** 104:5,9
**big** 72:19 98:11
**bill** 6:14 24:14
24:22 139:16,21
**biscayne** 2:5
**bit** 10:21 13:10
25:1 26:3 48:2
72:5 73:3 86:13
87:6 89:24 90:8
92:7 107:11
**bitral** 54:16
**blockage** 50:22
**blood** 145:19
**blvd** 2:5
**board** 7:3,9
12:5 14:19,21
15:4 16:21
23:11,13 30:2,6
30:10,14 32:1
32:13,18,18,19
32:22 33:1,13
35:25 42:3,7,15
42:22,23 46:10
49:13,16 51:9
51:16,19 52:2
52:10,15,25
55:10 56:2,5,18
56:23 75:2,8
76:23 82:7,24
83:23 84:8,24

85:6,7,11
101:10,16 109:6
109:18,21 110:1
110:9 111:3,14
112:9,22,25
117:2 127:2
129:19 138:14
139:8,11 141:13
141:14,16,24
**board's** 109:13
**boards** 14:23
15:7 22:6,11,12
22:14 138:13,21
**bodies** 126:15
**body** 126:21
**bolts** 62:6
**bombarded**
29:3
**bonus** 70:22
**bonuses** 30:21
**books** 43:7
**bottom** 19:16,22
19:24 91:21
95:13,25 98:2
107:11
**brager** 74:21,25
75:1,6,20,24
76:5 118:16,20
123:17
**brain** 145:19
**brammer**
139:12
**branches** 69:16
**brandon** 2:4
4:14 105:16

107:4
**brazil** 26:12,13
**break** 8:8,10
37:25 47:21
58:10 73:3
105:18,19 106:5
135:15,18
**brent** 1:11
52:18,19 59:20
103:17
**brian** 50:17
59:12
**brian's** 50:18
**briefly** 49:21
**bring** 29:8
51:15 64:7 71:7
75:15 76:25
77:2 94:19
**bringing** 77:22
**broadly** 67:25
**brochure** 86:6
**brought** 7:1,9
28:8,17 52:10
81:21 99:5
109:13
**brown** 2:11 4:21
59:12
**building** 47:3
**built** 12:14,16
**bullet** 89:17
90:3 108:1
**business** 9:24
12:7 24:4 26:6
31:9 38:17 39:2
39:3 51:10 52:5

52:6 69:18 71:7 110:5 111:19 132:20

**businesses** 12:5

**businessman** 52:11

**buy** 70:5 131:22 131:23,25 134:18 136:12

**buyers** 64:5,7,8 64:13,14 70:22 71:21 72:7 74:7 74:8,11,13

**buying** 72:12 73:22 74:15 99:23 137:24

**c**

**c** 2:1 4:2 5:11 20:6 62:1

**california** 79:12

**call** 73:10

**called** 5:3 7:2 12:25 15:2 24:16 27:13 40:1 61:6 73:5 81:9 82:15 93:15

**calls** 82:25 100:23 109:14 118:4 121:24 134:7

**canada** 52:14

**canceled** 17:7

**cancelled** 99:22

**cancer** 14:14

**capacity** 19:5 56:2,18 58:3,4 139:8,11

**capital** 24:16 139:14,19

**captioned** 96:9

**care** 137:24 138:1

**career** 28:18

**carlton** 54:15

**case** 1:6 7:3 48:4,6 49:10 148:1,1

**cases** 5:18,20,24

**cash** 30:21 32:11 37:23 38:13,21 39:2,4 47:7,15 131:19 131:22,24 135:4

**catch** 13:12

**cause** 38:21

**caused** 38:11

**causing** 28:3

**cayman** 1:5

**cdc** 108:9

**ceased** 42:8,11

**cecilia** 57:14

**cells** 12:20

**central** 1:2 4:10

**ceo** 50:11

**certain** 30:9 46:6 53:6 66:24 82:8,11,13 94:5 94:5 114:12

139:6

**certainly** 25:8 34:21 46:20 75:20 77:1 82:1 89:1 99:18 112:15

**certificate** 147:2 148:4

**certified** 147:5

**certify** 147:7,18 148:15

**cfo** 50:13,15 53:19,21,23

**chains** 75:3

**chairman** 30:15 51:24

**change** 42:14 55:7,10 86:10 121:21 148:9

**changed** 12:4 28:14 31:20

**changes** 125:13 126:11

**channels** 67:21

**characterization** 37:12 125:18

**characterize** 37:3,11

**charge** 13:15,18 20:23

**charged** 47:3

**checked** 44:3

**chemist** 88:5

**chief** 11:23 12:2 14:20 50:3

59:11 97:8 103:18

**children** 6:18

**circulated** 69:23

**circumstance** 38:18

**city** 2:12 73:19 77:20 118:10 131:20,20

**civil** 5:17,19,20

**claimed** 21:14 122:19,22

**claims** 124:2

**clarification** 14:8 15:6 27:3 34:9,13 46:1,19 50:20 61:25 71:1 80:7 84:16 114:21

**class** 4:16,17 10:18

**clean** 86:8

**cleaned** 86:10

**clear** 7:14 49:5 52:5 65:21,23 133:17

**clearly** 37:5

**clia** 65:5,7 66:12 66:14,16,23 67:4

**client** 6:4 128:7

**clinical** 12:16,19 14:6,11 66:18 66:19 67:18 84:13,18 119:17

**clinically** 120:1
**close** 17:6
**closer** 14:10
**clot** 145:19
**cmr** 1:7 148:1
**codi** 3:10,13,15
  3:17,19
**coin** 72:22 138:7
**cold** 73:23
**collection** 97:14
**college** 10:23
  11:1
**column** 131:14
**combination**
  38:25
**come** 23:10
  26:20 31:6 32:7
  101:16 102:12
  103:5 105:23
  110:5,12 113:13
  134:25 145:17
**comes** 22:19
  29:6 35:11
  44:24
**coming** 30:25
  82:5 93:14
**comments** 33:15
  33:18 69:25
**commercial**
  65:6 71:14
**commercially**
  65:14
**commission**
  3:11,25 20:3
  35:19 36:3

130:13
**committee**
  30:16,16,17,19
  31:2,13 43:3
  44:5 45:23 46:2
  47:11 51:23,24
  51:25 138:23
**committees**
  30:13 51:21
**common** 130:19
  132:16
**communicate**
  49:16
**communication**
  118:18 124:7
**communicatio...**
  17:22 127:9,9
  127:12,13,14
  128:7,12
**communities**
  94:20
**community**
  71:14 98:19
  99:5 137:3
**companies** 12:6
  12:15 13:19
  14:1,4,6,12,18
  14:20,22 15:4,5
  15:8 28:18,20
  29:1,2,5 31:16
  31:17 37:3 39:3
  66:20 134:23
  138:20
**company** 1:5,17
  3:12 7:2,2,8

14:25 15:1,2,3
15:16 17:20
18:4 19:11
22:17 23:17,18
23:22,24 24:16
24:25 25:2,3,25
26:2 30:25 31:6
31:10,11,21,23
33:23 36:19,22
37:5,24 38:22
42:23,25 43:12
43:14 44:7,12
45:4 46:9 50:6
51:1,10 52:12
52:16,20 53:1,3
53:8,17 54:10
54:25 57:3,5,8
60:15 64:8,8
65:9,24 66:22
67:2,24 70:18
70:21 72:3,14
75:9 76:23
79:12,20,23,24
82:3 83:12
86:21 98:21
99:6 100:12
104:3 111:24
118:1 121:6,12
121:12 122:4
125:21 126:7,12
132:2,3,14
134:6,12 136:10
138:19,19 139:9
139:17

**company's**
  136:12
**compared** 41:20
  98:11,23 104:15
**compensate**
  70:21 71:16
**compensation**
  30:16,19,20,23
  51:23 64:13
  71:21 72:1
  138:23 139:1
  141:15,20
  142:11
**competent**
  137:8
**competing** 37:7
**competition**
  36:10
**competitors**
  119:23 120:2
**complaining**
  27:20
**complaint** 100:8
  112:5,5
**complaints**
  112:6,16
**complete** 7:5
**completely**
  15:21 72:18
  87:4 91:20
**complex** 98:20
**compliance** 44:4
**compound** 33:5
**compounded**
  97:22

**comprised** 39:13

**computer** 147:14

**concern** 82:23 83:2,17,20

**concerned** 83:18,24 84:4 98:7

**concerning** 117:3

**concerns** 3:21 44:6,13 92:24 93:3,8 94:21 96:22 101:10 109:7 121:2 122:9 128:16 134:12

**concluded** 146:24

**conclusion** 41:8 81:6

**condition** 15:20 90:18,25 91:1

**conditions** 28:3 67:5,7 68:1 87:14 91:8

**conduct** 20:6,15 49:12

**conferenced** 1:15

**confidence** 134:5 135:3

**confusing** 72:8

**confusion** 72:25

**conglomerate** 47:2

**congressmen** 77:20

**connected** 33:22 34:1,5,16 35:3

**consented** 17:18

**consequence** 142:16

**consider** 33:16 36:19 46:7

**considered** 32:10 33:18 34:7 65:6

**considering** 69:23

**consisted** 40:20

**consistent** 85:18

**consistently** 87:2 117:4 119:1,16

**consolidate** 135:18

**constant** 31:20 39:4

**constantly** 29:3 97:23

**constitutes** 147:15

**consultant** 12:22 67:19 75:3 137:5

**consumer** 14:16 16:21

**contact** 72:13

**content** 118:11

**contents** 148:6

**context** 20:21 104:25 115:21

**continuation** 17:3

**continue** 47:24 71:24 96:1 99:7 99:10 126:12 138:10

**continued** 112:3

**contraceptive** 110:16

**contract** 12:16 14:6,11 84:13 84:18 99:23

**contracts** 104:5 104:9

**contrary** 93:21

**control** 43:20 46:7

**controls** 44:7 45:24

**controversy** 44:17

**convention** 6:10

**conversation** 47:13 70:1 84:4 84:8 85:8 101:19 109:24

**conversations** 8:18,19 47:18 75:6 76:20 80:3 80:4,6,9 82:6,8

82:10,12,14 83:4,25 85:3,6 85:10 123:14

**copies** 9:23 91:6

**copy** 15:22 117:2 146:10

**cords** 145:14

**corner** 130:16

**coronavirus** 3:15 26:5,9 81:2 103:4,11

**corporate** 12:8 133:23,24

**corporation** 1:9 11:21,22,23

**correct** 19:7 22:4 25:19 43:17 59:9 62:8 69:13 73:10 78:7 79:12,13 83:13 88:2,6,11 92:10,20 97:18 98:1,7 100:7,25 101:1 107:18 111:8 116:20 120:22 131:2,16 148:16

**correction** 59:15 148:9

**corrections** 148:6,14

**correctly** 37:3 69:12 81:15 82:17 83:14,17 86:4 110:20,23

**[correctly - december]**                                    Page 158

113:20 114:11 114:15

**correspondence** 3:9,14,18,21,22 96:3

**cosara** 46:23,25 47:1,13,17

**cosmetic** 14:16

**couching** 126:19

**council** 93:11

**counsel** 4:7,12 8:16 10:17 11:24 12:2 17:10 18:6 48:5 50:5 124:13,15 127:10,12,14,25 132:23 133:16 133:18,21,22,23 133:24 134:3 140:19

**counselors** 146:4

**counterfeit** 6:14 6:17

**countries** 13:3 119:15

**country** 46:22

**county** 147:4

**couple** 44:9 53:5

**course** 22:21 38:17 110:5,10 111:19 135:19 137:18

**court** 1:1 4:10 7:15 13:10 18:23 19:4 21:2 21:18 22:20 48:24 146:5,10 146:13,17,22

**courts** 23:3

**covance** 12:17

**covid** 9:7,9 58:17,25 59:2 59:18,23,24 60:7 61:24 62:14,21 64:2,5 64:11 72:7 74:4 74:15 81:10 86:17 93:9,16 94:23 99:11 100:15,21 101:5 101:7 102:25 103:12 106:10 106:14 108:2,8 108:9,13 109:9 114:16 117:4 118:25 120:17 121:3,8 128:17 131:20 141:6

**craig** 143:17,25

**crc** 1:25 147:24 148:2

**create** 43:17

**created** 62:22 119:22

**creates** 66:11

**creating** 131:21

**credence** 123:8

**credentials** 29:9

**credibility** 29:10 71:10

**credible** 136:21 136:25

**crime** 15:14

**crimes** 15:11

**criminal** 20:4

**crockett** 57:10

**crr** 1:25 147:24 148:2

**current** 10:15 15:4 50:15

**currently** 13:25 14:23 22:6,8 54:11

**curve** 31:22

**customer** 34:6,7 34:8,11,12 39:12,17,19

**customers** 34:5 34:18,23 39:9 39:12,22 40:9 40:13 64:11 65:3 74:3 78:9 137:24

**cut** 141:6

**cv** 1:7 148:1

**d**

**d** 3:1 4:2 5:11

**d.w.** 1:25 147:5 147:24 148:2

**danger** 37:15,20 38:2,22

**data** 66:2 103:5 119:1 122:13,13

**date** 4:5 39:14 43:3 99:4 125:4 125:5 126:17,18 126:19 133:2,3 133:8,9 134:20 142:6 148:2

**dated** 16:17 45:5 97:4 107:2 117:23

**dates** 58:21 129:9

**david** 57:20

**day** 6:16 17:8 53:1,1,4,4,8,8 114:6,7 117:23 120:12 142:4 147:22 148:19

**days** 132:20 133:11,13 148:2

**deal** 123:21,22 137:3,6,8

**dealing** 130:13

**deals** 67:19 71:25

**dealt** 15:15 32:9 110:4 113:10

**dear** 117:1

**debt** 31:8

**deceit** 20:6,16

**december** 35:22 36:18 40:8,20 41:19,21,23

**[decided - diagnostics]**

**decided** 78:5

**decision** 18:21
19:15 20:13,17
20:18 75:21
110:8

**declare** 148:4
148:15

**decreased** 108:2

**deemed** 21:3

**defamation** 6:18

**defendant** 6:3
6:23 21:2

**defendants** 1:12
2:9 4:22,25
115:19

**deficiencies**
46:8,14 47:7,11

**define** 34:23
80:15 94:16

**definitely** 83:25

**definition** 40:13
80:18 87:10
89:23,24 90:2,7
90:8 91:16,17

**definitive** 98:6

**degree** 10:23
11:2,3,4,4,5,6,8
11:10 20:24
21:1 50:7 85:8
93:19

**degrees** 11:1

**delisted** 37:15
37:20 38:2,12
38:23

**demonstrates**
119:1

**dennis** 57:10

**department**
16:20

**depends** 32:15
50:1 63:17
105:13

**deponent**
148:15,18

**deposed** 5:12

**deposition** 1:15
4:7,11 7:13 8:14
9:13,19,21 10:8

**depositions** 5:17

**derenard** 69:7
71:12

**describe** 6:6,24
9:20 11:16 17:1
35:16 45:6,19
61:10

**describing** 9:25
9:25

**description** 3:8

**designed** 63:21

**designee** 42:8

**destroy** 86:6

**detail** 9:5

**detect** 91:7

**detection** 87:20
91:3,4,13 98:23
104:15,17 105:1
105:7

**determined**
58:24

**develop** 13:6
28:2 62:21
63:14

**developed** 59:18
60:10 64:22

**developing**
14:14 26:7
58:17 60:15,24
61:24 63:16

**development**
12:8 138:18

**devices** 24:7

**diagnose** 61:8

**diagnostic** 9:9
13:15,18,20,22
23:24 26:7,10
26:22,24 34:15
40:24 41:4,12
58:17,25 59:19
59:24 60:7,15
60:19 61:24
62:7,21 63:5,14
63:16 64:2,11
69:22 88:8 91:7
92:5 98:22
100:15,21
113:16,24
114:10,12,13,14
134:23 137:15
141:6

**diagnostics** 1:8
3:9,13,16 4:9
9:7,9 10:1,3,16
14:24 23:17,19
24:3,6,11,18,20

24:25 25:10,21
25:24 26:5,10
27:12 28:8,13
29:14,18,24
30:11,14 32:2
33:2,23 35:19
36:2 37:15,18
38:2,12,22 39:4
39:22 40:8 41:3
41:25 42:14
43:5 44:6 46:17
46:21 47:2,4
49:13,23,24
50:16 51:11
52:3,23 55:19
56:14 57:18
58:17 59:8,18
59:24 60:2,7,16
62:20 64:1,10
64:16,22 65:2
65:23 66:6,11
67:9,12,25 68:7
69:17 70:4,7,9
70:14 72:7 73:7
73:10 74:4,15
75:7,18 76:4,10
76:20 77:5,14
77:25 78:6,13
78:16 79:15,25
80:1,22,24 81:9
82:24 86:17
88:22,23 89:3
92:1,4,8,17,25
93:4,9,16,25
94:23 97:6 98:9

**[diagnostics - documents]**                                    Page 160

98:10 99:3,10 99:24 100:11,16 100:20 101:11 101:18 103:12 103:18,23 104:10,14 105:8 106:10,14,18 107:16,20 108:13 109:7,9 109:22 114:16 114:25 115:5 118:25 119:22 119:24 120:5,17 121:3,7,21 122:11 126:15 126:20 127:1,17 128:16 129:1,5 129:8,24 130:22 131:8 132:15 133:24 134:3,14 134:21 135:9 138:11,15,21 139:2,22 140:2 140:6,20 141:1 141:13,20 142:12,24 144:3 144:9 148:1

**die** 145:21
**differ** 97:20
**difference** 85:25 102:3
**differences** 103:17
**different** 14:3,4 26:22 27:19

32:4 42:5,6,17 42:19,20 61:9 61:23 73:6,13 87:14 89:24 90:8,14 92:12 97:3 118:18 144:19

**differentiated** 70:11
**differentiates** 87:18
**difficult** 29:1 141:5
**direct** 17:14
**directly** 64:17 140:12
**director** 30:11 30:14 42:3,15
**directors** 7:9 30:2,6 36:1,5 51:10 56:23 75:8 76:23 111:3 112:22 113:1
**disability** 20:8
**disadvantage** 36:14
**disaster** 97:22 102:25
**discipline** 16:24 19:5
**disclose** 17:21 22:14
**discrepancy** 85:24

**discretion** 141:21
**discretionary** 141:25
**discuss** 95:17 123:10
**discussed** 55:9 108:12 118:19 122:13 129:17 129:20,22 130:1
**discussing** 47:10 69:10 85:3,12 104:22 120:16
**discussion** 108:6 136:19
**discussions** 55:13,14,15
**disease** 61:9
**diseases** 26:8,9 26:15,18,19,23 97:9
**dishonesty** 20:6 20:16
**dismissal** 7:5 17:5,12
**dismissed** 7:3 17:4 20:25
**disney** 6:8,15
**display** 143:11 143:12
**distress** 6:18
**distressed** 72:25
**distribute** 137:13

**distributed** 85:15
**distributing** 28:22
**distributions** 30:22
**distributor** 92:17
**distributors** 64:19
**district** 1:1,2 4:10,10 140:8
**division** 1:2 4:10 13:23 16:20 97:9
**document** 15:19 17:2 19:2 22:25 23:5,5,15 35:17 41:6 45:18 46:13 47:6 68:24 88:13,24 89:3 95:19 102:14 115:23 144:5,9
**documentation** 31:3,4 93:21 96:12
**documented** 43:9
**documents** 8:15 8:17,21 9:1 15:15,17 18:11 19:6,11 22:17 43:15 48:3 127:22,24 139:7

**doing** 62:18
**dollars** 31:11
  139:25 140:1
  143:4
**dominated** 37:7
**doors** 28:16,20
  28:23
**dr** 52:24 55:7,9
  60:18 61:7,17
  61:22 62:13
  69:6,7 71:12,19
  71:23 82:19
  86:25 93:20,22
  93:25 96:24
  97:2,8 98:18
  113:12 119:7,14
  120:24 136:20
  136:24 138:10
  139:1
**drafting** 33:11
**draw** 41:7
**driven** 71:9
**drug** 24:5,5
**drugs** 14:14,15
**due** 148:2
**duly** 5:3
**durenard** 1:10
  51:7,8,15,20
  68:18 69:5,6
  71:19,23 133:20
**duties** 32:2
**dwight** 1:9
  16:13 28:11
  29:18 30:7,9
  47:15 50:2,11

55:17

**e**

**e** 2:1,1 3:1,7 4:2
  4:2 5:11 62:1
  74:24 77:16
**earlier** 21:16
  22:5 33:20
  63:19 74:9 78:3
  87:25 89:25
  90:9 91:12 92:7
  92:23 107:14
  108:12 112:25
  113:1 131:4
  136:2 138:22
**early** 37:5 59:17
  83:7 101:4,5,5
**easier** 23:13
**east** 2:11
**edits** 33:16,17
**educated** 83:8
**edward** 1:10
**efficacy** 122:21
**effort** 55:21
  79:1
**efforts** 71:16
  74:6
**egan** 1:9 16:13
  28:11 29:19
  30:7 47:15 50:2
  50:11 52:10
  55:16,17 56:3,6
  56:24 81:23
**egan's** 55:17
**either** 21:23
  23:11 25:7

28:11 45:25
  67:18 81:22
  98:18 111:7
**elaborate** 73:17
**elapsed** 62:23
**electronic** 36:8
  133:7 146:18,19
**eligible** 141:21
**elkington** 57:20
**email** 3:9,14,18
  3:21,22 16:12
  18:18 48:13
  49:6,12,14,20
  69:2,4,10 71:12
  96:6,11,14,18
  96:20 97:2,3
  99:11,22 100:6
  100:19 116:14
  116:18,22
  120:24
**emails** 8:16 9:17
  9:21,22 10:7
  48:5,6 49:10
**embodied** 20:23
**emergency**
  65:11,16 66:2,5
  67:2,6,9,13,22
  68:6
**emit** 61:19
**employed** 13:25
  20:9
**employee**
  147:19
**employees**
  30:22 33:25

94:22 141:24
**ended** 35:22
  40:19 41:2,19
  41:20
**ends** 89:7
**entered** 21:1
**entire** 25:25
  41:24
**entirety** 115:18
**entities** 14:15
  61:9,20 128:15
**entitled** 16:23
  36:10 39:9
  40:16 141:24
**entity** 79:4,10
**entries** 47:17
**entry** 17:18
**epidemiologist**
  72:23
**epidemiology**
  97:10
**equipment**
  40:21 86:8,9
**equity** 30:21
**ergo** 63:6
**erroneous** 25:14
  90:21 122:19
**erwin** 2:15 3:5
  4:23,23 144:13
  144:16,20 145:4
**especially** 84:19
  110:21 121:14
**established**
  43:25 87:25
  98:23 104:15

**[et - fda]**                                                    Page 162

**et** 4:9 117:3 148:1
**ethanol** 86:6,8
**eua** 108:9
**eugene** 1:10 51:7,8 68:18 69:24 71:23 133:19
**evaluated** 119:15
**evaluation** 91:9
**evaluations** 117:4 119:3
**event** 142:6
**everybody** 141:5
**evidence** 100:1 114:3 121:10 124:5,21 132:5
**exact** 21:11 51:6 54:10 109:25 129:8 141:2
**exactly** 15:23 22:25 23:7 53:6 81:18 82:10 84:11 85:25 94:16 111:13 133:19 141:15
**examination** 3:3 3:4,5 5:6 143:13 144:15
**examinations** 3:2
**example** 27:19 32:21 61:23

110:13 122:16
**excess** 6:11
**exchange** 3:11 3:25 35:19 36:2 38:6 130:13
**excuse** 96:7
**executive** 14:20
**executives** 30:21
**exemplary** 117:4
**exemption** 66:14
**exemptions** 66:24
**exercised** 132:17 134:17
**exhibit** 3:8,9,11 3:12,14,16,18 3:20,20,21,22 3:24 15:25 16:1 16:9 35:7,8,14 39:6 44:20,21 45:2,4,7 68:11 68:12,15,17 88:15,16,21 94:25 95:2 101:23 102:7,9 102:11,12 106:20,21 107:4 107:12 115:9,10 129:11,12,15 130:8 143:16
**exhibits** 8:4
**expanding** 97:13

**experience** 11:16 63:15 84:23 98:22 101:6 113:15,22
**experts** 138:16
**explain** 23:5,12 60:14 74:14 98:12 101:3
**expunged** 15:13 15:21 18:8 21:6
**expungement** 17:12
**expunges** 20:19
**extent** 15:23 80:4 127:8 128:6
**extraordinary** 66:4

**f**

**faced** 73:2
**fact** 10:17 27:23 76:15 79:12 82:17 86:1 90:25 97:22 110:17 136:17
**factor** 36:21,24 38:11
**factors** 37:2,10
**facts** 100:1 112:18 114:3 121:9 122:23 124:4,21 132:4 132:14
**failing** 17:21

**failure** 47:16
**fair** 26:12 32:17 37:9,12 98:7
**fairly** 28:19 62:25
**false** 17:19 18:2 89:19 90:5,13 90:16,17,22,23 105:2
**falsifying** 15:15 15:18 18:10 19:6,11 20:24 21:1,8 22:15
**familiar** 7:13 79:6 92:18 93:23 94:4,5,7 144:2
**family** 69:16 76:16,18 131:22
**faq** 3:16 88:22
**far** 73:9 122:18 134:15,19 139:3
**fasano** 4:18
**fastest** 63:20
**father** 56:15
**fault** 25:14
**favors** 72:17 73:16,18
**fda** 11:23 12:2 65:21 66:3,3,4 66:21 67:19,20 68:1 113:23 114:5 123:5 124:1,7,11,12 124:13,15,17

**[fda - foundation]** Page 163

125:2,6,13,21
126:5,8,9,14,21
**featherstone**
50:8 51:2 95:8
96:7,24 101:9
**featherstone's**
50:25 51:4
**federal** 132:19
**feeling** 83:5
**female** 110:14
**females** 32:14
**fiduciary** 42:16
**field** 79:24
113:16
**figure** 72:23
**file** 132:23
133:16,18 134:2
**filed** 4:9 10:10
10:17 35:18
65:9 130:12
132:20 133:14
133:15,25 134:2
134:2
**filing** 32:22,25
39:6,18
**filings** 32:6,20
36:1 37:1
**final** 81:6
**finally** 8:3,8
**financial** 31:5,7
42:25 43:14
44:1 50:3,6
59:11 70:13
71:9 141:20
147:20

**financials** 32:5
43:4
**find** 10:18 23:14
29:6 61:3,20
62:17 63:4
64:10
**finding** 17:18
64:4 71:21
**fine** 47:22
135:16
**finish** 55:24
**finished** 45:11
95:11 96:3
107:12
**finishing** 95:23
**firm** 4:15,18,19
4:20 54:15
128:19,22 129:1
**first** 5:3 7:15
23:18,22 24:21
26:1 29:23
33:22 34:1,5,16
35:3 39:12 46:5
51:8 52:4 58:16
61:1 65:4,25
73:5 88:23
89:17 103:3
108:1,5 118:10
121:16 123:2
145:18
**fiscal** 35:21
**fitness** 20:5
**five** 5:16 47:20
105:18 126:20
134:20 135:15

135:17 145:10
**fl** 148:3
**flip** 72:22 138:7
**floch** 2:4 3:3
4:14,14 5:7 15:9
16:3 27:9 33:6
34:14 35:10
41:9 44:23
46:24 47:19,23
48:1,17,21 49:3
50:24 58:15
62:1,4 68:14
69:3 71:4 80:10
84:6 85:1 88:18
95:4,20 99:20
100:4 101:8,15
102:2,6,13
105:19,22 106:4
106:23 107:6,13
108:21 109:5,19
114:8,24 115:12
115:22 116:3
118:6 121:20
122:1 124:9,24
126:24 127:15
128:13 129:10
129:14 132:12
134:10 135:14
135:17,21 136:1
143:6 144:18,22
146:2,17,19
**florida** 2:6 6:10
74:7 78:17
**focus** 125:6
127:4 128:1

**fold** 108:8
**folks** 52:17
**follow** 86:3
**followed** 86:12
86:14
**following** 114:6
**follows** 5:5
**foregoing** 147:8
147:14 148:5,16
**forgive** 55:5
**forgot** 110:17
**form** 3:11,25
35:18 130:12
132:20,25
133:10,14,25
134:5
**former** 75:1
**forth** 147:10
**fortunate** 63:11
**forward** 13:24
72:5 96:10
118:7 146:16
**forwarded**
95:16 116:22
117:11 136:7,9
**forwarding**
116:17
**fought** 145:17
**found** 6:16 9:23
22:20 70:22
**foundation**
82:25 99:13,25
100:22 105:4
108:25 114:3
118:3 121:23

**[foundation - granted]**                                                          Page 164

134:8
**founder** 14:5,20
  103:18
**founders** 52:19
**four** 130:22
  134:20
**fourth** 20:24
  21:1
**frame** 6:13
  63:18 121:14
  129:8
**franchise** 80:18
**fraud** 7:6 20:6
  20:16 140:7
**friday** 1:20
  117:3
**friend** 51:9 52:4
**friends** 74:12
**front** 113:8
**full** 11:20
  115:21 132:14
  147:15
**function** 52:24
**functions** 42:6
**fund** 51:13
**funds** 7:8,10
  24:17 38:15
  51:13
**further** 143:6
  144:12 147:18
**future** 40:5
  142:6
**fw** 3:9,23
**fwd** 3:18

**g**

**g** 2:15 4:2 74:24
**gainfully** 20:8
**garbled** 27:6
**garcia** 57:2
**gears** 10:20 48:2
  87:5
**gee** 2:11 4:21
**gelt** 1:4 4:8,16
  148:1
**general** 26:18
  30:23 31:9,24
  50:2 60:17,25
  61:16 62:10,11
  62:19 66:25
  103:25 136:19
**generally** 6:6,24
  7:13 8:20 9:2,20
  11:16 12:12
  14:3 17:1 19:1
  27:1 31:25
  33:12 35:16
  43:11 44:13
  45:6,19 52:1
  61:10 63:13
  64:15 65:1
  76:21 93:7
  96:20
**generating**
  134:13
**generator**
  100:16
**genetic** 61:13,14
**genevieve** 2:15
  4:23

**gentleman** 52:9
  52:14 95:18
**give** 18:9 43:8
  48:13 60:17
  63:17 88:14
  95:19 105:11,14
  109:25 110:13
  138:17 146:20
**given** 6:16 73:20
**gives** 138:3
  142:5
**giving** 27:21
  69:11
**go** 7:14 8:5 22:9
  23:11 24:5
  33:20 39:5,25
  41:15 43:16
  54:21 58:10
  74:1 92:21
  95:13 96:1
  99:15 100:2,5
  100:25 105:22
  109:2 114:4
  116:12,21
  118:23 119:5,11
  129:16 135:21
  145:2,20
**godaddy** 22:23
  23:4
**goes** 46:13
  60:14 104:21
**going** 4:4 8:3
  13:9 15:24,25
  16:4 24:19 31:8
  32:22,24 35:6,7

35:24 36:9
  44:19 47:19
  59:17 65:17,19
  70:3,6,21 72:10
  73:1,16 88:13
  94:25 95:15
  102:6 105:12
  106:20 107:1
  110:3,4 115:8
  127:6 132:10,23
  133:18 144:22
  144:25 145:21
**golf** 145:18
**good** 4:14 5:8
  5:10 38:17 58:9
  63:10 75:15
  77:2 105:18
**google** 22:19
**governance**
  30:16 31:13
  51:23
**government**
  12:22 65:8,13
  74:8 87:1 93:18
  122:24 123:7
  138:6
**governmental**
  122:21
**governments**
  136:18
**governor** 73:21
**graduate** 11:8
**grant** 142:3
**granted** 142:4

**great** 26:11,14 26:17 105:21 134:24,24 143:10 146:19

**group** 43:14 47:2 59:8 66:19 79:13,16 96:24 138:16

**groups** 28:21 34:23 112:2

**guarantee** 83:10

**guess** 59:3 124:15

**guessing** 118:21 118:22

**guidance** 138:17

**guide** 30:22

**guidelines** 31:5 31:15

**guilty** 15:11,18 18:10 19:6,10 20:22,25 21:8 22:14 54:13

**guitar** 53:12 54:22 55:2

**guy** 136:21,25

**guys** 48:24 144:18

**gyorkerwin** 2:17

**h**

**h** 3:7 5:11 62:1

**half** 103:7

**hall** 11:7

**halt** 97:19

**hand** 38:13,21

**handle** 83:15 124:14

**handled** 83:14 83:16 84:15 140:18

**handling** 58:6

**hands** 121:13

**happen** 65:2

**happened** 7:5 19:13 63:11 112:1 134:25

**happens** 84:19

**hard** 52:12 120:3

**harris** 143:17 143:25

**harvard** 51:12

**haynie** 3:12 45:4,22

**heading** 88:23

**headline** 102:23

**heads** 55:20

**health** 13:6,7 17:21 18:3 19:11 79:21 80:2 92:4,8 94:12,15,18,22 96:11 97:21 99:23 102:24 108:24 110:14

**healthcare** 12:14,25 13:4,7

13:14 29:2 52:11 75:3 77:19 87:25 113:15 138:20

**healthy** 90:24

**hear** 23:18 58:16 109:7 145:13

**heard** 23:22 24:21 43:19 54:15 66:7 79:4 79:20 80:11 91:13 93:11,14 93:22 94:11 96:14 128:19,24

**hearing** 17:13 23:21 110:25 124:16

**held** 4:11 18:13 131:7,9,11 135:1

**help** 27:16 28:16 30:22 64:15 67:16 71:13 77:22 138:17

**helpful** 75:13 77:1

**helping** 67:8

**hesitate** 27:7

**hey** 71:20 101:17

**high** 62:9 93:18 132:9 134:15,19 143:2

**higher** 98:10,22 104:14,17 105:1

**highly** 98:20

**hindenburg** 128:19

**hire** 32:9

**history** 36:15 37:17 63:10,13

**hold** 88:3

**homes** 131:23

**honestly** 94:10

**honesty** 20:5

**hope** 33:19

**hoped** 136:11

**hopefully** 29:10

**hospital** 75:2 98:19 145:20

**hostetler** 4:24

**hot** 37:6

**hour** 47:20

**hours** 32:1

**house** 131:22,23 131:25 134:18

**huge** 34:7

**hundreds** 37:2

**hurdles** 67:23

**hutchins** 57:14

**i**

**idea** 45:8 87:10 115:3 134:9 140:5

**identification** 16:2 35:9 44:22 68:13 88:17 95:3 102:10

106:22 115:11 129:13

**identify** 28:5 61:1,14

**identifying** 28:2 60:22

**ike** 29:19 71:13 81:23,25

**illogical** 85:16

**imagine** 132:7

**immediately** 66:13

**impediment** 27:5

**implemented** 31:19,19

**important** 7:16 24:5,6,7 28:1 55:20 72:9 137:11,16,18,19 137:21

**impossible** 49:19

**impression** 132:22

**improbable** 55:15

**inappropriate** 72:18 122:8

**inaudible** 37:6 48:16,19

**incapacitated** 145:10

**incentive** 70:13 70:19

**include** 115:18

**included** 68:25

**inconsistent** 111:7

**incorporated** 35:20 40:10 60:20

**incorrect** 131:9

**increase** 105:1

**increases** 62:17

**independent** 85:9 87:1 119:2 122:21

**independently** 85:5

**india** 46:22,22 47:4 93:15 123:2

**indian** 46:18 47:2 93:11,20

**indicate** 61:8 121:6

**indicated** 84:22 86:25 90:1,18 90:20 93:18 99:6 101:20,21 109:23 110:22 111:16 113:4,12 113:13 119:24 122:20 133:15 135:12

**indicates** 96:21 98:3,4 123:1

**indicating** 45:23

**indication** 27:25

**indications** 27:19

**indicators** 62:14

**individual** 28:5 108:22 133:22 135:7 139:12

**individually** 140:14

**individuals** 96:11 109:8 135:7

**industry** 11:21 13:14 26:20 28:17,19 30:24 40:23 84:15 88:1 141:5

**inexperienced** 98:20

**infectious** 26:8 26:18,23 97:9

**inference** 90:11 90:15

**information** 45:22 49:15 58:6 60:17 62:19 69:11 75:12 82:4 85:15,24 86:13 88:10,11 99:18 99:19 115:19 118:17 120:8 121:13 123:8,19 123:24,25 136:8 136:10,17

137:13,16,20,21 139:5,7 145:6

**initial** 40:24

**initially** 107:23 111:16

**initiatives** 92:1

**inocon** 14:25

**inquiry** 3:9

**inside** 29:6 54:9 96:11 132:8

**insiders** 132:2

**instances** 64:18

**institute** 13:6,7

**instruct** 127:7 128:5

**instruction** 84:22 128:3

**instructions** 86:3

**insurance** 15:16 17:20 18:3 19:11 20:8 22:17

**intelligence** 60:21

**intentionally** 122:7

**interact** 49:25 50:2

**interacted** 50:6 57:16

**interaction** 79:17

**interactions** 55:22 56:3,6,19

**[interactions - kind]** Page 167

56:21 57:4 139:9

**interest** 24:1,2 26:11,14,17 27:1 52:12 69:17 147:20

**interested** 24:2 25:3 27:12 72:14

**interesting** 23:23

**interests** 69:19

**interim** 10:10

**intermountain** 94:11,15,18,22 96:11 97:9

**internal** 31:4 43:14,19 44:2,7 45:24 46:6 50:4 54:5,8

**internally** 44:18

**international** 136:18

**internet** 10:11 10:14

**interpret** 40:12

**introduced** 23:23,25 24:10 24:24 29:13,17 72:1

**introducing** 64:13

**introduction** 24:17,22 28:25 76:16

**introductions** 79:2

**invention** 29:4

**investigated** 126:20

**investigation** 124:1,11,17 125:2,7 126:25 127:5,17,20,23 128:2

**investigations** 126:15

**investor** 134:4 139:21

**investors** 52:16 132:1 137:20,23 138:2

**invited** 69:19

**involved** 6:22 14:1,11,14,15 24:8,9 28:15 32:5 50:5 56:9 63:25 74:13 76:14 77:18 78:25 94:19 104:9 108:7 127:1,2 140:12

**involvement** 74:10 124:17

**involving** 20:6 20:15 46:6

**iowa** 104:4

**ir** 15:2

**islands** 1:5

**issue** 17:11 50:1 59:1,3 100:25 101:2 110:19 118:1 126:6 135:2

**issued** 10:1,2 17:9 65:12,13 65:13 81:19 104:5 113:24 120:9 133:10 142:7,14,17

**issues** 31:6 32:7 32:8 39:1 43:18 45:24 47:14 50:8 54:19 101:22 111:21 112:13 122:18 138:18 140:13 145:12

**j**

**j&j** 12:6,7,8

**james** 1:9 52:8,9

**january** 115:1,1 115:6,6

**jennifer** 16:12 57:23,24

**jerry** 74:21 75:1 75:20 76:5 118:16,20 123:17,22

**jersey** 6:9,19 11:7 16:19 18:24 19:4 21:18,21 74:17 74:20,21 75:4

75:14,17,22,25 76:4 78:4

**jobs** 12:10,13 13:13

**johnson** 1:25 12:1,1,2,2,3,3,5 12:5 13:21,21 147:5,24 148:2

**join** 51:9

**joined** 26:1

**joint** 46:22 47:1

**joni** 2:10 4:20 102:2 105:20 107:7 115:22 144:20

**joseph** 50:7 51:2 95:7

**josh** 139:12

**jostler** 2:13

**journal** 47:16

**judge** 15:22

**judgment** 7:4 137:12

**june** 16:17 133:1

**k**

**k** 3:11 35:18 36:7 39:6,18

**kara** 107:2 143:18

**keep** 31:21

**keeps** 43:15

**kind** 31:18 36:20 67:17

**[kinds - legal]**                                        Page 168

**kinds** 26:19
32:11 61:9
**kit** 103:19
**knew** 64:9 72:21
77:21,23 102:1
121:15 131:24
135:6
**know** 8:5,19
13:11 16:5 19:1
19:12 20:15
24:13 29:9 30:8
33:14,25 34:4
34:15 35:1,1,4,5
35:12 37:14,17
38:7,8,14,15
39:17 40:12
43:2 44:15,24
45:11,15 49:11
51:4,6 54:10,18
56:13 57:3,11
57:12,17,19
59:1 61:14,21
62:2,22 63:8
67:12 68:20
69:17 71:15,22
72:21 75:21,23
77:6 78:17,20
78:21 79:2,18
80:3,4,17 87:9
88:19 89:5 94:8
94:8,17,24 95:5
95:10,12,21,24
99:6,7,12
101:19 102:8
103:24 104:23

105:11,17
106:16,19,25
109:3 110:7
112:18,21,23,24
115:14 116:9
117:20 118:5
121:5,19 122:18
124:10 125:4
127:11,24,25
128:23 129:2
130:3,8 132:6
138:25 139:6,17
139:17,18
140:16 141:10
143:18,19,21,23
143:25 144:8
148:6
**knowingly**
17:19
**knowledge** 36:4
55:1,8 75:20
86:19 87:4
107:22 112:6
122:23 128:6,9
128:11 140:3
144:10
**known** 24:14
28:19 121:17
**knows** 127:8

**l**

**l** 2:10 77:16
**lab** 83:9 98:19
**labeling** 124:8
126:1

**labels** 125:24
**laboratories**
65:5 74:5 78:9
86:7
**laboratory** 65:7
66:18,19,19
67:19 86:2
108:24
**labs** 64:17 66:12
66:14,23 67:4
71:14 97:20
**lack** 135:3
**lacks** 99:13,25
100:22 105:4
108:25 114:3
118:3 121:23
134:8
**lady** 77:18
**lake** 2:12 102:20
102:22 106:7
117:24 118:9
120:12,15 147:4
**landon** 139:14
139:19
**landscape** 65:10
**large** 34:7,11,11
74:7,8
**late** 37:14
130:19 131:18
133:11,14,25
**latin** 51:14
**launch** 13:15
**launched** 110:6
**launching** 13:18

**laureates** 13:2
137:3
**law** 4:15,18,20
11:4,5,6,7,8,9
11:10,15,17,19
12:9,11,13
16:20 19:8,23
21:20,22,25
22:2 32:12
132:19
**lawsuit** 6:6 7:1
7:6,7 10:10,19
17:4 55:6
140:11,14,17
**lawsuits** 6:22
10:17
**lawyer** 20:5
**lawyers** 48:14
130:3,3,6
**lead** 27:23 59:21
59:22 60:11
**leaders** 12:18
**leading** 19:17
**learn** 115:4
**learned** 127:8
**learning** 25:1
83:15 100:20
**leave** 53:3,23
54:23
**led** 83:3,25
**left** 12:7 53:7
54:1 130:15
145:11,12
**legal** 50:5 54:5,8

**legislation** 77:19

**legitimate** 63:18

**lesser** 50:7

**letter** 3:13 45:20 45:21 68:9 69:1 99:8 101:1 104:21,24 116:2

**letters** 66:17

**level** 62:10 122:22

**levinson** 107:3 143:18

**license** 13:5 18:10,14 40:22

**life** 13:1 17:20 24:4

**light** 73:23

**limit** 87:20 91:3 91:4,13 98:22 104:14,17 105:1

**limited** 1:5

**limits** 105:9

**line** 103:15 133:5 148:9

**link** 23:4

**linked** 115:19

**lisa** 143:21

**list** 14:3 46:13

**listing** 38:6

**litigation** 18:7

**little** 10:21 26:3 27:6 48:2 55:2 72:5 73:3 83:22 87:6 89:24 90:8

92:7

**live** 73:19 131:20 137:2

**lived** 28:18

**llp** 2:5 4:15

**lod** 91:4 98:10

**lodge** 7:20

**lodged** 33:8

**logix** 60:3,5

**long** 8:9 63:4,13 135:2 144:25

**longer** 53:21 57:8

**look** 8:25 10:7 17:5 31:5,14 32:5 37:1 41:10 43:16 45:10 62:16 68:19 69:24 75:15 95:10 99:3 102:19 106:25 110:19 111:19 112:12,12 115:14 116:6 130:8 134:4 144:2

**looked** 8:21 9:3 9:16,22 10:11 10:13,16,18 23:14 27:18 29:7 60:24 120:24 136:18

**looking** 31:9,18 31:20 32:10 43:12 47:3,12

60:19 61:18 62:19,21 70:8 73:23 87:18 90:13 92:11

**looks** 16:23 61:12,16 71:8 73:8 96:10 97:8 97:12 111:25 116:21 117:8 130:25 131:6 132:25 133:10

**lopansri** 93:22 97:8 98:18 120:24

**lopansri's** 93:25

**lopransri** 97:2 104:16

**lose** 145:13

**losing** 100:12

**loss** 35:4 41:16 41:19,20 140:21 140:23 141:1,3 142:14,17

**lost** 145:10

**lot** 52:12 63:15 72:12,16 73:15 73:20 113:9 123:8 145:23,23

**lots** 84:14

**love** 77:15 116:15 117:12 118:8,13,14 123:11,22 136:7

**loveless** 2:11 4:21

**low** 98:12

**lower** 98:13 104:13

**lowest** 91:5

**lucky** 145:22

**luncheons** 56:25

**m**

**m** 77:16

**made** 7:21 21:13 74:6 75:21 82:19 110:3,9 124:2,8 139:1 148:14

**main** 74:17

**maintain** 38:6

**major** 13:2 26:13 34:4,6 39:9,12,22 72:7 74:3 78:9,17,21 131:21 132:1

**make** 8:6,11 13:12 28:25 44:3 65:23 66:9 69:20 79:1 101:25 102:3 122:15 125:21 135:4 138:2 142:23

**makes** 33:3 36:2 114:5 123:7

**making** 41:25

**malone** 77:15 77:17,18 78:2 116:15 117:12 118:8,13,15

**[malone - minutes]**                                    Page 170

123:11 136:7
**malpractice**
  138:9
**manage** 145:14
**management**
  13:25 33:16
  47:8 49:22,24
  52:18 85:4,10
  85:11 100:20
  101:16 112:9
  117:1 129:24
**mandated** 42:22
**manual** 9:6,8
  10:7 83:6
**manuals** 8:22
  8:24 9:4 84:23
**march** 1:20 4:1
  4:5 69:8 72:6
  74:4 75:6 92:21
  147:22 148:2
**marcus** 2:5 4:15
**marginal** 141:9
**mark** 15:25
  35:7 115:9
**marked** 16:1,9
  35:8,13 44:21
  68:12 88:16
  95:2 102:7,9,12
  106:21 115:10
  129:12 143:16
**markers** 60:25
  60:25 61:2,12
  61:16
**market** 47:3
  65:18,20,23

125:12,19
  126:10,12 138:7
**marketplace**
  37:4,7
**marking** 44:20
  68:11 130:7
**masters** 11:14
**material** 46:8
  61:13,14
**mathematician**
  51:12
**matter** 4:8
**matters** 46:6
**matured** 80:5
**mayor** 73:21
**mcclusky** 24:12
  24:13,22 139:16
  139:19,21 140:1
**mean** 25:12
  27:17 28:24
  36:23 43:22
  48:9 50:1 59:25
  60:18 70:16
  73:17 80:15,23
  85:20 87:12,21
  87:23 90:11,17
  110:11 122:17
  126:4,5,5
  133:16 136:14
  138:19 139:24
**meaningful**
  72:24 137:11,14
  138:3
**means** 43:24
  71:9 87:9,11,13

87:17,22 104:17
  139:23
**meant** 25:16,17
**measurement**
  91:5
**med** 15:2
**media** 4:6 58:13
  106:2
**medical** 12:15
  15:20 36:15
  63:5 93:12
  94:19 121:12
  135:7 137:7,8
  145:5
**medicine** 12:21
**meet** 29:23
  43:17 67:24
**meeting** 25:2
**meetings** 29:4
  56:24 137:4,5
**member** 7:3
  14:21 30:1,5
  35:25 42:7,23
  56:2,5,18 109:6
  127:2 139:8,11
**members** 32:18
  33:13 47:7
  49:17,22 55:10
  56:23 82:7,24
  83:24 84:8
  85:11 117:2
  129:18,23
  141:14,16,24
**memory** 92:16
  107:19,23

145:25
**mental** 6:18
**mention** 120:19
**mentioned** 6:21
  22:5 27:10
  38:10 53:13
  76:7 77:9
  138:22
**mesh** 31:17
**message** 49:17
  68:18 95:16
**messages** 49:18
**metrics** 87:6
**mexico** 123:2
**miami** 2:6
**michael** 2:4
  4:17
**middle** 8:10
  36:12 89:14
  119:5,9
**million** 100:12
  104:5 143:3
**mind** 98:3,5
**mine** 9:24 51:9
  51:10 74:12
  75:2
**minimal** 56:20
**minimum** 38:5
  38:7 135:7
**minorities** 32:14
**minute** 47:20
  105:18 135:15
  135:17
**minutes** 105:23

**[mishandling - note]**                                    Page 171

**mishandling**
83:9 84:18
**misleading**
17:19 18:3
122:8 124:3
**misrepresenta...**
20:7,16
**missed** 11:13
**misstated** 38:25
**misstates** 41:5
84:1 108:16
135:11
**mistake** 133:19
**misunderstood**
38:25 48:9
**misuse** 7:7
**misused** 7:10
**mnrlawfirm.c...**
2:6,7
**mobility** 145:11
145:12,24
**modifications**
124:8
**molecular** 92:5
98:20
**molecule** 61:19
**moment** 50:19
95:25
**monetary** 21:7
142:11
**money** 6:17
31:8 41:25
52:16
**monitored** 44:3

**monoclonal**
26:20 27:11
**month** 21:17
**months** 19:8
40:19 99:21
134:20
**morning** 4:14
5:8,10
**morrison** 76:11
76:12,13,20
77:6,7 118:15
118:21 123:17
**move** 23:16 72:5
95:14 131:19,21
135:4
**moved** 42:14
**moving** 13:24
52:17 67:20
**mpineiro** 2:7
**multiple** 28:6
**murphy** 1:10
52:13,14

**n**

**n** 2:1 3:1 4:2
5:11 77:16
**name** 5:9 50:18
53:13 57:3,12
57:15,20,24
93:22 94:8
128:24 130:15
133:6 139:18
147:21
**named** 4:16
77:15 139:12
140:15

**names** 43:7,8
94:5,6 144:2
**narrative**
121:22
**nasdaq** 37:16,21
38:18,23
**national** 13:5,6
**nature** 42:21
54:10 56:21
82:11 123:16
**near** 40:5
**nearly** 86:22
120:5
**nebraska** 78:22
78:23 104:4
**necessarily**
26:23 33:12
109:18 120:2
**need** 8:5,8 32:8
36:13 43:18
45:8,14,15
71:13,15 91:6
**needed** 134:18
**needs** 31:19,20
**negative** 89:19
90:22,23 142:20
**negatives** 105:3
**neiman** 2:5 4:15
**nelson** 1:9 52:8
52:9
**net** 41:16,18,20
**neurologist**
145:19
**never** 7:4,4,10
12:9 22:21 57:4

57:16 64:6,12
71:25 86:13
111:9 122:18
**new** 6:9,19 11:7
11:8 16:19
18:23 19:4
21:18,21 32:9
32:12 56:23
60:19 61:5,8,11
61:22 62:13
73:19 74:17,18
74:18,19,21
75:4,14,17,22
75:25 76:4 77:9
77:11,13,20,21
77:23,24 78:4
84:20 86:2
101:23 110:22
131:20,20 140:8
**newest** 29:4
**news** 81:8 82:14
**night** 11:20
**nobel** 13:2
137:3
**nomi** 3:21 79:20
80:2 92:4,8,16
99:23 104:6
108:3,7,8,12,20
**nordic** 13:3
**normal** 65:6,17
65:19 110:5,10
111:18,25
**notary** 148:21
**note** 68:23
115:17,23

**[noted - opine]**

**noted**  46:6 148:7

**notes**  47:6 139:6 147:13

**notification**  3:23 116:18

**npr**  3:9

**null**  21:3

**nullified**  23:1

**number**  11:24 12:6,15,22 14:1 14:5,13,13,17 14:19,21 42:21 43:6 71:23 75:2 91:6 134:16

**numbers**  141:3 141:8,11

**nuts**  62:6

**o**

**o**  4:2 62:1 77:16

**o0o**  4:3 146:25

**oath**  8:1 147:10

**object**  115:20 144:23 145:1

**objected**  125:18 126:6

**objection**  7:21 7:21 33:4,8 41:5 82:25 84:1 99:13,25 100:22 101:12 105:4 108:15,15,25 109:14 114:2,2 115:25 118:3 121:9,23 124:4

124:19 126:22 127:6 129:6 132:4 134:7 135:10

**obtain**  65:12 67:9

**obtained**  99:18 107:7

**obtaining**  63:25 67:13,22

**obviously**  32:4 37:1 39:1 43:13 43:13 59:21 70:16 110:18

**occasion**  50:3

**occur**  5:17 125:3

**offending**  27:22 28:3,5 60:23 61:21

**offense**  21:1

**offer**  131:25 135:4

**offered**  98:23 104:15

**offering**  30:3 40:4

**offhand**  43:8 139:6

**office**  95:19

**officer**  14:21 50:3 59:11 103:18

**officials**  104:4 109:12

**oh**  50:4

**okay**  6:5,12,21 9:12 10:6 11:6 11:15,18 13:24 15:10,14,17 16:6,8 17:14 18:17 19:4,9,14 22:5 23:21 24:10 25:5,9 26:3 28:23 30:18 33:9,20 35:6,24 37:25 39:5,21,25 40:7 41:10,15 42:2 45:10 47:23 49:2,21 50:11 52:7 55:4,18 56:8 59:5,13 60:9 62:9 65:1 65:15 66:9 68:10,21 69:4 73:15 74:9,14 74:19 75:24 77:8 78:3 84:7 86:21 87:5,7,15 87:20,24,24 88:13 89:2,6,23 90:16 91:2,18 92:21 93:14 94:11,14,25 95:15,16,16 96:2,2,3,3,5 100:11 101:23 104:1,13 105:21 107:9,24 108:22

109:6 110:8 111:12 112:24 113:15,23 114:9 114:20 115:8 116:4,12 117:14 118:12,23 120:23 123:3 124:10 126:3,19 126:25 127:4,16 127:19 129:4,11 130:7,11 131:17 135:14,14 140:4 140:6 143:5,15 145:2 146:13

**old**  145:9

**omits**  120:23 121:1

**once**  61:20 64:22 65:13 66:11 67:2 68:5 102:3 132:14

**ones**  6:3 36:4 78:24 140:18

**ongoing**  127:16

**ooooo**  1:3 2:20

**open**  28:16,20 28:23

**operate**  54:7

**operating**  12:6 35:4 140:20

**operation**  31:21 46:7,18,21 53:1

**operations**  44:2

**opine**  88:8 138:17

**[opined - participating]**

**opined** 29:8 85:7 136:19
**opining** 87:3
**opinion** 43:18 66:3 73:25 75:10 81:3 83:20,21 85:7 105:14 112:14 112:19 138:8
**opportunities** 12:7 32:12 71:8
**opportunity** 29:7 50:9 72:20 76:17 77:3,22 134:24 136:22 146:8
**opposed** 28:6 40:13 61:15 62:18 73:8 82:18 142:4
**opposite** 112:11
**option** 142:3,5
**options** 32:11 70:18 131:10,10 131:13 132:18 134:17 141:22 142:22
**oral** 147:16
**order** 16:24 17:9,18 20:19
**orders** 72:11,14 72:15
**organism** 27:22 28:3,5,6 61:2,12 61:15,19,21,21

63:17
**organisms** 28:7
**organization** 12:17 29:9,12 56:16 80:11 84:14,18
**organizations** 14:12 139:16
**oriented** 13:8
**original** 17:3 18:1 28:10 104:24 111:1 112:5
**originally** 28:15 74:2 122:12
**ortho** 110:14,14
**ostler** 2:10 3:4 4:20,20 33:4 41:5 68:23 82:25 84:1 99:13,15,25 100:22 101:12 101:24 102:5 105:4,16,21 107:4,9 108:15 108:25 109:2,14 114:2 115:17 118:3 121:9,23 124:4,19,21 126:22 127:6 128:3,10 129:6 132:4 134:7 135:10 143:10 143:14 144:12 146:7,11,12,14

146:15,20
**outside** 31:3 34:21 51:11 52:2 56:5 58:7 67:14,15,17 127:11
**overall** 31:9 143:4
**overcome** 36:14
**overlapping** 48:16,19
**overruling** 17:11
**overseeing** 13:15 42:25
**oversight** 46:10
**overturned** 18:8
**owen** 2:19 4:18
**own** 43:14 121:11
**owned** 84:13,17
**owns** 139:24

**p**

**p** 2:1,1 4:2
**p.c.** 2:11
**p.m.** 1:21 4:1 146:24
**package** 32:10 125:24
**packages** 30:20 30:24
**page** 3:2,8 19:17 19:17 89:6,7,8 95:25 103:15 104:1 107:5,6

107:10 148:9
**paid** 7:4 23:2,4 35:1
**palie** 140:4
**pandemic** 59:4 63:12
**panel** 26:24 27:13,15,17 28:4
**paper** 81:12 101:21
**papers** 137:2
**paragraph** 17:15 19:21 36:13 39:8 40:3 40:18 41:18 46:5 71:11 95:24 98:17 103:3 116:10 119:10 123:2
**parallel** 79:11
**parent** 115:24
**parr** 2:11 4:21
**parrbrown.com** 2:13
**part** 11:20 31:9 33:12 42:6,7 43:2 58:5 96:3 98:12 103:14 139:16
**participate** 10:18 33:11
**participating** 42:2

**[particular - point]**                                    Page 174

**particular**
  60:23 91:8
  144:17 145:5
**parties**  14:13
  119:25 144:19
  147:19
**partner**  45:22
  51:10 75:1
**partners**  28:21
**passing**  6:14
**past**  15:5,8
  24:17 50:4
  129:17,22 130:1
  141:23
**patented**  61:7
**patents**  137:1
**pathogen**  91:6
**patient**  27:19
  62:14
**patients**  103:8
  138:1
**pattern**  72:2
**pay**  21:7 64:10
  142:16
**paying**  40:13
**payment**  39:14
**payments**  21:13
  21:15
**pcr**  73:11 138:8
**penalty**  21:7,17
  148:15
**pendency**  12:4
**pending**  140:10
**pennsylvania**
  74:18 76:7,10

  76:13,14,25
  77:4 78:5
**people**  13:2 25:2
  29:3,8,23 30:24
  37:8 44:18 59:7
  64:7 71:8 72:13
  72:15,15,16
  73:20,22 75:16
  77:1 83:8,15
  85:14 86:2,7,12
  94:17 101:5
  103:6 111:19,24
  122:5,15 123:18
  123:21 132:8
  137:6,9,13
  141:5
**percent**  82:18
  82:18,20 83:12
  83:14,18,18,19
  83:19 86:1,1,18
  86:18,22,23
  87:2 98:13
  113:14,16,25
  114:10,14,18
  120:1,3,18
  142:18
**percentage**
  81:13,14
**perfect**  120:5
**performance**
  119:1
**performs**  97:15
**period**  12:10
  17:6 21:14 25:1
  28:14 43:10

  63:24 133:20
  143:2,2,4
**periods**  43:8
**perjury**  148:15
**person**  23:25
  32:10 52:20
  57:12,15 77:20
  105:12 109:4
**personal**  73:25
  74:10 83:21
**personally**  33:9
  72:12 76:2,3
  79:19 83:20
  122:9 134:2
**pharmaceutical**
  11:21 13:22
  28:16,19 29:1
  84:15
**pharmaceutic...**
  14:22
**pharmaceuticals**
  37:6
**pharmacist**  88:2
**pharmacy**  11:4
  16:21 18:10,13
  18:16 22:2
**phd**  51:12
**phone**  32:23
  59:14
**phonetic**  14:25
  15:2 24:12
  54:16 57:10,14
  57:21,23 140:4
**physicians**
  94:18

**piercey**  143:21
**pineiro**  2:4,5
  4:15,18 145:2
**place**  126:2
  132:21 147:9
**placed**  72:11
  147:10
**places**  80:16
**plaintiff**  1:6 2:3
  4:8 5:25 6:2,6
**plaintiffs**  49:10
**platform**  108:3
**play**  53:12
  54:22
**player**  55:2
**plea**  18:1 19:10
  20:21,25 21:6
  22:14 23:1
**plead**  15:17
**pleading**  18:10
  21:8
**please**  4:13 5:8
  27:7 48:10 55:5
  119:12 143:11
**pled**  15:10 19:6
  54:13
**plough**  11:22
**plus**  82:18 83:14
  120:18
**point**  12:19 13:5
  15:12 30:1
  36:22 37:12,17
  38:5,16 39:23
  43:2 101:4,20
  102:16 103:9

105:13,17 108:1 134:15

**points** 62:17

**policies** 30:23

**political** 72:10 72:17 73:16,16 73:18,21

**politics** 76:14

**pool** 141:22

**pop** 63:6

**pops** 95:5

**population** 103:17

**portion** 61:19

**portions** 61:18

**position** 12:3 15:2 37:4,18 70:1 72:17 134:23 135:4

**positions** 42:9

**positive** 51:17 79:14 90:5,13 90:16,17 91:8 98:13 103:6 104:18 105:13

**positively** 44:11

**positives** 98:12

**possibly** 55:11 122:6

**posted** 23:2,3

**potential** 50:10 64:13 70:22 87:19 97:21 102:24 105:2 132:2

**potentially** 38:12 70:3 137:19

**pr** 58:6

**practice** 19:8,23 21:20,24 38:17 72:2

**practiced** 12:9 12:13 18:16 21:22 22:2

**practicing** 12:11

**prefer** 47:24 49:19

**pregnancy** 26:22 105:7,11

**pregnant** 105:12 110:15

**premium** 21:12

**premiums** 21:13

**preparation** 32:6,24 113:2

**prepare** 8:13 9:21 10:8

**prepared** 89:3

**prepares** 43:15

**preparing** 9:17 70:9 117:14

**present** 2:19 70:3 76:17 91:7

**presentation** 69:20,21

**presented** 109:17

**presenter** 56:25

**president** 6:9 7:8 24:15

**press** 3:23 8:22 8:24 9:23,25 10:2,3,6 33:15 56:22 113:1,4,6 113:11 114:25 115:5,18,20 116:5,18 117:9 117:11,15,17,23 118:1,7,23 119:21 120:4,9 120:19 121:14 123:10,14 124:2 124:18 128:14 129:4,18,21,23 130:2,23 136:3 136:15

**pretty** 32:19

**previously** 62:12 128:4 143:16

**price** 37:23 38:1 38:5

**prices** 131:23

**primarily** 51:3

**prior** 24:9,17,22 26:4 29:13,17 30:3,4 33:10 70:8 108:16 134:20 135:11

**private** 14:17 31:17

**privileged** 127:9 127:12,14 128:7 128:12

**probability** 81:22

**probably** 49:18 81:18,24 85:14 88:25 102:21,22 105:9 118:15,16 131:16 133:3 140:23 143:3

**problem** 26:13 72:24 98:11 100:21 102:5 110:7,24 111:5 111:8,9,10,17 111:18,20 112:2

**problems** 111:13 112:7 131:21

**procedure** 65:17,19,21

**procedures** 60:21 111:25

**proceedings** 147:8,12,16

**process** 62:25 65:2 66:10

**produce** 48:3,6 49:9 62:14

**produced** 115:24 127:22 127:24

**produces** 103:19

**[producing - r]** Page 176

**producing** 33:12

**product** 67:24 80:22,24 81:1 83:7,8,9 84:20 110:20 112:3,4 125:12 126:9,13 134:13 135:1 136:13

**products** 13:5 14:16,16 26:21 40:19 47:4 65:22 67:20 110:6,12,22,23

**professional** 147:6

**professionals** 36:16 135:8

**programs** 31:18

**project** 59:8 83:16

**projects** 76:15

**prominent** 59:3

**promoted** 72:20

**promoting** 97:23

**proof** 83:16 99:2

**property** 135:4

**proteins** 61:17 73:8

**protest** 17:10

**protocol** 86:13 86:15

**proud** 122:4

**provide** 9:5 17:19 48:5,8 49:6 85:24 118:17

**provided** 9:7 17:8 18:2 44:12 44:17 75:11 109:17 127:19

**providing** 45:22 47:7 120:7

**provisional** 16:24

**public** 12:17 14:17,23 15:1,3 15:4,5,8 16:20 22:6,11,12,13 22:19 25:25 26:2 30:3 31:8 31:16,22,23 33:2 42:23 46:9 56:9 59:3 86:21 97:21 102:24 107:7 108:23 121:11,16 129:8 148:21

**publicly** 97:23 126:2

**published** 22:21

**pudding** 99:2

**pull** 88:13 121:18

**pulling** 72:17

**punitive** 4:17

**purchase** 77:24 78:5,23 104:10

**purchased** 77:7 78:15

**purchaser** 137:16

**purchases** 112:3

**purchasing** 75:18 77:4 78:13 106:17

**purpose** 132:10

**purposes** 13:10

**put** 23:13 36:21 37:3 38:1 52:16 65:22 68:1 123:8 139:25 140:1

**puts** 66:21

**q**

**qualification** 43:17

**quarter** 39:13 47:16 140:22,22 140:22 141:4,18

**question** 7:17 8:10 18:6 23:9 36:25 44:10,17 48:10,11 49:4 55:24 71:5 72:8 72:9 74:1 81:9 82:15 85:17,21 85:22 91:3,25 93:15 94:6 98:5 98:5,7 99:5,9 103:5 104:23

106:9 107:1 108:19 111:1 118:12 129:16 143:11 144:13 145:3

**questioned** 6:15

**questioning** 82:17 108:20 135:8 144:23

**questions** 16:6 42:20 63:5,23 68:21 70:10 81:13 88:22 89:10,11,13 96:23 101:17 103:1 106:13 109:11 110:5,9 110:12,21 111:6 111:11 120:16 120:20 121:7 135:18 143:6 144:12

**quick** 62:25 63:1,2

**quickly** 58:10 95:10

**quite** 25:19 92:9 112:11

**quote** 104:24 119:6,14

**r**

**r** 2:1 4:2 5:11,11 5:11 62:1 74:24 74:24

**[r&d - reference]**   Page 177

**r&d** 71:14
**raise** 82:23
  122:17
**raised** 32:8 44:6
  44:10,14 81:12
  93:3 94:21
  104:22 109:8
  111:11 112:13
  120:16,21 121:7
  126:6 134:13
**raises** 101:22
**raising** 24:17
  31:7 38:15
  45:24 92:24
  93:8 96:23 98:5
  100:24 101:2
  103:1 121:2
  128:15
**ran** 12:6,8 51:13
  86:12 137:7
**rapid** 63:23
**rapidly** 125:9
**rashan** 140:4
**rashbaum** 2:5
  4:15
**rate** 89:18 90:4
  103:6
**rather** 58:25
  60:25 70:14
  82:16
**reach** 105:16
**reached** 81:7
**read** 20:20 45:8
  45:12,17 46:5
  69:1,2 80:25

  81:4 82:2 83:6
  86:5,13,24
  88:10,11 95:14
  95:15 96:21
  107:3 116:1,11
  117:17,20,21
  119:11,12,13
  137:1,1 146:6,8
  146:13 148:6
**reading** 20:23
  41:8 45:13 81:1
  92:23 103:14
  107:12 109:21
  122:10
**ready** 45:16
  130:9
**real** 27:24 53:10
**reality** 37:10
**realize** 133:16
**really** 32:15
  75:23 77:21
  78:25 128:23
  137:8
**reask** 48:11
**reason** 19:12
  69:12 83:13
  89:4 114:19,22
  145:5 148:9
**reasonable**
  91:20 134:4
**reassure** 17:20
**rebecca** 57:2
**recall** 5:23 19:3
  21:11 30:4 34:2
  34:3 37:19 38:8

  38:16 39:19
  43:3 44:15
  47:10,14,14,17
  55:12 67:14
  69:11 80:25
  81:6,15 82:10
  82:16,22 85:3
  88:25 91:13
  92:14 93:2,5,17
  93:17,20 94:1
  96:16,19 100:10
  103:9,13 107:22
  108:14,18
  109:10 110:25
  123:13 125:4
  128:15,18 129:9
  129:25 133:2
**recalling** 145:6
**receipt** 20:7
**receive** 64:12
  65:25 141:12,14
  141:15,19
**received** 39:14
  66:1 68:6
  141:23 142:12
**receiving** 21:15
**recently** 89:1
**recess** 58:12
  106:1 135:23
**recognize** 57:20
  71:16 102:14
**recollection**
  5:22 9:3 19:7
  21:19 37:22
  44:16 56:17

  58:7 80:21
  93:10 109:24,25
  123:16 125:9,11
  125:17,20,23
  144:4
**recommended**
  51:9,18
**record** 4:4,13
  5:9 15:21 49:5
  58:10,11,14
  68:23 95:17
  105:22,25 106:3
  115:17,22,25
  129:9 135:21,22
  135:24 146:9
  147:16
**recorded** 4:6
**records** 20:24
  21:1 22:20
  43:15
**recover** 145:23
**recruited** 11:23
  12:1
**recruitment**
  30:24
**redirect** 146:2
**reed** 1:11 28:11
  29:14 50:4,7,13
  53:13 56:10
**refer** 59:23,24
  60:2
**reference** 46:21
  89:15 120:23
  121:1

**referenced** 20:13 73:5
**referred** 80:16 82:9
**referring** 10:3 10:14 20:17,18 21:5 39:18 59:6 60:6 69:13 79:7 81:17,20 82:21 84:9 85:22 97:2 102:18,21 103:24 104:16 122:25 133:22
**refers** 44:2 69:14 89:18 90:4
**reflects** 20:4 148:7
**refresh** 92:16 107:19,23
**regain** 145:24
**regard** 15:19 30:23 31:15 32:15 52:24 65:22 69:17,25 70:10 72:17 82:20 83:4,5,6 85:25 101:14 111:21 122:14 126:17 136:21
**regarding** 75:7 140:13
**region** 47:5
**registered** 65:7 147:6

**registration** 65:8
**regular** 123:5
**regulation** 11:12,14
**regulations** 43:25
**regulators** 54:19
**regulatory** 31:15 64:1 65:10 67:19,23 113:13 123:6 126:15,21 137:6
**related** 9:23 12:14 14:6,22 17:13
**relating** 31:7
**relations** 56:9 121:12,16
**relationship** 24:20 25:9,20 25:24 29:14,18 52:2 80:1 92:8 93:25 94:2
**relationships** 52:6 92:12,15
**relative** 147:19
**release** 9:23,25 10:2,4 33:15 113:2,5,7,11 115:1,19,20 116:5 117:3,9 117:11,15,17,23 118:2,7,23

119:21 120:4,9 120:19 123:10 123:14 124:3,18 128:14 129:5,18 129:21,23 130:2 130:23 136:3,16
**released** 22:25 33:11 115:5 121:19
**releases** 8:22,24 10:6 33:2 56:22 114:25 115:5 118:25
**relevant** 49:10
**reliability** 62:18 92:25 93:3,8,15 94:22 101:18 106:14 109:9 110:10 120:17 120:20 121:2 122:14 128:16
**reliable** 61:4 62:14 63:14,22 88:9 121:22 122:11
**remain** 125:19
**remained** 125:12
**remarking** 119:10
**remember** 23:21 42:10 47:12,13 55:14 81:4 82:6 83:7 84:7,10 85:9,12

92:9,23 93:7 106:12 109:21 113:6 118:20 125:6,11 136:4 141:2
**remembered** 21:17
**remembering** 125:3
**rep** 4:16
**repeat** 27:8
**repeatedly** 119:17
**replaced** 141:22
**reply** 71:19
**report** 47:16 141:1
**reported** 1:25 93:19 120:7 148:2
**reporter** 7:15 13:10 14:8 15:6 27:3 34:9,13 46:19 48:24 50:20 61:25 71:1 80:7 84:16 114:21 146:5,10 146:13,17,22 147:6,7
**reporter's** 147:2
**reporting** 1:17 84:21 97:21 98:14 120:6
**reports** 44:8

represent 4:12
representation
  17:11 32:13
represented
  40:24
representing
  75:25 91:5
  144:18,21
represents
  69:19
reproducible
  61:4
request 52:15
requested 45:25
requests 58:6
  146:8
required 32:6
  36:5,5 38:5
  104:18
requirements
  38:18 43:24
research 12:16
  14:7,12,13
  67:18 84:13,18
  93:12 128:20
resident 76:13
resolution
  125:11
resolved 43:18
  44:11,16 110:24
  111:11 112:14
  125:9,10
resolves 111:25
respect 36:15

respond 101:3
  111:19 112:20
responded
  96:25 112:13,19
  126:7
respondent
  17:18 19:18,22
  19:25 20:1,2,12
responding
  113:9
response 44:17
  45:25 110:3
  111:5,15 112:10
responses 44:12
responsibilities
  28:13 31:1,12
  42:13,18,22,24
responsibility
  30:18 42:16
  58:6 64:4,6
rest 103:10,13
result 24:15
  39:3 83:10
  104:19 105:13
  137:12
resulted 80:8
  84:21
results 9:25
  45:23 83:11
  84:21 86:11
  87:1 89:19 90:5
  90:13,19 97:20
  101:1 102:25
  103:6 111:6,7
  113:12

resurfaced
  112:15,16
retained 25:4,5
retiring 19:22
retract 114:6
revenue 41:11
  41:12 100:16
  134:13
revenues 40:16
reversal 17:12
reverse 90:24
reversed 15:13
  15:21 18:8 21:6
  21:6 22:21,22
  23:1
reverses 20:19
review 9:21
  30:20 31:3
  33:10
reviewed 8:15
  8:17 66:3 113:2
reviewing 32:20
  33:1
revlon 11:23,24
  13:22,23
richard 1:10,16
  4:7,22,25 5:2,10
  127:11 128:8
  143:23 148:4,15
  148:18
richardserbin
  49:15
right 8:1 9:10
  18:4 21:18 22:3
  22:7,11 23:6

25:13,20 29:24
  32:4 33:23
  35:22 36:16,19
  39:22 40:9 41:4
  41:13,25 46:14
  50:17,19,22
  53:14,19,21
  58:23 60:7,10
  61:6 62:7,10,15
  62:17 63:21
  64:24 65:16
  66:12,23 69:8
  70:5 73:7 74:11
  77:9 78:10 83:3
  83:25 88:9
  89:25 90:9
  92:25 97:3,5,6
  97:10 99:24
  100:6,9,13,17
  100:21 103:8,23
  105:19 106:7,10
  110:1 113:3
  116:22 117:9,12
  117:24 119:9
  120:10,21 122:6
  123:1 130:4,23
  131:1,8,15
  133:1,11 134:14
  135:9 136:8
  137:17,20,25
  138:4,23 144:14
  145:12
ring 139:10
risk 36:20,24
  37:2,10 38:11

**[risk - seattle]**                                                Page 180

105:2
**risks** 37:4
**rna** 61:13 73:8
**roche** 61:23
  62:1,2 65:25
**rockefeller**
  69:15,16 76:16
  76:18
**rockefellers**
  69:14 70:4
**role** 13:25 24:25
  42:10 43:11
  44:5 50:25 53:8
  53:23 54:1,4,9
  54:10 55:7,10
  55:18,20 56:5
  67:8,13 92:1
  117:14
**roles** 14:4 53:16
**rough** 146:21
**routed** 98:19
**routinely** 56:4
**rpc** 20:3,6
**rpr** 1:25 147:24
  148:2
**rsu** 142:1
**rsus** 141:23
  142:21,23
**rubrics** 44:1
**rules** 7:13
**ruling** 15:22
**run** 12:24 31:16
  31:18,22 39:2,2
  51:13 137:3
  144:25

**running** 12:4
**ruo** 66:7
**rutgers** 11:2

**s**

**s** 2:1 3:7 4:2
  5:11
**safety** 16:20
**salary** 139:3,4
  141:12,17,19
  142:23,25
**sale** 13:15 14:16
  50:10 130:14
  133:12 143:3
**sales** 39:14
  40:19,21,22,24
  41:3 51:3 55:21
  67:6 71:13
  73:19 74:6
  78:20,21 79:1
  131:15 132:2
  142:24
**salt** 2:12 102:20
  102:21 106:7
  117:24 118:9
  120:12,15 147:4
**sample** 91:7
  104:18
**samples** 81:1
**sarcastic** 55:2
**sat** 12:5 15:4
**satterfield** 1:11
  52:18,19,22,24
  54:21 59:20
  60:9,18 61:5,7
  82:19 86:25

93:20 96:8,24
  101:9 103:16,17
  113:12 119:7,14
  136:20,24,24
  137:10 138:10
  139:1
**satterfield's**
  55:7,9 61:17,22
  62:13
**save** 144:25
**saw** 144:7,9,11
**saying** 94:3
  101:1 111:13,14
  113:24 122:2
  136:23
**says** 17:17 18:21
  19:17,22,24,25
  20:2,21 36:13
  39:11 40:4,18
  41:16,18 46:6
  68:17 86:25
  89:14,17 90:4
  90:11,24 91:4
  91:22,25 92:3
  102:24 103:4,10
  104:3,13 108:2
  108:6 116:18
  118:24
**scandinavian**
  13:3
**scheduled** 17:7
  117:3
**schering** 11:21
  11:22 13:21

**school** 11:7,9,15
  11:18,19 137:8
**science** 11:3
  13:1 56:11
  103:18 137:6
**scientific** 52:20
  52:25 137:2,4
  138:12,14,17,20
**scientifically**
  88:3
**scientist** 62:6
  88:1,4
**screen** 8:4 16:4
  16:8 18:19 24:6
  35:11,14 36:10
  39:6 40:15
  44:25 45:3
  68:16 88:20
  95:6,7 101:25
  102:8,12 143:16
**scroll** 16:16
  18:17 35:24
  36:9 91:21
  95:11,22 97:1
  115:13,14
**scrolling** 116:4
**scurrying** 72:16
**se** 81:14
**search** 23:12
  39:4 48:18
**searched** 22:24
**searching** 23:10
**seasoned** 52:10
**seattle** 2:16

**sec** 31:14 32:6 32:20,22 37:1 38:4 126:25 127:4,16,20,22 128:1

**second** 7:20 18:18 40:3 45:10 52:5 54:4 68:19 88:14 89:7 90:3 95:10 106:24 116:6 118:10 124:15 142:17 145:15

**secretary** 50:5

**section** 36:10,13 40:1,16 41:16 91:22

**securities** 3:11 3:24 7:6 36:2 54:13,19 130:13 130:14 131:7,12 140:7

**security** 35:18

**see** 8:4 10:15,19 16:5,8,10,10,12 16:16 17:17,24 18:19,21 19:16 19:19,21,24 20:2,10 28:1 32:21 33:10 35:13 36:7,8,9 36:12 39:5,8,11 39:16,25 40:3 40:15,18,25 41:15 43:16

45:2,4 46:11 47:9 68:15,17 71:11,17 80:19 81:2 88:21 89:8 89:10,13,17,20 89:21 90:3 91:2 91:10,22 92:3 97:16,18,25 98:2,8,9,15,16 98:17,25 99:1 102:8,23 103:3 103:15,21 104:2 104:7,13,20 107:11 108:1,4 108:5,10 116:14 116:17 117:2,6 118:24 119:6,14 119:19 130:10 132:1 133:5,7,8 141:8 143:15,17

**seeing** 41:8

**seemed** 26:23 41:2 69:12

**seems** 7:12 40:7 41:23 63:19 78:12 108:19,22 131:2

**seen** 24:4 57:24 63:20 80:15 88:24 96:18 102:15 118:9 122:13 144:5

**sell** 13:20 64:1 64:16,19,23 65:3,5,14 66:12

66:15,22 67:3 67:24 68:7 129:5 131:17 132:8,8,10,13 134:16

**selling** 41:12 73:7 107:16,20 120:5 134:11,21 135:2

**seminar** 12:24

**send** 56:22 118:13 123:23 146:14,15 148:3

**sending** 118:20

**senior** 50:19

**sense** 8:6,11

**sensitive** 105:15 108:9 120:1

**sensitivity** 87:9 89:14,18 104:17 108:2 119:2,17

**sent** 9:24 68:18 96:7 99:11,22 118:14,15 123:16,18,19

**sentence** 41:11 104:2 108:5

**separate** 23:5 39:1

**serbin** 1:10,16 4:7,22,25 5:2,8 5:10,12 6:8 7:12 8:13 10:20 13:9 15:10,24 16:8 17:15 21:10

27:10 33:7 35:6 35:13,25 43:23 44:19 45:2,14 47:19 55:25 58:9,16 62:5 68:10,15 88:14 88:21 95:1,21 96:5 99:16 100:2,5 102:6 102:14 106:5,24 107:15 112:17 115:13 116:7,12 129:16 135:15 136:2 143:7,15 144:21 146:3 148:4,15,18

**series** 27:18

**serious** 145:8,8 145:9

**seriously** 112:12

**serve** 14:24,25 51:20

**served** 22:10,12 30:10,14,15

**serves** 51:22,23

**service** 75:14

**services** 94:20

**serving** 22:6,13

**set** 30:23 147:9

**seth** 55:16,17 56:3,6

**seton** 11:7

**seven** 25:21

**several** 22:12 69:22

**[share - sorry]**                                      Page 182

share  16:4 83:4
  102:3 142:3,14
  142:15
shared  84:23
shareholders
  31:24 132:7
shares  129:5,7
  130:19,22,25
  131:7,11,15,17
  132:8,13 134:11
  135:2
sharing  8:3
  101:25
sheet  31:11
shift  10:20 48:2
  49:21 87:5
shipment  39:15
short  63:10
shorthand
  147:6,13
shortly  33:10
  59:4
show  15:24
  22:24 35:6
  44:19 68:10
  70:6 94:25
  101:23 102:6
  106:20 114:17
  115:8 122:21
  129:11,15 130:7
  130:15,18
showed  69:21
  87:2 122:17
showing  103:6

shows  88:19
  96:12 130:21
  131:14
side  144:24
  145:11,12
sign  36:1 132:3
  133:3 146:6,8
  146:13
signature  36:7,8
  96:2 133:5,7
  147:23
signed  28:10
  132:25 133:2,9
significant  46:8
  46:14 100:16
  145:10
significantly
  98:10
silicon  79:4,7,11
  79:18
similar  79:24
  139:18 140:18
simple  99:2
sin  138:5
single  34:11
sir  7:19,24 8:12
  9:11,18 10:5,24
  11:12,17 16:7
  16:18,25 18:20
  20:11 25:22
  29:25 30:12
  32:25 33:24
  35:23 36:11,17
  36:25 37:13
  39:7,10,20,24

40:6,17 41:1,14
  43:21 46:12
  50:12,14 53:15
  53:20 54:6,17
  60:4,8 62:8,16
  64:21 65:18
  67:11 68:17,22
  69:9 73:9,12,14
  74:13 76:8
  77:10 78:11,14
  87:8 89:9,12
  90:6 91:11,15
  91:24 92:2,6
  93:1 95:9 97:4,7
  97:11 99:1
  100:14 102:11
  102:16,22 103:2
  104:7,8,12,21
  106:8,11 116:16
  116:23,25 117:7
  117:25 119:4,11
  119:13,20
  120:11,14,18,22
  136:5 137:22
  138:13,24 143:9
sit  14:19
sites  103:7,20
sits  75:2
situation  20:21
  63:11 69:13
  90:24 142:20
situations
  111:23
six  5:16 19:8
  21:17 25:11,21

sized  145:19
skyrocketing
  131:24
slight  141:3
slopes  79:5,18
slow  13:9 14:9
slower  8:5
slowly  45:12
slur  145:13
small  28:20
  33:23 39:3
  98:19
smart  60:3,5
  137:8
smarter  54:2
socially  24:15
sold  9:9 12:15
  12:17 13:21
  34:15 70:14
  129:7 130:18,21
  130:25 131:6
  132:11,11
  133:20 134:15
  134:18,19
solutions  1:17
solve  72:24
somebody  34:23
  40:13,14 50:9
  52:11
son  55:17 56:10
sore  27:20
sorry  11:13 14:9
  19:20 25:13,19
  29:21 42:12
  45:12 48:9,20

49:2 50:21 55:24 56:1 58:20,21,24 59:10,14,15,23 74:22 77:11 84:17 99:15,17 107:25 108:19 113:1 114:2 119:6 124:22,23 125:2,15 131:5 131:9 136:24 137:23 143:20 144:20

**sought** 24:16

**sound** 94:5 123:8

**sounded** 94:4

**sounds** 79:6 91:20 92:18 93:23 94:7

**source** 82:4

**south** 2:5,11

**southern** 140:8

**spain** 54:19

**speak** 9:13 50:9 74:19 75:24 76:4,10 77:14

**speakers** 48:16 48:19

**specialist** 12:18

**specific** 11:11 28:6 55:14 60:22,25 61:2 61:14,18,20 65:8 73:9 79:1

82:9 87:18 93:6 110:13 120:1 123:16 126:17 126:18 129:9,20

**specifically** 17:17 34:3 47:15,18 63:16 79:3 85:9 93:5 101:14 108:18 118:13 141:9 143:19

**specificity** 87:16 87:17 89:15 90:4,7 119:2,18

**specifics** 60:18

**specifies** 67:6

**speculation** 53:9,11 83:1 100:23 109:15 118:4 121:24 134:8

**speech** 27:5,6 145:11,24,25

**spell** 5:9 74:22

**spend** 32:1,17

**spoke** 8:16 57:13 74:12 78:12

**stage** 37:5

**stamp** 66:21 107:8

**stand** 66:16

**standards** 46:9

**stanford** 137:7

**star** 17:21

**start** 20:22 95:12

**started** 11:17 62:21 71:15

**starts** 19:21 98:1

**startup** 36:14 36:19

**state** 4:12 5:9 16:19,21 18:14 21:21,25 74:7 74:11,13 75:4 75:17,22,25 76:9 77:8,13,22 77:24 84:3 99:10,22 103:5 103:8 104:4 107:20,24 109:12 118:18 135:8 147:3

**stated** 108:7

**statement** 37:9 40:4 82:19

**statements** 17:20 18:3 33:2 43:16 113:24 114:6

**states** 1:1 3:11 3:24 12:23 34:16,20,22 40:1,5,9 64:23 68:8 72:13 74:6 74:14,17 78:9 78:12,15,18

79:3 108:6 121:2 128:15

**stating** 25:15

**stay** 126:9

**stayed** 124:12

**steece** 143:23

**stem** 12:20

**step** 26:24

**stephen** 69:15

**steven** 45:21

**stipulated** 19:18 19:22,25 20:1,3

**stock** 37:22 38:1 38:5 70:18,19 130:19 132:2,16 133:20 134:16 134:16 139:24 142:2,3,15,18 142:23,25 143:3

**stopped** 99:23

**strategic** 28:21

**strep** 105:8

**streps** 26:18

**streptococcus** 27:21,22

**stroke** 145:8,9 145:16,18

**strokes** 27:5 45:13 145:7,8 145:16

**studies** 12:19 93:14 123:4

**stupid** 132:9

**subject** 3:9,14 3:18,21,22 68:9

**submitted** 66:2
**subscribed**
  147:21 148:19
**subsequently**
  18:7
**substance** 76:19
  123:13
**substances** 75:5
**substantiated**
  122:19
**success** 36:15
**successfully**
  89:19 90:5
**sued** 6:17
  110:15 140:7,14
**suggest** 119:21
  120:4
**suggests** 32:12
  86:14 120:6
**suit** 17:13 140:7
  140:9
**suite** 2:5,12,16
**summit** 13:1
**superior** 75:11
  119:22
**supplier** 92:4
  108:13
**supplying** 104:3
**support** 88:11
**supporter** 72:19
**supporters**
  73:21
**supposed** 67:1
  132:20 133:15
  133:17

**suppository**
  110:18
**supreme** 18:23
  19:4 21:18
**sure** 10:12,22
  13:12 15:7
  38:24 40:11
  42:17 43:1 44:3
  45:1,12 47:14
  48:25 58:19
  61:15 66:8,9
  81:18 84:23
  87:22,23 91:19
  91:19 92:19
  94:16 95:7
  96:17 101:19,22
  101:25 102:19
  108:17 109:23
  112:11,13,18
  123:12,15 126:1
  130:10 133:8
  138:2 139:5,15
  139:23 141:4,4
  141:9
**surely** 74:24
**surprise** 84:11
  92:19 115:4,7
  118:22
**surprised** 63:6
  63:22 84:20
**surprising** 63:3
  63:9 73:1 82:16
  86:9
**surprisingly**
  63:1,2

**suspended** 19:8
**suspension** 19:9
  21:18,20,24
**sweden** 12:24
  137:4
**swedish** 13:1
**sworn** 5:4
  148:19

---

**t**

**t** 3:7
**take** 8:10 19:14
  43:16 45:10,14
  47:20 63:14
  68:19 72:1 73:6
  75:15 89:2,6
  95:9 104:1
  105:19 106:24
  109:22 110:17
  111:3 115:14
  116:6 126:8
  130:8 132:21
  135:17
**taken** 1:16,20
  4:7 6:15 58:12
  106:1 135:23
  147:9,12 148:2
**takes** 52:11 63:4
**talk** 10:21 23:16
  87:6 140:25
**talked** 74:15
**talking** 19:10
  48:24 71:20
  74:10 97:6
  103:16 106:6
  121:15 125:15

125:16,25
**targeted** 61:18
**tax** 142:16
**taxable** 142:6
**taxes** 142:17
**team** 59:21
  71:13 104:6
**technique** 86:2
**technology** 8:23
  8:25 9:5 23:24
  34:24 40:22
  52:21 61:3 65:8
  66:6 75:10
  76:24 86:2
  136:21 137:7
**ted** 52:13,14
**tell** 5:4 7:22
  8:20 23:11 30:9
  66:17 92:18
  95:13 98:4
  133:8 138:5
  146:5 147:11
**telling** 8:18
**tells** 86:6
**ten** 105:23
  145:15
**tennessee**
  106:16 107:16
  107:21,25
  108:23 109:8
**term** 43:19,22
  66:7 87:15
**terms** 67:5 81:4
  89:14

**[terrible - think]**

Page 185

terrible 58:21

test 3:15 9:7,9
58:18 59:19,24
59:25 60:3,3,5,6
60:7,10,15,24
61:16,17 62:21
63:14,21,23
64:2,5,8,11,16
64:22,23 65:6
66:11,22,22
67:3,10 68:7
70:4,7,9,14 72:7
72:21 73:6,7,11
73:11,13 81:10
84:22 86:5,7,12
86:17,22 87:7
88:8 89:18 90:4
90:19,19 93:16
97:6,15 98:9,10
98:11,13,21
99:3,8,11
100:15,21
101:11,18
103:12,19
104:14 105:2,6
105:7,8,8,11,14
106:10,14 108:2
108:3,8,9,13
109:9,12 110:10
113:16,24
114:10,13,16
117:5 118:25
119:22,25 120:5
120:17 121:3,8
121:22 122:11

128:17 132:15
135:9 137:15,17
137:24 138:8
test's 104:16
tested 81:2
103:7,8 119:25
testified 5:5
21:16 62:12
65:15 74:9 78:3
78:8 91:12
92:23 107:14
112:25 113:1
131:4 136:6
testifying 6:3,4
112:17
testimony 33:21
63:19 84:2
86:16 108:16
112:8 114:9,11
127:19 135:11
147:16 148:7
testing 36:16
40:21 41:11
60:20,20 61:24
62:3,7 80:22,23
82:21 83:9
84:14,19 86:9
87:1 96:22
97:14,19 98:20
101:5 103:11
105:14 141:6
testiowa 91:23
testnebraska
91:23

tests 13:16,18
13:20,22 26:7
26:10,22,22,25
27:11,13,15,17
27:18 28:2,4
34:16,19 39:15
40:5,14,24 41:4
41:12 63:16
64:20 68:7 70:5
70:8,11,15
72:19 73:20,22
73:24 74:4,16
75:18 77:4,7,25
78:13,15 84:21
92:17,25 93:4,9
93:18 94:23
98:19,23 99:4
99:24 101:6
103:4,11,23,23
103:25 104:3,10
104:15 106:18
107:16,20
114:12,14,17,23
119:16 122:20
138:6
testutah 3:18
80:12,20 91:22
103:23 104:6
testutah's
103:19
testutah.com
102:25 103:5
text 49:17,18
thank 33:9
45:17,17 47:22

48:12 59:16
69:1,2 95:19,23
95:25 96:1,4
102:2 107:11,12
115:16 116:1,8
116:11,11 143:7
143:9 146:1,4
thanks 146:3
therapeutic
14:15
therapeutically
24:6
thereof 147:17
148:6
thing 61:1 75:15
76:22 90:11
122:6 134:25
things 10:11,13
24:5 32:8 37:11
38:19 68:2
72:10,18 73:16
90:12 113:9
think 6:2 9:16
21:12 27:10
29:11,11 32:19
33:16,18 36:20
36:25 37:9,11
38:10,19 40:10
41:7 52:11 58:5
58:8,9,23 60:10
60:11 62:12
69:13,21 73:23
74:9 77:8 78:3,8
78:24 79:7,13
79:17 82:16,22

**[think - turns]**

83:3,3,19,23
85:20 87:24
90:14 91:12,17
92:9,11 100:5
105:5,9 107:14
108:12 109:11
109:16,17 111:4
113:8,11 118:9
122:5 129:20
131:4 134:5
136:6,20 137:18
137:21 138:5
140:23 144:22
144:24
**thinking** 79:8
139:20
**third** 2:16 7:25
14:13 22:9
119:25
**thoroughly** 66:3
**thought** 20:19
23:25 38:10
50:8 63:9,10,23
64:7 75:10,13
75:14 76:24
77:2,21 81:5
94:4 122:12
132:14 136:11
137:14
**thoughts** 69:25
**thousands**
104:3
**three** 15:3 22:6
22:8 47:16
74:17 92:1

130:22
**throat** 27:20
**time** 4:5 6:13
8:9 9:7 11:20
12:10 15:20
17:5,5,6 23:10
23:14 25:1,16
25:17,23,25
28:14 32:3,3,15
32:17 38:20
41:24 42:6,7,9
43:8 45:15
58:10,14 62:20
62:22 63:4,10
63:18,18,24
72:11 81:19
84:19 86:18,23
105:24 106:3
110:13 113:17
113:25 114:11
114:18 121:14
129:4,8 135:2
135:14 137:7
143:7,7 144:25
146:3 147:9,10
**times** 5:15,16
32:4,7 42:5
**tinfoil** 110:17
**tired** 145:13
**title** 51:4,6
**tng** 139:9
**today** 7:16 8:1
9:13 10:9,10
13:24 14:4
59:25 102:18

113:2 120:16
140:20 142:9
143:8 144:6
**today's** 4:5 8:14
10:8
**together** 71:8
92:12 144:21
**told** 70:7 75:8,9
84:12 85:25
86:21 111:6,9
111:17 145:20
**tongue** 145:14
**took** 12:17
42:16 61:24
112:12,12
145:23
**top** 16:11
116:12 118:24
130:15 137:4
**topic** 11:11
**touch** 31:21
**tourist** 24:16
**towards** 74:6
**trade** 11:12,14
**trading** 1:4 4:8
4:16 148:1
**trained** 88:3
**training** 88:7
**transactions**
31:10 51:11
132:21
**transcribed**
147:13
**transcript**
147:15 148:6,6

148:7
**transcription**
147:14 148:16
**transcripts**
148:3
**trials** 40:14
**tribune** 102:20
102:22 106:7
117:24 120:13
120:15
**trigger** 104:18
**trivial** 125:8
**tropical** 26:15
**trouble** 145:6
**true** 122:17
123:20 134:22
147:15 148:16
**truly** 148:7
**trusted** 137:12
**trustworthiness**
20:5
**truth** 5:4,4,5
147:11,11,12
**try** 31:21 37:3
37:11 58:20
79:1 122:5
**trying** 6:2 76:17
102:19 109:25
110:1 118:16
121:21
**tuberculosis**
26:16
**turned** 124:13
**turns** 90:20
110:19

**[tweet - varies]**

**tweet** 129:2
**tweeted** 129:1
**tweeting** 129:3
**twelve** 40:19
**two** 6:22 14:13
  16:13 27:5
  37:25 38:19,25
  42:9,21 45:13
  53:16,24 99:21
  132:20 133:13
  145:7,16
**type** 36:24
  141:6
**types** 8:20,25
**typical** 26:18
  36:20,24 60:20
**typically** 82:4
**typing** 13:11

**u**

**u.s.** 4:9 65:3,10
  65:13
**ultimately** 126:8
**unaware** 54:14
  54:20 76:6
  100:3
**under** 7:25
  38:17 46:8 67:5
  87:13 91:2,8
  111:25 132:19
  132:22 133:17
  134:21 147:10
  148:15
**undergraduate**
  11:2,20

**underlying** 28:3
**undermines**
  71:10
**underneath**
  89:11
**understand**
  7:18,23,25 26:4
  26:5 27:7,16
  28:12 59:25
  60:6 62:9 64:16
  66:10 93:24
  97:19 132:7
  139:23
**understanding**
  38:3,4 42:19
  49:9 53:7,10,25
  57:7 62:11 68:5
  78:4 79:9 94:14
  110:4 111:13
  121:5 125:1
  132:23 133:18
  134:1 140:11
**understands**
  62:6
**underwater**
  142:19
**unfortunately**
  27:6 75:19
  145:16
**unique** 23:24
  26:7 60:23
  61:13,13 66:19
  90:12
**unit** 4:6

**united** 1:1 3:11
  3:24 12:23
  34:16,20,21
  40:1,5,9 64:23
  68:8
**university** 11:2
  11:8
**unknown** 98:21
**unknowns**
  97:14
**unreliable** 88:9
**unusual** 65:10
  65:15
**upcoming** 3:23
  116:18
**urge** 97:19
**use** 7:7 9:8
  27:23 49:12,14
  49:20 64:19
  65:11,16 66:2,5
  67:2,6,9,13,22
  68:6 83:7 86:7
  98:11 99:8,10
  138:8
**used** 26:21 28:4
  67:15,15 83:14
  91:5 103:19,23
  108:8 110:18,20
  110:23 113:20
  114:11,15,17
  115:20 121:11
  127:25 128:24
**useful** 27:24
  29:5 118:17
  120:8 136:8,11

  136:15,15
**user** 8:22,24 9:4
  9:6,8 10:7
**users** 67:3
**uses** 98:21
**using** 29:9 34:24
  40:14 63:3 83:8
  84:22 86:3
  101:6 108:2
  110:15
**utah** 1:2,9 2:12
  4:10 78:19,20
  79:7 81:12 82:2
  82:3 99:10,22
  101:21 135:8
  147:3

**v**

**v** 1:7
**vacated** 21:3
**vaccines** 63:7
**vaginal** 110:15
**vague** 33:4
  101:12 126:22
  129:6
**valid** 33:18
**validation** 86:7
  86:11 123:4
**valley** 79:11
**valuable** 70:19
  76:25
**value** 29:11
  37:24 73:23
  135:13 142:4,18
**varies** 32:3

**[vendor - worry]**

**vendor**  67:14,15
  67:17
**vendors**  98:24
  104:16
**venture**  46:22
  47:1
**veritext**  1:17
**veritext.com**
  148:3
**versus**  4:9 6:8
**video**  1:15 4:6
**videographer**
  4:4 58:11,13
  105:25 106:2
  135:22,24 146:9
**videotaped**  1:15
**view**  65:6
**violated**  20:3
**violations**  54:13
**viropro**  7:2
**virus**  59:2
  104:18
**vitro**  98:22
**vocal**  145:14
**void**  21:3
**vs**  148:1

**w**

**wa**  2:16
**wait**  111:5
**waiting**  111:14
**walk**  26:3 65:1
**walked**  95:18
**want**  8:19 10:20
  13:11 17:14
  19:14 23:16

33:20 49:21
68:23 71:20
89:2,6 95:21
101:25 104:1
115:17 124:14
130:3 138:2
146:10,14,17
**wanted**  24:8
  53:12 54:22
  131:21 137:13
**wants**  72:3
**warning**  132:2
**way**  48:25 61:4
  83:12 98:3,18
  115:23 123:21
**wayne**  76:11
  118:15,21
  123:17
**we've**  19:10
  85:2 113:10
**weaknesses**  46:8
**webb**  16:13
  57:23,24 58:1,2
**website**  10:16
  107:7
**wednesday**
  107:2
**week**  32:1 104:4
  141:10
**weeks**  130:22
  134:12
**went**  8:15 11:19
  23:5 59:10
  110:19 112:4
  117:18,19,21

**whatsoever**
  29:16,20 117:16
**widely**  99:3
**wife**  6:19 9:14
**william**  24:12
**withdrawn**  23:1
**witness**  4:22 5:3
  14:9 15:7 27:4
  34:10 41:7
  46:20 47:22,24
  48:20 49:2
  50:21 62:2 69:1
  71:2 80:8 83:2
  84:3,10,17
  95:18 99:14,17
  100:3,24 101:13
  102:11 105:5
  107:10 108:17
  109:1,3,16
  114:5,22 116:1
  118:5 121:11,25
  124:6,20,23
  126:23 127:7,13
  128:5,9,11
  129:7 132:6
  134:9 135:12,16
  135:19 143:9
  146:4,7 147:10
  148:4,5
**woman**  77:15
  110:15
**wonderful**
  135:1
**word**  63:3 83:3

**wording**  20:20
  90:10 125:14,15
  125:16,18,22,24
  125:25
**words**  90:14
  110:2
**work**  11:16
  17:21 26:12
  49:13 52:2 53:4
  71:24 122:5
  138:11 141:12
  145:24
**workable**  91:17
**worked**  11:20
  11:24 12:3,20
  12:21 13:19,23
  51:2 56:13,15
  58:2 59:21
  69:18 71:22
  72:12 76:15,17
  77:19 94:17
  110:14 139:12
  144:3
**working**  26:15
  27:2,14,14 32:1
  34:22,24 59:1,8
  60:13 144:21
**workings**  31:6
  80:17
**works**  52:12
  137:24
**world**  6:8
**worry**  45:16
  98:18

**[worth - zoom]**                                          Page 189

| | |
|---|---|
| **worth** 104:5 | 75:4 126:20 |
| **worthless** | 145:9,10,15,23 |
| 132:16 | **yesterday** 32:21 |
| **written** 99:4 | **york** 2:15 3:5 |
| 137:2 | 4:23,23 11:8 |
| **wrong** 7:11 | 56:24 73:19 |
| 27:21 58:8 | 74:18,18 77:9 |
| 86:23,24 111:24 | 77:11,13,20,21 |
| **wrote** 71:12 | 77:23,24 131:20 |
| 97:12,17,18 | 131:20 140:8 |
| 98:8,18 104:16 | 144:13,16,20 |
| 108:23 | 145:4 |

**x**

**x** 3:1,7

**y**

**yahoo.com.**
  49:15
**yeah** 16:10
  58:24 108:20
  131:16 140:19
  140:24
**year** 12:24 25:5
  32:4,16 35:21
  41:2,19,20
  100:12 129:17
  129:22 130:1
  142:13
**years** 6:10,11
  7:1 11:25 12:20
  12:23,25 13:2
  21:22 22:3,23
  24:8,14 25:10
  25:11,21 44:9
  53:5,24 71:23

**young** 77:15,18

**z**

**zero** 131:15
**zika** 26:12,13
**zoom** 1:17 4:11
  7:16

Utah Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30


(E) Submission to Witness; Changes; Signing.

Within 28 days after being notified by the officer

that the transcript or recording is available, a

witness may sign a statement of changes to the form

or substance of the transcript or recording and the

reasons for the changes. The officer shall append

any changes timely made by the witness.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.