# Exhibit 84

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION


CASE NO.:  2:20-CV-00368


GELT TRADING, LTD., a Cayman

Islands limited company,

          Plaintiff,

vs.

CO-DIAGNOSTICS, INC., a

Utah Corporation, DWIGHT

EGAN, JAMES NELSON, EUGENE

DURENARD, EDWARD MURPHY,

RICHARD SERBIN, REED BENSON,

BRENT SATTERFIELD,


          Defendants.

_____/


                Friday, March 1, 2024

              10:36 a.m. EST - 3:55 p.m. EST

                    Kula, Hawaii




              DEPOSITION OF ALLEN FERRELL


     Taken via Zoom before Rinele Abramson, Notary Public

  in and for the State of Florida at Large, pursuant to

  Notice of Taking Deposition filed in the above cause.

                    - - - - - - -

Page 2

APPEARANCES:

On behalf of the Plaintiff:
    Marcus Neiman Rashbaum & Pineiro
    2 South Biscayne Boulevard, Suite 2530
    Miami, Florida 33131
    BY:  MICHAEL PINEIRO, ESQUIRE
        TYLER QUADE, ESQUIRE
On behalf of the Defendant:
    Baker & Hostetler, LLP
    45 Rockefeller Plaza
    New York, New York 10111
    BY:  ZACHARY TAYLOR, ESQUIRE
        GENEVIEVE YORK-ERWIN, ESQUIRE

        - - - - - - -

Page 3

        I N D E X
WITNESS: ALLEN FERRELL                    PAGE:

    DIRECT EXAMINATION BY MR. PINEIRO:      5
    CROSS-EXAMINATION BY MR. TAYLOR:      164
    REDIRECT EXAMINATION BY MR. PINEIRO:  166


        - - -
        E X H I B I T S
        - - -
EXHIBIT NO:                          PAGE:
    Exhibit 1, Expert Rebuttal Report      18
    Exhibit 2, Article                49
    Exhibit 3, Article                52
    Exhibit 4, Article                55
    Exhibit 5, Article                57
    Exhibit 6, FINRA Document            70
    Exhibit 7, Article                75
    Exhibit 8, 2020 Earnings Report      100
    Exhibit 9, Journal of Financial Perspectiv133
    Exhibit 10, Guide to Economic Damages    137
    Exhibit 11, Bettencourt Expert Report    143

Page 4

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I, the court reporter, am not present with the witness and that I will be reporting the proceedings and administering the oath remotely.  This arrangement is pursuant to the Florida Supreme Court Administrative Order No. AOSC20-16.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Counsel, can you please indicate your agreement by stating your name and that you're in agreement with the statements made by the court reporter.  We can start with the noticing attorney.

MR. PINEIRO:  Michael Pineiro of Marcus Neiman Rashbaum & Pineiro behalf of the plaintiffs.

MR. TAYLOR:  And Zachary Taylor with Baker & Hostetler, LLP, on behalf of defendants.

MS. YORK-ERWIN:  Genevieve York-Erwin with Baker & Hostetler, also on behalf of defendants.

Thereupon:
        ALLEN FERRELL,
was called as a witness, and after being first remotely sworn, responded "I do," and was examined and testified under oath as follows:

Page 5

        DIRECT EXAMINATION
BY MR. PINEIRO:
    Q.  Good morning.
    A.  I have a quick question to start.  I have a clean copy of my two reports in front of me, but I'd be happy to put those away.  But I just thought it might be easier to have reference to that.
        I just wanted you folks to know.
    Q.  Sure.
        And do you go by Dr. Ferrell?
    A.  "Professor Ferrell" is fine.
    Q.  Professor Ferrell, okay.
        Professor, our preference would be if you could just put those aside.
    A.  Okay.
    Q.  What we will be doing is, you will have the Exhibit Share.  But also, I will share on my screen the report.  But obviously you are free to go through it on your own through the Exhibit Share.  But generally we want to avoid any papers being around in these Zoom depositions.
    A.  Okay.
    Q.  Great.
    A.  So I just put those off to the side.
    Q.  Okay.  Great.
        And do you have any other -- besides those -- so

2 (Pages 2 - 5)

Page 6

what you have with you there is your initial report and then your rebuttal report; is that right?

A. I did, until you told me to put them aside.

Q. Great.

Do you have any other notes with you in the room?

A. No.

Q. Notepads?

A. No.

Q. Okay. Great.

Is there anyone else with you in the room?

A. No. My daughter is sleeping down the hall, but I don't think we will hear her.

Q. Okay. That's fine.

So I know you've been deposed a bunch, so I'll be quick about it. I'm going to be asking you a series of questions. Your counsel at the deposition, Mr. Taylor, it seems, will be objecting from time to time. After he objects, obviously please provide your answer.

If you need a break, Professor, let us know, and we will take one.

And we're grateful. I know it's very early over there. So we are grateful for that.

A. Thank you for being accommodating.

Q. No problem.

So when were you first approached about serving as

Page 7

an expert in this case?

A. My best recollection, I was retained in September of last year. My memory, such as it is, it was, you know, very close in time as to when I was retained, is my -- when I was approached is my best recollection.

Q. Got it.

And do you recall the purpose or the description of the engagement when you were first retained?

A. Yeah. I did -- I always look at the complaint. So I did take a look at the complaint, so I had an understanding of what the complaint contained. And obviously, I don't remember exactly, but I did read the judge's motion to dismiss opinion as well, as context.

Q. Okay. So you're saying you reviewed the complaint and you reviewed the court's order on the motion to dismiss?

A. Yes. I forget exactly the date of the order to dismiss opinion, but I did read that.

Q. And you did that before you were engaged?

A. I read the complaint before I was engaged. I don't remember the motion to dismiss opinion. I don't remember the exact timing of that. But that was early on as well.

Q. Okay. And the engagement was just to serve as, I guess, the securities expert for defendants in this case?

A. To serve as an economic expert. That's how I would characterize it.

Page 8

Q. And this was an engagement to serve as a trial expert; correct?

A. My understanding, it was as an expert to provide expert analysis that could -- my understanding is that could involve trial testimony, but it was as an economic expert.

Q. Sure.

Are you serving also as a consulting expert?

A. No.

Q. So before, I guess, you signed the engagement, your recollection is that you reviewed the complaint; correct?

A. Yes. That's my standard practice, yes.

Q. And you didn't do any further -- did you do any further analysis regarding the case before you were engaged?

A. No, except for my lack of recollection as to the exact moment I read the motion to dismiss opinion. But I also, as a standard practice, try to read, you know, something along -- the judicial opinion that -- involving the particular matter.

Q. But as a standard practice before you're retained as an expert, do you traditionally request materials that might pertain -- that pertain to the opinion that you might be asked to render?

A. No, I don't ask for confidential information. So I read the public-available complaint. Obviously the lawyers may have some context around that. But that's sort of the

Page 9

materials that I review.

Q. Have you previously been retained by the attorneys at Baker & Hostetler to serve as an economic expert in a securities matter?

A. I've done a lot of cases. My recollection -- my best recollection is no.

Q. So here, I think as you referenced earlier, you provided an initial report and a rebuttal report; correct?

A. Yes.

Q. Do you have any supplements or -- any written supplements or written modifications to those reports?

A. I do. There's a footnote that I would correct. In Footnote 115 of the rebuttal report, I would correct that. There's a -- anyway. So yes, with respect to that particular footnote, going over everything, I noticed I needed to amend that.

It doesn't change materially my opinion or anything like that, but for the sake of completeness, I would notice that.

Q. Got it.

Have you prepared a modified rebuttal report with that revised footnote yet?

A. No. I'm happy -- I'm here and I can tell you what it is. It's pretty simple. But that would be the one thing I noticed. So I would mention Footnote 115, if my memory serves

3 (Pages 6 - 9)

Page 10

correctly.

Q. Okay. We will get to that.

A. Thank you.

Q. Besides the revision of -- the modification of that footnote you referenced, do you have any other modifications that you intend to make to your report?

A. No.

Q. So these reports contain all of your opinions and findings in this matter?

A. Yes, with the caveat that I did review -- and correct me if I am mispronouncing his name, Mr. Bettencourt's deposition transcript. So obviously that's something I reviewed after my two reports. So I did review that.

I had reactions to things he said there, but it doesn't change my opinions or my findings.

Q. Understood.

So are you providing any opinions in this case regarding the falsity of any of the alleged misrepresentations?

A. No.

Q. Are you providing any opinions regarding scienter?

A. No.

Q. Any opinions regarding materiality of those alleged misrepresentations?

A. No, with the caveat that my understanding of

Page 11

materiality is that there's an economic component to that, but there's also a legal component to that. So for that reason, the answer is no.

Q. Understood.

Did anybody else -- besides yourself, did anybody else participate in preparing the two reports?

A. Yes.

Q. Who is that?

A. So I think it's in paragraph 4 of my initial report, it's also in my rebuttal report, I did have the assistance pursuant to my supervision and instruction of Compass Lexecon.

Q. Who at Compass Lexecon assisted you in preparing the report?

A. So I interacted primarily with Michael Keable. I also interacted somewhat with Zantia -- and I'm going to mispronounce her last name -- Grinkagopolis (phonetic).

Q. How do you spell the first --

A. I butchered the last name.

Q. That's okay.

The first person was Michael Keable, I think you said.

A. Yes. And he was my primary, 95 percent interaction with him. I did have some interactions with that second person.

Oh, and then I should add, I did have one Zoom with

Page 12

Yoad, Y-O-A-D, and I don't remember his last name, again, at Compass Lexecon.

Q. And "Keable" is K-E-E-B-L-E?

A. No. I think it's K-E-A-B-L-E.

Q. Okay. Got it.

In terms of the writing the report, did you physically write it?

A. Yes, but there was interaction. So I had Compass Lexecon assist in various aspects of the report. So there was an iterative process.

So, for example, I'm terrible at exhibits. So I had Compass Lexecon put together the exhibits, but again, pursuant to my instructions and supervision.

Q. Got it.

Besides the exhibits, the words that are in the reports were written by you?

A. No. I certainly wrote -- I certainly was involved in the writing of the report, but there was a back-and-forth. So, for example, I'd say, "Let's have some discussion of, you know, the 10-K and the revenues and so forth."

So it was an iterative process in the preparation of the reports.

Q. Got it.

So some of the actual -- so what you're saying is, you provided some direction regarding substance to include in

Page 13

the report, and then some of the people over at Compass might have actually drafted the words that are on the page?

MR. TAYLOR: Objection; misstates prior testimony.

BY MR. PINEIRO:

Q. Is that fair?

A. I mean, there would be drafting, and then I would draft and change the words. So it was an iterative process with respect to everything.

Q. Were there multiple drafts of this report?

A. Yes. I mean, there was not a -- it did not come ab initio. So yes, it was a working -- you know, obviously it was not written in one go.

Q. Got it.

And who prepared -- in terms the actual writing of the actual report, was the first draft prepared by you?

A. Yes.

Q. And that means you wrote the first draft?

A. Yes. And then it -- again, per my description earlier of the iterative process, we would have conversations. I would get materials in hard copy. So it was kind of a flowing iterative process that produced the reports.

Q. Are any portions of this report taken or copied from other reports that you've prepared?

A. I think the description event study is going to be very similar. The description, the T statistic and what --

4 (Pages 10 - 13)

Page 14

it's probably going to be very similar. So I don't remember its exact wording, but it's going to be -- I have sort of a standard way to describe what an event study is.

So I guess that's the one thing that comes to mind.

Q. Got it.

Your hourly rate in this case was $1,500 an hour?

A. Correct.

Q. Were you directly engaged by Baker & Hostetler or by the defendants?

A. My understanding -- my engagement letter is through Compass Lexecon. My understanding, which is reflected in my report, is I was retained by counsel for the defendants. The engagement letter being through Compass Lexecon.

Q. So are you an employee of Compass Lexecon?

A. No.

Q. You are a contractor for them?

A. I'm an affiliate, academic affiliate. I don't even know what my title is. But I'm affiliated, I'm not an employee.

Q. Okay. Has Compass Lexecon submitted any invoices to Baker & Hostetler in connection with your expert services?

A. My guess would be yes, but I'm not privy to those.

Q. Do you know, has Compass Lexecon been paid -- to date, has Compass Lexecon been paid any amounts in connection with your expert services in this case?

Page 15

A. I could guess, but I'm not privy to that. I mean, my guess is yes, but I'm guessing. I'm not privy to payments from the client to Compass Lexecon.

Q. Do you know what Mr. Keable's hourly rate is?

A. I don't know.

Q. And I think you indicated that you are compensated a percentage of the Compass Lexecon staff billings on this matter?

A. Yes. Just to be clear, it would be junior staff members, not the more senior people like Michael Keable.

So an example would be, if a junior associate put together binders and materials to send to me, that would be a junior person for which I would get a percentage. So it would be a subset, the junior folks working on my particular matter.

Q. In connection with your services in this case, have you personally received any compensation yet?

A. Yes.

Q. How much was that?

A. So I bill. I submit my hours to Lexecon. My understanding is Lexecon then prepares an invoice for the client. Again, I'm not privy to that.

So I submit my hours to Compass Lexecon at the end of the month or -- end of the month/very beginning of the month, month-end-ish. And then I'm paid my hourly rate from Compass Lexecon, you know, somewhere between ten days and

Page 16

two weeks later, roughly speaking.

Q. And to date, do you know how much you've been paid on this matter?

A. I know how many hours I've submitted and I've been paid for. So I've -- I believe this is correct. There might be a margin of error here. But I think since I've been retained, I submitted 67 hours. And I've been paid for that.

I would add that I have not submitted my hours for February.

Q. Got it. So 67 hours through end of the January?

A. Correct.

Q. And do you know how much the staff at Compass Lexecon have billed in connection with this matter?

A. No.

Q. Is Compass Lexecon or you receiving any success fee in this case?

A. No, I think that would be illegal. But no.

Q. Did you provide Baker & Hostetler or Compass Lexecon with a budget or an estimate of the costs of your services?

A. I did not. I'm speaking for myself.

Q. Sure.

A. If Compass Lexecon had a communication, I'm not aware of it.

Q. Okay.

And how did you prepare for today's deposition?

Page 17

A. I met with counsel on Zoom for a couple of hours a couple of days ago. I can't remember whether it was two or three days ago, for a handful of hours. Maybe two hours-ish. Again, there's a margin of error here. Maybe it's two and a half, maybe it was -- but something like that. A couple of hours on Zoom with counsel.

On that call was, I believe, Michael Keable, who we've discussed. I also had a couple of conversations with Michael Keable.

And what else did I do? I reread all the reports: My two reports, Mr. Bettencourt's, I read Mr. Bettencourt's deposition. I think that's it.

Q. In terms of meeting with counsel, you just had the one Zoom meeting for a couple of hours?

A. Yes. I mean, yes, that's right. That's my -- my memory is one Zoom meeting, yes.

Q. And who was present at that Zoom meeting?

A. The counsel that's here with us today.

Q. Great.

So I'm going to introduce an exhibit. When I upload these exhibits, they should be uploaded to your Exhibit Share. I think maybe you have to refresh it. But also what I'm going to be doing is sharing my screen at all times.

A. That would be great, so I can avoid toggling maybe.

Q. Yeah. If that's easier for you, that's the way I'll

5 (Pages 14 - 17)

Page 18

do it.

A. Let's try it that way. And if it doesn't work, we can pivot.

(Exhibit 1, Expert Rebuttal Report, was marked for identification.)

BY MR. PINEIRO:

Q. So I've introduced what's been marked as Exhibit 1. Do you see that on your screen?

A. I do.

Q. And this is the rebuttal report that you prepared in this case?

A. Yes.

Q. Okay. Appendix A, do you see that on your screen?

A. Yes.

Q. Is this a copy of your current CV?

A. Yes.

Q. Is there a reason why it doesn't list your affiliation with Compass Lexecon here?

A. Well, I do have a line about consulting later on, so...

Q. Okay.

A. Yeah.

Q. Here we go. Is this what you're talking about, consulting areas?

Page 19

A. Yeah.

Q. What's listed under current positions, are these all of your existing current positions?

A. Let me think. Nothing else occurs to me, no.

Q. But these are all present? Like these are all present positions that you have now?

A. The Stanford thing is a little unclear. So I was supposed to be visiting Stanford during the winter term, and I did. And then COVID hit, and then they froze everything. So it was supposed to be a recurring gig at Stanford, and then COVID froze everything. So with respect to Stanford, it's unclear what the current status is.

Q. But you served as a visiting professor there at one point in time?

A. Yes.

Q. When was the last time you served as a visiting professor there?

A. My memory is it was right before COVID, so I believe that was January 2020. And then they just like froze everything. I never -- it was supposed to be, as I said, a recurring gig. It's unclear what the status of that is. I haven't asked.

Q. Got it.

Page 20

So the first one, the first occupation here is Greenfield professor of securities law at Harvard Law School.

A. Oh, the other thing I would -- oh, I'm sorry. I didn't mean to interrupt.

Q. Yeah.

A. What I would add, I don't think it's on here and it's on my report, I believe, I am a research associate at the National Bureau of Economic Research, NBER.

Q. I think it's here, National Bureau --

A. Oh, my eyesight is going. Thank you. I stand corrected.

Q. Here you go.

A. There it is.

Q. So in terms of your present occupations or employment, where do you spend most of your time?

A. Professor.

Q. Professor at Harvard Law School?

A. Correct.

Q. How much time a week would you say that you devote to that occupation?

A. 80 percent-plus of my time.

Q. And for how long have you been a professor -- the Greenfield professor of securities law at Harvard Law?

A. Well, I've been a professor at Harvard Law School since '99. I can't remember when I became a chaired

Page 21

professor. I believe it was '05/'06, but I'm not sure.

Q. Got it. What is your compensation for your professorship with Harvard?

A. I have a salary with benefits. It's sort of a -- I think we basically have a lockstep system. I don't know whether it's age or number of years there or some combination of the two, but it's a set salary with healthcare and...

Q. Do you know, what's the salary?

A. So it's roughly 300,000, but there's a summer research stipend, so it can increase that amount a bit. And that varies from year to year. But 300, 320, not including healthcare and retirement benefits, something like that, is going to be -- a little bit of the margin of error with that.

Q. Are you being paid by the National Bureau of Economic Research?

A. No. That's academic consortium, no.

Q. Got it. Are you being paid for your fellowship at Columbia University?

A. No.

Q. What about your role as a faculty associate at the Kennedy School?

A. No.

6 (Pages 18 - 21)

Page 22

Q. In terms of your role as a faculty associate at the Kennedy School, what does that mean?

A. It means I go to workshops there. They have an academic conference on finance. I have presented there, although not in a while. So it's that sort of interaction.

Q. Got it.

And then what is it -- you list here, research associate, European Corporate Governance Institute.

What is that?

A. So the ECGI, they have working papers -- it's an academic consortium of law schools in the United States and law schools around the world. So they have an annual conference where it rotates in one of these law schools. I think this summer is going to be Columbia.

So that's their big event, is their annual conference, you know, academic conference with papers. And then they also have working paper series.

Q. Got it.

Do you teach classes at Harvard?

A. Yes.

Q. Which classes do you teach?

A. I think I have -- so I teach securities regulation regularly. I teach securities litigation. I teach corporate finance, so like an MBA corporate finance class. I teach seminars on law and finance topics. Those would be the mix of

Page 23

classes I teach.

Q. Are you currently teaching any classes?

A. No, not this semester.

Q. Okay.

A. I taught winter term. So we have this weird winter term. We have a fall, we have a January term and then we have a spring term, which is really winter.

So we are now in the spring term. I did teach in the winter term.

Q. Got it.

A. Oh, yeah, this reminds me. I did do a crypto class before as well.

Q. Got it.

For how long have you been working as an affiliate for Compass Lexecon?

A. I believe 2010.

Q. 2010 you said?

A. Yes.

Q. And so you provide -- you know, part of what you do is you provide expert services; correct?

A. Yes.

Q. Do you provide all of your expert services through your affiliation with Compass Lexecon?

A. No. My agreement with Lexecon is, if they're conflicted in a particular matter, then I can use a different

Page 24

economic consulting firm or do whatever I want.

Q. But if there's no conflict, then you do it through them?

A. Yes.

Q. In terms of your overall, you know, workload between your professorships, et cetera, what percentage of that is spent serving as an expert in cases?

A. Now, it varies a lot over time. So if there's a trial, that's going to be one end of the spectrum. But it's roughly 80-20.

Q. 20 percent expert services; 80 percent professorship?

A. Correct, with obvious time variation.

Q. How many hours -- I know it's going to be hard to ballpark, but giving, you know, a ballpark figure, how many hours do you think you spend serving in connection with your expert services?

A. I don't really -- I haven't really thought about it in those terms. It's about 20 percent of my time.

Again, it varies. It could be less, it could be a bit more in any given week.

Q. So there's a list of papers in your CV.

A. Yes.

Q. Is this the full list of your published papers or articles?

Page 25

A. Yes.

Can you go to the very beginning? Let me take a look.

So we just got a revised and resubmitted that second paper, but it's not published yet.

Q. Which one?

A. The second one.

Q. This one right here, "Are star law firms better law firms"?

A. Yes. Sorry.

Q. That's okay.

There's a section here called "Testimony last four years."

Do you see that?

A. I do.

Q. And this is a full list of all the cases where you served as an expert in the last four years?

A. Correct, with testimony. By "testimony," I mean arbitration, trial or deposition.

Q. Got it.

What percentage of these cases would you say you were serving as an expert for the plaintiff versus the defense?

A. The vast majority of my expert work is for the defense. I had done plaintiff work. I was an expert for the

7 (Pages 22 - 25)

Page 26

U.S. Attorney, a criminal securities fraud trial.

But that being said, typically for the defense. I guess the other caveat -- oh, but -- oh, yeah, the CRCM case, I was an expert for the plaintiffs in that matter. IBM, the Global Foundries -- I'm looking at my list now -- I was an expert for the plaintiff. That's a breach of contract action.

I guess the other thing I would say, with respect to Delaware cases, I always -- you know, companies are suing each other. There's claims and counterclaims. I always lose track of who is the plaintiff and who is the defendant in those kinds of cases.

Q. If you had to put a percentage on it, what percentage would you say are the -- what's the percentage of cases for which you serve as an expert for the defense?

A. Again, in Delaware, you know, I really have to think about who is initially suing and who is countersuing.

In the cases that we're seeing here on this page that you have up, there's kind of a nexus between plaintiff and defense. But, you know, if we zoom out, so to speak, it is fair to say, for federal cases, the bulk of my work is on the defense side.

Q. More than 90 percent?

A. Yeah. So again, these breach of contract cases, I think they're based on state claims, so I believe that's correct.

Page 27

Q. Okay.

A. Like The House of Lithium Case here, I was the plaintiff's expert. That was a Delaware case. The very last one on that first page.

Q. Got it. Okay.

Have you ever provided any expert testimony or opined that a plaintiff or shareholder suffered damage or economic loss as a result of an alleged misstatement or omission?

MR. TAYLOR: Objection; compound.

THE WITNESS: Yes.

BY MR. PINEIRO:

Q. Okay. And do you recall roughly how many cases involved that type of testimony?

A. So I did a plaintiff's expert case in Australia under their version of 10(b)(5). So that's what I was thinking of.

I have, on the defense side, under different assumptions calculated damages per share. So, for example, in Bank of America versus Merrill Lynch, I did that. So this is -- those are the examples that come to mind.

MR. PINEIRO: I'm in the middle -- I had a lot of caffeine this morning. Can I take -- it will be a one-minute bathroom break. Can I run to the bathroom and come right back?

Page 28

THE WITNESS: Can we make it three minutes?

MR. PINEIRO: Yes, yes.

(Thereupon, a brief recess was taken.)

BY MR. PINEIRO:

Q. So I think before we broke, you were indicating to me that you had a case in Australia where you provided some testimony -- or you had an opinion that, you know, a plaintiff had suffered some economic loss as a result of a misrepresentation; is that --

A. Yeah.

Q. -- right?

A. Correct.

Q. Besides that, are there any other cases where you found the plaintiff had suffered economic damages as a result of a misrepresentation?

A. Well, I would just repeat my earlier answer, which is, I have, under various assumptions on the defense side, calculated damages per share.

So the case that comes to mind in that vein would be Bank of America versus Merrill Lynch. Oh, and the Household litigation, the same.

Q. Okay. And those scenarios, your assumptions -- there were assumptions that the misrepresentations had caused harm. And what you were doing was providing an opinion regarding quantification of those damages?

Page 29

A. I mean, I have to go back to what the assumptions were. But, I mean, obviously the assumption of any damage analysis would be liability.

Q. Got it.

You mentioned a couple of cases where you had done that. Is it two? Do you have a ballpark figure of how often you've done that?

A. That, I don't know. Those are the two that come to mind. I'm not saying I do that in every case. That would be -- that's inaccurate. But on occasion, I've done that.

Q. Got it.

Your opinion here is an opinion regarding liability. It pertains to liability; is that fair?

A. No.

Q. No?

A. I'm not opining on liability.

Q. You're opining solely on damages?

A. Damages, loss causation, assessing Mr. Bettencourt's analysis. I would add that part of the analysis is whether May 1st, which is the date of the alleged misstatements, whether that had a price impact. So I would incorporate that as well.

Q. Got it.

Have you ever had any of your opinions or testimony excluded under Daubert or any other evidentiary standard?

8 (Pages 26 - 29)

Page 30

A.  No, with one exception.  The exception is the Ripple case.  That was the crypto case that the SEC brought.  There was many, many experts and there was an omnibus Daubert opinion.

So it was very marginal -- I submitted a number of reports in that.  There was some marginal stuff where the judge, according to her or her opinion, that her view was some of the statements crossed the line into legal territory.  So that would be the one matter that I would mention.

Q.  Do you recall which statements or opinions that you made the judge found crossed the line into testifying in legal matters?

A.  I don't think it was an opinion, is my memory.  Again, it was very marginal.  It didn't really change the thrust of my opinions or analyses.

It was not rejecting me because I wasn't an expert or the methodology was unsound.  I would just refer you to the opinion.

Q.  Sure.

Besides the SEC versus Ripple case, there was no other instance where your opinion has been partially of fully excluded by a court?

A.  No.

Q.  If you scroll down to Appendix B, materials relied on, this is a list of the documents, articles, et cetera, that

Page 31

you referenced or relied upon in rendering your opinions in this case?

A.  Yes.

Q.  And in terms of any additional documents that you reviewed, the only document you've testified that you reviewed in addition to this was Mr. Bettencourt's deposition transcript?

A.  Correct, and the exhibits thereto.

Q.  In terms of the documents that you relied upon, were they provided to you by counsel?

A.  The way -- besides the initial complaint, I forget who -- whether I pulled it or somebody sent it to me.  So putting that aside, the way I get documents is through Compass Lexecon, just so I can stay organized.

So Compass Lexecon might get it through counsel.  They might gather it themselves.  But I get the materials through Compass Lexecon.

Q.  Did you request from Compass or from counsel certain categories or types of documents to review?

A.  Sure.

Q.  Okay.  And what did you request?

A.  Well, I mean, I don't have the list in front of me, but I like to read the 10-K, obviously the judge's opinion in the matter, obviously the opposing expert report, what are the alleged corrected disclosures, what are the corrected

Page 32

disclosures by the opposing expert.

So those would be obvious things to think about.

Q.  And you affirmatively requested those things?

A.  Yes.  I wanted to look at the corrected disclosures.  I wanted to look at, you know, how Mr. Bettencourt analyzes matters.

Q.  Right.

There are certain articles -- do you see the section here, "News articles, press releases and press conferences"?

Do you see that?

A.  I do not.

Q.  Sorry.  I'm not sharing my screen.  I apologize.

Do you see it now?

A.  Yes.  This is the rebuttal, okay.

Q.  Yeah, this is your rebuttal report.

Sorry.  I didn't realize I wasn't sharing my screen.

Do you see the section titled "News articles, press releases," et cetera?

A.  Yes.

Q.  Who selected the articles or press releases listed here?

A.  It was me in conversation with Compass Lexecon.  A lot of this stuff is pretty obvious to take a look at, you know.  But it speaks to the informational environment.  It speaks to some of these alleged corrective disclosures.  I

Page 33

believe Hindenburg is on here, for example.

So it's really trying to understand informational environment, including, you know, issues surrounding loss causation and damages.

Q.  Got it.

Are there any documents that you requested to see that you weren't provided?

A.  No.

Q.  Okay.  Upon reviewing Mr. Bettencourt's deposition transcript, are there any documents that you now think you should have reviewed in preparing your opinion?

A.  No.

Q.  In preparing your report, are there any assumptions that you relied upon?

A.  I am assuming liability.  I'm not -- it kind of alludes back to our prior conversation.  I'm not opining on falsity or misleading, so I would identify that.

Q.  Did you at all examine Co-Diagnostics' annual reports or financial statements?

A.  Yes.  So I think we can just go to the list.  I think the 10-K is listed there, or maybe that's in my initial report.  But I did, for example, review the 2019 10-K.  And I think I cite to in the beginning of my opening report.

Q.  Got it.

And are you familiar with what Co-Diagnostics'

Veritext Legal Solutions

800-726-7007                                             305-376-8800

Page 34

primary business was before the pandemic?

A. Yes, and I think I described that in my opening report.

Q. Sitting here, do you recall what it is?

A. Yes.

Q. What was it?

A. They did molecular diagnostics. I think they did stuff involving mosquito-borne diseases. Again, I have a description of this in my opening report from their 2019 10-K.

Q. Fair to say that their entry into COVID-19 testing was transformative for the company?

A. Transformative. It was an extension of -- you know, it is part of the molecular testing. But that being said, it did have an impact on revenues and analyst expectations and stock price. And I document that in my opening report.

Q. And that was a significant impact; right?

A. Yes. I believe that the stock price -- I think their market capital at one point was 15 million, and it definitely went up. I have those numbers in my opening report.

Q. Do you have any opinion in this case on whether Co-Diagnostics' stock traded on an efficient market?

A. I'm assuming efficiency.

Q. By the way, sometimes I'll refer to Co-Diagnostics' stock as CODX, C-O-D-X, which is the ticker, if that's okay

Page 35

with you.

A. Perfect.

Q. So turning to paragraph 19, there is -- it says "I have formed the following opinions." And it lists A through D.

Are those the four opinions -- those are the only four opinions you have in connection with your rebuttal report; is that right?

A. Correct, with the additional caveat that we discussed earlier, that I did review Mr. Bettencourt's deposition transcript.

Q. Got it.

So in this section, you know, you say "Mr. Bettencourt ignores that market participants understood that investing in Co-Diagnostics' stock was particularly risky."

What did you mean by that?

A. Well, equities are going to be riskier than -- as a general matter, than treasury bills or diversified portfolio stocks, such as S&P 500. And so you need to properly address thinking about price dynamics volatility; and in my opinion, Mr. Bettencourt clearly does not do a proper job of that.

Q. How so?

A. Okay. So I guess I would start with heteroscedasticity, that the volatility is changing. We know that from Breusch-Pagan test, the BP test. And I just think

Page 36

that Mr. Bettencourt -- I want to be diplomatic here -- but just simply does not understand the Newey-West correction for heteroscedasticity, that that does not correct for heteroscedasticity in error term. And the proper way to do it is GLS. And I think he is just massively confused or misinformed on that.

Q. Okay. And besides the issue with heteroscedasticity, what else?

A. You know, I would focus on that. So that's the volatility in the admitted variables as well as the co-variants that are being used to explain the terms. These are terms that are bouncing around. So I would focus on the proper statistical treatment of that, which he does not do.

Q. Now, Mr. Bettencourt's -- you know, the way that he dealt with heteroscedasticity -- and I apologize, I have a very difficult time pronouncing that word.

A. You're doing better than I am.

Q. That pertains mainly to price impact on May 1st, though; right?

A. Well, yes, in the sense that -- in the following sense: That May 1st, if you correct for heteroscedasticity with GLS, it's not statistically significant.

But that's not to say that with respect to other dates, there might be heteroscedasticity for which one needs to do a GLS correction.

Page 37

Now, it is fair to say that, you know, May 1st is sort of the focal point here in terms of whether or not statistically significant.

Q. With respect to the May 1st price impact, you found that, under your model, you found it at the 93 percent confidence level; isn't that right?

A. That's a misstatement of my report. That was one of -- that was -- if I remember correctly, and we can pull it up, that's the GLS for the one year after, one year forward model.

But there's also the six months. I believe Mr. Bettencourt said in his deposition, he thought six months was appropriate. Six months after, as well as six months straddling. And that would not be a P value of 7 percent.

Q. Got it.

On May 13th, was there a -- May 13, 2020, was there a statistically significant increase in the price of Co-Diagnostics?

A. Yes.

Q. And you don't dispute that; correct?

A. Correct.

Q. And on May 15th, there was a statistically significant decrease in Co-Diagnostic stock; correct?

A. Correct.

Q. And you don't dispute that?

A. Correct.

10 (Pages 34 - 37)

Page 38

Q.   When you say Mr. Bettencourt ignores that market participants understood that investing in Co-Diagnostics' stock was particularly risky, what you are mainly focused on is heteroscedasticity?

A.   This is a more general point, which is going into an analysis of stock price limits.  You need to take into account risk.  Risk, you know, as reflected in variants or volatility.

And we can see here that there is a lot of volatility in CODX.

And as I said in my opening report, if you look at the pattern of that volatility, just visually as well as formally, there is heteroscedasticity in that.

Q.   Right.

But my question is, I guess is, besides the heteroscedasticity, is there any other way that Mr. Bettencourt ignores that market participants understood investing in Co-Diagnostics' stock was risky?

A.   Well, I guess the second thing I would add here in terms of risk, is that the market was being informed prior to May 1st, both in the 10-K, but also in various news commentary that I cite, that there is a risk that the test wouldn't work.  There is a risk that, you know, we're not going to have 100 percent.  There was information about it being 95 percent or 99 percent.

So part of the risk here is how is this test that

Page 39

they announced they're going to develop in January going to actually unfold.

Q.   Besides what you just mentioned, is there anything else that forms the basis for your statement that Mr. Bettencourt ignores that market participants were aware of the risks of this -- of buying and selling this stock?

A.   Anything else in terms of his ignoring it?

Q.   Yes.

A.   No.  I think those are the two buckets, which is kind of thinking about volatility and the risk in the event study setting, as well as what the market was being informed about the risks generally, but also about this test in particular.

Q.   I mean, do you recall whether Mr. Bettencourt made any statements indicating that investing in stocks, in equities, you know, didn't have more risk than investing in treasury bills?

A.   I do not believe he said that.  I don't have a recollection of that, no.

Q.   And Mr. Bettencourt also didn't state that investing in Co-Diagnostics' stock was, you know, less risky than investing in an S&P 500 index; right?

A.   Correct.

Q.   Paragraph 25, you say "Mr. Bettencourt ignores that these risks and others were disclosed in Co-Diagnostics' SEC

Page 40

filings, for example."

And then you quote from the company's S1 and its 2019 10-K.

Do you see that?

A.   I do.

Q.   Have you read S-1s and 10-Ks for other companies?

A.   Of course.

Q.   And they routinely have disclaimers and disclosures regarding the risks to their business and their revenues; correct?

A.   I'm not here to provide a legal opinion, but my understanding is that's legally required.

Q.   So as a legal requirement, companies are required to disclose potential risks in these filings; right?

A.   Again, I'm not here to provide a legal opinion, but that is my understanding.

Q.   What's the basis to assert that Mr. Bettencourt disregarded these, you know, disclaimers or statements in these company documents?

A.   I guess the way I would frame it -- and this all came out in his deposition, that he basically ignores, in my view, the pre-May 1st information.  So that would obviously include the materials that we're looking at here, as well as the additional information the market had, that I cite after this particular paragraph, paragraph 25.

Page 41

And so, you know, my view is he ignores that.  And I think the result of that is his May 1st analysis, in my view, doesn't make any economic sense.

Q.   So you're testifying that he ignored some events and news pre-May 1, 2020, and that impacted -- and the impact that had was solely on his May -- on his findings regarding May 1, 2020?

MR. TAYLOR:  Objection --

THE WITNESS:  Not solely --

MR. TAYLOR:  One second.

Objection; misstates prior testimony.  Go ahead.

THE WITNESS:  Not solely.  That is to say the market is aware that this is risky.  The market is being told, and this goes to some subsequent paragraphs about the sensitivity of the test and it not being 100 percent leading up to May 1st.

That also impacts, you know, subsequent disclosures such as the FDA announcement after the close of the market on May 14th.

So I think this information pre-May 1st sets the stage for what the market knew and should affect one's judgment as to what is and is not new, value-relevant information.

Because, again, in an efficient market, it's new, value-relevant information that would cause a stock price

11 (Pages 38 - 41)

Page 42

reaction.

BY MR. PINEIRO:

Q.   On May 1, 2020, Co-Diagnostics' stock was up over 17 percent on the day; is that correct?

A.   I believe that's the raw return, yes.  That's my memory.  I'm not going to -- that's consistent with my memory, is that the raw return is in that range.

Q.   Do you have any opinion regarding what caused that large return on that day?

A.   I do in the following sense, and that is, as a financial economist, I would analyze it statistically.  And that raw price move is explainable at a certain level of confidence by normal random volatility.

Q.   Now, can you -- and I understand your testimony on that.  You can't exclude, right, you can't categorically exclude that there was a price impact on that date based on the May 1st press release; correct?

A.   I wouldn't frame it that way.  I would say there's no reliable economic evidence that that is the case.

As a financial economist, I would use the standard tools to assess that.  And my opinion would be:  There's no reliable economic evidence to support that conclusion.

Q.   Using the tools at your disposal, you're saying you can't conclude that the May 1st press release caused a statistically significant price increase.

Page 43

Is that what you're stating?

MR. TAYLOR:  Objection; misstates prior testimony.

Go ahead.

THE WITNESS:  We know that the stock price reaction on May 1st is not statistically significant; ergo, it is explainable by random volatility.  And that's the basis for my opinion, that there is no reliable economic evidence that raw stock return, you know, is caused by the May 1st statement.

But I would also add in -- you know, I would also include, you know, up my other analyses in terms of what was moving the stock price subsequent to that as well.

BY MR. PINEIRO:

Q.   How many other days did the company, I guess prior to that, did the company have an over-17-percent logarithmic return?

A.   I don't know the answer to that.  I do plot the abnormal -- the residuals, the abnormal returns in my opening report over time.

So that table or exhibit would be -- wouldn't be the raw returns, which I think you're referring to, but would show you, over time, the residuals.

Q.   You know, what you've been saying, there's no economically reliable way to opine using the models that use that the May 1st press release caused the return on the --

Page 44

caused the logarithmic return on May 1st.

But, again, that model doesn't exclude that explanation; correct?

A.   It tests the model -- what financial economists can do, what the academic literature enables one to do is whether it's explainable at a certain level of confidence by random volatility.  And that leads to a conclusion as to whether there's reliable economic evidence as understood by the academic literature for ascribing a raw return to new, value-relevant information on that date.

Q.   But certainly it's possible that, on May 1st, a bunch of people went in and they bought up this stock based on the press release, and that caused an over 17 percent return; correct?

MR. TAYLOR:  Objection; form.

THE WITNESS:  What individual investors are thinking, I have no -- I'm not here to opine on.  There's a lot of people that think a lot of things.

So the point of analysis is whether the actual price movement is explainable by random volatility or not.  And that's how a financial economist would view it.

BY MR. PINEIRO:

Q.   Do you know whether Mr. Bettencourt read the company's S-1 and the 2019 10-K?

A.   I don't know.  I'd just go to his docs considered or

Page 45

docs relied upon list.  I don't recall offhand.

Yeah, I'd have to review it and see if it's on the list or not.

Q.   On paragraph 27 -- one second.

You say "Mr. Bettencourt also ignores that articles discussed the uncertainty surrounding the accuracy of COVID-19 diagnostic tests in general as early as March 2020, which further highlights that market participants were aware of the risks in investing in Co-Diagnostics' stock prior to and during the class period."

Do you see that?

A.   Yes.

Q.   It says "for example," and you list a series of articles.

Do you see that in paragraph 4?

A.   I do.

Q.   In connection with your opinion here, did you do any analysis into market -- the investing market's awareness of PCR testing for COVID?

A.   Well, I'm not going to remember the exact articles, but there are -- I do think there is some discussion.  My memory, sitting here, is discussion of PCR tests.  But I don't -- I can't recall offhand the exact article.

Q.   But besides reviewing these --

A.   And I think -- maybe the Johns Hopkins talks about

12 (Pages 42 - 45)

Page 46

PCR, but I would have to refresh my recollection.

Q. Did you do any analysis yourself regarding the market's awareness, the investing market's awareness regarding the uncertainty of the accuracy of COVID-19 tests?

A. Yes. So this shows in the public domain those clear statements that no test is perfect. And there's obviously other things said concerning that.

But it is my opinion that this is part of the public information, and an efficient market would incorporate into the pricing because it's public.

Q. By way of example, do you know what's the readership of this article, this Johns Hopkins article; do you know?

A. I don't know.

Q. Did you do any investigation on how many clicks there were or if people read any of these articles that you list here?

A. Not relevant to my opinion.

Q. Why not?

A. Because in an efficient market, all publicly available information, such as something in the Washington Post or the Wall Street Journal or the Kansas City Star is going to be priced. If the market doesn't price, publicly available information, then that's inconsistent with the assumption of efficiency.

Q. In 28, you say "Mr. Bettencourt ignores that market

Page 47

participants also discussed the uncertainties surrounding the accuracy of Co-Diagnostics' COVID-19 diagnostic tests, in particular both prior to and during the class period, which also highlights that market participants were aware of the risk to investing in the company's stock prior to and during the class period. For example..."

Do you see that?

A. I do.

Q. So the first one that you list is an H.C. Wainwright analyst report from March 18th.

Do you see that?

A. Yes.

Q. And this is prior to the May 1st press release; correct?

A. Yes.

Q. Okay. And you also say "A study by BioCentury on April 1st," this is also prior to the May 1st press release; right?

A. I believe this is going to be true -- yes, that is correct.

Q. Same for the article in C; correct, the Salt Lake -- strike that.

This Salt Lake Tribune article on April 30th, this is an article that raised a concern regarding the accuracy of Co-Diagnostics' tests; correct?

Page 48

A. That's consistent with my memory.

Q. And the May 1st press release by Co-Diagnostics was prepared in response to this; correct?

A. That might be true. I don't have a specific recollection. I don't recall offhand if that was the reason for it, but there is certainly a May 1st release.

Q. Got it.

Then you cite this article in the Lincoln Journal Star dated May 5th, and it says -- you bolded, "An infectious disease specialist in Utah has challenged the accuracy of the coronavirus tests." And you also bolded, "Utah doctors question accuracy of the coronavirus test provided by Test Nebraska Partners."

Do you see that?

A. Yes.

Q. And so this is actually a reference to the April 30th Salt Lake Tribune article; correct?

A. Can we go back down?

So the Lincoln Journal Star, I don't remember -- I would have to refresh my recollection by reading the entire thing, but I don't remember if they reference April 30th offhand or not.

Q. Do you recall whether this article references that article, though -- this May 5th article references that Salt Lake Tribune article?

Page 49

A. It may, but I would have to refresh my recollection. I don't have it memorized.

Q. Let me share my screen. I didn't add a sticker to this one, but it's Exhibit 2.

A. Yes.

(Exhibit 2, Article, was marked for identification.)

BY MR. PINEIRO:

Q. Do you see that on your screen, sir?

A. Yeah. Can you make that a little bit bigger?

Q. Yes.

Do you see that on your screen, "Test Nebraska underway"?

A. I do.

Q. May 5th.

This is the article that we were just discussing, that was referenced in your report?

A. Yes, that's the Lincoln article.

Q. And so going down to the article, it says "An infectious disease specialist in Utah has challenged the accuracy of the coronavirus test provided by the same private company contracted for the same test kits in Nebraska."

Do you see that?

A. Yes.

Q. And then it provides -- you probably can't see it. There's a bullet here that's like a link.

13 (Pages 46 - 49)

Page 50

Do you see that?

A. I do see that.

Q. If this links this article, the reference to the Co-Diagnostics test, links back to the April 30th article, then this isn't new information post-dating the May 1st press release; right?

A. I agree. I agree that a link to a previously published article would just be repeating, at least to that extent, what was already known to the market.

Q. Okay. And then the May 14th -- I'm back on your report.

A. Yes.

Q. The May 14th SLT article, this is an article that the plaintiffs assert is a corrective disclosure in this case; correct?

A. Yes.

Q. So why did you list that in the articles discussing -- why did you list that as one of the articles that Mr. Bettencourt ignores?

A. Well, it's really the fact -- I mean, what I'm trying to convey here in this paragraph is, there's a drumbeat of information about the limits of this particular test. And it is true that part of that drumbeat includes the May 14th.

So I just wanted to include that in the sense that this is sort of part of these repeated concerns in the public

Page 51

domain concerning the test.

Q. The May 14th Iowa -- Sub H here, the May 14th Iowa governor press conference, that's also one of the alleged corrective statements; correct?

A. Yes.

Q. Did you review the May 1, 2020 press release?

A. Yes.

Q. Did you engage in any analysis of how the media received or interpreted that May 1st press release?

A. Yes. I mean, I did look at what the news reports are during this period. And, you know, I do remember -- I forget the publication, but I do remember seeing a publication on May 1st, off the top of my head.

So I did take a look at that in conjunction with whether there was anything to explain in the sense of being -- there being a statistically significant price movement.

Q. In connection with your opinion, did you evaluate how investors or the marketplace interpreted that May 1st press release?

A. Well, I did look at -- there was a May 1st, I forget if it was Bloomberg or Investor's Daily Business, but one of those, there is an article on May 1st, I think Mr. Bettencourt cites to it.

But my view would be, there's nothing to explain because there's -- the residual on that date is explainable by

Page 52

normal random volatility. I would also reference the fact that the market, both prior to and after May 1st, was well aware that this is not a perfect test.

Q. So I introduced to Exhibit Share what's been marked as Exhibit 3. I'll share it on my screen.

(Exhibit 3, Article, was marked for identification.)

BY MR. PINEIRO:

Q. Do you see an article from the Investor's Business Daily on your screen, Exhibit 3?

A. Yes.

Q. Have you ever seen this before?

A. Yes, I have.

Q. Did you review this in connection with issuing your rebuttal report?

A. That's my memory. And I think it was discussed -- yes, I think maybe it's in the motion to dismiss as well, but I do remember this.

Q. It says "Coronavirus test maker soars as its diagnostic proves 100 percent accurate."

Do you see that?

A. Yes.

Q. Fair to say that the statement in that title would appear to contradict what you said was public knowledge regarding the uncertainty around COVID-19 testing?

MR. TAYLOR: Objection; misstates prior testimony.

Page 53

Go ahead.

THE WITNESS: So if this is interpreted as a statement that there's a causal effect of the stock price due to the May 1st, I would disagree with that because there is no economic evidence that that happened.

The fact that commentary is repeating what's in the May 1st does not change my opinion about the market's knowledge about the limitations of the test.

BY MR. PINEIRO:

Q. Right. But you're basing -- so setting aside the statistically significant movement on May 1st, just looking at the articles that we had went through pre-May 1st --

A. Yes.

Q. -- the statement here would, on its face, would appear to contradict what those articles indicate; correct?

A. Look, I'm not an expert in interpreting -- I'm not here to say the definitive interpretation what this person meant when they wrote it. But the fact that they are repeating the estimates, the 100 percent, the 100 percent in the May 1st based on studies in Australia and Mexico and India, I believe, I think that's perfectly consistent with the market knowing that this is not a perfect test, both before and after this article.

Q. But just looking at just this title "Proves 100 percent accurate." That statement alone in isolation

14 (Pages 50 - 53)

Page 54

would appear to be in conflict with the pre-May 1st articles that we just went through; correct?

MR. TAYLOR: Objection; asked and answered. Go ahead.

THE WITNESS: I don't really have that view. That is repeating the results of the company analysis based on studies in these countries. It's not -- you know, it doesn't mean that the market unlearned that, you know, there's no perfect test or the limitations of this test.

Again, that's also consistent with the fact that, on May 11th, the market heard this information as well, that it's not perfect and there's no stock price reaction associated with that.

BY MR. PINEIRO:

Q. Your reference to May 11th, what are you referencing there?

A. The Nebraska information.

Q. Got it.

What Nebraska information are you referencing there?

A. Well, I don't -- I want to note for the record I don't have the report in front of me.

My memory is it was information about being 95 percent. There was information about it not being a perfect test, which is something that I think is reflected in that pre-May 1st commentary as well.

Page 55

MR. PINEIRO: I forgot a sticker again. I'm going to share my screen.

(Exhibit 4, Article, was marked for identification.)

BY MR. PINEIRO:

Q. I'm showing you what I marked as Exhibit 4.

Do you see an article on your screen?

A. Can you make it a little bit bigger?

Q. Yeah.

"Co-Diagnostics is a smart way to play coronavirus testing."

Do you see that?

A. I do.

Q. And the date of this article is May 11th.

Do you see that?

A. I do.

Q. And then on this -- on May 11th, they're still citing Co-Diagnostics -- this article states "Co-Diagnostics says its tests are 100 percent accurate."

Do you see that?

A. I do see that.

Q. So at this point, as of May 11th, this article makes no reference to the tests being 95 percent accurate; right?

A. Well, I would have to review the entire article, but it is true that this portion of the article says what we just discussed.

Page 56

Q. Okay. It's continuing to quote -- it actually is quoting the press release.

Do you see that?

A. I do.

Q. Now, you testified earlier that on May 13th, CODX stock had a --

MR. PINEIRO: And, again, Rinele, that's C-O-D-X when I say that.

BY MR. PINEIRO:

Q. -- CODX stock had a statistically significant increase on May 13th.

You said that; right?

MR. TAYLOR: Objection; misstates prior testimony. Go ahead.

THE WITNESS: May 13th is a statistically significant residual, as I remember.

BY MR. PINEIRO:

Q. Yes. And by that, a statistically significant increase in the price; correct?

A. Yes.

Q. To what do you attribute that?

A. Abbott's very poor results. My memory is something like a third to half were problematic, so they had results that were quite bad, at least the market interpreted them as quite bad given the information the market learned on May 13th

Page 57

about the Abbott test.

Q. So it seems the market is creating some type of a link between Abbott and Co-Diagnostics' tests?

MR. TAYLOR: Objection; vague.

THE WITNESS: I'm not sure what you mean by "link," but given Abbott's really bad results, or bad results as the market received it -- again, I remember something like a third to half, or something like that -- that relative to that, the market viewed the CODX test as more attractive. So that's how I would interpret the stock price movement on that day.

BY MR. PINEIRO:

Q. And it would have viewed Co-Diagnostics' tests as more attractive, at least in part, based on the May 1st press release; correct?

A. I don't -- actually, I would not put it that way.

I would say the market was well aware that the diagnostic test was not perfect. That was repeated ad nauseam. The market was well aware that no test is perfect.

But you don't need a perfect test to beat a test that fails a third or half the time.

Q. So I've uploaded what's been marked as Exhibit 5. I'll share it on my screen.

(Exhibit 5, Article, was marked for identification.)

15 (Pages 54 - 57)

Page 58

BY MR. PINEIRO:

Q. I'll make this bigger for you.

Do you see on your screen an article -- do you see that on your screen, Professor --

A. I do.

Q. -- Exhibit 5?

A. Yes.

Q. And this is an article on May 13th from -- do you see up top, it says "Seeking Alpha"?

A. Yes, I do.

Q. Do you know what "Seeking Alpha" is?

A. Yes.

Q. What is it?

A. It's a publication. They're online. It's kind of an investment-oriented publication. So my recollection is that Seeking Alpha is intended to be, as the name would suggest, focused on investments and financial markets.

Q. So this article is dated May 13, 2020 at 3:45 p.m. Do you see that?

A. Yes.

Q. And it says "Abbott's COVID-19 test pain is Co-Diagnostics' gain, up 31 percent."

Do you see that?

A. 30.5 percent, yes.

Q. Right. I was looking at the title, up 31 percent.

Page 59

A. Sorry. I went to the text.

Q. No problem.

So the first bullet point says "COVID-19 test developer, Co-Diagnostics, is poised to finish the day solidly in the green on more than 40 percent higher volume, enjoying a surge in buying in the wake of reported disappointing sensitivity data from a New York study evaluating Abbott's ID Now rapid molecular test for SARS-CoV-2."

Do you see that?

A. Yes.

Q. Fair to say, based this price movement on May 13th, that the market was paying close attention to the accuracy of Co-Diagnostics' tests?

A. I would say the market is interested in what the best test is out there, comparatively speaking. And so given these really -- my memory of the really bad results for Abbott, Co-Diagnostics' test, even though it's not perfect, and that was understood by the market, is looking good by comparison.

Q. So the second bullet point, it says "Co-Diagnostics recently announced data on its Logix Smart molecular test for SARS-CoV-2 that showed 100 percent sensitivity and 100 percent specificity."

Do you see that?

A. Yes.

Page 60

Q. So this article on May 13th is still citing the May 1st press release; correct?

A. Yes, they are citing the May 1st.

Q. Besides referencing the May 1st press release, there's no other information regarding the accuracy of the Co-Diagnostics test; correct?

A. Correct. So I think this article is these three bullet points, so I think that's a fair statement. So if we're confined to the four corners of these three bullet points.

Q. So it appears the article is juxtaposing the Abbott's disappointing sensitivity data with Co-Diagnostics' announced data on its May 1st press release; is that fair?

MR. TAYLOR: Objection; asked and answered.

THE WITNESS: It is repeating the May 1st information, again, you know, comparing the CODX diagnostic test to the disappointing Abbott results.

BY MR. PINEIRO:

Q. As part of your report, you're assuming liability you've said; right?

A. Yes.

Q. And that assumes, then, the falsity of the May 1st press release; correct?

A. I'm not arguing with you. My memory from the motion to dismiss is it's, according to the judge, for pleading

Page 61

purposes, misleading, is my memory. So I'm assuming that liability as articulated by the judge.

Q. So assuming that the May 1st press release referenced here was misleading, had the May 1st press release been accurate, again this is a hypothetical had it been accurate -- again, this is a hypothetical. Had it been accurate and not been misleading, it's possible that the significant increase in Co-Diagnostics' stock on that day would have been much lower; correct?

MR. TAYLOR: Objection; calls for legal conclusions. Go ahead.

THE WITNESS: So my view is the market, both prior to and after this date, May 13th, was well aware that no test is perfect, including Co-Diagnostics; and, therefore, I don't think the price reaction on this date would have been any different --

BY MR. PINEIRO:

Q. Okay.

A. -- given that knowledge.

Q. So let's do a hypothetical.

So let's say that on May 1st, CODX says "Our testing is not 100 percent and 100 percent. And it's 85 percent and 85 percent."

Okay. In that hypothetical, do you think -- is it possible that CODX wouldn't have had any bump at all in its

16 (Pages 58 - 61)

Page 62

stock price on May 13th, based on the sensitivity data regarding Abbott?

A. Well, in your hypo, it's 85 percent. So what the market was hearing was something like 95, 99. We can look at the different statements about the CODX test, as well as no test is perfect.

Relative to that baseline, I don't think there would have been any difference in the stock price reaction on May 13th. If you start saying that hypothetically -- let's go to the other extreme. If Co-Diagnostics' test is as bad as Abbott, then, yes, I agree there wouldn't be a stock price increase because it's not badder.

So obviously what I would use is a benchmark in answering the question as to the market's knowledge about the limitations to Co-Diagnostics' test as it actually existed.

Q. Right. But in my hypothetical, assuming, then, the market is -- in my hypothetical, it announces subpar or mediocre sensitivity and specificity data.

In that hypothetical, it's possible that CODX stock does not have a significant increase on May 13th; correct?

MR. TAYLOR: Objection; calls for speculation.

THE WITNESS: So the way I would answer that question is: If the information that's alleged to be corrective here, the May 14th and FDA announcement after hours of May 14th had been disclosed on May 13th, the

Page 63

morning of May 13, there would have been no difference in the price reaction.

Now, if the hypothetical is that they're told something worse or more -- you know, that the test is even worse than -- you know, has even more limitations than what's alleged to be corrective, the May 14th, including the after hours, you know, at some point, it's going to be close enough to Abbott that it doesn't look good in comparison.

BY MR. PINEIRO:

Q. Do you know whether the Abbott test -- the Abbott ID Now test is more or less accurate than the CODX test?

A. We would have to pull this New York study. I kind of referenced my general recollection, and my recollection is that the market, you know, consistent with what we've been talking about here, viewed it as disappointing.

MR. PINEIRO: Good time for a break? We've been going for an hour.

THE WITNESS: Sure.

(Thereupon, a brief recess was taken.)

BY MR. PINEIRO:

Q. Professor, what's a corrective disclosure?

A. That's information --

MR. TAYLOR: Objection; calls for legal conclusion. Go ahead.

Page 64

THE WITNESS: Generally speaking, it would be information that corrects, informs the market as it relates to an alleged misstatement or alleged materially misleading statement. So corrective or, you know, information to the market that updates the market --

BY MR. PINEIRO:

Q. And is there --

A. -- relative to the misimpression, if any, created by the statements that are alleged to be misleading or false.

Q. And is there such thing as a partial corrective disclosure?

A. Yes.

MR. TAYLOR: Objection; calls for legal conclusion. Go ahead.

BY MR. PINEIRO:

Q. And what does that mean?

A. Well, it doesn't -- so a partial corrective disclosure would be, you know, the market doesn't need to learn everything at once, so if some of the corrective information comes out but not all of it, then it would be a partial corrective disclosure.

Q. So I'm back on your report.

Do you see that on your screen?

A. Yes.

Q. There's a section here, Roman numeral IV, "Mr.

Page 65

Bettencourt's analyses of loss causation and alleged artificial inflation are fundamentally flawed and unreliable."

Do you see that?

A. Yes.

Q. So paragraph 29, you say "Plaintiff alleges that the alleged misstatement was partially corrected when third parties made certain disclosures during market hours on May 14th through the publication of the May 14th SLT article and the May 14th Iowa governor press conference. Mr. Bettencourt concludes that these two alleged corrective disclosures caused Co-Diagnostics' investors to suffer losses. Mr. Bettencourt conclusions is fundamentally flawed and unreliable for several reasons."

Do you see that?

A. Yes.

Q. And then it appears you have a list of three criticisms along those lines?

A. We have to -- can we scroll to the next page for a second?

Then the next page after that?

So yeah, Subsection A, there's three.

Q. Okay.

So paragraph 30, you say, "First, Mr. Bettencourt's own event study analysis found that the abnormal return on May 14th is not statistically significant. Hence, according

17 (Pages 62 - 65)

Page 66

to his own analysis, there's no reliable and scientific evidence to conclude that the price of Co-Diagnostics' stock on May 14, 2020 was impacted by the May 14, 2020 trading day disclosures."

Do you see that?

A. Yes.

Q. Mr. Bettencourt has used a two-day window involving May 14th and May 15th for his event study; correct?

A. He does do a two-day window.

Q. Right.

And so his event study calculated it over two days, not just based on May 14th; right?

A. Well, it is true that he uses two-day. It's also true, as I say here, that his event study for May 14th is as I reported.

Q. But for May 14th, you're saying he did not find a statistically significant return; correct?

A. Correct, using his event study.

Q. But he opined that you can't just look at May 14th; right?

A. It is true that he uses a two-day, so --

Q. Right.

A. -- both statements are true --

Q. Yeah.

A. -- that, according to his event study, May 14th is

Page 67

not statistically significant. It is also true that he uses a two-day window for his damages inflation analysis.

Q. Now, the footnote to May 1st, Footnote 49, do you see that?

I'm going to blow this up for you.

A. Thank you.

Q. Do you see that Footnote 49?

A. I do.

Q. On May 14th, there were multiple trading halts of CODX stock; correct?

A. There was two, for a total of 15 minutes.

Q. Right.

What's a trading halt?

A. There's no trading.

Q. Do you know why trading halts sometimes occur?

A. My general understanding, there could be rules on the NASDAQ or the New York Stock Exchange when certain price levels are hit within certain increments of time.

That's my general understanding such as it is.

Q. And the decision for a trading halt is done by the -- here, it was done by NASDAQ; correct?

A. That's my understanding.

Q. Okay. Have you done any studies or analysis of trading halts?

A. No. I did do a case where there is a trading halt

Page 68

for the entire day, but that's the only thing that comes to mind.

Q. Why was trading halted on May 14th?

A. I don't have a specific reason. My general understanding why trading halts occur, that is price levels are being hit per the NASDAQ rules, and then automatically there's a halt. Sometimes they do a halt for some special disclosure.

But that's just my general understanding. I'm not opining as to why, for these 15 minutes for NASDAQ, it was halted.

Q. So you don't have any opinion or findings why the halts occurred on May 14th?

A. I do remember somewhere there was a discussion why, I'm just not remembering off the top of my head.

Q. But do you have an opinion in this case as to why those halts occurred?

MR. TAYLOR: Objection; asked and answered.

THE WITNESS: No. I do remember, I'm just not recalling off the top of my head, where there was a discussion as to why the trading halt occurred for 15 minutes. But I'm not providing an opinion on that.

BY MR. PINEIRO:

Q. Why not?

A. It's not necessary to my opinion.

Page 69

Q. Why isn't it necessary?

A. Because it doesn't affect any of my opinions as to whether it was caused by a press release, you know, or I think trading limits based on price levels. It doesn't affect any of my analyses or conclusions.

Q. Did the trading halts occur here because of decreases in CODX's stock price?

A. I've already answered the question as best I could. I don't have a specific recollection. I do know -- my general understanding is that you can have trading halts as a result of the price levels being hit per the rules.

That might be the case here, but I would have to refresh my recollection. I do remember seeing some discussion of that, but I'm not -- I would have to refresh my recollection.

Q. Have you ever conducted an intraday event study?

A. Yes.

Q. When are those appropriate?

A. So when we say "intraday," I want to define what we're talking about.

So, for example, the standard increment of time for efficient markets that folks look at, a standard window is close to close, is a day, is typical.

So you could imagine confounding information. So depending on the facts and circumstances, you might want to do

18 (Pages 66 - 69)

Page 70

a close to open, you know, if it's after hours. So it really depends on the facts and circumstances and the company -- the nature of the company involved.

Q. Got it.

A. You can also do an intraday. You know, and this is obviously related to the issue of confounding information.

Q. So I've introduced what's been marked as Exhibit 6.

(Exhibit 6, FINRA Document, was marked for identification.)

BY MR. PINEIRO:

Q. Do you see document --

A. Can you make that a little bit bigger?

Q. Yeah. Do you see a document entitled "Trading halts, delays and suspensions"?

A. I do.

Q. Do you see up top, it's from the FINRA website?

A. Okay.

Q. This discusses trading halts, and it says "Stocks in U.S. markets can be halted or can experience a trading delay or suspension for a variety of reasons. In the case of trading halts and delays for listed stocks, most times the objective is simple: To allow the market to digest new company information."

Do you see that?

A. I do.

Page 71

Q. Was there any new company information on May 14th that you're aware of regarding Co-Diagnostics?

A. Well, I don't know how FINRA, for the purposes of the rules, is defining "new company information." So they might -- their goals and how they define things are not necessarily co-extensive in terms of what I'm doing here.

So what I'm doing here is asking the question: Is there any value-relevant information around May 14th in these preclosure, corrective disclosures?

And my answer to that is no.

Q. On May 14th, you had, regarding Co-Diagnostics, the Salt Lake Tribune article; correct?

A. Yes.

Q. You had the press conference from the Iowa Governor; correct?

A. Yes.

Q. Any other information -- was there any positive news that you're aware of on May 14th for Co-Diagnostics?

A. I'm not recalling -- offhand, not seeing my report, I'm not recalling any.

I do remember -- actually, I do remember. Mr. Bettencourt does claim in his report that there was a denial by the company on May 14th. But I think he abandons that claim and pivots to say it was after hours.

Q. So going back to note 49, why did you include that

Page 72

in here?

A. Why did I include that in here?

Q. Yeah.

A. Well, I'm discussing May 14th. There was a trading halt. And so, you know, I do want to note it in a footnote, at least. And I also wanted to note that this doesn't change, you know, my assumption or market efficiency in that the market would impound new, value-relevant information.

Q. Is it possible that a trading halt will mitigate a decrease in stock price?

MR. TAYLOR: Objection; calls for speculation. Go ahead.

THE WITNESS: Well, I mean, obviously between those 15 minutes, between 1:25 and 1:58 p.m., you know, the market is not going to price it because there's no trading. So we're halted. There's no -- but it doesn't change the fact that, over the course of the trading day, if the market is, in fact, deficient, that these two pieces of information would be quickly reflected in the price.

BY MR. PINEIRO:

Q. Do you know when the first trading halt occurred?

A. Well, I have it in the footnote, 1:25 p.m.

Q. And that's 1:25 p.m. Eastern Time; correct?

A. Yes.

Page 73

Q. And do you know when this Salt Lake Tribune article came out?

A. I have that in a footnote, if we could scroll up. I have it in a footnote, I believe. Not this footnote, but a different footnote.

Q. I mean, if you don't recall, that's fine.

A. Yeah. But it's earlier in the day, is my memory.

Q. Right. And you're aware that the Salt Lake Tribune is a Utah periodical?

A. Yes.

Q. They're two hours behind, on Mountain Time?

A. That sounds right.

I do believe I have the Eastern Standard Time disclosure somewhere.

Q. Do you have any opinion what caused the trading halt at 1:25?

A. I'd just invoke my earlier answer.

Q. Okay.

The Salt Lake Tribune article on May 19th, have you read it?

A. Yes.

Q. And you are aware that that article indicates that Test Utah, which was using Co-Diagnostics' tests, was declining to participate in an accuracy study that was being conducted?

Page 74

MR. TAYLOR: Objection to form.

THE WITNESS: That's my memory.

BY MR. PINEIRO:

Q. That was new information; correct?

A. I don't recall that information about declining to participate earlier in time. So it's new in that sense.

It doesn't mean it's new, value-relevant information, but yes, I don't -- I'm not aware of an earlier statement to that effect.

Q. And an article discussing Co-Diagnostics' refusal to participate in an accuracy test implicates or is related to the May 1st press release; correct?

MR. TAYLOR: Object to form.

THE WITNESS: It sounds like a legal conclusion. I'm not sure what link you have in mind.

Obviously, one can refuse to participate in a testing program for all sorts of reasons.

BY MR. PINEIRO:

Q. Right. But you would agree the subject matter, which is the accuracy of CODX's tests, is the same; correct?

A. Well, I think you're moving the -- so as I remember this article -- I think they also cite to the BioCentury back in April as well -- is their decision not to participate in the testing regimen.

Again, I don't believe there's any reason given for

Page 75

that, but that is the statement.

Q. So I've introduced what's been marked as Exhibit 7. Let me share that on my screen.

(Exhibit 7, Article, was marked for identification.)

BY MR. PINEIRO:

Q. I'm showing you a copy -- do you see that on your screen, Professor?

A. I do.

Q. It's an article entitled "Test Utah declines to join other Utah test labs in accuracy check."

Do you see that?

A. I do.

Q. The May 1st press release pertains to the accuracy of the Co-Diagnostics tests; correct?

A. I would just cite to the May 1st statement itself, the 100 percent, the 100 percent. You know, it says what it says. You don't need my testimony for what May 1st says. But I agree that there's language about specificity and sensitivity.

Q. I mean, it's fair to say the press release pertains to the quality and the accuracy of the test; correct?

MR. TAYLOR: Objection; asked and answered.

THE WITNESS: Again, I would just read the May 1st press release, and it says what it says. It does say 100 percent and 100 percent, based on, you know -- and

Page 76

there's a reference or a link to these studies in these various countries.

BY MR. PINEIRO:

Q. Do you have any opinion on whether this article is a corrective disclosure?

MR. TAYLOR: Objection; calls for a legal conclusion.

THE WITNESS: I would say -- so my opinion about this article is that it does not cause a stock price reaction; and, therefore, it cannot be used for loss causation or damages.

And so it's not -- let me put it slightly different. It is not new, value-relevant information to the market.

BY MR. PINEIRO:

Q. Is it possible for there to be a corrective disclosure that doesn't cause a statistically significant return?

MR. TAYLOR: Objection; calls for legal conclusion, calls for speculation. Go ahead.

THE WITNESS: That seems like a legal conclusion to me. As a financial economist, you know, if we're talking about inflation and loss causation and damages, what you care about is whether corrective -- you know, information moves the market, whether or not it's new, value-relevant information.

Page 77

BY MR. PINEIRO:

Q. But in your report -- I mean, what you're basically indicating is that, from your perspective as an economist, you just look at whether news creates an abnormal return; correct?

MR. TAYLOR: Objection; misstates prior testimony.

THE WITNESS: That's part of what you look at. Of course you also want to look at, you know, what the plaintiffs allege to be corrective. And is it not just statistically, but also what did the market know both prior to the news article as well as earlier -- as well as later.

And I would emphasize, the market was well aware prior to this article that no test is perfect, including the Co-Diagnostics test. And so information to that effect would not be new information.

BY MR. PINEIRO:

Q. So you agree that this article indicating that Test Utah, CODX, declines to join other Utah labs in an accuracy check, this is new information; correct?

A. "New" in the sense that --

MR. TAYLOR: Asked and answered.

THE WITNESS: -- I'm not aware of a statement to that effect. It's not new in -- we have to be careful what we mean here.

So if there were a disclosure about no test is

20 (Pages 74 - 77)

Page 78

perfect or Co-Diagnostics' tests is not perfect, that would not be new information because the market was well aware of it at that point.

The fact that they declined to join in this particular testing program, I'm not aware of that information being disclosed earlier.

So I want to be very careful about what we're referring to as new information or not.

BY MR. PINEIRO:

Q. Bear with me.

Turning back to your report in this footnote, you indicate "Co-Diagnostics' trading volume of 17.8 million shares from the end of the second trading halt at 1:58 on May 14th to the close of that market on that day was almost three times more than the daily -- the average daily trading volume of 6.6 million shares on May 20th, excluding May 1st, May 14th and May 15th."

Do you see that?

A. Yes.

Q. You say, "According to the amount of trading volume from the end of the trading halt to the close of May 14th is inconsistent with a claim that the trading halt of May 14th impeded Co-Diagnostics' stock price from fully incorporating the information in the May 14th pre-disclosures within the trading day."

Page 79

Do you see that?

A. Yes.

Q. Is that conclusion based on any economic or other principles?

A. Yes.

Q. Which are?

A. Well, it's simply the observation that in an efficient market, information gets priced quickly. And there was plenty of time for that information to get priced, and plenty of time for investors if they wanted to trade on that information. So it's simply an observation that in efficient markets, any of these preclosure disclosures had ample time to be priced as you would expect in an efficient market.

Q. We talked earlier about the use of two-day or multi-day windows; correct?

A. Yes.

Q. When is it appropriate to use a multi-day window?

A. I would identify a couple of situations. One is -- and this is common in the academic literature, is if there is uncertainty about the timing, you might want to use a two-day window. So, for example, in academic studies where they're looking at hundreds or thousands of firms, you might not have the precise date of a piece of information. And so in your large sample, you might use a multi-day window because you don't know when the information necessarily reached the

Page 80

market.

So again, I guess one circumstance would be when you're uncertain as to when information reached the market. Maybe it was Monday, maybe it was Tuesday.

Q. Can I stop you there for a second, Professor?

A. So just to be clear --

MR. TAYLOR: Wait --

BY MR. PINEIRO:

Q. Sorry. Go ahead.

A. That would be one scenario you would use a multi-day.

Q. Okay. And I apologize for interrupting your answer.

A. No problem.

Q. So what's an example of when there's uncertainty about the timing of information reaching the market?

A. So I mean in these large sample studies where you're looking at hundreds of firms or thousands -- normally, you know, in academic literature, you're looking at -- the interest is not in a particular firm necessarily, but normally what happens on average for a sample of firms.

So a researcher might have hundreds or thousands of firms, and they may not be confident that they've identified for every firm whether their earnings came out Monday or Tuesday. So you often see multi-day windows in that context.

Q. What do you mean by "firm"? Sorry. You're

Page 81

referencing hundreds of firms. What are you referring to there?

A. I'm just referring to an example of a research study where the researcher might be interested in the impact for sample of firms for a particular disclosure.

Q. Okay. What are the other scenarios where, in your view, using a multi-day is appropriate?

A. Well, if you think the market is inefficient, I-N-E-F-F-I-C-I-E-N-T, then maybe one day is not long enough. So inefficient markets might lead to different event windows, and so that would be another example.

I would also say that if there really is new, value-relevant information on Monday and new, value-relevant information on Tuesday -- I'm just using those days as an example -- and you want to look at the cumulative effect of both pieces of new, value-relevant information, assuming there's is no confounding information that's going to mess things up, you can do a multi-day.

Q. So here, for instance, the allegation is that there were corrective disclosures on May 14th during the trading day, and then there was an FDA press release post-close; correct? So it was effectively -- strike that.

So the allegation here is that you have corrective disclosures during the market on the 14th and then after the close of the market on the 14th as well; right?

21 (Pages 78 - 81)

Page 82

A.  That's the allegation in the complaint, yes.

Q.  And would you agree that in order to asses the impact of an alleged corrective disclosure after the close of trading on May 14th, you would have to look at May 15th?

A.  Well, I guess the first question would be -- and let's talk specifically about the facts and circumstances here.  In my judgment and my view, there's no way that the FDA announcement after the close of May 14th is new information.  The statement that -- I'm paraphrasing here -- that no test is perfect is something that was well known to folks to the market.  So there's no way, in my opinion, that that FDA announcement is new, value-relevant information.

So whatever causes the stock price reaction on May 15th, it cannot be that.

I would also note that as far as I can recall, that nobody in the market ties that FDA announcement to Co-Diagnostics' tests in particular.

So I would start there in terms of thinking about a one- or two-day window.  Is there any reason -- is there a basis, an economic basis, to believe that what's being alleged as corrective is, in fact, new, value-relevant information.

Q.  I understand your opinion in this case.  But just discussing the matter of a multi-day window more abstractly, where you have the allegation of a post-trading day corrective disclosure, you have to look at price impact the following

Page 83

trading day; isn't that right?

MR. TAYLOR:  Objection; asked and answered.  Go ahead.

THE WITNESS:  I don't think that's quite right.  So if, hypothetically, you know or you conclude that what's alleged to be corrective is not new information to the market, the market already knew that -- and again, we're efficient markets -- there's no way that that information, if the market is efficient, could cause a price reaction.

If there is a price reaction the following day, it has to be a function of something else.  And that just follows for efficient markets.

As my professor at MIT used to say:  In order for something to be news, it has to be new in an efficient market.

BY MR. PINEIRO:

Q.  Right.

In this hypothetical that I'm providing, let's assume the post-trading corrective disclosure is actually a corrective disclosure, right, that it provides the market with new information, in that scenario, you agree you have to look at the next trading day to look at price impact; correct?

MR. TAYLOR:  Objection; calls for speculation, legal conclusion, form.  Go ahead.

THE WITNESS:  So if there's an after-hours

Page 84

disclosure that is new information that's value-relevant to the market -- again, predicates that, in my judgment, the economic evidence is inconsistent with here with respect to the FDA announcement -- but, in fact, new relevant information after hours, then, yes, you would look at the following trading day, of course keeping an eye on confounding information in terms of thinking about how to interpret the results of the event study for that following day.

BY MR. PINEIRO:

Q.  Have you ever examined whether trading halts cause a decrease in post-halt trading volume?

A.  Cause a decrease in trading volume?

Q.  Yeah.

A.  No, I have not.

Q.  And do you know whether that's the case or not?

A.  I don't know either way.  As I said before, I'm assuming efficient markets, and that when the markets are open -- obviously they weren't open for 15 minutes on this particular day -- that information gets quickly priced.  So that's my assumption in the context of my analysis here.

Q.  So turning to your second criticism regarding --

A.  Oh, I do have one thing to add to complete my answer.

Q.  Yes.

Page 85

A.  I apologize.

Q.  Okay.

A.  The only thing I would add is, even if an inefficient market, and you were to say that a piece of information on Monday would have a price effect on Tuesday, normally you would expect it to have some price impact on Monday, not zero.

So even if you had a theory inconsistent with efficient markets, so there's like this long time period, normally you would think of it being priced, you know, on Monday as well as on Tuesday.

So I think the price reaction, even under that theory, on the first trading day is still relevant.

MR. PINEIRO:  Rinele, can you read back that answer for me?  I'm sorry.

(Thereupon, a portion of the record was read by the reporter.)

BY MR. PINEIRO:

Q.  So what you're saying there, Professor, is that even in an inefficient market, you would expect to see on the first day a statistically significant price impact?

MR. TAYLOR:  Objection; misstates prior testimony.  Go ahead.

THE WITNESS:  What I was saying is, if you have a theory, again, inconsistent with efficient markets, but if

22 (Pages 82 - 85)

Page 86

you had a theory of it takes two days to price information -- okay, let's say that your theory -- I would say that the first-day price reaction is still relevant to that theory because, as I understand these kinds of lags, you know, it takes time to price things, is it prices somewhat on Monday in this theory, and then prices it -- you know, fully prices it on Tuesday, if we're talking about a two-day period.

So again, even in kind of in an inefficient market, it prices it over two days, I still think that the first day and what's happening on the first day is going to be relevant.

BY MR. PINEIRO:

Q. On May 14, 2020, after all the trading halts and all that, end of close -- or by close, Co-Diagnostics' stock was down for the day; correct?

A. I believe that's right. I would to look at the raw return, but that's consistent with my memory.

Q. Do you have any opinion as to why it was down?

A. There's no -- I'm going to say the same answer that I did for May 1st, which is: The residual, the abnormal return, the return that's not explained by the market industry, is explainable by normal random volatility.

And I think -- I think that my understanding is Mr. Bettencourt and I don't disagree on that in terms of the --

Page 87

you know, in terms of the statistical significance of the residual.

Q. So paragraph 31, you say, "Second, Mr. Bettencourt ignores that contrary to his claim that the alleged misstatement caused the market to believe that Co-Diagnostics' tests were perfectly accurate with an accuracy of 100 percent, market participants were aware that Co-Diagnostics' tests in general -- sorry -- that COVID-19 diagnostics tests in general, and Co-Diagnostics' COVID-19 diagnostics test in particular, were not 100 percent accurate prior to the May 14th preclose disclosures."

Do you see that?

A. I do.

Q. And you say he specifically notes but disregards the fact that Nebraska's governor stated on May 11th that the Test Nebraska's lab validation showed Co-Diagnostics' tests have a 95 percent accuracy rate, which is the same accuracy rate Mr. Bettencourt claims is corrective information was stated by Iowa's governor May 14th."

Do you see that?

A. I do.

Q. Okay. The specific information regarding the Test Nebraska lab validation, would you agree that it's -- that lab validation is not the same lab validation that occurred in Iowa; is that correct?

Page 88

A. I'm not providing that opinion. Obviously it seems reasonable to say that there's labs in Nebraska or there's -- Nebraska is doing a validation and there's a validation in Iowa, so...

Q. Did you watch --

A. That's my understanding.

I would add one thing to that. My understanding is that both with respect to Iowa and Nebraska, as well as Utah, is that they were, you know -- that Co-Diagnostics' tests were being used.

Q. Right.

Did you watch the May 11th commentary by the governor regarding Test Nebraska?

A. I did not watch that YouTube. I watched the May 14th YouTube, but not the May 11th.

Q. Okay. And you're aware that the May 11th press conference pertained to youth sports?

A. That's my understanding.

Q. Okay.

So then you say, "If the company stopped trading in an efficient market, as Mr. Bettencourt assumes, then its price should not have reacted to the repetition of information that was previously disclosed."

Do you see that?

A. Yes.

Page 89

Q. But Mr. Bettencourt says that CODX's stock reacted on May 14th and 15th in response to not just one, but several corrective disclosures; correct?

A. He does say that.

Q. And where you have multiple alleged corrective disclosures, in an event study, you looked at the cumulative impact of those corrective disclosures over the event window; correct?

A. So we're going to go back to our earlier conversation. So the facts and circumstances here, in my judgment, there's no way that the FDA announcement is new, value-relevant information. So there would be no basis to conclude that it could possibly, in an efficient market, have a price impact on May 15th.

Q. Are you aware of any -- so you've indicated the three scenarios, I think, where using a multi-day window is appropriate. Are you aware of any treatises --

A. I would add another scenario there. I'm sorry. I didn't mean to interrupt.

Q. Go ahead.

A. You know, Cornell Morgan has this article on leakage. So my understanding is this is not a leakage case. But if there's a claim of leakage, that's a scenario where you can see multi-day windows. So somehow the market, not through a public disclosure like we're talking about here, somehow

23 (Pages 86 - 89)

Page 90

learns of the information. That's a very, very unusual case, but, you know, I would also mention leakage.

Q. What does "leakage" mean?

A. Well, when I use the word "leakage," you know, I'm referring to this notion that the market, not through a public disclosure, which is what we're talking about in this case, somehow learns through the grapevine the alleged misinformation.

Those cases -- you know, those cases are very unusual in my experience because it's very hard to establish economically that that's, in fact, occurring.

But, you know, the Cornell Morgan article does talk about leakage, and so I would just mention it for completeness' sake.

Q. Then you say paragraph 32, "Rather than causing an immediate decline in Co-Diagnostics' stock price, as one would expect in an efficient market if information was startling, as plaintiff claims, news articles noted that the price increased in the morning and early afternoon of May 14th following the May 14th preclose disclosures."

Do you see that?

A. I do.

Q. And so you say in Subsection A, "An RTT news article published on May 14th at 9:58 Eastern states, shares of CODX, a molecular diagnostic company, are climbing more than

Page 91

15 percent in Thursday's morning trade."

Do you see that?

A. I do.

Q. And 9:58 a.m. Eastern would be 7:58 Mountain Time; is that fair, two hours behind?

A. I believe that's right.

Q. In an efficient market, do you know how quickly the market price information from the moment of dissemination to -- from the moment of dissemination to, I guess, an impact on the actual price?

A. Yes. So the standard window, you know, for this -- you know, in sort of the type of economic analysis that we're talking about here, the default, so to speak, is a day. A day is more than enough, close to close, to price information.

But there's a lot of academic literature that it could be much quicker than that. So I believe the Patell article that Mr. Bettencourt cites -- and this is from the mid-'80s. So it's much quicker than that.

And there's articles from the late '90s and early 2000s that the pricing effect can be much, much quicker than that. So a day would be a very long period, but a day is sort of the default standard for the type of economic analysis that we're talking about here, close to close.

Q. And by "a day," does that mean a full trading day or just it occurs within the trading day?

Page 92

A. What I meant to say, excuse me, is a close-to-close window is sort of a standard window to use, at least as a default, if the assumption is efficient markets.

But like I said, there's literature that the pricing is quicker than that.

Q. What if, for instance, there's information at 3:00 p.m. Eastern, an hour before the close of trading?

A. So I'm not going to have a magical moment, so if it closes at 4:00, what about 3:59. I don't have a magical moment.

What I would say, you know, as those moments get more and more sparse, then we need to talk about the academic literature. Because, again, there's a number of studies that show for NASDAQ and New York Stock Exchange, the pricing is very, very quick.

Q. I'm sorry. I missed that, Professor. What did you say?

A. It's very, very quick. And so if that's correct, then the close-to-close standard event window would be -- would capture those pricing effects.

Q. It appears there could be a scenario, depending on the timing within the trading day of the corrective disclosure, where you may have to extend the event window to the next trading day; is that fair?

MR. TAYLOR: Objection to form.

Page 93

THE WITNESS: I would want to know about the hypothetical that you're thinking of.

BY MR. PINEIRO:

Q. Well, okay. 3:00 p.m. disclosure of information. Is that one hour of trading sufficient or would you probably look at the second day as well?

MR. TAYLOR: Objection; calls for speculation.

THE WITNESS: So I would need to think a little bit more about the facts and circumstances because, obviously, the disclosures on May 14th are not an hour before.

There is Hindenburg. We can talk about Hindenburg. But I would say, my general response to that hypothetical would be that the academic literature indicates for efficient markets, that the pricing is very quick: 15 minutes, actually there's a paper that looks at 30 seconds, a minute.

So my general sense of the academic literature is like the close-to-close, even an hour would be a sufficient amount of time given the academic literature on the question.

MR. PINEIRO: Rinele, can you read back the last portion of his answer?

(Thereupon, a portion of the record was read by the reporter.)

24 (Pages 90 - 93)

Page 94

BY MR. PINEIRO:

Q.   But hypothetically speaking -- and I understand this is an imperfect scenario, as I'm just presenting to you a sort of generic hypothetical.

Is it feasible, from the economic perspective, that depending on the timing of the disclosure, you may have to use a second day?

MR. TAYLOR:  Objection to form.

THE WITNESS:  That's an incomplete hypothetical.  I would just invoke my earlier answer, that the literature on efficient markets is that the pricing is very, very quick.

The Patell article from '84, I think, is about 15 minutes.  There's articles that talk about 30 seconds and a minute.

So again, different studies look at different pricing intervals.  But my general sense of the literature on efficient markets, it is, in fact, very quick.

BY MR. PINEIRO:

Q.   And you note a Benzinga article published on May 14, 2020 at 12:55 states, "Co-Diagnostics' rose 13.3 percent."

Do you see that?

A.   I do.

Q.   And this would have been at 10:55 a.m. Mountain Time?

Page 95

A.   I believe that's right.

Q.   If the May 14th Salt Lake article came out at 9:00 a.m. Mountain Time, then your assertion that this article demonstrates a rise in the price after that news is incorrect; right?

A.   I agree that if the disclosure occurred after the price increase, then obviously the price increase cannot be a function of that disclosure.  I agree with that as a matter of simple logic.

I would also note that all three of these are more color because they're referring to raw returns.  So ultimately, I would rely upon the statistical analysis of price movement.

Q.   Are you aware that on the intraday trading on May 14th, that between 1:24 p.m. and 1:58 p.m., CODX's stock price fell 37 percent?

A.   I don't remember that specific number, but I do remember -- you know, there's an overall return on the day or raw return, and you can line it up against these returns for the first part of the day and kind of do a back-of-the-envelope for the second half of the day.

So that might well be correct, but I haven't -- I don't know the specific numbers.

Q.   Do you recall that there was a very significant decrease in the price around the time of the trading halts?

Page 96

MR. TAYLOR:  Objection; form.

THE WITNESS:  I don't remember whether it was before the trading halts or after the trading halts.  But again, just doing the simple math and the raw return for the day and these returns, I do believe it's accurate that, in the afternoon, there was a raw price decline.

BY MR. PINEIRO:

Q.   And what is the explanation for this type of volatility on May 14th?  Do you have one?

A.   I do.

MR. TAYLOR:  Objection.

THE WITNESS:  Sorry.

I mean, the whole point of the event study is to quantify the normal volatility in a stock, including, you know, Co-Diagnostics.  So I think that's a reason why we need an event study, is to do precisely that work.

BY MR. PINEIRO:

Q.   Right.  But you're not -- as we talked about earlier, you can't exclude that the Salt Lake Tribune article, for example, caused the decrease in the stock price on May 14th; right?

A.   There's no reliable economic -- we're going to go back to our earlier conversation.  There's no reliable economic evidence that the alleged corrective disclosures on May 14th caused the stock price reaction.

Page 97

Q.   Okay.  Section B here, it says, "Mr. Bettencourt's claim of additional purportedly corrective information on May 14, 2020."

And you say, "Contrary to the disclosures identified by the plaintiff that it claims corrected the alleged misstatement, Mr. Bettencourt unilaterally asserts that a series of tweets made on May 14th at 1:38 p.m. by a short seller, Hindenburg Research also provided corrective information.  Hindenburg first tweeted, 'We are short CODX due to CFO's checkered history, involvement with companies halted by the SEC, its astronomical valuation, a growing list of higher quality COVID tests and its propensity to issue frequently fluffy press releases.'"

Do you see that?

A.   I do.

Q.   Would you agree that Hindenburg's tweet regarding a growing list of higher-quality COVID tests relates to the subject matter of the May 1st press release?

A.   So let me go back to what I'm assuming here.  When I said I'm assuming liability, what that means is, I'm assuming for purposes of the analysis that it was a false/misleading statement.

So that's really my assumption about May 1st, is that assumption about the falsity and misleading nature of it, given the fact that we're talking about damages inflation and

25 (Pages 94 - 97)

Page 98

loss causation in the economic analysis.

I view the Hindenburg as really two parts to it. It's citing already-known information, the checkered history that came out April 30th, the BioCentury came out early April, the SEC stuff came out in April as well. So part one of Hindenburg is citing already-known information to the market.

The second part of Hindenburg is it's opinion. It's opinion based on those publicly known facts. So I have a very hard time understanding how an opinion is something that the company could and should have disclosed earlier.

So I have a very hard time understanding how an opinion based on publicly available facts constitutes corrective information in the sense of information that could and should have been disclosed earlier given the theory of liability.

Q. So also, the tweet references "Propensity to issue frequent fluffy press releases."

Do you see is that?

A. I do.

Q. That could pertain to the May 1st press release; right?

A. It's plural. So their opinion is that there's fluffy press releases. Obviously the press releases that they're referring to, I assume, would be publicly available press releases to the market. And Hindenburg has an opinion

Page 99

about its fluffiness.

So again, I have a hard time seeing how Hindenburg's opinion based on publicly available facts is corrective information, or information that measures the inflation impact, if any, of the allegedly false and misleading statement on May 1st.

Q. And this tweet -- or these tweets came on the heels, a few hours after the May 14th Salt Lake Tribune article; correct?

A. I believe that's accurate.

THE WITNESS: How long have we been going for? We may not have been going for very long, but --

MR. PINEIRO: We've been going about an hour, if you want to take a break.

THE WITNESS: Is it okay if we take an hour break? Not an hour break -- I'm sorry. A break at this hour, on the hour.

MR. PINEIRO: Yes. No problem at all. I'm making good headway. I'm just trying to think also of the timing.

Maybe Zach, and I don't know if Rinele wants to eat, and all that. Do you guys want to go maybe another hour and then we can take a 20-minute break or 30-minute break?

MR. TAYLOR: That's fine.

(Thereupon, a brief recess was taken.)

Page 100

BY MR. PINEIRO:

Q. Professor, during any of these breaks that we've had, have you had phone calls with your counsel?

A. Yes. The first break, Mr. Taylor called me.

Q. Without revealing the content of your conversation, did you discuss the deposition?

A. Yes.

Q. I've introduced what I marked as Exhibit 8.

Give me a second to put this on my screen.

(Exhibit 8, 2020 Earnings Report, was marked for identification.)

THE WITNESS: Can you make it bigger?

BY MR. PINEIRO:

Q. No problem.

Did you review CODX's Q1 2020 earnings results or report?

A. Yes, I did. I remember the prepared remarks, and then there's, I think, the earnings. I believe so, yes. That's my recollection.

Maybe I'm confusing this with the prepared remarks from the conference call that was cancelled. But I do remember looking at their earnings.

Q. Did you see, in preparing your opinion, did you review the press release that Co-Diagnostics put out regarding its Q1 2020 results?

Page 101

A. I'd have to refer to my docs considered list because I'm afraid I'm confusing now the prepared remarks that was in lieu of the conference call with this document. I would -- so I'm hesitating. I would have to double-check.

Q. Just scrolling through this, do you recall reviewing this?

A. I would have to double-check.

I do remember, you know, reading about the earnings. And, again, whether it's this document or the prepared remarks, I just -- I don't remember. Or both. I just have -- I'd have to refresh my recollection.

Q. You see in this press release they have Q2 2020 mid-quarter highlights.

A. I do.

Q. And then they say "COVID-19 test kit shows 100 percent specificity and sensitivity in several independent evaluations."

Do you see that?

A. Remember seeing that statement. I do remember seeing that statement.

Q. So it appears as of the close of trading on May 14th, they're still touting the 100 percent specificity and sensitivity; correct?

A. You used the word "touting." There is that statement that you just read that's contained in this

26 (Pages 98 - 101)

Page 102

document.

Q. This comes out at 4:01 p.m. on May 14th.

Do you see that, on your screen?

A. I do.

Q. In this case, we've talked about an FDA disclosure; correct?

A. Yes.

Q. Do you know when that disclosure was made?

A. You're testing my memory, but my memory is between 7:00 and 8:00 p.m. Eastern Standard Time, is my memory. So 7:30-ish.

Q. So after the document that -- after the press release that I just showed you; correct?

A. Yes.

And by the way, I'm going off my memory. Obviously, it is what it is.

Q. So on 39, you say, "First, prior to the FDA disclosure, market participants understood that COVID-19 diagnostics tests, in general, and Co-Diagnostics' COVID-19 diagnostics tests, in particular, were not 100 percent accurate."

Do you see that?

A. Yes.

Q. "If the company stock traded in an efficient manner, as Mr. Bettencourt assumes, then the stock could not have

Page 103

reacted to the repetition of information that was previously disclosed."

Do you see that?

A. Yes.

Q. What if, hypothetically, investors interpreted the May 1st press release as indicating that CODX's tests were 100 percent accurate? Does this statement still stand in that scenario?

MR. TAYLOR: Objection; calls for speculation, vague.

THE WITNESS: The market -- yeah, I mean, so I'm not here to opine on falsity and misleading. But it depends -- yeah, what that statement means.

So if the statement hypothetically is true but misleading, hypothetically, because it was based on these studies that did indicate that, as a point estimate at least -- actually, let me -- could you repeat the question? I think I lost the thread.

MR. PINEIRO: Rinele, can you repeat my question, please?

(Thereupon, a portion of the record was read by the reporter.)

MR. TAYLOR: And I repeat my objection.

THE WITNESS: So it depends what we mean by the market believing that it's 100 percent accurate.

Page 104

In your hypothetical -- I'm not saying this is the actual facts and circumstances here -- but if in your hypothetical what you mean by "the market believes is 100 percent accurate" is that the test is perfect, you know, along these various dimensions, sensitivity, specificity, even with the error rate, it's perfect, if that's what you mean -- well, first of all, I'd say that's not consistent with the economic evidence that the market interpreted it that way.

But the second point would be that between May 1st and May 14th, there were numerous statements about the test not being perfect. And so part of the informational mix is all those disclosures that happened between May 1st and May 14th, including the statements during the day of May 14th and itself, about 95 percent and so forth.

BY MR. PINEIRO:

Q. Right. But as of May 14th, investors continue to misinterpret this May 1st press release as indicating that it's 100 percent -- the test is 100 percent accurate, then would the FDA disclosure be corrective?

MR. TAYLOR: Objection to form; calls for speculation.

THE WITNESS: So again, I would repeat: What do we mean by "The market saying it's 100 percent accurate"?

If what you're saying, in your hypothetical, is the

Page 105

market believes it's perfect, there's no error rate, it's perfection, and that's what the market -- I don't think that's at all consistent with the economic evidence -- but hypothetically, if that's what the market took from May 1st, hypothetically, I would still say the market had information on May 11th, on the day May 14th, all these different -- you know, the pre-existing BioCentury report.

So between May 1st and the FDA announcement on May 14th, the market had all that information. And that would be information available to it and information that was being told after the May 1st disclosure.

So you would still have to ask the question: Is the FDA announcement new information relative to all those disclosures that we've been talking about?

BY MR. PINEIRO:

Q. So I showed you that on the 14th, the company was re-referencing the May 1st press release results; correct?

A. Yes, after hours.

Q. After hours.

A. So Mr. Bettencourt kind of -- you know, said there was denials by the company during the trading day. But that's not the case. So this is an after-hours statement that we were discussing earlier.

Q. So assuming that somebody has been misled by that statement on the 14th at 4:01 p.m. --

27 (Pages 102 - 105)

Page 106

A. Yes.

Q. -- based on that statement at that time, somebody is misled, would the FDA disclosure later on in the evening qualify as a corrective disclosure?

MR. TAYLOR: Objection; calls for speculation, calls for legal conclusion. Go ahead.

THE WITNESS: So the class period now is after hours, the market, in your hypothetical, is misinformed at 4:01 and it's corrected at 7:30 p.m. But there's no stock trading. I don't know. It's a very unusual hypothetical.

I guess what I would come back to is: The economic evidence on May 1st, when that statement was also made, the economic evidence is that the market did not view it as indicating the test is perfect.

Because the stock price didn't change because the stock price didn't change when it was told the information on May 11th and so forth.

BY MR. PINEIRO:

Q. On paragraph 40, you say "Second, despite the fact that his opinions are, in part, based on his analysis of news articles and commentary by market participants, Mr. Bettencourt does not cite any news article, analyst report or other market commentary that relates the FDA disclosure to the accuracy of Co-Diagnostics' COVID-19 test or attributes it as the cause of the stock price decline on May 15, 2020 to

Page 107

support his conjecture."

Do you see that?

A. I do.

Q. Is it necessary to cite to the press reports to demonstrate that the FDA disclosure had an impact on the market?

A. I wouldn't say it's necessary. You know, it could be probative, but it's not necessary.

I think at the end of the day, what really matters is that this is not new information to the market, the idea that tests not perfect. The fact that no news commentary makes such an attribution, it's just consistent with that basic point.

Q. So you would agree it's not conclusive evidence, one way or another, that there's no article linking the FDA disclosure to the May 15th price drop?

A. Well, yes. So let me just explain why I say that. If there's somebody that said the cause -- you know, it's relevant, but I wouldn't say it's necessary. So, you know, the things can speak to whether it's probative or not, but not necessarily necessary.

As I said, what's important here is there's no basis to say that the FDA announcement that no test is perfect reveals anything new about the Co-Diagnostics test.

Q. Paragraph 41, you say "Bettencourt acknowledges that

Page 108

Co-Diagnostics reported its Q1 2020 financial results after market hours on May 14th, but ignores the negative impact of this announcement on Co-Diagnostics' stock price. In particular, shortly after the market closed, Co-Diagnostics announced its Q1 2020 financial results. The company reported lower earnings by higher revenues relative to analysts' forecasts."

A. And this does refresh my recollection. I'm sorry to interrupt. In Footnote 73, I believe I'm citing to the document that we were just discussing. So that does refresh my recollection.

Sorry.

Q. That's fine.

A. I do see that language.

Q. Okay.

And then if you go further down on 42, you say "News articles attributed to company's stock price declined after market hours on May 14th and on May 15th to the announcement of Q1 2020 financial results."

And then you list three different articles.

Do you see that?

A. I do.

Q. If these articles link the earnings to the price drop on May 15th, is that conclusive?

A. No. What I want to say here is, we know -- one

Page 109

knows that whatever the stock price change is on the 15th cannot be caused by the FDA announcement if the market is efficient because the information that no test is perfect is not new information.

So, you know, we know that whatever the causes of the 15th price reaction, it can't be the FDA announcement. And this is just adding a little bit of color on other things that were going on, such as the earnings announcement.

Q. Did you examine analysts' reactions to the earnings announced on the 14th?

A. I did look at analysts' reports. I think I cite like a Wainwright that's post-May 15th. I think that's on my docs considered list.

So I think it's fair to say that folks viewed it as mixed, kind of a mixed earnings announcement.

And nothing in my opinion depends on or is predicated on establishing that the entirety of the price movement on the 15th is due to the earnings miss.

What is necessary from my opinion is we know that the FDA announcement cannot be a cause for reasons that I articulated earlier.

Q. Do you have an opinion about what caused the statistically significant price increase on May 15th?

A. I'm not saying -- I'm not providing the opinion that the price reaction on the 15th is ascribable entirely to the

28 (Pages 106 - 109)

Page 110

earnings miss that I cite to.

All I'm saying is, there's other information in the market besides the FDA announcement, the earnings announcement, that would be relevant to assessing the negative price reaction, including the earnings miss.

Q. But do you have -- specifically, do you opine that the earnings is what caused the May 15th price reaction?

MR. TAYLOR: Objection; asked and answered.

THE WITNESS: I'm not providing that opinion. I'm saying that's part of the new information out there, the earnings information, including the earnings miss that the market would be pricing on the 15th. But I don't go further than that. It's not necessary for my opinion.

What I am interested in is whether the FDA announcement could have caused the May 15th price decline.

BY MR. PINEIRO:

Q. Besides earnings, was there any other new information regarding Co-Diagnostics post-close on May 14th or during the May 15th trading day?

A. I am not aware of that, sitting here. I'm not aware of that, sitting here.

Q. Is it possible that it took the market from one day to the next to fully price in the alleged corrective disclosures that occurred in the morning and afternoon on May 14th?

Page 111

MR. TAYLOR: Objection to form; calls for speculation.

THE WITNESS: So again, I view the close-to-close as the appropriate event window. And I would also add, I don't understand how the Hindenburg tweets could be corrective, given what I said earlier, that it's an opinion based on publicly available facts.

But I do view the close-to-close window as the appropriate event window in a market that's assumed to be efficient.

BY MR. PINEIRO:

Q. Right. But is it possible that the market didn't fully price in the alleged corrective disclosures that occurred during the trading day on the 14th until the next day?

MR. TAYLOR: Objection; asked and answered, form, calls for speculation.

THE WITNESS: So if you're saying that Salt Lake Tribune article on the morning of the 14th, it took two days to price that, I would view that as inconsistent with the assumption of efficiency.

BY MR. PINEIRO:

Q. But is it possible?

MR. TAYLOR: Objection; asked and answered --

THE WITNESS: Is it possible --

Page 112

MR. TAYLOR: -- form, calls for speculation.

THE WITNESS: -- the market is inefficient? Well, I'm making the assumption -- it's an assumption that it's efficient.

BY MR. PINEIRO:

Q. In an efficient market, is it possible that an article posted in the Salt Lake Tribune around noon Eastern Time wasn't fully priced then until the next day?

A. I believe in the footnote, I believe I say it came out at 9:00 or so Eastern Standard Time. But I take it that you take a different view as to the timing.

I would view that as inconsistent with efficiency, that a news article in the middle of the trading day, you know, elicits no price reaction on the 14th, but then elicits a price reaction on the 15th. I view that inconsistent with market efficiency.

Q. So setting aside inconsistency, my question is about the possibility.

Is it possible?

MR. TAYLOR: Objection; asked and answered, form, calls for speculation.

THE WITNESS: A delayed price reaction is possible if the market is inefficient, if the market is not efficient. That's almost the definition of a market not being efficient.

Page 113

BY MR. PINEIRO:

Q. Does the source of the public information matter? Like, for instance, if something is disseminated in the Wall Street Journal versus a small local newspaper, does it make a difference?

A. I think the only thing that matters is if it's in the public domain. You know, you don't have to live in Salt Lake City to have access to have to the Salt Lake City Tribune. There's data aggravators, there's Google alerts. There's all sorts of ways that information gets disseminated and gets compiled.

So in my view, for an efficient market, what matters is whether it's public or not.

Q. But there are instances, as you've indicated, where even in an efficient market, it takes multiple days for a corrective disclosure to be priced in; correct?

MR. TAYLOR: Objection; misstates prior testimony.

THE WITNESS: I didn't say that.

BY MR. PINEIRO:

Q. Just going back to the list of times where it's appropriate to use a multi-day window, one of them was leakage; correct?

A. Yes. You know, a very unusual type of case, but you do see multi-day event windows in that case. In a sense, the leakage theory is: Every day is a corrective disclosure, in a

29 (Pages 110 - 113)

Page 114

sense.

Q. Right.

The other one was in a scenario where you have an inefficient market; correct?

A. Yes.

Q. The other one was where you describe the hundreds of firms and uncertainty regarding the timing of the disclosure?

MR. TAYLOR: Objection; misstates prior testimony. Go ahead.

THE WITNESS: But my testimony doesn't depend on having hundreds of firms. It's uncertainty as to the timing of the disclosure.

BY MR. PINEIRO:

Q. Got it.

A. That scenario happens to occur, you know, is likely to arise when you're doing a large sample.

Q. And there was one more, I think you said. Do you recall what that is?

A. I do. So if there's a corrective disclosure, new, value-relevant information that's corrective -- I'm just going to pick days to make it concrete -- on Monday, and there's new, value-relevant information that's corrective on Tuesday, putting aside confounded information, which obviously can complicate matters, then you could look at the cumulative price impact of both pieces.

Page 115

Q. So for instance, if -- again, this is a hypothetical -- if the May 14th alleged corrective disclosures were, you know, new information and the FDA disclosure after hours was new information, in that hypothetical --

A. New, value-relevant information. Sorry. I'm not telling you what your hypo is.

Q. No, I know.

A. Can you restart?

Q. In that hypothetical, where all of that is new, value-relevant information, it would be appropriate to use a two-day window?

MR. TAYLOR: Objection; calls for speculation, form.

THE WITNESS: Hypothetically, yes, except for the confounding information, right. So you wouldn't want to take -- whether it's a one-day or two-day, if there's confounding information, then you wouldn't want to simply take that residual and say that's the price effect.

So for purposes of my hypo earlier, I was bracketing the issue of confounding information. Confounding information, meaning new, value-relevant information that's not corrective.

BY MR. PINEIRO:

Q. And your opinion is that the earnings is confounding information?

MR. TAYLOR: Objection; misstates prior testimony.

Page 116

THE WITNESS: I do think there's some reason to believe that it could be confounding, that there's an earnings miss, but I didn't go further than that.

BY MR. PINEIRO:

Q. So you don't opine that the earnings results on May 14th are confounding information; correct?

A. I think there's evidence that there is an earnings miss, but I'm not saying that's the reason for the entire decline on the 15th. I'm just identifying other potential factors --

Q. But --

A. -- in addition to, you know, what's alleged to be corrective here.

Q. But more specifically, using the term "confounding information," you are not opining that that earnings was confounding information; right?

A. I think there's economic evidence that it's potentially confounding. It is true that folks viewed it as a mixed picture from the earnings. It is true that some people talked about an earnings miss.

So this is information that the market needs to figure out whether it changes its view as to the value of the company.

Q. There were some articles indicating that earnings were positive, too; right?

Page 117

A. I believe that's accurate. I think some people viewed it as mixed, some people talked about earnings miss. So, you know, any time you have an earnings announcement, you want to kind of think about "What does this mean" according to the market for the value of the shares.

Q. In your experience, have you ever seen a statistically significant price drop as a result of mixed earnings?

A. Sure.

Q. Do you recall those instances where that occurred?

A. No. So let me make sure I didn't miss what the question was.

So can missed earnings -- earnings that are lower than the market expectations, can that cause a stock price reaction? Sure.

Q. Have you ever opined that -- well, it's been described as "mixed" earnings -- have caused a statistically significant price decline?

A. Oh, mixed? I thought you were saying earnings missed.

Q. Mixed.

A. I want to be clear on the record, when I was answering your prior questions, I thought you were saying "earnings missed." You were saying "mixed earnings"?

Q. Yes, M-I-X.

30 (Pages 114 - 117)

Page 118

A. My earlier answers were predicated on my misunderstanding that you were saying earnings missed.

Q. Okay. I don't remember the questions I asked you on that.

But going back to this question, have you ever seen a mixed -- have you ever seen a statistically significant price drop attributed to mixed, M-I-X, earnings?

A. I don't have a recollection either way. What I can say is, it's certainly the case that missed, missing, estimates of earnings can cause a statistically significant stock drop.

Q. Okay. And if you go to Footnote 74, we're looking at it here, you cite the Investor's Business Daily, and it says "Stock market shows bullish rebound after sharp sell-off." Investor's Business Daily.

Do you see that?

A. I do.

Q. And it says "Co-Diagnostics reported mixed quarterly results."

Do you see that?

A. I do.

Q. Are you aware the CEO of the company testified that the earnings reports were awesome, quote-unquote?

A. I didn't read the deposition, but I do remember Mr. Bettencourt talking about it.

Page 119

Q. Bear with me for a second that I cross out stuff here that I've gone through already.

A. Sure.

Q. The four criteria that you laid out, is that like a hard-and-fast rule? Is it set out in economic literature that these are the only four instances where you can use a multi-day window?

A. No.

MR. TAYLOR: Objection; vague, misstates prior testimony.

THE WITNESS: Yeah, I think you're misstating my testimony.

So the use of multi-day for when you're not sure, besides being just a matter of logic, is done all the time in economic studies. So I'd just refer to those studies.

The leakage theory multi-day, that's based on my experience, but Cornell Morgan talks about it as well. So you can look at that article.

Inefficient markets, there's a huge literature, I would say, to Gene Fama, and his papers on inefficient markets, markets that are not efficient, meaning the pricing effects could take longer. Dick Taylor at Chicago has papers on that, earnings taking longer to be priced in an inefficient way.

So that's -- so the uncertainty about timing, the

Page 120

leakage model and the inefficient market. So all three, you could look at academic papers that do exactly what I discussed.

BY MR. PINEIRO:

Q. So we have these four factors, or these four scenarios that you described. Is there any academic literature supporting the use of a multi-day window in scenarios other than those four?

MR. TAYLOR: Objection; asked and answered, misstates prior testimony. Go ahead.

THE WITNESS: So my testimony is, both my view as a financial economist and the situations in the finance literature about where multi -- where you see multi-day windows, it's those scenarios.

BY MR. PINEIRO:

Q. Right. And so you're not familiar with any academic literature supporting the use of a multi-day window in scenarios besides the four that you've listed?

A. I mean, look, we could talk about his citation to Patell, which is not what the study is doing, the '84 paper.

But if I'm forgetting a scenario, I'd be happy to hear it. But those are the scenarios that occur to me, where you do see in the academic literature multi-day windows. So those are the scenarios that occur to me based on the academic literature. I've also seen these scenarios come up, you know,

Page 121

in my expert work as well.

Q. And the scenario where you have -- so you indicated that where there is new, value-relevant information on, let's say, two consecutive days, in that scenario -- so let's do this hypothetical. You have new, value-relevant information on Monday and Tuesday. There is, in that two-day window, also confounding, potentially confounding information.

Is there a way to determine price impact of the allegedly corrective statements while also accounting for the impact of the confounding information?

MR. TAYLOR: Objection; form, calls for speculation, misstates prior testimony. Go ahead.

THE WITNESS: That's a big hypothetical. So the confounding information is nothing that's unique to a two- or one-day window.

If you have confounding information during your event window, whether that event window is a day or two days, and it's value-relevant, it's new, value-relevant information to the market, then, you know, you're going to have to -- you will have to do something or you'll have to think about how you're interpreting the results of your event study.

Because, again, if your event study window incorporates both new, value-relevant corrective information and new, value-relevant non-corrective

31 (Pages 118 - 121)

Page 122

information, confounding information, whether that event window is a day or two days, you know, regardless of the event window, if both things occur in your event window, the event study by itself is not going to tell you what's causing the residual.

BY MR. PINEIRO:

Q. What's the way that an economist, in that scenario, one-day event window, from an economic -- from your perspective as an economist, how do you go about attempting to segregate the impacts of the corrective disclosures versus the confounding information? Is there a way?

A. That's a big question, and it really depends on the facts and circumstances.

So I wrote an article called forward casting 10(b)(5) damages, where we have a method in particular facts and circumstances to try to do that aggregation. There, we use what's called earnings response coefficients. So that's an academic literature that goes back to the '60s. We talk about that and using that approach in certain facts and circumstances.

So it really depends on the facts and circumstances about how you're going to think about this disaggregation question.

But it's a big question, and I don't think there's a formulaic answer in all circumstances.

Page 123

Q. And here, you didn't deem it necessary to do that because your opinion is that the May 14th disclosures are not new, value-adding information?

MR. TAYLOR: Objection; form.

THE WITNESS: Not quite. So with respect to May 15th, I would make that statement with respect to the FDA announcement. There's no basis, there's no reliable economic basis -- in fact, the economic evidence indicates that the FDA announcement is not new, value-relevant information to the market; and, therefore, if the market is efficient, could not have caused a price reaction on May 15th. Whatever that price reaction is caused by, it can't be the FDA disclosure that no test is perfect.

BY MR. PINEIRO:

Q. Got it.

But just more generally, here, you didn't -- here, it doesn't appear that you believed it was necessary for you to examine the impact of the earnings on the May 15th abnormal return?

MR. TAYLOR: Objection; asked and answered. Go ahead.

THE WITNESS: Again, for the reasons I just gave, which is: Whatever is causing the price reaction on May 15th, it can't be the FDA announcement because it's not new, value-relevant information.

Page 124

BY MR. PINEIRO:

Q. Are you aware that Mr. Bettencourt opined that it's appropriate to use a multi-day window where there are corrective disclosures based -- there's corrective disclosures based on less regular releases of information?

A. I remember that language to that effect.

Q. And what's your position about that?

A. I think he is -- I think that, you know, that he's using this statement in the '84 article, and I would just go back to our discussion of efficient markets. The academic literature, including Patell's analysis in the '84 paper, is that efficient markets quickly price information.

This is a very old article, but there's more recent articles that speak to even shorter increments of time where information gets priced.

So if he's saying that information in the morning or the midday of the 14th doesn't get priced to the 15th, in my view, that's inconsistent with efficient markets.

Q. Did you review here in Subsection B, the article by Tabak and Dunbar?

A. Yes.

Q. And do you agree that it provides that experts -- many experts use one-, two- and five-day periods following an announcement?

A. This article is from -- I knew Dunbar and I know

Page 125

Tabak. This is an article from 2001, so a little dated.

But I would also say that I don't disagree that you could use a multi-day. And we discussed scenarios where multi-day could be appropriate. So at that level of generality, I don't disagree.

I guess I'm getting old. I know all these people.

Q. So you co-authored a paper in '07 with Saha; is that correct?

A. Correct.

Q. And in there you say, "If the stock price reaction in the days, weeks and months following a corrective disclosure are due to the market inferring additional information about the misrepresentations, implications for a firm's valuation, then these stock price movements occurring after the corrective disclosure date identified by the plaintiff should analytically be deemed to be additional corrective disclosures."

Do you see that?

A. I do.

Q. So what did you mean by market inferring additional information about misrepresentations?

A. I guess I would say two things here. One is, it's really the simple point that we discussed earlier, that there can be partial corrective disclosure. So there's a partial corrective disclosure. And then the market later learns

32 (Pages 122 - 125)

Page 126

additional information, another partial corrective disclosure. You want to look at the price effects of both. So this is just an example of the fact that there could be multiple points in time in which the market learns information that's corrective.

Q. So hypothetically, if the May 14th Salt Lake Tribune article was a partial corrective disclosure and the FDA disclosure after hours is considered a partial corrective disclosure, it would be appropriate to use a two-day window?

A. No. Again, it has to be new, value-relevant information. Again, if we're assuming efficient markets. If it's not new, value-relevant information, there's no need to do a two-day window or a statistical analysis by the assumption of efficiency. If it isn't new, value-relevant information, it could not have caused a stock price reaction.

Q. Is it possible, Professor, that the market, you know, observed the Salt Lake Tribune article, you know, towards the noontime Eastern on the 14th, it observed the Iowa press conference, and then later in the evening, it read the FDA disclosure, and cumulatively had came to a determination that the May 1st press release was inaccurate, and then on the 15th, that's why you have a statistically significant price drop?

MR. TAYLOR: Objection; form.

THE WITNESS: That's an inefficient market story.

Page 127

So the market quickly prices information. Here is the Salt Lake Tribune story, early morning, mid-afternoon, we can get the exact timing of that. It gets priced immediately. It doesn't wait. It gets priced. Same with the Hindenburg. Same with all this stuff during the day.

If it gets additional new, value-relevant information, then that gets priced quickly the following day.

So there's no like, we'll wait and price it later. It gets priced immediately.

BY MR. PINEIRO:

Q. Well, what you were saying earlier is that there are scenarios where you have partial corrective disclosures on different days, it's okay to use a multi-day event window; correct?

MR. TAYLOR: Objection; misstates prior testimony.

THE WITNESS: So you keep in your hypo -- and I'm going to be very clear about this -- saying partial corrective information.

The way I want to put it as an economist is, new, value-relevant information that's corrective on both days. Bracketing the issue of confounding information, then you could use a two-day window or the cumulative effect in that scenario.

In other words, just alleging that something is

Page 128

corrected doesn't mean, okay, we get to do a two-day window. It needs to be new, value-relevant information.

BY MR. PINEIRO:

Q. I understand.

In that scenario you described, right, your hypothetical, each partial corrective disclosure provides new, value-relevant information, you indicated in that scenario, it's okay to use a multi-day window; correct?

A. Yes. Obviously interpreting any residual for any of that window. Whether it be a day or two days --

Q. Right.

A. -- you want to be sensitive to confounding information. But that's kind of orthogonal to this discussion.

Q. So in this hypothetical, let's just say it's partial corrective disclosure, again, new, value-relevant information on Monday. Then you have the same on Tuesday, right. So we have a two-day window --

A. "The same" being new information, not the same information.

Q. Right. Right. Sorry.

On Tuesday, you have new, again, value-relevant information, right. So you have a two-day window as I've described.

In that scenario, in order to use a two-day window,

Page 129

do you have to -- must there be a statistically significant increase in the price of the company on Monday?

MR. TAYLOR: Objection; calls for speculation.

THE WITNESS: Oh, I see what you're saying.

I guess I would look at both. I would do a two-day and I would look at the individual days. I would look at both because they both provide information. So I wouldn't throw information away by not looking at the one-days, and also the cumulative.

So if the first day is not statistically significant, it raises questions as to the predicate of your question: Is it really new, value-relevant?

So I guess in this hypothetical, I would want to consider both, but I would not say a two-day is inappropriate in that scenario.

Again, not the label corrected, but that it is, in fact, new, value-relevant information on both days.

BY MR. PINEIRO:

Q. Right.

So what you're saying is that in this hypothetical, having a lack of statistically significant, you know, increase or decrease on that Monday, doesn't preclude the use of a two-day window?

MR. TAYLOR: Objection; misstates prior testimony.

Go ahead.

33 (Pages 126 - 129)

Page 130

THE WITNESS: I would want to look at both, the one-days and the two-days. And if on the Monday it's not statistically significant, I would want to think about, given the facts and circumstances of the case, whether that lack of significance on Monday, in our hypo, is indicative that maybe it's not new, value-relevant information.

But I do agree that you can, as part of your analysis, take a look at the two-day.

MR. TAYLOR: Is anybody on the east coast or the west coast getting hungry?

MR. PINEIRO: Let's take a lunch break.

(Thereupon, a lunch break was taken from 2:09 p.m. to 2:45 p.m.)

BY MR. PINEIRO:

Q. So I'm just going to put back on the screen your rebuttal report.

You see that on your screen, paragraph 48?

A. Yes.

Q. And you see, "Fourth, Mr. Bettencourt's own event study analysis finds that the abnormal return on the first of the two-day event window is not statistically significant and only on the abnormal return of the second of the two-day window is statistically significant. None of the literature he cites demonstrates that it is appropriate to use a two-day

Page 131

window when the first day is not statistically significant as he does. Rather, finance literature suggests that cumulating returns over multiple days in an event study when the first-day abnormal return is not statistically significant is inappropriate."

Do you see that?

A. Yes.

Q. Doesn't that just conflict with what you just said before the break?

A. No. What I said before the break is you can certainly look at a two-day as well as the one-day windows. And I also said that the one-day window might indicate that what you're analyzing on the first day is not new, value-relevant information. So I think it's perfectly consistent.

Q. But you said it's not preclusive; right? Do you remember that testimony?

A. You'd have to give me the full language.

But I said you could look at both the two, but I would not throughout the one day. I also said the one-day could speak to whether that first-day information is, in fact, new, value-relevant information.

Q. And then -- sorry. Go ahead.

A. Yeah. So that's sort of where I would come out on this issue.

Page 132

Q. And then you say, for example --

A. Oh, let me just add one more thing.

I'm sorry to interrupt.

Q. That's okay.

A. There's sort of another component to this.

So in our hypo that we were talking about earlier today, the hypo was that new, value-relevant information day one, new, value-relevant information day two, can you cumulate. I said, yes, you can take a look at that, assuming that the first day is new, value-relevant information and the second day is new, value-relevant information.

The other point I would make is a separate point, which is, if you only have new, value-relevant information on the first day, and let's assume that the second day, there's no new value-relevant information, and you had a theory, an inefficient market theory, that it takes two days for the market to figure it out, the fact that the first day is not significant would be inconsistent with that theory.

So I think we're moving between hypos, where on both days it's new and value-relevant information and how to think about the one-day there, versus a theory where there's possibly new, value-relevant information on day one, and the question is, do we think it takes two days in an inefficient market. So those are different hypos.

Q. And so you cite to finance literature here in A and

Page 133

B of your report?

A. Yes.

Q. So for the first one, "Rinaudo and Saha examine intraday intervals using an event study analysis and state 'Needless to say, if the initial CAR, cumulative abnormal return, is found to be statistically significant, then the information contained in the event at issue would not be deemed material.'"

Do you see that?

A. Yes. So I think what they're talking about here is really our second hypo. So we're kind of moving between hypos.

So I think the hypo that we're talking about here is: Do we think that it takes two days for the market to digest new, value-relevant information released on the first day.

(Exhibit 9, Journal of Financial Perspectives, was marked for identification.)

BY MR. PINEIRO:

Q. Now, this article specifically pertains to creating a methodology for intraday event studies; correct?

A. Yes.

Q. The thesis or the aim of this article had nothing do with multi-day windows; right?

A. It is true, it's about intraday, but it's also

34 (Pages 130 - 133)

Page 134

discussing when you have a shorter increment of time, is that -- what does that tell you about the market impact? And so it's -- anyway, so that's the reason why I cited it.

Q. But you agree the literature you cited had nothing to do -- at least that article has nothing to do with multi-day windows; correct?

A. I don't agree with that. So I'm citing the article for the -- it is true that the article is focused on cumulative abnormal returns on an intraday basis. That is accurate.

But it's simply -- the point that they're making there supports my view that, if for a given increment of time it's not significantly significant -- and in my example, the event window happens to be a day -- then there's no reason to assume that the second day is, all of a sudden, the price reaction to that first-day information.

So, yes, the event windows are different, but that point is the same.

Q. Are you aware of any published articles that have used this study or article and used it to opine in connection with the use of multi-day event windows?

A. I haven't done that research. It's really our earlier discussion about: If you think it takes the market two days to digest information, would you expect the first day, or whatever your first increment of time is, to have, you

Page 135

know, some price reaction.

So in other words, if it takes two days for the market to digest -- which, by the way, I think is irrelevant here because that's an inefficient market story -- but even if you had that view, you wouldn't expect all the price reaction to be on the second day. You would expect, under that theory, some price reaction on the first day and then some further price reaction on the second day.

Again, as I said before, I think it's irrelevant here because the assumption is the market is efficient.

Q. So again here, if you go to -- it says "The event window for a statistically significant event, therefore, is a time interval of T minutes after the event; thus, we do not a priori impose a predetermined event window, but allow the returns data to reveal the length of time during which the new information is fully reflected in the stock price."

Do you see that?

A. I do.

Q. What does that mean?

A. Well, that means that, in their view, it could take a lot less than a day for information to get priced. So that's why they're doing it intraday. That's why they're looking at T minutes.

So they're saying basically close to close, a one-day -- forget about two days -- a one-day could be too

Page 136

long, that information could be priced even quicker. And they're going to analyze that by looking at the return data on a minute-by-minute or even a second-by-second -- yeah, a minute-by-minute basis, at least.

Q. It says, "Needless to say, if the initial CAR is found to be statistically significant, then the information contained in the event at issue would not be deemed material."

Do you see that?

A. I do.

Q. Again, there's nothing in here saying that this statement applies to multi-day windows; correct?

A. Well, they are doing intraday, but I simply disagree with the way you are characterizing this. They're saying if there is no price effect in our event window, you know, then the information was not reflected in that stock price during that interval.

So it is true they're doing intraday, but I think the analytic point is the same, and that is simply: If your theory -- not my theory -- but if the theory, I think this is what Bettencourt is saying, if his theory -- not my theory -- his theory is it takes two days to price information on May 14th, then he has a problem, which is A, it's inefficient, and, therefore, all this is irrelevant; but, B, you would expect under that theory for some price reaction to occur on May 14th, as opposed to everybody just arbitrarily waiting

Page 137

until the next day.

Q. Again, though, here you say "Finance literature suggests that cumulating returns over multiple days in an event study when the first day of abnormal is not statistically significant, then appropriate."

Just to be clear, what you cited here doesn't say that; correct?

A. I think it supports my position the way I just described.

Q. And then you also cite to this Cowan 2020 article.

Do you see that?

A. I do. Well, I don't see it, but I did cite to it.

Q. Oh, sorry. Wait.

Is this the article that you were referring to there?

Do you see it?

A. Yes, I do see it.

Q. Okay.

(Exhibit 10, Guide to Economic Damages, was marked for identification.)

BY MR. PINEIRO:

Q. And then 3.2, section "Performing an event study."

Do you see that?

A. I do.

Q. It says, "The investigator first chooses an event

35 (Pages 134 - 137)

Page 138

window. The window should include the time during which the public revelation of the misstatement or misrepresentation is released and incorporated in prices and perhaps one or two trading days on either side."

Do you see that?

A. I do.

Q. Doesn't this suggest that you can use an event window with multiple days?

A. Again, I agree with that statement at that level of generality. And we discussed the scenarios where that might be appropriate.

Q. And then you quoted this saying, "However, care must be taken in the selection of the event window. The more efficient the market, the faster the information would be expected to be absorbed into the price. Guidance is provided for this from the district court's decision following Halliburton II, as the Northern District of Texas observed.

Do you see that?

A. I do.

Q. Are you familiar with case that's being cited there?

A. I am.

Q. Is that controlling case law?

A. I'm not providing a legal opinion. I agree with the economic analysis reflected here. But, you know, as to the -- whether it's binding or whether a circuit has different case

Page 139

law is not something I'm opining on.

Q. I put your report back on the screen.

Do you see paragraph 49 there?

A. I do.

Q. Okay. So here you say, "The inappropriateness of Bettencourt's use of a two-day event window is further illustrated by the fact that if you were to combine the May 15th abnormal return with any of the other daily abnormal daily returns in May 2020 that occurred after the end of the class period, he would find the two-day cumulative abnormal return to be statistically significant."

Do you see that?

A. Yes.

Q. When multi-day event windows are used, the days are always consecutive from each other; right?

A. That's typically what I've seen in the scenarios that we've discussed.

Q. Right. Have you ever seen a scenario where an event window is used where the days are not consecutive?

A. I can't recall one.

Q. And so why is it that to prove this point, you are using -- you are citing to the fact that any day after the end of the class period can be combined with May 15th? What's the relevance of that?

A. It's simply the observation, the fact that the

Page 140

two-day is statistically significant is just going to be a mechanical function really, that that second day, May 15th, is so statistically -- you know, is such a negative -- you know given the residual and the T stat.

So it's not at all surprising that if you combine a date such as May 14th with May 15th, it's statistically significant because of what happened on May 15th.

So it's just an illustration that the finding that the two-day is statistically significant is not -- not surprising.

Q. Okay.

Next, I'm turning to the part of your report that discusses heteroscedasticity -- I'm so bad at that word -- heteroscedasticity.

Do you see that?

A. I do.

Q. Paragraph 52, you say that -- so you say "The methodology used by Mr. Bettencourt to purportedly correct for heteroscedasticity is Newey-West does not place any structure on the variance of the error."

What does that mean?

A. I'm showing my age. I learned Newey-West from Newey at MIT. So I think -- I want to be polite, but I think Bettencourt doesn't understand what Newey-West does and what it doesn't do and what his results represent, what they don't

Page 141

do. While everybody may be entitled to their personal opinion, you're not entitled to your own facts.

What does Newey-West do? When you're doing a prediction -- and here, we're doing prediction, the predicted return on May 14th, the predicted return on May 15th. So we're doing prediction. In prediction -- and you can look at any standard econometric textbook for this. There's two sources of error. The coefficients on your variables. Here, that's the mark in the industry. So there is betas. There's going to be imprecision associated with those estimates. That's the source of error one, or uncertainty, I should say, in your beta or your coefficient estimate. That estimate of the uncertainty can be affected by heteroscedasticity.

The second -- and this is what I don't think Mr. Bettencourt understands -- the source of uncertainty in a prediction, such as a predicted return, is the error term. The error term represents all the unobservables that get absorbed into the error term.

Again, to reiterate, this is textbook econometrics. Two sources of uncertainty in a prediction: Your coefficient estimates and the error term.

Now, heteroscedasticity can affect both. It can affect the level of uncertainty with your coefficients. It can affect the level of uncertainty with the error term.

Newey-West -- and this is the critical point, and

36 (Pages 138 - 141)

Page 142

where I think he is very misinformed. Newey-West, which I've used myself, corrects for heteroscedasticity effect on the uncertainty surrounding the coefficients. So it corrects for that effect of heteroscedasticity, which is on the coefficients.

It does not correct for heteroscedasticity in the error term by itself. You know, the heteroscedastic effect on the coefficients is corrected for in Newey-West. It does not correct for the error term.

GLS, which is what I use, does. It corrects for both.

So now, if you look at his code, it is crystal clear that he has homoscedastic error terms. He uses, for the variance of the error term, the OLS residuals. That's what he uses. It assumes constant -- it assumes heteroscedasticity. He has a constant variance on the error term. And that's what you do in Newey-West.

So he's just very misinformed about what Newey-West does.

And of course, where he's cited to Exhibit 5 of his report, where there is changes in the standard error, that's just a mechanical function of the fact that the covariants are changing day by day.

But again, to reiterate, we're doing prediction here. You have to correct for both. The way you do that

Page 143

textbook econometrics is GLS, not Newey-West. And so that's just why he is flat-out wrong.

Q. So you indicate here, "Bettencourt attempts to skirt this issue by assuming that the variance of the error is constant when he calculates the standard error of forecast for the event date."

Do you see that?

Right here. I'm sorry.

A. Yeah, so that's exactly what I just said. He is using the OLS error term, which is a constant error term in his statistics. And again, that's what -- I mean, it's not surprising; that's what Newey-West does. It only corrects for your coefficient -- the uncertainty around the coefficient estimates.

So that's exactly what he's doing. He is just flat-out wrong, that he's adjusting the variances, the error term, for changing volatility. It's just wrong.

Q. I'm introducing what's been marked as Exhibit 11.

(Exhibit 11, Bettencourt Expert Report, was marked for identification.)

BY MR. PINEIRO:

Q. This is the report of Daniel Bettencourt.

Do you see that?

A. I do.

Q. So let's see if I can get to Exhibit 5.

Page 144

Q. So this is Exhibit 5 that you are referring to?

A. Yes.

Q. So do you see in the second column, the Newey-West standard residual and the date?

A. I do.

Q. And that rate isn't constant, though; it is?

A. Correct, because the covariants change. The error term is constant the covariants, when you move from May 1st to May 4th change. So you mechanically change the standard error because the covariants on each day change.

The error term is constant. So to make an inference from this to about -- whether or not the error term is constant is just wrong. And he is ignoring the fact that there's two sources of uncertainty that feed into the standard error: Uncertainty about the coefficients the and uncertainty about the error term.

So I just -- you know, I don't think he understands what Newey-West does.

Q. Are you saying the coefficient is constant, you're talking about this right here? This column right here?

A. No, I'm not. I'm not talking about that. It's in the regression model.

You have to look at the -- what Newey-West is doing. The error term that he uses is from the OLS regression. That assumes homoscedasticity. That's the assumption of OLS.

Page 145

What is corrected for in Newey-West, and I've used Newey-West, is uncertainty about the coefficients.

Now, the standard error from Newey-West does change from day-to-day because the covariants change. It's a mechanical function that your covariants are changing.

So I don't know. The only conclusion I can draw is he does not understand Newey-West.

Q. So paragraph 3, you say that you used the GLS regression using the VIX index; right?

A. Yes.

Q. Does the VIX index explain variance in CODX?

A. Yes. I have a model. I have a regression where I weight the variance, and then run that weight on the transformed OLS regression.

Q. So you use the VIX returns as an explanatory variable?

A. The VIX index, yes.

Okay. So in GLS, you need to put a structure on the variance, the error term. The structure I put on that through a regression of the squared residuals from OLS is on the VIX index. So sort of a very standard GLS where you put structure on the variance -- that's the only way you can correct for the variance in the error term.

Q. Are you familiar with any academic literature that examines, you know, manipulation of the VIX index?

37 (Pages 142 - 145)

Page 146

A. I'm not sure what you're referring to. Manipulation?

Q. Market manipulation of the VIX.

A. I'm not aware of that.

So the VIX, just to be clear, represents a 30-day on S&P 500 volatility.

Q. What's the difference between White and Newey-West corrections?

A. So Newey-West is like a version of the White estimator. So it's just another way of -- it's really an extension of Newey-West -- sorry, of the White estimator.

So White deals with heteroscedasticity, and Newey-West is a version of that. There's lots of versions of the stuff in the literature, and it's a version that's used to correct the coefficients.

Q. If you ran an OLS regression and a GLS regression on the same data, would the estimated coefficients be the same between the two methods?

A. I don't believe so. I think it's preserved in Newey-West. But I would have to double-check because you're running the squared residuals on the VIX and then you're transforming -- you're not actually running the same OLS. You're transforming the variables when you're running the second regression.

So you're not running it on the initial, you know,

Page 147

log return on the indexes. You're transforming it by one over the weights generated from that first regression.

So it's actually not the same regression. It's transformed, such that it doesn't have homoscedasticity -- I'm sorry, so it doesn't have heteroscedasticity errors.

Q. If you ran an OLS regression and a GLS regression on the same data, would the estimated residuals be the same?

A. No. So the OLS regression, if there's heteroscedasticity, the variance term, it's going to be a constant in the OLS regression. That's not correct.

So what the GLS does is it puts structure. That structure enables you to account for that change in volatility. So what you're doing with respect to the error term is quite different in OLS regression than you do in a GLS.

In OLS regression, under Gauss-Markov, you're assuming homoscedasticity errors. In GLS, you're putting structure on it, such that you can account for a violation of that Gauss-Markov assumption.

Q. If you ran an OLS regression and a Newey-West corrected regression on the same data, would the estimated coefficient be the same?

A. I don't know offhand. I believe so, but I would have to double-check. The estimate of the uncertainty around those coefficients is going to be different, so that's what

Page 148

Newey-West is doing, is correcting for the level of uncertainty relative to the OLS regression. So --

Q. But in that --

A. -- (inaudible cross-talking) standard errors in that way.

Q. In that same scenario, would the estimated residuals be the same?

A. Well, so you're assuming in the -- well, you're ignoring volatility in error terms. You're not putting any structure on it. So in terms of the prediction component, you're not putting any structure on the error term.

In fact -- and this is what Bettencourt does -- just use simply for the variance term, the OLS estimate of the squared residuals.

Q. And does the Newey-West correction adjust standard errors of the coefficients?

A. Yes. It adjusts for the uncertainty around the coefficient. So it gets fed into the overall standard error.

But again, for prediction, there's two sources that you need to correct for, the coefficients and the error term.

Q. Would you agree that the use of a 120-day OLS regression will, by definition, produce larger standard error for regression than using a 252-day regression?

A. Well, it depends on what time period. You know, it really depends on the data. But generally speaking, the more

Page 149

data that's representative, the better it is in terms of the coefficient. But again, we're making assumptions about the representative and the general point that more data represents more accurate.

So I think the coefficient estimates, as you increase your end, your uncertainty, holding all else constant, assuming the coefficient goes down.

Q. And --

A. I think the rate of change is 1/N.

Q. Have you ever -- in providing expert services or expert opinions, have you ever calculated cumulative residual returns?

A. Yes.

Q. Do you know how many --

A. I calculate cumulative returns here. So we can go to a footnote earlier where I cumulate the 14th and 15th, and I cumulate the 15th and all those other days. So in this very report, I cumulate returns.

Q. What's the longest period over which you've calculated cumulative returns?

A. Well, I did a leakage case. This is a household litigation, where the claim was -- it was a very long period where the claim was leakage. And I guess, there, I didn't do -- you know, I did a Monte Carlo to assess that.

Q. Was there a case involving the Las Vegas Sands,

38 (Pages 146 - 149)

Page 150

where you calculated it over a month?

A. It's possible. So there had been cases -- I don't know about Las Vegas Sands in particular -- where counsel has asked me to assess how the opposing expert has cumulated returns over a certain period.

Q. And you referenced this earlier. Did you look at Mr. Bettencourt's code?

A. Yes.

Q. And you looked at the underlying inputs to his regression model?

A. Yeah, well, the market index in the industry, yeah. Yes. The answer is yes.

Q. What does "price impact" mean?

A. Well, people can define terms in different ways. The way I would define it is, one version or one definition might be, in the securities litigation context: Does the alleged misrepresentation have an effect on the stock price?

Q. Here, in connection with plaintiff's damages theory, the price impact is the plaintiff alleges the price impact occurs on May 14th-15th; correct?

A. I don't agree with that.

MR. TAYLOR: Objection; calls for legal conclusion. Go ahead.

THE WITNESS: So Bettencourt, I believe, and I'm going off memory, 13-cent price impact associated with

Page 151

May 1st. Now, he derives that from his analysis of May 14th and 15th and 13th.

But, yes, he definitely has price impact associated with May 1st, the alleged misrepresentation.

BY MR. PINEIRO:

Q. Is it your opinion that the only way to establish price impact is by demonstrating an abnormal return on that day?

MR. TAYLOR: Objection to the extent it calls for a legal conclusion. Go ahead.

THE WITNESS: On that day? What day are you referring to?

BY MR. PINEIRO:

Q. Sorry. On the day that you are evaluating, you know, the impact of an alleged misstatement, is it your testimony that the only way to establish price impact is by finding an abnormal return on that day?

MR. TAYLOR: Same objection.

THE WITNESS: No, I would not say that. However, in the facts and circumstances here, Mr. Bettencourt says that the pre-May 1st stuff is irrelevant or not germane to it. He said something to the effect of that in his deposition.

My understanding of his theory is, and he says this in the deposition pretty clearly, that May 1st informed

Page 152

the market, regardless of what it was told earlier, informed the market that this test was perfect, something akin to that.

Now, if it's correct -- and I didn't see Mr. Bettencourt dispute this -- that the market was well informed that no test is perfect and that the Co-Diagnostics test is not perfect pre-May 1st, and if Mr. Bettencourt is right that on May 1st all the market thinks this is a perfect test, that's not price maintenance. That is: You should observe on that day given that theory a price increase, because now the market is blooming something wonderful. It thought no test was perfect, and now we have a perfect test.

And, in fact, I think we agree that it's not statistically significant.

BY MR. PINEIRO:

Q. Well, Mr. Bettencourt finds that May 1st is statistically significant; correct?

A. Well, okay. I don't mean to speak for him, but he said -- let me -- he said in his deposition, which I found surprising, that whether or not May 1st is statistically significant is not germane to his opinion, is what he said.

Q. You've indicated -- so I asked you whether you needed an abnormal return to establish price impact. What other ways can you establish price impact?

Page 153

A. Well, if the hypothetical -- I'm not talking about the facts and circumstances of this case. If the hypothetical is the market -- that the misrepresentation falsely confirmed a market expectation -- example, you might say the market thought the company was going to make $100 in profit. Reality is, in my hypothetical, the company made $50. And then the company comes out and falsely says "We made 100," that is lies to meet the street. That would be a case there'd presumably be price impact, but no price reaction on the date of the misrepresentation.

Now, when the market learns about the $50 later, there may be a price reaction.

So that would be a situation where there would be price impact associated with the misrepresentation, even though in the event study on the date of the misrepresentation there was no price reaction.

Again, that's not the situation here. Because his theory is, even though -- well, despite the fact that the market thought that no test was perfect, including this particular test, his theory is: On May 1st, the market learned this wonderful news that it's a perfect test. That's not a confirmatory lie. That's a lie that introduces -- or misrepresentation, I should say, new, value-relevant information that should cause a price reaction. New value-relevant information that happens to be false.

39 (Pages 150 - 153)

Page 154

Q. Is it your testimony that you can only conclude that a statement has price impact when there is either an abnormal return or in the scenario that you just described?

MR. TAYLOR: Objection; vague, compound.

THE WITNESS: So I don't know what you mean by the description I just described.

So my example of the $100 and $50 --

BY MR. PINEIRO:

Q. Yeah.

A. -- you can infer price impact when the market learns it's 50, the stock drops. So in that hypo, you would not say there's no price impact because there's no price movement on the date of the lie because the lie, the misrepresentation was confirmatory. It was not deviating from market expectations.

Q. Right. So that's one scenario.

Is there any other scenario, though, where price impact -- so let's just say that there is price movement. Like, for example, here, May 1st. There was, you know, approximately like an 18 percent increase in the CODX stock price after the press release; right?

A. 17, 18. I forget the exact raw return, but that's generally consistent with my memory.

Q. And so it's your testimony that's based purely on volatility?

A. I didn't say that. I said, as a financial

Page 155

economist, we have to use the techniques of the academic literature and what's accepted in the profession.

The way to think about stock prices in this type of situation is event studies. If the event and -- and in this case, the event study indicates that the price movement is explainable by normal, random volatility.

And as an economist, that's how you would think about that, there's no reliable economic evidence to indicate that there is a residual that's not explainable by random volatility. This is a volatile stock.

Q. Okay. I'm on paragraph 55 of your report.

Do you see that?

A. Yes.

Q. It says, "Mr. Bettencourt's event study is also fundamentally flawed and unreliable because it is not robust to the use of alternative estimation periods."

Do you see that?

A. Yes.

Q. What do you mean by that?

A. Well, I guess here I would -- you know, to kind of make this point, I would point to what Mr. Bettencourt said in his deposition. He agreed that six months was an appropriate window in the facts and circumstances of this case. So we're not -- we don't disagree on that as point of commonality. I've used six months and I've used a year as well.

Page 156

So Mr. Bettencourt agrees that six months would be appropriate. So it leads to the question of: Do you get the same results using that six-month window or that six-month estimation period versus, say, a year.

And this is sort of married to the fact that, in his view, after May of 2020, COVID was changing, lots of things were changing, it's a very fluid situation. So six months might be something that would be useful to take a look at.

So it just leads to the question of: Okay. Let's take a look at six months and see whether the results are robust to using that estimation window.

Q. And so in performing this type of analysis, do you always need to use alternative estimation periods to test, I guess, your conclusion?

A. I think you want to be sensitive to whether small changes in your approach or event windows that you -- I'm sorry, not event windows, the estimation periods that you feel are appropriate and informative, whether that changes your results or it's robust. So I think it is a helpful exercise.

Q. And there are other scenarios where you can use -- where multiple estimation periods are appropriate; correct?

A. Yeah, I don't -- I think that's right. I think six months -- yes, it's right in the following sense. I agree with Mr. Bettencourt that six months are used and folks used, and I've used as well, a year. So you do see both being used.

Page 157

Now, if you have the view, which I think Mr. Bettencourt does, that COVID is changing so quickly, that would be an argument or that would be a reason to take a look at the six-month estimation period.

Q. So what happens in a scenario where you have multiple appropriate estimation periods and one leads to an abnormal return and the other one doesn't?

MR. TAYLOR: Objection; vague, calls for speculation. Go ahead.

THE WITNESS: I think you would -- I think you wouldn't want to throw out information, so I do think -- obviously you want to look at the facts and circumstances of the case. But it does raise the question of: Is this finding of an abnormal return robust or not?

BY MR. PINEIRO:

Q. So it goes to the weight of the finding?

A. It could go to the weight or it could go to whether, in fact, there is a robust -- whether, in fact, there is an abnormal return, you know, if moving between the six-month window -- sorry, I keep saying window -- six-month estimation period or a year makes such a difference.

So again, you want to think about the facts and circumstances of the case, but it's certainly something that would be appropriate to consider.

Q. So having disparate results with two potentially

Veritext Legal Solutions
800-726-7007                                                      305-376-8800

Page 158

appropriate estimation windows doesn't mean you have to throw out the results; right? It means maybe there should be further weighing of which is the more appropriate --

A. It really -- I'm sorry. I didn't mean to interrupt.

I mean, it depends on the facts and circumstances of the case. Because as I said, I agree with Mr. Bettencourt that six months and a year are used. So at that level of generality, I agree.

You know, I know that Mr. Bettencourt has particular concerns about the rapidly changing nature of COVID. And so that would speak to the six-month window versus a year.

So yeah, I guess, you know, you would want to think about the facts and circumstances of the case.

In this case, when you properly run the regressions, nothing statistically significant, it is true, an OLS regression or a Newey-West regression, the May 1st is statistically significant, but that's not an appropriate regression given heteroscedasticity.

Q. Do you think that using an -- for a stock like this one, which is a COVID-19 diagnostic testing company, do you think that using an estimation period with pre-COVID -- involving a pre-COVID time frame is appropriate?

A. You know, so I looked at the full year before because he cites literature -- he cites literature about that being appropriate.

Page 159

For the six months, you know, I have less of a concern because most of it is during COVID, you know January 1st forward. I think the way to analyze that -- so Mr. Bettencourt made statements to that effect. He's really saying that, if it's to make any sense of it, that there's some sort of a lack of stationary, that there's some kind of structural break in the betas because of the changing nature of COVID.

So if he believed that, he should have just run the structural tests for that.

You know, for my purposes, it was not necessary to get into that because whether you ran it a year before, six months before, surrounding, after, six months after, a year after, regardless of how you do it, assuming you're running an appropriate regression, you get the same result. And that's it. That is to say it's not statistically significant.

Q. When you look at the returns on all of these dates on the screen, I mean, they're relatively close to each other; right? They're within a few percentage points of each other?

A. I agree with that.

And this is the footnote that we mentioned in the beginning, Footnote 115, that I had a change to. It doesn't change any of my opinions or results or conclusions, but this is the particular footnote I had referenced in the very beginning of our conversation.

Page 160

Q. And what's the change that you have to make to this?

A. Sure. So it should say -- two changes. The 10 percent -- I'm trying to find that now. I'm sorry.

Q. You want me to make it bigger?

A. Yeah. So it should say columns 3, 4 and 6. I thought this is -- maybe I got the wrong footnote. There is another footnote where I said -- I use the 10 percent test for Breusch-Pagan. It's 5 percent.

I'm sorry. I have to find where that is. I thought it was in this footnote, but it should read column 3, 4 and 6.

Q. When testing, I guess, for robustness of an event study based on alternative estimation periods, is there a number of alternative estimation periods that need to demonstrate an abnormal return for the test -- for the event test to be sufficiently robust in your view?

MR. TAYLOR: Objection; form.

THE WITNESS: There's not a formula for it. So I think we both agree that six-month and 12-month estimation windows that I've used are, generally speaking, appropriate.

You know, so I ran all those permutations and you get the same results. So there's no real need to say -- anyway, so that's what I found.

If, in the facts and circumstances, you're worried about COVID changing whether data is representative, I

Page 161

think, then, that would be an argument for six months.

BY MR. PINEIRO:

Q. You have a section of your report entitled "Bettencourt ignores that the economic evidence demonstrates that plaintiff was not harmed by the alleged fraud under its own claims."

Do you see that?

A. I do.

Q. Now, you note that Gelt sold on May 14th, a date on which there was not -- a date on which there was not an abnormal return; correct?

A. Well, there's a residual, but it's not statistically significant.

Q. Right. And because of that, your testimony is that Gelt was not harmed by the alleged misstatement?

MR. TAYLOR: Objection; misstates prior testimony. Go ahead.

THE WITNESS: That's correct. May 14th is the date where the market, according to the theory here, according to Mr. Bettencourt, the market learned partially, according to Mr. Bettencourt, about the misrepresentation or what the truth really is.

And Gelt had sold -- as I understand it, had sold out by the close of May 14th. And I think Mr. Bettencourt and I agree that May 14th is not statistically

41 (Pages 158 - 161)

Page 162

significant. So there's no losses, economic losses ascribable to those crafted disclosures on that day.

BY MR. PINEIRO:

Q. Now again, Mr. Bettencourt's opinion is that the price impact is baked in over the 14th and the 15th; correct?

A. Yes.

Q. And under his theory of the event window, Gelt would have sustained damages based on the alleged misstatement; correct?

A. I mean, I'll let him speak for himself, but obviously Gelt didn't suffer from May 15th because they were sold out by then. And we both agree the 14th is not statistically significant. But, yes, I agree he has this two-day theory.

Q. Do you consider the inflation ribbon methodology a widely accepted method to calculate class-wide damages in a 10(b) case?

A. Stated at that level of generality, yes.

Q. We talked about price impact on May 1st being around 13 cents. Did you test yourself to see if there was any artificial inflation at the start of the class period?

A. I ran an event study on May 1st.

Now, again, I'm not saying that if it was -- I don't view that as -- you know, obviously I also look at the alleged corrective disclosures, I consider what the market learned

Page 163

before then. So I don't want to be misconstrued as saying that's all I did, but I did, in conjunction with those other things, look at the price reaction on May 1st.

Q. And so it is your position that there's no price inflation at the beginning of the class period on May 1st?

A. There's no reliable economic evidence to indicate so, because if the theory which is -- well, I think it's very hard to -- my view is it's very hard to argue with the fact that before May 1st the market was well aware that no test was perfect, that this diagnostic test is not perfect.

So if the theory is the market, on May 1st, learned that it's a perfect test, you would expect to see inflation enter into the stock price.

Q. Did you measure at all inflation with respect to the alleged false and misleading statements in this case?

A. Well, I analyzed whether there's any reliable economic evidence as to whether there's inflation. And my conclusion was no.

Q. Are you providing any opinion in this case regarding what the amount of damages should be?

A. Yes, in the following sense, that there's no reliable basis for the damage numbers that he presents and no reliable basis for loss causation.

MR. PINEIRO: Professor, Zach, if you guys give me ten minutes to go over my notes, I think we're done. Let

Page 164

me just wrap up a little bit, review a few things. Give me 10, maybe even 15, and then I might have a few more questions, but probably not.

MR. TAYLOR: Okay. I'll also think if there's anything I want to ask as well, just so we can finish up once you're done.

MR. PINEIRO: Sure. Okay.

(Thereupon, a brief recess was taken.)

MR. PINEIRO: I don't have anything further.

MR. TAYLOR: Okay. I just have a couple, like, clean-up questions.

CROSS-EXAMINATION

BY MR. TAYLOR:

Q. Professor Ferrell, going back to your description of your assumptions for purposes of the report, do you recall that that was discussed earlier?

A. Yes.

Q. Okay. And is it correct that earlier you testified that you're opining on damages in this case; is that correct?

A. Well, damages, loss causation and rebuttal of Mr. Bettencourt and the topics that he -- inflation as well. So those are the topics that Mr. Bettencourt addresses.

Q. And you're also providing testimony on loss causation; that's correct?

A. Absolutely.

Page 165

Q. And you are providing testimony on price impact or the lack thereof of the challenged statements on May 1, 2020?

A. Yes. And I would incorporate that into the analysis of inflation, including the question as to whether there's any inflation as of May 1st.

Q. And earlier when you said that you were not opining on liability, you were only referring to whether the challenged statements were false or misleading; is that correct?

A. Correct.

Q. Okay. So you are, in fact, opining on liability with respect to causation and price impact as well as damages; is that right?

A. We're getting into semantics about what the word "liability" means. But when I refer to liability: Is there an actionable misstatement?

And that's what I was referring to as liability. Because if there's no actionable misstatement, there's nothing -- you know, there's no sense in talking about loss causation, damages, inflation.

So with respect to those topics, damages, loss causation, inflation, like Mr. Bettencourt, I am doing analyses on those topics and providing opinions on those topics.

MR. TAYLOR: Okay. That's all I have.

42 (Pages 162 - 165)

Page 166

MR. PINEIRO:  Two-question redirect.

REDIRECT EXAMINATION

BY MR. PINEIRO:

Q.   Mr. Ferrell, during the break we just had, did you speak to Mr. Taylor?

A.   No.

MR. PINEIRO:  Okay.  Nothing further.

Mr. Ferrell, thanks.  Appreciate the early depo start time.

THE WITNESS:  Thank you for being so helpful with the Zoom and showing the documents.  It really made life easier.

THE COURT REPORTER:  Mr. Ferrell, read or waive?

THE WITNESS:  I don't think that's for me.

MS. YORK-ERWIN:  He will read.  We want to review it.

THE COURT REPORTER:  Okay.

Mr. Pineiro, are you ordering the transcript?

MR. PINEIRO:  Yes.

THE COURT REPORTER:  And, Mr. Taylor, do you want a copy?

MR. TAYLOR:  Yes.

(Thereupon, the deposition was concluded at 3:55 p.m.)

CERTIFICATE OF OATH

Page 167

STATE OF FLORIDA

COUNTY OF BROWARD

I, the undersigned authority, certify that Allen Ferrell remotely appeared before me on March 1, 2024 and was duly sworn.

WITNESS my hand and official seal on March 9, 2024.

*Rinele Abramson*

Rinele Abramson
My Commission #HH224550
Expires June 4, 2026

Page 168

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF BROWARD

I, Rinele Abramson, Court Reporter, a Notary Public for the State of Florida at Large, hereby certify that I reported the deposition of Allen Ferrell; and that the foregoing pages constitute a true and correct transcription of my shorthand report of the deposition by said witness on this date.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action nor financially interested in the action.

WITNESS my hand and official seal in the State of Florida on March 9, 2024.

*Rinele Abramson*

Rinele Abramson, Court Reporter
Notary Public-State of Florida
My Commission #HH224550
Expires June 4, 2026

Page 169

Zachary Taylor, Esquire
Ztaylor@bakerlaw.com

RE: GELT Trading, Ltd. v Co-Diagnostics Inc., et al.
March 15, 2024
Allen Ferrell
JOB# 6455637

The above-referenced transcript is available for review.  Allen Ferrell should read the testimony to verify its accuracy.  If there are any changes, Allen Ferrell should note those with the reason on the attached Errata Sheet.  Allen Ferrell should, please, date and sign the Errata Sheet and e-mail to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be e-mailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e)

Page 170

RE: GELT Trading, Ltd. v Co-Diagnostics Inc., et al.

March 9, 2024
Allen Ferrell

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____  _____

Allen Ferrell            March 9, 2024

44 (Page 170)

**[& - 1:58]**                                                          Page 171

| **&** |
|---|

**&**   2:4,8 4:14,15
4:17 9:3 14:8,21
16:18

| **0** |
|---|

**00368**   1:3
**05**   21:1
**06**   21:1
**07**   125:7

| **1** |
|---|

**1**   1:14 3:11 18:4
18:7 41:5,6 42:3
44:24 51:6
149:9 165:2
167:6
**1,500**   14:6
**1.310**   169:23
**10**   3:15 12:20
27:16 31:23
33:21,22 34:9
38:20 40:3,6
44:24 122:15
137:19 160:3,7
162:17 164:2
**100**   3:14 38:22
41:15 52:19
53:19,19,25
55:18 59:22,22
61:22,22 75:16
75:16,25,25
87:6,10 101:16
101:22 102:20
103:7,25 104:4
104:19,19,24

153:5,7 154:7
**10111**   2:9
**10:36**   1:14
**10:55**   94:24
**11**   3:16 143:18
143:19
**115**   9:13,25
159:22
**11th**   54:11,15
55:13,16,21
87:15 88:12,15
88:16 105:6
106:17
**12**   160:18
**120**   148:21
**12:55**   94:21
**13**   37:15 58:18
63:1 150:25
162:20
**13.3**   94:21
**137**   3:15
**13th**   37:15 56:5
56:11,15,25
58:8 59:11 60:1
61:13 62:1,9,20
62:25 151:2
**14**   66:3,3 86:14
94:20 97:3
**143**   3:16
**14th**   41:19
50:10,13,23
51:2,2 62:24,25
63:6 65:8,8,9,25
66:8,12,14,16
66:19,25 67:9

68:3,13 71:1,8
71:11,18,23
72:4 78:14,16
78:21,22,24
81:20,24,25
82:4,8 87:11,19
88:15 89:2
90:19,20,24
93:10 95:2,15
96:9,21,25 97:7
99:8 101:22
102:2 104:11,14
104:15,17 105:6
105:9,16,25
108:2,18 109:10
110:18,25
111:14,19
112:14 115:2
116:6 123:2
124:17 126:6,18
136:22,25 140:6
141:5 149:16
150:20 151:2
161:9,18,24,25
162:5,12
**15**   34:18 67:11
68:10,22 72:14
84:19 91:1
93:15 94:14
106:25 164:2
169:4
**15th**   37:21 66:8
78:17 82:4,14
89:2,14 107:16
108:18,24 109:1

109:6,12,18,23
109:25 110:7,12
110:15,19
112:15 116:9
123:6,12,18,24
124:17 126:22
139:8,23 140:2
140:6,7 141:5
149:16,17
150:20 151:2
162:5,11
**164**   3:4
**166**   3:5
**17**   42:4 43:15
44:13 154:21
**17.8**   78:12
**18**   3:11 154:19
154:21
**18th**   47:10
**19**   34:10 35:3
45:6 46:4 47:2
52:24 58:21
59:3 87:8,9
101:15 102:18
102:19 106:24
158:20
**19866**   167:12
168:20
**19th**   73:19
**1:24**   95:15
**1:25**   72:14,23
72:24 73:16
**1:38**   97:7
**1:58**   72:14
78:13 95:15

**[1s - 73]**                                                                    Page 172

**1s**  40:6
**1st**  29:20 36:18
  36:21 37:1,4
  38:20 40:22
  41:2,16,20
  42:17,24 43:5,9
  43:25 44:1,11
  47:13,17,17
  48:2,6 50:5 51:9
  51:13,18,20,22
  52:2 53:4,7,11
  53:12,20 54:1
  54:25 57:14
  60:2,3,4,13,15
  60:22 61:3,4,21
  67:3 74:12
  75:13,15,17,23
  78:16 86:21
  97:18,23 98:20
  99:6 103:6
  104:10,13,18
  105:5,8,11,17
  106:12 126:21
  144:8 151:1,4
  151:21,25 152:7
  152:8,17,21
  153:20 154:18
  158:16 159:3
  162:19,22 163:3
  163:5,9,11
  165:5

**2**

**2**  2:4 3:11 49:4,6
  59:8,22

**20**  24:11,19
  99:23
**2000s**  91:20
**2001**  125:1
**2010**  23:16,17
**2019**  33:22 34:9
  40:3 44:24
**2020**  3:14 19:20
  37:15 41:5,7
  42:3 45:7 51:6
  58:18 66:3,3
  86:14 94:21
  97:3 100:10,15
  100:25 101:12
  106:25 108:1,5
  108:19 137:10
  139:9 156:6
  165:2
**2024**  1:14 167:6
  167:9 168:17
  169:4 170:3,24
**2026**  167:14
  168:22
**20th**  78:16
**25**  39:24 40:25
**252**  148:23
**2530**  2:4
**27**  45:4
**28**  46:25
**29**  65:5
**2:09**  130:13
**2:20**  1:3
**2:45**  130:14

**3**

**3**  3:12 52:5,6,9
  145:8 160:5,10
**3.2**  137:22
**30**  65:23 93:15
  94:14 99:23
  146:5 169:14,22
**30.5**  58:24
**300**  21:13
**300,000**  21:10
**30th**  47:23
  48:17,21 50:4
  98:4
**31**  58:22,25 87:3
**32**  90:15
**320**  21:13
**33131**  2:5
**37**  95:16
**39**  102:17
**3:00**  92:7 93:4
**3:45**  58:18
**3:55**  1:14
  166:24
**3:59**  92:9

**4**

**4**  3:12 11:9
  45:15 55:3,5
  160:5,10 167:14
  168:22
**40**  59:5 106:19
**41**  107:25
**42**  108:16
**45**  2:8
**48**  130:18

**49**  3:11 67:3,7
  71:25 139:3
**4:00**  92:9
**4:01**  102:2
  105:25 106:9
**4th**  144:9

**5**

**5**  3:4,13 27:16
  57:22,24 58:6
  122:15 142:20
  143:25 144:1
  160:8
**50**  153:6,11
  154:7,11
**500**  35:19 39:22
  146:6
**52**  3:12 140:17
**55**  3:12 155:11
**57**  3:13
**5th**  48:9,24
  49:14

**6**

**6**  3:13 70:7,8
  160:5,10
**6.6**  78:16
**60s**  122:18
**6455637**  169:5
**67**  16:7,10

**7**

**7**  3:14 37:13
  75:2,4
**70**  3:13
**73**  108:9

Page 173

**74** 118:12
**75** 3:14
**7:00** 102:10
**7:30** 102:11
 106:9
**7:58** 91:4

**8**

**8** 3:14 100:8,10
**80** 20:21 24:11
**80-20** 24:10
**80s** 91:18
**84** 94:13 120:20
 124:9,11
**85** 61:22,23 62:3
**8:00** 102:10

**9**

**9** 3:15 133:17
 167:9 168:17
 170:3,24
**90** 26:22
**90s** 91:19
**93** 37:5
**95** 11:22 38:23
 54:23 55:22
 62:4 87:17
 104:15
**99** 20:25 38:24
 62:4
**9:00** 95:3
 112:10
**9:58** 90:24 91:4

**a**

**a.m.** 1:14 91:4
 94:24 95:3
**ab** 13:10
**abandons** 71:23
**abbott** 57:1,3
 59:17 60:17
 62:2,11 63:8,11
 63:11
**abbott's** 56:22
 57:6 58:21 59:7
 60:12
**abnormal** 43:18
 43:18 65:24
 77:4 86:21
 123:18 130:21
 130:23 131:4
 133:5 134:9
 137:4 139:8,8
 139:10 151:7,17
 152:24 154:2
 157:7,14,19
 160:14 161:11
**above** 1:22
 169:6
**abramson** 1:20
 167:13 168:6,20
**absolutely**
 164:25
**absorbed**
 138:15 141:18
**abstractly** 82:23
**academic** 14:17
 21:18 22:4,11
 22:16 44:5,9

 79:19,21 80:18
 91:15 92:12
 93:13,17,19
 120:2,6,16,23
 120:24 122:18
 124:10 145:24
 155:1
**accepted** 155:2
 162:16
**access** 113:8
**accommodating**
 6:23
**account** 38:6
 147:12,18
**accounting**
 121:9
**accuracy** 45:6
 46:4 47:2,24
 48:10,12 49:20
 59:12 60:5
 73:24 74:11,20
 75:10,13,21
 77:18 87:6,17
 87:17 106:24
 169:8
**accurate** 52:19
 53:25 55:18,22
 61:5,6,7 63:12
 87:6,10 96:5
 99:10 102:21
 103:7,25 104:4
 104:19,24 117:1
 134:10 149:4
**acknowledge**
 4:2

**acknowledges**
 107:25
**action** 26:6
 168:14,15
**actionable**
 165:16,18
**actual** 12:24
 13:14,15 44:19
 91:10 104:2
**actually** 13:2
 39:2 48:16 56:1
 57:16 62:15
 71:21 83:19
 93:15 103:17
 146:22 147:3
**ad** 57:18
**add** 11:25 16:8
 20:6 29:19
 38:18 43:10
 49:3 84:23 85:3
 88:7 89:18
 111:4 132:2
**adding** 109:7
 123:3
**addition** 31:6
 116:12
**additional** 31:4
 35:9 40:24 97:2
 125:12,16,20
 126:1 127:6
**address** 35:19
**addresses**
 164:22
**adjust** 148:15

**[adjusting - announcement]**

**adjusting**
  143:16
**adjusts**  148:17
**administering**
  4:4
**administrative**
  4:6
**admitted**  36:10
**affect**  41:21
  69:2,4 141:22
  141:23,24
**affected**  141:13
**affiliate**  14:17
  14:17 23:14
**affiliated**  14:18
**affiliation**  18:19
  23:23
**affirmatively**
  32:3
**afraid**  101:2
**afternoon**  90:19
  96:6 110:24
  127:2
**age**  21:7 140:22
**aggravators**
  113:9
**aggregation**
  122:16
**ago**  17:2,3
**agree**  50:7,7
  62:11 74:19
  75:18 77:17
  82:2 83:21
  87:23 95:6,8
  97:16 107:14

124:22 130:8
134:4,7 138:9
138:23 148:21
150:21 152:14
156:23 158:6,8
159:20 160:18
161:25 162:12
162:13
**agreed**  155:22
**agreement**  4:9
  4:10 23:24
**agrees**  156:1
**ahead**  41:11
  43:3 53:1 54:4
  56:14 61:11
  63:25 64:14
  72:12 76:19
  80:9 83:3,24
  85:23 89:20
  106:6 114:9
  120:10 121:12
  123:21 129:25
  131:23 150:23
  151:10 157:9
  161:17
**aim**  133:23
**akin**  152:3
**al**  169:3 170:1
**alerts**  113:9
**allegation**  81:19
  81:23 82:1,24
**allege**  77:8
**alleged**  10:18,23
  27:8 29:20
  31:25 32:25

51:3 62:23 63:6
64:3,3,9 65:1,6
65:10 82:3,20
83:6 87:4 89:5
90:7 96:24 97:5
110:23 111:13
115:2 116:12
150:17 151:4,15
161:5,15 162:8
162:24 163:15
**allegedly**  99:5
  121:9
**alleges**  65:5
  150:19
**alleging**  127:25
**allen**  1:18 3:2
  4:20 167:6
  168:8 169:4,7,8
  169:9 170:3,24
**allow**  70:22
  135:14
**alludes**  33:16
**alpha**  58:9,11
  58:16
**alternative**
  155:16 156:13
  160:12,13
**amend**  9:15
**america**  27:20
  28:20
**amount**  21:11
  78:20 93:19
  163:20
**amounts**  14:24

**ample**  79:12
**analyses**  30:15
  43:11 65:1 69:5
  165:23
**analysis**  8:4,13
  29:3,19,19 38:6
  41:2 44:19
  45:18 46:2 51:8
  54:6 65:24 66:1
  67:2,23 84:21
  91:12,22 95:12
  97:21 98:1
  106:20 124:11
  126:13 130:9,21
  133:4 138:24
  151:1 156:12
  165:3
**analyst**  34:14
  47:10 106:22
**analysts**  108:6
  109:9,11
**analytic**  136:18
**analytically**
  125:16
**analyze**  42:11
  136:2 159:3
**analyzed**  163:16
**analyzes**  32:5
**analyzing**
  131:13
**announced**  39:1
  59:21 60:13
  108:5 109:10
**announcement**
  41:18 62:24

82:8,12,16 84:4
89:11 105:8,13
107:23 108:3,18
109:2,6,8,15,20
110:3,4,15
117:3 123:7,9
123:24 124:24
**announces**
62:17
**annual** 22:12,15
33:18
**answer** 6:18
11:3 28:16
43:17 62:22
71:10 73:17
80:12 84:24
85:14 86:20
93:22 94:10
122:25 150:12
**answered** 54:3
60:14 68:18
69:8 75:22
77:21 83:2
110:8 111:16,24
112:20 120:9
123:20
**answering**
62:14 117:23
**answers** 118:1
**anybody** 11:5,5
130:10
**anyway** 9:14
134:3 160:23
**aosc20-16** 4:6

**apologize** 32:12
36:15 80:12
85:1
**appear** 52:23
53:15 54:1
123:17
**appearances** 2:1
**appeared** 167:6
**appears** 60:11
65:16 92:21
101:21
**appendix** 18:14
30:24
**applies** 136:11
**appreciate**
166:8
**approach**
122:19 156:16
**approached**
6:25 7:5
**appropriate**
37:12 69:18
79:17 81:7
89:17 111:4,9
113:21 115:10
124:3 125:4
126:9 130:25
137:5 138:11
155:22 156:2,18
156:21 157:6,24
158:1,3,17,22
158:25 159:15
160:20
**approximately**
154:19

**april** 47:17,23
48:17,21 50:4
74:23 98:4,4,5
**arbitrarily**
136:25
**arbitration**
25:19
**areas** 18:25
**argue** 163:8
**arguing** 60:24
**argument** 157:3
161:1
**arrangement**
4:5,7
**article** 3:11,12
3:12,13,14
45:23 46:12,12
47:21,23,24
48:8,17,23,24
48:24,25 49:6
49:15,17,18
50:3,4,8,13,13
51:22 52:6,8
53:23 55:3,6,13
55:17,21,23,24
57:24 58:3,8,18
60:1,7,11 65:8
71:12 73:1,19
73:22 74:10,22
75:4,9 76:4,9
77:10,13,17
89:21 90:12,23
91:17 94:13,20
95:2,3 96:19
99:8 106:22

107:15 111:19
112:7,13 119:18
122:14 124:9,13
124:19,25 125:1
126:7,17 133:20
133:23 134:5,7
134:8,20 137:10
137:14
**articles** 24:25
30:25 32:8,9,17
32:20 45:5,14
45:20 46:15
50:17,18 53:12
53:15 54:1
90:18 91:19
94:14 106:21
108:17,20,23
116:24 124:14
134:19
**articulated** 61:2
109:21
**artificial** 65:2
162:21
**ascribable**
109:25 162:2
**ascribing** 44:9
**aside** 5:14 6:3
31:13 53:10
112:17 114:23
**asked** 8:21
19:24 54:3
60:14 68:18
75:22 77:21
83:2 110:8
111:16,24

**[asked - based]**

112:20 118:3 120:9 123:20 150:4 152:23

**asking** 6:15 71:7

**aspects** 12:9

**assert** 40:17 50:14

**assertion** 95:3

**asserts** 97:6

**asses** 82:2

**assess** 42:21 149:24 150:4

**assessing** 29:18 110:4

**assist** 12:9

**assistance** 11:10

**assisted** 11:12

**associate** 15:11 20:7 21:23 22:1 22:8

**associated** 54:13 141:10 150:25 151:3 153:14

**assume** 83:19 98:24 132:14 134:15

**assumed** 111:9

**assumes** 60:22 88:21 102:25 142:15,15 144:25

**assuming** 33:15 34:23 60:19 61:1,3 62:16

81:16 84:18 97:19,20,20 105:24 126:11 132:9 143:4 147:17 148:8 149:7 159:14

**assumption** 29:2 46:24 72:7 84:21 92:3 97:23,24 111:21 112:3,3 126:14 135:10 144:25 147:19

**assumptions** 27:19 28:17,22 28:23 29:1 33:13 149:2 164:15

**astronomical** 97:11

**attached** 169:9

**attempting** 122:9

**attempts** 143:3

**attention** 59:12

**attorney** 4:12 26:1 168:12,14 169:11

**attorneys** 4:1 9:2

**attractive** 57:10 57:14

**attribute** 56:21

**attributed** 108:17 118:7

**attributes** 106:24

**attribution** 107:12

**australia** 27:15 28:6 53:20

**authored** 125:7

**authority** 167:5

**automatically** 68:6

**available** 8:24 46:20,23 98:12 98:24 99:3 105:10 111:7 169:6

**average** 78:15 80:20

**avoid** 5:19 17:24

**aware** 16:23 39:5 41:13 45:8 47:4 52:3 57:17 57:19 61:13 71:2,18 73:8,22 74:8 77:12,22 78:3,5 87:7 88:16 89:15,17 95:14 110:20,20 118:22 124:2 134:19 146:4 163:9

**awareness** 45:18 46:3,3

**awesome** 118:23

**b**

**b** 3:8 12:3,4 27:16 30:24 97:1 122:15 124:19 133:1 136:23 162:17

**back** 12:18 27:25 29:1 33:16 48:18 50:4,10 64:22 71:25 74:22 78:11 85:14 89:9 93:21 95:21 96:23 97:19 106:11 113:20 118:5 122:18 124:10 130:16 139:2 164:14

**bad** 56:24,25 57:6,6 59:16 62:10 140:13

**badder** 62:12

**baked** 162:5

**baker** 2:8 4:15 4:17 9:3 14:8,21 16:18

**bakerlaw.com** 169:1

**ballpark** 24:15 24:15 29:6

**bank** 27:20 28:20

**based** 26:24 42:16 44:12

**[based - break]**

53:20 54:6 57:14 59:11 62:1 66:12 69:4 75:25 79:3 98:8 98:12 99:3 103:15 106:2,20 111:7 119:16 120:24 124:4,5 154:23 160:12 162:8

**baseline** 62:7

**basic** 107:13

**basically** 21:6 40:21 77:2 135:24

**basing** 53:10

**basis** 39:4 40:17 43:6 82:20,20 89:12 107:22 123:7,8 134:9 136:4 163:22,23

**bathroom** 27:24 27:24

**bear** 78:10 119:1

**beat** 57:20

**beginning** 15:23 25:2 33:23 159:22,25 163:5

**behalf** 2:3,7 4:14,16,18

**believe** 16:5 17:7 19:19 20:7 21:1 23:16 26:24 33:1

34:17 37:10 39:18 42:5 47:19 53:21 73:4,13 74:25 82:20 86:17 87:5 91:6,16 95:1 96:5 99:10 100:18 108:9 112:9,9 116:2 117:1 146:19 147:23 150:24

**believed** 123:17 159:9

**believes** 104:3 105:1

**believing** 103:25

**benchmark** 62:13

**benefits** 21:5,14

**benson** 1:10

**benzinga** 94:20

**best** 7:2,5 9:6 59:15 69:8

**beta** 141:12

**betas** 141:9 159:7

**bettencourt** 3:16 32:5 35:14 35:21 36:1 37:11 38:1,16 39:5,14,20,24 40:17 44:23 45:5 46:25 50:19 51:22

65:10,12 66:7 71:22 86:25 87:3,18 88:21 89:1 91:17 97:6 102:25 105:20 106:22 107:25 118:25 124:2 136:20 140:18 140:24 141:15 143:3,19,22 148:12 150:24 151:20 152:5,8 152:17 155:21 156:1,24 157:2 158:6,9 159:4 161:4,20,21,24 164:21,22 165:22

**bettencourt's** 10:11 17:11,11 29:18 31:6 33:9 35:10 36:14 65:1,23 97:1 130:20 139:6 150:7 155:14 162:4

**better** 25:8 36:17 149:1

**big** 22:15 121:13 122:12 122:24

**bigger** 49:9 55:7 58:2 70:12 100:12 160:4

**bill** 15:19

**billed** 16:13

**billings** 15:7

**bills** 35:18 39:17

**binders** 15:12

**binding** 138:25

**biocentury** 47:16 74:22 98:4 105:7

**biscayne** 2:4

**bit** 21:11,15 24:21 49:9 55:7 70:12 93:8 109:7 164:1

**bloomberg** 51:21

**blooming** 152:11

**blow** 67:5

**bolded** 48:9,11

**borne** 34:8

**bought** 44:12

**boulevard** 2:4

**bouncing** 36:12

**bp** 35:25

**bracketing** 115:18 127:22

**breach** 26:6,23

**break** 6:19 27:24 63:17 99:14,15,16,16 99:23,23 100:4 130:12,13 131:9 131:10 159:7 166:4

**[breaks - certificate]**

breaks 100:2

brent 1:10

breusch 35:25 160:8

brief 28:3 63:20 99:25 164:8

broke 28:5

brought 30:2

broward 167:3 168:4

buckets 39:9

budget 16:19

bulk 26:20

bullet 49:25 59:3,20 60:8,9

bullish 118:14

bump 61:25

bunch 6:14 44:12

bureau 20:8,9 21:16

business 34:1 40:9 51:21 52:8 118:13,15

butchered 11:18

buying 39:6 59:6

**c**

c 34:25 47:21 56:7 81:9

caffeine 27:23

calculate 149:15 162:16

calculated 27:19 28:18

66:11 149:11,20 150:1

calculates 143:5

call 17:7 100:21 101:3

called 4:21 25:12 100:4 122:14,17

calls 61:10 62:21 63:24 64:13 72:11 76:6,18,19 83:23 93:7 100:3 103:9 104:21 106:5,5 111:1,17 112:1 112:21 115:12 121:11 129:3 150:22 151:9 157:8

cancelled 100:21

capital 34:18

capture 92:20

car 133:5 136:5

care 76:23 138:12

careful 77:23 78:7

carlo 149:24

case 1:3 7:1,23 8:13 10:17 14:6 14:25 15:15 16:16 18:11 26:3 27:2,3,15

28:6,19 29:9 30:2,2,20 31:2 34:21 42:19 50:14 67:25 68:16 69:12 70:20 82:22 84:16 89:22 90:1,6 102:5 105:22 113:23 113:24 118:9 130:4 138:20,22 138:25 149:21 149:25 153:2,8 155:5,23 157:13 157:23 158:6,13 158:14 162:17 163:15,19 164:19

cases 9:5 24:7 25:16,21 26:8 26:11,14,17,20 26:23 27:13 28:13 29:5 90:9 90:9 150:2

casting 122:14

categorically 42:15

categories 31:19

causal 53:3

causation 29:18 33:4 65:1 76:11 76:22 98:1 163:23 164:20 164:24 165:12 165:20,22

cause 1:22 41:25 76:9,16 83:9 84:11,13 106:25 107:18 109:20 117:14 118:10 153:24

caused 28:23 42:8,24 43:8,25 44:1,13 65:11 69:3 73:15 87:5 96:20,25 109:2 109:22 110:7,15 117:17 123:11 123:12 126:15

causes 82:13 109:5

causing 90:15 122:5 123:23

caveat 10:10,25 26:3 35:9

cayman 1:4

cent 150:25

central 1:1

cents 162:20

ceo 118:22

certain 31:18 32:8 42:12 44:6 65:7 67:17,18 122:19 150:5

certainly 12:17 12:17 44:11 48:6 118:9 131:11 157:23

certificate 166:25 168:1

**[certify - coefficients]**

**certify** 167:5 168:7,12

**cetera** 24:6 30:25 32:18

**cfo's** 97:10

**chaired** 20:25

**challenged** 48:10 49:19 165:2,8

**change** 9:17 10:15 13:7 30:14 53:7 72:6 72:17 106:15,16 109:1 144:7,9,9 144:10 145:3,4 147:12 149:9 159:22,23 160:1 170:5,8,11,14 170:17

**changes** 116:22 142:21 156:16 156:18 160:2 169:8

**changing** 35:24 142:23 143:17 145:5 156:6,7 157:2 158:10 159:7 160:25

**characterize** 7:25

**characterizing** 136:13

**check** 75:10 77:19 101:4,7 146:20 147:24

**checkered** 97:10 98:3

**chicago** 119:22

**chooses** 137:25

**circuit** 138:25

**circumstance** 80:2

**circumstances** 69:25 70:2 82:6 89:10 93:9 104:2 122:13,16 122:20,21,25 130:4 151:20 153:2 155:23 157:12,23 158:5 158:13 160:24

**citation** 120:19

**cite** 33:23 38:21 40:24 48:8 74:22 75:15 106:22 107:4 109:11 110:1 118:13 132:25 137:10,12

**cited** 134:3,4 137:6 138:20 142:20

**cites** 51:23 91:17 130:25 158:24,24

**citing** 55:17 60:1,3 98:3,6 108:9 134:7 139:22

**city** 46:21 113:8 113:8

**civil** 169:22,22

**claim** 71:22,24 78:22 87:4 89:23 97:2 149:22,23

**claims** 26:9,24 87:18 90:18 97:5 161:6

**class** 22:24 23:11 45:10 47:3,6 106:7 139:10,23 162:16,21 163:5

**classes** 22:19,21 23:1,2

**clean** 5:4 164:11

**clear** 15:9 46:5 80:6 117:22 127:18 137:6 142:12 146:5

**clearly** 35:21 151:25

**clicks** 46:14

**client** 15:3,21

**climbing** 90:25

**close** 7:4 41:18 59:12 63:8 69:23,23 70:1 78:14,21 81:21 81:25 82:3,8 86:15,15 91:14 91:14,23,23 92:1,1,7,19,19

93:18,18 101:21 110:18 111:3,3 111:8,8 135:24 135:24 159:18 161:24

**closed** 108:4

**closes** 92:9

**coast** 130:10,11

**code** 142:12 150:7

**codx** 34:25 38:9 56:5,10 57:9 60:16 61:21,25 62:5,19 63:12 67:10 77:18 90:24 97:9 145:11 154:19

**codx's** 69:7 74:20 89:1 95:15 100:15 103:6

**coefficient** 141:12,20 143:13,13 144:19 147:22 148:18 149:2,5 149:7

**coefficients** 122:17 141:8,23 142:3,5,8 144:15 145:2 146:15,17 147:25 148:16 148:20

**[color - confounding]** Page 180

color 95:11 109:7

columbia 21:20 22:14

column 144:3 144:20 160:10

columns 160:5

combination 21:7

combine 139:7 140:5

combined 139:23

come 13:10 27:21,25 29:8 106:11 120:25 131:24

comes 14:4 28:19 64:20 68:1 102:2 153:7

commentary 38:20 53:6 54:25 88:12 106:21,23 107:11

commission 167:13 168:21

common 79:19

commonality 155:24

communication 16:22

companies 26:8 40:6,13 97:10

company 1:5 34:11 40:19 43:14,15 49:21 54:6 70:2,3,23 71:1,4,23 88:20 90:25 98:10 102:24 105:16 105:21 108:5 116:23 118:22 129:2 153:5,6,7 158:20

company's 40:2 44:24 47:5 108:17

comparatively 59:15

comparing 60:16

comparison 59:19 63:9

compass 11:11 11:12 12:2,8,12 13:1 14:11,13 14:14,20,23,24 15:3,7,22,25 16:12,15,18,22 18:19 23:15,23 31:13,15,17,18 32:22

compensated 15:6

compensation 15:16 21:3

compiled 113:11

complaint 7:9 7:10,11,14,19 8:10,24 31:11 82:1

complete 84:23

completed 169:14

completeness 9:18 90:14

complicate 114:24

component 11:1 11:2 132:5 148:10

compound 27:10 154:4

concern 47:24 159:2

concerning 46:7 51:1

concerns 50:25 158:10

conclude 42:24 66:2 83:5 89:13 154:1

concluded 166:23

concludes 65:10

conclusion 42:22 44:7 63:24 64:13 74:14 76:7,18 76:20 79:3 83:24 106:6 145:6 150:22

151:10 156:14 163:18

conclusions 61:10 65:12 69:5 159:23

conclusive 107:14 108:24

concrete 114:21

conducted 69:16 73:25

conference 22:4 22:13,16,16 51:3 65:9 71:14 88:17 100:21 101:3 126:19

conferences 32:9

confidence 37:6 42:13 44:6

confident 80:22

confidential 8:23

confined 60:9

confirmatory 153:22 154:14

confirmed 153:3

conflict 24:2 54:1 131:8

conflicted 23:25

confounded 114:23

confounding 69:24 70:6 81:17 84:7

**[confounding - corrected]** Page 181

115:14,16,19,19
115:23 116:2,6
116:14,16,18
121:7,7,10,14
121:16 122:1,11
127:22 128:12
**confused** 36:5
**confusing**
100:20 101:2
**conjecture**
107:1
**conjunction**
51:14 163:2
**connected**
168:14
**connection**
14:21,24 15:15
16:13 24:16
35:7 45:17
51:17 52:13
134:20 150:18
**consecutive**
121:4 139:15,19
**consent** 4:7
**consider** 129:14
157:24 162:15
162:25
**considered**
44:25 101:1
109:13 126:8
169:15
**consistent** 42:6
48:1 53:21
54:10 63:15
86:18 104:8

105:3 107:12
131:15 154:22
**consortium**
21:18 22:11
**constant** 142:15
142:16 143:5,10
144:6,8,11,13
144:19 147:10
149:7
**constitute** 168:9
**constitutes**
98:12
**consulting** 8:7
18:20,25 24:1
**contain** 10:8
**contained** 7:11
101:25 133:7
136:7
**content** 100:5
**context** 7:13
8:25 80:24
84:21 150:16
**continue** 104:17
**continuing** 56:1
**contract** 26:6,23
**contracted**
49:21
**contractor**
14:16
**contradict**
52:23 53:15
**contrary** 87:4
97:4
**controlling**
138:22

**conversation**
32:22 33:16
89:10 96:23
100:5 159:25
**conversations**
13:19 17:8
**convey** 50:21
**copied** 13:22
**copies** 169:12
**copy** 5:5 13:20
18:16 75:6
166:21
**cornell** 89:21
90:12 119:17
**corners** 60:9
**coronavirus**
48:11,12 49:20
52:18 55:9
**corporate** 22:8
22:23,24
**corporation** 1:8
**correct** 8:2,10
9:8,12,13 10:11
14:7 16:5,11
20:18 23:20
24:13 25:18
26:25 28:12
31:8 35:9 36:3
36:21 37:19,20
37:22,23,25
39:23 40:10
42:4,17 44:3,14
47:14,20,21,25
48:3,17 50:15
51:4 53:15 54:2

56:19 57:15
60:2,6,7,23 61:9
62:20 66:8,17
66:18 67:10,21
71:12,15 72:24
74:4,12,20
75:14,21 77:4
77:19 79:15
81:22 83:22
86:16 87:25
89:3,8 92:18
95:22 99:9
101:23 102:6,13
105:17 113:16
113:22 114:4
116:6 125:8,9
127:15 128:8
133:21 134:6
136:11 137:7
140:18 142:6,9
142:25 144:7
145:22 146:15
147:10 148:20
150:20 152:4,18
156:21 161:11
161:18 162:5,9
164:18,19,24
165:9,10 168:9
**corrected** 20:11
31:25,25 32:4
65:6 97:5 106:9
128:1 129:16
142:8 145:1
147:21

**[correcting - data]**                                                    Page 182

correcting
  148:1
correction  36:2
  36:25 148:15
corrections
  146:8
corrective  32:25
  50:14 51:4
  62:24 63:6,22
  64:4,10,17,19
  64:21 65:10
  71:9 76:5,15,23
  77:8 81:20,23
  82:3,21,24 83:6
  83:19,20 87:18
  89:3,5,7 92:22
  96:24 97:2,8
  98:13 99:3
  104:20 106:4
  110:23 111:6,13
  113:16,25
  114:19,20,22
  115:2,21 116:13
  121:9,24,25
  122:10 124:4,4
  125:11,15,17,24
  125:25 126:1,5
  126:7,8 127:13
  127:19,21 128:6
  128:16 162:25
correctly  10:1
  37:8
corrects  64:2
  142:2,3,10
  143:12

costs  16:19
counsel  4:7,9
  6:16 14:12 17:1
  17:6,13,18
  31:10,15,18
  100:3 150:3
  168:13,14
counterclaims
  26:9
countersuing
  26:16
countries  54:7
  76:2
county  167:3
  168:4
couple  17:1,2,5
  17:8,14 29:5
  79:18 164:10
course  40:7
  72:17 77:7 84:6
  142:20
court  1:1 4:1,2,5
  4:11 30:22
  166:13,17,20
  168:6,20
court's  7:15
  138:16
cov  59:8,22
covariants
  142:22 144:7,8
  144:10 145:4,5
covid  19:10,12
  19:19 34:10
  45:6,19 46:4
  47:2 52:24

58:21 59:3 87:8
  87:9 97:12,17
  101:15 102:18
  102:19 106:24
  156:6 157:2
  158:10,20,21,22
  159:2,8 160:25
cowan  137:10
crafted  162:2
crcm  26:3
created  64:8
creates  77:4
creating  57:2
  133:20
criminal  26:1
criteria  119:4
critical  141:25
criticism  84:22
criticisms  65:17
cross  3:4 119:1
  148:4 164:12
crossed  30:8,11
crypto  23:11
  30:2
crystal  142:12
cumulate  132:9
  149:16,17,18
cumulated
  150:4
cumulating
  131:2 137:3
cumulative
  81:15 89:6
  114:24 127:23
  129:9 133:5

134:9 139:10
  149:11,15,20
cumulatively
  126:20
current  18:16
  19:2,3,13
currently  23:2
cv  1:3 18:16
  24:22

**d**

d  3:1 12:1 34:25
  35:5 56:7
daily  51:21 52:9
  78:15,15 118:13
  118:15 139:8,9
damage  27:7
  29:2 163:22
damages  3:15
  27:19 28:14,18
  28:25 29:17,18
  33:4 67:2 76:11
  76:22 97:25
  122:15 137:19
  150:18 162:8,16
  163:20 164:19
  164:20 165:12
  165:20,21
daniel  143:22
data  59:7,21
  60:12,13 62:1
  62:18 113:9
  135:15 136:2
  146:17 147:7,21
  148:25 149:1,3
  160:25

**[date - demonstrate]** Page 183

| | | | |
|---|---|---|---|
| **date** 7:16 14:24 16:2 29:20 42:16 44:10 51:25 55:13 61:13,15 79:23 125:15 140:6 143:6 144:4 153:9,15 154:13 161:9,10,18 168:11 169:10 | 95:18,20,21 96:4 104:14 105:6,21 107:9 110:19,22 111:14,15 112:8 112:13 113:21 113:24,25 115:11,15,15 119:7,13,16 120:7,13,17,23 121:6,15,17 | 151:17 152:10 162:2,14 | 95:25 96:20 129:22 |

**dated** 48:9 58:18 125:1

**dates** 36:24 159:17

**dating** 50:5

**daubert** 29:25 30:3

**daughter** 6:11

**day** 42:4,9 57:11 59:4 61:8 66:3,7,9,13,21 67:2 68:1 69:23 72:17 73:7 78:14,25 79:14 79:15,17,20,24 80:11,24 81:7,9 81:18,21 82:19 82:23,24 83:1 83:10,22 84:6,9 84:20 85:13,21 86:3,8,11,11,16 89:16,24 91:13 91:13,21,21,24 91:24,25 92:22 92:24 93:6 94:7

122:2,8 124:3 124:23 125:3,4 126:9,13 127:5 127:8,14,23 128:1,8,10,18 128:23,25 129:5 129:10,14,23 130:9,22,23,25 131:1,4,11,11 131:12,13,20,20 131:21 132:7,8 132:10,11,14,14 132:17,21,22 133:16,24 134:6 134:14,15,16,21 134:25 135:6,7 135:8,21,25,25 136:11 137:1,4 139:6,10,14,22 140:1,2,9 142:23,23 144:10 145:4,4 146:5 148:21,23 151:8,11,11,14

**days** 15:25 17:2 17:3 43:14 66:11 81:14 86:1,10 111:20 113:15 114:21 121:4,18 122:2 125:11 127:14 127:21 128:10 129:6,8,17 130:2,2 131:3 132:16,20,23 133:14 134:24 135:2,25 136:21 137:3 138:4,8 139:14,19 149:17 169:15

**deals** 146:12

**dealt** 36:15

**decision** 67:20 74:23 138:16

**declare** 170:21

**decline** 90:16 96:6 106:25 110:15 116:9 117:18

**declined** 78:4 108:17

**declines** 75:9 77:18

**declining** 73:24 74:5

**decrease** 37:22 72:10 84:12,13

**decreases** 69:7

**deem** 123:1

**deemed** 125:16 133:8 136:7

**default** 91:13,22 92:3

**defendant** 2:7 26:10

**defendants** 1:11 4:16,18 7:23 14:9,12

**defense** 25:23 25:25 26:2,14 26:19,21 27:18 28:17

**deficient** 72:18

**define** 69:19 71:5 150:14,15

**defining** 71:4

**definitely** 34:19 151:3

**definition** 112:24 148:22 150:15

**definitive** 53:17

**delaware** 26:8 26:15 27:3

**delay** 70:19

**delayed** 112:22

**delays** 70:14,21

**demonstrate** 107:5 160:14

**[demonstrates - disclosure]** Page 184

**demonstrates** 95:4 130:25 161:4

**demonstrating** 151:7

**denial** 71:22

**denials** 105:21

**depend** 114:10

**depending** 69:25 92:21 94:6

**depends** 70:2 103:12,24 109:16 122:12 122:21 148:24 148:25 158:5

**depo** 166:8

**deposed** 6:14

**deposing** 169:11

**deposition** 1:18 1:22 4:2 6:16 10:12 16:25 17:12 25:19 31:6 33:9 35:11 37:11 40:21 100:6 118:24 151:23,25 152:20 155:22 166:23 168:8,10

**depositions** 5:20

**derives** 151:1

**describe** 14:3 114:6

**described** 34:2 117:17 120:6

128:5,24 137:9 154:3,6

**description** 7:7 13:18,24,25 34:9 154:6 164:14

**despite** 106:19 153:18

**determination** 126:20

**determine** 121:8

**develop** 39:1

**developer** 59:4

**deviating** 154:14

**devote** 20:19

**diagnostic** 37:22 45:7 47:2 52:19 57:18 60:17 90:25 158:20 163:10

**diagnostics** 1:8 33:18,25 34:7 34:22,24 35:15 37:17 38:2,17 39:21,25 42:3 45:9 47:2,25 48:2 50:4 55:9 55:17,17 57:3 57:13 58:22 59:4,13,17,20 60:6,12 61:8,14 62:10,15 65:11 66:2 71:2,11,18 73:23 74:10

75:14 77:14 78:1,12,23 82:17 86:15 87:5,7,8,9,9,16 88:9 90:16 94:21 96:15 100:24 102:19 102:19,20 106:24 107:24 108:1,3,4 110:18 118:18 152:7 169:3 170:1

**dick** 119:22

**difference** 62:8 63:1 113:5 146:7 157:21

**different** 23:25 27:18 61:16 62:5 73:5 76:12 81:10 94:16,16 105:7 108:20 112:11 127:14 132:24 134:17 138:25 147:14 147:25 150:14

**difficult** 36:16

**digest** 70:22 133:15 134:24 135:3

**dimensions** 104:5

**diplomatic** 36:1

**direct** 3:4 5:1

**direction** 12:25

**directly** 14:8

**disaggregation** 122:22

**disagree** 53:4 86:25 125:2,5 136:12 155:24

**disappointing** 59:6 60:12,17 63:16

**disclaimers** 40:8 40:18

**disclose** 40:14

**disclosed** 39:25 62:25 78:6 88:23 98:10,14 103:2

**disclosure** 50:14 63:22 64:11,18 64:21 68:8 73:14 76:5,16 77:25 81:5 82:3 82:25 83:19,20 84:1 89:25 90:6 92:23 93:4 94:6 95:6,8 102:5,8 102:18 104:20 105:11 106:3,4 106:23 107:5,16 113:16,25 114:7 114:12,19 115:3 123:13 125:12 125:15,24,25 126:1,7,8,9,20 128:6,16

**[disclosures - earnings]**   Page 185

**disclosures**
31:25 32:1,4,25
40:8 41:17 65:7
65:11 66:4 71:9
78:24 79:12
81:20,24 87:11
89:3,6,7 90:20
93:10 96:24
97:4 104:13
105:14 110:24
111:13 115:2
122:10 123:2
124:4,4 125:17
127:13 162:2,25
**discuss** 100:6
**discussed** 17:8
35:10 45:6 47:1
52:15 55:25
120:3 125:3,23
138:10 139:17
164:16
**discusses** 70:18
140:13
**discussing**
49:15 50:17
72:4 74:10
82:23 105:23
108:10 134:1
**discussion**
12:19 45:21,22
68:14,21 69:13
124:10 128:14
134:23
**disease** 48:10
49:19

**diseases** 34:8
**dismiss** 7:12,15
7:17,20 8:15
52:16 60:25
**disparate**
157:25
**disposal** 42:23
**dispute** 37:19
37:24 152:5
**disregarded**
40:18
**disregards**
87:14
**disseminated**
113:3,10
**dissemination**
91:8,9
**district** 1:1,1
138:16,17
**diversified**
35:18
**division** 1:1
**docs** 44:25 45:1
101:1 109:13
**doctors** 48:11
**document** 3:13
31:5 34:15 70:8
70:11,13 101:3
101:9 102:1,12
108:10 170:21
**documents**
30:25 31:4,9,13
31:19 33:6,10
40:19 166:11

**doing** 5:16
17:23 28:24
36:17 71:6,7
88:3 96:4
114:16 120:20
135:22 136:12
136:17 141:3,4
141:6 142:24
143:15 144:23
147:13 148:1
165:22
**domain** 46:5
51:1 113:7
**double** 101:4,7
146:20 147:24
**dr** 5:10
**draft** 13:7,15,17
**drafted** 13:2
**drafting** 13:6
**drafts** 13:9
**draw** 145:6
**drop** 107:16
108:24 117:7
118:7,11 126:23
**drops** 154:11
**drumbeat** 50:21
50:23
**due** 53:4 97:9
109:18 125:12
**duly** 167:7
**dunbar** 124:20
124:25
**durenard** 1:9
**dwight** 1:8

**dynamics** 35:20

**e**

**e** 3:1,8 12:3,3,3
12:4,4 81:9,9
169:11,12,22,23
170:4,4,4
**earlier** 9:7
13:19 28:16
35:10 56:5 73:7
73:17 74:6,8
77:10 78:6
79:14 89:9
94:10 96:19,23
98:10,14 105:23
109:21 111:6
115:18 118:1
125:23 127:12
132:6 134:23
149:16 150:6
152:1 164:16,18
165:6
**early** 6:21 7:21
45:7 90:19
91:19 98:4
127:2 166:8
**earnings** 3:14
80:23 100:10,15
100:18,22 101:8
108:6,23 109:8
109:9,15,18
110:1,3,5,7,11
110:11,17
115:23 116:3,5
116:7,15,19,20
116:24 117:2,3

**[earnings - establishing]** Page 186

117:8,13,13,17
117:19,24,24
118:2,7,10,23
119:23 122:17
123:18
**easier** 5:6 17:25
166:12
**east** 130:10
**eastern** 72:24
73:13 90:24
91:4 92:7
102:10 112:7,10
126:18
**eat** 99:21
**ecgi** 22:10
**econometric**
141:7
**econometrics**
141:19 143:1
**economic** 3:15
7:24 8:5 9:3
11:1 20:8 21:17
24:1 27:8 28:8
28:14 41:3
42:19,22 43:7
44:8 53:5 79:3
82:20 84:3
91:12,22 94:5
96:22,24 98:1
104:8 105:3
106:11,13
116:17 119:5,15
122:8 123:8,8
137:19 138:24
155:8 161:4

162:1 163:6,17
**economically**
43:24 90:11
**economist** 42:11
42:20 44:21
76:21 77:3
120:12 122:7,9
127:20 155:1,7
**economists** 44:4
**edward** 1:9
**effect** 53:3 74:9
77:15,23 81:15
85:5 91:20
115:17 124:6
127:23 136:14
142:2,4,7
150:17 151:22
159:4
**effectively** 81:22
**effects** 92:20
119:22 126:2
**efficiency** 34:23
46:24 72:7
111:21 112:12
112:16 126:14
**efficient** 34:22
41:24 46:9,19
69:22 79:8,11
79:13 83:8,9,12
83:14 84:18
85:9,25 88:21
89:13 90:17
91:7 92:3 93:14
94:11,18 102:24
109:3 111:10

112:4,6,24,25
113:12,15
119:21 123:11
124:10,12,18
126:11 135:10
138:14
**egan** 1:9
**either** 84:17
118:8 138:4
154:2
**elicits** 112:14,14
**emphasize**
77:12
**employee** 14:14
14:19 168:13
**employment**
20:15
**enables** 44:5
147:12
**engage** 51:8
**engaged** 7:18,19
8:13 14:8
**engagement** 7:8
7:22 8:1,9 14:10
14:13
**enjoying** 59:5
**enter** 163:13
**entire** 48:20
55:23 68:1
116:8
**entirely** 109:25
**entirety** 109:17
**entitled** 70:13
75:9 141:1,2
161:3

**entry** 34:10
**envelope** 95:21
**environment**
32:24 33:3
**equities** 35:17
39:16
**ergo** 43:5
**errata** 169:9,10
169:14
**error** 16:6 17:4
21:15 36:4
104:6 105:1
140:20 141:8,11
141:16,17,18,21
141:24 142:7,9
142:13,14,16,21
143:4,5,10,10
143:16 144:7,9
144:11,12,15,16
144:24 145:3,19
145:23 147:13
148:9,11,18,20
148:22
**errors** 147:5,17
148:4,16
**erwin** 2:10 4:17
4:17 166:15
**esquire** 2:5,6,9
2:10 169:1
**est** 1:14,14
**establish** 90:10
151:6,16 152:24
152:25
**establishing**
109:17

**estimate** 16:19 103:16 141:12 141:12 147:24 148:13

**estimated** 146:17 147:7,21 148:6

**estimates** 53:19 118:10 141:10 141:21 143:14 149:5

**estimation** 155:16 156:4,11 156:13,17,21 157:4,6,20 158:1,21 160:12 160:13,18

**estimator** 146:10,11

**et** 24:6 30:25 32:18 169:3 170:1

**eugene** 1:9

**european** 22:8

**evaluate** 51:17

**evaluating** 59:7 151:14

**evaluations** 101:17

**evening** 106:3 126:19

**event** 13:24 14:3 22:15 39:10 65:24 66:8,11 66:14,18,25

69:16 81:10 84:8 89:6,7 92:19,23 96:13 96:16 111:4,9 113:24 121:17 121:17,22,23 122:1,3,3,4,8 127:14 130:20 130:22 131:3 133:4,7,21 134:14,17,21 135:11,12,13,14 136:7,14 137:4 137:22,25 138:7 138:13 139:6,14 139:18 143:6 153:15 155:4,4 155:5,14 156:16 156:17 160:11 160:14 162:7,22

**events** 41:4

**everybody** 136:25 141:1

**evidence** 42:19 42:22 43:8 44:8 53:5 66:2 84:3 96:24 104:8 105:3 106:12,13 107:14 116:7,17 123:8 155:8 161:4 163:6,17

**evidentiary** 29:25

**exact** 7:21 8:15 14:2 45:20,23

127:3 154:21

**exactly** 7:12,16 120:2 143:9,15

**examination** 3:4 3:4,5 5:1 164:12 166:2

**examine** 33:18 109:9 123:18 133:3

**examined** 4:22 84:11

**examines** 145:25

**example** 12:11 12:19 15:11 27:19 33:1,22 40:1 45:13 46:11 47:6 69:21 79:21 80:14 81:3,11 81:15 96:20 126:3 132:1 134:13 153:4 154:7,18

**examples** 27:21

**except** 8:14 115:13

**exception** 30:1,1

**exchange** 67:17 92:14

**exclude** 42:15 42:16 44:2 96:19

**excluded** 29:25 30:22

**excluding** 78:16

**excuse** 92:1

**exercise** 156:19

**exhibit** 3:10,11 3:11,12,12,13 3:13,14,14,15 3:15,16 5:16,19 17:20,21 18:4,7 43:20 49:4,6 52:4,5,6,9 55:3 55:5 57:22,24 58:6 70:7,8 75:2 75:4 100:8,10 133:17 137:19 142:20 143:18 143:19,25 144:1

**exhibits** 12:11 12:12,15 17:21 31:8

**existed** 62:15

**existing** 19:3 105:7

**expect** 79:13 85:6,20 90:17 134:24 135:5,6 136:24 163:12

**expectation** 153:4

**expectations** 34:14 117:14 154:14

**expected** 138:15

**experience** 70:19 90:10 117:6 119:17

**expert** 3:11,16 7:1,23,24 8:2,3 8:4,5,7,20 9:3 14:21,25 18:4 23:20,22 24:7 24:11,17 25:17 25:22,24,25 26:4,6,14 27:3,6 27:15 30:16 31:24 32:1 53:16 121:1 143:19 149:10 149:11 150:4
**experts** 30:3 124:22,23
**expires** 167:14 168:22
**explain** 36:11 51:15,24 107:17 145:11
**explainable** 42:12 43:6 44:6 44:20 51:25 86:23 155:6,9
**explained** 86:22
**explanation** 44:3 96:8
**explanatory** 145:15
**extend** 92:23
**extension** 34:12 146:11
**extensive** 71:6
**extent** 50:9 151:9

**extreme** 62:10
**eye** 84:7
**eyesight** 20:10

**f**

**f** 81:9,9
**face** 53:14
**fact** 50:20 52:1 53:6,18 54:10 72:17,18 78:4 82:21 84:4 87:15 90:11 94:18 97:25 106:19 107:11 123:8 126:3 129:17 131:21 132:17 139:7,22 139:25 142:22 144:13 148:12 152:14 153:18 156:5 157:18,18 163:8 165:11
**factors** 116:10 120:5
**facts** 69:25 70:2 82:6 89:10 93:9 98:8,12 99:3 104:2 111:7 122:13,15,19,21 130:4 141:2 151:20 153:2 155:23 157:12 157:22 158:5,13 160:24 170:21
**faculty** 21:23 22:1

**fails** 57:21 169:18
**fair** 13:5 26:20 29:13 34:10 37:1 52:22 59:11 60:8,13 75:20 91:5 92:24 109:14
**fall** 23:6
**false** 64:9 97:21 99:5 153:25 163:15 165:8
**falsely** 153:3,7
**falsity** 10:18 33:17 60:22 97:24 103:12
**fama** 119:20
**familiar** 33:25 120:16 138:20 145:24
**far** 82:15
**fast** 119:5
**faster** 138:14
**fda** 41:18 62:24 81:21 82:7,11 82:16 84:4 89:11 102:5,17 104:20 105:8,13 106:3,23 107:5 107:15,23 109:2 109:6,20 110:3 110:14 115:3 123:7,9,13,24 126:7,20

**feasible** 94:5
**february** 16:9
**fed** 148:18
**federal** 26:20 169:16,22
**fee** 16:15
**feed** 144:14
**feel** 156:17
**fell** 95:16
**fellowship** 21:20
**ferrell** 1:18 3:2 4:20 5:10,11,12 164:14 166:4,8 166:13 167:6 168:8 169:4,7,8 169:10 170:3,24
**figure** 24:15 29:6 116:22 132:17
**filed** 1:22
**filings** 40:1,14
**finance** 22:4,24 22:24,25 120:12 131:2 132:25 137:2
**financial** 3:15 33:19 42:11,20 44:4,21 58:17 76:21 108:1,5 108:19 120:12 133:17 154:25
**financially** 168:15

**[find - function]** Page 189

**find** 66:16 139:10 160:3,9
**finding** 140:8 151:17 157:14 157:16
**findings** 10:9,15 41:6 68:12
**finds** 130:21 152:17
**fine** 5:11 6:13 73:6 99:24 108:13
**finish** 59:4 164:5
**finra** 3:13 70:8 70:16 71:3
**firm** 24:1 80:19 80:23,25
**firm's** 125:14
**firms** 25:8,9 79:22 80:17,20 80:22 81:1,5 114:7,11
**first** 4:21 6:25 7:8 11:17,20 13:15,17 20:1,1 27:4 47:9 59:3 65:23 72:22 82:5 85:13,20 86:3,10,11 95:20 97:9 100:4 102:17 104:7 129:10 130:21 131:1,4 131:13,21

132:10,14,17 133:3,15 134:16 134:24,25 135:7 137:4,25 147:2
**five** 124:23
**fl** 169:12
**flat** 143:2,16
**flawed** 65:2,12 155:15
**florida** 1:21 2:5 4:5 167:2 168:3 168:7,17,21 169:16,22
**flowing** 13:21
**fluffiness** 99:1
**fluffy** 97:13 98:17,23
**fluid** 156:7
**focal** 37:2
**focus** 36:9,12
**focused** 38:3 58:17 134:8
**folks** 5:8 15:14 69:22 82:10 109:14 116:18 156:24
**following** 35:4 36:20 42:10 82:25 83:10 84:6,9 90:19 124:23 125:11 127:7 138:16 156:23 163:21
**follows** 4:23 83:12

**footnote** 9:12,13 9:15,22,25 10:5 67:3,3,7 72:5,23 73:3,4,4,5 78:11 108:9 112:9 118:12 149:16 159:21,22,24 160:6,7,10
**forecast** 143:5
**forecasts** 108:7
**foregoing** 168:9 170:21
**forget** 7:16 31:11 51:12,20 135:25 154:21
**forgetting** 120:21
**forgot** 55:1
**form** 44:15 74:1 74:13 83:24 92:25 94:8 96:1 104:21 111:1,16 112:1,20 115:12 121:11 123:4 126:24 160:16
**formally** 38:12
**formed** 35:4
**forms** 39:4
**formula** 160:17
**formulaic** 122:25
**forth** 12:18,20 104:15 106:17
**forward** 37:9 122:14 159:3

**found** 28:14 30:11 37:4,5 65:24 133:6 136:6 152:20 160:23
**foundries** 26:5
**four** 25:12,17 35:6,7 60:9 119:4,6 120:5,5 120:8,18
**fourth** 130:20
**frame** 40:20 42:18 158:22
**fraud** 26:1 161:5
**free** 5:18
**frequent** 98:17
**frequently** 97:13
**friday** 1:14
**front** 5:5 31:22 54:21
**froze** 19:10,12 19:20
**full** 24:24 25:16 91:24 131:18 158:23
**fully** 30:21 78:23 86:7 110:23 111:13 112:8 135:16
**function** 83:11 95:8 140:2 142:22 145:5

**[fundamentally - guessing]**                                          Page 190

**fundamentally** 65:2,12 155:15

**further** 8:12,13 45:8 108:16 110:13 116:3 135:7 139:6 158:3 164:9 166:7 168:12

**g**

**gain** 58:22

**gather** 31:16

**gauss** 147:16,19

**gelt** 1:4 161:9 161:15,23 162:7 162:11 169:3 170:1

**gene** 119:20

**general** 35:18 38:5 45:7 63:14 67:16,19 68:4,9 69:9 87:8,9 93:12,17 94:17 102:19 149:3

**generality** 125:5 138:10 158:8 162:18

**generally** 5:19 39:12 64:1 123:16 148:25 154:22 160:19

**generated** 147:2

**generic** 94:4

**genevieve** 2:10 4:17

**germane** 151:21 152:22

**getting** 125:6 130:11 165:14

**gig** 19:11,23

**give** 100:9 131:18 163:24 164:1

**given** 24:21 56:25 57:6 59:15 61:19 74:25 93:19 97:25 98:14 111:6 130:4 134:12 140:4 152:10 158:18

**giving** 24:15

**global** 26:5

**gls** 36:5,22,25 37:9 142:10 143:1 145:8,18 145:21 146:16 147:6,11,15,17

**go** 5:10,18 13:12 18:24 20:12 22:3 25:2 29:1 33:20 41:11 43:3 44:25 48:18 53:1 54:3 56:14 61:11 62:9 63:25 64:14 72:11 76:19 80:9 83:2 83:24 85:23 89:9,20 96:22

97:19 99:22 106:6 108:16 110:12 114:9 116:3 118:12 120:10 121:12 122:9 123:20 124:9 129:25 131:23 135:11 149:15 150:23 151:10 157:9,17 157:17 161:17 163:25

**goals** 71:5

**goes** 41:14 122:18 149:7 157:16

**going** 6:15 9:15 11:15 13:24 14:1,2 17:20,22 20:10 21:14 22:14 24:9,14 35:17 38:5,22 39:1,1 42:6 45:20 46:22 47:19 49:18 55:1 63:7,18 67:5 71:25 72:15 81:17 86:11,20 89:9 92:8 96:22 99:11,12,13 102:15 109:8 113:20 114:20 118:5 121:19 122:4,22 127:18

130:16 136:2 140:1 141:10 147:9,25 150:25 153:5 164:14

**good** 5:3 59:18 63:8,17 99:19

**google** 113:9

**governance** 22:8

**governor** 51:3 65:9 71:14 87:15,19 88:13

**grapevine** 90:7

**grateful** 6:21,22

**great** 5:22,24 6:4,9 17:19,24

**green** 59:5

**greenfield** 20:2 20:23

**grinkagopolis** 11:16

**growing** 97:11 97:17

**guess** 7:23 8:9 14:4,22 15:1,2 26:3,7 35:23 38:14,18 40:20 43:14 80:2 82:5 91:9 106:11 125:6,22 129:5 129:13 149:23 155:20 156:14 158:12 160:11

**guessing** 15:2

**[guidance - hypothetical]**                                              Page 191

**guidance**
  138:15
**guide** 3:15
  137:19
**guys** 99:22
  163:24

**h**

**h** 3:8 51:2 170:4
**h.c.** 47:9
**half** 17:5 56:23
  57:8,21 95:21
**hall** 6:11
**halliburton**
  138:17
**halt** 67:13,20,25
  68:7,7,21 72:5,9
  72:22 73:15
  78:13,21,22
  84:12
**halted** 68:3,11
  70:19 72:16
  97:10
**halts** 67:9,15,24
  68:5,13,17 69:6
  69:10 70:14,18
  70:21 84:11
  86:14 95:25
  96:3,3
**hand** 167:9
  168:16
**handful** 17:3
**happened** 53:5
  104:13 140:7
**happening**
  86:11

**happens** 80:20
  114:15 134:14
  153:25 157:5
**happy** 5:5 9:23
  120:21
**hard** 13:20
  24:14 90:10
  98:9,11 99:2
  119:5 163:8,8
**harm** 28:24
**harmed** 161:5
  161:15
**harvard** 20:2,17
  20:23,24 21:4
  22:19
**hawaii** 1:15
**head** 51:13
  68:15,20
**headway** 99:19
**healthcare** 21:8
  21:13
**hear** 6:12
  120:22
**heard** 54:11
**hearing** 62:4
**heels** 99:7
**helpful** 156:19
  166:10
**hesitating** 101:4
**heteroscedastic**
  142:7
**heteroscedasti...**
  35:24 36:3,4,8
  36:15,21,24
  38:4,12,15

  140:13,14,19
  141:13,22 142:2
  142:4,6,15
  146:12 147:5,9
  158:18
**hh224550**
  167:13 168:21
**higher** 59:5
  97:12,17 108:6
**highlights** 45:8
  47:4 101:13
**hindenburg**
  33:1 93:11,11
  97:8,9 98:2,6,7
  98:25 111:5
  127:5
**hindenburg's**
  97:16 99:2
**history** 97:10
  98:3
**hit** 19:10 67:18
  68:6 69:11
**holding** 149:6
**homoscedastic**
  142:13
**homoscedasti...**
  144:25 147:4,17
**hopkins** 45:25
  46:12
**hostetler** 2:8
  4:16,18 9:3 14:8
  14:21 16:18
**hour** 14:6 63:18
  92:7 93:5,10,18
  99:13,15,16,16

  99:17,22
**hourly** 14:6
  15:4,24
**hours** 15:19,22
  16:4,7,8,10 17:1
  17:3,3,6,14
  24:14,16 62:25
  63:7 65:7 70:1
  71:24 73:11
  83:25 84:5 91:5
  99:8 105:18,19
  105:22 106:8
  108:2,18 115:3
  126:8
**house** 27:2
**household**
  28:20 149:21
**huge** 119:19
**hundreds** 79:22
  80:17,21 81:1
  114:6,11
**hungry** 130:11
**hypo** 62:3 115:6
  115:18 127:17
  130:5 132:6,7
  133:11,13
  154:11
**hypos** 132:19,24
  133:12
**hypothetical**
  61:5,6,20,24
  62:16,17,19
  63:3 83:18 93:2
  93:12 94:4,9
  104:1,3,25

**[hypothetical - indicate]**                                                    Page 192

106:8,10 115:1
115:4,9 121:5
121:13 128:6,15
129:13,20 153:1
153:2,6
**hypothetically**
62:9 83:5 94:2
103:5,14,15
105:4,5 115:13
126:6

**i**

**ibm** 26:4
**idea** 107:10
**identification**
18:5 49:6 52:6
55:3 57:24 70:9
75:4 100:11
133:18 137:20
143:20
**identified** 80:22
97:4 125:15
**identify** 33:17
79:18
**identifying**
116:9
**ignored** 41:4
**ignores** 35:14
38:1,16 39:5,24
40:21 41:1 45:5
46:25 50:19
87:4 108:2
161:4
**ignoring** 39:7
144:13 148:9

**ii** 138:17
**illegal** 16:17
**illustrated**
139:7
**illustration**
140:8
**imagine** 69:24
**immediate**
90:16
**immediately**
127:4,10
**impact** 29:21
34:14,16 36:18
37:4 41:5 42:16
81:4 82:3,25
83:22 85:6,21
89:7,14 91:9
99:5 107:5
108:2 114:25
121:8,10 123:18
134:2 150:13,19
150:19,25 151:3
151:7,15,16
152:24,25 153:9
153:14 154:2,10
154:12,17 162:5
162:19 165:1,12
**impacted** 41:5
66:3
**impacts** 41:17
122:10
**impeded** 78:23
**imperfect** 94:3
**implicates** 74:11

**implications**
125:13
**important**
107:22
**impose** 135:14
**impound** 72:8
**imprecision**
141:10
**inaccurate**
29:10 126:21
**inappropriate**
129:15 131:5
**inappropriate...**
139:5
**inaudible** 148:4
**include** 12:25
40:23 43:11
50:24 71:25
72:2 138:1
**includes** 50:23
**including** 21:13
33:3 61:14 63:6
77:13 96:14
104:14 110:5,11
124:11 153:19
165:4
**incomplete** 94:9
**inconsistency**
112:17
**inconsistent**
46:23 78:22
84:3 85:8,25
111:20 112:12
112:15 124:18
132:18

**incorporate**
29:21 46:9
165:3
**incorporated**
138:3
**incorporates**
121:24
**incorporating**
78:23
**incorrect** 95:4
**increase** 21:11
37:16 42:25
56:11,19 61:8
62:12,20 95:7,7
109:23 129:2,21
149:6 152:11
154:19
**increased** 90:18
**increment** 69:21
134:1,12,25
**increments**
67:18 124:14
**independent**
101:16
**index** 39:22
145:9,11,17,21
145:25 150:11
**indexes** 147:1
**india** 53:21
**indicate** 4:9
53:15 78:12
103:16 131:12
143:3 155:8
163:6

**[indicated - interpretation]**

**indicated**  15:6
89:15 113:14
121:2 128:7
152:23
**indicates**  73:22
93:13 123:8
155:5
**indicating**  28:5
39:15 77:3,17
103:6 104:18
106:14 116:24
**indicative**  130:6
**individual**
44:16 129:6
**industry**  86:23
141:9 150:11
**inefficient**  81:8
81:10 85:4,20
86:9 112:2,23
114:4 119:19,20
119:24 120:1
126:25 132:16
132:23 135:4
136:22
**infectious**  48:9
49:19
**infer**  154:10
**inference**
144:11
**inferring**
125:12,20
**inflation**  65:2
67:2 76:22
97:25 99:4
162:15,21 163:5

163:12,14,17
164:21 165:4,5
165:20,22
**information**
8:23 38:23
40:22,24 41:20
41:23,25 44:10
46:9,20,23 50:5
50:22 54:11,17
54:19,22,23
56:25 60:5,16
62:23 63:23
64:2,5,20 69:24
70:6,23 71:1,4,8
71:17 72:8,19
74:4,5,8 76:13
76:23,25 77:14
77:15,19 78:2,6
78:8,24 79:8,9
79:11,23,25
80:3,15 81:13
81:14,16,17
82:8,12,21 83:6
83:8,21 84:1,5,7
84:20 85:5 86:2
87:18,22 88:22
89:12 90:1,17
91:8,14 92:6
93:4 97:2,9 98:3
98:6,13,13 99:4
99:4 103:1
105:6,9,10,10
105:13 106:16
107:10 109:3,4
110:2,10,11,18

113:2,10 114:20
114:22,23 115:3
115:4,5,10,14
115:16,19,20,20
115:24 116:6,15
116:16,21 121:3
121:5,7,10,14
121:16,19,25
122:1,1,11
123:3,10,25
124:5,12,15,16
125:13,21 126:1
126:4,11,12,15
127:1,7,19,21
127:22 128:2,7
128:13,16,19,20
128:23 129:7,8
129:17 130:7
131:14,21,22
132:7,8,10,11
132:13,15,20,22
133:7,15 134:16
134:24 135:16
135:21 136:1,6
136:15,21
138:14 153:24
153:25 157:11
**informational**
32:24 33:2
104:12
**informative**
156:18
**informed**  38:19
39:11 151:25
152:2,6

**informs**  64:2
**initial**  6:1 9:8
11:9 31:11
33:21 133:5
136:5 146:25
**initially**  26:16
**initio**  13:11
**inputs**  150:9
**instance**  30:21
81:19 92:6
113:3 115:1
**instances**
113:14 117:10
119:6
**institute**  22:8
**instruction**
11:11
**instructions**
12:13
**intend**  10:6
**intended**  58:16
**interacted**  11:14
11:15
**interaction**
11:22 12:8 22:5
**interactions**
11:23
**interest**  80:19
**interested**  59:14
81:4 110:14
168:15
**interpret**  57:10
84:8
**interpretation**
53:17

**interpreted** 51:9 51:18 53:2 56:24 103:5 104:9

**interpreting** 53:16 121:21 128:9

**interrupt** 20:4 89:19 108:9 132:3 158:4

**interrupting** 80:12

**interval** 135:13 136:16

**intervals** 94:17 133:4

**intraday** 69:16 69:19 70:5 95:14 133:4,21 133:25 134:9 135:22 136:12 136:17

**introduce** 17:20

**introduced** 18:7 52:4 70:7 75:2 100:8

**introduces** 153:22

**introducing** 143:18

**investigation** 46:14

**investigator** 137:25

**investing** 35:15 38:2,17 39:15 39:16,20,22 45:9,18 46:3 47:5

**investment** 58:15

**investments** 58:17

**investor's** 51:21 52:8 118:13,15

**investors** 44:16 51:18 65:11 79:10 103:5 104:17

**invoice** 15:20

**invoices** 14:20

**invoke** 73:17 94:10

**involve** 8:5

**involved** 12:17 27:14 70:3

**involvement** 97:10

**involving** 8:17 34:8 66:7 149:25 158:22

**iowa** 51:2,2 65:9 71:14 87:25 88:4,8 126:18

**iowa's** 87:19

**irrelevant** 135:3 135:9 136:23 151:21

**ish** 15:24 17:3 102:11

**islands** 1:5

**isolation** 53:25

**issue** 36:7 70:6 97:12 98:16 115:19 127:22 131:25 133:7 136:7 143:4

**issues** 33:3

**issuing** 52:13

**iterative** 12:10 12:21 13:7,19 13:21

**iv** 64:25

**j**

**james** 1:9

**january** 16:10 19:20 23:6 39:1 159:3

**job** 35:21 169:5

**johns** 45:25 46:12

**join** 75:9 77:18 78:4

**journal** 3:15 46:21 48:8,19 113:4 133:17

**judge** 30:7,11 60:25 61:2

**judge's** 7:12 31:23

**judgment** 41:22 82:7 84:2 89:11

**judicial** 8:17

**june** 167:14 168:22

**junior** 15:9,11 15:13,14

**juxtaposing** 60:11

**k**

**k** 12:3,4,20 31:23 33:21,22 34:9 38:20 40:3 44:24

**kansas** 46:21

**keable** 11:14,20 12:3 15:10 17:7 17:9

**keable's** 15:4

**keep** 127:17 157:20

**keeping** 84:6

**kennedy** 21:24 22:2

**kind** 13:20 26:18 33:15 39:10 58:14 63:13 86:9 95:20 105:20 109:15 117:4 128:13 133:11 155:20 159:6

**kinds** 26:11 86:4

**kit** 101:15

**kits** 49:21

**[knew - level]** Page 195

**knew** 41:21 83:7 124:25

**know** 5:8 6:14 6:19,21 7:3 8:16 12:20 13:11 14:18,23 15:4,5 15:25 16:2,4,12 21:6,9 22:16 23:19 24:5,14 24:15 26:8,15 26:19 28:7 29:8 32:5,24 33:3 34:12 35:13,24 36:9,14 37:1 38:7,22 39:16 39:21 40:18 41:1,17 43:4,8 43:10,11,17,23 44:23,25 46:11 46:12,13 51:11 54:7,8 58:11 60:16 63:4,5,7 63:11,15 64:4 64:18 67:15 69:3,9 70:1,5 71:3 72:5,7,14 72:22 73:1 75:16,25 76:21 76:23 77:7,9 79:25 80:18 83:5 84:16,17 85:10 86:5,7 87:1 88:9 89:21 90:2,4,9,12 91:7 91:11,12 92:11 93:1 95:18,23 96:15 99:21 101:8 102:8 104:5 105:7,20 106:10 107:7,18 107:19 108:25 109:5,5,19 112:14 113:7,23 114:15 115:3,7 116:12 117:3 120:25 121:19 122:2 124:8,25 125:6 126:17,17 129:21 135:1 136:14 138:24 140:3,3 142:7 144:17 145:6,25 146:25 147:23 148:24 149:14 149:24 150:3 151:15 154:5,18 155:20 157:19 158:9,9,12,23 159:1,2,11 160:21 162:24 165:19

**knowing** 53:22

**knowledge** 52:23 53:8 61:19 62:14

**known** 50:9 82:10 98:3,6,8

**knows** 109:1

**ks** 40:6

**kula** 1:15

**l**

**l** 12:3,4

**lab** 87:16,23,23 87:24

**label** 129:16

**labs** 75:10 77:18 88:2

**lack** 8:14 129:21 130:5 159:6 165:2

**lags** 86:4

**laid** 119:4

**lake** 47:21,23 48:17,25 71:12 73:1,8,19 95:2 96:19 99:8 111:18 112:7 113:8,8 126:6 126:17 127:2

**language** 75:18 108:14 124:6 131:18

**large** 1:21 42:9 79:24 80:16 114:16 168:7

**larger** 148:22

**las** 149:25 150:3

**late** 91:19

**law** 20:2,2,17,23 20:23,24 22:11 22:12,13,25 25:8,8 138:22 139:1

**lawyers** 8:24

**lead** 81:10

**leading** 41:16

**leads** 44:7 156:2 156:9 157:6

**leakage** 89:22 89:22,23 90:2,3 90:4,13 113:22 113:25 119:16 120:1 149:21,23

**learn** 64:19

**learned** 56:25 140:22 153:21 161:20 162:25 163:11

**learns** 90:1,7 125:25 126:4 153:11 154:10

**legal** 11:2 30:8 30:11 40:11,13 40:15 61:10 63:24 64:13 74:14 76:6,18 76:20 83:23 106:6 138:23 150:22 151:10 169:21

**legally** 40:12

**length** 135:15

**letter** 14:10,13

**level** 37:6 42:12 44:6 125:4 138:9 141:23,24 148:1 158:7 162:18

**[levels - lower]**                                              Page 196

levels  67:18 68:5 69:4,11

lexecon  11:11 11:12 12:2,9,12 14:11,13,14,20 14:23,24 15:3,7 15:19,20,22,25 16:13,15,18,22 18:19 23:15,23 23:24 31:14,15 31:17 32:22

liability  29:3,12 29:13,16 33:15 60:19 61:2 97:20 98:15 165:7,11,15,15 165:17

lie  153:22,22 154:13,13

lies  153:7

lieu  101:3

life  166:11

likely  114:15

limitations  53:8 54:9 62:15 63:5

limited  1:5

limits  38:6 50:22 69:4

lincoln  48:8,19 49:17

line  18:20 30:8 30:11 95:19 170:5,8,11,14 170:17

lines  65:17

link  49:25 50:7 57:3,5 74:15 76:1 108:23

linking  107:15

links  50:3,4

list  18:18 22:7 24:22,24 25:16 26:5 30:25 31:22 33:20 45:1,3,13 46:16 47:9 50:17,18 65:16 97:11,17 101:1 108:20 109:13 113:20

listed  19:2 32:20 33:21 70:21 120:18

lists  35:4

literature  44:5,9 79:19 80:18 91:15 92:4,13 93:13,17,19 94:10,17 119:5 119:19 120:7,13 120:17,23,25 122:18 124:11 130:24 131:2 132:25 134:4 137:2 145:24 146:14 155:2 158:24,24

lithium  27:2

litigation  22:23 28:21 149:22

150:16

little  19:8 21:15 49:9 55:7 70:12 93:8 109:7 125:1 164:1

live  113:7

llp  2:8 4:16

local  113:4

lockstep  21:6

log  147:1

logarithmic 43:15 44:1

logic  95:9 119:14

logix  59:21

long  20:22 23:14 81:9 85:9 91:21 99:11,12 136:1 149:22

longer  119:22 119:23

longest  149:19

look  7:9,10 25:3 32:4,5,23 38:10 51:10,14,20 53:16 62:4 63:8 66:19 69:22 77:4,6,7 81:15 82:4,25 83:21 83:22 84:6 86:17 93:6 94:16 109:11 114:24 119:18 120:2,19 126:2 129:5,6,6 130:1

130:9 131:11,19 132:9 141:6 142:12 144:23 150:6 156:8,10 157:3,12 159:17 162:24 163:3

looked  89:6 150:9 158:23

looking  26:5 40:23 53:11,24 58:25 59:18 79:22 80:17,18 100:22 118:12 129:8 135:23 136:2

looks  93:15

lose  26:9

loss  27:8 28:8 29:18 33:3 65:1 76:10,22 98:1 163:23 164:20 164:23 165:19 165:21

losses  65:11 162:1,1

lost  103:18

lot  9:5 24:8 27:22 32:23 38:8 44:18,18 91:15 135:21

lots  146:13 156:6

lower  61:9 108:6 117:13

**[lunch - matter]**                                                     Page 197

**lunch** 130:12,13
**lynch** 27:20
28:20

**m**

**m** 117:25 118:7
**made** 4:11
30:11 39:14
65:7 97:7 102:8
106:12 153:6,7
159:4 166:11
**magical** 92:8,9
**mail** 169:11
**mailed** 169:12
**maintenance**
152:9
**majority** 25:24
**make** 10:6 28:1
41:3 49:9 55:7
58:2 70:12
100:12 113:4
114:21 117:11
123:6 132:12
144:11 153:5
155:21 159:5
160:1,4
**maker** 52:18
**makes** 55:21
107:12 157:21
**making** 99:18
112:3 134:11
149:2
**manipulation**
145:25 146:2,3
**manner** 4:8
102:24

**march** 1:14 45:7
47:10 167:6,9
168:17 169:4
170:3,24
**marcus** 2:4 4:13
**margin** 16:6
17:4 21:15
**marginal** 30:5,6
30:14
**mark** 141:9
**marked** 18:4,7
49:6 52:4,6 55:3
55:5 57:22,24
70:7,8 75:2,4
100:8,10 133:18
137:19 143:18
143:19
**market** 34:18,22
35:14 38:1,16
38:19 39:5,11
40:24 41:12,13
41:18,21,24
45:8,18 46:9,19
46:22,25 47:4
50:9 52:2 53:22
54:8,11 56:24
56:25 57:2,7,9
57:17,19 59:12
59:14,18 61:12
62:4,17 63:15
64:2,5,5,18 65:7
70:22 72:7,8,15
72:18 76:13,24
77:9,12 78:2,14
79:8,13 80:1,3

80:15 81:8,24
81:25 82:11,16
83:7,7,9,15,20
84:2 85:4,20
86:9,22 87:5,7
88:21 89:13,24
90:5,17 91:7,8
98:6,25 102:18
103:11,25 104:3
104:8,24 105:1
105:2,4,5,9
106:8,13,21,23
107:6,10 108:2
108:4,18 109:2
110:3,12,22
111:9,12 112:2
112:6,16,23,23
112:24 113:12
113:15 114:4
116:21 117:5,14
118:14 120:1
121:19 123:10
123:10 125:12
125:20,25 126:4
126:16,25 127:1
132:16,17,24
133:14 134:2,23
135:3,4,10
138:14 146:3
150:11 152:1,2
152:5,8,11
153:3,4,4,11,19
153:20 154:10
154:14 161:19
161:20 162:25

163:9,11
**market's** 45:18
46:3,3 53:7
62:14
**marketplace**
51:18
**markets** 58:17
69:22 70:19
79:12 81:10
83:8,12 84:18
84:18 85:9,25
92:3 93:14
94:11,18 119:19
119:21,21
124:10,12,18
126:11
**markov** 147:16
147:19
**married** 156:5
**massively** 36:5
**material** 133:8
136:7
**materiality**
10:23 11:1
**materially** 9:17
64:3
**materials** 8:20
9:1 13:20 15:12
30:24 31:16
40:23
**math** 96:4
**matter** 8:18 9:4
10:9 15:8,14
16:3,13 23:25
26:4 30:9 31:24

**[matter - misstatement]**                                              Page 198

35:18 74:19
82:23 95:8
97:18 113:2
119:14
**matters** 30:12
32:6 107:9
113:6,12 114:24
**mba** 22:24
**mean** 13:6,10
15:1 17:15 20:4
22:2 25:18 29:1
29:2 31:22
35:16 39:14
50:20 51:10
54:8 57:5 64:16
72:13 73:6 74:7
75:20 77:2,24
80:16,25 89:19
90:3 91:24
96:13 103:11,24
104:3,7,24
117:4 120:19
125:20 128:1
135:19 140:21
143:11 150:13
152:19 154:5
155:19 158:1,4
158:5 159:18
162:10
**meaning** 115:20
119:21
**means** 13:17
22:3 97:20
103:13 135:20
158:2 165:15

**meant** 53:18
92:1
**measure** 163:14
**measures** 99:4
**mechanical**
140:2 142:22
145:5
**mechanically**
144:9
**media** 51:8
**mediocre** 62:18
**meet** 153:8
**meeting** 17:13
17:14,16,17
**members** 15:10
**memorized** 49:2
**memory** 7:3
9:25 17:16
19:19 30:13
42:6,6 45:22
48:1 52:15
54:22 56:22
59:16 60:24
61:1 73:7 74:2
86:18 102:9,9
102:10,15
150:25 154:22
**mention** 9:25
30:9 90:2,13
**mentioned** 29:5
39:3 159:21
**merrill** 27:20
28:20
**mess** 81:17

**met** 17:1
**method** 122:15
162:16
**methodology**
30:17 133:21
140:18 162:15
**methods** 146:18
**mexico** 53:20
**miami** 2:5
**michael** 2:5
4:13 11:14,20
15:10 17:7,9
**mid** 91:18
101:13 127:2
**midday** 124:17
**middle** 27:22
112:13
**million** 34:18
78:12,16
**mind** 14:4 27:21
28:19 29:9 68:2
74:15
**minute** 27:24
93:16 94:15
99:23,23 136:3
136:3,4,4
**minutes** 28:1
67:11 68:10,22
72:14 84:19
93:15 94:14
135:13,23
163:25
**misconstrued**
163:1

**misimpression**
64:8
**misinformation**
90:8
**misinformed**
36:6 106:8
142:1,18
**misinterpret**
104:18
**misleading**
33:17 61:1,4,7
64:4,9 97:21,24
99:5 103:12,15
163:15 165:8
**misled** 105:24
106:3
**mispronounce**
11:16
**mispronounci...**
10:11
**misrepresenta...**
28:9,15 138:2
150:17 151:4
153:3,10,14,15
153:23 154:13
161:21
**misrepresenta...**
10:19,24 28:23
125:13,21
**missed** 92:16
117:13,20,24
118:2,9
**missing** 118:9
**misstatement**
27:8 37:7 64:3

**[misstatement - necessary]**                                     Page 199

65:6 87:5 97:6
138:2 151:15
161:15 162:8
165:16,18
**misstatements**
29:20
**misstates** 13:3
41:11 43:2
52:25 56:13
77:5 85:22
113:17 114:8
115:25 119:9
120:10 121:12
127:16 129:24
161:16
**misstating**
119:11
**misunderstan...**
118:2
**mit** 83:13
140:23
**mitigate** 72:9
**mix** 22:25
104:13
**mixed** 109:15
109:15 116:19
117:2,7,17,19
117:21,24 118:6
118:7,18
**model** 37:5,9
44:2,4 120:1
144:22 145:12
150:10
**models** 43:24

**modification**
10:4
**modifications**
9:11 10:5
**modified** 9:21
**molecular** 34:7
34:13 59:8,21
90:25
**moment** 8:15
91:8,9 92:8,10
**moments** 92:11
**monday** 80:4,23
81:13 85:5,7,11
86:6 114:21
121:6 128:17
129:2,22 130:2
130:5
**monte** 149:24
**month** 15:23,23
15:24,24 150:1
156:3,3 157:4
157:19,20
158:11 160:18
160:18
**months** 37:10
37:11,12,12
125:11 155:22
155:25 156:1,7
156:10,23,24
158:7 159:1,13
159:13 161:1
**morgan** 89:21
90:12 119:17
**morning** 5:3
27:23 63:1

90:19 91:1
110:24 111:19
124:16 127:2
**mosquito** 34:8
**motion** 7:12,15
7:20 8:15 52:16
60:24
**mountain** 73:11
91:4 94:24 95:3
**move** 42:12
144:8
**movement**
44:20 51:16
53:11 57:11
59:11 95:13
109:18 154:12
154:17 155:5
**movements**
125:14
**moves** 76:24
**moving** 43:12
74:21 132:19
133:11 157:19
**multi** 79:15,17
79:24 80:11,24
81:7,18 82:23
89:16,24 113:21
113:24 119:7,13
119:16 120:7,13
120:13,17,23
124:3 125:3,4
127:14 128:8
133:24 134:6,21
136:11 139:14

**multiple** 13:9
67:9 89:5
113:15 126:3
131:3 137:3
138:8 156:21
157:6
**murphy** 1:9

---

**n**

---

**n** 3:1 81:9,9
149:9
**name** 4:10
10:11 11:16,18
12:1 58:16
**nasdaq** 67:17,21
68:6,10 92:14
**national** 20:8,9
21:16
**nature** 70:3
97:24 158:10
159:7
**nauseam** 57:19
**nber** 20:8
**nebraska** 48:13
49:11,21 54:17
54:19 87:23
88:2,3,8,13
**nebraska's**
87:15,16
**necessarily** 71:6
79:25 80:19
107:21
**necessary** 68:25
69:1 107:4,7,8
107:19,21
109:19 110:13

**[necessary - objective]** Page 200

123:1,17 159:11
**need** 6:19 35:19
38:6 57:20
64:18 75:17
92:12 93:8
96:16 126:12
145:18 148:20
156:13 160:13
160:22
**needed** 9:15
152:24
**needless** 133:5
136:5
**needs** 36:24
116:21 128:2
**negative** 108:2
110:4 140:3
**neiman** 2:4 4:13
**nelson** 1:9
**never** 19:22
**new** 2:9,9 41:22
41:24 44:9 50:5
59:7 63:13
67:17 70:22
71:1,4 72:8 74:4
74:6,7 76:13,24
77:15,19,20,23
78:2,8 81:12,13
81:16 82:8,12
82:21 83:6,14
83:21 84:1,4
89:11 92:14
105:13 107:10
107:24 109:4
110:10,17

114:19,22 115:3
115:4,5,9,20
121:3,5,18,24
121:25 123:3,9
123:25 126:10
126:12,14 127:6
127:20 128:2,6
128:16,19,22
129:12,17 130:6
131:13,22 132:7
132:8,10,11,13
132:15,20,22
133:15 135:15
153:23,24
**newey** 36:2
140:19,22,22,24
141:3,25 142:1
142:8,17,18
143:1,12 144:3
144:18,23 145:1
145:2,3,7 146:7
146:9,11,13,20
147:20 148:1,15
158:16
**news** 32:9,17
38:20 41:5
51:10 71:17
77:4,10 83:14
90:18,23 95:4
106:20,22
107:11 108:16
112:13 153:21
**newspaper**
113:4

**nexus** 26:18
**non** 121:25
**noon** 112:7
**noontime**
126:18
**normal** 42:13
52:1 86:23
96:14 155:6
**normally** 80:17
80:19 85:6,10
**northern**
138:17
**notary** 1:20
168:6,21
**note** 54:20
71:25 72:5,6
82:15 94:20
95:10 161:9
169:8
**noted** 90:18
**notepads** 6:7
**notes** 6:5 87:14
163:25
**notice** 1:22 9:18
**noticed** 9:15,25
**noticing** 4:12
**notion** 90:5
**number** 21:7
30:5 92:13
95:17 160:13
**numbers** 34:19
95:23 163:22
**numeral** 64:25
**numerous**
104:11

**o**

**o** 12:1 34:25
56:7
**oath** 4:4,22
166:25
**object** 74:13
**objecting** 6:17
**objection** 13:3
27:10 41:8,11
43:2 44:15
52:25 54:3
56:13 57:4
60:14 61:10
62:21 63:24
64:13 68:18
72:11 74:1
75:22 76:6,18
77:5 83:2,23
85:22 92:25
93:7 94:8 96:1
96:11 103:9,23
104:21 106:5
110:8 111:1,16
111:24 112:20
113:17 114:8
115:12,25 119:9
120:9 121:11
123:4,20 126:24
127:16 129:3,24
150:22 151:9,18
154:4 157:8
160:16 161:16
**objections** 4:8
**objective** 70:22

**objects** 6:17
**observation**
  79:7,11 139:25
**observe** 152:10
**observed**
  126:17,18
  138:17
**obvious** 24:13
  32:2,23
**obviously** 5:18
  6:18 7:11 8:24
  10:12 13:11
  29:2 31:23,24
  40:22 46:6
  62:13 70:6
  72:13 74:16
  84:19 88:1 93:9
  95:7 98:23
  102:15 114:23
  128:9 157:12
  162:11,24
**occasion** 29:10
**occupation** 20:1
  20:20
**occupations**
  20:14
**occur** 67:15
  68:5 69:6
  114:15 120:22
  120:24 122:3
  136:24
**occurred** 68:13
  68:17,21 72:22
  87:24 95:6
  110:24 111:14

117:10 139:9
**occurring** 90:11
  125:14
**occurs** 19:5
  91:25 150:20
**offhand** 45:1,23
  48:5,22 71:19
  147:23
**official** 167:9
  168:16
**oh** 11:25 20:3,3
  20:10 23:11
  26:3,3 28:20
  84:23 117:19
  129:4 132:2
  137:13
**okay** 5:12,15,21
  5:24 6:9,13 7:14
  7:22 10:2 11:19
  12:5 14:20
  16:24 18:13,22
  23:4 25:11 27:1
  27:5,13 28:22
  31:21 32:14
  33:9 34:25
  35:23 36:7
  47:16 50:10
  56:1 61:18,24
  65:22 67:23
  70:17 73:18
  80:12 81:6 85:2
  86:2 87:22
  88:16,19 93:4
  97:1 99:15
  108:15 118:3,12

127:14 128:1,8
  132:4 137:18
  139:5 140:11
  145:18 152:19
  155:11 156:9
  164:4,7,10,18
  165:11,25 166:7
  166:17
**old** 124:13
  125:6
**ols** 142:14
  143:10 144:24
  144:25 145:14
  145:20 146:16
  146:22 147:6,8
  147:10,14,16,20
  148:2,13,21
  158:15
**omission** 27:9
**omnibus** 30:3
**once** 64:19
  164:6
**one's** 41:21
**online** 58:14
**open** 70:1 84:19
  84:19
**opening** 33:23
  34:2,9,15,19
  38:10 43:18
**opine** 43:24
  44:17 103:12
  110:6 116:5
  134:20
**opined** 27:7
  66:19 117:16

124:2
**opining** 29:16
  29:17 33:16
  68:10 116:15
  139:1 164:19
  165:6,11
**opinion** 7:13,17
  7:20 8:15,17,21
  9:17 28:7,24
  29:12,12 30:4,7
  30:13,18,21
  31:23 33:11
  34:21 35:20
  40:11,15 42:8
  42:21 43:7
  45:17 46:8,17
  51:17 53:7
  68:12,16,22,25
  73:15 76:4,8
  82:11,22 86:19
  88:1 98:7,8,9,12
  98:22,25 99:3
  100:23 109:16
  109:19,22,24
  110:9,13 111:7
  115:23 123:2
  138:23 141:2
  151:6 152:22
  162:4 163:19
**opinions** 10:8
  10:15,17,21,23
  29:24 30:10,15
  31:1 35:4,6,7
  69:2 106:20
  149:11 159:23

**[opinions - percent]**

165:23

**opposed** 136:25

**opposing** 31:24 32:1 150:4

**order** 4:6 7:15 7:16 82:2 83:13 128:25

**ordering** 166:18 169:13

**organized** 31:14

**oriented** 58:15

**orthogonal** 128:13

**overall** 24:5 95:18 148:18

**own** 5:18 65:24 66:1 130:20 141:2 161:6

**p**

**p** 37:13

**p.m.** 1:14 58:18 72:14,23,24 92:7 93:4 95:15 95:15 97:7 102:2,10 105:25 106:9 130:13,14 166:24

**pagan** 35:25 160:8

**page** 3:2,10 13:2 26:17 27:4 65:18,20 170:5 170:8,11,14,17

**pages** 168:9

**paid** 14:23,24 15:24 16:2,5,7 21:16,20

**pain** 58:21

**pandemic** 34:1

**paper** 22:17 25:5 93:15 120:20 124:11 125:7

**papers** 5:19 22:10,16 24:22 24:24 119:20,23 120:2

**paragraph** 11:9 35:3 39:24 40:25,25 45:4 45:15 50:21 65:5,23 87:3 90:15 106:19 107:25 130:18 139:3 140:17 145:8 155:11

**paragraphs** 41:14

**paraphrasing** 82:9

**part** 23:19 29:19 34:13 38:25 46:8 50:23,25 57:14 60:19 77:6 95:20 98:5,7 104:12 106:20 110:10 130:8 140:12

**partial** 64:10,17 64:21 125:24,24 126:1,7,8 127:13,18 128:6 128:15

**partially** 30:21 65:6 161:20

**participants** 35:14 38:2,16 39:5 45:8 47:1,4 87:7 102:18 106:21

**participate** 11:6 73:24 74:6,11 74:16,23

**participating** 4:1

**particular** 8:17 9:14 15:14 23:25 39:13 40:25 47:3 50:22 78:5 80:19 81:5 82:17 84:20 87:10 102:20 108:4 122:15 150:3 153:20 158:9 159:24

**particularly** 35:15 38:3

**parties** 4:6 65:7 168:13 169:13

**partners** 48:13

**parts** 98:2

**patell** 91:16 94:13 120:20

**patell's** 124:11

**pattern** 38:11

**paying** 59:12

**payments** 15:2

**pcr** 45:19,22 46:1

**penalties** 170:21

**people** 13:1 15:10 44:12,18 46:15 116:19 117:1,2 125:6 150:14

**percent** 11:22 20:21 24:11,11 24:19 26:22 37:5,13 38:23 38:23,24 41:15 42:4 43:15 44:13 52:19 53:19,19,25 54:23 55:18,22 58:22,24,25 59:5,22,22 61:22,22,22,23 62:3 75:16,16 75:25,25 87:6 87:10,17 91:1 94:21 95:16 101:16,22 102:20 103:7,25 104:4,15,19,19 104:24 154:19 160:3,7,8

**percentage** 15:7 15:13 24:6 25:21 26:12,13 26:13 159:19
**perfect** 35:2 46:6 52:3 53:22 54:9,12,24 57:18,19,20 59:17 61:14 62:6 77:13 78:1 78:1 82:10 104:4,6,12 105:1 106:14 107:11,23 109:3 123:13 152:2,6 152:7,9,12,13 153:19,21 163:10,10,12
**perfection** 105:2
**perfectly** 53:21 87:6 131:14
**performing** 137:22 156:12
**period** 45:10 47:3,6 51:11 85:9 86:8 91:21 106:7 139:10,23 148:24 149:19 149:22 150:5 156:4 157:4,21 158:21 162:21 163:5
**periodical** 73:9
**periods** 124:23 155:16 156:13

156:17,21 157:6 160:12,13
**perjury** 170:21
**permutations** 160:21
**person** 11:20,24 15:13 53:17
**personal** 141:1
**personally** 15:16
**perspectiv133** 3:15
**perspective** 77:3 94:5 122:9
**perspectives** 133:17
**pertain** 8:21,21 98:20
**pertained** 88:17
**pertains** 29:13 36:18 75:13,20 133:20
**phone** 100:3
**phonetic** 11:16
**physically** 12:7
**pick** 114:21
**picture** 116:19
**piece** 79:23 85:4
**pieces** 72:19 81:16 114:25
**pineiro** 2:4,5 3:4,5 4:13,13,14 5:2 13:4 18:6 27:12,22 28:2,4 42:2 43:13

44:22 49:7 52:7 53:9 54:14 55:1 55:4 56:7,9,17 57:12 58:1 60:18 61:17 63:10,17,21 64:6,15 68:23 70:10 72:21 74:3,18 75:5 76:3,14 77:1,16 78:9 80:8 83:16 84:10 85:14,18 86:13 93:3,21 94:1,19 96:7,17 99:13,18 100:1 100:13 103:19 104:16 105:15 106:18 110:16 111:11,22 112:5 113:1,19 114:13 115:22 116:4 120:4,15 122:6 123:14 124:1 127:11 128:3 129:18 130:12 130:15 133:19 137:21 143:21 151:5,13 152:16 154:8 157:15 161:2 162:3 163:24 164:7,9 166:1,3,7,18,19
**pivot** 18:3
**pivots** 71:24

**place** 140:19
**plaintiff** 1:6 2:3 25:22,25 26:6 26:10,18 27:7 28:7,14 65:5 90:18 97:5 125:16 150:19 161:5
**plaintiff's** 27:3 27:15 150:18
**plaintiffs** 4:14 26:4 50:14 77:8
**play** 55:9
**plaza** 2:8
**pleading** 60:25
**please** 4:9 6:18 103:20 169:10
**plenty** 79:9,10
**plot** 43:17
**plural** 98:22
**plus** 20:21
**point** 19:15 34:18 37:2 38:5 44:19 55:21 59:3,20 63:7 78:3 96:13 103:16 104:10 107:13 125:23 132:12,12 134:11,18 136:18 139:21 141:25 149:3 155:21,21,24
**points** 60:8,10 126:4 159:19

**[poised - price]**

Page 204

poised 59:4
polite 140:23
poor 56:22
portfolio 35:18
portion 55:24
85:16 93:22,23
103:21
portions 13:22
position 124:7
137:8 163:4
positions 19:2,3
19:7
positive 71:17
116:25
possibility
112:18
possible 44:11
61:7,25 62:19
72:9 76:15
110:22 111:12
111:23,25 112:6
112:19,22
126:16 150:2
possibly 89:13
132:22
post 46:21 50:5
81:21 82:24
83:19 84:12
109:12 110:18
posted 112:7
potential 40:14
116:9
potentially
116:18 121:7
157:25

practice 8:11,16
8:19
pre 40:22 41:5
41:20 53:12
54:1,25 78:24
105:7 151:21
152:7 158:21,22
precise 79:23
precisely 96:16
preclose 87:11
90:20
preclosure 71:9
79:12
preclude 129:22
preclusive
131:16
predetermined
135:14
predicate
129:11
predicated
109:17 118:1
predicates 84:2
predicted 141:4
141:5,16
prediction
141:4,4,6,6,16
141:20 142:24
148:10,19
preference 5:13
preparation
12:21
prepare 16:25
prepared 9:21
13:14,15,23

18:10 48:3
100:17,20 101:2
101:9
prepares 15:20
preparing 11:6
11:12 33:11,13
100:23
present 4:3
17:17 19:6,7
20:14
presented 22:4
presenting 94:3
presents 163:22
preserved
146:19
press 32:9,9,17
32:20 42:17,24
43:25 44:13
47:13,17 48:2
50:5 51:3,6,9,19
56:2 57:14 60:2
60:4,13,23 61:3
61:4 65:9 69:3
71:14 74:12
75:13,20,24
81:21 88:16
97:13,18 98:17
98:20,23,23,25
100:24 101:12
102:12 103:6
104:18 105:17
107:4 126:19,21
154:20
presumably
153:8

pretty 9:24
32:23 151:25
previously 9:2
50:7 88:23
103:1
price 29:21
34:15,17 35:20
36:18 37:4,16
38:6 41:25
42:12,16,25
43:4,12 44:19
46:22 51:16
53:3 54:12
56:19 57:11
59:11 61:15
62:1,8,11 63:2
66:2 67:17 68:5
69:4,7,11 72:10
72:15,20 76:9
78:23 82:13,25
83:9,10,22 85:5
85:6,12,21 86:1
86:3,5 88:22
89:14 90:16,18
91:8,10,14 95:4
95:7,7,13,16,25
96:6,20,25
106:15,16,25
107:16 108:3,17
108:23 109:1,6
109:17,23,25
110:5,7,15,23
111:13,20
112:14,15,22
114:25 115:17

**[price - published]** Page 205

117:7,14,18
118:7 121:8
123:11,12,23
124:12 125:10
125:14 126:2,15
126:22 127:9
129:2 134:15
135:1,5,7,8,16
136:14,15,21,24
138:15 150:13
150:17,19,19,25
151:3,7,16
152:9,11,24,25
153:9,9,12,14
153:16,24 154:2
154:10,12,12,16
154:17,20 155:5
162:5,19 163:3
163:4,13 165:1
165:12
**priced** 46:22
79:8,9,13 84:20
85:10 112:8
113:16 119:23
124:15,17 127:3
127:4,7,10
135:21 136:1
**prices** 86:5,6,7
86:10 127:1
138:3 155:3
**pricing** 46:10
91:20 92:4,14
92:20 93:14
94:11,17 110:12
119:22

**primarily** 11:14
**primary** 11:22
34:1
**principles** 79:4
**prior** 13:3 33:16
38:19 41:11
43:2,14 45:9
47:3,5,13,17
52:2,25 56:13
61:12 77:5,10
77:13 85:22
87:10 102:17
113:17 114:8
115:25 117:23
119:9 120:10
121:12 127:16
129:24 161:16
**priori** 135:14
**private** 49:20
**privy** 14:22 15:1
15:2,21
**probably** 14:1
49:24 93:5
164:3
**probative** 107:8
107:20
**problem** 6:24
59:2 80:13
99:18 100:14
136:22
**problematic**
56:23
**procedure**
169:22,22

**proceedings** 4:4
**process** 12:10
12:21 13:7,19
13:21
**produce** 148:22
**produced** 13:21
**profession**
155:2
**professor** 5:11
5:12,13 6:19
19:14,18 20:2
20:16,17,22,23
20:24 21:1 58:4
63:22 75:7 80:5
83:13 85:19
92:16 100:2
126:16 163:24
164:14
**professorship**
21:3 24:12
**professorships**
24:6
**profit** 153:5
**program** 74:17
78:5
**pronouncing**
36:16
**propensity**
97:12 98:16
**proper** 35:21
36:4,13
**properly** 35:19
158:14
**prove** 139:21

**proves** 52:19
53:24
**provide** 6:18 8:3
16:18 23:19,20
23:22 40:11,15
129:7
**provided** 9:8
12:25 27:6 28:6
31:10 33:7
48:12 49:20
97:8 138:15
**provides** 49:24
83:20 124:22
128:6
**providing** 10:17
10:21 28:24
68:22 83:18
88:1 109:24
110:9 138:23
149:10 163:19
164:23 165:1,23
**public** 1:20 8:24
46:5,8,10 50:25
52:23 89:25
90:5 113:2,7,13
138:2 168:6,21
**publication**
51:12,12 58:14
58:15 65:8
**publicly** 46:19
46:22 98:8,12
98:24 99:3
111:7
**published** 24:24
25:5 50:8 90:24

**[published - really]**                                                    Page 206

94:20 134:19
**pull** 37:8 63:13
**pulled** 31:12
**purely** 154:23
**purportedly**
  97:2 140:18
**purpose** 7:7
**purposes** 61:1
  71:3 97:21
  115:18 159:11
  164:15
**pursuant** 1:21
  4:5 11:11 12:12
**put** 5:5,14,23
  6:3 12:12 15:11
  26:12 57:16
  76:12 100:9,24
  127:20 130:16
  139:2 145:18,19
  145:21
**puts** 147:11
**putting** 31:13
  114:23 147:17
  148:9,11

**q**

**q1** 100:15,25
  108:1,5,19
**q2** 101:12
**quade** 2:6
**qualify** 106:4
**quality** 75:21
  97:12,17
**quantification**
  28:25

**quantify** 96:14
**quarter** 101:13
**quarterly**
  118:18
**question** 5:4
  38:14 48:12
  62:14,23 69:8
  71:7 82:5 93:20
  103:18,19
  105:12 112:17
  117:12 118:5
  122:12,23,24
  129:12 132:23
  156:2,9 157:13
  165:4 166:1
**questions** 6:16
  117:23 118:3
  129:11 164:3,11
**quick** 5:4 6:15
  92:15,18 93:14
  94:12,18
**quicker** 91:16
  91:18,20 92:5
  136:1
**quickly** 72:19
  79:8 84:20 91:7
  124:12 127:1,7
  157:2
**quite** 56:24,25
  83:4 123:5
  147:14
**quote** 40:2 56:1
  118:23
**quoted** 138:12

**quoting** 56:2

**r**

**r** 170:4,4
**raise** 157:13
**raised** 47:24
**raises** 129:11
**ran** 146:16
  147:6,20 159:12
  160:21 162:22
**random** 42:13
  43:6 44:6,20
  52:1 86:23
  155:6,9
**range** 42:7
**rapid** 59:8
**rapidly** 158:10
**rashbaum** 2:4
  4:14
**rate** 14:6 15:4
  15:24 87:17,17
  104:6 105:1
  144:6 149:9
**rather** 90:15
  131:2
**raw** 42:5,7,12
  43:8,21 44:9
  86:17 95:11,19
  96:4,6 154:21
**reached** 79:25
  80:3
**reaching** 80:15
**reacted** 88:22
  89:1 103:1
**reaction** 42:1
  43:4 54:12

61:15 62:8 63:2
76:10 82:13
83:9,10 85:12
86:3 96:25
109:6,25 110:5
110:7 112:14,15
112:22 117:15
123:11,12,23
125:10 126:15
134:16 135:1,5
135:7,8 136:24
153:9,12,16,24
163:3
**reactions** 10:14
  109:9
**read** 7:12,17,19
  8:15,16,24
  17:11 31:23
  40:6 44:23
  46:15 73:20
  75:23 85:14,16
  93:21,23 101:25
  103:21 118:24
  126:19 160:10
  166:13,15 169:7
  170:21
**readership**
  46:11
**reading** 48:20
  101:8
**real** 160:22
**reality** 153:5
**realize** 32:16
**really** 23:7
  24:18,18 26:15

**[really - relates]**                                          Page 207

30:14 33:2
50:20 54:5 57:6
59:16,16 70:1
81:12 97:23
98:2 107:9
122:12,21
125:23 129:12
133:11 134:22
140:2 146:10
148:25 158:4
159:4 161:22
166:11
**reason** 11:2
18:18 48:5 68:4
74:25 82:19
96:15 116:1,8
134:3,14 157:3
169:9 170:7,10
170:13,16,19
**reasonable** 88:2
169:15
**reasons** 65:13
70:20 74:17
109:20 123:22
**rebound** 118:14
**rebuttal** 3:11
6:2 9:8,13,21
11:10 18:4,10
32:14,15 35:7
52:14 130:17
164:20
**recall** 7:7 27:13
30:10 34:4
39:14 45:1,23
48:5,23 73:6

74:5 82:15
95:24 101:5
114:18 117:10
139:20 164:15
**recalling** 68:20
71:19,20
**receipt** 169:15
**received** 15:16
51:9 57:7
**receiving** 16:15
**recent** 124:13
**recently** 59:21
**recess** 28:3
63:20 99:25
164:8
**recollection** 7:2
7:5 8:10,14 9:5
9:6 39:19 46:1
48:5,20 49:1
58:15 63:14,14
69:9,13,15
100:19 101:11
108:8,11 118:8
**record** 54:20
85:16 93:23
103:21 117:22
**recurring** 19:11
19:23
**redirect** 3:5
166:1,2
**reed** 1:10
**refer** 30:17
34:24 101:1
119:15 165:15

**reference** 5:7
48:16,21 50:3
52:1 54:15
55:22 76:1
**referenced** 9:7
10:5 31:1 49:16
61:4 63:14
150:6 159:24
169:6
**references**
48:23,24 98:16
**referencing**
54:15,19 60:4
81:1 105:17
**referring** 43:21
78:8 81:1,3 90:5
95:11 98:24
137:14 144:1
146:1 151:12
165:7,17
**reflected** 14:11
38:7 54:24
72:19 135:16
136:15 138:24
**refresh** 17:22
46:1 48:20 49:1
69:13,14 101:11
108:8,10
**refusal** 74:10
**refuse** 74:16
**regard** 169:17
**regarding** 8:13
10:18,21,23
12:25 28:25
29:12 40:9 41:6

42:8 46:2,3
47:24 52:24
60:5 62:2 71:2
71:11 84:22
87:22 88:13
97:16 100:24
110:18 114:7
163:19
**regardless**
122:2 152:1
159:14
**regimen** 74:24
**regression**
144:22,24 145:9
145:12,14,20
146:16,16,24
147:2,3,6,6,8,10
147:14,16,20,21
148:2,22,23,23
150:10 158:16
158:16,18
159:15
**regressions**
158:14
**regular** 124:5
**regularly** 22:23
**regulation**
22:22
**reiterate** 141:19
142:24
**rejecting** 30:16
**related** 70:6
74:11
**relates** 64:3
97:17 106:23

**relative** 57:8 62:7 64:8 105:13 108:6 148:2 168:13

**relatively** 159:18

**release** 42:17,24 43:25 44:13 47:13,17 48:2,6 50:6 51:6,9,19 56:2 57:15 60:2 60:4,13,23 61:3 61:4 69:3 74:12 75:13,20,24 81:21 97:18 98:20 100:24 101:12 102:13 103:6 104:18 105:17 126:21 154:20

**released** 133:15 138:3

**releases** 32:9,18 32:20 97:13 98:17,23,23,25 124:5

**relevance** 139:24

**relevant** 41:22 41:25 44:10 46:17 71:8 72:8 74:7 76:13,24 81:13,13,16 82:12,21 84:1,5 85:13 86:3,12

89:12 107:19 110:4 114:20,22 115:5,10,20 121:3,5,18,18 121:24,25 123:9 123:25 126:10 126:12,14 127:6 127:21 128:2,7 128:16,22 129:12,17 130:6 131:14,22 132:7 132:8,10,11,13 132:15,20,22 133:15 153:23 153:25

**reliable** 42:19 42:22 43:7,24 44:8 66:1 96:22 96:23 123:7 155:8 163:6,16 163:22,23

**relied** 30:24 31:1,9 33:14 45:1

**rely** 95:12

**remarks** 100:17 100:20 101:2,10

**remember** 7:12 7:20,20 12:1 14:1 17:2 20:25 37:8 45:20 48:19,21 51:11 51:12 52:17 56:16 57:7 68:14,19 69:13

71:21,21 74:21 95:17,18 96:2 100:17,22 101:8 101:10,19,19 118:3,24 124:6 131:17

**remembering** 68:15

**reminds** 23:11

**remotely** 4:4,21 167:6

**render** 8:22

**rendering** 31:1

**repeat** 28:16 103:17,19,23 104:23

**repeated** 50:25 57:18

**repeating** 50:8 53:6,19 54:6 60:15

**repetition** 88:22 103:1

**report** 3:11,14 3:16 5:17 6:1,2 9:8,8,13,21 10:6 11:9,10,13 12:6 12:9,18 13:1,9 13:15,22 14:12 18:4,10 20:7 31:24 32:15 33:13,22,23 34:3,9,15,20 35:8 37:7 38:10 43:19 47:10

49:16 50:11 52:14 54:21 60:19 64:22 71:19,22 77:2 78:11 100:10,16 105:7 106:22 130:17 133:1 139:2 140:12 142:21 143:19 143:22 149:18 155:11 161:3 164:15 168:10

**reported** 59:6 66:15 108:1,5 118:18 168:8

**reporter** 4:1,2 4:11 85:17 93:24 103:22 166:13,17,20 168:1,6,20

**reporting** 4:3,8

**reports** 5:5 9:11 10:8,13 11:6 12:16,22 13:21 13:23 17:10,11 30:6 33:19 51:10 107:4 109:11 118:23

**represent** 140:25

**representative** 149:1,3 160:25

**represents** 141:17 146:5 149:3

**[request - right]**

**request**  8:20 31:18,21
**requested**  32:3 33:6
**required**  40:12 40:13
**requirement** 40:13
**reread**  17:10
**research**  20:7,8 21:11,17 22:7 81:3 97:8 134:22
**researcher** 80:21 81:4
**residual**  51:25 56:16 86:21 87:2 115:17 122:5 128:9 140:4 144:4 149:11 155:9 161:12
**residuals**  43:18 43:22 142:14 145:20 146:21 147:7 148:6,14
**respect**  9:14 13:8 19:12 26:7 36:23 37:4 84:4 88:8 123:5,6 147:13 163:14 165:12,21
**responded**  4:22
**response**  48:3 89:2 93:12

122:17
**restart**  115:8
**resubmitted** 25:4
**result**  27:8 28:8 28:14 41:2 69:10 117:7 159:15
**results**  54:6 56:22,23 57:6,6 59:16 60:17 84:8 100:15,25 105:17 108:1,5 108:19 116:5 118:19 121:21 140:25 156:3,10 156:19 157:25 158:2 159:23 160:22
**retained**  7:2,4,8 8:19 9:2 14:12 16:7
**retirement** 21:14
**return**  42:5,7,9 43:8,16,25 44:1 44:9,13 65:24 66:17 76:17 77:4 86:18,22 86:22 95:18,19 96:4 123:19 130:21,23 131:4 133:6 136:2 139:8,11 141:5 141:5,16 147:1

151:7,17 152:24 154:3,21 157:7 157:14,19 160:14 161:11
**returned**  169:14
**returns**  43:18 43:21 95:11,19 96:5 131:3 134:9 135:15 137:3 139:9 145:15 149:12 149:15,18,20 150:5 159:17
**reveal**  135:15
**revealing**  100:5
**reveals**  107:24
**revelation**  138:2
**revenues**  12:20 34:14 40:9 108:6
**review**  9:1 10:10,13 31:19 33:22 35:10 45:2 51:6 52:13 55:23 100:15,24 124:19 164:1 166:15 169:6
**reviewed**  7:14 7:15 8:10 10:13 31:5,5 33:11
**reviewing**  33:9 45:24 101:5
**revised**  9:22 25:4

**revision**  10:4
**ribbon**  162:15
**richard**  1:10
**right**  6:2 17:15 19:19 25:8 27:25 28:11 32:7 34:16 35:8 36:19 37:6 38:13 39:22 40:14 42:15 47:18 50:6 53:10 55:22 56:12 58:25 60:20 62:16 66:10,12,20,22 67:12 73:8,12 74:19 81:25 83:1,4,17,20 86:17 88:11 91:6 95:1,5 96:18,21 98:21 104:17 111:12 114:2 115:14 116:16,25 120:16 128:5,11 128:17,21,21,23 129:19 131:16 133:24 139:15 139:18 143:8 144:20,20 145:9 152:8 154:15,20 156:22,23 158:2 159:19 161:14 165:13

**[rinaudo - second]**

Page 210

**rinaudo** 133:3
**rinele** 1:20 56:7
  85:14 93:21
  99:21 103:19
  167:13 168:6,20
**ripple** 30:1,20
**rise** 95:4
**risk** 38:7,7,19
  38:21,22,25
  39:10,16 47:5
**riskier** 35:17
**risks** 39:6,12,25
  40:9,14 45:9
**risky** 35:15 38:3
  38:17 39:21
  41:13
**robust** 155:15
  156:11,19
  157:14,18
  160:15
**robustness**
  160:11
**rockefeller** 2:8
**role** 21:23 22:1
**roman** 64:25
**room** 6:5,10
**rose** 94:21
**rotates** 22:13
**roughly** 16:1
  21:10 24:10
  27:13
**routinely** 40:8
**rtt** 90:23
**rule** 119:5
  169:22,23

**rules** 67:16 68:6
  69:11 71:4
  169:16
**run** 27:24
  145:13 158:14
  159:9
**running** 146:21
  146:22,23,25
  159:14

**s**

**s** 3:8 40:6 44:24
  170:4
**s&p** 35:19 39:22
  146:6
**s1** 40:2
**saha** 125:7
  133:3
**sake** 9:18 90:14
**salary** 21:5,8,9
**salt** 47:21,23
  48:17,24 71:12
  73:1,8,19 95:2
  96:19 99:8
  111:18 112:7
  113:7,8 126:6
  126:17 127:2
**sample** 79:24
  80:16,20 81:5
  114:16
**sands** 149:25
  150:3
**sars** 59:8,22
**satterfield** 1:10
**saying** 7:14
  12:24 29:9

42:23 43:23
  62:9 66:16
  85:19,24 104:1
  104:24,25
  109:24 110:2,10
  111:18 116:8
  117:19,23,24
  118:2 124:16
  127:12,18 129:4
  129:20 135:24
  136:10,13,20
  138:12 144:19
  157:20 159:5
  162:23 163:1
**says** 35:3 45:13
  48:9 49:18
  52:18 55:18,24
  58:9,21 59:3,20
  61:21 70:18
  75:16,17,17,24
  75:24 89:1 97:1
  118:14,18
  135:11 136:5
  137:25 151:20
  151:24 153:7
  155:14
**scenario** 80:10
  83:21 89:18,23
  92:21 94:3
  103:8 114:3,15
  120:21 121:2,4
  122:7 127:24
  128:5,7,25
  129:15 139:18
  148:6 154:3,15

154:16 157:5
**scenarios** 28:22
  81:6 89:16
  120:6,8,14,18
  120:22,24,25
  125:3 127:13
  138:10 139:16
  156:20
**school** 20:2,17
  20:24 21:24
  22:2
**schools** 22:11,12
  22:13
**scienter** 10:21
**scientific** 66:1
**screen** 5:17
  17:23 18:8,14
  32:12,16 49:3,8
  49:11 52:5,9
  55:2,6 57:23
  58:3,4 64:23
  75:3,7 100:9
  102:3 130:16,18
  139:2 159:18
**scroll** 30:24
  65:18 73:3
**scrolling** 101:5
**seal** 167:9
  168:16
**sec** 30:2,20
  39:25 97:11
  98:5
**second** 11:23
  25:4,7 38:18
  41:10 45:4

**[second - sharp]**

59:20 65:19 78:13 80:5 84:22 87:3 93:6 94:7 95:21 98:7 100:9 104:10 106:19 119:1 130:23 132:11 132:14 133:11 134:15 135:6,8 136:3,3 140:2 141:14 144:3 146:24

**seconds** 93:16 94:14

**section** 25:12 32:8,17 35:13 64:25 97:1 137:22 161:3

**securities** 7:23 9:4 20:2,23 22:22,23 26:1 150:16

**see** 18:8,14 25:14 32:8,10 32:13,17 33:6 38:8 40:4 45:2 45:11,15 47:7 47:11 48:14 49:8,11,22,24 50:1,2 52:8,20 55:6,11,14,19 55:20 56:3 58:3 58:3,9,19,23 59:9,24 64:23 65:3,14 66:5

67:4,7 70:11,13 70:16,24 75:6 75:11 78:18 79:1 80:24 85:20 87:12,20 88:24 89:24 90:21 91:2 94:22 97:14 98:18 100:23 101:12,18 102:3 102:22 103:3 107:2 108:14,21 113:24 118:16 118:20 120:13 120:23 125:18 129:4 130:18,20 131:6 133:9 135:17 136:8 137:11,12,16,17 137:23 138:5,18 139:3,12 140:15 143:7,23,25 144:3 152:4 155:12,17 156:10,25 161:7 162:20 163:12

**seeing** 26:17 51:12 69:13 71:19 99:2 101:19,20

**seeking** 58:9,11 58:16

**seems** 6:17 57:2 76:20 88:1

**seen** 52:11 117:6 118:5,6 120:25 139:16 139:18

**segregate** 122:10

**selected** 32:20

**selection** 138:13

**sell** 118:15

**seller** 97:8

**selling** 39:6

**semantics** 165:14

**semester** 23:3

**seminars** 22:25

**send** 15:12

**senior** 15:10

**sense** 36:20,21 41:3 42:10 50:24 51:15 74:6 77:20 93:17 94:17 98:13 113:24 114:1 156:23 159:5 163:21 165:19

**sensitive** 128:12 156:15

**sensitivity** 41:15 59:7,22 60:12 62:1,18 75:19 101:16,23 104:5

**sent** 31:12

**separate** 132:12

**september** 7:2

**serbin** 1:10

**series** 6:15 22:17 45:13 97:7

**serve** 7:22,24 8:1 9:3 26:14

**served** 19:14,17 25:17

**serves** 9:25

**services** 14:21 14:25 15:15 16:19 23:20,22 24:11,17 149:10

**serving** 6:25 8:7 24:7,16 25:22

**set** 21:8 119:5

**sets** 41:20

**setting** 39:11 53:10 112:17

**several** 65:13 89:2 101:16

**share** 5:17,17 5:19 17:21 27:19 28:18 49:3 52:4,5 55:2 57:23 75:3

**shareholder** 27:7

**shares** 78:13,16 90:24 117:5

**sharing** 17:23 32:12,16

**sharp** 118:14

**[sheet - speaks]**    Page 212

| | | | |
|---|---|---|---|
| **sheet** 169:9,10 | 67:1 76:16 | **six** 37:10,11,12 | 131:23 132:3 |
| **short** 97:7,9 | 85:21 95:24 | 37:12 155:22,25 | 137:13 143:8 |
| **shorter** 124:14 | 109:23 117:7,18 | 156:1,3,3,7,10 | 146:11 147:5 |
| 134:1 | 118:6,10 126:22 | 156:22,24 157:4 | 151:14 156:17 |
| **shorthand** | 129:1,11,21 | 157:19,20 158:7 | 157:20 158:4 |
| 168:10 | 130:3,22,24 | 158:11 159:1,12 | 160:3,9 |
| **shortly** 108:4 | 131:1,4 132:18 | 159:13 160:18 | **sort** 8:25 14:2 |
| **show** 43:21 | 133:6 134:13 | 161:1 | 21:5 22:5 37:2 |
| 92:14 | 135:12 136:6 | **skirt** 143:3 | 50:25 91:12,21 |
| **showed** 59:22 | 137:5 139:11 | **sleeping** 6:11 | 92:2 94:3 |
| 87:16 102:13 | 140:1,7,9 | **slightly** 76:12 | 131:24 132:5 |
| 105:16 | 152:15,18,22 | **slt** 50:13 65:8 | 145:21 156:5 |
| **showing** 55:5 | 158:15,17 | **small** 113:4 | 159:6 |
| 75:6 140:22 | 159:16 161:13 | 156:15 | **sorts** 74:17 |
| 166:11 | 162:1,13 | **smart** 55:9 | 113:10 |
| **shows** 46:5 | **significantly** | 59:21 | **sounds** 73:12 |
| 101:15 118:14 | 134:13 | **soars** 52:18 | 74:14 |
| **side** 5:23 26:21 | **similar** 13:25 | **sold** 161:9,23,23 | **source** 113:2 |
| 27:18 28:17 | 14:1 | 162:12 | 141:11,15 |
| 138:4 | **simple** 9:24 | **solely** 29:17 | **sources** 141:8 |
| **sign** 169:10 | 70:22 95:9 96:4 | 41:6,9,12 | 141:20 144:14 |
| **signature** | 125:23 | **solidly** 59:4 | 148:19 |
| 167:12 168:20 | **simply** 36:2 | **solutions** 169:21 | **south** 2:4 |
| **signed** 8:9 | 79:7,11 115:16 | **somebody** 31:12 | **sparse** 92:12 |
| 169:19 | 134:11 136:12 | 105:24 106:2 | **speak** 26:19 |
| **significance** | 136:18 139:25 | 107:18 | 91:13 107:20 |
| 87:1 130:5 | 148:13 | **somewhat** 11:15 | 124:14 131:21 |
| **significant** | **sir** 49:8 | 86:6 | 152:19 158:11 |
| 34:16 36:22 | **sitting** 34:4 | **sorry** 20:3 25:10 | 162:10 166:5 |
| 37:3,16,22 | 45:22 110:20,21 | 32:12,16 59:1 | **speaking** 16:1 |
| 42:25 43:5 | **situation** 153:13 | 80:9,25 85:15 | 16:20 59:15 |
| 51:16 53:11 | 153:17 155:4 | 87:8 89:18 | 64:1 94:2 |
| 56:10,16,18 | 156:7 | 92:16 96:12 | 148:25 160:19 |
| 61:8 62:20 | **situations** 79:18 | 99:16 108:8,12 | **speaks** 32:24,25 |
| 65:25 66:17 | 120:12 | 115:5 128:21 | |

**[special - stock]**

**special** 68:7
**specialist** 48:10
  49:19
**specific** 48:4
  68:4 69:9 87:22
  95:17,23
**specifically** 82:6
  87:14 110:6
  116:14 133:20
**specificity** 59:23
  62:18 75:18
  101:16,22 104:6
**spectrum** 24:9
**speculation**
  62:21 72:11
  76:19 83:23
  93:7 103:9
  104:22 106:5
  111:2,17 112:1
  112:21 115:12
  121:11 129:3
  157:9
**spell** 11:17
**spend** 20:15
  24:16
**spent** 24:7
**sports** 88:17
**spring** 23:7,8
**squared** 145:20
  146:21 148:14
**staff** 15:7,9
  16:12
**stage** 41:21
**stand** 20:10
  103:7

**standard** 8:11
  8:16,19 14:3
  29:25 42:20
  69:21,22 73:13
  91:11,22 92:2
  92:19 102:10
  112:10 141:7
  142:21 143:5
  144:4,9,14
  145:3,21 148:4
  148:15,18,22
**stanford** 19:8,9
  19:12,13
**star** 25:8 46:21
  48:9,19
**start** 4:11 5:4
  35:23 62:9
  82:18 162:21
  166:9
**startling** 90:17
**stat** 140:4
**state** 1:21 26:24
  39:20 133:4
  167:2 168:3,7
  168:16,21
**stated** 87:15,18
  162:18 170:22
**statement** 39:4
  43:9 52:22 53:3
  53:14,25 60:8
  64:4 74:9 75:1
  75:15 77:22
  82:9 97:22 99:6
  101:19,20,25
  103:7,13,14

105:22,25 106:2
  106:12 123:6
  124:9 136:11
  138:9 154:2
**statements** 4:11
  30:8,10 33:19
  39:15 40:18
  46:6 51:4 62:5
  64:9 66:23
  104:11,14 121:9
  159:4 163:15
  165:2,8
**states** 1:1 22:11
  55:17 90:24
  94:21
**stating** 4:10
  43:1
**stationary**
  159:6
**statistic** 13:25
**statistical** 36:13
  87:1 95:12
  126:13
**statistically**
  36:22 37:3,16
  37:21 42:11,25
  43:5 51:16
  53:11 56:10,15
  56:18 65:25
  66:17 67:1
  76:16 77:9
  85:21 109:23
  117:7,17 118:6
  118:10 126:22
  129:1,10,21

130:3,22,24
  131:1,4 133:6
  135:12 136:6
  137:5 139:11
  140:1,3,6,9
  152:15,18,21
  158:15,17
  159:16 161:12
  161:25 162:13
**statistics** 143:11
**status** 19:13,23
**statute** 169:16
**stay** 31:14
**sticker** 49:3
  55:1
**stipend** 21:11
**stock** 34:15,17
  34:22,25 35:15
  37:22 38:3,6,17
  39:6,21 41:25
  42:3 43:4,8,12
  44:12 45:9 47:5
  53:3 54:12 56:6
  56:10 57:10
  61:8 62:1,8,11
  62:19 66:2
  67:10,17 69:7
  72:10 76:9
  78:23 82:13
  86:15 89:1
  90:16 92:14
  95:15 96:14,20
  96:25 102:24,25
  106:9,15,16,25
  108:3,17 109:1

[stock - taken]                                                                  Page 214

117:14 118:11
118:14 125:10
125:14 126:15
135:16 136:15
150:17 154:11
154:19 155:3,10
158:19 163:13
**stocks**  35:19
39:15 70:18,21
**stop**  80:5
**stopped**  88:20
**story**  126:25
127:2 135:4
**straddling**
37:13
**street**  46:21
113:4 153:8
**strike**  47:22
81:22
**structural**  159:7
159:10
**structure**
140:19 145:18
145:19,21
147:11,12,18
148:10,11
**studies**  53:20
54:7 67:23 76:1
79:21 80:16
92:13 94:16
103:16 119:15
119:15 133:21
155:4
**study**  13:24
14:3 39:11

47:16 59:7
63:13 65:24
66:8,11,14,18
66:25 69:16
73:24 81:3 84:8
89:6 96:13,16
120:20 121:22
121:23 122:4
130:21 131:3
133:4 134:20
137:4,22 153:15
155:5,14 160:12
162:22
**stuff**  30:6 32:23
34:8 98:5 119:1
127:5 146:14
151:21
**sub**  51:2
**subject**  74:19
97:18
**submit**  15:19,22
**submitted**  14:20
16:4,7,8 30:5
**subpar**  62:17
**subsection**
65:21 90:23
124:19
**subsequent**
41:14,17 43:12
**subset**  15:14
**substance**  12:25
**success**  16:15
**sudden**  134:15
**suffer**  65:11
162:11

**suffered**  27:7
28:8,14
**sufficient**  93:5
93:19
**sufficiently**
160:15
**suggest**  58:17
138:7
**suggested**
169:14
**suggests**  131:2
137:3
**suing**  26:8,16
**suite**  2:4
**summer**  21:10
22:14
**supervision**
11:11 12:13
**supplements**
9:10,11
**support**  42:22
107:1
**supporting**
120:7,17
**supports**  134:12
137:8
**supposed**  19:9
19:11,22
**supreme**  4:5
**sure**  5:9 8:6
16:21 21:1
30:19 31:20
57:5 63:19
74:15 117:9,11
117:15 119:3,13

146:1 160:2
164:7
**surge**  59:6
**surprising**
140:5,10 143:12
152:21
**surrounding**
33:3 45:6 47:1
142:3 159:13
**suspension**
70:20
**suspensions**
70:14
**sustained**  162:8
**sworn**  4:21
167:7
**system**  21:6

                    **t**

**t**  3:8 13:25 81:9
135:13,23 140:4
170:4,4
**tabak**  124:20
125:1
**table**  43:20
**take**  6:20 7:10
25:2 27:23
32:23 38:6
51:14 99:14,15
99:23 112:10,11
115:15,17
119:22 130:9,12
132:9 135:20
156:8,10 157:3
**taken**  1:20
13:22 28:3

**[taken - testimony]**    Page 215

63:20 99:25 130:13 138:13 164:8

**takes** 86:1,5 113:15 132:16 132:23 133:14 134:23 135:2 136:21

**talk** 82:6 90:12 92:12 93:11 94:14 120:19 122:18

**talked** 79:14 96:18 102:5 116:20 117:2 162:19

**talking** 18:24 63:16 69:20 76:21 86:7 89:25 90:6 91:13,23 97:25 105:14 118:25 132:6 133:10,13 144:20,21 148:4 153:1 165:19

**talks** 45:25 119:17

**taught** 23:5

**taylor** 2:9 3:4 4:15,15 6:16 13:3 27:10 41:8 41:10 43:2 44:15 52:25 54:3 56:13 57:4 60:14 61:10

62:21 63:24 64:13 68:18 72:11 74:1,13 75:22 76:6,18 77:5,21 80:7 83:2,23 85:22 92:25 93:7 94:8 96:1,11 99:24 100:4 103:9,23 104:21 106:5 110:8 111:1,16 111:24 112:1,20 113:17 114:8 115:12,25 119:9 119:22 120:9 121:11 123:4,20 126:24 127:16 129:3,24 130:10 150:22 151:9,18 154:4 157:8 160:16 161:16 164:4,10,13 165:25 166:5,20 166:22 169:1

**teach** 22:19,21 22:22,23,23,24 23:1,8

**teaching** 23:2

**techniques** 155:1

**tell** 9:23 122:4 134:2

**telling** 115:6

**ten** 15:25 163:25

**term** 19:9 23:5,6 23:6,7,8,9 36:4 116:14 141:16 141:17,18,21,24 142:7,9,14,16 143:10,10,17 144:8,11,12,16 144:24 145:19 145:23 147:9,14 148:11,13,20

**terms** 12:6 13:14 17:13 20:14 22:1 24:5 24:19 31:4,9 36:11,12 37:2 38:19 39:7 43:11 71:6 82:18 84:7 86:25 87:1 142:13 148:9,10 149:1 150:14

**terrible** 12:11

**territory** 30:8

**test** 35:25,25 38:21,25 39:12 41:15 46:6 48:12,12 49:11 49:20,21 50:4 50:22 51:1 52:3 52:18 53:8,22 54:9,9,24 57:1,9 57:18,19,20,20 58:21 59:3,8,15 59:17,21 60:6 60:17 61:14

62:5,6,10,15 63:4,11,12,12 73:23 74:11 75:9,10,21 77:13,14,17,25 82:9 87:9,15,22 88:13 101:15 104:4,12,19 106:14,24 107:23,24 109:3 123:13 152:2,6 152:7,9,12,13 153:19,20,21 156:13 160:7,14 160:15 162:20 163:9,10,12

**testified** 4:22 31:5 56:5 118:22 164:18

**testifying** 30:11 41:4

**testimony** 8:5 13:3 25:12,18 25:18 27:6,14 28:7 29:24 41:11 42:14 43:2 52:25 56:13 75:17 77:5 85:22 113:17 114:8,10 115:25 119:10 119:12 120:10 120:11 121:12 127:16 129:24 131:17 151:16

**[testimony - time]**                                                    Page 216

154:1,23 161:14
161:16 164:23
165:1 169:7,15
**testing**  34:10,13
45:19 52:24
55:10 61:21
74:17,24 78:5
102:9 158:20
160:11
**tests**  44:4 45:7
45:22 46:4 47:2
47:25 48:11
55:18,22 57:3
57:13 59:13
73:23 74:20
75:14 78:1
82:17 87:6,7,8
87:16 88:9
97:12,17 102:19
102:20 103:6
107:11 159:10
**texas**  138:17
**text**  59:1
**textbook**  141:7
141:19 143:1
**thank**  6:23 10:3
20:10 67:6
166:10
**thanks**  166:8
**theory**  85:8,13
85:25 86:1,2,4,6
98:14 113:25
119:16 132:15
132:16,18,21
135:6 136:19,19

136:19,20,20,21
136:24 150:18
151:24 152:10
153:18,20
161:19 162:7,14
163:7,11
**thereof**  165:2
**thereto**  31:8
**thesis**  133:23
**thing**  9:24 14:4
19:8 20:3 26:7
38:18 48:21
64:10 68:1
84:23 85:3 88:7
113:6 132:2
**things**  10:14
32:2,3 44:18
46:7 71:5 81:18
86:5 107:20
109:7 122:3
125:22 156:6
163:3 164:1
**think**  6:12 9:7
11:9,20 12:4
13:24 15:6 16:6
16:17 17:12,22
19:4 20:6,9 21:6
22:14,22 24:16
26:15,24 28:5
30:13 32:2
33:10,20,21,23
34:2,7,17 35:25
36:5 39:9 41:2
41:20 43:21
44:18 45:21,25

51:22 52:15,16
53:21 54:24
60:7,8 61:15,24
62:7 69:3 71:23
74:21,22 81:8
83:4 85:10,12
86:10,24,24
89:16 93:8
94:13 96:15
99:19 100:18
103:18 105:2
107:9 109:11,12
109:14 113:6
114:17 116:1,7
116:17 117:1,4
119:11 121:21
122:22,24 124:8
124:8 130:3
131:14 132:19
132:20,23
133:10,13,14
134:23 135:3,9
136:17,19 137:8
140:23,23
141:14 142:1
144:17 146:19
149:5,9 152:14
155:3,7 156:15
156:19,22,22
157:1,10,10,11
157:22 158:12
158:19,21 159:3
160:18 161:1,24
163:7,25 164:4
166:14

**thinking**  27:17
35:20 39:10
44:17 82:18
84:7 93:2
**thinks**  152:8
**third**  56:23 57:8
57:21 65:6
**thought**  5:6
24:18 37:11
117:19,23
152:12 153:5,19
160:6,9
**thousands**
79:22 80:17,21
**thread**  103:18
**three**  17:3 28:1
60:7,9 65:16,21
78:14 89:16
95:10 108:20
120:1
**throw**  129:8
157:11 158:1
**thrust**  30:15
**thursday's**  91:1
**ticker**  34:25
**ties**  82:16
**time**  6:17,17 7:4
19:15,17 20:15
20:19,21 24:8
24:13,19 36:16
43:19,22 57:21
63:17 67:18
69:21 72:24
73:11,13 74:6
79:9,10,12 85:9

**[time - two]**                                                                     Page 217

86:5 91:4 93:19 94:25 95:3,25 98:9,11 99:2 102:10 106:2 112:8,10 117:3 119:14 124:14 126:4 134:1,12 134:25 135:13 135:15 138:1 148:24 158:22 166:9

**times** 17:23 70:21 78:15 113:20

**timing** 7:21 79:20 80:15 92:22 94:6 99:20 112:11 114:7,12 119:25 127:3

**title** 14:18 52:22 53:24 58:25

**titled** 32:17

**today** 17:18 132:7

**today's** 16:25

**together** 12:12 15:12

**toggling** 17:24

**told** 6:3 41:13 63:3 105:11 106:16 152:1

**took** 105:4 110:22 111:19

**tools** 42:21,23

**top** 51:13 58:9 68:15,20 70:16

**topics** 22:25 164:21,22 165:21,23,24

**total** 67:11

**touting** 101:22 101:24

**towards** 126:18

**track** 26:9

**trade** 79:10 91:1

**traded** 34:22 102:24

**trading** 1:4 66:3 67:9,13,14,15 67:20,24,25 68:3,5,21 69:4,6 69:10 70:13,18 70:19,21 72:4,9 72:16,17,22 73:15 78:12,13 78:15,20,21,22 78:25 81:20 82:4,24 83:1,19 83:22 84:6,11 84:12,13 85:13 86:14 88:20 91:24,25 92:7 92:22,24 93:5 95:14,25 96:3,3 101:21 105:21 106:10 110:19 111:14 112:13 138:4 169:3

170:1

**traditionally** 8:20

**transcript** 10:12 31:7 33:10 35:11 166:18 169:6,18

**transcription** 168:9

**transcripts** 169:12

**transformative** 34:11,12

**transformed** 145:14 147:4

**transforming** 146:22,23 147:1

**treasury** 35:18 39:17

**treatises** 89:17

**treatment** 36:13

**trial** 8:1,5 24:9 25:19 26:1

**tribune** 47:23 48:17,25 71:12 73:1,8,19 96:19 99:8 111:19 112:7 113:9 126:6,17 127:2

**true** 47:19 48:4 50:23 55:24 66:13,14,21,23 67:1 103:14 116:18,19 133:25 134:8

136:17 158:15 168:9 170:22

**truth** 161:22

**try** 8:16 18:2 122:16

**trying** 33:2 50:21 99:19 160:3

**tuesday** 80:4,24 81:14 85:5,11 86:7 114:22 121:6 128:17,22

**turning** 35:3 78:11 84:22 140:12

**tweet** 97:16 98:16 99:7

**tweeted** 97:9

**tweets** 97:7 99:7 111:5

**two** 5:5 10:13 11:6 16:1 17:2,3 17:4,11 21:8 29:6,8 39:9 65:10 66:7,9,11 66:13,21 67:2 67:11 72:18 73:11 79:14,20 82:19 86:1,8,10 91:5 98:2 111:19 115:11 115:15 121:4,6 121:14,17 122:2 124:23 125:22 126:9,13 127:23

**[two - utah]** Page 218

128:1,10,18,23
128:25 129:5,14
129:23 130:2,9
130:22,23,25
131:11,19 132:8
132:16,23
133:14 134:24
135:2,25 136:21
138:3 139:6,10
140:1,9 141:7
141:20 144:14
146:18 148:19
157:25 160:2
162:14 166:1
**tyler** 2:6
**type** 27:14 57:2
91:12,22 96:8
113:23 155:3
156:12
**types** 31:19
**typical** 69:23
**typically** 26:2
139:16

**u**

**u.s.** 26:1 70:19
**ultimately** 95:12
**uncertain** 80:3
**uncertainties**
47:1
**uncertainty**
45:6 46:4 52:24
79:20 80:14
114:7,11 119:25
141:11,13,15,20
141:23,24 142:3

143:13 144:14
144:15,15 145:2
147:24 148:2,17
149:6
**unclear** 19:8,13
19:23
**under** 4:22 19:2
27:16,18 28:17
29:25 37:5
85:12 135:6
136:24 147:16
161:5 162:7
169:15 170:21
**underlying**
150:9
**undersigned**
167:5
**understand**
33:2 36:2 42:14
82:22 86:4 94:2
111:5 128:4
140:24 145:7
161:23
**understanding**
7:10 8:3,4 10:25
14:10,11 15:20
40:12,16 67:16
67:19,22 68:5,9
69:10 86:24
88:6,7,18 89:22
98:9,11 151:24
**understands**
141:15 144:17
**understood**
10:16 11:4

35:14 38:2,16
44:8 59:18
102:18
**underway** 49:12
**unfold** 39:2
**unilaterally**
97:6
**unique** 121:14
**united** 1:1 22:11
**university** 21:21
**unlearned** 54:8
**unobservables**
141:17
**unquote** 118:23
**unreliable** 65:2
65:13 155:15
**unsound** 30:17
**unusual** 90:1,10
106:10 113:23
**updates** 64:5
**upload** 17:20
**uploaded** 17:21
57:22
**use** 23:25 42:20
43:24 62:13
79:14,17,20,24
80:10 90:4 92:2
94:6 113:21
115:10 119:6,13
120:7,17 122:17
124:3,23 125:3
126:9 127:14,23
128:8,25 129:22
130:25 134:21
138:7 139:6

142:10 145:15
148:13,21 155:1
155:16 156:13
156:20 160:7
**used** 36:11 66:7
76:10 83:13
88:10 101:24
134:20,20
139:14,19
140:18 142:2
145:1,8 146:14
155:25,25
156:24,24,25,25
158:7 160:19
169:18
**useful** 156:8
**uses** 66:13,21
67:1 142:13,15
144:24
**using** 42:23
43:24 66:18
73:23 81:7,14
89:16 116:14
122:19 124:9
133:4 139:22
143:10 145:9
148:23 156:3,11
158:19,21
**utah** 1:1,8 48:10
48:11 49:19
73:9,23 75:9,10
77:18,18 88:8

**[v - washington]**                                                      Page 219

| v | | | |
|---|---|---|---|
| **v**  169:3 170:1 | **variance**  140:20 142:14,16 143:4 145:11,13,19,22 145:23 147:9 148:13 | **view**  30:7 40:22 41:1,2 44:21 51:24 54:5 61:12 81:7 82:7 98:2 106:13 111:3,8,20 112:11,12,15 113:12 116:22 120:11 124:18 134:12 135:5,20 156:6 157:1 160:15 162:24 163:8 | 84:12,13 |
| **vague**  57:4 103:10 119:9 154:4 157:8 | | | **vs**  1:7 |
| **validation**  87:16 87:23,24,24 88:3,3 | | | **w** |
| **valuation**  97:11 125:14 | **variances** 143:16 | | **wainwright** 47:9 109:12 |
| **value**  37:13 41:22,25 44:10 71:8 72:8 74:7 76:13,24 81:13 81:13,16 82:12 82:21 84:1 89:12 114:20,22 115:5,10,20 116:22 117:5 121:3,5,18,18 121:24,25 123:3 123:9,25 126:10 126:12,14 127:6 127:21 128:2,7 128:16,22 129:12,17 130:6 131:14,22 132:7 132:8,10,11,13 132:15,20,22 133:15 153:23 153:25 | **variants**  36:11 38:7 | | **wait**  80:7 127:4 127:9 137:13 |
| | **variation**  24:13 | | **waiting**  136:25 |
| | **varies**  21:12 24:8,20 | **viewed**  57:9,13 63:16 109:14 116:18 117:2 | **waive**  4:7 166:13 |
| | **variety**  70:20 | | **wake**  59:6 |
| | **various**  12:9 28:17 38:20 76:2 104:5 | **violation**  147:18 | **wall**  46:21 113:3 |
| | **vast**  25:24 | **visiting**  19:9,14 19:17 | **want**  5:19 24:1 36:1 54:20 69:19,25 72:5 77:7 78:7 79:20 81:15 93:1 99:14,22 108:25 115:14,16 117:4 117:22 126:2 127:20 128:12 129:13 130:1,3 140:23 156:15 157:11,12,22 158:12 160:4 163:1 164:5 166:15,20 |
| | **vegas**  149:25 150:3 | **visually**  38:11 | |
| | **vein**  28:19 | **vix**  145:9,11,15 145:17,20,25 146:3,5,21 | |
| | **verify**  169:7 | | |
| | **veritext**  169:11 169:21 | **volatile**  155:10 | |
| | **veritext.com** 169:12 | **volatility**  35:20 35:24 36:10 38:7,9,11 39:10 42:13 43:6 44:7 44:20 52:1 86:23 96:9,14 143:17 146:6 147:13 148:9 154:24 155:6,10 | |
| | **version**  27:16 146:9,13,14 150:15 | | |
| | **versions**  146:13 | | **wanted**  5:8 32:4 32:5 50:24 72:6 79:10 |
| **variable**  145:16 | **versus**  25:22 27:20 28:20 30:20 113:4 122:10 132:21 156:4 158:11 | | **wants**  99:21 |
| **variables**  36:10 141:8 146:23 | | **volume**  59:5 78:12,15,20 | **washington** 46:20 |

**[watch - working]**

**watch** 88:5,12 88:14

**watched** 88:14

**way** 14:3 17:25 18:2 31:11,13 34:24 36:4,14 38:15 40:20 42:18 43:24 46:11 55:9 57:16 62:22 82:7,11 83:8 84:17 89:11 102:15 104:9 107:15 118:8 119:24 121:8 122:7,11 127:20 135:3 136:13 137:8 142:25 145:22 146:10 148:5 150:15 151:6,16 155:3 159:3

**ways** 113:10 150:14 152:25

**we've** 17:8 63:15,17 99:13 100:2 102:5 105:14 139:17

**website** 70:16

**week** 20:19 24:21

**weeks** 16:1 125:11

**weighing** 158:3

**weight** 145:13 145:13 157:16 157:17

**weights** 147:2

**weird** 23:5

**went** 34:19 44:12 53:12 54:2 59:1

**west** 36:2 130:11 140:19 140:22,24 141:3 141:25 142:1,8 142:17,18 143:1 143:12 144:3,18 144:23 145:1,2 145:3,7 146:7,9 146:11,13,20 147:20 148:1,15 158:16

**white** 146:7,9 146:11,12

**wide** 162:16

**widely** 162:16

**window** 66:7,9 67:2 69:22 79:17,21,24 82:19,23 89:7 89:16 91:11 92:2,2,19,23 111:4,8,9 113:21 115:11 119:7 120:7,17 121:6,15,17,17 121:23 122:2,3 122:3,8 124:3

126:9,13 127:14 127:23 128:2,8 128:10,18,23,25 129:23 130:22 130:24 131:1,12 134:14 135:12 135:14 136:14 138:1,1,8,13 139:6,19 155:23 156:3,11 157:20 157:20 158:11 162:7

**windows** 79:15 80:24 81:10 89:24 113:24 120:14,23 131:11 133:24 134:6,17,21 136:11 139:14 156:16,17 158:1 160:19

**winter** 19:9 23:5 23:5,7,9

**witness** 3:2 4:3 4:21 27:11 28:1 41:9,12 43:4 44:16 53:2 54:5 56:15 57:5 60:15 61:12 62:22 63:19 64:1 68:19 72:13 74:2,14 75:23 76:8,20 77:6,22 83:4,25 85:24 93:1,8

94:9 96:2,12 99:11,15 100:12 103:11,24 104:23 106:7 110:9 111:3,18 111:25 112:2,22 113:18 114:10 115:13 116:1 119:11 120:11 121:13 123:5,22 126:25 127:17 129:4 130:1 150:24 151:11 151:19 154:5 157:10 160:17 161:18 166:10 166:14 167:9 168:10,16 169:18

**wonderful** 152:12 153:21

**word** 36:16 90:4 101:24 140:13 165:14

**wording** 14:2

**words** 12:15 13:2,7 127:25 135:2

**work** 18:2 25:24 25:25 26:20 38:21 96:16 121:1

**working** 13:11 15:14 22:10,17 23:14

**[workload - ztaylor]**                                        Page 221

**workload**  24:5
**workshops**  22:3
**world**  22:12
**worried**  160:24
**worse**  63:4,5
**wrap**  164:1
**write**  12:7
**writing**  12:6,18
  13:14
**written**  9:10,11
  12:16 13:12
**wrong**  143:2,16
  143:17 144:13
  160:6
**wrote**  12:17
  13:17 53:18
  122:14

**x**

**x**  3:1,8 34:25
  56:7 117:25
  118:7

**y**

**y**  12:1
**yeah**  7:9 17:25
  18:23 19:1 20:5
  23:11 26:3,23
  28:10 32:15
  45:2 49:9 55:8
  65:21 66:24
  70:13 72:3 73:7
  84:14 103:11,13
  119:11 131:24
  136:3 143:9
  150:11,11 154:9

156:22 158:12
  160:5
**year**  7:3 21:12
  21:12 37:9,9
  155:25 156:4,25
  157:21 158:7,11
  158:23 159:12
  159:13
**years**  21:7 25:13
  25:17
**yoad**  12:1
**york**  2:9,9,10
  4:17,17 59:7
  63:13 67:17
  92:14 166:15
**youth**  88:17
**youtube**  88:14
  88:15

**z**

**zach**  99:21
  163:24
**zachary**  2:9
  4:15 169:1
**zantia**  11:15
**zero**  85:7
**zoom**  1:20 5:20
  11:25 17:1,6,14
  17:16,17 26:19
  166:11
**ztaylor**  169:1

Utah Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(E) Submission to Witness; Changes; Signing.

Within 28 days after being notified by the officer

that the transcript or recording is available, a

witness may sign a statement of changes to the form

or substance of the transcript or recording and the

reasons for the changes. The officer shall append

any changes timely made by the witness.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

*In re: Gelt Trading, Ltd. v Co-Diagnostics, Inc., et al.*

**Errata Sheet and Declaration for the Deposition of Professor Allen Ferrell**
**Deposition Date:  March 1, 2024**

| Page No. | Line No. | Original Text | Change To | Reason |
|---|---|---|---|---|
| 8 | 24 | "read the public-available" | "read the publicly-available" | Transcription Error |
| 11 | 15-16 | "Zantia -- and I'm going to mispronounce her last name -- Grinkagopolis" | "Xanthi -- and I'm going to mispronounce her last name -- Gkougkousi" | Transcription Error/Clarification |
| 13 | 24 | "the description event study" | "the description of the event study" | Transcription Error |
| 31 | 25 | "corrected" | "corrective" | Transcription Error |
| 33 | 23 | "I cite to in" | "I cite to it in" | Transcription Error |
| 36 | 4 | "heteroscedasticity in error term" | "heteroscedasticity in the error term" | Transcription Error |
| 36 | 10 | "admitted variables" | "omitted variables" | Transcription Error |
| 37 | 3 | "statistically significant" | "it is statistically significant" | Transcription Error |
| 38 | 7 | "in variants or volatility" | "in variance or volatility" | Transcription Error |
| 43 | 11 | "up my other analyses" | "all my other analyses" | Transcription Error |
| 50 | 23 | "includes the May 14th" | "includes the May 14th article" | Transcription Error |
| 62 | 12 | "not badder" | "not better" | Transcription Error |
| 72 | 7 | "my assumption or market efficiency" | "my assumption of market efficiency" | Transcription Error |
| 72 | 18 | "if the market is, in fact, deficient" | "if the market is, in fact, efficient" | Transcription Error |
| 73 | 19 | "The Salt Lake Tribune article on May 19th" | "The Salt Lake Tribune article on May 14th" | Transcription Error/Clarification |
| 81 | 17 | "there's is" | "there is" | Transcription Error |
| 82 | 10-11 | "to folks to the market" | "to folks, to the market" | Transcription Error |
| 85 | 3-4 | "even if an inefficient market" | "even in an inefficient market" | Transcription Error |
| 86 | 9 | "even in kind of in an inefficient market" | "even in kind of an inefficient market" | Transcription Error |
| 86 | 17 | "I would to look" | "I would have to look" | Transcription Error |

| Page No. | Line No. | Original Text | Change To | Reason |
|---|---|---|---|---|
| 86 | 22-23 | "not explained by the market industry | "not explained by the market and industry | Transcription Error |
| 88 | 20 | "if the company stopped trading" | "If the Company's stock traded" | Transcription Error/Clarification |
| 89 | 21 | "Cornell Morgan" | "Cornell and Morgan" | Transcription Error |
| 97-98 | 25-1 | "we're talking about damages inflation and loss causation" | "we're talking about damages, inflation, and loss causation" | Transcription Error |
| 104 | 15 | "May 14th and itself" | "May 14th itself" | Transcription Error |
| 107 | 11 | "that tests not perfect" | "that tests are not perfect" | Transcription Error |
| 109 | 19 | "What is necessary from my opinion" | "What is necessary for my opinion" | Transcription Error |
| 113 | 8-9 | "to have access to have to the Salt Lake City Tribune." | "to have access to the Salt Lake City Tribune." | Transcription Error |
| 113 | 9 | "data aggravators" | "data aggregators" | Transcription Error |
| 119 | 17 | "Cornell Morgan" | "Cornell and Morgan" | Transcription Error |
| 119 | 22 | "Dick Taylor" | "Dick Thaler" | Transcription Error |
| 122 | 16 | "to do that aggregation" | "to do that disaggregation" | Transcription Error |
| 124 | 17 | "doesn't get priced to the 15th" | "doesn't get priced 'til the 15th" | Transcription Error |
| 131 | 20 | "would not throughout the one day" | "would not throw out the one day" | Transcription Error |
| 134 | 13 | "significantly significant" | "statistically significant" | Transcription Error |
| 141 | 9 | "that's the mark in the industry" | "that's the market and the industry" | Transcription Error |
| 142 | 15 | "It assumes constant -- it assumes heteroscedasticity" | "It assumes constant -- it assumes homoscedasticity" | Transcription Error/Clarification |
| 144 | 7-9 | "The error term is constant the covariants, when you move from May 1st to May 4th change." | "The error term is constant. The covariants, when you move from May 1st to May 15th, change." | Transcription Error/Clarification |
| 144 | 15 | "uncertainty about the coefficients the and uncertainty" | "uncertainty about the coefficients and uncertainty" | Transcription Error |

| Page No. | Line No. | Original Text | Change To | Reason |
|---|---|---|---|---|
| 147 | 5 | "heteroscedasticity errors" | "heteroscedastic errors" | Transcription Error |
| 147 | 17 | "homoscedasticity errors" | "homoscedastic errors" | Transcription Error |
| 149 | 2-4 | "we're making assumptions about the representative and the general point that more data represents more accurate" | "we're making assumptions about the representativeness and the general point that more data represents more accuracy" | Transcription Error |
| 149 | 5-7 | "So I think the coefficient estimates, as you increase your end, your uncertainty, holding all else constant, assuming the coefficient goes down." | "So I think the coefficient estimates, as you increase your N, your uncertainty, holding all else constant, the uncertainty goes down." | Transcription Error/Clarification |
| 149 | 21-22 | "a household litigation" | "the Household litigation" | Transcription Error |
| 150 | 11 | "the market index in the industry" | "the market index and the industry" | Transcription Error |
| 152 | 11-12 | "the market is blooming something wonderful" | "the market is believing something wonderful" | Transcription Error |
| 159 | 6 | "lack of stationary" | "lack of stationarity" | Transcription Error |
| 162 | 2 | "to those crafted disclosures" | "to those corrective disclosures" | Transcription Error |

I, Allen Ferrell, declare under penalty of perjury that I have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Executed on the _29_ day of _March_ (month) _2024_ (year).

_Frank Ferrell_ (Printed Name)

_____ (Signature)

3