Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: (212) 589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

*Attorneys for Defendants*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | **DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DANIEL S. BETTENCOURT AND MEMORANDUM IN SUPPORT THEREOF**<br><br>**(Oral Argument Requested)**<br><br><br>Case No. 2:20-cv-00368-JNP-DBP<br><br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

**INTRODUCTION & RELIEF REQUESTED**

Proposed expert Daniel Bettencourt ("Bettencourt") was retained by Plaintiff to provide economic support for its claims of loss causation and damages—a tough job, given that the parties agree (i) Co-Diagnostics' stock traded in an efficient market, and (ii) the stock price decline on the day of the alleged corrective disclosures (May 14, 2020) was not statistically significant. SOF ¶¶ 25, 34.[1] Thus, Bettencourt had to get creative: to take advantage of a statistically significant stock drop the following day (May 15), he used an atypical two-day event window to opine that the combined stock drop on May 14 and 15 proves the allegedly corrective disclosures on May 14 caused a statistically significant drop in Co-Diagnostics' stock price.

This is a scientifically unsupported, results-driven approach that is inconsistent with basic economic principles and methodologies as well as with the undisputed, material economic evidence in this case. As such, it is unreliable and irrelevant, and will only waste the Court's time and confuse a potential jury. Defendants therefore hereby respectfully move the Court, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for an order excluding Bettencourt's testimony in its entirety, or, at a minimum, excluding all opinions based on his methodologically unsupported and unreliable two-day event window.

**BACKGROUND**

Plaintiff's claims of loss causation are premised on two unsupported assertions: (1) that Co-Diagnostics' May 1, 2020 Press Release ("May 1 PR") allegedly misled investors into believing that its COVID PCR test ("Logix test") was "perfect" and that this caused the Company's

---

[1] For efficiency, Defendants refer throughout to the Statement of Undisputed Material Facts ("SOF") in their Mot. for Summary Judgment filed concurrently herewith. "Ex. _" refers to Exhibits 1-4 to the Greene Dec. in Support of this *Daubert* Motion, filed herewith.

share price to "soar" "artificially" (Dkt. # 86 ("SAC") ¶ 69, 98); and (2) that the allegedly hidden truth (i.e., that the Logix test was not "perfect") was "disclosed and became apparent to the market" through three "startling" announcements on May 14, 2020, causing the Company's stock price to fall "precipitously" on May 14 and 15 (*id.* ¶ 11, 74, 98). The "Alleged Corrective Disclosures" are: (1) a *Salt Lake Tribune* article ("May 14 SLT Article") about TestUtah declining to join a joint validation; (2) a press conference by the Iowa Governor ("Iowa Disclosure") announcing that Test Iowa's validation showed 95% sensitivity and 99.7% specificity; and (3) an after-hours "FDA Press Release" warning that a different company's COVID test might have accuracy problems and reminding the public that "[n]o diagnostic test will be 100% accurate." *Id.* ¶¶ 75, 77, 83.

Two undisputed facts, however, are fundamentally at odds with Plaintiff's theory of loss causation: (a) Co-Diagnostics' stock traded in an efficient market at all relevant times—meaning the stock price efficiently impounded all public information; and (ii) the abnormal return in the stock price on May 14, 2020 was not statistically significant. SAC ¶¶ 100, 103; SOF ¶¶ 25, 34.

## LEGAL STANDARD

Federal Rule of Evidence 702 requires the court to ensure that any "scientific testimony or evidence admitted is not only relevant, but reliable," so that it will assist and not confuse the trier of fact. *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). The Court must determine whether the expert is "qualified 'by knowledge, skill, experience, training, or education' to render an opinion," and "assess the reasoning and methodology underlying the expert's opinion [and] determine whether it is scientifically valid and applicable to a particular set of facts." *Id.*; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

## ARGUMENT

### I.  BETTENCOURT'S INITIAL REPORT IS INADMISSIBLE UNDER 28 U.S.C. § 1746.

Bettencourt's December 4, 2023 Report fails to meet even the basic requirements of 28 U.S.C. § 1746, which states that an unsworn statement must indicate that it is made under penalty of perjury. Bettencourt's failure to comply with this requirement renders his Report, and all testimony related thereto, inadmissible, and his opinions should be excluded on this basis alone. *See, e.g., Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015) (excluding expert report for failure to comply with § 1746); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2021 WL 2896040, at \*5 (S.D.N.Y. July 9, 2021) (excluding Bettencourt's report because it did "not include the language required by § 1746").

### II.  BETTENCOURT'S OPINIONS ARE UNRELIABLE BECAUSE THEY ARE METHODOLOGICALLY FLAWED AND SCIENTIFICALLY UNSUPPORTED.

In any event, Bettencourt's opinions are based on a scientifically unsupported model that is inconsistent with established econometric methodologies and makes no sense in context.

#### A.  Bettencourt's Two-Day Event Window Is Scientifically Unsupported and Inconsistent with Basic Economic Principles and the Economic Evidence.

Bettencourt's use of a two-day event window is a transparent, results-driven attempt to overcome the undisputed fact that there was no statistically significant decline in Co-Diagnostics' stock price on the day of the Alleged Corrective Disclosures. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014) (rejecting expert loss causation testimony where expert "cherry-picked unusually volatile days and made them the focus of the study"). Without a statistically significant price decline, Bettencourt cannot establish, using generally accepted economic principles, that the stock price decline on May 14

3

was attributable to anything other than random price movement. Ex. 1 (Ferrell Rbt.) ¶ 30 n.48. Accordingly, Bettencourt is forced to assert that the impact of the Alleged Corrective Disclosures was actually delayed, manifesting instead in the decline on May 15.

This approach, however, is methodologically flawed and at odds with basic principles of market efficiency. "[I]n an efficient market, all the available information about the company is quickly reflected in the price." *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 421 (D. Utah 1998). For corrective disclosures, "a misrepresentation's impact on market price is quickly nullified once the truth comes to light." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 472 (2013). And it is widely recognized in the economic literature that this happens "very quickly" absent extraordinary circumstances—in a matter of minutes, not over multiple days. Ex. 1 (Ferrell Rbt.) ¶¶ 47-48; Ex. 2 (Bettencourt Rep.) ¶¶ 18, 62-63, 69.

Here, the first two Alleged Corrective Disclosures—the May 14 SLT Article and the Iowa Disclosure—occurred early in the trading day on May 14, yet it is undisputed that the stock price went *up*, not down, in the hours following each disclosure. SOF ¶ 34. Nor was there any statistically significant price decline by the end of that trading day. Bettencourt failed to provide any economically sound explanation as to why these disclosures did not have a discernible impact on the stock price on May 14. Instead, he asserted at deposition that the sources of the information (the *Salt Lake Tribune* and Iowa public broadcasting) were not widely-disseminated so it *could* have taken more time for the information to enter the market (Ex. 3 at 109:5-19) and that "some" undefined investors "may" have waited for the Company to release its Q1 2020 financial results after market close before trading on the allegedly negative information (*id.* at 106:25-107:13; 108:7-21). But these theories are not grounded in any economic evidence or principles and amount

to nothing more than speculation. *Intellipharmaceutics*, 2021 WL 2896040, at *6 ("Bettencourt's report is [] inadmissible . . . because it is based on conjecture."). It is well-established in academic literature that a two-day event window in these circumstances is scientifically unsupported: "cumulating returns over multiple days in an event study when the first day of abnormal return is not statistically significant is inappropriate." Ex. 1 (Ferrell Rbt.) ¶¶ 47-48. Bettencourt offers no answer to the authority cited in Ferrell's Rebuttal Report, and provides no scientifically grounded justification for use of a two-day model here. Ex. 3 at 254:21-264:19.

Because Bettencourt's use of a two-day event window here is scientifically unsupported and inconsistent with his assertion that the market for Co-Diagnostics stock was efficient, the opinions that flow from that model are unreliable and should be excluded. Ex. 1 (Ferrell Rbt.) ¶¶ 44-50; *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015) (finding use of two-day window inappropriate: "An efficient market is said to digest or impound news into the stock price in a matter of minutes; therefore, an alleged corrective disclosure . . . at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged corrective disclosure.").

### B. Bettencourt's Opinions Are Based on Alleged Corrective Disclosures That Were Not Corrective.

Bettencourt's methodology is also unreliable in that he concludes the Alleged Corrective Disclosures "corrected" the May 1 PR without support and contrary to the economic evidence.

For a disclosure to be corrective and cause loss, it must "relate back to the misrepresentation and not some other negative information about the company" and must reveal "material, new, company-specific, and fraud-related information." *Williams*, 558 F.3d at 1140; *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1269 (N.D. Okla. 2007). Here, Bettencourt ignored

5

the many pre-class period news articles and other public sources discussing the fact that no COVID test is perfectly accurate, and that the Logix test in particular would not perform perfectly all of the time (SOF ¶¶ 17, 20-21)—undisputed facts that are fundamentally inconsistent with his assertion that the Alleged Corrective Disclosures revealed "new" and "company-specific" information. Ex. 3 at 151:6-13 ("Whether people understood diagnostic tests in general to be not 100 percent is not . . . relevant to my opinion here."). Since this information was already publicly known and thus already impounded into Co-Diagnostics' stock price, none of the Alleged Corrective Disclosures could have caused the May 14-15 stock price decline in an efficient market. Ex. 1 (Ferrell Rbt.) ¶¶ 31 & n.54, 46. Bettencourt's failure to consider prior, publicly available information that directly bears on whether the Alleged Corrective Disclosures were "corrective" flies in the face of market efficiency and shows his methodology is unreliable and unsupported.

Perhaps not surprisingly, then, Bettencourt fails to articulate how any Alleged Corrective Disclosure revealed the allegedly hidden truth (i.e., that the Logix test was not "perfect"). *Williams*, 558 F.3d at 1139-1140 (affirming exclusion of expert who failed to explain "why the[] disclosures should be considered 'corrective'"). Indeed, at deposition, he refused to opine on how any individual Alleged Corrective Disclosure was corrective, responding only with the repeated, generic assertion that he could only analyze them "holistically," in complete disregard of standard econometric approaches. *See, e.g.,* Ex. 3 at 199:15-18 ("[Y]ou can't consider any piece of information in isolation. You have to consider all the information holistically."); *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1257 (excluding expert testimony where expert failed to tie each alleged corrective disclosure to the misstatements and instead viewed them as having revealed the truth of the alleged fraud "as one big overlying theme"). Bettencourt could not identify any

6

statement in the May 14 SLT Article that revealed "new" information about the Logix test—just TestUtah's decision not to take part in a joint validation. Ex. 3 at 200:16-202:22. But that decision said nothing about Co-Diagnostics (which, in fact, asked to be included in the study (SOF ¶ 32)) or about the Logix test's accuracy, and thus cannot have corrected any statement in the May 1 PR.

Nor could Bettencourt explain how the Iowa Disclosure was corrective. His reports conveniently ignored the fact that on May 11, 2020, the Nebraska Governor announced that Test Nebraska (which also used the Logix test) had shown "95% accuracy" on its validation—the same result announced later in the Iowa Disclosure—and when asked at deposition, Bettencourt could not explain how the "corrective" May 14 Iowa Disclosure was substantively any different than the Nebraska disclosure three days earlier. Ex. 3 at 202:25-208:17; Ex. 2 (Bettencourt Rep.) ¶¶ 41-42. Under Bettencourt's theory, any disclosure that undermined the Company's alleged assertion that the test was "perfect" would have revealed the falsity of the May 1 PR (Ex. 2 (Bettencourt Rep.) ¶¶ 17, 70), yet neither Plaintiff nor Bettencourt claims the May 11 Nebraska disclosure was corrective and with good reason—the Company's stock price went *up* nearly 10% on May 11. *Id.* Ex. 3 at 67. Such cherry-picking of allegedly corrective information is methodologically unsound and renders Bettencourt's opinions unreliable and inadmissible. *Bricklayers*, 752 F.3d at 92.

Nor could Bettencourt explain how the FDA Press Release's statement that "[n]o diagnostic test will be 100% accurate" was corrective or had anything to do with Co-Diagnostics. Ex. 3 at 145:6-147:22; 149:16-157:25. And he admitted that he evaluated only "the sequence of events that happened over the course of the class period" (*id.* at 102:6-11; 105:3-11), ignoring any public information prior to the class period that contradicted his assertion that the FDA Press Release was corrective—namely, the plethora of public sources stating that "no diagnostic test,"

7

no COVID test, and no Logix test "will be 100% accurate." SOF ¶¶ 17, 20-21; Ex. 3 at 151:6-13 ("Whether people understood diagnostic tests in general to be not 100 percent is not . . . relevant to my opinion"). This failure to consider essential economic evidence that directly bears on correctiveness is methodologically unsound. Because Bettencourt's assertion that the Alleged Corrective Disclosures were corrective is unsupported and unreliable, his opinions will not help a jury. *Williams*, 558 F.3d at 1139-1140.

### C. Bettencourt's Consideration of the Hindenburg Tweets Further Demonstrates the Unreliability of His Methodology.

The May 14 tweets by short-seller Hindenburg ("Hindenburg Tweets") are not mentioned anywhere in the Complaint, much less identified as a corrective disclosure. Nonetheless, Bettencourt treats them as corrective, in a manner that is inconsistent with both the Complaint itself and basic principles of loss causation. *See* Ex. 2 (Bettencourt Rep.) ¶¶ 52, 54-55, 86, 89.

The Hindenburg Tweets raised numerous issues—the CFO's purported "checkered past," the Company's valuation, etc. (*id.*)—that cannot be "corrective" because they had nothing to do with the subjects of the May 1 PR. *Williams*, 558 F.3d at 1139. Yet Bettencourt's model and testimony treat *all* such negative information about Co-Diagnostics as correcting the May 1 PR, demonstrating the unreliability of his methodology and opinions. *See* Ex. 3 at 220:4-221:19; *id.* 152:25-153:1 ("I don't know exactly what constitutes corrective information"); *Williams*, 558 F.3d at 1142 (excluding expert who incorrectly "belie[ved] that all negative information about [the Company] was a revelation of the fraud"); *Intellipharmaceutics*, 2021 WL 2896040, at *6 (excluding Bettencourt's testimony because he similarly "relie[d] upon" "incorrect assumptions about the relevant legal standards"). Moreover, even with respect to the Logix test's performance, the Hindenburg Tweets merely put a negative spin on information that was already publicly

available. Hindenburg's opinion that the Logix test's quality "was deemed 'one of the worst'" was based on (and cited to) an April 1, 2020 *BioCentury* article that had been publicly available for weeks and was discussed in the April 30 *Salt Lake Tribune* article quoted in the Complaint. SAC ¶ 59; SOF ¶¶ 20, 21, 32. Third-party opinions like these, based purely on publicly available information, cannot be "corrective" and Bettencourt's reliance on the Hindenburg Tweets as a link in his chain of "holistically" corrective disclosures further demonstrates the unreliability of his methodology. *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("[T]he mere repackaging of already-public information . . . [cannot] constitute a corrective disclosure"); *In re PolarityTE, Inc., Sec. Litig.*, 2020 WL 6873798, at *12 (D. Utah Nov. 22, 2020) (same).

### D.  Bettencourt Ignores Other Factors That May Have Caused the May 15 Decline.

Bettencourt's testimony is also unreliable in that he fails to account for market evidence indicating that other occurrences caused some or all of the stock price decline on May 15. Fed. R. Evid. 702 (reliability depends partly on whether expert "has adequately accounted for obvious alternative explanations"); *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1267 (excluding as unreliable expert testimony that failed "to address the obvious alternative [non-fraud] explanations as required by the law of loss causation"). Specifically, Bettencourt ignores the fact that after the close of trading on May 14, Co-Diagnostics announced Q1 2020 financial results that showed lower earnings relative to analysts' consensus forecasts. SOF ¶35; Ex. 1 (Ferrell Rbt.) ¶ 41. Several market analysts attributed the May 15 stock price decline to this earnings announcement (SOF ¶ 38)—and no market analysist attributed it to any Alleged Corrective Disclosure—yet Bettencourt fails to consider the potential impact of the Q1 2020 results and attributes the entirety of the May 15 decline to the Alleged Corrective Disclosures. Ex. 2 (Bettencourt Rep.) ¶ 21. In this way too,

Bettencourt's methodology is unreliable. *Williams*, 558 F.3d at 1136 (affirming exclusion of expert who "failed to separate fraud-related losses from losses attributable to other factors").

**III.   TO THE EXTENT EXHIBIT 6 TO BETTENCOURT'S REPORT IS CONSTRUED AS TESTIMONY ON PRICE IMPACT (AND IT SHOULD NOT BE), IT IS METHODOLOGICALLY UNSUPPORTED AND UNRELIABLE.**

Finally, a note on price impact. Bettencourt does not opine on this topic: nowhere in either of his Reports does he analyze or draw conclusions regarding Co-Diagnostics' stock price movement on May 1, 2020. The sum total of his "testimony" on this topic is a single line item in a chart in Exhibit 6 to his initial Report, which indicates with an asterisk that the stock price movement on May 1 was statistically significant. Ex. 3 at 228:24-229:4. This is too slight an offering to constitute an opinion, but even if it were construed as such (and it should not be), Bettencourt conceded at deposition that because the stock price movement on May 1 was "not germane" to his analysis, he did not perform any "robustness analysis" to confirm that it was in fact statistically significant. *Id.* at 231:12-232:2. Such an analysis is both customary and scientifically necessary for a finding of statistical significance (Ex. 4 (Ferrell Rep.) ¶ 29); without it, his "opinion" on the statistical significance of the May 1 stock decline is scientifically unsound and unreliable. *See Intellipharmaceutics*, 2021 WL 2896040, at *6 (excluding "Bettencourt's report . . . . [because he] did not conduct an event study or other analysis of his own"); *Mud Buddy, LLC v. Gator Tail, LLC*, 2013 WL 5426274, at *4 (D. Utah Sept. 26, 2013) (similar re different expert). If this Court considers the line item in Bettencourt's Exhibit 6 an "opinion" on price impact at all, it must reject it as scientifically unsupported and thus unreliable and unhelpful to a jury.

## CONCLUSION

Because Bettencourt's testimony is methodologically flawed, scientifically unsound, and inconsistent with the economic evidence, it is unreliable and should be excluded in its entirety.

Dated: April 10, 2024                                   **BAKER & HOSTETLER LLP**


By:    */s/ Douglas W. Greene*
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com


Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 10th day of April, 2024, a copy of the foregoing **DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DANIEL S. BETTENCOURT AND MEMORANDUM IN SUPPORT THEREOF** was filed with this Court's CM/ECF system, which will send notification to all counsel of record.

*/s/ Douglas W. Greene*
Douglas W. Greene