# Exhibit 4

**UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br><br>Defendants. | Case No. 2:20-cv-00368-JNP-DBP<br><br>**DECLARATION OF PROFESSOR ALLEN FERRELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

<u>**DECLARATION OF PROFESSOR ALLEN FERRELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

**Professor Allen Ferrell** declares under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an economist and the Greenfield Professor of Securities Law at Harvard Law School in Cambridge, Massachusetts. I submit this Declaration Of Professor Allen Ferrell In Support of Defendants' Motion For Summary Judgment. I declare that I have personal knowledge of the facts set forth herein and I could and would testify competently thereto if called as a witness at trial.

2. On or about December 4, 2023, I signed and issued the Report of Professor Allen Ferrell (the "**Ferrell Report**"). Attached hereto is a true and accurate copy of the Ferrell Report. I drafted and issued the Ferrell Report, which contains my expert opinions and sets forth the analyses

that form the basis of my opinions. Attached to the Ferrell Report is a true and accurate copy of my curriculum vitae, which sets forth my qualifications to offer the opinions contained in the Ferrell Report. A true and accurate list of the materials I considered in forming the opinions expressed in the Ferrell Report is also attached thereto.

3.      I have personal knowledge of the facts stated in this Declaration and the facts and opinions contained in the Ferrell Report. If called as a witness at trial, I could and would competently testify to those facts and opinions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 9, 2024, at Cambridge, Massachusetts.

_____
                Professor Allen Ferrell

2

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| GELT TRADING, LTD., a Cayman Islands limited company, | ) ) | Case No. 2:20-cv-00368-CMR |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**REPORT OF PROFESSOR ALLEN FERRELL**

**December 4, 2023**

## I.    Qualifications

1.    I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. My Ph.D. dissertation concerned the relationship between stock prices and financial disclosures. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.    I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, a research associate at the National Bureau of Economic Research, and a visiting professor at Stanford. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), the ABA Task Force on Corporate Governance, American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.    I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of securities matters. I have

1

testified (including depositions) 25 times as an expert witness on these topics during the last four years. My testimony in the last four years and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.      I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,500, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

## II.      Introduction and Summary of Conclusion

5.      Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company") develops "molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications."[1] As of December 31, 2019, the Company's revenue was $214,974, which comprised sales of testing equipment of $128,124, sales from the license of its technology in the agriculture industry of $50,000, and $36,850 initial sales of its diagnostic tests (i.e., primarily of its mosquito vector products), and its net loss was $6,195,557.[2] As of the same date, the Company's market capitalization was $15.52 million.[3] The Company's stock has been trading on NASDAQ under the symbol "CODX" since July 12, 2017.[4]

6.      On January 23, 2020, Co-Diagnostics "announced the completion of the principle [*sic*] design work for a PCR screening test for new coronavirus, COVID-19, intended to address potential

---

[1]   Co-Diagnostics, Inc. Form 10-K for the fiscal year ended December 31, 2019, filed on March 30, 2020 ("2019 Form 10-K") at 4.
[2]   2019 Form 10-K at F-3 and 15.
[3]   Bloomberg L.P.
[4]   2019 Form 10-K at 10.

need for detection of the virus,"[5] the first cases of which were detected in China in December 2019.[6] On February 24, 2020, the Company announced that its Covid-19 diagnostics test obtained regulatory approval to be sold in international markets, including the European Union and the United Kingdom.[7] On March 11, 2020, the World Health Organization declared the Covid-19 outbreak a pandemic.[8] On April 6, 2020, the Company announced that it had received an Emergency Use Authorization from the Food and Drug ("FDA") allowing it to sell its Covid-19 diagnostics test to certain certified laboratories in the U.S.[9]

7.      On May 1, 2020, prior to the market open, Co-Diagnostics issued a press release titled "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations" ("May 1 Press Release") stating:

> "Co-Diagnostics, Inc. (Nasdaq: CODX), a molecular diagnostics company with a unique, patented platform for the development of molecular diagnostic tests, today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing. The data being released comes from independent evaluations of the performance of the Company's COVID-19 test in the field. These evaluations include the India National Institute of Pathology, the Mexican Department of Epidemiology ('InDRE'), and others in the US and abroad. Each study concluded 100% concordance for both specificity and sensitivity. In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent Satterfield, PhD said, 'In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. Other metrics that are important are availability, ease of use and throughput. In countries where we have been evaluated against other tests, we have consistently and

---

[5]   2019 Form 10-K at 5.
[6]   World    Health    Organization,    Coronavirus    disease    (COVID-19)    pandemic,    available    at https://www.who.int/europe/emergencies/situations/covid-19.
[7]   2019 Form 10-K at 5.
[8]   World    Health    Organization,    Coronavirus    disease    (COVID-19)    pandemic,    available    at https://www.who.int/europe/emergencies/situations/covid-19.
[9]   "Co-Diagnostics, Inc Receives FDA Emergency Use Authorization for COVID-19 Test," April 6, 2020 at 6:30 am ET, available at https://news.codiagnostics.com/2020-04-06-Co-Diagnostics-Inc-Receives-FDA-Emergency-Use-Authorization-for-COVID-19-Test.

repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that.'"[10]

The May 1 Press Release included a link to the data being released.[11] Co-Diagnostics' stock price rose from $11.34 at the close of trading on April 30, 2020 to $13.47 on May 1, 2020, an increase of 18.78%.[12]

8.    Lead Plaintiff Gelt Trading, Ltd. ("Plaintiff") brings this action on behalf of a putative class of purchasers of Co-Diagnostics' common stock during the period from April 30, 2020 through May 15, 2020.[13] I understand that the court has limited the Class to purchasers during the period from May 1, 2020 to May 14, 2020, inclusive ("Class Period").[14] Plaintiff alleges that Defendants[15] "made unequivocal statements to the market that [Co-Diagnostics'] Covid-19 tests were 100% accurate…. As was later revealed, however, this was not true."[16] In particular, Plaintiff alleges that the May 1 Press Release "materially misstated the accuracy of the Company's Covid-19 tests and omitted material information that the Company's tests have problems with their accuracy and are significantly less than 100% accurate."[17] I understand that Defendants contest these claims.

---

[10]    "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," May 1, 2020 at 6:30 am ET, available at https://news.codiagnostics.com/2020-05-01-Co-Diagnostics-Inc-Releases-COVID-19-Test-Performance-Data-Consistently-Demonstrates-100-Sensitivity-and-100-Specificity-Across-Independent-Evaluations.

[11]    The link to the data is no longer active.

[12]    Center for Research in Security Prices, LLC ("CRSP").

[13]    Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Second Amended Complaint. In the United States District Court, District of Utah, Central Division, Case No. 2:20-cv-00368-CMR, filed on April 7, 2021 ("Complaint") ¶¶ 23-25, 31. I understand that because the Court found an alleged misstatement on April 30, 2020 was not misleading, the Class Period begins on May 1, 2020. See Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Memorandum Decision and Order Denying Defendants' Motion to Dismiss, Case No. 2:20-cv-00368-JNP-DBP, filed on March 9, 2022, at 13-14.

[14]    Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Memorandum Decision and Order Partially Granting Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, Case No. 2:20-CV-00368-JNP-DBP, filed on August 18, 2023, at 20.

[15]    The Defendants are Co-Diagnostics, Inc., Dwight Egan, James Nelson, Eugene Durenard, Edward Murphy, Richard Serbin, Reed Benson, and Brent Satterfield. Complaint ¶¶ 24-26.

[16]    Complaint ¶ 7 (emphasis removed).

[17]    Complaint ¶ 64.

4

9.     In support of its motion for class certification,[18] Plaintiff retained Dr. Adam Werner who opined, among other things, that "Co-Diagnostics stock traded in an efficient market throughout the Class Period."[19] As part of his analysis, Dr. Werner prepared an "event study," which he describes as "a set of analytical methods used to measure the response of security prices to typical corporate news events such as earnings releases, merger announcements, guidance revisions, etc., after controlling for, among other things, market-wide factors."[20]

10.     More specifically, an event study is a statistical analysis that attempts to account for the effects of market and industry factors on a company's stock price, and then determines whether the resulting firm-specific price return, or "abnormal return," is unusual enough to be considered "statistically significant" based on a metric known as a "$t$-statistic."[21] A lack of statistical significance means that there is no scientific or reliable evidence that the firm-specific return on that day is distinguishable from random volatility in the stock's daily returns. Dr. Werner claims that according to his event study, "the abnormal return of 16.04% [on May 1, 2020] is associated with a $t$-statistic value of 2.34, which indicates that … the abnormal return was too severe to have been a random fluctuation. Consequently, the abnormal stock return is deemed statistically significant …."[22]

11.     I have been retained by counsel for the Defendants to determine whether there is any scientific or reliable basis to conclude that the abnormal return in Co-Diagnostics' stock price on May 1, 2020 is statistically significant. Based on my professional experience, review of the materials in **Appendix B**, and analyses, I have concluded that there is no scientific or reliable basis to conclude that the abnormal return on May 1, 2020 is statistically significant. I provide the bases for my

---

[18]   Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Lead Plaintiff's Motion for Class Certification, Case No. 2:20-cv-00368-CMR-DBP, filed on October 17, 2022.
[19]   Declaration of Dr. Adam Werner, October 17, 2022 ("Werner Declaration") at 3 (emphasis removed).
[20]   Werner Declaration ¶ 14.
[21]   Werner Declaration ¶¶ 51-52, 58.
[22]   Werner Declaration ¶ 62.

conclusion in the remainder of this report.

III.    **There Is No Scientific or Reliable Basis to Conclude that the Abnormal Return in Co-Diagnostics' Stock Price on May 1, 2020 Is Statistically Significant**

12.    I demonstrate that Dr. Werner's conclusion about the statistical significance of the abnormal return on May 1, 2020 is fundamentally flawed and unreliable. First, I explain that his event study model exhibits a statistical property known as "heteroscedasticity," which must be corrected before drawing any conclusion from the model's results, and that correcting for heteroscedasticity finds that his conclusion is wrong. Second, I explain that reasonable alternative options to Dr. Werner's arbitrary choice of estimation period show that his conclusion is not robust, i.e., a simple change to one arbitrary input to his model demonstrates that his conclusion is driven by his inappropriate choice.

13.    Consequently, making either of two appropriate changes to Dr. Werner's fundamentally flawed event study model demonstrates that the abnormal return on May 1, 2020 is not statistically significant. To see why his model is flawed, it is important to understand how an event study works, which I illustrate using his own description of the event study methodology.

14.    Dr. Werner explains that to conduct his event study, he created a "market model … to determine how Co-Diagnostics stock *typically* behaved in relation to the overall stock market and industry-specific factors."[23] Based on this relationship and the movements of market and industry indices on each event day he analyzed, he calculated an "expected return" and subtracted it from the actual stock price return to estimate the "abnormal return," which "measures the impact of new, firm-specific information on a firm's security price."[24]

15.    Dr. Werner further explains:

---

[23]    Werner Declaration ¶ 51 (emphasis added).
[24]    Werner Declaration ¶¶ 44, 51-52.

For each event, I conducted a statistical test called a *t*-test to determine whether Co-Diagnostics' abnormal return was statistically significant. If the absolute value of the *"t-statistic," which is equal to the abnormal return on an event date divided by the standard deviation of all abnormal returns in the regression estimation*, is greater than the critical *t*-statistic value of ±1.96, then the security price return is deemed statistically significant. That is, there is less than a 5% chance that the abnormal return was caused by random volatility alone, which is generally accepted to be so unlikely that the random volatility explanation can be rejected. If an event date's abnormal return is deemed to be statistically significant, one can conclude that the security price return was caused by company-specific information, rather than random volatility.[25]

16.     Hence, the *t*-statistic, which is used to estimate statistical significance, is determined by the standard deviation of the abnormal returns in the regression estimation. Dr. Werner's estimation of the *t*-statistic and thus his conclusion regarding the statistical significance of the abnormal return in Co-Diagnostics' stock price on May 1, 2020 is unfounded because his event study analysis does not appropriately account for the effect of the changes in the standard deviation of Co-Diagnostics' abnormal returns over time driven by the Covid pandemic.

17.     Dr. Werner chose to run his analysis "over the interval April 30, 2020 through April 29, 2021" – i.e., 252 trading days beginning on the first day of the putative class period as defined in the Complaint.[26]  A key issue with choosing such a long period is that the standard deviation of the abnormal returns (i.e., the denominator used to measure the *t*-statistic from which statistical significance is determined), may have changed substantially over time. Indeed, this case specifically involves the early months of the Covid-19 pandemic, during which time the public markets experienced extreme volatility as the public health situation evolved day to day and week to week. This volatility diminished over time.

18.     The reduction in stock market volatility over this period is illustrated by the Chicago

---

[25]   Werner Declaration ¶ 58 (emphasis added).
[26]   Werner Declaration ¶ 57; Complaint ¶ 31.

Board Options Exchange's ("CBOE") Volatility Index ("VIX"), a commonly used measure of the market's expectation of future uncertainty.[27] As shown in the chart below, the volatility is more than 20% higher in the first half of Dr. Werner's estimation period compared to the second half (and is even higher on April 30, 2020, before the market reacted to the alleged misstatement that begins the Class Period). Specifically, the implied volatility is 34% on April 30, 2020, but averages only 28% from April 30, 2020 to October 27, 2020 (i.e., the first half of Dr. Werner's estimation period) and drops to just 23% – more than 30% less than on April 30, 2020 – from October 28, 2020 to April 29, 2021 (i.e., the second half of Dr. Werner's estimation period).

---

[27]  *See*, e.g., D. Altig, S. Baker, J.M. Barrero, N. Bloom, P. Bunn, S. Chen, S.J. Davis, J. Leather, B. Meyer, E. Mihaylov, P. Mizen, N. Parker, T. Renault, P. Smietanka, and G. Thwaites, 2020, "Economic uncertainty before and during the COVID-19 pandemic," *Journal of Public Economics* Vol. 191, No. 104272, 1-13.

**CBOE VIX**
**4/30/2020 - 4/29/2021**



Notes & Source: The black vertical black line represents October 27, 2020, which is the midpoint of Dr. Werner's estimation period. The dashed black diagonal line represents the linear trend of the VIX and demonstrates that the volatility trended down during Dr. Werner's estimation period. Data from Chicago Board Options Exchange, Historical Data for Cboe VIX® Index and Other Volatility Indices, VIX Index data for 2004 to present (Updated Daily), available at https://www.cboe.com/tradable_products/vix/vix_historical_data/.

19.     Unsurprisingly, Co-Diagnostics' abnormal returns over time were similar. As shown in the chart below, the pattern in the abnormal returns over Dr. Werner's estimation period is striking – in the first half, the spread (i.e., the range from lowest to highest) of the abnormal returns is 51%, while in the second half of his estimation period the spread is 36%. Hence, the volatility of Co-Diagnostics' abnormal returns is substantially higher during the first half of Dr. Werner's estimation period relative to the second half.

9



**Co-Diagnostics, Inc.**
**Abnormal Returns from Dr. Werner's Event Study Model**
**4/30/20-4/29/21**

Note & Source: Werner Declaration Exhibit-7 shows that Dr. Werner used indicator or "dummy" variables in his event study model to eliminate the price impact of the Company's announcements of its quarterly financial results from his model. I exclude the abnormal returns on the dates that he used dummy variables. Data from Werner Declaration, Exhibit-7 and Exhibit-8.

20.    As a consequence, Dr. Werner's event study model generates nonsensical results. Specifically, in a properly specified event study, approximately five percent of the dates are expected to be associated with a statistically significant stock price movement due to random chance. However, as shown in the chart below, Dr. Werner's event study finds that during the first half of his estimation period, the percentage of abnormal returns that were statistically significant is 7.3%, while in the

10

second half of his estimation period, the percentage dramatically decreases to 1.6%.[28] In other words, his event study is substantially more likely to find a statistically significant abnormal return on days in the first half of his estimation period – such as May 1, 2020 – than in the second half. Consequently, it is not surprising that Dr. Werner erroneously finds a statistically significant abnormal return on this date.

**Co-Diagnostics, Inc.**
**Percentage of Statistically Significant Abnormal Returns from Dr. Werner's Event Study**
**In the First and Second Halves of his Estimation Period**



Note & Source: Werner Declaration Exhibit-7 shows that Dr. Werner used indicator or "dummy" variables in his event study model to eliminate the price impact of the Company's announcements of its quarterly financial results from his model. I exclude the abnormal returns on the dates that he used dummy variables. Data from Werner Declaration, Exhibit-7 and Exhibit-8.

---

[28] A standard statistical test of the difference between the two proportions shows that their difference is statistically significant at the 95 percent confidence level.

21.     In sum, Dr. Werner's failure to account for the change in the standard deviation of Co-Diagnostics' abnormal returns over time results in fundamentally flawed and unreliable event study results. In the sections that follow, I discuss two separate approaches to appropriately account for the change in the standard deviation of Co-Diagnostics' abnormal returns over time in the event study analysis. All of the corrections and alternative inputs to Dr. Werner's event study analysis show that the abnormal return on May 1, 2020 is not statistically different from zero.

A. Dr. Werner's Conclusion Regarding the Statistical Significance of the Abnormal Return on May 1, 2020 Is Incorrect Because his Event Study Model Must Be Corrected for Heteroscedasticity

22.     For stock returns, heteroscedasticity occurs when the variation in the abnormal returns is not constant, for example when it changes in magnitude over the course of the time period at issue. The assumption that the size of abnormal returns does *not* vary substantially over time – in other words, the *absence* of heteroscedasticity – is a fundamental assumption underlying inferences from a standard linear regression model, upon which Dr. Werner's event study is based. This premise is explained by any number of standard sources in the academic literature.[29] Failure to account for heteroscedasticity produces errors regarding statistical significance, in particular that an abnormal return may appear statistically significant when it is not, i.e., a false positive. As explained below, Dr. Werner's failure to account for heteroscedasticity in his estimation period causes him to erroneously conclude that the abnormal return on May 1, 2020 is statistically significant and thus the result of company-specific factors rather than simply random chance in a period of elevated volatility.

23.     Although the presence of heteroscedasticity is evident on visual inspection of Co-Diagnostics' abnormal returns and on review of Dr. Werner's event study results (*see supra* ¶¶ 19-

---

[29]   *See*, e.g., D.N. Gujarati and D.C. Porter, 2009, "Two-Variable Regression Model: The Problem of Estimation," Chapter 3 of *Basic Econometrics*, 5th Edition, Boston: McGraw-Hill Irwin, at 64-66.

20), there are formal tests through which its presence can be confirmed. I tested for heteroscedasticity in the residuals of Dr. Werner's regression model using the commonly-employed Breusch-Pagan test.[30] A p-value below 5% for the Breusch-Pagan test rejects homoscedasticity and indicates the presence of heteroscedasticity with a high level of statistical confidence.

24.     The Breusch-Pagan test applied to Dr. Werner's event study analysis rejects the null hypothesis of homoscedasticity with a high level of statistical confidence (p-value of 0%). In other words, the Breusch-Pagan test demonstrates the presence of heteroscedasticity in Dr. Werner's regression model. Thus, Dr. Werner's statistical testing on the abnormal returns from his event study ignoring heteroscedasticity renders his statistical conclusions misleading and unreliable because his linear regression model relies on a core assumption that is demonstrably invalid in this case (namely, the absence of heteroscedasticity).[31]

25.     A standard way to correct a regression model that suffers from heteroscedasticity is to perform a generalized least squares ("GLS") regression using the VIX index to estimate the weights of the errors.[32] I corrected Dr. Werner's event study model with respect to the heteroscedasticity associated with the Covid pandemic described above by implementing such a regression.[33] I find that after my corrections, the abnormal return on May 1, 2020 of 17.08% is *not* statistically significant,

---

[30]   *See*, e.g., D.N. Gujarati and D.C. Porter, 2009, "Heteroscedasticity: What Happens If the Error Variance Is Nonconstant?," Chapter 11 of *Basic Econometrics*, 5th Edition, Boston: McGraw-Hill Irwin, at 385-386.

[31]   D.N. Gujarati and D.C. Porter, 2009, "Heteroscedasticity: What Happens If the Error Variance Is Nonconstant?," Chapter 11 of *Basic Econometrics*, 5th Edition, Boston: McGraw-Hill Irwin, at 374-375.

[32]   *See*, e.g., A.C. Baker, 2016, "Single-Firm Event Studies, Securities Fraud, and Financial Crisis: Problems of Inference," *Stanford Law Review* Vol. 68, 1207-1261; A.C. Cameron and P.K. Trivedi, 2022, "Linear Regression with Correlated Errors," Chapter 6 of *Microeconometrics Using Stata Volume I: Cross-Sectional and Panel Regression Methods*, 2nd Edition, Stata Press, at 254-256.

[33]   I followed Dr. Werner's event study methodology solely for the purposes of this exercise, in particular his choices of estimation period, market and industry factors, and dummy variables. When the date of interest is within the estimation period, it is appropriate to include a dummy variable for that date in the regression model. Dr. Werner's event study model includes a dummy variable for May 15, 2020, one of the two dates on which I understand Plaintiff claims the market purportedly reacted to alleged corrective disclosures, but not for the other one on May 14, 2020. For the purposes of this report, the regression models I run include dummy variables for May 1, 2020 and May 14, 2020.

with a *t*-statistic of 1.82.

26.    Accordingly, correcting Dr. Werner's model to account for heteroscedasticity demonstrates that there is no scientific or reliable basis to conclude that the abnormal return in Co-Diagnostics' stock price on May 1, 2020 is statistically significant.

         B.   <u>Dr. Werner's Conclusion Regarding the Statistical Significance of the Abnormal Return on May 1, 2020 Is Incorrect Because It Is Driven by his Arbitrary and Inappropriate Choice of Estimation Period</u>

27.    Dr. Werner's event study is fundamentally flawed and unreliable because it is not robust to the use of alternative estimation periods.

28.    As discussed above, the denominator used to measure the *t*-statistic (i.e., the standard deviation of all abnormal returns) is determined by the "estimation period," which is the period over which the price movement relationship and the standard deviation of the abnormal returns are measured. Consequently, the choice of estimation period by itself can drive a finding of statistical significance.  For this reason, it is important to choose an estimation period during which the volatility of the abnormal returns is similar to the volatility of the abnormal returns at the time of the event being examined because failure to do so can result in a finding of statistical significance when the abnormal return is, in reality, due to random chance (commonly referred to as "Type I error") or a failure to find statistical significance when the abnormal return is, in reality, outside of the normal stock price fluctuations that would occur due to random chance (commonly referred to as "Type II error").

29.    It is also important to understand that the results of any statistical model are only scientific and reliable if small changes to the model do not change the results, i.e., the results must be robust to alternative specifications of the model. A chapter on "regression" analysis (the statistical technique underlying event studies) in a book cited by Dr. Werner explains:  "Regression provides an

accurate and reliable method to measure the relation between two or more variables, if implemented properly. … One should proceed by estimating a reasonable model and then testing it to check the robustness. Also, the expert should consider other variations of the model before settling on one to present."[34]

30.     Dr. Werner explains that "[p]rior to running a regression, one must decide on an estimation period over which to measure the relationship between the security at issue and the corresponding market and industry indices."[35] He chose to run his analysis "over the interval April 30, 2020 through April 29, 2021" – i.e., 252 trading days beginning on the first day of the putative Class Period as defined in the Complaint[36] – because "[i]n event study analysis, the choice of using a regression estimation period during the event window of interest is a widely used and generally accepted methodology."[37] As explained below, Dr. Werner's choice of estimation period drives his conclusion of statistical significance for the abnormal return on May 1, 2020.

31.     Dr. Werner fails to explain why he chose a 252 trading days estimation period that begins with the approximately two-week class period as defined in the Complaint and ends eleven-and-a-half months later. To test whether Dr. Werner's choice of estimation period impacts his

---

[34]    A.C. King, M.P. Rao, and C.D. Tregillis, 2017, "Econometric Analysis," Chapter 9 of the *Litigation Services Handbook: The Role of the Financial Expert* edited by R.L. Weil, D.G. Lentz, and E.A. Evans, 6th Edition, John Wiley & Sons, Inc., at 9.13, which is cited in Werner Declaration ¶¶ 15 and 43. *See also* D.L. Rubinfeld, 2011, "Interpreting Multiple Regression Results," Chapter 3 of the *Reference Manual on Scientific Evidence*, 3rd Edition, National Research Council, at 322 ("The issue of robustness – whether regression results are sensitive to slight modifications in assumptions (e.g., that the data are measured accurately) – is of vital importance. If the assumptions of the regression model are valid, standard statistical tests can be applied. However, when the assumptions of the model are violated, standard tests can overstate or understate the significance of the results. The violation of an assumption does not necessarily invalidate a regression analysis, however. In some instances in which the assumptions of multiple regression analysis fail, there are other statistical methods that are appropriate. Consequently, experts should be encouraged to provide additional information that relates to the issue of whether regression assumptions are valid, and if they are not valid, the extent to which the regression results are robust.").

[35]    Werner Declaration ¶ 57.

[36]    Complaint ¶ 31.

[37]    Werner Declaration ¶ 57. I note that, contrary to Dr. Werner's assertion, the one source he cites to support his claim states that "[t]hree general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window" but does not state the option of "during the event window" that he chose. *Id.* ¶ 57 n.64.

conclusion, I shortened it to 120 trading days beginning on the same day (i.e., April 30, 2020) but ending on October 19, 2020.[38] Eliminating the half of his estimation period that is furthest from May 1, 2020 finds that the relationship between movements in the Company's stock price and those of the market and industry indexes changed such that the abnormal return on May 1, 2020 declined from his estimate of 16.61% to 14.30%, and the standard deviation of the abnormal returns increased from 6.90% to 7.99%. Consequently, the $t$-statistic declined from 2.41 to 1.79, which is below his critical value of 1.96 – in other words, the May 1, 2020 price increase is not statistically significant and cannot be distinguished from random price movement. This demonstrates that Dr. Werner's finding of statistical significance on May 1, 2020 is not robust to a simple and appropriate change to his analysis.

32.     Moreover, in support of his estimation period, Dr. Werner cites a book chapter that states: "Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window."[39] Accordingly, I also tested the robustness of Dr. Werner's event study results on May 1, 2020 (i.e., the event window) by placing the estimation period before and surrounding this date using both 252 and 120 trading days. As shown in the table below, adopting Dr. Werner's event study analysis but simply changing the estimation period finds that *none* of the alternatives results in a statistically significant abnormal return on May 1, 2020.

---

[38]    An academic source Dr. Werner cites that he states "provide[s] a detailed description of the [event study] methodology and document[s] its wide use in academic research" supports this shorter estimation period, explaining that "the market-model parameters could be estimated over the 120 days prior to the event," approximately six calendar months of trading days. J.Y. Campbell, A.W. Lo, and A.C. MacKinlay, 1997, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, at 152, cited in Werner Declaration ¶¶ 14 and 43.

[39]    Werner Declaration ¶ 57 n.64.

**Co-Diagnostics, Inc.**
**May 1, 2020 Event Study Results Using Alternative Estimation Periods**

| | Estimation Period | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | After | | Before | | Surrounding | |
| | 252 Days | 120 Days | 252 Days | 120 Days | 252 Days | 120 Days |
| | 4/30/20-4/29/21 (1) | 4/30/20-10/19/20 (2) | 5/3/19-5/1/20 (3) | 11/8/19-5/1/20 (4) | 10/30/19-10/28/20 (5) | 2/5/20-7/27/20 (6) |
| Abnormal Return | 16.61% | 14.30% | 14.49% | 13.07% | 13.89% | 13.83% |
| $t$-statistic | 2.41 | 1.79 | 1.18 | 0.77 | 1.08 | 0.91 |
| Statistically Significant? | Yes | **NO** | **NO** | **NO** | **NO** | **NO** |

Notes & Sources: Abnormal returns and $t$-statistics using the event study methodology in the Werner Declaration and alternative estimation periods. I followed Dr. Werner's event study methodology solely for the purposes of this exercise. Per Werner Declaration Exhibit-7, I included dummy variables in the event study model to eliminate the impact of earnings announcements that fall within each estimation period. In addition to the earnings announcement dates, I included dummy variables for May 1, 2020 and May 14, 2020 (*see supra* ¶ 25 n.33). Statistical significance is measured at the 5% level using a two-tailed $t$-statistic. Data from CRSP and Bloomberg L.P.

33.     Consequently, Dr. Werner's event study results are not robust to alternative estimation periods (even ones indicated by the literature he cites), a critical test to determine whether an event study produces scientific and reliable results, and his finding of a statistically significant stock price movement on May 1, 2020 based on his unsupported and arbitrary estimation period must be rejected. Both standard statistical analysis and economic intuition (as well as common sense) support this result. Accordingly, I find that there is no scientific or reliable basis to conclude that the abnormal return on May 1, 2020 is statistically significant for this reason as well.

17

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: December 4, 2023

_____
Allen Ferrell

# Appendix A

December, 2023

## Allen Ferrell

Harvard Law School
Cambridge, Massachusetts 02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

### COURSES TAUGHT

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

### REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

### CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

### Papers

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, Working Paper (2021)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

3

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

 "Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)


**TESTIMONY LAST FOUR YEARS**


*In re Ripple Labs Litigation*, Case No. 4:18=CV-06753-PJH, Expert report and deposition on October 16, 2023

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074_JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019 and trial testimony June 7, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert report and deposition on August 26, 2021

*Pearlstein et al. v. Blackberry Limited*, Case No. 1:13-cv-7060-CM, Expert report and deposition on November 3, 2020

*In re Grupo Televisa Securities Litigation*, Case No. 1:18-cv-01979-LLS, Expert report and deposition on February 21, 2020

*In re Snap Securities Litigation,* Case No. 2:17-cv-03679-SVW-AGR, Expert report and deposition on December 16, 2019

*People of the State of New York v. Exxon Mobil Corporation,* Index No. 452044/2018, Expert report and deposition on July 23, 2019 and trial testimony on November 6, 2019

**Appendix B**
**Materials Relied Upon**


**Legal Documents**
1. Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Second Amended Complaint. In the United States District Court, District of Utah, Central Division, Case No. 2:20-cv-00368-CMR, filed on April 7, 2021.
2. Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Memorandum Decision and Order Denying Defendants' Motion to Dismiss, Case No. 2:20-cv-00368-JNP-DBP, filed on March 9, 2022.
3. Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Lead Plaintiff's Motion for Class Certification, Case No. 2:20-cv-00368-CMR-DBP, filed on October 17, 2022.
4. Gelt Trading, Ltd., v. Co-Diagnostics Inc., et al., Memorandum Decision and Order Partially Granting Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, Case No. 2:20-CV-00368-JNP-DBP, filed on August 18, 2023.


**Expert Reports**
1. Declaration of Dr. Adam Werner, October 17, 2022.


**Securities and Exchange Commission Filings**
1. Co-Diagnostics, Inc., Form 10-K for the fiscal year ended December 31, 2019, filed on March 30, 2020.


**Academic Articles & Books**
1. D. Altig, S. Baker, J.M. Barrero, N. Bloom, P. Bunn, S. Chen, S.J. Davis, J. Leather, B. Meyer, E. Mihaylov, P. Mizen, N. Parker, T. Renault, P. Smietanka, and G. Thwaites, 2020, "Economic uncertainty before and during the COVID-19 pandemic," *Journal of Public Economics* Vol. 191, No. 104274, 1-13.
2. A.C. Baker, 2016, "Single-Firm Event Studies, Securities Fraud, and Financial Crisis: Problems of Inference," *Stanford Law Review* Vol. 68, 1207-1261.
3. A.C. Cameron and P.K. Trivedi, 2022, "Linear Regression with Correlated Errors," Chapter 6 of *Microeconometrics Using Stata Volume I: Cross-Sectional and Panel Regression Methods*, 2nd Edition, Stata Press.
4. J.Y. Campbell, A.W. Lo, and A.C. MacKinlay, 1997, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press.
5. D.N. Gujarati and D.C. Porter, 2009, "Two-Variable Regression Model: The Problem of Estimation" and "Heteroscedasticity: What Happens If the Error Variance Is Nonconstant?," Chapters 3 and 11 of *Basic Econometrics*, 5th Edition, Boston: McGraw-Hill Irwin.
6. A.C. King, M.P. Rao, and C.D. Tregillis, 2017, "Econometric Analysis," Chapter 9 of the *Litigation Services Handbook: The Role of the Financial Expert* edited by R.L. Weil, D.G. Lentz, and E.A. Evans, 6th Edition, John Wiley & Sons, Inc.
7. D.L. Rubinfeld, 2011, "Interpreting Multiple Regression Results," Chapter 3 of the *Reference Manual on Scientific Evidence*, 3rd Edition, National Research Council.

1

**Press Releases**

1. "Co-Diagnostics, Inc Receives FDA Emergency Use Authorization for COVID-19 Test," April 6, 2020 at 6:30 am ET, available at https://news.codiagnostics.com/2020-04-06-Co-Diagnostics-Inc-Receives-FDA-Emergency-Use-Authorization-for-COVID-19-Test.
2. "Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations," May 1, 2020 at 6:30 am ET, available at https://news.codiagnostics.com/2020-05-01-Co-Diagnostics-Inc-Releases-COVID-19-Test-Performance-Data-Consistently-Demonstrates-100-Sensitivity-and-100-Specificity-Across-Independent-Evaluations.


**Websites**

1. World Health Organization, Coronavirus disease (COVID-19) pandemic, available at https://www.who.int/europe/emergencies/situations/covid-19.


**Data Sources**

1. Bloomberg L.P.
2. Chicago Board Options Exchange, Historical Data for Cboe VIX® Index and Other Volatility Indices, VIX Index data for 2004 to present (Updated Daily), available at https://www.cboe.com/tradable_products/vix/vix_historical_data/.
3. Center for Research in Security Prices, LLC ("CRSP").


All other materials cited in the report.