# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION


CASE NO. 2:20-cv-00368-CMR


GELT TRADING, LTD., a Cayman

Islands limited company,

     Plaintiff,

 VS.


CO-DIAGNOSTICS, INC., a Utah

Corporation, DWIGHT EGAN, JAMES

NELSON, EUGENE DURENARD, EDWARD

MURPHY, RICHARD SERBIN, REED

BENSON, BRENT SATTERFIELD,


     Defendants.

 _____/


                         Remote via Zoom

                         April 10, 2023

                         11:03 a.m. - 6:55 p.m.


        VIDEOTAPED DEPOSITION OF CECILIA HUTCHINS

           Taken before Lilly Villaverde, RPR and Notary

  Public in and for the State of Florida at Large,

  pursuant to Notice of Taking Deposition filed in the

  above-mentioned cause.

Page 2

APPEARANCES:

MICHAEL C. FASANO, ESQUIRE
mfasano@fasanolawfirm.com
Fasano Law Firm, PLLC
2 S. Biscayne Boulevard
Suite 2530
Miami, FL 33131
and
MICHAEL A. PINEIRO, ESQUIRE
mpinero@mnrlawfirm.com
BRANDON S. FLOCH, ESQUIRE
bfloch@mnrlawfirm.com
Marcus Neiman Rashbaum &
Pineiro, LLP
2 S. Biscayne Boulevard
Suite 2530
Miami, FL 33131
on behalf of the Plaintiff


JONI OSTLER, ESQUIRE
jostler@parrbrown.com
Parr Brown
101 South 200 East
Suite 700
Salt Lake City, UT 84111
and
ZACHARY R. TAYLOR, ESQUIRE
ztaylor@bakerlaw.com
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111
on behalf of the Defendants

ALSO PRESENT:
OWEN BADIN
FRED VEITCH, VIDEOGRAPHER

Page 3

I N D E X
E X A M I N A T I O N S

| WITNESS | PAGE |
|---|---|
| CECILIA HUTCHINS | |
| DIRECT EXAMINATION BY MR. FASANO | 7 |
| CROSS-EXAMINATION BY MS. OSTLER | 197 |


E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail Chain - Bates CoDi 80712-80716 | 87 |
| Exhibit 2 | E-mail Chain - Bates CoDi 73713-73715 | 90 |
| Exhibit 3 | E-mail - Bates CoDi 79338 | 94 |
| Exhibit 4 | E-mail Chain - Bates CoDi 79448-79451 | 99 |
| Exhibit 5 | E-mail Chain - Bates CoDi 89645-89652 | 102 |
| Exhibit 6 | E-mail Chain - Bates CoDi 79770-79772 | 109 |
| Exhibit 7 | E-mail Chain - Bates CoDi 4513-4514 | 113 |
| Exhibit 8 | E-mail Chain - Bates CoDi 7437-7438 | 122 |
| Exhibit 9 | E-mail Chain - Bates CoDi 75250-75252 | 128 |
| Exhibit 10 | E-mail Chain - Bates CoDi 1168-1169 | 134 |
| Exhibit 11 | E-mail Chain - Bates CoDi 102876-102878 | 139 |
| Exhibit 12 | E-mail Chain - Bates CoDi 86671-86673 | 144 |
| Exhibit 13 | E-mail Chain - Bates CoDi 102883-102885 | 150 |
| Exhibit 14 | E-mail Chain - Bates CoDi 5515-5517 | 155 |

Page 4

I N D E X
E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | E-mail Chain - Bates CoDi 1353-1356 | 159 |
| Exhibit 16 | Article - Evaluation of Factors that Affect the Performance of COVID-19 Molecular Assays Including Presence of Symptoms, Number of Detected Genes and RNA Extraction Type | 166 |
| Exhibit 17 | E-mail Chain - Bates CoDi 201703-201704 | 168 |
| Exhibit 18 | Press Release - Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations | 175 |

Page 5

THE VIDEOGRAPHER:  We are on the video record. Today is April 10, 2023, the time is 11:03 a.m.

Please note that this deposition is being conducted virtually.  The quality of the recording depends on the quality of internet connection and the camera of all participants.  What is heard from the witness and seen on screen is what will be recorded. And the audio and video recording will continue to take place, unless all parties agree to go off the record.

This is Media 1 of the video-recorded deposition of Cecilia Hutchins in the matter of Gelt Trading Limited versus Co-Diagnostics, Incorporated, et al., filed in the United States District Court, District of Utah, Central Division, case number 2:20-cv-0038.

My name is Fred Veitch, videographer for Veritext.  And the court reporter is Lilly Villaverde with Veritext.

At this time will counsel please state their appearances for the record.

MR. FASANO:  Michael Fasano, I represent the plaintiff Gelt Trading and the punitive class.

MR. PINEIRO:  Hi, Michael Pineiro is on as well, counsel for the plaintiffs.

2 (Pages 2 - 5)

Page 6

MR. FLOCH: And Brandon Floch, counsel for the plaintiffs as well.

MS. OSTLER: Joni Ostler from Parr Brown Gee & Loveless on behalf of the defendants and also on behalf of witness, Cecilia Hutchins.

MR. TAYLOR: And Zachary Taylor from Baker and Hostetler, LLP, on behalf of defendants and also on behalf of the witness, Cecilia Hutchins.

MS. OSTLER: I also note that there's someone named Owen Badin on. Is he counsel for plaintiffs?

MR. FASANO: Owen is counsel with my firm, Fasano Law Firm. He's going to be showing the exhibits today.

MS. OSTLER: Great.

MR. FASANO: Or he is our law clerk, I should say, not counsel.

MS. OSTLER: Great. Thank you.

THEREUPON:

CECILIA HUTCHINS

called as a witness on behalf of the Plaintiff herein, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

Can I just get some water? Sorry.

MR. FASANO: Sure.

Page 7

Joni, is that part of your home there behind you?

MS. OSTLER: Yeah, it's my backyard.

MR. FASANO: Oh, it looks beautiful.

MS. OSTLER: Thank you.

DIRECT EXAMINATION

BY MR. FASANO:

Q. Okay. Ms. Hutchins, are you -- are you ready?

A. Yeah.

Q. Okay. Let's start easy, just state your name for the record and spell it, please.

A. Cecilia Hutchins. You said name and what?

Q. And if you can spell it, please.

A. C-E-C-I-L-I-A, and Hutchins, H-U-T-C-H-I-N-S.

Q. Okay. Now, Ms. Hutchins, have you ever been deposed before?

A. In this case you mean?

Q. I mean on any case ever.

A. Yes.

Q. Okay. And do you remember when that was?

A. Not really. It was last year, but I don't remember when.

Q. Okay. Do you remember in what proceeding it was that you were deposed?

A. No. In another case for Co-Diagnostics, but --

Page 8

Q. Okay.

A. -- I don't remember.

Q. That's fine. So, look, let me do this, let me go over some rules of taking a deposition, because you're not a seasoned pro at it, no offense. Probably a good thing, right. And we'll go from there.

So do you understand that this is part of a legal proceeding?

A. Yes.

Q. Okay. And do you understand that what you are testifying to today is under oath, like it would be at a trial or a -- other legal proceeding?

A. Yes.

Q. Okay. Do you understand that we have a stenographer here with us on Zoom who is taking everything down that you and I say?

A. Yes.

Q. Now, this is sort of like a very weird conversation. I'm going to ask a bunch of questions of you and you're going to answer. Because there's a stenographer taking everything down, I would just ask that, you know -- and you've done a very good job of it so far, that you allow me to finish my question and then I'm going to try to allow you to finish your complete answer, so the stenographer can take everything down; is

Page 9

that okay?

A. Yes.

Q. Okay. Now for breaks. I know we already took a brief break for some water. You totally can take breaks. This is not a marathon. If you need to go to the bathroom or something like that, please tell me. The only thing that I ask is that you don't take a break while there's a live question pending from me; is that okay?

A. Yes.

Q. Now, you are represented here today by counsel and your counsel may object at times to the form of a question. If your counsel objects to the form of a question, I will ask you to answer the question anyway and your counsel will likely agree with that.

If your counsel directs you to not answer a question, please stop and then I will probably have a discussion with your counsel about the question.

But so -- so you may hear objection to form and if you hear that, you know you may answer. If your counsel instructs you not to answer, then don't answer, okay?

A. Okay.

THE VIDEOGRAPHER: Mr. Fasano --

MR. FASANO: Yes.

3 (Pages 6 - 9)

Page 10

THE VIDEOGRAPHER: Yes, sir. I am the videographer and I got knocked off somehow.

MR. FASANO: Oh.

THE VIDEOGRAPHER: Yeah, about -- I can let you know where I was at, if you want me to.

MR. FASANO: Sure. I can redo it, if you want.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record, 11:11 a.m.

BY MR. FASANO:

Q. Okay. Ms. Hutchins, we are back on the record. If I ask you a question, you respond, I'm going to assume you understood the question. However, I may ask you questions that you may not understand and, if so, I would like for you to ask me to clarify that question; is that okay?

A. Yes.

Q. Okay. Is there any reason why you can't testify truthfully or accurately today relating to the matters in this proceeding?

A. No.

Q. Okay. This next question is not meant to impugn your character in any way, but any drugs, alcohol, prescription medication or any other substance that would impair your ability to testify truthfully or

Page 11

accurately?

A. Nope.

Q. Okay. I may show you -- not may show you, I'm going to be showing you a fair number of documents today. If after I show you a document, you have the absolute right to read as much of it as you want to before we start asking questions to you about it. So when I show you a document, just let me know when you're ready to answer questions and I will ask you questions about it, okay?

A. Okay.

Q. Okay. Now, do you know if you're here today to testify pursuant to a subpoena that you received?

A. Yes.

Q. Okay. And you are represented here today by counsel, Joni Ostler and Zachary Taylor; is that correct?

A. Yes.

Q. Did that subpoena request also ask for you to collect documents?

A. Yes.

Q. Okay. Now, did you collect and -- did you collect documents responsive to the subpoena?

A. I didn't have any documents to provide. I am not at Co-Diagnostics any more.

Page 12

Q. Okay. Do you mind me just asking then, you know, not to be nosey, but how you searched for those documents to determine that you didn't have anything?

A. After I left Co-Diagnostics, I deleted everything that I had with them. I never used my personal e-mails or my personal e-mail when I was in the company and I didn't have messages or something -- anything else anymore, because I cleaned everything when I left.

Q. Did you have any handwritten notes or any documents in paper that you might have retained from the company when you left?

A. No, I returned everything I had or destroyed anything that was -- that I found -- that I found like in a couple months later, but I made sure to not have any documents for the company.

Q. Okay. So sitting here today, you feel confident that you -- that you do not have any documents that were responsive to the subpoena?

A. Yes.

Q. Okay. Did you do anything to prepare for this deposition today?

A. I discussed with the -- with my -- with my lawyers, with Joni.

Q. Okay. And for how long did you meet with your

Page 13

lawyers?

A. Four hours, about that.

Q. Okay. Don't want to know what you guys talked about. Not allowed to. So let's just start easy. I know you are a very educated person. Can you give me your educational background, start with your lowest level of college and go up to your highest level of certification.

A. I'm a pharmacist, graduated from Brazil. And last year I completed my MBA with WGU and I'm currently in -- I join another master program, just that.

Q. Okay. You said you currently are in a master's program?

A. I am working to enroll in next month.

Q. Oh, okay. And what is that program for?

A. Data science.

Q. Okay. What about your work history, take me to your first professional job after you became a pharmacist to the present?

A. I work at -- after my graduation, I work in a company called Cazi, which is spelled C-A-Z-I, in Brazil and I was a validation analyst working with process validation.

After that, I worked with GHL as a quality analyst -- quality assurance analyst, in fact, and I

4 (Pages 10 - 13)

Page 14

worked there for three years.

After that, I worked with Thermo Fisher Scientific as a quality assurance manager in regulatory affairs, and I worked there for almost four years.

After that, I came to the U.S. pursuing the Ph.D. program at University of Utah. I was a candidate, applied for the program. I didn't get the program at that time.

Then I met my husband, got married. I was out -- had a gap with my work -- with my profession because of family. And after that, in 2018, January 2018, I started with Co-Diagnostics and I worked with them until October 2021.

Then I worked with Jeunesse, but then Jeunesse had downsizing. With Jeunesse, I was regulatory affairs specialist with subassociation research and then I -- the company was downsizing and I was laid off in December 2022.

Q. Okay. And are you employed now?

A. Yeah.

Q. Doing what?

A. Oh, no, I'm not. Sorry. I understood -- I thought you said I am unemployed. Yes, I'm not -- currently not working.

Q. Okay. Now, you mentioned that you were a

Page 15

validation analyst. Can you explain what a validation analyst is?

A. So I was responsible for doing validation, that's a technical term for process validation. Cazi is a pharmaceutical industry in Brazil. It's a national company. It's a small pharmacist agency that makes genetics and other types of drug. So I was responsible for the process validation and I was also assisting with analytical validation, cleaning validation for the products they manufacture there.

Q. Okay. And is there anything different between being a validation analyst and a quality assurance person?

A. Yes.

Q. And what's the difference?

A. Validation analyst design the studies and establish an accepted criteria and build reports discussing with reasonable assurance that the process is capable of producing products according to a set of specifications.

And quality assurance is a process where you collect evidence, after the most -- after products are already in the market. So you collect evidence -- collect evidence for you to conclude with a reasonable assurance that the process that the product has been

Page 16

submitted for manufacture meet the specification requirements that were established during the development -- during the development process.

Q. Okay. Now, you said you started working for Co-Diagnostics in 2018?

A. Yes.

Q. Okay. And what was your role when you started working with Co-Diagnostics in 2018?

A. I was hired as liaison, regulatory affairs liaison. It was to help them to make reports for submission for registration in different markets, wherever they wanted to market a product in certain jurisdiction. So it's basically putting together the studies and produce a dossier that's going to be submitted to any regulatory agency in the world.

Q. Okay. As part of your compensation with Co-Diagnostics, did you ever receive shares of Co-Diagnostics stock?

A. After -- after some time I was with them, I did receive, but I -- I don't know, because I wasn't -- that was not part of my compensation or benefits package. But later on, because of some -- some changes they made, I was eligible and -- but I don't even know when I received. I don't remember -- because I wasn't very aware -- I wasn't very aware of where I turned in this

Page 17

eligibility, because -- there was some communication, but I don't actually remember. I believe I signed something, but I don't remember.

Q. Do you know how many -- do you still hold Co-Diagnostics stock today?

A. No.

Q. Okay. Do you recall when you sold the stock?

A. It was last year.

Q. Okay. Do you remember -- well, do you remember when last year?

A. No.

Q. Now, after you started with Co-Diagnostics in 2018, did you ever change roles within the company?

A. Yes, I was promoted to head of regulatory affairs.

Q. Okay. And what did being the head of regulatory affairs encompass?

A. It was basically the same, but -- well, I was head of regulatory and clinical affairs. The only thing that was added, it was also that planning and design of clinical studies.

Q. Okay. At any point, were you involved in the marketing aspect of Co-Diagnostics's products?

A. No.

Q. Would you review statements that were made to

5 (Pages 14 - 17)

Page 18

the public prior to them being released?

A. Sorry, can you repeat? It was -- let me put the volume up.

Q. Would you -- as part of your job duties, would you review statements that were made to the public by Co-Diagnostics for any reason?

A. The statement -- I started reviewing the statements -- I'm not going to be able to provide a date of when I started reviewing, but it was after we had a complaint from FDA. So I had -- and then FDA asked -- it was action that we took to -- so I started reviewing the statements after that point.

It was roughly something around, I believe, April or May. I don't remember when, but it was around that time, May or June. I -- I'm not going to be able to remember when. But it was after we had an instance with the FDA.

Q. Okay. Do you remember in what year that occurred?

A. It was in 2020, during the pandemic, yeah.

Q. Now, was there -- did someone come to you at some point from the company and say, Ms. Hutchins or Dr. Hutchins, we want you to review these statements now that the FDA has -- has come to us or how did you become involved in the making -- in the reviewing of statements

Page 19

made to the public?

A. So after we had a complaint from the FDA, we -- the company discussed the preventative actions and corrective actions that we needed to provide to the FDA to make sure that the error would not happen again. So one of the actions mentioned that regulatory affairs department would have to review all statements, be part of the review process of statements before they -- wherever they were talking about products that were registered in the -- or products that were impacting the U.S. market and -- so then I was just involved in the review process, whenever the company needed to make statement or wanted to make a statement, they would send me the -- the document for me to make comments and -- and provide some feedback before the document was published.

Q. Okay. And do you recall what error or errors, I'm using your words, the FDA cited Co-Diagnostics for?

A. I don't.

MS. OSTLER: Objection -- objection, misstate facts.

BY MR. FASANO:

Q. Okay. You can answer. Do you want me to say the question again?

A. Also, I don't remember.

Page 20

Q. Okay. But --

A. I -- yeah, it was -- I don't -- I'm not going to be able to -- I might make a mistake. It's been like almost three years ago.

Q. Okay. I may be able to show you some documents later that may refresh your memory and they may not, but let's move on then. I appreciate, by the way, that if you don't remember something, you just tell me that you don't remember.

Something I probably should have told you earlier in the deposition is you can estimate things, right. We can estimate about how fast a car was going, but don't guess. Don't just, you know, give me guesses out of thin air. That's not what I'm looking for. So I appreciate that.

What about statements to vendors of Co-Diagnostics, was there a point in time when you would review those as well?

A. Statements made by customers?

Q. To vendors that were selling the product, yes, so statements to customers or to other third-party sellers of Co-Diagnostics' test?

A. No.

Q. Okay. And when did you say you left Co-Diagnostics?

Page 21

A. October 2021.

Q. Okay. And why did you leave?

A. Our family, we move to Eagle Mountain and the commute to Salt Lake City started to get very complicated. I don't like driving in snow and I was offered the position with Jeunesse that was a remote position.

Q. Okay. What was your impression of Co-Diagnostics while you worked there? What type of company was it, in your own words?

MS. OSTLER: Objection, vague.

BY MR. FASANO:

Q. Okay. You can answer.

A. It's a small company, a start-up with awesome technology that was very exciting. In fact, that was the reason that a lot of people worked there, is because the technology is very exciting and it is remarkable. And we had the opportunity to work in something exciting, scientifically interesting and that is one reason that I -- and the group is very nice to work with.

Q. What was the exciting -- what was exciting about Co-Diagnostics' technology, from your perspective?

A. It is the molecule and how it works and the high specificity of the technology and how we can -- the

6 (Pages 18 - 21)

Page 22

possibilities for building our products for in vitro diagnostics offering solutions in a start-up environment, it's something that excites me.

Q. Okay. Now, when you first started working with Co-Diagnostics, what type of technology were they developing at that time?

A. The company does in vitro diagnostics. So it manufactured kits for -- to use as reagents for PCR tests. So that just -- and among other things in the research, as offering research services for a variety of industries, but that's the main product that the company makes.

Q. Now, was there any changes in how the company operated after the COVID-19 pandemic began?

A. What do you mean?

Q. Well, what I mean is, is did the company shift its focus at all in after -- after the COVID-19 pandemic began?

A. No.

Q. Okay. And what makes you say no?

A. Before COVID, the company designed, developed and manufacture in vitro diagnostics and after the COVID pandemic, the company designed, developed, manufactured in vitro diagnostic reagents, test kits.

Q. Okay. So did the focus change from creating

Page 23

test kits for other diseases to COVID-19 test kits after the pandemic began?

A. Sorry, what do you mean about that?

Q. In your experience, did the focus of the company change from developing diagnostic tests for other diseases to developing diagnostic tests for COVID-19 after the beginning of the COVID-19 pandemic?

A. No, the company had a portfolio of products and COVID was just one product, the COVID test was just one product in the portfolio.

Q. Okay. Do you know how -- was the COVID -- was there a special priority, after the pandemic, placed on the COVID product as opposed to other products?

MS. OSTLER: Objection, vague.

THE WITNESS: Was because of the demand, but not -- nothing beyond that.

BY MR. FASANO:

Q. Okay. Were you involved in any of the certification processes for the COVID-19 test that was developed by Co-Diagnostics?

A. You mean such -- what do you mean by "certification"?

Q. Like emergency -- let's start with the emergency use authorization from the FDA. What was your involvement with obtaining the emergency use

Page 24

authorization for Co-Diagnostics COVID-19 test?

A. I was the FDA correspondent for the company. I am the one that made the submission.

Q. Okay. And what did that submission include?

A. It is the information -- so when you are going to submit a product for emergency use authorization with the FDA, the FDA provides a protocol with the -- with all of the information that you need to submit, as far as performance studies and other product information, so the FDA is capable of doing the minimal review required for emergency authorization.

So the submission included all of the information required by the FDA for the submission at the time.

Q. Okay. Now, as part of that submission, did Co-Diagnostics have to submit sensitivity data for its test to the -- to the FDA?

A. Meeting the requirements for the emergency use authorization, yes, that's the basic information that you need to submit.

Q. And what about the specificity of the test?

A. Yes, it's included in the protocol.

Q. And do you recall what the sensitivity and specificity percentages were when you submitted the emergency use authorization?

Page 25

A. No.

Q. Okay. Were they 100 percent?

A. That is not -- that is not something that makes sense. So that is -- sensitivities are -- the protocol requests for you to submit sensitivity as -- there are many different ways for you to discuss sensitivity and specificity and it cannot be point down into one single number.

So I would be inaccurate to say that it was a hundred percent, because that's not how we report sensitivity and specificity. It's a collection of parameters.

Q. Okay. So can you explain to me what the parameters are for sensitivity and specificity for a diagnostic test?

A. So when you say that, it's inaccurate because --

Q. Okay.

A. -- emergency use authorization, like I said, the FDA has a protocol which describes which studies are you going to make to do claims of sensitivity and specificity. This parameters include a set of studies. So we do, in silico analysis, we do -- we provide sequence of the primers, we provide the studies with the requested amount of -- in different metrics. We provide

7 (Pages 22 - 25)

Page 26

information about -- well, we provided, I would say, in the past. So there is sensitivity you -- the limit of detection and then -- you do limit of detection and then you do specificity includes testing with different metrics. It includes the in silico analysis of your specificity, includes interference substances, includes a number of different situations where you can prove that you can still detect, even when there is variability of the sample.

And then also we do a clinical -- at the time, for the emergency use authorization was contrived samples where you use -- where you buy a standard -- a reference standard, like a sample that's a reference standard, so, and then you spike a certain amount of the -- and then you randomize those samples and then you do a clinical study on those randomized samples and then you determine how many you were able to find of your agreement of positives and negatives.

And then also included in the emergency authorization process, the FDA sends you samples as a blind test for -- that is up -- that's a process that is for all emergency use authorization for in vitro diagnostics with FDA. So they send you samples and then you test according to their protocol and then you submit the results and they evaluate the agreement and that is

Page 27

how they determine if -- that is how they review and how they determine if they are going to be able to authorize you to -- to market the product in the U.S.

So it is set of conditions and parameters and there's a variety of studies and tests I do have to make. It's all included in the report that is submitted to the FDA and then you produce instructions for use and the fact sheets and the process, it's like this. And then you are authorized to market your product in the U.S., according to the intended purpose and the instructions for use that -- intended purpose that you are claiming and with the performance information that -- the performance conditions or the performance -- yeah, the performance specifications that the FDA authorizes you to market the product.

Q. Thank you. That seemed like a very complete answer.

So would it be fair to say that specificity and sensitivity is -- is a complex -- is a complex metric that needs to be explained using different types of analysis?

MS. OSTLER: Objection, vague, mischaracterizes prior testimony.

THE WITNESS: Not really. I don't agree. I would say that sensitivity, specificity can be

Page 28

determined by a number of -- for someone to establish sensitivity and specificity and in a scientific term or -- it depends on the conditions that the customer wants to use the product as well. So it's a decisionmaking that -- that the customer will decide to do, depending on what are their objectives and how they are going to use the product.

It is the same thing of saying that is -- I don't know, is an SUV a fast car or is it -- any -- any comment of -- of quality that you have for a car, it depends on how you are going to be using the car for. So, basically, it is better for someone that understands and knows what they are doing to decide if a product -- if a reagent meets the requirement, meets their needs or not.

BY MR. FASANO:

Q. Okay. Well, my question, though, is a little bit different. It's not -- it's not whether the number that you come up with for specificity or sensitivity is good or not. It's -- it's the inputs that go into determining specificity or sensitivity are multivariable; is that correct?

A. Yes, it's correct.

Q. What about the CE certification for -- for Co-Diagnostics, were you involved in that process?

Page 29

A. For what?

Q. For the CE certification in Europe for the Co-Diagnostics COVID-19 test, were you involved in that process?

A. CD? What is CD?

Q. CE, as in Eric.

A. Oh, CE, yes. I am the one that made that -- the submission for the European Union.

Q. Okay. And is there a difference between you had to submit to the European Union versus what you had to submit to the U.S. FDA?

A. Yes.

Q. And what were those difference?

A. It's a jurisdiction that have their own growth and for the European Union, it was not an emergency authorization. According to the rule that was in the European Union at that time, we did a submission of the COVID test as in vitro diagnostic, not an emergency authorization, but that was a process that we were familiar with, because we had CE submissions prior to the COVID and pandemic. So we just did a submission under the process that we -- we already had in place before COVID. And the product was registered for consumerization in Europe.

Q. Okay. Do you recall ever having discussions

8 (Pages 26 - 29)

Page 30

about Co-Diagnostics' stock price with anyone else in the company?

A. Not -- not really. Maybe just with coworkers or just the type of conversations you have in the hallways, but not beyond that.

Q. Okay. And do you recall what any of those hallway conversations included?

A. Not really.

Q. Were they like, Hey, the stock is going up, this is great, stock is going down, or anything like that?

A. Yeah, like I believe most companies, public companies, employees pay attention to that.

Q. Okay. Was there --

A. But it was not something that -- sorry. It was not something that I was doing daily basis, for sure.

Q. Was there a period of time when code employees appeared excited that the stock was going up at a rapid rate?

A. No.

MS. OSTLER: Objection, calls for speculation, vague.

BY MR. FASANO:

Q. Just to clarify, I'm just -- when I ask you, I'm just asking for your personal knowledge. So I --

Page 31

you know, you don't have to have knowledge of what everyone was thinking at all times, okay?

A. Yes, I'm responding in regards to myself.

Q. Great. Okay. That's all I want you to do.

What type of tests -- what type of diagnostic tests did Co-Diagnostics make before the COVID-19 pandemic? And what I mean by that is what diseases was it making tests for?

A. Co-Diagnostics had one test for microbacterial causes, there was a test for Zika, a test for Zika virus, a test for -- I don't remember if at that time we had some other tests that were approved with the joint venture in India as well, and also there were tests that were for -- a variety of tests for mosquitos for -- so when you have -- I can't remember the name of the diseases. The most encephalitis, different types of encephalitis, the western cephalite and the eastern cephalite.

So what happens -- West Nile Virus, so when you have in -- like the mosquitos, they start to transmit, they start to grow during spring -- they start to grow -- they start to hatch the eggs and then they start to infect certain areas during spring. So the test was used to test mosquitos, for the mosquito control teams to start spraying and selecting which places, which

Page 32

districts in certain states they were going to spray. We had some work with the CDC for for validating and testing those tests.

So it was -- it was a really good opportunity and a good program that we were involved with. And, but by the time we were starting COVID, we had -- I don't remember if it was three or four products registered with the -- with CE at the time.

And then we had the mosquito products that were not in vitro diagnostics, because they were not designed for human use -- like for testing human samples. They were for mosquitos. So they were research-use only.

The company also had a set of products that were research-use only that were mainly for -- mainly for customers that wanted to use those products and they wanted to validate the products themselves until the company was ready to make in vitro diagnostics of that product. So there were a set of products.

Q. Okay. Did the focus of the company change after the COVID-19 pandemic began?

MS. OSTLER: Objection, asked and answered.

THE WITNESS: Yes. As I mentioned before, the change was due to the demand that COVID requested. But we never stopped producing the other products, selling them or developing and working with our

Page 33

customers for the development of other products.

BY MR. FASANO:

Q. And what kind of changes were there due to the demand for the COVID-19 test? I don't think I asked that one yet.

A. Well, the demand was huge, because, of course, the lack of products in the market, open opportunity for small companies to fill in the gap that major manufacturers were -- had a backlog of products and Co-Diagnostics was able to reach -- have a bigger reach of bringing the product to many different places in the world and a variety of customers and trying to feed -- trying to provide products in a time that was very stressful for everybody, and provide a solution for, especially when there was no solution.

Q. And for about how long did that period last where there was an -- a greatly increased demand for COVID-19 tests from Co-Diagnostics?

A. Well, up to the moment that I left the company, the company was still selling the COVID tests, so I can't answer about today, but --

Q. Well, had things slowed down by the time you left the company? Was there a -- was it busier prior to that developing and marketing the COVID tests?

A. It varied a lot, but I didn't see a slow down

9 (Pages 30 - 33)

Page 34

by the time I was there. Of course, when you have a huge peak in demand, you have to adapt to meet that demand. So the company was all the time trying to find solutions on how to meet the demand. And the demand was a lot bigger than the company was prepared to, because we had never had such a demand before and, of course, the company had to make changes in the process and find solutions.

But, also, we were able to, in a certain -- to meet the demand, things started to get more stable, but by the time I left, the demand was about the same. I don't -- like I was not involved in marketing or sales, so I don't know exact. I didn't -- I wasn't paying that much attention to the total numbers.

Q. Do you recall what processes, based on your personal knowledge, changed at the company due to the increase demand for the COVID-19 test?

A. Well, like I said, the demand was huge, so of course the company had to adapt that and in all the size of the company -- the number of employees practically, like, almost double in a short period of time in order for us to meet the demand.

And, yeah, the demand increase in all instances, in all -- in every single corner of the company. So it was -- it is complicated for me to

Page 35

like -- everything had to at least double. So from development to any part of the company, so.

Q. And when you said that there was a doubling of personnel, do you remember about when that doubling occurred?

A. As soon -- as I said, because of the demand increase, the doubling happened as soon as the demand increased. So we had to increase the personnel working in the manufacturing. We had to increase in -- we had to increase the processing of orders. We had to increase every single aspect of the company, so, yes.

Q. Okay. And I'm sorry if some of these questions may seem obvious to you, the answers. I just sometimes have to ask them for context and for the record, okay. So I apologize if I'm asking you something that -- where the answer may be obvious to you.

When did, if you know, Co-Diagnostics start developing its COVID-19 diagnostic test?

A. As soon as the sequence was released by the Chinese in the 10th of January. We had discussions before, some discussions in management meetings and as soon as the sequence was released, but we were paying attention and discussing as soon as the first information -- the first reports of the virus came in the first week of January, I believe, is when we were

Page 36

paying more attention to that.

Q. Okay. Now, when you said the sequence came from China, what do you mean by that, to someone who is not a science person?

A. So the Chinese published the -- the sequence of the virus, which is the -- so they map the virus and publish the sequence of the RNA in peer-reviewed article. I believe the date was about 9th or 10th of January.

So, yeah, after they announced the COVID in 31st of December, they published the sequence on the -- about the 10th of January. So that is when the information was available for anyone that wanted to create PCR tests.

Q. So when the -- after the RNA sequence of the COVID-19 virus that caused the pandemic was released, about how long from the release of the RNA code did it take for Co-Diagnostics to develop its test?

A. So the development -- the design was finished a couple of days later. The development, it depend. The development is -- is an ongoing process, almost, in the case of an emergency use authorization. So as much more as information was coming, the development was progressing.

So development is more like a process than an

Page 37

instance, but I would say we -- the company had a product as research-use only that we could say that the product is completed as a research use only, it was by the end of January.

Q. Okay. And what does a research use only certification mean?

A. It's not a certification. It is a status of the product. It means that it is a product that is a reagent that's used for, in the case for PCR tests, it's a PCR kit for research use only. So it's not in a format to be used as in vitro diagnostics for human use. It's the study that you cannot claim to be used as a reagent for a test kit to be used in humans. So a laboratory -- a clinical laboratory can use a research use only product, if they wish. But it is like -- I would say it's just a reagent. It's nothing more than that.

Q. Fair enough. Now, you mentioned that the development of the test was a process. For how long did that process go on?

A. It didn't -- it never -- well, because emergency use authorization -- the problem with emergency use authorization is that you don't have enough information to conclude the development --

THE VIDEOGRAPHER: Mr. Fasano, I'm sorry.

10 (Pages 34 - 37)

Page 38

MR. FASANO: Yes, sir.

THE VIDEOGRAPHER: Yeah, I got knocked off again. I don't know why.

MR. FASANO: All right.

THE VIDEOGRAPHER: My internet is still working.

MR. FASANO: All right. Well --

THE VIDEOGRAPHER: It keeps kicking me off.

MR. FASANO: All right. Let us know when you lost the recording and we'll start again.

(Off the record.)

THE VIDEOGRAPHER: Back on the record.

THE WITNESS: Yeah, so I can continue now on that.

BY MR. FASANO:

Q. Thank you so much, Ms. Hutchins. I apologize for that delay.

A. No, that's okay.

So when -- in the emergency use authorization process, the -- it is an emergency, because you have an unprecedented or a new virus or a new disease -- you have a situation where you don't have an approved product to treat -- or approved protocol or approved product to use on that -- on that disease or condition, because it's a new situation, and in order for you to do

Page 39

any studies or any development or establish performance, you need to know what -- what -- what you are dealing with.

And in the case for in the COVID situation, in the early stages of the pandemic, any information or any set of conditions or parameters or information we had for the development, the whole world was using the size one as reference to the determine what you are going to use in your development. However, as we -- as more information came and as the situation was developing and, of course, the demand for testing was increasing, the situation changed a lot.

So the development process, I -- it may be it has never ended and it's going to take some time until -- until things can be set in stone. As far as I know, the FDA didn't lift the emergency use authorization, most likely, for this reason.

Q. Okay. And thank you for that very complete answer.

What was -- and what was your role while you were there at the company, in the development process of the diagnostic test?

A. You mean for the COVID or for all products?

Q. For -- just for COVID. The other products I'm not so concerned about right now.

Page 40

A. Yeah, so one thing that I -- that was one of my roles was to determine what specifications were and how to meet the requirement for registration so I could help development process to know what the target was, as far as performance that we need to meet in order to register the product.

And also understand the market needs and be in conversation with marketing to understand what were the requirements as far as market goes, as far as our public or which -- which laboratories were our target customers so we could establish the requirements for the performance.

I was also reviewing the test results and reviewing the development process for in vitro diagnostics. We have, in fact, for all medical devices, we have a process called the "design controls" where you establish phases for development. So when you perform a set of studies and then you move to the next phase and then we have a development team that works together to determine if the set of conditions are enough or sufficient to move to the next phase of development and we had this process at Co-Diagnostics where we were establishing those performance, the set of conditions and evaluating and moving to the next phase and making sure that the studies would meet the requirement that we

Page 41

had for initial development.

Of course, with COVID, it was complicated because the conditions were changing way too fast and it was very complicated to be able to foresee a future need or foresee a future requirement, but we were able to navigate that process and I was helping mainly to ensure that not only the -- the tests were going to be performed as required by whatever regulatory agency we were -- our goal for registration was, but also making sure that the -- we had comprehensive information and we are providing a -- a compilation of the studies in a way that was meeting the requirements for the regulatory agency we were submitting for registration.

Q. Okay. Did the company ever, in your -- in your view, ever become concerned with competing with others to be the first or as fast to market as possible?

MS. OSTLER: Objection, vague, compound, calls for speculation.


BY MR. FASANO:

Q. Was the company concerned with being first to market with its COVID-19 test?

MS. OSTLER: Objection, calls for speculation, lacks foundation.

11 (Pages 38 - 41)

Page 42

BY MR. FASANO:

Q. Okay. You can answer.

A. Yes, I think that is a basic for any manufacture company in the pharmaceutical or medical devices industry. Of course everybody wants to be the first to market. That is very basic wish for every manufacture company.

Q. Do you feel like Co-Diagnostics cut any corners or comprised anything -- any -- anything scientifically in order to try and become first to market with this test?

MS. OSTLER: Objection, vague, compound, lacks foundation, calls for speculation.

BY MR. FASANO:

Q. You can answer.

A. Not that I am aware of.

Q. Okay. I'm going to change gears here a little bit.

In your knowledge, how are diagnostic tests typically tested for accuracy?

A. That is a very long question, because first thing, it depends on what you intend -- what do you intend for, what the market is intended for. But as I -- but roughly, as I mentioned before, you have the design controls process, that is the process that ensure

Page 43

that from designing to development and to reaching the market, you have a process in place that can evaluate each phase and if you have your -- if you are satisfied with your results, you can move to the next phase.

But in raw terms, basically, you have a design process that is mainly -- it starts with in silico analysis and then it goes to proof of concept and then you go to development phase where you are setting the needs for -- all of the needs and you set what your scope of development, and then once you completed the development process, which needs also to take into consideration what -- the scope needs to include not just the intended purpose, but the user and also the market that you are going to be submitting that development process for review.

And then you -- once you completed all the development process and you have your product ready, you can basically decide which -- in which phase of the process you are going to make research use only product as a finished product, but -- but it's a finished product that has not achieved approval for market in any place, as -- as in vitro diagnostics for human use.

And once you start your submission process and you have an authorization, this authorization is incremental, depending on the place -- the jurisdictions

Page 44

that you are applying and receiving your clearance approval or authorization to market, and it varies a lot depending on the jurisdiction. And once you have approval for marketing in that place, you can start marketing and selling the product on that jurisdiction, according to what your clearance for marketing -- for market, as far as claims goes.

Q. Okay. Now, is sensitivity a metric that would inform how accurate a test is?

A. No. Accuracy is not only sensitivity, includes also specificity and other set of parameters as well.

Q. Okay. But is sensitivity one of the parameters that would determine how accurate a test is?

A. I would say the other way. So what happens --

Q. Okay.

A. -- a lot of times is that whoever is buying a product needs to compare one product to the other. They are going to decide which -- which data point on the sensitivity analysis or the specificity to compare to other products so that they can decide how sensitive or -- that product is for them to decide if they should buy that product or not.

Q. Okay. So what -- when you use the word "sensitivity" in your line of work, what does that mean when a -- I'm sorry, go ahead.

Page 45

A. So sensitivity, for clinical laboratory, means that how -- how fast and how much of the viral load or the variation on the viral load that that product can detect. So sensitivity would be something like -- for example, if you -- sensitivity and specificity is a trade off. So if you have very -- let's say, I think it's -- it's easy to explain with an HIV test. So --

Q. Okay.

A. Sorry.

Q. No, no, I said okay. I --

A. Okay.

Q. I am happy you were giving me this education. I -- that's what I asked for. Thank you so much.

A. Yeah. So the sensitivity for, let's say, for the HIV test, so you want to be able to find -- you are okay if you're -- so the sensitivity is -- it's what can cause a false negative and the specificity can cause -- well, both of them.

But what happens in the HIV is that if someone has very low viral load, very -- especially because the virus can be compared -- compartmentalized in a cell and you don't have a lot of the virus in circulation, but you want -- you still need to find that -- a positive, even if it is very small amount of the virus that you have in the blood. Opposed to if you have -- a lot of

12 (Pages 42 - 45)

Page 46

time, it's complicated because you -- you can have -- a lot of times with the in vitro diagnostics, you can have a test that is very sensitive, which means that is going to be triggered by a very small amount of anything, but the problem is that it sometimes, it is very broad, because it can get -- it can give you a false positive, because it is looking for very -- a very small variation.  It is going to be able to find -- to give you a signal, which sometimes it is not -- like it is triggered very easily, which sometimes may not be what you are looking for and -- but because you want to be able to find anything, so then you have very sensitive test that is going to trigger with everything opposed to a test that has a very high specificity, means that it is going to find very like -- it's going to find -- if it -- if it gives you a positive, you can be sure that it's a positive, because it cannot be mistaken for anything else.

I would say it's kind of like you have your smoke detector in your kitchen that goes off every time you burn something on your stove, because -- because you want the smoke detector to be able to go off, if you have a fire.  So, and then you have a very sensitive smoke detector that goes off with any smoke you have in your kitchen and if you don't want your smoke detector

Page 47

to go off with any kind of smoke, then the smoke detector maybe will go -- will start with the fire -- when the house is already halfway burned.

So the thing with in vitro diagnostics is that sometimes you can have a very sensitive test that is going to go off, is going to give a signal if every variation or in a very small amount of the virus, or you can have a situation where the test is going to come give a signal, even though it's not the virus, it's something else.

So when you were testing, there are many things that can impact that.  For example, if you are with -- depending on which metrics or which sample you are using, if it's blood, if it is serum, if it is nasopharyngeal swab, if it is sputum, if it is saliva, you vary the metrics so you can -- you can vary the sensitivity and the specificity of your test, because maybe something in the sample is giving you a signal or because you have -- or because your test is not specific enough and instead of pointing you to the COVID -- to the SARS-2 virus, the test is detecting -- instead of the SARS-2 virus is detecting another coronavirus, because it had an overlap with another product with another virus and because that is giving you a false positive or because the test doesn't have -- the limit

Page 48

of detection is very -- let's say, it require for you to have a certain amount of the virus in the sample, otherwise the test is not going to detect if there is just one or two copies of the virus in a sample, which also is a complicated situation, because we don't have information about which limit of the detection correlates to a clinical presentation.  So PCR tests --

THE REPORTER:  I'm sorry to interrupt.  I just noticed we lost the videographer.

MR. FASANO:  Let's go off record for just a second.

(Off the record.)

THE VIDEOGRAPHER:  Back on the video record 12:33 p.m.

THE WITNESS:  So we don't have information, and I believe we still today have information about which limit of the detection correlates to -- to a clinical presentation.

So, yeah, so sensitivity and specificity is a very complicated issue because the way I see it is, especially with COVID, because -- let's say in another situation if a lab is procuring a reagent for their product, they are going to look into the instructions for use, they are going to think about how they are going to use the test and they -- how

Page 49

they are going to use that test on their operational process for testing samples, and most likely, most labs, they have more than one option, more than one protocol, because depending on what are the intentions of the test, what part of the intervention that the doctor is going to use or what kind of investigation the doctor is doing, they may use different methods to test that sample to provide information to the doctor as the doctor requested.

The problem with COVID is that everybody was so desperate for things and laboratories didn't have -- they didn't know how to handle emergency use authorization as well and people had a hard time procuring things, the -- the supply chain was a mess and people didn't have time to -- because the public was demanding for solutions that didn't exist and everybody had to go out of their way and they had to go out of their processes and they had to find a better -- like a faster way to do something that was not fast and people were demanding solutions for the next day, even though that's not how things work in the -- in the medical industry altogether.

So people were demanding for things that were not possible to be provided in the way that people wanted and people were requesting for things that

13 (Pages 46 - 49)

Page 50

were not scientific possible and from my opinion, people still think -- still request things that doesn't exist and then the industry, as a whole, has to come up with something that will meet that demand, which is very complicated.

So suddenly, what happened during COVID is that people were trying to fit the parameters, specifications in in vitro diagnostics reagents into a sensitivity and specificity box which doesn't exist. It may mean some -- it may be a simplification for someone that is not from the industry to try to go down to a single sensitivity and specificity thing and -- which doesn't make any sense in the industry. So for a lay -- for a person that is not from the industry that is procuring something, that would be very nice to have sensitivity and specificity box that they can compare one product to the other, but that is not that simple.

BY MR. FASANO:

Q. Okay. My next questions are going to be about limit of detection and sort of what that is. So if you would like, we can take a break. I know I've been asking you to teach me a lot here this morning. So can we go off for ten minutes and then --

Page 51

A. Yes.

Q. -- we'll come back and then we can keep going.

A. Okay.

Q. All right. Thank you. Let's go off the record.

THE VIDEOGRAPHER: Off the video record 12:38 p.m.

(Off the record.)

THE VIDEOGRAPHER: Back on the video record 11:52 a.m.

BY MR. FASANO:

Q. Okay. So, Ms. Hutchins, we're back from a brief break. So I really appreciate you explaining to me sensitivity and specificity. So would you say that sensitivity and specificity are inversely correlated in that if one goes up, the other one goes down or vice versa or is that not necessarily true?

A. It's not necessarily true, but it's true in most cases for in vitro diagnostics, in my opinion.

Q. Okay. So I wanted to ask you about another term, "limit of detection." What in -- in your line of work, what does "limit of detection" mean?

A. Limit of detection is the concentration in which you can detect with 95 percent of confidence.

Q. Okay. Now, help me out here, if -- if

Page 52

something -- if a test has a high limit of detection, what does that mean?

A. Well, even high compared to what?

Q. Well, how is limit of detection measured in terms of -- of the metric? Is it measured in a specific -- by a specific way, by a specific number, specific units, measurement, something like that?

A. It's the concentration of the analyte that you can detect with 95 percent of confidence. So the analyte in the case of the COVID is the sequence of the virus. So it's the concentration that determine reagent, in a set of conditions, can detect with 95 percent of confidence and the number of units, you can display it in whatever units you want, like you can -- you can talk about speed in miles per hour or kilometers per hour or --

Q. Is there a standard unit for limit of detection?

A. No.

Q. Okay. So other than sensitivity, specificity and limit of detection, are there any other major metrics that go into how accurate a -- a diagnostic test would be?

A. Yes. Like I mentioned before, it depends on the intended use, the instructions for use and, yes,

Page 53

there are a number of parameters, as I mentioned before.

Q. Okay. Thank you. And I apologize if I'm repeating myself, some of the stuff, to me, is complicated. I know you are -- you have a lot more experience with it than I do.

Now, did Co-Diagnostics do in-house testing for any of these metrics, sensitivity, specificity or limit of detection?

A. Yes, as part of development process.

Q. Okay. And in the in-house testing, what were -- what results was Co-Diagnostics getting?

A. I'm not going to be able to remember all the in-house testing we did. It's just enormous amount.

Q. Okay. Did you get -- did you get to a point where the test was 100 percent accurate?

A. Again, it doesn't make any sense. It just -- it's not -- that's not -- that's not something -- it doesn't make any sense, scientifically, talking in these terms.

Q. To say that a test is 100 percent accurate is not -- it doesn't make scientific sense?

A. No.

Q. Okay. What about to say that a test is 100 percent sensitive, does that make scientific sense?

A. No.

14 (Pages 50 - 53)

Page 54

Q. What about 100 percent specific, does that make scientific sense?

A. No.

Q. Okay. Did Co-Diagnostics also do testing with outside labs as part of this development?

A. Yes, that is part of the development.

Q. Okay. Do you remember what labs Co-Diagnostics worked with?

A. Nomi, PathWest, the Mexican reference lab, I believe the Utah reference lab also. I'm not going to remember all of them.

Q. Okay. Did Co-Diagnostics ever pay any outside companies to do validation tests for it, to your knowledge?

A. I am not remember, but most of the tests were performed in collaboration where it was like a shared enterprise, like each part was contributing with a set of inputs.

Q. Okay. Were different -- were different validation studies done for different, I guess, types of uses, like were certain validation tests done for research purposes and others done for the purpose of sending to vendors or was it all just one set of validation tests?

MS. OSTLER: Objection, compound.

Page 55

THE WITNESS: No. So, yeah, it -- it doesn't have any separation of tests that are made for. Any tests are -- any tests that have a scope or have a purpose, they are going to be considered, but, yeah, and make part of the development process.

BY MR. FASANO:

Q. Okay. Now, you had mentioned earlier that there were -- that the FDA had -- with certain -- Co-Diagnostics; do you remember that?

MS. OSTLER: Hold on. I couldn't hear you. Michael, you sort of fuzzed out in that question.

BY MR. FASANO:

Q. Oh, then that was technology. It wasn't me. Sorry. I will re-ask the question.

MR. FASANO: So as a matter of fact, Madam Court Reporter, did you get the question?

THE REPORTER: No, I had the same issue, you faded out.

BY MR. FASANO:

Q. Oh, then I will have to re-ask the question.

Do you recall previously that there was -- we had talked about an FDA investigation to certain statements made about Co-Diagnostics' tests?

MS. OSTLER: Objection, misstates prior testimony, assumes facts not in evidence.

Page 56

BY MR. FASANO:

Q. Okay.

A. I engaged with the FDA a couple of times. So, yes, there is a portion of the FDA that monitors what is marketed of a product in the U.S., so I had a couple of times discussions with them.

Q. Okay. And do you recall the discussions that -- do you recall the issues that the FDA brought to your attention?

A. No, not in detail.

Q. Okay. So we talked about limit of detection before. Is limit of detection an important variable when it comes to a diagnostic test?

A. It depends on the intention. It depends on what you are intended for.

Q. Okay. When it comes to testing people to determine whether they have COVID-19 or not, is it an important metric?

A. I don't think so.

Q. Okay. And why not?

A. Because like I said before, there is no correlation that says that a viral load corresponds to a clinical outcome. So it is different from hepatitis that a viral load, a determined number of load of the virus that you have in the sample that tells you in

Page 57

which phase of the clinical presentation or the disease that the patient is with.

So if someone gets in contact with someone that has COVID today and it's tested tomorrow, the viral load will be very low and most -- and, of course, depends on how the -- how the immune system of the person is.

So up and to today, I don't believe there's any correlation of the viral load and the outcome for hospitalization or even death. So if you have a very low viral load, is it because you have just come in contact with the virus? Is it because your immune system is fighting the virus and you are -- and you are asymptomatic? Is it because you had contact with the virus ten days ago and your viral load is very low because -- so there is no correlation between the viral load and clinical outcome. So it is the laboratory that determines how much of the virus they -- they want to be capable of the detecting or something.

So -- so the viral load, of course, the limit of the detection claimed by a test, it is the -- it is the performance according to the instructions for use. As a clinical laboratory, it is the responsibility of the laboratory to decide how they are going to use that reagent. So even the limit of detection that is claimed by Co-Diagnostics, it is correlated to the specific

Page 58

instructions for use as it is authorized by the FDA and as it is described in the -- in the document -- in the document that goes together with the test.

So, yeah, so limit of detection is just a claim that the FDA authorizes the manufacturer to do, to claim, but it's just that.

Q.  Now, I know that we talked about the complexity of the factors that go into sensitivity and specificity. When sensitivity and specificity are reduced to an individual number, is -- can there be a margin of error when they are tested?

A.  What do you mean by "margin of error"?  If you -- if someone uses according to the instruction for use, they should come with 95 percent of confidence the same way, as long as they follow the instructions for use as it is.

Q.  Well, I guess my question is a little different and maybe what I asked was not specific enough, but what I'm trying to ask is during the development phase of the COVID-19 test for Co-Diagnostics, when -- I will give you an example to try and illustrate what I want to know, is if -- if there was a batch, let's say 15 -- 15 separate tests run and it gave you 99 percent sensitivity and 99 percent accuracy, would there be a margin of error there to say, okay, well, it's

Page 59

99 percent plus or minus 2 percent or 99 percent plus or minus 3 percent or something like that or --

MS. OSTLER:  Objection, compound, incomplete hypothetical, calls for speculation.

THE WITNESS:  Yeah.  So the method on how to determine the limit of detection, it follows a statistical process where it does like -- if you follow the instructions for use, you are going to be able to find the same number.

So the statistical -- the limit of detection method, for you to determine the limit of detection, it is going to -- you are going to -- on that concentration, you're always going to be able to find at least 95 percent of the confidence.  So in 95 percent of your samples, you are going to be able to detect on that concentration.  That is how you determine limit of detection, it's a statistical process.

BY MR. FASANO:

Q.  So if a lab -- if a -- if a lab result came back in the development process saying that the test was 100 percent sensitive and 100 percent specific, what would that mean to you?

A.  There's no such thing.

Q.  And can you elaborate on that?  What does that

Page 60

mean, "no such thing"?

A.  There's no -- there's no -- so you could -- you could have -- you can break down in one of the studies -- in one of the studies, usually the clinical study, you do have a metric for sensitivity and specificity, but that is one study.  It's not the product.

Q.  Okay.  So would you say that one study that shows sensitivity and specificity being 100 percent is not representative of the -- of the overall product's ability?

MS. OSTLER:  Objection, calls for speculation.

THE WITNESS:  Yeah, it is not.  You can say that in this study with this protocol, you had 100 percent sensitivity and 100 percent specificity on this specific test that you made, that's the only thing you can say.

BY MR. FASANO:

Q.  Okay.  And how meaningful is that overall to determine how well the test performs in real life?

MS. OSTLER:  Objection.

THE WITNESS:  It depends --

MS. OSTLER:  Objection, vague, calls for speculation.

Go ahead, Cecilia, sorry.

Page 61

THE WITNESS:  It depends on the protocol that you are reporting the result.  So someone that is -- has a scientific background can look into the report and see how -- how the study was conducted and determine the validity or how good the result is and what does it mean.

BY MR. FASANO:

Q.  So when looking at a validation study, it would take someone with a scientific background to look into the specific validation study to determine how the test actually performed?

MS. OSTLER:  Objection, vague, calls for speculation.

THE WITNESS:  Yes, like any -- any -- in regards to reagents, you need to understand what the -- what you are looking for and what your needs are to understand if the specifications of that product meets your needs.  So, yes, you have to have scientific background for -- to understand that.

BY MR. FASANO:

Q.  Clearly.  Do you see the questions I'm asking you?  No, I'm just kidding.  Sorry, bad joke.

So when a test comes back from a lab and evaluation study and it says it's 100 percent specific and 100 percent sensitive, I guess my original question

16 (Pages 58 - 61)

Page 62

was is is there a statistical margin of error that gets placed upon those numbers based on the sample size that's used by people in the scientific community?

MS. OSTLER: Objection, ambiguous, incomplete hypothetical, calls for speculation.

Go ahead, Cecelia.

THE WITNESS: Yeah. So what happens when you are reporting a result, you are telling what you found. So what you found is what you found. And, no, there's no -- you are reporting a result. You are not -- if you are reporting a result as a range, you are going to say that's a range, but you are just reporting a result that you got from the study. So, no, it is what it is.

BY MR. FASANO:

Q. But in real life in the field, there will always be a range of -- of detection based on who's using the test, how they're using the test and other factors; is that correct?

A. So, again, when you report -- when you do -- so if you go -- if you are going to measure the -- the size of the door of your garage, if you are reporting in inches, anyone that has the -- a ruler are going to be able to find the same size because the size of your garage door didn't change. So as long as the person --

Page 63

as long as you did where and how you measured, the other person is going to be able to find the same measurement.

Again, when you are reporting a result, you report how you tested and what result you found. If someone wants to try to reproduce your -- your result, if you -- if you conducted a test -- your study properly and if you provided information in a good way, other person -- other people are going to be able to reproduce the same result. If you didn't -- if the other person changed the conditions of the testing, yes, they are going to be -- find another result, but that is -- just a second, I'm sorry.

Sorry, my son just got home.

Q. That's okay. That's more important than us, trust me.

MR. FASANO: Joni, are you still there?

MS. OSTLER: Yeah.

THE WITNESS: Sorry.

MS. OSTLER: I just dropped my pen and had to grab it off the floor.

MR. FASANO: Oh, I wanted to make sure you weren't off screen for some reason, okay.

THE WITNESS: So just to conclude. So if you -- if you are reporting your result, you're reporting result of what you tested. If someone wants to

Page 64

reproduce, they have to do exactly the same thing you did and they are going to find the same result. If they test in a different condition, they are going to find another result, of course, because they changed the conditions.

BY MR. FASANO:

Q. Okay. Now, did -- do you recall different validation studies for Co-Diagnostics COVID-19 tests giving different sensitivity and specificity metrics back to Co-Diagnostics after they did the test?

A. So a lot of the times when -- whenever we were receiving a result that was coming from -- because the test was evaluated in many different reference labs around the world and a lot of the times, we didn't have enough information to determine if the test was evaluated in the condition that was established in the instructions for use.

The only situations when we were able to have a full control and understanding of what the differences in testing was, we were able to draw any conclusions. The thing is that, especially in a situation where supply chain was so, so, so, so complicated during the time, even places where the reference lab would like to have had the same testing, the same conditions, very rarely they were able to perform with the same

Page 65

conditions.

So it -- we -- it could be a lot of variation, but also there was a lot of variations on the conditions. So --

Q. So did -- oh, I'm sorry, go ahead.

A. So a lot of time differences were expected and, of course, it was important input, but we could only draw conclusions when we know the conditions where the test was performed and many times we could not -- we did not receive any information about the conditions of -- that the test was performed.

Q. So the conditions under which the tests were performed could bring variability in the results that would be recorded back to Co-Diagnostics; is that fair to say?

A. Yeah, that's the definition of in vitro diagnostics.

Q. Sitting here right now, do you have any specific concerns with any statements released to the public by Co-Diagnostics?

A. No, not that I am aware of.

Q. Okay. Based on your experience working at the company, would the company pay attention to news about its products that were -- that were made in the public?

MS. OSTLER: Objection.

17 (Pages 62 - 65)

Page 66

THE WITNESS: I --

MS. OSTLER: Objection, calls for speculation.

Sorry, go ahead, Ceci. Did you hear it?

THE WITNESS: I will ask you to repeat the question.

Just a second. I will have to have someone go to the other room because I can't hear properly.

BY MR. FASANO:

Q. Okay. Just let us know when you are ready.

A. Yeah.

Sorry. Yeah. I'm sorry, I'm back.

Q. Okay.

MS. OSTLER: There is a question pending. Do you not remember it?

THE WITNESS: Yeah, I couldn't hear. Sorry.

BY MR. FASANO:

Q. Do you want me to repeat it?

A. Yes.

MR. FASANO: Okay. Madam Court Reporter, did you get it down?

THE REPORTER: Yes.

MR. FASANO: Okay. Can you just read back the question same way I said it?

(The court reporter read back the requested portion.)

Page 67

MS. OSTLER: And my objection was lack -- or calls for speculation.

THE WITNESS: Yes, the company paid attention to, any company would, what people say about you, especially in the case of media. It's, of course, important for your product. So, yes, of course we -- any company should, if it's not paying attention to what people say in the media, that is -- that's not -- that's not good business, I think.

BY MR. FASANO:

Q. Okay. Can you remember specific media that the company focused on that was out there in the public, again, based on your personal knowledge?

MS. OSTLER: Again, calls for speculation.

THE WITNESS: Yeah, like we have difficulties with one article from Salt Lake Tribune that was very trouble some.

BY MR. FASANO:

Q. Okay. And when you say the article from the Salt Lake Tribune, what did -- what article are you referring to?

A. It was very poor written, that article.

Q. Okay. And do you remember the contents of that article? Can you summarize what the article said?

A. No, I can't. I remember they -- Salt Lake

Page 68

Tribune seemed to be trying to smear the company saying -- talking about performance or something. I don't remember. It's been like three years, but poor quality reporting from Salt Lake Tribune. I think it is expected, that's why I don't read Salt Lake Tribune.

Q. Okay. Now, I understand you believe the article was of poor quality; is that correct?

A. Yeah.

Q. And do you -- I know you didn't recall the specifics of the article itself, but do you recall what made you think that the article was a poor quality article?

A. They didn't know anything about -- they didn't know -- the author didn't know anything about in vitro diagnostics industry or what an in vitro diagnostics is or that's -- that's my opinion.

Q. Do you feel like the author made -- were there specific mistakes that you can think of that the author made that specifically bothered you?

A. Oh, I could point out a bunch, if I -- but I don't remember.

Q. Okay. Sure. Other than the Salt Lake Tribune article that came out on the 30th of April 2020, any other specific press releases or press information that you recall the company being very focused on?

Page 69

MS. OSTLER: Objection, mischaracterizes the witness' prior testimony. She didn't say she remembered that was the article. And, further, calls for speculation.

BY MR. FASANO:

Q. Okay. You can answer.

A. Not that I remember. No, I don't remember any of -- any other press releases or other publications.

Q. Do you remember --

A. It can be, but I don't remember.

Q. Do you remember the company -- anyone from the company discussing how to respond to the Salt Lake Tribune article?

A. No.

Q. Okay. Were you consulted about how to respond to the Salt Lake Tribune article?

A. No.

Q. Would you say that at your time at Co-Diagnostics, the company would try to -- would you say it's fair to say that the company would try to respond to things in the media that came up about its test?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: No, and that was not my job, so.

BY MR. FASANO:

18 (Pages 66 - 69)

Page 70

Q. Okay. Do you know who was involved with interacting with the media on behalf of the company?

A. We have Andrew Benson, he was the investor relations person and communications. So it was his responsibility, not -- not mine, as I mentioned.

Q. I completely understand that. And did you ever work directly with Mr. Benson?

A. Yes.

Q. Okay. And when did you start working with Mr. Benson?

A. Well, he is the one that interviewed me and hired me, so.

Q. Okay. Other than interviewing and hiring you, did you work with Mr. Benson on any -- on anything specific while you were at Co-Diagnostics?

A. Yes.

Q. And what were -- what were those projects, if you can remember?

A. Well, he was responsible for shipping as well, so I discuss -- and he was involved in regulatory before me. So he was the one that passed me all that was done, as far as regulatory goes, and he was -- he was with the company for many years. So he knew all the products and he knew a lot about the technology and the operations.

So I had a lot of discussions with him about --

Page 71

especially about process and regulatory and the operational process. And, of course, communications when -- especially after I started reviewing the press releases.

Q. Okay. And again, you probably -- I know you told me this a couple of hours ago, when did you start reviewing the press releases?

A. After the issue we had with the FDA.

Q. Okay. Okay. Did you ever work with a company by the name of Coltrin?

A. Not that I remember.

Q. Does the name Jennifer Coltrin ring any bells to you?

A. No.

Q. Okay.

A. Maybe Jennifer, but not the last name.

Q. Okay. And when I mentioned Jennifer, who -- who was -- who did that remind you of?

A. I -- maybe someone -- maybe consulting, I don't remember. Well, I'm going to -- I'm not going to say something that I can't remember properly.

Q. Thank you for that. Okay. Then we'll move on from that one.

When it came to responding to media and press releases, was there anyone else who you worked with,

Page 72

other than Andrew Benson once he became involved in that process?

A. I was just one step of review. So it -- I was not involved on the crafting of the press release. So Andrew was responsible for the crafting of the press release and whenever he had it about ready to be -- to be published, he was going to -- I was going to give my inputs and recommendations, if there was any recommendation for changes, and he would -- like he run any changes to whoever was reviewing and I believe like, of course, the CEO would have to review and I -- and as I was just a step for review and -- so I was just reviewing and proposing changes, if any -- for anything that I saw fit and he was running with other people to do the reviews as well, but, yeah. That's as far as I -- I went with the process. I was only concerned about regulatory requirements, so that was my focus.

Q. Completely understand. Who is Brent Satterfield?

A. He was the chief scientific officer during that time I was there.

Q. Okay.

A. Up to a certain time.

Q. Did you have much -- did you have interaction with Mr. Satterfield?

Page 73

A. Yes, I did.

Q. Okay. And can you remember specifically in what context you would deal with Mr. Satterfield?

A. He visited the company a couple of times. And I had some meetings with him. Sometimes he was in management meetings. I had discussions with him about the technology as well.

Yeah, I had a couple, but he wasn't at the building very often, but, yeah, I had a couple, but I'm not going to remember all of them, of course.

Q. Okay. So what was Mr. -- do you know what Mr. Satterfield's area of scientific expertise is?

A. Sorry, question.

Q. Do you know Mr. Satterfield's area of scientific expertise?

A. I believe he was -- I'm -- I don't know his major. I know that he is the one that developed the technology for CoPrimers and he had a couple publications for the CoPrimers and, yeah, it was invented by him and -- but I don't know his background, like what is his major or -- I know he has a Ph.D. but I don't even know what the Ph.D. was.

Q. Okay. Were there specific areas where you thought Mr. Satterfield was not qualified to speak on behalf of the company?

19 (Pages 70 - 73)

Page 74

A. He knows about the technology, as far as a scientist perspective, but -- but I was -- I wasn't sure how much he know about establishing performance in a standardized process.

Q. Okay. And when you say "establish perform under standardized process," what do you mean by that?

A. Scientists, they are free to develop -- develop a set of studies according to -- to what they -- they see fit and following the -- like the creativity to explore and so that's what scientists do. And when you are in -- when you are developing a product, you have to set a standardized process on how to establish performance.

So it's not really that you can design your own limit of detection, statistical process and testing process and -- you can, there's nothing saying that you cannot, but then when you submit that, you are going to have to defend that -- that approach and -- which is not easy and it's counterproductive. So that's why you have guidelines on how to do it and your life is much easier if you follow the guidelines.

Q. Okay. I think I understood that. By the way, I completely made a mistake before when I said the person's name was Jennifer Cauldron. Someone brought that to my attention. Her name is Jennifer Webb,

Page 75

W-E-B-B. Did you ever work with someone by the name of Jennifer Webb?

A. Yeah, that's -- maybe -- I'm not sure what her role was, but I believe she was kind of like consulting for public something. I'm -- I don't know, because I've never worked with her directly. I remember that she worked -- I believe she worked with Andrew and I believe she was consulting. I'm not -- public emergency, something like that, handler. I'm not sure.

Q. Okay. So other than the people -- well, instead of asking it that way, I will make it a little bit easier.

Did you have any contact with Dwight Egan during the time that you worked at the company?

A. Yeah, he is the CEO. He was in management meetings.

Q. Okay. And do you recall any specific discussions you had with Mr. Egan?

A. Sorry, discussions for what?

Q. Any specific discussions you may have had with Mr. Egan?

A. Not personally with him, no.

Q. Okay. What about someone by the name of Joseph Featherstone. Do you know who Joseph Featherstone is?

A. Yeah, he is on the sales team.

Page 76

Q. Okay. And did -- oh. Did you have interactions with Mr. Featherstone?

A. Yeah, many.

Q. Okay. And what -- what types of things would you and Mr. Featherstone discuss?

A. He was in charge of some -- like some sales and some -- especially with the research, contract research projects. So, yeah, he had his -- as a regulatory person, I was a resource for all of the company. So whenever people had questions about the regulatory process or regulatory needs, I was helping to develop a strategy or something like that. So that was the main thing.

Sometimes he had customers that had questions about regulatory and then he was forwarding the customers to me and I could help the customer to understand any regulatory process or questions or -- yeah, or we're discussing on -- Joseph, also, is -- he was in management meetings too. So, yeah, we worked together and I was mainly with regards to regulatory processes.

Q. Okay. Sorry if you heard a voice coming in from the side. It was just someone interrupting me who I told not to interrupt me. But in any case, sorry. Thank you for your answer.

Page 77

What about Chad Apuli, I don't know if I'm saying his name correctly, but A-P-U-L-I, did you ever work with Mr. Apuli?

A. Yeah, we work together with the development. So he was -- he was managing the laboratory, so he was responsible for the development process and also the operational manufacturing process. And, yes, I had many discussion -- many interactions with him.

Q. Okay. Did you and Mr. Apuli ever discuss the accuracy of the COVID-19 test?

A. Yeah, we worked together developing the studies for -- in the whole process --

Q. Okay.

A. -- for development.

Q. And what about Rebecca Garcia, did you work with someone by the name of Rebecca Garcia?

A. Yes, but not very often.

Q. And what was Ms. Garcia's role with the company?

A. Prior -- prior to me, during the company she was VP of development, I believe. Then, after some time, she moved to be responsible for the India operations to help develop the joint venture there and help them with the whole process of building the facility and so on and so forth.

Veritext Legal Solutions
800-726-7007                                                    305-376-8800

Page 78

Q. Okay. Are you familiar with the company by the name of TNG Dx?

A. TNG Dx?

Q. Uh-huh.

A. I don't -- I'm not sure. I recall, but I wasn't really sure what their role was. I believe they were trying -- at some point, they were trying to help with the submissions in Brazil, but I don't -- I don't know much about them or what exactly their -- what exactly the -- what they were doing or who they are.

Q. Okay. Are you aware of a -- of any pending or former Securities and Exchange Commission investigation into Co-Diagnostics?

MS. OSTLER: Objection.

THE WITNESS: Yes.

MS. OSTLER: Oh, okay. I was just going to caution you not to disclose any communications with counsel.

MR. FASANO: Fair enough.

THE WITNESS: Yes, I am aware.

BY MR. FASANO:

Q. Okay. And how are you aware?

A. Of the investigation?

Q. Yes.

MS. OSTLER: Again, I caution you not to

Page 79

disclose the substance of any communication with counsel.

BY MR. FASANO:

Q. If you learned it in your preparations with counsel for this deposition, then, you know, let's put that to the side, but if you have any independent discussions or knowledge of the investigation outside of counsel, please tell me about those.

A. I -- I talked to -- I was, I don't know -- I don't know if it was a deposition or if it was -- but I was heard by the SEC.

Q. You sat for a deposition with the SEC?

A. Yes.

Q. Okay. And do you recall the topics of the deposition with the Securities and Exchange Commission that you were asked?

MS. OSTLER: Objection, I instruct the witness not to answer based on the fact -- based on the fact that the SEC has instructed us that they -- the investigation is non-public confidential investigation.

MR. FASANO: Okay. Well, just -- we're going to push back on that. The fact that it's confidential is -- is not necessarily privileged and I believe we have a confidentiality order in this

Page 80

case. So I'm going to ask the witness to answer. If you're going to instruct her not to, we can just take it up later.

MS. OSTLER: I have to instruct the witness not to answer. I understand that we may take it up later and I understand your position.

MR. FASANO: Understood. So, you know, we'll --

BY MR. FASANO:

Q. So Ms. Hutchins, you know, this is one of those situations where do not answer questions about the SEC investigation.

Other than the deposition, have you had any casual conversations with anyone relating to the SEC investigation -- relating to the SEC allegation or investigation relating to Co-Diagnostics?

A. No.

Q. Okay.

MS. OSTLER: And, Michael, I don't mean to say that she can't answer any questions about it. I was just objecting to that particular question. So, you know, feel free to ask what other questions you want and I will just make objections based on the specific question.

MR. FASANO: Right.

Page 81

BY MR. FASANO:

Q. So do you know who else was deposed by the SEC from Co-Diagnostics?

A. No.

Q. Okay. Other than your deposition, do you have any knowledge of the SEC investigation relating to Co-Diagnostics?

A. Nope.

Q. Okay. So it's just -- and -- so the only information you would have would be from the information that you obtained or spoke about in your SEC deposition?

A. Yes.

Q. Okay. Is the SEC investigation ongoing? Do you know?

A. I don't know.

Q. Okay. Do you know if any fines or penalties have been levied against Co-Diagnostics?

A. Not until I was in the company.

Q. And did you -- did the SEC ask you to search for any materials as part of its deposition process?

A. They -- they requested e-mails from -- they requested e-mails, communications to Co-Diagnostics.

Q. Okay. And did you produce any materials to the SEC?

A. I didn't send anything to them myself.

21 (Pages 78 - 81)

Page 82

Q. Okay.

A. I wasn't -- I wasn't the one providing the information they requested.

Q. So who was the one providing the information to the SEC?

A. I provided the -- the regulatory interactions or people that was interacting and I believe it was a lawyer or something. I don't know.

Q. Okay. So what documents did you provide to that -- to that lawyer?

A. I didn't provide documents.

Q. And why not?

A. No. I'm saying, I don't provide documents. I only provide the name of the people that I interacted with, because management asked --

MS. OSTLER: Okay. Okay. I think that she might be getting into, accidentally --

MR. FASANO: Okay.

MS. OSTLER: -- accidentally disclosing communications she had with counsel.

MR. FASANO: I'm not trying to --

MS. OSTLER: I know you are not. I'm just saying she might be.

Yeah, Cecilia just be careful. Don't say anything that you talked with your counsel, the

Page 83

counsel that represented you and the company in the SEC, just be careful not to say what they told you or what you told them. It was just --

THE WITNESS: Yeah, it was just like -- yeah. No, just -- yeah.

BY MR. FASANO:

Q. I just want to make sure that you didn't produce information to the government that you didn't produce to us that may have been overlapping, that's the purpose of my question.

So what I wanted to understand was who was -- what I wanted to understand at that point was who -- sorry, not who, just if you had produced documents responsive that were not produced in this case and I think the answer to that is no?

A. I'm not going to be able to know, because I'm not the one sending documents to anyone.

Q. I understand. I understand. Okay. I think I understand.

Now, do you know what lawyers are representing Co-Diagnostics in the SEC investigation?

A. No.

Q. Okay. Did you have a lawyer represent you in the SEC investigation?

A. Yes, I did, but I'm not going to remember who

Page 84

he was.

Q. Okay. But that was someone who you hired personally?

A. No.

Q. Co-Diagnostics obtained a lawyer for you?

A. Yeah.

Q. Okay. And are those lawyers from the same -- any of the -- are they either from the Baker and Hostetler firm or the Parr Brown law firm?

A. I don't remember.

Q. Okay.

A. I'm not going -- I don't remember his name or the law firm that they -- I'm not going to be able to remember.

Q. Was it a person -- does the name Christopher Milazzo ring a bell by any chance?

A. No.

Q. Or Michael Nacht, N-A-C-H-T?

A. No.

Q. Okay. Peter Dichiara?

A. No.

Q. Okay. That's fine. We will obviously reserve on our ability to ask questions about the substance -- the substantive testimony and other things, but for right now, Ms. Ostler has made and objection and we're

Page 85

not going to resolve that objection today on the record. So we'll deal with that in lawyer world somewhere else, okay?

Okay. So what I would like to do now is -- well, I've got a couple of questions that are more practical than legal. It is 1:53 p.m. here, which I guess is going to be make it almost 12:00 p.m. here for you -- almost 12:00 p.m. for you.

I'm going to start showing you a series of documents and asking you questions about them, that's going to take a good chunk of time. If you want to go -- start doing that and work through, you know, like until you are ready for a lunch break or something, I'm happy to do that. If you want to break now and have something to eat, something to drink, whatever and then we can start this at -- in the afternoon, we can do that as well. It's up to you and the court reporter, really, and the videographer. So -- so, Ms. Hutchins, what do you prefer to do?

A. I prefer continue -- I prefer to continue, if everybody --

Q. Okay.

MR. FASANO: Madam Court Reporter, can we continue, if you're up to it, or do you want to take -- I know for you, you're in Florida, so it's

22 (Pages 82 - 85)

Page 86

like 2:00. Do you want to take a break?

THE REPORTER: I can wait a little longer for a lunch break, that's fine.

MR. FASANO: Okay. Then let me know when you're ready and we'll break.

THE VIDEOGRAPHER: Mr. Fasano?

MR. FASANO: Yes, sir.

THE VIDEOGRAPHER: If I can just take a quick video break, just for the video purposes. I can go right back on. It's just for the recording.

MR. FASANO: Okay. Let's take a couple of minutes.

THE VIDEOGRAPHER: It's just a second, one moment.

Off the video record 1:55.

(Off the record.)

THE VIDEOGRAPHER: Back on the video record at 1:55 p.m.

BY MR. FASANO:

Q. Okay. So, Ms. Hutchins, I'm going to start showing you a series of documents that may be relevant to this matter that you may notice, so. This is where Owen is going to become the best supporting actor.

MR. FASANO: Owen, can you please show Ms. Hutchins what I have as my tab one.

Page 87

MS. OSTLER: Will it also show up in the Veritext thing, on the website thing?

MR. FASANO: I don't know if the exhibits have been uploaded to Exhibit Share. We can do that too.

MR. BADIN: They are on Exhibit Share. I am tagging it right now so I can share it.

MS. OSTLER: Okay.

MR. FASANO: Shoot, okay. Cool.

MR. BADIN: Okay. One moment. And is this the one that you were talking about, Michael, just to make sure?

MR. FASANO: Yeah, I think our system is working, at least for the first one.

MR. BADIN: Perfect.

MR. FASANO: We are going to mark this as Cecilia Hutchins' Exhibit 1.

(Cecilia Hutchins' Exhibit 1 was marked for identification.)

BY MR. FASANO:

Q. So, Ms. Hutchins, we are going to go through this -- this is an e-mail chain. I would like for you -- for Owen to scroll through so that you can see it. You can let me know, Ms. Hutchins, when you are ready to go to the next page and when you are ready, I can ask you some questions about it.

Page 88

A. Can you scroll down?

Can you scroll down?

Yeah, you can scroll down.

You can continue to scroll down.

Yeah, yeah, I already saw.

You have a question?

Q. Sure. I do, after you reviewed that. So after you reviewed that, does that refresh your recollection about a discussion that you -- that people were having about releasing certain results relating to the diagnostic tests for COVID-19?

A. Well, that's one chain of e-mails that we discussed, but I'm not going to be able to remember all of them. We had many discussions.

Q. Sure. Well, let me -- well, does this refresh your recollection about this specific discussion about providing Mr. Durenard with certain specific data?

A. I don't remember all details of it, but I -- I remember this discussion.

Q. Okay. So on February 4, 2020, Andrew Benson writes to a number of people, looks like Mr. Featherstone, Mr. Egan, copying Seth Egan and Reed Benson. It says, From my -- so Mr. Benson writes, "From my perspective, I think it is very important that this not be distributed. It is very much an internal

Page 89

document and there is a reason companies don't disclose development results at this stage of the R&D cycle. It is only -- it is one thing to let him know what's going on as a member of the board, but none of this has been approved by any regulatory body and I really strongly caution against releasing this to be sent to unknown people when we are so far out from commercialization"; do you see that?

A. Uh-huh, yes.

Q. And then it says, "It sounds like Eugene is going to start blasting this to everyone he knows. I think that's a bad idea"; do you see that?

A. Yes.

Q. Okay. And then above, you write, on the same day, the 4th of February 2020, from Cecilia Hutchins to Mr. Benson, Featherstone, Dwight Egan, Seth Egan Reed Benson, "I agree with Andrew. By definition, RUO is a product where the performance characteristics have not been established yet, therefore, no claim of performance should be made"; do you see that?

A. Yes.

Q. Now, do you think there were people involved with Co-Diagnostics who were pushing for Co-Diagnostics to release data before it was ready to do so?

MS. OSTLER: Objection, vague, calls for

23 (Pages 86 - 89)

Page 90

speculation.

THE WITNESS: You are asking my opinion?

BY MR. FASANO:

Q. Yes, informed by your experience at the company.

MS. OSTLER: Same objections.

THE WITNESS: I'm saying, like you can see that happening in the e-mail, but you can see that it -- I didn't approve and Andrew didn't agree as well. So it never happened. It's just someone may say something that may be a good idea, but not all ideas are good. So just because something is discussed, doesn't mean that it -- many ideas come and die. So that was just one idea that came and died.

BY MR. FASANO:

Q. Okay.

MR. FASANO: Owen, let's move on to what we will call Cecilia Hutchins' Exhibit 2.

(Cecilia Hutchins' Exhibit 2 was marked for identification.)

THE WITNESS: Can you scroll down?

You can scroll down -- oh, sorry.

MR. BADIN: Was that a yes, to scroll down?

THE WITNESS: No, it's just I missed a part here.

Page 91

MS. OSTLER: For the record, defendants object to the use of this without its accompanying attachments. It's an incomplete exhibit.

MR. FASANO: Owen, you don't have the report that's attached to the back of it?

MS. OSTLER: Looks like there are three attachments to the top e-mail.

MR. FASANO: Okay.

MS. OSTLER: But they are not there.

MR. FASANO: Okay. Well, we'll just -- we'll just ask the question that we need to ask. You can object to it. We will put it in at trial the right way.

BY MR. FASANO:

Q. So in any case --

A. Is this the last page?

Q. Okay.

A. Yeah. What's the question?

Q. Okay.

MR. FASANO: Can we go back to the first page.

BY MR. FASANO:

Q. Okay. So there's an e-mail up here at the top from Andrew Benson to Chad Apuli that's copying other people, Joseph Featherstone, Cecilia Hutchins, that's you. Subject is, "Re: Forward coronavirus," and there,

Page 92

as Ms. Ostler mentioned, several attachments, which I'm not going to ask you about for now.

Mr. Benson says, "As far as releasing sensitivity data goes, by and large I wouldn't give anyone numbers, especially in writing, unless he were under NDA, but if C&C are good with this, then I am"; do you see that?

A. Yes.

Q. Okay. First of all, who do you understand C&C to be?

A. It's Chad and Cecilia.

Q. Okay. I figured that, because there's a little joke below that, C&C science factory, but, okay, Chad and Cecilia.

And do you agree with Mr. Benson's statement there that the -- that no one should be -- as of that date, as of the 5th of February 2020, no one should be getting any numbers about sensitivity, unless they were under an NDA?

A. Yes. The development was not -- it was still under -- undergoing. So I -- we didn't think it was wise to release -- to start releasing numbers.

Q. Okay. And was there a point where you did feel comfortable releasing numbers?

A. I was more comfortable after we got the CE

Page 93

marking, because I had an official approved document to discuss numbers --

Q. Okay.

A. -- or promise numbers.

Q. Okay. But after the CE marking was obtained, you still were in development of the test; isn't that correct?

A. Yes.

Q. And when did the development cease?

A. As I mentioned before --

MS. OSTLER: Objection, asked and answered.

Go ahead.

THE WITNESS: Yeah, as I mentioned before, because of the emergency use authorization development, basically, has never -- I don't -- I'm not even sure if they has finished today.

BY MR. FASANO:

Q. Okay. But there was a point when you felt more comfortable, after you got the CE authorization, to share evaluation data with third parties, yes?

A. A point where you are allowed, you are legally allowed to make claims. So that's why I was more comfortable making claims after the CE marking or after the emergency use authorization.

Also, we got approvals in different countries.

24 (Pages 90 - 93)

Page 94

I was more comfortable making claims about those authorized or approved products and the performance claims.

Q. Okay. Thank you. We can move on to Exhibit 3. What we'll call Cecilia Hutchins' Exhibit 3 or Hutchins' Exhibit 3.

(Cecilia Hutchins' Exhibit 3 was marked for identification.)

MS. OSTLER: Michael?

MR. FASANO: Yeah.

MS. OSTLER: Can we go off the record for just one second?

MR. FASANO: Of course.

MS. OSTLER: Yeah, can I just take a five-minute break?

MR. FASANO: Of course, yeah.

MS. OSTLER: Thanks.

(Off the record.)

THE VIDEOGRAPHER: Back on the video record, 2:20 p.m.

MR. FASANO: Okay. So, Owen, when you can, let's just show Exhibit 4. What will be Cecilia Hutchins' Exhibit 4 -- oh, sorry, Exhibit 3. Exhibit 3. I wanted to show this one.

BY MR. FASANO:

Page 95

Q. Okay. So, Ms. Hutchins, let us know when you've reviewed this and then we can talk about it.

MR. FASANO: Owen, is there a way you can zoom in on this a little bit? I know you've got young eyes, mine are less young than yours.

All right. There we go.

MS. OSTLER: Also, I don't know if you know, but you can zoom in on your own screen too.

MR. FASANO: Oh, I tried to and I couldn't.

MS. OSTLER: If you go to the top of your screen, there's a view options and there's a little down arrow and then you can click that.

MR. FASANO: Oh, zoom ratio. Oh, I see. Thank you so much.

BY MR. FASANO:

Q. Okay.

A. You can scroll down.

Okay. Scroll down. Oh, it's just one page, yeah.

Q. Yeah. This is an easy one for you.

A. Yeah, you can ask your question.

Q. Okay. So this is an e-mail from Chad Apuli to you Ms. Hutchins on February 20, 2020, subject is accuracy results. Mr. Apuli says, "Hello all. We'll need to make a memo for this so we can add it to the CE

Page 96

mark verification report. Sorry, Madison. That being said, this is for Cecilia to put into the technical file. Previously we just tacked it onto the precision, with a separate result section.

"The data used to establish the," open parenthesis, "diagnostic," question mark, closed parenthesis, "accuracy results are from the single-site precision testing, LOD testing and the thermocycler comparison value on Eco 48."

My first question is, is what is Mr. Apuli talking about when he says "the data used to establish the accuracy results are from the single-site precision testing, LOD testing and the thermocycler comparison value on Eco 48"?

A. He's talking about one study that that was made to be included that was missing the first -- the first version of the verification report, as far if I remember right. So, yeah, I was just -- just a study that is the diagnostic accuracy and that is the parameters that it was tested, like it was within the LOD and a comparison between thermocyclers. So that is just the conditions of the study.

Q. Okay. So do you know who conducted the study? Was this an in-house study done by Co-Diagnostics or was this a study done by a third party?

Page 97

A. That's an in-house study.

Q. Okay. So in the in-house study, the number of true negatives was 120, the number of false positives was 0, the number of true positives was 238 and the number of false negatives was two; is that correct?

A. Yes.

Q. So that gave a sensitivity of 99.17, a specificity of 100, an accuracy of 0.99, a PPV of 1, an NPV of 0.98, and an MCC of 0.99. So I want to go through each one of those with you. For sensitivity of 99.17, what does that mean?

A. It means that -- I don't remember how you do the calculations right now, but it is basically like something like -- it's the number -- there's a formula on how to calculate those that are based on that, on the number of true negatives, false positives, true positives and false negatives. It just needs to get the methodology and -- and there's a formula and you apply the formula and you get the data. It's something like -- it represents the statistical result of -- I think it is something like true negatives plus true positives divided by false positive. I don't remember what the formula is right now. But it's something like that, so it is -- it is representing -- because of those results of negatives and positives, you can obtain this result,

25 (Pages 94 - 97)

Page 98

sensitivity, specificity, accuracy, PPV, NPV and MCC.

Q. Is it fair to say that Co-Diagnostics internally obtained a value of less than 100 percent sensitivity based on the test that you are being -- results you are being shown on February 20, 2020?

A. So this is the diagnostic accuracy study that was made and was used to submit for the CE marking. So, yeah, this is the result that we submitted to CE marking and as Chad pointed out, our input requirements were at least 95 percent, which is a standard and like accepted -- like acceptance requirement for most IVDs and it met our input requirements for development and that's what we submitted to the CE marking.

And, yes, that was the official data that was submitted and that was the official data that was in the instructions for use by the time when we got the CE marking. So, and that's nothing wrong with that.

Q. Okay. But my question is, is that the sensitivity results that Mr. Apuli came up with were less than 100 percent sensitive; is that fair to say?

A. It is within our input requirements and there was no need to be 100 percent, so that's why we approved.

Q. Okay.

A. We didn't have a hundred percent requirement.

Page 99

Q. Okay. Did the test ever reach 100 percent specificity and sensitivity?

A. I'm not going to remember all of the results we got, but --

Q. Did it ever consistently just start being 100, 100, 100?

MS. OSTLER: Objection.

THE WITNESS: It doesn't make sense what you're talking about.

BY MR. FASANO:

Q. Explain to me why that doesn't --

A. It doesn't have to be 100 percent. No tests are 100 percent. And it's never going to be 100 percent all the time. It doesn't make any sense.

Q. I agree it doesn't make any sense. That's sort of my point. But we can move on.

A. Yeah, so just our input requirement was 95 percent. So it was the -- the result was within at least 95 percent and it never had the requirement to be 100 percent.

Q. No, I understand that.

Okay. We can move on to, we'll call this Cecilia Hutchins' Exhibit 4.

(Cecilia Hutchins' Exhibit 4 was marked for identification.)

Page 100

BY MR. FASANO:

Q. Let me know when you've had a chance to take a look at it.

A. Okay. Scroll down.

Is there another page or is it all -- is it all?

Is it just the last one, yeah?

Is there any more pages? Are there --

Okay. What question?

Q. The question is on CoDi 79449, there's an e-mail from Andrew Benson to Cecilia Hutchins. It's from February 25, 2020, it says, "Ike shouted at me today that the other companies are selling their RUO tests in the U.S. and maybe we misunderstood the FDA when they told us not to do. Also, that primer design has sent out 300,000 IVDs, so they must be selling to airports and crews ships, et cetera, and it's not our job to tell the distributor how to tell the test or police them.

"I still feel obligated to tell the distributors that using the test in a PoC application will render the IVD void. My edits are attached, primarily as comments. I incorporated yours as best as I could. See attached."

Now, my first question there, Ms. Hutchins, is

Page 101

what is an IVD?

A. In vitro diagnostics.

Q. Okay. And what is a PoC application?

A. PoC is point of care.

Q. Okay.

A. So it is equipment or IVD that can be used like at the doctor's office or next to the patient, would be the best way to explain it.

Q. Okay. Now, who is Ike? Do you know who Mr. Benson is referring to?

A. It's Dwight Egan.

Q. Okay. Now, he says, "Ike, shouted at me today that other companies are selling their RUO," and then it goes on.

Did you witness Mr. --

A. Sorry.

MS. OSTLER: You're cutting out again.

MR. FASANO: Oh.

MS. OSTLER: I think maybe you just need to get a little closer to your microphone. I don't know.

BY MR. FASANO:

Q. Okay. Let me do this. Is this clearer?

A. Yeah.

Q. Okay. Wonderful. Like I said, I'm working on the road today. So I don't have my usual setup, which

26 (Pages 98 - 101)

Page 102

isn't so great anyway, I'm not going to lie.

So, anyway, now that it sounds better, it says -- did you witness Mr. Egan shouting at Mr. Benson?

A. No.

Q. Okay. And do you know why Mr. Egan would be shouting at Mr. Benson relating to other -- how people are selling their RUO tests?

A. No.

Q. Okay. And at that time, around February 25, 2020, was there a specific amount of pressure that you felt to get the product out into the market, meaning the COVID-19 tests so that it could be used or was that -- well, let's end the question there. Did you feel a specific amount of pressure from the company to get the test out into the market as of that date?

A. Yes, there's always pressure, that's just almost like a given when you are in regulatory, but I believe we got the CE marking on the 24th of February. So we got the CE marking on the previous -- on the day prior to that e-mail. And during the time, we were working with the emergency use authorization testing and development process.

Q. Okay. We can move on to Exhibit 5, Cecilia, which is Cecilia Hutchins' Exhibit 5. I apologize.

(Cecilia Hutchins' Exhibit 5 was marked for

Page 103

identification.)

THE WITNESS: Scroll to the next page.

MS. OSTLER: Shoot, the exhibit mark obscured some of the text. That's unfortunate.

MR. FASANO: Yeah, Owen, is there any way we can like change that or.

MR. BADIN: Let me see. I'm going to have to stop sharing my screen to do that, though, probably.

MR. FASANO: All right. That's fine. Just let's -- let's do that.

THE WITNESS: I believe this is the end, yeah.

MS. OSTLER: Is this -- so we did the document but without a sticker, is that --

MR. BADIN: Yeah, this is the same document without the exhibit mark on it.

MS. OSTLER: Oh, okay.

MR. BADIN: And it's marked on the Veritext website.

MS. OSTLER: Got it. Okay.

THE WITNESS: Can you scroll down? Okay.

Can you scroll down?

Yeah, I think I'm good.

MS. OSTLER: I would like to mark the portion of her testimony about this document confidential

Page 104

under the protective order.

MR. FASANO: Okay.

THE WITNESS: Is there any more pages? You can scroll down.

Another page? I think that is it -- oh, okay, eight of eight. Is that all?

MR. BADIN: Yeah, that's it.

THE WITNESS: Okay.

BY MR. FASANO:

Q. Okay. So, Ms. Hutchins, do you recall receiving an inquiry from Dr. Leroy N. Hwang from the FDA on February 11, 2020?

A. Yes.

Q. Okay. Do you remember what that inquiry was about?

A. Yeah, he wanted to discuss the website and the press releases, as he is discussing there.

Q. Okay. Was this -- did this lead to the first -- the FDA investigation where you then started to review press releases?

MS. OSTLER: Objection, misstates facts -- assumes facts not in the record.

THE WITNESS: I don't think so. I don't remember if it was. I don't think that was what triggered -- I'm not going to be able to remember if

Page 105

I -- because I don't -- yeah, I'm not going to be able to remember when the review of press releases became corrective action.

BY MR. FASANO:

Q. Okay.

MR. FASANO: Can we scroll up back to the beginning of the e-mail please, the e-mail chain.

BY MR. FASANO:

Q. Okay. This is an e-mail from you on February 26, 2020, to Leroy Hwang and some other people regarding the RUO Logix Smart 2019-nCoV kit. It says, "Dr. Hwang, I'm sorry to hear the FDA still has concerns about the previous press releases. We are trying our best to be in compliance with the federal regulations. We also understand there is a lot of misunderstanding in the general public nowadays than in the normal operations of the IVD industry.

When you say --

THE REPORTER: I'm sorry to interrupt. I believe we just lost the videographer.

(Off the record.)

THE VIDEOGRAPHER: Back on 2:53 p.m.

BY MR. FASANO:

Q. Now, Ms. Hutchins, when you say, "We also understand there's a lot of misunderstanding in the

27 (Pages 102 - 105)

Page 106

general public nowadays than in the normal operations of the IVD industry," what do you mean by that?

A. A lot of people that were not involved in the IVD industry tried to help with the supply chain, I would say, and didn't understand what IVD is or what are the requirements. So, and the general public were desperate -- were afraid, because of the pandemic and because of like the scope, like a pandemic involves a lot more people that are not trained to do things to start doing and, of course, there's not room to train everybody from day to night.

So, yes, even though there was a lot of people with well intentions to help, but they didn't understand -- they didn't understand -- they didn't have a well understanding of what -- what the purpose of IVD and how to interpret results or how to use results or how conduct operations -- all operations from procurement to testing to validations to understand what are the risk management of all IVD operations and, yeah, I still think a lot of people don't understand even after -- three years after, so.

Q. So do you think that it's -- it's easy for the public at large to not understand IVD testing and how it works?

MS. OSTLER: Objection, calls for speculation.

Page 107

THE WITNESS: Well, the thing is that for you to understand, you have to research and have a basic understanding of that thing for you to make your own conclusions and so I don't really understand what your question is about.

BY MR. FASANO:

Q. My question is if somebody says to the public that a test is 100 percent accurate and 100 percent sensitive, it gives the indication to the public that the test is perfect?

MS. OSTLER: Objection, calls for speculation, incomplete hypothetical.

THE WITNESS: A person can believe or assume whatever they want. It is not responsibility of the person -- the person can understand whatever they want, so.

BY MR. FASANO:

Q. But doesn't Co-Diagnostics, as a public company, have a duty to make accurate statements to the public when it does make statements to the public?

MS. OSTLER: Objection, calls for a legal conclusion.

BY MR. FASANO:

Q. If you understand that, if that's part of your job.

Page 108

MS. OSTLER: Objection.

THE WITNESS: So, you know, we can do our best to try to inform and educate people, but it doesn't mean that we are going to be successful to do all the time.

BY MR. FASANO:

Q. Okay.

A. Because I can try to tell someone how to go a certain place, but for whatever reason, the person made a mistake or didn't understand -- or I thought I was going -- I was being clear and the person didn't understand me. So it just -- it doesn't mean that I tried to make the person get lost.

So I can do my best to try to explain something to someone, but it doesn't mean that I'm going to be successful and also doesn't mean that if I was unsuccessful, that I did it on purpose. It just means that I may have -- that is why, for example, we were very glad to have this, because we have -- we were able to discuss with Leroy, with Dr. Hwang from the FDA and we were able to improve our communications and make it better, but the thing is that it doesn't mean that every time I'm trying to communicate something, I'm going to be successful 100 percent of the time.

Q. Okay. It says, "The review process for updates

Page 109

to the website has become more lengthy with the newly implemented process." What does that mean? What review processes were updated for the company?

A. I'm not going to be able to remember. What I can remember is that we were -- we started involving more people with the -- the review process, but I'm not -- I don't remember what things we implemented. It has happened more than three years ago and I'm not in the company anymore. So I don't remember what processes we implemented to make it more fully like and to make sure that -- to improve the communication to be able to -- to realize what pieces were like -- or the communication were coming short or, yeah, or failing to be more effective or clearer or something like that, but I'm not going to be able to remember.

Q. Okay.

MR. FASANO: Let's go to Exhibit 6, Owen.

(Cecilia Hutchins' Exhibit 6 was marked for identification.)

BY MR. FASANO:

Q. All right. Ms. Hutchins, I'm just going to ask you, to move this along, about the top portion of this e-mail. So once you've read that top portion, please just let me know and I'll ask you a question about it.

MS. OSTLER: Well, can she at least scan --

28 (Pages 106 - 109)

Page 110

MR. FASANO:  Yeah.

MS. OSTLER:  -- the whole thing so she can get sort of some context.

MR. FASANO:  Sure, if that's what she needs. Sure, but I'm not going to ask her about anything below the tailor -- you know, that -- the Cecilia Hutchins, head of regulatory affairs in that top portion.

BY MR. FASANO:

Q.  It's up to you, Ms. Hutchins.

MS. OSTLER:  When you say "the top portion," which portion do you mean?  Just like the first page or --

MR. FASANO:  No, there's like -- there's two e-mails.  There's an e-mail from Cecilia to Andrew Benson and then there's an e-mail from Andrew Benson to Cecilia Hutchins.

MS. OSTLER:  So the top two e-mails?

MR. FASANO:  Top two e-mails.  But if you want to scroll through it, I mean, there's some additional material in there.

THE WITNESS:  Okay.  Scroll down.

Can you scroll down?

Yeah, what's the question?

MR. FASANO:  Okay.  Scroll back up.

Page 111

BY MR. FASANO:

Q.  Okay.  It says -- on Sunday, March 1, 2020, you wrote, what looks like to Mr. Andrew Benson, "Also, there are a couple of things or dozens that we have to decide before shipping anything.  My suggestion is that we sell the Logix Smart 2019-nCoV RUO.  We will share only the information we have to for the labs to develop their LDT.  I don't want to share proprietary information, but there is a minimum that they will need in order to develop the test.

"The customer won't know without testing what is the difference between the 2019-nCoV and the COVID-19.  The COVID-19 won't sell in the U.S., so they won't be able to test.  We will discuss it later Sunday or Monday."

Then Mr. Benson responds, "No, we have to discuss it today because obviously we have to issue a press release first thing Monday morning, because God forbid we actually take a deep breath and think things through for a second before diving in," exclamation mark.

Do you understand -- was it your understanding that Co-Diagnostics would rush the science folks to get answers so that they can put out press releases as quickly as possible?

Page 112

MS. OSTLER:  Objection, calls for speculation.

THE WITNESS:  There's always a rush, like I said, in the medical devices and pharmaceutical industry.  You are also running against the clock, that's a given.

BY MR. FASANO:

Q.  But -- but my -- specifically relating to press releases to the public, were there statements -- were there -- was there a rush to react to news in the public sphere and to put out press releases on the scientists at Co-Diagnostics?

MS. OSTLER:  Objection, ambiguous, calls for speculation.

THE WITNESS:  I believe it was a rush to -- not I would say a rush, but there was a lot of pressure to like -- the same way that the public was pushing the FDA to put products on the market, the same way was a pressure with the manufacturers to put products on the market.  There was a pressure for everybody, there was a pressure for the doctors to figure out what to do, there was a pressure on people to make products move and there was a pressure everywhere.

So I don't think we at Co-Diagnostics were more pressured than everybody else was pressured.  There was --

Page 113

BY MR. FASANO:

Q.  So --

A.  There was a pressure and I don't think it was specific for Co-Diagnostics.  I think the pressure was because people were pressuring us as a company.  I don't think -- I don't feel the pressure was as far as management specific.  It was not isolated from management.  It was a pressure from the public mostly.

Q.  What pressure from the public are you specifically speaking about?

A.  Like the whole world screaming, the public, the people in the street screaming for tests.

Q.  Okay.  But what does that have to do with issuing press releases from a publicly traded company?

A.  Because people wanted results, people wanted to know what we were doing, if we had products already, how far we were to put products on the market, how far the trucks were to leave the company.

MR. FASANO:  Owen, let's move to tab nine and now I know we are going out of order, so you will have to tell me what exhibit this is.  It will be Exhibit 7.

(Cecilia Hutchins' Exhibit 7 was marked for identification.)

THE WITNESS:  Can you --

29 (Pages 110 - 113)

Page 114

Okay. That's the end, yeah.

MS. OSTLER: That is the end, Cecilia. Have you had a chance to read it now?

THE WITNESS: Yeah.

MS. OSTLER: You're good?

BY MR. FASANO:

Q. Okay. So it says -- there's an e-mail from Rebecca Garcia, Thursday, April 2, 2020, to Brent Satterfield, Chad Apuli and you Cecilia Hutchins, COVID clinical results. It says, "the ICMR," who is ICMR?

A. I guess it is the Indian reference lab. That's my guess.

Q. Don't guess. If you don't know just -- you could tell me you don't know.

A. Yeah, I don't -- I don't -- I am guessing, because that is where Rebecca was involved with the development.

Q. Okay.

A. But I am not familiar, because I've never worked with them. So if it is -- yeah, I don't know who ICMR is.

Q. Okay. "The ICMR has printed the results from our tests and they are not passing the guidelines. The positives samples were 100 percent confirmed with our test, but the negative samples are showing about

Page 115

88 percent false positive. CoSara does not want to manufacture tests that doesn't meet the guidelines which claim to be 100 percent sensitivity and specificity."

So my first question is, and of course that 88 percent number was corrected and I will put that on the record, but it says, "CoSara does not want to manufacture a test that doesn't meet the guidelines which claim to be 100 percent sensitivity and specificity," what guidelines is Ms. Garcia referring to?

MS. OSTLER: Objection, calls for speculation.

BY MR. FASANO:

Q. If you know.

A. I don't actually know. So this test -- I don't actually know. I can assume that it is the guidelines in India. However, I also don't remember if this test that was tested at this ICMR -- ICMR, if it was manufactured in India or manufactured in the U.S. I don't think it was manufactured in the U.S., because we did not export tests to India.

So I cannot tell about their manufacturer process and nor their validation process, their testing or their quality control or even because they were not using the same -- the same vendors that we were here in the U.S. So this results, it was from the test that

Page 116

they manufacture there, which was not the same -- it was not the same test. So those results are not the test that we had in the U.S.

Q. Okay. But my question is, is what are the guidelines which claim to be 100 percent sensitivity and specificity, do you have any knowledge of what Ms. Garcia is talking about?

A. No.

Q. Okay. Then she said -- then Ms. Garcia says, "Here is my opinion: First of all, 100 percent is impossible for any test and not mathematically sound if you believe in bell-shaped curve and 5 percent error"; do you see that?

A. Yes.

Q. Do you agree with that sentence?

A. Yes, that's why we didn't have a hundred percent as input requirement in our development.

Q. Okay. So you agree -- you agree with the fact that 100 percent is impossible for any test and is not mathematically sound, yes?

MS. OSTLER: Objection, out of context, ambiguous.

THE WITNESS: Yes. It's out of context because, as I mentioned before, you can report that in a study you got a hundred percent as a result, but

Page 117

it doesn't mean that the test is going to have 100 percent performance across the board.

BY MR. FASANO:

Q. Right. Now, what does bell -- you told me you agree with the first sentence. What does "bell-shaped curve and 5 percent error" refer to in your -- in your -- based on your training as a scientist?

A. It means that -- that when you say that -- for example, in the case for limit of detection, it means that if you have -- the definition of limit of detection is 95 percent of -- you detect under that concentration, which means that if you are going to look for an analyte and you have the concentration is limit of detection of ten milligrams per mL, it means that if you test 100 samples and all of your a hundred samples were over ten milligrams per mL, it means that you still are going to miss five of them. So it means that you have -- you have -- even if you have a 95 percent of confidence, you are still -- even if you have 100 percent of the samples within your range, you are going to still miss 5 percent, that's a statistical model.

Q. Okay. So if we go up to the top there, it says, it's -- it says from Rebecca Garcia to Brent Satterfield, Chad Apuli -- Apuli and Cecilia Hutchins, that's you, "Correction, the negative samples are

30 (Pages 114 - 117)

Page 118

showing 88 percent confirmation, 12 percent false positives"; do you see that?

So as of April 2, 2020, you were at least aware of one test that had 12 percent false positives, that one validation test, correct?

A. No. As I mentioned before, this is not a test that we were producing in here.

Q. When you say "in here," what do you mean?

A. In America.

Q. So this -- this is for a separate test?

A. Yes. Like I said, it's the test that Rebecca was in charge of. It was manufactured in India.

Q. So there were different tests being manufactured in different countries?

A. Yes.

Q. And did those tests have different validation study responses?

A. Yes.

Q. So it wouldn't be apples to apples then to compare the U.S.-produced test to the India-produced test; would that be fair?

A. Yes.

MS. OSTLER: Objection -- sorry. Sorry, Cecilia.

Objection, incomplete hypothetical and assumes

Page 119

facts.

BY MR. FASANO:

Q. So the Indian test -- my question is, is the India test is not the same as the U.S. test; is that fair to say?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: Yes, because they were produced in different facilities. By definition, they are not the same.

BY MR. FASANO:

Q. Okay. And what about were there other tests that were produced in different facilities, other than India and the United States?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: No.

BY MR. FASANO:

Q. So the only COVID-19 PCR tests that Co-Diagnostics created were either created in the United States or they were created in India; is that fair to say?

MS. OSTLER: Objection, lacks foundation.

THE WITNESS: The one produced in India didn't even have the same name. It was a joint venture. It had another name. It was another product.

BY MR. FASANO:

Page 120

Q. And what was that product called, do you recall?

A. No.

Q. Okay. Were the -- to your knowledge, were the U.S. tests ever sent to India for validation by people there?

A. Nope.

Q. Okay. And were the Indian tests ever sent to the United States for validation there?

A. No.

MS. OSTLER: Objection, assumes -- objection, assumes facts, and ambiguous.

BY MR. FASANO:

Q. You can answer.

A. I said no.

Q. Okay. Now, there were Mexican laboratories that evaluated some of the tests, some of the Co-Diagnostics COVID-19 PCR tests; do you recall that?

A. Yes.

Q. Okay. Now, what tests were they validating?

A. The one produced in America from Co-Diagnostics. Yeah, I -- it could have been that at some point they tested the Indian too, but I don't think so.

Q. So you don't remember precisely whether the

Page 121

Indian test or the U.S. test was the test that was tested in Mexico?

MS. OSTLER: Objection --

THE WITNESS: I know that -- that --

MS. OSTLER: Cecilia, sorry, I have an objection.

MR. FASANO: Yeah, please.

MS. OSTLER: Objection, assumes facts, ambiguous.

Go ahead, Cecilia.

THE WITNESS: I know that the Mexican tested the Co-Diagnostics test produced here in United States. I don't -- I'm just not sure if -- if the Indian facility also sent theirs, but I don't believe they did, but I could be wrong, but I -- as far as -- I believe it was just the Co-Diagnostics one.

BY MR. FASANO:

Q. Okay. Do you remember the name -- I may have asked you this already -- of the Indian test?

A. Sorry, what?

Q. What the name was of the test that was being developed in India that was different from the test being developed in the United States?

MS. OSTLER: Objection, assumes facts.

THE WITNESS: I'm not going to be able to

31 (Pages 118 - 121)

Page 122

remember.

BY MR. FASANO:

Q. Okay. That's fine.

MR. FASANO: Okay. Owen, can you go to tab ten, please. I don't know what exhibit number that is, but you will tag it.

(Cecilia Hutchins' Exhibit 8 was marked for identification.)

MS. OSTLER: Cecilia, are you doing okay or do you need a lunch break?

MR. FASANO: Yeah, I was going to ask everybody if, you know, it's been -- it's been a while.

THE WITNESS: Yeah, yeah, probably a lunch break would be better, unless it's just a couple more.

MR. FASANO: No, unfortunately, it's not just a couple more.

THE WITNESS: Yeah, so it's probably have a break.

MR. FASANO: I'm going to try, during the break, to cut out a few of them so that we can go faster, because some of them maybe we can just skip and -- but so I will do that while we take a break.

How long do you think you need to break for lunch?

Page 123

THE WITNESS: A half an hour.

MR. FASANO: Okay. So you want to say we'll come back at 2:00 p.m. Mountain time, 4:00 p.m. Eastern time?

THE WITNESS: Yeah.

MR. FASANO: Madam Court Reporter, does that work for you?

THE REPORTER: Yeah, that's good.

MR. FASANO: Okay. So let's go off the record for a half an hour.

THE VIDEOGRAPHER: Going off the video record 3:28 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record 4:05 p.m.

BY MR. FASANO:

Q. Welcome back, Ms. Hutchins.

A. Thank you.

MR. FASANO: Owen, can you please show tab ten, I don't know what exhibit that is, but you will tag it and I'll --

BY MR. FASANO:

Q. Okay. Let us know when you've read it and then we can ask you a couple of questions about it.

MS. OSTLER: Did we lose the witness? Oh, no,

Page 124

there she is. Okay. Sorry.

THE WITNESS: Yeah, I was just -- I couldn't remember anymore this e-mail.

Okay. Yeah -- is there another page?

Yes, what's the question?

BY MR. FASANO:

Q. Okay. Well, the question is very specific, it's -- it says here from Brent Satterfield, Thursday, April 2, 2020, to a group of people on the e-mail and then he forwards the e-mail on the same date to you, Chad Apuli and -- well, just to you and Chad Apuli. In that e-mail that he forwarded to you, Mr. Satterfield states, "While no test is ever 100 percent specific, I find the results by ICMR inconsistent with what we know about our test"; do you see that?

A. Uh-huh.

Q. First, do you agree with Mr. Satterfield's statement that no test is ever 100 percent specific?

A. It is always in relation to something else, yes.

Q. Okay. And then when he says, "I find the results by ICMR inconsistent with what we know about our tests," first of all, ICMR was dealing with the India test, right, not with the U.S. test?

MS. OSTLER: Objection, assumes facts.

Page 125

BY MR. FASANO:

Q. Is that correct, Ms. Hutchins?

A. Is it correct, let me just point out something, so you see that he is talking about primers.

Q. Yes.

A. So the primers were the same for both tests -- well, technically the same, the primers for -- that we use here in the U.S. are manufactured by our vendor here in the U.S. The primers that India used -- was using is the same sequence, but is manufactured by the same way -- the same vendor -- well, not sure if it was the same vendor, but it was a very similar vendor, but even if it was a similar -- the same vendor was their facility there -- somewhere there in Asia.

So, and also most of the components and raw materials were attempted to be very similar, but they had to procure vendors over there. So even when we talk as if it's the same test, internally in the company, we talk as if it was the same test, but, technically, and -- it was not the same. And when they were talking about tweaking and making adjustments, they were talking about making adjustments in the formulation or something like that, but they were different products and even though we were looking to have the similar results, something that was happening there, that's the reason

32 (Pages 122 - 125)

Page 126

why Satterfield is talking about the results they got there were inconsistent with what we had here, because we have never had this much -- like it's something -- like he's pointing out in his e-mail in this description is that we had never seen this results before.

And --

Q. Okay.

A. -- another point is that we don't know the conditions that was tested. So many reference labs, they were using whatever was available there, as far as machine goes and as far as reagents goes. So even though whenever we had results coming out and if they were not similar, the only way for us to evaluate what could have happened would be if we have the input they -- how they tested, did they really strictly follow the instructions for use or they were just doing the -- whatever they thought should have been done or did we have information about the samples they were using or they mention that they were talking about gold standard, they -- a lot of reference labs, they say gold standard, but they don't say what those -- this gold standard is.

So it is very complicated to understand why they got different results and it's never -- we can never -- it is impossible to understand why the result was different from all -- every time we know the testing

Page 127

conditions, we can have similar results. When we can't have any information about the testing conditions, there's no way I can -- I can understand what was wrong.

Q. Okay.

A. And even in that case, technically, even though the primers were the same sequence, but the test was not the same. It was manufactured in a different facility, the raw materials were -- were procured on whatever was available in Asia. So technically, like in a technical sense, it was not the same product.

Q. Okay. But just to clarify, you agree with Mr. Satterfield's statement that despite everything you just said, no test, including the United States COVID-19 Co-Diagnostics test, is ever 100 percent specific; is that correct?

MS. OSTLER: Objection, lacks context and incomplete hypothetical.

THE WITNESS: I have to say it one more time, not as over the board every time, but you can report something as a result of a specific study, but not across all conditions or all testing and every time you use the product, no. Those are two different things.

BY MR. FASANO:

Q. Okay.

Page 128

A. If you are reporting 100 percent sensitivity and 100 percent specificity as a result of a specific study, yes, you can say that.

Q. Okay.

A. Can you say that about performance over the board, no, you cannot.

Q. Okay. What about -- okay.

MR. FASANO: So let's go, Owen, to what we will call Exhibit 9, but it's going to be tab 14 in the binder.

(Cecilia Hutchins' Exhibit 9 was marked for identification.)

BY MR. FASANO:

Q. Okay. Ms. Hutchins, let me know when you're ready to read this one.

MS. OSTLER: I'm so sorry, but can you show one without the stamp covering up some of the text. I think it might be covering up something that's important.

Thank you.

THE WITNESS: Could you --

Is there anything after that?

Okay.

BY MR. FASANO:

Q. Okay. So let's go down to the second page. So

Page 129

there's an e-mail from Andrew Szentirmay at a place called Gene Target Solutions e-mail to Joseph Featherstone, Cameron Gundry and Valin Reja. First of all, do you know who Andrew Szentirmay is?

A. They were one of our -- I think one of our customers -- well, I know that Gene Target Solutions was, but I never talked to -- I don't think I have talked with Andrew Szentirmay.

Q. Okay. Now, in this e-mail, it says, "Hi, Joseph and Cameron, is this correct or a printing error on your website? Look at the LOD. This is nine times higher, poorer" -- open parenthesis, "poorer," closed parenthesis, "than previously reported. We have companies reporting 100 copies per mL."

And then below that you see "kit specs" and the kit specs have a limit of detection of 9.35 times 10 to the third copies per milliliter, sensitivity of 100 percent and specificity of 100 percent. What does that mean?

A. If I -- based on the date, that was the specification that was in the website for -- based on what we have -- based on what we had for the emergency use authorization. So that is the limit of detection that we had when we finished the development and finished the submission for the emergency authorization

33 (Pages 126 - 129)

Page 130

and that is the result that we had for sensitivity and specificity that we got on that submission.

Q. Okay.

A. On the study we did with the FDA, like for the emergency authorization.

Q. So when it says kit specs, it doesn't mean for every single kit, it means just for one study that you did at that limit of detection, you got sensitivity of 100 percent and specificity of 100 percent, yes?

A. No, kit specs means the product.

Q. Okay.

A. So that is the claim we have for the product, based on what we submit -- based on the results we submitted to the FDA and based on what the FDA authorized us to claim.

Q. So the FDA authorized Co-Diagnostics to claim 100 percent sensitivity and 100 --

A. Because it's based on the results we sent to them in the application and it's the same information that's available in the instructions for use.

Q. So the -- so on the website -- at this time, April 14, 2020, the specifications for the product stated that this specific limit of detection, the product was effectively perfect; is that correct?

A. If that was -- as I said, I'm basing my answer

Page 131

-- I am assuming that he got the print of the website on the day that he wrote the e-mail. Because, of course, I don't know what was the specification on that date three years ago.

Q. Okay. But isn't it -- isn't it true that we just went through some e-mails and you agreed that 100 percent sensitivity and 100 percent specificity can never be true?

A. Again, I'm going to repeat to you for the fifth or sixth time, I don't know how many times I've said that, when you are reporting a result of a specific study that you describe how you tested and you describe what the conditions you did, yes, that can be a result.

Q. Right. But this is -- this is the specifications for the kit that goes to everyone in the public; isn't that correct?

A. Who buys our product is not everyone in the public. Who buys the product is laboratory -- clinical laboratories. We don't sell to anyone in the street.

Q. So does this mean that you are telling clinical laboratories that the test is 100 percent sensitive and 100 percent specific?

A. A clinical laboratory knows that in vitro diagnostics has intended use, indications for use and instructions for use. They know that they are supposed

Page 132

to look into the intended use, the indications for use and the instructions for use to see if that reagent is going to meet their needs and they are the ones responsible for any validation of extra additions they do.

Q. And would someone from the public have that information?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: So if you are going to buy a tractor, do you know how to order a tractor according to the specification you are going to need?

BY MR. FASANO:

Q. I don't know how to order a tractor.

A. Yeah. So someone in the general public should not order a kit for a reagent for PCR test either.

Q. What about someone in the general public investigating in the publicly traded stock of a company that makes those type of tests?

A. Well --

MS. OSTLER: Objection --

THE WITNESS: -- they should do their own --

MS. OSTLER: Objection, lacks foundation, calls for speculation.

Go ahead, Cecilia.

THE WITNESS: If you are going to invest money

Page 133

in a company, you should at least understand what the company does. If you are willing to put your money in the company, I don't think it's my responsibility to know how much the person knows.

BY MR. FASANO:

Q. So -- so your testimony is that it's not your responsibility to verify -- to clarify information to the public in public statements about Co-Diagnostics?

MS. OSTLER: Objection, misstatements what the witness testified, calls for a legal conclusion.

BY MR. FASANO:

Q. You can answer.

A. I'm the regulatory affairs person responsible for submitting products to the market and abiding to the regulatory requirements for a product. My user is not a person in the street. My user is a clinical laboratory.

Q. Okay. But you did review press releases that were going out to literally people in the street, did you not?

A. Again, I was reviewing according to the regulatory requirements based on what I was legally allowed to claim for the product.

Q. Okay.

MR. FASANO: Let's go to number 17, Owen. I guess that will be Exhibit 10.

34 (Pages 130 - 133)

Page 134

(Cecilia Hutchins' Exhibit 10 was marked for identification.)

BY MR. FASANO:

Q. I'm not meaning to fight with you, Ms. Hutchins. I've just had a lot of coffee. I apologize.

A. Can you scroll down?

Yeah, what's the question?

Q. Okay. So let's just stay there for a second. There's an e-mail from Brent Satterfield on Thursday, April 30th to Chad Apuli, Rebecca Garcia, copying you, Cecilia Hutchins. It says, "Chad and Rebecca, please see the article that just came out," about us and there's a hyperlink.

Do you recall if -- well, I will show you the article later, but do you recall if April 30th was when the article came out that you stated was -- that you criticized earlier?

A. Yes.

Q. Okay.

A. I -- yeah, it is.

Q. And it says, "Notice what others are saying about us relative to our LOD and how we perform worse than other tests, including the CDC. If we had publications out already, none of this would be

Page 135

happening."

When Mr. Satterfield says "if we had publications out already, none of this would be happening," do you understand what he means?

A. Yeah, he's talking about peer-reviewed article.

Q. Okay. And so at this point, there was not a peer-reviewed article out for -- for the COVID-19 test?

A. Yeah, there was none for our test.

Q. Okay. It says, "I understand that Kyle and Maddie did the bulk of the work. It is their prerogative to be first authors and I want them to have that opportunity. That being said, Rebecca is very fast. If she writes it, then she has equal claim to the first author spot. She also needs continued education credits from a first author publication"; do you see that?

A. Yes.

Q. So at that time, was there a rush or a -- an increased desire for Co-Diagnostics to put out literature about its tests to the public?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: Yeah, as any other manufacturer would.

BY MR. FASANO:

Q. Okay. By the way, just so I understand, what's

Page 136

the big deal of being the first author?

A. It is just because being the first author of a peer-reviewed publication, like the paper counts as -- as if it's like yours, like it's your work and then you can claim to be the -- oh, the main owner or the first one to be responsible for that work.

But there are different forms for you to prove like -- like have stamps of the quality of work or something like that and a peer-reviewed article or regulatory approvals, they give more weight for your work or for your product. So that's one of the ways to add more weight or award or stamps, not just for the researchers involved, but also for the product.

Q. Okay. Let's go up the page. So then you write -- you then write to Chad Apuli, Brent Satterfield and Rebecca Garcia, you write, "Technically, the EUA says the test is intended for individuals suspected of COVID-19 by their health care provider. Our test is not intended for asymptomatic patients."

Can you explain that, that second sentence, "our test is not intended for asymptomatic patients"?

A. So like I said before, an IVD is linked to intended use. So what regulatory agencies do is that they authorized or they clear for market or they approve a product to go to market, but there is no such thing as

Page 137

authorization, clearance or approval of an individual diagnostics without intended use. You cannot separate these two things. The same way that you cannot separate a drug from the intended use for that drug to treat certain disease. So it's just basically what we call the label of label.

So the -- our -- the test kit that was received the authorization to market in the U.S. was supposed to be used for symptomatic patients, was not ever authorized, or at least at that time, authorized for use in asymptomatic patients.

So clinical laboratory that was purchasing our tests, it was supposed to use for symptomatic patients. If they wanted to use in asymptomatic patients, they would have to extend the testing for -- to prove that the test was performing as supposed to for asymptomatic patients.

Q. Okay. After that it says, "Also, the sensitivity of 99.52 percent and specificity of 100 percent are for samples with a viral load equal to or higher than the limit of detection."

So where do you get those numbers, sensitivity of 99.52 and specificity of 100 percent, where are those numbers being derived from?

A. So that is -- that is actually the results we

Page 138

got for the emergency authorization. I don't remember what was the limit of detection on the emergency authorization. Probably that screenshot that was in the previous e-mail, probably that was the performance for the CE marking, because I believe this one was the one for emergency authorization. I'm not going to remember the numbers, the results for every submission from three years ago.

But what it means that that was the result -- so let's say if the limit of detection was 100 copies per milliliter, let's say, it means that with that limit of detection, with the product as -- with that configuration, testing in all those conditions in the diagnostic accuracy test, it got 99.52 percent of sensitivity and 100 percent specificity. Those numbers come from that test that comes with the true negatives and true positives and false positives, false negatives, things like that.

Q. So is that -- are those the results of one test or of multiple tests or something different?

A. One study that includes -- that sometimes you doing -- you doing like -- you doing batches or you doing like many runs. You have to have statistical -- you have to have enough statistical results in order to determine the test, determine the result. So it is not

Page 139

just one run of -- one single run of the test. It is a number of samples. It has a statistical weight for you to determine that. So it is not one run. It is a batch of runs.

Q. Okay. And at what statistical rate do the results become meaningful for a test like this?

A. So I don't have the guidelines by my memory and I haven't been working with those type of products for more than a year, so I don't have guidelines and methods and procedures by memory. That's why we have books for that.

So you would have to go look into the guidelines for you to -- or you would have to have the study design or the protocol or consult the emergency authorization to see how many runs or what's the statistical weight it would have. And even that, every laboratory may follow a different guideline. So that is what we submitted to the FDA and they reviewed the results and they authorized us to claim those numbers.

Q. Okay.

MR. FASANO: Let's move on to own tab 19, I think it's going to be Exhibit 11 or 12. I'm not sure.

(Cecilia Hutchins' Exhibit 11 was marked for identification.)

Page 140

THE WITNESS: Can you scroll down?

Excuse me, just -- sorry, I had more kids coming back from school.

BY MR. FASANO:

Q. Sounds like my house.

A. Don't. Okay. Go downstairs.

I was going to scroll down myself.

Okay. Scroll down.

Yes, what was --

Q. Okay. So here --

MR. FASANO: Owen, if you just scroll up a little bit. Cool.

BY MR. FASANO:

Q. It's an e-mail from Brian Lowe at the United States Food and Drug Administration on Monday, May 11, 2020, to Cecilia Hutchins. The subject is, "RE: EUA200049 and it says, "To Cecilia Hutchins, head of clinical and regulatory affairs Co-Diagnostics, Inc.," with an address below.

It says, "Ms. Hutchins, it has come to our attention that your Logix Smart Coronavirus 2019 COVID-19 test kit is being promoted by distributors in a manner not consistent with its authorization," open paren, "EUA," close paren. The allegations -- the allegation is that the test sales promotion includes,

Page 141

one, for use with saliva specimens; two, that the test has perfect sensitivity and specificity; three, that the test is FDA approve; and, four, that the material includes the FDA logo."

Now, if you look down, there's a couple of different bullet points. It says, "No IVD is 100 percent sensitive and 100 percent specific, so please inform your distributors that performance of the test should be promoted as based on the validation study design and data as in the EUA, i.e., the results of your validation and, importantly, how it was performed."

Do you see that?

A. Sorry, your question again?

Q. I'm just asking if you see the bullet that starts with "no IVD is 100 percent sensitive and 100 percent specific"?

A. What's your question about that?

Q. My question is, it says, "The test should be promoted as based on the validation study designed and data as in the EUA," what do you understand that to mean?

A. The distributor was not advertising the product as this -- excuse me, sorry, can you hold just a second again?

Sorry, I have stubborn one.

36 (Pages 138 - 141)

800-726-7007                                                                    305-376-8800

Page 142

So the customer -- the distributor was not advertising as he was supposed to. He was claiming 100 percent sensitivity and 100 percent specificity without any support. If he was going to say that he tested in-house and he got this results, that would probably be okay, because he would be stating then, I tested in-house, in these conditions and I got this results, but that was not what he was saying. He was saying that, in general, the test had 100 percent sensitivity and 100 percent specificity, even though that was not what we, as Co-Diagnostics, were marketing.

So he was coming with things from his own head to be able to market the product, which was wrong and the FDA found that. We didn't find that in our screening. The FDA found that and we reached out to them and asked them to take out the page and then they fixed the page and then everything went back to normal.

The problem was that it was, like he said in the beginning of the e-mail, was a herculean work in order to be able to make all the distributors to be true to what the product was and what they could claim.

If you see the other bullet points, it's not just sensitivity and/or specificity they were lying about. They were lying about other things, too. They were talking about other points that were not true and

Page 143

the same way that they were not -- not being -- not knowing what they were doing wrong or something like that, but like I said, in this situation, they were not advertising the product as what the product was and not just the sensitivity or specificity was the problem, they were talking about saliva samples. We never had saliva samples in our emergency authorization.

Q. Okay. But if they had done a test and gotten 100 percent sensitivity and 100 percent specificity, why wouldn't they be able to tell -- to tell people that it was 100 percent?

A. They didn't do any test.

Q. So they just told people it was 100 percent sensitive and specific without doing any test?

A. Yes. They were just taking the number from just -- so they never -- so they were not reporting a result for a study. One person could do a study and if it's an in-house study, you take it -- you take as it's worth. If you think this is -- if that thing is worth -- because an in-house test, there's no peer review, there's no regulatory agency review, so you take it as -- as you think it should -- you should.

But what this distributor was reporting was not a result of a study. He was just -- they were just stating it in a vacuum, that was wrong.

Page 144

Q. Okay. Let's go to tab 21.

(Cecilia Hutchins' Exhibit 12 was marked for identification.)

THE WITNESS: Can you scroll down?

You want to scroll down just make sure.

Yes. What's your question?

BY MR. FASANO:

Q. Okay. So first of all, on the last page here, there's -- it looks like it says, "Cecilia Hutchins, head of regulatory and clinical affairs," under that line, did you ever sign that document or is there a signed version of that document anywhere?

A. Yes.

Q. Okay. I'm sure we'll find it or if we don't, I'm sure we have it.

All right. Let's go up.

A. Well, because I believe it was one was under review. It may be that the final version can be slightly different, but, yeah.

Q. Okay. Okay. So going down to the second page.

MR. FASANO: Go down to the second page, Owen.

BY MR. FASANO:

Q. Okay. It says, "It has come to the FDA's attention that the Logix Smart Coronavirus test -- sorry, I forgot to read part of it.

Page 145

CoDx regulatory bulletin, to all U.S. distributors, from Cecilia Hutchins head of regulatory and clinical affairs, Salt Lake City, May 11, 2020; do you see that?

A. Yes.

Q. So did you prepare that regulatory bulletin?

A. Yes.

Q. Okay. Now, I just have a question, it says -- so it says here in one if the bullets, "No IVD is 100 percent sensitive and 100 percent specific. Note that the Logix Smart COVID-19 has been found 99.52 percent sensitive and -- sensitivity and 100 percent specificity with the 631 replicates of the contrived samples used during verification studies. It does not mean 100 percent sensitivity or 100 percent specificity and Co-Diagnostics has never made claims of 100 percent sensitivity and 100 percent specificity"; do you see that?

A. Yes.

Q. Do you believe that that's an accurate statement?

A. Yes, because like I said before, the 99.52 percent sensitivity and 100 percent specificity that we had as a claim authorized under the emergency use authorization was the result obtained in that

37 (Pages 142 - 145)

Page 146

specific study with the 631 replicates.  It doesn't mean that the test is going to have 100 percent sensitivity and 100 percent specificity in all situations in a vacuum.  Again, it is not -- it's not a data point.  It is not a measure of the product.  It is how the product was measured in a certain study.

Q.  Okay.

A.  It's not how the product measures everything.

Q.  Sure.  So it says, "Co-Diagnostics has never made claims of 100 percent sensitivity and 100 percent specificity"; do you see that?

A.  Yes.

Q.  But didn't we just see a kit description from the website that said 100 percent specific and 100 percent sensitive?

A.  That was the result obtained in the result in the -- to get that table was just a screenshot to put in an easy way the results obtained on the study that was published in that same page.  So if you wanted to understand what those studies -- those results were, you had to go to the study that was in the instructions for use.  That was just the results that came from the instructions for use.

Q.  But so -- but it is then untrue that Co-Diagnostics, Inc., has never made claims of

Page 147

100 percent sensitivity and 100 percent specificity?  It doesn't say here, 100 percent claims of sensitivity and 100 percent specificity across -- across all tests.  It just simply says you've never made that claim, but that's untrue, isn't it?

MS. OSTLER:  Objection, ambiguous.

THE WITNESS:  Well, first thing, not with the emergency use authorization, because even if I had that hundred percent, it was not with the emergency use authorization.  That result was for the product that we -- we registered in Europe with the CE marking.  That was not even allowed to -- it was even -- it was only for exporting only.  Was not even the product that was market here in the U.S.

BY MR. FASANO:

Q.  Right.  But it doesn't say in the U.S. or --

A.  Yes, it said, because that was even the problem we had with the FDA.  The FDA requested, say, So please remind to put in there for exporting only, and that's what the changes we made.

Q.  Okay.

A.  So the emergency use authorization was not ever allowed by the FDA to carry 100 percent sensitivity and 100 percent specificity.

Q.  So wouldn't it -- wouldn't it be more accurate

Page 148

to say that we're 99.52 percent sensitive and 100 percent specific, wouldn't that be more accurate to say?

A.  What do you mean --

MS. OSTLER:  Objection.

THE WITNESS:  To say where, when?

BY MR. FASANO:

Q.  The FDA is telling you that no test is 100 percent specific or sensitive; is that right?

A.  Yes.

Q.  So wouldn't it have been appropriate to qualify the statement 100 percent sensitivity and specificity with that fact --

MS. OSTLER:  Objection.

BY MR. FASANO:

Q.  -- cannot be true?

MS. OSTLER:  Oh, Michael, I'm sorry.  You -- it might have been my fault when I tried to do an objection, but I think you cut out at the end.

MR. FASANO:  Oh, okay.

MS. OSTLER:  Can you say it again?

MR. FASANO:  Yes.

BY MR. FASANO:

Q.  So let me ask a different question.  Ms. Hutchins, wouldn't it be -- wouldn't it make the

Page 149

statement accurate instead of writing 100 percent and 100 percent in one study, wouldn't it be completely accurate to then qualify that statement by saying we -- no test can be 100 percent accurate?

MS. OSTLER:  Objection, incomplete hypothetical and vague.

THE WITNESS:  Yeah, I don't understand what you mean.  Like -- it's just because -- you understand that we are most likely saying the same thing.  We were just -- the intention with this letter was just to make it clear for distributors, please don't say 100 percent specificity and 100 percent sensitivity.

BY MR. FASANO:

Q.  Okay.  And --

A.  That's my intention, don't say it again.

Q.  Don't say what again, ma'am?

A.  100 percent sensitivity and 100 percent specificity.

Q.  Okay.  So this was a -- was basically admonishing the distributors to not say that the test was 100 percent specific or 100 percent sensitive, that was the goal of --

A.  Yeah, that was the goal.

Q.  Okay.  And when you say distributors who this was going to, I mean, who -- I don't want to know the

38 (Pages 146 - 149)

Page 150

names, but what type of distributors -- who is -- like who are the distributors?  Are they professional companies that distribute medical products?  Are they the public?  Are they somebody else?  Who is this -- who is this regulatory bulletin being sent to?

A.  For customers that were distributing our products, either to -- either because they were clinical laboratories that were distributing to other clinical laboratories or because they are -- they were companies that were distributing and we were -- and they had like -- they had some clinical laboratories as their customers.

Q.  Okay.  Let's go to tab 22.

MR. FASANO:  And, Owen, can you just tell us what exhibit we're up to, just so I remember.

MR. BADIN:  We're on Exhibit 13.

MR. FASANO:  Okay.  Exhibit 13, tab 22.

I was trying to get you on the record there Owen, for posterity's sake.  Now you live forever, kind of.

(Cecilia Hutchins' Exhibit 13 was marked for identification.)

BY MR. FASANO:

Q.  Okay.  So if you can take a look at this one, Ms. Hutchins, let me know when you are ready and we can

Page 151

read it.  It's a two-pager, this one, or two-and-change-pager.

A.  You want to go to the other page.

Q.  Sure, go down?

A.  Yeah, you can go.

Yeah.  What's the question?

Q.  Okay.  The question is, can you just summarize what you're asking -- there's an e-mail here at the bottom of, Tuesday, May 12, 2020, from you to Joseph Briggs and Chad Apuli.  It says, "Question about promoting brochure," can you just summarize what you're asking Mr. Briggs about and what your concern is about -- about the promoting brochure?

A.  We were -- so because of the problems we had with distributors, people trying to break down the information to become -- to become more like simple and easier to understand for all the people that were not from the industry and were trying to figure out.  So we thought that we could make the brochure, that we could simplify the test results and put in a simple way for people to try to help people to understand.  However, the FDA said, yeah, that's nice, but, no, because the test results -- to understand that the results were not a qualifier for the product but were just a result of a point in time.  So they said that, no, we could not have

Page 152

the brochure.

So the brochure was never approved and a table simplifying the test results in a single way was never approved and then it has never been used.  In fact, if you go in the instructions for use today, the test results and the -- are still in there.  So someone to understand what the performance results, they need to read the whole study.  They cannot just extract a point.

Even though in the internal e-mails we talk about the test results, especially when we are trying to compare and understand whatever results someone got some other place, but we know what were our testing conditions.  So internally, in our e-mails, we talk about -- we talk a lot about the test results or something like that, about comparing the results from different studies, but we understand what were our testing conditions.

So we were not allowed to put the results in a simple table in the instructions for use or make the brochure.

Q.  Okay.  Now, did the brochure call for -- did the brochure explain that in certain situations or in specific validation studies, the test was 100 percent sensitive and 100 percent specific?

A.  No.

Page 153

Q.  It did not?

A.  Why should I do that, if it was not the result I obtain in the study?

Q.  Okay.

A.  The brochure was going to reflect the result we got on a specific study.

Q.  Okay.  Let me --

A.  But the result -- but the brochure was never approved.  It has never been published.

Q.  Okay.

A.  As far as I know.

MR. FASANO:  Can we go up to the top, please.

BY MR. FASANO:

Q.  Okay.  So then it says -- so then Mr. Briggs passed you over to Mr. Lowe, who was dealing with you, and Mr. Lowe then says on 5/12/2020, copy to Mr. Briggs, to you, copying Mr. Apuli.  "Dear Cecilia, thank you for addressing your distributors.  Please e-mail your list and the information or instructions you sent to them."

I am going to skip down a little bit.  Mr. Lowe says, "It is not truthful to say that the test is 100 percent sensitive and 100 percent specific because it implies a perfectly truthful clinical test."

Do you agree with Mr. Lowe that a 100 percent sensitive and specific test could imply perfection

39 (Pages 150 - 153)

Page 154

across the board?

MS. OSTLER: Objection, you omitted the word "just." "It is not truthful to say just that the test is 100 percent sensitive and 100 percent specific."

MR. FASANO: Okay.

MS. OSTLER: And then the question also calls for speculation.

BY MR. FASANO:

Q. Okay. Based on your knowledge and understanding, Ms. Hutchins, can you answer that question?

A. Yes, if it is said in a vacuum without being a result for a specific study reporting a data point in time, yes, it would be wrong to say that and -- but that was never what we were trying to say here.

Q. Okay. I think the videographer needs to change the tape. So can we go off the record for a minute?

THE VIDEOGRAPHER: Yeah, off the record 5:15 p.m.

(Off the record.)

THE VIDEOGRAPHER: Okay. Back on the video record 5:16 p.m.

MR. FASANO: Okay. Let's go to tab 23, Owen. We'll mark it as the next exhibit.

Page 155

(Cecilia Hutchins' Exhibit 14 was marked for identification.)

BY MR. FASANO:

Q. Okay. Let me know when you're ready.

A. Is there any other page?

Okay.

Okay. What's the question?

Q. Okay. Yes. So the question is -- let's go to the first page.

It says -- it's an e-mail from -- so I'm reading from the e-mail from you sent on Friday, May 15, 2020, to JenniferWebb@coltrin.com Jennifer, underscore, Webb@coltrin.com, Andrew Benson and Brent Satterfield. Subject, RE: BioCentury, limits of detection for FDA authorized COVID-19 diagnostics.

And you write, "So this last Monday I received a complaint from the FDA that one of our distributors had on their website the claim of 100 percent sensitivity and 100 percent specificity about the Logix Smart. Little they know we have the same claim in our PR and I'm afraid it's just a matter of time until they found out from where it came from."

When you say "little they know what we have -- that we have the same claim in our PR and I'm afraid it is just a matter of time until they found out from where

Page 156

it came from," what do you -- what do you mean by that?

A. I believe I was just -- I was very stressed with all the -- all the convoluted and the fighting over and all. So I was afraid that the FDA was going to complain about the PR that was stating -- I believe it was maybe the PathWest study that showed 100 percent sensitivity and 100 percent specificity that we were discussing on the PR. So I believe I was just concerned that the FDA was going to complain about that PR, but I don't remember if they actually complained. I believe they didn't, because I -- I don't actually remember if that PR was removed or not. I don't think it was and the PR was talking about 100 percent specificity and 100 percent sensitivity on those studies and I was just over stressed with -- of receiving more complaints.

Q. So you believe if the FDA had come across -- so when you say "our PR," are you referring to the May 1, 2020 press release that mentioned 100 percent sensitivity and 100 percent specificity?

A. I'm not going to be able to remember the date now of the PR, but I remember that we had a PR that was reporting 100 percent sensitivity and 100 percent specificity in a study performed by a third party. So, yes, I was concerned about that, but as far as I can remember, I don't think I received any complaint about

Page 157

that PR. I don't think so.

Q. Okay. When you say "PR," PR stands for press release, yes?

A. Yes.

Q. Okay. So it's fair to say that on May 15th, you were concerned that the FDA was going to look at the -- at a press release where you claimed 100 percent sensitivity and 100 percent specificity as misleading is that fair to say?

A. No.

MS. OSTLER: Objection -- sorry, go ahead, Cecilia.

THE WITNESS: No, it's not fair to say that. I am saying --

BY MR. FASANO:

Q. Okay.

A. -- that I was complain -- I was worried that the FDA would be questioning about us reporting the result that a third party had of independent study of our test.

Q. Okay. It goes down here to say on the one, two, three, 4 paragraph beginning, "You may report that in a specific study with a certain number of samples and conditions you got something very close to 100 percent, but we cannot generalize the test will always be

40 (Pages 154 - 157)

Page 158

100 percent no matter what"; do you see that?

A. Yes.

Q. So are you saying here in this sentence that you are not allowed to say that the test is 100 percent sensitive and 100 percent specific?

A. I'm saying the same thing that I have said about ten times for you today. That when you are reporting a result of a test and that you got the result to be a hundred percent sensitivity and a hundred percent specificity on that study, on that specific conditions, yes, if that was the result you got, of course you can report that.

But you cannot claim as a generalized result that every single time you use that product, you are going to get the same result. Do I have to explain that again?

Q. Well, thank you for explaining it that time. You probably are going to have to explain it again, because I'm going to probably ask you some more questions about it.

So because it says here, "You -- you may report that in a specific study with a certain number of samples and conditions you got something very close to 100 percent, but we cannot generalize." So it's your testimony that that statement means if you get

Page 159

100 percent in a validation study, you can report 100 percent?

A. No.

Q. Okay. What -- what -- so what does that mean? You wrote it. I'm trying to understand what you meant by that. Because you say you can -- you can say something is very close and then you told me that you've told me ten times that you can report a validation study that's 100 percent specific and 100 percent accurate as it is.

MS. OSTLER: Objection --

BY MR. FASANO:

Q. So help me understand.

MS. OSTLER: Objection, misstates testimony.

Go ahead, Cecilia.

THE WITNESS: I can claim that when I test something under certain conditions, I got a certain result. That's all I can do.

BY MR. FASANO:

Q. Okay. Let's go to tab 24.

(Cecilia Hutchins' Exhibit 15 was marked for identification.)

MS. OSTLER: Cecilia, don't forget, if you need to take a break, you can.

BY MR. FASANO:

Page 160

Q. Yes, please.

MS. OSTLER: Let us know.

THE WITNESS: Yeah.

BY MR. FASANO:

Q. Yeah. I only play a tough guy on TV sometimes, Cecilia. If you need to take a break, you take a break, okay.

Okay. Ms. Hutchins, let me know when you want him to scroll down?

A. You can scroll down.

Yeah, what's -- I think it's the same thread with just a different -- parallel conversation. Probably, I'm not sure.

Q. It probably is.

A. If you want to scroll down.

Q. Yes, why don't we just do that to be --

A. Yeah, you want to scroll down.

Yeah. What's your question?

Q. Okay. So go up.

Okay. So from Cecilia Hutchins, on May 15, 2020, to Jennifer Webb, Andrew Benson, Brent Satterfield, RE: BioCentury - limits of detection for FDA authorized COVID-19 diagnostics. And it says, yes -- it says, "Yes, I just hope they miss it."

Do you know what you mean by that, "yes, I just

Page 161

hope they miss it"?

A. Because I don't want to answer another -- because it is tiresome to answer another request from the FDA to review something, just that.

Q. So in this sentence, they --

A. Sorry, what?

Q. In this statement, "I just hope they miss it," the "they" is the FDA, yes?

A. Yes.

Q. Okay. And then you said, "I don't think it is worth trying to fix the PR now." And as we said before, the PR is the press release, right?

A. Yes.

Q. Okay. What -- why did you write "I don't think it's worth trying to fix the PR now"?

A. Because I don't think it was worth the time. There was nothing wrong on that -- like it was nothing that was not true.

Q. So why were you worried about it if there was nothing that was untrue in the press release?

A. Because many times I had to discuss the same thing over and over and over and over and over and over and over again about 100 percent sensitivity and 100 percent specificity and because, as you have been claiming, other people took things out of context and

41 (Pages 158 - 161)

Page 162

that's what I mention in here, that distributors are not really distorting, but taking things out of context.

Q. Okay. When you say they aren't distorting, but they are taking things out of context, what do you mean by -- what do you specifically mean by that? I don't mean to be difficult, I just want to understand.

A. They're taking results -- taking results and not reporting -- not talking about the result -- the number as a result obtained in a certain study. So we had to keep monitoring distributors because of that and that was a lot of work to do.

Q. Okay. So when you say, "If they don't, I will be just grateful," it was because you didn't want to go through the process of reporting back to the FDA again about this potential issue?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: Yes, it is time consuming, so I didn't want to -- I hope not be asked again.

BY MR. FASANO:

Q. Because your answer would have been the same, that you are allowed to -- that you are allowed to report one study as being 100 percent, but you can't take that out of context and extrapolate it into all studies, correct?

A. Not necessarily, because that was not the issue

Page 163

here. I was already monitoring the distributors. I was asking any distributor that was not making proper claims and the sensitivity and specificity was not the only wrong claims. There were other -- they were making more mistakes than just specificity and sensitivity. That was just one issue, not the only issue.

So I was already working with the distributors and having to monitor and have to repeat myself over and over again to keep the claims, to keep the promoting material, to -- to keep the claims as it was authorized in the emergency use authorization. And I didn't want to -- for the FDA to again have to come back to me say you are not doing it properly.

Q. Okay.

MR. FASANO: Can we go back to the previous exhibit for just one minute?

BY MR. FASANO:

Q. There was something I wanted to ask you about that I didn't. And I apologize.

Okay. So on this first page, you use a phrase, "The comparison is basically bananas to banana smoothie." In the context of that e-mail, what does that mean?

A. I don't remember what was -- I was referring exactly, but it was just because -- I was probably

Page 164

referring to people taking things out of context and not being able to make the correct comparisons or to be able to discuss things as they were and a lot of people were just confused about specifications and claims and what they could or could not do. I believe that was my -- my -- my statement, but I don't remember exactly what I was referring to bananas and banana smoothie.

Q. Oh, okay.

A. It makes sense at the time, but I don't recall exactly what was the reference.

Q. You know, I had another case where I was wondering for months what that meant and I was waiting to ask the question and the person did not remember and I remember exactly what the phrase was. So I sometimes end up disappointed at the end of these questions where I ask people what they meant. So it's okay. Let's move on.

MR. FASANO: You can take that down, Owen.

THE WITNESS: It's the kind of thing that makes sense at the time, but then you don't remember anymore what it was.

BY MR. FASANO:

Q. Right. The other one that I remember was they were talking about a conversation they had in the San-Tropez and I made it into this big spy thriller

Page 165

novel in my head and -- totally forgot.

So, anyway, are you familiar with the -- with Co-Diagnostics' tests being -- with distributors canceling the use of -- of Co-Diagnostics in certain jurisdictions?

A. No.

Q. Okay. That wasn't something that you were involved with?

A. Not that I know of.

Q. Okay. So, for example, you know, were you involved with the state of Tennessee's independent testing of the Co-Diagnostics COVID-19 diagnostic test?

A. Not that I remember.

Q. Okay. Did you ever interact with an entity called test Utah?

A. Not directly, no. I was involved in some discussions they had, but -- like in -- I was like -- I was not in sales, so I just talked to customers where customers had a regulatory question or needed regulatory support, but I never interacted with Test Utah.

Q. Okay. What about Test Nebraska, would it be the same answer?

A. Yes, I never interacted with them.

Q. Okay. Any -- did you ever deal with any other state testing authorities or their -- or their outcomes

42 (Pages 162 - 165)

Page 166

when they did validation studies of tests?

A. No. No.

Q. Okay.

MR. FASANO: Let's go to tab 27, Owen.

(Cecilia Hutchins' Exhibit 16 was marked for identification.)

BY MR. FASANO:

Q. Okay. What I'm showing you now is just we'll call it --

MR. FASANO: Owen, what exhibit are we up to?

MR. BADIN: 16.

MR. FASANO: All right.

BY MR. FASANO:

Q. So this will be --

MR. FASANO: Oh, wow. Look, you were able to label it Hutchins' 16. Fantastic. Anyway, I never would have figured it out.

BY MR. FASANO:

Q. So, anyway, what I am showing you now is an abstract of a study -- a scientific study that was done relating to some testing around about -- that was released around about March 26, 2022. It's just the abstract. I'm just going to ask you about the abstract, go through it and then I'll ask you one or two questions.

Page 167

A. Yes.

Q. Okay. So I just -- are you familiar with or have you ever seen this study before?

A. No.

Q. Okay. Well, I just want to go to the -- to the materials and methods. It says, "204 nasopharyngeal samples were collected from participants aged greater than 18 years at the Baruch Padeh Medical Center in Poriya, Israel between" -- I'm sorry if I am pronouncing that incorrectly, but I'm sure I am -- "between June and August 2020. Samples were tested by," and you see a number of different -- a number of different companies, including the Co-Diagnostics Logix Smart Coronavirus Disease 2019, COVID-19, test kit; do you see that?

A. Yes.

Q. Okay. And it says that -- in the results, the Xpert Xpress SARS-CoV-2 test and Logix Smart COVID-19 kit had the highest 91.2 percent and the lowest 74.5 percent sensitivity respectively; do you see that?

A. Yes.

Q. Do you -- without having the full study in front of you, and I'm not going to ask you to read the full study in your deposition, do you have any understanding of why Co-Diagnostics' sensitivity would be only 74.5 percent in an evaluation like this with

Page 168

other tests?

A. I would never make any statement without reading the whole study.

Q. Okay. I -- I could show you the study, but I have a feeling that we would be here until really late. So we'll just move on from that for now.

A. It is -- it's impossible to make any conclusion without reading the whole study.

Q. Okay. And you -- but just to be clear, you were not -- you were not, before today, familiar with this -- with that study ever occurred?

A. No.

Q. Okay. Let's go to tab 28.

(Cecilia Hutchins' Exhibit 17 was marked for identification.)

BY MR. FASANO:

Q. Okay. Ms. Hutchins, you can read through this e-mail. I think this is again one of those separate chains that's part of a chain we looked at. But please familiarize yourself and let me know when you're ready.

A. Yeah, you can scroll.

Yeah. What's the question?

MR. FASANO: Okay. Can you go up to the top.

BY MR. FASANO:

Q. It's an e-mail from Cecilia Hutchins sent

Page 169

4/30/2020 to Andrew Benson and Chad Apuli. It says, "Forward: Paper." And you say, "Honestly, I'm concerned about Brent talking to the press about things he doesn't understand. I don't know about his academic curriculum, but I doubt he has a single analytical chemistry class -- he had a single analytical chemistry class in his whole life"; do you see that?

A. Yes.

Q. Okay. What did you -- what did you mean to convey in this e-mail?

A. That I thought that he didn't understand analytical chemistry pretty well. He knows a lot about PCR and -- and genetics, but I thought he lacked understanding of analytical chemistry.

Q. Okay. And what -- can you describe for me what analytical chemistry is, just so I understand what the field of analytical chemistry does?

A. It's understanding how to establish performance. Basically, it's understanding how to -- how to provide evidence following guidelines about performance.

Q. Okay. So you didn't think, based on this e-mail, that Brent Satterfield had the requisite knowledge to opine on the accuracy of COVID-19 tests; is that fair to say?

Veritext Legal Solutions
800-726-7007                                                305-376-8800

Page 170

MS. OSTLER: Objection --

THE WITNESS: No.

MS. OSTLER: -- mischaracterizes testimony.

Sorry, go ahead, Cecilia.

THE WITNESS: Sorry. No, it means that he could fall in a trap doing an interview talking about things that he would have difficult talking about on the semantics and he could have be misunderstood or misquoted easily.

BY MR. FASANO:

Q. Okay. And was there an example that you can think of in the St. Louis -- sorry, I do this all the time. I used to live in St. Louis, and I call it the St. Louis Tribune.

Is there anything in the Salt Lake Tribune article you can recall where -- where, I will use your words, where Mr. Satterfield got caught in a trap relating to analytical chemistry?

A. I don't remember the article. I just -- I just remember that that was one my feeling, but -- so I don't remember the article. I don't know -- I don't remember what was the problems and --

Q. Would -- okay. Would someone with a background in -- someone without a background in analytical chemistry have difficulty talking about specificity and

Page 171

sensitivity of diagnostic tests?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: Someone could have a hard time explaining things as they are and knowing the -- a lot of times, the problem is not being able to say what something is, but it's to say what something is not. So I would say that he wouldn't have -- without -- without more foundation, a better foundation, I would say, in analytical chemistry, he would have a hard time to explain things, what things are not, I would say.

BY MR. FASANO:

Q. When you say "what things are not," can you elaborate on that a little bit more or give me an example?

A. An example is saying that because you are claiming a result in a study, you can extrapolate generalized as a -- not as a single point in time in specific conditions, but then you would allow someone to generalize the hundred percent sensitivity and hundred percent specificity, for example.

Q. Do you believe that Mr. Satterfield made that mistake?

A. No, I don't think he made the mistake of saying that, but he could fall in a trap to say that he was

Page 172

stating something that he was not.

Q. Okay. So is it possible that Mr. Satterfield was unclear about 100 percent sensitivity and specificity meant in certain studies?

MS. OSTLER: Objection, incomplete hypothetical, calls for speculation.

THE WITNESS: I'm not going to be able to say, because I wasn't there during his interview.

BY MR. FASANO:

Q. Okay. What about the press release that was issued the following day?

MS. OSTLER: Same objections.

THE WITNESS: What do you mean?

BY MR. FASANO:

Q. What I mean was, is do you think that Mr. Satterfield, because of his inability -- his lack of ability in analytical chemistry, misstated or misstated the importance of the tests that were -- of the validation studies that were included in that -- in that press release?

MS. OSTLER: Objection, ambiguous, vague, lack of foundation, calls for speculation, assumes facts not in evidence.

THE WITNESS: I don't even know who wrote the press release. You are assuming that was Brent, but

Page 173

I don't know who wrote.

BY MR. FASANO:

Q. Okay. Can we maybe take five minutes off the record and then I should have like one or two more things to show and then we should be done.

A. Okay.

THE VIDEOGRAPHER: We will go off the record 5:54 p.m.

(Off the record.)

THE VIDEOGRAPHER: Back on the video record 6:02 p.m.

BY MR. FASANO:

Q. Okay. So, Ms. Hutchins, I'm going to show you the May 1st press release that was issued by Co-Diagnostics that we had been alluding to previously.

Okay. Now, I want you to read through it and then let me know when you're ready to answer some questions about it.

MR. FASANO: And, Owen, you might have to move the exhibit -- the exhibit tag.

MS. OSTLER: This copy of the press release did not include the linked information that was hyperlinked into the press release and part of it. We object to the use of an incomplete exhibit.

MR. FASANO: Okay. We'll -- I want to get it

44 (Pages 170 - 173)

| Page 174 | Page 176 |
|---|---|
| right, this one.  So let's go off the record and we'll go get the right version.<br><br>MS. OSTLER:  I have it.  Would you like me to e-mail it to you?<br><br>MR. FASANO:  Sure.  E-mail it to myself and Obadin, O-B-A-D-I-N, at Fasanolawfirm.com.<br><br>THE VIDEOGRAPHER:  We'll go off the record?<br><br>MR. FLOCH:  Michael, I have it.  I will give it to, Owen.<br><br>MR. FASANO:  Oh, you do?<br><br>MR. FLOCH:  Yeah.<br><br>MR. FASANO:  Oh, then Joni, don't worry.  Brandon, the other counsel for us, can do it.<br><br>MS. OSTLER:  Awesome.<br><br>THE VIDEOGRAPHER:  We staying on, Mr. Fasano?<br><br>MR. FASANO:  No, just stay off the record for now.<br><br>THE VIDEOGRAPHER:  Stay off.  I didn't go off yet.  Off 6:04 p.m.<br><br>(Off the record.)<br><br>THE VIDEOGRAPHER:  Back on the video record.  It's 6:07 p.m.<br><br>BY MR. FASANO:<br><br>Q.  All right.  Ms. Hutchins, I have now what is the version of the press release that is the file -- | BY MR. FASANO:<br><br>Q.  Yes.<br><br>A.  Yes, attachment.<br><br>Q.  This is the attachment of each of the validation reports.  So you have not the links, you actually have the documents attached to the exhibit itself.<br><br>MS. OSTLER:  I think you guys accidentally scrolled one page too far.<br><br>THE WITNESS:  No, this is good.<br><br>BY MR. FASANO:<br><br>Q.  Okay.<br><br>A.  Yeah, if you scroll down.<br><br>One more.  One more.  One more.<br><br>You want to scroll down, two more.<br><br>Yeah, you can move from the table.<br><br>You can move.  One more.<br><br>Can you scroll.<br><br>Okay.  Scroll down.<br><br>If you can scroll down.<br><br>You can scroll down one more time.<br><br>Is there another page?  I think maybe the one -- oh, okay.  If you scroll down one more time.<br><br>MR. BADIN:  There's the last page.<br><br>THE WITNESS:  Last page.  Okay.  You have any |
| **Page 175** | **Page 177** |
| they call it a file-stamped version.  You will see across the top that was filed in this lawsuit and I believe it's the accurate version that has the links.  So please scroll down and let me know when you're ready to read from it.<br><br>A.  Okay.  If you can scroll down.<br><br>MS. OSTLER:  Are you guys going to mark this as an exhibit?<br><br>MR. FASANO:  Yeah, we were.  It was -- the tag was going over some information, but.<br><br>MR. BADIN:  I'll upload it after we finish using this.<br><br>MR. FASANO:  Okay.  Perfect.  Thank you.<br><br>MS. OSTLER:  It will be Exhibit 19?<br><br>MR. FASANO:  Yeah, that's right.  I think that's right, yeah, lucky number 19.<br><br>(Cecilia Hutchins' Exhibit 18 was marked for identification.)<br><br>THE WITNESS:  Can you scroll down?<br><br>Yeah, I think the other is just like -- if you scroll down -- can you go -- I know -- go back.  If you go back one more -- I don't think there's any links in here, is it, or it's just the attachments?  If you want to scroll down.  Is there an attachment here? | questions?<br><br>BY MR. FASANO:<br><br>Q.  Yes, sorry.  Let me get back into position.<br><br>I wasn't sure how long it was going to take to read that one.<br><br>Okay.  So let's start with the title, "Co-Diagnostics, Inc., releases COVID-19 test performance data," colon, "consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations"; do you see that?<br><br>A.  Yes.<br><br>Q.  Now, how many independent evaluations were actually done that relate to the --<br><br>A.  So if you scroll to the -- the other -- if you go to the first page of the attachment -- no, go back.<br><br>So the thing is that I was not the one receiving the those independent evaluations.  So it was basically like the sales team taking the product to the places and to reference labs and to do the evaluations before we could even start registration or any discussion.<br><br>So, basically -- and many times, the only one that can apply for an evaluation is the company in the country, not really the manufacturer entity in -- in the U.S.  So those were evaluations were the ones that the |

Page 178

company received some independent evaluations. So by the time that the press release was made, those were the ones that were available.

We had many, and I'm not going to be able to remember when we received what, and a lot of time it's they were not a formal report, but those were the ones that were available by the time of the press release, I would say.

Q. Well, the -- so let me take a step back. You had no hand in drafting this -- this press release; is that fair to say?

A. No.

Q. Okay. Did you review it before it was sent out?

A. No.

Q. Okay. Did anyone ask you to review it before it was sent out?

A. No.

Q. Okay. Let's go back up to the top. Isn't it potentially misleading to say that the Co-Diagnostics test consistently demonstrates 100 percent sensitivity and 100 percent specificity across independent evaluations?

MS. OSTLER: Objection, ambiguous, calls for a legal conclusion.

Page 179

THE WITNESS: I don't think so. That is just a matter of fact. It is just reporting a data point, as far as I understand.

BY MR. FASANO:

Q. But it doesn't say consistently demonstrates across X number of tests 100 percent sensitivity and 100 percent specificity, it says consistently; isn't that correct?

A. About -- because this press release is talking about those specific independent evaluations.

Q. Wait. But when you say --

A. So --

Q. -- it's consistent, isn't consistency where you can replicate it multiple times?

MS. OSTLER: Objection, incomplete hypothetical, calls for speculation.

THE WITNESS: No, because it's talking about those specific studies that is reported in this press release. That's my understanding.

BY MR. FASANO:

Q. Okay. So let's go down more into the body. It says, "Salt Lake City, Utah," dash --

MR. FASANO: No, go up on the first page, Owen.

BY MR. FASANO:

Q. It says, Salt Lake City, Utah - May 1, 2020 -

Page 180

Co-Diagnostics, Inc., NASDAQ CODX, the company, a molecular diagnostics company with a unique patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100 percent sensitivity and 100 percent specificity, the metrics used to define accuracy in molecular diagnostic testing; do you see that?

A. Yes.

Q. It says that it released test performance data, but it doesn't say it released test performance data in just a few number of tests, does it?

MS. OSTLER: Objection, misrepresents the full document.

THE WITNESS: Yes, you are taking one paragraph of a whole document.

BY MR. FASANO:

Q. Okay.

A. So I don't know. A person that is reading a document, that's just the first paragraph.

Q. Okay. But in the first paragraph, it could have been more accurate if you would have said, demonstrates 100 percent sensitivity and 100 percent specificity in blank number of tests, that would make it more accurate, wouldn't it?

MS. OSTLER: Objection, ambiguous, calls for

Page 181

legal conclusion, lack of foundation.

THE WITNESS: It could be -- that could be your opinion, but not necessarily everybody's opinion.

BY MR. FASANO:

Q. Okay. Let's go down to the second page.

MR. FASANO: We need to go up one more. Sorry, Owen, I think it's my fault. I can't read my own document, because I'm -- okay.

Okay. We need to go back up to the first page.

BY MR. FASANO:

Q. So in the last paragraph of the first page, it says, "In remarking on the test's favorable limit of detection results in the evaluations, Brent Satterfield, Ph.D., said, 'In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and'" --

MR. FASANO: Go to the next page.

BY MR. FASANO:

Q. -- "specificity, but is not relevant as a standalone data point. Other metrics that are important are availability, ease of use and throughout. In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity and you can't do better than that."

46 (Pages 178 - 181)

Page 182

Is that a true statement, Ms. Hutchins?

A. I would say based on the information that we had at that point, I don't remember having anything that could go against that.

Q. Well, wasn't your EUA authorization 99.52 percent specific?

A. You are talking about something else.

Q. What's different from the validation study that was done for the EUA authorization versus other validation studies?

A. He's talking about like the clinical sensitivity that was done with -- against other methods across those independent studies. He was not talking about like the performance we have in the -- in the EUA. He was talking about the clinical sensitivity that it was done across those independent studies. I don't think he was talking about the sensitivity and specificity -- the sensitivity and specificity we got with the EUA. He was talking about field information, feedback from the customers, that's my understanding.

Q. Is it your position that in the field -- well, didn't we look at some field data that showed that there were -- that there was less than 100 percent sensitivity and specificity?

A. I don't remember from where. Like you are

Page 183

talking about the study from -- from India that was performed with another test that was manufacture -- excuse me.

THE WITNESS: Could you please go downstairs.

So he was talking about -- you were talking about another -- like the study was made in India with another product, even though like -- the thing is that that study -- there's not anything on that result that could say that I could compare that result with my product.

BY MR. FASANO:

Q. So when it says, "Consistently and repeatedly achieved 100 percent clinical sensitivity," doesn't that go against what the FDA recommended -- not recommended, required of Co-Diagnostics, which was to not say things like that?

A. If it would, the FDA would have asked me to retrieve this PR or redact it or review it or make any changes, which has not -- has not happened, as far as I can remember.

Q. Your position is that if the FDA took umbrage or took issue with this press release, it would have informed you?

A. Yes.

Q. But since it didn't, it has implicitly approved

Page 184

this press release?

A. I would say that they came to the same conclusion that I made, that we were talking about reporting results that came from the field, just that.

Q. Now, were you talking about all the reports that ever came from the field or were you talking about just the reports --

A. No, no.

Q. Well, what about the phrase "and you can't do better than that," doesn't that imply perfection, "you can't do better than that"?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: I don't know.

BY MR. FASANO:

Q. Well, if -- I'm asking you just as a person now, not as a pharmacist, not as a scientist, just as a person when someone says, Hey, you can't do better than this, doesn't that imply perfection or the top ability for something to work?

MS. OSTLER: Objection, incomplete hypothetical, ambiguous.

THE WITNESS: It may -- it tells me that the person that makes a product is telling me that the product is good. But I can only make sure that the product is good after I do my evaluation.

Page 185

BY MR. FASANO:

Q. So you can't do better than that, in your opinion, is a statement that the product is a good product?

A. Yeah --

MS. OSTLER: Objection, it's out of context.

BY MR. FASANO:

Q. Okay. You can answer.

A. For me, it means that Brent is saying that the product has a good quality.

Q. Okay. But he didn't say that the test was high quality. He said you can't do better than the results that they were -- than these results; is that fair to say?

MS. OSTLER: Objection, misstates what the press release says. You're taking that snippet of a phrase out of the context of the full sentence.

MR. FASANO: That's okay.

THE WITNESS: Yeah. No, I don't agree with you. It means -- for me, it means that he is happy with the results that came from the field.

BY MR. FASANO:

Q. So before you said it meant that it was a good test, now you say it means that it was -- he was happy with the results that came from the field, which one do

47 (Pages 182 - 185)

Page 186

you want it to be?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: Because he is saying that he got good -- he got good results from the field as a feedback and he is happy with that. He is happy to report the good results that we received up to that point.

BY MR. FASANO:

Q. Okay. You said that there were informal validation studies that were done; do you remember that?

A. Sorry, I couldn't --

Q. Do you remember saying that there were informal validation studies that were done?

A. What do you mean by "informal validations"?

Q. I'm asking you. I thought that you had said that there were informal validations that were done by Co-Diagnostics relating to the accuracy of its test. If that's not what you said, then -- then I can't ask you about it.

A. No, that's not what I meant.

Q. Okay. What did you mean then if you -- if you know what I mean?

MS. OSTLER: Objection, vague.

MR. FASANO: Sure.

THE WITNESS: Yeah, so there is no informal

Page 187

validations which we have as proof of concept or initial -- initial studies. I don't think I used the word "informal validation."

BY MR. FASANO:

Q. Okay.

A. You may have understood that, but that's not what I meant.

Q. Okay. Well, in any validation study that you can remember, did the Co-Diagnostics COVID-19 test perform less than 100 percent in specificity and accuracy?

A. First thing, I don't remember specific results. We did many, many, many, many studies, many, in different conditions, in different situations. And we had just discussed about the EUA that was 99.52 and 100 with specificity, with the 99.52 for sensitivity. So, yes, I do have one at least less than a hundred percent.

Q. I showed you Chad Apuli did a test at the lab for Co-Diagnostics where there were at least some fault -- there was some -- there was either some false positives or false negatives; do you remember that?

A. Sorry, what?

Q. Do you remember that I showed you a document previously where Chad Apuli reported less than 100 percent sensitivity in a lab test of the

Page 188

Co-Diagnostics COVID-19 CoPrimer test?

MS. OSTLER: Objection, misstates witness' prior testimony and the evidence.

THE WITNESS: Yeah, you are being very vague coming back after we saw many reports with positives and negatives. So I don't know which one you are talking about.

BY MR. FASANO:

Q. Okay. But it's fair to say that over the course of today, we've seen -- we've seen examples where the test has not performed perfectly?

A. Yeah, as in different conditions, you are going to have different results.

Q. And you know from working with the test for years, that the test did not perform perfectly in all situations, correct?

MS. OSTLER: Objection, ambiguous, vague.

THE WITNESS: Yeah, because there's no such thing as an in vitro diagnostics that performs 100 percent in all situations, as we have discussed many times, including with the FDA statements.

BY MR. FASANO:

Q. Okay. And you don't think the words such as "consistently" and "repeatedly" imply that in all situations or in a majority of situations that the test

Page 189

is perfect?

A. No, because you are taking it out of context.

Q. And why am I taking it out of context?

A. Because we have never said that it was consistently in all situations. We just said that was across these independent studies.

Q. So in order for this press release to be misleading, it would have had to use the word "all," that's the only way it would have been misleading to you?

MS. OSTLER: Objection, calls for a legal conclusion, ambiguous.

THE WITNESS: Just the word "all" doesn't mean much. Like -- I would have to see it, like I wouldn't make this --

BY MR. FASANO:

Q. Okay.

A. No, I don't agree with you.

Q. Okay. Do you think that Mr. Satterfield was qualified to make this statement to the public based on his knowledge of analytical chemistry?

MS. OSTLER: Objection, lack of foundation, ambiguous.

THE WITNESS: I cannot like -- I'm not the one to evaluate the chief scientific officer. So I had

48 (Pages 186 - 189)

Page 190

an opinion of -- about this analytical chemistry foundations, but as I -- but as I said before, just because I think he would be easy prey in an interview with someone trying to take his words out of context.

BY MR. FASANO:

Q. Okay. But you think that he would -- that his knowledge was appropriate for a controlled environment like a press release; is that your testimony?

MS. OSTLER: Objection, lacks foundation, ambiguous, vague.

THE WITNESS: That was not my role, to evaluate his -- he was the chief scientific officer, so I assume he knew -- he can talk for the company.

BY MR. FASANO:

Q. Okay. Would you have said what Mr. Satterfield was trying to get across in the same way or would you have said it differently?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: I don't have all of the information. I was not involved in the process. I did not talk to Salt Lake Tribune. I am not the one talking to investors. So I don't think I would have all of the information in order to make a better decision for the company. Like, I'm just responsible for the regulatory compliance, as far as claims, and

Page 191

so I don't have all pieces of information to make a decision that level for the company.

BY MR. FASANO:

Q. Do you believe that you should have been consulted prior to this press release being sent out to the public?

A. I could, yes, I believe I should have. That's why we make the changes later, that it was mandatory I was reviewing press releases, but at that point was not something that I was involved in, all press releases.

Q. But didn't you and the company tell the FDA prior to this date that you would be involved in reviewing all press releases?

A. I don't remember when that decision was made, but I'm sure that after we assumed the commitment -- after the company committed with the FDA for me to review all press releases, I did review all of them, but I -- prior -- but at that point, I was -- like we didn't have the commitment with the FDA. I don't remember when the commitment was made.

Q. Okay. Let me -- are you aware of a joint validation study that the State of Utah asked Co-Diagnostics to participate in?

A. A joint validation with the State of Utah?

Q. A joint validation study with different -- with

Page 192

different test makers conducted with the State of Utah, do you recall that?

A. I believe we had a joint validation with Nomi, but I don't remember more, more validations.

Q. Okay. Do you recall any results from Iowa labs -- well, let me rephrase that, from labs in the state of Iowa, their results relating to Co-Diagnostics's tests?

A. I remember discussing the Iowa testing, but I don't remember details.

Q. Okay. Do you remember how the tests performed in Iowa or what your -- what your role was in responding?

A. No, I don't remember.

Q. Okay. Now, let me circle back. Your counsel had made an objection previously --

MR. FASANO: Owen, you can take that down, if you want to.

BY MR. FASANO:

Q. We had -- your counsel made an objection previously to speaking about the details of certain matters relating to the deposition or interview that you did with the federal Securities and Exchange Commission. Your counsel was nice enough to confer with me and to withdraw that objection. So I'm just going to ask you some additional questions about that that I was going to

Page 193

ask you before.

So who did you meet with to discuss -- who from the SEC, if you remember, did you meet with to do an interview?

A. I don't remember her name and I don't remember even what was her position, but, yeah, it was just -- she was just -- it was like the deposition today.

Q. Was it -- was it a deposition where the stenographer took everything down and there were lawyers there and things like that or was it more informal?

A. It was formal with the lawyer, with the taking all the deposition, going on and off record, this kind of thing, yeah.

Q. Oh, okay. So been through this before, as you said.

Remember any of the questions that they asked you?

A. No, but it was a lot of about -- discussion about performance data, submissions, regulatory approvals and claims and this kind of thing.

Q. Okay. Did -- did the topic of Nomi Health come up at all?

A. I believe so.

Q. Okay. And do you recall the context in which Nomi Health was raised?

49 (Pages 190 - 193)

Page 194

A. It was discussing how the process were, what of -- like the relationships or responsibilities and -- I wasn't the sales. So I had some contact with Nomi, but not much. So it was based on my interactions with Nomi. I don't remember properly. It's been --

Q. Did they ask --

A. It's been like more than a year.

Q. Did they ask you about any topics I haven't covered with you today?

A. If they ask a topics that we haven't covered today?

Q. Yes.

A. I don't remember.

Q. Did they ask about --

A. Sorry.

Q. No, go ahead, please.

A. No. We discussed about the same things. It could have been more into the performance, more into the understanding of in vitro diagnostics or intended use, indications for use, things like that.

Q. Okay. Did they -- did they discuss the May 1st press release with you?

A. Yes.

Q. Did they discuss any other press releases with you by Co-Diagnostics?

Page 195

A. I believe so, but I don't remember which ones. I don't -- I don't even remember how many.

Q. Okay. I'm getting to the end, I promise.

MS. OSTLER: I -- if you're done asking about the SEC, I just wanted to ask for the record that those portions and her responses to those questions be marked highly confidential under the protective order.

MR. FASANO: We'll -- we'll reserve as to -- as to whether we oppose highly confidential for now. I'm not saying no, I'm just saying I would like to look at the protective order to make sure that we are okay with highly confidential, but for the moment, let's just continue and your statement is noted on the record, of course.

BY MR. FASANO:

Q. Let's -- do you know what -- did you get a sense of what the focus of the SEC investigation or what --

A. No, I don't really --

MS. OSTLER: Michael, sorry, I think it's when you lean back, you sort of fuzz out and I couldn't hear.

MR. FASANO: Oh.

MS. OSTLER: I heard the first part of your

Page 196

question, but then the second part --

BY MR. FASANO:

Q. Do you have any sense of what the focus of the SEC's investigation was?

MS. OSTLER: Objection, vague.

THE WITNESS: No, I didn't have the information about what were the -- I don't -- I didn't have -- I don't believe I had a lot of information about what they were investigating exactly.

BY MR. FASANO:

Q. Okay. Give me two minutes to review my notes and I may be done, finally, and we'll -- just give me two minutes off the record and then I will come back on and if I have any follow-up questions, I will let you know, okay?

A. Okay.

THE VIDEOGRAPHER: Okay. We will go off the record at 6:47 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record 6:51 p.m.

BY MR. FASANO:

Q. Okay. Ms. Hutchins, I want to thank you for being so professional. I want to thank you for your time today. I have no further questions of you at this

Page 197

time. If your counsel does, I will pass the witness and, again, I cannot emphasize enough, you are not a party to this litigation, thank you very much for your time and for being extremely professional with me here today. I know this is not easy.

A. Thank you.

CROSS-EXAMINATION

BY MS. OSTLER:

Q. Cecilia, I just have one question for you. Earlier I believe you testified that you were reviewing certain statements for what was legally allowed -- what you were legally allowed to claim for a product; does that sound familiar from earlier?

When you say what was legally allowed, what legal requirements were you referencing?

A. I'm referencing for claims that -- so because in the regulatory environment, for medical devices, each country or each jurisdiction is going to allow you to make certain claims, depending on the set of rules that you follow to make the registration in certain jurisdiction. So marketing claims are regulated in the U.S. by the FDA. So the set -- there's a set of rules that, as a manufacturer for in vitro diagnostics, Co-Diagnostics had to follow in order to market products in the -- in the U.S.

50 (Pages 194 - 197)

Page 198

So when I'm saying legally authorized to make to market or to make claims is according to the regulation for emergency use authorization for the FDA.

Q.  Thank you.  No further questions.

MR. FASANO:  All right.  Well -- or do you want to waive your right to your deposition, meaning you can get a copy of your deposition, read it and then, you know, there's a thing called an errata sheet where you can change certain things, based on your counsel -- you know, you can discuss that with your counsel or you can waive that right.  If you want to discuss that with your counsel or your counsel wants to answer for you, please go ahead and do it now.

MS. OSTLER:  We would like to review and sign please.

MR. FASANO:  Okay.  Perfect.  Then that's that.

THE VIDEOGRAPHER:  Okay.  We will go off the video record 6:54 p.m.

(The deposition was concluded at approximately 6:55 p.m.  Signature and formalities were not waived.)

Page 199

CERTIFICATE

STATE OF FLORIDA        :
COUNTY  OF  MIAMI-DADE :

I, the undersigned authority, certify that CECILIA HUTCHINS personally appeared before me on April 10, 2023, and was duly sworn.

WITNESS my hand and official seal this 26th day of April, 2023.

*Lilly Villaverde*

Lilly Villaverde
Registered Professional Reporter
My Commission HH016865
Expires July 23, 2024

Page 200

CERTIFICATE

STATE OF FLORIDA        :
COUNTY  OF  MIAMI-DADE  :

I, Lilly Villaverde, RPR, a Notary Public in and for the State of Florida at Large, hereby certify that I reported the deposition of CECILIA HUTCHINS; and that the foregoing pages constitute a true and correct transcription of my shorthand report of the deposition by said witness on this date.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action nor financially interested in the action.

WITNESS my hand and official seal in the State of Florida, this 26th day of April, 2023.

*Lilly Villaverde*

Lilly Villaverde
Registered Professional Reporter
My Commission HH016865
Expires July 23, 2024

Page 201

VERITEXT LEGAL
One Biscayne Tower, Suite 2250
2 South Biscayne Boulevard
Miami, Florida 33131
305-376-8800

April 26th, 2023
CECILIA HUTCHINS
c/o JONI OSTLER, ESQUIRE
101 South 200 East Suite 700
Salt Lake City, UT 84111
RE:        GELT TRADING, LTD., a Cayman Islands limited company v CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD
DEPO OF:        CECILIA HUTCHINS
TAKEN:        April 10, 2023

Dear JONI OSTLER, ESQUIRE,

With reference to the deposition of CECILIA HUTCHINS taken on April 10, 2023 in connection with the above-captioned case, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please have your client read the transcript and complete the errata page.  Upon completion, please send the signed errata to our office at Two South Biscayne Blvd., Ste. 2250, Miami, FL, 33131, or email it to litsup-fla@veritext.com.

If this is not taken care of, however, within the next 30 days, we shall conclude that the reading and signing of the deposition has been waived and the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court without further notice.

Sincerely,

Production Department
Veritext Florida

51 (Pages 198 - 201)

Page 202

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

Page-line    Should read    Reason for change

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____

Witness signature                    Date

52 (Page 202)

**[& - 19]**  Page 203

| & | | | |
|---|---|---|---|
| **&**  2:9 6:3 | 131:7,7,21,22 | **102**  3:12 | 160:20 |

**0**

**0**  97:4
**0.98**  97:9
**0.99**  97:8
**0.99.**  97:9
**00368**  1:2
**0038**  5:16

**1**

**1**  3:8 5:11 87:16
87:17 97:8
111:2 156:17
179:25
**10**  1:14 3:17 5:2
129:16 133:25
134:1 199:7
201:10,13
**100**  4:10,11 25:2
53:15,20,24
54:1 59:22,22
60:9,15,15
61:24,25 97:8
98:3,20,22 99:1
99:5,6,6,12,13
99:13,20 107:8
107:8 108:24
114:24 115:3,8
116:5,10,19
117:2,14,19
124:13,18
127:14 128:1,2
129:14,18,18
130:9,9,17,17

131:7,7,21,22
137:20,23
138:10,15 141:7
141:7,15,16
142:3,3,9,10
143:9,9,11,13
145:10,10,13,15
145:15,17,17,23
146:2,3,10,10
146:14,15 147:1
147:1,2,3,23,24
148:2,9,12
149:1,2,4,12,12
149:17,17,21,21
152:23,24
153:22,22,24
154:4,4 155:18
155:19 156:6,7
156:13,14,18,19
156:22,22 157:7
157:8,24 158:1
158:4,5,24
159:1,2,9,9
161:23,24
162:22 172:3
177:9,9 178:21
178:22 179:6,7
180:5,5,22,22
181:24 182:23
183:13 187:10
187:15,25
188:20
**101**  2:15 201:5
**10111**  2:20

**102**  3:12
**102876-102878**
3:18
**102883-102885**
3:20
**109**  3:13
**10th**  35:20 36:8
36:12
**11**  3:18 104:12
139:22,24
140:15 145:3
**113**  3:14
**1168-1169**  3:17
**11:03**  1:15 5:2
**11:11**  10:9
**11:52**  51:10
**12**  3:19 118:1,4
139:22 144:2
151:9
**120**  97:3
**122**  3:15
**128**  3:16
**12:00**  85:7,8
**12:33**  48:14
**12:38**  51:7
**13**  3:20 150:16
150:17,21
**134**  3:17
**1353-1356**  4:4
**139**  3:18
**14**  3:21 128:9
130:22 155:1
**144**  3:19
**15**  4:4 58:22,22
155:11 159:21

160:20
**150**  3:20
**155**  3:21
**159**  4:4
**15th**  157:5
**16**  4:5 166:5,11
166:16
**166**  4:5
**168**  4:8
**17**  4:8 133:24
168:14
**175**  4:9
**18**  4:9 167:8
175:17
**19**  4:6,9 22:14
22:17 23:1,7,7
23:19 24:1 29:3
31:6 32:20 33:4
33:18 34:17
35:18 36:16
41:23 56:17
58:20 64:8
77:10 88:11
102:12 111:13
111:13 119:17
120:18 127:13
135:7 136:18
139:21 140:22
145:11 155:15
160:23 165:12
167:14,17
169:24 175:14
175:16 177:7
180:4 187:9
188:1

**[197 - 87]**                                                      Page 204

**197** 3:4
**1:53** 85:6
**1:55** 86:15,18
**1st** 173:14
  194:21

**2**

**2** 2:4,10 3:9
  47:21,22 59:1
  90:18,19 114:8
  118:3 124:9
  167:17 201:2
**20** 95:23 98:5
**200** 2:15 201:5
**201703-201704**
  4:8
**2018** 14:11,11
  16:5,8 17:13
**2019** 105:11
  111:6,12 140:21
  167:14
**2020** 18:20
  68:23 88:20
  89:15 92:17
  95:23 98:5
  100:12 102:10
  104:12 105:10
  111:2 114:8
  118:3 124:9
  130:22 140:16
  145:3 151:9
  155:12 156:18
  160:21 167:11
  179:25
**2021** 14:13 21:1

**2022** 14:18
  166:22
**2023** 1:14 5:2
  199:7,9 200:16
  201:4,10,13
**2024** 199:15
  200:21
**204** 167:6
**21** 144:1
**22** 150:13,17
**2250** 201:1,17
**23** 154:24
  199:15 200:21
**238** 97:4
**24** 159:20
**24th** 102:18
**25** 100:12 102:9
**2530** 2:4,10
**26** 105:10
  166:22
**26th** 199:8
  200:16 201:4
**27** 166:4
**28** 168:13
**2:00** 86:1 123:3
**2:20** 1:2 5:16
  94:20
**2:53** 105:22

**3**

**3** 3:10 59:2 94:4
  94:5,6,7,23,24
**30** 201:19
**300,000** 100:16
**305-376-8800**
  201:3

**30th** 68:23
  134:11,16
**31st** 36:11
**3309** 199:11
  200:19
**33131** 2:5,11
  201:2,17
**3:28** 123:12

**4**

**4** 3:11 88:20
  94:22,23 99:23
  99:24 157:22
**4/30/2020** 169:1
**45** 2:19
**4513-4514** 3:14
**48** 96:9,14
**4:00** 123:3
**4:05** 123:15
**4th** 89:15

**5**

**5** 3:12 102:23,24
  102:25 116:12
  117:6,21
**5/12/2020**
  153:16
**5515-5517** 3:21
**5:15** 154:20
**5:16** 154:23
**5:54** 173:8
**5th** 92:17

**6**

**6** 3:13 109:17,18
**631** 145:13
  146:1

**6:02** 173:11
**6:04** 174:19
**6:07** 174:22
**6:47** 196:18
**6:51** 196:21
**6:54** 198:18
**6:55** 1:15
  198:20

**7**

**7** 3:4,14 113:22
  113:23
**700** 2:15 201:5
**73713-73715**
  3:10
**74.5** 167:19,25
**7437-7438** 3:15
**75250-75252**
  3:16
**79338** 3:10
**79448-79451**
  3:11
**79449** 100:10
**79770-79772**
  3:13

**8**

**8** 3:15 122:7
**80712-80716**
  3:9
**84111** 2:16
  201:6
**86671-86673**
  3:19
**87** 3:8

**[88 - agreement]**

Page 205

**88** 115:1,5 118:1
**89645-89652**
3:12

**9**

**9** 3:16 128:9,11
**9.35** 129:16
**90** 3:9
**91.2** 167:18
**94** 3:10
**95** 51:24 52:9,13
58:14 59:14,15
98:10 99:18,19
117:11,18
**99** 3:11 58:23,24
59:1,1
**99.17** 97:7,11
**99.52** 137:19,23
138:14 145:12
145:23 148:1
182:6 187:15,16
**9th** 36:8

**a**

**a.m.** 1:15 5:2
10:9 51:10
**abiding** 133:14
**ability** 10:25
60:11 84:23
172:17 184:18
**able** 18:8,15
20:3,5 26:17
27:2 33:10 34:9
41:4,5 45:15
46:8,12,22
53:12 59:9,13

59:15 62:24
63:2,8 64:18,20
64:25 83:16
84:13 88:13
104:25 105:2
108:19,21 109:4
109:11,15
111:14 121:25
142:13,20
143:10 156:20
164:2,2 166:15
171:5 172:7
178:4
**above** 1:22
89:14 201:13
**absolute** 11:6
**abstract** 166:20
166:23,23
**academic** 169:4
**acceptance**
98:11
**accepted** 15:17
98:11
**accidentally**
82:17,19 176:8
**accompanying**
91:2
**accuracy** 42:20
44:10 58:24
77:10 95:24
96:7,12,19 97:8
98:1,6 138:14
169:24 180:6
186:17 187:11

**accurate** 44:9
44:13 52:22
53:15,20 107:8
107:19 145:20
147:25 148:2
149:1,3,4 159:9
175:3 180:21,24
**accurately**
10:19 11:1
**achieved** 43:21
181:23 183:13
**action** 18:11
105:3 200:14,14
**actions** 19:3,4,6
**actor** 86:23
**actually** 17:2
61:11 111:19
115:14,15
137:25 156:10
156:11 176:6
177:13
**adapt** 34:2,19
**add** 95:25
136:12
**added** 17:20
**additional**
110:20 192:25
**additions** 132:4
**address** 140:19
**addressing**
153:18
**adjustments**
125:21,22
**administration**
140:15

**admonishing**
149:20
**advertising**
141:22 142:2
143:4
**advised** 201:13
**affairs** 14:4,15
16:9 17:15,17
17:19 19:6
110:7 133:13
140:18 144:10
145:3
**affect** 4:5
**afraid** 106:7
155:21,24 156:4
**afternoon** 85:16
**aged** 167:7
**agencies** 136:23
**agency** 15:6
16:15 41:8,13
143:21
**ago** 20:4 57:14
71:6 109:8
131:4 138:8
**agree** 5:9 9:15
27:24 89:17
90:9 92:15
99:15 116:15,18
116:18 117:5
124:17 127:11
153:24 185:19
189:18
**agreed** 131:6
**agreement**
26:18,25

**ahead** 44:25 60:25 62:6 65:5 66:3 93:12 121:10 132:24 157:11 159:15 170:4 194:16 198:13

**air** 20:14

**airports** 100:17

**al** 5:14

**alcohol** 10:24

**allegation** 80:15 140:25

**allegations** 140:24

**allow** 8:23,24 171:19 197:18

**allowed** 13:4 93:21,22 133:22 147:12,23 152:18 158:4 162:21,21 197:11,12,14

**alluding** 173:15

**altogether** 49:22

**ambiguous** 62:4 112:12 116:22 119:6,14 120:12 121:9 135:21 147:6 162:16 172:21 178:24 180:25 184:21 188:17 189:12 189:23 190:10

**america** 118:9 120:21

**amount** 25:25 26:14 45:24 46:4 47:7 48:2 53:13 102:10,14

**analysis** 25:23 26:5 27:21 43:7 44:19

**analyst** 13:22,25 13:25 15:1,2,12 15:16

**analyte** 52:8,10 117:12

**analytical** 15:9 169:5,6,12,14 169:16,17 170:18,24 171:9 172:17 189:21 190:1

**andrew** 70:3 72:1,5 75:7 88:20 89:17 90:9 91:23 100:11 110:15 110:16 111:3 129:1,4,8 155:13 160:21 169:1

**announced** 36:10

**answer** 8:20,25 9:14,16,20,21 9:21 11:9 19:23 21:13 27:17

33:21 35:16 39:19 42:2,15 69:6 76:25 79:18 80:1,5,11 80:20 83:15 120:14 130:25 133:12 154:11 161:2,3 162:20 165:22 173:17 185:8 198:13

**answered** 32:21 93:11

**answers** 35:13 111:24

**anymore** 12:8 109:9 124:3 164:21

**anyway** 9:14 102:1,2 165:2 166:16,19

**apologize** 35:15 38:16 53:2 102:24 134:6 163:19

**appearances** 2:1 5:21

**appeared** 30:18 199:6

**apples** 118:19 118:19

**application** 100:21 101:3 130:19

**applied** 14:7

**apply** 97:18 177:23

**applying** 44:1

**appreciate** 20:7 20:15 51:13

**approach** 74:18

**appropriate** 148:11 190:7

**approval** 43:21 44:2,4 137:1

**approvals** 93:25 136:10 193:20

**approve** 90:9 136:24 141:3

**approved** 31:12 38:22,23,23 89:5 93:1 94:2 98:23 152:2,4 153:9 183:25

**approximately** 198:19

**april** 1:14 5:2 18:14 68:23 114:8 118:3 124:9 130:22 134:11,16 199:7 199:9 200:16 201:4,10,13

**apuli** 77:1,3,9 91:23 95:22,24 96:10 98:19 114:9 117:24,24 124:11,11 134:11 136:15 151:10 153:17

**[apuli - back]**                                                        Page 207

169:1 187:18,24
**area** 73:12,14
**areas** 31:23
  73:23
**arrow** 95:12
**article** 4:5 36:8
  67:16,19,20,22
  67:24,24 68:7
  68:10,11,12,23
  69:3,13,16
  134:13,16,17
  135:5,7 136:9
  170:16,19,21
**asia** 125:14
  127:9
**asked** 18:10
  32:21 33:4
  45:13 58:18
  79:16 82:15
  93:11 121:19
  142:16 162:18
  183:17 191:22
  193:16
**asking** 11:7 12:1
  30:25 35:15
  50:24 61:21
  75:11 85:10
  90:2 141:14
  151:8,12 163:2
  184:15 186:15
  195:4
**aspect** 17:23
  35:11
**assays** 4:6

**assisting** 15:8
**assume** 10:13
  107:13 115:15
  190:13
**assumed** 191:15
**assumes** 55:25
  104:22 118:25
  120:11,12 121:8
  121:24 124:25
  172:22
**assuming** 131:1
  172:25
**assurance** 13:25
  14:3 15:12,18
  15:21,25
**asymptomatic**
  57:13 136:19,21
  137:11,14,16
**attached** 91:5
  100:22,24 176:6
**attachment**
  175:24 176:3,4
  177:15
**attachments**
  91:3,7 92:1
  175:23
**attempted**
  125:16
**attention** 30:13
  34:14 35:23
  36:1 56:9 65:23
  67:3,7 74:25
  140:21 144:24
**attorney** 200:11
  200:13 201:20

**audio** 5:8
**august** 167:11
**author** 68:14,17
  68:18 135:14,15
  136:1,2
**authorities**
  165:25
**authority** 199:5
**authorization**
  23:24 24:1,6,11
  24:19,25 25:19
  26:11,20,22
  29:16,19 36:22
  37:22,23 38:19
  39:16 43:24,24
  44:2 49:13
  93:14,19,24
  102:21 129:23
  129:25 130:5
  137:1,8 138:1,3
  138:6 139:15
  140:23 143:7
  145:25 147:8,10
  147:22 163:11
  182:5,9 198:3
**authorize** 27:2
**authorized** 27:9
  58:1 94:2
  130:15,16
  136:24 137:10
  137:10 139:19
  145:24 155:15
  160:23 163:10
  198:1

**authorizes**
  27:15 58:5
**authors** 135:11
**availability**
  181:21
**available** 36:13
  126:10 127:9
  130:20 178:3,7
**awaiting** 201:14
**award** 136:12
**aware** 16:25,25
  42:16 65:21
  78:11,20,22
  118:3 191:21
**awesome** 21:14
  174:14

**b**

**b** 3:7 4:2 75:1,1
  174:6
**back** 10:8,11
  38:12 48:13
  51:2,9,12 59:21
  61:23 64:10
  65:14 66:11,22
  66:24 79:23
  86:10,17 91:5
  91:20 94:19
  105:6,22 110:25
  123:3,14,17
  140:3 142:17
  154:22 162:14
  163:12,15
  173:10 174:21
  175:21,22 177:3
  177:15 178:9,19

**[back - box]** Page 208

181:9 188:5 192:14 195:22 196:13,20

**background** 13:6 61:3,9,19 73:20 170:23,24

**backlog** 33:9

**backyard** 7:3

**bad** 61:22 89:12

**badin** 2:23 6:10 87:5,9,14 90:23 103:7,14,17 104:7 150:16 166:11 175:11 176:24

**baker** 2:19 6:6 84:8

**bakerlaw.com** 2:18

**banana** 163:21 164:7

**bananas** 163:21 164:7

**baruch** 167:8

**based** 34:15 62:2,17 65:22 67:13 79:18,18 80:23 97:15 98:4 117:7 129:20,21,22 130:13,13,14,18 133:21 141:9,19 154:10 169:22 182:2 189:20 194:4 198:9

**basic** 24:19 42:3 42:6 107:2

**basically** 16:13 17:18 28:12 43:5,18 93:15 97:13 137:5 149:19 163:21 169:19 177:18 177:22

**basing** 130:25

**basis** 30:16

**batch** 58:22 139:3

**batches** 138:22

**bates** 3:8,9,10 3:11,12,13,14 3:15,16,17,18 3:19,20,21 4:4,8

**bathroom** 9:6

**beautiful** 7:4

**began** 22:14,18 23:2 32:20

**beginning** 23:7 105:7 142:19 157:22

**behalf** 2:11,20 6:4,5,7,8,20 70:2 73:25

**believe** 17:2 18:13 30:12 35:25 36:8 48:16 54:10 57:7 68:6 72:10 73:16 75:4,7,7 77:21 78:6

79:25 82:7 102:18 103:11 105:20 107:13 112:14 116:12 121:14,16 138:5 144:17 145:20 156:2,5,8,10,16 164:5 171:22 175:3 191:4,7 192:3 193:23 195:1 196:8 197:10

**bell** 84:16 116:12 117:4,5

**bells** 71:12

**benefits** 16:21

**benson** 1:10 70:3,7,10,14 72:1 88:20,23 88:23 89:16,17 91:23 92:3 100:11 101:10 102:3,6 110:16 110:16 111:3,16 155:13 160:21 169:1 201:9

**benson's** 92:15

**best** 86:23 100:23 101:8 105:14 108:2,14

**better** 28:12 49:19 102:2 108:22 122:14 171:8 181:25 184:10,11,17

185:2,12 190:23

**beyond** 23:16 30:5

**bfloch** 2:8

**big** 136:1 164:25

**bigger** 33:10 34:5

**binder** 128:10

**biocentury** 155:14 160:22

**biscayne** 2:4,10 201:1,2,16

**bit** 28:18 42:18 75:12 95:4 140:12 153:20 171:14

**blank** 180:23

**blasting** 89:11

**blind** 26:21

**blood** 45:25 47:14

**blvd** 201:17

**board** 89:4 117:2 127:19 128:6 154:1

**body** 89:5 179:21

**books** 139:10

**bothered** 68:19

**bottom** 151:9

**boulevard** 2:4 2:10 201:2

**box** 50:9,17

**brandon** 2:8 6:1 174:13
**brazil** 13:9,21 15:5 78:8
**break** 9:4,7 50:23 51:13 60:3 85:13,14 86:1,3,5,9 94:15 122:10,14,19,21 122:23,24 151:15 159:24 160:6,6
**breaks** 9:3,5
**breath** 111:19
**brent** 1:10 72:18 114:8 117:23 124:8 134:10 136:15 155:13 160:21 169:3,23 172:25 181:13 185:9 201:9
**brian** 140:14
**brief** 9:4 51:13
**briggs** 151:10 151:12 153:14 153:16
**bring** 65:13
**bringing** 33:11
**broad** 46:5
**brochure** 151:11,13,19 152:1,2,20,21 152:22 153:5,8

**brought** 56:8 74:24
**brown** 2:14 6:3 84:9
**build** 15:17
**building** 22:1 73:9 77:24
**bulk** 135:10
**bullet** 141:6,14 142:22
**bulletin** 145:1,6 150:5
**bullets** 145:9
**bunch** 8:19 68:20
**burn** 46:21
**burned** 47:3
**busier** 33:23
**business** 67:9
**buy** 26:12 44:21 132:9
**buying** 44:16
**buys** 131:17,18

**c**

**c** 2:2 7:14,14,14 13:21 84:18 199:1,1 200:1,1 201:5
**c&c** 92:6,9,13
**calculate** 97:15
**calculations** 97:13
**call** 90:18 94:5 99:22 128:9 137:5 152:21

166:9 170:13 175:1
**called** 6:20 13:21 40:16 120:1 129:2 165:15 198:8
**calls** 30:21 41:17,24 42:13 59:4 60:12,23 61:12 62:5 66:2 67:2,14 69:3,23 89:25 106:25 107:11,21 112:1 112:12 115:11 132:8,22 133:10 154:7 171:2 172:6,22 178:24 179:16 180:25 184:12 186:2 189:11 190:18
**camera** 5:6
**cameron** 129:3 129:10
**canceling** 165:4
**candidate** 14:6
**capable** 15:19 24:10 57:18
**captioned** 201:13
**car** 20:12 28:9 28:10,11
**care** 101:4 136:18 201:18
**careful** 82:24 83:2

**carry** 147:23
**case** 1:2 5:15 7:17,18,25 36:22 37:9 39:4 52:10 67:5 76:24 80:1 83:14 91:15 117:9 127:5 164:11 201:13
**cases** 51:19
**casual** 80:14
**caught** 170:17
**cauldron** 74:24
**cause** 1:22 45:17,17
**caused** 36:16
**causes** 31:10
**caution** 78:17 78:25 89:6
**cayman** 1:4 201:6
**cazi** 13:21 15:4
**cd** 29:5,5
**cdc** 32:2 134:24
**ce** 28:24 29:2,6 29:7,20 32:8 92:25 93:5,19 93:23 95:25 98:7,8,13,16 102:18,19 138:5 147:11
**cease** 93:9
**cecelia** 62:6
**ceci** 66:3

**cecilia** 1:18 3:3
5:12 6:5,8,19
7:12 60:25
82:24 87:16,17
89:15 90:18,19
91:24 92:11,14
94:5,7,22 96:2
99:23,24 100:11
102:23,24,25
109:18 110:6,15
110:17 113:23
114:2,9 117:24
118:24 121:5,10
122:7,9 128:11
132:24 134:1,12
139:24 140:16
140:17 144:2,9
145:2 150:21
153:17 155:1
157:12 159:15
159:21,23 160:6
160:20 166:5
168:14,25 170:4
175:17 197:9
199:6 200:7
201:4,10,12

**cell** 45:21

**center** 167:8

**central** 1:1 5:15

**ceo** 72:11 75:15

**cephalite** 31:17
31:18

**certain** 16:12
26:14 31:23
32:1 34:9 48:2

54:21 55:8,22
72:23 88:10,17
108:9 137:5
146:6 152:22
157:23 158:22
159:17,17 162:9
165:4 172:4
192:20 197:11
197:19,20 198:9

**certification**
13:8 23:19,22
28:24 29:2 37:6
37:7

**certify** 199:5
200:6,11

**cetera** 100:17

**chad** 77:1 91:23
92:11,13 95:22
98:9 114:9
117:24 124:11
124:11 134:11
134:12 136:15
151:10 169:1
187:18,24

**chain** 3:8,9,11
3:12,13,14,15
3:16,17,18,19
3:20,21 4:4,8
49:14 64:22
87:21 88:12
105:7 106:4
168:19

**chains** 168:19

**chance** 84:16
100:2 114:3

**change** 17:13
22:25 23:5
32:19,23 42:17
62:25 103:6
151:2 154:17
198:9 202:3

**changed** 34:16
39:12 63:10
64:4

**changes** 16:22
22:13 33:3 34:7
72:9,10,13
147:20 183:19
191:8 202:2

**changing** 41:3

**character** 10:23

**characteristics**
89:18

**charge** 76:6
118:12

**chemistry** 169:6
169:6,12,14,16
169:17 170:18
170:25 171:9
172:17 189:21
190:1

**chief** 72:20
189:25 190:12

**china** 36:3

**chinese** 35:20
36:5

**christopher**
84:15

**chunk** 85:11

**circle** 192:14

**circulation**
45:22

**cited** 19:18

**city** 2:16 21:4
145:3 179:22,25
201:6

**claim** 37:12
58:4,6 89:19
115:3,8 116:5
130:12,15,16
133:22 135:13
136:5 139:19
142:21 145:24
147:4 155:18,20
155:24 158:13
159:16 197:12

**claimed** 57:20
57:24 157:7

**claiming** 27:12
142:2 161:25
171:17

**claims** 25:21
44:7 93:22,23
94:1,3 145:16
146:10,25 147:2
163:2,4,9,10
164:4 190:25
193:20 197:16
197:19,21 198:2

**clarify** 10:15
30:24 127:11
133:7

**class** 5:23 169:6
169:7

**[cleaned - compare]**

**cleaned**  12:8

**cleaning**  15:9

**clear**  108:11
136:24 149:11
168:9

**clearance**  44:1,6
137:1

**clearer**  101:22
109:14

**clearly**  61:21

**clerk**  6:15
201:20

**click**  95:12

**client**  201:15

**clinical**  17:19,21
26:10,16 37:14
45:1 48:7,17
56:23 57:1,16
57:22 60:4
114:10 131:18
131:20,23
133:16 137:12
140:18 144:10
145:3 150:7,8
150:11 153:23
181:24 182:11
182:15 183:13

**clock**  112:4

**close**  140:24
157:24 158:23
159:7

**closed**  96:6
129:12

**closer**  101:20

**cmr**  1:2

**code**  30:17
36:17

**codi**  3:8,9,10,11
3:12,13,14,15
3:16,17,18,19
3:20,21 4:4,8
100:10

**codx**  145:1
180:1

**coffee**  134:5

**collaboration**
54:16

**collect**  11:20,22
11:23 15:22,23
15:24

**collected**  167:7

**collection**  25:11

**college**  13:7

**colon**  177:8

**coltrin**  71:10,12

**coltrin.com**
155:12,13

**come**  18:21,24
28:19 47:8 50:4
51:2 57:10
58:14 90:13
123:3 138:16
140:20 144:23
156:16 163:12
193:21 196:13

**comes**  56:13,16
61:23 138:16

**comfortable**
92:24,25 93:19

93:23 94:1

**coming**  36:23
64:12 76:22
109:13 126:12
140:3 142:12
188:5

**comment**  28:10

**comments**  19:14
100:23

**commercializ...**
89:7

**commission**
78:12 79:15
192:22 199:14
200:21

**commitment**
191:15,19,20

**committed**
191:16

**communicate**
108:23

**communication**
17:1 79:1
109:11,12

**communicatio...**
70:4 71:2 78:17
81:22 82:20
108:21

**community**  62:3

**commute**  21:4

**companies**
30:12,13 33:8
54:13 89:1
100:13 101:13
129:14 150:3,9

167:12

**company**  1:5
12:7,12,16
13:21 14:17
15:6 17:13
18:22 19:3,12
21:10,14 22:7
22:11,13,16,21
22:23 23:5,8
24:2 30:2 32:13
32:17,19 33:19
33:20,23 34:3,5
34:7,16,19,20
34:25 35:2,11
37:1 39:21
41:14,22 42:4,7
65:23,23 67:3,4
67:7,12 68:1,25
69:11,12,19,20
70:2,23 71:9
73:4,25 75:14
76:9 77:19,20
78:1 81:18 83:1
90:5 102:14
107:19 109:3,9
113:5,14,18
125:18 132:17
133:1,2,3
177:23 178:1
180:1,2 190:13
190:24 191:2,11
191:16 201:7

**compare**  44:17
44:19 50:17
118:20 152:11

**[compare - constitute]**                                          Page 212

183:9
**compared** 45:21 52:3
**comparing** 152:15
**comparison** 96:9,13,20 163:21
**comparisons** 164:2
**compartmenta...** 45:21
**compensation** 16:16,21
**competing** 41:15
**compilation** 41:11
**complain** 156:5 156:9 157:17
**complained** 156:10
**complaint** 18:10 19:2 155:17 156:25
**complaints** 156:15
**complete** 8:24 27:16 39:18 201:16
**completed** 13:10 37:3 43:10,16 201:14
**completely** 70:6 72:18 74:23

149:2
**completion** 201:16
**complex** 27:19 27:19
**complexity** 58:7
**compliance** 105:14 190:25
**complicated** 21:5 34:25 41:2 41:4 46:1 48:5 48:20 50:5 53:4 64:22 126:22
**components** 125:15
**compound** 41:17,19 42:12 54:25 59:3
**comprehensive** 41:10
**comprised** 42:9
**concentration** 51:23 52:8,11 59:13,16 117:11 117:13
**concept** 43:7 187:1
**concern** 151:12
**concerned** 39:25 41:15,22 72:16 156:8,24 157:6 169:3
**concerns** 65:19 105:12

**conclude** 15:24 37:24 63:23 201:19
**concluded** 198:19
**conclusion** 107:22 133:10 168:7 178:25 181:1 184:3 189:12
**conclusions** 64:20 65:8 107:4
**condition** 38:24 64:3,16
**conditions** 27:4 27:13 28:3 39:6 40:20,23 41:3 52:12 63:10 64:5,24 65:1,4,8 65:10,12 96:21 126:9 127:1,2 127:21 131:13 138:13 142:7 152:13,17 157:24 158:11 158:23 159:17 171:19 187:14 188:12
**conduct** 106:17
**conducted** 5:4 61:4 63:6 96:23 192:1
**confer** 192:23

**confidence** 51:24 52:9,13 58:14 59:14 117:18
**confident** 12:18
**confidential** 79:20,24 103:25 195:7,10,13
**confidentiality** 79:25
**configuration** 138:13
**confirmation** 118:1
**confirmed** 114:24
**confused** 164:4
**connected** 200:13
**connection** 5:5 201:13
**consideration** 43:12
**considered** 55:4
**consistency** 179:13
**consistent** 140:23 179:13
**consistently** 4:10 99:5 177:8 178:21 179:5,7 181:23 183:12 188:24 189:5
**constitute** 200:8

**[consult - covering]**                                    Page 213

consult   139:14

consulted   69:15
  191:5

consulting
  71:19 75:4,8

consumerizati...
  29:24

consuming
  162:17

contact   57:3,11
  57:13 75:13
  194:3

contents   67:23

context   35:14
  73:3 110:3
  116:21,23
  127:16 161:25
  162:2,4,23
  163:22 164:1
  185:6,17 189:2
  189:3 190:4
  193:24

continue   5:8
  38:13 85:20,20
  85:24 88:4
  195:14

continued
  135:14

contract   76:7

contributing
  54:17

contrived   26:11
  145:14

control   31:24
  64:19 115:23

controlled
  190:7

controls   40:16
  42:25

conversation
  8:19 40:8
  160:12 164:24

conversations
  30:4,7 80:14

convey   169:10

convoluted
  156:3

cool   87:8 140:12

copies   48:4
  129:14,17
  138:10

coprimer   188:1

coprimers   73:18
  73:19

copy   153:16
  173:21 198:7

copying   88:22
  91:23 134:11
  153:17

corner   34:24

corners   42:8

coronavirus
  47:22 91:25
  140:21 144:24
  167:13

corporation   1:9
  201:8

correct   11:17
  28:22,23 62:19
  68:7 93:7 97:5

118:5 125:2,3
  127:15 129:10
  130:24 131:16
  162:24 164:2
  179:8 188:16
  200:8

corrected   115:5

correction
  117:25

corrective   19:4
  105:3

correctly   77:2

correlated
  51:15 57:25

correlates   48:7
  48:17

correlation
  56:22 57:8,15

correspondent
  24:2

corresponds
  56:22

cosara   115:1,6

counsel   5:20,25
  6:1,10,11,16
  9:11,12,13,15
  9:16,18,21
  11:16 78:18
  79:2,5,8 82:20
  82:25 83:1
  174:13 192:14
  192:19,23 197:1
  198:10,11,12,12
  200:12,13

counterprodu...
  74:19

countries   93:25
  118:14 181:22

country   177:24
  197:18

counts   136:3

county   199:4
  200:4

couple   12:15
  36:20 56:3,5
  71:6 73:4,8,9,18
  85:5 86:11
  111:4 122:14,17
  123:24 141:5

course   33:6 34:1
  34:6,19 39:11
  41:2 42:5 57:5
  57:19 64:4 65:7
  67:5,6 71:2
  72:11 73:10
  94:13,16 106:10
  115:4 131:2
  158:12 188:10
  195:15

court   1:1 5:14
  5:18 55:16
  66:19,24 85:17
  85:23 123:6
  201:21

cov   167:17

covered   194:9
  194:10

covering   128:17
  128:18

**covid** 4:6,9 22:14,17,21,22 23:1,7,7,9,9,11 23:13,19 24:1 29:3,18,21,23 31:6 32:6,20,23 33:4,18,20,24 34:17 35:18 36:10,16 39:4 39:23,24 41:2 41:23 47:20 48:21 49:10 50:6 52:10 56:17 57:4 58:20 64:8 77:10 88:11 102:12 111:13 111:13 114:9 119:17 120:18 127:13 135:7 136:18 140:22 145:11 155:15 160:23 165:12 167:14,17 169:24 177:7 180:4 187:9 188:1

**coworkers** 30:3

**crafting** 72:4,5

**create** 36:14

**created** 119:18 119:18,19

**creating** 22:25

**creativity** 74:9

**credits** 135:15

**crews** 100:17

**criteria** 15:17

**criticized** 134:18

**cross** 3:4 197:7

**currently** 13:10 13:12 14:24

**curriculum** 169:5

**curve** 116:12 117:6

**customer** 28:3,5 76:16 111:11 142:1

**customers** 20:19 20:21 32:15 33:1,12 40:10 76:14,16 129:6 150:6,12 165:18 165:19 182:20

**cut** 42:8 122:21 148:19

**cutting** 101:17

**cv** 1:2 5:16

**cycle** 89:2

**d**

**d** 3:1 4:1 174:6

**dade** 199:4 200:4

**daily** 30:16

**dash** 179:22

**data** 4:10 13:16 24:16 44:18 88:17 89:24

92:4 93:20 96:5 96:11 97:19 98:14,15 141:10 141:20 146:4 154:14 177:8 179:2 180:4,9 180:10 181:20 182:22 193:19

**date** 18:8 36:8 92:17 102:15 124:10 129:20 131:3 156:20 191:12 200:10 202:24

**day** 49:21 89:15 102:19 106:11 131:2 172:11 199:8 200:16

**days** 36:20 57:14 201:19

**deal** 73:3 85:2 136:1 165:24

**dealing** 39:2 124:23 153:15

**dear** 153:17 201:11

**death** 57:9

**december** 14:18 36:11

**decide** 28:5,13 43:18 44:18,20 44:21 57:23 111:5

**decision** 190:24 191:2,14

**decisionmaking** 28:5

**declare** 202:22

**deep** 111:19

**defend** 74:18

**defendants** 1:11 2:20 6:4,7 91:1

**define** 180:6

**definition** 65:16 89:17 117:10 119:8

**delay** 38:17

**deleted** 12:4

**demand** 23:15 32:23 33:4,6,17 34:2,3,4,4,6,10 34:11,17,18,22 34:23 35:6,7 39:11 50:4

**demanding** 49:16,20,23

**demonstrates** 4:10 177:8 178:21 179:5 180:22

**demonstrating** 180:4

**department** 19:7 201:23

**depend** 36:20

**depending** 28:6 43:25 44:3 47:13 49:4 197:19

**[depends - diagnostics]**

**depends** 5:5 28:3,11 42:22 52:24 56:14,14 57:5 60:22 61:1

**depo** 201:10

**deposed** 7:16,24 81:2

**deposition** 1:18 1:21 5:3,12 8:4 12:22 20:11 79:5,10,12,15 80:13 81:5,11 81:20 167:23 192:21 193:7,8 193:12 198:6,7 198:19 200:7,9 201:12,14,19

**derived** 137:24

**describe** 131:12 131:12 169:15

**described** 58:2

**describes** 25:20

**description** 3:8 4:3 126:4 146:13

**design** 15:16 17:20 36:19 40:16 42:25 43:5 74:14 100:15 139:14 141:10

**designed** 22:21 22:23 32:10 141:19

**designing** 43:1

**desire** 135:19

**desperate** 49:11 106:7

**despite** 127:12

**destroyed** 12:13

**detail** 56:10

**details** 88:18 192:9,20

**detect** 26:8 45:4 48:3 51:24 52:9 52:12 59:16 117:11

**detected** 4:7

**detecting** 47:21 47:22 57:18

**detection** 26:3,3 48:1,6,17 50:22 51:21,22,23 52:1,4,18,21 53:8 56:11,12 57:20,24 58:4 59:6,10,11,17 62:17 74:15 117:9,10,13 129:16,23 130:8 130:23 137:21 138:2,10,12 155:14 160:22 181:13,14

**detector** 46:20 46:22,24,25 47:2

**determine** 12:3 26:17 27:1,2

39:8 40:2,20 44:13 52:11 56:17 59:6,11 59:17 60:20 61:5,10 64:15 138:25,25 139:3

**determined** 28:1 56:24

**determines** 57:17

**determining** 28:21

**develop** 36:18 74:7,7 76:11 77:23 111:7,10

**developed** 22:21 22:23 23:20 73:17 121:22,23

**developing** 22:6 23:5,6 32:25 33:24 35:18 39:10 74:11 77:11

**development** 16:3,3 33:1 35:2 36:19,20,21,23 36:25 37:19,24 39:1,7,9,13,21 40:4,14,17,19 40:21 41:1 43:1 43:8,10,11,15 43:17 53:9 54:5 54:6 55:5 58:19 59:21 77:4,6,14 77:21 89:2

92:20 93:6,9,15 98:12 102:22 114:17 116:17 129:24 180:3

**devices** 40:15 42:5 112:3 197:17

**diagnostic** 22:24 23:5,6 25:15 29:18 31:5 35:18 39:22 42:19 52:22 56:13 88:11 96:6,19 98:6 138:14 165:12 171:1 180:3,6

**diagnostics** 1:8 4:9 5:13 7:25 11:25 12:4 14:12 16:5,8,17 16:18 17:5,12 18:6 19:18 20:17,22,25 21:9,23 22:2,5,7 22:22 23:20 24:1,16 26:23 28:25 29:3 30:1 31:6,9 32:10,17 33:10,18 35:17 36:18 37:11 40:15,22 42:8 43:22 46:2 47:4 50:8 51:19 53:6 53:11 54:4,7,12

**[diagnostics - doctor]**

55:9,23 57:25 58:20 64:8,10 65:14,17,20 68:15,15 69:19 70:15 78:13 80:16 81:3,7,17 81:22 83:21 84:5 89:23,23 96:24 98:2 101:2 107:18 111:23 112:11 112:23 113:4 119:18 120:18 120:22 121:12 121:16 127:14 130:16 131:24 133:8 135:19 137:2 140:18 142:11 145:16 146:9,25 155:15 160:23 165:3,4 165:12 167:13 167:24 173:15 177:7 178:20 180:1,2 181:14 183:15 186:17 187:9,19 188:1 188:19 191:23 194:19,25 197:23,24 201:7

**diagnostics's** 17:23 192:7

**dichiara** 84:20

**die** 90:13

**died** 90:14

**difference** 15:15 29:9,13 111:12

**differences** 64:19 65:6

**different** 15:11 16:11 25:6,25 26:4,7 27:20 28:18 31:16 33:11 49:8 54:19,19,20 56:23 58:17 64:3,7,9,13 93:25 118:13,14 118:16 119:8,12 121:22 125:23 126:23,25 127:7 127:22 136:7 138:20 139:17 141:6 144:19 148:24 152:16 160:12 167:12 167:12 182:8 187:14,14 188:12,13 191:25 192:1

**differently** 190:17

**difficult** 162:6 170:7

**difficulties** 67:15

**difficulty** 170:25

**direct** 3:4 7:6

**directly** 70:7 75:6 165:16

**directs** 9:16

**disappointed** 164:15

**disclose** 78:17 79:1 89:1

**disclosing** 82:19

**discuss** 25:6 70:20 76:5 77:9 93:2 104:16 108:20 111:14 111:17 161:21 164:3 193:2 194:21,24 198:10,12

**discussed** 12:23 19:3 88:13 90:12 187:15 188:20 194:17

**discussing** 15:18 35:23 69:12 76:18 104:17 156:8 192:8 194:1

**discussion** 9:18 77:8 88:9,16,19 177:21 193:18

**discussions** 29:25 35:20,21 56:6,7 70:25 73:6 75:18,19 75:20 79:7 88:14 165:17

**disease** 38:21,24 57:1 137:5 167:14

**diseases** 23:1,6 31:7,16

**display** 52:14

**distorting** 162:2 162:3

**distribute** 150:3

**distributed** 88:25

**distributing** 150:6,8,10

**distributor** 100:18 141:22 142:1 143:23 163:2

**distributors** 100:21 140:22 141:8 142:20 145:2 149:11,20 149:24 150:1,2 151:15 153:18 155:17 162:1,10 163:1,7 165:3

**district** 1:1,1 5:14,15

**districts** 32:1

**divided** 97:22

**diving** 111:20

**division** 1:1 5:15

**doctor** 49:6,7,9 49:9

**[doctor's - emergency]** Page 217

**doctor's** 101:7
**doctors** 112:20
**document** 11:5
11:8 19:14,15
58:2,3 89:1 93:1
103:12,14,25
144:11,12
180:13,15,19
181:8 187:23
202:22
**documents** 11:4
11:20,23,24
12:3,11,16,18
20:5 82:9,11,13
83:13,17 85:10
86:21 176:6
**doing** 14:21
15:3 24:10
28:13 30:16
49:7 78:10
85:12 106:10
113:16 122:9
126:16 138:22
138:22,22,23
143:2,14 163:13
170:6
**door** 62:22,25
**dossier** 16:14
**double** 34:21
35:1
**doubling** 35:3,4
35:7
**doubt** 169:5
**downsizing**
14:15,17

**downstairs**
140:6 183:4
**dozens** 111:4
**dr** 18:23 104:11
105:12 108:20
**drafting** 178:10
**draw** 64:20 65:8
**drink** 85:15
**driving** 21:5
**dropped** 63:19
**drug** 15:7 137:4
137:4 140:15
**drugs** 10:23
**due** 32:23 33:3
34:16
**duly** 6:21 199:7
**durenard** 1:9
88:17 201:8
**duties** 18:4
**duty** 107:19
**dwight** 1:9
75:13 89:16
101:11 201:8
**dx** 78:2,3

**e**

**e** 3:1,2,7,8,9,10
3:11,12,13,14
3:15,16,17,18
3:19,20,21 4:1,2
4:4,8 7:14 12:6
12:6 75:1 81:21
81:22 87:21
88:12 90:8 91:7
91:22 95:22
100:11 102:20

105:7,7,9
109:23 110:15
110:15,16,18,19
114:7 124:3,9
124:10,12 126:4
129:1,2,9 131:2
131:6 134:10
138:4 140:14
142:19 151:8
152:9,13 153:18
155:10,11
163:22 168:18
168:25 169:10
169:23 174:4,5
199:1,1 200:1,1
**eagle** 21:3
**earlier** 20:11
55:7 134:18
197:10,13
**early** 39:5
**ease** 181:21
**easier** 74:20
75:12 151:17
**easily** 46:10
170:9
**east** 2:15 201:5
**eastern** 31:17
123:4
**easy** 7:10 13:4
45:7 74:19
95:20 106:22
146:18 190:3
197:5
**eat** 85:15

**eco** 96:9,14
**edits** 100:22
**educate** 108:3
**educated** 13:5
**education** 45:12
135:14
**educational**
13:6
**edward** 1:9
201:8
**effective** 109:14
**effectively**
130:24
**egan** 1:9 75:13
75:18,21 88:22
88:22 89:16,16
101:11 102:3,5
201:8
**eggs** 31:22
**eight** 104:6,6
**either** 84:8
119:18 132:15
150:7,7 187:20
**elaborate** 59:25
171:14
**eligibility** 17:1
**eligible** 16:23
**email** 201:17
**emergency**
23:23,24,25
24:6,11,18,25
25:19 26:11,19
26:22 29:15,18
36:22 37:22,23
38:19,20 39:16

49:12 75:8 93:14,24 102:21 129:22,25 130:5 138:1,2,6 139:14 143:7 145:24 147:8,9 147:22 163:11 198:3

**emphasize** 197:2

**employed** 14:19

**employee** 200:13

**employees** 30:13,17 34:20

**encephalitis** 31:16,17

**encompass** 17:17

**ended** 39:14

**engaged** 56:3

**enormous** 53:13

**enroll** 13:14

**ensure** 41:6 42:25

**enter** 202:2

**enterprise** 54:17

**entity** 165:14 177:24

**environment** 22:3 190:7 197:17

**equal** 135:13 137:20

**equipment** 101:6

**eric** 29:6

**errata** 198:8 201:16,16 202:1

**error** 19:5,17 58:10,12,25 62:1 116:12 117:6 129:10

**errors** 19:17

**especially** 33:15 45:20 48:21 64:21 67:5 71:1 71:3 76:7 92:5 152:10

**esquire** 2:2,7,8 2:13,18 201:5 201:11

**establish** 15:17 28:1 39:1 40:11 40:17 74:5,12 96:5,11 169:18

**established** 16:2 64:16 89:19

**establishing** 40:23 74:3

**estimate** 20:11 20:12

**et** 5:14 100:17

**eua** 136:16 140:24 141:10 141:20 182:5,9 182:14,19 187:15

**eua200049** 140:17

**eugene** 1:9 89:10 201:8

**europe** 29:2,24 147:11

**european** 29:8 29:10,15,17

**evaluate** 26:25 43:2 126:13 189:25 190:11

**evaluated** 64:13 64:16 120:17 181:22

**evaluating** 40:24

**evaluation** 4:5 61:24 93:20 167:25 177:23 184:25

**evaluations** 4:11 177:10,12 177:17,19,25 178:1,23 179:10 181:13

**everybody** 33:14 42:5 49:10,17 85:21 106:11 112:19 112:24 122:11

**everybody's** 181:3

**evidence** 15:22 15:23,24 55:25 169:20 172:23

188:3

**exact** 34:13

**exactly** 64:1 78:9,10 163:25 164:6,10,14 196:9

**examination** 3:4 3:4 7:6 197:7

**examined** 6:21

**example** 45:5 47:12 58:21 108:18 117:9 165:10 170:11 171:15,16,21

**examples** 188:10

**exchange** 78:12 79:15 192:22

**excited** 30:18

**excites** 22:3

**exciting** 21:15 21:17,19,22,22

**exclamation** 111:20

**excuse** 140:2 141:23 183:3

**exhibit** 3:8,9,10 3:11,12,13,14 3:15,16,17,18 3:19,20,21 4:4,5 4:8,9 87:4,5,16 87:17 90:18,19 91:3 94:4,5,6,7 94:22,23,23,24 99:23,24 102:23

102:24,25 103:3 103:15 109:17 109:18 113:21 113:22,23 122:5 122:7 123:20 128:9,11 133:25 134:1 139:22,24 144:2 150:15,16 150:17,21 154:25 155:1 159:21 163:16 166:5,10 168:14 173:20,20,24 175:8,14,17 176:6

**exhibits** 6:13 87:3

**exist** 49:16 50:3 50:10

**expected** 65:6 68:5

**experience** 23:4 53:5 65:22 90:4

**expertise** 73:12 73:15

**expires** 199:15 200:21

**explain** 15:1 25:13 45:7 99:11 101:8 108:14 136:20 152:22 158:15 158:18 171:10

**explained** 27:20

**explaining** 51:13 158:17 171:4

**explore** 74:10

**export** 115:20

**exporting** 147:13,19

**extend** 137:15

**extra** 132:4

**extract** 152:8

**extraction** 4:7

**extrapolate** 162:23 171:17

**extremely** 197:4

**eyes** 95:5

**f**

**f** 199:1 200:1

**facilities** 119:8 119:12

**facility** 77:25 121:14 125:13 127:7

**fact** 13:25 21:15 27:8 40:15 55:15 79:18,18 79:23 116:18 148:13 152:4 179:2

**factors** 4:5 58:8 62:19

**factory** 92:13

**facts** 19:21 55:25 104:21,22 119:1 120:12 121:8,24 124:25

172:22 202:22

**faded** 55:18

**failing** 109:13

**fair** 11:4 27:18 37:18 65:14 69:20 78:19 98:2,20 118:21 119:5,19 157:5 157:9,13 169:25 178:11 185:13 188:9

**fall** 170:6 171:25

**false** 45:17 46:6 47:24 97:3,5,16 97:17,22 115:1 118:1,4 138:17 138:17 187:20 187:21

**familiar** 29:20 78:1 114:19 165:2 167:2 168:10 197:13

**familiarize** 168:20

**family** 14:11 21:3

**fantastic** 166:16

**far** 8:23 24:8 39:15 40:4,9,9 44:7 70:22 72:15 74:1 89:7 92:3 96:17 113:6,17,17 121:15 126:10

126:11 153:11 156:24 176:9 179:3 183:19 190:25

**fasano** 2:2,3 3:4 5:22,22 6:11,12 6:15,25 7:4,7 9:24,25 10:3,6 10:10 19:22 21:12 23:17 28:16 30:23 33:2 37:25 38:1 38:4,7,9,15 41:19,21 42:1 42:14 48:10 50:20 51:11 55:6,12,15,19 56:1 59:19 60:18 61:7,20 62:15 63:16,21 64:6 66:8,16,19 66:22 67:10,18 69:5,25 78:19 78:21 79:3,22 80:7,9,25 81:1 82:18,21 83:6 85:23 86:4,6,7 86:11,19,24 87:3,8,12,15,19 90:3,15,17 91:4 91:8,10,14,20 91:21 93:17 94:10,13,16,21 94:25 95:3,9,13 95:15 99:10

100:1 101:18,21 103:5,9 104:2,9 105:4,6,8,23 107:6,17,23 108:6 109:17,20 110:1,4,9,14,19 110:25 111:1 112:6 113:1,19 114:6 115:12 117:3 119:2,10 119:16,25 120:13 121:7,17 122:2,4,11,16 122:20 123:2,6 123:9,16,19,22 124:6 125:1 127:24 128:8,13 128:24 132:12 133:5,11,24 134:3 135:24 139:21 140:4,11 140:13 144:7,21 144:22 147:15 148:7,15,20,22 148:23 149:13 150:14,17,23 153:12,13 154:6 154:9,24 155:3 157:15 159:12 159:19,25 160:4 162:19 163:15 163:17 164:18 164:22 166:4,7 166:10,12,13,15 166:18 168:16

168:23,24 170:10 171:12 172:9,14 173:2 173:12,19,25 174:5,10,12,15 174:16,23 175:9 175:13,15 176:1 176:11 177:2 179:4,20,23,24 180:16 181:4,6 181:10,17,18 183:11 184:14 185:1,7,18,22 186:8,24 187:4 188:8,22 189:16 190:5,14 191:3 192:16,18 195:9 195:16,24 196:2 196:10,22 198:5 198:16

**fasanolawfirm...** 2:3

**fasanolawfirm...** 174:6

**fast** 20:12 28:9 41:3,16 45:2 49:20 135:13

**faster** 49:19 122:22

**fault** 148:18 181:7 187:20

**favorable** 181:12

**fda** 18:10,10,17 18:24 19:2,4,18

23:24 24:2,7,7 24:10,13,17 25:20 26:20,23 27:7,14 29:11 39:16 55:8,22 56:3,4,8 58:1,5 71:8 100:14 104:12,19 105:12 108:20 112:17 130:4,14 130:14,16 139:18 141:3,4 142:14,15 147:18,18,23 148:8 151:22 155:14,17 156:4 156:9,16 157:6 157:18 160:23 161:4,8 162:14 163:12 183:14 183:17,21 188:21 191:11 191:16,19 197:22 198:3

**fda's** 144:23

**featherstone** 75:24,24 76:2,5 88:22 89:16 91:24 129:3

**february** 88:20 89:15 92:17 95:23 98:5 100:12 102:9,18 104:12 105:10

**federal** 105:14 192:22

**feed** 33:12

**feedback** 19:15 182:20 186:5

**feel** 12:17 42:8 68:17 80:22 92:23 100:20 102:13 113:6

**feeling** 168:5 170:20

**felt** 93:18 102:11

**field** 62:16 169:17 182:19 182:21,22 184:4 184:6 185:21,25 186:4

**fifth** 131:9

**fight** 134:4

**fighting** 57:12 156:3

**figure** 112:20 151:18

**figured** 92:12 166:17

**file** 96:3 174:25 175:1

**filed** 1:21 5:14 175:2 201:20

**fill** 33:8

**final** 144:18

**finally** 196:12

**financially** 200:14

**find** 26:17 34:3 34:7 45:15,23 46:8,12,15,15 49:18 59:9,13 62:24 63:2,11 64:2,4 124:14 124:21 142:14 144:14

**fine** 8:3 84:22 86:3 103:9 122:3

**fines** 81:16

**finish** 8:23,24 175:11

**finished** 36:19 43:20,20 93:16 129:24,25

**fire** 46:23 47:2

**firm** 2:3 6:11,12 84:9,9,13

**first** 6:21 13:18 22:4 35:23,24 35:25 41:16,22 42:6,10,21 87:13 91:20 92:9 96:10,16 96:16 100:25 104:18 110:12 111:18 115:4 116:10 117:5 124:17,23 129:3 135:11,14,15 136:1,2,5 144:8 147:7 155:9 163:20 177:15

179:23 180:19 180:20 181:9,11 187:12 195:25

**fisher** 14:2

**fit** 50:7 72:14 74:9

**five** 94:15 117:17 173:3

**fix** 161:11,15

**fixed** 142:17

**fl** 2:5,11 201:17

**fla** 201:17

**floch** 2:8 6:1,1 174:8,11

**floor** 63:20

**florida** 1:20 85:25 199:3 200:3,6,16 201:2,24

**focus** 22:17,25 23:4 32:19 72:17 195:18 196:3

**focused** 67:12 68:25

**folks** 111:23

**follow** 58:15 59:8 74:21 126:15 139:17 196:14 197:20 197:24

**following** 74:9 169:20 172:11

**follows** 6:22 59:6

**food** 140:15

**forbid** 111:19

**foregoing** 200:8 202:22

**foresee** 41:4,5

**forever** 150:19

**forget** 159:23

**forgot** 144:25 165:1

**form** 9:12,13,19

**formal** 178:6 193:11

**formalities** 198:20

**format** 37:11

**former** 78:12

**forms** 136:7

**formula** 97:14 97:18,19,23

**formulation** 125:22

**forth** 77:25

**forward** 91:25 169:2

**forwarded** 124:12 201:20

**forwarding** 76:15

**forwards** 124:10

**found** 12:14,14 62:9,9,9 63:4 142:14,15 145:11 155:22 155:25

**foundation** 41:25 42:13 119:21 132:22 171:8,8 172:22 181:1 189:22 190:9

**foundations** 190:2

**four** 13:2 14:4 32:7 141:3

**fred** 2:23 5:17

**free** 74:7 80:22

**friday** 155:11

**front** 167:22

**full** 64:19 167:21,23 180:12 185:17

**fully** 109:10

**further** 69:3 196:25 198:4 200:11 201:21

**future** 41:4,5

**fuzz** 195:22

**fuzzed** 55:11

**g**

**gap** 14:10 33:8

**garage** 62:22,25

**garcia** 77:15,16 114:8 115:9 116:7,9 117:23 134:11 136:16

**garcia's** 77:18

**gears** 42:17

**gee** 6:3

**gelt** 1:4 5:12,23 201:6

**gene** 129:2,6

**general** 105:16 106:1,6 132:14 132:16 142:9

**generalize** 157:25 158:24 171:20

**generalized** 158:13 171:18

**genes** 4:7

**genetics** 15:7 169:13

**getting** 53:11 82:17 92:18 195:3

**ghl** 13:24

**give** 13:5 20:13 46:6,8 47:6,9 58:20 72:7 92:4 136:10 171:14 174:8 196:11,12

**given** 102:17 112:5

**gives** 46:16 107:9

**giving** 45:12 47:18,24 64:9

**glad** 108:19

**go** 5:9 8:4,6 9:5 13:7 28:20 37:20 43:8 44:25 46:22 47:1,2,6 48:10

49:17,18 50:12 50:25 51:4 52:22 58:8 60:25 62:6,21 65:5 66:3,6 85:11 86:9 87:20,24 91:20 93:12 94:11 95:6,10 97:9 108:8 109:17 117:22 121:10 122:4,21 123:9 128:8,25 132:24 133:24 136:14 136:25 139:12 140:6 144:1,16 144:21 146:21 150:13 151:3,4 151:5 152:5 153:12 154:18 154:24 155:8 157:11 159:15 159:20 160:19 162:13 163:15 166:4,24 167:5 168:13,23 170:4 173:7 174:1,2,7 174:18 175:21 175:21,22 177:15,15 178:19 179:21 179:23 181:5,6 181:9,17 182:4 183:4,14 194:16 196:17 198:13

198:17

**goal** 41:9 149:22 149:23

**god** 111:18

**goes** 40:9 43:7 44:7 46:20,24 51:16,16 58:3 70:22 92:4 101:14 126:11 126:11 131:15 157:21

**going** 6:12 8:19 8:20,24 10:12 11:4 16:14 18:8 18:15 20:2,12 24:5 25:21 27:2 28:7,11 30:9,10 30:18 32:1 39:8 39:14 41:7 42:17 43:14,19 44:18 46:3,8,13 46:15,15 47:6,6 47:8 48:3,23,24 48:25 49:1,6 50:21 51:2 53:12 54:10 55:4 57:23 59:8 59:12,12,13,15 62:12,21,23 63:2,8,11 64:2,3 71:20,20 72:7,7 73:10 74:17 78:16 79:22 80:1,2 83:16,25 84:12,13 85:1,7

85:9,11 86:20 86:23 87:15,20 88:13 89:3,11 92:2 99:3,13 102:1 103:7 104:25 105:1 108:4,11,15,23 109:4,15,21 110:5 113:20 117:1,12,16,20 121:25 122:11 122:20 123:11 128:9 131:9 132:3,9,11,25 133:18 138:6 139:22 140:7 142:4 144:20 146:2 149:25 153:5,20 156:4 156:9,20 157:6 158:15,18,19 166:23 167:22 172:7 173:13 175:7,10 177:4 178:4 188:12 192:24,25 193:12 197:18

**gold** 126:19,20 126:21

**good** 8:6,22 28:20 32:4,5 61:5 63:7 67:9 85:11 90:11,12 92:6 103:23 114:5 123:8

**[good - hundred]**

176:10 184:24 184:25 185:3,10 185:23 186:4,4 186:6

**gotten** 143:8

**government** 83:8

**grab** 63:20

**graduated** 13:9

**graduation** 13:20

**grateful** 162:13

**great** 6:14,17 30:10 31:4 102:1

**greater** 167:7

**greatly** 33:17

**group** 21:20 124:9

**grow** 31:21,21

**growth** 29:14

**guess** 20:13 54:20 58:17 61:25 85:7 114:11,12,13 133:25

**guesses** 20:13

**guessing** 114:15

**guideline** 139:17

**guidelines** 74:20 74:21 114:23 115:2,7,9,15 116:5 139:7,9 139:13 169:20

**gundry** 129:3

**guy** 160:5

**guys** 13:3 175:7 176:8

**h**

**h** 3:7 4:2 7:14 7:14 84:18

**half** 123:1,10

**halfway** 47:3

**hallway** 30:7

**hallways** 30:5

**hand** 178:10 199:8 200:15

**handle** 49:12

**handler** 75:9

**handwritten** 12:10

**happen** 19:5

**happened** 35:7 50:6 90:10 109:8 126:14 183:19

**happening** 90:8 125:25 135:1,4

**happens** 31:19 44:14 45:19 62:7

**happy** 45:12 85:14 185:20,24 186:5,5

**hard** 49:13 171:3,10

**hatch** 31:22

**head** 17:14,16 17:19 110:7

140:17 142:12 144:10 145:2 165:1

**health** 136:18 193:21,25

**hear** 9:19,20 55:10 66:3,7,15 105:12 195:23

**heard** 5:6 76:22 79:11 195:25

**hello** 95:24

**help** 16:10 40:3 51:25 76:16 77:23,24 78:7 106:4,13 151:21 159:13

**helping** 41:6 76:11

**helps** 181:15

**hepatitis** 56:23

**herculean** 142:19

**hey** 30:9 184:17

**hh016865** 199:14 200:21

**hi** 5:24 129:9

**high** 21:25 46:14 52:1,3 185:11

**higher** 129:12 137:21

**highest** 13:7 167:18

**highly** 195:7,10 195:13

**hired** 16:9 70:12 84:2

**hiring** 70:13

**history** 13:17

**hiv** 45:7,15,19

**hold** 17:4 55:10 141:23

**home** 7:1 63:13

**honestly** 169:2

**hope** 160:24 161:1,7 162:18

**hospitalization** 57:9

**hostetler** 2:19 6:7 84:9

**hour** 52:15,16 123:1,10

**hours** 13:2 71:6

**house** 47:3 53:6 53:10,13 96:24 97:1,2 140:5 142:5,7 143:18 143:20

**huge** 33:6 34:2 34:18

**huh** 78:4 89:9 124:16

**human** 32:11,11 37:11 43:22

**humans** 37:13

**hundred** 25:10 98:25 116:16,25 117:15 147:9 158:9,9 171:20 171:20 187:17

**[husband - independent]** Page 224

husband 14:9
hutchins 1:18
3:3 5:12 6:5,8
6:19 7:8,12,14
7:15 10:11
18:22,23 38:16
51:12 80:10
85:18 86:20,25
87:16,17,20,23
89:15 90:18,19
91:24 94:5,5,7
94:23 95:1,23
99:23,24 100:11
100:25 102:24
102:25 104:10
105:24 109:18
109:21 110:7,10
110:17 113:23
114:9 117:24
122:7 123:17
125:2 128:11,14
134:1,5,12
139:24 140:16
140:17,20 144:2
144:9 145:2
148:25 150:21
150:25 154:11
155:1 159:21
160:8,20 166:5
166:16 168:14
168:17,25
173:13 174:24
175:17 182:1
196:23 199:6
200:7 201:4,10

201:12
hwang 104:11
105:10,12
108:20
hyperlink
134:14
hyperlinked
173:23
hypothetical
59:4 62:5
107:12 118:25
127:17 149:5
172:6 179:16
184:21

**i**

i.e. 141:10
icmr 114:10,10
114:21,22
115:17,17
124:14,22,23
idea 89:12 90:11
90:14
ideas 90:11,13
identification
87:18 90:20
94:8 99:25
103:1 109:19
113:24 122:8
128:12 134:2
139:25 144:3
150:22 155:2
159:22 166:6
168:15 175:18
ike 100:12 101:9
101:12

illustrate 58:21
immune 57:6,11
impact 47:12
impacting 19:10
impair 10:25
implemented
109:2,7,10
implicitly
183:25
implies 153:23
imply 153:25
184:10,18
188:24
importance
172:18
important 56:12
56:18 63:14
65:7 67:6 88:24
128:19 181:20
importantly
141:11
impossible
116:11,19
126:24 168:7
impression 21:8
improve 108:21
109:11
impugn 10:23
inability 172:16
inaccurate 25:9
25:16
inches 62:23
include 24:4
25:22 43:12
173:22

included 24:12
24:22 26:19
27:6 30:7 96:16
172:19
includes 26:4,5
26:6,6 44:10
138:21 140:25
141:4
including 4:6
127:13 134:24
167:13 188:21
incomplete 59:3
62:4 91:3
107:12 118:25
127:17 149:5
172:5 173:24
179:15 184:20
inconsistent
124:14,22 126:2
incorporated
5:13 100:23
incorrectly
167:10
increase 34:17
34:23 35:7,8,9
35:10,11
increased 33:17
35:8 135:19
increasing
39:11
incremental
43:25
independent
4:11 79:6
157:19 165:11

**[independent - investigation]** Page 225

177:10,12,17 178:1,22 179:10 182:13,16 189:6

**india** 31:13 77:22 115:16,18 115:20 118:12 118:20 119:4,13 119:19,22 120:5 121:22 124:23 125:9 183:1,6

**indian** 114:11 119:3 120:8,23 121:1,14,19

**indication** 107:9

**indications** 131:24 132:1 194:20

**individual** 58:10 137:1

**individuals** 136:17

**industries** 22:11

**industry** 15:5 42:5 49:22 50:3 50:12,14,15 68:15 105:17 106:2,4 112:4 151:18

**infect** 31:23

**inform** 44:9 108:3 141:8 181:15

**informal** 186:9 186:12,14,16,25 187:3 193:10

**information** 24:5,8,9,13,19 26:1 27:12 35:24 36:13,23 37:24 39:5,6,10 41:10 48:6,15 48:16 49:9 63:7 64:15 65:10 68:24 81:10,10 82:3,4 83:8 111:7,9 126:18 127:2 130:19 132:7 133:7 151:16 153:19 173:22 175:10 182:2,19 190:20 190:23 191:1 196:6,8

**informed** 90:4 183:23

**initial** 41:1 187:2,2

**input** 65:7 98:9 98:12,21 99:17 116:17 126:14

**inputs** 28:20 54:18 72:8

**inquiry** 104:11 104:14

**instance** 18:16 37:1

**instances** 34:24

**instruct** 79:17 80:2,4

**instructed** 79:19

**instruction** 58:13

**instructions** 27:7,11 48:24 52:25 57:21 58:1,15 59:8 64:17 98:16 126:16 130:20 131:25 132:2 146:21,23 152:5 152:19 153:19

**instructs** 9:21

**intend** 42:22,23

**intended** 27:10 27:11 42:23 43:13 52:25 56:15 131:24 132:1 136:17,19 136:21,23 137:2 137:4 194:19

**intention** 56:14 149:10,15

**intentions** 49:5 106:13

**interact** 165:14

**interacted** 82:14 165:20,23

**interacting** 70:2 82:7

**interaction** 72:24

**interactions** 76:2 77:8 82:6

194:4

**interested** 200:14

**interesting** 21:19

**interference** 26:6

**internal** 88:25 152:9

**internally** 98:3 125:18 152:13

**internet** 5:5 38:5

**interpret** 106:16

**interrupt** 48:8 76:24 105:19

**interrupting** 76:23

**intervention** 49:5

**interview** 170:6 172:8 190:3 192:21 193:4

**interviewed** 70:11

**interviewing** 70:13

**invented** 73:20

**inversely** 51:15

**invest** 132:25

**investigating** 132:17 196:9

**investigation** 49:7 55:22 78:12,23 79:7

79:20,21 80:12 80:15,16 81:6 81:13 83:21,24 104:19 195:18 196:4

**investor** 70:3

**investors** 190:22

**involved** 17:22 18:25 19:11 23:18 28:25 29:3 32:5 34:12 70:1,20 72:1,4 89:22 106:3 114:16 136:13 165:8,11,16 190:20 191:10 191:12

**involvement** 23:25

**involves** 106:8

**involving** 109:5

**iowa** 192:5,7,8 192:11

**islands** 1:5 201:7

**isolated** 113:7

**israel** 167:9

**issue** 48:20 55:17 71:8 111:17 162:15 162:25 163:6,6 183:22

**issued** 172:11 173:14

**issues** 56:8

**issuing** 113:14

**ivd** 100:22 101:1,6 105:17 106:2,4,5,15,19 106:23 136:22 141:6,15 145:9

**ivds** 98:11 100:16

**j**

**james** 1:9 201:8

**january** 14:11 35:20,25 36:9 36:12 37:4

**jennifer** 71:12 71:16,17 74:24 74:25 75:2 155:12 160:21

**jenniferwebb** 155:12

**jeunesse** 14:14 14:14,15 21:6

**job** 8:22 13:18 18:4 69:24 100:18 107:25

**join** 13:11

**joint** 31:12 77:23 119:23 191:21,24,25 192:3

**joke** 61:22 92:13

**joni** 2:13 6:3 7:1 11:16 12:24 63:16 174:12

201:5,11

**joseph** 75:23,24 76:18 91:24 129:2,10 151:9

**jostler** 2:14

**july** 199:15 200:21

**june** 18:15 167:10

**jurisdiction** 16:13 29:14 44:3,5 197:18 197:21

**jurisdictions** 43:25 165:5

**k**

**keep** 51:2 162:10 163:9,9 163:10

**keeps** 38:8

**key** 181:15

**kicking** 38:8

**kidding** 61:22

**kids** 140:2

**kilometers** 52:16

**kind** 33:3 46:19 47:1 49:6 75:4 150:20 164:19 193:12,20

**kit** 37:10,13 105:11 129:15 129:16 130:6,7 130:10 131:15 132:15 137:7

140:22 146:13 167:14,18

**kitchen** 46:20 46:25

**kits** 22:8,24 23:1,1

**knew** 70:23,24 190:13

**knocked** 10:2 38:2

**know** 8:22 9:3 9:20 10:5 11:8 11:12 12:2 13:3 13:5 16:20,23 17:4 20:13 23:11 28:9 31:1 34:13 35:17 38:3,9 39:2,15 40:4 49:12 50:23 53:4 58:7 58:22 65:8 66:9 68:9,13,14,14 70:1 71:5 73:11 73:14,16,17,20 73:21,22 74:3 75:5,24 77:1 78:9 79:5,9,10 80:7,10,22 81:2 81:14,15,16 82:8,22 83:16 83:20 85:12,25 86:4 87:3,23 89:3 95:1,4,7,7 96:23 100:2 101:9,20 102:5

**[know - limit]** Page 227

108:2 109:24 110:6 111:11 113:16,20 114:13,14,20 115:13,14,15 121:4,11 122:5 122:12 123:20 123:23 124:14 124:22 126:8,25 128:14 129:4,6 131:3,10,25 132:10,13 133:4 149:25 150:25 152:12 153:11 155:4,20,23 160:2,8,25 164:11 165:9,10 168:20 169:4 170:21 172:24 173:1,17 175:4 175:21 180:18 184:13 186:22 188:6,14 195:17 196:15 197:5 198:8,10

**knowing** 143:2 171:4

**knowledge** 30:25 31:1 34:16 42:19 54:14 67:13 79:7 81:6 116:6 120:4 154:10 169:24 189:21 190:7

**knows** 28:13 74:1 89:11 131:23 133:4 169:12

**kyle** 135:9

**l**

**l** 7:14 77:2

**lab** 48:22 54:9 54:10 59:20,20 61:23 64:23 114:11 187:18 187:25

**label** 137:6,6 166:16

**laboratories** 40:10 49:11 120:16 131:19 131:21 150:8,9 150:11

**laboratory** 37:14,14 45:1 57:16,22,23 77:5 131:18,23 133:16 137:12 139:17

**labs** 49:3 54:5,7 64:13 111:7 126:9,20 177:19 192:5,6

**lack** 33:7 67:1 172:16,21 181:1 189:22

**lacked** 169:13

**lacks** 41:25 42:12 119:21

127:16 132:22 190:9

**laid** 14:17

**lake** 2:16 21:4 67:16,20,25 68:4,5,22 69:12 69:16 145:3 170:15 179:22 179:25 190:21 201:6

**large** 1:20 92:4 106:23 200:6

**late** 168:5

**law** 2:3 6:12,15 84:9,13

**lawsuit** 175:2

**lawyer** 82:8,10 83:23 84:5 85:2 193:11

**lawyers** 12:24 13:1 83:20 84:7 193:9

**lay** 50:14

**ldt** 111:8

**lead** 104:18

**lean** 195:22

**learned** 79:4

**leave** 21:2 113:18

**left** 12:4,9,12 20:24 33:19,23 34:11

**legal** 8:8,12 85:6 107:21 133:10 178:25 181:1

189:11 197:15 201:1

**legally** 93:21 133:21 197:11 197:12,14 198:1

**lengthy** 109:1

**leroy** 104:11 105:10 108:20

**letter** 149:10

**level** 13:7,7 191:2

**levied** 81:17

**liaison** 16:9,10

**lie** 102:1

**life** 60:20 62:16 74:20 169:7

**lift** 39:16

**likely** 9:15 39:17 49:2 149:9

**lilly** 1:19 5:18 199:12 200:5,20

**limit** 26:2,3 47:25 48:6,17 50:22 51:21,22 51:23 52:1,4,17 52:21 53:7 56:11,12 57:19 57:24 58:4 59:6 59:10,11,17 74:15 117:9,10 117:13 129:16 129:23 130:8,23 137:21 138:2,10 138:11 181:12

800-726-7007 305-376-8800

**[limit - mails]**

181:14

**limited** 1:5 5:13 201:7

**limits** 155:14 160:22

**line** 44:24 51:21 144:11 202:3

**linked** 136:22 173:22

**links** 175:3,23 176:5

**list** 153:18

**literally** 133:18

**literature** 135:20

**litigation** 197:3

**litsup** 201:17

**little** 28:17 42:17 58:17 75:11 86:2 92:12 95:4,11 101:20 140:12 153:20 155:20 155:23 171:14

**live** 9:8 150:19 170:13

**llp** 2:9 6:7

**load** 45:2,3,20 56:22,24,24 57:4,8,10,14,16 57:19 137:20

**lod** 96:8,13,20 129:11 134:23 181:15

**logix** 105:11 111:6 140:21 144:24 145:11 155:19 167:13 167:17

**logo** 141:4

**long** 12:25 33:16 36:17 37:19 42:21 58:15 62:25 63:1 122:24 177:4

**longer** 86:2

**look** 8:3 48:23 61:3,9 100:3 117:12 129:11 132:1 139:12 141:5 150:24 157:6 166:15 182:22 195:12

**looked** 168:19

**looking** 20:14 46:7,11 61:8,16 125:24

**looks** 7:4 88:21 91:6 111:3 144:9

**lose** 123:25

**lost** 38:10 48:9 105:20 108:13

**lot** 21:16 33:25 34:5 39:12 44:2 44:16 45:22,25 46:2 50:24 53:4 64:11,14 65:2,3

65:6 70:24,25 105:15,25 106:3 106:9,12,20 112:15 126:20 134:5 152:14 162:11 164:3 169:12 171:5 178:5 193:18 196:8

**louis** 170:12,13 170:14

**loveless** 6:4

**low** 45:20 57:5 57:10,14

**lowe** 140:14 153:15,16,20,24

**lowest** 13:6 167:18

**lucky** 175:16

**lunch** 85:13 86:3 122:10,13 122:25

**lying** 142:23,24

**m**

**m** 3:2

**ma'am** 149:16

**machine** 126:11

**madam** 55:15 66:19 85:23 123:6

**maddie** 135:10

**made** 12:15 16:22 17:25 18:5 19:1 20:19 24:3 29:7 55:2

55:23 60:16 65:24 68:11,17 68:19 74:23 84:25 89:20 96:15 98:7 108:9 145:16 146:10,25 147:4 147:20 164:25 171:22,24 178:2 183:6 184:3 191:14,20 192:15,19

**madison** 96:1

**mail** 3:8,9,10,11 3:12,13,14,15 3:16,17,18,19 3:20,21 4:4,8 12:6 87:21 90:8 91:7,22 95:22 100:11 102:20 105:7,7,9 109:23 110:15 110:16 114:7 124:3,9,10,12 126:4 129:1,2,9 131:2 134:10 138:4 140:14 142:19 151:8 153:18 155:10 155:11 163:22 168:18,25 169:10,23 174:4 174:5

**mails** 12:6 81:21 81:22 88:12

**[mails - mean]**                                                                Page 229

110:15,18,19
131:6 152:9,13
**main** 22:11
76:12 136:5
**major** 33:8
52:21 73:17,21
**majority** 188:25
**make** 16:10
19:5,12,13,14
20:3 25:21 27:6
31:6 32:17 34:7
43:19 50:13
53:16,18,21,24
54:1 55:5 63:21
75:11 80:23
83:7 85:7 87:11
93:22 95:25
99:8,14,15
107:3,19,20
108:13,21
109:10,10
112:21 142:20
144:5 148:25
149:11 151:19
152:19 164:2
168:2,7 180:23
183:18 184:24
189:15,20
190:23 191:1,8
195:12 197:19
197:20 198:1,2
**makers** 192:1
**makes** 15:6
22:12,20 25:3
132:18 164:9,19

184:23
**making** 18:25
31:8 40:24 41:9
93:23 94:1
125:21,22 163:2
163:4
**management**
35:21 73:6
75:15 76:19
82:15 106:19
113:7,8
**manager** 14:3
**managing** 77:5
**mandatory**
191:8
**manner** 140:23
**manufacture**
15:10 16:1
22:22 42:4,7
115:2,7 116:1
183:2
**manufactured**
22:8,23 115:18
115:18,19
118:12,14 125:8
125:10 127:7
**manufacturer**
58:5 115:21
135:22 177:24
197:23
**manufacturers**
33:9 112:18
**manufacturing**
35:9 77:7

**map** 36:6
**marathon** 9:5
**march** 111:2
166:22
**marcus** 2:9
**margin** 58:10
58:12,25 62:1
**mark** 87:15
96:1,6 103:3,15
103:24 111:21
154:25 175:7
**marked** 87:17
90:19 94:7
99:24 102:25
103:17 109:18
113:23 122:7
128:11 134:1
139:24 144:2
150:21 155:1
159:21 166:5
168:14 175:17
195:7
**market** 15:23
16:12 19:11
27:3,9,15 33:7
40:7,9 41:16,23
42:6,10,23 43:2
43:14,21 44:2,7
102:11,15
112:17,19
113:17 133:14
136:24,25 137:8
142:13 147:14
197:24 198:2

**marketed** 56:5
**marketing**
17:23 33:24
34:12 40:8 44:4
44:5,6 142:11
197:21
**markets** 16:11
**marking** 93:1,5
93:23 98:7,8,13
98:17 102:18,19
138:5 147:12
**married** 14:9
**master** 13:11
**master's** 13:12
**material** 110:21
141:3 163:10
**materials** 81:20
81:23 125:16
127:8 167:6
**mathematically**
116:11,20
**matter** 5:12
55:15 86:22
155:21,25 158:1
179:2
**matters** 10:20
192:21
**mba** 13:10
**mcc** 97:9 98:1
**mean** 7:17,18
22:15,16 23:3
23:21,21 31:7
36:3 37:6 39:23
44:24 50:10
51:22 52:2

**[mean - missing]**                                                    Page 230

58:12 59:23 60:1 61:6 74:6 80:19 90:13 97:11 106:2 108:4,12,15,16 108:22 109:2 110:12,20 117:1 118:8 129:19 130:6 131:20 141:21 145:15 146:1 148:4 149:8,25 156:1 159:4 160:25 162:4,5,6 163:23 169:9 172:13,15 186:14,21,22 189:13

**meaning** 102:11 134:4 198:6

**meaningful** 60:19 139:6

**means** 37:8 45:1 46:3,14 97:12 108:17 117:8,9 117:12,14,16,17 130:7,10 135:4 138:9,11 158:25 170:5 185:9,20 185:20,24

**meant** 10:22 159:5 164:12,16 172:4 185:23 186:20 187:7

**measure** 62:21 146:5

**measured** 52:4 52:5 63:1 146:6

**measurement** 52:7 63:2

**measures** 146:8

**media** 5:11 67:5 67:8,11 69:21 70:2 71:24

**medical** 40:15 42:4 49:22 112:3 150:3 167:8 197:17

**medication** 10:24

**meet** 12:25 16:1 34:2,4,10,22 40:3,5,25 50:4 115:2,7 132:3 193:2,3

**meeting** 24:18 41:12

**meetings** 35:21 73:5,6 75:16 76:19

**meets** 28:14,15 61:18

**member** 89:4

**memo** 95:25

**memory** 20:6 139:7,10

**mention** 126:19 162:1

**mentioned** 1:22 14:25 19:6 32:22 37:18 42:24 52:24 53:1 55:7 70:5 71:17 92:1 93:10,13 116:24 118:6 156:18

**mess** 49:14

**messages** 12:7

**met** 14:9 98:12

**method** 59:5,11

**methodology** 97:18

**methods** 49:8 139:9 167:6 182:12

**metric** 27:19 44:8 52:5 56:18 60:5 181:15

**metrics** 25:25 26:5 47:13,16 52:22 53:7 64:9 180:6 181:15,20

**mexican** 54:9 120:16 121:11

**mexico** 121:2

**mfasano** 2:3

**miami** 2:5,11 199:4 200:4 201:2,17

**michael** 2:2,7 5:22,24 55:11 80:19 84:18 87:10 94:9

148:17 174:8 195:21

**microbacterial** 31:9

**microphone** 101:20

**milazzo** 84:16

**miles** 52:15

**milligrams** 117:14,16

**milliliter** 129:17 138:11

**mind** 12:1

**mine** 70:5 95:5

**minimal** 24:10

**minimum** 111:9

**minus** 59:1,2

**minute** 94:15 154:18 163:16

**minutes** 50:25 86:12 173:3 196:11,13

**mischaracteri...** 27:22 69:1 170:3

**misleading** 157:8 178:20 189:8,9

**misquoted** 170:9

**misrepresents** 180:12

**missed** 90:24

**missing** 96:16

**[misstate - never]** Page 231

**misstate** 19:20

**misstated** 172:17,17

**misstatements** 133:9

**misstates** 55:24 104:21 159:14 185:15 188:2

**mistake** 20:3 74:23 108:10 171:23,24

**mistaken** 46:17

**mistakes** 68:18 163:5

**misunderstan...** 105:15,25

**misunderstood** 100:14 170:8

**ml** 117:14,16 129:14

**mnrlawfirm.c...** 2:7,8

**model** 117:21

**molecular** 4:6 180:2,6

**molecule** 21:24

**moment** 33:19 86:14 87:9 195:13

**monday** 111:15 111:18 140:15 155:16

**money** 132:25 133:2

**monitor** 163:8

**monitoring** 162:10 163:1

**monitors** 56:4

**month** 13:14

**months** 12:15 164:12

**morning** 50:24 111:18

**mosquito** 31:24 32:9

**mosquitos** 31:14,20,24 32:12

**mountain** 21:3 123:3

**move** 20:7 21:3 40:18,21 43:4 71:22 90:17 94:4 99:16,22 102:23 109:22 112:22 113:19 139:21 164:16 168:6 173:19 176:16,17

**moved** 77:22

**moving** 40:24

**mpinero** 2:7

**multiple** 138:20 179:14

**multivariable** 28:22

**murphy** 1:10 201:9

**n**

**n** 3:1,2,2 4:1 7:14 84:18 104:11 174:6

**nacht** 84:18

**name** 5:17 7:10 7:12 31:15 71:10,12,16 74:24,25 75:1 75:23 77:2,16 78:2 82:14 84:12,15 119:23 119:24 121:18 121:21 193:5

**named** 6:10

**names** 150:1

**nasdaq** 180:1

**nasopharyngeal** 47:15 167:6

**national** 15:5

**navigate** 41:6

**ncov** 105:11 111:6,12

**nda** 92:6,19

**nebraska** 165:21

**necessarily** 51:17,18 79:24 162:25 181:3

**need** 9:5 24:8,20 39:2 40:5 41:4 45:23 61:15 91:11 95:25 98:22 101:19 111:9 122:10,24

132:11 152:7 159:23 160:6 181:6,9

**needed** 19:4,12 165:19

**needs** 27:20 28:15 40:7 43:9 43:9,11,12 44:17 61:16,18 76:11 97:17 110:4 132:3 135:14 154:17

**negative** 45:17 114:25 117:25

**negatives** 26:18 97:3,5,16,17,21 97:25 138:16,17 187:21 188:6

**neiman** 2:9

**nelson** 1:9 201:8

**never** 12:5 32:24 34:6 37:21 39:14 75:6 90:10 93:15 99:13,19 114:19 126:3,5 126:23,24 129:7 131:8 143:6,16 145:16 146:9,25 147:4 152:2,3,4 153:8,9 154:16 165:20,23 166:16 168:2 189:4

**new** 2:20 38:21 38:21,25
**newly** 109:1
**news** 65:23 112:9
**nice** 21:20 50:16 151:22 192:23
**night** 106:11
**nile** 31:19
**nine** 113:19 129:11
**nomi** 54:9 192:3 193:21,25 194:3 194:5
**non** 79:20
**nope** 11:2 81:8 120:7
**normal** 105:16 106:1 142:17
**nosey** 12:2
**notary** 1:19 200:5
**note** 5:3 6:9 145:10
**noted** 195:14
**notes** 12:10 196:11
**notice** 1:21 86:22 134:22 201:21
**noticed** 48:9
**novel** 165:1
**nowadays** 105:16 106:1

**npv** 97:9 98:1
**number** 3:8 4:3 4:7 5:15 11:4 25:8 26:7 28:1 28:18 34:20 52:6,13 53:1 56:24 58:10 59:9 88:21 97:2 97:3,4,5,14,16 115:5 122:5 133:24 139:2 143:15 157:23 158:22 162:9 167:12,12 175:16 179:6 180:11,23
**numbers** 34:14 62:2 92:5,18,22 92:24 93:2,4 137:22,24 138:7 138:15 139:19
**ny** 2:20

**o**

**o** 3:2 174:6 201:5
**oath** 8:11
**obadin** 174:6
**object** 9:12 91:1 91:12 173:24
**objecting** 80:21
**objection** 9:19 19:20,20 21:11 23:14 27:22 30:21 32:21 41:17,24 42:12

54:25 55:24 59:3 60:12,21 60:23 61:12 62:4 65:25 66:2 67:1 69:1,23 78:14 79:17 84:25 85:1 89:25 93:11 99:7 104:21 106:25 107:11 107:21 108:1 112:1,12 115:11 116:21 118:23 118:25 119:6,14 119:21 120:11 120:11 121:3,6 121:8,24 124:25 127:16 132:8,20 132:22 133:9 135:21 147:6 148:5,14,19 149:5 154:2 157:11 159:11 159:14 162:16 170:1 171:2 172:5,21 178:24 179:15 180:12 180:25 184:12 184:20 185:6,15 186:2,23 188:2 188:17 189:11 189:22 190:9,18 192:15,19,24 196:5

**objections** 80:23 90:6 172:12
**objectives** 28:6
**objects** 9:13
**obligated** 100:20
**obscured** 103:3
**obtain** 97:25 153:3
**obtained** 81:11 84:5 93:5 98:3 145:25 146:16 146:18 162:9
**obtaining** 23:25
**obvious** 35:13 35:16
**obviously** 84:22 111:17
**occurred** 18:19 35:5 168:11
**october** 14:13 21:1
**offense** 8:5
**offered** 21:6
**offering** 22:2,10
**office** 101:7 201:16
**officer** 72:20 189:25 190:12
**official** 93:1 98:14,15 199:8 200:15
**oh** 7:4 10:3 13:15 14:22

**[oh - okay]** Page 233

29:7 55:13,20
63:21 65:5
68:20 76:1
78:16 90:22
94:23 95:9,13
95:13,18 101:18
103:16 104:5
123:25 136:5
148:17,20 164:8
166:15 174:10
174:12 176:23
193:14 195:24
**okay**   7:8,10,15
7:20,23 8:1,10
8:14 9:1,3,9,22
9:23 10:11,16
10:18,22 11:3
11:10,11,12,15
11:22 12:1,17
12:21,25 13:3
13:12,15,17
14:19,25 15:11
16:4,7,16 17:7,9
17:16,22 18:18
19:17,23 20:1,5
20:24 21:2,8,13
22:4,20,25
23:11,18 24:4
24:15 25:2,13
25:18 28:17
29:9,25 30:6,14
31:2,4 32:19
35:12,14 36:2
37:5 38:18
39:18 41:14

42:2,17 44:8,12
44:15,23 45:8
45:10,11,16
50:21 51:3,12
51:20,25 52:20
53:2,10,14,23
54:4,7,12,19
55:7 56:2,7,11
56:16,20 58:25
60:8,19 63:14
63:22 64:7
65:22 66:9,12
66:19,22 67:11
67:19,23 68:6
68:22 69:6,15
70:1,9,13 71:5,9
71:9,15,17,22
72:22 73:2,11
73:23 74:5,22
75:10,17,23
76:1,4,22 77:9
77:13 78:1,11
78:16,22 79:14
79:22 80:18
81:5,9,13,16,23
82:1,9,16,16,18
83:18,23 84:2,7
84:11,20,22
85:3,4,22 86:4
86:11,20 87:7,8
87:9 88:20
89:14 90:16
91:8,10,17,19
91:22 92:9,12
92:13,23 93:3,5

93:18 94:4,21
95:1,16,18,22
96:23 97:2
98:18,24 99:1
99:22 100:4,9
101:3,5,9,12,22
101:24 102:5,9
102:23 103:16
103:19,21 104:2
104:5,8,10,14
104:18 105:5,9
108:7,25 109:16
110:22,25 111:2
113:13 114:1,7
114:18,22 116:4
116:9,18 117:22
119:11 120:4,8
120:16,20
121:18 122:3,4
122:9 123:2,9
123:23 124:1,4
124:7,21 126:7
127:4,11,25
128:4,7,7,14,23
128:25 129:9
130:3,11 131:5
133:17,23 134:9
134:20 135:6,9
135:25 136:14
137:18 139:5,20
140:6,8,10
142:6 143:8
144:1,8,14,20
144:20,23 145:8
146:7 147:21

148:20 149:14
149:19,24
150:13,17,24
151:7 152:21
153:4,7,10,14
154:6,10,17,22
154:24 155:4,6
155:7,8 157:2,5
157:16,21 159:4
159:20 160:7,8
160:19,20
161:10,14 162:3
162:12 163:14
163:20 164:8,16
165:7,10,14,21
165:24 166:3,8
167:2,5,16
168:4,9,13,17
168:23 169:9,15
169:22 170:11
170:23 172:2,10
173:3,6,13,16
173:25 175:6,13
176:12,19,23,25
177:6 178:13,16
178:19 179:21
180:17,20 181:5
181:8,9 185:8
185:11,18 186:9
186:21 187:5,8
188:9,23 189:17
189:19 190:6,15
191:21 192:5,10
192:14 193:14
193:21,24

**[okay - p.m.]**

194:21 195:3,13
196:11,15,16,17
196:23 198:16
198:17
**omitted** 154:2
**once** 43:10,16
43:23 44:3 72:1
109:23
**ones** 132:3
177:25 178:3,6
195:1
**ongoing** 36:21
81:13
**open** 33:7 96:5
129:12 140:23
**operated** 22:14
**operational**
49:1 71:2 77:7
**operations**
70:24 77:23
105:17 106:1,17
106:17,19
**opine** 169:24
**opinion** 50:1
51:19 68:16
90:2 116:10
181:3,3 185:3
190:1
**opportunity**
21:18 32:4 33:7
135:12
**oppose** 195:10
**opposed** 23:13
45:25 46:13

**option** 49:3
**options** 95:11
**order** 34:21
38:25 40:5
42:10 79:25
104:1 111:10
113:20 132:10
132:13,15
138:24 142:20
189:7 190:23
195:8,12 197:24
**ordering** 201:20
**orders** 35:10
**original** 61:25
201:20
**ostler** 2:13 3:4
6:3,3,9,14,17
7:3,5 11:16
19:20 21:11
23:14 27:22
30:21 32:21
41:17,24 42:12
54:25 55:10,24
59:3 60:12,21
60:23 61:12
62:4 63:17,19
65:25 66:2,13
67:1,14 69:1,23
78:14,16,25
79:17 80:4,19
82:16,19,22
84:25 87:1,7
89:25 90:6 91:1
91:6,9 92:1
93:11 94:9,11

94:14,17 95:7
95:10 99:7
101:17,19 103:3
103:12,16,19,24
104:21 106:25
107:11,21 108:1
109:25 110:2,11
110:18 112:1,12
114:2,5 115:11
116:21 118:23
119:6,14,21
120:11 121:3,5
121:8,24 122:9
123:25 124:25
127:16 128:16
132:8,20,22
133:9 135:21
147:6 148:5,14
148:17,21 149:5
154:2,7 157:11
159:11,14,23
160:2 162:16
170:1,3 171:2
172:5,12,21
173:21 174:3,14
175:7,14 176:8
178:24 179:15
180:12,25
184:12,20 185:6
185:15 186:2,23
188:2,17 189:11
189:22 190:9,18
195:4,21,25
196:5 197:8
198:14 201:5,11

**outcome** 56:23
57:8,16
**outcomes**
165:25
**outside** 54:5,12
79:7
**overall** 60:10,19
**overlap** 47:23
**overlapping**
83:9
**owen** 2:23 6:10
6:11 86:23,24
87:22 90:17
91:4 94:21 95:3
103:5 109:17
113:19 122:4
123:19 128:8
133:24 140:11
144:21 150:14
150:19 154:24
164:18 166:4,10
173:19 174:9
179:23 181:7
192:16
**own** 21:10
29:14 74:14
95:8 107:3
132:21 139:21
142:12 181:7
**owner** 136:5

**p**

**p** 77:2
**p.m.** 1:15 48:14
51:7 85:6,7,8
86:18 94:20

Veritext Legal Solutions

**[p.m. - percent]** Page 235

105:22 123:3,3 123:12,15 154:20,23 173:8 173:11 174:19 174:22 196:18 196:21 198:18 198:20

**package** 16:21

**padeh** 167:8

**page** 3:3,8 4:3 87:24 91:16,20 95:18 100:5 103:2 104:5 110:12 124:4 128:25 136:14 142:16,17 144:8 144:20,21 146:19 151:3 155:5,9 163:20 176:9,22,24,25 177:15 179:23 181:5,9,11,17 201:16 202:3

**pager** 151:1,2

**pages** 100:8 104:3 200:8

**paid** 67:3

**pandemic** 18:20 22:14,17,23 23:2,7,12 29:21 31:7 32:20 36:16 39:5 106:7,8

**paper** 12:11 136:3 169:2

**paragraph** 157:22 180:14 180:19,20 181:11

**parallel** 160:12

**parameters** 25:12,14,22 27:4 39:6 44:11 44:12 50:7 53:1 96:19

**paren** 140:24,24

**parenthesis** 96:6,7 129:12 129:13

**parr** 2:14 6:3 84:9

**parrbrown.com** 2:14

**part** 7:1 8:7 16:16,21 18:4 19:7 24:15 35:2 49:5 53:9 54:5,6 54:17 55:5 81:20 90:24 107:24 144:25 168:19 173:23 195:25 196:1

**participants** 5:6 167:7

**participate** 191:23

**particular** 80:21

**parties** 5:9 93:20 200:12

**party** 20:21 96:25 156:23 157:19 197:3

**pass** 197:1

**passed** 70:21 153:15

**passing** 114:23

**past** 26:2

**patented** 180:2

**pathwest** 54:9 156:6

**patient** 57:2 101:7

**patients** 136:19 136:21 137:9,11 137:13,14,17

**pay** 30:13 54:12 65:23

**paying** 34:13 35:22 36:1 67:7

**pcr** 22:8 36:14 37:9,10 48:7 119:17 120:18 132:15 169:13

**peak** 34:2

**peer** 36:7 135:5 135:7 136:3,9 143:20

**pen** 63:19

**penalties** 81:16 202:22

**pending** 9:8 66:13 78:11

**people** 21:16 49:13,15,20,23

49:24,25 50:2,7 56:16 62:3 63:8 67:4,8 72:14 75:10 76:10 82:7,14 88:9,21 89:7,22 91:24 102:6 105:10 106:3,9,12,20 108:3 109:6 112:21 113:5,12 113:15,15 120:5 124:9 133:18 143:10,13 151:15,17,21,21 161:25 164:1,3 164:16

**percent** 25:2,10 51:24 52:9,13 53:15,20,24 54:1 58:14,23 58:24 59:1,1,1,2 59:14,15,22,22 60:9,15,15 61:24,25 98:3 98:10,20,22,25 99:1,12,13,13 99:18,19,20 107:8,8 108:24 114:24 115:1,3 115:5,8 116:5 116:10,12,17,19 116:25 117:2,6 117:11,18,19,21 118:1,1,4 124:13,18

**[percent - plaza]**                                                    Page 236

127:14 128:1,2
129:18,18 130:9
130:9,17 131:7
131:7,21,22
137:19,20,23
138:14,15 141:7
141:7,15,16
142:3,3,9,10
143:9,9,11,13
145:10,10,12,13
145:15,15,17,17
145:23,23 146:2
146:3,10,10,14
146:15 147:1,1
147:2,3,9,23,24
148:1,2,9,12
149:1,2,4,12,12
149:17,17,21,21
152:23,24
153:22,22,24
154:4,4 155:18
155:19 156:6,7
156:13,14,18,19
156:22,22 157:7
157:8,24 158:1
158:4,5,9,10,24
159:1,2,9,9
161:23,24
162:22 167:18
167:19,25
171:20,21 172:3
177:9,9 178:21
178:22 179:6,7
180:5,5,22,22
181:24 182:6,23

183:13 187:10
187:17,25
188:20
**percentages**
24:24
**perfect** 87:14
107:10 130:24
141:2 175:13
189:1 198:16
**perfection**
153:25 184:10
184:18
**perfectly** 153:23
188:11,15
**perform** 40:17
64:25 74:5
134:23 187:10
188:15
**performance**
4:5,10 24:9
27:12,13,13,14
39:1 40:5,12,23
57:21 68:2 74:3
74:13 89:18,19
94:2 117:2
128:5 138:4
141:8 152:7
169:19,21 177:8
180:4,9,10
182:14 193:19
194:18
**performed** 41:8
54:16 61:11
65:9,11,13
141:11 156:23

183:2 188:11
192:10
**performing**
137:16
**performs** 60:20
188:19
**period** 30:17
33:16 34:21
**perjury** 202:22
**person** 13:5
15:13 36:4
50:14 57:6
62:25 63:2,8,9
70:4 76:9 84:15
107:13,15,15
108:9,11,13
133:4,13,16
143:17 164:13
180:18 184:15
184:17,23
**person's** 74:24
**personal** 12:6,6
30:25 34:16
67:13
**personally**
75:22 84:3
199:6
**personnel** 35:4
35:8
**perspective**
21:23 74:2
88:24
**peter** 84:20
**ph.d.** 14:6 73:21
73:22 181:14

**pharmaceutical**
15:5 42:4 112:3
**pharmacist** 13:9
13:19 15:6
184:16
**phase** 40:18,21
40:24 43:3,4,8
43:18 57:1
58:19
**phases** 40:17
**phrase** 163:20
164:14 184:9
185:17
**pieces** 109:12
191:1
**pineiro** 2:7,9
5:24,24
**place** 5:9 29:22
43:2,22,25 44:4
108:9 129:1
152:12
**placed** 23:12
62:2
**places** 31:25
33:11 64:23
177:19
**plaintiff** 1:6
2:11 5:23 6:20
**plaintiffs** 5:25
6:2,10
**planning** 17:20
**platform** 180:3
**play** 160:5
**plaza** 2:19

**please** 5:3,20 7:11,13 9:6,17 79:8 86:24 105:7 109:23 121:7 122:5 123:19 134:12 141:8 147:18 149:11 153:12 153:18 160:1 168:19 175:4 183:4 194:16 198:13,15 201:13,15,16

**pllc** 2:3

**plus** 59:1,1 97:21

**poc** 100:21 101:3,4

**point** 17:22 18:12,22 20:17 25:7 44:18 53:14 68:20 78:7 83:12 92:23 93:18,21 99:16 101:4 120:23 125:3 126:8 135:6 146:4 151:25 152:8 154:14 171:18 179:2 181:20 182:3 186:7 191:9,18

**pointed** 98:9

**pointing** 47:20 126:4

**points** 141:6 142:22,25

**police** 100:19

**poor** 67:22 68:3 68:7,11

**poorer** 129:12 129:12

**poriya** 167:9

**portfolio** 23:8 23:10

**portion** 56:4 66:25 103:24 109:22,23 110:8 110:11,12

**portions** 195:6

**position** 21:6,7 80:6 177:3 182:21 183:21 193:6

**positive** 45:23 46:6,16,17 47:25 97:22 115:1

**positives** 26:18 97:3,4,16,17,21 97:25 114:24 118:2,4 138:17 138:17 187:21 188:5

**possibilities** 22:1

**possible** 41:16 49:24 50:1 111:25 172:2

**posterity's** 150:19

**potential** 162:15

**potentially** 178:20

**ppv** 97:8 98:1

**pr** 155:21,24 156:5,8,9,12,13 156:17,21,21 157:1,2,2 161:11,12,15 183:18

**practical** 85:6

**practically** 34:20

**precisely** 120:25

**precision** 96:3,8 96:12

**prefer** 85:19,20 85:20

**preparations** 79:4

**prepare** 12:21 145:6

**prepared** 34:5

**prerogative** 135:11

**prescription** 10:24

**presence** 4:6

**present** 2:22 13:19

**presentation** 48:7,18 57:1

**press** 4:9 68:24 68:24 69:8 71:3 71:7,24 72:4,5 104:17,20 105:2 105:13 111:18 111:24 112:7,10 113:14 133:17 156:18 157:2,7 161:12,20 169:3 172:10,20,25 173:14,21,23 174:25 178:2,7 178:10 179:9,18 183:22 184:1 185:16 189:7 190:8 191:5,9 191:10,13,17 194:22,24

**pressure** 102:10 102:14,16 112:15,18,19,20 112:21,22 113:3 113:4,6,8,9

**pressured** 112:24,24

**pressuring** 113:5

**pretty** 169:12

**preventative** 19:3

**previous** 102:19 105:13 138:4 163:15

**previously** 55:21 96:3

**[previously - professional]** Page 238

129:13 173:15 187:24 192:15 192:20

**prey** 190:3

**price** 30:1

**primarily** 100:23

**primer** 100:15

**primers** 25:24 125:4,6,7,9 127:6

**print** 131:1

**printed** 114:22

**printing** 129:10

**prior** 18:1 27:23 29:20 33:23 55:24 69:2 77:20,20 102:20 188:3 191:5,12 191:18

**priority** 23:12

**privileged** 79:24

**pro** 8:5

**probably** 8:5 9:17 20:10 71:5 103:8 122:13,18 138:3,4 142:6 158:18,19 160:13,14 163:25

**problem** 37:22 46:5 49:10 142:18 143:5 147:17 171:5

**problems** 151:14 170:22

**procedures** 139:10

**proceeding** 7:23 8:8,12 10:20

**process** 13:22 15:4,8,18,21,25 16:3 19:8,12 26:20,21 27:8 28:25 29:4,19 29:22 34:7 36:21,25 37:19 37:20 38:20 39:13,21 40:4 40:14,16,22 41:6 42:25,25 43:2,6,11,15,17 43:19,23 49:2 53:9 55:5 59:7 59:18,21 71:1,2 72:2,16 74:4,6 74:12,15,16 76:11,17 77:6,7 77:12,24 81:20 102:22 108:25 109:2,6 115:22 115:22 162:14 190:20 194:1

**processes** 23:19 34:15 49:18 76:21 109:3,9

**processing** 35:10

**procure** 125:17

**procured** 127:8

**procurement** 106:17

**procuring** 48:22 49:14 50:15

**produce** 16:14 27:7 81:23 83:8 83:9

**produced** 83:13 83:14 118:20,20 119:7,12,22 120:21 121:12

**producing** 15:19 32:24 118:7

**product** 15:25 16:12 20:20 22:11 23:9,10 23:13 24:6,9 27:3,9,15 28:4,7 28:14 29:23 32:18 33:11 37:2,3,8,8,15 38:23,24 40:6 43:17,19,20,21 44:5,17,17,21 44:22 45:3 47:23 48:23 50:18 56:5 60:7 61:17 67:6 74:11 89:18 102:11 119:24 120:1 127:10,22 130:10,12,22,24

131:17,18 133:15,22 136:11,13,25 138:12 141:22 142:13,21 143:4 143:4 146:5,5,8 147:10,14 151:24 158:14 177:18 183:7,10 184:23,24,25 185:3,4,10 197:12

**product's** 60:10

**production** 201:23

**products** 15:10 15:19,22 17:23 19:9,10 22:1 23:8,13 32:7,9 32:13,15,16,18 32:24 33:1,7,9 33:13 39:23,24 44:20 65:24 70:23 94:2 112:17,18,22 113:16,17 125:23 133:14 139:8 150:3,7 197:24

**profession** 14:10

**professional** 13:18 150:2 196:24 197:4 199:13 200:20

**program** 13:11 13:13,15 14:6,7 14:7 32:5
**progressing** 36:24
**projects** 70:17 76:8
**promise** 93:4 195:3
**promoted** 17:14 140:22 141:9,19
**promoting** 151:11,13 163:9
**promotion** 140:25
**pronouncing** 167:9
**proof** 43:7 187:1
**proper** 163:2
**properly** 63:6 66:7 71:21 163:13 194:5
**proposing** 72:13
**proprietary** 111:8
**protective** 104:1 195:7,12
**protocol** 24:7,22 25:4,20 26:24 38:23 49:4 60:14 61:1 139:14
**prove** 26:7 136:7 137:15

**provide** 11:24 18:8 19:4,15 25:23,24,25 33:13,14 49:8 82:9,11,13,14 169:20
**provided** 26:1 49:24 63:7 82:6
**provider** 136:18
**provides** 24:7
**providing** 41:11 82:2,4 88:17
**public** 1:20 18:1 18:5 19:1 30:12 40:9 49:15 65:20,24 67:12 75:5,8 79:20 105:16 106:1,6 106:23 107:7,9 107:18,20,20 112:8,9,16 113:8,9,11 131:16,18 132:6 132:14,16 133:8 133:8 135:20 150:4 189:20 191:6 200:5
**publication** 135:15 136:3
**publications** 69:8 73:19 134:25 135:3
**publicly** 113:14 132:17

**publish** 36:7
**published** 19:16 36:5,11 72:7 146:19 153:9
**punitive** 5:23
**purchasing** 137:12
**purpose** 27:10 27:11 43:13 54:22 55:4 83:10 106:15 108:17
**purposes** 54:22 86:9
**pursuant** 1:21 11:13
**pursuing** 14:5
**push** 79:23
**pushing** 89:23 112:16
**put** 18:2 79:5 91:12 96:2 111:24 112:10 112:17,18 113:17 115:5 133:2 135:19 146:17 147:19 151:20 152:18
**putting** 16:13

## q

**qualified** 73:24 189:20
**qualifier** 151:24
**qualify** 148:11 149:3

**quality** 5:4,5 13:24,25 14:3 15:12,21 28:10 68:3,7,11 115:23 136:8 185:10,12
**question** 8:23 9:8,13,14,14,17 9:18 10:12,13 10:15,22 19:24 28:17 42:21 55:11,14,16,20 58:17 61:25 66:5,13,23 73:13 80:21,24 83:10 88:6 91:11,18 95:21 96:6,10 98:18 100:9,10,25 102:13 107:5,7 109:24 110:24 115:4 116:4 119:3 124:5,7 134:8 141:13,17 141:18 144:6 145:8 148:24 151:6,7,10 154:7,12 155:7 155:8 160:18 164:13 165:19 168:22 196:1 197:9
**questioning** 157:18

**[questions - redact]**

**questions** 8:19 10:14 11:7,9,9 35:12 50:21 61:21 76:10,14 76:17 80:11,20 80:22 84:23 85:5,10 87:25 123:24 158:20 164:15 166:25 173:18 177:1 192:25 193:16 195:6 196:14,25 198:4

**quick** 86:8

**quickly** 111:25

**r**

**r** 2:18 199:1 200:1

**r&d** 89:2

**raised** 193:25

**randomize** 26:15

**randomized** 26:16

**range** 62:11,12 62:17 117:20

**rapid** 30:18

**rarely** 64:25

**rashbaum** 2:9

**rate** 30:19 139:5

**ratio** 95:13

**raw** 43:5 125:15 127:8

**reach** 33:10,10 99:1

**reached** 142:15

**reaching** 43:1

**react** 112:9

**read** 11:6 66:22 66:24 68:5 109:23 114:3 123:23 128:15 144:25 151:1 152:8 167:22 168:17 173:16 175:5 177:5 181:7 198:7 201:15 202:3,22

**reading** 155:11 168:3,8 180:18 201:19

**ready** 7:8 11:9 32:17 43:17 66:9 72:6 85:13 86:5 87:23,24 89:24 128:15 150:25 155:4 168:20 173:17 175:4

**reagent** 28:14 37:9,13,16 48:22 52:12 57:24 132:2,15

**reagents** 22:8 22:24 50:8 61:15 126:11

**real** 60:20 62:16

**realize** 109:12

**really** 7:21 27:24 30:3,8

32:4 51:13 74:14 78:6 85:17 89:5 107:4 126:15 162:2 168:5 177:24 195:20

**reason** 10:18 18:6 21:16,20 39:17 63:22 89:1 108:9 125:25 202:3

**reasonable** 15:18,24

**rebecca** 77:15 77:16 114:8,16 117:23 118:11 134:11,12 135:12 136:16

**recall** 17:7 19:17 24:23 29:25 30:6 34:15 55:21 56:7,8 64:7 68:9 68:10,25 75:17 78:5 79:14 104:10 120:2,18 134:15,16 164:9 170:16 192:2,5 193:24

**receive** 16:17,20 65:10

**received** 11:13 16:24 137:7 155:16 156:25 178:1,5 186:6

**receiving** 44:1 64:12 104:11 156:15 177:17

**recollection** 88:8,16

**recommendati...** 72:9

**recommendati...** 72:8

**recommended** 183:14,14

**record** 5:1,10,21 7:11 10:7,9,11 35:14 38:11,12 48:10,12,13 51:5,6,8,9 85:1 86:15,16,17 91:1 94:11,18 94:19 104:22 105:21 115:6 123:9,11,13,15 150:18 154:18 154:19,21,23 173:4,7,9,10 174:1,7,16,20 174:21 193:12 195:5,15 196:13 196:18,19,21 198:18

**recorded** 5:7,11 65:14

**recording** 5:4,8 38:10 86:10

**redact** 183:18

**[redo - remember]**

**redo** 10:6 41:20
**reduced** 58:9
**reed** 1:10 88:22
  89:16 201:9
**refer** 117:6
**reference** 26:13
  26:13 39:8 54:9
  54:10 64:13,23
  114:11 126:9,20
  164:10 177:19
  201:12
**referencing**
  197:15,16
**referring** 67:21
  101:10 115:9
  156:17 163:24
  164:1,7
**reflect** 153:5
**refresh** 20:6
  88:8,15
**regarding**
  105:11
**regards** 31:3
  61:15 76:20
**register** 40:5
**registered** 19:10
  29:23 32:7
  147:11 199:13
  200:20
**registration**
  16:11 40:3 41:9
  41:13 177:20
  197:20
**regulated**
  197:21

**regulation**
  198:3
**regulations**
  105:14
**regulatory** 14:3
  14:15 16:9,15
  17:14,17,19
  19:6 41:8,12
  70:20,22 71:1
  72:17 76:8,10
  76:11,15,17,20
  82:6 89:5
  102:17 110:7
  133:13,15,21
  136:10,23
  140:18 143:21
  144:10 145:1,2
  145:6 150:5
  165:19,19
  190:25 193:19
  197:17
**reja** 129:3
**relate** 177:13
**relating** 10:19
  80:14,15,16
  81:6 88:10
  102:6 112:7
  166:21 170:18
  186:17 192:7,21
**relation** 124:19
**relations** 70:4
**relationships**
  194:2
**relative** 134:23
  200:12

**release** 4:9
  36:17 72:4,6
  89:24 92:22
  111:18 156:18
  157:3,7 161:12
  161:20 172:10
  172:20,25
  173:14,21,23
  174:25 178:2,7
  178:10 179:9,19
  183:22 184:1
  185:16 189:7
  190:8 191:5
  194:22
**released** 18:1
  35:19,22 36:16
  65:19 166:22
  180:4,9,10
**releases** 4:9
  68:24 69:8 71:4
  71:7,25 104:17
  104:20 105:2,13
  111:24 112:8,10
  113:14 133:17
  177:7 191:9,10
  191:13,17
  194:24
**releasing** 88:10
  89:6 92:3,22,24
**relevant** 86:21
  181:19
**remarkable**
  21:17
**remarking**
  181:12

**remember** 7:20
  7:22,23 8:2
  16:24 17:2,3,9,9
  18:14,16,18
  19:25 20:8,9
  31:11,15 32:7
  35:4 53:12 54:7
  54:11,15 55:9
  66:14 67:11,23
  67:25 68:3,21
  69:7,7,9,10,11
  70:18 71:11,20
  71:21 73:2,10
  75:6 83:25
  84:10,12,14
  88:13,18,19
  96:17 97:12,22
  99:3 104:14,24
  104:25 105:2
  109:4,5,7,9,15
  115:16 120:25
  121:18 122:1
  124:3 138:1,6
  150:15 156:10
  156:11,20,21,25
  163:24 164:6,13
  164:14,20,23
  165:13 170:19
  170:20,21,21
  178:5 182:3,25
  183:20 186:10
  186:12 187:9,12
  187:21,23
  191:14,19 192:4
  192:8,9,10,13

**[remember - result]** Page 242

193:3,5,5,16 194:5,13 195:1 195:2

**remembered** 69:3

**remind** 71:18 147:19

**remote** 1:14 21:6

**removed** 156:12

**render** 100:22

**repeat** 18:2 66:4 66:17 131:9 163:8

**repeatedly** 181:23 183:12 188:24

**repeating** 53:3

**rephrase** 192:6

**replicate** 179:14

**replicates** 145:13 146:1

**report** 25:10 27:6 61:3 62:20 63:4 91:4 96:1 96:17 116:24 127:19 157:22 158:12,21 159:1 159:8 162:22 178:6 186:6 200:9

**reported** 129:13 179:18 187:24 200:7

**reporter** 5:18 48:8 55:16,17 66:19,21,24 85:17,23 86:2 105:19 123:6,8 199:13 200:20

**reporting** 61:2 62:8,10,11,13 62:22 63:3,24 63:24 68:4 128:1 129:14 131:11 143:16 143:23 154:14 156:22 157:18 158:8 162:8,14 179:2 184:4

**reports** 15:17 16:10 35:24 176:5 184:5,7 188:5

**represent** 5:22 83:23

**representative** 60:10

**represented** 9:11 11:15 83:1

**representing** 83:20 97:24

**represents** 97:20

**reproduce** 63:5 63:8 64:1

**request** 11:19 50:2 161:3

**requested** 25:25 32:23 49:9 66:24 81:21,22 82:3 147:18

**requesting** 49:25

**requests** 25:5

**require** 48:1

**required** 24:10 24:13 41:8 183:15

**requirement** 28:14 40:3,25 41:5 98:11,25 99:17,19 116:17

**requirements** 16:2 24:18 40:9 40:11 41:12 72:17 98:9,12 98:21 106:6 133:15,21 197:15

**requisite** 169:23

**research** 14:16 22:10,10 32:12 32:14 37:2,3,5 37:10,14 43:19 54:22 76:7,7 107:2

**researchers** 136:13

**reserve** 84:22 195:9

**resolve** 85:1

**resource** 76:9

**respectively** 167:19

**respond** 10:12 69:12,15,21

**responding** 31:3 71:24 192:12

**responds** 111:16

**responses** 118:17 195:6

**responsibilities** 194:2

**responsibility** 57:22 70:5 107:14 133:3,7

**responsible** 15:3,7 70:19 72:5 77:6,22 132:4 133:13 136:6 190:24

**responsive** 11:23 12:19 83:14

**result** 59:20 61:2,5 62:8,10 62:11,13 63:3,4 63:5,9,11,24,25 64:2,4,12 96:4 97:20,25 98:8 99:18 116:25 126:24 127:20 128:2 130:1 131:11,13 138:9 138:25 143:17

**[result - samples]** Page 243

143:24 145:25
146:16,16
147:10 151:24
153:2,5,8
154:14 157:19
158:8,8,11,13
158:15 159:18
162:8,9 171:17
183:9,10
**results** 26:25
40:13 43:4
53:11 65:13
88:10 89:2
95:24 96:7,12
97:24 98:5,19
99:3 106:16,16
113:15 114:10
114:22 115:25
116:2 124:14,22
125:24 126:1,5
126:12,23 127:1
130:13,18
137:25 138:7,19
138:24 139:6,19
141:10 142:5,8
146:18,20,22
151:20,23,23
152:3,6,7,10,11
152:14,15,18
162:7,7 167:16
181:13 184:4
185:12,13,21,25
186:4,6 187:12
188:13 192:5,7

**retained** 12:11
**retrieve** 183:18
**returned** 12:13
**review** 17:25
18:5,23 19:7,8
19:12 20:18
24:10 27:1
43:15 72:3,11
72:12 104:20
105:2 108:25
109:2,6 133:17
143:21,21
144:18 161:4
178:13,16
183:18 191:17
191:17 196:11
198:14
**reviewed** 36:7
88:7,8 95:2
135:5,7 136:3,9
139:18
**reviewing** 18:7
18:9,11,25
40:13,14 71:3,7
72:10,13 133:20
191:9,13 197:10
**reviews** 72:15
**richard** 1:10
201:9
**right** 8:6 11:6
20:12 38:4,7,9
39:25 41:19
51:4 65:18
80:25 84:25
86:10 87:6

91:12 95:6
96:18 97:13,23
103:9 109:21
117:4 124:24
131:14 144:16
147:16 148:9
161:12 164:23
166:12 174:1,2
174:24 175:15
175:16 198:5,6
198:11
**ring** 71:12 84:16
**risk** 106:18
**rna** 4:7 36:7,15
36:17
**road** 101:25
**rockefeller** 2:19
**role** 16:7 39:20
75:4 77:18 78:6
190:11 192:11
**roles** 17:13 40:2
**room** 66:7
106:10
**roughly** 18:13
42:24
**rpr** 1:19 200:5
**rule** 29:16
**ruler** 62:23
**rules** 8:4 197:19
197:22
**run** 58:23 72:9
139:1,1,3
**running** 72:14
112:4

**runs** 138:23
139:4,15
**ruo** 89:17
100:13 101:13
102:7 105:11
111:6
**rush** 111:23
112:2,9,14,15
135:18

**s**

**s** 2:4,8,10 3:2,7
4:2 7:14
**sake** 150:19
**sales** 34:12
75:25 76:6
140:25 165:18
177:18 194:3
**saliva** 47:15
141:1 143:6,7
**salt** 2:16 21:4
67:16,20,25
68:4,5,22 69:12
69:16 145:3
170:15 179:22
179:25 190:21
201:6
**sample** 26:9,13
47:13,18 48:2,4
49:8 56:25 62:2
**samples** 26:12
26:15,16,20,23
32:11 49:2
59:15 114:24,25
117:15,15,19,25
126:18 137:20

**[samples - see]** Page 244

139:2 143:6,7 145:14 157:23 158:23 167:7,11
**san** 164:25
**sars** 47:21,22 167:17
**sat** 79:12
**satisfied** 43:3
**satterfield** 1:10 72:19,25 73:3 73:24 114:9 117:24 124:8,12 126:1 134:10 135:2 136:15 155:13 160:22 169:23 170:17 171:22 172:2,16 181:13 189:19 190:15 201:9
**satterfield's** 73:12,14 124:17 127:12
**saw** 72:14 88:5 188:5
**saying** 28:8 59:21 68:1 74:16 77:2 82:13,23 90:7 134:22 142:8,9 149:3,9 157:14 158:3,6 171:16 171:24 185:9 186:3,12 195:11 195:11 198:1

**says** 56:22 61:24 88:23 89:10 92:3 95:24 96:11 100:12 101:12 102:3 105:11 107:7 108:25 111:2 114:7,10 115:6 116:9 117:23,23 124:8,21 129:9 130:6 134:12,22 135:2,9 136:16 137:18 140:17 140:20 141:6,18 144:9,23 145:8 145:9 146:9 147:4 151:10 153:14,16,21 155:10 158:21 160:23,24 167:6 167:16 169:1 179:7,22,25 180:9 181:12 183:12 184:17 185:16
**scan** 109:25
**school** 140:3
**science** 13:16 36:4 92:13 111:23
**scientific** 14:3 28:2 50:1 53:21 53:24 54:2 61:3 61:9,19 62:3 72:20 73:12,15

166:20 189:25 190:12
**scientifically** 21:19 42:9 53:18
**scientist** 74:2 117:7 184:16
**scientists** 74:7 74:10 112:10
**scope** 43:10,12 55:3 106:8
**screaming** 113:11,12
**screen** 5:7 63:22 95:8,11 103:8
**screening** 142:15
**screenshot** 138:3 146:17
**scroll** 87:22 88:1,2,3,4 90:21 90:22,23 95:17 95:18 100:4 103:2,20,22 104:4 105:6 110:20,22,23,25 134:7 140:1,7,8 140:11 144:4,5 160:9,10,15,17 168:21 175:4,6 175:19,21,24 176:13,15,18,19 176:20,21,23 177:14

**scrolled** 176:9
**seal** 199:8 200:15
**search** 81:19
**searched** 12:2
**seasoned** 8:5
**sec** 79:11,12,19 80:11,14,15 81:2,6,11,13,19 81:24 82:5 83:2 83:21,24 193:3 195:5,18
**sec's** 196:4
**second** 48:11 63:12 66:6 86:13 94:12 111:20 128:25 134:9 136:20 141:23 144:20 144:21 181:5 196:1
**section** 96:4
**securities** 78:12 79:15 192:22
**see** 33:25 48:20 61:4,21 74:9 87:22 89:8,12 89:20 90:7,8 92:7 95:13 100:24 103:7 116:13 118:2 124:15 125:4 129:15 132:2 134:13 135:15 139:15 141:12

**[see - shouted]** Page 245

141:14 142:22
145:4,18 146:11
146:13 158:1
167:11,14,19
169:7 175:1
177:10 180:7
189:14
**seem** 35:13
**seemed** 27:16
68:1
**seen** 5:7 126:5
167:3 188:10,10
**selecting** 31:25
**sell** 111:6,13
131:19
**sellers** 20:22
**selling** 20:20
32:25 33:20
44:5 100:13,16
101:13 102:7
**semantics** 170:8
**send** 19:13
26:23 81:25
201:16
**sending** 54:23
83:17
**sends** 26:20
**sense** 25:4 50:14
53:16,18,21,24
54:2 99:8,14,15
127:10 164:9,20
195:18 196:3
**sensitive** 44:20
46:3,12,23 47:5
53:24 59:22

61:25 98:20
107:9 131:21
141:7,15 143:14
145:10,12
146:15 148:1,9
149:21 152:24
153:22,25 154:4
158:5
**sensitivities**
25:4
**sensitivity** 4:10
24:16,23 25:5,6
25:11,14,21
26:2 27:19,25
28:2,19,21 44:8
44:10,12,19,24
45:1,4,5,14,16
47:17 48:19
50:9,12,17
51:14,15 52:20
53:7 58:8,9,24
60:5,9,15 64:9
92:4,18 97:7,10
98:1,4,19 99:2
115:3,8 116:5
128:1 129:17
130:1,8,17
131:7 137:19,22
138:15 141:2
142:3,10,23
143:5,9 145:12
145:15,17,23
146:2,10 147:1
147:2,23 148:12
149:12,17

155:19 156:7,14
156:19,22 157:8
158:9 161:23
163:3,5 167:19
167:24 171:1,20
172:3 177:9
178:21 179:6
180:5,22 181:16
181:24 182:12
182:15,17,18,23
183:13 187:16
187:25
**sent** 89:6 100:16
120:5,8 121:14
130:18 150:5
153:19 155:11
168:25 178:13
178:17 191:5
**sentence** 116:15
117:5 136:20
158:3 161:5
185:17
**separate** 58:23
96:4 118:10
137:2,3 168:18
**separation** 55:2
**sequence** 25:24
35:19,22 36:2,5
36:7,11,15
52:10 125:10
127:6
**serbin** 1:10
201:9
**series** 85:9
86:21

**serum** 47:14
**services** 22:10
**set** 15:19 25:22
27:4 32:13,18
39:6,15 40:18
40:20,23 43:9
44:11 52:12
54:17,23 74:8
74:12 197:19,22
197:22
**seth** 88:22 89:16
**setting** 43:8
**setup** 101:25
**several** 92:1
**shaped** 116:12
117:5
**share** 87:4,5,6
93:20 111:6,8
**shared** 54:16
**shares** 16:17
**sharing** 103:8
**sheet** 198:8
202:1
**sheets** 27:8
**shift** 22:16
**shipping** 70:19
111:5
**ships** 100:17
**shoot** 87:8 103:3
**short** 34:21
109:13
**shorthand**
200:9
**shouted** 100:12
101:12

**shouting** 102:3 102:6
**show** 11:3,3,5,8 20:5 86:24 87:1 94:22,24 123:19 128:16 134:15 168:4 173:5,13
**showed** 156:6 182:22 187:18 187:23
**showing** 6:12 11:4 85:9 86:21 114:25 118:1 166:8,19
**shown** 98:5
**shows** 60:9
**side** 76:23 79:6
**sign** 144:11 198:14
**signal** 46:9 47:6 47:9,18
**signature** 198:20 199:11 200:19 201:14 202:24
**signed** 17:2 144:12 201:16
**signing** 201:19
**silico** 25:23 26:5 43:6
**similar** 125:12 125:13,16,24 126:13 127:1
**simple** 50:19 151:16,20

152:19
**simplification** 50:11
**simplify** 151:20
**simplifying** 152:3
**simply** 147:4
**sincerely** 201:22
**single** 25:7 34:24 35:11 50:12 96:7,12 130:7 139:1 152:3 158:14 169:5,6 171:18 181:15
**sir** 10:1 38:1 86:7
**site** 96:7,12
**sitting** 12:17 65:18
**situation** 38:22 38:25 39:4,10 39:12 47:8 48:5 48:22 64:21 143:3
**situations** 26:7 64:18 80:11 146:3 152:22 187:14 188:16 188:20,25,25 189:5
**sixth** 131:10
**size** 34:19 39:7 62:2,21,24,24

**skip** 122:22 153:20
**slightly** 144:19
**slow** 33:25
**slowed** 33:22
**small** 15:6 21:14 33:8 45:24 46:4 46:7 47:7
**smart** 105:11 111:6 140:21 144:24 145:11 155:20 167:13 167:17
**smear** 68:1
**smoke** 46:20,22 46:24,24,25 47:1,1
**smoothie** 163:22 164:7
**snippet** 185:16
**snow** 21:5
**sold** 17:7
**solution** 33:14 33:15
**solutions** 22:2 34:4,8 49:16,20 129:2,6
**somebody** 107:7 150:4
**son** 63:13
**soon** 35:6,7,19 35:22,23
**sorry** 6:24 14:22 18:2 23:3 30:15 35:12 37:25

44:25 45:9 48:8 55:14 60:25 61:22 63:12,13 63:18 65:5 66:3 66:11,11,15 73:13 75:19 76:22,24 83:13 90:22 94:23 96:1 101:16 105:12,19 118:23,23 121:5 121:20 124:1 128:16 140:2 141:13,23,25 144:25 148:17 157:11 161:6 167:9 170:4,5 170:12 177:3 181:6 186:11 187:22 194:15 195:21
**sort** 8:18 50:22 55:11 99:15 110:3 195:22
**sound** 116:11,20 197:13
**sounds** 89:10 102:2 140:5
**south** 2:15 201:2,5,16
**speak** 73:24
**speaking** 113:10 192:20
**special** 23:12

**[specialist - state]**

specialist  14:16
specific  47:19
  52:5,6,6,6 54:1
  57:25 58:18
  59:22 60:16
  61:10,24 65:19
  67:11 68:18,24
  70:15 73:23
  75:17,20 80:23
  88:16,17 102:10
  102:14 113:4,7
  124:7,13,18
  127:14,20 128:2
  130:23 131:11
  131:22 141:7,16
  143:14 145:10
  146:1,14 148:2
  148:9 149:21
  152:23,24 153:6
  153:22,25 154:5
  154:14 157:23
  158:5,10,22
  159:9 171:19
  179:10,18 182:6
  187:12
specifically
  68:19 73:2
  112:7 113:10
  162:5
specification
  16:1 129:21
  131:3 132:11
specifications
  15:20 27:14
  40:2 50:8 61:17

130:22 131:15
  164:4
specificity  4:11
  21:25 24:21,24
  25:7,11,14,22
  26:4,6 27:18,25
  28:2,19,21
  44:11,19 45:5
  45:17 46:14
  47:17 48:19
  50:9,13,17
  51:14,15 52:20
  53:7 58:8,9 60:6
  60:9,15 64:9
  97:8 98:1 99:2
  115:3,9 116:6
  128:2 129:18
  130:2,9 131:7
  137:19,23
  138:15 141:2
  142:3,10,23
  143:5,9 145:13
  145:16,17,23
  146:3,11 147:1
  147:3,24 148:12
  149:12,18
  155:19 156:7,13
  156:19,23 157:8
  158:10 161:24
  163:3,5 170:25
  171:21 172:4
  177:9 178:22
  179:7 180:5,23
  181:19,24
  182:18,18,24

187:10,16
specifics  68:10
specimens  141:1
specs  129:15,16
  130:6,10
speculation
  30:21 41:18,24
  42:13 59:4
  60:12,24 61:13
  62:5 66:2 67:2
  67:14 69:4,23
  90:1 106:25
  107:11 112:1,13
  115:11 132:8,23
  154:8 171:2
  172:6,22 179:16
  184:12 186:2
  190:18
speed  52:15
spell  7:11,13
spelled  13:21
sphere  112:10
spike  26:14
spoke  81:11
spot  135:14
spray  32:1
spraying  31:25
spring  31:21,23
sputum  47:15
spy  164:25
st  170:12,13,14
stable  34:10
stage  89:2
stages  39:5

stamp  128:17
stamped  175:1
stamps  136:8,12
standalone
  181:20
standard  26:12
  26:13,14 52:17
  98:10 126:19,20
  126:21
standardized
  74:4,6,12
stands  157:2
start  7:10 11:7
  13:4,6 21:14
  22:2 23:23
  31:20,21,21,22
  31:22,25 35:17
  38:10 43:23
  44:4 47:2 70:9
  71:6 85:9,12,16
  86:20 89:11
  92:22 99:5
  106:10 177:6,20
started  14:12
  16:4,7 17:12
  18:7,9,11 21:4
  22:4 34:10 71:3
  104:19 109:5
starting  32:6
starts  43:6
  141:15
state  1:20 5:20
  7:10 165:11,25
  191:22,24 192:1
  192:6 199:3

[state - substantive]                                                    Page 248

200:3,6,15
**stated** 130:23
  134:17 202:22
**statement** 18:7
  19:13,13 92:15
  124:18 127:12
  145:21 148:12
  149:1,3 158:25
  161:7 164:6
  168:2 182:1
  185:3 189:20
  195:14
**statements**
  17:25 18:5,8,12
  18:23,25 19:7,8
  20:16,19,21
  55:23 65:19
  107:19,20 112:8
  133:8 188:21
  197:11
**states** 1:1 5:14
  32:1 119:13,19
  120:9 121:13,23
  124:13 127:13
  140:15
**stating** 142:6
  143:25 156:5
  172:1
**statistical** 59:7
  59:10,17 62:1
  74:15 97:20
  117:21 138:23
  138:24 139:2,5
  139:16

**status** 37:7
**stay** 134:9
  174:16,18
**staying** 174:15
**ste** 201:17
**stenographer**
  8:15,21,25
  193:9
**step** 72:3,12
  178:9
**sticker** 103:13
**stock** 16:18 17:5
  17:7 30:1,9,10
  30:18 132:17
**stone** 39:15
**stop** 9:17 103:8
**stopped** 32:24
**stove** 46:21
**strategy** 76:12
**street** 113:12
  131:19 133:16
  133:18
**stressed** 156:2
  156:15
**stressful** 33:14
**strictly** 126:15
**strongly** 89:5
**stubborn**
  141:25
**studies** 15:16
  16:14 17:21
  24:9 25:20,22
  25:24 27:5 39:1
  40:18,25 41:11
  54:20 60:4,4

64:8 74:8 77:11
  145:14 146:20
  152:16,23
  156:14 162:24
  166:1 172:4,19
  179:18 182:10
  182:13,16
  186:10,13 187:2
  187:13 189:6
**study** 26:16
  37:12 60:5,6,8
  60:14 61:4,8,10
  61:24 62:13
  63:6 96:15,18
  96:22,23,24,25
  97:1,2 98:6
  116:25 118:17
  127:20 128:3
  130:4,7 131:12
  138:21 139:14
  141:9,19 143:17
  143:17,18,24
  146:1,6,18,21
  149:2 152:8
  153:3,6 154:14
  156:6,23 157:19
  157:23 158:10
  158:22 159:1,8
  162:9,22 166:20
  166:20 167:3,21
  167:23 168:3,4
  168:8,11 171:17
  182:8 183:1,6,8
  187:8 191:22,25

**stuff** 53:3
**subassociation**
  14:16
**subject** 91:25
  95:23 140:16
  155:14
**submission**
  16:11 24:3,4,12
  24:13,15 29:8
  29:17,21 43:23
  129:25 130:2
  138:7
**submissions**
  29:20 78:8
  193:19
**submit** 24:6,8
  24:16,20 25:5
  26:24 29:10,11
  74:17 98:7
  130:13
**submitted** 16:1
  16:15 24:24
  27:6 98:8,13,15
  130:14 139:18
**submitting**
  41:13 43:14
  133:14
**subpoena** 11:13
  11:19,23 12:19
**substance** 10:24
  79:1 84:23
**substances** 26:6
**substantive**
  84:24

Veritext Legal Solutions

800-726-7007                                                    305-376-8800

**[successful - telling]**                                    Page 249

**successful**  108:4 108:16,24
**suddenly**  50:6
**sufficient**  40:21
**suggestion** 111:5
**suite**  2:4,10,15 201:1,5
**summarize** 67:24 151:7,11
**sunday**  111:2,14
**supply**  49:14 64:22 106:4
**support**  142:4 165:20
**supporting** 86:23
**supposed** 131:25 137:8,13 137:16 142:2
**sure**  6:25 10:6 12:15 19:5 30:16 40:25 41:10,20 46:16 63:21 68:22 74:2 75:3,9 78:5 78:6 83:7 87:11 88:7,15 93:16 109:10 110:4,5 121:13 125:11 139:23 144:5,14 144:15 146:9 151:4 160:13 167:10 174:5 177:4 184:24

186:24 191:15 195:12
**suspected** 136:17
**suv**  28:9
**swab**  47:15
**sworn**  6:21 199:7
**symptomatic** 137:9,13
**symptoms**  4:6
**system**  57:6,12 87:12
**szentirmay** 129:1,4,8

**t**

**t**  3:2,7 4:2 7:14 84:18 199:1,1 200:1,1
**tab**  86:25 113:19 122:4 123:19 128:9 139:21 144:1 150:13,17 154:24 159:20 166:4 168:13
**table**  146:17 152:2,19 176:16
**tacked**  96:3
**tag**  122:6 123:20 173:20 175:9
**tagging**  87:6
**tailor**  110:6

**take**  5:9 8:25 9:4,7 13:17 36:18 39:14 43:11 50:23 61:9 80:2,5 85:11,25 86:1,8 86:11 94:14 100:2 111:19 122:23 142:16 143:18,18,21 150:24 159:24 160:6,6 162:23 164:18 173:3 177:4 178:9 190:4 192:16
**taken**  1:19 201:10,13,18
**talk**  52:15 95:2 125:17,19 152:9 152:13,14 190:13,21
**talked**  13:3 55:22 56:11 58:7 79:9 82:25 129:7,8 165:18
**talking**  19:9 53:18 68:2 87:10 96:11,15 99:9 116:7 125:4,20,21 126:1,19 135:5 142:25 143:6 156:13 162:8 164:24 169:3 170:6,7,25

179:9,17 182:7 182:11,13,15,17 182:19 183:1,5 183:5 184:3,5,6 188:7 190:22
**tape**  154:18
**target**  40:4,10 129:2,6
**taylor**  2:18 6:6 6:6 11:16
**teach**  50:24
**team**  40:19 75:25 177:18
**teams**  31:24
**technical**  15:4 96:2 127:9
**technically** 125:7,19 127:5 127:9 136:16
**technology** 21:15,17,23,25 22:5 55:13 70:24 73:7,18 74:1
**tell**  9:6 20:8 79:8 100:18,18 100:20 108:8 113:21 114:14 115:21 143:10 143:10 150:14 191:11
**telling**  62:8 131:20 148:8 184:23

**[tells - text]**                                                    Page 250

**tells** 56:25 184:22

**ten** 50:25 57:14 117:14,15 122:5 123:19 158:7 159:8

**tennessee's** 165:11

**term** 15:4 28:2 51:21

**terms** 43:5 52:5 53:19

**test** 4:9 20:22 22:24 23:1,1,9 23:19 24:1,17 24:21 25:15 26:21,24 29:3 29:18 31:9,10 31:10,11,23,24 33:4 34:17 35:18 36:18 37:13,19 39:22 40:13 41:23 42:11 44:9,13 45:7,15 46:3,13 46:14 47:5,8,17 47:19,21,25 48:3,25 49:1,5,8 52:1,22 53:15 53:20,23 56:13 57:20 58:3,20 59:21 60:16,20 61:10,23 62:18 62:18 63:6 64:3 64:10,13,15

65:9,11 69:22 77:10 93:6 98:4 99:1 100:18,21 102:15 107:8,10 111:10,14 114:25 115:7,14 115:16,25 116:2 116:2,11,19 117:1,14 118:4 118:5,6,10,11 118:20,21 119:3 119:4,4 121:1,1 121:1,12,19,21 121:22 124:13 124:15,18,24,24 125:18,19 127:6 127:13,14 131:21 132:15 135:7,8 136:17 136:18,21 137:7 137:16 138:14 138:16,19,25 139:1,6 140:22 140:25 141:1,3 141:9,18 142:9 143:8,12,14,20 144:24 146:2 148:8 149:4,20 151:20,23 152:3 152:5,10,14,23 153:21,23,25 154:4 157:20,25 158:4,8 159:16 165:12,15,20,21 167:14,17 177:7

178:21 180:4,9 180:10 183:2 185:11,24 186:17 187:9,18 187:25 188:1,11 188:14,15,25 192:1

**test's** 181:12

**tested** 42:20 57:4 58:11 63:4 63:25 96:20 115:17 120:23 121:2,11 126:9 126:15 131:12 142:5,7 167:11

**testified** 6:21 133:10 197:10

**testify** 10:19,25 11:13

**testifying** 8:11

**testimony** 27:23 55:25 69:2 84:24 103:25 133:6 158:25 159:14 170:3 188:3 190:8

**testing** 26:4 32:3,11 39:11 47:11 49:2 53:6 53:10,13 54:4 56:16 63:10 64:20,24 74:15 96:8,8,13,13 102:21 106:18 106:23 111:11

115:22 126:25 127:2,21 137:15 138:13 152:12 152:17 165:12 165:25 166:21 180:7 192:8

**tests** 22:9 23:5,6 27:5 31:5,6,8,12 31:13,14 32:3 33:18,20,24 36:14 37:9 41:7 42:19 48:7 54:13,15,21,24 55:2,3,3,23 58:23 64:8 65:12 88:11 99:12 100:14 102:7,12 113:12 114:23 115:2,20 118:13,16 119:11,17 120:5 120:8,17,18,20 124:23 125:6 132:18 134:24 135:20 137:13 138:20 147:3 165:3 166:1 168:1 169:24 171:1 172:18 179:6 180:3,11 180:23 181:23 192:7,10

**text** 103:4 128:17

**[thank - title]** Page 251

**thank** 6:17 7:5
27:16 38:16
39:18 45:13
51:4 53:2 71:22
76:25 94:4
95:13 123:18
128:20 153:17
158:17 175:13
196:23,24 197:3
197:6 198:4
**thanks** 94:17
**theirs** 121:14
**thermo** 14:2
**thermocycler**
96:8,13
**thermocyclers**
96:21
**thin** 20:14
**thing** 8:6 9:7
17:19 28:8 40:1
42:22 47:4
50:13 59:24
60:1,17 64:1,21
76:13 87:2,2
89:3 107:1,3
108:22 110:2
111:18 136:25
143:19 147:7
149:9 158:6
161:22 164:19
177:16 183:7
187:12 188:19
193:13,20 198:8
**things** 20:11
22:9 33:22

34:10 39:15
47:11 49:11,14
49:21,23,25
50:2 69:21 76:4
84:24 106:9
109:7 111:4,19
127:23 137:3
138:18 142:12
142:24 161:25
162:2,4 164:1,3
169:3 170:7
171:4,10,10,13
173:5 183:15
193:10 194:17
194:20 198:9
**think** 33:4 42:3
45:6 48:24 50:2
56:19 67:9 68:4
68:11,18 74:22
82:16 83:15,18
87:12 88:24
89:12,22 92:21
97:20 101:19
103:23 104:5,23
104:24 106:20
106:22 111:19
112:23 113:3,4
113:6 115:19
120:23 122:24
128:18 129:5,7
133:3 139:22
143:19,22
148:19 154:17
156:12,25 157:1
160:11 161:10

161:14,16
168:18 169:22
170:12 171:24
172:15 175:15
175:20,22 176:8
176:22 179:1
181:7 182:17
187:2 188:23
189:19 190:3,6
190:22 195:21
**thinking** 31:2
**third** 20:21
93:20 96:25
129:17 156:23
157:19
**thought** 14:23
73:24 108:10
126:17 151:19
169:11,13
186:15
**thread** 160:11
**three** 14:1 20:4
32:7 68:3 91:6
106:21 109:8
131:3 138:7
141:2 157:22
**thriller** 164:25
**thursday** 114:8
124:8 134:10
**time** 5:2,20 14:8
16:19 18:15
20:17 22:6
24:14 26:10
29:17 30:17
31:11 32:6,8

33:13,22 34:1,3
34:11,21 39:14
46:1,20 49:13
49:15 64:23
65:6 69:18
72:21,23 75:14
77:22 85:11
98:16 99:14
102:9,20 108:5
108:23,24 123:3
123:4 126:25
127:18,19,21
130:21 131:10
135:18 137:10
151:25 154:15
155:21,25
158:14,17
161:16 162:17
164:9,20 170:13
171:3,10,18
176:21,23 178:2
178:5,7 196:25
197:1,4
**times** 9:12 31:2
44:16 46:2 56:3
56:6 64:11,14
65:9 73:4
129:11,16
131:10 158:7
159:8 161:21
171:5 177:22
179:14 188:21
**tiresome** 161:3
**title** 177:6

**[tng - unclear]** Page 252

**tng** 78:2,3

**today** 5:2 6:13 8:11 9:11 10:19 11:5,12,15 12:17,22 17:5 33:21 48:16 57:4,7 85:1 93:16 100:13 101:12,25 111:17 152:5 158:7 168:10 180:3 188:10 193:7 194:9,11 196:25 197:5

**together** 16:13 40:19 58:3 76:20 77:4,11

**told** 20:10 71:6 76:24 83:2,3 100:15 117:4 143:13 159:7,8

**tomorrow** 57:4

**took** 9:3 18:11 161:25 183:21 183:22 193:9

**top** 91:7,22 95:10 109:22,23 110:7,11,18,19 117:22 153:12 168:23 175:2 178:19 184:18

**topic** 193:21

**topics** 79:14 194:8,10

**total** 34:14

**totally** 9:4 165:1

**tough** 160:5

**tower** 201:1

**tractor** 132:10 132:10,13

**trade** 45:6

**traded** 113:14 132:17

**trading** 1:4 5:13 5:23 201:6

**train** 106:10

**trained** 106:9

**training** 117:7

**transcript** 201:14,15 202:2

**transcription** 200:9

**transmit** 31:20

**trap** 170:6,17 171:25

**treat** 38:23 137:4

**trial** 8:12 91:12

**tribune** 67:16 67:20 68:1,4,5 68:22 69:13,16 170:14,15 190:21

**tried** 95:9 106:4 108:13 148:18

**trigger** 46:13

**triggered** 46:4 46:10 104:25

**tropez** 164:25

**trouble** 67:17

**trucks** 113:18

**true** 51:17,18,18 97:3,4,16,16,21 97:21 131:5,8 138:16,17 142:20,25 148:16 161:18 182:1 200:8 202:23

**trust** 63:15

**truthful** 153:21 153:23 154:3

**truthfully** 10:19 10:25

**try** 8:24 42:10 50:12 58:21 63:5 69:19,20 108:3,8,14 122:20 151:21

**trying** 33:12,13 34:3 50:7 58:19 68:1 78:7,7 82:21 105:13 108:23 150:18 151:15,18 152:10 154:16 159:5 161:11,15 190:4,16

**tuesday** 151:9

**turned** 16:25

**tv** 160:5

**tweaking** 125:21

**two** 48:4 97:5 110:14,18,19 127:22 137:3 141:1 151:1,2 157:22 166:24 173:4 176:15 196:11,13 201:16

**type** 4:7 21:9 22:5 30:4 31:5,5 132:18 139:8 150:1

**types** 15:7 27:20 31:16 54:20 76:4

**typically** 42:20

**u**

**u** 7:14 77:2

**u.s.** 14:5 19:11 27:3,10 29:11 56:5 100:14 111:13 115:18 115:19,25 116:3 118:20 119:4 120:5 121:1 124:24 125:8,9 137:8 145:1 147:14,16 177:25 197:22 197:25

**uh** 78:4 89:9 124:16

**umbrage** 183:21

**unclear** 172:3

**[under - vacuum]** Page 253

**under** 8:11 29:22 65:12 74:6 92:6,19,21 104:1 117:11 144:10,17 145:24 159:17 195:7 202:22
**undergoing** 92:21
**underscore** 155:12
**undersigned** 199:5
**understand** 8:7 8:10,14 10:14 40:7,8 61:15,17 61:19 68:6 70:6 72:18 76:17 80:5,6 83:11,12 83:18,18,19 92:9 99:21 105:15,25 106:5 106:13,14,18,20 106:23 107:2,4 107:15,24 108:10,12 111:22 126:22 126:24 127:3 133:1 135:4,9 135:25 141:20 146:20 149:7,8 151:17,21,23 152:7,11,16 159:5,13 162:6 169:4,11,16

179:3
**understanding** 64:19 106:15 107:3 111:22 154:11 167:24 169:14,18,19 179:19 182:20 194:19
**understands** 28:13
**understood** 10:13 14:22 74:22 80:7 187:6
**unemployed** 14:23
**unfortunate** 103:4
**unfortunately** 122:16
**union** 29:8,10 29:15,17
**unique** 180:2
**unit** 52:17
**united** 1:1 5:14 119:13,18 120:9 121:12,23 127:13 140:14
**units** 52:7,13,14
**university** 14:6
**unknown** 89:6
**unprecedented** 38:21
**unsuccessful** 108:17

**untrue** 146:24 147:5 161:20
**updated** 109:3
**updates** 108:25
**upload** 175:11
**uploaded** 87:4
**use** 22:8 23:24 23:25 24:6,18 24:25 25:19 26:11,12,22 27:7,11 28:4,7 32:11,12,14,15 36:22 37:2,3,5 37:10,11,14,15 37:22,23 38:19 38:24 39:9,16 43:19,22 44:23 48:24,25 49:1,6 49:7,12 52:25 52:25 57:21,23 58:1,13,15 59:8 64:17 91:2 93:14,24 98:16 102:21 106:16 125:8 126:16 127:22 129:23 130:20 131:24 131:24,25 132:1 132:1,2 136:23 137:2,4,10,13 137:14 141:1 145:25 146:22 146:23 147:8,10 147:22 152:5,19 158:14 163:11

163:20 165:4 170:16 173:24 181:21 189:8 194:19,20 198:3
**used** 12:5 31:24 37:9,11,12,13 62:3 96:5,11 98:7 101:6 102:12 125:9 137:9 145:14 152:4 170:13 180:6 187:2
**user** 43:13 133:15,16
**uses** 54:21 58:13
**using** 19:18 27:20 28:11 39:7 47:14 62:18,18 100:21 115:24 125:9 126:10,18 175:12
**usual** 101:25
**usually** 60:4
**ut** 2:16 201:6
**utah** 1:1,8 5:15 14:6 54:10 165:15,20 179:22,25 191:22,24 192:1 201:7

**v**

**v** 201:7
**vacuum** 143:25 146:4 154:13

**[vague - want]**

**vague** 21:11 23:14 27:22 30:22 41:17 42:12 60:23 61:12 89:25 149:6 172:21 186:23 188:4,17 190:10 196:5

**validate** 32:16

**validating** 32:2 120:20

**validation** 13:22 13:23 15:1,1,3,4 15:8,9,9,12,16 54:13,20,21,24 61:8,10 64:8 115:22 118:5,16 120:5,9 132:4 141:9,11,19 152:23 159:1,8 166:1 172:19 176:5 182:8,10 186:10,13 187:3 187:8 191:22,24 191:25 192:3

**validations** 106:18 186:14 186:16 187:1 192:4

**validity** 61:5

**valin** 129:3

**value** 96:9,14 98:3

**variability** 26:9 65:13

**variable** 56:12

**variation** 45:3 46:8 47:7 65:2

**variations** 65:3

**varied** 33:25

**varies** 44:2

**variety** 22:10 27:5 31:14 33:12

**vary** 47:16,16

**veitch** 2:23 5:17

**vendor** 125:8,11 125:12,12,13

**vendors** 20:16 20:20 54:23 115:24 125:17

**venture** 31:13 77:23 119:23

**verification** 96:1,17 145:14

**verify** 133:7

**veritext** 5:18,19 87:2 103:17 201:1,24

**veritext.com.** 201:17

**versa** 51:17

**version** 96:17 144:12,18 174:2 174:25 175:1,3

**versus** 5:13 29:10 182:9

**vice** 51:16

**video** 5:1,8,11 10:8 48:13 51:6

51:9 86:9,9,15 86:17 94:19 123:11,14 154:22 173:10 174:21 196:20 198:18

**videographer** 2:23 5:1,17 9:24 10:1,2,4,8 37:25 38:2,5,8,12 48:9 48:13 51:6,9 85:18 86:6,8,13 86:17 94:19 105:20,22 123:11,14 154:17,19,22 173:7,10 174:7 174:15,18,21 196:17,20 198:17

**videotaped** 1:18

**view** 41:15 95:11

**villaverde** 1:19 5:18 199:12 200:5,20

**viral** 45:2,3,20 56:22,24 57:4,8 57:10,14,15,19 137:20

**virtually** 5:4

**virus** 31:11,19 35:24 36:6,6,16 38:21 45:21,22 45:24 47:7,9,21

47:22,24 48:2,4 52:11 56:25 57:11,12,14,17

**visited** 73:4

**vitro** 22:1,7,22 22:24 26:22 29:18 32:10,17 37:11 40:14 43:22 46:2 47:4 50:8 51:19 65:16 68:14,15 101:2 131:23 188:19 194:19 197:23

**voice** 76:22

**void** 100:22

**volume** 18:3

**vp** 77:21

**vs** 1:7

**w**

**w** 75:1

**wait** 86:2 179:11

**waiting** 164:12

**waive** 198:6,11

**waived** 198:21 201:19

**want** 10:5,6 11:6 13:3 18:23 19:23 31:4 45:15,23 46:11 46:22,25 52:14 57:17 58:21 66:17 80:22 83:7 85:11,14

**[want - worked]**                                                   Page 255

85:24 86:1 97:9
107:14,16
110:19 111:8
115:1,6 123:2
135:11 144:5
149:25 151:3
160:8,15,17
161:2 162:6,13
162:18 163:11
167:5 173:16,25
175:24 176:15
186:1 192:17
196:23,24 198:5
198:11
**wanted** 16:12
19:13 32:15,16
36:13 49:25
51:20 63:21
83:11,12 94:24
104:16 113:15
113:15 137:14
146:19 163:18
195:5
**wants** 28:4 42:5
63:5,25 198:12
**water** 6:24 9:4
**way** 10:23 20:7
41:3,11 44:14
48:20 49:17,19
49:24 52:6
58:15 63:7
66:23 74:22
75:11 91:13
95:3 101:8
103:5 112:16,17

125:10 126:13
127:3 135:25
137:3 143:1
146:18 151:20
152:3 189:9
190:16
**ways** 25:6
136:11
**we've** 188:10,10
**webb** 74:25 75:2
155:13 160:21
**website** 87:2
103:18 104:16
109:1 129:11,21
130:21 131:1
146:14 155:18
**week** 35:25
**weight** 136:10
136:12 139:2,16
**weird** 8:18
**welcome** 123:17
**went** 72:16
131:6 142:17
**west** 31:19
**western** 31:17
**wgu** 13:10
**willing** 133:2
**wise** 92:22
**wish** 37:15 42:6
**withdraw**
192:24
**witness** 3:3 5:7
6:5,8,20,23
23:15 27:24
32:22 38:13

48:15 55:1 59:5
60:13,22 61:1
61:14 62:7
63:18,23 66:1,4
66:15 67:3,15
69:2,24 78:15
78:20 79:17
80:1,4 83:4 90:2
90:7,21,24
93:13 99:8
101:15 102:3
103:2,11,20
104:3,8,23
107:1,13 108:2
110:22 112:2,14
113:25 114:4
116:23 119:7,15
119:22 121:4,11
121:25 122:13
122:18 123:1,5
123:25 124:2
127:18 128:21
132:9,21,25
133:10 135:22
140:1 144:4
147:7 148:6
149:7 157:13
159:16 160:3
162:17 164:19
170:2,5 171:3
172:7,13,24
175:19 176:10
176:25 179:1,17
180:14 181:2
183:4 184:13,22

185:19 186:3,25
188:2,4,18
189:13,24
190:11,19 196:6
197:1 199:8
200:10,15
202:24
**wonderful**
101:24
**wondering**
164:12
**word** 44:23
154:2 187:3
189:8,13
**words** 19:18
21:10 170:17
188:23 190:4
**work** 13:17,20
13:20 14:10
21:18,20 32:2
44:24 49:21
51:22 70:7,14
71:9 75:1 77:3,4
77:15 85:12
123:7 135:10
136:4,6,8,11
142:19 162:11
184:19
**worked** 13:24
14:1,2,4,12,14
21:9,16 54:8
71:25 75:6,7,7
75:14 76:19
77:11 114:20

**[working - ztaylor]** Page 256

**working** 13:14 13:22 14:24 16:4,8 22:4 32:25 35:8 38:6 65:22 70:9 87:13 101:24 102:21 139:8 163:7 188:14
**works** 21:24 40:19 106:24
**world** 16:15 33:12 39:7 64:14 85:2 113:11
**worried** 157:17 161:19
**worry** 174:12
**worse** 134:23
**worth** 143:19,20 161:11,15,16
**wow** 166:15
**write** 89:14 136:14,15,16 155:16 161:14 202:2
**writes** 88:21,23 135:13
**writing** 92:5 149:1
**written** 67:22
**wrong** 98:17 121:15 127:3 142:13 143:2,25 154:15 161:17 163:4

**wrote** 111:3 131:2 159:5 172:24 173:1

**x**

**x** 3:1,2,7 4:1,2 179:6
**xpert** 167:17
**xpress** 167:17

**y**

**yeah** 7:3,9 10:4 14:20 18:20 20:2 27:14 30:12 34:23 36:10 38:2,13 40:1 45:14 48:19 55:1,4 58:4 59:5 60:13 62:7 63:17 65:16 66:10,11 66:15 67:15 68:8 72:15 73:8 73:9,19 75:3,15 75:25 76:3,8,18 76:19 77:4,11 82:24 83:4,4,5 84:6 87:12 88:3 88:5,5 91:18 93:13 94:10,14 94:16 95:19,20 95:21 96:18 98:8 99:17 100:7 101:23 103:5,11,14,23 104:7,16 105:1

106:19 109:13 110:1,24 114:1 114:4,15,20 120:22 121:7 122:11,13,13,18 123:5,8 124:2,4 132:14 134:8,21 135:5,8,22 144:19 149:7,23 151:5,6,22 154:19 160:3,5 160:11,17,18 168:21,22 174:11 175:9,15 175:16,20 176:13,16 185:5 185:19 186:25 188:4,12,18 193:6,13
**year** 7:21 13:10 17:8,10 18:18 139:9 194:7
**years** 14:1,4 20:4 68:3 70:23 106:21 109:8 131:4 138:8 167:8 188:15
**york** 2:20
**young** 95:4,5

**z**

**z** 13:21
**zachary** 2:18 6:6 11:16
**zika** 31:10,10

**zoom** 1:14 8:15 95:3,8,13
**ztaylor** 2:18

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.