# EXHIBIT 22

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

GELT TRADING, LTD., a Cayman    :
Islands limited company,

                                :

              Plaintiff,

                                :

v.                                        Case No.
                                :  2:20-cv-00368-JNP-DBP

CO-DIAGNOSTICS, INC., a Utah
Corporation, DWIGHT EGAN,       :
JAMES NELSON, EUGENE
DURENARD, EDWARD MURPHY,        :
RICHARD SERBIN, REED BENSON,
BRENT SATTERFIELD,              :

              Defendants.       :

_____


VIDEO-CONFERENCED
DEPOSITION OF CHAD APULI
TAKEN THROUGH
ADVANCED REPORTING SOLUTIONS, a Veritext company


Taken on Friday, September 1, 2023
1:31 p.m. to 5:26 p.m.


Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC

Page 2

A P P E A R A N C E S

For the Plaintiff:

Brandon Floch
MARCUS NEIMAN RASHBAUM PINEIRO LLP
One Biscayne Tower
2 South Biscayne Blvd, Suite 2530
Miami, Florida 33131
Bfloch@mnrlawfirm.com
(305) 400-4260

Michael C. Fasano
KOBRE & KIM LLP
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131
Michael.fasano@kobrekim.com
(305) 967-6104

For JENNIFER WEBB:

Marissa A. Peirsol
BAKERHOSTETLER
200 Civic Center Drive
Columbus, OH 43215
Mpeirsol@bakerlaw.com
(614) 228-1541

-ooOoo-

Page 3

I N D E X

EXAMINATIONS                                                      PAGE
 Examination By Mr. Floch............................... 5


                           E X H I B I T S
 EXHIBIT NO.              DESCRIPTION                          PAGE
     Exhibit 1   Email correspondence .................23
                 [CoDI_00020113-00020117]

     Exhibit 2   Email correspondence .................29
                 [CoDI_00078888-00078894]
     Exhibit 3   Email correspondence .................37
                 [CoDI_00079338]

     Exhibit 4   Email correspondence .................45
                 [CoDI_00239009-00239010]
     Exhibit 5   Email correspondence .................61
                 [CoDI_00074699-00074700]

     Exhibit 6   Email correspondence .................72
                 [00075465-00075466]
     Exhibit 7   Email correspondence .................80
                 [CoDI_00075552-00075553]

     Exhibit 8   Spreadsheet...........................84

     Exhibit 9   Email correspondence .................90
                 [CoDI_00001168-00001169]
    Exhibit 10   Co-Diagnostics, Inc. Releases ........103
                 COVID-19 Test Performance Data:
                 Consistently Demonstrates 100%
                 Sensitivity and 100% Specificity
                 Across Independent Evaluations
    Exhibit 11   Email correspondence .................114
                 [CoDI_00007747]

    Exhibit 12   Email correspondence .................117
                 [00007778]

Page 4

Exhibit 13    Email correspondence .................125
                 [CoDI_00049695-00049697]


Exhibit 14    Email correspondence [CoDI_00014535]..130

-o0o-

Page 5

September 1, 2023                              1:31 p.m.

P R O C E E D I N G S

-o0o-

Thereupon --

CHAD APULI,

was called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

MR. FLOCH:  Mr. Apuli, just for the record, my name is Brandon Floch.  I'm at the law firm Marcus Neiman Rashbaum & Pineiro and I'm here on behalf of the Plaintiff, Gelt Trading, Limited and the punitive class.  And I will let your counsel introduce herself, too, for the record.

MS. PEIRSOL:  Thank you.  I'm Marissa Piersol.  I'm with BakerHostetler here on behalf of Defendants.

EXAMINATION

BY MR. FLOCH:

Q.   Mr. Apuli, can you just state and spell your name for the record, please?

A.   Mm-hmm, it's Chad Apuli, C-h-a-d, and then the last name is A-p-u-l-i.

Q.   Have you ever given a deposition before, Mr. Apuli?

Page 6

A.    I have not.

Q.    Okay.  So I'm going to give you some ground rules just so you kind of know how this is going to go today.  Because we have a court reporter, it's very important for you to let me get my question out and then you can give your answer.

Do you understand that?

A.    Yes.

Q.    Second, your attorney might lodge objections during today's deposition.  Unless she tells you not to answer, you can answer after her objection.  She is just going to be making objections for the record.

A.    Okay.

Q.    Do you understand that?

A.    Yep.

Q.    Okay.  Third, I know you understand that you are under oath today as if you are in a courtroom.

Do you get that?

A.    Yep.

Q.    Okay.  And then last, you should have access to the Exhibit Share that we talked about.  I'm also going to share those same exhibits on the screen.

If you have any trouble with the technology during today, just stop me and we will make sure you

Page 7

can actually see the exhibits.

Does that make sense?

A.    Yes.

Q.    And last, if you need a break, I am at your discretion.  So if you need a break at any time, you just ask me as long as we are not in the middle of a question.

A.    Okay.  Sounds great.

Q.    Okay.  So what did you do to prepare for today's deposition?

A.    I met with a lawyer two days ago and reviewed some documents.

Q.    Okay.  And how many times did you meet with a lawyer in preparation for today?

A.    Just a -- just a single time.

Q.    Okay.  And about how many documents did you look at?

A.    I couldn't tell you.  More than a handful.

Q.    Okay.  And what types of documents did you look at in preparation for today?

A.    Basically, Co-Diagnostics' documents, documents that were related to the -- you know, Logix Smart COVID-19.

Q.    Okay.  So I just want to ask a little bit about your background and then we will get into more

Page 8

substantive questions.

A.    Mm-hmm.

Q.    Do you have a college degree?

A.    Yes, I do.

Q.    Where is it from?

A.    Utah State University.

Q.    And what was your major?

A.    Biochemistry.

Q.    Besides a bachelor's degree, do you have any other higher education degrees?

A.    I haven't completed it, but I'm almost done with my masters in bioinformatics.

Q.    Okay.  What is bioinformatics?

A.    It is basically the conjunction of computer science and biology.  So it's using computer systems to analyze biological data.

Q.    When did you get your bachelor's degree?

A.    In 2015.

Q.    Okay.  Besides your bachelor's degree and the master's degree that you have almost completed, do you have any other certifications or licenses?

A.    Nope.

Q.    Okay.  Have you ever been arrested?

A.    I have not.

Q.    So I just want to take you now to your work

Page 9

history after you graduated from college.

A.    Mm-hmm.

Q.    Where did you work after you graduated from Utah State?

A.    So after I graduated from Utah State, I started at Co-Diagnostics.  I worked here for about a year and then left after my son was born because I wanted to move back home to Wisconsin where my family was.  I worked at Lucigen, which is another biotechnology company located in Madison, Wisconsin, for -- it was probably four months.  And then Co-Diagnostics made me an offer to come back.  And I came back and have been there ever since.

Q.    Okay.  So when you first started working at Co-Diagnostics in around 2015 or 2016 --

A.    Mm-hmm.

Q.    -- what was your role?

A.    I was a laboratory technician.

Q.    And what were your job responsibilities with your role as laboratory technician?

A.    Mm-hmm.  So I had a variety of different responsibilities:  Managing inventory, managing equipment, performing laboratory testing for the development of products, basically doing analytical studies and a variety of other lab cleaning, quality

documentation.  That sort of thing.

Q.   And so then you went to work at another company, but you came back to Co-Diagnostics after returning from Wisconsin; right?

A.   Yep, that's correct.

Q.   Did you have the same job role as the laboratory technician when you came back?

A.   Yeah, when I came back it was still a laboratory technician.  It just paid better.

Q.   Okay.  Did -- has your role, the entire time you've been at Co-Diagnostics since that second return -- or the return, has it been the same role or has it --

A.   No.

Q.   -- changed?

A.   It changed.  I got promoted to laboratory manager probably eight months after I came back.  And then later, after that, I was promoted to laboratory director around the time COVID started.  And then beyond that, probably six months -- well, no, like, a year ago, I got promoted to the director of product development.

Q.   And can you just briefly summarize for me, how has your job responsibility changed from when you were laboratory technician to laboratory to director to

Page 11

head of development?

A.   Mm-hmm.  Yeah, so when I was a laboratory technician and then moved to laboratory manager, I basically hired laboratory technicians under me.  And so they were the ones doing the testing and I was the one supervising and making sure they had the tools, equipment, materials that they needed.  I provided technical guidance as well as writing protocols and reports for the verification testing.  I handled safety issues and worked with the quality and regulatory teams.

When I got promoted to the laboratory director, I was overseeing both the product development and manufacturing groups.  So I worked on the development of the COVID -- and actually, all Co-Diagnostics' products that have been developed, and oversaw the manufacturing during COVID-19 when we had to scale up and increase our production capacity.  And that includes training and helping train new hires and that sort of thing.

Q.   So I just want to go back to a phrase you used.  You mentioned that you were involved with "verification testing" --

A.   Mm-hmm.

Q.   -- right?

Page 12

What does -- what does that mean?

A.    Verification testing?  Verification testing is a part of the product development process.  It's essentially analytical testing that is performed to determine the performance characteristics of your product.  So things like establishing a limit of detection, testing precision, cross reactivity, those sorts of things.

Q.    Okay.  Can you just explain to me in -- as if you are speaking to a nonscientist, what -- what does "limit of detection" mean?

A.    Mm-hmm.  "Limit of detection" is the lowest concentration of a target that you can reliably detect depending on the percentage set.  Typically, it's -- limit of detection is usually 95 percent detection.  So the concentration of target that you can detect 95 percent of the time, it would be your limit of detection.

Q.    So is it accurate to say that "limit of detection" is a measure of how much virus someone needs to have in order to detect a positive with a certain diagnostic test?

A.    It's -- that would be a very simplified way of -- there's other factors and things that determine into that.  But if we're really simplifying things

down, you could say that.

Q.   And why is limit of detection one of the performance characteristics that Co-Diagnostics would look at when conducting verification testing?

A.   Mm-hmm.  It's -- it's not just something that Co-Diagnostics looked at.  It's a common performance characteristic that I would say every single diagnostic company uses, among other performance characteristics.  And the reason for that is it is one of the measures of how well a test performs.  It's not the only measure, but it's one that, along with other performance characteristics, can give you a picture of the performance of the -- the test.

Q.   So besides limit of detection, what are the other characteristics that a diagnostic company would look at in determining whether a test performs well or doesn't perform well?

A.   Mm-hmm.  So you could use sensitivity and specificity.  And specifically, clinical sensitivity and clinical specificity.  Accuracy, which is a combination of those two.  There is precision, so the amount of variability between runs and reproducibility goes along with that in the precision category.  Cross-reactivity, basically establishing whether or not the test reacts with different off-target organisms.

Page 14

Q.    So I just want to break down all of those different performance characteristics.  So let's start with -- what does clinical sensitivity mean in sort of the most simplified way that you can explain it?

A.    It's basically the ability of the test to determine whether or not with someone has the disease in question.

Q.    And then the same question, can you describe for me, in the most simplified way you can, clinical specificity?

A.    It's basically the ability of a test to correctly identify patients without that disease.

Q.    Okay.  And you've used the -- the modifier "clinical" in front of both "sensitivity" and "specificity."  Is there a reason for that?  Is there something that is sensitivity but it is not clinical sensitivity, like, a different type of --

A.    Yeah, you could calculate, like, an analytical sensitivity, but clinical sensitivity would be done testing clinical samples, essentially.  So it's sort of, like, the highest bar where you could establish sensitivity and specificity with contrived samples or sort of simplified PCR reactions where you are able to calculate that.  But because it's not in a clinical specimen or a true natural sample, it's not

Page 15

as, sort of, robust.

Q.    And why -- so -- let me back up.

When you say -- when you say clinical sensitivity activity is more robust than analytical sensitivity, for example, what do you mean by the word "robust"?

A.    It's basically, like, a higher level of testing.  For example, if we were trying to submit data to the FDA.  If we did a completely contrived sample preparation and gave them sensitivity and specificity without any clinical data, that wouldn't sort of pass muster.  It is not as high of a bar because there's more -- there's more nuance and factors in testing a clinical sample.

Q.    So all things being equal, if you were analyzing the performance of a diagnostic test, you would rather see clinical sensitivity and specificity than analytical sensitivity and specificity?

A.    Yeah, that's correct.

Q.    And am I correct in understanding that what you're saying is that you would rather see those two metrics because you want to know how the test performs in real life, for example, rather than the contrived samples from a lab?

A.    Yep.

Page 16

Q.    Okay.  So back to the performance characteristics you mentioned, you mentioned clinical specificity and clinical sensitivity.  And then the next one you mentioned was precision.

Can you just give me a simplified understanding of what the term "precision" means?

A.    Mm-hmm.  So "precision" is basically how reliable or consistent the results for a test are over time.  There's different measurements, repeatability and reproducibility, that basically give you a picture of how much it varies.

Q.    Okay.  And then I think the last performance characteristic you mentioned in the list was cross-reactivity?

A.    Mm-hmm.

Q.    Can you help me understand what that means?

A.    Yeah, it's basically whether or not the test would misidentify another organism.  This could be things that, like, in the case of a respiratory infection, making sure that our COVID assay doesn't cross-react with flu targets, so influenza targets, making sure that it does not come up positive when that nucleic acid material is there.

Q.    So is it right to think that cross-reactivity is basically a measure of making sure

Page 17

that the test is showing a positive for the disease that you're testing rather than another disease?

A.    Yeah, you can think of it as basically a measure of specificity.  It's one way to evaluate the specificity.

Q.    Okay.  So let's move on from talking about the diagnostic testing generally, to talking about COVID-19?

A.    Mm-hmm.

Q.    Okay?  So when did you first hear about the COVID-19 virus in terms of Co-Diagnostics going to work on that virus?

A.    Mm-hmm.  I'm not sure the exact date, but it would have been in January of 2020.

Q.    And what do you recall about any discussions you or others had at Co-Diagnostics about the beginning of the COVID-19 pandemic?

A.    Mm-hmm.  I -- I don't recall exactly, but I vaguely remember there being a meeting and someone bringing up that they saw on the news that there was a report of this novel coronavirus and that we should start looking into it and see, sort of, what's happening.  And that's -- initially, that's what I remember.

Q.    So were you involved in the development of

Page 18

a diagnostic test for COVID-19 at all?

A.    Yes, I was.

Q.    And what was your involvement?

A.    So I basically oversaw the development of the test.  That first week that we had started working on the development of the test, I was actually in a mosquito conference in Virginia.  But basically, I oversaw the development and verification testing of the Logix Smart COVID-19 test.

Q.    Before the -- before COVID-19, have you ever overseen the development of another test for any other diseases?

A.    Yep.

Q.    Can you just give me an understanding of what other diseases you had developed tests for?

A.    Mm-hmm.  So we worked on the development of a microbacterium tuberculosis test.  So for the detection of the causative agent of tuberculosis.  I also worked on the development of a Zika test.  Then we developed Zika, Dengue and Chikungunya virus tests.

After that, we had done some work with development, but never got products for an HIV test, a malaria test, HBV, and HCV.  And then we had -- then I worked on the development of some mosquito diagnostic tests, so for testing mosquitoes.  We have three

separate products that the North American West Mosquito test, the Vector Smart North American Mosquito West. The Vector Smart North American Mosquito East and the Vector Zika, Dengue and Chikungunya tests.  So all of those tests were for testing mosquitos for different diseases.

Q.    Was the development of the COVID-19 test similar in process to the development of those other tests you just listed?

A.    Yes, very similar in process.

Q.    Okay.  Can you just walk me through the process of developing a diagnostic test as briefly as you can.

A.    Mm-hmm.  So the first sort of step is identifying the regions that you want to target.  So you basically want to target a region in the genome of whatever organism you're looking at that is well conserved within that organism.  So there's not variability in different sequences for the organism, but that is not present in other organisms that you don't want to detect.

Q.    And how do you -- how do you go about figuring out what to target?

A.    Mm-hmm.  So there's multiple different sort of avenues.  You can use sequence alignments, basically

Page 20

taking a bunch of sequence of the organism that you're looking at or other organisms that you don't want to target and do an alignment to find conserved regions. You can also use the tool called "BLAST" to search for the sequence that you're looking at to see if it's present in other organisms.  And also, we will use journal articles and basically regions that have been identified by other people in the field.  Usually, that's a good starting point, but then we look at the alignments from there.

Q.    So after selecting a gene target, what's the next step in development?

A.    Then, it would be creating or doing the designs for -- you know, in our case we have a proprietary primer technology called "CoPrimers."  And we have a software that basically designs CoPrimers based on different algorithms and stuff that we've worked on over the years.

So it will design a bunch of CoPrimers. And then, we will take a look at them and narrow them down and order a handful of CoPrimers based on those designs.

Q.    And then, is there another step after that?

A.    Yeah.  So then after that, basically we'll get the CoPrimers in.  They will be manufactured for

Page 21

us, synthesized for us and then sent to us.  And then, when we get them in, we will begin testing and so we will start testing to pick between the different designs that we had selected to pick the best one.

And then we will usually test on synthetic materials at first to get an idea of the performance sort of in a clean and pure environment.  And then, start with the multiplexing and then testing on contrived samples, basically semi-clinical samples. And go from there.  Basically, that's -- that testing process is the start of verification testing.  And then, it would move to a clinical trial following that.

Q.    Okay.  You used the term "semi-clinical," I think, to describe contrived samples?

A.    Mm-hmm.

Q.    Is that correct?

A.    Yeah.

Q.    What do you mean by that?

A.    That's probably a poor term.  Basically, a contrived sample is preparing a sample that's using, basically, materials that you have.

So a contrived sample for COVID would be -- let's say we are doing a nasal swab.  It would be a nasal swab from a negative patient.  You would do testing on it to make sure that it was negative.  And

Page 22

then, you would spike or add material to it.  And so -- COVID material to it, either inactivated virus or genome or a live virus, potentially.

Q.    So about how long did it take Co-Diagnostics to develop the Logix Smart Test?

A.    I'm not sure of the exact dates or time, but it was one of the faster tests that we've developed.  And part of the reason for that was -- it was because of the -- the nature of the pandemic and how big it grew, we were able to sort of pull resources from all other projects so they could be focused on the development of this test.

Q.    You said it was faster, or Co-Diagnostics built that test quicker than it had done any other test; is that correct?

A.    (Witness nods head.)

Q.    Was there a sense of urgency inside the company to develop that test quickly?

A.    I don't know that I used the word "urgency."  We were trying to get things done quickly and effectively, but I don't know that -- it was still calm and we follow their processes and that sort of thing.  So...

Q.    Okay.  So I'm going to start showing you some exhibits.  And I will let you look at them and

Page 23

then I will ask you a question.  So I am going to pull it up and then it will pop up on Exhibit Share, if you give me one second.

A.    Okay.

Q.    So you should see in the Exhibit Share a document that says, "Exhibit APULI 1."

(Exhibit No. 1 was marked

for identification.)

THE WITNESS:  Yep, I see it.

BY MR. FLOCH:

Q.    If you want to just take a look at it and let me know when you're ready, and I will have a question for you.

A.    Okay.  Okay.

Q.    Okay.  So I want to just focus your attention to the top of page 2.  Well, let me start at the top.

Do you see that this is an email chain, that you are on, from February 2nd, 2020?

A.    Yes.

Q.    And if you scroll down, you see lower down on the email chain, there is an email from Dwight Egan to others at Co-Diagnostics.

Do you see that?

A.    Yes, I do.

Q.    Okay.  And it appears that he's asking about the limit of detection of the Logix Smart Test; right?

A.    Mm-hmm.

Q.    And then, if you scroll up, there's a response by someone named Madison Stark; right?

A.    Yep.

Q.    And you are CCed on that email?

A.    Mm-hmm.

Q.    Who is Madison Stark?

A.    Madison Stark was one of the laboratory technicians that was on my team.

Q.    Okay.  And do you see Madison replied to Mr. Egan and said, "So one thing to keep in mind is that because we don't have any real strains of the 2019 nCOV, we had to perform the LOD experiments on the synthetic template that we use as the positive control. We do not normally do this.  We hope that the limit of detection on the synthetic template translates to real world patient samples, but this may not always be the case."

Do you see that?

A.    Mm-hmm.

Q.    And then if you scroll up further, it looks like you replied to Mr. Egan too; right?

Page 25

A.    Yes.

Q.    And you said, "Just to add to what Madison was saying, I wouldn't use those numbers as our LoD at this point.  This is just based on testing on the synthetic templates, which is going to be a lot cleaner than a patient sample would be.  This LoD is more of a simulated Lod rather than the actual LoD."

Do you see that?

A.    Yep.

Q.    Can you help me understand, why were you telling Mr. Egan not to use the LoD numbers that came from an analysis on the synthetic templates?

A.    Mm-hmm.  Yeah, that's a great question.

So this is sort of similar to what we had talked to about earlier with the sensitivity and clinical sensitivity.  Essentially, these are -- this is early stage testing where -- and Madison is slightly incorrect.  A lot of times we would do some limit of detection testing on the synthetic templates, but that wouldn't be used to establish our actual limit of detection.  It is sort of a first step that we would do to characterize the -- the CoPrimers and the tests that we were working with.

Q.    So I guess, just going back to my question, why would you tell Mr. Egan not to use the numbers from

Page 26

the synthetic LoD as the -- as the actual LoD --

A.    Mm-hmm.

Q.    -- number, I guess?

A.    Mm-hmm.  The reason for that is because it wouldn't be, sort of, correct or we wouldn't be able to make claims as a company that that is our LoD with the -- with that data.  And so -- so because of that, I just wanted to clearly communicate to him because he -- he doesn't work on the -- the technical side.  And so I was just making sure that he understood that this is sort of an early number and not an actual limit of detection that could be used.

Q.    So if a third party were to come to you, as a scientist, and say, "Hey, what's the Logix Smart's LoD?"  If you were going to give them the LoD based on synthetic template, you would always tell them, "Hey, this is our LoD, but it's based on the synthetic samples"; right?

MS. PEIRSOL:  Objection.  Misstates his testimony.

You can -- you can answer, Chad.

THE WITNESS:  Okay.  I wouldn't necessarily say that.  A lot of it depends on the -- the situation, but depending on a customer, I -- there's a chance that I -- I might say that.

BY MR. FLOCH:

Q.   Okay.  Do you recall when in the development process or -- sorry, let me strike that.

Do you recall when Co-Diagnostics first got patient samples to test the Logix Smart Test on?

A.   I know we got them, but I don't recall sort of when -- when we -- we got them.

Q.   Okay.  Were you involved at all in drafting press releases for the company?

A.   I wouldn't say that I was involved in the drafting.  Occasionally, they would ask for me to review certain parts of the press release, but I -- I didn't draft, at least not that I can remember.

Q.   When you say "they," who are you referring to?

A.   Andrew Benson, typically.  He would be the one who would draft the press releases.

Q.   And when he came to you to review something, what -- what types of information was he asking you to review usually?

A.   Some technical details.

Q.   What do you mean when you say, "technical details"?

A.   Things related to the performance, potentially.  I wasn't the only person that would do

Page 28

that.  I would say Cecilia Hutchins was probably the one who was most responsible for that because she was head of regulatory.  And so she knew the, sort of, regulations about what things we can and can't say about a diagnostic product during and after development.

Q.    Did you and Ms. Hutchins have overlapping responsibilities at Co-Diagnostics?

A.    Yeah.  I would say during this time I -- there was an increased demand.  And so I did whatever I could to sort of help out and handle her -- help her handle the load better.

Q.    So Mr. Benson sometimes asked you to review press releases.

Did he ever ask you to review statements made on Co-Diagnostics' website?

A.    He could have, but I don't recall if he did or he didn't.

Q.    Okay.  Do you recall any conversations with the FDA about claims made on Co-Diagnostics' website about the Logix Smart Test?

A.    Yeah, I vaguely recollect that early on we had a conversation with the FDA.

Q.    Okay.  What do you remember about that conversation with the FDA?

A.    I believe they were -- they had some concerns about comments made on the website related to the COVID-19 product, but I can't recall beyond that what -- what their objection exactly was.

Q.    Did you have -- did you personally have conversations with individuals at the FDA?

A.    Yes.  I don't know if I was personally involved in that conversation, but I did have conversations with people in the FDA.

Q.    And what do you remember about those conversations?

A.    That it went well.  We -- we had questions during the development and during the submission process about, sort of, what data they were looking for and how to present it to them so that it was easy to digest.  They were really slammed during the pandemic. And so trying to make things as understandable and sort of doing things exactly how they wanted.  Because a lot of times, there's multiple different methodologies to figure things out.

Q.    Okay.  I'm going to show you what we are going to mark as Exhibit 2.

              (Exhibit No. 2 was marked

                 for identification.)

              MR. FLOCH:  If you will just give me one

second.

BY MR. FLOCH:

Q.   And you should see Exhibit 2 in that share folder now, it's going to be called "APULI 2."

A.   Okay.

Q.   And I'll share it on my screen too.  Why don't you take a brief look at it and then let me know when you're ready.

A.   Okay.

Q.   Mr. Apuli, just let me know when you are ready and I will just have a few questions for you.

A.   I'm just -- I'm on page 6.  So I'm almost done.  Okay.

Q.   Do you recognize this email chain?

A.   It looks familiar, but I don't -- I can't recall it -- writing these things.

Q.   Okay.  If we scroll down to the second page, do you see there's an email from someone named Leroy Hwang to you and others at Co-Diagnostics and the FDA?

A.   Yep.

Q.   And it appears to summarize a teleconference call; right?

A.   Mm-hmm.

Q.   And if you go down a little bit lower,

there's a line that says, "Specific concerns include," and there is a bunch of bullet points; right?

A.   Yep.

Q.   And if you look at the first bullet point, it appears to quote something that says, "CoPrimer technology has shown enhanced specificity when compared to other products on the market."  And then it says, "-specificity implies a performance claim."

Do you see that?

A.   Yep.

Q.   And then if you scroll down to the next page and go down one, two, three, the fourth bullet, it quotes something else and says, "Increased specificity is one of the hallmarks of test build using our patented CoPrimer platform," and then "-performance claim."

Do you see that?

A.   Yep.

Q.   Do you have an understanding of what concerns the FDA was talking about when they referenced performance claims?

A.   I -- I have a vague understanding.  I'm definitely not a regulatory professional.  So I have a -- a general sense of why they don't want the performance claims.

Page 32

Q.    Okay.  And what -- what's your general sense of why they didn't want performance claims?

A.    In the case of this, specifically, they didn't want research-use only -- one of the things with research-use only products is -- especially ones for diseases that humans can get, they don't want companies to skirt around regulations by developing an RUO product, but basically marketing it as an IVD product. So because of that they limit the -- the claims that company can make about the product.

So performance claims specifically should not be included for RUO products on tests that are -- could be used on humans.

Q.    And was it your understanding that the FDA was concerned about performance claims made on Co-Diagnostics' website about the Logix Smart Test when it only had RUO authorization?

A.    So there's not really an RUO authorization. And I wouldn't say it's on the content of the claims, more just that there are claims.

Q.    Does this email refresh your recollection about any other conversations you had, around February 11, 2020, with the FDA about concerns they had about representations being made regarding the Logix Smart Test?

A.    About other conversations that we had or just about this?

Q.    Just about this conversation.

A.    Yeah.  I -- I'm -- I don't exactly recall the details, but then some of -- reading through this sort of refreshed my memory.  And now I remember these, sort of, issues that they had brought up.

Q.    And then if you scroll all the way to the top, do you see that there's an email from you to Ms. Hutchins?

A.    Mm-hmm.

Q.    And it appears you're editing her response back to the FDA; right?

A.    Mm-hmm.

Q.    And it looks like there are two bullet points in that response; right?

A.    Mm-hmm.

Q.    One says, "Work on the corrective actions immediately to fix and clarify the discussed concerns."

And then the second bullet point says, "Plan the necessary actions to prevent this issue from happening in the future."

A.    Mm-hmm.

Q.    Do you see that?

A.    Yep.

Page 34

Q.    Are you aware of any actions or preventative measures that Co-Diagnostics took after being told by the FDA that it had concerns about claims made on the website?

A.    I don't recall the specific corrective or preventive [sic] actions that were taken, but most likely, there were.  And they would have been documented in our quality management system.

Q.    Does the company currently have a protocol to request that scientists, the scientists at the company, review any statements that are made to the public about the diagnostic test?

A.    I can't say for certain whether they do or not, but I imagine that we do have something in place, maybe not with scientists, but with the regulatory or -- and maybe even just appropriate personnel, depending on the content of the press release.

Q.    So are you -- are -- you think that there is one or you are just kind of guessing that there is one because you assume there might be one?

A.    Yeah, I would assume there would be one. I -- I'm not sure of the specific standard operating procedure thing that it's listed in, but I -- I'm guessing that we would have that procedure.

Q.    Okay.  And do you recall whether or not any

type of procedure was put in place after this reachout from the FDA for regulatory or science to review public-facing statements about the company's tests?

A.    Mm-hmm.   I'm -- based on how I remember this conversation going, I'm almost positive there was something put in place, but -- but I'm not 100 percent sure.   It would be my -- my sort of best guess that that would be something -- if there is something that you have that -- any documents or anything to --

Q.    Well, let me ask you a different question.

Before this contact from the FDA about concerns about performance claims with the Logix Smart Test, had you ever received another contact from the FDA about claims made for any of your -- any of Co-Diagnostics' other diagnostic tests?

MS. PEIRSOL:   Objection.   I just want to state for the record that Chad is not here to testify on behalf of the company, so -- and -- and I think the question was asked appropriately, Brandon, but I just want to make sure that, you know, he is just testifying in his individual capacity and whether he has knowledge of that.

BY MR. FLOCH:

Q.    I'm only asking:   Have you ever had any contact from the FDA about performance claims made on

Page 36

any other diagnostic tests that you were involved with developing?

A.    I -- I do not recall having any -- any conversations with the FDA prior to that.

Q.    Okay.  Was it concerning for you to be contacted by the FDA about the Logix Smart Test?

A.    Slightly.  Sort of like the first time you get pulled over, even if it's for something like a rear taillight, you know, you are always going to be a little -- little nervous, you know?  But beyond that, I also realized that they were doing their job and reaching out to us.  And all of the concerns that they brought up were -- were valid.  And they were things that we addressed.

Q.    Do you recall any internal discussions you had at Co-Diagnostics about this reach out from the FDA?

A.    I -- I don't recall.  I'm sure they happened, but I don't recall the details of --

Q.    Okay.  Let's move on to another topic, still focusing on February 2020.

Have you heard the term "CE marking."

A.    Mm-hmm.  Yep.

Q.    What -- what's -- what's a CE marking?

A.    It's basically regulatory approval from the

Page 37

European Union.  And for that, you can get CE IVD approval.  So approval in the European Union for the product as an IVD.

Q.    And when you say approval as an IVD, that means that the company could sell the product to -- to test on actual human beings not just for research?

A.    Yep.

Q.    Were you involved at all with Co-Diagnostics getting the CE marking for the Logix Smart Test?

A.    Yep.  I assisted Cecilia Hutchins in adding technical content.  Basically, it's the report -- the content from verification reports to our product dossier, which was then submitted to the European Union.

Q.    Okay.  When you submitted technical data to the European Union, was that data based on clinical samples or contrived samples?

A.    I don't recall exactly.  My -- yeah, I would have to look at the product dossier or --

Q.    Let -- I'm going to show you another document.  Give me one second.  This will be APULI 3.

(Exhibit No. 3 was marked for identification.)

THE WITNESS:  Okay.

Page 38

BY MR. FLOCH:

Q.    And just take a look at it and then let me know when you're ready.

A.    Okay.  Okay.

Q.    Okay.  What -- what is APULI 3?

A.    It looks like it's an email from myself --

Q.    Okay.

A.    -- to Cecilia, CCed to some of the laboratory technicians, discussing accuracy results.

Q.    And is this the data that you were referencing before that got put into some dossier to be submitted to the European Union for approval to sell the Logix Smart Test?

A.    I would have to see the product dossier to make sure, so I can't say exactly if this was the exact date that that made it into the product dossier.

Q.    Okay.  But it -- the top email says, "We'll need to make a memo for this, or we can add it to the CE Mark Verification Report (sorry Madison)."

A.    Mm-hmm.

Q.    Do you see that?

A.    Mm-hmm.

Q.    What is the CE Mark Verification Report?

A.    Mm-hmm.  So we basically created two verification records because the verification testing

we did with the CE mark and European Union, there was sort of less of a regulatory burden on our end. So the data that -- they basically needed a certain set of data and the FDA needed additional data beyond that. So the CE Mark Verification Report was the verification report for that initial data that most likely would have gotten sent to the European Union, but without knowing -- without seeing the product dossier, I can't guarantee that this exact data is what made it into it. I would imagine so, but there could have been changes or updates following this email.

Q.    Okay. I just want to walk through some of the -- the things in the email.

If -- do you see there's a paragraph that says, "The data used to establish the (diagnostic?) accuracy results are from the single-site precision testing, LoD testing, and the thermocycler comparison values on the Eco 48."

Do you see that?

A.    Yep.

Q.    Why did you put "diagnostic" in parentheses and a question mark?

A.    It was earlier in my career. And there was -- it was basically something that I wasn't quite sure of at the time. And so I wasn't sure if it would

be considered diagnostic accuracy.  So, yeah.

Q.    Help me understand that, though.  So, like, what -- what's the difference between just accuracy and diagnostic accuracy?

A.    Mm-hmm.  And I wouldn't -- I would say, like, clinical accuracy, that's sort of the issue.  I wasn't sure if diagnostic accuracy meant clinical accuracy or if it would be sort of analytical testing accuracy.  So I believe that's -- that's what it -- the confusion was about, but I couldn't say for certain.

Q.    So you think your question was really, "Oh, do I call it clinical or -- or analytical?"

A.    Yeah, or diagnostic or just accuracy, sort of.

Q.    And then do you see that there's a table below that says, "# of True Negatives, # of False Positives, # of True Positives, # of False Negatives"?

A.    Yep.

Q.    Can you explain to me what each of those mean --

A.    Mm-hmm.

Q.    -- in terms of the data that's being reported on that table?

A.    Mm-hmm.  So the "# of True Negatives" would be the number of negative samples.  So these samples,

Page 41

that were used to do this, were contrived samples.

And so with a contrived sample, you know if something is positive or negative because we are the ones creating the sample and spiking them in. So the "# of True Negatives" is the number of negative samples that were tested that also had a negative result from the -- our test.

The "# of False Positives" would have been if there were any true negatives that had a positive result. Then the "# of True Positives" is the number of positive samples that we had that had a positive result. And then the "# of False Negatives" is the number of positive samples that were called as negative when they should have been called as positive.

Q.   Okay. Understood. So -- so basically what you're doing is you're testing how well the Logix Smart Test performs on the contrived samples where you know whether a contrived sample is actually positive or actually negative?

A.   Yep, mm-hmm.

Q.   And then do you see that there is a last sentence in the third paragraph, that says, "The chosen samples were all at concentrations at or above the LoD, and samples with concentrations below the LoD were not included."

Page 42

A.    Mm-hmm.

Q.    Do you see that?

A.    Mm-hmm.

Q.    Can you explain to me what that means in as simple terms as possible for someone who is a nonscientist?

A.    Mm-hmm.  So basically -- I think I had mentioned earlier the limit of detection is the lowest amount of target that can be present that you can reliably detect.  In this case, it was a 95 percent limit of detection.  So where you get 95 percent or greater detection.

And so evaluating samples below the limit of detection basically is beyond the -- beyond the -- I guess -- what's a good way to -- yeah, it's basically outside the, sort of, use case for the -- the test.  I mean, just by definition, evaluating things below the limit of detection, if it was a 95 percent limit of detection, would give you a sensitivity less than 95 percent all the time because, if it's below the limit of detection, which is sort of the 95 percent detection rate, you wouldn't -- it would be below 95 percent.  And it's not an accurate measure of the actual performance of the test because you're measuring at a level that it's not intended to measure at.

Q.   Okay.  Let's -- let's just back up and -- I have a few questions about the Logix Smart's limit of detection.

As compared to other diagnostic tests for COVID-19 on the market, did Co-Diagnostics have a higher limit of detection than those tests or a lower limit of detection?

MS. PEIRSOL:  Objection.  Vague.  Are we talking about a particular test that you want to compare to or -- it's just ambiguous.  I don't know what you're asking.

BY MR. FLOCH:

Q.   If you understand the question, you can answer it, Mr. Apuli.

A.   I would say that we were roughly in the middle of the pack as far as claimed LoDs go.

Q.   Okay.  Can you -- can you help me understand two things you just said.  When you say "middle of the pack," what do you mean?

A.   Just sort of -- we definitely didn't have the best LoD and definitely didn't have the worst LoD.

Q.   And when you say, "best LoD," is it accurate to say that you mean an LoD that could pick up lower -- lower viral loads than another test?

A.   I don't know that that's necessarily the

Page 44

case.  I guess you could say that, but whether or not it has clinical relevance is another thing.  So --

Q.    Let me ask a different question.

How would -- how would you describe the difference between a test with the best LoD and a test with the worst LoD?  What's the difference between what those two tests can do?  All else being equal?

A.    Mm-hmm.  It would be, basically, that the level of target that they can detect is -- would be lower.

Q.    Okay.  And I think your testimony was -- before, was that the Logix Smart Test was the middle of the pack for LoD; right?

A.    Mm-hmm.

Q.    Did the Logix Smart's -- Smart Test's LoD impact its performance on real world samples?

A.    I don't think so.  Based on the viral loads of the coronavirus and the pandemic, I think we were plenty sensitive, where I don't think it was -- would have caused an issue.

Q.    And your conclusion that you don't think the test's LoD impacted its performance, what is that based on?

A.    There were basically clinical studies on the viral load of patients over time.  And so that data

Page 45

is what I would base it on.

Q.   Okay.  I'm just going to share my screen again, so we can look at APULI 2 again.  Or APULI 3, I'm sorry.

So at least as of February 20th, 2020, did Co-Diagnostics have clinical samples to run its verification study on yet, as of that time?

A.   I don't believe so.

Q.   Okay.  I'm going to show you what we are going to mark as APULI 4 now.

(Exhibit No. 4 was marked

for identification.)

BY MR. FLOCH:

Q.   And I assure you, Mr. Apuli, I am cutting out exhibits I was going to show you because I was trying to get you out of here at a decent hour.

A.   I appreciate it.

Q.   This will be APULI 4.  Am I saying your name correctly?

A.   Yeah, mm-hmm.  I'm actually surprised.  Did someone tell you how to pronounce it?

Q.   It has come up in other depositions.  And I was trying to remember if I had it correct.  And I --

A.   Uh-huh.

Q.   And I guess I did remember it correctly.

Okay.  This will be APULI 4.  So take a look at it and then let me know when you are ready.

A.    Okay.  Okay.

Q.    Okay.  So if we scroll down to the bottom, there's an email from you to others at Co-Diagnostics on March 12th, 2020; right?

A.    Mm-hmm.

Q.    And the subject line is, "Results"?

A.    Mm-hmm.

Q.    And can you just describe for me what results were you summarizing to your colleagues at Co-Diagnostics?

A.    So if I recall correctly, this was internal testing that we had done to -- to test an employee and his families.  And there may have been other samples in there.  The purpose for it was for -- I believe, the individual in question and his family were feeling sick and they may have traveled recently.  And so they were concerned and wondering if they should get a diagnostic test for it.  And so I believe we tested the samples to see if they should get a diagnostic test because our laboratory is not able to do diagnostic -- to diagnose people with illnesses.  And we can't do diagnostic tests, I'm saying, essentially.

Q.    So Co-Diagnostics was using its Logix Smart

Page 47

Test on these individuals to determine whether or not they should go get another test --

A.    Yes.

Q.    -- to actually see if they had COVID?

A.    Yeah, because we aren't a CLIA laboratory. We design and develop diagnostic products, but we're not the actual lab that performs the testing -- the clinical testing for patients and provides them with a diagnosis.

Q.    Okay.  Do you -- do you see on the bottom email, you said, "Hello all, I have the results, and I'm not sure if you'd like me to email the individuals as well, but some of the results are somewhat inconclusive."

A.    Mm-hmm.

Q.    Do you see that?

A.    Mm-hmm, yep.

Q.    What did you mean when you said "inconclusive"?

A.    Just -- it looks like the testing that was done, below in that table, they have the "Person" and then the "# of hits" and there's "2/2" for some of them and "1/2" for others.

The -- the "# of hits" would have been the number of replicates that were done for testing.  And

if they were inconclusive, it's the samples that say "1/2," basically meaning one sample tested positive and one sample tested negative.

Q.   Got it.  And then do you see, if you scroll down in the email, it says, "These discrepancies could be due to random variability, or there could be contamination or issues with the test; however, we haven't seen these issues during the validation, but that may be because of the contrived samples that we've been using may not represent the real-life scenario."

Do you see that?

A.   Mm-hmm.

Q.   What were you saying -- why were you mentioning contrived samples to your colleagues at Co-Diagnostics?

A.   The contrived samples that we were talking about is referring to the -- we haven't seen these issues during the validation.  And I said "validation," but it really it was the verification.  So it's referring to -- "we haven't seen these issues during the validation," because the validation, which was the verification used contrived samples, which may not have accurately represented the real life scenario.

Q.   So -- so when running the Logix Smart Test on real-life samples, the results, at least from this

Page 49

email, appear to be inconclusive; right?

A.    On -- from these specific experiments, but that doesn't apply to all the results.

Q.    And I guess my question is:  Getting this data back from running the Logix Smart Test on these patient samples, did it concern you that the results were not behaving similar to the results you had gotten on the contrived samples?

A.    Mm-hmm.  I -- I -- I don't know if I was concerned.  I knew that there was something wrong, based on the -- the amount of testing that we did before that, that we should not be seeing results like this.

And we eventually -- I -- I can't remember what -- if the issue was because of contamination or not -- something else.  But it was something that I do believe that we did resolve later on.

Does that answer your question?

Q.    Yeah.  But how is it resolved?  Because it appears, at least from your initial assessment, you were saying there might be issues with the test because when the test is run on real-life samples, its results are different than when it is run on contrived samples; right?

A.    Well, so if you -- an example would be if

Page 50

you go to start a car and it doesn't start, does that mean the car is -- you should just get a new car?  So basically, what -- I was sort of listing out different possibilities of what the issue could be.  So, for example, if it -- if it is contamination, that could be what is giving the results.  So we would need our product that isn't contaminated to use that.  And then after that, the -- the results could be fine.

Or if there was random variability or it could have been that there was issues between the contrived samples and real-life samples, but based on how the test is performed throughout the life of it, that's not the case because we know it performs well.

Q.    Okay.  So you -- is it your testimony that you believe that random variability or contamination or something was what caused the inconclusive results here, rather than an underlying problem with the test?

A.    Yep.

Q.    And what are you basing that conclusion on?

A.    Just from my recollection.  We did this testing and then, I think, we did some further testing with the CDC tests and protocol.  And then at some point, I think we used a new lot of, basically, chemistry, a new lot of products and tested that and the performance -- there wasn't the inconsistent

Page 51

results that we saw here.

Q.    Okay.  If you go up to the top email, you see it's from Dr. Satterfield to you and some others at Co-Diagnostics?

A.    Mm-hmm.

Q.    And do you see he wrote, "Chad, thanks for results.  Rebecca and I had a chance to look at these.  Only one of these" and then there's a redaction, "has a positive level above the LOD cutoff."

Do you see that?

A.    Yep.

Q.    Is it possible that the results were inconclusive because the limit of detection for the Logix Smart Test was too high?

A.    So that was one of the possibilities, but that's not what ended up being the issue here.  Now that I'm thinking about it, I believe it was low-level contamination that was the issue.  And so basically, low-level contamination would result in results similar to what was seen here, where a lot of things come up really late at the end, depending on the level of contamination, that could come up earlier, but it was low-level contamination.  And so the amplification took place after where we would see samples amplify with the limit of detection.

Page 52

Q.   How do you know it was low-level contamination, sitting here now?  What caused you to remember that?

A.   Just sort of talking through the email and then reading Brent's assessment, "Only one of these...has a positive level above the LOD cutoff."

So basically, one of them had an early CQ value.  I'm doing curves, like you know what that means.  Sorry.

So basically, just the email and talking through it, just I remember now that it was low-level contamination.

Q.   And then, do you see that Dr. Satterfield wrote, "Clearly there was a problem with this run, but they were probably negative"; right?

Do you see that?

A.   Mm-hmm.

Q.   Then he says, "We can repeat this procedure tomorrow with the CDC primer sets."

A.   Mm-hmm.

Q.   Can you -- can you explain to me what a "CDC primer set" is?

A.   Mm-hmm.  So the CDC primer set is basically the primers, which are one of the working pieces in PCR, that the CDC developed to test for COVID-19.  And

Page 53

they publicly made those sequences available so laboratories could basically obtain those primers and do testing.  Specifically, in our case, it was basically for research testing and we used it to compare between the Logix Smart and the CDC's test.

Q.    After getting these results back, did the results cause you to question whether the Logix Smart Test performed well?

A.    This wasn't enough to make me question.  And part of that was just the number of results that we had done for verification testing.  We had, basically, a large body of evidence that it performed well.  We had the smaller subset of evidence, which wasn't enough to really throw all the other evidence out, but it definitely is something that needed to be looked into further and figured out.  And had it been an issue with how it performed on real-life samples, that would have been something that, as we collected more and more evidence for that, that could have changed my mind and made me worried about the performance, but that's not something that we saw.

Q.    Okay.  But -- but I think what you were saying before is that up until around this point in time, all of the results you had received from verification studies were based on contrived studies;

Page 54

right?

A.    Mm-hmm.

Q.    And at least around early March 2020, this may have been the first time that the test was being performed on real-life samples; right?

A.    Mm-hmm.

Q.    And the results from the real-life samples were not matching up with what you had seen on the contrived samples; right?

A.    Yep.

Q.    And your testimony is:  Even though the results from the real-life samples were a little bit different from the contrived samples, it didn't cause you any worries or doubts about the performance of the test; right?

A.    Well, I wouldn't -- I wouldn't say that they were a little different.  I would say that they were a lot different because we have all of -- basically, every single of the -- the people sample, at least one of them amplified.  And so that -- that's sort of wildly different.  And then seeing that low-level amplification, that's sort of wildly different than what we saw.  So it wasn't like it just performed a little worse.  It was like -- it was a -- a different test that we were seeing.  And so something

Page 55

didn't seem to -- to make sense.

Q.    When you say "amplified," can you explain to me, in the simplest way you can, what -- what is amplification?

A.    Basically, it's what happens during PCR. When the target that you're looking for is present, each cycle in PCR, you amplify the product.  So you basically make copies of the certain piece of the genome that your looking at.  And so if -- basically, if a sample is amplified, it suggests that the target is there.  So, like, a positive result.  And if it didn't amplify, it would essentially be a negative result, that the target wasn't there.

Q.    And when you say that there was an amplification issue with the employee samples we've been looking at, can you explain to me what the -- what the amplification issue is?

A.    Mm-hmm.  So, I wish I had a board to draw. So essentially, in PCR curves -- in PCR, you are measuring the fluorescence, basically.  So each time -- each cycle in PCR, you basically can make up to double the amount of copies.  So if you start with two copies, then it goes to four, eight, 16, 32, so on and so forth.

Each time one of these copies is made, a

Page 56

fluorescent signal is generated.  And at some point,
that fluorescent signal that you're generating is
enough to, basically, be greater than the background
signal.  And so the fluorescence increases and you get
a curve, basically.

Where those curves come up, the cycle
threshold, is determined by several things, but one of
the things is the concentration of virus.  So if
something has a high viral load or concentration, it
would come up in an earlier cycle.  And if it had a low
concentration, it would come up on a later cycle.

And so these were all coming up on later
cycles, all except the one that they mentioned.  One of
these had a positive level above the LoD cutoff.  And
the rest of them had, basically, late amplification.

Q.   Is it possible that the late amplification
problem is impacted by the test's limit of detection?

A.   So that -- that could have been a
possibility, but that wasn't what the issue was.  So it
was in the realm of possibilities, but that's not what
it ended up being.

Q.   And -- and how do you know that the late
amplification problem was not caused by the test limit
of detection?

A.   It's because of what I recall from,

Page 57

basically, being the conclusion of this was that the issue was low-level contamination of a certain -- I don't know if it was the lot or a specific tube of product. And once we did testing with the different tube, we didn't see issue.

Q. Okay. Besides these results that we've been talking about, do you recall any -- seeing any other results where the limit of detection led to late amplification of the Logix Smart's -- sorry, let me back up. Let me -- let me ask a different question.

Besides the results we just looked at, do you recall any other late amplification problems being caused by the test limit of detection?

MS. PEIRSOL: Objection. Misstates the evidence. Misstates the record.

He never said that those late amplifications were caused by the LoD.

BY MR. FLOCH:

Q. Let me ask a different question.

Do you recall any results where the late amplification of the Logix Smart Test was caused by the limit of detection of the Logix Smart Test?

A. I don't think there were any issues that were caused by the -- the Logix Smart limit of detection. There were -- yeah.

Page 58

Q.   Okay.  Let's move on to a different topic.

So we have been talking about the term "verification study" quite a bit; right?

A.   Mm-hmm.

Q.   What -- what is a validation study and how is that different than a verification study?

A.   So verification is basically establishing the performance of your -- your test.  And so it's just the performance metrics that we talked about.

And validation is, sort of, "Okay, we know that these are the performance characteristics of our test.  Does the test, in real-life scenarios, perform well?"  So outside the hands of the trained laboratory staff that have been developing the product to -- are other customers able to use it?  Is it able to, sort of, detect patient samples?  That sort of thing.

Does that answer your question?

Q.   Yeah.  And if I say the term "concordance test," do you know what that means?

A.   Mm-hmm, yep.

Q.   And what does it mean to you?

A.   Basically, concordance with another test are whether or not the results agree with the comparator test.

Q.   And is a concordance test a type of

Page 59

validation test?

A.     Yeah, you could use it as a type of validation test.

MR. FLOCH:  Would you guys be okay with a five-minute break now and then we will come back?

THE WITNESS:  Yeah, that would be perfect, actually.

MR. FLOCH:  Let's just take five minutes and then we will be back at, like, 3:07 your time.

THE WITNESS:  Okay.

(Recess was taken.)

BY MR. FLOCH:

Q.     So Mr. Apuli, before the break, we were talking about validation studies; right?

A.     Yep.

Q.     Do you remember the Logix Smart Test having any validation studies run on it from the country of India?

A.     I know that there were -- there was a -- or there were multiple studies from India.

Q.     And what do you remember about those studies?

A.     I think I -- I remember some of them.  The results did not turn out well.  But I think the studies were flawed.  And then I think others had good

performance.

Q.   Okay.  When you say, "the results did not turn out well," what do you mean by "did not turn out well"?

A.   I think that the performance of our test just wasn't, sort of, around the level that we expected it to be.

Q.   Okay.  Do you remember any other details about that Indian validation study that you're referencing?

A.   I -- I don't.

Q.   Besides the Indian validation study, do you remember any other validation studies run on the Logix Smart Test from any other countries?

A.   Mm-hmm.  I know there was a Path West, which I think was an Australia validation study. There's another one from another country I can't remember, in south America, I think.  And there might be others.

Q.   Did you have any involvement in analyzing the validation studies that you're talking about right now?

A.   I -- I looked at them and I'm sure I was in discussions where we were -- where the company talked about the results of the validation.  I don't know if

Page 61

we independently, like, went through all the data, like from their raw data and sort of reanalyzed it from there, but yeah.

Q.   So besides the Indian validation study that didn't perform that well, do you remember any other validation studies that didn't perform well?

A.   I don't recall off the top of my head if there were others.  Yeah.

Q.   Do you remember any validation studies run from labs in the country of South Africa?

A.   Not off the top of my head, no.

Q.   Okay.  Let's look at some exhibits.  I'm going to show you what we are going to mark as APULI 5.

(Exhibit No. 5 was marked

for identification.)

BY MR. FLOCH:

Q.   And why don't you take a look at it and then let me know when you're ready.

A.   Okay.  Okay.

Q.   So let's start with the bottom email.  It's from Rebecca Garcia to you and others at Co-Diagnostics; right?

A.   Mm-hmm.

Q.   Who is Dr. Garcia?

A.   Dr. Garcia was the former VP of product

Page 62

development.  And when I started as a laboratory technician, she was my supervisor.

Q.   Okay.  The current role that you have, is that the role that Dr. Garcia used to have?

A.   Not exactly.  It's different.

Q.   Okay.

A.   Her focus was more on India.  And my position was basically a result of restructuring the company.

Q.   Okay.  Do you see that she wrote you an email that the subject line is, "COVID Clinical Results"?

A.   Yep.

Q.   And the first line is, "The ICMR has printed the results from our tests and they are not passing the guidelines."

Do you see that?

A.   Mm-hmm.

Q.   Do you know what ICMR is?

A.   I'm pretty sure it's an Indian health agency, something like that, but I don't know what ICMR -- Indian Counsel of Medical Review or something.

Q.   And when Dr. Garcia said, "They are not passing the guidelines," is she referring to the validation study that you referenced before, where you

Page 63

said something along the lines of the Indian validation study, where the test was not performing well?

A.    Yeah, that's probably related to this.

Q.    Okay.  And then do you see, if you go to the second paragraph, she writes, "Here is my opinion: First of all 100% is impossible for any test and not mathematically sound if you believe in bell shaped curve and 5% error."

Do you see that?

A.    Yes.

Q.    And then do you see she says, "Secondly, I think what they are seeing is exactly what was seen in the samples SLC got from testing employes.  Even though you guys say it was contamination, my interpretation was different."

Do you see that?

A.    Yep.

Q.    And then she goes on to say, "If I took the LoD which was 8 copies with approx. Ct value of 36 and I put everything that amplifies past cycle 36 in a grey zone as unreportable, then I remove all those potential false positive results."

Do you see that?

A.    Mm-hmm.

Q.    Do you have any understanding of what she

Page 64

meant when she said, "grey zone"?

A.    I -- I vaguely -- no, I wouldn't call it, necessarily, a "grey zone."  I would say, basically, it's at a concentration lower than the limit of detection, but --

Q.    Got it.  So -- so did you understand Dr. Garcia to be saying, "I think what we saw with employee testing and what we are seeing with the Indian testing is that the Logix Smart Test cannot accurately predict a positive or a negative for a certain concentration that's lower than a cutoff amount"?

MS. PEIRSOL:  Objection.  Misstates the evidence.

THE WITNESS:  I don't know that she's saying that.  And I disagree with a lot of the things that she says in this email.  But could you ask the question again, please?

BY MR. FLOCH:

Q.    Yeah, yeah.  So I -- I guess what I'm trying to understand is, you know, your -- you have some technical background here.  And what I'm trying to do is understand what you understood Dr. Garcia to be saying.

A.    Mm-hmm.

Q.    And my question is:  Can you help me

Page 65

understand what she means when she describes the "grey zone" problem being applicable to both the Indian testing and the employee testing --

A.    Mm-hmm.

Q.    -- whether or not you agree or disagree --

A.    Mm-hmm.

Q.    -- just tell me, what do you understand her to be saying when she is talking about a "grey zone" applicable to employee testing and the Indian testing?

A.    Mm-hmm.  Okay.  Yeah.  So the -- from my best idea of what I think she is saying, I think she thought that there -- sorry, I'm trying to think of a good way to say it.  So I think she basically disagreed with the -- where our cycle cutoff was placed.  And because of that, she thinks that the results that we saw in Salt Lake City in the employee samples and the other things -- that they basically are a result of the cycle cutoff being placed where it is.

Q.    Okay.  Let me -- let me see if I can ask a different question, because I'm still not quite understanding.

A.    Mm-hmm.

Q.    And I think maybe you can help me.  Is she saying that certain patient samples just can't be accurately called positive or negative by virtue of how

much virus is in the sample?

A.    Mm-hmm.

Q.    Or am I misunderstanding what she's saying?

A.    I think potentially you have a piece of it. So no matter the test that there is, there's always going to be, basically, an area that's below the limit of detection that the test can't reliably detect at that level.  Sometimes it might, sometimes it might not.

So that's something that's, basically, every single diagnostic test, no matter what, there's basically a lower limit that you can't reliably detect. And so there's that.  Can you say your question again -- sorry -- or what you want me to clarify. Because I think I --

Q.    Is she saying that there are certain patient samples that, because the viral load of that sample is lower than the lowest limit of detection of the Logix Smart Test, the test can never accurately predict whether that sample is positive or negative? Is that what she is saying?

A.    I don't think so.

So one of -- a common issue with PCR tests and this is one of the things that CoPrimers sort of do better at than standard PCR tests is -- basically, she

Page 67

thinks that our results, the results that have been happening, are a result of nonspecific amplification.

So basically, a false positive result that happens from, basically, random events during PCR that lead to there being a signal, making it look like there is amplification, but they're not actually -- the target wasn't actually present.

And so a lot of other tests have this issue and so because of that, they have a cycle cutoff, where, if you don't see a positive result before this cycle, anything after that could be nonspecific amplification.  And so they -- those results should be just discounted.  And it could be that you have a low-level positive in that area or it could be that it's a false positive and so they create that cutoff so that they aren't, basically, giving false positive diagnoses.

Q.   Got it.  So let me -- let me ask a different question so I make sure I understand.  What -- what are the causes of nonspecific amplification? Like, what are the possible causes of nonspecific amplification?

A.   Mm-hmm.  There can be a variety of different factors.  This is what allows the development of the PCR test is figuring out.  But they can be

Page 68

changed by different conditions in the -- the product, the buffers in the product, as well as the cycling conditions of the thermocycler, basically what temperatures you go to during the PCR, which leads to the polymerase chain reaction and amplification.

But most often, it -- they are caused by something called primer dimers, which is basically what happens when primers or other nucleic acids stick to one another when they shouldn't really stick to one another at the temperatures you're at.  And basically, that product is amplified.  And so it's not -- in that case, it's not saying that your target was there, but that it's just a collision of two of your -- your things.

And so it would be a false positive result. And so the structure of CoPrimers basically helps reduce that primer dimer or nonspecific amplification.

Does that answer --

Q.    Yeah.  So is the primer dimer issue -- is the primer dimer issue that you described, is that a contamination issue or it's a separate -- it's a separate thing that happens?

A.    It's a separate thing that happens.

Q.    So besides the primer dimer problem causing nonspecific amplification, what other -- sorry.

Page 69

It seems like you said low-level positive could lead to no specific amplification -- amplification, but so could the primer dimer problem; right?

A.    Mm-hmm.

Q.    Are there any other issues, besides low-level positive, primer dimer, that could lead to nonspecific amplification?

A.    I'm sure there are.  Like, you could have differing conditions either from the sample that affect it, errors in the performance of the thermo-cycler.  So there's a handful of other things that it could be.

Q.    Okay.  So let's go back to her "grey zone" comment.

A.    Mm-hmm.

Q.    How is that "grey zone" she is talking about related to nonspecific amplification?

A.    So basically, that "grey zone" that she is talking -- if I understand her correctly, that "grey zone" is basically that area where nonspecific amplification would come up.  And so you can't trust the -- the positive result as being positive necessarily.  Even though it could potentially be.  So that's why it -- I think she is using the "grey zone" terminology.

Page 70

Q. So is it reasonable to say that the "grey zone" is the area in which nonspecific amplification could occur, so therefore, we should not really reliably or -- let me back up.

The "grey zone" appears to be the area in which nonspecific amplification could occur, so we should discount all results that appear in the "grey zone" because that's the zone where nonspecific amplification could happen?

A. Yeah, I think that's reasonable.

Q. Okay.

A. Mm-hmm.

Q. Okay. So at least from this email, it appears that Dr. Garcia was saying, "Hey, Co-Diagnostics colleagues, I disagree with you that contamination was causing the results we were seeing with employees, I think it had to do with nonspecific amplification."

A. Yep.

Q. "And one of the things that could cause nonspecific amplification is if there are low-level positives that our test can't truly pick up as being true positives"; right?

A. So --

Q. Among many?

Page 71

A.    -- that wouldn't be a reason for nonspecific amplification.  It would be specific amplification because you are amplifying the target that you're looking for, but potentially, it could come up, the positive result could come up in that "grey zone."

Does that --

Q.    Understood.  So what you're saying is that it is a low-level positive -- it is a true positive, but it is coming up in the gray zone, so maybe we should not trust it even though it's correct?

A.    Yeah, and you wouldn't know whether or not it is correct because you could see that it is coming up there.  And you don't know if the person actually has this or if it's actually nonspecific amplification.  And so, at that point, you would basically call it either an inconclusive or a negative result depending on how the test is designed.

Q.    Okay.  So we spent a lot of time on this email.  And I appreciate you explaining very technical things to me.  You're helping me understand --

A.    Mm-hmm.

Q.    -- that email.

But let's move on to -- do you remember any other conversations with anyone at the company about

Page 72

the test showing nonspecific amplification besides the email we just looked at?

A.    I'm sure there were times that we talked about that, but I can't recall specific conversations or things like that.

Q.    Okay.  I'm going to show you next what we are going to mark as Apuli 6.

(Exhibit No. 6 was marked

for identification.)

BY MR. FLOCH:

Q.    Give me one second.  And why don't you take a look at it and then let me know when you are ready and I will ask you a question.

A.    Okay.

Q.    Okay.  So do you see that there's a bottom email from someone associated with RX Medicals to Denny Crockett?

A.    Yep.

Q.    Do you see that that email says, "Subject: Final Feedback from Government Laboratory in South Africa."

A.    Yep.

Q.    Do you see that it looks like there's an email about results from a South Africa validation study?

Page 73

A.      Mm-hmm.

Q.      And it says, "Dear Tielman, With regards to the verification of the Logix Smart ncov real-time PCR assay this the final update following additional PCR and sensitivity analysis.  As I informed you in our telephonic discussion just looking at pos/neg the assay performed well for the specimens tested, but I didn't do a sensitivity analysis.  Following our sensitivity analysis looking at all data combined the Logix assay positives had had a Cq of 33 and above on the reference assay.  In summary 5/12 (42%) positives were missed.  Therefore concerns with the Logix assay is that very early and later stages of infection will be missed."

Do you see that?

A.      Yep.

Q.      Do you have an understanding of what "Cq of 33" means?

A.      Mm-hmm.

Q.      What does that mean?

A.      So that's -- basically the "Cq" is the cycle of quantification or it can also be referred to as the CT, the cycle threshold.  That is, basically, the point at which the curve -- the fluorescence pass the background fluorescence and crosses that threshold value.  So, basically, saying it was a positive result

"that had a Cq of 33 and above."

Q.   So do you have any understanding of why the writer of this email said -- sorry, let me back up.

It appears that this test resulted in 5 out of 12 positives being missed; right?

A.   Mm-hmm.

Q.   And then this individual wrote that there are "concerns with the Logix assay is that very early and later stages of infection will be missed."

Do you see that?

A.   Mm-hmm.

Q.   Do you have an understanding of why a result of 42 percent would lead to a concern that the test couldn't pick up early and late stages of an infection?

A.   I don't exactly -- no.

Q.   Okay.  And if you scroll up, do you see that you -- it looks like Mr. Crockett forwarded you and Cecilia the results.

A.   Mm-hmm.

Q.   And then you wrote an email to him?

A.   Yep.

Q.   And then do you see, up above that, Mr. Gundry said it should be entered into the QT9 system --

Page 75

A.    Mm-hmm.

Q.    -- as a customer complaint?

A.    Mm-hmm.

Q.    He also said it should be looked at carefully; right?

A.    Mm-hmm.

Q.    Now, do you recall discussing this South Africa -- South Africa results with anyone at Co-Diagnostics?

A.    I -- I don't recall other conversations beyond this email chain, no.

Q.    Did -- was -- do you recall what your reaction was when you received this email with the results from South Africa?

A.    I don't recall what my reaction was, no. Yeah.

Q.    So -- so it seems like, since we've been sitting here today, we've seen at least three different results where the test was either not performing well or showing inconclusive results; right?

A.    Mm-hmm.

MS. PEIRSOL:  Objection.  Misstates the evidence.

BY MR. FLOCH:

Q.    Well, we saw -- we saw the employee study,

Page 76

right, where the results were inconclusive; right?

A.    Mm-hmm.

Q.    And we saw the Indian study where Dr. Garcia described it as not passing the guidelines; right?

A.    Mm-hmm.

Q.    And then we saw this study now, where, at least it was saying, "5/12 (42%) positives were missed"; right?

A.    Mm-hmm.

Q.    Do you remember around April 2020, whether or not, after receiving these results, that you had any doubts about how the Logix Smart Test performed on real-life samples?

A.    I think -- again, this is more evidence that is added to the side that, "Oh, there's an issue with the -- the product."  But what -- what's not shown is all the other evidence that it was further collected after those other studies that are showing that the test is performing well.  During this time, we had a lot of customers who had never done PCR testing before. And so there were a lot of people who were new and needed a lot of help in explaining the results, basic laboratory procedures, basically every -- everything under the sun.  And so one thing that we consistently

saw is that a customer would get our product, start testing it, and then they would have an issue.

And then they contact us.  We work with them, identify the issue and are able to resolve it because they were doing something wrong or they were doing certain steps out of order or whatever it might have been.  Their laboratory procedures weren't up to snuff.  And then after that, we would see that the -- the results are -- looked better.  And so we had lots of cases of things like that, that sort of -- whenever we get these results that vary so wildly from what we have seen, it makes us sort of think, "Okay, what -- what could be going on here?"  And that's where I asked some of those questions, which could be some reason for the differences.

Q.   Got it.  And it seems like this South African study came from a government laboratory, right, running the clinical samples?

A.   Yeah, it says, "Government Laboratory in South Africa."

Q.   Do you have any reason to believe that that government laboratory, that was running the clinical samples, had little experience with running PCR tests?

A.   I -- I couldn't say.  There is a chance that they might not have a lot of experience.  I think

Page 78

PCR testing in Africa is relatively novel or it was relatively novel.  So that could be the case.  And even if they were familiar with PCR testing, different products and different extractions and -- there is a bunch of different variables that, even in an experienced -- PCR -- somebody who does PCR could make mistakes because it's -- you do this for one product, one PCR test, but not for this other one.

Q.    So is it your testimony that the South African results were more likely caused by a user issue rather than a problem with the actual Logix Smart Test?

A.    Yeah, I would say not 100 percent certain. It also could have been an issue with the specific lot product.  Because some of these tests were shipped from the U.S. to South Africa.  And so if the cold chain was not maintained, there could have been an issue with the stability of the product.  So there could have been that, but it also could have been user error.

Q.    Okay.  Let me -- let's go back to something you said.  You said there were a lot of customers who were around the -- there were a lot of customers who were doing diagnostic testing for the first time; right?

A.    Mm-hmm.

Q.    Which customers are you referring to when

you say that?  Are you referring to distributors or are you referring to, like, end laboratories?  What do you mean when you say "customers"?

A.    More end laboratories.  I guess some distributors, but more sort of, like, end customers.

Q.    Okay.  And when you say some of them came to you with, like, complaints about the test, could you just general describe for me what types of complaints people were making about their use of the Logix Smart Test?

A.    Mm-hmm.

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  So I would say everything from things that should be amplifying, aren't amplifying, to things that should not be amplifying, are amplifying.  And sort of everything in between.

So basically issues with our positive control, negative control or the sample and the results associated with those.

MR. FLOCH:  Okay.  I am going to show you what we will mark as APULI 7.

BY MR. FLOCH:

Q.    Actually, before we mark that, what is QT9?

A.    QT9 is a quality management software that

Page 80

we use -- well, we used.  Well, I guess we are transitioning out of it.

Q.   And in terms of how you use it, what -- what types of things do you do on that program?

A.   Mm-hmm.  So it -- we do our document control.  So basically, to access the most revised versions and update documents.  We handle that on there, corrective actions, preventive actions, nonconforming products.  We have some information on the design history file, maintenance, calibration, just a variety of quality functions.

Q.   Okay.  And is it your protocol to enter information into QT9 in realtime or do you usually, maybe, wait a few weeks until after an event occurs to put it into QT9?

A.   It would be to enter it in sort of around the time that we get it.  But I do know, during this time, especially, that some of it was delayed in getting entered.  And just the reason for that was the unprecedented demand sort of.  Everybody's plate was overloaded.  So...

MR. FLOCH:  I'm going to show you what we are marking as APULI 7.  Just take a look at it and let me know when you're ready.

(Exhibit No. 7 was marked

Page 81

for identification.)

THE WITNESS:  Okay.  Okay.

BY MR. FLOCH:

Q.    So do you see that this is an email from Cameron Gundry to you and Cecilia Hutchins?

A.    Yes.

Q.    And the subject line says, "Fwd:  Client Files-Seeing False Positives"?

A.    Mm-hmm.

Q.    And if we look at the email below, it appears to be an email from someone at Biodynamics to Cameron?

A.    Mm-hmm.

Q.    Who is Cameron Gundry?

A.    He's a sales rep at Co-Diagnostics.

Q.    Got it.  And do you know who Biodynamics is?

A.    Vaguely.  I think they were a distributor of ours.

Q.    Okay.

A.    Yeah.

Q.    And do you recall receiving this email?

A.    This sort of event, I vaguely recall, I don't necessarily recall this specific email, but...

Q.    What do you mean when you say this type of

Page 82

event you vaguely recall?

A.    Or -- not this type of event, this event with Laura Benzonana and the laboratory.  I -- I do recollect this event.

Q.    And what do you remember -- what do you remember about that event?

A.    That they were worried about false positive results.  And so we had worked with them to troubleshoot and find the issue.  And this one kind of took a while.  But if I recall correctly, the issue was that they had contamination, but it was amplicon contamination.

So she mentions in the email that "she compared them with certest and primer design," which those are two other diagnostic test companies, to rule out cross-contamination.  But there is different types of contamination that you can have.  And because the Certest and the Primer Design test and our test basically target different regions of the COVID genome.

There could be contamination that would result that would lead to, basically, false positive results on our test, but not other tests, because it's contaminated with, basically, the target that we are looking for and not the targets that they are looking for.

Page 83

Q.   So you believe Ms. Benzonana was saying, "Hey, there is no contamination issue here.  Something else is going on.  Can you help us"?

A.   No, in this email, she thought -- she was basically asking for help and guidance on what could be going on.  My conclusion is, basically, the result of what happened here probably a few weeks after this, after working through testing with them and having them trying out different things, that's basically what the conclusion was.

Q.   And sorry, explain to me again, what was your conclusion about why they were seeing false positives?

A.   So basically, there was contamination of our amplicon in their laboratory.  And so they were seeing these false positive results, these sporadic positives for our test that they were using.  But they had these comparator tests that they weren't seeing it.  And the -- the reason for that was because the -- the amplicon, the target that we were targeting, was the contamination that they had.  And so that wouldn't lead to a false positive result for those other tests because they are not targeting those same regions.

Yeah.  Does that answer the question?

Q.   Yes.  So let me show what we are marking

Page 84

APULI 8.  It should be up.  And just take a quick look at it.

MR. FLOCH:  And Marissa, for the record and for your purposes, this is an excel spreadsheet from CoDI_00239081 that we've turned into a PDF to make it easier to read.

MS. PEIRSOL:  Okay.  Thank you.

MR. FLOCH:  And I can blow it up, too.

(Exhibit No. 8 was marked

for identification.)

BY MR. FLOCH:

Q.    Let me know when you are ready, Mr. Apuli, and I will just ask you a few questions.

A.    Okay.  Yeah, I am ready.

Q.    Do you know what this document is?

A.    It looks like a summary of customer complaints from QT9.

Q.    Okay.  And can you explain to me how this document is created.

A.    Basically, there's a report that you can generate on QT9 to get, basically, a summary of customer complaints that were filed in the -- in QT9.

Q.    Got it.  So you see that under "Resp. Party" column, that your name is in there a few times?

A.    Mm-hmm.

Page 85

Q.    Does that mean that you entered a customer complaint into QT9?

A.    Mm-hmm.

Q.    Or a customer inquiry into QT9?

A.    Yep.  Mm-hmm.

Q.    Okay.  So I want to go through the ones where you entered something.  "Resnova," do you see on March 2nd, 2020 it says "Improvement Suggestions."

Do you see that?

A.    Mm-hmm.

Q.    Do you remember anything about that entry?

A.    Nope.

Q.    What about the "Ecuagen" entry below that, where it says, "Improvement Suggestions," do you remember anything about that?

A.    Hmm-mm.

Q.    Do you see that, on March 30th, 2020, you entered something related to the "Hungarian Ministry of Health (through MASKAF)," and you put "Complaints"?

Do you see that?

A.    Mm-hmm.

Q.    Do you remember anything about that?

A.    Nope.

Q.    And then if we go down further, it looks like you made one, two, three, four -- four entries on

July 16th -- oh, no, five -- six entries on July 16th for different labs?

A.    Mm-hmm.

Q.    And they all say "Complaints"?

A.    Mm-hmm.

Q.    Right?

A.    Yep.

Q.    Do you believe or do you know whether those complaints all occurred on that day or did you just happen to enter the complaints all around that day?

A.    That's when I entered them.  That's what I was referring to when I said that we were overloaded. And we should have been doing them, but we were just swamped.

Q.    So a lot of these complaints probably occurred before July 16th, 2020?

A.    Yeah, probably.  I don't know what proportion, but --

Q.    Okay.

A.    Or when exactly that would have been, but --

Q.    Do you -- I mean, there's -- if we look at number 23, Row 23, there is "Biodynamics" and "Complaints," do you think that refers to the Biodynamics issue we were just discussing?

Page 87

A.      It very likely could.

Q.      Now there are a lot of other customer names here and then "Complaints."  Do you remember anything specifically about any of the other customers entered on July 16th?

A.      No, I couldn't tell you any details about any of those.

Q.      Okay.  But at least from this chart, it looks like you entered complaints for one, two, three, four, five, six, seven customers, right, in July -- around July of 2020?

A.      Yeah, that looks right.

Q.      Okay.  And besides the issues you talked about with contamination or user error, do you remember any other issues that these customers raised that caused you to enter complaints into QT9?

A.      I -- I don't remember.

Q.      Do you remember anyone -- do any of your customers -- criticizing the limit of detection of the Logix Smart Test?

A.      I do know there were customers that would have liked us to have a lower limit of detection.

Q.      And which customers -- which customers asked for the company to have a lower limit of detection?

Page 88

A.   I -- I couldn't tell you the exact customers.  I know it was a conversation that -- that was sort of an interest from management because of feedback from customers.  But I don't -- I don't recall who.

Q.   Do you remember when that feedback from customers about that LoD happened approximately?

A.   Probably between March and July of 2020.

Q.   Okay.  Do you remember anything else about internal conversations regarding customer feedback on the Logix Smart limit of detection?

A.   I do not.

Q.   Do you remember having a conversation with Dr. Satterfield about the test limit of detection and possible improvements to the limit of detection?

A.   Not necessarily with Dr. Satterfield, but I know I have had conversations, maybe with him.  I'm thinking of Casey Bramwell, but -- I know that we're -- we had discussions about how to improve it.

Q.   For what purpose -- just based on your understanding, for what purpose would Co-Diagnostics have to undertake an ability to improve the limit of detection of the Logix Smart Test?

A.   I think it's mostly marketing.

Q.   When you say "mostly marketing," why do you

Page 89

use the qualifier "mostly"?

A.    There could be, you know, customers that actually care about that lower limit of detection, potentially for -- whether it's for research or clinical applications.  But I think most of what we saw was that our test was plenty sensitive, clinically. And so basically, having a lower limit of detection on that doesn't necessarily mean that the test is performing better on real samples.

Q.    Are you aware of any third parties criticizing the Logix Smart Test because its higher limit of detection caused it to perform poorly in the real world?

A.    I can't say for certain.  That might have been the Salt Lake Tribune article.  But I don't know if that's specifically what they were criticizing or if it was something else.  But that does seem familiar.

Q.    When you say, "the Salt Lake Tribune article," what are you referring to?

A.    There was a Salt Lake Tribune article that was published at some point about the company and TestUtah.

Q.    Okay.  And what do you remember about that article?

A.    I just -- I remember it being critical, but

Page 90

I can't remember the details of it.

Q. Besides that article criticizing Co-Diagnostics' higher limit of detection as affecting the test performance, do you remember any other similar criticisms from anywhere else?

A. I couldn't say. There might have been, but I'm not certain.

Q. Okay. Let me show you what we're going to mark as APULI 9. Give me one second.

(Exhibit No. 9 was marked for identification.)

BY MR. FLOCH:

Q. Okay, why don't you take a look at it and then let me know when you are ready and I will ask you some questions.

A. Okay.

Q. So if we start at the bottom, there is an email on April 30th, 2020 from Dr. Satterfield to you, Dr. Garcia and Ms. Hutchins; right?

A. Mm-hmm.

Q. And Dr. Satterfield writes, "Chad and Rebecca, Please see the article that just came out about us," and he provides a link.

A. Mm-hmm.

Q. And then, do you see he writes, "Notice

what others are saying about us relative to our LOD and how we perform worse than other tests, including the CDC.  If we have publications out already, none of this would be happening."

Do you see that?

A.    Mm-hmm.

Q.    And then, if you scroll down a little, he says, "Can the three of us talk and figure out a way to satisfy everyone's needs?  Frankly, I don't care who gets to be first author.  The company needed that paper published well before this article went out.  We need a response and/or multiple responses ASAP.  We need multiple papers out, the faster the better."

Do you see that?

A.    Mm-hmm.

Q.    Do you recall having any discussions with Dr. Satterfield, around April 30th, 2020, about writing a paper?

A.    Yeah, I think we had talked before this about it, but yeah, I remember having conversations.

Q.    And -- and what were the substances of those discussions?

A.    Basically, the interest of us publishing a paper and the verification results that we had collected and, basically, us publishing it.

Page 92

Specifically, there were discussions about having Rebecca Garcia publish it versus Kyle and Madison who were the ones who did the lab work, but they were really busy and didn't necessarily have the time to write the paper and also do the other stuff that they needed to.

Q.   Why would the paper being published have prevented --

A.   I don't think it would have.

Q.   Okay.

A.   I think he thought it would have, but I don't think that having a paper published by us would have prevented that or -- I think he was incorrect there.

Q.   Okay.  Do you recall -- sorry, let me back up.  Besides talking about publishing a paper, do you remember -- do you remember the substance of any other conversations with Dr. Satterfield when the article was published?

A.   I'm pretty sure around this time is when we had talked about LoD improvements and, basically, things that we could tune to improve the LoD and potentially either making another version of the test or updating the tests, the Logix Smart COVID-19 test.

Q.   Do you remember what the criticism of that

Page 93

April 30th Salt Lake Tribune article was, regarding the Logix Smart Test?

A.   I don't remember the exact details, no.

Q.   Okay.  And then do you see, if you scroll up a little bit, you reply to Dr. Satterfield and you said, "We need to collect more data to show that our LoD is better than what we claimed it is.  I'm good to talk whenever."

A.   Mm-hmm.

Q.   When you say, "is better than what we claimed it is," what -- what claim are you referring to there?

A.   So that's the limit of detection in our EUA submission.  So basically, when we were doing the verification testing, we had had our own procedures on how we did verification testing that used a different method of -- of detection.  And so we ended up doing what the FDA had suggested on their website.  Let me back up.  Basically, the -- when we submitted for our EUA, we submitted various different testing results including limit of detection testing and then it was called "clinical evidence."  And at the time, it was basically a contrived clinical, like, evaluation for that.

The clinical evidence section, the

concentration for those contrived samples were supposed to be based on the limit of detection, but we had changed -- the concentrations that we chose were different than based on our limit of detection.  And so essentially, they wouldn't accept the results unless it was based on the -- if the concentrations for the clinical evidence section matched -- were based on the -- the LoD concentration.  And so we had to do an LoD study that basically made our LoD worse, so we could use the clinical evidence section.  And because we were sort of -- there was a time crunch, we thought that it would be better to do that, even though we knew our LoD was better than that, than to wait and do another contrived clinical evidence study.

Q.    How did you know or -- let me back up.

Your testimony is that you knew that your LoD was better than the -- for lack of a better term, "simulated LoD" that was submitted in the EUA papers?

A.    Uh-huh.

Q.    How did you know that?

A.    So basically, we had done an LoD study. Got an LoD that was lower than our claim, but then the FDA said, "Oh, for your clinical evidence, the concentrations have to be based on the LoD."  But they were -- the concentrations that we had chosen were

higher than, like, what they should have been.  There might have been, like -- they had to be at 2 to 5 X LoD, 10 to 50 X and 100 X or greater.  And so because they weren't, we had to basically go back and do an LoD study and the concentration that we chose of that LoD was higher than what our initial LoD study had been in order to make it so it matched.  So we chose the concentrations for that so it would make it so we could use our clinical evidence study.

Q.    So the study that you are referring to that had the better LoD finding, was that study on contrived samples or real-life samples?

A.    Contrived samples.  I think all of these results were on contrived samples at the time.

Q.    Okay.  So let me just pull up the exhibit again.  APULI 9, back to your statement when you say, "We need to collect more data to show that our LoD is better than what we claimed it is."

What were you suggesting to your colleagues?  What type of -- like, what were you looking to collect.

A.    I think, basically, the LoD study, along with the contrived clinical evidence at the appropriate -- the lower LoD concentration that we expected.

Page 96

Q.    Okay.  When you received this email from Dr. Satterfield and the link to the news article criticizing the LoD, did it cause you to question whether Co-Diagnostics' Logix Smart limit of detection was impacting its performance in the field?

A.    I don't think so because I -- we had data showing that the limit of detection was better than our claim limit of detection.  That being said, they -- the article basically provided, I think, that we -- was it Timpanogos?  Yeah, I think that Timpanogos -- because I think they were the ones for TestUtah that our positivity rate was lower, I believe.  So I wouldn't say that I was concerned that the -- our LoD wasn't good enough, I guess.

Yeah, I -- I don't accurately -- accurately recall what I felt at that time.  So I was just making conjecture.  Yeah.

Q.    Let me ask it a different way.

A.    Mm-hmm.

Q.    Well, when you as a scientist and someone who developed the test received criticism in -- you know, about the test LoD, is your immediate reaction to say that criticism is wrong or do you usually just investigate the underlying criticism to see if it has any merit?

Page 97

A.      Usually --

MS. PEIRSOL:  Objection.  Objection. Incomplete hypothetical.  Go ahead.  You can answer.

THE WITNESS:  Okay.  Yeah, I would investigate.  Yeah, go ahead.

BY MR. FLOCH:

Q.      No, go ahead.  No, finish your answer.

A.      I was going to say, especially during this time, it was a pandemic.  Things were crazy.  I was -- I was questioning whether or not that the -- the results, as any good scientist should.  But over time -- and I think I probably have a more confident view now seeing, basically, how well the tests have done, but time and time again, we would do different -- do different evaluations or other things, the test performed to a high level, except in a variety of cases, most of which ended up being a result of user error or the specific -- the specific lot of product or something like that.

Q.      Let's just go up to the top of the email.

A.      Mm-hmm.

Q.      Do you see that Ms. Hutchins wrote back when you and Mr. Satterfield when Dr. Garcia copied her?

A.      Mm-hmm.

Page 98

Q.    And she said, "the sensitivity of 99.25% and specificity of 100% are for samples with a viral load equal or higher than the limit of detection. Therefore, a test with the same percentage of sensitivity but a lower limit of detection is more sensitive than ours."

Do you see that?

A.    Mm-hmm.

Q.    Do you have an understanding of what she means by that?

A.    I -- I think I understand what she is -- she is saying.

Q.    What -- what is she saying?

A.    Basically, on an analytical -- strictly analytical level, basically, if a test had the same sensitivity and specificity, but a lower limit of detection, that it would have better sensitivity than ours.  But that term "sensitivity" -- or it would be more sensitive, it is kind of complicated and nuanced. Because if it had the same percentage for sensitivity, 99.52 percent, they would both have the same sensitivity, but she is saying that it would be more sensitive, but that's because it has a lower limit of detection.

So a sensitivity and a limit of detection

Page 99

on their own don't -- aren't really -- it's basically
the whole shebang, but that also doesn't include the
clinical performance, which is ultimately what trumps
all of this.  And the clinical relevance to a lower
limit of detection, there may -- there may not be any
clinical relevance to having a lower limit of detection
if the viral load is above that during the infectious
stages or --

Q.    Do you have any understanding of why this
was her reply to your email, "Hey, we need to collect
more data about the LoD"?

A.    I think she -- she was irritated at
Timpanogos Hospital and Barbara Blanke, I think she --

Q.    What causes you to say that?

A.    I just remember Barbara reaching out to her
a lot, to Cecilia, basically asking for help and
basically -- I think she was one of the laboratories
that they hadn't really done a ton of PCR testing.  And
so I think they had done, like, other testing but not
really PCR.  So she needed a lot of assistance and she
was sort of hoping that we would do -- specifically
Cecilia would do the work instead of her having to do
it.  And so I -- I think that's why.  But -- yeah.

Q.    Do you see that there is a sentence that
says, "I would like to add that Chad, KC, and I are

Page 100

currently working with MRI Global for an independent evaluation that we will use in the paper"?

A.     Mm-hmm.

Q.     What -- what is MRI Global?

A.     I -- they were a company that we talked to about setting up clinical trials, like an independent evaluation, as they were saying.  I don't remember specifically what they do.  I think the clinical trial that we were looking for them to set up with was in Brazil, but --

Q.     Do -- sorry, go ahead.

A.     No, go ahead.

Q.     Do you know whether or not that -- whether or not MRI Global did an independent evaluation of the Logix Smart Test?

A.     No, I think we got that quote back and I think it was just way ridiculously expensive.

Q.     Was the expense of the -- the independent evaluation the only reason the company decided not to go through with MRI Global doing an evaluation of the test?

A.     I don't know if that was the only reason or not.

Q.     Were there any other reasons that you are aware of being discussed about why the company did not

Page 101

have MRI Global run a validation or a study on the Logix Smart Test?

A.   No -- no other reasons that I'm aware of.

Q.   Okay.  So centering you again to April 30th, 2020, having just received the Salt Lake Tribune article.

A.   Mm-hmm.

Q.   If the company had asked you to make a statement that the test performed well and accurately in all circumstances, would you have allowed the company to attribute -- attribute that statement to you?

MS. PEIRSOL:  Objection.  Incomplete hypothetical.

You can answer.

THE WITNESS:  I don't know that I would.  It's hard to place myself in April of 2020.  It feels like the past three years have been a blur.  But -- so yeah, I don't know that I could say whether or not I would have done it then or not.

MS. PEIRSOL:  Brandon, can we take a quick break?  We have been going for a long time.

MR. FLOCH:  Sure.

MS. PEIRSOL:  Yeah.

MR. FLOCH:  And I want to give you guys

Page 102

probably no more than 45 minutes, maybe less.

Hopefully.  Yeah, let's go on break.

MS. PEIRSOL:  Okay.  Cool.  Thanks.

THE WITNESS:  Thanks.

(Recess was taken.)

BY MR. FLOCH:

Q.   So Mr. Apuli, before the break, we were talking about an April 30th, 2020, Salt Lake Tribune article; right?

A.   Mm-hmm.

Q.   And we saw an email where Mr. Satterfield -- or Dr. Satterfield was asking for you to write a paper or some response or something like that; right?

A.   Mm-hmm.

Q.   Did -- do you recall whether or not you worked on any paper or response to the April 30th, 2020, Salt Lake Tribune article?

A.   I think we started writing the paper, the journal article that we were going to publish, that we talked about in that.  But it never got finished or published, at least not to my knowledge.

Q.   Okay.  Besides that paper that you just referenced, did you write up anything else in response to the Salt Lake Tribune article?

Page 103

A.    Not that I can recall, no.

Q.    Okay.  I'm going to show you what I've marked as APULI 10.

(Exhibit No. 10 was marked

for identification.)

BY MR. FLOCH:

Q.    It should be in your Exhibit Share and on the screen.  And it is a little bit long, but I'm not going to ask you about the -- anything beyond the actual press release except for page 7.  So besides the press release and page 7, I won't ask you about anything else.  So you can only -- if you read the first seven pages, that will be everything I ask you about.  So why don't you take a look at it and then let me know when you are done.

A.    Okay.  Okay.

Q.    Have you seen this press release that's marked APULI 10 before?

A.    I'm not sure if I have seen -- yeah, I have seen it before.

Q.    Did -- did you have any involvement in preparing this press release?

A.    I don't believe so.

Q.    When have you seen this press release before?

Page 104

A.    Shortly after it came out.  I -- I've looked at the press releases that the company has done.

Q.    Okay.  And why -- is there any specific reason why you remember this press release?

A.    Well -- and I -- we recently reviewed it.  Yeah.

Q.    Okay.  You said you often look at the company's press releases; is that what you just testified?

A.    Yeah, that I have, just throughout.  Just because I have been with the company a long time.  So it's interesting to sort of keep up with things.

Q.    Do you follow the company's stock price as well?

A.    I -- sometimes, yeah.  Mm-hmm.  Not regularly, but --

Q.    Did you own stock in the company around May 1st, 2020?

A.    I don't know if I had gotten stock options at this point or not.

Q.    Okay.  Did you ever sell stock, around May 2020, of Co-Diagnostics?

A.    No, I did not.

Q.    So let's look at APULI 10.

Do you see that the header says,

Page 105

"Co-Diagnostics, Inc. Releases COVID-19 Test Performance Data: Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations."

Do you see that?

A. Yep.

Q. Do you agree with the statement that the Logix Smart Test data consistently demonstrated 100 -- demonstrated 100 percent sensitivity and 100 percent specificity across independent evaluations?

A. Yes, I do agree with that.

Q. Okay. And you agree with that despite us looking today at the South African data and the Indian data and the data from testing your own employees?

A. Yeah, because it's referring -- it demonstrates 100 percent sensitivity and 100 experience specificity across independent evaluations. And so from those evaluations that were cited, it had 100 percent sensitivity and specificity.

Q. Let's scroll down a little bit. Do you see the paragraph that says "In remarking"? Right here.

A. Yep.

Q. On the bottom of page 1. Do you see that it says, "In remarking on the test's favorable limit of detection (LOD) results in the evaluations, Brent

Page 106

Satterfield, PhD said, 'In diagnostics, the limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point."

Do you see that?

A.    Mm-hmm.

Q.    I think you testified earlier that the Logix Smart Test, to you, was middle of the pack.  It wasn't the best LoD, it wasn't the worst LoD; right?

A.    Yep.

Q.    Okay.  If the company had asked to attribute this statement to you about a favorable limit of detection, would you have allowed the company to attribute that statement to you?

MS. PEIRSOL:  Objection.  Incomplete hypothetical.

You can answer, Chad.

THE WITNESS:  Mm-hmm.  Yeah, I -- I think I would be fine saying that.

BY MR. FLOCH:

Q.    Is it accurate to say that the data appended to this press release showed a favorable limit of detection?

MS. PEIRSOL:  Objection.  Vague.

THE WITNESS:  I don't know if this -- if

Page 107

that data necessarily has anything to do with the limit
of detection.  There might be a limit of detection
studies in some of that.

MS. PEIRSOL:  And just for the record, I
would like to note that you asked the witness or told
the witness you were going to ask about the first seven
pages and he didn't need to review the data attached.
Does he need to review the data attached?

BY MR. FLOCH:

Q.   No, that -- that's okay.  I don't want to
keep us here all day.  And I understand that you didn't
prepare this press release; right?

A.   Yes.

Q.   And you didn't prepare the data that is
attached to the press release?

A.   Yeah, I don't -- I don't believe I did.

Q.   Okay.  If you scroll down a little bit in
the press release, do you see that there is a line
attributed to Dr. Satterfield that says, "In countries
where we have been evaluated against other tests, we
have consistently and repeatedly achieved 100% clinical
sensitivity and specificity and you can't do better
than that."

Do you see that?

A.   Mm-hmm.

Page 108

Q.    Do you think that statement is accurate?

A.    Yes, I think we have consistently and repeatedly achieved 100 percent clinical sensitivity and specificity in those evaluations and you can't do better than 100 percent clinical sensitivity and specificity in an evaluation, so I would agree with that.

Q.    Would you have allowed the company to attribute that last sentence to you?

MS. PEIRSOL:  Objection.  Incomplete hypothetical.

You can answer.

THE WITNESS:  Yeah, I -- I would let them attribute it to me.

BY MR. FLOCH:

Q.    Do you think this press release is misleading because it doesn't mention the ICMR study or the South African study?

MS. PEIRSOL:  Objection.  Calls for a legal conclusion.

THE WITNESS:  I --

BY MR. FLOCH:

Q.    You can answer.

A.    I don't know that -- I'm sorry, could you state the question again?

Page 109

Q.    Well, this press release says that the Logix Smart Test consistently and repeatedly achieves 100 percent clinical sensitivity and specificity; right?

A.    Uh-huh.

Q.    But today, you and I looked at data from the ICMR and a government laboratory in South Africa that --

A.    Mm-hmm.

Q.    -- did not show 100 percent clinical sensitivity and specificity; right?

A.    Mm-hmm.

Q.    So the company had at least two tests from other countries that did not show 100 percent clinical specificity and sensitivity; right?

MS. PEIRSOL:  Objection.  Mischaracterizes the evidence.

THE WITNESS:  I don't know.  I think the issue is the quality for some of those evaluations was -- is called into question, that if you do a poor evaluation, you are going to get poor results and whether, including a poor evaluation just to include it, that might not accurately represent the performance of the product.

///

Page 110

BY MR. FLOCH:

Q. So when an evaluation shows that the Logix Smart Test is doing really well, then the company doesn't have any criticisms of that evaluation. But if an evaluation shows that the Logix Smart Test is performing poorly, then there are reasons why the company is going to criticize it; right?

A. No.

MS. PEIRSOL: Objection. Mischaracterizes the evidence. Assumes facts not in evidence. Argumentative.

THE WITNESS: I --

BY MR. FLOCH:

Q. Mr. Apuli, you are -- you are a scientist; right?

A. Uh-huh.

Q. Like, as a scientist, if someone is going to present you with a statement that their product consistently and repeatedly achieves 100 percent clinical sensitivity and specificity, wouldn't it be important for you to know whether or not there were any evaluations that did not match up with that representation?

MS. PEIRSOL: Objection. Incomplete hypothetical. Argumentative. Misstates the document.

THE WITNESS:  I don't know if I would need to know if there were cases because there's always going to be cases.  Any diagnostic test is going to have -- just through statistical randomness, there's going to be cases where that's not going to happen.  So -- yeah.

BY MR. FLOCH:

Q.    Okay.  So besides seeing this press release after it came out, do you recall any other discussions about the press release with anyone at the company?

A.    I'm certain that we talked about it in the company, but I don't recall specific conversations. Yeah.

Q.    Let me just ask you a question about Dr. Satterfield.

In terms of his role in the development and verification of the Logix Smart Test.  Can you help me understand how he fits into that process?

A.    Mm-hmm.  He was -- sort of became more heavily involved in the development, sort of -- not initially, not in January -- maybe February, he started, but around March just the demand and workload. He -- he was sort of on his way out of the company. And so -- but based on the demand and workload on the other staff members, I think he was called back in to

Page 112

basically help address some of these things and basically work with the management team on scientific communication and that sort of thing.

Q.    Is he -- does he have any experience doing verification studies?

A.    Yeah.  That was more before the COVID stuff happened.

Q.    Okay.  Did -- did he leave the company at some point?

A.    Yeah.  He's no longer with the company.

Q.    Do you have an understanding of why he left the company?

A.    I -- I don't know.

Q.    Okay.  So the press release we just looked at called the limit of detection of the Logix Smart Test "favorable"; right?

A.    Mm-hmm.

Q.    Okay.  After this press release was issued, did the company attempt to improve the limit of detection in the Logix Smart Test at all?

A.    So I think there's two points to that.  We had talked about -- I know we had worked on additional LoD studies to try and support a lower limit of detection claim.  But that didn't involve any changes to the product.  And then we also had conversations

Page 113

about developing a separate potential -- potentially developing a separate high-sensitivity test that would basically have some modifications -- most likely not to the chemical composition of the test, but more the -- the input volume and reaction size that would lead to improved sensitivity.

Q.   And why would the company undertake an effort to improve the LoD if the LoD was already at a favorable limit that wasn't affecting the performance?

A.   Because there was an article that was published that, basically, was saying that the LoD wasn't good enough.  And so, basically, being able to provide that as another offering to customers, that's my understanding.

Q.   So -- so it's your testimony that the only reason the company undertook an effort to improve the LoD was for marketing purposes?

MS. PEIRSOL:  Objection.  Misstates his testimony.  Assumes facts not in evidence.

THE WITNESS:  I don't know that that is the only reason.  There is a chance it could have been or there could have been additional reasons, but...

BY MR. FLOCH:

Q.   Okay.  I'm going to show you what we are marking as APULI 11.  If you just take a look at it.

Page 114

A.    Okay.

(Exhibit No. 11 was marked for identification.)

BY MR. FLOCH:

Q.    So Mr. Apuli, this is an email from Dr. Satterfield to you and others at Co-Diagnostics on May 1st, 2020; right?

A.    Yep.

Q.    And that's the same date as the press release that we looked at in APULI 10; right?

A.    Yep.

Q.    And the subject is "Iowa"?

A.    Yep.

Q.    And do you see Dr. Satterfield wrote to you, and he said, "Chad and Joseph, I was on a call with Iowa this morning.  They are getting very different results for the verification.  With 727 samples run side-by-side with the CDC, we only had a sensitivity of 41.1% (roughly 100 out of 250 positives)."

And then he goes on to say some other stuff.  And then the last sentence says, "Further, they ran an LOD study where our LOD was 100 times worse than the CDC."

Do you see that?

Page 115

A.    Mm-hmm.

Q.    And so on the very same day that the company is issuing a press release that calls the limit of detection of the Logix Smart test favorable, it also received information that the LoD was 100 times worse than the CDC, at least according to this Iowa study; right?

A.    Mm-hmm.

Q.    Do you remember anything about these Iowa results?

A.    I don't specifically remember these Iowa results.  I remember that somebody did end up going and they worked on it and I believe the performance was improved dramatically from this.  So it was more in line with what we had been seeing.  But I don't remember specifically the details.

Q.    And do you remember receiving this email?

A.    Not -- I remember needing to get someone to go to Iowa.  I don't know if it was Jana, it might have been Madison.  But that might have been at a different time.  So I'm not sure.

Q.    Do you remember what your reaction was to needing to send someone to Iowa?

A.    I -- I don't.  If it helps, at other times we have sent, like, people to help with setting up

Page 116

laboratories, like, with mosquito abatement districts.
So it wasn't necessarily something uncommon.  Even
before COVID, we worked with labs to sort of help them
and make sure that they were following protocols
appropriately and that sort of thing.  And trouble
shoot if there were any issues.

Q.    Do you remember anything about the LoD
study coming out of Iowa saying that the Logix Smart
Test was 100 times worse than the CDC test?

A.    Say that again.

Q.    Do you -- so -- let me pull up -- the
exhibit up again.

Dr. Satterfield says in this email to you
that the Iowa labs "ran an LOD study where our LOD was
100 times worse than the CDC."

Do you see that?

A.    Mm-hmm.  Yep.

Q.    Do you recall any discussions about the LoD
study run by Iowa showing that the Logix Smart test was
100 times worse, at least for its LoD, than the CDC
test?

A.    I don't recall.  Yeah, I don't recall the
details of it.

Q.    Okay.  I'm going to show you what we are
going to mark as APULI 12.

Page 117

(Exhibit No. 12 was marked

for identification.)

BY MR. FLOCH:

Q.    And take a look at it and let me know when you are ready.

A.    Okay.  Okay.

Q.    Is this a May 3rd email from Dr. Satterfield to you, Dr. Bramwell and Seth Egan?

A.    Yep.

Q.    And this is about two days after the May 1st press release; right?

A.    Mm-hmm.

Q.    And do you see that Dr. Satterfield wrote to you and Dr. Bramwell and said, "I ran into our first competitor that I believe absolutely has a better LOD than us-the Abbot m2000 test.  They claim a 0.1 copy/uL LOD.  We got samples from them in Nebraska that were near their LOD that we consistently were unable to detect."

Do you see that?

A.    Mm-hmm.

Q.    Do you recall receiving this email?

A.    I don't recall receiving this email.

Q.    Sitting here today, is it concerning to you that there were patient samples from Nebraska that the

Page 118

Abbott test was able to pick up as positive that Co-Diagnostics' test could not pick up?

A.    No.  It -- an example of why it doesn't worry me:  We had someone in the company who tested positive for COVID and continued to test positive for three months after because there was still viral RNA present even though he wasn't contagious.  And so having an extremely low LoD doesn't necessarily have any clinical relevance.  Yeah.

Does that answer your question?

Q.    Yeah.  And I -- and I guess -- your example there, is that -- is that true 100 percent of the time, that someone with a low viral load is essentially, what I think what you are saying is, not infectious, is that true 100 percent of the time?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  Yeah, I wouldn't say it is true 100 percent of the time.  I wouldn't know what percentage of the time and I would probably need to look up, sort of, more details on specific viral loads in patients throughout the course of treatment and when they are still infectious and that sort of thing.

BY MR. FLOCH:

Q.    Okay.  So it seems like your testimony, for

the most part of today, was that the primary reason to improve the test LoD was for marketing purposes; right?

A.    Mm-hmm.

MS. PEIRSOL:  Objection.  Misstates his testimony.

BY MR. FLOCH:

Q.    And if I'm misstating anything, let me know.  But it appears that most of the day you were saying that the primary reason to improve the LoD of the Logix Smart Test was for marketing purposes; right?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I would say, in general, from my understanding, that's how I felt, but I, by no means -- my opinion doesn't represent the entire company's opinion.

BY MR. FLOCH:

Q.    And at least from this email, it appears that Dr. Satterfield is saying that the company should improve the LoD, not just for marketing purposes, but to actually be able to pick up positives that competitors' tests could pick up that the Logix Smart Test could not pick up; right?

MS. PEIRSOL:  Objection.  Calls for speculation.

Page 120

THE WITNESS:  Yeah, I wouldn't necessarily say that --

BY MR. FLOCH:

Q.   Well, let's --

A.   That's -- go ahead.

Q.   Go ahead.  Sorry, I didn't mean to cut off your answer.

A.   He talks about how he found a competitor with better a LoD than us.  Then talks about potentially using digital PCR to quantify reference materials.  And then that second point is we may need to offer a competitive "offering to compete with Abbott and other more sensitive players.  As the dust settles, LOD may become an increasingly important aspect of testing."

And so whether that increasingly important aspect of testing is to increase the -- to be able to detect samples that they were unable to detect or to -- for marketing purposes.  I'm not certain.

Q.   Okay.  But it -- but, you know, at least the top of the email says, "We got samples from them in Nebraska that were near their LOD that we" -- and I think he is referring to the company -- "consistently were unable to detect"; right?

A.   Uh-huh.

Page 121

Q.   Okay.   So if we go down to the very bottom of the email, Dr. Satterfield -- Satterfield says, "The State of Utah may be sending us samples to evaluate our test next to 8 or 9 others in the state.   It might be a good time to try an upgraded protocol to put our best foot forward and show we have the capacity to lead the way."

Do you see that?

A.   Mm-hmm.

Q.   Do you remember anything about a study being conducted by the State of Utah comparing the Logix Smart Test to eight or nine other tests?

A.   I don't recall, no.

Q.   Do you know whether or not the company participated in a study conducted by the State of Utah comparing the Logix Smart Test to eight or nine other tests?

A.   I don't know how we ended up in it.

Q.   Okay.   After receiving this email, do you recall any other conversations or work to improve the limit of detection of the Logix Smart Test?

A.   So I -- I -- I don't recall specific conversations, but I know that we did work, not necessarily -- like I said, there's two, sort of, aspects.   One would be doing LoD studies on the current

Page 122

COVID-19 product to submit to the FDA for an amendment for an improved LoD on that product.  And then we had talked about developing another product that would be higher sensitivity.

And so I know we did testing with that, but I don't know -- I don't recall specific details or things like that.

Q.   Well, when you say you did testing with that, are you referring to the -- the testing of old -- the original test or testing on a new test with a better LoD?

A.   Sorry, that -- yes.  It's kind of both because -- so in -- in the email, he talks about improving our LoD by "50x," so that is 50 times better.

And here, he specifically says, "5x rxn volume, 5x sample input, and 2x less elution."

You could use that with the current chemistry of our kit, but it would have a new, sort of, instructions for use and would technically be considered a new product.  But it wouldn't necessarily have to be.  We could also make changes to it in addition to just those changes.  So it -- not necessarily.

Q.   Okay.  So what changes did the company make to the test for purposes of improving the limit of

Page 123

detection?

A.   I -- I don't think we actually made any changes, but we looked at -- basically did, like, R&D studies to see if doing these things would prove it, and it would.  Theoretically, it should.  And then we got results that it also did.  But other than a few people, most customers were happy with the product.  And so there wasn't really a demand.  And there were other products that we were looking into that had more of a demand.

Q.   So you said other -- other than a few people.  Do you remember who those few people were who wanted the limit of detection?

A.   I -- I don't.

Q.   Okay.  Do you remember -- let me back up.

You said that there was more of a demand for different products.  What -- are you referring to a COVID-19 diagnostic product or a different disease completely?

A.   It is sort of both.  The two following products that we did was our SARS-CoV-2 test, which was basically a two-gene COVID test, which in the European Union, they wouldn't accept test results for single-gene tests.  So we basically included CoPrimers that targeted another gene.  So that was one of the

Page 124

products.  And then our other product was our Logix Smart ABC which -- which detect COVID and Flu A and Flu B.

Q.    Back to the two-gene targeted test.

A.    Mm-hmm.

Q.    The original test targeted the RDRP gene; is that correct?

A.    Yep.

Q.    And the new test targeted that gene and another gene?

A.    Yep.

Q.    Is it your understanding that a test that targets two genes is better than a test that targets one gene?

A.    No.  It's complicated.

Q.    Okay.  So it could be better in some instances and could be the same or worse in other instances?

A.    Exactly.

Q.    It was just -- you were responding to a request from the market, essentially?

A.    Yeah, essentially.  The European Union thought that the two-gene was something that was important that the U.S. FDA didn't and still doesn't feel that way.

Page 125

Q.   Okay.  I'm going to show you two more exhibits.

A.   Okay.

Q.   This will be Exhibit 13.

(Exhibit No. 13 was marked

for identification.)

BY MR. FLOCH:

Q.   And just take a look at it and let me know when you're ready.

A.   Okay.

Q.   Okay.  Let's just -- this appears to be an email chain from July 2020; right?

A.   Yep.

Q.   And someone named Ashlyn Garner from Mountain Star Health sent an email to you and others at Co-Diagnostics and Mountain Star Health with the subject line "disparaging COVID-19 results with Cq > 35"; right?

A.   Yep.

Q.   Did you have an understanding of what her concern -- of what Ms. Garner's concern was with the Logix Smart result she was seeing?

A.   Yep.

Q.   What -- what is your understanding what her concern was?

Page 126

A.    Basically, just concern about results that had a CQ great than 35.  That would have inconsistent results.  And she was potentially worried about those results being nonspecific amplification or false positives, basically.

Q.    And then, do you see you replied to her and said, "Hello all, we should probably" or -- no, you replied -- sorry -- to everyone at Co-Diagnostics and said, "Hello All, We should probably have a meeting to discuss how we want to proceed and handle this.  This, in conjunction with some of the other feedback that we've gotten has me concerned."

      Do you see that?

A.    Yep.

Q.    What -- what were you concerned about?

A.    Just we had more pieces of evidence suggesting that there was an issue.  And it was enough to sort of get my concern up and say, "Okay, we need to look into this."  We had looked into the other instances, but as I said, I was concerned.  And that's just because there had been multiple similar reports in a short period of time.

Q.    And -- and what was the -- what was the issue you were concerned about?

A.    If there was an issue with the -- the

Page 127

product and/or manufacturing process or just basically concerned about the results that we had been seeing.

Q. Do you remember receiving the inquiry from Ms. Garner?

A. This email?

Q. Yeah.

A. Yeah. Mm-hmm.

Q. And did you ultimately determine what was causing her concerns?

A. I -- I -- while I was reading through this, I was trying to think about it and I can't remember exactly what ended up happening with this, if we identified what the issue was or what exactly came of it.

Q. So you can't rule out that her concern was based on a problem -- sorry, let me back up.

If we go to the top of the email, do you see Cameron Gundry responded to you?

A. Mm-hmm.

Q. He said, "I have just entered 7 customer complaints, international, 5 of them with false positive complaints. Honduras, Greece, Kosovo, Peru, and Mexico. This is extremely serious and does deserve ASAP attention."

Do you see that?

Page 128

A.    Yep.

Q.    Do you remember the inquiries from those countries as well?

A.    I -- I don't off the top of my head.

Q.    And sitting here today, you don't remember whether or not Co-Diagnostics resolved the issue that Ms. Garner was referring to?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  I -- yeah, I don't recall what happened with the -- Ms. Garner's results, what we ended up figuring out or if we figured something out.

BY MR. FLOCH:

Q.    Did Mountain Star continue using Co-Diagnostics' tests after July 2020?

A.    I do not know.

Q.    Do you recall any companies deciding not to buy the test after having problems with the results that were occurring from the test?  Sorry, let me ask a better question.

Do you recall any customers deciding to drop you as -- drop Co-Diagnostics as its vendor for its COVID-19 diagnostic test?

A.    I'm sure there were some, but I don't recall specific customers.

Page 129

Q.   Okay.  Let me ask you about -- there is going to be one more document, I promise.  And then just a few more questions.

A.   Okay.

Q.   Do you recall ever receiving contact from your attorneys in this case to preserve your emails, like, not delete them?

A.   I don't think so.  I don't recall.

Q.   Okay.

A.   Maybe.

Q.   Have you deleted any emails related to the Logix Smart Test between June 2020 and today?

A.   I don't believe so.  I -- I may have deleted them, but usually I don't clear out my trash. So I kind of keep all my emails.  So...

Q.   Between 2020 -- sorry, let me back up.

Do you -- do you use your cell phone for work at all?

A.   Yes.

Q.   Did you use your cell phone at work -- for work in March, April, May, June 2020?

A.   I -- I couldn't say.  I may have, but I -- I don't know.

Q.   Have you deleted any messages from 2020 until today that were on your phone related to the

Page 130

Logix Smart Test?

A.    I couldn't say.  I doubt I have many texts from 2020 still, but yeah, I don't know.  I have a new phone, so I don't know.

Q.    Let me show you the last document and then I will be done.  And I do appreciate your time.  I know it's Labor Day weekend.  So I feel terrible that you're here this late.

A.    It's fine.  I appreciate you being kind and understanding.

Q.    Let me mark what will be APULI 14.

            (Exhibit No. 14 was marked

                for identification.)

BY MR. FLOCH:

Q.    And take a look at it and then I'll ask you a few questions.

A.    Okay.

Q.    So do you see that there is a bottom email from Mr. Benson to you and others at Co-Diagnostics?

A.    Mm-hmm.

Q.    And do you see it says, "Hey all, This was brought to my attention, I'm wondering whether we have been sent the materials as mentioned here, whether it's something we are participating in, and we have received the materials but opted not to, why not?"

Page 131

Do you see that?

A.   Mm-hmm.

Q.   And he says, "It may give us an opportunity to quell a lot of the rumblings about the tests LOD if we can point them to this table."

A.   Mm-hmm.

Q.   And you reply and you say, "We have received the materials and we submitted the data this week."

A.   Yep.

Q.   What -- do you have an understanding of what you were referring to there?

A.   Yeah.  It was basically a COVID reference panel that the FDA sent out to different customers -- to different test manufacturers for them to do testing on so they could basically have a table where different tests were compared with the same materials.

Q.   And then you see Mr. Benson wrote, "Nice, thanks.  Where did we end up with the LoD"?

A.   Yep.

Q.   And what -- what type of study was being run on the LoD?  Yeah, what type of study were you -- were you running on the LoD?

A.   So I didn't run the -- I, like, supervised the study.  But it was basically another LoD study

Page 132

following a protocol from the FDA with reference material.  So basically, COVID reference material that was sent to us, either by the FDA or another group in conjunction with them.

Q.    Okay.  And then do you see, you replied and said, "I believe we were at 14,000 NDU/ml, but we haven't gotten final approval.  It isn't that great to be honest"; right?

A.    Mm-hmm.

Q.    So even as of September 16th, 2020, the limit of detection of Co-Diagnostics' test, at least according to you, isn't that great; right?

MS. PEIRSOL:  Objection.  Misstates the evidence.

THE WITNESS:  So you can think of, like, an LoD study being like taking a test in a class.  So you can know a lot about the subject, but sometimes there's harder tests than others.  And so this was the case where we had a test and we didn't perform that well.  So just because there was a -- a single test that we didn't perform well, doesn't necessarily mean that there's anything wrong with the test.

BY MR. FLOCH:

Q.    But Mr. Apuli, you are a scientist --

A.    Mm-hmm.

Q.    -- and we've been looking at all day at criticisms of detection of the Co-Diagnostics; right?

A.    Mm-hmm.

MS. PIERSOL:  Objection.  Misstates the evidence.

BY MR. FLOCH:

Q.    And -- and every time I show you a criticism of the test, whether it be from the Salt Lake Tribune article or a Nebraska piece of data that shows that the Logix Smart Test is not picking up what Abbott is picking up or this FDA test, you appear to be telling me that I should discount all of those data points; right?

MS. PEIRSOL:  Objection.  Misstates his testimony.

THE WITNESS:  No.  One thing you're -- you're kind of cherry-picking the data.  You haven't shown all the other studies and all the other data that show the test performed great.  And so, when you rule out all those other data points, the large amount of evidence showing that the test performed great, with -- with this stuff, then you see the -- the bigger, grander picture that the -- there were some, sort of, hiccups or potential issues.  But overall, the performance of the -- the test was great.

Page 134

Q.   Okay.   But at least in APULI 14, when we are looking at an LoD study that you were overseeing, you were saying that the results were not that great to be honest; right?

(Clarification by the reporter.)

THE WITNESS:  Yes.

MR. FLOCH:  I have no more questions.  And I will pass you over to Ms. Peirsol.

MS. PEIRSOL:  No questions.

MR. FLOCH:  Okay.  Well, thank you, Mr. Apuli for your time.

THE WITNESS:  Thank you.

MR. FLOCH:  Especially on a Labor Day weekend.  And I hope you have a good weekend.

THE WITNESS:  Of course.

COURT REPORTER:  I just need to know your orders.

MS. PEIRSOL:  We want electronic, and we will read and sign.

MR. FLOCH:  Electronic.

(Concluded at 5:26 p.m.)

-o0o-

Page 135

REPORTER'S CERTIFICATE

STATE OF UTAH            )

                        )

COUNTY OF SALT LAKE )

I, ABIGAIL D.W. JOHNSON, a Certified Shorthand Reporter and Registered Professional Reporter, hereby certify:

THAT the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was placed under oath to tell the truth, the whole truth, and nothing but the truth; that the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such testimony adduced and oral proceedings had, and of the whole thereof.

I FURTHER CERTIFY that I am not a relative or employee of any attorney of the parties, nor do I have a financial interest in the action.

(X) Review and signature was requested.

( ) Review and signature was waived.

( ) Review and signature was not requested.

I have subscribed my name on this 15th day of September,

ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

Page 136

Marisa A Peirsol

mpeirsol@bakerlaw.com

September 15th, 2023

RE: Gelt Trading, Ltd. v. Co-Diagnostic, Inc. Et Al

9/1/2023, Chad Apuli (#6086645)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (transcripts-fl@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 137

Gelt Trading, Ltd. v. Co-Diagnostic, Inc. Et Al

Chad Apuli (#6086645)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Chad Apuli                                      Date

Page 138

Gelt Trading, Ltd. v. Co-Diagnostic, Inc. Et Al

Chad Apuli (#6086645)

ACKNOWLEDGEMENT OF DEPONENT

I, Chad Apuli, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____     _____

Chad Apuli                                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.



_____

NOTARY PUBLIC

**[& - 42]**                                              Page 139

| & |
|---|
| **&**  2:9 5:11 |

**0**

**0.1**  117:16
**00001168-00...**  3:19
**00007747**  3:23
**00007778**  3:25
**00014535**  4:2
**00020113-00...**  3:7
**00049695-00...**  4:1
**00074699-00...**  3:13
**00075465-00...**  3:15
**00075552-00...**  3:16
**00078888-00...**  3:9
**00079338**  3:10
**00239009-00...**  3:12
**00239081**  84:5
**00368**  1:7

**1**

**1**  1:19 3:7 5:1
  23:6,7 105:23
**1/2**  47:23 48:2
**10**  3:20 95:3
  103:3,4,18
  104:24 114:10

**100**  3:21,21 35:6
  63:6 78:12 95:3
  98:2 105:2,3,8,9
  105:9,16,16,19
  107:21 108:3,5
  109:3,10,14
  110:19 114:19
  114:23 115:5
  116:9,15,20
  118:12,15,19
**103**  3:20
**11**  3:23 32:23
  113:25 114:2
**114**  3:23
**117**  3:24
**12**  3:24 74:5
  116:25 117:1
**125**  4:1
**12th**  46:6
**13**  4:1 125:4,5
**130**  4:2
**14**  4:2 130:11,12
  134:1
**14,000**  132:6
**15th**  135:24
  136:3
**16**  55:23
**16th**  86:1,1,16
  87:5 132:10
**19**  3:20 7:23
  11:17 17:8,11
  17:17 18:1,9,10
  19:7 29:3 43:5
  52:25 92:24
  105:1 122:1

  123:18 125:17
  128:23
**1900**  2:10
**1:31**  1:20 5:1
**1st**  104:18 114:7
  117:11

**2**

**2**  2:5 3:8 23:16
  29:22,23 30:3,4
  45:3 95:2
  123:21
**2/2**  47:22
**20**  138:15
**200**  2:15
**201**  2:9
**2015**  8:18 9:15
**2016**  9:15
**2019**  24:15
**2020**  17:14
  23:19 32:23
  36:21 45:5 46:6
  54:3 76:11 85:8
  85:17 86:16
  87:11 88:8
  90:18 91:17
  101:5,17 102:8
  102:18 104:18
  104:22 114:7
  125:12 128:15
  129:12,16,21,24
  130:3 132:10
**2023**  1:19 5:1
  135:24 136:3
**20th**  45:5

**228-1541**  2:16
**23**  3:7 86:23,23
**250**  114:19
**2530**  2:5
**28932**  135:25
**29**  3:8
**2:20**  1:7
**2nd**  23:19 85:8
**2x**  122:16

**3**

**3**  3:10 37:22,23
  38:5 45:3
**30**  136:17
**305**  2:7,11
**30th**  85:17
  90:18 91:17
  93:1 101:5
  102:8,17
**32**  55:23
**33**  73:10,17 74:1
**33131**  2:6,10
**35**  125:18 126:2
**36**  63:19,20
**37**  3:10
**3:07**  59:9
**3rd**  117:7

**4**

**4**  3:11 45:10,11
  45:18 46:1
**400-4260**  2:7
**41.1**  114:19
**42**  73:11 74:13
  76:8

Veritext Legal Solutions

800-726-7007                                              305-376-8800

**[43215 - agree]**

**43215** 2:15
**45** 3:11 102:1
**48** 39:18

**5**

**5** 3:3,13 61:13 61:14 63:8 74:4 95:2 127:21
**5/12** 73:11 76:8
**50** 95:3 122:14
**50x** 122:14
**5:26** 1:20 134:21
**5x** 122:15,16

**6**

**6** 3:14 30:12 72:7,8
**6086645** 136:5 137:2 138:2
**61** 3:13
**614** 2:16

**7**

**7** 3:16 79:22 80:23,25 103:10 103:11 127:20
**72** 3:14
**727** 114:17

**8**

**8** 3:17 63:19 84:1,9 121:4
**80** 3:16
**84** 3:17

**9**

**9** 3:18 90:9,10 95:16 121:4
**9/1/2023** 136:5
**90** 3:18
**95** 12:15,17 42:10,11,18,20 42:21,23
**967-6104** 2:11
**99.25** 98:2
**99.52** 98:21

**a**

**abatement** 116:1
**abbot** 117:16
**abbott** 118:1 120:12 133:10
**abc** 124:2
**abigail** 1:25 135:4,25
**ability** 14:5,11 88:22
**able** 14:24 22:10 26:5 46:22 58:15,15 77:4 113:12 118:1 119:21 120:17
**above** 41:23 51:9 52:6 56:14 73:10 74:1,23 99:7 136:6 138:7
**absolutely** 117:15

**accept** 94:5 123:23
**access** 6:22 80:6
**accuracy** 13:20 38:9 39:16 40:1 40:3,4,6,7,8,9 40:13 136:9
**accurate** 12:19 42:23 43:23 106:21 108:1 135:14
**accurately** 48:23 64:9 65:25 66:19 96:15,15 101:9 109:23
**achieved** 107:21 108:3
**achieves** 109:2 110:19
**acid** 16:23
**acids** 68:8
**acknowledge...** 138:3
**acknowledgm...** 136:12
**action** 135:19
**actions** 33:18,21 34:1,6 80:8,8
**activity** 15:4
**actual** 25:7,20 26:1,11 37:6 42:24 47:7 78:11 103:10

**actually** 7:1 11:15 18:6 41:18,19 45:20 47:4 59:7 67:6,7 71:14,15 79:24 89:3 119:21 123:2
**add** 22:1 25:2 38:18 99:25
**added** 76:16
**adding** 37:11
**addition** 122:22
**additional** 39:4 73:4 112:22 113:22
**additions** 138:6
**address** 112:1
**addressed** 36:14
**adduced** 135:15
**advanced** 1:16
**affect** 69:10
**affecting** 90:3 113:9
**africa** 61:10 72:21,24 75:8,8 75:14 77:20 78:1,15 109:7
**african** 77:17 78:10 105:13 108:18
**agency** 62:21
**agent** 18:18
**ago** 7:11 10:21
**agree** 58:23 65:5 105:7,11

**[agree - asking]** Page 141

105:12 108:6
**ahead** 97:3,5,7
  100:11,12 120:5
  120:6
**aided** 135:13
**al** 136:4 137:1
  138:1
**algorithms**
  20:17
**alignment** 20:3
**alignments**
  19:25 20:10
**allotted** 136:20
**allowed** 101:10
  106:13 108:8
**allows** 67:24
**ambiguous**
  43:10
**amendment**
  122:1
**america** 60:18
**american** 19:1,2
  19:3
**amount** 13:22
  42:9 49:11
  55:22 64:11
  133:20
**amplicon** 82:11
  83:15,20
**amplification**
  51:23 54:22
  55:4,15,17
  56:15,16,23
  57:9,12,21 67:2
  67:6,12,20,22

68:5,17,25 69:2
69:3,8,17,21
70:2,6,9,18,21
71:2,3,15 72:1
126:4
**amplifications**
  57:17
**amplified** 54:20
  55:2,10 68:11
**amplifies** 63:20
**amplify** 51:24
  55:7,12
**amplifying** 71:3
  79:15,16,16,17
**analysis** 25:12
  73:5,8,9
**analytical** 9:24
  12:4 14:19 15:4
  15:18 40:8,12
  98:14,15
**analyze** 8:16
**analyzing** 15:16
  60:20
**andrew** 27:16
**answer** 6:6,11
  6:11 26:21
  43:14 49:18
  58:17 68:18
  83:24 97:3,7
  101:15 106:17
  108:12,23
  118:10 120:7
**appear** 49:1
  70:7 133:11

**appears** 24:1
  30:22 31:5
  33:12 49:20
  70:5,14 74:4
  81:11 119:8,18
  125:11
**appended**
  106:22 138:7
**applicable** 65:2
  65:9 136:8
**applications**
  89:5
**apply** 49:3
**appreciate**
  45:17 71:20
  130:6,9
**appropriate**
  34:16 95:24
**appropriately**
  35:19 116:5
**approval** 36:25
  37:2,2,4 38:12
  132:7
**approx** 63:19
**approximately**
  88:7
**april** 76:11
  90:18 91:17
  93:1 101:5,17
  102:8,17 129:21
**apuli** 1:15 5:5,9
  5:20,22,25 23:6
  30:4,10 37:22
  38:5 43:14 45:3
  45:3,10,14,18

46:1 59:13
61:13 72:7
79:22 80:23
84:1,12 90:9
95:16 102:7
103:3,18 104:24
110:14 113:25
114:5,10 116:25
130:11 132:24
134:1,11 136:5
137:2,24 138:2
138:4,12
**area** 66:6 67:14
  69:20 70:2,5
**argumentative**
  110:11,25
**arrested** 8:23
**article** 89:15,19
  89:20,24 90:2
  90:22 91:11
  92:18 93:1 96:2
  96:9 101:6
  102:9,18,20,25
  113:10 133:9
**articles** 20:7
**asap** 91:12
  127:24
**ashlyn** 125:14
**asked** 28:13
  35:19 77:13
  87:24 101:8
  106:11 107:5
**asking** 24:1
  27:20 35:24
  43:11 83:5

**[asking - benson]**

99:16 102:12

**aspect** 120:14 120:17

**aspects** 121:25

**assay** 16:20 73:4 73:6,9,11,12 74:8

**assessment** 49:20 52:5

**assistance** 99:20

**assisted** 37:11

**associated** 72:16 79:20

**assume** 34:20 34:21

**assumes** 110:10 113:19

**assure** 45:14

**attached** 107:7 107:8,15 136:11

**attempt** 112:19

**attention** 23:16 127:24 130:22

**attorney** 6:9 135:18 136:13

**attorneys** 129:6

**attribute** 101:11 101:11 106:12 106:14 108:9,14

**attributed** 107:19

**australia** 60:16

**author** 91:10

**authorization** 32:17,18

**available** 53:1 136:6

**avenues** 19:25

**aware** 34:1 89:10 100:25 101:3

**b**

**b** 3:5 124:3

**bachelor's** 8:9 8:17,19

**back** 9:8,12,13 10:3,7,8,17 11:21 15:2 16:1 25:24 33:13 43:1 49:5 53:6 57:10 59:5,9 69:13 70:4 74:3 78:19 92:15 93:19 94:15 95:4,16 97:22 100:16 111:25 123:15 124:4 127:16 129:16

**background** 7:25 56:3 64:21 73:24

**bakerhostetler** 2:14 5:16

**bakerlaw.com** 2:16 136:2

**bar** 14:21 15:12

**barbara** 99:13 99:15

**base** 45:1

**based** 20:17,21 25:4 26:15,17 35:4 37:17 44:17,23 49:11 50:11 53:25 88:20 94:2,4,6,7 94:24 111:24 127:16

**basic** 76:23

**basically** 7:21 8:14 9:24 11:4 13:24 14:5,11 15:7 16:7,10,17 16:25 17:3 18:4 18:7 19:16,25 20:7,16,24 21:9 21:10,19,21 32:8 36:25 37:12 38:24 39:3,24 41:15 42:7,14,15 44:8 44:24 48:2 50:3 50:23 51:18 52:7,10,23 53:2 53:4,11 54:19 55:5,8,9,20,21 56:3,5,15 57:1 58:7,22 62:8 64:3 65:13,17 66:6,10,12,25 67:3,4,16 68:3,7 68:10,16 69:18 69:20 71:16 73:20,22,25 76:24 79:18

80:6 82:19,21 82:23 83:5,6,9 83:14 84:20,21 89:7 91:23,25 92:21 93:14,19 93:23 94:9,21 95:4,22 96:9 97:13 98:14,15 99:1,16,17 112:1,2 113:3 113:11,12 123:3 123:22,24 126:1 126:5 127:1 131:13,16,25 132:2

**basing** 50:19

**beginning** 17:17

**behalf** 5:11,16 35:18

**behaving** 49:7

**beings** 37:6

**believe** 29:1 40:9 45:8 46:16 46:20 49:17 50:15 51:17 63:7 77:21 83:1 86:8 96:12 103:23 107:16 115:13 117:15 129:13 132:6

**bell** 63:7

**benson** 1:10 27:16 28:13 130:19 131:18

**[benzonana - cdc]**

**benzonana** 82:3 83:1
**best** 21:4 35:7 43:21,22 44:5 65:11 106:9 121:5
**better** 10:9 28:12 66:25 77:9 89:9 91:13 93:7,10 94:12 94:13,17,17 95:11,18 96:7 98:17 107:22 108:5 117:15 120:9 122:11,14 124:13,16 128:20
**beyond** 10:20 29:3 36:10 39:4 42:14,14 75:11 103:9
**bfloch** 2:6
**big** 22:10
**bigger** 133:22
**biochemistry** 8:8
**biodynamics** 81:11,16 86:23 86:25
**bioinformatics** 8:12,13
**biological** 8:16
**biology** 8:15
**biotechnology** 9:10

**biscayne** 2:5,5,9
**bit** 7:24 30:25 54:12 58:3 93:5 103:8 105:20 107:17
**blanke** 99:13
**blast** 20:4
**blow** 84:8
**blur** 101:18
**blvd** 2:5
**board** 55:18
**body** 53:12
**born** 9:7
**bottom** 46:4 47:10 61:20 72:15 90:17 105:23 121:1 130:18
**boulevard** 2:9
**bramwell** 88:18 117:8,14
**brandon** 2:4 5:10 35:19 101:21
**brazil** 100:10
**break** 7:4,5 14:1 59:5,13 101:22 102:2,7
**brent** 1:10 105:25
**brent's** 52:5
**brief** 30:7
**briefly** 10:23 19:12

**bringing** 17:20
**brought** 33:7 36:13 130:22
**buffers** 68:2
**build** 31:14
**built** 22:14
**bullet** 31:2,4,12 33:15,20
**bunch** 20:1,19 31:2 78:5
**burden** 39:2
**busy** 92:4
**buy** 128:18

**c**

**c** 2:1,8 5:2,22
**calculate** 14:18 14:24
**calibration** 80:10
**call** 30:23 40:12 64:2 71:16 114:15
**called** 5:6 20:4 20:15 30:4 41:13,14 65:25 68:7 93:22 109:20 111:25 112:15
**calls** 108:19 115:3 119:24
**calm** 22:22
**cameron** 81:5 81:12,14 127:18
**capacity** 11:18 35:21 121:6

**car** 50:1,2,2
**care** 89:3 91:9
**career** 39:23
**carefully** 75:5
**case** 1:7 16:19 20:14 24:21 32:3 42:10,16 44:1 50:13 53:3 68:12 78:2 129:6 132:18
**cases** 77:10 97:17 111:2,3,5
**casey** 88:18
**category** 13:23
**causative** 18:18
**cause** 53:7 54:13 70:20 96:3
**caused** 44:20 50:16 52:2 56:23 57:13,17 57:21,24 68:6 78:10 87:16 89:12
**causes** 67:20,21 99:14
**causing** 68:24 70:16 127:9
**cayman** 1:4
**cced** 24:8 38:8
**cdc** 50:22 52:19 52:22,23,25 91:3 114:18,24 115:6 116:9,15 116:20

**[cdc's - come]**

cdc's 53:5

ce 36:22,24 37:1 37:9 38:19,23 39:1,5

cecilia 28:1 37:11 38:8 74:19 81:5 99:16,22

cell 129:17,20

center 2:15

centering 101:4

central 1:2

certain 12:21 27:12 34:13 39:3 40:10 55:8 57:2 64:10 65:24 66:16 77:6 78:12 89:14 90:7 111:11 120:19

certest 82:14,18

certificate 135:1

certifications 8:21

certified 135:4

certify 135:6,17

chad 1:15 5:5 5:22 26:21 35:17 51:6 90:21 99:25 106:17 114:15 136:5 137:2,24 138:2,4,12

chain 23:18,22 30:14 68:5

75:11 78:15 125:12

chance 26:24 51:7 77:24 113:21

change 137:4,7 137:10,13,16,19

changed 10:15 10:16,24 53:19 68:1 94:3

changes 39:10 112:24 122:21 122:22,24 123:3 136:10 138:6

characteristic 13:7 16:13

characteristics 12:5 13:3,9,12 13:15 14:2 16:2 58:11

characterize 25:22

chart 87:8

chemical 113:4

chemistry 50:24 122:18

cherry 133:17

chikungunya 18:20 19:4

chose 94:3 95:5 95:7

chosen 41:22 94:25

circumstances 101:10

cited 105:18

city 65:16

civic 2:15

claim 31:8,16 93:11 94:22 96:8 112:24 117:16

claimed 43:16 93:7,11 95:18

claims 26:6 28:20 31:21,25 32:2,9,11,15,19 32:20 34:3 35:12,14,25

clarification 134:5

clarify 33:19 66:14

class 5:13 132:16

clean 21:7

cleaner 25:5

cleaning 9:25

clear 129:14

clearly 26:8 52:14

clia 47:5

client 81:7

clinical 13:19,20 14:3,10,14,16 14:19,20,25 15:3,11,14,17 16:2,3 21:9,12 21:13 25:16 37:17 40:6,7,12

44:2,24 45:6 47:8 62:11 77:18,22 89:5 93:22,23,25 94:7,10,14,23 95:9,23 99:3,4,6 100:6,8 107:21 108:3,5 109:3 109:10,14 110:20 118:9

clinically 89:6

codi 3:7,9,10,12 3:13,16,19,23 4:1,2 84:5

cold 78:15

colleagues 46:11 48:14 70:15 95:20

collect 93:6 95:17,21 99:10

collected 53:18 76:18 91:25

college 8:3 9:1

collision 68:13

columbus 2:15

column 84:24

combination 13:21

combined 73:9

come 9:12 16:22 26:13 45:22 51:20,22 56:6 56:10,11 59:5 69:21 71:4,5

**[coming - contaminated]**                                    Page 145

coming 56:12
71:10,13 116:8
comment 69:14
comments 29:2
common 13:6
66:23
communicate
26:8
communication
112:3
companies 32:6
82:15 128:17
company 1:5,16
9:10 10:3 13:8
13:15 22:18
26:6 27:9 32:10
34:9,11 35:18
37:5 60:24 62:9
71:25 87:24
89:21 91:10
100:5,19,25
101:8,11 104:2
104:11,17
106:11,13 108:8
109:13 110:3,7
111:10,12,23
112:8,10,12,19
113:7,16 115:3
118:4 119:19
120:23 121:14
122:24
company's 35:3
104:8,13 119:16
comparator
58:24 83:18

compare 43:10
53:5
compared 31:6
43:4 82:14
131:17
comparing
121:11,16
comparison
39:17
compete 120:12
competitive
120:12
competitor
117:15 120:8
competitors
119:22
complaint 75:2
85:2
complaints 79:7
79:8 84:17,22
85:19 86:4,9,10
86:15,24 87:3,9
87:16 127:21,22
complete 138:8
completed 8:11
8:20 136:17
completely 15:9
123:19
complicated
98:19 124:15
composition
113:4
computer 8:14
8:15 135:13

concentration
12:13,16 56:8,9
56:11 64:4,11
94:1,8 95:5,24
concentrations
41:23,24 94:3,6
94:24,25 95:8
concern 49:6
74:13 125:21,21
125:25 126:1,18
127:15
concerned
32:15 46:19
49:10 96:13
126:12,15,20,24
127:2
concerning 36:5
117:24
concerns 29:2
31:1,20 32:23
33:19 34:3
35:12 36:12
73:12 74:8
127:9
concluded
134:21
conclusion
44:21 50:19
57:1 83:6,10,12
108:20
concordance
58:18,22,25
conditions 68:1
68:3 69:10

conducted
121:11,15
conducting 13:4
conference 18:7
conferenced
1:14
confident 97:12
confusion 40:10
conjecture
96:17
conjunction
8:14 126:11
132:4
conserved 19:18
20:3
considered 40:1
122:20
consistent 16:8
consistently
3:21 76:25
105:2,8 107:21
108:2 109:2
110:19 117:18
120:23
constitutes
135:14
contact 35:11
35:13,25 77:3
129:5
contacted 36:6
contagious
118:7
contaminated
50:7 82:23

**[contamination - customer]**    Page 146

**contamination** 48:7 49:15 50:5 50:15 51:18,19 51:22,23 52:2 52:12 57:2 63:14 68:21 70:16 82:11,12 82:16,17,20 83:2,14,21 87:14

**content** 32:19 34:17 37:12,13

**continue** 128:14

**continued** 118:5

**contrived** 14:22 15:9,23 21:9,14 21:20,22 37:18 41:1,2,17,18 48:9,14,16,22 49:8,23 50:11 53:25 54:9,13 93:23 94:1,14 95:11,13,14,23

**control** 24:17 79:19,19 80:6

**conversation** 28:23,25 29:8 33:3 35:5 88:2 88:13

**conversations** 28:19 29:6,9,11 32:22 33:1 36:4 71:25 72:4 75:10 88:10,17 91:20 92:18

111:12 112:25 121:20,23

**cool** 102:3

**copied** 97:23

**copies** 55:8,22 55:22,25 63:19 136:14

**coprimer** 31:5 31:15

**coprimers** 20:15 20:16,19,21,25 25:22 66:24 68:16 123:24

**copy** 117:16

**coronavirus** 17:21 44:18

**corporation** 1:8

**correct** 10:5 15:19,20 21:16 22:15 26:5 45:23 71:11,13 124:7 138:8

**corrections** 138:6

**corrective** 33:18 34:5 80:8

**correctly** 14:12 45:19,25 46:13 69:19 82:10

**correspondence** 3:7,8,10,11,13 3:14,16,18,23 3:24 4:1,2

**counsel** 5:13 62:22 136:14

**countries** 60:14 107:19 109:14 128:3

**country** 59:17 60:17 61:10

**county** 135:3

**course** 118:22 134:15

**court** 1:1 6:4 134:16

**courtroom** 6:18

**cov** 123:21

**covid** 3:20 7:23 10:19 11:15,17 16:20 17:8,11 17:17 18:1,9,10 19:7 21:22 22:2 29:3 43:5 47:4 52:25 62:11 82:19 92:24 105:1 112:6 116:3 118:5 122:1 123:18,22 124:2 125:17 128:23 131:13 132:2

**cq** 52:7 73:10,16 73:20 74:1 125:17 126:2

**crazy** 97:9

**crc** 1:25 135:25

**create** 67:15

**created** 38:24 84:19

**creating** 20:13 41:4

**critical** 89:25

**criticism** 92:25 96:21,23,24 133:8

**criticisms** 90:5 110:4 133:2

**criticize** 110:7

**criticizing** 87:19 89:11,16 90:2 96:3

**crockett** 72:17 74:18

**cross** 12:7 13:24 16:14,21,25 82:16

**crosses** 73:24

**crr** 1:25 135:25

**crunch** 94:11

**ct** 63:19 73:22

**current** 62:3 121:25 122:17

**currently** 34:9 100:1

**curve** 56:5 63:8 73:23

**curves** 52:8 55:19 56:6

**customer** 26:24 75:2 77:1 84:16 84:22 85:1,4 87:2 88:10 127:20

**[customers - detection]**                                             Page 147

**customers** 58:15
  76:21 78:20,21
  78:25 79:3,5
  87:4,10,15,19
  87:21,23,23
  88:2,4,7 89:2
  113:13 123:7
  128:21,25
  131:14
**cut** 120:6
**cutoff** 51:9 52:6
  56:14 64:11
  65:14,18 67:9
  67:15
**cutting** 45:14
**cv** 1:7
**cycle** 55:7,21
  56:6,10,11
  63:20 65:14,18
  67:9,11 73:21
  73:22
**cycler** 69:11
**cycles** 56:13
**cycling** 68:2

            **d**

**d** 3:1 5:2,22
**d.w.** 1:25 135:4
  135:25
**data** 3:20 8:16
  15:8,11 26:7
  29:14 37:16,17
  38:10 39:3,4,4,6
  39:9,15 40:22
  44:25 49:5 61:1
  61:2 73:9 93:6

95:17 96:6
99:11 105:2,8
105:13,14,14
106:4,21 107:1
107:7,8,14
109:6 131:8
133:9,12,17,18
133:20
**date** 17:13
  38:16 114:9
  137:24 138:12
**dates** 22:6
**day** 86:9,10
  107:11 115:2
  119:8 130:7
  133:1 134:13
  135:24 138:15
**days** 7:11
  117:10 136:17
**dbp** 1:7
**dear** 73:2
**decent** 45:16
**decided** 100:19
**deciding** 128:17
  128:21
**declare** 138:4
**deemed** 138:6
**defendants** 1:11
  5:17
**definitely** 31:23
  43:20,21 53:15
**definition** 42:17
**degree** 8:3,9,17
  8:19,20

**degrees** 8:10
**delayed** 80:18
**delete** 129:7
**deleted** 129:11
  129:14,24
**demand** 28:10
  80:20 111:22,24
  123:8,10,16
**demonstrated**
  105:8,9
**demonstrates**
  3:21 105:2,16
**dengue** 18:20
  19:4
**denny** 72:16
**depending**
  12:14 26:24
  34:17 51:21
  71:17
**depends** 26:23
**deponent**
  136:13 138:3
**deposing** 136:13
**deposition** 1:15
  5:24 6:10 7:10
**depositions**
  45:22
**describe** 14:9
  21:14 44:4
  46:10 79:8
**described** 68:20
  76:4
**describes** 65:1
**description** 3:6

**deserve** 127:23
**design** 20:19
  47:6 80:10
  82:14,18
**designed** 71:18
**designs** 20:14
  20:16,22 21:4
**despite** 105:12
**details** 27:21,23
  33:5 36:19 60:8
  87:6 90:1 93:3
  115:16 116:23
  118:21 122:6
**detect** 12:13,16
  12:21 19:21
  42:10 44:9
  58:16 66:7,12
  117:19 120:18
  120:18,24 124:2
**detection** 12:7
  12:11,12,15,15
  12:18,20 13:2
  13:14 18:18
  24:2,19 25:19
  25:21 26:12
  42:8,11,12,14
  42:18,19,21,22
  43:3,6,7 51:13
  51:25 56:17,24
  57:8,13,22,25
  64:5 66:7,18
  87:19,22,25
  88:11,14,15,23
  89:3,7,12 90:3
  93:13,17,21

**[detection - division]** Page 148

94:2,4 96:4,7,8 98:3,5,17,24,25 99:5,6 105:25 106:2,13,23 107:2,2 112:15 112:20,24 115:4 121:21 123:1,13 132:11 133:2

**determine** 12:5 12:24 14:6 47:1 127:8

**determined** 56:7

**determining** 13:16

**develop** 22:5,18 47:6

**developed** 11:16 18:15,20 22:8 52:25 96:21

**developing** 19:12 32:7 36:2 58:14 113:1,2 122:3

**development** 9:24 10:22 11:1 11:13,15 12:3 17:25 18:4,6,8 18:11,16,19,22 18:24 19:7,8 20:12 22:12 27:3 28:6 29:13 62:1 67:24 111:16,20

**diagnose** 46:22

**diagnoses** 67:17

**diagnosis** 47:9

**diagnostic** 12:22 13:8,15 15:16 17:7 18:1 18:24 19:12 28:5 34:12 35:15 36:1 39:15,21 40:1,4 40:7,13 43:4 46:19,21,22,23 47:6 66:11 78:22 82:15 111:3 123:18 128:23 136:4 137:1 138:1

**diagnostics** 1:8 3:20 7:21 9:6,12 9:15 10:3,11 11:16 13:3,6 17:11,16 22:5 22:13 23:23 27:4 28:8,16,20 30:19 32:16 34:2 35:15 36:16 37:9 43:5 45:6 46:5,12,25 48:15 51:4 61:22 70:15 75:9 81:15 88:21 90:3 96:4 104:22 105:1 106:1 114:6 118:2 125:16

126:8 128:6,15 128:22 130:19 132:11 133:2

**difference** 40:3 44:5,6

**differences** 77:15

**different** 9:21 13:25 14:2,17 16:9 19:5,19,24 20:17 21:3 29:19 35:10 44:3 49:23 50:3 54:13,17,18,21 54:23,25 57:4 57:10,19 58:1,6 62:5 63:15 65:20 67:19,24 68:1 75:18 78:3 78:4,5 82:16,19 83:9 86:2 93:16 93:20 94:4 96:18 97:14,15 114:17 115:20 123:17,18 131:14,15,16

**differing** 69:10

**digest** 29:16

**digital** 120:10

**dimer** 68:17,19 68:20,24 69:3,7

**dimers** 68:7

**director** 10:19 10:21,25 11:13

**disagree** 64:15 65:5 70:15

**disagreed** 65:13

**discount** 70:7 133:12

**discounted** 67:13

**discrepancies** 48:5

**discretion** 7:5

**discuss** 126:10

**discussed** 33:19 100:25

**discussing** 38:9 75:7 86:25

**discussion** 73:6

**discussions** 17:16 36:15 60:24 88:19 91:16,22 92:1 111:9 116:18

**disease** 14:6,12 17:1,2 123:18

**diseases** 18:12 18:15 19:6 32:6

**disparaging** 125:17

**distributor** 81:18

**distributors** 79:1,5

**district** 1:1,2

**districts** 116:1

**division** 1:2

**[document - environment]** Page 149

**document** 23:6 37:22 80:5 84:15,19 110:25 129:2 130:5

**documentation** 10:1

**documented** 34:8

**documents** 7:12 7:16,19,21,22 35:9 80:7

**doing** 9:24 11:5 20:13 21:23 29:18 36:11 41:16 52:8 77:5 77:6 78:22 86:13 93:14,17 100:20 110:3 112:4 121:25 123:4

**dossier** 37:14,20 38:11,14,16 39:8

**double** 55:21

**doubt** 130:2

**doubts** 54:14 76:13

**dr** 51:3 52:13 61:24,25 62:4 62:23 64:7,22 70:14 76:4 88:14,16 90:18 90:19,21 91:17 92:18 93:5 96:2 97:23 102:12

107:19 111:15 114:6,14 116:13 117:8,8,13,14 119:19 121:2

**draft** 27:13,17

**drafting** 27:8,11

**dramatically** 115:14

**draw** 55:18

**drive** 2:15

**drop** 128:22,22

**due** 48:6

**duly** 5:6

**durenard** 1:9

**dust** 120:13

**dwight** 1:8 23:22

**e**

**e** 2:1,1 3:1,5 5:2 5:2 137:3,3,3

**earlier** 25:15 39:23 42:8 51:22 56:10 106:7

**early** 25:17 26:11 28:22 52:7 54:3 73:13 74:8,14

**easier** 84:6

**east** 19:3

**easy** 29:15

**eco** 39:18

**ecuagen** 85:13

**editing** 33:12

**education** 8:10

**edward** 1:9

**effectively** 22:21

**effort** 113:8,16

**egan** 1:8 23:22 24:14,25 25:11 25:25 117:8

**eight** 10:17 55:23 121:12,16

**either** 22:2 69:10 71:17 75:19 92:23 132:3

**electronic** 134:18,20

**elution** 122:16

**email** 3:7,8,10 3:11,13,14,16 3:18,23,24 4:1,2 23:18,22,22 24:8 30:14,18 32:21 33:9 38:6 38:17 39:11,13 46:5 47:11,12 48:5 49:1 51:2 52:4,10 61:20 62:11 64:16 70:13 71:20,23 72:2,16,19,24 74:3,21 75:11 75:13 81:4,10 81:11,22,24 82:13 83:4 90:18 96:1 97:20 99:10

102:11 114:5 115:17 116:13 117:7,22,23 119:18 120:21 121:2,19 122:13 125:12,15 127:5 127:17 130:18

**emails** 129:6,11 129:15

**employee** 46:14 55:15 64:8 65:3 65:9,16 75:25 135:18

**employees** 70:17 105:14

**employes** 63:13

**ended** 51:16 56:21 93:17 97:17 121:18 127:12 128:12

**enhanced** 31:6

**enter** 80:12,16 86:10 87:16

**entered** 74:24 80:19 85:1,7,18 86:11 87:4,9 127:20

**entire** 10:10 119:15

**entries** 85:25 86:1

**entry** 85:11,13

**environment** 21:7

**[equal - familiar]**

**equal** 15:15 44:7 98:3

**equipment** 9:23 11:7

**errata** 136:11 136:13,17

**error** 63:8 78:18 87:14 97:18

**errors** 69:11

**especially** 32:5 80:18 97:8 134:13

**essentially** 12:4 14:20 25:16 46:24 55:12,19 94:5 118:13 124:21,22

**establish** 14:22 25:20 39:15

**establishing** 12:6 13:24 58:7

**et** 136:4 137:1 138:1

**eua** 93:13,20 94:18

**eugene** 1:9

**european** 37:1,2 37:14,17 38:12 39:1,7 123:22 124:22

**evaluate** 17:4 121:3

**evaluated** 107:20

**evaluating** 42:13,17

**evaluation** 93:23 100:2,7 100:14,19,20 108:6 109:21,22 110:2,4,5

**evaluations** 3:22 97:15 105:4,10,17,18 105:25 108:4 109:19 110:22

**event** 80:14 81:23 82:1,2,2,4 82:6

**events** 67:4

**eventually** 49:14

**everybody's** 80:20

**everyone's** 91:9

**evidence** 53:12 53:13,14,19 57:15 64:13 75:23 76:15,18 93:22,25 94:7 94:10,14,23 95:9,23 109:17 110:10,10 113:19 126:16 132:14 133:5,21

**exact** 17:13 22:6 38:15 39:9 88:1 93:3

**exactly** 17:18 29:4,18 33:4 37:19 38:15 62:5 63:12 74:16 86:20 124:19 127:12 127:13

**examination** 3:3 5:18

**examinations** 3:2

**example** 15:5,8 15:23 49:25 50:5 118:3,11

**excel** 84:4

**except** 56:13 97:16 103:10

**exhibit** 3:6,7,8 3:10,11,13,14 3:16,17,18,20 3:23,24 4:1,2 6:22 23:2,5,6,7 29:22,23 30:3 37:23 45:11 61:14 72:8 80:25 84:9 90:10 95:15 103:4,7 114:2 116:12 117:1 125:4,5 130:12

**exhibits** 6:23 7:1 22:25 45:15 61:12 125:2

**expected** 60:6 95:25

**expense** 100:18

**expensive** 100:17

**experience** 77:23,25 105:16 112:4

**experienced** 78:6

**experiments** 24:16 49:2

**explain** 12:9 14:4 40:19 42:4 52:21 55:2,16 83:11 84:18

**explaining** 71:20 76:23

**extractions** 78:4

**extremely** 118:8 127:23

**f**

**facing** 35:3

**factors** 12:24 15:13 67:24

**facts** 110:10 113:19

**fails** 136:19

**false** 40:16,17 41:8,12 63:22 67:3,15,16 68:15 81:8 82:7 82:21 83:12,16 83:22 126:4 127:21

**familiar** 30:15 78:3 89:17

**[families - garner]** Page 151

**families** 46:15
**family** 9:8 46:17
**far** 43:16
**fasano** 2:8
**faster** 22:7,13
  91:13
**favorable**
  105:24 106:12
  106:22 112:16
  113:9 115:4
**fda** 15:9 28:20
  28:23,25 29:6,9
  30:20 31:20
  32:14,23 33:13
  34:3 35:2,11,14
  35:25 36:4,6,17
  39:4 93:18
  94:23 122:1
  124:24 131:14
  132:1,3 133:11
**february** 23:19
  32:23 36:21
  45:5 111:21
**feedback** 72:20
  88:4,6,10
  126:11
**feel** 124:25
  130:7
**feeling** 46:17
**feels** 101:17
**felt** 96:16
  119:14
**field** 20:8 96:5
**figure** 29:20
  91:8

**figured** 53:16
  128:12
**figuring** 19:23
  67:25 128:12
**file** 80:10
**filed** 84:22
**files** 81:8
**final** 72:20 73:4
  132:7
**financial** 135:19
**find** 20:3 82:9
**finding** 95:11
**fine** 50:8 106:19
  130:9
**finish** 97:7
**finished** 102:21
**firm** 5:10
**first** 5:6 9:14
  17:10 18:5
  19:14 21:6
  25:21 27:4 31:4
  36:7 54:4 62:14
  63:6 78:22
  91:10 103:13
  107:6 117:14
**fits** 111:18
**five** 59:5,8 86:1
  87:10
**fix** 33:19
**fl** 136:15
**flawed** 59:25
**floch** 2:4 3:3 5:9
  5:10,19 23:10
  27:1 29:25 30:2
  35:23 38:1

43:12 45:13
57:18 59:4,8,12
61:16 64:18
72:10 75:24
79:21,23 80:22
81:3 84:3,8,11
90:12 97:6
101:23,25 102:6
103:6 106:20
107:9 108:15,22
110:1,13 111:7
113:23 114:4
117:3 118:24
119:6,17 120:3
125:7 128:13
130:14 132:23
133:6 134:7,10
134:13,20
**florida** 2:6,10
**flu** 16:21 124:2
  124:3
**fluorescence**
  55:20 56:4
  73:23,24
**fluorescent** 56:1
  56:2
**focus** 23:15 62:7
**focused** 22:11
**focusing** 36:21
**folder** 30:4
**follow** 22:22
  104:13
**following** 21:12
  39:11 73:4,8
  116:4 123:20

132:1
**follows** 5:8
**foot** 121:6
**foregoing** 135:7
  135:13 138:5
**former** 61:25
**forth** 55:24
  135:9
**forward** 121:6
**forwarded**
  74:18
**found** 120:8
**four** 9:11 55:23
  85:25,25 87:10
**fourth** 31:12
**frankly** 91:9
**friday** 1:19
**front** 14:14
**full** 135:14
**functions** 80:11
**further** 24:24
  50:21 53:16
  76:18 85:24
  114:22 135:17
**future** 33:22
**fwd** 81:7

**g**

**g** 5:2
**garcia** 61:21,24
  61:25 62:4,23
  64:7,22 70:14
  76:4 90:19 92:2
  97:23
**garner** 125:14
  127:4 128:7

**[garner's - hbv]**

**garner's** 125:21 128:11

**gelt** 1:4 5:12 136:4 137:1 138:1

**gene** 20:11 123:22,24,25 124:4,6,9,10,14 124:23

**general** 31:24 32:1 79:8 119:13

**generally** 17:7

**generate** 84:21

**generated** 56:1

**generating** 56:2

**genes** 124:13

**genome** 19:16 22:3 55:9 82:19

**getting** 37:9 49:4 53:6 80:19 114:16

**give** 6:2,6 13:12 16:5,10 18:14 23:3 26:15 29:25 37:22 42:19 72:11 90:9 101:25 131:3

**given** 5:24 138:9

**giving** 50:6 67:16

**global** 100:1,4 100:14,20 101:1

**go** 6:3 11:21 19:22 21:10 30:25 31:12 43:16 47:2 50:1 51:2 63:4 68:4 69:13 78:19 85:6,24 95:4 97:3,5,7,20 100:11,12,20 102:2 115:19 120:5,6 121:1 127:17

**goes** 13:23 55:23 63:18 114:21

**going** 6:2,3,12 6:23 17:11 22:24 23:1 25:5 25:24 26:15 29:21,22 30:4 35:5 36:9 37:21 45:2,9,10,15 61:13,13 66:6 72:6,7 77:13 79:21 80:22 83:3,6 90:8 97:8 101:22 102:20 103:2,9 107:6 109:21 110:7,17 111:3,3,5,5 113:24 115:12 116:24,25 125:1 129:2

**good** 20:9 42:15 59:25 65:13

93:7 96:14 97:11 113:12 121:5 134:14

**gotten** 39:7 49:7 104:19 126:12 132:7

**government** 72:20 77:17,19 77:22 109:7

**graduated** 9:1,3 9:5

**grander** 133:23

**gray** 71:10

**great** 7:8 25:13 126:2 132:7,12 133:19,21,25 134:3

**greater** 42:12 56:3 95:3

**greece** 127:22

**grew** 22:10

**grey** 63:20 64:1 64:3 65:1,8 69:13,16,18,19 69:24 70:1,5,7 71:5

**ground** 6:2

**group** 132:3

**groups** 11:14

**guarantee** 39:9

**guess** 25:24 26:3 35:7 42:15 44:1 45:25 49:4 64:19 79:4 80:1 96:14 118:11

**guessing** 34:19 34:24

**guidance** 11:8 83:5

**guidelines** 62:16 62:24 76:4

**gundry** 74:24 81:5,14 127:18

**guys** 59:4 63:14 101:25

**h**

**h** 3:5 5:22 137:3

**hallmarks** 31:14

**handful** 7:18 20:21 69:12

**handle** 28:11,12 80:7 126:10

**handled** 11:9

**hands** 58:13

**happen** 70:9 86:10 111:5

**happened** 36:19 83:7 88:7 112:7 128:11

**happening** 17:23 33:22 67:2 91:4 127:12

**happens** 55:5 67:4 68:8,22,23

**happy** 123:7

**hard** 101:17

**harder** 132:18

**hbv** 18:23

**[hcv - imagine]**

**hcv** 18:23

**head** 11:1 22:16 28:3 61:7,11 128:4

**header** 104:25

**health** 62:20 85:19 125:15,16

**hear** 17:10

**heard** 36:22

**heavily** 111:20

**hello** 47:11 126:7,9

**help** 16:16 25:10 28:11,11 40:2 43:17 64:25 65:23 76:23 83:3,5 99:16 111:17 112:1 115:25 116:3

**helping** 11:19 71:21

**helps** 68:16 106:2 115:24

**hereto** 138:7

**hey** 26:14,16 70:14 83:2 99:10 130:21

**hiccups** 133:24

**high** 15:12 51:14 56:9 97:16 113:2

**higher** 8:10 15:7 43:6 89:11 90:3 95:1,6 98:3

122:4

**highest** 14:21

**hired** 11:4

**hires** 11:19

**history** 9:1 80:10

**hits** 47:22,24

**hiv** 18:22

**hmm** 5:22 8:2 9:2,16,21 11:2 11:24 12:12 13:5,18 16:7,15 17:9,13,18 18:16 19:14,24 21:15 24:4,9,23 25:13 26:2,4 30:24 33:11,14 33:17,23 35:4 36:23 38:20,22 38:24 40:5,21 40:24 41:20 42:1,3,7 44:8,14 45:20 46:7,9 47:15,17 48:12 49:9 51:5 52:17 52:20,23 54:2,6 55:18 58:4,20 60:15 61:23 62:18 63:24 64:24 65:4,6,10 65:22 66:2 67:23 69:5,15 70:12 71:22 73:1,18 74:6,11 74:20 75:1,3,6

75:21 76:2,6,10 78:24 79:11 80:5 81:9,13 84:25 85:3,5,10 85:16,21 86:3,5 90:20,24 91:6 91:15 93:9 96:19 97:21,25 98:8 100:3 101:7 102:10,15 104:15 106:6,18 107:25 109:9,12 111:19 112:17 115:1,8 116:17 117:12,21 119:3 121:9 124:5 127:7,19 130:20 131:2,6 132:9 132:25 133:3

**home** 9:8

**honduras** 127:22

**honest** 132:8 134:4

**hope** 24:18 134:14

**hopefully** 102:2

**hoping** 99:21

**hospital** 99:13

**hour** 45:16

**huh** 45:24 94:19 109:5 110:16 120:25

**human** 37:6

**humans** 32:6,13

**hungarian** 85:18

**hutchins** 28:1,7 33:10 37:11 81:5 90:19 97:22

**hwang** 30:19

**hypothetical** 97:3 101:14 106:16 108:11 110:25

**i**

**icmr** 62:14,19 62:22 108:17 109:7

**idea** 21:6 65:11

**identification** 23:8 29:24 37:24 45:12 61:15 72:9 81:1 84:10 90:11 103:5 114:3 117:2 125:6 130:13

**identified** 20:8 127:13

**identify** 14:12 77:4

**identifying** 19:15

**illnesses** 46:23

**imagine** 34:14 39:10

**[immediate - issue]** Page 154

| | | | |
|---|---|---|---|
| **immediate** 96:22 | **incomplete** 97:3 101:13 106:15 108:10 110:24 | **individuals** 29:6 47:1,12 | **international** 127:21 |
| **immediately** 33:19 | **inconclusive** 47:14,19 48:1 49:1 50:16 51:13 71:17 75:20 76:1 | **infection** 16:20 73:13 74:9,15 | **interpretation** 63:14 |
| **impact** 44:16 | | **infectious** 99:7 118:14,23 | **introduce** 5:13 |
| **impacted** 44:22 56:17 | | **influenza** 16:21 | **inventory** 9:22 |
| **impacting** 96:5 | | **inform** 106:2 | **investigate** 96:24 97:5 |
| **implies** 31:8 | **inconsistent** 50:25 126:2 | **information** 27:19 80:9,13 115:5 | **involve** 112:24 |
| **important** 6:5 110:21 120:14 120:16 124:24 | **incorrect** 25:18 92:13 | **informed** 73:5 | **involved** 11:22 17:25 27:8,10 29:8 36:1 37:8 111:20 |
| **impossible** 63:6 | **increase** 11:18 120:17 | **initial** 39:6 49:20 95:6 | **involvement** 18:3 60:20 103:21 |
| **improve** 88:19 88:22 92:22 112:19 113:8,16 119:2,9,20 121:20 | **increased** 28:10 31:13 | **initially** 17:23 111:21 | **iowa** 114:12,16 115:6,9,11,19 115:23 116:8,14 116:19 |
| | **increases** 56:4 | **input** 113:5 122:16 | |
| | **increasingly** 120:14,16 | **inquiries** 128:2 | |
| **improved** 113:6 115:14 122:2 | **independent** 3:22 100:1,6,14 100:18 105:3,10 105:17 | **inquiry** 85:4 127:3 | **irritated** 99:12 |
| **improvement** 85:8,14 | | **inside** 22:17 | **islands** 1:5 |
| **improvements** 88:15 92:21 | **independently** 61:1 | **instances** 124:17,18 126:20 | **issue** 33:21 40:6 44:20 49:15 50:4 51:16,18 53:16 55:15,17 56:19 57:2,5 66:23 67:8 68:19,20,21 76:16 77:2,4 78:10,13,16 82:9,10 83:2 86:25 109:19 126:17,24,25 127:13 128:6 |
| **improving** 122:14,25 | **india** 59:18,20 62:7 | **instructions** 122:19 | |
| **inactivated** 22:2 | **indian** 60:9,12 61:4 62:20,22 63:1 64:8 65:2,9 76:3 105:13 | **intended** 42:25 | |
| **include** 31:1 99:2 109:22 | | **interest** 88:3 91:23 135:19 | |
| **included** 32:12 41:25 123:24 | | **interesting** 104:12 | |
| **includes** 11:19 | **individual** 35:21 46:17 74:7 | **internal** 36:15 46:13 88:10 | |
| **including** 91:2 93:21 109:22 | | | |

**[issued - level]** Page 155

**issued** 112:18

**issues** 11:10 33:7 48:7,8,18 48:20 49:21 50:10 57:23 69:6 79:18 87:13,15 116:6 133:24

**issuing** 115:3

**ivd** 32:8 37:1,3 37:4

**j**

**james** 1:9

**jana** 115:19

**january** 17:14 111:21

**jennifer** 2:13

**jnp** 1:7

**job** 9:19 10:6,24 36:11

**johnson** 1:25 135:4,25

**joseph** 114:15

**journal** 20:7 102:20

**july** 86:1,1,16 87:5,10,11 88:8 125:12 128:15

**june** 129:12,21

**k**

**kc** 99:25

**keep** 24:14 104:12 107:11 129:15

**key** 106:3

**kim** 2:9

**kind** 6:3 34:19 82:9 98:19 122:12 129:15 130:9 133:17

**kit** 122:18

**knew** 28:3 49:10 94:12,16

**know** 6:3,17 7:22 15:22 20:14 22:19,21 23:12 27:6 29:7 30:7,10 35:20 36:9,10 38:3 41:2,17 43:10 43:25 46:2 49:9 50:13 52:1,8 56:22 57:3 58:10,19 59:19 60:15,25 61:18 62:19,21 64:14 64:20 71:12,14 72:12 80:17,24 81:16 84:12,15 86:8,17 87:21 88:2,17,18 89:2 89:15 90:14 94:15,20 96:22 100:13,22 101:16,19 103:15 104:19 106:25 108:24 109:18 110:21 111:1,2 112:13

112:22 113:20 115:19 117:4 118:19 119:8 120:20 121:14 121:18,23 122:5 122:6 125:8 128:16 129:23 130:3,4,6 132:17 134:16

**knowing** 39:8

**knowledge** 35:21 102:22

**kobre** 2:9

**kobrekim.com** 2:11

**kosovo** 127:22

**kyle** 92:2

**l**

**l** 5:23

**lab** 9:25 15:24 47:7 92:3

**labor** 130:7 134:13

**laboratories** 53:2 79:2,4 99:17 116:1

**laboratory** 9:18 9:20,23 10:7,9 10:16,18,25,25 11:2,3,4,12 24:11 38:9 46:22 47:5 58:13 62:1 72:20 76:24 77:7,17,19,22

82:3 83:15 109:7

**labs** 61:10 86:2 116:3,14

**lack** 94:17

**lake** 65:16 89:15 89:18,20 93:1 101:5 102:8,18 102:25 133:8 135:3

**large** 53:12 133:20

**late** 51:21 56:15 56:16,22 57:8 57:12,16,20 74:14 130:8

**laura** 82:3

**law** 5:10

**lawyer** 7:11,14

**lead** 67:5 69:2,7 74:13 82:21 83:21 113:5 121:6

**leads** 68:4

**leave** 112:8

**led** 57:8

**left** 9:7 112:11

**legal** 108:19 136:23

**leroy** 30:19

**level** 15:7 42:25 44:9 51:9,17,19 51:21,23 52:1,6 52:11 54:22 56:14 57:2 60:6

**[level - looked]** Page 156

66:8 67:14 69:1
69:7 70:21 71:9
97:16 98:15
**licenses** 8:21
**life** 15:23 48:10
48:23,25 49:22
50:11,12 53:17
54:5,7,12 58:12
76:14 95:12
**liked** 87:22
**likely** 34:7 39:6
78:10 87:1
113:3
**limit** 12:6,11,12
12:15,17,19
13:2,14 24:2,18
25:18,20 26:11
32:9 42:8,11,13
42:18,18,21
43:2,6,7 51:13
51:25 56:17,23
57:8,13,22,24
64:4 66:6,12,18
87:19,22,24
88:11,14,15,22
89:3,7,12 90:3
93:13,21 94:2,4
96:4,7,8 98:3,5
98:16,23,25
99:5,6 105:24
106:1,12,22
107:1,2 112:15
112:19,23 113:9
115:3 121:21
122:25 123:13

132:11
**limited** 1:5 5:12
**line** 31:1 46:8
62:11,14 81:7
107:18 115:15
125:17 137:4,7
137:10,13,16,19
**lines** 63:1
**link** 90:23 96:2
**list** 16:13
**listed** 19:9 34:23
**listing** 50:3
**little** 7:24 30:25
36:10,10 54:12
54:17,24 77:23
91:7 93:5 103:8
105:20 107:17
**live** 22:3
**llp** 2:4,9
**load** 28:12
44:25 56:9
66:17 98:3 99:7
118:13
**loads** 43:24
44:17 118:21
**located** 9:10
**lod** 24:16 25:3,6
25:7,7,11 26:1,1
26:6,15,15,17
39:17 41:23,24
43:21,21,22,23
44:5,6,13,15,22
51:9 52:6 56:14
57:17 63:19
88:7 91:1 92:21

92:22 93:7 94:8
94:9,9,13,17,18
94:21,22,24
95:3,4,5,6,11,17
95:22,24 96:3
96:13,22 99:11
105:25 106:2,9
106:9 112:23
113:8,8,11,17
114:23,23 115:5
116:7,14,14,18
116:20 117:15
117:17,18 118:8
119:2,9,20
120:9,14,22
121:25 122:2,11
122:14 131:4,19
131:22,23,25
132:16 134:2
**lodge** 6:9
**lods** 43:16
**logix** 7:22 18:9
22:5 24:2 26:14
27:5 28:21
32:16,24 35:12
36:6 37:9 38:13
41:16 43:2
44:12,15 46:25
48:24 49:5
51:14 53:5,7
57:9,21,22,24
59:16 60:13
64:9 66:19 73:3
73:9,12 74:8
76:13 78:11

79:9 87:20
88:11,23 89:11
92:24 93:2 96:4
100:15 101:2
105:8 106:8
109:2 110:2,5
111:17 112:15
112:20 115:4
116:8,19 119:10
119:22 121:12
121:16,21 124:1
125:22 129:12
130:1 133:10
**long** 7:6 22:4
101:22 103:8
104:11
**longer** 112:10
**look** 7:17,20
13:4,16 20:9,20
22:25 23:11
30:7 31:4 37:20
38:2 45:3 46:1
51:7 61:12,17
67:5 72:12
80:23 81:10
84:1 86:22
90:13 103:14
104:7,24 113:25
117:4 118:21
125:8 126:19
130:15
**looked** 13:6
53:15 57:11
60:23 72:2 75:4
77:9 104:2

**[looked - mathematically]**

109:6 112:14 114:10 123:3 126:19

**looking** 17:22 19:17 20:2,5 29:14 55:6,9,16 71:4 73:6,9 82:24,24 95:21 100:9 105:13 123:9 133:1 134:2

**looks** 24:24 30:15 33:15 38:6 47:20 72:23 74:18 84:16 85:24 87:9,12

**lot** 25:5,18 26:23 29:18 50:23,24 51:20 54:18 57:3 64:15 67:8 71:19 76:21,22 76:23 77:25 78:13,20,21 86:15 87:2 97:18 99:16,20 131:4 132:17

**lots** 77:9

**low** 51:17,19,23 52:1,11 54:22 56:10 57:2 67:14 69:1,7 70:21 71:9 118:8,13

**lower** 23:21 30:25 43:6,24 43:24 44:10 64:4,11 66:12 66:18 87:22,24 89:3,7 94:22 95:24 96:12 98:5,16,23 99:4 99:6 112:23

**lowest** 12:12 42:8 66:18

**lucigen** 9:9

**m**

**m2000** 117:16

**made** 9:12 28:16,20 29:2 32:15,24 34:4 34:11 35:14,25 38:16 39:9 53:1 53:20 55:25 85:25 94:9 123:2 138:5

**madison** 9:10 24:6,10,11,13 25:2,17 38:19 92:2 115:20

**maintained** 78:16

**maintenance** 80:10

**major** 8:7

**make** 6:25 7:2 21:25 26:6 29:17 32:10 35:20 38:15,18

53:9 55:1,8,21 67:19 78:6 84:5 95:7,8 101:8 116:4 122:21,24

**makes** 77:12

**making** 6:12 11:6 16:20,22 16:25 26:10 67:5 79:9 92:23 96:16

**malaria** 18:23

**management** 34:8 79:25 88:3 112:2

**manager** 10:17 11:3

**managing** 9:22 9:22

**manufactured** 20:25

**manufacturers** 131:15

**manufacturing** 11:14,17 127:1

**march** 46:6 54:3 85:8,17 88:8 111:22 129:21

**marcus** 2:4 5:10

**marisa** 136:1

**marissa** 2:14 5:15 84:3

**mark** 29:22 38:19,23 39:1,5 39:22 45:10 61:13 72:7

79:22,24 90:9 116:25 130:11

**marked** 23:7 29:23 37:23 45:11 61:14 72:8 80:25 84:9 90:10 103:3,4 103:18 114:2 117:1 125:5 130:12

**market** 31:7 43:5 124:21

**marketing** 32:8 88:24,25 113:17 119:2,10,20 120:19

**marking** 36:22 36:24 37:9 80:23 83:25 113:25

**maskaf** 85:19

**master's** 8:20

**masters** 8:12

**match** 110:22

**matched** 94:7 95:7

**matching** 54:8

**material** 16:23 22:1,2 132:2,2

**materials** 11:7 21:6,21 120:11 130:23,25 131:8 131:17

**mathematically** 63:7

**[matter - mnrlawfirm.com]**

**matter**  66:5,11
**mean**  12:1,11
  14:3 15:5 21:18
  27:22 40:20
  42:17 43:19,23
  47:18 50:2
  58:21 60:3
  73:19 79:3
  81:25 85:1
  86:22 89:8
  120:6 132:21
**meaning**  48:2
**means**  16:6,16
  37:5 42:4 52:9
  58:19 65:1
  73:17 98:10
  119:15
**meant**  40:7 64:1
**measure**  12:20
  13:11 16:25
  17:4 42:23,25
**measurements**
  16:9
**measures**  13:10
  34:2
**measuring**
  42:24 55:20
**medical**  62:22
**medicals**  72:16
**meet**  7:13
**meeting**  17:19
  126:9
**members**
  111:25

**memo**  38:18
**memory**  33:6
**mention**  108:17
**mentioned**
  11:22 16:2,2,4
  16:13 42:8
  56:13 130:23
**mentioning**
  48:14
**mentions**  82:13
**merit**  96:25
**messages**
  129:24
**met**  7:11
**method**  93:17
**methodologies**
  29:19
**metric**  106:2
**metrics**  15:22
  58:9 106:3
**mexico**  127:23
**miami**  2:6,10
**michael**  2:8
**michael.fasano**
  2:11
**microbacterium**
  18:17
**middle**  7:6
  43:16,19 44:12
  106:8
**mind**  24:14
  53:19
**ministry**  85:18
**minute**  59:5

**minutes**  59:8
  102:1
**mischaracteri...**
  109:16 110:9
**misidentify**
  16:18
**misleading**
  108:17
**missed**  73:11,13
  74:5,9 76:9
**misstates**  26:19
  57:14,15 64:12
  75:22 79:12
  110:25 113:18
  118:16 119:4,11
  128:8 132:13
  133:4,14
**misstating**
  119:7
**mistakes**  78:7
**misunderstan...**
  66:3
**ml**  132:6
**mm**  5:22 8:2 9:2
  9:16,21 11:2,24
  12:12 13:5,18
  16:7,15 17:9,13
  17:18 18:16
  19:14,24 21:15
  24:4,9,23 25:13
  26:2,4 30:24
  33:11,14,17,23
  35:4 36:23
  38:20,22,24
  40:5,21,24

  41:20 42:1,3,7
  44:8,14 45:20
  46:7,9 47:15,17
  48:12 49:9 51:5
  52:17,20,23
  54:2,6 55:18
  58:4,20 60:15
  61:23 62:18
  63:24 64:24
  65:4,6,10,22
  66:2 67:23 69:5
  69:15 70:12
  71:22 73:1,18
  74:6,11,20 75:1
  75:3,6,21 76:2,6
  76:10 78:24
  79:11 80:5 81:9
  81:13 84:25
  85:3,5,10,16,21
  86:3,5 90:20,24
  91:6,15 93:9
  96:19 97:21,25
  98:8 100:3
  101:7 102:10,15
  104:15 106:6,18
  107:25 109:9,12
  111:19 112:17
  115:1,8 116:17
  117:12,21 119:3
  121:9 124:5
  127:7,19 130:20
  131:2,6 132:9
  132:25 133:3
**mnrlawfirm.c...**
  2:6

**[modifications - o0o]**                                   Page 159

**modifications**
   113:3
**modifier**   14:13
**months**   9:11
   10:17,20 118:6
**morning**   114:16
**mosquito**   18:7
   18:24 19:1,2,3
   116:1
**mosquitoes**
   18:25
**mosquitos**   19:5
**mountain**
   125:15,16
   128:14
**move**   9:8 17:6
   21:12 36:20
   58:1 71:24
**moved**   11:3
**mpeirsol**   2:16
   136:2
**mri**   100:1,4,14
   100:20 101:1
**multiple**   19:24
   29:19 59:20
   91:12,13 126:21
**multiplexing**
   21:8
**murphy**   1:9
**muster**   15:12

**n**

**n**   2:1 3:1 5:2
**name**   5:10,21,23
   45:19 84:24
   135:23

**named**   24:6
   30:18 125:14
**names**   87:2
**narrow**   20:20
**nasal**   21:23,24
**natural**   14:25
**nature**   22:9
**ncov**   24:16 73:3
**ndu**   132:6
**near**   117:18
   120:22
**nebraska**
   117:17,25
   120:22 133:9
**necessarily**
   26:22 43:25
   64:3 69:23
   81:24 88:16
   89:8 92:4 107:1
   116:2 118:8
   120:1 121:24
   122:20,23
   132:21
**necessary**   33:21
   138:6
**need**   7:4,5 38:18
   50:6 91:11,12
   93:6 95:17
   99:10 107:7,8
   111:1 118:20
   120:11 126:18
   134:16
**needed**   11:7
   39:3,4 53:15
   76:23 91:10

   92:6 99:20
**needing**   115:18
   115:23
**needs**   12:20
   91:9
**neg**   73:6
**negative**   21:24
   21:25 40:25
   41:3,5,6,13,19
   48:3 52:15
   55:12 64:10
   65:25 66:20
   71:17 79:19
**negatives**   40:16
   40:17,24 41:5,9
   41:12
**neiman**   2:4 5:11
**nelson**   1:9
**nervous**   36:10
**never**   18:22
   57:16 66:19
   76:21 102:21
**new**   11:19 50:2
   50:23,24 76:22
   122:10,18,20
   124:9 130:3
**news**   17:20 96:2
**nice**   131:18
**nine**   121:12,16
**nods**   22:16
**nonconforming**
   80:9
**nonscientist**
   12:10 42:6

**nonspecific**   67:2
   67:11,20,21
   68:17,25 69:8
   69:17,20 70:2,6
   70:8,17,21 71:2
   71:15 72:1
   126:4
**nope**   8:22 85:12
   85:23
**normally**   24:18
**north**   19:1,2,3
**notary**   138:13
   138:19
**note**   107:5
   136:10
**noted**   138:7
**notes**   135:12
**notice**   90:25
**novel**   17:21 78:1
   78:2
**nuance**   15:13
**nuanced**   98:19
**nucleic**   16:23
   68:8
**number**   26:3,11
   40:25 41:5,10
   41:13 47:25
   53:10 86:23
**numbers**   25:3
   25:11,25

**o**

**o**   5:2
**o0o**   4:3 5:3
   134:22

**[oath - pandemic]**

**oath** 6:18 135:9
**objection** 6:11
26:19 29:4
35:16 43:8
57:14 64:12
75:22 79:12
97:2,2 101:13
106:15,24
108:10,19
109:16 110:9,24
113:18 118:16
119:4,11,24
128:8 132:13
133:4,14
**objections** 6:10
6:12
**obtain** 53:2
**occasionally**
27:11
**occur** 70:3,6
**occurred** 86:9
86:16
**occurring**
128:19
**occurs** 80:14
**offer** 9:12
120:12
**offering** 113:13
120:12
**oh** 2:15 40:11
76:16 86:1
94:23
**okay** 6:2,14,17
6:21 7:8,9,13,16
7:19,24 8:13,19

8:23 9:14 10:10
12:9 14:13 16:1
16:12 17:6,10
19:11 21:13
22:24 23:4,14
23:14,15 24:1
24:13 26:22
27:2,8 28:19,24
29:21 30:5,9,13
30:17 32:1
34:25 36:5,20
37:16,25 38:4,4
38:5,7,17 39:12
41:15 43:1,17
44:11 45:2,9
46:1,3,3,4 47:10
50:14 51:2
53:22 57:6 58:1
58:10 59:4,10
60:2,8 61:12,19
61:19 62:3,6,10
63:4 65:10,19
69:13 70:11,13
71:19 72:6,14
72:15 74:17
77:12 78:19
79:6,21 80:12
81:2,2,20 84:7
84:14,18 85:6
86:19 87:8,13
88:9 89:23 90:8
90:13,16 92:10
92:15 93:4
95:15 96:1 97:4
101:4 102:3,23

103:2,16,16
104:3,7,21
105:12 106:11
107:10,17 111:8
112:8,14,18
113:24 114:1
116:24 117:6,6
118:25 120:20
121:1,19 122:24
123:15 124:16
125:1,3,10,11
126:18 129:1,4
129:9 130:17
132:5 134:1,10
**old** 122:9
**once** 57:4
**ones** 11:5 32:5
41:4 85:6 92:3
96:11
**ooooo** 1:3 2:19
**operating** 34:22
**opinion** 63:5
119:15,16
**opportunity**
131:3
**opted** 130:25
**options** 104:19
**oral** 135:15
**order** 12:21
20:21 77:6 95:7
**orders** 134:17
**organism** 16:18
19:17,18,19
20:1

**organisms**
13:25 19:20
20:2,6
**original** 122:10
124:6
**outside** 42:16
58:13
**overall** 133:24
**overlapping**
28:7
**overloaded**
80:21 86:12
**oversaw** 11:17
18:4,8
**overseeing**
11:13 134:2
**overseen** 18:11
**own** 93:15 99:1
104:17 105:14

**p**

**p** 2:1,1 5:2,23
**p.m.** 1:20,20 5:1
134:21
**pack** 43:16,19
44:13 106:8
**page** 3:2,6 23:16
30:12,18 31:12
103:10,11
105:23 137:4,7
137:10,13,16,19
**pages** 103:13
107:7
**paid** 10:9
**pandemic** 17:17
22:9 29:16

**[pandemic - pieces]**                                    Page 161

44:18 97:9
**panel**  131:14
**paper**  91:10,18
  91:24 92:5,7,12
  92:16 100:2
  102:13,17,19,23
**papers**  91:13
  94:18
**paragraph**
  39:14 41:22
  63:5 105:21
**parentheses**
  39:21
**part**  12:3 22:8
  53:10 119:1
**participated**
  121:15
**participating**
  130:24
**particular**  43:9
**parties**  89:10
  135:18
**parts**  27:12
**party**  26:13
  84:24
**pass**  15:11
  73:23 134:8
**passing**  62:16
  62:24 76:4
**past**  63:20
  101:18
**patented**  31:15
**path**  60:15
**patient**  21:24
  24:20 25:6 27:5

49:6 58:16
  65:24 66:17
  117:25
**patients**  14:12
  44:25 47:8
  118:22
**pcr**  14:23 52:25
  55:5,7,19,19,21
  66:23,25 67:4
  67:25 68:4 73:3
  73:4 76:21
  77:23 78:1,3,6,6
  78:8 99:18,20
  120:10
**pdf**  84:5
**peirsol**  2:14
  5:15 26:19
  35:16 43:8
  57:14 64:12
  75:22 79:12
  84:7 97:2
  101:13,21,24
  102:3 106:15,24
  107:4 108:10,19
  109:16 110:9,24
  113:18 118:16
  119:4,11,24
  128:8 132:13
  133:14 134:8,9
  134:18 136:1
**people**  20:8 29:9
  46:23 54:19
  76:22 79:9
  115:25 123:7,12
  123:12

**percent**  12:15
  12:17 35:6
  42:10,11,18,20
  42:21,23 74:13
  78:12 98:21
  105:9,9,16,19
  108:3,5 109:3
  109:10,14
  110:19 118:12
  118:15,19
**percentage**
  12:14 98:4,20
  118:20
**perfect**  59:6
**perform**  13:17
  24:16 58:12
  61:5,6 89:12
  91:2 132:19,21
**performance**
  3:20 12:5 13:3,7
  13:8,12,13 14:2
  15:16 16:1,13
  21:6 27:24 31:8
  31:15,21,25
  32:2,11,15
  35:12,25 42:24
  44:16,22 50:25
  53:20 54:14
  58:8,9,11 60:1,5
  69:11 90:4 96:5
  99:3 105:2
  109:23 113:9
  115:13 133:25
**performed**  12:4
  50:12 53:8,12

53:17 54:5,24
  73:7 76:13
  97:16 101:9
  133:19,21
**performing**
  9:23 63:2 75:19
  76:20 89:9
  110:6
**performs**  13:10
  13:16 15:22
  41:17 47:7
  50:13
**period**  126:22
**person**  27:25
  47:21 71:14
**personally**  29:5
  29:7
**personnel**  34:16
**peru**  127:22
**phd**  106:1
**phone**  129:17
  129:20,25 130:4
**phrase**  11:21
**pick**  21:3,4
  43:23 70:22
  74:14 118:1,2
  119:21,22,23
**picking**  133:10
  133:11,17
**picture**  13:12
  16:10 133:23
**piece**  55:8 66:4
  133:9
**pieces**  52:24
  126:16

**[piersol - procedure]**

**piersol** 5:16 133:4

**pineiro** 2:4 5:11

**place** 34:14 35:1 35:6 51:24 101:17 135:8

**placed** 65:14,18 135:9

**plaintiff** 1:6 2:3 5:12

**plan** 33:21

**plate** 80:20

**platform** 31:15

**players** 120:13

**please** 5:21 64:17 90:22

**plenty** 44:19 89:6

**point** 20:9 25:4 31:4 33:20 50:23 53:23 56:1 71:16 73:23 89:21 104:20 106:4 112:9 120:11 131:5

**points** 31:2 33:16 112:21 133:13,20

**polymerase** 68:5

**poor** 21:19 109:20,21,22

**poorly** 89:12 110:6

**pop** 23:2

**pos** 73:6

**position** 62:8

**positive** 12:21 16:22 17:1 24:17 35:5 41:3 41:9,11,11,13 41:14,18 48:2 51:9 52:6 55:11 56:14 63:22 64:10 65:25 66:20 67:3,10 67:14,15,16 68:15 69:1,7,22 69:22 71:5,9,9 73:25 79:18 82:7,21 83:16 83:22 118:1,5,5 127:22

**positives** 40:17 40:17 41:8,10 70:22,23 73:10 73:11 74:5 76:8 81:8 83:13,17 114:20 119:21 126:5

**positivity** 96:12

**possibilities** 50:4 51:15 56:20

**possibility** 56:19

**possible** 42:5 51:12 56:16 67:21 88:15

**potential** 63:21 113:1 133:24

**potentially** 22:3 27:25 66:4 69:23 71:4 89:4 92:23 113:1 120:10 126:3

**precision** 12:7 13:21,23 16:4,6 16:7 39:16

**predict** 64:10 66:20

**preparation** 7:14,20 15:10

**prepare** 7:9 107:12,14

**preparing** 21:20 103:22

**present** 19:20 20:6 29:15 42:9 55:6 67:7 110:18 118:7

**preserve** 129:6

**press** 27:9,12,17 28:14 34:17 103:10,11,17,22 103:24 104:2,4 104:8 106:22 107:12,15,18 108:16 109:1 111:8,10 112:14 112:18 114:9 115:3 117:11

**pretty** 62:20 92:20

**prevent** 33:21

**preventative** 34:2

**prevented** 92:8 92:13

**preventive** 34:6 80:8

**price** 104:13

**primary** 119:1,9

**primer** 20:15 52:19,22,23 68:7,17,19,20 68:24 69:3,7 82:14,18

**primers** 52:24 53:2 68:8

**printed** 62:15

**prior** 36:4

**probably** 9:11 10:17,20 21:19 28:1 52:15 63:3 83:7 86:15,17 88:8 97:12 102:1 118:20 126:7,9

**problem** 50:17 52:14 56:17,23 65:2 68:24 69:3 78:11 127:16

**problems** 57:12 128:18

**procedure** 34:23,24 35:1 52:18

**[procedures - ran]** Page 163

**procedures**
76:24 77:7
93:15
**proceed** 126:10
**proceedings**
135:7,11,15
**process** 12:3
19:8,10,12
21:11 27:3
29:14 111:18
127:1
**processes** 22:22
**product** 10:21
11:13 12:3,6
28:5 29:3 32:8,8
32:10 37:3,5,13
37:20 38:14,16
39:8 50:7 55:7
57:4 58:14
61:25 68:1,2,11
76:17 77:1 78:7
78:14,17 97:18
109:24 110:18
112:25 122:1,2
122:3,20 123:7
123:18 124:1
127:1
**production**
11:18
**products** 9:24
11:16 18:22
19:1 31:7 32:5
32:12 47:6
50:24 78:4 80:9
123:9,17,21

124:1
**professional**
31:23 135:5
**program** 80:4
**projects** 22:11
**promise** 129:2
**promoted** 10:16
10:18,21 11:12
**pronounce**
45:21
**proportion**
86:18
**proprietary**
20:15
**protocol** 34:9
50:22 80:12
121:5 132:1
**protocols** 11:8
116:4
**prove** 123:4
**provide** 113:13
**provided** 11:7
96:9
**provides** 47:8
90:23
**public** 34:12
35:3 138:19
**publications**
91:3
**publicly** 53:1
**publish** 92:2
102:20
**published** 89:21
91:11 92:7,12
92:19 102:22

113:11
**publishing**
91:23,25 92:16
**pull** 22:10 23:1
95:15 116:11
**pulled** 36:8
**punitive** 5:12
**pure** 21:7
**purpose** 46:16
88:20,21
**purposes** 84:4
113:17 119:2,10
119:20 120:19
122:25
**put** 35:1,6 38:11
39:21 63:20
80:15 85:19
121:5

**q**

**qt9** 74:24 79:24
79:25 80:13,15
84:17,21,22
85:2,4 87:16
**qualifier** 89:1
**quality** 9:25
11:10 34:8
79:25 80:11
109:19
**quantification**
73:21
**quantify** 120:10
**quell** 131:4
**question** 6:5 7:7
14:7,8 23:1,13
25:13,24 35:10

35:19 39:22
40:11 43:13
44:3 46:17 49:4
49:18 53:7,9
57:10,19 58:17
64:17,25 65:20
66:13 67:19
72:13 83:24
96:3 108:25
109:20 111:14
118:10 128:20
**questioning**
97:10
**questions** 8:1
29:12 30:11
43:2 77:14
84:13 90:15
129:3 130:16
134:7,9
**quick** 84:1
101:21
**quicker** 22:14
**quickly** 22:18
22:20
**quite** 39:24 58:3
65:20
**quote** 31:5
100:16
**quotes** 31:13

**r**

**r** 2:1 5:2 137:3,3
**r&d** 123:3
**raised** 87:15
**ran** 114:23
116:14 117:14

**[random - referring]**

| | | | |
|---|---|---|---|
| **random** 48:6 50:9,15 67:4 | **real** 15:23 24:15 24:19 44:16 | **rebecca** 51:7 61:21 90:22 | **recently** 46:18 104:5 |
| **randomness** 111:4 | 48:10,23,25 49:22 50:11 | 92:2 | **recess** 59:11 102:5 |
| **rashbaum** 2:4 5:11 | 53:17 54:5,7,12 58:12 73:3 | **recall** 17:15,18 27:2,4,6 28:17 | **recognize** 30:14 |
| **rate** 42:22 96:12 | 76:14 89:9,13 95:12 | 28:19 29:3 30:16 33:4 34:5 | **recollect** 28:22 82:4 |
| **rather** 15:17,21 15:23 17:2 25:7 | **realized** 36:11 | 34:25 36:3,15 36:18,19 37:19 | **recollection** 32:21 50:20 |
| 50:17 78:11 | **really** 12:25 29:16 32:18 | 46:13 56:25 57:7,12,20 61:7 | **record** 5:9,14,21 6:13 35:17 |
| **raw** 61:2 | 40:11 48:19 | 72:4 75:7,10,12 | 57:15 84:3 |
| **rdrp** 124:6 | 51:21 53:14 | 75:15 81:22,23 | 107:4 135:15 |
| **reach** 36:16 | 68:9 70:3 92:4 | 81:24 82:1,10 | **records** 38:25 |
| **reaching** 36:12 99:15 | 99:1,18,20 110:3 123:8 | 88:4 91:16 92:15 96:16 | **redaction** 51:8 **reduce** 68:17 |
| **reachout** 35:1 | **realm** 56:20 | 102:16 103:1 | **reed** 1:10 |
| **react** 16:21 | **realtime** 80:13 | 111:9,12 116:18 | **reference** 73:10 |
| **reaction** 68:5 | **reanalyzed** 61:2 | 116:22,22 | 120:10 131:13 |
| 75:13,15 96:22 | **rear** 36:8 | 117:22,23 | 132:1,2 |
| 113:5 115:22 | **reason** 13:9 | 121:13,20,22 | **referenced** |
| **reactions** 14:23 | 14:15 22:8 26:4 | 122:6 128:10,17 | 31:20 62:25 |
| **reactivity** 12:7 | 71:1 77:14,21 | 128:21,25 129:5 | 102:24 136:6 |
| 13:24 16:14,25 | 80:19 83:19 | 129:8 | **referencing** |
| **reacts** 13:25 | 100:19,22 104:4 | **receipt** 136:18 | 38:11 60:10 |
| **read** 84:6 | 113:16,21 119:1 | **received** 35:13 | **referred** 73:21 |
| 103:12 134:19 | 119:9 136:11 | 53:24 75:13 | **referring** 27:14 |
| 136:9 138:5 | 137:6,9,12,15 | 96:1,21 101:5 | 48:17,20 62:24 |
| **reading** 33:5 | 137:18,21 | 115:5 130:24 | 78:25 79:1,2 |
| 52:5 127:10 | **reasonable** 70:1 | 131:8 | 86:12 89:19 |
| **ready** 23:12 | 70:10 | **receiving** 76:12 | 93:11 95:10 |
| 30:8,11 38:3 | **reasons** 100:24 | 81:22 115:17 | 105:15 120:23 |
| 46:2 61:18 | 101:3 110:6 | 117:22,23 | 122:9 123:17 |
| 72:12 80:24 | 113:22 | 121:19 127:3 | 128:7 131:12 |
| 84:12,14 90:14 | | 129:5 | |
| 117:5 125:9 | | | |

**[refers - result]**

**refers** 86:24
**refresh** 32:21
**refreshed** 33:6
**regarding** 32:24
88:10 93:1
**regards** 73:2
**region** 19:16
**regions** 19:15
20:3,7 82:19
83:23
**registered** 135:5
**regularly**
104:16
**regulations** 28:4
32:7
**regulatory**
11:10 28:3
31:23 34:15
35:2 36:25 39:2
**related** 7:22
27:24 29:2 63:3
69:17 85:18
129:11,25
**relative** 91:1
135:18
**relatively** 78:1,2
**release** 27:12
34:17 103:10,11
103:17,22,24
104:4 106:22
107:12,15,18
108:16 109:1
111:8,10 112:14
112:18 114:10
115:3 117:11

**releases** 3:20
27:9,17 28:14
104:2,8 105:1
**relevance** 44:2
99:4,6 118:9
**relevant** 106:4
**reliable** 16:8
**reliably** 12:13
42:10 66:7,12
70:4
**remarking**
105:21,24
**remember**
17:19,24 27:13
28:24 29:10
33:6 35:4 45:23
45:25 49:14
52:3,11 59:16
59:21,23 60:8
60:13,18 61:5,9
71:24 76:11
82:5,6 85:11,15
85:22 87:3,14
87:17,18 88:6,9
88:13 89:23,25
90:1,4 91:20
92:17,17,25
93:3 99:15
100:7 104:4
115:9,11,12,16
115:17,18,22
116:7 121:10
123:12,15 127:3
127:11 128:2,5

**remove** 63:21
**rep** 81:15
**repeat** 52:18
**repeatability**
16:9
**repeatedly**
107:21 108:3
109:2 110:19
**replicates** 47:25
**replied** 24:13,25
126:6,8 132:5
**reply** 93:5 99:10
131:7
**report** 17:21
37:12 38:19,23
39:5,6 84:20
**reported** 1:25
40:23
**reporter** 6:4
134:5,16 135:5
135:6
**reporter's** 135:1
**reporting** 1:16
**reports** 11:9
37:13 126:21
**represent** 48:10
109:23 119:15
**representation**
110:23
**representations**
32:24
**represented**
48:23
**reproducibility**
13:22 16:10

**request** 34:10
124:21
**requested**
135:20,22
**required** 138:13
**research** 32:4,5
37:6 53:4 89:4
**resnova** 85:7
**resolve** 49:17
77:4
**resolved** 49:19
128:6
**resources** 22:10
**resp** 84:23
**respiratory**
16:19
**responded**
127:18
**responding**
124:20
**response** 24:6
33:12,16 91:12
102:13,17,24
**responses** 91:12
**responsibilities**
9:19,22 28:8
**responsibility**
10:24
**responsible**
28:2
**rest** 56:15
**restructuring**
62:8
**result** 41:6,10
41:12 51:19

**[result - samples]**

55:11,13 62:8 65:17 67:2,3,10 68:15 69:22 71:5,17 73:25 74:13 82:21 83:6,22 97:17 125:22

**resulted**   74:4

**results**   16:8 38:9 39:16 46:8 46:11 47:11,13 48:25 49:3,6,7 49:12,22 50:6,8 50:16 51:1,7,12 51:19 53:6,7,10 53:24 54:7,12 57:6,8,11,20 58:23 59:24 60:2,25 62:12 62:15 63:22 65:15 67:1,1,12 70:7,16 72:24 74:19 75:8,14 75:19,20 76:1 76:12,23 77:9 77:11 78:10 79:19 82:8,22 83:16 91:24 93:20 94:5 95:14 97:11 105:25 109:21 114:17 115:10 115:12 123:6,23 125:17 126:1,3 126:4 127:2

128:11,18 134:3

**return**   10:12,12 136:13,17

**returning**   10:4

**review**   27:12,18 27:20 28:13,15 34:11 35:2 62:22 107:7,8 135:20,21,22 136:7

**reviewed**   7:12 104:5

**revised**   80:6

**richard**   1:10

**ridiculously** 100:17

**right**   10:4 11:25 16:24 24:3,6,25 26:18 30:23 31:2 33:13,16 44:13 46:6 49:1 49:24 52:15 54:1,5,9,15 58:3 59:14 60:21 61:22 69:4 70:23 74:5 75:5 75:20 76:1,1,5,9 77:17 78:23 86:6 87:10,12 90:19 102:9,14 105:21 106:9 107:12 109:4,11 109:15 110:7,15 112:16 114:7,10 115:7 117:11

119:2,10,23 120:24 125:12 125:18 132:8,12 133:2,13 134:4

**rna**   118:6

**robust**   15:1,4,6

**role**   9:17,20 10:6,10,12 62:3 62:4 111:16

**roughly**   43:15 114:19

**row**   86:23

**rpr**   1:25 135:25

**rule**   82:15 127:15 133:19

**rules**   6:3

**rumblings** 131:4

**run**   45:6 49:22 49:23 52:14 59:17 60:13 61:9 101:1 114:18 116:19 131:22,24

**running**   48:24 49:5 77:18,22 77:23 131:23

**runs**   13:22

**ruo**   32:7,12,17 32:18

**rx**   72:16

**rxn**   122:15

**s**

**s**   2:1 3:5 5:2 137:3

**safety**   11:9

**sales**   81:15

**salt**   65:16 89:15 89:18,20 93:1 101:5 102:8,18 102:25 133:8 135:3

**sample**   14:25 15:9,14 21:20 21:20,22 25:6 41:2,4,18 48:2,3 54:19 55:10 66:1,18,20 69:10 79:19 122:16

**samples**   14:20 14:23 15:24 21:9,9,14 24:20 26:18 27:5 37:18,18 40:25 40:25 41:1,5,11 41:13,17,23,24 42:13 44:16 45:6 46:15,20 48:1,9,14,16,22 48:25 49:6,8,22 49:23 50:11,11 51:24 53:17 54:5,7,9,12,13 55:15 58:16 63:13 65:16,24 66:17 76:14

**[samples - selected]** Page 167

77:18,23 89:9
94:1 95:12,12
95:13,14 98:2
114:18 117:17
117:25 120:18
120:21 121:3
**sars** 123:21
**satisfy** 91:9
**satterfield** 1:10
51:3 52:13
88:14,16 90:18
90:21 91:17
92:18 93:5 96:2
97:23 102:12,12
106:1 107:19
111:15 114:6,14
116:13 117:8,13
119:19 121:2,2
**saw** 17:20 51:1
53:21 54:23
64:7 65:16
75:25,25 76:3,7
77:1 89:5
102:11
**saying** 15:21
25:3 45:18
46:24 48:13
49:21 53:23
64:7,15,23 65:8
65:11,24 66:3
66:16,21 68:12
70:14 71:8
73:25 76:8 83:1
91:1 98:12,13
98:22 100:7

106:19 113:11
116:8 118:14
119:9,19 134:3
**says** 23:6 31:1,5
31:7,13 33:18
33:20 38:17
39:15 40:16
41:22 48:5
52:18 63:11
64:16 72:19
73:2 77:19 81:7
85:8,14 91:8
99:25 104:25
105:21,24
107:19 109:1
114:22 116:13
120:21 121:2
122:15 130:21
131:3
**scale** 11:18
**scenario** 48:10
48:23
**scenarios** 58:12
**science** 8:15
35:2
**scientific** 112:2
**scientist** 26:14
96:20 97:11
110:14,17
132:24
**scientists** 34:10
34:10,15
**screen** 6:23 30:6
45:2 103:8

**scroll** 23:21
24:5,24 30:17
31:11 33:8 46:4
48:4 74:17 91:7
93:4 105:20
107:17
**search** 20:4
**second** 6:9
10:11 23:3 30:1
30:17 33:20
37:22 63:5
72:11 90:9
120:11
**secondly** 63:11
**section** 93:25
94:7,10
**see** 7:1 15:17,21
17:22 20:5 23:5
23:9,18,21,24
24:13,22 25:8
30:3,18 31:9,17
33:9,24 38:14
38:21 39:14,19
40:15 41:21
42:2 46:21 47:4
47:10,16 48:4
48:11 51:3,6,10
51:24 52:13,16
57:5 62:10,17
63:4,9,11,16,23
65:19 67:10
71:13 72:15,19
72:23 73:14
74:10,17,23
77:8 81:4 84:23

85:7,9,17,20
90:22,25 91:5
91:14 93:4
96:24 97:22
98:7 99:24
104:25 105:5,20
105:23 106:5
107:18,24
114:14,25
116:16 117:13
117:20 121:8
123:4 126:6,13
127:18,25
130:18,21 131:1
131:18 132:5
133:22
**seeing** 39:8
49:12 54:21,25
57:7 63:12 64:8
70:16 81:8
83:12,16,18
97:13 111:8
115:15 125:22
127:2
**seem** 55:1 89:17
**seems** 69:1
75:17 77:16
118:25
**seen** 48:8,17,20
51:20 54:8
63:12 75:18
77:12 103:17,19
103:20,24
**selected** 21:4

**[selecting - smart]**

**selecting** 20:11
**sell** 37:5 38:12
  104:21
**semi** 21:9,13
**send** 115:23
**sending** 121:3
**sense** 7:2 22:17
  31:24 32:2 55:1
**sensitive** 44:19
  89:6 98:6,19,23
  120:13
**sensitivity** 3:21
  13:18,19 14:3
  14:14,16,17,19
  14:19,22 15:4,5
  15:10,17,18
  16:3 25:15,16
  42:19 73:5,8,8
  98:1,5,16,17,18
  98:20,22,25
  105:3,9,16,19
  106:3 107:22
  108:3,5 109:3
  109:11,15
  110:20 113:2,6
  114:19 122:4
**sent** 21:1 39:7
  115:25 125:15
  130:23 131:14
  132:3 136:14
**sentence** 41:22
  99:24 108:9
  114:22
**separate** 19:1
  68:21,22,23

113:1,2
**september** 1:19
  5:1 132:10
  135:24 136:3
**sequence** 19:25
  20:1,5
**sequences** 19:19
  53:1
**serbin** 1:10
**serious** 127:23
**set** 12:14 39:3
  52:22,23 100:9
  135:8
**seth** 117:8
**sets** 52:19
**setting** 100:6
  115:25
**settles** 120:13
**seven** 87:10
  103:13 107:6
**several** 56:7
**shaped** 63:7
**share** 6:22,23
  23:2,5 30:3,6
  45:2 103:7
**shebang** 99:2
**sheet** 136:11
**shipped** 78:14
**shoot** 116:6
**short** 126:22
**shorthand**
  135:5,12
**shortly** 104:1
**show** 29:21
  37:21 45:9,15

61:13 72:6
  79:21 80:22
  83:25 90:8 93:6
  95:17 103:2
  109:10,14
  113:24 116:24
  121:6 125:1
  130:5 133:7,19
**showed** 106:22
**showing** 17:1
  22:24 72:1
  75:20 76:19
  96:7 116:19
  133:21
**shown** 31:6
  76:17 133:18
**shows** 110:2,5
  133:9
**sic** 34:6
**sick** 46:17
**side** 26:9 76:16
  114:18,18
**sign** 134:19
  136:12
**signal** 56:1,2,4
  67:5
**signature**
  135:20,21,22,25
**signed** 136:20
**similar** 19:8,10
  25:14 49:7
  51:19 90:4
  126:21
**simple** 42:5

**simplest** 55:3
**simplified** 12:23
  14:4,9,23 16:5
**simplifying**
  12:25
**simulated** 25:7
  94:18
**single** 7:15 13:8
  39:16 54:19
  66:11 106:2
  123:24 132:20
**site** 39:16
**sitting** 52:2
  75:18 117:24
  128:5
**situation** 26:23
**six** 10:20 86:1
  87:10
**size** 113:5
**skirt** 32:7
**slammed** 29:16
**slc** 63:13
**slightly** 25:17
  36:7
**smaller** 53:13
**smart** 7:23 18:9
  19:2,3 22:5 24:2
  27:5 28:21
  32:16,25 35:12
  36:6 37:10
  38:13 41:16
  44:12,15 46:25
  48:24 49:5
  51:14 53:5,7
  57:21,22,24

**[smart - statements]**

59:16 60:14
64:9 66:19 73:3
76:13 78:11
79:9 87:20
88:11,23 89:11
92:24 93:2 96:4
100:15 101:2
105:8 106:8
109:2 110:3,5
111:17 112:15
112:20 115:4
116:8,19 119:10
119:22 121:12
121:16,21 124:2
125:22 129:12
130:1 133:10
**smart's** 26:14
43:2 44:15 57:9
**snuff** 77:8
**software** 20:16
79:25
**solutions** 1:16
136:23
**somebody** 78:6
115:12
**somewhat** 47:13
**son** 9:7
**sorry** 27:3 38:19
45:4 52:9 57:9
65:12 66:14
68:25 74:3
83:11 92:15
100:11 108:24
120:6 122:12
126:8 127:16

128:19 129:16
**sort** 10:1 11:20
14:3,21,23 15:1
15:11 17:22
19:14,24 21:7
22:10,22 25:14
25:21 26:5,11
27:6 28:3,11
29:14,17 33:6,7
35:7 36:7 39:2
40:6,8,13 42:16
42:21 43:20
50:3 52:4 54:21
54:22 58:10,15
58:16 60:6 61:2
66:24 77:10,12
79:5,17 80:16
80:20 81:23
88:3 94:11
99:21 104:12
111:19,20,23
112:3 116:3,5
118:21,23
121:24 122:18
123:20 126:18
133:23
**sorts** 12:8
**sound** 63:7
**sounds** 7:8
**south** 2:5,9
60:18 61:10
72:20,24 75:7,8
75:14 77:16,20
78:9,15 105:13
108:18 109:7

**speaking** 12:10
**specific** 31:1
34:5,22 49:2
57:3 69:2 71:2
72:4 78:13
81:24 97:18,18
104:3 111:12
118:21 121:22
122:6 128:25
**specifically**
13:19 32:3,11
53:3 87:4 89:16
92:1 99:21
100:8 115:11,16
122:15
**specificity** 3:21
13:19,20 14:10
14:15,22 15:10
15:17,18 16:3
17:4,5 31:6,8,13
98:2,16 105:3
105:10,17,19
106:3 107:22
108:4,6 109:3
109:11,15
110:20
**specimen** 14:25
**specimens** 73:7
**speculation**
119:25
**spell** 5:20
**spent** 71:19
**spike** 22:1
**spiking** 41:4

**sporadic** 83:16
**spreadsheet**
3:17 84:4
**stability** 78:17
**staff** 58:14
111:25
**stage** 25:17
**stages** 73:13
74:9,14 99:8
**stand** 106:4
**standard** 34:22
66:25
**star** 125:15,16
128:14
**stark** 24:6,10,11
**start** 14:2 17:22
21:3,8,11 22:24
23:16 50:1,1
55:22 61:20
77:1 90:17
**started** 9:6,14
10:19 18:5 62:1
102:19 111:22
**starting** 20:9
**state** 5:20 8:6
9:4,5 35:17
108:25 121:3,4
121:11,15 135:2
**statement** 95:16
101:9,11 105:7
106:12,14 108:1
110:18
**statements**
28:15 34:11
35:3

**states** 1:1
**statistical** 111:4
**step** 19:14 20:12 20:23 25:21
**steps** 77:6
**stick** 68:8,9
**stock** 104:13,17 104:19,21
**stop** 6:25
**strains** 24:15
**strictly** 98:14
**strike** 27:3
**structure** 68:16
**studies** 9:25 44:24 53:25,25 59:14,17,20,22 59:24 60:13,21 61:6,9 76:19 107:3 112:5,23 121:25 123:4 133:18
**study** 45:7 58:3 58:5,6 60:9,12 60:16 61:4 62:25 63:2 72:25 75:25 76:3,7 77:17 94:9,14,21 95:5 95:6,9,10,11,22 101:1 108:17,18 114:23 115:6 116:8,14,19 121:10,15 131:21,22,25,25 132:16 134:2

**stuff** 20:17 92:5 112:6 114:22 133:22
**subject** 46:8 62:11 72:19 81:7 114:12 125:17 132:17
**submission** 29:13 93:14
**submit** 15:8 122:1
**submitted** 37:14 37:16 38:12 93:19,20 94:18 131:8
**subscribed** 135:23 138:14
**subset** 53:13
**substance** 92:17
**substances** 91:21
**substantive** 8:1
**suggested** 93:18
**suggesting** 95:19 126:17
**suggestions** 85:8,14
**suggests** 55:10
**suite** 2:5,10
**summarize** 10:23 30:22
**summarizing** 46:11
**summary** 73:11 84:16,21

**sun** 76:25
**supervised** 131:24
**supervising** 11:6
**supervisor** 62:2
**support** 112:23
**supposed** 94:1
**sure** 6:25 11:6 16:20,22,25 17:13 21:25 22:6 26:10 34:22 35:7,20 36:18 38:15 39:25,25 40:7 47:12 60:23 62:20 67:19 69:9 72:3 92:20 101:23 103:19 115:21 116:4 128:24
**surprised** 45:20
**swab** 21:23,24
**swamped** 86:14
**sworn** 5:7 138:14
**synthesized** 21:1
**synthetic** 21:5 24:17,19 25:5 25:12,19 26:1 26:16,17
**system** 34:8 74:25

**systems** 8:15

**t**

**t** 3:5 137:3,3
**table** 40:15,23 47:21 131:5,16
**taillight** 36:9
**take** 8:25 20:20 22:4 23:11 30:7 38:2 46:1 59:8 61:17 72:11 80:23 84:1 90:13 101:21 103:14 113:25 117:4 125:8 130:15
**taken** 1:15,19 34:6 59:11 102:5 135:8,11
**talk** 91:8 93:8
**talked** 6:22 25:15 58:9 60:24 72:3 87:13 91:19 92:21 100:5 102:21 111:11 112:22 122:3
**talking** 17:6,7 31:20 43:9 48:16 52:4,10 57:7 58:2 59:14 60:21 65:8 69:16,19 92:16 102:8
**talks** 120:8,9 122:13

**[target - testing]** Page 171

**target** 12:13,16 13:25 19:15,16 19:23 20:3,11 42:9 44:9 55:6 55:10,13 67:7 68:12 71:3 82:19,23 83:20

**targeted** 123:25 124:4,6,9

**targeting** 83:20 83:23

**targets** 16:21,21 82:24 124:13,13

**team** 24:12 112:2

**teams** 11:11

**technical** 11:8 26:9 27:21,22 37:12,16 64:21 71:20

**technically** 122:19

**technician** 9:18 9:20 10:7,9,25 11:3 62:2

**technicians** 11:4 24:12 38:9

**technology** 6:24 20:15 31:6

**teleconference** 30:23

**telephonic** 73:6

**tell** 5:7 7:18 25:25 26:16 45:21 65:7 87:6

88:1 135:10

**telling** 25:11 133:12

**tells** 6:10

**temperatures** 68:4,10

**template** 24:17 24:19 26:16

**templates** 25:5 25:12,19

**term** 16:6 21:13 21:19 36:22 58:2,18 94:17 98:18

**terminology** 69:25

**terms** 17:11 40:22 42:5 80:3 111:16

**terrible** 130:7

**test** 3:20 12:22 13:10,13,16,25 14:5,11 15:16 15:22 16:8,18 17:1 18:1,5,6,9 18:11,17,19,22 18:23 19:2,7,12 21:5 22:5,12,14 22:15,18 24:2 27:5,5 28:21 31:14 32:16,25 34:12 35:13 36:6 37:6,10 38:13 41:7,17 42:16,24 43:9

43:24 44:5,5,12 46:14,20,21 47:1,2 48:7,24 49:5,21,22 50:12,17 51:14 52:25 53:5,8 54:4,15,25 56:23 57:13,21 57:22 58:8,12 58:12,19,22,24 58:25 59:1,3,16 60:5,14 63:2,6 64:9 66:5,7,11 66:19,19 67:25 70:22 71:18 72:1 74:4,14 75:19 76:13,20 78:8,11 79:7,10 82:15,18,18,22 83:17 87:20 88:14,23 89:6,8 89:11 90:4 92:23,24 93:2 96:21,22 97:15 98:4,15 100:15 100:21 101:2,9 105:1,8 106:8 109:2 110:3,5 111:3,17 112:16 112:20 113:2,4 115:4 116:9,9 116:19,21 117:16 118:1,2 118:5 119:2,10 119:23 121:4,12

121:16,21 122:10,10,25 123:21,22,23 124:4,6,9,12,13 128:18,19,23 129:12 130:1 131:15 132:11 132:16,19,20,22 133:8,10,11,19 133:21,25

**test's** 44:15,22 56:17 105:24

**tested** 41:6 46:20 48:2,3 50:24 73:7 118:4

**testified** 5:8 104:9 106:7

**testify** 35:17

**testifying** 35:20

**testimony** 26:20 44:11 50:14 54:11 78:9 79:13 94:16 113:15,19 118:17,25 119:5 119:12 128:9 133:15 135:15 136:9,18 138:8

**testing** 9:23 11:5,9,23 12:2,2 12:4,7 13:4 14:20 15:8,13 17:2,7 18:8,25 19:5 21:2,3,8,10

**[testing - timeframe]**

21:11,25 25:4
25:17,19 38:25
39:17,17 40:8
41:16 46:14
47:7,8,20,25
49:11 50:21,21
53:3,4,11 57:4
63:13 64:8,9
65:3,3,9,9 76:21
77:2 78:1,3,22
83:8 93:15,16
93:20,21 99:18
99:19 105:14
120:15,17 122:5
122:8,9,10
131:15

**tests** 18:15,20
18:25 19:4,5,9
22:7 25:22
32:12 35:3,15
36:1 43:4,6 44:7
46:24 50:22
62:15 66:23,25
67:8 77:23
78:14 82:22
83:18,22 91:2
92:24 97:13
107:20 109:13
119:22 121:12
121:17 123:24
128:15 131:4,17
132:18

**testutah** 89:22
96:11

**texts** 130:2
**thank** 5:15 84:7
134:10,12
**thanks** 51:6
102:3,4 131:19
**theoretically**
123:5
**thereof** 135:16
**thermo** 69:11
**thermocycler**
39:17 68:3
**thing** 10:1 11:20
22:23 24:14
34:23 44:2
58:16 68:22,23
76:25 112:3
116:5 118:23
133:16
**things** 12:6,8,24
12:25 15:15
16:19 22:20
27:24 28:4
29:17,18,20
30:16 32:4
36:13 39:13
42:17 43:18
51:20 56:7,8
64:15 65:17
66:24 68:14
69:12 70:20
71:21 72:5
77:10 79:15,16
80:4 83:9 92:22
97:9,15 104:12
112:1 122:7

123:4
**think** 16:12,24
17:3 21:14
34:18 35:18
40:11 42:7
44:11,17,18,19
44:21 50:21,23
53:22 57:23
59:23,24,25
60:5,16,18
63:12 64:7
65:11,11,12,13
65:23 66:4,15
66:22 69:24
70:10,17 76:15
77:12,25 81:18
86:24 88:24
89:5 91:19 92:9
92:11,12,13
95:13,22 96:6,9
96:10,11 97:12
98:11 99:12,13
99:17,19,23
100:8,16,17
102:19 106:7,18
108:1,2,16
109:18 111:25
112:21 118:14
120:23 123:2
127:11 129:8
132:15
**thinking** 51:17
88:18
**thinks** 65:15
67:1

**third** 6:17 26:13
41:22 89:10
**thought** 65:12
83:4 92:11
94:11 124:23
**three** 18:25
31:12 75:18
85:25 87:9 91:8
101:18 118:6
**threshold** 56:7
73:22,24
**throw** 53:14
**tielman** 73:2
**time** 7:5,15
10:11,19 12:17
16:9 22:6 28:9
36:7 39:25
42:20 44:25
45:7 53:24 54:4
55:20,25 59:9
71:19 73:3
76:20 78:22
80:17,18 92:4
92:20 93:22
94:11 95:14
96:16 97:9,12
97:14,14 101:22
104:11 115:21
118:12,15,19,20
121:5 126:22
130:6 133:7
134:11 135:8,9
136:19
**timeframe**
136:8

**[times - understanding]**    Page 173

**times** 7:13 25:18 29:19 72:3 84:24 114:23 115:5,24 116:9 116:15,20 122:14

**timpanogos** 96:10,10 99:13

**today** 6:4,18,25 7:14,20 75:18 105:13 109:6 117:24 119:1 128:5 129:12,25

**today's** 6:10 7:10

**told** 34:3 107:5

**tomorrow** 52:19

**ton** 99:18

**took** 34:2 51:23 63:18 82:10

**tool** 20:4

**tools** 11:6

**top** 23:16,17 33:9 38:17 51:2 61:7,11 97:20 120:21 127:17 128:4

**topic** 36:20 58:1

**tower** 2:5

**trading** 1:4 5:12 136:4 137:1 138:1

**train** 11:19

**trained** 58:13

**training** 11:19

**transcribed** 135:12

**transcript** 135:14 136:6,20 138:5,8

**transcription** 135:13

**transcripts** 136:15

**transitioning** 80:2

**translates** 24:19

**trash** 129:14

**traveled** 46:18

**treatment** 118:22

**trial** 21:12 100:8

**trials** 100:6

**tribune** 89:15 89:18,20 93:1 101:6 102:8,18 102:25 133:9

**trouble** 6:24 116:5

**troubleshoot** 82:9

**true** 14:25 40:16 40:17,24 41:5,9 41:10 70:23 71:9 118:12,15 118:19 135:14 138:8

**truly** 70:22

**trumps** 99:3

**trust** 69:21 71:11

**truth** 5:7,7,8 135:10,10,11

**try** 112:23 121:5

**trying** 15:8 22:20 29:17 45:16,23 64:20 64:21 65:12 83:9 127:11

**tube** 57:3,5

**tuberculosis** 18:17,18

**tune** 92:22

**turn** 59:24 60:3 60:3

**turned** 84:5

**two** 7:11 13:21 15:21 31:12 33:15 38:24 43:18 44:7 55:22 68:13 82:15 85:25 87:9 109:13 112:21 117:10 121:24 123:20 123:22 124:4,13 124:23 125:1

**type** 14:17 35:1 58:25 59:2 81:25 82:2 95:20 131:21,22

**types** 7:19 27:19 79:8 80:4 82:16

**typically** 12:14 27:16

**u**

**u** 5:23

**u.s.** 78:15 124:24

**uh** 45:24 94:19 109:5 110:16 120:25

**ul** 117:16

**ultimately** 99:3 127:8

**unable** 117:18 120:18,24

**uncommon** 116:2

**under** 6:18 11:4 76:25 84:23 135:9

**underlying** 50:17 96:24

**understand** 6:7 6:15,17 16:16 25:10 40:2 43:13,18 64:6 64:20,22 65:1,7 67:19 69:19 71:21 98:11 107:11 111:18

**understandable** 29:17

**understanding** 15:20 16:6

**[understanding - want]**                                    Page 174

18:14 31:19,22
32:14 63:25
65:21 73:16
74:2,12 88:21
98:9 99:9
112:11 113:14
119:14 124:12
125:20,24
130:10 131:11
**understood**
26:10 41:15
64:22 71:8
**undertake**
88:22 113:7
**undertook**
113:16
**union**  37:1,2,15
37:17 38:12
39:1,7 123:23
124:22
**united**  1:1
**university**  8:6
**unprecedented**
80:20
**unreportable**
63:21
**update**  73:4
80:7
**updates**  39:11
**updating**  92:24
**upgraded**  121:5
**urgency**  22:17
22:20
**use**  13:18 19:25
20:4,6 24:17

25:3,11,25 32:4
32:5 42:16 50:7
58:15 59:2 79:9
80:1,3 89:1
94:10 95:9
100:2 122:17,19
129:17,20
**used**  11:22
14:13 21:13
22:19 25:20
26:12 32:13
39:15 41:1
48:22 50:23
53:4 62:4 80:1
93:16 136:20
**user**  78:10,18
87:14 97:17
**uses**  13:8
**using**  8:15 21:20
31:14 46:25
48:10 69:24
83:17 120:10
128:14
**usually**  12:15
20:8 21:5 27:20
80:13 96:23
97:1 129:14
**utah**  1:2,8 8:6
9:4,5 121:3,11
121:15 135:2

**v**

**v**  1:7 136:4
137:1 138:1
**vague**  31:22
43:8 106:24

**vaguely**  17:19
28:22 64:2
81:18,23 82:1
**valid**  36:13
**validation**  48:8
48:18,18,21,21
58:5,10 59:1,3
59:14,17 60:9
60:12,13,16,21
60:25 61:4,6,9
62:25 63:1
72:24 101:1
**value**  52:8 63:19
73:25
**values**  39:18
**variability**
13:22 19:19
48:6 50:9,15
**variables**  78:5
**varies**  16:11
**variety**  9:21,25
67:23 80:11
97:16
**various**  93:20
**vary**  77:11
**vector**  19:2,3,4
**vendor**  128:22
**verification**
11:9,23 12:2,2
13:4 18:8 21:11
37:13 38:19,23
38:25,25 39:5,5
45:7 48:19,22
53:11,25 58:3,6
58:7 73:3 91:24

93:15,16 111:17
112:5 114:17
**verify**  136:9
**veritext**  1:16
136:14,23
**veritext.com**
136:15
**version**  92:23
**versions**  80:7
**versus**  92:2
**video**  1:14
**view**  97:13
**viral**  43:24
44:17,25 56:9
66:17 98:3 99:7
118:6,13,21
**virginia**  18:7
**virtue**  65:25
**virus**  12:20
17:11,12 18:20
22:2,3 56:8 66:1
**volume**  113:5
122:16
**vp**  61:25

**w**

**wait**  80:14
94:13
**waived**  135:21
**walk**  19:11
39:12
**want**  7:24 8:25
11:21 14:1
15:22 19:15,16
19:21 20:2
23:11,15 31:24

**[want - yeah]**

32:2,4,6 35:16
35:20 39:12
43:9 66:14 85:6
101:25 107:10
126:10 134:18
**wanted** 9:8 26:8
29:18 123:13
**way** 12:23 14:4
14:9 17:4 33:8
42:15 55:3
65:13 91:8
96:18 100:17
111:23 121:7
124:25
**we've** 20:17
22:7 48:9 55:15
57:6 75:17,18
84:5 126:12
133:1
**webb** 2:13
**website** 28:16
28:20 29:2
32:16 34:4
93:18
**week** 18:5 131:9
**weekend** 130:7
134:14,14
**weeks** 80:14
83:7
**went** 10:2 29:12
61:1 91:11
**west** 19:1,2
60:15
**wildly** 54:21,22
77:11

**wisconsin** 9:8
9:10 10:4
**wish** 55:18
**witness** 5:6
22:16 23:9
26:22 37:25
59:6,10 64:14
79:14 81:2 97:4
101:16 102:4
106:18,25 107:5
107:6 108:13,21
109:18 110:12
111:1 113:20
118:18 119:13
120:1 128:10
132:15 133:16
134:6,12,15
135:9 136:8,10
136:12,19
**wondering**
46:19 130:22
**word** 15:5 22:19
**work** 8:25 9:3
10:2 17:11
18:21 26:9
33:18 77:3 92:3
99:22 112:2
121:20,23
129:18,20,21
**worked** 9:6,9
11:10,14 18:16
18:19,24 20:18
82:8 102:17
112:22 115:13
116:3

**working** 9:14
18:5 25:23
52:24 83:8
100:1
**workload**
111:22,24
**world** 24:20
44:16 89:13
**worried** 53:20
82:7 126:3
**worries** 54:14
**worry** 118:4
**worse** 54:24
91:2 94:9
114:23 115:5
116:9,15,20
124:17
**worst** 43:21
44:6 106:9
**write** 92:5
102:13,24
**writer** 74:3
**writes** 63:5
90:21,25
**writing** 11:8
30:16 91:17
102:19
**wrong** 49:10
77:5 96:23
132:22
**wrote** 51:6
52:14 62:10
74:7,21 97:22
114:14 117:13
131:18

**x**

**x** 3:1,5 95:2,3,3
135:20

**y**

**yeah** 10:8 11:2
14:18 15:19
16:17 17:3
20:24 21:17
25:13 28:9,22
33:4 34:21
37:19 40:1,13
42:15 45:20
47:5 49:19
57:25 58:18
59:2,6 61:3,8
63:3 64:19,19
65:10 68:19
70:10 71:12
75:16 77:19
78:12 81:21
83:24 84:14
86:17 87:12
91:19,20 96:10
96:15,17 97:4,5
99:23 101:19,24
102:2 103:19
104:6,10,15
105:15 106:18
107:16 108:13
111:6,13 112:6
112:10 116:22
118:9,11,18
120:1 124:22
127:6,7 128:10
130:3 131:13,22

**[year - zone]**                                    Page 176

**year**  9:7 10:21
**years**  20:18
   101:18
**yep**  6:16,20 10:5
   15:25 18:13
   23:9 24:7 25:9
   30:21 31:3,10
   31:18 33:25
   36:23 37:7,11
   39:20 40:18
   41:20 47:17
   50:18 51:11
   54:10 58:20
   59:15 62:13
   63:17 70:19
   72:18,22 73:15
   74:22 85:5 86:7
   105:6,22 106:10
   114:8,11,13
   116:17 117:9
   124:8,11 125:13
   125:19,23
   126:14 128:1
   131:10,20

**z**

**zika**  18:19,20
   19:4
**zone**  63:21 64:1
   64:3 65:2,8
   69:13,16,18,20
   69:24 70:2,5,8,8
   71:6,10

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.