# EXHIBIT 23

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

_____

| GELT TRADING, LTD., a Cayman | ) Case No. |
| Islands limited company, | ) |
| | ) 2:20-cv- |
| | ) 00368-CMR |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| CO-DIAGNOSTICS, INC., a Utah | ) |
| Corporation; DWIGHT EGAN, JAMES | ) |
| NELSON, EUGENE DURENARD, EDWARD | ) |
| MURPHY, RICHARD SERBIN, REED | ) |
| BENSON, BRENT SATTERFIELD, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____

***********************CONFIDENTIAL***********************

VIDEOTAPED DEPOSITION BY ZOOM OF REBECCA GARCIA, Ph.D.

SIMPSONVILLE, SOUTH CAROLINA

FRIDAY, MAY 12, 2023

REPORTED BY:  Tammy M. Breed, CCR No. 7801

JOB NO:  FLA 5902786

CONFIDENTIAL

Page 2

VIDEOTAPED DEPOSITION BY ZOOM OF REBECCA GARCIA, Ph.D., taken at 234 SANDUSKY LANE, SIMPSONVILLE, SOUTH CAROLINA, on FRIDAY, MAY 12, 2023, at 7:00 A.M. EDT, before Tammy M. Breed, Certified Court Reporter, in and for the State of Utah.

APPEARANCES:

For Gelt Trading, Ltd. and Proposed Class:
    Brandon S. Floch
    MARCUS NEIMAN RASHBAUM & PINEIRO LLP
    2 South Biscayne Boulevard
    Suite 2530
    Miami, Florida 33131
    (305) 400-4260
    bfloch@mnrlawfirm.com

For the Defendants and Deponent:
    Joni Ostler
    PARR BROWN GEE & LOVELESS
    101 South 200 East
    Salt Lake City, Utah 84111
    (801) 532-7840
    jostler@parrbrown.com

    Zachary R. Taylor
    Baker Hostetler
    45 Rockefeller Plaza
    New York, New York 10111
    (212) 589-4200
    ztaylor@bakerlaw.com

Also Present:
    Sofia Johnson, Videographer

Page 3

I N D E X

WITNESS:  REBECCA GARCIA, Ph.D.

EXAMINATION                         PAGE
  BY:  Mr. Floch                      7

Page 4

E X H I B I T S

EXHIBIT                          PAGE

Exhibit 1  E-mail from Denny Crockett to        28
    Rebecca Garcia, Dated 12/17/21,
    Bates Nos. CoDI_00131545 to
    131546

Exhibit 2  "Fluorescence" Graphic, 1 page       54

Exhibit 3  Original Research Article,            79
    Evaluation of Factors that
    Affect the Performance of
    COVID-19 Molecular Assays
    Including Presence of Symptoms,
    Number of Detected Genes and RNA
    Extraction Type, 10 pages

Exhibit 4  E-mail from Andrew Benson to          90
    Dwight Egan, Dated 1/22/2020,
    Bates Nos. CoDI_00023286 and
    23287

Exhibit 5  E-mail from Chad Apuli to             97
    Rebecca Garcia, Dated 3/3/2020,
    and Other Related Documents,
    Bates Nos. CoDI_00077784 to
    77878

Exhibit 6  E-mail from Rebecca Garcia to        105
    Tom Williams, Dated 3/23/2020,
    Bates No. CoDI_00004420

Exhibit 7  E-mail from Rebecca Garcia to        111
    Brent Satterfield, Dated
    4/2/2020, Bates No.
    CoDI_00004509 to 4511

Exhibit 8  E-mail from Rebecca Garcia to        120
    Brent Satterfield, Dated
    4/2/2020, Bates No.
    CoDI_00004512

Exhibit 9  E-mail from Cameron Gundry to        127
    Laura Benzonana, Dated 4/3/2020,
    Bates No. CoDI_00004529

Page 5

Exhibit 10  E-mail from Rebecca Garcia to       131
    Dwight Egan, Dated 4/11/2020,
    Bates Nos. CoDI_00023726 and
    00023727

Exhibit 11  E-mail from Rebecca Garcia to       141
    Andrew Benson, Dated 4/28/2020,
    Bates Nos. CoDI_00024111 to
    00024114

Exhibit 12  E-mail from Andrew Benson to        145
    Anurag Mehta, Dated 4/29/2020,
    Bates Nos. CoDI_00024121 and
    24122

Exhibit 13  E-mail from Cameron Gundry to       148
    Chad Apuli, Dated 4/9/2020,
    Bates Nos. CoDI_00075061 to
    75069

Exhibit 14  E-mail from Brent Satterfield       157
    to Chad Apuli, Dated 5/5/2020,
    Bates Nos. CoDI_00007794 and
    7795

Exhibit 15  E-mail from Cecilia Hutchins        159
    to Kenneth KC Bramwell, Dated
    8/14/2020, Bates Nos.
    CoDI_00085324 to 85328

Exhibit 16  E-mail from Cecilia Hutchins        166
    to Chad Apuli, Dated 4/30/2020,
    Bates Nos. CoDI_00001168 and 1169

Exhibit 17  E-mail from Brent Satterfield to    173
    Rebecca Garcia, Dated 4/30/2020,
    Bates Nos. CoDI_00001371 and 1372

Exhibit 18  E-mail from Rebecca Garcia to       176
    Andrew Benson, Dated 4/30/2020,
    and Validation Report, Bates
    Nos. CoDI_00024155 to 24165

Exhibit 19  E-mail from Rebecca Garcia to       182
    Dwight Egan, Dated 4/30/3030,
    Bates Nos. CoDI_00027453 to
    27455

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

Exhibit 20  Co-Diagnostics, Inc. Releases      189
COVID-19 Test Performance Data
Document, 24 pages

Exhibit 21  E-mail from Rebecca Garcia to      208
Brent Satterfield, Dated
5/15/2020, Bates Nos.
CoDI_00005465 to 5467

Exhibit 22  E-mail from Mayuranki Almaula      212
to Kenneth KC Bramwell, Dated
6/10/2020, Bates Nos.
CoDo_00024872 to 24875

Page 7

SIMPSONVILLE, SOUTH CAROLINA; FRIDAY MAY 12, 2023

9:00 A.M. EDT

-oOo-

Whereupon --

07:01:01

THE VIDEOGRAPHER:  Good morning, we're going 07:01:01 on the record at 9:00 a.m. eastern time on May 12th, 07:01:02 2023.     07:01:06

Please note that this deposition is being 07:01:08 conducted virtually.  Quality of recording depends on 07:01:10 quality of camera and internet connection of 07:01:14 participants.  What is seen from the witness heard on 07:01:17 the screen is what will be recorded.  Audio and video 07:01:20 recording will continue to take place unless all parties 07:01:23 agree to go off the record.     07:01:27

This is Media Unit 1 of the video recorded 07:01:28 deposition of Rebecca Garcia in the matter of Gelt 07:01:31 Training (sic) versus Co-Diagnostics, et al. 07:01:34

This deposition is being conducted remotely 07:01:38 using virtual technology.  My name is Sofia Johnson 07:01:41 representing Veritext, and I'm the videographer.  The 07:01:45 court reporter is Tammy Breed, also from Veritext.  I'm 07:01:48 not authorized to administer an oath, I'm not related to 07:01:53 any party in this action, nor am I financially 07:01:56 interested in the outcome.     07:01:59

Page 8

If there are any objections to proceeding, 07:01:59 please state them at the time of your appearance. 07:02:02 Will counsel please state their appearance 07:02:04 for the record, after which the court reporter will 07:02:07 swear in the witness.     07:02:09

MR. FLOCH:  Good morning.  Brandon Floch 07:02:11 from the law firm Marcus Neiman Rashbaum & Pineiro.  I 07:02:14 represent the named Plaintiff, Gelt Trading, Ltd. and 07:02:17 the putative class.     07:02:23

MS. OSTLER:  Joni Ostler, Parr Brown Gee & 07:02:23 Loveless on behalf of Defendants and the witness, joined 07:02:27 by my colleague -- oh, Zach, you introduce yourself. 07:02:29

MR. TAYLOR:  Zachary Taylor with the firm 07:02:33 Baker and Hostetler, LLP, on behalf of Defendants and 07:02:37 the witness.     07:02:39

THE REPORTER:  Can I have all parties -- counsel stipulate to me swearing in the witness.  She's in another state.  Is that okay?  Because I'm in -- 07:02:49

MS. OSTLER:  I stipulate.     07:02:49

MR. FLOCH:  We stipulate too.     07:02:50

THE REPORTER:  Thank you.

////
///
//
/

Page 9

Whereupon --

REBECCA GARCIA, Ph.D.

having been first duly sworn to testify to the truth, was examined and testified as follows:

EXAMINATION

BY MR. FLOCH:     07:03:02

Q.  Good morning, Dr. Garcia.     07:03:02

A.  Good morning.     07:03:07

Q.  Can you please state and spell your name for the 07:03:08 record?     07:03:10

A.  Yes.  My name's Rebecca Garcia.  Rebecca's 07:03:10 spelled R-e-b-e-c-c-a; Garc- -- Garcia's spelled 07:03:18 G-a-r-c-i-a.     07:03:21

Q.  Have you ever been deposed before?     07:03:21

A.  Yes.     07:03:26

Q.  Were you deposed in a civil litigation?     07:03:27

A.  I'm not exactly sure what it was classified as. 07:03:32

Q.  Can you just generally describe for me what the 07:03:38 substance of your deposition was?     07:03:41

A.  It had to do with claims of sensitivity and 07:03:43 specificity for a Co-Diagnostics test.     07:03:51

Q.  And who was deposing you, Dr. Garcia, in that 07:03:55 deposition?     07:03:59

A.  I don't remember the name of the company. 07:04:00

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

Q. Was it a regulatory authority who was deposing you?

A. I don't remember the exact details of who was filing the claim or anything.

Q. Just generally, can you describe for me the substance of the testimony you gave in that deposition?

A. I -- they wanted to know, like, my role in the company. There was documentation that was shown wanting to know, like, what was sensitivity/specificity, how we derive those claims. They wanted my input on my role in testing and writing specific things about the test.

Q. Was that a deposition you gave before the Securities and Exchange Commission?

A. I believe it was.

Q. Do you recall when you gave that deposition?

A. It would have been approximately a year ago, in 2022.

Q. And were you represented by counsel in that deposition?

A. Yes.

Q. Do you remember the name of your counsel at that deposition?

A. I don't remember the name of the counsel, no.

Q. Was it the counsel who's representing you today?

A. None of these lawyers I remember at that

Page 11

deposition.

Q. Okay. Besides asking you about sensitivity and specificity and how you derived claims about sensitivity and specificity, do you recall any other topic matters that were asked of you at that prior deposition?

A. They showed some documents, some of them I had seen before, some of them I hadn't, like news articles and such.

Q. And in that prior deposition, what did you understand the underlying dispute to be about that you were present for and being deposed for?

A. I don't remember exactly, but I think it was just the claim of the test.

Q. When you say "the test," what -- what test are you referring to?

A. A COVID test.

Q. And is that a COVID diagnostic test that Co-Diagnostics invented and sold?

A. It was considered emergency release test.

Q. About how long did that previous deposition last?

A. I don't remember the time frame, but it was within a day.

Q. Was it over two hours?

A. I believe it was. It took most of the morning.

Q. Okay. After you gave that deposition, was there

Page 12

any follow up from the people who deposed you about the deposition?

A. No.

Q. Okay. Besides that deposition that you gave related to the sensitivity and specificity of the test, have you given any other testimony under oath?

A. No.

Q. Okay. So I know you've been deposed before, but I just want to walk through some ground rules today because we are doing this virtually and there will be exhibits shared through technological means.

So first, because we have a court reporter today, it's important for me to get out my question before you give your answer. Do you understand that?

A. Yes.

Q. You've been doing a very good job of it, but I just want to remind you so the court reporter can easily take down the record.

Second, your attorney may lodge an objection today. Unless she instructs you not to answer the question, you can answer the question after she makes her objection. Do you understand that?

A. Yes.

Q. Third -- and I know we already went over this, but you understand you're under oath today and it's as

Page 13

if you're testifying in a court of law? Do you understand that?

A. Yes.

Q. And finally, I'm going to share exhibits on the screen here but also on a program called Exhibit Share.

Did you -- were you provided access to Exhibit Share?

A. I was provided access, I don't have it open because I thought it was connected.

Q. Okay. Well, as long as you're okay with just looking at the documents on the share screen, I don't think we need it, unless your counsel wants us to get it.

MR. FLOCH: Can we go off the record for one second?

THE VIDEOGRAPHER: We're going off the record at 9:10 a.m.

(Pause in the proceedings.)

THE VIDEOGRAPHER: We're back on the record at 9:10 a.m.

Q. (BY MR. FLOCH) So Dr. Garcia, the -- the last ground rule is that if you need a break at any time, you just ask me, and I'll of course -- we can take a break for as long as you need. Does that make sense?

A. Okay.

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

Q. Okay. Besides your attorneys, did you speak with anyone else about today's deposition?

A. No.

Q. What did you do to prepare for today's deposition?

A. I prepped with the attorneys.

Q. Did you review any documents to help you prepare for today's deposition?

A. Yes, they showed documents.

Q. And just generally, what types of documents did you review?

A. Some e-mails, some articles, some of the test information.

Q. When you say, "test information," what are you referring to?

A. Instructions for Use.

Q. What's -- what's an Instruction For Use?

A. Instructions For Use is like a manual that is provided with the test kit.

Q. Did you review any validation reports?

A. Yes, there were validation reports included.

Q. And can you explain to me what -- what do you understand a validation report to be?

A. A validation report is a requirement by ISO 13485 as part of the quality management system. And that

Page 15

report is a document that's produced in-house to maintain traceability of any testing that is done on a device.

Q. So when you say, "validation report," you're referring to something that the manufacturer or seller of a test prepares for that test?

A. Yes. It's usually internal document that is recorded by the manufacturer of that test that becomes part of that device history file.

Q. And if I use the term "validation study," do you have an understanding of what that means?

A. Typically the validation study is referring to a clinical evaluation.

Q. Did you review any clinical evaluations in preparation for today, of the Co-Diagnostics COVID-19 test?

A. Yes.

Q. About how many?

A. Four or five, I believe.

Q. Okay. Can you tell me who were the entities that produced those clinical evaluations?

A. Can you clarify that question?

Q. Sure.

So you said you had reviewed about four or five clinical evaluations in preparation for today. And my

Page 16

question is: Who -- who are the authors of those clinical evaluations that you reviewed?

MS. OSTLER: Objection, vague.

THE WITNESS: So it depends. The internal documents authored by somebody at Co-Diagnostics, but some of the actual clinical evaluation sites may provide some type of summary or documentation of the testing that was done at their facility.

Q. (BY MR. FLOCH) Okay. And my question is: Who -- who were the facilities that were coming out with these validation studies?

A. The main group that I was involved with was with India. So under the CDSCO guidelines for India, which is like the Indian FDA, those evaluation sites would have been National Laboratories.

Q. Okay. So besides the Indian National Laboratory clinical evaluations that you reviewed today, do you recall any other entities, besides those Indian National Labs, doing validation studies that you reviewed today?

MS. OSTLER: Objection --

MR. FLOCH: (Cutting out.)

MS. OSTLER: Objection. You're saying, "reviewed today," I'm trying to get what you're getting at. Because I think you're skirting on -- you're trying to delve into our attorney-client communication with her

Page 17

yesterday and her preparation. And I -- getting close I'm going to instruct her not to answer because you're basically trying to get her to give you details of the things that we spoke about.

So be -- just be clear like what exactly are you trying to ask her about our communications yesterday, because I may need to tell her not to answer.

MR. FLOCH: I appreciate the objection. Let me ask a better question.

Q. (BY MR. FLOCH) So you reviewed -- in preparation for the deposition today, you reviewed some clinical evaluations prepared by national labs in India, right?

A. Yes.

Q. Did you review any other clinical evaluations prepared by anyone else besides the national labs in India?

A. Yes.

Q. And who were those other entities or individuals who prepared the evaluation studies that you reviewed in preparation for today?

MS. OSTLER: I'm going to object that this is starting to reveal our attorney-client privilege communications with her yesterday.

And I instruct the witness not to answer.

MR. FLOCH: Okay. I'm -- I'm failing to see

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

how that's attorney-client privileged information or legal advice. She answered that she reviewed one, so she's already -- you know, we've already talked about the -- the one document she reviewed. So to the extent there was any attorney-client privilege, it's been waived. But I don't understand how that's legal advice.

Q. (BY MR. FLOCH) I'm going to ask again.

Besides the National Labs of India clinical evaluations, did you review any other clinical evaluations?

MS. OSTLER: Again, I instruct the witness not to answer.

You're getting into not just our attorney-client privilege communication with her but our work product and the different things that we selected for her to review. Like previously you were talking generally, but now you're trying to extract specifics. And I -- I just have to object and instruct the witness not to answer.

MR. FLOCH: And again, Joni, I appreciate your objection, but I -- but I disagree. But I'll move on so we can -- we can keep going.

Q. (BY MR. FLOCH) So besides, I think you said, news articles, e-mails, clinical evaluations, categorically did you review anything else in

Page 19

preparation for today?

A. I don't remember anything else.

Q. Okay. Dr. Garcia, I want to move on now to talk a little bit about your educational and work history. Okay?

A. Okay.

Q. Do you have a college degree?

A. Yes, I have two college -- well, three college degrees.

Q. What are those college degrees in?

A. I have a Bachelor's from Erskine College in Natural Sciences, which includes biology, chemistry, and physics. I have Associate of Science in Medical Laboratory Technology from Greenville Technical College. And I have a Ph.D. in Healthcare Genetics from Clemson University.

Q. Did you go right from getting your college degrees straight to your Ph.D. program?

A. I went straight from my undergraduate into industry.

Q. And when you say, "industry," you mean you just -- you went to work before getting your Ph.D.?

A. Yes.

Q. Okay. Do you have any professional licenses or certifications?

Page 20

A. Yes, I have a Medical Laboratory Technician Certification from the American Society of Clinical Pathology.

Q. And what does that certification mean in layman's terms for someone who's never heard of it before?

A. It allows me to work in a clinical laboratory in any of the general positions, like hematology, microtoxicology, blood banking, chemistry.

Q. Have you ever been arrested before?

A. No.

Q. Have you ever been sued before?

A. No.

Q. Okay. So I'm going to just move to talk a little bit about your work history.

So after college and before the Ph.D., what type of work were you doing?

A. I started working at the Greenwood Genetics Center in 2003 in the research facility that they had, where I did DNA, RNA extractions. I helped build some genetic tests and actually run those tests. And then I also helped in their clinical lab.

Q. So when you say you built a genetic test, what does that mean?

A. So you have to un- -- have an understanding of genetics and the sequences in order to design primers

Page 21

for a specific target.

Q. What's a primer?

A. A primer is a short oligonucleotide sequence that hybridizes to a DNA or RNA target to identify a specific genomic target location.

Q. So a primer -- and correct me if my characterization is off here, but as a nonscientist I'm trying to understand what a primer is.

Is a primer essentially a tool to locate a pathogen?

A. I guess in layman's terms, yes, you could call it that.

Q. Okay. So after your work at Greenwood, did you move to another job?

A. I did a short six month job in a toxicology lab. It was an environmental toxicology lab, ETT Environmental.

Q. Okay.

A. And then I went to Greenville Tech for a two-year med/tech program.

Q. Sorry, I missed the last -- me- -- mentech (sic) program?

A. Yeah, the medical technology --

Q. Ah.

A. -- program at Greenville Tech.

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

Q. Okay. And after you got the degree from Greenville Tech, where did you work after that?

A. I worked at a company called Welvista. It's a company that provides pharmaceutical assistance to people who are low soc- -- socioeconomic status. And I was the upstate director of outreach. And I implemented the first program at the Greenville hospital system for prescription assistance. And I did that for one year.

And then through the investors that I knew working with that company, I was introduced to Cooperative Diagnostics, which was in the South Carolina bioincubator. And I went to work with Cooperative Diagnostics in Greenwood, South Carolina.

Q. And what is Cooperative Diagnostics?

A. Cooperative Diagnostics was a tech start up where the focus was on developing molecular diagnostic tests for mainly infectious diseases.

Q. And did that company have any relationship to Dr. Brent Satterfield?

A. He was the CEO of that company.

Q. Did you first Dr. Brent Satterfield in connection with your work at Cooperative Diagnostics?

A. Yes.

Q. Did he hire you at Cooperative Diagnostics?

A. Yes.

Page 23

Q. How did you first meet Dr. Brent Satterfield?

A. I was introduced to Dr. Satterfield through one of the SC launch -- or I think it's South Carolina Research Authority Investors, Greg Hillman.

Q. And do you have an understanding of why Mr. Hillman introduced you to Dr. Satterfield?

A. Hillman knew that I had a background in genetics, and he -- he understood what Brent's, I guess, platform was for the new company and thought I would be a good fit.

Q. What do you mean when you say, platform for his new company? What do you mean by "platform"?

A. Well, he had -- Hillman had heard the pitch that Dr. Satterfield had give to the SCRA in order to get funding for the start-up company. At the time I didn't know what the company was about, so Hillman had put me in touch with Satterfield, talked to him and learn more about the company. He knew it was building molecular testing, he knew I had a background in genetics.

Q. Around what year were you introduced to Dr. Satterfield?

A. I believe that was around 2009.

Q. And so was Dr. Satterfield the CEO of Cooperative Diagnostics for the entirety of your term at Cooperative Diagnostics?

Page 24

A. Yes.

Q. Is -- is that company that you -- sorry, let me back up.

Did you start working there around 2009?

A. I believe I started working there in 2009.

Q. And is that company, Cooperative Diagnostics that you started working at in 2009, the same company, Co-Diagnostics, that you were working for in 2020?

A. I'm not sure of the progression of exchanges, like from an executive management position, because there was a period of time when there was no money at Cooperative. And after working for six months and no pay, I could no longer maintain that and keep my house. So that's when I left that position and I went back to school to be able to work in the -- to be able to get a Ph.D.

Q. Okay. So let's just back up a little bit.

You said that at some point Cooperative Diagnostics stopped paying you a salary, right?

A. That's right.

Q. And when was that?

A. I don't remember the date specifically. It's been a while.

Q. What circumstances led to Cooperative Diagnostics no longer being able to pay your salary?

Page 25

A. To my knowledge, they were working off of a $200,000 grant, and there was no product in the market making revenue, so there was no income.

Q. And what type of products was Cooperative Diagnostics selling around 2009?

A. They didn't have FDA clearance to sell anything. Everything was being exported as a "Research Use Only" test.

Q. And what types of tests were being exported as Research Use Only by Cooperative Diagnostics around 2009?

A. I don't remember all of them. I do remember there was Hepatitis B, Hepatitis C.

Q. So you left after they stopped paying you for about six months you said, right?

A. That's right.

Q. Do you know what Dr. Satterfield was doing after you left the company?

A. No, I have no idea what he was doing.

Q. How many people were employed by Cooperative Diagnostics?

A. At one point in time, I believe there was three people employed.

Q. And you -- when you were at Cooperative Diagnostics, did you report directly to Dr. Satterfield?

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

A. Yes.

Q. How would describe Dr. Satterfield as a boss?

MS. OSTLER: Objection, vague.

THE WITNESS: Dr. Satterfield was a very intelligent scientist. He was like a mentor to me, so he showed me -- introduced to me a lot of the bioinformatics that could be utilized in test design because it was new at the time.

Q. (BY MR. FLOCH) So I think you said you went to Clemson to get your Ph.D.; is that correct?

A. That's right.

Q. And what was the Ph.D. in again?

A. Healthcare Genetics.

Q. And after you got your Ph.D. from Clemson, did you go back to work?

A. Dr. Satterfield asked me to come to Utah and work at his new company, which was DNA Logics.

Q. And what business was DNA Logics in?

A. Molecular test design.

Q. Was DNA Logics working on similar products that Cooperative Diagnostics had been working on previously?

A. When I arrived at DNA Logics, they were working on tuberculosis testing and malaria.

Q. So at a certain point, did you move from DNA Logics to a company called Co-Diagnostics?

Page 27

A. It was the same company, it just changed names. And I'm not sure if anything else like executive management changed.

Q. And around what time period did you start working at DNA Logics?

A. I started working at DNA Logics somewhere around June, I believe, of 2014.

Q. And did you move to Utah when you were hired by DNA Logics?

A. Yes.

Q. And how long did you work for DNI -- DNA Logics and the entity that is now known as Co-Diagnostics?

A. I believe the name was changed somewhere at the -- either towards the end of 2014, beginning of 2015. I don't remember the date exactly.

Q. Are you still working at Co-Diagnostics?

A. No.

Q. Where do you work now?

A. I work at Bob Jones University.

Q. Are you a professor?

A. Yes.

Q. What do you teach?

A. Biotechnology.

Q. Do you teach undergraduates?

A. Yes.

Page 28

Q. And do you also teach graduate students?

A. No.

Q. Just undergraduates?

A. Yes.

Q. Okay. When did you leave Co-Diagnostics?

A. December of 2021.

Q. Okay. I'm going to show you our first exhibit today, Dr. Garcia. And what I'm going to ask you to do is just take a look at the document. And when you're done looking at it, let me know, and I'll have a few questions for you. Give me one second and I'll share it on the screen.

(Exhibit No. 1 marked.)

Q. (BY MR. FLOCH) Okay. Dr. Garcia, do you see that there's an exhibit marked Garcia 1 on this (cutting out) when you're ready, and then I'll have a question for you.

(Off the record discussion with the reporter.)

(The question was read by the reporter.)

MR. FLOCH: Sorry, I'll continue there. We didn't say anything substantive there.

Q. (BY MR. FLOCH) I just said, do you see there's an exhibit marked Garcia 1 on your screen?

A. Yes.

Q. And I'm going to scroll down. And if you could

Page 29

read the e-mail and then let me know when you're ready and I'll ask you a question. Okay?

A. Okay. (Witness complying.) Okay.

Q. Okay. Dr. Garcia, do you see that the bottom e-mail is from you to employees at Co-Diagnostics, and it's dated December 17, 2021?

A. Yes.

Q. Do you see the "Subject" line says, "Formal Resignation"?

A. Yes.

Q. And do you see that the second full paragraph you wrote, (as read): Ike, you asked me once in a New York City taxi what my career goal was. I answered that I planned to be CSO of this company or a biotech in the future.

Do you see that?

A. Yes.

Q. Who is Ike?

A. That's the short name for Dwight Egan.

Q. And who was Dwight Egan?

A. He's the CEO of Co-Diagnostics.

Q. And you see you went on to write, (as read): I've thought about that same question over the last year as the vision of the company has changed and new hires continue to be brought on, and I have found myself

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

questioning where I fit.

Do you see that?

A. Yes.

Q. What did you mean when you wrote "the vision of the company has changed"?

A. The original vision of Co-Diagnostics was to create tests that were affordable for countries that needed them the most. It was more of testing for basically, like, third world countries, Africa, Asia, Central America. And my background was specific to that area, high -- moderate to high complex molecular devices. And the vision of the company was changing to focus more on point of care technology.

Q. What do you mean when you say "point of care technology"?

A. Point of care means that it's like a -- a device that can be used at the bedside. It's more commonly used in, like, the U.S. or Europe.

Q. So -- so is it fair to say that the company had changed its focus from developing and selling tests to the developing world to selling tests really for the more modernized world?

A. Yes, that's what I was referring to.

Q. Okay. And then do you see you went on to write, "I have found myself questioning where I fit"?

Page 31

A. Yes, I see that.

Q. What did you mean by that?

A. Well, my background and my training is in developing moderate to complex tests, and the point of care test market is not necessarily in that area. Point of care tests are typically waived tests that are sold either over the counter or they are waived by CLIA.

Q. In terms of these tests you're talking about for the developing world, who are usually the buyers for the tests that are used for the developing world?

A. The buyers that I had interacted with were like either distributors or laboratories. Like they're either private or they're publicly-owned laboratories.

Q. From the time you started at Co-Diagnostics to the time you left, did Co-Diagnostics customer base change in any material way?

A. Well, I'm not sure about the customers exactly, because I wasn't necessarily on the sales team seeking out customers. So I'm not sure what their objectives were.

Q. Okay. Do you see that you go on to write, "Unfortunately, the question grew stronger and my goals changed as my place in the company seemed to be fading with time"?

A. Yes, I see that.

Page 32

Q. What did you mean when you said "my place in the company seemed to be fading with time"?

A. Well, I mean, as you hire more and more people, it's like it gets diluted. And so -- I mean, they built a software that could do what I started out doing manually at the company. You know, there is just...

I felt like, you know, I had done everything I could do with the technology, and that was all I could do with it. It was time to just hand it over to somebody else, maybe they had better ideas.

Q. Did you have any conversations with anyone at Co-Diagnostics about becoming the chief science officer?

A. There had been just brief discussions between the CEO and the chief financial officer at some points, but there was never any like -- any like agreement or anything proposed to me that would make me really take a decision and -- I mean, I was never offered a position. I was never provided anything that would indicate they were offering me that type of position.

(Pause in the proceedings.)

Q. (BY MR. FLOCH) If they had offered you the position of chief science officer, would you have accepted it?

A. That would be dependent on what they offered.

Q. Okay. So let's go back to talk about -- I want

Page 33

to focus us on 2014 when you started at DNA Logics.

Dr. Satterfield hired you for DNA Logics, right?

A. Yes.

Q. And what was your title when you first started working at DNA Logics?

A. I believe my title was laboratory manager.

Q. And as the laboratory manager of DNA Logics, what were your job responsibilities?

A. I oversaw the daily operations of the lab. I helped create the quality management system to get the ISO 13485 certification. I was helping to find a partner where we could manufacture in India.

Q. For someone who is relatively green in the molecular diagnostics space, can you explain to me what an ISO certification is?

A. Yes. ISO stands for International Standards Organization. And the actual 13485 is the regulations for quality management systems and medical devices.

Q. So without that ISO certification, you can't -- you don't have authority to run a lab, essentially?

A. It's not necessarily the authority to run a lab, it's more for manufacturing purposes.

Q. Okay. Did your role at DNA Logics ever change from the lab manager to a different role?

A. Yes, it changed.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

Q. And did you get a new title after lab -- after you had the lab manager title?

A. Yes, my title changed to vice president of product development, but I don't remember exactly when that happened.

Q. Did you have different job responsibilities from your lab manager responsibilities when you obtained the new title vice president of product development?

A. Yes, it moved away from just overseeing daily operations more to overseeing product development pipeline, helping the CEO raise money for the public filing, helping to install the manufacturing company, and oversee the transfer of devices to manufacturing in India with the joint venture. And also helping with some customer training.

Q. And the responsibilities you just referenced in connection with your vice president role, did those responsibilities remain constant throughout your time at Co-Diagnostics?

A. They changed just a little bit, but they pretty much remained the same.

Q. Okay. So the first one you mention, you said you helped the CEO raise money when the company went public, right?

A. That's right.

Page 35

Q. What do you mean by that?

A. He invited me to join him in New York and Boston when he had to go in front of some potential investors, and I was there to answer scientific questions.

Q. And when you say, "he," are you referring to Dr. Satterfield?

A. No, I'm referring to Dwight Egan.

Q. So can you just ballpark for me the time when the company changed its name from DNA Logics to Co-Diagnostics?

A. Somewhere between the end of 2014 and the beginning of 2015.

Q. And in the beginning of 2015, around there, was Dr. Satterfield the CEO of Co-Diagnostics?

A. I don't remember -- I think Dwight was the CEO of Co-Diagnostics.

Q. Do you recall -- sorry, let me back up.
Was Dr. Satterfield ever the CEO of Co-Diagnostics?

A. I'm not sure, but I -- I don't think so.

Q. Okay. What was Dr. Satterfield's role at Co-Diagnostics in or around 2015?

A. His title was the chief science officer.

Q. And just generally, what were his job responsibilities as chief science officer?

Page 36

A. I don't know what his job responsibilities were.

Q. In your role as vice president of product development, did you work with Dr. Satterfield at all?

A. Very occasionally.

Q. What were the circumstances under which you would be working with Dr. Satterfield when you were vice president of product development?

A. Sometimes he was on management meeting calls. Sometimes it was just discussing technology questions or test questions.

Q. Before the pandemic, did you work in an office in Utah when you were at Co-Diagnostics?

A. No.

Q. Where did you work from?

A. My home in South Carolina.

Q. Okay. So I thought you had testified earlier that when you were hired for DNA Logics, you moved out to Utah?

A. I did.

Q. At some point did you move from Utah back to South Carolina?

A. Yes.

Q. And when was that?

A. About mid October of 2014.

Q. Okay. So let's go back to talking about some of

Page 37

the job responsibilities you mentioned in your role as vice president of product development. You also mentioned that you helped, I think, locate manufacturers; is that what you said?

A. That's right.

Q. What did you mean when you said you helped locate manufacturers?

A. So we were trying to find a partner in India. So I would travel to India two or three times a year and would meet with different companies to see how we would partner to manufacture product there.

Q. Did you eventually locate a manufacturer in India for Co-Diagnostics' products?

A. We identified a group that would partner with us and become a joint venture to manufacture.

Q. What was the name of that group?

A. The group that they partnered with was Simbiotics.

Q. Did the joint venture have a name?

A. CoSara Diagnostics.

Q. So CoSara was a joint venture between Co-Diagnostics and a company called Simbiotics?

A. That's right.

Q. And did you work for CoSara?

A. No.

10 (Pages 34 - 37)

Veritext Legal Solutions

800-726-7007                                                              305-376-8800

CONFIDENTIAL

Page 38

Q. Did CoSara have its own employees?

A. Yes.

Q. What was your role vis-à-vis CoSara?

A. I oversaw the creation of the manufacturing on behalf of Co-Diagnostics and the transfer of tests or technology to that facility.

Q. So forgive me if I -- I don't understand some of the molecular diagnostic pipeline here, but when you say tran- -- the transfer of tests, what are you -- what do you mean by transfer of tests? Are you talking about actually shipping tests?

A. Well, there's two different ways to transfer tests. The requirements for the CDSCO is you either transfer completed device, which would be transfer of full kit as an import device, or you transfer the components or sequences that go into development of that kit for production there in India.

Q. So is it fair to say that when you use the term "transfer," you could either mean a physical transfer of the kit or a transfer of the intellectual property of the kit to another manufacturer?

A. Not necessarily intellectual property, but the information in order to manufacture that kit.

Q. So let's just go back to one other responsibility you mentioned as vice president of product development.

Page 39

I think you said you helped with customer training; is that right?

A. That's right.

Q. What type of training did customers need from Co-Diagnostics?

A. Well, in third world countries a lot of the customers might not even use molecular testing, like PCR testing, so I would be asked to actually go and teach them what PCR is and tell them a little bit about the difference in Co-Diagnostics' technology, what's the difference in using a PCR test versus antibody or antigen test and actually go through the technical pipe heading and workflow processes of using a kit.

Q. So when you were at Co-Diagnostics, who was your supervisor?

A. At the beginning my supervisor was Dr. Satterfield. There was a period of time where my direct report was Dwight Egan, the CEO. And then there was a period of time where Jesse Montgomery was a direct report.

Q. And did you oversee any employees of Co-Diagnostics when you worked there?

A. What do you mean by oversee?

Q. Were you the direct supervisor of any employees at Co-Diagnostics while you were working there?

Page 40

A. I don't know if you classified it as direct report, but the lab personnel could contact me at any time and ask questions about testing or anything that they needed related to that or to quality system.

Q. And when you say, lab people, are you referring to Chad Apuli, for example?

A. Yes, Chad Apuli or any of the lab technicians.

Q. Okay. And in terms of -- how would you characterize Cecilia Hutchins's job as compared to your job at Co-Diagnostics?

A. Cecilia, I believe, was hired to handle more of the regulatory aspects. And she took over most of the role of quality.

Q. Okay. So let's move on now from talking about your general job responsibilities to talking about document collection for this case.

So were you asked to collect documents and give them to lawyers for this litigation?

A. I don't remember being asked for documents for this litigation.

Q. Do you remember being asked by any lawyers to collect documents in connection with any disputes that arose from questions about the tests' sensitivity and specificity?

A. Yes.

Page 41

Q. Okay. And was that -- who spoke to you about collecting documents?

A. I don't remember who spoke to me, but I was asked at some point to provide any documents or cell phone information or e-mail, personal or company wise, that would have had information.

Q. And do you recall when this was?

A. I don't remember the exact dates, and I can't remember whether it was before I left the company or after I left the company.

Q. Do you recall ever receiving something from anyone at the company called a litigation hold?

A. No, I don't remember anything like that.

Q. Do you remember anyone at the company or any agent of the company telling you not to delete any files or documents?

A. No, I don't remember anybody saying anything.

Q. So you said that you do have a general memory of being asked to collect some documents, right?

A. Yes.

Q. Just generally, can you explain to me what you did after getting that request.

A. I remember I had to get some -- I don't know what they're called, but they're files that collect WhatsApp text messages that were between me and CoSara employees.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

And then there was one or two files that had been sent to my personal Gmail that I had to give. That's all I remember.

Q. So besides the WhatsApp and the personal Gmail that you collected, did you collect any documents or -- from your physical laptop?

A. I didn't have any documents on my laptop.

Q. Do you use -- sorry, let me back up.

So when you were at Co-Diagnostics, you worked from home, right?

A. That's right.

Q. And what computer, if any, did you use to do your work at Co-Diagnostics?

A. I have a -- a Co-Diagnostics laptop.

Q. Okay. And when you were asked to collect documents, did you search for documents on that Co-Diagnostics laptop?

A. All the documents that I would have used on my laptop would have been filed in the cloud-based system that the company used to record all of those documents.

Q. So did -- when you left the company, did you return the Co-Diagnostics laptop back to the company?

A. No, they told me to keep the laptop.

Q. Okay. And when they told you to ke- -- so they didn't ask you to return the laptop to them -- sorry,

Page 43

let me back up.

Who told you to keep the laptop?

A. I believe it was Seth Egan who told me to keep the laptop.

Q. Besides Seth Egan, did you have any conversations with anyone else at Co-Diagnostics about what to do with the laptop?

A. I remember I sent an e-mail, but I don't remember who I sent it to, because I wanted written evidence.

Q. When you say you wanted written evidence, written evidence of what?

A. Of being told to keep the laptop.

Q. You didn't want to be accused of taking company property or anything, right?

A. Exactly.

Q. Okay. Do you recall what response you got when you sent that e-mail?

A. I don't remember if they responded by e-mail or whether they called, I just don't remember.

Q. Do you remember what the substance of the communication was from Co-Diagnostics about what to do with the laptop?

A. Yes. They told me to keep the laptop because it cost more to ship it and everything than...

Q. Did they ask you to remove any files from that

Page 44

laptop that were Co-Diagnostics-related files?

A. They didn't ask me to remove any files.

Q. Did you remove any files from that laptop that were related to your work at Co-Diagnostics?

A. There were -- we completely cleared out the laptop, reset it to its original function.

Q. When you said we cleared it out, what -- who do you mean by "we"?

A. Well, my cus- -- my husband has a background in computer information management, so he reset the computer. But that was only done after I left the company and was told to keep the laptop.

Q. And this was about late 2021 that the laptop would have been deleted?

A. No, that would have been in 2022.

Q. When in 2022?

A. January or February.

Q. Okay. Are you aware that the lawsuit that we're here for today was filed in June of 2020?

A. No.

Q. Okay. So during the pendency of a lawsuit -- sorry, let me back up.

From your memory, what types of files were on your laptop that were related to Co-Diagnostics that got removed when the laptop was cleaned?

Page 45

A. If there were any files, they would have been draft versions of something, because everything that was a final version was uploaded into the QT9 or the OneDrive for the company.

Q. When you say QT9, what's QT9?

A. QT9 is a quality management online cloud-based system where all of the company records are kept, including tests, reports, validation reports, any type of document control.

Q. Okay. And when you say you may have deleted draft versions, draft versions of what types of documents are you --

A. So --

Q. -- referring to?

A. -- like if I had to create a new SOP, if I had to create a new validation report, I might have had a template that I started with. You know, it'd go through editing and writing and you cha- -- change changes before you submit a final copy to be signed.

Q. And what's a SOP?

A. Standard operating procedure.

Q. And when you say there may have been drafts of validation reports, what types of validation reports are you referring to?

A. Any type of validation report that would have

12 (Pages 42 - 45)

Veritext Legal Solutions
800-726-7007                                   305-376-8800

CONFIDENTIAL

Page 46

been created for a test.

Q. If there were clinical evaluations done by government bodies, would you have saved that to the laptop?

A. No.

Q. Where -- where would those have gone, do you think?

A. Those would have went directly into the QT9 system in the -- underneath the actual device or the test that it was associated with, in the folder for validation.

There was also a copy of that on the OneDrive.

Q. Okay. Besides -- sorry, let me back up.

Did -- did you ever speak to Andrew Benson about the wiping of your company laptop?

A. I don't remember talking to Andrew.

MR. FLOCH: Okay. We've been going about an hour. I'm okay to keep going, unless you would like to take a break.

THE WITNESS: I probably need a break.

MR. FLOCH: Okay. Why don't -- let's go off the record.

THE VIDEOGRAPHER: We're going off the record at 10:08 a.m.

(A brief recess was taken.)

Page 47

THE VIDEOGRAPHER: This is the beginning of Media Unit 2, and we're back on the record at 10:17 a.m.

Q. (BY MR. FLOCH) Dr. Garcia, before the break we were discussing your company laptop, right?

A. Yes.

Q. I just want to go back and ask about what devices -- sorry, let me back up.

You mentioned that you used WhatsApp to communicate with some of the CoSara employees?

A. That's right.

Q. Besides WhatsApp, did you use any other programs to communicate with employees at CoSara?

A. Yes.

Q. And what programs were those?

A. So CoSara had access to QT9. And sometimes we communicated by Zoom meetings or Skype or some type of like way of interaction. On occasion, direct phone call. E-mail.

Q. And what e-mail address did you use to communicate with people at CoSara?

A. I mainly used my Co-Diagnostics e-mail.

Q. And when you say, "mainly," are you suggesting that you used another e-mail as well to communicate with people at CoSara?

A. Just very rarely there was an e-mail that somehow

Page 48

landed in my Gmail account.

Q. Let's shift to your communications with Co-Diagnostic employees, okay?

A. Okay.

Q. How did you -- just generally, how did you communicate with your Co-Diagnostic -- Co-Diagnostics' colleagues?

A. Phone calls, e-mail, Zoom meetings, Skype, QT9 OneDrive, Sharepoint, Box.

Q. After you left Co-Diagnostics, did you still have access to QT9?

A. No.

Q. Okay. After you left Co-Diagnostics, did you still have access to any Box files that you shared with colleagues at Co-Diagnostics?

A. No.

Q. What about Sharepoint?

A. No.

Q. Same question for OneDrive?

A. No.

Q. And what e-mail address were you using to communicate with your colleagues at Co-Diagnostics?

A. The Co-Diagnostic e-mail.

Q. And that's r.garcia@codiagnostics.com?

A. I believe that's what it was.

Page 49

Q. What type of e-mail account was that, if you know?

A. I'm not sure.

MS. OSTLER: Objection, vague.

THE WITNESS: I'm not sure.

Q. (BY MR. FLOCH) You don't know if it was an Outlook-based e-mail?

A. Pretty much any type of e-mail can be connected to Outlook.

Q. How -- how did you -- how did you access the r.garcia@codiagnostics e-mail when you were working at Co-Diagnostics?

A. It was connected through my computer somehow.

Q. When you, with your husband's help, scrubbed the laptop, do you know whether or not you deleted your e-mails from the r.garcia@codiagnostics account?

A. I have no idea.

Q. Do you know whether or not the company kept a backup of your e-mails from your r.garcia@codiagnostics.com account?

A. I'm not sure what the company did.

Q. Okay. But did anyone from Co-Diagnostics before you left Co-Diagnostics ask you to do anything to create a backup of your r.garcia@codiagnostics.com account?

A. I don't remember anybody asking.

Q. So let's move on now. And I want to get into the

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

mechanics of diagnostic testing. Okay?

A. Okay.

Q. So I'm -- I'm relatively with the molecular diagnostic stuff. So when I ask you a question, please if you can describe it for me in the -- the simplest way possible. Does that make sense?

A. Okay.

Q. So just generally, what -- what is a PCR test?

A. So a PCR test is a molecular-based test that replicates a target sequence of DNA.

Q. And have you heard the term, PCR cycle?

A. Yes.

Q. What -- what does that mean?

A. So in the process of a PCR, it goes through thermocycling, which is a process of heating and cooling, heating and cooling over a certain number of cycles.

Q. And what is the purpose of doing cycles for a PCR diagnostic test?

A. Every time the PCR cycles, it creates exponential amplification of the target sequence if it's in the sample.

Q. What do you mean when you say, "amplification"?

A. Like if you put in one copy, then you'd get four copies out. In the next cycle, you get eight copies.

Page 51

And the next cycle, you get 16, 32 until you get millions and billions of copies.

Q. Okay. And is the purpose of amplifying to determine whether or not the PCR diagnostic test is detecting a certain pathogen?

A. It depends on the use of the test. With realtime PCR, there's multiple uses. So it's either detection or quantification or gene expression or snip detection.

Q. Can you break those down for me? Like what -- what do you mean when you say -- you just gave me, like, four different purposes of a PCR diagnostic test. And the first one you said is detection.

Can you explain to me what you mean when you say, "detection"?

A. So detection is the simplest way to use PCR. It tells you if your target sequence is there or it's not there in the sample.

Q. And have you heard the term "fluorescence"?

A. Yes.

Q. What does that mean?

A. Fluorescence is used with realtime PCR so that not only do you have primers for the target, but now you have a probe that sits in between the primers. And that probe has a florescent dial on one end and a clincher either on the other end or somewhere in the sequence

Page 52

that whenever the target is present in the sample, the PCR creates the replicate and the probe binds if the target sequence is there. And as it binds in the PCR reaction, the reaction actually clips off the fluorescent dye, and the machine that it's run in collects the emission and absorbance of that dye.

Q. Okay. So let me make sure I understand.

Is it fair to say if one is running a PCR diagnostic test with the purpose of detection and the sample fluoresces, a fluorescent sample could indicate that a pathogen is present?

A. Usually the test is going to specify between what cycles that you can claim that is a true positive and what cycles you lower the probability of it being positive.

Q. Okay. So let -- let me ask about that because that was going to be my next question.

Have you heard the term "cycle threshold"?

A. Yes.

Q. What -- is that what you're fer- -- referring to when you're talking about...

Sorry, let me back up.

What does cycle threshold mean?

A. Cycle threshold refers to the cycle number at which the exponential amplification curve is passing a

Page 53

threshold. And that threshold line is set based on the initial recording that the machine did to remove background noise from the sample. So it's differentiating between background noise and ample -- amplification of the target.

Q. So in order for a PCR diagnostic test to locate a true positive, a certain number of cycles have to be run before the test can accurately detect a true positive, right?

A. Yes.

Q. And how does -- do different diagnostic tests have different cycle thresholds?

A. Yes. There's usually a specific range for each test and a limit of detection for each test.

Q. Okay. Well, let me just back up.

So what is the relationship between a cycle threshold and limit of detection?

A. Okay, so the limit of detection is defined by the FDA, the MIQE guidelines, the CLSI guidelines as the lowest concentration of an analyte that can be detected with a probability of 95 percent.

And the Ct value or CQ value -- those are sort of interchangeable -- referring to the cycle threshold, is the number value that is produced by the machine when you have amplification of a target sequence and you use

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

that number value to determine the range of the test, like from what cycle it -- you begin to see amplifications to the cycle at which you claim is a limit of detection.

Q. So is there a relationship between cycle threshold and limit of detection?

A. So the higher -- well, I don't know if it's a -- the relationship of the limit of detection and the cycle threshold, the -- the limit of detection, per the guidelines, is that you determine the range. So, what's the highest concentration you can detect 100 percent of the time; the lowest concentration of the analyte that you can tect (sic) 100 percent of the time. And then you have to confirm the lowest end of detection with at least 19 out of 20 replicates. And that's straight from the FDA guidelines.

Q. Okay. Let -- let me show -- I'm going to show you a graphic as Exhibit 2. And once you look at it, let me know when it's on your screen.

(Exhibit No. 2 marked.)

Q. (BY MR. FLOCH) Okay. Do you see what's been marked as Garcia Exhibit 2 on your screen?

A. Yes.

Q. And just generally, have you seen this type of chart before?

Page 55

A. I've seen charts similar to it.

Q. Okay. Can you help me understand what a chart like this is showing? What is on the x-axis?

A. So the x-axis is the cycles.

Q. And that's number of times that the thermocycler has to be -- or is run, right?

A. That's the number of times the thermocycler heats and cools.

Q. Okay. And what's on the y-axis?

A. Well, in this case it's the florescence. It's usually identified by a Delta R though.

Q. Okay. And do you have an understanding of what the blue, purple, maybe pink that -- do you have an understanding of what the three colored lines are here, the orange, pink, and blue lines are, just generally?

A. Yes.

Q. And what are those lines referencing?

A. Well, they're either samples or controls.

Q. Okay. Do you see that they're identified in this is graphic as "Positive Sample," "Negative Sample," and "Negative Sample"?

A. Yes.

Q. Okay. So let's just imagine hypothetically we're talking about COVID, for example. So these -- the blue line, the pink line, and the orange line would be

Page 56

different samples of someone's bodily fluid or sputum or something like that from a human being, it would be a sample, right?

MS. OSTLER: Objection, compound, speculation.

THE WITNESS: If you've identified it as a sample, then that's what I -- I know it as.

Q. (BY MR. FLOCH) Okay. So do you see that there's a green line that says, "Threshold"?

A. Yes.

Q. And can you explain to me what that line is?

A. That's the threshold that is set by the PCR instrument when it takes a reading at the beginning before any cycles are conducted, where it subtracts out the background noise up to the point where there begins to be exponential amplification of a target sequence.

Q. So before any cycles are run, the test can't determine what's a positive sample and what's a negative sample, right?

A. Can you repeat that?

Q. Sorry, maybe that's a silly question. A certain number of PCR cycles have to be run before the test can determine whether a sample is positive or negative, right?

A. It differs based on the test being used.

Page 57

Q. Okay. Well, let's go back to the graphic. And I'm just going to ask: Do you have an understanding of what that redline is that says, "Ct"?

A. Yes.

Q. What do you understand that to be?

A. So the Ct is the cycle threshold. So that's the point where in this case that you're showing me, that blue line crosses the threshold.

Q. So for the blue sample, once the PCR cycle has gone to the cycle threshold for the blue sample, you can tell that the blue sample is positive, right?

A. You can't base the results on a sample alone.

Q. What do you mean by that?

A. There has to be control information to know that the quality control of the test is in place before you can interpret a sample result.

Q. Okay. Just a general question, if -- if a patient has a higher viral load for a certain disease, are less cycles needed to show a positive?

A. Depends on how the test is created, but that can be possible.

Q. As -- as a general matter, is it true that if a person has a higher viral load that the cycle threshold to determine a positive for that person is going to be lower?

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

MS. OSTLER: Objection, ambiguous.

THE WITNESS: It is possible if it's a quantitative PCR. It has to be quantitative though, it can't just be presence-absence. In QPCR, based on the standard curve controls that are used with the sample, you can identify if there is a relationship between the Ct value of the sample within the standard curve that is produced by the same test, and use that information in a formula to derive the viral copies or copies, colony-forming units, or whatever the units are for the sample.

Q. (BY MR. FLOCH) So moving on from the -- the graph and back to a term that we were talking about before, do you recall we discussed limit of detection?

A. Yes.

Q. How is limit of detection measured?

A. Limit of detection follows the guidelines by the FDA, the MIQE guidelines, or the CLSI guidelines, and that is specific criteria that's set forth to determine the limit of detection.

Q. I think I'm -- I'm -- and it was a bad question, so forgive me.

What are the metrics that are used to report limit of detection? Is it usually like copies per milliliter, or is it something different?

Page 59

A. It's dependent on what is tested.

Q. Okay. What are some of the metrics that you've seen that are used to report limit of detection?

A. Again, limit of detection is based on what is tested. By the FDA guidelines, that is going to be a sample of known concentration that's diluted out between 5 and 11 points in a standard curve. That gives you the range of detection. So it has to be 100 percent detection among replicates for the highest concentration and lowest concentration of whatever is being run.

And then it has to be confirmed in 19 of 20 replicates at that lowest concentration and a concentration below that that gives -- the limit of detection would be 95 percent probability, and one below that would be anything less than 95 percent.

Q. Okay. Well, let's move on to some other terms related to PCR diagnostic testing.

Have you heard the term "false positive"?

A. Yes.

Q. What does that mean?

A. That means the sample has been interpreted by the criteria of the test that's being run as a positive, and it's been confirmed somehow as actually being negative.

Q. And have you heard the term "false negative"?

A. Yes.

Page 60

Q. And what does that term mean?

A. A false negative means that the kit being run per the instructions is showing a negative result but has been confirmed as a positive.

Q. And I know we discussed earlier the term "sensitivity and specificity," right?

A. Did we?

Q. I think we referenced it generally.

Can you just tell me, what does sensitivity mean?

A. Okay. Well, there's two types of sensitivity, so can you clarify.

Q. Sure.

Can you -- can you describe for me what you mean when you say that there's two types? What's the first type, sensitivity?

A. Okay. The first type of sensitivity is done in early verification, so that's analytical sensitivity. And that would be including three potential subfactors. So you would be -- well, four maybe. You confirm the range of the test, you confirm the limit of blank, you confirm the limit of quantification if it is a quantifiable PCR, and you determine the limit of detection.

The second would be clinical sensitivity where there's two subgroups of that. You're either confirming

Page 61

using a de novo device, meaning you are collecting the sensitivity and then confirming it by sequencing or some other means the samples that you're testing. And then you're also -- there is a predicate device where you're comparing your device to one that's already been approved.

Q. Okay. So let's go back to the first type and talk about analytical sensitivity for a second. I think you mentioned that there were four subfactors or four component parts of analytical sensitivity, right?

A. That's right.

Q. And the first one you mentioned was range, right?

A. Yes.

Q. What do you mean when you say "range"?

A. So when you run a diluted sample, your test will perform at a high concentration all the way through to a lower concentration with 100 percent amplification of the replicates that you're running. That's the range.

Q. So let me make sure I understand this. And I -- I may be off base here, so help me if I'm misunderstanding it.

Is what you're saying that, once you get a sample from someone, you can only tell if it's positive or negative if the sample has enough viral load between a low end of a range and a high end of a range?

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

A. So when you have a kit, a device, you have to determine the performance characteristics of that device. So in order to provide the range at which you can detect any type of amplification, you have to run a known concentration sample type that is in the same matrix of the samples that you're intending to run with the kit. So you're running that in a standard dilution from a very high concentration to low concentrations, and you're finding the range at which the probability is 100 percent of detection.

Q. Can you describe for me what you mean when you say, "dilution"?

A. Yes. So you take a high concentration sample, like in scientific notation would be something like 1 e to the eighth copies per microliter, and you would dilute that out in tenfold dilutions or -- I mean, you can determine whatever fold you want. But you're taking from the same sample, and you are diluting it in the same matrix or with water for some blank material that you know is negative. And you're diluting it down into known intervals so that you know what specific concentrations you are testing across a series of replicates at each concentration.

Q. Okay. So range was the first component of analytical sensitivity that we discussed, right?

Page 63

A. Yes.

Q. Second one I think you said limit of blank, right?

A. That's right.

Q. Can you describe in -- in the simplest way possible for me what you mean when you say "limit of blank"?

A. You have to confirm at what point your test determines negative. So like if -- if you're using a matrix of serum and you know it's negative, then you have to confirm that every serum sample that you run that does not contain analyte is going to show you no amplification, which would be assumed as a zero limit of blank. There's some tests, especially like with gene expression, where your -- your genome is constantly amplifying that gene at a certain level. But with disease it may rise or fall.

Q. And then the third component I think you said was limit of quant; is that correct?

A. Yeah, that only applies if it's quantitative PCR.

Q. And what is quantitative PCR?

A. Quantitative PCR is where you use the Ct value of your sample in comparison to a standard curve in the same run to be able to plot that sample within a standard curve using a formula to derive the

Page 64

concentration of the unknown sample.

Q. And I think the fourth component you mentioned was limit of detection, right?

A. Yes.

Q. And that's referring to the limit of detection that we've already discussed a few minutes ago, right?

A. That's right.

Q. Okay. So I want to focus now on the second type of sensitivity that you mentioned, you called it clinical sensitivity, right?

A. Yes.

Q. And you said there were two components to clinical sensitivity, right?

A. That's right.

Q. And one of them you said was where you have a predicate to compare your sample to, right?

A. That's right.

Q. Can you explain what that means?

A. Yes. A predicate device means there is a device that is methodologically similar to your device. So an example, if your device is based on realtime PCR, then that device also uses realtime PCR. So that predicate device would be one device that has already received some type of clearance. And usually within the regulatory body that you're applying for, like if it's

Page 65

FDA in the U.S., then it has to be a predicate device that already has FDA approval in the U.S. to compare it to.

Q. So is it fair to say when you're talking about the -- the predicate comparison type of clinical sensitivity, you're basically taking your -- a company's diagnostic finding and comparing it to a known negative or a known positive from the predicate?

A. It depends on how the research agreement or clinical evaluation agreement's set up of how your test -- what you're testing.

And maybe I didn't understand your question exactly, sorry.

Q. When...

Well, I -- we'll get to it later.

Why don't we move on to the de novo. I think you said there was a second component of clinical sensitivity, and you referred to it as a de novo device sequencing; is that correct?

A. No, no.

Q. Okay.

A. De novo means that there is no predicate device available. It's a brand new idea, brand new technology.

Q. So can you explain to me what you mean by sequencing?

17 (Pages 62 - 65)

Page 66

A. So sequencing is a way to confirm the results from a realtime PCR assay or PCR. So if you're running a PCR and you get a result that says it's a positive, then to way -- the way to confirm that result would be sequencing because sequencing is a gold standard method. And sequencing will actually give you the actual DNA sequence of the target and what the test has identified.

Q. Okay. So is it fair to say that the -- the de novo method uses DNA sequencing to confirm whether a sample is positive or negative, whereas the predicate type basically compares your sample to another known positive or negative?

A. Well, the de novo method's only used if there's no predicate device.

Q. Okay. But if you have a predicate device, what you're doing when you try and determine sensitivity is saying, did my test have the same outcome as the predicate test?

A. That's right. And if there's any discrepancies, it still has to be confirmed by some other method.

Q. And one of the other methods is sequencing?

A. Yes.

Q. Okay. So we just talked about sensitivity, right?

A. Yes.

Page 67

Q. Have you heard of the term "specificity"?

A. Yes.

Q. And what does that term mean to you?

A. So that term also gets divided into analytical and clinical.

Q. Okay. In the simplest way possible for me, can you describe for me what analytical specificity is?

A. Yeah. So analytical specificity is going to break down into subgroups again.

Q. Okay.

A. One of those is going to be in silico, meaning you take the actual sequences that you created for your primers that are used in the device, your primers and your probe, and you can do bioinformatics, you can use bioinformatics tools, to see if those sequences crossreact, running computer simulations. And you're looking for anything that has the similar sequence identity to the one that you're inputting, with greater than 80 percent identity.

So that --

Q. So --

A. Oh, sorry.

Q. No, go ahead, you weren't finished.

A. No, because you told me to describe both of them. So that's in silico.

Page 68

Q. Okay.

A. And then the second one is the actual wet take -- wet testing or testing in the lab where we're using the reagents. And in that case, you're going to test anything that came back positive from your simulation of in silico testing. And you're also going to test any -- for any, like, inhibitor substances or cross-reactive substances.

So it's not just -- okay, if I design a test for hepatitis and I want to detect all the types of hepatitis, then I have to test all the types of hepatitis that I can get my hands on. Plus, if those patients undergo any type of therapy where those chemicals interfere or inhibit my PCR, then I have to also test levels of interference with those different chemicals.

Q. Okay. Besides the in silico and the wet testing, are there any other components of analytical specificity?

A. I can't remember any right now for specificity.

Q. Okay. Let's move on to clinical specificity. Do you have an under- -- what do you mean when you tell me that there's something different -- sorry, let me back up.

What does clinical spec- -- specificity mean?

Page 69

A. Yeah, so clinical specificity is similar to the clinical sensitivity where you are either comparing with de novo, so you have to come up with some way to test that; or you're doing the comparison with a predicate device. In both those cases, the clinical specificity is derived from a formula, comparing the two devices, your device versus the predicate device.

Q. So if I'm doing a -- a clinical specificity analysis and I have positive predicates, my test, if it's perfectly specific in -- under that scenario, it will identify all of the positives of the predicate, right?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: Can you clarify that question?

MR. FLOCH: Sure.

THE WITNESS: It was a little confusing to me.

Q. (BY MR. FLOCH) Is specificity the percentage of negatives that are correctly identified when you have samples that are known positives and negatives?

A. I'm not remembering the exact formula. It's usually reported as a percentage of agreement with a confidence interval.

Q. Okay. So can a diagnostic test ever be 100 percent specific in all circumstances?

CONFIDENTIAL

Page 70

MS. OSTLER: Objection, ambiguous.    08:54:57

THE WITNESS: Well, the sensitivity and    08:54:58 specificity is going to change based on different    08:55:04 variables.    08:55:08

Q. (BY MR. FLOCH) So is it ever fair to say that a    08:55:10 test is 100 percent specific in all circumstances?    08:55:15

A. If I -- in all circumstances? No, because it's    08:55:20 based on other factors.    08:55:31

Q. Okay. Is the accuracy of a diagnostic test based    08:55:36 in part at least on the test sensitivity and    08:55:44 specificity?    08:55:49

A. So the accuracy actually has its own formula, and    08:55:50 it's reported as a percentage with a confidence    08:55:56 interval.    08:56:00

Q. Okay. And what's the relationship between    08:56:01 accuracy sensitivity and specificity?    08:56:04

A. So they're different formulas, and I don't    08:56:09 remember those off the top of my head.    08:56:13

Q. Okay. So let's move on now from talking about    08:56:15 sensitivity and specificity to the Logix Smart test that    08:56:25 Co-Diagnostics developed. Okay?    08:56:30

A. Okay.    08:56:33

Q. Did you have a role at all in the development of    08:56:34 the Logix Smart Co-Diagnostic test?    08:56:38

A. No.    08:56:42

Page 71

Q. And if I say, the Saragene test, do you know what    08:56:42 I'm referring to?    08:56:47

A. Yes.    08:56:48

Q. Am I pronouncing that correctly?    08:56:49

A. Yes.    08:56:52

Q. Okay. So what -- are the Saragene diagnostic    08:56:53 test for COVID-19 and the Logix Smart COVID-19 test the    08:56:57 same test?    08:57:03

A. They're not exactly the same.    08:57:04

Q. Okay. How are they different?    08:57:05

A. Okay. So the Saragene test was transferred by    08:57:07 its sequences, like component parts. The testing had to    08:57:13 be reconfirmed in India under their manufacturing    08:57:20 conditions, and there was differences in the    08:57:24 Instructions for Use.    08:57:27

Q. So the Saragene test is derived from the Logix    08:57:32 Smart test, though, right?    08:57:37

A. Only in sequence and some of the basic    08:57:38 components.    08:57:42

Q. So who at Co-Diagnostics developed the Logix    08:57:44 Smart test?    08:57:51

A. I'm not exactly sure who developed it.    08:57:51

Q. But it -- it wasn't you?    08:57:55

A. No.    08:57:57

Q. Did -- what genes does the Logix Smart test    08:57:58

Page 72

target?    08:58:09

A. I don't remember all of them. I think RdRp was    08:58:10 one of them. I can't remember, it's been too long.    08:58:16

Q. Is a test more -- can a test's sensitivity be    08:58:20 affected by which genes the test targets?    08:58:29

A. Yes.    08:58:34

Q. Why is that?    08:58:35

A. Because there's diversity in the population    08:58:38 globally, and there's also diversity between genes and    08:58:44 between species.    08:58:50

Q. Can you explain to me why the diversity between    08:58:53 genes would affect a test's sensitivity?    08:59:07

A. Well, there's multiple factors that affect    08:59:13 sensitivity. But if we're just talking genes, some    08:59:19 genes are more conserved than others.    08:59:25

Q. Sorry, what -- what you said more conservative?    08:59:28

A. More conserved, meaning they hold -- they hold    08:59:32 more of their genomic sequence structure. It -- it    08:59:39 remains the same, it doesn't change. Whereas, other    08:59:44 genes have -- it's easier to get multiple mutations    08:59:48 because they may have a weaker structure. It gets into    08:59:53 biochemistry.    08:59:58

Q. Okay. Are there any benefits to a test that    09:00:00 targets two genes rather than one gene?    09:00:03

MS. OSTLER: Objection. Ambiguous.    09:00:06

Page 73

THE WITNESS: It depends on what the    09:00:09 intended use is for the test and the particular genes,    09:00:11 what the goal is.    09:00:16

Q. (BY MR. FLOCH) Did customers of Co-Diagnostics    09:00:20 ever request that Co-Diagnostics develop a test that    09:00:23 targeted multiple genes rather than a single gene?    09:00:27

MS. OSTLER: Objection, ambiguous, vague.    09:00:31

THE WITNESS: I'm not certain what customers    09:00:33 requested because I'm -- I didn't receive all the sales    09:00:36 feedback. I know it was a topic of debate.    09:00:41

Q. (BY MR. FLOCH) What was a topic of debate?    09:00:49

A. Whether to include more than one gene is based on    09:00:56 what the WHO was talking about in their releases.    09:01:02

Q. And when you say there was a debate, are you    09:01:14 referring to an internal debate inside Co-Diagnostics?    09:01:16

A. It was a global debate. Just not inside of    09:01:21 Co-Diagnostics, but globally.    09:01:25

Q. Do you recall any discussions inside    09:01:27 Co-Diagnostics about whether the Co-Diagnostics'    09:01:29 COVID-19 test should target multiple genes or a single    09:01:36 gene?    09:01:40

MS. OSTLER: Objection, ambiguous.    09:01:40

THE WITNESS: It got brought up.    09:01:41

Q. (BY MR. FLOCH) And what do you recall about the    09:01:43 substance of those conversations?    09:01:46

19 (Pages 70 - 73)

Veritext Legal Solutions

800-726-7007    305-376-8800

CONFIDENTIAL

Page 74

A. All I remember is that we were trying 09:01:48 scientifically trying to weigh out whether it was 09:01:55 needed, what it would add to the test, if there were any 09:01:58 complications with it. The more things you add in a 09:02:02 test, then you know the higher error and variability you 09:02:05 introduce. 09:02:09

Q. So let -- let me just ask you a general question 09:02:10 about the Logix Smart COVID test. Okay? 09:02:22

A. Okay. 09:02:28

Q. Just generally, how -- how did the Logix Smart 09:02:29 COVID-19 test compare to Co-Diagnostics' competitors' 09:02:36 tests? 09:02:40

MS. OSTLER: Objection, foundation, 09:02:41 ambiguous. 09:02:42

THE WITNESS: Well, I would have to see 09:02:46 specific performance criteria to answer that question. 09:02:47

Q. (BY MR. FLOCH) Was the Logix Smart test the best 09:02:52 test for detecting COVID-19 on the market in 2020? 09:02:56

MS. OSTLER: Objection, foundation, 09:03:02 speculation, vague, ambiguous. 09:03:04

THE WITNESS: I don't know what I think 09:03:06 about that. 09:03:15

Q. (BY MR. FLOCH) Well, I mean, you're here today 09:03:16 under oath, you're the VP of Product Development of 09:03:19 Co-Diagnostics. 09:03:23

Page 75

I guess I'm asking, you know: Was the Logix 09:03:24 Smart test the worst test on the market in 2020 to 09:03:27 detect COVID-19? 09:03:30

MS. OSTLER: Same objections. 09:03:33

THE WITNESS: No. 09:03:34

Q. (BY MR. FLOCH) What -- in your opinion was it 09:03:35 middle of the road in terms of -- of how it compared to 09:03:38 competitors' tests? 09:03:43

MS. OSTLER: Same objections. 09:03:45

THE WITNESS: I personally think that it was 09:03:48 -- it was equivalent to some of the tests that were on 09:03:50 the market. 09:03:54

Q. (BY MR. FLOCH) Okay. So when you say you 09:03:55 personally think it was equivalent to some of the tests 09:03:57 on the market, you're -- you're not saying it was the 09:04:01 best test on the market, right? 09:04:03

A. I don't know how I would describe the best test 09:04:05 on the market. 09:04:09

Q. In your time at Co-Diagnostics, did you ever have 09:04:10 any concerns about the performance of the Logix Smart 09:04:17 test? 09:04:27

MS. OSTLER: Objection, ambiguous. 09:04:27

THE WITNESS: I don't necessarily call them 09:04:33 concerns, but every time a test is run I want to see the 09:04:37 facts and how they derived. So part of my job is to 09:04:41

Page 76

critique. So any way that we can make improvements -- I 09:04:45 mean, they're required, per ISO 13485, continuous 09:04:49 improvement. 09:04:53

Q. (BY MR. FLOCH) So it seems like what you're 09:04:56 saying is, as part of your role as VP product 09:05:01 development, you basically have a skeptic's eye towards 09:05:04 your own test, right? 09:05:08

A. Always. 09:05:09

Q. Okay. Just generally thinking back to 2020, do 09:05:10 you have certain memories about critiques that you made 09:05:20 about the Logix Smart COVID-19 test? 09:05:27

A. What I can remember is mostly based on the 09:05:30 product being tested in India because that's where I was 09:05:41 most involved, and that would have been mainly with the 09:05:45 Saragene test. And in India, based on all of my 09:05:48 experience dealing with them and the different labs, 09:05:55 there's always multiple variables to consider, and 09:05:59 especially when you do not have full control of a 09:06:03 clinical evaluation. You are introducing more variables 09:06:09 in those situations. 09:06:14

Q. Okay. So I asked you if you remembered any 09:06:24 specific critiques, and you answered that you remember 09:06:27 talking about India and the Saragene test, right? 09:06:30

A. That's mostly what I remember. 09:06:37

Q. Do you remember any critiques that the Indian 09:06:38

Page 77

authorities made about the Saragene test? 09:06:43

MS. OSTLER: Objection, ambiguous. 09:06:49

THE WITNESS: So there were a series of 09:06:52 clinical evaluations which were done at institutions 09:06:54 that were required by the government. I mean, you 09:06:59 basically submit the application to the CDSCO, and they 09:07:07 tell you where the test is going to be sent. In those 09:07:11 cases, we have no control whether they follow our 09:07:15 instructions or not. So there was always questions 09:07:19 about variables like that. 09:07:24

You know, what was their -- how do they 09:07:27 clean their lab? What are their protocols in place? Do 09:07:30 they use PPE? Do they follow the instructions? Do they 09:07:35 use the same extraction kit? What are they using to 09:07:38 interpret the test? I mean, there's all these factors 09:07:42 that I have to evaluate any time the test was sent out. 09:07:45

Q. (BY MR. FLOCH) From India or from any other 09:07:49 countries, do you recall any analyses of the Logix Smart 09:08:00 or Saragene test that -- where the result showed 09:08:05 clinical sensitivity of less than 100 percent? 09:08:10

MS. OSTLER: Objection, ambiguous, compound. 09:08:14

THE WITNESS: I don't remember specific 09:08:17 numbers, but there were some instances where it was less 09:08:20 than 100 percent, because 100 percent's not required in 09:08:22 every country. 09:08:27

Veritext Legal Solutions

800-726-7007                                                          305-376-8800

CONFIDENTIAL

Page 78

Q. (BY MR. FLOCH) Okay. And just off the top of your head, what -- what countries are you referring to when you say, "some instances"?

A. The initial tests that were performed in India did not show 100 percent.

Q. And when you say, "did not show 100 percent," are you saying did not show 100 percent clinical sensitivity?

A. Well, I'd have to go back to the validation report because I don't remember the exact information provided.

Q. Okay. So you said you recall the initial test in India didn't have 100 percent.

Do you recall any other instances from any other countries besides India where an evaluation did not show 100 percent sensitivity or specificity?

A. I don't remember the specific numbers from other countries.

Q. But do you remember any other countries where the evaluation of the Logix Smart or Saragene test showed sensitivity or specificity of less than 100 percent?

MS. OSTLER: Objection, vague, compound.

THE WITNESS: No, because I don't remember the exact numbers from the other countries. I would have to see those reports.

Page 79

Q. (BY MR. FLOCH) Okay. Have you heard -- sorry, let me back up.

Have you read any peer-reviewed publications that analyze the performance of the Logix Smart COVID-19 test?

A. I believe there may be one peer-reviewed publication out there, I haven't read through it.

Q. Okay. What do you remember about the peer-reviewed publication that you just referenced?

A. I just remember seeing it when I had a student doing a project this past semester, but that's all I know. I just saw the title and it was talking about CoPrimers, and that was it.

Q. Okay. Let me show you what I'm going to mark as Exhibit 3.

(Exhibit No. 3 marked.)

MS. OSTLER: Brandon, can you do us a favor and close out that comments column so that the exhibit's bigger.

MR. FLOCH: Oh.

MS. OSTLER: The col- -- yeah, the comments column was taking up half the screen. Thanks.

Q. (BY MR. FLOCH) So Dr. Garcia, if you could look at the abstract and then let me know when you're done. And I'm going to ask you a question.

Page 80

A. (Witness complying.) Okay.

Q. Is this the study that you saw when your student was work -- sorry.

Is this the study that your student showed you in regards to your work at Bob Jones?

A. I'm not certain if it's exactly the same or not.

Q. Okay. Do you recall seeing this study before?

A. No.

Q. Do you recall discussing this study with anyone at Co-Diagnostics?

A. No.

Q. Okay. Have you heard of the journal, Molecular Diagnosis & Therapy?

A. Not exactly. It doesn't seem familiar to me.

Q. Okay. I want to just go through this article and certain paragraphs. And I'll point you to the paragraphs we're going to go through.

So if we could go to the "Introduction" paragraph here that begins, "In this study," why don't you take a second to read that paragraph, and then let me know when you're done.

A. (Witness complying.) Okay.

Q. Do you see where it says, (as read): In this study, we compared the performance of four traditional molecular assays and two automated, rapid tests that

Page 81

have been used worldwide by experienced clinical diagnos- -- diagnostic laboratories to detect COVID-19?

Do you see that?

A. Yes.

Q. And do you see that one of the tests that this study analyzed with the "Logix Smart Coronavirus Disease 2019 Test Kit"?

A. Yes.

Q. That's the test kit Co-Diagnostics sells and sold while you were at Co-Diagnostics, right?

A. Yes.

Q. Now if you go down, why don't you take a look at section 2.1 and then I'll ask you a question.

A. (Witness complying.) Okay.

Q. Do you see that the first paragraph of section 2.1 says, (as read): The study group included 204 patients aged eight -- greater than or equal to 18 years, who were admitted to the Baruch Padeh Medical Center in Poriya, Israel, between June 2020 and August 2020 for COVID-19 molecular testing?

A. Yes.

Q. Do you see that?

A. I see that.

Q. If you go down in the second paragraph, it looks like it says that the Israeli Ministry of Health

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

approved -- the study that we're reading is part of a  09:15:45

validation of kits, right?  09:15:50

A. Yes.  09:15:52

Q. And if you go to third paragraph it says, (as  09:15:52

read): Out of 204 participates, 102 were positive and  09:15:56

102 were negative for the presence of COVID-19 RNA,  09:16:01

according to the Allplex 2019-nCOV Assay, which was  09:16:05

considered our reference kit.  09:16:09

Do you see that?  09:16:10

A. I see that.  09:16:11

Q. Do you understand what a reference kit is?  09:16:12

A. That's what they're using as their gold standard  09:16:14

or their predicate device.  09:16:19

Q. Okay. So it appears that in this study, the  09:16:22

Allplex kit is the predicate device. And so what this  09:16:24

study is doing is comparing whether or not the other  09:16:28

five tests identify the same negatives and positives  09:16:31

that the Allplex test identify, right?  09:16:36

A. That's right.  09:16:39

Q. Okay. And then if we scroll to paragraph 3.1...  09:16:40

Why don't you take a look at this section, and  09:16:50

then I'll ask you a question.  09:16:53

A. (Witness complying.) Okay.  09:16:55

Q. Okay. Do you see that 3.1, the section is  09:17:47

entitled, "Performance of Kits, in Comparison with  09:17:51

Page 83

Allplex 2019-nCoV Assay"?  09:17:54

A. Yes.  09:17:58

Q. And do you see the first sentence says, "Our main  09:17:58

aim was to evaluate the performance of traditional and  09:18:02

rapid molecular tests for COVID-19 detection, compared  09:18:05

to our reference kit, the Allplex 2019-nCoV Assay."  09:18:09

Do you see that?  09:18:13

A. Yes.  09:18:14

Q. And then if you go down to the middle of the  09:18:14

third full paragraph, do you see that there's a sentence  09:18:17

that said, "All kits had false-negative results, with  09:18:20

Logix Smart COVID-19 Kit having the highest (26/102,  09:18:25

25.5%) and the Xpert Xpress SARS-CoV-2 test having the  09:18:36

lowest (9/102, 8.8%) number of false-negative  09:18:40

results..."  09:18:45

Do you see that?  09:18:45

A. Yes.  09:18:46

Q. So is it fair to say that this study is saying  09:18:47

out of 102 positives detected by the Allplex kit, Logix  09:18:50

-- the Logix Smart test failed to identify 26 of those  09:18:57

known positives?  09:19:02

MS. OSTLER: Objection, foundation.  09:19:04

THE WITNESS: I need more information.  09:19:07

Q. (BY MR. FLOCH) What do you understand this  09:19:09

sentence to be that says, "All kits had false-negative  09:19:12

Page 84

results, with Logix Smart COVID-19 Kit having the  09:19:16

highest (26/102)..."?  09:19:19

What do you understand the 26 out of 102 to be  09:19:23

referring to?  09:19:25

MS. OSTLER: Objection, foundation.  09:19:26

THE WITNESS: That's just telling me how  09:19:28

many of the samples that they tested showed negative  09:19:31

results with the Logix kit; however, it does not  09:19:34

disclose any of the limitations or the way that they  09:19:37

handled the samples when they tested them.  09:19:40

Q. (BY MR. FLOCH) Okay. I -- I understand that.  09:19:43

But I'm -- I'm asking a fairly straightforward question,  09:19:48

which is: What does the 26 out of 102 refer to?  09:19:51

MS. OSTLER: Objection, foundation.  09:19:56

THE WITNESS: Well, it's just -- I just read  09:20:00

back what it says there. And that's the only thing I  09:20:02

can answer to that because it just says the Logix Smart  09:20:05

Kit showed 26 out of 102 false-negative results. But  09:20:09

that one sentence doesn't tell me what the limitations  09:20:14

were for the test, what the criteria was between the  09:20:18

Allplex test versus the Logix Smart test, and how the  09:20:24

samples were handled. All of those being variables to  09:20:29

an interpretation.  09:20:36

Q. (BY MR. FLOCH) So what you're saying is you --  09:20:37

you read the sentence as saying, there were 26 false  09:20:43

Page 85

negatives, but you're saying to me you don't know why  09:20:46

they would have been false negatives and there could be  09:20:49

explanations for why there were false negatives that  09:20:53

aren't described in this paragraph?  09:20:56

A. Exactly.  09:20:57

Q. So let's go down to...  09:21:00

Okay. Let's go down to No. 4. And if could read  09:21:15

the first two paragraphs, and then I'll scroll down so  09:21:19

you can read the remainder of the section. And let me  09:21:22

know when you're finished.  09:21:25

A. (Witness complying.)  09:21:27

Q. And I'm only going to ask you through this  09:21:29

footnote 5, if you want to just read to there.  09:22:06

A. (Witness complying.)  09:22:24

Where did you say to stop?  09:22:56

Q. Right at footnote 5, the blue 5 in the middle of  09:22:57

the first column?  09:23:03

A. All right. Just a minute, I'm almost finished.  09:23:04

Okay.  09:23:32

Q. So if we go back up to section 4, it says  09:23:32

"Discussion," right?  09:23:36

A. Yes.  09:23:37

Q. And the first sentence says, "The main aim of the  09:23:37

current study was to evaluate the performance of six  09:23:40

molecular tests for COVID-19 detection and to allocate  09:23:44

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

factors that may affect the tests' performance," right?

A. That's what it says, yes.

Q. And of the six tests, this study found that the Xpert Xpress SARS-CoV-2 test had the highest sensitivity among all tests, right?

A. That's what it says.

Q. And this study says that, "The least sensitive assay among all assays was the Logix Smart COVID-19 Kit, with 74.5% sensitivity," right?

A. That's what it says in that sentence.

Q. And it looks like following that paragraph after that sentence, the study attempts to find a justification for the low sensitivity, right?

MS. OSTLER: Objection, lack of foundation, document speaks for itself.

THE WITNESS: Well, at the end of the first paragraph of this section, it also identified things that would lead to differences in test performances. And this then also suggests or supports some of the reasons there would be a difference in performance.

Q. (BY MR. FLOCH) Okay. Do you see that there's a sentence that says, "Nevertheless, it was shown that primers targeted against the RdRp gene were less sensitive compared to primers targeted against N2 and E genes," do you see that?

Page 87

A. Yes, I see that.

Q. Then you see there's a sentence that says, "Thus, this evidence can explain the relatively low sensitivity of the Logix Smart COVID-19 Kit, which amplifies the RdRp gene," do you see that?

A. I see that.

Q. So have you ever heard -- before looking at this study had you ever heard any criticisms that targeting the RdRp gene could cause a test to be less sensitive than a test that targeted the N2 and E genes?

A. This has been a debate, and they're actually quoting from another paper in one of their sentences.

Q. So there's a debate over whether it's better to target the RdRp gene or N2 and E genes; is that what you're saying?

A. There's been a debate of whether to have more than one gene in a test.

Q. Do you have a certain opinion on that debate?

A. There has to be justification for me of why there is a second gene. Is the second gene used in making the interpretation or is it confirming the first gene? You know, what's the purpose of adding additional components?

Q. So I'm -- I'm not asking a general question about one or two genes. I'm asking specifically about

Page 88

COVID-19 and COVID-19 diagnostic testing. As to COVID-19 diagnostic testing, do you have a specific opinion on whether it's better to target just the RdRp gene or to target the N2 and E genes?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: Well, I -- right now I don't have enough information to make an opinion on whether to include one or more genes.

Q. (BY MR. FLOCH) But I -- I thought you testified earlier that this was discussed within Co-Diagnostics, right?

A. I said it was debated. I don't know that there was ever a conclusion to that debate.

Q. Did you have a certain position when that debate was occurring inside Co-Diagnostics?

A. I don't remember what my position was at that time.

Q. Okay. And it seems at least from this study, the authors are asserting that the lower sensitivity found in their study is a result of targeting just the RdRp gene instead of the N2 and E genes, right?

MS. OSTLER: Objection, foundation, document speaks for itself.

THE WITNESS: I don't believe that's the only point that they are pointing out. If you go back

Page 89

to the end of the first paragraph in this section, they talk about extraction methods and sample types as well.

Q. (BY MR. FLOCH) Is the finding of 74.5% sensitivity in this study on the Logix Smart test surprising to you?

MS. OSTLER: Objection, foundation.

THE WITNESS: I wouldn't say it's surprising because the more samples that you include and the wider your global population is, the more variability you're adding to the results.

MR. FLOCH: Okay. Why don't we -- let's just go off the record for one second?

THE VIDEOGRAPHER: We're going off the record at 11:29 a.m.

(Pause in the proceedings.)

THE VIDEOGRAPHER: We're back on the record at 11:30 a.m.

Q. (BY MR. FLOCH) Okay. So Dr. Garcia, I want to move now towards January 2020. Okay?

A. Okay.

Q. When did you first hear about Coronavirus?

A. I don't remember exact dates.

Q. Just ballpark?

A. I believe it had to have been some time in January. I was in India in most of January.

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

Q. When you were working at Co-Diagnostics, how many months out of the year did you spend in India?

A. I usually spent two to four weeks, like two or three times a year. Sometimes maybe a little more, little less.

Q. And do you remember who decided to develop a test to detect COVID-19 at Co-Diagnostics?

A. No, I'm not sure who that came from.

Q. How long did it take Co-Diagnostics to develop the COVID-19 Logix Smart test?

A. I'm not sure.

Q. Do you know whether it took a month for Co-Diagnostics to develop the COVID-19 Logix Smart test?

A. I don't know when they started developing, so I'm not sure of the time frame.

Q. Generally, how long does it take for a molecular diagnostics company to develop a diagnostic test?

MS. OSTLER: Objection, foundation, overbroad.

THE WITNESS: Depends on what you mean by develop.

Q. (BY MR. FLOCH) Let -- why don't I show you an exhibit. This will be Exhibit 4.

(Exhibit No. 4 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, why don't you take a

Page 91

second to read the bottom e-mail and then I'll ask you a question. And let me know when you need me to scroll down?

A. (Witness complying.) Okay.

Q. Okay. You see this bottom e-mail is from someone named Frank Garcia to Andrew Benson from January 22nd, 2020?

A. I see that.

Q. And do you see that the e-mail says, (as read): Hi Sue, I'm sorry for the delay. I'm just getting back to you with this. We have been tracking down Dr. Sat- -- Satterfield, who is currently traveling, so we approached Dr. Rebecca A. Garcia, who was able to answer the questions you posed in e-mail.

Do you see that?

A. I see that.

Q. And then what follows, it looks like there's bold and highlight -- sorry, bold and italicized language that apparently is attributed to you?

A. Yeah, supposedly it's attributed to me.

Q. Do you recall whether or not you drafted up these answers?

A. I do not recall it at all.

Q. Do you have any reason to doubt that you drafted up these answers?

Page 92

A. There is a reason to doubt based on the answer to the last question. Because in that paragraph it says that, the genetic sequence of the virus that have been published by WHO, genetic sequences would be put into national databases. And that's where we would get the sequences to start test design.

Q. Are -- do you have any relation to Frank Garcia?

A. I have no idea who that is.

Q. Okay. But you don't recall being asked to provide the answer that's bold and highlighted under bullet 3?

A. I don't remember it specifically, no.

Q. Okay. Do you see that the question in 3 says, "What are some of the science challenges of designing a Coronavirus test, or test kit, for use in the field?"

A. I see that.

Q. And do you see that in the middle of the answer it says, "The challenge of developing a test that enters the world stage so abruptly, and of doing so quickly, is scarcely of available data."

A. I see that.

Q. Do you agree with that sentence?

A. Yes and no. You -- I mean, let me explain a little bit, I guess.

The -- there wouldn't be a large number of

Page 93

sequences if it's something that is new and never been introduced in the world. So I can see where, yes, it would harder to design something if there's not a lot of sequence information to compare to see how a virus has changed over time or, you know, to predict its next mutation or whatever.

Q. And then do you see that there's a sentence that said, "Any test initially designed by Co-Diagnostics would use targets in genetic sequence of the virus that have been published by the WHO, but such a test would also likely be improved and iterated upon as time goes on."

Do you see that?

A. I see that.

Q. And then do you see there's a sentence that said, "Additionally, RNA can be quite variable, making it difficult for a test developed at early stages to consistently pick up variations over time in all affected populations."

Do you see that?

A. I see that.

Q. Do you agree with that second sentence? Is it difficult for a test developed at an early stage to accurately pick up variations that occur over time?

A. Depends on how the test is developed and the

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

technology used in it. But anybody designing a test is 09:38:39 going to consider that changes are going to happen over 09:38:44 a long period of time. That's why it's important in 09:38:48 choosing the genes which ones are more conserved than 09:38:53 others. 09:38:57

Q. Did the Logix Smart test have difficulty picking 09:39:02 up variations over time of Coronavirus? 09:39:09

MS. OSTLER: Objection, foundation. 09:39:13

THE WITNESS: The purpose of the test wasn't 09:39:16 to detect mutations over time. It was developed to be 09:39:17 able to withstand any mutations that occurred in the 09:39:24 target area. 09:39:28

Q. (BY MR. FLOCH) Okay. So let's move forward to 09:39:29 about February 2020, February/March 2020. Obviously a 09:39:47 pandemic is occurring at that time? Did -- did you have 09:39:56 any responsibilities in regards to selling the Logix 09:40:00 Smart test around February or March 2020? 09:40:06

MS. OSTLER: Objection, assumes facts not in 09:40:09 evidence, misstates facts. 09:40:13

MR. FLOCH: Sorry, I'll -- I'll ask another 09:40:16 question. 09:40:18

Q. (BY MR. FLOCH) Around February and March 2020, 09:40:18 did you have any responsibilities related to sales of 09:40:21 the Logix Smart COVID-19 test? 09:40:25

A. I was only asked to assist if anybody needed 09:40:29

Page 95

training or if they needed help analyzing data, how to 09:40:34 use the kits, explaining the differences between 09:40:39 antibody testing, antigen testing, and how the kit 09:40:44 worked. 09:40:49

Q. Around February 2020, did have you any 09:40:49 responsibility for finding distributors? 09:40:59

A. No. 09:41:01

Q. Around February 2020, did you have any 09:41:01 responsibility for locating any other customers for the 09:41:05 Logix Smart test? 09:41:08

A. No. 09:41:10

Q. Around February 2020, did you have any 09:41:10 responsibility with -- working with regulatory 09:41:17 authorities to approve the sale of the Logix Smart test? 09:41:22

A. Not the Logix Smart test, no. 09:41:26

Q. Okay. Around February 2020, did you have any 09:41:29 responsibility with working with regulatory authorities 09:41:35 to approve the sale of the Saragene test? 09:41:39

A. I had responsibilities helping CoSara, and CoSara 09:41:44 was the direct contact with the regulatory group in 09:41:49 India. 09:41:53

Q. Okay. So just remind me again, what is the 09:41:54 difference between the Saragene test and the Logix Smart 09:42:01 test? 09:42:06

A. So the Saragene test is where we transferred the 09:42:06

Page 96

sequence information and the basic formulary to CoSara. 09:42:13 And then CoSara adapted that based on the products that 09:42:20 they could obtain in India at the time. And then they 09:42:24 had to revalidate the test and file that test as 09:42:30 Saragene with -- it had different Instructions for Use 09:42:36 than the Logic's test. 09:42:43

Q. So I take it from your answer that the Saragene 09:42:45 test and the Logix Smart test are not identical? 09:42:52

A. They're not identical. 09:42:56

Q. Are -- are they similar? 09:42:57

A. The only similarity is the basic sequence 09:43:03 information and formulary. 09:43:09

Q. So if there was a clinical evaluation study run 09:43:13 on the Saragene test, would that clinical evaluation 09:43:25 study be applicable to the Logix Smart test too? 09:43:29

A. No. 09:43:33

Q. So it would be inappropriate in your opinion to 09:43:34 use a clinical evaluation test on the Saragene test to 09:43:52 represent facts about the Logix Smart test because those 09:43:56 two tests are not the same? 09:44:02

MS. OSTLER: Objection, ambiguous. 09:44:04

THE WITNESS: My opinion would be that you 09:44:09 keep them separated as two different products. 09:44:10

Q. (BY MR. FLOCH) Okay. So let me back up a 09:44:15 second. You testified that you helped CoSara get 09:44:31

Page 97

regulatory authority to sell the Saragene test in India 09:44:35 and elsewhere? 09:44:41

MS. OSTLER: Objection, misstates prior 09:44:41 testimony. 09:44:43

THE WITNESS: That's right, I helped CoSara 09:44:46 put together the information required to file the 09:44:50 regulatory application. 09:44:52

Q. (BY MR. FLOCH) And who was that -- where did you 09:44:55 file that regulatory application? 09:45:02

A. CoSara filed the regulatory application. 09:45:04

Q. With the CDSCO? 09:45:09

A. I believe that's the appropriate channel, yes. 09:45:15

Q. And the CDSCO was essentially the Indian FDA? 09:45:18

A. It works in the same capacity. 09:45:28

Q. Okay. In assisting CoSara with getting 09:45:30 regulatory approval for Saragene, did you ever have a 09:45:43 meeting with the Secretary of Health of India? 09:45:47

A. I don't remember having a meeting with secretary 09:45:50 of health. 09:45:53

Q. Okay. Let me show you Exhibit 5. 09:45:54

(Exhibit No. 5 marked.) 09:46:08

Q. (BY MR. FLOCH) So I'm going to scroll down to 09:46:08 the bottom of the chain, Dr. Garcia. And why don't we 09:46:45 take it chain by chain in the e-mail. So let me know 09:46:53 when you're finished reading the March 3rd e-mail, and 09:46:56

25 (Pages 94 - 97)

Page 98

then I'll ask you a question.

A. (Witness complying.)  Okay.

Q. Okay.  Is the e-mail in the chain we're looking at, an e-mail from you to Cecilia Hutchins, Chad Apuli, and Brent Satterfield?

A. Yes.

Q. And is it from March 3rd, 2020?

A. Yes.

Q. And is the "Subject" line "Urgent-COVID Info for Meeting"?

A. Yes.

Q. And do you see that you wrote, "We have a meeting with the Secretary of Health in India at 2:00 p.m."?

A. Yes, I see that.

Q. And then it goes on to request some information from your Co-Diagnostic colleagues, right?

A. Yes.

Q. And the second bullet point in the request to your Co-Diagnostics' colleagues says, "They want to know what performance evaluation has been done, where the samples were obtained, or if nothing then what is the plan and where will it be done."

Do you see that?

A. Yes.

Q. And then if you go down to the bottom of the

Page 99

e-mail you say, "Everything must be scientific and creditable or this person will throw us out of the office."

Do you see that?

A. Yes, I see that.

Q. So do -- do you remember anything about preparing for a meeting with the Secretary of Health of India?

A. I don't remember if I was in that meeting or whether I was just liaisoning the information for CoSara.

Q. It seemed like you were -- there was some urgency in your preparations for the meeting, though, right?

A. Yes, there -- there was.

Q. And -- and it looks like in bullet two you're -- you're requesting a per- -- performance evaluation data, right?

A. That's right.

Q. Why were you looking for that?

A. I don't remember exactly why.  Usually if you're submitting a test, the more evidence you have of any performance that's been done on any iteration of the device will help you get it through the regulatory channels.

Q. And -- and why is that?

A. It just shows evidence that -- that testing has

Page 100

been done from the very ideation of the device to the point that it's currently in.

Q. So if you were going to a meeting with the Secretary of Health of India, you wanted data to basically prove that your test could work, right?

MS. OSTLER:  Objection, mischaracterizes prior testimony, assumes facts.

THE WITNESS:  We needed evidence to support that the -- the test performed the way it was intended to perform.

Q. (BY MR. FLOCH)  Okay.  Now if you scroll up a little bit, do you see that there's a reply from Dr. Satterfield to you, Ms. Hutchins, and Mr. Apuli?

A. Yes, I see one.

MS. OSTLER:  Are you --

Q. (BY MR. FLOCH)  Do you --

MS. OSTLER:  Can you -- sorry.  Can you just please let the witness read the whole document.

MR. FLOCH:  Of course.

Q. (BY MR. FLOCH)  Why -- why don't you -- why don't you scroll up and read the e-mail -- or sorry, why don't you read this portion of the e-mail, and then I'll scroll up so you can read the rest of it.  And then I'll ask you some questions when you're done.

A. Okay.  (Witness complying.)  Okay.

Page 101

Q. And then I'm going to scroll up to the next chain in the e-mail.  And let me know when you're done, and I can scroll up to the top.

A. (Witness complying.)  Okay.

Can I see who this was from at the top?

Q. (Indicating.)

A. Okay.

I need to see the end of this under 4.

Q. (Indicating.)

A. Okay.

Q. Okay.  So let's go back down to the e-mail I was asking you about.

We talked about an original e-mail from you requesting information from your colleagues that occurred on Tuesday, March 3rd, right?

A. Yes.

Q. And then if you scroll up, you see that Dr. Satterfield replied to you and Ms. Hutchins and Mr. Apuli at 10:36 a.m., right?

A. Well, I can't confirm which time zone that that's in.

Q. Ah.  Okay.

He responded to your original e-mail at some point?

A. Yes.

Veritext Legal Solutions
800-726-7007                                    305-376-8800

CONFIDENTIAL

Page 102

Q. Okay. And do you see in the response he says, (as read): Cecilia - just anticipating objections from the Secretary of Health - they are going to criticize the lack of actual samples.

Do you see that?

A. Yes.

Q. Now I think you testified earlier you don't recall any meetings with the Secretary of Health of India, do you?

A. No, I don't.

Q. Do you have an understanding of why Dr. Satterfield would say that the Secretary of Health was going to criticize the lack of actual samples?

MS. OSTLER: Objection, speculation.

THE WITNESS: Dr. Satterfield wasn't very confident in work being done in India.

Q. (BY MR. FLOCH) What do you mean by that?

A. He always had reservations of contamination and other variables for anything that was done in India and -- of course, the lack of any type of sample was a lack of evidence that the test performed the way it was expected to perform.

Q. So was it your understanding that his reservations were about the CoSara operations in India?

MS. OSTLER: Objection, misstates prior

Page 103

testimony, speculation.

THE WITNESS: Not necessarily operations at CoSara, but anything that we didn't have control over.

Q. (BY MR. FLOCH) So when you say he had reservations about the work in India, are you referring to manufacturing, for example, of the Saragene test?

A. No. He had re- -- the question always in India was the environmental controls that were maintained in a lab and the lab that may be actually testing samples using our kit.

Q. Okay. So if we scroll up to the very top e-mail, you see Chad Apuli replies to the chain?

A. Yes, I see.

Q. And do you see that under the question 2, "They want to know what performance evaluation has been done where the samples were obtained or if nothing then what is the plan and where will it be done," do you see that?

A. I see that.

Q. And you see he responded and he said, "We don't have any data from samples"?

A. I see that.

Q. Okay. So at least as of March 2020, the Co-Diagnostics test -- sorry. Co-Diagnostics did not have -- let me back up.

At least as of March 2020, Co-Diagnostic did not

Page 104

have any data of -- from samples where its test had been run on human samples, right?

MS. OSTLER: Objection, misstates document, assumes facts not in evidence.

THE WITNESS: Well, it just means that Chad did not have any data from samples, but it didn't mean there wasn't any performance evaluation done anywhere else outside of the Salt Lake City lab.

Q. (BY MR. FLOCH) But at least as of March 2020, neither Chad nor anyone else on this e-mail chain, including you, had been given any data about how the Co-Diagnostics' COVID-19 test was performing?

MS. OSTLER: Objection, misstates the document, calls for speculation, assumes facts not in evidence.

THE WITNESS: The only part of that that I can answer is what I had, and I didn't have -- I was requesting performance evaluation data. And by this response, he didn't have anything to give me. And so no, I didn't have any information.

Q. (BY MR. FLOCH) Were you requesting performance evaluation data from the performance of the Saragene test?

A. I believe this was in reference to the Logix Smart test that was sent over as importation device

Page 105

because of the attachments that's on this e-mail, but it's not specified in the e-mail what we're talking about.

Q. And I think you testified earlier, you assisted CoSara with getting the authorization to sell the Saragene test, right?

A. I did assist them with that.

Q. So why would performance data about the Logix Smart test be applicable to getting authorization to sell the Saragene test?

A. Because we were importing the Logix Smart test.

Q. Okay. So let's just back up and talk about the authority to sell the Logix Smart test in India.

Did CoSara ever have authority to sell the Logix Smart test in India?

A. I'm not sure if they received clearance to import and sell the test. I don't remember that.

Q. Did CoSara ever receive authority to sell the Saragene test in India?

A. Yes.

Q. Okay. About when was that?

A. I'm not sure of the specific date. I believe it was in April of 2020. I'm not sure though.

Q. Okay. Let me show you another exhibit.

(Exhibit No. 6 marked.)

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

Q. (BY MR. FLOCH) Dr. Garcia, why don't you take a look at what's been marked as Garcia 6 and then let me know when you're done and I'll have a question for you.

A. Okay.

Q. So is this a March 23rd, 2020 e-mail from you to Tom Williams, Seth Egan, and Dr. Satterfield?

A. Yes.

Q. And does the "Subject" line say, "Needs"?

A. Yes.

Q. Do you recall sending this e-mail?

A. I don't remember exactly.

Q. Do -- who is Tom Williams?

A. He -- all I know is he was assisting data entry for sales orders.

Q. Okay. And do you see the second paragraph you wrote, "CoSara asked for a list again of places we have shipped tests and it looks like there is no different information from the one which sent the other day," do you see that?

A. I see that.

Q. Do you recall being asked to prepare a list of places that Co-Diagnostics was shipping tests to?

A. I believe the regulatory authorities had asked for a list of where the Logic Smart tests were being shipped and where the Co- -- where the Saragene tests

Page 107

were being shipped.

Q. And so in this e-mail you're basically assisting CoSara with responding to the Indian regulatory authorities?

A. Yes.

Q. Okay. And then you see in last sentence of the e-mail says, (as read): No proof showing CLIA labs are buying the tests and no data to support that we have tested on samples.

Do you see that?

A. I see that.

Q. So at least as of March 23rd, 2020, you personally still have not seen any data to support that the Logix Smart test had been tested on samples, right?

A. That's right.

Q. Okay. And why were you asking for data that had been tested on samples?

A. Because that would help us get regulatory approval for the test in India.

Q. It -- is it easier to make a claim about a test performance if you have data that shows the test has been tested on samples?

MS. OSTLER: Objection, ambiguous, overbroad.

THE WITNESS: Can you repeat the question

Page 108

again?

Q. (BY MR. FLOCH) Sorry. Yeah, let me...

As of late March 2020, had the Logix Smart test been tested on synthetic samples of COVID-19?

MS. OSTLER: Foundation.

THE WITNESS: Well, I wasn't involved with the testing in Salt Lake. I would just have to assume that it had been tested on synthetic samples to confirm that the primers were designed for its target.

Q. (BY MR. FLOCH) Okay. And can you help me understand what's the difference between obtaining data that shows a test has been tested on synthetic samples and data -- sorry, let me back up.

What -- what -- what is synthetic...

When I say "synthetic samples," what do you understand me to mean?

MS. OSTLER: Objection, foundation, speculation.

THE WITNESS: A synthetic sample is an oligonucleotide sequence that may be taken from a full genome that we have designed a target for. And we send that sequence off to a specific chemical company that then manufactures that sequence for that target. And they send us what's called a synthetic DNA or RNA, you know, sequence that we can then use to confirm that our

Page 109

primer design works for the target sequence that's been selected.

Q. (BY MR. FLOCH) So is it fair to understand that the synthetic sample is essentially an artificial COVID-19 that you can run the Co-Diagnostics' test on?

A. The synthetic sequence is typically used as the control to confirm the primer performance.

Q. Okay. Have you heard the term ICMR?

A. Yes.

Q. What's the ICMR?

A. It's the Indian Counsel of Medical Research.

Q. And what does that entity -- what are the responsibilities of that entity in India?

A. They work hand in hand with the CDSCO to determine where to send a device out for it to be clinically evaluated. And they give the final approval if they agree that it meets the criteria or not for the regulations.

Q. So is the ICMR part of the CDSCO?

A. I'm not sure of the specific structure.

Q. But they have some type of relationship with each other?

MS. OSTLER: Objection --

THE WITNESS: Yeah, they have a --

Oh, sorry.

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

MS. OSTLER: I was just objecting foundation.

Go ahead.

THE WITNESS: The ICMR and CDSCO have some type of relationship, but I don't know how that's defined.

Q. (BY MR. FLOCH) Okay. Are both of those entities government authorities in India?

A. Yes.

Q. Have you heard of the National Institute of Virology?

A. Yes.

Q. Okay. What -- what is that entity?

A. That's a national reference lab in India.

Q. And what's the relationship of the National Institute of Vir- -- virology to the CDSCO?

MS. OSTLER: Objection, ambiguous and foundation.

THE WITNESS: So the nat- -- there's several national labs in India that are run by the government. I don't know what their structure is in relation to CDSCO, but the CDSCO, ICMR typically use those labs to verify devices before approval.

Q. (BY MR. FLOCH) And when you say, "verify devices," what do you mean by "verify"?

Page 111

A. So it's like -- they do a clinical evaluation to ensure the device meets their criteria. They control the testing procedure and everything.

Q. Let -- have you heard the name -- and I'm probably not going to pronounce this correctly -- Anurag Mehta?

A. Yes.

Q. Who is he or she?

A. He's the Chief Operations Officer of Simbiotics and CoSara.

Q. Okay. Let me show you another exhibit.

(Exhibit No. 7 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, I'm showing you what's been marked as Exhibit 7. Why don't you review it and let me know when you're done, and I'll have a few questions for you. And let me know when you need me to scroll down.

A. You can scroll down.

Q. (Complying.)

A. Okay. (Witness complying.)

Can you scroll down some more.

Q. (Complying.)

A. And can you scroll up to the top so I make sure which version this is? I think I put it in the "Subject".

Page 112

Q. (Complying.)

A. Okay. I've read through all of it.

Q. And Dr. Garcia, there's attachment and I'm going to ask you about it, so I'll let you look at it. Let me know when you'd like me to scroll down.

A. (Witness complying.) Okay.

Q. So let's go up to the very top of the e-mail. It's from you to Dr. Satterfield, right, from April 2nd, 2020?

A. Yes.

Q. And it looks like the "Subject" line says, (as read): Forward, Performance Evaluation Result?

A. Yes.

Q. And there's an attachment that says, (as read): Validation of Commercial Kits 02042020 NIV Pune.pdf?

A. Yes.

Q. Okay. And if you scroll down, there's an e-mail from Anurag Mehta to you and individuals at Co-Diagnostics, CoSara, and Asence, right?

A. Yes.

Q. Okay. And let me just ask a question about some of the individuals on this e-mail that we haven't spoken about before.

Who is Mohab -- Mohal Sarabhai?

A. His name is Mohal Sarabhai. He's the CEO of

Page 113

Asence Pharma Group, which is a umbrella company for Simbiotics and CoSara.

Q. And who is Mayuranki Almaula?

A. That's Dr. Mayuranki Almaula. She is vice president of partnerships and strategic alliance, I think is her title, for Co-Diagnostics. And she's also director of CoSara.

Q. Okay. So Dr. Anurag writes, "Dear All, Today the results of PE are published on ICMR site and unfortunately our score is not that satisfactory."

Do you see that?

A. I see that.

Q. And before we get further in the e-mail, he's referring to a performance evaluation that's attached to his e-mail, right?

A. Yes.

Q. And if you scroll down to No. 19, there's an entry for CoSara Diagnostics, right?

A. Yes.

Q. And under the column "Name of the Kit," there's an entry for, "SARAGENE Corona Virus (2019 CV) test kit"?

A. Yes.

Q. And do you see that in the column, "Concordance among true negative (%)," it lists 88% for the Saragene

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

test, right?

A. I see that.

Q. What does that 88% mean?

A. So, 88% is the probability -- can you go back up to the top of that column so I can -- is the probability that the test detects true negatives. But it does not provide a confidence interval. Usually those numbers are listed with the confidence interval.

Q. So is another way to understand the 88% number that, at least in this study, the Saragene test was finding 12% false positives?

A. Yes, I guess that's one way to look at it.

Q. Okay. So if we go back up to Dr. -- sorry, is it Dr. Mehta or Mr. Mehta?

A. It's a Mr. Meta, he doesn't have a "Dr.".

Q. Mr. Mehta goes on to write, "We have submitted this results to CDSCO for granting the permission for manufacturing but I am having doubts, which I am listing below..."

Do you see that?

A. I see that.

Q. And then he writes, (as read): CDSCO will again raise the query that the results of PE are not meeting the ICMR requirements and so the product needs improvements to meet the criteria.

Page 115

Do you see that?

A. Yes.

Q. Had the CDCO -- sorry.

Had the CDSCO before this study raised any criticisms about the Saragene test?

A. I don't remember any, but I wasn't in direct contact with CDSCO.

Q. Okay. And then do you see that he goes on to write, (as read): In that case we will not be granted manufacturing license and some improvement needs to be done on this product at SLC or maybe some minor concentration changes at CoSara using existence comp- -- using existing components only.

Do you see that?

A. Yes.

Q. What do you understand "SLC" to mean?

A. Salt Lake City.

Q. And...

And then Mr. Mehta goes on to write, "After doing that we can again submit the sample (version 2) to NIV for evaluation." And then in parenthesis, here also the risk is involved that we may get the same or even not better results as the existing one, do you see that?

A. I see that.

Q. Then he goes on to list some more doubts --

Page 116

sorry.

Then he goes on to say, (as read): The counter thoughts say that when NIV has established standards in India for comparison of commercial kits, it is difficult to believe that they have not verified their standards at the lowest possible levels, in parentheses, limit of detection.

Do you see that?

A. Uh-huh, I see that.

Q. And then he says, "I'm sure NIV and ICMR must have done enough work on this before declaring their standards," do you see that?

A. I see that.

Q. So when you first received this -- sorry, let me back up.

Do you recall receiving this performance evaluation result?

A. I remember it faintly.

Q. Okay. Did you think that the NIV study -- sorry, let -- let me ask a different question.

(Cutting out) -- evaluation from the NIV cause you any concern about the accuracy of the Saragene test?

MS. OSTLER: Brandon, you cut out a little at the beginning of that. I didn't hear that full question. Somehow it cut out. Can you --

Page 117

MR. FLOCH: I'll ask it again.

Q. (BY MR. FLOCH) Did this NIV evaluation study cause you any concerns about the performance of the Saragene diagnostic test?

A. The results from the study raised for me questions of all different types of variables. There was no indication of what they compared it to, like -- I don't know what test they compared it to or anything about that test. And there's different factors, you know, that go into a test and how its performance can be evaluated, such as reaction volumes and whether it's running one gene or two genes or does it have an internal control? I mean, all types of information. How it's being interpreted.

There's also the question of how old those samples are that they're running, the practices that's going on in their lab. There was just too many unidentified variables and too many questions surrounding this that I had that needed to be evaluated.

Q. Did you attempt to evaluate or get answers to any of the questions that you just raised in your testimony?

A. Yes.

Q. Okay. Can you walk me through how you attempted to answer the questions you just raised in your testimony?

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

A. So -- well, I was still trying to get performance 10:23:41 information from Salt Lake that I had previously 10:23:47 requested. Because that would tell me if the primers 10:23:51 worked or not inside of a sample matrix. Because there 10:23:55 can be a difference between using synthetic samples 10:23:59 versus using samples. There can also be differences in 10:24:03 genomic diversity between an American population versus 10:24:08 an Asian population. 10:24:12

I also -- I can't remember when I talked to the 10:24:15 lady at the NIV lab, whether it was after this study or 10:24:19 after we ran the second round of testing, but some time 10:24:26 during that I talked to her on the phone to try to get 10:24:31 more information. But there was a lot of things she 10:24:36 would not disclose to me. 10:24:40

Q. So you mentioned three different avenues that you 10:24:42 were exploring to get answers to your questions about 10:24:54 the NIV study, right? 10:24:58

A. Yes. 10:25:00

Q. You first said that you went back to Salt Lake 10:25:00 City to ask if they had any performance information, 10:25:04 right? 10:25:08

A. Yes. 10:25:09

Q. Did -- did they provide you with any performance 10:25:10 information in your response to your query regarding NIV 10:25:14 test? 10:25:19

Page 119

A. Eventually I got performance information, but I 10:25:19 don't know the time frame in comparison to this 10:25:23 particular e-mail. 10:25:27

Q. Okay. You also mentioned that you had questions 10:25:30 about genomic diversity. 10:25:32

Did you obtain any answers about whether genomic 10:25:35 diversity was accounting for the results shown by the 10:25:39 NIV test? 10:25:45

A. So there were some tests run in Salt Lake City by 10:25:46 our bioinformatics team, and they were monitoring 10:25:49 mutations. 10:25:54

Q. Did the bioinformatics team provide you with any 10:25:57 data that would allow you to conclude that genomic 10:26:08 diversity was the cause of the NIV results? 10:26:17

A. They provided data that showed that there were 10:26:21 some genes that had more mutation build up over time 10:26:25 than others. But without knowing what tests we were 10:26:30 comparing it to, I wouldn't know if that was related or 10:26:34 not. 10:26:39

Q. Okay. Did you eventually come to a conclusion 10:26:41 about -- sorry, let me back up. 10:26:45

Did you trust the 12% false-positive finding that 10:26:52 the NIV found when they analyzed the Saragene test? 10:26:57

A. I don't fully put my trust in data until I see 10:27:02 all the facts, so I was still searching for answers. 10:27:09

Page 120

MR. FLOCH: Okay. Let's go off the record. 10:27:18

THE VIDEOGRAPHER: We're going off the 10:27:20 record at 12:27 p.m. 10:27:24

(A lunch recess was taken.) 11:02:14

THE VIDEOGRAPHER: This is the beginning of 11:02:14 Media Unit 3, and we're back on the record at 1:02 p.m. 11:02:15

Q. (BY MR. FLOCH) Dr. Garcia, when we left before 11:02:23 the break, we were talking about a study conducted on 11:02:24 the Saragene test by the National Institute of Virology, 11:02:27 right? 11:02:32

A. Yes. 11:02:33

Q. Okay. I'm going to show you what I'm going to 11:02:33 mark as Exhibit 8. 11:02:36

(Exhibit No. 8 marked.) 11:02:54

Q. (BY MR. FLOCH) Why don't you take a second to 11:02:54 look at it, and then let me know when you're ready for a 11:02:56 question. 11:03:02

A. (Witness complying.) Okay. 11:03:02

Q. Dr. Garcia, is this an e-mail from April 2nd, 11:04:14 2020 to Dr. Satterfield, Chad Apuli, and Cecilia 11:04:18 Hutchins? 11:04:23

A. Yes. 11:04:23

Q. And do you see that in the first line of the 11:04:24 e-mail you wrote, "The ICMR has printed the results from 11:04:30 our tests and they are not passing guidelines"? 11:04:34

Page 121

A. Yes. 11:04:37

Q. Then do you see you write, "Here's is my opinion: 11:04:37 First of all 100% is impossible for any test and not 11:04:40 mathematically sound if you believe in bell shaped curve 11:04:44 and 5% error," do you see that? 11:04:48

A. I see that. 11:04:50

Q. What did you mean when you wrote "100% is 11:04:51 impossible for any test"? 11:04:54

A. Well, I was referring to the criteria that the 11:04:55 NIV had provided in one of the previous documents where 11:04:58 they were requiring the 100% clinical concordance. 11:05:06

Q. Okay. What -- what does "clinical concordance" 11:05:15 mean? 11:05:22

A. When you compare one test with another test, you 11:05:22 get an agreement percentage or concordance percentage. 11:05:25 100% would not consider any error. 11:05:35

Q. Okay. And it's your testimony that it's 11:05:38 impossible for any diagnostic test to be perfect all the 11:05:42 time? 11:05:50

MS. OSTLER: Objection, mischaracterizes 11:05:51 prior testimony. 11:05:53

THE WITNESS: So the percentage is based on 11:05:54 the population and the test information that's being 11:06:00 compared. The larger the population, the number can 11:06:02 change. 11:06:11

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

Q. (BY MR. FLOCH) And then do you see you go on to write, "Secondly, I think what they are seeing is exactly what was seen in the samples SLC got from testing employees"?

A. Yes, I see that.

Q. What did you mean by that second sentence?

A. So after I had went to India in, I believe it was March of 2020, then I went to Salt Lake City. And while I was there, they were collecting samples to test for COVID basically to prevent any contamination getting in anything that they were manufacturing. So those results that they got from testing employees were showing some questionable results.

Q. When you say, "questionable results," what do you mean?

A. So one of the variables that we had considered even from the NIV results from India was the global debate of: Does a molecular test require some type of Ct value interpretation cut off? And some places, like in India, were suggesting that the interpretation reporting value should be cut at cycle 35. And so that's why my sentence here in this e-mail goes on to talk about the cycle values.

Q. So then you go on to write, "Even though you guys say it was contamination, my interpretation was

Page 123

different."

Can you explain to me what your interpretation of -- sorry.

Can you explain to me what your interpretation was as regards to the 12% false-positive finding in the NIV study?

A. Well, if you consider a cycle value cut off at 35, which was different from the Instructions for Use, when reporting a positive value, then you get a different outcome in the results. The same would be true for the NIV study. If you cut off the value at cycle 35, then you eliminate anything that possibly amplified past that cycle and would have been called a positive sample.

Q. Do you see you go on to write, (as read): If I took the LoD, which was 8 copies with approximate Ct value of 36 and I put everything I amplifies past 36 in a grey zone as unreportable, then I remove all those potential false-positive results.

A. Yes.

Q. You see that?

Okay. So help me understand what effect does the limit of detection have on your interpretation of why the NIV results were showing 12% false positives?

A. I'm sorry, I think I missed part of that

Page 124

question, can you repeat it.

Q. Okay. So you reference a limit of detection in this e-mail, right?

A. Yes.

Q. What does the limit of detection of the Saragene test have to do with your interpretation of the 12% false-positive finding in the NIV results?

A. Well, the primer performance, if there are no changes in the primers or the component parts that are used in the tests, they should perform equivalently. So the LoD should be about the same if you have -- consider the same amount of error for technician or mechanical error.

Q. Was the limit of detection of the Saragene test higher than the limit of detection of Saragene's competitors' tests?

MS. OSTLER: Foundation.

THE WITNESS: I don't remember the limit of detection.

Q. (BY MR. FLOCH) Do you recall any criticisms of -- by anyone about the limit of detection of Saragene's test -- sorry, of the Saragene test?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I don't recall specific comments about the limit of detection.

Page 125

Q. (BY MR. FLOCH) Okay. So you mention this grey zone in your e-mail to Dr. Satterfield and others. Can you help me understand what is the grey zone that you're talking about?

A. Yeah. So the limit of detection is the lowest point that an analyte can be detected 95 percent of the time. That's what it's confirmed at is 95 percent of the time. Any Ct value that is more -- so the LoD at that point is related to a Ct value. So any Ct value that is more would mean that those concentrations related to that Ct value would be less. So that means they would have less than a 95 percent probability that they would be a true result. Because as you decrease the probability of the true result, you increase the percent probability for error.

Q. Okay. Do you see that in the last sentence you wrote, (as read): Some regulatory boders -- bodies require a grey zone to be identified - it usually refers to the area between LoD and cut off that could be positive or negative.

Do you see that?

A. Yes.

Q. So help me understand, because I may not be understanding it correctly. But is it fair to say that the grey zone is an area -- or sorry let me back up.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

Is it fair to say that the grey zone is a point at which the test can neither distinguish between a true positive and a true negative?

A. Yes, that's a good layman's definition.

Q. Okay. And is it also fair to say that if a test has a very high limit of detection, it will have a larger grey zone?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I'm not sure what you mean by "high limit of detection". High limit of detection would mean that the Ct value is moving the other direction.

Q. (BY MR. FLOCH) If it takes -- sorry.

So let's just take this e-mail in context and explain to me in the simplest way possible, what was your conclusion about why the NIV test was showing 12% positives -- false positives.

A. I'm not sure that I came up to a conclusion because none of my variables could be actually confirmed.

Q. Okay. Well, you did say, "Here's my opinion..."

Can you at least describe for me what was your opinion as to why the NIV results were showing 12% false positive?

A. So my opinion based on the information that was

Page 127

provided me was that there were variables that could not be determined that would influence the results of the test.

Q. Okay. Let me show you another document.

(Exhibit No. 9 marked.)

Q. (BY MR. FLOCH) Do you see what's marked as Exhibit Garcia 9 on your screen?

A. I didn't see the exhibit number but...

Okay. Yes.

Q. Why don't you take a look at this real quickly.

A. (Witness complying.) Okay.

Q. Okay. Do you see this is an e-mail from Cameron Gundry to Lauren (sic) Benzonana on April 3rd, 2020?

A. Yes.

Q. And do you see that you and Dr. Satterfield, among others, are in the "CC" line?

A. Yes.

Q. And do you see Dr. Gundry wrote, (as read): Laura, Sorry to bug you, but could you send any official info, or even make a document or point to one, saying our kits have been evaluated at some level of performance? We need this today to help with an Indian submission for our partner's clinical, CoSara. Something specifically referring to specificity, number of samples, et cetera.

Page 128

Who was Cameron Gundry?

A. He was part of the sales team.

Q. And what is "biodynamics"?

A. I have no idea.

Q. Did you ask Mr. Gundry to request performance evaluations that customers had run on the Saragene test?

A. I don't remember specifically asking him. I believe this goes back to my original request to Salt Lake for any performance information, because it got brought up in a management meeting, and he would have been in a management meeting.

Q. Okay. And to your understanding, sorry let me back up.

Why would a request for performance evaluation data been -- why was a request for this performance evaluation data brought up in a management meeting?

A. Because we still needed some proof of the test performance on a basic level to a company the -- the regulatory application filings in India.

Q. So was it your understanding that the National Institute of Virology would not have given a passing score without some data to rebut the 12% false-positive finding that they had made?

A. I'm not sure the use of the data by the regulatory agency.

Page 129

Q. Well, you -- the company -- sorry.

Co-Diagnostics was asking for performance evaluation data for some reason, right?

A. Did you mean CoSara?

Q. Well, let me back up.

Mr. Gundry in his e-mail doesn't distinguish between performance evaluation data for Logix Smart and performance evaluation data for CoSara -- sorry, for the Saragene test, right?

A. Yes, he doesn't specify which one.

Q. If you had received performance evaluation data on the Logix Smart test, would you have then taken that data and showed it to the National Institute for Virology?

MS. OSTLER: Objection, calls for speculation, uncomp -- incomplete hypothetical.

THE WITNESS: I would have shared that data with CoSara. I don't know to whom CoSara would then -- if they shared it to somebody or whether they kept it internally.

Q. (BY MR. FLOCH) Okay. I think you testified earlier that you recall having conversations with someone at the NIV after the first performance evaluation results came out on the Saragene test, right?

A. I don't know when I had the conversation, whether

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

it was after the first performance or the second, but I did talk to the lady who was in charge of the lab.

Q. When you say the second performance, what are you referring to?

A. There were two runs of data done at the NIV.

Q. Okay. So the Saragene test failed the first NIV evaluation, right?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: They don't claim it as passing or failing. They give you the chance to make improvements and resubmit.

Q. (BY MR. FLOCH) So I'm -- I'm just reading your words in Exhibit Garcia 8. And we can pull it back up again. But at least according to your words, you said, The ICMR has printed the results from our tests and they are not passing the guidelines," right?

A. Yeah.

Q. Okay. So at least on the first try, the Saragene did not pass the ICMR/NIV guidelines, right?

A. Yes. What they listed as 100 percent. It didn't meet 100 percent.

Q. Okay. Now, what about the second performance, did the Saragene test pass the guidelines on the second evaluation?

A. I don't recall the specific numbers, but I don't

Page 131

think it passed.

Q. Okay. Let me show you a document.

(Exhibit No. 10 marked.)

Q. (BY MR. FLOCH) And Dr. Garcia, why don't you take a second to read this document, and then I'll ask you a question.

A. (Witness complying.) Okay, I'm down to four.

Okay.

Q. So is this an April 11th, 2020 e-mail from you to Dwight Egan and Mayuranki Almaula?

I apologize for the pronunciation.

A. Yes.

Q. And you see the "Subject" line says, "Urgent - NIV India Results"?

A. Yes.

Q. And you write, (as read): Hi Ike. The following is a report from NIV that needs action from us. This is feedback that affects the entire test and company. I would like to talk with you before bringing anyone -- everyone else in. Please call as soon as possible.

Do you see that?

A. Yes.

Q. So Dwight Egan was the CEO of Co-Diagnostics in April 2020, right?

A. Yes.

Page 132

Q. And why did you say to him that the feedback from NIV affected the entire test and company?

A. Because if it gets in to the wrong hands, it gets misinterpreted.

Q. Okay. Why do you say that?

A. Because somebody who's not a scientist won't be able to understand the information, and then they'll make false accusations and claims about the performance of the test.

Q. Okay. So you see it says, "NIV tested the following points in this order," and then there's a bunch of bullet points?

A. Yes.

Q. And Bullet 1 says, "First submission tested COVID samples with NIV assay and Saragene assay (produced in Ranoli), the results were 88% specificity and 100% sensitivity," right?

A. Yes.

Q. And the reference to specificity there is clinical specificity, right?

A. Yes.

Q. And the reference to sensitivity is clinical sensitivity, right?

A. Yes.

Q. And so the reference to the first submission in

Page 133

Bullet 1 is a reference to the evaluation that did not pass the guidelines, right?

A. Yes, it didn't pass the guidelines.

Q. Okay. So Bullet 2 starts and says, (as read): Second submission, CI -- sorry, (CE-IVD kit sent from US) was tested for LoD first.

Do you see that?

A. Yes.

Q. Okay. Can you explain to me what that means?

A. That would be the Logix Smart kit.

Q. Okay. And what -- what -- how -- sorry, let me back up.

What did you mean when you said that the submission was tested for LoD?

A. So it means that the group that we sent it to established a limit of detection based on the criteria they use in their lab to determine the limit of detection.

Q. And then do you see the next line says, "They agree the sensitivity is much lower than their test. Agreed by both entities"?

A. Yes.

Q. Were you telling Dwight Egan that the NIV test had a much higher sensitivity than the Co-Diagnostics test?

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

MS. OSTLER: Objection, ambiguous.    11:29:53

THE WITNESS: I was telling Ike in    11:29:59 comparison to the data that they had shared with CoSara,    11:30:01 that the numbers showed that the sensitivity was lower    11:30:06 for the Logix test than whatever they compared it to.    11:30:13 But we -- I don't believe we knew what they were    11:30:17 comparing it to. I would have to go back to the report.    11:30:20

Q. (BY MR. FLOCH) Okay. And why did you say,    11:30:23 "Agreed by both entities"?    11:30:24

A. Because CoSara and the NIV had looked at the data    11:30:27 and come to the same conclusion from the information    11:30:33 that was provided.    11:30:38

Q. Okay. Do you recall any discussions you had with    11:30:41 anyone at CoSara about whether the NIV test had a higher    11:31:04 sensitivity than the Logix Smart test?    11:31:09

A. We had discussions at CoSara to try to determine    11:31:12 the variables that would yield a difference in the    11:31:19 results.    11:31:25

Q. Okay. So if we scroll down past Bullet Point 3,    11:31:30 there's a line that says, "She says the specificity for    11:31:53 our test is now 65%; she is not recommending the assay."    11:31:56

Do you see that?    11:32:02

A. Yes.    11:32:04

Q. What did you mean when you wrote, "she is not    11:32:04 recommending the assay"?    11:32:08

Page 135

A. The lab director for the -- I think that was the    11:32:09 NIV, when I spoke to her on the phone she had told me    11:32:18 that information.    11:32:21

Q. And is it fair to say that this lab director was    11:32:22 telling you that NIV was not going to recommend to the    11:32:33 CDSCO that CoSara could sell the Saragene test in India?    11:32:39

A. She was suggesting that we make some changes to    11:32:48 improve the test before she would recommend it.    11:32:54

Q. Okay. And what types of changes did she    11:32:58 recommend to you that could be applied to the Saragene    11:33:02 test to obtain a passing result?    11:33:08

A. So her suggestions are listed there in No. 4.    11:33:10

Q. Okay. Do you see in 4(b) it says, "She suggests    11:33:21 increasing the Tm," period?    11:33:25

A. Yes.    11:33:28

Q. What does "Tm" mean?    11:33:28

A. Tm is the melting temperature of the primers and    11:33:30 prob.    11:33:36

Q. Okay. So it appears from this e-mail that the    11:33:36 NIV during their second evaluation found an even lower    11:33:40 specificity than they found in the first evaluation,    11:33:47 right?    11:33:53

A. They're not really comparable because they're two    11:33:53 different tests.    11:33:58

Q. When you say, "tests," do you mean two different    11:33:59

Page 136

evaluations?    11:34:04

A. Well, they're two different evaluations, but the    11:34:05 first was using the Saragene kit produced in Ranoli, and    11:34:08 the second was using the Logix kit produced in the U.S.    11:34:14

Q. So it appeared that the Logix Smart Test    11:34:18 performed even worse than the Saragene test, at least    11:34:21 under the NIV evaluation?    11:34:25

MS. OSTLER: Objection, ambiguous.    11:34:27

THE WITNESS: You can't say that it    11:34:40 performed worse if it wasn't tested the first time. So    11:34:41 the 65% was the original results they got from testing    11:34:46 the Logix kit.    11:34:50

Q. (BY MR. FLOCH) Okay. And it seems -- sorry, if    11:34:53 we go back up to Bullet Point 2, is it fair to say that    11:34:56 CoSara and the NIV agreed that the Logix Smart test had    11:35:03 lower sensitivity in comparison to whatever test NIV was    11:35:08 looking at?    11:35:14

A. Yes, it had a lower sensitivity to whatever NIV    11:35:15 was testing and against. But there's several variables    11:35:24 related to that outcome.    11:35:27

Q. And is it also fair to read Bullet Point 2 to    11:35:29 mean that the Logix Smart test had a higher limit of    11:35:32 detection than whatever test the NIV was looking at?    11:35:36

MS. OSTLER: Objection, ambiguous.    11:35:41

THE WITNESS: I can't necessarily derive    11:35:44

Page 137

limit of detection information because there's no data    11:35:46 provided for that.    11:35:50

Q. (BY MR. FLOCH) Well, you were the one writing    11:35:52 this e-mail and providing information to Dwight Egan    11:35:54 about a submission that was tested on LoD, right?    11:35:59

A. Just No. 2 is talking about LoD; the others are    11:36:03 talking about correlation.    11:36:10

Q. Okay. If we go down to the bottom paragraph, do    11:36:11 you see that you wrote, "Based on the above information,    11:36:17 we have agreed that she will tell the Chief regulatory    11:36:21 agency that we are working on the test instead of    11:36:24 reporting the 65% failed test."    11:36:28

A. Yes.    11:36:31

Q. Do you see that?    11:36:31

A. I see that.    11:36:32

Q. Why did you agree with her not to report the 65%    11:36:33 failed test to the chief regulatory agency?    11:36:37

A. I mean, it didn't pass the criteria. So I mean    11:36:40 if you can make improvements and produce another    11:36:51 iteration, it's better to send in your improvement than    11:36:58 to report something that may be based on variable    11:37:01 testing methods.    11:37:08

Q. So let me back up and ask one other question.    11:37:10

What was the purpose of submitting the Logix    11:37:18 Smart kit for evaluation by the NIV if the NIV was    11:37:25

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

trying to determine whether or not to authorize sale of 11:37:29 the Saragene test? 11:37:32

A. Because they were two separate regulatory items. 11:37:34

Q. So did the CDS -- sorry, let me back up. 11:37:40

Was Co-Diagnostics and CoSara looking for 11:37:50 regulatory approval from the Indian government to sell 11:37:54 both the Saragene test and the Logix Smart test? 11:37:58

A. Yes. 11:38:03

Q. Okay. So help me understand why you are 11:38:03 describing it as first submission and second submission 11:38:08 if the first submission was for the Saragene test and 11:38:12 the second submission was for the Logix Smart test? 11:38:16

A. Because they were both submitted to the same 11:38:19 testing institution. 11:38:23

Q. But aren't they just both first submissions for 11:38:24 separate products? 11:38:29

A. They're for separate products. I was trying to 11:38:30 keep them separated. So instead of just generally 11:38:36 talking about NIV, I talked about it based on the 11:38:38 submission and identified each test. 11:38:42

Q. Okay. I understand. 11:38:46

So your bullet points here are not -- you are not 11:38:49 -- sorry, let me back up. 11:38:54

You're not implying to Dwight that the first 11:38:55 submission and the second submission are connected to 11:39:00

Page 139

each other? 11:39:04

A. No. 11:39:04

Q. Okay. So you're -- you're basically telling him, 11:39:05 the Saragene test didn't do well -- sorry. 11:39:11

You're telling Dwight, the Saragene test didn't 11:39:13 pass the guidelines when we ran it a few days ago, 11:39:16 right? 11:39:22

A. Yeah, that's the first point. 11:39:23

Q. Then the second point is, now that NIV has 11:39:25 evaluated the Logix Smart test, that one is also not 11:39:29 passing the guidelines, right? 11:39:33

A. Yes. 11:39:35

Q. Okay. I understand. 11:39:35

And is that why you were telling him that the 11:39:39 feedback for both the first submission and the second 11:39:42 submission affected the entire company and not just 11:39:46 CoSara? 11:39:50

A. Yes. 11:39:50

Q. So do you see in the bottom paragraph you say, 11:39:51 "We need to discuss steps moving forward and how to 11:39:56 respond," do you see that? 11:40:00

A. Yes. 11:40:03

Q. Did you discuss steps moving forward with Dwight 11:40:03 Egan and -- sorry, did you discuss next steps with 11:40:08 Dwight Egan? 11:40:10

Page 140

A. I don't remember when, but we did discuss what to 11:40:13 do next. 11:40:16

Q. Okay. And what do you recall build conversations 11:40:17 regarding that discussion? 11:40:21

A. So conversations for my part are always to 11:40:23 identify all the potential variables that would lead to 11:40:34 the outcome. So I literally have to piece apart each 11:40:38 step that a lab would have taken and each step that is 11:40:43 in the kit and identify its risks, whether they're good 11:40:47 or bad. And then, of course, with I -- it usually gets 11:40:52 brought up in a management meeting, so you get sales 11:41:00 input, you get Ike's input, you get regulatory input, 11:41:03 you know, what you steps have to be taken. If we do 11:41:07 more testing, if we make a change, then what else has to 11:41:10 -- what else is related to that? 11:41:14

Q. Okay. Did Co-Diagnostics ever follow up with the 11:41:32 NIV about the Logix Smart test? 11:41:35

A. I don't believe Co-Diagnostics would have any 11:41:42 contact with NIV because it went through CoSara. 11:41:46

Q. Okay. So did CoSara follow up with NIV after the 11:41:50 e-mail we just looked at, Garcia 10, and -- sorry, let 11:41:54 me back up. 11:42:02

Did the NIV ever provide a passing score for the 11:42:03 Logix Smart test? 11:42:08

A. I don't recall anything else from the NIV. 11:42:11

Page 141

Q. Did the NIV ever provide a passing score for the 11:42:16 Saragene test? 11:42:20

A. I don't remember any other data from NIV. 11:42:23

Q. Okay. So let me show you, Exhibit 11. 11:42:27

(Exhibit No. 11 marked.)

Q. (BY MR. FLOCH) And why don't you take a look at 11:43:04 it, as well as the attachment, and let me know when 11:43:05 you're ready. And Dr. Garcia, just let me know when to 11:43:08 scroll down, and I'll... 11:43:12

A. Okay. Can you scroll down. 11:43:32

Whoa, whoa, what was the e-mail from Andrew? 11:43:36

Q. Oh, sorry. 11:43:39

A. (Witness complying.) Okay. 11:43:53

Q. So let's scroll up. 11:44:49

Do you see that the top e-mail is from you to 11:44:50 Andrew Benson, Mayu, Anurag, and Dwight from April 28, 11:44:53 2020? 11:45:00

A. Yes. 11:45:01

Q. And it looks like you're providing redlines to a 11:45:01 draft press release? 11:45:05

A. Yes. 11:45:06

Q. And you write, "The proper branding of the test 11:45:07 is Saragene COVID RT-PCR Test per the brochures received 11:45:11 from Swapnali. Can we mention NIP so no one confuses 11:45:15 the results with those first published by NIV?" 11:45:21

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

Do you see that?

A. Yes.

Q. What did you mean when you wrote, "Can we mention NIP so no one confuses the results"?

A. So this was a different clinical evaluation at the National Institute of Pathology.

Q. Okay.

A. That was being reported in the attachment.

Q. So the National Institute of Pathology is different than the National Institute of Virology?

A. They're different institutions, but they're both government national labs in India.

Q. And the Logix Smart test did not get a passing score from the National Institute of Virology?

A. I -- yeah, the Logix Smart didn't pass their criteria at the NIV.

Q. And the Saragene test did not pass the guidelines for the National Institute of Virology?

MS. OSTLER: Asked and answered.

THE WITNESS: The Saragene test didn't pra- -- pass the criteria at NIV.

Q. (BY MR. FLOCH) Okay. But -- let's go down to the press release.

So this press release says, "Co-Diagnostics JV CoSara Receives Clearance from Indian Council of Medical

Page 143

Research for COVID-19 test," right?

A. Yes.

Q. And then if you go to the redline edits you made at the bottom of the first paragraph, it says, (as read): The National Institute of Pathology tests showed 100% sensitivity and 100% specificity...

Do you see that?

A. Yes.

Q. So after the National Institute of Pathology did their evaluation of the Saragene test, then the Saragene test -- sorry, then CoSara had authority to sell the Saragene test to the Indian market, right?

A. Yes.

Q. Okay. Now this press release doesn't mention the studies from the National Institute of Virology, right?

A. No.

Q. Isn't that misleading?

MS. OSTLER: Objection, calls for legal conclusion, assumes facts not in evidence.

MR. FLOCH: I don't -- well, I'm going to object. Whether or not --

Q. (BY MR. FLOCH) You can answer the question, if you understand the question.

A. So, they're two different studies. And as you've already shown me from the NIV, the conclusion was to

Page 144

make some changes for continuous improvement. And I believe changes were made between testing each one of these, because it -- the samples couldn't get to the NIP without being sent there from the ICMR.

Q. Okay. Don't you think a reasonable consumer of the Saragene test would have liked to have known that before the NIP passing score that it failed the NIV evaluation?

MS. OSTLER: Objection, speculation, assumes facts not in evidence.

THE WITNESS: I don't think a consumer's going to have enough scientific knowledge to interpret the data.

Q. (BY MR. FLOCH) Well, what about a reasonable distributor who is buying the Saragene test? Do you think a reasonable distributor of the Saragene test would have liked to have known that the Saragene test failed the NIV study?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: Distributors from my experience don't necessarily have scientific people on staff.

Q. (BY MR. FLOCH) In your role as VP of product development, if you were determining whether or not to

Page 145

buy a diagnostic test, would it be important for you to know that the test that you're buying had failed evalu- -- an evaluation before it passed an evaluation?

MS. OSTLER: Objection, incomplete hypothetical, calls for speculation.

THE WITNESS: I think that it's not necessarily the need of the consumer to understand the full technical design history of a product. What's important to the consumer is how that product performs in its final format, not in its multiple iterations.

Q. (BY MR. FLOCH) Okay. So are you testifying that in some instances it's okay not to share performance information about a test with consumers, as long as you believe the test performs properly?

MS. OSTLER: Objection, mischaracterizes prior testimony, incomplete hypothetical.

THE WITNESS: I don't -- I don't think that all the information is required to be disclosed, because any type of medical device or pharmaceutical drug goes through iterations before it's released into the market.

Q. (BY MR. FLOCH) Okay. Let me show you another document.

(Exhibit No. 12 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, why don't you take a look at this document, and let me know when you're ready

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

and I'll have a few questions for you.   11:51:57

A. (Witness complying.)  Okay.   11:53:09

Q. Okay.  So, is this an e-mail from April 29th, 2020 from Andrew Benson to you and others at Co-Diagnostic, CoSara, and Asence?   11:53:18

A. Yes.   11:53:21

Q. And it appears to be discussing the draft press release that we just looked at in Garcia Exhibit 11, right?   11:53:30

A. I think so, I'm not sure.   11:53:31

Q. Do you see that Andrew wrote, "This release doesn't really differentiate between the two, and Ike and I talked it over and we'd rather not go into detail about why this one matters more, so I think we'll probably just pass on issuing it altogether."   11:53:53

Do you see that?   11:53:58

A. Yes.   11:53:59

Q. Do you recall any conversations you had with Andrew Benson about deciding not to issue the press release regarding the NIP evaluation?   11:54:06

A. No, I don't recall any conversation.   11:54:12

Q. Was the reason Co-Diagnostics decided not to release information on the NIP results because it didn't want to highlight that the same test had failed the NIV evaluation?   11:54:29

Page 147

MS. OSTLER:  Objection, misstates the witness's prior testimony, lacks foundation, calls for speculation.   11:54:32

THE WITNESS:  I'm not the one who made a decision on what's released in a press release.   11:54:38

Q. (BY MR. FLOCH)  Have you ever drafted press releases for Co-Diagnostics?   11:54:45

A. No.   11:54:47

Q. Have you ever commented on press releases for Co-Diagnostics?   11:54:51

A. I've commented to scientific information.   11:54:52

Q. About how many times do you think you've commented on press releases that the company released?   11:54:59

A. Just a handful.  I mean, I -- not many at all.   11:55:04

Q. Have you ever been the primary drafter of a press release for the company?   11:55:15

MS. OSTLER:  Objection, asked and answered.   11:55:16

THE WITNESS:  Not that I remember.   11:55:18

Q. (BY MR. FLOCH)  Okay.  So we've been talking a lot about India, right?   11:55:27

A. Yeah.   11:55:29

Q. Okay.  So I want to move on and now focus on another responsibility you said you had as vice president of product development.  Okay?   11:55:39

A. Okay.   11:55:41

Page 148

Q. You said that one of your responsibilities was responding to customers who may have had -- who may have had questions about test application, right?   11:55:52

A. Yes.   11:55:54

Q. Okay.  So the first -- let's go back to the first half of 2020, do you recall assisting customers with usage of the Logix Smart test?   11:56:08

MS. OSTLER:  Objection, ambiguous.   11:56:13

THE WITNESS:  I helped a lot of customers, and I can't remember specific tests.  I mean, the COVID test was one of them, but there were other tests.   11:56:24

Q. (BY MR. FLOCH)  Do you recall providing support to customers with the usage of the Saragene test?   11:56:31

A. I did help some.  Most of that went through CoSara, though.   11:56:43

Q. Okay.  I'm going to show you Exhibit 13.   11:56:58

(Exhibit No. 13 marked.)

Q. (BY MR. FLOCH)  And Dr. Garcia, it's a fairly long e-mail, but I'm only going to be asking you about one chain in the e-mail.  So, it's up to you, you can read the whole thing if you want, but I'm just going to be asking you about a single e-mail in it.   11:57:29

Why don't you read the -- the top e-mail and then the second e-mail, and let me know when you're finished.   11:57:45

MS. OSTLER:  I prefer that the witness reads   11:57:49

Page 149

the entire thing to get context.  I think your last couple of pages are just footers and not substantive, so it's not actually as long as it seems.  We've got really, really long --   11:57:51

MR. FLOCH:  Okay, good.

Q. (BY MR. FLOCH)  Okay.  Dr. Garcia, why don't you take a second to read it, and let me know when you're done.   11:58:09

A. (Witness complying.)  Can you move it down a little?   11:58:34

Q. (Complying.)   11:58:34

A. Okay.   11:59:43

Q. I think --   12:02:19

A. Yeah, I think that's about it.   12:02:20

Q. Yeah.  Okay.  So let's go back up to the top.   12:02:21

Just generally, can you describe for me what this e-mail chain shows?   12:02:31

A. This is a customer that's using a different instrument than the one that was approved to be used with the test.   12:02:40

Q. And when you say, the "test," are you talking about the Logix Smart test?   12:02:44

A. I believe in this case we're talking about Logix Smart.   12:02:50

Q. And when you say, "instrument," are you referring   12:02:50

CONFIDENTIAL

Page 150

to a thermocycler?  12:02:53

A. Yes.  12:02:56

Q. Do you see there's someone named Sara Canarecci?  12:02:57

A. Yes.  12:03:08

Q. And do you know who she works for?  12:03:08

A. I don't remember who she works for.  12:03:10

Q. Okay. After reviewing this e-mail, do you have an understanding of what concern she was raising with you about the results that she was seeing with the Logix Smart test?  12:03:13  12:03:18  12:03:21  12:03:26

MS. OSTLER: Objection, assumes facts.  12:03:26

THE WITNESS: Her concerns were related to the differences when you change a machine that is not the same machine that's approved for the test kit. So it's the responsibility of the lab to revalidate the test performance.  12:03:29  12:03:32  12:03:38  12:03:43  12:03:47

Q. (BY MR. FLOCH) Okay. Let's go up to the e-mail from you to Sara Canarecci from April 8th, 2020; do you see that?  12:03:48  12:03:53  12:03:59

A. Yes.  12:04:00

Q. Okay. And I want you to read in the middle of the paragraph. Or sorry, I want -- do you see in the middle of the paragraph you wrote, "According to the instructions and our performance testing, the limit of detection for this assay is 600 total copies of virus at  12:04:00  12:04:07  12:04:12  12:04:15  12:04:20

Page 151

100% detection."  

Do you see that?  12:04:25

A. Yes.  12:04:25

Q. Can you explain to me what "600 total copies of virus at 100% detection" means?  12:04:26  12:04:30

A. So that would have been the test criteria at that point in time that Salt Lake City had evidence of for the limit of detection. And I -- from this e-mail, I wouldn't know how that number was derived, whether it was contrived sample or from real samples.  12:04:33  12:04:37  12:04:45  12:04:49  12:04:52

Q. Okay. So all you are telling Sara is that based on an IFU that you had, that the limit of detection, at least to detect 100%, was 600 total copies, right?  12:04:58  12:05:02  12:05:10

A. Yes.  12:05:17

Q. Okay. And then do you see you go on to write, "That means that any sample containing less viral copies than this may be hit or miss in its detection rate."  12:05:18  12:05:21  12:05:26

Do you see that?  

A. Yes.  12:05:31

Q. And then do you see you wrote, "If only 50 viral copies are present in the sample they may not be evenly disbursed, so one reaction may have viral copies and a second reaction may have none"?  12:05:31  12:05:35  12:05:38  12:05:42

A. Yes.  12:05:44

Q. See that?  12:05:44

Page 152

And then you wrote, "The detection rate is less than 100% when the viral load becomes less than the detectable limit."  12:05:45  12:05:48  12:05:53

Do you see that?  12:05:54

A. Yes.  12:05:55

Q. Okay. So are you telling Sara that if the viral load of the sample is under 600 that the Logix Smart test may not be able to accurately predict a true positive or a true negative?  12:05:55  12:05:58  12:06:02  12:06:06

A. Yes.  12:06:08

Q. Okay. Do you recall discussing with Ms. Canarecci whether or not the limit of detection for the Logix Smart test was high compared to the limit of detection of Co-Diagnostics' competitors tests?  12:06:09  12:06:20  12:06:25  12:06:29

A. I don't re- --  12:06:34

MS. OSTLER: Vague and ambiguous.  12:06:34

THE WITNESS: I don't recall having any conversations about that.  12:06:36  12:06:37

Q. (BY MR. FLOCH) Okay. Do you see that if you go down you write, "any time a sample is in a grey zone the first recommendation is to repeat PCR or repeat from extraction," do you see that?  12:06:38  12:06:43  12:06:46  12:06:49

A. Yes.  12:06:51

Q. So is it fair to say that what you mean is that if the number of viral copies is below the limit of  12:06:51  12:06:56

Page 153

detection, then the lab is recommended to repeat the PCR test again?  12:07:05  12:07:11

MS. OSTLER: Objection --  12:07:12

THE WITNESS: Yes.  12:07:13

MS. OSTLER: Sorry.  12:07:16

THE WITNESS: Oh, sorry.  

MS. OSTLER: Sorry. Go ahead. You're fine.  

Q. (BY MR. FLOCH) And then you write, "A repeatable result is usually reported but an unrepeatable result may be considered unreportable or undetermined."  12:07:18  12:07:20  12:07:24

Do you see that?  12:07:29

A. Yeah, the next sentence, the repeatable or -- yeah, I see that.  12:07:30  12:07:34

Q. So is what you're saying that -- let -- let's take the numbers you're -- you have in this e-mail, for example.  12:07:35  12:07:38

So let's assume that the sample has 50 viral copies. Okay?  12:07:41  12:07:44

Okay?  12:07:47

A. Okay.  12:07:47

Q. So what you're saying is if you run the test on a sample with 50 viral copies and it's negative, you should run it again; and if it's negative again, then you can report negative, right?  12:07:49  12:07:53  12:07:57  12:08:01

A. It depends on the requirements of the lab. So  12:08:05

39 (Pages 150 - 153)

Veritext Legal Solutions

800-726-7007  305-376-8800

CONFIDENTIAL

Page 154

it's up to the lab because in this case they're having to verify this test due to the changes that they're making to the instructions. And so they internally have to decide what they're going to report and what they're not going to report.

Q. Okay. And -- but when you said, "A repeatable result is usually reported," what did you mean by "usually reported"?

A. So the reason why you repeat the sample is to remove any possible variables. So you're trying to figure out, okay, why did that result come up like it did? So you have to test to confirm the reaction. So if you repeat it and the result is repeatable, then you can report a repeatable result. But it still has to be a repeatable result that's within the parameters of the test design.

Q. Okay. Do you see that you go on to write, "This depends on the clinical laboratory in-house guidelines. Some doctors prefer to not report for liability."

A. Yes, I see that.

Q. Then you wrote, (as read): Just keep in mind that in this zone there is a chance that COVID is being defected just at a lower than 95% detection rate, so any potted -- positive amplification may be a true result.

A. Yes.

Page 155

Q. What did you mean when you wrote, "Some doctors prefer to not report for liability"?

A. When you're in a CLIA lab, there is a doctor who is responsible for that CLIA lab. And so because they are the ones holding the liability insurance, they're the ones who make the ultimate decision of what's reported and what's not based on the clinical guidelines.

Q. So is it fair to say that what you're writing here is that, if a test has a lower number of viral copies than the reported limit of detection, it's up to the lab to determine whether or not they want to report to as positive, negative, or inconclusive?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: So the clinical lab has to make the decision on what they're reporting or not. The manufacturer provides the performance criteria of the test that they're selling. The clinical lab has the responsibility of verifying and validating that test at that performance level. And all of those guidelines are in the CLSI documents.

Q. (BY MR. FLOCH) Do you have any idea whether or not...

Sorry, let me back up.

Did -- did the issue of the grey zone come up

Page 156

with more than one customer?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I don't remember how many customers that that particular topic got brought up.

Q. (BY MR. FLOCH) Did you discuss it with more than one customer?

MS. OSTLER: Same objection.

THE WITNESS: I did discuss it, I believe, with more than one customer, but I don't remember who they are.

Q. (BY MR. FLOCH) And you would discuss the grey zone issue with a customer when the customer was finding that the viral copies in samples were lower than the copies listed as the limit of detection on the Logix Smart IFU, right?

A. That conversation is totally dependent on whether that customer was changing anything related to the test and needed guidance on doing the in-house validation or not.

Q. Right.

But -- but my question is: Isn't the grey zone issue only an issue to discuss with the customer when they -- when the customer is finding that its samples have viral copies that are lower than the viral copies listed on the limit of detection in the IFU?

Page 157

MS. OSTLER: Objection, lacks foundation, unintelligible.

THE WITNESS: So the conversation of the grey zone is discussed whenever a customer has a question of interpretation of their data. So it would depend on what they're running, what machine they're running, and the sample types and extraction they're using.

MR. FLOCH: Okay. Let me take this exhibit down.

Can we go off the record for a second.

THE VIDEOGRAPHER: We're going off the record at 2:13 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 4, and we're back on the record at 2:21 p.m.

(Exhibit No. 14 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, I'm going to show you another exhibit. This one is marked Garcia Exhibit 14. If you could take a read of it, and let me know when to scroll down.

A. (Witness complying.) Okay.

Q. So Dr. Garcia, I want to ask you about the e-mail from May 5th from you to Mr. Apuli, Mr. Benson, and Dr. Satterfield; do you see that e-mail?

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

A. Yes.    12:23:31

Q. You see the "Subject" line says, (as read):    12:23:31 Forward: QC Run File?    12:23:33

A. Yes.    12:23:35

Q. What does "QC" stand for?    12:23:35

A. So, quality control.    12:23:38

Q. And then do you see in the body of the e-mail you    12:23:40 wrote, "The QC for one of the batches that was sent to    12:23:43 India is showing a delayed Ct value"?    12:23:46

A. Yes.    12:23:50

Q. And then you wrote, "This is the same problem we    12:23:50 have seen in the past. Do you come up with a solution    12:23:53 for this, or did you decide just to ignore it?"    12:23:57

Do you see that?    12:24:00

A. Yes.    12:24:01

Q. Can you explain to me what -- what -- what is the    12:24:01 delayed Ct value issue?    12:24:05

A. Well, I'm not sure from this e-mail, because I    12:24:07 don't remember which test this is in context to or...    12:24:13

And I don't see the run -- like the run file    12:24:18 information.    12:24:21

Q. Generally, do you have an understanding of what    12:24:22 you meant when you wrote, "This is the same problem we    12:24:29 have seen in the past"?    12:24:34

MS. OSTLER: Objection, ambiguous,    12:24:35

Page 159

foundation.    12:24:36

THE WITNESS: So usually QC is done after    12:24:37 you manufacture a batch, and the controls have to be    12:24:39 within a certain range. So if the Ct value is delayed    12:24:42 in some way, then it's usually evidence of something    12:24:46 getting degraded over time or something -- you know,    12:24:51 some type of variable that's been introduced in the    12:24:57 manufacturing process.    12:25:00

Q. (BY MR. FLOCH) Okay. I'm going to show you    12:25:02 another exhibit, Dr. Garcia.    12:25:09

(Exhibit No. 15 marked.)    12:25:12

Q. (BY MR. FLOCH) This will be Exhibit 15. And why    12:25:12 don't you read it and let me know when to scroll down.    12:25:44

A. (Witness complying.) Okay.    12:25:47

Q. I'm sorry, the print is small. I can scroll    12:27:08 through this if you want. It looks like -- or just let    12:27:12 me know when you're ready.    12:27:16

A. (Witness complying.)

Q. Dr. Garcia, I just want you to focus on the    12:35:15 bottom e-mail. It's an e-mail from you to others at    12:35:17 Co-Diagnostics from August 14th, 2020.    12:35:23

A. Okay.

Q. And do you see the "Subject" line says, "URGENT    12:35:24 Repeated Complaint from 4 customers False Positives"?    12:35:27

A. Yes.    12:35:30

Page 160

Q. And do you see you wrote, "We have a repeated    12:35:30 complaint from 4 customers indicating false positives    12:35:32 showing up around cycle 38 in comparison with ABI tests    12:35:35 and even between our own tests with the same lot    12:35:40 number."    12:35:44

Do you see that?    12:35:44

A. Yes.    12:35:45

Q. Then you go on to write, (as read): This is a --    12:35:45 in all caps -- very critical issue because the attached    12:35:47 study with a complaint coming from the government of    12:35:51 Gujurat."    

Do you see that?    12:35:57

A. Yes.    12:35:58

Q. What's the -- what's the government of Gujurat?    12:35:58

A. Gujurat is a state in India. It's the state    12:36:00 where our manufacturing plant's located.    12:36:04

Q. Okay. Do you see that you go on to say, "They    12:36:07 are wanting our test parameters changed to cut off any    12:36:09 reported results past cycle 35 and they are ready to    12:36:13 send report to ICMR to make it happen."    12:36:17

Do you see that?    12:36:20

A. Yes.    12:36:21

Q. What did you mean when you wrote, "They are    12:36:21 wanting our test parameters changed..."?    12:36:24

A. I'm not sure because I don't remember the    12:36:27

Page 161

background for this e-mail. I think it's referring to    12:36:36 the specific customer of the government of Gujurat,    12:36:46 which had been -- would've been in contact with CoSara.    12:36:51

Q. Do you have an understanding of why the customer    12:36:56 referenced in this e-mail was continuing to find false    12:37:08 positives?    12:37:11

A. I believe they were finding false positives    12:37:12 because they were not -- they were running the -- the    12:37:18 test out to the original cycles that was established.    12:37:23 And I think the original cycles was like 50 cycles. I    12:37:29 can't remember exactly. And then CoSara tried to change    12:37:34 those Instructions for Use. And this must have been    12:37:40 before they implemented the 35 cycles, because there was    12:37:44 pressure in India from the WHO telling government    12:37:49 officials that all the tests needed to be cut at cycle    12:37:53 35 for reporting.    12:37:56

Q. Okay. And then do you see you go on to write,    12:37:58 "Do we have any validation data to support the detection    12:38:06 at 95% positive rate past cycle 35 and the associated    12:38:10 viral load concentration at that point"?    12:38:14

A. Yes, I see that.    12:38:17

Q. Did anyone from Co-Diagnostics ever provide you    12:38:18 any validation data to support the detection at 95%    12:38:21 positive rate past cycle 35?    12:38:26

A. I don't remember if data was given to me about    12:38:29

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

that or not.

Q. Okay. So we've been talking a lot about your interactions with customers as customers were using the Logix Smart or Saragene test, right?

A. Yes.

Q. I want to move on now and talk about another responsibility that you seem to have had as vice president of product development. Okay?

A. Okay.

Q. Was one of your responsibilities to author articles or academic papers while you were at Co-Diagnostics?

A. Not necessarily a responsibility, but I was the only one willing to write one.

Q. Okay. When you say you were the only one willing to write one, were there certain individuals at Co-Diagnostics who asked you to author articles?

A. I can't remember who specifically asked me to author an article, but I was at some point asked to write an article based on data that they had acquired in Salt Lake.

Q. Okay. Do you recall the substance of the article you're referring to?

A. I believe the substance of that article was supposed to be basically a performance evaluation of the

Page 163

COVID tests.

Q. And did that performance evaluation of the COVID test analyze the analytical sensitivity and specificity of the test or the clinical sensitivity and specificity of the test?

A. I don't remember what was specifically in the article.

Q. What purpose was served by you writing an article about the internal performance evaluation of the COVID test?

A. To have peer-reviewed publication out there about the technology because there was not many publications about what the technology was or how it worked.

Q. When you say, "technology," what technology are you referring to?

A. The CoPrimer technology.

Q. And was it your opinion that a peer-reviewed article about Co-Diagnostics Logix Smart test would bring added credibility to the Logix Smart test?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: Peer-reviewed publication usually supports evidence that technology is working like it's intended to.

Q. (BY MR. FLOCH) Did you publish a peer-reviewed publication regarding the performance of the Logix Smart

Page 164

test while you were at Co-Diagnostics?

A. No.

Q. Did you submit a peer-reviewed publication about the performance of the Logix Smart test to any journals while you were at Co-Diagnostics?

A. No.

Q. Did you author a draft of what was supposed to become a peer-reviewed publication on the performance of the Logix Smart test while you were at Co-Diagnostics?

A. I authored an initial draft.

Q. Besides the initial draft that you authored, did you write any other articles relating to the Logix Smart test while you were at Co-Diagnostics?

A. I don't remember writing any articles.

Q. Okay. So we've been talking about articles for the last few minutes, right?

A. Yes.

Q. What's the difference between an article and a validation summary?

A. An article is something that's submitted to an journal or some place that is going to have other scientists who review that document and give reviewer commentary back before it's decided whether it's published or not.

A validation summary is a requirement per our ISO

Page 165

13485 quality management system that is an internal document that provides document control and traceability of either verification or validation testing that's been done on a device and becomes part of the technical file and the device history file.

Q. Does Co-Diagnostics ever publish those internal validation summaries?

MS. OSTLER: Objection, foundation, speculation.

THE WITNESS: I believe some validation reports did get linked or something, but I'm not the one who makes the decision on what they publish and what they don't.

Q. (BY MR. FLOCH) Well, let's back up for a second. You've worked at five or so molecular diagnostic companies over the past 20 years, right?

A. Yes.

Q. When you were at any of those companies, did those companies ever publish validation summaries?

MS. OSTLER: Objection, foundation.

THE WITNESS: They usually do not publish internal validation reports, no.

Q. (BY MR. FLOCH) Why not?

MS. OSTLER: Objection, speculation.

THE WITNESS: Because those are internal

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

documents that are used for traceability, and it's not necessarily public information.

Q. (BY MR. FLOCH) Is one of the reasons that those internal validation summaries are not shared with the public because they are not peer-reviewed?

MS. OSTLER: Objection, speculation.

THE WITNESS: That could be considered one reason.

Q. (BY MR. FLOCH) Do you recall any time in your career, besides while you were at Co-Diagnostics, ever releasing an internal validation summary to the public?

A. I'm sorry, did -- can you repeat that question.

Q. All right. Besides your time at Co-Diagnostics, when you were at other companies, do you recall when you were at other companies ever releasing an internal validation summary to the public?

A. I don't recall any internal documents being released to the public.

Q. Okay. Let me show you Exhibit 16.

(Exhibit No. 16 marked.)

Q. (BY MR. FLOCH) And Dr. Garcia, why don't you take a second to read it, and then let me know when you're done and --

MS. OSTLER: It's not on the screen.

MR. FLOCH: Oh, sorry about that.

Page 167

Q. (BY MR. FLOCH) When you're done reading, Dr. Garcia, just let me know and I'll scroll down.

A. Okay.

MS. OSTLER: Which exhibit did you say you're showing her?

MR. FLOCH: Exhibit 16.

MS. OSTLER: Thank you.

MR. FLOCH: And, Joni, for purposes of the record, the -- the exhibit number after Exhibit T -- 16 is just a --

MS. OSTLER: So --

MR. FLOCH: -- notation, so please go by the sticker number.

MS. OSTLER: Got it. Thanks. That's why I got messed up.

MR. FLOCH: That just reflects that I'm doing everyone a favor and removing some exhibits.

MS. OSTLER: Okay.

Would you mind starting at the bottom? I think it -- because the bottom e-mails are always the first in time. Thanks. I think it might be more helpful.

MR. FLOCH: (Complying.)

THE WITNESS: (Witness complying.) Okay. Can you go back to the other part?

Page 168

MR. FLOCH: (Complying.)

THE WITNESS: Okay.

Q. (BY MR. FLOCH) Okay. So let's scroll down to the earliest in time e-mail.

Do you see that there's a e-mail from Dr. Satterfield to you, Chad Apuli, and Cecilia Hutchins on April 30th, 2020?

A. Yes.

Q. Do you see the "Subject" line is "Paper"?

A. Yes.

Q. Then do you see that Dr. Satterfield wrote, "Chad and Rebecca,

"Please see the article that just came out about us."

And he attaches a link?

A. Yes.

Q. Did you read that article?

A. I don't remember which article that is.

Q. Okay. Do you see he goes on to say, "Notice what others are saying about us relative to our LoD and how we perform worse than other tests, including the CDC. If we had publications out already, none of this would be happening."

Do you see that?

A. Yes.

Page 169

Q. And then he goes on to write, "I understand that Kyle and Maddie did the bulk of the work."

Who are Kyle and Maddie?

A. They were lab technicians.

Q. And what does he mean when he's saying "bulk of the work"?

A. They were the ones in the lab daily in Salt Lake who did lab testing.

Q. Okay. And then he goes on to write, (as read): It is their prerogative to be first authors, and I want them to have that opportunity. That being said, Rebecca is -- in all caps -- very fast. If she writes it, then she has equal claim on that first author spot. She also needs continued education credits from a first author publication.

Do you see that?

A. Yes.

Q. Did Dr. Satterfield on April 30th, 2020, ask you to prepare a paper?

A. I don't know if that was the date, but he did ask me to write a draft.

Q. And what was the substance of the draft he asked you to write?

A. I believe it was based on the -- the lab work that they had done for the COVID tests.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

Q. Besides asking you to write a draft on the lab work that Kyle and Maddie had done, did he ask you to write any other publications?

A. I don't remember being asked to write any other publications.

Q. Okay. Do you see he goes on to write, "Can the three of us talk and figure out a way to satisfy everyone's needs. Frankly, I don't care who gets to be first author. The company needed that paper published well before this article went out. We need a response and/or multiple responses ASAP. We need multiple papers out, the faster the better. Brent."

Do you see that?

A. Yeah.

Q. Did you have a discussion with Dr. Satterfield about putting out multiple papers after he sent this e-mail on April 30th?

A. I think in the management meeting we had talked about getting more publication -- peer-reviewed publications out. But I don't recall having a conversation about other papers at that particular moment.

Q. Did Dr. Satterfield express -- sorry.

Besides this e-mail, did Dr. Satterfield express any concerns to you that the news article listed in this

Page 171

e-mail could cause harm to the company sales of its Logix Smart test?

MS. OSTLER: Objection, foundation, speculation.

THE WITNESS: I -- I don't recall him talking about this article specifically.

Q. (BY MR. FLOCH) Do you recall any other discussions while you were at Co-Diagnostics about the April 30th, 2020 Salt Lake Tribune article?

MS. OSTLER: Objection, foundation, speculation.

THE WITNESS: There was discussions in management meetings about different things that had been in the news and stuff, but I don't remember specifically, you know, when those occurred or what is it was about.

Q. (BY MR. FLOCH) How often did those management meetings occur?

A. They were usually weekly meetings.

Q. And who attended those weekly management meetings?

A. So most of the executive officers, head of sales, business development, quality, myself, Dr. Mayu (phonetic).

Q. So Dr. Satterfield sent you this e-mail on April

Page 172

30th, 2020, right?

A. Yes.

Q. Around this same time, did he ask you to prepare any validation summaries?

A. I don't remember him asking me to prepare any validation summaries. I -- I remember it got brought up in a management meeting. I don't know who specifically had mentioned it, but the validation summaries were missing from whatever work had been done from Salt Lake City.

Q. Okay. When you say the validation summaries had been missing, what do you mean by "missing"?

A. They're supposed to be in the QT9 for the quality management system.

Q. So I think you had testified that you recall someone bringing up the missing validation summaries at a management meeting, right?

A. I believe it was in a management meeting, yes.

Q. Do you recall any other conversations at that management meeting about the validation summaries?

A. I don't remember anything, the details about the conversation.

Q. Did -- did you prepare validation summaries that were missing from the QT9 file?

A. I did prepare validation summaries based on data

Page 173

that was sent to me.

Q. And how was it that you were selected to prepare the validation summaries?

A. I truthfully don't remember.

Q. How long does it take you to prepare a validation summary?

A. It depends on how large the data set is, how long it takes me to analyze the data.

Q. Now, I think you testified that data was provided to you to prepare the validation summaries, right?

A. Yes. It had to be sent to me, I didn't have the data.

Q. And you don't recall who sent you that data?

A. I don't remember who sent it to me.

Q. Once you received the data, did you select which data to write a validation summary for?

A. So I used the data that is sent to me. And I look at the controls and everything. And I do a statistical analysis in using their grubs (phonetic) test or a two standard deviation test to eliminate outliers. And then I analyze it like is required by the CLSI guidelines.

Q. Okay. Let's look at another document.

(Exhibit No. 17 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, this is Garcia

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

Exhibit 17. And I'll scroll to the bottom so you can    12:59:49 read up, and just let me know when to scroll up.    12:59:53

A. (Witness complying.) Okay.    13:00:06

Q. Okay. So if we scroll down to the bottom in time    13:00:46 e-mail, it looks like Joseph Featherstone is forwarding    13:00:50 you some data from Australia, right?    13:00:54

A. Yes.    13:00:58

Q. And Dwight Egan received the e-mail from Joseph    13:00:59 Featherstone too?    13:01:05

A. Yes.    13:01:06

Q. And Dwight Egan's the CEO of Co-Diagnostics?    13:01:07

A. That's correct.    13:01:12

MS. OSTLER: Asked and answered.    13:01:13

Q. (BY MR. FLOCH) And who's Joseph Featherstone.    13:01:16

A. He's the -- he's over business development. I    13:01:18 don't know what his title is.    13:01:21

Q. Okay. So if we scroll up, it looks like after    13:01:23 you reviewed the data, then you prepared a summary of    13:01:30 the results of the data, right?    13:01:33

A. Yes.    13:01:35

Q. And did you put this summary in a validation    13:01:39 report?    13:01:45

A. Yes.    13:01:46

Q. Okay. And then you said, "Brent do you want to    13:01:46 sign this report," right?    13:01:51

Page 175

A. Yes.    13:01:52

Q. Why were you asking Brent if he wanted to sign    13:01:53 the report?    13:01:59

A. Because I wasn't the one who originally set up    13:02:00 the experiment so...    13:02:04

I felt that somebody in Salt Lake should have    13:02:10 been the one to sign the report.    13:02:14

Q. And when you say you weren't the one who set up    13:02:16 the -- the testing, are you talking about the Australian    13:02:19 testing?    13:02:22

A. Yeah. Somebody from Salt Lake should have    13:02:23 established some type of clinical evaluation agreement    13:02:26 with this PathWest Laboratories in Australia. And in    13:02:30 that agreement, they would have been the ones    13:02:35 responsible for seeing that the validation report was    13:02:38 completed and everything for the study.    13:02:41

Q. And then if you scroll up, you see    13:02:44 Dr. Satterfield reply to you, and he said, "Rebecca,    13:02:54 I'm good with the results and the summary. Have either    13:02:56 KC, Cecilia, or Chad sign it - they're technically over    13:03:00 development, including clinical results."    13:03:04

Do you see that?    13:03:07

A. I see that.    13:03:08

Q. Okay. So once you got this e-mail from    13:03:08 Dr. Satterfield, did you ask KC, Cecilia, or Chad to    13:03:10

Page 176

sign the Validation Report?    13:03:15

A. I don't remember.    13:03:17

Q. Okay. Let me show you the Validation Report.    13:03:18

MS. OSTLER: Oh, you're showing us your    13:03:27 thing. Did you mean to show us your thing? Your whole    13:03:29 screen right now?    13:03:33

MR. FLOCH: Thank you, Joni, no.    13:03:34

(Exhibit No. 18 marked.)    13:03:36

Q. (BY MR. FLOCH) Dr. Garcia, I'm showing you what    13:03:36 I've marked as Exhibit 18. And why don't you let me    13:04:14 know when you're done reading the top e-mail, and I'll    13:04:27 scroll through the report.    13:04:30

A. Okay. (Witness complying.)    13:04:31

Hang on. Can you go back up so I can see the    13:04:42 time stamp on that?    13:04:44

Q. (Complying.)

A. Okay.    13:04:45

MS. OSTLER: Dr. Garcia, just be aware that    13:04:45 those time stamps have been processed in a different    13:04:47 time zone, so that may be UTC.    13:04:51

THE WITNESS: (Witness complying.) Okay.    13:05:00

Okay, that's all data.    13:05:29

Q. (BY MR. FLOCH) So if we go all the way up, it    13:05:32 looks like this is an e-mail from to you Mr. Benson and    13:07:03 Mr. Egan around April 30th, 2020?    13:07:06

Page 177

A. Yes.    13:07:09

Q. And that's the same day that Dr. Satterfield was    13:07:10 writing to you about finishing a paper?    13:07:13

A. Yeah, same date, but a much later time.    13:07:17

Q. Okay. And do you see the "Subject" says "signed    13:07:21 copy"?    13:07:27

A. Yes.    13:07:28

Q. And then do you see the attachment says,    13:07:28 "Validation Report COVID-19 Australia"?    13:07:31

A. Yes.    13:07:34

Q. Why were you sending this Validation Report to    13:07:35 Mr. Benson and Mr. Egan?    13:07:39

A. I believe that Dwight had asked me to send him a    13:07:41 copy when I was done.    13:07:46

Q. Do you have an understanding of what he was going    13:07:47 to do with the Validation Report once you sent it to him    13:07:53 with your signature?    13:07:57

A. No, I had no idea what they were going to do with    13:07:58 it.    13:08:01

Q. Okay. Is it normal in the molecular diagnostic    13:08:01 industry to draft and finish a Validation Report in one    13:08:08 day?    13:08:15

A. It's possible.    13:08:15

MS. OSTLER: Objection, ambiguous.    13:08:16

Q. (BY MR. FLOCH) And let's scroll all the way down    13:08:28

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

before we go through the report.

Do you see that there's two signature lines on the report on page 10?

A. Yes.

Q. And the "Author," is that your signature --

A. That's mine.

Q. -- in the "Author" --

And then in the "Supervisor," is that your signature as well?

A. That's mine.

Q. Is it odd for the author also be the supervisor of a Validation Report?

MS. OSTLER: Objection, ambiguous, overbroad, foundation.

THE WITNESS: It's usually two separate people. But if there's nobody who as the supervisor is going to sign it, then my position will allow me to sign it.

Q. (BY MR. FLOCH) Before preparing this Validation Report, how many other validation reports had you prepared where you were both the author and the supervisor?

A. I don't know how many that was prepared like this.

Q. Okay. Let's go back to the top of the Validation

Page 179

Report.

So do you see that bullet 1 says, "Validation Report Scope"?

A. Yes.

Q. And do you see it says, "To report the validation results of the Logix Smart COVID-19 RT-PCR test for sensitivity, specificity, and agreement with laboratory developed test performed at PathWest Laboratory Medicine WA (Australia)"? Do you --

A. Yes.

Q. -- see that?

Okay. Can you explain to me what the results are in "Table 1"?

A. Yeah, so this is specificity testing where they're testing the kit with all types of bacteria viruses and maybe even inhibiting substances. I don't know what all's in that last. So they're identifying what they're testing the kit against, if the strain for that potential organism is known or whether it's not known, and then the result of the test.

Q. Okay. And then if we scroll to "Table 2," can you explain to me what Table 2 is showing?

A. Yeah, so this is sensitivity where they're taking a known sample concentration and they're serial diluting it into nine different points of concentration. And

Page 180

they're testing it in a replicates to identify the limit of detection. And they confirmed the limit of detection with 20 replicates.

Q. And is a 20-replicate limit of detection favorable, unfavorable?

MS. OSTLER: Objection, ambiguous, misstates prior testimony.

THE WITNESS: The FDA guidelines says there has to be 19 out of 20 replicates positive to de- -- confirm the limit of detention.

Q. (BY MR. FLOCH) So does this table reveal anything about whether or not the Logix Smart test has a good or bad limit of detection?

MS. OSTLER: Objection, vague.

THE WITNESS: You can't determine good or bad from the table, it simply confirms the limit of detection.

Q. (BY MR. FLOCH) Okay. So this table doesn't reveal anything about whether or not the limit of detection for the Logix Smart test is favorable or unfavorable?

MS. OSTLER: Objection, vague, asked and answered.

THE WITNESS: So the only thing you can derive from this table is the range of testing to the

Page 181

limit of detection, and you can estimate the probability past the limit of detection.

Q. (BY MR. FLOCH) Okay. What does "Table 3" show?

A. Table 3 summarizes what was in the previous table.

Q. Okay. And what about Table 4?

A. Table 4 is the comparison between the Logix kit and the laboratory-developed tests from Australia.

Q. After you sent this Validation Report to Mr. Egan and Mr. Benson, did you have any follow-up conversations about this specific Validation Report?

A. I don't remember if I had conversations after I sent the report.

Q. On April 30th, 2020, besides the Validation Report summarizing the Australian data, did you prepare any other validation reports describing other datasets?

A. I believe there was a few validation reports that I -- I wrote.

Q. Okay. Do you remember how many?

A. I don't remember the number exactly, maybe two or three.

Q. And if you recall, was all the data that you provided -- sorry.

Was all the data that was given to you to analyze, did all of it show 100% sensitivity and 100%

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

specificity performance by the Logix Smart test?

MS. OSTLER: Objection, vague as to time, foundation.

THE WITNESS: I don't remember the specific numbers for each one.

Q. (BY MR. FLOCH) Okay. Let's look at another exhibit.

(Exhibit No. 19 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, I'm showing you what I've marked as Garcia Exhibit 19. And let me know when you're ready for me to scroll down.

A. Okay. (Witness complying.)

Okay.

Okay.

Q. You see there's a top e-mail from you to Mr. Egan and Mr. Benson on April 30th, 2020?

A. Yes.

Q. And the "Subject" line says, "India Signed Report"?

A. Yes.

Q. And the "Attachments" say, "Validation Report COVID-19 India.pdf"?

A. Yes.

Q. And did you prepare this Validation Report?

A. Yes.

Page 183

Q. And do you see under bullet 1, it says, "Validation Report Scope"?

A. Yes.

Q. Did you write the language under Validation Report Scope?

A. I believe so.

Q. And do you see it says, "To report the validation results of the Logix Smart COVID-19 RT-PCR Test manufactured by CoSara Diagnostics Pvt. Ltd. and re-branded Saragene Corona Virus (2019 NCV) RT-PCR Test."

Do you see that?

A. Yes.

Q. And do you see that you wrote, "This report shares the sensitivity, specificity, and agreement of the Logix Test with a laboratory developed test performed at the National Institute of Pathology, India."

Do you see that?

A. Yes.

Q. Can you help me understand -- we were talking earlier today about the fact that the Logix Smart test and the Saragene test are two separated products, right?

A. Yes.

Q. And you testified earlier that the National

Page 184

Institute of Pathology did an analysis of the performance of the Saragene test, right?

A. That's right.

Q. And the National Institute of Pathology did not do an analysis of the Logix Smart test, right?

A. That's right.

Q. But this first paragraph seems to imply that the National Institute of Pathology did an analysis of the Logix Smart test, right?

MS. OSTLER: Objection, speculation.

THE WITNESS: Well, I actually think it's a typo.

Q. (BY MR. FLOCH) Okay. What -- what's the typo in here?

A. In the last sentence referring to the Logix Test, as in there's another typo in Table 1 referring to the NIV.

Q. Because it -- sorry, going back up.

So the typo in paragraph one, it should say, This report shares the sensitivity, specificity, and agreement of the Saragene test?

A. That's right.

Q. Okay. And then in Table 1, instead of "NIV Gold Standard RT-PCR Test, it should say, NIP Gold Standard RT-PCR Test, right?

Page 185

A. That's correct.

Q. And that's because if the company had reported the NIP results, they would not be the results that are in the document we're looking at that's Garcia 19, right?

A. Yeah, the results would have been different for NIV.

Q. Okay. And so it's your testimony that -- sorry, let me back up.

Why don't you take a read of the Validation Report again, and let me know if you see any other typos.

A. (Witness complying.)

Yeah, there's one in 4.1.1. The, ICMR-NIV gold standard, should have been NIP.

Q. And do you see any other typos?

A. Yeah, 1 -- 4.1.3, NIV again should be NIP.

Q. Okay. Sitting here today, is this the first time that you're noticing the typos in this validation report?

A. Yes.

Q. Did anyone ask you to insert the word Logix Test into the first paragraph under section 1?

A. No, nobody asked me.

Q. Okay. Did anyone ask you in Table 1 to insert

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

the line NIV instead of NIP?

A. No, nobody asked.

Q. Okay. And what about for 4.1.1, did anyone ask you to write ICMR-NIV instead of ICMR-NIP?

A. No, nobody asked.

Q. Okay. Besides --

MS. OSTLER: Oh, sorry, go ahead. I was just going to say, when you get a chance can we take a quick break.

MR. FLOCH: Yeah, I'm in the middle of questioning on this document but...

MS. OSTLER: Yeah, go ahead. Okay.

Q. (BY MR. FLOCH) Besides Dwight Egan and Andrew Benson, did you discuss this Indian Validation Report with anyone else at Co-Diagnostics?

A. I don't remember if it had been discussed with anyone at Co-Diagnostics.

Q. Did anyone help you prepare this Indian Validation Report?

A. No.

Q. Did Dr. Satterfield have any input on the Indian Validation Report?

A. Dr. Satterfield didn't have any input, that I recall, on any of the validation done in India.

MR. FLOCH: We can take a break.

Page 187

MS. OSTLER: Actually, I don't need to anymore. My -- there was a situation in my kitchen that my husband just came in and was dealing with it for me. So continue, unless other people want a break.

MR. FLOCH: Dr. Garcia, at your pleasure. If you want one, we can take a break; if not...

THE WITNESS: I'm fine.

Q. (BY MR. FLOCH) Okay. So...

MR. FLOCH: Just to confirm, are we on the record still?

THE REPORTER: Yes.

THE VIDEOGRAPHER: Yes, we are.

MR. FLOCH: Okay.

Q. (BY MR. FLOCH) So we just looked at an Australian Validation Report, right?

A. (No response.)

Q. A few minutes --

A. We did before, yes.

Q. Before the Indian Validation Report?

A. Yes.

Q. Now we looked at the Indian Validation Report?

A. Yes.

Q. Did you have an understanding that these Validation Reports were going to be shared with the public after you wrote them?

Page 188

A. No, I had no idea that they would be shared with the public.

Q. If someone from Co-Diagnostics had told you that those Validation Reports were going to be shared with the public, would you have allowed them to publish those Validation Reports publicly?

MS. OSTLER: Objection, incomplete hypothetical, calls for speculation.

THE WITNESS: I would have shared with them why it would be best not to publish them. But I didn't have a final say-so in what was published or not.

Q. (BY MR. FLOCH) Okay. And why would it be best not to publish those Validation Reports?

A. Because those are internal documents, and a validation report is usually converted into some type of peer-reviewed information before it's published.

Q. So you said one of the reasons for why it would be best not to publish the Validation Reports is because they're non-peer-reviewed internal documents, right?

A. That's right.

Q. Are there any other reasons why it would be best not to publish the internal Validation Reports?

A. Well, it's internal information on the design of a test. Sometimes they can include information that you want in order to make changes to a test that's not

Page 189

actually applicable to the performance of the test that is in the market.

Q. Okay. Let's look at another exhibit.

(Exhibit No. 20 marked.)

Q. (BY MR. FLOCH) Okay. Dr. Garcia, why don't you take a second to read Exhibit 20. And I'm -- let me know when you're ready for me to scroll.

A. (Witness complying.)

Q. Are you ready for me to go to the next page, Dr. Garcia?

A. I'm right at the end, hold on a second.

Q. Okay.

A. That's the same thing we saw earlier.

Q. Okay.

A. And that's the same thing.

Okay.

That's really weird, but okay.

Q. Why do you say, "That's really weird..."?

A. It doesn't have a title.

Q. Did you prepare this table?

A. I don't remember if I did or not.

Q. And the table that you just said is really weird to is attachment 5 to the May 1st, 2020 press release?

A. Well, I mean, it says attachment 5, but I don't know -- this is data, I just don't know where it's from

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

at this point.

Q. Okay.

A. There's no title indicating what it is.

Q. Okay. Let's scroll up, back to the top of the document, if it will load.

Okay. Dr. Garcia, have you seen this May 1st, 2020 press release before?

A. Yes.

Q. Did you see it at or around the time that it was published?

A. I don't really remember seeing it when it was published.

Q. When do you recall first seeing it?

A. I remember seeing it in my last deposition.

Q. Okay. In your last deposition, do you remember what you were asked about this press release?

A. I was asked about statements made by Dr. Satterfield. I -- I think they asked me some other questions, but I don't remember.

Q. Okay. Do you remember what your testimony was in regards to the questions they asked about Dr. Satterfield's statements?

A. No, I don't remember exactly.

Q. What kind of -- kinds of questions were they asked you about Dr. Satterfield's statements?

Page 191

A. If I agreed with his statements or if I agreed with some of the claims that he made.

Q. And in response to those questions, did you say you agreed with his statements?

A. I didn't always agree with his statements.

Q. Okay. Do you remember which ones -- which statements you said you didn't agree with?

A. No, because there were a lot of questions, and it's been a little while.

Q. No, I understand.

So let's just go through some of -- I want to start with the third line in the press release. Do you see that there's a line that says, "A summary of recent validation data and the data itself can be found here"?

A. Yes, I see that.

Q. Okay. And if we scroll down, does this appear to be the summary of the validation data and the data?

A. Yes, that looks like the summary.

Q. Did you prepare this summary?

A. I do not remember preparing a summary like this.

Q. Okay. Would you be surprised if it was you who prepared this?

MS. OSTLER: Objection, speculation.

THE WITNESS: I don't think I could have prepared all of it, unless I was given the data for each

Page 192

one of them because I do not recall anything about the Minnesota Department of Health. And I don't recall much of Mexican Government's InDRE program. And No. 4, I -- I wasn't involved in Timpanogos, and I have no idea who Barbara Blonka -- or Blanke -- I don't know who that is.

Q. (BY MR. FLOCH) Okay. So let's -- let's just go through the summary one by one.

So bullet point one is a summary of an Australian report, right?

A. Yes.

Q. And if we scroll down to Attachment 1, the Validation Report summarizing the Australian data, is a report that you prepared, right?

A. Yes, I prepared that report.

Q. Okay. This is the report that we looked at in a prior exhibit, right?

A. Yes.

Q. And if we scroll all the way down to the bottom of that Australian report, do you see that there's a list of "Attachments"?

A. Yes.

Q. Were those -- sorry.

Are those attachments appended to this Validation Report?

A. I don't see them there.

Page 193

Q. Okay. Let's go back up to the summary page we were just looking at.

So No. 2 summarizes the National Institute of Pathology test, right?

A. Yes.

Q. And if we scroll down to Attachment 2, is this the Validation Report summarizing the National Institute of Pathology study?

A. Yes.

Q. And does it appear to have the typos that you referenced earlier?

A. Still has the typos.

Q. And the typos say that the report shares the sensitivity, specificity, and agreement of the Logix test, when it should say the Saragene test?

A. Yes.

Q. And there are some typos referencing NIV gold standards, rather than NIP gold standards?

A. Yes.

Q. And those typos do not appear to be removed from Attachment 2?

MS. OSTLER: Asked and answered.

THE WITNESS: They're not --

Q. (BY MR. FLOCH) Okay. And then if we go back up to Exhibit -- sorry, the summary page that we were

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

looking at before, there's a third paragraph 13:38:13 (indicating); do you see that? 13:38:15

A. I see that. 13:38:17

Q. It talks about a Mexican study? 13:38:18

A. I see that. 13:38:21

Q. Okay. And if we scroll down to Attachment 3, 13:38:24 there's a memo on the Mexican study; do you see that? 13:38:35

A. I see that. 13:38:40

Q. Did you prepare this memo on the Mexican study? 13:38:41

A. I don't recall preparing that memo. 13:38:45

Q. Do you know who prepared it? 13:38:48

A. I have no idea who prepared it. 13:38:49

Q. Would you call this memo a Validation Report? 13:38:53

MS. OSTLER: Objection, ambiguous. 13:38:57

THE WITNESS: That does not follow the 13:38:59 control document validation report template that would 13:39:01 be in the QT9 system. 13:39:05

Q. (BY MR. FLOCH) And do you see any data from the 13:39:09 Mexican Government attached to Attachment 3? 13:39:20

A. I don't see the specific data. 13:39:26

Q. Now if we go back to the summary page, 13:39:31 paragraph 4 talks about Timpanogos Regional; do you see 13:39:47 that? 13:39:57

A. I see that. 13:39:57

Q. And it talks about data from the internal control 13:39:58

Page 195

for the samples at Timpanogos Regional; do you see that? 13:40:03

A. I see that. 13:40:07

Q. Did you see any data from Timpanogos Regional in 13:40:08 the attachments we just looked at? 13:40:16

A. I don't remember seeing any data from it. 13:40:18

Q. Okay. And then paragraph 5 says, "The Minnesota 13:40:22 Department of Health comparison data against another 13:40:28 assay showing 100% concordance," do you see that? 13:40:33

A. I see that. 13:40:37

Q. And if we go down to Attachment 5, does this 13:40:37 appear to be the Minnesota data referenced in the 13:40:49 summary page? 13:40:52

A. I can only assume it is based on the Attachment 13:40:53 5, but there's no label to this and there's no 13:41:01 identifiers of the acronyms used. 13:41:06

Q. When you say "there's no identifiers of the 13:41:08 acronyms used," what acronyms are you referring to? 13:41:12

A. AGCL, DOH, MN DOH, COV-FAM, IC. 13:41:27

Q. Okay. Let's scroll back up to the actual press 13:41:27 release, and again we're going to look at the third line 13:41:30 on the first page of the press release. 13:41:38

It says, "A summary of recent validation data and 13:41:41 the data itself can be found here," do you see that? 13:41:45

A. I see that. 13:41:48

Q. Now, when we went down to the link, did we see 13:41:49

Page 196

any of the data from the Australian study appended to 13:41:52 the Validation Report? 13:42:01

MS. OSTLER: Objection, document speaks for 13:42:03 itself. 13:42:05

THE WITNESS: You didn't see the attachment, 13:42:06 but you did see some of the data. 13:42:11

Q. (BY MR. FLOCH) Okay. And what about for the 13:42:14 Indian report, did we see the data itself in the 13:42:17 Validation Report? 13:42:20

MS. OSTLER: Same objection. 13:42:21

THE WITNESS: Again, you didn't see the 13:42:22 attachment, but you saw the -- some of the data in the 13:42:24 -- the report. 13:42:29

Q. (BY MR. FLOCH) And what about the Mexican memo, 13:42:32 was there data appended to the Mexican memo? 13:42:37

MS. OSTLER: Same objection. 13:42:41

THE WITNESS: There was no visible data, 13:42:42 just summaries. 13:42:44

Q. (BY MR. FLOCH) Okay. So isn't this sentence 13:42:45 misleading, because if you go to the link there's no 13:42:47 actual data provided, right? 13:42:52

MS. OSTLER: Objection, calls for 13:42:54 speculation, calls for a legal conclusion, vague. 13:42:56

THE WITNESS: There is some data, but not 13:43:01 for each summary. 13:43:04

Page 197

Q. (BY MR. FLOCH) Okay. So let's go to the 13:43:07 headline. Do you see it says, "Co-Diagnostics, Inc. 13:43:10 Releases COVID-19 Test Performance Data: Consistently 13:43:14 Demonstrates 100% Sensitivity and 100% Specificity 13:43:17 Across Independent Evaluations." 13:43:22

Do you see that? 13:43:24

A. Yes, I see that. 13:43:25

Q. Okay. So let me ask you a question, because 13:43:27 we've been looking -- we looked at two Indian 13:43:28 evaluations today from the NIV that were not referenced 13:43:35 in this press release, right? 13:43:41

A. Not -- that's right. 13:43:49

THE REPORTER: What was that? 13:43:50

THE WITNESS: I said that's right. 13:43:50

Q. (BY MR. FLOCH) Oh, okay. Go ahead. 13:43:51

So appended to this press release is a Mexican 13:43:59 study showing 100% sensitivity and 100% specificity, 13:44:03 right? 13:44:10

A. I believe that's what it said. 13:44:10

Q. And there's an Australian study appended to this 13:44:14 press release that shows 100% sensitivity and 100% 13:44:21 specificity, right? 13:44:21

A. Yes, I believe so. 13:44:22

Q. And were both of those evaluations run on a Logix 13:44:23 Smart test? 13:44:29

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

MS. OSTLER: Objection, lack of foundation.

THE WITNESS: I believe they said they were run on the Logix Smart, but I don't remember seeing which iteration of the test it was.

Q. (BY MR. FLOCH) And then appended to this press release are some data from the National Institute of Pathology run on a Saragene test, right?

A. That's right.

Q. So we also looked at today two evaluations from the NIV, right?

A. Yes.

Q. And one was on the Logix Smart test?

A. Yes, one was Logix Smart. I'm not sure which iteration of that.

Q. And the other NIV evaluation was on the Saragene test, right?

A. Yes. And again, I'm not sure which version of the Saragene it was.

Q. And both of those NIV evaluations, the Logix Smart test and the Saragene test, did not pass the guidelines of the NIV, right?

MS. OSTLER: Objection, asked and answered.

THE WITNESS: It did not meet the criteria set forth by NIV.

Q. (BY MR. FLOCH) So isn't this headline misleading

Page 199

because it says that the Co-Diagnostic test "Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations" when the company knows that at least for one test for Logix Smart and one test for Saragene, it did not meet 100% sensitivity and 100% specificity?

MS. OSTLER: Objection, calls for speculation, calls for legal conclusion, argumentative.

THE WITNESS: I think each -- each validation needs to be evaluated independently because you can have one sample size, and if they're small enough, yeah, you'll get 100%. The more you add to that the larger your sample size becomes, so the increase in error is what you get from that. And like I've said before, you don't want to have all of your data displayed for misinterpretation, so you want the most recent product represented in the information that you're providing.

Q. (BY MR. FLOCH) Okay. Let's go to the first paragraph of the press release. It says, (as read): Co-Diagnostics, Inc. (Nasdaq:CODX) (the Company), a molecular diagnostics company with a unique, patented platform for the development of diagnostic tests, today released COVID-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used

Page 200

to define accuracy in molecular diagnostics testing.

Do you see that?

A. I see that.

Q. Do you agree that sensitivity and specificity are the metrics used to define accuracy in molecular diagnostics testing?

A. I'm sorry, you were completely breaking up when you asked the question, so I don't -- I couldn't piece it together.

Q. Sorry about that.

Do you agree that sensitivity and specificity are the metrics used to define accuracy in molecular diagnostics testing?

A. I think that each one of those holds its own weight for molecular testing. They have to be evaluated individually because each one has its own formula.

Q. But I thought you testified earlier today that when you're looking at the term "accuracy," that that actually has a different formula than either sensitivity or specificity?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I thought that's what I just explained, that each one of those would have to be looked at individually. Sensitivity is one formula. Specificity has one formula. Accuracy has one formula.

Page 201

They're not the same.

Q. (BY MR. FLOCH) Okay. So is it misleading to say that sensitivity and specificity are the metrics used to define accuracy in molecular diagnostics testings?

MS. OSTLER: Objection, calls for speculation, calls for legal discussion, ambiguous.

THE WITNESS: I believe there's a difference in interpretation, if you're looking at this from a scientific perspective or whether you're looking at it from a lay perspective.

Q. (BY MR. FLOCH) And what perspective -- sorry, let me back up.

From a scientific perspective, is it misleading?

MS. OSTLER: Objection, calls for legal conclusion, speculation.

THE WITNESS: Well, to me it's clear that a scientist didn't write that because a scientist would know that each one of those are independent factors that then define the performance of a test.

Q. (BY MR. FLOCH) Okay. To a lay person do you think that the sentence that we've been discussing is misleading?

MS. OSTLER: Objection, calls for speculation, calls for legal conclusion.

THE WITNESS: Because I'm considered an

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

expert in the field, it's hard for me to determine what    13:50:18
a lay person would interpret from a sentence.    13:50:21

Q. (BY MR. FLOCH) Okay. So let's go down a little    13:50:28
bit.    13:50:30

A. I don't see anything moving, is it supposed to be    13:50:40
moving?    13:50:43

Q. No.    13:50:44

The -- let's look at the second paragraph, the    13:50:45
last sentence, do you see that it says, "Each study    13:50:46
concluded 100% concordance for both specificity and    13:50:51
sensitivity"? Do you see that?    13:50:54

A. Yes, I see that.    13:50:55

Q. Do you agree with that statement?    13:50:56

A. I don't remember the concordance for each one, so    13:50:58
I'm not exactly sure. I'd have to go back through the    13:51:09
data and see if the concordance was the same for each    13:51:12
one.    13:51:16

Q. And then let's go to the paragraph that begins,    13:51:17
"In remarking..."    13:51:20

Do you see it says, (as read): In remarking on    13:51:22
the test's favorable limit of detection (LoD) results in    13:51:24
the evaluations, Brent Satterfield, PhD said, "In    13:51:29
diagnostics, the limit of detection or LoD is a single    13:51:32
metric that helps inform the key metrics of sensitivity    13:51:35
and specificity but is not relevant as a stand-alone    13:51:39

Page 203

data point.    13:51:43

Do you see that?    13:51:43

A. I see that.    13:51:44

Q. So let me ask you: Do the results that are    13:51:45
attached to this press release say anything about the    13:51:50
Logix Smart's -- the Logix Smart test's favorable limit    13:51:55
of detection?    13:52:01

MS. OSTLER: Objection, ambiguous, document    13:52:02
speaks for itself.    13:52:05

THE WITNESS: Well, I don't know what is    13:52:07
meant by "favorable," but I believe two of the studies    13:52:08
indicate something about the limit of detection that was    13:52:13
determined in those individual labs.    13:52:17

Q. (B MR. FLOCH) Okay. But do those results say    13:52:21
anything about whether or not Co-Diagnostics had a    13:52:24
favorable or unfavorable limit of detection?    13:52:27

MS. OSTLER: Objection, ambiguous, document    13:52:32
speaks for itself.    13:52:34

THE WITNESS: Well, I'm not sure what the    13:52:35
author of this document is meaning by "favorable".    13:52:36
What's favorable to one person may be different for    13:52:40
another.    13:52:43

Q. (BY MR. FLOCH) Well, do you think it's    13:52:44
misleading to -- for a molecular diagnostics company to    13:52:46
put out a press release that says the limit of detection    13:52:50

Page 204

of its test is favorable based on data when that data    13:52:53
doesn't say anything about the favorability of the limit    13:52:57
of detection?    13:53:01

MS. OSTLER: Objection, argumentative, calls    13:53:02
for legal conclusion, calls for speculation.    13:53:04

THE WITNESS: I think that the data    13:53:08
published needs to be looked at in the context of its    13:53:10
regulatory requirements, because that's the only way you    13:53:14
determine what is going to be sufficient for clearance    13:53:21
or not.    13:53:28

Q. (BY MR. FLOCH) Are you aware that the April    13:53:30
30th, 2020 Salt Lake Tribune article criticized    13:53:33
Co-Diagnostics' COVID-19 limit of -- sorry, let me back    13:53:37
up.    13:53:41

Are you aware that the April 30th, 2020 article    13:53:44
criticized the Logix Smart's limit of detection?    13:53:47

MS. OSTLER: Objection, argumentative,    13:53:51
characterizes (sic) the evidence.    13:53:53

THE WITNESS: I'm not too familiar with    13:53:55
articles published in Salt Lake because I'm not in the    13:53:57
area so I don't keep up with the news there.    13:54:01

Q. (BY MR. FLOCH) Are the results appended to this    13:54:04
press release, do they show a favorable limit of    13:54:08
detection?    13:54:12

MS. OSTLER: Objection, asked and answered,    13:54:13

Page 205

calls for legal conclusion, lacks foundation, calls for    13:54:14
speculation.    13:54:17

THE WITNESS: I think the -- the limit of    13:54:19
detection in the, I believe it's two attachments here    13:54:21
need to be looked at independently because they're from    13:54:29
different countries. And ev- -- each country's -- that    13:54:32
country, usually the ministry of health defines what is    13:54:35
acceptable limit or not.    13:54:40

Q. (BY MR. FLOCH) So is it your testimony that you    13:54:42
cannot say whether or not the data shows a favorable or    13:54:45
unfavorable limit of detection for the Logix Smart test?    13:54:49

MS. OSTLER: Objection, ambiguous,    13:54:54
misrepresents prior testimony.    13:54:56

THE WITNESS: So like I -- I believe that    13:55:00
the limit of detection is tested per the regulatory    13:55:02
requirements for the region that that test is going to    13:55:09
be approved to be sold. But whether that's favorable or    13:55:16
not is dependent on -- I mean, the person buying the    13:55:22
test and where they're going to be using the test and    13:55:26
how they're going to be using the test. So I can't say    13:55:29
whether it's favorable or not.    13:55:32

Q. (BY MR. FLOCH) Okay. And then if we scroll down    13:55:33
a little bit further, do you see that there's a second    13:55:38
sentence attributed to Dr. Satterfield?    13:55:42

A. Yes, I see that.    13:55:46

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

Q. And do you see it says, "In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that."

Do you see that?

A. I see that.

Q. Okay. If the company had asked you whether or not they could attribute the second sentence to you, would you have allowed them to do that?

MS. OSTLER: Objection, incomplete hypothetical, calls for speculation.

THE WITNESS: I would have not used the same words that are listed here in the sentence.

Q. (BY MR. FLOCH) Why not?

A. Because I think there's debate over the terms "consistently" and "repeatedly".

Q. Okay.

A. And I think it's very arrogant to say the last, "you can't do better than that." It's ego.

Q. Sorry, what was -- what was the last word you said?

A. I think -- I see the last part of that sentence after the "and" as very arrogant and egotistical.

Q. And why do you say it's "egotistical"?

Page 207

A. I mean, it's like dismissing error altogether.

Q. Did you discuss this press release with Dr. Satterfield?

A. I don't remember having any discussions about this with him.

Q. Did there come a time when you realized that the company had appended your Validation Reports to this press release?

A. At some point, yes, but I don't recall when that was.

Q. Okay. What was your reaction when you found out they had appended your Validation Reports to the press release?

A. I don't remember my reaction. It wasn't my decision.

Q. Okay. Sitting here today, do you have a reaction as to whether or not it was appropriate to append your Validation Reports to this press release?

MS. OSTLER: Objection, ambiguous, calls for legal conclusion.

THE WITNESS: Hindsight's always better, right? I probably would not have attached internal documentation and -- and I would have never give any type of data because most lay people wouldn't know how to interpret the data.

Page 208

MR. FLOCH: Sorry, if you give me one second...

Okay. Dr. Garcia, would it be okay if we take a five minute break?

THE WITNESS: That's fine.

MR. FLOCH: Let's go off the record.

THE VIDEOGRAPHER: We're going off the record at 3:59.

(A brief recess was taken.)

THE VIDEOGRAPHER: This the beginning of Media Unit 5, and we're back on the record at 4:08 p.m.

(Exhibit No. 21 marked.)

Q. (BY MR. FLOCH) Dr. Garcia, I'm showing what you I've marked as Exhibit Garcia 21. Why don't you take a look at it and the attachment and let me know when you're ready.

A. (Witness complying.) Okay.

Q. Dr. Garcia, just let me know when you're ready for me to scroll down.

A. Yeah, almost, I'm in that last paragraph.

Q. Okay.

A. Okay.

Q. Okay. So let's go back up to the top e-mail.

Do you see that this is an e-mail from you to Dr. Satterfield and Mr. Benson on May 15th, 2020?

Page 209

A. Yes.

Q. And do you see the "Subject" line as, "Something to Post in FAQ section on website"?

A. Yes.

Q. And I want to start with the second paragraph.

Do you see you wrote, "Customers want to see published data. I wrote a publication around that Australian data and was told not to publish yet. I've been told its all over our website. What data do we have that is publishable from a third party?"

Do you see that?

A. Yes.

Q. Why did you write to Dr. Satterfield and tell him that customers wanted to see published data?

A. Because I kept getting asked by customers about peer-reviewed publications or white papers or anything that showed how the test functioned.

Q. Okay. And you said you kept getting asked about peer-reviewed publications; who was asking you?

A. Customers always ask if you have any peer-reviewed literature out.

Q. And what is your understanding of why they ask that question?

MS. OSTLER: Speculation.

THE WITNESS: A customer wants as much

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

information as possible before they make a decision to buy.

Q. (BY MR. FLOCH) Okay. And do you see that you wrote you were told not to publish yet; do you see that?

A. Yes.

Q. Who told you not to publish the Australian data?

A. That would have come from an -- internally in the company because I didn't send it anywhere external to publish.

Q. And when you said, "I've been told it's all over our website," what are you referring to there?

A. I think I had been told by somebody that at that point that the -- the data from the -- the performance evaluations had been published on the website.

Q. Was that a customer who told you that the performance evaluation data had been published on the website?

A. I don't remember if it came from a customer or internal.

Q. Okay. And then if we go back up to the first paragraph, do you see you wrote and you said, "We need to post something in the FAQ on the website. I am constantly answering these same questions about why we selected one gene versus multiple genes."

Do you see that?

Page 211

A. Yes.

Q. What did you mean when you said, "these same questions"?

A. I was receiving the same question from multiple customers.

Q. And what was the question?

A. Why we chose to design a test using one gene instead of more than one gene.

Q. Was it your understanding that customers were asking that question because they thought a test that targeted multiple genes was better than a test that targeted one gene?

A. Many of the customers in Asia was asking the question because they were getting pressure from the WHO to only use tests with more than one gene.

Q. Did Co-Diagnostics develop a new test that targeted multiple genes after getting the questions from customers Co-Diagnostics?

A. I believe they did create a second version.

Q. When was that?

A. I don't remember when that was exactly.

Q. Did you have any input into deciding to create a second version of the Logix Smart test?

A. No, I don't think I had the decision on whether to do that or not.

Page 212

Q. In addition to a second version of the Logix Smart test, did CoSara create a second version of the Saragene test that targeted multiple genes?

A. I believe they did.

Q. Let me show you one more exhibit. This will be Garcia Exhibit 22, Dr. Garcia.

(Exhibit No. 22 marked.)

Q. (BY MR. FLOCH) And why don't you read from the bottom and let me know when to scroll up.

A. (Witness complying.) Okay.

Who did this go to? Who did the e-mail go to from Kenneth Bramwell? This is what he wrote, but who did it go to?

Q. I'm sorry --

MS. OSTLER: It doesn't show.

Q. (BY MR. FLOCH) -- Dr. Garcia, it doesn't show on the -- the actual --

MS. OSTLER: Yeah --

MR. FLOCH: -- e-mail.

MS. OSTLER: -- it doesn't show.

THE WITNESS: Okay.

Q. (BY MR. FLOCH) Okay. Do you see that the top e-mail in Exhibit 22 is from Ms. Almaula to you and others at Co-Diagnostics and Asence?

A. Yes.

Page 213

Q. And do you see that Ms. Almaula wrote, (as read): Dear Drs. Bramwell, Montgomery, Satterfield and Garcia, After receiving Dr. Bramwell's mail, I had another meeting with Mr. Mohal Sarabhai, the CEO of CoSara Diagnostics, on Monday. It is very clear that COVID is here through this year and early 2021. We will most certainly need another COVID test with two genes. I have advised Rebecca to also go the ICMR guidelines.

Do you see that?

A. Yes.

Q. What did Ms. Almaula advise you to do in regards to a two-gene test?

A. So, ICMR produced the guidelines of what type of tests that they we're looking for, based on the government putting out -- in the U.S. the FDA -- or the -- in the U.S., the NIH puts out like contracts for people to develop stuff, and then they pay them for it or they sell the material.

In India it's similar, where the ICMR will put out government bids. And if you meet the requirements of that bid, then you receive it and can -- that way the government basically buys hundreds of thousands of tests from your company.

So she was wanting me to review the guidelines of what had to be included in a test to meet their

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

requirements for a bid.

Q. And was one of their requirements that the test target two genes rather than one gene?

A. Yeah, there requirement was either to have two or three genes.

Q. And as of June 10th, 2020, did the Saragene test target more than one gene?

A. I'm not exactly sure when the other gene was introduced in the CoSara test.

Q. What about if I asked the same question in regards to the Logix Smart test?

A. I think it took longer for them to implement the second gene in the Logix Smart test.

Q. Okay. Are you familiar with any data from a government lab in South Africa reviewing and analyzing the Logix Smart test?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I don't recall anything from South Africa.

Q. (BY MR. FLOCH) While you were at Co-Diagnostics, did you have any -- sorry.

While you were at Co-Diagnostics, did you do any work with Find (phonetic)?

A. I don't remember doing any work with Find because we didn't have the WHO criteria in place.

Page 215

Q. Do you currently own any Co-Diagnostic stock?

A. Actually, I'm not sure.

Q. Did you own Co-Diagnostic stock in 2020?

A. I did.

Q. Did you sell Co-Diagnostic stock in 2020?

A. I did.

Q. Do you remember how many times you sold Co-Diagnostic stock in 2020?

A. I believe I just sold once in 2020.

Q. And do you remember what month you sold in 2020?

A. I do not recall what month that was.

Q. Do you remember whether it was the first half of the year or the second half of the year in 2020?

A. No, I don't recall. The only thing I do remember is there were blackout dates for employees, and so I had to ask when that blackout was inactive in order to sell.

Q. Did you sell any Co-Diagnostic stock in 2021?

A. Yes.

Q. Do you remember when?

A. I'm not sure when that was either.

Q. Between your sales of Co-Diagnostic stock in 2020 and 2021, how much money did you make?

A. I don't remember the total exactly. I think the first one was somewhere around -- I think what I actually got out of that was like somewhere around

Page 216

260,000. I don't remember the exact numbers. And the second one was less than that.

Q. Was the second one six figures?

A. I believe what I got was somewhere around 150-ish. I don't remember the numbers.

MR. FLOCH: Dr. Garcia, let's go off the record quickly.

THE VIDEOGRAPHER: We're going off the record at 4:26 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're on the back on the record at 4:33 p.m.

Q. (BY MR. FLOCH) Dr. Garcia, did you hire Ms. Ostler and Mr. Taylor's firm to represent you today?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I didn't hire anybody.

Q. (BY MR. FLOCH) Are you paying the attorneys' fees for Ms. Ostler and Mr. Taylor to represent you today?

A. No.

Q. Who's paying your legal fees for you to be here today?

A. I assume Co-Diagnostics is, I'm not sure.

Q. Besides the May 1st press release, did anyone at Co-Diagnostics ever ask you to prepare data to

Page 217

supplement press releases?

MS. OSTLER: Objection --

THE WITNESS: I don't re -- I don't remember data being used in press releases.

Q. (BY MR. FLOCH) Okay. While you were at Co-Diagnostics, did you monitor Co-Diagnostics' stock price?

A. No.

Q. While you were at Co-Diagnostics, were other employees of Co-Diagnostics monitoring Co-Diagnostics' stock price?

MS. OSTLER: Objection, calls for speculation.

THE WITNESS: I really don't know what other people were doing.

Q. (BY MR. FLOCH) How often did you talk about Co-Diagnostics' stock price with your colleagues at Co-Diagnostics?

A. Hardly ever. Maybe one or two people brought it up once in awhile, but it wasn't a topic of conversation.

Q. Is CoSara a public company in India?

MS. OSTLER: Objection, calls for legal conclusion.

THE WITNESS: I'm not sure what CoSara's

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

status is in India.

Q. (BY MR. FLOCH) Did you have any stock in CoSara?

A. Not that I know of.

MR. FLOCH: Okay. Dr. Garcia, I have no further questions. And I just want to thank you for your time today. I know you're -- you don't work for the company anymore and you're a busy professional, so I really appreciate your time.

And I'll allow -- or I'll pass the witness to Ms. Ostler.

MS. OSTLER: So we need to take a break so I can confer with Zach. Give us five minutes, and we'll come right back.

MR. FLOCH: Okay.

Thank you -- and thank you again, Dr. Garcia.

THE VIDEOGRAPHER: We're going off the record at 4:36 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 4:42 p.m.

MS. OSTLER: We have no questions.

We'd like to designate the entire transcript provisionally confidential under the protective order.

And we would like to read and sign.

Page 219

THE REPORTER: Okay.

MS. OSTLER: Please send the read and sign version to me.

(Pause in the proceedings.)

THE VIDEOGRAPHER: Ready to go off the record? Okay.

We're off the record at 4:42 p.m. And this concludes today's testimony given by Rebecca Garcia. The total number of media used was five and will be retained by Veritext.

(Signature requested.)

(The proceedings concluded at 4:42 p.m. EDT)

Page 220

REPORTER'S CERTIFICATE

I, Tammy M. Breed, CSR No. 7801, Certified Reporter, certify:

That the foregoing proceedings were taken before me remotely at the time and place therein set forth, at which time the witness was put under oath remotely by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Utah that the foregoing is true and correct.

Dated this 31st day of May, 2023.

TAMMY M. BREED, C.C.R. No. 7801

Page 221

Rebecca Garcia, Ph.D. c/o Joni Ostler, Esq.
jostler@parrbrown.com

May 31st, 2023

RE: GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al
5/12/2023, Rebecca Garcia , Ph.D. (#5902786)
The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at transcripts-fl@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Rebecca Garcia , Ph.D. (#5902786)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Rebecca Garcia , Ph.D.                Date

Page 223

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Rebecca Garcia , Ph.D. (#5902786)

ACKNOWLEDGEMENT OF DEPONENT

I, Rebecca Garcia , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Rebecca Garcia , Ph.D.                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

57 (Pages 222 - 223)

CONFIDENTIAL

**[& - 2]**                                                                    Page 224

| & | |
|---|---|
| **&** 2:9,15 8:7,10 80:13 | |

**0**

**00001168** 5:17
**00001371** 5:19
**00004420** 4:17
**00004509** 4:19
**00004512** 4:22
**00004529** 4:24
**00005465** 6:4
**00007794** 5:12
**00023286** 4:11
**00023726** 5:2
**00023727** 5:2
**00024111** 5:4
**00024114** 5:5
**00024121** 5:7
**00024155** 5:21
**00024872** 6:7
**00027453** 5:23
**00075061** 5:9
**00077784** 4:14
**00085324** 5:15
**00131545** 4:4
**00368** 1:6
**02042020** 112:15

**1**

**1** 4:3,5 7:16
28:13,15,23
62:15 132:14
133:1 179:2,13
183:1 184:16,23

185:17,23,25
192:11
**1/22/2020** 4:11
**10** 4:9 5:1 131:3
140:21 178:3
**100** 54:11,13
59:8 61:17
62:10 69:24
70:6 77:20,24
77:24 78:5,6,7
78:13,16,21
121:3,7,11,16
130:20,21
132:16 143:6,6
151:1,5,13
152:2 181:25,25
195:8 197:4,4
197:17,17,21,21
199:2,2,5,6,12
199:25,25
202:10 206:3
**101** 2:16
**10111** 2:20
**102** 82:5,6 83:19
84:3,13,18
**105** 4:16
**10:08** 46:24
**10:17** 47:2
**10:36** 101:19
**10th** 214:6
**11** 5:3 59:7
141:4,5 146:8
**111** 4:18
**1169** 5:17

**11:29** 89:14
**11:30** 89:17
**11th** 131:9
**12** 1:19 2:3 5:6
7:1 114:11
119:22 123:5,24
124:6 126:16,23
128:22 145:23
**12/17/21** 4:3
**120** 4:20
**127** 4:23
**12:27** 120:3
**12th** 7:7
**13** 5:8 148:16,17
**131** 5:1
**131546** 4:4
**13485** 14:24
33:11,17 76:2
165:1
**1372** 5:19
**14** 5:11 157:17
157:19
**141** 5:3
**145** 5:6
**148** 5:8
**14th** 159:21
**15** 5:13 159:11
159:12
**150** 216:5
**157** 5:11
**159** 5:13
**15th** 208:25
**16** 5:16 51:1
166:19,20 167:6
167:9

**166** 5:16
**17** 5:18 29:6
173:24 174:1
**173** 5:18
**176** 5:20
**18** 5:20 81:17
176:8,10
**182** 5:22
**189** 6:1
**19** 4:8 5:22 6:1
15:15 54:15
59:11 71:7,7
73:20 74:11,18
75:3 76:11 79:4
81:2,20 82:6
83:5,12 84:1
85:25 86:8 87:4
88:1,1,2 90:7,10
90:13 94:24
104:12 108:4
109:5 113:17
143:1 177:9
179:6 180:9
182:8,10,22
183:8 185:4
197:3 199:24
204:13
**1:02** 120:6
**1st** 189:23 190:6
216:24

**2**

**2** 2:10 4:5 47:2
54:18,20,22
83:13 86:4
103:14 115:20

CONFIDENTIAL

**[2 - 4:36]**

133:4 136:14,21 137:6 179:21,22 193:3,6,21
**2.1** 81:13,16
**20** 6:1 54:15 59:11 165:16 180:3,4,9 189:4 189:6 223:15
**200** 2:16
**200,000** 25:2
**2003** 20:18
**2009** 23:22 24:4 24:5,7 25:5,11
**2014** 27:7,14 33:1 35:11 36:24
**2015** 27:14 35:12,13,22
**2019** 81:7 82:7 83:1,6 113:21 183:10
**2020** 24:8 44:19 74:18 75:2 76:9 81:19,20 89:19 91:7 94:14,14 94:17,22 95:5,8 95:12,16 98:7 103:22,25 104:9 105:23 106:5 107:12 108:3 112:9 120:20 122:8 127:13 131:9,24 141:17 146:4 148:6 150:18 159:21

168:7 169:18 171:9 172:1 176:25 181:14 182:16 189:23 190:7 204:12,15 208:25 214:6 215:3,5,8,9,10 215:13,21
**2021** 28:6 29:6 44:13 213:6 215:17,22
**2022** 10:17 44:15,16
**2023** 1:19 2:3 7:1,8 220:20 221:2
**204** 81:16 82:5
**208** 6:3
**21** 6:3 208:12,14
**212** 2:20 6:5
**22** 6:5 212:6,7 212:23
**22nd** 91:6
**23287** 4:12
**234** 2:2
**23rd** 106:5 107:12
**24** 6:2
**24122** 5:7
**24165** 5:21
**24875** 6:7
**25.5** 83:13
**2530** 2:10
**26** 83:20 84:3,13 84:18,25

**26/102** 83:12 84:2
**260,000** 216:1
**27455** 5:24
**28** 4:3 141:16
**28097** 220:24
**29th** 146:3
**2:00** 98:13
**2:13** 157:13
**2:20** 1:5
**2:21** 157:16
**2nd** 112:8 120:19

**3**

**3** 4:6 79:15,16 92:11,13 120:6 134:19 181:3,4 194:6,19
**3.1** 82:24
**3.1...** 82:20
**3/23/2020** 4:16
**3/3/2020** 4:13
**30** 221:17
**305** 2:11
**30th** 168:7 169:18 170:17 171:9 172:1 176:25 181:14 182:16 204:12 204:15
**31st** 220:20 221:2
**32** 51:1
**33131** 2:11

**35** 122:21 123:8 123:12 160:19 161:13,16,19,24
**36** 123:17,17
**38** 160:3
**3:59** 208:8
**3rd** 97:25 98:7 101:15 127:13

**4**

**4** 4:10 85:7,20 90:23,24 101:8 135:12,13 157:16 159:24 160:2 181:6,7 192:3 194:22
**4.1.1** 186:3
**4.1.1.** 185:14
**4.1.3** 185:17
**4/11/2020** 5:1
**4/2/2020** 4:19,21
**4/28/2020** 5:4
**4/29/2020** 5:6
**4/3/2020** 4:23
**4/30/2020** 5:16 5:18,20
**4/30/3030** 5:23
**4/9/2020** 5:9
**400-4260** 2:11
**45** 2:19
**4511** 4:19
**4:08** 208:11
**4:26** 216:9
**4:33** 216:12
**4:36** 218:18

CONFIDENTIAL

**[4:42 - adding]**

Page 226

| | | | |
|---|---|---|---|
| **4:42** 218:21 219:7,12 | **7** | **9:10** 13:17,20 | **accurately** 53:8 93:24 152:8 |

**5**

**5** 4:13 59:7 85:13,16,16 97:20,21 121:5 189:23,24 195:6 195:10,14 208:11
**5/12/2023** 221:5
**5/15/2020** 6:4
**5/5/2020** 5:11
**50** 151:20 153:17,22 161:10
**532-7840** 2:17
**54** 4:5
**5467** 6:4
**589-4200** 2:20
**5902786** 1:24 221:5 222:2 223:2
**5th** 157:24

**6**

**6** 4:16 105:25 106:2
**6/10/2020** 6:6
**600** 150:25 151:4,13 152:7
**65** 134:21 136:11 137:12 137:16

**7** 3:4 4:18 111:12,14
**74.5** 86:9 89:3
**75069** 5:10
**77878** 4:15
**7795** 5:12
**7801** 1:23 220:3 220:24
**79** 4:6
**7:00** 2:3

**8**

**8** 4:20 120:13,14 123:16 130:13
**8.8** 83:14
**8/14/2020** 5:14
**80** 67:19
**801** 2:17
**84111** 2:16
**85328** 5:15
**88** 113:25 114:3 114:4,9 132:16
**8th** 150:18

**9**

**9** 4:23 127:5,7
**9/102** 83:14
**90** 4:10
**95** 53:21 59:14 59:15 125:6,7 125:12 154:23 161:19,23
**97** 4:13
**9:00** 7:2,7

**a**

**a.m.** 2:3 7:2,7 13:17,20 46:24 47:2 89:14,17 101:19
**abi** 160:3
**able** 24:15,15,25 63:24 91:13 94:11 132:7 152:8
**above** 137:9 221:6 223:7
**abruptly** 92:19
**absence** 58:4
**absorbance** 52:6
**abstract** 79:24
**academic** 162:11
**acceptable** 205:8
**accepted** 32:23
**access** 13:6,8 47:15 48:11,14 49:9
**account** 48:1 49:1,15,19,23
**accounting** 119:7
**accuracy** 70:9 70:12,16 116:22 200:1,5,12,18 200:25 201:4 221:9

**accurately** 53:8 93:24 152:8
**accusations** 132:8
**accused** 43:13
**achieved** 206:3
**acknowledge...** 223:3
**acknowledgm...** 221:12
**acquired** 162:20
**acronyms** 195:15,17,17
**action** 7:24 131:17 220:17
**actual** 16:6 33:17 46:9 66:6 67:12 68:2 102:4,13 195:19 196:21 212:17
**actually** 20:20 38:11 39:8,12 52:4 59:23 66:6 70:12 87:11 103:9 126:19 149:3 184:11 187:1 189:1 200:19 215:2,25
**adapted** 96:2
**add** 74:3,4 199:12
**added** 163:19
**adding** 87:22 89:10

CONFIDENTIAL

[addition - answer]                                                          Page 227

addition 212:1
additional
  87:22
additionally
  93:16
additions 223:6
address 47:19
  48:21
administer 7:23
admitted 81:18
advice 18:2,6
advise 213:11
advised 213:8
affect 4:7 72:12
  72:13 86:1
affected 72:5
  93:19 132:2
  139:16
affects 131:18
affordable 30:7
africa 30:9
  214:15,19
agcl 195:18
aged 81:17
agency 128:25
  137:11,17
agent 41:15
ago 10:16 64:6
  139:6
agree 7:15
  92:22 93:22
  109:17 133:20
  137:16 191:5,7
  200:4,11 202:13

agreed 133:21
  134:9 136:15
  137:10 191:1,1
  191:4
agreement
  32:15 65:9
  69:22 121:15
  175:12,14 179:7
  183:15 184:21
  193:14
agreement's
  65:10
ah 21:24 101:22
ahead 67:23
  110:3 153:7
  186:7,12 197:15
aim 83:4 85:23
al 7:18 221:4
  222:1 223:1
all's 179:17
alliance 113:5
allocate 85:25
allotted 221:20
allow 119:13
  178:17 218:9
allowed 188:5
  206:10
allows 20:6
allplex 82:7,15
  82:18 83:1,6,19
  84:21
almaula 6:5
  113:3,4 131:10
  212:23 213:1,11

altogether
  146:15 207:1
ambiguous 58:1
  69:13 70:1
  72:25 73:7,22
  74:14,20 75:22
  77:2,21 88:5
  96:21 107:23
  110:17 124:23
  126:8 130:8
  134:1 136:8,24
  148:8 152:16
  155:14 156:2
  158:25 163:20
  177:24 178:13
  180:6 194:14
  200:21 201:6
  203:8,17 205:12
  207:19 214:17
  216:15
america 30:10
american 20:2
  118:7
amount 124:12
ample 53:4
amplification
  50:21,23 52:25
  53:5,25 56:16
  61:17 62:4
  63:13 154:24
amplifications
  54:3
amplified
  123:13

amplifies 87:4
  123:17
amplifying 51:3
  63:16
analyses 77:18
analysis 69:9
  173:19 184:1,5
  184:8
analyte 53:20
  54:12 63:12
  125:6
analytical 60:17
  61:8,10 62:25
  67:4,7,8 68:18
  163:3
analyze 79:4
  163:3 173:8,21
  181:25
analyzed 81:6
  119:23
analyzing 95:1
  214:15
andrew 4:10 5:4
  5:6,20 46:14,16
  91:6 141:11,16
  146:4,11,19
  186:13
answer 12:14,20
  12:21 17:2,7,24
  18:12,19 35:4
  74:16 84:17
  91:14 92:1,10
  92:17 96:7
  104:17 117:24
  143:22

CONFIDENTIAL

**[answered - asking]**

Page 228

**answered** 18:2 29:13 76:22 142:19 147:17 174:13 180:23 193:22 198:22 204:25

**answering** 210:23

**answers** 91:22 91:25 117:20 118:16 119:6,25

**antibody** 39:11 95:3

**anticipating** 102:2

**antigen** 39:12 95:3

**anurag** 5:6 111:5 112:18 113:8 141:16

**anybody** 41:17 49:24 94:1,25 216:16

**anymore** 187:2 218:7

**apart** 140:7

**apologize** 131:11

**apparently** 91:19

**appear** 191:16 193:10,20 195:11

**appearance** 8:2 8:3

**appearances** 2:7

**appeared** 136:5

**appears** 82:14 135:19 146:7

**append** 207:17

**appended** 192:23 196:1,15 197:16,20 198:5 204:22 207:7,12 223:7

**applicable** 96:15 105:9 189:1 221:8

**application** 77:6 97:7,9,10 128:19 148:3

**applied** 135:10

**applies** 63:20

**applying** 64:25

**appreciate** 17:8 18:20 218:8

**approached** 91:13

**appropriate** 97:12 207:17

**approval** 65:2 97:16 107:19 109:16 110:23 138:6

**approve** 95:14 95:18

**approved** 61:6 82:1 149:19 150:14 205:17

**approximate** 123:16

**approximately** 10:16

**april** 105:23 112:8 120:19 127:13 131:9,24 141:16 146:3 150:18 168:7 169:18 170:17 171:9,25 176:25 181:14 182:16 204:11,15

**apuli** 4:13 5:9 5:11,16 40:6,7 98:4 100:13 101:19 103:12 120:20 157:24 168:6

**area** 30:11 31:5 94:12 125:19,25 204:21

**argumentative** 199:8 204:4,17

**arose** 40:23

**arrested** 20:9

**arrived** 26:22

**arrogant** 206:19 206:24

**article** 4:6 80:15 162:19,20,22,24 163:7,8,18 164:18,20 168:13,17,18 170:10,25 171:6

171:9 204:12,15

**articles** 11:7 14:12 18:24 162:11,17 164:12,14,15 204:20

**artificial** 109:4

**asap** 170:11

**asence** 112:19 113:1 146:5 212:24

**asia** 30:9 211:13

**asian** 118:8

**asked** 11:5 26:16 29:12 39:8 40:17,19 40:21 41:3,19 42:15 76:21 92:9 94:25 106:16,21,23 142:19 147:17 162:17,18,19 169:22 170:4 174:13 177:13 180:22 185:24 186:2,5 190:16 190:17,18,21,25 193:22 198:22 200:8 204:25 206:8 209:15,18 214:10

**asking** 11:2 49:24 75:1 84:12 87:24,25 101:12 107:16

CONFIDENTIAL

**[asking - back]**

Page 229

128:7 129:2 148:19,22 170:1 172:5 175:2 209:19 211:10 211:13

**aspects** 40:12

**assay** 66:2 82:7 83:1,6 86:8 132:15,15 134:21,25 150:25 195:8

**assays** 4:8 80:25 86:8

**asserting** 88:19

**assist** 94:25 105:7

**assistance** 22:4 22:8

**assisted** 105:4

**assisting** 97:15 106:13 107:2 148:6

**associate** 19:13

**associated** 46:10 161:19

**assume** 108:7 153:17 195:13 216:23

**assumed** 63:13

**assumes** 94:18 100:7 104:4,14 143:19 144:9 150:11

**attached** 113:14 160:9 194:19

203:5 207:22 221:11

**attaches** 168:15

**attachment** 112:3,14 141:7 142:8 177:8 189:23,24 192:11 193:6,21 194:6,19 195:10 195:13 196:5,12 208:15

**attachments** 105:1 182:21 192:20,23 195:4 205:4

**attempt** 117:20

**attempted** 117:23

**attempts** 86:12

**attended** 171:20

**attorney** 12:19 16:25 17:22 18:1,5,14 220:16 221:13

**attorneys** 14:1,6 216:17

**attribute** 206:9

**attributed** 91:19,20 205:24

**audio** 7:13

**august** 81:19 159:21

**australia** 174:6 175:13 177:9 179:9 181:8

**australian** 175:9 181:15 187:15 192:8,12 192:19 196:1 197:20 209:8 210:6

**author** 162:10 162:17,19 164:7 169:13,14 170:9 178:5,7,11,21 203:20

**authored** 16:5 164:10,11

**authorities** 77:1 95:14,17 106:23 107:4 110:8

**authority** 10:1 23:4 33:20,21 97:1 105:13,14 105:18 143:11

**authorization** 105:5,9

**authorize** 138:1

**authorized** 7:23

**authors** 16:1 88:19 169:10

**automated** 80:25

**available** 65:23 92:20 221:6

**avenues** 118:15

**aware** 44:18 176:18 204:11 204:15

**awhile** 217:20

**axis** 55:3,4,9

**b**

**b** 4:1 9:13 25:13 135:13 203:14

**bachelor's** 19:11

**back** 13:19 24:3 24:14,17 26:15 32:25 35:17 36:20,25 38:24 42:8,22 43:1 44:22 46:13 47:2,6,7 52:22 53:15 57:1 58:13 61:7 68:5 68:23 76:9 78:9 79:2 84:16 85:20 88:25 89:16 91:10 96:24 101:11 103:24 105:12 108:13 114:4,13 116:15 118:19 119:21 120:6 125:25 128:8,13 129:5 130:13 133:12 134:7 136:14 137:23 138:4,23 140:22 148:5 149:15 155:24 157:16 164:23 165:14 167:25 176:14 178:25 184:18

CONFIDENTIAL

**[back - blackout]** Page 230

185:9 190:4 193:1,24 194:21 195:19 201:12 202:15 204:13 208:11,23 210:20 216:11 218:13,20

**background** 23:7,19 30:10 31:3 44:9 53:3,4 56:15 161:1

**backup** 49:18 49:23

**bacteria** 179:15

**bad** 58:21 140:10 180:13 180:16

**baker** 2:19 8:14

**bakerlaw.com** 2:21

**ballpark** 35:8 89:23

**banking** 20:8

**barbara** 192:5

**baruch** 81:18

**base** 31:15 57:12 61:20

**based** 42:19 45:6 49:6 50:9 53:1 56:25 58:4 59:4 64:21 70:3 70:8,9 73:12 76:12,15 92:1 96:2 121:22 126:25 133:16

137:9,21 138:19 151:11 155:7 162:20 169:24 172:25 195:13 204:1 213:14

**basic** 71:18 96:1 96:11 128:18

**basically** 17:3 30:9 65:6 66:11 76:6 77:6 100:5 107:2 122:10 139:3 162:25 213:22

**batch** 159:3

**batches** 158:8

**bates** 4:4,11,14 4:17,19,21,24 5:2,4,7,9,12,14 5:17,19,21,23 6:4,6

**becoming** 32:12

**bedside** 30:17

**beginning** 27:14 35:12,13 39:16 47:1 56:13 116:24 120:5 157:15 208:10

**begins** 56:15 80:19 202:18

**behalf** 8:11,14 38:5

**believe** 10:14 11:24 15:19 23:22 24:5 25:22 27:7,13

33:6 40:11 43:3 48:25 79:6 88:24 89:24 97:12 104:24 105:22 106:23 116:5 121:4 122:7 128:8 134:6 140:18 144:2 145:14 149:23 156:8 161:7 162:24 165:10 169:24 172:18 177:13 181:17 183:6 197:19,23 198:2 201:7 203:11 205:4,14 211:19 212:4 215:9 216:4

**bell** 121:4

**benefits** 72:23

**benson** 1:11 4:10 5:4,6,20 46:14 91:6 141:16 146:4,19 157:24 176:24 177:12 181:10 182:16 186:14 208:25

**benzonana** 4:23 127:13

**best** 74:17 75:16 75:17 188:10,12 188:18,21

**better** 17:9 32:10 87:13 88:3 115:23 137:20 170:12 206:4,20 207:21 211:11

**bfloch** 2:12

**bid** 213:21 214:1

**bids** 213:20

**bigger** 79:19

**billions** 51:2

**binds** 52:2,3

**biochemistry** 72:22

**biodynamics** 128:3

**bioincubator** 22:12

**bioinformatics** 26:7 67:14,15 119:10,12

**biology** 19:12

**biotech** 29:14

**biotechnology** 27:23

**biscayne** 2:10

**bit** 19:4 20:14 24:17 34:20 39:9 92:24 100:12 202:4 205:23

**blackout** 215:15 215:16

CONFIDENTIAL

**[blank - categorically]**                                        Page 231

**blank** 60:20 62:19 63:2,7,14
**blanke** 192:5
**blonka** 192:5
**blood** 20:8
**blue** 55:13,15 55:24 57:8,9,10 57:11 85:16
**bob** 27:19 80:5
**boders** 125:17
**bodies** 46:3 125:17
**bodily** 56:1
**body** 64:25 158:7
**bold** 91:17,18 92:10
**boss** 26:2
**boston** 35:2
**bottom** 29:4 91:1,5 97:23 98:25 137:8 139:19 143:4 159:20 167:19 167:20 174:1,4 192:18 212:9
**boulevard** 2:10
**box** 48:9,14
**bramwell** 5:14 6:6 212:12 213:2
**bramwell's** 213:3
**brand** 65:23,23

**branded** 183:10
**branding** 141:22
**brandon** 2:9 8:6 79:17 116:23
**break** 13:22,23 46:19,20 47:3 51:9 67:9 120:8 186:9,25 187:4 187:6 208:4 218:11
**breaking** 200:7
**breed** 1:23 2:4 7:22 220:3,24
**brent** 1:11 4:18 4:21 5:11,18 6:3 22:19,21 23:1 98:5 170:12 174:24 175:2 202:22
**brent's** 23:8
**brief** 32:13 46:25 157:14 208:9 216:10 218:19
**bring** 163:19
**bringing** 131:19 172:16
**brochures** 141:23
**brought** 29:25 73:23 128:10,16 140:11 156:4 172:6 217:19

**brown** 2:15 8:10
**bug** 127:19
**build** 20:19 119:16 140:3
**building** 23:18
**built** 20:22 32:4
**bulk** 169:2,5
**bullet** 92:11 98:18 99:14 132:12,14 133:1 133:4 134:19 136:14,21 138:22 179:2 183:1 192:8
**bunch** 132:12
**business** 26:18 171:23 174:15
**busy** 218:7
**buy** 145:1 210:2
**buyers** 31:9,11
**buying** 107:8 144:15 145:2 205:18
**buys** 213:22

**c**

**c** 9:13,13,14 25:13 221:1
**c.c.r.** 220:24
**call** 21:11 47:18 75:23 131:20 194:13
**called** 13:5 22:3 26:25 37:22 41:12,24 43:19 64:9 108:24

123:13
**calls** 36:8 48:8 104:14 129:15 143:18 144:19 145:5 147:2 188:8 196:22,23 199:7,8 201:5,6 201:14,23,24 204:4,5 205:1,1 206:12 207:19 217:12,23
**camera** 7:11
**cameron** 4:23 5:8 127:12 128:1
**canarecci** 150:3 150:18 152:12
**capacity** 97:14
**caps** 160:9 169:12
**care** 30:13,14,16 31:5,6 170:8
**career** 29:13 166:10
**carolina** 1:18 2:3 7:1 22:11,13 23:3 36:15,21
**case** 1:4 40:16 55:10 57:7 68:4 115:9 149:23 154:1
**cases** 69:5 77:8
**categorically** 18:25

CONFIDENTIAL

**[cause - clearance]**                                              Page 232

cause  87:9
  116:21 117:3
  119:14 171:1
cayman  1:4
cc  127:16
ccr  1:23
cdc  168:21
cdco  115:3
cds  138:4
cdsco  16:13
  38:13 77:6
  97:11,13 109:14
  109:19 110:4,16
  110:22,22
  114:17,22 115:4
  115:7 135:6
ce  133:5
cecilia  5:13,16
  40:9,11 98:4
  102:2 120:20
  168:6 175:20,25
cell  41:4
center  20:18
  81:19
central  1:2
  30:10
ceo  22:20 23:23
  29:21 32:14
  34:11,23 35:14
  35:15,18 39:18
  112:25 131:23
  174:11 213:4
certain  26:24
  50:16 51:5 53:7
  56:22 57:18

63:16 73:8
  76:10 80:6,16
  87:18 88:14
  159:4 162:16
certainly  213:7
certificate  220:1
certification
  20:2,4 33:11,15
  33:19
certifications
  19:25
certified  2:4
  220:3
certify  220:4,15
cetera  127:25
cha  45:18
chad  4:13 5:9
  5:11,16 40:6,7
  98:4 103:12
  104:5,10 120:20
  168:6,11 175:20
  175:25
chain  97:23,24
  97:24 98:3
  101:1 103:12
  104:10 148:20
  149:17
challenge  92:18
challenges
  92:14
chance  130:10
  154:22 186:8
change  31:16
  33:23 45:18
  70:3 72:19

121:25 140:14
  150:13 161:11
  222:4,7,10,13
  222:16,19
changed  27:1,3
  27:13 29:24
  30:5,20 31:23
  33:25 34:3,20
  35:9 93:5
  160:18,24
changes  45:18
  94:2 115:12
  124:9 135:7,9
  144:1,2 154:2
  188:25 221:10
  223:6
changing  30:12
  156:17
channel  97:12
channels  99:23
characteristics
  62:2
characterization
  21:7
characterize
  40:9
characterizes
  204:18
charge  130:2
chart  54:25 55:2
charts  55:1
chemical  108:22
chemicals  68:14
  68:16

chemistry  19:12
  20:8
chief  32:12,14
  32:22 35:23,25
  111:9 137:10,17
choosing  94:4
chose  211:7
ci  133:5
circumstances
  24:24 36:5
  69:25 70:6,7
city  2:16 29:13
  104:8 115:17
  118:20 119:9
  122:8 151:7
  172:10
civil  9:17
claim  10:4
  11:13 52:13
  54:3 107:20
  130:9 169:13
claims  9:21
  10:10 11:3
  132:8 191:2
clarify  15:22
  60:11 69:14
class  2:8 8:9
classified  9:18
  40:1
clean  77:12
cleaned  44:25
clear  17:5
  201:16 213:5
clearance  25:6
  64:24 105:16

**[clearance - compared]**                                                    Page 233

142:25 204:9
**cleared** 44:5,7
**clemson** 19:15
  26:10,14
**clia** 31:7 107:7
  155:3,4
**client** 16:25
  17:22 18:1,5,14
**clincher** 51:24
**clinical** 15:13,14
  15:21,25 16:2,6
  16:17 17:11,14
  18:8,9,24 20:2,6
  20:21 46:2
  60:24 64:10,13
  65:5,10,17 67:5
  68:21,25 69:1,2
  69:5,8 76:19
  77:4,20 78:7
  81:1 96:13,14
  96:18 111:1
  121:11,12
  127:23 132:20
  132:22 142:5
  154:18 155:7,15
  155:18 163:4
  175:12,21 206:3
**clinically**
  109:16
**clips** 52:4
**close** 17:1 79:18
**cloud** 42:19
  45:6
**clsi** 53:19 58:18
  155:21 173:22

**cmr** 1:6
**codi** 4:4,11,14
  4:17,19,22,24
  5:2,4,7,9,12,15
  5:17,19,21,23
  6:4
**codiagnostics**
  49:10,15
**codiagnostics....**
  48:24 49:19,23
**codo** 6:7
**codx** 199:21
**col** 79:21
**colleague** 8:12
**colleagues** 48:7
  48:15,22 98:16
  98:19 101:14
  217:17
**collect** 40:17,22
  41:19,24 42:5
  42:15
**collected** 42:5
**collecting** 41:2
  61:1 122:9
**collection** 40:16
**collects** 52:6
**college** 19:7,8,8
  19:10,11,14,17
  20:15
**colony** 58:10
**colored** 55:14
**column** 79:18
  79:22 85:17
  113:20,24 114:5

**come** 26:16 69:3
  119:20 134:11
  154:11 155:25
  158:12 207:6
  210:7 218:13
**coming** 16:10
  160:10
**commentary**
  164:23
**commented**
  147:9,11,13
**comments** 79:18
  79:21 124:25
**commercial**
  112:15 116:4
**commission**
  10:13
**commonly**
  30:17
**communicate**
  47:9,12,20,23
  48:6,22
**communicated**
  47:16
**communication**
  16:25 18:14
  43:21
**communicatio...**
  17:6,23 48:2
**comp** 115:12
**companies**
  37:10 165:16,18
  165:19 166:14
  166:15

**company** 1:5
  9:25 10:8 22:3,4
  22:10,18,20
  23:9,12,15,16
  23:18 24:2,6,7
  25:18 26:17,25
  27:1 29:14,24
  30:5,12,19
  31:23 32:2,6
  34:12,23 35:9
  37:22 41:5,9,10
  41:12,14,15
  42:20,21,22
  43:13 44:12
  45:4,7 46:15
  47:4 49:17,20
  90:17 108:22
  113:1 128:18
  129:1 131:18
  132:2 139:16
  147:13,16 170:9
  171:1 185:2
  199:4,21,22
  203:24 206:8
  207:7 210:8
  213:23 217:22
  218:7
**company's** 65:6
**comparable**
  135:23
**compare** 64:16
  65:2 74:11 93:4
  121:14
**compared** 40:9
  75:7 80:24 83:5

CONFIDENTIAL

**[compared - constant]**                                                    Page 234

86:24 117:7,8
121:24 134:5
152:13
**compares**  66:11
**comparing**  61:5
65:7 69:2,6
82:16 119:18
134:7
**comparison**
63:23 65:5 69:4
82:25 116:4
119:2 134:3
136:16 160:3
181:7 195:7
**competitors**
74:11 75:8
124:16 152:14
**complaint**
159:24 160:2,10
**complete**  223:8
**completed**
38:14 175:16
221:17
**completely**  44:5
200:7
**complex**  30:11
31:4
**complications**
74:4
**complying**  29:3
80:1,22 81:14
82:23 85:11,14
91:4 98:2
100:25 101:4
111:19,20,22

112:1,6 120:18
127:11 131:7
141:13 146:2
149:9,11 157:22
159:14,18
167:23,24 168:1
174:3 176:13,16
176:21 182:12
185:13 189:8
208:17 212:10
**component**
61:10 62:24
63:18 64:2
65:17 71:12
124:9
**components**
38:16 64:12
68:18 71:19
87:23 115:13
**compound**  56:4
77:21 78:22
**computer**  42:12
44:10,11 49:12
67:16
**concentration**
53:20 54:11,12
59:6,9,10,12,13
61:16,17 62:5,8
62:13,23 64:1
115:12 161:20
179:24,25
**concentrations**
62:8,22 125:10
**concern**  116:22
150:8

**concerns**  75:20
75:24 117:3
150:12 170:25
**conclude**  119:13
**concluded**
202:10 219:12
**concludes**  219:8
**conclusion**
88:13 119:20
126:16,18
134:11 143:19
143:25 196:23
199:8 201:15,24
204:5 205:1
207:20 217:24
**concordance**
113:24 121:11
121:12,15 195:8
202:10,14,16
**conditions**
71:14
**conducted**  7:10
7:19 56:14
120:8
**confer**  218:12
**confidence**
69:23 70:13
114:7,8
**confident**
102:16
**confidential**
1:15 218:24
**confirm**  54:14
60:19,20,21
63:8,11 66:1,4,9

101:20 108:8,25
109:7 154:12
180:10 187:9
**confirmed**
59:11,23 60:4
66:20 125:7
126:20 180:2
**confirming**
60:25 61:2
87:21
**confirms**  180:16
**confuses**  141:24
142:4
**confusing**  69:16
**connected**  13:9
49:7,12 138:25
**connection**  7:11
22:21 34:17
40:22
**conservative**
72:16
**conserved**  72:15
72:17 94:4
**consider**  76:17
94:2 121:16
123:7 124:11
**considered**
11:19 82:8
122:16 153:10
166:7 201:25
**consistently**
93:18 197:3
199:2 206:3,17
**constant**  34:18

CONFIDENTIAL

**[constantly - course]**

Page 235

**constantly**
63:15 210:23
**consumer** 144:5
145:7,9
**consumer's**
144:11
**consumers**
145:13
**contact** 40:2
95:20 115:7
140:19 161:3
**contain** 63:12
**containing**
151:16
**contamination**
102:18 122:10
122:25
**context** 126:14
149:1 158:19
204:7
**continue** 7:14
28:20 29:25
187:4
**continued**
169:14
**continuing**
161:5
**continuous** 76:2
144:1
**contracts**
213:16
**contrived**
151:10
**control** 45:9
57:14,15 76:18

77:8 103:3
109:7 111:2
117:13 158:6
165:2 194:16,25
**controls** 55:18
58:5 103:8
159:3 173:18
**conversation**
129:25 146:21
156:16 157:3
170:21 172:22
217:21
**conversations**
32:11 43:5
73:25 129:22
140:3,5 146:18
152:18 172:19
181:10,12
**converted**
188:15
**cooling** 50:16,16
**cools** 55:8
**cooperative**
22:11,12,14,15
22:22,24 23:23
23:24 24:6,12
24:18,24 25:4
25:10,20,24
26:21
**copies** 50:25,25
51:2 58:9,9,24
62:15 123:16
150:25 151:4,13
151:16,21,22
152:25 153:18

153:22 155:11
156:13,14,24,24
221:14
**coprimer**
163:16
**coprimers** 79:13
**copy** 45:19
46:12 50:24
177:6,14
**corona** 113:21
183:10
**coronavirus**
81:6 89:21
92:15 94:7
**corporation** 1:9
**correct** 21:6
26:10 63:19
65:19 174:12
185:1 220:13,19
223:8
**corrections**
223:6
**correctly** 69:19
71:4 111:5
125:24
**correlation**
137:7
**cosara** 37:20,21
37:24 38:1,3
41:25 47:9,12
47:15,20,24
95:19,19 96:1,2
96:25 97:5,10
97:15 99:10
102:24 103:3

105:5,14,18
106:16 107:3
111:10 112:19
113:2,7,18
115:12 127:23
129:4,8,18,18
134:3,10,14,16
135:6 136:15
138:5 139:17
140:19,20
142:25 143:11
146:5 148:15
161:3,11 183:9
212:2 213:4
214:9 217:22
218:2
**cosara's** 217:25
**cost** 43:24
**council** 142:25
**counsel** 8:3,17
10:18,21,23,24
13:12 109:11
221:14
**counter** 31:7
116:2
**countries** 30:7,9
39:6 77:18 78:2
78:15,18,19,24
205:6 206:1
**country** 77:25
205:7
**country's** 205:6
**couple** 149:2
**course** 13:23
100:19 102:20

CONFIDENTIAL

**[course - data]**

Page 236

140:10

**court** 1:1 2:4 7:22 8:4 12:12 12:17 13:1

**cov** 83:13 86:4 195:18

**covid** 4:8 6:1 11:16,17 15:15 55:24 71:7,7 73:20 74:8,11 74:18 75:3 76:11 79:4 81:2 81:20 82:6 83:5 83:12 84:1 85:25 86:8 87:4 88:1,1,2 90:7,10 90:13 94:24 98:9 104:12 108:4 109:5 122:10 132:14 141:23 143:1 148:10 154:22 163:1,2,9 169:25 177:9 179:6 182:22 183:8 197:3 199:24 204:13 213:5,7

**cq** 53:22

**create** 30:7 33:10 45:15,16 49:22 211:19,22 212:2

**created** 46:1 57:20 67:12

**creates** 50:20 52:2

**creation** 38:4

**credibility** 163:19

**creditable** 99:2

**credits** 169:14

**criteria** 58:19 59:22 74:16 84:20 109:17 111:2 114:25 121:9 133:16 137:18 142:16 142:21 151:6 155:17 198:23 214:25

**critical** 160:9

**criticisms** 87:8 115:5 124:20

**criticize** 102:3 102:13

**criticized** 204:12,16

**critique** 76:1

**critiques** 76:10 76:22,25

**crockett** 4:3

**cross** 68:7

**crosses** 57:8

**crossreact** 67:16

**cso** 29:14

**csr** 220:3

**ct** 53:22 57:3,6 58:7 63:22 122:19 123:16

125:8,9,9,11 126:11 158:9,17 159:4

**current** 85:24

**currently** 91:12 100:2 215:1

**curve** 52:25 58:5,7 59:7 63:23,25 121:4

**cus** 44:9

**customer** 31:15 34:15 39:1 149:18 156:1,6 156:9,12,12,17 156:22,23 157:4 161:2,4 209:25 210:15,18

**customers** 31:17 31:19 39:4,7 73:4,8 95:9 128:6 148:2,6,9 148:13 156:4 159:24 160:2 162:3,3 209:6 209:14,15,20 211:5,9,13,18

**cut** 116:23,25 122:19,21 123:7 123:11 125:19 160:18 161:15

**cutting** 16:21 28:15 116:21

**cv** 1:5 113:21

**cycle** 50:11,25 51:1 52:18,23

52:24,24 53:12 53:16,23 54:2,3 54:5,8 57:6,9,10 57:23 122:21,23 123:7,12,13 160:3,19 161:15 161:19,24

**cycles** 50:17,18 50:20 52:13,14 53:7 55:4 56:14 56:17,22 57:19 161:9,10,10,13

**d**

**d** 3:1

**daily** 33:9 34:9 169:7

**data** 6:1 92:20 95:1 99:15 100:4 103:20 104:1,6,11,18 104:22 105:8 106:13 107:8,13 107:16,21 108:11,13 119:13,15,24 128:15,16,22,24 129:3,7,8,11,13 129:17 130:5 134:3,10 137:1 141:3 144:13 157:5 161:18,23 161:25 162:20 172:25 173:7,8 173:9,12,13,15 173:16,17 174:6

CONFIDENTIAL

**[data - design]**                                                Page 237

174:18,19
176:22 181:15
181:22,24
189:25 191:14
191:14,17,17,25
192:12 194:18
194:20,25 195:3
195:5,7,11,22
195:23 196:1,6
196:8,12,15,17
196:21,24 197:3
198:6 199:15,24
202:16 203:1
204:1,1,6
205:10 207:24
207:25 209:7,8
209:9,14 210:6
210:13,16
214:14 216:25
217:4
**databases** 92:5
**datasets** 181:16
**date** 24:22
27:15 105:22
169:20 177:4
222:24 223:12
**dated** 4:3,11,13
4:16,18,21,23
5:1,4,6,9,11,14
5:16,18,20,23
6:3,6 29:6
220:20
**dates** 41:8 89:22
215:15

**day** 11:22
106:18 177:2,22
220:20 223:15
**days** 139:6
221:17
**de** 61:1 65:16,18
65:22 66:8,13
69:3 180:9
**dealing** 76:16
187:3
**dear** 113:8
213:2
**debate** 73:10,11
73:14,15,16
87:11,13,16,18
88:13,14 122:18
206:16
**debated** 88:12
**december** 28:6
29:6
**decide** 154:4
158:13
**decided** 90:6
146:22 164:23
**deciding** 146:19
211:22
**decision** 32:17
147:5 155:6,16
165:12 207:15
210:1 211:24
**declare** 220:18
223:4
**declaring**
116:11

**decrease** 125:13
**deemed** 223:6
**defected** 154:23
**defendants** 1:12
2:14 8:11,14
**define** 200:1,5
200:12 201:4,19
**defined** 53:18
110:6
**defines** 205:7
**definition** 126:4
**degraded** 159:6
**degree** 19:7
22:1
**degrees** 19:9,10
19:18
**delay** 91:10
**delayed** 158:9
158:17 159:4
**delete** 41:15
**deleted** 44:14
45:10 49:14
**delta** 55:11
**delve** 16:25
**demonstrates**
197:4 199:2
**demonstrating**
199:24
**denny** 4:3
**department**
192:2 195:7
**depend** 157:6
**dependent**
32:24 59:1
156:16 205:18

**depends** 7:10
16:4 51:6 57:20
65:9 73:1 90:20
93:25 153:25
154:18 173:7
**deponent** 2:14
221:13 223:3
**deposed** 9:15,17
11:11 12:1,8
**deposing** 9:23
10:1 221:13
**deposition** 1:17
2:1 7:9,17,19
9:20,24 10:6,12
10:15,19,22
11:1,5,9,20,25
12:2,4 14:2,5,8
17:11 190:14,15
**derive** 10:10
58:9 63:25
136:25 180:25
**derived** 11:3
69:6 71:16
75:25 151:9
**describe** 9:19
10:5 26:2 50:5
60:13 62:11
63:5 67:7,24
75:17 126:22
149:16
**described** 85:4
**describing**
138:10 181:16
**design** 20:25
26:7,19 68:9

**[design - diagnostics]** Page 238

92:6 93:3 109:1
145:8 154:16
188:23 211:7
**designate**
218:23
**designed** 93:8
108:9,21
**designing** 92:14
94:1
**detail** 146:13
**details** 10:3 17:3
172:21
**detect** 53:8
54:11 62:4
68:10 75:3 81:2
90:7 94:10
151:13
**detectable** 152:3
**detected** 4:9
53:20 83:19
125:6
**detecting** 51:5
74:18
**detection** 51:7,8
51:12,14,15
52:9 53:14,17
53:18 54:4,6,8,9
54:14 58:14,16
58:17,20,24
59:3,4,8,9,14
60:23 62:10
64:3,5 83:5
85:25 116:7
123:23 124:2,5
124:14,15,19,21

124:25 125:5
126:6,10,10
133:16,18
136:23 137:1
150:25 151:1,5
151:8,12,17
152:1,12,14
153:1 154:23
155:11 156:14
156:25 161:18
161:23 180:2,2
180:4,13,17,20
181:1,2 202:21
202:23 203:7,12
203:16,25 204:3
204:16,24 205:4
205:11,15
**detects** 114:6
**detention**
180:10
**determine** 51:4
54:1,10 56:18
56:23 57:24
58:19 60:22
62:2,17 66:16
109:15 133:17
134:16 138:1
155:12 180:15
202:1 204:9
**determined**
127:2 203:13
**determines** 63:9
**determining**
144:25

**develop** 73:5
90:6,9,13,17,21
211:16 213:17
**developed** 70:21
71:20,22 93:17
93:23,25 94:10
179:8 181:8
183:16
**developing**
22:16 30:20,21
31:4,9,10 90:14
92:18
**development**
34:4,8,10 36:3,7
37:2 38:16,25
70:23 74:24
76:6 144:25
147:24 162:8
171:23 174:15
175:21 199:23
**deviation**
173:20
**device** 15:3,9
30:16 38:14,15
46:9 61:1,4,5
62:1,3 64:19,19
64:20,21,22,23
64:23 65:1,18
65:22 66:14,15
67:13 69:5,7,7
82:13,15 99:22
100:1 104:25
109:15 111:2
145:19 165:4,5

**devices** 30:12
33:18 34:13
47:6 69:6
110:23,25
**diagnos** 81:2
**diagnosis** 80:13
**diagnostic**
11:17 22:16
38:8 48:3,6,23
50:1,4,19 51:4
51:11 52:9 53:6
53:11 59:17
65:7 69:24 70:9
70:24 71:6 81:2
88:1,2 90:17
98:16 103:25
117:4 121:18
145:1 146:5
165:15 177:20
199:1,23 215:1
215:3,5,8,17,21
**diagnostics** 1:9
6:1 7:18 9:22
11:18 15:15
16:5 22:11,13
22:14,15,22,24
23:24,25 24:6,8
24:19,24 25:5
25:10,21,25
26:21,25 27:12
27:16 28:5 29:5
29:21 30:6
31:14,15 32:12
33:14 34:19
35:10,14,16,19

CONFIDENTIAL

**[diagnostics - distributors]** Page 239

35:22 36:12 37:13,20,22 38:5 39:5,10,14 39:22,25 40:10 42:9,13,14,17 42:22 43:6,21 44:1,4,24 47:21 48:6,10,13,15 48:22 49:11,21 49:22 70:21 71:20 73:4,5,15 73:17,19,19 74:11,25 75:19 80:10 81:9,10 88:10,15 90:1,7 90:9,13,17 93:8 98:19 103:23,23 104:12 106:22 109:5 112:19 113:6,18 129:2 131:23 133:24 138:5 140:16,18 142:24 146:22 147:7,10 152:14 159:21 161:22 162:12,17 163:18 164:1,5 164:9,13 165:6 166:10,13 171:8 174:11 183:9 186:15,17 188:3 197:2 199:21,22 200:1,6,13 201:4 202:23 203:15,24

204:13 211:16 211:18 212:24 213:5 214:20,22 216:23,25 217:6 217:6,9,10,10 217:17,18 221:4 222:1 223:1

**dial** 51:24

**difference** 39:10 39:11 86:20 95:23 108:11 118:5 134:17 164:18 201:7

**differences** 71:14 86:18 95:2 118:6 150:13

**different** 18:15 33:24 34:6 37:10 38:12 51:11 53:11,12 56:1 58:25 68:15,23 70:3 70:17 71:10 76:16 96:5,23 106:17 116:20 117:6,9 118:15 123:1,8,10 135:24,25 136:2 142:5,10,11 143:24 149:18 171:13 176:19 179:25 185:6 200:19 203:21 205:6

**differentiate** 146:12

**differentiating** 53:4

**differs** 56:25

**difficult** 93:17 93:23 116:4

**difficulty** 94:6

**dilute** 62:16

**diluted** 32:4 59:6 61:15

**diluting** 62:18 62:20 179:24

**dilution** 62:7,12

**dilutions** 62:16

**direct** 39:18,19 39:24 40:1 47:17 95:20 115:6

**direction** 126:12

**directly** 25:25 46:8

**director** 22:6 113:7 135:1,4

**disagree** 18:21

**disbursed** 151:22

**disclose** 84:9 118:14

**disclosed** 145:18

**discrepancies** 66:19

**discuss** 139:20 139:23,24 140:1 156:5,8,11,22 186:14 207:2

**discussed** 58:14 60:5 62:25 64:6 88:10 157:4 186:16

**discussing** 36:9 47:4 80:9 146:7 152:11 201:21

**discussion** 28:18 85:21 140:4 170:15 201:6

**discussions** 32:13 73:18 134:13,16 171:8 171:12 207:4

**disease** 57:18 63:17 81:6

**diseases** 22:17

**dismissing** 207:1

**displayed** 199:16

**dispute** 11:10

**disputes** 40:22

**distinguish** 126:2 129:6

**distributor** 144:15,16

**distributors** 31:12 95:6 144:21

CONFIDENTIAL

**[district - e]** Page 240

**district** 1:1,2
**diversity** 72:8,9
  72:11 118:7
  119:5,7,14
**divided** 67:4
**division** 1:2
**dna** 20:19 21:4
  26:17,18,20,22
  26:24 27:5,6,9
  27:11 33:1,2,5,7
  33:23 35:9
  36:17 50:10
  66:6,9 108:24
**dni** 27:11
**doctor** 155:3
**doctors** 154:19
  155:1
**document** 6:2
  15:1,7 18:4 28:9
  40:16 45:9
  86:15 88:22
  100:18 104:3,14
  127:4,20 131:2
  131:5 145:22,25
  164:22 165:2,2
  173:23 185:4
  186:11 190:5
  194:16 196:3
  203:8,17,20
**documentation**
  10:8 16:7
  207:23
**documents** 4:14
  11:6 13:11 14:7
  14:9,10 16:5

40:17,19,22
41:2,4,16,19
42:5,7,16,16,18
42:20 45:12
121:10 155:21
166:1,17 188:14
188:19
**doh** 195:18,18
**doing** 12:10,16
  16:19 20:16
  25:17,19 32:5
  50:18 66:16
  69:4,8 79:11
  82:16 92:19
  115:19 156:18
  167:17 214:24
  217:15
**doubt** 91:24
  92:1
**doubts** 114:18
  115:25
**dr** 9:8,23 13:21
  19:3 22:19,21
  23:1,2,6,14,21
  23:23 25:17,25
  26:2,4,16 28:8
  28:14 29:4 33:2
  35:6,14,18,21
  36:3,6 39:17
  47:3 79:23
  89:18 90:25
  91:12,13 97:23
  100:13 101:18
  102:12,15 106:1
  106:6 111:13

112:3,8 113:4,8
114:13,14,15
120:7,19,20
125:2 127:15,18
131:4 141:8
145:24 148:18
149:6 157:18,23
157:25 159:10
159:19 166:21
167:2 168:6,11
169:18 170:15
170:23,24
171:23,25
173:25 175:18
175:25 176:9,18
177:2 182:9
186:21,23 187:5
189:5,10 190:6
190:18,22,25
205:24 207:3
208:3,13,18,25
209:13 212:6,16
213:3 216:6,13
218:4,16
**draft** 45:2,11,11
  141:20 146:7
  164:7,10,11
  169:21,22 170:1
  177:21
**drafted** 91:21
  91:24 147:6
**drafter** 147:15
**drafts** 45:22
**drs** 213:2

**drug** 145:19
**due** 154:2
**duly** 9:3
**durenard** 1:10
**dwight** 1:9 4:11
  5:1,23 29:19,20
  35:7,15 39:18
  131:10,23
  133:23 137:4
  138:24 139:5,23
  139:25 141:16
  174:8,11 177:13
  186:13
**dye** 52:5,6

**e**

**e** 3:1 4:1,3,10,13
  4:16,18,20,23
  5:1,3,6,8,11,13
  5:16,18,20,22
  6:3,5 9:13,13
  14:12 18:24
  29:1,5 41:5 43:8
  43:17,18 47:18
  47:19,21,23,25
  48:8,21,23 49:1
  49:6,7,10,15,18
  62:15 86:25
  87:10,14 88:4
  88:21 91:1,5,9
  91:14 97:24,25
  98:3,4 99:1
  100:21,22 101:2
  101:11,13,23
  103:11 104:10
  105:1,2 106:5

CONFIDENTIAL

**[e - evaluate]** Page 241

106:10 107:2,7 112:7,17,22 113:13,15 119:3 120:19,24 122:22 124:3 125:2 126:14 127:12 129:6 131:9 135:19 137:4 140:21 141:11,15 146:3 148:19,20,22,23 148:24 149:17 150:7,17 151:8 153:15 157:23 157:25 158:7,18 159:20,20 161:1 161:5 167:20 168:4,5 170:17 170:24 171:1,25 174:5,8 175:24 176:11,24 182:15 208:23 208:24 212:11 212:19,23 222:3 222:3,3

**earlier** 36:16 60:5 88:10 102:7 105:4 129:22 183:22 183:25 189:13 193:11 200:17

**earliest** 168:4

**early** 60:17 93:17,23 213:6

**easier** 72:20 107:20

**easily** 12:17

**east** 2:16

**eastern** 7:7

**editing** 45:18

**edits** 143:3

**edt** 2:3 7:2 219:12

**education** 169:14

**educational** 19:4

**edward** 1:10

**effect** 123:22

**egan** 1:9 4:11 5:1,23 29:19,20 35:7 39:18 43:3 43:5 106:6 131:10,23 133:23 137:4 139:24,25 174:8 176:25 177:12 181:9 182:16 186:13

**egan's** 174:11

**ego** 206:20

**egotistical** 206:24,25

**eight** 50:25 81:17

**eighth** 62:15

**either** 27:14 31:7,12,13 38:13,19 51:7

51:25 55:18 60:25 69:2 165:3 175:19 200:19 214:4 215:20

**eliminate** 123:12 173:20

**emergency** 11:19

**emission** 52:6

**employed** 25:20 25:23

**employee** 220:16

**employees** 29:5 38:1 39:21,24 41:25 47:9,12 48:3 122:4,12 215:15 217:10

**ensure** 111:2

**enters** 92:18

**entire** 131:18 132:2 139:16 149:1 218:23

**entirety** 23:24

**entities** 15:20 16:18 17:18 110:7 133:21 134:9

**entitled** 82:25

**entity** 27:12 109:12,13 110:13

**entry** 106:13 113:18,21

**environmental** 21:16,17 103:8

**equal** 81:17 169:13

**equivalent** 75:11,14

**equivalently** 124:10

**errata** 221:11 221:13,17

**error** 74:5 121:5 121:16 124:12 124:13 125:15 199:14 207:1

**erskine** 19:11

**especially** 63:14 76:18

**esq** 221:1

**essentially** 21:9 33:20 97:13 109:4

**established** 116:3 133:16 161:9 175:12

**estimate** 181:1

**et** 7:18 127:25 221:4 222:1 223:1

**ett** 21:16

**eugene** 1:10

**europe** 30:18

**ev** 205:6

**evalu** 145:2

**evaluate** 77:16 83:4 85:24

CONFIDENTIAL

**[evaluate - expression]** Page 242

117:20
**evaluated**
109:16 117:11
117:19 127:21
139:10 199:10
200:15 206:2
**evaluation** 4:7
15:13 16:6,14
17:19 65:10
76:19 78:15,20
96:13,14,18
98:20 99:15
103:15 104:7,18
104:22 111:1
112:12 113:14
115:21 116:17
116:21 117:2
128:14,16 129:3
129:7,8,11,24
130:7,24 133:1
135:20,21 136:7
137:25 142:5
143:10 144:8
145:3,3 146:20
146:25 162:25
163:2,9 175:12
198:15 210:16
**evaluations**
15:14,21,25
16:2,17 17:12
17:14 18:9,10
18:24 46:2 77:4
128:6 136:1,2
197:5,10,24
198:9,19 199:3

202:22 210:14
**evenly** 151:21
**eventually**
37:12 119:1,20
**everyone's**
170:8
**evidence** 43:9
43:10,11 87:3
94:19 99:20,25
100:8 102:21
104:4,15 143:19
144:10 151:7
159:5 163:22
204:18
**exact** 10:3 41:8
69:21 78:10,24
89:22 216:1
**exactly** 9:18
11:12 17:5
27:15 31:17
34:4 43:15
65:13 71:9,22
80:6,14 85:5
99:19 106:11
122:3 161:11
181:20 190:23
202:15 211:21
214:8 215:23
**examination** 3:3
9:6 220:11
**examined** 9:4
**example** 40:6
55:24 64:21
103:6 153:16

**exchange** 10:13
**exchanges** 24:9
**executive** 24:10
27:2 171:22
**exhibit** 4:2,3,5,6
4:10,13,16,18
4:20,23 5:1,3,6
5:8,11,13,16,18
5:20,22 6:1,3,5
13:5,6 28:7,13
28:15,23 54:18
54:20,22 79:15
79:16 90:23,23
90:24 97:20,21
105:24,25
111:11,12,14
120:13,14 127:5
127:7,8 130:13
131:3 141:4,5
145:23 146:8
148:16,17 157:9
157:17,19,19
159:10,11,12
166:19,20 167:4
167:6,9,9
173:24 174:1
176:8,10 182:7
182:8,10 189:3
189:4,6 192:16
193:25 208:12
208:14 212:5,6
212:7,23
**exhibit's** 79:18
**exhibits** 12:11
13:4 167:17

**existence** 115:12
**existing** 115:13
115:23
**expected** 102:22
**experience**
76:16 144:22
**experienced**
81:1
**experiment**
175:5
**expert** 202:1
**explain** 14:22
33:14 41:21
51:13 56:11
64:18 65:24
72:11 87:3
92:23 123:2,4
126:15 133:9
151:4 158:16
179:12,22
**explained**
200:23
**explaining** 95:2
**explanations**
85:3
**exploring**
118:16
**exponential**
50:20 52:25
56:16
**exported** 25:7,9
**express** 170:23
170:24
**expression** 51:8
63:15

CONFIDENTIAL

**[extent - first]**

Page 243

extent 18:4
external 210:8
extract 18:17
extraction 4:9
 77:14 89:2
 152:22 157:7
extractions
 20:19
eye 76:6

**f**

facilities 16:10
facility 16:8
 20:18 38:6
fact 183:22
factors 4:7 70:8
 72:13 77:15
 86:1 117:9
 201:18
facts 75:25
 94:18,19 96:19
 100:7 104:4,14
 119:25 143:19
 144:10 150:11
fading 31:23
 32:2
failed 83:20
 130:6 137:12,17
 144:7,18 145:2
 146:24
failing 17:25
 130:10
fails 221:19
faintly 116:18
fair 30:19 38:18
 52:8 65:4 66:8

70:5 83:18
109:3 125:24
126:1,5 135:4
136:14,21
152:24 155:9
fairly 84:12
 148:18
fall 63:17
false 59:18,24
 60:2 83:11,14
 83:25 84:18,25
 85:2,3 114:11
 119:22 123:5,19
 123:24 124:7
 126:17,23
 128:22 132:8
 159:24 160:2
 161:5,7
fam 195:18
familiar 80:14
 204:19 214:14
faq 209:3
 210:22
fast 169:12
faster 170:12
favor 79:17
 167:17
favorability
 204:2
favorable 180:5
 180:20 202:21
 203:6,11,16,20
 203:21 204:1,23
 205:10,17,21

fda 16:14 25:6
 53:19 54:16
 58:18 59:5 65:1
 65:2 97:13
 180:8 213:15
featherstone
 174:5,9,14
february 44:17
 94:14,14,17,22
 95:5,8,12,16
feedback 73:10
 131:18 132:1
 139:15
fees 216:18,21
felt 32:7 175:6
fer 52:20
field 92:15
 202:1
figure 154:11
 170:7
figures 216:3
file 15:9 96:4
 97:6,9 158:3,20
 165:4,5 172:24
filed 42:19
 44:19 97:10
files 41:15,24
 42:1 43:25 44:1
 44:2,3,23 45:1
 48:14
filing 10:4 34:12
filings 128:19
final 45:3,19
 109:16 145:10
 188:11

finally 13:4
financial 32:14
financially 7:24
 220:16
find 33:11 37:8
 86:12 161:5
 214:23,24
finding 62:9
 65:7 89:3 95:6
 114:11 119:22
 123:5 124:7
 128:23 156:12
 156:23 161:7
fine 153:7 187:7
 208:5
finish 177:21
finished 67:23
 85:10,18 97:25
 148:24
finishing 177:3
firm 8:7,13
 216:14
first 9:3 12:12
 22:7,21 23:1
 28:7 33:4 34:22
 51:12 60:14,16
 61:7,12 62:24
 81:15 83:3 85:8
 85:17,23 86:16
 87:21 89:1,21
 116:14 118:19
 120:23 121:3
 129:23 130:1,6
 130:18 132:14
 132:25 133:6

CONFIDENTIAL

**[first - found]**                                                    Page 244

135:21 136:3,10
138:10,11,15,24
139:8,15 141:25
143:4 148:5,5
152:21 167:21
169:10,13,14
170:9 184:7
185:18,23
190:13 195:21
199:19 210:20
215:12,24
**fit** 23:10 30:1,25
**five** 15:19,24
  82:17 165:15
  208:4 218:12
  219:9
**fl** 221:15
**fla** 1:24
**floch** 2:9 3:4 8:6
  8:6,20 9:7 13:14
  13:21 16:9,21
  17:8,10,25 18:7
  18:20,23 26:9
  28:14,20,22
  32:21 46:17,21
  47:3 49:5 54:21
  56:8 58:12
  69:15,18 70:5
  73:4,11,24
  74:17,23 75:6
  75:13 76:4
  77:17 78:1 79:1
  79:20,23 83:24
  84:11,24 86:21
  88:9 89:3,11,18

90:22,25 94:13
94:20,22 96:24
97:8,22 100:11
100:16,19,20
102:17 103:4
104:9,21 106:1
108:2,10 109:3
110:7,24 111:13
117:1,2 120:1,7
120:15 122:1
124:20 125:1
126:13 127:6
129:21 130:12
131:4 134:8
136:13 137:3
141:6 142:22
143:20,22
144:14,24
145:11,21,24
147:6,19 148:12
148:18 149:5,6
150:17 152:19
153:8 155:22
156:5,11 157:9
157:18 159:9,12
163:24 165:14
165:23 166:3,9
166:21,25 167:1
167:6,8,12,16
167:23 168:1,3
171:7,17 173:25
174:14 176:7,9
176:23 177:25
178:19 180:11
180:18 181:3

182:6,9 184:13
186:10,13,25
187:5,8,9,13,14
188:12 189:5
192:6 193:24
194:18 196:7,14
196:19 197:1,15
198:5,25 199:19
201:2,11,20
202:3 203:14,23
204:11,22 205:9
205:22 206:15
208:1,6,13
210:3 212:8,16
212:19,22
214:20 216:6,13
216:17 217:5,16
218:2,4,14
**florescence**
  55:10
**florescent** 51:24
**florida** 2:11
**fluid** 56:1
**fluorescence** 4:5
  51:18,21
**fluorescent** 52:5
  52:10
**fluoresces** 52:10
**focus** 22:16
  30:13,20 33:1
  64:8 147:22
  159:19
**fold** 62:17
**folder** 46:10

**follow** 12:1 77:8
  77:13 140:16,20
  181:10 194:15
**following** 86:11
  131:16 132:11
**follows** 9:4
  58:17 91:17
**footers** 149:2
**footnote** 85:13
  85:16
**foregoing** 220:5
  220:13,19 223:5
**forgive** 38:7
  58:22
**formal** 29:8
**format** 145:10
**forming** 58:10
**formula** 58:9
  63:25 69:6,21
  70:12 200:16,19
  200:24,25,25
**formulary** 96:1
  96:12
**formulas** 70:17
**forth** 58:19
  198:24 220:6
**forward** 94:13
  112:12 139:20
  139:23 158:3
**forwarding**
  174:5
**found** 29:25
  30:25 86:3
  88:19 119:23
  135:20,21

CONFIDENTIAL

**[found - given]** Page 245

191:14 195:23 207:11

**foundation** 74:13,19 83:22 84:5,14 86:14 88:22 89:6 90:18 94:8 108:5,17 110:2 110:18 124:17 147:2 157:1 159:1 165:8,20 171:3,10 178:14 182:3 198:1 205:1

**four** 15:19,24 50:24 51:11 60:19 61:9,9 80:24 90:3 131:7

**fourth** 64:2

**frame** 11:21 90:15 119:2

**frank** 91:6 92:7

**frankly** 170:8

**friday** 1:19 2:3 7:1

**front** 35:3

**full** 29:11 38:15 76:18 83:10 108:20 116:24 145:8

**fully** 119:24

**function** 44:6

**functioned** 209:17

**funding** 23:15

**further** 113:13 205:23 218:5 220:15

**future** 29:15

**g**

**g** 9:14

**garc** 9:13

**garcia** 1:17 2:1 3:2 4:3,13,16,18 4:20 5:1,3,18,20 5:22 6:3 7:17 9:2,8,12,23 13:21 19:3 28:8 28:14,15,23 29:4 47:3 54:22 79:23 89:18 90:25 91:6,13 92:7 97:23 106:1,2 111:13 112:3 120:7,19 127:7 130:13 131:4 140:21 141:8 145:24 146:8 148:18 149:6 157:18,19 157:23 159:10 159:19 166:21 167:2 173:25,25 176:9,18 182:9 182:10 185:4 187:5 189:5,10 190:6 208:3,13 208:14,18 212:6 212:6,16 213:2

216:6,13 218:4 218:16 219:8 221:1,5 222:2 222:24 223:2,4 223:12

**garcia's** 9:13

**gee** 2:15 8:10

**gelt** 1:4 2:8 7:17 8:8 221:4 222:1 223:1

**gene** 51:8 63:14 63:16 72:24 73:6,12,21 86:23 87:5,9,14 87:17,20,20,21 88:4,21 117:12 210:24 211:7,8 211:12,15 213:12 214:3,7 214:8,13

**general** 20:7 40:15 41:18 57:17,22 74:7 87:24

**generally** 9:19 10:5 14:10 18:17 35:24 41:21 48:5 50:8 54:24 55:15 60:8 74:10 76:9 90:16 138:18 149:16 158:22

**genes** 4:9 71:25 72:5,9,12,14,15 72:20,24 73:2,6

73:20 86:25 87:10,14,25 88:4,8,21 94:4 117:12 119:16 210:24 211:11 211:17 212:3 213:7 214:3,5

**genetic** 20:20,22 92:3,4 93:9

**genetics** 19:15 20:17,25 23:7 23:19 26:13

**genome** 63:15 108:21

**genomic** 21:5 72:18 118:7 119:5,6,13

**getting** 16:23 17:1 18:13 19:17,22 41:22 91:10 97:15 105:5,9 122:10 159:6 170:19 209:15,18 211:14,17

**give** 12:14 17:3 23:14 28:11 40:17 42:2 66:6 104:19 109:16 130:10 164:22 207:23 208:1 218:12

**given** 12:6 104:11 128:21 161:25 181:24

CONFIDENTIAL

**[given - guidance]**

191:25 219:8 223:9

**gives** 59:7,13

**global** 73:16 89:9 122:17

**globally** 72:9 73:17

**gmail** 42:2,4 48:1

**go** 7:15 13:14 19:17 26:15 31:21 32:25 35:3 36:25 38:16,24 39:8 39:12 45:17 46:21 47:6 57:1 61:7 67:23 78:9 80:15,17,18 81:12,24 82:4 83:9 85:6,7,20 88:25 89:12 98:25 101:11 110:3 112:7 114:4,13 117:10 120:1 122:1,24 123:15 134:7 136:14 137:8 142:22 143:3 146:13 148:5 149:15 150:17 151:15 152:19 153:7 154:17 157:11 160:8,17 161:17 167:12 167:25 176:14

176:23 178:1,25 186:7,12 189:9 191:11 192:6 193:1,24 194:21 195:10 196:20 197:1,15 199:19 202:3,15,18 208:6,23 210:20 212:11,11,13 213:8 216:6 219:5

**goal** 29:13 73:3

**goals** 31:22

**goes** 50:14 93:11 98:15 114:16 115:8,19 115:25 116:2 122:22 128:8 145:19 168:19 169:1,9 170:6

**going** 7:6 13:4 13:16 17:2,21 18:7,22 20:13 28:7,8,25 46:17 46:18,23 52:12 52:17 54:17 57:2,24 59:5 63:12 67:8,11 68:4,6 70:3 77:7 79:14,25 80:17 85:12 89:13 94:2,2 97:22 100:3 101:1 102:3,13 111:5 112:3 117:17

120:2,12,12 135:5 143:20 144:12 148:16 148:19,21 154:4 154:5 157:12,18 159:9 164:21 177:15,18 178:17 184:18 186:8 187:24 188:4 195:20 204:9 205:16,19 205:20 208:7 216:8 218:17

**gold** 66:5 82:12 184:23,24 185:14 193:17 193:18

**good** 7:6 8:6 9:8 9:9 12:16 23:9 126:4 140:9 149:5 175:19 180:13,15

**government** 46:3 77:5 110:8 110:20 138:6 142:12 160:10 160:14 161:2,14 194:19 213:15 213:20,22 214:15

**government's** 192:3

**graduate** 28:1

**grant** 25:2

**granted** 115:9

**granting** 114:17

**graph** 58:13

**graphic** 4:5 54:18 55:20 57:1

**greater** 67:18 81:17

**green** 33:13 56:9

**greenville** 19:14 21:19,25 22:2,7

**greenwood** 20:17 21:13 22:13

**greg** 23:4

**grew** 31:22

**grey** 123:18 125:1,3,18,25 126:1,7 152:20 155:25 156:11 156:21 157:4

**ground** 12:9 13:22

**group** 16:12 37:14,16,17 81:16 95:20 113:1 133:15

**grubs** 173:19

**guess** 21:11 23:8 75:1 92:24 114:12

**guidance** 156:18

**[guidelines - husband's]** Page 247

**guidelines** 16:13 53:19,19 54:10 54:16 58:17,18 58:18 59:5 120:25 130:16 130:19,23 133:2 133:3 139:6,11 142:17 154:18 155:8,20 173:22 180:8 198:21 213:8,13,24
**gujurat** 160:11 160:14,15 161:2
**gundry** 4:23 5:8 127:13,18 128:1 128:5 129:6
**guys** 122:24

**h**

**h** 4:1 222:3
**half** 79:22 148:6 215:12,13
**hand** 32:9 109:14,14
**handful** 147:14
**handle** 40:11
**handled** 84:10 84:22
**hands** 68:12 132:3
**hang** 176:14
**happen** 94:2 160:20
**happened** 34:5
**happening** 168:23

**hard** 202:1
**harder** 93:3
**harm** 171:1
**head** 70:18 78:2 171:22
**heading** 39:13
**headline** 197:2 198:25
**health** 81:25 97:17,19 98:13 99:7 100:4 102:3,8,12 192:2 195:7 205:7
**healthcare** 19:15 26:13
**hear** 89:21 116:24
**heard** 7:12 20:5 23:13 50:11 51:18 52:18 59:18,24 67:1 79:1 80:12 87:7 87:8 109:8 110:10 111:4
**heating** 50:15 50:16
**heats** 55:7
**help** 14:7 49:13 55:2 61:20 95:1 99:22 107:18 108:10 123:22 125:3,23 127:22 138:9 148:14 183:21 186:18

**helped** 20:19,21 33:10 34:23 37:3,6 39:1 96:25 97:5 148:9
**helpful** 167:22
**helping** 33:11 34:11,12,14 95:19
**helps** 202:24
**hematology** 20:7
**hepatitis** 25:13 25:13 68:10,11 68:12
**hereto** 223:7
**hi** 91:10 131:16
**high** 30:11,11 61:16,25 62:8 62:13 126:6,10 126:10 152:13
**higher** 54:7 57:18,23 74:5 124:15 133:24 134:14 136:22
**highest** 54:11 59:9 83:12 84:2 86:4
**highlight** 91:18 146:24
**highlighted** 92:10
**hillman** 23:4,6,7 23:13,16

**hindsight's** 207:21
**hire** 22:24 32:3 216:13,16
**hired** 27:8 33:2 36:17 40:11
**hires** 29:24
**history** 15:9 19:4 20:14 145:8 165:5
**hit** 151:17
**hold** 41:12 72:17,17 189:11
**holding** 155:5
**holds** 200:14
**home** 36:15 42:10
**hospital** 22:7
**hostetler** 2:19 8:14
**hour** 46:18
**hours** 11:23
**house** 15:1 24:13 154:18 156:18
**huh** 116:9
**human** 56:2 104:2
**hundreds** 213:22
**husband** 44:9 187:3
**husband's** 49:13

CONFIDENTIAL

**[hutchins - indian]**

**hutchins** 5:13 5:16 98:4 100:13 101:18 120:21 168:6
**hutchins's** 40:9
**hybridizes** 21:4
**hypothetical** 129:16 145:5,16 188:8 206:12
**hypothetically** 55:23

**i**

**ic** 195:18
**icmr** 109:8,10 109:19 110:4,22 113:9 114:24 116:10 120:24 130:15,19 144:4 160:20 185:14 186:4,4 213:8 213:13,19
**idea** 25:19 49:16 65:23 92:8 128:4 155:22 177:18 188:1 192:4 194:12
**ideas** 32:10
**ideation** 100:1
**identical** 96:8,9
**identified** 37:14 55:11,19 56:6 66:7 69:19 86:17 125:18 138:20

**identifiers** 195:15,16
**identify** 21:4 58:6 69:11 82:17,18 83:20 140:6,9 180:1
**identifying** 179:17
**identity** 67:18 67:19
**ifu** 151:12 156:15,25
**ignore** 158:13
**ike** 29:12,18 131:16 134:2 146:12
**ike's** 140:12
**imagine** 55:23
**implement** 214:12
**implemented** 22:6 161:13
**imply** 184:7
**implying** 138:24
**import** 38:15 105:16
**important** 12:13 94:3 145:1,9
**importation** 104:25
**importing** 105:11
**impossible** 121:3,8,18

**improve** 135:8
**improved** 93:11
**improvement** 76:3 115:10 137:20 144:1
**improvements** 76:1 114:25 130:11 137:19
**inactive** 215:16
**inappropriate** 96:17
**include** 73:12 88:8 89:8 188:24
**included** 14:21 81:16 213:25
**includes** 19:12
**including** 4:8 45:8 60:18 104:11 168:21 175:21
**income** 25:3
**incomplete** 129:16 145:4,16 188:7 206:11
**inconclusive** 155:13
**increase** 125:14 199:13
**increasing** 135:14
**independent** 197:5 199:3 201:18

**independently** 199:10 205:5
**india** 16:13,13 17:12,16 18:8 33:12 34:14 37:8,9,12 38:17 71:13 76:13,15 76:23 77:17 78:4,13,15 89:25 90:2 95:21 96:3 97:1 97:17 98:13 99:7 100:4 102:9,16,19,24 103:5,7 105:13 105:15,19 107:19 109:13 110:8,14,20 116:4 122:7,17 122:20 128:19 131:14 135:6 142:12 147:20 158:9 160:15 161:14 182:18 183:18 186:24 213:19 217:22 218:1
**india.pdf** 182:22
**indian** 16:14,16 16:18 76:25 97:13 107:3 109:11 127:22 138:6 142:25 143:12 186:14

CONFIDENTIAL

**[indian - introduced]**                                                          Page 249

186:18,21
187:19,21 196:8
197:9
**indicate**  32:18
52:10 203:12
**indicating**  101:6
101:9 160:2
190:3 194:2
**indication**  117:7
**individual**
203:13
**individually**
200:16,24
**individuals**
17:18 112:18,22
162:16
**indre**  192:3
**industry**  19:20
19:21 177:21
**infectious**  22:17
**influence**  127:2
**info**  98:9 127:20
**inform**  202:24
**information**
14:13,14 18:1
38:23 41:5,6
44:10 57:14
58:8 78:10
83:23 88:7 93:4
96:1,12 97:6
98:15 99:9
101:14 104:20
106:18 117:13
118:2,13,20,24
119:1 121:23

126:25 128:9
132:7 134:11
135:3 137:1,4,9
145:13,18
146:23 147:11
158:21 166:2
188:16,23,24
199:17 210:1
**inhibit**  68:14
**inhibiting**
179:16
**inhibitor**  68:7
**initial**  53:2 78:4
78:12 164:10,11
**initially**  93:8
**input**  10:10
140:12,12,12
186:21,23
211:22
**inputting**  67:18
**insert**  185:22,25
**inside**  73:15,16
73:18 88:15
118:4
**install**  34:12
**instances**  77:23
78:3,14 145:12
**institute**  110:10
110:16 120:9
128:21 129:13
142:6,9,10,14
142:18 143:5,9
143:15 183:17
184:1,4,8 193:3
193:7 198:6

**institution**
138:14
**institutions**  77:4
142:11
**instruct**  17:2,24
18:11,18
**instruction**
14:17
**instructions**
14:16,18 60:3
71:15 77:9,13
96:5 123:8
150:24 154:3
161:12
**instructs**  12:20
**instrument**
56:13 149:19,25
**insurance**  155:5
**intellectual**
38:20,22
**intelligent**  26:5
**intended**  73:2
100:9 163:23
**intending**  62:6
**interacted**  31:11
**interaction**
47:17
**interactions**
162:3
**interchangeable**
53:23
**interested**  7:25
220:17
**interfere**  68:14

**interference**
68:15
**internal**  15:7
16:4 73:15
117:13 163:9
165:1,6,22,25
166:4,11,15,17
188:14,19,22,23
194:25 207:22
210:19
**internally**
129:20 154:3
210:7
**international**
33:16
**internet**  7:11
**interpret**  57:16
77:15 144:12
202:2 207:25
**interpretation**
84:23 87:21
122:19,20,25
123:2,4,23
124:6 157:5
201:8
**interpreted**
59:21 117:14
**interval**  69:23
70:14 114:7,8
**intervals**  62:21
**introduce**  8:12
74:6
**introduced**
22:10 23:2,6,20
26:6 93:2 159:7

**[introduced - know]**  Page 250

214:9
**introducing** 76:19
**introduction** 80:18
**invented** 11:18
**investors** 22:9 23:4 35:3
**invited** 35:2
**involved** 16:12 76:14 108:6 115:22 192:4
**ish** 216:5
**islands** 1:5
**iso** 14:24 33:11 33:15,16,19 76:2 164:25
**israel** 81:19
**israeli** 81:25
**issue** 146:19 155:25 156:12 156:22,22 158:17 160:9
**issuing** 146:15
**it'd** 45:17
**italicized** 91:18
**items** 138:3
**iterated** 93:11
**iteration** 99:21 137:20 198:4,14
**iterations** 145:10,20
**ivd** 133:5

**j**

**james** 1:9
**january** 44:17 89:19,25,25 91:6
**jesse** 39:19
**job** 1:24 12:16 21:14,15 33:8 34:6 35:24 36:1 37:1 40:9,10,15 75:25
**johnson** 2:24 7:20
**join** 35:2
**joined** 8:11
**joint** 34:14 37:15,19,21
**jones** 27:19 80:5
**joni** 2:15 8:10 18:20 167:8 176:7 221:1
**joseph** 174:5,8 174:14
**jostler** 2:17 221:1
**journal** 80:12 164:21
**journals** 164:4
**june** 27:7 44:19 81:19 214:6
**justification** 86:13 87:19
**jv** 142:24

**k**

**kc** 5:14 6:6 175:20,25
**ke** 42:24
**keep** 18:22 24:13 42:23 43:2,3,12,23 44:12 46:18 96:23 138:18 154:21 204:21
**kenneth** 5:14 6:6 212:12
**kept** 45:7 49:17 129:19 209:15 209:18
**key** 202:24
**kind** 190:24
**kinds** 190:24
**kit** 14:19 38:15 38:17,20,21,23 39:13 60:2 62:1 62:7 77:14 81:7 81:9 82:8,11,15 83:6,12,19 84:1 84:8,18 86:8 87:4 92:15 95:3 103:10 113:20 113:22 133:5,10 136:3,4,12 137:25 140:9 150:14 179:15 179:18 181:7
**kitchen** 187:2
**kits** 82:2,25 83:11,25 95:2

112:15 116:4 127:21
**knew** 22:9 23:7 23:18,19 134:6
**know** 10:7,9 12:8,24 18:3 23:16 25:17 28:10 29:1 32:6 32:7 36:1 40:1 41:23 45:17 49:2,5,14,17 54:7,19 56:7 57:14 60:5 62:20,21 63:10 71:1 73:10 74:5 74:21 75:1,17 77:11 79:12,24 80:20 85:1,10 87:22 88:12 90:12,14 91:2 93:5 97:24 98:19 101:2 103:15 106:3,13 108:25 110:5,21 111:15,16 112:5 117:8,10 119:2 119:18 120:16 129:18,25 140:13 141:7,8 145:2,25 148:24 149:7 150:5 151:9 157:20 159:6,13,17 166:22 167:2 169:20 171:15

CONFIDENTIAL

**[know - limit]**                                                                 Page 251

172:7 174:2,16 176:11 178:23 179:17 182:10 185:11 189:7,25 189:25 192:5 194:11 201:18 203:10 207:24 208:15,18 212:9 217:14 218:3,6
**knowing** 119:17
**knowledge** 25:1 144:12
**known** 27:12 59:6 62:5,21 65:7,8 66:11 69:20 83:21 144:6,17 179:19 179:20,24
**knows** 199:4
**kyle** 169:2,3 170:2

**l**

**lab** 20:21 21:15 21:16 33:9,20 33:21,24 34:1,2 34:7 40:2,5,7 68:3 77:12 103:9,9 104:8 110:14 117:17 118:10 130:2 133:17 135:1,4 140:8 150:15 153:1,25 154:1 155:3,4,12,15 155:18 169:4,7

169:8,24 170:1 214:15
**label** 195:14
**laboratories** 16:15 31:12,13 81:2 175:13
**laboratory** 16:16 19:14 20:1,6 33:6,7 154:18 179:7,8 181:8 183:16
**labs** 16:19 17:12 17:15 18:8 76:16 107:7 110:20,22 142:12 203:13
**lack** 86:14 102:4 102:13,20,20 198:1
**lacks** 147:2 157:1 205:1
**lady** 118:10 130:2
**lake** 2:16 104:8 108:7 115:17 118:2,19 119:9 122:8 128:9 151:7 162:21 169:7 171:9 172:9 175:6,11 204:12,20
**landed** 48:1
**lane** 2:2
**language** 91:18 183:4

**laptop** 42:6,7,14 42:17,19,22,23 42:25 43:2,4,7 43:12,22,23 44:1,3,6,12,13 44:24,25 46:4 46:15 47:4 49:14
**large** 92:25 173:7
**larger** 121:24 126:7 199:13
**late** 44:13 108:3
**launch** 23:3
**laura** 4:23 127:19
**lauren** 127:13
**law** 8:7 13:1
**laws** 220:18
**lawsuit** 44:18 44:21
**lawyers** 10:25 40:18,21
**lay** 201:10,20 202:2 207:24
**layman's** 20:4 21:11 126:4
**lead** 86:18 140:6
**learn** 23:17
**leave** 28:5
**led** 24:24
**left** 24:14 25:14 25:18 31:15 41:9,10 42:21 44:11 48:10,13

49:22 120:7
**legal** 18:2,6 143:18 196:23 199:8 201:6,14 201:24 204:5 205:1 207:20 216:21 217:23 221:23
**level** 63:16 127:21 128:18 155:20
**levels** 68:15 116:6
**liability** 154:19 155:2,5
**liaisoning** 99:9
**license** 115:10
**licenses** 19:24
**liked** 144:6,17
**likely** 93:11
**limit** 53:14,17 53:18 54:4,6,8,9 58:14,16,17,20 58:24 59:3,4,13 60:20,21,22 63:2,6,13,19 64:3,5 116:6 123:23 124:2,5 124:14,15,18,21 124:25 125:5 126:6,10,10 133:16,17 136:22 137:1 150:24 151:8,12 152:3,12,13,25

CONFIDENTIAL

**[limit - looking]** Page 252

155:11 156:14 156:25 180:1,2 180:4,10,13,16 180:19 181:1,2 202:21,23 203:6 203:12,16,25 204:2,13,16,23 205:3,8,11,15

**limitations** 84:9 84:19

**limited** 1:5

**line** 29:8 53:1 55:25,25,25 56:9,11 57:8 98:9 106:8 112:11 120:23 127:16 131:13 133:19 134:20 158:2 159:23 168:9 182:18 186:1 191:12,13 195:20 209:2 222:4,7,10,13 222:16,19

**lines** 55:14,15 55:17 178:2

**link** 168:15 195:25 196:20

**linked** 165:11

**list** 106:16,21,24 115:25 192:20

**listed** 114:8 130:20 135:12 156:14,25 170:25 206:14

**listing** 114:18

**lists** 113:25

**literally** 140:7

**literature** 209:21

**litigation** 9:17 40:18,20 41:12

**little** 19:4 20:13 24:17 34:20 39:9 69:16 90:4 90:5 92:24 100:12 116:23 149:10 191:9 202:3 205:23

**llp** 2:9 8:14

**load** 57:18,23 61:24 152:2,7 161:20 190:5

**locate** 21:9 37:3 37:6,12 53:6

**located** 160:16

**locating** 95:9

**location** 21:5

**lod** 123:16 124:11 125:8,19 133:6,14 137:5 137:6 168:20 202:21,23

**lodge** 12:19

**logic** 106:24

**logic's** 96:6

**logics** 26:17,18 26:20,22,25 27:5,6,9,11 33:1 33:2,5,7,23 35:9

36:17

**logix** 70:20,24 71:7,16,20,25 74:8,10,17 75:1 75:20 76:11 77:18 78:20 79:4 81:6 83:12 83:19,20 84:1,8 84:17,21 86:8 87:4 89:4 90:10 90:13 94:6,16 94:24 95:10,14 95:15,23 96:8 96:15,19 104:24 105:8,11,13,14 107:14 108:3 129:7,12 133:10 134:5,15 136:4 136:5,12,15,22 137:24 138:7,12 139:10 140:17 140:24 142:13 142:15 148:7 149:22,23 150:9 152:7,13 156:14 162:4 163:18,19 163:25 164:4,9 164:12 171:2 179:6 180:12,20 181:7 182:1 183:8,16,22 184:5,9,15 185:22 193:14 197:24 198:3,12 198:13,19 199:4

203:6,6 204:16 205:11 211:23 212:1 214:11,13 214:16

**long** 11:20 13:10,24 27:11 72:3 90:9,16 94:3 145:13 148:19 149:3,4 173:5,7

**longer** 24:13,25 214:12

**look** 28:9 54:18 79:23 81:12 82:21 106:2 112:4 114:12 120:16 127:10 141:6 145:25 173:18,23 182:6 189:3 195:20 202:8 208:15

**looked** 134:10 140:21 146:8 187:14,21 192:15 195:4 197:9 198:9 200:24 204:7 205:5

**looking** 13:11 28:10 67:17 87:7 98:3 99:18 136:17,23 138:5 185:4 193:2 194:1 197:9 200:18 201:8,9

CONFIDENTIAL

**[looking - manufacturing]**                                          Page 253

213:14
**looks** 81:24
  86:11 91:17
  99:14 106:17
  112:11 141:19
  159:16 174:5,17
  176:24 191:18
**lot** 26:6 39:6
  93:3 118:13
  147:20 148:9
  160:4 162:2
  191:8
**loveless** 2:15
  8:11
**low** 22:5 61:25
  62:8 86:13 87:3
**lower** 52:14
  57:25 61:17
  88:19 133:20
  134:4 135:20
  136:16,18
  154:23 155:10
  156:13,24
**lowest** 53:20
  54:12,14 59:10
  59:12 83:14
  116:6 125:5
**lunch** 120:4

**m**

**m** 1:23 2:4
  220:3,24
**machine** 52:5
  53:2,24 150:13
  150:14 157:6

**maddie** 169:2,3
  170:2
**made** 76:10
  77:1 128:23
  143:3 144:2
  147:4 190:17
  191:2 220:11
  223:5
**mail** 4:3,10,13
  4:16,18,20,23
  5:1,3,6,8,11,13
  5:16,18,20,22
  6:3,5 29:1,5
  41:5 43:8,17,18
  47:18,19,21,23
  47:25 48:8,21
  48:23 49:1,6,7
  49:10 91:1,5,9
  91:14 97:24,25
  98:3,4 99:1
  100:21,22 101:2
  101:11,13,23
  103:11 104:10
  105:1,2 106:5
  106:10 107:2,7
  112:7,17,22
  113:13,15 119:3
  120:19,24
  122:22 124:3
  125:2 126:14
  127:12 129:6
  131:9 135:19
  137:4 140:21
  141:11,15 146:3
  148:19,20,22,23

148:24 149:17
  150:7,17 151:8
  153:15 157:23
  157:25 158:7,18
  159:20,20 161:1
  161:5 168:4,5
  170:17,24 171:1
  171:25 174:5,8
  175:24 176:11
  176:24 182:15
  208:23,24
  212:11,19,23
  213:3
**mails** 14:12
  18:24 49:15,18
  167:20
**main** 16:12 83:3
  85:23
**maintain** 15:2
  24:13
**maintained**
  103:8
**make** 13:24
  32:16 50:6 52:7
  61:19 76:1 88:7
  107:20 111:23
  127:20 130:10
  132:8 135:7
  137:19 140:14
  144:1 155:6,16
  160:20 188:25
  210:1 215:22
**makes** 12:21
  165:12

**making** 25:3
  87:20 93:16
  154:3
**malaria** 26:23
**management**
  14:25 24:10
  27:3 33:10,18
  36:8 44:10 45:6
  128:10,11,16
  140:11 165:1
  170:18 171:13
  171:17,20 172:7
  172:14,17,18,20
**manager** 33:6,7
  33:24 34:2,7
**manual** 14:18
**manually** 32:6
**manufacture**
  33:12 37:11,15
  38:23 159:3
**manufactured**
  183:9
**manufacturer**
  15:5,8 37:12
  38:21 155:17
**manufacturers**
  37:4,7
**manufactures**
  108:23
**manufacturing**
  33:22 34:12,13
  38:4 71:13
  103:6 114:18
  115:10 122:11
  159:8 160:16

Veritext Legal Solutions

800-726-7007                                                          305-376-8800

CONFIDENTIAL

**[march - mentor]** Page 254

**march** 94:14,17 94:22 97:25 98:7 101:15 103:22,25 104:9 106:5 107:12 108:3 122:8

**marcus** 2:9 8:7

**mark** 79:14 120:13

**marked** 28:13 28:15,23 54:20 54:22 79:16 90:24 97:21 105:25 106:2 111:12,14 120:14 127:5,6 131:3 141:5 145:23 148:17 157:17,19 159:11 166:20 173:24 176:8,10 182:8,10 189:4 208:12,14 212:7

**market** 25:2 31:5 74:18 75:2 75:12,15,16,18 143:12 145:20 189:2

**material** 31:16 62:19 213:18

**mathematically** 121:4

**matrix** 62:6,19 63:10 118:4

**matter** 7:17 57:22

**matters** 11:4 146:14

**mayu** 141:16 171:23

**mayuranki** 6:5 113:3,4 131:10

**mean** 19:21 20:4,23 23:11 23:12 30:4,14 31:2 32:1,3,4,17 35:1 37:6 38:10 38:19 39:23 44:8 50:13,23 51:10,13,20 52:23 57:13 59:20 60:1,9,13 61:14 62:11,16 63:6 65:24 67:3 68:22,25 74:23 76:2 77:5,15 90:20 92:23 102:17 104:6 108:16 110:25 114:3 115:16 117:13 121:7,13 122:6,15 125:10 126:9,11 129:4 133:13 134:24 135:16,25 136:22 137:18 137:18 142:3 147:14 148:10 152:24 154:7

155:1 160:23 169:5 172:12 176:5 189:24 205:18 207:1 211:2

**meaning** 61:1 67:11 72:17 203:20

**means** 12:11 15:11 30:16 59:21 60:2 61:3 64:18,19 65:22 104:5 125:11 133:9,15 151:5 151:16

**meant** 158:23 203:11

**measured** 58:16

**mechanical** 124:12

**mechanics** 50:1

**med** 21:20

**media** 7:16 47:2 120:6 157:16 208:11 219:9

**medical** 19:13 20:1 21:23 33:18 81:18 109:11 142:25 145:19

**medicine** 179:8

**meet** 23:1 37:10 114:25 130:21 198:23 199:5 213:20,25

**meeting** 36:8 97:17,18 98:10 98:12 99:7,8,12 100:3 114:23 128:10,11,16 140:11 170:18 172:7,17,18,20 213:4

**meetings** 47:16 48:8 102:8 171:13,18,19,21

**meets** 109:17 111:2

**mehta** 5:6 111:6 112:18 114:14 114:14,16 115:19

**melting** 135:17

**memo** 194:7,9 194:10,13 196:14,15

**memories** 76:10

**memory** 41:18 44:23

**mentech** 21:21

**mention** 34:22 125:1 141:24 142:3 143:14

**mentioned** 37:1 37:3 38:25 47:8 61:9,12 64:2,9 118:15 119:4 172:8

**mentor** 26:5

CONFIDENTIAL

**[messages - name]**                                                                Page 255

messages  41:25
messed  167:15
meta  114:15
method  66:5,9
  66:20
method's  66:13
methodologic...
  64:20
methods  66:21
  89:2 137:22
metric  202:24
metrics  58:23
  59:2 199:25
  200:5,12 201:3
  202:24
mexican  192:3
  194:4,7,9,19
  196:14,15
  197:16
miami  2:11
microliter  62:15
microtoxicolo...
  20:8
mid  36:24
middle  75:7
  83:9 85:16
  92:17 150:21,23
  186:10
milliliter  58:25
millions  51:2
mind  154:21
  167:19
mine  178:6,10
ministry  81:25
  205:7

minnesota
  192:2 195:6,11
minor  115:11
minute  85:18
  208:4
minutes  64:6
  164:16 187:17
  218:12
miqe  53:19
  58:18
mischaracteri...
  100:6 121:20
  145:15
misinterpretat...
  199:16
misinterpreted
  132:4
misleading
  143:17 196:20
  198:25 201:2,13
  201:22 203:24
misrepresents
  205:13
missed  21:21
  123:25
missing  172:9
  172:12,12,16,24
misstates  94:19
  97:3 102:25
  104:3,13 147:1
  180:6
misunderstan...
  61:21
mn  195:18

mnrlawfirm.c...
  2:12
moderate  30:11
  31:4
modernized
  30:22
mohab  112:24
mohal  112:24
  112:25 213:4
molecular  4:8
  22:16 23:18
  26:19 30:11
  33:14 38:8 39:7
  50:3,9 80:12,25
  81:20 83:5
  85:25 90:16
  122:18 165:15
  177:20 199:22
  200:1,5,12,15
  201:4 203:24
moment  170:22
monday  213:5
money  24:11
  34:11,23 215:22
monitor  217:6
monitoring
  119:10 217:10
montgomery
  39:19 213:2
month  21:15
  90:12 215:10,11
months  24:12
  25:15 90:2
morning  7:6 8:6
  9:8,9 11:24

move  18:21 19:3
  20:13 21:14
  26:24 27:8
  36:20 40:14
  49:25 59:16
  65:16 68:21
  70:19 89:19
  94:13 147:22
  149:9 162:6
moved  34:9
  36:17
moving  58:12
  126:11 139:20
  139:23 202:5,6
multiple  51:7
  72:13,20 73:6
  73:20 76:17
  145:10 170:11
  170:11,16
  210:24 211:4,11
  211:17 212:3
murphy  1:10
mutation  93:6
  119:16
mutations  72:20
  94:10,11 119:11

**n**

n  3:1
n2  86:24 87:10
  87:14 88:4,21
name  7:20 9:10
  9:25 10:21,23
  27:13 29:19
  35:9 37:16,19
  111:4 112:25

CONFIDENTIAL

**[name - number]**

Page 256

113:20
**name's** 9:12
**named** 8:8 91:6
  150:3
**names** 27:1
**nasdaq** 199:21
**nat** 110:19
**national** 16:15
  16:16,18 17:12
  17:15 18:8 92:5
  110:10,14,15,20
  120:9 128:20
  129:13 142:6,9
  142:10,12,14,18
  143:5,9,15
  183:17,25 184:4
  184:8 193:3,7
  198:6
**natural** 19:12
**ncov** 82:7 83:1,6
**ncv** 183:10
**necessarily** 31:5
  31:18 33:21
  38:22 75:23
  103:2 136:25
  144:22 145:7
  162:13 166:2
**necessary** 223:6
**need** 13:12,22
  13:24 17:7 39:4
  46:20 83:23
  91:2 101:8
  111:16 127:22
  139:20 145:7
  170:10,11 187:1

205:5 210:21
  213:7 218:11
**needed** 30:8
  40:4 57:19 74:3
  94:25 95:1
  100:8 117:19
  128:17 156:18
  161:15 170:9
**needs** 106:8
  114:24 115:10
  131:17 169:14
  170:8 199:10
  204:7
**negative** 55:20
  55:21 56:18,24
  59:23,24 60:2,3
  61:24 62:20
  63:9,10 65:7
  66:10,12 82:6
  83:11,14,25
  84:7,18 113:25
  125:20 126:3
  152:9 153:22,23
  153:24 155:13
**negatives** 69:19
  69:20 82:17
  85:1,2,3 114:6
**neiman** 2:9 8:7
**neither** 104:10
  126:2
**nelson** 1:10
**never** 20:5
  32:15,17,18
  93:1 207:23

**nevertheless**
  86:22
**new** 2:20,20
  23:9,12 26:8,17
  29:12,24 34:1,8
  35:2 45:15,16
  65:23,23 93:1
  211:16
**news** 11:7 18:24
  170:25 171:14
  204:21
**nih** 213:16
**nine** 179:25
**nip** 141:24
  142:4 144:3,7
  146:20,23
  184:24 185:3,15
  185:17 186:1,4
  193:18
**niv** 112:15
  115:20 116:3,10
  116:19,21 117:2
  118:10,17,24
  119:8,14,23
  121:10 122:17
  123:6,11,24
  124:7 126:16,23
  129:23 130:5,6
  130:19 131:14
  131:17 132:2,10
  132:15 133:23
  134:10,14 135:2
  135:5,20 136:7
  136:15,16,18,23
  137:25,25

138:19 139:9
  140:17,19,20,23
  140:25 141:1,3
  141:25 142:16
  142:21 143:25
  144:7,18 146:24
  184:17,23 185:7
  185:14,17 186:1
  186:4 193:17
  197:10 198:10
  198:15,19,21,24
**noise** 53:3,4
  56:15
**non** 188:19
**nonscientist**
  21:7
**normal** 177:20
**nos** 4:4,11,14
  5:2,4,7,9,12,14
  5:17,19,21,23
  6:4,6
**notary** 223:13
  223:19
**notation** 62:14
  167:12
**note** 7:9 221:10
**noted** 223:7
**notes** 220:14
**notice** 168:19
**noticing** 185:19
**novo** 61:1 65:16
  65:18,22 66:9
  66:13 69:3
**number** 4:9
  50:16 52:24

**[number - okay]**

Page 257

53:7,24 54:1
55:5,7 56:22
83:14 92:25
114:9 121:24
127:8,24 151:9
152:25 155:10
160:5 167:9,13
181:20 219:9
**numbers**  77:23
78:17,24 114:7
130:25 134:4
153:15 182:5
216:1,5

**o**

**o**  221:1
**oath**  7:23 12:6
12:25 74:24
220:7
**object**  17:21
18:18 143:21
**objecting**  110:1
**objection**  12:19
12:22 16:3,20
16:22 17:8
18:21 26:3 49:3
56:4 58:1 69:13
70:1 72:25 73:7
73:22 74:13,19
75:22 77:2,21
78:22 83:22
84:5,14 86:14
88:5,22 89:6
90:18 94:8,18
96:21 97:3
100:6 102:14,25

104:3,13 107:23
108:17 109:23
110:17 121:20
124:23 126:8
129:15 130:8
134:1 136:8,24
143:18 144:9,19
145:4,15 147:1
147:17 148:8
150:11 153:3
155:14 156:2,7
157:1 158:25
163:20 165:8,20
165:24 166:6
171:3,10 177:24
178:13 180:6,14
180:22 182:2
184:10 188:7
191:23 194:14
196:3,10,16,22
198:1,22 199:7
200:21 201:5,14
201:23 203:8,17
204:4,17,25
205:12 206:11
207:19 214:17
216:15 217:2,12
217:23
**objections**  8:1
75:4,9 102:2
220:10
**objectives**  31:19
**obtain**  96:3
119:6 135:11

**obtained**  34:7
98:21 103:16
**obtaining**
108:11
**obviously**  94:14
**occasion**  47:17
**occasionally**
36:4
**occur**  93:24
171:18
**occurred**  94:11
101:15 171:15
**occurring**  88:15
94:15
**october**  36:24
**odd**  178:11
**offered**  32:17,21
32:24
**offering**  32:19
**office**  36:11
99:3
**officer**  32:12,14
32:22 35:23,25
111:9
**officers**  171:22
**official**  127:19
**officials**  161:15
**oh**  8:12 67:22
79:20 109:25
141:12 153:6
166:25 176:4
186:7 197:15
**okay**  8:18 11:2
11:25 12:4,8
13:10,10,25

14:1 15:20 16:9
16:16 17:25
19:3,5,6,24
20:13 21:13,18
22:1 24:17 28:5
28:7,14 29:2,3,3
29:4 30:24
31:21 32:25
33:23 34:22
35:21 36:16,25
40:8,14 41:1
42:15,24 43:16
44:18,21 45:10
46:13,17,18,21
48:3,4,13 49:21
50:1,2,7 51:3
52:7,16 53:15
53:18 54:17,21
55:2,9,12,19,23
56:8 57:1,17
59:2,16 60:10
60:16 61:7
62:24 64:8
65:21 66:8,15
66:23 67:6,10
68:1,9,17,21
69:24 70:9,15
70:19,21,22
71:6,10,11
72:23 74:8,9
75:13 76:9,21
78:1,12 79:1,8
79:14 80:1,7,12
80:15,22 81:14
82:14,20,23,24

CONFIDENTIAL

**[okay - ostler]**                                               Page 258

84:11 85:7,19
86:21 88:18
89:11,18,19,20
91:4,5 92:9,13
94:13 95:16,22
96:24 97:15,20
98:2,3 100:11
100:25,25 101:4
101:7,10,11,22
102:1 103:11,22
105:12,21,24
106:4,15 107:6
107:16 108:10
109:8 110:7,13
111:11,20 112:2
112:6,17,21
113:8 114:13
115:8 116:19
117:23 119:4,20
120:1,12,18
121:12,17
123:22 124:2
125:1,16 126:5
126:21 127:4,9
127:11,12
128:12 129:21
130:6,18,22
131:2,7,8 132:5
132:10 133:4,9
133:11 134:8,13
134:19 135:9,13
135:19 136:13
137:8 138:9,21
139:3,13 140:3
140:16,20 141:4

141:10,13 142:7
142:22 143:14
144:5 145:11,12
145:21 146:2,3
147:19,22,24,25
148:5,16 149:5
149:6,12,15
150:7,17,21
151:11,15 152:6
152:11,19
153:18,19,20
154:6,11,17
157:9,22 159:9
159:14,22
160:17 161:17
162:2,8,9,15,22
164:15 166:19
167:3,18,24
168:2,3,19
169:9 170:6
172:11 173:23
174:3,4,17,24
175:24 176:3,13
176:17,21,22
177:5,20 178:25
179:12,21
180:18 181:3,6
181:19 182:6,12
182:13,14
184:13,23 185:8
185:18,25 186:3
186:6,12 187:8
187:13 188:12
189:3,5,12,14
189:16,17 190:2

190:4,6,15,20
191:6,16,21
192:6,15 193:1
193:24 194:6
195:6,19 196:7
196:19 197:1,8
197:15 199:19
201:2,20 202:3
203:14 205:22
206:8,18 207:11
207:16 208:3,3
208:17,21,22,23
209:18 210:3,20
212:10,21,22
214:14 217:5
218:4,14 219:1
219:6
**old** 117:15
**oligonucleotide**
   21:3 108:20
**once** 29:12
   54:18 57:9
   61:22 173:15
   175:24 177:16
   215:9 217:20
**onedrive** 45:4
   46:12 48:9,19
**ones** 94:4 155:5
   155:6 169:7
   175:14 191:6
**online** 45:6
**ooo** 7:3
**open** 13:8
**operating** 45:21

**operations** 33:9
   34:10 102:24
   103:2 111:9
**opinion** 75:6
   87:18 88:3,7
   96:17,22 121:2
   126:21,23,25
   163:17
**opportunity**
   169:11
**orange** 55:15,25
**order** 20:25
   23:14 38:23
   53:6 62:3
   132:11 188:25
   215:16 218:24
**orders** 106:14
**organism**
   179:19
**organization**
   33:17
**original** 4:6
   30:6 44:6
   101:13,23 128:8
   136:11 161:9,10
**originally** 175:4
**ostler** 2:15 8:10
   8:10,19 16:3,20
   16:22 17:21
   18:11 26:3 49:3
   56:4 58:1 69:13
   70:1 72:25 73:7
   73:22 74:13,19
   75:4,9,22 77:2
   77:21 78:22

CONFIDENTIAL

**[ostler - partner's]**                                                    Page 259

79:17,21 83:22 84:5,14 86:14 88:5,22 89:6 90:18 94:8,18 96:21 97:3 100:6,15,17 102:14,25 104:3 104:13 107:23 108:5,17 109:23 110:1,17 116:23 121:20 124:17 124:23 126:8 129:15 130:8 134:1 136:8,24 142:19 143:18 144:9,19 145:4 145:15 147:1,17 148:8,25 150:11 152:16 153:3,5 153:7 155:14 156:2,7 157:1 158:25 163:20 165:8,20,24 166:6,24 167:4 167:7,11,14,18 171:3,10 174:13 176:4,18 177:24 178:13 180:6,14 180:22 182:2 184:10 186:7,12 187:1 188:7 191:23 193:22 194:14 196:3,10 196:16,22 198:1 198:22 199:7

200:21 201:5,14 201:23 203:8,17 204:4,17,25 205:12 206:11 207:19 209:24 212:15,18,20 214:17 216:14 216:15,18 217:2 217:12,23 218:10,11,22 219:2 221:1 **outcome** 7:25 66:17 123:10 136:20 140:7 **outliers** 173:21 **outlook** 49:6,8 **outreach** 22:6 **outside** 104:8 **overbroad** 90:19 107:24 178:14 **oversaw** 33:9 38:4 **oversee** 34:13 39:21,23 **overseeing** 34:9 34:10 **own** 38:1 70:12 76:7 160:4 200:14,16 215:1 215:3 **owned** 31:13

**p**

**p.m.** 98:13 120:3,6 157:13 157:16 208:11 216:9,12 218:18 218:21 219:7,12 **padeh** 81:18 **page** 3:3 4:2,5 178:3 189:9 193:1,25 194:21 195:12,21 222:4 222:7,10,13,16 222:19 **pages** 4:9 6:2 149:2 **pandemic** 36:11 94:15 **paper** 87:12 168:9 169:19 170:9 177:3 **papers** 162:11 170:11,16,21 209:16 **paragraph** 29:11 80:18,20 81:15,24 82:4 82:20 83:10 85:4 86:11,17 89:1 92:2 106:15 137:8 139:19 143:4 150:22,23 184:7 184:19 185:23 194:1,22 195:6 199:20 202:8,18

208:20 209:5 210:21 **paragraphs** 80:16,17 85:8 **parameters** 154:15 160:18 160:24 **parentheses** 116:6 **parenthesis** 115:21 **parr** 2:15 8:10 **parrbrown.com** 2:17 221:1 **part** 14:25 15:9 70:10 75:25 76:5 82:1 104:16 109:19 123:25 128:2 140:5 165:4 167:25 206:23 **participants** 7:12 **participates** 82:5 **particular** 73:2 119:3 156:4 170:21 **parties** 7:14 8:16 220:16 **partner** 33:12 37:8,11,14 **partner's** 127:23

CONFIDENTIAL

**[partnered - permission]** Page 260

**partnered** 37:17
**partnerships** 113:5
**parts** 61:10 71:12 124:9
**party** 7:24 209:10
**pass** 130:19,23 133:2,3 137:18 139:6 142:15,17 142:21 146:15 198:20 218:9
**passed** 131:1 145:3
**passing** 52:25 120:25 128:21 130:9,16 135:11 139:11 140:23 141:1 142:13 144:7
**past** 79:11 123:13,17 134:19 158:12 158:24 160:19 161:19,24 165:16 181:2
**patented** 199:22
**pathogen** 21:10 51:5 52:11
**pathology** 20:3 142:6,9 143:5,9 183:17 184:1,4 184:8 193:4,8 198:7

**pathwest** 175:13 179:8
**patient** 57:18
**patients** 68:13 81:17
**pause** 13:18 32:20 89:15 219:4
**pay** 24:13,25 213:17
**paying** 24:19 25:14 216:17,21
**pcr** 39:7,9,11 50:8,9,11,14,18 50:20 51:4,7,11 51:15,21 52:2,3 52:8 53:6 56:12 56:22 57:9 58:3 59:17 60:22 63:20,21,22 64:21,22 66:2,2 66:3 68:14 141:23 152:21 153:1 179:6 183:8,10 184:24 184:25
**pe** 113:9 114:23
**peer** 79:3,6,9 163:11,17,21,24 164:3,8 166:5 170:19 188:16 188:19 209:16 209:19,21
**penalty** 220:18

**pendency** 44:21
**people** 12:1 22:5 25:20,23 32:3 40:5 47:20,24 144:22 178:16 187:4 207:24 213:17 217:15 217:19
**percent** 53:21 54:11,13 59:8 59:14,15 61:17 62:10 67:19 69:25 70:6 77:20,24 78:5,6 78:7,13,16,21 125:6,7,12,15 130:20,21
**percent's** 77:24
**percentage** 69:18,22 70:13 121:15,15,22
**perfect** 121:18
**perfectly** 69:10
**perform** 61:16 100:10 102:22 124:10 168:21
**performance** 4:7 6:1 62:2 74:16 75:20 79:4 80:24 82:25 83:4 85:24 86:1,20 98:20 99:15,21 103:15 104:7,18 104:21,22 105:8

107:21 109:7 112:12 113:14 116:16 117:3,10 118:1,20,23 119:1 124:8 127:22 128:5,9 128:14,15,18 129:2,7,8,11,23 130:1,3,22 132:8 145:12 150:16,24 155:17,20 162:25 163:2,9 163:25 164:4,8 182:1 184:2 189:1 197:3 199:24 201:19 210:13,16
**performances** 86:18
**performed** 78:4 100:9 102:21 136:6,10 179:8 183:17
**performing** 104:12
**performs** 145:9 145:14
**period** 24:11 27:4 39:17,19 94:3 135:14
**perjury** 220:18
**permission** 114:17

CONFIDENTIAL

**[person - predicate]**                                              Page 261

**person** 57:23,24 99:2 201:20 202:2 203:21 205:18

**personal** 41:5 42:2,4

**personally** 75:10,14 107:13

**personnel** 40:2

**perspective** 201:9,10,11,13

**ph.d.** 1:17 2:2 3:2 9:2 19:15,18 19:22 20:15 24:16 26:10,12 26:14 221:1,5 222:2,24 223:2 223:4,12

**pharma** 113:1

**pharmaceutical** 22:4 145:19

**phd** 202:22

**phone** 41:4 47:17 48:8 118:12 135:2

**phonetic** 171:24 173:19 214:23

**physical** 38:19 42:6

**physics** 19:13

**pick** 93:18,24

**picking** 94:6

**piece** 140:7 200:8

**pineiro** 2:9 8:7

**pink** 55:13,15 55:25

**pipe** 39:12

**pipeline** 34:11 38:8

**pitch** 23:13

**place** 7:14 31:23 32:1 57:15 77:12 164:21 214:25 220:6

**places** 106:16 106:22 122:19

**plaintiff** 1:6 8:8

**plan** 98:22 103:17

**planned** 29:14

**plant's** 160:16

**platform** 23:8 23:11,12 199:23

**plaza** 2:19

**please** 7:9 8:2,3 9:10 50:4 100:18 131:20 167:12 168:13 219:2

**pleasure** 187:5

**plot** 63:24

**plus** 68:12

**point** 24:18 25:22 26:24 30:13,14,16 31:4,5 36:20 41:4 56:15 57:7 63:8 80:16

88:25 98:18 100:2 101:24 125:6,9 126:1 127:20 134:19 136:14,21 139:8 139:9 151:7 161:20 162:19 190:1 192:8 203:1 207:9 210:13

**pointing** 88:25

**points** 32:14 59:7 132:11,12 138:22 179:25

**population** 72:8 89:9 118:7,8 121:23,24

**populations** 93:19

**poriya** 81:19

**portion** 100:22

**posed** 91:14

**position** 24:10 24:14 32:17,19 32:22 88:14,16 178:17

**positions** 20:7

**positive** 52:13 52:15 53:7,8 55:20 56:18,24 57:11,19,24 59:18,22 60:4 61:23 65:8 66:3 66:10,12 68:5 69:9 82:5

119:22 123:5,9 123:14,19 124:7 125:20 126:3,24 128:22 152:9 154:24 155:13 161:19,24 180:9

**positives** 69:11 69:20 82:17 83:19,21 114:11 123:24 126:17 126:17 159:24 160:2 161:6,7

**possible** 50:6 57:21 58:2 63:6 67:6 116:6 126:15 131:20 154:10 177:23 210:1

**possibly** 123:12

**post** 209:3 210:22

**potential** 35:3 60:18 123:19 140:6 179:19

**potted** 154:24

**ppe** 77:13

**pra** 142:20

**practices** 117:16

**predicate** 61:4 64:16,19,22 65:1,5,8,22 66:10,14,15,18 69:4,7,11 82:13 82:15

CONFIDENTIAL

**[predicates - program]** Page 262

predicates 69:9
predict 93:5
  152:8
prefer 148:25
  154:19 155:2
preparation
  15:15,25 17:1
  17:10,20 19:1
preparations
  99:12
prepare 14:4,7
  106:21 169:19
  172:3,5,23,25
  173:2,5,10
  181:15 182:24
  186:18 189:20
  191:19 194:9
  216:25
prepared 17:12
  17:15,19 174:18
  178:21,23
  191:22,25
  192:13,14
  194:11,12
prepares 15:6
preparing 99:6
  178:19 191:20
  194:10
prepped 14:6
prerogative
  169:10
prescription
  22:8
presence 4:8
  58:4 82:6

present 2:23
  11:11 52:1,11
  151:21
president 34:3,8
  34:17 36:2,7
  37:2 38:25
  113:5 147:24
  162:8
press 141:20
  142:23,24
  143:14 146:7,19
  147:5,6,9,13,15
  189:23 190:7,16
  191:12 195:19
  195:21 197:11
  197:16,21 198:5
  199:20 203:5,25
  204:23 207:2,8
  207:12,18
  216:24 217:1,4
pressure 161:14
  211:14
pretty 34:20
  49:7
prevent 122:10
previous 11:20
  121:10 181:4
previously
  18:16 26:21
  118:2
price 217:7,11
  217:17
primary 147:15
primer 21:2,3,6
  21:8,9 109:1,7

124:8
primers 20:25
  51:22,23 67:13
  67:13 86:23,24
  108:9 118:3
  124:9 135:17
print 159:15
printed 120:24
  130:15
prior 11:5,9
  97:3 100:7
  102:25 121:21
  145:16 147:2
  180:7 192:16
  205:13
private 31:13
privilege 17:22
  18:5,14
privileged 18:1
prob 135:18
probability
  52:14 53:21
  59:14 62:9
  114:4,5 125:12
  125:14,15 181:1
probably 46:20
  111:5 146:15
  207:22
probe 51:23,24
  52:2 67:14
problem 158:11
  158:23
procedure
  45:21 111:3

proceeding 8:1
proceedings
  13:18 32:20
  89:15 219:4,12
  220:5
process 50:14
  50:15 159:8
processed
  176:19
processes 39:13
produce 137:19
produced 15:1
  15:21 53:24
  58:8 132:15
  136:3,4 213:13
product 18:15
  25:2 34:4,8,10
  36:2,7 37:2,11
  38:25 74:24
  76:5,13 114:24
  115:11 144:24
  145:8,9 147:24
  162:8 199:17
production
  38:17
products 25:4
  26:20 37:13
  96:2,23 138:16
  138:17 183:23
professional
  19:24 218:7
professor 27:20
program 13:5
  19:18 21:20,22
  21:25 22:7

**[program - question]**                                          Page 263

192:3
**programs** 47:11 47:14
**progression** 24:9
**project** 79:11
**pronounce** 111:5
**pronouncing** 71:4
**pronunciation** 131:11
**proof** 107:7 128:17
**proper** 141:22
**properly** 145:14
**property** 38:20 38:22 43:14
**proposed** 2:8 32:16
**propounded** 220:10
**protective** 218:24
**protocols** 77:12
**prove** 100:5
**provide** 16:6 41:4 62:3 92:10 114:7 118:23 119:12 140:23 141:1 161:22
**provided** 13:6,8 14:19 32:18 78:11 119:15 121:10 127:1

134:12 137:2 173:9 181:23 196:21
**provides** 22:4 155:17 165:2
**providing** 137:4 141:19 148:12 199:18
**provisionally** 218:24
**public** 34:11,23 166:2,5,11,16 166:18 187:25 188:2,5 217:22 223:19
**publication** 79:7,9 163:11 163:21,25 164:3 164:8 169:15 170:19 209:7
**publications** 79:3 163:12 168:22 170:3,5 170:20 209:16 209:19
**publicly** 31:13 188:6
**publish** 163:24 165:6,12,19,21 188:5,10,13,18 188:22 209:8 210:4,6,9
**publishable** 209:10

**published** 92:4 93:10 113:9 141:25 164:24 170:9 188:11,16 190:10,12 204:7 204:20 209:7,14 210:14,16
**pull** 130:13
**pune.pdf** 112:15
**purple** 55:13
**purpose** 50:18 51:3 52:9 87:22 94:9 137:24 163:8
**purposes** 33:22 51:11 167:8
**put** 23:16 50:24 92:4 97:6 111:24 119:24 123:17 174:21 203:25 213:19 220:7
**putative** 8:9
**puts** 213:16
**putting** 170:16 213:15
**pvt** 183:9

**q**

**qc** 158:3,5,8 159:2
**qpcr** 58:4
**qt9** 45:3,5,5,6 46:8 47:15 48:8 48:11 172:13,24 194:17

**quality** 7:10,11 14:25 33:10,18 40:4,13 45:6 57:15 158:6 165:1 171:23 172:13
**quant** 63:19
**quantifiable** 60:22
**quantification** 51:8 60:21
**quantitative** 58:3,3 63:20,21 63:22
**query** 114:23 118:24
**question** 12:13 12:21,21 15:22 16:1,9 17:9 28:16,19 29:2 29:23 31:22 48:19 50:4 52:17 56:21 57:17 58:21 65:12 69:14 74:7,16 79:25 81:13 82:22 84:12 87:24 91:2 92:2,13 94:21 98:1 103:7,14 106:3 107:25 112:21 116:20,25 117:15 120:17 124:1 131:6

CONFIDENTIAL

**[question - recall]**                                                    Page 264

137:23 143:22
143:23 156:21
157:5 166:12
197:8 200:8
209:23 211:4,6
211:10,14
214:10
**questionable**
122:13,14
**questioning**
30:1,25 186:11
**questions** 28:11
35:4 36:9,10
40:3,23 77:9
91:14 100:24
111:16 117:6,18
117:21,24
118:16 119:4
146:1 148:3
190:19,21,24
191:3,8 210:23
211:3,17 218:5
218:22 220:10
**quick** 186:9
**quickly** 92:19
127:10 216:7
**quite** 93:16
**quoting** 87:12

**r**

**r** 2:18 9:13,14
55:11 222:3,3
**r.garcia** 48:24
49:10,15,19,23
**raise** 34:11,23
114:23

**raised** 115:4
117:5,21,24
**raising** 150:8
**ran** 118:11
139:6
**range** 53:13
54:1,10 59:8
60:20 61:12,14
61:18,25,25
62:3,9,24 159:4
180:25
**ranoli** 132:16
136:3
**rapid** 80:25
83:5
**rarely** 47:25
**rashbaum** 2:9
8:7
**rate** 151:17
152:1 154:23
161:19,24
**rather** 72:24
73:6 146:13
193:18 214:3
**rdrp** 72:2 86:23
87:5,9,14 88:4
88:20
**reaction** 52:4,4
117:11 151:22
151:23 154:12
207:11,14,16
**reactive** 68:7
**read** 28:19 29:1
29:12,22 79:3,7
80:20,23 81:16

82:5 84:15,25
85:7,9,13 91:1,9
100:18,21,22,23
102:2 107:7
112:2,12,14
114:22 115:9
116:2 123:15
125:17 127:18
131:5,16 133:4
136:21 143:5
148:21,23 149:7
150:21 154:21
157:20 158:2
159:13 160:8
166:22 168:17
169:9 174:2
185:10 189:6
199:20 202:20
212:8 213:1
218:25 219:2
221:9 223:5
**reading** 56:13
82:1 97:25
130:12 167:1
176:11
**reads** 148:25
**ready** 28:16
29:1 120:16
141:8 145:25
159:17 160:19
182:11 189:7,9
208:16,18 219:5
**reagents** 68:4
**real** 127:10
151:10

**realized** 207:6
**really** 30:21
32:16 135:23
146:12 149:4,4
189:17,18,22
190:11 217:14
218:8
**realtime** 51:6,21
64:21,22 66:2
**reason** 91:24
92:1 129:3
146:22 154:9
166:8 221:11
222:6,9,12,15
222:18,21
**reasonable**
144:5,14,16
**reasons** 86:20
166:3 188:17,21
**rebecca** 1:17 2:1
3:2 4:3,13,16,18
4:20 5:1,3,18,20
5:22 6:3 7:17
9:2,12 91:13
168:12 169:11
175:18 213:8
219:8 221:1,5
222:2,24 223:2
223:4,12
**rebecca's** 9:12
**rebut** 128:22
**recall** 10:15
11:4 16:18
35:17 41:7,11
43:16 58:14

Veritext Legal Solutions

CONFIDENTIAL

**[recall - relative]**                                                    Page 265

73:18,24 77:18 78:12,14 80:7,9 91:21,23 92:9 102:8 106:10,21 116:16 124:20 124:24 129:22 130:25 134:13 140:3,25 146:18 146:21 148:6,12 152:11,17 162:22 166:9,14 166:17 170:20 171:5,7 172:15 172:19 173:13 181:22 186:24 190:13 192:1,2 194:10 207:9 214:18 215:11 215:14

**receipt** 221:18

**receive** 73:9 105:18 213:21

**received** 64:23 105:16 116:14 129:11 141:23 173:15 174:8

**receives** 142:25

**receiving** 41:11 116:16 211:4 213:3

**recent** 191:13 195:22 199:17

**recess** 46:25 120:4 157:14 208:9 216:10

218:19

**recommend** 135:5,8,10

**recommendati...** 152:21

**recommended** 153:1

**recommending** 134:21,25

**reconfirmed** 71:13

**record** 7:7,15 8:4 9:11 12:18 13:14,17,19 28:18 42:20 46:22,24 47:2 89:12,14,16 120:1,3,6 157:11,13,16 167:9 187:10 208:6,8,11 216:7,9,12 218:18,20 219:6 219:7

**recorded** 7:13 7:16 15:8 220:11

**recording** 7:10 7:14 53:2

**records** 45:7

**redline** 57:3 143:3

**redlines** 141:19

**reed** 1:10

**refer** 84:13

**reference** 82:8 82:11 83:6 104:24 110:14 124:2 132:19,22 132:25 133:1

**referenced** 34:16 60:8 79:9 161:5 193:11 195:11 197:10 221:6

**referencing** 55:17 193:17

**referred** 65:18

**referring** 11:15 14:15 15:5,12 30:23 35:5,7 40:5 45:14,24 52:20 53:23 64:5 71:2 73:15 78:2 84:4 103:5 113:14 121:9 127:24 130:4 149:25 161:1 162:23 163:15 184:15,16 195:17 210:11

**refers** 52:24 125:18

**reflects** 167:16

**regarding** 118:24 140:4 146:20 163:25

**regards** 80:5 94:16 123:5

190:21 213:11 214:11

**region** 205:16

**regional** 194:22 195:1,3

**regulations** 33:17 109:18

**regulatory** 10:1 40:12 64:25 95:13,17,20 97:1,7,9,10,16 99:22 106:23 107:3,18 125:17 128:19,25 137:10,17 138:3 138:6 140:12 204:8 205:15

**related** 4:14 7:23 12:5 40:4 44:1,4,24 59:17 94:23 119:18 125:9,11 136:20 140:15 150:12 156:17

**relating** 164:12

**relation** 92:7 110:21

**relationship** 22:18 53:16 54:5,8 58:6 70:15 109:21 110:5,15

**relative** 168:20 220:15

CONFIDENTIAL

**[relatively - reported]**

**relatively** 33:13
  50:3 87:3
**release** 11:19
  141:20 142:23
  142:24 143:14
  146:8,11,20,23
  147:5,16 189:23
  190:7,16 191:12
  195:20,21
  197:11,16,21
  198:6 199:20
  203:5,25 204:23
  207:2,8,13,18
  216:24
**released** 145:20
  147:5,13 166:18
  199:24
**releases** 6:1
  73:13 147:7,9
  147:13 197:3
  217:1,4
**releasing**
  166:11,15
**relevant** 202:25
**remain** 34:18
**remainder** 85:9
**remained** 34:21
**remains** 72:19
**remarking**
  202:19,20
**remember** 9:25
  10:3,21,23,25
  11:12,21 19:2
  24:22 25:12,12
  27:15 34:4

35:15 40:19,21
41:3,8,9,13,14
41:17,23 42:3
43:8,8,18,19,20
46:16 49:24
68:20 70:18
72:2,3 74:1
76:12,22,24,25
77:22 78:10,17
78:19,23 79:8
79:10 88:16
89:22 90:6
92:12 97:18
99:6,8,19
105:17 106:11
115:6 116:18
118:9 124:18
128:7 140:1
141:3 147:18
148:10 150:6
156:3,9 158:19
160:25 161:11
161:25 162:18
163:6 164:14
168:18 170:4
171:14 172:5,6
172:21 173:4,14
176:2 181:12,19
181:20 182:4
186:16 189:21
190:11,14,15,19
190:20,23 191:6
191:20 195:5
198:3 202:14
207:4,14 210:18

211:21 214:24
215:7,10,12,14
215:19,23 216:1
216:5 217:3
**remembered**
  76:21
**remembering**
  69:21
**remind** 12:17
  95:22
**remotely** 7:19
  220:6,7
**remove** 43:25
  44:2,3 53:2
  123:18 154:10
**removed** 44:25
  193:20
**removing**
  167:17
**repeat** 56:20
  107:25 124:1
  152:21,21 153:1
  154:9,13 166:12
**repeatable**
  153:8,12 154:6
  154:13,14,15
**repeated** 159:24
  160:1
**repeatedly**
  206:3,17
**replicate** 52:2
  180:4
**replicates** 50:10
  54:15 59:9,12
  61:18 62:23

180:1,3,9
**replied** 101:18
**replies** 103:12
**reply** 100:12
  175:18
**report** 5:21
  14:23,24 15:1,4
  25:25 39:18,20
  40:2 45:16,25
  58:23 59:3
  78:10 131:17
  134:7 137:16,21
  153:24 154:4,5
  154:14,19 155:2
  155:12 160:20
  174:22,25 175:3
  175:7,15 176:1
  176:3,12 177:9
  177:11,16,21
  178:1,3,12,20
  179:1,3,5 181:9
  181:11,13,15
  182:19,21,24
  183:2,5,7,14
  184:20 185:11
  185:20 186:14
  186:19,22
  187:15,19,21
  188:15 192:9,12
  192:13,14,15,19
  192:24 193:7,13
  194:13,16 196:2
  196:8,9,13
**reported** 1:23
  69:22 70:13

CONFIDENTIAL

**[reported - reviewed]**                                                Page 267

142:8 153:9
154:7,8 155:7
155:11 160:19
185:2
**reporter** 2:4
7:22 8:4,16,21
12:12,17 28:18
28:19 187:11
197:13 219:1
220:4
**reporter's** 220:1
**reporting**
122:21 123:9
137:12 155:16
161:16
**reports** 14:20
14:21 45:8,8,23
45:23 78:25
165:11,22
178:20 181:16
181:17 187:24
188:4,6,13,18
188:22 207:7,12
207:18
**represent** 8:8
96:19 216:14,18
**represented**
10:18 199:17
**representing**
7:21 10:24
**request** 41:22
73:5 98:15,18
128:5,8,14,15
**requested** 73:9
118:3 219:11

**requesting**
99:15 101:14
104:18,21
**require** 122:18
125:18
**required** 76:2
77:5,24 97:6
145:18 173:21
223:13
**requirement**
14:24 164:25
214:4
**requirements**
38:13 114:24
153:25 204:8
205:16 213:20
214:1,2
**requiring**
121:11
**research** 4:6
20:18 23:4 25:7
25:10 65:9
109:11 143:1
**reservations**
102:18,24 103:5
**reset** 44:6,10
**resignation** 29:9
**respond** 139:21
**responded**
43:18 101:23
103:19
**responding**
107:3 148:2
**response** 43:16
102:1 104:19

118:24 170:10
187:16 191:3
**responses**
170:11
**responsibilities**
33:8 34:6,7,16
34:18 35:25
36:1 37:1 40:15
94:16,23 95:19
109:13 148:1
162:10
**responsibility**
38:24 95:6,9,13
95:17 147:23
150:15 155:19
162:7,13
**responsible**
155:4 175:15
**rest** 100:23
**resubmit** 130:11
**result** 57:16
60:3 66:3,4
77:19 88:20
112:12 116:17
125:13,14
135:11 153:9,9
154:7,11,13,14
154:15,24
179:20
**results** 57:12
66:1 83:11,15
84:1,8,18 89:10
113:9 114:17,23
115:23 117:5
119:7,14 120:24

122:11,13,14,17
123:10,19,24
124:7 126:23
127:2 129:24
130:15 131:14
132:16 134:18
136:11 141:25
142:4 146:23
150:9 160:19
174:19 175:19
175:21 179:6,12
183:8 185:3,3,6
202:21 203:4,14
204:22
**retained** 219:10
**return** 42:22,25
221:13,17
**revalidate** 96:4
150:15
**reveal** 17:22
180:11,19
**revenue** 25:3
**review** 14:7,11
14:20 15:14
17:14 18:9,16
18:25 111:14
164:22 213:24
221:7
**reviewed** 15:24
16:2,17,19,23
17:10,11,19
18:2,4 79:3,6,9
163:11,17,21,24
164:3,8 166:5
170:19 174:18

CONFIDENTIAL

**[reviewed - samples]**

Page 268

188:16,19
209:16,19,21
**reviewer**  164:22
**reviewing**  150:7
214:15
**richard**  1:10
**right**  17:12
19:17 24:19,20
25:15,16 26:11
33:2 34:24,25
37:5,23 39:2,3
41:19 42:10,11
43:14 47:4,10
53:9 55:6 56:3
56:19,24 57:11
60:6 61:10,11
61:12 62:25
63:3,4 64:3,6,7
64:10,13,14,16
64:17 66:19,24
68:20 69:12
71:17 75:16
76:7,23 81:10
82:2,18,19
85:16,18,21
86:1,5,9,13 88:6
88:11,21 97:5
98:16 99:12,16
99:17 100:5
101:15,19 104:2
105:6 107:14,15
112:8,19 113:15
113:18 114:1
118:17,21
120:10 124:3

129:3,9,24
130:7,16,19
131:24 132:17
132:20,23 133:2
135:22 137:5
139:7,11 143:1
143:12,15 146:9
147:20 148:3
151:13 153:24
156:15,20 162:4
164:16 165:16
166:13 172:1,17
173:10 174:6,19
174:25 176:6
183:23 184:2,3
184:5,6,9,22,25
185:5 187:15
188:19,20
189:11 192:9,13
192:16 193:4
196:21 197:11
197:12,14,18,22
198:7,8,10,16
198:21 207:22
218:13
**rise**  63:17
**risk**  115:22
**risks**  140:9
**rna**  4:9 20:19
21:4 82:6 93:16
108:24
**road**  75:7
**rockefeller**  2:19
**role**  10:7,10
33:23,24 34:17

35:21 36:2 37:1
38:3 40:13
70:23 76:5
144:24
**round**  118:11
**rt**  141:23 179:6
183:8,10 184:24
184:25
**rule**  13:22
**rules**  12:9
**run**  20:20 33:20
33:21 52:5 53:7
55:6 56:17,22
59:10,22 60:2
61:15 62:4,6
63:11,24 75:24
96:13 104:2
109:5 110:20
119:9 128:6
153:21,23 158:3
158:20,20
197:24 198:3,7
**running**  52:8
61:18 62:7 66:2
67:16 117:12,16
157:6,7 161:8
**runs**  130:5

**s**

**s**  2:9 4:1 222:3
**salary**  24:19,25
**sale**  95:14,18
138:1
**sales**  31:18 73:9
94:23 106:14
128:2 140:11

171:1,22 215:21
**salt**  2:16 104:8
108:7 115:17
118:2,19 119:9
122:8 128:8
151:7 162:21
169:7 171:9
172:9 175:6,11
204:12,20
**sample**  50:22
51:17 52:1,10
52:10 53:3
55:20,20,21
56:3,7,18,19,23
57:9,10,11,12
57:16 58:5,7,11
59:6,21 61:15
61:22,24 62:5
62:13,18 63:11
63:23,24 64:1
64:16 66:10,11
89:2 102:20
108:19 109:4
115:20 118:4
123:14 151:10
151:16,21 152:7
152:20 153:17
153:22 154:9
157:7 179:24
199:11,13
**samples**  55:18
56:1 61:3 62:6
69:20 84:7,10
84:22 89:8
98:21 102:4,13

CONFIDENTIAL

**[samples - screen]**                                                    Page 269

103:9,16,20
104:1,2,6 107:9
107:14,17,22
108:4,8,12,15
117:16 118:5,6
122:3,9 127:25
132:15 144:3
151:10 156:13
156:23 195:1
**sandusky** 2:2
**sara** 150:3,18
  151:11 152:6
**sarabhai** 112:24
  112:25 213:4
**saragene** 71:1,6
  71:11,16 76:15
  76:23 77:1,19
  78:20 95:18,23
  95:25 96:5,7,14
  96:18 97:1,16
  103:6 104:22
  105:6,10,19
  106:25 113:21
  113:25 114:10
  115:5 116:22
  117:4 119:23
  120:9 124:5,14
  124:22 128:6
  129:9,24 130:6
  130:18,23
  132:15 135:6,10
  136:3,6 138:2,7
  138:11 139:4,5
  141:2,23 142:17
  142:20 143:10

143:10,12 144:6
144:15,16,17
148:13 162:4
183:10,23 184:2
184:21 193:15
198:7,15,18,20
199:5 212:3
214:6
**saragene's**
  124:15,21
**sars** 83:13 86:4
**sat** 91:12
**satisfactory**
  113:10
**satisfy** 170:7
**satterfield** 1:11
  4:18,21 5:11,18
  6:3 22:19,21
  23:1,2,6,14,17
  23:21,23 25:17
  25:25 26:2,4,16
  33:2 35:6,14,18
  36:3,6 39:17
  91:12 98:5
  100:13 101:18
  102:12,15 106:6
  112:8 120:20
  125:2 127:15
  157:25 168:6,11
  169:18 170:15
  170:23,24
  171:25 175:18
  175:25 177:2
  186:21,23
  190:18 202:22

205:24 207:3
208:25 209:13
213:2
**satterfield's**
  35:21 190:22,25
**saved** 46:3
**saw** 79:12 80:2
  189:13 196:12
**saying** 16:22
  41:17 61:22
  66:17 75:15
  76:5 78:7 83:18
  84:24,25 85:1
  87:15 127:20
  153:14,21
  168:20 169:5
**says** 29:8 56:9
  57:3 66:3 80:23
  81:16,25 82:4
  83:3,25 84:16
  84:17 85:20,23
  86:2,6,7,10,22
  87:2 91:9 92:2
  92:13,18 98:19
  102:1 107:7
  112:11,14
  116:10 131:13
  132:10,14 133:4
  133:19 134:20
  134:20 135:13
  142:24 143:4
  158:2 159:23
  177:5,8 179:2,5
  180:8 182:18
  183:1,7 189:24

191:13 195:6,22
197:2 199:1,20
202:9,20 203:25
206:1
**sc** 23:3
**scarcely** 92:20
**scenario** 69:10
**school** 24:15
**science** 19:13
  32:12,22 35:23
  35:25 92:14
**sciences** 19:12
**scientific** 35:4
  62:14 99:1
  144:12,22
  147:11 201:9,13
**scientifically**
  74:2
**scientist** 26:5
  132:6 201:17,17
**scientists**
  164:22
**scope** 179:3
  183:2,5
**score** 113:10
  128:22 140:23
  141:1 142:14
  144:7
**scra** 23:14
**screen** 7:13 13:5
  13:11 28:12,23
  54:19,22 79:22
  127:7 166:24
  176:6

800-726-7007                                                    305-376-8800

CONFIDENTIAL

**[scroll - seeing]**

Page 270

**scroll** 28:25
82:20 85:8 91:2
97:22 100:11,21
100:23 101:1,3
101:17 103:11
111:17,18,21,23
112:5,17 113:17
134:19 141:9,10
141:14 157:21
159:13,15 167:2
168:3 174:1,2,4
174:17 175:17
176:12 177:25
179:21 182:11
189:7 190:4
191:16 192:11
192:18 193:6
194:6 195:19
205:22 208:19
212:9
**scrubbed** 49:13
**search** 42:16
**searching**
119:25
**second** 12:19
13:15 28:11
29:11 60:24
61:8 63:2 64:8
65:17 68:2
80:20 81:24
87:20,20 89:12
91:1 93:22
96:25 98:18
106:15 118:11
120:15 122:6

130:1,3,22,23
131:5 133:5
135:20 136:4
138:10,12,25
139:9,15 148:24
149:7 151:23
157:11 165:14
166:22 189:6,11
202:8 205:23
206:9 208:2
209:5 211:19,23
212:1,2 214:13
215:13 216:2,3
**secondly** 122:2
**secretary** 97:17
97:18 98:13
99:7 100:4
102:3,8,12
**section** 81:13,15
82:21,24 85:9
85:20 86:17
89:1 185:23
209:3
**securities** 10:13
**see** 17:25 28:14
28:22 29:4,8,11
29:16,22 30:2
30:24 31:1,21
31:25 37:10
54:2,21 55:19
56:8 67:15
74:15 75:24
78:25 80:23
81:3,5,15,22,23
82:9,10,24 83:3

83:7,10,16
86:21,25 87:1,2
87:5,6 91:5,8,9
91:15,16 92:13
92:16,17,21
93:2,4,7,13,14
93:15,20,21
98:12,14,23
99:4,5 100:12
100:14 101:5,8
101:17 102:1,5
103:12,13,14,17
103:18,19,21
106:15,19,20
107:6,10,11
113:11,12,24
114:2,20,21
115:1,8,14,23
115:24 116:8,9
116:12,13
119:24 120:23
121:2,5,6 122:1
122:5 123:15,21
125:16,21 127:6
127:8,12,15,18
131:13,21
132:10 133:7,19
134:22 135:13
137:9,14,15
139:19,21
141:15 142:1
143:7 146:11,16
150:3,19,22
151:2,15,18,20
151:25 152:4,19

152:22 153:11
153:13 154:17
154:20 157:25
158:2,7,14,20
159:23 160:1,6
160:12,17,21
161:17,21 168:5
168:9,11,13,19
168:24 169:16
170:6,13 175:17
175:22,23
176:14 177:5,8
178:2 179:2,5
179:11 182:15
183:1,7,12,14
183:19 185:11
185:16 190:9
191:13,15
192:19,25 194:2
194:3,5,7,8,18
194:20,22,24
195:1,2,3,8,9,23
195:24,25 196:5
196:6,8,11
197:2,6,7 200:2
200:3 202:5,9
202:11,12,16,20
203:2,3 205:23
205:25 206:1,6
206:7,23 208:24
209:2,6,6,11,14
210:3,4,21,25
212:22 213:1,9
**seeing** 79:10
80:7 122:2

CONFIDENTIAL

**[seeing - ship]**                                                          Page 271

150:9 175:15
190:11,13,14
195:5 198:3
**seeking**  31:18
**seem**  80:14
162:7
**seemed**  31:23
32:2 99:11
**seems**  76:4
88:18 136:13
149:3 184:7
**seen**  7:12 11:7
54:24 55:1 59:3
107:13 122:3
158:12,24 190:6
**select**  173:15
**selected**  18:15
109:2 173:2
210:24
**sell**  25:6 97:1
105:5,10,13,14
105:17,18 135:6
138:6 143:11
213:18 215:5,16
215:17
**seller**  15:5
**selling**  25:5
30:20,21 94:16
155:18
**sells**  81:9
**semester**  79:11
**send**  108:21,24
109:15 127:19
137:20 160:20
177:13 210:8

219:2
**sending**  106:10
177:11
**sense**  13:24 50:6
**sensitive**  86:7
86:24 87:9
**sensitivity**  9:21
10:9 11:2,3 12:5
40:23 60:6,9,10
60:15,16,17,24
61:2,8,10 62:25
64:9,10,13 65:6
65:18 66:16,23
69:2 70:2,10,16
70:20 72:4,12
72:14 77:20
78:8,16,21 86:4
86:9,13 87:3
88:19 89:4
132:17,22,23
133:20,24 134:4
134:15 136:16
136:18 143:6
163:3,4 179:7
179:23 181:25
183:15 184:20
193:14 197:4,17
197:21 199:2,6
199:25 200:4,11
200:19,24 201:3
202:11,24 206:4
**sent**  42:1 43:8,9
43:17 77:7,16
104:25 106:18
133:5,15 144:4

158:8 170:16
171:25 173:1,11
173:13,14,17
177:16 181:9,13
221:14
**sentence**  83:3
83:10,25 84:19
84:25 85:23
86:10,12,22
87:2 92:22 93:7
93:15,22 107:6
122:6,22 125:16
153:12 184:15
196:19 201:21
202:2,9 205:24
206:9,14,23
**sentences**  87:12
**separate**  138:3
138:16,17
178:15
**separated**  96:23
138:18 183:23
**sequence**  21:3
50:10,21 51:16
51:25 52:3
53:25 56:16
66:7 67:17
71:18 72:18
92:3 93:4,9 96:1
96:11 108:20,22
108:23,25 109:1
109:6
**sequences**  20:25
38:16 67:12,15
71:12 92:4,6

93:1
**sequencing**  61:2
65:19,25 66:1,5
66:5,6,9,21
**serbin**  1:10
**serial**  179:24
**series**  62:22
77:3
**serum**  63:10,11
**served**  163:8
**set**  53:1 56:12
58:19 65:10
173:7 175:4,8
198:24 220:6
**seth**  43:3,5
106:6
**several**  110:19
136:19
**shaped**  121:4
**share**  13:4,5,7
13:11 28:11
145:12
**shared**  12:11
48:14 129:17,19
134:3 166:4
187:24 188:1,4
188:9
**sharepoint**  48:9
48:17
**shares**  183:15
184:20 193:13
**sheet**  221:11
**shift**  48:2
**ship**  43:24

800-726-7007                                                                 305-376-8800

CONFIDENTIAL

**[shipped - snip]**                                                                    Page 272

**shipped** 106:17 106:25 107:1
**shipping** 38:11 106:22
**short** 21:3,15 29:19
**shorthand** 220:14
**show** 28:7 54:17 54:17 57:19 63:12 78:5,6,7 78:15 79:14 90:22 97:20 105:24 111:11 120:12 127:4 131:2 141:4 145:21 148:16 157:18 159:9 166:19 176:3,5 181:3,25 204:23 212:5,15,16,20
**showed** 11:6 14:9 26:6 77:19 78:20 80:4 84:7 84:18 119:15 129:13 134:4 143:5 209:17
**showing** 55:3 57:7 60:3 107:7 111:13 122:12 123:24 126:16 126:23 158:9 160:3 167:5 176:4,9 179:22 182:9 195:8

197:17 208:13
**shown** 10:8 86:22 119:7 143:25
**shows** 99:25 107:21 108:12 149:17 197:21 205:10
**sic** 7:18 21:21 54:13 127:13 204:18
**sign** 174:25 175:2,7,20 176:1 178:17,17 218:25 219:2 221:12
**signature** 177:17 178:2,5 178:9 219:11 220:24
**signed** 45:19 177:5 182:18 221:20
**silico** 67:11,25 68:6,17
**silly** 56:21
**simbiotics** 37:18 37:22 111:9 113:2
**similar** 26:20 55:1 64:20 67:17 69:1 96:10 213:19
**similarity** 96:11

**simplest** 50:5 51:15 63:5 67:6 126:15
**simply** 180:16
**simpsonville** 1:18 2:2 7:1
**simulation** 68:5
**simulations** 67:16
**single** 73:6,20 148:22 202:23
**site** 113:9
**sites** 16:6,14
**sits** 51:23
**sitting** 185:18 207:16
**situation** 187:2
**situations** 76:20
**six** 21:15 24:12 25:15 85:24 86:3 216:3
**size** 199:11,13
**skeptic's** 76:6
**skirting** 16:24
**skype** 47:16 48:8
**slc** 115:11,16 122:3
**small** 159:15 199:11
**smart** 70:20,24 71:7,17,21,25 74:8,10,17 75:2 75:20 76:11 77:18 78:20

79:4 81:6 83:12 83:20 84:1,17 84:21 86:8 87:4 89:4 90:10,13 94:6,17,24 95:10,14,15,23 96:8,15,19 104:25 105:9,11 105:13,15 106:24 107:14 108:3 129:7,12 133:10 134:15 136:5,15,22 137:25 138:7,12 139:10 140:17 140:24 142:13 142:15 148:7 149:22,24 150:10 152:7,13 156:15 162:4 163:18,19,25 164:4,9,12 171:2 179:6 180:12,20 182:1 183:8,22 184:5 184:9 197:25 198:3,12,13,20 199:4 203:6 205:11 211:23 212:2 214:11,13 214:16
**smart's** 203:6 204:16
**snip** 51:8

Veritext Legal Solutions

800-726-7007                                                                    305-376-8800

CONFIDENTIAL

**[soc - standard]**                                                                    Page 273

| | | | |
|---|---|---|---|
| **soc** 22:5 | 129:1,8 133:5 | 70:6 74:16 | **specify** 52:12 |
| **society** 20:2 | 133:11 136:13 | 76:22 77:22 | 129:10 |
| **socioeconomic** | 138:4,23 139:4 | 78:17 88:3 | **speculation** |
| 22:5 | 139:24 140:21 | 105:22 108:22 | 56:5 74:20 |
| **sofia** 2:24 7:20 | 141:12 143:11 | 109:20 124:24 | 102:14 103:1 |
| **software** 32:5 | 150:22 153:5,6 | 130:25 148:10 | 104:14 108:18 |
| **sold** 11:18 31:6 | 153:7 155:24 | 161:2 181:11 | 129:16 144:9,20 |
| 81:9 205:17 | 159:15 166:12 | 182:4 194:20 | 145:5 147:3 |
| 215:7,9,10 | 166:25 170:23 | **specifically** | 165:9,24 166:6 |
| **solution** 158:12 | 181:23 184:18 | 24:22 87:25 | 171:4,11 184:10 |
| **solutions** 221:23 | 185:8 186:7 | 92:12 127:24 | 188:8 191:23 |
| **somebody** 16:5 | 192:22 193:25 | 128:7 162:18 | 196:23 199:8 |
| 32:10 129:19 | 200:7,10 201:11 | 163:6 171:6,15 | 201:6,15,24 |
| 132:6 175:6,11 | 204:13 206:21 | 172:7 | 204:5 205:2 |
| 210:12 | 208:1 212:14 | **specificity** 9:22 | 206:12 209:24 |
| **someone's** 56:1 | 214:21 | 10:9 11:3,4 12:5 | 217:13 |
| **soon** 131:20 | **sort** 53:22 | 40:24 60:6 67:1 | **spell** 9:10 |
| **sop** 45:15,20 | **sound** 121:4 | 67:7,8 68:19,20 | **spelled** 9:13,13 |
| **sorry** 21:21 24:2 | **south** 1:18 2:2 | 68:21,25 69:1,5 | **spend** 90:2 |
| 28:20 35:17 | 2:10,16 7:1 | 69:8,18 70:3,11 | **spent** 90:3 |
| 42:8,25 44:22 | 22:11,13 23:3 | 70:16,20 78:16 | **spoke** 17:4 41:1 |
| 46:13 47:7 | 36:15,21 214:15 | 78:21 127:24 | 41:3 135:2 |
| 52:22 56:21 | 214:19 | 132:16,19,20 | **spoken** 112:22 |
| 65:13 67:22 | **space** 33:14 | 134:20 135:21 | **spot** 169:13 |
| 68:23 72:16 | **speak** 14:1 | 143:6 163:3,4 | **sputum** 56:1 |
| 79:1 80:3 91:10 | 46:14 | 179:7,14 182:1 | **staff** 144:23 |
| 91:18 94:20 | **speaks** 86:15 | 183:15 184:20 | **stage** 92:19 |
| 100:17,21 | 88:23 196:3 | 193:14 197:4,17 | 93:23 |
| 103:23 108:2,13 | 203:9,18 | 197:22 199:3,6 | **stages** 93:17 |
| 109:25 114:13 | **spec** 68:25 | 199:25 200:4,11 | **stamp** 176:15 |
| 115:3 116:1,14 | **species** 72:10 | 200:20,25 201:3 | **stamps** 176:19 |
| 116:19 119:21 | **specific** 10:11 | 202:10,25 206:4 | **stand** 158:5 |
| 123:3,25 124:22 | 21:1,4 30:10 | **specifics** 18:17 | 202:25 |
| 125:25 126:13 | 53:13 58:19 | **specified** 105:2 | **standard** 45:21 |
| 127:19 128:12 | 62:21 69:10,25 | | 58:5,7 59:7 62:7 |

800-726-7007                                                                            305-376-8800

CONFIDENTIAL

**[standard - summarizes]** Page 274

63:23,25 66:5 82:12 173:20 184:24,24 185:15

**standards** 33:16 116:3,5,12 193:18,18

**stands** 33:16

**start** 22:15 23:15 24:4 27:4 92:6 191:12 209:5

**started** 20:17 24:5,7 27:6 31:14 32:5 33:1 33:4 45:17 90:14

**starting** 17:22 167:19

**starts** 133:4

**state** 2:5 8:2,3 8:18 9:10 160:15,15

**statement** 202:13

**statements** 190:17,22,25 191:1,4,5,7 220:10

**states** 1:1

**statistical** 173:19

**status** 22:5 218:1

**stenographica...** 220:12

**step** 140:8,8

**steps** 139:20,23 139:24 140:13

**sticker** 167:13

**stipulate** 8:17 8:19,20

**stock** 215:1,3,5 215:8,17,21 217:6,11,17 218:2

**stop** 85:15

**stopped** 24:19 25:14

**straight** 19:18 19:19 54:15

**straightforward** 84:12

**strain** 179:18

**strategic** 113:5

**stronger** 31:22

**structure** 72:18 72:21 109:20 110:21

**student** 79:10 80:2,4

**students** 28:1

**studies** 16:11,19 17:19 143:15,24 203:11

**study** 15:10,12 80:2,4,7,9,19,24 81:6,16 82:1,14 82:16 83:18

85:24 86:3,7,12 87:8 88:18,20 89:4 96:13,15 114:10 115:4 116:19 117:2,5 118:10,17 120:8 123:6,11 144:18 160:10 175:16 193:8 194:4,7,9 196:1 197:17,20 202:9

**stuff** 50:4 171:14 213:17

**subfactors** 60:18 61:9

**subgroups** 60:25 67:9

**subject** 29:8 98:9 106:8 111:25 112:11 131:13 158:2 159:23 168:9 177:5 182:18 209:2

**submission** 127:23 132:14 132:25 133:5,14 137:5 138:10,10 138:11,12,20,25 138:25 139:15 139:16

**submissions** 138:15

**submit** 45:19 77:6 115:20

164:3

**submitted** 114:16 138:13 164:20

**submitting** 99:20 137:24

**subscribed** 223:14

**substance** 9:20 10:6 43:20 73:25 162:22,24 169:22

**substances** 68:7 68:8 179:16

**substantive** 28:21 149:2

**subtracts** 56:14

**sue** 91:10

**sued** 20:11

**sufficient** 204:9

**suggesting** 47:22 122:20 135:7

**suggestions** 135:12

**suggests** 86:19 135:13

**suite** 2:10

**summaries** 165:7,19 166:4 172:4,6,8,11,16 172:20,23,25 173:3,10 196:18

**summarizes** 181:4 193:3

CONFIDENTIAL

**[summarizing - target]**

Page 275

**summarizing** 181:15 192:12 193:7

**summary** 16:7 164:19,25 166:11,16 173:6 173:16 174:18 174:21 175:19 191:13,17,18,19 191:20 192:7,8 193:1,25 194:21 195:12,22 196:25

**supervisor** 39:15,16,24 178:8,11,16,22

**supplement** 217:1

**support** 100:8 107:8,13 148:12 161:18,23

**supports** 86:19 163:22

**supposed** 162:25 164:7 172:13 202:5

**supposedly** 91:20

**sure** 9:18 15:23 24:9 27:2 31:17 31:19 35:20 49:4,20 52:7 60:12 61:19 69:15 71:22 90:8,11,15

105:16,22,23 109:20 111:23 116:10 126:9,18 128:24 146:10 158:18 160:25 198:13,17 202:15 203:19 214:8 215:2,20 216:23 217:25

**surprised** 191:21

**surprising** 89:5 89:7

**surrounding** 117:19

**swapnali** 141:24

**swear** 8:5

**swearing** 8:17

**sworn** 9:3 223:14

**symptoms** 4:8

**synthetic** 108:4 108:8,12,14,15 108:19,24 109:4 109:6 118:5

**system** 14:25 22:7 33:10 40:4 42:19 45:7 46:9 165:1 172:14 194:17

**systems** 33:18

| t |
| --- |

**t** 4:1 167:9 222:3,3

**table** 179:13,21 179:22 180:11 180:16,18,25 181:3,4,5,6,7 184:16,23 185:25 189:20 189:22

**take** 7:14 12:18 13:23 28:9 32:16 46:19 62:13 67:12 68:2 80:19 81:12 82:21 90:9,16,25 96:7 97:24 106:1 120:15 126:14 127:10 131:5 141:6 145:24 149:7 153:15 157:9,20 166:22 173:5 185:10 186:8,25 187:6 189:6 208:4,14 218:11

**taken** 2:2 46:25 108:20 120:4 129:12 140:8,13 157:14 208:9 216:10 218:19 220:5,14

**takes** 56:13 126:13 173:8

**talk** 19:3 20:13 32:25 61:8 89:2 105:12 122:23

130:2 131:19 162:6 170:7 217:16

**talked** 18:3 23:17 66:23 101:13 118:9,12 138:19 146:13 170:18

**talking** 18:16 31:8 36:25 38:10 40:14,15 46:16 52:21 55:24 58:13 65:4 70:19 72:14 73:13 76:23 79:12 105:2 120:8 125:4 137:6,7 138:19 147:19 149:21,23 162:2 164:15 171:6 175:9 183:21

**talks** 194:4,22 194:25

**tammy** 1:23 2:4 7:22 220:3,24

**target** 21:1,4,5 50:10,21 51:16 51:22 52:1,3 53:5,25 56:16 66:7 72:1 73:20 87:14 88:3,4 94:12 108:9,21 108:23 109:1 214:3,7

800-726-7007

305-376-8800

CONFIDENTIAL

**[targeted - test]**

Page 276

**targeted** 73:6
  86:23,24 87:10
  211:11,12,17
  212:3
**targeting** 87:8
  88:20
**targets** 72:5,24
  93:9
**taxi** 29:13
**taylor** 2:18 8:13
  8:13 216:18
**taylor's** 216:14
**teach** 27:22,24
  28:1 39:8
**team** 31:18
  119:10,12 128:2
**tech** 21:19,20,25
  22:2,15
**technical** 19:14
  39:12 145:8
  165:4
**technically**
  175:20
**technician** 20:1
  124:12
**technicians** 40:7
  169:4
**technological**
  12:11
**technology** 7:20
  19:14 21:23
  30:13,15 32:8
  36:9 38:6 39:10
  65:23 94:1
  163:12,13,14,14

  163:16,22
**tect** 54:13
**tell** 15:20 17:7
  39:9 57:11 60:9
  61:23 68:22
  77:7 84:19
  118:3 137:10
  209:13
**telling** 41:15
  84:6 133:23
  134:2 135:5
  139:3,5,14
  151:11 152:6
  161:14
**tells** 51:16
**temperature**
  135:17
**template** 45:17
  194:16
**tenfold** 62:16
**term** 15:10
  23:24 38:18
  50:11 51:18
  52:18 58:13
  59:18,24 60:1,5
  67:1,3,4 109:8
  200:18
**terms** 20:5
  21:11 31:8 40:8
  59:16 75:7
  206:16
**test** 6:1 9:22
  10:11 11:13,14
  11:14,16,17,19
  12:5 14:12,14

  14:19 15:6,6,8
  15:16 20:22
  25:8 26:7,19
  31:5 36:10
  39:11,12 46:1
  46:10 50:8,9,9
  50:19 51:4,6,11
  52:9,12 53:6,8
  53:14,14 54:1
  56:17,23,25
  57:15,20 58:8
  59:22 60:20
  61:15 63:8
  65:10 66:7,17
  66:18 68:4,6,9
  68:11,15 69:3,9
  69:24 70:6,9,10
  70:20,24 71:1,7
  71:7,8,11,16,17
  71:21,25 72:4,5
  72:23 73:2,5,20
  74:3,5,8,11,17
  74:18 75:2,2,16
  75:17,21,24
  76:7,11,15,23
  77:1,7,15,16,19
  78:12,20 79:5
  81:7,9 82:18
  83:13,20 84:20
  84:21,21 86:4
  86:18 87:9,10
  87:17 89:4 90:6
  90:10,13,17
  92:6,15,15,18
  93:8,10,17,23

  93:25 94:1,6,9
  94:17,24 95:10
  95:14,15,18,23
  95:24,25 96:4,4
  96:6,8,8,14,15
  96:18,18,19
  97:1 99:20
  100:5,9 102:21
  103:6,23 104:1
  104:12,23,25
  105:6,9,10,11
  105:13,15,17,19
  107:14,19,20,21
  108:3,12 109:5
  113:21 114:1,6
  114:10 115:5
  116:22 117:4,8
  117:9,10 118:25
  119:8,23 120:9
  121:3,8,14,14
  121:18,23 122:9
  122:18 124:6,14
  124:22,22 126:2
  126:5,16 127:3
  128:6,17 129:9
  129:12,24 130:6
  130:23 131:18
  132:2,9 133:20
  133:23,25 134:5
  134:14,15,21
  135:6,8,11
  136:5,6,15,16
  136:22,23
  137:11,12,17
  138:2,7,7,11,12

CONFIDENTIAL

**[test - think]**                                                                 Page 277

138:20 139:4,5
139:10 140:17
140:24 141:2,22
141:23 142:13
142:17,20 143:1
143:10,11,12
144:6,15,16,17
145:1,2,13,14
146:24 148:3,7
148:11,13
149:20,21,22
150:10,14,16
151:6 152:8,13
153:2,21 154:2
154:12,16
155:10,18,19
156:17 158:19
160:18,24 161:9
162:4 163:3,4,5
163:10,18,19
164:1,4,9,13
171:2 173:20,20
179:6,8,20
180:12,20 182:1
183:8,11,16,16
183:22,23 184:2
184:5,9,15,21
184:24,25
185:22 188:24
188:25 189:1
193:4,15,15
197:3,25 198:4
198:7,12,16,20
198:20 199:1,4
199:5,24 201:19

204:1 205:11,16
205:19,19,20
209:17 211:7,10
211:11,16,23
212:2,3 213:7
213:12,25 214:2
214:6,9,11,13
214:16
**test's** 72:4,12
202:21 203:6
**tested** 59:1,5
76:13 84:7,10
107:9,14,17,22
108:4,8,12
132:10,14 133:6
133:14 136:10
137:5 205:15
**testified** 9:4
36:16 88:9
96:25 102:7
105:4 129:21
172:15 173:9
183:25 200:17
**testify** 9:3
**testifying** 13:1
145:11
**testimony** 10:6
12:6 97:4 100:7
103:1 117:21,25
121:17,21
145:16 147:2
180:7 185:8
190:20 205:9,13
219:8 220:9
221:9,18 223:8

**testing** 10:11
15:2 16:7 23:19
26:23 30:8 39:7
39:8 40:3 50:1
59:17 61:3
62:22 65:11
68:3,3,6,17
71:12 81:20
88:1,2 95:3,3
99:25 103:9
108:7 111:3
118:11 122:4,12
136:11,19
137:22 138:14
140:14 144:2
150:24 165:3
169:8 175:9,10
179:14,15,18
180:1,25 200:1
200:6,13,15
**testings** 201:4
**tests** 20:20,20
22:16 25:9 30:7
30:20,21 31:4,6
31:6,8,10 38:5,9
38:10,11,13
40:23 45:8
53:11 63:14
74:12 75:8,11
75:14 78:4
80:25 81:5
82:17 83:5
85:25 86:1,3,5
96:20 106:17,22
106:24,25 107:8

119:9,17 120:25
124:10,16
130:15 135:24
135:25 143:5
148:10,11
152:14 160:3,4
161:15 163:1
168:21 169:25
181:8 199:23
206:2 211:15
213:14,22
**text** 41:25
**thank** 8:21
167:7 176:7
218:5,15,15
**thanks** 79:22
167:14,21
**therapy** 68:13
80:13
**thermocycler**
55:5,7 150:1
**thermocycling**
50:15
**thing** 84:16
148:21 149:1
176:5,5 180:24
189:13,15
215:14
**things** 10:11
17:4 18:15 74:4
86:17 118:13
171:13
**think** 11:12
13:12 16:24
18:23 23:3 26:9

CONFIDENTIAL

**[think - touch]**

Page 278

35:15,20 37:3 39:1 46:7 58:21 60:8 61:8 63:2 63:18 64:2 65:16 72:2 74:21 75:10,14 102:7 105:4 111:24 113:6 116:19 122:2 123:25 129:21 131:1 135:1 144:5,11,16 145:6,17 146:10 146:14 147:12 149:1,13,14 161:1,10 167:20 167:21 170:18 172:15 173:9 184:11 190:18 191:24 199:9 200:14 201:21 203:23 204:6 205:3 206:16,19 206:23 210:12 211:24 214:12 215:23,24

**thinking** 76:9

**third** 12:24 30:9 39:6 63:18 82:4 83:10 191:12 194:1 195:20 209:10

**thought** 13:9 23:9 29:23 36:16 88:9

200:17,22 211:10

**thoughts** 116:3

**thousands** 213:22

**three** 19:8 25:22 37:9 55:14 60:18 90:4 118:15 170:7 181:21 214:5

**threshold** 52:18 52:23,24 53:1,1 53:17,23 54:6,9 56:9,12 57:6,8 57:10,23

**thresholds** 53:12

**throw** 99:2

**time** 7:7 8:2 11:21 13:22 23:15 24:11 25:22 26:8 27:4 31:14,15,24 32:2,9 34:18 35:8 39:17,19 40:3 50:20 54:12,13 75:19 75:24 77:16 88:17 89:24 90:15 93:5,11 93:18,24 94:3,7 94:10,15 96:3 101:20 118:11 119:2,16 121:19 125:7,8 136:10

151:7 152:20 159:6 166:9,13 167:21 168:4 172:3 174:4 176:15,19,20 177:4 182:2 185:18 190:9 207:6 218:6,8 220:6,7,11 221:19

**timeframe** 221:8

**times** 37:9 55:5 55:7 90:4 147:12 215:7

**timpanogos** 192:4 194:22 195:1,3

**title** 33:4,6 34:1 34:2,3,8 35:23 79:12 113:6 174:16 189:19 190:3

**tm** 135:14,16,17

**today** 10:24 12:9,12,20,25 15:15,25 16:17 16:19,23 17:11 17:20 19:1 28:8 44:19 74:23 113:8 127:22 183:22 185:18 197:10 198:9 199:23 200:17 207:16 216:14

216:19,22 218:6

**today's** 14:2,4,8 219:8

**together** 97:6 200:9

**told** 42:23,24 43:2,3,12,23 44:12 67:24 135:2 188:3 209:8,9 210:4,6 210:10,12,15

**tom** 4:16 106:6 106:12

**took** 11:24 40:12 90:12 123:16 214:12

**tool** 21:9

**tools** 67:15

**top** 70:18 78:1 101:3,5 103:11 111:23 112:7 114:5 141:15 148:23 149:15 176:11 178:25 182:15 190:4 208:23 212:22

**topic** 11:4 73:10 73:11 156:4 217:20

**total** 150:25 151:4,13 215:23 219:9

**totally** 156:16

**touch** 23:17

Veritext Legal Solutions

800-726-7007

305-376-8800

CONFIDENTIAL

**[towards - understand]**

**towards** 27:14 76:6 89:19

**toxicology** 21:15,16

**traceability** 15:2 165:2 166:1

**tracking** 91:11

**trading** 1:4 2:8 8:8 221:4 222:1 223:1

**traditional** 80:24 83:4

**training** 7:18 31:3 34:15 39:1 39:4 95:1

**tran** 38:9

**transcribed** 220:12

**transcript** 218:23 220:14 221:6,20 223:5 223:8

**transcripts** 221:15

**transfer** 34:13 38:5,9,10,12,14 38:14,15,19,19 38:20

**transferred** 71:11 95:25

**travel** 37:9

**traveling** 91:12

**tribune** 171:9 204:12

**tried** 161:11

**true** 52:13 53:7 53:8 57:22 113:25 114:6 123:11 125:13 125:14 126:2,3 152:8,9 154:24 220:13,19 223:8

**trust** 119:22,24

**truth** 9:3

**truthfully** 173:4

**try** 66:16 118:12 130:18 134:16

**trying** 16:23,24 17:3,6 18:17 21:8 37:8 74:1,2 118:1 138:1,17 154:10

**tuberculosis** 26:23

**tuesday** 101:15

**two** 11:23 19:8 21:19 37:9 38:12 42:1 60:10,14,25 64:12 69:6 72:24 80:25 85:8 87:25 90:3 90:3 96:20,23 99:14 117:12 130:5 135:23,25 136:2 138:3 143:24 146:12 173:20 178:2,15 181:20 183:23

197:9 198:9 203:11 205:4 213:7,12 214:3 214:4 217:19

**type** 4:9 16:7 20:15 25:4 32:19 39:4 45:8 45:25 47:16 49:1,7 54:24 60:15,16 61:7 62:4,5 64:8,24 65:5 66:11 68:13 102:20 109:21 110:5 122:18 145:19 159:7 175:12 188:15 207:24 213:13

**types** 14:10 25:9 44:23 45:11,23 60:10,14 68:10 68:11 89:2 117:6,13 135:9 157:7 179:15

**typically** 15:12 31:6 109:6 110:22

**typo** 184:12,13 184:16,19

**typos** 185:12,16 185:19 193:10 193:12,13,17,20

**u**

**u.s.** 30:18 65:1,2 136:4 213:15,16

**uh** 116:9

**ultimate** 155:6

**umbrella** 113:1

**un** 20:24

**uncomp** 129:16

**under** 12:6,25 16:13 36:5 68:22 69:10 71:13 74:24 92:10 101:8 103:14 113:20 136:7 152:7 183:1,4 185:23 218:24 220:7,18 220:18

**undergo** 68:13

**undergraduate** 19:19

**undergraduates** 27:24 28:3

**underlying** 11:10

**underneath** 46:9

**understand** 11:10 12:14,22 12:25 13:2 14:23 18:6 21:8 38:7 52:7 55:2 57:5 61:19 65:12 82:11 83:24 84:3,11

CONFIDENTIAL

**[understand - validation]**                                 Page 280

108:11,16 109:3
114:9 115:16
123:22 125:3,23
132:7 138:9,21
139:13 143:23
145:7 169:1
183:21 191:10
**understanding**
15:11 20:24
23:5 55:12,14
57:2 102:11,23
125:24 128:12
128:20 150:8
158:22 161:4
177:15 187:23
209:22 211:9
**understood**
23:8
**undetermined**
153:10
**unfavorable**
180:5,21 203:16
205:11
**unfortunately**
31:22 113:10
**unidentified**
117:18
**unintelligible**
157:2
**unique**  199:22
**unit**  7:16 47:2
120:6 157:16
208:11
**united**  1:1

**units**  58:10,10
**university**  19:16
27:19
**unknown**  64:1
**unrepeatable**
153:9
**unreportable**
123:18 153:10
**uploaded**  45:3
**upstate**  22:6
**urgency**  99:11
**urgent**  98:9
131:13 159:23
**usage**  148:7,13
**use**  14:16,17,18
15:10 25:7,10
38:18 39:7 42:8
42:12 47:11,19
51:6,15 53:25
58:8 63:22
67:14 71:15
73:2 77:13,14
92:15 93:9 95:2
96:5,18 108:25
110:22 123:8
128:24 133:17
161:12 211:15
**used**  30:17,18
31:10 42:18,20
47:8,21,23
51:21 56:25
58:5,23 59:3
66:13 67:13
81:1 87:20 94:1
109:6 124:10

149:19 166:1
173:17 195:15
195:17 199:25
200:5,12 201:3
206:13 217:4
219:9 221:20
**uses**  51:7 64:22
66:9
**using**  7:20 39:11
39:13 48:21
61:1 63:9,25
68:3 77:14
82:12 103:10
115:12,13 118:5
118:6 136:3,4
149:18 157:8
162:3 173:19
205:19,20 211:7
**usually**  15:7
31:9 52:12
53:13 55:11
58:24 64:24
69:22 90:3
99:19 114:7
125:18 140:10
153:9 154:7,8
159:2,5 163:22
165:21 171:19
178:15 188:15
205:7
**utah**  1:2,9 2:5
2:16 26:16 27:8
36:12,18,20
220:19

**utc**  176:20
**utilized**  26:7

**v**

**v**  221:4 222:1
223:1
**vague**  16:3 26:3
49:3 73:7 74:20
78:22 152:16
180:14,22 182:2
196:23
**validating**
155:19
**validation**  5:21
14:20,21,23,24
15:4,10,12
16:11,19 45:8
45:16,23,23,25
46:11 78:9 82:2
112:15 156:18
161:18,23
164:19,25 165:3
165:7,10,19,22
166:4,11,16
172:4,6,8,11,16
172:20,23,25
173:3,5,10,16
174:21 175:15
176:1,3 177:9
177:11,16,21
178:12,19,20,25
179:2,5 181:9
181:11,14,16,17
182:21,24 183:2
183:4,7 185:10
185:19 186:14

CONFIDENTIAL

**[validation - way]**                                                                Page 281

186:19,22,24
187:15,19,21,24
188:4,6,13,15
188:18,22
191:14,17
192:12,23 193:7
194:13,16
195:22 196:2,9
199:10 207:7,12
207:18
**value** 53:22,22
53:24 54:1 58:7
63:22 122:19,21
123:7,9,11,17
125:8,9,9,11
126:11 158:9,17
159:4
**values** 122:23
**variability** 74:5
89:9
**variable** 93:16
137:21 159:7
**variables** 70:4
76:17,19 77:10
84:22 102:19
117:6,18 122:16
126:19 127:1
134:17 136:19
140:6 154:10
**variations** 93:18
93:24 94:7
**venture** 34:14
37:15,19,21
**verification**
60:17 165:3

**verified** 116:5
**verify** 110:23,24
110:25 154:2
221:9
**verifying**
155:19
**veritext** 7:21,22
219:10 221:14
221:23
**veritext.com**
221:15
**version** 45:3
111:24 115:20
198:17 211:19
211:23 212:1,2
219:3
**versions** 45:2,11
45:11
**versus** 7:18
39:11 69:7
84:21 118:6,7
210:24
**vice** 34:3,8,17
36:2,6 37:2
38:25 113:4
147:23 162:7
**video** 7:13,16
**videographer**
2:24 7:6,21
13:16,19 46:23
47:1 89:13,16
120:2,5 157:12
157:15 187:12
208:7,10 216:8
216:11 218:17

218:20 219:5
**videotaped** 1:17
2:1
**vir** 110:16
**viral** 57:18,23
58:9 61:24
151:16,20,22
152:2,6,25
153:17,22
155:10 156:13
156:24,24
161:20
**virology** 110:11
110:16 120:9
128:21 129:14
142:10,14,18
143:15
**virtual** 7:20
**virtually** 7:10
12:10
**virus** 92:3 93:4
93:9 113:21
150:25 151:5
183:10
**viruses** 179:16
**vis** 38:3,3
**visible** 196:17
**vision** 29:24
30:4,6,12
**volumes** 117:11
**vp** 74:24 76:5
144:24
**vs** 1:7

### w

**wa** 179:9
**waived** 18:6
31:6,7
**walk** 12:9
117:23
**want** 12:9,17
19:3 32:25
43:13 47:6
49:25 62:17
64:8 68:10
75:24 80:15
85:13 89:18
98:19 103:15
146:24 147:22
148:21 150:21
150:22 155:12
157:23 159:16
159:19 162:6
169:10 174:24
187:4,6 188:25
191:11 199:15
199:16 209:5,6
218:5
**wanted** 10:7,10
43:9,10 100:4
175:2 209:14
**wanting** 10:8
160:18,24
213:24
**wants** 13:12
209:25
**water** 62:19
**way** 31:16 47:17
50:5 51:15

CONFIDENTIAL

**[way - working]**

Page 282

61:16 63:5 66:1
66:4,4 67:6 69:3
76:1 84:9 100:9
102:21 114:9,12
126:15 159:5
170:7 176:23
177:25 192:18
204:8 213:21
**ways** 38:12
**we've** 18:3
46:17 64:6
147:19 149:3
162:2 164:15
197:9 201:21
**weaker** 72:21
**website** 209:3,9
210:11,14,17,22
**weekly** 171:19
171:20
**weeks** 90:3
**weigh** 74:2
**weight** 200:15
**weird** 189:17,18
189:22
**welvista** 22:3
**went** 12:24
19:19,22 21:19
22:12 24:14
26:9 29:22
30:24 34:23
46:8 118:19
122:7,8 140:19
148:14 170:10
195:25

**wet** 68:2,3,17
**whatsapp** 41:24
42:4 47:8,11
**white** 209:16
**whoa** 141:11,11
**wider** 89:8
**williams** 4:16
106:6,12
**willing** 162:14
162:15
**wiping** 46:15
**wise** 41:5
**withstand** 94:11
**witness** 3:2 7:12
8:5,11,15,17
16:4 17:24
18:11,18 26:4
29:3 46:20 49:4
56:6 58:2 69:14
69:16 70:2 73:1
73:8,23 74:15
74:21 75:5,10
75:23 77:3,22
78:23 80:1,22
81:14 82:23
83:23 84:6,15
85:11,14 86:16
88:6,24 89:7
90:20 91:4 94:9
96:22 97:5 98:2
100:8,18,25
101:4 102:15
103:2 104:5,16
107:25 108:6,19
109:24 110:4,19

111:20 112:6
120:18 121:22
124:18,24 126:9
127:11 129:17
130:9 131:7
134:2 136:9,25
141:13 142:20
144:11,21 145:6
145:17 146:2
147:4,18 148:9
148:25 149:9
150:12 152:17
153:4,6 155:15
156:3,8 157:3
157:22 159:2,14
159:18 163:21
165:10,21,25
166:7 167:24,24
168:2 171:5,12
174:3 176:13,21
176:21 178:15
180:8,15,24
182:4,12 184:11
185:13 187:7
188:9 189:8
191:24 193:23
194:15 196:5,11
196:17,24
197:14 198:2,23
199:9 200:22
201:7,16,25
203:10,19 204:6
204:19 205:3,14
206:13 207:21
208:5,17 209:25

212:10,21
214:18 216:16
217:3,14,25
218:9 220:7,9
221:8,10,12,19
**witness's** 147:2
**word** 185:22
206:21
**words** 130:13
130:14 206:14
**work** 18:15 19:4
19:22 20:6,14
20:16 21:13
22:2,12,22
24:15 26:15,16
27:11,18,19
36:3,11,14
37:24 42:13
44:4 80:3,5
100:5 102:16
103:5 109:14
116:11 169:2,6
169:24 170:2
172:9 214:23,24
218:6
**worked** 22:3
39:22 42:9 95:4
118:4 163:13
165:15
**workflow** 39:13
**working** 20:17
22:10 24:4,5,7,8
24:12 25:1
26:20,21,22
27:4,6,16 33:5

CONFIDENTIAL

**[working - à]**                                                              Page 283

36:6 39:25
49:10 90:1
95:13,17 137:11
163:22
**works** 97:14
109:1 150:5,6
**world** 30:9,21
30:22 31:9,10
39:6 92:19 93:2
**worldwide** 81:1
**worse** 136:6,10
168:21
**worst** 75:2
**would've** 161:3
**write** 29:22
30:24 31:21
114:16 115:9,19
121:2 122:2,24
123:15 131:16
141:22 151:15
152:20 153:8
154:17 160:8
161:17 162:14
162:16,20
164:12 169:1,9
169:21,23 170:1
170:3,4,6
173:16 183:4
186:4 201:17
209:13
**writes** 113:8
114:22 169:12
**writing** 10:11
45:18 137:3
155:9 163:8

164:14 177:3
**written** 43:9,10
43:10
**wrong** 132:3
**wrote** 29:12
30:4 98:12
106:16 120:24
121:7 125:17
127:18 134:24
137:9 142:3
146:11 150:23
151:20 152:1
154:21 155:1
158:8,11,23
160:1,23 168:11
181:18 183:14
187:25 209:6,7
210:4,21 212:12
213:1

**x**

**x** 3:1 4:1 55:3,4
**xpert** 83:13 86:4
**xpress** 83:13
86:4

**y**

**y** 55:9
**yeah** 21:23
63:20 67:8 69:1
79:21 91:20
108:2 109:24
125:5 130:17
139:8 142:15
147:21 149:14
149:15 153:12

153:13 170:14
175:11 177:4
179:14,23 185:6
185:14,17
186:10,12
199:12 208:20
212:18 214:4
**year** 10:16
21:19 22:8
23:20 29:23
37:9 90:2,4
213:6 215:13,13
**years** 81:18
165:16
**yesterday** 17:1
17:7,23
**yield** 134:17
**york** 2:20,20
29:12 35:2

**z**

**zach** 8:12
218:12
**zachary** 2:18
8:13
**zero** 63:13
**zone** 101:20
123:18 125:2,3
125:18,25 126:1
126:7 152:20
154:22 155:25
156:12,21 157:4
176:20
**zoom** 1:17 2:1
47:16 48:8

**ztaylor** 2:21

**à**

**à** 38:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.