# EXHIBIT 38

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No.  97834 / July 5, 2023**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21512**

| | |
|---|---|
| **In the Matter of**<br><br>**ANDREW B. BENSON,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), against Andrew B. Benson ("Benson" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## SUMMARY

1.      These proceedings concern Benson's failure to exercise reasonable care in drafting misleading press releases that Co-Diagnostics, Inc. ("Co-Diagnostics") issued on February 6 and 10, 2020 concerning a screening test Co-Diagnostics had developed to detect the novel coronavirus, later named COVID-19 by the World Health Organization.  Specifically, the press releases misleadingly suggested that the test could be used by consumers to detect COVID-19, when in fact, at that time, the test was intended for Research Use Only ("RUO"), which meant it could not be sold for clinical diagnostic purposes.

2.      Co-Diagnostics offered and sold securities to investors after it issued the February 6, and 10, 2020 press releases.

3.      Based on this conduct, and as described in further detail below, Benson violated Sections 17(a)(2) and 17(a)(3) of the Securities Act.  Negligence is sufficient to establish a violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act.  *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980).

## RESPONDENT

4.      **Benson,** age 44, is a resident of Salt Lake City, Utah.  Benson has been Co-Diagnostics's Head of Corporate Communications and Investor Relations since 2014.  Benson is also a co-owner and Managing Partner of a consulting company that provides services relating to public and investor relations.

## OTHER RELEVANT ENTITY AND INDIVIDUAL

5.      **Co-Diagnostics**, a Utah company with its principal executive offices in Salt Lake City, Utah, develops, manufactures, and sells reagents used for diagnostic tests, as well as polymerase chain reaction ("PCR") test kits used for diagnostic and research purposes.  Co-Diagnostics's common stock is registered under Section 12(b) of the Exchange Act and trades on the Nasdaq under the ticker "CODX."

6.      **Dwight H. Egan ("Egan")**, age 69, is a resident of Sandy, Utah.  Egan has been the CEO of Co-Diagnostics, as well as the Chairman of its Board, since 2013.

## FACTS

### Background

7.      Co-Diagnostics's business focuses on the development of molecular tools for the detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications.  Prior to 2020, Co-Diagnostics designed and sold polymerase chain reaction ("PCR") diagnostic tests for diseases and pathogens such as tuberculosis, hepatitis B and C, Malaria, dengue, human papilloma virus, chikungunya, and Zika virus.

2

8.      On July 2, 2019, Co-Diagnostics received a letter from the staff of Nasdaq informing the company that it was in danger of becoming de-listed because its stock had closed below $1.00 for the prior 30 consecutive business days.  Per Nasdaq rules, to remain listed, Co-Diagnostics's stock had to close at or above $1.00 for 10 consecutive business days within the next 180 calendar days, and if it failed to regain compliance within that time Co-Diagnostics could be eligible for an additional 180 calendar day period to regain compliance.

9.      As a result of this notice, Co-Diagnostics increased its public relations efforts in order to inform the public and its customers about the development of its testing products and to maintain its Nasdaq listing.  These efforts included issuing frequent press releases, as well as using third-party consultants, including the firm co-owned by Benson, to disseminate those press releases and other information about the company.

10.     On January 23, 2020, Co-Diagnostics announced that it had completed the principal design work for a PCR screening test for the novel coronavirus, which would later be named COVID-19 ("the Logix Smart Test").  At this time, this version of the Logix Smart Test was intended for research use only, which meant it could not be sold for clinical diagnostic purposes (*i.e.*, to actually diagnose a patient as having COVID-19) without receiving further authorization.

**The February 6 and 10, 2020 Press Releases**

11.     On February 6, 2020, Egan and Benson worked on drafting a press release relating to the Logix Smart Test with the goal of issuing it sometime that day.  Egan ultimately approved the final version of the press release for publication (the "February 6 Release").

12.     As of February 6, 2020, Co-Diagnostics had not received authorization from the Food and Drug Administration ("FDA") or any other regulatory entity to sell or use its Logix Smart Test for diagnostic purposes.  Co-Diagnostics later received approval to sell the Logix Smart Test for diagnostic purposes in the European Union and other places that accepted a CE marking on February 24, 2020, and Emergency Use Authorization from the FDA to sell the test for diagnostic purposes in the United States on April 3, 2020.

13.     Yet, the February 6 Release announced that Co-Diagnostics's "research use only (RUO) CoPrimer Test for the 2019 n-Cov coronavirus [was] ready for sale to appropriate laboratories, hospitals and institutions in need of a solution to the current coronavirus epidemic." The press release further stated that Co-Diagnostics "believe[d] that the test's unique design [would] provide enhanced accuracy when detecting the presence of the coronavirus, including improved specificity over tests designed on a different platform."

14.     Egan was also quoted in the release as stating, "[i]ncreased specificity is one of the hallmarks of tests built using [Co-Diagnostics's] patented CoPrimer platform."

15.     The references to the "specificity" of the Logix Smart Test in the February 6 Release spoke to whether the Company's technology could differentiate COVID-19 from other

3

viruses with similar genetic sequences in a patient (*i.e.*, to correctly identify as negative patients who do not have COVID-19).

16.    On February 6, 2020, Co-Diagnostic's stock closed at $3.08, representing an 18.92% increase over the day prior on a volume of 10,909,200, a 48 % increase from the average daily volume for the prior thirty calendar days.

17.    Co-Diagnostics used similar language to describe the Logix Smart Test in a February 10, 2020 press release (the "February 10 Release"). In the February 10 Release, Co-Diagnostics announced "sales of its screening test designed to identify the presence of the novel coronavirus" and quoted Egan as stating that the company was "pleased to be able to offer a product to this market that excels in being both sensitive and specific, the two benchmarks for accuracy in molecular diagnostics." The February 10 Release further quoted Egan as stating that the company believed it could be "most helpful in this ongoing situation . . . by providing diagnostic solutions that are affordable and accessible in any market in the world" and that the speed with which Co-Diagnostics had designed and commercialized its test was a "compelling proof-of-concept that the Company's unique process and patented technology could quickly and efficiently be applied to address the diagnostic needs associated with other emergencies, including potential mutations of the coronavirus."

18.    Egan and Benson worked on drafting the February 10 Release, which Egan ultimately approved.

19.    On February 10, 2020, Co-Diagnostics stock closed at $3.96, representing a 32% increase over the day prior, on a volume of 28,920,600.

**The FDA Has Concerns About the Statements Made By Co-Diagnostics in the February 6 and 10, 2020 Press Releases**

20.    On February 11, 2020, a representative from the FDA contacted Co-Diagnostics's Head of Regulatory Affairs to inform Co-Diagnostics that the FDA had concerns with, among other things, the above-quoted language in the February 6 and 10 Releases.

21.    With respect to the February 6 Release, the FDA said that the language in question implied that the Logix Smart Test could be used for diagnostic purposes, when it could not, and also impermissibly made claims about the test's performance given it had not yet been approved for diagnostic use. With respect to the February 10 Release, the FDA said that the language in question implied that the Logix Smart Test could be used for screening and diagnostic purposes, when it could not. The FDA requested that Co-Diagnostics take immediate action to resolve these issues and provide to the FDA a list of proposed corrective actions by February 14, 2020.

22.    Three days later, on February 14, 2020, Co-Diagnostics sent the FDA a corrective and preventive action plan, signed by Benson and Co-Diagnostics's then-Head of Regulatory Affairs which required the then-Head of Regulatory Affairs, to review press releases relating to the Logix Smart Test going forward to ensure better accuracy.

23.     The FDA again contacted Co-Diagnostics on February 26, 2020 with remaining concerns regarding the February 6 and 10 Releases, which were still accessible on Co-Diagnostics's website.  In response, on or around February 28, 2020, Co-Diagnostics added a legend to the releases clarifying that the test was (1) for research use only and not intended for use in diagnostic procedures; and (2) not available for sale in the U.S.  Thereafter, the February 6 and 10 Releases remained on Co-Diagnostics's website with the addition of this language.

24.     Prior to the addition of the clarifying legend, the February 6 and 10 Releases were materially misleading because they implied that the Logix Smart Test was able to be sold and used to diagnose COVID-19 with accuracy when it had not yet received the appropriate regulatory approval to be utilized in this manner either in the United States or abroad.

25.     A reasonable investor would have found the statements in the February 6 and 10 Releases about the purported ability of the Logix Smart Test to be shipped to "laboratories, hospitals and institutions in need of a solution to the current coronavirus epidemic" to be material, especially because these statements were made in the early stages of the pandemic when COVID-19 testing was scarce.

**Co-Diagnostics Offers and Sells Securities**

26.     On or around February 13, 2020, Co-Diagnostics offered and sold 3,324,676 shares of the Company's common stock at a purchase price of $3.08 per share in a registered direct public offering, for gross proceeds of approximately $10.2 million.  At the time of the offer and sale, Co-Diagnostics had neither retracted nor modified the materially misleading statements contained in the February 6 or 10 Releases.

**Violations**

27.     As a result of the conduct described above, Benson violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, which prohibit any person in the offer or sale of securities from obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and from engaging in any practice or course of business which operates or would operate as a fraud or deceit upon the purchaser in the offer or sale of securities, respectively.

**IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent Benson's Offer.

Accordingly, it is hereby ORDERED that**:**

A.        Pursuant to Section 8A of the Securities Act, Respondent Benson cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act.

B.        Respondent shall, within 30 days of the entry of this Order, pay a civil money penalty in the amount of $40,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Payment must be made in one of the following ways:

   (1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

   (2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

   (3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Benson as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Steven G. Rawlings, Assistant Regional Director, Division of Enforcement, New York Regional Office, Securities and Exchange Commission, 100 Pearl St., Suite 20-100, New York, NY 10004-2616.

C.        Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a

private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary