D. Loren Washburn (#10993)
WASHBURN LAW GROUP
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-9660
loren@washburnlawgroup.com

Michael A. Pineiro (*pro hac vice*)
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4268
mpineiro@mnrlawfirm.com

*Attorneys for Gelt Trading, Ltd. and the Class*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>    Plaintiff,<br><br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, | **CLASS PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT DR. STEPHEN BUSTIN**<br><br>Case No. 2:20-cv-00368-JNP-DBP |

Class Plaintiff Gelt Trading, Ltd. ("Gelt" or "Class Plaintiff"), pursuant to Federal Rules of Evidence 702 and 403 and *Daubert v. Merrell Dow Pharms*, hereby moves this Court to exclude portions of the proposed testimony of the Defendants' expert witness Dr. Stephen Bustin.

## **INTRODUCTION**

On the heels of a negative article about the accuracy of its Covid-19 tests, the Defendant Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company") issued a press release on May 1, 2020 that misled investors that its Covid-19 test (the Logix Smart test) had achieved 100% sensitivity and specificity in all prior evaluations and that it was 100% accurate. However, that press release (the "May 1 Press Release") was fraudulent and misleading because the Company's test had previously demonstrated very poor performance (well below 100% accuracy) in evaluations in India, South Africa, and Greece. Investors lost millions as a result of that misrepresentation.

In order to proffer an unsupported *post hoc* justification for the fraudulent May 1 Press Release, the Defendants submit the proposed expert testimony of Dr. Stephen Bustin, an expert in PCR testing. Relying solely on a few emails selected by Defendants' counsel, without conducting any investigation or speaking to Company employees or anyone else about the failed evaluations, and without applying any methodology and scientific process, Dr. Bustin offers up conclusory opinions that the poor evaluations and failed results were "likely" caused by contamination and, thus, were properly excluded from the May 1 Press Release. This opinion is the very type of unreliable speculation—based solely on intuition—that must be excluded under *Daubert*. The opinion is also irrelevant because the Company's executives who prepared the May 1 Press Release did not testify that they decided to omit these failed results because they believed they were caused by contamination. Expert testimony cannot be offered to create *post hoc* justifications not supported

2

by the record. For these reasons, this portion of Dr. Bustin's testimony should be excluded.

## BACKGROUND

### A. Defendants Proffer Dr. Bustin to Rebut Allegations Regarding the Fraudulent Misleading May 1 Press Release

The Class Plaintiff alleges that Co-Diagnostics' May 1 Press Release contained misrepresentations because: *first*, it explicitly misstates that all prior validation studies on the Logix Smart Test demonstrated 100% sensitivity and specificity, when in fact there is undisputed evidence that prior to the press release the Logix smart test had failed validation studies performed in India by the National Institute of Virology (NIV), in South Africa, and in Greece; and *second*, it created the misleading impression that the Logix Smart had always achieved 100% accuracy in testing and that it was 100% accurate, when that was not the case.

To rebut these central allegations, the Defendants seek to proffer the testimony of Dr. Stephen Bustin, a purported expert in PCR testing, who opines that the "May 1 Press Release was supported by the data available to the Company at the time, and that the Logix Smart Test is an excellent diagnostic…[Covid-19] test." *See* **Ex, A**, December 1, 2023 Expert Report of Dr. Bustin at 1. In relevant part, Dr. Bustin opines that the Company's failed results in validation studies from the Indian NIV, in South Africa, and Greece "were based on flawed, incomplete, or irrelevant data, and were legitimately excluded from the May 1 Press Release" (*id*. at 36-40). In other words, he says that the May 1 Press Release was accurate—despite these prior failed validation results— because those failed results were properly disregarded by the Company.

### B. Dr. Bustin's Failure to Investigate the Facts Underlying His Opinions

Despite offering opinions that go to the crux of this case—whether the Defendants' May 1 Press Release properly considered and disclosed the testing data available at the time—Dr. Bustin

performed little to no independent investigation of the facts underlying his conclusions. Indeed, as is evident from his deposition testimony, Dr. Bustin's opinions are based almost exclusively on biased, cherry-picked materials and information provided by Defendants' counsel—which excluded key documents and deposition transcripts that would undercut his theories.

At the outset of his engagement, Defendants' counsel provided Dr. Bustin with a list of documents. Dr. Bustin asked only for raw data on the validation reports listed in the May 1 Press Release; other than that, he relied exclusively on the documents selected by Defendants' counsel.

> Q. At the outset of your engagement, did you ask for a list of materials from counsel?
> A. Asked for a list of materials. No, I was -- I was -- I was given -- I was sent or I downloaded these documents. Yeah, I wouldn't have known what to ask for.
> Q. So counsel selected these materials?
> A. I presume so. That's what I was sent, so someone selected them. I do not know who selected them.
> Q. Besides asking for raw data [from the Australia validation results], is there any other information or materials that you asked for?
> A. I don't think so.

*See* **Ex. B**, Deposition Transcript of Dr. Bustin ("Bustin Dep.") at 48-49. Notably, the only deposition transcript that Dr. Bustin reviewed in preparing his report was that of Dr. Satterfield; in preparing his report he was not provided access to and did not review the transcripts of the depositions of Rebecca Garcia and Chad Apuli—Co-Diagnostics' employees who worked in the Company's lab and who were centrally involved in dealing with validation results regarding the Logix test. *Id*. at 50:8:51-9. In fact, even though Dr.. Garcia wrote the validation reports that Dr. Bustin reviewed and relied upon as part of his report, he did not for a copy of her deposition transcript. *Id*. 53:6-56:8.

Worse, Dr. Bustin did not speak with anyone at the Company or other third-party witnesses—not even to discuss issues highly pertinent to his opinions such as the validation reports attached to the May 1 Press Release or the failed results from the Indian NIV, South Africa, and Greece.

> Q. Did you speak to anybody at Co-Diagnostics?
> A. No.
> Q. Did you request to speak to anybody at Co-Diagnostics?
> A. No.
> Q. Did you speak to any former employees of Co-Diagnostics?
> A. I don't -- I don't know anyone at Co-Diagnostics.
> A. No.
> Q. Did you ask counsel to set up meetings with former employees?
> A. No.
> Q. Did you ask counsel to set up meetings between you and any other third parties in preparing this report?
> A. No. Why would I have done that?

*Id.* at 57:23-58:21.

Moreover, despite opining that the Logix Smart Test is an "excellent test," Dr. Bustin did not conduct his own analysis or validation study on the test. *Id.* at 61:6-62:2. Instead, he relied on the validation studies and reports that Co-Diagnostics attached to the May 1 Press Release. In reaching this conclusion regarding the Logix test, Dr. Bustin also did not investigate any of the numerous customer complaints registered on the Company's QT9 database, *see* Plaintiffs' MSJ at ¶ 15, nor review any internal data from the Company that post-dated the May 1 Press Release.

## ARGUMENT

### I.    Legal Standard for Exclusion of Expert Testimony

Under Rule 702, the court serves as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This gatekeeping obligation requires a two-part inquiry. *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir. 2005). "A district court must first determine if the expert's proffered testimony has a reliable basis in the knowledge and experience of his or her discipline." *Id.* (cleaned up). Second, the court must determine whether the expert testimony is relevant, i.e., the testimony "logically advances a material aspect of the case." *Norris*, 397 F.3d at

884 n.2. "[T]he court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *Graystone Funding Co., LLC v. Network Funding, L.P.*, 598 F. Supp. 3d 1228, 1234 (D. Utah 2022) (Parrish, J.) (quoting *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009)).

> To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which implies a grounding in the methods and procedures of science based on actual knowledge, ***not subjective belief or unsupported speculation***. In other words, an inference or assertion must be derived by the scientific method and must be supported by appropriate validation—*i.e.* good grounds, based on what is known.

*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (cleaned up) (emphasis added).

To assess reliability, there are four nonexclusive factors that the Court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. *Id*. (citing *Daubert,* 509 U.S. at 593–94). The proponent of the expert testimony bears the burden of showing that it is admissible. *Ronwin v. Bayer Corp*., 332 F. App'x 508, 511 (10th Cir. 2009).

While the Court should focus on the expert's methodology, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Cotter*, 328 F.3d at 1223 (quotes, cites omitted). "It is critical that the district court determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* (cleaned up). Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes

the practice of an expert in the relevant field." *Id.*

## II.     Dr. Bustin's Proposed Expert Testimony Regarding the Exclusion of the Unfavorable Test Results in the May 1 Press Release Be Excluded as Unreliable

As noted, Dr. Bustin opines that the failed results for the validation tests conducted by the Indian NIV, in South Africa, and in Greece "were legitimately excluded from the May 1 Press Release" because it is his opinion that these "results reflected flawed, incomplete, or irrelevant data, likely due to contamination." *See* **Ex.** A at 36. This speculative testimony—reached exclusively based upon reviewing emails produced in this case and without applying any scientific or other methodology—is the quintessential example of unreliable expert testimony. It should be excluded.

### The Indian NIV Results

In opining that the Indian NIV results—where the Logix test showed only 88% specificity—were "likely" based on contamination and were properly not referenced or omitted from the May 1 Press Release, Dr. Bustin reviewed three email chains produced in the case and the April 2, 2020 NIV results. *See* **Ex. A** at 36-37. He did not review the underlying data. He did not speak with anyone from the Company about these emails to verify or discuss their content. *See* **Ex. B** at 235:17-23. That includes Dr. Garcia, who at the time was the Company's vice present of products development and who was dealing with the NIV results. Dr. Garcia stated that she did not believe it was contamination. *See* **Ex. 12** (April 2, 2020 email)[1] (Garcia: "Even though you guys say it was contamination, my interpretation was different"). And he did not speak with anyone at the NIV, even though it appears that they "tested for contamination" after the failed results and "it was not present" and that there was a "list of specific types of virus that are cross reacting with [the Logix] test. *See* **Ex. 11** (April 11,

---

[1] Citations to numerical exhibits are references to the exhibits appended to Plaintiff's Motion for Partial Summary Judgment filed contemporaneously with this Motion.

2020 email).

Instead, based merely on his "interpretation" of the emails, Dr. Bustin speculates that "[c]ontamination with the test-specific PCR amplicon would cause such a result, since that amplicon would not be detected by other tests." **Ex. A** at 38. Dr. Bustin provides no support—and nothing resembling a methodology or process—in arriving at this bare conclusion. Dr. Bustin further speculates that "the lower specificity reported in the NIV results was due to contamination" given that the same test achieved 100% concordance in an evaluation by a "different Indian lab." *Id.*

## The South African Results

Dr. Bustin's approach to the failed South African results is even worse. The South African results showed that the Logix test was missing Covid-19 positive patients, demonstrating only 58% sensitivity and "creating concerns" that the test "will miss[]…very early and later stages of infection," as noted in the April 30 SLT Article. **Ex. 14** ( April 18, 2020 email). In categorically excluding consideration of these results, Dr. Bustin merely reviewed the one single email where the Company was informed of the results. *Id*; *see also* **Ex. A** at 38. In wholly conclusory fashion, Dr. Bustin states that this information is "useless" because the email does not provide "any information about what was done" in the validation study. **Ex. A** at 38. Of course, Dr. Bustin did not investigate this result on his own; he merely relied upon the documents provided by counsel. Dr. Bustin further states that "the fact this result was so far outside of the test's established confidence interval" that it is "highly unlikely to be a true measure of the test's performance." *Id*. In short, because this result did not comport with the validation reports attached to the May 1 Press Release, Dr. Bustin—with no support or methodology—purports to claim the result should be disregarded.

**The Greece Results**

Dr. Bustin did the same with the failed Greece results. The Greece evaluations results showed that the Logix test was "riddled with false positive results"—meaning that its specificity was well below 100%. *See* **Ex. 15** (April 24, 2020 email). In speculating that contamination was the cause of these poor results, Dr. Bustin again bases his conclusion on the review of just the single email where the failed Greece validation results were discussed. *See* **Ex. A** at 38. Like with the South Africa results, Dr. Bustin notes that there is "additional" information that is needed to evaluate these results and that, without that information, "it is impossible to comment" on these results. *Id.* at 39.  It follows, according to Dr. Bustin, that without this additional information, he must conclude—again, with no actual scientific process or methodology—that "contamination introduced shipping the kit and it being used in Greece is the obvious cause for these results." *Id.*

***

Dr. Bustin's opinions regarding these failed tests—and the proper exclusion of these results from the May 1 Press Release—is plainly unreliable. Where, as here, an expert purports to reach conclusions devoid of any scientific process or methodology, based entirely on hand-selected documents provided by counsel (which the expert fails to scrutinize through any type of further investigation), and without conducting any independent analysis or investigation, the Court must exclude expert testimony. *See Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 301 (D.D.C. 2018) (excluding expert who "appears to have uncritically relied on documents supplied to him by plaintiffs' counsel, cited to those pieces of evidence that supported his theories, and concluded that this selective evidence" supports his theories); *Chesapeake Climate Action Network v. Exp.–Imp. Bank of the United States*, 78 F. Supp. 3d 208, 219 (D.D.C. 2015) (expert excluded where he failed

9

to identify any "principles or methodology" used to arrive at his opinions, but rather "note[d] only that he reviewed certain documents and reached a series of conclusions"); *Obrycka v. City of Chicago*, 792 F.Supp.2d 1013, 1025 (N.D. Ill. 2011) (excluding expert who "did not conduct any independent research" to prepare his report and who failed to "investigate[ ] the veracity of the materials Plaintiff's counsel provided to him, or request[ ] additional materials from Plaintiff's counsel to further inform his opinion"); *Booth v. Black & Decker,* 166 F.Supp.2d 215, 216-17 (E.D. Pa. 2001) (excluding expert who "offered no methodology at all for his design defect theory," "performed no tests of his own to determine whether his hypotheses were indeed true" and whose testimony " seemed wholly based on his own training and experience," with "no objective anchor for his conclusions.").

There is no dispute that Dr. Bustin's testimony fails to provide any underlying reasoning or methodology, as required by *Daubert*. There is simply no "appropriate validation" or "good grounds" for his opinions that these failed results were due to contamination. *See Cotter*, 328 F.3d at 1222. Dr. Bustin's opinions fail to satisfy any of the *Dauber*t factors—they are not susceptible to testing; they are not subject to peer review; and there is no methodology or scientific standards that were applied. Rather, Dr. Bustin offers speculation based on inferences drawn exclusively from his training and experience—the very type of *ipse dixit* expert testimony that prohibited by *Daubert*. To be sure, Dr. Bustin's opinion on this matter is the very type of "unscientific speculation offered by a genuine scientist" that the Court must exclude as part of its gatekeeping role. *See Cotter*, 328 F.3d at 1223

Further, his testimony that the Company could disregard the South Africa and Greece results because there was not sufficient information about those validation tests is conclusory and, again, unmoored to any scientific principle or methodology. Dr. Bustin offers no support for why the

Company properly disregarded these failed results when announcing its test was showing 100% accuracy in all prior validation tests. This testimony is unreliable and it will not help the jury.

In sum, there is simply nothing reliable about this testimony, which completely lacks in the type of intellectual rigor required under *Daubert*. The Court should exclude this testimony.

### III.  Dr. Bustin's Proffered Testimony is an Irrelevant Post-Hoc Rationale for Fraud

Further, not only is Dr. Bustin's testimony unreliable but it is irrelevant. As noted, expert testimony must "logically advance[] a material aspect of the case." *Norris*, 397 F.3d at 884 n.2. Dr. Bustin's testimony that the Defendants properly disregarded the failed tests is irrelevant because there is no evidence that the Defendants actually did what Dr. Bustin suggests—*i.e.*, that they actually decided omit any reference to the failed tests in the May 1 Press Release based on their belief that those failed evaluations stemmed from contamination or were unreliable. To be sure, none of the Company's executives testified consistent with Dr. Bustin's proffered opinion.

- Dwight Egan (Company CEO) testified that was not made aware of the failed South Africa results. **Ex. 2** (Egan Dep.) at 312-313.

- Satterfield (then Company chief science officer) testified that he does not recall receiving the failed South Africa results; he "didn't know" whether "anybody made a decision" on whether to include the South Africa failed test data in the May 1 Press Release; and that he "cannot speculate…as to why [Dwight Egan]…or whoever wrote this would have omitted that information." **Ex. 1** (Satterfield Dep.) at 175:9-178:22.

- Andrew Benson (Company head of investor relations) testified that the only validation data he was aware of was that linked to the May 1 Press Release and that, in preparing the May 1 Press Release, he did not ask if there was any validation data that did not show 100% sensitivity and specificity as stated in the press release. **Ex. 3** (A. Benson Dep.) at 171:24-172:19.

As a result, Dr. Bustin's testimony is irrelevant; he is attempting to provide a *post hoc* justification for the Defendants' omission of the failed results in the May 1 Press Release that is not consistent with their testimony and the record evidence. *Fluor Corp. v. Zurich Am. Ins. Co.*, 2021 WL 3021973,

at \*15 (E.D. Mo. July 16, 2021) (excluding expert whose testimony offered "post hoc…rationales" because it was "not only unhelpful but may serve to confuse the jury"); *Wanner v. State of Kan., Dep't of Admin.*, 1991 WL 151050, at \*1-\*2 (D. Kan. July 5, 1991) (excluding expert in age discrimination suit who intended to offer an "after-the-fact" justification about why plaintiffs were terminated because expert's post hoc justification for firing was untethered to record evidence and would only serve to "confuse the issues.").

DATED: April 10, 2024

**WASHBURN LAW GROUP**

/s/ D. Loren Washburn
D. Loren Washburn (#10993)
loren@washburnlawgroup.com
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-9660
loren@washburnlawgroup.com

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**

Michael A. Pineiro
Florida Bar No. 041897
mpineiro@mnrlawfirm.com
Brandon S. Floch
bfloch@mnrlawfirm.com
Florida Bar No. 125218

2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131
Telephone: (305) 400-4260
Facsimile: (866) 780-8355

*Attorneys for Gelt Trading, Ltd. and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 10, 2024 a copy of the foregoing was filed on the CM/ECF system and delivered to all parties of record.

/s/ D. Loren Washburn
D. Loren Washburn