Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
**BAKER HOSTETLER, LLP**
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO CLASS PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT DR. STEPHEN BUSTIN**<br><br>Case No. 2:20-cv-00368-JNP-DBP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead<br><br>**ORAL ARGUMENT REQUESTED** |

## I.     INTRODUCTION AND RELIEF REQUESTED

Plaintiff does not, and cannot, challenge Dr. Bustin's qualifications—after all, he is unquestionably a world-renowned expert in the field of PCR diagnostic testing. *See Snyder v. Sec'y of Dep't of Health &* Hum. Servs., 2009 WL 332044, at \*21 (Fed. Cl. Feb. 12, 2009) ("Bustin was one of the most highly qualified and credible expert witnesses I have ever encountered."). Rather than seek to exclude Dr. Bustin's expert testimony in its entirety, Plaintiff focuses on just one of his many opinions—that the lower-than-expected performance data from certain labs in India (the National Institute of Virology; "NIV"), South Africa, and Greece were caused by contamination or other non-test factors and thus properly omitted from the May 1 PR—and asserts that this particular opinion should be excluded because it is unreliable and irrelevant. Plaintiff is wrong.

**First**,  while Plaintiff asserts that this opinion should be excluded merely because Dr. Bustin relied on evidence selected by counsel, this is not a valid basis to exclude an expert's opinion. An expert is not required to review all evidence to satisfy *Daubert*. Nor is he expected to interview witnesses that possibly have information about the evidence upon which he relied. Because the facts and data Dr. Bustin considered were sufficient for him to form a well-supported scientific opinion as to the likely causes of the NIV, South African, and Greek data, his opinion is admissible.

**Second**, Dr. Bustin's opinion is a classic example of an expert reviewing the evidence, applying well-established principles for validating PCR diagnostic tests, grounded in his extensive and specialized knowledge and experience in the relevant field, and rendering an opinion. As the Tenth Circuit has stated: "That is exactly how an expert is supposed to operate." *Kechi Twp. v. Freightliner, LLC*, 592 F. App'x 657, 669 (10th Cir. 2014).

**Third**, Plaintiff's rationale for excluding Dr. Bustin's opinion on relevancy grounds cannot

1

be squared with its central argument as to why the May 1 PR allegedly was fraudulently misleading. On the one hand, Plaintiff argues that Defendants intentionally misled investors in the May 1 PR by improperly excluding the NIV, South African, and Greek results; on the other hand, Plaintiff asserts that Dr. Bustin's opinion that those results were legitimately excluded is irrelevant because "there is no evidence that the Defendants actually did what Dr. Bustin suggests—*i.e.*, that they actually decided [*sic*] omit any reference to the failed tests . . . based on their belief that those failed evaluations stemmed from contamination or were unreliable." Mot. 11. But Dr. Bustin does not opine as to what any Co-Diagnostics' senior leader knew or intended—he merely opines that it is a standard, accepted, and appropriate practice to exclude flawed data, including data due to likely contamination, when reporting performance results. Contamination is a corollary of the extreme sensitivity of the PCR reaction and is commonly caused by mistakes within an individual lab. Data that are compromised by contamination do not accurately represents a test's performance, and reporting such data along with credible results would lead to confusion. Dr. Bustin's opinion in this regard is directly relevant to both the falsity and scienter analyses in this case.

The Court should deny Plaintiff's motion.

## II.    UNDISPUTED EVIDENCE

When the COVID-19 pandemic emerged in early-2020, there was an urgent need for labs around the world to implement COVID-19 diagnostic tests. But prior to implementing a test, a lab must confirm that the test performs as expected in its specific environment. Dkt. 169-6, Bard Rep. 8-11. When evaluating a PCR diagnostic test, it is essential to differentiate between issues arising from the test itself and those stemming from external factors. One problem that labs routinely face in attempting to validate a test's performance is contamination. Dkt. 169-13, Satterfield Dep.

130:20-21 ("Contamination [is] part of the PCR process."). During COVID, contamination was especially problematic for labs lacking experience with high-complexity tests, like the Logix test. Dkt. 169-6, Bard Rep. 11-12 (explaining same).

Contamination, however, makes it impossible to accurately evaluate a test's performance because, plainly put, contamination leads to "screwy results." Dkt. 169-11, Bustin Dep. 216:9. When contamination is present, data generated by the lab tends to be highly skewed and deviate considerably from the expected range of results. Dkt. 169-13, Satterfield Dep. 127:1-3 ("[The] confidence interval tells you that there is no way that that data that they're reporting is accurate."). In these situations, the issue in the lab must be resolved before it can properly validate the test.

Thus there is a difference between troubleshooting issues during the validation process (such as contamination) and completing a full validation necessary to implement the test. Dkt. 169-6, Bard Rep. 10-11 ("Labs typically work with the manufacturer to try to identify and correct any non-test causes of the reduced performance."). Once resolved, labs exclude any data compromised by contamination or other non-test issues when determining whether the PCR test passes muster, because those data are not accurate indicators of the test's performance. Dkt. 169-13, Satterfield Dep. 204:1-3 ("[Excluding] runs from labs . . . that have contamination, that's not considered cherry-picking.").

## III.    DR. BUSTIN'S OPINION IS RELIABLE

Dr. Bustin opines that "the NIV, South Africa, and Greece results reflected flawed, incomplete, or irrelevant data, likely due to contamination, and that it was scientifically justified to exclude them from the May 1 Press Release." Dkt. 169-5, Bustin Rep. 36. Plaintiff argues that Dr. Bustin's opinion in this regard should be excluded because it is "exclusively based upon

3

reviewing emails produced in this case and without applying any scientific or other methodology." Mot. 7. Plaintiff's position is contrary to the law and facts of this case.

### A. Dr. Bustin's Opinion Is Based On Sufficient Facts And Data.

Plaintiff asserts that Dr. Bustin's opinion is unreliable because it is based on "biased, cherry-picked materials and information provided by Defendants' counsel—which excluded key documents and deposition transcripts that would undercut his theories." Mot. 4. As an initial matter, Defendants' counsel did not "cherry-pick" evidence; rather, counsel provided Dr. Bustin with a compilation of the documents produced in this case that most directly related to the NIV, South African, and Greek evaluations. But in any case, the fact that an expert relies upon evidence provided by counsel is not a basis for exclusion. *See* FRE 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *see also Turck v. Baker Petrolite Corp.*, 10 F. App'x 756, 766 (10th Cir. 2001) (holding opinion reliable where expert relied on data provided by a party to the litigation).

Further, unlike the cases relied upon by Plaintiff, nothing about the evidence provided to Dr. Bustin is inherently unreliable. Defendants' counsel did not summarize deposition transcripts or other evidence for Dr. Bustin's review. *See, e.g., Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 299-304 (D.D.C. 2018) (excluding expert because he relied on deposition summaries prepared by counsel); *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011) (excluding expert when he relied solely on outlines and summaries prepared by counsel).

Plaintiff's complaint that Dr. Bustin did not review every deposition transcript or interview all individuals that could possibly provide additional information rings equally as hollow. Plaintiff does not cite to (nor could Defendants locate) any authority holding that an expert is required to

review deposition transcripts or interview sources of potential information in order to satisfy the *Daubert* test. Indeed, caselaw holds the opposite. *Kechi Twp.*, 592 F. App'x at 669 (expert's "failure to speak with the two employees [present at the location where the fire started] did not render his opinion unreliable"); *Stryker Spine v. Biedermann Motech GmbH*, 684 F. Supp. 2d 68, 101 (D.D.C. 2010) (failure to review "several relevant materials" did not render expert's opinion unreliable).

Regardless, the only "key" evidence that Plaintiff asserts Dr. Bustin did not review, but should have, is the deposition testimony of Dr. Rebecca Garcia and Chad Apuli, former and current Co-Diagnostic employees. But Dr. Garcia's and Mr. Apuli's testimony do not undercut Dr. Bustin's opinion. *See* Ex. 1, Garcia Dep. 120:19-127:3 (explaining why NIV results did not reflect the Logix test's true performance); Dkt. 169-22, Apuli Dep. 82:10-12 ("[I]f I recall correctly, the issue was that they had contamination. . . ."). Dr. Bustin also confirmed at deposition that reviewing Dr. Garcia's testimony would not have impacted his opinion—likely because he reviewed documents setting forth the same information discussed in her deposition. Dkt. 169-11, Bustin Dep. 52:19-22 ("Q Does Rebecca Garcia's transcript in any way, shape or form impact your opinion or findings in this case? A Not at all. No."); *see also* Dkt. 169-5, Bustin Rep. 37 (citing emails in which Dr. Garcia sets forth possible explanations for the NIV's faulty results).

The evidence Dr. Bustin reviewed was reliable and sufficient for him to conclude that the NIV, South African, and Greek results were likely due to contamination and thus his opinion should not be excluded merely because he did not review every deposition transcript available in this case.

### B. Dr. Bustin's Opinion Is Based On His Experience In PCR Testing And Supported By Sound Scientific Principles.

Plaintiff also asserts that Dr. Bustin's opinion regarding the NIV, South African, and Greek results is not based on scientific reasoning or methodology and thus is unreliable. Mot. 9-10. "To

be reliable under Daubert, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Turner v. Phillips 66 Co.*, 791 F. App'x 699, 706 (10th Cir. 2019) (citations omitted). Further, "[d]rawing upon one's education background and practical experience is a reliable methodology through which to develop opinions and reach conclusions about scientific, technical, or other areas of specialized knowledge." *Zerega Ave. Realty Corp. v. Hanover Ins. Co.*, 2006 WL 1343643 (S.D.N.Y. May 17, 2006); *Stratton v. Thompson/Ctr. Arms, Inc.*, 601 F. Supp. 3d 1139, 1154 (D. Utah 2022) ("The Tenth Circuit has noted that observation based on experience and technical knowledge, although . . . not susceptible to testing or peer review, can be considered reliable if standard in a field."). Accordingly, Plaintiff's argument that Dr. Bustin's opinion should be disregarded because he reviewed the evidence, applied scientific principles grounded in his specialized knowledge and experience in the field, and rendered an expert opinion, is a strange proposition and not supported by the law.

The Tenth Circuit's holding in *Turner* is instructive. The *Turner* court refused to exclude an expert's opinion that he did not believe (among other things) that over-the-counter medications would lead to a false positive result in a standard drug screening. 791 F. App'x at 707. The expert based his opinion on his review of evidence produced in the case, including a list of the plaintiff's medications and results from the drug test. *Id.* The court held that the opinion was not based on speculation but "actual knowledge" because it was informed by the expert's "thirty-four (34) years of experience" and "his review of various documents." *Id.*

Dr. Bustin's opinion is no different. For example, in opining that the NIV results were skewed by contamination, Dr. Bustin reviewed evidence showing the following:

- On April 2, 2020, an initial evaluation performed by the NIV lab suggested much lower-than-expected performance characteristics for the Saragene test[1]—indicating specificity of 88%, or 12% false positive results.

- Subsequently, the NIV lab attempted to troubleshoot the issue with Co-Diagnostics and tested additional samples, including some samples from early-2019, before the pandemic.

- On April 24, 2020, the Logix/Saragene test was re-tested by a different Indian Council for Medical Research ("ICMR") lab (the National Institute of Pathology; "NIP"), using samples provided by NIV and the same reference test used by NIV. The NIP evaluation showed 100% sensitivity and 100% specificity.

Dkt. 169-5, Bustin Rep. 37-38. Dr. Bustin explained that this is "definitive evidence" of contamination because (among other reasons) pre-COVID samples cannot not be positive for COVID. *See*, *e.g.*, Dkt. 169-11, Bustin Dep. 252:5-10. A conclusion further strengthened by evidence that the NIP evaluation, using the same samples used in the NIV evaluation, showed 100% concordance with the same reference test used by the NIV:

> [I]f you do the same tests in two different laboratories, as I told you earlier on, and one gives you false positives and the other one doesn't, then you know that the false positive test must have been contaminated.

Dkt. 169-11, Bustin Dep. 254:3-12.

There is no dispute that the scientific reasoning employed by Dr. Bustin is standard in the field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (considering whether others in the industry use the same scientific reasoning to determine reliability of expert opinion). Indeed, Dr. Satterfield, Co-Diagnostics' former Chief Scientific Officer, reviewed the same evidence, applied the same scientific principles, and reached the same conclusion:

> [T]he ICMR also, to their credit, they went back and they tried to troubleshoot. And so they pulled out samples from 2019 that should not have had COVID. . . and yet they're still finding positives. The only explanation for that -- especially if run at this lab they show positive and run at this other lab down the street there's no

---

[1] The Saragene test is identical to the Logix test, but is manufactured and rebranded "Saragene."

positives, the only explanation that I know of for that is contamination.

Dkt. 169-13, Satterfield Dep. 128:4-14.

Similarly, Dr. Bustin concluded that the data provided by the South African lab also showed contamination based on his review of the data and application of sound scientific reasoning. Dr. Bustin explained that a wealth of data showed that the Logix test had routinely and accurately detected positive samples past a Cq of 33, but the South African lab claimed that the Logix test missed true positives above this threshold. Dkt. 169-5, Bustin Rep. 38-39; Dkt. 169-11, Bustin Dep. 280:7-281:17. Dr. Bustin's testified that—applying standard scientific reasoning, accepted and used by other experts in the PCR diagnostic testing industry and informed by his thirty-eight years of experience and extensive training in the field—this demonstrated that the South African results were due to contamination. *Id.*; *see also* Dkt. 169-13, Satterfield Dep. 304:5-15 ("Had I been aware of that information, it would not have bothered me . . . because it's outside of the confidence interval to such a degree as to alert us that something is going wrong in that process."); Dkt. 169-6, Bard Rep. 10 ("[W]hen a test shows significantly lower-than-expected sensitivity or specificity in the []validation process—i.e., outside of the statistical confidence intervals ('CI') for those measures provided by the manufacturer—then it is standard practice to assume that something went wrong with respect to the implementation of the testing protocol.").

Finally, Dr. Bustin's opinion regarding the Greek results is also based on his review of the evidence and application of scientific principles. Based on his review of email correspondence between a Greek distributor and a Co-Diagnostics' sales representative concerning one batch of Logix tests, Dr. Bustin reached two conclusions: (1) the batch of tests at issue (Lot 179) was contaminated because tests from that particular batch were showing false positives, while tests from

a different batch (Lot 219) were not; and (2) the contamination occurred after it left Co-Diagnostics' facilities because an aliquot from Lot 179 that never left Co-Diagnostics' facilities preformed as expected upon retesting. Dkt. 169-5, Bustin Rep. 39; *see also* Dkt. 169-38 at 5 (email referring to issues in Greek lab as "an isolated event"). Here too, Dr. Bustin's conclusions are moored to the facts and supported by scientific reasoning accepted by other experts. *See* Dkt. 169-13, Satterfield Dep. 218:5-10 ("Based off of the data that Cameron presented, it's most likely that the customer contaminated the test because if there is no contamination in the original manufactured batch, then it -- it shows that we didn't manufacture it incorrectly.").

In short, Dr. Bustin's opinion that the NIV, South African, and Greek results were due to contamination or other non-test factors is a product of his evaluation of the data using standard scientific approaches and application of his extensive experience in PCR diagnostic testing to the same. Dkt. 169-11, Bustin Dep. 227:9-10 ("[My opinion] is based on the best practice for qPCR experiments."); *see also* Dkt. 169-5, Bustin Rep. 2-4 (setting forth qualifications). Accordingly, this opinion is reliable and should not be excluded.

## IV.    DR. BUSTIN'S OPINION IS RELEVANT

Plaintiff argues that Dr. Bustin's testimony that the NIV, South African, and Greek results were properly excluded from the May 1 PR is irrelevant because "there is no evidence that the Defendants . . . actually decided [*sic*] omit any reference to the failed tests in the May 1 [PR] based on their belief that those failed evaluations stemmed from contamination or were unreliable." Mot. 11. This argument fails for many reasons.

As an initial matter, it is undisputed that Dr. Satterfield was in fact aware of the issues encountered by the NIV and Greek labs and concluded that contamination was likely to blame. *See*

9

Dkt. 169-13, Satterfield Dep. 128:20-129:14 (re NIV: "[T]he only explanation that I know of for that is contamination."); at 218:3-19, 221:3-9, 301:9-302:5 (similar re Greek data). Indeed, despite Plaintiff's attempt to twist the evidence, Dr. Garcia also appears to have reached that conclusion. Dkt. 169-32 at 5 (re NIV: "It is possible that our reagents have acquired contamination from their lab and by the third test all are positive with contamination as it became homogenized."). And while Dr. Satterfield was not copied on the emails with the South African lab, he agrees that the correspondence reflects that Co-Diagnostics employees were trying to troubleshoot suspicious-looking performance data (due to contamination) and did not understand that data to be final, credible validation results. *See* Dkt. 171-13; Dkt. 171-14. Dr. Bustin's opinion shores up this evidence of good faith.

In any case, Dr. Bustin's opinion that it was "scientifically justified" to exclude the NIV, South African, and Greek results from the May 1 PR is relevant not only to scienter, but also to the element of falsity. If it was proper, from a scientific perspective, to exclude those results because they were due to non-test factors and did not accurately reflect the Logix test's performance, then their omission cannot have rendered the May 1 PR misleading. Indeed, Dr. Bustin opines that the exclusion of the NIV, South African, and Greek results from the May 1 PR was not just appropriate but also necessary, because they were "not indicative of the test's actual performance." Dkt. 169-5, Bustin Rep. 36, 52. This opinion is relevant to Plaintiff's argument that Defendants cherry-picked the validations included in the May 1 PR and is helpful in resolving the ultimate issue of whether the May 1 PR fairly represented the Logix test's performance.

## V.   CONCLUSION

For all of these reasons, the Court should deny Plaintiff's motion.

Dated: May 22, 2024                                    **BAKER & HOSTETLER LLP**


By:     */s/ Douglas W. Greene*
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of May, 2024, a copy of the foregoing DEFENDANTS' OPPOSITION TO CLASS PLAINTIFF'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT DR. STEPHEN BUSTIN was filed with this Court's CM/ECF system, which will send notification to all counsel of record.

/s/ Douglas W. Greene
Douglas W. Greene