# Exhibit 1

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

_____

GELT TRADING, LTD., a Cayman          ) Case No.
Islands limited company,              )
                                      ) 2:20-cv-
                                      ) 00368-CMR
                        Plaintiff,    )
                                      )
               vs.                    )
                                      )
                                      )
CO-DIAGNOSTICS, INC., a Utah          )
Corporation; DWIGHT EGAN, JAMES       )
NELSON, EUGENE DURENARD, EDWARD       )
MURPHY, RICHARD SERBIN, REED          )
BENSON, BRENT SATTERFIELD,            )
                                      )
                                      )
                        Defendants.   )
                                      )

_____

***********************CONFIDENTIAL***********************

VIDEOTAPED DEPOSITION BY ZOOM OF REBECCA GARCIA, Ph.D.
SIMPSONVILLE, SOUTH CAROLINA
FRIDAY, MAY 12, 2023

REPORTED BY:  Tammy M. Breed, CCR No. 7801

JOB NO:  FLA 5902786

CONFIDENTIAL

Page 2

VIDEOTAPED DEPOSITION BY ZOOM OF REBECCA GARCIA, Ph.D., taken at 234 SANDUSKY LANE, SIMPSONVILLE, SOUTH CAROLINA, on FRIDAY, MAY 12, 2023, at 7:00 A.M. EDT, before Tammy M. Breed, Certified Court Reporter, in and for the State of Utah.

APPEARANCES:

For Gelt Trading, Ltd. and Proposed Class:

Brandon S. Floch
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
(305) 400-4260
bfloch@mnrlawfirm.com

For the Defendants and Deponent:

Joni Ostler
PARR BROWN GEE & LOVELESS
101 South 200 East
Salt Lake City, Utah 84111
(801) 532-7840
jostler@parrbrown.com

Zachary R. Taylor
Baker Hostetler
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200
ztaylor@bakerlaw.com

Also Present:
Sofia Johnson, Videographer

Page 3

I N D E X

WITNESS:  REBECCA GARCIA, Ph.D.

EXAMINATION                          PAGE

BY:  Mr. Floch                          7

Page 4

E X H I B I T S

EXHIBIT                          PAGE

Exhibit 1  E-mail from Denny Crockett to Rebecca Garcia, Dated 12/17/21, Bates Nos. CoDI_00131545 to 131546 ..... 28

Exhibit 2  "Fluorescence" Graphic, 1 page ..... 54

Exhibit 3  Original Research Article, Evaluation of Factors that Affect the Performance of COVID-19 Molecular Assays Including Presence of Symptoms, Number of Detected Genes and RNA Extraction Type, 10 pages ..... 79

Exhibit 4  E-mail from Andrew Benson to Dwight Egan, Dated 1/22/2020, Bates Nos. CoDI_00023286 and 23287 ..... 90

Exhibit 5  E-mail from Chad Apuli to Rebecca Garcia, Dated 3/3/2020, and Other Related Documents, Bates Nos. CoDI_00077784 to 77878 ..... 97

Exhibit 6  E-mail from Rebecca Garcia to Tom Williams, Dated 3/23/2020, Bates No. CoDI_00004420 ..... 105

Exhibit 7  E-mail from Rebecca Garcia to Brent Satterfield, Dated 4/2/2020, Bates No. CoDI_00004509 to 4511 ..... 111

Exhibit 8  E-mail from Rebecca Garcia to Brent Satterfield, Dated 4/2/2020, Bates No. CoDI_00004512 ..... 120

Exhibit 9  E-mail from Cameron Gundry to Laura Benzonana, Dated 4/3/2020, Bates No. CoDI_00004529 ..... 127

Page 5

Exhibit 10  E-mail from Rebecca Garcia to Dwight Egan, Dated 4/11/2020, Bates Nos. CoDI_00023726 and 00023727 ..... 131

Exhibit 11  E-mail from Rebecca Garcia to Andrew Benson, Dated 4/28/2020, Bates Nos. CoDI_00024111 to 00024114 ..... 141

Exhibit 12  E-mail from Andrew Benson to Anurag Mehta, Dated 4/29/2020, Bates Nos. CoDI_00024121 and 24122 ..... 145

Exhibit 13  E-mail from Cameron Gundry to Chad Apuli, Dated 4/9/2020, Bates Nos. CoDI_00075061 to 75069 ..... 148

Exhibit 14  E-mail from Brent Satterfield to Chad Apuli, Dated 5/5/2020, Bates Nos. CoDI_00007794 and 7795 ..... 157

Exhibit 15  E-mail from Cecilia Hutchins to Kenneth KC Bramwell, Dated 8/14/2020, Bates Nos. CoDI_00085324 to 85328 ..... 159

Exhibit 16  E-mail from Cecilia Hutchins to Chad Apuli, Dated 4/30/2020, Bates Nos. CoDI_00001168 and 1169 ..... 166

Exhibit 17  E-mail from Brent Satterfield to Rebecca Garcia, Dated 4/30/2020, Bates Nos. CoDI_00001371 and 1372 ..... 173

Exhibit 18  E-mail from Rebecca Garcia to Andrew Benson, Dated 4/30/2020, and Validation Report, Bates Nos. CoDI_00024155 to 24165 ..... 176

Exhibit 19  E-mail from Rebecca Garcia to Dwight Egan, Dated 4/30/3030, Bates Nos. CoDI_00027453 to 27455 ..... 182

2 (Pages 2 - 5)

CONFIDENTIAL

Page 118

A. So -- well, I was still trying to get performance information from Salt Lake that I had previously requested. Because that would tell me if the primers worked or not inside of a sample matrix. Because there can be a difference between using synthetic samples versus using samples. There can also be differences in genomic diversity between an American population versus an Asian population.

I also -- I can't remember when I talked to the lady at the NIV lab, whether it was after this study or after we ran the second round of testing, but some time during that I talked to her on the phone to try to get more information. But there was a lot of things she would not disclose to me.

Q. So you mentioned three different avenues that you were exploring to get answers to your questions about the NIV study, right?

A. Yes.

Q. You first said that you went back to Salt Lake City to ask if they had any performance information, right?

A. Yes.

Q. Did -- did they provide you with any performance information in your response to your query regarding NIV test?

Page 119

A. Eventually I got performance information, but I don't know the time frame in comparison to this particular e-mail.

Q. Okay. You also mentioned that you had questions about genomic diversity.

Did you obtain any answers about whether genomic diversity was accounting for the results shown by the NIV test?

A. So there were some tests run in Salt Lake City by our bioinformatics team, and they were monitoring mutations.

Q. Did the bioinformatics team provide you with any data that would allow you to conclude that genomic diversity was the cause of the NIV results?

A. They provided data that showed that there were some genes that had more mutation build up over time than others. But without knowing what tests we were comparing it to, I wouldn't know if that was related or not.

Q. Okay. Did you eventually come to a conclusion about -- sorry, let me back up.

Did you trust the 12% false-positive finding that the NIV found when they analyzed the Saragene test?

A. I don't fully put my trust in data until I see all the facts, so I was still searching for answers.

Page 120

MR. FLOCH: Okay. Let's go off the record.

THE VIDEOGRAPHER: We're going off the record at 12:27 p.m.

(A lunch recess was taken.)

THE VIDEOGRAPHER: This is the beginning of Media Unit 3, and we're back on the record at 1:02 p.m.

Q. (BY MR. FLOCH) Dr. Garcia, when we left before the break, we were talking about a study conducted on the Saragene test by the National Institute of Virology, right?

A. Yes.

Q. Okay. I'm going to show you what I'm going to mark as Exhibit 8.

(Exhibit No. 8 marked.)

Q. (BY MR. FLOCH) Why don't you take a second to look at it, and then let me know when you're ready for a question.

A. (Witness complying.) Okay.

Q. Dr. Garcia, is this an e-mail from April 2nd, 2020 to Dr. Satterfield, Chad Apuli, and Cecilia Hutchins?

A. Yes.

Q. And do you see that in the first line of the e-mail you wrote, "The ICMR has printed the results from our tests and they are not passing guidelines"?

Page 121

A. Yes.

Q. Then do you see you write, "Here's is my opinion: First of all 100% is impossible for any test and not mathematically sound if you believe in bell shaped curve and 5% error," do you see that?

A. I see that.

Q. What did you mean when you wrote "100% is impossible for any test"?

A. Well, I was referring to the criteria that the NIV had provided in one of the previous documents where they were requiring the 100% clinical concordance.

Q. Okay. What -- what does "clinical concordance" mean?

A. When you compare one test with another test, you get an agreement percentage or concordance percentage. 100% would not consider any error.

Q. Okay. And it's your testimony that it's impossible for any diagnostic test to be perfect all the time?

MS. OSTLER: Objection, mischaracterizes prior testimony.

THE WITNESS: So the percentage is based on the population and the test information that's being compared. The larger the population, the number can change.

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

Q. (BY MR. FLOCH) And then do you see you go on to write, "Secondly, I think what they are seeing is exactly what was seen in the samples SLC got from testing employees"?

A. Yes, I see that.

Q. What did you mean by that second sentence?

A. So after I had went to India in, I believe it was March of 2020, then I went to Salt Lake City. And while I was there, they were collecting samples to test for COVID basically to prevent any contamination getting in anything that they were manufacturing. So those results that they got from testing employees were showing some questionable results.

Q. When you say, "questionable results," what do you mean?

A. So one of the variables that we had considered even from the NIV results from India was the global debate of: Does a molecular test require some type of Ct value interpretation cut off? And some places, like in India, were suggesting that the interpretation reporting value should be cut at cycle 35. And so that's why my sentence here in this e-mail goes on to talk about the cycle values.

Q. So then you go on to write, "Even though you guys say it was contamination, my interpretation was

Page 123

different."

Can you explain to me what your interpretation of -- sorry.

Can you explain to me what your interpretation was as regards to the 12% false-positive finding in the NIV study?

A. Well, if you consider a cycle value cut off at 35, which was different from the Instructions for Use, when reporting a positive value, then you get a different outcome in the results. The same would be true for the NIV study. If you cut off the value at cycle 35, then you eliminate anything that possibly amplified past that cycle and would have been called a positive sample.

Q. Do you see you go on to write, (as read): If I took the LoD, which was 8 copies with approximate Ct value of 36 and I put everything I amplifies past 36 in a grey zone as unreportable, then I remove all those potential false-positive results.

A. Yes.

Q. You see that?

Okay. So help me understand what effect does the limit of detection have on your interpretation of why the NIV results were showing 12% false positives?

A. I'm sorry, I think I missed part of that

Page 124

question, can you repeat it.

Q. Okay. So you reference a limit of detection in this e-mail, right?

A. Yes.

Q. What does the limit of detection of the Saragene test have to do with your interpretation of the 12% false-positive finding in the NIV results?

A. Well, the primer performance, if there are no changes in the primers or the component parts that are used in the tests, they should perform equivalently. So the LoD should be about the same if you have -- consider the same amount of error for technician or mechanical error.

Q. Was the limit of detection of the Saragene test higher than the limit of detection of Saragene's competitors' tests?

MS. OSTLER: Foundation.

THE WITNESS: I don't remember the limit of detection.

Q. (BY MR. FLOCH) Do you recall any criticisms of -- by anyone about the limit of detection of Saragene's test -- sorry, of the Saragene test?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I don't recall specific comments about the limit of detection.

Page 125

Q. (BY MR. FLOCH) Okay. So you mention this grey zone in your e-mail to Dr. Satterfield and others. Can you help me understand what is the grey zone that you're talking about?

A. Yeah. So the limit of detection is the lowest point that an analyte can be detected 95 percent of the time. That's what it's confirmed at is 95 percent of the time. Any Ct value that is more -- so the LoD at that point is related to a Ct value. So any Ct value that is more would mean that those concentrations related to that Ct value would be less. So that means they would have less than a 95 percent probability that they would be a true result. Because as you decrease the probability of the true result, you increase the percent probability for error.

Q. Okay. Do you see that in the last sentence you wrote, (as read): Some regulatory boders -- bodies require a grey zone to be identified - it usually refers to the area between LoD and cut off that could be positive or negative.

Do you see that?

A. Yes.

Q. So help me understand, because I may not be understanding it correctly. But is it fair to say that the grey zone is an area -- or sorry let me back up.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

Is it fair to say that the grey zone is a point at which the test can neither distinguish between a true positive and a true negative?

A. Yes, that's a good layman's definition.

Q. Okay. And is it also fair to say that if a test has a very high limit of detection, it will have a larger grey zone?

MS. OSTLER: Objection, ambiguous.

THE WITNESS: I'm not sure what you mean by "high limit of detection". High limit of detection would mean that the Ct value is moving the other direction.

Q. (BY MR. FLOCH) If it takes -- sorry.

So let's just take this e-mail in context and explain to me in the simplest way possible, what was your conclusion about why the NIV test was showing 12% positives -- false positives.

A. I'm not sure that I came up to a conclusion because none of my variables could be actually confirmed.

Q. Okay. Well, you did say, "Here's my opinion..."

Can you at least describe for me what was your opinion as to why the NIV results were showing 12% false positive?

A. So my opinion based on the information that was

Page 127

provided me was that there were variables that could not be determined that would influence the results of the test.

Q. Okay. Let me show you another document.

(Exhibit No. 9 marked.)

Q. (BY MR. FLOCH) Do you see what's marked as Exhibit Garcia 9 on your screen?

A. I didn't see the exhibit number but...

Okay. Yes.

Q. Why don't you take a look at this real quickly.

A. (Witness complying.) Okay.

Q. Okay. Do you see this is an e-mail from Cameron Gundry to Lauren (sic) Benzonana on April 3rd, 2020?

A. Yes.

Q. And do you see that you and Dr. Satterfield, among others, are in the "CC" line?

A. Yes.

Q. And do you see Dr. Gundry wrote, (as read): Laura, Sorry to bug you, but could you send any official info, or even make a document or point to one, saying our kits have been evaluated at some level of performance? We need this today to help with an Indian submission for our partner's clinical, CoSara. Something specifically referring to specificity, number of samples, et cetera.

Page 128

Who was Cameron Gundry?

A. He was part of the sales team.

Q. And what is "biodynamics"?

A. I have no idea.

Q. Did you ask Mr. Gundry to request performance evaluations that customers had run on the Saragene test?

A. I don't remember specifically asking him. I believe this goes back to my original request to Salt Lake for any performance information, because it got brought up in a management meeting, and he would have been in a management meeting.

Q. Okay. And to your understanding, sorry let me back up.

Why would a request for performance evaluation data been -- why was a request for this performance evaluation data brought up in a management meeting?

A. Because we still needed some proof of the test performance on a basic level to a company the -- the regulatory application filings in India.

Q. So was it your understanding that the National Institute of Virology would not have given a passing score without some data to rebut the 12% false-positive finding that they had made?

A. I'm not sure the use of the data by the regulatory agency.

Page 129

Q. Well, you -- the company -- sorry.

Co-Diagnostics was asking for performance evaluation data for some reason, right?

A. Did you mean CoSara?

Q. Well, let me back up.

Mr. Gundry in his e-mail doesn't distinguish between performance evaluation data for Logix Smart and performance evaluation data for CoSara -- sorry, for the Saragene test, right?

A. Yes, he doesn't specify which one.

Q. If you had received performance evaluation data on the Logix Smart test, would you have then taken that data and showed it to the National Institute for Virology?

MS. OSTLER: Objection, calls for speculation, uncomp -- incomplete hypothetical.

THE WITNESS: I would have shared that data with CoSara. I don't know to whom CoSara would then -- if they shared it to somebody or whether they kept it internally.

Q. (BY MR. FLOCH) Okay. I think you testified earlier that you recall having conversations with someone at the NIV after the first performance evaluation results came out on the Saragene test, right?

A. I don't know when I had the conversation, whether

33 (Pages 126 - 129)

CONFIDENTIAL

Page 218

status is in India.

Q. (BY MR. FLOCH) Did you have any stock in CoSara?

A. Not that I know of.

MR. FLOCH: Okay. Dr. Garcia, I have no further questions. And I just want to thank you for your time today. I know you're -- you don't work for the company anymore and you're a busy professional, so I really appreciate your time.

And I'll allow -- or I'll pass the witness to Ms. Ostler.

MS. OSTLER: So we need to take a break so I can confer with Zach. Give us five minutes, and we'll come right back.

MR. FLOCH: Okay.

Thank you -- and thank you again, Dr. Garcia.

THE VIDEOGRAPHER: We're going off the record at 4:36 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 4:42 p.m.

MS. OSTLER: We have no questions.

We'd like to designate the entire transcript provisionally confidential under the protective order.

And we would like to read and sign.

Page 219

THE REPORTER: Okay.

MS. OSTLER: Please send the read and sign version to me.

(Pause in the proceedings.)

THE VIDEOGRAPHER: Ready to go off the record? Okay.

We're off the record at 4:42 p.m. And this concludes today's testimony given by Rebecca Garcia. The total number of media used was five and will be retained by Veritext.

(Signature requested.)

(The proceedings concluded at 4:42 p.m. EDT)

Page 220

REPORTER'S CERTIFICATE

I, Tammy M. Breed, CSR No. 7801, Certified Reporter, certify:

That the foregoing proceedings were taken before me remotely at the time and place therein set forth, at which time the witness was put under oath remotely by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Utah that the foregoing is true and correct.

Dated this 31st day of May, 2023.

TAMMY M. BREED, C.C.R. No. 7801

Page 221

Rebecca Garcia, Ph.D. c/o Joni Ostler, Esq.
jostler@parrbrown.com

May 31st, 2023

RE: GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al
    5/12/2023, Rebecca Garcia , Ph.D. (#5902786)
    The above-referenced transcript is available for review.
    Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.
    The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at transcripts-fl@veritext.com

    Return completed errata within 30 days from receipt of testimony.
    If the witness fails to do so within the time allotted, the transcript may be used as if signed.

        Yours,
        Veritext Legal Solutions

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Rebecca Garcia , Ph.D. (#5902786)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Rebecca Garcia , Ph.D.               Date

Page 223

GELT Trading Ltd. v. Co-Diagnostics Inc., Et Al

Rebecca Garcia , Ph.D. (#5902786)

ACKNOWLEDGEMENT OF DEPONENT

I, Rebecca Garcia , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Rebecca Garcia , Ph.D.               Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

57 (Pages 222 - 223)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.