D. Loren Washburn (#10993)
WASHBURN LAW GROUP
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-9660
loren@washburnlawgroup.com

Michael A. Pineiro (*pro hac vice*)
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4268
mpineiro@mnrlawfirm.com

*Attorneys for Gelt Trading, Ltd. and Proposed Class*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>    Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>    Defendants. | **CLASS PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE EXPERT TESTIMONY OF DANIEL S. BETTENCOURT**<br><br>Case No. 2:20-cv-00368-JNP-DBP |

The Class Plaintiff Gelt Trading hereby submits this response in opposition the Defendants' motion to exclude the expert testimony of Daniel Bettencourt (D.E. 173-1).

## INTRODUCTION

In support of this securities class action, Class Plaintiff proffers the expert testimony of economic expert Daniel Bettencourt on certain technical issues related to loss causation and damages, among other matters. Mr. Bettencourt's expert opinions are based on fully accepted, standard practices and methodologies. Unable to challenge the underlying securities fraud here, the Defendants attempt to undermine the Class Plaintiffs' claims by excluding Mr. Bettencourt's expert testimony. As shown below, Mr. Bettencourt's expert opinions easily satisfy the *Daubert* standard.

## BACKGROUND

As the Court is aware, the Class Plaintiff asserts that Defendant Co-Diagnostics issued a misleading press release (the "May 1 Press Release") regarding the accuracy of the Logix Test. *See* D.E. 86 (Second Amended Complaint); D.E. 168 at 3, 13 (Class Plaintiff's Motion for Partial Summary Judgment). Two weeks later, on May 14, 2020, a series of partial corrective disclosures— undermining and contradicting the misleading statements May 1 Press Release—caused the Company's share price to drop over 31% on May 14-15, 2020. *Id.* at 16.

In support of Class Plaintiff's allegations, Mr. Bettencourt, a vice president at Crowninshield Financial Research, has submitted opinions about loss causation and damages in this case. *See* D.E. 171-5 (Bettencourt Report). In summary, Mr. Bettencourt opines (i) that misrepresentations in the May 1 Press Release caused the price of the Company's shares to be artificially inflated during the Class Period; and (ii) that the corrective disclosures disseminated to the market during and after the

close of trading on May 14, 2020, informed investors that they had been misled by Co-Diagnostics'
May 1 Press Release, causing the Company's share price to fall, and dissipation of artificial price
inflation of, more than $6 per share over the two-day window on May 14-15, 2020. *Id.* at 5-6.

***The Company's Misrepresentations Cause Artificial Inflation.*** Mr. Bettencourt concludes
that immediately following the May 1 Press Release, the news media digested the Company's
representations about the accuracy of the Logix Smart test and, consequently, the Company's shares
had a logarithmic price increase (or return) of 17.21%—an abnormal movement in the share price
based on reaction to the misleading press release. *Id.* at ¶40; p. 82, Exhibit- 6 (showing statistically
significant return on May 1, 2020); D.E. 169-70 at 236:14-237:19 (Bettencourt Depo) (testifying
that according to his event study "the stock price return on [May 1] was statistically significant at
greater than the 95 percent confidence level."). Further, on May 13, 2020, because investors closely
tracked information on the Company's test and its competitor, Abbott Labs, the Co-Diagnostics'
share price increased over 37% based on news reporting questioning the accuracy of Abbott's
Covid-19 test and repetition of the Defendants' false claims. *See* D.E. 171-5 at ¶¶ 43-47.

***Corrective Disclosures and Loss Causation.*** As found by Mr. Bettencourt, on May 14,
2020, "news events unfolded that contradicted the Company's representations about the accuracy
of Co-Diagnostics' Covid-19 test." *Id*. ¶ 47. Mr. Bettencourt points to the following events on May
14th as contradicting or undermining the Company's representations in the May 1 Press Release:

- ***Salt Lake Tribune Article***: A Salt Lake Tribune article indicating that Test Utah, which was
  using the Company's Logix Test, had declined to participate in an accuracy check with other
  Utah labs (*id*. ¶¶ 47-49).

- ***Iowa Press Conference:*** A press conference by Iowa's Governor where she disclosed that

2

the state's validations of the Test Iowa tests—the Logix Smart Test—showed 95% accuracy for determining positives (i.e., sensitivity). *Id*. ¶ 50. Following this noon press conference, trading in Co-Diagnostics' stock was temporarily suspended due to volatility. *Id*. ¶ 51.

- *Hindenburg Tweets*: A series of tweets by Hindenburg with negative information about the accuracy of the Company's test and its press releases (*id*. ¶ 52). Subsequently, NASDAQ again halted trading in Co-Diagnostics' shares (*id*. ¶ 53).

- *FDA Release*: After the close of trading and after the Company again reaffirmed its alleged 100% performance in validation studies, the FDA issued a press release alerting the public that Abbott's test—which was closely followed alongside Co-Diagnostics' test— "may return false negatives" and that "No diagnostic test will be 100% accurate," which "corrected the market's understanding regarding the accuracy of Co-Diagnostics' tests (*id*. ¶ 60).

*See also id*. ¶¶ 83-87 (listing corrective disclosures used for event study).

To establish loss causation, Mr. Bettencourt prepared an event study assessing the impact of these corrective disclosures on the Company's shares on May 14-15, 2020. He used a two-day window because the corrective disclosures "arrived at various intervals throughout the day," these type of disclosures (not made by the Company) are considered "less regular information releases" that could impact the stock price over more than one day, the disclosures were met with "countervailing denials by Co-Diagnostics" on May 14th, and one of the disclosures occurred after the market close on May 14th. *Id*. ¶¶ 88-92. When using a multi-day window, the "threshold for statistical significance increases"—meaning that it requires a more significant price decrease to demonstrate that the price drop is attributed to the corrective disclosures. *Id*. ¶ 115. Mr. Bettencourt opines that corrective disclosures caused the Company's share price to decrease by over 31.63%

3

over May 14-15—a decline of $6.42 per share. *Id*. ¶¶ 113-116.

## ARGUMENT

### I.    LEGAL STANDARD

"The Federal Rules of Evidence generally favor the admissibility of expert testimony: the rejection of expert testimony is the exception rather than the rule." *Mickelsen v. Aramark Sports & Ent. Servs.*, 536 F. Supp. 3d 1238, 1241 (D. Utah 2021) (cleaned up). To be sure, "there is a strong and undeniable preference for admitting *any evidence* having *some potential* for assisting the trier of fact[.]" *United States v. Johnson*, 731 F. App'x 638, 656 (10th Cir. 2018) (cleaned up). (unpublished). Notably, the "district court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Mickelson*,  536 F.Supp. at 1241 (cleaned up). As a result, often times, the "appropriate means" of attacking "admissible expert testimony is through vigorous cross-examination and presentation of contrary evidence." *Id*. (cleaned up).

### II.    MR. BETTENCOURT'S INITIAL REPORT CANNOT BE EXCLUDED BECAUSE IT IS UNSWORN

The Defendants raise a baseless procedural argument—that because Mr. Bettencourt's initial report was not made under penalty of perjury under 28 U.S.C. § 1746, it must be excluded. This is wrong. Under Fed. R. Civ. P. 26(a)(2)(B), which addresses the submission of expert reports, there is no requirement that an expert report be made under penalty of perjury; rather, the report must simply be "prepared and signed by the [expert] witness." Nor is there any caselaw stating that an expert report can be *excluded* under Fed. R. Evid. 702 because it is not under penalty of perjury. To be sure, Defendants seek to mislead the Court on this front—the two cases they cite in support (*Cent. Tank. Coatings* and *Alpha Cap*.) pertain to whether an unsworn expert reports can be considered as admissible evidence for *purposes of summary judgment*. These cases have nothing to do with the

4

exclusion of expert opinions under *Daubert*. The argument ends here.[1]

### III.   MR. BETTENCOURT'S OPINIONS ARE RELIABLE AND WELL-SUPPORTED

#### A.   Mr. Bettencourt's Use of a Two-Day Window is Well-Founded

Mr. Bettencourt's use of a two-day window to examine the impact of the various corrective disclosures on the price of the Company's shares—*i.e.*, loss causation—is a "common" and accepted practice. As stated by the First Circuit, "financial economists *often* define the event period as the two-day period consisting of the announcement day *and the following day*." *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n. 11 (1st Cir. 2005) (citing economist treatise and case law) (emphasis added). In fact, some economic treatises provide that the "*academic standard* is to extend the event period to the close of trading on the *day after the release of the pertinent information*." *See United States v. Hatfield*, 2014 WL 7271616, at *12 (E.D.N.Y. Dec. 18, 2014) (quoting Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 BUS. LAW. 545, 559 (1994)) (emphasis added).

Consistent with this, there is an over-abundance of caselaw from all over the country—all omitted by the Defendants—supporting the use of a two-day window, as used here. *See, e.g., Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, 2024 WL 1497110, at *20 (S.D.N.Y. Apr. 5, 2024) ("Courts in this District routinely find that an event window of at least two days is appropriate."); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015)

---

[1]   Moreover, to the extent that Class Plaintiff submits Mr. Bettencourt's report as evidence in connection with summary judgment briefing, the Court must consider it because Mr. Bettencourt affirmed under oath in a deposition that he prepared his initial report and that it contains his opinions in this case. *See, e.g.*, D.E. 169-70 at 22:14-23:3; 71:25-72:6. *See Oh v. Trujillo-Montoya*, 2024 WL 1282417, at *5 (E.D.N.Y. Mar. 25, 2024); *Mueller v. Chugach Fed. Sols., Inc.*, 2014 WL 2891030, at *13 (N.D. Ala. June 25, 2014).

("A two-to three-day window is common in event studies. Because it is standard for experts to utilize an event window including both the day of the event and the day following an event, this event window was proper."); *Indiana Public Retirement System v. AAC Holdings, Inc.*, 2023 WL 2592134, at \*14 (M.D. Tenn. Feb. 24, 2023) ("[C]ourts have regularly accepted the use of two-day windows to assess price impact.") (collecting cases); *Monroe County Employees' Retirement System v. Southern Co.*, 332 F.R.D. 370, 391 (N.D. Ga. 2019) (finding that "there are many cases that find that multi-day event windows are appropriate for event study analysis in securities fraud class actions" and that "academic literature supports the use of two-day (or more) event windows.").

To be sure, through these decisions, courts have resoundingly found that there is no "irreconcilable inconsistency between the efficient markets hypothesis and extending the relevant window" beyond one day." *Allegheny County Employees' Retirement System v. Energy Transfer LP*, 623 F. Supp. 3d 470, 485 (E.D. Pa. 2022) (collecting cases). That is because there is a "difference between the hypothesis of efficient markets and the real world." *Id.* at 486. Thus, "the selection of an appropriate event window is an inexact science, and the question whether a multi-day window is appropriate is fact-dependent." *Ap-Fonden*, 2023 4865617, at \*7 (S.D.N.Y. July 31, 2023). Here, for several reasons, Mr. Bettencourt's use of a two-day window cannot be excluded.

***Two-Day Window is General Practice***: First, as shown above, there is no dispute that Mr. Bettencourt's use of a two-day window acceptable, given that the two-day window—May 14 and 15—includes the day when the various corrective disclosures occurred (May 14th—during and after the market closed) and the following trading day (May 15th). Here, Mr. Bettencourt finds that the two-day price drop was over 31%--the shares dropped almost 6% on May 14th and 25% on May 15th. This methodology—"including the entirety of the trading for one day following [the corrective

6

disclosures]"—is "in accord with generally accepted practice." *Hatfield*, 2014 WL 7271616, at *13 (E.D.N.Y. Dec. 18, 2014); *In re Xcelera.com Sec. Litig.*, 430 F.3d at 513 (no basis to exclude two-day event study that includes "same-day reaction…of stock price to company specific events"). This was not a matter of cherry-picking days; rather, Mr. Bettencourt just applied the common practice of using the date *of* the corrective disclosures *and* the next trading day.

*The FDA Disclosure Was After Trading Closed on May 14th*: Relatedly, a two-day window was absolutely necessary because the final partial corrective disclosure—the FDA's press release—occurred *after* the close of trading on May 14th, at 7:44 p.m. *See* D.E. 171-5 at ¶ 87 (Bettencourt Report). Thus, a one-day window with just the May 14th trading day would not account for the impact of the FDA disclosure. *See In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *18 (W.D. Pa. Aug. 11, 2022) (using a two-day window for a disclosure that "involved the filing of voluminous proxy materials after the market closed on June 17"). This is dispositive as to the use of a two-day window. Indeed, the use of a two-day window is justified when the corrective disclosures at issue occur *late* in the trading date. *See, e.g., Monroe Cnty. Empl*, 332 F.R.D. at 386.

*The Corrective Disclosures Stemmed from Less Regular News Events and Contradicted Prior Misrepresentations*: Unlike a corrective disclosure made by a company that unequivocally corrects a prior misstatement, here, the partial corrective disclosures stem from news stories and other events undermining the May 1 Press Release. As Mr. Bettencourt explains, citing to academic literature, these type of "less regular" corrective disclosures—which were made at the end of the class period—require the use of a multi-day window. *See* D.E. 171-5 at ¶ 89 (Bettencourt Report). *See, e.g., Monroe Cnty. Empl.*, 332 F.R.D. at 386 (affirming use of two-day window where news released "was complex and contradicted prior misrepresentations" and where news "released near

7

the end of the Class Period, which required…investors to conduct substantial reevaluation of the Company").

*Investors Waited for After Earnings Call to Sell*: Mr. Bettencourt also opines that in light of the scheduled Company Q1 earnings call on May 14th after market close, "it's reasonable that certain investors might wait for the company to weigh in on whether or not these media reports have any validity and potentially undermine the perfectly accurate representations about the [Company's] test." *See* D.E. 169-70 at 106:25-107:21; 108:7-21 (Bettencourt Depo.); D.E. 171-5 at ¶¶ 56-59. In other words, because the Company had an earnings call after trading ended on May 14th, certain investors might have abstained from selling their shares—thus driving the stock price down—and instead waited to see if the Company addressed the negative reports before selling shares.

Finally, importantly, because the use of a two-day window is so common, where, as here, an expert proposes and explains his or her use of a two-day window, the court should not exclude the testimony as unreliable under *Daubert*. Instead, the Defendants' proper avenue to raise this attack is at trial, where it can cross-examine the expert on the purported lack of support for the two-day window. *See, e.g., Monroe County Empl.*, 2019 WL 2482399, at *3 ("[T]he Court will not exclude Dr. Feinstein's event study or opinion due to his reliance on both 1 and 2-day window. If Plaintiffs are unable to support the use of the 2-day window, this can be made clear at trial."); *AP-Fonden*, 2023 WL 6314939, at *16 "(Defendants' quarrel with [the expert's] explanation [of the use of a two-day window] is fodder for cross-examination, not exclusion.").

Notably, the Defendants ignore all of the above caselaw and arguments. Instead, in support of their unfounded argument, they cite two things—one lone case out of the Northern District of Texas (*Erica P. John Fund*) and their own expert's opinion (see Mot. at 6) referencing the same

8

case—and nothing else. Yet, the *Erica P. John* case is not on point, because it does not involve several, "less regular" corrective disclosures, including some occurring *after* market closed, and because, there, the expert did not support his use of a two-day window, as here. Moreover, that case is not compelling in the face of the mountain of caselaw rejecting that court's ruling.

### B.   Mr. Bettencourt Does Not Ignore the Company's Quarterly Earnings Results

Defendants incorrectly argue that Mr. Bettencourt did not account for the Company's quarterly earnings results in evaluating the cause of the Company's stock price drop on May 14-15th. That is wrong. Mr. Bettencourt explicitly addressed the Company's Q1 2020 earnings results in his report, finding that the Q1 earnings results were positive and did not cause the price drop. In support of this, Mr. Bettencourt observed that, according to those earnings results, the Company's revenues were "more than twice consensus estimates," that the loss per share was "in-line with consensus estimates," and that the Company's CEO, Dwight Egan, testified that it "was an awesome earnings report." D.E. 171-5 at ¶ 56 (Bettencourt Report). Further, Mr. Bettencourt notes that less than a week after the earnings report, analysts commented favorably on the earnings results, raised their revenue forecasts for the Company, and upgraded the stock to a "buy." *Id*. ¶ 61. Based on all this, Mr. Bettencourt opines that the May 14th earnings report was not "confounding information"— or "negative news"—that would reasonably have contributed to decline in Co-Diagnostics' stock price the following day. *Id*. ¶ 125. *See also* D.E. 169-70 at 258:4-12 (Bettencourt Depo.).

More importantly, setting aside that Mr. Bettencourt did consider the earnings results, his failure to consider them would not provide grounds for exclusion; rather, it would simply go to the weight of his testimony at trial. *Goebel v. Denver and Rio Grande W. R.R. Co.*, 346 F.3d 987, 998–99 (10th Cir. 2003) (expert's failure to rule out possible alternative causal sources does not render

the expert's testimony inadmissible, but should be challenged via cross-examination); *Shea v. Long Island R. Co.*, 2009 WL 1424115, at *5 (S.D.N.Y. May 21, 2009) ("if…there are weaknesses in [an expert's] reasons for discounting alternative explanation…, the remedy is not preclusion but cross-examination and presentation of contrary evidence.").

### C. Mr. Bettencourt's Remaining Opinions are Well-Founded

The Defendants raise two additional, ancillary arguments—that Mr. Bettencourt's opinions are based on disclosures that were not corrective (Mot. at 5-9) and that his opinion on price impact was improper. However, the Defendants also raised these very issues in their motion for summary judgment (*see* D.E. 169 at 33-38). The Class Plaintiff has addressed these arguments in great detail in its response to the Defendants' motion for summary judgment. The Class Plaintiff's response shows how each corrective disclosure in fact undermines or shows the falsity of the May 1 Press Release, and that the issue of price impact has been and remains settled. Class Plaintiff incorporates those arguments here, so as not to burden the Court with duplicative briefing on the same issues.

### CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion to exclude Mr. Bettencourt. His opinions are well-founded, satisfy *Daubert*, and should be presented to a jury.

DATED: May 22, 2024

/s/ *D. Loren Washburn*
WASHBURN LAW GROUP, LLC

MARCUS NEIMAN RASHBAUM & PINEIRO LLP
Michael A. Pineiro

*Attorneys for Class Plaintiff Gelt Trading, Ltd. and All Class Members*

10

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 22, 2024 a copy of the foregoing was filed on the CM/ECF system and delivered to all parties of record.

/s/ D. Loren Washburn
D. Loren Washburn