D. Loren Washburn
(#10993) WASHBURN
LAW GROUP
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-9660
loren@washburnlawgroup.com

Michael A. Pineiro (*pro hac vice*)
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-4268
mpineiro@mnrlawfirm.com

*Attorneys for Gelt Trading, Ltd. and the Class*

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, <br><br> Plaintiff, <br><br> v. <br><br> CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, <br><br> Defendants. | **CLASS PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:20-cv-00368-JNP-DBP |

Class Plaintiff Gelt Trading, Ltd. ("Gelt" or "Class Plaintiff"), hereby submits this response in opposition to the Defendants' Motion for Summary Judgment (D.E. 169).

## INTRODUCTION

As shown in the Class Plaintiff's motion for partial summary judgment (D.E. 168), this class action presents a case of clear-cut securities fraud. In response to a damaging news report about the accuracy of its Covid-19 test (the Logix Smart test), Defendant Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company") and its executives issued a press release on May 1, 2020 (the "May 1 Press Release") that lied to and misled the investing public. Citing cherry-picked studies, the May 1 Press Release misleadingly conveyed that the Logix test had achieved 100% accuracy in all prior evaluations and that the test was performing perfectly. That was not true. Defendants knew that the Logix test had actually failed several validation studies and that it was the subject of several customer complaints. Defendants tried to bury those reports, knowingly omitting and disregarding them in the May 1 Press Release. Investors suffered significant damages when the truth about Co-Diagnostics' test came out, including that the Company did not want its inaccurate test subject to real scrutiny.

Understandably, Defendants want to avoid a trial about their securities fraud. Their two prior attempts to dismantle this case have failed—the Court previously denied the Defendants' motion to dismiss and their efforts to oppose class certification. Now, faced with direct evidence of fraud, Defendants resort to a grab-bag of baseless, unsupported arguments in an attempt to avoid a jury on this matter. The Court should deny Defendants' motion for summary judgment. As shown below, there are material facts supporting all aspects of the Class Plaintiffs' claims. Indeed, for many of the key elements (such as material misrepresentation, scienter), the Class Plaintiff is entitled to summary judgment. This case belongs before a jury. The Defendants' motion has no merit.

1

## STATEMENT OF DISPUTED FACTS[1]

1.      Admitted

2.      Admitted.

**Co-Diagnostics' Test Has Issues with its Limit of Detection and Failed Validation Results**

3.      Admitted.

4.      Admitted.

5.      Disputed in part, as to the statement by Defendants' expert, Dr. Bard. Despite claiming that its clinical sensitivity and specificity was greater than 95%, Co-Diagnostics examined and confirmed that other tests had a lower limit of detection (LoD) and, thus, were more sensitive, and it worked on improving its LOD at the same time it issued the May 1 Press Release. *See* Plfs. Appdx., Ex. 26, 27 (D.E. 171-26, 171-27). Admitted as to rest.

6.      Disputed in part, to the extent that this paragraph suggests that Co-Diagnostics' employees believed that the Logix test had a satisfactory LoD before or around May 1, 2020 such that its LoD would not affect the test's sensitivity in the field. Before and around May 1, 2020 the company possessed information calling into question whether the Logix test's high LoD was causing problems with the test's sensitivity in clinical practice. Ex. 42[2] (March 13, 2020 email finding that in clinical test the Logix test results were inconclusive and could be caused by "issues with the test."); Ex. 43 (April 22, 2020 email from A. Benson noting that "[w]e may not have the

---

[1]     Class Plaintiff adopts the same numbering convention as Defendants. In other words, paragraph 1 in this response refers to paragraph 1 in Defendants' Statement of Undisputed Material Facts. *See* D.E. 169 at 5-22, ¶¶ 1-41.

[2]     Class Plaintiff begins at Ex. 42 for any new exhibits cited. Plaintiff's Appendix in support of its Motion for Partial Summary Judgment ended at Ex. 41.

best LOD…"); Ex. 44 (April 17, 2020 email showing that Satterfield received an email where a health official in Utah noted that the "test has a significantly higher LOD compared to the tests we use which can be a big problem for low positives and could explain in part why their percent positive is lower than what [we are seeing with other tests] … I worry about … usi[ing] a test from an unknown company without much in vitro diagnostic experience that has a higher limit of detection compared to tests offered by more stablished vendors."); Plfs Ex. 26 (D.E. 171-26) (May 2, 2020 email where Satterfield states that he believed Abbott "absolutely has a better LOD than us … We got samples from them in Nebraska what were near their LOD that we consistently were unable to detect."); Plfs. Ex. 27 (D.E. 171-27) (May 4, 2020 email showing that company was working to improve the test's LoD); Ex. 50 (June 11, 2020 email).

7.    Disputed. The evidence shows that various customers or potential customers complained about the test, and Chad Apuli who works in the Company's lab, testified that a spreadsheet generated by Co-Diagnostics QT9 software system shows that between March 1, 2020, and May 1, 2020, the Company had received numerous "complaints" regarding the Logix test, including from the Hungarian Ministry of Health and Gentech Biosciences. Plfs. Ex. 16 (D.E. 171-16) (QT Spreadsheet). Further, there were seven customer complaints logged in July 2020 by Chad Apuli, Co-Diagnostic's laboratory director, which Mr. Apuli says might have occurred earlier and been logged at that later time. Plfs. Ex. 22 (D.E. 171-22) (Apuli Dep.) at 84:12-87:12. Additionally, between March and July 2020, Mr. Apuli received complaints from customers indicating that they would like the Logix test to have a lower limit of detection. *Id.* at 87:18-88:8. Finally, various analyst reports noted that despite issuing 34 press releases in the first half of 2020, Co-Diagnostics failed to detail the number of tests sold, calling into question whether customers were happy with the test's

performance. Ex. 45 (May 14, 2020 Hindenburg Tweets); Ex. 49 (Hindenburg Website).

8.    Disputed. Prior to May 1, 2020, in addition to some evaluations showing 100% sensitivity and specificity, Co-Diagnostics possessed other problematic evaluations showing the test had less than 100% sensitivity and specificity—in some cases substantially below the purported 95% threshold standard, such as the failed results out of South Africa, Greece, India, and others. Ex. 44 (April 17, 2020 email related to evaluation in Utah); Plfs. Ex. 1 (D.E. 171-1) (Satterfield Dep.) at 104:13-23, 121:5-123:24; Plfs. Ex. 9 (D.E. 171-9) (First April 2, 2020 email regarding failed India test); Plfs. Ex. 23 (D.E. 171-23) (Garcia Dep.) at 111:13-116:18; Plfs. Ex. 10 (D.E. 171-10) (Second April 2, 2020 email regarding India test); Plfs. Ex. 11 (D.E. 71-11) (April 11, 2020 email regarding failed India test); Plfs. Ex. 13 (D.E. 171-13) (April 17, 2020 email regarding failed South Africa test); Plfs. Ex. 22 (D.E. 171-22) (Apuli Dep.) at 72:6-73:15; Plfs. Ex. 14 (D.E. 171-14) (April 18, 2020 email regarding failed South Africa test); Plfs. Ex. 15 (D.E. 171-15) (April 24, 2020 email regarding test in Greece). Further, Co-Diagnostics also possessed customer complaints about the Logix test in the QT9 system, many of which the Company admits might have occurred before May 1, 2020, and been logged a few months later. Plfs. Ex. 16 (D.E. 171-16) (QT9 Spreadsheet); Plfs. Ex. 22 (D.E. 171-22) (Apuli Dep.) at 84:12-87:12.

9.    Disputed. Attaching a summary of the Australian data to the May 1 Press Release was not "common practice." In fact, the individual who prepared the summary data, Dr. Garcia, testified that it was unusual to append an internal summary of validation data to a public press release because they are not peer reviewed data. Plfs. Ex. 23 (D.E. 171-23) (Garcia Dep.) at 165:14-166:18. Co-Diagnostics did not inform Dr. Garcia those summary data would be shared publicly. Id. at 187:14-188:20. Had she been asked, she would have told the company that it would "be best

not to publish" the summary data because it was not peer-reviewed. *Id.* Co-Diagnostics' Head of Regulatory Affairs, Cecilia Hutchins, also asked that this summary data be removed from the website because it was not peer-reviewed. Ex. 46 (May 13, 2020 email). Further, Dr. Westgard opined it was odd for the same individual to sign an internal validation report as both author and supervisor. D.E. 169-12 at PageID.2780 (Westgard Report).

10.     Disputed. Dr. Garcia testified that the summary data she prepared based on the NIP data had typos that affected the validity of the summary data. Plfs. Ex. 23 (D.E. 171-23) (Garcia Dep.) at 183:21-186:5. Further, as noted, publishing and attaching these reports to the May 1 Press Release was not "common practice." *See supra* ¶ 9.

11.     Admitted.

12.     Disputed in part, to the extent that Defendants frame the Minnesota data is "independent." The single spreadsheet from Minnesota contains no analysis, context, or explanation to show how it was prepared or by whom. The study was not even performed by the Minnesota Department of Health, but rather an "oral rinse group" and the Minnesota DOH may not even be familiar with the data in the report. *See* Plfs. Ex. 1 (Satterfield Dep.) at 282:14-283:16.

13.     Disputed in part, to the extent that Defendants suggest the Timpanogos and Gentech validations show that the test would likely have 100% sensitivity and specificity in a clinical setting. The Timpanogos validation was based on just 20 patient samples and the document cited by Defendants does not show that the Gentech validations showed 100% sensitivity and specificity.

14.     Disputed in part, to the extent that Defendants suggest the failed Indian NIV results were caused by contamination. Contrary to Dr. Satterfield's "belief," Co-Diagnostics' lab director, Rebecca Garcia, did not agree that the poor results in India stemmed from contamination. Plfs. Ex.

23 (D.E. 171-23) (Garcia Dep.) at 122:14-123:20; Pltfs. Ex. 12 (D.E. 171-12) (Third April 2, 2020 email regarding failed NIV results). In fact, the Indian NIV re-evaluated the results and "rule[d] out contamination." Plfs. Ex. 1 (D.E. 171-1) (Satterfield Dep.) at 150:7-22.

15.    Disputed in part, to the extent Defendants suggest the Greek and South African results were based on contamination or other non-test causes. There is nothing in the South African study to suggest that those results suffered from contamination—the email related to the failed South Africa validation test does not mention contamination. Plfs. Ex. 14 (D.E. 171-14) (April 18, 2020 email). And, as stated by Defendants, Dr. Satterfield claims to not even recall that failed result. In fact, South Africa's finding of 58% sensitivity is consistent with later peer-reviewed publications that found that Logix test had the highest number of false negative results (26/102) and that it was the "least sensitive" of all the tests. *See* Plfs. Ex. 35 (D.E. 171-35) (December 2021 Molecular Diagnosis Publication). As to the Greek failed results, Co-Diagnostics' employee, Cameron Gundry, said that it is "very hard to believe [the results were due to] systemic contamination" and that the "lot had no contamination detected." Plfs. Ex. 15 (D.E. 171-15) (April 24, 2020 email).

16.    Disputed. Dr. Bustin has no basis to opine that the Greek, Indian, and South African lab results were the result of contamination, and Class Plaintiff has moved to exclude Dr. Bustin from offering this testimony. *See* Plaintiffs' Motion to Exclude Dr. Bustin's Testimony (D.E. 172). And, Dr. Westgard has opined that contamination is unlikely because "experienced laboratories who conduct" validation and studies for publications are likely aware of contamination issues and will have dealt with them before running tests. *See* D.E. 169-88 at 13, 18 (Westgard Rebuttal Report).

**The Public is Unaware a PCR Test Cannot be 100% Accurate**

17.    Disputed. Various news sources and statements from investors showed that there was

6

considerable confusion in the early days of the Covid-19 pandemic about whether a PCR test could be 100 percent accurate, with many news analysts and investors believing that a diagnostic PCR test could be 100% accurate. *See* Plfs. Ex. 25 (D.E. 171-25) (Investor Business Daily Article, entitled "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate.". The first sentence of the article states: "Co-Diagnostics (CODX) said Friday its coronavirus test has proven 100% accurate in field testing — leading CODX stock to rocket."); Plfs. Ex 40 (D.E. 171-40) (analyst report suggesting that a PCR test can be 100% accurate); Plfs. Ex. 41 (D.E. 171-41) (same). Indeed, even the company's own board members and distributors thought a PCR test could be 100% accurate. *See* Plfs. Ex. 32 (D.E. 171-32) (Head of Regulatory noting that distributors were claiming that Co-Diagnostics' test was 100% accurate based on May 1 Press Release); Ex. 47 (May 12, 2020 email from board member James Nelson to CEO stating that the company should communicate to the market that "[o]ur test is the only test that is 100% accurate"); Ex. 48 (May 14, 2020 email from Yahoo blogger who posted that CODX has the following going for it: "100% accurate Covid-19 test as validated by multiple independent certified labs.").

18.   Disputed. See the disputed facts set out *supra* ¶ 17. Further, Co-Diagnostics' own head of investor relations, Andrew Benson, testified that the general public that was reading the Company's press releases was "unsophisticated" as to the "science" of PCR tests. Plfs. Ex. 3 (D.E. 171-3) (A. Benson Dep) at 104:13-16.

19.   Disputed. See the disputed facts set out *supra* ¶ 17

20.   Disputed. See the disputed facts set out *supra* ¶ 17. Further, these articles all appeared *before* May 1, 2020, which was when Co-Diagnostics released its misleading statement into the market and changed the public perception of the test's sensitivity.

21.    Admitted.

22.    Disputed in part, to the extent that this paragraph suggests that Co-Diagnostics' employees believed that the Logix test had a satisfactory LoD before or around May 1, 2020. *See* the disputed facts set out *supra* ¶ 6. Further, disputed as to contention that Logix test demonstrated "excellent sensitivity." *See* the facts set out *supra* ¶ 8 establishing that the Logix test had several failed results, including showing 58% sensitivity in a South African validation test.

**The Fraudulent May 1 Press Release Caused a Significant Jump in Stock Price**

23.    Admitted.

24.    Disputed in part. The May 1 Press Release was not reviewed by the two people who mattered most—Dr. Hutchins, the Company's head of regulatory compliance, who was required to review press releases making scientific claims before they were released, and Dr. Garcia who prepared the summary data. Under a Corrective and Preventive Action (CAPA) Plan, Dr. Hutchins was supposed to review all scientific claims before making claims to the market. Plfs. Ex. 3 (D.E. 171-3) (A. Benson Dep.) at 75:17-79:21; Plfs. Ex. 8 (D.E. 171-8) (Feb. 14, 2020 email). Thus, by agreement with regulators, as conceded by the Company's head of investor relations, Hutchins was required to review and approve of the May 1 Press Release before it was issued. Plfs. Ex. 3 (D.E. 171-3) (A. Benson Dep.) at 163:2-164:18; Plfs. Ex. 6 (D.E. 171-6) (Hutchins Dep.) at 191:4-10. But was not consulted about and did not review the press release before it was issued. *Id*. at 69:11-17, 178:9-18. And Dr. Garcia, the individual who prepared the summary data, testified that it was unusual to append an internal summary of validation data to a public press release because they are not peer reviewed data.  Plfs. Ex. 23 (D.E. 171-23) (Garcia Dep.) at 165:14-166:18. Co-Diagnostics did not inform Dr. Garcia those summary data would be shared publicly. *Id.* at 187:14-188:20. Had

she been asked, Dr. Garcia would have told the company that it would "be best not to publish" the summary data because it was not peer-reviewed. *Id.* Further, Dr. Garcia testified that had the company asked to attribute Satterfield's statement—"[i]n countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that—to her, she would have said no. D.E. 171-23 at 206:8-207:5 (Garcia Dep.). She testified that it was "very arrogant" and "egotistical" to say "you can't do better than that" because "it's like dismissing error altogether." *Id.* Admitted as to the rest.

25.     Admitted.

26.     Admitted.

27.     Disputed to the extent that Defendant suggest that a 95% confidence level is necessary to show price impact or loss causation in an event study in securities cases because multiple courts hold that while a 5% significance level is the typical measure of significance, "[n]o hard and fast rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020) (citing cases).

28.     Admitted

29.     Disputed. Bettencourt opined that he conducted an event study that showed a statistically significant price increase on May 1. Pltfs. Ex. 5 (D.E. 171-5) at Bettencourt Ex. 6, PageID.5290 (Bettencourt Report) (showing a 17.21% statistically significant increase on May 1); D.E. 169-70 at 236:14-237:19 (Bettencourt Depo) (testifying that according to his event study "the stock price return on [May 1] was statistically significant at greater than the 95 percent confidence level."). A "good dose of common sense" bolsters Bettencourt's quantitative price impact finding.

9

*Goldman*, 594 U.S. at 122. News articles attributed the large stock price increase on that day to Co-Diagnostics' misleading Press Release. D.E. 171-5 at ¶ 40 (Bettencourt Report). For example, one article from the Dow Jones Institutional News noted that "Co-Diagnostics Inc. shares were up 16% … after the company said it had Covid-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing." *Id.*

30.     Disputed. *See supra* ¶ 29.

31.     Disputed in part, to the extent that Defendants suggest that Nebraska's announcement caused the price to increase on May 11, 2020, as Mr. Bettencourt's cited testimony did not indicate that.

**The Company's Massive Stock Price Drop on May 14-15, 2020**

32.     Disputed in part, to the extent that Defendants suggest that Co-Diagnostics would have agreed to the joint validation study. Co-Diagnostics' CEO Dwight Egan testified that Co-Diagnostics had a role in refusing to do the joint validation and chose to decline the "proficiency challenge" because it believed the state of Utah was biased. Plfs. Ex. 2 (D.E. 171-2) (D. Egan Dep.) at 282:9-283:12. Admitted as to the rest.

33.     Disputed in part, to the extent that Defendants suggest a 95% sensitivity finding is "excellent." The difference between a 95% sensitivity finding and a 98% sensitivity finding can be vast, as Dr. Westgard explains in his report. D.E. 169-12 at PageID.2782 (Westgard Report). For example, if the Co-Diagnostics' test had a sensitivity of 98%, there is still a 1-in-3 chance that the test will show a false positive for any given individual. D.E. 86 at ¶ 85 (Second Amended Complaint). If the test's sensitivity is 95%, instead, "the probability of getting a false positive increases to 55.2%." *Id.* Admitted as to the rest.

34.     Disputed. Dr. Ferrell's opinion is in error because he forgot about the time-zones. He cites an article published on May 14th at 9:58 a.m. stating that the Company's stock price is increasing, but that was at 7:58 a.m. Mountain time—before the Salt Lake Tribune article was published at 9 a.m. Mountain time. Plfs. Ex. 30 (D.E. 171-30) (April 30, 2022 SLT Article). Further, on this day the Company's stock declined over 5%, dropped to a low of $18.35 per share, and was subject to multiple trading halts due to extreme volatility.  Pltfs. Ex. 5 (D.E. 171-5) at ¶¶ 51, 53 111 (Bettencourt Report). Dr. Ferrell did not examine whether the trading halts were implemented due to extreme drops in the stock price or whether they mitigated any further drop in the stock price. D.E. 169-85 at 69:6-15. Finally, though the May 14 stock decline was not statistically significant at the 95% level, it was significant when a two-day window is used. D.E. 171-5 at ¶ 113.

35.     Disputed in part, to the extent the Defendants suggest that it was a poor earnings call. CEO Dwight Egan said the the earnings report "awesome." Plfs. Ex. 2 (D.E. 171-2) (Egan Dep.) at 325:2-9. Bettencourt explicitly addressed the Company's Q1 2020 earnings results in his report, finding that the Q1 earnings results were positive and did not cause price drop. In support of this, Mr. Bettencourt observed that, according to those earnings results, the Company's revenues were "more than twice consensus estimates," that the loss per share was "in-line with consensus estimates," and that the Company's CEO, Dwight Egan, testified that it "was an awesome earnings report." D.E. 171-5 at ¶ 56 (Bettencourt Report). Further, Mr. Bettencourt notes that less than a week after the earnings report, analysts commented favorably on the earnings results, raised their revenue forecasts for the Company, and upgraded the stock to a "buy." *Id.* ¶ 61. Based on all this, Mr. Bettencourt opines that the May 14th earnings report was not "confounding information"—or "negative news"—that would reasonably have contributed to decline in Co-Diagnostics' stock price

the following day. *Id*. ¶ 125. *See also* D.E. 169-70 at 258:4-12 (Bettencourt Dep.).

36.     Admitted that the FDA issued the press release.

37.     Admitted.

38.     Disputed in part, to the extent the Defendants suggest that the earnings were poor or contributed to the decline in stock price. *See* facts set out *supra* ¶ 35 .

39.     Admitted.

40.     Admitted.

41.     Disputed to the extent Defendants suggest Satterfield, Egan, and Reed Benson were not involved in the day-to-day operations of the company. As to Nelson, Durenard, Murphy, and Serbin, the motion does not offer or to cite any admissible evidence showing that these directors did *not* exert control or influence over the day-to-day operations of the Company.

### SUPPLEMENTAL FACTS

1.   Mr. Egan, Dr. Satterfield, Mr. Benson and others involved in preparing the May 1 Press Release own shares in the Company and are compensated through stock options. *See* Plfs. Ex. 2 (D.E. 171-2) (Egan Dep.) at 21:13-20; Pltfs. Ex. 1 (D.E. 171-1) (Satterfield Dep.) at 16:11-17, 64:12-22; Plfs. Ex. 3 (D.E. 171-3) (Benson Dep.) at 38:11-25.

2.   Mr. Benson indicated that he was aware press releases could positively impact the stock price. *Id.* at 108:23-109:19. Mr. Egan indicated that he followed the Company's stock price on a daily basis. D.E. 171-2 at 246:12-22.

3.   Mr. Bettencourt affirmed under oath in a deposition that he prepared his initial report and that it contains his opinions in this case. *See, e.g.*, D.E. 169-70 at 22:14-23:3; 71:25-72:6.

**ARGUMENT**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Instead, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

As shown below, there is no basis to grant summary judgment on any of the elements of the Class Plaintiff's claims for securities fraud against the Defendants.

**I. THE MAY 1 PRESS RELEASE WAS FALSE AND MISLEADING**

The record evidence establishes that the May 1 Press Release falsely suggested that the Logix test had achieved 100% sensitivity and specificity on all prior validations and falsely claimed that the test was performing perfectly, when it was not—based on failed validations from across the globe. As result, *the Plaintiffs* have moved for summary judgment on this element of their claim. *See* D.E. 168 at 19-24. Defendants' unfounded arguments can be quickly rejected.

*Misrepresentation/Omission Regarding Prior Failed Validation Studies*

Faced with clear evidence that the May 1 Press Release omitted key information regarding prior failed validation studies, the Defendants proffer a half-hearted argument—consisting of two pages with no legal citation—that the May 1 Press Release did not misrepresent the prior performance of the Logix test. *See* D.E. 169 at 28-30. In its order denying the Defendants' motion

to dismiss, the Court set out the applicable standard for evaluating the Class Plaintiff's fraud claim:

> [The Class Plaintiff's securities fraud claim] alleges that Co-Diagnostics' press release misleads because it fails to speak the full truth. [I]t is also axiomatic that once a company undertakes partial disclosure of ... information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading. While section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information, disclosure of material information is required when necessary to make statements made, in the light of the circumstances under which they were made, not misleading. Stated in other words, a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.

*See* Order (D.E. 101) at 12-13 (cleaned up). Here, based on this applicable law, the record evidence requires *the opposite* of a defense-side summary judgment (*i.e.*, a plaintiff-side summary judgment), as it conclusively establishes that the May 1 Press Release was fraudulent.

As noted, prior to the May 1 Press Release, there is no dispute that the Company had failed or received problematic evaluations in Utah (a large discrepancy between positives found by Co-Diagnostics' tests (2%) and positives found by other tests (5%)), South Africa (just 58% sensitivity), Greece ("riddled with false positives"), and India (88% specificity), among other complaints. *See supra* SOF ¶ 8; *see also* (D.E. 168) SOF ¶¶ 11-18. Nonetheless, the May 1 Press Release makes no mention of those results. *See* (D.E. 168) SOF ¶ 29. Instead, while omitting those unfavorable results, the release cited to and attached certain selective favorable results and stated (in its title): "Co-Diagnostics Inc. Releases COVID-19 Test Performance Data: *Consistently Demonstrates 100% Sensitivity and 100% Specificity Across Independent Evaluations.*" D.E. 171-20. Worse, the release quotes Dr. Satterfield as stating: "In countries where we have been evaluated against other tests, we have *consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that.*" *Id.* (emphasis added). That was a bald-face lie: the Company had, in fact, *not*

14

achieved 100% clinical sensitivity and specificity in the above-referenced failed tests. These statements in the May 1 Press Release are clearly fraudulent and misleading because they omit highly material information contradicting the release's message and meaning.

To be sure, the Defendants do not dispute that they omitted key information in the release; instead, they try to justify it. They say that, based on the proposed testimony of their expert, Dr. Bustin, and Dr. Satterfield, the Company was justified in omitting these poor results because "to their expert eyes…the performance issues observed in those labs were caused by contamination" and "were not credible indicators of the test performance." D.E. 169 at 29. But these purported explanations ***do not dispute*** that that the failed validation results were omitted from the May 1 Press Release or that the failed results pertain to and on their face undermine the release's pronouncement. Rather, this argument—that Defendants reasonably omitted these results—goes to the materiality of the omitted information and scienter (state of mind in making the omission).

Further, although it is beside the point, there is *no record evidence* showing that the Company or the labs found that the failed results were due to contamination. *See supra* SOF ¶¶ 14-15. This is just post-hoc speculation by a paid expert, Dr. Bustin—whose unsupported testimony on this issue is subject to Plaintiffs' motion to exclude—and post-hoc justification by Dr. Satterfield. Indeed, the record shows that Company employees believed the Indian NIV and Greek results were *not* due to contamination (*id.* ¶¶ 14-15), and Dr. Satterfield does not even recall the failed South Africa results (*id.* ¶ 15), fully undermining the argument that those results were excluded because he concluded the failure was due to contamination. *See* D.E. 171-1 at 177:10-12.

### *Misleading Representation as to the 100% Accuracy of the Logix Test*

Relatedly, and in conjunction with misrepresenting the Logix test's prior performance in

15

validation studies, the May 1 Press Release created the false impression that the test was 100% accurate. The Court elaborated on this aspect of the claim, stating:

> ***[T]he impression that Co-Diagnostics' test was 100% accurate misled investors by omitting any indication that Defendants' test was less than perfect.….***[T]he court is particularly troubled by Satterfield's statement in relation to the test's accuracy that "you can't do better than that." Rather than limiting himself to the specific context of the press release—that a few small studies found the test 100% accurate— ***Satterfield's editorializing statement suggests to potential investors that his company has created a Covid-19 test that has achieved perfection or is, at least, superior to any competitor (i.e., a competitor "can't do better than that").***

*See* D.E. 101 at 11-12 (emphasis added).

The Court's threshold ruling that the May 1 Press Release misleadingly conveyed that the Logix test was 100% accurate and superior to any competitor is supported by the record—most notably the Company's omission of the failed validation results, but also other evidence showing that the Company knew its test did not perform perfectly and was *not* superior. *See supra* SOF ¶¶ 6-8. This includes internal company emails showing there were complaints about the performance of the test, confirming that Abbott's test had superior sensitivity and that the Logix test "consistently [was] unable to detect" positives at the Abbott test's LoD, and that the Company was working on improving its problematic limit of detection, among other things. *Id*.

Nonetheless, the Defendants try to wrangle out of this by saying that reasonable investors should know that no test can always achieve 100% accuracy, so the Company's misstatements should not have misled them. D.E. 169 at 24-25. But this misstates the allegations and the Court's findings on the misleading release. The release was *not* misleading because—conceptually or theoretically—a test can never *always* be 100% accurate due to environmental or "non-test" factors, as argued by the Defendants. Rather, as stated by the Court, the press release was misleading

16

because it misrepresented that the test, *in and of itself*, "ha[d] achieved perfection or is, at least, superior to any competitor (i.e., a competitor "can't do better than that"). *See* D.E. 101 at 12.

The Defendants are also wrong that a reasonable investor would not misunderstand the May 1 Press Release and mistakenly believe the Company's tests were 100% accurate. The best evidence is the media commentary about the release. On the same day as the release, the Investor's Business Daily, one of the largest financial publications in the U.S., published a story with the headline "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate." D.E. 171-25. The first sentence of the article states: "Co-Diagnostics (CODX) said Friday its coronavirus test *has proven 100% accurate in field testing* — leading CODX stock to rocket." *Id.* (emphasis added). And, the Company's executives, who were made aware of this article after it was posted, did nothing to disabuse the market of that misimpression. *See* (D.E. 168) SOF ¶¶ 36-38.

The Company's board members also appeared to interpret the release as stating that the test was 100% accurate. For example, on May 12, 2020, James Nelson, a Company director, sent the Company's CEO an email about "what you want to communicate to the [investing] market." In his email, Nelson tacked off a list of the Company's attributes where he noted that "[o]ur test is the only test that is 100% accurate." *See supr*a SOF ¶ 17 (Ex 47). At a minimum, this shows that this director interpreted the press release as claiming the test was perfect; but it could also signal that there was an internal campaign to falsely tout the Logix test as the only 100% accurate test. Either way, this contradicts the Defendants' argument on this aspect of the securities fraud claim.

Notably, the company's own scientific employees testified that they, too, believed the press release was misleading and falsely implied the test was 100% accurate. Dr. Garcia, the former Company lab director, testified that had the Company asked to attribute Satterfield's statement in

17

the press release to her, she would have said no. *See supra* SOF ¶ 24. Dr. Garcia testified that it was "very arrogant" and "egotistical" to say "you can't do better than that" because "*it's like dismissing error altogether*"—which directly undercuts the Defendants' arguments on this score. *Id.* (emphasis added). Further, Ms. Hutchins, the Company's head of regulatory compliance, commented that the Company's distributors (presumably knowledgeable about PCR testing) were also "taking [the release] out of context, like many articles I have seen, with so many of those articles talking about the 100% sensitivity and specificity." D.E. 171-32.

The Defendants also make the odd argument that public information *before* the release "acknowledged that the Logix test, specifically, was not perfect." D.E. 169 at 25. The Defendants cite news articles, including the April 30th Salt Lake Tribune article, in support of this argument. This is illogical: the entire point of the fraudulent May 1 Press Release was to falsely rebut some of those news sources criticizing the Logix test's performance. Moreover, the release clearly superseded any prior (misleading) commentary from Dr. Satterfield that the test was "between 99.52% and 100% in evaluations conducted by the FDA and in Europe." *Id.* at 26.

The cases cited by the Defendants do not help them on this argument. Two of those cases—*Tongue* and *In re Amairon Corp.*—pertain to securities fraud suits against pharmaceutical companies. *Id.* at 24. Those courts noted that a reasonable investor in those companies would be familiar with the FDA approval process. This has no bearing here, where it has been shown that the investing market believed that Co-Diagnostics was touting its test as performing with 100% accuracy and Company employees were concerned about misleading the public in that respect. Further, *Richfield* does not apply. There, the defendant's own SEC filings and news reports provided "context" for certain opinion statements. This is situation is much different: the Company did not

18

provide investors any context or guidance in the May 1 Press Release or otherwise to make clear the Logix test was not 100% accurate, and, here, the news media actually echoed the Company's statements indicating the test was 100% accurate. Indeed, it is important to note that the Company could have provided investors with the appropriate context for its statements by providing disclaimers on the limitations of PCR testing. It did no such thing.

### *Materiality*

Defendants make an argument regarding materiality only as to the release's misleading implication that the Logix test was 100% accurate. They do not appear to argue that the omitted failed validation results were not material. Regardless, there is no dispute that all of the misrepresentations at issue here *were* material. As stated in the Class Plaintiffs' motion for summary judgment on this issue, the Defendants' misrepresentations that the Logix test—its primary product that caused a 3,700% increase in annual sales from 2019 to 2020—had achieved 100% accuracy in all prior validations and was 100% accurate clearly "affect[ed] the desire of investors to buy, sell, or hold the [C]ompany's securities." *SEC v. Cell>Point*, 2022 WL 2716549, at *5 (D. Colo. July 13, 2022). The caselaw provides that representations about the performance of a company's primary product are material. *See, e.g., SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300, 325 (D.D.C. 2015).

## II.    DEFENDANTS POSSESSED THE REQUISITE SCIENTER

The record evidence shows that the Defendants possessed the requisite scienter. For this reason, the Class Plaintiff moved for summary judgment on this element of its claim. *See* D.E. 168 at 25-28. To be sure, there is absolutely no basis to grant Defendants' motion on this element.[3] A

---

[3]    Class Plaintiff incorporates by reference all of the scienter arguments made in its Motion for Partial Summary Judgment. *See* D.E. 168 at 25-28.

plaintiff can prove scienter by establishing the following: the defendant knew of a potentially material fact, and the defendant knew that failure to reveal that potentially material fact would likely mislead investors. *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001).

There is an abundance of evidence showing that the misrepresentations here were knowing, intentional, or at least reckless. First, Defendants do not dispute that they were aware of the failed and problematic test results before the May 1 Press Release was issued. They simply cannot claim ignorance of these key results, nor do they. Second, there was a prior draft of the May 1 Press release that correctly noted that "some" of the Logix test's validation results showed 100% sensitivity and specificity, but that was removed by the Company's head of investors relations and that change was approved by the Company's executives. *See* D.E. 168, SOF ¶ 30. Removing that word was a conscious, knowing act of fraud. Third, in violation of an agreement with the FDA, the Company issued the release without consulting with Ms. Hutchins, the Company's head of regulatory compliance. *See supra* ¶ 24. Upon seeing the release, Ms. Hutchins called for parts of the release to be removed and taken off of the Company's public website. *See* Ex. 45. Fourth, Mr. Benson wrote to Ms. Hutchins that the release's headline alone was "damning." *Id.* Fifth, the Company saw that investing publications, Company board members, and distributor were interpreting the release as conveying that the Logix test was 100% accurate. And the Company did nothing to remedy those misimpressions. *See supra* SOF ¶ 17; D.E. 168, SOF ¶¶ 36-39. This is just a short list of the clear indicia that the Defendants' state of mind was knowing and fraudulent.

Ignoring the all of the evidence showing scienter, Defendants argue that there is no scienter because: (1) Defendants testified that they subjectively believed the press release was not misleading; (2) they testified that they properly ignored the South Africa, Greece, and NIV studies

because it was "obvious" those reports were not credible; and (3) Egan, Benson, and Satterfield did not sell stock during the class period. None of these arguments work.

First, Defendants' self-serving testimony that they believed the May 1 Press Release was accurate does not warrant granting summary judgment for them on scienter because they cannot just ignore bad facts. A defendant "will not be able to defeat summary judgment," nor should it be allowed to obtain summary judgment "by the mere denial of subjective knowledge of the risk that a statement could be misleading … If such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud." *SEC* v. *Platforms*, 617 F.3d 1072, 1094-95 (9th Cir. 2010). Where, as here, a defendant is aware of facts that make the statement misleading, "he cannot ignore the facts and plead ignorance of the risk." *Id.* at 1094. In those instances, a court need not credit a Defendant's self-serving assertion. *Id.* at 1095. Here, Defendants' were aware of negative evaluations of the test (from Utah, South Africa, India, Greece, and elsewhere) that made their May 1 statements misleading and they cannot ignore those negative findings to defeat scienter. *Platforms*, 617 F.3d at 1094-95.

Second, Defendants are not entitled to summary judgment on scienter by arguing, post-hoc, that they omitted any reference to the poor evaluations because the validations were plagued by contamination. Besides Defendants' self-serving assertions and Dr. Bustin's speculative, improper opinion that is untethered from any facts, there is no evidence to show that the results in South Africa, India, and Greece were caused by contamination. To the contrary, as shown above, emails demonstrate that Company employees believed the Indian NIV and Greek results were *not* due to contamination, and Dr. Satterfield does not even recall the failed South Africa results and did not maintain they were based on contamination. *See supra* SOF ¶¶ 14-15.

Finally, Defendants' argument that they did not personally benefit from the fraud rings hollow. D.E. 169 at 33. To show scienter, a plaintiff need not point to "suspicious stock sales." *Smallen v. The Western Union Co.*, 950 F.3d 1297, 1311 (10th Cir. 2020). And Defendants *did* benefit from the misleading statement. The Defendants' owned stock in the Company, which surged on the day of the May 1 Press Release; they closely followed the stock price; and they were aware that issuing press releases could positively impact the stock price. *See supra* Supplemental Facts ¶¶ 1-2. So they had a motive to issue a misleading press release that catapulted the stock's price.

## III.   THE CLASS PLAINTIFFS HAVE SHOWN RELIANCE

In this case, Class Plaintiff satisfies the reliance element using the "fraud-on-the-market" theory. Under this theory, a plaintiff may "satisfy the reliance element … by invoking a presumption that a public, material misrepresentation will distort the price of a stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*"). To defeat this presumption, a defendant must prove that the alleged misstatement did not impact the stock price. *Id.* at 279-80. In assessing whether a misrepresentation impacted a stock price, a court must look at both "qualitative as well as quantitative [evidence]—aided by a good dose of common sense." *Goldman Sachs v. Ark. Teacher Retirement Sys.*, 594 U.S. 113, 122 (2021). As shown below, there is no basis for summary judgment on reliance.

To start, the Defendants waived this price impact argument. A party waives certain defenses if they are not raised at the threshold or class certification stage. *See Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*, 203 F.3d 835, at * 2 (10th Cir. 2000); *Brown v. D.C.*, 2019 WL 3423208, at *7 n. 5 (D.D.C. July 8, 2019) ("a party that waits to raise [arguments that

could have been raised at the motion to dismiss or class certification stages] may be deemed to have forfeit[ed] those arguments" when raised at a later stage). At class certification stage, Plaintiff's expert opined that on May 1, 2020, Co-Diagnostics' stock rose 17% and that this increase was statistically significant at the 95% level, meaning that the May 1 Press Release caused the increase (*i.e.*, price impact). D.E. 114-1 at ¶¶ 60-63. Defendants did not challenge this point, instead conceding that the May 1 Press Release impacted the stock price. D.E. 125-1 at ¶ 8 (Werner Reply Report) (noting that Defendants' expert did not dispute that the May 1, 2020 residual return was "statistically significant at the 95% confidence level," meaning that Defendants agreed that the Press Release caused the stock price reaction and not "random volatility alone."). Indeed, in its Class Certification Order, the Court found that there was no dispute that the May 1 Press Release impacted the stock. D.E. 154 at 10 n. 4. Having failed to promptly raise the price impact argument until four years into this litigation, Defendants should be deemed to have forfeited this argument.

Turning to the merits, Class Plaintiff has shown the May 1st misrepresentations impacted the stock price in at least three ways based on both qualitative and quantitative evidence.

First, Class Plaintiff can show price impact because Bettencourt opines that there was a statistically significant increase in the stock price on the day the company issued the misleading press release. A statistically significant price increase on the day of a misstatement conclusively shows price impact. *In re Chicago Bridge*, 2020 WL 1329354, at *3. Bettencourt opined that he conducted an event study that showed a statistically significant price increase on May 1st. D.E. 171-5 at Bettencourt Ex. 6, PageID.5290 (Bettencourt Report) (showing a 17.21% statistically significant increase on May 1); D.E. 169-70 at 236:14-237:19 (Bettencourt Depo) (testifying that according to his event study "the stock price return on [May 1] was statistically significant at greater

than the 95 percent confidence level."). Further, a "good dose of common sense" supports and bolsters Bettencourt's quantitative price impact finding. *Goldman*, 594 U.S. at 122. On the day the release was issued, various news articles attributed the stock's increase to Co-Diagnostics' misleading Press Release. D.E. 171-5 at ¶ 40 (Bettencourt Report). For example, one article from the Dow Jones Institutional News noted that "Co-Diagnostics Inc. shares were up 16% … after the company said it had Covid-19 test performance data demonstrating 100% sensitivity and 100% specificity, the metrics used to define accuracy in molecular diagnostics testing." *Id.*

Second, Class Plaintiff can also demonstrate that the misrepresentations impacted the stock price because, when the misrepresentations were repeated on May 13th, the stock shot up again and had considerable artificial price inflation. Sometimes "the movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused." *Glickenhaus & Co. v. Household Int'l., Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). As some courts have noted, misrepresentations "can continue to cause artificial inflation in the price by repeated assurance that the false statement is true." *In re Chicago Bridge*, 2019 WL 5287980, at *19. Thus, one can assess whether the May 1 Press Release impacted the stock price by looking at dates when that Press Release's misleading statements were repeated. That is exactly what Bettencourt analyzed. He found that on May 13, 2020, Co-Diagnostics' stock price increased 37.85% and that the increase was statistically significant, meaning that the company-specific news caused the increase. D.E. 171-5 at ¶¶ 45-46 & PAGEID.5290 (Bettencourt Report). Dr. Ferrell agreed that there was a statistically significant price increase that day. D.E. 169-84 at 37:15-20 (Ferrell Deposition) (agreeing that there was a statistically significant increase on May 13, 2020).

On that day, Seeking Alpha reported "disappointing sensitivity data" raising doubts about

the accuracy of Abbott's Covid-19 test. D.E. 171-5 at ¶¶ 45-46 (Bettencourt Report). The author of that article reported that Co-Diagnostics' share price skyrocketed on that same day because investors were juxtaposing the negative news about the Abbott test with the recent glowing (and false) news about the 100% accuracy of Co-Diagnostics' test. That article noted that "Co-Diagnostics … is poised to finish the day solidly in the green on more than 40% higher volume, *enjoying a surge in buying in the wake of reported disappointing sensitivity data from a New York study evaluating Abbott's [test] … Co-Diagnostics recently announced data on its LogixSmart molecular test for SARS-CoV-2 that showed 100% sensitivity and 100% specificity*." D.E. 171-5 at ¶¶ 45-46 (Bettencourt Report) (emphasis added).

Bettencourt opines that while the "artificial inflation was embedded in the stock price on the first day of the Class Period (the day of the May 1 Press Release), "artificial inflation [also] increased on 13 May 2020" due to investors comparing the Abbott results to Co-Diagnostics' false claims of 100% accuracy, thus "tying [the increase]…back to the original misrepresentation that the [C]ompany's tests were perfectly accurate." D.E. 169-70 at 102:21-103:6, 148:12-149:6 (Bettencourt Dep.). And commentators similarly attributed the May 13th stock price increase to Co-Diagnostics' prior misleading May 1 Press Release when combined with Abbott's disappointing information. In short, Bettencourt's analysis of May 13th further shows price impact.

Finally, Class Plaintiff can also show price impact indirectly based on the stock's decrease when the truth about the accuracy of the Logix test was revealed. Price impact can be observed on both the front-end (as above) or the back-end (by looking at a decline price after corrective disclosures). *Bond v. Clover Health Investments, Corp.*, 2023 WL 1999859, at *13 (M.D. Tenn. Feb. 14, 2023) (citing *Halliburton II* and noting that price impact can be shown through evidence

that a stock's price declined in a statistically significant manner after a corrective disclosure). In other words, another way to determine "the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." *Glickenhaus*, 787 F.3d at 415. Bettencourt found that after the truth was revealed during and after market hours on May 14, 2020, the stock declined 31.63% and that decrease was statistically significant, meaning company-specific information caused the decline. D.E. 171-5 at ¶¶ 113-115 (Bettencourt Report). The stock's decline after the truth emerged further supports price impact.

Despite the quantitative and qualitative evidence showing price impact, Defendants contend that the undisputed material facts show that the May 1 Press Release had no effect on Co-Diagnostics' stock price. D.E. 169 at 35. Defendants' argument rests on a skewed understanding of Bettencourt's report as well as an incorrect interpretation of the law related to event studies. Defendants claim that Bettencourt did not "discuss" the May 1st stock price increase in his reports. *Id.* But as Bettencourt explained at his deposition, he found a statistically significant increase on May 1st and pointed Defendants to Exhibit 6 to his report which detailed his analysis. *See above* at 25. This, alone, is enough to defeat Defendants' request to grant summary judgment on reliance.

Further, Defendants' argument rests on an improperly narrow reading of the law. Defendants' expert, Ferrell, conducted his own event study and found that the abnormal return on May 1st was not statistically significant at the 95% level; instead, Ferrell's GLS model found an abnormal return on May 1 that was significant only at the 93% level—just 2% less. D.E. 169-85 at 37:4-13 (Ferrell Depo.); D.E. 169-70 at 236:14-237:19 (Bettencourt Depo.). Defendants treat Ferrell's 93% statistical significance finding as conclusive proof that the May 1 Press Release did

not impact Co-Diagnostics' stock price. Not only does this ignore the qualitative data discussed above—analysts' attributing the May 1st price increase to the May 1 Press Release—it also ignores the law. Courts hold that while a 5% significance level is the typical measure of significance, "[n]o hard and fast rule dictates a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one." *In re Chicago Bridge*, 2020 WL 1329354, at *4 (citing cases). In fact, Ferrell's 93% finding, combined with the Bettencourt's May 1, May 13 and May 15 back-end findings, suggests that summary judgment should be granted for Class Plaintiff on price impact and thus reliance. *See* D.E. 168 at 30-31. At worst, there are fact issues on price impact based on a battle of the experts, and it would be improper to grant summary judgment for Defendants on reliance.

## IV. THE CLASS PLAINTIFFS HAVE PROVEN LOSS CAUSATION

There is no basis for summary judgment on loss causation. The four adverse events and disclosures identified by the Class Plaintiff qualify as corrective disclosures, and the impact of those corrective disclosures can properly be evaluated over a two-day period of time (May 14-15, 2020).

### A. The Plaintiffs Have Identified Four Corrective Disclosures That Undercut and Reveal the Falsity of the May 1 Press Release.

Loss causation in a securities fraud case is effectively "proximate cause." *In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 260 (2d Cir. 2016). Plaintiffs can prove loss causation by: (1) identifying corrective disclosures that reveal to the market the pertinent truth that was previously concealed or obscured by the company's fraud; (2) showing that the stock price dropped after the truth emerged; and (3) eliminating other possible explanations for the price drop so that the factfinder can infer that it was more probable than not that it was the revelation of the truth that caused a substantial amount of the price drop. *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1311-12 (11th Cir. 2011); *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1136

27

(10th Cir. 2009).

As to the first element, there are no hard-and-fast rules about what types of events or disclosures count as corrective. *Public Emps. Ret. Sys. Of Miss v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014). To be corrective, an event or disclosure need only "relate back" rather than precisely mirror the early misleading statement. *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d at 1140 (emphasis added). "It is enough if the disclosure reveals new facts that, taken as true, render *some aspect* of the defendant's prior statement false or misleading." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020). "A corrective disclosure can come from any source, and can take any form from which the market can absorb the information and react, so long as it reveals to the market the falsity of the prior misstatements." *FindWhat*, 658 F.3d at 1311 n. 28 (cleaned up). Sometimes, a corrective disclosure is a disclosure in the traditional sense—that is, a statement by the defendant admitting the truth. *Bond v. Clover Health*, 587 F.Supp.3d 641, 679 (M.D. Tenn. 2022). Other times, the corrective disclosure comes from third parties uncovering the truth and informing the market. *Id.* And, in some cases, a plaintiff can show a corrective disclosure when a defendant "concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). A corrective disclosure does not have "to be a single disclosure; rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures." *Amedisys*, 769 F.3d at 322.

Importantly, in assessing whether certain events or disclosures are corrective, a court must consider all potential disclosures collectively rather than viewing each in isolation. *Amedisys*, 769 F.3d at 322. Courts must take a "flexible approach" in evaluating whether some event or occurrence revealed a fraud to a market; they must consider whether a revelation contains enough "information

to significantly undermine" the fraudulent misrepresentation such that it "can be reasonably read to reveal the underlying fraud." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024). Further, at summary judgment, all facts related to loss causation must be viewed in the light most favorable to the Class Plaintiff. *Id.*

Here, there are four corrective disclosures that relate to the May 1 Press Release: (1) a May 14, 2020 Salt Lake Tribune Article showing that Test Utah refused to engage in a state-wide, U.S.-based validation test; (2) a Test Iowa validation result showing the test had lower sensitivity than Co-Diagnostics claimed; (3) an analyst report published by well-known research analyst Hindenburg Research; and (4) an FDA Press Release about PCR diagnostic tests. Viewing these disclosures collectively and in the light most favorable to the Class Plaintiff, a reasonable juror could find that together they operated to correct the misleading May 1 Press Release.

***The May 14, 2020 Salt Lake Tribune article revealed the fraud because it suggested the Logix test had accuracy problems and that the Company did not want to submit its allegedly perfect test to scrutiny:*** On May 14, 2020, the Salt Lake Tribune released an article introducing new facts to the market that showed that the May 1 Press Release was misleading and fraudulent. *See* D.E. 169-95 (May 14, 2020 Salt Lake Tribune Article). The article reported that Test Utah, a joint venture using Co-Diagnostics' tests, had "declined to join other major Utah labs in a joint experiment to confirm one another's quality." *Id.* Instead, Test Utah had agreed to a "sample comparison" but refused to submit Co-Diagnostics Logix tests to the more formal "proficiency challenge." *Id.* The sample comparison, as opposed to the formal proficiency challenge, was not as "detailed," "would not show whether [Co-Diagnostics'] tests [were] detecting the virus in patients who might be producing scant amounts of the virus," and would not "confirm the test's sensitivity."

29

In short, the article reported that Test Utah (Co-Diagnostics' proxy) was refusing to subject the Logix test to sensitivity testing that would reveal whether the test had problems identifying positives from patients with lower viral loads—the concern about the Logix test stated in the April 30th Salt Lake Tribune article, which led the Company to issue the misleading press release.

This article about the refusal operated as a corrective disclosure. Although Co-Diagnostics did not expressly admit that the May 1 Press Release was misleading, Test Utah and Co-Diagnostics' refusal to submit their test to joint accuracy and sensitivity testing signaled to the market that the May 1 Press Release was misleading. A defendant's actions can "constructively" disclose that a prior statement was false when those actions cast doubt on the prior representation. *See In re Vivendi*, 838 F.3d at 262 ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."). For example, in *Vivendi*, defendant made various misleading statements that suggested that it "faced no liquidity risk." *Id.* at 251. "A series of events … made the truth about the liquidity risk come to light." *Id.* at 262. Months after signaling it had no liquidity issues, the company sold 55 million treasury shares. *Id.* This sale signaled to the market that the company needed cash and thus acted to show that the company's prior statements about no liquidity risk were false. *Id.*

Just as Vivendi's sale of millions of treasury shares undercut its prior statements about a healthy financial condition, suggesting the statements were false, Co-Diagnostics and Test Utah's refusal to submit to joint validation revealed that Co-Diagnostics' prior statements suggesting its test were nearly perfect were false. Defendants contend that Test Utah's choice not to participate in the state-wide validation says "nothing about the Logix test itself." D.E. 169 at 37. Not so. The

refusal to engage in state-wide testing that would provide information about the test's clinical sensitivity revealed, at least partially, that the May 1 Press Release overstated the efficacy of the Logix test and that, despite claiming 100% accuracy across all evaluations, the Company was not willing to subject its test to real scrutiny and comparison with other Covid-19 tests.

Relying on testimony from Satterfield, Defendants also assert that Test Utah, rather than Co-Diagnostics, made the decision to not submit to testing. But there is a factual dispute on this issue. Contrary to Satterfield's testimony, Co-Diagnostics' CEO Egan testified that Co-Diagnostics had a role in refusing to do the joint validation and chose to decline the "proficiency challenge" because it believed the state of Utah was biased. D.E. 171-2 at 282:9-283:12 (D. Egan Depo.). In any event, whether Test Utah alone or with Co-Diagnostics' input made the refusal decision is immaterial. The refusal itself, by an entity that had non-public knowledge about the accuracy of the test, reveals that the May 1 Press Release overstated the accuracy of the test or had serious concerns about it—contrary to the misrepresentations about the test's perfect performance in validations.

The May 14, 2020 Salt Lake Tribune article also provided other new corrective information. A few days earlier, Test Nebraska (another entity using the Co-Diagnostics test) had reported that only about 3% of its tests showed positives compared to 18% being tested statewide. *See* D.E. 169-95. Before May 14, 2020, Nebraska's Governor argued that the discrepancy existed because Co-Diagnostics' tests were used for non-symptomatic patients whereas the other tests used in Nebraska were geared towards sicker individuals. For the first time—on May 14, 2020—the Salt Lake Tribune questioned Governor Rickett's position, questioning whether the discrepancy was due to "population differences" or whether the discrepancy resulted from the test's inability to pick up true positives. The author noted that she had conducted an analysis undercutting Rickett's assertion:

"[S]creengrabs of Nebraska's case updates collected by the data website CovidTracking.com show the statewide positive rate since April 30, when TestNebraska was to begin testing, has been more than 20%." *Id.* In short, the May 14, 2020 Salt Lake Tribune article revealed that the May 1 Press Release was misleading by showing that the test was having issues with picking up true positives in Nebraska—like in Utah. Taken together, Test Utah's refusal and the negative information about the test's clinical performance in Nebraska, exposed that the May 1 Press Release was misleading. Thus, a reasonable juror could find that the May 14, 2020 article operated as a corrective disclosure.

*The Iowa Test Validation revealed the fraud because it suggested that, in the field, the test performed worse than Co-Diagnostics had reported:* On the heels of the May 14th Salt Lake Tribune article, the State of Iowa disclosed its validation results from Test Iowa (another entity using Co-Diagnostics' tests). This validation operated as a corrective disclosure because it revealed that the test was not as accurate as the May 1 Press Release claimed that it was. Ex. 51. On May 14, 2020, the Des Moines register reported the results of the validation. The articled stated that "the state hygienic lab achieved ratings of 95% accuracy for determining positives …" In short, Iowa reported that the Co-Diagnostics' test were showing a 95% sensitivity in the field. The difference between a 95% sensitivity finding and a 98% sensitivity finding can be vast as Dr. Westgard explains in his report. D.E. 169-12 at PageID.2782 (Westgard Report). For example, if the Co-Diagnostics' test had a sensitivity of 98%, there is still a 1-in-3 chance that the test will show a false positive for any given individual. D.E. 86 at ¶ 85 (Second Amended Complaint). If the test's sensitivity is 95%, instead, "the probability of getting a false positive increases to 55.2%." Further, while potentially acceptable accuracy for clinical purposes, 95% sensitivity or accuracy does not set Co-Diagnostics apart from its competitors the way the false claims of 100% accuracy did. Instead

32

of being *the* "superior" to test on the market, as claimed in the press release, this new information showed that it was just another acceptable, non-differentiated test—one in a long line of them.

Defendants argue that the Iowa validation cannot constitute a corrective disclosure because they "constituted new data from a new validation, not a correction of those previously announced data." D.E. 169 at 37. That fact does not make the Iowa validation any less corrective. The May 1 Press Release represented that the test was perfect, and the Iowa Validation signaled to the market that the representation was false. Defendants suggest that to be corrective, the new data would have to correct the previously reported data. Of course not. A disclosure can be corrective so long as it "relates back" to the earlier misleading statement; it need not mirror the earlier statement directly. *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d at 1140. Defendants also suggest that the Iowa announcement cannot be corrective when Nebraska had announced a similar sensitivity finding of 95% on May 11, three days earlier. But Defendants fail to appreciate why the Nebraska disclosure may not have fully revealed the fraud to the market on May 11. First, it was only a single state finding the 95% sensitivity number rather than now two states calling into question the accuracy of the May 1 Press Release. Second, as explained above, the Salt Lake Tribune article helped clarify and explain why Nebraska's 95% sensitivity finding was less-than-ideal. This clarification likely impacted how the market then viewed Nebraska's additional 95% sensitivity finding.

In short, a reasonable juror could find that the Iowa validation revealed information to the market—that the test had sensitivity of materially less than 100% and that it was not superior to its competitors—that was previously obscured by the company's May 1 Press Released. *FindWhat*, 658 F.3d at 1311 n. 28. Thus, this information operated as a corrective disclosure.

> ***The Hindenburg Research analysis revealed the fraud because, based on expert analysis,***

*it cast doubt on the May 1 Press Release:* After the above articles were published, Hindenburg Research released an analysis—via a series of tweets on Twitter—revealing that the May 1 Press Release was misleading. These tweets operated as a corrective disclosure because, using expert analysis to make previously disclosed information digestible to the public, Hindenburg expressly found that the May 1 Press Release was false.

Hindenburg Research is a U.S.-based investment research firm that focuses on short-selling. Ex. 49. According to its website, Hindenburg uncovers "hard-to-find information from atypical sources." *Id*. Analyst reports based on publicly available information can constitute corrective disclosures when the report transforms information that is difficult to interpret or access into an "easily digestible" form. *In re Genius Brands*, 97 F.4th at 1186; *Amedisys*, 769 F.3d at 323. "This makes sense [because] securities issuers should not escape liability for misrepresentations merely because they can show that corrective information was publicly available on some webpage tucked in a deep corner of the internet or buried in some unwieldy spreadsheet." *In re Genius Brands*, 97 F.4th at 1186. Various courts have found that Hindenburg's analyses, some of which are based almost entirely on public information, constituted corrective disclosures in securities fraud cases. *See Bond*, 587 F.Supp.3d at 680; *In re Genius Brands*, 97 F.4th at 1187; *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *16 (D. Ariz. Dec. 8, 2023); *In re Mullen Auto Sec. Litig.*, 2023 WL 8125447, at *11 (C.D. Cal. Sept. 28, 2023); *Theodore v. Purecycle Tech, Inc.*, 2022 WL 21057415, at *18 (M.D. Fla. Aug. 4, 2022).

Also, analyst reports that contain a mix of public and new information can constitute corrective disclosures. For example, in *Purecycle*, plaintiffs alleged that a recycling company made various misleading statements to the market that were revealed when Hindenburg released a

research report. *Purecycle*, 2022 WL 21057415, at *18. Defendants asserted that the Hindenburg report did not constitute a "corrective disclosure" because it merely "repackaged" already-public information from "public sources." *Id.* Though the report primarily relied on public data, it also relied on interviews with company employees, those interviews were "new" information, and that "new" information deemed the report a corrective disclosure. *Id.*

And, in certain circumstances, analyst reports based exclusively on public information can constitute corrective disclosures. For example, in *In re Genius*, plaintiffs sued defendant Nickelodeon (the Children's television program) for violating the securities laws. 97 F.4th at 1186. Plaintiffs alleged that Nickelodeon misled investors by asserting in a press release that it aired the show Rainbow Rangers 26 times per week when, in reality, it aired the show less than 15 times per week. *Id.* at 1185. Plaintiffs based their loss causation arguments on a Hindenburg report premised entirely on public information. *Id.* at 1186. Although the March 2020 broadcast schedule was on Nickelodeon's website—and would have revealed the fraud and the true number of airings of Rainbow Ranger per week—a shareholder attempting to review the website would have no easy time doing so. *Id.* at 1187. "Put simply, the information contained in the … [online] broadcast schedule was not in a 'readily digestible' form on the [] website and did not become digestible until the Hindenburg Report synthesized it for the marketplace."

Here, like in *PureCycle* and *In re Genius*, the Co-Diagnostics Hindenburg analysis took far-flung and difficult to find information and used analytical skills to make certain facts digestible to the market. On the afternoon of March 14, 2020, Hindenburg issued various tweets about Co-Diagnostics. In the first tweet, Hindenburg noted that "We are short CODX due to … a growing list of higher quality COVID tests & its propensity to issue frequent fluffy press releases." Ex. 45. Next,

Hindenburg tweeted a chart showing an analysis that it had done of all of Co-Diagnostics' press releases. *Id.* Above the chart, Hindenburg tweeted: "CODX has issued 34 press releases over the last 4 months and yet NONE have detailed the number of COVID-19 tests sold or the economics of the transactions. In Jan & Feb, the company was averaging about 1 press release every other business day." *Id.* In another tweet, Hindenburg stated that "[w]e believe CODX provides a third-tier option of questionable quality amidst a sea of growing competition." *Id.* Finally, Hindenburg cited to a previously-released Biocentury article that "CODX's test quality has been consistently rated one of the worst, despite its own press releases touting 100% specificity and sensitivity."

Hindenburg's tweets constitutes a corrective disclosure in at least two ways. First, Hindenburg's tweets synthesized far-flung public information to reveal to the market that the test was a "third-tier" option. Hindenburg is in the business of "uncovering hard-to-find information from atypical sources." Analyzing webpages (the FDA and the Biocentury article) "tucked in [] deep corner[s] of the internet," *In re Genius*, 97 F.4th at 1186, Hindenburg transformed previously public information into a digestible form that allowed the market to see, for the first time, that Co-Diagnostics' test was not nearly as good as its competitors and a "third-tier" Covid-19 testing option—as the earlier corrective disclosures confirmed. This revelation undermined and contradicted the May 1 Press Release such that it "can be reasonably [understood] to reveal the underlying fraud." *In re Genius*, 97 F.4th at 1184. Second, Hindenburg's tweet synthesized and analyzed company press releases to reveal that they were silent on the company's sales thus suggesting to the market that the tests were not selling (and likely not performing) as well as the company claimed. Just as *In re Genius* and *PureCycle*'s frauds were only revealed after Hindenburg synthesized hard-to-find, public sources, Co-Diagnostics' fraud was only revealed once Hindenburg

36

did the same analysis of the company. Thus, a reasonable juror could find that the Hindenburg tweets constitute a corrective disclosure sufficient for purposes of loss causation.

*The FDA Release revealed the fraud because it contradicted the May 1 Press Release:* Finally, after the market closed on May 14th, the FDA issued a press release that operated to significantly undermine the claims of 100% accuracy in the May 1 Press Release. During the early months of the pandemic, investment analysts had been closely watching Co-Diagnostics and Abbott side-by-side as they competed to become market leaders in Covid-19 PCR testing. *See* D.E. 169-70 at 155:5-157:19 (Bettencourt Depo) (testifying that "market commentary … linked the fortunes of Co-Diagnostics and Abbott together."); D.E. 171-5 at ¶¶ 45-46 (Bettencourt Report) (noting that analysts tracked Abbott and Co-Diagnostics together because their PCR tests were competing to become the market leader and citing an analyst report that found that "Co-Diagnostics … is poised to finish the day solidly in the green on more than 40% higher volume, enjoying a surge in buying in the wake of reported disappointing sensitivity data from a New York study evaluating Abbott's [test].). As the analyst report shows and as Bettencourt's undisputed testimony suggests, investors tracked the two companies together. Unsurprisingly, then, the FDA's May 14, 2020 after-market press release about the Abbott test can be understood to also affect Co-Diagnostics' share price because investors were viewing information about both companies together. The FDA Release noted that "The FDA is sharing early information available about potential inaccurate results in the spirit of transparency … The FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. *No diagnostic test will be 100% accurate due to performance characteristics, specimen handling, or user error, which is why its*

*important ... to identify the cause of suspected false results.*" D.E. 169-41 (emphasis added). As explained above (*see* SOF ¶ 17), the market had exhibited confusion about whether a diagnostic could be 100% accurate in the field and many news analysts and investors understood Co-Diagnostics to say that its test performed 100% accurately or nearly 100% accurately. This FDA release, especially taken together with all the other corrective disclosures from earlier in the day, significantly undermined the fraudulent misrepresentation such that it can be reasonably be understood to reveal the May 1 Press Release's misleading nature.

***

When these four corrective disclosures are viewed together, and when all inferences are viewed in favor of the Class Plaintiff, a reasonable juror could find that corrective disclosures disseminated to the market during and after the close of trading on May 14, 2020, informed investors that they had been misled by Co-Diagnostics' May 1 Press Release, causing the Company's share price to fall, and artificial price inflation to dissipate.

### B. The Use of a Two-Day Window (May 14-15) to Evaluate Loss Causation is Proper

The Class Plaintiffs' expert, Mr. Bettencourt, opines that the impact of these corrective disclosures manifested itself over two days—May 14th and 15th—and caused an approximately 31% drop in Co-Diagnostics' stock price. As Mr. Bettencourt has done, it is common practice to use a two-day window—consisting of the day of the corrective disclosures and the next trading day—to evaluate the negative impact of corrective disclosures on a company's stock price. The Defendants have moved to exclude Mr. Bettencourt's opinion, insofar as he uses a two-day window to evaluate loss causation. D.E. 173-1. Simultaneous with this response memorandum, the Class Plaintiffs are submitting an opposition to that motion to exclude; the Class Plaintiff's opposition shows that the

38

use of a two-day window is standard, acceptable, and cannot be excluded under *Daubert*.

Nonetheless, in a cursory, one-paragraph argument without legal citation, the Defendants argue that the Class Plaintiffs cannot use the May 14-15th window to prove loss causation and, thus, they are entitled to summary judgment on this issue. Of course, this not a proper summary judgment argument because Mr. Bettencourt's report creates a dispute of fact on this issue. Unless that report is excluded, which it should not be, then summary judgment is not proper on this matter.

## V.      **GELT HAS STANDING**

A class plaintiff has standing to pursue a securities action even when the timing of its stock sales creates different damages calculations than those of other class members. *See* D.E. 154 at 11 (Court's Order Granting Motion for Class Certification) (citing cases). So long as a plaintiff can show it suffered any damage as a result of the alleged misstatements, it has standing to proceed. *Christian v. BT Grp., PLC*, 2017 WL 3705804, at \*6-8 (D.N.J. Aug. 28, 2017) (plaintiff that sold its shares after one of two corrective disclosures during class period had standing and was a typical for class certification purposes because it suffered losses as a result of the misrepresentations).

There is no dispute here that the Class Plaintiff purchased Co-Diagnostics' stock at $26.65 per share after the May 1 Press Release, and sold the stock on May 14th—after the initial corrective disclosures and on the first day of a two-day span where the Company's stock declined over 31%-- at price of $20.97 per share, for a loss of over $125,000. *See* D.E. 168, SOF ¶¶ 41, 44 (Ex. 29). As shown in Mr. Bettencourt's report, artificial inflation declined by $6.42 per share over the May 14-15 window. Of that amount, $1.32 dissipated on May 14, 2020 and the remaining $5.10 dissipated on May 15, 2020. D.E. 171-5 at Bettencourt Ex. 7, PageID.5291 (Bettencourt Report). Recoverable damages are not the entire amount by which an investor overpaid for a security on account of fraud,

which is the artificial inflation at the time of purchase, but rather how much of that artificial inflation was actually lost by the investor during their holding period. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). Here, Class Plaintiff Gelt's damages are easily calculated by Mr. Bettencourt based on the May 14th artificial inflation and Gelt's holding period during that day.

The Defendants do not dispute this through their expert or otherwise. Rather, they lodge a different, totally unprecedented argument: that because there was not a statistically significant price drop on *just* May 14th (the first day of the two-day window), when the Class Plaintiff sold its shares, the Class Plaintiff has no recoverable damages. Naturally, there is zero support for this theory. The two cases cited by the Defendants (*Rodriguez* and *Rector*) pertain to class certification and do not remotely support or even touch upon this unfounded argument. And the Court already rejected this argument at the class certification stage. *See* D.E. 154 at 12-13.

## VI.     THE SECTION 20(A) CLAIMS ARE PROPER

The Defendants do not contest that § 20(a) claims are proper against Dwight Egan, Reed Benson, and Brent Satterfield. D.E. 169 at 35 (Defendants' Motion for Summary Judgment). Further, as to the remaining Defendants—Nelson, Durenard, Murphy, and Serbin—the motion does not offer or to cite any admissible evidence showing that these directors did *not* exert control or influence over the day-to-day operations of the Company. Because it is the movant's initial burden to marshal evidence in support of summary judgment, this argument fails and does not require factual rebuttal.

## CONCLUSION

For all of these reasons, the Court should deny Defendants' motion for summary judgment. This securities fraud case should be presented to a jury.

DATED: May 22, 2024

40

/s/ *D. Loren Washburn*
WASHBURN LAW GROUP, LLC

MARCUS NEIMAN RASHBAUM & PINEIRO LLP
Michael A. Pineiro
Brandon Floch

*Attorneys for Certified Class and Class Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on May 22, 2024 a copy of the foregoing was filed on the CM/ECF system and

delivered to all parties of record.

/s/ D. Loren Washburn
D. Loren Washburn