**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, <br><br><br> Plaintiff, <br><br> v. <br><br> CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, <br><br> Defendants. | Case No. 2:20-cv-00368-JNP-DBP <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND RELIEF REQUESTED..........................................................................1

RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS..........4

STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS.................................12

    A.    Extensive Public Discussion in Early 2020 of the Fact that No Test Is Perfect...................................................................................................12

    B.    The NIV, Greek, and South African "Results" Were Due to Contamination or Other Non-Test Factors and Were Not Credible Indicators of the Logix Test's Performance...............................................15

    C.    The Defendants and Other Co-Diagnostics Employees Involved in Preparing the May 1 PR Believed It Truthfully Described the Performance of the Logix Test and Was Not Misleading........................16

    D.    The Stock Price Did Not React to the May 1 Press Release....................17

    E.    No Defendant Sold Stock During the Class Period. ................................18

ARGUMENT.............................................................................................................................18

    I.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ELEMENTS OF FALSITY OR MATERIALITY. .....................................19

        A.    No Evidence Shows There Were Undisclosed Problems with the Logix Test's Accuracy.............................................................................21

        B.    The Undisputed, Material Facts Show that No Investor Could Have Read the May 1 PR As Promising the Test Would Perform Perfectly All of the Time. .......................................................................24

    II.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON SCIENTER. . ................................................................................................30

    III.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE RELIANCE AND "IN CONNECTION WITH" ELEMENTS. ..................36

    IV.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF DEFENDANTS' AFFIRMATIVE DEFENSES. ...............................38

CONCLUSION.........................................................................................................................40

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abady v. Lipocine Inc.*,
   2023 WL 2938210 (D. Utah Apr. 13, 2023)............................................................................29

*Adler v. Wal–Mart Stores, Inc.*,
   144 F.3d 664 (10th Cir. 1998) .................................................................................................5

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)................................................................................................................36

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................................18

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)............................................................................................3, 28, 37, 38

*Caprin v. Simon Transp. Servs.*,
   112 F. Supp. 2d 1251 (D. Utah 2000).....................................................................................28

*Chipman v. Aspenbio Pharma, Inc.*,
   2012 WL 4069353 (D. Colo. Sept. 17, 2012)........................................................................29

*City of Philadelphia v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) .............................................................................................28

*DeKalb Cnty. Pension Fund v. Allergan PLC*,
   2024 WL 677081 (2d Cir. Feb. 20, 2024)..............................................................................24

*In re Fannie Mae Sec.*,
   905 F. Supp. 2d 63 (D.D.C. 2012).........................................................................................36

*Garber v. Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) ............................................................................................29

*In re Gold Res. Corp. Sec. Litig.*,
   776 F.3d 1103 (10th Cir. 2015) .............................................................................................33

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..........................................................................................4, 36, 37, 38

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
2018 WL 4945703 (C.D. Cal. Oct. 5, 2018)..............................................................................37

*Johnson v. Weld Cty., Colo.*,
594 F.3d 1202 (10th Cir. 2010) ...............................................................................................19

*Leone v. Owsley*,
810 F.3d 1149 (10th Cir. 2015) ..........................................................................................18, 19

*Milman v. Box Hill Sys. Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999)........................................................................................29

*O'Connor v. R.F. Lafferty & Co.*,
965 F.2d 893 (10th Cir. 1992) .................................................................................................36

*Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015).........................................................................................2, 24, 25, 26

*In re PolarityTE, Inc., Sec. Litig.*,
2020 WL 6873798 (D. Utah Nov. 22, 2020)...........................................................................29

*Raymond Weil, S.A. v. Theron*,
585 F. Supp. 2d 473 (S.D.N.Y. 2008).....................................................................................39

*In re Regeneron Pharms., Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)........................................................................28, 29

*Richfield v. PolarityTE, Inc.*,
2023 WL 3010208 (D. Utah Apr. 19, 2023)............................................................................25

*S.E.C. v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) .....................................................................................28, 32, 35

*Scott v. Harris*,
550 U.S. 372 (2007)..................................................................................................................24

*Scott v. Paychex Ins. Agency, Inc.*,
2023 WL 5036099 (S.D. Fla. Aug. 8, 2023)............................................................................39

*Sec. & Exch. Comm'n v. e-Smart Techs., Inc.*,
85 F. Supp. 3d 300 (D.D.C. 2015).....................................................................................28, 29

*SEC v. Strategic Global Investments, Inc.*,
262 F. Supp. 3d 1007 (S.D. Cal. Apr. 17, 2017)......................................................................35

*Shuster v. Symmetricom, Inc.*,
  35 F.App'x 705 (9th Cir. 2002) ......................................................................................33

*In re Skechers USA, Inc. Sec. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020)...........................................................................24

*Smallen v. The W. Union Co.*,
  950 F.3d 1297 (10th Cir. 2020) ...............................................................................30, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................................30

*In re Tesla Inc., Sec. Litig.*,
  2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) .................................................................35

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)...........................................................................................25

*United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake
  Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) ...............................................................................19, 28

*In re Volkswagen*,
  2017 WL 6041723 (N.D. Cal. Dec. 6, 2017).................................................................24

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
  739 F.2d 1434 (9th Cir. 1984) .................................................................................32, 36

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) .........................................................................................33

## Other Authorities

5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1269 (4th ed.
  2016) ..............................................................................................................................39

10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2727.1 (4th
  ed. 2016) ........................................................................................................................18

Co-Diagnostics, Inc., Dwight Egan, James Nelson, Eugene Durenard, Edward Murphy, Richard Serbin, Reed Benson, and Dr. Brent Satterfield ("Defendants"), respectfully submit this brief in opposition to Plaintiff's Motion for Partial Summary Judgment (Dkt. #168; "MPSJ").

## INTRODUCTION AND RELIEF REQUESTED

Plaintiff has litigated this case for three and a half years, taken fifteen fact and expert depositions, received hundreds of thousands of pages of documents in response to broad requests, and now faces an inconvenient truth: the press release issued by Co-Diagnostics on May 1, 2020 ("May 1 PR") fairly and truthfully described the excellent performance of the Company's Logix Smart® COVID-19 test (the "Logix test") on independent lab evaluations based on the information available at the time. No evidence suggests otherwise. There is no evidence (i) that the results attached to the May 1 PR do not in fact show 100% sensitivity and specificity as reported in the press release; (ii) that any credible evaluation results at the time were inconsistent with the press release's statements; or (iii) that anyone at Co-Diagnostics believed the press release was misleading or intended for it to be so. To the contrary, the evidence uniformly shows that the Defendants believed they were speaking truthfully in defense of an excellent product that had been unfairly maligned in a *Salt Lake Tribune* article the day before.

Faced with this mountain of contrary evidence, Plaintiff is forced to rely on conclusory assertions and misleading soundbites to argue that it is entitled to partial summary judgment on the elements of falsity, scienter, reliance, and "in connection with" the sale or purchase of securities, as well as all of Defendants' affirmative defenses. The result is an argument section that is nearly devoid of factual references and ignores a wealth of undisputed, material evidence—Plaintiff cannot (and has not) met its burden:

*Falsity.* Plaintiff's argument on falsity boils down to the bare assertion that a handful of troubleshooting emails from labs in India (the National Institute of Virology; "NIV"), Greece, and South Africa constituted "failed" validation study results that were inconsistent with the statements in the May 1 PR and rendered it misleading. But no evidence supports this characterization—none. Every scientist who spoke to the issue (including Defendants' PCR expert, Dr. Bustin) stated that the NIV, Greek, and South African data were not credible, that they were due to contamination or other non-test factors, and that they did not accurately reflect the Logix test's performance. No evidence disputes this—not even Plaintiff's own purported scientific expert Dr. Westgard, whose reports and testimony Plaintiff chose not to submit. On this undisputed record, no rational trier of fact could find that omission of these unreliable results rendered the May 1 PR false or misleading. Nor could any reasonable investor have read the May 1 PR in context as indicating that the test would perform with perfect accuracy all of the time. Under *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), whether a statement is false or misleading "always depends on context," including "apparently conflicting" public information. *Id.* at 190-91. The fact that no test is 100% accurate was widely discussed in the months leading up to and following the May 1 PR, and prior public statements, including by Defendants, indicated the Logix test, specifically, was highly accurate but imperfect. Viewed within this full and undisputed context, no reasonable investor could have been misled, and no rational trier of fact could find for Plaintiff on falsity.

*Materiality.* For essentially the same reasons, Plaintiff also cannot prove that it is entitled to summary judgment on materiality. Undisclosed information is only material—and its omission only renders a misstatement materially misleading—if its disclosure would have "significantly

altered the total mix of information made available" to a reasonable investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Here, no rational trier of fact could find that the allegedly omitted information—that the Logix test was not "perfect"—would have "significantly altered the total mix of information" in light of the extensive, undisputed evidence that this fact had already been widely discussed in the press (and elsewhere) for months prior to the May 1 PR.

*Scienter.* To be entitled to summary judgment on scienter, Plaintiff must show that no rational trier of fact could conclude from the evidence that Dr. Satterfield and Co-Diagnostics acted in good faith. Plaintiff cannot do so because an abundance of undisputed evidence demonstrates just that: the Defendants had no motive to commit fraud, did not personally benefit from the purported fraud in any way, and each testified that they genuinely believed the May 1 PR fairly described the Logix test's performance based on the information available at the time. Plaintiff again points to the NIV, Greek, and South African lab emails to argue that Dr. Satterfield knew "the test had performed poorly in certain evaluations" and therefore must have intended to deceive, but the documents themselves show the opposite—that Dr. Satterfield believed the data from those labs were due to contamination or other non-test factors and were not credible indicators of the test's performance. This is further supported by credible and undisputed testimony from other Co-Diagnostics employees involved in those communications, and corroborated by Dr. Bustin's expert opinions. These undisputed facts preclude summary judgment for Plaintiff on scienter and compel it for Defendants.

*Reliance and "in connection with" the sale or purchase of securities.* Plaintiff relies on the "fraud-on-the-market" presumption to establish reliance on a class-wide basis, and claims that it is entitled to summary judgment because it has satisfied the factors necessary to invoke the

3

presumption. But the fraud-on-the-market presumption can be rebutted with any "appropriate evidence" showing that the alleged misstatements did not in fact impact the stock price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014) ("*Halliburton II*"). Here, the undisputed testimony of Defendants' economic expert Prof. Allen Ferrell proves that there was no statistically significant movement in the stock price on May 1, 2020 following the May 1 PR. This "severs the link" between the challenged statements and the price paid by Plaintiff and rebuts the presumption of reliance as a matter of law. *See id.* at 281. Because Plaintiff offers no evidence that it individually relied on the challenged statements when it traded in Co-Diagnostics' securities during the class period, it cannot prove reliance or satisfy the "in connection with" element of its claims and is not entitled to summary judgment.

In short, the undisputed, material evidence clearly demonstrates that summary judgment should be granted for *Defendants*, as detailed in their motion for summary judgment (Dkt. #169; "Def's MSJ"), and against Plaintiff on all claims. Because a rational trier of fact could (and should) easily find for Defendants on each of the elements and issues raised in Plaintiff's motion, summary judgment for Plaintiff is inappropriate and its MPSJ should be denied in its entirety.

## RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants agree that there are no genuine issues of material fact in this case, and respectfully refer the Court to their MSJ for an accurate account of the full set of undisputed, material facts. As discussed below, Plaintiff's Statement of Undisputed Material Facts ("Pl's SUF") is replete with mischaracterizations of the evidence and irrelevant asides, but those characterizations are simply characterizations—not facts themselves. And much of the prominently-featured content in Plaintiff's SUF is immaterial to Plaintiff's Motion, as detailed

below. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (fact is only "material" at summary judgment if it is "essential to the proper disposition of the claim").

**Response to Pl's SUF ¶¶ 1-5**: Undisputed solely for purposes of this motion, except that Defendants object to all facts derived from the reports or testimony of Plaintiff's purported economic expert Daniel Bettencourt.[1] For the reasons detailed in Defendants' Motion to Exclude his testimony (Dkt. #173; "Bettencourt *Daubert* Mot."), Mr. Bettencourt's opinions are unreliable and scientifically unsupported and therefore inadmissible, and should be excluded in their entirety. Dkt. #173 at 3-10[2] (explaining why Bettencourt's unsworn initial report is procedurally deficient and inadmissible under Rule 26 and 28 U.S.C. § 1746, and all of his opinions are inadmissible because they are unreliable, methodologically flawed, and scientifically unsupported).

**Response to Pl's SUF ¶¶ 6-8**: Immaterial, but undisputed solely for purposes of this motion. Paragraphs 6-7 detail communications between individuals at Co-Diagnostics and the FDA in February 2020 concerning language in the Company's February 6 and 10, 2020 press releases and related marketing materials that the FDA believed suggested the Logix test could be sold for diagnostic purposes in the United States when at the time (prior to its emergency use authorization on April 4, 2020) it was only available for research use. *See* Pl's SUF ¶¶ 6-7; Dkt. #171-7. In response, Co-Diagnostics modified the language at issue and put in place a corrective action plan under which its regulatory department, headed by Cecilia Hutchins, was to review

---

[1] Defendants similarly object to any reliance on Plaintiff's purported scientific expert Dr. James Westgard's opinions, which Defendants also have moved to exclude in their entirety. Dkt. #167 at 3-10 (explaining why Westgard's opinions are inadmissible under 28 U.S.C. § 1746 and Rule 26(a)(2)(B)). Notably, Plaintiff does not submit or cite anywhere in the MPSJ to Dr. Westgard's opinions, presumably because it too recognizes that they are immaterial to its claims.

[2] Pincites to docket items herein refer to the document's internal pagination wherever possible; for documents that do not have internal pagination, pincites refer to the ECF pagination.

press releases related to the Logix Smart line of products prior to issuance. Pl's SUF ¶ 8; Dkt. #171-Dkt. #171-8. All of this is true but not material: the fact that the FDA found certain earlier, unrelated press releases misleading with respect to a different set of issues says nothing about whether the May 1 PR itself was false or misleading in context.

**Response to Pl's SUF ¶¶ 9-10**: Undisputed but clarified as follows: The testimony cited in ¶ 10 shows that Dr. Satterfield stated: "A diagnostic test cannot be 100 percent sensitive and 100 percent [] specific in all circumstances. *It can be in a given data set*." Dkt. #171-1 at 86:11-16 (emphasis added). It is undisputed both that (i) no test can be 100% sensitive and specific all of the time, and (ii) a test *can* be 100% sensitive and specific on a particular evaluation or evaluations.

**Response to Pl's SUF ¶¶ 11-13**: Undisputed but clarified as follows: The *documents and testimony* cited here are not disputed, but Plaintiff fundamentally mischaracterizes the nature and import of that evidence. These paragraphs concern a handful of communications in April 2020 between Co-Diagnostics and the NIV lab in India concerning suspicious-looking performance data. Plaintiff refers to the NIV data as a "failed test" and treats them—without any factual support—as on equal footing with the independent lab validation results that were reported in and attached to the May 1 PR. But the evidence Plaintiff cites shows that the participants in those communications believed the NIV results were due to contamination or other non-test factors and did not accurately reflect the Logix test's performance. *See* Dkt. #171-1 (Satterfield Tr.) at 123:15-130:21, 146:16-150:13, 301:9-304:5 (testifying Co-Diagnostics concluded NIV results were result of contamination); Dkt. #171-22 (Apuli Tr.) at 51:15-25; Dkt. #171-23 (Garcia Tr.) at 117:2-126:20 (testifying she did not take NIV data as indicating lower Logix test performance characteristics); Dkt. #171-9-11 (email chains from 4/2/20 and 4/11/20 reflecting belief that non-

test factors were causing the seemingly lower performance, and showing that other COVID test manufacturers received similarly suspicious results from NIV lab); *see also* Dkt. #169-32, -33, -36, -37 (additional undisputed documents reflecting the same).

Moreover, Dr. Garcia did *not* (as Plaintiff asserts in ¶ 12) "opine" that the NIV results "did not result from alleged lab contamination." The email Plaintiff quotes (Dkt. #171-12) simply shows Dr. Garcia expressing an initial hypothesis—on the day the Company first learned of the NIV issues—that the NIV results might be due to a different non-test cause than contamination (i.e., the late Ct cutoff used for the Logix test, which can cause it to pick up true positives missed by other tests with earlier Ct cutoffs). Dkt. #171-12 (Apr. 2, 2020 email). Later emails show that Dr. Garcia came to believe the NIV results may in fact have been due to contamination of the Logix test reagents in the NIV lab. Dkt. #169-32 at 4 (4/11/20 email: "It is possible that our reagents have acquired contamination from their lab and by the third test all are positive with contamination . . . ."); *see also* Dkt. #171-23 (Garcia Tr.) at 126:14-20 (testifying there was not enough information to reach a firm conclusion as to the cause of the NIV results).

**Response to Pl's SUF ¶¶ 14-16**: Undisputed but clarified as follows: As with the NIV evidence, Defendants do not dispute the communications and testimony cited in these paragraphs, but the evidence does not represent what Plaintiff suggests. The handful of Greek and South African communications cited in ¶¶ 14-16 reflect that the participants were trying to troubleshoot suspicious-looking performance data and that they did not understand those data to be final, credible validation results. Dkt. #171-13-14 (Apr. 17-18, 2020 email chain showing internal discussion of South African issue); Dkt. #171-15 (Apr. 24, 2020 email chain showing participants believed the Logix tests had been contaminated at the Greek lab); Dkt. #171-22 (Apuli Tr.) at

76:15-79:20, 83:14-23 (South African results were due to non-test factors), 82:7-83:23 (Greek results were due to contamination of the Logix test amplicon in the Greek lab); *see also* Dkt. #171-1 (Satterfield Tr.) 218:3-19, 221:3-9, 301:9-302:5 (same re Greek lab); Dkt. #169-39, -40 (emails re Greek and South African issues). Nor does Dkt. #171-15 show that the Greek lab stopped using the test: rather, it states the lab was giving the test another chance and the distributor needed help from the Company to identify and solve the problem (which it did). Dkt. #171-15 at 5.

**Response to Pl's SUF ¶ 17**: Immaterial, but undisputed solely for purposes of this motion. Paragraph 17 discusses a spreadsheet from Co-Diagnostics' QT9 software system (Dkt. #171-16) showing that a handful of customer "complaints" were logged in the months before and after the May 1 PR, and Plaintiff assumes, without support, that they must have raised concerns about the test's performance. But customers contact manufacturers about all kinds of issues (e.g., shipping problems, order issues, troubleshooting), and the mere fact that unspecified "complaints" were made—without any evidence showing that they undercut any challenged statement, or that any Defendant knew about them—is immaterial. Dkt. #171-16 shows a handful of "complaints" logged in the weeks prior to the May 1 PR, but it does not indicate the nature of those complaints, and the evidence shows that the two log entries Plaintiff specifically references in the SUF concerned routine sales issues, not test performance. *See* Ex. 2[3] (CoDI_00239225) (3/30/20 Customer Feedback Record re complaint from Hungarian Ministry of Health that shipment arrived with empty test tubes); Ex. 3 (CoDI_00239228) (4/6/20 Customer Feedback Record re complaint from Gentech Biosciences that shipment was short several boxes of tests kits). The bare fact of unspecified "complaints" being made to Co-Diagnostics prior to May 1, 2020 is not material to

---

[3] "Ex. _" refers to Exhibits 2-4 contained in the Appendix of Evidence filed herewith.

Plaintiff's claims.

**Response to Pl's SUF ¶¶ 19-21**: Undisputed solely for purposes of this motion, except that Defendants dispute Plaintiff's argumentative assertion that Dr. Satterfield's statement in the April 30 *Salt Lake Tribune* "was a lie." Pl's SUF ¶ 21. That assertion is immaterial, however, as Plaintiff's claims with respect to challenged statements in that article (the "Apr. 30 SLT Article") were previously dismissed by this Court. Dkt. #101 at 13-14.

**Response to Pl's SUF ¶¶ 22-34**: Undisputed solely for purposes of this motion, but immaterial as follows: The fact that Ms. Hutchins was not consulted prior to issuance of the May 1 PR (¶ 31) is immaterial. Plaintiff insinuates that she would have disagreed with the draft press release if she had been consulted (¶ 31), but Ms. Hutchins herself testified that she believed the statements in the May 1 PR were true "based on the information that we had at that point." Dkt. #171-6 at 178:9-182:4; *see also* Dkt. #171-3 (A. Benson Tr.) 173:25-174:20 (testifying that if Hutchins was not consulted it was inadvertent). Likewise, the quoted commentary from Ms. Hutchins and Dr. Garcia (¶¶ 23, 25, 32-33) are not material to any element of Plaintiff's claims.

**Response to Pl's SUF ¶¶ 35-40**: Immaterial, but undisputed solely for purposes of this motion. Plaintiff selectively quotes and mischaracterizes the news articles and testimony it describes. But even if certain news articles had oversimplified the information in the May 1 PR when summarizing it, that would not suggest that the May 1 PR itself was misleading in context. The fact that the Company's stock price "rose" by a particular percentage on May 1, 2020 (¶ 40) is immaterial, since it is undisputed that the abnormal return that day was not statistically significant. *See infra* Statement of Additional Undisputed Material Facts ("AUF") ¶¶ 6-11.

**Response to Pl's SUF ¶¶ 41-46**: Undisputed but immaterial for purposes of this motion, and inadmissible to the extent they rely on Bettencourt's testimony (*see supra* 5). Plaintiff's MPSJ (unlike Defendants' MSJ) does not seek summary judgment on causation or any other element that turns on these economic facts, therefore they are immaterial for present purposes.

**Response to Pl's SUF ¶ 47**: Undisputed solely for purposes of this motion, but immaterial and clarified as follows: Plaintiff disingenuously characterizes the FDA's May 15, 2020 email as "Flag[ging] the May 1 Press Release as Misleading," but the document itself clearly states that the FDA contacted Co-Diagnostics because it was concerned about how a Logix test *distributor*—not Co-Diagnostics or the May 1 PR—was describing the Logix test's performance. Dkt. #171-32 at 3. The FDA took issue with the distributor's unqualified claim that the Logix test was "100% Sensitive and 100% Specific" because the distributor failed to do precisely what the May 1 PR *did* do—tie the performance metrics of 100% sensitivity and 100% specificity to *specific independent evaluations*, which were described in and attached to the May 1 PR. *Id.* ("No IVD is 100% Sensitive and 100% Specific, so please inform your distributors that performance of the test should be promoted as based on the validation study design and data and as in the EUA, i.e., the results of your validation and, importantly how it was performed."). The fact that a distributor chose, for its own marketing reasons, to exaggerate or oversimplify the truthful statements in the May 1 PR says nothing about the May 1 PR itself and is not material.

**Response to Pl's SUF ¶¶ 48-52**: Immaterial. As Plaintiff's own purported expert conceded, the post-May 1, 2020 facts Plaintiff cites as indicating performance issues (Dkt. #171-26, -27, -33 to -35) are necessarily immaterial because they were not available when the May 1

10

PR was issued.[4] Plaintiff's factual recitation and selective quotations in this section are especially misleading: for example, Plaintiff submits only the first page of a two-page May 6, 2020 email between Tennessee health officials (*compare* Dkt. #171-33 *with* Ex. 4) and characterizes it as a "negative performance review" of the Logix test. SUF ¶ 50. In fact, the email clearly states that the health officials' concerns pertained primarily to Nomi Health's ability to implement testing, and indicates that the officials had no firsthand experience with the Logix test. *See, e.g.*, Dkt. #171-33 at 2 ("Based on conversations with Nomi staff it is clear they [have] limited if any laboratory experience, nor are they versed in the federal regulatory requirements that laboratories that perform clinical testing must abide by"). Plaintiff similarly selectively quotes early-May 2020 emails to suggest that Co-Diagnostics was worried its LoD was too high (Dkt. #171-26-27), but it is undisputed that the Company had long understood its LoD to be lower than the official LoD approved by the FDA and that its efforts to "improve" the official LoD in the summer and fall of 2020 were for marketing reasons and not due to concerns about its sensitivity.[5] In any case, even if the evidence said what Plaintiff claims, none of it would matter—any post-May 1, 2020 "negative performance reviews" would have no bearing on whether the May 1 PR was false or misleading when it was issued on May 1, or what any Defendant knew or intended at that time.

**Response to Pl's SUF ¶¶ 53-55**: Immaterial. The SEC Cease and Desist Orders described in ¶¶ 53-55 concern the same issues raised by the FDA regarding the February 6 and 10, 2020

---

[4] *See* Dkt. #169-10 (Westgard Tr.) at 101:16-102:4; 193:1-194:8 (agreeing that post-May 1, 2020 information was not relevant generally to the May 1 PR, and that the "Addendum" to his own rebuttal report, which included discussion of the Israeli paper described in Pl's SUF ¶ 52, was not relevant for the same reasons).

[5] Dkt. #169-18 at 7, 16; Dkt. #169-19 at 1; Dkt. #169-20 at 2; Dkt. #171-1 (Satterfield Tr.) at 152:6-153:12, 257:7-21; Dkt. #171-3 (A. Benson Tr.) 143:1-144:23; Dkt. #171-22 (Apuli Tr.) 88:20-89:9, 113:7-14.

press releases (i.e., that they suggested the Logix test could be sold for diagnostic purposes when only research use was allowed at the time). *See supra* 5-6 (discussing immateriality of criticisms of Feb. 6 & 10 press releases); Dkt. #171-36 to -39 at 1-2, 7 (finding Co-Diagnostics and certain employees acted negligently in issuing Feb. 6 and 10, 2020 press releases, for same reasons articulated by FDA, but noting Defendants neither admitted nor denied findings). This is not material to Plaintiff's claims: the fact that the SEC, like the FDA, found certain earlier, unrelated press releases misleading with respect to different issues says nothing about whether the May 1 PR itself was misleading in context. And even if any Defendant's mental state with respect to the February 6 or 10, 2020 press releases were somehow relevant (it is not), the negligence charged by the SEC does not suggest that any Defendant intended for the May 1 PR to defraud investors. The facts concerning the February 2020 press releases, and the FDA and SEC's views with respect to them, simply are not relevant, much less material, to Plaintiff's claims.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Plaintiff's MPSJ ignores the following additional undisputed, material facts, which have important implications for its motion.

**A.     Extensive Public Discussion in Early 2020 of the Fact that No Test Is Perfect**

1.      The May 1 PR was issued in the context of extensive public discussion of the fact that no diagnostic test is perfect and that all COVID tests sometimes produce false positive and false negative results. Numerous public sources from February, March, and April 2020 explicitly discussed the inherent uncertainty in diagnostic testing and the fact that no COVID test could perform with perfect accuracy all of the time:

   a. **Feb. 4, 2020, FDA press release**: "Negative results do not preclude [COVID] infection and should not be used as the sole basis for treatment . . . ." (Dkt. #169-41)

12

b. **Feb. 14, 2020, CDC**, "The test we're using at CDC is very sensitive. . . . [but] if a person tests negative once, it's not clear that it's a true negative." (Dkt. #169-42)

c. **Mar. 5, 2020, Johns Hopkins**: "<u>No diagnostic test ever provides complete certainty. Results exist within a margin of error</u> . . . . [T]he veracity of diagnosis is always an approximation . . . . Even when a test performs well in a laboratory, new uncertainties emerge as soon as the test enters the field." (Dkt. #169-43)

d. **Mar. 26, 2020, *Washington Post***: "<u>The clamor for long-delayed coronavirus testing is teaching a basic lesson about how all medical tests work: No test is 100 percent accurate</u>. . . . Any medical test has two important qualities: sensitivity and specificity. . . . [COVID tests] are typically very sensitive and specific under lab conditions, but in the real world, how the swab was done and the stage of illness the person was in can make a big difference. . . . 'A negative result does not rule out [COVID] . . . . The test is a screening tool. One has to think of it in terms of probabilities . . . ." (Dkt. #169-44)

e. **Apr. 1, 2020, *NY Times***, "If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative": "[U]nder ideal conditions, [COVID] tests can detect small amounts of viral RNA. In the real world, though, the experience can be quite different, and the virus can be missed. . . . [I]f you test negative, 'you probably were not infected at the time your specimen was collected.' The key word there is 'probably.' . . . There are many reasons a test would be falsely negative . . . ." (Dkt. #169-45)

f. **Apr. 1, 2020, ABC News**: "<u>[A]s with any medical test, the [COVID] test cannot be expected to be accurate 100% of the time</u>. . . . <u>The tests will 'never be perfect'</u> . . . . '<u>All tests have a chance of false negatives . . . .</u>'" (Dkt. #169-46)

g. **Apr. 2, 2020, *Analytics***: "<u>Tests aren't perfect</u>—many of us are familiar with debates about the consequences of false positive cancer scares arising from mammograms and PSA tests, screening for breast cancer and prostate cancer. . . . Interpreting negative results, and sensitivity/specificity, are reaching mainstream media outlets. On April 1, the *[NY] Times* published the following article: 'If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative.'" (Dkt. #169-47)

h. **Apr. 3, 2020, *LiveScience***: "<u>No diagnostic test is 100% accurate</u> . . . 'No test detects every case . . .'" (Dkt. #169-48)

i. **Apr. 6, 2020, *Slate***: "<u>No test is perfect</u>. . . . There's always a degree of error involved in any testing . . . ." (Dkt. #169-49)

j. **Apr. 12, 2020, *The Kansas City Star***: "COVID testing has a nearly 100 percent detection rate in the lab . . . [B]ut in real life, in people, it's only 70 percent. . . . Experts

13

say the potential for error is tied to how and when specimens are collected for analysis, not to mention the potential for contamination down the line." (Dkt. #169-50)

k. **Apr. 16, 2020, *The Conversation***: "No test is 100% accurate. Although tests can perform well in ideal laboratory conditions, in real life lots of other factors affect accuracy . . . ." (Dkt. #169-51)

2.        Publicly available sources in February, March, and April 2020 also indicated that

the Logix test, specifically, was not perfectly accurate all of the time:

a. **Feb. 24, 2020, H.C. Wainright** analyst report: "The test was designed with the company's CoPrimer technology that can significantly reduce the incidence of false positive results compared to other [PCR] tests." (Dkt. #169-53)

b. **Feb. 26, 2020, Maxim Research** analyst report: "With a sensitivity and specificity of >99% and 100%, respectively for the [CODX] coronavirus test, the chance of false positives is substantially lower." (Dkt. #169-54)

c. **Mar. 3, 2020, Maxim Research** analyst report: "With sensitivity and specificity of >99% and 100%, respectively, for the CODX coronavirus test, the chance of false positives is substantially lower." (Dkt. #169-55)

d. **Mar. 9 and 13, 2020, H.C. Wainright** analyst reports: "[T]he test has 99.2% sensitivity and 100% specificity . . . ." (Dkt. #169-56, -57)

e. **Mar. 18, 2020, H.C. Wainwright** analyst report: "We remind investors that [the Logix test] has 99.2% sensitivity and 100% specificity." (Dkt. #169-58)

f. **Apr. 1, 2020, *BioCentury***, "Limits of detection for FDA-authorized Covid-19 diagnostics" (updated Apr. 3, 2020): Showing Logix test's official LoD (4,290 copies/mL) as higher than most other EUA tests listed. (Dkt. #169-59)

g. **Apr. 3, 2020, Logix test "Fact Sheet for Patients,"** publicly available with Logix test's Information for Use ("IFU"): "There is a very small chance that this test can give a positive result that is wrong (a false positive result). . . . [A] negative test result for a sample collected while a person has symptoms usually means that COVID-19 did not cause your recent illness. . . . However, it is possible for this test to give a negative result that is incorrect (false negative) . . . ." (Dkt. #169-60)

14

**B.**      **The NIV, Greek, and South African "Results" Were Due to Contamination or Other Non-Test Factors and Were Not Credible Indicators of the Logix Test's Performance**.

3.      Every scientist who weighed in on this issue—including Defendants' PCR expert, Dr. Bustin—testified that the NIV, Greek, and South African results were not credible and/or were certainly or likely due to contamination. Dkt. #169-13 (Satterfield Tr.) 124:9-130:21, 146:16-150:22, 177:10-178:17, 218:3-19, 221:3-9, 301:9-304:23; Dkt. #169-22 (Apuli Tr.) 51:15-25, 82:7-25; 83:14-23; Dkt. #171-23 (Garcia Tr.) at 117:2-117:19; 126:14-20, 143:9-145:20; Dkt. #169-11 (Bustin Tr.) at 148:19-149:18, 172:8-174:23, 216:14-218:6, 218:8-219:18, 229:24-230:21, 234:24-235:6, 243:15-244:8, 245:12-246:12, 247:2-17, 253:15-254:17, 257:1-10, 263:8-11; 265:13-267:10; 272:6-273:8, 280:7-281:7; Dkt. #169-5 (Bustin Rep.) at 36-39 (opining that "anyone with PCR experience" would not have credited the NIV, Greek, or South African results and would have attributed them to non-test factors); *see also* Dkt. #169-14 (D. Egan Tr.) 119:10-19, 129:5-8, 195:11-13; Dkt. #169-32, -36 to -38 (emails reflecting same). Moreover, just a couple weeks later, the Saragene test was re-tested by a different ICMR lab (the National Institute of Pathology; "NIP"), using samples provided by NIV and the same NIV reference test, and Co-Diagnostics learned on April 24, 2020 that the test showed 100% sensitivity and 100% specificity on NIP's evaluation. Dkt. #169-27, -28, -29. This led the Indian government to clear the Saragene test for sale, and it supports the conclusion that the NIV results were due to contamination. *Id.*; Dkt. #169-11 (Bustin Tr.) at 243:15-244:8; Dkt. #169-13 (Satterfield Tr.) at 124:12-24.

4.      Plaintiff offers no evidence disputing that the NIV, Greek, and South African results were due to contamination or other non-test factors—even from its own purported scientific

15

expert, Dr. Westgard, whose reports and testimony Plaintiff chose not to submit with this Motion.[6]

**C.     The Defendants and Other Co-Diagnostics Employees Involved in Preparing the May 1 PR Believed It Truthfully Described the Performance of the Logix Test and Was Not Misleading.**

5.      Dr. Satterfield testified that he genuinely believed (and still believes) that the statements made in the May 1 PR accurately described the performance of the Logix test based on the information available at the time. Dkt. #169-13 at 282:7-13, 297:24-299:17, 304:1-23, 318:2-14. Ike Egan, Reed Benson, and other individuals who helped prepare, review, and issue the May 1 PR testified similarly. Dkt. #169-14 (D. Egan Tr.) 217:17-218:23, 220:5-21, 228:18-23, 261:14-24, 323:21-324:6; Dkt. #169-63 (R. Benson Tr). 108:22-109:16, 126:12-127:16, 163:22-164:16; Dkt. #169-21 (A. Benson Tr.) 185:17-186:14; Dkt. #169-64 (Webb Tr.) 75:10-20. Dr. Garcia also testified that she believed the NIV results were not representative of the Logix test's performance and that she felt it was not misleading to report the NIP results while omitting the NIV results. Dkt. #171-23 at 143:9-145:20. Ms. Hutchins likewise testified that while she did not review the May 1 PR before it was issued, she believes the statements in it were true "based on the information that we had at that point." Dkt. #169-65 at 178:9-182:4. After analyzing the available performance results, Dr. Bustin corroborated these views, opining that in his expert opinion the statements in the May 1 PR were consistent with the Logix test performance data known to Co-Diagnostics at the time. Dkt. #169-5 at 52-53.

---

[6] As detailed *supra* 7, Dr. Garcia did not "opine[] [in Dkt. #171-12] that these problematic results did not result from alleged lab contamination" (MPSJ 8). She merely proposed one hypothesis for the NIV results in one of the earliest internal emails regarding the NIV data. Dkt. #171-12. Later emails show that Dr. Garcia too came to believe the NIV results may in fact have been due to contamination. Dkt. #169-32 (4/11/20 email).

16

**D.      The Stock Price Did Not React to the May 1 Press Release**.

6.      Plaintiff claims, and Defendants do not dispute, that the Company's stock traded in an efficient market at all relevant times. SAC ¶¶ 100, 103.

7.      Co-Diagnostics' stock price rose from $11.34 at the close of trading on April 30, 2020 to $13.47 at close of trading on May 1, 2020. Dkt. #169-66 (Ferrell Rep.) ¶ 7.

8.      It is generally accepted that the statistical significance of stock price movement in excess of what an economic model would predict, all things being equal—an "abnormal return"—should be assessed using a 95% confidence level (i.e., a $t$-statistic with an absolute value of 1.96 or greater indicates statistical significance, because there is less than a 5% chance that the abnormal return was caused by random volatility). Dkt. #169-69, ¶ 21; Dkt. #169-70 (Bettencourt Tr.) 237:20-238:5.

9.      At class certification, Plaintiff's expert Dr. Werner opined that the abnormal return on May 1, 2020 was statistically significant (with a $t$-statistic of 2.34) based on an event study that ran from April 30, 2020 through April 29, 2021. Dkt. #169-66 (Ferrell Rep.) ¶¶ 9-10, 17.

10.      However, Dr. Ferrell's subsequent analysis shows that Dr. Werner's model failed to correct for heteroscedasticity (i.e., the fact that the market was more volatile in the early part of his estimation period, when COVID was new, than in the later part), and that it was not robust to the use of reasonable alternative estimation periods, including shorter periods that Plaintiff's new proposed expert, Mr. Bettencourt, agreed are appropriate. *Id.* ¶¶ 12-13; Dkt. #169-70 (Bettencourt Tr.) 242:13-17; 242:23-243:9. Dr. Ferrell opined that when properly corrected for heteroscedasticity, Werner's own model demonstrates that the abnormal return on May 1, 2020 was not statistically significant. Dkt. #169-66 ¶¶ 22-26. Dr. Ferrell also opined that the fact that

17

Werner's finding of statistical significance for May 1 is not robust to several reasonable alternative estimation periods demonstrates that the finding is unreliable and arbitrary. *Id.* ¶¶ 27-33. Thus, Dr. Ferrell concluded that there is no scientific or reliable basis to conclude that the abnormal return on May 1, 2020 was statistically significant. *Id.* ¶ 11.

11. Bettencourt did not discuss the May 1 stock price movement in either of his reports, and he testified that whether the abnormal return on May 1 was statistically significant was "not germane to my opinion" and "doesn't bear on any of the conclusions in my report." Dkt. #169-70 at 228:24-229:3; 231:12-17; 235:6-236:13. Bettencourt did not dispute Prof. Ferrell's assertion that Werner's model failed to correct for heteroscedasticity, and he did not conduct any robustness analysis with respect to the abnormal return on May 1, 2020. *Id.* at 231:6-232:2; 235:6-15.

**E.    No Defendant Sold Stock During the Class Period.**

12. Dr. Satterfield did not sell any stock during the class period. Dkt. #169-93. None of the other Defendants sold stock during the class period either. Dkt. #169-89 to -92.

**ARGUMENT**

On a motion for summary judgment, the movant bears the initial burden of showing that there is no genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In addition, where the movant bears the ultimate burden of persuasion at trial—as Plaintiff does here—the burden is even higher: it must support its motion with credible evidence that would be admissible and entitle it to a directed verdict if not contradicted at trial. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.* at 1154; *see also* 10A Charles Alan Wright et al., *Federal*

*Practice and Procedure* § 2727.1, at 492 (4th ed. 2016) (record must be "so one-sided as to rule out the prospect of the nonmovant prevailing"). Moreover, only evidence the substance of which would be admissible at trial may be considered when deciding a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010). Plaintiff's motion for partial summary judgment here—which relies primarily on conclusory assertions and misleading citations to immaterial evidence—cannot clear this high bar.

## I.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ELEMENTS OF FALSITY OR MATERIALITY.

Summary judgment on the element of falsity must be denied if any reasonable jury could conclude from the record that the challenged statements were truthful and not misleading. *See Leone*, 810 F.3d at 1154. Likewise, summary judgment on the element of materiality is improper if any reasonable trier of fact could find that disclosure of the allegedly omitted information "would not have significantly altered the total mix of information available to a reasonable investor" at the time of the statement. *United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1237-38 (10th Cir. 2014). Plaintiff cannot make either showing; indeed, as detailed in Defendants' MSJ, the undisputed material facts prove that no reasonable trier of fact could find for *Plaintiff* on either of these elements.

As Plaintiff's MPSJ implicitly recognizes, the challenged statements in the May 1 PR—that the Logix test had "consistently and repeatedly achieved 100% clinical sensitivity and specificity" in independent evaluations and that "you can't do better than that"—were not false. *See* MPSJ 20-22; Dkt. #101, at 9 (holding same on motion to dismiss). Plaintiff argues only that these literally true statements, taken together and in context, nonetheless materially misled investors "about the accuracy and performance of the Logix Smart test" (i) by failing to disclose

19

that "the Logix test had received poor or failed results in evaluations or validation studies in India, South Africa, and Greece," and (ii) by giving the false impression "that the test had been immaculate in all evaluations and was 100% accurate." MPSJ 22-24.

But the undisputed, material facts directly contradict both assertions: the undisputed evidence establishes that the NIV, Greek, and South African results were the result of contamination or other non-test factors rather than poor performance, and no reasonable investor could have read the May 1 PR as promising perfect accuracy in the context of numerous contemporaneous articles discussing the fact that no test is perfect. Ignoring all of this, Plaintiff's brief and conclusory argument on falsity (MPSJ 22-24) cites just a single "fact"—an email chain from May 15, 2020, two weeks after the alleged misstatements (Dkt. #171-32)—for the ancillary point that certain Logix test distributors were making exaggerated and oversimplified performance claims in the wake of the May 1 PR. A single factual reference cannot do the work required of a summary judgment motion argument, and Plaintiff's failure to meaningfully engage with the factual record in and of itself should preclude summary judgment for Plaintiff on any of the elements.[7] In any case, the undisputed, material facts disprove Plaintiff's conclusory assertions: the May 1 PR did not in fact omit any known "problems" with the Logix test's accuracy, and no reasonable investor could have read the statements in context as promising the test would perform perfectly all of the time.

---

[7] Plaintiff's materiality, "in connection with," reliance, and affirmative defenses arguments contain no factual citations at all. MPSJ 24-25, 28-31. The scienter section cites just two emails (MPSJ 28, citing Dkt. #171-12 & -15), discussed *supra* and *infra*.

### A.    No Evidence Shows There Were Undisclosed Problems with the Logix Test's Accuracy.

Plaintiff argues first that the May 1 PR was misleading because it failed to disclose that "the Logix test had received poor or failed results in evaluations or validation studies in India, South Africa, and Greece." MPSJ 22. As detailed above, this fundamentally mischaracterizes the NIV, South African, and Greek "results," and ignores the overwhelming and undisputed evidence demonstrating that they were due to contamination or other non-test factors and that their omission from the May 1 PR was appropriate and not misleading. *See supra* 6-8; AUF ¶¶ 3-5.

As an initial matter, all of the credible performance data available to Co-Diagnostics as of May 1, 2020 is undisputed and consistent with the statements in the May 1 PR. It is undisputed that the results from the independent evaluations attached to the May 1 PR, as well as non-public evaluation results from Timpanogos and Gentech available at the time, all showed the Logix test performing with 100% sensitivity and 100% specificity. Dkt. #169-25 (May 1 PR) at 8-17 (reports attached to May 1 PR summarizing PathWest, NIP, InDRE, and Minnesota results); Dkt. #169-27, -29 (NIP results); Dkt. #169-31 (memo summarizing Timpanogos and Gentech results and indicating that Co-Diagnostics could not share them publicly at the time); Dkt. #169-5 (Bustin Rep.) at 25-35. It is also undisputed that those excellent results were supported by the Company's internal verification data[8] and by strong sales from around the world, indicating that labs were consistently finding the Logix test to be sensitive and specific enough for them to want to purchase it.[9] Dr. Satterfield, CEO Ike Egan, and others at Co-Diagnostics all testified that they believed the

---

[8] *See, e.g.*, Dkt. #169-15 at 34-35, Dkt. #169-16, Dkt. #169-17 at 17, 26-30.
[9] *See* Dkt. #169-14 (D. Egan Tr.) 90:4-91:7; Dkt. #169-13 (Satterfield Tr.) 108:5-17, 134:10-135:11, 145:3-8, 193:13-15; Dkt. #169-23 (S. Egan Tr.) 38:22-25; Dkt. #169-24 (4/20/20 Co-

May 1 PR  was fair and truthful based on the information available at the time.[10] This testimony was corroborated by Defendants' PCR expert Dr. Bustin,[11] and was not disputed by Plaintiff's purported expert Dr. Westgard.

Faced with this overwhelming evidence, Plaintiff tries to turn certain troubleshooting emails into material performance issues by mischaracterizing the NIV, Greek, and South African data as "poor or failed" validation results that were inconsistent with the May 1 PR. MPSJ 22. But Plaintiff cites no factual support for this assertion, because there is none—the undisputed, material facts all show that those results were due to contamination or other non-test factors and did not reflect lower performance by the Logix test itself. Dr. Satterfield and Dr. Bustin testified, based on their extensive experience in the PCR field, that the communications with those labs in April 2020 conclusively showed that the anomalous results observed in those labs were almost certainly due to contamination, that they were not credible indicators of the test's performance, and that it would have been inappropriate to include them along with the credible independent lab results reported in the May 1 PR. *See* Dkt. #169-5 (Bustin Rep.) at 36-39; Dkt. #169-11 (Bustin Tr.) 229:24-230:21 ("Q: Can you conclusively testify that there was contamination in India and in Greece? A. Yes. . . . Q: Eliminating all other doubts? A. Yes. . . . [also re South Africa:] "I'm as certain as I can be that there's contamination . . . . 95 percent [certain]."); Dkt. #169-13 (Satterfield

---

Diagnostics press release reflecting strong sales); *see also* Dkt. #169-6 (Bard Rep.) at 7-8; Dkt. #169-10 (Westgard Tr.) 98:12-22.

[10] AUF ¶ 5; Dkt. #169-13 at 282:7-13; 297:24-298:11; 298:18-22; 304:1-23; 318:2-14; Dkt. #169-14 (D. Egan Tr.) 217:17-218:9, 220:16-21, 261:14-24, 323:21-324:6; Dkt. #169-63 (R. Benson Tr). 126:12-127:16, 163:22-164:16; Dkt. #169-21 (A. Benson Tr.) 185:17-186:14; Dkt. #169-65 (Hutchins Tr.) at 178:9-182:4 (testifying that she did not review the May 1 PR before it was issued, but she believes the statements in it were true "based on the information that we had at that point.").

[11] Dkt. #169-5 at 25-35 (analyzing evaluation results from independent labs available to Co-Diagnostics prior to May 1, 2020).

22

Tr.) 124:9-130:21, 146:16-150:13, 218:3-19, 221:3-9, 301:9-304:5.[12] The handful of emails concerning the NIV, Greek, and South African lab issues likewise reflect that the Co-Diagnostics employees involved viewed them as troubleshooting exercises and believed the performance issues were due to non-test factors. AUF ¶ 5; Dkt. #169-32 at 3-4; Dkt. #169-33, -35 to -40.

Plaintiff offers no evidence to the contrary—no expert testimony or other facts disputing Dr. Bustin's and Dr. Satterfield's well-informed testimony that the NIV, Greek, and South African lab results were due to contamination or other non-test factors, and no evidence providing any other basis for treating those results as credible indicators of the Logix test's performance.[13] Instead, Plaintiff relies on the simplistic and incorrect assertion that because those lab data appear at first blush to show lower performance—regardless of the cause, or the data's credibility—they were inconsistent with the results reported in the May 1 PR and rendered it misleading. This is wrong scientifically and wrong as a matter of law. As Dr. Bustin opined, and Plaintiff's purported expert Dr. Westgard did not dispute: contamination is an "ever-present danger in any laboratory carrying out PCR experiments" and it is customary not to "report runs that give atypical results due to contamination, as they are immaterial with regards to the final conclusions (and in fact would distort the true results if included)." Dkt. #169-5 at 40; Dkt. #169-11 (Bustin Tr.) at 263:8-

---

[12] *See also* Dkt. #169-11 (Bustin Tr.) at 148:19-149:18, 172:8-174:23, 216:14-218:6, 218:8-219:18, 229:24-230:21, 234:24-235:6, 243:15-244:8, 245:12-246:12, 247:2-17, 253:15-254:17, 257:1-10, 263:8-11; 265:13-22; 266:5-7, 265:25-267:10, 272:6-273:8, 280:7-281:7; Dkt. #169-36, -37; Dkt. #169-32 at 2-3; Dkt. #169-14 (D. Egan Tr.) 119:10-19, 129:5-8, 195:11-13; Dkt. #169-22 (Apuli Tr.) 51:15-25, 82:7-25; 83:14-23.

[13] As discussed *supra* 7, Dkt. #171-12 does not show Dr. Garcia "opining" to the contrary (MPSJ 8): she merely proposed a hypothesis for the NIV results on the day Co-Diagnostics received them, and later emails show that she too came to believe they may have been due to contamination. Dkt. #169-32 (4/11/20 email). In any case, she testified that she believed the NIV results were not representative of the Logix test's performance and that it was not misleading to omit them from the May 1 PR. Dkt. #171-23 (Garcia Tr.) at 143:9-145:20.

11; 265:13-22; 266:5-7; *see also* Dkt. #169-13 (Satterfield Tr.) at 129:19-130:9; 204:1-5 (similar). Because the undisputed, material evidence demonstrates that the NIV, Greek, and South African lab results were due to contamination or other non-test factors and did not reflect the true performance characteristics of the Logix test, omission of that data from the May 1 PR was both appropriate and necessary and did not render it misleading. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). This entitles *Defendants* to summary judgment as a matter of law, as detailed in their MSJ; at a minimum, it precludes summary judgment for Plaintiff. *See, e.g.*, *DeKalb Cnty. Pension Fund v. Allergan PLC*, 2024 WL 677081, at *2 (2d Cir. Feb. 20, 2024) (affirming grant of defendant's motion for summary judgment and denial of plaintiff's cross motion where plaintiff "[has] !not offered sufficient evidence" of falsity); *In re Volkswagen*, 2017 WL 6041723, at *6 (N.D. Cal. Dec. 6, 2017) (denying summary judgment for plaintiff because "a reasonable trier of fact could conclude that Plaintiffs have not met their burden of proving that [the] statements were false").

**B.      The Undisputed, Material Facts Show that No Investor Could Have Read the May 1 PR As Promising the Test Would Perform Perfectly All of the Time.**

Nor can Plaintiff point to any evidence—much less the overwhelming evidence required for summary judgment in its favor—showing that the May 1 PR made any materially misleading "representation as to the 100% accuracy of the Logix test." MPSJ 23.

"The key question in considering the misleading nature of a statement is whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor, not whether it is susceptible to any interpretation that could generate misleading

impressions when read in isolation." *In re Skechers USA, Inc. Sec. Litig.,* 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020); *see also Omnicare*, 575 U.S. at 186-89, 191, 194 (statement is only misleading if it would have misled a "reasonable investor" reading it "fairly and in context"; omission that renders statement misleading "in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame"). That context includes, "all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information" as well as other public statements by the company, the "customs and practices of the relevant industry," and other publicly available information. *Omnicare*, 575 U.S. at 190-91. Moreover, the "reasonable investor," for purposes of this objective inquiry, is assumed to be aware of that full context, to have a basic understanding of the relevant industry, and to incorporate all public information into their decisionmaking in a rational manner. *See id.* at 186-87; *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (assuming "reasonable investor" in pharmaceutical company would understand FDA approval process); *Richfield v. PolarityTE, Inc.*, 2023 WL 3010208, at *6 (D. Utah Apr. 19, 2023) (reasonable investor would not have been misled in light of "FDA guidance, [company's] SEC filings, and news reports [that] were all available to investors and provided context").

Here, as described *supra* and detailed in Defendants' MSJ, the undisputed, material facts show that the May 1 PR was issued amidst extensive press coverage and public discussion of the fact that no COVID test will perform perfectly all of the time. *See* AUF ¶ 1-2. Numerous articles from February, March, and April 2020 sought to explain PCR technology to an intensely interested general public, discussing the most important performance metrics for COVID PCR tests (sensitivity and specificity); the many ways in which non-test factors, such as collection issues, contamination, lab inexperience, etc., can cause erroneous results; and the fact that any test might

produce a false positive or negative at any time—i.e., "no test is perfect."[14]

Not only was this widely discussed as a general matter, but undisputed evidence also shows that it was publicly acknowledged, by Defendants and others, with respect to the Logix test in particular. Analyst reports in February and March 2020 described the Logix test as having a sensitivity of "99.2%" or ">99%," indicating less than 100%. AUF ¶ 2. Similarly, the Apr. 30 SLT Article (published the day before the May 1 PR) described Dr. Satterfield himself as saying "that [Logix] tests scored between 99.52% and 100% in evaluations conducted by the FDA and in Europe"—again, excellent but not perfect performance.[15] Pl's SUF ¶ 21; Dkt. #169-61 at 10. Indeed, Co-Diagnostics' own publicly available "Fact Sheet for Patients" explicitly warned that there is always a small chance the test will give a false positive or negative result. AUF ¶ 2(g); Dkt. #169-60. And when the May 1 PR reported the independent evaluation results, it did not simply summarize them; it attached the performance data and reports themselves, two of which clearly stated confidence intervals for the sensitivity and specificity they reported. Dkt. #169-25 at 17-19 (PathWest showing "100% sensitivity (CI 96.48-100) and 100% specificity (CI 96.52-100)"; NIP showing "100% sensitivity (CI 85.4-100) and 100% specificity (CI 78.1-100)"). By definition, these confidence intervals indicated that while the Logix test had correctly identified all positive and negative samples in those evaluations, it might reasonably be expected, in future,

---

[14] *E.g.*, AUF ¶ 1(c) (3/5/20 Johns Hopkins: "No diagnostic test ever provides complete certainty"); ¶ 1(d) (3/26/20 Washington Post: "No test is 100% accurate."); ¶ 1(f) (4/1/20 ABC News: "[A]s with any medical test, the [COVID] test cannot be expected to be accurate 100% of the time"); ¶ 1(h) (4/3/20 LiveScience: "No diagnostic test is 100% accurate"); ¶ 1(i) (4/6/20 Slate: "No test is perfect"); ¶ 1(k) (4/16/20 The Conversation: "No test is 100% accurate").

[15] The Apr. 30 SLT Article also discussed an Apr. 1, 2020 *BioCentury* article that showed the Logix test's official LoD as higher than many competitors' and incorrectly suggested this indicated a less "sensitive" test that might produce more false negatives. AUF ¶ 2(f); Dkt. #169-59.

to perform anywhere within the confidence intervals—i.e., with sensitivity as low as 96.48% or 85.5% and specificity as low as 96.52% or 78.1%, based on those respective evaluations.

In light of these undisputed facts—crucial context, under *Omnicare*, for assessing the challenged statements—no reasonable investor could have read the May 1 PR as promising that the Logix test would perform perfectly all of the time, and no rational trier of fact could find for Plaintiff on the element of falsity. Plaintiff cites just two facts in support of its conclusory assertion to the contrary: an email indicating that some Logix test distributors were touting the test as having 100% sensitivity and specificity after the May 1 PR, and a news headline stating "Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate." *See* MPSJ 24; Dkt. #171-32. But the mere fact that a distributor or news editor chose to describe the test's performance in more simplistic terms than the press release itself, for their own commercial purposes, says nothing about how a reasonable investor would have read the May 1 PR in the full context described above. *See supra* 9-10. Anyone with even a passing familiarity with medical testing understands that there is always a risk of a false positive or negative; and anyone who lived through COVID recalls the widespread public and private concern at the time, and especially in the spring of 2020, about how to behave following a COVID test given the inherent risk of false results. The May 1 PR truthfully reported that the Logix test had consistently and repeatedly shown 100% sensitivity and 100% specificity on independent lab evaluations, which were attached to the press release, and it did so in the midst of this intense public dialogue about the inherent risks and imperfections of COVID testing. In this context, and on this record, it simply is not possible that a reasonable investor could have been misled by the May 1 PR into thinking the Logix test—unlike every other COVID test— would be perfectly accurate in every situation.

For essentially the same reasons, no rational trier of fact could find for Plaintiff on the element of materiality. Plaintiff asserts in conclusory fashion that it is entitled to summary judgment because "representations about the performance of a company's primary product are material" and the Logix test was Co-Diagnostics' primary product. MPSJ 24-25. But this misstates the test for materiality. Materiality does not turn simply on whether the subject of the challenged statement was "important" to a company; rather, "[materiality] depends on the information that already exists in the market. Undisclosed information is material only if its disclosure would have 'significantly altered the total mix of information available' to a reasonable investor."[16] *United Food*, 774 F.3d at 1237-38; *see also Basic*, 485 U.S. at 231-32 ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); *Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1251, 1256 (D. Utah 2000) ("Whether a misstatement or omission is material is determined by a two-step inquiry. A court must first determine whether the information would be considered important by a reasonable investor; if so, the court must then determine whether the information would still be considered important in light of other information already available to the market."). Notably, news articles and other public documents, like those described above, "are part of that total mix if an investor interested in a particular type of information about a company would know of the

---

[16] Plaintiff's authorities also recognize this standard. *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1265 (10th Cir. 2001) ("[A] statement or omission is only material if . . . it would have 'significantly altered the total mix of information available' to current and potential investors."); *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010) (similar); *Sec. & Exch. Comm'n v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300, 325 (D.D.C. 2015) (similar); *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *14 (S.D.N.Y. Feb. 1, 2005) (similar).

existence of the record and could readily access it." *United Food*, 774 F.3d at 1238.

Here, the undisputed facts show that the allegedly omitted information—that the Logix test was not "perfect"—would not have "significantly altered the total mix of information available to a reasonable investor" because that fact was already widely known and discussed in news articles and other public materials, as detailed above. AUF ¶¶ 1-2. The May 1 PR was issued against the backdrop of an extensive public dialogue discussing the fact that no COVID test is perfect, as well as public statements from Dr. Satterfield, Co-Diagnostics, and analysts acknowledging that the Logix test specifically was not perfect. An explicit statement to the same effect in the May 1 PR would not have added anything to this "total mix of information" already widely available from numerous public sources. *See In re PolarityTE, Inc., Sec. Litig.*, 2020 WL 6873798, at *12 (D. Utah Nov. 22, 2020) (dismissing where alleged misstatements were not material in context of numerous public sources indicating the opposite); *Chipman v. Aspenbio Pharma, Inc.*, 2012 WL 4069353, at *5 (D. Colo. Sept. 17, 2012) (same); *Abady v. Lipocine Inc.*, 2023 WL 2938210, at *19 (D. Utah Apr. 13, 2023) (same).[17] On the undisputed record here, no reasonable trier of fact could find for Plaintiff on the element of materiality. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668-69 (2d Cir. 2009) (omission is not material where it "was already in the public domain and was reasonably available to [company] shareholders").

---

[17] The motion-to-dismiss decisions Plaintiff cites are not to the contrary. Not only did they draw all inferences in Plaintiff's favor (which the Court may not do here), each also involved the alleged omission of highly significant information that was not already publicly known and thus not part of the total mix of information available to investors. *See e-Smart Techs.*, 85 F. Supp. 3d at 325 (re omission of the fact that the touted product did not actually exist and likely could not be built); *In re Regeneron*, 2005 WL 225288, at *14 (re omission of significant problems with clinical drug candidate); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) (omission of internal market data re important new product line).

29

\*     \*     \*

Thus, the undisputed, material facts demonstrate that the May 1 PR was not misleading in either of the regards Plaintiff claims, much less materially so. This precludes summary judgment in favor of Plaintiff on the elements of falsity or materiality, and compels summary judgment for Defendants, as detailed in Defendants' MSJ.

## II.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON SCIENTER.

To establish the element of scienter, Plaintiff must prove that Dr. Satterfield and/or Co-Diagnostics (the two § 10(b) Defendants) made one or more of the challenged statements in the May 1 PR intending to defraud investors, or with recklessness so severe that it "approximat[ed] actual intent." *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). This is a high bar rarely satisfied even at trial, much less on summary judgment. For Plaintiff to be entitled to summary judgment on scienter, it would have to show that no rational trier of fact could find for Defendants on the evidentiary record—i.e., that there is no evidence from which a jury might reasonably conclude Defendants acted in good faith. Plaintiff cannot do so; as detailed in Defendants' MSJ, the undisputed, material evidence all indicates that Defendants acted in good faith, and no rational trier of fact could find for *Plaintiff* on this evidentiary record.

As an initial matter, Dr. Satterfield and the other officer Defendants (CEO Ike Egan and CFO Reed Benson) each credibly testified that they believed the statements in the May 1 PR were true and not misleading and that they had no intention of misleading investors. AUF ¶ 5. Dr. Satterfield described how he carefully surveyed and reviewed the available performance data before helping to draft what he considered to be an accurate description in the May 1 PR of the

30

Logix test's performance. Dkt. #169-13 at 303:10-14 ("I requested every piece of data we could get our hands on. I was severely disappointed that we could not make more data public. We looked at all of it that was available to us."); *id.* at 202:8-18 ("The only thing that we were able to state is what the data was giving us . . . . And in the handful of studies that we got back that we had permission to put into our press release, we had a hundred percent concordance, meaning . . . we were seeing a hundred percent sensitivity, a hundred percent specificity in those data sets."). Ike Egan and Reed Benson testified similarly, both as to the extensive review process and their belief that the final version was accurate. Dkt. #169-14 (D. Egan Tr.) at 217:17-218:9, 228:18-23; Dkt. #169-63 (R. Benson Tr.) at 108:22-109:16, 163:22-164:6; *see also* Dkt. #169-14 (D. Egan Tr.) 220:16-21 ("Should I have lied to the FDA and said, 'Well, everything said 100 [%], 100 [%]; but we're going to put 93 and 87'? I mean, we put what the data said. The data speaks for itself.").

Moreover, Dr. Satterfield testified that it never occurred to him that anyone could read the May 1 PR as promising the Logix test would perform perfectly in every situation, especially given the widespread, public recognition that no test is 100% accurate all of the time. Dkt. #169-13 at 297:24-299:17 ("I didn't have any concerns whatsoever on that. . . . I was reporting [the data] accurately. If I would have said anything else like we got 90 percent sensitivity or 90 percent specificity, that would have been false information. . . . 'You can't do better than that' is accurate in that you cannot get better than a 100 percent result in an evaluation. . . . You just can't."); *id.* ("That [no test is perfect] is the most elementary understanding in diagnostics. . . . It is so clearly understood that it just—it's just not something that you expect anyone else would ever misunderstand who has any understanding of what a diagnostic test is."). CEO Egan testified similarly, explaining how the May 1 PR spoke about Logix test's performance in the "common

parlance" of the industry and attached the underlying data, and that it never occurred to him that an investor might read it as promising perfect accuracy every time. Dkt. #169-14 at 218:13-23 ("This is the way that every other COVID-19 manufacturer reported their results . . . [many] of them also cited 100 [%] sensitivity and 100 [%] specificity. . . . It was basically de rigueur in the industry."); *id.* at 220:5-13 ("[Readers didn't] need to have a specialized knowledge. They [used] the common parlance of the industry in the press release; and we're showing, through the hyperlinks, the data that supports what we're talking about. So . . . they can look at the data, they can look at the actual field testing . . . and make their own determination.").

This deposition testimony, in and of itself, is strong, credible evidence from which a rational juror could (and should) find that the Defendants acted in good faith. *See, e.g.*, *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (reversing summary judgment and noting it can properly be denied where "the defendant presents affidavits or other evidence establishing a lack of scienter").[18] But additional evidence strongly supports this conclusion as well. Testimony from PCR expert Dr. Bustin and diagnostic-lab expert Dr. Dien Bard corroborated the Defendants' testimony on these points, describing how it was common for a PCR test to perform with 100% sensitivity and 100% specificity on particular evaluations, and how no one in the industry understood this to mean the test would perform with 100% accuracy in all circumstances. Dkt. #169-5 (Bustin Rep.) at 52-53; Dkt. #169-11 (Bustin Tr.) at 102:4-18; Dkt. #169-8 (Bard Tr.) at 41:1-42:1. Moreover, the fact that none of the Defendants sold any Co-

---

[18] The decision in *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010), is not to the contrary. There, the Ninth Circuit merely held that in the extreme circumstances of that case—where the defendants issued a press release unveiling a new technology and describing its characteristics and capabilities in the present tense when it did not actually exist—the Court did not have to credit the CEO's "self serving" testimony. No such extreme facts are present here.

Diagnostics stock during the class period or personally benefitted from the purported fraud in any way demonstrates their lack of motive and cuts strongly against scienter. AUF ¶ 12; *see, e.g.*, *Smallen*, 950 F.3d at 1310-11 (lack of unusual sales by defendants "undermine[s] [Plaintiff's] theor[y] that negative information was withheld to obtain a higher sell price" and "militate[s] against" scienter); *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015) ("the absence of any allegation of a financial benefit from the alleged fraud cuts" against scienter); *Shuster v. Symmetricom, Inc.*, 35 F.App'x 705, 707 (9th Cir. 2002) (affirming summary judgment for defendants due to lack of scienter where defendants "did not sell any of their stock holdings" during class period); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (affirming summary judgment for defendant in part because lack of insider sales negates an "inference of scienter").[19]

Ignoring all this, Plaintiff again turns to the NIV, Greek, and South African emails, simplistically arguing that the "results" communicated in those troubleshooting emails were "so material" that Dr. Satterfield must have "known that their non-disclosure and omission from the May 1 Press Release would likely mislead investors." MPSJ 27-28 (citing only Dkt. #171-12 and Dkt. #171-15). As an initial matter, this is fundamentally inconsistent with Plaintiff's *Daubert* Motion to Exclude the Testimony of Defendants' Proposed Expert Dr. Stephen Bustin (Dkt. #172; "Pl's *Daubert* Mot."), which appears to concede that the Defendants did *not* intentionally omit these results or act with scienter. There, Plaintiff argues that "Dr. Bustin's testimony that the

---

[19] Despite the SAC pleading stock sales by Defendants Serbin and Durenard in "late May" (SAC ¶¶ 91, 95), Plaintiff appears to have abandoned any argument that these bear on scienter. The MPSJ does not discuss these facts or suggest that they matter to the scienter analysis; after all, the earliest such sale by Serbin or Durenard was not until May 19, 2020, after the class period had ended and any artificial inflation in the stock price, by definition, had dissipated. Dkt. #169-86, -87.

Defendants properly disregarded the [NIV, Greek, and South African lab data] is irrelevant because there is no evidence that the Defendants actually did what Dr. Bustin suggests—*i.e.*, that they actually decided [*sic*] omit any reference to the failed tests in the May 1 Press Release . . . ." Pl's *Daubert* Mot. 11. If Defendants were not aware of the NIV, Greek, and/or South African lab issues, and did not "actually decide" to omit those results from the May 1 PR, as Plaintiff argues in its *Daubert* motion, then Defendants cannot have acted with intent to defraud.

But in any case, the undisputed, material facts disprove the theory of scienter articulated in Plaintiff's MPSJ. Dr. Satterfield and others testified (and contemporaneous documents reflect) that they were aware of communications with the NIV and Greek labs regarding issues those labs were experiencing, but that they believed (and still believe) those results were due to contamination or other non-test factors and therefore were not credible, concerning, or appropriate to include in the May 1 PR. *See supra* 6-8; AUF ¶¶ 3, 5; Dkt. #169-13 (Satterfield Tr.) at 124:9-130:21, 146:16-150:13, 218:3-19, 221:3-9, 301:9-304:5; Dkt. #169-14 (D. Egan Tr.) 119:10-19 (re NIV: "To us it was obvious on its face that it was a noncredible test."), 129:5-8, 195:11-13; Dkt. #169-22 (Apuli Tr.) 51:15-25, 82:7-25; 83:14-23; *see also* Dkt. #169-39 at 1 (re Greek lab: "Strongly suspect contamination here."); Dkt. #169-32 at 3 (similar re NIV); Dkt. #169-36 to -38. This is supported by the fact that the test[20] showed 100% sensitivity and specificity when it was evaluated by a different Indian government lab (NIP) just a couple weeks after the NIV issues; Co-Diagnostics received notice of those NIP results on April 24, 2020, and the Indian government cleared the Saragene test for sale soon after. Dkt. #169-28, -29. And while Dr. Satterfield did not recall

---

[20] The Saragene test evaluated by NIV and NIP is "functionally identical" to the Logix test but is manufactured in India by Cosara, Co-Diagnostics' joint venture, and rebranded "Saragene." *See* Pl's SUF ¶ 11; Dkt. #169-25 at 18; Dkt. #169-28; Dkt. #169-13 at 104:13-23.

knowing about the South African issues at the time, he testified that they would not have concerned him for the same reasons—the data provided to Co-Diagnostics about those results indicated that they were not credible. Dkt. #169-13 at 177:10-178:22, 304:1-23.

Dr. Bustin examined these same communications with the NIV, Greek, and South African labs, and corroborated the Defendants' views. He testified that, based on his more than 30 years of PCR experience, he could conclusively state that each of those instances of seemingly lower test performance in the NIV, Greek, and South African labs was the result of contamination of the lab and/or reagent and not due to poor performance by the Logix test. Dkt. #169-11 at 148:19-149:18, 172:8-174:23, 216:14-218:6, 218:8-219:18, 229:24-230:21, 234:24-235:6, 243:15-244:8, 245:12-246:12, 247:2-17, 253:15-254:17, 257:1-10, 265:25-267:10, 272:6-273:8, 280:7-281:7; Dkt. #169-5 at 36-39. And he opined that "anyone with PCR experience" would not have credited the NIV, Greek, or South African results and would have attributed them to contamination, and that in his opinion it would have been scientifically wrong, and would have given the wrong idea about the test's true performance characteristics, if the Company had reported them in the May 1 PR. Dkt. #169-5 at 39; Dkt. #169-11 (Bustin Tr.) at 263:8-11; 265:13-22; 265:25-266:7.

All this is strong evidence from which a jury could reasonably conclude that Defendants did not intend to deceive, manipulate, or defraud investors when they issued the May 1 PR. These facts also fully distinguish the instant case from the authorities Plaintiff cites, each of which—unlike here—involved strong evidence of personal financial motive, actual knowledge of falsity, and/or egregious recklessness, and lacked countervailing evidence of good faith.[21] Defendants

---

[21] *See In re Tesla Inc., Sec. Litig.*, 2022 WL 1497559, at *17-*19 (N.D. Cal. Apr. 1, 2022) (granting partial summary judgment for plaintiff where defendant Musk stated that "funding [had been] secured" when the undisputed evidence showed that he "knew all of the facts" that made this

35

respectfully contend that the undisputed, material facts discussed above and outlined in their MSJ compel summary judgment in favor of Defendants, but at a minimum they preclude summary judgment for Plaintiff. *See, e.g.*, *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 900 (10th Cir. 1992) (granting summary judgment for defendant where record evidence did not show scienter); *In re Fannie Mae Sec.*, 905 F. Supp. 2d 63, 73-81 (D.D.C. 2012) (granting summary judgment for defendant where plaintiff's evidence was insufficient for reasonable jury to find that defendant acted with intent); *Vucinich*, 739 F.2d at 1436 (summary judgment for plaintiff should be denied where "the defendant presents affidavits or other evidence establishing a lack of scienter").

## III.   PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE RELIANCE AND "IN CONNECTION WITH" ELEMENTS.

To prevail on a securities fraud claim under Rule 10b-5, a plaintiff must prove that it relied upon the alleged misrepresentation in deciding whether to buy or sell a particular security; "this ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Halliburton II*, 573 U.S. at 267. One way in which a plaintiff can do so is by invoking the "fraud-on-the-market" theory, which "recogniz[es] a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013). Plaintiff argues that because it has satisfied each of the prima facie factors necessary to invoke the fraud-on-the-market

_____

statement undeniably false at the time); *Platforms Wireless*, 617 F.3d at 1094 (affirming summary judgment for plaintiff where evidence was so one sided that "no reasonable juror could credit" defendant's assertion that he subjectively believed the false statement to be true); *SEC v. Strategic Global Investments, Inc.*, 262 F. Supp. 3d 1007, 1025 (S.D. Cal. Apr. 17, 2017) (granting partial summary judgment for plaintiff because "no reasonable juror could find that Defendants did not act with scienter" where defendant stated they would soon open a marijuana cultivation facility in a particular location, but the facility was not licensed, could not become licensed due to lack of residency, and was located in a county that specifically prohibited such businesses).

presumption, it is entitled to summary judgment on the element of reliance. MPSJ 30-31.

Not so. As Plaintiff's own authority explains, "even if a plaintiff establishes these elements, a defendant can rebut the presumption of reliance through any 'showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price' because such showings would erase any 'basis for finding that the fraud had been transmitted through the market.'" *Hsingching Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at \*4 (C.D. Cal. Oct. 5, 2018) (quoting *Basic*, 485 F.3d at 248). And "without [this] presumption . . . a Rule 10b-5 suit cannot proceed as a class action [and] [e]ach plaintiff [must] prove reliance individually." *Halliburton II*, 573 U.S. at 281-82.

Here, even assuming Plaintiff can satisfy the factors necessary to invoke the fraud-on-the-market presumption as an initial matter, additional undisputed material facts rebut that presumption as a matter of law by proving that the May 1 PR did not impact Co-Diagnostics' stock price. *See* AUF ¶¶ 6-11. Plaintiff alleges that Co-Diagnostics' stock traded in an efficient market and that "[t]he market . . . understood [the May 1 PR] to mean [Logix] tests were perfect—sending the Company's share price soaring." SAC ¶ 69. But the undisputed evidence shows that the Company's stock price movement on May 1, 2020 was not statistically significant—i.e., the stock price movement following the May 1 PR was indistinguishable from random chance. AUF ¶¶ 6-11. Defendants' economic expert, Prof. Ferrell, opined that any properly adjusted version of the economic model advanced by Plaintiff's purported expert at class certification, Dr. Werner, demonstrates that the price movement on May 1, 2020 was not statistically significant. AUF ¶ 10. And even if the Court were to consider the opinions of Plaintiff's purported economic expert Bettencourt—and it should not, for the reasons articulated in the Bettencourt *Daubert* Motion—

Bettencourt did not dispute Prof. Ferrell's testimony on this point. AUF ¶ 11. Bettencourt did not

discuss the May 1, 2020 stock price movement in his reports; did not dispute Prof. Ferrell's finding

that Dr. Werner failed to correct for heteroscedasticity; and conceded that he did not conduct a

robustness analysis with respect to the May 1 abnormal return; indeed, he testified that whether

that abnormal return was statistically significant was "not germane to [his] opinion." *Id.*

These undisputed material facts demonstrate that the stock price movement on May 1, 2020

cannot be distinguished from random chance, thereby "sever[ing]the link" between the challenged

statements and the price paid by Plaintiff and the class for Co-Diagnostics stock. This rebuts the

presumption of reliance on which Plaintiff's § 10(b) claim depends (*Basic*, 485 U.S. at 248), and

makes it necessary for each class member, including Lead Plaintiff, to individually prove that it

relied on the May 1 PR when it traded in Co-Diagnostics' securities during the class period, in

order to prove the element of reliance or that any alleged misstatement was made "in connection

with" the purchase or sale of a Co-Diagnostics security. Because Lead Plaintiff offers no evidence

of its individual reliance, it is not entitled to summary judgment on either of these elements.[22]

## IV.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF DEFENDANTS' AFFIRMATIVE DEFENSES.

Finally, Plaintiff asks for summary judgment on Defendants' affirmative defenses, "all of

which" Plaintiff claims "are boilerplate and legally insufficient as a matter of law." MPSJ 31. But

Plaintiff makes no effort to identify any particular, supposedly deficient affirmative defense, nor

does it offer any evidence or explanation in support, relying instead on the blanket assertion that

---

[22] For the same reasons, as detailed in their SJM, Defendants are entitled to summary judgment on the element of reliance, and this action must be decertified since rebuttal of the fraud-on-the-market presumption means that common issues no longer predominate over individual ones under Rule 23(b)(3). *See Halliburton II*, 573 U.S. at 281-82.

38

"[a]ll of the Defendants' forty-one affirmative defenses assert that the Class Plaintiff has not or cannot meet certain aspects of its prima facie burden of proof" and that because these are "not proper affirmative defenses" Plaintiff is entitled to summary judgment.

This fails in multiple respects. As an initial matter, Plaintiff's request wastes judicial and party resources on an issue with no substantive import: even assuming some of the affirmative defenses in Defendants' Answer are simply challenges to Plaintiff's prima facie case (and not best denominated affirmative defenses), striking those affirmative defenses would have no substantive effect, since Plaintiff still must carry its burden of proof as to each element of its claims, and Defendants still may argue that it cannot do so, regardless of whether those arguments are termed affirmative or general defenses. For precisely this reason, courts have taken a dim view of motions to strike "boilerplate" affirmative defenses as a waste of judicial time and resources. *See, e.g.*, *Raymond Weil, S.A. v. Theron*, 585 F. Supp. 2d 473, 489–90 (S.D.N.Y. 2008) ("There is nothing dumber than a motion to strike boilerplate affirmative defenses; it wastes the client's money and the court's time."); *see also Scott v. Paychex Ins. Agency, Inc.*, 2023 WL 5036099, at *8 (S.D. Fla. Aug. 8, 2023) (denying plaintiff's motion for summary judgment on affirmative defenses that were really general defenses: "There is no need to grant summary judgment on these defenses because these are not affirmative defenses."); 5 Charles Alan Wright, et al., *Federal Practice and Procedure* § 1269 (4th ed. 2016) ("The federal courts have accepted the notion of treating a specific denial that has been improperly denominated as an affirmative defense as though it were correctly labeled.").

In any case, it is not factually correct that "[a]ll of the Defendants' forty-one affirmative defenses assert that the Class Plaintiff has not or cannot meet certain aspects of its prima facie

39

burden of proof"—at a minimum, the following affirmative defenses concern issues on which Defendants bear the burden of proof and are properly denominated as such:

- Seventh Affirmative Defense: "The claims are barred under the truth-in-the-market doctrine."

- Tenth Affirmative Defense: "Lead Plaintiff and/or the Class Members were unreasonable in relying on the alleged statements and/or the mischaracterizations or paraphrasing of such alleged statements as recast by third-parties. Lead Plaintiff and/or the Class Members did not exercise the diligence a reasonable person would have exercised under the circumstances to protect their interests."

- Eleventh Affirmative Defense: "Lead Plaintiff and/or the Class Members were unreasonable in relying on the alleged statements based on their own sophistication."

- Fourteenth Affirmative Defense: "Lead Plaintiff and/or the Class Members were aware of the risks of their investments."

- Thirty-Fourth Affirmative Defense: "Lead Plaintiff and/or the Class Members failed to mitigate the damages alleged."

- Thirty-Fifth Affirmative Defense: "Lead Plaintiff and/or the Class Members failed to exhaust other remedies available to them."

- Fortieth Affirmative Defense: "Lead Plaintiff and/or the Class Members had the opportunity to sell the stock for gain and/or to minimize losses following the release of information which either constituted the information which they allege should have been disclosed by Defendants or which completed all of the relevant or required information."

Plaintiff makes no attempt to distinguish between the forty-one affirmative defenses pleaded in Defendants' Answer, much less identify any particular affirmative defense as lacking or show why Defendants will not be able to prove it at trial. Accordingly, Plaintiff is not entitled to summary judgment on any of Defendants' affirmative defenses.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for partial summary judgment in its entirety.

40

Dated: May 22, 2024

**BAKER & HOSTETLER LLP**


By:      */s/ Douglas W. Greene*
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of May, 2024, copies of the foregoing DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT and APPENDIX OF EVIDENCE IN SUPPORT THEREOF were filed with this Court's CM/ECF system, which will send notification to all counsel of record.

/s/ Douglas W. Greene
Douglas W. Greene