Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
**BAKER HOSTETLER, LLP**
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00368-JNP-DBP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead<br><br>**<u>Oral Argument Requested</u>** |

## TABLE OF CONTENTS

**Page**

I.    RESPONSE TO PLAINTIFF'S "SUPPLEMENTAL FACTS" ........................................ 3

II.   NO RATIONAL JURY COULD FIND FALSITY OR MATERIALITY. ........................ 3

III.  NO RATIONAL JURY COULD FIND DEFENDANTS ACTED WITH SCIENTER. . 11

IV.   DR. FERRELL'S UNDISPUTED OPINION PROVES LACK OF PRICE IMPACT.... 14

V.    NO RATIONAL JURY COULD FIND LOSS CAUSATION. ..................................... 16

VI.   GELT LACKS STANDING TO SUE OR REPRESENT THE CLASS.......................... 20

VII.  SECTION 20(a) CLAIM ALSO FAILS. .............................................................................. 20

CONCLUSION.................................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................2, 4

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................11, 14

*Blumenthal v. NY Life Ins. & Annuity Corp.*,
2010 WL 11508851 (W.D. Okla. Sept. 27, 2010) ....................................................18

*Bond v. Clover Health Invest., Corp.*,
2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023) .......................................................15

*Brown v. D.C.*,
2019 WL 3423208 (D.D.C. July 8, 2019).................................................................15

*Caprin v. Simon Transp. Servs.*,
112 F. Supp. 2d 1251 (D. Utah 2000).......................................................................11

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)...........................................................15

*EEOC v. Jackson Nat'l Life Ins. Co.*,
2023 WL 2727736 (D. Colo. Mar. 31, 2023) ...........................................................18

*Felkins v. City of Lakewood*,
774 F.3d 647 (10th Cir. 2014) .....................................................................................6

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017).............................................................15

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024) ...................................................................................19

*Glickenhaus & Co. v. Household Int'l, Inc.*
787 F.3d 408, 145 (7th Cir. 2015) ............................................................................15

*In re Gold Res. Corp. Sec. Litig.*,
776 F.3d 1103 (10th Cir. 2015) ................................................................................12

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)...............................................................................................16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)...............................................................................................14

*Hunger v. Hardie-Tynes*,
    2000 WL 147392 (10th Cir. 2000) ........................................................................15

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .............................................................................19

*Mitchell v. Gencorp Inc.*,
    165 F.3d 778 (10th Cir. 1999) ..............................................................................15

*Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)...............................................................................................4, 9

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)...................................................................................19

*In re PolarityTE, Inc., Sec. Litig.*,
    2020 WL 6873798 (D. Utah Nov. 22, 2020) .....................................................11, 19

*Richfield v. PolarityTE, Inc*,
    2023 WL 3010208 (D. Utah Apr. 19, 2023)............................................................9

*Scott v. Harris*,
    550 U.S. 372 (2007)................................................................................................6

*SEC v. e-Smart Techs., Inc.*,
    85 F. Supp. 3d 300 (D.D.C. 2015) ........................................................................11

*Sherman v. Klenke*,
    653 F. App'x 580 (10th Cir. 2016) ........................................................................20

*Smallen v. W. Union Co.*,
    950 F.3d 1297 (10th Cir. 2020) .........................................................................11, 12

*Theodore v. Purecycle Tech, Inc.*,
    2022 WL 20157415 (M.D. Fla. Aug. 4, 2022) .......................................................19

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)....................................................................................9

*United Food & Com. Workers Union v. Chesapeake Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) ...............................................................................11

*In re Vivendi*,
  838 F.3d 223 (2d Cir. 2016)....................................................................................17

*In re Williams Sec. Litig.*,
  558 F.3d 1130 (10th Cir. 2009) ..........................................................................16, 20

**Rules**

Fed. R. Civ. P. 12(h)(1)................................................................................... 14-15

If ever there were a case for summary judgment, this is it. Plaintiff's claims survived a motion to dismiss on the possibility that discovery might uncover support for its speculative theory—that the Logix test must not actually be very good, that contemporaneous evidence must have contradicted the strong performance results described in the May 1 PR,[1] and that Defendants must have known this and intended to mislead investors. But extensive discovery has conclusively disproved each aspect of this theory. The Logix test is, in fact, highly sensitive and specific and undoubtedly prevented tens of thousands of deaths during COVID; Defendants were not, as the complaint offensively suggests, peddling an inferior product in a pandemic without regard for health consequences. Moreover, no credible performance results contradicted the May 1 PR: every scientist who weighed in on this testified that the data available to Co-Diagnostics at the time were consistent with the May 1 PR, and that the handful of troubleshooting emails on which Plaintiff fixates reflected contamination or other non-test issues and were not credible indicators of the test's performance. And consistent with this, the evidence uniformly shows the Defendants genuinely believed the May 1 PR was true and not misleading.

Having failed to uncover any evidence of fraud—and confronted with a mountain of evidence showing good faith—Plaintiff obfuscates. It mischaracterizes irrelevant "facts" as creating genuine issues; it tries to exclude the testimony of Defendants' world-renowned PCR expert, Dr. Bustin; and it advances new theories of causation not pled in the complaint in an improper attempt to remedy its obvious deficiencies. These last-ditch efforts only betray Plaintiff's desperation, and the Court should not be taken in. Plaintiff's Opposition (Dkt. #179; "Opp.")

---

[1] Defined terms are the same as in Defendants' "MSJ" (Dkt. #169) and Opposition (Dkt. #180; "MPSJ Opp.") to Pl's "MPSJ" (Dkt. #168). "RSOF" refers to Pl's Response to SOF in Dkt. #179.

asserts one immaterial, factually unsupported "dispute" after another in an attempt to manufacture

a genuine issue of material fact. But a dispute is only "genuine" if the evidence is such that it "may

reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248-50 (1986). If "the evidence [for nonmovant] is merely colorable, or is not significantly

probative, summary judgment may be granted." *Id.* That is precisely the case here. Ultimately, this

case is simple and can be decided on just a few material facts that are not genuinely disputed:

1. **The Logix test is an excellent diagnostic test that has proven highly accurate in clinical practice.** Every scientist agreed on this point—including Plaintiff's purported expert, Dr. Westgard, whose opinions Plaintiff chose not to submit at summary judgment.[2] No evidence supports Plaintiff's foundational assumption that Co-Diagnostics must have been trying to hide the truth about a bad test.

2. **The independent evaluation results described in the May 1 PR were attached to it and showed that it had performed with 100% sensitivity and specificity.** Plaintiff admits these were attached and does not genuinely dispute the data therein (*see infra* n.3). A reasonable investor is assumed to have viewed these along with the May 1 PR.

3. **The credible performance data available to Co-Diagnostics as of May 1, 2020 were consistent with the May 1 PR.** Dr. Bustin opined to this effect, applying his decades of PCR knowledge and experience to the facts, and Dr. Satterfield and others testified similarly. Dr. Westgard did not analyze the data or opine on this issue.

4. **The NIV, Greek, and South African lab data were due to contamination or other non-test causes and were not credible indicators of the test's performance.** Dr. Bustin applied his expert knowledge and experience to the available facts and concluded that "anyone with PCR experience" would not have credited the NIV, Greek, or South African results. Dr. Satterfield and other scientists at Co-Diagnostics testified similarly. Dr. Westgard did not opine on the issue, nor did Dr. Garcia (*see infra* 5-7).

5. **The fact that no COVID PCR test will perform perfectly all the time (and that the Logix test specifically is not perfect) was widely publicly discussed prior to May 1.** Plaintiff does not dispute that the articles in SOF ¶¶ 17 & 20 were published on the dates and in the sources shown, or that the May 1 PR was issued against this backdrop.

6. **Each Defendant who helped prepare the May 1 PR credibly testified he believed**

---

[2] *See* Dkt. #169-5 at 53 (Bustin: Logix test is "as good a diagnostic [PCR] test as can be designed"); Dkt. #169-10 (Westgard Tr.) at 149:9-13 (Logix test results showed "excellent" performance).

**it was true and not misleading.** Plaintiff does not dispute this testimony. RSOF ¶ 24.

7. **No Defendant sold stock during the class period or personally benefited from the alleged fraud in any way.** Plaintiff does not genuinely dispute this. RSOF ¶ 40.

8. **Co-Diagnostics' stock traded in an efficient market at all relevant times.** This is undisputed, and means the market quickly impounded all new public information.

9. **Co-Diagnostics' stock price did not increase statistically significantly on May 1.** The only economic expert opinion on price impact before the Court—Defendants' expert Prof. Ferrell's—concluded that the price movement on May 1, 2020 was not statistically significant and could not be distinguished from random chance. Plaintiff engaged Mr. Bettencourt to opine on *loss causation and damages*—not price impact—and he did not analyze or opine on the price movement on May 1.

10. **Co-Diagnostics' stock price did not decrease statistically significantly on May 14, 2020.** The first and second alleged corrective disclosures were announced in an efficient market hours prior to market close, and it is undisputed that the stock price decline on May 14 was indistinguishable from random chance.

From these undisputed, material facts, Defendants are entitled to summary judgment at least five different ways—on falsity, materiality, scienter, reliance, and loss causation.

## I.    RESPONSE TO PLAINTIFF'S "SUPPLEMENTAL FACTS"

**Supp. Facts ¶¶ 1-2**: Immaterial. It is undisputed that no Defendant sold stock during the class period (RSOF ¶ 40), so these additional facts cannot suggest scienter. *See infra* 11-14.

**Supp. Facts ¶ 3**: Disputed, but unnecessary to grant the MSJ (*see infra* 16-20). Bettencourt was only asked if he "recognized" his initial report and said it "looks like the report that I filed" (Dkt. #169-70 at 22:14-23:3); when asked if he had sworn under penalty of perjury to the statements in that report he said no (*id.* 71:25-72:12). He did not at any point affirm under oath that his initial report contained his opinions in this case or that its contents were true and correct.

## II.    NO RATIONAL JURY COULD FIND FALSITY OR MATERIALITY.

The heart of this case is Plaintiff's claim that the May 1 PR misleadingly failed to disclose "that the Company's tests ha[d] problems with their accuracy and [were] significantly less than

3

100% accurate." SAC ¶¶ 64-65. But this theory has always been based in speculation, not fact—born from unfounded (and later disproved) accusations in the April 30 SLT Article, fed by short-seller conjecture, and based on a fundamental misunderstanding of PCR science. Summary judgment is about facts, not theories, and to survive summary judgment, Plaintiff must proffer "significant probative evidence" of some contemporaneous fact that rendered the May 1 PR materially misleading in context. *Anderson*, 477 U.S. at 256; *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 190-91 (2015). Plaintiff cannot do so.

*The May 1 PR was consistent with the scientific data available to the Company at the time.* Plaintiff does not genuinely dispute that the Logix test performed with 100% sensitivity and specificity in the independent evaluations attached to the May 1 PR as well as the non-public Gentech and Timpanogos evaluations. SOF ¶¶ 9-13.[3] Instead, Plaintiff argues the May 1 PR was misleading because it shared those (truthful) results while omitting (i) "prior failed validation studies" from the NIV, Greek, and South African labs, (ii) a purported discrepancy in positivity rates between TestUtah and other Utah testing sites reported in the April 30 SLT Article; and (iii) unspecified "customer complaints" that "might have" been received by the Company prior to May 1, 2020. Opp. 13-15. As detailed below and in Defendants' MSJ and Opp. to Pl's MPSJ (both incorporated herein by reference), none of this has merit or creates a *genuine* issue of material fact.

As an initial matter, Plaintiff fundamentally mischaracterizes the NIV, Greek, and South African emails—they were not sharing final validation results on par with those described in the

---

[3] No "disputed" fact in RSOF ¶¶ 9-13 *genuinely* disputes this. The Gentech report does show 100% sensitivity/specificity. Dkt. #169-31 at 2 (all 10 known-positive samples "amplified as expected" (positive); all 10 known-negatives "did not show any amplification" (negative)). And Dr. Garcia's testimony about NIP "typos" has nothing to do with the "validity of the [] data"; the undisputed, original NIP report (Dkt. #169-25 at 18-19) clearly shows 100% sensitivity and specificity.

May 1 PR, but were troubleshooting emails of the type routinely exchanged between labs and manufacturers when initial test runs indicate a problem with implementation in the lab. SOF ¶ 5. In any event, the undisputed scientific evidence proves that the NIV, Greek, and South African data were due to contamination or other non-test causes, did not constitute valid performance results, and therefore could not "contradict" statements in the May 1 PR. SOF ¶¶ 14-16. This is ultimately a scientific question, and every scientist to weigh in on it said the same thing—it was obvious, based on their scientific knowledge and PCR experience, that the results did not truly indicate lower performance characteristics for the Logix test. *See* SOF ¶¶ 15-16. Defendants' scientific expert Dr. Bustin—among the few people most qualified to speak to these issues— offered the only expert scientific opinion with respect to the NIV, Greek, and South African lab data. He analyzed the available evidence and concluded that the data "appeared compromised due to contamination" and "[a]nyone with PCR experience would have viewed [those] results as not indicative of the test's actual performance, making it inappropriate to include them in any report or characterisation of the test's performance." Dkt. #169-5 at 52. Dr. Satterfield and Mr. Apuli (also scientists with extensive PCR experience) said the same thing—that it was clear for scientific reasons that the results from those labs were due to contamination or other non-test factors and therefore were not credible, concerning, or appropriate to include in the May 1 PR. SOF ¶¶ 14-15; Dkt. #169-13 (Satterfield Tr.) at 123:15-130:21, 146:16-150:22, 218:3-19, 221:3-9, 301:9-304:5 (re NIV/Greek labs); Dkt. #169-22 (Apuli Tr.) at 51:15-25, 76:15-79:20, 82:7-25 (re all three labs).

No scientist—not even Plaintiff's purported scientific expert, Dr. Westgard[4]—opined or

---

[4] Westgard was not asked to opine on the credibility of the NIV, Greek, or South African data, and did not do so. Plaintiff's claim that he "opined that contamination is unlikely because experienced lab[s] . . . will have dealt with" this (RSOF ¶ 16) is an outrageous mischaracterization; the quoted

testified to the contrary. Unable to genuinely dispute this unanimous scientific conclusion, Plaintiff instead tries to exclude Dr. Bustin (one of the most widely respected PCR experts in the world), and argues that the NIV, Greek, and South African lab data "on their face" contradict the May 1 PR. Plaintiff's proffered lay interpretation of scientific data cannot create a genuine issue as to this important scientific fact.[5] As Dr. Bustin opined, and Dr. Westgard did not dispute: contamination is an "ever-present danger" and it is customary not to "report runs that give atypical results due to contamination, as they are immaterial . . . to the final conclusions (and in fact would distort the true results if included)." Dkt. #169-5 at 40; *see also* Dkt. #169-11 (Bustin Tr.) at 263:8-11; 265:13-22; 266:5-7; Dkt. #169-13 (Satterfield Tr.) at 129:19-130:9; 204:1-5. Plaintiff's bare assertion that the NIV, Greek, and South African data appear "on their face" to contradict the May 1 PR is not significant probative evidence from which a reasonable jury could find for Plaintiff. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories [on summary judgment], one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts . . . .").

Nor do any of the NIV, Greek, or South African emails themselves create a genuine dispute. Plaintiff points to one as showing Dr. Garcia did not believe the NIV results were contaminated (RSOF ¶ 14), but she was only expressing an initial hypothesis—on the day they first learned of the NIV issues—that those results might be due to a different non-test cause (Dkt. #171-12), and later emails show that she too came to believe the NIV results may in fact have been due to

---

language was in reference to an Israeli lab's published 2021 study and had nothing to do with the NIV, Greek, or South African labs or the likelihood of contamination there (Dkt. #169-88 at 18).
[5] *See Felkins v. City of Lakewood*, 774 F.3d 647, 651 (10th Cir. 2014) (plaintiff's lay opinion re medical diagnosis in ADA case inadmissible and thus insufficient to oppose summary judgment).

contamination. Dkt. #169-32 at 4 (4/11/20: "It is possible that our reagents have acquired contamination from their lab"). Plaintiff also claims NIV "rule[d] out" contamination, citing Dr. Satterfield's testimony, when what he actually said was that NIV tried to rule out contamination, but its methods were inadequate to determine if contamination was present. Dkt. #169-13 at 150:2-22. The issue in the Greek lab was contamination of a *particular lot* of Logix tests after shipment, so statements that the contamination was not "systemic" and that a lot still in Co-Diagnostics' warehouse "had no contamination" are entirely consistent with that conclusion. *See* Dkt. #169-11 at 148:19-149:18, 174:17-23, 229:24-230:21; Dkt. #169-13 at 218:3-19, 227:4-228:1, 301:19-302:5. And the mere fact that the South African lab email "does not mention" contamination (RSOF ¶ 15) is immaterial to the scientific question of whether the information therein indicated the results were contaminated (as Dr. Bustin and Mr. Apuli testified it did). Dkt. #169-11 at 280:7-281:7; Dkt. #169-5 at 39; Dkt. #169-22 at 76:15-79:20, 83:14-23.

Plaintiff's arguments that the "disparity in positives" reported in the April 30 SLT Article and unspecified "customer complaints" rendered the May 1 PR misleading are equally unsupported. The former is a non-starter, since that purported disparity was publicly reported the day before the May 1 PR and thus could not have been a hidden omission that rendered it misleading. In any case, Dr. Satterfield's undisputed white paper demonstrates that the lower positivity rate at TestUtah sites in April 2020 was because they were testing people with fewer and less severe symptoms and not (as the Article posited and Plaintiff assumes) because the Logix test was less sensitive; once TestUtah adopted the stricter "symptomatic" screening criteria used by other sites, the disparity disappeared. SOF & RSOF ¶¶ 21-22 (not disputing). As for "customer complaints" listed on a QT9 spreadsheet, Plaintiff offers no evidence that these related to test

7

performance, and undisputed evidence shows the two complaints Plaintiff specifically references did not. RSOF ¶ 7; Dkt. #180-3 (3/30/20 Hungarian Ministry complaint: shipment arrived with empty test tubes); Dkt. # 180-4 (4/6/20 Gentech complaint: shipment was short several boxes of tests). Neither the purported "disparity" in positivity rates nor the fact of unspecified customer complaints contradict any statement in the May 1 PR or create a genuine issue of material fact.

In sum, the evidence is so one-sided that no reasonable jury could find that omission of any of these facts (NIV, Greek, or South African data; purported disparity in positivity rates; or unspecified customer complaints) rendered the May 1 PR materially misleading.

***No reasonable investor could have viewed the May 1 PR as promising 100% accuracy.*** Plaintiff's only other falsity argument is that the May 1 PR "created the false impression that the test was 100% accurate." Opp. 16. But the May 1 PR clearly stated that the performance results it was reporting were from particular evaluations—not inherent properties of the test—and it did so amidst extensive public discussion of the fact that no COVID test is perfect. SOF ¶¶ 17, 20, 23. Plaintiff does not dispute that the articles quoted in SOF ¶¶17 & 20 were published in major news outlets across the U.S. prior to May 1, 2020, or that they said what is clear on their face: COVID PCR tests (including the Logix test specifically) are inherently imperfect; many non-test factors, including contamination, can cause erroneous results; and all COVID tests (including the Logix test) can produce a false result at any time. Dkt. #169-41-51, -53-59; Dkt. #169-60 (Logix test "Fact Sheet" warning of possible false results). Plaintiff also does not dispute that the PathWest and NIP reports attached to the May 1 PR reported confidence intervals ("CIs") for their results, indicating that while the Logix test correctly identified all positive and negative samples in those evaluations it is reasonably expected to perform anywhere in those CIs in the future (i.e., below

8

100%). Dkt. #169-25 at 17-19 (PathWest: "100% sensitivity (CI 96.48-100) and 100% specificity (CI 96.52-100)"; NIP: "100% sensitivity (CI 85.4-100) and 100% specificity (CI 78.1-100)").

Under *Omnicare*, all of this is critical context[6] for evaluating whether the statements in the May 1 PR were misleading. 575 U.S. at 186-191, 194 (only misleading if it would have misled a "reasonable investor" viewing it "fairly and in context"). Reasonable investors are assumed to be familiar with important aspects of the industry in which they invest. *Omnicare*, 575 U.S. at 186-87; *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016); *Richfield*, 2023 WL 3010208, at *6 (D. Utah Apr. 19, 2023). Here, the reasonable Co-Diagnostics investor must be assumed to have understood the basics of diagnostic PCR testing (including the foundational principle that no test is perfect), to have been familiar with the publicly available information described above (stating that no test, including the Logix test, is perfect), and to have brought all that to bear when viewing the May 1 PR. That reasonable investor, properly defined, simply could not have read the May 1 PR as promising that the Logix test would always perform with 100% accuracy.

Plaintiff cannot escape this proper falsity analysis. Instead, Plaintiff argues that "the best" evidence on falsity is a May 2, 2020 news headline—"Coronavirus Test Maker Soars As Its Diagnostic Proves 100% Accurate"—which it claims shows the author was misled by the May 1 PR. Opp. 17. But even a cursory review of the article itself shows it accurately reported that the Logix test had shown 100% sensitivity and specificity *on a particular set of recent validations*. Dkt. #171-25 ("Evaluations from officials in India, Mexico, the U.S. and elsewhere show [the tests] have performed with 100% specificity and 100% sensitivity."). And even if certain media

---

[6] Plaintiff suggests it is "odd" to point to pre-May 1 statements that the Logix test was not perfect, since the May 1 PR "superseded" them (Opp. 18), but *Omnicare* directs courts to consider *all* publicly available information (including "apparently conflicting information"). 575 U.S. at 190.

outlets or test distributors were "taking [the release] out of context" (Opp. 18) or oversimplifying it for their own commercial reasons, that would not suggest the May 1 PR itself was misleading. MPSJ Opp. 10. Out-of-context soundbites from director Nelson and Dr. Garcia are equally immaterial. Nelson's May 12, 2020 email (Dkt. #179-7) made a shorthand reference to the test's excellent accuracy; it did not refer to or discuss the May 1 PR and sheds no light on how a reasonable investor would have viewed it. Dr. Garcia's personal view that certain statements in the press release were "egotistical" is immaterial to whether the market knew no test is perfect.

Finally, none of Plaintiff's evidence suggests Defendants knew or believed the Logix test was clinically inferior to other tests when the May 1 PR was issued. Dr. Satterfield's statement that "you can't do better than that" was explicitly in reference to the fact that it is not possible for a diagnostic test to score better than 100% sensitivity and specificity on an evaluation, and the Logix test had just achieved that top result on multiple evaluations. Dkt. #169-25 (May 1 PR) at 2. This was a true statement, and no evidence shows it was misleading in context. *See supra* 4-8.[7]

*Materiality.* Plaintiff's only argument on materiality is the simplistic assertion that the alleged misrepresentations were material because "representations about the performance of a company's primary product are material." Opp. 19. That is not the standard: "[materiality] depends on the information that already exists in the market. Undisclosed information is material only if its disclosure would have 'significantly altered the total mix of information available' to a reasonable investor."[8] *United Food & Com. Workers Union v. Chesapeake Energy Corp.*, 774 F.3d 1229,

---

[7] Internal emails about improving LoD *for marketing purposes* do not suggest Defendants believed LoD was negatively impacting clinical performance. SOF ¶¶ 5-6; Dkt. #169-18-20; Dkt. #169-13 at 152:6-153:12, 257:7-21; Dkt. #169-21 at 143:1-144:23; Dkt. #169-22 at 88:20-89:9, 113:7-14.
[8] Plaintiff's cases are not contrary. *See SEC v. e-Smart Techs., Inc.*, 85 F. Supp. 3d 300, 325 (D.D.C. 2015) (*Basic* satisfied where omitted info was significant and not public).

1237-38 (10th Cir. 2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1251, 1256 (D. Utah 2000) ("A court must first determine whether the information would be considered important by a reasonable investor; if so, the court must then determine whether the information would still be considered important in light of other information already available to the market."). Explicitly stating in the May 1 PR that the Logix test was not "perfect" would not have "significantly altered the total mix of information" because that fact had been widely publicly discussed for months, both with respect to COVID tests generally and the Logix test in particular. SOF ¶¶ 17, 20; *United Food*, 774 F.3d at 1238 (news is "part of that total mix"); *In re PolarityTE, Inc., Sec. Litig.*, 2020 WL 6873798, at *12 (D. Utah Nov. 22, 2020) (no materiality where public sources contradicted statements).

It simply is not possible that a reasonable investor could have been materially misled by the May 1 PR. Thus, Defendants are entitled to summary judgment on falsity and materiality.

## III.   NO RATIONAL JURY COULD FIND DEFENDANTS ACTED WITH SCIENTER.

Nor does Plaintiff offer significant probative evidence that Dr. Satterfield or Co-Diagnostics issued the May 1 PR intending to deceive investors or with a recklessness so severe it "approximat[ed] actual intent." *Smallen v. W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020). To the contrary, the undisputed evidence overwhelmingly demonstrates the Defendants acted in good faith. MSJ 30-33; MPSJ Opp. 30-36. Dr. Satterfield and every other Co-Diagnostic employee who helped prepare the May 1 PR credibly testified that they believed it accurately described the Logix test's performance and was consistent with the data available at the time, and they explained the scientific bases for that belief. SOF ¶ 24; Dkt. #169-13 (Satterfield Tr.) at 202:8-18 ("The only thing that we were able to state is what the data was giving us . . . . And in the handful of studies

11

that we got back . . . we were seeing [100%] sensitivity, [100%] specificity in those data sets."); *see also* SOF ¶¶ 6-16, 18-22; Dkt. #169-14 at 220:16-21. Indeed, Dr. Satterfield testified that it never occurred to him that anyone could read the May 1 PR as promising perfect test performance since that "is the most elementary understanding in diagnostics. . . . [I]t's just not something that you expect anyone [] would ever misunderstand who has any understanding of what a diagnostic test is." *Id.* at 297:24-299:17; Dkt. #169-14 (D. Egan Tr.) at 220:5-13; SOF ¶ 18. Dr. Bustin, the only expert to analyze the performance data available at the time, corroborated all of this. SOF ¶¶ 16, 22 (explaining why the available scientific data were consistent with the May 1 PR). Moreover, Defendants had no motive—none of them sold Co-Diagnostics stock during the class period or personally financially benefited[9] from the purported fraud, which cuts strongly against scienter. SOF ¶ 40; *Smallen*, 950 F.3d at 1310-11 (lack of unusual sales "militate[s] against" scienter); *In re Gold*, 776 F.3d at 1117 n.8 (same re "absence of any allegation of a financial benefit").

Plaintiff does not genuinely dispute any of these material facts. Instead, it argues that "a court need not credit a defendant's self-serving" denial of intent if he was "aware of facts that ma[de] the statement misleading," and it identifies five pieces of evidence that purportedly show scienter. Opp. 20-21. None does so. First, omission of the NIV, Greek, and South African results from the May 1 PR cannot show Defendants' intent to mislead for the same reasons discussed *supra*. It is undisputed that Dr. Satterfield was unaware of the South African emails and data (SOF ¶ 15), and he testified (and the emails reflect) that he understood the NIV and Greek data to be due to contamination and not credible performance results. *Supra* 4-5; SOF ¶ 14. All of the evidence

---

[9] The benign facts that Defendants owned Company stock, were compensated in part with stock, or followed the stock price cannot show "personal benefit" where they did not cash in on the purported fraud. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015).

concerning these results back this up and confirm that it was customary *not* to report them alongside the credible performance results. *Supra* 4-6; SOF ¶¶ 14-16; MPSJ 33-35. On this record, no reasonable juror could find that omission of the NIV, Greek, or South African data from the May 1 PR establish Dr. Satterfield's or Co-Diagnostics' intent to defraud.

Nor do Plaintiff's four other "facts" (Opp. 20) suggest scienter or create a genuine issue of material fact. Plaintiff mischaracterizes a prior draft of the May 1 PR as having said that "'some' of the Logix test's validation results showed 100% sensitivity and specificity," and argues that removal of the "some" from the final shows scienter. But the referenced statement in the draft did not concern sensitivity or specificity—it described *LoD* results in "some" evaluations—and Andrew Benson (not Dr. Satterfield) removed the word "some" when he removed most other LoD content in the sentence. Dkt. #171-20 at 2, 7. Plaintiff also insinuates that Ms. Hutchins was not consulted about the draft because she would have disagreed with it, but she testified that she believed the May 1 PR was true "based on the information that we had at that point." Dkt. #169-65 at 178:9-182:4; Dkt. #169-21 at 173:25-174:20 (A. Benson: if Hutchins was not consulted it was inadvertent). Nor is the May 13, 2020 email chain between Hutchins and Andrew Benson (Dkt. #179-6) material to any Defendant's mental state (none of whom were copied on it). It merely shows Hutchins asking, weeks after the May 1 PR, if they can now remove the underlying data since the FDA might not like public posting of data it had not reviewed.[10] Finally, even if certain distributors or journalists oversimplified the May 1 PR, it would not matter to scienter; Defendants had no duty to remedy isolated misimpressions even if they knew of them. *Supra* 11-12. On this

---

[10] Dkt. #169-21 at 213:9-214:9 (Benson did not "think[] the headline in the first paragraph was damning," just that if the FDA took issue with their posting data the FDA had not reviewed then "wouldn't the FDA already have a problem with [the headline]" saying basically the same thing).

record, no rational jury could find Dr. Satterfield or the Company intended to deceive investors.

## IV.    DR. FERRELL'S UNDISPUTED OPINION PROVES LACK OF PRICE IMPACT.

"Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade . . . [will] rebut the presumption of reliance." *Basic*, 485 U.S. at 248. Here, Defendants submitted the expert opinion of Prof. Ferrell, a highly credentialed Harvard professor of econometrics, who opines that there is no scientific basis to conclude that the abnormal return on May 1, 2020 was statistically significant. SOF ¶ 29; Dkt. #169-66 at ¶ 11. Plaintiff fails to offer any evidence genuinely disputing that material fact: the only purported economic expert opinion Plaintiff submits is Mr. Bettencourt's, which is both inadmissible on summary judgment (*see supra* 3; Dkt. #170) and addresses only loss causation and damages, not price impact. Dkt. #169-67 (Bettencourt Rep.) at §§ 1, 6.

Confronted with this glaring deficiency, Plaintiff argues it should not matter. None of Plaintiff's arguments holds water. First, it claims Defendants "waived" the right to argue lack of price impact by not raising it at class certification. Not so: lack of price impact is an affirmative defense, and the fact that Defendants did not argue it at class certification (prior to full development of the expert facts) cannot waive their right to argue it at summary judgment. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-80 (2014) (may offer evidence of lack of price impact at class certification or merits stage).[11] Next, Plaintiff simply asserts what it wishes were true—that "Bettencourt opines that there was a statistically significant increase in the stock price on [May 1]." Opp. 23. He does not: the scope of his engagement did not include price impact; his

---

[11] Plaintiff's cases are inapposite: *Hunger* concerned a personal jurisdiction defense explicitly waived under Rule 12(h)(1) (2000 WL 147392 (10th Cir. 2000)); *Brown* involved a "purely legal argument" unlike price impact, which turns on facts (2019 WL 3423208 (D.D.C. July 8, 2019)).

reports do not discuss stock price movement on May 1; and he testified that it was "not germane to my opinion" and "doesn't bear on any of the conclusions in my report." SOF ¶ 30.[12]

Finally, Plaintiff argues that, regardless of how the price moved on May 1, the challenged statements' price impact can be observed through price movement on later dates: May 13, when the price increased following bad news for competitor Abbott labs, and on May 14-15 following the alleged corrective disclosures. Again, because Bettencourt did not opine on price impact at all, Plaintiff offers no expert evidence for these technical economic arguments, and mere legal argument cannot suffice. And Plaintiff's legal argument regarding May 13 makes no sense: the bad news about Abbott Labs was new and did not "repeat" anything in the May 1 PR, but even if it had, Plaintiff cannot explain why later "repetition" of the alleged misstatements impacted the stock price when the May 1 PR itself did not, and such a delayed price impact is inconsistent with an efficient market. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017). As for "back-end" movement on May 14-15, Plaintiff's own authorities[13] reflect that this is only allowed when plaintiff alleges a "price maintenance" theory (i.e., the statements maintained artificial inflation by omitting new bad information or confirming false positive understanding) or when unusual circumstances complicate front-end price movement—not under a typical "price inflation" theory like the one pled here.[14] Moreover, back-end movement also cannot show price

---

[12] A single line item in an expert report is too cursory to be an admissible expert "opinion." Dkt. #173-1 at 10; *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

[13] *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *19 (S.D.N.Y. Oct. 18, 2019) (looking to back-end for price-maintenance theory, front-end for price-inflation); *Bond v. Clover Health Invest., Corp.*, 2023 WL 1999859, at *13 (M.D. Tenn. Feb. 14, 2023) (looking to back-end due to confounding front-end news). The *Glickenhaus* quote concerned loss causation, not price impact. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).

[14] Plaintiff claims the May 1 PR artificially inflated the stock price on May 1 when it "changed the public perception of the test's sensitivity." SAC ¶ 69 (it "sen[t] the [] price soaring"); RSOF ¶ 20.

impact here because the alleged corrective disclosures did not correct any statement in the May 1 PR. *See infra* 18-22; *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (on price-maintenance theory, back-end drop cannot equal front-end inflation if there is a "mismatch between the contents of the misrepresentation and the corrective disclosure").

All of this proves lack of price impact and "severs the link" between the challenged statements and the price paid by Plaintiff and the class, rebutting the presumption of reliance and making it necessary for each plaintiff to individually prove reliance. Because Plaintiff cannot do so, Defendants are entitled to summary judgment, and the class should be de-certified.

## V.   NO RATIONAL JURY COULD FIND LOSS CAUSATION.

To prove loss causation on a corrective disclosure theory, Plaintiff must show "both that corrective information was revealed, and that this revelation caused the resulting decline in price." *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009). Here too, Plaintiff's claims rely entirely on the unsupported and unreliable opinions of Mr. Bettencourt; if the Court grants Defendants' motion to exclude his opinions then it must grant the MSJ as well. But even if the Court does not exclude Bettencourt, no reasonable trier of fact could find on this record that (i) any "corrective disclosure" alleged in the complaint "corrected" any alleged misstatement; or (ii) any corrective disclosures caused a statistically significant drop in the stock price. MSJ 35-39.

***May 14 SLT Article.*** Plaintiff argues the May 14 SLT Article revealed "the Logix test had accuracy problems and [] the Company did not want to submit its allegedly perfect test to scrutiny" (Opp. 29), but the Article plainly did neither of those things. It reported that *TestUtah*, not Co-Diagnostics, had declined to be part of a particular state-wide validation (but agreed to a different

joint validation).[15] SOF ¶ 32. And it repeated the April 30 SLT Article's speculation that a disparity in positivity rates might reflect lower performance by the Logix test—a theory Plaintiff concedes was subsequently disproved (RSOF ¶ 22)—but the Article did not reveal anything new about the test's accuracy at all, much less that the May 1 PR had "overstated the [test's] efficacy" (Opp. 31). Nor could the May 14 SLT Article's discussion of similar speculation about TestNebraska, first reported in news articles a few days earlier, correct any statement in the May 1 PR about the Logix test's past performance. And even if some aspect of the Article were theoretically corrective, it is not genuinely disputed that the stock price *increased* for hours after this disclosure. SOF ¶ 34.[16]

*Test Iowa Results*. Plaintiff argues that the TestIowa results (showing 95% sensitivity and 99.7% specificity, rather than 100%) operated as a corrective disclosure because with 95% sensitivity "the probability of getting a false positive increases to 55.2%." Opp. 32; SAC ¶ 85. This is scientifically wrong and dramatically overstates the public health import of such a difference, again betraying Plaintiff's fundamental misunderstanding of diagnostic testing science. First, specificity (not sensitivity) determines the rate of false positives. SOF ¶ 4. Second, Dr. Westgard himself admits the methodology underlying Plaintiff's assertion is wrong.[17] Third, 95% sensitivity and 99.7% specificity are *good*, not bad, clinical results: every scientist asked (including Dr. Westgard) testified that the TestIowa results showed excellent accuracy and were *consistent with*

---

[15] In *In re Vivendi,* 838 F.3d 223 (2d Cir. 2016), a *defendant* constructively corrected the falsity.

[16] Several articles show this (Dkt. #169-68, ¶¶ 32-33), and Plaintiff disputes only one, on an immaterial timing issue (RSOF ¶ 34; claiming May 14 SLT Article published at 9am MT not ET).

[17] TestIowa's 99.7% specificity means only 0.3% of patients received a false positive. Even using SAC ¶ 85's assumptions (1 million tested, 4.1% prevalence), a test with 95% specificity would not result in 55.2% of people tested "getting a false positive" (552,000 people) as Plaintiff claims, but 55.2% *of people who receive a positive result* getting a false positive (~50,000 people). Dkt. #169-5 at 13-16; Dkt. #169-10 at 73:5-79:14 (Westgard admitting his report was wrong in this regard).

17

the strong performance described in the May 1 PR. SOF ¶¶ 5, 31, 33. In any event, the undisputed fact that the stock price increased in the hours following this announcement (and did not drop after TestNebraska's 95% sensitivity announcement days earlier) confirms that investors likewise did not view it as corrective. *Supra* 16-17& n.16; SOF ¶ 31.

**FDA Press Release.** As for the after-hours FDA Press Release—concerning competitor Abbot Labs, not Co-Diagnostics—Plaintiff offers only that some market commentary discussed Co-Diagnostics and Abbott together (as one would expect) and that the market had not previously realized that COVID tests cannot be perfect. The latter conclusory assertion, again, is plainly contradicted by widespread public discussion in spring 2020 that no COVID test is perfect. *Supra* 8-9; SOF ¶¶ 17, 20. And Plaintiff fails to identify a single analyst report or article linking the FDA Press Release with the Logix test or the May 15 decline (as one would expect if the market saw it as corrective). No reasonable jury could find the FDA Press Release "corrected" the May 1 PR.

**_Unpled Hindenburg Tweets._** Recognizing the weakness of its arguments, Plaintiff now, for the first time on Opposition, also asserts a *fourth* "corrective disclosure" not alleged in the complaint: a series of tweets by notorious short-seller Hindenburg at 1:38pm ET on May 14, 2020, which Plaintiff claims "synthesized" public information to reveal that the May 1 PR was false. Opp. 33-37. This is improper; Plaintiff may not effectively amend its pleadings through expert testimony and briefing.[18] In any case, this new argument has no merit and is contradicted by the tweets themselves. The "expert analysis" Plaintiff touts was nothing more than a few conclusory accusations based on readily-available public information—*none of which concerned the Logix*

---

[18] *See EEOC v. Jackson Nat'l Life Ins. Co.*, 2023 WL 2727736, at *4 (D. Colo. Mar. 31, 2023) ("[Party] cannot effectively amend the complaint . . . through [] expert's testimony"); *Blumenthal v. NY Life Ins. & Annuity Corp.*, 2010 WL 11508851, at *6 (W.D. Okla. Sept. 27, 2010) (similar).

*test's accuracy.* Dkt. #179-5 at 1 ("We are short [Co-Diagnostics] due to its CFO's checkered history, involvement with companies halted by the SEC, its astronomical valuation, a growing list of higher quality COVID tests & its propensity to issue frequent fluffy press releases."). Hindenburg's only statement about the Logix test itself was that "[its] quality has been consistently rated one of the worst,"[19] citing the same *BioCentury* article on LoD discussed in the April 30 and May 14 SLT Articles. This is nothing more than repetition of a readily available news article's easily digestible contents,[20] and cannot constitute a corrective disclosure as a matter of law. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("[N]egative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure."); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013); *In re PolarityTE*, 2020 WL 6873798, at *12.

Finally, even if Plaintiff could prove that any of these disclosures "corrected" the May 1 PR, it fails to offer any probative evidence showing that they caused the alleged losses. Because it is undisputed both that Co-Diagnostics traded in an efficient market and that the May 14 "abnormal" decrease was not statistically significant (SOF ¶ 34), there is no basis for concluding that any alleged corrective disclosure during the May 14 trading day caused any loss. MSJ 38-39. In an efficient market, only the after-hours FDA Press Release could possibly have caused the drop on May 15, and that disclosure did not concern the Logix test or correct the May 1 PR. *Supra* 18; SOF ¶¶ 36, 38. In Opposition, Plaintiff argues only that Bettencourt opines that it is appropriate to combine the May 14 and 15 drops. But this is scientifically unsupported and unreliable—Plaintiff

---

[19] Hindenburg's speculation about sales is not tied to accuracy, and in any case is contradicted by Bettencourt's own claim that Q1 2020 revenue came in higher than analyst estimates. RSOF ¶ 35.
[20] Plaintiff's cases involved independent investigations and/or detailed reports synthesizing obscure public sources. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1187 (9th Cir. 2024); *Theodore v. Purecycle Tech, Inc.*, 2022 WL 20157415, at *18 (M.D. Fla. Aug. 4, 2022).

cannot identify a single case in which courts have used a two-day window where, as here, *there was no statistically significant price drop on the first day*. Dkt. #173-1 at 3-5; Bettencourt *Daubert* Reply 3-7. Because the only evidence Plaintiff offers is Bettencourt's unsupported and unreliable opinion, no reasonable jury could find loss causation. *See In re Williams*, 558 F.3d at 1143.

## VI.   GELT LACKS STANDING TO SUE OR REPRESENT THE CLASS.

It is undisputed that (i) Gelt purchased shares on May 13, (ii) it sold those shares at 2:07pm ET on May 14, after the first two alleged corrective disclosures, and (iii) the "abnormal" decrease on May 14 was not statistically significant. MSJ 39-40. Thus, Gelt cannot attribute its sales to any alleged corrective disclosure or the challenged statements. Plaintiff argues only that it paid more for its shares on May 13 than it sold them for on May 14. But without a *statistically significant* price decrease on the day of sale, it cannot show loss causation. MSJ ¶ 27. And the stock price went *up* in the hours following the first two alleged corrective disclosures, further showing that any temporary price drop when Plaintiff sold was caused by other factors. SOF ¶ 34.

## VII.   SECTION 20(a) CLAIM ALSO FAILS.

Plaintiff's § 20(a) claim fails against all Defendants because it cannot prove a § 10(b) claim. Even if it could, Plaintiff offers no evidence that any outside director Defendant exercised sufficient day-to-day control for § 20(a) liability. Where defendants "point out an absence of proof on an essential element [], the burden shifts to the nonmovant to provide evidence to the contrary." *Sherman v. Klenke*, 653 F. App'x 580, 585 (10th Cir. 2016). Plaintiff has failed to do so.

<u>**CONCLUSION**</u>

Accordingly, the Court should grant summary judgment for Defendants on all claims.

20

Dated: July 3, 2024

**BAKER & HOSTETLER LLP**

By:      _Douglas W. Greene_
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd day of July, 2024, a copy of the foregoing

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was

filed with this Court's CM/ECF system, which will send notification to all counsel of record.

*/s/ Douglas W. Greene*
Douglas W. Greene