Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
**BAKER HOSTETLER, LLP**
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DR. JAMES WESTGARD**<br><br>Case No. 2:20-cv-00368-JNP-DBP<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead<br><br>**ORAL ARGUMENT REQUESTED** |

## SUMMARY OF REPLY

Westgard's purported expert opinions violate the federal rules and essential requirements governing admissibility of expert testimony set forth by *Daubert* and its progeny. Plaintiff does not dispute that Westgard's reports fail to satisfy the specific requirements of Rule 26(a)(2)(B), but instead argues that such technical deficiencies do not warrant exclusion. Plaintiff is wrong. The federal rules are more than mere formalities and should not be ignored.

Regardless, by his own admission, Westgard is not qualified in the specific field of PCR diagnostic testing. And courts in the Tenth Circuit do not permit witnesses who disclaim expertise on a particular subject matter to offer an expert opinion about the same. Further, because Westgard lacks the requisite knowledge and experience in the relevant field, his opinions are unmoored from scientific principles generally accepted in the PCR diagnostic community. Finally, as Westgard admits, his specific conclusions regarding the May 1 PR and the reliability of the appended data are contradicted by the facts of this case and thus are unreliable and irrelevant.

Defendants ask that the Court exclude Westgard's testimony and opinions in their entirety.

## ARGUMENT

### I.      Technical Violations Matter And Should Not Be Ignored.

First, Plaintiff attempts to convince the Court that Westgard's violations of the rules governing expert opinions should be ignored. But these are not minor or "hyper-technical" violations as Plaintiff suggests. Westgard's reports failed almost *all* of Rule 26(a)(2)(B)'s requirements: in addition to not being sworn, they did not contain a complete statement of his opinions; did not identify all the materials he considered in forming his opinion; did not list his publications authored in the past 10 years; and did not describe his compensation. These are not

mere technicalities; rather, they ensure that every litigant in federal court has sufficient information about an opposing expert to properly test and assess the expert and his opinions.[1] *See Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006) (party should not have to ferret out required information).

Indeed, Westgard's reports do not satisfy even the most basic requirement of the Rule: to provide a statement of all opinions. For example, Plaintiff asserts that it is Westgard's opinion that the May 1 PR "should have highlighted" the confidence intervals for the validation results, but no such opinion appears anywhere in Westgard's reports.[2] Dkt. 178 ("Westgard Opp."), at 9. And the entirety of the deposition excerpt upon which Plaintiff relies to rebut these blatant deficiencies shows that Westgard also failed to identify all facts and data considered in formulating his opinion:

> Q **What materials and data did you consider in drafting this report?** Are all of them -- Are all of them listed in the document itself?
>
> A The essential ones or the important ones should be. I think the last page has, yeah, 14 references. Those were the key documents. **Now, that -- I don't know that that means everything is referenced**, but those are the ones that I typically felt were important and needed . . . .

Dkt. 169-10 ("Westgard Dep."), Westgard Dep. 16:15-24 (emphasis added). In addition to relying on unidentified materials, *id.* 19:15-20 (admitting reliance on unidentified emails), Westgard also referenced documents during his deposition that are missing from his reports, *id.* 50:5-51:6.

Plaintiff also has failed to demonstrate that Westgard's noncompliance is substantially

---

[1] Nor is Westgard's failure to verify his report without consequence. Plaintiff fails to show if or how Westgard's deposition testimony "reaffirmed" any the opinions set forth in his reports, and indeed Westgard agreed at deposition that his reports were wrong in several respects. Westgard Dep. 56:21-57:8; 59:3-5; *see also Zorn v. Mount Sinai Med. Ctr., Inc.*, 2012 WL 4320575, at *3 (S.D.N.Y. Sept. 20, 2012) (opinion excluded because unsworn report was not supported by expert's deposition testimony).

[2] This purported opinion also does not appear in Plaintiff's summary judgment argument, presumably because it has no merit as a matter of law given that the confidence intervals were included in the May 1 PR.

justified or harmless. *See Zaklit v. Glob. Linguist Sols., LLC*, 2014 WL 4925780, at *5 (E.D. Va. Sept. 30, 2014) (excluding expert when plaintiffs provided no explanation for noncompliance). Indeed, Plaintiff has offered no explanation for the deficient expert disclosures and merely states in a conclusory manner only that "Defendants were in no way prejudiced or harmed by the lack of a publication list" because such publications can be found online. Westgard Opp. 5. But, like Westgard's other omissions, his failure to include the requisite list of his publications is meaningful, especially given Plaintiff's post-factum reliance on Westgard's undisclosed publications in an attempt to rebut his lack of relevant qualifications. Westgard Opp. 6, nn.4-5; Westgard Dep. 17:10-12 ("Q Does your report list the publications that you've authored in the last ten years? A No. It just lists a few of the recent ones."); *Ronwin v. Bayer Corp.*, 332 F. App'x 508, 512-13 (10th Cir. 2009) (excluding expert when relevant publications were "too stale").

These technical violations have had real-world consequences—making it difficult for Defendants to fully test or assess Westgard's opinions—and Plaintiff has offered no justification for its noncompliance. Accordingly, the Court should exclude Westgard's opinions for failing to satisfy Rule 26(a)(2)(B)'s requirements.

## II.   Westgard Is Not Qualified To Opine On The Material Scientific Issues In This Case, Including PCR Tests, Testing Practices, And Performance Validations.

There is no dispute that Westgard is a well-regarded clinical chemist. But this case is not about quantitative clinical chemistry tests, it concerns interpretation of data and performance results for *qualitative clinical microbiology tests*—namely, PCR diagnostic tests. As Plaintiff admits, Westgard is not a microbiologist and does not "specialize in PCR tests." Westgard Opp. 6. And Westgard himself concedes that he is not expert in the particular field of PCR testing:

- Clinical microbiology—not clinical chemistry—is the relevant science for evaluating PCR tests. *See* Westgard Dep. 27:21-25 (Q Is clinical chemistry different than molecular biology? A Well, it's different in some of the techniques that are used."; *see also id.* 31:17-19 (testifying "PCR has some unique characteristics that . . . require some different experiments . . . [and] some different data interpretation" than clinical chemistry tests).

- He is <u>not</u> a microbiologist. *See id.* 64:18-19 (Q And do you consider yourself a microbiologist? A No.).

- He has <u>never</u> worked in a microbiology lab, including a COVID-19 diagnostic testing lab. *See id.* 40:24-41:4 (Q Have you directed or worked in a clinical microbiology or a virology lab? A No. Q Did you direct or work in a COVID-19 diagnostic testing lab during the pandemic? A No.).

- He has <u>never</u> been involved in the validation or implementation of a diagnostic COVID-19 PCR test. *See id.* 42:2-8 (Q Have you ever been involved in the validation of a COVID PCR test? A No. Q Have you ever been involved in implementing a COVID PCR test for diagnostic use with patients? A No.).

- He has <u>never</u> validated or implemented any kind of PCR test. *See id.* 41:5-21 (Q Have you ever reviewed or signed off on a verification or validation report for a molecular infectious disease test? A No, no. Q For any RT-qPCR diagnostic test? . . . A No.).

- He has <u>never</u> even performed a PCR test. *See id.* 64:20-23 (Q And you don't perform PCR testing; is that right? A I guess we should be clear about that by now that I never performed a PCR test.").

Unsurprisingly, none of the more than 200 articles Westgard has written is about the validation of PCR diagnostic tests for molecular infectious diseases, like COVID-19. *See id.* 17:14-19.

Plaintiff is correct that, to be admissible, an expert's testimony must fall "within the reasonable confines" of the witness's expertise. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). But to satisfy this burden, the expert "must possess such skill, experience or knowledge" in the "particular field" about which he is opining. Fed. R. Evid. 702. This means that "the expert's qualifications must be both (i) adequate in a general, qualitative sense . . . and (ii) specific to the matters he proposes to address as an expert." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1232 (N.D. Okla. 2007), *aff'd sub nom. In re Williams Sec. litigation-*

*WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009); *see also Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) ("An expert who 'possesses knowledge as to a general field' but 'lacks specific knowledge does not necessarily assist the jury.'") (citation omitted).

Accordingly, courts in the Tenth Circuit routinely exclude purported experts that have generalized knowledge and experience, but lack specialized knowledge and experience as to the specific subject matter at issue. *See, e.g.*, *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013) (purported expert not qualified because he had not researched or published about the "particular field" at issue); *Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1133-34 (10th Cir. 2009) (purported expert not qualified to testify about mountain bike races because his expertise was in paved road races); *Kinser v. Gehl Co.*, 184 F.3d 1259, 1271 (10th Cir. 1999) (engineer not qualified to testify about alternate designs because he had "no practical experience in mechanical design"); *Broadcort Cap. Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1195 (10th Cir. 1992) (attorney with "some education and training in the field" was not qualified "as an expert in the securities area").

Further, when an expert witness disclaims expertise on a particular subject matter, Utah courts uniformly exclude that witness's opinions on that subject. The Tenth Circuit opinion cited by Plaintiff—*Ralston*, 275 F.3d 965—is instructive. In that case, the plaintiffs' expert was a board-certified orthopedic surgeon and offered to provide an opinion about a specific device used in orthopedic surgery, but because she testified at her deposition that she had never worked with or studied the device at issue, the court held that she was unqualified to render expert testimony.

Here, by his own admissions, Westgard is not qualified to testify about PCR testing practices and performance validations—that should be the end of the matter. *See supra*, § II. This Court must follow Tenth Circuit precedent and exclude Westgard's unqualified expert opinions.

5

### III.    Westgard Did Not Opine On Whether The May 1 PR Is Scientifically Accurate, And He Is Not Qualified To Opine On Whether It Would Have Misled Investors.

Contrary to Plaintiff's assertion, Westgard does not opine on whether the May 1 PR is scientifically accurate. Westgard Opp. 6. Rather, in a conclusory fashion, he states his personal view that the "validation data in the press release would have been difficult to understand by the intended audience" of investors. Dkt. 169-12 ("Westgard Rep."), Westgard Rep. 25; *see also* Westgard Dep. 187:1-3 (explaining "investors" are "the intended audience"); *Richfield v. PolarityTE, Inc.*, 2023 WL 3010208, at *6 (D. Utah Apr. 19, 2023) (assumed "reasonable investor" has at least a basic understanding of industry in which he invests). Although Plaintiff attempts to equate this opinion with those provided by Drs. Bustin and Bard, they are not the same.[3] Dr. Bustin opined that "the statements in the May 1 Press Release fairly represented the performance of the Logix Smart Test based on the information available to the Company at the time;" and Dr. Bard opined that "[t]he way the May 1 Press Release described the Logix Test's performance was consistent with how manufacturers typically describe diagnostic test performance." Westgard Opp. 7. Neither speaks to how investors viewed the May 1 PR and thus Plaintiff's "good for the goose, good for the gander rule" simply does not apply.[4]

---

[3] Because neither Dr. Bustin nor Dr. Bard opined on an investor's understanding, Westgard's rebuttal opinions regarding investors' understanding of the May 1 PR are outside the scope of a rebuttal report (as well as his expertise) and thus should be excluded on that basis as well. *See Cross-Fit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2018 WL 3491854, at *12 (S.D. Cal. July 18, 2018) ("An expert report qualifies as a rebuttal report if it 'is intended solely to contradict or rebut evidence on the same subject matter' that is identified in another party's expert report.") (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)).

[4] This argument also does not apply more broadly. Plaintiff does not challenge Dr. Bustin's or Dr. Bard's qualifications: Dr. Bustin is world renowned in the PCR diagnostic testing industry, and Dr. Bard is director of a clinical microbiology lab that validated COVID PCR tests throughout the pandemic. Plaintiff will not be *unfairly* prejudiced if its unqualified expert's opinion on a subject is excluded while Defendants' indisputably qualified experts are allowed to opine on the same

In any event, Plaintiff does not (and, in good faith, cannot) argue that Westgard is qualified to testify about whether the May 1 PR mislead investors. Westgard Dep. 185:17-187:7 (admitting he has no experience or knowledge regarding investor behaviors). Nor is such an opinion proper expert testimony. *See S.E.C. v. Daifotis*, 2012 WL 2051193, at *5 (N.D. Cal. June 7, 2012) (holding opinions about what investors "actually" or "should have understood" is "not the proper subject of expert testimony"). Accordingly, Westgard's opinion on this subject is inadmissible.

## IV.    Westgard's Opinions Are Irrelevant And Unreliable.

Plaintiff argues that Westgard should be allowed to offer four specific opinions: (1) the underlying data appended to the May 1 PR was poorly presented and lacked consistency; (2) the appended validations lack reliability because they were not peer reviewed; (3) the validations referenced in the May 1 PR have less value because of their limited sample size; and (4) the May 1 PR should have highlighted the fact that the validations referenced therein had wide confidence intervals.[5] Westgard Opp. 8-9. All are irrelevant and unreliable.

### A. Westgard's opinions are not relevant.

Westgard's opinions are not relevant because they do not concern any material issue in this case. Indeed, Plaintiff appears to recognize as much—it chose not to submit Dr. Westgard's reports or his testimony with its own summary judgment motion. Plaintiff primarily argues that the May 1

---

matter. *See Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 405 (D. Md. 2001) (allowing defendants' qualified expert to opine on material issue, but not plaintiff's unqualified expert).

[5] Westgard's opinion that the May 1 PR is misleading because it did not "highlight" confidence intervals should be summarily excluded as this opinion is absent from his report. *Kozak v. Liberty Mar. Corp.*, 2024 WL 1558809, at *11 (E.D.N.Y. Apr. 10, 2024) ("[O]pinions . . . not disclosed in the expert's report cannot be offered."). Rather, Westgard opines that the May 1 PR should have reported the lower limits of the confidence intervals rather than the point estimates, which he admits is a "ridiculous" opinion and not supported by industry practices. Westgard Dep. 176:5-14.

PR was false and misleading because Co-Diagnostics failed to include what it characterizes as "failed validation results" from the NIV, Greek, and South African labs. Westgard's opinions do not address these validations and thus do not aid the jury in resolving any issue related to the same.[6] Instead, Westgard offers his unscientific, personal view that the May 1 PR was less clear and reliable than it could have been due to "lack of consistency" between the underlying validations, their lack of peer review, limited sample size, and failure to highlight confidence intervals. But none of these purported shortcomings could have rendered the press release *misleading* as a matter of law because the lack of peer review, sample size,[7] confidence intervals, and results were clearly stated in the reports attached to the press release. *See* Dkt. 169-25 (May 1 PR); *Omnicare Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 190-91 (2015) (whether a statement is false or misleading "always depends on context" including "all its surrounding text"). Because none of the four Westgard "opinions" is relevant to the central question of whether the May 1 PR was misleading, they should be excluded.

### B. Westgard's opinions are not reliable.

Even if the opinions outlined above were relevant (they are not), they are unreliable and thus inadmissible. While Defendants agree that an expert's reliance on his knowledge and

---

[6] Plaintiff cites Westgard's rebuttal report to dispute that the validation results from the NIV, South African, and Greek labs were the result of contamination, claiming that "Westgard has opined that contamination is unlikely because 'experienced laboratories who conduct' validations . . . will have dealt with [contamination issues] before running tests." Dkt. 179, MSJ Opp. 6. This is an egregious mischaracterization: Westgard was talking about an Israeli lab's study published in 2021, not the NIV, Greek, or South African labs. Dkt. 167-2, Westgard Rebuttal 18. Westgard has never analyzed or opined on any aspect of the NIV, Greek, or South African data or their credibility, or whether contamination contributed to the results. *See* Westgard Dep. 188:18:189:1.

[7] Indeed, Westgard admits that one can assess reliability based on reported sample size, even if the data are not peer reviewed. *See* Westgard Dep. 100:9-14.

experience can be a reliable methodology, the expert must have specialized knowledge and practical experience in the specific subject at issue. But, as set forth in detail above, Westgard's experience and knowledge do not provide a reliable basis for his opinions because, as Westgard concedes, he is not an expert in PCR diagnostic testing. *See supra*, § II.

An individualized analysis of the specific opinions above further illustrates the unreliability of Westgard's opinions. To be admissible, a "plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). An expert's methodology is not scientifically sound when it is generally not accepted by others within the relevant field. *See id.* Westgard's opinions are nothing more than his subjective beliefs—unmoored to the facts and generally accepted scientific principles.

Westgard's opinion that the validation data are unreliable because the data were not peer reviewed is illustrative. Importantly, Westgard did not review the data to conclude that the results as reported are inaccurate or unreliable; he merely stated his conclusion based on general skepticism with respect to results that have not been peer reviewed. *See* Westgard Dep. 114:10-115:24 (admitting he did not analyze the data).[8] But it is not a standard practice for laboratories performing validations to have their data peer reviewed.[9] *See* Dkt. 169-7, JDB Rebuttal 6 ("Lab

---

[8] Westgard creatively testified that by "peer reviewed" he meant that the validation reports should have been reviewed by other qualified scientists. Westgard Dep. 189:22-25. The undisputed evidence in this case is that they were. *See* Dkt. 169-13, Satterfield Dep. 262:9-12; *see also Mitchell*, 165 F.3d at 782 (holding expert opinion unreliable when it is does not flow from facts presented).

[9] Contrary to the Plaintiff's assertions, no evidence in this case shows otherwise. Indeed, while Dr. Garcia testified that is it not common for a manufacturer to publish validation data, she did not testify that such data is unreliable merely because it is not peer reviewed. Westgard Opp. 9 (citing testimony). Nor are the validations unreliable because Dr. Garcia was not consulted before the data were released. *See* Garcia Dep. 165:11-13 ("I'm not the one who makes the decision on what they

verification and validation studies for diagnostic tests are rarely published in peer-reviewed journals."); *see also* Westgard Dep. 93:20-23 (admitting same). Nor is data inherently unreliable because they are not peer reviewed. *See* Dkt. 169-9, Bustin Rebuttal 7 (concluding same).

The same is true for Westgard's opinion that the validation data are unreliable due to the limited sample size, pointing to practices for the Clinical and Laboratory Standards Institute ("CLSI"). Plaintiff is correct that the focus should be on the expert's methodology rather than the conclusions it generates. Here, the failure to follow CLSI guidelines is the underlying "methodology" or reasoning Westgard applied to reach his conclusion. The problem, however, is that scientists do not use CLSI guidelines to evaluate the reliability of validation results for COVID-19 PCR tests—which Westgard himself admits. *See* Westgard Dep. 104:18-20 ("I can only surmise from I think it's Dr. Bard's report that common practice doesn't necessarily adhere to the CLSI guidelines."). Accordingly, failure to adhere to CLSI guidelines is not a sound basis for finding that validation results for a PCR diagnostic test are unreliable. *See Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 663 (10th Cir. 2013) (expert's conclusions unreliable when unsupported by reliable methodology).

Westgard's opinions are not grounded in sound scientific reasoning and should be excluded.

## CONCLUSION

Defendants respectfully ask that the Court exclude Westgard's purported expert opinions in their entirety.

---

publish and what they don't."). Similarly, the evidence does not show that Dr. Hutchins asked to have the validation data removed from Co-Diagnostics' website because they were in any way unreliable. *See* Hutchins Dep. 156:2-158:16 (explaining why she wanted the data removed).

Dated: July 3, 2024                                           **BAKER & HOSTETLER LLP**


By:    */s/ Douglas W. Greene*
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com

Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3rd day of July, 2024, a copy of the foregoing

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DR. JAMES WESTGARD** was filed with this Court's CM/ECF system, which will send notification to all counsel of record.

*/s/ Douglas W. Greene*
Douglas W. Greene