Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: (212) 589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com


Robert Wing (4445)
**PARR BROWN GEE & LOVELESS, P.C.**
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

---

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company, <br><br> Plaintiff, <br><br> v. <br><br> CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD, <br><br> Defendants. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DANIEL S. BETTENCOURT** <br><br> **(Oral Argument Requested)** <br><br> Case No. 2:20-cv-00368-JNP-DBP <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Dustin B. Pead |

## SUMMARY OF REPLY

Plaintiff's Opposition does nothing to counter the fact that Bettencourt's testimony is results-driven, speculative, methodologically and scientifically unsupported, and unreliable. Moreover, Plaintiff's Opposition fails to address several arguments raised in Defendants' Motion to Exclude—including that Bettencourt fundamentally does not understand what makes a disclosure corrective for purposes of loss causation and that he improperly considered the unpled Hindenburg Tweets as part of his analysis—and has thus abandoned any such objections.

In sum, the Court should exclude Bettencourt's testimony because he fails to provide any proper methodological support or evidence to support his theories, rendering his testimony unreliable and of no help to the Court or a jury in determining loss causation or damages.

## ARGUMENT

## I.   BETTENCOURT'S INITIAL REPORT IS INADMISSIBLE UNDER 28 U.S.C. § 1746

Relying solely on Rule 26(a)(2)(B), Plaintiff asserts that Bettencourt's Initial Report can be considered because he prepared and signed it. Dkt. #177 ("Opp.") at 4. Plaintiff ignores the fact that Rule 56(c) requires that an expert report comply with the requirements of 28 U.S.C. § 1746, i.e., the report must indicate that it was made under penalty of perjury. Dkt. #173-1 ("Mot.") at 3; *Peak ex rel. Peak v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2021 WL 2896040, at *5 (S.D.N.Y. July 9, 2021). This is not a mere technicality, as Plaintiff suggests (Opp. at 4): "[T]he penalty of perjury requirement . . . is more than a mere formality—it goes to the very ability of the Court to consider testimony by declarants who do not stand in person before the Court." *Young v. Allstate Co.*, 662 F. Supp. 3d 1066, 1073 (C.D. Cal. 2023). Accordingly, under well-established caselaw,

1

Bettencourt's failure to comply with § 1746 requires exclusion of his Initial Report on summary judgment. *Cent. Tank Coatings*, 606 F. App'x at 895. Indeed, Plaintiff does not contest this. Opp. at 4 (conceding that *Cent. Tank. Coatings* and *Alpha Cap.* establish that failure to comply with § 1746 requires exclusion of an expert report on summary judgment).

Instead, Plaintiff argues that Bettencourt somehow rectified this deficiency when he testified at deposition that he "recognized" the Initial Report, that it "looks like the report that [he] filed," and that he "prepared [the] report." Opp. at 5 (citing Dkt. #169-70 at 22:14-23, 71:25-72:6). This is clearly insufficient. § 1746 required Bettencourt to declare under penalty of perjury that the contents of his Initial Report were "true and correct." 28 U.S.C. § 1746. He did not do so.[1]

Plaintiff also creates a strawman that failure to comply with § 1746 does not warrant exclusion under Federal Rule of Evidence 702. Opp. at 4-5. Defendants never argued that it did (but reserve the right to do so). Regardless, Rule 56 is determinative, and the Initial Report and testimony related thereto must be excluded on summary judgment. And as detailed in Defendants' summary judgment motion and reply, this exclusion compels summary judgment for Defendants.

## II.    BETTENCOURT'S USE OF A TWO-DAY WINDOW IS ARBITRARY, METHODOLOGICALLY FLAWED, AND SCIENTIFICALLY UNSUPPORTED.

Bettencourt's use of a two-day event window is a results-driven and methodologically unsound attempt to tie the statistically significant stock price decline on May 15 to the first two Alleged Corrective Disclosures published early in the day on May 14. To justify this approach, Bettencourt speculates: (1) that the Alleged Corrective Disclosures were "less regular news events"; (2) that certain unspecified investors may (or may not) have waited to trade on the

---

[1] Neither of the cases Plaintiff cites addressed § 1746. Opp. at 5 n.1.

information disclosed in the first two Alleged Corrective Disclosures until after the Company's earnings call after the close of trading on May 14; and (3) that the FDA Press Release was published after trading hours on May 14. Opp. at 6-9. None of these arguments justifies a two-day window here because there is no scientific or economic support for such an approach.

a. **Bettencourt's Use of a Two-Day Window is Methodologically Unsupported.**

As explained in the Motion to Exclude, "in an efficient market, all the available information about the company is quickly reflected in the [stock] price." *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 421 (D. Utah 1998). This happens in a matter of minutes, not days. Mot. at 4; *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015). Accordingly, "[a]bsent unusual circumstances," use of a two-day window for determining the stock price impact caused by alleged corrective disclosures on the first day is inappropriate and methodologically unsound. *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016); *Halliburton*, 309 F.R.D. at 269 ("[A]n alleged corrective disclosure released to the market at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged corrective disclosure.").

There are no unusual circumstances justifying use of a two-day window here. The May 14 SLT Article and Iowa Disclosure were published early in the trading day (at 9:00 a.m. ET[2] and 12 p.m. ET, respectively) and principles of market efficiency establish that any negative impact on the Company's stock price from them should have been quickly reflected in the stock price—

---

[2] Whether the May 14 SLT Article was published at 9 a.m. ET or 9 a.m. MT (11 a.m. ET) (Dkt. # 179 at ¶34) does not change anything. Neither Plaintiff nor Bettencourt alleges that the stock price declined in the hours following the May 14 SLT Article, and it is undisputed that it increased in the hours following the Iowa Disclosure, which would have occurred approximately an hour later even assuming it was disclosed at 11 a.m. ET as Plaintiff contends.

3

certainly by the close of trading on May 14 (at the very latest). Dkt. # 173-3 ¶¶ 9-10, 29-33. That did not happen. Instead, in the hours following each of these disclosures, the stock price went *up* and not down, and by the time trading closed on May 14 there was only a price decline *t*-statistic of -0.86—less than half of the -1.96 threshold for determining statistical significance.[3] *Id.*; Dkt. # 173-4, Exhibit-6. Without a statistically significant price decline by the end of the May 14 trading day—particularly where, as here, the price decline was so clearly insignificant—there is no scientific or logical basis to infer that the May 14 SLT Article or Iowa Disclosure, rather than random market volatility, caused the stock price drop on May 14. Mot. at 3-5.

The cases Plaintiff cites as support for a two-day window are either inapposite or involved unusual circumstances not at play here. Opp. at 5-7. In those cases: the stock price movements were statistically significant on the same day as the relevant disclosures and/or the expert used a multi-day window merely as a control (*In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 (1st Cir. 2005); *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *19 (S.D.N.Y. Apr. 5, 2024)); the alleged corrective disclosures occurred late in the trading day and/or there was a dispute as to whether the price movements on the first day were statistically significant (*United States v. Hatfield*, 2014 WL 7271616, at *13 (E.D.N.Y. Dec. 18, 2014); *Sjunde*, 2024 WL 1497110, at *19); or there was direct evidence of late-in-the-day or post-trading negative analyst reports concerning the alleged corrective disclosures on the first day (*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015); *Monroe Cnty. Employees' Ret.*

---

[3] Bettencourt does not assert that the five-minute trading halt at 1:25 p.m. ET or the ten-minute trading halt at 1:48 p.m. ET were caused by the May 14 SLT Article or Iowa Disclosure, but instead only states that they were the result of "volatility." Dkt. #173-4 ¶¶ 51, 53. Nor does he argue that these short trading halts hours before the close of trading would have delayed the purported impact of the May 14 SLT Article and Iowa Disclosure to May 15 (nor could they).

*Sys. v. S. Co.*, 332 F.R.D. 370, 386, 396 (N.D. Ga. 2019)).[4] And in *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *14 (M.D. Tenn. Feb. 24, 2023), the court determined that markets react more slowly to "clarifying information" concerning prior corrective disclosures than to "new information," justifying use of a two-day window as to the "clarifying" disclosures.

None of the operative facts that drove the outcomes in those cases are present here: the May 14 SLT Article and Iowa Disclosure were disclosed early in the trading day; it is undisputed that there was nothing even close to a statistically significant price drop on May 14; there are *no* analyst reports or other sources attributing the stock price decline on May 14 (or May 15) to the May 14 SLT Article or Iowa Disclosure; and the May 14 SLT Article and Iowa Disclosure are alleged to have been new rather than clarifying information. Mot. at 2, 4-5.

Because there is no support for attributing the stock price drop on May 15 to the trading-day disclosures early on May 14, Bettencourt's use of a two-day window is arbitrary, methodologically unsound, and unreliable.

### b. Bettencourt's "Less Regular News" Theory is Unsupported and Arbitrary.

Plaintiff argues that the impact from the Alleged Corrective Disclosures was somehow delayed because they were "less regular" disclosures. But Plaintiff and Bettencourt fail to explain what a "less regular" corrective disclosure is or why the May 14 SLT Article or Iowa Disclosure would fall into this category.[5] The most that can be inferred is Bettencourt's conclusory assertion that alleged corrective disclosures from third parties are "less regular" because they do not come

---

[4] *See also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* Declaration of John D. Finnerty, Ph.D. ¶¶ 56-57, No. 12-cv-05329-SAS (S.D.N.Y. Apr. 20, 2015), Dkt. No. 140.

[5] It is unclear whether Plaintiff is asserting that the FDA Disclosure was a "less regular" news event, given that it was published after-trading hours on May 14 and Plaintiff alleges that it impacted the Company's stock price at the start of trading on May 15.

from the Company itself. Opp. at 3. Nowhere does Bettencourt provide any support for this assertion, rendering it pure speculation. And it strains credulity to believe that the *Salt Lake Tribune*—the largest newspaper in Utah (the state in which Co-Diagnostics is headquartered)—would be somehow "less regular" and evade the attention of Co-Diagnostics investors for an entire day, and Bettencourt provides no explanation as to why the Iowa Disclosure would have taken an unusually long time to reach the market. Mot. at 7.[6]

Bettencourt also contradicts his own theory. For purposes of quantifying artificial inflation, Bettencourt cites a third-party May 13 *Bloomberg* Article concerning a different company's Covid test, and which was published at 2:39 p.m. ET (about an hour before the close of trading that day), to show that this article caused the Company's stock price to increase 32.1% *that same day*. Dkt. # 173-4 ¶134. Conveniently, however, when it comes to the Alleged Corrective Disclosures, Bettencourt allows principles of market efficiency to fall by the wayside. Bettencourt's selective application of economic principles further demonstrates that his methodology is results-driven, fatally flawed, and unreliable. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014) (rejecting expert testimony on loss causation where expert "cherry-picked" information).

### c. Bettencourt's Theory that Investors May Have Waited to Trade Until After the Close of Trading on May 14 is Pure Speculation.

Seeking to avoid the fact that there was no significant—much less statistically significant—price drop on May 14, Bettencourt invented a theory that "certain" unspecified investors "may"

---

[6] *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 386 (N.D. Ga. 2019) is inapposite here. Opp. at 7-8. In that case, the alleged corrective disclosures occurred close to the end of trading and there were post-trading analyst reports that interpreted that late-breaking information.

(or may not) have waited to trade on the information disclosed in the May 14 SLT Article and Iowa Disclosure until after the close of trading on May 14 when the Company was scheduled to hold its earnings call. Opp. at 8-9. But speculation cannot stand in for scientific method. Bettencourt did not cite one piece of evidence—factual or academic—to support this theory or to demonstrate that any such assumption is scientifically sound. *Id.* Because this theory is based on nothing more than Bettencourt's personal musing, it is methodologically unreliable, and cannot be of any help to the Court or a jury.

### d.   The FDA Disclosure Cannot Support the Use of a Two-Day Window.

Having demonstrated that none of the disclosures during trading hours on May 14 justify the use of a two-day window, Plaintiff is left with only the after-hours FDA Press Release. However, given that any potential impact of the FDA Press Release could only have been felt on May 15, it cannot, on its own, support the use of a two-day window extending backward in time.

### III.   Bettencourt's Opinions Are Based on Alleged Corrective Disclosures That Were Not Corrective.

Plaintiff does not address Defendants' arguments that Bettencourt's testimony is inherently unreliable because he fundamentally does not understand what makes a disclosure "corrective" for purpose of loss causation and because he relies on the unpled Hindenburg Tweets. Mot. at 5-9. Instead, Plaintiff refers the Court to its arguments on loss causation in Opposition to Defendants' Motion for Summary Judgment. Opp. at 10. However, while Plaintiff there did argue that the Alleged Corrective Disclosures and unpled Hindenburg Tweets were corrective, Plaintiff did not address the question here: whether Bettencourt's testimony is methodologically reliable.[7]

---

[7] Any such objection is waived and abandoned. *Told v. Interwest Const. Co.*, 505 F. Supp. 2d 1245, 1251 (D. Utah 2007) ("arguments not addressed in an opposition [are] abandoned").

It is not. At his deposition, Bettencourt asserted that *any* negative information about the Company—whether or not it was related to the May 1 PR—was "corrective" information, while also conceding that he had no idea what actually constitutes a corrective disclosure. Dkt. # 173-5 at 220:4-221:19 (asserting that information about the CFO's purported "checkered past" and the Company's valuation somehow corrected the May 1 Press Release); *id.* at 152:25-153:1 ("I don't know exactly what constitutes corrective information"). Moreover, Bettencourt conceded that he failed to consider any disclosures prior to the class period or May 14 that may bear on his evaluation of whether the Alleged Corrective Disclosures were indeed corrective. Mot. at 5-6. And he could not explain why the May 11 Nebraska Disclosure reporting that Test Nebraska had shown "95%" percent accuracy was substantively any different than the May 14 Iowa Disclosure disclosing the same information, or why there was a *positive* price impact following the Nebraska Disclosure. *Id.* at 7. It appears that the same information only became corrective when it suited Bettencourt's results-driven narrative. This itself demonstrates that Bettencourt's methodology and opinions are unreliable. Mot. at 8; *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1142 (10th Cir. 2009); *Alpha Cap*, 2021 WL 2896040, at \*6; *Bricklayers*, 752 F.3d at 92.

Trying to make up for this fundamental lack of knowledge, Bettencourt asserted that there was simply no need to tie any Alleged Corrective Disclosure to the May 1 PR because he evaluated them together "holistically." Dkt. # 173-5 at 199:15-18. This flippant and scientifically unsupported approach likewise demonstrates that his testimony is unreliable and must be excluded. Mot. at 6; *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1257 (N.D. Okla. 2007).

## A. Bettencourt Ignores Other Factors That May Have Caused the May 15 Price Drop.

Plaintiff claims that Bettencourt properly considered the Company's May 14 after-hours

8

disclosure of its Q1 2020 financial results and concluded that it was "positive and did not cause the price drop" on May 15. Opp. at 9. This assertion is disingenuous at best. While Bettencourt fails to identify a single market analyst or *any* other source attributing the May 15 stock price drop to any of the Alleged Corrective Disclosures, there are *several* market analysts who attributed the May 15 price drop to the Q1 2020 announcement (*see* Dkt. 173-3 ¶ 42):

1.  A May 14, 2020 *Investor's Business Daily* article states: After the stock market close, . . . **Co-Diagnostics reported mixed quarterly results. . . . The stock tumbled more than 20% to 17.68 in the after-hours session**.

2.  A May 15, 2020 *Impact Financial News* article states: **CODX shares fell 13.5% to $19.15 in pre-market trading after reporting Q1 results**.

3.  A May 15, 2020 *Benzinga.com* article states: **Co-Diagnostics, Inc. . . . shares fell 19.8% to $17.76 after reporting Q1 results**.

Such wanton disregard of this confounding information exposes Bettencourt's testimony as results-driven and unreliable. Mot. at 9-10. Bettencourt tries to wave away the only market evidence bearing on the cause of the May 15 price drop by relying on his own selective reading and personal interpretation of the Q1 2020 earnings announcement itself and the personal opinion of the Company's CEO stated in a press release and at a deposition nearly three years after the fact. Opp. at 9. But that has nothing to do with how the *market* perceived the Q1 2020 announcement at the time and is irrelevant to any proper loss causation analysis.

## IV.   BETTENCOURT DOES NOT OPINE ON PRICE IMPACT AND ANY TESTIMONY RELATED THERETO SHOULD BE EXCLUDED.

Contrary to Plaintiff's assertions, Bettencourt did not provide *any* explanation or description of the event study he claims to have performed which purportedly demonstrates that there was a statistically significant price impact on May 1. Opp. at 2. This is not surprising: after all, the scope of his engagement was limited to "loss causation and damages" and did not extend

9

to price impact. Dkt. #173-4 at §§ 1, 6, 7; *see also* Dkt. #173-5 at 231:12-232:2 (price impact on May 1 was "not germane" to his opinion). Nonetheless, Bettencourt suggested at deposition (and Plaintiff now contends) that a single line item buried in Exhibit 6 to his Initial Report constitutes an admissible "opinion" on price impact. Not so: to be admissible, an expert opinion must do more than simply state a conclusion—it must describe the scientific and methodological bases for that conclusion with sufficient detail to provide assurances of its reliability. *See, e.g., Williams.*, 496 F. Supp. 2d at 1272–73 ("courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar.") (collecting cases). A single line item in Exhibit 6 to Bettencourt's report is too cursory to be admissible, and his bare assertion at deposition that it was based on an event study cannot make up for these deficiencies.[8] Dkt. #173-1 at 10; *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) ("At a minimum, the expert testimony should include a description of the method … and [supporting] scientific data . . . . The expert's assurance that the methodology and supporting data is reliable will not suffice."). This purported "opinion" on price impact is too slight even to constitute an opinion, much less to be of any help to the Court or a jury in determining whether price impact is established as to the May 1 PR; if the Court finds it to be an opinion at all, it should be excluded as unsupported and unreliable.

## CONCLUSION

Because Bettencourt's testimony is methodologically flawed, scientifically unsound, and inconsistent with the economic evidence, it is unreliable and should be excluded in its entirety.

---

[8] Moreover, Bettencourt conceded that because price impact on May 1 was "not germane" to his analysis, he failed to perform any robustness analysis as part of his elusive event study. Mot. at 10. Accordingly, it is inherently unreliable for failure to conduct a robustness analysis. *Id*.

Dated: July 3, 2024                                 **BAKER & HOSTETLER LLP**


By:     */s/ Douglas W. Greene*
Douglas W. Greene (*Pro Hac Vice*)
Genevieve G. York-Erwin (*Pro Hac Vice*)
Zachary R. Taylor (*Pro Hac Vice*)
45 Rockefeller Plaza
New York, NY 10111-0100
Phone: 212-589-4200
dgreene@bakerlaw.com
gyorkerwin@bakerlaw.com
ztaylor@bakerlaw.com


Robert Wing (4445)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
rwing@parrbrown.com

*Attorneys for Defendants*

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 3[trd] day of July, 2024, a copy of the foregoing

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PROPOSED EXPERT WITNESS DANIEL S. BETTENCOURT** was served electronically upon opposing counsel.

*/s/ Douglas W. Greene*
Douglas W. Greene