D. Loren Washburn
(#10993) WASHBURN
LAW GROUP
881 Baxter Dr. Ste. 100
South Jordan, UT, 84095
Telephone: (385) 881-
9660
loren@washburnlawgroup.com

Michael A. Pineiro (*pro hac vice*)
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Blvd., Suite 2530
Miami, FL 33131
Telephone: (305) 400-
4268
mpineiro@mnrlawfirm.co
m

*Attorneys for Gelt Trading, Ltd. and the Class*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>Defendants. | **CLASS PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00368-JNP-DBP |

Class Plaintiff Gelt Trading, Ltd. ("Gelt" or "Class Plaintiff"), hereby submits this reply in support of its Motion for Partial Summary Judgment (the "Motion) (D.E. 168).

## INTRODUCTION[1]

This class action presents a case of a clear-cut securities fraud; this is the type of case where, on the undisputed record, the Court can and should enter summary judgment for the Class Plaintiff on the key elements of its claim—including and especially falsity and scienter.

In their response, Defendants ***do not dispute*** any of the undisputed facts submitted by the Class Plaintiff demonstrating that they committed securities fraud. Instead, Defendants argue that the Class Plaintiff's undisputed facts are somehow immaterial, and they try to offer additional facts that purport to provide "context" for Defendants' misrepresentations to the investing public. In short, they try to dispute their fraud by justifying why they lied about the Logix Test's accuracy.

As shown below, the Court should disregard Defendants' arguments in opposition to partial summary judgment. ***First***, there is no dispute that the May 1 Press Release misstated that the Logix Test had achieved 100% sensitivity and specificity in all prior validation tests, when that was untrue, and omitted information about prior failed results. Defendants cannot and do not dispute that. Instead, they improperly argue that the Court should ignore these failed results—and that these results were correctly omitted—based on their self-serving, unsupported explanations for the omissions. ***Second***, as to scienter, there is no dispute that Defendants knew about the failed results and intentionally omitted them from the May 1 Press Release—and thus knew about the risks that investors would be

---

[1]    Because the parties have cross-moved for summary judgment, many of the arguments in the Class Plaintiff's Opposition to Defendants' Motion for Summary Judgment (D.E. 179) support the Class Plaintiff's request for partial summary judgment. The Class Plaintiff thus incorporates by reference all arguments made in D.E. 179 into this reply brief.

misled. While Defendants, again, proffer self-serving explanations for their lies and omissions, there is no dispute that they consciously ignored a serious risk of misleading investors, which ultimately resulted in investors losing tens of millions of dollars when the truth emerged. ***Third***, Defendants' cursory arguments on the reliance element also fail, as they cannot overcome the presumption of reliance by disproving that the fraudulent May 1 Press Release affected the price of Co-Diagnostics' stock. There is no question that Co-Diagnostics' share price abnormally and dramatically increased as a result of the fraudulent May 1 Press Release—on the date of the fraudulent release and subsequently when the misstatements were repeated.

The undisputed evidence thus warrants granting partial summary judgment for Plaintiff.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS IN THEIR OPPOSITION

Defendants' statement of facts (D.E. 180 at 4-18) ***does not*** dispute any of the undisputed facts proffered by the Class Plaintiff in its Motion. Instead, Defendants argue that somehow the Class Plaintiff's undisputed facts are *immaterial* by mischaracterizing the supporting evidence. There are two overarching mischaracterizations that should be addressed.

First, Defendants imply that the many customer complaints about the Logix Test logged in Co-Diagnostics' QT9 software system did not bear on the test's performance. D.E. 180 at 8 (discussing Plaintiff's Supplemental Facts ¶ 17). Not true. The undisputed evidence shows that QT9 contained various customer complaints about the Logix Test's performance. *See* **Ex. 1**. At a minimum, the QT9 system contained these performance-related complaints:

- Raver, a Mexican customer, "complained of too many positives, implying false positives."

- Biodynamics, a Greek distributor, reported "[f]alse positives complaint at Greek

private lab."

- A company in Kosovo called Interlab, complained of "[f]alse positives implicated at government lab in Kosovo."

- Another company called Analytical Technologies SA reported feeling "insecure" about the Logix Test because of too many "discordant" results showing that the "positive results from co-diagnostics are negative results with another kit."

Many of these above complaints were logged on July 16, 2020, by Chad Apuli, Co-Diagnostic's laboratory director. Although he logged these complaints in July 2020, Mr. Apuli testified the complaints likely occurred earlier. D.E. 171-22 at 84:12-87:12. Mr. Apuli's testimony that the complaints logged in July 2020 occurred earlier is corroborated by the fact that the complaint from the Greek lab occurred on April 24, 2020 (*see* D.E. 171-15), but was not entered into QT9 until July 16, 2020. *See* Ex. 1 (describing the April 24, 2020, complaint from the Greek distributor). In short, it is undisputed that the QT9 system contained customer complaints from before May 1 about the test's performance.

Second, Defendants claim that it is undisputed that its "efforts to 'improve' the [test's] official [Limit of Detection] in the summer and fall of 2020 were for marketing reasons and not due to concerns about its sensitivity." D.E. 180 at 11. Again, another serious mischaracterization. The undisputed written record shows that Dr. Satterfield sought to improve the test's limit of detection because the Logix Test *could not* identify positives with low-viral loads identified by its competitors. *See* D.E. 171-26 (Dr. Satterfield noting that Abbott's test was picking up positives that the Logix Test could not identify and asking his team to develop a "second product offering to compete with Abbott and other more sensitive players.").

3

## ARGUMENT

**I.**   **PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON FALSITY AND MATERIALITY.**

The undisputed evidence establishes that the May 1 Press Release falsely conveyed and misled investors that the Logix Test had achieved 100% sensitivity and specificity on all prior evaluations and falsely claimed that the test was performing perfectly, when it was not, based on prior failed validation tests and customer complaints from across the globe. As result, the Court should grant summary judgment for Plaintiff on the elements of falsity and materiality.

### *Misrepresentation/Omission Regarding Prior Failed Validation Studies*

As shown in the Motion (D.E. 168 at 22-24) and Class Plaintiff's Opposition to Defendants' Motion for Summary Judgment (D.E. 179 at 13-15), the May 1 Press Release misled investors because it claimed that the Logix Test had achieved 100% sensitivity and specificity on all prior validations. As the Court noted, "it is axiomatic that once a company undertakes a partial disclosure of information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading. A statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." D.E. 101 at 12-13 (cleaned up). In the May 1 Press Release, Dr. Satterfield and Co-Diagnostics asserted that the Logix Test had "consistently and repeatedly achieved 100% clinical sensitivity and specificity [in evaluations] and you can't do better than that." D.E. 171-21. This was an outright and egregious lie, one that has been fully exposed by the undisputed record evidence. There is no dispute that before issuing the release, the Company received unfavorable evaluations in at least the below locations.

- *Utah*. There was a large discrepancy between positives found by the Logix Test (2%) and

positives found by other tests (5%) suggesting the Logix Test's high limit of detection ("LoD") caused it to miss low-viral positives. D.E. 171-18; D.E. 179-4. A test with a high LoD may detect people who are acutely ill, when they are carrying a high viral load, but struggle to identify patients who are at the beginning or end of their illness, when the load will be lower. Dr. Lopansri, an infectious disease doctor overseeing testing in Utah, wrote to statewide testing officials noting he was "deeply alarmed" with the discrepancy, urged the state to "halt" using the Logix Test, and requested that the state send Co-Diagnostics potential validation materials such as "positive [samples] including low positives to better understand how their test performs." D.E. 179-4.

- **South Africa**. "[F]inal results from [a South African] government laboratory" showed that 5 out of 12 Covid-19 positives were missed by the Logix Test and the lab had "concerns" that the Logix Test would miss "very early and later stages of infection." *See* Motion, D.E. 168, Statement of Undisputed Facts ("SOF") ¶¶ 14-15; D.E. 171-13. The South African data reflected the very same concerns highlighted by the Utah data—that the Logix Test was not sensitive enough to pick up Covid-19 positive patients with low-viral loads.

- **India.** In India, the Logix Test failed the National Institute of Virology's ("NIV") evaluation in early April obtaining just an 88% specificity score. SOF ¶¶ 11-13; D.E. 171-11. NIV decided, at that time, to recommend that the test not be authorized for sale in India. *Id.* In forwarding the failed validation data to Co-Diagnostics' CEO, Dr. Garcia put the words "URGENT" in the email title and explained that the NIV study is "feedback that affects the entire test and company … Please call as soon as possible." *Id.*

- **Greece.** In Greece, the country's largest, private lab complained to Co-Diagnostics'

5

distributor Biodynamics that the Logix Test was "riddled with false positives." SOF ¶ 16; D.E. 171-15. Biodynamics complained to Co-Diagnostics and lamented that the false positive issue created "huge problems for us and is putting our credibility in jeopardy … The lab has decided to stop using [the Logix Test] …"

- **_QT9 Complaints_:** The QT9 system contained customer complaints about the performance of the test noting that customers were seeing "false positives" and "discordant" results in countries from Mexico to Kosovo to Greece. Ex. 1.

There is no dispute that Defendants omitted any reference to these unfavorable evaluations and complaints in the May 1 Press Release, thus rendering the release false and misleading as a matter of law. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.").[2]

Defendants do not dispute that they omitted the failed evaluations from the release; instead, they try to justify it. Over and over—with no sound basis—they repeat that the NIV, Greece, and South Africa evaluations were definitively the "result of contamination or other non-test factors." D.E. 180 at 2. But no matter the number of times repeated, this post-hoc contamination justification **_does not dispute_** that the failed validation results were omitted from the press release or that the failed results pertain to and seriously undermine the press release's unequivocal statement that the

---

[2]    In fact, in addition to omitting unfavorable information, Dr. Satterfield and Co-Diagnostics lied to the public the day before the May 1 Press Release, falsely claiming that there had not been a single complaint about the test. In the face of mounting criticism of the test by Utah officials and journalists, Dr. Satterfield went on record with the Salt Lake Tribune claiming that "there have been no complaints from nearly 50 other countries, where Co-Diagnostics has sold the majority of its tests." D.E. 169-61. That was another bald-faced lie, completely contradicted by the emails from India, Greece, and South Africa, and designed to overstate the efficacy of the Logix Test.

test had achieved 100% sensitivity and specificity in all prior validations. Rather, this argument—that Defendants reasonably omitted these results—goes to materiality of the omitted information and scienter (state of mind in making the omission). In other words, the contamination defense is irrelevant to falsity. The May 1 Press Release stated that the Logix Test had "consistently and repeatedly achieved 100% clinical sensitivity and specificity [in evaluations] and you can't do better than that." The undisputed, failed evaluations establish that this statement was false.

While Defendants' post-hoc justifications for their misstatements are not pertinent to falsity and, thus should be disregarded in that respect, they also can easily be set aside. First, Defendants suggest that the South Africa, India, and Greece results were "troubleshooting" emails, not validation tests on-par with those attached to the May 1 Press Release and thus did not need to be discussed or referenced in the release because they were not "final." D.E. 180 at 7, 22. This argument is unfounded. Having chosen to make performance claims about the Logix Test in "countries where [the Logix Test has] been evaluated against other tests," (D.E. 171-21), Defendants needed to fully disclose the results of *all* such evaluations, even the negative ones. And, in any event, Defendants do not point to any record evidence showing the failed South Africa, India, and Greece evaluations were any less significant than the ones that Co-Diagnostics appended to the May 1 Press Release or that they were just purported "troubleshooting" issues.

Indeed, the emails about the failed results in South Africa and India establish that these were final results and deserved serious consideration by the company. *See* D.E. 171-14 (showing that the 58% South Africa sensitivity constituted the "final results from the government laboratory" and the company employees noted that it should "be looked at carefully); D.E. 171-11 (showing that Co-Diagnostics "failed" the NIV validation with 88% specificity and the company employee on-the-

7

ground in India noted that the failed result "affects the entire test and company.").

Alternatively, Defendants try to somehow erase the existence of these negative results by claiming they resulted from "contamination or other non-test" factors. Although it is beside the point and Plaintiff has no burden to prove that the negative evaluations were not caused by contamination, there is *no record evidence that* the Company or the labs found that the failed results were based on contamination. *See* D.E. 171-14 (making no contemporaneous mention of contamination in South Africa); D.E. 171-12 (noting that Dr. Garcia did not believe the NIV results stemmed from contamination); D.E. 171-11 (showing that the NIV lab controlled for contamination). This is post-hoc speculation by Defendants' paid expert Dr. Bustin—whose unsupported testimony on this issue is subject to Plaintiffs' motion to exclude—and post-hoc justification by Dr. Satterfield. In fact, the evidentiary record shows that Company employees believed the failed Indian NIV and Greek results were *not* because of contamination, and Dr. Satterfield does not even recall the failed South Africa results, fully undermining the argument that those results were excluded because he concluded the failure was based on contamination. *See* D.E. 171-1 at 177:10-12.

In any event, the undisputed evidence confirms that the negative evaluations did not result from contamination and likely resulted from the test's poor limit of detection. Before May 1st, Utah health officials criticized the Logix Test for having a high LoD, meaning that the test would likely identify positives from people who are acutely ill, when they are carrying a high viral load, but struggle to identify patients who are at the beginning or end of their illness, when the load will be lower. In April, a South African lab ran a validation and found the test's high LoD negatively affected the test's sensitivity: "Following our sensitivity analysis looking at all data combined the

Logix assay missed positives … In summary 5/12 (42%) positives were missed. Therefore concerns with the Logix assay is that very early and later stages of infection will be missed." D.E. 171-13.

The post-May 1st evidence suggests the Utah and South African results stemmed from the Logix Test's inability to identify positives from patients with low viral loads. For example, just a day after issuing the May 1 Press Release, Dr. Satterfield wrote to his colleagues that he reviewed data from Nebraska showing that competitor Abbott identified positives that the Logix Test was "unable to detect." SOF ¶ 48; D.E. 171-26. Dr. Satterfield admitted that Abbott "absolutely has a better LOD than" the Logix Test and suggested that his employees work on a new product "offering to compete with Abbott and other *more sensitive players*." *Id.* (emphasis added). It is also undisputed that peer-reviewed studies possess more weight than those not-peer reviewed. D.E. 171-23 at 166:3-18; 188:12-20; 209:13-210:2. And, at least two peer-reviewed studies showed the Logix Test performed the worst of all the kits analyzed in those studies, obtaining only 74.5% sensitivity in an Israeli peer-reviewed study and only 86.7% sensitivity and 66.7% specificity in a Mexican peer-reviewed study. D.E. 169-12 at 23-25 (Dr. Westgard opined that both those peer-reviewed studies described "less than perfect performance" by the Logix Test). The peer-reviewed studies' findings align with the negative performance evaluations from Utah, South Africa, India, and elsewhere and undercut any argument that those negative, foreign evaluations resulted from contamination.

The Court can and should enter summary judgment on this issue in favor of Plaintiffs—as Defendants' lies and omissions regarding the Company's prior failed results is not disputed.

### *Misleading Representation About the Superiority of the Logix Test*

The May 1 Press Release also misled investors by falsely suggesting that Co-Diagnostics had

created a Covid-19 test that was superior to any competitor.

Defendants devote their opposition to refuting a theory not actually pursued by Plaintiffs. D.E. 180 at 24-27. The May 1 Press Release was false not because it suggested that the test would perform perfectly every single time. On top of lying about prior validation results, it was also misleading, as this Court noted previously, because Dr. Satterfield's editorializing statements suggested that the Logix Smart test was "superior to any competitor (i.e., a competitor 'can't do better than that.'" D.E. 101 at. Indeed, this is the reason that the Court found Dr. Satterfield's statement to be "particularly troubl[ing.]" This suggestion—that the Logix Test was superior to all competitors' tests—was clearly false. As noted above, the undisputed record evidence shows failed validations, complaints about the test (many catalogued in QT9), the Logix Test's failure to pick up positives identified by Abbott's test, and Co-Diagnostics' earnest development of a product with a better LoD.

Stated another way, the May 1 Press Release was *not* misleading because—conceptually or theoretically—a test can never *always* be 100% accurate due to environmental or "non-test" factors. Rather, as stated by the Court, the press release was misleading because it misrepresented that the test, ***in and of itself***, "ha[d] achieved perfection or is, at least, superior to any competitor (i.e., a competitor "can't do better than that"). *See* D.E. 101 at 12.

The company's own scientific employees testified that they, too, believed the press release was misleading and falsely implied the test was 100% accurate. Dr. Garcia testified that had the Company asked to attribute Dr. Satterfield's statement—"[i]n countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that"—to her, she would have said no. D.E. 171-23 at 206:8-207:1. Dr. Garcia testified that she thought it was "very arrogant" and "egotistical" to say

"you can't do better than that" because "it's like dismissing error altogether." *Id.*

### *Materiality*

Defendants' argument about materiality comes close to a concession on the issue. Defendants *do not* contest that their misstatements and omissions about the Logix Test's prior failed validation tests were material. That makes sense—how could they dispute that misrepresentations about the prior performance of the Company's centerpiece product are not material? To be sure, Defendants' fraudulent misrepresentations that the Logix Test—its primary product that caused a 3,700% increase in annual sales from 2019 to 2020—had achieved 100% accuracy in all prior validations and was essentially superior to all competitors' tests clearly "affect[ed] the desire of investors to buy, sell, or hold the [C]ompany's securities." *SEC v. Cell>Point*, 2022 WL 2716549, at *5 (D. Colo. July 13, 2022). Instead, Defendants try to oppose summary judgment on this element by mischaracterizing the misstatement at issue, focusing on whether the public was already aware that no Covid-19 test could perform perfectly all the time. *See* D.E. 180 at 29. But that is not the nature of the misstatements at issue; Defendants made specific performance claims that were patently untrue and not known to the public. Indeed, Defendants do not reference any evidence that the investing public knew about the prior failed validation results because they concede that these results were intentionally withheld from the public.

## II.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON SCIENTER.

The record shows that there is no dispute Defendants knowingly made misrepresentations in the May 1 Press Release or were reckless as to the truth or falsity of those statements. For example:

- It is undisputed that Defendants were aware of negative or failed evaluations from, at a minimum, Utah, South Africa, Greece, and India, and yet the May 1 Press

11

Release did not mention those evaluations.

- It is undisputed that Andrew Benson, the head of investor relations at Co-Diagnostics, modified an early draft of the May 1 Press Release to misleadingly suggest that the Logix Test had achieved perfect scores across all prior validations. The initial draft, which Benson modified, correctly noted that only "*some*" of the Logix's test's prior validations were "favorable." SOF ¶ 30; D.E. 171-20. Mr. Benson committed a deliberate act of fraud by removing the word "some," especially where it is undisputed that Defendants were aware of the prior failed validations and that the test's high LoD could lead to false negatives. *Id.*; D.E. 171-3 at 99:3-101:8; 161:21-162:7; D.E. 179-4.

- It is undisputed that before issuing the May 1 Press Release, Co-Diagnostics executives did not consult with or seek input from Cecilia Hutchins (head of regulatory compliance) in violation of a regulatory compliance agreement with the FDA (SOF ¶ 31), or Rebecca Garcia (head of laboratory), who prepared the validation results attached to release and who testified that she would have told Defendants not to publish the validation reports attached to the fraudulent release (SOF ¶ 32).

- It is undisputed that Benson admitted in writing to Hutchins that the May 1 Press Release's title alone was a "damning" misrepresentation. D.E. 179-6.

- It is undisputed that Defendants knew that investment publications, Company board members, and distributors were interpreting the May 1 Press Release as falsely conveying the Logix Test had performed with 100% accuracy in all prior

evaluations, yet they remedied none of those misimpressions. D.E. 179 at 20.

- It is undisputed that Defendants have a history of lying about the efficacy of their test to boost their stock price, making it more likely that they knowingly lied about the efficacy of their test in the May 1 Press Release. Recent cease-and-desist orders entered from the SEC include specific allegations that Co-Diagnostics and Defendants Andrew Benson and Dwight Egan authored and approved press releases that misled investors about the Logix Test in February 2020. *See* D.E. 171-37; 171-38. Courts may take judicial notice of SEC cease-and-desist orders and treat those orders as supporting a finding of scienter where appropriate. *See In re Under Armour Securities Litig.*, 540 F.Supp.3d 513, 521-23 (D. Md. 2021) (considering an SEC cease-and-desist order because it contained "factual details which may support the Plaintiffs' allegations … with respect to scienter."); *United States v. Watts*, 2011 WL 167627, at *6 (S.D.N.Y. Jan. 11, 2011) ("Evidence of a defendant's participation in [] similar frauds is routinely admissible … to show knowledge and intent in fraud cases.").

These undisputed facts warrant granting summary judgment for Plaintiff on scienter.

Defendants ignore this evidence and argue that there is no scienter because: (1) Defendants testified that they subjectively believed the press release was not misleading, and (2) they testified that they properly ignored the failed South Africa, Greece, and NIV studies because it was "obvious" those reports were not credible. D.E. 180 at 30-35. Neither argument supports the denial of summary judgment for the Class Plaintiff on this issue. Where, as here, a defendant is aware of facts that make the statement misleading, "he cannot ignore the facts and plead ignorance of the risk." *SEC* v.

13

*Platforms*, 617 F.3d 1072, 1094-95 (9th Cir. 2010). In those instances, a court need not credit a Defendant's self-serving assertion. *Id.* at 1095.

As shown in the record, there is no dispute that Defendants were aware of negative or failed evaluations of the Logix Test (from Utah, South Africa, India, Greece, Kosovo and elsewhere) that made the May 1 Press Release misleading; Defendants simply cannot ignore those negative results—that render the release misleading—to defeat scienter. *Platforms*, 617 F.3d at 1094-95. And the purported contamination defense does not preclude summary judgment on scienter because besides Defendants' self-serving assertions and Dr. Bustin's improper opinion disconnected from any facts, there is no record evidence that the South African, Indian, or Greek evaluations resulted from contamination. As noted above, those unfavorable evaluations align with later, peer-reviewed studies showing the Logix Test performed materially worse than competitors' tests.

**III.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON THE RELIANCE AND "IN CONNECTION WITH" ELEMENTS**

In their response, Defendants fail to rebut or defeat the fraud-on-the-market theory's presumption of reliance. To defeat this presumption, a defendant must prove that the alleged misstatement did not impact the stock price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-80 (2014). In assessing whether a misrepresentation impacted a stock price, a court must look at both "qualitative as well as quantitative [evidence]—aided by a good dose of common sense." *Goldman Sachs v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021).

Defendants assert that the undisputed evidence shows no price impact. In its Opposition to Defendant's Motion for Summary Judgment, the Class Plaintiff detailed the evidence that conclusively established price impact. D.E. 179 at 22-27. To summarize, price impact has been conclusively established for at least three reasons. *First*, earlier in this case, Defendants conceded

that the May 1 Press Release impacted the stock price, and the Court recognized this concession in its class certification order. *Id.* at 23. Defendants have thus forfeited the right to contest price impact now. *Second*, Class Plaintiff's expert, Bettencourt, opined that a statistically significant price increase occurred on May 1, 2020, after the May 1 Press Release was issued. *Id.* at 23-24. A "good dose of common sense" bolsters that quantitative finding because news articles on May 1st attributed the stock's increase to the misleading May 1 Press Release. *Id. Third*, the Class Plaintiff showed price impact because when Defendants' misrepresentations were reiterated to the investing public and when the truth was finally revealed, the stock reacted in statistically significant ways, thus conclusively proving price impact. *Id.* at 24-26.

Despite the overwhelming evidence of price impact and even though they conceded price impact exists at the class certification stage, Defendants assert that their expert's testimony defeats a price impact finding. D.E. 180 at 37. They claim that Ferrell's testimony shows that "the stock price movement following the May 1 PR was indistinguishable from random chance." *Id.* Defendants ignore and fail to discuss Ferrell's GLS model, which found an abnormal return on May 1 that was significant at the 93% level—just 2% less than the 95% level that would have made his finding statistically significant (according to Defendants). D.E. 169-85 at 37:4-9. Defendants improperly treat this 93% statistical finding as conclusive proof of no price impact when, in reality, Ferrell's finding, along with Bettencourt's findings and the qualitative evidence, proves price impact. *See* D.E. 169-70 at 196:2-13 (Bettencourt testifying about price impact: "But again, whether it's statistically significant at a 95 percent confidence level as indicated [by my report] or 93 percent confidence level which Dr. Ferrell finds, there is still, when you consider all of the evidence available, it's undeniable that the stock price increase on May 1st was highly unusual and caused by

15

… the alleged misrepresentations in the company's press release."). As many Courts hold, while a 5% significance level is the typical measure of significance, "[n]o hard and fast rules dictate a cutoff of a 5% significance level to prove price impact in a securities fraud case, nor should one." *In re Chicago Bridge & Iron Co. Sec. Litig.*, 2020 WL 1329354, at *4 (S.D.N.Y. Mar. 23, 2020) (collecting cases).

In sum, the evidence compels granting summary judgment for Class Plaintiff on reliance and rejecting Defendants' price impact challenge.

## IV.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSES.

Defendants admit that 34 of their so-called affirmative defenses are not proper affirmative defenses.[3] The Court can thus grant summary judgment on those 34 affirmative defenses. *See Boyko v. Parker*, 960 F. Supp. 2d 1270, 1271 (D. Utah 2013) ("A motion for partial summary judgment may be used by the Court to dispose of affirmative defenses.") (cleaned up).

### CONCLUSION

Defendants committed fraud. They lied to the investing public regarding the performance of their Covid-19 test by misrepresenting its performance. Defendants do not dispute that they made misstatements, but they try to avoid the implications of their securities fraud by submitting post-hoc justifications for their misconduct. Their arguments are meritless. This is a case where the Court can and should grant the Class Plaintiff's summary judgment motion on the key elements of its claim, and then hold a trial on the limited open issues, such as damages. For all the reasons stated above,

---

[3]   *See* D.E. 180 at 40 (conceding that only Defenses 7, 10, 11, 14, 34, 35, and 40 are ones on which Defendants bear the burden of proof and effectively admitting that Defenses 1, 2, 3, 4, 5, 6, 8, 9, 12, 13, 15-33, 36, 37, 38, and 39 are not affirmative defenses and should be stricken).

the Court should grant Plaintiff's motion for partial summary judgment.

DATED: July 17, 2024

> /s/ *D. Loren Washburn*
> WASHBURN LAW GROUP, LLC
>
> MARCUS NEIMAN RASHBAUM & PINEIRO LLP
> Michael A. Pineiro
> Brandon Floch
>
> *Attorneys for Certified Class and Class Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on July 17, 2024 a copy of the foregoing was filed on the CM/ECF system and delivered to all parties of record.

/s/ D. Loren Washburn
D. Loren Washburn