IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GELT TRADING, LTD., a Cayman Islands limited company,<br><br>    Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., a Utah Corporation, DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, BRENT SATTERFIELD,<br><br>    Defendants. | Case No. 2:20-cv-00368-JNP-DBP<br><br><br>**CLASS PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY FOLLOWING SUMMARY JUDGMENT AND *DAUBERT* HEARING** |

Under D. Utah Local Rule 7.1(c),[1] the Class Plaintiff submits this Notice of Supplemental Authority in further support of its Opposition to Defendants' Motion for Summary Judgment (D.E. 179) and its Response in Opposition to the Motion to Exclude the Expert Testimony of Daniel Bettencourt (D.E. 177). During the recent February 21, 2025, hearing, the Court made certain pointed inquiries into whether the Class Plaintiff's expert, Daniel Bettencourt, disaggregated the fraud-related and non-fraud-related reasons (*i.e.*, Co-Diagnostics' earnings report) in opining on loss causation for the stock price decline on May 14-15, 2020. On this issue, we submit additional authorities supporting the admissibility of Mr. Bettencourt's testimony.

The supplemental authority below demonstrates that courts have consistently held that where, as here, an expert such as Mr. Bettencourt evaluates (rather than ignores) potentially confounding information (the earnings report) and concludes that it had a neutral or positive impact—meaning it would not have negatively affected the stock price—his opinion should not be excluded. Instead, an expert's determination that an event was not confounding or did not adversely impact the stock price presents an issue for the trier of fact, making exclusion under *Daubert* inappropriate.[2] *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511,

---

[1]    Under that rule, "[w]hen pertinent and significant authority comes to the attention of a party before the court has entered a decision on a motion, the party may file a Notice of Supplemental Authority, which may not exceed 2 pages."

[2]    In fact, if anything, Bettencourt's analysis is conservative because if "confounding information" like the May 14, 2020 after-hours earnings report, has a "positive valuation effect, such that it countervails against the negative valuation effect of the corrective disclosures, non-removal of the positive confounding information effect produces a conservatively low measure of the decline caused by the corrective disclosures." Bettencourt Report, D.E. 171-5 at 21, 47. At the very least, there is a factual dispute about whether a Q1 2020 revenue amount that was more than twice the consensus estimates and a loss per share in-line with consensus estimates could have had a positive, negative, or neutral effect on the share price. *Id.* at 21. Bettencourt believed it was positive, especially because the CEO noted it was an "awesome" earnings report. *Id.* at 21, 47. And, even Dr. Ferrell did not opine that the May 14-15 stock price decline was attributed to the earnings report, nor could he recall a single instance of a nearly 30% stock decline based on the type of allegedly mixed earnings announced in the May 14, 2020 earnings report. Ferrell Deposition, D.E. 169-85 at 110:6-13 (**Q.** [D]o you opine that the earnings is what caused the May

1

519–20 (S.D.N.Y. 2013) (finding exclusion of plaintiff's expert inappropriate where plaintiff's expert opined event did not negatively affect stock price and defendant's expert opined the event did negatively affect stock price) (attached as **Ex. A**); *In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *11-12 (N.D. Cal. Oct. 13, 2022) (collecting cases holding that disputes over whether potentially confounding variables were properly accounted for presents a fact question for the jury) (attached as **Ex. B**); *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *17 (N.D. Ill. Jan. 10, 2022) (collecting cases rejecting exclusion of securities fraud expert's loss causation analysis when it accounts for major factors) (attached as **Ex. C**); *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *8 (S.D. Cal. Oct. 25, 2013) ("[T]he failure to include one of the relevant variables does not dictate exclusion of the report as unreliable. This deficiency may affect the probative value of the analysis but not necessarily its admissibility, and Plaintiffs will have to overcome that large obstacle at trial.") (attached as **Ex. D**); *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019) ("Defendants' criticisms that [expert] discounted the confounding information and exaggerated the impact of the alleged fraud go to his credibility and the weight of his opinions, not their admissibility.") (attached as **Ex. E**); *In re Homestore.com, Inc.*, 2011 WL 291176, at *8 (C.D. Cal. Jan. 25, 2011) (denying *Daubert* motion where expert evaluated potential confounding causes) (**Ex. F**).

DATED: February 26, 2025

/s/ *D. Loren Washburn*
WASHBURN LAW GROUP, LLC

/s/ *Michael A. Pineiro*
MARCUS NEIMAN RASHBAUM & PINEIRO LLP

*Attorneys for Certified Class and Class Plaintiff*

---

15th price reaction? **A.** I'm not providing that opinion); 118:5-11.

# EXHIBIT A

923 F.Supp.2d 511
United States District Court, S.D. New York.

LIBERTY MEDIA CORPORATION, LMC Capital LLC, Liberty Programming Company LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLC Holdings, Inc., and Liberty Media International, Inc., Plaintiffs,

v.

VIVENDI UNIVERSAL, S.A., and Universal Studios, Inc., Defendants.

No. 03 Civ. 2175(SAS)
|
Feb. 12, 2013.

**Synopsis**

**Background:** Purchaser brought action against target corporation, alleging violations of federal securities law and breach of four different express warranties contained in an agreement and plan of merger and exchange. Following jury award of damages to purchaser for each cause of action, target renewed its motion for judgment as matter of law (JMOL), or, in the alternative, for a new trial.

**Holdings:** The District Court, Shira A. Scheindlin, J., held that:

purchaser's expert's analysis was not so flawed as to be legally insufficient to support the jury's verdict on loss causation and damages;

jury faithfully obeyed its instructions, arriving at a reasonable estimate of purchaser's damages that fell between the plausible calculations of the experts, and therefore remittitur was not warranted; and

purchaser provided sufficient evidence of the requisite causal connection between company's misrepresentations and purchaser's injuries so as to establish reliance element of its securities fraud claim.

Motion denied.

**Procedural Posture(s):** Motion for Judgment as a Matter of Law (JMOL)/Directed Verdict.

**Attorneys and Law Firms**

**\*513** Macey R. Stokes, Esq., Baker Botts LLP, Houston, TX, R. Stan Mortenson, **\*514** Esq., Michael L. Calhoon, Esq., Alexander M. Walsh, Esq., Baker Botts LLP, Washington, D.C., for Plaintiffs.

Daniel Slifkin, Esq., Cravath Swaine & Moore LLP, New York, NY, James P. Quinn, Esq., Penny P. Reid, Esq., Weil, Gotshal & Manges LLP, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

Plaintiffs, Liberty Media Corporation and certain of its subsidiaries (collectively, "Liberty"), sued defendants, Vivendi Universal, S.A. and Universal Studios, Inc. (collectively, "Vivendi"), alleging violations of federal securities law and breach of express warranty under New York state law. In particular, Liberty sued Vivendi for violations of Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b–5 (collectively, "Section 10(b)"). Liberty also sued Vivendi for breach of four different express warranties contained in the Agreement and Plan of Merger and Exchange ("Merger Agreement") that was signed on December 16, 2001. On June 25, 2012, the jury found Vivendi liable for violating Section 10(b) and for breach of warranty. The jury awarded Liberty €765 million in damages for each cause of action. [1]

Vivendi now renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. Vivendi argues on various grounds that Liberty's evidence at trial was legally insufficient on both liability and damages.

For the following reasons, Vivendi's motion is denied.

**II. BACKGROUND**

Familiarity with the facts and procedural background of this case is assumed. Only those facts necessary to the disposition of Vivendi's motion will be noted.

On December 16, 2001, the parties signed the Merger Agreement, which involved, in part, a commitment for Liberty to exchange its multiThématiques ("MTH") shares for Vivendi securities.[2] On May 7, 2002, the merger closed.[3] In March 2003, plaintiffs brought an individual action (the "Liberty Action") asserting various claims against defendants under both federal securities law and state common-law theories.[4] Two months later, Judge Harold Baer, Jr., consolidated the Liberty Action with a separate securities class action (the "Class Action") filed **\*515** against Vivendi in July 2002.[5] In the Class Action, U.S. and foreign shareholders of Vivendi alleged that they purchased certain shares at artificially inflated prices as a result of defendants' material misrepresentations and omissions regarding a concealed risk of a liquidity crisis at Vivendi.[6] In 2004, the consolidated action was transferred to Judge Richard J. Holwell.[7] On March 2, 2009, Judge Holwell vacated Judge Baer's consolidation order.[8]

The Class Action was tried before a jury from October 2009 to January 2010.[9] On January 29, 2010, the jury returned its verdict, finding that Vivendi had violated Section 10(b) as to all fifty-seven misstatements alleged by the Class Action plaintiffs, and that Vivendi acted recklessly with respect to each statement.[10] On April 11, 2012, after the deconsolidated Liberty Action had been reassigned to this Court, I issued an opinion explaining that based on the jury's finding at the Class Action trial, Vivendi was collaterally estopped from contesting the falsity, materiality, and scienter elements of Liberty's Section 10(b) claim for twenty-five statements for which the Class Action jury found Vivendi liable.[11]

The Liberty Action was tried before a jury from May to June 2012. On June 25, 2012, the jury returned its verdict, finding Vivendi liable for violating Section 10(b) and for breach of warranty.[12]

### III. APPLICABLE LAW

A defendant is entitled to judgment as a matter of law if, after a party has been fully heard on an issue during trial, the Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue ...."[13] In ruling on a motion for judgment as a matter of law, the trial court is required to

consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.[14]

A jury verdict should not be set aside lightly. A court may not grant judgment as a matter of law unless: (1) there is such a " 'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer **\*516** surmise and conjecture' " or (2) there is " 'such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].' "[15]

Under Federal Rule of Civil Procedure 50(b),

[n]o later than 28 days after the entry of judgment ... the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59 ... In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct entry of judgment as a matter of law.

The legal test for granting a new trial under Rule 59 is less stringent than for granting judgment as a matter of law. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."[16] Nevertheless, " '[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously

erroneous result or that the verdict is a miscarriage of justice.' " [17]

With regard to the merits of Liberty's claims, under New York law, a breach of warranty claim sounds "essentially in contract." [18] To prevail, a party must establish the existence of a contract containing a bargained-for express warranty with respect to a material fact, reliance on that warranty, a breach of that warranty, and damages suffered as a result of the breach. [19]

A Section 10(b) claim requires proof by a preponderance of the evidence that, in connection with the purchase or sale of a security: (1) defendants made an untrue statement of material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading; (2) defendants acted with scienter; (3) plaintiffs justifiably relied on the misstatement or omission; and (4) plaintiffs suffered an economic loss as a result of the misstatement or omission. [20] As part of the fourth element, plaintiffs must prove "loss causation," which is, in the words of Judge Holwell,

the required "causal link" between the alleged fraud and the subsequent decline in value of the stock when the fraud comes to light. It is typically shown by the reaction of the market to a "corrective disclosure" which reveals a prior **\*517** misleading statement. However, loss causation may also be shown by the "materialization of risk" method, whereby a concealed risk—here, a liquidity crisis—comes to light in a series of revealing events that negatively affect stock price over time. Unlike corrective disclosures, these events do not identify prior company statements as misleading, but they must reveal new information previously concealed and fall within the "zone of risk" concealed so that the events were foreseeable consequences of the fraud. In addition, a plaintiff must show that the loss was caused by

materializations of the concealed risk and not other factors. [21]

## IV. DISCUSSION

Vivendi offers six arguments for setting aside the jury's verdict and granting judgment as a matter of law, or in the alternative for a new trial: (1) Liberty failed to prove causation and damages because the opinion of Liberty's expert, Dr. Blaine Nye, is legally defective and unreliable; (2) Liberty failed to prove causation because the alleged events or disclosures that ostensibly caused Liberty's losses did not reveal a previously undisclosed risk; (3) the jury's damages award is not supported by any evidence in the record; (4) Liberty failed to prove Section 10(b) reliance; (5) Vivendi proved that Liberty was not obligated to close the transaction, thereby establishing an affirmative defense; and (6) Vivendi was unfairly prejudiced by the admission of evidence regarding falsity and therefore is entitled to a new trial. [22]

I address each argument in turn.

### A. Dr. Nye's Opinion

Vivendi argues that it should be granted judgment as a matter of law because "[n]o jury should have been permitted to base a verdict on Dr. Nye's inconsistent, unreliable, and inadmissible testimony." [23] In particular, Vivendi argues that Dr. Nye's testimony provided a legally insufficient evidentiary basis for the jury's loss causation and damages findings. [24] To establish loss causation, Liberty was required to "prove both that the loss it suffered was foreseeable and that the loss was caused by events that revealed information concerning Vivendi's true liquidity risk that previously had been concealed by the false/untrue or misleading statements." [25]

Vivendi challenges Dr. Nye's testimony under five headings. [26] For the reasons stated below, Vivendi's challenges are without merit.

### *518  1. Disaggregation

A number of factors may affect a company's stock price, including fluctuations in the market as a whole, news affecting the industry to which the company belongs, and the

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

release of information specifically related to the company.[27] Under the principle of loss causation, Liberty is only entitled to damages for declines in Vivendi's stock price that resulted from events that represented materializations of Vivendi's previously concealed liquidity risk.[28] Liberty thus bore the burden of disaggregating the effects of such "materialization" events on Vivendi's stock price from the effects of other, non-fraud-related "confounding" events.[29]

At trial, Dr. Nye testified that he had examined each of the 166 trading days between December 16, 2001, the day on which the Merger Agreement was signed, and August 14, 2002, the date of the final alleged materialization event, to determine if there was a statistically significant decline in Vivendi's stock price on any of those days after removing market and industry effects.[30] Dr. Nye also testified to removing company-specific effects on the stock price that were not related to the disclosure of Vivendi's concealed liquidity risk.[31] To perform these analyses, Dr. Nye testified to having reviewed all publicly available information about Vivendi over the period noted above, including sixteen thousand news releases and several thousand analyst reports.[32]

In the end, Dr. Nye identified nine days on which statistically significant negative returns resulted from materializations of Vivendi's concealed liquidity risk.[33] Dr. Nye testified that he had also identified days on which Vivendi's share price dropped as a result of non-fraud-related company-specific news, but that none of these days were among the nine days of materialization events.[34] In addition, Dr. Nye testified that he had studied each of the nine materialization days "for other things that happened on that day that you might need to take out that weren't related to the concealed liquidity risk."[35] When **\*519** challenged on cross-examination, Dr. Nye clarified that he had found no material non-fraud-related company-specific negative news on the nine materialization days: "In those days, ... everything had to do with the fraud."[36] Dr. Nye concluded that Liberty suffered roughly €842 million in damages from the net share price declines over the nine materialization days.[37]

By contrast, Vivendi's expert, Dr. William Silber, testified that there was competing negative news on several of the materialization days that could have affected Vivendi's stock price.[38] For example, Dr. Silber testified that on June 24, 2002, the fourth of the materialization days, "there was an announcement overnight that News Corp. .... was not going to buy Telepiu," a Vivendi subsidiary.[39] On cross-examination, Liberty challenged the significance of Dr. Silber's alleged confounding events, either by questioning whether they had any effect on Vivendi's stock price, or by questioning whether the market perceived the events as liquidity-related, or both. For example, in the case of the news regarding the Telepiu sale, Dr. Silber conceded under cross-examination that "[i]t didn't seem to affect the stock price."[40] In addition, Liberty introduced evidence suggesting that the market perceived Vivendi's effort to sell Telepiu as liquidity-related.[41]

The jury was charged with the following instruction regarding damages under Section 10(b):

> Liberty bears the burden of separating the alleged fraud from any other factors that may have affected Vivendi's stock price and ascrib[ing] some rough proportion of the whole loss to the alleged false or misleading statement. Vivendi is not liable for any loss resulting from those other non-fraud related events.[42]

Having heard the competing testimony of the parties' experts, the jury found that Liberty's reliance on Vivendi's statements caused Liberty to suffer an economic loss of €765 million.[43]

Vivendi now argues that Dr. Nye's disaggregation analysis was so flawed as to be legally insufficient to support the jury's verdict on loss causation and damages.[44] But Vivendi offers no significant arguments beyond what the jury heard and reasonably rejected at trial.[45] Vivendi criticizes Dr. Nye for claiming to have excluded non-fraud-related company-specific events from his damages calculation, but then failing to "disaggregate a single **\*520** such event on any one of his nine disclosure days."[46] According to Dr. Nye's testimony, however, there simply were no confounding events during the nine days on which he identified materialization events.[47] The credibility of Dr. Nye's testimony was a matter for the jury, and neither legal precedent nor common sense compels the conclusion that every set of materialization event

windows, no matter how small in number, must contain at least one confounding event. [48]

Viewing the evidence in the light most favorable to upholding the jury's verdict, I conclude that a reasonable juror could have found that none of the ostensible confounding events put forth by Vivendi were both non-fraud-related and affected Vivendi's share price. [49] Dr. Nye's testimony was not inadmissible simply because it took an aggressively skeptical view of the significance of non-fraud-related news on the nine materialization days, any more than Dr. Silber's testimony was inadmissible because of his equally aggressive but opposite interpretation of potential confounding events. The weighing of the experts' conflicting testimony was a matter for the jury and will not be disturbed by this Court.

### 2. One-day Event Window

At trial, Dr. Nye testified that he measured the share price declines resulting from the materialization events by using a "one-day event window." [50] That is, for each materialization event, Dr. Nye measured the change in Vivendi's share price in response to the event over the course of one trading day, from market close to market close. [51] Dr. Nye explained that he chose a one-day event window, rather than a longer window of a month or a shorter window of less than a day, because over a day the market becomes more or less efficient. [52] That is, over a day of trading any public information relevant to a stock has been "fully absorbed and reflected in the market price." [53]

Dr. Nye testified that the current academic standard for measuring the effect of the release of information on a stock's price "is to extend the event period to the close of ... trading on the day after the release of the pertinent information." [54] A **\*521** reasonable juror could have found that Dr. Nye adopted a similar approach. For most of the materialization events, Dr. Nye's one-day event window for measuring share decline began at the last close of trade preceding the event and ended at the close of trade following the event. [55] On an occasion when the materialization event arrived after the close of trading in Paris but before the close in New York, Dr. Nye's one-day event window extended from market close on the date of the disclosure to market close on the following day. [56]

Vivendi argues that Dr. Nye's one-day event window analysis is invalid because it fails to take into account the intraday movement of Vivendi's stock price or consider the impact at market opening of overnight disclosures. [57] Vivendi's argument regarding intra-day stock price movements rests on two premises: *first,* that it is an undisputed principle that stock markets have at least some immediate reaction to significant news, including some reaction at the start of trading if the news occurred overnight; and *second,* that Dr. Nye impermissibly violated this principle when he "attributed Vivendi's stock price declines on three dates to events to which the stock market had *no immediate negative price reaction,"* [58] and "attributed Vivendi's stock price decline on certain dates to events happening overnight that did *not* cause *any* reaction in the stock price at the next day's opening." [59]

It is true, as Vivendi suggests, that Dr. Nye testified approvingly about the theory that the market will make at least some virtually instantaneous reaction to any significant news. [60] Liberty cites no passage in Dr. Nye's testimony in which Dr. Nye explicitly rejects this principle. [61] It is also true that Dr. Nye attributed Vivendi's stock price decline on three dates to materialization events that at some point involved news-related developments that produced no immediate negative price reaction in the stock market. [62]

**\*522** Vivendi is incorrect to conclude, however, that there is an unavoidable inconsistency between Dr. Nye's theoretical principle that markets make virtually instantaneous responses to significant news and his analysis of the connection between materialization events and stock price changes in this case. Dr. Nye repeatedly testified at trial that it is difficult to say in retrospect when, precisely, new information first entered the market. [63] A reasonable juror could have concluded that Dr. Nye was correct about markets making some immediate response to significant news, and could also have concluded that the market did not respond immediately to the developments mentioned by Vivendi, by finding that the developments likely did not contain new information by the time they occurred.

Moreover, even if there were an irreconcilable conflict between Dr. Nye's theory of immediate market reaction and his analysis of the connection between materialization events and stock price changes in this case, the jury could have reasonably disregarded the former theory while accepting the latter results. Dr. Nye's loss causation and damages analysis did not depend on the validity of his beliefs about

instantaneous market reactions. Rather, his analysis depended on the assumption that markets are more or less efficient over a day,[64] an assumption that Vivendi does not meaningfully contest.[65]

Finally, Vivendi's suggestion that Dr. Nye offered inconsistent testimony in prior cases regarding the extent to which markets are efficient is only relevant as an indication of Dr. Nye's credibility.[66] Credibility determinations lie within the province of the jury, and will not be second-guessed by this Court.[67]

### 3. May 3, 2002 Moody's Downgrade

Vivendi argues that Dr. Nye impermissibly included in his loss causation and damages analysis a stock decline that *preceded* a materialization event.[68] Specifically, Dr. Nye attributed the entire company-specific decline in Vivendi's share price on May 3, 2002 to the Moody's downgrade, even though the first news release in the record revealing the downgrade did not arrive until 5:12 p.m. Paris time, after Vivendi's stock had already made approximately sixty percent of the total decline it would experience on May 3.[69]

Liberty counters that Dr. Nye concluded "that news of the downgrade had entered the market before that announcement —either through a leak, or because the announcement in a Dow Jones news release at 5:12 Paris time was not the first the market learned of the downgrade."[70] Liberty argues that the jury could reasonably have accepted Dr. Nye's conclusion based **\*523** on several factors: *First,* Dr. Nye explained, based on his general expertise regarding trading, that it is easy and common for information to leak into the market before an official announcement.[71] *Second,* Dr. Silber was unable to identify any specific alternative cause for the decline in Vivendi's stock price on May 3 prior to 5:12 p.m.[72] *Third,* two internal Vivendi emails show that news of the downgrade may have leaked to part of the market as early as May 2.[73]

The first two factors are together sufficient to support the finding that the pre–5:12 p.m. declines in Vivendi's share price resulted from information concerning Moody's downgrade. A significant share decline occurred shortly before the first record evidence of the public release of news about Moody's downgrade. Liberty's expert testified that leaks of such news are common, and explained how

such leaks unfold. The opposing party could provide no alternative cause for the share decline. In light of this evidence, and considering that direct evidence of trading based on impermissibly leaked information will presumably be difficult to prove in many cases even where such trading took place,[74] the jury could have reasonably inferred that the pre–5:12 p.m. share decline more likely than not resulted from information concerning the Moody's downgrade.[75]

Because the first two factors are sufficient to support the jury's finding, it is not necessary to determine whether the two Vivendi emails might provide additional support.[76] It is also unnecessary to address Liberty's argument that Vivendi's challenge is waived.[77]

### \*524  4. Maximum Inflation Date

Vivendi argues that no evidence supports Dr. Nye's choice of December 13, 2001 as the date of maximum inflation, that is, the date at which the value of Vivendi's shares was most inflated by Vivendi's fraud.[78] Vivendi's argument suggests that Dr. Nye should have taken into account Vivendi's "multiple misrepresentations" between December 13, 2001 and January 7, 2002,[79] because Liberty should not recover for inflation resulting from misrepresentations made after the signing of the Merger Agreement on December 16, 2001.[80] Vivendi also criticizes Dr. Nye for failing to conduct a quantitative analysis of Vivendi's concealed liquidity risk as a basis for arriving at the date of maximum inflation.[81]

Vivendi's arguments are without merit. A reasonable juror could have accepted Dr. Nye's conclusion that the inflation of Vivendi's stock price as a result of Vivendi's misrepresentations reached its peak on or before December 13, 2001. Dr. Nye's choice was not arbitrary, but rather based on plausible and sufficiently supported reasoning that was submitted to the jury for its consideration. Dr. Nye claimed that in the period leading up to December 13, there were a series of indicators that liquidity risk was very high, but these indicators were unknown to the market and to Liberty.[82] On December 13, Vivendi CFO Guillaume Hannezo wrote a private letter of reassurance to ratings agencies, which the jury could reasonably have concluded helped to prevent a downgrade.[83] Vivendi attempted to suggest at trial, including during the cross-examination of Dr. Nye, that misrepresentations between December 13 and

January 7 further inflated Vivendi's share price.[84] But the jury was entitled to reject Vivendi's counternarrative based on the jury's weighing of the evidence, including the testimony of the parties' experts.

Vivendi is also incorrect to suggest that Dr. Nye had an obligation to derive the maximum inflation date from a quantitative analysis of Vivendi's liquidity risk, a suggestion for which Vivendi provides no legal support.[85] It was unnecessary to arrive at an absolute quantitative measure of Vivendi's liquidity risk in order to determine when the inflation of Vivendi's stock price reached its highest point, and for the same reason that it is unnecessary to know the height of each mountain in a range in order to identify which is the tallest: comparative terms like "highest" and "tallest" do not require absolute measures. It would not have been unreasonable for the jury to have accepted Dr. Nye's maximum inflation date based on his narrative analysis of the growth of the gap between Vivendi's actual liquidity risk and the inaccurate perceptions of that risk based on Vivendi's misrepresentations and omissions.

### 5. Inflation Amount

Finally, Vivendi suggests that a reasonable jury could not have relied on Dr. Nye's damages calculation, because Dr. Nye arrived at the same inflation amount based on different sets of misstatements in the Class and Liberty trials.[86] At the **\*525** Class Action trial, plaintiffs presented fifty-seven misstatements or omissions ranging from October 30, 2000 to June 26, 2002.[87] At the Liberty trial, Liberty relied on a smaller set of twenty-five misstatements or omissions.[88] A small part of the difference resulted from the fact that under the Merger Agreement, Liberty was only entitled to recover for Vivendi's misrepresentations between December 31, 2000 and the signing of the Merger Agreement on December 16, 2001.[89] Liberty's claim thus did not include the two misrepresentations from before this period introduced at the Class Action trial, one of which occurred on October 30, 2000, and the other on December 19, 2000.[90] Despite this and other differences, Dr. Nye testified to the same inflation amount (€22.52 per share) in both trials.[91]

If Dr. Nye's analysis were based on the assumption that each of Vivendi's misstatements played a distinct and independently measurable role in inflating Vivendi's share price, then Vivendi's argument might have merit. At minimum, Liberty would not be entitled to recover for whatever inflation Dr. Nye's analysis would suggest was already built into Vivendi's share price at the start of trading on December 31, 2000 based on Vivendi's two earlier misstatements regarding its liquidity risk.[92]

Vivendi's challenge is without merit, however, because Dr. Nye's damages analysis did not depend on the assumption that every misrepresentation by Vivendi could be independently monetized and subtracted from Liberty's damages.[93] Again, Dr. Nye presented to the jury a sufficiently supported narrative of the growth of the inflation in Vivendi's share price based on Vivendi's misstatements and omissions from December 31, 2000 to December 16, 2001. The calculation of damages was not derived from an analysis of the specific effects of individual misrepresentations and omissions. Dr. Nye calculated the damages Liberty suffered as a result of this inflation by analyzing the declines in Vivendi's stock price on the nine days during which the market responded to the materialization of the hidden liquidity risk. Vivendi has offered no legal basis for concluding that this was an unacceptable approach.

Vivendi was free to attempt to persuade the jury to reject Dr. Nye's relatively simple method for determining loss causation and damages in favor of a more sophisticated one. Using a different method, it might in theory have been possible to offer a more precise causal analysis, one that **\*526** would have arrived at different damages calculations for the fifty-seven misrepresentations at the Class Action trial and the twenty-five at the Liberty trial. But the law does not require the use of such a fine-grained quantitative method, if one in fact exists that would produce reliable rather than spuriously precise results. The jury in this case was explicitly charged that "[d]amages need not be proven with mathematical certainty, but there must be enough evidence for you to make a reasonable estimate of damage."[94] Dr. Nye's analysis more than satisfies this standard, even if his method leads to the same result based on the misrepresentations in both the Class and Liberty trials.

Finally, a reasonable juror could have concluded that where losses result from a party's failure to correct a false impression it created that a risk does not exist, the losses may be the same whether the party failed to correct the false impression on twenty-five occasions over one year or fifty-seven occasions

over a year and a half. Either way, plaintiffs may suffer the same losses as a result of the materialization of the risk. [95]

**B. Disclosure of Previously Undisclosed Risk**

The jury was instructed that for Liberty to establish loss causation in its Section 10(b) claim, it was required to "prove both that the loss it suffered was foreseeable and that the loss was caused by events that revealed information concerning Vivendi's true liquidity risk that previously had been concealed by the false/untrue or misleading statements." [96] Vivendi now argues, as it did in an unsuccessful post-verdict motion for judgment as a matter of law in the Class Action trial, [97] that the materialization events in the present case did not reveal a previously undisclosed risk, and thus that Liberty failed to prove loss causation. [98] Specifically, Vivendi argues that it is entitled to judgment as a matter of law because Liberty failed to prove that (i) "a reasonable investor misled **\*527** by the fraud would have perceived the allegedly corrective events as 'remote or highly unlikely,' " and (ii) "the allegedly corrective events related to the 'specific misrepresentations alleged.' " [99] Neither of these elements were included in the jury's instructions regarding loss causation, but Vivendi purports to derive them from a reading of Second Circuit case law. [100] Vivendi argues that because Liberty produced "no evidence" to satisfy standards (i) and (ii), there was insufficient evidence for the jury to conclude that Liberty proved loss causation. [101]

Liberty responds that Vivendi's loss causation argument is waived under Rule 50(b) because it did not appear in Vivendi's Rule 50(a) Motion. [102] I agree. The Second Circuit has stated:

> [B]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion. The earlier motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to

provide additional evidence that may be available. [103]

"As to any issue on which proper Rule 50 motions were not made, JMOL may not properly be granted by the district court ... unless that action is required in order to prevent manifest injustice." [104] Vivendi did not suggest in its Rule 50(a) motion that Liberty was required to prove, and failed to prove, either element (i) or (ii). [105] Vivendi is thus barred from raising these arguments in its Rule 50(b) motion.

Waiver under Rule 50, however, does not imply waiver under Rule 59. [106] I thus consider Vivendi's challenge to the jury's answer to Question 10 under Rule 59, and conclude that Vivendi's challenge is without merit. Vivendi misinterprets Second Circuit case law to create requirements for Liberty's Section 10(b) claim that do not exist. *First,* the Second Circuit reaffirmed in *Lentell* the following principle:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely **\*528** by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss. [107]

Vivendi infers from this that "there can be no loss causation unless a reasonable investor misled by the fraud would have thought it 'remote or highly unlikely' that the event causing his or her loss would occur." [108] But *Lentell* asks whether a reasonable investor who believed the fraud would perceive the *zone of risk* as remote or highly unlikely, not whether such an investor would perceive any *specific event* within the zone of risk as unlikely. [109] What Judge Holwell noted in response to Vivendi's identical argument in the Class Action is equally true in the present case: plaintiffs have "offered substantial evidence that the zone of risk—a liquidity crisis—would have

been thought unlikely by shareholders who believed Vivendi's repeated assurances about its financial health." [110]

*Second,* the Second Circuit distinguished in *Omnicom* between the proof of loss causation based on a theory of corrective disclosure, and proof of loss causation based on a theory of materialization of the risk. [111] Under the former theory, "loss causation can be established by a 'corrective disclosure to the market' that 'reveal[s] ... the falsity of prior recommendations.' " [112] Under the latter theory, loss causation can be established by showing " 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.' " [113] In rejecting the *Omnicom* plaintiffs' corrective disclosure argument, the Second Circuit noted that none of the ostensible disclosures put forth by plaintiffs "even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." [114]

Vivendi infers from *Omnicom* that Liberty had the burden to prove that "the allegedly corrective events" in the present case "related to the 'specific misrepresentations alleged' " in the present case. [115] But what Judge Holwell stated in the context of the Class Action trial also applies here: "This is not a corrective disclosure case. Rather, plaintiffs are proceeding under a materialization of the risk theory." [116] Vivendi's invocation of the Second Circuit's language in analyzing the *Omnicom* plaintiffs' corrective disclosure argument is misplaced. It was not necessary for Liberty "to establish a one-to-one correspondence between concealed facts and the materialization of the risk." [117]

 **\*529** Even if Vivendi's sufficiency arguments were treated as though they were independent from its novel legal interpretations, [118] the sufficiency arguments would also fail on the merits. Vivendi repeatedly suggests that the materialization events identified by Liberty were either recharacterizations of previously known information or unrelated to Vivendi's liquidity risk as it existed at the time the Merger Agreement was signed. [119] To take one example, Vivendi suggests that the news on June 21 and June 24, 2002 regarding the repurchase agreement ("repo") that Vivendi used in connection with its sale of Vivendi Environnement could not have been understood by a reasonable juror as a revelation of Vivendi's liquidity risk in December 2001, because "it was well known that Vivendi intended to sell Vivendi Environnement in June." [120] Liberty responds that

Dr. Nye testified the market was troubled not by the sale itself but by its rapid timing and the use of the "repo" in the deal. [121] Vivendi then suggests that even if Liberty succeeded in proving that the June 21 and 24 news revealed a liquidity risk that troubled the market, that liquidity risk "had nothing to do with Vivendi's liquidity condition six months earlier." [122] Vivendi argues that its asset and share sales in the intervening months "[broke] the chain of causation between the liquidity risk of December and the sale of Vivendi Environnement shares." [123]

Vivendi's attempt to suggest that the liquidity problems revealed in 2002 had "nothing to do" with the liquidity risk concealed in 2001 is unpersuasive. A reasonable juror could have concluded that Vivendi had a need for cash in late June 2002, despite the asset and share sales mentioned by Vivendi, precisely *because of* the sources of liquidity risk it concealed in 2001. In fact, the intervening asset sales strengthen rather than weaken the chain of causation between the concealed liquidity risk in 2001 and the liquidity problems in 2002. It would be easier for Vivendi to argue that its liquidity problems in June 2002 were unrelated to its liquidity risk in December 2001 if Vivendi had purchased rather than sold assets in the intervening months. In that case, Vivendi could have argued that the June 2002 problems were the result of risk created by the new purchases rather than the result of any liquidity risk existing in December 2001.

Vivendi's arguments regarding the other materialization days are equally unpersuasive. Vivendi repeatedly suggests that the materialization events "revealed nothing," [124] "revealed no new information," [125] "were recharacterizations of previously disclosed facts," [126] or were "unrelated to Vivendi's ... liquidity risk" altogether. [127] **\*530** With regard to each challenge, Liberty offers persuasive arguments as to how a reasonable juror could have concluded based on Dr. Nye's testimony and other evidence that each of the materialization events did, in fact, reveal new information specifically related to Vivendi's liquidity risk. [128] For example, in response to Vivendi's argument that the May 3 Moody's downgrade "revealed no new information about Vivendi's liquidity risk" because "the reasons for the Moody's downgrade were known to the market before the downgrade," [129] Liberty correctly recounts testimony heard by the jury that could easily have supported the conclusion that "the downgrade conveyed to the market new information about Vivendi's liquidity," including Dr. Nye's

testimony that ratings agencies have access to nonpublic information. [130] The jury could reasonably have rejected Dr. Silber's competing testimony. [131]

### C. Damages

The jury awarded €765 million in damages. [132] This was roughly €77 million less than Dr. Nye's damages calculation of roughly €842 million. [133] Stated in terms of share price, the jury's award was €2.06 per share less than Dr. Nye's calculation of €22.52 inflation per share. [134] By contrast, Dr. Silber had calculated Liberty's damages as between €0 and €175 million. [135]

Vivendi argues that the jury's damages award is not supported by any evidence in the record and must be rejected. [136] Specifically, Vivendi's opening brief criticizes the jury's damages finding because it "bears no relation to either Dr. Nye's or Dr. Silber's analyses" and "does not correspond to any of the price drops that Dr. Nye attributes to corrective disclosures." [137] Vivendi's reply brief attempts to clarify that "Vivendi does not argue that the jury's award has to match either expert witness's damages calculation 'wholesale,' or exactly match the price drops claimed by Dr. Nye." [138] If a jury may **\*531** depart from expert damages calculations, however, and need not do so in a way that exactly, numerically corresponds to the rejection of specific elements of those calculations, it is difficult to understand the basis for Vivendi's criticism of the jury's award. Vivendi gives no indication of the nature of the "relation" that the jury's award was required to have, but failed to have, to Dr. Nye's and Dr. Silber's analyses, if the "relation" was not one of the two relations disavowed in Vivendi's reply brief. [139]

In any case, Vivendi's argument is probably waived. [140] Vivendi failed to request a jury instruction placing strict numerical constraints on the jury's damages award, or requiring the jury to itemize its award based on specific declines in share price. To the contrary, the jury was instructed "to make a reasonable *estimate* " (emphasis added):

> Any damages you award must have a reasonable basis in the evidence and may not be based on speculation.

Damages need not be proven with mathematical certainty, but there must be enough evidence for you to make a reasonable estimate of damage. [141]

The jury heard Dr. Nye's and Dr. Silber's calculations and apparently found the former largely but not entirely credible. If the jury discounted Dr. Nye's calculation by roughly ten percent, the jury acted appropriately and within the bounds of its instructions. Even Vivendi seems to acknowledge the appropriateness of such discounting: Vivendi approvingly notes that the jury in the Class Action awarded roughly half the damages calculated by Dr. Nye because the jury "found Dr. Nye's calculations non-credible by a factor of 50%." [142] The jury here has apparently done nothing different, except that it found Dr. Nye's calculations roughly ninety percent credible rather than roughly fifty percent credible. Credibility determinations are the province of the jury, and it is appropriate for damages awards to reflect credibility determinations regarding the damages calculations of experts. [143] Vivendi has not cited, and I am not aware of, any precedent for the proposition that juries departing from expert calculations must themselves reason like experts and perform technical calculations, rather than arriving at rough estimates based on reasonable but imprecise credibility determinations.

The question remains, however: if the jury did find Dr. Nye roughly ninety percent credible, why did it award €765 million in damages, which is 90.86% of €842 million, rather than a simple, round 90% of €842 million (that is, € 757.8 million)? One possible answer would be that the jury, recognizing the many sources of imprecision in the damages calculations in this case, conceived of Dr. Nye's damages as "roughly €850 million," and then discounted that number by ten percent. Ninety percent of €850 million is exactly €765 million. Another possible answer would be that the jury subtracted €2.06 per share from Dr. Nye's €22.52 per share inflation calculation by partially or wholly discounting one or more of the materialization events, as noted above, or by partially or wholly incorporating one or more of Dr. **\*532** Silber's confounding events, also as noted above. Liberty invited such discounting in its summations: "Now, if there are some of these days you're not persuaded by, like you think, well, one of the days is a close call or whatever ... I understand that.... I would understand if you don't do that exact number...." [144] This invitation, as well as the jury's instructions, were appropriate in light of the Second Circuit's

repeated emphasis that losses resulting from securities fraud need not be proved with mathematical precision. [145]

It is hopeless to attempt to determine which specific materialization events, if any, the jury might have questioned; or which specific confounding events, if any, it might have incorporated; and what specific degrees of credence it gave to either or both. The jury's deliberations cannot be deduced from the number 77, nor from the number 2.06. But while I cannot know for sure which calculations the jury actually made, " 'a jury has wide discretion in determining damages, so long as it has a reasonable basis.' " [146] There were any number of reasonable paths for arriving at a damages award of €765 million based on rough credibility determinations regarding the experts' calculations.

Finally, Vivendi argues that the Court should grant remittitur and reduce Liberty's award because it "deviates materially" from reasonable compensation as measured by awards in similar cases, in violation of section 5501(c) of New York's Civil Practice Law and Rules ("CPLR"). [147] Section 5501(c) was enacted "as part of a series of tort reform measures," [148] and states in relevant part:

> In reviewing a money judgment *in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter* in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation. [149]

The only subsections of CPLR § 4111 that require an itemized verdict are subsections (d) and (e), which concern, respectively, "medical, dental, or podiatric malpractice actions," and "personal injury, injury to property or wrongful death." Neither Liberty's Section 10(b) claim nor its breach of warranty claim fall within these tort law categories. Nevertheless, Vivendi points to past decisions in which

federal courts have applied CPLR § 5501(c) outside of the tort context. [150]

**\*533** In any case, even if the "deviates materially" standard applied to the jury's €765 million award on Liberty's state-law-based breach of warranty claim, the more difficult "shocks the conscience" standard would continue to apply to the jury's €765 million award on Liberty's federal section 10(b) claim. "When federal law provides the cause of action, remittitur is appropriate when the jury award includes an identifiable error of a quantifiable amount or is so high as to 'shock the conscience.' " [151]

Thus, even if I were persuaded by Vivendi's argument that the jury's verdict on the breach of warranty claim is excessive under section 5501(c)—which I am not [152]—and even if I were to reduce the breach-of-warranty award on that basis, Liberty would still be entitled to the full €765 million in damages from the jury's verdict on the section 10(b) claim—unless Vivendi succeeded in establishing that the latter verdict shocked the judicial conscience. Vivendi has not done so. The jury faithfully obeyed its instructions, arriving at a reasonable estimate of Liberty's damages that fell between the plausible calculations of the experts.

#### D. Section 10(b) Reliance

Reliance by Liberty upon Vivendi's "deceptive acts is an essential element of the § 10(b) private cause of action." [153] The Supreme Court has found

> a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the **\*534** market price of the security. Then it can be assumed that an investor who buys or sells stock

at the market price relies upon the statement.[154]

The jury instructions reflected these principles:

Liberty must prove by a preponderance of the evidence that it relied upon the statements Vivendi made to the public. In order to satisfy this element, Liberty must prove that it read or heard the false and misleading statement and relied on it, and that its reliance was reasonable and justified....

...

What Liberty must prove to establish reliance depends on whether the particular statement in question was a misstatement or an omission. To prove that it relied on a misstatement that Vivendi made, Liberty must prove that, but for the misstatement that Vivendi made, Liberty would not have signed the Merger Agreement.

With respect to an omission—that is Vivendi's failure to state a material fact that was necessary to prevent the statements that were made from being misleading under the circumstances—Liberty is entitled to a presumption of reliance. An omission is material if there is a substantial likelihood that a reasonable investor would have considered the omitted fact to be important in making investment decisions regarding Vivendi's stock.[155]

The instructions then described how Vivendi could rebut the presumption of reliance regarding material omissions. The instructions also reflected my ruling before trial that the fraud-on-the-market presumption only applied in a very limited sense.[156]

At trial, Liberty introduced evidence that Robert Bennett, Liberty's CEO, directed Liberty Vice President Neal Dermer to perform due diligence and formulate a recommendation on a Vivendi investment; Bennett and John Malone, Liberty's Chairman, expected Dermer to review public information about Vivendi, including SEC filings and press releases; during his review, Dermer read all or nearly all of the twenty-five material misrepresentations presented to the jury;[157] Dermer's review of these misrepresentations affected his conclusion that Vivendi's stock was fairly valued and his recommendation; and Bennett and Malone relied on Dermer's recommendation when they decided to sign the Merger Agreement.[158]

**\*535** At the conclusion of trial, the jury answered "YES" to the following question on the Special Verdict Form regarding Liberty's Section 10(b) claim: "Has Liberty proven, by a preponderance of the evidence, that it justifiably relied on any of the statements set forth in Table A when it signed the Merger Agreement with Vivendi on December 16, 2001?"[159] As will be discussed at greater length below, Table A contained the list of Vivendi's twenty-five "False or Misleading Statements That Misstated or Omitted Vivendi's True Liquidity Risk That Were Made Prior to [the] Signing of the Liberty Contract."[160]

Vivendi argues that based on the evidence at trial, Liberty "utterly failed" to prove reliance under Section 10(b),[161] and thus that the jury's finding of Section 10(b) reliance lacked a "legally sufficient basis" and must be rejected.[162] Vivendi's argument is factually detailed, but ultimately depends on the false premise that in order to establish reliance, Liberty needed to prove that someone with the authority to sign or close the transaction personally reviewed some or all of the twenty-five misrepresentations, or reviewed an analysis that specifically dealt with the misrepresentations.[163]

The only legal support Vivendi offers for this position is a brief 1987 decision, *Zaro v. Mason,* in which the District Court found that three individual plaintiffs had failed to show Section 10(b) reliance on a misstatement in the offering memo for a limited real estate partnership.[164] In *Zaro,* however, the three plaintiffs who failed to prove Section 10(b) reliance had neither read the misstatement at issue nor relied on representations from an agent that were based on a review of the misstatement.[165] By contrast, Liberty, through its corporate agent Dermer, actually read all or nearly all of the misrepresentations at issue in the present case.

It is a general rule " 'that a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority.' "[166] As the jury was instructed: "Vivendi and Liberty are corporations and thus can only act through their agents. That is, statements and actions by Vivendi and Liberty employees acting within the scope of their employment are imputed to the corporation."[167] Because Dermer was an employee of Liberty, and because his analysis of the Vivendi investment took place within the scope of his employment,

a reasonable juror could have found that Liberty read the misrepresentations that Dermer read. [168]

**\*536** The reliance requirement of Section 10(b) ultimately aims to ensure "that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists." [169] Even if the jury viewed all twenty-five of Vivendi's misrepresentations as misstatements rather than omissions, [170] Liberty provided sufficient evidence of the requisite causal connection between Vivendi's misrepresentations and Liberty's injuries. A reasonable juror could have inferred that if Vivendi had accurately stated its liquidity risks—or remained entirely, conspicuously silent regarding its financial health—Dermer's analysis would have been materially different, and the Merger Agreement, at least in the form it ultimately took, would not have been signed. [171]

### E. Vivendi's Obligation to Close the Transaction

Even if Liberty justifiably relied on Vivendi's fraud in signing the Merger Agreement on December 16, 2001, Vivendi could have broken the chain of causation between this justifiable reliance and Liberty's losses by showing that before Liberty *closed* the transaction, on May 7, 2002, Liberty knew or should have known of Vivendi's fraud and was free to walk away. **\*537** The jury was thus instructed that Vivendi could defend itself against Liberty's proof of Section 10(b) causation by showing the following:

> after signing the Merger Agreement on December 16, 2001 but prior to closing on the Agreement on May 7, 2002, (1) Liberty knew or should have known of Vivendi's fraud, such that Liberty's continued reliance on the statements made on or before December 16, 2001, was utterly unreasonable, foolish, or knowingly blind, and ... (2) Liberty could have walked away from its obligations under the Merger Agreement. [172]

Questions 10 and 11 on the Special Verdict Form addressed this defense. Question 10 asked: "Has Vivendi proven ... that

Liberty was not legally obligated to close the transaction embodied in the Merger Agreement?" If the jury answered "NO," the form told the jury to proceed to Question 12, the calculation of Section 10(b) damages. If the jury answered "YES," the form told the jury to proceed to Question 11, which asked: "Has Liberty proven ... that Liberty's decision to close the Merger Agreement, on May 7, 2002, in reliance on any of the statements set forth in Table A caused Liberty to suffer an economic loss?" [173] If the jury answered "YES," it was directed to proceed to the damages calculation in Question 12; if "NO," to sign the verdict sheet without calculating damages. [174]

After deliberation, the jury answered "NO" to Question 10, and—as instructed—proceeded to the calculation of damages in Question 12 without addressing the issue of post-signing reliance in Question 11. [175] Vivendi now argues that no reasonable juror could have answered "NO" to Question 10 based on the evidence at trial. [176] In Vivendi's view, Liberty was not legally obligated to close the Merger Agreement when Liberty did so on May 7, because under the terms of the Merger Agreement, Liberty was only obligated to close if certain conditions were met. [177] Vivendi argues that no reasonable juror could have found that the following two conditions were met: (i) Vivendi's "Registration Statement shall have been declared effective by the SEC under the Securities Act," [178] and (ii) Vivendi "shall have performed or complied in all respects" with its obligation to obtain a waiver of the right of first refusal held by other holders of MTH shares. [179] Vivendi further argues that the jury's erroneous finding in Question 10 significantly impacted the verdict, because if the jury had answered "YES" to Question 10, it would have proceeded to Question 11 and could have answered "NO" there, which would have resulted in no Section 10(b) damage award against Vivendi. [180]

**\*538** Liberty does not dispute that (i) and (ii) were conditions for Liberty's obligation to close. But Liberty argues that a reasonable juror could have found that both conditions were satisfied. [181] Liberty also argues that Vivendi waived its challenge to the jury's verdict on Question 10, because Vivendi failed to move for the exclusion of Question 10 from the verdict form before deliberations began. [182] Vivendi concedes that its Rule 50(a) motion did not argue for judgment as a matter of law on the issue of whether closing conditions (i) and (ii) had been met before May 7. Vivendi argues, however, that it was not required to make such an argument

in its Rule 50(a) motion, because it filed the motion before having the opportunity to present evidence in support of its closing-conditions defense.[183]

It is true that Vivendi filed its Rule 50(a) motion at the close of plaintiffs' case. But Vivendi could have moved under Rule 50(a) again at the close of evidence, before the jury began deliberations.[184] Thus, Vivendi could have raised its closing-conditions challenge in a Rule 50(a) motion after it had been fully heard on its affirmative defense and before the case was submitted to the jury. By failing to do so, Vivendi waived its ability to bring the challenge under Rule 50(b). As noted above, however, waiver under Rule 50 does not imply waiver under Rule 59.[185] I thus consider Vivendi's challenge to the jury's answer to Question 10 under Rule 59.

*First,* with regard to the Registration Statement condition, a reasonable juror could have found the following facts: (1) Under the Merger Agreement, the parties agreed that if Vivendi had not met the closing conditions by the end of September 2002, either party could walk away from the deal.[186] As Vivendi's lead lawyer for the United States testified, "[W]e had until the end of September [2002] effectively to satisfy both of those closing conditions," that is, conditions (i) and (ii) above. Until then, "Liberty could not walk away because of those conditions not being satisfied."[187] (2) On May 7, 2002, Liberty closed on the Merger Agreement and signed a Letter Agreement waiving the Registration Statement condition in exchange for a modification in another provision of the Merger Agreement.[188] (3) On June 3, 2002, Vivendi's Registration Statement was declared effective by the SEC.[189]

Vivendi does not dispute that a reasonable jury could have found these facts.[190] Rather, Vivendi suggests that no inferences **\*539** can be reasonably drawn from these facts that would support the jury's verdict.[191] I disagree. It is true that there is a narrow, trivial sense in which the jury's response to Question 10 could be viewed as erroneous. But there is a far more relevant and significant sense in which the jury's response to Question 10 was reasonable—and indeed, may have been the only reasonable inference from the evidence introduced at trial.[192]

Setting aside for a moment the issues raised by the May 7 Letter Agreement, discussed below, and assuming provisionally that none of the other closing conditions were unmet when Liberty closed, I turn to the language of Section 6.03 of the Merger Agreement. This section states in relevant part: "The obligation of the Liberty Parties to consummate the Transactions is subject to the satisfaction *on the Closing Date* of the following conditions, any one or more of which conditions may be waived ..."[193] One of the conditions is: "The Registration Statement shall have been declared effective by the SEC under the Securities Act."[194] In the event, the SEC had not declared the Registration Statement effective by the closing date of May 7, 2002. As a result, the Registration Statement condition was not satisfied on the closing date. Because Liberty's obligation to close was, strictly speaking, subject to the satisfaction on the closing date of the Registration Statement condition, there is a literalistic sense in which Liberty never incurred an obligation under Section 6.03 to close. That is, under a literal application of Section 6.03 to the chronology of Liberty's closing, by closing before the registration statement became effective, Liberty ensured that the legal obligation to close under Section 6.03 would never come into effect.

As this chain of reasoning already suggests, however, there is another, more significant sense in which Liberty's decision to close on May 7, prior to the effective date of the registration statement, had no effect on its obligation to close on the Merger Agreement. Section 6.03 does not state that Liberty was free to walk away from the Merger Agreement until the moment when the SEC declared the Registration Statement effective. To the contrary, as the parties understood,[195] and as the Merger Agreement stated,[196] the parties had until September 30 to satisfy the conditions. If Liberty had attempted to walk away from the Merger Agreement on May 7, rather than closing, the Merger Agreement made clear that Liberty's attempt to walk away could prove futile: Vivendi's satisfaction of the Registration Statement condition at any time before September 30 would have obligated Liberty to close despite any attempt to walk away.[197] In other words, it was only *by closing* that Liberty avoided the risk of being *obligated to close* under Section **\*540** 6.03.[198] Because Liberty was neither free to walk away after it closed nor before it closed, the Registration Statement condition never provided a basis for Liberty to escape its legal obligation to close the Merger Agreement.

A reasonable juror could thus have found that Vivendi did not prove the Registration Statement condition provided Liberty with an avenue for avoiding its legal obligation to close the Merger Agreement. Vivendi's challenge to the jury's rejection

of Vivendi's closing-conditions defense is without merit to the extent that the challenge is based on the Registration Statement condition.[199]

I now turn to the effect of the May 7 Letter Agreement, which was excluded from the foregoing analysis. As noted above, in the Letter Agreement, signed on the day of closing, Liberty waived the Registration Statement condition in exchange for a modification in another provision of the Merger Agreement.[200] Vivendi **\*541** cites the Letter Agreement in its brief, apparently as further evidence that the Registration Statement had not been declared effective by May 7.[201] There is no dispute, however, that the Registration Statement was not declared effective until June 3. The Letter Agreement would only be relevant to the present analysis if it had freed Liberty to walk away from the Merger Agreement. In fact, the Letter Agreement did the opposite: it removed what still appeared (incorrectly, as it turned out) to be a potential avenue for walking away. By signing the Letter Agreement and thereby waiving the Registration Statement condition, Liberty imposed a legal obligation on itself to close even if the Registration Statement was never declared effective.

*Second,* as noted above, another closing condition in the Merger Agreement required Vivendi to obtain a waiver of the right of first refusal held by other holders of MTH shares.[202] Vivendi argues that no reasonable juror could have found based on the evidence at trial that Vivendi satisfied the MTH waiver condition.[203] As a result, Vivendi argues, no reasonable juror could have found that Liberty was obligated to close on the Merger Agreement, and the jury's answer to Question 10 requires a new trial under Rule 59.[204]

The jury heard conflicting evidence regarding the satisfaction of the MTH waiver condition. The dispute between the parties turns in large part on a letter that Vivendi forwarded to Liberty on March 19, 2002. At the time, Vivendi presented the letter as "confirming that Lagardere Active Broadcast will not exercise its right of first refusal under the Multithematique Cooperation Agreement."[205] The crux of Vivendi's post-trial argument is that the March 8 letter from Lagardere (the "Lagardere Letter") did *not* in fact satisfy the MTH waiver condition, and thus that Liberty was free to walk away from the Merger Agreement on this basis.

On the one hand, Vivendi notes that prior to closing, Liberty itself questioned whether the Lagardere Letter satisfied the

MTH waiver condition.[206] For example, when Liberty received the letter, it responded by writing that it did not "quite see how this letter meets the requirements of the merger agreement," and noted language in the letter that "casts doubt in our minds as to the validity of this letter as a waiver of the [right of first refusal] rights."[207] Liberty concluded: "Therefore, we consider it imperative that Vivendi obtain a clear, irrevocable waiver from Lagardere...."[208] Later, Vivendi notes, Liberty proposed and the parties entered into an Indemnification Agreement that required Vivendi to indemnify Liberty for any losses "directly or indirectly related to, based upon, arising out of or otherwise in respect of (i) Vivendi's failure to satisfy in full its obligations pursuant to and in accordance with Section 5.01(e) of the Merger Agreement," which contains the MTH waiver condition.[209]

**\*542** On the other hand, Liberty notes that Vivendi forwarded Liberty a March 12 letter from Messier to Lagardere confirming Lagardere's waiver of the right of first refusal.[210] At the time, Vivendi argued "that the original [March 8] letter, combined with the fact of Lagardere's cooperation to date ... and the absence of a response from them to [Messier's letter] to date, together satisfy the requirements of obtaining the necessary waivers."[211] Vivendi also provided, at closing, an "Officer's Certificate" warranting that it had "performed or complied in all respects with" the MTH waiver condition.[212]

Based on the evidence introduced at trial, a reasonable juror could have found that Liberty was not free to walk away from the Merger Agreement based on the MTH waiver condition having not been satisfied. While the evidence suggested *uncertainty* as to whether the Lagardere Letter satisfied the MTH waiver condition, none of the evidence established that the Letter *in fact* failed to satisfy the condition. A reasonable juror could have found that Liberty insisted on the Indemnification Agreement in order to protect itself against the risk created by the uncertainty around the Lagardere Letter, not because it had been definitively established that the Letter failed to satisfy the waiver condition. The fact that Liberty questioned the validity of the Letter before, and now defends it—while Vivendi defended its validity before, and now questions it—illustrates the lack of clarity regarding the effect of the Letter on the waiver condition.[213]

In the face of such uncertainty, it is appropriate to defer to the jury's findings. Because a reasonable juror could have found

that the MTH waiver condition was adequately satisfied despite the lack of certainty regarding the legal effect of the Lagardere Letter, the waiver condition does not provide a basis for concluding that the jury's answer to Question 10 was seriously erroneous.

Viewing the evidence concerning both the Registration Statement condition and the waiver condition together, a reasonable juror could have found that Liberty was never free to walk away from the Merger Agreement based on unsatisfied closing conditions. The jury's answer to Question 10 was thus not seriously erroneous, and there was no need for the jury to answer Question 11. Vivendi is not entitled to a new trial under Rule 59.

### F. Challenges to Admitted Evidence

Vivendi argues that at trial Liberty introduced "highly prejudicial evidence that was not relevant to any issue before the jury," and that as a result Vivendi should be granted a new trial under Rule 59, which permits the granting of a new trial " 'if substantial errors were made in admitting or excluding evidence.' "[214] Specifically, **\*543** Vivendi argues that the Court allowed the introduction of evidence "related solely to falsity—an element of Liberty's Section 10(b) claim that was not before the jury" because of the Court's collateral estoppel order.[215]

The evidence challenged by Vivendi related to: (1) Vivendi having engaged in "earnings management" to boost its reported earnings; (2) Vivendi having failed to disclose the role of one-time "purchase accounting benefits" in its reported EBITDA growth; (3) Vivendi having concealed its obligation to purchase an additional stake in a Moroccan telephone company, Maroc Telecom; and (4) Vivendi having failed to consolidate earnings with an affiliate, Telco, which allowed Vivendi to report less debt.[216] Vivendi suggests that Liberty used these categories of evidence only "to show that Vivendi had made false statements and had lied regarding the true nature of its liquidity risk."[217]

Liberty argues that Vivendi's evidentiary challenges are waived because Vivendi failed to object when the Court issued its pretrial rulings limiting Liberty's evidence and, for the most part, failed to object during trial to the introduction of the evidence it now contests.[218] But before trial Vivendi challenged the evidence it challenges now, using many of the same arguments it uses now.[219] Given the rapid pace of

the pretrial proceedings, the definitive nature of the Court's rulings, and Vivendi's clearly stated disagreement with those rulings, it would have been a formalism to have required Vivendi to explicitly repeat, after each ruling with which it obviously disagreed, that it continued to disagree and thus preserved its objection.[220]

Thus, Vivendi's challenges to the evidence introduced at trial were not waived. They are, however, without merit. *First,* some discussion of the four categories of evidence challenged by Vivendi was obviously necessary for the jury to have a basic understanding of the facts of the case. Vivendi is incorrect to the extent that it argues the jury should have determined—or indeed could have determined—whether Liberty suffered damages caused by its justifiable reliance on Vivendi's fraud, without being exposed to relatively detailed evidence concerning the nature of that fraud and how the fraud was causally related to Liberty's losses.

In addition, the jury was instructed that Liberty was required to "show that its reliance was reasonable or justified":

> [I]f through minimal diligence Liberty should have discovered the statements were false or misleading, Liberty's reliance would not be justified. In deciding **\*544** whether Liberty justifiably relied on the misstatements, you may consider evidence of:
>
> ...
>
> 3. Liberty's access to relevant information;
>
> 4. Vivendi's concealment of the fraud;
>
> 5. Liberty's opportunity to detect the fraud; and
>
> 6. the generality or specificity of the misrepresentation.[221]

Much of the evidence that Vivendi now challenges was relevant to showing how difficult it would have been for Liberty to uncover Vivendi's fraud, and thus that Liberty's reliance on the fraud was justified.[222] Indeed, one of Vivendi's primary defenses at trial was that Liberty's reliance on Vivendi's fraud was unjustified because Liberty failed to take adequate steps to uncover the fraud.[223] It would have been unfair to Liberty to preclude it from introducing evidence of the difficulties of investigating Vivendi's fraud and the extent to which the fraud was concealed even within Vivendi.

*Second,* the evidence challenged by Vivendi was not unfairly prejudicial, and certainly was not "so clearly prejudicial to the outcome of the trial"[224] that a new trial is warranted. The jury was instructed of the falsity of Vivendi's statements, so evidence related to that falsity would have been unlikely to prejudice the jury unless it were presented in an inflammatory or otherwise inappropriate way. Vivendi provides no persuasive examples of Liberty exploiting the evidence related to Vivendi's fraud in such a way.[225] To the contrary, Liberty's counsel made efforts during the trial to prevent witnesses from offering prejudicial testimony, in accordance with my pretrial rulings.[226]

In sum, Vivendi has neither provided grounds for revisiting my pretrial evidentiary rulings, nor provided persuasive evidence that Liberty departed from those rulings at trial in such a way as to warrant a new trial.

## V. CONCLUSION

For the foregoing reasons, Vivendi's renewed motion for judgment as a matter of law pursuant to Rule 50(b), or, in the alternative, for a new trial pursuant to Rule 59, is DENIED. The Clerk of Court is not required to take any action, as there **\*545** is no open docket entry corresponding to plaintiffs' motion.

SO ORDERED.

**All Citations**

923 F.Supp.2d 511

---

### Footnotes

1    *See Liberty Media Corp. v. Vivendi Universal, S.A.,* No. 03 Civ. 2175, 2013 WL 105776, at \*1 (S.D.N.Y. Jan. 9, 2013) (ordering entry of final judgment). The jury was instructed as follows: "If you determine that Liberty is entitled to damages on both its breach of warranty claims and its Section 10(b) claims, you should award whatever amount of damages you find that Liberty suffered for *each of these claims* even though this may appear to award the same damages twice. In entering the judgment, the Court will ensure that Liberty does not obtain double recovery for any injury you find that it suffered." Jury Charge ("Jury Charge"), Exhibit ("Ex.") 1 to 8/20/12 Declaration of Julie B. Rubenstein, Liberty's counsel, in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Rubenstein Decl."), at 2930 (emphasis in original).

2    *See Liberty Media Corp. v. Vivendi Universal, S.A.,* 861 F.Supp.2d 262, 268 (S.D.N.Y.2012).

3    *See id.*

4    *See Liberty Media Corp. v. Vivendi Universal, S.A.,* 842 F.Supp.2d 587, 589–90 (S.D.N.Y.2012) (citing *Liberty Media Corp. v. Vivendi Universal, S.A.,* No. 03 Civ. 2175).

5    *See id.* (citing *In re Vivendi, S.A. Sec. Litig.,* No. 02 Civ. 5571).

6    *See In re Vivendi Universal, S.A. Sec. Litig.,* 765 F.Supp.2d 512, 521 (S.D.N.Y.2011). The two types of shares originally at issue were "ordinary shares," which "traded primarily on the Paris Bourse, and did not trade on any U.S. exchange," and "American Deposity Receipts" ("ADRs"), which "were listed and traded on the New York Stock Exchange." *Id.* After the Supreme Court's decision in *Morrison v. National Austl. Bank Ltd.,* —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), Judge Holwell dismissed the claims of purchasers of ordinary shares. *See In re Vivendi,* 765 F.Supp.2d at 533–34.

7    *See Liberty Media,* 842 F.Supp.2d at 589.

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6955    Page 22 of 113

8      *See id.* at 590.

9      *See In re Vivendi,* 765 F.Supp.2d at 520.

10     *See id.* at 523–25.

11     *See Liberty Media,* 861 F.Supp.2d at 272–74.

12     *See Liberty Media,* 2013 WL 105776, at *1.

13     Fed.R.Civ.P. 50(a)(1).

14     *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir.2001) (quotation marks and citation omitted). *Accord Caceres v. Port Auth. of N.Y. & N.J.,* 631 F.3d 620, 622 (2d Cir.2011).

15     *Altria Grp., Inc. v. United States,* 658 F.3d 276, 290 (2d Cir.2011) (quoting *Kosmynka v. Polaris Indus., Inc.,* 462 F.3d 74, 79 (2d Cir.2006)). "It is rare that the party having the burden of proof on an issue at trial is entitled to a directed verdict." *Granite Computer Leasing Corp. v. Travelers Indem. Co.,* 894 F.2d 547, 551 (2d Cir.1990) (citing *Service Auto Supply Co. of P.R. v. Harte & Co.,* 533 F.2d 23, 24–25 (1st Cir.1976); *Powers v. Continental Cas. Co.,* 301 F.2d 386, 388 (8th Cir.1962)).

16     *Caruolo v. John Crane, Inc.,* 226 F.3d 46, 54 (2d Cir.2000) (quotation marks and citation omitted).

17     *Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41, 51 (2d Cir.2012) (quoting *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.,* 290 F.3d 98, 106 (2d Cir.2002)).

18     *CBS, Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y.2d 496, 503, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990).

19     *See Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 642 (S.D.N.Y.1999); *Ainger v. Michigan Gen. Corp.,* 476 F.Supp. 1209, 1220–21 (S.D.N.Y.1979). *See also CBS,* 75 N.Y.2d at 503, 554 N.Y.S.2d 449, 553 N.E.2d 997.

20     *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 478 n. 1 (2d Cir.2008).

21     *In re Vivendi,* 765 F.Supp.2d at 555 (citations omitted).

22     *See* Vivendi's Memorandum of Law in Support of Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Viv. Mem.") at i–ii. Because Vivendi offers no arguments in support of its previously rejected contention that "Liberty's breach of warranty claims should have resulted in dismissal under the Securities Litigation Uniform Standards Act of 1998 ('SLUSA')," and that "Liberty was not entitled to collateral estoppel with respect to the falsity, materiality, and scienter elements of Liberty's Section 10(b) claim and partial summary judgment with respect to section 3.11 of the Merger Agreement," I will not repeat the Court's reasoning here. Viv. Mem. at 3 n. 2. *See also Liberty Media,* 861 F.Supp.2d at 264–66, 269–74.

23     Viv. Mem. at 2, 5–6.

24     *See id.* at 5.

25     Jury Charge at 27. *See generally In re Vivendi Universal, S.A. Sec. Litig.,* 634 F.Supp.2d 352, 360 (S.D.N.Y.2009) ("Proving loss causation is prescribed by statute for actions under Section 10(b) and Rule 10b–5." (citing 15 U.S.C. § 78u–4(b)(4))).

26    *See* Viv. Mem. at 6.

27    *See Dura,* 544 U.S. at 342–43, 125 S.Ct. 1627 (noting that a lower stock price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events").

28    *See* Jury Charge at 27.

29    *See In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 36 (2d Cir.2009) (quoting *Dura,* 544 U.S. at 342–43, 125 S.Ct. 1627). *Accord In re Vivendi,* 634 F.Supp.2d at 364–65 (holding that "[t]o demonstrate the connection between the events and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events." (citing *Dura,* 544 U.S. at 342–43, 125 S.Ct. 1627; *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 158 (2d Cir.2007))).

30    *See* Transcript of May–June 2012 Liberty Action Trial ("Tr.") 6/13 at 18781891; Tr. 6/14 at 1911; Excerpts from Dr. Blaine Nye's Demonstrative Slides ("Viv. Nye Slides"), Ex. 1 to 7/23/12 Declaration of Caitlyn M. Campbell, Vivendi's counsel, in Support of Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Campbell Decl."), at 86.

31    *See* Tr. 6/14 at 1903:9–1904:23.

32    *See* Tr. 6/13 at 1878:6–10.

33    *See* Tr. 6/14 at 1911:5–1912:5.

34    *See* Tr. 6/15 at 2121:15–2122:6 ("Q. Were there days where there were statistically significant declines of Vivendi stock net of market and industry that you looked at and did not include in the damages calculation? A. Sure. Those were all taken out.").

35    Tr. 6/14 at 1936:4–23. Liberty provides no citation to Dr. Nye explicitly stating that he found no non-fraud-related company-specific negative events on the nine days of materialization events, but a jury could reasonably have inferred this from the statements above.

36    *Id.* at 2051:14.

37    *See* Tr. 6/13 at 1879:1–8.

38    *See* Tr. 6/19 at 2564–2581.

39    *Id.* at 2564:20–22. *See also* Viv. Mem. at 7.

40    Tr. 6/20 at 2773:3–4.

41    *See, e.g., id.* at 2843–2845. To the extent that the ostensible confounding events were liquidity-related and revealed Vivendi's concealed liquidity risk, they would not be confounding events, but materializations of the risk.

42    Jury Charge at 31.

43    *See* Special Verdict Form, Ex. 21 to Campbell Decl., at 7. The discrepancy between Dr. Nye's damages calculation and the jury's award is discussed below in Part IV.C.

44    *See* Viv. Mem. at 8.

45    *See id.* at 5–8; Vivendi's Reply Memorandum of Law in Further Support of Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Viv. Reply") at 2.

46    Viv. Reply at 2.

47    *See* Tr. 6/14 at 2051:14.

48    The absence of confounding events during the nine materialization event windows might also be explained by Dr. Nye having excluded days containing non-fraud related declines prior to selecting the nine materialization event windows, though Dr. Nye's testimony was unclear on this point. *See* Tr. 6/15 at 2121:15–2122:6.

49    In fact, it is not clear that the jury entirely accepted Dr. Nye's testimony and rejected Dr. Silber's on the issue of confounding events. As will be discussed in greater detail below, the jury's reduction of Dr. Nye's damages calculation could have been based in whole or in part on the conclusion that some of Dr. Silber's confounding events *should* have been factored into Dr. Nye's analysis. Thus, even if I were to accept Vivendi's suggestion that Dr. Nye's rejection of all the ostensible confounding events on the nine materialization days fatally undermined his analysis, which I do not, Vivendi would still not necessarily be entitled to judgment as a matter of law or a new trial, because the jury's damages award could be upheld as having incorporated at least some of the confounding events that Dr. Nye rejected.

50    Tr. 6/14 at 1908–1909.

51    *See id.* at 1906, 1908; Viv. Nye Slides at 86.

52    *See* Tr. 6/14 at 1905–1906.

53    *Id.* at 1905.

54    *Id.* (citing Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission,* 49 BUS. LAW. 545, 559 (1994)).

55    *See, e.g., id.* at 2058:11–16, 2602:2–21 (regarding the May 3, 2002 materialization event).

56    *See id.* at 2075:7–2077:20 (regarding the June 21, 2002 materialization event).

57    *See* Viv. Mem. at 8.

58    *Id.* at 10.

59    *Id.* at 11.

60    *See* Def. Mem. at 10. Dr. Nye's most direct statement along these lines may have been when he concluded a discussion of how the market acts on news by stating: "The information starts to hit the market immediately." Tr. 6/14 at 2081:16–17. It is less clear that Dr. Nye endorsed the notion that when news arrives overnight, "there is an initial reaction that's impounded into the opening price." *Id.* at 1907:20–21. This quotation from Dr. Nye's direct examination, presented by Vivendi as Dr. Nye's acknowledgment of the stated principle, *see* Viv. Mem. at 11, in fact appeared in the context of Dr. Nye's summary of an article. *See* Tr. 6/14 at 1907:19–20. To the extent that any conflict exists between the stated principle and Dr. Nye's loss causation and damages analysis, the jury could reasonably have inferred that Dr. Nye did not endorse the stated principle. Alternately, the jury could reasonably have disregarded the stated principle and still accepted Dr. Nye's loss causation and damages analysis: the two are logically independent. That is, one can believe that significant overnight

news does not always display an impact at the opening of trading and still believe that the nine materialization events identified by Dr. Nye caused the share declines in Dr. Nye's one-day event windows.

*See* Liberty's Memorandum of Law in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), or, in the Alternative, for a New Trial Pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Lib. Mem.") at 9–11.

*See* Viv. Mem. at 10.

*See, e.g.,* Tr. 6/15 at 2103:19–21, 2104:24–2105:1.

6/14 Tr. at 1905.

*See* Viv. Mem. at 8–11.

*See id.* at 9–10. The jury was specifically charged that the prior inconsistent statements of non-party witnesses were introduced "solely for the purpose of attacking the credibility of the witness." Jury Charge at 11. In Vivendi's summation, Vivendi's attorney placed the question of Dr. Nye's credibility squarely before the jury. *See* Tr. 6/21 at 2961:6–15 (Vivendi's argument that based on inconsistent testimony in prior cases, "Dr. Nye is simply not worthy of anybody's belief").

*See Tolbert,* 242 F.3d at 70.

*See* Viv. Mem. at 11.

*See id.* at 11–12 (citing Tr. 6/14 at 2058:8–2059:1; Tr. 6/19 2550:15–21).

Lib. Mem. at 11 (citing Excerpts of Dr. Blaine Nye's Demonstrative Slides ("Lib. Nye Slides"), Ex. 8 to Rubenstein Decl., at 3435, 37; Tr. 6/14 at 2066:7–2067:25).

*See, e.g.,* Tr. 6/15 at 2125:1–20.

*See* Tr. 6/19 at 2551:3–8.

*See* Lib. Mem. at 12 (citing 5/2/02 Email from Eileen McLaughlin to Guillaume Hannezo ("McLaughlin Email"), Ex. 9 to Rubenstein Decl.; 5/2/02 Email from Laurence Daniel to Guillaume Hannezo ("Daniel Email"), Ex. 10 to Rubenstein Decl.).

The jury was repeatedly instructed to use its common sense in finding the facts. *See* Jury Charge at 8, 12, 13, 15.

In fact, it is unclear whether the jury made this finding. The jury may have discounted Dr. Nye's damages award in part based on a rejection of Dr. Nye's theory that the share decline prior to 5:12 p.m. resulted from information about Moody's downgrade. Drawing all inferences in favor of upholding the jury's verdict, the jury's verdict could be upheld on this basis even if Vivendi's challenge to Dr. Nye's May 3 analysis were successful, which it is not.

One of the internal Vivendi emails from May 2 reports a third party's statement that Vivendi stock was being shorted because hedge funds thought Vivendi would soon be downgraded by Moody's. *See* McLaughlin Email. The other reports that a third party heard Moody's could downgrade Vivendi. *See* Daniel Email. At trial, I sustained Vivendi's hearsay objection to Dr. Nye's reliance on the emails for the truth of the third parties' assertions. *See* Tr. 6/14 at 1932:921. But I allowed the admission of the emails for the purpose of showing "Vivendi was aware that people were saying this." *Id.* The mere fact that on May 2 Vivendi was discussing possible speculation concerning trading based on a looming Moody's downgrade strengthens the plausibility

of Dr. Nye's theory that news of the downgrade might have leaked prior to any formal announcement, or at the very least that such a leak would not have been out of the ordinary.

77    *See* Lib. Mem. at 11. Liberty suggests that Vivendi's argument is not a sufficiency challenge but is in fact a renewed *Daubert* challenge to Dr. Nye's reliability, and that Vivendi waived the *Daubert* challenge by failing to raise it in either of its two prior *Daubert* motions in this case. *See id.* Vivendi argues that it sufficiently preserved its challenge to Dr. Nye's inclusion of the pre–5:12 p.m. May 3 share decline through general arguments made in prior briefing. *See* Viv. Reply at 5 n.6.

78    *See* Viv. Mem. at 13.

79    *See id.* at 14.

80    *See id.* at 13.

81    *See id.* at 13–14.

82    *See* Lib. Nye Slides at 10.

83    *See id.* at 11.

84    *See, e.g.,* Tr. 6/14 at 2022:22–24.

85    *See* Viv. Mem. at 13–14.

86    *See id.* at 14.

87    *See* Class Action Verdict Form, Ex. 5 to Campbell Decl., at tbl. A ("Class Action Misstatement or Omission Table").

88    *See* Special Verdict Form, Ex. 13 to Rubenstein Decl., at tbl. A ("Liberty Misstatement or Omission Table").

89    *See* Viv. Mem. at 15 & n. 9 (citing 12/16/01 Agreement and Plan of Merger and Exchange ("Merger Agreement"), Ex. 6 to Campbell Decl., §§ 3.08, 3.11).

90    *See* Class Action Misstatement or Omission Table.

91    *See* Viv. Mem. at 15 (citing Tr. 6/14 at 2012:11–23).

92    Once again, however, even if I were to accept this conclusion, which I do not, the jury's verdict would not need to be disturbed. The jury could have corrected for Dr. Nye's hypothetical error on this point by discounting Dr. Nye's damages calculation.

93    As Vivendi itself recognized in its 50(a) motion, "Dr. Nye did not calculate the amount of inflation in Vivendi's share price that was caused by any particular alleged misstatement or omission identified by Liberty." Vivendi's 6/15/12 Memorandum of Law in Support of Motion for Judgment as a Matter of Law ("Viv. 50(a) Mot.") at 14.

94    Jury Charge at 29.

95    It is true that viewing the liquidity risk in this case in such a binary way—as though investors only considered whether the risk existed, or not, rather than viewing the risk in terms of the likelihoods of various crisis-related events—could gloss over potentially significant differences between the damages suffered by the Class and by Liberty. For example, if some of the statements or omissions admitted in the Class Action trial but not in

the Liberty trial had suggested that there was no more than a five percent chance of a liquidity crisis, while the most positive statements or omissions admitted in the Liberty trial had suggested that there was no more than a twenty-five percent chance of a liquidity crisis, and if the market inflated Vivendi's stock price based on the claims of a five percent or smaller risk, then Liberty would not have been entitled to damages resulting from the fall in Vivendi's stock price from the height it actually reached based on the five percent claims to the height it would have reached if the market had only heard the twenty-five percent claims. Such speculation, however, hardly compels the striking of Dr. Nye's testimony, the entry of judgment as a matter of law, or the granting of a new trial. Dr. Nye's methods in the present case were adequate to meet the Second Circuit's standards for the proof of loss causation and damages, according to which plaintiffs are not " 'required to allege the precise loss attributable' to defendants' fraud." *In re Vivendi,* 634 F.Supp.2d at 365 (quoting *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 177 (2d Cir.2005)). *See also Lattanzio,* 476 F.3d at 158 (suggesting that Section 10(b) obligates plaintiffs to allege facts "that would allow a factfinder to ascribe some rough proportion of the whole loss" to defendants' misstatements).

96 Jury Charge at 27.

97 *See In re Vivendi,* 765 F.Supp.2d at 555–60.

98 *See* Lib. Mem. at 16.

99 *Id.* at 18 (quoting *Lentell,* 396 F.3d at 173; *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 511 (2d Cir.2010)).

100 *See* Jury Charge at 27–28; Lib. Mem. at 16–18 (analyzing *Lentell,* 396 F.3d at 173; *In re Omnicom,* 597 F.3d at 511).

101 *See* Lib. Mem. at 16, 23.

102 *See id.* at 15.

103 *Lore v. City of Syracuse,* 670 F.3d 127, 153 (2d Cir.2012) (quoting Fed.R.Civ.P. 50 Advisory Committee Note (2006) (emphasis omitted)).

104 *Id.* (citing *Kirsch v. Fleet St., Ltd.,* 148 F.3d 149, 164 (2d Cir.1998); *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 287 (2d Cir.1998)).

105 *Compare* Viv. 50(a) Mot. at 11–15; *and* Viv. Mem. at 16–18. Vivendi's Rule 50(a) brief states that "Liberty has failed to prove that Vivendi's false or misleading statements *caused* the losses they suffered." Viv. 50(a) Mot. at 2. But the details of Vivendi's Rule 50(a) loss causation argument contain no hint that materialization events need to be perceived as "remote or highly unlikely," or that materialization events must reveal some fact directly traceable to the "specific misrepresentation alleged." *Id.* at 2, 11–15. Vivendi suggests in its reply brief that its citation of *Lentell* and *Omnicom* in the Rule 50(a) motion somehow provide a sufficient foundation for the arguments in its renewed motion. *See Viv.* Reply at 6 n. 7. However, Vivendi cited those cases in the earlier brief for different legal rules. *See* Viv. 50(a) Mot. at 11, 12. The citations gave no indication of the arguments Vivendi raises now.

106 *See, e.g., Bracey v. Board of Educ. of City of Bridgeport,* 368 F.3d 108, 117–19 (2d Cir.2004) (denying Rule 50(b) motion based on failure to file Rule 50(a) motion, but granting Rule 59 motion).

107 *Lentell,* 396 F.3d at 173 (quoting *Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 188 (2d Cir.2001)).

108    Viv. Mem. at 17 (emphasis added). *See also id.* at 18 ("At trial, Liberty introduced no evidence that ... a reasonable investor misled by the fraud would have perceived the allegedly corrective events as 'remote or highly unlikely.' ").

109    *See In re Vivendi,* 765 F.Supp.2d at 556.

110    *Id.*

111    *See Omnicom,* 597 F.3d at 511–14.

112    *Id.* at 511 (quoting *Lentell,* 396 F.3d at 175 n. 4).

113    *Id.* at 513 (quoting *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 107 (2d Cir.2007)).

114    *Id.* at 511.

115    Viv. Mem. at 18 (quoting *Omnicom,* 597 F.3d at 511).

116    *In re Vivendi,* 765 F.Supp.2d at 559.

117    *In re Vivendi,* 634 F.Supp.2d at 367. As Judge Holwell went on to explain: "if a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity)." *Id.*

118    As even Liberty recognizes, Vivendi's sufficiency arguments do not seem to depend in any straightforward way on its novel legal arguments for elements (i) and (ii). *See* Lib. Mem. at 17.

119    *See* Viv. Mem. at 18–23.

120    *Id.* at 20 (citing Martine Orange, *Vivendi Universal Prepared to Sell Its Stake in Vivendi Entertainment,* LE MONDE, June 10, 2002, Ex. 9 to Campbell Decl.).

121    *See* Lib. Mem. at 20 (citing Tr. 6/14 at 1937:4–1939:12; Lib. Nye Slides at 39–54).

122    Viv. Reply at 7.

123    *Id.*

124    Viv. Mem. at 18 (referring to the January 7 treasury share sale).

125    *Id.* at 19 (referring to the May 3 Moody's downgrade).

126    *Id.* at 20 (referring to July 1–2 downgrades and July 3 analyst and press reports). *Accord id.* at 21 (referring to July 10 S & P press release); *id.* at 23 (referring to August 14 factors as mostly recharacterization).

127    *Id.* at 21 (referring to aspects of July 1 Moody's downgrade). *Accord id.* (referring to July 10 Bloomberg article); *id.* at 22 (referring to July 15 press articles); *id.* (referring to the August 14 factors).

128    *See* Lib. Mem. at 18–23.

129    Viv. Mem. at 19.

130    Lib. Mem. at 19 (citing Tr. 6/14 at 1927:14–21). I also note that even if a ratings agency justified its downgrade entirely through information already known to the market, a reasonable juror could have found that the downgrade *itself* represented a materialization of the liquidity risk: because downgrades involve judgment,

they constitute new information beyond the individual facts offered in support of the judgment. A downgrade is new information for the market even if the stated explanation for the downgrade contains no new facts. *Cf. In re Vivendi,* 634 F.Supp.2d at 367 ("[I]f a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity).").

131    *See, e.g.,* Tr. 6/19 at 2553:8–16 (Dr. Silber testifying that market had already anticipated Moody's downgrade).

132    *See* Special Verdict Form at 5, 7.

133    *See* Tr. 6/13 at 1879; Tr. 6/21 at 3054 (Liberty summation stating damages as €841,942,539); 12/21/07 Expert Report of Blaine F. Nye (stating damages as €842.2 million).

134    *See* Tr. 6/21 at 3054. Without citation, Liberty's brief states the total decline in the value of Liberty's shares in Vivendi between December 16, 2001 and August 14, 2002 as €1.56 billion. *See* Lib. Mem. at 26.

135    *See* Tr. 6/19 at 2582–2584.

136    Viv. Mem. at 24.

137    *Id.*

138    Viv. Reply at 9 n. 9.

139    *See id.*

140    *See In re Vivendi,* 765 F.Supp.2d at 575.

141    Jury Charge at 29.

142    Viv. Mem. at 25.

143    *See First Nat'l Bank of Kenosha v. United States,* 763 F.2d 891, 896 (7th Cir.1985) (upholding verdict where "the jury was presented ... with widely divergent opinions" about quantity of damages, the jury "apparently did not accept whole-cloth the view of either of the experts," and "very possibly ... split[ ] the difference" between the two).

144    Tr. 6/21 at 3054–3055.

145    *See Lattanzio,* 476 F.3d at 158 (requiring plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough proportion of the whole loss" to defendant's fraud); *Lentell,* 396 F.3d at 177 ("We do not suggest that plaintiffs were required to allege the precise loss attributable to [defendant's] fraud....").

146    *In re Vivendi,* 765 F.Supp.2d at 576 (quoting *Dresser Indus., Inc. v. Gradall Co.,* 965 F.2d 1442, 1447 (7th Cir.1992)).

147    *See* Viv. Mem. at 25.

148    *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 423, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

149    CPLR § 5501(c) (emphasis added).

150    Vivendi cites the following cases as examples: *Learning Annex Holdings, LLC v. Rich Global, LLC,* No. 09 Civ. 4432, 2012 WL 2878124, at *6 (S.D.N.Y. July 13, 2012) (applying section 5501(c) in unjust enrichment

and quantum meruit case); *Uni–Rty Corp. v. Guangdong Bldg., Inc.,* No. 95 Civ. 09432, 2012 WL 1901200, at *6 (S.D.N.Y. May 25, 2012) (applying section 5501(c) in breach of contract and fraudulent inducement case); *Health Alliance Network, Inc. v. Continental Cas. Co.,* 245 F.R.D. 121, 131 (S.D.N.Y.2007) (applying section 5501(c) in breach of confidentiality agreement and misappropriation of trade secrets case). *See* Viv. Mem. at 10. The commentary to the statute in McKinney's Consolidated Laws of New York states, inconclusively: "The reference to cases in which an itemized verdict is required by CPLR 4111 appears to restrict the operation of this 5501(c) amendment to the tort case, but the tort case is of course the traditional context of the excess verdict problem." David D. Siegel, *Practice Commentaries,* in 7B McKinney's Consol. Laws of N.Y. CPLR § 5501(c) (2011). *See also* David D. Siegel, New York Practice § 407 (5th ed. 2012) (stating that the "shocks the conscience" standard "was relaxed in 1986 *in tort actions,* including the common personal injury and wrongful death actions in which additur and remittitur are most often seen" (emphasis added)). "[A] federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur." *Payne v. Jones,* 696 F.3d 189, 200 n. 7 (2d Cir.2012) (citing *Gasperini,* 518 U.S. at 429–30, 116 S.Ct. 2211). However, Vivendi has not cited a case in which a New York state court applied the "deviates materially" standard outside the tort context, nor provided any other clear explanation or justification for the practice of federal courts applying the "deviates materially" standard to New York jury verdicts outside of tort law.

151    *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.,* 681 F.Supp.2d 456, 469 (S.D.N.Y.2010) (citing *Kirsch,* 148 F.3d at 165).

152    Vivendi emphasizes that the jury's award in the present case "deviates materially" from the jury's award in the Class Action, where the jury considered the same calculations by Dr. Nye but arrived at a much smaller verdict. *See In re Vivendi,* 765 F.Supp.2d at 524 ("The jury found the daily inflation in the price of Vivendi's [shares] to be approximately half of the daily inflation amount that Dr. Nye had calculated on most days in the Class Period."). Yet Vivendi does not explain why this Court should assume the jury in the present case to be unreasonable and the jury in the prior case to be reasonable, rather than vice versa. One cannot disprove the accuracy of a ruler simply by comparing it to another ruler and observing that one is longer than the other.

153    *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta,* 552 U.S. 148, 159, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

154    *Id.* (citations omitted).

155    Jury Charge at 24–25.

156    *See* Tr. 3/13 at 21:3–21. The Jury Charge incorporated the fraud-on-the-market presumption only in the following sense:

> In setting the ratio in the Merger Agreement at which Vivendi stock was exchanged for USA Networks and [MTH] stock, Liberty was entitled to rely on the fact that the market price of Vivendi stock at the time it signed the Merger Agreement reflected and incorporated all of the information known to the market about Vivendi, including the information contained in Vivendi's false or misleading public statements.

Jury Charge at 24–25.

157    Vivendi argues that Dermer did not review two of the twenty-five statements. *See* Viv. Mem. at 28 n. 12. The issue is immaterial. Just as fifty-seven misrepresentations can cause the same false impression and harm as twenty-five, so can the same false impression and harm be caused by twenty-three. Moreover, the jury was not required to find that Vivendi relied on all twenty-five statements. *See* Special Verdict Form at 6 ¶ 8 ("Has Liberty proven ... that it justifiably relied on *any* of the statements set forth in Table A ...?" (emphasis added)).

158    *See* Tr. 6/6 at 1005–1006; Tr. 6/7 at 1172, 1358–1366; Tr. 6/8 at 1380–1394.

159    Special Verdict Form at 6 ¶ 8.

160    Liberty Misstatement or Omission Table.

161    Viv. Mem. at 27.

162    *Id.* at 29. Vivendi does not challenge Liberty's proof of reliance for the purposes of Liberty's breach of warranty claim. *See id.* at 26–29.

163    *See* Viv. Mem. at 26–29; Viv. Reply at 11–13.

164    *See* Viv. Mem. at 28 (citing *Zaro v. Mason,* 658 F.Supp. 222, 228–29 (S.D.N.Y.1987)).

165    *See Zaro,* 658 F.Supp. at 228–29.

166    *In re Parmalat Sec. Litig.,* 684 F.Supp.2d 453, 472 n. 116 (S.D.N.Y.2010) (quoting 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 790 (perm. ed. 2002)).

167    Jury Charge at 17.

168    Moreover, it would be odd if Section 10(b) required Liberty to prove that Dermer specifically mentioned Vivendi's misrepresentations to his superiors. Precisely because the misrepresentations *concealed* Vivendi's liquidity risk, there may have been no reason for Dermer to mention them specifically.

169    *Stoneridge,* 552 U.S. at 159, 128 S.Ct. 761 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

170    The jury was instructed that "[a]s a result of the prior proceeding, it has already been determined that the statements on which Liberty bases its Section 10(b) claim were materially false/untrue or misleading statements that misstated or omitted Vivendi's true liquidity risk in 2001." Jury Charge at 23. The jury was not asked to determine which of the misrepresentations were misstatements, and which omissions. *See* Special Verdict Form at 6–7. In general, the line between the two is not always clear. For example, misrepresentations 21 and 22 in Table A are the following statement, delivered separately in a press release and a Form 6–K: "VU is in a very strong position, with solid performance in virtually every business." Jury Charge at 26. This statement could be described either as omitting the truth about Vivendi's liquidity risk (that is, failing to state the material fact that the liquidity risk existed, which was necessary to prevent the statement from being misleading under the circumstances), or as misstating Vivendi's financial health. A reasonable juror could have identified this and other, similar misrepresentations either as omissions or misstatements, and on that basis could either have applied the rebuttable presumption of reliance to those misrepresentations or not.

171    Finally, Vivendi argues that it is entitled to judgment on Liberty's entire Section 10(b) claim as a result of *Morrison,* 130 S.Ct. 2869, where the Supreme Court held that "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 2888. To the extent that this argument is not newly raised and thus waived, I already addressed it in my ruling on Vivendi's motion for partial summary judgment:

Having established that the operative date for irrevocable liability is December 16, 2001, ... the multiThematiques transaction was a domestic transaction such that it falls within the scope of [Section 10(b) ] under *Morrison* .... Liberty Media's CEO signed the Agreement in Colorado and faxed his signature page to New York. Messier, Vivendi's CEO, was in New York the morning of December 17, 2001 to announce the agreement, and there is no evidence indicating that he was anywhere else on December 16.

*Liberty,* 861 F.Supp.2d at 268–69. *See also Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 62 (2d Cir.2012) ("[T]o sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."). Vivendi has provided no basis for revisiting my earlier conclusion that the Merger Agreement falls under *Morrison* as interpreted by the Second Circuit.

172     Jury Charge at 28.

173     One of the key elements in Question 11 is "in reliance." If Liberty knew or should have known of Vivendi's fraud by May 7, then it did not close the Merger Agreement in justifiable reliance on the statements in Table A. In any case, as described below, the jury did not reach this question.

174     *See* Special Verdict Form at 6–7.

175     *See id.*

176     *See* Viv. Mem. at 29. Vivendi does not challenge the jury's instructions or the Special Verdict Form.

177     *See id.* at 30 (citing Merger Agreement § 6.03(b)-(c)). Section 6.03 of the Merger Agreement begins by stating: "The obligation of the Liberty Parties to consummate the Transactions is subject to the satisfaction on the Closing Date of the following conditions ...."

178     Merger Agreement § 6.03(c).

179     *Id.* §§ 5.01(e), 6.03(b).

180     *See* Viv. Mem. at 33. As this statement makes clear, the argument in this section concerns only Section 10(b) damages, and not damages for breach of warranty.

181     *See* Lib. Mem. at 31–35.

182     *See id.* at 31.

183     *See* Viv. Mem. at 14–15.

184     *See* Rule 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury."); *Weisgram v. Marley Co.,* 528 U.S. 440, 445, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000) (example of defendant moving under Rule 50(a) at the close of plaintiff's evidence and again at the close of all evidence).

185     *See Bracey,* 368 F.3d at 117–19.

186     *See* Tr. 6/15 at 2158, 2165, 2252 (testimony of Vivendi Senior Vice President and Deputy General Counsel George Bushnell); Merger Agreement § 7.01(iv) (stating that Merger Agreement may be terminated "by any party ... if the Closing does not occur on or prior to September 30, 2002").

187     Tr. 6/15 at 2252.

188     *See* 5/7/02 Letter Agreement ("Letter Agreement"), Ex. 22 to Campbell Decl., at (f)(i); 6/12 Tr. at 1624–1629 (testimony of Liberty General Counsel Charles Tanabe).

189     *See* 6/3/02 SEC Pre-effective Amendment No. 1 to Form F–3 Registration Statement under the Securities Act of 1933 Vivendi Universal, Ex. 30 to Rubenstein Decl.

190    *See* Viv. Reply at 16.

191    *See* Viv. Mem. at 30–31.

192    The logic supporting this conclusion is unavoidably complex. However, because it is necessary to explain my conclusion, I have no choice but to present this reasoning despite its complexity.

193    Merger Agreement at § 6.03 (emphasis added).

194    *Id.* at § 6.03(c).

195    *See* Tr. 6/15 at 2158, 2165, 2252 (Bushnell testimony).

196    *See* Merger Agreement § 7.01(iv) (stating that Merger Agreement may be terminated "by any party ... if the Closing does not occur on or prior to September 30, 2002").

197    Indeed, in the event, the registration statement became effective on June 3. If Liberty had not already closed, it would have been obligated to close on June 3 or in the following days. *See* Tr. 6/12 at 1677:19–22 (Tanabe testimony). Strictly speaking, the fact that the registration statement became effective before September 30 is irrelevant. As Vivendi correctly notes, the jury was instructed not to consider information that only became available after May 7, 2002 in its answer to Questions 10 and 11. *See* Viv. Reply at 16. The Jury Charge states that in making the determination of whether Liberty (1) knew or should have known of Vivendi's fraud, and (2) could have walked away from its obligations under the Merger Agreement, "you will only consider information available as of May 7, 2002." Jury Charge at 28. Nevertheless, the fact that the registration statement did, in fact, become effective before September 30, and would have obligated Liberty to close if it had not done so by then, makes clear the *risk* that would have prevented Liberty from walking away at any time before September 30.

198    Liberty was like an employee faced with the choice between voluntarily resigning and involuntarily being fired at some later date based on a condition that might or might not come to pass. Because the relevant condition in this case—the SEC's declaration of the registration statement's effectiveness—did in fact come to pass, Vivendi's argument that Liberty was not legally obligated to close the Merger Agreement has no more validity than an employer arguing that because an employee voluntarily resigned before being fired, she was never required to lose her job.

199    Another way of presenting the preceding analysis would be to say that Question 10 on the Special Verdict Form contains an ambiguity when applied to the Registration Statement condition. The question can either be interpreted as asking, in line with the jury's instructions: Was Liberty free to walk away from the Merger Agreement, despite the registration statement having become effective after the closing date? Or the question can be interpreted as asking, abstractly and for no apparent reason: Does the word "obligation" in Section 6.03 mean that if Liberty closed on the Merger Agreement before the registration statement became effective, it had no legal obligation to close? I have concluded that the jury adopted the former interpretation, and was correct to do so. Vivendi offers no basis for questioning that conclusion. In the context of the trial as a whole, where Liberty's freedom to walk away from the Merger Agreement was a major issue, the former interpretation is the only natural one.

Even if Vivendi were to offer support for the latter interpretation, however, there would be a further reason to reject it. Vivendi successfully argued against Liberty's attempt to rephrase Question 10 in such a way that the ambiguity discussed here would not have arisen. *See* Tr. 6/19 at 2730–2734 (Liberty's counsel arguing that the question "should track the language used in the charge," and should thus ask: "Has Vivendi proven by a preponderance of the evidence that Liberty could have walked away from its obligation under the Merger Agreement on May 7?"). Because Vivendi was thus to some extent responsible for the ambiguity in Question

10, and did not bring the ambiguity to the Court's or the other party's attention, it would arguably be unfair to allow Vivendi to benefit from the ambiguity. *Cf. C & L Enters. v. Citizen Band Potawatomi Indian Tribe of Okla.,* 532 U.S. 411, 423, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) (noting " 'the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it' " (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995))).

200   *See* Letter Agreement at (f)(i); Tr. 6/12 at 1624–1629 (Tanabe testimony).

201   *See* Viv. Mem. at 30.

202   *See* Merger Agreement §§ 5.01(e), 6.03(b).

203   *See* Viv. Mem. at 31–33.

204   *See id.;* Viv. Reply at 15.

205   3/19/02 Letter from Faiza J. Saeed to Frederick H. McGrath, Ex. 26 to Rubenstein Decl.

206   *See* Viv. Mem. at 31–32.

207   3/19/02 Email from Frederick McGrath to Faiza Saeed, Ex. 23 to Campbell Decl.

208   *Id.*

209   *See* Viv. Mem. at 32 (quoting 5/7/02 Waiver and Indemnification Agreement, Ex. 25 to Campbell Decl., at § 2(a)).

210   *See* Lib. Mem. at 32 (citing 4/2/02 Email from Faiza Saeed to Frederick McGrath ("4/2/02 Saeed Email"), Ex. 27 to Rubenstein Decl.).

211   4/2/02 Saeed Email.

212   5/7/02 Officer's Certificate of Universal Studios, Inc., Ex. 28 to Rubenstein Decl.

213   Moreover, if Liberty *had* walked away from the Merger Agreement based on the Lagardere Letter having not satisfied the MTH waiver condition, and if it had been in Vivendi's interest to enforce the Agreement, Vivendi could plausibly have argued, in court, that the waiver condition was fully satisfied. Liberty's "freedom" to walk away from the Merger Agreement as a result of the Lagardere Letter was, at best, a freedom to walk into a costly lawsuit for breach of contract—with no guarantees that it would prevail. It would be a manifest injustice to free Vivendi from all liability under Section 10(b) simply because Liberty declined to take such a risky course.

214   Viv. Mem. at 34 (quoting Rule 59).

215   *Id.* (citing *Liberty Media,* 861 F.Supp.2d 262).

216   *See id.;* Lib. Mem. at 39. For further factual background on these issues, see *In re Vivendi,* 765 F.Supp.2d at 512, 535–43.

217   Viv. Mem. at 36. *See also id.* at 37 (earnings management evidence "was used *only* to reinforce that Vivendi had lied and acted deceitfully" (emphasis added)).

218   *See* Lib. Mem. at 36.

219    *See, e.g.,* Tr. 5/18 at 190–195, 204–209; Tr. 5/21 at 244–247.

220    *See* Fed.R.Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal."); *United States v. McDermott,* 245 F.3d 133, 140 n. 3 (2d Cir.2001) ("*in limine* objections are covered under Rule 103" (citing Fed.R.Evid. 103, notes, 2000 Amendment)). *See also* Fed.R.Civ.P. 46 ("A formal exception to a ruling or order is unnecessary.... Failing to object does not prejudice a party who had no opportunity to do so when the ruling or order was made.").

221    Jury Charge at 26.

222    *See, e.g.,* Tr. 6/4 at 676–707 (Mintzer testimony).

223    *See, e.g.,* Tr. 6/21 at 2929–2933 (Quinn summation).

224    *Luciano v. Olsten Corp.,* 110 F.3d 210, 217 (2d Cir.1997).

225    *See* Viv. Mem. at 34–39. Vivendi's strongest evidence in support of its speculation that Liberty harbored improper, unspoken motives in its use of fraud-related evidence may be the fact that Liberty's counsel "uttered the words 'false' and/or 'falsity' *sixty* times in his summation alone." *Id.* at 36 n. 15. There is nothing sinister, however, in the frequent use of the terms "false" or "falsity" during summation in a complex case concerned with the consequences of a stipulated series of falsities. Likewise, Vivendi's suggestion that Liberty's counsel "[a]mazingly ... explicitly acknowledged in a post-trial interview that the evidence pertaining to the falsity of Vivendi's statements did not concern reliance, causation, or damages, but rather served to show that Vivendi lied to the market," is a blatant misrepresentation of Liberty's counsel's words, which clearly conveyed the opposite of what Vivendi suggests. *Id.* at 39.

226    *See, e.g.,* Tr. 6/4 at 695:22–25.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

Case 2:20-cv-00368-JNP  Document 207  Filed 02/26/25  PageID.6970  Page 37 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

2022 WL 7374936
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

IN RE TESLA, INC. SECURITIES LITIGATION

Case No. 18-cv-04865-EMC
|
Signed October 13, 2022

**ORDER DENYING MOTION TO EXCLUDE
OPINIONS OF MICHAEL HARTZMARK**

Docket No. 451

EDWARD M. CHEN United States District Judge

### I. INTRODUCTION

**\*1**  Lead Plaintiff Glen Littleton has filed a securities class action against Defendants Tesla, Inc., Elon Musk (Tesla's CEO and former Chairman), and Tesla's Board of Directors (collectively, "Tesla") based on events that took place in August 2018. Mr. Littleton alleges that Mr. Musk made false representations in multiple tweets about taking Tesla from a public to a private company. The detailed factual and legal background for Mr. Littleton's claims is set forth in the Court's summary judgment order. *See* Docket No. 387 (April 1, 2022 Order Granting in Part and Denying in Part Summary Judgment, or "April 1, 2022 Order"). This background information is recounted below to the extent relevant to the present motion.

Currently pending before the Court is Tesla's Motion in Limine No. 2 to Exclude the Opinions of Dr. Michael Hartzmark, Mr. Littleton's loss causation and damages expert. Docket No. 451.[1] For the following reasons, the Court **DENIES** the motion.

### II. FACTUAL AND PROCEDURAL BACKGROUND

A. Factual Background
During the morning and early afternoon of August 7, 2018, Mr. Musk announced via a series of tweets that he was considering taking Tesla from a public to a private company.

First, at 9:48 a.m., Mr. Musk tweeted "Am considering taking Tesla private at $420. Funding secured." Ex. 8 (tweet)[2]; Hartzmark Report ¶ 68. The tweet caused an immediate price jump in Tesla's stock, with Tesla's stock price shooting up to $365.03 per share (just prior to 9:49 a.m.) from $356.85 per share (just prior to 9:48 a.m.) in the first minute of trading. Hartzmark Report ¶ 69. Shortly after Mr. Musk's first tweet, an email to employees was sent to employees and posted on Tesla's website as a blog post regarding "Taking Tesla private." Ex. 12 (website); Hartzmark Report ¶ 70. The email/blog post explained Mr. Musk's rationale for wanting to take Tesla private and conveyed his vision for a "private Tesla." Ex. 12 (website).

At 12:36 p.m., Mr. Musk sent out another tweet: "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote." Ex. 13 (tweet); Hartzmark Report ¶ 70. At the bottom of the tweet, there was a link to the above blog post on "Taking Tesla Private." *Id.*

There was an immediate reaction to Mr. Musk's tweets and the blog post. On the same day that the tweets and blog post were sent out, for instance, several of Tesla's shareholders reached out to Martin Viecha, Tesla's Director of Investor Relations. Mr. Viecha essentially conveyed to these shareholders that there was a "firm offer." *See, e.g.*, Exs. 58, 146, 150; *see also* Hartzmark Report ¶ 79. Analysts and journalists also began to react to the tweets and blog post. *See, e.g.*, Hartzmark Report ¶¶ 72–74 (compiling and quoting from articles published on August 7). Tesla's stock closed at $379.57 per share that evening, which was a statistically significant increase from $356.85 per share, the price per share just prior to Mr. Musk's tweets, at the 1% level. *Id.* ¶¶ 71, 77.

**\*2**  From August 8 to August 12, 2018, hundreds of analyst reports and news articles commented on the prospective deal. *See* Hartzmark Report, Appendix 14 at 23–81 (identifying Tesla-related news articles published during that time). During this time, news sources also reported that the United States Securities and Exchange Commission ("SEC") was probing Tesla over Mr. Musk's tweets. *Id.* ¶¶ 78, 82, 89. By August 11, 2018, news sources reported that lawsuits were being filed against Tesla and Mr. Musk for allegedly violating federal securities law. *Id.* ¶ 102. Although Tesla's stock price during this window fluctuated, *see* Hartzmark Report, Charts 2–4, there were no daily declines that were statistically significant at the 5% level. *Id.* ¶¶ 86, 93, 99.

On August 13, 2018, Mr. Musk posted an update on the Tesla website (as a blog post): "Update on Taking Tesla Private." In the update, Mr. Musk stated, *inter alia*, as follows:

> As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy. As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.
>
> **What has happened so far?**
>
> On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share. This was a 20% premium over the ~$350 then current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st). My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.
>
> After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal [Mr. Musk's brother and also a Board member], a full board meeting was held. During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.
>
> At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders. Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me. They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future. I told the board that I would report back after I had these discussions.
>
> **Why did I make a public announcement?**
>
> The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private. However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time.

> As a result, it was clear to me that the right thing to do was announce my intentions publicly. To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.
>
> **Why did I say "funding secured"?**
>
> Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.
>
> **\*3** .... During the [July 31] meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed and that they were eager to proceed.
>
> I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.
>
> Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.
>
> Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used. However, it would be premature to do so now. I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base. It is appropriate to complete

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6972    Page 39 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

those discussions before presenting a detailed proposal to an independent board committee.

....

**What are the next steps?**

As I mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time. I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options. Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected. If the board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

Ex. 16 (website) (bold in original); Hartzmark Report ¶ 103. Market commentary discussing the blog post was mixed: some analysts viewed the blog post as "contradict[ing] [Musk's] claim" that "funding had been secured," while others interpreted the blog post as indicating that the going private deal was "more likely than previously thought." Hartzmark Report ¶¶ 104–106 (quoting news articles and analyst reports). Tesla's stock price on August 13, 2022, continued to experience minor fluctuations (from a close of $355.49 per share on August 10 to a close of $356.41 per share on August 13), but there were no statistically significant changes at the 5% level. *Id.* ¶ 108.

On August 15, 2018, news sources reported that the SEC had issued subpoenas to Tesla and Mr. Musk regarding the company's privatization plans and Mr. Musk's statements involving funding. *Id.* ¶¶ 115, 117 (summarizing coverage of the subpoenas and SEC investigation). Tesla's stock price, which opened at $341.91, declined slightly and closed at $338.69. *Id.* ¶ 115; Chart 7. This decline was not statistically significant at the 5% level. *Id.* ¶ 120.

 **\*4** On August 16, 2018,[3] the *New York Times* published an article on Mr. Musk and Tesla, titled "Elon Musk Details

'Excruciating Personal Toll of Tesla Turmoil.' " *See* Ex. 19 (article); Hartzmark Report ¶ 127. The article recounted an interview that the *Times* conducted with Mr. Musk. *Id.* The article stated, *inter alia*, that:

Elon Musk was at home in Los Angeles, struggling to maintain his composure. "This past year has been the most difficult and painful year of my career," he said. "It was excruciating."

The year has only gotten more intense for Mr. Musk, the chairman and chief executive of the electric-car maker Tesla, since he abruptly declared on Twitter last week that he hoped to convert the publicly traded company into a private one. The episode kicked off a furor in the markets and within Tesla itself, and he acknowledged on Thursday that he was fraying. [...]

funding, it turned out, was far from secure.

Mr. Musk has said he was referring to a potential investment by Saudi Arabia's government investment fund. Mr. Musk had extensive talks with representatives of the $250 billion fund about possibly financing a transaction to take Tesla private – maybe even in a manner that would have resulted in the Saudis' owning most of the company. One of those sessions took place on July 31 at the Tesla factory in the Bay Area, according to a person familiar with the meeting. But the Saudi fund had not committed to provide any cash, two people briefed on the discussions said.

Ex. 19; Hartzmark Report ¶ 127. Following the release of the *Times* article, various news sources questioned Mr. Musk's leadership and expressed concern regarding his "erratic behavior." Hartzmark Report ¶¶ 131–32 (quoting and summarizing news sources). Tesla's stock price tumbled from a close of $355.45 per share on August 16 to a close of $305.50 per share by market close, which was a statistically significant decrease at the 1% level. *Id.* ¶ 135; Chart 9.

On August 24, 2018, Mr. Musk announced via tweet and blog post on Tesla's website that Tesla would remain a public company. *Id.* ¶ 136.

B. Procedural Background

On January 16, 2019, Mr. Littleton filed the Consolidated Complaint, which is the operative pleading in this case. Docket No. 184 (Consolidated Class Action Complaint). The Consolidated Complaint included allegations regarding nine

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6973    Page 40 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

alleged misrepresentations. *See* Docket No. 224 (Addendum to Complaint) at 1–9.

On January 11, 2022, Mr. Littleton moved for partial summary judgment as to whether four[4] alleged false statements at issue were false and made with the requisite scienter, among other things. Docket No. 352. On April 1, 2022, the Court granted Mr. Littleton's motion in part, finding that the three August 7, 2018 statements—(1) "Am considering taking Tesla private at $420. Funding secured."; (2) "Investor support is confirmed."; and (3) "Only reason why this is not certain is that it is contingent on a shareholder vote"—were false and that Mr. Musk recklessly made those representations. *See* April 1, 2022 Order at 32–33. The Court will refer to these three August 7, 2018 statements as the Musk Tweets.

**\*5** On July 1, 2022, the parties submitted four motions in limine, including the instant *Daubert* motion. Docket Nos. 448, 450–452. The Court ruled on three of these motions during the hearing on July 28, 2022, and took Tesla's motion to exclude Dr. Hartzmark's opinions under submission. *See* July 29, 2022 Min. Entry.

### C. Summary of Dr. Hartzmark's Opinion

Dr. Hartzmark is president of Hartzmark Economics Litigation Practice, LLC. Hartzmark Report ¶ 7. Prior to that role, he served as a Principal and Director at Navigant Economics and an economics professor at the University of Chicago and the University of Michigan. *Id.* ¶¶ 7, 10.

In his report, Dr. Hartzmark examined the economic impact of the three Musk Tweets, which he defined and analyzed as a unit. *Id.* ¶¶ 4 & 4 n.8, 4 n.9. Dr. Hartzmark opined that the misrepresentations in the Musk Tweets caused a price increase of $66.67 per share over the Class Period (which ran from August 7 to August 17). *Id.* ¶¶ 13, 169, 171. To reach this conclusion, Dr. Hartzmark conducted an event study methodology: he examined Tesla's stock reaction to an "event"—the Musk Tweets—and statistically analyzed Tesla's stock price movements to determine within a specified degree of certainty whether the stock fluctuations were caused by the Musk Tweets. *Id.* ¶ 34. Dr. Hartzmark also took steps to disaggregate the general decline in the stock market that occurred during the Class Period, as well as any company-specific information unrelated to the alleged misstatements (*i.e.* potentially confounding information) that could have impacted Tesla's stock price. *Id.* ¶¶ 146–150.

Dr. Hartzmark found quantitative evidence that Tesla's stock price artificially increased by $23.27 on August 7, 2018 as a direct response to the Musk Tweets. *Id.* ¶¶ 13, 76–77. Dr. Hartzmark characterized the initial price jump as artificial inflation due to the "direct effects" of the Musk Tweets. *Id.* ¶ 13, 171. In addition to inflation from these "direct effects," Dr. Hartzmark opined that Tesla's stock price also declined over the course of the Class Period due to "foreseeable consequential effects" caused by disclosures following the Musk Tweets that exposed their falsity. *Id.* ¶¶ 4, 13. These consequential effects included, for instance, Tesla's increased legal risks amid scrutiny from the SEC and Tesla's reduced management credibility. *Id.* Dr. Hartzmark opined that these consequential effects, which were "inextricably bound and causally-linked to the Musk Tweets," resulted in artificial inflation totaling $43.40 per share as of the close of trade on August 7, 2018. *Id.* ¶¶ 4, 13, 171.

Tesla charges that Dr. Hartzmark's methodology is unreliable for six reasons. First, Tesla takes issue with Dr. Hartzmark's "unprecedented" leakage model. *See* Docket No. 451 (Defendants' Motion in Limine to Exclude the Opinions of Michael Hartzmark, or "Mot.") at 5. Second, Tesla contends that Dr. Hartzmark fails to separate any loss caused by corrective information from disclosure of other company-specific information. *Id.* at 4. In particular, Tesla argues that Dr. Hartzmark fails to account for the impact of Mr. Musk's truthful statements (*i.e.* that he was considering taking Tesla private at $420) when considering the loss caused by the first tweet. *Id.* Third, Tesla charges that Dr. Hartzmark does not disaggregate other confounding information. *Id.* at 6–7. Fourth, Tesla argues that Dr. Hartzmark selected an inappropriate "corrective interval" that runs through August 17, 2018. *Id.* at 8. Fifth, Tesla argues that his model does not satisfy the requirement of demonstrating a statistically significant decline at the 5% level. *Id.* Finally, Tesla argues that "consequential damages" arising from "consequential effects" such as shareholder lawsuits or negative news coverage are not recoverable in a securities class action. *Id.* at 8–9.

**\*6** Mr. Littleton responds that Dr. Hartzmark's methodology and his leakage model are well-suited to evaluate loss causation given the facts of the case. Docket No. 451-1 (Plaintiff's Opposition to Defendants' Motion in Limine No. 2 to Exclude the Opinions of Michael Hartzmark, or "Opp.") at 3–4. In Mr. Littleton's view, Tesla's criticisms regarding disaggregation are conjecture or factual questions for the

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.6974   Page 41 of
113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

jury that go to the weight of Dr. Hartzmark's opinions, not their admissibility. Opp. at 4. Mr. Littleton also defends Dr. Hartzmark's disaggregation analysis, *id.* at 4–7, and the inclusion of consequential damages (such as reputational harm and concerns over corporate governance) that Dr. Hartzmark found were proximately tied to the Musk Tweets. *Id.* at 9–10.

### III. LEGAL STANDARD

Under *Daubert*, in assessing the admissibility of expert testimony under Federal Rule of Evidence 702,[5] the Court must perform "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 592–93 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (explaining that *Daubert* standards apply to all expert testimony, not only scientific experts). The Supreme Court has identified a non-exhaustive list of factors that may bear on the inquiry:

- whether the theory or technique can be or has been tested;

- whether the theory or technique has been subjected to peer review and publication;

- the known or potential rate of error with a scientific technique;

- acceptance of the technique by a relevant scientific community;

*Daubert*, 509 U.S. at 593–94; *see also United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). None of these factors is dispositive and, ultimately, "[t]he inquiry envisioned by Rule 702 is... a flexible one" which is focused "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95. The district court "must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citation omitted). The trial court "has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citation omitted).

In this role, the judge is "a gatekeeper, not a fact finder," and the "gate [should] not be closed to [a] relevant opinion offered with sufficient foundation by one qualified to give it." *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010). The purpose of the gatekeeping role is to ensure that expert testimony is "properly grounded, well-reasoned and not speculative," but it is not meant to substitute for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden and proof [which] are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Evid. 702, Adv. Comm. Notes (2000) (quotation omitted). Thus, "[a]fter an expert establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).

**\*7** Because the Court acts as a gatekeeper and not a factfinder, an expert whose methodology is otherwise reliable should not be excluded simply because the facts upon which his or her opinions are predicated are in dispute, unless those factual assumptions are "indisputably wrong." *See Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (excluding expert opinion based on a "fictitious set of facts"); *see also* Fed. R. Evid. 702, Adv. Comm. Notes (2000) (explaining that "[w]hen facts are in dispute, experts sometimes reach different conclusions" and a trial court is not "authorize[d] ... to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other"). Indeed, Rule 702 is "broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." Fed. R. Evid. 702, Adv. Comm. Notes (2000). "It traditionally falls upon cross-examination to negate the facts or factual assumptions underlying an expert's opinion." *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018).

### IV. DISCUSSION

As noted above, Tesla advances six arguments why Dr. Hartzmark's methodology is unreliable. Tesla objects to Dr. Hartzmark's use of a leakage model and raises issues relating to disaggregation, the length of the corrective interval, the purported lack of statistically significant declines, and the inclusion of consequential damages. Mot. at 4–9.

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6975    Page 42 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

The Court addresses each argument in turn, beginning with Dr. Hartzmark's use of a leakage model to establish loss causation.

## A. Leakage Models May Plausibly Establish Loss Causation in the Ninth Circuit

Dr. Hartzmark uses a leakage model to opine that investor losses were proximately caused by information allegedly misrepresented in the Musk Tweets. Hartzmark Report ¶¶ 13, 49, 206. To determine the theoretical validity of Dr. Hartzmark's approach, the Court first examines the scope of loss causation in the Ninth Circuit, and then addresses the conceptual underpinnings of Dr. Hartzmark's leakage model.

### 1. Loss Causation

"To recover damages in a private securities fraud action, the plaintiff must establish a causal connection between the defendant's fraudulent conduct and the plaintiff's economic loss— an element known as loss causation." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020), *cert. denied sub nom. BofI Holding, Inc. v. Houston Mun. Emps. Pension Sys.*, 142 S. Ct. 71 (2021). "Loss causation is shorthand for the requirement that investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation and citation omitted).

In a fraud-on-the-market case, the plaintiff's theory of loss causation "begins with the allegation that the defendant's misstatements (or other fraudulent conduct) artificially inflated the price at which the plaintiff purchased her shares— meaning the price was higher than it would have been had the false statements not been made." *BofI Holding*, 977 F.3d at 789. But proving loss causation requires more than showing that the plaintiff bought the stock at a price that was artificially inflated. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "[T]he plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *BofI Holding*, 977 F.3d at 789 (internal citation and quotation omitted).

As the Ninth Circuit recently explained, the test for loss causation "requires no more than the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citing *Dura*, 544 U.S. at 346); *accord Lloyd*, 811 F.3d at 1210. A plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (internal citation and quotation omitted) (emphasis in original). Instead, "to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* (internal citation omitted). Because there are a "tangle of factors" that may affect stock price, "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Id.* at 1123. "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210.

**\*8** In sum: to establish loss causation in this fraud-on-the-market case, Dr. Hartzmark is tasked with showing that the alleged misrepresentations in the Musk Tweets artificially inflated Tesla's stock price, and that once the market learned the truth, the artificially inflated stock price dropped. *BofI Holdings*, 977 F.3d at 789. And because of the "tangle of factors" that influence stock price, Dr. Hartzmark must also "reasonably distinguish" the loss attributable to the misrepresentations from the loss attributable to other factors. *Nuveen*, 730 F.3d at 1123.

### 2. Dr. Hartzmark's Leak age Model

Tesla criticizes Dr. Hartzmark's use of a leakage model as opposed to a specific-disclosure model. Mot. at 1, 5–6. Dr. Hartzmark opines that the predominant cause of Tesla's stock price decline flowed from "the continual incorporation of news (or lack thereof) correcting the alleged misrepresentations and/or omissions of the Musk Tweets and the revelations about the Consequential Harm." Hartzmark Report ¶ 206. In other words, Dr. Hartzmark adopts a theory of loss causation whereby the truth of the funding status gradually "leaked out" over the course of the eleven-day Class Period.

The most common way for plaintiffs to prove that the market learned the truth is to identify one or more corrective disclosures. *BofI Holding*, 977 F.3d at 790. A corrective disclosure occurs when "information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1). A specific-disclosure model for loss causation evaluates the effect of each particular corrective disclosure on the stock

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.6976   Page 43 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

price on that specific day. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 416 (7th Cir. 2015).

"One problem with the specific-disclosure model is that the information contained in a major disclosure event often leaks out to some market participants before its release." *Id.* "If this happens, the model will understate the truth's effect on the price and thus the amount that the stock was overpriced before the truth became known." *Id.* This is because the specific-disclosure model only measures price changes on the identified disclosure days and not the effect of more gradual exposure of the fraud. *Id.* A leakage model, on the other hand, calculates the difference between predicted returns and actual returns during the class period, assuming an efficient market reaction to more gradual information diffusion. *Id.* In other words, the theory behind a leakage model is that the truth gradually "leaks out" over time.

Tesla suggests that leakage models are disfavored. Mot. at 5–6. While specific-disclosure models are certainly more common, leakage models have been conceptually accepted by the Second, Seventh, and Tenth Circuits. [6] *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) ("We do not take issue with the plausibility of Plaintiffs' "leakage" theory."); *Glickenhaus*, 787 F.3d at 422; *In re Williams Sec. Litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009); *but see In re the Bear Stearns Companies, Inc. Sec.*, No. 08-MDL-1963, 2016 WL 4098385, at *9 (S.D.N.Y. July 25, 2016) (rejecting leakage model on the basis that it had not achieved general acceptance within the relevant scientific community or been subjected to peer review and publication). Additionally, the Supreme Court has generally recognized that the truth can leak out over time. *Dura*, 544 U.S. at 342 ("But if, say, the purchaser sells the shares quickly before *the relevant truth begins to leak out*, the misrepresentation will not have led to any loss.") (emphasis added).

 **\*9**  The Ninth Circuit has taken a flexible approach to loss causation that recognizes that there are an "infinite variety of ways for a tort to cause a loss." *First Solar*, 881 F.3d at 753; *see also Kui Zhu v. Taronis Techs. Inc.*, No. 19-cv-04529, 2020 WL 1703680, at *6 (D. Ariz. Apr. 8, 2020) (explaining that "Plaintiffs' theory of a 'slow leak' revelation is nuanced, but this Circuit has recognized that there are an infinite number of ways to allege loss causation" and holding that "[t]he allegations in the FAC, viewed together, adequately allege a viable loss causation theory").

In keeping with the Ninth Circuit's flexible approach to loss causation, to the extent that Tesla argues that leakage models are inherently conceptually unsound, the Court disagrees. So long as Dr. Hartzmark shows that the alleged misrepresentations, as opposed to something else, foreseeably caused Mr. Littleton's loss, loss causation is satisfied. *See Lloyd*, 811 F.3d at 1210 ("[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."); *First Solar*, 881 F.3d at 754 (same).

Having determined that leakage models are a theoretically viable way to show loss causation in this Circuit, the Court next turns to the specific issues raised by Tesla with regard to Dr. Hartzmark's methodology.

B. The Disaggregation Issues Do Not Render Dr. Hartzmark's Report Unreliable

Tesla raises two arguments regarding disaggregation: first, that Dr. Hartzmark failed to disaggregate the effect of the allegedly false statements from other company-specific information that was released during the Class Period, and second, that Dr. Hartzmark failed to address other potential causes of Tesla's stock movement. Mot. at 4. The Court briefly summarizes Dr. Hartzmark's disaggregation analysis and then addresses Tesla's concerns.

1. Dr. Hartzmark's Loss Causation and Disaggregation Analysis

As explained in Section A.1, to establish loss causation, Dr. Hartzmark must show that alleged misstatements were a "substantial cause of the investment's decline in value," *Daou*, 411 F.3d at 1025, and must "reasonably distinguish" between the loss attributable to the fraud and the loss attributable to "other economic factors," such as non-fraud-related news and events. *Nuveen*, 730 F.3d at 1123. Dr. Hartzmark has done so.

Dr. Hartzmark engaged in quantitative and qualitative analysis to determine and isolate the Musk Tweets' effect on Tesla's stock price. First, he conducted a minute-by-minute analysis of Tesla's stock price from shortly before the issuance of the first tweet ("Am considering taking Tesla private at $420. Funding secured.") through the market's close on August 7, 2018, and found that Tesla's stock price shot up 6.37%, which he determined to be statistically significant at the 1% level. [7] Hartzmark Report ¶¶ 76–77, Appendix 4. Second, he analyzed the price reaction from the close of the market on August 7 through the close of the market on August

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6977    Page 44 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

17 and found that, after adjusting for market and industry influences, the cumulative return was negative 17.6%, which is statistically significant at the 5% level. *Id.* ¶ 65.

 **\*10** Dr. Hartzmark then engaged in various measures to isolate the impact of any potentially confounding information on Tesla's stock price movements. *Id.* ¶¶ 146–69. Because of a general decline in the market and industry indexes over the Class Period, Dr. Hartzmark removed those market-wide and industry-influences on Tesla's stock price. *Id.* ¶ 146. His calculations resulted in "adjusted" stock prices for each day in the Class Period. *Id.* ¶¶ 147–48; Table 5. He then examined all related news sources and analyst reports, as well as the minute-by-minute results from his event study, to determine whether Tesla's stock price may have been impacted by contemporaneous disclosures of other Tesla-specific, unanticipated, material information that was unrelated to the Musk Tweets or consequential harm from the tweets. *Id.* ¶ 149. In particular, Dr. Hartzmark examined the headlines of approximately 2,400 articles published during the Class Period to identify any articles which could contain Tesla-specific information which was unrelated to the Musk Tweets or consequential harm (*i.e.* potentially confounding information). *Id.* ¶¶ 56, 149. Dr. Hartzmark found twelve such news articles. *Id.* ¶ 150; Table 6. Dr. Hartzmark then examined the abnormal returns and statistical significance measures for the one-minute and fifteen-minute intervals following the publication of these articles. *Id.* Based on his statistical analyses and his review of the news articles themselves, he "did not identify any materially, negative, new, unanticipated confounding information" that should be incorporated into the "adjusted" price of Tesla stock. *Id.*; *see also id.* ¶¶ 151–67 (analyzing the twelve potentially confounding news articles).

Because Dr. Hartzmark did not find any confounding information in any of the sources that, in his opinion, would have lowered the stock price, he concluded that the adjusted price reflected the "revelation of the truth in the Musk Tweets and Consequential Harm." *Id.* ¶ 168. In other words, he determined that no further adjustment of Tesla's stock price movements was needed after he accounted for market-wide and industry influences on Tesla's stock price. *Id.* Dr. Hartzmark concluded that the decline in value in Tesla's stock price resulting from the Musk Tweets and the related consequential harm totaled $66.67 per share. *Id.* ¶ 169.

#### 2. Disaggregation of Loss Caused by Company-Specific Information

According to Tesla, Dr. Hartzmark's methodology is fundamentally flawed from the outset because he makes no attempt to isolate the effect of the allegedly misleading information— "funding secured"—from the truthful statement that Musk was "considering taking Tesla private at $420" per share. Mot. at 4.

Tesla has a point. Dr. Hartzmark included the "considering taking Tesla private at $420" statement in the Musk Tweets, and he analyzed the effect of the Musk Tweets as a unit, which meant that he did not separate any effect related to the non-false portions of tweets which may have been caused by the $420 statement. *See* Hartzmark Report ¶ 4 n.8 (defining "Musk Tweets"); *id.* ¶¶ 13, 169, 171 (describing findings with regard to the "Musk Tweets"). Tesla repeatedly pressed Dr. Hartzmark on this issue during his deposition. *See* Hartzmark Depo. At 59:3–5 ("Do you have a view on how the market would have reacted if Mr. Musk had simply tweeted, 'Am considering taking Tesla private at $420?' "); *id.* at 143:22-144:3 (asking whether Dr. Hartzmark conducted any analysis to "break[ ] down" inflation based on any particular August 7 statement); *id.* at 146:2-11 (asking whether Dr. Hartzmark has "any analysis" that breaks the two statements from the 12:48 tweet "apart so that we could determine what damages are attributable to just the second part of the statement being false but not the first"). In response to these questions, Dr. Hartzmark testified that he "was asked that the plaintiff will prove that the defendants misled the market when making certain misstatements, plural ... regarding the potential to take Tesla private. This series of statements is an interwoven bundle." *Id.* at 60:3-10; *see also id.* at 146:6-12 ("There's an interwoven bundle ... my understanding of the allegations is there's a series of tweets and that there's an interwoven bundle there."); 226:20-22 ("[T]his was an interwoven bundle of information."); 230:7-15 ("[M]y assumption was it's an interwoven bundle. That even if what you said is true, that the finder of fact will find that the falsity of a portion of the Musk tweets makes the Musk tweets, as an interwoven basket, a falsity and moved the market and impacted the market because of false information."). In other words, Dr. Hartzmark assumed that Mr. Musk's August 7 tweets constituted an "interwoven bundle" and analyzed them accordingly. The Court views this as a fair criticism of Dr. Hartzmark's opinion. The question is whether it renders Dr. Hartzmark's opinion inadmissible under Rule 702. For the reasons explained below, the Court concludes that it does not.

 **\*11** First, to the extent that Tesla argues that Dr. Hartzmark relied on an improper assumption, in general such issues are

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.6978   Page 45 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

for the jury to assess. "The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *McCurley v. Royal Seas Cruises, Inc.*, 331 F.R.D. 142, 159 (S.D. Cal. 2019) (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013)); *see also Martin v. F.E. Moran, Inc.*, No. 13-cv-03526, 2017 WL 1105388, at *6 (N.D. Ill. Mar. 24, 2017)) ("[T]here is no need to evaluate an expert's underlying data or factual assumptions so long as there is a basis in the record supporting the expert's factual assumptions.") (internal quotation and citation omitted); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Here, there is a basis in the record supporting Dr. Hartzmark's assumption that the two statements in the 9:48 a.m. tweet form an interwoven bundle. The two statements were published as part of the same tweet and concerned the same topic; and, as Mr. Musk testified at his deposition, he intended for the tweets to be read together. *See* Musk Depo. Tr. at 133:6-9 ("The reason I included the number of 420 - $420 [*sic*] per share was to make it clear that the funding was secured at that level, but not at some much higher level.").

There is also a factual basis for Dr. Hartzmark's assumption that the "funding secured" rather than the "Am considering taking Tesla private at $420" statement caused Tesla's stock price to jump. As Tesla's own expert recognized, Mr. Musk had previously expressed his interest in taking Tesla private. *See* Exhibit 378 (Expert Report of Daniel Fischel) ¶¶ 11, 12 (quoting Musk as saying "I wish we could be private with Tesla. It actually makes us less efficient to be a public company" in November 2017). Tesla's expert also opined that the $420 potential offer price was "reasonable" because it was "within the range of initial premia" based on over a hundred similar going-private transactions that Professor Fischel analyzed. *Id.* ¶¶ 27–28. There is at least a plausible argument, then, that because Mr. Musk's desire to privatize Tesla and the $420 offer price were not new or unexpected pieces of information, the "funding secured" statement is what animated the power of the tweet. Courts have found that a failure to consider some non-fraud-related company-specific news is not grounds for total exclusion under *Daubert* where the expert made some effort to disaggregate other variables. *See, e.g., In re Novatel Wireless Sec. Litig.*, No. 08-cv-1689, 2013 WL 12144150, at *8 (S.D. Cal. Oct. 25, 2013) ("[T]he failure to include one of the relevant [non-fraud] variables

does not dictate exclusion of the report as unreliable."); *In re Homestore.com, Inc.*, No. 01-cv-11115, 2011 WL 291176, at *8 (C.D. Cal. Jan. 25, 2011) ("[The] expert ... expressly states that her regression analysis distinguishes between loss attributable to alleged fraud and loss attributable to non-fraud related news and events ... As a result, [she] makes an attempt to account for other possible causes, and her opinions therefore meet the reliability threshold requirement."); *S.E.C. v. Leslie*, No. 07-cv-3444, 2010 WL 2991038, at *15 (N.D. Cal. July 29, 2010) ("While [defendant] certainly may argue to the jury that [the expert] did not reliably filter out other confounding variables that would have affected the stock price[,] ... he has not shown that [the] opinion is so unreliable that it must be excluded."); *Smilovits v. First Solar, Inc.*, No. 12-cv-0555, 2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019) ("Defendants' criticisms that Feinstein discounted the confounding information and exaggerated the impact of the alleged fraud go to his credibility and the weight of his opinions, not their admissibility.").[8] While Dr. Hartzmark did not attempt to disaggregate any price impact from the non-false portions of the August 7 tweet, he did address and disaggregate other potentially confounding variables that could have affected Tesla's stock price. *See* Section B.1 *supra*; *see also* Hartzmark Report ¶¶ 146–68. Hartzmark's "failure to include one of the relevant variables does not dictate exclusion of [his] report as unreliable ... [Tesla's challenge] goes to the weight of [Hartzmark's] testimony." *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *8.

**\*12** Finally, the Court notes that neither party articulated a method by which the price impact of "considering taking Tesla private at $420" could be disaggregated from "funding secured." Opp. at 5. This underscores that the disaggregation issue goes to weight and not admissibility. *See Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 934 (S.D. Cal. 2019) (holding that a challenge to an expert's loss causation analysis based on (among other things) a failure to properly disaggregate goes to weight and not admissibility where defendants do not "suggest a superior approach to disaggregation").

The Court also rejects Tesla's related arguments that Dr. Hartzmark fails to disaggregate truthful company-specific information in other sources, such as an August 13 tweet by Mr. Musk that he was "excited to work with Silver Lake and Goldman Sachs as financial advisors" and the August 16 *New York Times* article (which discussed Mr. Musk's emotional and physical health). Mot. at 4, 7. From Mr. Littleton's perspective, Dr. Hartzmark did not find a

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.6979   Page 46 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

statistically significant increase from the Silver Lake tweet and Tesla provides no evidence to challenge Dr. Hartzmark's findings. Opp. at 7 n.4; Hartzmark Report ¶¶ 112–13. As for the information regarding Mr. Musk's health that was included in the August 16 *New York Times* article, Dr. Hartzmark characterized this information in his report as "previously stated concerns." Hartzmark Report ¶ 125. To the extent that Dr. Hartzmark contends that such information did not influence Tesla's stock price because it was not new, this theory is precisely the type of argument which may be explored at cross-examination.[9]

In sum, the Court finds that any issues connected to Dr. Hartzmark's disaggregation (or lack thereof) with regard to non-fraud and company-specific information go to the weight of Dr. Hartzmark's opinions, not their admissibility.

### 3. Disaggregation of Loss Related to Other Causes of Stock Price Movement

Tesla asserts that Dr. Hartzmark's report is also unreliable because it purportedly "fails to address other potential causes of stock movement." Mot. at 4. But Tesla does not identify any specific potential cause of stock movement that it contends that Dr. Hartzmark should have addressed. As noted in Section B.1 *supra*, Dr. Hartzmark accounted for the general decline in the market and industry indexes as part of his analysis. *See* Hartzmark Report ¶¶ 147–48. Dr. Hartzmark also examined approximately 2,400 news articles and analyst reports released during the Class Period to determine if any sources contained confounding information. *Id.* ¶¶ 149–50. He found, based on stock price reaction (or lack thereof) that there was none. *Id.* ¶¶ 155–68. Because Tesla has not identified any particular cause of stock movement that it believes Dr. Hartzmark overlooked, the Court denies Tesla's motion for exclusion on this ground.

### C. Dr. Hartzmark's Corrective Interval Is Not Inappropriate

Fourth, Tesla argues that Dr. Hartzmark's report is unreliable because he selected a corrective interval that runs through August 17, 2018. Mot. at 8. Tesla asserts that this corrective interval is "inappropriate" because Dr. Hartzmark purportedly did not identify any new corrective information on August 17 (or any time after August 13). *Id.*

**\*13** Tesla is essentially rehashing its first motion in limine seeking to exclude damages evidence after August 13, 2018. *See* Docket No. 450. In Tesla's view, the *New York Times* article does not contain any new corrective information

regarding the alleged fraud. Mot. at 8. But the Court has already found that Mr. Littleton may be able to show that the article is at least a partial corrective disclosure.[10] *See* July 29, 2022 Min. Entry at 1.

The Court thus rejects Tesla's theory that Dr. Hartzmark's report is unreliable because he uses a corrective interval that runs through August 17, 2018.

### D. Statistically Significant Decline

Fifth, Tesla argues that the Dr. Hartzmark's leakage model is unreliable because it "does not satisfy the requirement of demonstrating a statistically significant decline at the 5% level." Mot. at 8. Tesla's argument rests on the faulty premise that the corrective interval ends prior to August 17. The Court has already concluded that August 17 may be included in the corrective interval. *See* Section IV.C. *supra*; *see also* July 29, 2022 Min. Entry at 1. Tesla does not challenge Dr. Hartzmark's calculations showing that the corrective interval as a whole demonstrates a statistically significant decline due to the stock price decrease on August 17. Hartzmark Report ¶ 65. Tesla's fifth argument is thus mooted by the Court's prior rulings.

For the sake of argument, though, the Court addresses Tesla's theory that loss causation is limited to statistically significant declines at the 5% level in stock price. Opp. at 7–8. While the Court is aware of district courts in this Circuit which have required such a showing, *see REMEC*, 702 F. Supp. at 1266 ("[T]he decline in stock price caused by the revelation of that truth must be statistically significant."); *Eng v. Edison Int'l*, No. 15-cv-01478, 2018 WL 1367419, at \*3 (S.D. Cal. Mar. 16, 2018) (same), the Court is not convinced that the authorities cited by *REMEC* and *Eng* support such a proposition.[11] To be sure, there are cases outside of the Ninth Circuit holding that findings made at the 90% confidence level are not enough. *See, e.g., In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) (noting, in a footnote, that a significant negative return at the 90% confidence level is "below the conventional statistical measure of a 95% confidence level and is therefore not sufficient evidence of a link between the corrective disclosure and the price"); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 187 (S.D.N.Y. 2010), *reversed on other grounds*, 689 F.3d 229 (2d Cir. 2012) (distinguishing between an expert reporting results at the 10% level and drawing conclusions at the 10% level). However, the Ninth Circuit has observed that "[a]s a general matter, so long as the evidence is relevant

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6980    Page 47 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) (citation omitted). [12] Instead, the question is whether the "statistics offered are sufficiently probative of the ultimate fact in issue, regardless of the statistical significance levels associated with them." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at \*5 (N.D. Cal. Apr. 12, 2017) (citing *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 (9th Cir. 1981)); *cf. Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001) (describing use of "[t]he five percent test" to determine statistical significance as "arbitrary"). In this vein, district courts have denied *Daubert* motions based on a purported lack of statistical significance. *See, e.g., In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at \*15 ("The Court finds that the fact that these two variables are not statistically significant at the 1%, 5%, and 10% levels goes to the weight, not the admissibility of expert's model ... [even if those] are the conventional levels statisticians typically use."); *In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at \*11 (denying *Daubert* motion based on confidence levels because "courts have generally found that a statistical confidence level is more a matter of weight than admissibility" and "all or nearly all" of expert's analyses "result in estimates statistically significant at either the 90% or 95% confidence levels, both widely accepted as valid for evidentiary purposes"); *see also Apple iPod iTunes Antitrust Litig.*, No. 05-cv-0037-YGR, 2014 WL 4809288, at \*7 (N.D. Cal. Sept. 26, 2014) (rejecting *Daubert* motion based in part on expert's purported lack of "statistically significant results"); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1102 (D. Colo. 2006) (same).

**\*14** In any event, because Dr. Hartzmark found a statistically significant decline, the Court need not reach the question of whether such showing was needed. Tesla's argument that Dr. Hartzmark's model fails for lack of a statistically significant decline is rejected.

### E. Consequential Damages

Finally, Tesla argues that Dr. Hartzmark improperly includes "consequential effects" in his assessment of the artificial inflation in stock price. Mot. at 8–10. Dr. Hartzmark attributed a significant amount of inflation to "consequential harm," [13] which he defined as the "foreseeable consequential effects caused by disclosures following the Musk Tweets exposing their falsity," such as "Tesla's reduced management credibility and revealed failures of corporate governance and internal controls," "Tesla's increased legal risks," and "scrutiny from [SEC] investigations." *Id.* ¶¶ 4, 13, 33, 54.

As a factual matter, these "consequential effects" appear to be borne out by the record. Dr. Hartzmark found that during the 11-day Class Period, there was a considerable amount of news and information released relating to the following topics: (1) lawsuits filed against Tesla and Mr. Musk related to the Musk tweets; (2) information about the SEC probing and investigating the accuracy of the Musk tweets; (3) apparent failure to comply with NASDAQ rules; (4) lapses in internal controls that purportedly existed in Tesla, such as the failure to review the Musk Tweets before they were published; (5) lapses in corporate governance at the Company; and (6) loss in credibility and reputation of Tesla management and the Board of Directors. *Id.* ¶ 55; *see also id.* ¶¶ 67–133 (describing information released throughout each of day of the Class Period); Appendix 3 (summarizing news related to Musk Tweets and consequential harm).

The economic theoretical basis for such consequential effects also appears to be well-founded. Dr. Hartzmark cited academic scholarship supporting his view that the reputational harm to Tesla that occurred during the Class Period as a result of the Musk Tweets would have a quantifiable effect on a corporation's stock price. *Id.* ¶¶ 41–46. Dr. Hartzmark noted, for instance, scholarship from 28 different papers measuring the share price impact related to the revelation of financial misconduct. *Id.* ¶¶ 42 & 42 n.69. Dr. Hartzmark's authorities explained how the revelation of misconduct affects a firm's cost and operations: such effects included, for instance, customers changing the terms of doing business because of a perception of an "increased probability of cheating"; managers diverting resources to assist with an investigation; and companies being required to "implement new monitoring and control policies, increasing the cost of operations." *Id.* ¶ 44. Dr. Hartzmark also cited research showing that the stock market reacts negatively to failed attempts to go private, as demonstrated by unsuccessful management buyouts. *Id.* ¶ 45. After describing this body of scholarship, Dr. Hartzmark concluded that:

> **\*15** In summary, academic research supports the conclusion that if Plaintiff is successful in proving that the Defendants allegedly misled the market by making misstatements

concerning taking Tesla private, its subsequent revelation would communicate important information concerning the lack of adequate internal controls or corporate governance mechanisms in place to prevent such misstatements, and there would be a material impact on the value of the corporation and foreseeable investor losses. In other words, there would be Consequential Harm upon the failure of the actions proposed in the Musk Tweets stemming from a loss of management credibility and ongoing distrust in Tesla's public statements.

*Id.* ¶ 46.

Tesla does not challenge the factual theory that an investigation by the SEC or shareholder lawsuits may affect a corporation's stock price. Instead, Tesla asserts that such damages are "not permitted under the circumstances here." Mot. at 9. Tesla points out that courts have generally used an "out-of-pocket" measure of damages in securities fraud actions, which allows a plaintiff to recover the difference between what the buyer paid and what the buyer would have paid had there been no fraudulent conduct. *Id.* at 9 (citing *Chassin Holdings Corp. v. Formula VC Ltd.*, No. 15-cv-02294-EMC, 2017 WL 66873, at *13 (N.D. Cal. Jan. 6, 2017) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972)).

Tesla is correct that Mr. Littleton cannot recover any damages for a decline in price that is attributable to factors *unrelated to the fraud.* The Ninth Circuit has made clear that:

Even if the true facts concealed by the fraud are revealed to the market, the plaintiff must still show that the disclosure of the truth caused the company's stock price to decline. For a subsequent decline in price could be attributable to factors unrelated to the fraud, such as a change in economic circumstances or investor expectations. *Dura Pharmaceuticals,*

544 U.S. at 343. The securities laws do not protect against ordinary investment losses of that sort. *See id.* at 345.

*BofI*, 977 F.3d at 790. However, the "consequential effects" that Dr. Hartzmark references in his report are not "unrelated to the fraud." Rather, according to Dr. Hartzmark, they are the "foreseeable consequential effects caused by disclosures following the Musk Tweets exposing their falsity," such as "Tesla's reduced management credibility and revealed failures of corporate governance and internal controls," "Tesla's increased legal risks," and "scrutiny from [SEC] investigations." *Id.* ¶¶ 4, 13, 33, 54. These effects are, according to Dr. Hartzmark, reflected in Tesla's stock price. *Id.* ¶¶ 207–08 & 208 n.300. In other words, Dr. Hartzmark opines that the Musk Tweets had both "direct effects" and "consequential effects" on Tesla's stock price—both components are included in his measure of out-of-pocket damages, because he opined that both components are causally connected to the disclosure of the alleged falsity of the Musk Tweets. *Id.* ¶¶ 13, 169.

According to Tesla, "consequential damages" arising from "consequential effects" such as shareholder lawsuits or negative news coverage are not recoverable in a securities class action. *Id.* at 8–9. But the cases that Tesla cites deal with the question whether certain events can constitute corrective disclosures, not whether the harm arising from such events is recoverable. *See Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 186–88 (4th Cir. 2007) (rejecting loss causation analysis where, contrary to plaintiff's theory that a lawsuit "finally revealed the 'true facts' of fraud," the complaint contained no new information regarding the fraud); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 511–12 (rejecting loss causation analysis where negative media coverage did not contain any new information and thus could not serve as a corrective disclosure). Hence, these cases are inapposite to the question at hand.

 **\*16** In support of Dr. Hartzmark's consequential damages, Mr. Littleton cites to *Waggoner v. Barclays PLC*. There, the Second Circuit upheld a damages model that included damages related to a subsequent regulatory action by the New York Attorney General and ensuing fines. *See* 875 F.3d 79, 106 (2d Cir. 2017). *Waggoner* reasoned that these damages were part of the harm experienced by the plaintiffs:

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6982    Page 49 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

The Plaintiffs' allegations are that shareholders of Barclays' ADS were harmed when statements that maintained the impression that Barclays was protecting its LX investors were shown to be false, thereby exposing Barclays' business practices and culture, and causing a substantial drop in share price. Their damages model directly measured that harm by examining the drop in price that occurred when the New York Attorney General's action revealed ongoing problems related to Barclays' management. [...]

Investors were concerned with lack of management honesty and control because, as had happened in the past following the LIBOR scandal, such problems could result in considerable costs related to defending a regulatory action and, ultimately, in the imposition of substantial fines. Thus, the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification.

*Id.* Mr. Littleton also cites *Baker*, where the expert attributed damages based on harm to the "corporate brand and corporate reputation," *Baker*, 423 F. Supp. 3d at 908, and *Vivendi*, where the court found that concerns about corporate management could be recoverable. *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 371 (S.D.N.Y. 2009).

Tesla responds that these cases are distinguishable because none of these cases involved a situation "where the purported 'consequential' or 'collateral' effects depend on the alleged fraud occurring." Docket No. 467 at 1. Tesla observes that, in each of the three cases cited by Mr. Littleton, the harm experienced by the company would have occurred had the truth been disclosed originally, rather than the alleged misstatements. *Id.* Tesla contends that this fact distinguishes those cases from the instant matter, where the consequential harm would not have occurred had Mr. Musk not allegedly misrepresented the status of the funding for the privatization transaction. *Id.* But Tesla does not explain why this distinction matters for purposes of loss causation or damages.

In the Court's view, insofar as the "consequential effects" are *proximately caused* by the Musk Tweets, these damages may be recovered under federal securities law. Causation is fundamental to recoverability. *See* 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the

loss for which the plaintiff seeks to recover damages."). And the Ninth Circuit has made clear that the touchstone for loss causation is proximate cause. *See First Solar*, 881 F.3d at 751–52 ("[T]he correct test for loss causation under the Securities Exchange Act of 1934 ... [is] a general proximate cause test [ ]"); *Lloyd*, 811 F.3d at 1210 ("[L]oss causation is simply a variant of proximate cause ..."). "The ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210. Tesla has not cited any convincing authority negating the application of proximate cause under the Securities Exchange Act, a deeply rooted legal concept well-established in the law when the Act was enacted. *Cf. Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 348 (1928) (Andrews, J., dissenting) ("We deal in terms of proximate cause ..."); *Aetna Ins. Co. v. Boon*, 95 U.S. 117, 133, (1877) ("The proximate cause, as we have seen, is the dominant cause, not the one which is incidental to that cause, its mere instrument, though the latter may be nearest in place and time to the loss."); *Peters v. Warren Ins. Co.*, 39 U.S. 99, 101 (1840) ("We do not undertake to say that there are no contracts in which the *remota causa spectatur*, but certainly the law of insurance looks only at the proximate cause.") (internal citation omitted).

**\*17** The Court concludes that, so long as the "consequential effects" that Dr. Hartzmark observes are proximately caused by the Musk Tweets, these effects may be asserted as damages. Given the short span of time in which these incidents occurred, the relatively clear chain of causation, and the allegedly measurable scope of these damages, it may well be that the jury will determine that these consequential effects are a logical and foreseeable consequence of the Musk Tweets and thus properly included as damages. Of course, Tesla is free to argue to the jury that these consequential effects are too distant or removed to be proximate and recoverable. However, Dr. Hartzmark's inclusion of these consequential damages does not render his report unreliable and excludable under Rule 702.

In sum, Dr. Hartzmark's inclusion of consequential damages does not include "factors unrelated to the fraud." His out-of-pocket damages analysis plausibly concludes that the difference between what the buyer paid and what the buyer would have paid had there been no fraudulent conduct amounted to $66.67 per share, based on the direct and proximate cause of the Musk Tweets. Hartzmark Report ¶¶ 13, 169, 171–72. Tesla's critiques of how Dr. Hartzmark calculated consequential harm, *see* Mot. at 10, may be

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6983    Page 50 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

explored during cross-examination. It is not a basis to exclude his report under Rule 702.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Tesla's motion to exclude the opinions of Dr. Hartzmark. Dr. Hartzmark's methodology is sufficiently reliable to satisfy Rule 702. Tesla's criticisms of Dr. Hartzmark's conclusions go to his credibility and the weight of his opinions, not their admissibility.

This order disposes of Docket Nos. 451 and 454.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 7374936

---

**Footnotes**

1    Tesla also seeks to seal four exhibits cited by Mr. Littleton in his opposition to Tesla's third motion in limine. *See* Docket No. 454 (Administrative Motion to File Under Seal) at 1. The Court has previously determined that these exhibits warrant sealing, *see* Docket No. 432, and hereby **GRANTS** Tesla's motion to seal the four exhibits. The Clerk is directed to seal the exhibits found at Docket Nos. 454-3, 454-4, 454-5, and 454-6.

2    Unless otherwise noted, the numbered exhibits are found at Docket Nos. 437 and 453. Dr. Hartzmark's report, which is Exhibit 375, is found at Docket No. 453-1.

3    The article was published online at 8:22 p.m. on August 16, 2018, and was published in print on August 17, 2018. Hartzmark Report ¶¶ 127, 127 n.207.

4    The fourth statement came from Mr. Musk's August 13, 2018 blog post. The Court denied summary judgment as to this statement and subsequently precluded Plaintiffs from introducing evidence or argument related to that statement at trial because it was not included in the Consolidated Complaint and Plaintiffs had not shown good cause to amend. *Id.* at 29–30; Docket No. 466 (July 29, 2022 Min. Entry) at 1–2.

5    "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

6    The Court notes that the particular leakage models at issue in these cases were rejected for other reasons. In *Flag Telecom*, the plaintiffs failed to show that any of the information that leaked into the market revealed the truth with respect to the alleged misrepresentations. *Flag Telecom*, 574 F.3d at 41. In *Glickenhaus*, the expert's leakage model was rejected because it failed to adequately account for the possibility that firm-specific, nonfraud related information may have affected the decline in the relevant period. *Glickenhaus*, 787 F.3d at 423. *Williams* rejected the expert's leakage model because the expert did not show any mechanism for how the truth was revealed. *Williams*, 558 F.3d at 1138.

7    "Significance level" is a term of art used by statisticians when they measure the accuracy of a regression model's estimates using what is called "significance testing." *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK, 2014 WL 1351040, at *8 (N.D. Cal. Apr. 4, 2014). In conducting significance testing, statisticians determine whether the results are statistically significant enough that they can reject the "null hypothesis" of zero effect, which means that the independent variable being tested has no actual impact on the

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.6984   Page 51 of 113

In re Tesla, Inc. Securities Litigation, Not Reported in Fed. Supp. (2022)

dependent variable and whatever relationship is shown in the model occurred due to random chance. *Id.* A 1% significance level means that there is no more than a 1% likelihood that one would observe that relationship between the independent variable and dependent variable merely by chance. *Id.* Statistical significance can also be conveyed by use of confidence intervals. "Every confidence interval is the complement of a respective significance level." *Id.* at \*11 n.22. A 99% confidence level reflects a statistical significance of 1%. *Id.*

8   The cases that Tesla cites in its motion are distinguishable. Tesla relies heavily on *REMEC*, where an expert's report was excluded after the expert failed to account for non-fraud company information, but that was just one of the problems associated with that expert's report. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) ("Dr. Nye makes no attempt to account for other possible causes [in stock price movement], i.e., industry-specific news (for example, if an increase in global sales of defense products due to an increase in U.S. presence in Iraq was announced during the class period), market-specific news (for example, if a 5% decline in stock prices occurred across the market due to an announcement of an expected drop in consumer sales in December), or other measurable macroeconomic variables (for example, the inflation rate and GDP).""). Tesla's reliance on *Omnicom* is likewise misplaced. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ("[T]he event study at best incorrectly identifies several corrective disclosures and at worst fails to identify any at all.").

9   The same goes for Tesla's complaints regarding Dr. Hartzmark's analysis of an SEC subpoena. Mot. at 7. Such criticisms go to Dr. Hartzmark's credibility and the weight of his opinions, not their admissibility. *Smilovits*, 2019 WL 7282026, at \*9.

10   As Dr. Hartzmark notes, the *New York Times* article identified that, *inter alia*, "funding was 'far from secure,' " that "no one had seen or reviewed Musk's August 7, 2018 tweet before he posted it" and that the Public Investment Fund "had not committed to provide any cash." Hartzmark Report ¶ 125. Tesla contends that this information had already been revealed by other sources. *See* Docket No. 450 at 6. With regard to the cash commitment, for instance, Tesla asserts that the August 13, 2018 blog post disclosed this information via the following language: "the Managing Director of the Saudi fund ... has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals." *Id.* at 4, 6. The Court is skeptical that this language from the blog post could be interpreted as disclosing the PIF's decision to not commit cash. At least, it cannot so hold as a matter of law for *Daubert* purposes.

11   Both *REMEC* and *Eng* rely on *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), but *Metzler* does not discuss statistical significance (or statistics at all)—*Metzler* merely states that "a complaint must allege that the defendant's 'share price fell significantly after the truth became known.' " *Id.* at 1062 (citing *Dura*, 544 U.S. at 347); *see also Kain v. ACM Rsch., Inc.*, No. 20-cv-09241-VC, 2021 WL 5998396, at \*2 (N.D. Cal. Dec. 20, 2021) (noting disagreement in caselaw regarding whether loss causation can be alleged where there are "relatively miniscule fluctuations in the stock price after the alleged disclosures").

12   While *Obrey* addressed a claim of discrimination under Title VII, the Court sees no reason why *Obrey*'s discussion of statistical significance under Rule 702 would not apply with equal force in a securities case.

13   The "consequential harm" that Dr. Hartzmark describes is distinct from the "consequential damages" traditionally available in contracts law and occasionally awarded in securities cases where a plaintiff incurs damages in an attempt to mitigate the damage caused by the defendant's fraud. *See, e.g., Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999) (discussing consequential damage award of $0.5 million "because Ambassador spent that amount in an attempt to mitigate the harm it suffered").

# EXHIBIT C

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.6986 Page 53 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

2022 WL 842737
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

IN RE the ALLSTATE CORPORATION
SECURITIES LITIGATION

No. 16 C 10510
|
Signed 01/10/2022

## REPORT AND RECOMMENDATION

BETH W. JANTZ, United States Magistrate Judge

**\*1** This District Court has referred this securities class action to the Magistrate Judge for a report and recommendation on the parties' motions to exclude various experts [365, 366]. The parties filed motions to seal certain of their submissions in connection with the motions to exclude.

For the reasons that follow, the Court grants the motions to seal [379, 380, 389, 395, 408, 417, 433, 435],[1] and recommends that: (1) Defendants' motion to exclude the opinions of Steven E. Hall and Steven C. Root [381] be denied; (2) Defendants' motion to exclude the opinions of Tyler Leverty [374] be denied; (3) Defendants' motion to exclude the opinions of John D. Finnerty [371] be denied; and (4) Plaintiffs' motion to exclude the opinions of Lucy P. Allen, Bruce Deal, and Paul A. Gompers [382] be granted in part and denied in part.

## DISCUSSION

Plaintiffs bring this securities fraud class action against Defendants Allstate Corporation, Allstate's Chief Executive Officer and Chairman and 2005-15 President Thomas Wilson, and Allstate Financial's CEO and President since 2015 Matthew Winter. [Dkt. 106, Second. Am. Compl. ¶ 1.] Plaintiffs assert claims against all Defendants for violation of Section 10(b) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and claims against Defendants Wilson and Winter for control person liability under Section 20(a) of the Exchange Act. 15 U.S.C. § 78(a). [*Id.* ¶¶ 153-161.]

The details of Plaintiffs' claims and the procedural history of this case have been set out in decisions of the District Judge and the Seventh Circuit Court of Appeals, and are accordingly discussed herein only to the extent necessary to explain this Court's reasoning in reaching its recommendations. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595 (7th Cir. 2020). [*See also* dkt. 67, 172, 309, 348]. It is sufficient at this point to note that Plaintiffs allege that Defendants made material misstatements and omissions regarding the proximate cause of a spike in auto claims frequency (*i.e.*, the number of claims filed against auto insurance policies), which they allege had a material negative impact on Allstate's financial condition. [Second. Am. Compl. ¶ 2.] Specifically, Plaintiffs contend that, beginning in 2013, Allstate implemented an aggressive new growth strategy to increase the number of Allstate insurance policies in force by greatly relaxing its underwriting standards. [*Id.* ¶¶ 3, 4.] According to Plaintiffs, although Defendants informed investors about changes in claims frequency, they minimized the risk of increased claims frequency from their new growth strategy, which unbeknownst to the market, materialized almost immediately. [*Id.* ¶¶ 7-10.] Plaintiffs further allege that when it became clear to the market that claims frequency had increased, Defendants falsely attributed the increase to external factors such as precipitation and miles driven, rather than the actual cause, which was the company's growth strategy of taking on riskier business. [*Id.* ¶¶ 11-15.] According to Plaintiffs, when Allstate finally revealed through a series of corrective disclosures that its aggressive growth strategy and reduced underwriting standards were the reasons for its claims frequency increase, its stock price fell dramatically. [*Id.* ¶¶ 16-17.] As a result, they allege, Allstate lost billions in market capitalization, and the class suffered substantial damages. [*Id.* ¶¶ 17, 161.] A class was certified on behalf of all investors who purchased Allstate common stock between October 29, 2014, and August 3, 2015. [Dkt. 348, Dec. 21, 2020 Op.]

**\*2** Plaintiffs' claims are based on the "inflation maintenance" theory of securities fraud. *See In re Allstate*, 966 F.3d at 612. Accordingly, Plaintiffs must prove " 'that the defendants' false statements caused the stock price to remain higher than it would have been had the statements been truthful,' even if the price itself does not change by a single cent." *Id.* (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015)).

### I. Legal Standard

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6987    Page 54 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

The admission of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal citations and quotations omitted). The Court's evaluation of proposed expert testimony under *Daubert* is not intended to "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Id.* (quoting *Daubert*, 509 U.S. at 596). The Court's inquiry is a flexible one and provides wide latitude as the Court performs its duty as "gatekeeper." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834-35 (7th Cir. 2015).

"In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Smith v.*

*Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). Because "there are many different kinds of experts, and many different kinds of expertise, ... the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). Courts do not ask whether an expert witness is qualified in general, but whether the expert's qualifications provide a foundation to answer a specific question. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal quotation and citation omitted).

The reliability of a qualified expert's testimony is evaluated by considering, among other things: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; (4) whether the theory has been accepted in the relevant scientific community; (5) whether maintenance standards and controls exist; (6) whether the testimony relates to matters growing naturally and directly out of research they have conducted independent of the litigation, or developed expressly for purposes of testifying; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. *Gopalratnam*, 877 F.3d at 779-80. Notably, this list is neither exhaustive nor mandatory, and the court "may apply these factors flexibly as the case requires." *Id.* at 780. The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that the expert meets the requirements of Rule 702 and *Daubert. Id.* at 782.

## II. Defendants' Motion to Exclude - Steven E. Hall and Steven C. Root [381]

**\*3** In support of their claims, Plaintiffs allege that a stock option exercised by CEO Wilson in November 2014 is evidence of his scienter. [Second Am. Compl. ¶ 123.] According to Plaintiffs, although the frequency spike Allstate experienced was undisclosed at the time of Wilson's exercise, he publicly admitted in early 2015 that he had been aware of it as early as October 2014. [*Id.* ¶¶ 74, 123.] Plaintiffs further contend that the November 2014 exercise was dramatically out of character for Wilson, and that Allstate's insider pre-clearance process at the time was too informal to ensure that insiders' trades complied with public company standards.

[*Id.* ¶¶ 8, 54, 123-26; dkt. 406, Pls.' H&R Resp. at 4-6.] To support their assertions, Plaintiffs proffer the opinions of two executive benefits consultants, Steven E. Hall and Steven C. Root, who opine in a joint report that: (1) the timing of Wilson's November 2014 exercise was out of character with his prior transactions; (2) the November 2014 exercise reduced Wilson's economic interest in Allstate; and (3) Allstate's pre-clearance process at the time was informal and did not conform with public company standards. [Dkt. 386-1 at Ex. A, H&R Rpt.]

With a limited exception discussed below, Defendants do not dispute Hall and Root's qualifications to provide their opinions, and do not dispute their relevance. [*See* dkt. 383, Defs.' H&R Mem.] The Court therefore does not address either. *See United States v. Moore,* 521 F.3d 681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists."). Instead, Defendants argue that their opinions are not the product of reliable principles and methods applied reliably to the facts of the case. [Defs.' H&R Mem. at 1. [2] ]

### A. "Out-of-Character" Opinion

According to Defendants, Hall and Root's opinion that CEO Wilson's November 2014 stock option exercise was out of character should be excluded because: (1) they reached the opinion unreliably as it is simply the product of calculating the days left between the exercise date and the expiration date of each option; (2) it is based on incomplete data since Hall and Root admit that they neither considered all of Wilson's option transactions nor the option's value under the Black-Scholes model; and (3) it is unsupported by any empirical data or similar evidence. [*Id.* at 5-13.] According to Plaintiffs, on the other hand, the opinion is reliable because Hall and Root utilized a methodology that is consistent with how courts consider the issue, and Defendants' other critiques go to weight, and not admissibility. [Pls.' H&R Resp. at 6-14.] The Court agrees with Plaintiffs' arguments, as explained below.

First, Hall and Root employed a methodology that is consistent with the relevant legal framework. In reaching their opinion, Hall and Root reviewed 32 options granted to Wilson between July 1995 and February 2019, removed those that were expired or were outstanding, and analyzed each option by determining the amount of time remaining before the option's expiration at the time Wilson exercised it. [*Id.* at 6-7.] This methodology is consistent with the relevant legal framework for assessing whether an insider's trade is out of

character, thus contributing to an inference of scienter. *See Fryman v. Atlas Fin. Holdings, Inc.,* 462 F. Supp. 3d 888, 904 (N.D. Ill. 2020). As explained in *Fryman,* to determine whether individual stock sales are out of character, " '[T]he Court can consider the amount and percentage of overall shares sold, the profit made, *the timing of the stock sales and the consistency of the sales with the insider's prior trading history.*' " *Id.* (emphasis added) (quoting *Johnson v. Tellabs, Inc.,* 262 F. Supp. 2d 937, 956 (N.D. Ill. 2003)). Hall and Root's methodology is consistent with this approach.

This is so despite Defendants' assertion that to be consistent with the approach described in *Fryman,* Hall and Root must have considered *all* of the factors identified by the court, as opposed to just some of them. Neither *Fryman* nor the authorities it cites require such an all-inclusive showing. *See id.* And, at this stage, the Court does not ask whether expert testimony carries Plaintiffs' burden of proof on the merits, but rather the "[C]ourt is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith,* 215 F.3d at 719; *see also Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1393 (Fed. Cir. 2003) (district court properly declined to exclude expert whose methodology was consistent with the relevant legal framework). Hall and Root's methodology here meets both of those guideposts.

**\*4** Likewise, the fact that Hall and Root did not apply the Black-Scholes method of valuation or otherwise consider the value of the stock options at the time of Wilson's exercise does not make their methodology unreliable. The Black-Scholes method is simply "*one* possible way of calculating grant-date present value," *Resnik v. Swartz,* 303 F.3d 147, 152 (2d Cir. 2002) (emphasis in original), which was irrelevant to Hall and Root's analysis given their focus on the timing and consistency of Wilson's prior exercises. [Dkt. 386-4, Hall Dep. at 103:22-106:08]. Additionally, as Hall testified, he did not perform such a calculation because in his opinion based on 45 years of experience of working with executives, executives do not ask for the Black-Scholes value in determining whether to exercise options. [Hall Dep. at 103:10-108:23.] Instead, Hall explained, in his long experience, the Black-Scholes method is used to determine how many options an executive should be granted, not whether an executive should exercise them. [*Id.* at 108:01-23.]

The Court is unpersuaded by Defendants' argument that Hall's testimony as to executives' typical considerations in deciding whether to exercise an option is an improper

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6989    Page 56 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

argument about scienter. [*See* Defs.' H&R Mem. at 7.] Rather, it is the necessary and sufficient link explaining how Hall's professional experience informed the methodology he and Root selected and the conclusion they reached. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019) (expert must explain how experience or expertise led to conclusion); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761-62 (7th Cir. 2010) (expert's opinion was reliable where it was tied specifically to his experience).

In this respect, the record is not like that in Defendants' cited authorities. In *Crawford Supply Grp., Inc. v. Bank of Am., N.A.*, No. 09 C 2513, 2011 WL 4840965, at *2-4 (N.D. Ill. Oct. 12, 2011), the proffered expert failed to draw explicit connections between his professional history and the opinions he reached, and further did not explain what criteria he used to render his opinions. In contrast here, Hall identified his particular experience and explained how it informed both his methodology and opinion. [*See* Hall Dep. at 103:10-108:23.] Further, unlike the proffered expert in *Crawford, id.*, Hall did not fail to support his experience with reference to his prior practices with clients. To the contrary, Hall testified that although he could not remember specifics, it was customary to do interviews with executives both at the start of projects and as questions came up. [Hall Dep. at 113:25-115:22.] Indeed, Hall further offered to take a deposition break to "pull my files and all my interview records that I have and everything else in order to see who I had covered topics like this with," but Defendants apparently did not take him up on his offer to provide even more specifics. [*Id.*] Likewise, unlike in *Bogathy v. Union Pacific Railroad*, No. 17-CV-4290, 2020 WL 419406, at *5 (N.D. Ill. Jan. 24, 2020), where the expert simply provided his own personal judgment and what he thought others had been thinking, Hall and Root provide no such type of opinion.

Defendants next argue that Hall and Root's "out-of-character" opinion is unreliable because they omitted four of Wilson's prior option exercises from their review, two of which involved stock options Wilson exercised with more time remaining than the November 2014 exercise. [Defs.' H&R Mem. at 7-8; dkt. 415, Defs.' H&R Reply at 3.] Because Hall and Root opined after learning of those additional exercises that the November 2014 exercise was nevertheless still out of character, Defendants add, Hall and Root additionally failed to reliably apply their methods to the facts of the case. [Defs.' H&R Mem. at 8.] This Court disagrees.

Defendants' criticism of Hall and Root's explanation and supplementation is not a proper *Daubert* challenge to reliability, but is instead a dispute as to their selection of underlying data and ultimate conclusion, which are issues left to the trier of fact. *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."). "[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself." *Manpower*, 732 F.3d 807.

**\*5** In this way, the record here is not like Defendants' cited authority, *Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp.*, No. 00 C 0191, 2003 WL 1797844, at *2 (N.D. Ill. Apr. 3, 2003), where the proffered expert had disregarded known data. To the contrary, Hall and Root used what was readily publicly available, and when the additional exercises were brought to their attention, they addressed the additional data and explained its lack of impact on their opinion. [*See* dkt. 386-3, Hall and Root Reply Rpt. at 5.] Because Hall and Root adequately explained their methodology and sufficiently tied it to the facts of the case, their opinion as to Winter's November 2014 stock option exercise meets the reliability threshold. *See Manpower*, 732 F.3d 807; *Smith*, 215 F.3d at 718.

### B. Opinion on the Impact of the November 2014 Exercise

Hall and Root also opine that Wilson's November 2014 exercise significantly decreased his economic interest in Allstate, by analyzing Wilson's total shares through equity awards before the November 2014 stock option exercise, on the date of them, and after. [H&R Rpt. at 2-3, 6 and Ex. C.] According to Defendants, their opinion is unreliable and "fundamentally erroneous" because they improperly treated ownership of unexercised stock options as equivalent to ownership of the underlying stock, and because they did not consider Wilson's pre-existing stock holdings and discounted the value of his performance stock awards. [Defs.' H&R Mem. at 9-10.] Properly distinguishing options from held shares, Defendants contend, demonstrates that Wilson's actual holdings of Allstate stock increased from 20 times his salary to 26 times his salary after the November 2014 exercise. [*Id.*] According to Plaintiffs, on the other hand, Hall and Root's opinion is reliable because it calculates Wilson's ability to benefit from increases in stock price in terms of total shares, and Defendants' arguments to the contrary go to weight, and

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.6990 Page 57 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

not admissibility. [Pls.' H&R Resp. at 11-14.] Here too, the Court agrees with Plaintiffs' arguments.

Notably, as Plaintiffs observe, Defendants' own expert, Dr. Wayne Guay, valued Wilson's stock options the same way Hall and Root did. [*Compare* H&R Rpt. Ex. C. *with* dkt. 386-2, Guay Rebuttal Rpt. at Ex 8.] More to the point, however, Defendants' criticism is not a proper *Daubert* challenge, but is instead an attack on the correctness of their ultimate valuation. *See Gross v. Comm'r of Internal Revenue*, 272 F.3d 333, 340 (6th Cir. 2001) (rejecting "*Daubert* claim [as] misguided, for they are attacking the correctness of that ultimate valuation more than the reliability of the expert's methods in deriving the value of the shares of stock."). The fact that Defendants and their expert disagree with Plaintiffs and theirs as to what comprises "economic interest" in the company is not a basis for exclusion. *See, e.g., Gross*, 272 F.3d at 340; *Manpower*, 732 F.3d at 808; *Winters v. Fru–Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) ("The focus of the district court's *Daubert* analysis must be solely on principles and methodology, not on the conclusions they generate."). As Plaintiffs emphasize, Hall and Root's analysis aimed to determine the value, or number, of shares Wilson was entitled to through equity awards, or as to which an increase in the market price of Allstate stock would confer an economic benefit to him. [*See* Pls.' H&R Resp. at 12.] To that end, Plaintiffs explain, whether Wilson was aligned with Allstate and whether his stock holdings increased as compared to his salary was not relevant to their comparative assessment of his economic interest before and after the November 2014 exercise. [*See id.* at 13.] Defendants are free to raise their alternative view on Wilson's economic interest before the jury. Because the framework employed by Hall and Root to value Wilson's economic interest in Allstate before and after the November 2014 exercise is reliable, their opinion is admissible.

### C. Opinion on Allstate's Then-Applicable Pre-Clearance Process

**\*6** Defendants' final challenge is to Hall and Root's opinion that Allstate's pre-clearance process was informal and did not conform with public company standards. [Defs.' H&R Mem. at 10-12.] According to Defendants, the opinion is unreliable because Hall and Root did not support it with any empirical research on public company standards, but based it only on their experience, which Defendants say is both lacking and insufficiently explained. [*Id.*]

As Plaintiffs correctly observe, however, Federal Rule of Evidence 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000); *see also Kumho*, 526 U.S. 147-50; *Metavante*, 619 F.3d at 761. Further, Hall and Root adequately explained how their experience informed their opinion. [Dkt. 386-5, Root Dep. at 20:15-23:25, 59:18-62:08, 71:18-72:05, 75:19-76:10; Hall Dep. at 150:16-155:25.] Among other things, Root explained that he had worked with companies related to insider trading policies since the early 1990s, and that virtually every company he has recently done work for has a pre-clearance policy in place. [Root Dep. at 21:03-09; 59:03-11.] He has been asked to review such policies, suggest improvements, and offer commentary that benchmarks policies against other public companies' policies, and he specifically reviewed several policies to confirm his general understanding in order to opine on Allstate's policy. [*Id.* at 21:10-23:15.] Root's experience thus sufficiently equips him to offer this opinion. *See Metavante*, 619 F.3d at 761-62 (expert explained how specialized experience shaped opinions). Defendants' critique that Root could not recall during his deposition details about pre-clearance requirements in the policies he reviewed in the course of his engagement for this case goes to the probative weight of the opinion, and not its admissibility. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Finally, the fact that Hall does not similarly have such experience does not render the opinion inadmissible, because an expert may rely on another expert's admissible opinion as a basis for forming his own opinion. *See Walker*, 208 F.3d at 588 ("[C]ourts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable."); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 825 (N.D. Ill. 2005), *amended by Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, No. 01 C 9389, 2005 WL 8178971, at \*2 (N.D. Ill. Sept. 8, 2005) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert[.]").

\*\*\*\*\*

For these reasons, the Court recommends that Defendants' motion to exclude the opinions of Hall and Root be denied.

**III. Defendants' Motion to Exclude - Tyler Leverty [374]**
Defendants move to exclude Plaintiff's proposed expert Tyler Leverty, including his reports dated March 12, 2020, July 9, 2020, and August 19, 2020, as flawed and unreliable. [Dkt. 374, Defs.' Leverty Mot.; dkt. 375, Defs.' Leverty Mem. at 6-15.] Leverty is a risk management and insurance professor at the University of Wisconsin-Madison who has taught and published on insurance and risk management. [Dkt. 377-1, Leverty Rpt. ¶¶ 1-4.] Defendants do not challenge Leverty's qualifications to testify, and therefore, the Court does not address them. *See Moore*, 521 F.3d at 685.

**\*7** Based on his performance of multiple regression analyses and a review of the record, Leverty provides several opinions that Plaintiffs say support the required elements of falsity and materiality for their securities fraud claims. [Dkt. 402, Pls.' Leverty Resp. at 4-15.] Specifically, Leverty opines that: (1) Allstate's internal claims frequency analyses were flawed and contradicted Defendants' public statements during the class period; (2) the external factors of miles driven and precipitation accounted for, at most, around 10% of Allstate's observed claims frequency increase during the class period; (3) Allstate's growth initiatives "Broaden the Target" ("BTT") and "Complementary Group Rating" ("CGR") had an estimated impact of about 35% to 74% on Allstate's claims frequency increase during the class period; and (4) the remaining proportion of Allstate's claims frequency increase was due to internal factors such as its other growth initiatives and underwriting changes. [*Id.* at 3 (citing Leverty Rpt. ¶¶ 14, 188, 198).]

**A. Opinion on Impact of BTT and CGR on Allstate's Claims Frequency**

**1. "Reasonableness Tests"**

According to Defendants, Leverty's opinion on the causes of Allstate's claims frequency increase should be excluded because his regression analyses fail what they call "basic reasonableness tests" in three regards: first, his regressions incorrectly predict immediate increases in Allstate's claims frequency starting with implementation of those initiatives in 2011, which did not in fact happen; second, his regressions fail to account for the fact that other automobile insurers saw similar increases in claims frequency during the period when Leverty asserts that Allstate's claims frequency was increasing for Allstate-specific reasons; and third, his

regressions fail the "placebo" test, a common technique to test whether an analysis appropriately measures causality. [Defs.' Leverty Mem. at 6-8.]

In opposition, Plaintiffs assert that Defendants' "reasonableness tests" are irrelevant because they mischaracterize Leverty's opinions. [Pls.' Leverty Resp. at 4.] Specifically, they say that Leverty did not project that BTT and CGR would have an immediate impact on claims frequency, but rather, in estimating their impact, he assumed claims frequency was impacted by BTT and CGR only in the first year of implementation, despite that they impact claims frequency over the entire period after implementation, and thus he reached a conclusion that conservatively underestimates the impact of those initiatives. [*Id.* at 4-5 (citing dkt. 377-4, Leverty Reply Rpt. ¶¶ 126-128).] As for trends with other insurers, Plaintiffs assert that Leverty controlled for external factors common to all insurers in the way he structured his regressions. [*Id.* at 5.] Lastly, Plaintiffs emphasize that Leverty disputed the propriety of applying a placebo test on his calculations because he had already given placebo treatments to the industry data at the same time that Allstate's data received the treatments. [*Id.* at 5-7.] Defendants reply that Leverty's explanations do not adequately explain why or how his regressions can be squared with "reality." [Dkt. 413, Defs.' Combined Reply at 2-3.]

What Defendants call "reasonableness tests," and the points that Plaintiffs argue in response, stem from disagreements over inputs and conclusions between the experts, and those issues go only to weight and not admissibility. *See Manpower*, 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis."); *Schultz v. Akzo Nobel*, 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 [does] not require, or even permit, the district court to choose between [competing] studies at the gatekeeping stage. Both experts were entitled to present their views, and the merits and demerits of each study can be explored at trial."); *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 WL 6675117, at \*8 (E.D.N.Y. Dec. 21, 2012) (noting it is not proper for a court on *Daubert* review to take sides in dispute between experts on intricacies of econometric modeling or economic theories).

**\*8** Rather, with a proper *Daubert* focus on reliable methods, Leverty employed one of the tried and true methods of his discipline, regression analysis, [*see* Leverty Rpt. ¶¶

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6992    Page 59 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

199-255]. As the Seventh Circuit has recognized, courts are afforded wide "[l]attitude ... to statisticians employing regression analysis, a proven statistical methodology used in a wide variety of contexts[.]" *Manpower*, 732 F.3d at 808. Leverty also sufficiently explained the reasons for the choices he made in structuring his analyses [*see id.*; Leverty Reply Rpt. ¶¶ 113-129], and the propriety of his choices goes to weight rather than admissibility. *See Manpower*, 732 F.3d at 808 (noting that "the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility."). In performing its gatekeeping role, "[t]he court does not decide whether the expert's views are correct, but instead 'is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.' " *Smith v. I-Flow Corp.*, 2011 WL 12556366, at *1 (N.D. Ill. May 3, 2011) (Kennelly, J.) (quoting *Smith*, 215 F.3d at 718); *see also Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) ("[C]lassic battle of the experts ... called upon the factfinder to determine what weight and credibility to give the testimony of each expert[.]").

The record here is not like Defendants' cited authority, *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 WL 1506892 (N.D. Ill. Sept. 21, 2000) (Gettleman, J.). In *Kaufman*, the proffered expert employed what he called a "proportional trading model" to determine aggregate damages for a securities fraud class by multiplying the alleged per share price differential by the aggregate number of shares that were "damaged" by the alleged fraud. 2000 WL 1506892, at *1. Notably, however, the proposed expert acknowledged not only that his theory had never been tested against reality, but also that there was no way to test it, and that it had not been accepted by professional economists. *Id.* at *2. To the contrary here, Leverty employed regression analysis, which is commonly employed by others in his field and capable of duplication, *see e.g.*, *Manpower*, 732 F.3d at 808, and Plaintiffs identify multiple tests that Leverty performed to confirm the strength of his analysis. [*See* Pls' Leverty Resp. at 6 n.2 (citing Leverty Reply Rpt. ¶¶ 20-35).] The failures against "reality" that Defendants assert in this case are not proper *Daubert* challenges, for example, to the methodology Leverty employed or the testability of his analysis, but instead are challenges to the assumptions he used in formulating his analysis and to his ultimate conclusions. These latter arguments go to the weight of his opinions, and may be raised before the factfinder. *See Owens*, 895 F.3d at 973; *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013).

### 2. Purported Errors in Analysis

Defendants next assert that Leverty's opinions should be excluded because his regression analyses are "replete with errors." [Defs.' Leverty's Mem. at 10.] Relying heavily on the opinions of their own proffered expert, Bruce Deal, Defendants identify five specific errors they say reverse Leverty's results when corrected, and further argue that the cumulative effect of the asserted errors warrants exclusion for lack of reliability. [*Id.* at 10-13.] Plaintiffs respond to each argument in kind, explaining their view as to why Leverty properly structured his analysis in the way that he did, and why his calculations are sound. [Pls' Leverty Resp. at 7-11.]

As explained in turn below, however, each of Defendants' criticisms in this regard again goes to the weight of Leverty's opinions, not their admissibility. Specifically, Defendants first assert that Leverty's primary regressions are incorrectly specified. Citing Deal's analysis, Defendants argue that all five sets of explanatory variables Leverty employed—state fixed effects, quarter-year fixed effects, state-specific time trends, miles driven, and precipitation—are incorrectly applied both to Allstate and the industry. [Defs.' Leverty Mem. at 10-11.] As a result, Defendants say, Leverty's regressions cannot control for differences between Allstate and the industry, as he claimed that he did. [*Id.*] Plaintiffs emphasize in response that Leverty explained that he applied all five sets of variables that way because his goal was to observe how Allstate's specific growth initiatives impacted Allstate's claims frequency as compared to the industry at large. [Pls' Leverty Resp. (citing Leverty Reply Rpt. ¶¶ 38-49).] According to Plaintiffs, therefore, if Leverty had applied the variables to Allstate and the industry separately, the analysis would estimate the impact of growth initiatives within Allstate and within the industry, which would not have answered the question posed. [*See id.*] Defendants dispute this rationale on reply, and insist Leverty erred in applying explanatory variables both to Allstate and the industry. [Defs.' Combined Reply at 2.]

**\*9** Resolution of this debate is not the province of a *Daubert* motion. As Defendants' own authority makes clear, "[t]he question of what explanatory variables should be included in a particular regression normally "affect[s] the analysis' probativeness, not its admissibility." *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 468 (8th Cir. 2004) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). It is not the

role of the Court at this gatekeeping stage to choose among competing economic theories. *See Manpower*, 732 F.3d at 806; *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *5-9.

Defendants next assert that Leverty did not use the correct time period to compare Allstate's claims frequency to that of the industry as a whole, and that he did not correctly weigh U.S. states according to their percentage of Allstate's business, both of which Defendants say cause his findings to substantially decrease or reverse. [Defs.' Leverty Mem. at 11.] Plaintiffs argue in opposition that Leverty chose a time period that corresponds to the complete dataset that was available to him, which they say is standard econometric practice, and that weighting the states as Defendants suggest would not have been appropriate since it would not have identified the average effect of BTT and CGR initiatives on overall Allstate claims frequency. [Pls.' Leverty Resp. at 7-8 (citing Leverty Reply Rpt. ¶¶ 19, 33-34, 50-53, 61-71).] Citing a 2015 journal publication, Plaintiffs further argue that Defendants' criticism is not supported by academic literature. [*Id.* at 8.]

Once again, such disagreements over which time periods to use or how to weight individual states reflect a classic dispute among the experts over the choice of inputs, which is inappropriate to resolve at this *Daubert* juncture. *See, e.g., In re Zimmer Nexgen Knee Implant Prod. Liab. Litig.*, No. 11 C 5468, 2015 WL 4880953, at *5 (N.D. Ill. Aug. 13, 2015) ("[T]he accuracy of the underlying assumptions goes to the relevance and weight of the evidence, rather than its reliability."); *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *5 (declining to exclude expert who provided reasonable rationales for his methodological assumptions grounded in econometric profession). "Reliability ... is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *See Manpower*, 732 F.3d at 806. It is for the fact finder to determine whether Leverty's choice of data inputs render his analysis either more or less persuasive than that which is offered by Defendants. *See id.* at 809 ("That the reasoning behind [the expert's data selection] could be challenged as incomplete or faulty does not make it any less grounded in real data."); *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *8-9.

Similarly, Defendants argue that Leverty's decision to run separate regressions estimating the effects of BTT and CGR

and then add them together results in overcounting and thus inflated findings. [Defs.' Leverty Mem. at 12.] Plaintiffs disagree, explaining that Leverty structured his analysis in this way because CGR is only implemented in states with BTT, and always implemented after BTT, which means there is a strong dependence between the two and to include them both in the same model thus would have resulted in a multicollinearity problem. [Pls.' Leverty Resp. at 9 (citing Leverty Reply Rpt. ¶¶ 79-87).][3] According to Defendants, however, this is a "misdirection," because Leverty could have measured the combined effect of BTT and CGR on Allstate's claims frequency regardless of the multicollinearity between BTT and CGR. [Defs.' Leverty Mem. at 12 n.9.]

**\*10**  Here again, the parties' dispute reflects a reasonable disagreement between the experts about *how* Leverty conducted and calculated his analyses, rather than a proper *Daubert* challenge over whether the method is a reliable one. Leverty provides explanations for his choices in how he conducted and calculated his analysis [Leverty Reply ¶¶ 79-87], and Defendants' disagreements with them go to the weight of his opinions, not their admissibility. *See Manpower*, 732 F.3d at 806; *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir. 2002) (describing issue of multicollinearity, noting competing economic experts' different approaches to it, and declining to exclude expert testimony where the experts disagreed over whether certain variables should be included or excluded due to multicollinearity).

Likewise, Defendants' criticism that Leverty erroneously coded the first two and last two quarters of the covered time period as a single quarter also goes to weight, and not admissibility. According to Plaintiffs, Leverty structured his analysis in this way to approximate an average and to minimize issues with multicollinearity because there were fewer observations in the first two and last two quarters. [Pls.' Leverty Resp. at 9 (citing Leverty Reply Rpt. ¶¶ 136-37).] Defendants call this choice an error, and assert that correcting for it causes his findings to decrease or even reverse. [Defs.' Leverty Mem. at 12.] To support their critique that he should have structured his analyses differently, Defendants cite their own expert's different approach. [*See id.*] As with their previous challenges, this critique does not make Leverty's opinion non-admissible under *Daubert*, however, and Defendants may raise their challenges before the finder of fact. *See Manpower*, 732 F.3d at 806; *High Fructose Corn Syrup*, 295 F.3d at 660.

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6994    Page 61 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

Finally, Defendants argue that because (what they see as) Leverty's sloppiness resulted in several corrected reports, and because Leverty admitted that he had made certain other errors identified by Deal, his opinion should be excluded as unreliable. [Defs.' Leverty Mem. at 12 (quoting Leverty Reply Rpt. ¶ 106).] The record, however, is unlike that in Defendants' cited authorities, where the challenges focused on and went to the soundness of the expert's entire methodology. *See Alexian Bros. Health Providers Ass'n, Inc. v. Humana Health Plan, Inc.*, 608 F. Supp. 2d 1018, 1025-27 (N.D. Ill. 2009) (excluding opinion based on an analysis that was "methodologically unsound," and noting Rule 702's 2000 version of the Advisory Committee Notes explains that "the rejection of expert testimony is the exception rather than the rule," and that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 574, 611-12 (S.D.N.Y. 2007) (cumulative errors added up to cast doubt on the entire reliability of the analysis). To the contrary here, Defendants essentially complain about Leverty's data choices [Defs.' Leverty Mem. at 10-13], upon which reasonable experts may disagree and which do not impact admissibility. *See Stollings*, 725 F.3d at 766-67; *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 660. Furthermore, only two of Defendants' expert Deal's criticisms were viewed by Leverty to have any merit, and Leverty appropriately re-ran his analysis before concluding that neither changed his opinions significantly. [*See* Pls.' Leverty Resp. at 10 & n.7, 8 (citing Leverty Reply Rpt. ¶¶ 54-56, 105-108).] To the extent that Defendants disagree with his conclusions, they may raise their challenge before the finder of fact. *See Manpower*, 732 F.3d at 806; *Gicla*, 572 F.3d at 414.

### B. Opinion on Impact of Other Internal Factors

**\*11**  Defendants next move to exclude Leverty's opinion that up to 55% of Allstate's claims frequency increase was "likely due to internal factors—loosening underwriting standards and Allstate's many other growth initiatives," programs that Leverty acknowledged he had "not been able to quantitatively analyze." [Defs' Leverty Mem. at 13-14; Leverty Rpt. ¶ 270.][4]  According to Defendants, the opinion should be excluded as unsupported by any analysis, and not specifically tied to any particular experience. [Defs' Leverty Mem. at 13-14; Defs.' Combined Reply at 3; dkt. 428, Defs.' Suppl. at 4-6.] Defendants contend that unlike the detailed regression analyses Leverty offered in support of his opinions on the effects of miles driven, precipitation, and Allstate programs

BTT and CGR on its claims frequency, this opinion on other "internal factors" is not based on any methodology, but instead is simply offered based on Leverty's say-so. [Defs' Leverty Mem. at 13-14; Defs.' Suppl. at 4-6.] Plaintiffs dispute this characterization, and assert that in rendering his opinion, Leverty utilized the reliable methodology of process of elimination, informed by sufficient facts and data, econometric theory, and his experience in practice. [Pls.' Leverty Mem. at 11-13; dkt. 431, Pls.' Suppl. at 4-8.] Defendants disagree, asserting that Leverty did not attempt to rule out *any* possible alternative causes for Allstate's claims frequency increase beyond miles driven and weather, and instead just assumed that the balance of the increase he had not otherwise attributed was the result of internal Allstate factors. [Defs.' Suppl. at 5.]

Notwithstanding Defendants' arguments, however, and although the methodology he employed is different in nature than that used for his other opinions, Plaintiffs demonstrate that Leverty's opinion is sufficiently reliable to be presented to the trier of fact. Leverty reached his challenged opinion based on substantially more than the unspecified experience and say-so that Defendants describe. First, Leverty considered, analyzed and ruled out significant possible causes of Allstate's claims frequency increase—namely, the two external factors that Defendants had identified to the public as the cause of the increase, miles driven and precipitation. [Pls.' Suppl. at 4 (citing Leverty Rpt. ¶¶ 153-179).] He then performed regression analyses between those external factors and quantified their impact. [*See id.* at 5.] Next, he considered and analyzed the two growth initiatives that potentially impacted Allstate's claims frequency and for which he had sufficient data, BTT and CGR, again performing regression analyses to quantify their impact. [Pls.' Suppl. at 5-6; Leverty Reply Rpt. ¶¶ 103, 127-28, 133.] After performing statistical analyses to quantify those factors, Leverty concluded that it was reasonable to attribute the remaining increase to internal factors such as Allstate's other growth initiatives. He grounded that determination not only on his experience, but also on econometric theory, a review of Allstate documents about its various other growth initiatives that were designed and implemented to grow its auto insurance business, and data suggesting that, as Allstate's auto insurance business grew, so too did its claims frequency. [Pls.' Suppl. at 6 (citing Leverty Rpt. ¶¶ 75-83, 88-90, 98, Ex. 6 & 7, and dkt. 377-5, Leverty Dep. at 113:15-23, 119:25-120:11); Leverty Reply Rpt. ¶¶ 132-34.]

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6995    Page 62 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

This process of elimination that Leverty employed is reliable for *Daubert* purposes, and Defendants do not cite any legal authority questioning the reliability of the process of elimination. *See, e.g., Ballard v. Zimmer, Inc.*, No. 11 C 6786, 2015 WL 5144350, at *7 (N.D. Ill. Aug. 31, 2015) (Pallmeyer, J.) (noting that "process of elimination is a valid methodology," and declining to strike where expert considered and explained why he could not rule out all alternative causes); *Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779276, at *6 (S.D. Ala. Mar. 2, 2010) (admitting chemical engineer's testimony on likely sources of contaminant on plaintiffs' properties where he did not quantify the amount emanating from defendant's plant pursuant to specific pathways but instead opined based on a process of elimination of alternative sources); *St. Paul Mercury Ins. Co. v. Viking Corp.*, No. 04-C-1124, 2007 WL 129063, at *11-13 (E.D. Wis. Jan. 12, 2007), *aff'd sub nom. St. Paul Mercury Ins. Co. v. The Viking Corp.*, 539 F.3d 623 (7th Cir. 2008) (rejecting exclusion of expert opinion based on an *ipse dixit* argument where, although expert "did not exhaustively investigate all potential causes," he used the reliable methodology of process of elimination, and supported his opinion with sufficient facts and data).

**\*12** Notwithstanding Defendants' argument, the fact that Leverty utilized different methodologies to reach his other opinions does not determine the reliability of this one. This Court focuses on the reliability of the principles and methodology Leverty employed to reach each opinion, not on whether they were all reached in the same way. *See Daubert*, 509 U.S. at 565. For this same reason, Leverty's acknowledgment that he did not "quantitatively analyze" the internal factors he opines were "likely" the cause of Allstate's claims frequency increase [*see* Leverty Rpt. ¶ 270] is not a basis for exclusion, because he used the reliable process of elimination to reach this opinion. *See, e.g., Ballard*, 2015 WL 5144350, at *7; *Abrams*, 2010 WL 779276, at *6. The question to be considered is not why a proffered expert "did not use regression analysis, but whether the method he did use is reliable." *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *10 (N.D. Ill. Aug. 21, 2017).

This is so even assuming, *arguendo*, that Leverty may have failed to rule out every possible factor impacting Allstate's claims frequency, which would go to weight and not admissibility.[5] *See In re Titanium Dioxide Antitrust Litig.*, No. CIV.A. RDB-10-0318, 2013 WL 1855980, at

*13 (D. Md. May 1, 2013) (in conducting an economic analysis, an expert "need not account for every possible explanation before reaching an opinion on the matter" but " 'only demonstrate that he has adequately accounted for alternative explanations'[.]") (quoting *U.S. Info Sys. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 238-39 (S.D.N.Y. 2004)); *Ballard*, 2015 WL 5144350, at *7-8 (argument that expert could not conclusively rule out alternative causes goes to weight, not admissibility).

Further, Defendants' critique that Leverty did not rule out any factors other than the ones he did does not make his opinion unreliable. Indeed, such a criticism could be made of any analysis that does not rule out every single factor, and that is not the standard for admissibility. *See id.* While a reliable expert should consider alternative causes, the expert need not rule out *every* alternative cause. *Id.* Leverty's consideration of the probable alternative causes of Allstate's claims frequency increase is sufficiently reliable to be admissible. *See id.*

Nor is the Court's analysis changed by Defendants' assertion that based on Leverty's prior publication identifying distracted driving as a potential factor affecting claims frequency, he should have also measured that external factor in this case. [*See* Defs.' Suppl. at 2, 5.] Unlike in Defendants' cited authority, however, *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005), where the proffered expert did not test for *any* alternative causes, Leverty considered and provided a reasoned explanation for why he did not measure the impact of distracted driving on Allstate's claims frequency increase—namely, because there was no information or data in this case suggesting it as a factor, and because indeed distracted driving was actually decreasing due to cell phone bans implemented during the same time as the class period. [*See* Leverty Dep. at 154:03-156:07; Leverty Reply Rpt. ¶ 134.] Accordingly, Defendants' criticism in this respect is not as to a purported failure of Leverty's methodology, but instead goes only to the probative value of his opinion, which Defendants are free to argue to the fact finder. *See Manpower*, 732 F.3d at 808; *Ballard*, 2015 WL 5144350, at *7.

**\*13** Similarly, whether Leverty knew details of Allstate's other growth initiatives or whether he lacked access to data to quantify their impact are not questions that go to the reliability of his opinion. *See Ballard*, 2015 WL 5144350, at *7. Defendants will have the opportunity to cross-examine Leverty about the data and evidence underlying his opinions, and the possible alternative causes that he was unable to rule

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6996    Page 63 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

out. "The absence of evidence available to [Leverty], and his inability to express an opinion with 100% certainty, does not imply that his methodology was flawed" for *Daubert* review. *Ballard*, 2015 WL 5144350, at *7.

Finally, because Leverty employed a reliable methodology which he adequately explained and supported, the record is unlike Defendants' cited authorities. *Cf. Clark v. Takata Corp.*, 192 F.3d 750, 758-59 (7th Cir. 1999) (affirming exclusion of proffered opinion in a 1.5 page report offering only a bottom line "based solely on his belief and assumption" without any scientific testing data or other supporting material in the record, and the district judge had been unable to determine what methodology or reasoning the expert had even used); *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (admission of expert's testimony was error where it was "undisputed" that the expert had performed no scientific tests or studies to arrive at his conclusions although he had represented to the court that such tests would be forthcoming); *Hershey v. Pac. Inv. Mgmt. Co. LLC*, 697 F. Supp. 2d 945, 955 (N.D. Ill. 2010) (excluding expert's causation opinion where it was undisputed that he had not performed an analysis to distinguish between loss attributable to fraud from *any* other possible significant causes). Here, in contrast, Leverty sufficiently offered the evidence, reasoning, and methodology recited above to support his opinion [Leverty Rpt. ¶¶ 75-83, 88-90, 98, 270, Ex. 6 & 7] so that Defendants and this Court can see and evaluate what serves as its basis. Leverty's opinions "may be subject to doubt," and Defendants are free to raise their challenges at trial, but it is the role of the factfinder, and not this Court at the *Daubert* stage, to determine their weight. *See Stollings*, 725 F.3d at 765-766; *Ballard*, 2015 WL 5144350, at *6.

**C. Opinion on Impact of Miles Driven and Precipitation on Allstate's Claims Frequency**

Defendants next argue that Leverty's opinion on the impact of miles driven and precipitation on Allstate's claims frequency is unreliable because it contradicts with his academic work. [Defs.' Leverty Mem. at 6-7.] Specifically, Defendants highlight a 2019 article in which Leverty noted the increasing number of miles driven in an expanding economy and concluded that a recent, industry-wide increase in the frequency of automobile accidents was likely due to increases in the miles driven during the period of economic expansion. [*Id.* at 6-7 & Ex. K.] According to Defendants, because Leverty's opinion in this case contradicts his prior writing, it so undermines his credibility that his opinion should be excluded under *Daubert*. [*Id.*] Plaintiffs argue in response

that the cited article does not in fact contradict Leverty's opinion because the article looked at more than 30 years based on a survey of academic studies about the affordability of automobile insurance, and drew no specific conclusions about the drivers of claims frequency or severity. [Pls.' Leverty Resp. at 13-14.] The opinions are different and indeed not contradictory, Plaintiffs add, because Leverty did not quantify the relationship between miles driven and the increase in claims frequency for the article, whereas to render his opinions in this case, he performed rigorous regression analysis on the impact of those factors on Allstate's claims frequency. [*Id.* at 14.]

**\*14** Whether the positions asserted in Leverty's academic publication contradict his opinions in this action is not properly the subject of a *Daubert* motion. The crediting or discrediting of Leverty's opinion based on an academic publication poses an issue to be determined at trial. *See Baldonado v. Wyeth*, No. 04 C 4312, 2012 WL 1802066, at *7 (N.D. Ill. May 17, 2012) (St. Eve, J.) (argument that opinion in prior publication contradicts proffered opinion in litigation goes to the weight of testimony, not admissibility). Nor does Defendants' cited case, *United States v. Johnson*, 122 F. Supp. 3d 272 (M.D.N.C. 2015), prove otherwise. In that case, the court addressed a *Daubert* challenge *after* a bench trial had already been conducted. *Id.* at 336. It was only *after* granting the motion to exclude on *Daubert* grounds that the court added that, even if they were admissible, the court would not have found the expert's *conclusions* credible because his testimony directly contradicted his prior writings. *See id.* at 337 ("Even if [the expert's] study were admissible, this court would not accept his conclusions as credible for several reasons...."). In performing its gatekeeping function under *Daubert*, this Court must focus "solely on principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595.

Similarly, Defendants' footnote argument[6] that Leverty's opinions are unreliable because of allegedly plagiarized report passages is not an appropriate basis to exclude. Defendants do not contend that Leverty's opinions are not his own, but only that Leverty's supporting discussion is not properly attributed to original sources. [*See* Defs.' Leverty Mem. at 13, n.11.] This credibility question is not one of admissibility, but rather one of weight to be assessed by the trier of fact. *See, e.g., Legier & Materne v. Great Plains Software, Inc.*, No. CIV.A. 03-0278, 2005 WL 2037346, at *4 (E.D. La. Aug. 3, 2005) (denying motion to strike expert testimony based on argument that portions of report were plagiarized, and noting general

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6997    Page 64 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

rule that "questions relating to the bases and sources of an expert's opinion rather than its admissibility ... should be left for the jury's consideration." (internal quotation omitted)).

### D. Opinion on Allstate's Contemporaneous Internal Analyses

Lastly, Defendants assert that Leverty's opinion that Allstate's contemporaneous internal analyses were flawed is unreliable because it is based on what Defendants characterize as a misleading presentation of "cherry-picked" facts. [Defs.' Leverty Mem. at 14-15.] Specifically, Defendants argue, Leverty selectively relied on an Allstate presentation to support his opinion that Allstate's March through April 2015 analyses showed "a growing recognition of an association between new business growth and increased frequency" despite the fact that the same presentation also noted that the "frequency uptick" was "driven across segments of the book." [*Id.*]

As Plaintiffs correctly observe, however, Leverty did not ignore the materials that Defendants highlight, but instead considered and explained his analysis of why certain conclusions they contained were flawed. [Pls.' Leverty Resp. at 15; Leverty Rpt. ¶¶ 108-21, 133-41, 145-50.] Unlike in Defendants' cited authorities, *Barber v. United Airlines, Inc.,* 17 F. App'x 433, 437 (7th Cir. 2001), and *Holden Metal & Aluminum Works*, 2003 WL 1797844, at *2, in which the proffered experts ignored certain facts or data without explanation, Leverty considered the materials that Defendants highlight, and explained his reasoning in assessing them. [*See* Leverty Rpt. ¶¶ 108-21, 133-41, 145-50.] To the extent that Defendants believe certain facts undermine his analysis, their challenge goes to the weight of his opinion, and not its admissibility. *See Manpower*, 732 F.3d at 806; *Smith*, 215 F.3d at 718. It is the duty of the finder of fact, not the court exercising its *Daubert* gatekeeping function, to weigh Leverty's opinion in this regard. *See Stollings*, 725 F.3d at 765. Accordingly, Leverty's opinion on Allstate's contemporaneous analyses is sufficiently reliable to be presented to the finder of fact.

\* \* \* \* \*

**\*15** For each of these reasons above, the Court recommends that Defendants' motion to exclude Leverty's opinions and testimony be denied.

### IV. Defendants' Motion to Exclude - John D. Finnerty [371]

Defendants move to exclude Plaintiffs' proposed expert John D. Finnerty's testimony and opinions, including his February 27, 2020 and July 30, 2020 reports, as implausible and unreliable. [Dkt. 371, Defs.' Finnerty Mot.; dkt. 372, Defs.' Finnerty Mem. at 5-10.] Finnerty is an economist and Professor of Finance and Business Economics at Fordham University's Gabelli School of Business, who provided loss causation and damages opinions in support of Plaintiffs' claims. [Defs.' Finnerty Mem. at 1.] Finnerty opined that: (1) Allstate's common stock price declined on February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015, immediately following the public revelation of previously undisclosed facts regarding Allstate's increase in auto claims frequency, and that the abnormal returns on those dates were statistically significant; (2) the price declines were due to the revelation of Allstate-specific information; (3) the economic loss suffered by Allstate shareholders was substantially caused by Defendants' disclosure of the existence of a claims frequency increase and the cause of that increase; and (4) the amount of damages suffered by Allstate shareholders due to Defendants' misrepresentations is up to $9.38 per share. [Dkt. 398, Pls.' Finnerty Resp. at 6 (citing dkt. 373-1, Finnerty Rpt. ¶ 11).]

In rendering his opinions, Finnerty conducted an event study of the stock drops at issue by reviewing the record and accounting for information that may have affected the stock price. [Finnerty Rpt. ¶ 38.] Defendants do not challenge Finnerty's qualifications or that the use of an event study is a generally accepted methodology in economics.[7] [*See* Pls.' Finnerty Resp. at 1; Defs.' Combined Reply; Defs.' Suppl.] Instead, Defendants argue that Finnerty's opinions should be excluded as unreliable because (1) he relied on the unreliable opinions of Leverty, (2) he failed to disaggregate the impact of allegation-related statements from statements unrelated to the alleged fraud, and (3) his analysis begins with the erroneous assumption that disclosures could have been made on the first day of the class period despite his acknowledgment that they could not. [Defs.' Finnerty Mem. at 5-10.]

As explained below, however, the Court concludes that Finnerty reasonably relied on Leverty's analysis in adjusting for confounding information, and Defendants' other arguments are based on a mischaracterization of Plaintiffs' liability case and call for the Court to make determinations that are inappropriate at the *Daubert* gatekeeping stage. [*See*

dkt. 398, Pls.' Finnerty Resp. at 8-10; Pls.' Suppl. at 8-9.] The Court addresses each argument in turn.

### A. Reliance on Leverty

Defendants' argument that Finnerty's opinions are unreliable because they rely on the purportedly unreliable opinions of Leverty is rejected based on the Court's recommendation above that Leverty's opinions are sufficiently reliable to be admissible. *See supra,* Sect. III. "[I]n order to prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors." *Glickenhaus,* 787 F.3d at 421. In adjusting for confounding information as part of his event study, Finnerty reasonably relied on Leverty's regression-based opinions regarding the impact of external factors on Allstate's claims frequency. [*Id.* ¶ 66-67, 90-91, 124-25.] *See Walker,* 208 F.3d at 588 (expert may rely on reliable opinion of another expert). Moreover, Defendants' criticism of the data upon which Finnerty relied would not be a basis to exclude. *See Stollings,* 725 F.3d at 766-67 (uncertainty of data input affects weight of expert's opinion, not admissibility, and is an issue for the trier of fact); *Manpower,* 732 F.3d at 808 (same).

### B. Disaggregation of Confounding Information

**\*16** Defendants next argue that Finnerty's opinions are unreliable because he did not properly disaggregate the impact of allegation-related statements, *i.e.*, statements about loosened underwriting standards—from statements unrelated to the alleged fraud, *i.e.*, statements about Allstate's other growth strategies. [Defs.' Finnerty Mem. at 8-10.] According to Defendants, Plaintiffs allege that the true cause of Allstate's claims frequency increase was its loosened underwriting standards, and Finnerty acknowledged that the market never learned that Allstate had reduced its underwriting standards. [*Id.* at 8-9.] Therefore, Defendants reason, no part of Allstate's stock price decline was attributable to the fraud Plaintiffs allege, and Finnerty was thus obliged to disaggregate the impact of statements about aggressive growth strategies from statements about loosened underwriting standards. [*Id.*]

According to Plaintiffs, however, Defendants' argument rests on a mischaracterization of the nature of their fraud case. [Pls.' Finnerty Mem. at 8-10.] Plaintiffs contend that they do not allege that changes in underwriting standards were the *sole* cause of Allstate's claims frequency increase, but rather, they allege that investors were "shocked" when Allstate disclosed that its claims frequency increase was proximately

caused by its aggressive growth strategy, *including* greatly reduced underwriting standards. [*Id.* at 8 (citing Second Am. Compl. ¶¶ 16, 97, 107).] As Plaintiffs reason, there is therefore no need for Finnerty to disaggregate the impact of statements related to loosened underwriting standards from those relating to other growth strategies. [*Id.* at 8-10.] Citing references to Plaintiffs' allegations regarding Allstate's aggressive growth strategies as noted in earlier decisions in the case and Defendants' expert's report, Plaintiffs argue that the District Judge, the Seventh Circuit, and Defendants' own expert have understood their allegations accordingly. [*Id.* at 9.]

In determining whether Finnerty's opinions satisfy the requirements of FED. R. EVID. 702 and *Daubert,* the Court assesses the relevance of Finnerty's analysis to the claims that Plaintiffs say they present. *See Gopalratnam,* 877 F.3d at 779; *Smilovits v. First Solar, Inc.,* No. CV12-0555-PHX-DGC, 2019 WL 7282026, at \*8 (D. Ariz. Dec. 27, 2019) (rejecting argument that plaintiffs' expert's opinions were contrary to plaintiffs' allegations, reasoning that "the Court must look to Plaintiffs, not Defendants, for the nature of their liability case"). Given Plaintiffs' framing of their claims, Defendants' argument that Finnerty failed to disaggregate in this way is no basis to exclude. *See id.*

Defendants further argue that Finnerty's analysis is unreliable because he failed to consider or account for (1) the extent to which the market expected that Allstate's growth strategy would lead to an increase in claims frequency, and (2) the "new business penalty," *i.e.*, the small size of the disclosed effect of new business on claims frequency. [*Id.* at 9-10.] Both challenges go to the weight of his opinions, however, not their admissibility.

Finnerty expressly considered the extent to which the market already expected an increase in Allstate's claims frequency given certain statements made before the class period, and explained in his opinion why those statements were excluded from his analysis. [*See* Pls.' Finnerty Resp. at 11 (citing dkt. 373-2, Finnerty Reply Rpt. ¶¶ 75-84).] As Finnerty reasoned, Defendants' earlier statements were economically different from the alleged corrective disclosures—and thus he excluded them from his analysis—since they did not reveal that Allstate's aggressive growth strategy, including loosened underwriting standards, was causing a substantial increase in claims frequency. [*See* Finnerty Reply Rpt. ¶ 78.] That defendants disagree with how he considered certain

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.6999    Page 66 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

data – those earlier statements – does not render his opinion unreliable. *See Manpower*, 732 F.3d at 806.

**\*17** Similarly, given Plaintiffs' claims, the issue of the "new business penalty" is plausibly irrelevant to Finnerty's opinions. [*See* Pls.' Finnerty Resp. at 11-12.] According to Plaintiffs, the new business penalty is the average difference in claims frequency between new business and renewal business, *holding fixed* the insurer's underwriting standards in the composition of the business. [*See id.* (citing Leverty Dep. at 66:10-67:04).] As Plaintiffs contend, that is irrelevant to Finnerty's analysis because Allstate's underwriting standards and the composition of its business was changing (and thus not "held fixed") at the time as a result of Allstate's aggressive growth strategy. [*Id.*] Given that Leverty's analysis was focused on that change, Plaintiffs contend that Leverty properly controlled for the new business penalty. [*See id.* (citing 377-1, Ex. A, Leverty Rpt. ¶ 199).] Whether Plaintiffs' and Finnerty's analysis of the issue is the correct one is a matter for the trier of fact to decide. *See Manpower*, 732 F.3d at 806.

Further, the Seventh Circuit has recognized that an event study may be reliable although it does not perfectly exclude nonfraud related factors. *See Glickenhaus*, 787 F.3d at 422 (rejecting argument that event study must perfectly exclude all nonfraud related matters that may have contributed to stock price, but finding error in admission of that expert's opinion where expert acknowledged mixed disclosures during the relevant period but had not sufficiently accounted for or explained the possibility that *any* firm-specific, nonfraud related information had affected the price); *see also* FED R. EVID. 702 Advisory Co.'s Note to 2000 Amendment (proponents of evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable" (citation and quotation omitted)). Thus, even if Defendants are correct that Finnerty failed to account for *some* confounding factors, the failure would go only to the weight of his analysis, not its admissibility. *See Bazemore*, 478 U.S. at 400 ("While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable[.]" (internal quotation omitted)); *Glickenhaus*, 787 F.3d at 422 ("It may be very difficult, if not impossible, for any statistical model" to perfectly exclude nonfraud factors); *In re Novatel Wireless*

*Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12144150, at \*8 (S.D. Cal. Oct. 25, 2013) (despite finding expert's omission to be "problematic," an expert's testimony that he did not consider a certain non-fraud related factor in his event study "does not dictate exclusion of the report as unreliable," but instead goes to weight); *S.E.C. v. Manouchehr Moshayedi*, No. SACV1201179JVSMLGX, 2013 WL 12129282, at \*6 (C.D. Cal. Nov. 20, 2013) (upon a challenge that the expert failed to disaggregate confounding factors in an event study, observing that whether expert "chose the correct factors and gave them the correct weight is for the jury.").

**C. Purportedly Erroneous Assumption**

Lastly, Defendants argue that Finnerty's opinions should be excluded as unreliable because they depend on an impossible assumption: that Allstate could have disclosed its claims frequency increase through Q2 2015, which was reported on August 3, 2015, nearly ten months earlier, on October 29, 2014, which was the first day of the class period. [Defs.' Finnerty Mem. at 7.] According to Defendants, because Finnerty posits that the inflation attributable to the alleged fraud is constant from the first day of the class period to the last day despite acknowledging that Allstate could not have disclosed the impact of its Q2 2015 frequency statistics any earlier than it did, his opinions rest on an impossibility that renders them unreliable. [*Id.*]

**\*18** As discussed above, however, Plaintiffs' fraud claims are more nuanced than Defendants suggest, and Finnerty reliably conducted an event study to provide opinions that support their claims. [*See supra* Sect. IV. B.] As Plaintiffs frame it, their fraud claim is not based on allegations regarding a simple failure to disclose the claims frequency increase, but rather on allegations that when the claims frequency increase was disclosed, Defendants falsely denied any connection between it and Allstate's new growth, and falsely attributed the increase solely to external factors. [*See* Pls.' Finnerty Resp. at 8-9, 13.] As Finnerty testified, Allstate's reporting of frequency statistics had nothing to do with his loss causation and damages analyses. [*Id.* at 13 (citing dkt. 373-3, Finnerty Dep. at 62:19-63:16, 69:06-70:21).] According to Finnerty, although Allstate could not have disclosed claims frequency increases before they had happened, Allstate could have been truthful about and disclosed earlier in time the underlying causes of claims frequency increases. [*See* Finnerty Dep. 61:13-63:16 ("It could have disclosed information about how claims frequency was behaving. But it couldn't have disclosed the precise numbers because they hadn't—they hadn't been realized

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7000   Page 67 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

yet.... If it had told the truth about the claims frequency and had avoided the misstatements that are alleged in the complaint, then it's my opinion that the stock would have fallen by $9.38").] Finnerty's opinions thus do not rest on the impossible assumption Defendants claim. Rather, Finnerty's opinions track Plaintiffs' theory and are designed to measure the effect that Plaintiffs say the truth would have had on Allstate's stock price, and Defendants' complaint of an impossible premise misunderstands the nature of Plaintiffs' allegations. [8] *See In re Allstate Corp. Sec. Litig.*, 966 F.3d at 613 ("[T]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." (quoting *Glickenhaus*, 787 F.3d at 415)).

\* \* \* \* \*

For each of these reasons above, the Court recommends that Defendants' motion to exclude Finnerty's opinions and testimony be denied.

## V. Plaintiffs' Motion to Exclude - Lucy P. Allen, Bruce Deal, and Paul A. Gompers [382 (redacted), 387 (sealed)]

### A. Lucy P. Allen

Plaintiffs move to exclude the opinions of Lucy P. Allen, an economist who opines that Allstate's alleged misstatements had no impact on Allstate's stock price. [Dkt. 387, Pls. Mot. at 3-6; dkt. 384-1 at Ex. 1, Allen Rpt.] According to Allen, Allstate's growth strategy was widely expected to cause the company to experience higher claims frequency, and this expectation was already impounded into its stock price at the start of the class period. [Allen Rpt. § VI.C.] Additionally, Allen opines that the 10% decline in Allstate's stock price that occurred after the final alleged corrective disclosure is not evidence of price impact, because analysts at the time did not attribute the company's claims frequency increase to its lowered underwriting standards. [*Id.* § VI.F.2.]

Plaintiffs do not dispute Allen's qualifications or the methodology she employed in reaching her conclusions. Instead, Plaintiffs argue that Allen's opinions should be excluded because they lack the requisite fit with the facts of the case, and are contrary to established law. [Pls.' Mot. at 3-6.] Defendants argue in opposition that Plaintiffs' motion is untimely because Allen's report was served in 2018, and her opinions have already been considered by the Seventh Circuit

and the District Court without any objection by Plaintiffs. [Dkt. 391, Defs.' Resp. at 2-3.] In any event, Defendants continue, Allen's opinions are admissible since they are based on substantially more than the single piece of evidence Plaintiffs challenge, and because they conform with Seventh Circuit law. [*Id.* at 3.]

### 1. Timeliness

At the outset, the Court readily concludes that Plaintiffs' motion is not untimely. First, as Plaintiffs correctly observe, their motion was filed in accordance with a court-ordered briefing schedule for *Daubert* motions, which was set following Defendants' motion to modify the briefing schedule that had been set by the District Judge's standing order for such motions. [*See* dkt 418, Pls.' Reply at 1 (citing dkt. 367, Feb. 18, 2021 order); dkt. 304, Defs.' Mot. to Modify.] Notably, nowhere in Defendants' motion to modify did they assert that Plaintiffs had effectively waived any challenge to Allen's testimony by failing to raise it earlier; to the contrary, in seeking to extend the deadline, Defendants asserted at the time that *Daubert* motions were not yet due. [*See* Defs.' Mot. to Modify at 2-3.] Additionally, as discussed above, notwithstanding their timeliness objection, Defendants contemporaneously move to exclude Finnerty, whose report was considered alongside Allen's at the class certification stage, and they do not attempt to explain why the timeliness of their own motion should receive different scrutiny.

**\*19** Second, this is the Court's first opportunity to apply *Daubert* scrutiny to the parties' expert reports even though some of the reports—including Allen's—were already introduced at the class certification stage. Courts in similar circumstances have not hesitated to consider *Daubert* motions at this juncture. *See, e.g., Kleen Prods. LLC v. Int'l Paper*, No. 10 C 5711, 2017 WL 2362567, at *2 (N.D. Ill. May 31, 2017) (considering *Daubert* motions regarding experts whose reports had already been considered at class certification and on appeal, where no admissibility challenge had been made earlier). Given the history and procedural posture of the case, it is appropriate to undertake the rigorous *Daubert* analysis now.

### 2. Reliability and Fit

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7001   Page 68 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

According to Plaintiffs, Allen's opinion that the market knew that Allstate's growth strategy would increase claims frequency is unreliable because she relies on a statement made by Defendant Winter to support it, and Winter testified in his deposition that his statement was not about auto insurance, but rather, homeowner's insurance. [Pls.' Mot. at 3.] Further, Plaintiffs contend, Allen's opinion is irrelevant and lacks the requisite fit to the case because she only tested for whether the market knew of Allstate's new underwriting strategy, and not whether the market knew of Allstate's claims frequency increase or that the increase was caused by the underwriting standards as opposed to miles driven and precipitation. [*Id.* at 4.] And because the District Judge concluded at the class certification stage that Allen's study was "unresponsive to plaintiffs' allegations [in the complaint] and of questionable propriety," Plaintiffs argue that exclusion of her opinion is the law of the case. [*Id.*; Dec. 21, 2020 Op. at 12-13.]

In forming her opinion that the market understood Allstate's growth strategy and its anticipated impact on claims frequency before the class period began, Allen examined years of statements by Defendants and securities analysts. [*See* Allen Rpt. ¶¶ 26-36.] Whether Allen properly relied on the single challenged statement of Winter's (and further, whether that statement related only to homeowners' insurance, as Plaintiffs say, or also to automobile insurance, as Defendants do) is a matter that goes to the weight of her opinion, not its admissibility. *See Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (questions regarding an expert's use of faulty assumptions or data should be left to trier of fact). "The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *Stollings*, 725 F.3d at 768; *accord Smith*, 215 F.3d at 718 (soundness of factual basis and correctness of expert's conclusions are questions for trier of fact).

Likewise, notwithstanding the limitations of Allen's opinions observed by the District Court in its second class certification decision, her opinions do not lack the requisite fit to be relevant in this case under a *Daubert* analysis. Fit for *Daubert* purposes is a specific aspect of relevancy which requires expert testimony to be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (internal quotations omitted); *accord Owens*, 895 F.3d at 972. The issue before the District Court at the certification stage was not a *Daubert* analysis of fit, but rather whether Defendants had rebutted Plaintiffs' showing of price impact in accordance with the

Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), and subsequent others. [9] [*See* Dec. 21, 2020 Op.] Given this distinction, the doctrine of law of the case does not apply in this context. *See Boyer v. BNSF Ry. Co.*, 824 F.3d 694, 711 (7th Cir.), *opinion modified on reh'g*, 832 F.3d 699 (7th Cir. 2016) (law of the case doctrine is "discretionary rather than mandatory," and does not prohibit a court from considering an issue that was not or may not have been considered earlier).

**\*20** At the time of the cited class certification decision, the Seventh Circuit had already agreed with the District Judge that Plaintiffs had established the preliminary elements sufficient to invoke the *Basic* presumption of "fraud on the market," but had remanded the case for consideration of whether Defendants presented evidence that sufficiently rebutted that presumption, *i.e.*, that severed the link showing price impact. *See In re Allstate*, 966 F.3d at 608-11 (noting Defendants would carry the burden of production and persuasion on remand). [*See also* Dec. 21, 2020 Op. at 1-4.] The question to be decided at that time was "not the truthfulness or materiality of any of Allstate's representations ..., but whether they are susceptible to common proof, and the level of specificity of the information the market would have understood the price of Allstate's common stock to transmit at the time of the purchase transaction." *In re Allstate*, 966 F.3d at 614.

In this context, the District Court concluded that because Allen's opinion—that there was no price impact from the final alleged corrective disclosure—was not based on empirical testing or disaggregation analysis, it could not be used to show that the stock price decline following the alleged corrective disclosure was due to some factor other than the alleged fraud, and therefore could not demonstrate a lack of price impact. [Dec. 21, 2020 Op. at 8-10.] In considering Plaintiffs' critique that Allen had tested only for whether the market knew the truth about Allstate's underwriting strategy, and not whether it knew of Allstate's actual claims frequency increase or that the increase was caused by its new underwriting standards, the Court added that her opinion was "not responsive" to the complaint which alleges more. [*Id.* at 9-12.]

For resolution of the merits, however, the jury will be called upon to determine precisely what a court may not at class certification, that is, the weight to be afforded to Plaintiffs' loss causation evidence and Defendants' evidence supporting their truth on the market defense. *See In re Allstate*, 966 F.3d at 605-08. Allen's opinion is relevant to these inquiries

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.7002 Page 69 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

in that it will assist the trier of fact in determining whether the market knew of at least some of the information at the center of the alleged fraud. *See Owens*, 895 F.3d at 972. As the Seventh Circuit explained, the issue in this case centers on "scope and specificity." *In re Allstate*, 966 F.3d at 614. On the one hand, Defendants claim that their broad statements disclosed to the market that profitability could decrease as a result of their strategic decision to soften underwriting standards, whereas on the other, Plaintiffs assert that Defendants' generalized representations did not encompass the more specific representations that Allstate should have made, especially since they knew that the risk already had been realized. *Id.* Notwithstanding its limitations at class certification, therefore, Allen's report is relevant to Defendants' truth-on-the-market defense which will be weighed at trial. *See In re Allstate*, 966 F.3d at 613-14.

Likewise, any infirmities in Allen's understanding of Plaintiffs' allegations can be raised in front of the jury. *See, e.g.*, *Hayes v. City of Des Plaines*, No. 97 C 8412, 2001 WL 709467, at *3 (N.D. Ill. June 22, 2001) (distinguishing challenge to sufficiency of expert's understanding from merits of the case). As Defendants correctly observe, Allen not only opined that the market knew of Allstate's softened underwriting standards, but also that securities analysts at the time attributed the increase to external factors and not Allstate's reduced underwriting standards. [*See* Defs.' Resp. at 4 (quoting Allen Rpt. § VI(F)(2)).] Plaintiffs' arguments to the contrary about the fit of Allen's opinions go to weight, and not admissibility. *See Stollings*, 725 F.3d at 768 (where expert's opinion provides "a probative piece of the evidentiary puzzle," arguable limitations of opinion are matters of weight to be addressed through cross-examination).

### 3. Contrary to Law

**\*21** Finally, Allen's opinion – that the stock price decline following the final alleged disclosure is not evidence of price impact – is not inadmissible as contrary to law. According to Plaintiffs, it should be excluded as contrary to law because she based her opinion on the observation that analysts had not attributed the company's claims frequency increase to Allstate's lowered underwriting standards, despite that an alleged corrective disclosure need not "specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges." [Pls.' Mot. at 5 (quoting *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 543 (N.D. Ill. 2007),

*overruled on other grounds, Antelis v. Freeman*, 799 F Supp. 2d 854 (N.D. Ill. 2011)).] As Defendants correctly observe, however, regardless of whether the alleged corrective disclosure must identify or explicitly correct the alleged prior misrepresentation, Plaintiffs must show "[i]f and when the misinformation is finally corrected by the release of truthful information." [Defs.' Resp. at 3-4 (quoting *In re Allstate*, 966 F.3d at 612 n.5).] Allen's opinion that that securities analysts did not attribute Allstate's claims frequency increase to Allstate's reduced underwriting standards goes to this showing, and is thus not inadmissible on this basis.

\*\*\*\*\*

For these reasons, the Court recommends that Plaintiffs' motion to exclude be denied as to Lucy P. Allen.

### B. Bruce Deal

Bruce Deal is an economist who opined based on his experience and his review of Allstate-produced and publicly available materials concerning the weather, miles driven, and auto claims across the industry, that: (1) Allstate's statements—that economic conditions and the weather were the likely causes for its increase in claims frequency during the class period—were consistent with the data available at the time; (2) Allstate's explanations for its claims frequency increase were reasonably based on available information appropriately analyzed at the time; and (3) the data does not support Plaintiffs' allegations (that Allstate's claims frequency increase during the class period was not proximately caused by external factors but rather was caused by Allstate's growth strategy and greatly reduced underwriting standards). [Dkt. 390-1 at Ex. 6, Deal Rpt. ¶ 4.]

Plaintiffs move to exclude Deal's opinions on the bases that (1) he is not qualified to be an expert on auto insurance, (2) he did not utilize reliable principles and methods normally used by economists, and (3) what they refer to as his improper "stamp of approval" testimony is unhelpful and prejudicial. [Pls.' Mot. at 7-13.][10] Defendants respond that Deal's three decades of experience as a consulting economist more than sufficiently qualifies him to provide the opinions he offers, which they assert are also based on reliable principles and methods used by economists and insurance companies, and will be helpful to the trier of fact. [Defs.' Resp. at 5-14.]

### 1. Qualifications

A witness may be "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702. There is no requirement under Rule 702 that a proposed expert hold particular credentials in order to give expert opinion testimony. *See id.* Instead, the court considers the "proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616 (internal quotation omitted). The focus of the inquiry is on whether the expert's qualifications provide a foundation to answer a specific question. *Id.* at 617.

In this case, Deal's experience sufficiently qualifies him to provide the opinions he offers, and his specialized knowledge is likely to assist the jury. *See Gayton*, 593 F.3d 610. Deal has an undergraduate degree in economics, and a graduate degree in public policy. [Deal Rpt. ¶ 8.] His graduate work focused on risk assessment and probability, and he has taught economics, statistics, and risk assessment at the post-graduate level. [*Id.*] He has worked as a consulting economist for more than 30 years, working with clients and analyzing data in the insurance industry. [*Id.* ¶¶ 6-9.] He has extensive experience with data analytics for insurance companies, including projects focusing on data sets regarding claims, premiums, and accidents. [Dkt 392-1, Deal Dep. at 36:09-38:10, 100:16-101:19.] He has testified or consulted on numerous insurance matters, performing similar analyses to those he performed in this case, including analyzing claims frequency, comparing loss ratios, and looking at the relative performance of companies versus the expected performance. [*Id.* at 36:12-38:13; Deal Rpt. ¶¶ 7, 11.] Additionally, his experience is not limited solely to litigation. In addition to his work in the context of litigation, he has worked on projects for insurance companies in a prelitigation posture, as well as consulted with insurers on regulatory matters and worked with insurers on various other projects, including the administration of a state Medicaid program. [Deal Dep. at 38:15-39:23.] In sum, Deal's experience sufficiently equips him to provide the challenged opinions.

**\*22** Furthermore, Deal need not have worked for an automobile insurer in order to provide reliable, helpful testimony. *See Gayton*, 593 F.3d at 617; *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000) (accountant did not need a degree in mathematics or economics to testify as an expert regarding calculation of damages); *Kucharski v. Orbis Corp.,* No. 14-CV-05574, 2017 WL 1806581, at \*5 (N.D. Ill. May 5, 2017) ("Courts will not exclude experts regarding industry standards generally at issue in a case merely because they do not have expertise in a sub-specialty.") To the extent that Plaintiffs believe Deal's experience is "not narrowly specialized enough in the relevant field" to equip him to reach his conclusions, "the way to test his expertise is not at the threshold in a *Daubert* motion, but at trial though opposing evidence or cross-examination." *Prayitno v. Nextep Funding LLC,* No. 17 C 4310, 2019 WL 6497374, at \*6 (N.D. Ill. Dec. 3, 2019) (citing *Gayton*, 593 F.3d at 616). "Determinations on admissibility should not supplant the adversarial process; "shaky" expert testimony may be admissible, and assailable by its opponents through cross-examination. *Gayton*, 593 F.3d at 616 (citing *Daubert*, 509 U.S. at 596).

### 2. Reliability

Turning to reliability, Plaintiffs argue that Deal did not utilize reliable principles and methods normally used by economists, because in rendering his opinions, he neither utilized multivariate regression analysis to isolate the effects of multiple variables nor conducted a simple correlation analysis. [Pls.' Mot. at 8-9.] Deal's opinions cannot be tested, Plaintiffs add, because he failed to use any objective criteria but instead essentially "eyeballed" Allstate's frequency trends to determine if they were consistent with other available data. [*Id.* at 9.]

As Defendants correctly observe, however, Deal did not just opine on Allstate frequency trends from a "common sense" perspective, contrary to what Plaintiffs say. [Defs.' Resp. at 7-8.] Instead, he prepared detailed quarter-by-quarter comparisons of Allstate's claims frequency and the industry's claims frequency, and compared Allstate's claims frequency with publicly available statistics on weather and vehicle miles driven in order to assess whether the data supported Allstate's explanations of those factors at the time. [*Id.*; Deal Rpt. ¶¶ 29, 30, 35, 38, 51-54, 61-64.]

Further, contrary to Plaintiffs' assertion in which they only selectively quote from his deposition, Deal did not concede that the methodology he utilized was not commonly used by

economists, but rather, he expressly testified that his approach is common among *both* economists and data analysts. [*See* Deal Dep. at 82:18-84:09.] Likewise, his methodology, supported by detailed numerical analysis, is further reliable because it may be replicated by other professionals using the same data in order to test his conclusions. *See, e.g., In re Pressure Sensitive Labelstock Antitrust Litig.,* No. 3:03-MDL-1556, 2007 WL 4150666, at *19 (M.D. Pa. Nov. 19, 2007) (concluding that analysis of sales trends based on inspection of price charts over time was sufficiently reliable to be admissible, even though the expert did not perform a correlation analysis). Similar statistical comparisons of trends have been held reliable under *Daubert*, even when regression analysis is not employed. *See, e.g., Elorac,* 2017 WL 3592775, at *10 (finding comparative benchmarking analysis reliably scientific to support expert's opinions and noting challenges to causation are questions of fact for the jury); *Dover v. Brit. Airways, PLC (UK)*, 254 F. Supp. 3d 455, 461 (E.D.N.Y. 2017) ("[A] quarter-by-quarter comparison of [factor one] and [factor two] and a comparison of the relative growth of [factor one] and [factor two], is at a minimum a reasonable and sufficiently reliable method of assessing the relationship between [factor one] and [factor two].").]

 **\*23** Furthermore, Deal's choice not to employ regression analysis does not render his opinion unreliable. The Seventh Circuit has expressly rejected the notion that "nothing but regression analyses can produce evidence that passes the *Daubert* and *Kumho Tire* thresholds." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) ("Statisticians might have good reasons to look at data in different ways."). Other courts agree. *See, e.g.*, *United States v. Valencia*, 600 F.3d 389, 427 (5th Cir. 2010) ("[R]egression analysis is not a mandatory feature in all applications of economics or statistics). Thus, the question to be considered is not why a proffered expert "did not use regression analysis, but whether the method he did use is reliable." *Elorac*, 2017 WL 3592775, at *10.

The purpose of Deal's engagement was to evaluate Defendants' public statements and explanations regarding Allstate's claims frequency in light of Allstate's internal analyses and publicly available data to determine whether Allstate's statements were consistent with the underlying data, and whether Plaintiffs' allegations may be reconciled with the then-available data. [*See* Deal Rpt. ¶¶ 3, 113.] In this context, regression analysis is not necessary to present an opinion that is both relevant and reliable because the opinion is not aimed at identifying a causal link. *See Valencia*, 600 F.3d at 427-28

("In cases where a causal relationship is not an essential fact of consequence, an expert need not eliminate all confounding variables or potential contributory factors in order to present an opinion that is both relevant and reliable") (citing *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 340 (1977) (noting that the usefulness of statistics "depends on all of the surrounding facts and circumstances")). Deal additionally explained why the data he considered mattered and why his inferences were justified. [Dkt. 390-1 at Ex. 9, Deal Reply Rpt. ¶¶ 13-16 ("In my experience, using regression analysis is not common in the insurance industry when analyzing claim frequency.")] *See Varlen*, 924 F.3d at 459 (expert must explain how experience or expertise led to conclusion). To the extent Plaintiffs disagree, their critique goes to the weight of Deal's opinions, not their admissibility, and they are free to cross-examine him on this point. *See Adams,* 231 F.3d 425; *Valencia*, 600 F.3d at 427; *Dover*, 254 F. Supp. 3d at 461.

### 3. "Stamp of Approval"

Plaintiffs' final challenge as to Deal is that (what they refer to as) Deal's "stamp of approval" opinions are unhelpful and prejudicial. [Pls.' Mot. at 10-13.] Specifically, Plaintiffs contend, Deal's opinions that Allstate analyzed the appropriate types of information to understand its claims frequency and that its claims frequency-related statements were consistent with the underlying data and analyses should be excluded because they amount to a "gratuitous" interpretation of the factual record based on a "cherry-picked" recitation of Allstate's internal analyses. [*Id.* at 11.] In addition, Plaintiffs assert, the opinions also reflect an improper effort to bring in testimony as to Defendants' state of mind under the guise of expert opinion. [*Id.* at 12.] Defendants emphasize in opposition Deal's complete access to the discovery record, and his reasoned application of extensive insurance industry experience to matters beyond the knowledge and experience of lay jurors. [Defs.' Resp. at 11-14.] Finally, Defendants respond that Deal specifically disclaimed any opinion as to Defendants' state of mind. [*Id.* at 13-14.]

The Court agrees with Defendants' arguments that Deal's opinions will aid the jury in determining whether Allstate's analyses were reasonable when compared to industry standards, and whether Defendants' statements were consistent with the underlying data. Deal's opinions are informed by three decades of analyzing insurance company performance metrics, which is far beyond the ken of the

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7005    Page 72 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

average juror. [*See* Deal Rpt. ¶¶ 6-10.] *See also Fed. Ins. Co. v. Arthur Andersen,* 2006 WL 6555232, at *2-3 (N.D. Ill. Jan. 18, 2006) (St. Eve, J.) (finding opinion on insurance industry custom and practice helpful to jury in determining whether insurer breached duty to defend); *Kucharski,* 2017 WL 1806581, at *4 (noting "courts typically allow expert testimony regarding the customs, standards, and practices in a given industry[,]" and finding expertise in trucking industry generally sufficient to qualify an expert to testify on custom and practice of shipping, even though proffered expert had not actually worked as a shipper). To the extent that the Defendants challenge the breadth of Deal's experience, they may cross-examine him and present contrary evidence as they see fit. *Kucharski,* 2017 WL 1806581, at *5.

**\*24** Also contrary to Plaintiffs' characterization, Deal based his opinions on an unrestricted review of the discovery record, and provided testimony that is more nuanced than Plaintiffs suggest. [*See* Deal Dep. at 74:12-77:23.] Specifically, Deal testified that, "[N]ot every single measure in every single circumstance always point[ed] to only external factors and no internal variation, ... [but,] given the overall set of data that was analyzed, ... there isn't any data that would be understood—or should be understood to say [Allstate's internal analysis] is inconsistent with what Allstate is saying." [*Id.* at 128:07-129:14.]

Nor is the Court persuaded by Plaintiffs' assertion that Deal provides Defendants a back-door attempt to opine on their state of mind. Plaintiffs incompletely quote an exchange during Deal's deposition to suggest that Deal's "true role" in the litigation is to opine on what Defendants believed at the time. [*See* Pls.' Mot. at 12.] A review of the transcript makes clear, however, that not only did Deal expressly disclaim any opinion on what Defendants thought at the time they made the challenged statements, but the referenced question asked of him during the deposition did as well. [Deal Dep. at 209:18-212:04, 295:01-296:09.] Deal carefully and repeatedly explained that his opinions go only to the quality of Allstate's internal analyses, and not what Defendants were thinking about them. [*Id.*] Such qualitative opinions on Allstate's analyses will be helpful to the jury. *See Kucharski,* 2017 WL 1806581, at *5. Additionally, given the extensive and complex record, Deal's opinions will help to synthesize voluminous internal analyses in a manner that will streamline presentation to the jury and help them understand Allstate's complex analytical data. *See, e.g., Scott v. Chipotle Mexican Grill, Inc.,* 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (expert testimony may not simply rehash evidence, but

may synthesize or summarize data in a way that streamlines presentation and avoids unnecessary confusion).

\*\*\*\*\*

For these reasons, the Court recommends that Plaintiffs' motion to exclude be denied as to Bruce Deal.

### C. Paul A. Gompers

Lastly, Plaintiffs move to exclude two opinions of Defendants' rebuttal expert on loss causation and damages, Paul A. Gompers, a professor at Harvard Business School, as (1) beyond proper rebuttal scope of their expert's opinions, and (2) contrary to law. [Pls.' Mot. at 13-14.] Defendants offered Gompers as a rebuttal expert who opines that Plaintiffs' loss causation and damages expert John Finnerty's opinions are unreliable. [Defs.' Resp. at 2.]

### 1. Proper Rebuttal Scope

Gompers opined that Finnerty failed to show how any observed increase in Allstate's claims frequency "*should have led Allstate to believe* that its growth strategy would not be profitable." [Dkt 390-1 at Ex. 10, Gompers Rebuttal Rpt. ¶ 139 (the "Paragraph 139 opinion") (emphasis added).] According to Plaintiffs, this opinion is beyond the scope of proper rebuttal because Finnerty did not offer an opinion as to what Allstate *should have known* during the class period. [Pls.' Mot. at 13-14; Finnerty Rpt. ¶ 11 (listing a summary of opinions).] According to Defendants' attempted characterization in response, Gompers "merely highlights Finnerty's failure to consider what information *could have and should have been disclosed* at the beginning of the class period" to avoid the alleged fraud. [Defs.' Resp. at 14-15 (emphasis added).]

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't,* 535 F.3d 621, 630 (7th Cir. 2008) (internal quotation omitted). "Rebuttal reports should be limited to "contradict[ing] or rebut[ting] evidence on the same subject matter identified by another party" in its expert disclosures. *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,* No. 08 C 242, 2010 WL 3397358, at *13 (N.D. Ill. Aug. 24, 2010) (quoting Fed. R. Civ. P. 26(a)(2)(C)(i), which has since been amended as Fed. R. Civ. P. 26(a)(2)(D)(ii)).

**\*25** This Court agrees with Plaintiffs' argument that Plaintiffs' expert, Finnerty, does not opine on what Allstate *should have known* during the class period, and it would have been improper for him to do so. *See Williams v. Mary Diane Schwarz, P.A.*, No. 15 C 1691, 2018 WL 2463391, at \*9 (N.D. Ill. June 1, 2018) ("[E]xperts may not testify regarding what another person believed, understood, or intended, as these are inappropriate subjects for expert testimony.") (internal quotation omitted). Accordingly, Gompers' opinion, as quoted above—that Finnerty failed to show how Allstate's claims frequency increase should have led it to believe that its growth strategy would not be profitable—neither contradicts nor rebuts evidence that Plaintiffs present in Finnerty's Report. The Court therefore recommends its exclusion.

### 2. Contrary to Law

Finally, Plaintiffs argue that Gompers' opinions are contrary to law to the extent that he criticizes Finnerty for failing to determine what information Defendants could have and should have disclosed, and when that information should have been disclosed, in order to avoid the alleged fraud. [Pls.' Mot. at 14.] According to Plaintiffs, because a plaintiff may prove loss causation in several ways that do not require explanation of how and when a corrective disclosure should have occurred, Gompers' criticism is contrary to law. [*Id.* (citing *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007)).] According to Defendants, on the other hand, Gompers "correctly" criticizes Finnerty's analysis, because under *Glickenhaus*, 787 F.3d at 415, "The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward[.]" [Defs.' Mem. at 14.] In order to do so in this case, Defendants continue, Plaintiffs are required to construct an equivalent disclosure price at which Allstate stock would have traded if the allegedly omitted and misrepresented information had been accurately disclosed at the start of the class period, which in turn requires determining the information omitted or misrepresented and estimating its impact. [Defs.' Mem at 14-15 (citing Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 894-94 (1990)).]

While the Court agrees that "[e]xpert opinions that are contrary to law are inadmissible," *Loeffel Steel Prods.*, 387 F. Supp. 2d at 806, the Court is not persuaded by Plaintiff's argument that Gompers is offering such an opinion. Plaintiffs' assertion that they may prove their claim in other ways than Defendants envision does not render Gompers' opinion contrary to law. If anything, it may render it of limited utility, which is a criticism they are free to raise in front of the jury. It is not the province of this Court upon *Daubert* review to choose between competing theories of proof. *See Schultz*, 721 F.3d at 433.

\*\*\*\*\*

For these reasons, the Court recommends that Plaintiffs' motion to exclude be granted in part and denied in part as to Paul A. Gompers.

### CONCLUSION

**\*26** For these reasons, the Court grants the motions to seal [379, 380, 389, 395, 408, 417, 433, 435], and recommends that: (1) Defendants' motion to exclude the opinions of Steven E. Hall and Steven C. Root [381] be denied; (2) Defendants' motion to exclude the opinions of Tyler Leverty [374] be denied; (3) Defendants' motion to exclude the opinions of John D. Finnerty [371] be denied; and (4) Plaintiffs' motion to exclude the opinions of Lucy P. Allen, Bruce Deal, and Paul A. Gompers [382] be granted in part and denied in part. Specific written objections to this Report and Recommendation may be filed within 14 days from the date that this recommendation is issued. Fed. R. Civ. P. 72(a), (b)(2). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, addressed in this Report and Recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

### All Citations

Not Reported in Fed. Supp., 2022 WL 842737

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7007   Page 74 of 113

In re Allstate Corporation Securities Litigation, Not Reported in Fed. Supp. (2022)

## Footnotes

1   The Court recognizes the presumption of public access to judicial documents and proceedings, *see Bond v. Utreras*, 585 F.3d 1061, 1075 (7th Cir. 2009), and the parties have complied with N.D. ILL. LOC. R. 26.2 by filing public versions of their submissions with redactions of their sealed materials. Upon review of the parties' submissions, the Court concludes that the parties' motions to seal, referencing confidential materials produced pursuant to the protective order in this case, should be granted at this stage of the litigation.

2   Pin citations to briefs refer to the internal page numbers of the parties' submissions, not the page numbers affixed by PACER.

3   As Plaintiffs explain, multicollinearity describes the situation in which two independent variables are dependent on each other, and indicates that changes in one variable are associated with shifts in the other. [*See id.* at 9 n.6.]

4   The full text of Paragraph 270 (and its corresponding footnote) provides [Leverty Rpt. ¶ 270]:

As seen in the table above, BTT and CGR account for 74%, 38% and 35% respectively from the increases in frequency that Allstate experienced in Q4 2014, Q1 2015 and over Q4 2013-Q2 2015. In addition, as I explained in Section 5, miles driven and precipitation account for at most 10%, 14%, and 10% of the increases in frequency, respectively for Q4 2014, Q1 2015 and over Q4 2013-Q2 2015 [224]. This leaves about 16.3%, 48.2% and 54.8% of the frequency increases in these periods being unexplained by BTT, CGR, miles driven and precipitation. Based on my experience, it is my opinion that these remaining amounts of frequency increase are likely due to internal factors – loosening underwriting standards and Allstate's many other growth initiatives, which I have not been able to quantitatively analyze. As I explained earlier, Allstate's other growth initiatives include DriveWise, Price Optimization, discounts such as E-Smart, and others.

(n.224): I am conservatively treating the negative impact of precipitation on frequency values as zero.

5   Notably, in defending their own expert's opinions, Defendants made a similar argument. [*See* dkt. 391, Defs' Resp. at 11 & n.10 ("Deal did not set out to (and was not required to) determine that miles driven and weather were the *only* causes of Allstate's frequency increase, and thus was not required to disaggregate all other factors.").]

6   Furthermore, although the court addresses the argument here in the interest of thoroughness, an argument raised in a footnote may be deemed waived. *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 862 (7th Cir. 2005); *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (argument raised in passing in a footnote deemed waived).

7   Indeed, as the Seventh Circuit explained in this case, "[E]vent studies have come to be treated as the *sine qua non* for providing or disproving price impact and loss causation." *In re Allstate Corp. Sec. Litig.*, 966 F.3d at 613 n.6.

8   To this end, as Plaintiffs note, Finnerty's damages calculation is based on application of a loss causation methodology called the "constant dollar" methodology, which Defendants notably have not challenged. [*See* Pls.' Finnerty Resp. at 13 n. 8.]

9   The *Basic* "fraud on the market" presumption allows plaintiffs to demonstrate reliance without individual proof, but rather with proof of market efficiency. *In re Allstate*, 966 F.3d at 600. The presumption is rebuttable, however, and defendants may rebut it with " 'any showing that severs the link between the alleged

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   32

misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price[.]' " *Id.* at 605 (quoting *Basic,* 485 U.S. at 248).

10      Plaintiffs move to exclude only Deal's affirmative opinions, and not those offered separately to rebut the opinions of Plaintiffs' proffered expert, Tyler Leverty. [*See* Defs.' Resp. at 8 n.6.]

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7010   Page 77 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

2013 WL 12144150
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

IN RE NOVATEL WIRELESS
SECURITIES LITIGATION.
This Document Relates to All Actions.

Civil No. 08cv1689 AJB (RBB)
|
Signed 10/25/2013

ORDER:

1) VACATING PREVIOUS ORDER
CONDITIONING PLAINTIFFS'
OPPORTUNITY TO CURE ON FEE SHIFTING;

2) DENYING DEFENDANTS' MOTION TO
EXCLUDE EXPERT TESTIMONY; AND

3) DENYING PLAINTIFFS' MOTION
TO EXCLUDE EXPERT TESTIMONY.

Hon. Anthony J. Battaglia, U.S. District Judge

### INTRODUCTION

**\*1** On March 6, 2013, this Court issued an Order granting in part and denying in part Plaintiff's Motion for Reconsideration (Doc. No. 462) of the Court's previous Order issued on February 7, 2013. (Doc. No. 458.) Among other things, the February Order granted Plaintiffs the opportunity to cure their expert testimony from Bjorn I. Steinholt with Plaintiffs to bear the expense of doing so. The March Order granted reconsideration on whether Plaintiffs should bear the expense associated with the cure process. The Court invited briefing on the issue and both parties have submitted briefs for the Court's consideration.

Plaintiffs have submitted an amended expert report from Steinholt and Defendants again seek to exclude it. (Doc. No. 468.) Plaintiffs also seek to exclude the testimony of Defendants' rebuttal expert, Dr. David Tabak. (Doc. No. 467.) For the reasons set forth, the Court VACATES the prior Order conditioning Plaintiffs' opportunity to cure on fee-shifting,

DENIES Defendants' Motion to Exclude the Testimony of Bjorn I. Steinholt, and DENIES Plaintiffs' Motion to Exclude the Testimony of David Tabak.

### I. FACTUAL BACKGROUND

Plaintiffs allege that between February 27, 2007, and November 10, 2008 (the "Class Period"), Defendants engaged in a fraudulent scheme to inflate Novatel's stock value so that Defendants could sell their stock in the company for a profit. (CC, Doc. No. 23 at ¶¶ 1, 12.) Plaintiffs contend that Novatel's success was largely dependent on its ability to supply wireless modems to its two largest customers, Sprint and Verizon, which in 2006 accounted for 38.2% and 19.7% of Novatel's revenue respectively. (*Id.* at ¶ 14.) According to Plaintiffs, Defendants "knew that the market was particularly sensitive to information about these customers" and "[s]trong financial results would surely spur an increase in Novatel's stock price whereas any negative information regarding these customers would reduce it." (*Id.* at ¶ 14.)

Plaintiffs allege that throughout the Class Period, Defendants Weinert and Leparulo misrepresented the financial condition of the Company because they told investors that the Company was seeing strong demand for its products, and did not disclose to investors that Novatel did not have an adequate "product mix" to meet the needs of its customers. (*Id.* at ¶¶ 57(a)(iii), 62(a)(ii), 66(a)(ii), 73(a)(ii).) Plaintiffs also allege that Novatel covered up the slowdown in its business by shipping product "early" which purportedly violated accounting rules governing revenue recognition. (*Id.* at ¶ 6.) Plaintiffs allege that during this time period, Defendants were selling significant amounts of their Novatel holdings. (*Id.*) Plaintiffs allege that during the Class Period, Defendants sold 1,258,466 shares of Novatel stock for almost $29 million in proceeds. (*Id.* at ¶ 15.) Plaintiffs allege that 62% of the Defendants' Class Period sales occurred in June and July 2007, just before the market learned about these concealed facts. (*Id.* at ¶ 16.) Plaintiffs claim that four specific stock price declines on July 20, 2007, February 21, 2008, April 15, 2008, and August 20, 2008, resulted from the market learning of these allegedly concealed facts. (*Id.* at ¶¶ 125-28.)

### II. PROCEDURAL BACKGROUND

**\*2** The procedural history of this action is lengthy and the Court will only note those aspects pertinent to the issues of fee-shifting and the current *Daubert* motions. On February 7, 2013, the Court issued an order granting Defendant's Motion to Exclude the Expert Testimony of

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.7011 Page 78 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

Bjorn I. Steinholt, (Doc. No. 299), and granted Plaintiffs the opportunity to cure Steinholt's testimony with Plaintiffs to bear costs associated. The Court directed Plaintiffs and their expert to fashion an amended expert report on "what impact, if any, the removal of Plaintiff's channel staffing claims has upon the resulting loss causation and damages analysis[1]. (Doc. No. 458 at 8.) This was because the Court granted Defendants' summary judgment motion with regards to Plaintiffs' channel stuffing claims after the expert reports had been submitted. Plaintiffs filed a Motion for Reconsideration arguing that: 1) the Court's Order Excluding Steinholt is based on a mistaken interpretation of his methods; 2) the Order excluding Steinholt's testimony in its entirety is manifestly unjust and amounts to clear error; and 3) the Order shifting fees and costs to Plaintiffs is manifestly unjust and amounts to clear error. (Doc. No. 461.)

The Court declined to reconsider the previous exclusion of Steinholt's testimony but granted reconsideration as to fee-shifting. (Doc. No. 462.) The Court denied reconsideration of excluding Steinholt's testimony because the Court did not exclude the testimony in its entirety, instead the Court had determined the best solution was to provide an amended report, removing objectionable material and explaining the impact of the removal upon Steinholt's analysis. The Court did grant reconsideration as to its Order on fee shifting and invited parties to submit briefs on this limited issue. (Doc. No. 462 at 7.) Defendants filed a response in support of the Order conditioning Plaintiffs' opportunity to cure on shifting the fees on March 3, 2013. (Doc. No. 463.) Plaintiffs filed a reply on March 27, 2013. (Doc. No. 464.)

Pursuant to the Court's Order, Plaintiffs submitted an amended expert report from Steinholt addressing the Court's question on the impact of removing the channel stuffing claim from his analysis. Defendants again seek to exclude that testimony supported by their rebuttal expert Tabak. (Doc. No. 468.) Not to be outdone, Plaintiffs also seek to exclude Tabak's testimony. (Doc. No. 467.) The Court now discusses each motion in turn.

## FEE SHIFTING

### I. DISCUSSION

#### A. Legal Standards

Federal Rule of Civil Procedure 37 addresses discovery sanctions where a party fails to obey a discovery order.

Rule 37(b) provides that in lieu of or in addition to another appropriate order, "the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." Fed. R. Civ. Proc. 37(b). Rule 37(c) provides that "a party who fails to provide information or identify a witness as required by Rule 26(a) or (2)" is not allowed to use that information or witness. Additionally, the court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure ..." Fed. R. Civ. Proc. 37(c)(1)(A).

Moreover, federal courts have the inherent power to shift fees as a sanction for bad-faith litigation. However, the assertion of this power "requires special justification in each case," as "inherent powers are the exception, not the rule." *Chambers v. NASCO, INC.*, 501 U.S. 32, 63, 111 S.Ct. 2123, 2143 (1991). Like all applications of inherent power, the authority to sanction bad-faith litigation practices can be exercised only when necessary to preserve the authority of the court. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463 (1980) (inherent powers "are those which 'are necessary to the exercise of all others' ").

#### B. Analysis

**\*3** Defendants argue that Plaintiffs' "second bite of the apple" should be conditioned on Plaintiffs' bearing the cost associated to mitigate any prejudice to Defendants. (Doc. No. 463 at 1, 5.) Defendants note that since the Court had the power to exclude Mr. Steinholt's report in its entirety, the Court must also possess the "lesser included power" to condition any opportunity to cure on fee shifting. (*Id.* at 6.) In support, Defendants proffer several cases where courts "condition [the] opportunity to cure on payment of the opposing party's fees and costs." (*Id.*)

However, the Court finds these cases distinguishable from the facts of the instant case. Unlike *Paladin Assocs. v. Montana Power Co.* and *Pagliaro v. Stevens Transp., Inc.*, Plaintiffs in the instant case timely designated, filed and served their expert report. 328 F.3d 1145 (9th Cir. 2003); 2011 WL 2671567, at *1 (S.D.N.Y. July 06, 2011). Here, the opportunity to cure was granted because the Summary Judgment Order dismissing the channel stuffing claim rendered Mr. Steinholt's report irrelevant. (Doc. No. 414) Unlike *Donovan v. Quade* and *In re Kreta Shipping, S.A.*, Plaintiffs' original expert cannot be deemed impermissible or

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7012    Page 79 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

substantively deficient. 830 F. Supp. 2d 460 (N.D. Ill. 2011); 181 F.R.D. 273 (S.D.N.Y. 1998).

Defendants next cite to Rule 37(c)(1) which allows a court to impose fees rather than exclusion of required disclosures in violation of Rule 26(a). (Doc. No. 463 at 7.) Defendants argue that the Court's Order on fee shifting can "be seen as, in effect, a refusal to exclude Steinholt's late-disclosed second expert report, conditioned on fee shifting." (*Id.* at 8.) The Court declines to take this view. Plaintiffs' actions cannot be construed as a violation of discovery provisions. The Court initially determined Steinholt's testimony was reliable and relevant under *Daubert*, however that decision was made in a "vacuum without considering the impact of the Court's previous summary judgment decision." (Doc. No. 462 at 4.) The Court granted the opportunity to cure only because the Court's retroactive Order rendered Mr. Steinholt's original report irrelevant.

Finally, the present facts do not trigger the Court's inherent power to shift fees. Plaintiffs' action cannot be construed as the type of "bad-faith" that suffices as "special justification" to warrant fee shifting. Upon reconsideration, the Court's conditioning Plaintiffs' opportunity to cure on Plaintiffs bearing the cost was improper and unwarranted by the facts of the case.

The Court does note Defendants' concern that they will be prejudiced by having to reexamine the new expert report and prepare a rebuttal report. However, the Court sought to mitigate any potential damage by requiring Mr. Steinholt to specifically address the impact of removing the channel stuffing allegations. It is the Court's belief that a concise summary of the impact will have afforded Defendants ample opportunity to redirect their arguments without overextending resources.

### DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' LOSS CAUSATION AND DAMAGES EXPERT TESTIMONY

## I. DISCUSSION

### A. Legal Standard

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid.

702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

**\*4** As a guide for assessing the scientific validity of expert testimony, the Supreme Court provided a non-exhaustive list of factors that courts may consider: (1) whether the theory or technique is generally accepted within a relevant scientific community, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593–94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Ninth Circuit also has indicated that independent research, rather than research conducted for the purposes of litigation, carries with it the indicia of reliability. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ( "*Daubert* II"). In particular, using independent, pre-existing research "provides objective proof that the research comports with the dictates of good science" and is less likely "to have been biased by the promise of remuneration." *Id.* If the testimony is not based on "pre-litigation" research or if the expert's research has not been subjected to peer review, then the expert must explain precisely how he went about reaching his conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like, to show that he has followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in his field. *Id.* at 1318–19 (citing *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994)); *see also Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996). The proponent of the evidence must prove its admissibility by a preponderance of proof. *See Daubert*, 509 U.S. at 593 n.10.

### B. Loss Causation

To succeed on a private right of action brought pursuant to Section 10(b) of the Securities and Exchange Act, a plaintiff must prove, *inter alia*, loss causation. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 156-57 (2008). Loss causation is the causal connection between a defendant's material misrepresentation and a plaintiff's loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344–45 (2005); *see also In re Oracle Corp. Sec. Litig.*, 627

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7013    Page 80 of
113
In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

F.3d 376, 387 (9th Cir. 2010). "A plaintiff bears the burden of proving that a defendant's alleged unlawful act 'caused the loss for which the plaintiff seeks to recover damages.' " *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)(4)). In *Dura*, the Supreme Court held that a person who misrepresents the financial condition of a corporation in order to sell stock is only liable to relying purchaser for the loss the purchaser sustains when the facts "become generally known" and "as a result" share value depreciates. 544 U.S. at 344–45.

To meet this burden, a plaintiff must demonstrate a causal connection between the material misrepresentation and the injury suffered. *Dura*, 544 U.S. at 342. A plaintiff is not required to show "that a misrepresentation was the sole reason for the investment's decline in value," as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement. *In re Daou Systems, Inc.* 411 F.3d 1006, 1025 (9th Cir. 2005). Establishing price inflation alone is insufficient, the plaintiff must show an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Dura*, 544 U.S. at 342. The disclosed information must reflect part of the "relevant truth," or the truth obscured by the fraudulent statements. *Alaska Elec. Penion Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). The decline in stock price caused by the revelation of that truth must be statistically significant." *Id.* at 342-47. To identify a corrective disclosure, one must show that "[a] disclosed fact [was] new to the market" and that it "reveal [ed] some aspect of the alleged fraud." *Id.* A price decline before disclosure of the fraud may not be attributed to the defendants. *See Akerman v. Oryx Comm., Inc.,* 810 F.2d 336, 342 (2d Cir. 1987). [2]

**\*5** Event studies are crucial to demonstrate loss causation, and indeed some courts describe them as "almost obligatory." *See e.g., In re Vivendi Universal, S.A. Sec. Lit.*, 2009 WL 1066254, at \*10 (S.D.N.Y. Apr. 2009). Because an event study can show the "true value" of the stock, event study analysis has been used to demonstrate both that the economic loss occurred and that this loss was proximately caused by the defendant's misrepresentation. Federal courts have required event studies to establish loss causation and damages. The absence of an event study for damages, in particular, will result in summary judgment in favor of defendants. *See Oscar Private Equity Investments v. Allegiance Telecom, Inc.,* 487 F.3d 261, 265 n.22 (5th Cir. 2007).

### 1. Steinholt's Testimony

As an initial matter, it is worth noting that Steinholt's amended report complies with the Court's Order. The amended report addresses how the dismissal of the channel stuffing claim impacts the event study analysis. Steinholt states that dismissing the claim does not impact his loss causation analysis or any other conclusions. (2013 Steinholt Rep., ¶ 142.)

Plaintiffs claim there are four specific stock price declines on: 1) July 20, 2007; 2) February 21, 2008; 3) April 15, 2008; and 4) August 19, 2008, that resulted from the market learning of the allegedly concealed facts. Steinholt uses these dates and disclosures made to prove loss causation. Steinholt reports that the relevance of the channel stuffing claim is simply that it was one of several ways Plaintiffs allege how the relevant truth was concealed. Despite being eliminated from the case, the channel stuffing claim deletion does not change Steinholt's analysis to the concurrent remaining claims. As to those other two claims, omission regarding sufficiency of product mix and Sprint cancellation, Steinholt's loss causation conclusions for the four relevant disclosure dates remain intact.

### 2. Steinholt's Event Study Methodology

The event study methodology remains the same as that used to create the initial report. Steinholt formed an event chronology that summarized relevant analyst reports available and key media accounts on Novatel during the Class Period to assess the impact of the fraudulent conduct alleged by Plaintiffs. (*Id.* at ¶ 33.) In an efficient market, securities prices quickly incorporate new material information. Thus price movements following disclosures can be analyzed to assess statistical significance and quantify the portion of price movement not explained by market and/or industry factors, *i.e.*, the company specific portion of the price movement. (*Id.* ¶ 36.) Steinholt follows this general process in conducting an event study: define the event(s); adjust for market and industry factors; select control period; calculate predicted return; abnormal returns and t–statistics; and interpret results. (*Id.*)

Defendants do not object to Steinholt's general methodology and this Court previously found Steinholt's event study reliable and admissible.

### 3. Novatel's Alleged Misrepresentations

Case 2:20-cv-00368-JNP     Document 207     Filed 02/26/25     PageID.7014     Page 81 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

Plaintiffs alleged that they paid an artificially inflated price for Novatel stock due to false and misleading statements made in early 2007 concerning the Company's relationship with Sprint, financial results, product demand, and internal controls. The Consolidated Complaint alleges Defendants failed to truthfully present the financial condition of the Company, failed to disclose that one of their biggest customers was cancelling all future orders of Novatel's 720 USB modem months before Novatel's next generation U727 would be available, failed to disclose the Company's product mix did not meet the needs of its two largest domestic customers, and signed false financial results. (*See* CC, Doc. No. 23)

**\*6** In early 2007, Novatel reported strong financial results. Novatel told investors that its USB modem was extremely successful in the market and that Novatel was seeing strong sales to Verizon and Sprint. (*Id.* at ¶ 15.) On February 27, 2007, Defendant Weinert stated in a press release that with respect to the first quarter of 2007, Novatel would "continue to ramp to meet increasing demand in the marketplace." (*Id.* at ¶ 51.) In a conference call the same day, Weinert stated that competitors are using "fairly well tried out, older technologies and really the market isn't ready for that right now." In a May 1, 2007 press release, Novatel reported first quarter revenue increases of 174% year over year. The Company attributed this to strong end of the quarter momentum for newly introduced ExpressCards and Ovation USB devices. (*Id.* at ¶ 53-54.) Company officials continued to state that the market is "taking off" and that Novatel was "perfectly positioned" to take advantage of the growth in 3G Wireless. (*Id.* at ¶ 55.)

Plaintiffs allege that Novatel stock prices fell each time the truth was "partially" disclosed and became known over the Class Period. Steinholt examined four specific dates in which Plaintiffs allege the truth was revealed. As an initial matter, the Court does not find this method objectionable. Indeed, fraud is not always "revealed through one correction." [3] Most securities fraud actions "consists of a series of exaggerations, omissions, and misleading statements which are corrected, or merely revealed for what they are in a series of subsequent statements that convey additional information as well." *In re Apollo Group Inc., Sec. Lit.*, 509 F. Supp. 2d, 837, 845 (D. Ariz. 2007).

4. Loss Causation Dates and Disclosures

*July 20, 2007*

Plaintiffs argue that the truth concerning Sprint's cancellation of Novatel's 720 USB modem became known on July 20, 2007, which undercuts previous statements concerning product demand and market share. As a results Novatel stock prices fell. (CC. Doc. No. 23, ¶ 16.) An unscheduled JMP analyst report disclosed that Sprint would be cancelling Novatel's 720 USB modem prior to the next generation 727 USB being available. This information was new to the market. The report further stated that there was going to be a two month gap until the 727 USB would be available and that Sprint would be recommending competitor Sierra Wireless's product. (2013 Steinholt Rep. ¶ 65.) Following the issuance of the JMP report, Novatel stock price declined from a closing price of $28.37 per share on July 19, 2007, to a low of $25.09 on July 20, 2007 at 11:40am. (*Id.* at ¶ 71.)

That same day, a Craig Hallum analyst called Defendant Weinert for clarification and later issued a report stating that the "transition had been jointly planned for some time between [Novatel] and Sprint." The report stated "we believe there will be little or no gap in the sales ... and as a result, no loss of market share." Following the issuance of the Craig Hallum report, Novatel's stock price increased from the $25.09 per share intra-day low to a closing price of $27.05 per share. (*Id.* ¶ 77.)

*February 20, 2008*

Plaintiffs allege a February 20, 2008 Novatel press release, forecasting $110 million in revenues for 1Q08, $10 million below analysts' estimates and missing revenue guidance by $2 million, caused the Company's stock price to fall. (CC. ¶¶ 7-8.) On the same day, Novatel stated that carriers were emphasizing the consumer market where Novatel "historically had not placed an emphasis," which undermines Novatel's statements concerning product demand and the superiority of its products. (*Id.* at ¶ 7.) On a conference call, the Company explained the lower guidance related to customers reducing excess inventory. Novatel's stock price closed at $13.86 per share and on the next day had fallen to $10.69.

*April 14, 2008*

**\*7** Plaintiffs allege that Novatel's announcement of 1Q08 revenues, $19 million short of Novatel's estimates, caused the stock price to fall. (CC. ¶ 9.) Defendant Leparulo, partially attributed this shortfall to the fact that Novatel was "between product launch cycles for our USB devices and demand in the current environment has shifted toward lower end

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7015    Page 82 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

product" and that, "in some cases, we did not have the right products for the right customers." (*Id.* at ¶¶ 76-77; 2013 Steinholt Rep. ¶ 94.) These disclosures undercut Defendants' previous statements concerning product demand and ability to compete. Novatet's stock closed at $10.01 per share and fell to $7.76 per share the next day.

*August 19, 2008*

On August 19, 2008, Novatel disclosed that the Company's accounting review had uncovered $3.4 million of prematurely recognized revenues for 1Q08 which may result in changes to reported results in 2008, 1Q08 and 2Q08, and the resulting expenses of $2.6 million in 2Q08 and expected expenses of between $1.2 million to $1.5 million for 3Q08. This contradicted previous Company statements made on May 13, 2008 that the review was substantially competed and that no change was expected to any previously reported financial statements. (CC. ¶ 79.) Plaintiffs allege that this disclosure also undermines Defendants' representations that the Company had sufficient internal controls in place and was acting in accordance with generally accepted accounting principles ("GAAP"). Novatel stock closed at $8.40 per share and dropped to $6.29 per share the next day.

### 5. Defendants' Challenges to Loss Causation Testimony

#### i. Steinholt's Theory of Proving Loss Causation is Contrary to Law.

Defendants' first argument is that with the dismissal of the channel stuffing claim, Steinholt is now forced to admit the market did not learn of the alleged fraud and only learned of the "disappointing results" that Plaintiffs allege resulted from the fraud. (Doc. No. 468 at 5.) This in turn forces Steinholt to concede that loss causation will only be proven by non-public internal documents. (*Id.*) Defendants argue this type of analysis is contrary to the requirements of *Dura* and subsequent Ninth Circuit law.

Defendants appear to be accusing Steinholt of attempting to establish causation through the True Financial Condition Theory. Under this theory, a plaintiff would be able to prove loss causation simply through indirect disclosures such as reduced earnings, disappointing financial results, or a drop in the stock price rather than disclosure of the truth of any alleged misrepresentation. Courts have rejected this theory, recognizing it as contrary to Supreme Court dictate. The Ninth Circuit finds reliance on the True Financial Condition Theory without producing evidence of a causal connection to be

problematic. *See Metzler Inc. v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008).

Defendants are correct in stating that loss causation requires more than the revelation of a company's financial conditions. However, Plaintiffs are not blindly relying on the revelation of Novatel's true financial conditions to establish the fraud. Steinholt does appear to attempt to establish a causal connection between the alleged fraud and omissions to the declines resulting from the disclosures on the relevant dates. For each of the four disclosures made on the relevant dates, Steinholt testifies that the information revealed related to the subject matter of the misrepresentation which concealed Novatel's shortfalls regarding product mix as well as the Sprint omission. Steinholt analyzed the substance of Novatel press releases as well as related analyst reports in attempting to establish the relevance of the disclosures to alleged fraud and loss causation. These disclosures which accompanied the revelation of the Company's true financial conditions do appear to be related to the misrepresentations Plaintiffs allege. Thus constituting the "relevant truth." *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (explaining application of the "relevant truth" standard with regards to press releases and financial results). As the financial results, press releases, conference calls from the Company's officers, and analyst reports clearly concern revenue and guidance shortfalls due to Novatel's inability to meet the demands of its customers and loss of market share; Plaintiffs have shown the requisite link between those disclosures and earlier alleged misrepresentations to survive a *Daubert* motion.

**\*8** Defendants' characterization of Steinholt's reliance on internal documents is misleading. In Defendants' motion, they say that Steinholt concedes that only internal documents can prove loss causation. In support, Defendants directed the Court's attention to Steinholt's deposition. (Doc. No. 468 at 6). In the deposition portion Defendants cite, Steinholt answered a question on whether he considered the greater than anticipated market reaction to an analyst report stating there was a component shortage in the first quarter of 2008 in making his event study assessment. (Steinholt Dep. 189:2-8). Steinholt answers no; he was only considering the disclosures made by Novatel in the February 20, 2008 disclosure in quantifying the price decline associated with the Company's disclosure. In explaining his methodology, Steinholt notes that he is only looking at publicly available information, and the truth of public information will only be revealed by

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7016    Page 83 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

internal documents that will be provided to the jury. (*Id.* at 188: 8-15.)

To be reliable, an event study must separate out movements from fraudulent and non-fraudulent factors. Thus, the Court finds Steinholt's admission that he did not consider the greater than anticipated market reaction to the analyst report to be problematic. The same thing can be said with regards to the possible effect of stronger sales at AT&T. (*See* Doc. No. 468 at 10). However, the failure to include one of the relevant variables does not dictate exclusion of the report as unreliable. This deficiency may affect the probative value of the analysis but not necessarily its admissibility, and Plaintiffs will have to overcome that large obstacle at trial. *Bazemore v. Friday*, 478 U.S., 385, 400 (1986); *see also In re REMEC Inc. Sec. Lit.*, 702 F. Supp. 2d 1202, 1273 (S.D. Ca. 2010). [4] In any event, Defendants' challenge does not render Steinholt's testimony inadmissible but instead goes towards the weight of the testimony.

### ii. Steinholt's Testimony is Inadmissible as He Cannot Opine on the Controlling Issue

Defendants' second argument is related to the first challenge. Defendants again state that Steinholt has been forced to retreat to the position that he cannot determine whether the 2008 losses resulted from the alleged fraud and that Plaintiffs will prove loss causation through internal documents. (Doc. No. 468 at 7.) Defendants argue that Steinholt cannot show that the disclosures made the public aware of the subject of the alleged fraud or that the disclosures were related to alleged fraudulent factors. (*Id.* at 10.)

For many of the same reasons cited in dismissing Defendants' first objections, the Court must also dismiss the second objection. In selecting the dates for event analysis, Steinholt focused on specific event dates that contained alleged misrepresentations and event dates that partially revealed the alleged truth. (2013 Steinholt Rep. at 16-17.) The dates selected were not random, indeed they were selected because the disclosures made tended to relate to the alleged fraud based upon Novatel's own press releases and analyst reports. Steinholt explains that he would then adjust for market and industry factors to remove non-fraud related movements in stock prices. (*Id.*)

In explaining the relevant disclosure dates, Steinholt includes analyst reports released simultaneously to explain the reason for Novatel's lower than expected financial results. Many

of these analyst reports point to factors related to what Plaintiffs allege to be the fraud, such as the Sprint cancellation and excess buildup of products in customer's inventory due to inadequate product mix. (*See Id.* at 36-63.) Moreover, even the Company's own statements made in press releases and conference calls relate to Plaintiffs' allegations of misrepresentations and concealment.

### iii. Steinholt Fails to Adjust Based on Novatel's Accurate Financial Results

**\*9** Steinholt selected three dates in early and mid-2007 with allegedly artificially inflated Novatel stock prices as disclosures made contained misrepresentations. (2013 Steinholt Rep. ¶ 37.) Defendants contend that these disclosures are separated by a "wide span of time" from the loss causation, or corrective disclosure dates in 2008. Defendants argue that given Plaintiffs' allegation that Novatel's product mix did not meet customers' "immediate demands," the three 2008 dates cannot be corrective disclosure dates then. According to Defendants, Steinholt previously explained this gap by arguing Novatel's allegedly false financial results continued to conceal the levels of immediate demand in 2007 until the alleged channel-stuffing scheme unraveled in 2008. (Doc. No 468 at 13-14.) Defendants now contend that with the dismissal of the channel stuffing claim, the financial statements are now "deemed accurate" which makes it impossible to continue to conceal the level of intra-quarter immediate demand. (*Id.* at 14.)

If Defendants' contention, that the financial statements are now "accurate" is true, then Plaintiffs would not be able to establish loss causation from the 2008 disclosure dates. The 2008 disclosures would then be merely repeating old information that had been released in the financial statements from 2007, namely the level of product demand. Loss causation requires new undisclosed information which caused a drop in stock price. However, Defendants' argument is illogical. The Court fails to see how merely dismissing the channel stuffing allegation automatically renders the financial statements to be accurate. It may still be the case that Defendants improperly recognized revenue, in some other manner, in order to conceal the demand for its products. This is for Plaintiffs to prove at trial. Indeed, Novatel's own April 19, 2008 disclosure seems to support the contention that there may have been some impropriety with the 2007 financial statements. Novatel's own press release reported that further investigation was needed to decide if restatement of the 2007 audited financial statement would be necessary.

Moreover, Plaintiffs have proffered the expert testimony of Dr. Paul Regan who testified that there were more than 125 transactions that are allegedly in violation of GAAP. While the Court has excluded some aspects of Regan's opinion, testimony on the existence of possible accounting manipulation may still be presented. (Doc. No. 409.) Dismissal of the channel stuffing claim means the claim is not actionable, it does not mean that all evidence of other methods to accelerate revenue into earlier periods is automatically excluded. Indeed, as the Court's November 17, 2011 Order notes, Dr. Regan's pull in opinion may properly be used to address whether Defendants complied with SEC and GAAP requirements. (Doc. No. 409 at 5.)

### iv. Critical Factual Premise of Steinholt's Loss Causation for July 20, 2007 has no Reliable Basis

Defendants fourth objection is the same as their objection made against Steinholt's first report. A brief summary of Steinholt's version of events taking place on July 20, 2007 is appropriate to explain the Court's rationale. Prior to the market opening on July 20, 2007, an unscheduled JMP Securities analyst report confirmed Sprint's cancellation of the U720 and expressed concern that Novatel would be losing market share to Sierra Wireless as the next generation 727 would not be immediately available to replace. (Steinholt Rep. ¶¶ 65-66.) Following the issuance of the report, Novatel's stock price declined from a closing price of $28.37 per share on July 19, 2007, to a low of $25.09 on July 20, 2007, at 11:40 am. During this period of time, Defendants received several inquiries regarding the JMP report and Novatel's relationship with Sprint. Additionally, Defendant Weinert sent an email to a Craig-Hallum analyst regarding the JMP report in order to "reiterate that this 'news' is no news to us, this has been expected, planned and forecasted for quite some time." (*Id.* at ¶¶ 75-76.) Plaintiffs contend that Craig-Hallum then issued a report stating, among other things, "NVTL shares were off sharply this morning, we believe in response to a rumor that NVTL may lose market share at Sprint." Further, the report stated "[w]e understand this transition has been jointly planned for some time by NVTL and Sprint ... [and we] believe NVTL will continue to get the lion's share of Sprint business." (*Id.* at ¶ 76.) Following the issuance of the Craig-Hallum report, partly rebutting the JMP Securities report, Novatel's stock price increased from $25.09 per share intraday low to a closing of $27.05. (*Id.* at ¶ 77.) Based on this version of events, Steinholt performed an intraday analysis to determine whether the price movements on July 20, 2007 were unusual.

**\*10** Defendants' main objection centers on their contention that Steinholt's assessment was based on an incorrect conclusion as to the timing of the Craig-Hallum report release. There appears to be a difference of opinion as to whether the 11:35 am time stamp on an internal Craig-Hallum email reflects Eastern time or Central time. This mirrors the argument made in Defendants' first Daubert motion. (Doc. No. 299.) For many of the same reasons the Court declined to exclude this testimony in the original *Daubert* Order, the Court again declines to exclude. This objection pertains to the probative value of the testimony rather than admissibility. Steinholt appears to have considered and compiled the available evidence regarding the Craig-Hallum report and reached a conclusion on that basis. To the extent that the parties disagree over Steinholt's assessment of the timing of the report, it becomes a question of fact for the jury to consider.

### C. Damages Calculation in Securities Fraud

There are two standard measures of damages in securities law. *Jordan v. Duff & Phelps Inc.,* 815 F.2d 429, 441 (7th Cir. 1987) (citations omitted). Steinholt uses the "out of pocket" method. The "out-of-pocket" or "market" measure is the most often applied and is the difference between the fair market value of what was received and the fair value of what one would have received had there been no fraudulent conduct. *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1208 (9th Cir. 2012). Out of pocket damages accept the transaction as complete and are measured by reference to the value of the property on the date of the transaction. *Id.* In the instant action, the out of pocket measure is the difference between the price paid and the value of the stock absent misrepresentation.

To determine the "true value," plaintiffs in a securities fraud case also employ the use of event studies. Generally, experts follow a set of standard steps to evaluate the inflation in the share price that was caused by the allegedly fraudulent behavior.[5] The expert first determines a normal return by utilizing data from before the Class Period that continues the trend of stock prices through the fraudulent disclosure period. Presently, Steinholt reports he used a one-year period before the Class Period as the control. (2013 Steinholt Rep. ¶ 39.) This serves as the baseline, or "true value" line. Finally, the expert estimates the stock price inflation by deducting the estimated baselines normal stock price generated from his regression analysis from the actually observed stock price

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.7018 Page 85 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

on "abnormal return" dates. Defendants object to Steinholt's method of calculating damages.

*i. Steinholt's Assessment of True Value and Artificial Inflation is Unreliable*

First, Defendants argue that Steinholt's method is unreliable as it does not take an independent measure of the stock's true value. Instead, he calculates true value by subtracting the artificial inflation determined from the actual stock price sold. Second, Defendants argue that the stock prices on dates Steinholt selected as being artificially high were a result of "strong financial results that exceeded market expectations. (Doc. No. 468 at 19.) Thus, those "high" stock prices could not have been "artificial" inflation. (*Id.*)

Steinholt notes that "the most important part of calculating out-of-pocket damages is to determine the price at which the security would have traded absent the alleged fraud." (2013 Steinholt Rep. ¶ 127.) This is consistent with the case law. Steinholt states that he used a commonly accepted method to calculate the value line known as backcasting. (*Id.*) This method involves working backwards replacing the stock's actual return on the fraud-related disclosure days with the predicted returns, while using the stock's actual returns on all other days. Steinholt reports that he used the "event study methodology to calculate the value by effectively replacing the fraud-related price returns ... with the predicted returns." (*Id.*)

 **\*11** Steinholt's backcasting method appears reasonable and logical. As discussed above, Steinholt addressed both industry and market factors when considering the impact of Defendants's alleged misrepresentations and the alleged corrective disclosures. Thus, in determining how much of the stock was inflated due to alleged fraud, Steinholt assessed the price the security would have traded at absent fraud. (*Id.* at ¶ 128.) Additionally, Steinholt excluded damages for shares purchased and sold during the periods where loss causation had not been established.

Defendants' arguments centers on the contention that the artificial inflation purportedly introduced by the three 2007 alleged fraud event dates analyzed were in fact caused by the release of strong financial results and/or guidance. (Doc. No. 468 at 19.) And that in light of the dismissal of channel stuffing, those financial results are deemed accurate and non-fraudulent. (*Id.*) However, as explained above, dismissal of the channel stuffing claim does not necessarily render Defendants' financial statements accurate. Indeed, the "strong

financial results" are a part of Plaintiffs' allegations that Defendants' concealed the true financial condition of the Company.

*ii. Steinholt's Inclusion of Damages for Price Decline Not From Fraud Disclosure is Contrary to Law*

According to Steinholt's expert report, investors who purchased their share during the Class Period and retained them should be able to recover the inflation per share at the time of purchase. Investors who purchased and sold their shares during the Class Period should be able to recover the difference between the inflation per share at the time of purchase less inflation per share at the time of sale, but only if loss causation is established for them. (2013 Steinholt Rep. ¶ 128.)

Defendants argue that Steinholt's measure of damages include stock declines that occurred prior to the revelation of relevant truth. (Doc. No. 468 at 22.) By way of example, Defendants say that "Steinholt's damages calculation would give a plaintiff that bought Novatel stock in August 2007 and held through the February 20, 2008 loss causation date significant damages for price declines that occurred from August 2007 to February 19, 2008—none of which resulted from any revelation of any relevant truth. (*Id.*) The Court agrees with Defendants that loss suffered before any revelation of truth is not recoverable. However, Defendants' concerns appears to be misplaced. First, in the instance of an investor who purchased Novatel stock but sold prior to any alleged disclosure, those investors would be unable to prove loss causation and thus barred from recovery. Second, the damages method Steinholt's reports on is the out-of-pocket calculation; this calculation is the difference between true value and purchase value, values that are set and assessable at the time of the transaction should Plaintiffs prove to a jury the existence of the alleged fraud and thus artificial inflation. To the extent that Defendants suggest there is the possibility that Plaintiffs would recover losses that are non-fraud related, Defendants have not shown the risk undermines the reliability of the analysis as a whole. This argument tends to go towards the probative value of the testimony to be addressed at trial for the jury to consider.

*iii. Steinholt's Insider Trading Damages is Contrary to the Facts and Law*

Under Section 20A of the Exchange Act, the total amount of damages imposed for insiders shall not exceed the profit gained or loss avoided in the transaction or transactions

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7019    Page 86 of
113
In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

that are the subject of the violation. 15 U.S.C. § 87t-1(b)
(2). Steinholt interprets this language to mean Section 20A
damages are either calculated based on: 1) the inflation per
share that existed at the time of the insider sales, or 2) the
losses avoided by the Defendants in selling their shares during
the Class Period as opposed to selling shares following the
disclosure of the relevant truth at the end of the Class Period.
(2013 Steinholt Rep. ¶ 133.) In the instant case, Steinholt
found that the profits gained were the lesser of the two
calculations, thus profits gained are the Section 20A damages.
(*Id.*)

**\*12**  Defendants raise two main objections. First, Defendants
contend that Steinholt's method would award damages for
alleged insider trading occurring after the relevant truth was
completely revealed on July 27, 2007. Second, Defendants
argue Steinholt improperly applied the requirements of §
78t which is based on a disgorgement theory requiring a
comparison of the actual price at which the defendant sold
the stock with the actual price at the time the alleged inside
information was revealed.

In addressing Defendants' first argument, we note that the
July 27, 2007 disclosure was not the only date Plaintiffs
allege the relevant truth was disclosed. In the instant case,
Plaintiffs have alleged a series of exaggerations, omissions,
and misleading statements revealed for what they are in a
subsequent series of partial disclosures that occurred over a
period of time. As Plaintiffs state, not all of the "relevant
truth" was disclosed on July 27, 2007. (Doc. No. 471 at 22.)

Defendants' second argument centers on the fact that
Steinholt's method would assess damages as the difference
between the proceeds from the sales price and the "true
value" of the stock. Based on Exhibit L of Steinholt's Report,
it appears that the damages calculated are the "benefit of
the alleged fraud" for each remaining defendants. Instead,
Defendants contend the proper measure should be the stock
price which defendants sold less the price at the time the
alleged insider information was revealed. What Defendants
argue for is based on a disgorgement theory which seeks to
take away illegal profits. This theory is generally applied in
SEC actions and is based on the definition of "profit gained"
for purposes of SEC civil penalties. *See U.S. v. Nacchio*, 573
F.3d 1062, 1079-80 (10th Cir. 2009). For purposes of SEC
civil penalties, "profit gained" or "loss avoided" is defined
as the difference between the purchase or sale price of the
security and the value of that security as measured by the
trading price of the security a reasonable period after public

dissemination of the nonpublic information. 15 U.S.C. §
78u-1; *S.E.C. v. Rajaratnam*, 822 F. Supp. 2d 432, 434-35
(S.D.N.Y. 2011).

In the SEC civil action *S.E.C. v. Rajaratnam*, Defendant
argued the proper measure of profit gained or loss avoided
is the amount directly attributable to the advantages reaped
from possessing the insider information illegally obtained.
*Id.* at 434. In support, Defendant proffered an expert who
performed an event study to calculate the profit attributable
directly to the non-public information. Much like Plaintiffs'
method in the instant case. In rejecting this method, the
New York district court noted that "[i]n a private civil
securities action, such an approach, and such an 'event
study' calculation, might be appropriate," however given
that Congress has decreed the definition of profit gained or
loss avoided for purposes of SEC civil penalties, the event
study benefit approach was inappropriate for that case. *Id.*
at 434-35. In SEC civil cases, the penalty is the difference
between the purchase or sale price of the security and
the value of that security after disclosure of the nonpublic
information. *Id.* at 435.

The Court finds *Elkind v. Liggett &Myers,* cited by
Defendants, to be distinguishable. The *Elkind* Court found
it grossly unfair to make the *tipper* and *tippee* liable for
losses suffered by open market buyers after public disclosure
of material insider information, not insiders who may have
caused direct harm to investors. [6] *Elkind v. Liggett & Myers*,
635 F.2d 156, 170 (2d Cir. 1980). Notably, the method used
to assess the value of the stock during the period of non-
disclosure in the lower court did not include an event study.
Instead, a "speculative" method of approximating the drop
that would have occurred if the tip was disclosed based on
what the drop in price of the stock after actual disclosures was
employed. *Id.* Finally, the Second Circuit objected to a view of
damages that sought to make each plaintiff whole, a result that
would have given damage awards far in excess of any gains
the defendant made from unlawful trading. [7] Such is not the
case with Steinholt's method, Steinholt's assessment would
disgorge any benefit the Defendants received by trading on
the basis of their alleged insider information thereby prevent
unjust enrichment. It does not seem to make Plaintiffs whole.

**\*13**  Thus, Steinholt's method is not expressly contrary to
law as Defendants suggest. Faced with two differing, but
reasonable, theories on how to calculate profits gained, the
Court finds that the issue is not one of reliability to be decided
under *Daubert*. The Court again concludes that Steinholt's

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7020   Page 87 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

method of calculation is well-reasoned and Defendants' objections pertain to weight rather than admissibility. The Court concludes that Steinholt's testimony on loss causation and damages, based on his event study analysis, is reasonable and reliable.

## PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' REBUTTAL EXPERT TESTIMONY

### I. DISCUSSION

#### A. Legal Standard

The same Rule 702 and *Daubert* standards apply to this Motion. Furthermore, while an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts. *U.S. v. Bilzerian*, 926 F.2d 1285, 1294 (2nd Cir. 1991). "[A]n expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law. *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). However, it is well-established that expert testimony concerning an ultimate issue is not per se improper. *Elsayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1067, n.10 (9th Cir. 2002). An expert may give his opinion even if it embraces an ultimate issue to be decided by the jury. *U.S. v. Rogers,* 769 F.2d 1418, 1425 (9th Cir. 1985) (internal citations omitted).

#### B. Plaintiff's Objections

Plaintiffs object to three specific statements in Dr. David Tabak's expert report on the ground that they are "legal conclusions" that tread upon the province of the Court and Jury. (Doc. No. 467 at 1.) Plaintiffs assert that Tabak's opinion is based only upon a review of "very few internal Novatel documents ... and [he] has not relied upon any internal Novatel documents to reach his conclusions that plaintiffs' allegations are untenable." According to Plaintiffs, Tabak's statements go "beyond critiquing Mr. Steinholt's analysis." (*Id.* at 4.) Statements objected to are:

1. "The dismissal of the channel-stuffing allegations has substantial implications...Certain claims...are now **incorrect on their face**."[8] (Tabak Rep. ¶ 71)

2. "The simple allegation that Defendants were hiding the fact that Novatel was losing market share is **untenable**[9]" and "[t]he implausibility of Defendant's overstating current demand is further shown when..." (*Id.* at ¶ 41, ¶17.)

3. Plaintiffs allegations regarding Sprint's cancellation of Novatel's U720 are **untenable**. (¶¶41-46).

First, whether Plaintiffs' allegations and claims are valid based on the sufficiency of the evidence is a question of fact for the jury to decide. It appears that Tabak's opinions are based on his interpretation of the financial evidence in light of the dismissal of the channel stuffing claim and thus admissible as an opinion that embraces an ultimate issue. Second, Tabak's opinions do not appear to be improper legal conclusions. Tabak is not attempting to explain the applicable law nor is he attempting to testify as to the legal sufficiency of Plaintiffs' claims. Instead, he merely explains, based upon his analysis of Steinholt's expert report, Novatel's financial statements, and the facts of the case, why Plaintiffs' allegations are factually fatal (or unestablished) in his own opinion. Third, the appropriate redress for Plaintiffs' contention that Tabak's review of internal documents is insufficient, should be cross-examination rather than outright exclusion.

### CONCLUSION

**\*14** For the foregoing reason the Court:

1. VACATES the Court's previous Order conditioning Plaintiffs' opportunity to cure on fee shifting;

2. DENIES Defendants' Motion to Exclude expert testimony of Bjorn Steinholt; and

3. DENIES Plaintiff's Motion to Exclude expert testimony of David Tabak.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2013 WL 12144150

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7021   Page 88 of 113

In re Novatel Wireless Securities Litigation, Not Reported in Fed. Supp. (2013)

## Footnotes

1    The plaintiff made two related claims in this regard. First, Plaintiffs claimed that the Company violated accounting rules by prematurely recognizing revenue. Second, they argue that Novatel inflated perceptions of demand for its product by engaging in undisclosed "channel stuffing." Finding no evidence to support a question of fact that Novatel's actions or accounting practices were improper, Summary Judgment was granted. (Doc. No. 414 at 19).

2    To establish loss causation, Plaintiffs must show: 1) Novatel's stock price dropped in reaction to the disclosure of information about Novatel and 2) this reaction resulted from learning the truth about facts previously misrepresented by Defendants.

3    *See* Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud-on-the-Market Cases*, 37 UCLA L. Rev. 883, 889 (1990).

4    Moreover, even if Steinholt failed to consider the analyst report regarding component shortages, the Court is of the opinion that such information tends to be industry relevant and thus adjusted for by comparison to the NASDAQ indices based on Steinholt's description of his methodology.

5    *See* Linda Allen, *Meeting Daubert Standards in Calculating Damages For Shareholder Class Action Litigation*, 62 Bus. Law. 955, 956 (2007).

6    The Court notes that this case has been superseded by statute.

7    *See* Donald C. Langevoort, *Insider Trading Regulation, and Prevention § 9.4* (2013).

8    The Court questions the relevance and appropriateness of Tabak's reference to the dismissal of the channel stuffing claim in front of a jury. A jury may be confused or prejudiced as to the issue of dismissing the channel stuffing claim. To avoid this prejudice would require fully revealing the allegations and the Court's rationale on issues not before the jury, and thus excludable under F.R.E. 403.

9    The Court considers "untenable" to mean "of a position or view not able to be maintained or defended against attack or objection" as defined in the Marriam Webster. www.marriam-webster.com (last visited Oct. 23, 2013).

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

**2019 WL 7282026**
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Mark SMILOVITS, individually and on behalf
of all others similarly situated, Plaintiffs,

v.

FIRST SOLAR, INC.; Michael J. Ahearn; Robert J.
Gillette; Mark R. Widmar; Jens Meyerhoff; James
Zhu; Bruce Sohn; and David Eaglesham, Defendants.

No. CV12-0555-PHX-DGC
|
Signed 12/27/2019

**Attorneys and Law Firms**

Garrett Webster Wotkyns, Schneider Wallace Cottrell
Konecky Wotkyns LLP, Scottsdale, AZ, Jennifer Lynn Kroll,
Susan Joan Martin, Martin & Bonnett PLLC, Phoenix, AZ,
Jeremy A. Lieberman, Pomerantz LLP, Richard W. Gonnello,
Faruqi & Faruqi LLP, New York, NY, Patrick V. Dahlstrom,
Pomerantz LLP, Chicago, IL, for Plaintiff Mark Smilovits.

Richard W. Gonnello, Faruqi & Faruqi LLP, New York, NY,
for Plaintiff Johnny Hyldmar.

Andrew S. Friedman, Bonnett Fairbourn Friedman & Balint
PC, Phoenix, AZ, Daniel S. Drosman, Danielle S. Myers,
Hillary B. Stakem, Pro Hac Vice, Jason A. Forge, Jessica Tally
Shinnefield, Pro Hac Vice, Luke Brooks, Marco Janoski,
Mark Solomon, Michael J. Dowd, Ting Liu, Christopher
Dennis Stewart, Cody R. LeJeune, Darren J. Robbins, Darryl
J. Alvarado, Jennifer N. Caringal, Pro Hac Vice, Lonnie A.
Browne, Pro Hac Vice, Tor Gronborg, Pro Hac Vice, Robbins
Geller Rudman & Dowd LLP, San Diego, CA, Kevin Richard
Hanger, Struck Love Bojanowski & Acedo PLC, Chandler,
AZ, for Plaintiff Mineworkers' Pension Scheme.

Andrew S. Friedman, Bonnett Fairbourn Friedman & Balint
PC, Phoenix, AZ, Daniel S. Drosman, Danielle S. Myers,
Hillary B. Stakem, Pro Hac Vice, Jason A. Forge, Jessica Tally
Shinnefield, Pro Hac Vice, Luke Brooks, Marco Janoski,
Pro Hac Vice, Mark Solomon, Michael J. Dowd, Ting Liu,
Christopher Dennis Stewart, Cody R. LeJeune, Darren J.
Robbins, Darryl J. Alvarado, Jennifer N. Caringal, Pro Hac
Vice, Lonnie A. Browne, Pro Hac Vice, Tor Gronborg, Pro
Hac Vice, Robbins Geller Rudman & Dowd LLP, San Diego,
CA, Kevin Richard Hanger, Struck Love Bojanowski &

Acedo PLC, Chandler, AZ, for Plaintiff British Coal Staff
Superannuation Scheme.

David Thorpe, Dietrich Siben Thorpe LLP, Beverly Hills, CA,
for Plaintiff Maverick Funds.

Antony L. Ryan, Pro Hac Vice, Daniel Slifkin, Pro Hac
Vice, David H. Korn, Pro Hac Vice, Karin A. DeMasi, Pro
Hac Vice, Lauren M. Rosenberg, Pro Hac Vice, Michael
T. Reynolds, Pro Hac Vice, Morgan J. Cohen, Pro Hac
Vice, Rebecca J. Schindel, Pro Hac Vice, Robert Gianchetti,
Cravath Swaine & Moore LLP, New York, NY, Joseph
Nathaniel Roth, Osborn Maledon PA, Phoenix, AZ, Eugene
G. Illovsky, Pro Hac Vice, Morrison & Foerster LLP, San
Francisco, CA, for Defendant First Solar Incorporated.

Antony L. Ryan, Pro Hac Vice, Daniel Slifkin, Pro Hac Vice,
David H. Korn, Pro Hac Vice, Karin A. DeMasi, Pro Hac
Vice, Michael T. Reynolds, Pro Hac Vice, Morgan J. Cohen,
Pro Hac Vice, Rebecca J. Schindel, Pro Hac Vice, Robert
Gianchetti, Cravath Swaine & Moore LLP, New York, NY,
Joseph Nathaniel Roth, Osborn Maledon PA, Phoenix, AZ,
for Defendant Michael J. Ahearn.

Antony L. Ryan, Pro Hac Vice, Daniel Slifkin, Pro Hac
Vice, David H. Korn, Pro Hac Vice, Karin A. DeMasi, Pro
Hac Vice, Lauren M. Rosenberg, Pro Hac Vice, Michael T.
Reynolds, Pro Hac Vice, Morgan J. Cohen, Pro Hac Vice,
Robert Gianchetti, Cravath Swaine & Moore LLP, New York,
NY, Joseph Nathaniel Roth, Osborn Maledon PA, Phoenix,
AZ, for Defendant Robert J. Gillette.

Antony L. Ryan, Pro Hac Vice, Daniel Slifkin, Pro Hac
Vice, David H. Korn, Pro Hac Vice, Karin A. DeMasi, Pro
Hac Vice, Lauren M. Rosenberg, Pro Hac Vice, Michael
T. Reynolds, Pro Hac Vice, Rebecca J. Schindel, Pro Hac
Vice, Cravath Swaine & Moore LLP, New York, NY, Joseph
Nathaniel Roth, Osborn Maledon PA, Phoenix, AZ, for
Defendant Mark R. Widmar.

Antony L. Ryan, Pro Hac Vice, Daniel Slifkin, Pro Hac
Vice, David H. Korn, Pro Hac Vice, Karin A. DeMasi, Pro
Hac Vice, Lauren M. Rosenberg, Pro Hac Vice, Michael
T. Reynolds, Pro Hac Vice, Morgan J. Cohen, Pro Hac
Vice, Rebecca J. Schindel, Pro Hac Vice, Robert Gianchetti,
Cravath Swaine & Moore LLP, New York, NY, Joseph
Nathaniel Roth, Osborn Maledon PA, Phoenix, AZ, for
Defendants Jens Meyerhoff, James Zhu, Bruce Sohn, David
Eaglesham.

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7024   Page 91 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

## ORDER

[David G. Campbell](), Senior United States District Judge

**\*1** This securities fraud class action is set for trial in January 2020. The parties filed nine motions to exclude expert testimony under [Federal Rule of Evidence 702]() and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court ruled on six of the motions in an earlier order. Doc. 674. This order addresses the remaining motions.

### I. Background.

Defendant First Solar, Inc. produces photovoltaic solar panel modules. Its stock is publicly traded on the NASDAQ stock exchange. Plaintiffs purchased First Solar stock between April 30, 2008 and February 28, 2012 (the "Class Period"). *See* Doc. 171 at 22.[1] The Individual Defendants are First Solar officers and executives who purchased or sold First Solar stock during the Class Period while allegedly concealing information from the market about manufacturing and design defects causing faster power loss in certain modules.[2]

Steep declines in First Solar's stock price, beginning on July 29, 2010, followed the departure of First Solar's CEO, disappointing financial results, and the release of quarterly financial disclosures reporting the product defects. *See* Doc. 401 at 7-8. First Solar's stock fell from nearly $300 per share to less than $50 per share during the Class Period. *See id.* at 2.

Plaintiffs allege that Defendants engaged in several acts of fraud during the Class Period, including concealing the product defects, misrepresenting the cost and scope of the defects, and reporting false information on financial statements. Doc. 93 at 7-20. Plaintiffs further allege that when First Solar later disclosed the product defects and attendant financial liabilities to the market, the stock price fell, causing economic loss to Plaintiffs. *Id.* at 124-41.

Plaintiffs assert violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5. *Id.* at 135-36. Section 10(b) "makes it unlawful to 'use or employ, in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.' " *In re Oracle*

*Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 forbids, in connection with the purchase or sale of a security, "the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made ... not misleading.' " *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 17 C.F.R. § 240.10b-5). The scope of Rule 10b-5 is coextensive with that of § 10(b). *See Oracle*, 627 F.3d at 387; *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). To establish a violation of § 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*, 552 U.S. at 157.

**\*2** Plaintiffs claim that the Individual Defendants are liable for the alleged § 10(b) and Rule 10b-5 violations as "controlling persons" under § 20(a). Doc. 93 at 136, ¶¶ 257-58. To establish a claim under § 20(a), a plaintiff must first prove a primary violation of § 10(b) or Rule 10b-5 and then show that the defendant exercised actual power over the primary violator. *See In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).[3]

### II. [Rule 702]() and *Daubert* Standards.

Under [Rule 702](), an expert may offer "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." [Fed. R. Evid. 702(a)-(d)](). The proponent of expert testimony has the ultimate burden of showing, by a preponderance of the evidence, that the proposed testimony is admissible under [Rule 702](). *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); [Fed. R. Evid. 104(a)](). The trial court acts as a gatekeeper for expert testimony to assure that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at \*3-4 (D. Ariz. Aug. 2, 2019).

### III. Defendants' Motion to Exclude Henderson's Testimony (Docs. 532, 633).

Plaintiffs retained M. Todd Henderson, a professor at the University of Chicago Law School, to opine on the sales of company stock by the Individual Defendants pursuant

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7025    Page 92 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

to Rule 10b5-1 trading plans ("10b5-1 plans"). Doc. 532-1 at 3. Henderson explains that 10b5-1 plans are meant to provide company executives with the ability to trade for diversification reasons and not on the basis of inside information. *Id.* at 4. Henderson opines that there are seven "hallmarks" of a valid 10b5-1 plan: (1) a significant time lag between the plan's adoption and the first trade; (2) regularly scheduled trades; (3) sales over long periods of time; (4) sales of relatively consistent size and relatively small amounts compared with overall shareholdings; (5) sales at a range of stock prices; (6) no changes or cancellations of the plan; and (7) a high level of board and general counsel involvement in plan adoption, alteration, and termination decisions. *Id.* Henderson further opines the Individual Defendants' 10b5-1 plans during the Class Period contained few or none of these hallmarks and are consistent with plans from his empirical research in which insiders earned large abnormal returns based on inside information. *Id.*

Defendants move to exclude Henderson's testimony under Rule 702, arguing that his opinions and purported hallmarks are based solely on speculation and fail every prong of *Daubert*'s reliability test. Docs. 532 (lodged sealed motion), 633 (public redacted version). Plaintiffs counter that Henderson is eminently qualified to offer his opinions, that the *Daubert* reliability factors do not apply to the non-scientific hallmarks, and that the hallmarks satisfy Rule 702's reliability requirements and will assist the jury in deciding whether the Individual Defendants' stock trades were made in good faith or to evade the prohibitions of Rule 10b5-1. Doc. 556 at 6-17.

### A. 10b5-1 Plans and the Need for Expert Testimony.

**\*3** Rule 10b5-1 provides an affirmative defense to securities fraud allegations of trading " 'on the basis of' material nonpublic information[.]" 17 C.F.R. § 240.10b5-1. A corporate-insider may defend his trades by showing that they were made pursuant to a "written plan for trading securities" created before he learned of the material non-public information at issue in the suit. *Id.* at (c)(1)(i)(A). To be valid, the plan must list the amount and price of the securities to be sold or purchased, provide the date of the transactions, and prevent the insider from exercising any subsequent influence over how, when, or whether to effect purchases or sales. *Id.* at (c)(1)(i)(B). The trade must also have been executed according to the plan's terms. *Id.* (c)(1)(i)(C). Finally, the plan must have been entered "in good faith and not as part of a plan or scheme to evade the prohibitions of [Rule 10b5-1]." *Id.* at (c)(1)(ii); *see CSX Corp. v. Children's*

*Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 303 n.13 (2d Cir. 2011) ("[T]he affirmative defense is available only when the plan to purchase or sell securities was 'given or entered into in good faith.' "); *Elec. Workers Pension Tr. Fund of IBEW Local Union No. 58 v. CommScope, Inc.*, No. 5:10-CV-00062-RLV, 2013 WL 4014978, at \*7 (W.D.N.C. Aug. 6, 2013) ("[Rule 10b5-1] clearly requires a showing of good faith [that] ... require[s] additional evidence to be presented by Defendants[.]"); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("[A Rule] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an additional factual finding of good faith."). A plaintiff may present circumstantial evidence giving rise to an "inference of[ ] bad faith and scienter for § 10(b) and Rule 10b-5 purposes" by showing that the corporate-insider's trades under a 10b5-1 plan are "unusual" or "suspicious." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 593 (S.D. Tex. 2003).

The Individual Defendants claim that their stock trades during the Class Period were proper because they were made largely pursuant to valid 10b5-1 plans. *See* Doc. 311 at 65-68. Plaintiffs counter that the Individual Defendants engaged in improper insider trading, and that their suspicious trading behavior is relevant evidence of scienter and materiality. Doc. 556 at 10.

In order for the jury to make an informed analysis of the relevant trades, it will be helpful for them to understand the purpose of 10b5-1 plans and their legal requirements, the various features of such plans in practice, and trading behaviors that may be suspicious. *See* Doc. 556 at 10-11. Henderson explains that the purpose of his opinions, and his application of the seven hallmarks he identifies for valid 10b5-1 plans, is to help the jury understand such plans and determine whether the Individual Defendants' trading behaviors are suspicious. Doc. 532-3 at 6-7. Because 10b5-1 plans generally are beyond the ken of the average juror, Henderson's expert testimony on these issues will assist the jury in understanding the evidence and determining facts in issue. *See In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2012 WL 5463214, at \*4 (S.D. Cal. Nov. 8, 2012) (rejecting a Rule 403 challenge to "Henderson's opinion setting forth the 'seven hallmarks' [because it] describes for the jury the best practices when employing 10b5-1 trading plans"); *United States v. Robinson*, No. 98 CR 167 DLC, 2000 WL 65239, at \*3 (S.D.N.Y. Jan. 26, 2000) (expert testimony on the " 'hallmarks' of financial fraud schemes" would help the jury understand the evidence); *United States v.*

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7026   Page 93 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

*Jergensen*, No. 8:16-CR-235(BKS), 2017 WL 11458077, at *4 (N.D.N.Y. Oct. 6, 2017) (same).

**B. The Reliability of Henderson's Hallmarks.**

Defendants contend that Henderson's hallmarks are not reliable because they cannot be tested, have never been published, have no known error rate, and lack general acceptance in the securities regulation field. Doc. 532 at 9-11. But these factors are neither exclusive nor dispositive in a Rule 702 inquiry, *see Daubert*, 509 U.S. at 593-94, and "may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony[,]" *Primiano*, 598 F.3d at 565. As the Supreme Court has explained, although some expert testimony "rests upon scientific foundations," in other cases "the relevant reliability concerns may focus upon personal knowledge or experience. *Daubert* makes clear that the factors it mentions do *not* constitute a definitive checklist or test." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (citations omitted; emphasis in original). The Ninth Circuit likewise holds that "[t]he *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

**\*4** Defendants do not dispute that Henderson is a highly qualified expert in securities regulation. *See* Doc. 532-1 at 6-7 (Henderson's qualifications); *In re Novatel*, 2012 WL 5463214, at *4 ("Henderson is qualified pursuant to Rule 702 to testify as an expert regarding the use of 10b5-1 trading plans."). Henderson's opinions are based on a review of the documents in this case, his position on the Financial Industry Regulatory Authority, his experience as a management consultant advising companies on security regulation matters, his extensive research on thousands of 10b5-1 plans used by various companies over the past decade, and his specialized knowledge in the areas of corporate governance, executive compensation, and insider trading. *Id.* at 3. Under Rule 702 and *Daubert*, expert testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565 (citation omitted). The Court finds that Henderson's experience in the field of securities regulation generally, and his knowledge about the creation and use of 10b5-1 plans in particular, form a sufficient foundation for his opinions on the purported hallmarks of a valid plan. *See In re Novatel*, 2012 WL 5463214, at *5 ("Henderson's training, education and

practical experience provide a sufficient basis for his opinions regarding 10b5-1 trading plans"); *United States v. Barreiro*, No. 13-CR-00636-LHK, 2016 WL 259590, at *2 (N.D. Cal. Jan. 21, 2016) (testimony on whether "notes of expenditures have the hallmarks of business or personal expenditures" was within the expert's "specialized knowledge and training as a CPA and a certified fraud examiner"); *S.E.C. v. Lines*, No. 07 CIV. 11387 (DLC), 2010 WL 2926591, at *1 (S.D.N.Y. July 26, 2010) (rejecting the argument that the expert identified no reliable methodology to support his description of the common characteristics of a "pump and dump scheme" where the expert was "well qualified by years of experience as a regulator to describe this species of securities fraud, and [gave] an extensive and detailed report explaining the hallmarks of such a scheme"). Defendants' criticisms of Henderson's methodology and his purported hallmarks for valid 10b5-1 plans are matters for the jury's consideration in weighing the evidence. *See Lines*, 2010 WL 2926591, at *1 (the arguments that "many of the characteristics that the expert identifies as associated with pump and dump schemes can also be found in legitimate transactions, and [that] he did not adequately consider factors that tend to show that a transaction is not a pump and dump scheme, may be proper as lines of cross-examination but do not render the testimony inadmissible").

Defendants note that "[t]he first time [the] hallmarks appeared in a bulleted list was for an expert opinion on behalf of Plaintiffs[.]" Doc. 532 at 10. But Henderson explains that "the general impression of [the hallmarks], each of them in different forms or different words[,] was used by [him] countless times before then[.]" Doc. 532-3 at 16. The Court cannot conclude that Henderson developed the hallmarks solely for purposes of litigation.

Defendants further contend that Henderson's opinions are replete with improper legal conclusions and that his hallmarks are contrary to law because Rule 10b5-1 offers an affirmative defense for individuals who comply with the Rule's three express legal requirements. Doc. 532 at 12, 14-16. But to avail themselves of the affirmative defense, Defendants must show that their 10b5-1 plans were entered "in good faith and not as part of a plan or scheme to evade the prohibitions of [Rule 10b5-1]." 17 C.F.R. § 240.10b5-1(c)(1)(ii). Henderson's opinions about 10b5-1 plans generally, his purported hallmarks of valid plans, and whether the Individual Defendants' trading behavior is suspicious are relevant to the affirmative defense. Henderson states that he will offer no legal opinion on the Individual Defendants'

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7027    Page 94 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

trading plans and behavior or any other issue in the case. Doc. 532-3 at 6, 19-21. Defendants may object at trial if they believe Henderson crosses the line into inadmissible legal opinions. The same is true with respect to any potential opinions on the mental state or credibility of witnesses, which would be improper. *See* Doc. 532 at 17-18.

### C. Henderson's Analysis of Empirical Studies.

Henderson discusses empirical studies purportedly showing that "insiders systematically abuse [Rule 10b5-1]." Doc. 532-1 at 5; *see id.* at 36-43 (citing M. Todd Henderson, Alan D. Jagolinzer & Karl A. Muller, *Offensive Disclosure: How Voluntary Disclosure Can Increase Returns from Insider Trading*, 103 Geo L.J. 1275 (2015); Jagolinzer, Alan D., *SEC Rule 10b5-1 and Insiders' Strategic Trade*, Management Science Quarterly (Feb. 2009)). Henderson opines that "[t]he characteristics of the Individual Defendants' trades under their plans are consistent with plans that this empirical research shows are abusing the Rule and trying to shield trades that are based on material, nonpublic information." *Id.* at 5.

Defendants argue that Henderson does not reliably apply the empirical studies to the facts of this case. Doc. 532 at 13-14. Plaintiffs do not meaningfully respond to this argument, claiming instead that Henderson's general discussion of the empirical studies will assist the jury in understanding why scrutiny of Defendants' Rule 10b5-1 plans is appropriate. Doc. 556 at 17-18. More importantly, Henderson made clear in his deposition that he has not "taken the trading behavior of the First Solar executives and compared them to other companies in an empirical study." Doc. 532-3 at 23. Plaintiffs have not demonstrated the reliability of Henderson's opinion that the characteristics of the Individual Defendants' 10b5-1 trades are consistent with abusive plans in the empirical studies. Henderson is precluded from offering this opinion at trial.

**\*5** Defendants' motion to exclude Henderson's testimony (Docs. 532, 633) is **granted in part and denied in part** as set forth above.

### IV. Defendants' Motion to Exclude Dr. Feinstein's Testimony (Docs. 552, 632).

Plaintiffs retained Dr. Steven Feinstein to opine about market efficiency, loss causation, and damages. Based in part on an "event study," Dr. Feinstein concludes that First Solar's alleged fraud caused its stock price to be artificially inflated and that corrective disclosures caused stock price declines resulting in investor losses. Doc. 545-1 at 9.

An event study is a statistical analysis used to " 'disentangle[ ] the effects of two types of information on stock prices – information that is specific to the firm under question ... and information that is likely to affect stock prices marketwide.' " *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (quoting Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 556-57 (1994)). The study includes a regression analysis of daily stock returns to determine the typical level of stock price volatility and the relationship between a company's stock price movements and market and sector index movements. It allows an expert "to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information." *Id.* at 253-54. Event studies are widely accepted and have been characterized as "standard operating procedure in federal securities litigation." *Id.* at 253; *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

Defendants do not contend than an event study is improper methodology. In fact, their own expert uses an event study as discussed below. Defendants move to exclude Dr. Feinstein's testimony because he fails to evaluate when inflation entered First Solar's stock price and analyze how much of the price decline is attributable to the alleged fraud. Docs. 545 (lodged), 632 (public).

### A. Stock Price Inflation.

Dr. Feinstein describes artificial inflation as "the difference between what the stock price actually was at a point in time, and what the price would have been absent the alleged fraud." Doc. 545-1 ¶ 232. To calculate artificial inflation in this case, Dr. Feinstein worked chronologically backwards from the final corrective disclosure and cumulated the fraud-related residual stock price declines. *Id.* ¶ 234. Dr. Feinstein opines that (1) all price declines attributable to corrective information regarding the low power module issue reflect inflation that was in place at the start of the Class Period (the date of the first alleged misrepresentation regarding that issue), and (2) all price declines attributable to corrective information regarding heat degradation reflect inflation that was in place on February 22, 2010 (the date of the first alleged heat

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7028    Page 95 of 113

degradation misrepresentation). *Id.* ¶ 235. He concludes that "the artificial inflation in First Solar's stock price at the start of the Class Period was at least $17.93 per share, measured using the stock price declines that occurred when the corrective disclosures were made regarding the LPM issues," and that "the heat degradation-related artificial inflation of $11.48 per share that dissipated following the corrective disclosures ... represented artificial inflation that was in the stock as of 22 February 2010 at the latest." *Id.* ¶¶ 237, 243; *see id.* at 389 (graph showing LPM and heat degradation inflation during the Class Period).

**\*6** Defendants contend that the premise of Dr. Feinstein's damages analysis – that the entire inflation for both LPM and heat degradation was in place at the outset – contradicts Plaintiffs' theory of liability. Doc. 545 at 10-11. Defendants assert that Dr. D. Paul Regan, whom Defendants characterized as Plaintiffs' "liability expert," offers opinions fundamentally at odds with Dr. Feinstein's analysis because Regan opines that First Solar learned of the LPM and hot climate problems incrementally over time and should have made incremental accounting disclosures to reflect its growing knowledge. If the problems were understood only incrementally, Plaintiffs suggest, they could have been disclosed only incrementally, and, it follows, their disclosure would have affected stock prices only incrementally. As a result, Defendants' alleged nondisclosure likewise could have had only an incremental effect on any fraud-related inflation in the value of First Solar stock, and all such inflation would not have been in place from the beginning of the Class Period. Defendants argue, therefore, that Feinstein's "constant dollar inflation ribbon" is unreliable, results in overstated damages early in the class period, and does not correspond with Plaintiffs' theory of liability. *Id.* at 14-16. [4]

Defendants have a point. The Second Circuit has described the problem of assuming that fraud-related inflation ultimately eliminated from a stock's price by a series of truthful disclosures was all present on the first day of the class period:

> A key question was how that inflation entered the stock or, more aptly, *when.* Given that the maximum amount of inflation in the stock was €22.52, one approach to determining how inflated the stock price was throughout the Class Period would have been to say

that all €22.52 of inflation entered into Vivendi's stock price from the very beginning of that period, on October 30, 2000, and remained at that level until the date of the first negative residual return, January 7, 2002. There is an obvious downside to this approach, however. Namely, the full amount of the inflation reflects the value of the truth about Vivendi's liquidity problem at the apex of that problem. But the magnitude of Vivendi's liquidity risk—and by extension, the amount of liquidity-related inflation in Vivendi's stock—presumably had not reached its peak at the start of the Class Period. Rather, it grew over time as Vivendi's liquidity situation worsened, and as the distance between the truth and the deception thus widened. Ascribing the full value amount of loss to the very first alleged misstatement would therefore tend to overstate the degree to which Vivendi's stock was inflated due to the market's lack of knowledge about Vivendi's true liquidity risk, at least toward the beginning of the Class Period. Such an approach might thus lead to an inflated recovery for class members who purchased the stock earlier in the Class Period.

*In re Vivendi*, 838 F.3d at 255 (emphasis in original).

Here's another way to describe the issue. Assume that on the first day of a class period a company's stock is selling for $100 per share, the company's product has a serious defect which is unknown inside and outside of the company, and, if the defect was known publicly, the stock price would drop $30 per share. Although the price of the stock can be said to be inflated on that date, it is not inflated because of any fraudulent actions of the part of the company – the company does not know of the defect. A person buying the stock on this date could not claim to have been defrauded in the amount of $30 because no false statements have been made. Assume a week later the company gains the first intimation of a defect in its product, the full extent of the defect and its eventual cost to

Case 2:20-cv-00368-JNP   Document 207   Filed 02/26/25   PageID.7029   Page 96 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

the company are not understood, and, because the information is incomplete and does not reflect the full extent of the actual problem, even full disclosure of the known information would not cause the stock to drop $30 per share. If full disclosure was made, the market would learn of a *potential* problem and would take the potential problem into account in the stock price, but would not likely reflect the full $30 extent of the problem because the full extent is not known. If disclosure of this incomplete information would cause the stock price to drop, say, by $10 per share, then a fraudulent nondisclosure of the information would result in $10 of inflation remaining in the stock due to fraud – the fraud-related inflation would be $10 per share. There would remain another $20 per share of inflation in the stock price due to the undiscovered extent of the defect, but it could not be claimed as fraud damages by a person purchasing on the date of the nondisclosure because it did not remain in the stock due to nondisclosure. If more was learned by the company but not revealed on later dates, the fraud-related component would increase on each of those dates by the amount the stock would have dropped if the information was disclosed, until the full $30 becomes fraud-related inflation.

**\*7** Defendant argue that Plaintiffs' own accounting expert, Dr. Regan, opines that the extent of the LPM and hot climate defects became known to First Solar only gradually over time, and that GAAP therefore required First Solar to make incremental and increasing accounting disclosures over time. Defendants argue that this opinion conflicts with Feinstein's conclusion that the full extent of the fraud-related inflation was in First Solar stock from the start. The Court views this as a fair criticism of Dr. Feinstein's opinion. The question is whether it renders his opinion inadmissible under Rule 702.

Defendants do not challenge Dr. Feinstein's qualifications. He is a Yale Ph.D. economist, a professor of finance at Boston College, has authored numerous publications in the fields of economics and finance, and has testified in numerous securities fraud cases. Doc. 552 at 8. Nor do Defendants challenge the principles and methods he applies – "event studies or backcasting generally." Doc. 654 at 9. The question appears to be whether he has applied the principles and methods reliably to the facts of this case. Fed. R. Evid. 702(d).

Plaintiffs respond, in part, by rejecting Defendants' premise concerning the nature of their fraud case. They contend that Dr. Regan is not their liability expert and that his incremental *accounting* opinion does not reflect the *liability* case they will present to the jury. They contend that Dr. Regan's role

is to explain why First Solar's accounting was defective and failed to reveal the fraud in which Defendants were engaged. Plaintiffs assert that their fraud case will consist of evidence that Defendants had enough information to disclose the LPM defect on the first day of the Class Period and the heat degradation defect on February 22, 2010. Doc. 552 at 11. Feinstein assumes Plaintiffs will be able to provide this proof, and concludes that such disclosures would have lowered the valuation of First Solar stock to the same levels that resulted from later disclosures. *Id.* at 11-12.

Plaintiffs also argue that their theory of the case is that the mere *existence* of the defects, not the *extent* of the defects, was enough to cause the full economic damages they claim. *Id.* at 14. Feinstein opines that the effect of unfavorable disclosures would have been greater earlier in the Class Period – when the value of the stock was higher and the prospects for the company were brighter – than in the later periods when more difficulties had arisen in the industry. As Feinstein states: "The valuation impact of the LPM issues would have been larger at the start of the Class Period on account of, among other things, the higher expected earnings and growth prospects for the Company at that time.... Moreover, had the market been aware of management's alleged intent to mislead investors, a discount for reputation effect would have been impounded in the stock price at the start of the Class Period." Doc. 545-1 ¶ 239.[5]

Finally, citing two scholarly articles,[6] Feinstein also asserts that "[b]ased on the fundamental principles of market efficiency and rational expectations, because investors generally do not make systematic errors in forecasting when they are equipped with full truthful information, one can estimate that investors would have centered their forecasts on a valuation that reflected the ultimate outcome." Doc. 469-3, ¶ 238.[7]

**\*8** The Court's decision is guided by two principles. First, the Court cannot exclude Plaintiffs' expert by concluding that Defendants' factual recitation concerning the unfolding of the First Solar product defects is correct and Plaintiffs' is incorrect. As the Advisory Committee on the Federal Rules of Evidence noted when it adopted the current version of Rule 702: "The emphasis in the amendment on 'sufficient facts and data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, 2000 Advisory Committee Note.

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.7030 Page 97 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

Second, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595; *see also Wendell v. GlaxoSmithKline LLC,* 858 F.3d 1227, 1232 (9th Cir. 2017) (same). The Court's task is not to determine whether Dr. Feinstein's opinions are correct, but whether they satisfy the requirements of Rule 702. *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495607, at *4 (D. Ariz. Jan. 22, 2018) ("It is not the job of the court to insure that the evidence heard by the jury is error-free, but to insure that it is sufficiently reliable to be considered by the jury." (internal quotations and citation omitted)); *see also* Fed R. Evid. 702, 2000 Advisory Committee Note (proponents of evidence "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable" (citation and quotation marks omitted)).

The Court concludes that Defendants' arguments go more to the correctness of Feinstein's conclusions than the method by which he reaches them. A well-qualified expert has used an accepted methodology to reach conclusions with which Defendants disagree. Defendants contend that his opinions are contrary to Plaintiffs' liability case, but the Court must look to Plaintiffs, not Defendants, for the nature of their liability case, and Plaintiffs claim they can prove an extent of knowledge at the beginning of the Class Period and on February 22, 2010, and a sensitivity to misrepresentations at that time, that will support Feinstein's opinion that the full amount of the fraud-related inflation was in the stock from the start. Given this situation, the Court concludes that the jury must assess the validity of Feinstein's conclusions. *See In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12247558, at *3 & n.3 (S.D. Cal. Nov. 19, 2013) (finding that the two alternative calculations for calculating damages – the constant dollar and constant percentage methods – "may properly be presented to a jury for determination as to which is the more reasonable measurement of damages").

**B. Confounding Information.**

**\*9** Stock price declines can result from corrective disclosures concerning earlier misrepresentations and various confounding information unrelated to the alleged fraud, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events[.]" *Dura Pharms.*, 544 U.S. at 343. As part of his event study, and for each corrective

disclosure he identifies, Feinstein considers and accounts for potentially confounding information. Doc. 545-1 ¶¶ 20, 39, 161-231. Defendants argue that Feinstein's opinions on loss causation and damages are unreliable because his approach to confounding information is arbitrary and inconsistent. Docs. 545 at 17-20, 654 at 11.

Feinstein's methodology – conducting an event study that purports to account for confounding information – meets Rule 702's admissibility threshold. *See In re Vivendi,* 838 F.3d at 253; *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1129 & n.20 (C.D. Cal. 2018) (collecting cases that "have recognized the event study/out of pocket method ... is an accepted method for calculating damages in securities fraud class actions"). Defendants' criticisms that Feinstein discounted the confounding information and exaggerated the impact of the alleged fraud go to his credibility and the weight of his opinions, not their admissibility. *See In re Novatel*, 2013 WL 12144150, at *8 ("[T]he failure to include one of the relevant [non-fraudulent] variables does not dictate exclusion of the [loss causation] report as unreliable."); *In re Homestore.com, Inc.*, No. CV 01-11115 RSWL CWX, 2011 WL 291176, at *8 (C.D. Cal. Jan. 25, 2011) ("[The] expert ... expressly states that her regression analysis distinguishes between loss attributable to alleged fraud and loss attributable to non-fraud related news and events.... As a result, [she] makes an attempt to account for other possible causes, and her opinions therefore meet the reliability threshold requirement."); *S.E.C. v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *15 (N.D. Cal. July 29, 2010) ("While [defendant] certainly may argue to the jury that [the expert] did not reliably filter out other confounding variables that would have affected the stock price[,] ... he has not shown that [the] opinion is so unreliable that it must be excluded."); *In re Sci.-Atlanta, Inc. Sec. Litig.*, No. CIV.A.1:01-CV1950RWS, 2009 WL 4281256, at *3 (N.D. Ga. Nov. 24, 2009) ("[The expert] conducted an event study which is an acceptable method for analyzing loss causation.... The failure to disaggregate the fraudulent and non-fraudulent statements does not require exclusion of [his] opinion[.]").[8]

Defendants' motion to exclude Feinstein's testimony (Docs. 545, 632) is **denied**.

**V. Plaintiffs' Motion to Exclude Dr. Kleidon's Testimony (Docs. 469, 485).**

Defendants retained Dr. Allan Kleidon to rebut Dr. Feinstein's opinions on loss causation and damages. Doc. 469-1 at 6.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7031    Page 98 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

Plaintiffs move to exclude Dr. Kleidon's testimony based on the method of his event study and his "peer comparison" opinion. Docs. 469 (lodged), 485 (public).

### A. Dr. Kleidon's Event Study.

**\*10**  Dr. Kleidon conducted an event study and found no evidence that company-specific information caused statistically significant price declines in First Solar's stock on the corrective disclosure dates. Doc. 469-1 at 7, 26-75. Dr. Kleidon claims that Dr. Feinstein's event study is flawed in finding statistically significant declines, in part because Feinstein fails to account for the increased "beta" of First Solar stock on those dates.[9] *Id.* at 7. Plaintiffs contend that Dr. Kleidon's use of a date-specific beta improperly alters the widely-accepted event study methodology by applying a manual adjustment that attributes nearly all of First Solar's stock price declines on corrective disclosure dates to industry-wide, rather than company-specific, information. Doc. 469 at 5; *see* Doc. 469-3 at 33. Plaintiffs claim that this adjustment is invalid because it measures "the impact of First Solar's company-specific information on First Solar's *industry peers' stock* – an inquiry that has no relevance to loss causation and damages in this case – and then treats the result as a measurement of the industry's impact on *First Solar's stock.*" Doc. 469 at 6 (emphasis in original).

Plaintiffs have a point. Dr. Kleidon seems to assert that First Solar's corrective disclosures on the key dates, which revealed negative information about the LPM and hot climate defects, reduced stock prices in the entire solar industry, which resulted in an increased correlation between First Solar stock prices and industry stock prices (because First Solar stock also decreased that day) and therefore increased First Solar's beta, at least on that date. Applying the higher daily beta, Dr. Kleidon's event study seems to suggest that the reduction in First Solar stock was a reaction to downward price movement in the solar industry and cannot be attributed to any company-specific factors at a statistically significant level. This seems to be a kind of economic boomerang. First Solar's corrective disclosures depressed the stocks of other companies, which in turn depressed the price of First Solar stock – at a higher rate than usual due to the increased daily beta – leading to the conclusion that First Solar's negative disclosures were not the cause of its stock price decline. But it is difficult to understand how a process that begins with allegedly fraud-related disclosures, and eventually reduces First Solar stock, cannot be said to have been caused by the fraud-related disclosures.

Plaintiffs argue that Dr. Kleidon uses unreliable methodology to reach this conclusion because event analysis does not use a daily beta as he does, the article Kleidon relies on for his daily beta does not support his approach, the effects of a company's negative disclosures are unidirectional – they affect prices in the market, not vice versa – and Dr. Kleidon errs in concluding that the increased daily beta he observed was caused by First Solar's negative information.[10]

After considering these arguments, the Court concludes that Plaintiffs, like Defendants with respect to Dr. Feinstein, are quarrelling more with the results of Kleidon's analysis than his methodology. Plaintiffs do not dispute Dr. Kleidon's qualifications. After receiving a Ph.D. in economics and finance from the University of Chicago, Dr. Kleidon taught at Stanford University and the University of California at Berkeley. Doc. 485-2. He has served as an associate editor for the Journal of Finance and the Journal of Financial Economics, and has conducted event studies and testified about causation and damages in numerous securities actions.

**\*11**  Nor do Plaintiffs dispute the reliability of his general methodology – an event study. It is the same method used by Plaintiffs' expert Dr. Feinstein.

Plaintiffs disagree with how Dr. Kleidon applies the event study methodology. They claim that he errs by introducing a daily-calculated beta for First Solar stock rather than using the more general beta adopted by Dr. Feinstein and typically used in event studies. But Plaintiffs cannot dispute that the peer-reviewed article relied on by Dr. Kleidon specifically finds that higher betas occur on dates of significant public disclosures: "Using daily firm-level betas estimated from intraday prices, we find that betas increase on earnings announcement days and revert to their average levels two to five days later." Andrew J. Patton & Michela Verardo, *Does Beta Move with News? Firm-Specific Information Flows and Learning about Profitability*, 25 Rev. of Fin. Stud. 2789, 2789 (2012) ("Patton & Verardo"). Nor do Plaintiffs argue that Dr. Kleidon misapplied the technique developed by Patton & Verardo for calculating a daily beta.

Instead, Plaintiffs' argument boils down to this:

> The causation described in the literature on which Kleidon relies is unidirectional – from the Company

Case 2:20-cv-00368-JNP    Document 207    Filed 02/26/25    PageID.7032    Page 99 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

spilling over to the market. Feinstein Rebuttal, ¶¶78-82. These studies observe that a company's earnings announcements, which may or may not include information with implications for the market or industry, could influence the market in general. *Id.* Because of this spillover effect, some researchers have found that there is a greater correlation between a company's stock price returns and the market index returns on earnings announcement dates. *Id.* But, correlation does not imply causation, and the literature Kleidon relies on does not suggest that the company is more sensitive to sector news on earnings announcement days. *Id.* To the contrary, the correlation that the researchers detect is, as they explain, an artifact of the sector reacting to company news, not, as Kleidon claims, an increased sensitivity of the Company to sector news. *Id.*

Doc. 469 at 12. The sole authority Plaintiffs cite for this key argument is their own expert, Dr. Feinstein. And the portion of his report from which this language is directly quoted cites no other authorities. *See* Doc. 469-3, ¶¶ 80-82. Thus, it is clear that Feinstein disagrees with Kleidon's application of an event study, just as Kleidon disagrees with Feinstein's. This is not a basis for inadmissibility.

The Court concludes that both experts are well qualified and apply a generally accepted methodology for determining loss causation. Although the Court sees problems in the conclusions of each expert, the Court does not find a basis for excluding their opinions. The Court is satisfied that the testimony of both experts is sufficiently reliable to be admitted under Rule 702. As the Advisory Committee noted when it amended Rule 702 after *Daubert*: "When a trial court, applying the amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable." Fed. R. Evid., 2000 Advisory Committee Note.

## B. Dr. Kleidon's Peer Comparison.

**\*12** The background section of Dr. Kleidon's report discusses macroeconomic and industry factors that adversely affected the solar industry during the Class Period. Doc. 469-1 at 11-21. Dr. Kleidon intends to testify that "the solar industry was adversely affected by a number of issues during the Class Period, and First Solar's stock price decline was nearly identical to that of the Industry Peers." *Id.* at 93; *see* Doc. 622 at 20.

Plaintiffs contend that Dr. Kleidon's peer comparison is inadmissible because it is unreliable, irrelevant to loss causation and damages, and focuses on the wrong timeframe. Docs. 469 at 20-21, 640 at 13-14. Defendants counter that the peer comparison is directly responsive to Plaintiffs' claims about First Solar's stock performance and Dr. Feinstein's opinions, and provides context about First Solar's business and the environment in which the company operates. Doc. 622 at 20-21.

The Court cannot conclude that the peer comparison is irrelevant. Plaintiffs contend that First Solar's stock price drop was due to Defendants' alleged fraud. Doc. 93 ¶ 4. And Dr. Feinstein asserts that his damages opinion is conservative because it accounts for only $29.41 of the $280.72 that First Solar declined over the Class Period. Doc. 545-1 ¶ 21. Given these assertions, Dr. Kleidon's explanation of the solar industry's general stock price decline during the Class Period is clearly relevant.

Plaintiffs claim that Kleidon does not use a defined or accepted methodology for this opinion, but they do not dispute that he is qualified to opine on the causes of stock price declines, and it does not require a scientific method for such an expert to identify relevant comparison stocks and identify their general trend. The Court will not exclude this portion of Dr. Kleidon's testimony. Plaintiffs may object at trial to any testimony they view as unfounded or irrelevant.

Plaintiffs' motion to exclude Kleidon's testimony (Docs. 469, 485) is **denied**.

## All Citations

Not Reported in Fed. Supp., 2019 WL 7282026

Case 2:20-cv-00368-JNP Document 207 Filed 02/26/25 PageID.7033 Page 100 of 113

Smilovits v. First Solar, Inc., Not Reported in Fed. Supp. (2019)

## Footnotes

1 The parties have filed multiple motions to file documents under seal, which the Court will address in a separate order. *See* Docs. 468, 511, 551, 589, 639, 649. The parties have lodged the proposed sealed versions of the documents on the Court's electronic case filing ("ECF") system pending rulings on the motions to seal, and have also filed redacted public versions of the documents on the ECF system. *See* LRCiv 5.6(b)-(c). Where appropriate, and as noted below, this order cites to some of the lodged documents, which will be filed on the ECF system (either under seal or in the public record) once the Court rules on the motions to seal. Citations to pages of a lodged document correspond to the same pages in the filed public copy (the documents are the same except for redactions). Citations are to page numbers added at the top of each page by the ECF system.

2 The modules affected by the manufacturing defect are referred to as "low power modules" or "LPM," and the design defect is termed "hot climate degradation." *See id.* at 3-6.

3 The Court has precluded Plaintiffs from asserting a new insider trading claim under § 10(b). Doc. 661 at 19-21. Evidence of insider trading by the Individual Defendants, however, may be relevant to the scienter element of the § 10(b) and Rule 10b-5 misrepresentation claims and perhaps for other purposes. *See id.* at 21; Doc. 401 at 7.

4 An inflation ribbon is a time series indicating how much artificial inflation caused by the alleged fraud was in the stock price on each day of the Class Period. Doc. 545-1 at 8.

5 The Court does not find this last point very persuasive because if Defendants had made a full disclosure of what they knew from the start, they would not have been acting fraudulently and the effect on First Solar's stock value simply would have been the value of the information they disclosed, not some additional fraud premium.

6 "Rational Expectations and the Theory of Price Movements," by John Muth, *Econometrica*, 1961; and "Asset Prices in an Exchange Economy," by Robert Lucas, *Econometrica*, 1978.

7 The Court is skeptical of this last argument because Plaintiffs do not appear to contend that First Solar could have disclosed "full truthful information" about the defects on the first day of the Class Period or February 22, 2010. They seem to acknowledge that more became known about the defects over time.

8 The cases Defendants cite in their reply (Doc. 654 at 11-12) are distinguishable. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 191 (D. Mass. 2012) ("Given ... the pervasiveness of [the expert's] methodological errors and the lack of congruity between his theory and the data, the Court is compelled to exercise its role as gatekeeper and to exclude his event study as unreliable."); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (finding that "there [was] simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss" where the expert's "event study at best incorrectly identifies several corrective disclosures and at worst fails to identify any at all").

9 A "beta" measures stock price volatility – the degree to which a single company's stock return fluctuates in response to forces that affect the industry or market as a whole. *See* Docs. 469 at 11, 622 at 5. A stock with a beta above 1.0 is more volatile than the overall market, while a beta below 1.0 is less volatile. *See United States v. Gushlak*, No. 03-CV-833 NGG, 2012 WL 1379627, at *4 (E.D.N.Y. Apr. 20, 2012); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 354 n.72 (S.D. Tex. 2008).

10 Plaintiffs discuss Dr. Kleidon's bellwether opinion, which suggests that First Solar was an industry leader watched by analysts and others, and therefore more likely to affect solar industry stock prices than non-

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

bellwether companies. But their primary complaint is about how this is translated into an increased daily beta as part of his event study.

---

**End of Document**                                                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

2011 WL 291176
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

In re HOMESTORE.COM, INC. Securities Litigation.
This Document Relates To: All Actions.

Master File No. CV 01–11115 RSWL (CWx).
|
Jan. 25, 2011.

**ORDER**

RONALD S.W. LEW, Senior District Judge.

**\*1** Before the Court are Lead Plaintiff California State Teachers Retirement System's ("Plaintiff") Omnibus Motions *in Limine* [1220] and Defendant Stuart H. Wolff's ("Defendant") Motions *in Limine* Numbers 1 through 17 [1218, 1219, 1223, 1224, 1225, 1226, 1228, 1229, 1230, 1231, 1232, 1233, 1234, 1235, 1236, 1237, 1238.] After considering all papers and arguments submitted, the Court **NOW FINDS AND RULES AS FOLLOWS:**

*I. Plaintiff's Motion in Limine*
Plaintiff brings these Omnibus Motions *in Limine,* requesting the Court exclude eight types of evidence from Trial and issue an Order affirming Plaintiff's right to admit former trial and deposition testimony from unavailable witnesses at Trial.

1. *Plaintiff's Motion in Limine No. 1*
The Court **GRANTS** Plaintiff's Motion *in Limine* Number 1 to exclude reference to or evidence of Plaintiff's financial condition and other litigation.

Evidence of a party's financial condition is generally not relevant and can be unduly prejudicial, as it can distract the jury from the real issues in the case. *See, e.g., Utility Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.,* 2010 WL 1946625 (D.Kan., May 14, 2010). Accordingly, the Court finds that references to and evidence of Plaintiff's financial condition should be excluded. Further, reference to or evidence of Plaintiff's involvement in other litigation prior to this Action is also irrelevant and carries with it a high risk of prejudice. *See, e.g ., Ritten v. Lapeer Regional Medical*

*Center,* 2010 WL 374163, \*8 (E.D.Mich., Jan. 25, 2010). As such, the Court also excludes reference to or evidence of Plaintiff's involvement in prior lawsuits.

Therefore, the Court **GRANTS** Plaintiff's Motion *in Limine* Number 1 to exclude reference to or evidence of Plaintiff's financial condition and other litigation.

2. *Plaintiff's Motion in Limine No. 2*
The Court **GRANTS** Plaintiff's Motion *in Limine* Number 2 to exclude settlement communications. Defendant does not oppose this Motion, and evidence of settlement communications is inadmissible under Federal Rule of Evidence 408. Fed.R.Evid. 408.

3. *Plaintiff's Motion in Limine No. 3*
The Court **GRANTS** Plaintiff's Motion *in Limine* Number 3 to exclude reference to or evidence of amount of settlement with previous defendants.

Federal Rule of Evidence 408 excludes complete compromises with third parties and prior defendants. Fed.R.Evid. 408. *See Young v. Verson Allstate Press Co.,* 539 F.Supp. 193, 195–96 (D.C.Pa.1982). Moreover, the Court finds that evidence of the amount of prior settlements is not relevant here and is prejudicial. *See Pucci v. Litwin,* 1993 WL 405448, \*1 (N.D.Ill., Oct. 4, 1993).

Accordingly, the Court **GRANTS** Plaintiff's Motion *in Limine* Number 3 to exclude reference to or evidence of amount of settlement with previous defendants.

However, the Court cautions the Parties that evidence of prior settlements is not excluded for purposes of making a determination as to whether to offset any damages that the jury may assign to Defendant.

4. *Plaintiff's Motion in Limine No. 4*
**\*2** The Court **DENIES** Plaintiff's Motion *in Limine* Number 4 to exclude character evidence regarding Defendant Wolff pursuant to Federal Rule of Evidence 404(a).

The Court finds Plaintiff's request as over-broad and vague, and therefore inappropriate for review at the motion *in limine* stage. *See Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc.,* 2010 WL 2035800, (C.D.Cal. May 19, 2010) (holding that motions *in limine* should "rarely seek to

exclude broad categories of evidence, as the court is almost always better situated to rule on evidentiary issues in their factual context during trial").

Accordingly, the Court **DENIES** Plaintiff's Motion *in Limine* Number 4 to exclude character evidence regarding Defendant Wolff pursuant to Federal Rule of Evidence 404(a).

5. *Plaintiff's Motion in Limine No. 5*
The Court **DENIES** Plaintiff's Motion *in Limine* Number 5 to exclude Defendant from offering expert testimony through deposition testimony rather than through live witness testimony.

The Court finds that Plaintiff has not met its burden here to show that the deposition testimony of all experts should be excluded at this time. *See Pucci v. Litwin,* 1993 WL 405448 (N.D.Ill., Oct. 4, 1993) (denying plaintiffs' motion *in limine* to exclude all deposition testimony because plaintiff had not proven that under any circumstances the testimony would be admissible).

Therefore, the Court **DENIES** Plaintiff's Motion *in Limine* Number 5 to exclude Defendant from offering expert testimony through deposition testimony rather than live witness testimony.

6. *Plaintiff's Motion in Limine No. 6*
The Court **GRANTS** Plaintiff's Motion *in Limine* Number 6 to exclude John Costello's ("Costello") deposition testimony. Plaintiff had previously designated Costello as an expert leading up to the previously scheduled Trial in this Action, but now does not plan on calling Costello to testify at this Trial [1202]. However, Defendant seeks to introduce the deposition testimony of Costello at Trial [1200].

The Court finds that Federal Rule of Civil Procedure 26(b) (4) (B) precludes the use of this deposition testimony by Defendant, as Plaintiff had previously designated Costello as an expert witness, is no longer calling him to testify, and Defendant has not demonstrated that "exceptional circumstances" exist here to enable Defendant to use this deposition testimony. Fed.R.Civ.P. 26(b) (4)(B). *See Otsuka v. Polo Ralph Lauren Corp.,* 2010 U.S. Dist. LEXIS 25017 (N.D.Cal. Mar. 17, 2010); *FMC Corp. v. Vendo Co.,* 196 F.Supp.2d 1023, 1036 (E.D.Cal.2002) (applying the "exceptional circumstances" test under Rule 26(b)(4)(B) to determine whether to exclude plaintiff's request to depose

and offer testimony from defendant's previously disclosed expert witness). Defendant states that Costello's testimony concerns the auditing practices of PricewaterhouseCoopers, but the Court finds that this is not a unique field of expertise and Defendant could have designated other experts to testify on this matter. *See Rubel v. Eli Lilly & Co.,* 160 F.R.D. 458, 460 (S.D.N.Y.1995) (noting that "[i]f this were a case in which the expert sought to be called possessed unique evidence, plaintiff's case [to admit expert testimony previously designated by defendant] would have considerabl[y] [more] appeal").

**\*3** Therefore, the Court **GRANTS** Plaintiff's Motion *in Limine* Number 6 to exclude John Costello's ("Costello") deposition testimony.

7. *Plaintiff's Motion in Limine No. 7*
The Court **DENIES** Plaintiff's Motion *in Limine* Number 7 to exclude evidence relating to individualized issues of the Class Representative. Plaintiff seeks to exclude any evidence regarding Plaintiff's individual reliance, arguing that it will be able to use the "fraud on the market" theory to show that the class of Homestore shareholders, as a whole, suffered damages as a result of Defendant's conduct.

The Court finds that this Motion is pre-mature, as Plaintiff must first establish it is entitled to use the "fraud on the market" theory in order to establish that the class, as a whole, suffered damages here before it can show that evidence relating to Plaintiff's individualized proof of reliance is not relevant. *See Basic Inc. v. Levison,* 485 U.S. 224, 247 (1988).

Accordingly, the Court **DENIES** Plaintiff's Motion *in Limine* Number 7 to exclude evidence relating to individualized issues of the Class Representative.

8. *Plaintiff's Motion in Limine No. 8*
The Court **DENIES** Plaintiff's Motion *in Limine* Number 8 to exclude arguments or evidence by Defendant that he is not liable for 10b–5 violations between May 15, 2001 to December 21, 2001 and that the jury be instructed that Defendant must be found liable for 10b–5 violations between May 15, 2001 to December 21, 2001.

The Court finds that Plaintiff has failed to establish that Defendant's guilty plea meets all of the criteria that must be satisfied in order to enable Plaintiff to utilize the collateral estoppel doctrine here to establish Defendant's Section 10(b)

violation for the requested period of time. *See United States v. Real Prop. Located at Section 18,* 976 F.2d 515, 519 (9th Cir.1992).

Specifically, Plaintiff has failed to show that the issue on which it now offers Defendant's conviction and plea agreement, the issue of his liability for the Section 10(b) violations, is identical to those issues decided by Defendant's plea agreement and conviction. The Court finds that the plea agreement and conviction did not address all the required elements in Plaintiff's 10b–5 claim, such as reliance or economic loss.

As such, the Court **DENIES** Plaintiff's Motion *in Limine* Number 8 to exclude arguments or evidence by Defendant that he is not liable for 10b–5 violations between May 15, 2001 to December 21, 2001 and that the jury be instructed that Defendant must be found liable for 10b–5 violations between May 15, 2001 to December 21, 2001.

### 9. *Plaintiff's Motion in Limine No. 9*

Plaintiff's Motion *in Limine* Number 9 for an Order that testimony given during Defendant's 2006 criminal trial is admissible is **DENIED AS MOOT,** as Plaintiff has now withdrawn this Motion.

### 10. *Plaintiff's Motion in Limine No. 10*

Plaintiff's Motion *in Limine* Number 10 for an Order that deposition testimony given in this Case is admissible where the witness is shown to be unavailable is **DENIED AS MOOT,** as Plaintiff has now withdrawn this Motion.

### II. Defendant's Motions in Limine

**\*4** Defendant Stuart H. Wolff brings the following 17 Motions *in Limine.*

### 1. *Defendant's Motion in Limine No. 1*

The Court **DENIES** Defendant's Motion *in Limine* Number 1 to Decertify "Dismissed Defendants" Subclass and/or to Exclude from Plaintiff Class AOL Time Warner, David Colburn, Eric Keller, Cendant Corporation, Richard A. Smith & L90, Inc.

On November 16, 2004, this Court granted then-Defendant PricewaterhouseCoopers' Motion for an Order establishing a Subclass of "Dismissed Defendants" [693]. These

"Dismissed Defendants" are persons or entities who were at one point Defendants in this case, but were dismissed from the Action with prejudice.

The Court finds the November 16, 2004 Order [693] properly certified this subclass of "Dismissed Defendants," and that nothing has changed since this Order to necessitate a decertification here.

Accordingly, Defendant's Motion *in Limine* Number 1 to Decertify "Dismissed Defendants" Subclass and/or to Exclude from Plaintiff Class AOL Time Warner, David Colburn, Eric Keller, Cendant Corporation, Richard A. Smith & L90, Inc. is **DENIED.**

### 2. *Defendant's Motion in Limine No. 2*

The Court **DENIES** Defendant's Motion *in Limine* Number 2 to exclude from the Plaintiff Class all persons who received a distribution from the settlement with Time Warner, Inc.

Defendant argues that the class members who accepted a distribution from the settlement between Plaintiff and Time Warner, Inc. after receiving the August 24, 2007 notice of this proposed settlement agreement ("Notice") have waived their claims against Defendant and should therefore be excluded from the Plaintiff Class. Defendant argues that the terms in this Notice informed the Class Members they would be releasing all claims against the "Released Time Warner Parties," which was defined as "Time Warner Inc .... and any of its or their present or former ... shareholders." [Declaration of Howard Privette ("Decl.Privette") in support of Defendant's Motion *in Limine* No. 2, Exh. C at 21.] Defendant argues that because he was a shareholder of AOL Time Warner, Inc., now known as Time Warner, Inc., prior to this settlement and remains a shareholder of Time Warner, Inc. to this date, the members of the Class who accepted the settlement have therefore waived their claims against Defendant.

This particular settlement agreement is governed by California law. [Decl. Privette in support of Defendant's Motion *in Limine* No. 2, Exh. B at 18.] Under California law, an individual who is not a party to the release or settlement agreement can still enforce that agreement. *Vahle v. Barwick,* 93 Cal.App. 4th 1323, 1328 (2001). However, the "burden is on the third party to prove the parties to the release agreement intended to benefit the third party," and the third party must "affirmatively show that the parties intended to release him." *Id.*

The Court finds that Defendant has not met his burden to prove that the parties to the settlement agreement intended to benefit Defendant by releasing all claims against him by virtue of his position as a shareholder of Time Warner, Inc. Specifically, the settlement agreement states that the "remaining claims against ... [Defendant] are not being settled or compromised by this settlement and will continue to be prosecuted by [Plaintiff] on behalf of the Class." [Decl. Privette in support of Defendant's Motion *in Limine* No. 2, Exh. B at 3.] Moreover, under the circumstances, it is not likely that the parties to this agreement intended to release him from liability through this settlement, as claims against him for the same conduct were still pending at this time. *See Vahle, 93 Cal.App. 4th at 1328* (looking to motives of the parties in examining whether there was an intent to release the third party).

 **\*5** Defendant argues that this specific language is not controlling, as it was not in the Notice. However, the Court finds that Defendant's arguments here that the Notice prevails over the actual settlement agreement are unpersuasive, as class members are "not expected to rely upon notices as a complete source of settlement information, and courts have held that "[a]ny ambiguities regarding the substantive aspects of the settlement could be cleared up by obtaining a copy of the agreement." *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 112 (5th Cir.1995).

Accordingly, the Court **DENIES** Defendant's Motion *in Limine* Number 2 to exclude from the Plaintiff Class all persons who received a distribution from the settlement with Time Warner, Inc.

   3. *Defendant's Motion in Limine No. 3*
The Court **DENIES** Defendant's Motion *in Limine* Number 3 to exclude evidence of Homestore's financial restatements.

Defendant seeks to exclude evidence regarding the Restatement of Homestore's financial reports for the year 2001 and the first three quarters of 2001 (hereinafter, "Restatement"). As part of an internal investigation initiated in late 2001, Homestore formed a committee of various outside accountants and attorneys in order to review Homestore's accounting practices and certain past business transactions. In 2002, after Defendant had left the company, this committee concluded that the accounting decisions at issue were improper, and determined that Homestore should issue restated financial records for fiscal year 2000 and the first three quarters of fiscal year 2001, subsequently filing the Restatement at issue here with the Securities and Exchange Commission ("SEC"). This Restatement lays out that the history of this investigation and states that certain transactions had been improperly recorded. [Decl. Privette in support of Defendant's Motion *in Limine* No. 3, Exh. A.]

Defendant first argues that evidence of the Restatements is inadmissible under Federal Rule of Evidence 407, as it is a subsequent remedial measure by Homestore's accountants and lawyers. However, the Court finds that the Restatement is not a subsequent remedial measure under Federal Rule of Evidence 407 because it was not voluntary, given the Restatement was "mandated by federal securities laws." *See U.S. SEC v. Battenberg,* 2010 WL 3835760 (E.D.Mich. Sept. 24, 2010). Further, Homestore's Restatement does not meet the plain language or policy of Rule 407, as the Restatement was not a voluntary remedial measure but instead a required corrective action under both SEC regulations and the guidelines in the Generally Accepted Accounting Principles. *See SEC v. Uzzi,* 2003 WL 1342962 (S.D.Fla. Jan. 21, 2003) (holding that Defendant's financial restatement ... [was] not at all voluntary, and thus, neither the intent nor the policy underlying Rule 407 support exclusion of this material").

Defendant also argues that the Restatement is inadmissible hearsay and not a business record under Federal Rule of Evidence 803(6). The Court finds this argument unpersuasive and that the Restatement is a business record under Rule 803(6). Fed.R.Evid. 803(6). Specifically, the Restatement was made at or near the time of the accounting investigation by those with knowledge of the company's books, the circumstances of its creation do not indicate a lack of trustworthiness, and the Restatement was created and kept in the regular business practice of the company, as the company had a duty to file restated financial statements with the SEC. *See Fed.R.Evid. 803(6). See also In re Worldcom, Inc. Securities Litigation,* 2005 U.S. Dist. LEXIS 2215, \*18–24.

 **\*6** Finally, Defendant has not shown that the probative value of this Restatement is substantially outweighed by the risk of prejudice to Defendant. *See id.,* 2005 U.S. Dist. LEXIS 2215 at \*29 (noting that "evidence that prior statements were inaccurate "does not mean that [defendant] will suffer any unfair prejudice from [plaintiff's] possession of persuasive evidence").

Accordingly, the Court **DENIES** Defendant's Motion *in Limine* No. 3 to exclude the Restatement.

4. *Defendant's Motion in Limine No. 4*

The Court **GRANTS WITHOUT PREJUDICE** Defendant's Motion *in Limine* Number 4 to exclude the March 29, 2002 Investigation Report of the Audit Committee of Homestore.com ("Cahill Report").

As noted above, in 2001, Defendant initiated an internal investigation into various accounting practices and transactions at issue here. The Audit Committee of Homestore's Board of Directors eventually hired outside special counsel from the law firm of Cahill, Gordon and Reindel ("Cahill") and the forensic accounting firm of FTI Simpson to continue this investigation. Upon completion of this investigation, a report was prepared by Cahill: the Cahill Report. This Report contains a compilation of documents, including memorandum describing interviews of Homestore employees, summaries of Homestore's transactions, and other documents such as wire transfers and agreements. This Report summarizes the reasons for Homestore's restatement of revenues associated with a certain number of its business transactions. Plaintiff's seek to admit evidence from this Report regarding the investigation into the nature of all of Homestore's revenue transactions during the years 2000 to 2001 and the final determination of the necessary restatements to Homestore's financial statements.

Defendant first argues the Cahill Report is inadmissible under Federal Rule of Evidence 407 because it is a subsequent remedial measure. However, the Court finds that the Cahill Report is not a subsequent remedial measure under this Rule. The Report was not created for the purpose of "improving the procedures and controls relating to [Homestore's] transaction system," unlike the audit report in *Alimenta (U.S.A.), Inc. v. Stauffer* that was found to be a subsequent remedial measure under Rule 407. 598 F.Supp. 934, 941 (D.C.Ga.1984). Instead, the Report here was made in response to the alleged improprieties and for the purposes of investigating the transactions, not to improve any accounting at Homestore. As such, the Report does not constitute a subsequent remedial measure within the realm of Rule 407. Fed.R.Evid. 407.

However, the Court finds that the Cahill Report contains documents and statements that constitute hearsay. The Report contains many statements and interviews with unknown individuals, and Plaintiff is seeking to offer evidence from this Report to prove the truth of the matter asserted within these

documents: Homestore's and Defendant's past fraudulent practices and activities. Plaintiff argues this Report falls within the exception under Federal Rule of Evidence 804(6) for a business record. However, the Court finds that this Report does not meet the requirements in order to constitute a business record pursuant to this Rule. First, the Court finds that the Cahill Report is not a record of a regularly conducted business activity, as it does not "reflect[ ] the accounting work done." *Paddack v. Dave Christenson* is instructive here. In *Paddack,* the trustees of the trust fund suspected that the employer's records were incorrect, and they employed an audit company to perform an audit of the employer's contributions. 745 F.2d 1254, 1256–57 (9th Cir.1984). The auditors were requested to determine the extent of the employer's compliance with the agreements, and ultimately the report and summaries in the report asserted that the employers had wrongfully failed to contribute to the funds. *Id.* at 1257. The Ninth Circuit held that the report was not admissible under the business records exception, because it was not made or kept in the ordinary course of business, as the audit was in response to the suspicion of irregularities. *Id.* at 1258. Here, the Cahill Report, like the audit report in *Paddick,* was not just a regular audit report. Instead, it was made in response to irregular transactions, and moreover, was likely made in anticipation of and preparation for this current litigation. *Id.* Therefore, the Court finds that the Report was not made in the normal, regular course of business, as required by Federal Rule of Evidence 804(6).

**\*7** In addition, the Court finds that the Report lacks the requisite indicia of trustworthiness, as at least one individual interviewed during the investigation that ultimately produced the Report later admitted that he had lied during this interview. *See id.* (noting that in finding the audit report not a business record that "substantial evidence exists that the summaries were untrustworthy .... [for example] the Employer's cross-examination of the accountant supervisor revealed inaccuracies in the audit report").

Moreover, the Court finds that the Cahill Report has not been authenticated pursuant to Federal Rule of Evidence 901. There are no declarations or other testimony here to authenticate this document, and the Court finds Plaintiff's argument here that the Cahill Report is properly authenticated based on the submitted deposition testimony of Adam Zurofsky and Sally Knutson is unpersuasive. This deposition testimony only authenticates the general scope and description of the Report, not the two-thousand plus pages of

interviews, memorandum, or items that are being offered by Plaintiff according to the exhibit list [1203].

As such, the Court **GRANTS WITHOUT PREJUDICE** Defendant's Motion *in Limine* Number 4 to exclude the Cahill Report at this time.

### 5. *Defendant's Motion in Limine No. 5*

The Court **DENIES** Defendant's Motion *in Limine* Number 5 to exclude the loss causation and damages Opinions of Plaintiff's designated expert Jane Nettesheim ("Nettesheim").

In order for expert testimony to be admissible under Federal Rule of Evidence 702, it must be scientifically valid and assist the trier of fact. *United States v. Ginn,* 87 F.3d 367, 370 (9th Cir.1996) (citing *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 592–600 (1993). *See also* Fed.R.Evid. 702. Moreover, "under the [Federal Rules of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589.

Defendant argues that Nettesheim's opinions on loss causation and damages are unreliable and contrary to law after the Supreme Court's holding in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005).[1] Specifically, Defendant argues that Nettesheim employs an improper legal standard and premises her damage analysis on the theory of loss causation rejected by the Supreme Court in *Dura:* that price inflation at purchase itself causes damages.

The Court finds that Nettesheim's opinions are not contrary to the Supreme Court's holding in *Dura,* as Nettesheim does not base her damage methodology solely on the price of inflation at the time of the stock purchase. Instead, the expert report shows that Nettesheim uses an event study and regression analysis to determine the effect of the alleged misrepresentations and corrective disclosures on the inflated price of the stock. As the Supreme Court in *Dura* held that the inflated purchase price *alone* is not sufficient to show loss causation, Defendant's arguments here regarding Nettesheim's methodology and use of inflation are unpersuasive.

**\*8** Moreover, the Court finds that Nettesheim's opinions show the requisite causal nexus between the alleged fraud misrepresentations and the economic loss. *In re DVI, Inc., Sec. Litig.,* 2010 WL 3522090, \*12 (E.D.Pa. Sept. 3, 2010)

(stating that courts require that a loss causation expert explain how the truth of fraudulent behavior was revealed to the market and "link this revelation to a corresponding loss"). Specifically, Nettesheim identifies the four corrective disclosures that she explains revealed the truth of Homestore's fraudulent behavior to the market, and also explains how she then used these disclosures in determining the effect of the alleged misrepresentations and omissions on Homestore's stock price. This is sufficient to show loss causation here, as the Court finds that there is a logical connection between these disclosures and the claim of damages resulting from the underlying fraud. *See In re Vivendi Univ.,* 634 F.Supp.2d 352 at 364 (noting that corrective disclosures only need to reveal an aspect of the fraud and that the alleged fraud is not always revealed through one correction).

Next, Defendant attacks Nettesheim's report and opinions for failing to take into consideration outside, non-fraud related factors that may have affected the price of the stock. However, the Court finds these arguments unpersuasive, as Nettesheim's expert report expressly states that her regression analysis distinguishes between loss attributable to alleged fraud and loss attributable to non-fraud related news and events. [Decl. Sterrett in Opposition to Defendant's Motion *in Limine* No. 5, Exhs. 3, 9–11.] As a result, Nettesheim makes an attempt to account for other possible causes, and her opinions therefore meet the reliability threshold requirement

Accordingly, Defendant's Motion *in Limine* to exclude Nettesheim's loss causation and damages opinions is **DENIED.**

However, with respect to the issue of Nettesheim's use of the trading model to calculate damages, the Parties both acknowledge that the real data is available here and that they can make estimates with this data and present per-share damages to the jury. Given the potential issues with using a trading model that are outlined in *In re Broadcom Corp. Securities Litigation,* such as potential for error and questionable accuracy, along with the fact that the data is available here given the prior settlements in this Action, the Court orders that the Parties use a per-share presentation of damages. 2005 WL 1403756 (C.D. Cal. June 3 2005) (holding that per share damages estimate should be used because "the Court can easily use the claims administration process to supply the remaining information to calculate an accurate, reliable total damage figure and payout").

### 6. *Defendant's Motion in Limine No. 6*

The Court **DENIES** Defendant's Motion *in Limine* Number 6 to exclude evidence of and reference to Defendant's plea agreement.

Defendant entered into a binding plea agreement with the United States Attorney's Office on January 1, 2010. Defendant pled guilty to criminal conspiracy in violation of 18 U.S.C. § 371.[2]

**\*9** First, as the Court may take judicial notice of this plea agreement pursuant to Federal Rule of Evidence 201, the Court finds that general references to the existence of this plea agreement itself are admissible. Fed.R.Evid. 201. *See Scholes v. Lehmann,* 56 F.3d 750, 762 (7th Cir.1995).

Under Federal Rule of Evidence 803(22), "evidence of a final judgment, entered after a trial or upon a plea of guilty, adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year," is admissible "to prove any fact essential to sustain the judgment." Fed.R.Evid. 803(22).

The Court finds that the plea agreement is admissible under Federal Rule of Evidence 803(22), as it meets the above requirements. Therefore, the plea agreement can be used to prove facts that were essential to sustain the judgment. Further, courts have held that admissions in a plea agreement constitute non-hearsay party admissions, and therefore the Court finds that the factual admissions in Defendant's plea agreement are admissible on these grounds as well. *See* Fed.R.Evid. 801(d)(2). *See, e.g., Country Mutual Ins. Co. v. Duncan,* 794 F.2d 1211, 1215 (7th Cir.1986).

Defendant argues that the facts contained in the plea agreement are not relevant to the determination of Defendant's liability, claiming that conspiracy to commit securities fraud is insufficient to state a claim for Section 10(b). In the plea agreement, Defendant admits that he signed 10–Qs on May 15 and August 14, 2001 that contained false and misleading representations and omitted material facts regarding the company's revenue results. [Decl. Privette in support of Defendant's Motion *in Limine* No. 6, Exh. A.] The Court finds that these admitted facts are relevant to the issue of whether Defendant made material misrepresentations with scienter, elements that Plaintiff must prove to establish a Section 10(b) violation here. While Plaintiff is incorrect that this plea conclusively establishes Defendant's liability here, as noted in the Court's ruling above on Plaintiff's Motion *in Limine* Number 8, the facts contained in this plea agreement

are probative and relevant to the determination of the outcome here. *See In re Bristol–Myers Squibb Co. Sec. Litig.,* 586 F.Supp.2d 148, 170 (S.D.N.Y.2008). *See also Palmerin v. City of Riverside,* 794 F.2d 1409, 1414 (9th Cir.1986).

Defendant stresses that the plea should be excluded under Federal Rule of Evidence 403 because the jury will be confused and equate a guilty plea of conspiracy with civil liability. However, the Court finds this argument unpersuasive, as cautionary jury instructions can be used to counter these concerns. Moreover, Defendant will also have the opportunity at Trial to stress that Defendant's guilty plea does not establish his liability in this civil Action. Finally, the risk of prejudice here is not substantial when compared to other situations in which courts have excluded plea agreements on prejudicial grounds, such as when the plea has been withdrawn or when the terms in the agreement have an "undue tendency to suggest decision on an improper basis." *See, e.g., U .S. v. Alama,* 486 F.3d 1062, 1065 (8th Cir.2007).

*7. Defendant's Motion in Limine No. 7*

**\*10** The Court **DENIES** Defendant's Motion *in Limine* Number 7 to exclude opinions and testimony of Ruben A. Davila ("Davila"). Plaintiff has designated Davila to testify on the issue of appropriate accounting standards that a corporate Chief Executive Officer should adhere to in the management of a public company.

The Court finds that based on Davila's report, Davila has made the requisite showing that his testimony and opinions qualify as scientific knowledge that will assist the trier of fact to understand or determine a fact in issue in this case. Specifically, Davila has provided the requisite information to prove that his research is legitimately scientific, and has extensive experience in the area of accounting. Moreover, an examination of his expert report illustrates how his opinions are based on his own research of financial statements relevant to this case and that his research is legitimately scientific.

With regard to the relevance inquiry outlined in *Daubert,* that requirement is met here. Plaintiffs intend to offer Davila's expert testimony to establish what a CEO should know and do in regards to the financials of a company. The Court finds that such information will assist the jury in this case in determining the ultimate issue of whether Defendant had the scienter necessary to establish a violation of Section 10(b).

As such, Davila's testimony meets the requirements set forth in *Daubert,* and Defendant's Motion *in Limine* Number 8 to exclude his opinions and testimony is **DENIED.**

However, Plaintiff is cautioned that Davila will not be able to testify to legal conclusions at trial. *See Crow Tribe of Indians v. Raciot,* 87 F.3d 1039, 1045 (9th Cir.1996) (noting that "[e]xperts interpret and analyze factual evidence. They do not testify about the law"). Specifically, Davila is not to be permitted to state any opinion that Defendant knew or must have known about alleged accounting improprieties at Homestore.

### 8. *Defendant's Motion in Limine No. 8*

The Court **DENIES** Defendant's Motion *in Limine* Number 8 to exclude opinions of Alfred E. Osborne ("Osborn"). Osborne is designated to testify regarding corporate governance, fiduciary duties owed by corporate officers and whether Defendant met his fiduciary duties.

The Court finds that Osborne's testimony qualifies as scientific knowledge that will assist the trier of fact in understanding or determining a fact in issue in this case, as Plaintiff has made the requisite showing as outlined in *Daubert* to prove that his method is scientifically reliable.

Moreover, the Court finds that Osborne's opinion should provide helpful testimony to the jury on the appropriate standard of behavior a CEO owes its company and shareholders. Osborne's testimony with regard to the standard of behavior would be more probative than prejudicial and relevant to the issue of corporate governance which may impact the ultimate issue of this case of whether Defendant had the scienter necessary to establish a violation of Section 10(b).

**\*11** However, as noted above, Plaintiff is cautioned that Osborne will not be able to testify to legal conclusions at trial. *See Crow,* 87 F.3d at 1045.

### 9. *Defendant's Motion in Limine No. 9*

The Court **GRANTS** Defendant's Motion *in Limine* Number 9 to exclude Joseph Shew's "Notes," as Plaintiff's do not oppose this Motion.

### 10. *Defendant's Motion in Limine No. 10*

The Court **DENIES** Defendant's Motion *in Limine* Number 10 to exclude cumulative expert testimony.

Defendant moves for an Order stating that Plaintiff may only present testimony of at most one expert on the issue of whether Homestore stock traded on an efficient market and that Plaintiff may only present testimony of at most one expert on the issue of whether Defendant had knowledge of any of the alleged wrongdoing at Homestore. Plaintiff has designated two expert witnesses to testify on each of these issues.

The Court finds that Defendant has not shown that the testimony from Plaintiff's four designated expert witnesses will be cumulative. The expert reports show that these experts are slated to testify about different issues within these two general subject matters. Therefore, there is not a substantial risk of prejudice in presenting these experts, nor is there a risk of waste of judicial resources should Plaintiff present all four experts to testify at Trial.

Accordingly, the Court **DENIES** Defendant's Motion *in Limine* Number 10 to exclude cumulative expert testimony.

### 11. *Defendant's Motion in Limine No. 11*

The Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion *in Limine* Number 11 to exclude evidence regarding Defendant's stock sales and financial condition.

The Court **GRANTS** Defendant's Motion with respect to evidence and reference to Defendant's financial condition. As noted above, this type of evidence is irrelevant and prejudicial, and Plaintiff does not oppose this request. *See In re Global Health Sciences,* 2007 WL 4591679, *3 (C.D.Cal. August 21, 2007)* (excluding reference to the defendant's financial condition). With regard to references to Defendant's stock sales, Plaintiff does not oppose this Motion, and therefore the Court **GRANTS** Defendant's Motion with respect to these references. However, the Court **DENIES** Defendant's Motion insofar as Defendant requests to exclude references to the amount of stock Defendant held during the Class Period, as this is relevant to the issue of Defendant's motive and scienter during the Class Period.

### 12. *Defendant's Motion in Limine No. 12*

The Court **DENIES** Defendant's Motion *in Limine* Number 12 to prevent the introduction of evidence or references to Lead Plaintiff as "teachers" or a pension fund for "teachers."

The Court finds that Defendant has not sufficiently shown that use of this term will be prejudicial under Federal Rule of Evidence 403.

#### 13. *Defendant's Motion in Limine No. 13*

The Court **DENIES** Defendant's Motion *in Limine* Number 13 to prevent references to the Lead Plaintiff and the Plaintiff Class as "victims."

**\*12** The Court finds that Defendant has not sufficiently shown that use of this term will be prejudicial under Federal Rule of Evidence 403. *See Sears v. PHP of Alabama, Inc.2006 WL 1223302,* \*3 (M.D .Ala., May 5, 2006) (denying defendant's motion *in limine* to exclude the word "victim" because defendant did not sufficiently prove the use of this term would be prejudicial).

Therefore, the Court **DENIES** Defendant's Motion *in Limine* Number 13 to prevent references to Plaintiffs as "victims."

#### 14. *Defendant's Motion in Limine No. 14*

The Court **GRANTS** Defendant's Motion *in Limine* Number 14 to exclude evidence or references regarding unrelated corporate "scandals."

Defendant moves to exclude evidence or references to unrelated corporate "scandals," such as the Enron scandal or the Madoff scheme. The Court finds that evidence and reference to these unrelated scandals are not relevant to the Action at hand, and any such reference would be prejudicial to Defendant. *See CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Associates,* 411 B.R. 591, 605–06 (N.D.Ill.2009). *See also Sabratek Liquidating LLC v. KPMG LLP,* 2003 WL 22715820, \*6 (N.D.Ill., Nov. 18, 2003) (holding that improper conduct at other firms had little relevance to the defendant's conduct at issue, and any of its probative value was substantially outweighed by the risk of unfair prejudice).

Therefore, the Court **GRANTS** Defendant's Motion *in Limine* Number 14 to exclude evidence or references regarding unrelated corporate "scandals."

However, evidence and references to these past "scandals" are admissible insofar as they are used to provide foundation for Plaintiff's expert witnesses' qualifications, such as their past experiences and work, including work on other corporate "scandals."

#### 15. *Defendant's Motion in Limine No. 15*

The Court **DENIES** Defendant's Motion *in Limine* Number 15 to exclude evidence and speculation concerning transactions involving SPD LLC and Translations.com.

The Court finds that Defendant has not sufficiently shown that this evidence is irrelevant and prejudicial. Moreover, any concerns over the strength or credibility of Plaintiff's evidence on this issue are better addressed by the trier of fact in the trial setting. *See Bado–Sanatana v. Ford Motor Co.,* 364 F.Supp.2d 79 (D. Puerto Rico, 2005) (noting that issues of credibility are not normally determined in motions *in limine.*). *See also Pulsipher v. Clark Cty.,* 2010 5437252, \*2 (D.Nev., Dec. 27, 2010) (stating that "a motion *in limine* should not be used to ... weigh evidence").

Therefore, the Court **DENIES** Defendant's Motion *in Limine* Number 15 to exclude evidence and speculation concerning transactions involving SPD LLC and Translations.com.

#### 16. *Defendant's Motion in Limine No. 16*

The Court **DENIES** Defendant's Motion *in Limine* Number 16 to limit Plaintiff's evidence and arguments to the fourteen transactions identified by Plaintiff in response to the Court's Scheduling Order.

**\*13** Defendant seeks to limit Plaintiff's evidence and arguments at Trial to the fourteen transactions that were identified by Plaintiff on October 31, 2003, in response to the Court's July 28, 2003 Scheduling Order [253]. The Court finds that this Motion is over-broad in terms of excluding all evidence and arguments except those which pertain to these fourteen transactions. Moreover, Defendant mis-categorizes Plaintiff's identifications here, as Plaintiff identified fourteen categories of transactions, not just fourteen transactions in general, and it should therefore be able to present argument and evidence relating to these disclosed categories.

Accordingly, the Court **DENIES** Defendant's Motion *in Limine* Number 16 to limit Plaintiff's evidence and arguments to the fourteen transactions identified by Plaintiff in response to the Court's Scheduling Order.

#### 17. *Defendant's Motion in Limine No. 17*

The Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion *in Limine* Number 17 to exclude

testimony from and evidence relating to parallel criminal and SEC proceedings, including judgments and assertions of Fifth Amendment privileges.

Defendant seeks to preclude the admission of testimony from and evidence and references relating to the parallel criminal and SEC proceedings that involve Defendant and other Homestore personnel, including testimony and judgments in such proceedings, as well as the fact that the individuals exercised their Fifth Amendment rights in this and other proceedings.

The Court first **DENIES** this Motion insofar as Defendant attempts to exclude any and all evidence or reference to these proceedings, including the complaints, indictments, and other evidence, as this request is over-broad and Defendant has not provided the Court with the specific evidence claimed to be inadmissible. *See Lopez v. Chula Vista Police Dept.,* 2010 WL 685014, at \*7 (S.D.Cal. Feb. 12, 2010) (denying defendants' motion *in limine* on the grounds it was vague and over-broad).

However, the Court **GRANTS** Defendant's Motion *in Limine* to exclude the SEC consent judgments insofar as the judgments are used to establish liability, as Plaintiff does not oppose this request.

The Court **DENIES** the Motion insofar as it seeks to exclude any third-party plea agreements related to this Action. Plea agreements from third parties have been admitted to prove the facts that are contained therein. *See, e.g., In re Slatkin,* 310 B.R. 740, 744–45 (C.D.Cal.2004); *Scholes v. Lehmann,* 56 F.3d 750, 762 (7th Cir.1995). Defendant mainly argues here that these plea agreements are not probative and highly prejudicial. However, the plea agreements have not been provided to the Court, and therefore the Court cannot make a determination at this point in time as to the relevancy and potential prejudicial effect of the plea agreements.

Furthermore, the Court **DENIES** this Motion insofar as Defendant seeks to preclude all former testimony from Defendant's 2006 criminal proceeding. The Court finds that this Motion is pre-mature, as it is unclear at this point whether the former testimony meets the requirements set forth under Federal Rule of Evidence 804(b) for admitting former testimony. Fed.R.Evid. 804(b). *See Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004) (noting that to exclude evidence on a motion *in limine,* "the evidence must be inadmissible on all potential grounds").

**\*14** As the Parties agree that references to past Fifth Amendment invocations should be excluded, the Court **GRANTS** Defendant's Motion *in Limine* with respect to this request.

Therefore, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion *in Limine* Number 17 to exclude testimony from and evidence relating to parallel criminal and SEC proceedings, including judgments and assertions of Fifth Amendment privileges.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 291176

---

**Footnotes**

1   In *Dura,* the Supreme Court held that a private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss. *Id.* at 342. Specifically, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff. *In re Daou Sys.,* 411 F.3d 1006, 1025 (9th Cir.2005).

2   Criminal conspiracy under this statute occurs when "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy...." 18 U.S.C. § 371.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.