IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GELT TRADING, LTD.,<br><br>        Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT EGAN, JAMES NELSON, EUGENE DURENARD, EDWARD MURPHY, RICHARD SERBIN, REED BENSON, and BRENT SATTERFIELD,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY; GRANTING ONE AND DENYING ONE OF DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00368-JNP-DBP<br><br>District Judge Jill N. Parrish |

Defendant Co-Diagnostics, Inc., manufacturers diagnostic tests for a range of diseases, including tuberculosis and HIV. Early in the COVID-19 pandemic, it raced to create a cost-effective, accurate PCR diagnostic test for COVID-19 and quickly won lucrative contracts in the United States and abroad. At the end of April 2020, the *Salt Lake Tribune* published an article questioning the accuracy of the Co-Diagnostics test based on data suggesting that it was less effective at detecting COVID-19 compared to other diagnostic tests. In response, Co-Diagnostics issued a press release reiterating its confidence in its diagnostic test and stating that its test had achieved 100% clinical sensitivity and specificity in validation studies.

Approximately two weeks later, Co-Diagnostics' stock price dropped, and Class Plaintiff Gelt Trading along with other investors lost large sums of money. Gelt Trading, representing a class of traders, sued, alleging that Co-Diagnostics violated Section 10(b) of the Securities and Exchange Act of 1934 and implementing Rule 10b-5 by deliberately issuing a misleading press release to artificially inflate Co-Diagnostics' stock price, which dropped after corrective information was released to the market from third parties such as media outlets and government agencies.

In March 2022, this court denied Defendants' motion to dismiss Gelt Trading's complaint for failure to state a claim, and the parties proceeded to discovery. Before the court now are the following five motions: Gelt Trading's *Daubert* motion to exclude one of Defendants' expert witnesses, Dr. Stephen Bustin; Defendants' *Daubert* motions to exclude two of Gelt Trading's expert witnesses, Dr. James Westgard and Mr. Daniel S. Bettencourt; Gelt Trading's motion for partial summary judgment; and Defendants' motion for summary judgment. For the reasons that follow, the court GRANTS Defendants' motion to exclude Mr. Bettencourt's testimony; GRANTS Defendants' motion for summary judgment; and DENIES the remaining motions as moot.

## BACKGROUND

### I.    Co-Diagnostics, PCR Testing, and the Logix Smart Test

Co-Diagnostics, founded in 2013 by Defendant Dr. Brent Satterfield, is a Utah-based biotechnology company that develops, manufactures, and sells PCR diagnostic tests. A PCR test operates by rapidly amplifying copies of viral genetic material and then testing for the presence of that material in a given sample. Before the COVID-19 pandemic, Co-Diagnostics specialized in PCR diagnostic tests for diseases like tuberculosis, malaria, dengue fever, and HIV. During these six or so years, Co-Diagnostics was losing money. In 2019, for example, its gross revenues were

not even a quarter million dollars, causing the company to lose about six million dollars that year. The company's stock, which hovered under a dollar per share, was in jeopardy of being delisted by the NASDAQ.

The COVID-19 pandemic, for all the disruption and anxiety it brought to the world, presented Co-Diagnostics with an opportunity to recoup its losses by developing a PCR test for COVID-19. The company created its Logix Smart COVID-19 diagnostic test by February 2020 and obtained emergency use authorization to sell the test in the United States from the U.S. Food and Drug Administration ("FDA") by April. Co-Diagnostics quickly won lucrative contracts at home and abroad, including with the testing programs in Utah (TestUtah), Iowa (TestIowa), and Nebraska (TestNebraska). These developments sent the company's stock price soaring from 91¢ at the beginning of the year to over $23 by late spring.

During April 2020, Co-Diagnostics sent its Logix Smart test to several validation studies around the world to obtain data on the performance of its test compared to that of other tests. PCR validation studies often evaluate several performance measures, such as the limit of detection, sensitivity, and specificity. A test's limit of detection is the smallest amount of virus that it can consistently detect under precise lab conditions. A test's sensitivity and specificity reflect its ability to correctly identify the target pathogen or disease without identifying other pathogens or diseases.

Sensitivity and specificity come in two varieties: analytical and diagnostic (i.e., clinical). During the development phrase, a test's performance is typically characterized by its analytical sensitivity and analytical specificity. A test's analytical sensitivity directly corresponds to its limit of detection, and its analytical specificity captures its ability to discriminate between the target pathogen and other similar pathogens. Because analytical sensitivity and analytical specificity are

determined under tightly controlled lab conditions, a test is expected to exhibit 100% performance on both metrics.

As a test moves past the development phase, its diagnostic sensitivity and diagnostic specificity become more important. A test's diagnostic sensitivity is the proportion of patients with the target disease who test positive for it; a higher diagnostic sensitivity means fewer false negatives. And a test's diagnostic specificity is the proportion of patients without the target disease who test negative for it, so a higher diagnostic specificity means fewer false positives. These metrics can be measured by assessing how often the test correctly identifies patient samples known to be positive or negative or by comparing the test's results against those generated by a reference test. The test's limit of detection is less relevant as a standalone metric in the development phase because it is reflected in the diagnostic sensitivity (that is, a test with a very high limit of detection typically has a lower diagnostic sensitivity).

The data from the April 2020 validation studies from around the world joined other verification data Co-Diagnostics had received. The company's own development and lab testing, the data from which were sent to the government for obtaining emergency use authorization, showed 100% sensitivity and 100% specificity. Several of the validation studies from abroad corroborated these data. For example, PathWest, an Australian government pathology service, found that the Logix Smart test showed 100% sensitivity and 100% specificity compared to their in-house reference test using over 200 real-world patient samples. The National Institute of Pathology in India compared the equivalent of the Logix Smart test in India (an identical test known as Saragene) with a gold-standard reference test from the National Institute of Virology, a different Indian lab, and similarly found that the Saragene test showed 100% sensitivity and 100%

4

specificity. And data from the Mexican government's Institute of Epidemiological Diagnosis and Reference showed the same results.

Alongside these favorable evaluations, however, Co-Diagnostics had also received several results suggesting lower performance characteristics for the Logix Smart test (or Saragene test in India). Results from the National Institute of Virology showed 100% sensitivity but 85% specificity, meaning the test was returning false positives. A Greek lab also showed that the test was showing false positives. On the other hand, a South African lab found that the test was returning false negatives. These unfavorable results did not concern Co-Diagnostics, however, because several of its employees believed that they were caused by contamination or poor data recording in the validating lab, not by any flaws with the test itself.

## II.    *Salt Lake Tribune* Article and Co-Diagnostics' Press Release

During these early months of the pandemic, the news media and government agencies sought to help the public understand the COVID-19 virus and PCR testing. Numerous sources underscored the inherent uncertainty in diagnostic testing and the reality that no diagnostic test can perform 100% accurately all the time. Amidst this frenzy of new information and public discussion about COVID-19 diagnostic testing, the *Salt Lake Tribune* published an article on April 30, 2020, questioning the accuracy of the Logix Smart test. According to the article, results from TestUtah's testing site (which was using the Logix Smart test) were showing a lower rate of positive tests than those from other testing sites using other diagnostic tests. The article quoted a doctor who observed that "the Co-Diagnostics test has a higher limit of detection compared to tests offered by more established vendors" and said that the lower detection levels with the Logix Smart test could lead to a "public health disaster." *See* ECF No. 169-61 (April 30 *Tribune* Article), at 9, 11.

To respond to the negative reporting in the *Tribune*, Co-Diagnostics issued a press release the next day (May 1) reiterating its confidence in its COVID-19 diagnostic test. ECF No. 169-25 (Co-Diagnostics Press Release). The press release quoted Dr. Satterfield as saying, "[T]he limit of detection or LOD is a single metric that helps inform the key metrics of sensitivity and specificity but is not relevant as a stand-alone data point. . . . In countries where we have been evaluated against other tests, we have consistently and repeatedly achieved 100% clinical sensitivity and specificity and you can't do better than that." *Id.* at 3. Linked to the press release were the validation reports that showed 100% sensitivity and 100% specificity (such as the one from Australia), but notably absent were the reports from India, Greece, and South Africa showing that the Logix Smart test appeared to have performed significantly worse.

III.     **Gelt Trading's Purchase of Co-Diagnostics Stock, Allegedly Corrective Disclosures, and Co-Diagnostics' Stock Price**

The parties agree that Co-Diagnostics' stock traded in an efficient market at all times relevant to this action. An efficient market is one where new information gets quickly impounded into the stock price. As noted above, Co-Diagnostics' stock price, which hovered under a dollar per share at the beginning of 2020, skyrocketed following the development, production, and sale of the Logix Smart test. At the close of trading on April 30, the company's stock sold for $11.34 a share. At the close of trading on May 1, it sold for $13.47, a 17.21% increase over the price the day before.

After the stock market had closed on May 13, Gelt Trading purchased 22,000 shares of Co-Diagnostics stock at $26.65 per share. The next day (May 14), an article in the *Tribune* reported that TestUtah had "declined to join other major Utah labs in a joint experiment to confirm one another's quality," instead agreeing "to a less-sophisticated 'compromise' experiment." ECF No.

6

169-95 (May 14 *Tribune* Article), at 2. The article stated, "The tests [used by TestUtah] have a higher 'limit of detection'—that is, they require more of the virus to trigger a positive result—than most other coronavirus tests approved for sale in the U.S." *Id.* at 3. The same day, a different news outlet reported a statement made by Iowa Governor Kim Reynolds during a press conference regarding results from TestIowa (which also used the Logix Smart test): "I'm pleased to announce that the State Hygienic Lab completed the Test Iowa validation process yesterday, achieving high ratings of 95 percent accuracy for determining positives and 99.7 percent accuracy for determining negatives." ECF No. 169-68, at 7–8. That afternoon, Gelt Trading sold its Co-Diagnostics stock for $20.97 per share, resulting in a loss of $125,017.77. The company's stock price closed at $22.13 that day.

Shortly after the market closed on May 14, Co-Diagnostics announced its Q1 2020 financial results. According to Co-Diagnostics CEO Dwight H. Egan, the earnings statement was "awesome." ECF No. 171-2 ("D. Egan Depo."), at 83. By other observers' metrics, however, the statement was more "mixed" with greater losses but also greater sales than expected. ECF No. 169-79, at 6. Later that evening, the FDA issued a press release alerting the public to concerns about the accuracy of Abbott Lab's ID NOW diagnostic test, a competitor to the Logix Smart test, and cautioning that "[n]o diagnostic test will be 100% accurate due to performance characteristics, specimen handling, or user error." ECF No. 169-81, at 2. The next morning, Co-Diagnostics' stock price opened at $19.52, dropping further to $17.07 by the close of the day.

In June 2020, Gelt Trading and a number of other plaintiffs sued Co-Diagnostics, claiming that the company committed securities fraud. In their view, Co-Diagnostics' May 1 press release misrepresented the true performance of the Logix Smart test and thereby artificially inflated the company's stock price. Then, after the plaintiffs had purchased Co-Diagnostics stock at the

artificially inflated price, corrective information disseminated on May 14 deflated the price, causing the plaintiffs to lose large sums of money. The plaintiffs sued Co-Diagnostics under Section 10(b) of the Securities and Exchange Act (along with its implementing Rule 10b-5), and sued several of the company's board members for derivative violations of Section 20(a) of the Act.

In March 2021, this court consolidated the plaintiffs' separate cases. Defendants moved to dismiss the complaint, and the court denied their motion in March 2022. About a year and half later, the court approved a class of investors who purchased Co-Diagnostics stock between May 1, 2020, and May 14, 2020, inclusive, and certified Gelt Trading as the class representative. The parties proceeded to discovery and filed cross-motions for summary judgment (or partial summary judgment) alongside *Daubert* motions to exclude expert testimony.

## ANALYSIS

As noted above, the core of this action is Gelt Trading's claim under Section 10(b) of the Securities and Exchange Act. Section 10(b) of the Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful to (among other things) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. The Supreme Court has implied a private cause of action from the text and purpose of Section 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

To succeed on a Section 10(b) claim, a private plaintiff must prove the following essential elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37–38 (internal quotation marks omitted). The failure to prove any one element dooms the plaintiff's case.

Under Gelt Trading's theory, the May 1 press release was misleading in two ways. First, in stating that the Logix Smart test had achieved 100% sensitivity and specificity in validation studies, it strongly suggested that the Logix Smart test was 100% accurate all the time, not just in validation studies. Second, the press release omitted any mention of the failed validation studies, thereby misrepresenting the test's true performance even on the validation studies themselves. These misrepresentations were then corrected by (i.e., the stock price dropped in response to) the various statements on May 14—namely, the reporting about TestUtah declining to participate in a joint validation study, Governor Reynolds's statements about the test's 95% sensitivity, and the FDA press release cautioning that no test is 100% accurate—but not before Gelt Trading had already purchased shares at the artificially inflated price.

As the court sees it, this case turns on element six, loss causation. To satisfy loss causation, Gelt Trading "must show a sufficient connection between the fraudulent conduct and the losses suffered." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014) (cleaned up). That means that it must (1) identify corrective disclosures that reveal to the market the pertinent truth that was previously concealed or obscured by the company's fraud; (2) show that the stock price dropped after the truth emerged; and (3) eliminate other possible explanations for the price drop. *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d

1130, 1137, 1140 (10th Cir. 2009). Plaintiffs often must rely on evidence from an expert's event

study or similar analysis to meet their loss-causation burden. *Baker v. SeaWorld Ent.*, 423 F. Supp.

3d 878, 917 (S.D. Cal. 2019).

Here, Gelt Trading offers the expert testimony of Mr. Bettencourt, a vice president of

Crowninshield (a financial economics consulting firm) with over a decade of experience

conducting and applying financial and econometric analysis to business-litigation matters, to

establish that the allegedly corrective information released on May 14—rather than other factors—

caused the drop in stock price on May 15. As counsel for Gelt Trading conceded at oral argument,

Mr. Bettencourt's testimony is essential for Gelt Trading's case to survive Defendants' motion for

summary judgment, so the court begins with Defendants' *Daubert* motion to exclude Mr.

Bettencourt's expert testimony and then turns to Defendants' motion for summary judgment.

## I.    *Daubert* Motion to Exclude the Testimony of Mr. Bettencourt

### A.    Legal Standard

Ordinarily, witnesses in a trial may testify only as to matters based on their perception of

the events in question. FED. R. EVID. 701. However, Rule 702 of the Federal Rules of Evidence

allows expert witnesses to provide a "broader range of testimony" and imposes on district courts

a concomitant "gatekeeping function" to "ensure that an expert witness's testimony is not only

relevant, but reliable." *D.H. Pace Co. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d

1360, 1366 (N.D. Ga. 2021); FED. R. EVID. 702.

Rule 702 provides that "[a] witness who is qualified . . . by knowledge, skill, experience,

training, or education may testify in the form of an opinion" if

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. The "proponent [must] demonstrate[] to the court that it is more likely than not" that the expert testimony satisfies these conditions.[1] *Id.*

To determine whether expert testimony is admissible and thereby perform their gatekeeping function, district courts must assess (1) whether the expert is qualified to provide the testimony; (2) whether the testimony is relevant; and (3) whether the testimony is reliable. *See United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). Rule 702 indicates that an expert may be qualified by his "knowledge, skill, experience, training, or education." FED. R. EVID. 702. It also indicates that the expert's testimony is relevant if it "w[ould] help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* And it asks courts to consider the expert's data, method, and application of the method to the data in assessing reliability. *Id.*; *Nacchio*, 555 F.3d at 1241.

In considering the expert's data, method, and application of the method, district courts are guided by the Supreme Court's foundational decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[2] The *Daubert* Court, recognizing that this inquiry is highly fact- and

---

[1] This "more likely than not" language was added in December 2023 in response to many court decisions incorrectly applying Rule 702 and explicitly reminds courts of their gatekeeping obligations. *See* FED. R. EVID. 702 committee notes to 2023 amendment.

[2] The Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), interpreted an earlier, leaner version of Rule 702. Following *Daubert* and several other decisions from the Supreme Court and circuit courts of appeals, Rule 702 was amended to "provide[] some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." FED. R. EVID. 702 committee notes to 2000 amendment. The committee notes clarify, however, that the amendment was not meant to codify the specific factors that the *Daubert* Court

11

case-specific, provided a nonexhaustive list of factors to analyze: (1) whether the expert's theory

or technique "can be (and has been) tested"; (2) whether the theory or technique "has been

subjected to peer review and publication"; (3) in the case of a technique, whether it carries a

"known or potential rate of error" and whether it conforms to "standards controlling [its]

operation"; and (4) whether the theory or technique has been "general[ly] accept[ed]" in the

scientific community. *Id.* at 593–94. The Court emphasized that the inquiry is "flexible" and that

its focus is on the "principles and methodology" employed, not the "conclusions that they

generate." *Id.* at 594. If an expert and his report satisfy the basic requirements of qualifications,

relevance, and reliability, then any shortcomings in the testimony go to weight (a jury

determination) rather than admissibility (a judge decision). *See ClearPlay, Inc. v. Dish Network,*

*LLC*, No. 2:14-cv-00191, 2023 WL 185434, at *1 (D. Utah Jan. 13, 2023). The decision whether

to ultimately admit or exclude expert testimony rests firmly in the district court's discretion, as

does the decision about how to test the expert's reliability in the first place. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 152 (1999); *Gen. Elec. Co. v. Joinder*, 522 U.S. 136, 140 (1997).

B.    Conformity to 28 U.S.C. § 1746

Before addressing Rule 702, Defendants argue that the court should exclude Mr.

Bettencourt's expert report because it was not made under penalty of perjury and therefore does

not meet the requirements of 28 U.S.C. § 1746. That provision states that

> [w]henever, under any law of the United States or under any rule, regulation, order,
> or requirement made pursuant to law, any matter is required or permitted to be
> supported, evidenced, established, or proved by the sworn declaration, verification,
> certificate, statement, oath, or affidavit, in writing of the person making the
> same . . . , such matter may, with like force and effect, be supported, evidenced,

---

enumerated. *Id.* Thus, courts should still consider the *Daubert* factors alongside the factors
specified in the text of Rule 702.

> established, or proved by the unsworn declaration, certificate, verification, or
> statement, in writing of such person which is subscribed by him, as true under
> penalty of perjury, and dated, in substantially the following form: . . . "I
> declare . . . under penalty of perjury that the foregoing is true and correct. Executed
> on (date)."

28 U.S.C. § 1746. By its plain terms, § 1746 requires that an unsworn statement (such as an expert

report) to be used in place of a sworn statement be signed and indicate that it was made under

penalty of perjury, but only if some other "law of the United States" or "rule, regulation, order, or

requirement" demands a sworn statement in the first place. *Id.* Rule 702, which governs the

admission of expert testimony, does not require an expert's proposed opinion to be sworn or

otherwise satisfy the requirements of § 1746.

Nevertheless, unsworn expert reports that do not contain the § 1746 language are not

competent evidence on summary judgment. *See* FED. R. CIV. P. 56(c)(4) committee notes to 2010

amendment (explaining that although "[a] formal affidavit is no longer required," a "written

unsworn declaration, certificate, verification, or statement [must still be] submitted in proper form

as true under penalty of perjury [under § 1746] to substitute for an affidavit"); *Peak ex rel. Peak*

*v. Cent. Tank Coatings, Inc.*, 606 F. App'x 891, 895 (10th Cir. 2015); *Alpha Cap. Anstalt v.*

*Intellipharmaceutics Int'l Inc.*, No. 19cv9270, 2021 WL 2896040, at \*5 (S.D.N.Y. July 9, 2021)

(excluding an expert report by Mr. Bettencourt in a different case on the grounds that it did not

meet the requirements of § 1746). That means that the court can disregard Mr. Bettencourt's expert

report on this basis alone in resolving the parties' cross-motions for summary judgment.

Nevertheless, for the sake of completeness, the court will consider the substance of Mr.

Bettencourt's report.

C.        Motion to Exclude the Testimony of Mr. Bettencourt

Gelt Trading alleges that Co-Diagnostics' artificially inflated price declined in response to corrective information from the May 14 *Tribune* article, a statement by Governor Reynolds, and the FDA press release. Mr. Bettencourt examined company press releases, equity analyst reports, news articles, SEC filings, records of Co-Diagnostics' daily stock prices, and other data to conduct an event study on the impact of these three allegedly corrective disclosures.[3] Based on his event study, he concluded that the alleged misrepresentation in Co-Diagnostics' May 1 press release inflated the company's stock price until the allegedly corrective disclosures informed investors about the true performance of the Logix Smart test. Defendants argue that his testimony is not reliable, and that it therefore must be excluded, because Mr. Bettencourt used a two-day time window for his event study and because he failed to consider other factors that may have caused the price decline.

First, Defendants challenge Mr. Bettencourt's choice of a two-day as opposed to one-day event-study window. To understand this challenge, a little background on event studies is helpful. An event study, a common method of establishing loss causation, "is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price." *In re Under Armour Sec. Litig.*, 730 F. Supp. 3d 172, 181 (D. Md. 2024) (internal quotation marks omitted). In securities-fraud cases, "the 'event' analyzed is the disclosure of the alleged fraud to the market." *Id.* Conducting an event study requires selecting an appropriate time window;

---

[3] Defendants argue that the three allegedly corrective disclosures did not constitute corrective disclosures as a matter of law. The court agrees, *see infra* pages 20–23, but notes here that Mr. Bettencourt, a nonlawyer financial expert, was asked to assess the impact of those three news statements assuming that they did indeed constitute corrective disclosures under the law.

a one-day window reveals the same-day effect of corrective information on stock price, a two-day window reveals the effect over two days, and so forth. Separately, event-study analysis often assumes that the market is efficient, meaning that the market price of a given company's stock fully and quickly reflects all publicly available information. *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 271 (D. Mass. 2006). Finally, an event study can also segregate the effects of corrective disclosures from the effects of other negative information that may not support a particular securities-fraud claim, such as a poor quarterly earnings statement released around the same time as corrective information.

With this background in mind, Defendants argue that Mr. Bettencourt, who assumed an efficient market for his event study, should have adopted a one-day May 14 window instead of extending the window to May 15 because the allegedly corrective disclosures came on May 14 and therefore, under the efficient-market assumption, should have affected the market on the same day. In Defendants' view, Mr. Bettencourt's choice to extend the window by a day, particularly when his same-day analysis showed no statistically significant decline in the stock price on May 14, indicates that his method is results-oriented and unreliable.

The court concludes that the use of the two-day window alone does not render Mr. Bettencourt's method unreliable. At a general level, "financial economists often define the event period as the two-day period consisting of the announcement day and the following day." Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell & Jeffry M. Netter, *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of* Basic v. Levinson, 77 VA. L. REV. 1017, 1031 (1991). Although an efficient-market assumption logically implies that corrective information will be reflected in the stock price very quickly, likely the same day, choosing a window for an event study is an "inexact science," and numerous courts around the country have

15

accepted the use of a two-day window. *United States v. Hatfield*, No. 06-CR-050, 2014 WL
7271616, at *12 (E.D.N.Y. 2014); *see also id.* at *13 ("Including the entirety of the trading for one
day following the announcement is appropriate . . . [and] in accord with generally accepted
practice."); *Carpenters Pension Tr. Fund v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015)
("[I]t is standard for experts to utilize an event window including both the day of the event and the
day following an event . . . ."). *But see Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D.
251, 269 (N.D. Tex. 2015) ("An efficient market is said to digest or impound new into the stock
price in a matter of minutes; therefore, an alleged corrective disclosure released to the market at
the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price
impact on Day 2, will not show price impact as to the alleged corrective disclosure.").

  And at a particular level, Mr. Bettencourt justified his use of a two-day window on the facts
of this case. He observed that the FDA press release, one of the pieces of allegedly corrective
information in Gelt Trading's theory of the case, was not released until after the close of trading
on May 14 and so could not be impounded into the stock price on May 14. *See* ECF No. 170-4
("Bettencourt Depo."), at 28. Second, he noted that the allegedly corrective information arrived
from third parties through what he called less regular releases (i.e., not from Co-Diagnostics itself),
and he cited an article in the *Journal of Financial Economics*, one of the top finance journals,
explaining that less regular information releases could take more than one day to impact stock
prices. ECF No. 170-3 (Bettencourt Report), at 40, 42. So far, so good.

  Mr. Bettencourt also justified his use of the two-day window by proposing that some
investors may have waited to sell based on the May 14 information because they wanted to see the
company's earnings statement, which the company planned to announce at the end of the day.
Bettencourt Depo. at 28. This justification, however, amounts to a recognition that the drop in

stock price may well have stemmed not from the allegedly corrective disclosures proposed by Gelt Trading but rather by the quarterly earnings statement, and thus only underscores the elephant in Mr. Bettencourt's report—his failure to analyze the price impact of the earnings statement and eliminate it as a possible cause of the price decline.

Although an expert need not rule out every possible alternative cause of the event at issue, *see Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003), an expert opinion "that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation," *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999). Here, Mr. Bettencourt's report failed to test for the causal effect of the most "obvious alternative explanation[]" of the price decline on May 15—the company's quarterly earnings statement. FED. R. EVID. 702 committee notes to 2000 amendment. In his view, the quarterly earnings statement could not have confounded any negative effects from the allegedly corrective disclosures because the statement was "awesome" and "significantly exceeded the second quarter estimates," at least according to Mr. Egan, the CEO of Co-Diagnostics.[4] Bettencourt Report at 25 (quoting Mr. Egan).

The court finds this explanation for disregarding the statement implausible for two reasons. First, a company's quarterly earnings report summarizes the company's earnings and financial information for a three-month period, providing investors invaluable insight into the company's

---

[4] In its notice of supplemental authority, Gelt Trading observes that where an expert evaluates potentially confounding information and concludes that it had a neutral or positive impact, the opinion should not be excluded. Instead, Gelt Trading urges, the expert's determination that an event was not confounding presents an issue for the trier of fact. Fair enough, but this observation does not change the reality that Mr. Bettencourt did not evaluate the quarterly earnings statement. Relying on one comment from the company's CEO, he ignored the earnings statement entirely.

17

profitability. So analyzing the causes of a change in stock price the day after a quarterly earnings statement is released without running the regression on the earnings statement is poor practice at a general level. Second, the earnings statement at issue here was described as less than glamorous by several news sources and at least one expert witness in this case. *See, e.g.*, ECF No. 169-68 (Ferrell Rebuttal Report), at 25–26. These general and particular considerations should have led Mr. Bettencourt to at least test whether the market reacted negatively to the earnings statement and, if so, the degree to which the decline in stock price was attributable to the earnings statement as opposed to other negative information. The court determines that Mr. Bettencourt's failure to test for the effects of the quarterly earnings statement renders his testimony on loss causation unreliable. Because his opinion on loss causation underlies his testimony on damages (the other portion of his testimony), the court excludes the entirety of Mr. Bettencourt's testimony.[5]

## II.    Defendants' Motion for Summary Judgment

Turn now to Defendants' motion for summary judgment. The court must grant summary judgment on a claim or part of a claim when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, the court must always view the facts "in the light most favorable to the non-moving party[,] draw[ing] all reasonable inferences in [its] favor." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). When the parties have filed cross-motions for summary judgment, the court "must view each motion separately, in the light most favorable to the non-

---

[5] Another way of putting it is that the flaw in Mr. Bettencourt's report is so serious that it renders his expert opinion results-driven. It therefore goes to the report's admissibility, not its weight, making the report inadmissible.

moving party." *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016) (internal quotation marks omitted).

Initially, "[t]he movant has the burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant does not bear the burden of persuasion at trial, it may satisfy its burden "simply by pointing out . . . a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Then, the nonmovant must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* If instead the movant bears the burden of persuasion at trial, "[its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for [it]." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis removed) (internal quotation marks omitted). The nonmovant must then show that "the evidence is susceptible of different interpretations or inferences by the trier of fact." *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

As noted above, this case turns on loss causation, the sixth element of a Section 10(b) claim, which requires the plaintiff to (1) identify a corrective disclosure, (2) show that the corrective disclosure caused the decline in stock price, and (3) eliminate other potential causes of the price decline. *In re Williams Sec. Litig.*, 558 F.3d at 1137, 1140. A corrective disclosure "reveals the fraud, or at least some aspect of the fraud, to the market." *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011).

Gelt Trading alleges that Co-Diagnostics' fraud was revealed through the following corrective disclosures on May 14: (1) an article published on May 14 in the *Salt Lake Tribune* reporting that a testing center using Co-Diagnostics' tests declined to join other major Utah labs

in a joint validation study; (2) a statement by Iowa Governor Kim Reynolds the same day indicating that Co-Diagnostics' tests performed with 95% sensitivity; and (3) an FDA press release after hours on May 14 stating that no diagnostic test will be 100% accurate.[6] ECF No. 86 (Second Amended Complaint), at 16–18. Both parties move for summary judgment on the loss-causation element.

In the court's view, Gelt Trading cannot show loss causation using any of these sources because they are not even corrective disclosures in the first place. Begin with the May 14 *Tribune* article. That piece stated that TestUtah (a testing operation that was using the Logix Smart test) had "declined to join other major Utah labs in a joint experiment to confirm one another's quality." May 14 *Tribune* Article at 2. "Instead," the article explained, "TestUtah . . . [had] agreed to a less-sophisticated 'compromise' experiment." *Id.* It went on to restate concerns raised in the April 30 *Tribune* article that "TestUtah's tests were [perhaps not] sensitive enough to be reliably accurate,"

---

[6] Gelt Trading also points to a series of tweets from short-seller Hindenburg Research that Gelt Trading claims synthesized public information to reveal that the May 1 press was misleading. As an initial matter, Gelt Trading did not reference these tweets in its complaint, instead raising them for the first time in its opposition brief after one of its experts relied on them. ECF No. 86 (Second Amended Complaint); ECF No. 179 ("Gelt Opp.") at 34; Bettencourt Report at 23. Gelt Trading may not use an expert's report and its opposition to constructively amend its complaint. *See EEOC v. Jackson Nat'l Life Ins. Co.*, No. 16-cv-02472, 2023 WL 2727736, at *4 (D. Colo. Mar. 31, 2023); *Blumenthal v. N.Y. Life Ins. & Annuity Corp.*, No. CIV-08-456, 2010 WL 11508851, at *6 (W.D. Okla. Sept. 27, 2010). Setting this issue aside, the Hindenburg tweets do not constitute corrective information. The most they express is that Co-Diagnostics' CFO has had a "checkered history"; that the company has a "propensity to issue frequent fluffy press releases"; and that the company "provides a third-tier option of questionable quality amidst a sea of growing competition." ECF No. 179-5, at 2–3. These statements do not reveal the falsity of either of the misstatements alleged by Gelt Trading: they do not state that the Logix Smart test is not 100% accurate, and neither do they state that the Logix Smart test had achieved less than 100% concordance in certain validation studies known to Co-Diagnostics before May 1.

and it reported that TestNebraska (another entity using Co-Diagnostics' test) was showing a 3% positivity rate compared to 18% statewide.

According to Gelt Trading, this article cast doubt on Co-Diagnostics' prior representations by pointing out TestUtah's refusal to submit its test to joint accuracy and sensitivity testing and the lower rates of positive tests in Nebraska. The court disagrees. For one, the article said nothing about the Logix Smart test directly, and it never expressed that Co-Diagnostics refused to submit its test to statewide validation. Insofar as the article expressed doubts about the test's sensitivity and publicized data about low rates of positive tests, it did not introduce new information into the market—the speculation about its sensitivity and its relatively low rate of positive tests was public knowledge even before May 1. *See, e.g.*, April 30 *Tribune* Article at 4, 6. Thus, the May 14 *Tribune* article is best understood as "the mere repackaging of already-public information . . . [that] is simply insufficient to constitute a corrective disclosure." *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."). Gelt Trading's attempt to show loss causation based on the May 14 *Tribune* article fails on the first element.

Governor Reynolds's statement about "95% accuracy for determining positives" from TestIowa (another entity using the Logix Smart test) fares no better. ECF No. 179-11, at 2. Although it may have plausibly undermined Co-Diagnostics' suggestion in the press release that the Logix Smart test was 100% accurate, it was not new information when it was released. The article containing Governor Reynolds's statement was published on May 14—three days after the governor of Nebraska had similarly announced that TestNebraska (which, as noted above, also used the Logix Smart test) had shown 95% sensitivity in its validation. The parties agree that Co-

21

Diagnostics' stock price *increased* that day. Gelt Trading does not satisfactorily explain why the May 11 statement would be followed by a price increase while a nearly identical statement on May 14 would cause a price decrease.[7]

        As for the after-hours FDA press release, it could not have been a corrective disclosure for at least two reasons. First, as with Governor Reynolds's statement, it did not provide the market any new information. The early months of the pandemic saw repeated public discussion of the limitations inherent in PCR tests like the Logix Smart one. For example, an FDA release in early February 2020 explained that a negative test result did not mean that the patient did not have the virus and that test results should not be used as the sole basis for determining an appropriate course of treatment. ECF No. 169-41, at 2. And a *Washington Post* article in late March explicitly stated that "[n]o test is 100 percent accurate." ECF No. 169-44, at 2. Many other outlets, including the *New York Times* and ABC News, put out similar cautionary statements. ECF Nos. 169-42 to -43; -45 to -51. Even Co-Diagnostics' own factsheet about the Logix Smart test for patients warned that "it is possible for this test to give a negative result that is incorrect (false negative) in some people with COVID-19." ECF No. 169-60, at 3. Any reasonable investor would have already known well that no diagnostic test, including the Logix Smart test, can be 100% accurate always. *See also United Food & Com. Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1238 (10th Cir. 2014) ("A reasonable investor is neither an ostrich, hiding

---

[7] Gelt Trading argues that Governor Reynolds's May 14 statement produced a different response in the stock price because at that point two States, not just one, had reported 95% sensitivity, and because the *Tribune* article from the same day explained the public-health ramifications of Nebraska's finding of low positive rates. The court is not persuaded. The fact that two States reported 95% sensitivity should not suddenly cause a price decline if the news about one State's report was followed by a price increase. And as noted previously, the May 14 *Tribune* article did not correct any misrepresentation; it merely reiterated speculation from even before May 1.

her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." (cleaned up)).

Second, the May 14 after-hours FDA press release made no mention of Co-Diagnostics or the Logix Smart test. Instead, it discussed the potential limitations of a competitor to the Logix Smart test (the ID NOW test manufactured by Abbott Labs). The press release contained the heading "Coronavirus (COVID-19) Update: FDAInforms [sic] Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test," and cautioned that "early data . . . suggest potential inaccurate results from using the Abbott ID NOW point-of-case test to diagnose COVID-19[ because] the test may return false negative results." ECF No. 169-81, at 2. It was in this context that the press release stated, "The FDA looks at a variety of sources to identify and understand potential patterns or significant issues with the use of the Abbott test. No diagnostic test will be 100% accurate . . . ." *Id.* at 3. Bad news about a competitor, if anything, would have boosted Co-Diagnostics' stock.

But even if these three sources constituted corrective disclosures, Gelt Trading could not show the third component of loss causation—that other factors did not cause the price decline. Gelt Trading entirely ignores the obvious alternative explanation for the price decline on May 15— the quarterly earnings statement that Co-Diagnostics released after hours on May 14. ECF No. 169-78. As noted previously, according to at least one news source, the results in the earnings statement were "mixed." ECF No. 169-79, at 6. "[Co-Diagnostics'] loss widened to 5 cents per share, missing estimates for a loss of 4 cents. Sales topped analyst estimates. *The stock tumbled more than 20% to 17.68 in the after-hours session*." *Id.* (emphasis added). Given that at least some observers linked the decline in stock price to the earnings statement, Gelt Trading bears the burden of producing some evidence tending to exclude the possibility that the decline was caused by the

earnings statement. The most Gelt Trading does is point to Mr. Bettencourt's expert report, which the court excludes as unreliable for the reasons above. And counsel for Gelt Trading conceded at oral argument that without Mr. Bettencourt's expert report, Gelt Trading loses on loss causation. Losing on loss causation means that it has failed to show an essential element of its Section 10(b) claim, and Defendants are entitled to summary judgment accordingly. This conclusion makes it unnecessary to separately analyze class-plaintiff standing or Gelt Trading's Section 20(a) claim (which cannot stand without a viable Section 10(b) claim in the first place, *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)). It also renders the remaining motions moot.

*    *    *

Section 10(b) "[is] not meant to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *In re Williams Sec. Litig.*, 558 F.3d at 1137. Gelt Trading took a risk when it invested in Co-Diagnostics' stock, and it ended up with a loss. Because Gelt Trading cannot show that loss to be attributable to any misrepresentations by Co-Diagnostics, Section 10(b) cannot rescue it from its regrettable investment decision.

## CONCLUSION AND ORDER

For the foregoing reasons, the court **GRANTS** Defendants' motion to exclude the testimony of Mr. Bettencourt, **GRANTS** Defendants' motion for summary judgment, and **DENIES** the remaining motions as moot (Defendants' motion to exclude the testimony of Dr. Westgard, Gelt Trading's motion to exclude the testimony of Dr. Bustin, and Gelt Trading's motion for partial summary judgment).

Signed March 4, 2025.

BY THE COURT

Jill N. Parrish
United States District Court Judge